# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

―――――――――

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

(*additional captions listed on inside cover*)

―――――――――

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1-18-cv-10507, 1-22-cv-04397, 1:22-cv-04360

―――――――――

## BRIEF FOR APPELLANTS-CROSS-APPELLEES
## BLAKE ELLMAN, THOMAS R. ROGERS, MARC WEINBERG, AND
## ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS

―――――――――

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc
Weinberg, and Association of New Jersey Rifle and Pistol Clubs*

November 18, 2024

―――――――――――

MARK CHEESEMAN, TIMOTHY CONNELLY, FIREARMS POLICY COALITION, INC.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

―――――――――――

BLAKE ELLMAN; THOMAS R. ROGERS; ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

*Appellants-Cross-Appellees,*

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

―――――――――――

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellant-Cross-Appellee Association of New Jersey Rifle and Pistol Clubs certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock. Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, and Marc Weinberg are individuals.

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF AUTHORITIES.................................................................................... iv

INTRODUCTION ................................................................................................... 1

JURISDICTION...................................................................................................... 4

STATEMENT OF THE ISSUES ............................................................................ 4

STATEMENT OF THE CASE................................................................................ 4

      A.     Historical Background............................................................................ 4

      B.     New Jersey's "Assault Firearms" Law and Magazine Prohibition .................................................................................... 12

      C.     Procedural History............................................................................. 15

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................ 22

STANDARD OF REVIEW ................................................................................... 22

SUMMARY OF ARGUMENT.............................................................................. 23

ARGUMENT ........................................................................................................ 25

I.    The Assault Firearms Law Violates The Second Amendment. .................... 25

      A.     The Second Amendment's Plain Text Covers Keeping and Bearing All Firearms, Including the Ones §1(w) Outlaws. ............... 25

      B.     No Historical Tradition Supports Banning Common Arms. ............. 28

      C.     The District Court's Inexplicable Decision to Narrow Plaintiffs' Challenge to Just AR-15s Cannot Withstand Even Slight Scrutiny. .................................................................................... 33

II.   The Magazine Ban Is Unconstitutional Twice Over.................................... 38

      A.     The Magazine Ban Violates the Second Amendment. ........................ 38

B.    The Confiscatory Aspect of New Jersey's Magazine Ban Violates the Takings Clause. ............................................................ 48

CONCLUSION ...................................................................................................... 52

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................22

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.*,
2022 WL 22860232 (3d Cir. Aug. 25, 2022) ........................ 18, 19, 22

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.*,
974 F.3d 237 (3d Cir. 2020) .................................................... 17, 18, 22

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ........................................................ *passim*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*,
142 S.Ct. 2894 (2022) .............................................................18

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*,
2018 WL 4688345 (D.N.J. Sept. 28, 2018) ................................ 15, 16

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*,
2019 WL 3430101 (D.N.J. July 29, 2019)...................................17

*Berckeley Inv. Grp. Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ...................................................22

*Caetano v. Massachusetts*,
577 U.S. 411 (2016)............................................................ 26, 29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................22

*Chi., Burlington & Quincy Ry. Co. v. Illinois ex rel. Grimwood*,
200 U.S. 561 (1906)...............................................................51

*Dempsey v. Del. Dep't of Pub. Safety*,
359 F.App'x 347 (3d Cir. 2009)..............................................37

*District of Columbia v. Heller*,
554 U.S. 570 (2008).................................................................. *passim*

iv

*Drake v. Filko,*
    724 F.3d 426 (3d Cir. 2013) .................................................................16

*Duncan v. Becerra,*
    970 F.3d 1133 (9th Cir. 2020) ................................................. 5, 7, 39

*Duncan v. Becerra,*
    988 F.3d 1209 (9th Cir. 2021) ...............................................................5

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) ................................................................5

*Duncan v. Bonta,*
    49 F.4th 1228 (9th Cir. 2022) ................................................................5

*Duncan v. Bonta,*
    142 S.Ct. 2895 (2022) ............................................................................ 5

*Foehl v. United States,*
    238 F.3d 474 (3d Cir. 2001) .................................................................22

*Garland v. Cargill,*
    602 U.S. 406 (2024) ...........................................................................8, 9

*Harrel v. Raoul,*
    144 S.Ct. 2491 (2024) ............................................................................2

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ..........................................................42

*Horne v. Dep't of Agric.,*
    576 U.S. 350 (2015) .............................................................................50

*Jackson v. City & Cnty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ...............................................................39

*Kelo v. City of New London,*
    545 U.S. 469 (2005) ........................................................................ 49, 51

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013) .............................................................................50

*Loretto v. Teleprompter Manhattan CATV Corp.*,
 458 U.S. 419 (1982)........................................................................ 50, 51

*Lucas v. S.C. Coastal Council*,
 505 U.S. 1003 (1992)................................................................................51

*Melo v. Hafer*,
 912 F.2d 628 (3d Cir. 1990) ....................................................................22

*Mennen Co. v. Atl. Mut. Ins. Co.*,
 147 F.3d 287 (3d Cir. 1998) ....................................................................49

*Miller v. Bonta*,
 542 F.Supp.3d 1009 (S.D. Cal. 2021) ..............................................11, 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 597 U.S. 1 (2022) ......................................................................... *passim*

*Ray v. Pinnacle Health Hosps., Inc.*,
 416 F.App'x 157 (3d Cir. 2010)...............................................................37

*Staples v. United States*,
 511 U.S. 600 (1994)..................................................................................35

*United States v. Moore*,
 111 F.4th 266 (3d Cir. 2024) ...................................................................26

*United States v. Rahimi*,
 144 S.Ct. 1889 (2024).................................................... 25, 28, 37, 47

**Constitutional Provision**

U.S. Const. amend. II ........................................................................ 1, 26

**Statutes**

N.J.S. §2C:39-1(ee).................................................................................13

N.J.S. §2C:39-1(w) ....................................................................... *passim*

N.J.S. §2C:39-1(y) ...................................................................................15

N.J.S. §2C:39-19 ................................................................................15, 49

N.J.S. §2C:39-19(a) ....................................................49

N.J.S. §2C:39-19(b) ....................................................50

N.J.S. §2C:39-19(c) ....................................................49

N.J.S. §2C:39-5(f) ........................................... 12, 13, 25

N.J.S. §2C:39-5(h) ....................................................13

N.J.S. §2C:39-5(i) ....................................................13

N.J.S. §43-3(a)(2) ....................................................13

N.J.S. §43-6(a)(2) ....................................................13

1990 N.J. Laws 217 ............................................... 15, 43

2017 N.J. Laws, ch. 323 ............................................. 13

1965 Cal. Stat., ch. 33 ............................................. 10

1927 Mich. Pub. Acts 887 .............................................43

1959 Mich. Pub. Acts 249 ......................................... 10, 43

1927 R.I. Acts & Resolves 256 ........................................43

1959 R.I. Acts & Resolves 260 .................................... 10, 43

1975 R.I Pub. Laws 738 ............................................. 10

1933 Minn. Laws ch. 190 .............................................43

1963 Minn. Sess. L. ch. 753 ...................................... 10, 43

1972 Ohio Laws 1866 .................................................10

1975 Va. Acts, ch. 14 ...............................................10

Pub. L. No. 103-322, 108 Stat. 1796 (1994) ...................... 43, 44

Pub. L. No. 72-275, 47 Stat. 650 (1932) ............................12

## Rules and Regulation

Fed. R. App. P. 4(a)(1) ................................................................................4

Fed. R. Civ. P. 56(a) .......................................................................... 22, 37

Third Cir. I.O.P. 9.1 ................................................................................ 49

*Factoring Criteria for Firearms with Attached "Stabilizing Braces"*,
86 Fed. Reg. 30,826 (proposed June 10, 2021) ................................. 30

## Other Authorities

Stephen E. Ambrose, *Undaunted Courage* (1996) ....................................6

Att'y Gen. Peter Verniero, *Guidelines Regarding the "Substantially
Identical" Provision in the State's Assault Firearms Laws*
(Aug. 19, 1996), https://www.nj.gov/lps/dcj/agguide/assltf.htm..... 12, 13, 14, 34

Joseph G. Bilby, *A Revolution in Arms: A History of the First
Repeating Rifles* (2006) ...................................................................... 6

Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field &
Stream (Mar. 20, 2023) .................................................................... 30

John Ellis, *The Social History of the Machine Gun* (1975) .................... 10

William English, Ph.D., *2021 National Firearms Survey: Updated
Analysis Including Types of Firearms Owned* (Sept. 28, 2022),
https://bit.ly/3yPfoHw...................................................................... 41

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups
on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB .................. 41

Louis A. Garavaglia & Charles G. Worman, *Firearms of the American
West 1866-1894* (1984) ...................................................................... 7

Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase
for Guns and Ban High-Capacity Magazines*, NPR
(Nov. 15, 2022), https://n.pr/3QMJCC1 ......................................... 41

Ben Johnson, *ATF Announces Pistol Brace Ban Affecting Millions of
Gun Owners*, Salem News Online (updated Feb. 1, 2023),
https://bit.ly/42gPhEN ......................................................................30

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3d ed. 2021) ................................................ 7, 31

*Journals of the Continental Congress 1774-1789* (1907) ....................................... 5

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ................................................... *passim*

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Legis. 223 (2024) ...................................... 5

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Just., U.S. Dep't of Just. (2004), https://bit.ly/3wUdGRE ........................................................ 44

*Letter from Joseph Belton to the Continental Congress* (Apr. 11, 1777), *in* 1 A-B *Papers of the Continental Congress, Compiled 1774-1789* (1904) ............................................................... 5

Nat'l Shooting Sports Found., *Detachable Magazine Report 1990-2021* (2024), https://tinyurl.com/4p2j5xbz............................................. 41

Harold F. Williamson, *Winchester: The Gun That Won The West* (1952) ........................................................................... 7

# INTRODUCTION

The Supreme Court has been emphatic that "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," are "presumptively protect[ed]" by the Second Amendment. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17, 28 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The Court has been equally clear that this presumptive protection becomes iron-clad when it comes to arms that are "typically possessed by law-abiding citizens for lawful purposes"—i.e., "in common use," as opposed to "those that 'are highly unusual in society at large.'" *Heller*, 554 U.S. at 625, 627; *Bruen*, 597 U.S. at 47. *Bruen* held that states cannot "restrict[] the public carry of weapons that are unquestionably in common use today," 597 U.S. at 47; *a fortiori*, states cannot ban their mere possession. That is the irreducible minimum of the fundamental "right of the people to keep and bears Arms," U.S. Const. amend. II: States may not "prohibit[] … an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

Despite those admonitions, New Jersey has seen fit to criminally prohibit scores of common semiautomatic rifles, shotguns, and pistols—including some of the most popular firearms in America—as well as the magazines that allow them to function as intended. Those sweeping prohibitions cannot withstand Second Amendment scrutiny. The scores of semiautomatic rifles, pistols, and shotguns New

Jersey outlaws are plainly "Arms" covered by the plain text of the Second Amendment; millions of Americans keep and bear them for self-defense and other lawful purposes; and, as the district court correctly recognized, an "absolute prohibition of an 'entire class of "arms"' that is widely utilized for the lawful purpose of self-defense" is flatly inconsistent with our Nation's historical tradition JA53. The constitutional calculus as to the ubiquitous magazines New Jersey has banned is, if anything, even easier, as this Court has already answered the dispositive questions, holding that the magazines at issue not only are "Arms" covered by the Second Amendment's plain text, but are in common use for lawful purposes. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.* ("*ANJRPC II*"), 910 F.3d 106, 116-17 (3d Cir. 2018). After *Bruen*, the upshot of those holdings—which the state has identified no basis to disturb—is clear: New Jersey's flat bans on these common arms cannot stand.

Unfortunately, the district court got less than half of that right. The court started off on the right foot, holding that New Jersey's ban on AR-15s—"America's most common civilian rifle," *Harrel v. Raoul*, 144 S.Ct. 2491, 2493 (2024) (statement of Thomas, J.)—is unconstitutional. JA55-56. But the court then arbitrarily cut Plaintiffs' challenge to *all* of the rifles, pistols, and shotguns New Jersey outlaws as "assault firearms" down to just the most popular one. That was inexplicable. To be sure, Plaintiffs sometimes used America's most popular civilian

rifle as an exemplar of the kinds of firearms that New Jersey's prohibition encompasses. But that in no way negates the pages and pages of summary-judgment briefing, expert declarations, and pleadings Plaintiffs supplied addressing the full suite of firearms the state has banned. Even more troubling, the court relied on the fact that *Defendants* focused on the AR-15, thus improperly allowing the non-movant to shape the movant's summary-judgment motion.

Meanwhile, as to magazines, the district court correctly held that the banned magazines are "Arms" covered by the Second Amendment's plain text. It recognized too that they are in common use for lawful purposes (though it mistakenly treated that issue as part of the threshold inquiry rather than part of the state's burden). But things went south from there: In attempting to apply a "nuanced" version of analogical reasoning, the court suddenly—and without explanation—held that the state's ban on possessing these arms was merely a restriction on how people may *use* them.

The district court also failed to recognize that the confiscatory aspect of New Jersey's magazine ban violates the Takings Clause. While the ban gives citizens who lawfully acquired now-banned magazines three options for *how* to dispossess themselves of their property, no option allows citizens to keep that property as it was when they lawfully acquired it. The magazine ban thus violates the Fifth Amendment as well as the Second.

# JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 and §1343(a)(3). It entered an order granting summary judgment on July 30, 2024. JA9. Plaintiffs timely filed a notice of appeal on August 14, 2024. JA1; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1291.

# STATEMENT OF THE ISSUES

1. Whether New Jersey's ban on the firearms listed in or covered by N.J.S. §2C:39-1(w) violates the Second Amendment.

2. Whether New Jersey's confiscatory ban on magazines with a capacity of more than ten rounds of ammunition violates the Second Amendment.

3. Whether the confiscatory aspect of New Jersey's magazine ban violates the Takings Clause.

# STATEMENT OF THE CASE

## A. Historical Background

Firearms technology is constantly evolving, but one thing has never changed: Law-abiding citizens who wish to keep and carry arms for self-defense have consistently welcomed features that enhance the accuracy, efficiency, and speed with which they can fire. Technological advancements throughout the ages thus unsurprisingly have focused on exactly that.

1. Firearms that can fire several rounds without reloading are nothing new. "[T]he first firearm that could fire more than ten rounds without reloading was

invented around 1580," and several more long "pre-date[d] the American Revolution." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020).[1]  For example, the Pepperbox-style pistol could "shoot 18 or 24 shots before reloading individual cylinders," and the Girandoni air rifle, which "had a 22-round capacity," "was famously carried on the Lewis and Clark expedition." *Id.*  "[I]n 1777, Joseph Belton of Philadelphia demonstrated a musket that shot sixteen rounds all at once," David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Legis. 223, 255 (2024), and could do so in as little as "five seconds," *Letter from Joseph Belton to the Continental Congress* (Apr. 11, 1777), *in* 1 A-B *Papers of the Continental Congress, Compiled 1774-1789* at 139 (1904).  The Continental Congress was so impressed that it ordered a variant of Belton's invention, Kopel & Greenlee, *supra*, at 255, but the deal ultimately fell through on financial grounds, 7 *Journals of the Continental Congress 1774-1789* at 324, 361 (1907); *see also* JA502-03.

The explanation for the interest in these early experimental rifles is not hard to discern.  Muzzle-loading muskets and rifles were "slow and difficult to load." JA1921 ¶61.  Even a well-trained shooter could fire no more than three rounds per

_____

[1] The panel decision in *Duncan* was vacated by the en banc Ninth Circuit; the en banc decision was vacated after *Bruen*. 988 F.3d 1209 (9th Cir. 2021); 19 F.4th 1087 (9th Cir. 2021) (en banc); 142 S.Ct. 2895 (2022); 49 F.4th 1228 (9th Cir. 2022).

minute, and "[a]fter they had fired[,] … they were nearly helpless until they reloaded." Stephen E. Ambrose, *Undaunted Courage* 178 (1996). That said, there were significant impediments to the development of multi-shot weapons in the 18th century. Before machine tooling and interchangeable parts, it was virtually impossible to ensure that a breach-loading barrel would fit together well enough to contain repeated explosions; black powder would foul any such mechanism in short order; and any gun refined enough to deal with these issues was sure to be expensive and difficult to produce in large numbers. Joseph G. Bilby, *A Revolution in Arms: A History of the First Repeating Rifles* 23-25 (2006).

2. Things changed once the Industrial Revolution kicked into gear. "New innovations built on one another, such that the period from the 1820s through the 1860s became one of the most productive and dynamic in the history of firearms technology." JA1914 ¶51. Advances in "machine precision," as well as "the adoption of percussion-cap ignition in the 1830s and metallic cartridges in the 1850s," allowed "repeating firearms [to] become practical weapons of mass production, widespread military adoption, and commercial viability." JA1893 ¶18.

That trend accelerated over the following decades. The Henry Rifle of 1860 was "a quantum leap forward in repeating arms technology." Bilby, *supra*, at 65. The Henry was a "breech-loading, lever-action rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen from an attached, tubular

magazine)." JA1922 ¶63; *accord* Harold F. Williamson, *Winchester: The Gun That Won The West* 28-31 (1952). A government test of the Henry in May 1862 demonstrated that it could fire 15 shots in 10.8 seconds. Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 437 (3d ed. 2021). More than 170,000 Henrys were manufactured. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 855 (2015).

"Refinements to the Henry resulted in an even better gun: the Winchester Model 1866," JA1922 ¶63, which "could fire 18 rounds in half as many seconds," *Duncan*, 970 F.3d at 1148. *See generally* Louis A. Garavaglia & Charles G. Worman, *Firearms of the American West 1866-1894* 128 (1984). Later models, including the famed Winchester 73 (also known as "the gun that won the West"), likewise had magazines that held more than ten rounds and were huge commercial successes, selling "over 1.7 million total copies between 1873 and 1941." *Duncan*, 970 F.3d at 1148. And other manufacturers were not far behind. Colt started selling its "popular Lightning Slide Action Rifle," which "had a twelve- or fifteen-round tube magazine and used a pump-action to cycle rounds into the chamber," in the 1880s. JA1925 ¶68; *see also id.* (noting that "around 126,000" Colt Lightnings were "produced between 1884-1904").

These rifles, as well as "[n]umerous [other] firearms" with "capacities exceeding ten" rounds, were quite common among civilians in "late nineteenth century" America. JA1928 ¶72; *see also* JA510-11 ¶45 ("In all, there were over one hundred manufacturers or makers in the United States alone producing some type of repeating firearm leading up to and decades after the Civil War."). Yet restrictions on keeping and bearing them were not. *See* JA1928 ¶¶72-74; *accord* Kopel, *supra*, at 864. Indeed, consistent with the almost-uniform tradition of treating such arms as lawful instruments of self-defense, many models of high-capacity "lever-action rifles continue to be popular in the United States today." JA1927 ¶72.

3. They likely would be even more popular but for the advent of semiautomatic technology, which most—including Defendants' experts—view as the "great innovation" in firearms technology. JA1928 ¶75. Whereas "[l]ever-action or pump-action rifles require energy transferred from human muscle through an internal mechanism to eject a spent casing and chamber a new round," "semi-automatic firearms don't rely on human muscle. Instead, [they] enlist some of the energy released by the first round to eject the spent casing and chamber the next round." JA1928-29 ¶75; *see also Garland v. Cargill*, 602 U.S. 406, 416-21 (2024).

Notably, this "great innovation" happened well over a century ago. "By the early 1890s, … gunmakers had at their disposal a trio of potent new design features that would become characteristic of most modern automatic and semi-automatic

firearms—self-loading mechanisms, smokeless powder ammunition, and detachable magazines." JA1931 ¶80; *see also* JA1929 ¶76 ("[S]emi-automatic firearms first started coming on the market in the 1890s."); JA1930 ¶79 ("[D]etachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century."). What would "become characteristic of most modern automatic and semi-automatic firearms" thus came around before Henry Ford sold his first Model A or the Wright Brothers took their first flight. Yet, for the better part of a century, no state outlawed semiautomatic firearms, no matter what features or capacity they had, and only a handful of outlier states ever restricted how many rounds semiautomatic firearms could fire without reloading. *See* Kopel, *supra*, at 864-67.

4. That history is particularly notable because it contrasts starkly with the history of *fully* automatic firearms. "[A] fully automatic [weapon] fires multiple rounds 'automatically … by a single function of the trigger,'" while semiautomatics require a separate pull of the trigger to fire each round. *Cargill*, 602 U.S. at 425; *accord* JA31-32. Fully automatic technology developed at roughly the same time as semiautomatic technology. JA1929 ¶76. But it was initially confined to cumbersome devices that took multiple people to maneuver and operate. *Id.* (describing the "heavy Maxim gun"). It was not until the early 1920s that an automatic firearm that could be carried and fired by one person (the "submachine"

gun) was developed. JA1932 ¶81. Yet while the submachine gun soon "became much sought-after by criminals," *id.*, it "was a failure from the start" among civilians looking for arms for individual self-defense, JA1060 ¶6, likely because its indiscriminate fire made it difficult to shoot and hit only one's target, John Ellis, *The Social History of the Machine Gun* 155 (1975). "By 1925," "only about 3,000" units "had sold" in the United States, JA1060 ¶6, and states and Congress quickly began to severely restrict them, JA1065 ¶14 (32 states enacted submachine gun bans between 1925-1933).

As states mobilized to address these uncommon weapons, however, the vast majority continued to impose no restrictions on by-then-common *semi*automatic firearms, and *no* state banned the sale or possession of magazines "separately from the guns themselves." JA1933 ¶83. Even by Defendants' (flawed) estimation, only seven states restricted citizens' ability to keep and bear semiautomatic firearms *at all* during the Prohibition Era. JA1069-70 ¶21; *accord* JA1933-34 ¶84. No state completely banned semiautomatic firearms, and all laws that restricted them were either repealed entirely or replaced within a few decades with laws regulating only fully automatic weapons.[2]

---

[2] *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263, *amended by* 1975 R.I Pub. Laws 738, 738-39, 742; 1963 Minn. Sess. L. ch. 753, at 1229; 1965 Cal. Stat., ch. 33, at 913; 1972 Ohio Laws 1866, 1963; 1975 Va. Acts, ch. 14, at 67.

Things did not change as semiautomatic technology was enhanced over the years. Auto Ordnance Company's semiautomatic rifle (1927, detachable 30-round magazine) and the Browning Hi-Power pistol (1935, detachable 13-round magazine) remained perfectly legal and popular, as did the surplus M-1 carbines with 15- and 30-round magazines that the U.S. government sold to civilians in the hundreds of thousands at a steep discount starting in 1963 as part of the Civilian Marksmanship Program. Kopel, *supra*, at 859, 861. The first AR-15 rifle, which comes standard with a detachable 30-round magazine and remains the most popular civilian rifle in America today, was released that same year. *Id.* at 859-60. Yet while these and other new models of semiautomatic firearms consistently evolved in ways that made them easier to more accurately fire, states consistently reacted by welcoming, rather than banning, those advancements. And, until "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds." *Miller v. Bonta*, 542 F.Supp.3d 1009, 1024 (S.D. Cal. 2021). The earliest law treating such features as sufficient to convert an otherwise-lawful semiautomatic firearm into a so-called unlawful "assault weapon" dates back only to 1989, and New Jersey passed the first state law

restricting magazine capacity outside the machine gun context in 1990.[3] *See id*.; Kopel, *supra*, at 867.

## B. New Jersey's "Assault Firearms" Law and Magazine Prohibition

1. Enacted in 1990, the Assault Firearms Law ("§1(w)") makes it a crime to possess an "assault firearm" in New Jersey. N.J.S. §2C:39-5(f). The statute defines "assault firearm" to include dozens of rifles, pistols, and shotguns listed by make and model-type, *id.* §2C:39-1(w)(1), as well as "[a]ny firearm … which is substantially identical to any of the firearms listed [there]," *id.* §2C:39-1(w)(2).[4] The law also bans "semi-automatic rifle[s] with a fixed magazine capacity exceeding 10 rounds" (unless they fire only .22 caliber rimfire ammunition) and "semi-automatic shotgun[s] with either a magazine capacity exceeding six rounds, a pistol grip, or a

---

[3] The District of Columbia—the jurisdiction whose exceedingly and anomalously restrictive gun laws produced *Heller*—took that approach a bit earlier. In 1932, Congress banned possession in the District of Columbia of firearms that "shoot[] automatically or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 654 (1932), *repealed by* 48 Stat. 1236 (1934), *currently codified as amended at* 26 U.S.C. §§5801-72. That law was not originally understood to ban magazines. But after the District achieved home rule in 1975, the new D.C. government interpreted its law to "outlaw[] all detachable magazines and all semiautomatic handguns." Kopel, *supra*, at 866. The latter portion of that D.C. law was invalidated in *Heller*.

[4] The district court incorrectly stated that the firearm-types listed in §1(w)(1) are all "rifles and shotguns." JA35. Some of them are pistols, which is why the *Guidelines* discuss what makes a "semi-automatic pistol … 'substantially identical' … to a named assault weapon." Att'y Gen. Peter Verniero, *Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws* 2-3 (Aug. 19, 1996), https://www.nj.gov/lps/dcj/agguide/assltf.htm; *see* pp.13-15, *infra*.

folding stock." *Id.* §2C:39-1(w)(3)-(4).[5] Violating the ban is a crime punishable by up to ten years in prison and a $150,000 fine. *See* N.J.S. §2C:39-5(f), (h), (i); *id.* §§43-3(a)(2), 43-6(a)(2).[6]

In 1996, New Jersey's Attorney General promulgated guidelines purporting to clarify what makes a firearm "substantially identical" to an "assault firearm" for purposes of §1(w)(2). *See* Att'y Gen. Peter Verniero, *Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws* (Aug. 19, 1996), https://www.nj.gov/lps/dcj/agguide/assltf.htm. Under the *Guidelines*, a firearm's features, not its model-type designation, determine whether it is lawful.

A "semi-automatic rifle" is "considered to be 'substantially identical' … to a named assault weapon," and thus banned, if it "has the ability to accept a detachable magazine and has at least [two] of the following: 1. a folding or telescoping stock;

---

[5] Any "part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person," also constitutes an "assault firearm." N.J.S. §2C:39-1(w)(5). And in 2017, the legislature amended the statute to outlaw any "firearm with a bump stock attached." 2017 N.J. Laws, ch. 323 (codified in N.J.S. §2C:39-1(w)(6)); *see* N.J.S. §2C:39-1(ee) (defining "bump stock"). Plaintiffs did not challenge either of those provisions at summary judgment, and do not challenge them here.

[6] Theoretically, a New Jerseyan could lawfully possess an "assault firearm" if a judge grants her a license to do so under N.J.S. §2C:58-5(b). *See* N.J.S. §2C:39-5(f). But, at least as far as Plaintiffs can tell, no one has actually ever been issued such a license. That is unsurprising: To get a license under §2C:58-5(b), one must show "that the public safety and welfare … *require*" it. (Emphasis added.)

2. a pistol grip that protrudes conspicuously beneath the action of the weapon; 3. a bayonet mount; 4. a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and 5. a grenade launcher." *Id.* at 2. Nearly every semiautomatic rifle on the market today satisfies that definition. *See* pp.29-31, *infra*.

A "semi-automatic pistol" is "considered to be 'substantially identical' … to a named assault weapon," and thus banned, if it "has an ability to accept a detachable magazine and has at least [two] of the following: 1. an ammunition magazine that attaches to the pistol outside of the pistol grip; 2. a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; 3. a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned; 4. manufactured weight of 50 ounces or more when … unloaded; and 5. a semi-automatic version of an automatic firearm." *Guidelines* 2-3. Many popular pistols today have at least two of those features. *See* pp.30-31, *infra*.

Finally, "a semi-automatic shotgun" is "substantially identical" to a named firearm, and thus banned, if it "has at least 2 of the following: 1. a folding or telescoping stock; 2. a pistol grip that protrudes conspicuously beneath the action of the weapon; 3. a fixed magazine capacity in excess of 5 rounds; and 4. an ability to accept a detachable magazine." *Guidelines* 3. Again, many popular shotguns today have at least two of those features. *See* pp.30-31, *infra*.

2. At the same time that it enacted the Assault Firearms Law, New Jersey also became the first state in the Nation to ban possession of so-called "large capacity magazines." *See* 1990 N.J. Laws 217, 235 (codified at N.J.S. §2C:39-3(j)). The law initially defined "large capacity" to mean "capable of holding more than 15 rounds of ammunition." 1990 N.J. Laws 217, 221 (previously codified at N.J.S. §2C:39-1(y)). But the state amended the definition in 2018 via Assembly Bill 2761, lowering the threshold capacity to ten rounds. N.J.S. §2C:39-1(y). Residents who had lawfully acquired magazines exceeding that capacity were given just 180 days to surrender their heretofore-lawful magazines, transfer them out of state, or permanently modify them to accept ten rounds or fewer or be wholly inoperable. *Id.* §2C:39-19.

### C. Procedural History

1. Plaintiffs ANJRPC and Ellman brought suit in 2018 challenging New Jersey's magazine ban. The district court applied this Court's pre-*Bruen*, two-step framework for Second Amendment challenges. At the first step, the court held that "[t]he Second Amendment protects firearms and the ammunition and magazines that enable arms to fire." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal* ("*ANJRPC I*"), 2018 WL 4688345, at *9 (D.N.J. Sept. 28, 2018). It also held that "magazines holding more than ten rounds are in common use and, therefore, entitled to Second Amendment protection." *Id.* at *10. But, at the second step, applying a form of

intermediate scrutiny that "accord[ed] substantial deference to the [legislature]," *id.* (quoting *Drake v. Filko*, 724 F.3d 426, 436-37 (3d Cir. 2013)), the court held that such arms could nevertheless be banned.

A divided panel of this Court affirmed. At the threshold, the majority "determined that magazines are arms." *ANJRPC II*, 910 F.3d at 116; *see id.* ("[T]he question is whether a magazine is an arm under the Second Amendment. The answer is yes."). It further concluded that "millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, and there is no longstanding history of LCM regulation." *Id.* at 116-17 (citations omitted). Nonetheless, the majority applied intermediate scrutiny and held that the state's interest in preventing criminals from putting these common arms to unlawful use outweighed the burden on law-abiding citizens. *Id*. at 119-24.

Turning briefly to the Takings Clause, the majority rejected, in two sentences and a footnote, the claim that the retrospective and confiscatory aspect of the law effected a taking that requires just compensation. The majority reasoned that there is no taking because, as an alternative to surrendering their previously lawful 15-round magazines to law enforcement, the law allows citizens to sell them to a private party who is not prohibited from possessing them, permanently modify them, or render them inoperable. *Id.* at 124 & n.32. The majority never explained how

requiring a citizen to get rid of lawfully obtained personal property or convert it into something else is not a taking. The majority also opined that the law does not effect a taking because it is a valid exercise of the state's police power, although it did "not rest on this ground." *Id.* at 124 n.32.

Judge Bibas dissented. In his view, *Heller* dictated the outcome of the case: "People commonly possess large magazines to defend themselves," and that should be the "end of [the] analysis." *Id.* at 130.

On remand, the district court held that *ANJRPC II* "resolves all legal issues in this case and there remains no genuine disputes of material fact," and so issued summary judgment for the defendants. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal* ("*ANJRPC III*"), 2019 WL 3430101, at *3 (D.N.J. July 29, 2019). Plaintiffs again appealed, and a panel of this Court again split. The majority held that the only question on appeal was whether *ANJRPC II* controlled all the legal questions, such that the only thing to do was to apply the rule from that preliminary-injunction decision to the summary-judgment appeal. The majority held that the answer to that question was yes. *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.* ("*ANJRPC IV*"), 974 F.3d 237, 247 (3d Cir. 2020).

Judge Matey dissented. He disagreed that the law-of-the-case doctrine controlled, and thus reached the merits. Judge Matey "conclude[d] th[at] magazines, including those regulated [here], are protected arms under the Second Amendment

as best understood by history and tradition." *Id.* at 253. Judge Matey rejected the *ANJRPC II* panel's further holding, however, that the right to keep and bear these arms could be balanced away under intermediate scrutiny. *Id.* at 261. And he urged this Court to reconsider its two-step balancing test. *Id.* at 262.

Plaintiffs petitioned for certiorari. While that petition was pending, the Supreme Court decided *Bruen*, which rejected the "two-step approach" and held that "*Heller* … do[es] not support applying means-ends scrutiny in the Second Amendment context." *Bruen*, 597 U.S. at 19. The Supreme Court subsequently granted Plaintiffs' petition, vacated this Court's decision in *ANJRPC IV*, and remanded "for further consideration in light of" *Bruen*. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck* ("*ANJRPC V*"), 142 S.Ct. 2894 (2022).

On remand from the Supreme Court, Judge Matey argued that this Court should decide the case itself. *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.* ("*ANJRPC VI*"), 2022 WL 22860232, at *2 (3d Cir. Aug. 25, 2022) (Matey, J., dissenting). He noted that "both questions" posed by *Bruen* "have already been answered" by this Court: "First, '[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines [fall] within the meaning of the Second Amendment.' And second, 'there is no longstanding history of' magazine capacity regulation," making the state's magazine ban unconstitutional. *Id*. at *4 (quoting *ANJRPC II*, 910 F.3d at 116-17) (citation

omitted).  The majority acknowledged that "there are good arguments to be made for resolving this case now," but it granted the state's request for a remand to allow it to try to develop additional historical evidence.  *Id.* at *1 n.1.

2. Separately, Plaintiffs filed a second suit (No. 22-cv-4397) on July 1, 2022, challenging New Jersey's "assault weapons" ban as inconsistent with the Second Amendment.  The plaintiffs in *Cheeseman v. Platkin*, No. 22-cv-4360, filed a suit challenging that ban as well.  All three cases were consolidated and proceeded to cross-motions for summary judgment.[7]

Although all Plaintiffs challenged the state's "assault firearms" ban as to *all* the firearms the statute outlaws, the district court began by inexplicably holding that Plaintiffs had not challenged anything but the ban on the Colt AR-15.  The district court gave two reasons for this ruling:  First, while the court acknowledged (with considerable understatement) that "Plaintiffs sometimes broadly frame their argument [as] effectively seeking a wholesale declaration that the Assault Firearms Law is unconstitutional," it faulted them for "[a]t other times … focusing their arguments on the AR-15." JA12.  Second, the court narrowed the scope of Plaintiffs' challenge because "*Defendants'* briefing also appears to focus largely on the AR-15

---

[7] "Given" that the critical facts about the commonality and utility of the arms in question "are legislative facts," the court denied the parties' respective *Daubert* motions and "consider[ed] all the expert reports presented to it."  JA20-21.

as a *typical* 'assault weapon' under the Assault Firearms Law." JA13 (emphasis added). The court thus proceeded to address *only* New Jersey's ban on AR-15s.

Applying *Bruen* and *Heller*, the court held that the plain text of the Second Amendment covers keeping and bearing an AR-15 rifle, just as it protects keeping and bearing a handgun. JA53-54. The court then treated "common use" as part of the threshold-textual inquiry, rather than the historical-tradition inquiry, but in any event concluded that AR-15s are "'overwhelmingly chosen by American society for [a] lawful purpose.'" JA41-42 (quoting *Heller*, 554 U.S. at 628). Moving to the historical-tradition phase of the analysis, the court held that the outcome is dictated by *Heller* and *Bruen*: A "total prohibition on a commonly used firearm for self-defense" is "impermissible." JA60.

For good measure, the court added that a more fulsome "historical analogue analysis leads to the same conclusion." JA60. Comparisons to historical "regulat[ions]" of "trap guns, gunpowder, Bowie knives, slingshots, and clubs" all "are unavailing given a single fact: New Jersey's AR-15 Provision constitutes a complete ban on a class of firearms that is commonly-used for self-defense," which none of those historical regulations were. JA60-61. And *Heller* instructs that it is "no answer to say," as the state argued, that other avenues for self-defense remain available. JA61 (quoting 554 U.S. at 629). "A categorical ban on a class of weapons commonly used for self defense is unlawful." JA61.

Turning to New Jersey's magazine ban, the district court adhered to this Court's prior conclusions that "large capacity ammunition magazines are an arm within the meaning of the Second Amendment" and are in common use for lawful purposes. JA65. Understanding both of these questions to inhere in *Bruen*'s threshold inquiry, the court then moved on to the historical-tradition stage. It recognized that "firearms with detachable magazines" were "widely available" by the "end of the Nineteenth Century," yet there was no tradition of banning them. JA29. But it then puzzlingly held that the same analogues it had just rejected as to AR-15s because they were not complete bans somehow *are* analogous to a complete ban on common magazines. In the court's view, concerns about mass shootings justified that purportedly more "nuanced" approach. JA67-69. Addressing whether the magazine ban is similar in its "how" and "why" to historic laws "prohibit[ing] the *use* of … weapons" "such as pistols or Bowie knives" "in certain ways," the court suddenly proclaimed, without explanation, that New Jersey's outright ban on magazines is somehow just a *use* prohibition. JA74-75.

Finally, the court summarily disposed of Plaintiffs' claim that the confiscatory magazine ban violates the Takings Clause, holding that it was "bound" by this Court's *ANJRPC II* decision rejecting that claim. JA76.

Plaintiffs timely appealed. JA1.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

As explained, this Court has previously decided two appeals in this case and issued a third decision remanding to the district court. *See ANJRPC II*, 910 F.3d 106 (3d Cir. 2018); *ANJRPC IV*, 974 F.3d 237 (3d Cir. 2020); *ANJRPC VI*, 2022 WL 22860232 (3d Cir. Aug. 25, 2022).

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001). Summary judgment is appropriate if there is no genuine dispute of material fact and, drawing all reasonable inferences against it, the movant shows that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the non-movant "has the burden of proof at trial" on an issue, then it "must set forth facts 'sufficient to establish the existence of an element essential to [its] case,'" or else it cannot object to the entry of summary judgment on that issue. *Berckeley Inv. Grp. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). Finally, this Court treats decisions "dismiss[ing] an action for failure to state a claim on the face of the pleadings on a motion for summary judgment" as "functionally equivalent to a … [Rule 12] dismiss[al]." *Melo v. Hafer*, 912 F.2d 628, 633 (3d Cir. 1990).

## SUMMARY OF ARGUMENT

New Jersey has banned many of the most common firearms in the country. Under a straightforward application of Supreme Court precedent, that ban cannot withstand Second Amendment scrutiny. Each of the semiautomatic rifles, pistols, and shotguns §1(w) outlaws is an "Arm" covered by the plain text of the Second Amendment. Millions of law-abiding Americans keep and bear these common arms for lawful purposes. And the Supreme Court has made crystal clear that no historical tradition supports bans on arms that are commonly owned for lawful purposes today. New Jersey's ban on so-called "assault firearms" is therefore unconstitutional.

The district court recognized as much when it came to AR-15s, but it stopped there, claiming that Plaintiffs had not challenged the ban as to any of the many other firearms it covers. That claim is inexplicable. Plaintiffs explicitly and repeatedly challenged the Assault Firearms Law as to *all* of the common semiautomatic firearms §1(w) bans, not just the Colt AR-15. The district court seemed to think it could ignore the bulk of the challenge because Plaintiffs sometimes used the AR-15 as an exemplar and Defendants often declined to devote attention to their broader arguments. That reasoning finds no support in law or logic. The movant, not the opposing party, defines the scope of a summary-judgment motion. And a court must address all issues on which the movant seeks summary judgment, not just the ones that it thinks the movant devoted the most attention to. That is especially so when,

as here, the movant was simply using a particularly strong exemplar (one often cited by other courts) to illustrate the problems with a sweeping law. The district court's eminently correct conclusion that the state may not ban arms that are commonly possessed for self-defense thus should have compelled the conclusion that the Assault Firearms Law is unconstitutional in toto.

It should have compelled that conclusion as to the magazines New Jersey has outlawed as well. This Court has already held that these magazines are "Arms" under the plain text and in common use for lawful purposes—conclusions the state has identified no basis to disturb. *ANJRPC II*, 910 F.3d at 116. That should have resolved Plaintiffs' challenge, given the district court's eminently correct conclusion that there is no historical tradition of flatly banning common arms. Instead, the district court upheld the ban on the theory that magazine bans demand an approach to historical tradition so "nuanced" as to permit treating flat bans on the *possession* of arms and restrictions on their *use* as if they were one and the same. JA67. But no amount of "nuance" can justify treating the very same laws that *Bruen* deemed insufficient to justify bans on *carrying* arms as somehow sufficient to justify bans on possessing them.

Finally, while the district court deemed itself bound by *ANJRPC II* to reject Plaintiffs' Takings Clause challenge, it was doubly wrong to do so. *ANJRPC II*'s takings analysis amounted to just two sentences and a single footnote, and it is

demonstrably wrong. While *ANJRPC II* correctly explained that New Jersey's law gives citizens a menu of "options" for *how* to dispossess themselves of their property, it nowhere explained how these different options lead to results that are not takings. 910 F.3d at 124. Nor could it; all roads lead to a taking of some kind. New Jersey's confiscatory magazine ban thus flouts both the Fifth Amendment and the Second.

## ARGUMENT

**I.    The Assault Firearms Law Violates The Second Amendment.**

The threshold question in a Second Amendment challenge is whether "the plain text of the Second Amendment protects [the challengers'] proposed course of conduct." *Bruen*, 597 U.S. at 32. If the answer is yes—i.e., if the state has "regulate[d] arms-bearing conduct"—then "the Constitution presumptively protects that conduct," and the government "bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 144 S.Ct. 1889, 1897 (2024); *Bruen*, 597 U.S. at 24. The government can do so only by "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. The state failed to meet that burden here.

### A.    The Second Amendment's Plain Text Covers Keeping and Bearing All Firearms, Including the Ones §1(w) Outlaws.

1. The Assault Firearms Law makes it "a crime" to "knowingly … possess[] an assault firearm," N.J.S. §2C:39-5(f), a term the statute defines broadly to include dozens of semiautomatic rifles, pistols, and shotguns explicitly listed by make and

model-type, *id.* §2C:39-1(w)(1), plus "[a]ny firearm … substantially identical to any of the firearms listed," *id.* §2C:39-1(w)(2). *See also id.* §2C:39-1(w)(3)-(4); pp.12-15, *supra*. New Jersey thus prohibits the general public ("the people") from possessing ("keep[ing]") scores of firearms. Because the Second Amendment's plain text protects "the right of the people to keep … Arms," U.S. Const. amend. II, the threshold question—and the only one on which Plaintiffs bear the burden—is whether the firearms the state bans are "Arms."

The answer is easy: Yes, they are. It should go without saying that rifles, pistols, and shotguns are "Arms" no matter what kind of grip, stock, firing action, or feeding device they may have. Indeed, this Court has recognized as much. *See, e.g.*, *United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024) (describing "possessing a handgun" as "quintessential Second Amendment conduct," full stop). But to the extent there were any lingering doubt about that, the Supreme Court has eliminated it. As *Heller* explained and *Bruen* reiterated, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582); *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam), which includes "'any thing that a man … takes into his hands, or useth in wrath to cast at or strike another,'" which rifles, pistols, and shotguns plainly are, *Heller*, 554 U.S. at 581.

The district court got this question exactly right: "Although *Heller* and *Bruen* treated handguns and not semi-automatic weapons" generally, their reasoning "answer[s]" in the affirmative the threshold question of whether the Second Amendment's plain text covers possessing the latter as well as the former. JA54. And although the district court improperly pretermitted the analysis with respect to everything other than AR-15s, *see supra*, pp.19-20; *infra*, Part I.C, its reasoning applies with full force to the remaining "semi-automatic weapons" the state outlaws.

2. That is where the threshold inquiry should end, and the burden to justify the Assault Firearms Law should shift to the state. The district court saw things differently, treating common use as part of the threshold textual inquiry. *See* JA54-55. But *Bruen* could not have been clearer that the threshold inquiry is a "plain text" inquiry. *See, e.g.*, 597 U.S. at 17, 32, 33. And nothing in the *text* of the Second Amendment differentiates between Arms that are common and Arms that are not. For purposes of the text, an Arm is an Arm.

To be clear, that does not mean that the Second Amendment guarantees "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Nor does it mean that whether an arm is in common use for lawful purposes—or, conversely, "dangerous and unusual"— is irrelevant to the final analysis; that question is critical when it comes to historical tradition. But considerations that find no purchase in the text are not part of the

plain-text inquiry. And just as nothing in the Second Amendment's text draws a home/public or necessary/unnecessary distinction, *see Bruen*, 597 U.S. at 32, the text says nothing about common use.

It should therefore come as no surprise that the Supreme Court has plainly instructed that whether a type of arm is "in common use"—or instead is "highly unusual in society at large"—is part of the "historical tradition" inquiry, not the textual inquiry. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see also Rahimi*, 144 S.Ct. at 1897 (noting that, "[a]t the founding," "[s]ome jurisdictions banned the carrying of 'dangerous and unusual weapons'" (quoting *Heller*, 554 U.S. at 627)). The threshold inquiry here thus begins and ends with the indisputable fact that the firearms New Jersey has outlawed "constitute bearable arms," which suffices to render them "presumptively protect[ed]." *Bruen*, 597 U.S. at 17, 24, 28.

### B. No Historical Tradition Supports Banning Common Arms.

1. Because all the rifles, pistols, and shotguns §1(w) bans satisfy "the Second Amendment's definition of 'arms,'" the state bears the burden of proving that they nevertheless can be banned "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, 28. It cannot do so. While laws that regulate arms-bearing conduct around the edges require independent inquiry, when it comes to a *ban* on possession, the Supreme Court has already done the work. As *Heller* held and *Bruen* reiterated, the only "arms" a state may ban "consistent with this Nation's

historical tradition of firearm regulation" are those that are (at a minimum) "highly unusual in society at large," as opposed to those that are "in common use today." *Id.* at 17, 47; *accord Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment) (an arms ban can pass muster only if the banned arms are "*both* dangerous *and* unusual"). The district court correctly recognized as much, acknowledging that an "absolute prohibition of an 'entire class of "arms"' that is widely utilized for the lawful purpose of self-defense" is inconsistent with our Nation's historical tradition and therefore "impermissible." JA53. As the court explained, "a categorical ban on a class of weapons commonly used for self-defense is unlawful" under "Supreme Court precedent." JA61.

2. The critical question, then, is whether the firearms the state bans are in common use for lawful purposes, or whether the state (which bears the burden of persuasion at this stage of the analysis) has demonstrated that they are dangerous and unusual. The answer once again is easy, as the firearms §1(w) outlaws are the furthest thing from "highly unusual" in modern America.

To begin, the district court found that millions of law-abiding civilians own millions of modern sporting rifles—including, but not limited to, AR-15s—for lawful purposes. JA33 ("As of 2022, it was estimated that there were around 24 million AR-15s and similar sports weapons in circulation," and there were "an estimated five to ten million AR-15s" alone as of 2018.). This fact was (rightly)

dispositive in the court's analysis of the ban on (Colt) AR-15s. JA56-57. It is no less dispositive as to statute's ban on all other modern sporting rifles—i.e., semiautomatic rifles that accept a detachable magazine and have both a folding or telescoping stock and a pistol grip, *see* JA340-54 ¶¶48-73 (detailing features shared by the AR-15 and other similar rifles)—which are "substantially identical" to AR-15s under §1(w)(2) and the *Guidelines*.

The same logic applies even moving beyond modern sporting rifles. Plaintiffs submitted evidence showing that multiple types of shotguns §1(w) bans are listed among *Field & Stream*'s best duck-hunting shotguns, *see* JA663-64 (citing Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field & Stream (Mar. 20, 2023)), and that millions of Americans own "pistol braces," which are most commonly used for the types of pistols the statute bans, *see* JA663 (citing Ben Johnson, *ATF Announces Pistol Brace Ban Affecting Millions of Gun Owners*, Salem News Online (updated Feb. 1, 2023), https://bit.ly/42gPhEN); *see also Factoring Criteria for Firearms with Attached "Stabilizing Braces"*, 86 Fed. Reg. 30,826, 30,845-46 (proposed June 10, 2021) (ATF estimate that 3 to 7 million stabilizing braces, designed for and commonly used with AR-style pistols of the sort New Jersey bans, were sold between 2013 and 2020). The state rebutted none of this—because none of it is rebuttable.

Nor did the state rebut Plaintiffs' copious evidence that law-abiding citizens own for lawful purposes (including self-defense) firearms equipped with the features that, under §1(w), render a rifle, pistol, or shotgun an "assault firearm."  As the record demonstrates, the features New Jersey has singled out improve the utility of firearms for fulfilling the Second Amendment's *ne plus ultra* purpose of self-defense.[8]  *See, e.g.*, JA336-40, JA343-54 ¶¶36-47, 52-58, 60-73 (explaining the self-defense utility of semiautomatic firing, detachable magazines, pistol grips, adjustable stocks, etc.); Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1997 (3d ed. 2021) (2024 Supp.) (a rifle with the verboten features is particularly well-suited as "a primary home defense weapon"); *see also* JA57 (acknowledging that "AR-15s are well-adapted for self-defense" and that "the AR-15 is used—or would be used should it be permitted to be used in New Jersey—for self-defense").

3. This Court can and should end there.  The firearms New Jersey has banned are the furthest things from highly unusual in modern America.  Under a straightforward application of *Heller*, *Bruen*, and *Rahimi*, that should be the end of the historical-tradition analysis.  While other Second Amendment cases may require

---

[8] The one glaring exception is a "grenade launcher," which the *Guidelines* bizarrely include alongside features designed to increase the ability to use firearms safely and effectively for lawful purposes like self-defense, even though grenades are separately illegal under federal law.

independent examination to determine what the country's historical traditions are, the Supreme Court has already examined the question of which arms can be banned consistent with our historical tradition, and it concluded that arms commonly owned for lawful purposes cannot. Indeed, that was the square and dispositive holding of *Heller*: Handguns cannot be banned because they are in common use for lawful purposes. So when it comes to arms bans, common use *is* the historical test.

In all events, even if further historical inquiry were necessary, New Jersey has not (and cannot) come close to identifying any historical tradition that could justify its sweeping ban. To the contrary, as the Supreme Court concluded after studying the historical record in exhaustive detail, "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense," *Bruen*, 597 U.S. at 70, let alone prohibited the bare possession of arms that are "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625. The historical record instead reveals a long tradition of welcoming technological advancements aimed at enhancing law-abiding citizens' ability to accurately fire a firearm repeatedly without reloading—as the district court recognized. *See* JA62-63. The Assault Firearms Law is therefore unconstitutional.

**C. The District Court's Inexplicable Decision to Narrow Plaintiffs' Challenge to Just AR-15s Cannot Withstand Even Slight Scrutiny.**

The district court correctly concluded that, under a straightforward application of Supreme Court precedent, the state's flat ban on (Colt) AR-15s violates the Second Amendment. But the court then pulled the rug out from under Plaintiffs. The Assault Firearms Law bans dozens and dozens of common arms, and Plaintiffs spilled considerable digital ink challenging its full sweep, not just the slice that covers AR-15s. Yet the district court ignored all aspects of Plaintiffs' challenge to the Assault Firearms Law except their challenge to the ban on AR-15s—and even then, only those manufactured by Colt. That was both inexplicable and inexcusable.

1. Nothing about Plaintiffs' challenge has ever been limited to AR-15s specifically, let alone to Colt AR-15s. Even a cursory review of Plaintiffs' pleadings and summary-judgment papers makes that clear.

At "[t]he threshold," Plaintiffs argued that *all* of "the various firearms" §1(w) outlaws "are 'presumptively protect[ed]'" because all of them "constitute bearable arms." JA660 (quoting *Bruen*, 597 U.S. at 17, 28); *see also Bruen*, 597 U.S. at 28 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (quoting *Heller*, 554 U.S. at 582)); pp.26-28, *supra*. Plaintiffs did not use the word "AR-15" (or "AR-platform rifle") even once in making that argument. *See* JA659-60. Nor did they ever single out Colt. Instead, Plaintiffs focused on the *features* that

33

transform otherwise-lawful rifles, pistols, and shotguns into unlawful "assault firearms," e.g., pistol grips and adjustable stocks—features that are common on, but certainly not unique to, AR-15s. *See* JA652-54, JA659-60; JA196-97 ¶¶33-39; *see also* pp.29-31, *supra*.

That approach made eminent sense, as the Assault Firearms Law does not just ban the specific makes and model-types of rifles, pistols, and shotguns listed in §1(w)(1). Under §1(w)(2) and the *Guidelines* interpreting that provision, *see* pp.13-15, *supra*, the list is only the starting point. The statute outlaws possession of "[a]ny firearm manufactured under any designation which is substantially identical to any of the firearms listed." N.J.S. §2C:39-1(w)(2). As the *Guidelines* makes clear, substantial identity under §1(w)(2) is determined *by reference to a firearm's features*, not simply by looking at a firearm's "designation" (i.e., make and model). *See, e.g.*, *Guidelines* 2 (a "semi-automatic rifle" is prohibited as "'substantially identical' … to a named assault weapon" if it "has the ability to accept a detachable magazine and has at least 2 of," *inter alia*, "a folding or telescoping stock," "a pistol grip," and "a threaded barrel designed to accommodate a flash suppressor"). So the key question is whether firearms equipped with those features qualify as "Arms." And if a Colt AR-15 does not cease to be an "Arm" just because it contains the features New Jersey has singled out, then neither does any other firearm that contains them.

As for the historical-tradition stage, Plaintiffs began their discussion of common use by explaining that "New Jersey bans many AR-platform rifles by name and/or by feature," and that "[m]illions of Americans collectively own more than 24 million" such rifles, which "the Supreme Court itself has described … as 'widely accepted as lawful possessions.'" JA662 (quoting *Staples v. United States*, 511 U.S. 600, 603, 612 (1994)). That alone sweeps far more broadly than the Colt AR-15; even just looking at §1(w)(1)'s list of banned firearm types, several beyond the Colt model are AR-platform rifles. For instance, the FN-15, which is prohibited by make and model-type as an "FN-FAL, FN-LAR, or FN-FNC type semi-automatic firearm[]," N.J.S. §2C:39-1(w)(1), is an "AR-15 clone[]." JA325 ¶16. But more to the point, Plaintiffs explicitly argued that it would be "nonsensical" to take a make-and-model-only "approach" to commonality. JA664. The state decided to outlaw firearms based on whether they have "certain features in certain combination[s]." *Id.* Plaintiffs accordingly argued that, in undertaking the common-use inquiry, the court must look "not merely" at how common a given "model or platform" is, but at "the commonality of [the] features" that typify the banned firearms. *Id.*; *see also* JA196-97.

To be sure, Plaintiffs' briefing often focused on the AR platform (although never just those manufactured by Colt) in demonstrating commonality. But that is because the AR platform typically has the features the state has banned. So if AR-

platform rifles are not dangerous and unusual, then neither are the many "functionally identical" firearms New Jersey banned. *See, e.g.*, JA325 ¶16 (explaining that the FN-15 is an "AR-15 clone[]," while the Mini-14, versions of which §1(w)(1) also lists, is "functionally virtually identical to the AR-15 rifle in terms of its ballistics, rate of fire, and other capabilities"). After all, if historical tradition cannot justify banning a particular make or model of firearm, then it cannot justify banning prohibiting a "functionally identical" firearm either.

And Plaintiffs' commonality discussion did not end with the AR-platform. They explicitly argued that §1(w) "does not stop with AR-platform rifles," and explained that the *other* types of semiautomatic firearms §1(w) and the *Guidelines* ban because of their features are not unusual either, but rather are in common use for lawful purposes. JA663-65. Plaintiffs then took pains to show not only *that* firearms equipped with those features (whether they be rifles, pistols, or shotguns) are common, but *why*: Those features facilitate armed self-defense. *See* JA652-54, JA664, JA667; *see also* JA340-51 ¶¶48-73; JA511-16 ¶¶47-59; JA588-90; p.31, *supra*. The record thus confirms beyond cavil that Plaintiffs unquestionably challenged the ban on *all* the firearms captured by §1(w) and the *Guidelines*, not just (Colt) AR-15s.

2. To the extent the district court pared *Plaintiffs'* summary-judgment request down to the nub because "*Defendants'* briefing … focus[ed] largely on the AR-15,"

JA13 (emphasis added) (citing JA771, JA789-90, JA799-804), that is beyond the pale. Under Rule 56, *movants* control the scope of issues on which summary judgment is sought: "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought"; the court then must ("shall") grant or deny summary judgment on the grounds sought. Fed. R. Civ. P. 56(a). It is flatly inconsistent with the text and structure of the rule—and would create perverse incentives—to allow a non-movant to (re)shape a summary-judgment motion by declining to engage with all of the movant's argument. In fact, the usual rule is the opposite: When a non-movant fails to adequately respond to arguments made by the movant, it waives any objection to summary judgment on those bases. *See, e.g.*, *Ray v. Pinnacle Health Hosps., Inc.*, 416 F.App'x 157, 162 (3d Cir. 2010); *Dempsey v. Del. Dep't of Pub. Safety*, 359 F.App'x 347, 348-49 (3d Cir. 2009). The district court turned that basic principle of party presentation upside-down.

It also turned *Bruen* upside-down. *Bruen* "clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 144 S.Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24). And when it comes to a statute (like the Assault Firearms Law) that goes so far as to criminalize the possession of certain types of firearms, there is no question that the government has "regulate[d] arms-

bearing conduct." Accordingly, the state bears the burden to "justify" its decision to ban *all of the firearms* §1(w) reaches—which it can do only "by demonstrating that [its ban] is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. So if the district court thought that the state failed to even *try* to make its case as to the many other types of firearms Plaintiffs challenged, then the right thing to do was grant Plaintiffs judgment on those challenges, not pretend they did not exist. Party-presentation rules, *Bruen*'s burden-shifting regime, and text and historical tradition thus all compel the same conclusion: The Assault Firearm Law is unconstitutional in its entirety.

## II.    The Magazine Ban Is Unconstitutional Twice Over.

### A.    The Magazine Ban Violates the Second Amendment.

1. As the district court recognized, this Court has already answered *Bruen*'s threshold question with respect to the magazines New Jersey bans: "[T]he Third Circuit … has held that large capacity ammunition magazines are an arm within the meaning of the Second Amendment." JA65; *see ANJRPC II*, 910 F.3d at 116 ("[T]he question is whether a magazine is an arm under the Second Amendment. The answer is yes."). To be sure, *ANJRPC II* predates *Bruen* and *Rahimi*, but nothing about those decisions dictates (or even permits) a change in this Court's "reading of plain text of the Second Amendment." JA65. In fact, *Bruen* emphasized repeatedly that the textual inquiry this Court undertook in *ANJRPC II* is the *only* part of the threshold

inquiry. 597 U.S. at 17, 32, 33; *see* pp.27-28, *supra*. And *Bruen* made clear that this Court's reading of the term "Arms" is correct.

As *Bruen* reiterated, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582)—i.e., to "any thing that a man … takes into his hands, or useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581, including all "modern instruments that facilitate armed self-defense," *Bruen*, 597 U.S. at 28. *See* pp.26-27, *supra*. Modern magazines unquestionably fit that bill. Unlike a cardboard cartridge box of yore, which merely held ammunition while it was not being used, magazines are integral to the design of semiautomatic firearms and the mechanism that makes them work, actively feeding ammunition into the firing chamber. *Duncan*, 970 F.3d at 1146. A semiautomatic firearm equipped with a feeding device is thus indisputably a "thing that a man … takes into his hands," *Heller*, 554 U.S. at 581, as a "bearable" instrument that "facilitate[s] armed self-defense," *Bruen*, 597 U.S. at 28. Indeed, "without bullets, the right to bear arms would be meaningless," and the central purpose of the Second Amendment—self-defense—eviscerated. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

What this Court held four years before *Bruen* is thus even more obviously correct today: "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms'

within the meaning of the Second Amendment." *ANJRPC II*, 910 F.3d at 116. That is true regardless of how many rounds a magazine holds. A bearable instrument that facilitates self-defense in Size Small does not cease accomplishing that end in Size Medium or Large. If anything, having more rounds at the ready *better* facilitates a citizen's ability to defend herself in case of confrontation—regardless of whether she ends up needing to expend every round.

2. Because the Second Amendment's plain text covers keeping and bearing the magazines New Jersey bans, the next question is whether those magazines are "in common use today" or are instead "highly unusual in society at large." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see* pp.28-29, *supra*. Again, this Court has already answered the question: "The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense[.]" *ANJRPC II*, 910 F.3d at 116-17 (citations omitted).[9]

Unsurprisingly, the record here shows the same—and then some. Hundreds of millions of magazines that hold more than ten rounds of ammunition have been

---

[9] It is not entirely clear why the Court included the caveat "occasionally," but to the extent it was focused only on how often people actually fire all the rounds in the magazine in a self-defense situation, it was mistaken, as "the right to 'bear arms' refers to the right to 'wear, bear, or carry … for the purpose … *of being armed and ready* for offensive or defensive action in a case of conflict.'" *Bruen*, 597 U.S. at 32 (second ellipsis in original; emphasis added) (quoting *Heller*, 554 U.S. at 584).

sold in the United States in the past few decades alone, *see* Nat'l Shooting Sports Found., *Detachable Magazine Report 1990-2021* (2024), https://tinyurl.com/4p2j5xbz, making them far more common than the Ford F-150, the most popular vehicle in the country, *see* Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB. In fact, the average American gun owner owns *more* ten-plus-round magazines than magazines that hold only ten rounds or fewer. William English, Ph.D., *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 24-25 (Sept. 28, 2022), https://bit.ly/3yPfoHw. To say that the magazines New Jersey prohibits are "highly unusual" would be to deny reality.

Nor is there any question that the typical person who possesses these arms does so for lawful purposes. *See ANJRPC II*, 910 F.3d at 116-17 (recognizing as much). In the vast majority of states, magazines that hold more than ten rounds of ammunition are perfectly lawful. *See* Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://n.pr/3QMJCC1. And the reasons most frequently cited by the millions of Americans who own them are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23. What is more, a significant subset of these banned arms were widely owned in New Jersey for lawful purposes "*by definition*" (insofar as the state

allowed 11-to-15-round magazines to be owned) "for more than thirty years" under its previous definition. JA66-67 (emphasis added). Simply put, what the D.C. Circuit recognized over a decade ago is even more true today: While "[t]here may well be some capacity above which magazines are not in common use[,] … that capacity surely is not ten." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

3. Once again, the Court can and should end its analysis here. Common-use-for-lawful purposes *is* the historical test when it comes to a flat arms ban, and that test forecloses New Jersey's decision to ban these ubiquitous arms no less than it foreclosed the District's decision to ban handguns in *Heller*. *See* pp.28-32, *supra*.

But even if one were to look beyond common use, the historical record reveals no tradition whatsoever of banning firearms or feeding devices based on their firing capacity. Firearms capable of firing multiple rounds without reloading have been around for centuries—longer than even the United States. *See* pp.4-12, *supra*. Yet "[a]t the time the Second Amendment was adopted, there were no laws restricting ammunition capacity." Kopel, *supra*, at 864. And while semiautomatic firearms equipped with feeding devices holding more than ten rounds have been on the civilian market since the turn of the twentieth century, not a single state in the Union (or Congress) restricted the manufacture, sale, or possession of magazines or other ammunition feeding devices until the 1990s.

To be sure, a handful of states enacted laws restricting the firing capacity of semiautomatic firearms in the 1920s, contemporaneous with their enactment of restrictions on fully automatic firearms that had just started to make their way onto civilian markets in very limited numbers. *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I. Acts & Resolves 256, 256-57; 1933 Minn. Laws ch. 190. But all those laws were soon either repealed or replaced with laws that restricted only fully automatic firearms—which, unlike semiautomatics, were never widely adopted by law-abiding citizens for lawful purposes. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263; 1963 Minn. Sess. L. ch. 753, at 1229. And none of those laws—which were outliers even in the brief period when they were on the books— was ever understood to apply to magazines or other feeding devices, regardless of capacity. Kopel, *supra*, at 864-66.

The earliest state law restricting magazine capacity did not come until 1990, when New Jersey enacted the predecessor to the Magazine Ban. *See* 1990 N.J. Laws 217, 221, 235. And the vast majority of states still today allow law-abiding citizens to decide for themselves what ammunition capacity best suits their needs. As for the federal government, it did not regulate magazine capacity until 1994, when Congress temporarily banned magazines with a capacity of more than ten rounds. *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)). Unlike New Jersey's ban, however, that federal law was time-limited and operated

only prospectively, allowing people who had lawfully acquired such magazines to keep them. *Id.* And Congress let the law expire in 2004 after a Justice Department study revealed that it had produced "no discernible reduction" in firearms violence. Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Just., U.S. Dep't of Just. 96 (2004), https://bit.ly/3wUdGRE.

In short, the common-use test and the historical record confirm the same conclusion: There is no historical tradition of prohibiting ammunition feeding devices (or firearms) based on their capacity to fire without being reloaded.

4. The district court did not purport to find one. Nor could it; as this Court correctly concluded in *ANJRPC II*, "there is no longstanding history of LCM regulation." 910 F.3d at 916-17. But rather than follow that conclusion to its logical end, the court converted it into an excuse to cast a much wider net, reasoning that states are entitled to greater leeway when it comes to things that increase "the lethality and accuracy of modern firearms." JA68.

The consequences of that (il)logic are perverse. Technological advancements that improve the accuracy, capacity, and functionality of firearms are exactly what law-abiding citizens want, as they increase the chances of hitting one's target and decrease the risk of causing collateral damage in a stressful self-defense situation. To be sure, those same qualities unfortunately are also often attractive to individuals

determined to commit heinous criminal acts. But if the government could ban any arm that is exceptionally dangerous in the hands of those who would use it to inflict maximum injury, then it is hard to see what modern arms it could not ban. Indeed, much of what the district court said about why the magazines New Jersey now deems too "large" are supposedly different from their historical predecessors could be said equally of semiautomatic handguns or rifles without regard to the magazine with which they are equipped.

That is precisely why our historical tradition is one of protecting arms that are commonly chosen by *law-abiding* citizens, not focusing on how dangerous arms would be in the hands of criminals. Simply put, advancements in accuracy and capacity welcomed by law-abiding citizens are not the sort of "dramatic technological changes" with which *Bruen* was concerned—as evidenced by the Court's emphatic focus on whether arms are "in common use *today*." 597 U.S. at 27, 47 (emphasis added). To say that is not to deny that there are some who have misused the arms New Jersey has banned for unlawful—indeed, awful—purposes. But that was equally true of the handguns banned in *Heller*. The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute these points; it just found them irrelevant to whether handguns are constitutionally protected, because that question

does not turn on whether arms are misused by criminals. It turns on whether law-abiding citizens commonly own and use them for lawful purposes.

Having watered down the historical-tradition inquiry, the district court proceeded to distort the "how" and "why" inquiries too. "With respect to the 'how,'" the court concluded that the Magazine Ban "places a burden on self-defense that is comparable to the burden imposed by the historical analogues." JA73. But *Bruen* does not instruct courts to conduct an ad hoc inquiry into whether the burden a law imposes is "meaningful." It was the *dissent* that advocated a test focused on "the degree to which the [challenged] law burdens the Second Amendment right." *Bruen*, 597 U.S. at 131 (Breyer, J., dissenting). The *majority* embraced a test that examines "how" a law "burdens" the right, not how *much* of a burden (a court thinks) a law imposes. Courts are thus supposed to conduct the historical-tradition inquiry by comparing the mechanics of historical and modern laws—i.e., how they regulate—not by trying to situate laws on some overarching "burdensomeness" spectrum.

*Rahimi* is illustrative. When analyzing whether 18 U.S.C. §922(g)(8) is consistent with historical tradition, the Court did not start by assigning the law to a "substantial," "meaningful," or "minimal" burden category. It examined how the law actually works—i.e., by authorizing state actors to disarm someone only after a "judicial determination[]" that the person "likely would threaten or had threatened another with a weapon," and even then only for a "limited duration"—and compared

that to how the government's proffered historical analogs worked. 144 S.Ct. at 1902.

That makes sense, since the whole point of embracing a historical-tradition mode of analysis is to get courts out of the business of subjectively assessing how much of a burden on Second Amendment rights is too much.

But even if the abstract degree of burden a law imposes mattered, the court's assessment of that question defies reason. Indeed, it defies the court's own opinion. The court (correctly) concluded that the magazines New Jersey has prohibited are arms in common use and correctly acknowledged that "Supreme Court precedent" instructs that "a categorical ban on a class of weapons commonly used for self-defense is unlawful." JA61. And when addressing the firearms ban, the court rejected the state's effort to analogize to nineteenth-century restrictions on the use of "trap guns, gunpowder, Bowie knives, slungshots, and clubs," JA60-61, for a "single" and simple reason: Whereas those restrictions generally did *not* prohibit possession of the arms in question, and instead merely restricted how and where people could carry them, "New Jersey's AR-15 Provision constitutes a complete ban on a class of firearms that is commonly-used for self-defense." JA61. "[T]he 'hows'" of the former restrictions were thus fundamentally different from, and could not begin to justify, a law that "*categorically bans* a type of weapon that is commonly used for self-defense." JA63.

That is exactly what the Magazine Ban does: It categorically bans a class of arms that *the court itself held* is in common use for self-defense and other lawful purposes. And even accepting the (dubious) proposition that New Jersey's late-breaking effort to ban magazines that Americans (including New Jerseyans) have lawfully kept and borne for a century implicates "unprecedented societal concerns or dramatic technological changes," *Bruen*, 597 U.S. at 27, no amount of "nuance" can justify deeming an outright arms ban analogous to a concealed carry law or laws forbidding "discharge of firearms … in a public area," JA74. Any mode of analysis that suggests otherwise has strayed far from the Supreme Court's teachings and this Court's holdings.

## B. The Confiscatory Aspect of New Jersey's Magazine Ban Violates the Takings Clause.

Although it refused to abide by the clear implications of this Court's opinions with respect to the status of magazines under the Second Amendment, the district court—like the state—wrapped itself in those opinions when it came to the Takings Clause. According to the district court, "[t]his exact issue was already addressed and decided … [in] *ANJRPC II*," and "while the Supreme Court vacated the judgment" in *ANJRPC IV* "and remanded the matter for reconsideration in light of *Bruen*," nothing in *Bruen* "disrupt[ed] the Third Circuit's decision as it relates to the Fifth Amendment analysis." JA76. This was error.

Whatever impact the Supreme Court's vacatur of *ANJRPC IV* may have had on *ANJRPC II*, the rule that "the holding of a panel in a precedential opinion is binding on subsequent panels," Third Cir. I.O.P. 9.1, "gives way when the prior panel's holding is in conflict with Supreme Court precedent," including when the Supreme Court precedent with which it conflicts predates the decision of this Court, *Mennen Co. v. Atl. Mut. Ins. Co.*, 147 F.3d 287, 294 n.9 (3d Cir. 1998). And *ANJRPC II*'s drive-by Takings Clause ruling meets this criterion. The majority dismissed the Takings Clause claim in a mere two sentences, finding it sufficient that the law gives citizens a menu of "options" for *how* to dispossess themselves of their property with no compensation. *ANJRPC II*, 910 F.3d at 124; *see* N.J.S. §2C:39-19. But the majority missed the forest for the trees: None of those "options" lets law-abiding citizens *keep* their constitutionally protected property.

New Jersey's magazine ban provides four options for citizens to comply, but all four run afoul of settled Supreme Court Takings Clause jurisprudence. That is obvious as to the first two options. Being forced to surrender lawfully acquired property to law enforcement (N.J.S. §2C:39-19(c)) is the definition of a taking. And being forced to transfer lawfully acquired property to someone else who is "lawfully entitled to own" it (N.J.S. §2C:39-19(a)) is equally a physical taking, as the Takings Clause applies no less to state-forced sales (or transfers) to private entities. *Kelo v. City of New London*, 545 U.S. 469, 473-75 (2005).

49

The final options—permanently altering the magazine to accept ten rounds or fewer or to render it permanently "inoperable" (N.J.S. §2C:39-19(b))—do not save the statute. This is not the first time a government has tried "you can just modify it" as a get-out-of-the-Takings-Clause-free card; the Supreme Court has rejected that argument twice before. In *Horne v. Department of Agriculture*, it made no difference that the raisin growers could avoid the taking by "plant[ing] different crops" or selling "their raisin-variety grapes as table grapes or for use in juice or wine." 576 U.S. 350, 365 (2015). And in *Loretto v. Teleprompter Manhattan CATV Corp.*, it made no difference that the property owner could convert her building into something other than an apartment complex. 458 U.S. 419, 439 n.17 (1982). As the Supreme Court has repeatedly admonished, "property rights 'cannot be so easily manipulated.'" *Horne*, 576 U.S. at 365 (quoting *Loretto*, 458 U.S. at 439 n.17).[10]

The *ANJRPC II* majority purported to distinguish *Horne* in a footnote, on the theory that the government took the raisins "for government use" by forcing the growers "to sell in noncompetitive markets." 910 F.3d at 124 n.32. In fact, the government in *Horne* was free to "dispose of" the raisins "in its discretion," including by simply giving them away to third parties. *Horne*, 576 U.S. at 355.

---

[10] At a minimum, forcing citizens to permanently modify their property or render it inoperable places an unconstitutional condition on the possession of their property, which itself is a taking. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605 (2013).

More important, the panel never explained how confiscating property so that the government may give it to someone else is a taking, *see Kelo*, 545 U.S. at 473-75, but ordering the owner to give it away is not. Nor could it.

The state fell back below on the even more dangerous theory, raised but not embraced by the *ANJRPC II* majority, that New Jersey's law is "not a taking at all" because it was passed pursuant to the state's "police powers." 910 F.3d at 124 n.32. But the Supreme Court squarely rejected any police-power exception to the Takings Clause more than a century ago. In *Chicago, Burlington & Quincy Railway Co. v. Illinois ex rel. Grimwood*, the Court made crystal clear that "if, in the execution of *any power, no matter what it is*, the government … finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner." 200 U.S. 561, 593 (1906) (emphasis added); *accord Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). And the Court reaffirmed that holding in *Loretto*, holding that a state law "dispossess[ing]" an owner of property amounts to a physical "taking" even if the law was "within the State's police power." 458 U.S. at 425, 435 n.12. Indeed, the Court has held the same even in the *regulatory*-takings context. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1020-27 (1992).

That makes sense, as almost every state action the Bill of Rights protects against can be (and often is) taken under the police power, meaning a police-power

exception to these rights would render them hollow.  Indeed, the Takings Clause (rather uniquely) *assumes* that the government has the power to take property pursuant to eminent domain, but permits it to do so only if (unlike here) it ensures just compensation.  Labeling this law an exercise of the police power simply means New Jersey had the power to enact its law (which, in that sense, no one doubts); it says nothing about whether the law complies with the Takings Clause.  Because New Jersey pays no compensation, it does not.

## CONCLUSION

For the reasons set forth above, and with the exception of the district court's conclusion that the ban on the AR-15 is unconstitutional, this Court should reverse.

Respectfully submitted,

<table>
<tr>
<td>

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
(NJ Bar No. 049381991)
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

</td>
<td>

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

</td>
</tr>
</table>

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle and Pistol Clubs*

November 18, 2024

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that Erin E. Murphy was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit on March 25, 2013, and is presently a member in good standing at the Bar of said Court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a).  Specifically, this brief contains 12,651 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program SentinelOne, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy