# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————

ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC. ; et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

(*additional captions listed on inside cover*)

———————

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1-18-cv-10507, 1-22-cv-04397, 1:22-cv-04360

———————

# JOINT APPENDIX
# Vol. III of XIII (pgs. JA740-JA1411)

———————

DANIEL M. VANNELLA
OFFICE OF ATTORNEY
  GENERAL OF NEW JERSEY
25 Market Street
Trenton, NJ 08625
(609) 376-2850
daniel.vannella@law.njoag.gov

*Counsel for Appellees-Cross-Appellants State of New Jersey,* et al.

ERIN E. MURPHY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle & Pistol Clubs, Inc.*

BRADLEY LEHMAN
GELLERT SEITZ BUSENKELL & BROWN
1201 N. Orange Street
Wilmington, DE 19801
(302) 416-3344
blehman@gsbblaw.com

*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connelly, and Firearms Policy Coalition, Inc.*

(*additional counsel listed on inside cover*)

November 18, 2024

———————————

MARK CHEESEMAN, TIMOTHY CONNELLY, FIREARMS POLICY COALITION, INC.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

———————————

BLAKE ELLMAN; THOMAS R. ROGERS; ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

———————————

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

PAUL D. CLEMENT
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle & Pistol Clubs*

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connelly, and Firearms Policy Coalition, Inc.*

# TABLE OF CONTENTS

## Volume I

*ANJRPC* and *Ellman* Plaintiffs' Notice of Appeal, Nos. 18-cv-10507, 22-cv-4397 (Aug. 18, 2024), Dkt.234[1] ..............................................JA1

*Cheeseman* Plaintiffs' Notice of Appeal, No. 22-cv-04360 (July 30, 2024), *Cheeseman* Dkt.82 ......................................................................JA3

State Defendants' Notice of Cross-Appeal, Nos. 18-cv-10507, 22-cv-4397, 22-cv-04360 (Aug. 5, 2024), *Cheeseman* Dkt.84 ......................JA7938

Order and Judgment (July 30, 2024), Dkt.229 .....................................JA5

Memorandum Opinion (July 30, 2024), Dkt.228 .................................JA9

## Volume II

District Court Docket Sheet, No. 18-cv-10507 (D.N.J.) .....................JA78

District Court Docket Sheet, No. 22-cv-04360 (D.N.J.) ...................JA110

District Court Docket Sheet, No. 22-cv-04397 (D.N.J.) ...................JA124

*ANJRPC* Amended Complaint (Oct. 28, 2022), Dkt.122 ...............JA134

*Cheeseman* Amended Complaint (July 14, 2022), No. 22-cv-04360 Dkt.4........................................................................................................JA150

    Exhibit A - New Jersey Assault Firearms Guidelines, No. 22-cv-04360 Dkt.4-1........................................................JA182

*Ellman* Complaint (July 1, 2022), No. 22-cv-04397 Dkt.1 .............JA186

*Cheeseman* Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174........................................................................................................JA202

    Brief in Support of *Cheeseman* Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-1 ..........................................JA205

---

[1] ECF numbers are to *ANJRPC* docket (No. 18-cv-10507) unless otherwise indicated.

Exhibit 1 – Declaration of Mark Cheeseman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-2 .................................................................JA251

Exhibit 2 – Declaration of Timothy Connolly in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-3 .................................................................JA254

Exhibit 3 – Declaration of Brandon Combs on Behalf of Firearms Policy Coalition, Inc. in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-4 ...........................JA257

Exhibit 4 – Excerpts from Frank Miniter, *The Future of the Gun* (2014), Dkt.174-5 .........................................................JA261

Exhibit 5 – Excerpts from Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (2022), Dkt.174-6 .................................................................JA267

*Cheeseman* Statement of Undisputed Material Fact in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-7 ..............JA272

*ANJRPC* and *Ellman*'s Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175 ...................................................................JA303

Declaration of Blake Ellman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-1 .....................................JA306

Declaration of Marc Weinberg in Support of Motion for Summary Judgment (Oct. 6, 2024), Dkt.175-2 .....................................JA309

Declaration of Thomas Rogers in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-3 .....................................JA312

Declaration of Scott Bach in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-4.......................................JA315

Declaration of Emanuel Kapelsohn in Support of Motion for Summary Judgment with Accompanying Exhibits (Oct. 6, 2023), Dkt.175-5 .......................................................JA319

Declaration of Ashley Hlebinsky in Support of Motion for
Summary Judgment with Accompanying Exhibits (Oct. 6,
2023), Dkt.175-6..................................................................................JA479

*ANJRPC* and *Ellman*'s Brief in Support of Motion for Summary
Judgment (Oct. 6, 2023), Dkt.175-7......................................................JA634

*ANJRPC* and *Ellman*'s Statement of Undisputed Material Facts
(Oct. 6, 2023), Dkt.175-8 ......................................................................JA682

## **Volume III**

State's Notice of Cross-Motion for Summary Judgment
(Nov. 3, 2023), Dkt.183 ........................................................................JA740

State's Combined Brief in Opposition to Motions for Summary
Judgment and in Support of State's Cross-Motion for Summary
Judgment (Nov. 3, 2023), Dkt.183-1 ....................................................JA743

State's Counter-Statement of Material Facts Not in Dispute
(Nov. 3, 2023), Dkt.183-2......................................................................JA837

State's Response to *ANJRPC* and *Ellman*'s Statement of
Undisputed Material Facts (Nov. 3, 2023), Dkt.183-3 ...........................JA881

State's Response to *Cheeseman*'s Statement of Undisputed
Material Facts (Nov. 3, 2023), Dkt.183-4 ..............................................JA943

Declaration of Daniel Vannella in Support of Cross-Motion for
Summary Judgment, Motion to Exclude Testimony of Emanuel
Kapelsohn & Clayton Cramer, and State's Opposition to Motion to
Exclude Certain Expert Testimony (Nov. 3, 2023), Dkt.184..........................JA969

Exhibits 1-5 (May 15, 2023), Dkt.184-1 ...............................................JA982

## **Volume IV**

Exhibits 6-10 (May 15, 2023), Dkt.184-1 ...........................................JA1412

Exhibit 11 – Declaration and Expert Report of James Yurgealitis
with Accompanying Exhibits (June 7, 2023), Dkt.184-2.....................JA1813

Exhibits 12-13 (May 15, 2023), Dkt.184-3 .........................................JA1877

### Volume V

Exhibits 14 (May 15, 2023), Dkt.184-3 .................................................JA2123

Exhibit 15 – Supplemental Letter with Accompanying Exhibits
from Emanuel Kapelsohn to *ANJRPC* Plaintiffs (July 31, 2023),
Dkt.184-4 .......................................................................................JA2154

Exhibit 16 – Transcript of Emanuel Kapelsohn Deposition with
Exhibits Introduced During Deposition (Aug. 4, 2023),
Dkt.184-5 .......................................................................................JA2345

### Volume VI

Exhibit 16 (Continued) – Transcript of Emanuel Kapelsohn
Deposition with Exhibits Introduced During Deposition
(Aug. 4, 2023), Dkt.184-5 ...............................................................JA2849

Exhibits 17 (May 15, 2023), Dkt.184-6 .............................................JA3382

### Volume VII

Exhibits 18-19 (May 15, 2023), Dkt.184-6 .........................................JA3483

Exhibit 20 – Transcript of Clayton Cramer's Deposition with
Exhibits Introduced During Deposition (Aug. 21, 2023),
Dkt.184-7 .......................................................................................JA3901

### Volume VIII

Exhibit 20 (Continued) – Transcript of Clayton Cramer's
Deposition with Exhibits Introduced During Deposition (Aug.
21, 2023), Dkt.184-7...........................................................................JA3901

Exhibits 21-44 (May 15, 2023), Dkt.184-8 .........................................JA4466

Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.195.............................JA4706

Cheeseman's Reply to State's Response to Statement of
Undisputed Material Fact in Support of *Cheeseman* Motion for
Summary Judgment (Dec. 15, 2023), Dkt.195-1 .................................JA4766

## Volume XI

Cheeseman's Response to State's Counter-Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.195-2 .................JA4871

Declaration of Bradley Lehman in Support of Exhibits to
Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.196 ............................JA4961

Exhibits 1-12 (Dec. 15, 2023), Dkt.196-1 ............................................JA4980

Exhibits 13-28 (Dec. 15, 2023), Dkt.196-2 .........................................JA5462

Exhibits 29 (Dec. 15, 2023), Dkt.196-3 ...............................................JA5583

## Volume X

Exhibits 30-43 (Dec. 15, 2023), Dkt.196-3 .........................................JA5609

Exhibits 44-50 (Dec. 15, 2023), Dkt.196-4 .........................................JA5750

Exhibits 51-60 (Dec. 15, 2023), Dkt.196-5 .........................................JA6242

## Volume XI

Exhibits 61 (Dec. 15, 2023), Dkt.196-5 ...............................................JA6344

Exhibits 62-72 (Dec. 15, 2023), Dkt.196-6 .........................................JA6348

Exhibits 73-86 (Dec. 15, 2023), Dkt.196-7 .........................................JA6481

Exhibits 87-99 (Dec. 15, 2023), Dkt.196-8 .........................................JA6629

Exhibits 100-105 (Dec. 15, 2023), Dkt.196-9 .....................................JA6808

## Volume XII

Exhibits 106-115 (Dec. 15, 2023), Dkt.196-9 .....................................JA7048

Exhibits 116-124 (Dec. 15, 2023), Dkt.196-10 ...................................JA7341

*ANJRPC* and *Ellman*'s Reply Brief in Support of Motion for
Summary Judgement and in Opposition to State's Cross-Motion for
Summary Judgment (Dec. 15, 2023), Dkt.197 ..............................................JA7569

Reply Declaration and Rebuttal Expert Report of Emanuel
Kapelsohn (Dec. 15, 2023), Dkt.197-1.................................................JA7608

*ANJRPC* and *Ellman*'s Response to State's Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.197-2..................JA7641

## <u>Volume XII</u>

*ANJRPC* and *Ellman*'s Brief in Opposition to State's Motion to
Exclude Expert Testimony of Emanuel Kapelsohn & Clayton
Cramer and in Reply in Further Support of Daubert Motion
(Dec. 15, 2023), Dkt.197-3....................................................................JA7712

*ANJRPC* and *Ellman*'s Amended Response to State's Statement of
Material Facts Not in Dispute (Dec. 16, 2023), Dkt.198...............................JA7739

Declaration and Rebuttal Expert Report of Clayton Cramer
(Dec. 15, 2023), Dkt.200 ..............................................................................JA7817

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | **STATE DEFENDANTS' NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> Motion Return Date: December 4, 2023 |
| Defendants. | |
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

TO:   Clerk of Court, United States District Court
      District of New Jersey – Trenton Vicinage
      402 East State Street
      Trenton, New Jersey 08608

      All counsel of record (via CM/ECF)

**JA741**

**PLEASE TAKE NOTICE** that on December 4, 2023, or as soon thereafter as counsel may be heard, Matthew J. Platkin, Attorney General of New Jersey, by Assistant Attorney General Daniel M. Vannella, appearing on behalf of Defendants, Matthew J. Platkin, Patrick J Callahan, Christine A. Hoffman, and Bradley D. Billhimer (collectively, "State Defendants") shall move before the United States District Court for the District of New Jersey for an Order pursuant to Federal Rule of Civil Procedure 56 for an Order granting summary judgment to State Defendants in the above-consolidated matters.

**PLEASE TAKE FURTHER NOTICE** that the undersigned will rely on the attached Brief, Responses to Plaintiffs' Statement of Material Facts Not In Dispute, Counterstatement of Material Facts Not In Dispute, and Declaration of Daniel M. Vannella with exhibits (filed separately) in support of the motion.

**PLEASE TAKE FURTHER NOTICE** that the undersigned respectfully requests oral argument pursuant to Federal Rule of Civil Procedure 78. A proposed form of Order is attached hereto.

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY


By:  /s/ Daniel M. Vannella
      Daniel M. Vannella
      Assistant Attorney General

Dated: November 3, 2023

**JA742**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

     Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

     Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

     Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

---

**COMBINED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR
SUMMARY JUDGMENT AND IN SUPPORT OF STATE DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 116
Trenton, New Jersey 08625
(609) 376-3202
Daniel.Vannella@law.njoag.gov
*Attorney for State Defendants*

Jeremy M. Feigenbaum, *Solicitor General*
Angela Cai, *Deputy Solicitor General*
Daniel Vannella, *Assistant Attorney General*

Christopher Ioannou
Nicholas Kant
Justine Longa
Jonathan Mangel
Rachel Manning
Tim Sheehan
  *Deputy Attorneys General*

Of Counsel And On The Brief

**JA745**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ........................................................ iii

PRELIMINARY STATEMENT ....................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ............5

    A.    New Jersey's Assault Weapons and Magazine Capacity Restrictions. .....5

    B.    Procedural History. ....................................................9

STANDARD OF REVIEW ...........................................................13

ARGUMENT .............................................................................14

I.     THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIMS. ...........................................14

    A.    Plaintiffs Cannot Show That Possessing LCMs Or Assault Weapons Is Protected By The Second Amendment. ....................................15

        1.    Large-Capacity Magazines Are Not "Arms." .....................16

        2.    Neither LCMs Nor Assault Weapons Are In Common Use For Self Defense. ....................................................................22

            a.  LCMs And Assault Weapons Are Rarely Used For Self-Defense. ....22

            b.  Assault Weapons And LCMs Were Designed For Military Combat, And Are Disproportionately Used By Criminals To Perpetrate Mass Shootings. ...................................................................28

            c.  The Relevant Test Is Common Use, Not Common Ownership. .........35

    B.    The Challenged Laws Are Consistent With The Nation's Tradition Of Restricting Firearms That Were Particularly Dangerous Or Susceptible To Disproportionate Criminal Misuse. ....................................41

        1.    Bruen Requires Engaging In Nuanced Analogical Reasoning. ..........41

        2.    There Is A Longstanding National Tradition Of Restricting Instruments That Were Particularly Dangerous Or Susceptible To

i

Disproportionate Criminal Misuse. ................................................................55

II.    THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON ANJRPC'S TAKINGS CLAIM.................................................................76

CONCLUSION .......................................................................................80

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................13

*Andrews v. State,*
  50 Tenn. 165 (1871) ............................................................................64

*Andrus v. Allard,*
  444 U.S. 51 (1979) ..............................................................................80

*ANJRPC v. Att'y Gen. N.J.,*
  974 F.3d 237 (3d Cir. 2020) ...................................................... 11, 76, 77

*ANJRPC v. Attorney Gen. N.J.,*
  910 F.3d 106 (3d Cir. 2018) ........................................................... passim

*ANJRPC v. Bruck,*
  142 S. Ct. 2894 (2022) ........................................................................12

*ANJRPC v. Grewal,*
  2018 WL 4688345 (D.N.J. Sept. 28, 2018) .................................. 10, 24, 41

*ANJRPC v. Grewal,*
  2019 WL 3430101 (D.N.J. July 29, 2019) ...............................................11

*Aymette v. State,*
  21 Tenn. 154 (1840) ....................................................................... 62, 69

*Bevis v. City of Naperville,*
  No. 23-1353, Dkt. No. 170 (7th Cir. Nov. 3, 2023) ..................................4

iii

*Bevis v. City of Naperville*,
  No. 22-cv-4775, ___ F.Supp.3d ____, 2023 WL 2077392
  (N.D. Ill. Feb. 17, 2023) ............................................................................4

*Blackburn v. United Parcel Serv., Inc.*,
  179 F.3d 81 (3d Cir. 1999) .......................................................................47

*Brown v. Maryland*,
  25 U.S. 419 (1827) ....................................................................................60

*Brumback v. Ferguson*,
  No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) .............4

*Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*,
  932 F.3d 91 (3d Cir. 2019) .......................................................................16

*Cheeseman v. Platkin*,
  No. 22-cv-4360 (D.N.J.) ...........................................................................12

*Chicago B. & Q. Railroad Co. v. Illinois*,
  200 U.S. 561 (1906) ..................................................................................79

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  No. 22-cv-951, ___ F.Supp.3d ____, 2023 WL 2655150
  (D. Del. Mar. 27, 2023) ........................................................................ 4, 38

*Dist. of Colum. v. Heller*,
  554 U.S. 570 (2008) ..................................................................... passim

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) ........................................................................73

*Duncan v. Becerra*,
  265 F. Supp. 3d 1106 (S.D. Cal. 2017) ....................................................79

iv

**JA749**

*Duncan v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) ...................................................................30

*Fife v. State,*
  31 Ark. 455 (1876)......................................................................... 64, 69

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ................................................ 37, 54, 70

*Hanson v. Dist. of Colum.,*
  No. 22-cv-2256, ___ F.Supp.3d ____, 2023 WL 3019777
  (D.D.C. Apr. 20, 2023) .................................................................. passim

*Hartford v. Ferguson,*
  No. 23-5364, 2023 WL 3836230 (W.D. Wash. June 6, 2023) ..............................4

*Heller v. District of Columbia,*
  670 F.3d 1244 (U.S. App. D.C. 2011) ...................................................70

*Herrera v. Raoul,*
  No. 23-cv-532, ___ F.Supp.3d ____, 2023 WL 3074799
  (N.D. Ill. Apr. 25, 2023) ...............................................................4

*Horne v. Dep't of Ag.,*
  576 U.S. 350 (2013) .........................................................................78

*In re Continental Airlines,*
  134 F.3d 536 (3d Cir. 1998).............................................................77

*In re Engers v. AT&T,*
  No. 98-cv-3660, 2005 WL 6460846 (D.N.J. Sept. 9, 2005)..................................39

*Kaucher v. Cty. of Bucks,*
  455 F.3d 418 (3d Cir. 2006)..............................................................13

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ....................................................................37

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ...................................................................................80

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992) .................................................................................80

*Luis v. United States*,
    578 U.S. 5 (2016) .......................................................................................19

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ...................................................................................74

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ...................................................................................22

*Mugler v. Kansas*,
    123 U.S. 623 (1887) ...................................................................................79

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ....................................................................... passim

*Nat'l Ass'n of Gun Rights v. Lamont*,
    No. 22-cv-1118, ___ F.Supp.3d ____, 2023 WL 4975979
    (D. Conn. Aug. 3, 2023) ..................................................................... passim

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ...................................................................................68

*O'Neill v. State*,
    16 Ala. 65 (1849) .......................................................................................56

*Ocean State Tactical LLC v. Rhode Island*,
  646 F. Supp.3d 368 (D.R.I. 2022) ................................................................. passim

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*,
  514 U.S. 175 (1995) ..........................................................................................60

*Or. Firearms Fed'n v. Kotek*,
  No. 22-cv-01815, ___ F.Supp.3d ____, 2023 WL 4541027
  (D. Or. July 14, 2023) ...................................................................... passim

*Or. Firearms Fed'n, Inc. v. Brown*,
  644 F. Supp.3d 782 (D. Or. 2022) ........................................................ 4, 78

*People v. Brown*,
  235 N.W. 245 (Mich. 1931)................................................................ 66, 69

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023) (en banc) ................................................. 21, 74

*Staples v. United States*,
  511 U.S. 600 (1994).........................................................................................40

*State v. Huntly*,
  25 N.C. 418 (1843) ...........................................................................................72

*State v. Reid*,
  1 Ala. 612 (1840) ............................................................................... 62, 69

*State v. Wilburn*,
  66 Tenn. 57 (1872)............................................................................. 64, 69

*United States ex rel. Doe v. Heart Solution, PC*,
  923 F.3d 308 (3d Cir. 2019)...........................................................................39

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010)..............................................................................10

*United States v. Stevens,*
  70 F.4th 653 (3d Cir. 2023) ...................................................21

*United States v. White,*
  401 U.S. 745 (1971) ............................................................36

*Univ. of Texas v. Camenisch,*
  451 U.S. 390 (1981) ............................................................41

*Wiese v. Becerra,*
  306 F. Supp. 3d 1190 (E.D. Cal. 2018) ................................10

*Worman v. Healey,*
  922 F.3d 26 (1st Cir. 2019) .................................................37

## **Historical Laws**

20 Rich. 2 c. 1 (1396) ............................................................57

33 Hen. 8, c. 6, § 2 (1541–1542) ...........................................57

7 Rich. 2 c. 13 (1383) ............................................................57

1686 N.J. Laws 289-90, ch. 9 ................................................57

1783 Mass. Acts 37 ................................................................60

1784 Laws of N.Y. 627, ch. 28 ..............................................59

1821 Me. Laws 98, ch, 25 ......................................................60

1837 Ala. Laws 7 ...................................................................61

1837 Ga. Acts 90 (1838) ........................................................61

1837-1838 Tenn. Pub. Acts 200-01, ch. 137 .........................61

1850 Mass. Gen. Law, ch. 194................................................62

Laws & Ordinances Governing the City of Chicago 239
  (Myers & Chandler 1866)....................................................60

1870 Tex. Gen. Laws 63 ...................................................................64

1871 Tenn. Pub. Acts 81 ch. 90, § 1 ...............................................64

1881 Ark. Acts 191, ch. XCVI .................................................. 61, 64

Illinois Act of Apr. 16, 1881 ...........................................................62

1888 Gen. Minn. Law §§ 333, 334 ................................................62

1890 Okla. Sess. Laws 475, § 18 ....................................................62

1927 Mass. Acts 413, ch. 326 .........................................................66

1927 Mich. Pub. Acts 888-89 .........................................................66

1927 R.I. Pub. Laws 256, ..............................................................66

Pub. L. No. 72-275, 47 Stat. 650 (1932) ........................................66

1933 Minn. Laws 231, ch. 190 .......................................................66

1933 Ohio Laws 189 .......................................................................66

1934 Va. Acts 137-39 ch. 96 ..........................................................66

Pub. L. No. 75-474, 48 Stat. 1236 (1934) ......................................66

Pub. L. No. 75-785, 52 Stat. 1250 (1938) ......................................66

Pub. L. No. 103-322, 108 Stat. 1796 (1994) ....................................8

## Statutes

2023 Wash. Sess. Laws, ch. 162, § 1 ................................................9

720 Ill. Comp. Stat. 5/24-1.10 ..........................................................9

720 Ill. Comp. Stat. 5/24-1.9 ............................................................9

720 Md. Code Ann., Crim. Law § 4-305 ...........................................9

Cal. Penal Code § 16740 ...................................................................9

Cal. Penal Code § 30500-30515 .......................................................9

Cal. Penal Code § 30600 ........................................................................................... 9

Cal. Penal Code § 30605 ........................................................................................... 9

Colo. Rev. Stat. § 18-12-301 ..................................................................................... 9

Conn. Gen. Stat. § 53-202 ......................................................................................... 9

D.C. Code § 7-2506.01 .............................................................................................. 9

D.C. Code § 7-2501.01 .............................................................................................. 9

D.C. Code § 7-2502.01 .............................................................................................. 9

D.C. Code § 7-2502.02 .............................................................................................. 9

Del. Code Ann. tit. 11, § 1468 ................................................................................... 9

Del. Code Ann. tit. 11, §§ 1465-1466 ....................................................................... 9

Haw. Rev. Stat. Ann. § 134-8 .................................................................................... 9

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a) ...................................................... 9

Mass. Gen. Laws ch. 140, § 121 ................................................................................ 9

Mass. Gen. Laws ch. 140 § 131 ................................................................................. 9

Md. Code Ann., Crim. Law § 4-301 ........................................................................... 9

Md. Code Ann., Crim. Law § 4-303 ........................................................................... 9

N.J. Stat. Ann. § 2C:39-1 ................................................................................... 5, 6, 7

N.J. Stat. Ann. § 2C:39-19 ............................................................................. 8, 78, 79

N.J. Stat. Ann. § 2C:39-20 ............................................................................. 8, 78, 79

N.J. Stat. Ann. § 2C:39-3 ........................................................................................... 7

N.J. Stat. Ann. § 2C:58-3 ........................................................................................... 6

N.Y. Penal Law § 265.00 ........................................................................................... 9

N.Y. Penal Law § 265.02 ........................................................................................... 9

x

N.Y. Penal Law § 265.37 ...................................................................9

Or. Laws 2023, c. 1, § 11 .................................................................9

P.L. 1990, ch. 32 ............................................................................5, 6

P.L. 2017, ch. 323 .............................................................................6

P.L. 2018, ch. 39 ...............................................................................7

R.I. Gen. Laws § 11-47.1-2 ..............................................................9

Vt. Stat. Ann. Tit. 13, § 4021 ...........................................................9

Wash. Rev. Code § 9.41.010 .............................................................9

Wash. Rev. Code § 9.41.240 .............................................................9

Wash. Rev. Code § 9.41.390 .............................................................9

## **Rules**

Fed. R. Civ. P. 56 ...........................................................................13

## **Other Authorities**

1 W. & M., ch. 2, § 7 .....................................................................57

H.R. Rep. No. 103-489 (1994).........................................................8

N.J. Div. of Criminal Justice, Guidelines Regarding the "Substantially Identical"
    Provision in the State's Assault Firearms Laws (1996),
    https://nj.gov/lps/dcj/agguide/assltf.htm ..................................7

William Blackstone, 4 Commentaries on the Laws of England 55 (1769) ............56

William English, "2021 National Firearms Survey: Updated Analysis Including
    Types of Firearms Owned" (May 13, 2022).........................................39

## PRELIMINARY STATEMENT

The development and the widespread dissemination of assault weapons and large-capacity magazines (LCMs) in the 20th and 21st Centuries led to an unprecedented, devastating societal problem in modern America: mass shootings. In contrast to the single-shot muskets and other firearms that were prevalent at the Founding, technological changes in the last 100 years have provided everyday Americans access to weapons of far greater lethality. The AR-15 enables civilians to fire 45 rounds per minute, a significantly greater firepower than that enjoyed by soldiers during the Civil War. LCMs allow them to fire 11 or more bullets without even pausing to reload another magazine. And the bullets they fire cause damage of unprecedented scope, especially when they strike children. The consequences that follow are grave: because civilians now maintain access to weapons of unprecedented lethality, the Nation has for years been in the throes of a mass shooting epidemic that would have been unimaginable to the Founders. Five of the top ten deadliest mass shootings in American history occurred since 2010, all involving assault weapons. And assault weapons and LCMs have become a common feature of school shootings—allowing a lone shooter to kill 21 people (mostly children) and to wound 17 others in Uvalde just last year.

Yet even as the devastation inflicted with assault weapons and/or LCMs is of unprecedented scope, laws restricting these weapons find extensive support both in

our Constitution's text and in the Nation's historical tradition. In 2022, the Supreme Court reiterated that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense," and held that it allows citizens to carry the same in public. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022). But at the same time, *Bruen* took care to confirm that this right was not "a regulatory straightjacket," *id.*—that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring) (quoting *Dist. of Colum. v. Heller*, 554 U.S. 570, 626 (2008)). Indeed, that much had been clear long before even the Founding of this Nation: "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the [self-defense] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (majority op.) (quoting *Heller*, 554 U.S. at 626); *see id.* at 2162 (Kavanaugh, J., concurring) (quoting same passage). As *Bruen* explained, that promise remains true today.

*Bruen* provided two different ways to show that modern laws are consistent with the self-defense right, and the challenged assault weapons and LCM restrictions satisfy both. First, *Bruen* explained that firearms restrictions withstand muster if they do not fall within the scope of the Second Amendment's protection in the first place. That matters here in two respects. For one, the Second Amendment applies only to

"arms," but as the historical record and linguistic experts confirm, LCMs are not arms at all—they are simply ammunition containers. For another, the Second Amendment applies only to arms that are "'in common use' for self-defense today," *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627), in contrast to those— like M-16 rifles—most useful in military service. But as this record reveals, LCMs and assault weapons are not commonly used for self-defense, and instead bear many of the features of the M-16. Since these weapons fall outside the self-defense right itself, "the analysis can stop there." *Id.* at 2126.

Second, these laws also find support in an extensive historical tradition. *Bruen* establishes that even where a law falls within the scope of the Second Amendment, that law will still pass constitutional scrutiny when it is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. That does not mean the State has to identify *identical* historical laws—after all, States confront new technologies and modern challenges "beyond those the Founders specifically anticipated." *Id.* at 2132. Instead, States are free to justify their laws through "analogical reasoning"— that is, by identifying analogous laws that "impose a comparable burden on the right of armed self-defense" and were "comparably justified." *Id.* at 2132-33. And as the historical record and experts in this case confirm, that is what New Jersey has done. From the Founding through Reconstruction through the 20th Century, governments have long regulated guns that are particularly dangerous or susceptible to

disproportionate criminal misuse, while leaving the quintessential self-defense weapons available for civilian use. New Jersey law, like the laws of multiple other States, is no different: it limits only a narrow subset of particularly dangerous weapons that are especially susceptible to causing mass death and damage, and that are of little or no self-defense use.

Since *Bruen*, the vast majority of federal courts to confront these challenges have upheld assault weapons and/or LCM laws. *See Bevis v. City of Napierville*, No. 23-1353, Dkt. No. 170 (7th Cir. Nov. 3, 2023) (slip op.), *Brumback v. Ferguson*, No. 22-cv-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023); *Nat'l Ass'n of Gun Rights v. Lamont*, No. 22-cv-1118, ___ F.Supp.3d ____, 2023 WL 4975979 (D. Conn. Aug. 3, 2023); *Or. Firearms Fed'n v. Kotek*, No. 22-cv-01815, ___ F.Supp.3d ____, 2023 WL 4541027 (D. Or. July 14, 2023); *Hartford v. Ferguson*, No. 23-5364, 2023 WL 3836230 (W.D. Wash. June 6, 2023), *Herrera v. Raoul*, No. 23-cv-532, ___ F.Supp.3d ____, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023); *Hanson v. Dist. of Colum.*, No. 22-cv-2256, ___ F.Supp.3d ____, 2023 WL 3019777 (D.D.C. Apr. 20, 2023); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 22-cv-951, ___ F.Supp.3d ____, 2023 WL 2655150 (D. Del. Mar. 27, 2023); *Bevis v. City of Naperville*, No. 22-cv-4775, ___ F.Supp.3d ____, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023); *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp.3d 782 (D. Or. 2022); *Ocean State Tactical LLC v. Rhode Island*, 646 F.

Supp.3d 368 (D.R.I. 2022). In reaching these results, courts have endorsed the State's arguments at both steps of *Bruen*'s inquiry: that LCMs and assault weapons are not commonly used for self-defense and that LCMs are not arms, and that assault weapons and LCM laws fit within a long tradition of regulating arms that are particularly dangerous or susceptible to disproportionate criminal misuse. There is no basis for this Court to break from that near-consensus; rather, this Court should deny Plaintiffs' motion and grant summary judgment to the State.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.   New Jersey's Assault Weapons and Magazine Capacity Restrictions.

In 1990, in the wake of a mass shooting at a California school where the shooter killed five children and wounded thirty-three others using an AK-47 and a handgun, New Jersey enacted a law prohibiting the possession of assault weapons. P.L. 1990, ch. 32 *see* N.J. Stat. Ann. §§ 2C:39-1(w)(1); *see* Declaration of Daniel Vannella Ex. 4, Rpt. of Professor Robert J. Spitzer ¶ 1.[1] In signing the bill, Governor Jim Florio recognized the "wholesale destruction" these weapons can inflict, making them a "direct threat to our police, our citizens and especially our children." Vannella Decl. Ex. 42, News Release, Office of the Governor, Florio Signs Nation's Toughest Assault Weapon Law (May 30, 1990). He explained that this measure targets only

---

[1] Unless otherwise noted, cited exhibits refer to exhibits attached to the Vannella Declaration.

those weapons "designed to wipe out the greatest number of people in the shortest possible time." *Id.* As the Governor put it, "hunters don't need Uzis to shred their prey, and law abiding citizens don't need 'street-sweepers'" for self-defense. *Id.*

The 1990 Act's prohibition on "assault firearms" did not apply at all to most handguns and rifles, which remain generally available in New Jersey subject to generally-applicable permitting and background check requirements. *See* N.J. Stat. Ann. § 2C:58-3. The Act listed the specific firearms prohibited under the defined term "assault firearm," P.L. 1990, ch. 32 § 1 (w), and captured any copycat designs, by including "[a]ny firearm manufactured under any designation which is substantially identical to any of the firearms listed" in subsection (w)(1). *Id.* § 1(w)(2). And the law also clarified the specific features that otherwise characterized impermissible assault firearms: namely, "A semiautomatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock;" "A semiautomatic rifle with a fixed magazine capacity exceeding 15 rounds;" and "A part or combination of parts designed or intended to convert a firearm into an assault firearm," or "from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person." *Id.* § 1(w). In 2017, the definition was amended to include "A firearm with a bump stock attached." P.L. 2017, ch. 323 § 1(w)(6). In August 1996, Attorney General Peter Verniero issued guidelines on the criteria that renders a firearm

6

"substantially identical," N.J. Stat. Ann. § 2C:39-1(w)(2), to the listed weapons defined as "assault firearms" under N.J. Stat. Ann. § 2C:39-1(w)(1).[2] In short, "assault firearm" is thus simply the statutory umbrella for the enumerated list and series of functional definitions that identify the features which make a firearm illegal to possess—similar to how the defined terms "destructive device" and "machine gun" in the same statute operate. *See id.* § 2C:39-1(c), (i).

New Jersey law also governs the permissible capacity for a magazine. In 1990, the Act defined an impermissible "large capacity ammunition magazine" to mean "a box, drum, tube, or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." P.L. 1990, ch. 32 § 1(y). But in 2018—as the threat of mass shootings, often with LCMs, proliferated—New Jersey enacted P.L. 2018, Chapter 39 (A2761), which revised the definition of an unlawful "large capacity ammunition magazine" from 15 to 10 rounds of capacity. *See* N.J. Stat. Ann. § 2C:39-1(y); *see id.* § 2C:39-3 (j). Although the law restricts the capacity of each individual magazine, it imposes no limitation on the number of firearms or magazines, or the amount of ammunition, that a person can lawfully purchase or own.

---

[2] N.J. Div. of Criminal Justice, Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws (1996), https://nj.gov/lps/dcj/agguide/assltf.htm.

Chapter 39 gave owners of prohibited magazines 180 days to comply with the revised limit. *Id.* § 2C:39-19. Owners could comply in several ways: "[t]ransfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine; [r]ender the semi-automatic rifle or magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less; or [v]oluntarily surrender the semi-automatic rifle or magazine." *Id.* Chapter 39 also created exemptions for firearms "with a fixed magazine capacity [of up to] 15 rounds which is incapable of being modified to accommodate 10 or less rounds" and a "firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds." *Id.* § 2C:39-20(a). Owners of those weapons simply had to register them within one year of the law's effective date. Both the 1990 Act and Chapter 39 contain certain exemptions, including for law enforcement, that are not applicable here.

This change to New Jersey's LCM regulations brought it in line with the capacity limits of a number of other states, and with the prior federal limits that governed under Congress's 1994 assault-weapons ban until it sunset in 2004. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, §§ 110101–06, 108 Stat. 1796, 1996-2010 (1994); H.R. Rep. No. 103-489, at 19 (1994) (explaining LCMs "make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent," such that "a single

person with a single assault weapon can easily fire literally hundreds of rounds within minutes"). Indeed, fourteen states and the District of Columbia maintain some restriction on the capacity of magazines used with semiautomatic weapons—and eleven states also choose 10-rounds (or less) as the limit.[3] New Jersey is likewise one of ten jurisdictions that currently prohibits the possession or sale of semiautomatic assault weapons.[4]

## B.    Procedural History.

On the same day Chapter 39 was signed into law, the *ANJRPC* Plaintiffs filed the instant suit, alleging that New Jersey's LCM restriction violates the Second Amendment, the Takings Clause of the Fifth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. This Court denied Plaintiffs' motion for a preliminary injunction, *ANJRPC v. Grewal*, 2018 WL 4688345 (D.N.J. Sept. 28,

---

[3] *See* Cal. Penal Code § 16740 (ten rounds); Conn. Gen. Stat. § 53-202a(1) (same); D.C. Code § 7-2506.01(b); Haw. Rev. Stat. Ann. § 134-8(c); 720 Md. Code Ann., Crim. Law § 4-305(b); Mass. Gen. Laws ch. 140, § 121; Or. Laws 2023, c. 1, § 11; R.I. Gen Laws § 11-47.1-2; Wash. Rev. Code § 9.41.010(25); *see* N.Y. Penal Law §§ 265.02(8), 265.37 (seven); *see also* Colo. Rev. Stat. § 18-12-301 (fifteen); Del. Code Ann. tit. 11, § 1468 (seventeen); 720 Ill. Comp. Stat. 5/24-1.10 (10 for "long guns;" 15 for "handguns"); Vt. Stat. Ann. Tit. 13, § 4021 (same).

[4] *See* Cal. Penal Code §§ 30500-30515, 30600, 30605; Conn. Gen. Stat. §§ 53-202a-202c; Del. Code Ann. tit. 11, §§ 1465-1466(a); D.C. Code §§ 7-2501.01(3A), 7-2502.01, 7-2502.02(a)(6); Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a); 720 Ill. Comp. Stat. 5/24-1.9; Md. Code Ann., Crim. Law §§ 4-301, 4-303; Mass. Gen. Laws ch. 140, §§ 121, 131M; N.Y. Penal Law §§ 265.00(22), 265.02(7); Wash. Rev. Code §§ 9.41.390, 9.41.010(2), 9.41.240 (2023 Wash. Sess. Laws, ch. 162, § 1).

2018), and the Third Circuit affirmed, finding Chapter 39 constitutional, *ANJRPC v. Attorney Gen. N.J. ("ANJRPC I")*, 910 F.3d 106 (3d Cir. 2018).

Although this was at the preliminary-injunction stage, the panel made clear it was resolving all the legal challenges on the merits and upholding the law. The panel concluded that the LCM restriction does not "violate[] the Second Amendment." *Id.* at 110. Applying the Circuit's then-governing "two-step framework," *id.* at 116 (citing *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)), the panel held that "laws restricting magazine capacity to ten rounds of ammunition do not violate the Second Amendment," *id.* at 122. The panel also rejected the Takings Clause challenge. *Id.* at 110. It reasoned that the LCM restriction does not effect a taking, because owners of proscribed magazines can "transfer or sell" them to third parties who may lawfully possess them, "modify their LCMs to accept fewer than ten rounds," or "register those LCMs that cannot be modified," but are not required to surrender them to the State. *Id.* at 124. And "because it does not deprive the gun owners of all economically beneficial or productive uses of their magazines," the statute does not work a regulatory taking. *Id.* After all, "modifying the magazine to hold fewer rounds of ammunition than before does not 'destroy the functionality of the magazine.'" *Id.* at 124-25 (quoting *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018)). And notably, even for magazines incapable of being modified to accommodate 10 or less rounds, owners can "keep their unmodifiable LCMs and

modified versions" and use them "in the same way expected: to hold multiple rounds of ammunition in a single magazine." *Id.* at 125.

The State subsequently prevailed at summary judgment. This Court granted summary judgment to the State, finding the Third Circuit's "precedential decision" in *ANJRPC I* resolved all legal issues in the case. *ANJRPC v. Grewal*, 2019 WL 3430101, at *3 (D.N.J. July 29, 2019). The Third Circuit affirmed, holding that its prior opinion was the law of the case as to these claims. *ANJRPC v. Att'y Gen. N.J. ("ANJRPC II")*, 974 F.3d 237, 240 (3d Cir. 2020).

While Plaintiffs' petition for certiorari from the Third Circuit's 2020 opinion was pending, the U.S. Supreme Court in June 2022 decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). The majority in *Bruen* rejected the use of means-end scrutiny in assessing the constitutionality of laws under the Second Amendment, *id.* at 2129-30, abrogating the approach the Third Circuit had applied in this case. In its place, *Bruen* mandated a historically-informed inquiry. It required courts to first assess if the Second Amendment's "plain text covers an individual's conduct," focusing on the "'normal and ordinary' meaning" of the text, and whether the weapons at issue are "'in common use' today for self-defense." *Id.* at 2126–27, 2134. *Bruen* then instructed that "when the Second Amendment's plain text covers an individual's conduct," courts proceed to a second part of the inquiry: to determine

whether "the regulation is consistent with this Nation's historical tradition of firearm regulation" using "analogical reasoning." *Id.* at 2126, 2132.

The following week, the Supreme Court granted the *ANJRPC* Plaintiffs' petition, vacated the judgment of the Third Circuit, and "remanded ... for further consideration in light of [*Bruen*]." *ANJRPC v. Bruck*, 142 S. Ct. 2894 (2022) (mem.). The Third Circuit, in turn, remanded to this Court "for decision in the first instance under the standard announced in *Bruen*." No. 19-3142, Dkt. 147-1 (3d Cir.), ECF 109[5] at 1; *see id.* n.1 (adding remand would afford opportunity "for further record development, targeted at the legal and historical analysis required under *Bruen*").

Meanwhile, two other groups of plaintiffs commenced new suits in the days following the *Bruen* decision. *See Cheeseman v. Platkin*, No. 22-cv-4360 (D.N.J.); *Ellman v. Platkin*, No. 22-cv-4397 (D.N.J.). And the *ANJRPC* Plaintiffs, following the Third Circuit's remand, filed an Amended Complaint, which dropped the Equal Protection claim they had initially pled. Am. Compl., ECF 122. As the *Cheeseman* and *Ellman* complaints both challenge the validity of New Jersey's assault-firearms prohibition on Second Amendment grounds—a central claim also being litigated in *ANJRPC*—this Court on February 6, 2023, granted the State's motion to consolidate and consolidated all three matters for coordination of discovery. ECF 148. The parties then engaged in extensive consolidated discovery, including both exchanging

---

[5] All citations to "ECF __" refer to the *ANJRPC* docket, No. 18-cv-10507 (D.N.J.).

expert reports and conducting depositions.[6] After the close of discovery, this Court

extended consolidation "through the resolution of *Daubert* motions and dispositive

motions." ECF 168. On September 6, 2023, this Court entered the parties' joint

proposed briefing schedule for *Daubert* and dispositive motions. ECF 166-67. On

October 6, each set of Plaintiffs filed a motion for summary judgment. ECF 174-75.

The State now cross-moves for summary judgment.[7]

## STANDARD OF REVIEW

Summary judgment is appropriate where the movant shows "that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" "only if there is

a sufficient evidentiary basis on which a reasonable jury could find for the non-

moving party," and is "material" only if it has the ability to "affect the outcome of

the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir.

2006). "Factual disputes that are irrelevant or unnecessary" thus do not preclude

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[6] The *Cheeseman* Plaintiffs proffered no experts. No Plaintiffs deposed any of the
State's expert witnesses.

[7] The *ANJRPC/Ellman* Plaintiffs filed motions seeking to exclude the testimony of
the State's affirmative experts, and the State is contemporaneously moving to
exclude the testimony of two Plaintiffs' experts.

# **ARGUMENT**

## I. THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIMS.

Courts assessing Second Amendment claims after *Bruen* conduct a two-step inquiry. First, courts ask whether the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct," focusing on the "'normal and ordinary' meaning" of the text, and whether the weapons at issue are "'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2126–27, 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 576, 624 (2008)). If the Amendment does not cover the conduct, "the analysis can stop there; the regulated activity is categorically unprotected." *Id.* at 2126. Second, if the conduct is protected, courts must ask if the regulation still accords with "the Nation's historical tradition of firearm regulation." *Id.* at 2130. States can satisfy that burden by identifying "historical analogue[s]," *id.* at 2133, for their laws—even if an identical measure did not exist historically. And that analysis is particularly "nuanced" when the modern law "implicat[es] unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. In assessing whether an analogue is "relevantly similar" to the modern law, courts ask whether the two laws "impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Id.* at 2132-33; *see id.* at 2133 (calling these the "how and why" of the laws). Laws can be sufficiently analogous even if the modern law "is not a dead ringer for historical precursors";

that is, the State need not point to a "historical *twin*." *Id.* at 2133. *Bruen*'s analogical test thus offers neither "a regulatory straightjacket nor a regulatory blank check." *Id.*

Under either step, New Jersey's laws are valid. Plaintiffs cannot meet their threshold burden of showing that their proposed conduct—to possess and carry assault weapons and magazines capable of holding more than 10 bullets—is protected by the Second Amendment, for two independent reasons. First, neither LCMs nor assault weapons enjoy Second Amendment protection because LCMs are not "arms" and because neither are commonly used for self-defense. Moreover, even if the Second Amendment right is implicated, the challenged laws are relevantly similar to historical restrictions on firearms that were particularly dangerous or susceptible to disproportionate criminal misuse, especially considering the dramatic technological and social changes that bear on the historical inquiry.

## A. Plaintiffs Cannot Show That Possessing LCMs Or Assault Weapons Is Protected By The Second Amendment.

The Second Amendment protects "only" "arms" that are "'in common use' for self-defense today." *Bruen*, 142 S. Ct. at 2132, 2143. Plaintiffs cannot show their desired conduct is protected by the Second Amendment: they can neither show that LCMs are "arms" at all under the Amendment's plain text, nor that LCMs or assault weapons are in common use for self-defense, both predicates for Second Amendment protection. Because the regulated conduct falls outside the scope of the right, the analysis "stop[s] there." *Id.* at 2126.

1.    *Large-Capacity Magazines Are Not "Arms."*

To determine whether "the Second Amendment's plain text covers an individual's conduct," courts must "focus on the 'normal and ordinary' meaning of the Second Amendment's language" in its historical context. *Id.* at 2126-27 (quoting *Heller*, 554 U.S. at 576-77). Although technology has changed, "the Second Amendment's definition of 'arms' is fixed according to its historical understanding." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582). The undisputed record evidence establishes the word "arms" was not historically understood to include ammunition containers like LCMs. Plaintiffs' contrary arguments fail.

The unrebutted expert testimony of linguist Dennis Baron, Ph.D., is that the word "arms" was understood in the 18th and 19th Centuries to encompass weapons like firearms but *not* to encompass accessories like ammunition containers. Professor Baron analyzed both historical dictionaries and databases containing historical texts during the Founding through the Reconstruction eras to glean the "original public meaning" of terms like "arm," "accoutrement," and "magazine." *See* Ex. 6, Rpt. of Professor Dennis Baron ¶¶ 2, 9-20 (describing methodology); *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91, 95 & n.1 (3d Cir. 2019) (approving of this method, known as corpus linguistics, to interpret legal texts). And his analysis of the historical textual evidence demonstrates that in both the Founding and Reconstruction eras, the terms "arms" and "accoutrements"

described "separate categories of military gear" or equipment. Baron Rpt. ¶ 37; *id.* ¶¶ 2(a), 28, 32, 51. "'Arms' as a stand-alone term refers to weapons," *id.* ¶ 29, while "'accoutrements' generally refers not to weapons, but to other accessories worn or carried by soldiers." *Id.* ¶ 25. In particular, "cartridge boxes" and other "ammunition containers" were "typically categorized as 'accoutrements,' not 'arms.'" *Id.* ¶ 2(b); *id.* ¶¶ 26-27, 30-32, 71. That makes sense: up until the mid-1800s, "bullets were kept in 'cartridge boxes,'" variously called "cartouch boxes," "cartridge cases," or "pouches," *id.* ¶ 71, which were among the "items worn with a soldier's uniform." *Id.* ¶ 30.

The evidence shows not only that "arms" excluded accoutrements like cartridge boxes, but also that cartridge boxes are "the historical analog to magazines." *Id.* ¶¶ 30, 32. Contemporaneous newspaper articles show that the term cartridge box referred to "ammunition containers," whether worn on the person or used to feed ammunition into a weapon. *Id.* ¶¶ 3, 31. The term "magazine" emerged as a term similarly referring to "a bullet storage container" as early as the 1860s. *Id.* ¶ 22. Indeed, "magazine" began "replacing the earlier terms 'cartridge box' [and] 'cartridge case'" in everyday usage at around that time. *Id.* ¶ 68. By contrast, "there is virtually no lexical data" showing "that 'arms' includes ... 'magazines.'" *Id.* ¶ 74.

As such, LCMs fall outside the textual ambit of the Second Amendment, which only

protects the right to bear "arms," not "accoutrements."[8]

Other courts have already recognized the import of this linguistic, historical

analysis. As multiple courts have explained after examining substantially the same

historical evidence, Plaintiffs "failed to meet their burden of establishing that LCMs

are 'Arms' within the textual meaning of the Second Amendment." *Ocean State*

*Tactical*, 646 F. Supp. 3d at 388, *appeal pending*, No. 23-1072 (1st Cir.); *Kotek*,

2023 WL 4541027, at *26, *appeal pending*, No. 23-35479 (9th Cir.). To the contrary,

as they rightly reasoned, "The word 'Arms' was a general term for weapons such as

---

[8] Tellingly, Plaintiffs fail to even cite their own proffered experts, who have no linguistics training but attempt to rebut Professor Baron's linguistic testimony. *See* Ex. 14, Rebuttal Rpt. of Emanuel Kapelsohn at 3-7; Ex. 19, Rebuttal Rpt. of Clayton Cramer at 12-13. Their proffered lay opinions betray a lack of expert understanding, and create no genuine issue of material fact, even if they were admissible. While Kapelsohn argues that "the modern magazine is *not* the 'analog' of the Revolutionary War soldier's cartridge box," because such "cartridge box[es] did not feed cartridges into the chamber of his musket or rifle," Kapelsohn Rebuttal Rpt. at 4, he simply overlooks Professor Baron's specific analysis of evidence from 1869 that "cartridge box" *was* used to refer to "what today we would call a detachable magazine that both contains ammunition and feeds it." Baron Rpt. at 17-18. More importantly, Kapelsohn's quip is not germane to the corpus linguistics inquiry at all. Plaintiffs' arguments relate to the *functional* equivalency of cartridge boxes and magazines, not those items' *linguistic* equivalency. After all, no record evidence disputes that the term "cartridge box[es]" referred to containers that "store[d] ammunition." Cramer Rebuttal Rpt. at 13. Nor does any record evidence dispute Professor Baron's testimony that the term "magazine" was referred to as a "bullet storage container" as early as 1868. Baron Rpt. ¶ 22 (quoting the Oxford English Dictionary). There is thus no genuine dispute that cartridge boxes share the same *linguistic* meaning as magazines: "device[s] that hold[] cartridges or ammunition." *ANJRPC I*, 910 F.3d at 116 (citing "Magazine," Merriam-Webster Dictionary).

swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or 'parts' of weapons such as the trigger, or a cartridge box. [By contrast,] in the 18th Century, bullets were kept in cartridge boxes or cases, called 'accoutrements,' and the word 'magazine,' which was used at that time to mean 'storehouse' did not come to mean a compartment holding ammunition until the late 19th Century." *Ocean State Tactical*, 646 F. Supp. 3d at 387-88. This Court need not break any new ground; it should simply hold the same.

Plaintiffs present no contrary evidence as to the original public meaning of "arms," and instead wrongly assert that magazines are "integral to the functionality" of semiautomatic firearms, and thus presumptively protected. ANJRPC Br. 21. The central problem is that Plaintiffs are conflating *bullets* with magazines. All agree that because they are necessary for the operation of firearms (the subject of the Second Amendment's guarantee), bullets fall within the ambit of the Second Amendment. *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) (stating that the scope of the right to keep and bear arms implicitly protects "those closely related acts necessary to [its] exercise," including "obtain[ing] the bullets necessary to use them"). Yet there is no record evidence similarly suggesting that any particular form of bullet container—an LCM—is somehow necessary for a firearm to operate.

Rather, the undisputed expert evidence establishes that, generally speaking, "any firearm designed to accept a detachable magazine holding more than 10 rounds

will also accept a magazine with a maximum capacity" of fewer than 10 rounds. Ex.

11, Rpt. of James E. Yurgealitis ¶ 145. Thus, an AR-15 type rifle "will function as

designed whether the operator utilizes a magazine limited to 10 rounds or one of

greater capacity." *Id.*; *see also id.* ¶¶ 103-09 (noting mass market in firearms that

come standard with 10-round magazine). In other words, a magazine's *capacity* "is

not a determinant of firearm operability." *Id.* ¶ 145. As another court put it in

rejecting this functionality argument, "[w]ithout *bullets*, a firearm would be useless.

But a firearm can fire bullets without a detachable magazine, and in any event, a

firearm does not need a magazine containing more than ten rounds to be useful."

*Ocean State Tactical*, 646 F. Supp. 3d at 386. That *bullets* are necessary for a firearm

to function thus says nothing about whether *LCMs* are "arms."

The Third Circuit's pre-*Bruen* opinion does not compel a different conclusion.

*See ANJRPC I*, 910 F.3d at 116. Because the parties in that 2018 appeal did not

litigate whether LCMs are "arms" as historically understood, the Third Circuit said

only that "[b]ecause magazines feed ammunition into certain guns, and ammunition

is necessary for such a gun to function as intended, magazines are 'arms' within the

meaning of the Second Amendment." *Id.* Given the law as it stood then, *ANJRPC I*

did not conduct the historically-driven textual analysis of "arms" the Supreme Court

now requires, *Bruen*, 142 S. Ct. at 2127, or consider any of the historical evidence

the State has compiled on that score. *Supra* at 16-18. *ANJRPC I*'s rationale regarding

"arms" was thus abrogated by *Bruen*. *See United States v. Stevens*, 70 F.4th 653, 657-60 (3d Cir. 2023) (explaining panel's "analysis and holding" is "abrogated by intervening" Supreme Court precedent that "undermined" the panel's "rationale"); *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) (confirming "*Bruen* abrogated [the Circuit's] Second Amendment jurisprudence"). Indeed, the Third Circuit's 2020 opinion holding that it was bound by *ANJRPC I* on this very Second Amendment challenge was itself "vacated" and remanded by the Supreme Court for reconsideration in light of *Bruen*, 142 S. Ct. 2894, underscoring that *ANJRPC I* is no longer good law on issues relating to the Second Amendment's scope.

In any event, *ANJRPC I*'s rationale does not support Plaintiffs' functionality point. The opinion stated that "*ammunition* is necessary for such a gun to function as intended." 910 F.3d at 116 (emphasis added). "Magazines," meanwhile, merely "feed ammunition into certain guns." *Id.* And as laid out above, there is no genuine dispute that even for firearms designed to use detachable magazines, a magazine *holding more than 10 rounds* is not "necessary" for the gun to function as intended—such weapons would function perfectly well with a smaller magazine. *Supra* at 19-20; Yurgealitis Rpt. ¶ 145. That magazines *generally* "feed ammunition into certain guns" is thus nonresponsive to the State's specific, uncontroverted evidence showing that *LCMs* are unnecessary to a firearm's operability. That helps explain why bullets generally fall within the Second Amendment's ambit, but LCMs do not.

2.    *Neither LCMs Nor Assault Weapons Are In Common Use For Self Defense.*

Even if this Court considers LCMs "Arms," Plaintiffs' claims still fail at the threshold step because the Second Amendment only protects "Arms" that are "'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627). That makes sense: *Bruen* explained that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128. To the contrary, because "individual self-defense" is "'the *central component*' of the Second Amendment right," *id.* at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)), the sole "Arms" protected by the Second Amendment right are those "that facilitate armed self-defense," *id.* at 2132. Certain firearms are thus excluded; as *Heller* stated expressly, "weapons that are most useful in military service—M-16 rifles and the like—may be banned." 554 U.S. at 627; *id.* at 624-25 (same). And here, the record is undisputed that the LCMs and assault weapons at issue are not commonly used for self-defense. This Court should join a host of others rejecting Plaintiffs' claims on this basis. *See, e.g.*, *Kotek*, 2023 WL 4541027, at *26-33; *Hanson*, 2023 WL 3019777, at *7-12; *Ocean State Tactical*, 646 F. Supp. 3d at 388–90; *Lamont*, 2023 WL 4975979, at *19-26.

a.    LCMs And Assault Weapons Are Rarely Used For Self-Defense.

Abundant record evidence shows that LCMs and assault weapons are rarely used for self-defense. That evidence—results of statistical analysis of data from

22

multiple sources—is entirely undisputed by Plaintiffs, who present no competent evidence that law-abiding citizens *commonly* employ assault weapons or fire more than 10 bullets in acts of self-defense.

The undisputed record evidence shows that civilians acting in self-defense rarely use more than 10 shots, much less from one magazine. The State's statistical expert Lucy Allen, an economist, analyzed real-life armed self-defense incidents in two independent analyses, whose results were markedly similar. The first analysis was based on incidents recorded in the NRA Armed Citizen database. Of the 736 incidents of self-defense from January 2011 to May 2017 recorded in the database, there are *two* cases (or 0.3%) in which a person using a gun in self-defense fired more than 10 bullets. Ex. 7, Rpt. of Lucy P. Allen ¶¶ 9, 10. And the underlying reporting of those two incidents did not indicate the defenders needed to fire more than 10 shots to defend themselves. *Id.* ¶ 6, n.2. Indeed, in the vast majority of incidents—587 (or 79.8%)—the defender fired 1 to 5 bullets; and in 134 (or 18.2%), the defender fired no shots at all. *Id.* ¶¶ 9-10. Overall, defenders fired an average of 2.2 shots. *Id.*

Her two other database analyses found the same. The second database analysis was also performed on a sample of published news stories in a large aggregative archive, evaluating instances of persons using a gun in self-defense and how many rounds they fired. *See id.* ¶ 5. Of the 200 randomly sampled news stories "describing

incidents of self-defense with a firearm in the home" from the same period of January 2011 to May 2017, *id.* ¶ 13, there "were *no incidents* where the defender was reported to have fired more than 10 bullets." *Id.* ¶ 17 (emphasis added). The results showed that "[i]n 97.3% of incidents the defender fired five or fewer shots," and in 11.6% of incidents fired no shots at all. *Id.* Thus, in the "almost 1,000 incidents of self-defense" culled from both datasets, "in only 0.2% of reported incidents of self-defense with a firearm were more than 10 rounds used." *Id.* ¶ 18.[9] And the third analysis—a study of the NRA database from 1997 to 2001—also yielded a 2.2-shot average. *Id.* ¶ 9, n.14; Yurgealitis Rpt. ¶ 147. And there is a good reason why: self-defense scenarios "are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire." Yurgealitis Rpt. ¶ 137.

---

[9] In its 2018 preliminary-injunction decision, this Court observed that both Allen and Plaintiffs' expert Gary Kleck were credible, but "failed to clearly convey the effect this law will have on reducing mass shootings in New Jersey or the extent to which the law will impede gun owners from defending themselves." *ANJRPC I*, 2018 WL 4688345, at *5, 8. While those determinations—made before *Bruen* abrogated the two-step means-end approach previously employed by courts—are no longer binding, Allen's instant expert report is different in several respects. First, Allen has updated her analysis, including analysis to confirm the reliability of her methodology as to the NRA Armed Citizen and Factiva study approaches. Allen Rpt. ¶¶ 9, 12 (finding Factiva search terms yielded 90% overlap of results as NRA database and finding no difference in results in remaining 10%, and addressing selection bias). Second, Allen conducted additional analyses on new databases for defensive gun use with handguns versus rifles and for mass shooting data. *Id.* ¶¶ 19-28. Notably, her findings on the latter are consistent with other published studies. *Id.* ¶ 35. Importantly, these findings are undisputed by Plaintiffs.

There is no genuine dispute that individuals acting in self-defense rarely use more than 10 shots, and in fact tend to use between 2 and 3. Plaintiffs' sole response does not create genuine disputes of material fact. They do not dispute the reliability of the data used, the methodology used, or the accuracy of the findings—nor can they, given that such findings were replicated across multiple independent analyses. *See, e.g*, Ex. 16, Kapelsohn Dep. Tr. T114:15-17 (agreeing on inability to opine on Allen's statistical results). Instead, Plaintiffs' purported expert Emanuel Kapelsohn only observes that averages are averages, and "there are some instances where the number is smaller" than the average, and "some where the number is larger." Kapelsohn Rebuttal Rpt. at 11. That truism is entirely unresponsive to the data results. As to his other argument that it is theoretically possible that newspaper accounts are inaccurate, Kapelsohn does not suggest any reasons that the hypothetical inaccuracy would tend to skew downward in reporting the number of shots fired. *Id.* at 12.

The undisputed record evidence also shows assault weapons are rarely used for self-defense.[10] Of the 2,714 defensive gun incidents from January 2019 to October 2022 recorded in the Heritage Foundation's *Defensive Gun Uses in the United States* database—a representative set of "stories of successful self-defense,"

---

[10] Plaintiffs proffer no record evidence disputing facts relating to Allen's statistical analysis of rifle use in self-defense and of assault weapon and LCM use in mass shootings and resulting differentials in fatalities and injuries.

not intended as a comprehensive dataset, Allen Rpt. ¶¶ 21, 22—a "rifle" was used in 51 incidents. *Id.* ¶ 23. That represents 2% of all recorded incidents, and 4% of incidents in which the firearm type was known. *Id.*; *id.* ¶ 24 (findings substantially the same when excluding incidents in "states that had restrictions on assault weapons in 2022"). And because "rifle" includes more than just assault weapons, this most likely reflects overcounts of instances of use of *assault weapons* for self-defense. *See id.* ¶ 22.

These data also confirm the obvious: that handguns are far and away the most commonly used firearm for self-defense, accounting for 41% of all reported cases of defensive gun use, and 90% of cases in which the firearm type was known. *Id.* ¶ 23; *accord Bruen*, 142 S. Ct. at 2143 (agreeing handguns are "the quintessential self-defense weapon." (quoting *Heller*, 554 U.S. at 629)). Indeed, a separate analysis of the FBI's active-shooter database between January 1, 2000 and December 31, 2022, by Professor Louis Klarevas—a political scientist who has published acclaimed research on gun violence epidemiology—finds similar results for self-defense incidents in response to attacks by armed perpetrators "in a populated area." Ex. 9, Rpt. of Professor Louis Klarevas ¶ 25. That revealed 17 active-shooter incidents where the firearms used by a civilian defender was known: 14 involved handguns, 1 involved a shotgun, 1 involved a bolt-action rifle, and 1 involved an assault rifle. *Id.* ¶ 26. Thus, only 5.9% (1 of 17) cases where a firearm was used for self-defense in

an active-shooter scenario involved the use of an assault weapon. *Id.* Overall, only 1 out of 456 active-shooter scenarios in the last 23 years involved a civilian intervening with an assault weapon.  *Id.*

Against these statistical analyses, Plaintiffs present only 7 anecdotal examples of defensive arm uses with an assault firearm. *See* ANJRPC Br. 27; Kapelsohn SJ Decl. ¶¶ 29-47, ECF 175-5; Ex. 13, Rpt. of Emanual Kapelsohn at 14-16. The State has moved to exclude Kapelsohn's testimony on Rule 702 and *Daubert* grounds; in any event, Mr. Kapelsohn himself admitted he had no recollection of how the examples were provided to him and that he did not "take any actions to verify" their accuracy.  Kapelsohn Dep. Tr. 132:21-133:8. But even if these anecdotal examples were admissible, they do not present a genuine issue of material fact. After all, Kapelsohn was only able to identify 7 anecdotes, but presents no evidence of the denominator. As such, Plaintiffs offer no evidence on how *commonly* assault weapons are used for self-defense, as what Kapelsohn offers is not a statistical analysis at all. *See id.* at 132:21-133:4 (acknowledging no information on how many cases or incidents in a particular time period involved the use of a semi-automatic rifle in self-defense).

Moreover, these very articles do nothing to dispute the State's evidence that LCMs are not commonly used for self-defense. Indeed, only one of the seven articles indicates that more than 10 rounds were fired, but even that article fails to indicate

whether the individual used an LCM or reloaded magazines of lower capacity—or even whether more than 10 rounds were necessary. *See* Kapelsohn Decl. ¶ 40, ECF 175-5, Ex. 3. Several of the other articles indicate that no shots were fired, *id.* ¶ 41, Ex. 4, or a single round was fired, *id.* ¶ 44, Ex. 7. Plucking individual examples from an unknown dataset provides no admissible evidence regarding how commonly assault weapons and large-capacity magazines are used in self-defense scenarios.

At bottom, the undisputed data demonstrates that instances of actual use of assault weapons or LCMs in self-defense scenarios are vanishingly rare—and such instruments are not in "common use" for self-defense. *See Kotek*, 2023 WL 4541027, at *33 (holding, based on similar expert and historical record, that challengers "have not shown that LCMs are commonly employed for self-defense"); *Hanson*, 2023 WL 3019777, at *12 (agreeing that LCMs "are not in fact commonly used for self-defense"); *Ocean State Tactical*, 646 F. Supp. 3d at 390 (same).

### b. Assault Weapons And LCMs Were Designed For Military Combat, And Are Disproportionately Used By Criminals To Perpetrate Mass Shootings.

By contrast, the undisputed record evidence shows that assault weapons and LCMs are designed for military purposes. The very characteristics that are central to their use for military combat also make them the preferred instruments for perpetrating mass murders, not lawful self-defense.

The undisputed record evidence demonstrates that assault weapons and LCMs were designed for military use, not civilian self-defense. The assault weapons in circulation today derive from, and "are near identical copies" of, weapons developed for use by military forces in the post-World War II era. Ex. _, Rpt. of James Yurgealitis ¶ 112; *id.* ¶¶ 52-58, 64-65, 158 (tracing lineage of AR-type and other commercially available assault weapons to arms developed in conjunction with U.S. military). The AR-15 specifically was originally designed and developed in the 1950s to meet U.S. Army specifications. *Id.* ¶¶ 54-56. After U.S. Army testing in South Vietnam demonstrated its "suitability" for use against Viet Cong combatants—who suffered "catastrophic injuries ... including severing of limbs and decapitation" when shot, *id.* ¶ 56—the AR-15 "was adopted as standard issue by the U.S. Army in the mid 1960's" and was subsequently renamed the M-16. *Id.* ¶ 57.

Indeed, modern AR-15s are functionally identical to the M-16, except lacking a pre-set automatic-fire option. *Id.* ¶¶ 72-74. They have the same "effective range, muzzle velocity and semiautomatic rate of fire." *Id.* ¶ 73. Their "basic configuration, appearance, construction and operation" remained "unchanged." *Id.* They "retained the capability to accommodate" LCMs. *Id.* And modern AR-15's internal components are "completely interchangeable" with the 1960s-era M-16s. *Id.* ¶ 74; *id.* ¶¶ 75-77. In other words, today's AR-15 type rifles are in essence functionally "identical" to the "M-16 rifles and the like" that *Heller* confirms "may be banned"

consistent with the Second Amendment. 554 U.S. at 627; *see also Lamont*, 2023 WL 4975979, at *24–26 (relying on this relationship between AR-15s and M-16s in finding that assault weapons "are more suitable for military use than civilian self-defense," and thus rejecting similar constitutional claims).

LCMs bear the same "military heritage." Yurgealitis Rpt. ¶ 91. The earliest LCMs with magazine capacity beyond 10 rounds were designed specifically for use by soldiers during World War II. *Id.* ¶¶ 73, 95-96. LCMs' basic function—conferring "the ability to fire an increased quantity of cartridges without reloading"—results in increased "lethality and effectiveness" that was "intended for military use." *Id.* ¶ 110; *see Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021) ("Evidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to a soldier[.]"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Indeed, manufacturers long marketed both LCMs and assault weapons as military weaponry intended for offensive use—the very terms "assault weapon" and "assault rifle" originated in firearm industry marketing in the 1980s. Rpt. of Robert J. Spitzer ¶ 50; *id.* ¶¶ 51 ("The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public."), 52-58; Yurgealitis Rpt. ¶¶ 85-88 (providing copies of contemporaneous advertisements depicting such firearms as semiautomatic versions of military weapons).

Unsurprisingly, the military pedigree of assault weapons and LCMs reflects their exceptional lethality. Assault weapons are designed to inflict catastrophic injuries by firing high-velocity bullets "at battlefield ranges of up to 500 yards." Yurgealitis Rpt. ¶ 137. Given its ability to rapidly fire uninterrupted, an assault weapon is "capable of inflicting significant carnage upon civilians in a short period of time, especially in conjunction with large capacity magazines." *Id.* ¶ 5; *see also* Ex. _, Rpt. of Professor Brian DeLay ¶¶ 6, 82. Similarly, LCMs offer "the ability to fire an increased quantity of cartridges without reloading," which "increases the lethality and effectiveness of small arms in combat." Yurgealitis Rpt. ¶ 110. These features allow a single shooter to "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." Ex. _, Rpt. of Professor Randolph Roth ¶ 60; Yurgealitis Rpt. ¶ 156 (noting assault weapons can penetrate law enforcement standard-issue body armor).

As biomechanical modeling shows, bullets fired by AR-15 style rifles produce "significantly larger" cavities in human tissue than even the Thompson machine gun. Ex. _, Rpt. of Dr. Stephen W. Hargarten ¶ 26; *see id.* ¶ 28.[11] That expert, an

---

[11] Plaintiffs' purported expert only questions the comparison of experiment results from the AR-15 rifle versus the musket, but does not dispute the remaining results or Dr. Hargarten's medical opinions. *See* Kapelsohn Rebuttal Rpt. at 7-9. In any event, Kapelsohn's assertion that a larger "Brown Bess" musket was used on the *battlefield* during the American Revolution, in no way contradicts the use of a smaller musket ball in Dr. Hargarten's biomedical study, since there Kapelsohn provides no evidence that civilians would have been using the "Brown Bess" musket

emergency room physician, also testified that bullets from assault weapons "are capable of inflicting enormous damage on the human body" by causing "extreme damage to the tissue and organs of shooting victims ... leading to relatively high fatality" rates compared to lower-powered guns. *Id.* ¶¶ 13, 32; *see also id.* ¶ 34 (citing observation of trauma surgeon who treated Parkland victim that "only shreds of the organ that had been hit by a bullet from an AR-15" remained, and "nothing was left to repair"). The risks are "amplified when there are multiple bullet wounds," including a higher risk of death. *Id.* ¶ 34. Using an LCM in combination with an assault weapon thus exacerbates the risks, as it "increase[s] this destructive potential by increasing ... the number of bullets that can be fired during a given time period." *Id.* ¶ 30.

The very characteristics that are central to these instruments' use for military combat helps to explain why they are preferred instruments for perpetrating mass murders. Not only is the prevalence of mass shootings increasing overall; perpetrators of particularly deadly mass shootings are also increasingly choosing LCMs and assault weapons to inflict carnage. *See* Allen Rpt. ¶¶ 39, 40 (increasing trendline in public mass shootings and public mass shootings with LCMs from 1982

---

ball to defend themselves in the 18th and 19th Centuries. Moreover, as the State explains in its concurrent motion to exclude expert testimony, Mr. Kapelsohn is in no way qualified to render expert opinions about the kinetic energy release of an experiment he did not even conduct.

to 2001); Klarevas Rpt. ¶¶ 12-13 (increased incidence of mass shootings and increased percentage of high-fatality mass shootings with assault weapons or LCMs from 1991 to 2022); Ex. _, Rpt. of Professor Daniel Webster ¶ 12 (citing 2017 study finding that LCMs constituted up to 57% of firearms used in mass shootings and 41% of firearms used to murder police). From 1982 to 2022, LCMs were used to perpetrate 63% of mass shootings with 4 or more victim fatalities; assault weapons were used to perpetrate 24%. Allen Rpt. ¶¶ 30-31. And for high-fatality mass shootings especially (6 or more victim fatalities), between 1991 and 2022, the percentage involving assault weapons is 34%, but rose to 53% for the past 4 years. Klarevas Rpt. ¶ 13. The percentage involving LCMs is 77%, but rose to 100% for the past 4 years. *Id.*

Moreover, several studies confirm that the average number of casualties in mass shootings is higher when the perpetrator uses LCMs or assault weapons. Allen Rpt. ¶ 35; Klarevas Rpt. ¶¶ 15-16; Webster Rpt. ¶¶ 9, 11. The results are even starker when both instruments are used. Klarevas Rpt. ¶ 17 (finding use of LCMs with assault weapons in high-fatality mass shootings resulted in a 92% increase in the average death toll compared to high-fatality mass shootings involving neither); Allen Rpt. ¶¶ 32-34 (finding average number of injuries or fatalities was 40 per mass shooting with both assault weapons and LCMs versus 8 for those with neither); *see also* Webster Rpt. ¶¶ 9-13 (other studies showing assault weapons and LCMs

disproportionately account for recent mass shootings and cause a comparatively higher number of fatalities and injuries).

The undisputed record evidence shows that they are *not* in common use for self-defense, but *are* in common use for crime—in particular, mass murder. LCMs and assault weapons are far more often used in mass shootings (conservatively, 63% and 24% of mass shootings) than for armed self-defense (conservatively, 0.2% and 2% of self-defense). *See supra* at 23-26, 32-33; Klarevas Rpt. ¶ 27 ("assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings."); *see also Lamont*, 2023 WL 4975979, at *23-24 (agreeing, based on evidence, that "the use of [assault weapons and LCMs] in mass shootings demonstrates that the weapons are commonly used for reasons other than lawful self-defense."); Webster Rpt. ¶ 9 (citing the "evidence that the design features of assault weapons make them especially appealing to criminals and to those who commit mass shootings"). Because the undisputed evidence shows assault weapons and LCMs are not designed for and do not "facilitate" self-defense, they are not protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2132.[12]

---

[12] While Plaintiffs' proffered expert disputes the State's expert evidence that assault weapons can actually hamper self-defense, *compare* Yurgealitis Rpt. ¶¶ 137-42 (noting ways in which such weapons can hamper self-defense capabilities and harm bystanders and loved ones), *with* Kapelsohn Rebuttal Rpt. at 13-15 (commenting on specific firearm recommendations without support but acknowledging opinion "is not that the Court should accept my opinions rather than those of Yurgealitis"), that does not create a genuine issue of material fact. The relevant question is not whether

c.  The Relevant Test Is Common Use, Not Common Ownership.

Against this overwhelming record, Plaintiffs adduce no credible evidence that

LCMs and assault weapons are commonly used for self-defense; instead, Plaintiffs

erroneously contend that "typical[] possess[ion]" is the dispositive inquiry. ANJRPC

Br. 22; Cheeseman Br. 27 (same). But their simple circulation tally, even if Plaintiffs

could bear their evidentiary burden, is simply not the law.

As an initial matter, the test for whether a specific weapon falls within the

Second Amendment right turns on whether it is in common *use* for self-defense, not

common *ownership* or possession. As *Bruen* explains, the Second Amendment

protects "commonly *used* firearms for self-defense." 142 S. Ct. at 2138 (emphasis

added); *see id.* at 2156 (describing "right to bear commonly *used* arms in public"

(emphasis added)). It is weapons that actually "facilitate armed self-defense" that

fall within the protection of the "central component of the Second Amendment

right." *Id.* at 2132-33. Indeed, that was central to *Heller*'s reasoning why a ban on

handgun possession violated the Second Amendment. The Court emphasized that

the handgun is "the quintessential self-defense weapon." 554 U.S. at 629. And since

the "right of self-defense" is "central to the Second Amendment right," the Court

assessed the scope of the right by looking to "arms 'in common use at the time' for

---

such instruments *could* be used by a civilian in self-defense scenarios, but rather
whether they are in fact in common use for that purpose.

lawful purposes like self-defense." *Id.* at 624-25, 629. It strains credulity to find, as Plaintiffs suggest in a footnote, that when *Bruen* referred to "use" (relying on cases that did the same) it silently meant "possession." ANJRPC Br. 3 n.1.

Nothing in *Heller*, *McDonald*, or *Bruen* suggests an individual's subjective motivation for purchasing a firearm is the fulcrum of constitutional protection. Otherwise, it would be enough for Americans to *believe* that grenade launchers or automatic weapons could be helpful for self-defense, even when they are not in fact so used. *See* Yurgealitis Rpt. at 29 ¶ 88 (Colt brochure advertising AR-15, including depiction of "grenade launcher" and touting interchangeability). But subjective expectations alone do not dictate the parameters of constitutional rights. *See Kotek*, 2023 WL 4541027, at *30 (owners' "subjective intent" does not establish common use for self-defense); *Lamont*, 2023 WL 4975979, at *14 (same). After all, "[o]ur expectations … are in large part reflections of laws that translate into rules the customs and values of the past and present." *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting). *Bruen* instead rightly requires that courts analyze the actual use of the weapon for self-defense.

Moreover, relying on mere ownership figures at the time of the litigation is hopelessly circular. Indeed, that would mean the Second Amendment would permit prohibiting a weapon simply because the State banned the weapon before it ever became commercially available. But it "would be absurd to say that the reason why

a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (similar). This could be easily gamed by regulated parties as well: manufacturers would only need to "flood[] ... the market" before any restrictions could be enacted to forever insulate a weapon from restrictions. *Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. But just as any given "law's existence can't be the source of its own constitutional validity," the converse is also true: that governments did not uniformly prohibit a weapon for the initial years of commercial production cannot be the reason why it is presumptively protected by the Constitution. *Id.* n.15. And as *Kotek* observed, "the commonality of LCMs is at least partially due to choices made by firearms manufacturers and dealers rather than firearms purchasers," making the ownership figures not "reflective of an affirmative choice by consumers." 2023 WL 4541027 at *28; *see* Yurgealitis Rpt. ¶¶ 96-97, 99-100, 102-103 (describing sellers' choices to offer firearms with certain standard magazine capacities).

Indeed, Plaintiffs' proposed ownership tally test is inconsistent with *Heller,* which held that the Second Amendment does not protect machine guns because they are "not typically possessed by law-abiding citizens for lawful purposes," and found "startling" the suggestion that these are entitled to constitutional protection. 554 U.S.

at 624-25. But under Plaintiffs' ownership tally test, machine guns would be entitled to Second Amendment protection, since there are roughly "176,000 legal civilian-owned machine guns in the United States." *DSSA*, 2023 WL 2655150, at *5, *appeal pending*, No. 23-1633 (3d Cir.); *see* Vannella Decl. Ex. _ (February 2016 ATF document indicating 175,977 machine guns acquired before 1986 are registered in the National Firearms Registration Transfer Record System). That, of course, defies *Heller*'s command, and confirms that Plaintiffs' test is not the Court's.

Plaintiffs appear to recognize the problem with their argument, *see* ANJRPC Br. at 24 (acknowledging that a common-ownership test would mean "New Jersey could simply ban any brand new firearm merely because no one owns it yet"), but their attempt to circumvent it gets them no further. Plaintiffs argue that because New Jersey bans particularized *features* of firearms that make them assault weapons (and likewise regulates the magazine-capacity feature), so long as a feature is in common possession, that is enough to come under the Second Amendment's protection. But that runs into the same problems: if firearms with a certain feature—*e.g.*, automatic fire—were immediately prohibited when introduced, then under Plaintiffs' view, they would also fall outside the scope of the Second Amendment. Conversely, if automatic-fire is not banned as a feature all-but immediately, and weapons with that characteristic circulated in society in sufficient quantities, under Plaintiffs' logic,

governments could never ban automatic weapons. *See also, e.g.*, Yurgealitis Rpt. ¶¶ 85-88 (early advertisements for grenade launcher capability for AR-15).

But even if this Court adopts Plaintiffs' common-ownership test—despite the contrary precedent—Plaintiffs cannot point to any competent record evidence that assault weapons (or their features) and LCMs *are* commonly owned by civilians for self-defense. Plaintiffs rely almost exclusively on outside-the-record unpublished survey data not authenticated by any sworn declarant. *See* ANJRPC Br. 22, 25-26; Cheeseman Br. 28 (citing William English, "2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned" (May 13, 2022)). That is inadmissible double hearsay, which may not be considered. *See Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999); *In re Engers v. AT&T*, No. 98-cv-3660, 2005 WL 6460846, at *2 (D.N.J. Sept. 9, 2005) (survey results inadmissible hearsay). Since no declarant swore to its accuracy, it "is incompetent summary judgment evidence." *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 316 (3d Cir. 2019). It is also inadmissible for its unreliability, as expert witnesses on *both sides* have criticized its methodology. Klarevas Rpt. ¶ 29 n.31 (noting violation of Code of Professional Ethics and Practices of the American Association for Public Opinion Research); Dep. of Gary D. Kleck, *Kotek*, No. 22-cv-1815 (D. Or.), ECF 175-7 at 12-13 (plaintiff expert stating he "would not rely" on it "for any purpose").

Admissibility aside, Plaintiffs' evidence does not even support their theory. Bare aggregate sales and circulation figures do not show anything about how many of the weapons are specifically owned *for self-defense* (as opposed to those sold to law enforcement or to straw buyers, or owned for hunting, target practice, and/or as collector's items). *E.g.*, ANJRPC Br. 22-23, 26; Cheeseman Br. 28. Indeed, the NSSF "Commonly Owned" and "Firearm Production" reports, ANJRPC Br. 22, 26, are not civilian common-ownership figures, as they appear to include sales to law enforcement, firearm retailers, "and possibly prohibited possessors" as well as straw buyers. *See* Klarevas Rpt. ¶ 14. Similarly, assault-weapons sales totals alone do nothing to prove they are commonly owned (as opposed to being "concentrated in the hands of" a relative few, Klarevas Rpt. ¶ 29)—let alone that they are commonly used for self-defense, *see* Allen Rpt. ¶¶ 21-24 (assault weapons accounted for 2% of instances of a firearm being used in self-defense). In other words, even accepting Plaintiffs' premise, they have adduced no record evidence that assault weapons and LCMs are commonly owned for self-defense purposes.[13] That means the State is

---

[13] Plaintiffs' citation to *Staples v. United States*, 511 U.S. 600, 632 (1994), is inapposite, as *Staples* says nothing about whether assault weapons are indeed in common use for self-defense. The *Staples* Court answered the very narrow criminal law question of the requisite level of *mens rea* required for conviction under the federal prohibition on ownership of a machine gun, and "emphasize[d] that our holding is a narrow one." At best, it observes that AR-15s are legally available in some states, an obvious fact that does not bear on whether they are commonly used for self-defense without running into the problem of circularity described above.

entitled to summary judgment; but at a minimum, Plaintiffs are not entitled to summary judgment, as any evidence they present on this score is disputed.[14]

### B. The Challenged Laws Are Consistent With The Nation's Tradition Of Restricting Firearms That Were Particularly Dangerous Or Susceptible To Disproportionate Criminal Misuse.

Even if this Court believes that New Jersey's assault weapons and LCM laws trigger further Second Amendment scrutiny under the first *Bruen* step, it should still enter judgment for the State under *Bruen*'s second step because the challenged laws are relevantly similar to historic firearm regulations. *See Bruen*, 142 S. Ct. at 2129-30 (holding that even if "the Second Amendment's plain text covers an individual's conduct," a challenged statute remains constitutional where it is "consistent with the Nation's historical tradition of firearm regulation").

### 1. Bruen *Requires Engaging In Nuanced Analogical Reasoning.*

The initial question this Court must confront is how to determine whether the modern laws at issue are "consistent with the Nation's historical tradition of firearm

---

[14] This Court's common-use analysis at the preliminary injunction stage, 2018 WL 4688345, at *10, should not be treated as law of the case. First, decisions on preliminary injunction motions about the *likelihood* of success are not law-of-the-case. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Second, *Bruen* has since clarified that the proper inquiry is whether the arm is in "common use today for self-defense," 142 S. Ct. at 2134, binding guidance this Court did not have in 2018. Moreover, the analysis this Court previously engaged in was a feature of the means-end scrutiny *Bruen* abrogated, and thus it should assess common-use anew under the proper inquiry as articulated by *Bruen*, on the record compiled by the parties.

regulation." *Id. Bruen* provides the answer: "analogical reasoning." *Id.* at 2131-33. In other words, even if the modern statute itself was unfamiliar to the Founding and Reconstruction generations, the State may show that a statute aligns with this Nation's history by "identify[ing] a well-established and representative historical *analogue*" – rather than a "historical *twin*" – supporting the restriction. *Id.* at 2133; *see id.* (confirming that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster"). In reviewing the historical and expert record, courts will consider "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by evaluating "whether the two regulations are relevantly similar." *Id.* at 2132 (citation omitted). And while *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it provided "at least two metrics" for courts to use: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Said another way, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (citation omitted).

*Bruen* also made clear that certain cases would require especially "nuanced" analogical reasoning. *Id.* at 2132. As *Bruen* noted, the "regulatory challenges posed

by firearms today are not always the same as those that preoccupied the Founders in
1791 or the Reconstruction generation in 1868," and therefore courts should apply
the historical understanding of the Second and Fourteenth Amendments "to
circumstances beyond those the Founders specifically anticipated." *Id.* To that end,
*Bruen* emphasized that if modern laws "implicat[e] unprecedented societal concerns
or dramatic technological changes," courts may need to apply "a more nuanced
approach" when evaluating historic analogues. *Id.* And, notably, the Court identified
the development of new firearms as appropriate for this nuanced, analogical
analysis. *See id.* (explaining that the Court has "already recognized in *Heller* at least
one way in which the Second Amendment's historically fixed meaning applies to
new circumstances: Its reference to 'arms' does not apply 'only [to] those arms in
existence in the 18th century'") (quoting *Heller*, 554 U.S. at 582). In other words,
even if a particular firearm—and thus a particular firearm restriction—did not exist
at the time the States ratified the Second and Fourteenth Amendments, that is not
dispositive in either direction. *Id.* at 2133 (agreeing that "analogical reasoning under
the Second Amendment is neither a regulatory straightjacket nor a regulatory blank
check"). To the contrary, this Court must consider what restrictions on arms *did* exist
historically, and then ask whether the principles that underlie them are relevantly
similar to the modern law. *See generally id.* at 2162 (Kavanaugh, J., concurring)

(emphasizing that, under analogical reasoning, "the Second Amendment allows a 'variety' of gun regulations") (quoting *Heller*, 554 U.S. at 636).

This is precisely the sort of modern suit that calls for "nuanced" "analogical" reasoning for two reasons: it implicates both "dramatic technological changes" and "unprecedented societal concerns." This brief addresses each in turn.

*First*, this action implicates "dramatic technological changes." *See id.* at 2132 (citing development of new arms as classic modern change). The most commonly-owned firearms during the colonial era—such as "single-shot" muskets and fowling pieces—"had significant limitations" that prevented widespread use in "murder" or mass shooting events. Rpt. of Randolph Roth ¶¶ 18-19; *see also* Spitzer Rpt. ¶¶ 30, 40; Delay Rpt. ¶¶ 34, 37; Ex. 3, Rpt. of Professor Saul Cornell at 24. Among other things, these single-shot weapons "had to be reloaded manually" after every single shot—a "time-consuming process" ("at least half a minute") that "required skill and experience." Roth Rpt. ¶ 19. This significantly reduced the risk that these firearms could harm or kill multiple persons in a single episode, and also increased opportunities for officers or bystanders to stop any would-be murderer. *See* Rpt. of Brian DeLay ¶ 61 (adding that the process of re-loading colonial-era firearms necessitated rising up from a prone position, "ma[king] one an easier target during combat"). Nor was this the only technological defect: in addition to manual reloading after each shot, these arms "were liable to misfire," Roth Rpt. ¶ 19;

notoriously "inaccurate at range," DeLay Rpt. ¶ 37; and sometimes even carried a risk of explosion, *id.* ¶¶ 14-15; *see also, e.g.*, Roth Rpt. ¶ 19 (explaining that once muzzle-loading guns "were fired (or misfired)," these firearms "lost their advantage: they could only be used as clubs in hand-to-hand combat"). For all these reasons, "repeat-fire was difficult to achieve." DeLay Rpt. ¶ 61. The limits on the technology thus limited the lethality an individual could achieve with a gun.

That state of affairs held true throughout the antebellum period. Indeed, as the historical record establishes, "single shot guns were the ubiquitous firearm until after the Civil War." Spitzer Rpt. ¶ 40; *see* DeLay Rpt. ¶ 51 (same). That is, repeating (i.e., "multi-shot") firearms were a rarity until the late 1800s. *See, e.g.*, Spitzer Rpt. ¶ 30; DeLay Rpt. ¶¶ 8, 14, 33-34. And when such firearms did become available, they shared many of the same limitations as the colonial-era guns. *See, e.g.*, Spitzer Rpt. ¶ 30; DeLay Rpt. ¶¶ 8, 14, 33-34. Early repeater weapons were slow to reload, unreliable, prone to misfiring, and dangerous to the user. *See* DeLay Rpt. ¶¶ 14-16, 59; Spitzer Rpt. ¶ 30. Guns that relied on superposed loading "were painfully slow to load" and liable to "explode like a tubular grenade in the shooter's hands." DeLay Rpt. ¶ 15. Given those limitations, it is not surprising that no repeating firearm achieved military or commercial significance before the nineteenth Century. DeLay Rpt. ¶¶ 8, 14. Indeed, of the repeating firearms found in eighteenth- to mid-nineteenth-Century America discussed in the report of Plaintiffs' expert Ashley

Hlebinsky, none were produced for commercial sale.  *See* Spitzer Rpt. ¶¶ 31-37; DeLay Rpt. ¶¶ 16, 20-24, 52-53 (describing repeaters designed and/or advertised by Puckle, Belton, Jennings, Miller, Pim, Chambers, Cookson, and the Volcanic Repeating Arms Company). By and large, they were rare, experimental and flawed curiosities. DeLay Rpt. ¶¶ 5, 8, 13, 51. Air guns had their own "major drawbacks"— the Girandoni air rifle called for *1,500 hand strokes* to prime, and thus "proved to be impractical … for civilian use." Spitzer Rpt. ¶ 36; *see* DeLay Rpt. ¶¶ 31-32.

The "*vast* majority" of nineteenth-century revolvers and pepperboxes also had limited capacity (seven or fewer rounds) and were slow to load (at least one minute). DeLay Rpt. ¶¶ 58-60; *see* Spitzer Rpt. ¶¶ 37-39. The Colt revolver did not proliferate until after the Civil War, and was designed as only a six-shot weapon. *See* Spitzer Rpt. ¶¶ 39-41, 44. And the few firearms that had larger capacities were almost entirely fixed-magazine, lever-action rifles (*i.e.*, the shooter had to work a lever forward and back between shots to eject each spent casing and chamber a new round) which required manual reloading once the magazine was spent. *See* Spitzer Rpt. ¶¶ 41-42; DeLay Rpt. ¶¶ 63, 69, 75.Those larger capacity rifles were mostly purchased by the military or exported abroad during the years surrounding the adoption of the Fourteenth Amendment, making up less than 0.02% of all firearms in the United States by 1872.  DeLay Rpt. ¶ 65; Correction to Rebuttal Expert Rpt. of Brian DeLay ¶¶ 1-2. In short, while a number of experimental multi-shot guns existed in the 1800s

and may have been sampled by military forces, few were "common, ordinary, or found in general circulation." Spitzer Rpt. ¶ 30.

Even the briefest of analyses of modern firearms demonstrates the "dramatic technological change" that has transpired since. *Hanson*, 2023 WL 3019777, at *13 (finding that although "[h]igh-capacity firearms became more common in military settings in the second half of the 19th century," such weapons remained "rare" and "did not resemble the semiautomatic weapons of today"). In contrast to weapons from the 18th and 19th Centuries, automatic and semiautomatic weapons available today allow one person to inflict substantially greater lethality. *See*, *e.g.*, Roth Rpt. ¶ 58 (explaining assault rifles operate "more accurately, effectively, and sustainably as a weapon for inflicting mass casualties," especially if set on "semiautomatic"); *id.* ¶ 63 (the danger posed "is intrinsically different from past weaponry"); Spitzer Rpt. ¶ 29 (agreeing that modern guns are "a dramatically different type of firearm").

There are a number of reasons for this change. For one, these weapons afford shooters the "ability to fire rapidly"—that is, firing substantially more bullets over a short period of time. Roth Rpt. ¶ 56. Multiple modern features enable this increased rapidity. A single high-capacity magazine allows individuals to fire multiple shots without pausing to reload. Moreover, even when a shooter has to reload, the use of detachable magazines "dramatically accelerated loading"—detachable magazines allow shooters to simply "eject[] the spent magazine, insert[] a full magazine, and

resume[] firing," meaning that shooters can now "load and reload" a whole magazine "all at once, rather than round by round." DeLay Rpt. ¶¶ 79, 82. Further, historical guns required "human muscle" to position a new round in the chamber, but modern assault weapons "capture the recoil energy of a fired round in order to chamber the next round." *Id.* ¶¶ 75-76. These features and others thus give users the "ability to fire rapidly from large-capacity magazines" Roth Rpt. ¶ 56. An AR-15, for instance, can fire 45 rounds per minute, *id.* ¶ 58, and an expert can "fire an entire 30-round clip" from a semiautomatic Glock 17 handgun "in five seconds," *id.* ¶ 59; *compare* DeLay Rpt. ¶¶ 16 (noting, "an average soldier fired two or three shots a minute from a smoothbore musket"). In short, in either the 18th or mid-19th Centuries, Americans —including would-be criminals—could "hardly have conceived of" the firepower of modern handguns available on the civilian market today. *Id.* ¶ 60. *See also Or. Firearms Fed'n*, 2023 WL 4541027, at *38 (concluding that "modern-day LCMs represent a dramatic technological change from the Founding and Reconstruction-era firearms based on at least two key metrics: the time and effort involved in reloading and the time involved in shooting the firearm's rounds").

Not only do these dramatic technological changes allow more bullets to be fired in rapid succession, but each individual shot can create unprecedented physical damage as well. Bullets fired by AR-15 style rifles produce "significantly larger" cavities in human tissue than muskets or even the early 20th Century Thompson

Machine gun. *See supra* at 31-32; Hargarten Rpt. ¶¶ 26-28. Their uniquely lethal nature—obliterating organs and body parts—make them far more lethal than their predecessors. *Id.* ¶¶ 32-34. Using an LCM only exacerbates those risks. *Id.* ¶ 30. And the likelihood of catastrophic injury or death is particularly high for children. *Id.* ¶ 36.

*Second*, as a result of these dramatic technological changes, the country now grapples with "unprecedented societal concerns": the spate of mass shooting events that would have been "unimaginable" to the Founders. *Bruen*, 142 S. Ct. at 2132. As explained above, the limits on early firearms technology imposed a "ceiling on the damage a single shooter could inflict on a group of people." DeLay Rpt. ¶ 69; *see also, e.g.*, Roth Rpt. ¶ 47 (adding that, during these periods, the "only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own"); DeLay Rpt. ¶ 90 (agreeing that in 1791 and 1868, if a single person's "purpose was murdering a large number of strangers in a school or a church or at a public event, nothing would have sufficed. There was no functioning firearm then in existence that would enable someone to do that."). By contrast, given the ability to rapidly fire uninterrupted with brief pauses to reload, a single individual armed with an assault weapon is "capable of inflicting significant carnage upon

civilians in a short period of time, especially in conjunction with large capacity magazines." Yurgealitis Rpt. ¶ 5; *see* Delay Rpt. ¶ 6.[15] It thus allows a single individual to both "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." Roth Rpt. ¶ 60.  And, given that rifle-caliber assault weapons can "readily penetrate" body armor issued to most law enforcement officers, these weapons pose an even greater threat to public safety by "increas[ing] the likelihood that first responders charged with stopping such a threat may be injured or killed in the performance of their duty."  Yurgealitis Rpt. ¶¶ 6, 156.

As multiple courts have held, these changes have produced "the contemporary problem of mass shootings in America today." *Hanson*, 2023 WL 3019777, at *14; *Lamont*, 2023 WL 4975979, at *29 ("[M]ass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem; the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers."); *Kotek,* 2023 WL 4541027, at *36 ("[M]ass shootings using LCMs are an unprecedented societal concern rather than a general societal problem

---

[15] The fact that a single individual has such firepower changes the very "character" of mass murder: since they need not rally a group to a common cause, lone shooters "can kill large numbers of people simply because they feel slighted at school," or for any number of purely personal reasons. Roth Rpt. ¶¶ 14, 68.

that has persisted since the eighteenth century"); *Hanson*, 2023 WL 3019777, at *14 ("LCMs implicate 'unprecedented societal concerns.'"). Consider the historical baseline: Mass murder by a lone shooter was virtually non-existent before the twentieth Century. *See* Klarevas Rpt. ¶ 19. Even group shootings pale in comparison to contemporary tragedies: in the 1770 Boston Massacre, for example, "seven soldiers opened fire on a crowd of" roughly 50 people, but managed to kill only five people and wound six. Roth Rpt. ¶ 47. Mass killings of this type were "rare" in our early history. *Id.* The proportion of both domestic (family, household, or intimate partner) and nondomestic homicides committed with guns was likewise low, at "10 to 15 percent." *Id.* ¶ 18; DeLay Rpt. ¶¶ 37 (same), 74 (noting even proliferation of slow-load large-capacity rifles in latter half of nineteenth Century "did not represent a fundamental change in how a single armed individual could threaten public safety."). Indeed, "the United States did not experience a *single* mass shooting resulting in double-digit fatalities" until 1949—over 150 years after the Founding. Klarevas Rpt. ¶ 19; *see Kotek*, 2023 WL 4541027, at *36 (recognizing that "the shooting of multiple victims by a single assailant using a firearm is a recent phenomenon in American history").

Contrast that with mass shootings in the modern era. Experts have established in painstaking detail the extraordinary increase in the number of mass shootings per year, Allen Rpt. ¶¶ 39-41, including a 260% increase in number of fatalities in mass

shootings from 1991-2022 alone, Klarevas Rpt. ¶ 12, and ultimately producing "five of the top ten deadliest mass public shootings in U.S. history" in the 2010s alone, Webster Rpt. ¶ 17. *See supra* at 32-33. And the role of modern firearms is clear. All five of the recent deadliest mass shootings were "committed with an assault weapon," Webster Rpt. ¶ 17, and assault weapons and LCMs were used, respectively, in 34% and 77% of the 91 high-fatality mass shootings since 1991, *see* Klarevas Rpt. ¶ 15. *See also* Klarevas Rpt. ¶¶ 12-13; Allen Rpt. ¶¶ 30-31. In the Virginia Tech massacre in 2007, using a Glock 19 and Walther P22 equipped with multiple LCMs of up to 15-rounds, the shooter "fired 174 shots in 9 minutes, killing 33 people and wounding 17 others before taking his own life." DeLay Rpt. ¶ 60. In the 2017 Mandala Bay Hotel shooting in Las Vegas, the shooter killed 60 people and wounded more than 400 using an AR-15 and LCMs. *See* Klarevas Rpt., Ex. C at C2; Yurgealitis Rpt. ¶ 155. So too the shooter in Orlando, Florida in 2016, who killed 49 people and wounded more than 50; and Uvalde, Texas in 2022, where 21 mostly schoolchildren were killed and 17 people wounded. *Id.* And the harms such weapons can inflict help to explain why "[n]ot a single child wounded by an assault weapon bullet at Sandy Hook survived." Hargarten Rpt. ¶ 36. The unprecedented death toll tied to single shooters—using assault weapons and LCMs—has no historical precursor.

Plaintiffs' smorgasbord of responses are unavailing. Initially, Plaintiffs resist the need for analogical reasoning at all because *some* multi-shot weapons existed by the Founding. *See* ANRPC Br. 30-31. But as explained above, the historical record establishes that even if a few multi-shot weapons *existed*, they were not widespread; not for civilian use; and most importantly, faced serious technological limitations that limited the lethality any one person could cause. *See supra* at 44-47; *Hanson*, 2023 WL 3019777, *13 (rejecting identical argument on basis that multi-shot weapons were "experimental curiosities" and "exotic curios"); *Friedman*, 784 F.3d at 410 (observing assault weapons and LCMs "are more recent developments"); Dep. of Ashley Lynn Hlebinsky 104:6-105:1 (Ex. 18) (admitting to look only at existence of models, rather than prevalence—even more than a single curio—on the basis that it was allegedly "not necessarily relevant to the conclusions that [she is] making"). Nor do Plaintiffs identify a single weapon that could fire 45 rounds per minute—or a 30-round clip in five seconds—in these periods. *See* Roth Rpt. ¶ 59; *compare* DeLay Rpt. ¶ 16 (noting that "an average soldier fired two or three shots a minute from a smoothbore musket").

Plaintiffs do not get any further by arguing that modern weapons are allegedly "linear descendants" of Founding-era guns, or that the Founders knew that weapons technology would one day develop further. ANJRPC Br. 33. For one, this argument makes little sense. That the Founders knew weapons technology could develop (and

develop iteratively, building on technology already in existence) hardly proves they understood the degree of lethality such weapons could achieve, let alone shows any belief that such weapons could never be regulated no matter how lethal. For another, the Supreme Court has repeatedly recognized that the "weapons that are most useful in military service—M-16 rifles and the like," can be regulated, no matter that their technology, too, may descend "linearly" from Founding-era arms. *Heller*, 554 U.S. at 627. And Plaintiffs themselves acknowledge that states can at least ban arms not in common use (though, as explained above, they misunderstand this test), which itself recognizes that modern conditions can inform the analysis.

Finally, Plaintiffs err in resisting analogical reasoning by denying that mass shootings represent an unprecedented societal concern. Plaintiffs callously suggest that *Bruen*'s analysis need not be nuanced here because "mass murder has been a fact of life in the United States for a very long time." ANJRPC Br. 34. But as laid out above, as this record demonstrates, and as federal courts have long recognized, "[a]ctive shooting and mass shooting incidents have dramatically increased during recent years." *ANJRPC*, 910 F.3d at 110 & n.1; *see also Hanson*, 2023 WL 3019777, at *14. The famous Boston Massacre was itself significantly less lethal—even though it involved seven soldiers opening fire—than *multiple* mass shootings this decade alone, all perpetrated by individual lone shooters armed with assault weapons and/or LCMs. Roth Rpt. ¶ 47. That represents a significant and unprecedented

societal concern that allows the States to respond—consistent with our Nation's traditions.

2.  *There Is A Longstanding National Tradition Of Restricting Instruments That Were Particularly Dangerous Or Susceptible To Disproportionate Criminal Misuse.*

New Jersey's laws are part of a long historical tradition, from pre-Founding English history through the Prohibition era, that restricted dangerous weapons and accessories once they spread in society and posed a public safety threat through characteristics that made them particularly dangerous or particularly susceptible to disproportionate criminal misuse.

1. Laws that restrict assault weapons and magazine capacity are just the latest chapter within a long tradition of regulating specific weapons and accessories that pose a heightened public safety threat, while leaving open other avenues of self-defense. The historical record bears out that the Second Amendment never protected "any weapon whatsoever," and instead has always been understood to fit within "a historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626-27 (quoting William Blackstone, 4 Commentaries on the Laws of England 55, 148–149 (1769)).[16]

---

[16] Notably, the term "dangerous and unusual" employs an "archaic grammatical and rhetorical form" of hendiadys, which combine to form a single concept of "unusually dangerous," much like other legal terms like "cruel and unusual." Cornell Rpt. at 5, n.9. *Heller* itself refers to the term both disjunctively and conjunctively. *See* 554 U.S. at 623 ("dangerous or unusual weapons"); *id.* at 627 ("dangerous and unusual

English and colonial governments identified particular weapons for restriction while leaving room for other tools of self-defense. *See, e.g.*, *Bruen*, 142 S. Ct. at 2140 (noting English prohibitions on "wearing of armor" and "such weapons as the 'launcegay,' a 10- to 12-foot-long lightweight lance," which "were generally worn or carried only when one intended to engage in lawful combat or … to breach the peace" (citing 7 Rich. 2 c. 13 (1383) (Ex. 36); 20 Rich. 2 c. 1 (1396) (Ex. 37)); *id.* (noting prohibitions on "Handguns and Crossbows," "Steelets, Pocket Daggers, Pocket Dagges and Pistols"); *id.* at 2143 (citing 1686 East New Jersey law prohibiting concealed carry of "pocket pistol[s],"); 1686 N.J. Laws 289-90, ch. 9 (prohibiting "pocket pistols, skeins, stilettoes, daggers, or dirks, or other unusual or unlawful weapons") (Spitzer Rpt. at Ex. E, 54–55); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–31 (9th Cir. 2016) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (noting English prohibitions on "owning or carrying concealable (not merely concealed) weapons, such as 'little shorte handguns and little hagbutts,' and guns 'not of the lengthe of one whole Yarde or hagbutt or demyhake beinge not of the lenghe of thre quarters of a Yarde'" (citing 33 Hen. 8, c. 6, § 2 (1541–1542) (Ex. 38)). Indeed, the English Bill of Rights, "the predecessor to our Second Amendment," protected the right of the people to "'have Arms for

---

weapons"). And state high courts in the 19th century likewise understood the terms to be disjunctive. *See, e.g.*, *O'Neill v. State*, 16 Ala. 65, 67 (1849); *State v. Lanier*, 71 N.C. 288, 289 (1874); *English v. State*, 35 Tex. 473, 476 (1872).

their Defence *suitable to their Conditions*, and *as allowed by Law*.'" *Heller*, 554

U.S. at 593 (quoting 1 W. & M., ch. 2, § 7). In other words, the foundations of the

Second Amendment reflected a period in which governments regulated the types of

arms that are "suitable" for self-defense, and disallowed those that are not.

That tradition continued in America, where a range of governments enacted

laws regulating specific weapons and accessories that posed threats to public safety

because of certain dangerous features from the Founding era into the 20th Century.

As the State's experts explain, this spanned a wide range of weapons and accessories

with features that made them particularly dangerous or particularly susceptible to

disproportionate criminal misuse. *See* Roth Rpt. ¶¶ 28, 30, 32 (States "restricted the

use or ownership of certain types of weapons after it became obvious" that they

"were being used in crime by people who carried them concealed on their persons

and were thus contributing to rising crime rates," problems acute in southern and

frontier states in the 1800s); Spitzer Rpt. ¶ 78 (such restrictions were "public policy

remedies to the emergent crime problems"); Cornell Rpt. at 7 ("states singled out

weapons that posed a particular danger for regulation").

The evidence spans our Nation's history:

***Trap Guns***. A number of states identified the trap gun as a threat to public

safety. Trap guns were "devices or contraptions … [that] could be set to fire remotely

… by rigging the firearm to be fired with a string or wire which then discharged

when tripped," and often used by individuals "to defend their places of business, properties, or possessions." Spitzer Rpt. ¶¶ 79-80. However, they sometimes "wound up hurting or killing innocents." *Id.* ¶  80-81. Thus, as trap guns proliferated, more than a dozen states had anti-trap gun statutes in the 18th and early 20th Centuries. *Id.* ¶ 82 & Exs. B, F (listing evidence of such restrictions).

New Jersey was one of those states, enacting a law in 1771 that noted "a most dangerous Method of setting Guns has too much prevailed in this Province," and prohibiting "set[ting] any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance." *Id.* Ex. F at 3 (1763-1775 N.J. Laws 346, ch. 539, § 10); *see also, e.g., id.* Ex. F at 2 (1866 Minnesota law prohibiting "setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon"); 6 (1865 Utah law prohibiting "set[ting] any gun"); 7-8 (1884 Vermont law prohibiting "set[ting] a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap"); 9 (1871 Wisconsin law prohibiting "set[ting] any gun, pistol or revolver, or any other firearms").

***Gunpowder Aggregation And Storage***. 18th and 19th Century governments heavily regulated gunpowder, including its storage and aggregation in the home. Although gunpowder was essential to the operation of firearms at the time, States

heavily regulated its possession, storage, and transfer because of the risk that it posed to public safety in the event of fire or explosion. Cornell Rpt. at 30-32.

Among those regulations were storage restrictions that limited the amount of gunpowder that could be aggregated. For example, New York City in 1784 made it unlawful "to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place," and required that allotment "shall be separated into four stone jugs or tin canisters, which shall not contain more than seven pounds each." Ex. 39, 1784 Laws of N.Y. 627, ch. 28; Cornell Rpt. at 30-31. In the same period, Massachusetts prohibited anyone from "tak[ing] into any Dwelling-House, Stable, Barn, Out-house, Warehouse, Store, Shop, or other Building, within the Town of Boston, any … Fire-Arm, loaded with, or having gun-powder." Ex. 40, Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37; Cornell Rpt. at 30; *see also* Ex. 43, Laws & Ordinances Governing the City of Chicago 239 (Myers & Chandler 1866) (allowing "one pound of gunpowder or gun-cotton at one and the same time" per person and prohibiting the transfer of "gunpowder or gun-cotton, in any quantity," without prior permission from a city official).

Several states also delegated plenary authority to local governments to regulate the storage and acquisition of gunpowder. *See* Cornell Rpt. at 31 (listing laws); Ex. 41, 1821 Me. Laws 98, ch, 25, § 2. Others also enacted gunpowder inspection laws. Cornell Rpt. at 32. The regulation of particularly dangerous

instruments like gunpowder was not only commonplace, but also understood to be a valid exercise of State police power. *See Brown v. Maryland*, 25 U.S. 419, 443 (1827) (affirming States' prerogative to "direct the removal of gunpowder"), *abrogated on other grounds by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).

**Bowie Knives**. In the 1830s, the "Bowie knife," a "long-bladed and usually single-edged knife with a hand guard," became widespread in the United States. Spitzer Rpt. ¶ 61. Its distinctive features were "intended for combat" and led to the knives' proliferation. *Id.* ¶¶ 61-63. Unfortunately, the knives were "widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate." *Id.* ¶ 61.

In response, nearly every state eventually restricted Bowie (or similar long-bladed) knives in some manner, whether by prohibiting or restricting carry or sale, enhancing criminal penalties, or taxing their ownership. Spitzer Rpt. ¶¶ 61, 67-68; *see also id.* Ex. H (listing bowie knife restrictions by manner, state, and year). That included Georgia in 1837, which made it a crime to "sell, or offer to sell, or to keep, or to have about their person or elsewhere," "Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c." 1837 Ga. Acts 90 (1838); Spitzer Rpt. ¶ 67; Roth Rpt. ¶ 31. And it included Alabama, which in 1837

aimed to "suppress" Bowie knives by enacting a prohibitive financial burden, requiring that "for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars." Spitzer Rpt. Ex. E at 2-3 (Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7). Other States, such as Tennessee and Arkansas, prohibited the carry and sale of bowie knives. *See* Spitzer Rpt. Ex. E at 78 (1837-1838 Tenn. Pub. Acts 200-01, ch. 137, §§ 1, 2); Spitzer Rpt. ¶ 67 (1881 Ark. Acts 191, ch. XCVI (96) §§1-3). These restrictions were approved by contemporaneous decisions. One court, in upholding Tennessee's law, noted Bowie knives were singled out because they "are usually employed in private broils" and "are efficient only in the hands of the robber and the assassin," thus distinguishing them from protected arms. *Aymette v. State*, 21 Tenn. 154, 158 (1840); *see also State v. Reid*, 1 Ala. 612, 617 (1840) (noting law was intended "to promote personal security, and to put down lawless aggression and violence").

***Slungshots and Clubs***. Dozens of states enacted anti-slungshot laws in the 19th Century. A slungshot "is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s." Spitzer Rpt. ¶ 74. Slungshots were "widely used" in the 19th Century for criminal purposes; they were "easy to make, silent, and very effective." *Id.* That led many States to prohibit or otherwise restrict them. *Id.* ¶ 76; *see also id.*

Ex. E at 28 (Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, ch. 38 (1885) 88, § 1) (prohibiting possession, sale, or transfer of "any slung shot or metallic knuckles, or other deadl[y] weapon of like character")); 42-43 (1850 Mass. Gen. Law, ch. 194, §§ 1, 2 (prohibiting manufacture or sale)); 46 (1888 Gen. Minn. Law §§ 333, 334 (prohibiting manufacture, sale, or possession with intent to use)); 70 (1890 Okla. Sess. Laws 475, § 18 (prohibiting manufacture, sale, or carrying)). Similarly, States heavily regulated clubs and blunt objects, both understood in the 19th and early 20th Centuries to be embroiled in crime. *See* Spitzer Rpt. ¶¶ 70-71; *id.* Ex. C.

*Pistols.* In the lead-up to the Civil War, the single-shot guns prevalent in the early 1800s were displaced by pistols and revolvers. Roth Rpt. ¶¶ 33-40. These guns "contribute[d] to the later stages" of a spike in the ratio of homicides committed with firearms toward the end of the nineteenth Century, *id.* ¶¶ 39-40, due to their "lethality and the new ways in which they could be used." *Id.* ¶ 35. An unprecedented rise in "interpersonal assaults" using such firearms exacerbated the problem. *Id.* ¶ 39.[17]

That led States to respond by restricting the carry of "certain concealable weapons" at the root of the problem—in particular "the modern revolvers that had been invented in the mid- and late-nineteenth century[.]" *Id.* ¶ 40; *see* DeLay Rpt. ¶

---

[17] That knives, clubs and pistols were often treated together in one statute underscores that the animating concern was the same: these were "dangerous and inimical to public safety." Spitzer Rpt. ¶ 69 (same).

70 (similar); *see also* Spitzer Rpt. Ex. C (listing dangerous weapons restrictions by type, state, and year). States of course did not prohibit all handguns; instead, they focused on specific varieties that presented a heightened threat.

To take a few illustrative examples, Texas prohibited the "carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense" except on one's own premises or with "reasonable grounds for fearing an ["immediate and pressing"] unlawful attack on his person." Spitzer Ex. E, at 82 (1871 Tex. Laws 25, § 1); *see also* Roth Rpt. ¶ 41 & n.82 (1870 Tex. Gen. Laws 63 (prohibiting in certain places carrying of "a six-shooter, gun or pistol of any kind")); Roth Rpt. ¶ 41 & n.82. Tennessee and Arkansas also passed weapon-specific restrictions. Tennessee in 1871 banned carrying a "belt or pocket pistol, or revolver" in public, with a carve-out for certain pistols typically carried by members of the military. Roth Rpt. ¶ 42 & n.85 (1871 Tenn. Pub. Acts 81 ch. 90, § 1); *Andrews v. State*, 50 Tenn. 165, 186 (1871). That law was upheld. *See State v. Wilburn*, 66 Tenn. 57, 59-62 (1872). Arkansas likewise prohibited carry of pocket pistols, *Fife v. State*, 31 Ark. 455, 456, 462 (1876), and later legislative enactments exempted army or navy pistols, *see* Spitzer Rpt., Ex. E at 10 (1881 Ark. Acts 191, ch. XCVI (96) §§1-3). That prohibition was not challenged again. Roth Rpt. ¶ 42.

*Semiautomatic Weapons.* The early twentieth Century saw a revolutionary change: the emergence and spread of automatic and semiautomatic weapons on the commercial market. *See id.* ¶¶ 50-53; DeLay Rpt. ¶¶ 76-78, 79 (noting detachable magazines "first emerged in the 1880s" and began to be integrated into firearms "by the end of the century"). Indeed, weapons like submachine guns enabled "a single individual" to carry a "weapon[] of war" capable of firing 20-, 50- or 100-round clips or magazines "at a rate of 600 of 725 rounds per minute." Roth Rpt. ¶ 52. This meant "individuals or small groups of people" now had "the power to kill large numbers of people in a short amount of time." *Id.* ¶ 50; *see* DeLay Rpt. ¶ 82 (same). That included criminals and terrorists, who adopted these new weapons starting in the 1920s. *See* Spitzer Rpt. ¶¶ 6-15 (detailing popularity of Thompson submachine gun (Tommy gun) and Browning Automatic Rifle (BAR)); *see also* Roth Rpt. ¶¶ 53-54; DeLay Rpt. ¶ 81; Cornell Rpt. at 35.

Once these large-capacity firearms began to circulate and became associated with criminal activity, legislatures responded to "the threats these new technologies posed for public safety" by restricting their sale, possession, and manufacture.[18] Roth Rpt. ¶ 56; *see* DeLay Rpt. ¶ 82 (noting lawmakers legislated against these automatic firearms "as they had with the advent of multi-fire pistols in the nineteenth century");

---

[18] "Before the early 1920s, these fully automatic weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society." Spitzer Rpt. ¶ 8.

Spitzer Rpt. ¶¶ 8, 23 (explaining those threats were first presented in early twentieth Century). These restrictions often revealed a "widened … regulatory focus" beyond carry restrictions. Roth Rpt. ¶ 56.

Many States regulated not only automatic weapons, but also semiautomatic weapons and magazine capacity. Spitzer Rpt. ¶¶ 23-24; Roth Rpt. ¶ 56. For example, Rhode Island in 1927 prohibited the manufacture, sale, or possession of "any weapon which shoots automatically and any weapon which shoots more than twelve shots semiautomatically." Spitzer Rpt. Ex. D, at 23 (1927 R.I. Pub. Laws 256, § 1); *see also id.* ¶ 24. The District of Columbia broadly prohibited "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading." Spitzer Rpt. Ex. D at 2-3, 6 (Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 14, 47 Stat. 650, 654 (1932)). Michigan in 1927 prohibited the manufacture, sale, or possession of "any machine gun or firearm which can be fired more than sixteen times without reloading." *Id.* at 14 (1927 Mich. Pub. Acts 888-89 §3); *see People v. Brown*, 235 N.W. 245, 247 (Mich. 1931). Virginia in 1934 defined the prohibited machine gun as any "weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise

discharged without reloading." Spitzer Rpt. Ex. D at 30-31 (1934 Va. Acts 137-39 ch. 96 §§ 1-7).[19]

These provisions were widespread. The National Rifle Association endorsed the District of Columbia's law during Congressional testimony, noting its desire that such a prohibition "can then be used as a guide throughout the states of the Union." Spitzer Rpt. ¶ 16. And Congress itself passed the National Firearms Acts of 1934 and 1938, *see* Pub. L. No. 75-474, 48 Stat. 1236 (1934); Pub. L. No. 75-785, 52 Stat. 1250 (1938), which imposed a tax on the making, sale and transfer of certain automatic weapons (including machine guns), and required such weapons to be registered with the Treasury Department and for their owners to be fingerprinted and subject to background checks. Spitzer Rpt. ¶ 17. All in all, at least 23 states in the early twentieth Century enacted restrictions on magazines and ammunition capacity, *id.* ¶¶ 24-26; DeLay Rpt. ¶ 84, confirming the examples given here are "representative" analogues. *Bruen*, 142 S. Ct. at 2133.

States recognized that part of what made these automatic and semiautomatic weapons "so dangerous" was the ability to fire numerous shots without reloading. DeLay Rpt. ¶ 83; Spitzer Rpt. ¶ 22. Thus, in all, "nearly half of all states" adopted some form of "[r]egulations concerning removable magazines and magazine

---

[19] *See also, e.g.*, Spitzer Rpt. Ex. D at 13, 14-15, 20 (1927 Mass. Acts 413, 413-15, ch. 326, §§ 1-2; 1933 Minn. Laws 231, 232-33, ch. 190 §§ 1, 3; 1933 Ohio Laws 189, 189-90).

capacity" in the 20th Century. Spitzer Rpt. ¶¶ 24-26 & Ex. D. That included California, which prohibited "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges." Spitzer Rpt. Ex. D, at 1-2 (1933 Cal. Stat. 1169, 1170); *see also id.* Ex. D, at 12 (1932 La. Acts 336, 337 (prohibiting firearms "capable of automatically discharging more than eight cartridges successively without reloading")); *id.* Ex. D, at 9 (1931 Ill. Laws 452-53 §§ 1-2) (same); *id.* Ex. D, at 30 (1923 Vt. Acts and Resolves 127 § 1) (prohibiting the use in hunting of any "automatic rifle of military type with a magazine capacity of over six cartridges").

2. All told, the measures from before the Founding and continuing through the twentieth Century, and their subsequent judicial approval, reveal an established tradition of restricting weapons and accessories that were particularly dangerous or particularly susceptible to disproportionate criminal misuse. As any given weapon or accessory became widespread in society and posed a specific, heightened threat to public safety—such as bowie knives, slungshots, certain concealable pistols, and automatic and semiautomatic weapons—governments in turn regulated the features that made them so unusually dangerous. And the historical record similarly shows that when a particular weapon was configured to create a specific danger, such as the setting of trap guns, governments prohibited those, too. *See, e.g.*, *Lamont*, 2023

WL 4975979, at *33 (finding "rationale" underlying modern assault-weapons and LCM laws and historical precursors is "the same").

The evidence also shows that States retained significant leeway to choose the manner of regulation for the dangerous instrument at issue, and that variation is the natural product of federalism. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) ("In a functioning democracy, policy choices … belong to the people and their elected representatives."). Some chose to expressly prohibit the entire instrument at issue, *see supra* at 60-62 (possession bans on bowie knives and slingshots); *supra* at 63-66 (possession bans of semiautomatic weapons with expanded magazine capacity), while other States chose to prohibit only certain forms of public carry. Still others enacted restrictions, including prohibitions on sale or transfer and taxation and registration requirements, that effectively made the dangerous weapons extremely difficult to acquire. *See supra* at 61-62 (transfer prohibition and taxation regulations on bowie knives and slingshots); *supra* at 66 (taxation and registration requirements for machine guns). And some States enacted laws that target especially dangerous features of the instrument at issue, such as prohibitions on configuring firearms to operate as trap-guns, *see supra* at 58-59, setting limits on aggregate storage of gunpowder, *see supra* at 59-60, prohibiting concealed-carry of certain pistols and other weapons whose concealability made

them especially dangerous, *see supra* at 63-64, and prohibiting certain ammunition feeding devices that allow shots to be fired without reloading, *see supra* at 65-67.

The State is not aware of any contemporaneous doubt as to "the lawfulness of such prohibitions," *Bruen*, 142 S. Ct. 2133, regardless of the particular regulatory option the historical government chose. To the contrary, state high courts frequently passed on them with approval. *See, e.g.*, *Brown*, 235 N.W. at 247; *Fife*, 31 Ark. at 456; *Wilburn*, 66 Tenn. at 61; *Aymette*, 21 Tenn. at 158; *Reid*, 1 Ala. at 617. And *Bruen* nowhere suggests that historical analogues must be precisely the same type of regulation, especially if the modern problem itself did not exist in the 18th or 19th Century. *See Bruen*, 142 S. Ct at 2132 (requiring "only that the government identify a well-established and representative historical analogue, not a historical twin" and emphasizing that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach"); *supra* at 14-15.  In fact, *Heller* itself recognized that a "historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'" can "fairly support[]" restrictions "on the right to *keep* and carry arms." 554 U.S. at 626-27 (emphases added).

Instead, *Bruen* asks whether the analogues work a comparably "substantial burden" on the right to self-defense—and these do. 142 S. Ct. at 2145. The theme of the historical tradition is clear: Governments could pass restrictions that targeted specific weapons and accessories that pose particular risk, but they have to leave

other arms available for self-defense. The modern approach is the same: New Jersey's laws are not flat bans on rifles or pistols, and do not functionally prevent individuals from carrying firearms for self-defense. Indeed, individuals remain free to possess any number of different types of handguns, rifles, and shotguns. *See* Yurgealitis Rpt. ¶¶ 8-26. And an individual remains free to own as many bullets and magazines as he wishes. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1262 (U.S. App. D.C. 2011) (noting LCM prohibition "does not effectively disarm individuals or substantially affect their ability to defend themselves"); *Friedman*, 784 F.3d at 411 (same). That is in contrast to *Bruen* and *Heller*, which eliminated access to an entire class of quintessential self-defense arms: handguns. *See Bruen*, 142 S. Ct. at 2156; *Heller*, 554 U.S at 574-75.

Indeed, New Jersey's law is particularly tailored—to specific weapons and accessories that pose particular risk and that are not actually used for self-defense, *see supra* at 6-7. Given that limited scope, prohibiting their use in particular does little to burden the right to self-defense, just like the historical tradition that comes before it. *See Lamont*, 2023 WL 4975979, at *33 (relying on comparable "available sufficient avenues of carrying firearms for self-defense" in finding laws relevantly similar); *Hanson*, 2023 WL 3019777, at *15 (same analogical analysis). Applying the "nuanced approach" required by *Bruen* makes clear that these historical laws are apt analogues for New Jersey's modern and targeted restrictions on assault weapons

and magazine capacity. In short, New Jersey's laws and its historical predecessors share relevant similarities in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. 2133.

3. Plaintiffs resist the weight of historical tradition, but their efforts sound in a misapprehension of precedent and blindness to historical evidence.

*First*, Plaintiffs ask this Court to disregard historical evidence of relevantly similar regulations of weapons—notwithstanding *Bruen*'s detailed instructions on this score—by incorrectly insisting that "[t]he Supreme Court has already decided" that so long as a weapon or accessory is commonly owned, "the state may not ban them, full stop." ANJRPC Br. at 21-22; Cheeseman Br. at 20, 35 (claiming issue "has already been decided by the Supreme Court"). As an initial matter, assault weapons and large-capacity magazines are *not* commonly used for self-defense, and common ownership, even if proven, is not the test. *See supra* at 22-39. But beyond that threshold error, Plaintiffs' argument is also wrong both as a matter of precedent and history.

As to precedent, Plaintiffs' position flies in the face of the Supreme Court's plain language: although some guns are undoubtedly in common use for self-defense and are thus "presumptively protect[ed]," that is not the end of the inquiry. *Bruen*, 142 S. Ct. at 2130. Instead, a second step of historical inquiry ensues, where the government may "justify its regulation" of the weapon "by demonstrating that it is

consistent with the Nation's historical tradition of firearm regulation." *Id.* If *Bruen* had meant to say that this analysis need not be conducted for any weapons in common use, the majority would presumably have said so clearly.

And as to history, Plaintiffs' position simply has no grounding. There is no evidence that States historically believed they could only regulate firearms that were not commonly possessed. To the contrary, States believed the opposite. *State v. Huntly*, 25 N.C. 418 (1843)—a decision cited favorably by *Bruen* and *Heller*—forecloses the very argument advanced by Plaintiffs today, as it rejected the notion that "a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort." *Huntly*, 25 N.C. at 422.

Moreover, the record is replete with examples of restrictions, including flat prohibitions or effective prohibitions, on particularly dangerous weapons that *were* in common use. *See supra* at 58-65 (citing evidence that trap guns, bowie knives, slungshots, clubs, pocket pistols, and Tommy guns were in wide circulation when governments enacted restrictions). Indeed, that even included weapons often used by law-abiding citizens, such as trap guns, *see* Spitzer Rpt. ¶ 80, and pepperbox pistols, *see* Delay Rpt. ¶ 92. In fact, Plaintiffs get it backwards: the history shows that governments enact laws to address the violence and harm that results from the *proliferation* of dangerous weapons. *See supra* at 58 (noting such weapons "were

being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates" (quoting Roth Rpt. ¶ 32)); Spitzer Rpt. ¶ 78 (similar). Adopting Plaintiffs' approach would be to jettison *Bruen*'s command to look to history to understand the proper scope of the Second Amendment, and to adopt a view of the Second Amendment "that our ancestors would never have accepted." *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021).

***Second***, Plaintiffs insist that the lack of ammunition-capacity restrictions at the Founding means New Jersey cannot enact its large-capacity magazine restriction today, and that the laws that were enacted in the early 20th Century come too late. ANJRPC Br. 31-33. But *Bruen* and *Heller* nowhere stand for that proposition; instead, they direct courts to consider the totality of this Nation's history in evaluating the constitutionality of a state law. While twentieth-Century history that "'contradicts earlier evidence'" is not probative, *Range v. Att'y Gen.*, 69 F.4th 96, 104 n.8 (3d Cir. 2023) (en banc) (quoting *Bruen*, 142 S. Ct. at 2154 n.28), there is only a consistent tradition of historical regulation here.

Initially, and most obviously, there was no reason for Founding-era States to regulate ammunition capacity, since commonly-owned firearms at that time had *single-shot* capacity. *See supra* at 44-46; Roth Rpt. ¶¶ 18-19; Spitzer Rpt. ¶ 40; DeLay Rpt. ¶ 51. Indeed, revolvers with six-shot capacity did not proliferate until after the Civil War. *See supra* at 45-46; Spitzer Rpt. ¶¶ 39-41, 44. Other repeating-

action firearms were either experimental and not commonly possessed by civilians, or required manual action that made them substantially different from the firearms regulated in New Jersey today. *See supra* at 46-47; DeLay Rpt. ¶¶ 13, 47, 73-74. The absence of eighteenth- and nineteenth-Century legislative enactments addressing these weapons thus cannot disprove a historical tradition of comparable regulation, as there would have been scant reason for States to regulate those specific weapons during those eras. *See, e.g.*, Roth Rpt. ¶¶ 18-20; *id.* ¶ 26; DeLay Rpt. ¶¶ 46-49. Just as the "First Amendment does not require States to regulate for problems that do not exist," nor does the Second Amendment impose on States such a burden. *McCullen v. Coakley*, 573 U.S. 464, 481 (2014). The Constitution allows States the flexibility to "adopt laws to address the problems that confront them," consistent with the overall limits provided by the Nation's historical tradition. *Id.*

Moreover, Plaintiffs ignore the myriad evidence of weapons and ammunition-capacity restrictions enacted soon after semiautomatic weapons with ammunition-feeding magazines became widely available. *See* ANJRPC Br. at 31 (acknowledging semiautomatic pistols with detachable magazines only began retail sales in 1890s). Plaintiffs do not dispute that automatic and semiautomatic weapons technology was a major innovation, which meant "individuals or small groups of people" now had "the power to kill large numbers of people in a short amount of time." Roth Rpt. ¶ 50; *see* DeLay Rpt. ¶ 82 (same); *see supra* at 47-49. And when that precise problem

began to emerge in the early 20th Century, *see supra* at 64-65, states moved to ban these weapons and limit ammunition capacity soon thereafter.

Twentieth-Century history can be uniquely probative in cases—like here—involving emergent weapons that only came into existence at that time. *Heller* itself noted that early 20th Century restrictions on possession of machine guns—often enacted alongside the restrictions here—were presumptively constitutional. 554 U.S. at 624. And a majority of the Court in *Bruen* reaffirmed the constitutionality of those measures. *See* 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring). For good reason: the twentieth-Century history is especially probative because it "confirm[s]" the historical tradition, stretching back to the Founding, of singling out for regulation the particular features of new weapons technologies that render such weapons unusually dangerous. *Kotek*, 2023 WL 4541027, at *45; *see also Hanson*, 2023 WL 3019777, at *16 (similar).

New Jersey's restrictions on assault weapons and large-capacity magazines follow the footsteps of States confronting 18th, 19th, and early 20th-Century threats to public safety posed by weapons that were particularly dangerous or particularly susceptible to disproportionate criminal misuse. In addressing a profound problem today—spades of mass shootings by lone shooters yielding catastrophic losses of life, perpetrated by weapons designed for war—New Jersey's choice is consistent with a long tradition of relevantly similar historical regulations.

## II.    THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON ANJRPC'S TAKINGS CLAIM.

This Court should also reject the *ANJRPC* Plaintiffs' argument that the LCM restriction violates the Takings Clause, *see* Br. 35, for two independent reasons: the suit is foreclosed by binding circuit precedent and lacks merit in any event.

Initially, this claim is flatly inconsistent with binding Third Circuit precedent. In this very case, the Third Circuit considered and rejected the Takings Clause claim on the merits, *ANJRPC I*, 910 F.3d at 124-25, a holding that the Third Circuit already recognized to be law of the case, *ANJRPC II*, 974 F.3d at 245-46. As the panel held, "the compliance measures in the Act do not result in either an actual or regulatory taking." *Id.* at 124. "There is no actual taking," the panel reasoned, "because owners have the option to transfer or sell their LCMs to an individual or entity who can lawfully possess LCMs, modify their LCMs to accept fewer than ten rounds, or register those LCMs that cannot be modified." *Id.* And "[t]he Act also does not result in a regulatory taking because it does not deprive the gun owners of all economically beneficial or productive uses of their magazines": among other things, it allows them to "modify[] the magazine to hold fewer rounds of ammunition," an act that leaves the item with significant "functionality." *Id.* at 124-25.

Nothing in *Bruen*'s subsequent decision remotely undermined that holding as to the Takings Clause. *Bruen* abrogated *ANJRPC I*'s Second Amendment holding, by replacing the Third Circuit's prior Second Amendment analysis with an analysis

grounded in text, history, and analogical reasoning. But *Bruen* never considered any Takings Clause claim at all, and thus it did not disturb any part of the Third Circuit's takings analysis. *See, e.g.*, *In re Continental Airlines*, 134 F.3d 536, 539-40, 542 (3d Cir. 1998) (circuit precedent overruled in part by Supreme Court remains binding as to other issues not decided by Supreme Court). So while the State has consistently acknowledged that *Bruen* is the type of "intervening change in the law" that requires reconsideration of the Second Amendment question, *ANJRPC II*, 974 F.3d at 246, it did not change the law *ANJRPC I* applied in deciding this takings challenge. That is why other district courts have consistently continued to follow pre-*Bruen* decisions reviewing a *takings* challenge to similar restrictions on magazine capacity. *See, e.g.*, *Oregon Firearms Fed'n*, 644 F. Supp. 3d at 808 n.28 (*Bruen* left Ninth Circuit's takings holding "undisturbed"); *Ocean State Tactical*, 646 F. Supp. 3d at 398 n.42 (*Bruen* "cast no doubt" on these holdings). That is dispositive here.

Even if this Court considers the Takings Clause issue anew, New Jersey's law regulating maximum magazine capacity does not present a taking. As explained in more detail above, the challenged Act gave owners of affected magazines multiple avenues to comply: owners could just "modify a large capacity magazine to accept 10 rounds or less"; transfer or sell the magazine to anyone who can lawfully possess it (whether in or outside of New Jersey); or, only if the owner preferred, voluntarily surrender it. *See* N.J. Stat. Ann. § 2C:39-19. Moreover, the owners of firearms with

magazine capacities of more than ten rounds that were "incapable of being modified to accommodate 10 or less rounds" simply had to register them within a year, and did not need to make modifications to the items. *See id.* § 2C:39-20(a).

Although Plaintiffs primarily argue that this law is a physical taking, ANJRPC Br. 36-37, the entire paradigm of a physical taking is inapplicable: physical takings involve "direct appropriations" of property for public use, not the regulation of use or possession by the property owner. *See Horne v. Dep't of Ag.*, 576 U.S. 350, 361 (2013). Whereas cases like *Horne* involve laws that set aside certain property "for the government" to use (including to sell or transfer to another party), New Jersey's law by contrast "does not involve a taking for government use in any way." *ANJRPC I*, 910 F.3d at 124 n.32. Instead, turning an LCM over to the government is but one *voluntary* form of compliance; an owner can continue possessing a magazine with modifications, transfer or sell their LCM to someone who can lawfully possess it, or register LCMs that cannot be modified. *See* N.J. Stat. Ann. §§ 2C:39-19, -20. As the Third Circuit rightly held, those "alternatives" mean the statute "does not require" surrendering an LCM to the government. *ANJRPC I*, 910 F.3d at 124.[20]

---

[20] *Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017), is thus distinct, because the only alternatives that LCM owners had to "surrender[ing]" the magazine to law enforcement under that law were to sell an LCM to a firearms dealer or "remove" the LCM "from the state." *Id.* at 1138. Owners, in other words, lacked the options to keep their LCM (in-state) by modifying it or registering an unmodifiable arm that New Jersey offers. *Duncan*'s finding that California's law "compel[s] the physical *dispossession* of" magazines thus does not compel the same conclusion here. *Id.*

Were that not enough, there is an independent problem too: over a century of consistent cases confirm that "[a] compensable taking does not occur when the state prohibits the use of property as an exercise of its police powers rather than for public use." *Id.* at 124 n.32. As the Supreme Court explained in *Mugler v. Kansas*, 123 U.S. 623 (1887), any "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking." *Id.* at 668-69; *see also Chicago B. & Q. Railroad Co. v. Illinois*, 200 U.S. 561, 594 (1906) ("It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property and though no compensation is given."). Plaintiffs' position would "effectively compel the government to regulate by purchase," an unsupportable rule that would extend beyond the firearm context to drug regulations and more. *Andrus v. Allard*, 444 U.S. 51, 65 (1979) (noting that "[g]overnment could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law").

Nor is the law a regulatory taking. While the Takings Clause can be implicated by "regulations that compel the property owner to suffer a physical 'invasion' of his property," *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992), the restriction on LCMs is not such a law. The archetype for this type of taking—and the case on which ANJRPC primary relies, *see* Br. 37-38, is *Loretto v. Teleprompter Manhattan*

*CATV Corp.*, 458 U.S. 419 (1982), but that case is inapposite. In *Loretto*, a state law mandated owners of apartment buildings to allow cable companies to permanently attach equipment to their buildings. *Id.* at 421-22. That is distinct, as New Jersey is not "physical[ly] inva[ding]" LCM owners' property or placing them "into some form of public service." *Lucas*, 505 U.S. at 1018. Rather, New Jersey is allowing owners to "keep" their magazines and "use[]" them "in the same way" as before, with only the slight modifications needed to reduce the risk that they can be used in a mass shooting event. *ANJRPC I*, 910 F.3d at 125. That is not a taking.

## CONCLUSION

This Court should enter summary judgment for the State and deny Plaintiffs' motions (ECF 174 & 175).

Dated:  November 3, 2023                    Respectfully submitted,

                                            MATHEW J. PLATKIN
                                            ATTORNEY GENERAL OF NEW JERSEY

                                    By:     */s/ Daniel M. Vannella*
                                            Daniel M. Vannella
                                            Assistant Attorney General

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

**JA837**

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

     Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

     Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

     Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

---

## STATE DEFENDANTS' COUNTER-STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Federal Rules of Civil Procedure 56 and D.N.J. Local Rule 56.1, State Defendants submit the following Statement of Material Facts Not in Dispute.

1. New Jersey enacted its assault firearms prohibition in 1990. P.L. 1990, Ch. 32.

2. That law was enacted after a mass shooting in Stockton, California when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others at an elementary school. Decl. of Daniel Vannella Ex. 4, Rpt. of Professor Robert Spitzer ¶ 1.[1]

3. New Jersey Governor Jim Florio's bill signing statement for Public Law 1990 discussed the capacity of the prohibited firearms to cause mass destruction and pose a threat to police, citizens, and children. Vannella Decl. Ex. 42.

4. In 2018, New Jersey enacted P.L. 2018, Chapter 39, which revised the definition of an unlawful "large capacity ammunition magazine" from 15 to 10 rounds of capacity.

5. N.J. Stat. Ann. § 2C:39-1(w) regulates only a specific subset of handguns, rifles, and shotguns. Vannella Decl. Ex. 11, Rpt. of James Yurgeleatis ¶¶ 8-26.

6. N.J. Stat. Ann. § 2C:39-1(y) does not limit how many magazines an individual may possess.

---

[1] For ease of reference, the following lists frequently cited expert reports and their corresponding exhibits within the Vannella Declaration:

Ex. 3: Rpt. of Professor Saul Cornell
Ex. 4: Rpt. of Professor Robert Spitzer
Ex. 5: Rpt. of Professor Randolph Roth
Ex. 6: Rpt. of Professor Denis Baron
Ex. 7: Rpt. of Lucy Allen
Ex. 8: Rpt. of Dr. Stephen Hargarten
Ex. 9: Rpt. of Professor Louis Klarevas
Ex. 10: Rpt. of Professor Daniel Webster
Ex. 11: Rpt. of James Yurgealitis
Ex. 12: Rpt. of Professor Brian DeLay

7. Fourteen states plus the District of Columbia restrict large-capacity magazines, representing more than 115 million people, or approximately 34.5% of the U.S. population.  Spitzer Rpt. ¶¶ 2, 56.

8. Ten states plus the District of Columbia have enacted assault weapons and large-capacity magazine bans, as have various localities around the country, representing approximately 109 million people, or 32.7% of the U.S. population.  Spitzer Rpt. ¶ 2.

9. Semi-automatic rifles and pistols which are designed to function with detachable magazines will still function as intended regardless of the capacity of the magazine a user inserts into the firearm.  Numerous manufacturers sell semi-automatic pistols packaged with detachable magazines ranging in size from 7 rounds to 15 rounds.  Yurgealitis Rpt. ¶¶ 131–134.

10. "Any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity" of less than 10 rounds.  Yurgealitis Rpt. ¶ 145.  Thus an AR-15 style rifle "will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity."  Yurgealitis Rpt. ¶ 145.

11. Each of the features listed in N.J. Stat. Ann. 2C:39-1(w)(2) and the 1996 Attorney General Guidelines, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a combat scenario:

     i. A pistol grip or thumbhole stock (for rifles and shotguns);
     ii. Forward handgrip (rifles, shotguns, and pistols);
     iii. Folding/telescoping stocks (rifles and shotguns);
     iv. Flash suppressors;
     v. Grenade launchers;
     vi. Barrel shroud;
     vii. Threaded barrel;
     viii. Buffer tube, arm brace, or the like;
     ix. "Bump stocks"

Yurgealitis Rpt. ¶¶ 117–130.

## History Of Firearms Technology

12. Single-shot, muzzle-loading firearms were the ubiquitous guns from the time of America's initial settlement by Europeans until the latter part of the 19th Century.  Spitzer Rpt. ¶¶ 30, 40; Vannella Decl. Ex. 12, Rpt. of Professor Brian DeLay ¶ 34; Rpt. of Professor Saul Cornell at 24.  These were slow-loading guns that had to be loaded with gunpowder and ball before every shot, and could not be kept loaded without corroding the iron barrels.  DeLay Rpt. ¶ 37; Cornell Rpt. at 24. Moreover, the black powder used in these weapons was both corrosive and attracted moisture like a sponge. Cornell Rpt. at 18. These weapons were thus limited as practical tools for self-defense. Cornell Rpt. at 18.

13. Repeat fire was difficult to achieve with colonial-era muzzle loading firearms, and they were known to be inaccurate at range. DeLay Rpt. ¶¶ 37, 61.

14. Muzzle loading firearms could not be loaded while lying prone, such that soldiers became an easier target during combat when they rose to reload. DeLay Rpt. ¶ 61.

15. The average 18th Century soldier fired two or three shots a minute from a smoothbore musket.  DeLay Rpt. ¶ 16.

16. Multi-shot firearms were not common, ordinary, or found in general circulation during the Colonial and Founding eras.  Spitzer Rpt. ¶ 30. Repeating firearms did not pose a threat to public safety in 1791.  DeLay Rpt. ¶ 49.

17. Repeating arms were experimental, flawed curiosities at the times of the Founding and ratification of the Fourteenth Amendment, and were rare in the United States during those eras.  DeLay Rpt. ¶¶ 5, 8, 13, 51.  No repeating firearm achieved military or commercial significance before the 19th Century. DeLay Rpt. ¶¶ 8, 14.

18. 18th Century repeaters were unreliable and prone to misfiring.  DeLay Rpt. ¶ 14.

19. Early repeaters that used the superposed firing method were slow to load and could explode in the user's hands if the sequencing between rounds was off. They also produced clouds of white smoke from the gunpowder when fired. DeLay Rpt. ¶ 15.

20. The Puckle gun, an 18th Century repeater, was a military weapon, was not a self-loading or hand-held firearm, and was not manufactured for commercial sale. Spitzer Rpt. ¶¶ 31-32; DeLay Rpt. ¶ 16.

21. The 18th Century Belton repeater was neither proven feasible nor produced for distribution. It used the superposed firing method. Spitzer Rpt. ¶¶ 33-34; DeLay Rpt. ¶ 24.

22. Only a few hundred of the 19th Century Jennings multi-shot rifle were manufactured. This gun used the superposed firing method. Spitzer Rpt. ¶ 35; DeLay Rpt. ¶ 53.

23. The 18th Century Girandoni air rifle required 1500 strokes to restore power after its reservoirs were empty, making it impractical for civilian use. These air guns were complex and expensive to make and repair, and therefore were rare in 18th and early 19th Century America. Spitzer Rpt. ¶ 36; DeLay Rpt. ¶¶ 28-29, 32; Cornell Rpt. at 28. Indeed, the Austrian military, one of the few armed forces to purchase this weapon, quickly abandoned it. Cornell Rpt. at 28.

24. The repeating pistols produced by the Volcanic Repeating Arms Company in the 19th Century were few, flawed, and experimental. Spitzer Rpt. ¶ 37.

25. The guns advertised by Samuel Miller and James Pim in the early 1700s were not offered for sale, used for self-defense, or employed in combat. DeLay Rpt. ¶ 20.

26. The gun advertised by John Cookson in the early 1700s was for a single weapon. There is no evidence that Cookson continued to make or sell that firearm. DeLay Rpt. ¶ 21.

27. The Continental Congress cancelled its order for 100 of Joseph Belton's gun in the 1770s. There is no evidence that Belton ever produced that gun in quantity. DeLay Rpt. ¶ 23-24; Spitzer Rpt. ¶ 33-34.

28. The U.S. Navy purchased several hundred Chambers repeaters, which utilized the superposed load technology, but there is no evidence that the guns were put to use or produced for commercial sale. DeLay Rpt. ¶ 52.

29. The market for firearms in early America shared very few features with the contemporary world of firearms commerce. Cornell Rpt. at 22.

30. In the early 1800s, the government took an active role in encouraging the manufacture of arms, and it had a vested interest in what types of weapons would be produced. The American firearms industry, then in its infancy, was thus largely dependent on government contracts and subsidies. Cornell Rpt. at 20.

31. Early American firearms production in the era of the Second Amendment was dominated by artisan production, while local gun smiths—not big box stores like Walmart—sold most firearms. Most households, apart from the wealthiest ones, could not afford to own multiple weapons. Cornell Rpt. at 22.

32. The vast majority of the repeating pistols that entered the market in the 1830s (i.e., pepperbox pistols and revolvers) held seven or fewer rounds. Only three 19th Century revolvers had greater than ten-round capacity, and only a few hundred of those were produced. DeLay Rpt. ¶ 58.

33. Mid-19th Century repeating pistols had to be manually reloaded when empty. It could take at least one minute to complete the reloading process. DeLay Rpt. ¶ 59. This limited the damage a single shooter could inflict on a group of people. DeLay Rpt. ¶ 69.

34. The Colt revolver was designed as a six-shot weapon and did not circulate widely in society until after the Civil War. Spitzer Rpt. ¶ 41.

35. The Henry and Winchester repeating firearms were the only reliable firearms that could fire more than ten rounds in the years surrounding the ratification of the Fourteenth Amendment. DeLay Rpt. ¶ 64. Most of those weapons produced between 1861 and 1871 were purchased by the military or exported abroad. DeLay Rpt. ¶ 65; Spitzer Rpt. ¶ 42. Overall, large-capacity firearms constituted less than 0.02% of all firearms in the United States as late as 1872. Vannella Decl. Ex. 12, Correction to Rebuttal Report of Professor Brian DeLay ¶¶ 1-2.

36. The Winchester firearms in the last third of the 19th Century were fixed magazine, lever-action rifles that required the shooter to manipulate a lever in a forward-and-back motion before each shot in order to eject a spent casing and chamber a new round. When the magazine was empty, it had to be manually reloaded round by round. Spitzer Rpt. ¶ 42; DeLay Rpt. ¶¶ 69, 75.

37. Both automatic and semi-automatic weapons use energy released by the first round fired to load the next round into the firing chamber. Both are capable of firing numerous rounds without reloading, potentially with the use of

detachable ammunition magazines or similar feeding devices.  Spitzer Rpt. ¶¶ 21, 23; DeLay Rpt. ¶ 75.  Automatic arms continue to fire as long as the trigger is depressed, while semiautomatic arms require the shooter to squeeze the trigger for each round fired.  DeLay Rpt. ¶ 76.

38. Detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century.  These drastically accelerated the process to load and reload a firearm by making it possible to load an entire magazine at once, rather than bullet-by-bullet.  DeLay Rpt. ¶ 79.

39. Semi- and fully automatic firearm technology was developed in the 1880s and did not become reliable or widely available until the beginning of the 20th Century.  The primary market was the military.  Spitzer Rpt. ¶ 38; DeLay Rpt. ¶¶ 6; 76.  When this dramatic technological change provoked unprecedented social concern, it led to a wave of regulatory legislation across the country.  DeLay Rpt. ¶ 6.

40. The firearms and firearm feeding devices regulated in the early 20th Century, unlike those from previous centuries, were capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.  Spitzer Rpt. ¶ 29.

41. Early precursors to modern semi-automatic and automatic firearms were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus due to their large size and weight, such as the Gatling gun.  Because their use and suitability were limited to military settings, there was no need to regulate these weapons among the civilian population.  Spitzer Rpt. ¶ 5.

42. Fully automatic machine guns, capable of firing all of their rounds from a single barrel and with a single trigger pull, were developed during World War I.  These weapons, such as the Thompson submachine gun ("Tommy gun") and Browning Automatic Rifle ("BAR"), were developed as military weapons but were made available to civilians after the war.  It was not until the early 1920s that these hand-held, fully automatic weapons operated reliably, were available to civilians, and began to circulate in society.  Spitzer Rpt. ¶¶ 5, 6, 8; DeLay Rpt. ¶ 81.

43. After 1930, commercial sales of the Tommy gun were discontinued except to the military and law enforcement due to concerns about criminal use of the firearm.  Spitzer Rpt. ¶ 7.

## History and Development of Assault Rifles and LCMs

44. Rapid-fire semiautomatic weapons that accept magazines capable of holding more than 10 rounds, such as the AR-15, are derived from technologies developed for military use. Roth Rpt. ¶¶ 58-59.  Many of the assault weapons available for purchase by the public are near identical copies of military firearms, save for the lack of select fire capability.  Yurgealitis Rpt. ¶ 112. The only difference between the Colt-produced military and civilian versions of the AR-15 / M-16 was removal of select fire capability and relocation of assembly/ disassembly pins in the lower receiver as stated previously. Yurgealitis Rpt. ¶ 72.

45. The first "assault rifle" or "assault weapon," which arose during World War II, was the German StG 44. The features of the German StG 44 were intended, in part, to increase the effectiveness of the individual soldier by enabling more rapid fire, increasing the amount of ammunition an individual combatant could carry, and allowing more rapid re-loading. Yurgealitis Rpt. ¶¶ 40-44. These features were also utilized in the German MP40, and by the United States's M3 "Greasegun" in in World War II.  Yurgealitis Rpt. ¶¶ 64-65. Many of these features were also utilized in the design and manufacture of mid-20th Century submachine guns. Yurgealitis Rpt. ¶ 64.

46. In 1947, after the end of World War II, the USSR developed what one firearm expert and historian termed "the quintessential assault rifle – the Kalashnikov designed AK-47." The AK-47 adopted several features from the German StG 44. Yurgealitis Rpt. ¶¶ 50-51.

47. Other countries followed suit and developed military rifles that incorporated these same features to some extent. Yurgealitis Rpt. ¶ 52. In the United States, for instance, Eugene Stoner developed a number of lightweight assault rifle designs that resulted in the AR-10 (.308 caliber) with features that are now commonplace in the standard assault rifle design: light weight, separate pistol grip and shoulder stock, foregrip/barrel shroud, detachable magazine, and numerous lash hider/muzzle brake variations. Yurgealitis Rpt. ¶ 55.

48. In 1961, the United States Department of Defense purchased a quantity of AR-15 rifles, which followed the original AR-10.  The Department tested those AR-15 rifles in Vietnam and issued a report summarizing their field evaluation. Comments in that report describe "catastrophic injuries" to combatants shot by AR-15 rifles, including "severing of limbs and decapitation." Yurgealitis Rpt.

¶ 56.  By the mid 1960's, the U.S. Army adopted the AR-15 as standard issue and renamed the M-16. Yurgealitis Rpt. ¶¶ 56-57.

49. In the 1950's and 1960's, assault rifles proliferated and civilian version of these weapons were developed. These civilian versions, including the Colt AR-15, retained the performance capacities of the military weapons off which they were based, including the effective range, muzzle velocity, and semiautomatic range of fire. Their "basic configuration, appearance, construction and operation" remained "unchanged."  Yurgealitis Rpt. ¶¶ 71-73.

50. These civilian versions also retained the capability to accommodate large-capacity magazines of more than ten rounds. Yurgealitis Rpt. ¶ 73.

51. Over time, these weapons have remained largely consistent. For instance, there are multiple internal parts that are completely interchangeable between military weapons that Colt manufactured in the 1960's and an AR-15 today. Yurgealitis Rpt. ¶ 74. The same goes for internal AK operating parts and assemblies. Yurgealitis Rpt. ¶ 81.

52. The term "assault weapon" entered common use in the firearms community as early as 1986, as the below "Gun Digest Book of Assault Weapons," published that year, demonstrates:



Yurgealitis Rpt. ¶ 85.

53. The terms "assault weapon" and "assault rifle" originated in the firearms industry marketing in the 1980s.  The use of military terminology, and the

weapons' military character and appearance, were key to marketing the guns to the public.  Spitzer Rpt. ¶¶ 50-51.

54. The firearms industry has also promoted the similarities between semi-automatic versions of their full/select battle rifles for marketing purposes, as well as conversion capabilities with features like grenade launchers, as the below advertisement demonstrates:





Yurgealitis Rpt. ¶ 88.

55. In 1990, following the passage of Federal and numerous State local Assault Weapon Bans, the firearm industry began to use the moniker "Modern Sporting Rifle" to describe semi-automatic variants of the fully automatic/select fire M-16. Yurgealitis Rpt. ¶ 90.

56. The lineage and refinement of large capacity detachable magazines and belt feeding mechanisms can be traced directly to a military heritage.  Development and refinement of large capacity feeding devices for machine guns gained increased importance with the advent of World War I. Yurgealitis Rpt. ¶ 91.

57.  The ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat, which is a feature of design intended for military use.  Yurgealitis Rpt. ¶ 110.

58. After World War I, a number of advancements in arms technology and design facilitated practical semi-automatic rifles for standard issue. In World War II,

U.S. Forces where issued a rifle with eight-round internal magazine (the Springfield Armory M-1 "Garand" rifle). The United States also deployed a .30 caliber M-1 with a fifteen-round detachable box magazine that was issued to support personnel behind the front lines. Yurgealitis Rpt. ¶ 95.

59. When the AR-15 (later the M-16) was issued to U.S. Forces in the 1960's, it was issued with twenty-round detachable magazines. Yurgealitis Rpt. ¶ 96.

60. When the first semi-automatic variant became available for sale to the public in 1964, it only came with two five-round magazines. Yurgealitis Rpt. ¶ 97. This remained the case as late as 1987. Yurgealitis Rpt. ¶ 99.

61. Even as development of semi-automatic pistols continued after World War II, magazine capacities generally remained under ten rounds. Yurgealitis Rpt. ¶ 100.

62. By the late 1980's, numerous domestic and foreign manufacturers began developing and offering numerous semi-automatic models with magazine capacities equaling or exceeding fifteen rounds. Yurgealitis Rpt. ¶ 101-102.

63. In 1994 Congress adopted the Federal Assault Weapons Ban, which limited the maximum capacity of a detachable magazine to ten rounds. Numerous firearm and aftermarket magazine manufacturers, in turn, initiated production of "post ban" magazines to confirm to the new legislation. Magazines with a capacity of over ten rounds were termed "Large Capacity Magazines." Yurgealitis Rpt. ¶ 103.

64. "Post ban" magazines were modified versions of existing large-capacity magazines to keep their dimensions identical and ensure that ten-round magazines functioned identically to "large capacity magazines." Yurgealitis Rpt. ¶ 103.

65. Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation that also contained magazine-capacity limitations. In turn, many semi-automatic handgun manufacturers and rifles continued to offer "state compliant" versions to customers in affected states. Yurgealitis Rpt. ¶ 105.

66. Many aftermarket manufacturers, including Mec-Gar and ProMag, offer ten-round magazines specifically for use in handguns that come with large-capacity magazines. Yurgealitis Rpt. ¶ 109.

**Assault Weapons and LCMs' Lethality**

67. Assault firearms are not designed for traditional hunting purposes. Rather, the .223 caliber / 5.56 mm bullets fired from AR type rifles and pistols cause considerable tissue damage to their targets and are therefore counterintuitive choices for hunting. Yurgealitis Rpt. ¶ 153.

68. Assault firearms banned under New Jersey law were designed for military use, effective at battlefield ranges of up to 500 yards, and the design purpose of the .223 caliber bullet used in the AR-16 / M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet. Yurgealitis Rpt. ¶ 137.

69. The AR-15 has approximately the same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute. Delay Rpt. ¶ 58.

70. More than 45,000 individuals die each year from gun-related injuries in the United States. Rpt. of Dr. Stephen Hargarten ¶ 11. Those who survive suffer from serious complications, lifelong disabilities, and psychological trauma. Hargarten Rpt. ¶¶ 11, 36.

71. The AR-15 was designed to chamber and fire a 5.56 x 45 mm cartridge. Yurgealitis Rpt. ¶ 55. This cartridge has a muzzle velocity of approximately 3200 feet per second, which is almost three times greater than the muzzle velocity of a 9mm pistol. Yurgealitis Rpt. ¶ 58. This velocity is sufficient to penetrate the soft body armor (Level II or Level IIIA) that most officers are issued. Yurgealitis Rpt. ¶ 6.

72. Once a 5.56mm bullet connects with tissue, it will "yaw"—rotate on its axis—creating temporary and permanent large wound cavities. Handgun bullets, by contrast, because they are heavier and travel at a lower velocity, do not typically "yaw" and do not create as large a wound cavity. Yurgealitis Rpt. ¶ 58. In part because of the significant damage that 5.56mm bullets create upon impact with living tissue, they are generally not favored as a hunting cartridge. Yurgealitis Rpt. ¶ 62.

73. A bullet damages a body by transferring kinetic energy to the target. Increases in the mass, velocity, and surface area of a bullet each increase the energy delivered to a target. Hargarten Rpt. ¶ 12.

74. A study by Hargarten 2022 showed that assault weapons can release more kinetic energy per minute than other kinds of firearms. Hargarten Rpt. ¶ 13. For instance, assault weapons release approximately three times more energy than a Thompson Machine Gun bullet, between four to nineteen times more energy than handguns, depending on the caliber, and ten times more energy than a musket. And the energy release can increase if the bullet fragments upon impact. Hargarten Rpt. ¶ 25; *see also id*. Ex. B.

75. In the Hargarten 2022 study, the size of the temporary cavity that assault-weapon bullets cause was significantly larger than what the Thompson Machine gun, handguns, and muskets cause. Hargarten Rpt. ¶¶ 13, 26; *see also id*. Ex. B. The AR-15 style bullet, with its kinetic energy release and its greater permanent and temporary cavities is more destructive than those fired by the Thompson Machine gun rifle and handguns. Hargarten Rpt. ¶ 28.

76. Assault weapons can cause extreme damage to the tissue and organs of shooting victims, leading to high fatality and complication rates in victims. Hargarten Rpt. ¶¶ 13, 32.

77. Assault weapons are also more likely to cause significant damage to bones, the skeletal structure, and critical solid organs like the liver and spleen. Damage to these organs, in turn, increases the risk of catastrophic bleeding. Hargarten Rpt. ¶ 32.

78. Assault weapons cause added damage when there are multiple bullet wounds. In this case, a victim's wounds are more complex, carry a higher likelihood of injury requiring surgical intervention, and increase the likelihood of death at the scene or upon arrival at an emergency department. Hargarten Rpt. ¶ 34.

79. Large capacity magazines increase this destructive potential by increasing the number of rounds someone can fire without having to reload, thereby increasing the number of bullets that can be fired during a given time period. Hargarten Rpt. ¶ 30.

80. Assault weapons are even more likely to cause serious injury or death for children due to children's smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves. Hargarten Rpt. ¶ 36.

81. In the Sandy Hook Elementary School shooting, not one child wounded by an assault-weapon bullet ultimately survived. Hargarten Rpt. ¶ 36.

## History of Firearms Regulations

82. Weapons regulations in the United States have historically followed the same series of steps: First, a new gun or gun technology is invented. Second, it may then be patented. Third, it is often developed with a focus on military applications and needs, not directly for civilian acquisition or use. Fourth, some military-designed weapons may spread to, or be adapted to, civilian markets and use. Finally, if such weapons circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, the government may implement gun policy/law changes.  Spitzer Rpt. ¶¶ 27, 47.

83. The general progression of firearms regulation follow a general patter. New gun regulations are not enacted at the time that firearm technologies are invented or conceived.  Rather, they are enacted when those technologies circulate sufficiently in society to present a public safety concern.  Spitzer Rpt. ¶ 27.

84. There were few restrictions on firearms from the colonial period to the start of the Revolution because homicide rates were low. When homicides did occur, guns were seldom used, largely due to the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy.  Spitzer Rpt. ¶ 78.; Roth Rpt. ¶¶ 16-17.

85. In the 1800s, states and cities enacted regulations on every aspect of the manufacture, sale, and storage of gunpowder due to the substance's dangerous potential to detonate if exposed to fire or heat. Cornell Rpt. at 30. Indeed, early American governments recognized the danger posed by gunpowder and multiple states passed laws delegating authority to local governments to regulate the sale of gunpowder for public safety. Cornell Rpt. at 31.

86. Specific crime-related concerns that involved dangerous weapons led to legislative enactments in the late 1700s and early 1800s.  Between 1780 and 1809, at least four states enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed, at least three states enacted laws to punish the discharge of firearms near populated areas, and at least four states criminalized public arms carrying.  Spitzer Rpt. ¶ 59.

87. As early as 1771, New Jersey and other states banned or heavily regulated trap guns, which were often used to defend the user's property but posed a public safety problem because they sometimes killed or hurt innocent people.  At least 18 states enacted anti-trap gun laws between the 1700s and early 1900s.  Spitzer Rpt. ¶¶ 79-82 & Exs. B, F.

88. In the 18th and 19th Centuries, every state in the nation had laws restricting dangerous weapons such as clubs, knives, slungshots, bludgeons, sandbags, and pistols, which were widely used for criminal purposes. Spitzer Rpt. ¶¶ 70-74, 76-77 & Ex. C.

89. In the 1800s, the government started to regulate the firearms industry to prevent sub-standard weapons from being sold, as well as from military weapons being diverted from the militia. Cornell Rpt. at 20.

90. Starting in the 1830s, most, if not all, states in the country enacted laws that barred or restricted the carrying or possession of Bowie knives, which were intended for combat and became associated with criminal use and dueling. Spitzer Rpt. ¶¶ 61, 67; *see also id.* Ex. H.

91. Forty-three states enacted anti-slungshot laws in the 19th Century. Overall, 71 anti-slungshot laws were enacted in the 19th Century and 12 enacted in the 20th Century. Spitzer Rpt. ¶¶ 74, 76; *see also id.* Ex. C.

92. In the late 1800s and early 1900s several states effectively barred possession of certain weapons outright. Spitzer Rpt. ¶ 45. For example, an 1837 Georgia law made it a crime to sell, offer to sell, keep, or have Bowie knives. Spitzer Rpt. ¶ 67 & Ex. E; Roth Rpt. ¶ 31. And as early as 1850, Massachusetts banned the manufacture and sale of slung shots. Spitzer Rpt. Ex. E.

93. States also targeted easily concealed pistols during America's gun violence crisis in the Jacksonian era for regulation, reflecting concerns that these firearms were dangerous or capable of provoking terror. Cornell Rpt. at 35.

94. In the post-Civil War period, the rise in the circulation of multi-shot handguns in society, such as the Colt revolver, contributed to escalating interpersonal violence and was accompanied by the rapid spread of concealed carry restrictions. By the end of the 19th Century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying. Spitzer Rpt. ¶ 45; DeLay Rpt. ¶ 70.

95. During Reconstruction, Republican-dominated legislatures in the South enacted a range of racially-neutral gun regulations in response to violence directed against African Americans including by white supremacist groups. Cornell Rpt. at 39-40.

96. The slow-load lever-action firearms of the 19th Century did not attract regulatory attention at that time and would not be banned under the challenged New Jersey laws today. DeLay Rpt. ¶¶ 73-74.

97. Before the early 1920s, automatic weapons were unregulated because they did not exist or were not circulating widely in society. Spitzer Rpt. ¶ 8.

98. Criminals and terrorists began adopting machine guns and submachine guns starting in the 1920s. Roth Rpt. ¶¶ 53-54.

99. In the early 20th Century, legislatures responded to the risks that fully automatic and semiautomatic firearms posed to public safety by restricting their sale, possession, and manufacture. Roth Rpt. ¶ 56. Once they circulated appreciably in society and became associated with criminal activity, states began to restrict their sale, manufacturing, and possession. DeLay Rpt. ¶ 82; Spitzer Rpt. ¶ 6, 11-15, 45; Cornell Rpt. at 35-36. Some jurisdictions also prohibited large-capacity semi-automatic weapons. Spitzer Rpt. Ex. D.

100.  Beginning in the 20th Century, ten states plus the District of Columbia regulated semi-automatic and fully automatic weapons; eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices; and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner. Spitzer Rpt. ¶ 24. In total, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity between 1917 and 1934. Spitzer Rpt. ¶¶ 24-25. *See also* DeLay Rpt. ¶ 84 (describing 20th Century restrictions on semi-automatic firearms and magazine capacity).

101.  Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots automatically or semi-automatically more than twelve shots without reloading." The National Rifle Association endorsed the law and encouraged it to be used as a guide for other states. Spitzer Rpt. ¶ 16.

102.  In 1934, Congress enacted the National Firearms Act, which strictly regulated fully automatic weapons. Spitzer Rpt. ¶ 17. During the same time period, at least seven states plus the District of Columbia enacted laws restricting semi-automatic weapons. Spitzer Rpt. ¶ 21.

103.   Congress passed the National Firearms Acts of 1934 and 1938 in response to the use of machine guns and submachine guns in notorious killings. Roth Rpt. ¶¶ 53-56.

104.   In passing the National Firearms Acts of 1934 and 1938, Congress placed restrictions on the ownership of machine guns and submachine guns based on their ability to fire rapidly from magazines capable of holding more than 10 rounds. Roth Rpt. ¶¶ 55-56.

105.   None of the federal laws regulating machine guns, automatic weapons, silencers, certain ammunition and large-caliber weapons, or destructive devices such as grenades and artillery have ever applied to the U.S. military.  DeLay Rpt. ¶ 94.  *See also* Spitzer Rpt. ¶ 17.

106.   Removable magazines were not subject to regulation before the early 20th Century because those that did exist were rare and had not played any appreciable role in creating civil disorder.  Spitzer Rpt. ¶ 23.

## History of Firearms-Related Homicides

107.   Levels of interpersonal gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. Cornell Rpt. at 17-18.

108.   In the colonial era leading up to the Revolutionary War, homicides among colonists were rare. Roth Rpt. ¶¶ 17-18.

109.   In the colonial era, the proportion of homicides committed with firearms was no greater than 15 percent. Roth Rpt. ¶¶ 18, 20.

110.   The vast majority of muzzle-loading firearms available in the colonial era, such as muskets and fowling pieces, needed to be reloaded manually after every shot. Roth Rpt. ¶ 19.

111.   Reloading one of the muzzle-loading firearms available in the colonial era took at least half a minute to complete. Roth Rpt. ¶ 19.

112.   The muzzle-loading firearms of the colonial era, such as muskets and fowling pieces, were liable to misfire. Roth Rpt. ¶ 19.

113.   In the colonial era, most owners of muzzle-loaded firearms stored their guns empty and loaded them anew before every use. Roth Rpt. ¶ 19; Cornell Rpt. at

18. Due to the preference for storing these weapons unloaded, they posed fewer dangers to children from accidental discharges. Cornell Rpt. at 18.

114. The rates of homicides of European Americans in the colonies by unrelated adults rose during the Revolutionary War period. Roth Rpt. ¶¶ 23-24.

115. Following the end of the Revolutionary War, homicide rates fell across New England, the Mid-Atlantic states, and the settled Midwest. Roth Rpt. ¶¶ 23-24.

116. Following the end of the Revolutionary War, the proportion of homicides committed with firearms was between 0 and 10 percent. Roth Rpt. ¶ 24.

117. In the colonial era, firearm use was generally limited to hunting, controlling vermin, or serving in the militia. Roth Rpt. ¶¶ 18, 26.

118. In the Founding era, there was little interest among public officials in northern states in restricting the use of firearms, with the exception of placing restrictions on dueling. Roth Rpt. ¶ 26.

119. In the slave states during the Founding era, the proportion of homicides committed with firearms increased to between one-third and two-fifths. Roth Rpt. ¶ 27.

120. Pistols that started to become commercially available in the early 1800s could be kept loaded and carried for longer amounts of time without risk of corrosion than the firearms that were prevalent in the colonial era. Roth Rpt. ¶ 29.

121. Pistols and revolvers contributed to a sharp increase in the proportion of homicides committed with firearms at the end of the 19th Century. Roth Rpt. ¶¶ 30-40.

122. States that imposed restrictions on carrying certain concealed weapons in the 19th Century were responding to concealable weapons contributing to rising crime rates. Roth Rpt. ¶¶ 30-33.

123. States that imposed restrictions on carrying certain concealed weapons in the 19th Century were responding to technological advances that enabled firearms to fire multiple rounds in succession without reloading. Roth Rpt. ¶ 33.

124. In the mid-1800s, homicide rates rose across the United States. Roth Rpt. ¶¶ 34, 35.

125.   Economic transformation was accompanied by profound social changes that gave rise to America's first gun violence crisis. As cheaper, more dependable, and easily concealable handguns proliferated, Americans, particularly southerners, began sporting them regularly. Cornell Rpt. at 24.

126.   From the Mexican War through Reconstruction, the proportion of homicides committed with firearms increased. Roth Rpt. ¶ 35.

127.   Once pistols and revolvers became commercially available in the mid-19th Century, they began to displace the single-shot guns prevalent in the early 1800s. Roth Rpt. ¶¶ 33-40.

128.   The pistols and revolvers that became commercially available in the mid-19th Century could be fired multiple times before having to reload. Roth Rpt. ¶¶ 37-38.

129.   Once single-shot guns began to be displaced by breech-loading firearms in the mid-19th Century, the proportion of homicides committed with firearms increased even in periods when overall homicide rates temporarily fell. Roth Rpt. ¶ 40.

130.   By the 1920s, the proportion of homicides committed with firearms reached a median of 56% in New England and over 70% in the South and West. Roth Rpt. ¶ 40.

131.   In the Reconstruction era, state legislators understood that placing restrictions on the carrying and/or possession of certain weapons was within states' constitutional authority. Roth Rpt. ¶¶ 40-46.

132.   In response to Reconstruction-era violence directed against African Americans, Republican-dominated legislatures in the Reconstruction South passed a range of racially neutral gun regulations to protect individuals from gun violence. Cornell Rpt. at 39-40.

133.   Incidents in which a single person killed four or more persons using firearms were rare, if not non-existent, in the colonial, Founding or Reconstruction eras. Roth Rpt. ¶¶ 47-48; Vannella Decl. Ex. 9, Rpt. of Professor Louis Klarevas ¶ 19.

134.   Firearms were used in approximately two fifths of homicides between unrelated white people before the Civil War era, and in approximately four fifths of all homicides in 2021.  DeLay Rpt. ¶ 37.

135.   In the 1980s, the introduction of semi-automatic handguns into the criminal market led to a dramatic increase in criminal firepower.  This resulted in more gun crimes and homicides with no corresponding increase in non-gun homicides.  Spitzer Rpt. ¶ 83.

**Mass Shootings – General**

136.   From the colonial era through the end of the 19th Century, mass killings were predominantly committed by a group of people. Roth Rpt. ¶¶ 47-50.

137.   There is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949. For 70% of its 247-year existence as a nation, the United States did not experience a single mass shooting resulting in double-digit fatalities.  Klarevas Rpt. ¶ 19.

138.   After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966.  The third such mass shooting then occurred nine years later, in 1975.  And the fourth such incident occurred seven years after, in 1982.  Klarevas Rpt. ¶ 20.



139.   The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years.  Klarevas Rpt. ¶ 21.

140.  This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). Klarevas Rpt. ¶ 21.

141.  In the 20-year period between 1987-2007, only two double-digit-fatality mass shootings occurred. Klarevas Rpt. ¶ 21.

142.  Between 1987 and 2007, three federal measures were in effect: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.  Klarevas Rpt. ¶ 21.

143.  A broader dataset of shooting incidents from the Gun Violence Archive shows that shooting events with four or more injuries or fatalities has been increasing from 2014 to 2021. Vannella Decl. Ex. 7, Rpt. of Lucy Allen ¶ 41.



144.  The 7 deadliest acts of intentional criminal violence in the U.S. since
      September 11, 2011 have all been mass shootings. Klarevas Rpt. ¶ 12.
      Perpetrators in all 7 employed LCMs, and 6 of the 7 used assault weapons.
      Klarevas Rpt. ¶ 15.

| | | | | |
|---|---|---|---|---|
| **Table 2. The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11** | | | | |
| **Deaths** | **Date** | **Location** | **Involved Assault Weapons** | **Involved LCMs ( > 10 Rounds )** |
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

145.  Assault firearms with large-capacity magazines inflicted significant damage
      in recent mass shootings at the Pulse Nightclub in 2016 (49 fatalities, 50+
      wounded), Las Vegas in 2017 (60 fatalities, 400+ wounded), the Uvalde, Texas
      school shooting in 2022 (21 fatalities, 17 wounded), and the July 4th Highland
      Park shooting in 2022 (7 fatalities, 48 wounded). Yurgealitis Rpt. ¶ 5. Assault
      firearms are capable of inflicting significant carnage upon civilians in a short
      period of time, especially in conjunction with large capacity magazines.
      Yurgealitis Rpt. ¶ 5.

146.  All but four mass shootings that have occurred in the United States since
      1965 involved a single shooter. Roth Rpt. ¶ 67.

147.  The four mass shootings in the United States since 1965 that involved more
      than one shooter were each committed by two assailants. Roth Rpt. ¶ 67.

148.  The availability of semiautomatic weapons and magazines that hold more
      than 10 rounds has made it possible for one or two individuals to kill or wound
      a large number of people in a short amount of time. Roth Rpt. ¶¶ 50, 67-68.

149.  The availability of semiautomatic weapons and magazines that hold more
      than 10 rounds has made it possible for a single shooter to commit mass murder
      without rallying collaborators around a common cause. Roth Rpt. ¶¶ 47, 68.

150.  In the 2011 mass shooting in which U.S. House Representative Gabby
      Giffords was wounded, the shooter fired 31 rounds with a Glock 19

semiautomatic handgun before he was disarmed by bystanders while changing magazines; each of the 31 rounds fired struck an individual. Roth Rpt. ¶ 69.

151.  Lucy Allen performed a 2023 study of public mass shootings was conducted using data from four sources: Mother Jones, the Citizens Crime Commission of New York City, the Washington Post, and the Violence Project (the latter two of which began publishing data in 2018-2019). Each source defines mass shooting as one where four or more people were killed in a public place in one incident, excluding incidents related to other crimes such as robberies and domestic violence). The combined data spanned 1982 to October 2022, which yielded 179 mass shooting events. Allen Rpt. ¶¶ 25-29.

152.  The Allen 2023 study shows the number of mass shooting events has been increasing, from 1982 to 2022. Allen Rpt. ¶ 39.



153.   The Allen 2023 study shows the number of mass shooting events with large-capacity magazines has been increasing, from 1982 to 2022. Allen Rpt. ¶ 40.



154. From 1991 to 2022, both the number of high-fatality mass shooting incidents and number of mass shooting fatalities have grown significantly. Klarevas Rpt. ¶ 12.





## Use of Assault Weapons and LCMs in Mass Shootings

155.   There is evidence that the design features of assault weapons and LCMs make them especially appealing to criminals and to those who commit mass shootings.  Data on 15 mass shootings from 1984 to 1993 compiled by Gary Kleck (1997) revealed six (40%) involved assault weapons or other firearms equipped with LCMs.  Vannella Decl. Ex. 10, Rpt. of Professor Daniel Webster ¶ 9.

156.   The rate at which assault weapons are used to commit gun massacres far outpaces the rate at which they are owned in the United States. Klarevas Rpt. ¶ 14.

157.   **Percentage of mass shootings perpetrated with AWs or LCMs.** Within the Allen 2023 dataset discussed above, there were 153 mass shooting events for which it was known if an assault weapon was used.  Of those 153 mass shootings, an assault weapon was used in 36 of them (24%). In the same dataset, there were 115 mass shooting events for which magazine capacity was known. Out of those 115 events, there were 73 where the perpetrator used large-capacity magazines (63%). Allen Rpt. ¶¶ 30-31.

158.   Of the 179 mass shooting incidents examined in the Allen 2023 Study, whether the guns used were obtained legally was known in 112 of them.  In those 112 mass shootings, shooters in 89 (79%) of them obtained their guns legally. Even if one assumed the guns were illegally obtained in the 67 incidents for which legal purchase status of the gun used was not known, 50% of the mass shootings were still done with guns obtained legally (89 out of 179). Allen Rpt. ¶ 38.

159.   In the Allen 2023 Study, 80% of the guns used in mass shooting events for which it was known whether the guns were legally obtained (202 out of 252 guns) were obtained legally.  Allen Rpt. ¶ 38.

160.    **Average number of shots by perpetrator (AWs).** Of the 36 events involving assault weapons in the Allen 2023 study data, there are 24 in which the number of shots fired is known. Shooters fired more than 10 rounds in each of the 24 incidents. The average number of shots fired was 149. By contrast, the average number of shots fired in mass shootings without an assault weapon was 38.  Allen Rpt. ¶ 36.

161.    **Average number of shots by perpetrator (LCMs).** Of the 73 incidents known to have involved a large-capacity magazine in the Allen 2023 study data, there are 49 in which the number of shots fired is known. Shooters fired more than 10 rounds in 46 of the 49 incidents. The average number of shots fired was 99. In contrast, the average number of shots fired in mass shootings without large-capacity magazines was 16. Allen Rpt. ¶ 37.

162.    **Comparative casualties.** Within the Allen 2023 dataset, the average number of fatalities was 12 per mass shooting with an assault weapon versus 6 for those without an assault weapon. The average number of fatalities was 10 per mass shooting with large-capacity magazines versus 6 for those without large-capacity magazines. The average number of fatalities was 13 per mass shooting with both assault weapons and large-capacity magazines versus 6 for those with neither. Allen Rpt. ¶¶ 32-34.

163.   Within the Allen 2023 dataset, the average number of injuries or fatalities
was 36 per mass shooting with an assault weapon versus 10 for those without
an assault weapon. The average number of injuries or fatalities was 25 per mass
shooting with large-capacity magazines versus 9 for those without large-
capacity magazines. The average number of injuries or fatalities was 40 per
mass shooting with both assault weapons and large-capacity magazines versus 8
for those with neither. Allen Rpt. ¶¶ 32-34.

**Numbers of Fatalities and Injuries in Public Mass Shootings**
**1982 - October 2022**

| Weapon Used | # of Incidents | Average # of | | |
|---|---|---|---|---|
| | | Fatalities | Injuries | Total |
| Assault Weapon | 36 | 12 | 24 | 36 |
| No Assault Weapon | 117 | 6 | 4 | 10 |
| Unknown | 26 | 5 | 3 | 9 |
| Large-Cap. Mag. | 73 | 10 | 16 | 25 |
| No Large-Cap. Mag. | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |
| Assault Weapon & Large-Cap. Mag. | 31 | 13 | 27 | 40 |
| Large-Cap. Mag. Only[1] | 36 | 8 | 7 | 15 |
| No Assault Weapon or Large-Cap. Mag.[2] | 41 | 6 | 3 | 8 |
| Unknown[3] | 71 | 5 | 3 | 8 |

Notes and Sources:
  Casualty figures exclude the shooter. Assault Weapon and large-capacity magazine classification and casualties
  updated based on review of stories from Factiva/Google searches.
[1] Shootings involving large-capacity magazine and no Assault Weapon.
[2] Shootings involving neither a large-capacity magazine nor Assault Weapon.
[3] Shootings where it is either unknown whether a large-capacity magazine was involved or unknown whether an
  Assault Weapon was involved.

164.   A study by Christopher Koper in 2014 showed that between 1982 and 2012,
mass shootings (defined as shootings with four or more victim fatalities)
committed with assault weapons caused more fatalities per incident than mass
shootings committed with other firearms (a mean of 10.4 fatalities with assault
weapons vs. 7.4 fatalities with other firearms) and caused non-fatal gunshot
wounds to more people (a mean of 13.5 people with non-fatal gunshot wounds
in mass shootings with assault weapons vs. 6.4 without).  Webster Rpt. ¶¶ 9, 11.

165.   A study by Luke Dillon in 2013 showed that mass shootings (defined as shootings with four or more victim fatalities) committed with firearms with LCMs had 60% more fatalities on average than those committed with firearms without LCMs (a mean of 10.19 fatalities vs. 6.35) and had more than 3 times as many victims with non-fatal gunshot wounds (a mean of 12.39 people with non-fatal gunshot wounds in mass shootings with LCMs vs. 3.55 without LCMs).  Webster Rpt. ¶ 11.

166.   The Allen 2023 study results are consistent with those of other studies that have analyzed mass shootings, each of which show that the average number of casualties (whether defined as injuries and fatalities or fatalities alone) were higher in mass shooting events where the perpetrator used large-capacity magazines. Allen Rpt. ¶ 35; Roth Rpt. ¶¶ 64-66.

**Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings**

| Source | Criteria | | Time Period | # of Incidents | Avg. # of Fatalities + Injuries / Fatalities | |
|---|---|---|---|---|---|---|
| | # Victims | Other Criteria | | | With LCM | Without LCM |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2023)[1] | at least 4 killed[3] | Includes shootings "in a public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-October 2022 | 179 | 25 / 10 | 9 / 6 |
| Allen (2020)[2] | | | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[4] | more than 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[5] | at least 6 killed[3] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[6] | at least 4 killed[3] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

**Notes and Sources:**
[1] Exhibit B of this report.
[2] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.*, dated January 23, 2020.
[3] Excluding shooter.
[4] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).
[5] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).
[6] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

167. **High Fatality Mass Shootings – AWs.** Focusing on high-fatality mass shootings in particular (defined as events resulting in 6 or more victims being shot to death), an analysis of such events by Prof. Klarevas (based on a dataset that Prof. Klarevas maintains and continuously updates, which is reproduced at Exhibit C to his report) between 1991 and 2022, where the weapon used was known, showed that the percentage of such shootings where the perpetrator employed an assault weapon has increased over time. The overall rate of use of assault weapons in such high fatality mass shootings is 34%, but rose to 53% over the past 4 years. Klarevas Rpt. ¶ 13.



Figure 3. Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022

Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

168. **High Fatality Mass Shootings – LCMs.** Of the high fatality mass shootings between 1991 and 2022 where magazine capacity used was known, the percentage of such shootings where the perpetrator employed a large-capacity magazine (with greater than 10 rounds of capacity) has increased. The overall rate of use of LCMs in such high fatality mass shootings is 77%, but rose to 100% over the past 4 years. Klarevas Rpt. ¶ 13.



Figure 4. Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022

Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

169. **High Fatality Mass Shootings – Lethality.** There is a positive association between the lethality of mass shootings and the use of assault weapons and LCMs. The average death toll for high-fatality mass shootings involving assault weapons was 13.7 fatalities per shooting. By contrast, the average death toll for high-fatality mass shootings without assault weapons was 8.2 fatalities per shooting. The average death toll for high-fatality mass shootings involving LCMs was 11.5 fatalities per shooting. By contrast, the average death toll for high-fatality mass shootings without LCMs was 7.3 fatalities per shooting. Klarevas Rpt. ¶15, 16.

**Table 3. The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

**Table 4. The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

170.   Use of LCMs with assault weapons in high-fatality mass shootings resulted in a 92% increase in the average death toll compared to high-fatality mass shootings involving neither instrument. Klarevas Rpt. ¶ 17.

**Table 5. The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

171.   A 2020 study in *Criminology & Public Policy* by Webster et al found that for the period of 1984 to 2017, state bans on LCMs were associated with a 48 percent lower incidence of fatal mass shootings within those states, when compared to years in those states in which there was no LCM ban and with 70% fewer deaths from fatal mass shootings per capita.  Webster Rpt. ¶ 14.

172.   A 2020 study in *Law and Human Behavior* by Siegel et al found that LCM bans were also associated with significantly lower rates of fatal mass shootings. Webster Rpt. ¶ 14.

173.   A 2019 study by Klarevas et al. in the *American Journal of Public Health* found that between 1990 and 2017, the incidence of fatal mass shootings (those with 6 or more victim deaths) in states without LCM bans was more than double the rate than in states with LCM bans.  The annual number of deaths in non-LCM ban states was also 3 times higher.  Webster Rpt. ¶ 14.

174.   A 2015 study by Gius et al in *Applied Economics Letters* found statistically significant negative associations between assault weapon bans and fatalities from public mass shootings.  Webster Rpt. ¶ 16.

175.   A 2022 study by Cook et al. in *JAMA* found that, during the federal assault weapons ban from 1994 to 2004, fatalities from shootings with banned weapons

decreased during the second half of the ban and then surged after the ban expired. Webster Rpt. ¶ 17. A 2004 study by Koper et al. for the National Institute of Justice found a one-third reduction in the share of crime guns recovered and traced by law enforcement that were assault weapons. Webster Rpt. ¶ 15.

176. From 2015 to 2019, five of the top ten deadliest mass shootings in U.S. history occurred and each was committed with an assault weapon. Webster Rpt. ¶ 17.

177. A 2021 study in *JMIR Public Health Surveillance* by Post et al. showed that during the years the federal assault weapons ban was in place, statistical models estimated that the federal ban on assault weapons and LCMs resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries during the decade the ban was in place. Those statistical models estimated that if the federal ban had continued after 2004, there would have been 30 fewer public mass shootings, 339 fewer people murdered in those shootings, and 1,139 fewer people injured in those shootings. Webster Rpt. ¶ 18.

178.    The number of fatalities from mass public shootings committed with non-assault weapons has remained relatively flat. Webster Rpt. ¶ 17.



**Use of Assault Weapons/ LCMs and Crime**

179.   The features of assault style firearms, including LCMs, are attractive to users who are most likely to use firearms in crime.  Webster Rpt. ¶ 13.

180.   After rapid-fire semiautomatic handguns and rifles with large capacity magazines arrived on the domestic market in the 1970s and 1980s, they were picked up by criminals, terrorists, and lone gunmen.  These firearms inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff.  Roth Rpt. ¶ 60.

181.   Uniformed police officers are generally outfitted with soft body armor of a "Level II" or "Level IIIA" protection rating for the National Institute of Justice.  Those ratings of body armor are suitable protection against most handgun bullets (which reach a muzzle velocity of 1200FPS (+ or -), but not against rifle caliber AR & AK type assault rifles (which reach a muzzle velocity of 3200FPS (+ or -).  Yurgealitis Rpt. ¶ 156.

182.   The firearms prohibited by N.J. Stat. Ann. § 39-1(w) pose a threat to overall public safety and increase the likelihood that first responders charged with stopping a threat, or attending to wounded citizens, may be injured or killed in performance of their duty.  Yurgealitis Rpt. ¶ 156.

183.   A study by Christopher Koper et al. in 2017 showed that across ten different cities in the United States, firearms with LCMs accounted for between 15 and 36% of firearms recovered by law enforcement between 2001 and 2014.  Webster Rpt. ¶ 12.

184.   Firearms with LCMs accounted for 40.6% of the firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings with 4 or more fatalities for the period of 2009 to 2015.  Webster Rpt. ¶ 12 (citing Koper).

185.   Assault weapons accounted for between 2.6 and 8.5% of firearms recovered by law-enforcement officers in the same ten cities between 2001 and 2014.  Webster Rpt. ¶ 12. (citing Koper).

186.   Assault weapons also accounted for 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally between 2009 and 2015.  Webster Rpt. ¶ 12. (citing Koper).

187.   Assuming that assault weapons account for 3 percent of the population of firearms in civilian hands, the data discussed above indicates assault firearms and firearms with LCMs are specifically used in crime, in lethal violence against law enforcement officers, and in fatal mass shootings at percentages five to ten times higher than they would be expected to if those weapons' features played no role in whether they were used in crimes.  Webster Rpt. ¶ 13.

188.   A study by Wintemute et al. (1998) in *Annals of Emergency Medicine*, using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses.  Webster Rpt. ¶ 13.

## Self-Defense Data

189.   Home defense and self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire.  Yurgealitis Rpt. ¶ 137.

190.   Based on incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017, it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Allen Rpt. ¶¶ 9-11.

191.   **Average number of shots fired for self-defense – NRA Data.** Out of 736 incidents in the NRA Armed Citizen database between January 2011 and May 2017, the average number of shots fired by a person using firearms in self-defense was 2.2. Allen Rpt. ¶ 10.[2]

192.   Indeed, in the vast majority of incidents—587 (or 79.8%)—the defender fired 1 to 5 bullets; and in 134 (or 18.2%), the defender fired no shots at all. Allen Rpt. ¶¶ 9-10.

193.   Within that same dataset, only 2 incidents (0.3% of all incidents) were reported where the defender fired more than 10 bullets. In 18.2% of incidents, the defender fired zero shots. In 80% of incidents, the defender fired 1 to 5 shots. In 2% of incidents, the defender fired 6 to 10 shots. Allen Rpt. ¶ 10.

---

[2] Paragraph 11 is mislabeled as Paragraph 9. *See* Allen Rpt. at 6.

| Breakdown of Incidents in NRA Armed Citizen Database by Number of Shots Fired January 2011 - May 2017 | | |
| --- | --- | --- |
| # of Shots Fired | # of Incidents | % of Incidents |
| 0 | 134 | 18.2% |
| 1-5 | 587 | 79.8% |
| 6-10 | 13 | 1.8% |
| More than 10 | 2 | 0.3% |

*Average Number of Shots Fired: 2.2*

Notes and Sources:
Data from NRA Armed Citizen database covering 736 incidents from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

194.   These 2 incidents were reported in the database after Allen's initial findings were published (at which time there were zero incidents involving more than 10 shots fired). Underlying reporting of those two incidents did not indicate the defenders needed to fire more than 10 shots to defend themselves. Allen Rpt. ¶ 5, n.2.

195.   The NRA database is not limited to cases of self-defense in the home, and the number of shots fired was found to be similar in incidents both inside and outside the home. Allen Rpt. ¶¶ 9, 11 n.16.

196.   A separate study of the NRA database for an earlier time period, 1997 to 2001, found similar results.  Specifically, that study also found that, on average, 2.2-shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. Allen Rpt. ¶ 9, n.14; Yurgealitis Rpt. ¶ 147.

197.   An additional study of news reports using the Factiva archive of aggregated news content from nearly 33,000 sources using keyword search criteria resulted in 35,000 stories from January 2011 to May 2017 in the United States. The search criteria matched approximately 90% of the NRA Armed Citizen database reports, and the remaining 10% showed the typical number of shots fired was no different. Allen Rpt. ¶12.

198.   **Average number of shots fired for self-defense - Factiva.** Separately, a random number generator was used to sample the 35,000 news stories aggregated on Factiva between January 2011 to May 2017 that matched relevant search terms, yielding 4,800 news stories on incidents of self-defense

of a firearm in the home. A random selection of 200 such stories were analyzed. In that analysis the average number of shots fired per *story* was 2.61. Allen Rpt. ¶¶ 12-15.

199.    There was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering the incident (i.e., the more shots fired, the more news stories covered the incident). A statistical calculation was performed to adjust for this effect, yielding the average number of shots fired per incident as 2.34. In 11.6% of incidents, the defender fired no shots; in 97.3% of incidents, the defender fired 5 or fewer shots. In no incidents was the defender reported to have fired more than 10 bullets. Allen Rpt. ¶¶ 15-17.

### Number of Shots Fired in Self-Defense in the Home Based on Random Selection of Articles from Factiva
#### January 2011 - May 2017

|  | Incidents in the Home |
| --- | --- |
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with <=5 Shots Fired | 195 |
| Percent of Incidents with <=5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

Notes and Sources:
Based on news stories describing defensive gun use in a random selection of Factiva stories 2011 to May 2017 using search string (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property") with region set to United States and excluding duplicate stories classified as "similar."
Calculated using weights reflecting the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home.

200.    Out of almost 1,000 incidents of self-defense analyzed (736 from the NRA Armed Citizen database and 200 randomly sampled from Factiva), only 2

involved reports of more than 10 shots fired in a self-defense scenario in the home (0.2%). Because the analysis excludes incidents without news reportage, and because the fewer shots fired, the less news coverage there is, the 0.2% figure likely overestimates the overall percentage of self-defense incidents in which more than 10 rounds were used. Allen Rpt. ¶18.

201. **Percentage of rifle use for self-defense.** The Heritage Foundation maintains a "Defensive Gun Uses In the U.S." database (DGU), with data beginning in January 1, 2019. An analysis of the 2,714 incidents in the database spanning January 1, 2019 through October 6, 2022 showed 51 incidents where a rifle was used. This represents 2% of all incidents in the database and 4% of all incidents in the database with a known gun type. After conducting the same analysis again, but excluding incidents in states that had restrictions on assault weapons, the results were 48 incidents, representing 2% and 4% of the total number of incidents, 2,499. Allen Rpt. ¶¶ 19-24.

202. **Percentage of handgun use for self-defense.** Within the same dataset, there were 1,113 incidents where a handgun was used. This represents 41% of all incidents in the database and 90% of all reported incidents with a known gun type. Allen Rpt. ¶ 23.

| The Heritage Foundation Defensive Gun Uses Database | | | |
|---|---|---|---|
| Firearm Type | Incidents[1] | % of Total | % of Known |
| (1) | (2) | (3) | (4) |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| **Total known:** | **1,241** | | |
| **Total:** | **2,714** | | |

Source:
"Defensive Gun Uses in the U.S.," *The Heritage Foundation*.
Data as of October 7, 2022.
[1] Note that three incidents are coded as having more than one firearm type and thus the sum by firearm type is larger than the total number of incidents.

203. **Assault Weapons Self-Defense Use in Active Shootings.** An analysis of FBI data of active shootings between January 1, 2000 and December 31, 2022

in the United States revealed 456 active shooter incidents, of which 18 incidents involved defensive gun use by civilians, excluding law enforcement or armed security. For this dataset, active shooter incident refers to attacks by perpetrators "in a populated area." In 17 of the 18 incidents, the firearm used by an armed private citizen was identifiable. 14 involved handguns, 1 involved a shotgun, 1 involved a bolt-action rifle, and 1 involved an assault rifle. Thus, only 5.9% (1 of 17) cases where a firearm was used for self-defense in an active-shooter scenario involved the use of an assault weapon. Overall, only 1 out of 456 active-shooter scenarios in the last 23 years (0.2%) involved an armed civilian intervening with an assault weapon. Klarevas ¶¶ 25-26.

## Historical Linguistics

204.  An appropriate way to glean the original public meaning of constitutional text is to consider historical dictionaries and databases comprising real-world examples of how Americans used words between Founding and Reconstruction. Vannella Decl. Ex. 6, Rpt. of Professor Dennis Baron ¶¶ 2, 9–20.

205.  Between Founding and Reconstruction, the word "arms" referred to weapons. Baron Rpt. ¶¶ 20, 29, 31(q), 32, 74.

206.  During that same period, the word "arms" was used separately from the word "accoutrements," which referred to accessories such as belts, scabbards, and cartridge boxes. Baron Rpt. ¶¶ 2(a), 23–28, 31(f), 31(l), 32, 37, 39, 42–44, 47–48, 51, 55.

207.  "Cartridge boxes," "cartridge cases," and "cartouch cases" were phrases used during this period to describe ammunition containers. Baron Rpt. ¶¶ 3, 30, 31(i), 71.

208.  The word "magazine" is currently used to describe ammunition containers, but it began to be so used only during the latter half of the 19th Century. Baron Rpt. ¶¶ 3, 21–22, 30, 31(n), 58, 67–68. For instance, the Oxford English Dictionary notes the earliest use of magazine meaning "a bullet storage container" as 1868. Baron Rpt. ¶ 3, 22, 58, 64. From that point, the word "magazine" gradually replaced the phrase "cartridge box" and the like.  Baron Rpt. ¶ 68.

209.  Modern magazines often feed ammunition into firearms. Baron Rpt. ¶¶ 30, 31(n), 58.

210.   Historically, cartridge boxes also fed ammunition into firearms. For example, to operate the "Mitrailleuse," a French field weapon analogous to today's machine guns, a person "fire[d] it by turning a crank" and then "removed" "the cartridge box … from the canon" and "put a new one in." Baron Rpt. ¶ 31(n).

211.   Ammunition containers—whether cartridge boxes or magazines—were not historically understood to be "arms." Baron Rpt. ¶¶ 2(b), 3, 22–23, 29–32, 44, 58, 64, 68, 71, 74.


Dated:  November 3, 2023          Respectfully submitted,

                                  MATHEW J. PLATKIN
                                  ATTORNEY GENERAL OF NEW JERSEY


                          By:   /s/ Daniel M. Vannella
                                Daniel M. Vannella
                                Assistant Attorney General

42

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG,<br><br>    Plaintiffs,<br><br>v.<br><br>MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department,<br><br>    Defendants. | HON. PETER G. SHERIDAN<br><br><br>Civil Action No.<br>3:18-cv-10507 |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | HON. RENEE M. BUMB<br><br><br>Civil Action No.<br>1:22-cv-4360 |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN


Civil Action No.
3:22-cv-04397

---

**STATE DEFENDANTS' RESPONSE TO *ANJRPC/ELLMAN* PLAINTIFFS'
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rules of Civil Procedure 56 and D.N.J. Local Rule 56.1, State Defendants submit the following Response to the Statement of Material Facts Not in Dispute submitted by *ANJRPC v. Platkin* and *Cheeseman v. Platkin* Plaintiffs (hereinafter, "*ANJRPC Plaintiffs*")

## **GENERAL OBJECTIONS**

The State objects generally to the form and contents of *ANJRPC* Plaintiffs' statement of material facts, which fail to comply with Local Civil Rule 56.1(a). ANJRPC Plaintiffs' statement paragraphs 23 to 112 are a wholesale copy-and-paste of expert declarations of Emanuel Kapelsohn and Ashley Lynn Hlebinsky.

On a motion for summary judgment, a moving party must "furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). The purpose of the Rule 56.1 Statement is to clarify the issues before the court, not to increase the burden on it. *Durkin v. Wabash Nat.*, No. 10-2013, 2013 WL 1314744, *6 (D.N.J. Mar. 28, 2013) (citing *Sprint Spectrum v. Paramus Zoning Bd.*, No. 09-4940, 2010 WL 4868218, *18 (D.N.J. Nov. 22, 2010) (noting that "arguments inserted [into Rule 56.1 statements] accomplish the opposite" of this goal)).The requirements of this rule are clear, and to the extent a movant's statement of material facts fails to meet them, it "will be disregarded." *Id*.

The vast majority of the statements in *ANJRPC* Plaintiffs' Rule 56.1 statement consist of legal conclusions rather than facts. They  also "frequently blur[] the line between fact and opinion," and present as "undisputed facts" arguments that are "fervently disputed by the parties." *See N.J. Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 395 n.4 (D.N.J. 1998). This "poses a problem in deciding the weight to be given" to these submissions." *Id*. Even when they do consist of proposed facts, each paragraph frequently contains more than one proposed fact or even one subject matter, making responses to same and the Court's identification of disputed vs. undisputed facts unnecessarily difficult. Indeed, the majority of their statements consist of entire passages or paragraphs copied and pasted verbatim from their expert reports/declarations (citations to "Exhibits," subject headings, and footnotes included), without any effort to distill the facts that are material to the dispute at issue.

Moreover, many of the paragraphs plainly contain content that are not material facts, as they would not affect the outcome of a trial of this matter based on

1

allegations contained in Plaintiffs' complaints. *See Park v. Tsiavos*, 165 F. Supp. 3d 191, 195 (D.N.J. 2016).

Accordingly, the Court should only consider *ANJRPC* Plaintiffs' Rule 56.1 statement to the extent it clearly present specific proposed facts, including specific citation to the record in this case, that are material to the case. *See Durkin*, 2013 WL 1314744, \*6. Thus, it should freely disregard the majority of their Rule 56.1 statement.

The State adopts these general objections to each of their responses to paragraphs 23 to 112 of the *ANJRPC* Plaintiffs' Rule 56.1 paragraphs that follow.

## THE STATE'S RESPONSES

1.    Blake Ellman is a plaintiff in this matter and a member of ANJRPC.

**RESPONSE:**        **Undisputed.**

2.    Ellman is a firearms instructor, range safety officer, armorer, and competitive shooter.

**RESPONSE:**        **Undisputed.**

3.    Ellman is a law-abiding resident and citizen of the United States and the State of New Jersey. Ellman is not a retired law enforcement officer, and does not fall within any of the other exceptions enumerated in New Jersey's ban on ammunition magazines capable of holding more than 10 rounds of ammunition.

**RESPONSE:**        **Undisputed.**

4.    Prior to the effective date of Act A2761, Ellman is (sic) lawfully owned and kept in New Jersey ammunition magazines that qualified as "large capacity ammunition magazines" under the amended law because they were capable of holding more than 10 but fewer than 16 rounds of ammunition. He owned these magazines for lawful purposes, including self-defense in the home. But for the newly

2

**JA884**

enacted ban, he would have continued to own and keep these magazines in my (sic) New Jersey home. Instead, he was forced to, in some instances, transfer noncompliant magazines and purchase new replacement magazines at considerable cost and in other instances, spend money to permanently modify other magazines thereby significantly impairing their value. Further, since the ban went into effect, he have (sic) purchased several new pistols for which he was required to pay money to permanently modify the magazines down to 10 rounds prior to receiving them in New Jersey.

**RESPONSE:**    **Undisputed.**

5.    If it were lawful, he would also acquire new magazines capable of holding more than 10 rounds of ammunition. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

**RESPONSE:**    **Assuming "he" refers to Plaintiff Ellman, undisputed as to his attested reasons for not acquiring new magazines that hold more than 10 rounds of ammunition.**

6.    He also does not fall within any of the exceptions enumerated in New Jersey's ban on common semi-automatic firearms.

**RESPONSE:**    **Assuming "he" refers to Plaintiff Ellman, undisputed.**

7.    He wishes to own common semi-automatic firearms for lawful purposes, including self-defense in the home. In particular, He (sic) would choose a common semi-automatic rifle as an option for home defense because, as an experienced firearm owner and instructor, he believes that a common semi-automatic rifle is ideally suited to his home defense needs. But for the ban, he would acquire and keep one or more common semi-automatic firearms in his New Jersey home. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

3

**JA885**

**RESPONSE:**    Assuming "he" refers to Plaintiff Ellman, undisputed as to his attested reasons for not acquiring semi-automatic firearms, and as to his attested reasons for wishing to own them.

8.    He would apply for a license to possess common semi-automatic firearms, but he know [sic] that such an attempt would be futile and he would be denied.

**RESPONSE:**    Assuming "he" refers to Plaintiff Ellman, the State also objects that his personal beliefs and speculation are not facts, and the word "common" is unsupported by facts in the record and/or legal conclusions. Undisputed to the extent Plaintiff Ellman attests interest in applying for a license to possess semi-automatic firearms.

9.    Marc Weinberg is a member of ANJRPC.

**RESPONSE:**    Undisputed.

10.    He am [sic] an adult citizen of the United States and resident of New Jersey. He am [sic] not a retired law enforcement officer, and he does not fall within any of the other exceptions enumerated in New Jersey's ban on ammunition magazines capable of holding more than 10 rounds of ammunition.

**RESPONSE:**    Assuming "he" refers to Plaintiff Weinberg, undisputed.

11.    He lawfully owned and kept in New Jersey ammunition magazines that qualified as "large capacity ammunition magazines" under the amended law because they were capable of holding more than 10 but fewer than 16 rounds of ammunition. He owned these magazines for lawful purposes, including self-defense in the home. But for the newly enacted ban, he would have continued to own and keep these magazines in his New Jersey home. Instead, he was forced to sell these magazines at a substantial loss. Further, since the ban went into effect, he have (sic) purchased

4

**JA886**

two new pistols for which he was required to pay money to permanently modify the magazines down to 10 rounds prior to receiving them in New Jersey.

**RESPONSE:** **Assuming "he" refers to Plaintiff Weinberg, undisputed.**

12.    If permitted to do so, he would also acquire new magazines capable of holding more than 10 rounds of ammunition. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

**RESPONSE:** **Assuming "he" refers to Plaintiff Weinberg, undisputed as to his attested reasons for not acquiring new magazines that hold more than 10 rounds of ammunition.**

13.    Thomas Rogers is a member of ANJRPC.

**RESPONSE:** **Undisputed.**

14.    He is an adult citizen of the United States and resident of New Jersey. He does not fall within any of the exceptions enumerated in New Jersey's ban on common semi-automatic firearms.

**RESPONSE:** **Assuming "he" refers to Plaintiff Rogers, undisputed.**

15.    He is a long time, experienced firearms owner, having owned and responsibly used firearms for more than 40 years.

**RESPONSE:** **Assuming "he" refers to Plaintiff Rogers, the State objects that "experienced" and "responsibly used" are is unsupported by facts in the record and/or are legal conclusions. Undisputed that Plaintiff Rogers attests to have owned and used firearms for more than 40 years.**

5

**JA887**

16.    He wishes to own common semi-automatic firearms for lawful purposes, including self-defense in the home. In particular, he would choose a common semi-automatic shotgun as an option for home defense because, as an experienced firearm owner, he believes that a common semi-automatic shotgun is ideally suited to his home defense needs. But for the ban, he would acquire and keep one or more common semi-automatic firearms in his New Jersey home. Because of New Jersey's ban and the associated criminal penalties, he refrains from doing so.

**RESPONSE:**    **Assuming "he" refers to Plaintiff Rogers, the State also objects that his personal beliefs and speculation are not facts, and the word "common" is unsupported by facts in the record and/or legal conclusions. Undisputed as to his attested reasons for not acquiring semi-automatic firearms, and as to his attested reasons for wishing to own them.**

17.    He would apply for a license to possess common semi-automatic firearms, but he knows that such an attempt would be futile and he would be denied.

**RESPONSE:**    **Assuming "he" refers to Plaintiff Rogers, the State also objects that his personal beliefs and speculation are not facts, and the word "common" is unsupported by facts in the record and/or legal conclusions. Undisputed to the extent Plaintiff Rogers attests interest in applying for a license to possess semi-automatic firearms.**

18.    ANJRPC is a nonprofit membership corporation, incorporated in the State of New Jersey in 1936, which represents its members. Its mailing address is 5 Sicomac Road, Suite 292, North Haledon, New Jersey 07508.

**RESPONSE:**    **Undisputed.**

19.    ANJRPC represents the interests of target shooters, hunters, competitors, outdoors people, and other law-abiding firearms owners. Among the ANJRPC's purposes is aiding such persons in every way within its power and supporting and defending the people's right to keep and bear arms, including the right of its members and the public to purchase and possess firearms and magazines.

6

The New Jersey restrictions on magazine size and common semi-automatic firearms at issue in these consolidated cases are thus a direct affront to ANJRPC's central mission. ANJRPC has many thousands of members who reside in New Jersey. ANJRPC brings the claims herein on behalf of its members.

**RESPONSE:    Undisputed that ANJRPC's self-described purposes are as stated and that the organization objects to New Jersey laws challenged here.**

21.    ANJRPC has members who owned and kept in New Jersey ammunition magazines that qualified as "large capacity" or firearms that qualified as "assault firearms" due to their magazine capacity under the revised definitions of those terms enacted by the challenged laws. But for these laws, ANJRPC members would have continued to possess these magazines and firearms in New Jersey for lawful purposes, including self-defense in the home.

**RESPONSE:    Undisputed that the individual Plaintiffs Ellman, Weinberg, and Rogers are currently members of Plaintiff ANJRPC, that each has attested interest in possessing semi-automatic firearms, and that Plaintiffs Ellman and Weinberg has attested interest in possession of ammunition capacities in excess of 10 rounds.**

22.    ANJRPC has members, including Plaintiffs Ellman and Thomas Rogers, who wish to acquire—and but for the ban would acquire—one or more of the banned common semi-automatic firearms for purposes of self-defense in the home or other lawful purposes. Such members would apply for a license to possess common semi-automatic firearms, but they believe that such an attempt would be futile and they would be denied.

**RESPONSE:    Undisputed that individual Plaintiffs Ellman and Rogers are currently members of Plaintiff ANJRPC, and that each has attested interest in possessing semi-automatic firearms.**

7

**JA889**

**The following represents ANJRPC Plaintiffs' reproduction of the Kapelsohn Declaration in full as paragraphs of its Rule 56.1 Statement.**

23.     **Semiautomatic Firearms: Function and History.** A semiautomatic firearm uses the power of the firing cartridge, typically either through diverting some of the pressurized gas from the cartridge's burning propellant gunpowder, or through the rearward recoil produced when the projectile moves forward out of the cartridge case, to operate the gun's mechanism, extracting and ejecting the fired cartridge case and bringing a fresh cartridge into position for firing. In a semiautomatic firearm, the trigger must be pulled separately for each shot. A semiautomatic firearm differs from a manually operated repeating firearm, such as a bolt-action, lever-action, or pump-action firearm, in which the user manually operates the mechanism to bring a fresh cartridge into position for firing. The semiautomatic also differs from a fully automatic ("automatic") firearm – such as a "machine gun" -- in which holding the trigger depressed will result in a continuous, rapid series of shots until the trigger is released or the ammunition supply is exhausted. Semiautomatic firearms are not a new invention. Semiautomatic rifles, shotguns, and handguns were all developed before 1900, and were in common use in the early 1900's. Our military first adopted a semiautomatic pistol (the Colt .45 caliber Model 1911) in the year 1911.

**RESPONSE:        Aside from the General Objections, the State objects to the following statement as inadmissible: "Semiautomatic rifles, shotguns, and handguns … were in common use in the early 1900[s]." This statement lacks foundation, calls for a legal conclusion, and is not supported by record evidence. Mr. Kapelsohn was unable to point to any basis for this opinion. Declaration of Daniel Vannella Ex. 16, Kapelsohn Dep. Tr. at 74:8-76:7.**

**To the extent this statement is admissible, it is disputed. No reasonable trier of fact could reach such a conclusion based on the record evidence.  Semi- and fully automatic firearm technology was developed in the 1880s and did not become reliable or widely available until the beginning of the twentieth century. The primary market was the military.  Vannella Decl. Ex. 4, Spitzer Rpt. ¶ 38; Ex. 12, DeLay Rpt. ¶¶ 6; 76.  When this dramatic technological change provoked unprecedented social concern, it lead to a wave of regulatory legislation across the country.  DeLay Rpt. ¶ 6.**

24.    Armalite, an American small arms engineering firm located in California, developed the AR-15 in the 1950's. It was designed in large part by Eugene ("Gene") Stoner, a famous American firearms designer whom I met and spoke with several times. In 1959, due to financial and production problems, Armalite sold its rights to its AR-10 and AR-15 designs to Colt's Manufacturing. The model designation "AR-15" stands for "Armalite Rifle, Model 15," not for "assault rifle" as some uninformed individuals maintain. A version of the rifle, in "selectfire" form (meaning it could, by operation of a selector switch, be fired either semiautomatically, i.e., one shot for each pull of the trigger, or fully-automatically, i.e., continuous firing as long as the trigger was held depressed), was first used by our military in the Vietnam War as the M-16. AR-15 type rifles, also called "MSRs" or "Modern Sporting Rifles," are today among the most popular rifles sold and used in the United States. They have been manufactured by literally hundreds of companies, including Colt, FN, Ruger, Remington, Bushmaster, Rock River Arms, Wilson Combat, Barrett, DPMS Panther Arms, H&K, Lewis Machine, Olympic Arms, Palmetto State Armory, and Mossberg. The National Shooting Sports Foundation (NSSF), a firearms industry trade group, estimated about five years ago that there were, at that time, between 5 and 10 million AR-15 rifles in civilian hands in the United States. In recent years popularity and sales of the AR-15 have increased greatly, and it has now become one of the most popular rifles and widely-used rifles in the country. AR-15s are made or assembled and sold by many manufacturers, ranging in size from one-man shops to large companies such as Colt, Ruger, Remington, Mossberg, SigArms, Rock River Arms, and others. Current estimates of AR-15 and AK-type semiautomatic firearms in civilian hands in the United States are in the range of 25 million or more. The "AK" stands for Automat Kalashnikova, or Kalashnikov Automatic Rifle. First produced as a Soviet military rifle in 1947 (thus "AK-47"), the AK was the invention of Russian firearms designer Mikhail Kalashnikov. The AK became one of the most widely-used rifles in the world, with semiautomatic versions being sold in the United States and other countries for civilian use. While made in a number of calibers, the most commonly seen caliber for the AK rifles is 7.62 x 39mm, a larger caliber than is used in the standard AR-15 rifle, which fires the .223 Remington or 5.56mm NATO cartridge.

**RESPONSE:**        **Aside from the General Objections, State objects to the following statements as inadmissible:**

a.    **The statements "AR-15 type rifles … are today among the most popular rifles sold and used in the United States," "[i]n recent years popularity and sales of the AR-15 have increased greatly, and it has**

9

**JA891**

now become one of the most popular rifles and widely-used rifles in the country," and "[t]he AK became one of the most widely-used rifles in the world" lack foundation. Kapelsohn was unable to provide any supporting evidence for his opinions. Kapelsohn Dep. Tr. at 82:19-83:14.

b. The statements relying on the NSSF survey are not admissible because they are inadmissible hearsay. Moreover, the State objects to the reliability of its methodology and admissibility as competent evidence. James Curcuruto, a former director of research and market development at NSSF, testified in another case that he and Steve Sanetti, the president of NSSF, essentially made estimates between themselves, and that Mr. Sanetti's personal knowledge was the "sources of data" relied upon when they published statistics related to the number of firearm magazines in circulation. Vannella Decl. Ex. 44, Dep. of James Curcuruto, *Wiese v. Bonta*, 2:17-cv-00903-WBS-KJN (E.D. Ca.) at 48, 133-40.

Even if the NSSF survey is admissible, the State disputes any conclusion that it shows the weapons in question are commonly owned. No reasonable trier of fact could reach such a conclusion based on the record evidence. The NSSF figures also do not represent civilian ownership, as the figures appear to include law enforcement and security agencies, firearms retailers, and possibly prohibited possessors (e.g. violent criminals). Klarevas Rpt. ¶ 14. The surveys and reports by the NSSF also don't necessarily account for AR-15s being amassed in the hands of a relative few. Klarevas Rpt. ¶ 29. Based on the NSSF's own data and Census Bureau statistics, less than 2% of all Americans own a modern sporting rifle. Klarevas Rpt. ¶ 38.

25. The challenged version of the New Jersey "assault firearms" law has nothing to do with the military M16 select-fire rifle, only with the AR-15, the civilian semiautomatic version that fires one single shot for each separate pull of the trigger, just as all other semiautomatic firearms do. The select-fire ("fully automatic") M16 version of the rifle is heavily regulated under federal law and other New Jersey statutes, and is not involved in this case.

10

**RESPONSE:**    **Aside from the General Objections, undisputed that the challenged laws do not address the M16 rifle.**

26.    **Semiautomatic Rifle and Pistol Magazines.** The AR-15 uses a detachable box magazine for the .223 Remington or 5.56mm NATO cartridge. These two rounds are very similar, and can be used interchangeably in many AR-15s. The most common magazine size for the AR-15, and the size of the great majority of magazines manufactured and sold for the AR-15, is 30 rounds. The next most commonly seen magazine size is 20 rounds. Magazines of 5, 10 and 40 rounds are also available, as well as other sizes, but are relatively rare. Over the past decades Kapelsohn has personally seen tens of thousands of 30-round AR-15 magazines, perhaps a thousand 20-round AR-15 magazines, and fewer than 100 AR-15 magazines of all other sizes combined. The New Jersey law is incorrect and misleading when it describes 20-round and 30-round AR-15 magazines as "large capacity ammunition magazines." They are, to the contrary, the <u>standard-sized magazines</u> for the AR-15.

**RESPONSE:**    **Aside from the General Objections, undisputed that "[t]he AR-15 uses a detachable box magazine for the .223 Remington or 5.56mm NATO cartridge. These two rounds are very similar, and can be used interchangeably in many AR-15s."**

**As to the remainder of the alleged facts, the State objects to their admissibility as they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. Mr. Kapelsohn was unable to point to any basis for this opinion. Vannella Decl. Ex. 16 (Kapelsohn Dep. Tr. at 94:1-95:9; 97:20-98:15; 100:17-101:3; 101:13-102:1).**

**Even if admissible, the statement that magazines with ammunition capacity under 10 rounds are "relatively rare" is disputed, and no reasonable trier of fact could reach such a conclusion based on the record evidence. Vannella Decl. Ex. 11, Yurgealitis Rpt. ¶¶ 91-110.**

27.    The AK-type firearms also use detachable box magazines. Far and away the most commonly seen and commonly available magazine for the AK firearms holds 30 rounds, although both smaller capacity and larger capacity

11

**JA893**

magazines are available. The most widely-available and commonly seen magazines for other semiautomatic rifles, including the Ruger Mini-14, Steyr AUG, M1A, Galil and others are 20 to 30 rounds. Standard-size magazines for the M1 Carbine are 15 and 30 rounds.

**RESPONSE:    Aside from the General Objections, undisputed that "[t]he AK-type firearms also use detachable box magazines." As to the remainder of the alleged facts, the State objects to their admissibility as they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. *See* State's Response to ¶ 26.**

28.    With an estimated 25 million AR-15 and AK-type firearms in civilian hands in the United States, there are certainly many times that number of 20-round and 30-round magazines in private ownership as well. Estimates that there are currently 100 million or more 30-round AR-15 magazines in circulation are quite credible. Magazines are relatively inexpensive, with either metal or plastic 30-round AR-15 magazines commonly selling for $10 to $15 each, whereas the rifles in which the magazines are used may cost $600 to $1,000 or more. It is not unusual to see literally several thousand 30-round AR-15 and AK magazines for sale at a modest-sized weekend gun show.

**RESPONSE:    Aside from the General Objections, undisputed that "either metal or plastic 30-round AR-15 magazines commonly sell[] for $10 to $15 each, whereas the rifles in which the magazines are used may cost $600 to $1,000 or more." As to the remainder of the alleged facts, the State objects to their admissibility as they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. *See* State's Response to ¶ 26. *See also* Kapelsohn Dep. Tr. 103:24-105:14; 105:15-106:13 (unable to provide support for opinions).**

29.    The New Jersey law's limit of handgun magazine size to 10 rounds imposes an unreasonable restriction on New Jersey gun owners, especially (but not only) those with concealed carry permits. Many popular semiautomatic pistols have greater magazine capacities.  Examples include the Glock 17 (17 rounds), the SIG P320 (17 rounds), and the Smith & Wesson M&P9 2.0 (17 rounds). Even the compact versions of these pistols – specifically, the Glock 19, the SIG P320 Compact, and the S&W M&P9 Compact, all have magazine capacities of 15 rounds. Some of the most popular "micro-9" pistols have magazine capacities that exceed

12

the New Jersey limit, such as the Springfield Hellcat (11-round and 13-round magazines), the S&W Shield Plus (10-round and 13-round magazines), and the SIG P365 (10, 12, 15 and 17-round magazines). For many individuals carrying a concealed handgun for self-protection, carrying an extra magazine to compensate for the New Jersey law's magazine size limit imposes an uncomfortable, and in some cases impossible, burden. There is no rational basis for an argument that limiting pistol magazine size to 10 rounds, as opposed to 12 or 15 or some other number of rounds, has any discernible effect on crime, or any negative effect on public safety. Most police nationwide, including in New Jersey, carry handguns that hold 16-18 rounds, plus between one and three additional loaded magazines on their persons. If police officers need that many rounds to protect themselves and the public, why should gun owners in New Jersey be limited to fewer rounds to protect themselves and their loved ones?

**RESPONSE:**    **Aside from the General Objections, State objects to the following statements as inadmissible:**

    a.  **The State objects to the admissibility of statements about the practices of "police nationwide" as these statements lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

    b.  **Disputed as to: "Many popular semiautomatic pistols have greater [than 10 rounds] magazine capacities.  Examples include the Glock 17 (17 rounds), the SIG P320 (17 rounds), and the Smith & Wesson M&P9 2.0 (17 rounds). Even the compact versions of these pistols – specifically, the Glock 19, the SIG P320 Compact, and the S&W M&P9 Compact, all have magazine capacities of 15 rounds. Some of the most popular 'micro-9' pistols have magazine capacities that exceed the New Jersey limit, such as the Springfield Hellcat (11-round and 13-round magazines), the S&W Shield Plus (10-round and 13-round magazines), and the SIG P365 (10, 12, 15 and 17-round magazines)." These alleged facts are unclear in stating what certain firearms "have."  In fact, 10-round magazines are manufactured by many companies, and magazines that hold more than 10 rounds can be easily modified to hold only 10 rounds.  Yurgealitis Rpt. ¶¶ 91-110.**

    30.    **Use and Advantages of the AR-15 Rifle.** AR-15 rifles are commonly used for both formal and informal target shooting (including each year at the

13

National Matches at Camp Perry, Ohio), for hunting, by farmers and ranchers for control of predators and pest animals, and for self-defense. They are also widely used by law enforcement agencies as "patrol rifles," in many parts of the country all but completely replacing the 12-gauge shotgun as the shoulder weapon carried in most police cars. Anyone visiting a retail gun store in most states will likely see many AR-15 rifles for sale, as well as displays of magazines, accessories, and ammunition for these rifles. Similarly, someone taking a trip to most outdoor shooting ranges, and indoor ranges with rifle capability as well, will find many people target shooting with AR-15 rifles.

**RESPONSE:    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. To the extent the evidence is admissible, the State disputes that AR-15 rifles are "commonly used … for self-defense." No reasonable trier of fact could reach such a conclusion based on the record evidence. *See, e.g.*, Vannella Decl. Ex. 7 Allen Rpt. ¶¶ 19-24; Ex. 9, Klarevas Rpt. ¶¶ 25-26.**

31.    The AR-15 is especially popular because of its light weight, very mild recoil, and good ergonomics, all of which make it well suited to younger shooters, female shooters, and other shooters of smaller stature, as well as an easy rifle for larger, stronger individuals to use. All of these design features of the AR-15 – its light weight, mild recoil, and good ergonomics – as well as the adjustable length of its buttstock when fitted with a telescoping buttstock (as it commonly is), the effectiveness of its cartridge for self-defense use, and its better continuity of fire when used with its most commonly available 20-round and 30-round magazines, make the AR-15, in many cases, a much better choice of shoulder weapon for self-defense by a female user or other smaller-statured user than the 12-gauge or other shotguns that have often been recommended for that purpose in the past. The shotgun, in fact, is much harder for most women (as well as most other shooters) to use, too heavy, ill-fitting in its commonly available stock configurations, and has recoil which is far too punishing, discouraging practice and resulting in poor competence and many safety problems. For the same reasons that the AR-15 has largely replaced the shotgun in police use, it is a better choice as a self-defense weapon for many private individuals as well. Other semiautomatic rifles which would be prohibited by the New Jersey legislation are similarly good choices as self-defense shoulder weapons for women and men alike.

14

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.** *See, e.g.*, **Kapelsohn Dep. Tr. 82:19-83:14; 94:1-95:9; 97:20-98:15; 100:17-101:3; 101:13-102:1). Further, disputed as to the notion that use of AR-15's by law enforcement makes them suitable for civilian self defense. No reasonable trier of fact could reach such a conclusion based on the record evidence.** *See, e.g.*, **Kapelsohn Dep. Tr. 118:16-119:17 (admitting that civilians and law enforcement offices confront different defensive situations are subject to different standards); Yurgealitis Rpt. ¶ 156 (noting dangers of AR-15 in civilian hands for law enforcement safety).**

32.    A major disadvantage of the shotguns often recommended for defense in the home is the shotgun's considerable recoil. Used with the type of shotgun usually recommended for defensive use, the typical 12-gauge shotgun often has 25 foot pounds or more of free recoil when fired, which makes firing more than a few shots unpleasant or painful for many shooters. Even in police training programs, this much recoil becomes problematic, limiting the amount of shooting that can be done, and the familiarity and skill level with the shotgun that can be achieved. Also, the spreading pattern of shotgun pellets, whether birdshot or buckshot, creates a danger due to the possibility of pellets missing the intended target, even with a properly-aimed shot. In contrast, the AR-15 and similar semi-automatic rifles have little perceptible recoil, and are therefore much more pleasant to shoot. More shots can therefore be fired in training, and better familiarity with the firearm and accurate results can thus be more easily obtained. In many thousands of law enforcement agencies nationwide, the switch from shotguns to AR-15s and similar semiautomatic rifles as shoulder weapons has resulted in officers handling the guns with greater confidence and competence, and firing with accuracy, even at distances of 50 yards and more, far exceeding the accuracy most officers were ever able to achieve with shotguns. This results not only in greater effectiveness when the rifle must be used for self-defense, but greater safety as well, not only for the user but for any others who may be in the area. The same effectiveness and safety should be available to non-police officers as to police officers.

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. Further, disputed as to the notion that use of AR-15's by law**

15

**JA897**

enforcement makes them suitable for civilian self defense. **No reasonable trier of fact could reach such a conclusion based on the record evidence.** *See, e.g.*, **Kapelsohn Dep. Tr. 118:16-119:17 (admitting that civilians and law enforcement offices confront different defensive situations are subject to different standards). Further disputed that assault firearms are effective weapons for choice for home defense or personal protection. Yurgealitis Rpt ¶¶ 141-149.**

33.    <u>Use of the AR-15 and Similar Rifles for Self-Defense.</u> The fact that AR-15s and similar semiautomatic rifles are suitable for self-defense use by private individuals is supported by many examples of such use. For example, a pregnant mother used an AR-15 to save the life of her husband, killing one of the two intruders who were terrorizing her family. **Exhibit 2** is a true and correct copy of the digital article "Pregnant Florida Mom Uses AR-15 to Kill Home Intruder."

**<u>RESPONSE:</u>        Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.** *See, e.g.,* **Vannella Decl. Ex. 14 (Kapelsohn rebuttal report stating "that newspaper articles are "often extremely inaccurate" and "I certainly would not accept newspaper stories for accurate data on how many shots were fired"). In addition, Mr. Kapelsohn admitted that he does not know how many cases or incidents in the last ten years in the United States involved use of semi-automatic rifles in self-defense. Kapelsohn Dep. Tr. 138:7-11.  Mr. Kapelsohn also admitted that he does not know how many unlawful uses of force with semi-automatic rifles there have been in the last ten years, only that he has a "general impression."** *Id.* **at 138:23-139:7.  Mr. Kapelsohn also did not know whether more self-defense incidents use a semi-automatic rifle versus another type of weapon; he just has a "belief" that more handguns are used.** *Id.* **at 142:2-18.**

**Even if these statements are admissible, disputed as to the notion that use of AR-15's by law enforcement makes them suitable for civilian self defense. No reasonable trier of fact could reach such a conclusion based on the record evidence.** *See, e.g.*, **Kapelsohn Dep. Tr. 118:16-119:17 (admitting that civilians and law enforcement offices confront different defensive situations are subject**

to different standards). **Further disputed that assault firearms are effective weapons for choice for home defense or personal protection. Yurgealitis Rpt ¶¶ 141-149.**

34.     Another example was in Glen St. Mary, Florida in 2018, where seven home invaders were fought off by their would-be victim using an AR-15. One of the seven invaders was killed, and five others were arrested. The defender fired over thirty (30)shots in the process, underscoring the need for magazines that hold more than a few rounds of ammunition. **Exhibit 3** is a true and correct copy of the digital article, "Deputies: 30 Rounds Fired From AR-15 in Deadly Florida Home Invasion."

**RESPONSE:     Aside from the General Objections, disputed as to all alleged facts for the same reasons provided in the State's Response to #33.**

35.     In another case, in Oswego, Illinois, a man named Dave Thomas, who was in legal possession of an AR-15, used it without the need to fire a single shot to stop a man who was repeatedly stabbing one of his neighbors. **Exhibit 4** is a true and correct copy of the digital article "Man Armed With AR-15 Stops Attack By Neighbor in Oswego."

**RESPONSE:     Aside from the General Objections, disputed as to all alleged facts for the same reasons provided in the State's Response to #33.**

36.     In the highly-publicized 2017 active shooter event at the First Baptist Church in Sutherland Springs, Texas, in which the gunman killed 27 people and wounded 20 others, a 55- year-old plumber living across the street from the church, alerted by his daughter that a man was shooting people at the church, got his AR-15 out of his gun safe, loaded it, and exchanged shots with the gunman, hitting him twice, and then flagged down a passing motorist to pursue the gunman together when the gunman attempted to flee from the scene. **Exhibit 5** is a true and correct copy of the digital article, "Texas Hero Reportedly Used His Own AR to Confront the Sutherland Springs Shooter."

17

**JA899**

**RESPONSE:**    Aside from the General Objections, disputed as to all alleged facts for the same reasons provided in the State's Response to #33.

37.    In a case in Harris County, Texas in 2013, a 15-year-old boy, at home with his little sister, used an AR-15 to drive off two burglars who had broken a window to enter the house. They fled, leaving a trail of blood. **Exhibit 6** is a true and correct copy of the digital article, "Harris County Deputy's Son Shoots One of Two Intruders."

**RESPONSE:**    Aside from the General Objections, disputed as to all alleged facts for the same reasons provided in the State's Response to #33.

38.    Also in 2013, a man with a .223 AR-15-type rifle in Montgomery County, Pennsylvania, successfully defended himself and his wife against an intruder, who died later in the hospital. **Exhibit 7** is a true and correct copy of the digital article, "Elkins Park Man Killed After Forcing His Way Into Apartment."

**RESPONSE:**    Aside from the General Objections, disputed as to all alleged facts for the same reasons provided in the State's Response to #33.

39.    In 2017 in Broken Arrow, Oklahoma, three masked intruders were shot and killed by 23-year-old Zach Peters, the son of the home's owner, using an AR-15 rifle. The shooting was ruled justifiable. Exhibit 8 is a true and correct copy of the digital article, "Shooting Deemed Justifiable: Authorities Say Zach Peters Acted Lawfully When He Shot, Killed Three Intruders."

**RESPONSE:**    Aside from the General Objections, disputed as to all alleged facts for the same reasons provided in the State's Response to #33.

40.    Numerous other cases in which the AR-15 and other semi-automatic rifles have been used in self-defense can be found. The fact that several of the above examples are cases in which a homeowner or other private citizen has had to fight

off multiple attackers is significant in explaining the need for semiautomatic firearms and magazines that hold 20-30 rounds of ammunition.

**RESPONSE:** **Aside from the General Objections, disputed as to all alleged facts for the same reasons provided in the State's Response to #33.**

41.    It is incorrect, and in fact a common myth, that the .223/5.56mm projectile fired by the AR-15 and other rifles under consideration is too penetrative to be used safely for self-defense inside and around homes, businesses, farms and ranches. If that were the case, police would not be using AR-15 "patrol rifles" nationwide, including in urban and suburban areas, and as entry weapons for indoor searches and arrests. The fact is that with properly selected ammunition, the .223/5.56mm actually presents less danger of overpenetrating walls, floors, ceilings and criminal attackers than conventional self-defense handgun bullets in calibers such as 9mm, .40 S&W, and .45 Auto. This is because the .223/5.56mm has a much higher muzzle velocity and fires a much smaller, lighter projectile which, if properly selected as to projectile type (e.g., the self-defense type rounds that are widely available where ammunition is sold), will fragment easily and will be unlikely to penetrate as many sheetrock partitions or other common building elements as many common handgun bullets. Kapelsohn has demonstrated this to classes of police and others by firing through sheetrock and other materials, and many published studies confirm the same results. See Exhibit 9 an article by R.K. Taubert (FBI, Ret.), "About .223 Penetration," Exhibit 10 "Real World Testing: .223/5.56 Penetration Tests vs. .40 S&W and 12 ga. Slug," and Exhibit 11 "Why 'High-Powered' 5.56 NATO/.223 AR-15 is Safer for Home Defense (FBI Overpenetration Testing)," Prepared Gun Owners, July 14, 2016.

**RESPONSE:** **Aside from the General Objections, disputed as to all alleged facts. No reasonable trier of fact could reach such a conclusion based on the record evidence. At his deposition, Mr. Kapelsohn admitted that the basis for this statement is simply his own amorphous "knowledge" and anecdotal experience. Kapelsohn Dep. Tr. 142:19-143:17. He admitted that penetration depends on many factors.** *Id.* **at 144:11-13. He claimed to have performed his own penetration tests, but stated he did not have any written records of prior tests and could not even describe any with any detail.** *Id.* **at 146:16-17.** *See generally* **State's Mot. to Exclude Testimony of Emanuel Kapelsohn and Clayton Cramer.**

19

**The remaining bases for Mr. Kapelsohn's opinion about firearm projectile penetration are three articles. As to the first article, which he marked Exhibit 9, he could not state at his deposition where or when it was published, or who performed the tests. Kapelsohn Dep. Tr. 149:13-21; 151:2-7). Exhibit 9 also contradicts Mr. Kapelsohn's own statement that .223 caliber bullets cannot penetrate sheetrock, because it states such ammunition penetrates body armor, military ballistic helmets, and ballistic garments. *See* Kapelsohn Decl. at Exhibit 9, p. 3. As to the second article, Exhibit 10, he could not state at his deposition where or when it was published, who wrote it, or where he even found it. Kapelsohn Dep. Tr. 154:19-22; T155:1-6. The third article, Exhibit 11, "Prepared Gun Owners," is not an admissible source and lacks foundation. *Id.* at 155:25-156:4.**

42.    **Features of the AR-15 and Other So-Called "Assault Weapons."** The New Jersey statute, in addition to listing a number of prohibited "assault weapons," identifies several features that supposedly distinguish "assault weapons" – as it defines that term -- from ordinary semiautomatic firearms. In actuality, the term "assault weapon" (unlike "assault rifle," which is a compact, lightweight select-fire rifle firing an intermediate-powered cartridge) is a pejorative term created by legislative draftsmen which has no technical definition in the firearms field. See Standards & Practices Reference Guide for Law Enforcement Firearms Instructors, P. Covey and E. Kapelsohn, 1995, "assault rifle" and "assault weapon," p. 5 ff.

**RESPONSE:    Aside from the General Objections, this paragraph consists entirely of legal conclusion and/or argument and/or improper opinion. In any event, the statutes speak for themselves.**

43.    The New Jersey statute categorizes as "substantially identical" to the banned firearms, and thus also banned, semiautomatic rifles that have the ability to accept a detachable magazine, and at least two of the following features: i. a folding or telescoping stock; ii. a pistol grip that protrudes conspicuously beneath the action of the weapon; iii. a bayonet mount; iv. a flash suppressor, or a threaded barrel designed to accommodate a flash suppressor; or v. a grenade launcher.

**RESPONSE:    Aside from the General Objections, this paragraph consists entirely of legal conclusion and/or argument and/or improper opinion. In any event, the statutes speak for themselves.**

20

44.    The statute also prohibits a semiautomatic shotgun that has at least two of the following features: i. a folding or telescoping stock; ii. a pistol grip that protrudes conspicuously beneath the action of the weapon; iii. a fixed magazine capacity in excess of 5 rounds; or iv. an ability to accept a detachable magazine.

**RESPONSE:    Aside from the General Objections, this paragraph consists entirely of legal conclusion and/or argument and/or improper opinion. In any event, the statutes speak for themselves.**

45.    Having extensive personal experience as a user, as a firearms instructor, and as a consultant, with all of the design features identified by the legislation, and with their practical effects on the capabilities of firearms, Kapelsohn has addressed these features below.

**RESPONSE:    Aside from the General Objections, this paragraph consists entirely of legal conclusion and/or argument and/or improper opinion.**

46.    **Pistol Grips.** One of the New Jersey law's prohibited features is a "pistol grip that protrudes conspicuously beneath the action of the weapon." The AR-15 is, as discussed above, a semiautomatic version of the select-fire military M16 and its predecessor, the Armalite Rifle Model 15 ("AR-15"). The M16 is designed, as its "select-fire" description indicates, to fire either semiautomatically, or automatically ("full-auto") by the positioning of its safety/selector lever for one or the other mode of fire. When firing automatically ("full-auto"), the military M16 has a cyclic rate of fire of 750-900 rounds per minute. In practical effect, with the most commonly used 30-round magazines, a shooter firing an M16 full-auto may actually be able to discharge roughly 250-300 rounds per minute, although not necessarily with good accuracy. In order to allow military users of the M16 to fire it full-auto while staying on target, rather than having significant "muzzle climb" while firing, the M16, and similar fully-automatic or select-fire rifles, employ what is termed a "straight-line design," meaning that the rifle's barrel and its stock, which is placed on the user's shoulder when firing, are in a straight line, so that recoil is transmitted straight rearward into the user's shoulder along the axis of the bore,

21

**JA903**

which is the axis of recoil. **Exhibit 12** is a diagram of a standard AR-15/M16, showing this straight-line design. In order to make the straight-line design possible, the front and rear sight assemblies of the M16 and AR-15 are raised considerably (about 2-1/2 inches) above the line of the rifle's bore (barrel), so that they will be in line with the shooter's eye for aiming, when the rifle's buttstock is seated on the user's shoulder in firing position. This differs from the conventional design of sporting rifles and shotguns (generally wooden-stocked), in which the sights are mounted much closer to the axis of the bore/axis of recoil, and the buttstock angles downward significantly to reach the user's shoulder. Because the buttstock and the point of shoulder support is thus significantly below the axis of recoil, such conventionally-stocked rifles exhibit a great deal of "muzzle rise" when each shot is fired. This slows down even semiautomatic or manually-operated shots from conventionally-stocked rifles, and would make it very hard to keep them on target if they could be made to fire full-auto. The purpose of the M16's straight-line design is to eliminate this muzzle rise from shot to shot. However, because the M16 and AR-15 have a stock which comes straight back from the rifle's receiver to the user's shoulder, it then becomes necessary to provide a "pistol grip" that protrudes downward from the rifle's receiver ("action," per the New Jersey statute). Otherwise, the user would have to raise his or her dominant arm uncomfortably high to grip the rifle, operate the manual safety, and pull the trigger. In such a position, the dominant hand could interfere with aiming the rifle, in addition to which the trigger and trigger guard of the M16 and AR-15 are not located in a position that would make this contorted arm and hand position easily performable. The design purpose of the M16/AR-15's pistol grip is to position the user's hand properly and comfortably behind the trigger and trigger guard of the rifle – a position which would not be feasible for the user to assume without the pistol grip – and, in the case of the M16 when fired full-auto in military use, to provide better control of the rifle in full-auto fire.

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

**Disputed that "The design purpose of the M16/AR-15's pistol grip is to position the user's hand properly and comfortably behind the trigger and trigger guard of the rifle." No reasonable trier of fact could reach such a**

**conclusion based on the record evidence. In fact, the pistol grip somewhat increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator). Yurgealitis Rpt. ¶ 122.**

47.    Even when the rifle is fired semiautomatically, in the normal manner for the "civilian" AR-15, the straight-line stock design and the pistol grip reduces muzzle rise, allowing more accurate fire and faster follow-up shots.

**RESPONSE:    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

48.    Contrary to the claims of some anti-gun activists, a pistol grip on a rifle stock does not allow the rifle to be "wildly spray fired" in all directions. Certainly our Department of Defense would not want our military rifles, including our M16 and later evolved M4 rifles, to be so equipped. Neither would law enforcement agencies all over the United States, which are concerned with the accuracy and safety with which their AR-15 patrol rifles can be fired, including in areas which may be densely populated with innocent bystanders. The pistol grip on the AR-15 stock, and pistol grips on the stocks of other semiautomatic rifles and shotguns, also do not allow these rifles to be reloaded any faster than similar firearms without pistol grips. Instead, pistol grips on semiautomatic rifles and shotguns simply provide an appropriate and comfortable way of gripping these firearms, without contorting one's hand, wrist and arm into an unnatural position.

**RESPONSE:    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

**The following statement is disputed: "The pistol grip on the AR-15 stock, and pistol grips on the stocks of other semiautomatic rifles and shotguns, also do not allow these rifles to be reloaded any faster than similar firearms without**

23

**JA905**

pistol grips. Instead, pistol grips on semiautomatic rifles and shotguns simply provide an appropriate and comfortable way of gripping these firearms, without contorting one's hand, wrist and arm into an unnatural position." *See* Yurgealitis Rpt. 122.

49.    Largely because pistol grip stocks on semiautomatic rifles have proven to be so comfortable, and to permit good control of the weapon and its controls, pistol grip stocks have in recent years grown in popularity on semiautomatic and pump-action shotguns as well. As with pistol grip stocks on semiautomatic rifles, pistol grip stocks on semiautomatic or other shotguns do not especially permit or induce "spray firing" (whatever that means), or faster reloading of the firearms. Pistol grip stocks do not make the rifles or shotguns better suited to criminal purposes, and do not create a public safety problem. Pistol grip stocks are not "evil." Pistol grip stocks, commonly used on rifles and shotguns throughout most of the United States, are simply a feature the New Jersey legislature seems to have chosen to identify rifles and shotguns it wishes to make illegal, with no apparent reason that supports such action.

**RESPONSE:    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. At his deposition, Mr. Kapelsohn provided no evidence to support the claim that "pistol grip stocks have in recent years grown in popularity on semiautomatic and pump-action shotguns as well" and admitted he had no data about how many firearms have pistol grips. Kapelsohn Dep. Tr. 158:4-18.**

50.    **Folding or Telescoping Stocks.** Another of the prohibiting features for both semiautomatic rifles and shotguns in New Jersey, is the firearm having a "folding or telescoping stock." While the AR-15 can be equipped with a solid (that is, not telescoping) buttstock, telescoping buttstocks are far more popular, and are in fact standard on most AR-15 rifles sold today throughout the country, as well as on many other models of semiautomatic rifles.

24

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

51.    What telescoping buttstocks actually do is allow for the rifle stock to be adjusted to properly fit the user. The U.S. military's current telescoping buttstock for its M4 rifle (the modern evolution of the M16) allows the stock to be set for any of four to six different lengths. This allows the rifle to be used comfortably and fired accurately by shorter-statured shooters, including female shooters among others. It also allows the rifle to be adjusted for comfortable, accurate firing from different shooting positions, as a stock length that works well in the standing position may be too long for optimum use from a sitting or kneeling position. The telescoping stock also allows the stock to be shortened when the shooter is wearing heavy clothing, as in wintertime, and lengthened when lighter clothing is worn in warmer weather. Telescoping-style adjustable stocks are used for these same reasons on many other firearms other than semiautomatic rifles, including both pump-action and semiautomatic shotguns, for example the Mossberg pump-action Model 500 Tactical and ATI Tactical shotguns.

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. Also, disputed to the extent it conflicts with the State's evidence.** ***See*** **Yurgeleatis ¶ 124.**

52.    Folding stocks, in contrast to telescoping stocks, offer law-abiding firearms users the advantage of storing the firearm more conveniently, and transporting it to and from the range in a more compact carrying case. A folding-stock semiautomatic rifle or shotgun with its stock folded is still not a particularly concealable firearm, and handguns, not rifles or shotguns with either a folding or a telescoping stock, will remain the firearms most often used by criminals.

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a**

25

legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. Also, disputed to the extent it conflicts with the State's evidence. *See* Yurgeleatis ¶ 124.

53.    __Bayonet Mounts.__ Another prohibited feature is a "bayonet mount," sometimes called a "bayonet lug." This is typically a small steel block, welded to the barrel of a firearm a few inches back from the muzzle, which can be used to attach a bayonet to the rifle or shotgun. In fact, bayonet mounts are common on many types of civilian rifles and shotguns. Bayonet mounts have approximately zero significance with regard to crime and public safety in the United States. One would be hard pressed to find crimes committed with bayonets mounted on rifles or shotguns. One never hears, for instance, of "drive-by bayonettings." Again, the New Jersey statute's prohibiting of bayonet mounts, while sensational, is largely superfluous.

__RESPONSE:__    __Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. Disputed that bayonet mounts "have approximately zero significance with regard to crime and public safety in the United States." No reasonable trier of fact could reach such a conclusion based on the record evidence. *See* Yurgeleatis Rpt. ¶ 47.__

54.    __Flash Suppressors and Threaded Muzzles.__ Another of the prohibited features is a "flash suppressor," or a threaded barrel designed to accommodate a flash suppressor. A flash suppressor is a fixture on the end of a rifle's barrel that divides and diverts the muzzle flash through several slots or holes, most commonly arranged radially around the axis of the bore. The most common type of flash suppressor on AR-15 rifles is probably the Mil Spec A2 birdcage type, which has four slots from about the nine o'clock to three o'clock positions (that is, around the top 180 degrees of the suppressor), but is solid on the bottom in order not to raise clouds of dust or dirt when firing from a prone position on dry ground. __Exhibit 13__ is a picture of an A2 birdcage flash suppressor. Flash suppressors are not expensive accessories; for example, the Aero Precision A2 birdcage-type suppressor shown in Exhibit 13 retails for $7.99.

26

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

55.    The major advantages of a flash suppressor on a rifle's barrel are: (1) the reduction of muzzle flash so as not to temporarily blind a shooter who is firing in a darkened environment, whether in a defensive situation or on an indoor shooting range, and (2) the reduction of muzzle flash from a military rifle, so as to minimize the illumination of the shooter, which might reveal his location to enemy troops in darkened environments. The flash suppressor also serves to protect the muzzle of the rifle from dirt, mud, sand, etc., which could dangerously plug the muzzle if it were to touch the ground outdoors. Purpose (2) above, which is primarily military in nature, is of questionable importance in regard to the criminal use of firearms in the civilian world. Purpose (1) above is important in a rifle used for self-defense by civilians, and legislation that prohibits flash suppressors makes rifles less suitable for self-defense use by civilians. Law enforcement statistics indicate that a high percentage of violent crime occurs during the hours of darkness, or in otherwise darkened environments (poorly lighted indoor areas, for example). Exhibit 14 is a digital article from Security Magazine, "Violent Crimes Most Likely to Occur At Night." The use of a rifle without a flash suppressor under those circumstances is likely to temporarily blind the user, or at least seriously impair the user's vision, placing the law-abiding user at a disadvantage to a criminal attacker, and increasing the danger to the public if the vision-impaired user must fire the rifle before his or her normal visual abilities return after an unsuppressed muzzle flash in the dark. **Exhibit 15** provides an example of the difference between an AR-15's muzzle flash with no flash suppressor (Exh. 15A), and the muzzle flash when a suppressor is used (Exh. 15B).

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. *See* Kapelsohn Dep. Tr. 163:17-164:2. Also, disputed to the extent it conflicts with the State's evidence. *See* Yurgeleatis Rpt. ¶ 125.**

27

56.    The value of the flash suppressor in protecting the rifle's muzzle from being damaged, or from being plugged with mud, dirt or sand if the rifle's muzzle touches the ground, is significant, and is stressed by some instructors in defensive rifle classes. I have personally seen a firearm's barrel burst upon firing when the muzzle was plugged with mud after inadvertent contact with the ground. Luckily no one was injured, but the results could have been catastrophic.

**RESPONSE:**    **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  Also, disputed to the extent it conflicts with the State's evidence.** *See* **Yurgeleatis Rpt. ¶ 125.**

57.    A great many rifles today come standard from the manufacturers with threaded muzzles, with the threads protected by screw-off metal caps. These threaded muzzles will allow the attachment of various muzzle devices, including flash suppressors, recoil-reducing muzzle brakes, or sound suppressors (so-called "silencers"). While sound suppressors are prohibited for civilian ownership in New Jersey, they are legal, with proper federal licensing, in many other states, including nearby Pennsylvania. Contrary to their portrayal on television and in movies as instruments of crime, sound suppressors do not make the report of most firearms nearly inaudible, and the suppressors have many legitimate purposes on semiautomatic rifles used for defensive purposes, whether by police or private individuals. The most important of those legitimate purposes is to allow the user to fire the rifle, especially in indoor environments, without suffering permanent hearing loss from the sound of shots. This can occur because, unlike shooting on a firing range while wearing hearing protectors, firing a .223 rifle without hearing protection, as would likely be the case in a self-defense situation, can in many cases result in some degree of permanent hearing loss. For this reason, police departments today are often equipping their AR-15 patrol rifles with sound suppressors to protect the hearing of their police officers.

**RESPONSE:**    **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a**

28

**JA910**

legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  Also, disputed to the extent it conflicts with the State's evidence. Yurgeleatis Rpt. ¶¶ 40, 48, 128.

58.    Even though sound suppressors are not legal for civilian ownership in New Jersey, and regardless of whether or not the user wishes to, or can legally, attach a flash suppressor to the muzzle of the rifle, the fact that New Jersey's "assault firearm" statute prohibits rifles with threaded muzzles eliminates many excellent threaded-muzzle firearms from being able to be sold, purchased or possessed in New Jersey, despite the fact that the threaded muzzle, in and of itself, has little if any effect on crime or public safety.

**RESPONSE:**    **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  Also, disputed to the extent it conflicts with the State's evidence. Yurgeleatis Rpt. ¶¶ 40, 48, 128.**

59.    One of the muzzle devices a threaded muzzle allows the user to attach to a rifle is a muzzle brake, which is a recoil-reducing device. Muzzle brakes are advantageous, are preferred by many shooters, and are perfectly legal under New Jersey law. But because the New Jersey law lists threaded muzzles as one of the prohibiting features, it makes it much more difficult, if not in some cases impossible, for a New Jersey gun owner to make use of a muzzle brake for his semiautomatic rifle.

**RESPONSE:**    **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  Also, disputed to the extent it conflicts with the State's evidence. Yurgeleatis Rpt. ¶¶ 40, 48, 128.**

60.    **Prohibited Pistol Features.** The New Jersey statute also prohibits semiautomatic pistols that have the ability to accept detachable magazines and have

29

at least two of the following features: i. magazine that attaches to the pistol outside of the pistol grip; ii. A threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; iii. A shroud that is attached to, or partially or completely encircles, the barrel and permits the shooter to hold the firearm with the non-trigger hand without being burned; or iv. A manufactured weight of 50 ounces or more when the pistol is unloaded.

**RESPONSE:    Aside from the General Objections, the entire paragraph consists of legal conclusion.  In any event, the laws of New Jersey speak for themselves.**

61.    The attachment point of the pistol's magazine (item i above) has nothing to do with the pistol's safety or its usefulness to criminals. Like other features discussed above, this is an arbitrarily-chosen feature that is only useful as a means of criminalizing certain firearms, with no rational basis for doing so.

**RESPONSE:    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  At his deposition Mr. Kapelsohn testified he had no data supporting how common this feature is.  Kapelsohn Dep. Tr. 173:5-174:9.**

62.    Threaded barrels (item ii of Paragraph 66) have already been discussed above. The threaded barrel itself does not make the handgun "evil" or unsafe. Increasing numbers of handguns today come from the factory with threaded muzzles. The advantages of a flash suppressor have already been discussed, and will not be covered again here. Flash suppressors are, in any event, rarely used on handguns. Silencers are illegal for ownership by private individuals in New Jersey, so it seems fairly senseless to prohibit a pistol with a threaded barrel simply because that feature might allow the pistol to be fitted with a silencer. A "barrel extender" is usually a purely cosmetic feature, affecting only the appearance of the handgun. A forward handgrip may allow some people to hold pistol more firmly and fire it more accurately. It is hard to see why the New Jersey legislature would be opposed to this.

30

JA912

**RESPONSE:**    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.

63.    A barrel shroud (item iii of Paragraph 66) serves to protect the shooter's hand from being burned by a barrel that has become hot from firing. Barrel shrouds have been commonly used on rifle and shotgun barrels since the early 1900's, and are available on many rifles and shotguns today. It is hard to see how a device that serves to protect the user's hand, and that is legally provided on many rifles and shotguns, should be illegal when used on a handgun.

**RESPONSE:**    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  Also, disputed to the extent it conflicts with the State's evidence. Yurgeleatis Rpt. ¶¶ 46, 127

64.    The total weight of the handgun (item iv of Paragraph 66), at 50 ounces when unloaded, makes the described firearm unusually large and heavy for a handgun. This, in turn, makes the handgun less easily concealed and carried, whether by a criminal or a law-abiding user. It is difficult to see how this forms a rational basis for prohibiting a firearm.

**RESPONSE:**    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  Also, disputed to the extent it conflicts with the State's evidence. Yurgeleatis Rpt. ¶¶ 142.

65.    **Shotgun Magazine Capacity.** Another of the prohibited features is a semiautomatic shogun with a fixed magazine capacity of over five rounds. Many semiautomatic shotguns intended for self-defense use have magazine capacity of over five rounds. The Mossberg 930 (8-shot capacity) and several of the excellent

31

**JA913**

Benelli tactical shotguns are examples. Because shotguns with fixed (i.e., tubular) magazines must be reloaded one round at a time – a slow and difficult process at best in a stressful self-defense situation – the magazine capacity of the shotgun is an important feature, as larger capacity reduces the likelihood that reloading during the midst of a self-defense shooting incident will be necessary.

**RESPONSE:    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  Also, disputed to the extent it conflicts with the State's evidence.**

66.    **Conclusion.** New Jersey's so-called "assault weapon" legislation appears to focus primarily on cosmetic features of firearms. In fact, the AR-15 is just another semiautomatic rifle, a type of firearm that has existed since about 1900. The AR-15 is, in many cases, an excellent rifle for law-abiding citizens to use for self-defense, as well as for target shooting, recreational shooting, and hunting or control of predators, rodents and other pest animals where game laws permit. Features such as flash suppressors, threads at the muzzle end of the barrel, pistol grips, telescoping or folding stocks, bayonet mounts, and the other features discussed above are of little significance to criminals, but serve to criminalize rifles and shotguns, widely used by the tens of millions throughout most of the United States, that are useful, accurate, and safe for law-abiding citizens to use. Pistol grips, flash suppressors, threaded muzzles, telescoping or folding stocks, detachable magazines for semiautomatic rifles, and shotgun magazine capacity in excess of five rounds, all have legitimate advantages to the law-abiding user. These are not "evil" features, and are not features that particularly suit the firearm to criminal use, rather than to legitimate use by law-abiding gun owners. It appears that this legislation is either ill-informed, or that its intent is to prohibit some of the most widely used – because they are the most useful – firearms in existence in the United States, which are regularly chosen by law-abiding Americans to protect themselves and their loved-ones from violent crime.

**RESPONSE:    Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

32

**JA914**

67. (i) Semi-automatic handguns, rifles and shotguns are not new, "evil" creations, but have been in use since before 1900.

(ii)    The AR-15 and AK-type semiautomatic rifles are owned and used by millions of law-abiding Americans for lawful purposes including self-protection, recreational shooting, hunting, and pest control.

(iii)    20-round and 30-round semiautomatic rifle magazines are not "large capacity ammunition magazines," as the New Jersey law misleadingly states. To the contrary, these are the standard-sized magazines for many of the semiautomatic rifles addressed in this lawsuit.

(iv)    AR-15 rifles are accurate, reliable, safe and easy to use effectively, which is why these rifles are often the firearms chosen by law enforcement and by private individuals for defensive use.

(v)    Limiting New Jersey gun owners to 10-round magazines for their semiautomatic rifles and pistols imposes an unreasonable and arbitrary disadvantage on them, which negatively affects their ability to defend themselves and their loved ones against violent criminal attack.

(vi)    Pistol grips on semiautomatic rifles and shotguns are not "evil" features, but have practical advantages in allowing the firearms to be controlled and fired accurately. On the AR-15, for example, these advantages are why Eugene Stoner, one of the world's foremost firearms designers, designed the AR-15 with a pistol grip rather than with some other kind of stock.

(vii)    Telescoping stocks are not "evil" features, but can be adjusted to allow rifles and shotguns to be handled and fired effectively by shooters of various statures, in various shooting positions, and when wearing various types of clothing or equipment.

(viii)    Folding and telescoping stocks for rifles and shotguns allow the firearms to be stored more conveniently, and transported more easily. Even when folded or retracted, these stocks do not make the rifles or shotguns so small as to be easily concealed by criminals. Handguns will remain the weapons of choice of most criminals, as they have always been.

(ix)    It is unlikely that the technical restrictions of the New Jersey law will be heeded by violent criminals, or that these restrictions will have any noticeable effect on crime.

(x)    Bayonet mounts are basically irrelevant to the use of firearms by criminals, and the inclusion of bayonet mounts in the list of prohibited features will have no noticeable effect on crime or public safety. The only effect of this provision will be to make many excellent rifles and shotguns unavailable for sale to or ownership by New Jersey gun users.

(xi)        Flash suppressors on AR-15s and other semiautomatic rifles have a valuable purpose, make the rifles safer to use in dim light, and improve public safety as well.

(xii)   Threaded muzzles per se have no significant impact on crime or public safety. The prohibition of threaded muzzles makes many excellent firearms unavailable for sale to or ownership by New Jersey gun users. The prohibition of threaded muzzles also makes it difficult or impossible for New Jersey gun users to use muzzle brakes – a perfectly legal device with valuable recoil-reducing advantages – on their firearms.

(xiii)  Some of the prohibited features in the handgun section of the law, such as barrel shrouds, provide specific, legitimate advantages to the firearms user. Other prohibited handgun features, such as where the magazine attaches to the handgun, or whether the handgun has a barrel extender, are arbitrary and irrelevant to crime and public safety. The overall effect of the handgun section is simply to criminalize various handguns, based on an arbitrary list of features.

(xiv)  Especially given the slowness and difficulty of reloading a tubular-magazine shotgun during the stress of a self-defense confrontation, the limitation of semiautomatic shotguns to a capacity of 5 rounds places New Jersey gun users at a significant disadvantage in confrontations with violent criminal attackers.

**RESPONSE:**        **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.  As this paragraph contains a summary of statements made in prior paragraphs, and State has previously responded in above paragraphs, it adopts those same responses here.**

**The following represents ANJRPC Plaintiffs' reproduction of the Hlebinsky Declaration in full as paragraphs of its Rule 56.1 Statement.**

68.    1. Until recently, civilians often had superior firearms than the military. The 1986 Hughes Amendment, a civilian machine gun ban, shifted that trend in the opposite direction. 2. Technologies often associated with modern day have roots back as far as the 1400s in some respects, and those modern-day firearms are the direct descendants of a centuries long trail of innovations that gradually and continually advanced firearms technology for the purpose of increasing efficiency and effectiveness. 3. It is likely that individuals during the Founding Era were aware (a) that these technologies existed before and at the time of the Founding Era and

34

immediately thereafter and (b) that firearm technology previously underwent and would in the future undergo significant change and innovation.

**RESPONSE:**      **Aside from the General Objections, the State objects to the admissibility of these statements because they lack foundation and are not supported by record evidence.**

**To the extent these statements are admissible, they are disputed in their entirety. No reasonable trier of fact could reach such a conclusion based on the record evidence. First, the record evidence disputes that "[u]ntil recently, civilians often had superior firearms than the military." Spitzer Decl. ¶ 47; DeLay Decl. ¶¶ 86, 87, 89, 90. Disputed also that modern-day firearms technologies existed before and at the time of the Founding and immediately thereafter, and that individuals during the Founding Era were aware of them at that time. Spitzer Decl. ¶¶ 8, 23; DeLay Decl. ¶ 22. Disputed to the extent it is being suggested that the Hughes Amendment was the first enactment to limit civilian access to military weapons or "shifted [a] trend." DeLay Decl. ¶ 93; Vannella Decl. Ex. 5, Roth Rpt. ¶ 56; Spitzer Rpt. ¶¶ 6, 11-15, 45 & Ex. D; Vannella Decl. Ex. 3, Cornell Rpt. at 35-36.**

69.    Terminology

**[Reproduction omitted]**

**RESPONSE:**      **Aside from the General Objections, the State objects to this statement because it contains no material facts.**

70.    The term assault weapon (or the equivalent New Jersey legislative term "assault firearm") is used in this record based on an overarching theme among various federal and state laws as a legislative catch-all term that has differing definitions dependent of proposed legislation that typically center around features of certain semi-automatic firearms. Note, this is not to be confused with the term Assault Rifle, which is defined by the Defense Intelligence Agency (1970) to mean a machine gun that is single person portable, selective fire (meaning it has both automatic and semi-automatic functions) and chambers an intermediate cartridge from a detachable magazine. The terms assault weapon (or firearm) and assault

35

rifle are constantly confused with one another despite being extremely different technologies. Additionally, due to the Hughes Amendment, a part of the Firearms Owners Protection Act (1986), which is a civilian machine gun ban, assault rifles made after 1986 are not permitted for private purchase, and therefore, not a concern for this case.

**RESPONSE:**     **Aside from the General Objections, the State objects to this statement because it contains no material facts.**

71. In this record the term repeater or repeating firearm is defined as a firearm, of all types, that can fire more than one round before needing to be manually reloaded. A magazine is a vital part of the firearm; it is a container, detachable or fixed, that holds and feeds ammunition into a repeating firearm. In the periods being discussed, there are repeating firearms that do not use magazines, such as revolvers, which use a rotating cylinder that is as important and integral as a magazine is to fire a gun. Capacity to refer specifically to the number of rounds of ammunition that can be held within a firearm. Please see **Exhibit B** for more definitions.

**RESPONSE:**     **Aside from the General Objections, the State objects to this statement because it contains no material facts. Object to the statement "[a] magazine is a vital part of the firearm" as it is vague, confusing, and lacks foundation.**

72.     **History of Sport and War**. The expression "weapon of war" is used a lot in modern and historical discussions surrounding firearms. Today, it is used as an umbrella term to describe a range of different firearms that people perceive as being useful to warfare, regardless of whether they were actually used on or designed for the battlefield. How the expression is used today implies a distinct line between firearms made for the military and firearms made for the civilian market. However, that line for centuries has always been blurred.

**RESPONSE:**     **Aside from the General Objections, the State objects to this statement because it contains no material facts. The State also objects to the admissibility of this statements because it lacks foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

36

73.    Once firearms were developed, technology often advanced too quickly for common battlefield use, finding popularity in the civilian market. Military firearms in a general sense were limited by tactics, government bureaucracy, and expense, while civilian arms, until recently, were predominantly limited by individual budget. Additionally, civilian arms could be employed for far greater number of uses, including hunting, self-defense, and target shooting. The earliest firearms technology appeared on the battlefield by the thirteenth century. The hand cannon, or handgonne, was little more than the name suggests, a cannon for your hands. The user utilized a touchhole and external fire source to ignite powder and fire the gun (**Exhibit C**). This primitive technology may not have been designed for a sporting purpose, but once it was designed, inventors pushed the boundaries, capabilities, and usages of firearms into the future. And while the hand cannon specifically may not have been used for sport, other military weapons of the time such as longbows and crossbows were popularly used for target shooting competitions in fairs during the Middle Ages.

**RESPONSE:**    **Aside from the General Objections, the State objects to this statement because it contains no material facts. The State also objects to the admissibility of these statements because they lack foundation, call for a legal conclusion, constitute improper lay opinion, and are not supported by record evidence. The Hlebinsky Declaration does not attach or cite to any information or authorities to support this paragraph, with the exception of Exhibit C which merely displays a photograph of a hand cannon.**

**Disputed to the extent that the Hlebinsky Declaration wrongly asserts that "Once firearms were developed, technology often advanced too quickly for common battlefield use, finding popularity in the civilian market," and "Military firearms in a general sense were limited by tactics, government bureaucracy, and expense, while civilian arms, until recently, were predominantly limited by individual budget." No reasonable trier of fact could reach such a conclusion based on the record evidence. (Spitzer Decl. ¶ 47; DeLay Decl. ¶¶ 10, 11, 14, 33.)**

74.    The first true ignition system, the matchlock, was developed around 1400. This firearm, which utilized a burning match cord, was a popular military arm used for centuries around the world (**Exhibit D).** By the end of the 1400s, however, matchlocks and subsequent ignition systems also began appearing in early target shooting competitions (**Exhibit E).** Another example of a firearm being adopted for

37

civilian use dates a century after the matchlock. In the first decade of the 1500s, a highly advanced handgun was developed, the wheellock. This gun, developed for use on horseback, was operated by the turning of a spring-loaded wheel **(Exhibit F).** While it saw some battlefield use, it was expensive and difficult to repair. As a result, it was used for specialized purposes on the battlefield in Europe, but not as much in the colonies. However, the technology was considered so advanced, some European countries made and used wheellocks for sport in the 1800s. Another example of superior technology being used by civilians rather than military is rifling. Rifling, the boring out of the inside of a barrel with spiral lands and grooves to spin a projectile, thus making it more accurate, was developed in the mid-1400s and appeared predominantly in civilian arms, with a few military exceptions in the American Revolution, until improved developments in ammunition technology allowed it to be more commonly adopted on the battlefield by the mid-1800s (**Exhibit G**). Although in many instances, such as with the infantry, it was not until later in the nineteenth century that tactics caught up enough for rifling to be fully utilized. [INCLUDED IN FOOTNOTE "2":] Examples of rifled matchlocks do exist. Rifled wheellocks are far more common as they were so often used for hunting. Halbrook, Stephen. *America's Rifle: The Case for the AR-15,* pg. 101: "Around 1450, a German gunsmith cut spiral lands and grooves inside a gun barrel…such guns were called riffeln."

**RESPONSE:**      **Aside from the General Objections, the State objects to this statement because it contains no material facts. The State also objects to the admissibility of these statements because they lack foundation, call for a legal conclusion, constitute improper lay opinion, and are not supported by record evidence.  The Hlebinsky Declaration does not attach or cite to any information or authorities to support this paragraph, with the exception of Exhibit D, E, F, and G which merely contain photographs or diagrams of the weapons referenced therein.**

**Disputed to the extent that the Hlebinsky Declaration wrongly asserts that civilians had superior technology to the military.  Spitzer Decl. ¶ 47; DeLay Decl. ¶¶ 86, 87, 89, 90.**

75.      Before the ability to mass manufacture firearms, guns often were privately made by gunsmiths. Although armories existed in some form for centuries, there was significant cross pollination among gunsmiths, who did not work autonomously from one another. Rather, between the sixteenth through eighteenth

centuries in Europe, the process of becoming a gunmaker was governed by guilds. These associations set rules about how to identify prospective students as well as create a standard for what they would be taught. As a result, ideas concerning the construction and decoration of firearms flowed freely throughout continental Europe. Another factor that allowed makers to emulate work was the widespread distribution of pattern books illustrating the latest fashions in arms in the years following 1640. Primarily produced in Paris, these books were eagerly sought after by makers throughout Europe and in the eighteenth century even made their way to the American colonies. [INCLUDED IN FOOTNOTE "3":] Information from the exhibition narrative. Houze, Herbert G. Co-Curator. "Art of the Hunt: Decorated European Sporting Arms from 1500-1800." Exhibition. Houston Museum of Natural Science, 2019.

**RESPONSE:    Aside from the General Objections, undisputed; however, this paragraph contains no material facts.**

76.    Although two armories did exist in the United States around the time of the Founding Era, many guns for the battlefield were made or assembled by individuals or receive via foreign aid. It is estimated that 2,500-3,000 gunsmiths worked in the colonies alone. They, as private citizens, were responsible for making guns for both the military and civilians. While the standard infantry arm during the American Revolution was a smoothbore (no rifling) musket, there were some regiments during the War that used a common civilian firearm at the time, the American long rifle (**Exhibit H**). The long rifle was a modified design from the German jaeger (hunting) rifle that tended to have a longer barrel and a smaller caliber than its German counterpart. This civilian rifle was the far superior firearm in terms of accuracy compared to the inaccurate military smoothbore musket. however, because of the type of projectile employed at the time—a round musket ball – the process to load was slower for rifles because the ball had to fit snuggly within the lands and grooves of the rifling, therefore it was not feasible for expansive military adoption. Examples of long rifles, however, were made with two barrels that would swivel to compensate for that limitation (**Exhibit I**). The long rifle in the colonies served as a multi-purpose tool. It was capable of being used for hunting, self-defense, and target shooting. Important to note though that unless being made for large-scale military adoption, such as the smoothbore musket, and/or produced with the use of parts kits ordered from overseas, civilian arms could be made at the request of individuals or in small runs. [INCLUDED IN FOOTNOTE "4":] Moller, George D. *American Military Shoulder Arms: Volume 1.* University of New Mexico Press, 2011. P.107. [INCLUDED IN FOOTNOTE "5":] Until the development of a

39

successful conically shaped bullet (rather than a round musket ball) by Claude Etienne Minie and modified by James Burton at Harpers Ferry, rifling was expensive and slow to load. For a round ball to effectively spin in rifling, it had to fit perfectly which slowed the loading process. However, it was perfect for target shooting as well as hunting and specialized military use. Since tactics by the military were still shoulder-to-shoulder fighting, accuracy was not of prime importance, so militaries used smoothbore (unrifled) barrels for their standard equipment. [INCLUDED IN FOOTNOTE "6":] Examples can be found in the Cody Firearms Museum.

**RESPONSE:    Aside from the General Objections, undisputed; however, this paragraph contains no material facts. The statement that colonial-era rifles were "*capable* of being used for … self-defense" is not disputed. (emphasis added).** *Cf.* **Roth Decl. ¶¶ 18, 20, 21.**

77.    Target shooting was a part of American culture before the formation of the United States with colonists taking part in competitions known as "Rifle Frolics." In fact, David Ramsay in his "History of the American Revolution" (1789) spoke about the Battle of Bunker Hill (1775). He wrote, "None of the provincials in this engagement were riflemen, but they were all good marksmen. The whole of their previous military knowledge had been derived from hunting, and the ordinary amusements of sportsmen. The dexterity which by the long habit they had acquired in hitting beasts, birds, and marks, was fatally applied to the destruction of the British officers." This tradition has continued throughout American history, especially after the Civil War. For example, the National Rifle Association was founded by Union officers in 1871, and its corde purpose was "to promote and encourage rifle shooting on a scientific basis." What resulted was the proliferation of international shooting competitions. Another example is the Olympic sport of Biathlon, a sport which involves both skiing and target shooting, dating to 1767 in Europe. It was initially created for government use in places like Norway. That purpose persisted for centuries, even after becoming an international sport. In the 1930s, Finnish troops still used skis and rifles for patrol. Until recently, the firearms used in Biathlon and other disciplines of the shooting sports, often used modified versions of centerfire NATO cartridge firearms **(Exhibit J).** By the nineteenth century, progress on manufacturing processes allowed more firearms of more varieties to be available to the U.S. government as well as civilians. Many repeaters of all sorts produced during this century came in specific models indicating sporting vs military variants. [INCLUDED IN FOOTNOTE "7":] Halbrook, Stephen. *The Founders of the Second Amendment: Origins of the Right to Bear Arms.* Pg. 96-97. [INCLUDED IN FOOTNOTE "8":] The National Rifle Association of America was founded after the

40

**JA922**

National Rifle Association in the United Kingdom (1859). [INCLUDED IN FOOTNOTE "9":] An example of a centerfire modified firearm can be found in the Cody Firearms Museum. [INCLUDED IN FOOTNOTE "10":] Flayderman, Norm. *The Flayderman's Guide to Antique American Firearms…and their Values*. 9th Ed (2019). This book is considered the gold standard in the evaluation of antique American made firearms. It provides not only firearms organized by manufacturer but also by type, such as repeater, sporting, military etc. Here is just one example: pgs. 694-695. [INCLUDED IN FOOTNOTE "11":] Moller, George D. *American Military Shoulder Arms: Volume 1*. University of New Mexico Press, 2011. P.107.

**RESPONSE:** **Aside from the General Objections, undisputed, except that the statement "By the nineteenth century" is vague and confusing. To the extent the statement asserts that repeaters were manufactured for civilian use by 1800, that statement is not admissible because it lacks foundation and is not supported by record evidence. To the extent that statement is admissible, it is disputed, and no reasonable trier of fact could reach such a conclusion based on the record evidence.** *See* **DeLay Rpt. ¶¶ 5, 8, 13, 14, 51; Cornell Rpt. 22.**

78.    The line between military and civilian arms was certainly blurred at the founding of the country. While the military, as previously referenced, sometimes utilized superior civilian arms, civilians could also possess guns that were traditionally associated with the military, such as cannons. That blurred line also extended to the role of the civilian and soldier. In the colonies and in early America, certain citizens were required to serve in their militias with firearm and ammunition requirements and some soldiers carried their personal firearms into battle. By the American Civil War, it was not unheard of for soldiers to privately purchase firearms that the U.S. government had not adopted or did not issue to them for use in battle. After the war, even military issue weapons that were used in war were often sold on the civilian market. After the Civil War, soldiers could buy their firearms and many dealers and distributors sold the surplus in mass in their catalogs or at stores for even lower prices. According to Springfield Armory National Historic Site, "many thousands [of] cheap surplus weapons were released into private hands through General Orders 101, providing rifles, pistols, carbines, and muskets that found their ways into the hands of Americans in the decades following the Civil War." The tradition of selling military arms to civilians continues today with firearms such as the Springfield Model 1903 bolt action rifle and even with semi-automatics such as the M1 Garand rifle, the M1 carbine, and the Model 1911 pistol. [INCLUDED IN FOOTNOTE "11":] Moller, George D. *American Military Shoulder Arms: Volume 1*. University of New Mexico Press, 2011. P.107  [INCLUDED IN FOOTNOTE

41

"12":] Springfield Armory details this information here <https://www.nps.gov/spar/learn/historyculture/a-springfield-rifle-musket.htm> Accessed June 15, 2023. [INCLUDED IN FOOTNOTE "13":] Today, postwar weapon surplus guns including several semi-automatic firearms such as the M1 Garand are sold through the Civilian Marksmanship Unit <https://thecmp.org/sales-and-service/1911-information/> <https://thecmp.org/sales-and-service/services-for-the-m1-garand/> Accessed June 15, 2023.

**RESPONSE:** **Aside from the General Objections, undisputed that certain weapons used by the military, such as bolt-action rifles, are also available to civilians. Disputed to the extent that the Hlebinsky Declaration wrongly asserts that civilians had more superior arms than the military at the Founding. No reasonable trier of fact could reach such a conclusion based on the record evidence. Spitzer Decl. ¶ 47; DeLay Decl. ¶¶ 86, 87, 89, 90.**

79.    To summarize, there has always been an ebb and flow of civilian and military firearms for centuries, some with clearer lines than others. It is unfair to suggest that historically a gun at the time of its use would have been completely understood as only for war or sport because there was such interchangeability.

**RESPONSE:** **Aside from the General Objections, the State objects to this statement because it contains no material facts. The State also objects to the admissibility of this statements because it lacks foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence.**

80.    **Timeline of Major Inventions**. (too voluminous and unnecessary to restate in full here):

**RESPONSE:** **Aside from the General Objections, the State does not dispute the approximate dates and technological events set forth in the timeline.**

**As to the following statement:**

**"Importantly, many of the greatest technological leaps occurred in the first three hundred years of development, with the initial invention of many technologies that are still employed in modern firearms. Later**

42

innovations, even into the mid-twentieth century, have tended to be more gradual refinements."

**This statement is not admissible because it is vague, confusing, lacks foundation and is not supported by record evidence. Ms. Hlebinsky could provide no support for her opinion, and could not specify which events "in the first three hundred years of development," or for that matter any time period, are examples of the "greatest technological leaps." Vannella Decl. Ex. 18, Hlebinsky Dep. Tr. 135:18-140:2.**

**To the extent that statement is admissible, it is disputed, and no reasonable trier of fact could reach such a conclusion based on the record evidence. *See* DeLay Decl. ¶ 93; Spitzer Decl. ¶¶ 83, 84.).**

81.    There are many terms used to define rifles, pistols, and shotguns regulated in assault weapons (firearms) bans. Regardless, the technologies banned by the statutes represent incremental change in technological innovation over the past 600 years.

**RESPONSE: Aside from the General Objections, this statement is not admissible because it is vague, confusing, lacks foundation and is not supported by record evidence. The State refers to and adopts its response to paragraph 80.**

82.    **General History of Repeaters**. As will be seen below, New Jersey's legal limit of ten rounds in an ammunition magazine is historically arbitrary, particularly for the time frame being discussed. The capacity for repeaters and magazine-fed repeaters were not fixed to one number, rather the number was constantly changing depending on design. Even model variations, such as a Winchester Model 1866, feature a range of different capacities based on the size of the magazine, the barrel, the caliber etc. Therefore, a ten-round ammunition capacity is not notable historically. As previously mentioned, repeater is a firearm of any type that can fire multiple rounds before having to manually reload. [INCLUDED IN FOOTNOTE "15":] The federal government itself did not make this distinction until the 1990s. This date is referencing the Public Safety and Recreational Firearms Use Protection Act (1994). Additionally, there are many resources that can showcase the number of repeaters available in this time frame in the United States, but the place

43

**JA925**

that aggregates them the best is Flayderman, Norm. *The Flayderman's Guide to Antique American Firearms…and their Values*. 9th Ed.

**RESPONSE**: **Aside from the General Objections, the State objects to this statement because it contains no material facts. As to the statement "Therefore, a ten-round ammunition capacity is not notable historically," the State objects to this statement as vague and confusing, as it is unclear what "notable historically" means. To the extent the above statement means to assert that 19th Century repeaters commonly had greater than ten-round capacity, that is disputed, and no reasonable trier of fact could reach such a conclusion based on the record evidence. The record evidence shows that vast majority of repeating pistols produced in the nineteenth century held seven or fewer rounds, DeLay Decl. ¶ 58, and the larger capacity repeating rifles in existence at that time constituted only approximately 0.02% of all firearms in the United States, Vannella Decl. Ex. 4, Correction to Rebuttal Report of Professor Brian DeLay ¶¶ 1-2.**

83.    The concept of a repeater dates to the earliest technology of firearms. Hand cannons even came in multi-barrel variations (**Exhibit K).** While some repeaters were employed on the battlefield, they would not be widely popular for use in war until the late nineteenth century. That did not mean, however, that innovation in repeating technology was stymied. In fact, it was quite the opposite. Without the confines of wartime tactics and budget, many repeating firearms were commissioned by civilians who utilized them. The simplest method of producing arms capable of firing more than one round without manually reloading initially was to fit a firearm with more than one barrel. However, due to weight limitations, gunmakers began experimenting with other means of producing repeating arms during the sixteenth century. One of the first methods attempted involved superimposed loads, which were successive charges of powder and ball on top of each other that were separated by wadding or the projectile itself in one barrel. They were fitted with locks that either had multiple cocks and pans or a single lock that could slide upon a rail. One such example was a sixteen-shot firearm made in 1580 (**Exhibit L).** [INCLUDED IN FOOTNOTE "16":] This firearm was on display at the National Firearms Museum's location in Missouri. Winant, Lewis. "A 16-Shot Wheel Lock," *America's 1st Freedom* (2014).

**RESPONSE:**        **Aside from the General Objections, undisputed as to any alleged facts.**

84.    By the 1630s, a Dutch gun making family, Kalthoff (also spelled in some sources, Calthoff), began experimenting with a design that allowed up to fifteen shots to be fired in rapid succession. It utilized a tubular magazine located in a pistol or rifle stock to hold powder and balls (**Exhibit M).** This system was so innovative it was reproduced and modified for over 150 years. According to late historian Herbert G. Houze, "their longevity is perhaps best demonstrated by the fact that Admiral Horatio Nelson owned a repeating flintlock pistol of their basic design, as did President Thomas Jefferson." Also, by the mid-seventeenth century in Italy, other magazine-fed repeaters were being developed. According to the Royal Armouries (Leeds), an early example can be found at the Musée de l'Armée which was made by Giacomo Berselli of Bolognia in the late 1660s. However, more well-known is the Lorenzoni of Florence. The firearm is a magazine-fed repeater that came in pistol and rifle form. This design was copied and modified by numerous designers after its invention with various configurations and magazine capacities (**Exhibit N**). In addition to magazines, revolving technology was also being developed during this time. The Dafte revolver, for example, had a "single fixed barrel mounted to a central arbor upon which a cylinder of chambers rotates." **(Exhibit O).** [INCLUDED IN FOOTNOTE "17":] Houze, Herbert G. Co-Curator. "Art of the Hunt: Decorated European Sporting Arms from 1500-1800." Exhibition. Houston Museum of Natural Science, 2019. [INCLUDED IN FOOTNOTE "18":] Ibid. [INCLUDED IN FOOTNOTE "19":] For more information, visit: https://royalarmouries.org/stories/our-collection/the-christmas-connection-to-captain-souths-lorenzoni-pistol-ourcollection/ Accessed June 15, 2023. [INCLUDED IN FOOTNOTE "20":] Ferguson, Jonathan. "An Important Early Self-Rotating Revolver c. 1680, possibly by John Dafte." *The Antique Arms Fair at Olympia London*. Pg. 30.

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

85.    In 1722, Boston designer John Pim demonstrated a firearm that was alleged to have been "loaded but once" and "discharged eleven times following with bullets, in the space of two minutes." Additionally, a Boston gunsmith named Samuel Miller advertised for a twenty-shot repeater. [INCLUDED IN FOOTNOTE "21":] Kopel, David and Joseph Greenlee. "The History of Bans on Type of Arms before 1900." *Journals of Legislation*, page 38 (Forthcoming 2024). [INCLUDED IN FOOTNOTE "22":] Ibid, 38.

45

**RESPONSE:**        **Aside from the General Objections, undisputed as to any alleged facts.**

86.    In 1724, another designer Emmanual Wetschgi of Augsburg advertised his flintlock magazine firearm in a handbill (**Exhibit P**). According to Houze:

> "Not only did he describe his design's advantages and the ease with which it could be used, he also included an engraving showing one of his pistols being fired. This image, which is believed to represent Christian III, Count Palatine of Zweibrucken with the inventor by his side holding a sporting gun built on the same system…More importantly, it also incorporates what may be the first true advertising slogan…'What other pistols can shoot multiple rounds on one loading as accurately, rapidly, and as far, as today's Wetscghi?'"

[INCLUDED IN FOOTNOTE "23":] Houze, Herbert G. Co-Curator. "Art of the Hunt: Decorated European Sporting Arms from 1500-1800." Exhibition. Houston Museum of Natural Science, 2019.

**RESPONSE:**        **Aside from the General Objections, undisputed as to any alleged facts.**

87.    Another example of the Lorenzoni style was a firearm designed by British gunsmith, John Cookson in the late seventeenth century (**Exhibit Q**). A gunmaker in Boston, also named John Cookson – it is not clear if this person was the same Cookson from England, a relative, or a coincidence – published an ad in the *Boston Gazette*, in 1756, advertising a nine- shot repeating firearm (**Exhibit R**). Around the same time a Cookson-type twelve-shot repeater was made by gunmaker John Shaw. Another example from the 1750s in America is the Belton repeating fusil. This gun was invented by Joseph Belton around 1758 (**Exhibit S**). Not a magazine repeater like the Lorenzoni, the Belton utilized superimposed loads. Notably, he petitioned the Continental Congress during the American Revolution to adopt his firearm. In 1777, Belton showcased a musket that shot sixteen rounds at once in front of General Horatio Gates, Major General Benedict Arnold, and scientist David Rittenhouse. The observers wrote on July 10, 1777:

46

**JA928**

"Having Carefully examined M. Belton's New Constructed Musket from which he discharged Sixteen Balls loaded at one time, we are fully of Opinion that Muskets of his Construction with some small alterations, or improvements might be Rendered, or great Service, in the Defense of lives, Redoubts, Ships & c. & even in the Field, and that for his ingenuity & improvement he is Intitled to a handsome reward from the Publick."

[INCLUDED IN FOOTNOTE "24":] An example of this firearm can be found in the National Firearms Museum <https://www.nramuseum.org/the-museum/the-galleries/the-roadto-american-liberty/case-22-the-paper-cartridge/cookson-volitional-repeating-flintlock.aspx> It is also discussed here in this site linked directly from the Royal Armouries: <http://firearmshistory.blogspot.com/2014/02/the-cookson-repeater.html> Accessed June 15, 2023.  [INCLUDED IN FOOTNOTE "25":] Kopel, pg. 38.

**RESPONSE**:        **Aside from the General Objections, undisputed as to any alleged facts.**

88.    The Continental Congress ordered one hundred Belton firearms for use in the Continental Army. However, this order was canceled. Surviving and modified examples of the Belton design were made by his partner in the 1780s, including artifacts at the Royal Armouries in Leeds, that include a detachable magazine variation. One also has a sliding spout meant for port fire – a slow-burning ignition system. When locked into place, the user would essentially ignore the main trigger, frizzen, and cock and just pull the lock backwards one stage at a time, making the firearm, while not strictly a semi-automatic, have a similar rate of fire to that or a double action. Around 1779, the Girardoni (also spelled Girandoni) air rifle was developed. It was a repeating arm that could fire twenty-two rounds from a tubular magazine (**Exhibit T).** The magazine itself was quick to reload with the help of speed loading tubes. Speed loading tubes or speed loaders are essentially a device through which you can load ammunition quickly into a magazine or a firearm. There are several ways this can be employed. Additionally, the Girardoni could fire forty rounds before needing air to be pumped again. The Girardoni was used by Meriweather Lewis on the Lewis and Clark Expedition (1804-1806). Over 1,000 Girardonis were made for service with the Austrian military, but light weight examples were allegedly produced in sporting variations. This design also was

47

copied by gunmakers around the world.  [INCLUDED IN FOOTNOTE "26":] The Royal Armouries has two of these detachable magazine Belton repeaters. It can be seen here: <https://www.youtube.com/watch?v=-wOmUM40G2U> Accessed June 15, 2023. The description of the operation of fire is from a conversation with Keeper of Arms, Jonathan Ferguson. [INCLUDED IN FOOTNOTE "27":] Kopel, David. "The History of Firearms Magazines and Magazine Prohibitions." Albany Law Review, Vol. 88, 2015, pg. 853.[INCLUDED IN FOOTNOTE "28":] Kopel, David & Joseph G.S. Greenlee. "The History of Bans on Types of Arms before 1900. Pg. 40. [INCLUDED IN FOOTNOTE "29":] For more information on Lewis and Clark and the Girardoni, the most comprehensive research on the Girardoni air rifle was done by scholar Michael Carrick. His research is footnoted in this summary article of the Lewis and Clark firearms that can be found here: <http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf>  Accessed June 15, 2023, Additionally, Ian McCollum, one of the foremost authorities on firearms technology in the United States, has done several videos and articles about the firearm. This is one article he wrote <https://www.forgottenweapons.com/rifles/girardoni-air-rifle/> Accessed June 15, 2023. A surviving example of a Girardoni can be found: <https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-8-romance-of-the-long-rifle/girardoni-air-rifle-asused-by-lewis-and-clark.aspx> Accessed June 15, 2023, Rock Island sold a sporting variation in 2018: <https://www.rockislandauction.com/detail/75/3293/girardoni-system-repeating-air-gun > Accessed June 15, 2023. [INCLUDED IN FOOTNOTE "30":] An example of a Russian copy of a Girardoni Rifle can be found in the Cody Firearms Museum.

**RESPONSE:**    **Aside from the General Objections, disputed that the Girardoni air rifle could fire forty rounds before needing to be air pumped. DeLay Decl. ¶ 29.  Undisputed as to any other alleged facts.**

89.    Around the ratification of the Second Amendment, other repeaters were being developed throughout the world, including multi-barrel firearms in which all barrels could fire at once, such as the Nock Volley gun and Duck's Foot pistol (**Exhibit U**). There is also a surviving example of a firearm commissioned by an individual around the end of the 1700s. It is a fourteen-barrel double Nock volley gun style rifle. Each set of seven barrels has its own lock plate and trigger. To better facilitate loading, the firearm came with a speed loader that allowed the user to pour the charge into a small device that the user could then pour down seven barrels simultaneously. This firearm was a sporting arm. To facilitate accuracy at such a

large size, it has a hand rest forward of trigger, under the barrels. In the event the user only wanted to use one set of seven barrels, he had a replaceable stock made with one lock plate and trigger. In America, Joseph Gaston Chambers devised a repeating musket that could fire, according to him, twenty rounds a minute (**Exhibit V**). He approached the U.S. War Department in 1792 with his invention. The Secretary of War, Henry Knox, was interested in finding a firearm that would supply more power and requested that one of Chambers' firearms be acquired for testing. A demonstration was set up at Alexander Hamilton's "Seat" on the Schuylkill. Furthermore, Chambers petitioned Thomas Jefferson for help spreading the word of his invention. To which Jefferson referred him to the U.S. Patent Office. His invention was not adopted initially with concerns for structural stability, but his repeating muskets, pistols and seven-barreled swivel guns were adopted by the U.S. Navy and Pennsylvania for the War of 1812. Between September 1813 and September 1814, Philadelphia arms makers would produce at least fifty-three seven-barreled swivel guns that could fire two-hundred bullets a piece, two hundred repeating muskets, and one hundred repeating pistols. Outside of the United States, European countries were also interested in his inventions. Another repeater designed in 1821 was known as the Jennings repeating flintlock. It was capable of firing twelve rounds before having to reload (**Exhibit W).** [INCLUDED IN FOOTNOTE "31":]An example of the Duck's Foot Pistol can be found here: <https://www.recoilweb.com/ducks-foot-pistol-old-school-172784.html> Accessed January 31, 2023. An example of the Nock Volley Gun can be found here by British scholar Matthew Moss https://armourersbench.com/2020/01/12/nock-volley-gun/. Accessed June 15, 2023. [INCLUDED IN FOOTNOTE "32":] McCollum, Ian. Forgotten Weapons: <https://www.youtube.com/watch?v=ivdlcHUwaEw> Accessed June 15, 2023. [INCLUDED IN FOOTNOTE "33":] Fagal, Andrew J.B. "The Promise of American Repeating Weapons, 1791-1821. *Age of Revolutions*. Fagal is the Associate Editor at Princeton University's Papers of Thomas Jefferson. https://ageofrevolutions.com/2016/10/20/the-promise-of-american-repeating-weapons-1791-1821/ June 15, 2023. [INCLUDED IN FOOTNOTE "34":] < https://founders.archives.gov/?q=Joseph%20chambers%20bursted&s=1111311111 &sa=&r=1&sr=> Accessed June 15, 2023. [INCLUDED IN FOOTNOTE "35":] Fagal.[INCLUDED IN FOOTNOTE "36":] Flayderman, Pg 683.

**RESPONSE:**        **Aside from the General Objections, undisputed as to any alleged facts.**


90.    The foregoing demonstrates that numerous types of repeating firearms existed leading up to, around, and directly after the time of the ratification of the

49

Second Amendment, which in some cases, had direct ties to Founding Fathers. As was typical of the era, these were often made by private gunsmiths and sometimes individually commissioned. During the Founding Era and after, unless employed for military purposes with the need for quantity, firearms at large were not produced in volume as they would have been by the late nineteenth century after great shifts in the industrial era. We also know that Americans were likely aware of various European innovations, since surviving examples in America are sometimes modeled after those firearms, from the simple musket that supplied much of the US military during the American Revolution to repeaters such as the Cookson, following a Lorenzoni magazine style. Overseas travel and the exchange of information was also common. For example, as Minister of France, Thomas Jefferson traveled overseas in the 1780s, where he learned about the concept behind interchangeable parts. Notably, even to some of the less successful firearms designs with flaws, imperfections, and issues, it is interesting that while the Founding Fathers were aware of them, manufacturers could continue to produce those designs, to my knowledge, without regulations, unlike the fire safety laws that were enacted to regulate gunpowder.

**RESPONSE:**    **Aside from the General Objections, to the extent this paragraph is intending to refer back to and adopt prior Rule 56.1 statements, the State has previously responded in above paragraphs and adopts those same responses here.  Undisputed as to any new alleged facts.**

91.    It is also interesting to note that the reason we are aware of these firearms, in most cases, is that examples have survived thanks in large part to museums and private collectors. In fact, gun collecting dates to the 1600s. While the earliest firearms collector is credited to be King Louis XIII of France, firearms were not only owned by royalty or the aristocracy. For example, in 1666, according to Houze, it was recorded that the merchant, Alexandra Delamarre, had put together a collection numbering some thirty pieces. Gun collecting continued to grow ever more popular during the eighteenth century and some truly large collections were assembled. For example, one collector, Joseph von Dufresne of Munich, Germany, at the time of his death in 1768 possessed 277 pistols, 457 long arms, plus crossbows and other items. Even in the colonies, estate sales featured repeating firearms, including an advertisement from South Carolina (1736) (**Exhibit X**). [INCLUDED IN FOOTNOTE "37":] Houze, Herbert G. Co-Curator. "Art of the Hunt: Decorated European Sporting Arms from 1500-1800." Exhibition. Houston Museum of Natural Science, 2019 [INCLUDED IN FOOTNOTE "38":] The South Carolina Gazette. Number 125. June 19, 1736.

50

**RESPONSE:**      **Aside from the General Objections, undisputed as to any alleged facts.**

92.    Importantly, this meant that those of the Founding Era were aware of significant innovations in firearms technology over time and it's reasonable to expect that innovation to continue into the future – the most notable example being the major difference in technology between the military smoothbore muskets used by most soldiers during the American Revolution and the far more advanced American long rifles owned by the American colonist during that same time frame.

**RESPONSE:**      **Aside from the General Objections, the State objects to this statement because it contains no material facts. The State also objects to the admissibility of these statements because they lack foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. The statement "those of the Founding Era were aware of significant innovations in firearms technology over time" is inadmissible because it is vague, confusing, speculative, and has no basis in evidence. It is unclear who "those of the Founding Era" refers to, and any speculation as to what those individuals would have been aware of is outside the ken of Ms. Hlebinsky's expertise.**

93.    Prior to the American Civil War, there were many makers and manufacturers of repeating firearms, however, the tradition of individual gunmakers was still prominent. As manufacturing processes advanced, these concepts evolved into more standard repeaters produced in greater quantities. The transition of firearms being made by private gunmakers increasingly shifted to factories by the mid-nineteenth century. Inline manufacturing, interchangeable parts, and mass production impacted not only the types of firearms that were available, but also quantity and quality. While repeating firearms, magazine-fed or not, exceeded ten-rounds centuries prior, the number of distinct types of repeaters in general by the middle of the nineteenth century was staggering.

**RESPONSE:**      **Aside from the General Objections, undisputed as to any alleged facts.**

51

**JA933**

94.    With these industrial changes, repeaters continued to evolve as they had for centuries. Around 1814, another step in revolving technology appeared with the Collier flintlock (later percussion) revolving rifles, pistols, and shotguns (**Exhibit Y**). Decades later, pepperbox pistols, a revolving pistol with multiple barrels that were manually rotated on a central axis, were popular in the United States by the 1830s, some were even taken out west with California gold miners (**Exhibit Z**). One maker of pepperboxes alone, Ethan Allen, between the 1840s and 1850s made over forty variations of this style of firearm. While many pepperbox pistols typically fired four to six shots, some were capable of firing twelve, eighteen, or twenty-four rounds. It becomes difficult to quantify the number of repeaters on the market though because makers were so plentiful. In 1836, a year before Samuel Colt's first patent in England of his revolving mechanism, the patent process was standardized through the United States Patent Act. That year, Samuel Colt took out two patents for five or six-shot revolving rifles and pistols (**Exhibit AA**). As a result, he essentially owned the legal right to produce the revolver until the patent expired in the mid-1850s. This Act created a flurry of production, innovation, and design especially towards repeaters and magazines to varying degrees of success. The fact though that so many people were trying to design the next great repeater shows the desire to capitalize on this technology. It should be noted, however, that while 1836 was an important year, the recognition of the importance of patents to support technological innovation dates to the Constitution (See Article I; Section 8). As Secretary of State, Jefferson himself was involved in the earliest patent process. All this further demonstrates the expectation of the Founding generation that technological innovation was not only likely but to be encouraged. [INCLUDED IN FOOTNOTE "39":] Flayderman, pg. 56-61. [INCLUDED IN FOOTNOTE "40":] Kopel, pg. 854. Additionally, pinfire pistols and long guns can be found in museum collections with capacities greater than ten rounds.    [INCLUDED IN FOOTNOTE "41":] Examples of these patented repeaters include Volcanic lever actions, the Jarre Harmonica pistol and rifle, Porter and Genhart turret rifles, Josselyn Chain Revolvers etc. More successfully were revolvers and repeaters by Smith & Wesson, Remington, Merwin & Hulbert, Henry,Winchester etc.

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

95.    Regardless of whether or not a design was successful that desire to innovate has always been present. One such attempt was in 1851, when Perry W. Porter developed a nine-shot repeating rifle and pistol that instead of a traditional cylinder as in Colt's design, the cylinder is seated in a way that the chambers point

52

towards the shooter and anyone nearby (**Exhibit BB**). Another attempted design, in which a proof of concept prototype survives, is the Lindner patent of 1856, which is a rifle with a six-round cylinder and nine-round tubular magazine. The gun design could hold multiple magazines at a time that could extend the length of the barrel (**Exhibit CC).** [INCLUDED IN FOOTNOTE "42":] The 1837 Cochran turret rifle operated off a similar construct with a horizontally seated cylinder.

      **RESPONSE**:        **Aside from the General Objections, undisputed as to any alleged facts.**

96.      Successful innovations obviously did occur as well. Horace Smith & Daniel Wesson developed a self-contained metallic cartridge to pair with a revolver they designed and would sell when Colt's patent expired in the 1850s. The invention of their revolver coupled with a patent by designer Rollin White to have a bored through cylinder, allowing the revolver to be loaded from behind, greatly increased the speed of reloading the firearm (**Exhibit DD**). Additionally, in 1854, Smith and Wesson patented a lever action design called the Volcanic, which was based on a few earlier designs in the 1840s and would serve as the basis for the Winchester lever actions (**Exhibit EE**). This design would be modified by Benjamin Tyler Henry into the Henry Model 1860 lever action rifle (**Exhibit FF**). The next iteration of lever action was the Winchester Model 1866 (**Exhibit GG**). The main innovation with this gun was Nelson King's Patent in May 1865, that allowed the firearm to be loaded from the receiver, a faster and superior design to Henry in which the user had to essentially load the tubular magazine from the muzzle.

      **RESPONSE**:        **Aside from the General Objections, undisputed as to any alleged facts.**

97.      Winchester was not the only manufacturer of repeating firearms in the mid to late nineteenth century. Other companies were producing competitive repeaters, such as the Evans Repeating Rifle, which was made between 1873 and 1879. Approximately, 12,200 were made and they came in three variations, Sporting (approximately 4,350 made), Military (approximately 3,200), and Carbine (not specified as either sporting or military, approximately 4,700 made). The Evans held magazine capacities at twenty-eight, thirty-four, and thirty-eight rounds (**Exhibit HH).** The Evans as well as other companies such as the Spencer Repeating Rifle, Fogerty Repeating Rifle, Adirondack Firearms, Bullard Repeating Arms, Burgess Gun, and the Whitney Arms Companies also were making repeaters. However, some

names are lesser known, partially because Winchester realized the value in their designs and the threat of them as a competitor, so they acquired the companies. Other major manufacturers, such as Marlin, quickly popped up as well by the 1890s as a direct competitor to the Winchester lever action as did Savage firearms, including the Model 1899, equipped with a rotary magazine (**Exhibit II**). In all, there were over one hundred manufacturers or makers in the United States alone producing some type of repeating firearm leading up to and decades after the Civil War. [INCLUDED IN FOOTNOTE "43":] Flayderman, pg. 694-695. [INCLUDED IN FOOTNOTE "44":] An entire exhibit at the Cody Firearms Museum is dedicated to the many repeating arms companies that Winchester acquired. Examples are archived in the Winchester Arms Collection.  [INCLUDED IN FOOTNOTE "45":] Flayderman, Chapters V: A-F pages 50-299; Chapter VII: A, B, C Pages 351-387; Chapter VIII: A Pg458-524; Chapter XIII pages 691-697; Chapter XV: pages 709-733.

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

98.    The experimentations in design ultimately led to incremental improvements on repeating technology, culminating in the design of automatic and semi-automatic technology. Automatic technology operation involves pressing a trigger to fire continuously until the user releases the trigger, the firearm runs out of ammunition, or the firearm malfunctions. Semiautomatic operation involves pressing a trigger to fire one round, eject a spent case, and load another to be fired on the next trigger pull. Today, most firearms are semi-automatic rifles, pistols, or shotguns. Semi-automatic technology was developed in the 1880s around the same time as automatic technology. Mannlicher is generally attributed to creating the first semiautomatic rifle, although his initial design was far from successful; handguns followed shortly after. The first mass produced semi-automatic pistol was the Hugo Borchardt designed C-93 with detachable eight-round magazine (**Exhibit JJ**). The Mauser C-96 (**Exhibit KK**) followed, as did John Moses Browning's Model 1899/1900 pistol, which by 1905 would serve as the basis of the iconic Colt Model 1911 semi-automatic pistol (**Exhibit LL).**

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

54

99.    **Features**. Assault firearm bans and magazine limitation statutes often concern themselves with firearm features, such as detachable magazines, various types of grips, barrel shrouds, and threaded barrels. These features themselves have their own long history as they have often served to mitigate side effects from shooting firearms, including aiding in stabilization and individualized fit, as well as flash and sound suppression, which historically have had purposes in both sport and defense.

**RESPONSE:**    **Aside from the General Objections, the State objects to this statement because it contains no material facts. The State also objects to the admissibility of this statement because it lacks foundation, calls for a legal conclusion, constitutes improper lay opinion, and is not supported by record evidence. To the extent this paragraph is an interpretation of one or more laws, that is an impermissible legal conclusion. The statement "[t]hese features themselves have their own long history as they have often served to mitigate side effects from shooting firearms" is inadmissible as it is vague, confusing, lacks foundation, and is outside the ken of Ms. Hlebinsky's expertise.**

**To the extent that the statement is admissible, disputed that the "features" of assault firearms and large capacity magazines have historically had purposes in "sport" and/or "self-defense." no reasonable trier of fact could reach such a conclusion based on the record evidence. Yurgealitis Rpt. ¶¶ 39-40, 41-48, 72-73, 84, 91, 113-14, 116, 122-130.**

100.    **Detachable Magazines**. As this Declaration has previously cited, magazines of many types existed as far back as the 1600s. They also come in many forms, such as tubular, box, rotary, etc. Within these subcategories, they can either be fixed or detachable. For example, more than half a century after Girardoni's tubular magazine, Walter Hunt received a patent for a fixed tubular magazine in the 1840s to pair with his invention, the Hunt Volitional rifle, which is the older direct ancestor to the Winchester lever action rifle (**Exhibit MM**). On the other side, Christopher Spencer developed a tubular magazine in the butt stock that was detachable in 1860 (**Exhibit NN**). Beyond tubular magazines, there were other designs such as the Genhart turret rifle, from the 1850s, that had a detachable circular magazine with an externally visible shot/round counter and the Jarre Harmonica Pistol and Rifle with a detachable horizontally seated magazine that slides after each round is fired like a typewriter (**Exhibits OO & PP**). [INCLUDED IN FOOTNOTE "46":] Hunt, Walter. US Patent 6663A (1849).

55

**JA937**

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

101.   In terms of box magazines specifically, Rollin White patented one in 1855 (**Exhibit QQ**). A detachable version was patented in 1864 by Robert Wilson (**Exhibit RR**). And a vertically stacked box magazine was patented by James Paris Lee in 1879 which was applied to several rifles including the Mannlicher Model 1886 bolt action rifle (**Exhibit SS**). Even the earliest semi-automatic handguns utilized either fixed or detachable magazines. The Mauser C-96 had a fixed one, and the Borchardt C-93 detachable. [INCLUDED IN FOOTNOTE "47":]   White, Rollin. US Patent No 12648 (1855).    [INCLUDED IN FOOTNOTE "48":] Wilson, Robert. US Patent No 45105 (1864) . [INCLUDED IN FOOTNOTE "49":] Lee, James Paris US Patent No 221328 (1879).    [INCLUDED IN FOOTNOTE "50":]Kopel, 857 referencing *Standard Catalog of Firearms.* (2014), Gun Digest Books, pg. 708-709.

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

102.   **Grips/Barrel Shroud**. The concept of a stabilizing entity to help not only simply hold the firearm but also do so with maneuverability and accuracy dates to the earliest arms and sporting guns. For example, early target shooting competitions relied on it. Schuetzen, a sport dating to the 1600s that continues today, incorporates elaborate molded cheek pieces and palm rests. German Frei pistol of the nineteenth and twentieth centuries, essentially do the same. While these customizations may not fit the typical definition of a pistol grip or thumbhole stock, the intent is similar (**Exhibit TT).**

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

103.   The simplest form of a stabilizing device is the *barrel shroud*, which is essentially just a forearm. The purpose of a barrel shroud is to prevent "burning the bearer's hand." By that definition, any firearm with a full-length stock has a barrel shroud, such as an eighteenth-century Brown Bess or early single shot pistols.

**RESPONSE:**        Aside from the General Objections, undisputed as to any alleged facts.

104.   Stock design in and of itself necessities a *pistol grip*. These grips date to the 1700s. When taken literally, single shot flintlock and later percussion pistols sometimes would have the option to attach a removable stock. When assembled pistols become long guns and the grip from the pistol serves as the stabilizing device. This trend of detachable stocks continued with repeating arms, including several models of Colt revolvers, in the civilian and military market. Even semi-automatics such as the Borchardt C93 and Mauser C96 had detachable stock options. If a user did not have one of these models, universal holsters to convert a pistol to a rifle with a detachable stock existed (**Exhibit UU**). On firearms without detachable stocks, pistol grips appear on all variances of firearm actions. Standard rifles and shotguns would often have some sort of partial grip. Full pistol grips even made their way on machine guns by the end of the nineteenth century, including the Colt Model 1895, French Chauchat (1907) and several Maxim models. Submachine guns like the Thompson (1918) had them as well. Pistol Grips also appeared on other National Firearms Act firearms, outside of machine guns, such as Any Other Weapons, like the Ithaca Auto & Burglar (1922), the Harrington & Richardson Handy-Gun (1921), and the Marble Game Getter (1908). The design continues to be used far into the twentieth century, including other semi-automatic firearms such as the M1A1Paratrooper Carbine designed with not only a pistol grip but also folding stock (**Exhibit VV**).

**RESPONSE:**        Aside from the General Objections, undisputed as to any alleged facts.

105.   *Forward grips*, on which the user holds a grip forward of the breech, have also been around since the late eighteenth century. The previously referenced fourteen-barrel firearm (ca 1795) has a forward grip. Additionally, another example is the French Magot rifle from the 1880s. Possibly one of the only copies of this gun is in the Cody Firearms Museum (**Exhibit WW**).

**RESPONSE:**        Aside from the General Objections, undisputed as to any alleged facts.

57

**JA939**

106.    While not technically a grip, *thumbhole stocks* serve a similar purpose. It is more difficult to historically trace, but their regulation has had a deep impact on sporting and Olympic firearms in the modern era. Certain Olympic rifles feature thumbhole stocks, including several models of Winchester, dating to the 1950s. This type of concept or technology is a very prominent shooting sports feature.

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

107.    **Folding/Telescoping Stock**. The Cody Firearms Museum has a folding stock snaphaunce blunderbuss that dates to between 1650-1700 (**Exhibit XX).** With early firearms, folding or adjustable stocks are not necessarily common because pieces in the civilian world were made by artisans prior to mass production. However, the appearance of detachable stocks – converting a pistol to a rifle/carbine – appear in the 1700s on flintlocks and continue to be incorporated on percussion, revolver, and semi-automatic guns. As guns were mass produced in scale, various models were often made, such as a Junior or Ladies rifle, to provide a different size option for the size or ability of the sport shooter. The flexibility of stock size in a telescoping stock is very important in the civilian market where comfort and having firearms suited for the individual are preferable and feasible. In the early 1900s, and possibly earlier, consumers would be relegated to finding their correct stock size using Try Guns, which were carried by salesmen to allow the consumer to adjust the stock to fit them to see what size a given person needed. Two examples in the Cody Firearms Museum collection are the Winchester Model 12 and LC Smith Try Guns (**Exhibit YY**). Once an appropriate size was determined, the firearm would be made with a fixed stock. Folding stocks do make appearances in the military sphere with the M1A1 Paratrooper Carbine model as well as several submachine guns.

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

108.    **Flash Suppressor/Threaded Barrel**. While the above concerns itself more with the fit of a firearm and how to stabilize it, other features exist to mitigate the negative side effects of shooting firearms.

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

58

**JA940**

109.   Flash suppressors at their core are meant to reduce muzzle flash. The issue of a flash either giving away one's positions or temporarily distorting the vision of the user, dates to the earliest technology of firearms. Firearms, until the development of percussion ignition in the early nineteenth century, made use of an exposed flame at the breech of the gun. Hand cannons and matchlocks used burning matches to ignite gun powder inside the barrel. Wheellocks and flintlocks used pyrite and flint to create a spark. These technologies created a lot of smoke and flash which was a detriment to the user.

**RESPONSE:**       **Aside from the General Objections, undisputed as to any alleged facts.**

110.   The modern concept of a flash suppressor appears on machine guns from World War I, including the Chauchat. The traditional flash hider on military arms, not classified as a machine gun, was used during WWII on guns such as the Lee-Enfield "jungle carbine" and has appeared on AR platform firearms, originally invented in the 1950s (**Exhibit ZZ**). Even the invention of a sound suppressor, known legally as a silencer, by Hiram Percy Maxim in 1902 suppressed flash. Silencers were heavily marketed to the civilian population as target accessories.

**RESPONSE:**       **Aside from the General Objections, undisputed as to any alleged facts.**

111.   Another method to contribute to the ease of shooting is a threaded barrel for several purposes, including the use of a silencer, however, the concept dates back much further. An early idea of a quick attachment system in or on a barrel of a gun is the bayonet. Developed in the sixteenth century, the bayonet was commonly used for both military and civilian firearms. There have been a variety of muzzle devices that have been attached to a barrel (compensators, silencers, muzzle brakes, flash hiders etc.). While some early semi-automatic rifles, pistols, and shotguns had threaded barrels, the military did not always use threaded barrels for their suppressed firearms, nor did the civilian market. This is because Hiram Percy Maxim, the inventor of the Silencer, sold his silencer often with an adapter that allowed a silencer to be affixed without a threaded barrel, making the need for a threaded barrel or the thought that no threaded barrel would prevent the addition of a silencer moot.

**JA941**

**RESPONSE:**    **Aside from the General Objections, undisputed as to any alleged facts.**

112.  To summarize, this Declaration has looked at the long history of firearms around the world. It has looked at technologies specifically relevant to this case with a lens for their technical functions and their varied uses. One of the core takeaways from this report is the context of the interconnectivity between military and civilian firearms since the development of the first ignition system and why civilians have often had superior firearms. It also identifies major developments in firearm technology and establishes that some of the most significant changes in design occurred in the first few centuries, laying the foundation for most if not all modern firearms technology. Ultimately, firearms innovation is a continuum of gradual advancements in technology. Over time, such incremental advancements have contributed to the increasing ability of individuals to operate their firearms effectively and safely.

**RESPONSE:**    **Aside from the General Objections, this entire paragraph consists either of legal conclusions and/or argument and/or improper opinion, or of alleged facts to which the State has previously responded in above paragraphs and adopts those same responses here.**

Dated:  November 3, 2023           Respectfully submitted,

                                   MATHEW J. PLATKIN
                                   ATTORNEY GENERAL OF NEW JERSEY

                          By:    */s/ Daniel M. Vannella*
                                   Daniel M. Vannella
                                   Assistant Attorney General

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

     Defendants.

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

     Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

     Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## STATE DEFENDANTS' RESPONSE TO *CHEESEMAN* PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rules of Civil Procedure 56 and D.N.J. Local Rule 56.1, State Defendants submit the following Response to Cheeseman Plaintiffs' Statement of Material Facts Not in Dispute.

1.     Former New Jersey Attorney General Peter Verniero issued "Guidelines Regarding the 'Substantially Identical' Provision in the State's Assault Firearms Laws" dated August 19, 1996, https://www.nj.gov/lps/dcj/agguide/assltf.htm ("Guidelines"), which the current Attorney General (Defendant Platkin) and Superintendent of the New Jersey State Police (Defendant Callahan) continue to enforce.

Supporting Citations: Ans. to FAC ¶¶ 15, 18 (Admitted that Defendant Platkin "continues to publish the Guidelines").

**RESPONSE:**     **Undisputed.**

2.     The Guidelines direct that they "should be followed by all county prosecutors and all law enforcement officers in this State so that the State's assault firearms laws will be uniformly enforced throughout the State."

Supporting Citations: *Guidelines* at 3; Ans. to FAC ¶ 17 (Admitted).

**RESPONSE:**     **Undisputed that the Guidelines include this quoted statement.**

3.     The exceptions are largely limited to exemptions for: (1) those in the military or law enforcement, § 2C:39-6(a), (j); (2) rifles that the Attorney General designates as "legitimate" target-shooting firearms (which can only qualify for such designation if registered and owned by an individual who has been a member of a rifle or pistol club since at least 1990), § 2C:58-12; (3) "assault firearms" rendered "inoperable" (or else voluntarily surrendered or transferred to an exempt person or entity), § 2C:58-13; and (4) those who satisfy the statutory criteria for a license to purchase, possess, and carry an assault firearm, § 2C:58-5(a)-(b).

Supporting Citations: Ans. to FAC ¶ 19 (State Defendants do not deny the exemptions are limited as stated).

**RESPONSE:**     **Undisputed that the statute contains limited exemptions.**

1

4.      To lawfully purchase, possess, or carry any operable firearm falling within the classification of an "assault firearm" under this scheme—other than an "assault firearm" deemed "legitimate" by the Attorney General for target-shooting purposes—an ordinary, law-abiding person must demonstrate to the satisfaction of a judge that such a license is required in the interest of public safety and welfare.

Supporting Citations: Ans. to FAC ¶ 19 (State Defendants do not deny this interpretation of the law).

**RESPONSE:      Undisputed that the statute contains limited exemptions.**

5.      The New Jersey Legislature has recognized that this statutory scheme operates as a general "ban" on the so-called "assault firearms."

Supporting Citations: *Statement of the New Jersey State Legislature on Assembly Concurrent Resolution No. 106*, 220th Leg. (2022), https://www.njleg.state.nj.us/bill-search/2022/ACR106/bill-text?f=ACR&n=106_I1 ("in 1990 New Jersey enacted legislation *banning* assault weapons and certain large capacity ammunition feeding devices") (italics added).

**RESPONSE:      Undisputed that the 2022 statement reads, in part, that "in 1990 New Jersey enacted legislation banning assault weapons and certain large capacity ammunition feeding devices."**

6.      The Attorney General's Office itself characterizes the regulatory scheme in this way on its public website.

Supporting Citations: State of New Jersey, Department of Law & Public Safety, Office of the Attorney General, https://nj.gov/njsp/firearms/firearms-faqs.shtml (FAQ No. 15: "What type of firearms are considered assault weapons in New Jersey? [¶] "A complete list of *banned* firearms can be found in N.J.S. 2C:39-1.w as well as N.J.A.C. 13:54-1.2.") (italics added); Readington Township Police Department, New Jersey, Frequently Asked Questions, https://www.readingtontwpnj.gov/firearms/firearms-faq (FAQ No. 17: characterizing the scheme in the same way).

**RESPONSE:      Undisputed only that the cited web pages include the statements quoted in the "Supporting Citations." Disputed that the website for**

**the Readington Township Police Department is "The Attorney General's Office itself," or speaks on behalf of it.**

7.      Courts in New Jersey and elsewhere have also recognized this scheme as a general "ban."

Supporting Citations: *See e.g.*, *Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D.N.J. 1990) ("the prohibition is de facto, for that person [seeking to purchase an 'assault firearm'] must go through the extremely rigorous qualification process required for receiving a license[,]" and, "[t]his regulatory scheme vests unbridled discretion over the licensing process with the State"); *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 207 (1st Cir. 2002) ("The New Jersey law examined in *Coalition* [of *New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 673 n. 10] was effectively a ban on assault weapons.").

**RESPONSE:        Undisputed that the cases contain the language cited.**

8.      Anyone who "manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm" in violation of the scheme "is guilty of a crime of the third degree." N.J. Stat. Ann. § 2C:39-9(g).

Supporting Citations: Ans. to FAC ¶ 24 (admitted).

**RESPONSE:        Undisputed that the statute includes the language quoted.**

9.      One who knowingly possesses such an arm illegally "is guilty of a crime of the second degree." N.J. Stat. Ann. §§ 2C:39-5(f).

Supporting Citations: Ans. to FAC ¶ 25 (admitted).

**RESPONSE:        The State objects that this paragraph calls for a legal conclusion, and/or mischaracterizes and/or offers argument and/or improper opinion concerning the meaning of laws, and mischaracterizes the State Defendants' answer to the complaint.  In any event, the pertinent laws speak for themselves.**

10.      A crime in the second degree generally carries a term of imprisonment of five to ten years and a fine of up to $150,000, and a crime in the

third degree generally carries a term of imprisonment of three to five years and a fine of up to $15,000. §§ 43-3(a)-(b), 43-6(a).

Supporting Citations: Ans. to FAC ¶ 26 (not denied).

**RESPONSE:**        **Undisputed that N.J. Stat. Ann. § 2C:43-3 and -6 contain the maximum fines and sentence ranges for second and third degree crimes in the State of New Jersey**

11.    Moreover, a conviction would result in a lifetime ban on the possession of firearms and ammunition under federal and state law. *See* 18 U.S.C. § 922(g).

Supporting Citations: Ans. to FAC ¶ 27 (not denied).

**RESPONSE:**        **This paragraph calls for legal conclusion and is not a proper statement of material fact.**

12.    Plaintiff Cheeseman is a law-abiding resident of Gloucester County, New Jersey.

Supporting Citations: Decl. of Mark Cheeseman (Ex. 1) ¶ 1.

**RESPONSE:**        **The State objects that this paragraph calls for a legal conclusion that Plaintiff Cheeseman is "law-abiding." Subject to those objections, undisputed.**

13.    Plaintiff Connolly is a law-abiding resident of Ocean County, New Jersey.

Supporting Citations: Decl. of Connolly (Ex. 2) ¶ 1.

**RESPONSE:**        **The State objects that this paragraph calls for a legal conclusion that Plaintiff Connolly is "law-abiding." Subject to those objections, undisputed.**

14.    Plaintiff Cheeseman is not disqualified from possessing and acquiring firearms under federal and state law.

Supporting Citations: Decl. of Mark Cheeseman (Ex. 1) ¶ 1.

**RESPONSE:**        **The State objects that this paragraph calls for a legal conclusion.**

15.    Plaintiff Connolly is not disqualified from possessing and acquiring firearms under federal and state law.

Supporting Citations: Decl. of Connolly (Ex. 2) ¶ 1.

**RESPONSE:**      **The State objects that this paragraph calls for a legal conclusion.**

16.    Plaintiff Cheeseman is a member of Plaintiff FPC.

Supporting Citations: Ex. 1 ¶ 2.

**RESPONSE:**      **Undisputed.**

17.    Plaintiff Connolly is a member of Plaintiff FPC.

Supporting Citations: Ex. 2 ¶ 2.

**RESPONSE:**      **Undisputed.**

18.    Plaintiff Cheeseman intends and desires to exercise his rights to keep and bear firearms classified as "assault firearms" under New Jersey's Ban, including but not limited to an AR-15 style rifle, for lawful purposes, especially for home defense, target shooting, and proficiency training.

Supporting Citations: Ex. 1 ¶ 3.

**RESPONSE:**      **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion, including as to "New Jersey's Ban" and the scope of the "rights to keep and bear firearms."**

19.    Plaintiff Connolly intends and desires to exercise his rights to keep and bear firearms classified as "assault firearms" under New Jersey's Ban, including but not limited to an AR-15 style rifle, for lawful purposes, especially for home defense, target shooting, and proficiency training.

Supporting Citations: Ex. 2 ¶ 3.

**RESPONSE:**      **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion, including as to "New Jersey's Ban" and the scope of the "rights to keep and bear firearms."**

20.    But for the Ban, Plaintiff Cheeseman would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns.
Supporting Citations: Ex. 1 ¶ 4.

**RESPONSE:**    **Undisputed to the extent Plaintiff Cheeseman attests interest in acquiring and using "assault firearms."**

21.    But for the Ban, Plaintiff Connolly would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns.
Supporting Citations: Ex. 2 ¶ 4.

**RESPONSE:**    **Undisputed to the extent Plaintiff Connolly attests interest in acquiring and using "assault firearms."**

22.    The Ban nonetheless renders it illegal for either of them to do so.
Supporting Citations: Ex. 1 ¶¶ 3-4; Ex. 2 ¶¶ 3-4.

**RESPONSE:**    **Undisputed that New Jersey law prohibits non-exempt individuals from acquiring and using "assault firearms."**

23.    In light of the State's enforcement of this Ban, Plaintiff Cheeseman continues to refrain from acquiring, possessing, and using for self-defense and other lawful purposes any AR-15 rifle, any other firearm prohibited under the Ban, or any "substantially identical" firearm as defined under the Guidelines, based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Ban.
Supporting Citations: Ex. 1 ¶ 5.

**RESPONSE:**    **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Undisputed as to Plaintiff Cheeseman's attested reasons for not acquiring an "assault firearm."**

24.    In light of the State's enforcement of this Ban, Plaintiff Connolly continues to refrain from acquiring, possessing, and using for self-defense and other

lawful purposes any AR-15 rifle, any other firearm prohibited under the Ban, or any "substantially identical" firearm as defined under the Guidelines, based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Ban.

Supporting Citations: Ex. 2 ¶ 5.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Undisputed as to Plaintiff Connolly's attested reasons for not acquiring an "assault firearm."**

25.    Plaintiff FPC is a nonprofit membership organization, the purposes of which include defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom.

Supporting Citations: Decl. of Brandon Combs (Ex. 3) ¶ 2.

**RESPONSE:** **Undisputed that FPC is a nonprofit membership organization whose self-described purposes are as stated.**

26.    Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

Supporting Citations: Ex. 3 ¶ 2.

**RESPONSE:** **Undisputed that FPC's self-described mission is as stated.**

27.    Plaintiff FPC brings this action on behalf its New Jersey resident members, including Plaintiffs Cheeseman and Connolly, who seek to exercise their right to keep and bear common semi-automatic arms for lawful purposes in New Jersey but who are prohibited from doing so under the Ban.

Supporting Citations: Ex. 3 ¶ 3.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms.**

**Disputed as to the remainder of the paragraph. Plaintiff FPC has produced no evidence that, aside from the individually named Plaintiffs Cheeseman and Connolly, any of their other members would possess semi-automatic firearms in their homes, whether or not New Jersey law permitted it. Further, when asked in interrogatories if any of its members has applied for a license to possess an assault firearm in New Jersey, Plaintiff ANJRPC responded on May 4, 2023, "[u]nknown at this time." Cheeseman Interrogatory Response #9.**

28.    Law-abiding New Jersey resident members of Plaintiff FPC intend and desire to, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of various semiautomatic rifles, shotguns, and handguns labeled by the State as "assault firearms," but they are subject to, adversely affected by, and prevented from doing so under the prohibitions of the Ban against "assault firearms."

Supporting Citations: Ex. 3 ¶ 4.

**RESPONSE:    The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

29. But for the enactment and enforcement of the Ban, these FPC members would forthwith, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of such rifles, shotguns, and handguns targeted under the Ban.

Supporting Citations: Ex. 3 ¶ 5.

**RESPONSE:    The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

30.     However, they cannot and do not do so because the weapons are labeled "assault firearms," such that they reasonably fear and face a threat of arrest, confiscation, prosecution, fine, and imprisonment in light of the Ban's prohibitions.

Supporting Citations: Ex. 3 ¶ 5.

**RESPONSE:     The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing certain semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

31.     But for the enactment and enforcement of this Ban, and the criminal penalties (including a life-long ban on the individuals' exercise of their Second Amendment protected rights) associated with violations of the Ban, these members of Plaintiff FPC would exercise their right to keep and bear the banned firearms for lawful purposes, including self-defense, without the fear or risk of arrest and prosecution for engaging in otherwise protected, lawful conduct.

Supporting Citations: Ex. 3 ¶ 6.

**RESPONSE:     The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing certain semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

32.     The injuries suffered by these members are germane to the core purposes of Plaintiff FPC.

Supporting Citations: Ex. 3 ¶ 7.

**RESPONSE:     The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27.**

33.    As Attorney General of New Jersey, Defendant Platkin is the head of the State's Office of the Attorney General and Department of Law and Public Safety, which includes the New Jersey State Police, and this Office holds statewide criminal jurisdiction to investigate and prosecute any indictable offense.

Supporting Citations: *See* State of New Jersey, Department of Law & Public Safety website, https://www.njoag.gov/about/ ("the Attorney General oversees the New Jersey State Police (NJSP), the state's largest law enforcement agency, and the Division of Criminal Justice (DCJ), which has statewide authority to investigate and prosecute criminal offenses").

**RESPONSE:    Undisputed.**

34.    In this official capacity, Defendant Platkin is thus responsible for executing, delegating, and/or supervising the laws and regulations governing the possession of firearms and magazines and impose criminal sanctions for violations of the same, including the "assault firearms" regulatory scheme at issue in this case.

Supporting Citations: *See* State of New Jersey, Department of Law & Public Safety website, https://www.njoag.gov/about/ ("the Attorney General oversees the state's 21 County Prosecutors, and may assume responsibility for, or 'supersede,' investigations or prosecutions handled by a County Prosecutor's Office"); *Kendrick v. Bruck*, 586 F. Supp. 3d 300, 307 (D.N.J. 2022) (the Attorney General oversees the Division of State Police, "which is responsible for executing and enforcing New Jersey's laws and regulations governing the possession of firearms"); Ans. to FAC ¶ 9 (admitting that "Defendant Platkin is the Acting Attorney General of New Jersey, and serves as the head of the New Jersey Office of the Attorney General and Department of Law and Public Safety, which includes the New Jersey State Police").

**RESPONSE:    Undisputed that the Attorney General of New Jersey is the chief law enforcement officer of the State.**

35.    Defendant Callahan is the Superintendent of the New Jersey Division of State Police, which is responsible for executing and enforcement of all criminal laws in the State, including those regulating the possession of firearms and magazines.

Supporting Citations: *See* State of New Jersey, Department of Law & Public Safety, State Police website, https://www.nj.gov/njsp/about/core-functions.shtml ("the New Jersey Division of State Police performs "all functions associated with the

statewide enforcement of laws, the prevention of crime, the pursuit and apprehension of offenders, and the gathering of legal evidence to ensure conviction of such offenders"); *Kendrick*, 586 F. Supp. 3d at 307; Ans. to FAC ¶ 10 (admitting that "Defendant Patrick J. Callahan is the Superintendent of the New Jersey State Police").

**RESPONSE:**    **Undisputed.**

36.    Defendant Callahan's division acts under the general oversight and supervision of the Attorney General.

Supporting Citations: Plaintiffs incorporate the citations in support of SOUMF No. 35 as equally applicable and supportive here.

**RESPONSE:**    **Undisputed.**

37.    Defendant Hoffman is the County Prosecutor of Gloucester County, where Plaintiff Cheeseman resides.

Supporting Citations:
https://www.gloucestercountynj.gov/Directory.aspx?did=69; Ex. 1 ¶ 1.

**RESPONSE:**    **Undisputed that Christine A. Hoffman is the Acting County Prosecutor of Gloucester County.**

38.    Defendant Billhimer serves as the County Prosecutor for Ocean County, where Plaintiff Connolly resides.

Supporting Citations: https://ocponj.gov/staff/bradley-d-billhimer/; Ex. 2 ¶ 1.

**RESPONSE:**    **Undisputed that Bradley D. Billhimer is the County Prosecutor of Ocean County.**

39.    As the County Prosecutors for their respective counties, Defendants Hoffman and Billhimer are "responsible for the prosecution of crimes committed in the county" and have "authority to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws."

Supporting Citations: *Yurick v. State*, 875 A.2d 898, 903 (N.J. 2005) (quotations omitted).

**RESPONSE:** **Undisputed that county prosecutors generally are responsible for the prosecution of crimes committed in their respective county.**

40. In addition, they would be responsible for preparing the necessary investigation and recommendation to law enforcement as to any individual in their respective counties who applies through the Superior Court for a license to purchase, possess, and carry any of otherwise prohibited "assault firearms."
Supporting Citations: N.J. Stat. Ann. §§ 2C:58-5(a).

**RESPONSE:** **This paragraph contains improper legal argument. The text of N.J. Stat. Ann. §§ 2C:58-5(a) provides: "Any person who desires to purchase, possess and carry a machine gun or assault firearm in this State may apply for a license to do so by filing in the Superior Court in the county in which he resides, or conducts his business if a nonresident, a written application setting forth in detail his reasons for desiring such a license. The Superior Court shall refer the application to the county prosecutor for investigation and recommendation. A copy of the prosecutor's report, together with a copy of the notice of the hearing on the application, shall be served upon the superintendent and the chief police officer of every municipality in which the applicant intends to carry the machine gun or assault firearm, unless, for good cause shown, the court orders notice to be given wholly or in part by publication."**

41. Accordingly, Defendants Hoffman and Billhimer would be responsible for prosecuting Plaintiff Cheeseman and Plaintiff Connolly, respectively, for any violation of the Ban that they may be accused of committing in their respective counties of residence.
Supporting Citations: Plaintiffs incorporate the citations in support of SOUMF Nos. 37-40 as equally applicable and supportive here.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion.**

42. Similarly, Defendants Hoffman and Billhimer would be responsible for the investigation and recommendation as to Plaintiff Cheeseman and Connolly, respectively, concerning any application for a license to purchase, possess, and carry any "assault firearm."

Supporting Citations: Plaintiffs incorporate the citations in support of SOUMF Nos. 37-40 as equally applicable and supportive here.

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. The complete text of N.J. Stat. Ann. §§ 2C:58-5(a) is above at paragraph 40.**

43.    The Court has jurisdiction over this case and controversy, with the full power to adjudicate all claims for relief in the FAC, pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, and venue properly lies in this district for purposes of adjudicating these claims, pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

Supporting Citations: Ans. to FAC ¶¶ 4-5 (not disputing jurisdiction or venue).

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion. To the extent the paragraph contains any alleged facts, they are undisputed.**

44.    The term "assault firearm" (or "assault weapon," as used in other states that have enacted similar weapons bans) is a pejorative term that does not refer to any identifiable class of firearms.

Supporting Citations: "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted).

**RESPONSE:** **The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Disputed that the term "assault weapon" or "assault firearm" does not refer to "any identifiable class of firearms." See Decl. of Daniel Vannella, Ex. 11, Rpt. of James Yurgealitis ¶ 85 (documenting firearms industry use of "assault weapons" as early as the 1980s); *id.* ¶ 89; id. ¶¶ 113-130 (describing defined features).**

45.    It is semiautomatic firearms that the State bans and that Plaintiffs seek to acquire.

Supporting Citations: Ex. 1 ¶¶ 3-4; Ex. 2 ¶¶ 3-4; Ex. 3 ¶¶ 3-6.

**RESPONSE:**    **Undisputed that Plaintiffs allege they seek to acquire prohibited firearms.**

46.    Unlike an automatic firearm, a semiautomatic firearm will not fire continuously with one pull of its trigger. Instead, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round.

Supporting Citations: *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

**RESPONSE:**    **Undisputed, except to the extent that a semiautomatic firearm outfitted with certain additional features prohibited under New Jersey law may  simulate automatic fire.**

47.    Semiautomatic firearms have "traditionally have been widely accepted as lawful possessions."

Supporting Citations: *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

**RESPONSE:**    **Undisputed that the quoted case states that possession of semiautomatic firearms in general has been lawful.**

48.    Indeed, semiautomatic firearms have been commercially available for over a century.

Supporting Citations: *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. 381, 413 (1994), https://davekopel.org/2A/LawRev/rational.htm.

**RESPONSE:**    **Undisputed that semiautomatic firearms became commercially available in the beginning of the 20th Century. See Decl. of Daniel Vannella, Ex. 4, Rpt. of Professor Robert Spitzer ¶ 38; Decl. of Daniel Vannella, Ex. 12, Rpt. of Professor Brian DeLay ¶¶ 6; 76. The State objects to Plaintiffs' use of inadmissible hearsay.**

49.    Apart from the now-expired ten-year federal "assault weapons" ban, the federal government has not banned semiautomatic firearms.

Supporting Citations: Associated Press, *Congress lets assault weapons ban expire*, Sept. 8, 2004, https://www.nbcnews.com/id/wbna5946127.

**RESPONSE:** **Undisputed that the Public Safety and Recreational Firearms Use Protection Act expired on September 13, 2004, and that law is not currently in effect.**

50.    The only states that have enacted bans on "assault weapons" (with varying definitions of that term) are California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Delaware, New York, and Washington.

Supporting Citations: *See* Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02.

**RESPONSE:** **Disputed that the laws of each of these states "bans" assault firearms. The State objects to Plaintiffs' use of inadmissible hearsay and mischaracterization of the statutes of the states listed.**

51.    An AR-15 can only fire as often as a person can pull its trigger, while an M249 light machine gun, commonly used by the U.S. military, can fire 750 to 1,000 rounds per minute.

Supporting Citations: *See Squad Automatic Weapon (SAW), M249 Light Machine Gun*, Military Analysis Network, https://bit.ly/3tsQGtd.

**RESPONSE:** **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record.**

52.    "Heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute).

Supporting Citations: *See M61A1/M61A2 20mm Automatic Gun, Military Analysis Network*, https://bit.ly/3ttnemV.

**RESPONSE:** **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record.**

53.    Most AR-style firearms are chambered for 5.56 x 45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has

sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target.

Supporting Citations: *See Modern Sporting Rifle Comprehensive Consumer Report*, National Shooting Sports Foundation (NSSF) ("*Comprehensive Consumer Report*"), https://bit.ly/3GLmErS (noting that self/home-defense is the second most important reason that Americans reported for owning AR- style firearms, second only to recreational target shooting); FRANK MINITER, *The Future of the Gun* at 35 (2014) (Ex. 4) ("ARs are popular with civilians and law enforcement around the world because they're accurate, light, portable and modular  It's also easy to shoot and has little recoil, making it popular with women.").

**RESPONSE:    The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record. The State objects to the reliability of the methodology employed in the cited documents.**

54.    A telescoping or folding stock is merely an adjustable shoulder stock, which allows one to change the length of his gun to fit his stature, in the same way that he can change the height of an adjustable chair; some people have shorter arms than others, so it promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position.

Supporting Citations: *See* E. Gregory Wallace, *Assault Weapon Myths*, 43 S. ILL.    U.    L.    J.    193,    232    (2018), https://scholarship.law.campbell.edu/cgi/viewcontent.cgi?article=1265&context=fa c_sw; STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 at 8 (2022) (Ex. 5)

**RESPONSE:    The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder. U.S. Military origins for this type of stock can be found on the M1 carbine in World War II when modified for paratrooper use." Yurgealitis Rpt. ¶ 124.**

55.    Similarly, a pistol grip makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and thus also promotes accuracy and reduces the risk of stray shots.

Supporting Citations: *See* Wallace, *Assault Weapon Myths* at 228; Kopel, *Rational Basis*, *supra*, 20 J. CONTEMP. L. 381, 396 (1994).

**RESPONSE:**    **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that a "semiautomatic rifle or shotgun that includes a pistol grip (or does not include a shoulder stock) somewhat increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator)." Yurgealitis Rpt. ¶ 122.**

56.    A flash suppressor is merely a device that reduces the flash of light from firing a round, "prevent[ing] the night-time home defender from being blinded by her own muzzle flash."

Supporting Citations: *Miller*, 542 F. Supp. 3d at 1035; *See also* Wallace, *Assault Weapon Myths* at 233-34.

**RESPONSE:**    **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low light conditions and also helps to conceal the flash from view. This allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position." Yurgealitis Rpt. ¶ 125.**

57.    Most common semiautomatic firearms, including those banned under the State's law, can accept a detachable magazine.

Supporting Citations: NRA Shooting Sports USA, *Handgun Operation: Types Of Semi-Automatic Pistol Mechanisms*, https://www.ssusa.org/content/handgun-operation-types-of-semi-automatic-pistol-mechanisms/ ("Most semi-automatic firearms use detachable box magazines, which afford one of the main advantages of such arms").

**RESPONSE:** **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that most firearms regulated by the statutes at issue can accept a detachable magazine. Yurgealitis Rpt. ¶¶ 131-34.**

58.    Detachable magazines not only help law-abiding shooters to reload their weapon in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to remedy malfunctions safely and quickly.

Supporting Citations: *See* Dennis Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles* 29-30 (Oct. 5, 2021) (working paper), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3436512 (explaining the propensity of self-loading weapons to overheat and malfunction).

**RESPONSE:** **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation.**

59.    The AR-15 is America's "most popular semi-automatic rifle."
Supporting Citations: *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting)

**RESPONSE:** **Undisputed that then-Judge Kavanaugh's dissent in *Heller II* contains the quoted statement.**

60.    In recent years, the AR-15 has been "the best-selling rifle type in the United States."
Supporting Citations: Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1494634.

**RESPONSE:** **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation.**

61.    Today, the number of AR-rifles and other similar "modern sporting rifles" in circulation in the United States exceeds *twenty-four million*.
Supporting Citations: *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv; *See also* William English, *2021 National Firearms Survey: Updated Analysis Including*

*Types of Firearms Owned* at 1-2 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles).

**RESPONSE:**    The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State objects to the reliability of the methodology employed in the cited documents.

As to the NSSF Survey, the State specifically objects to the reliability of its methodology. James Curcuruto, a former director of research and market development at NSSF, testified in another case that he and Steve Sanetti, the president of NSSF, essentially made estimates between themselves, and that Mr. Sanetti's personal knowledge was the "sources of data" relied upon when they published statistics related to the number of firearm magazines in circulation. Vannella Decl. Ex. 44, Dep. of James Curcuruto, *Wiese v. Bonta*, 2:17-cv-00903-WBS-KJN (E.D. Ca.). at T:133:4-140:15.

Even if the NSSF survey is admissible, the State disputes any conclusion that it shows the weapons in question are commonly owned. The NSSF figures also do not represent civilian ownership, as the figures appear to include law enforcement and security agencies, firearms retailers, and possibly prohibited possessors (e.g. violent criminals). See Decl. of Daniel Vannella, Ex. 9, Rpt. of Professor Louis Klarevas ¶ 14. The surveys and reports by the NSSF also don't necessarily account for AR-15s being amassed in the hands of a relative few. Klarevas Rpt. ¶ 29. Based on the NSSF's own data and Census Bureau statistics, less than 2% of all Americans own a modern sporting rifle. Klarevas Rpt. ¶ 38.

As to the English survey, the State specifically objects to the reliability of its methodology. Klarevas Rpt. ¶ 29, n.31 (noting serious violation of Code of Professional Ethics and Practices of the American Association for Public Opinion Research); Dep. of Gary D. Kleck, *Oregon Firearms Fed'n v. Kotek*, No. 22-cv-1815 (D. Or.), ECF 175-7 at 12-13 (plaintiff-side expert stating he "would not rely" on it "for any purpose").

**Even if the English survey is admissible, the State disputes any conclusion that it shows the weapons in question are commonly owned. The study results indicate that approximately 74,000 people own over 100 such rifles. A conservative calculation of the English study results show that approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners. Klarevas Rpt. ¶ 29.**

62.    In recent years they have been the second- most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns.

Supporting Citations: *See 2021 Firearms Retailer Survey Report* at 9, NSSF (2021), https://bit.ly/3gWhI8E.

**RESPONSE:**    **The State repeats its objection in Paragraph 61.**

63.    And the English survey is not limited to the semiautomatic firearms that the State enumerates by name, but rather extends to the "AR-15 or *similarly styled rifle[s]*."

Supporting Citations: *National Firearms Survey, supra*, at 33.

**RESPONSE:**    **The State repeats its objection in Paragraph 61.**

64.    Just like the rifles, handguns are semiautomatic firearms and semiautomatic firearms are indisputably common.

Supporting Citations: *See, e.g., Firearms Retailer Survey Report, supra*, at 9, NSSF.

**RESPONSE:**    **The State repeats its objection in Paragraph 61.**

65. The legislative facts documenting the ubiquity of detachable magazines associated with these firearms further illustrate the commonality of the banned arms.

Supporting Citations: *See, e.g., ANJRPC*, 910 F.3d at 116 (finding that magazines capable of holding more than ten rounds are owned by the "millions, . . . often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense"); *National Firearms Survey, supra*, at 23-25 (documenting that approximately 39 million Americans have owned at least one magazine capable of

owning more than 10 rounds and that Americans have owned as many as 542 million of such magazines).

**RESPONSE:**    **The State repeats its objection in Paragraph 61.**

66.    It is clear that these arms (detachable magazines) are overwhelmingly used for lawful purposes.

Supporting Citations: *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (Ex. 6) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'").

**RESPONSE:**    **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper legal argument. The State's undisputed *fact* evidence regarding the prevalence of LCMs in crime are as follows:**

a.  **A study by Christopher Koper in 2017 *Journal of Urban Health* showed that across ten different cities in the United States, firearms with LCMs accounted for between 15 and 36% of firearms recovered by law enforcement between 2001 and 2014.  Vannella Decl. Ex. 10, Rpt. of Daniel Webster ¶ 12.**

b.  **Firearms with LCMs accounted for 40.6% of the firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings with 4 or more fatalities for the period of 2009 to 2015.  Webster Rpt. ¶ 12.**

c.  **Assault weapons accounted for between 2.6 and 8.5% of firearms recovered by law enforcement officers from crime scenes in the same ten cities between 2001 and 2014. Webster Rpt. ¶ 12.**

d.  **Assault weapons also accounted for 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally between 2009 and 2015.  Webster Rpt. ¶ 12.**

e.  **A study by Wintermute et al. (1998) in *Annals of Emergency Medicine*, using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault**

pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses.  Webster Rpt. ¶ 13.

f.  **A study of mass shooting events from 1982 to October 2022 showed that there were 115 mass shooting events for which magazine capacity was known. Out of those 115 events, there were 73 where the perpetrator used large-capacity magazines (63%). Mass shooting was defined as one where four or more people were killed in a public place in one incident, excluding incidents related to other crimes such as robberies and domestic violence. Decl. of Daniel Vannella, Ex. 7, Rpt. of Lucy Allen ¶¶ 30-31.**

g.  **A study of high-fatality mass shootings (defined as events resulting in 6 or more victims being shot to death) between 1991 and 2022 where magazine capacity used was known showed the percentage of such shootings where the perpetrator employed a large-capacity magazine (with greater than 10 rounds of capacity) has increased. The overall rate of use of LCMs in such high fatality mass shootings is 77%, but rose to 100% over the past 4 years. Klarevas Rpt. ¶ 13.**

h.  **Several statistical studies of defensive gun use showed that it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Allen Rpt. ¶¶ 9-15 & n.4; Yurgealitis Rpt. ¶ 147.**

67.    According to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects.

Supporting Citations: *See Expanded Homicide Table 8, Crime in the United States* (FBI 2019), https://bit.ly/3HdolNd.

**RESPONSE:**     **Disputed that the FBI UCR report cited to in the "Supporting Citations" concerns "homicides" (which include, but are not limited to, murders), because on its face it is addressing only "Murder Victims." It is also unclear what this report defines as "Other guns" (45 known murders in 2019); or "Firearms, type not stated" (3,281 known murders in 2019). Otherwise, undisputed that this report provides the statistics highlighted in this**

paragraph. **To the extent this paragraph contains any other alleged facts, they are disputed; and *Cheeseman* Plaintiffs have identified no non-hearsay and otherwise admissible evidence in support.**

68.    According to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases.
Supporting Citations: https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf.

**RESPONSE:    Undisputed only that the September 2010 Special Report by the Bureau of Justice Statistics listed in the "Supporting Citations" states that from the time period of 2003 to 2007, a household member was present for a household burglary approximately 27.6% of the time; and "[o]n average, household members became victims of violent crimes in about 266,560 burglaries annually" (or, approximately 7.2% of the time).**

69.    Studies on the frequency of defensive gun uses in the United States have determined that up to 2.5 million instances occur each year in which civilians use firearms to defend themselves or their property.
Supporting Citations: Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY    150,    164    (1995), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6853&context=jclc;  *See also* English, *National Firearms Survey*, *supra* at 5 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

**RESPONSE:    The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper legal argument. The State repeats its objections contained in paragraph 61.**

70.    At least a third of all gun owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning semiautomatic firearms like those banned by the State.

Supporting Citations: *See* Modern Sporting Rifle Comprehensive Consumer Report and Sport Shooting Participation in the U.S. in 2020, *supra*.

**RESPONSE:**     **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper legal argument. The State repeats its objections contained in paragraph 61.**

71.     All semiautomatic firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature the (sic) same cyclical rate of fire: one round fired per pull of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions.

Supporting Citations: *Staples*, 511 U.S. at 602 n.1 ("We use the term 'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired."); Wallace, *Assault Weapon Myths* at 216 ("Because a semiautomatic firearm fires only one round with each pull of the trigger, it can fire only as fast as the individual shooter can pull the trigger.")

**RESPONSE:**     **The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot." Yurgealitis Rpt. ¶ 29.**

Dated:  November 3, 2023          Respectfully submitted,

                                  MATHEW J. PLATKIN
                                  ATTORNEY GENERAL OF NEW JERSEY

                        By:    /s/ Daniel M. Vannella
                               Daniel M. Vannella
                               Assistant Attorney General

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

---

## DECLARATION OF DANIEL M. VANNELLA

---

**DANIEL M. VANNELLA**, being of full age, hereby declares as follows:

1.     I am licensed to practice law in the State of New Jersey and before the United States District Court for the District of New Jersey.  I am employed as an Assistant Attorney General of the State of New Jersey, and in that capacity I represent State Defendants in the above-captioned consolidated matters.  I am fully familiar with the facts to which I now certify.

2.     For purposes of clarity, the Plaintiffs in the matters of *Association of New Jersey Rifle & Pistol Clubs v. Platkin*, No. 18-10507, and *Ellman v. Platkin*, No. 22-4397, shall be referred to collectively as "*ANJRPC* Plaintiffs" in this Declaration. That term therefore does *not* include the Plaintiffs from the remaining matter of *Cheeseman v. Platkin*, No. 22-4360. Further, all citations to "ECF ___ " refer to the *Association of New Jersey Rifle & Pistol Clubs* docket, No. 18-10507.

3.     This Declaration is being submitted in support of the following: State Defendants' Cross-Motion for Summary Judgment (ECF 183); State Defendants' Motion to Exclude Testimony of Emanuel Kapelsohn and Clayton Cramer, and to Strike Supplemental Productions of Mr. Kapelsohn and Mr. Cramer (ECF 182); and State Defendants' Opposition to Plaintiffs' "Motion to Exclude Certain Expert Testimony" filed on October 6, 2023 (ECF 181; *see* ECF 176). The foregoing motion papers were all filed on the Court's ECF docket on November 3, 2023, prior to the filing of this Declaration.

1

4.     Attached as **Exhibit 1** is a true and accurate copy of State Defendants' letter provided to the other parties, dated May 15, 2023, identifying their proposed affirmative experts, as per the Court's March 16, 2023 pretrial scheduling order.

5.     Attached as **Exhibit 2** is a true and accurate copy of *ANJRPC* Plaintiffs' letter to the parties, dated May 15, 2023, identifying their proposed affirmative experts, as per the Court's March 16, 2023 pretrial scheduling order, which State Defendants had received.

6.     Attached as **Exhibit 3** is a true and accurate copy of an October 20, 2023 declaration of Saul Cornell, attaching a copy of his expert report (including exhibit) dated June 2, 2023, which was served on the parties.

7.     Attached as **Exhibit 4** is a true and accurate copy of an October 20, 2023 declaration of Robert Spitzer, attaching a copy of his expert report (including exhibits) dated June 7, 2023, which was served on the parties.

8.     Attached as **Exhibit 5** is a true and accurate copy of an October 20, 2023 declaration of Randolph Roth, attaching a copy of his expert report (including exhibit) dated June 8, 2023, which was served on the parties.

9.     Attached as **Exhibit 6** is a true and accurate copy of an October 20, 2023 declaration of Dennis Baron, attaching a copy of his expert report (including exhibit) dated June 15, 2023, which was served on the parties.

10.    Attached as **Exhibit 7** is a true and accurate copy of an October 25, 2023 declaration of Lucy Allen, attaching a copy of her expert report (including exhibits) dated June 16, 2023, which was served on the parties.

11.    Attached as **Exhibit 8** is a true and accurate copy of an October 20, 2023 declaration of Stephen Hargarten, attaching a copy of his expert report (including exhibits) dated June 7, 2023, which was served on the parties. An additional copy of the PowerPoint file attached to this report as Exhibit B, including its embedded videos, will be submitted to the Court and opposing counsel on USB drives.

12.    Attached as **Exhibit 9** is a true and accurate copy of an October 31, 2023 declaration of Louis Klarevas, attaching a copy of his expert report (including exhibits) dated June 13, 2023, which was served on the parties.

13.    Attached as **Exhibit 10** is a true and accurate copy of an October 20, 2023 declaration of Daniel Webster, attaching a copy of his expert report (including exhibits) dated June 7, 2023, which was served on the parties.

14.    Attached as **Exhibit 11** is a true and accurate copy of an October 24, 2023 declaration of James Yurgealitis, attaching a copy of his expert report (including exhibits) dated June 15, 2023, which was served on the parties.

15.    Attached as **Exhibit 12** is a true and accurate copy of an October 20, 2023 declaration of Brian DeLay, attaching a copy of his expert report (including

3

**JA973**

exhibits) dated July 11, 2023, as well as a Correction to Rebuttal Expert Report of Brian DeLay, dated September 21, 2023, which was served on the parties.

16.     Attached as **Exhibit 13** is a true and accurate copy of a report of Emanuel Kapelsohn (including exhibits), dated June 15, 2023, as well as Mr. Kapelsohn's separate case list and fee schedule, as received from counsel for *ANJRPC* Plaintiffs on June 16, 2023.

17.     Attached as **Exhibit 14** is a true and accurate copy of the July 17, 2023 report of Emanuel Kapelsohn (including exhibits), as received from counsel for *ANJRPC* Plaintiffs on July 17, 2023.

18.     Attached as **Exhibit 15** is a true and accurate copy of a supplemental letter (including exhibits) from Emanuel Kapelsohn, dated July 31, 2023, as received from counsel for *ANJRPC* Plaintiffs on July 31, 2023.

19.     Attached as **Exhibit 16** is a true and accurate copy of the transcript of Emanuel Kapelsohn's August 4, 2023 deposition, including exhibits introduced during that deposition.

20.     Attached as **Exhibit 17** is a true and accurate copy of the report of Ashley Hlebinsky (including exhibits), as received from counsel for *ANJRPC* Plaintiffs on June 16, 2023.

**JA974**

21.     Attached as **Exhibit 18** is a true and accurate copy of the transcript of Ashley Hlebinsky's August 11, 2023 deposition, including the exhibit introduced during that deposition.

22.     Attached as **Exhibit 19** is a true and accurate copy of the report of Clayton Cramer (including exhibit), dated July 17, 2023, as received from counsel for *ANJRPC* Plaintiffs on July 17, 2023.

23.     Attached as **Exhibit 20** is a true and accurate copy of the transcript of Clayton Cramer's August 21, 2023 deposition, including exhibits introduced during that deposition..

24.     Pursuant to the Court's March 16, 2023 scheduling order, the last day of all discovery in these matters was August 31, 2023. ECF 154. The deadline for all parties to produce affirmative expert reports was June 16, 2023. *Id.* The deadline for all parties to produce rebuttal expert reports was July 17, 2023. *Id.*

25.     During the August 4, 2023 deposition of *ANJRPC* Plaintiffs' witness Emanuel Kapelsohn, the undersigned made several requests on the record for specific documents or data that Mr. Kapelsohn testified about, but did not provide and/or specify in his deposition or in his previously served reports. *See also* **Exhibit 16** *passim*. Though these requests were placed on the record, counsel for *ANJRPC* Plaintiffs asked that State Defendants follow up in writing as to any request. *Id.*

5

**JA975**

26.    Upon receipt of the deposition transcript, State Defendants promptly did follow up in writing. They did not follow up as to all specific requests made on the record during the deposition, but rather only a few of them. They served the letter via e-mail to counsel on August 8, 2023. Attached as **Exhibit 21** is a true and accurate copy of the letter, and e-mail delivering it to counsel on August 8, 2023. This e-mail also attached, as a courtesy, a copy of Mr. Kapelsohn's deposition transcript.

27.    The August 8, 2023 letter demanded that *ANJRPC* Plaintiffs provide any responsive records to each of 7 requested items, or confirm that none exists for a particular item(s), by no later than August 11, 2023. *See* **Exhibit 21**.

28.    Counsel for *ANJRPC* Plaintiffs provided no response by August 11, 2023. On that date, they advised verbally that they had overlooked the August 8, 2023 e-mail and attached letter, and would need more time to respond. They did not ask for a specific extended deadline to respond, nor was any specific extended deadline volunteered to them by counsel for State Defendants.

29.    Thereafter, other than briefly discussing this issue with the undersigned and the Court during the Court's August 14, 2023 status conference, *see* ECF 164, counsel for *ANJRPC* Plaintiffs did not communicate at all with the undersigned regarding the August 8, 2023 letter or the items requested therein, until August 31, 2023—the last day of discovery—at approximately 8:44 p.m.

30.    On August 31, 2023 at approximately 8:44 p.m., counsel for *ANJRPC* Plaintiffs served via e-mail a cover letter attaching, among other things, Mr. Kapelsohn's "response" to State Defendants' August 8, 2023 letter. Attached as **Exhibit 22** is a true and accurate copy of the e-mail received from counsel for *ANJRPC* Plaintiffs. Attached as **Exhibit 23** is a true and accurate copy of the aforementioned cover letter attached to that e-mail.

31.    The "response" from Mr. Kapelsohn consisted of a letter, dated August 29, 2023, from Mr. Kapelsohn, providing written answers to questions as well as enclosing certain separate items. Attached as **Exhibit 24** is a true and accurate copy of this letter as received from counsel for *ANJRPC* Plaintiffs.

32.    Attached as **Exhibit 25** are true and accurate copies of the following items referred to in Mr. Kapelsohn's August 29, 2023 letter, as received from counsel for *ANJRPC* Plaintiffs on August 31, 2023: (1) a .pdf entitled "Rough Notes from Ballistic Testing"; (2) a spreadsheet file entitled "Penetration and Accuracy Test"; and (3) a .pdf entitled "ANJRPC Ballistic Testing – Sheetrock Wall Penetration (004)."

33.    Also referred to in Mr. Kapelsohn's August 29, 2023 letter were three .mp4 video files, entitled "Sheetrock Wall Penetration Testing," "Shooting Glass Video 1 of 2," and "Shooting Glass Video 2 of 2." As these cannot be attached and served on the Court via electronic filing, true and accurate hard copies of these

7

videos, as received from counsel for *ANJRPC* Plaintiffs on August 31, 2023, will be provided to the Court and all parties, as **Exhibit 26**.

34.    Also referred to in Mr. Kapelsohn's August 29, 2023 was a .pdf entitled "NSSF MODERN SPORTING RIFLE COMPREHENSIVE CONSUMER REPORT 2022." A true and accurate copy of this, as received from counsel for *ANJRPC* Plaintiffs on August 31, 2023, is attached as **Exhibit 27.**

35.    On August 31, 2023 at approximately 8:44 p.m., counsel for *ANJRPC* Plaintiffs also served via e-mail an errata sheet for Mr. Kapelsohn's deposition, as well as a signature page from Mr. Kapelsohn signed and notarized August 29, 2023. Attached as **Exhibit 28** is a true and accurate copy of these two documents, as received from counsel for *ANJRPC* Plaintiffs.

36.    On August 31, 2023 at approximately 11:59 p.m., the undersigned received from counsel for ANJRPC Plaintiffs another e-mail, this one enclosing a "Supplemental Rebuttal Expert Report of Clayton Cramer." Attached as **Exhibit 29** is a true and accurate copy of the e-mail as received from counsel for *ANJRPC* Plaintiffs.

37.    Attached as **Exhibit 30** is a true and accurate copy of the "Supplemental Rebuttal Expert Report of Clayton Cramer," dated August 31, 2023, that was attached to the aforementioned e-mail, as received from counsel for *ANJRPC* Plaintiffs.

38.    Counsel for State Defendants advised counsel for ANJRPC Plaintiffs of their objection to portions of their August 31, 2023 submissions. Following *ANJRPC* Plaintiffs' refusal to withdraw those submissions, State Defendants raised their objections to the Court via letter filed September 20, 2023. ECF 169. Following a September 27, 2023 conference, the Court entered a September 28, 2023 text order directing that State Defendants "may [] incorporate any objections to the materials at issue, and any requests that the Court strike or disregard them, into their forthcoming Daubert and summary judgment briefing." ECF 171.

39.    On September 20, 2023, counsel for *ANJRPC* Plaintiffs served via e-mail an errata sheet and for Ashley Hlebinsky's August 11, 2023 deposition testimony. Attached as **Exhibit 31** is a true and accurate copy of the e-mail received from counsel for *ANJRPC* Plaintiffs.  Attached as **Exhibit 32** is a true and accurate copy of the errata sheet that was attached to that e-mail, as well as a signature page from Ms. Hlebinsky signed August 29, 2023, as received from counsel for *ANJRPC* Plaintiffs.

40.    On September 22, 2023, counsel for *ANJRPC* Plaintiffs served via e-mail an errata sheet for Clayton Cramer's August 21, 2023 deposition testimony. Attached as **Exhibit 33** is a true and accurate copy of the e-mail received from counsel for *ANJRPC* Plaintiffs. Attached as **Exhibit 34** is a true and accurate copy of the errata sheet that was attached to that e-mail, as received from counsel for

9

**JA979**

*ANJRPC* Plaintiffs. A signature page for that errata sheet from Mr. Cramer, signed September 22, 2023, was served via separate e-mail on September 22, 2023. Attached as **Exhibit 35** is a true and accurate copy of that signed signature page.

41.    Attached as **Exhibit 36** is a true and accurate copy of the English statute from 1383 cited as 7 Rich. 2 c. 13 (1383), obtained by State Defendants.

42.    Attached as **Exhibit 37** is a true and accurate copy of the English statute from 1396 cited as 20 Rich. 2 c. 1 (1396), obtained by State Defendants.

43.    Attached as **Exhibit 38** is a true and accurate copy of the English statute from 1541-1542, cited as 33 Hen. 8, c. 6, § 2 (1541–1542), obtained by State Defendants.

44.    Attached as **Exhibit 39** is a true and accurate copy of the New York statute from 1784 cited as 1784 Laws of N.Y. 627, ch. 28, obtained by State Defendants.

45.    Attached as **Exhibit 40** is a true and accurate copy of the Massachusetts statute from 1783 cited as Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 46, obtained by State Defendants.

46.    Attached as **Exhibit 41** is a true and accurate copy of the Maine statute from 1821 cited as 1821 Me. Laws 98, ch, 25, § 2, obtained by State Defendants.

47.    Attached as **Exhibit 42** is a true and accurate copy of a press release from the New Jersey Office of the Governor entitled "Florio Signs Nation's Toughest Assault Weapon Law," dated May 30, 1990, obtained by State Defendants.

48.    Attached as **Exhibit 43** is a true and accurate copy of the Chicago statute from 1866 cited as Laws & Ordinances Governing the City of Chicago 239 (Myers & Chandler 1866) , obtained by State Defendants.

49.    Attached as **Exhibit 44** is a true and accurate copy of the transcript of James Curcuruto's August 3, 2023 deposition in the action entitled *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.), obtained by State Defendants.

I declare that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


/s/ Daniel M. Vannella
Daniel M. Vannella
Assistant Attorney General

DATE:    November 3, 2023

11

# Exhibit 1



PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

### *State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO BOX 112
TRENTON, NJ 08625-0112

MATTHEW J. PLATKIN
*Attorney General*

MICHAEL T.G. LONG
*Director*

May 15, 2023

**VIA EMAIL**
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Attorney for *ANJRPC* and *Ellman* Plaintiffs

Bradley Lehman
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
Attorney for *Cheeseman* Plaintiffs

> Re:  *Association Of New Jersey Rifle & Pistol Clubs,*
> *Inc. et al. v. Platkin et al.* ("*ANJRPC*")
> Docket No. 3:18-cv-10507
> *Cheeseman et al. v. Platkin et al.*
> Docket No. 1:22-cv-04360
> *Ellman et al. v. Platkin et al.*
> Docket No. 3:22-cv-04397

Dear Mr. Schmutter and Mr. Lehman,

Pursuant to the Court's March 16, 2023 Scheduling Order in the above-captioned cases, Defendants Matthew J. Platkin, Patrick J. Callahan, Bradley D. Billhimer, and Christine A. Hoffman hereby disclose the following names and subject matters of the experts they intend to use in this litigation:



HUGHES JUSTICE COMPLEX ● TELEPHONE: (609) 376-3202 ● FAX: (609) 292-0690
*New Jersey Is An Equal Opportunity Employer ● Printed on Recycled Paper and Recyclable*

**JA983**

May 15, 2023
Page 2

1. Lucy Allen, M.Phil., National Economic Research Associates, Inc. – statistics and data analysis;

2. Dennis Baron, Ph.D. – linguistic anthropology;

3. Saul Cornell, Ph.D. – history;

4. Stephen Hargarten, M.D., M.P.H. – weapons hardware and ballistics;

5. Louis Klarevas, Ph.D. – statistics and data analysis;

6. Randolph Roth, Ph.D. – mass casualty events;

7. Robert Spitzer, Ph.D. – history;

8. Daniel Webster, Sc.D., M.P.H. – gun violence; and

9. James Yurgealitis, B.A. – weapons technology and forensics.

Please contact me with any questions or concerns.

Sincerely yours,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:  _Daniel M Vannella_

Daniel M. Vannella
Assistant Attorney General

cc: All counsel of record

# Exhibit 2

LAW OFFICES
# HARTMAN & WINNICKI, P.C.

Dariusz M. Winnicki *°
Richard L. Ravin *°□
Daniel L. Schmutter*
Andrew T. Wolfe*

74 PASSAIC STREET
RIDGEWOOD, NEW JERSEY 07450

Phone: (201) 967-8040
Fax:    (201) 967-0590

*  *  *

\* New York and New Jersey Bars
\* Florida Bar
□ Washington, D.C. Bar
◊ New Jersey Bar

WEBSITE
www.hartmanwinnicki.com

Porter E. Hartman (1920-2009)
Charles R. Buhrman (1938-1994)
William T. Marsden (1943-1993)
Cyrus D. Samuelson (1911-1998)

May 15, 2023

**VIA EMAIL**
Daniel M. Vannella Esq.
Assistant Attorney General
25 Market St., P.O. Box 112
Trenton, NJ 08625

Mitchell Jacobs, Esq.
Clearly Giacobbe Alfieri Jacobs, LLC
169 Ramapo Valley Rd.
Oakland, NJ 07436

Kathleen N. Fennelly, Esq.
McElroy, Deutsch, Mulvaney &
Carpenter LLP
1300 Mount Kemble Avenue
Morristown, NJ 07962

Re:    **Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC") v. Platkin, et al. - 3:18-cv-10507-PGS-LHG**
**Ellman v. Platkin - 3:22-cv-04397-PGS-LHG**
**Cheeseman v. Platkin - 1:22-cv-04360-PGS-LHG**

Dear Counsel:

We represent the ANJRPC and Ellman Plaintiffs in the above referenced consolidated matters. We hereby disclose the following affirmative experts and topics ANJRPC and Ellman Plaintiffs may offer in these cases:

1. Emanuel Kapelsohn – General firearms knowledge, use, and nature;

2. Ashley Hlebinsky – History, including, but not limited to, historical development, nature, and use of firearms.

Very truly yours,

/s/ Daniel L. Schmutter
DANIEL L. SCHMUTTER

DLS/ars
Cc:    Bradley Lehman, Esq.

JA986

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | |
| v. | Civil Action No. 3:18-cv-10507 |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-cv-4360 |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

     Defendants.

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

     Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

     Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## DECLARATION OF SAUL CORNELL

    I, SAUL CORNELL, hereby depose and state:

1.     I am over the age of 18 and am competent to testify to the matters stated
below based on personal knowledge.

**JA989**

2.    I have attached a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.


I declare under penalty of perjury on this ___20th___ day of October, 2023, that the foregoing is true and correct.


_____
SAUL CORNELL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>        Plaintiffs,<br>v.<br><br>PLATKIN, et al.,<br><br>        Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>        Plaintiffs,<br>v.<br><br>PLATKIN, et al.,<br><br>        Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>       Plaintiffs,<br>v.<br><br>PLATKIN, et al.,<br><br>       Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Expert Report of Saul Cornell**

---

## I.    INTRODUCTION

I have been asked by the Office of the Attorney General for the State of New Jersey to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. I have also been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

## II.    BACKGROUND AND QUALIFICATIONS

I received my BA from Amherst College and MA and PhD from the University of Pennsylvania. I currently hold the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American History. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law

2

School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers v. City of Boulder*, No. 2018-cv-30581 (Colo. D. Ct., Boulder Cty.); *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.); *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226 (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537 (S.D. Cal.); and *Duncan v. Bonta*, No. 3:17-cv-01017 (S.D. Cal.); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal.); *Boland v. Bonta*, No. 8:22-cv-1421 (C.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-746

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

(C.D. Cal.); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718 (S.D. Cal.); *NAGR v. Campbell*, No.1:22-cv-11431  (D. Mass.); *NAGR v. Lamont*, No. 3:22-cv-0118 (D. Conn.); *NAGR v. Lopez*, No. 1:22-cv-404 (D. Haw.); *Rhode Island v. Ortiz*, No. 19-0672AG (R.I. Super.); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn.)

I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports; $1000 per hour for depositions and court appearances. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## III.    SUMMARY OF OPINIONS

Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding. It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights.

In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4] Each of the new states, either by statute or judicial decision, adopted multiple

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

4

**JA994**

aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]

The concept of the peace was central to common law.[6] As one early American justice of the peace manual noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7] Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8] The use of Blackstone as an authority on how early Americans understood their inheritance from England has been reiterated by the Supreme Court.[9] Thus, the dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[10]

---

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).; *District of Columbia v. Heller*, 554 U.S. 570, 626–627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012). The phrase was an example of the archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016). The proper rendering of the term thus becomes "unusually dangerous."

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept, *see generally*

The most basic right of all at the time of Founding was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[11] The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[12] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." The term police encompassed more than law enforcement, it also included the right of the people to legislate for the common good.[13]

Thus, any argument that rights must be understood as they were at the time of founding, such as the right to bear arms, must also apply to the scope of the right of the people to regulate their internal police by enacting laws to promote the security and welfare of the people. The history of regulation, including guns, in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point about the scope of legislative authority in this area.

In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the people of the individual states exercised their right to regulate to address longstanding issues and novel problems created by firearms in American

---

JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[11] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[12] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[13] Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government (2005); Gary Gerstle, Liberty and Coercion: The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015).

6

society. Over the eighteenth and nineteenth century, American regulation increased with the advancement of firearm technology, from the manufacturing, storage, and sale of gunpowder, to regulating where firearms and other dangerous weapons cannot be carried. The response of states to the emergence of new firearms that threatened the peace was more regulation. When faced with changes in technology and consumer behavior, as well as novel threats to public safety, the individual states enacted laws to address these problems. In every instance apart from a few outlier cases in the Antebellum South, courts upheld such limits on the unfettered exercise of the right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about infringement: whether the law negated the ability to act in self-defense.[14] In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition. Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment. The Founding generation and their successors sought to create a well-regulated society in which ordered liberty, not anarchy prevailed.[15]

## IV.    The Right to Keep and Bear Arms in Historical Context:  Liberty and Regulation in Founding Era Constitutional Thought.

### A.  The Difficulty of a Historical Inquiry In This Context

The United States Supreme Court's decisions in *Heller*, *McDonald*,[16] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. Legal texts must not be read in a

---

[14] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[15] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[16] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Similarly, a mechanistic strategy of digital searching for historical gun laws would be incapable of answering the historical inquiries required under *Bruen*. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts—how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, responded to societal ills created by those changes.[17]

In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[18] Indeed, such research is still ongoing and new materials continue to emerge; and even since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[19]

Each provision of the Bill of Rights, including the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. *Bruen*, 142 S. Ct. at 2131; *Heller*, 554 U.S. at 635. Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to

---

[17] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[18] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[19] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

regulate arms to promote the goals of preserving a free state. Although rights and regulations are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[20] In Founding-era American English, the word "infringement" meant to "violate" or "destroy." In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the conduct protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying right. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.

John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the

---

[20] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201. This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True freedom, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted ordered liberty. Regulation was the indispensable correlate of rights in Founding era constitutionalism.[21]

Similarly, Nathan Bailey's Dictionarium Britannicum (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[22] And his 1763 New Universal Dictionary repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[23] Samuel Johnson's Dictionary of the English Language (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[24] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[25] And Noah Webster's An American Dictionary of the English Language (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[26] Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The Founding generation was far more nuanced in distinguishing between the differences between these two terms.

For the framers, ratifiers, and other relevant legal actors in the Founding era, robust regulation was not understood to be an "infringement" of the right to bear arms, but rather the

---

[21] *Liberty,* A NEW LAW DICTIONARY (1792) *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[22] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[23] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[24] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[25] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[26] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

**JA1000**

necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[27] As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having no government, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property."[28] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[29]

The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text. The inclusion of rights guaranteed in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause

---

[27] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

[28] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[29] *See generally* Quentin Skinner, *Liberty Before Liberalism* (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

11

**JA1001**

and only with consent of the body politic."[30] Thus, rather than limiting rights, regulation was the essential means of preserving rights, including self-defense.[31]

In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[32] The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.[33] Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[34] The plain text of the Second Amendment not only protects the right to keep and bear arms, it acknowledges that this right is

---

[30] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. & CRIMINOLOGY 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[31] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017); SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[32] H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002).

[33] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 CONST. COMMENT. 228–30 (1999).

[34] *Id.*

12

designed to encourage the security of a free state.  Actions that undermine this security are clearly not protected by the Amendment.

In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and encourage the equally vital goal of promoting public safety. The proper metric for deciding if such laws were constitutional was and remains the same today: whether a regulation infringes on the core right protected by the Second Amendment.[35]

### B.  Arms And Accoutrements: Taking Founding-Era Texts Seriously

The text of the Second Amendment references arms. In Founding Era American English the term arm did not include "ammunition" or any of the other "accoutrements" essential to militia service. Thus, the claim that, as a matter of history and original meaning, modern large capacity magazines (LCMs) are either lineal descendants or analogs to the Founding era arms protected by the Second Amendment is false. As a matter of history, it is my opinion that these items indisputably do not fall under the Second Amendment's protections.  Indeed, the Second Amendment and early American militia laws acknowledge that government had both a compelling interest and ample authority to regulate and proscribe the types of arms, ammunition, and accoutrements that may be purchased in the marketplace. The Founding era term that incorporates all three of these parts of the equipment of a militiaman was "a stand of arms." The Second Amendment references arms, not "a stand of arms." [36]   In his dictionary, Noah Webster

---

[35] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[36]  *See* the relevant entries in Noah Webster,  A DICTIONARY OF THE ENGLISH LANGUAGE (1832) *s.v.*

defined "a stand of arms as follows: "A stand of *arms* consists of a musket, bayonet, cartridge-box and belt, with a sword. But for common soldiers a sword is not necessary."[37]

A search of the phrase "arms and accoutrements" in the Brigham Young University Corpus of Founding Era English, a standard source in any originalist inquiry into constitutional meaning yields close to nine hundred occurrences of these two terms. A computer search of the Founders Online archive, another standard source consulted by originalist scholars also reveals hundreds of uses that underscore the irrefutable fact that arms and accoutrements were two distinct categories of military items.

One need not depend on the methods of corpus linguistics alone to document this basic fact about how "arms," "ammunition," and "accoutrements" were typically used in Founding era English.   William Duane's important military dictionary published during the Founding era made it clear that arms and accoutrements were distinct categories of equipage: "Accoutrements, by contrast, refers to equipage, including 'belts, pouches, and cartridges.'"[38] Similarly, ammunition, which was sometimes combined with accoutrements into a single category, was distinct from arms. The definition of ammunition from the Founding period included "all sorts of powder and ball, shells, bullets cartridges, and grape shot."[39]

Accoutrements were often listed separately from arms and ammunition. This order from General Washington underscores the seriousness with which the Continental Army scrutinized the condition of Arms, ammunition, and accoutrements in the possession of its soldiers:

> Twice a week (Wednesdays and Saturdays) the officers of each company are
> carefully to inspect the arms, ammunition, and accoutrements of their men, to

---

[37] 1 Encyclopædia Britannica: Or, a Dictionary of Arts, Sciences, and Miscellaneous Literature; Enlarged and Improved (1823) at 673.
[38]  William Duane, MILITARY DICTIONARY (1810) at 2-3.
[39]  *Id.*

14

see that they are in perfect order and that nothing is wanting. At the first inspection they are to take an exact account of every article belonging to each man; and if afterwards any be missing, they are immediately to report the same to the officer commanding their regiment, that the matter may be enquired into, if he judges it proper, by a regimental court martial, and the delinquent punished if deserving it, and charged with the articles lost, to be deducted from his wages.[40]

Further evidence of the importance of the distinction between arms, ammunition, and accoutrements can be gleaned from the range of fines levied for failing to appear at muster adequately armed and accoutered. Persons too indigent to purchase these items were supplied out of the public arms and this included arms, ammunition, and accoutrements.[41]

Fines levied by Massachusetts for Deficient Equipment [42]

| Item | Category | Fine |
|------|----------|------|
| Musket | Arms | One dollar |
| Cartridge Box | Ammunition | Thirty Cents |
| Cartridges | Ammunition | Thirty Cents |
| Good Powder | Ammunition | Thirty Cents |
| Flints | Accoutrements | Twenty Cents |
| Wire Brush | Accoutrements | Twenty Cents |

---

[40] General Orders, 11 October 1777," Founders Online, National Archives, https://founders.archives.gov/documents/Washington/03-11-02-0488. [Original source: The Papers of George Washington, Revolutionary War Series, vol. 11, 19 August 1777–25 October 1777, ed. Philander D. Chase and Edward G. Lengel. Charlottesville: University Press of Virginia, 2001, pp. 480–482.]

[41] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[42] Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836 (1836) at 120. See also, Acts and Laws of the State of Connecticut, in America. United States (1784). "Table of Fines, Forfeitures, and Penalties," A Collection of All Such Acts of the General Assembly of Virginia of a Public and Permanent Nature as Have Passed Since the Session of (1808) at 223.

15

### C.  From Muskets To Pistols: Change And Continuity In Early American Firearms Regulations

Guns have been regulated from the dawn of American history.[43] At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[44] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*.[45]

Anglo-American law venerated the natural right of self-defense but the legal understanding of this doctrine had been shaped by centuries of common law adjudication.  The right of self-defense protected by Anglo-American law was not unlimited; it was shaped by the need to preserve human life and promote the peace. [46] Statutory law, both in England and America functioned to further these inter-related goals.  The use of deadly force was extremely limited.  At the time of the Second Amendment, retreat, not stand your ground was the legal norm.[47] Given these indisputable facts the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[48] To deny such an authority would be to convert the Constitution into a suicide pact and not a charter

---

[43] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017).

[44] *Id.*

[45] Ruben & Miller, *supra* note 18, at 1.

[46] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & Contemp. Probs. 11 (2017).

[47]  The three notable exceptions to this principle were the "castle doctrine," defense against threat when there was no opportunity to escape or seek help, and defense against felonious assault, see  the arguments made by John Adams in his defense of the soldiers in the Boston Massacre trial, "Adams' Argument for the Defense: 3–4 December 1770," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016. [Original source: *The Adams Papers*, Legal Papers of John Adams, vol. 3, *Cases 63 and 64: The Boston Massacre Trials*, ed. L. Kinvin Wroth and Hiller B. Zobel. Cambridge, MA: Harvard University Press, 1965, pp. 242–270

[48] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

16

of government. In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[49]

*Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[50] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[51]

Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[52]

The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[53] Levels of interpersonal gun violence among those of white

---

[49] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[50] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[51] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[52] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009). Roth's data makes clear that gun violence was not a major problem at the Founding.

[53] It is important to recognize that there were profound regional differences in early America. *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988). These differences also had important consequences for the evolution of American law. *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF

17

European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the almost constant state of war that existed between the tribal populations of the region and their American neighbors.

Limits in Founding-era firearms technology militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[54] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[55] Simply put, there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[56] The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that these types of firearms were less likely to be used in crimes of passion. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

---

LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

[54] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061 (last visited June 2, 2023).

[55] Sweeney, *supra* note 41.

[56] HAAG, *supra* note 50.

18

In short, the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America. Rather, they faced a different, but no less serious problem: American reluctance to purchase the type of weapons needed to effectively arm their militias. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[57] Killing pests and hunting were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[58]

Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by the military tactics of the time. A gun had to be able to receive a bayonet and serve as a bludgeon if necessary. The light-weight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin, but were not well suited to eighteenth-century ground wars. In particular, fowling pieces, loaded with shot, not bullets or musket balls were especially useful in a predominantly agrarian society.[59] When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved. Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[60]

---

[57] Sweeney, *supra* note 41.

[58] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

[59] Sweeney, *supra* note 41.

[60] *Id.*

As a result, the government took an active role in encouraging the manufacturing of arms and had a vested interest in determining what types of weapons would be produced. The American firearms industry in its infancy was thus largely dependent on government contracts and subsidies. The industry was also regulated to prevent sub-standard weapons from being sold and from military weapons being diverted from the militia.[61]

One important form of government regulation of the firearms industry, a practice that began in the era of the Second Amendment and persisted throughout the nineteenth century included inspection of weapons and Government-imposed safety standards on the firearms industry. Indeed, without such interventions it is likely that the industry would never have survived. The danger posed by defective arms, or poorly manufactured ones could be catastrophic. A burst barrel of a musket or fowling piece could turn a firearm into a pipe bomb, maiming or killing an unfortunate user.

In 1805 Massachusetts enacted a law requiring all guns to be inspected before they could be sold in the Commonwealth.[62]  As stated in the law's preamble, the law's purpose was to prevent harm to residents from the sale of unsafe firearms. The law required the appointment of inspectors, up to two per county, who would "prove," i.e. test and inspect, all musket barrels and pistol barrels. The law detailed the manner in which these inspections were to be conducted, which included testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance. If the firearm passed inspection, then the inspector would stamp it with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. Only firearms that passed inspection and were stamped could be sold, and the sale of firearms without a stamp was subject to a fine. The standards that all muskets and pistols had to meet to pass inspection were

---

[61] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[62] 1804 Mass. Acts. 111, ch. 81, "An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth."

20

updated in 1814.[63]

Maine imposed a similar requirement on firearms in 1821, and continued the practice through the end of the century.[64] Similar to the Massachusetts proving law, the Maine law required the governor to appoint inspectors of firearms who would then ensure that firearms met certain safety standards and stamped prior to their sale. The Maine and Massachusetts laws persisted throughout the nineteenth century.[65]

The federal armory in Springfield, Massachusetts, began producing muskets in 1794. The presence of the armory served as a spur to innovation among local gun smiths. In fact, this confluence of factors helped Western Massachusetts become the leading small arms producer in America on the eve of the War of 1812. The Springfield armory, a federal entity, was governed by federal law (not Massachusetts law) but it nonetheless extensively scrutinized and inspected all arms made at its facilities and any arms produced by local gunsmiths under government contract. The quality of these weapons, literally being stamped with government approval, made these guns particularly valuable in the civilian arms market when government surplus guns were sold to consumers in times of peace.[66] Federal weapons not made in Massachusetts were also stamped to discourage theft. In 1776, George Washington ordered all Continental Army firearms stamped

---

[63] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . .. . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")

[64] "An Act to Provide for the Proof of Fire Arms," 2 Laws State of Maine (1821) at 685-86.

[65] 1 The General Statutes of the Commonwealth of Massachusetts: Enacted December 28, 1859, to Take Effect June 1, 1860 (2d ed., William A. Richardson & George P. Sanger, eds.) 255 (1873).

[66] Lindsay Schakenbach Regele, *Manufacturing Advantage: War, The State, And The Origins Of American Industry*, 1776–1848 (2019) at 63-65.

with an insignia: "U.S.XIII." Government marked weapons in this fashion to make it easier to identify cases where arms were being illegally sold in a secondary market to private individuals or sold to person who were not allowed to own firearms.[67] In 1780, George Washington also ordered that the Continental Army ensure all gun barrels were sufficiently proved to avoid buying poor quality guns.[68]

Stamping and marking firearms aided government efforts to keep track of weapons and enforce manufacturing standards.  These types of policies were understood at the time of the Second Amendment and its various state analogs to be perfectly consistent with the right to keep and bear arms.[69]

The market for firearms in early America shared very few features with the contemporary world of firearms commerce. Today's Americans have a myriad of choices of the type and style of weapon when they wish to acquire a firearm. Gun shows, gun supermarkets, and internet sales are a few of the many ways Americans acquire firearms today. Although estimates vary, it is likely that there are now more guns than people in contemporary America.[70]

Early American firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production.[71] Apart from the wealthiest Americans, most households could not afford to own multiple weapons. Local gun smiths, not big box stores such as Walmart, were responsible for selling most firearms.

---

[67] E. Wayne Carp, *To Starve The Army At Pleasure: Continental Army Administration And American Political Culture, 1775-1783* (1984) at 66-67.

[68] Letter from George Washington to Henry Knox (Nov. 30, 1780), *in* The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, *ed.*) ("I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. ... Lee charges Mr. Deane[']s Agent with purchasing.")

[69] Regele, *supra* note 61.

[70] Terry L. Schell, Samuel Peterson, Brian G. Vegetabile, Adam Scherling, Rosanna Smart, and Andrew R. Morral, State-Level Estimates of Household Firearm Ownership. Santa Monica, CA: RAND Corporation, 2020. https://www.rand.org/pubs/tools/TL354.html.

[71] Merritt Roe Smith, Harpers Ferry Armory and the New Technology: The Challenge of Change (1977).

Fire Arms ownership in New England During the Era of the Second Amendment, 1770-1798[72]

| Years | % Inventories with firearms | % Inventories with muskets | % Inventories with pistols |
|---|---|---|---|
| 1770-1775 | 51 | .9 | 5 |
| 1783-1786 | 46 | .5 | 2.5 |
| 1795-1798 | 32 | 1.5 | 1.5 |

Most sellers and buyers of firearms in early America were members of the same community. Moreover, given the nature of eighteenth-century firearms technology gun owners needed to maintain an on-going relationship with their local gun smith to keep their guns in good working order. The informal ties of kin and community that defined the close-knit communities of early America meant that individuals were effectively vetted and monitored by their neighbors in ways that share little with the largely anonymous world of modern firearms commerce.[73]

The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[74] The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[75] The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints -- common items in many homes -- also transformed American gun culture.[76] These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common. The culmination of this gradual evolution in both firearms and

---

[72]   Data adapted from Sweeney, *supra* note 41. Probate data does not perfectly correlate with total number of weapons in circulation so these figures must be used with some caution. In some cases, arms were passed on to family members before probate. These numbers do, however, offer a useful way to capture the relative number of different categories of arms owned by the population.

[73]   Scott Paul Gordon, *The Ambitions of William Henry*, 136 PENNSYLVANIA MAGAZINE OF HISTORY AND BIOGRAPHY  253 (2012).  Pennsylvania was one of the main regions of early American gunsmithing. M.L. Brown, *Firearms In Colonial America: The Impact On History And Technology*, 1492-1792 (1980).

[74]   Cornell, *supra* note 3, at 745.

[75]   Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

[76]   Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY (Eric Foner ed., 1990).

ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican-American War.[77] Economic transformation was accompanied by a host of profound social changes that gave rise to America's first gun violence crisis. As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity. The change in behavior was most noticeable in the case of handguns. [78]

### D. The Myth of Founding Era Repeaters

Virtually all firearms in common use in the era of the Second Amendment were single-shot, muzzle-loading black powder weapons. Guns capable of firing more than a single round, repeaters, could best be described as exceedingly rare and exotic. Thus, the claim that firearms capable of firing more than ten rounds without reloading "are nothing new" and the related claim that such weapons were familiar to Americans in the Founding era is deceptive at best. The existence of such weapons did not mean that they were common, nor did it mean that the average American would have understood that such weapons were generally understood to fall within the protection of the Second Amendment. There is no evidence to support such a conclusion.

Moreover, the claim that "repeaters" and other rare weapons were widely believed to be protected by the Second Amendment is not consistent with the originalist framework employed in *Bruen*. An analysis of history, text, and tradition requires a contextually sensitive assessment of what types of weapons were in common use at the time and which weapons were singled out by governments for heighted forms of legal protection or treated simply as property subject to the normal range of regulation.[79] Thus, the relevant historical question is not what firearms

---

[77] William N. Hosley, *Colt: The Making of an American Legend* (1st ed. 1996).

[78] Cornell, *supra* note 3, at 716.

[79] Kevin Sweeney and Saul Cornell, *All Guns Are Not Created Equal*, CHRONICLE OF HIGHER EDUCATION. January 28, 2013; Priya Satia, *What Guns Meant in Eighteenth-century Britain* 5 PALGRAVE COMMUN 104 (2019).

technology existed at the time of the Second Amendment. The constitutionally pertinent question is: did the average reader of the Constitution and the first ten amendments understand repeaters to be among those weapons the Second Amendment was intended to protect?[80]

Few if any Americans would have ever encountered these types of weapons and even fewer owned such weapons, an indisputable fact that makes the argument that these types of weapons were encompassed by the Second Amendment highly improbable.[81]

The best way to understand the historical importance (or irrelevance) of these weapons is to analyze the discussion of arms in the print culture of the period, paying close attention to how repeating weapons were discussed in newspapers, books, and to a lesser extent private correspondence.[82] If one consults the standard sources associated with originalist scholarship and jurisprudence the silence is deafening. These types of weapons were rarely mentioned and when they were discussed they were described as rare and "curious."[83] Founding era newspapers often contained advertisements for the sale of firearms. Although one must approach data gained from this type of digital searching with some historical sophistication and caution, the evidence clearly shows that "repeating" weapons were neither common nor readily available in the period between the American Revolution and enactment of the Second Amendment. Given this fact it strains credulity to claim that such weapons were originally understood to be encompassed within the protections afforded by the Second Amendment. During the almost two-decade period between the Declaration of Independence and the adoption of the Second Amendment

---

[80] William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 LAW & HISTORY REVIEW 809-820 (2019).

[81] See discussion below *infra* Section IV.D.

[82] Saul Cornell, *Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning Id.*, 821–45.

[83] See discussion below *infra* Section IV.D.

there were a total of five advertisements for the sale of air rifles in American newspapers.[84] In the same period there were over four thousand advertisements for the sale of guns of various types, most notably muskets of one type or another.    The advertisement reproduced in Figure One below illustrates the exotic nature of these weapons, which were described as "singular" and "curious."[85]

Figure One[86]



These guns were so rare and expensive that a New York Museum from the period decided to showcase an air gun alongside other curiosities such as mammoth bones and a full-size working guillotine.  For an additional fee beyond the price of admission one could purchase an opportunity to fire one these "singular" weapons.[87]

---

[84]  [New York] Royal Gazette October 1, 1783  at 3;  Pennsylvania Packet  July 21, 1789 at 3 ; *id*.  July 28, at 1;  *id*., July 31 at 1; *id*., August 13, at 1.

[85] "To be Sold at Private Sale," [New York] ROYAL GAZETTE October 1, 1783  at 3
[86] *Id.*
[87] Lawrence W. Levine, *Highbrow/Lowbrow* (2009) at 149.

26

**JA1016**

Figure Two [88]



The notion that the Second Amendment was widely understood to protect weapons that were rarely advertised for sale and that generally recognized to be of a "singular" and "curious" nature is not credible; nor is such a claim consistent with Heller and Bruen's originalist methodology which requires that texts be interpreted according to their ordinary public meaning in the eighteenth century.  Weapons described as "singular and curious" are a poor choice for understanding the ordinary meaning of the term "arms" in Founding era English.

Visitors to today's NRA's museum of firearms may be treated to an impressive exhibit featuring the type of Girondoni air rifle that Lewis and Clark carried on their Expedition of Discovery. [89]  Although modern gun rights advocates and antiquarian firearms enthusiasts are well acquainted with this weapon, few Americans in the era of Lewis and Clark could make a comparable claim. Indeed, in the first published account of the Corps of Discovery's mission there are less than a handful of references to the air gun carried by Lewis and Clark.  The

---

[88] "To the Curious," [New York] DAILY ADVERTISER, February 9, 1792.
[89] https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-8-romance-of-the-long-rifle/girardoni-air-rifle-as-used-by-lewis-and-clark.aspx (last visited on 6/1/23).

27

**JA1017**

primary use of the weapon was not for war, hunting, or individual self-defense, but the weapon

was a show piece used to impress the different Indian nations the Corps encountered with the

superiority of American technology.[90] But, few Americans at the time of the Lewis and Clark

exhibition would have had the opportunity to ever see one of these weapons or any other

repeating gun up close.

Under ideal conditions priming the Girardoni air gun required 1500 strokes of a pump.

The Austrian military, one of the few armed forces in the world to purchase these types of

weapons, quickly abandoned them because they were ill suited to battle-field conditions.  In

1789, an Austrian officer complained that the weapons were of little military value because of

the difficulty of using them and their tendency to malfunction:

> Due to their construction, these guns were much more difficult to
> use effectively than normal, as one had to handle them much more
> cautiously and carefully. In addition, the soldiers using them had to
> be supervised extremely carefully, as they were unsure about the
> operation. The guns became inoperable after a very short time—so
> much so that after a while no more than one-third of them were still
> in a usable state. We needed the whole winter to repair and replace
> them.[91]

William Duane's popular military dictionary (1810) devoted a short entry to air guns, noting that

the gun's performance was so unreliable, "it has long been out of use among military men."[92]

## E.  The Police Power And Firearms Regulation

The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to

bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the

people of this State have the sole, exclusive and inherent right of governing and regulating the

---

[90]  2 History of the Expedition Under the Command of Captains Lewis and Clark...in Two (ed., Paul Allen, 1814) at 136, 28,364. For a discussion of the Corps of Discovery's use of technology to over-awe Indian peoples and impress upon them the superiority of American technology, see James P. Rhonda, LEWIS AND CLARK AMONG THE INDIANS (1984) at 225.

[91]  Frederick J. Chiaventone, *The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon* 14 MILITARY HERITAGE (2015), 19.

[92]  William Duane, A MILITARY DICTIONARY (1810) at 5.

internal police of the same."[93] The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[94] By the early nineteenth century, the term "police" was a fixture in American law.[95] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[96] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[97] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority,

---

[93] PA. CONST. OF 1776, Ch. I, art iii.

[94] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV. For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[95] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[96] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[97] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

29

**JA1019**

including the authority to regulate guns and gun powder.[98]

Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible. Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic] of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[99] Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[100]

State police power authority was at its pinnacle in matters relating to guns or gun powder.[101] Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the substance's dangerous potential to detonate if exposed to fire or heat. Firearms were also subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons.[102]

Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[103] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

---

[98] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[99] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[100] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[101] Cornell and DeDino, *supra* note 35.

[102] *Id.*

[103] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[104]

New Hampshire enacted a law in 1825 penalizing the sale or offer to sell "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."[105]

Other examples of state laws delegating authority to local governments to regulate the sale of gunpowder for public safety include but are not limited to:

    a.  1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

    b.  An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder);

    c.  An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8, pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

The purpose of these gunpowder regulations was to promote public safety. Early American governments recognized the danger posed by gun powder and regulated every aspect of its production, sale, and storage. Early American governments also regulated shooting galleries for

---

[104] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, 2 LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE at 191-2 (Thomas Greenleaf, ed., 1792).

[105] 1825 N.H. Laws 74, ch. 61, § 5

31

**JA1021**

similar reasons.[106]

There were also laws that required the inspection of gunpowder. In 1809, Massachusetts established requirements for the quality and composition of gunpowder; authorized the appointment of inspector. Before being placed in any public magazine gunpowder that passed inspection was placed in a cask and marked with the inspector's initials; gunpowder that was marked condemned or that had not yet passed inspection could not be sold.[107] Four other states, including Rhode Island, New Jersey, New Hampshire, and Pennsylvania, adopted similar gunpowder inspection laws in the late eighteenth and early nineteenth centuries.[108]

The regulation of firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[109] This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning

---

[106] John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 80 (1848); Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220 (1854); Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149-150 (1856) ; Rhode Island: 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement, §§ 1-2; Samuel Ames, The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State Page 204-205(1857); William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149 (1863*);* Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council. New Edition Page 257 (1870).

[107] 1808 Mass. Acts 444, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder.

[108] 1776 R.I. Pub. Laws 25 (Oct. Sess.); 1776-77 N.J. Laws 6-7, ch. 6; 1820 N.H. Laws 274, ch. 25; 1794 Pa. Laws 764, ch. 337.

[109] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

32

with the Marshall Court and continuing with the Taney Court.[110]  Nor was Chief Justice John

Marshall unique in highlighting the centrality of this idea to American law.[111] The ubiquity of

the police power framework for evaluating the constitutionality of legislation regarding firearms

reflected the centrality of this approach to nearly every question of municipal legislation

touching health or public safety in early America.[112] Massachusetts Judge Lemuel Shaw, one of

the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential

1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers,

judges, and legislators looking for guidance on the meaning and scope of the police power.

Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and
> establish all manner of wholesome and reasonable laws, statutes and
> ordinances, either with penalties or without, not repugnant to the constitution,
> as they shall judge to be for the good and welfare of the commonwealth, and
> of the subjects of the same. It is much easier to perceive and realize the
> existence and sources of this power, than to mark its boundaries, or prescribe
> limits to its exercise. There are many cases in which such a power is exercised
> by all well-ordered governments, and where its fitness is so obvious, that all
> well regulated minds will regard it as reasonable. Such are the laws to prohibit
> the use of warehouses for the storage of gunpowder.[113]

In short, there was unanimous agreement among leading antebellum jurists, at both the

---

[110] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice.
The Marshall Court Period covered the years 1801-1835. For a brief overview, *see The Marshall
Court, 1801-1835*, SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022),
https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-
history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years
1836-1864**.** See *The Taney Court, 1836-1864*, SUPREME COURT HISTORICAL SOCIETY (last visited
Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-
of-the-courts-history-of-the-courts-the-taney-court-1836-1864/**.**

[111] In the extensive notes he added as editor of the 12th edition of James Kent's classic
*Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms
was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN
LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[112] FREUND, *supra* note 95, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE:
LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996).

[113] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion
of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures. Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[114] A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[115]

No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged. This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[116] Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[117] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

---

[114] CORNELL, THE POLICE POWER, *supra* note 31.

[115] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

[116] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[117] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[118]

One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[119] The case is a classic example of antebellum police power jurisprudence. The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[120] In the court's view, the regulation of arms was at the very core of state police power.[121] The judicial determination was straightforward: was the challenged law a legitimate exercise of the police power or not?

Modern-day legislative efforts to ban large-capacity magazines, semi-automatic weapons, and machine guns fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror. During American's first gun violence crisis in the Jacksonian era, states targeted pistols that were easily concealed, and in the New Deal era, states singled out gangster weapons such as the notorious Thompson sub-machine gun (or "Tommy Gun"), treating these weapons as sufficiently dangerous or unusual to warrant extensive regulation,

---

[118] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[119] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[120] *Id.* at 616.

[121] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 95, at 91.

35

or prohibition.  The same imperatives and constitutional logic guided both regulatory regimes.[122]

### F.  Reconstruction And State Police Power To Regulate Firearms (1863-1877)

Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were textually distinct in the Founding era but were mutually reinforcing in both theory and practice: both were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.[123] This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.[124] As a result, state constitutions no longer included positive affirmations of a police right. Secondly, the constitutional "mischief to be remedied" had changed as well.[125] Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.[126] By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical

---

[122] Spitzer, *supra* note 43.

[123] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[124] See Knapp *supra* note 11.

[125] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[126] Noah. Shusterman, ARMED CITIZENS: THE ROAD FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

Stuart Kings using their standing army to oppress American colonists. In place of these older fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[127]

The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[128] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[129] Texas was not an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[130] Americans living in the newly organized western states and newly reconstructed states of the former Confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[131]

---

[127] On the change in state constitutional arms bearing provisions, *See McDonald*, 561 U.S. at 767–68. For an analysis of the different mischiefs shaping the structure of state arms bearing provisions in these two periods, see Cornell, *supra* note 123.

[128] Cornell, *supra* note 123.

[129] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[130] Cornell, *supra* note 123, at 75–76.

[131] *Id.*

37

JA1027

This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies. The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[132]

Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[133]

Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government. The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[134] As long as state and local laws were racially neutral and favored no person over any

---

[132] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[133] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[134] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [135]

It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[136] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[137] The expansion of regulation did not represent a new constitutional principle, but it did embody a new application that represented an adaptation to changed circumstances of post-Civil War America.

Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[138] Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that the "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[139]

In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral

---

[135] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[136] *See* Spitzer, *supra* note 43, at 59–61 tbl. 1.

[137] *Id.*

[138] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[139] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

regulations aimed at public safety. Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[140] The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction. The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[141]

The laws adopted to address these problems underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty and the use of police power to promote public safety.

## V.    CONCLUSION: The Scope Of Permissible Regulation

The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.[142] Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American

---

[140]    Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

[141]    *See* Darrell A. H. Miller*, Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

[142]    Spitzer, *supra* note 43.

law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[143] States and localities have regulated arms and ammunition since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[144] The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture. Weapons have been subject to regulation since before the Founding and this power has been at the core of state police power from time immemorial.[145]

I declare that the foregoing is true and correct to the best of my knowledge.

_Saul Cornell_
_____
Saul Cornell

June 2, 2023
_____
Date

---

[143] *Id.*

[144] GERSTLE, *supra* note 13.

[145] Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum* 34 UCLA L. REV. 1713, 1769 (1986-1987).

41

**JA1031**

# Exhibit 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✴ Bronx, NY 10458 ✴ 203 826-6608 (c) ✴ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

## Book Publications

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
New Histories of American Law, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]  (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)  (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 Hastings Constitutional  Law Quarterly (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"  55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*, 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u> 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u> 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" <u>Albany Government Law  Review</u> 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u> (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u> (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," <u>Law and History Review</u> (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u> 47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," <u>Stanford Law and</u> <u>Policy Review</u> (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," <u>Fordham Law Review</u> 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> <u>History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II: The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

**Book Reviews:**

- Journal of American History
- William and Mary Quarterly
- American Studies  Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

**Journal Manuscript Referee:**

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

### Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy" The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:  The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History," American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment" Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy, Albany Law School ( 2007)

"*District of Columbia* v. *Heller* and the Problem of Originalism," University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post,* January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## State Courts:

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, Young v. State of Hawaii N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, Flanagan vs. Becerra, Central District of California Case (2018) [2nd Amendment]

Amicus Brief, Gill v. Whitford (US Supreme Court, 2017) [Partisan Gerrymandering]

Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

**JA1046**

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2[nd] Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

## **Law Review Symposia Organized**

### **Second Amendment:**

"The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms" 17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev*. 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev*. 2545 (2022).

### **New Originalism:**

"The New Originalism" 82 *Fordham L. Rev*. 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev*. 915 (2015).

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## **DECLARATION OF ROBERT J. SPITZER**

    I, ROBERT J. SPITZER, hereby depose and state:

1.    I am over the age of 18 and am competent to testify to the matters stated
below based on personal knowledge.

**JA1050**

2.    I have attached a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty.  I hereby adopt and incorporate my report in this declaration as if set forth in full.

I declare under penalty of perjury on this _____ day of October, 2023, that the foregoing is true and correct.

_____
ROBERT J. SPITZER

Expert Report: Historical Gun Laws and Weaponry

Prepared for the New Jersey Office of the Attorney General by

Robert J. Spitzer, Ph.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br><br>& PISTOL CLUBS, INC., et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

## I.        INTRODUCTION

I have been asked by the New Jersey State Attorney General's Office to render an

opinion on the history of firearms restrictions, including those pertaining to fully automatic and

semiautomatic firearms, ammunition feeding devices, the origins of multi-shot firearms, and the

historical regulation of other dangerous weapons.

## II.        BACKGROUND AND QUALIFICATIONS

I am a Distinguished Service Professor of Political Science Emeritus at the State

University of New York at Cortland and an Adjunct Professor at the College of William and

Mary School of Law. I was also a visiting professor at Cornell University for thirty years. I

earned my Ph.D. in Government from Cornell University. I have been studying, teaching, and

writing about gun policy for over thirty years. My first publication on the subject appeared in

1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays

on gun policy. My expertise includes the history of gun laws, gun policy in American politics,

and related historical, legal, political, and criminological issues. My book, *The Politics of Gun

Control,* has been in print since its initial publication in 1995. It examines firearms policy in the

United States through the lenses of history, law, politics, and criminology. The eighth edition of

the book was published in 2021 by Routledge Publishers. My two most recent books on gun

policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford

University Press, 2023), both deal extensively with the study of historical gun laws. I am

frequently interviewed and quoted in the national and international media on gun-related matters.

For over twenty years, I have been a member of both the National Rifle Association and of

Brady (formerly, the Brady Campaign to Prevent Gun Violence). I am being compensated at a

rate of $500/hour for my work on any written materials, and $750/hour for any testimony in

connection with this matter. A copy of my curriculum vitae is attached as Exhibit A.

---

[1] Robert J. Spitzer, "Shooting Down Gun Myths," *America*, June 8, 1985, 468-69.

I have been invited to submit written testimony and serve as an expert witness in the following cases, in addition to this one: *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu* , No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141, (S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.).

**JA1054**

## SUMMARY OF OPINIONS

Gun ownership is as old as America, but so are gun laws. From the 1600s through the early twentieth century, the colonies, states and localities enacted literally thousands of gun laws of every imaginable variety. In this document, I demonstrate that a specific relationship existed between the development of new weapons technologies, their spread into society, and regulation by the government as part of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence. The pattern of criminal violence and concerns for public safety leading to weapons restrictions, as seen in contemporary restrictions on assault weapons and large capacity magazines, is not new; in fact, it can be traced back throughout the Nation's history.

I examine a number of specific examples of weapons that, when they were invented or developed and then made their way into civil society, were subject to governmental restriction. The examples include restrictions on fully automatic (most famously the Tommy gun) and semi-automatic firearms, detachable ammunition feeding devices, both from the early twentieth century; analysis of experimental multi-shot firearms dating back several hundred years, and of multi-shot firearms that proved more successful, including Colt revolvers and Winchester rifles; Bowie and similar long-bladed fighting knives; clubs and other blunt weapons; anti-concealed carry laws; and restrictions on "trap guns."

Firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality.  This historical record is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century.  The historical record summarized

3

here makes clear that contemporary restrictions among the states pertaining to assault weapons and large capacity ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

## I.    INTRODUCTION

1.    The current controversy surrounding legislative efforts to restrict assault weapons and large capacity magazines (LCMs) has roots in earlier generations. The effort to restrict such magazines was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others. The assailant fired a total of 105 rounds in about three minutes from a 75-round magazine and a 30-round magazine, both of which he emptied before killing himself.[2]  Later that year, California enacted the first assault weapons ban in the country. New Jersey enacted an assault weapons and LCM ban in 1990.[3] Five years later, Congress enacted a limited ten year assault weapons ban that also included a restriction on ammunition magazines holding more than 10 rounds.[4]

2.    As of this writing, ten states plus the District of Columbia have enacted assault weapons and LCM bans, as have various localities around the country.[5]  These jurisdictions

---

[2] "A Report to Attorney General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings," October 1989, 7-8, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf

[3] *See Assault Weapons in New Jersey*, GIFFORDS LAW CENTER, https://giffords.org/lawcenter/state-laws/assault-weapons-in-new-jersey/ (last visited May 30, 2023).  *See also* N.J.S.A. 2C:39-1.

[4] Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25-26, 205-11.

[5] Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14–15.  The ten American jurisdictions with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington State.  The Hawaii law applies only to

4

**JA1056**

represent approximately 109 million people, or approximately 32.7% of the U.S. population.[6]

Fourteen states plus the District of Columbia restrict LCMs.[7]  These jurisdictions represent more

than 115 million individuals, or approximately 34.5% of the U.S. population.[8]

      3.      These recent efforts to restrict assault weapons and LCMs are simply the latest

chapter in a centuries-long effort to promote public safety, protect the public from harm, and to

dampen weapons-related criminality.  The pattern of criminal violence and concerns for public

safety leading to weapons restrictions is not new; in fact, it can be traced back to the Nation's

beginnings.  While the particular weapons technologies and public safety threats have changed

---

assault pistols. Illinois enacted its law, including an LCM limit, in early 2023. C. Mandler, "Illinois governor signs ban on assault weapons and high-capacity magazines," *CBS News,* January 10, 2023, https://www.cbsnews.com/news/illinois-governor-signs-ban-on-assault-weapons-and-high-capacity-magazines/. The U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware enacted its assault weapons and LCM restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[6] See U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates).  The total population in these jurisdictions is estimated to be 101,000,000 out of a U.S. total of about 333,000,000.

[7] Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, 30.  The fifteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.  With four exceptions (Colorado, Delaware, Illinois, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. The Illinois and Vermont laws limit magazines for long guns to ten rounds, and handguns to fifteen. Colorado law limits all magazines to fifteen rounds. Delaware law limits all magazines to seventeen rounds.  Litigation challenging most of these assault weapon and LCM restrictions is currently pending.

[8] U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates).  The total population in these jurisdictions is estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

over time, governmental responses to the dangers posed by certain weapons have remained
constant.  Current restrictions on assault weapons and detachable ammunition magazines are
historically grounded.  They are part of a pattern in America's history of legislative restrictions
on particular weapons stretching back centuries.

4.      In order to understand this pattern, this document begins with a detailed and
instructive examination of the wide-ranging restrictions that accompanied the introduction of
fully automatic and semi-automatic weapons into civilian circulation in the early 1900s. It then
reaches back several centuries to examine pre-twentieth century firearms technologies,
incorporating a lengthy list of experimental multi-shot failures, leading to the eventually
successful Colt-type revolver and Winchester-type rifle. Before leaving the subject of multi-shot
weapons, the section concludes with clarifications about the contemporary assault weapons
debate. This document next turns to historical restrictions on fighting knives, blunt clubs and
similar weapons, pistols, and trap guns. All follow a remarkably similar and consistent regulatory
pattern, culminating in recent developments that also punctuate the relationship between
weapons development, their spread into society, and subsequent legal restrictions.

## II.  REGULATORY HISTORY OF FULLY AUTOMATIC AND SEMI-AUTOMATIC FIREARMS

5.      A clear example of this historical pattern is provided by early twentieth-century
restrictions related to fully automatic and, in some cases, semi-automatic firearms.  While
weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth
and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire
up to 200 rounds per minute,[9] it and its successors were military weapons designed to be used in

---

[9] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S.
Army in 1866, and was utilized in warfare against Native Americans and in the Spanish-

combat and fired from a tripod or similar supporting apparatus, owing to the Gatling gun's size and weight.  Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger.  The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I. These tripod-mounted military guns, like the Maxim, operated to devastating effect on the battlefield. They initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[10]  Because their use and suitability were limited to military settings, there was no need to regulate these weapons among the civilian population.

6.    Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon:  the Thompson submachine gun, widely known as the Tommy gun.  Though it was developed for use in World War I as "purely a military weapon,"[11] it came too late in the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber gun in 1920.[12] The Tommy gun was initially unregulated after World War I and was made available for civilian

---

American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

[10] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How the Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[11] William J. Helmer, *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 75.

[12] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

purchase in order to try to boost anemic sales, typically with either a 20–30 round stick magazine or a 100-round drum magazine (though the Tommy gun could also fire in semi-automatic fashion[13]).  The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[14]  It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[15] though sales in the early 1920s were sluggish.  By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[16]  This pattern of anemic sales typified the gun's commercial trajectory: "Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start."[17] This was especially true for police forces, to whom Thompson and his company marketed the gun aggressively, even when criminals found the gun appealing. "As a criminal's weapon, the Tommy gun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it has never come off the drawing board."[18] For example, after the 1929 St. Valentine's Day massacre, a representative of Auto-Ordnance visited Chicago police captain

---

[13] Helmer, The Gun That Made the Twenties Roar, 137.

[14] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 149–52; Helmer, The Gun That Made the Twenties Roar, 161-64.

[15] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[16] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 203. Helmer confirms the number of 3000 guns sold by 1925. *The Gun That Made the Twenties Roar*, 74. Helmer says that "sales declined steadily" after 1921; see 130.

[17] Helmer, *The Gun That Made the Twenties Roar*, 129.

[18] Helmer, *The Gun That Made the Twenties Roar,* 126. Helmer quotes numerous police officials denouncing the weapon as useless for the police; see 126-28.

8

John Stege to offer assistance. Captain Stege "practically ran him out of the office. . . .It was Stege's opinion that not even the police should be armed with machine guns," an opinion shared "by many other lawmen in the country."[19] Another police chief explained why: "It is not possible for a police officer to open a machine gun up on a crowded street . . . because you are going to kill possibly ten innocent people to one criminal."[20] Poor military and law enforcement sales forced the company to "peddle the new gun in peacetime" by trying "to think up something else it might be good for." Their conclusion was to market the gun as "good for anything."[21]

7.    After 1926, sales began to rise, primarily because of newfound interest by the American military, which started to use the weapon in foreign military operations especially in Nicaragua, and by the Belgian military.[22] In 1930, the Auto-Ordnance company closed down its sales department because of escalating concerns about its weapons falling into criminal hands, and the attendant bad publicity. All commercial sales were discontinued except to the military and law enforcement.[23]  The result was that by 1932, sales had fallen to fewer than ten per month.  Through 1938, the company reported total sales of 10,300. The company's revival came thanks to World War II.[24]

---

[19] Helmer, *The Gun That Made the Twenties Roar*, 126.

[20] Helmer, *The Gun That Made the Twenties Roar,* 126. The gun's rare actual use confirmed this fear. In an attack on John Dillinger, for example, FBI agents "mistakenly shot three innocent customers." (128).

[21] Helmer, *The Gun That Made the Twenties Roar*, 75.

[22] Helmer, *The Gun That Made the Twenties Roar*, 130-45.

[23] Helmer, *The Gun That Made the Twenties Roar*, 143-44.

[24] Helmer, *The Gun That Made the Twenties Roar*, 167-79.

9

8.      Before the early 1920s, these fully automatic weapons were unregulated for the

obvious reason that they did not exist or were not circulating widely in society.  When they did

begin to circulate, however, their uniquely destructive capabilities rapidly became apparent,

especially to the emergent Prohibition-fueled gangster organizations of the 1920s.  Another

automatic weapon developed for World War I was the Browning Automatic Rifle (BAR).  It

fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire up to 650

rounds per minute.  The BAR first appeared on the battlefield in 1918.[25]  It was "a heavy

machine rifle weighing nearly twenty pounds with bipod and loaded magazine. . . ."[26]  It, too,

made its way into civilian life and found favor among criminals and gangsters in the 1920s and

early 1930s.[27]  Guns like the Tommy gun and the BAR were actually used relatively infrequently

by criminals generally, but when they were used, they exacted a devastating toll and garnered

extensive national attention, such as their use in the infamous St. Valentine's Day massacre in

Chicago in 1929.[28]

9.      I conducted a search of Newspapers.com from 1920-1930 using the search terms

"Tommy Gun," "Thompson submachine" and "machine gun." The term Tommy Gun turned up

essentially no hits until 1928, a clear indication that this particular term did not come in to wide

---

[25] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?"
*The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle,"
*Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[26] Helmer, *The Gun That Made the Twenties Roar*, 37.

[27] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR
was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The
Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26,
2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[28] Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey
Publishing, 2009), 97–98.

use until fairly late in the decade. The search for machine gun turned up more, but many of them referenced the weapons owned or used by the military (including many stories about World War I). The search for Thompson submachine was much more successful, yielding many articles from across the country. Starting in the fall of 1920, a few newspaper articles described regular reports of demonstrations of the gun for police and other government officials and agencies, and reports of local police forces sometimes purchasing a few of the guns. Reports of demonstrations of the gun to police forces and other state and local officials and also of some purchases appeared regularly starting in 1921, and continued throughout the 1920s, as did numerous articles describing the gun's development and capabilities by inventor John Thompson. These articles also reprinted standard accounts of the Tommy gun's weight, size, firing capabilities and possible uses by law enforcement. Despite this degree of coverage, however, relatively few of the guns were actually purchased in the 1920s, as noted earlier.

10.    To cite a few examples of early news coverage, an account in the Western Sentinel[29] from December 3, 1920 reported on a demonstration of the Tommy gun, saying that it weighed about seven pounds, fired .45 caliber rounds, could fire up to 1500 rounds per minute, could receive a box magazine holding 20 rounds, or a drum magazine with either 50 or 100 rounds. It went on to say that the gun was "without equal for riot use and for the police chasing thieves and other lawbreakers who attempt to escape in automobiles, for with this little weapon it is a very easy thing to rip the tires off of an escaping car, and the gun is so light and simple that an inexperienced man can fire with the effect of an expert marksman and moving targets can be hit with the ease that a fireman sprays a hose or on flame." Other articles touted the gun's

---

[29] "New Type of Gun is Demonstrated Here," Winston-Salem, North Carolina; https://www.newspapers.com/image/89498556/?terms=%22Thompson%20submachine%22&match=1

usefulness in controlling riots and mobs. An account from the Jamestown Weekly Alert[30]
reported that state and county officials were provided with ten of the guns for "hunting down
whiskey runners in the northern part of the state."

11.     Starting in roughly late 1921 and early 1922, a handful of small news items
reported thefts of Tommy guns from armories or police stations. The one notable crime-related
case to receive enormous press attention was a major seizure of about 600 Tommy guns with
ammunition and magazines, first reported about June 16, 1921, from a ship docked at the port of
Hoboken, N.J. bound for Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won
its independence from Britain in 1922).[31]

12.     Newspaper reports of criminal use of Tommy guns were few, small, and spare
until 1926, when a few very sensational news reports of their criminal use received widespread
and extensive attention in newspapers across the country. Most of these initial stories were
reports of Chicago gangster use (notably one "Al Caponi" in an early account) along with stories
from the New York City-New Jersey area. For example, an AP story from October 16, 1926 with
the dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer police on
the mountain stronghold of New Jersey's machine gun mail bandits."[32] According to the account,
eight men robbed a truck of over $100,000 and were holed up at the stronghold. The authorities

---

[30] "New Submachine Guns Received," Jamestown, North Dakota, May 12, 1921;
https://www.newspapers.com/image/465633429/?terms=%22Thompson%20submachine%22&m
atch=1

[31] Helmer, *The Gun That Made the Twenties Roar*, 53-61.

[32] "Use Expert Riflemen to Hunt Robbers," Ithaca Journal, N.Y.,
https://www.newspapers.com/image/254505945/?terms=%22Thompson%20submachine%22&m
atch=1

12

were also armed with weapons that included machine guns, and were contemplating the expansion of the search party with 2000 militiamen.

13.    Coinciding with these extensive stories were articles, editorials, and exposés calling for changes in the law to address this growing gun crime problem. For example, an article from the Boston Herald[33] began by quoting a magazine story from Collier's Weekly that observed: "The police authorities are powerless to interfere with the sale and distribution of the highest powered instrument of destruction that has yet been placed at the convenience of the criminal element in this country." The Herald sent out a man to see if an average person could buy a machine gun "without trouble." The buyer's conclusion: "He had no trouble" purchasing the gun, which the article labeled "a diabolical engine of death." The article detailed that for the prospective gun purchaser, "Pistols would not be shown unless the customer exhibited a permit, but machine guns could be had over the counter with no such formalities." The article concluded this way: "Here is a case where it seems that 'there ought to be a law.' This weapon. . . was designed for war. . . .a machine gun is the greatest aid to crime that yet has been placed within the reach of criminals."

14.    Reports and exposés, juxtaposed with lurid and sensational accounts of Tommy gun criminality, built pressure on the states to enact anti-machine gun laws, (at least 32 states did so between 1925 and 1933; see Exhibits B and D) and Congress was also pressured to act. A long-stalled bill in Congress to restrict the interstate shipment of guns received renewed interest and support in 1926, eventually leading to congressional enactment of the Mailing of Firearms Act of 1927, a limited measure that failed to restrict interstate handgun shipment because it did

---

[33] "Machine Guns for All," Kennebec Journal, Augusta, Maine, December 4, 1926, https://www.newspapers.com/image/857617757/?terms=%22Thompson%20submachine%22&match=1

not affect non-Postal Service shipments.  From 1926 on, news stories were filled with the kind of

sensational gangster-related stories that led to the Tommy gun being labeled the weapon that

"made the Twenties roar," and that also led to many anti-machine gun laws. For example, an

article dated November 27, 1928[34] reported that "Chicago's war on gangsters and racketeers was

reopened tonight with the drafting of a law to prohibit the sale of machine guns. 'Tommy guns,'

the bullet spitting little Thompson submachine guns which are inseparable from gang fights,

bank robberies, assassinations and other major crimes. . .could be purchased as easily and legally

in Chicago as a pound of meat. . . .practically every sporting goods establishment in Chicago

carried the firearms and sold them readily. State Senator Arthur Huebsch will introduce the bill."

(Illinois adopted an anti-machine gun law in 1931.[35])

### A. State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century

15.     In response to the wider availability of firearms like the Tommy gun and the

BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws (see Exhibits B

and D).  These state (and eventually federal) enactments were anticipated, justified, and

promoted by the National Conference of Commissioners on Uniform State Laws, a national

organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted

legislation that brings clarity and stability to critical areas of state statutory law."[36]  (Today, the

organization is known as the Uniform Law Commission.)  In 1923, the Commission organized a

---

[34] "Machine Gun Ban Plan of Chicago," The Salt Lake Tribune, https://www.newspapers.com/image/542285510/?terms=%22Thompson%20submachine%22&match=1

[35] Former Ill. Rev. Stat. ch. 38, ¶¶414a to 414g, "An Act to regulate the sale, possession and transportation of machine guns," approved July 2, 1931.

[36] Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms." In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[37] In 1930, it issued a model firearms act focusing on "guns of the pistol type." In 1932, it issued a model act "intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type." The Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun—the Thompson .45 inch caliber submachine gun becoming most popular. . . ."[38]

16.    Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading."[39] The National Rifle Association endorsed D.C.'s ban, stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."[40] In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the

---

[37] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[38] "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[39] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

[40] S. Rep. No. 72-575, at 5–6 (1932).

JA1067

association I represent is absolutely favorable to reasonable legislation. We are responsible for the uniform firearms act. . . . in the District of Columbia. It is on the books now."[41]

17.     In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun. The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities. Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[42] The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute. A Tommy gun could go through a 100-round drum magazine in four seconds. Later versions fired 600 to 700 rounds per minute."[43]

18.     In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[44]

---

[41] "Hearings Before the Committee on Ways and Means," 36.

[42] 48 Stat. 1236.

[43] Moss, "From Gangland to the Battlefield."

[44] "Hearings Before the Committee on Ways and Means," 4. The version of the bill that appears on page 1 of the Hearings had this definition of machine gun: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."

19.     As one member of the committee observed, "The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as [John] Dillinger and others."[45]

20.     To address the problem, the original version of the bill proposed regulating both semi-automatic and fully automatic firearms, as it defined restricted machine guns as did the 1932 D.C. law, with its emphasis on outlawing guns that could fire rapidly and repetitively without reloading, whether semi-automatically or fully automatically: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[46]  The final version of the bill limited restrictions to fully automatic firearms.

21.     In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting semi-automatic weapons (see Exhibit B).[47] The reason for restricting semi-automatic firearms is not hard to discern.  These restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology:  an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[48]  During

---

[45] "Hearings Before the Committee on Ways and Means," 42.

[46] Ibid., 52.

[47] *See also* Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 68–71.  The language of the restrictions in Louisiana, Illinois, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[48] Spitzer, *The Gun Dilemma*, 32–33.  In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns." While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a

the time that Thompson and his company were developing and marketing the Tommy gun

(which could fire in semi- or full-auto modes[49]), they were also developing the Thompson

Autorifle, a "strictly semiautomatic rifle" for which the military showed greater interest than it

did for the Tommy gun.[50] The Autorifle was also promoted to police and military organizations,

though it was overshadowed by the Tommy gun.[51]

22.    As the prior discussion reveals, the regulation of automatic and semi-automatic

weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these

weapons and the attractiveness (and use) of these weapons by criminals at that time, and the

related understanding that these weapons had no justifiable civilian use.  By that time, gun

technology was now available that made it possible for ammunition to be reliably fired in rapid

succession and guns to be reloaded through interchangeable ammunition magazines or similar

devices.  Again, the lesson is the same: once these technologies began to spread in civil society

and be used for criminal or other dangerous purposes, and because of the belief that it was

"unwise for any civilian to possess" such weapons,[52] regulatory efforts ensued. In sections to

come I examine the first successful multi-shot revolvers and multi-shot rifles.

### B.  State Regulation of Ammunition Feeding Devices

23.    Restrictions on fully automatic and semi-automatic firearms were closely tied to

restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic

---

semi-automatic weapon fires a single shot with each pull of the trigger.

[49] Helmer, *The Gun That Made the Twenties Roar*, 48-49, 255-56.

[50] Helmer, *The Gun That Made the Twenties Roar*, 37, 50.

[51] Helmer, *The Gun That Made the Twenties Roar*, 161. Ultimately, the military opted for the semiautomatic M1 Garand over the Autorifle.

[52] "Uniform Machine Gun Act."

18

**JA1070**

weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired. As is the case with contemporary state limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio). As discussed elsewhere in this document, removable magazines were not subject to regulation before this time because those that did exist were a rarity in society and had not played any appreciable role in prodding civil disorder in civil society.

24.    Magazine capacity/firing limits were imposed in three categories of state laws (see Table 1 below): ten states plus the District of Columbia regulating semi-automatic and fully automatic weapons (California, District of Columbia, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and Virginia[53]); eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices (Illinois, Louisiana, Minnesota, New Jersey, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Vermont, and Wisconsin[54]); and four states restricted all guns that could receive

---

[53] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137. Two of these states enacted early laws focused on such weapons' use in hunting. New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, Section 9. North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

[54] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine

19

any type of ammo feeding mechanism or round feeding device and fire them continuously in a

fully automatic manner (California, Hawaii, Missouri, and Washington State)[55].

---

Guns, §§ 1-2; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[55] 1927 Cal. Stat. 938, ch. 552, §§ 1–2; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

20

**JA1072**

## TABLE 1

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917-1934[56]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Louisiana (8 rounds; 1932)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-South Carolina (8 rounds; 1934)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

See Exhibit D for statutory text.

25.     A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

   all firearms known as machine rifles, machine guns or submachine guns
   capable of discharging automatically and continuously loaded ammunition of

---

[56] Including the District of Columbia.  Note that California, Minnesota, and New Jersey appear twice in this table.  The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934.  See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

**JA1073**

any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.[57]

The other three states in this category (Hawaii, Missouri, Washington[58]) utilized this same description. In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).

26.    The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[59]  (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.[60]  The final version of the 1934 bill was limited to fully automatic firearms only and did not include any limitation by number of rounds fired.) Regulations concerning removable magazines and magazine capacity were thus common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality, as illustrated by the Tommy gun

---

[57] 1927 Cal. Stat. 938.

[58] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[59] "National Firearms Act," Hearings Before the Committee on Ways and Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 52.

[60] Ibid., 45.

narrative and other weapons discussed here—as these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time.[61]

### C. Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices

27.    The lesson from this sequence of events early in the twentieth century is indicative of our nation's history of weapons regulations, whereby changes in gun policy followed a series of steps that respond to developments in firearms technologies and their use in crime, each dependent on the previous step. *First*, a new gun or gun technology is invented. *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point. *Third*, it is often developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use. *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use. *Finally*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes. New gun laws are not enacted when firearm technologies are invented or conceived. They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

28.    This lesson is significant because some argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis. For example, David Kopel argues that "[m]agazines of more than ten rounds are older than the

---

[61] U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

United States."[62]  Drawing on examples like a firearm "created around 1580" capable of firing

sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said

to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and

the Pepperbox pistol of the early 1800s,[63]  Kopel suggests that "magazines of more than ten

rounds are older than the Second Amendment."[64]  Therefore, by Kopel's reckoning, since these

weapons existed early in (or even before) the country's existence, and were not specifically

regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-

platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[65]  More

to the point, Kopel's claim that ammunition magazines holding "more than ten rounds" were

"very commonly possessed in the United States since 1862" and were "owned by many millions

of law-abiding Americans" dating back to the "mid-nineteenth century"[66] is simply false, as this

report demonstrates.

  29. Kopel's and similar arguments[67] fail for two sets of reasons.  First, as explained in

the following section, this sort of narrative misrepresents the availability and capabilities of these

---

[62] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 851.

[63] Ibid., 852-54.

[64] Ibid., 849.

[65] Ibid., 871-72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

[66] Ibid., 871. Kopel insists "that [10-round] magazines" have been "'in common use' and 'typically possessed by law-abiding citizens for lawful purposes'" for "a century and a half" (871-72). This claim is both false and unverified by his article.

[67] Declaration of Ashley Hlebinsky in Support Of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, United States District Court For The Southern District Of California, filed September 27, 2019 (Plaintiffs' Trial Exhibit 2).

24

**JA1076**

early weapons.  Second, the account fails to understand the relationship between firearms'

technological development, their spread into civil society, and government gun policy.  As one

gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single

metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot,

the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a

projectile. . .; then ignite the gunpowder and send the projectile on its way."[68]  The firearms and

firearm feeding devices regulated in the early twentieth century in the previous account

represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing

interchangeable ammunition feeding devices.

### D.  The History of Pre-Twentieth Century Firearms Technologies

30.     Single-shot, muzzle-loaded firearms were the ubiquitous guns from the time of

America's initial settlement by Europeans until the latter part of the nineteenth century.[69]  Yet as

researchers and experts of gun history have noted, experimental multi-shot guns existed in the

eighteenth century (with multi-shot experimental designs dating back as much as two centuries

earlier).  For example, a firearm from the late 1500s that could fire up to sixteen rounds is

described in a book titled, *Firearms Curiosa*.  But this book's very title indicates why this

narrative is irrelevant to the modern gun debate.  The definition of "curiosa" is something that is

rare or unusual.  As the book's author, Lewis Winant says, his book is about "oddity guns" and

"peculiar guns."[70]  That is, they were anything but common, ordinary, or found in general

---

[68] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3-4.

[69] "Weapons of War (1600-1800)," The Smithsonian, February 6, 2018, https://learninglab.si.edu/collections/weapons-of-war-1600-1800/HUoHq60eaAj1UKyz

[70] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

circulation. Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[71] A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[72] In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited. Roman candle firing was one type of "superposed" or "superimposed" firing. The other type was controlled, where the gun "was charged with one load on top of another, but the operator had control of the interval between shots. It might have one movable lock or several fixed locks. Each shot would be fired by trigger pull, presumably when the operator felt he had the proper aim."[73] Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[74]

31.    An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the twentieth and twenty-first centuries). The patent drawing of this weapon shows it sitting on a tripod on the ground.[75] It was not a hand-held weapon. In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a

---

[71] Ibid., 168.

[72] Ibid., 166.

[73] Ibid., 166.

[74] Ibid., 166.

[75] Ibid., 220.

DEFENCE."[76]  It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun.  It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated machine guns."  Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[77]  A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[78] although there are claims to the contrary.  A contemporaneous poet, commenting on 'Puckle's Machine Company', wrote 'Fear not, my friends, this terrible machine.  They're only wounded who have shares therein.'"[79]  This weapon "never advanced beyond the prototype stage."[80]

32.    In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense.  As this account confirms, it was likely never even manufactured beyond perhaps a prototype.  It was a failed effort, even though later gun inventors learned from its failure.

33.    Another example is the case of Joseph Belton, an inventor who corresponded with Congress in 1777, claiming that he could produce and provide a flintlock that could fire as many as 16 to 20 consecutive rounds without reloading. After showing preliminary interest on May 3, Congress balked at Belton's proposed "extraordinary allowance" and decided on May 15 that the

---

[76] Ibid., 219.

[77] Ibid., 219-20.

[78] Ellis, *The Social History of the Machine Gun*, 13.

[79] Winant, *Firearms Curiosa*, 219-21.  See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[80] Rasenberger, *Revolver*, 3.

idea "be dismissed"[81] even though Belton offered to provide a demonstration of his invention.

Belton demonstrated the rifle, which by his account fired projectiles a distance of 20 to 30 yards,

to several government officials, including General Horatio Gates, Major General Benedict

Arnold, and scientist David Rittenhouse.  These individuals, and some others, signed a

cautiously worded letter submitted by Belton to Congress on July 10 saying that "Muskets of his

Construction with some small alterations, or improvements might be Rendered, of great Service,

in the Defense of lives, Redoubts, Ships &c, & even in the Field. . . ."[82]  That same day,

however, Congress decided again that "the petition of Thomas [Joseph] Belton be dismissed."[83]

34.     The problems with Belton's scheme were evident. It relied on "superposed loads"

as a firing method, a "discredited" and dead-end technology (see discussion above). Despite

Belton's offer to demonstrate the gun, not only are there "no known surviving examples of

Belton's gun," but "the only evidence" of the gun's existence is "the correspondence between

Belton and Congress."[84] From this account, there is no reason to believe that the gun "had been

produced, and was possible to produce in quantity. . . ."[85] In all, Belton's claims about his

---

[81] https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_C
ongress

[82] https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_C
ongress#Belton's_fourth_letter_to_Congress,_July_10,_1777

[83] https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_C
ongress#Belton's_fourth_letter_to_Congress,_July_10,_1777

[84] "Belton Flintlock," https://military-history.fandom.com/wiki/Belton_flintlock. Harold L.
Peterson similarly noted that the only evidence of the alleged existence or operation of the
Belton gun was his "meager description" of it, from which "it is impossible to determine exactly
how the Belton improvement operated." *Arms and Armor in Colonial America, 1526-1783*
(Harrisburg, PA: The Stackpole Co., 1956), 218.

[85] David Kopel, "The Founders were well aware of continuing advances in arms technology,"
*The Volokh Conspiracy,* May 26, 2023, https://reason.com/volokh/2023/05/26/the-founders-
were-well-aware-of-continuing-advances-in-arms-technology/

experimental weapon bore no relationship to actual firearms in circulation in America—since Belton's weapon was never proven feasible, much less reproduced, much less distributed—during this time.  For anyone to claim based on the Belton case that "our Founding Fathers . . . knew about repeating rifles" and therefore "the Second Amendment was . . . designed to protect the right to own a repeating rifle"[86] is not only an unsupported claim, but a preposterous claim.

35.    Isaiah Jennings' multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading,[87] is also cited as an early multi-shot gun.  Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[88]  By

---

[86] Logan Metesh, "As a Matter of Fact, the Founding Fathers Did Know About Repeating Rifles," https://www.thetruthaboutguns.com/founding-fathers-knew-repeating-rifles-bill-rights-drafted/, November 24, 2019; https://memory.loc.gov/cgi-bin/query/D?hlaw:4:./temp/~ammem_XxF4:: ; Dave Duringer, "Founding Fathers Knew About Repeating Rifles Before Bill of Rights," LawNews.TV, July 17, 2016, https://lawnews.tv/founding-fathers-knew-about-repeating-rifles-before-bill-of-rights/; Eli D. Camacho, "5 Myths About the 2nd Amendment and the AR-15," Medium.com, April 2, 2018, https://medium.com/@EliDCamacho/5-myths-about-the-2nd-amendment-and-the-ar-15-a080a94e9a2c; Kopel makes the similar, meaningless claim that the country's Founders "were well aware" of these pioneering, experimental, but unproven multishot technologies. The Founders' "awareness" that such experimental weapons existed centered around their hope that the weapon might eventually prove to be feasible and suitable for military use, a prospect that in any case never came to fruition. Kopel also conflates early American leaders' abiding interest in funding, advancing, and reproducing new weapons technologies for the country's military/national defense forces, on the one hand, with the notion that it had anything whatever to do with private citizen gun acquisition and use, on the other. These two, of course, are profoundly different. Kopel, "The Founders were well aware of continuing advances in arms technology."

[87] Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 853.

[88] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

29

**JA1081**

one account, "probably not more than 100 rifles of this type [were] manufactured."[89]  Similar

problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century.

According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some

practical use very early in the nineteenth century, but the loose priming powder in the pan of

each cylinder constituted a hazard that was never eliminated."[90]

36.     Another example often cited is the Girandoni (or Girardoni) air rifle, a military

weapon developed in Europe in the late 1700s for crack shots in the Austrian army that was

capable of firing up to 20 rounds.  One of these made its way to the U.S. where it was taken

along on the Lewis and Clark expedition of 1804-1806.[91]  But these guns were a rarity, as they

were extremely expensive, fragile, and complex, and few were made—no more than about

1,500.[92]  As one writer noted: "The Girandoni air rifle is a might-have been; a footnote to

military history."[93]  In fact, the rifles never caught on as they proved to be impractical on the

battlefield, and even more so for civilian use.  To wit: "Leather gaskets needed to be constantly

maintained and swelled with water to sustain pressure.  Once empty the reservoirs required a

significant effort and 1500 strokes to restore full power.  A supply wagon was subsequently

---

[89] "Isaiah Jennings,"
https://www.littlegun.info/arme%20americaine/artisan%20i%20j%20k%20l/a%20jennings%20g
b.htm

[90] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

[91] David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.

[92] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

[93] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility. The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[94] First introduced to the Austrian army in the late 1700s, the gun was pulled from military service by 1815.[95] One American manufacturer, Isaiah Lukens of Pennsylvania, apparently produced perhaps four such weapons.[96] The rest were made and used in Europe. And while Lewis and Clark did bring a Girandoni with them, they never intended to use it in combat or battle, but to impress and deter the Native Americans they encountered (which it did). Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that the Indians were not aware of the extensive pre-fire preparations needed.[97]

37.     To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[98] The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations. But the company was "short-lived" and went "defunct" in 1866, even though its partners included

---

[94] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[95] Markowitz, "The Girandoni Air Rifle"; "Girardoni Air Rifle," ForgottenWeapons.com, https://www.forgottenweapons.com/rifles/girardoni-air-rifle/

[96] Nancy McClure, "Treasures from Our West: Lukens air rifle," Buffalo Bill Center of the West, August 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/

[97] Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[98] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6 (Plaintiffs' Trial Exhibit 2).

31

**JA1083**

Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[99]  Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[100] dubbed "radical defects" by Winchester himself.[101]  In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[102]

38.     Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle. . . generally attributed to be the first semi-automatic rifle."[103]  Yet this "development" was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[104]  The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military.[105]

39.     The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together,

---

[99] These are the three men who came together to form what became the Smith & Wesson gun company. Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.

[100] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[101] Quoted in Haag, *The Gunning of America*, 56.

[102] Haag, *The Gunning of America*, 60.

[103] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8 (Plaintiffs' Trial Exhibit 2).

[104] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[105] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32-39.

**JA1084**

found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver.  The reason: pepperboxes were "heavy, lumpy, and impractical."[106]  The addition of more barrels added more weight to the gun.  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[107]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[108]  Indeed, the Colt revolver was "the first widely used multishot weapon,"[109] although it took decades for this and similar revolvers to catch on.

40.     Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun repeaters appeared late in the Civil War.[110]  Even so, the "standard infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[111] Historian James M. McPherson concurred that, even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war."[112]

41.     As noted, the idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s.  Indeed, Colt biographer

---

[106] Rasenberger, *Revolver*, 54.

[107] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[108] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154.  By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison."  Winant, *Pepperbox Firearms,* 32.

[109] Rasenberger, *Revolver*, 401.

[110] Kopel, "The history of magazines holding 11 or more rounds"; Kennett and Anderson, *The Gun in America*, 112-13.

[111] Snow and Drew, *From Lexington to Desert Storm*, 90.

[112] James M. McPherson, *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.

33

**JA1085**

Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[113]  The Colt revolver was a six-shot weapon, though the company experimented with other shot capabilities.[114] Even then, Colt could not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public.  The government, in fact, dismissed such firearms as mere "novelties."[115]  After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[116]  The government also rejected the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s.  The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[117]  And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a single shot pistol."[118]  It took the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar

---

[113] Rasenberger, *Revolver*, 3-5, 401.

[114] Rasenberger, *Revolver,* 35, 316; Kyle Mizokami, "Meet the Colt Single Action Revolver: The Most Famous Gun of All Time?" *The National Interest,* January 24, 2019, https://nationalinterest.org/blog/buzz/meet-colt-single-action-revolver-most-famous-gun-all-time-42352. Though the six-shot was the standard, gun companies experimented and produced revolvers of varying round capacity. Colt, for example, produced a poor-selling seven-shot revolver in the 1870s. Haag, *The Gunning of America,*173-74.

[115] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

[116] Rasenberger, *Revolver*, 136.

[117] Ibid.*,* 390.

[118] Kennett and Anderson, *The Gun in America*, 91.

34

firearms into society.[119] As discussed here, the increasing circulation of more and cheaper

handguns spurred the enactment of anti-concealed carry laws.

42.    While inventor Benjamin Henry claims credit for developing the first practical,

lever action repeating rifle (patented in 1860), his competitor Winchester "deftly gutted" the

Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the

way for Winchester's dominance.[120]  The Winchester rifle could fire up to fifteen rounds without

reloading.  Yet the widely known Winchester 1873, "was designed for sale to the Government as

a military arm."[121]  A gun whose legendary status wildly outdistanced its actual production and

impact, it was nevertheless an important firearm in the late nineteenth century, although this

"quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its celebrity

biography backdated its diffusion and even its popularity."[122]  In fact, the slogan stating that the

Winchester "won the West" was invented by a Winchester executive as a marketing ploy in

1919.[123]  Further, "the notion of the Winchester and the Colt as iconic frontier guns is 'as much a

fiction as the sources from which it is drawn.'"[124] An analysis of production runs of Henrys and

Winchesters from 1861-1871 concluded that they produced a total of 74,000 guns. Most of

them—about 64,000—were sold to foreign militaries, leaving about 9200 for domestic American

sales. Of those, 8500 were acquired by Union soldiers, leaving a very small supply of guns for

---

[119] Haag, *The Gunning of America,* 34-37, 46-64.  As Haag said, "the Civil War saved" the gun
industrialists (65).

[120] Haag, *The Gunning of America*, 96.

[121] Koller, *The Fireside Book of Guns*, 112.

[122] Haag, *The Gunning of America*, 179.

[123] Haag, *The Gunning of America*, 353.

[124] Haag, The Gunning of America, 175.

domestic civilian acquisition.[125]  By comparison, about 845,000 Springfield "trap-door" single

shot rifles were manufactured during this same time period.[126]  Additionally, the Winchester was

not a semi-automatic firearm; it was a lever-action rifle that required the shooter to manipulate a

lever in a forward-and-back motion before each shot.  And when the gun was emptied, it had to

be manually reloaded, one round at a time.[127]  The Winchester Model 1905, then called a "self-

loading" rifle, was a true semi-automatic firearm.  It could receive a five or ten round box

magazine, although from 1905 to 1920 only about 30,000 of the guns were made.  Even in World

War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per

minute.[128]

43.    With all this, the Winchester was by no means universally embraced by long gun

users.  Indeed, "a good many westerners would have nothing to do with the early Winchesters or

other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating

---

[125]    Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 21, 36–41, 51, 59, 65–66, 71, 73, 75; Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[126] See "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3; some of the data in this report is aggregated and printed at the Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm. According to an account of the Springfield, "The end of the Trapdoor series came in 1892, when the government adopted a bolt-action repeating rifle known as the Krag-Jorgensen." "The Trap Door Rifle," National Park Service, July 22, 2020, https://www.nps.gov/spar/learn/historyculture/trapdoor-rifle.htm

[127] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

[128] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

rifle assert its dominance over the single-shot breechloader."[129]  According to A.C. Gould,

writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will

shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched

bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of

rear sights on tang can be used."[130]

44.    Following the Civil War, revolvers were heavily marketed to the civilian

population. For example, when Smith & Wesson's near-monopoly over the manufacture of

cartridge revolvers ended with the expiration of its Rollin White patent in 1870, "dozens of other

[gun] makers"[131] entered the market. Soon these other manufacturers were producing abundant

cheap revolvers at low cost to the consumer. As Kennett and Anderson noted, Colt's initial

revolvers sold for $35, but by 1900 the "'two dollar pistol' was a fixture in American life."[132]

Further, as the mail order business boomed from the 1870s on, companies like Montgomery

Ward and Sears began selling revolvers through their catalogs—especially small, cheaper,

lighter-weight models that cost less to mail. Cheap handguns were advertised not only through

catalogs, but also through newspaper and magazine advertisements.[133]

---

[129] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[130] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131. A tang sight is an aperture or "peep" sight mounted on the tang end of a rifle (that is, the portion of the rifle extending behind of the receiver) that is used to more accurately aim the rifle. It normally folds and is made of metal. "Vernier Tang Sight," https://www.hallowellco.com/vernier_tang_sight.htm

[131] Kennett and Anderson, *The Gun in America,* 98.

[132] Kennett and Anderson, *The Gun in America,* 99.

[133] Kennett and Anderson, *The Gun in America,* 99-100. See also Haag, *The Gunning of America*, 251-55.

45.     The rise in the circulation of multi-shot handguns in society—notably the Colt revolver and its many handgun copycats—was accompanied by the rapid spread of concealed carry restrictions (see Exhibits B-E), especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[134] By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[135] In addition, in the late 1800s and early 1900s several states effectively barred possession of such weapons outright, regardless of other circumstances.[136] As discussed earlier, it was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern. While the Winchester rifle circulated some in society by the late 1800s, the actual numbers of Winchesters and similar rifles in circulation has been wildly overstated, as discussed here. Among those in civilian hands, they were largely found in sparsely populated Western and frontier areas.

---

[134] Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 218-19.

[135] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[136] Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1917 Cal. Sess. Law 221-225; 1923 Cal. Stat. 695; 1931 N.Y. Laws 1033, ch. 435, § 1. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

46.     As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to understand the connection between gun technology developments and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments. As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

47.     *First*, a new gun or gun technology must be invented. *Second*, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination. As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[137] And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[138] *Third*, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications. Military weaponry is developed without consideration of potential civilian use and the consequences of dissemination in the civilian market.[139] *Fourth*, some military-designed weapons may then spill over into, or be adapted to, civilian markets and use. *Fifth*, if such weapons then circulate sufficiently to pose a public safety or criminological problem or threat, calls for government regulation or restriction

---

[137] Winant, *Firearms Curiosa*, 36.

[138] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

[139] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs. These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War. Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

then may lead to gun policy/law changes. This general sequence is echoed in works like the *Buyer's Guide to Assault Weapons,* a standard reference work on assault weapons.[140]

48.    Again, to simply assert or assume that past firearms design/development, invention, or patenting equals commonality, viability, or a measurable presence or impact on society, is a leap in logic without historical foundation. It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy Regulatory Commission because no such regulation was enacted around the time of Benjamin Franklin's experiments with electricity in the mid-eighteenth century. The fact that inventors worked on new firearm designs and modifications tells us nothing about the consequences of such designs for society and public policy. And the existence of such designs does not equal technological viability or reliability, much less general availability, much less societal circulation and use of these weapons. Other weapons subject to government restriction in our history further illustrate these principles.

**E.  Clarifying Terms and Concepts about Assault Weapons and LCMs.**

49.    Opponents of assault weapons and LCM laws often assert that "[p]rior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance."[141]

---

[140] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4-7. Peterson's Foreword summarizes a similar relationship between weapons development and subsequent calls for regulation.

[141] *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (quoting Kobayashi & Olson et al., In re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons," 8 Stan. L. & Pol'y Rev. 41, 43 (1997)).

40

50.     Such assertions are incorrect.  The terms "assault weapon" and "assault rifle" were the very terms used by the gun companies that first produced, marketed, and sold such weapons to the public.  Gun industry use of the terms "assault weapons" and "assault rifles" appeared in the early 1980s (and even earlier), before political efforts to regulate them emerged in the late 1980s and early 1990s.[142]

51.     A study of the marketing strategies employed by gun manufacturers and gun publications from the time that such weapons emerged in the American civilian market in a significant way in the early 1980s verifies this by reference to company advertisements and gun magazines.[143]  Examples include: Heckler and Koch selling its "HK 91 Semi-Automatic Assault Rifle"; ads for the "Bushmaster assault rifle"; the AKM "imported assault rifle"; the Beretta M-70 that "resembles many other assault rifles"; the AR10/XM-10 (made by Paragon S&S Inc.) advertised as a "Famous Assault Rifle [that] is Now Available in a Semi Auto Civilian Legal Form!" (see Exhibit J); the "AMT 25/.22 Lightning Carbine" that was advertised as an "assault-type semi-auto"; Intratec extolling its TEC-9 as one that "clearly stands out among high capacity assault-type pistols" (see Exhibit I); and the after-market supplier Assault Systems that appealed to civilian owners of "assault weapons," among many other examples.  The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public.[144]  *Guns & Ammo* magazine described the "success of military assault rifles in

---

[142] Violence Policy Center, *The Militarization of the U.S. Civilian Arms Market*, June 2011, http://www.vpc.org/studies/militarization.pdf#page=33; also Violence Policy Center, *Assault Weapons and Accessories in America*, 1988, http://www.vpc.org/studies/awacont.htm; http://www.vpc.org/studies/thatintr.htm.

[143] Tom Diaz, *Making a Killing* (NY: The New Press, 1999) and Tom Diaz, *The Last Gun* (New York: The New Press, 2013).

[144] Diaz, *Making a Killing*, 124–128, 230–231; Diaz, *The Last Gun*, 142–43; Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 8.

**JA1093**

the civilian market" in its July 1982 issue.[145]  In 1984, *Guns & Ammo* advertised a book called

*Assault Firearms* that the magazine extolled as "full of the hottest hardware available today."[146]

52.    As a standard buyer's guide on assault weapons noted, the "popularly-held idea

that the term 'assault weapon' originated with anti-gun activists, media or politicians is wrong.

The term was first adopted by the manufacturers, wholesalers, importers and dealers in the

American firearms industry . . . ."[147]  The more expansive phrase "assault weapon" is generally

used over "assault rifle" because "weapon" also includes not only rifles but some shotguns and

handguns that were also subject to regulation in the federal 1994 assault weapons ban and

subsequent laws.

53.    An article in *Outdoor Life* belied the claim that assault weapons are limited only

to firearms that fire fully automatically.  That article urged its readers to share its information

with non-shooting friends to dispel "myths" about "assault weapons."  In its account, it correctly

noted that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm

initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such

as the AK-47 and the M16/M4.  These are selective-fire weapons that can shoot semi-auto, full-

auto, or in three-round bursts."[148]

---

[145] "Wooters Chooses the 10 Best Gun Designs," *Guns & Ammo*, July 1982, 58, 68; Diaz, *Making a Killing,* 126.

[146] Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 17, 2013, A1, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html

[147] Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* (Iola, WI: Gun Digest Books, 2008), 11.

[148] John Haughey, "Five Things You Need to Know About 'Assault Weapons'," *Outdoor Life*, March 19, 2013, http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons

54.     The effort to rebrand "assault weapons" as something more benign and severed
from its military origins was seen in the publication struggles of Phillip Peterson, whose book,
titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*,[149] is a well-known
reference work on the subject.  As Peterson explained, the gun industry "moved to shame or
ridicule" those who used the phrase "assault weapons," insisting that the term should now only
apply to fully automatic weapons.  Peterson noted that the origin of the term "assault weapon"
was the industry itself.[150]  He found that the NRA refused to sell his book until he changed the
title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles.*[151]  The very same
pattern played out in Canada, where gun companies also used the term "assault rifle" in the
1970s and 1980s until political pressure began to build to restrict such weapons in the aftermath
of a mass shooting in Montreal in 1989.  By the 1990s, gun companies marketing guns in Canada
and their allies also adopted terms like "modern sporting rifles."[152]

55.     Similar claims are also made about the term "large capacity magazine," again
calling it "politically charged rhetoric," and describing such magazines as "standard capacity."[153]

---

[149] Peterson, *Gun Digest Buyer's Guide to Assault Weapons*.

[150] Goode, "Even Defining 'Assault Rifles' Is Complicated."

[151] Phillip Peterson, *Gun Digest Buyer's Guide to Tactical Rifles* (Iola, WI: Gun Digest Books, 2010).

[152] According to Blake Brown, Canadian newspapers ran ads from gun companies selling weapons like the "AR-15 semi-automatic assault rifle," the "Colt AR-15 Semi Auto Assault Rifle," and the "SKS Assault Rifle" among others, in 1976, 1982, 1983, 1985, and 1986 from dealers and companies including MilArm, Colt, and Ruger. "Gun Advocates' Changing Definition of 'Assault Rifles' is Meant to Sow Confusion," *Toronto Globe and Mail*, May 21, 2020, https://www.theglobeandmail.com/opinion/article-gun-advocates-changing-definition-of-assault-rifles-is-meant-to-sow/

[153] E.g. Complaint ¶ 18, Rocky Mountain Gun Owners, et al. v. Town of Superior, No. 22-cv-2680, filed 10/12/22 (D. Colo.).

43

**JA1095**

Identifying a large capacity magazine as one that holds more than ten rounds is not arbitrary, for at least three reasons.

56.     First, the LCM definition of one holding ten or more rounds dates back to at least 1989,[154] in an early version of the law Congress eventually passed in 1994 that defined "a large capacity magazine or belt as one which holds over ten rounds."[155]  Since that time, fourteen states plus the District of Columbia have adopted the LCM ten round limit (see earlier discussion at note 5).

57.     Second, the definition of LCMs based on a ten round limit has been and is widely accepted and used in the scholarly literature in criminology and other fields examining such devices.[156]

58.     Third, as Table 1 and the accompanying discussion in this document shows, from 1917 to 1934 roughly half of the states in the U.S. enacted laws that restricted various ammunition feeding devices, or guns that could accommodate them, based on a set number of

---

[154] Summary: S.386 — 101st Congress (1989-1990), Introduced in Senate (02/08/1989), https://www.congress.gov/bill/101st-congress/senate-bill/386; Violent Crime Control and Law Enforcement Act of 1994, H.R. REP. 103–489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess. 1994, 36.

[155] Violent Crime Control and Law Enforcement Act of 1994, 6.

[156] For example: Gregg Lee Carter, ed., *Guns in American Society,* 3 vols. (Santa Barbara, CA: ABC-CLIO, 2012), III, 777-78; Jaclyn Schildkraut and Tiffany Cox Hernandez, "Laws That Bit The Bullet: A Review of Legislative Responses to School Shootings," *American Journal of Criminal Justice* 39, 2 (2014): 358-74; Luke Dillon, "Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012," Mason Archival Repository Service, George Mason University, May 22, 2014, http://mars.gmu.edu/xmlui/handle/1920/8694; Jaclyn Schildkraut, "Assault Weapons, Mass Shootings, and Options for Lawmakers," Rockefeller Institute of Government, March 22, 2019, https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/; Christopher Koper, et al., "Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms," *Criminology & Public Policy*, 19 (February 2020): 157; Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2nd ed. (NY: Oxford University Press, 2020), 201.

**JA1096**

rounds, though the numerical cap for gun firing without reloading varied at that time from more than a single round up to eighteen. Thus, the idea of restricting removable magazines by capping the number of rounds dates back at least a century.

## III. HISTORICAL HARDWARE RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS, AND TRAP GUNS

59.   Similar to government regulation of certain types of firearms and ammunition feeding devices in the early twentieth century, which occurred only after the weapons technologies matured, entered the civilian market, and threatened the public through criminal use, government regulation of other weapons typically followed a version of this trajectory during the 1700s and 1800s. Even though, as discussed earlier, serious crimes became more widespread in the early 1800s, specific crime-related concerns that involved dangerous weapons led to legislative enactments in the late 1700s and early 1800s. For example, from 1780-1809, at least four states (Connecticut, Ohio, New Jersey, Maryland) enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed.[157] At least three states (New York, Ohio, Maryland) enacted laws to punish the discharge of firearms near populated areas.[158] At least four states (Virginia, Massachusetts, North Carolina, Tennessee) criminalized

---

[157] 1783 Conn. Acts 633, An Act For The Punishment of Burglary And Robbery; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4. 1788; Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources. 1799 [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2; The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources, 1809.

[158] James Kent, Laws of the State of New-York Page 41-42, Image 44-45 (Vol. 1, 1802-1812) available at The Making of Modern Law: Primary Sources, 1785; An Act of April 22, 1785, An Act to Prevent the Firing of Guns and Other Fire-Arms within this State, on certain days therein mentioned; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of

45

public arms carrying.[159] Other examples of restrictions of specific types of weapons are
discussed in this section.

### A. Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives

60.    The Bowie knife is generally credited with having been invented by the brother of
adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly
killed one man and wounded another using a "big knife" given to him by his brother in the
alternately notorious or celebrated "Sandbar Duel" in 1827.[160]

61.    The "Bowie knife" rapidly became known beginning in the 1830s for the
distinctive type of long-bladed and usually single-edged knife with a hand guard identified with
Bowie, the man after whom the knife was named. While Bowie knives initially "came in a
variety of forms—with or without guards, with differently shaped blades," they eventually

---

Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in
Furtherance Thereof, ch. 13, § 4. 1788; 1792 Md. Laws 22, A Supplement To An Act Entitled,
An Act to Improve and Repair the Streets in Elizabethtown, in Washington County, and For
Other Purposes Therein Mentioned, chap. 52, § 4.

[159] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; 1786 Mass. Sess. Laws
An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences
Thereof; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force
in the State of North Carolina, 60-61 (Newbern 1792); Judge Edward Scott, Laws of the State of
Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to
the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law:
Primary Sources. 1801, An Act for the Restraint of Idle and Disorderly Persons § 6.

[160] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/
entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins,
1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he
invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says,
erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower
Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother
used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes
1837-1899," *The Volokh Conspiracy*, November 20, 2022,
https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

**JA1098**

became more standardized as "a large knife with a cross guard and a blade with a clipped

point."[161]  The distinctive traits of the Bowie knife are revealed in Robert Abels' book, Bowie

Knives, which includes pictures of nearly one hundred such knives made between 1835 and

1890.[162] The Bowie legend, the explosive growth and spread of Bowie-related mythology (only

magnified by his death at the Alamo in 1836), and the knife's distinctive features, encouraged its

proliferation,[163] referred to by one historian as "the craze for the knives."[164]  As was true of other

knives with long, thin blades,[165] they were widely used in fights and duels, especially at a time

when single-shot pistols were often unreliable and inaccurate.[166]  Indeed, such knives were

known as "fighting knives"[167] that were "intended for combat."[168]  In the early nineteenth

century "guns and knives accounted for a growing share of the known weapons that whites used

to kill whites."[169]  In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to
> arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of
> protecting themselves against insult, when in fact being so armed they frequently insult
> others with impunity, or if resistance is made the pistol dirk or club is immediately

---

[161] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/
entries/bowie-knife-2738/.

[162] Robert Abels, *Bowie Knives* (NY: Abels, 1979).

[163] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press,
1985), 39–63.

[164] Davis, *Three Roads to the Alamo*, 583.

[165] Other such long-bladed, thin knives of varying configurations typically named in laws barring
their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[166] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen
Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d.,
https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI:
Andrew Mowbray, 2004), 485; Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting
Techniques* (Boulder, CO: Paladin Press, 2010), 35-44.

[167] Roth, *American Homicide*, 218.

[168] Flayderman, *The Bowie Knife*, 59.

[169] Roth, *American Homicide*, 218.

47

**JA1099**

resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[170]

62.     Homicide rates increased in the South in the early nineteenth century, as did laws restricting concealed weapons carrying.  Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[171]  Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[172]  Flayderman concludes that, as early as 1836, "most of the American public was well aware of the Bowie knife."[173]  (Very much like the allure of contemporary assault weapons to some,[174] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[175])  All this contributed to widespread enactment of

---

[170] Quoted in Roth, *American Homicide*, 218–19.

[171] Baugh, *Rendezvous at the Alamo*, 51.

[172] Flayderman, *The Bowie Knife*, 25–64; 495–502.

[173] Ibid., 43.

[174] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[175] Flayderman, *The Bowie Knife*, 46.

48

laws prohibiting dueling in the states.[176]  In 1839, Congress passed a measure barring dueling in

the District of Columbia.[177]  Both pistols and knives were prominently used in such affairs.[178]

  63. At least three state court cases dealt in some manner with fighting knives like the

Bowie knife. In the 1840 case of *Aymette v. State*[179] the Supreme Court of Tennessee upheld the

conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a

state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-

knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble

a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his

person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined

in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less

than three months and not more than six months."[180]  In its decision, the court concluded that the

prohibition against wearing the named weapons was well justified in that they "are usually

employed in private broils, and which are efficient only in the hands of the robber and the

assassin."[181]  The court continued, "The Legislature, therefore, have a right to prohibit the

wearing or keeping weapons dangerous to the peace and safety of the citizens. . . ."[182]  Further,

the court added that the state law existed "to preserve the public peace, and protect our citizens

---

[176] A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws
yields 35 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[177] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838,
https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[178] Roth, *American Homicide*, 180–83, 210–17.

[179] Cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[180] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

[181] *Aymette v. State*, 156.

[182] *Aymette v. State*, 157.

from the terror which a wanton and unusual exhibition of arms might produce, or their lives from

being endangered by desperadoes with concealed arms. . . ."[183]

64.    Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law

violation and challenge. In the case of *Haynes v. Tennessee* (1844),[184] Stephen Haynes was

indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that

resembled a Bowie knife but appealed his conviction on the grounds that he was actually

carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial,

witnesses disagreed as to the proper name for the knife in question.) He also argued that the state

law, in listing various types of knives including those "similar" to Bowie knives, was "too

indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement.

. . ."[185] On appeal, the court upheld his conviction and commended the Tennessee state

legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives

and others of a similar description, which the experience of the country had proven to be

extremely dangerous and destructive to human life; the carrying of which by truculent and evil

disposed persons but too often ended in assassination."[186] The court continued: "The design,

meaning, and intent was to guard against the destruction of human life, by prohibiting the

wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[187] The

court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or

---

[183] *Aymette v. State*, 157.

[184] *Haynes v. Tennessee*, 24 Tenn. 120 (1844).

[185] *Haynes v. Tennessee*, 122.

[186] *Haynes v. Tennessee*, 122.

[187] *Haynes v. Tennessee*, 123.

any other weapon in form, shape or size, resembling them."[188] Noting the similarity among

knives and the possibility of an unjust outcome where, say, a person might be convicted of

carrying a mere pocket knife, the court posed this question: "what is to protect against

conviction, when the words of the statute cover the charge, and its true spirit and meaning does

not?" Their answer: "the judge and jury who try the case."[189] As the author of a book on Bowie

knives noted, "the fact that the term 'bowie knife' had never been precisely defined did not help

his [Haynes's] case."[190]

65.    A third state court case relevant to the legal status of Bowie knives is *Cockrum v.*

*State* (1859).[191] The *Cockrum* case involved John Cockrum, who was charged with the murder of

his brother-in-law, William Self, with a Bowie knife.[192] Under Texas law, "a homicide, which

would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be

---

[188] *Haynes v. Tennessee*, 122.

[189] *Haynes v. Tennessee*, 123.

[190] Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques*, 43.

[191] *Cockrum v. State,* 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm. David Kopel says that a fourth case, *Nunn v. State*, 1 Ga. 243 (1846), is a "major state supreme court case[s] involving Bowie knives." "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy,* November 20, 2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/. But *Nunn* involved a man who was prosecuted for carrying a pistol (openly, not concealed), not a knife. A state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State." By contrast, the court upheld the constitutionality of the concealed carry restrictions, and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." 246; italics in original.

[192] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html

deemed murder and punished as such. . . ."[193] The court upheld the added penalty provision of

the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the

right to bear arms, but reversed and remanded the man's conviction because of an error related to

statutory changes and jury instructions. It described Bowie knives as "an exceeding destructive

weapon," an "instrument of almost certain death," and "the most deadly of all weapons in

common use."[194] Further, the court said: "He who carries such a weapon. . .makes himself more

dangerous to the rights of others, considering the frailties of human nature, than if he carried a

less dangerous weapon."[195]

66.    All of these cases underscore the courts' recognition of the dangerous nature and

nefarious use of Bowie knives not only by their characterizations of them, but by the fact that

they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly

weapons including pistols and various named clubs.[196]

---

[193] *Cockrum v. State*, 394.

[194] *Cockrum v. State*, 403–04. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See Exhibits C and E. Kopel, "Bowie knife statutes 1837-1899."

[195] *Cockrum v. State*, 403.

[196] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan, "Lincoln assassination: The other murder attempt," *CBS News,* May 10, 2015, https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape.

67.    The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[197]  In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[198]  From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives:  a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibits C, E, and H) totaling 49 states plus the District of Columbia.[199]  For example, 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry), while others imposed taxes on the ability for individuals to acquire or possess them. Georgia sought to stamp out Bowie knife circulation (as well as that of other named weapons) in an 1837 law: "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons . . . Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c."[200] (see Exhibit H).  The desirability and utility of concealed-

---

https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/

[197] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[198]  A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law. See Exhibit H.

[199] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibits C and E.

[200] 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the

carry restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence. Arkansas combined no-carry provisions (whether concealed or openly) applying to Bowie knives, as well as pistols and other weapons, with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person"[201] bowie knives, pistols, or other listed weapons. Even though the law allowed persons to have them on their own premises, it begs the question of how, exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

68.    States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit H).

69.    The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to enact, much less implement, any measure as sweeping as

---

Unwarrantable and too Prevalent use of Deadly Weapons, § 1.

[201] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3. The law also made an allowance for those carrying weapons "upon a journey."

a knife ban, especially since knives are technologically very simple to produce. After all, the

front-line administrative entity on which we today relay for law enforcement, the police, barely

existed (in the way we think of policing today) in the early nineteenth century (up to this time

policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes).

Modern police forces only came in to being in a handful of large cities before the Civil War.[202]

Second, the chief remedy enacted by the states to address the problem of knife fighting was far

more focused and feasible: to bar the carrying of knives, along with the other two categories of

weapons that also threatened public safety, clubs and pistols.[203] The fact that all three types of

weapons were consistently treated together is conclusive evidence that all were considered so

dangerous and inimical to public safety that subject to anti-carry laws and bundled together in

legislative enactments.

### B. Historical Restrictions on Clubs and Other Blunt Weapons

70.    Among the most widely and ubiquitously regulated harmful implements in

U.S. history were various types of clubs and other blunt weapons. (See Exhibits C and E.)  Most

were anti-carry laws, which also generally encompassed pistols and specific types of knives,

although some of the laws extended prohibitions to these weapons' manufacture, possession,

---

[202] Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.

[203] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

sale, or use in crime.[204]  As the table in Exhibit C shows, at least six distinct types of clubs and

blunt objects were regulated in the United States.  Notably, every state in the nation had laws

restricting one or more types of clubs.  According to a detailed reference book on the subject of

these blunt instruments by Robert Escobar, they were considered "objectionable objects, once

feared but now forgotten."[205]  Escobar provides what he calls "a family history" of these blunt

weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within

the study of weaponry."[206]  They have been described as "wicked, cowardly, 'Soaked in blood

and cured in whiskey.'"[207]  Those who carried them (excluding police) "were called vicious,

devils and lurking highwaymen."[208]  These club-type blunt objects compose a family of objects

used for striking others, and while they vary in name and construction, the categories are

"somewhat fluid."[209]

71.    Among the six types of clubs regulated in U.S. laws, 15 states barred bludgeon

carrying.  A bludgeon is a short stick with a thickened or weighted end used as a weapon.[210]  The

earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and

1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total

exceeds the total number of states because some states enacted the same or similar laws in

---

[204] E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

[205] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.

[206] Escobar, *Saps, Blackjacks and Slungshots*, 2.

[207] Escobar, *Saps, Blackjacks and Slungshots,* 2.

[208] Escobar, *Saps, Blackjacks and Slungshots,* 2.

[209] Escobar, *Saps, Blackjacks and Slungshots,* 1.

[210] https://www.merriam-webster.com/dictionary/bludgeon.

multiple centuries).

72.     A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[211] usually made of wood, plastic, or metal,[212] that is traditionally carried by police, often called a nightstick or baton.[213]  Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[214] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in Kansas in 1862,[215] followed by a New York law in 1866.[216]  Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

73.     At least 14 states barred the carrying of "clubs" more generically, without

---

[211] Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[212] https://www.merriam-webster.com/dictionary/billy%20club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c."  "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[213] Escobar, *Saps, Blackjacks and Slungshots, 2*, 69-70, 105, 113-30.

[214] Escobar, *Saps, Blackjacks and Slungshots*, 105.

[215] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[216] Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

57

specifying the type. The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-

1700s, 7 states in the 1800s, and 2 in the early 1900s.

74.     Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s

and 12 in the 1900s. A slungshot (or slung shot), also referred to as "a type of blackjack,"[217] is a

hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible

strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was

1842[218]). By one account, "[s]lungshots were widely used by criminals and street gang members

in the 19th Century. They had the advantage of being easy to make, silent, and very effective,

particularly against an unsuspecting opponent. This gave them a dubious reputation, similar to

that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions.

The use as a criminal weapon continued at least up until the early 1920s."[219] Escobar concurs

that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could

be merciless in their use."[220]

75.     In a criminal case considered the most famous of those involving lawyer Abraham

Lincoln, the future president defended a man charged with murdering another using a slung shot.

In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's

acquittal.[221]

---

[217] Escobar, *Saps, Blackjacks and Slungshots*, 228.

[218] See https://www.merriam-webster.com/dictionary/slungshot Escobar agrees with this rough
date. See *Saps, Blackjacks and Slungshots*, 67.

[219] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[220] Escobar, *Saps, Blackjacks and Slungshots*, 86.

[221] Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike
the victim with a slung shot at night because of the full moon. Lincoln used as evidence an
Almanac to prove that on the night in question, there was no full moon. Judson Hale, "When
Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022,

76.     These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements.  These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions.  The earliest anti-Slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

77.     Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.  Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[222] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag.  (Alternately, they could be made heavier by adding water to the sand.)  The first anti-sandbag law was 1866, with 10 states enacting such laws—7 in the 1800s and 7 in the early 1900s. Only 4 states did not have any prohibitions in any of these six categories, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.  One state, New Hampshire, may not have enacted such a law during this time but did at some point.[223]

---

https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

[222] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/;
Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to
sandbags as weapons to the 1600s (22).

[223] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling
Weapons.  Whoever, except as provided by the laws of this state, sells, has in his possession with
intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife,

### C. Historical Restrictions on Pistol and Gun Carrying

78.    Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."  Massachusetts followed in 1750.  In the late 1700s, North Carolina and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun carrying spread, forty-three states joined the list; three more did so in the early 1900s (see Exhibit B).[224]  The enactment of laws restricting concealed weapons carrying followed the rise of homicides and interpersonal violence described by historian Randolph Roth who noted that restrictions on firearms from the colonial period to the start of the Revolution were few because homicide rates were low. When homicides did occur, guns were seldom used, in large part because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy.  After the Revolutionary period the spread of violence tied to concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed carry weapons laws.[225]  Concealed carry laws normally targeted pistols as well as the types of fighting knives and various types of clubs discussed here (see Exhibit E for text of such laws). In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in

---

slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665).

[224] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[225] Roth, *American Homicide*, 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17; Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[226] As of 1938, "the

carrying of concealed pistols is either prohibited absolutely or permitted only with a license in

every state but two."[227] Thus, the widespread enactment of concealed carry laws, along with

brandishing and display restrictions, were the public policy remedies to the emergent crime

problems described here.  In addition, and consonant with a maturing society, at least 30 states

broadened their laws to restrict open weapons carrying as well. Most of these laws were enacted

in the post-Civil War period (see Exhibit B).

### D.  Historical Restrictions on Trap Guns

79.    Not to be confused with firearms used in trapshooting, trap guns were devices or

contraptions rigged in such a way as to fire when the owner need not be present.  Typically, trap

guns could be set to fire remotely (without the user being present to operate the firearm) by

rigging the firearm to be fired with a string or wire which then discharged when tripped.[228]  This

early law from New Jersey in 1771 both defines and summarizes the problem addressed by this

law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this
> Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within
> this Colony shall presume to set any loaded Gun in such Manner as that the same shall be
> intended to go off or discharge itself, or be discharged by any String, Rope, or other
> Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on
> Non-payment thereof shall be committed to the common Gaol of the County for Six
> Months.[229]

---

[226] Spitzer, *The Gun Dilemma*, 77-80.

[227] Sam B. Warner, "The Uniform Pistol Act," *Journal of Criminal Law and Criminology* 29
(Winter 1938): 530.

[228] See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[229] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to
Prevent Trespassing with Guns, ch. 539, § 10.

80.        Also sometimes referred to as "infernal machines,"[230] the term trap gun came

to encompass other kinds of traps designed to harm or kill those who might encounter them,

including for purposes of defending property from intruders.  Unlike the other weapons

restrictions examined here, opinion was initially more divided on the relative merits or wisdom

of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices

had it coming,[231] though the weight of opinion seemed mostly against such devices because of

the likelihood that innocent persons could be injured or killed, and also because such devices

represented an arbitrary and excessive meting out of private, vigilante-type "justice" that was

unjustifiably harsh—to seriously wound or kill a person—for crimes like stealing food or similar

commodities.[232]  Those who set gun traps typically did so to defend their places of business,

properties, or possessions.  This 1870 newspaper account from an incident in New York City

provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then

prosecuted: "As there is a statute against the use of such infernal machines, which might cause

loss of life to some innocent person, the jury censured Agostino."  After the verdict the man

continued to be held under $2,000 bail.[233]

---

[230] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties
for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or
Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.

[231] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27,
1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top
of his head blown off by a trap-gun so placed that it would be discharged by any one tampering
with the window.  A few such 'accidents' are needed to teach the thieves who have lately been
operating in this city, a lesson."

[232] This is my observation based on my reading of numerous historic newspaper accounts from
the mid-to late 1800s, and from the number of anti-trap gun laws enacted.  As policing became
more consistent, professional, and reliable, support for vigilante-type actions like setting trap
guns seems to have declined.

[233] "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*,
October 29, 1870, https://bit.ly/3yUSGNF.  See Exhibit G.

**JA1114**

81.     Inevitably, however, the traps wound up hurting or killing innocents, even including the person who set the trap.  For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[234]

82.     In all, at least 18 states had anti-trap gun laws (see Exhibits B and F).  The earliest such law encountered was the 1771 New Jersey law (above).  eleven laws were enacted in the 1700s-1800s, and 9 in the early 1900s (counting states that enacted multiple laws across the centuries).

## IV.  RECENT DEVELOPMENTS

83.     A profound change in firepower occurred in the U.S. in the 1980s, when semi-automatic handguns, and a new generation of more expensive and more deadly guns, entered the criminal market.[235]  According to criminologists Alfred Blumstein and Richard Rosenfeld, writing in the 1990s about the period from 1985-1993 and the dramatic rise in gun crime and homicides during that period, "[o]ver the last decade the weapons involved in settling juveniles' disputes have changed dramatically from fists or knives to handguns, with their much greater lethality."[236]  More specifically, Blumstein attributed this deadly crime spike in the 1980s to "the

---

[234] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.  See Exhibit G.

[235] The prevailing crime handguns of the 1970s and early 1980s were so-called "Saturday night specials," cheap, smaller caliber, short-barreled, easily concealable revolvers that accounted for much gun crime. "Hot Guns," *Frontline,* PBS, aired June 3, 1997, https://www.pbs.org/wgbh/pages/frontline/shows/guns/etc/script.html; also Interview with Garen Wintemute, "Hot Guns," PBS, https://www.pbs.org/wgbh/pages/frontline/shows/guns/interviews/wintemute.html

[236] Alfred Blumstein and Richard Rosenfeld, "Explaining Recent Trends in U.S. Homicide

63

**JA1115**

advent of crack cocaine, semiautomatic handguns and gangs" which "sparked the surge in killings by teen-agers."[237]  Blumstein noted that "[b]eginning in 1985, there was steady growth in the use of guns by juveniles in committing murder, leading to a doubling in the number of juvenile murders committed with guns, with no shift in the number of non-gun homicides."[238] These "young people are less likely to exercise the restraint necessary to handle dangerous weapons, particularly rapid-fire assault weapons."[239]

84.    This shift to greater firepower is consistent with the fact that "from 1973 to 1993, the types of handguns most frequently produced" were "pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993."[240]  Pistols "generally contain cartridges in a magazine located in the grip of the gun. When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is ejected, the firing mechanism is cocked, and a new cartridge is chambered"[241] whereas a revolver is defined as a "handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges. . . ."[242]

---

Rates," *Journal of Criminal Law and Criminology* 4 (Summer 1998): 1191, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6976&context=jclc

[237] Fox Butterfield, "Guns Blamed for Rise in Homicides by Youths in 80's," *New York Times,* December 10, 1998, https://www.nytimes.com/1998/12/10/us/guns-blamed-for-rise-in-homicides-by-youths-in-80-s.html

[238] Alfred Blumstein, "Violence by Young People: Why the Deadly Nexus?" *National Institute of Justice Journal,* August 1995, 5, https://www.ojp.gov/pdffiles/nijj_229.pdf

[239] Blumstein, "Violence by Young People," 5.

[240] Marianne W. Zawitz, "Guns Used in Crime," *Bureau of Justice Statistics,* July 1995, 3, https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF

[241] Zawitz, "Guns Used in Crime," 2.

[242] Zawitz, "Guns Used in Crime," 2.

85.    In testimony before Congress on what became the assault weapons ban of 1994, law enforcement representatives discussed the rise in criminal firepower they witnessed in the 1980s.  For example, the executive vice president of the National Association of Police Organizations, Tony Loizzo, offered this testimony:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased. . . dramatically. . . . The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon.[243]

John Pitta, executive vice president of the Federal Law Enforcement Officers Association testified similarly with respect to the 1994 bill: "[t]he TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals.  Cities across the country confiscate more TEC–9s than any other assault pistol."[244]  The ultimate result was congressional enactment of a ten year restriction on assault weapons and also on ammunition magazines capable of holding more than ten rounds.[245]

## V. Conclusion

What does the law say, and what should the law be, regarding the regulation of firearms and other harmful or dangerous weapons and accessories? Given the importance of history, the lesson is abundantly clear. Firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society,

---

[243] H.R. REP. 103-489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess. 1994, 1994 WL 168883, 1994 U.S.C.C.A.N. 1820 (Leg.Hist.), Violent Crime Control and Law Enforcement Act Of 1994, 32.

[244] H.R. REP. 103-489, H.R. Rep. No. 489, 32.

[245] Spitzer, *The Politics of Gun Control*, 205-11.

proliferated, and resulted in violence, harm, criminality, or threats to public safety and good order. This historical record from the 1600s through the early twentieth century, as seen in the examples examined here, is even more remarkable given that the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century. The historical record summarized here makes clear that contemporary restrictions of firearms among the states are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

Gun ownership is as old as the country. But so are laws restricting guns and other dangerous weapons, which have adapted to changes in threats to public safety. If this history teaches anything, it is that the state has no less an abiding interest in preserving public safety today by restricting the tools that magnify violence than it did in prior centuries.

I declare that the foregoing is true and correct to the best of my knowledge.

Executed on _June 7, 2023_, at Williamsburg, Virginia

Robert Spitzer

66

**JA1118**

Exhibit A

October 2022

# Curriculum Vitae

## Robert J. Spitzer

### Distinguished Service Professor, Emeritus
### SUNY Cortland

Address:  5333 Center St.
Alexandria, VA  23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

Education:  A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

Positions Held:

Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-2021.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-
1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985,
1986, 1988.
Copy Editor, Administrative Science Quarterly, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

JA1120

Honors:

> Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London,
> England, 2020.
> Founding member, Regional Gun Violence Research Consortium, coordinated with the
> Rockefeller Institute of Government. Consortium of gun policy experts from eight states
> to advance research on gun policy, 2018-present.
> Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees,
> SUNY System Administration, campus leadership teams, and the leadership team of the
> Research Foundation (RF) for SUNY, 2018-2021.
> Member, Scholars Strategy Network, 2015-present. Created to improve public policy and
> strengthen democracy by connecting scholars and their research to policymakers, citizens
> associations, and the media.
> Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor
> of the Year Award for 2013.
> Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
> Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
> Winner, State University of New York's Chancellor's Excellence in Scholarship and
>     Creative Activities Award, 2003.
> SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi
>     Kappa Phi, 1994-95.
> Winner, New York State/United University Professions Excellence Award, 1991, for
>     "outstanding professional performance and superior service."
> Member, New York State Commission on the Bicentennial of the U.S. Constitution,
>     1986-1990.
> Member, New York State Ratification Celebration Committee for U.S. Constitution
> Bicentennial, 1987-88.
> Member, National Bicentennial Competition on the Constitution and the Bill of Rights,
>     1987-1991.
> Who's Who in the World, 1996.
> Dictionary of International Biography, 1995.
> Who's Who in the East, 1995-96; 1997-98
> Ex officio member, Cortland County Bicentennial Committee, 1987-89.
> Chair, SUNY Cortland Bicentennial Committee, 1987-89.
> Phi Eta Sigma, SUNY Cortland, 1994.
> Phi Kappa Phi, SUNY Cortland, 1990.
> Men of Achievement (1986)
> Contemporary Authors, vol. 112 (1985) and subsequent updates.
> International Authors and Writers Who's Who, 1985-present.
> International Who's Who in Education, Winter 1985-86.
> Herbert H. Lehman Graduate Fellowship, 1975-79.
> Who's Who Among Students in American Universities and Colleges, 1974-75.
> Phi Beta Kappa Club, SUNY College at Fredonia, 1975.

2

Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

Books:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert

3

Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

4

**JA1123**

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023, forthcoming). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:
> Daniel Hoffman, Our Elusive Constitution, (1997)
> Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)
> Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)
> Robert Spitzer, ed., Politics and Constitutionalism, (2000)
> Laura Langer, Judicial Review in State Supreme Courts (2002)
> Ian Brodie, Friends of the Court (2002)
> Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)
> Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)

5

**JA1124**

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, Universal Rights and the Constitution (2014).

Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).

Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).

Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).

Peter J. Galie, et al., eds., New York's Broken Constitution (2016).

Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).

Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).

Clyde H. Ray, John Marshall's Constitutionalism (2019).

Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).

6

Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)


Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.


<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar,

7

**JA1126**

closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY: Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York: Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

8

**JA1127**

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in The Clinton Scandal and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

9

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul

10

Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in <u>Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi</u>, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New

11

**JA1130**

York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian

12

**JA1131**

Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Gun Control (Baltimore: Johns Hopkins University Press, 2023, forthcoming).


Articles:

"Jamestown: Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69. Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY: Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985):

13

**JA1132**

611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

14

**JA1133**

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15. Reprinted in <u>Annual Editions: Criminal Justice</u> (Dushkin/McGraw-Hill, 2000); and in <u>Criminology</u> (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," <u>Congress Monthly</u>, September/October 2000.

"Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u> 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, <u>Silveira v. Lockyer</u> (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, <u>American Literary History</u> 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, <u>Injury Prevention</u> 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008): 329-46.

15

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," <u>Law and Contemporary Problems</u> 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" <u>Items: Insights from the Social Sciences,</u> Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

Op-Ed Articles

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

"Assault Weapons Ban," Christian Science Monitor, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," Syracuse Post-Standard, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," Syracuse Post-Standard, April 20, 1999.

17

**JA1136**

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" Intellectual Capital, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

18

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

19

**JA1138**

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post
(www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post
(www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com),
posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5,
2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January
16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington
Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

20

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

21

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

22

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

23

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com,* September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

25

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-*

26

**JA1145**

*Standard,* November 4, 2022.

<u>Testimony, Briefs, and Reports</u>:
"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and <u>Sine</u> <u>Die</u> Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA,

February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

28

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

29

**JA1148**

<u>Papers and Presentations (not including those given on the Cortland campus)</u>:

"The President as Policy-Maker: The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party: The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic: Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet: Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power: Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power: The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto: Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete? An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington,

30

D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg,

31

**JA1150**

PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute

32

for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

33

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

34

**JA1153**

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

36

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

37

**JA1156**

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

38

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.

Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

40

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA,

41

Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

42

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

43

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

44

**JA1163**

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H.

45

**JA1164**

Richard Uviller and William G. Merkel, <u>Journal of American History</u>, March 2004.

<u>Power Without Persuasion: The Politics of Direct Presidential Action</u>, by William G. Howell, <u>Perspectives on Politics</u>, June 2004.

<u>The George W. Bush Presidency: An Early Assessment</u>, ed. By Fred Greenstein, <u>Perspectives</u>, Spring 2004.

<u>The Invention of the United States Senate</u>, by Daniel Wirls and Stephen Wirls, <u>Perspectives</u>, Summer 2004.

<u>The Mythic Meanings of the Second Amendment</u>, by David C. Williams, <u>Law and Politics Book Review</u>, April 2004.

<u>Empowering the White House</u>, by Karen M. Hult and Charles E. Walcott, <u>Rhetoric and Public Affairs</u>, Fall 2005.

<u>Defining Americans: The Presidency and National Identity</u>, by Mary E. Stuckey, <u>Perspectives</u>, Spring 2005.

<u>Presidential Leadership: Rating the Best and Worst in the White House</u>, ed. By James Taranto and Leonard Leo, <u>Rhetoric and Public Affairs</u>, Summer 2006.

<u>A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America</u>, by Saul Cornell, <u>American Journal of Legal History</u>, October 2006.

<u>The Founders' Second Amendment: Origins of the Right to Bear Arms</u>, by Stephen Halbrook, <u>Law and Politics Book Review</u> 18(October 2008).

<u>Out of the Shadow: George H.W. Bush and the End of the Cold War</u>, by Christopher Maynard, <u>Journal of American History</u> (September 2009).

<u>Guns, Democracy, and the Insurrectionist Idea</u>, by Joshua Horwitz, <u>Law and Politics Book Review</u> 19(June 2009).

<u>Talking Together</u>, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

<u>Accidental Presidents</u>, by Philip Abbott, <u>Presidential Studies Quarterly</u>, June 2010.

<u>The Co-Presidency of Bush and Cheney</u>, by Shirley Anne Warshaw, <u>Congress and the Presidency</u>, 2010.

46

**JA1165**

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post,

47

**JA1166**

Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.


Professional Associations:

    Scholars Strategy Network.
    American Political Science Association.
    Center for the Study of the Presidency.
    Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
    New York Political Science Association.
    Pi Sigma Alpha.
    Phi Kappa Phi.


Teaching Areas:

    American Government:  courses taught include Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

    Public Policy:  courses taught include Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

Teaching-Related Awards:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)


Other Professional Activities

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

49

**JA1168**

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

Selected Community Service

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010 Project, 1996.

51

EXHIBIT B

EXHIBIT B

FIREARM HARDWARE RESTRICTIONS TABLE

(YEARS OF ENACTMENT)

| STATE | TRAP GUNS[1] | CONCEALED CARRY RESTRICT[2] | OPEN/ ANY CARRY BARRED | AUTOMATIC FIREARMS | SEMI-AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | 1837 | | | |
| Alaska | | 1896 | | | | |
| Arizona | | 1889 | 1867, 1889, 1901 | | | |
| Arkansas | | 1820, 1837 | 1875, 1881 | | | |
| California | | 1850, 1864 | 1861, 1878, 1917 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | | |
| Connecticut | | 1890, 1923 | 1890 | | | |
| Delaware | | 1852 | | 1931 | | |
| District of Columbia | | 1857, 1871 | 1858 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1838, 1868 | 1913[3], 1933 | | |
| Georgia | | 1837 | 1837, 1873 | | | |
| Hawaii | | 1913 | 1852, 1913 | 1933 | | 1933 |

[1] Sometimes trap guns were also referred to as "infernal machines."

[2] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[3] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

| State | | | | | | | |
|---|---|---|---|---|---|---|---|
| Idaho | | 1909 | | | | | 1931 |
| Illinois | | 1881 | | | 1931 | 1931† | 1931 |
| Indiana | | 1820 | | 1927, 1929 | 1927, 1929 | | |
| Iowa | | 1882, 1887, 1897, 1929 | | | 1927 | | |
| Kansas | | 1901 | 1868, 1881, 1899 | | 1933 | | |
| Kentucky | | 1812, 1813 | | | | | |
| Louisiana | | 1813 | 1870 | | 1932 | 1932† | 1932 |
| Maine | | 1840 | | | | | |
| Maryland | 1910 | 1872 | 1874, 1886 | | 1927 | 1927 | 1927 |
| Massachusetts | | 1751 | 1891, 1903, 1927 | | 1927, 1929 | 1927 | 1927 |
| Michigan | 1875, 1931 | 1887 | | 1927, 1929 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | | | 1933 | 1933 | 1933, 1933 |
| Mississippi | | 1878 | 1878 | | | | |
| Missouri | 1891[4] | 1873 | 1923 | | 1929 | 1929 | 1929 |
| Montana | | 1864, 1865 | | | | | |
| Nebraska | | 1881 | 1872 | | 1929 | | |
| Nevada | | 1881, 1925 | | | | | |
| New Hampshire | 1915 | | | | | | |
| New Jersey | 1771 | 1686 | 1871, 1873 | | 1927, 1934 | 1927, 1929 | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | | | |

---

[4] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

| | | | | | | |
|---|---|---|---|---|---|---|
| New York | 1870[5] | 1891 | | 1931, 1933 | | 1917 |
| North Carolina | | 1792 | | | | |
| North Dakota | 1891, 1895 | 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | 1890,1891 | 1933 | | 1933 |
| Oregon | 1925 | 1853 | 1898,1917 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1901 | 1934 | 1934[†] | 1934 |
| South Dakota | 1909 | 1877 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | 1867,1869, 1879,1881, 1893 | | | |
| Texas | | 1870 | 1871,1879, 1879 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | 1877 | | | |
| Vermont | 1884, 1912 | 1892,1895, 1897 | 1895 | 1923 | | 1923 |
| Virginia | | 1794, 1838, 1847,1870, 1877,1884, | | 1934 | 1934 | 1934 |

[5] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

| | | | | | | |
|---|---|---|---|---|---|---|
| Washington State | 1909 | 1887,1908 | | 1933 | | 1933 |
| West Virginia | 1870 | 1881 | 1882,1891, 1925 | 1925 | | |
| Wisconsin | 1872, 1921 | 1858 | | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1893 | 1933 | | |
| NUMBER OF STATES | 16 | 50 (inc. D.C.) | 30 | 32 | 8–11 | 23 |
| NUMBER OF LAWS | 24 | 65 | 55 | 39 | 12 | 26 |

**EXHIBIT C**

1

EXHIBIT C

DANGEROUS WEAPONS RESTRICTIONS
(YEARS OF ENACTMENT)

| STATE[1] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871,1875, 1881 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | | 1797 | | | 1852 | |
| District of Columbia | 1858,1871, 1892 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,[†]1838 ,1847,1868 ,1893[†] | | 1888 | | 1868, 1888 | | 1887 | |

2

---

[1] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| Georgia | 1837,1860, 1873 | 1816 |  |  |  |  | 1837 |  |
| Hawaii | 1852, 1913 |  |  |  |  | 1852, 1913 | 1913 |  |
| Idaho | 1864†1875, 1879, 1909 | 1875 |  |  |  | 1879 | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 |  |  | 1881, 1893 |  | 1881 |  |
| Indiana | 1859 |  |  | 1804, 1855, 1881, 1905 | 1875, 1905 |  | 1820 | 1831 |
| Iowa | 1882,1887, 1900 |  | 1882 | 1882 |  | 1887, 1900 |  | 1882,1887, 1897, 1929 |
| Kansas | 1862,1863 1868,1883, 1887 |  | 1862, 1887 |  | 1883, 1887, 1899 |  | 1901 |  |
| Kentucky | 1859 |  | 1798 |  | 1859 |  | 1812, 1813 |  |
| Louisiana | 1870 |  |  |  |  |  | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884† |  | 1786 |  |  |  | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 |  | 1886 | 1890 | 1872 |  |
| Massachusetts | 1836† |  | 1750 |  |  | 1850, 1927 | 1751 |  |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | 1882 |
| Minnesota | 1882 |  |  |  | 1882, 1888 | 1888 | 1881 |  |
| Mississippi | 1837,1838, 1878 |  | 1799, 1804 |  | 1878 |  | 1838,1878 |  |
| Missouri | 1871,1897, 1917,1923 |  | 1871, 1897, 1923 | 1818,1923 |  | 1883, 1888, 1897, 1917 | 1873 |  |
| Montana | 1864,1879, 1885 | 1887 |  |  |  |  | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 |  | 1890 |  | 1881 | 1888 |

JA1178

| | 1873 | 1872 | | 1881 | | | | |
|---|---|---|---|---|---|---|---|---|
| Nevada | | | | | | | | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871,1905† | 1799, 1877, 1927 | 1871, 1927 | 1871, 1873, 1927 | 1871, 1927 | | 1686 | 1881, 1925 |
| New Mexico | 1852†1853, 1859,1864, 1887 | 1887 | | 1853, 1859, 1869, 1887 | | | | 1852, 1853 |
| New York | 1866,1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1664 | | 1891 |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | 1879 | | | | 1792, 1840 |
| North Dakota | 1895,1915† | 1915 | 1915 | 1895 | 1915 | | | 1895 |
| Ohio | 1859,1880, 1890 | | | | | | 1788, 1859, 1880 | 1859 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | 1890, 1891, 1903 | 1890 | | | 1890 |
| Oregon | 1885† | | 1898, 1917 | 1885, 1917 | 1917 | | | 1853 |
| Pennsylvania | 1897 | 1897 | 1897 | 1851 | | | | 1851 |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | 1893, 1896 | 1893, 1896 | | | 1893 |
| South Carolina | 1880, 1923 | | | 1880 | | | | 1880 |
| South Dakota | 1903† | | | 1877, 1903 | | | | 1877 |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | 1879, 1882, 1893 | 1879, 1882, 1893 | | | 1821 |
| Texas | 1856,1871, 1879,1897 | | | 1871, 1879, 1889, 1897, 1899 | 1871, 1879, 1889, 1897, 1899 | 1899 | | 1870 |

4

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | | 1877, 1888 |
| Vermont | 1892, 1895† | | | | 1895 | | | 1895, 1897 |
| Virginia | 1838, 1887 | | | 1792 | 1887 | | | 1794 |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1870, 1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883, 1896 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884, 1890 1899, 1925 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 136 | 25 | 44 | 17 | 79 | 21 | 66 | 24 |

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/

† States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

5

**JA1180**

# EXHIBIT D

EXHIBIT D

MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

**CALIFORNIA:**

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine
Guns and Submachine Guns Capable of Automatically and Continuously
Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed
to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable
Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552,
§§ 1-2.
§ 1. . . . [E]very person, firm or corporation, who within the State of California
possesses any firearm of the kind commonly known as a machine gun shall be
guilty of a public offense and upon conviction thereof shall be punished by
imprisonment in the state prison not to exceed three years or by a fine not to
exceed five thousand dollars or by both such fine and imprisonment. Provided,
however that nothing in this act shall prohibit police departments and members
thereof, sheriffs, and city marshals or the military or naval forces of this state or of
the United States from possessing such firearms for official use in the discharge of
their duties.
§ 2. The term machine gun as used in this act shall be construed to apply to and
include all firearms known as machine rifles, machine guns or submachine guns
capable of discharging automatically and continuously loaded ammunition of any
caliber in which the ammunition is fed to such gun from or by means of clips,
disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells,
offers for sale, possesses or knowingly transports any firearms of the kind
commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and
include all firearms known as machine rifles, machine guns, or submachine guns
capable of discharging automatically and continuously loaded ammunition of any
caliber in which the ammunition is fed to such gun from or by means of clips,
discs, drums, belts or other separable mechanical device and all firearms which are
automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

1

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

## DELAWARE:

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.
On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

## DISTRICT OF COLUMBIA:

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

of repair or back to his home or place of business or in moving goods from one
place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the
application of any person having a bona fide residence or place of business within
the District of Columbia or of any person having a bona fide residence or place of
business within the United States and a license to carry a pistol concealed upon his
person issued by the lawful authorities of any State or subdivision of the United
States, issue a license to such person to carry a pistol within the District of
Columbia for not more than one year from date of issue, if it appears that the
applicant has good reason to fear injury to his person or property or has any other
proper reason for carrying a pistol and that he is a suitable person to be so licensed.
The license shall be in duplicate, in form to be prescribed by the Commissioners
of the District of Columbia and shall bear the name, address, description, photograph,
and signature of the licensee and the reason given for desiring a license. The
original thereof shall be delivered to the licensee, and the duplicate shall be
retained by the superintendent of police of the District of Columbia and preserved
in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person
who he has reasonable cause to believe is not of sound mind, or is a drug addict, or
is a person who has been convicted in the District of Columbia or elsewhere of a
crime of violence or, except when the relation of parent and child or guardian and
ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the
purchaser thereof until forty-eight hours shall have elapsed from the time of the
application for the purchase thereof, except in the case of sales to marshals,
sheriffs, prison or jail wardens or their deputies, policemen, or other duly
appointed law enforcement officers, and, when delivered, said pistol shall be
securely wrapped and shall be unloaded. At the time of applying for the purchase
of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement
containing his full name, address, occupation, color, place of birth, the date and
hour of application, the caliber, make, model, and manufacturer's number of the
pistol to be purchased and a statement that he has never been convicted in the
District of Columbia or elsewhere of a crime of violence. The seller shall, within
six hours after such application, sign and attach his address and deliver one copy to
such person or persons as the superintendent of police of the District of Columbia
may designate, and shall retain the other copy for six years. No machine gun,
sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section

4

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

**JA1186**

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

6

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

## FLORIDA:

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

7

**HAWAII:**

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.

Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 2.

Definitions. "Firearm" as used in this Act means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon and sub-machine guns. The specific mention herein of certain weapons does not exclude from the definition other weapons operated by explosives. "Crime of violence" as used in this Act means any of the following crimes, namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol" or "revolver" as used in this Act, means and includes any firearm of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas. "'Person" as used in this Act includes

8

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

## INDIANA:

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.

Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

**IOWA:**

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.

§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.

§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

**KANSAS:**

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.

§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other

11

**JA1192**

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

12

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS:

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)

§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .

§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

13

**JA1194**

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.

§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

## MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

15

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.

§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.

§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.

It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

16

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

17

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW YORK:

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

18

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

**NORTH CAROLINA:**

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.
That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

**NORTH DAKOTA:**

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

19

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

**OHIO:**

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

20

**JA1201**

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

## PENNSYLVANIA:

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

22

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.

§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

23

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

24

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

25

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase own, carry or have in his possession or under his control any firearm.

## SOUTH CAROLINA:

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store,

keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

27

application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace

28

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

**TEXAS:**

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**<u>VIRGINIA:</u>**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

30

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

31

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## WEST VIRGINIA:

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b. It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b. (b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

32

powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.

164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .

164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.

164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.

164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.
No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## WYOMING:

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.
§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.
§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

35

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

36

**EXHIBIT E**

1

**EXHIBIT E**

**DANGEROUS WEAPONS LAWS**

<u>**ALABAMA**</u>

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the
Statutes and Resolutions in Force at the End of the General Assembly in January,
1823. To which is Added an Appendix; Containing the Declaration of
Independence; the Constitution of the United States; the Act authorizing the People
of Alabama to form a Constitution and State Government; and the Constitution of
the State of Alabama Page 627, Image 655 (1823) available at The Making of
Modern Law: Primary Sources.  1805
Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting
Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave
shall keep or carry any gun, powder, shot, club, or other weapon whatsoever,
offensive or defensive, except the tools given him to work with, or that he is
ordered by his master, mistress, or overseer, to carry the said articles from one
place to another, but all and every gun , weapon, or ammunition, found in the
possession or custody of any slave, may be seized by any person, and upon due
proof made thereof, before any justice of the peace of the county or corporation
where such seizure shall be made, shall, by his order, be forfeited to the seizer, for
his own use; and moreover, every such offender shall have and receive, by order of
such justice, any number of lashes, not exceeding thirty-nine, on his bare back for
every such offense : Provided nevertheless, That any justice of the peace may
grant, in his proper county, permission in writing to any slave, on application of his
master or overseer, to carry and use a gun and ammunition within the limits of his
said master's or owner's plantation, for a term not exceeding one year, and
revocable at any time within such term, at the discretion of the said justice, and to
prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama
in General Assembly convened, That if any person carrying any knife or weapon,
known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or
weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw
[sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,

2

**JA1219**

by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.

Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed

3

**JA1220**

by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.
Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

4

**JA1221**

the General and Permanent Acts of the Session of 1876-7 have been Incorporated
Page 901, Image 917 (1877) available at The Making of Modern Law: Primary
Sources.
Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending,
pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells,
gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife,
or other knife of like kind or description, must on conviction, be fined not less than
fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of
the Supreme Court of the State upon the Construction of the Statutes; and in Which
the General and Permenent Acts of the Session of 1876-7 have been Incorporated
Page 883, Image 899 (1877) available at The Making of Modern Law: Primary
Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles
and slung-shots. – Any person who carries, concealed about his person, brass
knuckles, slung-shot, or other weapon of like kind or description, shall, on
conviction thereof, be fined not less than twenty, nor more than two hundred
dollars, and may also, at the discretion of the court trying the case, be imprisoned
in the county jail, or sentenced to hard labor for the county, for a term not
exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any
person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be
fined not less than five hundred dollars, nor more than one thousand dollars, and be
imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery
[Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The
Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to
apprehend an attack, or travelling or setting out on a journey, carries concealed
about his person a bowie-knife or any other knife of like kind or description, or a
pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-
knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not
less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of
the General Assembly of the State of Alabama, Approved February 16, 1897,
Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such

5

**JA1222**

Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.

That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.

That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

6

**JA1223**

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other

7

**JA1224**

kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).

Race and Slavery Based | Arkansas | 1835

§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and

8

JA1225

receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

9

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.
That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.

1881 Ark. Acts 191-192, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.
That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.
§ 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person any person [sic] any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

## **CALIFORNIA**

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the

10

**JA1227**

Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of
Independence, the Constitutions of the United States and of California, the Treaty
of Queretaro, and the Naturalization Laws of the United States Page 663-664,
Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.

If any person shall be found having upon him or her any picklock, crow, key, bitt,
or other instrument or tool, with intent feloniously to break and enter into any
dwelling house, store, shop, warehouse, or other building containing valuable
property, or shall be found in any of the aforesaid buildings with intent to steal any
money, goods, and chattels, every person so offending shall, on conviction thereof,
be imprisoned in the county jail not more than two years; and if any person shall
have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon,
with intent to assault any person, every such person, on conviction, shall be fined
not more than one hundred dollars or imprisoned in the county jail not more than
three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .

Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

13

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.


1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

14

**JA1231**

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

15

**JA1232**

Government of the United States, and the Rules and Order of Business Page 100,
Image 101 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Affecting Streets and Public Property, § 9.
If any person or persons, within the corporate limits of Georgetown, shall be found
carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or
other deadly weapon, such person shall, on conviction thereof, be fined in a sum
not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without
Warrant—Jurisdiction of Justice, § 248. (1881)
No person, unless authorized so to do by the chief of police of a city, mayor of a
town or the sheriff of a county, shall use or carry concealed upon his person any
firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling
shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369,
Image 370 (1886) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Colorado | 1886
City of Denver, Slung Shot – Brass Knuckles, § 10.
Whenever there shall be found upon the person of anyone who is guilty of a breach
of the peace, or of conduct calculated to provoke a breach of the peace, any slung
shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence
shall be adduced proving that such weapons were in the possession or on the
person of anyone while in the act of commission of the acts aforesaid, such person
shall upon conviction be fined not less than twenty-five dollars nor more than three
hundred dollars.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven,
Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890)
available at The Making of Modern Law: Primary Sources.
Good Order and Decency § 192.
Every person who shall carry in said City, any steel or brass knuckles, pistol, or
any slung shot, stiletto or weapon of similar character, or shall carry any weapon
concealed on his person without permission of the Mayor or Superintendent of
Police in writing, shall, on conviction, pay a penalty of not less than five, nor more
than fifty dollars for every such offense.

16

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

17

**JA1234**

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.
It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons || 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)
CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

18

**JA1235**

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

19

**JA1236**

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

20

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.

An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

21

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.

Passed 5th February 1838.—Approved 10th Feb. 1838.

https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.

Sentence Enhancement for Use of Weapon | Florida | 1868

Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]

Offences Against Public Peace, § 13.

Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.

Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the

22

public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Georgia | 1816
Offences Against the Public Peace, (1816) § 19.
If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.
§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.
§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum

23

not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.


1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .


R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or

imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more

25

than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources. Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

27

**JA1244**

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.
Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody

28

**JA1245**

of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach,

29

**JA1246**

locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that

30

this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.


## KANSAS

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

31

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.

Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868.

Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); "for cities of the second class":
Sec. 62. The council may prohibit and punish the carrying of firearms, or other deadly weapons, concealed or otherwise, and may arrest and imprison, fine or set at work all vagrants and persons found in said city without visible means of support, or some legitimate business.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities of the Second Class: Also a Complete List of the Officers of Salina During its Organization as a Town and City of the Second and Third Class Page 99, Image 100 (1879) available at The Making of Modern Law: Primary Sources. 1879 Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly Weapons, § 1. That it shall be unlawful for any person to carry on or about his person any pistol, bowie knife, dirk, or other deadly or dangerous weapon, anywhere within the limits of the city of Salina, save and except as hereinafter provided. § 2. This ordinance shall not apply to cases when any person carrying

32

any weapon above mentioned is engaged in the pursuit of any lawful business, calling or employment and the circumstances in which such person is placed at the time aforesaid, are such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family, nor to cases where any person shall carry such weapon openly in his hands, for the purpose of sale, barter, or for repairing the same, or for use in any lawful occupation requiring the use of the same. § 3. Any person violating any of the provisions of this ordinance shall, upon conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles,

33

**JA1250**

slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2. Any person who shall in the city of Wichita carry unconcealed, any fire-arms, slungshot, sheath or dirk knife, or any other weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3. Any person who shall, in the city of Wichita, use or carry concealed or unconcealed, any bean snapper or like articles shall upon conviction be fined in any sum not less than one dollar nor more than twenty-five dollars. Carrying Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita, carry concealed about his person any fire-arm, slung shot, sheath or dirk knife, brass knuckles, or any weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred dollars.

## KENTUCKY

34

**JA1251**

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813
Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

Louisiana 1855 law 1855 La. L. Chap. 120, Sec. 115, p. 148

35

Sec. 115, Be it further enacted, &c., That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentnient, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury, specially as to this section.

https://babel.hathitrust.org/cgi/pt?id=osu.32437123281277&view=1up&seq=300&q1=Bowie

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.

Subject(s): Sensitive Places and Times

[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.

Post-Civil War State Constitutions | Louisiana | 1879

A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

36

JA1253

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1809 If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.
Carrying Weapons | Maryland | 1872
It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local

Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court

39

of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1886

Concealed Weapons, § 30.

Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of
Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and
City Council, in Force on the First Day of November, 1891, with a Supplement,
Containing the Public Local Laws Relating to the City of Baltimore, Passed at the
Session of 1892 of the General Assembly, and also the Ordinances of the Mayor
and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the
Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The
Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace,
entitled or required to carry such weapons as a part of his official equipment, who
shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club,
metal knuckles, razor or any other dangerous or deadly weapon of any kind
whatsoever, (pen knives excepted.) concealed upon or about his person; and every
person who shall carry or wear such weapons openly, with the intent or purpose of
injuring any person, shall, upon a conviction thereof, be fined not more than five
hundred dollars, and be imprisoned not more than six months in jail or in the house
of correction; that this act shall not release or discharge any person or persons
already offending against the general law in such cases made and provided, but any
such person or persons may be proceeded against, prosecuted and punished under
the general law of this State as if this act had not been passed.

## MASSACHUSETTS

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs
And Unlawful Assemblies, chap. 17, § 1.

If any persons to the number of twelve or more, being armed with clubs or other
weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read
riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such
persons, and carry them before a justice of the peace; and if such persons shall be

41

killed or hurt by reason of their resisting . . . officers and their assistants shall be indemnified and held guiltless.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.

All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.

Of Proceedings to Prevent the Commission of Crimes, § 16.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.

Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

42

**JA1259**

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances. 1891
The Board of Park Commissioners of the City of Lynn , by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .
3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell, at 58 (1903)
The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .
3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions, to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

43

Carrying Weapons | Massachusetts | 1927
Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1913 Mich. Pub. Acts 452, An Act Defining the Crime of Felonious Assault and Prescribing Punishment Therefor, § 1.
Whoever shall assault another with a gun, revolver, pistol, knife, iron bar, club, brass knuckles or other dangerous weapon, but without intending to commit the crime of murder, and without intending to inflict great bodily harm less than the crime of murder, shall be deemed guilty of a felonious assault, and upon conviction shall be punished by imprisonment in the State Prison for a term not exceeding

44

**JA1261**

three years or by imprisonment in the county jail for a term not exceeding one year, in the discretion of the court.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1927
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.
It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city

45

to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

46

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, &c, and a Manual for Clerks, Sheriffs and Justices of the Peace Page 676, Image 688 (1840) available at The Making of Modern Law: Primary Sources. 1840 Crimes, Misdemeanors and Criminal Prosecution, § 55. If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper

47

county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.

That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.

Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

48

**JA1265**

Carrying Weapons | Missouri | 1871
Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.
§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.
§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"
§ 1274.
If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.

49

Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half

50

**JA1267**

inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.
If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.
Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one

51

month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.
If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together

with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1890

Ordinances of Omaha, Concealed Weapons, § 10.

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1899

Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.

It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2. Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of
1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The
Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.
§ 35. If any person shall by previous appointment or agreement, fight a duel with a
rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous
weapon, and in doing shall kill his antagonist, or any person or persons, or shall
inflict such wound as that the party or parties injured shall die thereof within one
year thereafter, every such offender shall be deemed guiltily of murder in the first
degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no
homicide ensue or shall challenge another to fight such duel, or shall send or
deliver any verbal or written message reporting or intending to be such challenge,
although no duel ensue, shall be punished by imprisonment in the State prison not
less than two nor more than ten years, and shall be incapable of voting or holding
any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861
to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating
Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law:
Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible |
Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any
dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon
concealed upon his person, shall be deemed guilty of a misdemeanor, and shall,
upon conviction thereof, be fined not less than twenty nor more than two hundred
($200) dollars, or by imprisonment in the county jail not less than thirty days nor
more than six months or by both such fine and imprisonment.

## NEW JERSEY

The Grants, Concessions, And Original Constitutions Of The Province Of New
Jersey Page 289-290 (1881) (1686)
An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by
the inhabitants of this Province, that several persons wearing swords, daggers,
pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by

54

reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

55

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New Jersey | 1871

An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New Jersey | 1871

An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk

56

**JA1273**

or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

57

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.
And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
Manufacturing, Inspection and Sale of Gunpowder and Firearms | New Jersey | 1927
No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or

58

other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

## NEW MEXICO

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.
That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859 N.M. Laws 94, § 1-2.
§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons
Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to
carry concealed weapons on their persons, or any class of pistols whatever, bowie
knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any
other deadly weapon, of whatever class or description that may be, no matter by
what name they may be known or called, under the penalties and punishment
which shall hereinafter be described.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18,
1887, reprinted in Acts of the Legislative Assembly of the Territory of New
Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing
Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all
kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or
any kind or class of pistol or gun; any and all kinds of daggers, bowie knives,
poniards, butcher knives, dirk knives, and all such weapons with which dangerous
cuts can be given, or with which dangerous thrusts can be inflicted, including
sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons
or any other deadly weapons with which dangerous wounds can be inflicted. . . .

## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution,
Including The Charters To The Duke Of York, The Commissions And Instructions
To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler
Assemblies, The Charters Of Albany And New York And The Acts Of The
Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894)
available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority
aforesaid that it shall not be lawful for any slave or slave to have or use any gun,
pistol, sword, club or any other kind of weapon whatsoever, but in the presence or
by the direction of his her or their Master or Mistress, and in their own ground on
Penalty of being whipped for the same at the discretion of the Justice of the Peace
before whom such complaint shall come or upon the view of the said justice not
exceeding twenty lashes on the bare back for every such offense.

60

**JA1277**

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1866

An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.

Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1881

Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.

Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a

61

term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any

62

**JA1279**

instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pistol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under the age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

64

**NORTH CAROLINA**

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.

Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.

Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, §
23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every
bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five
cents: Provided, however, That of said arms, only such shall be taxable, as at some
time within the year have been used, worn or carried about the person of the
owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25,
§ 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified:
. . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or
worn about the person of any one at any time during the year, one dollar and
twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107,
Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, §
1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows:
If any free negro shall wear or carry about his person or keep in his house any shot
gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot,
he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty
dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina
Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or
unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his
person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or
metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of
a misdemeanor, and be fined or imprisoned at the discretion of the court. And if
anyone not being on his own lands, shall have about his person any such deadly
weapon, such possession shall be prima facie evidence of the concealment thereof.
. .

## NORTH DAKOTA

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and
Safety, ch. 40, §§ 7312-13.

66

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be

67

fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Ohio | 1859

An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.

§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec. § 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Ohio | 1880

Offences Against Public Peace, § 6892.

Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## OKLAHOMA

1890 Okla. Laws 495, art. 47

Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

69

**JA1286**

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

70

**JA1287**

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.

It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## OREGON

71

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oregon | 1898

An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.

Carrying Weapons | Oregon | 1917

§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law. Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.

That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one

year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Pennsylvania | 1897

An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.

No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## RHODE ISLAND

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.

No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.

Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893

§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

74

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Rhode Island | 1896
Offences Against Public Policy, §§ 23, 24, 26.

§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws
Carrying Weapons | Rhode Island | 1908

§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the

75

**JA1292**

blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.
§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises.

1923 S.C. Acts 221

If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

**TENNESSEE**

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie
Knives and Arkansas Tooth Picks in this State, ch 137, § 2.
That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife
or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas
toothpick under his clothes, or keep the same concealed about his person, such
person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined
in a sum not less than two hundred dollars, nor more than five hundred dollars, and
shall be imprisoned in the county jail not less than three months and not more than
six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie
Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives,
or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and
upon conviction thereof upon indictment or presentment, shall be fined in a sum
not less than one hundred dollars, nor more than five hundred dollars, and shall be
imprisoned in the county jail for a period not less than one month nor more than
six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie
Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife,
Arkansas tooth pick, or any knife or weapon that shall in form, shape or size
resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another
person with such knife or weapon, whether death ensues or not, such person so
stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be
confined in the jail and penitentiary house of this state, for a period of time not less
than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of
Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code
of Tennessee, With Notes and References, Including Acts of Session of 1870-1871
Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law:
Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk,
Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for
hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall

78

be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.

Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.

It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be

79

fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources. 1869 Elections.
§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.
§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas: Williamson S. Oldham & George W. White, comp., 1859)

Texas, Chapter 3, Act of August 28, 1856

Art. 493. If any person shall assault another with intent to murder, he shall be punished by confinement in the Penitentiary, not less than two years, nor more than seven years. If the assault be made with a bowie-knife, or dagger, the punishment shall be doubled. Page 520

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538&q1=bowie%20knife

Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly. [emphasis in original] Page 534

81

Article 611. A "bowie-knife" or "dagger," as the terms are here and elsewhere used, means any knife intended to be worn on the person, which is capable of inflicting death, and not commonly known as a pocket knife. Page 534
https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552&q1=bowie%20knife

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons.
§ 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; provided, that this section shall not be so contrued as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.
§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).

Art. 163.

If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)

Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.

Brandishing | Texas | 1899

Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.

If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

## UTAH

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14.

Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).

84

§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[1]

## VERMONT

No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892.
Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.
Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.
Approved November 19, 1892.
https://www.google.com/books/edition/Acts_and_Laws_Passed_by_the_Legislatur e/DXFOAQAAIAAJ?hl=en&gbpv=1&dq=Vermont+%22while+a+member+of+an d+in+attendance+upon+any+school,%22++%22any+firearms,+dirk+knife,+bowie +knife,+dagger+or+other+dangerous+or+deadly+weapon%22%C2%A0&pg=PA9 5&printsec=frontcover

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any

---

[1] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

weapon concealed on his person without permission of the mayor or chief of police in writing.[2]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

**JA1303**

## VIRGINIA

1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays.
Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | Virginia | 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.
§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.
§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

87

**JA1304**

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap.
101, at 76; 1838.
Be it enacted by the general assembly, That if any person shall hereafter habitually
or generally keep or carry about his person any pistol, dirk, bowie knife, or any
other weapon of the like kind, from this use of which the death of any person might
probably ensue, and the same be hidden or concealed from common observation,
and he be thereof convicted, he shall for every such offense forfeit and pay the sum
of not less than fifty dollars nor more than five hundred dollars, or be imprisoned
in the common jail for a term not less than one month nor more than six months,
and in each instance at the discretion of the jury; and a moiety of the penalty
recovered in any prosecution under this act, shall be given to any person who may
voluntarily institute the same.

1847 Va. Laws 127, c. 14, § 16.
If any person shall go armed with any offensive or dangerous weapon without
reasonable cause to fear an assault or other injury, or violence to his person, or to
his family or property, he may be required to find sureties for keeping the peace for
a term not exceeding twelve months, with the right of appealing as before
provided.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia
Page 87, Image 107 (1892) available at The Making of Modern Law: Primary
Sources, 1867.
Ordinances of The Town of Lexington, VA, Of Concealed Weapons and
Cigarettes, § 1. If any person carrying about his person, hid from common
observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the
like kind, he shall be fined not less than twenty dollars nor more than one hundred
dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing
in this section shall apply to any officer of the town, county or state while in the
discharge of his duty.

The Code of Virginia: With the Declaration of Independence and the Constitution
of the United States; and the Constitution of Virginia Page 897, Image 913 (1887)
available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Virginia | 1887
Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished.
Forfeiture and Sale of Weapons. If any person carry about his person, hid from
common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any
weapon of the like kind, he shall be fined not less than twenty nor more than one
hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any

88

weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

## WASHINGTON

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

89

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956, Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or

90

any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1896
Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.
If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1897
Carrying Concealed Weapons, § 7084.
If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

91

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

92

**JA1309**

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

93

**JA1310**

## WISCONSIN

1858 Wis. Rev. Stat. 985, Of Proceedings to Prevent the Commission of Crime, ch. 175, § 18.
If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons.
SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.
To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

94

Charter and Ordinances of the City of Superior; Also Harbor Act, Municipal Court Act, Rules of the Common Council and Board of Education Page 390, Image 481 (1896) available at The Making of Modern Law: Primary Sources. 1896 Ordinances of the City of Superior, Carrying Concealed Weapons, § 18. It shall be unlawful for any person, other than a policeman or other officer authorized to maintain the peace or to serve process, to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger or any other dangerous weapon within the limits of the City of Superior, and any person convicted of a violation of this section shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars.

## __WYOMING__

1876 Wyo. Comp. Laws 352, An Act to Prevent the Carrying of Fire Arms and Other Deadly Weapons, ch. 52, § 1-3.
§ 1. That hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said territory, but a sojourner therein, to bear upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village. § 2. That if any person not a resident of any town, city or village of Wyoming Territory, shall, after being notified of the existence of the last preceding section by a proper peace officer, continue to carry or bear upon his person any fire arm or other deadly weapon, he or she, shall be deemed to be guilty of a violation of the provisions of said section and shall be punished accordingly. § 3. Any person violating any of the provisions of this act shall be deemed guilty of misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five dollars nor more than fifty dollars, and, in the default of the payment of any fine which may be assessed against him, shall be imprisoned in the county jail for not less than five days nor more than twenty days.

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

95

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.

If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Wyoming | 1893

Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.

It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT F

EXHIBIT F

TRAP GUN RESTRICTIONS[1]

**MARYLAND:**

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .

**MICHIGAN:**

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

---

[1] Further research may yield additional laws regulating trap guns.

**MINNESOTA:**

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

**MISSOURI:**

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891: "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[2]

---

[2] See https://bit.ly/3CtZsfk.

**NEW HAMPSHIRE:**

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

**NEW JERSEY:**

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

**NEW YORK:**

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870: "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . . A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

person, the jury censured Agostino.  He will not be released, however, but will be held under $2,000 bail."[3]

## NORTH DAKOTA:

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

## OREGON:

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

---

[3] See https://bit.ly/3yUSGNF.

4

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.


**RHODE ISLAND:**

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

**SOUTH CAROLINA:**

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

5

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

## SOUTH DAKOTA:

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

## UTAH:

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or

property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3. Dangerous or Unusual Weapons | Utah | 1901

§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.

§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.

§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

**VERMONT:**

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884
A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his

7

**JA1321**

personal representative may have the action, as provided in sections two thousand
one hundred and thirty-eight and two thousand one hundred and thirty-nine of the
Revised Laws.

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a
spring gun or other device the object of which is to discharge a firearm shall be
fined not more than five hundred dollars nor less than fifty dollars, and shall also
be liable for twice the amount of the damage caused by his act to be recovered by
the person sustaining the injury or loss, in an action on this section.


## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the
Rights and Custody of Persons Accused or Convicted of Crime, and Repealing
Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring
pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury
result therefrom to any human being, by imprisonment in the county jail for not
more than one year or by a fine of not more than one thousand dollars, or by both.
2. If injuries not fatal result therefrom to any human being, by imprisonment in the
state penitentiary for not more than twenty years. 3. If the death of a human being
results therefrom, by imprisonment in the state penitentiary for not more than
twenty years.

8

**WISCONSIN:**

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Wisconsin | 1872

Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1.
Hunting | Wisconsin | 1921

(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

9

# EXHIBIT G

The Buffalo Commercial (Buffalo, New York) · Tue, Nov 1, 1870 · Page 4
https://www.newspapers.com/image/264632378
Downloaded on Aug 8, 2022

gentleman will now be brought to a summary conclusion.

# THE MAN TRAP.

### Inquest on the Body of Tweedle, the Burglar, Blown to Pieces by a Gun-Trap.

*From the N. Y. Standard, Oct. 29th.*

Coroner FLYNN and the jury previously impanelled yesterday morning concluded the inquest on the body of GEORGE TWEEDLE, the burglar, who was shot by the trap-gun in the shop of JOSEPH J. AGOSTINO, at No. 301 East Twenty-third street, on Wednesday morning.

AGOSTINO and many of his friends were present, and some few of the intimates of the deceased also looked on with interest. The first and only witness examined was Officer OLIVER WINSHIP, of the Eighteenth Precinct. He testified that early that morning, before seven o'clock, he was informed that the body of a man was lying in the back-yard of AGOSTINO's gun-shop. He went there and found the body as described. The hat, shown to the jury, he identified as the one found lying beside the body, having evidently been worn by the burglar. It was a round black felt hat, and its tattered and riddled appearance showed how terrible must have been the charge in the weapon. It was filled with little holes made by small shot, and the whole top had been blown open. The chisel and piece of stick were also shown. The officer found a hole in one of the shutters of the rear window, which looked as if an attempt had been made to pry it open. A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow.

Nothing further was elicited from this witness, and the case was here rested, there being no more testimony. The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by JOSEPH D. AGOSTINO. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured AGOSTINO. He will not be released, however, but will be held under $2,000 bail.

HOW JUDGE DOWLING CATCH

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers
by ancestry
https://www.newspapers.com/image/513456592

The South Bend Tribune (South Bend, Indiana) · Wed, Feb 11, 1891 · Page 3

Downloaded on Aug 8, 2022

### Shot by a Trap-Gun.

CHILLICOTHE, Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

Copyright © 2022 Newspapers. All Rights Reserved.

POWERED BY
Newspapers™

EXHIBIT H

EXHIBIT H: BOWIE KNIFE LAWS BY TYPE#

| STATE | No Concealed Carry | No Carry | Greater Criminal Penalty | Tax/Punish for Sale | Tax Owner-ship | No Sale to Barred Groups* | No brandish |
|---|---|---|---|---|---|---|---|
| Alabama | 1839,1841 1876,1879 | | 1837 | 1837,1897 | 1837,1867 | 1876 | |
| Alaska | | | | | | | |
| Arizona | 1893,1901 | 1889 | | | | | |
| Arkansas | 1875 | 1881 | 1871 | 1881 | | | |
| California | 1896 | | | | | 1896 | 1855,1858 |
| Colorado | 1862,1877 | 1881 | | | | | |
| Connecticut | | | | | | | |
| Delaware | | | | | | | |
| District of Columbia | 1871 | | | | | | |
| Florida | | | | 1838a | | | |
| Georgia | 1837***,1873 | 1852,1913 | | 1837*** | | 1860 | |
| Hawaii | | | | | | | |
| Idaho | 1909 | 1879 | | | | | |
| Illinois | 1876,1881 1883 | | | | | 1881 | |
| Indiana | | 1859 | | | | | |
| Iowa | 1882,1887 1900 | | | | | | |
| Kansas | 1862,1863 1887 | | | | | 1883 | |
| Kentucky | 1855 | | | | | 1859 | |
| Louisiana | | 1870 | | | | | |
| Maine | | | | | | | |
| Maryland | 1872,1884 1886,1890 | | | | | | |
| Massachusetts | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Michigan | 1891 | | | | | | |
| Minnesota | 1884 | | | | | | |
| Mississippi | 1878,1896^ | | 1837,1838 | | 1841** | | 1840 |
| Missouri | 1871,1883 1890,1897 | 1917,1923 | | | | | |
| Montana | 1864 | | 1879 | | | | |
| Nebraska | 1890,1899 | 1872 | | | | | |
| Nevada | | | 1873 | | | | |
| New Hampshire | | | | | | | |
| New Jersey | | | | | | | |
| New Mexico | 1859,1887 | | | | | | |
| New York | | 1885 | | | | | |
| North Carolina | 1879 | | | | 1856,1858 | 1846b | |
| North Dakota | | | | | | | |
| Ohio | 1859,1880 | | | | | | |
| Oklahoma | 1890,1903 | 1890,1891 | | | | | |
| Oregon | 1897 | | | | | | |
| Pennsylvania | 1893,1896 1908 | | | | | | |
| Rhode Island | | | | | | | |
| South Carolina | | | | | | 1923 | |
| South Dakota | | | | | | | |
| Tennessee | 1838,1863 1867 | 1869,1881 1893 | 1838,1856 | 1838,1867 | | 1856,1867 | |
| Texas | 1871 | | 1856 | | | 1897 | |
| Utah | 1877 | | | | | | |
| Vermont | | | | | | | |
| Virginia | 1838,1867, 1887 | | 1838 | | | | |
| Washington | | | | | | | 1854,1859 1869 |
| West Virginia | 1870 | 1882,1891 | | | | | |

| | 1883 | 1925 | | | 1884 |
|---|---|---|---|---|---|
| Wisconsin | 1883 | | | | |
| Wyoming | | | | | 1884 |

Source: https://firearmslaw.duke.edu/repository/search-the-repository/ unless otherwise noted.

*Barred groups included Native Americans/Indians, African Americans/Enslaved, minors.

#Table excludes laws that punish carry/use of "knives" or "sharp or dangerous weapons" but do not mention Bowie knives by name.

** 1841 Miss. Chap. 1, p. 52. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

^ 1896 Miss. L. chap. 104, pp. 109-10. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

***https://dlg.galileo.usg.edu/georgiabooks/pdfs/gb0439.pdf, pp. 210-211.

a 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838). See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

b 1846 N.C. L. chap. 42. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

EXHIBIT I



# Higher TEC.

At two-thirds the weight (and price) of an Uzi, the TEC-9 series clearly stands out among high capacity 9mm assault-type pistols.

Ounce for ounce they deliver more gutsy performance and reliability than any other gun on the market.

TEC-9's are built tough for rugged weather and terrain. And they're built comfortable with an ergonomically designed grip and frame. 36 rounds of firepower make them ideal for self-defense or recreation. Simple, two-step disassembly for easy cleaning makes them convenient.

In Standard or Mini version, blued or stainless steel, the TEC-9's

offer rugged, reliable, affordable technology.

Higher TEC.

See the TEC-9 Series at your dealer today.

*"... (Intratec) makes a gun that doesn't cost an arm and a leg, yet functions with impeccable reliability."*
*—Jerry Ahern,*
*Petersen's Handguns*



Ask about our hot new TEC-22 Scorpion.



12405 S.W. 130th St.
Miami, Florida 33186



EXHIBIT J



# The XM-10 (AR-10)
## Semi Automatic .308
## (7.62 NATO) Rifle

*This Famous Assault Rifle is Now Available in
a Semi Auto. Civilian Legal Form!*

The XM-10 incorporates the excellent design features of the AR-10/AR-15/M16 rifles with the high energy and long effective range of the 7.62 NATO round.

**FEATURES:**

- Gas Operated, Semi-Automatic Brown fiberglass grip, stock, forend.

- Integral grenade launcher Threaded for Blank - Fire attachment 20 Rd. magazine.

- Spring loaded dust cover

- Quickpin, hinged breakdown design

- Length-overall 41"

- Weight w/empty Mag 9½ Pds.

- Barrel length 21 3/8"

- Sight adjustment 100-500 M.

'Straight-Back' recoil design allows for minimal muzzle climb. This means your sights come back on target faster than any other 308 assault rifle, making a faster second shot.

No 'close-tolerance' dirt stoppage problems that have plagued the .223 AR-15 rifle. The XM-10 functions perfectly under adverse conditions.

'Natural Feel' and simple, practical design of the famous AR-15 allows for easy field stripping and cleaning.



The Semi-Auto XM-10 has a new manufacture lower receiver made from Aircraft grade aluminum. Thus weight is kept to a minimum without sacrificing strength, and allows an exact copy of the original. All other parts are original AR-10, made by Artillerie-Inrichtingen in Holland. Condition excellent. All external metal parts are refinished to match the original appearance. We can arrange for a manufacturer to convert an XM-10 to non-restricted full auto for qualified buyers. Supply is very limited - this rifle is destined to become an excellent investment.

**RPLUS AMMUNITION!** We also distribute
l line of military surplus ammunition at reason-
e prices. A variety of assault rifles, magazines,
accessories are available. Our stock changes
dly. Send $3.00 (refundable on purchase) for an
rmative assault rifle brochure and complete
e list.



**SALES & SERVICES INC.**
P.O. Box 2022•Joliet, IL 60434•(815) 725-9212

**JA1334**

# Exhibit 5

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
|     Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
|     Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
|     Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## DECLARATION OF RANDOLPH ROTH

    I, RANDOLPH ROTH, hereby depose and state:

1.    I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

**JA1337**

2.      I have attached a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.


I declare under penalty of perjury on this _____ day of October, 2023, that the foregoing is true and correct.


_____
RANDOLPH ROTH

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br>     Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br>     Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br>     Defendants. | Civil Action No. 3:22-cv-04397 |

---

## Expert Report of Randolph Roth

---

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1.      I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University. I have personal knowledge of the facts set forth in this report, and if called upon as a witness, I could and would testify competently as to those facts.

2.      I have been retained by the Town of Superior, Colorado; the City of Louisville, Colorado; the City of Boulder, Colorado; and the Board of County Commissioners of Boulder County, Colorado, to render expert opinions in this case. I am being compensated at a rate of $250 per hour.

## BACKGROUND AND QUALIFICATIONS

3.      I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History. I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history. I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this report.

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which is an interregional, internationally comparative study of homicide in the United States from colonial times to the present. The book received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to

research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial

Book Award from the Social Science History Association for outstanding books in social science

history.[2] *American Homicide* was also named one of the Outstanding Academic Books of 2010

by *Choice*, and the outstanding book of 2009 by *reason.com*.

5.        I am a Fellow of the American Association for the Advancement of Science, and I

have served as a member of the National Academy of Sciences Roundtable on Crime Trends,

2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most

influential journal in the discipline. And in 2022 I received the inaugural Distinguished Scholar

Award from the Historical Criminology Division of the American Society of Criminology.

6.        I am the principal investigator on the National Homicide Data Improvement

Project ("NHDIP"), a project funded by the National Science Foundation,[3] and the Harry Frank

Guggenheim Foundation to improve the quality of homicide data in the United States from 1959

to the present. I have begun the NHDIP with a pilot project in Ohio, which has drawn on a wide

range of sources in its effort to create a comprehensive database on homicides (including

narratives of each incident) based on the mortality statistics of the Ohio Department of Health,

the confidential compressed mortality files of the National Center for Health Statistics, the

F.B.I.'s Supplementary Homicide Reports, death certificates, coroner's reports, the homicide

case files of Cincinnati, Cleveland, and Columbus, obituaries, and newspaper accounts.

---

[1] *See* American Society of Criminology, Michel J. Hindelang outstanding Book Award
Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2] *See* Social Science History Association, Allan Sharlin Memorial Book Award,
https://ssha.org/awards/sharlin_award/.

[3] *See* National Sciences Foundation, Award Abstract 1228406,
https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406.

(continued...)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)
JA1341

7.      I have published numerous essays on the history of violence and the use of firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240;[4] b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708;[5] c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021).[6]

8.      I am also co-founder and co-director of the Historical Violence Database.[7] The historical data on which this report draws are available through the Historical Violence Database.

9.      The Historical Violence Database is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."[8] It is a collaborative project by scholars in the United States, Canada, and

---

[4] Available at https://www.jstor.org/stable/3491655#metadata_info_tab_contents.

[5] Available at https://www.jstor.org/stable/40267796#metadata_info_tab_contents.

[6] Available at https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States.

[7] The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.

[8] *Historical Methods* (2008) 41: 81-98, available at https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

JA1342

Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present. The only way to obtain reliable historical homicide estimates is to review every scrap of paper on criminal matters in every courthouse (indictments, docket books, case files, and judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article in every issue of a number of local newspapers, every entry in the vital records, and every local history based on lost sources, local tradition, or oral testimony. That is why it takes months to study a single rural county, and years to study a single city.[9]

     10.    My work on data collection and my research for *American Homicide*, together with the research I have conducted for related essays, has helped me gain expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence.

---

98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU.

[9] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides that appear in the surviving records by looking at the degree to which homicides reported in the surviving legal sources overlap with homicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on contested frontiers and during civil wars and revolutions, means a lower percentage and a wider confidence interval. *See* Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates" (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147 (https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M. Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

JA1343

11.     The insights that my colleagues and I have gained as social science historians into the causes of violence and the history of violence in the United States stem from our commitment to empiricism.   Our goal is to gather accurate data on the character and incidence of violent crimes and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be true proved false. As my colleagues and I are fond of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right.   That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

12.     I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Rupp v. Bonta*, 8:17-cv-00746-JLS-JDE (C.D. Cal.); *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.); *Hanson v. District of Columbia*, No. 1:22-cv-02256-RC (D.D.C.); *State of Vermont v. Max B. Misch*, No. 173-2-19 Bnrc (Vt. Sup. Ct., Criminal Division, Bennington Unit); *National Association for Gun Rights v. Campbell*, No. 22-cv-11431-FDS (D. Mass.); *National Association for Gun Rights v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.); *Oregon Firearms Federation, et al. v. Brown*, No. 2:22-cv-01815-IM (D. Or.); *National Association for Gun Rights v. Lopez*, No. 22-cv-00404-DKW-RT (D. Haw.); *National Association for Gun Rights v. Lamont*, No. 3:22-cv-01118 (D. Conn.); *Harrell v. Raoul*, 23-141-SPM (S.D. Ill.); and *Rocky Mountain Gun Owners v. Town of Superior*, No 22-cv-2680 (D. Colo.).

5

## OPINIONS

### I.  SUMMARY OF OPINIONS

13.     I have been asked by the State of New Jersey to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technological change has played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

14.     For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal society, as it remains today. I have discovered that high homicide rates among unrelated adults—friends, acquaintances, strangers—coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[10] As I have argued in my scholarship, we are still feeling the aftershocks of our failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and

---

[10] *See* Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217, available at https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dkP_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwiRWPEom7M, for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building.  My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present.  In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random.  They reveal deep patterns that are causal.

1850s through the Civil War, Reconstruction, and the rise of Jim Crow laws. But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.

15.    My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder. It is my conclusion, based on my analysis of developments in weaponry and related technologies

from before the Revolution to the present, that throughout our nation's history public officials have enacted a variety of restrictions and regulations on firearms use and possession to address and mitigate the risks firearms have posed to public safety.

## II.    GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A.    Homicide and Firearms in the Colonial Era (1688-1763)

16.    In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[11]

17.    But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[12] By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[13] Violence among colonists was not a pressing problem on the eve of the Revolution.

---

[11] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[12] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together. The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[13] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91. By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to
(continued…)

18.     Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread. Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[14] Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[15] In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per million for African Americans for the seventeenth and most of the eighteenth century, and the rate fell to 1 per million for both European and African Americans after the Revolution. The rates in the Chesapeake region were likewise low, at 8 per million per year for European Americans and 4 to 5 per million for African Americans.[16] Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.[17] The homicide rate among unrelated adults was also low,

---

that in the colonial era—was 7 per 100,000 per year. *See* CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[14] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[15] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

[16] Roth, "Why Guns Are and Aren't the Problem," 116.

[17] Ibid., 117-118.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

as was the proportion of nondomestic homicides committed with guns—approximately 10 to 15 percent.[18]

19.    Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[19] They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[20] They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[21] And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[22] It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[23] The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[24] The firing mechanism also had to be readied, often with a

---

[18] Ibid., 116-119.

[19] Ibid., 117.

[20] Ibid.

[21] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

[23] Ibid.

[24] Ibid.

(continued…)

fresh flint.[25]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[26]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[27]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[28]

20.     The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[29]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[30]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[31]

21.     When colonists anticipated violence, or during times of political instability, gun use was more common.  When homicide rates were high among unrelated adults in the early and

---

[25] Ibid.

[26] Ibid.

[27] Ibid.

[28] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[29] Roth, "Why Guns Are and Aren't the Problem," 117.

[30] Ibid.

[31] Ibid.  Contrary to popular belief, dueling was also rare in colonial America.  Roth, *American Homicide*, 45, 158.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

mid-seventeenth century, colonists went armed to political or interpersonal disputes,[32] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[33] Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[34] And slave catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were killed in Virginia were shot.[35] Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[36] That is why firearms had a modest impact on homicide rates among colonists.

### B.     The Rise in Violence in the South and on Contested Frontiers During the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)

22.     The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.   At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[37]   The threats that such citizens posed to public safety

---

[32] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[33] Ibid., 116-117.

[34] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[35] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[36] Ibid., 118-119.

[37] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, *see* Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70,

(continued…)

could be checked in most instances by ordinary criminal statutes, drawn largely from British

common law. But at times those threats could be checked only by statutes that placed limits on

basic rights.[38]

23.    The Founders were aware that the rate at which civilians killed each other or were

killed by roving bands of Tories or Patriots rose during the Revolution.[39]    They also recognized

---

282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[38] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." *See also* Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[39] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia:*

(continued…)

13

that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England during the Revolutionary period.[40]

24.    But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over. In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century. By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year.[41] And the proportion of domestic and nondomestic homicides committed with firearms was similarly low—between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[42]

---

*The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[40] Roth, "Why Guns Are and Aren't the Problem," 119-120.

[41] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[42] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf). On weapons use in homicides in the North, see Figures 25 through 46.

(continued…)

25.     Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[43] And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread. By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[44] African Americans still faced discrimination and limits on their basic rights in most Northern states. But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[45]

26.     Because gun use was generally limited to hunting, controlling vermin, or serving in the militia, there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels. They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed for the nation's democratic polity and the lives of public men: editors, attorneys, military officers, and politicians.[46]

---

[43] Roth, *American Homicide*, 180, 183-186.

[44] Ibid., 180, 183-186.

[45] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[46] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

(continued…)

27.    Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[47] where violence among citizens increased after the Revolution to extremely high levels. Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[48] Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.[49] Prominent whites were subjected to the rough and tumble of partisan politics and their position in society was threatened by people from lower social positions.[50] African Americans despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of African American rebellion.[51] As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[52] The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in the early national period.[53] During the Early National period, the proportion of homicides

---

[47] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[48] Roth, *American Homicide*, 180, 199-203.

[49] Ibid., 182.

[50] Ibid.

[51] Ibid.

[52] Ibid., 182, 199-203.

[53] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[54]

28.    Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming proportion of the era's murders and serious assaults.[55] They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[56]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[57] These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates. Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

---

[54] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[55] Roth, *American Homicide*, 218.

[56] Ibid., 218-219. See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[57] Roth, *American Homicide*, 219.

29.     The pistols of the early national period represented a technological advance. Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber. Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[58] The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting. Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[59]

30.     The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838. These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.

31.     Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive. It made it unlawful for merchants

---

[58] Roth, "Why Guns Are and Aren't the Problem," 117.

[59] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

> and any other person or persons whatsoever, to sell, or offer to sell,
> or to keep, or have about their person or elsewhere . . . Bowie, or
> any other kind of knives, manufactured or sold for the purpose of
> wearing, or carrying the same as arms of offence or defence,
> pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers. But the laws in the other five states were also strict: they forbade the carrying of concealable weapons in all circumstances. Indiana made an exemption for travelers.[60]

32.    Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[61]

---

[60] *See* Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols; *see also* Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[61] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*,

(continued...)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

### C.    Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

33.    By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[62]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.

34.    Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[63]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Rates that had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities.  In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana to 90 per

---

revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[62] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.  These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont.  However, Vermont also had such a law by the early twentieth century.  *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

[63] Roth, *American Homicide*, 297-300.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

JA1359

100,000, and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. In the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers. And so, the United States became—and remains today—by far the most murderous affluent society in the world.[64]

35.     The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[65] Because the pistols, muskets, fowling pieces, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[66] Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons. But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

36.     Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their

---

[64] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[65] Roth, "Why Guns Are and Aren't the Problem," 116-117.

[66] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

(continued…)

association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[67] They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time. Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever. Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun. But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[68]

37.    Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway. It had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[69] And it did not require a new percussion cap for each chamber, because the primer

---

[67] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

[68] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshalltown, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[69] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

(continued…)

was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the

hammer.[70]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and
> ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod,
> powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;
>
> That no injury is caused to the arm or ammunition by allowing it to
> remain charged any length of time.[71]

38.    Smith and Wesson had created a near-perfect murder weapon.  It was lethal,

reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[72]  Its

only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop

an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.

The reloading problem was remedied by Colt's development in 1889 of the first double-action

commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an

ejector to push out spent cartridges.[73]

39.    These new weapons were not the primary cause of the surge in violence that

occurred in the United States from the Mexican War through Reconstruction.  But they did

contribute to the later stages of the crisis, as they superseded knives and black powder handguns

---

[70] Ibid., 38-57.

[71] Ibid., 39.

[72] Ibid., 38-57.

[73] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati:  F+W Media, 2011), 96;
Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO,
2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

(continued…)

as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[74] Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[75]

40.    As modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.  By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states.[76]  In the West, rates had fallen to 12 per 100,000 adults per year in California,  15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.  Homicide rates whipsawed, however, in the South.  They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.[77]  Ominously,  too, firearms invaded families and

---

[74] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*." (emphasis added)).

[75] Ibid., 124-125.

[76] In this analysis, the Prairie states include Iowa, Kansas, Minnesota, Nebraska, North Dakota, South Dakota, and Wisconsin.  The industrial states include Illinois, Indiana, Michigan, New Jersey, New York, Ohio, and Pennsylvania.

[77] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.

(continued…)

intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as

unrelated adults—something that had never happened before in America's history.[78]  That is why

the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—

reached today's levels by the 1920s, ranging from a median of 56 percent in New England to

over 70 percent in the South and West.[79]  And that is why every state in the Union restricted the

right to carrying certain concealable weapons, including restrictions on the modern revolvers that

had been invented in the mid- and late-nineteenth century, such as the Smith and Wesson Model

1 revolver and the Colt double-action revolver.[80]

     41.     It is important to note that state legislators experimented with various degrees of

firearm regulation as the nation became more and more violent.  In Texas, where the homicide

rate soared to at least 76 per 100,000 adults per year from June 1865 to June 1868,[81] the

legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed

carry of a wide range of weapons, including firearms, on social occasions;[82] and it followed in

---

[78] Ibid., 125.

[79] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[80] *See supra* paragraph 33 & note 62.

[81] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West,"
*Western Historical Quarterly* 42 (2011): 192, available
at https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents.

[82] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case
Study," *UC Davis Law Review* 55 (2021): 2609-2610, available
at https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf. "Be it enacted by
the Legislature of the State of Texas, That if any person shall go into any church or religious
assembly, any school room or other place where persons are assembled for educational, literary
or scientific purposes, or into a ball room, social party or other social gathering composed of
ladies and gentlemen, or to any election precinct on the day or days of any election, where any
portion of the people of this State are collected to vote at any election, or to any other place
where people may be assembled to muster or perform any other public duty, or any other public
assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms,
whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be
(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

**JA1364**

1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[83] These laws

---

deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63; *see also* Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019), available at https://repository.tcu.edu/handle/116099117/26778.

[83] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611. Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25. The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[84]

42.     Tennessee and Arkansas went further than Texas to stem the tide of post-Civil War interpersonal violence. In 1871, Tennessee flatly prohibited the carrying of pocket pistols and revolvers, openly or concealed, except for the large army and navy pistols commonly carried by members of the military, which could be carried openly, but not concealed.[85] Arkansas

---

shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3." The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces. Also, the deadly weapon law did not apply to all guns or firearms but just pistols. The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'" *See also* Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163, available at https://repository.tcu.edu/handle/116099117/26778.

[84] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620. The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication. *See also* Rivas, "Deadly Weapon Laws of Texas," 164-195.

[85] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

followed suit in 1881.[86]  Tennessee's law withstood a court challenge, and Arkansas's was never

challenged.[87]

43.    Both Tennessee and Arkansas also moved to prevent the sale or transfer of pocket

pistols or ordinary revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell,

or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or

pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[88]  Arkansas

passed a similar prohibition in 1881, but went even further by prohibiting the sale of pistol

cartridges as well: "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in

any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass

or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of

the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any

person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[89]

---

[86] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[87] *See* Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), available at https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[88] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[89] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

(continued...)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

JA1367

44.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[90] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons. A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[91]

45.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves. And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[92] A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances

---

[90] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[91] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851.

[92] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

JA1368

that they enforced.[93]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[94]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[95]

46.    Other states, like Ohio, tried to have it both ways. The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety. But it directed jurors, in the same law, to acquit persons who carried such weapons

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[96]

The burden of proof remained with the person who carried the concealed weapon.

It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement. The varying policy choices illustrate that as jurisdictions debated the appropriate response to violence in the late nineteenth and early twentieth century, restrictions of particular weapons were some of the policy options available to

---

[93] Ibid., 11.

[94] Ibid., 11-13.

[95] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[96] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

lawmakers, even if they opted not to use them.

### III.  ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

47.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies which, unlike those of today, did not enable single individuals to commit mass murder.[97]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans, irregular warfare among citizens seeking political power, or public demonstrations that turned deadly, like the Boston Massacre, in which seven soldiers opened fire on a crowd of roughly fifty men and boys, killing five and wounding six.[98]

---

[97] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).  On the Boston Massacre, see Alan Taylor, *American Revolutions: A Continental History, 1750-1804* (New York: W. W. Norton, 2016), 109-110; Eric Hinderaker, *Boston's Massacre* (Cambridge: The Belknap Press of Harvard University Press, 2017); Bernard Bailyn, *The Ordeal of Thomas Hutchinson* (Cambridge: Belknap Press of Harvard University Press, 1974), 156-163; and Alfred F. Young, *The Shoemaker and the Tea Party: Memory and the American Revolution* (Boston: Beacon Press, 1999), 36-41.

[98] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish, as described in Roth, *American Homicide*, 42; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio, as described in Rob Harper, "Looking the

(continued...)

48.    Examples of mass killings carried out by groups include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871. Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent. Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[99]

---

Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644, available at https://www.jstor.org/stable/25096733#metadata_info_tab_contents. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War, as described in Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54, and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham, as described in J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

[99] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

49.    The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments. The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[100] But when federal troops were withdrawn, white supremacist mass killings resumed. In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[101] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes. Rioters and vigilantes remained a threat well into the twentieth century. In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[102]

---

[100] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

[101] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158. *See also* LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[102] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

## IV. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT

50.     The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time. These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers, which led public officials to implement a variety of restrictions to aid law enforcement and safeguard the citizenry.

51.     The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

52.     The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare. The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[103]

53.     Criminals and terrorists quickly discovered how accessible and useful these new technologies were. They could be purchased legally by private citizens.

---

[103] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

(continued…)

54.     In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[104]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.  Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), and was favored by labor activists and anarchists.[105]

55.     Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day Massacre and the Kansas City Massacre.[106]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an

---

[104] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022.  The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[105] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  *See* U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012*, available at https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download, accessed October 4, 2022.

[106] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

(continued...)

35

attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and

businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A.

Mitchell Palmer and his family.[107]   Dynamite was also used effectively for malicious, private

ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to

gain their headrights and profit from insurance policies on them.[108]

56.     Because of the threats these new technologies posed for public safety, public

officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen

states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms

between 1927 and 1934,[109] and Congress passed the National Firearms Acts of 1934 and 1938,

which restricted ownership of machine guns and submachine guns (known today as automatic

weapons) because of their ability to fire rapidly from large-capacity magazines.[110]   The

Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives,

building upon regulations that began in 1917 with the passage of the Federal Explosives Act,

---

[107] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[108] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[109] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238, https://scholarship.law.duke.edu/lcp/vol83/iss3/13.   In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[110] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[111]

57.     Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder. The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder. The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[112] And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks. It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[113]

58.     In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines. These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed

---

[111] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[112] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J). The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007. Accessed August 31, 2022.

[113] See Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, New York Times, December 18, 2018, available at https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html, accessed October 4, 2022.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

for military use during the Cold War, beginning with the Soviet AK-47 assault rifle, which was invented in 1947, adopted by the Soviet Army in 1949, and used in the 1950s by the Soviets or their allies during the Hungarian Revolution, the Vietnam War, and the Laotian Civil War.[114] The signature military firearm of that era—the M-16 rifle with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[115]—was capable of firing 750 to 900 rounds per minute when set on fully automatic.[116] But the M-16 was used more often in combat—and more accurately, effectively, and sustainably as a weapon for inflicting mass casualties—when set on semiautomatic, which was standard military procedure. That is why the U.S. Army defines "rapid fire" as 45 rounds per minute (the rate of fire of an M-16 when set on semiautomatic), not 750 to 900.[117] And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst (but otherwise the same weapon as the M-16)—an alteration that slows the potential rate of fire, conserves ammunition, and improves accuracy.[118] The civilian version of the M-16—the ArmaLite AR-15—has

---

[114] Edward and Ezell, *The AK-47 Story: Evolution of the Kalashnikov Weapons* (Harrisburg, Pennsylvania: Stackpole Books, 1986).

[115] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[116] Edward Ezell, *The Great Rifle Controversy: Search for the Ultimate Infantry Weapon from World War II through Vietnam and Beyond* (Harrisburg, Pennsylvania: Stackpole Books, 1984).

[117] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016), https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf, accessed October 4, 2022.

[118] *See* military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

(continued…)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

approximately the same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute.[119]

59.    The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second. But technological advances have increased the speed at which semiautomatic handguns can be fired. An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[120] And they are affordable. A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[121]

60.    It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that arrived on the domestic market in the 1970s and 1980s. These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff, which is why many police and sheriff departments across the United States have purchased semiautomatic rifles and armored vehicles to defend themselves and decrease the likelihood that officers are killed or wounded.[122]

---

[119] Ezell, *The Great Rifle Controversy, 177-192*.

[120] *See* Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

[121] *See* guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

[122] Sam Bieler, "Police Militarization in the USA: The State of the Field," Policing: An International Journal 39 (2016): 586-600, available at https://www.emerald.com/insight/content/doi/10.1108/PIJPSM-03-2016-0042/full/pdf?casa_token=TYUuIouUCc8AAAAA:IWXQRQOtW90KZ2AKwzHNMX2tfRix0zAxRRkjQSy3rA-uUpnylZrnp0Xolhj7UFIf05WGZkr_92L__QGk_OAxnSH-3h26oxKC4e7vM79VCBpFl9_cHg.

(continued...)

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

**JA1378**

61.     Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further. Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles. And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[123]

62.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms. The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15. The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil. The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[124]

---

[123] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022, available at https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download, accessed October 4, 2022. The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement. Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida. See James Gangler, *Are Binary Triggers Legal (2023) All You Need to Know*, Lunde Studio, available at https://lundestudio.com/are-binary-triggers-legal/, accessed October 4, 2022; *see also* americanfirearms.org, "A Complete Guide to Binary Triggers," available at https://www.americanfirearms.org/guide-to-binary-triggers/, accessed October 4, 2022.

[124] *See* "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

63.     The threat to public safety and law enforcement posed by semiautomatic rifles—

with or without dangerous modifications—is a modern phenomenon that has a direct correlation

with mass murder and mass shootings.  The danger these firearms pose is intrinsically different

from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded

firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and

handguns dramatically increased the number killed or wounded in mass shootings from 1966 to

the present (see Figure 1, below).

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been more deadly than mass shootings

with fully automatic weapons.

64.     And the threat posed by semiautomatic rifles is amplified when they are used

in conjunction with extended magazines (more than 10 rounds) (see figure 2, below, for the

number of persons killed or wounded).

41

Figure 2

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

65.    Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and semiautomatic handguns 11 percent more than regular firearms. But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns. Semiautomatic handguns cause an average of 184 percent more deaths than regular firearms. In combination, semiautomatic firearms and extended magazines are extraordinarily lethal.

66.    The data in Figures 1 and 2, and in the immediately above paragraph, are from the Violence Project.[125] The Violence Project, which has compiled data on mass shootings from

---

[125] The Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022. The Violence Project database provides information on the weapons used in the shootings. It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons. Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic. I have not participated in Violence Project or in the collection of their data. In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, not yet included in the Violence Project's data, that fit the Violence Project's definition of a mass shooting: the Buffalo, New York, supermarket shooting on May 14; the Robb Elementary School shooting in Uvalde, Texas, on May 24; the Tulsa, Oklahoma medical center shooting on June 1; the concrete company shooting in Smithsburg, Maryland, on June 9; the Highland Park, Illinois, Fourth of July Parade shooting; and the Greenwood, Indiana, Park Mall shooting on July 17. Three were committed with semiautomatic rifles and three with semiautomatic handguns. The table in this report,

(continued…)

1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." Other authorities have adopted similar definitions of "mass shootings" and "mass murder." For example, the FBI has defined mass murder as "a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murderers." [126] Federal legislation enacted in 2013 authorized the Attorney General to assist in the investigation of mass killings, defined to mean "3 or more killings in a single incident." [127]

67.      What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two: in 1998 in Jonesboro, Kentucky; in 1999 in Littleton, Colorado; in 2015 in San Bernardino, California; and in 2019 in Jersey City, New Jersey. In the nineteenth and early twentieth centuries, it required scores of individuals to gather together as mobs, rioters, vigilantes, or terrorists to kill or wound dozens of people in a short space of time—generally because of their race, ethnicity, or faith.

---

unlike the tables in the Violence Project, does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded). The Las Vegas shooting is an outlier in the number killed and wounded which would skew the results of the analysis.

[126] FBI, *Serial Murder: Multi-Disciplinary Perspectives for Investigators* at 8 (2005), available at https://www.fbi.gov/stats-services/publications/serial-murder#two, accessed January 3, 2023.

[127] 28 U.S.C. § 530C(b)(1)(M).

68.     Today, because of the availability of extended magazines and certain classes of semiautomatic firearms, it requires only one or two individuals to kill or wound that many people. And because of these modern technologies, which were developed for warfare, angry, alienated individuals can commit mass murder for reasons that are simply personal. Mass murderers no longer require collaborators to rally to a cause. For example, they can kill large numbers of people simply because they feel slighted at school, because they don't get along with their coworkers, because they were rejected romantically, or because they simply want to make a name for themselves. Since it is impossible in our society—indeed, in any society—to ensure that no one is angry or alienated, public officials have recognized that restricting access to extended magazines and certain classes of semiautomatic firearms mitigates the risk to every American.

69.     For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004. Local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene—usually when the shooter is reloading. For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011, was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines. Every one of those rounds hit an individual, killing six and injuring twelve.[128]

---

[128] "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

Expert Report of Randolph Roth (D.N.J. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397)

**JA1383**

## V.  CONCLUSION

70.    From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why every state restricted the carrying of concealable weapons by the early 20th Century, and the majorly of states prohibited it outright;  why the federal government passed the Ku Klux Klan Acts during Reconstruction;  and why states, municipalities,  and the federal government have passed and enforced laws since World War I to restrict ownership and control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit murder.  Public officials are not required to pass such laws, of course, but historically, they have always understood their ability to do so, and there is no evidence in the historical record to suggest that policy makers took their decisions lightly when they imposed these restrictions.

71.    In recent decades, public officials have been called on to address not just the longstanding and vexing criminological problems of murder and interpersonal violence in the United States, but also *mass* murder and *mass* interpersonal violence resulting from changes in firearms technology that emerged in the late nineteenth through the late twentieth century.  And at the state, local and federal levels, officials have responded to this new threat similar to the way they responded to its antecedents — by exercising their authority to restrict the lethal technologies that underlie the problem and jeopardize the safety of their constituents.

Randolph Roth

Randolph Roth

6/8/2023          Date

45

# EXHIBIT A

Randolph Roth                                                                            Page 1

Curriculum Vitae

RANDOLPH ROTH

Department of History                                6987 Grandee Cliffs Drive
The Ohio State University                             Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                       (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                            2

Education                                                               2
Academic Positions                                                      2
Honorary Positions                                                      2
Professional Honors and Awards for Scholarship                          2
Professional Honors and Awards for Teaching                             3
Grants                                                                  3

**Bibliography and Research**                                           4-17

**Teaching**                                                            18-20

**Service**                                                             21-26

Randolph Roth                                                        Page 2

**Personal**

| | | |
|---|---|---|
| Marital Status: | Married | Allison Sweeney |
| Children: | Alexander | |

**Education**

1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)

**Academic Positions**

1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
1978-1985, Grinnell College: Assistant Professor of History
1978, University of Vermont: Instructor in History
1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

2022, Distinguished Scholar Award, Division of Historical Criminology, American Society of Criminology

2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

2012, Fellow, American Association for the Advancement of Science

2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

2010, Allan Sharlin Memorial Award, Social Science History Association,

Randolph Roth                                                          Page 3

for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village
Research Society, for distinguished work in the history of rural society

1982, Theron Rockwell Field Prize, Yale University, for the outstanding
dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the
outstanding dissertation in American history

1973, James Birdsall Weter Prize, Stanford University, for the outstanding
senior thesis in history

**Professional Honors and Awards for Teaching**

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and
Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student
Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in
History at Ohio State University

**Grants**

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the
Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science
Foundation (SBR-9808050)

**JA1388**

Randolph Roth                                                    Page 4

    1992, Fellow, Workshop on the Rhetoric of Social History, University of
Iowa

    1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

    1987, National Endowment for the Humanities, Summer Stipend

    1983, Research Fellowship for Recent Recipients of the Ph.D., American Council
of Learned Societies

    1981, Fred Harris Daniels Fellowship, American Antiquarian Society


**Bibliography and Research**


**Books**

    *American Homicide* (an interregional study of violent crime and violent death in
America from colonial times to the present). The Belknap Press of Harvard
University Press (2009), 655 pp.

    *The Democratic Dilemma:  Religion, Reform, and the Social Order in the
Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press
(1987), 399 pp.


**Edited Volumes**

    Co-founder and co-director, Historical Violence Database (on-line database on
violent crime, violent death, and collective violence).  Web address:
www.sociology.ohio-state.edu/cjrc/hvd

    American Homicide Supplementary Volume (on-line supplement to *American
Homicide*, including detailed appendices on methods, supplemental tables, graphs,
and statistical analyses), approx. 750 pp. Web address:
http://cjrc.osu.edu/researchprojects/hvd/AHsup.html


**Essays on Historical Subjects**

    "Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with
Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).


**JA1389**

"The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-399.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

"Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence

Randolph Roth                                                    Page 6

in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

 "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

**JA1391**

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism? The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central

Randolph Roth                                                              Page 8

Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods* (1986) 19: 103-117.


**Public History Essays**

"Can Faith Change the World?  Religion and Society in Vermont's Age of Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.


**Works in Progress**

*Child Murder in America*. An interregional study of murders of and by children from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of Speaking for Nature" (essay in manuscript)


**Editorial Boards**

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*


**Invited Lectures**

"Trust, Legitimacy, and the Recent Rise in Homicide in the United States," Council on Criminal Justice, Washington, D.C., October 19, 2022.

"The History of Police Involved Homicides in the United States," Mary Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime Historians Symposium, Leeds University, Great Britain, Scheduled for September

2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

Randolph Roth                                                    Page 10

"Quantitative Analysis of the History of Crime and Violence: Achievements and
Prospects," Keynote Address, Conference on "Making Sense of Violence,"
University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences,
and the Social Sciences in the Study of Violence." Conference on Emerging
Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May
25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences,
and the Social Sciences in the Study of Violence." Presidential Plenary Address,
Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal
Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern
College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the
"From Borderland to Backcountry Conference: Frontier Communities in
Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar
on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15,
2007

 "American Homicide: Its History," Ohio State University at Newark, Nov. 6,
2007

 "American Homicide: A Political Hypothesis" and "The Case for Social Science
History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early
American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the
Historical Approaches in the Social Sciences series, State University of New York
at Binghamton, Oct. 12, 2006

 "The History of American Homicide," Winter College, Ohio State University,
Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group,

**JA1395**

Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies? A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder: An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University. May, 2000

"Understanding Homicide in America: An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October,

Randolph Roth                                                                Page 12

1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities.  The presentation was televised in Vermont.  It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999

## Papers Delivered at Professional Meetings (recent)

"The Social and Geographical Context of Child Homicides in the United States, 1989-2015," Homicide Research Working Group, June 2, 2022, Excelsior Springs, Missouri, and Social Science History Association, November 17, 2022, Chicago.

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic," Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

"The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports,"

Randolph Roth                                                                    Page 14

Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable? The Impact of Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent." Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005


**Reviews**

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty: A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Randolph Roth                                                          Page 16

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic: Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness: Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence: an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love: Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America: Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws: Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation: Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen: The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change: Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power: The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life: Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Randolph Roth                                                          Page 17

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture*
(Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South*
(International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early
Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of
Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

German
Spanish
French (reading)


**Quantitative Skills**

Probability and Statistics (including econometric techniques of political analysis,
exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry
Linear Algebra and Nonlinear Dynamics
Differential and Series Equations
Abstract Algebra

Randolph Roth                                                                 Page 18

**Teaching**

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| | |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

**JA1403**

Randolph Roth                                                        Page 19

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Randolph Roth                                                    Page 20

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                                 Page 21

## Service

**Service in Professional Organizations**

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                                    Page 22

      1987, Program Committee, Social Science History Association

**Reviews of Manuscripts**

      American Historical Review
      Journal of American History
      William and Mary Quarterly
      Journal of the Early Republic
      Social Science History
      Journal of Interdisciplinary History
      Historical Methods
      Journal of Women's History
      Journal of the Family
      Crime, History, and Societies
      European Journal of Criminology
      American Journal of Sociology
      Sociological Quarterly
      Criminology
      Criminal Justice Review
      Journal of Criminal Law and Criminology
      Law and Social Inquiry
      Homicide Studies
      International Criminal Justice Review
      International Journal of Law, Crime, and Justice
      Law and Society Review
      City and Community
      Eras Review
      Western Historical Quarterly
      Canadian Journal of Sociology
      Journal of the Gilded Age

**Memberships in Professional Organizations (current)**

      American Historical Association
      Organization of American Historians
      Social Science History Association
      European Social Science History Association
      American Society of Criminology
      Homicide Studies Working Group
      American Association for the Advancement of Science

**Service at Ohio State University**

Randolph Roth                                                                    Page 23

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and
Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of
Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of
Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior
Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

**JA1408**

Randolph Roth                                                                Page 24

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer
Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin:
advises City Council on all matters concerning utilities, policing, transportation,
parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of
Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at
the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit
Badge Counselor / Eagle Scout Association / Philmont Staff Association /
Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge
Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee
for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic
association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

**JA1409**

Randolph Roth                                                    Page 25

     1988-present, President / Vice President / Trustee, East Dublin Civic Association

     1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

**Outreach / Media Appearances**

     Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.

     B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

     Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.

     Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

     Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019

     "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

     "How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017

     "Mass Murder in American History," CSpan-3, April 2, 2017

     All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.

     Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014

     Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)

     Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)

     "It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009

**JA1410**

Randolph Roth                                                                    Page 26

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and
http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 **(http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column)**

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

**IDENTICAL PDF AND HARD COPY CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

**VIRUS SCAN CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program SentinelOne Agent, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy