# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

―――――――――

ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC. ; et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

(*additional captions listed on inside cover*)

―――――――――

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1-18-cv-10507, 1-22-cv-04397, 1:22-cv-04360

―――――――――

## JOINT APPENDIX
## Vol. IV of XIII (pgs. JA1412-JA2122)

―――――――――

DANIEL M. VANNELLA
OFFICE OF ATTORNEY
  GENERAL OF NEW JERSEY
25 Market Street
Trenton, NJ 08625
(609) 376-2850
daniel.vannella@law.njoag.gov

*Counsel for Appellees-Cross-Appellants State of New Jersey, et al.*

ERIN E. MURPHY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle & Pistol Clubs, Inc.*

BRADLEY LEHMAN
GELLERT SEITZ BUSENKELL & BROWN
1201 N. Orange Street
Wilmington, DE 19801
(302) 416-3344
blehman@gsbblaw.com

*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connelly, and Firearms Policy Coalition, Inc.*

(*additional counsel listed on inside cover*)

November 18, 2024

---

MARK CHEESEMAN, TIMOTHY CONNELLY, FIREARMS POLICY COALITION, INC.,

*Appellants-Cross-Appellees,*

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

---

BLAKE ELLMAN; THOMAS R. ROGERS; ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

*Appellants-Cross-Appellees,*

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

---

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

PAUL D. CLEMENT
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle & Pistol Clubs*

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connelly, and Firearms Policy Coalition, Inc.*

# TABLE OF CONTENTS

## Volume I

*ANJRPC* and *Ellman* Plaintiffs' Notice of Appeal, Nos. 18-cv-10507, 22-cv-4397 (Aug. 18, 2024), Dkt.234[1] ...............................................JA1

*Cheeseman* Plaintiffs' Notice of Appeal, No. 22-cv-04360 (July 30, 2024), *Cheeseman* Dkt.82 ......................................................................JA3

State Defendants' Notice of Cross-Appeal, Nos. 18-cv-10507, 22-cv-4397, 22-cv-04360 (Aug. 5, 2024), *Cheeseman* Dkt.84 ......................JA7938

Order and Judgment (July 30, 2024), Dkt.229 ....................................JA5

Memorandum Opinion (July 30, 2024), Dkt.228 .................................JA9

## Volume II

District Court Docket Sheet, No. 18-cv-10507 (D.N.J.) ....................................JA78

District Court Docket Sheet, No. 22-cv-04360 (D.N.J.) ..................................JA110

District Court Docket Sheet, No. 22-cv-04397 (D.N.J.) ..................................JA124

*ANJRPC* Amended Complaint (Oct. 28, 2022), Dkt.122 ................................JA134

*Cheeseman* Amended Complaint (July 14, 2022), No. 22-cv-04360 Dkt.4 .........................................................................................JA150

    Exhibit A - New Jersey Assault Firearms Guidelines, No. 22-cv-04360 Dkt.4-1 ........................................................JA182

*Ellman* Complaint (July 1, 2022), No. 22-cv-04397 Dkt.1 .............................JA186

*Cheeseman* Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174 ........................................................................................JA202

    Brief in Support of *Cheeseman* Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-1 ......................................................JA205

---

[1] ECF numbers are to *ANJRPC* docket (No. 18-cv-10507) unless otherwise indicated.

Exhibit 1 – Declaration of Mark Cheeseman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-2 ................................................................... JA251

Exhibit 2 – Declaration of Timothy Connolly in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-3 ................................................................... JA254

Exhibit 3 – Declaration of Brandon Combs on Behalf of Firearms Policy Coalition, Inc. in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-4 ............................ JA257

Exhibit 4 – Excerpts from Frank Miniter, *The Future of the Gun* (2014), Dkt.174-5 ............................................................ JA261

Exhibit 5 – Excerpts from Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (2022), Dkt.174-6 ................................................................... JA267

*Cheeseman* Statement of Undisputed Material Fact in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-7 .............. JA272

*ANJRPC* and *Ellman*'s Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175 ................................................................... JA303

Declaration of Blake Ellman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-1 ...................................... JA306

Declaration of Marc Weinberg in Support of Motion for Summary Judgment (Oct. 6, 2024), Dkt.175-2 ...................................... JA309

Declaration of Thomas Rogers in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-3 ...................................... JA312

Declaration of Scott Bach in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-4 ...................................... JA315

Declaration of Emanuel Kapelsohn in Support of Motion for Summary Judgment with Accompanying Exhibits (Oct. 6, 2023), Dkt.175-5 ...................................... JA319

Declaration of Ashley Hlebinsky in Support of Motion for
Summary Judgment with Accompanying Exhibits (Oct. 6,
2023), Dkt.175-6 ........................................................................JA479

*ANJRPC* and *Ellman*'s Brief in Support of Motion for Summary
Judgment (Oct. 6, 2023), Dkt.175-7 .........................................JA634

*ANJRPC* and *Ellman*'s Statement of Undisputed Material Facts
(Oct. 6, 2023), Dkt.175-8 .........................................................JA682

## **Volume III**

State's Notice of Cross-Motion for Summary Judgment
(Nov. 3, 2023), Dkt.183 .............................................................JA740

State's Combined Brief in Opposition to Motions for Summary
Judgment and in Support of State's Cross-Motion for Summary
Judgment (Nov. 3, 2023), Dkt.183-1 ..........................................JA743

State's Counter-Statement of Material Facts Not in Dispute
(Nov. 3, 2023), Dkt.183-2...........................................................JA837

State's Response to *ANJRPC* and *Ellman*'s Statement of
Undisputed Material Facts (Nov. 3, 2023), Dkt.183-3 ...............JA881

State's Response to *Cheeseman*'s Statement of Undisputed
Material Facts (Nov. 3, 2023), Dkt.183-4 ..................................JA943

Declaration of Daniel Vannella in Support of Cross-Motion for
Summary Judgment, Motion to Exclude Testimony of Emanuel
Kapelsohn & Clayton Cramer, and State's Opposition to Motion to
Exclude Certain Expert Testimony (Nov. 3, 2023), Dkt.184...........JA969

Exhibits 1-5 (May 15, 2023), Dkt.184-1 ...................................JA982

## **Volume IV**

Exhibits 6-10 (May 15, 2023), Dkt.184-1 ...............................JA1412

Exhibit 11 – Declaration and Expert Report of James Yurgealitis
with Accompanying Exhibits (June 7, 2023), Dkt.184-2 ...........JA1813

Exhibits 12-13 (May 15, 2023), Dkt.184-3 .............................JA1877

**Volume V**

Exhibits 14 (May 15, 2023), Dkt.184-3 ...............................................JA2123

Exhibit 15 – Supplemental Letter with Accompanying Exhibits
from Emanuel Kapelsohn to *ANJRPC* Plaintiffs (July 31, 2023),
Dkt.184-4 ........................................................................................JA2154

Exhibit 16 – Transcript of Emanuel Kapelsohn Deposition with
Exhibits Introduced During Deposition (Aug. 4, 2023),
Dkt.184-5 ........................................................................................JA2345

**Volume VI**

Exhibit 16 (Continued) – Transcript of Emanuel Kapelsohn
Deposition with Exhibits Introduced During Deposition
(Aug. 4, 2023), Dkt.184-5 .................................................................JA2849

Exhibits 17 (May 15, 2023), Dkt.184-6 ...............................................JA3382

**Volume VII**

Exhibits 18-19 (May 15, 2023), Dkt.184-6 ..........................................JA3483

Exhibit 20 – Transcript of Clayton Cramer's Deposition with
Exhibits Introduced During Deposition (Aug. 21, 2023),
Dkt.184-7 ........................................................................................JA3901

**Volume VIII**

Exhibit 20 (Continued) – Transcript of Clayton Cramer's
Deposition with Exhibits Introduced During Deposition (Aug.
21, 2023), Dkt.184-7..........................................................................JA3901

Exhibits 21-44 (May 15, 2023), Dkt.184-8 ..........................................JA4466

Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.195.............................JA4706

Cheeseman's Reply to State's Response to Statement of
Undisputed Material Fact in Support of *Cheeseman* Motion for
Summary Judgment (Dec. 15, 2023), Dkt.195-1 .................................JA4766

## Volume XI

Cheeseman's Response to State's Counter-Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.195-2 ................. JA4871

Declaration of Bradley Lehman in Support of Exhibits to
Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.196 ........................... JA4961

Exhibits 1-12 (Dec. 15, 2023), Dkt.196-1 ........................................... JA4980

Exhibits 13-28 (Dec. 15, 2023), Dkt.196-2 ........................................ JA5462

Exhibits 29 (Dec. 15, 2023), Dkt.196-3 ............................................. JA5583

## Volume X

Exhibits 30-43 (Dec. 15, 2023), Dkt.196-3 ........................................ JA5609

Exhibits 44-50 (Dec. 15, 2023), Dkt.196-4 ........................................ JA5750

Exhibits 51-60 (Dec. 15, 2023), Dkt.196-5 ........................................ JA6242

## Volume XI

Exhibits 61 (Dec. 15, 2023), Dkt.196-5 ............................................. JA6344

Exhibits 62-72 (Dec. 15, 2023), Dkt.196-6 ........................................ JA6348

Exhibits 73-86 (Dec. 15, 2023), Dkt.196-7 ........................................ JA6481

Exhibits 87-99 (Dec. 15, 2023), Dkt.196-8 ........................................ JA6629

Exhibits 100-105 (Dec. 15, 2023), Dkt.196-9 ..................................... JA6808

## Volume XII

Exhibits 106-115 (Dec. 15, 2023), Dkt.196-9 ..................................... JA7048

Exhibits 116-124 (Dec. 15, 2023), Dkt.196-10 ................................... JA7341

*ANJRPC* and *Ellman*'s Reply Brief in Support of Motion for
Summary Judgement and in Opposition to State's Cross-Motion for
Summary Judgment (Dec. 15, 2023), Dkt.197 ............................................. JA7569

Reply Declaration and Rebuttal Expert Report of Emanuel
Kapelsohn (Dec. 15, 2023), Dkt.197-1.................................................JA7608

*ANJRPC* and *Ellman*'s Response to State's Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.197-2..................JA7641

## **<u>Volume XII</u>**

*ANJRPC* and *Ellman*'s Brief in Opposition to State's Motion to
Exclude Expert Testimony of Emanuel Kapelsohn & Clayton
Cramer and in Reply in Further Support of Daubert Motion
(Dec. 15, 2023), Dkt.197-3....................................................................JA7712

*ANJRPC* and *Ellman*'s Amended Response to State's Statement of
Material Facts Not in Dispute (Dec. 16, 2023), Dkt.198...............................JA7739

Declaration and Rebuttal Expert Report of Clayton Cramer
(Dec. 15, 2023), Dkt.200 ................................................................................JA7817

# Exhibit 6

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON   ICINA   E

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as S  perintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Depart   ent, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Par   Ridge Police Depart   ent, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as S  perintendent of the New Jersey | |

**JA1413**

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Glo cester Co nty Prosec tor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean Co nty
Prosec tor,

    Defendants.

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as S perintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Depart ent, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Depart ent,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## <u>DEC ARATION OF DENNIS ARON</u>

    I, DENNIS BARON, here y depose and state:

1.    I a over the age of 18 and a co petent to testify to the atters stated
elow ased on personal nowledge.

**JA1414**

2.    I have attached a copy of an e pert report I have prepared, together with a copy of  y C rric l    itae attached as E hi it A of  y e pert report . The opinions e pressed in this report are  ased on  y  nowledge, s ill, e perience, training, and ed cation, and I hold these opinions to a reasona le degree of professional certainty.  I here y adopt and incorporate  y report in this declaration as if set forth in f ll.

I declare  nder penalty of per  ry on this    20th    day of Octo er, 2023, that the foregoing is tr e and correct.

DENNIS BARON

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br> Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br> Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br> Defendants. | Civil Action No. 3:22-cv-04397 |

**Expert Report of Dennis Baron**

## EXPERT REPORT OF DENNIS BARON

I, Dennis Baron, the undersigned, declare as follows:

1.        I have been retained by the New Jersey Attorney General's Office to provide expert

opinion and testimony regarding Corpus Linguistics research. I am professor of English and

linguistics, emeritus, at the University of Illinois at Urbana-Champaign. I have written ten books

on various aspects of the English language, with two of them focused on language and law. I am

being compensated at a rate of $350 per hour.

2.        For this report I have examined the historical use of the terms *arms* and

*accoutrements* in the Founding Era (1760–1820) and during the Civil War and Reconstruction era

(1860–1890). It is my opinion that,

a)   during those periods the words "arms" and "accoutrements" typically signified two

distinct lexical or semantic categories.

b)   during those periods, ammunition containers were typically categorized as

"accoutrements," not "arms."

3.        The present case involves firearm magazines. I have found that the term

"magazine" was not generally used to describe an ammunition container until well into the

nineteenth century, and that use of "magazine" did not become common until the early twentieth

century. The detachable ammunition containers from the Founding Era to the later nineteenth

century were typically referred to as "cartridge cases," "cartridge boxes," or "cartouch cases" (the

words "cartridge" and "cartouch" both derive from the same French word and are synonymous in

English during the Founding Era; of this pair, "cartouch" eventually falls out of use and "cartridge"

is the term that remains in use today).  Because both the cartridge case and the modern magazine

are ammunition containers, it made the most sense to treat the cartridge case as an analogue to the

modern firearms magazine. In the Founding Era and during and after the Civil War, cartridge cases were typically considered accoutrements, not arms.

4.      I have also examined the lexical evidence for repeater air guns, which are sometimes referred to as "wind guns," and the rare terms "magazine wind-gun" and "magazine gun" in the Founding Era. "Air guns" used compressed air instead of gunpowder to propel a ball. Repeater air guns were capable of firing multiple shots before requiring the user to reload the weapon. Although a few artisans did invent air guns capable of firing multiple balls without reloading the ammunition or recharging the air cylinder, such guns were rare in England and America. In addition, although magazine firearms were patented as early as 1860, they remained military weapons during and shortly after the Civil War, with only a few references to them in the corpora before the 1880s.

## BACKGROUND AND QUALIFICATIONS

5.      I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the University for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, in addition to topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship for work on a book on language and law, and, most recently, a Guggenheim Fellowship for work on

my latest book on language and law. I have also published books on language reform, on usage, and on gender in language.

6.      Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, 2023). In addition, I served as lead author on what came to be called "the Linguists' Brief" in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a brief cited both by Justice Scalia in the majority opinion, and by Justice Stevens in his dissent. I was a co-author on another brief by professors of linguistics and corpus linguistics, cited in *New York State Rifle and Pistol Ass'n. v. Bruen*, 142 S. Ct. 2111 (2022), which Justice Breyer cited in his dissent. In that dissent, Justice Breyer also quoted directly from my essay "Corpus Evidence Illuminates the Meaning of 'Bear Arms'" (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical meaning and the Second Amendment at the Federalist Society at the University of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the University of Chicago, at Brigham Young University Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law. I have also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times*. And I have submitted declarations or reports in a number of cases, including *Kenneally v. Raoul, et al.*, No. 3:22-cv-50039 (N.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.); *Harrel v. Raoul*, No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Gates v. Polis*, No. 1:22-cv-1866-GPG-SKC (D. Colo.); *Rocky Mountain Gun Owners, et al. v. Town of Superior*, et al., No. 1:22-cv-02680 (D. Colo.) *Ocean State Tactical, LLC, et al. v. State*

*of Rhode Island*, No. 1:22-cv-00246-JJM-PAS (D.R.I.); *Hanson, et al, v. District of Columbia, et al.*, No. 1:22-cv-02256-RC (D.D.C.); *Delaware State Sportsmen's Association, Inc., et al., v. Delaware Department of Safety and Homeland Security, et al.*, No. 1:22-cv-00951-RGA, (D. Del.); *Capen, et al., v. Campbell, et al.*, No. 22-cv-11431-FDS (D. Mass.); *National Association for Gun Rights, et al., v. Lamont, et al.*, No. 3:22-CV-1118 (D. Conn.); *National Association for Gun Rights, et al., v. Lopez*, No. 1:22-cv-404-DKW-RT (D. Haw.); *Oregon Firearms Federation, et al, v. Kotek, et al.,* (lead case with three additional, consolidated) No. 2:22-cv-01815-IM (D. Or.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Rupp, et al., v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.); *Duncan, et al. v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); and *Fouts, et al., v. Bonta*, No. 3:19-cv-01662-BEN-JLB (S.D. Cal.). I have testified by deposition and at trial in the following case: *Oregon Firearms Federation, et al. v. Kotek,* No. 2:22-cv-01815-IM (D. Or.). In the past twenty years I have also served as an expert in nineteen cases involving document interpretation.

7.    My recent essay, "Look It Up in Your *Funk and Wagnalls*: How Courts Define the Words of the Law," an analysis of how judges incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, appears in *Dictionaries*: *Journal of the Dictionary Society of North America*, vol. 43.2 (2022): 95–144.

8.    This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of one or more large, digitized corpora consisting of many millions of words.

## Theory and Methodology

9.    Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text. Initial work in corpus linguistics did

not typically involve legal issues. Literary scholars, taking advantage of the ability of computers to search large digitized databases, facilitated their analysis of print materials by developing computerized concordances to the works of Shakespeare, Milton, and other major English writers. They plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt. Soon, in addition to solving literary mysteries, linguists successfully applied computerized textual analysis in a number of criminal cases in the United States and in England involving, for example, the authorship of a ransom note or an email. Lexicographers, who began compiling analog databases of text in the late nineteenth century, began to digitize their data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.

10.    The Oxford English Dictionary (OED) is the standard dictionary of the English language compiled on historical principles. As a graduate student at the University of Michigan in 1970, I coded analog texts from the relevant OED files to help build the computerized database for the Dictionary of Early Modern English, which covers the period from 1500–1800 and is particularly relevant to the language of the Founding Era. Today, major dictionaries like the OED and the Merriam-Webster suite of dictionaries rely on public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The major dictionary makers working on other languages use similar databases in their own work.

11.    Over the past twenty years, legal corpus linguistics (LCL) has developed as a subset of corpus linguistics. LCL involves the analysis of digitized corpora of current and historical

English to establish meaning—often referred to as "original public meaning"—in statutes and in the Constitution. LCL often provides more information about the meaning of words and phrases than can be gleaned from dictionary definitions. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt. In *Muscarello v. United States*, 524 U.S. 125 (1998), we find an early computer search to help determine the meaning of a word in a statute. In *Muscarello,* the Supreme Court considered whether "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or trunk, can be deemed to be within the scope of the statutory phrase 'carries a firearm.'" To answer that question in the affirmative, Justice Breyer searched two computerized newspaper databases (Lexis/Nexis, for the New York Times, and Westlaw, for "US News") to clarify the meaning of the words "carry," "vehicle," and "weapon." In 2012, Judge Richard Posner, of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Judge Posner ran a Google search to confirm that the word "harbor" in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute. *United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012).

12.    More principled, scientific database searches soon followed, and in 2018 Justice Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, summarized the latest research in corpus linguistics and LCL as a way to determine ordinary meaning, and more specifically, original public meaning, with more clarity (Thomas Lee and Stephen Mouritsen, "Judging Ordinary Meaning," *Yale Law Journal* 127(2018): 788–879). Jurists over the past few years have found that in several cases, LCL

proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the Oxford English Dictionary, as well, allowing a more precise interpretation of historical text data.

13.    In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on legal corpus linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, corpus linguistics has drawn increased attention from the courts, including a recent mention in the Sixth Circuit (*Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 440 (6th Cir. 2019) (Thapar, J., concurring)), as well as a comment by Justice Alito in his concurrence in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation.

14.    Several large databases have come online in the past few years that facilitate LCL research. The Center for Law and Corpus Linguistics at Brigham Young University (BYU) hosts the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words and covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), with data from 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth century, the Corpus of Historical American English (COHA), initially developed at BYU but now independent of that institution, currently contains 475 million words of text from 1820–2020. The size of these databases continues to grow as more works are digitized, coded, and added to the corpora. In compiling this report, I reviewed each of these databases. Some of the corpora provided data for some lexical searches, but not for others. The examples cited below specify which corpus they are drawn from.

15.    Critics of LCL have objected that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people" who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora. It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists and professional writers. Although "ordinary people" are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge. A reading-difficulty formula like the commonly used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, Adult Literacy in America (National Center for Education Statistics, U.S. Department of Education, 1993; https://nces.ed.gov/pubs93/93275.pdf), the average American adult tends to have a seventh- or eighth-grade reading level. The National Center for Education Statistics no longer uses "grade level," instead rating literacy levels for Americans between ages 16 and 65 on a scale from 1 to 5; measurements conducted in 2003 showed no significant change from the 1993 NCES report; and the most recent data, from 2014, confirm that most adult Americans still test at or below level 2, with 4.1% testing *below* level 1 (https://nces.ed.gov/pubs2019/2019179/index.asp).

16.    In order to counter any "elite" bias that may be found in databases like COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment. Newspapers of the eighteenth and nineteenth centuries were the principal means of communicating news and information. As such, they embodied much

of the language of the "ordinary people" who read them. These early newspapers also provide researchers with more data for the nineteenth century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.[1] Newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news. Although newspaper subscribers tended to be "elites," newspaper content was widely shared by word of mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

17.    Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans. Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

18.    The newspaper databases that I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (compiled by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this report, both Readex and newspapers.com provide the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later nineteenth century.

---

[1] Because of changes in print technology and the spread of literacy, Founding Era newspapers differed from the newspapers of the post-Civil War era. Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early nineteenth century, when the Industrial Revolution drastically changed printing methods. The first printing press was adapted by Gutenberg from the design of the traditional wine press, and for centuries, printing was a slow and labor-intensive process. As a result, newspapers in the founding era were small by today's standards, averaging four to eight pages. Publication was less frequent as well. Papers tended to appear weekly or semi-weekly, rather than daily.

19.     All the databases contain some duplicates. COFEA and COEME digitize multiple editions of the same work. The newspaper databases duplicate some, though not all, of one another's content; in addition, they contain a number of duplicate stories because, particularly in the period of newspaper growth during the nineteenth century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not. (I therefore exclude duplicate citations from all my corpus searches). The databases often offer more insight into the meaning of words and phrases than simply going to a dictionary. Jurists from Learned Hand[2] and Felix Frankfurter[3] to Frank Easterbrook[4] and Richard Posner[5] have warned their colleagues not to make a fortress of the dictionary. Like dictionaries, corpora are by necessity incomplete. LCL does not replace dictionaries, but it does provide an important supplement to them. Typical LCL analyses are conducted using a keyword and a few words surrounding it, to supply context. Sometimes a limited specific citation is ambiguous. And sometimes, a search of the data set returns only small number of citations, perhaps ten or twenty rather than a few hundred. In such cases, I supplement my use of LCL with a reading of the full context of the citations in order better to determine the keyword's meaning and the relevance of the citation to the search question.

**The meaning of arms and accoutrements in the databases**

20.     There are more than 150,000 citations for the word "arms" alone in the various databases that I consulted, many of them referring not to weapons but to limbs or, in some cases,

---

[2] *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).

[3] *Dennis v. United States*. 341 U.S. 494, 523 (1951) (Frankfurter, J., concurring).

[4] Frank H. Easterbrook, "Text, History, and Structure in Statutory Interpretation," *Harvard Journal of Law and Public Policy* 61, 67 (1994).

[5] *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012).

heraldic symbols (that is, a coat of arms). I selected a random sample of about 500 citations from COFEA and newspapers.com to see what a search for "arms" alone might turn up. I found that the cites where "arms" referred to weapons did not generally specify what constituted an "arm," but I did find that in many of the cites "arms" appears in collocation with "accoutrements," with "ammunition," or with both "accoutrements" and "ammunition." I then searched for the phrase "arms and accoutrements" in the Founding Era and during the period following the adoption of the Fourteenth Amendment. I also asked whether the term "magazine" as used today falls within the meaning of the term "arms" when used on a standalone basis during those eras, or whether the magazine and its earlier analogues, the cartridge case and cartouch box, are treated as accessories or accoutrements, rather than arms. I look as well at lexical evidence in the Founding Era on the "air rifle," or "air gun," and assess any lexical evidence about the availability and popularity of the repeater air gun and the use of the term "magazine" in association with such guns.

21.    In the eighteenth and nineteenth centuries, "magazine" was a word that meant "storehouse, depot." A magazine was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a magazine was a building designated for storing gunpowder, and because gunpowder was an explosive substance, it was subject to strict regulation: some towns banned or heavily regulated the storage of gunpowder within city limits. The word "magazine" was not typically used to refer to the compartment of a gun containing bullets until late in the nineteenth century. Although the term "magazine" appears in the phrase "magazine wind gun" in 1744, that usage is marked as "rare" by the Oxford English Dictionary, which also marks the phrase "magazine wind gun" as "obsolete." References to "magazine guns," "magazine rifles," or "magazine carbines" appear as early as 1860, when C. M. Spencer received a patent for a "magazine gun" (U.S. Patent No. 27,393, March 6, 1860). B. T. Henry patented a "magazine fire

arm" that same year (U.S. Patent No. 30,446, Oct. 16, 1860). And N. King patented another "magazine fire arm" in 1866 (U.S. Patent 55,012, May 22, 1866).

22.    Although patents for guns with "magazines" capable of holding multiple bullets appear as early as 1860, in its separate, main entry for "magazine," the OED gives the earliest use of "magazine" meaning 'a bullet storage container' as 1868, typically associated with weapons designed for military rather than civilian use. Though repeater guns began to be used by the military during and shortly after the Civil War, the corpus data suggests that use was not common, even in the military, nor were they commonly used by civilians at the time.

23.    The data suggests that "cartridge boxes," which I treated as analogous to today's LCMs, would have been viewed as accoutrements, the ancillary equipment associated with soldiering, or service in the military.

24.    The OED defines "accoutrements" as, "items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments." [OED online, s.v. "accoutrement"; the word typically appears as a plural.]

25.    Thus, the military sense of "accoutrements" generally refers, not to weapons, but to other accessories worn or carried by soldiers. The OED illustrates this second, military, sense, with an example from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here Wellington, widely recognized as a consummate soldier who would be well aware of military terminology, and who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between "arms" and "accoutrements."

26.    The OED definitions are instructive. But in order to determine more specifically whether the term "accoutrements" included "cartridge boxes," the predecessor to modern

magazines, I consulted two digitized historical databases: COFEA and COEME. A COFEA search

returns these examples where "cartridge boxes" and "cartouch boxes" are specifically included in

the category of accoutrements, not arms

a.  1776 – "The General is surprised to find the Militia applying for Cartouch Boxes
    and other Accoutrements." (George Washington, General Orders, February 17;
    here Washington, who certainly knew his military terminology, refers to the fact
    that militia members often failed to come equipped with their accoutrements,
    including cartridge or cartouch boxes; see also Carl Bogus, *Madison's Militia,*
    Oxford Univ. Press, 2023, for a discussion of the militia's general unpreparedness
    for battle during the Revolutionary War).

b.  1777 – "Many of their Arms are indifferent, and almost the whole [of
    Washington's troops] are destitute of pouches and Other necessary
    Accoutrements." (George Washington, Letter to John Hancock, October 10–11;
    the pouches in question are ammunition holders; another instance where
    Washington distinguishes between arms and accoutrements).

c.  1777 – "The cartouch boxes and every other species of military accoutrements
    annexed to the persons of the officers and soldiers of General Burgoyne's army,
    ought, agreeably to the spirit of the Convention, and the technical interpretation of
    the word *arms* in similar cases, to have been delivered up…. though the surrender
    of *arms* only is specified . . . yet the cartouch boxes and other military
    accoutrements belonging to the noncommissioned officers and privates were
    without hesitation given up to the commissaries of the American Army."
    (Journals of the Continental Congress 9, December, 1777, p. 1059).  An
    interesting example where the first part suggests that *accoutrements* are "arms" to
    be surrendered, while the second part suggests that, although the terms of
    surrender required the losing British to give up their "arms only," they also
    voluntarily gave the Americans their accoutrements. Given that the Americans
    were eager to acquire as much war equipment as possible, the victors in this case
    surely wanted to get everything they could from the British soldiers.

d.  1778 – "[T]he board, on the 17th of April, impowered a Capt. Starr of Middleton
    in Connecticut to receive a quantity of public leather of Colo. Trumbull, and get it
    made up into shoes and accoutrements, half of each, the cartridge boxes upon the
    new model; and to send on both to the main army…." (Timothy Pickering, Letter
    to George Washington, June 9, 1778. At the time, cartridge boxes were made of
    wood or leather, or a combination of the two).

e.  1783 – "And as to cartridge boxes and other leathern accoutrements, saddles &
    other furniture for dragoons…." (Timothy Pickering, Letter to George
    Washington, April 22; the word "other" sweeps "cartridge boxes" into the general

category of accoutrements).

27.    And COEME adds this example, where "cartridge box" appears in a list that includes "accoutrements" but not "arms":

    a.    1788 – "If you could only tell us how to keep papa at home, my drum, spontoon, cartouch box, and accoutrements, should all be yours." (*The Children's Friend, Translated from the French*).

28.    My review of the corpora also confirmed that "accoutrements" are regularly referred to separately from "arms." A COFEA search for the occurrence of "accoutrements" within six words of "arms" returned 873 hits (including a small number of duplicates). A similar search of COEME returned 126 hits, the earliest from 1656. I determined that the two search terms, "arms" and "accoutrements," often appear together as a single phrase, "arms and accoutrements," typically in military contexts having to do with an army or militia unit. "Accoutrements" often occurs in a list alongside, but separate from, ammunition: "arms, accoutrements, (and) ammunition," though when ammunition is not listed separately, the term "accoutrements" will generally include ammunition. The second OED citation for "accoutrements," dated 1902, differentiates "ammunition" from "accoutrements": "When they landed they brought on shore besides a quantity of ammunition and accoutrements…and large stores of flour, sugar and tobacco, &c." (G. S. Whitmore, *Last Maori War* i. 4).

29.    "Arms" as a stand-alone term refers to weapons. "Arms" almost never includes ammunition or ammunition storage containers such as cartridge boxes. These are the three examples that a COHA search returns:

    a.    1780 – "It is necessary to obtain ammunition, arms and accoutrements, and as many horses as you can get" (William Dobein James, "A Sketch of the life of Brig. Gen. Francis Marion and a history of his brigade," 1820—although this account was published in 1820 it quotes from a letter dated 1780).

b. 1909 – "Lyon was ordered to deliver to Governor Yates 10,000 stand of arms with accoutrements and ammunition." (Robert J. Rombauer, "The Union Cause in St. Louis in 1861").

c. 1949 – "It will be necessary that arms, ammunition, accoutrements, tents and camp equipage be deposited there for them the troops." (Francis F. Beirne, "War of 1812").

30.    The "cartridge box" or "cartouch box"—the precursor to today's "magazine"—is typically mentioned in lists of accoutrements, often in connection with other items worn with a soldier's uniform. The "cartridge box" almost never appears to be included among a soldier's weapons. The OED defines "cartridge box" as "a box for storing or carrying cartridges; the case in which a soldier carries his supply of cartridges" (OED online; this definition covers "cartouch box" as well). The OED cites the definition in Smyth and Belcher's *Sailor's Word-Book* (1867) to illustrate its function. Here is the full definition of "cartridge-box" in that dictionary of navy terminology: "a cylindrical wooden box with a lid sliding upon a handle of small rope, just containing one cartridge, and used for its safe conveyance from the magazine to the gun—borne to and fro by the powder-monkeys (boys) of old. The term is loosely applied to the ammunition-pouch" (Admiral W. H. Smyth and Vice-Admiral Sir E. Belcher, *The Sailor's Word-Book: An Alphabetical Digest of Nautical Terms,* London, 1867; see ¶ 58, below, for the authors' definition of "magazine" as a gunpowder storeroom either on land or on a ship). The OED offers an 1892 citation for "magazine" as the equivalent of a cartridge box, calling such usage "obsolete and rare": "W. W. Greener, *Breech-loader* 184 Cartridges are best carried in a magazine of solid leather" (OED online, *s.v.* magazine, IV (d)). By that time, "magazine" was more typically used in the sense we use it today, "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech" (OED online, s.v. magazine, sense IV (b)).

31.    A search of Readex America's Historical Newspapers for "cartridge box," and the synonymous "cartouch-box," for the Founding Era years 1750–1790 returns 176 citations. including multiple duplicates. A Readex search for the period after the adoption of the Fourteenth Amendment, from 1868–1890, returns 1,306 citations, also with many duplicates. The following examples show instances where "cartouch boxes" or "cartridge boxes," are categorically separate from arms or appear in the list of accessories to arms (examples (a), (b), (d), (e), (g), (h), (i)). And examples (f), (j), (k), (l), (n), (o), (p), (q), and (r) clearly show that cartridge boxes are accoutrements, not arms:

a.   1756 – "Every such Male Person . . . provide himself with one well fixed Musket, or Fuzee, with a Worm and Priming Wire, one Cartouch Box, with nine charges of Gun Powder, and Ball suitable therein, and three good Flints … and shall keep such Arms and Ammunition by him, in good Order." *Pennsylvania Gazette,* May 13, 1756. The parallel structure of arms and ammunition suggests that the Musket and Fuzee are arms, the rest, accoutrements.

b.   1774 – "That each man be provided with a good firelock and bayonet fitted thereon, half a pound of powder, two pounds of lead, and a cartouch box, or powder-horn and bag for ball, and be in readiness to act on any emergency." Proceedings of the Continental Congress, *Pennsylvania Journal,* December 21, 1774. Again, the parallel structure suggests that firelock and bayonet are the arms, while powder, lead, and cartouch box are accessories.

c.   1775 – "That each Inhabitant, or Person, as aforesaid, who shall provide Arms for himself, well fixed with a good Bayonet and Cartouch-Box, shall be paid a minimum of 10s." *The Massachusetts Gazette,* May 19, 1775. Here again, arms and cartouch boxes seem separate categories.

d.   1775 – "We hear from Charlestown, South-Carolina, that on the 21st of March, at Night, about eight Hundred Stand of Small Arms, 2 Hundred Cutlasses, and all the Cartouch-Boxes, fit for Service, with several Bundles of Match & some Flints, were taken out of the public Armoury." *New Hampshire Gazette,* June 2, 1775.

e.   1775 – "Deserted from Colonel Woodridge's regiment . . . Martin Nash . . . carried away a long gun of Gen. Pomeroy's make, a cartridge box and good stock of ammunition belonging to the province." *New England Chronicle,* November 9, 1775.

f.   1778 – "List of Necessaries and Accoutrements for each Horseman: 1. A well-tempered sword . . . 2. A carbine, fusee, or short blunderbuss . . . 3. A pair of pistols and holsters. 4. A sword-belt—a belt for the carbine . . . 5. A cartridge-box to buckle round the waist,

with twelve tin pipes for the cartridges. 6. A helmet . . . 7. A saddle….” *New-Jersey Gazette* March 25, 1778. The mention of the cartridge box further down this list suggests that it is an accessory.

g.  1785 – “A Neapolitan officer was killed in the same engagement by a cartouch box taking fire while charging the guns.” *South-Carolina Weekly Gazette,* August 4, 1785.

h.  1787 – Abstract from the Militia Law. “That every non-commissioned officer and private soldier of the said militia . . . shall equip himself . . . with a good fire-arm, with a steel or iron ramrod, a spring to retain the same, a worm, priming wire and brush, a bayonet fitted to his fire-arm, and a scabbard and belt for the same, a cartridge box that will hold fifteen cartridges at least, six flints, one pound of powder, forty leaden balls suitable for his fire-arm, a haversack, blanket, and canteen.” *Massachusetts Gazette,* February 2, 1787.

i.  1787 – “All persons liable to do Militia Duty . . . must provide themselves with proper arms and accoutrements, viz. a musket and bayonet, a cartouch box or pouch that will contain twenty-four cartridges.” *State Gazette of South Carolina,* July 16, 1787. Parallel structure here suggests that musket and bayonet are arms, cartouch box, pouch, and cartridges are accoutrements.

j.  1793 – Cartridge boxes appear under the category “military stores” in this multi-page “List of Ordnance, Arms, and Military Stores” in *American State Papers,* Senate, 3rd Congress, First Session, vol. 1, p. 45. Items on this list also include “bullet pouches,” “gun rods,” “worms,” and “fuses.”

k.  On p. 47, “cartouch boxes” and “cartridge boxes” appear under “military stores.” On p. 49, “musket cartridges” themselves are listed as “military stores.” Suggesting that these lists may be regarded as *ad hoc* rather than definitional, on p. 50, “cartouch boxes” are listed under “arms.” But on pp. 52 and 57, “cartouch boxes” appear under “Military Stores.” On p. 60, “cartridge boxes” and “musket cartridges” are listed under “stores.” In sum, “cartridgte boxes” and synonyms are most commonly listed as stores, not arms. https://memory.loc.gov/cgi-bin/ampage?collId=llsp&fileName=016/llsp016.db&recNum=49

l.  1868 – “Government Sale at Watertown Arsenal Mass. . . . Lot of cavalry accoutrements, consisting of Cartridge Boxes, Pistol Holsters, Sabre Belts, Knots, &c.: lot of Infantry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings.” *Evening Star* (Washington, D.C.), January 9, 1868. [Perhaps the clearest and most direct citation specifying cartridge boxes, a term that persists during the Reconstruction Era, as accoutrements.]

m.  1868 – Another government sale lists weapons (carbines, muskets, rifles, and pistols) followed by a list of items that are separate from weapons: “254 carbine cartridge boxes,” carbine slings, cavalry sabre belts, bayonet scabbards, cap pouches, “1,619 cartridge boxes,” “257 cartridge-box Belts,” gun slings, waist belts, “and various other articles.” *Daily Morning Chronicle* (Washington, D.C.), April 22, 1868.

n.  1869 – This account describes the new French "Mitrailleuse," a field weapon which would seem to be analogous to what we call a machine gun today, and the cartridge box would be the equivalent of we call today a detachable magazine. The Mitrailleuse is "a new 'ball syringe' in the shape of a small cannon. . . . It contains thirty-seven common infantry cartridges, arranged like cigars in a bundle. As soon as it is attached to the breech of the cannon, the Mitrailleuse is loaded. A man sitting on the carriage fires it by turning a crank. . . . The crank is turned once more and the cartridge box is removed from the cannon; a man to the right takes it, removes it from the 'cigar box'; the men to the left put a new one in." *Missouri Republican* (St. Louis), September 3, 1869, p.2. It is important to note in this citation that "cartridge box" is used to refer to what today we would call a detachable magazine that both contains ammunition and feeds it. Although the term "magazine" was available at the time to refer to an "ammunition container," it was still not a common term, and the writer uses the apparently more-familiar term "cartridge box" here.

o.  1870 –  In this description of the French National Guard, the writer notes the importance of rapid-fire rifles for defense against the Prussian troops. Several paragraphs later, the cartridge box is listed along with a guard's uniform requirements: "a uniform will be obligatory for all. Each one must be provided with a weather-proof knapsack. . . , a cartridge-box or pouch, and a half-woolen covering of the material of a tent." *New York Tribune,* November 5, 1870.

p.  1871 – Article about a memorial statue in which the cartridge box is identified as part of the soldier's uniform: "a soldier dressed in full uniform (overcoat, cartridge box, belt, etc.,) leaning on his musket." *Boston Journal,* November 12, 1870.

q.  1872 – This list of government ordnance and ordnance stores for sale groups weapons and accoutrements separately, with cartridge boxes clearly identified as accoutrements. The weapons for sale are muskets, rifled muskets, and revolvers, followed by this comment, "Nearly all the Starr's Revolvers and about two-thirds of the other arms are in fair order." After the arms list comes the list of accoutrements, consisting of cap pouches, waist belts, bayonet scabbards, "cartridge box and belt plates," musket and pistol appendages, "and an assortment of other accoutrements and appendages." *Daily Morning Chronicle* (Washington, D.C.), February 3, 1872.

r.  1876 – In this description of a dead body of a soldier found on a beach, the cartridge box is described as an article of the deceased's uniform: "The body was clothed in a blue overcoat and pants, and had on waist-belt, cross-belt and cartridge-box." *Wilmington Morning Star* (North Carolina), February 8, 1876.

s.  1879 – The cartridge box forms part of a new military uniform: "In the rest of the brigade the multiplicity of belts is done away with, and in place is substituted a simple body belt to which the bayonet scabbard and cartridge box is attached. Equipped in such a uniform . . . the brigade will present a solid and soldierly appearance." *New Haven Register,* July 28, 1879.

32.     In sum, in the vast majority of examples, arms referred to weapons. Arms generally did not include ammunition or other weapon accessories, including the cartridge box, the historical analog to magazines. Instead, "cartridge boxes" and "cartouch boxes" were considered "accoutrements," or accessories, like the other military equipment (scabbards, belts, and so forth) that was separate from, and did not include, arms.

33.     But English usage is never simple. As linguists often put it, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of such outliers does not invalidate the data or undercut an interpretation; it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage occurs in all human language. Given the volume of samples, that is not surprising. In addition to the 1777 entry in the Journals of the Continental Congress (above), where "arms" seems to include accoutrements in one part of the sentence and in the next it seems to exclude accoutrements, this example from COFEA shows that "accoutrements" may occasionally encompass arms:

   a.   1789 – A few years since, some boys, equipped in mock military accoutrements, such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston. [*The American jest book*: Part I[-II]; emphasis added; here military accoutrements includes toy swords.]

34.     In these four citations from the Readex newspaper corpus, it is not always clear from the context whether cartridge boxes are arms or accoutrements, or if they are simply not being categorized:

   a.   1753 – "[E]very listed Soldier and other Householder . . . be always provided with a well-fix'd Firelock . . . a Snapsach, Cartouch Box, one Pound of Powder, twenty Bullets fit for his Gun, twelve Flints, a good Sword or Cutlass, a Worm and Priming Wire, on penalty of six Shillings for want of such Arms as is hereby required, and two Shillings for each other Defect." *Boston Post-Boy,* April 30, 1753. Considering citation (c), below, dated 1756, it is likely that the fine for not having a cartouch box in this example would not be the higher fine for a weapons

defect, but rather the lower fine of 2s. levied for "other defects."

b.  1755 – "whoever provides himself a good Firelock, Sword or Hatchet, Belt and Cartridge-Box, to receive 16s. more . . . . but the Arms to be returned when the Service is over." *Boston Gazette,* April 21, 1755. It is not clear from the context whether the cartridge boxes are part of the arms that must be returned. In other articles, cartridge boxes are treated as personal items. They may bear a variety of decorations, and they are sometimes listed along with other uniform items in a description of a soldier's funeral.

c.  1756 – "That every Male Person . . . shall . . . provide himself with one well fixed Musket, or Fuzee, with a Worm and Priming Wire, one Cartouch Box with nine Charges of Gun Powder, and Ball suitable therein, and three good Flints . . . and shall keep such Arms and Ammunition by him, in good Order, and fit for Service, at all Times . . . under the Penalty of Twenty Shillings for Want of a well fixed Musket or Fuzee, with a Worm and Priming Wire, and Two Shillings for the Want of every Cartouch Box, and Two Shillings for the Want of nine Charges of Gun Power and Ball, and three Flints, or any of them." *Pennsylvania Gazette,* May 13, 1756. The larger fine for lack of arms, along with lower fines for missing Cartouch Boxes and ammunition, suggest that cartouch boxes and cartridge boxes do not belong to the category "arms" but are instead a form of accessory.

d.  1785 – "His European weapons consisted of a musket, bayonet and cartouch-box; a fowling piece; two pair of pistols; and two or three swords or cutlasses." *History of Capt. Cook's Voyage, Massachusetts Centinel,* January 15, 1785. Here cartouch box appears among the list of weapons carried by an islander that Cook encountered.

35.    Another cite, from 1777, refers to firearms and other military accoutrements, implying, by the use of the word "other," that arms may be a subcategory of "accoutrements":

"any drafted soldier . . . who is unprovided with a fire-arm, and other military accoutrements prescribed by the militia law." Massachusetts, Acts & Laws, March Session, Colony of Massachusetts Bay, 1777, p. 10 (but see ¶ 37, ex. a).

36.    "Arms" are sometimes included as a subcategory of accoutrements, when "accoutrements" is used in its most general sense, referring to 'the equipment of a soldier,' but that does not mean that "arms" typically includes accessories or other "accoutrements."

37.     Despite a handful of exceptions like those just cited, in literally hundreds of cases, "arms" and "accoutrements" are treated as separate categories of military gear. Here are some typical examples from the Founding Era:

   a.   1776 – "The Sum of ten Shillings … to purchase said Fire Arms and Accoutrements" (Acts and Laws March Session, Colony of Massachusetts Bay). Here arms and accoutrements are separate, unlike the citation from 1777, above in ¶ 35, from the same source, where arms and accoutrements are lumped together).

   b.   1780 – "arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments" (George Washington, General Orders January 22).

   c.   1783 – "Such of the Noncommissioned officers and privates … shall be allowed the fire arms and accoutrements as an extra reward" (George Washington, General Orders, May 1).

   d.   1795 – "you will march …. with arms and accoutrements in good order." (*Incidents of the Insurrection in the Western Part of Pennsylvania, in the year 1774*). This example is from COEME; the other examples in this list are from COFEA.

   e.   1798 – "To hold his powder and his ball, his gun, accoutrements and all …." (French Arrogance, or, "The Cat Let Out of the Bag"). This poetic example shows that the idiomatic phrase arms and accoutrements has become part of the general language available not just to military specialists but also to poets and novelists.

38.     A newspapers.com search for "accoutrements" returns 1,392 hits. There are 692 matches for the exact phrase "arms and accoutrements."

39.     Here is a mid-eighteenth-century British example from the newspapers.com corpus where "arms" and "accoutrements" are separate categories, as is "ammunition": "This Militia shall receive their Arms, Accoutrements, and Ammunition from the Ordnance." *Derby Mercury,* March 19, 1756, p. 3.

40.     Similarly, there is this "ploughshares into swords" example of a Cambridge University library to be converted to military use: "[T]he new Building intended for a publick Library . . . may be converted into a Barrack, and be supplied with Provisions, Arms, and

Accoutrements, at the Expence of the University" *Jackson's Oxford Journal,* March 20, 1756, p.

2.

41.     A search of "arms and accoutrements" in the Readex database of America's

Historical Newspapers returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. An

early example from the colonial period appeared in the *Boston Evening Post* in 1750. It

distinguishes "arms" from uniforms, "accoutrements," and other military equipment: "All

Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth,

receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger"

(*Boston Evening Post,* September 10, 1750, p. 2).

42.     This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that "arms" and

"accoutrements" are distinct categories in the new nation as well: "The militia . . . must be

considered as the palladium of our security …. The formation and discipline of the militia of the

continent should be absolutely uniform; and that the same species of arms, accoutrements, and

military apparatus, should be introduced in every part of the United States" (*Pittsburgh Gazette,*

February 14, 1789, p. 1).

43.     The text of a bill in Congress to establish a uniform militia appeared in the *New*

*York Journal* in 1790. It confirms the Founding-Era sense that "arms," "ammunition," and

"accoutrements" make up distinct and separate elements of a soldier's kit: "There shall be

appointed an adjutant general for each state … whose duty it shall be to … report[] the actual

situation of their arms, accoutrements, and ammunition…. Every non-commissioned officer or

private … for appearing at such meeting or rendezvous without his arms, ammunition, or

accoutrements, as directed by this act, shall pay the sum of twenty-five cents" (*New York Journal,*

July 23, 1790).

44.    And this cite from 1868 clearly distinguishes what counts as "arms," and what counts, separately, as "accoutrements": "At Watertown Arsenal, Massachusetts … the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets … ; 261 Carbines … ; 305 Sabres … ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c." *Daily Morning Chronicle* (Washington, D.C.), January 7, 1868, p.4.

45.    The newspaper data parallels that of COFEA: the phrase "arms and accoutrements" is almost always military. The phrase sometimes occurs alongside "ammunition" as a separate list item. *"Accoutrements,"* when it appears alone in a military context in these newspapers, is a more general term, used for gear and rarely, for arms as well.

46.    It is clear that "arms and accoutrements" was, during the eighteenth and nineteenth centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like "bacon and eggs" or "salt and pepper." Such pairs take on the characteristics of a formula and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). For example, "eggs and bacon" is rarer than "bacon and eggs." Such ordered pairs are called "irreversible binomials," though there is often nothing but custom to prevent anyone from reversing the order.

47.    The word "accoutrements" typically occurs in a list after "arms" (more rarely, it may occur before "arms" as well), and it is typically a separate category from "arms" (though not always, as the above examples show).

48.    There are over 47,000 citations in newspapers.com for "arms" or "accoutrements" in the period 1868–1900, and 15,799 cites for the exact phrase "arms and accoutrements." Examining a selection of the 15,799 citations of the phrase confirms that both in England and the

United States, "arms" and "accoutrements" are separate categories. Here is one example from Gloucestershire, in England, in 1868: "[A] letter was received from the Home Secretary, pointing out the danger of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot." *Gloucester Chronicle,* January 4, 1868, p. 2.

49.    A similar cite from Iowa in 1868 states, "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property." *Cedar Falls Gazette* (Iowa), January 10, 1868, p. 3.

50.    And this, from Stroudsburg, Pennsylvania, also 1868, states: "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana." *The Jeffersonian* (Stroudsburg, Pennsylvania), January 9, 1868, p. 2.

51.    The circa-1868 data confirmed the Founding Era data that "accoutrements" is primarily a military term, and that when "accoutrements" co-occurs with "arms," the terms refer to separate categories of equipment.

52.    One final note on "accoutrements": the United States Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) references *North Carolina v. Huntley*, 25 N.C. 418 (1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328. In that decision, the North Carolina Supreme Court stated, "A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements—as a part of his dress …"

53.     In the citation above, "accoutrements" does not refer to weaponry, but to the more general category of "everyday attire, or clothing." The court is saying that it may be normal to wear a shirt, or a belt, or shoes, but it is not normal to wear a gun in North Carolina in 1843. It is legal—the court agrees—to carry a gun for any lawful purpose, "either of business or amusement"—but it is not normal or typical to do so. In affirming Huntley's conviction, the court noted that his purpose in carrying a shotgun was not a legal one.

**What does it mean to go "armed"?**

54.     Many Founding Era laws restrict persons from "going armed" in particular circumstances. Searching COFEA for occurrences of "armed" within six words of "ammunition" yields nine citations, of which the following are relevant:

a.  1776 –  If Nine Months ago the Colonies had assumed Governments, they would have been infinitely better armed, trained, furnished with Ammunition, salt Petre, Powder Works—they would have been rid of the Plague of Toryism. (From John Adams to William Heath, 15 April 1776; https://founders.archives.gov/documents/Adams/06-04-02-0042)

b.  1777 – A detachment of 900 men and twelve light horsemen, with proper officers, to furnish themselves with three days provisions, cooked, and parade at 2 o'Clock this afternoon, behind the park of Artillery, completely armed, accoutered and furnished with ammunition, and with their blankets slung. (General Orders, 21 June 1777; https://founders.archives.gov/documents/Washington/03-10-02-0091)

c.  1778 – I desire you to send a party of 150 Men, under a good Officer, well armed and completed with Ammunition to Bartholomews Tavern. (From George Washington to Brigadier General John Lacey, Jr., 2 March 1778; https://founders.archives.gov/documents/Washington/03-14-02-0021)

d.  1779 – The soldiers of such militia, if not well armed and provided with ammunition, shall be furnished with the arms and ammunition of the county, and any deficiency in these may be supplied from the public magazines or if the case admit not that delay, by impressing arms and ammunition of private property; which ammunition, so far as not used, and arms, shall be duly returned, as soon as they may be spared. (6. A Bill Making Provision against Invasions and Insurrections, 18 June 1779; https://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0006)

e.  1785 – same language as above, used in a Virginia militia law. (Collection of All Such Public Acts of the General Assembly and Ordinances of the Conventions of Virginia, Passed since the year 1768. https://heinonline.org/HOL/P?h=hein.sstatutes/pagava0001&i=1)

f.  1790 – The Warriors of the Creeks have been stated at various numbers from four to six thousand, and are said to be generally well armed, and furnished with ammunition. (To George Washington from Henry Knox, 4 January 1790; https://founders.archives.gov/documents/Washington/05-04-02-0353)

g.  1790 – such armed vessel, with her tackle, appurtenances, ammunition . . . . (Annals of the Congress of the United States 1st Congress to 18th Congress, 1st Session (1789-1924); https://heinonline.org/HOL/P?h=hein.congrec/aoc0009&i=1)

55.    For the same dates, searching "arms" and "ammunition" yields more than 973 hits; in all of these, "arms" and "ammunition" are separate categories, as shown in my earlier discussion of these terms. Some of the lists mention accoutrements as well. Here are some samples: arms, accoutrements, and ammunition (1776); arms, ammunition, and clothing (1776); arms, blankets, cloathing, kettles, and ammunition (1776); arms, ammunition, and blankets (1776); arms, ammunition, and stores (1776); arms, ammunition, and warlike stores (1776); arms, ammunition, cannon, and other implements of war (1776); arms, ammunition, money, or other stores (1776); arms, ammunition, money, cloathing, or other articles (1776); arms, ammunition, flints, and lead (1776); arms, gun powder, ammunition, provisions (1777); Cloathing and particularly shoes — Arms, dragoons and Horse Equipments, Ammunition of every kind (1781).

56.    Searching COEME for the dates 1641–1800 for "armed" within six words of "ammunition" yields 23 hits, of which the following are relevant (some duplicates have been removed):

a.  1641 – great ships full of ammunition and armed men (The life of Merlin, sirnamed Ambrosius his prophesies and predictions interpreted; eebo.A43598).

b.  1642 – completely armed and well furnished with ammunition. (September 29. 1642. The persons to whom the militia of the Citie of London is committed, for the safetie of the said Citie, have thought fit, and hereby declare. EEBO eebo.A88439).

c. 1658 – exceeding well armed and furnished with excellent ammunition (A compleat history of the life and raigne of King Charles from his cradle to his grave collected and written by William Sanderson, Esq.; eebo.A62144).

d. 1658 – The County were not so many, ill trained, dispersed, meanly armed, slender Ammunition, and such Commanders as in like cases are more for reputation, then direction or execution. (A compleat history of the life and raigne of King Charles from his cradle to his grave collected and written by William Sanderson, Esq.)

e. 1662 – Neither excellently armed nor plentifully stored with ammunition (The history of the worthies of England who for parts and learning have been eminent in the several counties : together with an historical narrative of the native commodities and rarities in each county, endeavoured by Thomas Fuller. eebo.A40672).

f. 1680 – well provided both of Victuals and Ammunition, and armed with Ordnance both great and small. (The history of the Turkish empire from the year 1623 to the year 1677 containing the reigns of the three last emperours / by Paul Rycaut, Esq.; eebo.A57996).

g. 1687 – these Powerful Perſons would by no means conceal their triumph over Us, but the next day are guarded from their residence in the City with multitudes of armed Men and Ammunition in a hostile and warlike manner to Westminſser. (Basiliká the works of King Charles the martyr: with a collection of declarations, treaties, and other papers; eebo.A31771).

h. 1688 – the Souldiers raised and armed, and the Victuals and Ammunition provided. (The royal commentaries of Peru, in two parts the first part, treating of the original of their Incas or king; eebo.A42257).

i. 1775 – five private men, all well armed, with plenty of ammunition, two wall-pieces, and three days provision. (Journal of the Resolution's voyage: in 1772, 1773, 1774, and 1775. On discovery to the southern hemisphere; ecco.K111410.000).

57.    COEME and COEFA do not cover the post-Civil War period, and newspaper searches for that period for the "armed" together with "ammunition" are not practical because these databases do not permit collocate searches. From my searches of COFEA and COEME, I conclude being "armed" in the Founding Era typically refers to weapons, while "ammunition," when it is mentioned, is typically listed as a separate category, along with other items like food or accoutrements. In addition, "arms" and "ammunition" are routinely treated as separate categories before and during the Founding Era, both in England and in the U.S. "Ammunition," when it occurs

in lists, often appears in the pair of items "arms and ammunition" or in the three item list, "arms,

ammunition, and accoutrements." But "ammunition" does not always appear immediately before

or after "arms." In several cases "arms" occurs first, then there are one or more intervening list

items, such as food, blankets, or clothing, and then "ammunition."   This further supports my

conclusion        that        "arms"        does        not        include        "ammunition."


**Some early use of the words "magazine" and "magazine wind gun," along with instances of repeater or magazine guns in the Founding Era and the years 1860–1880**

58.    Although most uses of the word "magazine" today still refer to printed periodicals,

during the nineteenth century, one sense of the term "magazine" narrows, referring more and more

to an "ammunition container," a primary sense of the word in reference to firearms today. The

OED defines *magazine*, sense IV b, as "A container or (detachable) receptacle in a repeating rifle,

machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech,"

with the earliest citation in this sense from 1868 (OED online). It is noteworthy that as late as

1867, the British naval dictionary *The Sailor's Word-Book* retains the older definition of

"magazine" as a gunpowder storage facility on land or at sea: "A place built for the safe-keeping

of ammunition; afloat it is confined to a close room, in the fore or after part, or both, of a ship's

hold, as low down as possible; it is lighted occasionally by means of candles fixed in the light-

room adjoining it, and no person is allowed to enter it with a lamp or candle" (Admiral W. H.

Smyth and Vice-Admiral Sir E. Belcher, *The Sailor's Word-Book: An Alphabetical Digest of

Nautical Terms,* London, 1867; the authors suggest that the placement of the magazine room "as

low down as possible" minimizes the risk of a direct hit by enemy fire, and they note as well that

no one is permitted to carry a lighted flame into the ship's magazine room to minimize the risk of

an accidental explosion; see ¶ 30, above, for the Smyth and Belcher definition of the term

"cartridge-box" to refer to the box or pouch used for transporting ammunition to a small arm or a large gun). In addition, Smyth and Belcher define "repeating fire-arm" as "One by which a number of charges, previously inserted, may be fired off in rapid succession, or after various pauses. The principle is very old, but the effective working of it is new." Their definition—which does not mention "magazine" in connection with such guns—acknowledges the existence of earlier repeater guns, but judges them to have been ineffective. Only the repeater guns designed and manufactured in quantity during the period just before the dictionary's publication in 1867 are actually judged to be "effective." The earliest example in COHA of "magazine" referring to the ammunition compartment is dated 1882: "Solitary travelers still find it prudent to make a display of a magazine rifle, and to keep a sharp eye on any roving bands" (E. V. Smalley, "The New North-West," *Century,* September, 1882, pp. 769–79). COHA lists only 40 examples of "magazine rifle," occurring a bit later, between 1890 and 1930. "Magazine gun" appears in the COHA data 16 times between 1920–2010. And an 1893 editorial in the *New York Times* refers to the army's "new magazine rifle" ("New Powder for the Army," *New York Times,* December 7, 1893, p. 4). However, as with a very few instances of "accoutrements" including "arms," there are an extremely small number of early counterexamples between 1744 and 1820 where "magazine" refers to the bullet compartment of a gun—not a pistol or rifle using conventional gunpowder and bullets, but an air gun.

59.     The common, single-shot "wind gun" or "air gun" used compressed air rather than ignited gunpowder to propel a ball, and was much quieter than a traditional gun. Although the air gun did not require powder or a match, the user had to re-charge the compressed air cylinder once the air had been expended. The novelist and essayist Oliver Goldsmith found air guns to be useful for experiments in physics, adding, "THIS, however, is but an instrument of curiosity, and

sometimes of mischief" (Oliver Goldsmith, *A survey of experimental philosophy, considered in its present state of improvement*, 1776). This newspaper story from the same period reports that the scientist Joseph Priestley was injured by an accidental discharge of an air gun: "We hear from Birmingham, that the celebrated Dr Priestley, in a late trial of some experiments with an air gun, was badly wounded by an accidental discharge of it; the ball with which it was loaded, passing thro' one of his hands, and shattering it to pieces" (*The Leeds Intelligencer and Yorkshire General Advertiser*, June 5, 1781, p. 3).

60.    A number of newspaper references suggest that its relative quietness made the air gun popular with criminals, and many references to air guns refer either to accidental discharges or to criminal assaults (to cite an example of the latter, numerous newspaper accounts in 1785 suggested that the weapon which broke a window in an attack on King George III's carriage was an air gun).

61.    Air guns typically fired a single shot. However, there are references in the corpora to approximately eight inventors between 1744 and 1820 who built air guns capable of firing anywhere from 9 to 50 balls without reloading the ammunition or recharging the compressed-air cylinder. Lexical evidence suggests almost all of these repeater air guns were experimental models rather than guns available for military or civilian use.

62.    The OED dates the term "magazine wind-gun" to 1744 in a reference to an air gun capable of firing more than one shot without reloading. "Magazine wind-gun" is the term used by its inventor, a man named L. Colbe. I have found no other examples of the term "magazine wind gun" in any database, suggesting that the phrase is a *hapax legomenon,* or "oncer," terms that lexicographers use to define a word that merits a definition, but that does not appear anywhere else. Colbe also uses the term "magazine gun" for his device, and that term does occur twice more

in the data, suggesting that it was never a common term. In an entry separate from its entry for

"magazine," the OED marks the usage of both "magazine wind gun" and "magazine gun" as "rare"

and "obsolete":

> a.  †magazine wind-gun *n. Obsolete rare* a type of wind-gun fitted with a magazine of
> bullets. 1744 J. T. Desaguliers *Course Exper. Philos.* II. 399   An ingenious
> Workman call'd L. Colbe has very much improv'd it [sc. the old Wind-Gun], by
> making it a Magazine Wind-Gun; so that 10 Bullets are so lodg'd in a Cavity…that
> they may be…successively shot. [Oxford English Dictionary Online, s.v. magazine
> wind-gun.]

63.     The OED citation is from John Theophilus Desaguliers, *A Course of Experimental*

*Philosophy* (London, 1744), vol. II: 399–402. Desaguliers, an assistant to Isaac Newton, was a

member of the Royal Society who specialized in mechanics and hydraulics. In his treatise,

Desaguliers offers an elaborate description of the common, single-shot wind gun, more typically

referred to as an air gun, along with a three-page description of Colbe's so-called "Magazine Wind-

Gun," accompanied by a detailed drawing of the mechanism of that gun. I have found no

biographical information about L. Colbe, inventor of the gun, and I have found no lexical evidence

that Colbe made more than one such gun, or if he did, that it was produced in any significant

numbers. Although Desaguliers suggests that this "magazine gun" may be "the best Defence

against Highway-men, or Robbers that Travellers are aware of because when they have cause to

suspect them, they may make five or six Discharges before a Thief can come within Pistol-Shot"

(*Id*. at  402), there is no evidence in any of the corpora that Colbe's invention was ever used either

by the military for any purpose, or by civilians for individual self defense. And there is no lexical

evidence that the other repeater air guns invented before the mid-nineteenth century were ever

more than curiosities until workable models of what we now call machine guns or automatic or

semiautomatic weapons, using conventional gunpowder and bullets, not compressed air and balls,

were produced during and after the Civil War.

64.    As further confirmation that the magazine wind gun was an anomalous and uncommon term, the OED definition of "magazine," updated most recently in 2022, gives the earliest date of the sense of the word as 'ammunition container' as 1868. The corpus evidence confirms that the magazine wind gun is correctly dated by the OED as 1744, and I have found only two references to "magazine guns" in the 1790s and early 1800s, confirming that this usage of the word remained rare. "Magazine wind-gun" and "magazine gun" do not appear in the COEME or COFEA corpora. I have found no information in the corpora on the availability or popularity of such guns, but the sparse lexical data suggests that they were not in common use.

65.    A small number of references to later repeater wind guns indicate they were made, not by armorers, but by clockmakers and other highly-skilled artists or artisans. There is no indication in the lexical evidence that repeater air guns were ever mass produced or publicly available in the Founding Era. Several of the citations I found treat these guns as curiosities and their owners charged a small fee to anyone interested in looking at them (and in one case, trying the gun out). Like Colbe's wind gun, they seem to be rare inventions or curiosities, not weapons commonly available to the military or to the American or English public. Besides Colbe's gun, there are only two examples from the data that use the word "magazine" in connection with a repeater air gun:

a.  1784 – "An artist of this town [Birmingham, Eng; the artist is also identified as a compass maker] has lately invented a magazine gun, that will discharge 45 bullets separately in two minutes and a half, each bullet would kill an ox at 40 yards distance; it is only charged once, and aim is taken with more certainty than with the fowling piece" (*New York Packet and American Advertiser,* New York, NY, August 5, 1784).

b.  1815 – Advertisement for "one magazine Gun, when once loaded can be discharged ten times in a minute" (*New York Gazette*, Aug. 30, 1815).

66. The corpora contain just nine other references to repeater air guns, none of them using the word "magazine":

a. 1783 – "Vienna. A watchmaker has invented an Air Gun, which, without recharging, fires 15 times successively. A corps of Hunters are to be armed with these guns." (*The Newcastle Weekly Courant* (England), May 10, 1783, p. 3). There is no follow-up to indicate whether the corps of Viennese hunters did employ such a weapon.

b. 1792 – A number of American newspapers report on the invention by a man, only identified as someone from Rhode Island, of a repeating air gun capable of firing twenty times without reloading. Here is one: "A person in Rhode Island has invented an Air-gun, which can be discharged, to do execution, 20 times, each time it is loaded.—As nothing is cheaper, and easier to be transferred, than the ammunition for the above pieces; and as saving much expense, they recommend themselves strongly to the Secretary at War, to be used in the approaching campaign against the Indians" (*National Intelligencer: National Gazette*, April 26, 1792, p. 3). There is no indication that the Secretary of War knew of the invention or acted on this suggestion. In fact, the following advertisement suggests that the repeater air gun in question was treated as a curiosity to be admired in a museum:

c. 1792 – "An air-gun, made by a young man, a native of Rhode-Island, but now resident in this city [New York], and which has been purchased by the subscriber, with a view eventually to make it the property of the American museum but wishes to reimburse himself in the following manner, viz. He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence. This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13 Maiden Lane, every day in the week, from 10 to 12 in the forenoon, and from 3 to 5 in the afternoon, Tuesday and Friday afternoons excepted, at which time it may be seen at the Museum. Gardiner Baker, Keeper of the Museum" (*New York Daily Advertiser*, February 9, 1792).

d. 1796 – "This carabine, lighter and smaller than the common ones, is composed of two barrels, the smallest of which contains 25 balls: and by a slight movement, they pass from the one to the other; which ball, by lowering the firelock, goes off with the same rapidity and carries further than if fired with powder, without the least noise, and that as often as a hundred times alternately, during the space of 8 or 10 minutes; after which, the reservoir being exhausted, it requires to pump in fresh air, which takes up at most, 16 minutes (*The Independent Gazetteer* (Philadelphia), August 6, 1796, p. 1). This report adds that the repeater air gun, invented in the reign of Emperor Joseph II (reg. 1765–1790), was distributed to German troops, and that a sample weapon was given to the Prince of Wales. The writer suggests such guns would be useful at sea, since they are not affected by dampness. But there is no indication in the corpora that the Royal Navy ever considered such a weapon.

e. 1797 – "An Air GUN has been constructed by Messrs. Darlings and Wilkinson, of Cumberland, Rhode Island, upon a plan entirely new. It can be discharged twelve times with once loading, and will do execution with great exactness, at fifty yards distance" (*Columbian Centinel* (Boston), June 21, 1797).

f. 1801  – Multiple newspapers run the story of a repeater air gun invented by a man known as Girardami, identified as a peasant, artist, and watchmaker, and variously referred to in gun history articles as Girandoni or Girardoni (those spellings do not appear in the corpora that I consulted): "Girardami, a Tyrolese peasant, and self-taught artist, has invented an air-gun, which may be discharged fifty times without pumping again. The first twenty shots penetrate through a door at an uncommon distance. Girardami makes these air-guns himself, and likewise very good wooden watches" (*The Caledonian Mercury* (Edinburgh), March 2, 1801, p. 2). There are indications that Austrian troops used Girardami (or Girardoni) air guns among other weapons at the Battle of Austerlitz in 1805, where Napoleon won an important victory over the Austrian forces. In that battle, the air gun seems not to have been an effective weapon. In any case, there is no indication that it was ever adopted by English or American troops.

g. 1802 – The Newly-Invented Philosophical Air Gun That can be used as Gun or Pistol, and discharge 20 balls with one loading of the globe [that is, the compressed-air cylinder], unless the charge of air is let out at once. To be seen at Mr. Wyant's tavern, Market street, both night and day. Admittance one fourth of a dollar (*Telegraphe and Daily Advertiser* (Baltimore), March 17, 1802). "Philosophical" in this sense is often used to refer to physicists experimenting with air guns to measure air temperature, pressure, and volume, among other things (see, for example, the work of Desaguliers and the experiments of Goldsmith and Priestley mentioned above).

h. 1807 – An ad for an auction includes, among other items, "an air gun in compleat order which, when loaded will discharge twenty five times after being pumped" (*American Citizen* (New York, NY), May 28, 1807).

i. 1814 – One article in the corpora refers to a repeater air gun taken by Lewis and Clark on their expedition to the Pacific some eight years earlier, though the article itself has nothing to do with the expedition. Instead, this letter to the newspaper, criticizing a politician for repeating the same things that he has been saying for years, suggests as well that the Lewis and Clark repeater air gun was used not for hunting or warfare but rather to dazzle the Indians that the explorers encountered with their "great medicine," thereby ensuring a peaceful encounter: "he [the politician in question], forthwith, becomes a "great medicine," as the Shoshones called captain Lewis' air gun"(*National Advocate*, Mar. 23, 1814). This article was written ten years after the start and eight years after the completion of the expedition. I did not find any contemporaneous articles or firsthand accounts in the corpora of such a gun or how it may have been used.

j.  1819 – Finally, there is an ad for a French repeater air gun, for sale at 90 crowns: "which discharges 20 times before the air is expended" (*Salem Gazette* (Massachusetts), February 5, 1819).

67.     To summarize: the corpus data shows that the terms "magazine gun," "magazine wind gun," and "magazine air gun" are extremely rare, occurring a mere three times in the corpora, along with nine instances of repeater air guns that do not include the word "magazine." In contrast, there are approximately 1,200 references to the single-shot "air gun" in the several databases that I consulted. Subtracting an estimated 150 duplicates, that leaves about 1,050 references to a single-shot air gun. Two of the references, ¶ 66 (b) and (d) in the list above, suggest that they would be useful weapons for the military; one, ¶ 66 (a) above, recommends their use to hunters; and one writer, Desaguliers, in 1744 (above, ¶ 63), speculates that the weapon could be useful for self-defense. But for the most part, the references listed above to early repeater guns seem to be treated as curiosities: marvels of engineering constructed by clockmakers or other skilled artisans, items to be seen in a museum or exhibited at a tavern (*see* examples ¶ 66 (c) and (g) above). There is no lexical evidence that they were manufactured in quantity. Their mechanisms were complex, requiring a clockmaker's skill to design, make, and repair. And it took time to re-charge the air cylinder (one source in the list above, ¶ 66 (d), suggests sixteen minutes for one such repeater air gun, which would render them suboptimal in battle situations). A couple of entrepreneurs charged admission to view them (¶ 66 (c) and (g) above), and in one case, in  ¶ 66 (c) above, patrons may pay six pence to try shooting the gun. The writer who cites the Lewis and Clark repeater gun (¶ 66 (i)) suggests that the explorers used the gun to "impress" potentially hostile Native Americans rather than as a weapon against them. It too may have been a one-off. Furthermore, only three of the twelve references to repeater air guns refer to the bullet container as a "magazine," a further indication that this usage of "magazine" is extremely rare before 1820.

68.    With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term "magazine" starts to appear in the sense 'ammunition container' (gradually replacing the earlier terms "cartridge box" or "cartridge case"), not in air guns but in ones using gunpowder and bullets.

69.    COFEA and COEME do not cover the period past 1800. COHA, which does have nineteenth century coverage, turns up only a handful of uses of "magazine" in collocation with bullets, guns, rifles, or weapons in the 1890s, and only three such uses cited above before 1820. Most COHA cites for "magazine" refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses.

70.    Searching the word "magazine" in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. It is not currently possible to tease out the subset of these citations to determine exactly how many refer to weapons rather than print journals. In addition to the patents granted in 1860 (see above), I have found twelve citations in newspapers.com for "magazine carbine" and "magazine rifle" from 1860 to 1880:

a.    1864 – Advertisement for "Henry's Magazine Rifle, 15 shots" along with other firearms. *Chicago Tribune,* January 25, 1864, p. 1.

b.    1864 – The War Department establishes a Board of Officers "for the purpose of examining, testing and recommending for adoption a suitable breech-loader for muskets and carbines, and a repeater or magazine carbine." *New York Times,* Dec. 22, 1864. A few other newspapers carry notices of this commission and later report on its findings.

c.    1865 – "The Meriden Manufacturing Company have a contract for 5,000 breech-loading magazine carbines, Trippett's patent, for the State of Kentucky." *Sunbury* (Pennsylvania) *Gazette,* June 3, 1865, p. 3. No follow-up information in the corpora.

d.    1866 – "The Board would be unwilling to dispense entirely with magazine arms, and as these same can be used ordinarily as single-loaders." The military Board of Officers (see (a), concluded that the repeater gun patented by Spencer had promise, though it was not yet ready for service until improvements could be made to the mechanisms. *Chicago Tribune,* Dec, 19, 1866, p. 4.

e.  1868 – Report of another trial of various weapons under the auspices of the Board of Officers, including "magazine and single breech loaders," (one of them patented by Spencer). *New York Daily Herald,* July 7, 1868, p. 8.

f.  1873 – Marksmanship contest sponsored by the National Rifle Association includes one contestant firing a "magazine carbine" and 36 contestants firing other rifles. *Brooklyn Daily Eagle,* September 1, 1873, p. 4.

g.  1874 – Another NRA-sponsored contest at Creedmoor offers a second prize in one competition for NY State National Guard members, "an elegant Ward-Burton magazine carbine" valued at $50. *New York Times,* September 17, 1874, p. 2.

h.  1877 – A museum in Birmingham, England, displays Russian and Turkish rifles, including one Turkish "Winchester magazine gun." *Birmingham Daily Post,* December 29, 1877, p. 5.

i.  1878 – A display in Sidney, Australia, of a variety of firearms, including "some novelties from America . . . [including] the Evans Magazine carbine." *Sydney Morning Herald,* April 29, 1878, p. 5.

j.  1879 – Under "Military Items," this notice: "An invoice of Hotchkiss Magazine Carbines were received here this week." *Vancouver* (Canada) *Independent,* August 14, 1879, p. 5.

k.  1880 – Under the heading "Maryland Military Affairs," report on the Maryland National Guard. "Each infantry organization is armed with . . . breech-loading magazine carbines." *Baltimore Sun,* January 16, 1880, p. 1.

l.  1880 – Advertisement of F. Lassetter & Co. includes "Evans' Magazine Military Carbines [that] will carry twenty-two rounds." *Otago* (New Zealand) *Witness,* May 15, 1880, p. 1. The advertisement ran on multiple days in multiple newspapers.

71.    A number of these references are optimistic about the future of such weapons, but several note that single-shot weapons will predominate until the repeater mechanisms of these new rifles are improved. Perhaps because the term was largely associated with military weapons, it remained relatively rare until the 1920s. In any case, before mid-nineteenth century, bullets were kept in "cartridge boxes," sometimes called "cartouch boxes," or "cartridge cases" or pouches, and these bullet storage containers were part of the general category of military accoutrements, not arms.

72.     I did try to estimate, indirectly, the frequency of the gun-specific use of "magazine" by running a Google n-gram search. Google's n-gram viewer searches the corpus of digitized Google Books. It can give a rough approximation of a word's frequency in relation to the other words in the Google Books corpus. The results appear as a graph. The n-gram viewer is capable of showing the relative frequency of several words on the same graph. My n-gram search showed that between 1750–1880 the word "magazine" occurs with a frequency of 0.0005121511% in 1789 and a frequency of 0.0007324368 in 1880.[6] A search for "magazine gun" returns no hits for that same period. But a search for "magazine rifle" shows that it does not appear in the database before 1813; there are few instances from 1813 to 1820, with a frequency of 0.0000000185%; and then a sharp rise between 1863 and 1880, when the frequency reaches a high of 0.000000936%, reflecting both the increased use of the revolver and the invention of repeating rifles and machine guns during the Civil War.[7] Still, it remains a rare term. Searching "magazine carbine" from 1860–1880 shows the term to be even rarer than "magazine rifle," with no occurrences in 1860, a peak frequency in 1866 of 0.0000002185%, and a sharp drop thereafter.[8] In contrast, an n-gram search for "carbine" during those years shows that "carbine" occurs about 370 times more frequently than "magazine carbine" in the Google Books corpus.[9] The Google n-gram data shows that the use of "magazine" in the Founding Era was not associated with guns. By 1880, the association with guns had become more common. Comparing the use of "magazine" in 1880 in all contexts with the use of "magazine rifle" that same year, it appears that the gun-related sense of "magazine" represents approximately

---

[6]https://books.google.com/ngrams/graph?content=magazine&year_start=1750&year_end=1880&corpus=en-2019&smoothing=3).

[7](https://books.google.com/ngrams/graph?content=magazine+rifle&year_start=1750&year_end=1880&corpus=en-2019&smoothing=3).

[8]https://books.google.com/ngrams/graph?content=magazine+carbine&year_start=1860&year_end=1880&corpus=en-2019&smoothing=3.

[9]https://books.google.com/ngrams/graph?content=carbine&year_start=1860&year_end=1880&corpus=en-2019&smoothing=3.

0.0012% of the occurrences of the word "magazine." In other words, the association exists in the period surrounding the ratification of the Fourteenth Amendment, but it is still a rare term.

73. The n-gram estimate, together with the sparse evidence in COHA and the OED, all suggest that "magazine" in the sense of 'device for holding bullets' forms only a very small subset of the 3.3 million occurrences of "magazine" in the newspaper corpora. Although "magazine" in the gun-related sense shows a distinct rise between 1864 and 1880, it took another thirty to forty years for the 'bullet holder' sense of the word "magazine" to become more common. Even then, text references to ammunition magazines often appear, not in general discourse, but in legislation passed early in the twentieth century restricting their size or use.



Fig. 1 Google n-gram showing the frequency of "magazine."



Fig. 2 Google n-gram showing the frequency of "magazine rifle"



Fig. 3 Google n-gram showing the frequency of "magazine carbine."

**Conclusion**

74.     To repeat, there is virtually no lexical data that I have found showing that "arms"

includes "accoutrements," "cartridge boxes," "cartouch boxes," "magazines," or any parts of

weapons. To the contrary, while "arms" is used as a general term for weapons (typically swords,

knives, rifles, and pistols), it does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category "accoutrements." And there is no evidence from the small number of mentions of the repeater air guns in the databases before the Civil War that such guns were used in the Founding Era by the American or British military, or that they were widely available in that period to civilians for hunting or self-defense.

I declare that the foregoing is true and correct to the best of my knowledge.

_____
Dennis Baron

_____
June 15, 2023
Date

41

# Exhibit A

**DENNIS BARON**

Professor of English, Emeritus
Research professor of English                                    *email:* debaron@illinois.edu
University of Illinois at Urbana-Champaign        Web Page *url:* http://faculty.las.illinois.edu/debaron/
Home: 1801 Foxborough Ct
Champaign IL 61822-8501

### VITA

**Education:**

> Ph.D., University of Michigan (English Language and Literature), 1971.
> M.A., Columbia University (English and Comparative Literature), 1968.
> A.B., Brandeis University (English and American Literature), 1965.

**Positions held:**

> Research Professor of English and linguistics, University of Illinois, 2018–present.
> Professor English, Emeritus, University of Illinois, 2018–present.
> Professor of English and Linguistics, University of Illinois at Urbana-Champaign, 1984–2018.
> Head, Department of English, University of Illinois at Urbana-Champaign, 1998–2003.
> Acting Head, Department of English, Univ. of Illinois at Urbana-Champaign, 1997–98.
> Director of Rhetoric, University of Illinois, 1985–97.
> Director, Writing Outreach Workshop, Univ. of Illinois, 1985–88.
> Professor, Campus Honors Faculty, Univ. of Illinois, 1988–2018.
> Professor, College of Education, UIUC, Summer 1988.
> Associate Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1981–84.
> Assistant Professor of English and Linguistics, Univ. of Illinois, Urbana-Champaign, 1975–81.
> Assistant Professor of English, The City College of CUNY, 1973–74.
> Assistant Professor of English, Eastern Illinois University, 1971–73.

**Fellowships and Grants:**

> John Simon Guggenheim Memorial Foundation Fellow, 2016–17.
> Faculty Fellow, Program for the Study of Cultural Values and Ethics, Univ. of Illinois, Spring 1992.
> National Endowment for the Humanities Fellowship, calendar year 1989.
> Newberry Library National Endowment for the Humanities Fellowship, 1988–89 (offered, not held).
> IBM Project Excel Grant C-41, 1986-87: "Computer Analysis of Student Writing."
> Associate, Center for Advanced Study, University of Illinois 1984–85.
> Fulbright Lecturer, University of Poitiers, France, 1978–79.
> Fellow, Center for Advanced Study, University of Illinois, 1978 (offered, not held).
> University of Illinois Research Board grants, multiple years, 1978–2017.

**Books:**

1. ***You Can't Always Say What You Want: The Paradox of Free Speech.*** Cambridge University Press, 2023. (Available Dec., 2022).

2.  ***What's Your Pronoun? Beyond He and She.*** Liveright, 2020; paperback, 2021. Reviews: *New York Times Book Review, The Times* (London); *The London Review of Books; Harpers; The Atlantic; The Economist; Attitude.*

3.  ***A Better Pencil: Readers, Writers and the Digital Revolution.*** Oxford University Press, 2009, pp. xviii + 259. Paperback edition, 2012. Chinese translation, 2012. Reviews: *Salon; City Journal*; History News Network; *The Scotsman; Library Journal; internet review of books; Montreal Mirror*; Innovation Leadership Network; mantex.com (Manchester, England)*; The Star* (Malaysia); *Times Higher Education; International Journal of Communication; The Guardian; Choice; American Scientist; 3quarksdaily, The New Yorker*; *Arts Journal.*

4.  ***Guide to Home Language Repair*** (questions, answers, and essays on the English language)*.* National Council of Teachers of English (1994), viii + 165. Reviews: *Boston Book Review*; *New York Times Magazine.*

5.  ***The English-Only Question: An Official Language for Americans?*** Yale University Press, 1990; paper ed., 1992. Reviews: *Publishers Weekly; Washington Post Book World; Booklist; Library Journal; Education Week;* Hazel *New York City Tribune; The Bookwatch—Midwest Book Review; Change; The Jerusalem Post; Times Literary Supplement; American Political Science Review; Book Review Digest; American Journal of Sociology; Publishers Weekly; College English; Modern Language Journal; Language Problems and Language Planning; Language.*

6.  ***Declining Grammar and Other Essays on the English Vocabulary*** National Council of Teachers of English. Reviews: *Newsweek* (Dec. 11, 1989), p. 71; William Safire, *New York Times Magazine; The State Journal-Register* (Springfield, IL); *The Chicago Tribune; The Chicago Sun-Times; The Denver Post*; *Library Materials Guide; Book Report; NATE News; Language; Young Adult Paperback Book Guide.*

7.  ***Grammar and Gender*** Yale University Press, 1986; paper ed., 1987. Reviews: *Kirkus Reviews; Publishers Weekly; Patriot Ledger* (Quincy, MA); *The Washington Times Magazine;* John Simon, *The New Leader; Chronicle of Higher Education; Los Angeles Times; Library Journal; Insight; Champaign-Urbana News-Gazette; Choice; Language Monthly; The Times Literary Supplement; Psychology Today; Virginia Quarterly Review; The Toronto Star; ETC.; Book Review Digest; Chicago Tribune; Akron* (OH) *Beacon Journal; Clearwater* (FL) *Sun; Corpus Christi* (TX) *Caller-Times*; *Wilkes-Barre* (PA) *Times Leader; Troy* (NY) *Record; The Editorial Eye; Studies in the American Renaissance; Lingua; Modern Language Review; Review 9; American Speech; Southern Quarterly Review; Signs; Language; JEGP; Frontiers; Anglia; Journal of English Linguistics* Nominated for the Mina P. Shaughnessy Medal of the Modern Language Association.

8.  ***Grammar and Good Taste: Reforming the American Language*** Yale University Press, 1982; paper ed., 1984. Reviews: *Library Journal; America; The New York Times Book* Review; *The Washington Post Book World; Chronicle of Higher Education; The Times* (London); *The Los Angeles Times Book Review; Journal of American History; Encounter; American Literature; Journal of American Studies; Amerikastudien; Book Review Digest; Journal of English and Germanic Philology; Technical Communication; The Augusta Chronicle, Augusta Herald; American Studies; South Atlantic Quarterly; English Language Notes; World Literature Today; History of Education Quarterly;* Caroline Bokinsky, *Studies in the American* Renaissance; *Etudes Anglaises; Review of English Studies; College Composition and Communication; American Speech; Anglia; Book Review Digest; ESQ; English Journal.* Selected for the "Editor's Choice" section of *The New York Times Book Review.* Selected by the Library of Congress for recording for the blind. Nominated for the 1982 Mina P. Shaughnessy Medal and the 1987 James Russell Lowell award of the Modern Language Association; selected by the Editorial Board of the National Council of Teachers of English for distribution as an affiliate publication of the NCTE.

Dennis Baron, *Vita,* 3

9. ***Going Native: The Regeneration of Saxon English.*** Publication of *The American Dialect Society,* No. 69, University of Alabama Press, 1982.

10. ***Case Grammar and Diachronic English Syntax.*** Mouton, 1974. Reviews: *Linguistics; Indogermanische Forschungen; The Year's Work in Old English Studies; Revue Belge de Philologie et d'Histoire.*

**Supreme Court Amicus Briefs:**

Brief for Corpus Linguistics Professors and Experts as Amici Curiae Supporting Respondents. *New York State Rifle and Pistol Assn. v. Bruen,* No. 20-843 (2022). [Cited by J. Breyer in his dissent]

Brief for Professors of Linguistics and English Dennis E. Baron, Ph.D., Richard W. Bailey, Ph.D., and Jeffrey P. Kaplan, Ph.D. in support of petitioners. *District of Columbia, et al., v. Dick Anthony Heller.* 554 U.S. 570 (2008)

**Recent Media:**

"Does the Second Amendment Actually Give You the Right to Own a Gun?" *Think,* with Andrew Miller, NBC News, May 26, 2022. https://www.nbcnews.com/think/video/does-the-2nd-amendment-actually-give-you-the-right-to-own-a-gun-140886597910

"The Plain Language Movement." Part of Stephen Fry's series "English Delight,"  BBC Radio 4, August 2014.

"Latinos in America." PBS Documentary aired in Oct. 2013. In episode 6 of the 6-part series I discuss official English, bilingualism, and minority language rights.

**Book Chapters:**

1. "Post on Facebook, go directly to jail." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
2. "Don't make English official, ban it instead." Rpt. in Roen, Duane, ed., *McGraw-Hill Guide: Writing for college, writing for life.* Forthcoming, January, 2017.
3. "Facebook multiplies genders but offers users the same three tired pronouns." Melissa Goldthwaite, *et al.,* eds. *The Norton Reader,* 14/e New York: W.W. Norton. Forthcoming, January, 2016.
4. "Facebook multiplies genders but offers users the same three tired pronouns." *The Little Norton Reader.* New York: W.W. Norton. A special edition containing 50 essays from the first 50 years, to celebrate the 50th anniversary of *The Norton Reader.* Forthcoming, 2016.
5. "Who owns global English?" *The Norton Reader,* ed. Linda H. Peterson and John C. Brereton. New York: Norton.
6. "Should Everybody Write?" In Andrea Lunsford, *Everyone's an author, with readings.* New York, NY: W. W. Norton, 2012
7. "The Noun Game: A simple grammar lesson leads to a clash of civilizations." *The Simon and Schuster Short Prose Reader.* Robert Funk, Susan Day, et. al. Boston: Prentice Hall, 2011. Pp. 128-34.
8. "#Twitter Revolution." *They Say, I Say, with Readings 2e.* New York: W.W. Norton, 2012.
9. "The More Things Change: Language and Education." In Anne Curzan and Michael Adams, eds., *Contours of English.* Univ. of Michigan Press (2010).
10. "The New Technologies of the Word." In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 136-51.  Rpt. in Lynn Bloom and Louise Smith, *The Arlington Reader,* 2e., New York: Bedford/St. Martin's, 2008; rpt. 2010.

11. "Don't Make English Official—Ban It Instead." [rpt. of 1996 essay]. In Keith Walters and Michal Brody, eds., *What's Language Got to Do with It?"* New York: W. W. Norton, 2005, pp. 477-79.

12. "Forget Everything You Learned About Writing." In Chris Anson, ed., *The WAC Casebook: Scenes for Faculty Reflection and Program Development.* New York: Oxford Univ. Press, 2003, pp. 261-65.

13. "Language Legislation and Language Abuse: American Language Policy through the 1990s." In *Language Ideologies: Critical Perspectives on the Official English Movement,* vol. 2: History, Theory and Policy, ed. Roseann D. Gonzalez with Ildiko Melis (Urbana: NCTE, and Lawrence Earlbaum Assoc., 2001), pp. 5-29.

14. "From Pencils to Pixels: The Stages of Literacy Technologies." In *Passions, Pedagogies and 21ˢᵗ-Century Technologies,* ed. Gail Hawisher and Cynthia Selfe (Logan: Utah State Univ. Press and the National Council of Teachers of English, 1999), pp. 15-33. [This is the lead essay in the book.] Rpt. in Ellen Cushman, Eugene R. Kintgen, Barry M. Kroll, and Mike Rose, eds., *Literacy: A Critical Sourcebook*. Boston: Bedford St. Martin's, 2001. Pp. 70-84.

15. "An Official Language." Rpt. (from *The English Only Question*) in *Writing About Diversity: An Argument Reader and Guide*, ed. Irene L. Clark (Fort Worth: Harcourt Brace, 1994), pp. 284-302.

16. "Language Is the Enemy." Rpt. (from *Declining Grammar*) in *Dimensions of Language*, ed. Boyd Davis.  (New York: Macmillan, 1993), pp. 427-31.

17. "Language, Culture, and Society," in *Introduction to Scholarship in Modern Languages and Literatures*, ed. Joseph Gibaldi.  2nd ed. (New York: Modern Language Association, 1992), pp. 28-52.

18. "Federal English and the Constitution," rpt. in *Language Loyalties*, ed. James Crawford.  Chicago: Univ. of Chicago Press (1992), pp. 36-40.

19. "The Legal Status of English in Illinois: Case Study of a Multilingual State," in *Not Only English: Affirming America's Multilingual Heritage*, ed. Harvey A. Daniels (Urbana: National Council of Teachers of English, 1990), pp. 13-26.

20. "Watching Our Grammar: The English Language for English Teachers," in *On Literacy and Its Teaching: Issues in English Education,* ed. Gail Hawisher and Anna Soter (Albany: State Univ. of New York Press, 1990), pp. 208-23.  [Review: Sharon J. Hamilton, *College English* 55 (1993): 794-800.

21. "Watching Our Grammar" (rpt. from *Grammar and Good Taste*), in *The Story of English: Study Guide and Reader* (Dubuque, IA: Kendall/Hunt, 1986).

22. "Nonstandard English, Composition, and the Academic Establishment," 1975; rpt. in *Readings in Applied English Linguistics,* ed. Harold B. Allen and Michael Linn, 3rd. ed. (New York: Alfred Knopf, 1982), pp. 436-43.

**Recent Articles:**

1. "Look it up in your *Funk & Wagnalls*: How Courts Define the Words of the Law," *Dictionaries* (forthcoming).

2.  "Corpus Evidence Illuminates the Meaning of Bear Arms," *Hastings Constitutional Law Quarterly* 46.3 (2019): 509–22.

3.  "A brief history of singular 'they,' *Oxford English Dictionary Blog,* Sept. 4, 2018. https://public.oed.com/blog/a-brief-history-of-singular-they/#__prclt=9gZeU4Sf

4.  "Antonin Scalia Was Wrong about the Meaning of 'Bear Arms," *Washington Post,* May 21, 2018. https://www.washingtonpost.com/opinions/antonin-scalia-was-wrong-about-the-meaning-of-bear-arms/2018/05/21/9243ac66-5d11-11e8-b2b8-08a538d9dbd6_story.html?utm_term=.9f23ab854a09

5.  "Nowadays, 'Like' Just Means 'Uh-Huh'" *Visual Thesaurus.* August 11, 2014. http://www.visualthesaurus.com/cm/wc/nowadays-like-just-means-uh-huh/' *Vocabulary.com http://www.vocabulary.com/articles/wc/nowadays-like-just-means-uh-huh/*

6.  "America's war on language." *OxfordWords Blog.* Sept. 17. http://blog.oxforddictionaries.com/2014/09/americas-war-language/ Days and Memories Blog. http://hgmsblog.weebly.com/blog/americas-war-on-language  Sept. 3.

7.  "Changing gender in language isn't easy." *New York Times,* "Room for Debate" Oct. 19, 2014. http://nyti.ms/1tDISSa

8.  "Nobody likes a whistleblower, wrayer, snitch, narker, denunciator, quadruplator, or emphanist." *Visual Thesaurus.* Feb. 23, 2014.

9.  "Plain English: It's the law." *Visual Thesaurus.* Feb. 7, 2014. http://www.visualthesaurus.com/cm/wc/plain-english-its-the-law/

10. "Banning words for the new year." *Vocabulary.com.* January 20, 2914. http://www.vocabulary.com/articles/wc/banning-words-for-the-new-year/" *Visual Thesaurus.* January 20, 2014. http://www.visualthesaurus.com/cm/wc/banning-words-for-the-new-year/

11. "Dennis Baron's Word of the Year for 2013: 'marriage'" *Visual Thesaurus.* Dec. 24, 2013. http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2013-marriage/

12. "The highest dictionary in the land?" *Oxford University Press Blog.* June 23, 2013. http://bit.ly/11UkV54

13. "The highest dictionary in the land?" *Visual Thesaurus.* June 24, 2013. http://bit.ly/11GYbGK

14. "Will the real Gettysburg Address please stand up?" *Visual Thesaurus.* Nov. 19, 2013. http://www.visualthesaurus.com/cm/wc/will-the-real-gettysburg-address-please-stand-up/

15. "Pens and Pencils Down: New York City's 'Banned Words' Controversy." *Visual Thesaurus.* April 4, 2012. http://www.visualthesaurus.com/cm/wc/3212/

16. "Wikipedia: Write first, ask questions later." Rpt. in James C. McDonald, *The Reader.* New York: Pearson, 2012.

17. "Learning not to curse in Arizona." *Oxford Univ. Press blog.* May 27, 2012

18. "Why we misread." *Visual Thesaurus.* July 3, 2012. http://www.visualthesaurus.com/cm/wc/why-we-misread/

19. "Grammar freaks really *are* strange." *Cultural Weekly.* July 19, 2012. http://www.culturalweekly.com/grammar-freaks-strange.html

20. "Grammar sticklers may have OCD." *Oxford Univ. Press Blog.* Aug. 18, 2012. http://blog.oup.com/2012/08/grammar-sticklers-may-have-ocd/

21. "The e-reader over your shoulder." *Visual Thesaurus.* Nov. 12, 2012. http://www.visualthesaurus.com/cm/wc/the-e-reader-over-your-shoulder/

22. "The e-reader over your shoulder." *Oxford University Press blog,* Nov. 24, 2012. http://blog.oup.com/2012/11/the-e-reader-over-your-shoulder/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+oupblog+%28OUPblog%29

23. "Apple patents page-turning. What's next, the letter "i"? *Visual Thesaurus.* Nov. 27, 2012. http://www.visualthesaurus.com/cm/wc/apple-patents-page-turning-whats-next-the-letter-i/

24. "Dennis Baron's Word of the Year for 2012 is #hashtag." *Visual Thesaurus,* Dec. 16, 2012. http://www.visualthesaurus.com/cm/wc/dennis-barons-word-of-the-year-for-2012-hashtag

25. "No laptops: Classroom bans on digital devices are spreading." *Visual Thesaurus,* Jan. 14, 2013. http://www.visualthesaurus.com/cm/teachersatwork/no-laptops-classroom-bans-on-digital-devices-are-spreading/

Dennis Baron, *Vita*, 6

26. "National Grammar Day in Wartime." *Visual Thesaurus.* Mar. 4, 2013.
http://www.visualthesaurus.com/cm/wc/national-grammar-day-in-wartime/
27. "The Great Language Change Hoax." *Academe.* (The AAUP blog). April 1, 2013.
http://academeblog.org/2013/04/01/the-great-language-change-hoax/
28. "English-only in the exit row." *Oxford Univ. Press Blog.* April 29, 2011.
http://blog.oup.com/2011/04/exit-row/
29. "The most human computer?" *Oxford Univ. Press Blog.* May 5, 2011.
http://blog.oup.com/2011/05/human-computer/
30. "Teaching commas won't help." *Visual Thesaurus,* May 16, 2011.
http://www.visualthesaurus.com/cm/wc/2848
31. "Teaching commas won't help." *Oxford Univ. Press Blog.* June 14, 2011.
http://blog.oup.com/2011/06/teaching-commas/
32. "Webster's lays down the law." *Visual Thesaurus Magazine.* June 15, 2011.
http://www.visualthesaurus.com/cm/dictionary/2883/
33. "But the dictionary says. . ." *Oxford Univ. Press Blog.* June 27, 2011.
http://blog.oup.com/2011/06/dictionary-courtroom/
34. "Content-Free Prose: Death of Writing or Next Big Thing?" *Visual Thesaurus.* June 29, 2011.
http://www.visualthesaurus.com/cm/wc/2893?utm_source=rss
35. "Content-Free Prose: Death of Writing or Next Big Thing?" *Oxford Univ. Press Blog.* July 8,
2011. http://blog.oup.com/2011/07/content-free-prose/
36. "Are laws requiring English signs discriminatory?" *Oxford Univ. Press Blog.* July 21, 2011.
http://blog.oup.com/2011/07/english-signs/
37. "Computers remember so you don't have to." *Oxford Univ. Press Blog.* July 28, 2011.
http://blog.oup.com/2011/07/google-effect/
38. "That ugly Americanism? It could well be British." *Oxford Univ. Press Blog.* Aug. 5, 2011.
http://blog.oup.com/2011/08/ugly-americanism/
39. "New words are great for back to school." *Visual Thesaurus.* Aug. 30, 2011.
http://www.visualthesaurus.com/cm/dictionary/2956/?utm_source=rss
40. "New words are great for back to school." Oxford Univ. Press Blog, Sep. 1, 2011.
http://blog.oup.com/2011/09/school-words/
41. "The linguistic impact of 9/11? '9/11' itself." Visual Thesaurus. Sep. 12, 2011.
http://www.visualthesaurus.com/cm/dictionary/2969/
42. "The linguistic impact of 9/11." *Oxford Univ. Press Blog.* Sep. 12, 2011.
http://blog.oup.com/2011/09/linguistic-impact/
43. "The only linguistic impact of 9/11 is '9/11' itself." *Cultural Weekly,* Sep. 14, 2011.
http://www.culturalweekly.com/only-linguistic-impact-of-911-is-911-itself.html
44. "Are there alternatives to global English?" *Visual Thesaurus.* Sept. 27, 2011.
http://www.visualthesaurus.com/cm/wc/2985/
45. "Is resistance futile? Are there alternatives to global English?" *Cultural Weekly.* Sept. 29, 2011.
http://www.culturalweekly.com/is-resistance-futil-are-there-alternatives-to-global-english.html
46. "Resistance may be futile: Are there alternatives to global English?" *OUP Blog,* Oct. 11, 2011.
http://blog.oup.com/2011/10/global-english/; reposted in the Daily Beast, Oct. 12, 2011.
http://andrewsullivan.thedailybeast.com/2011/10/english-has-taken-over.html
47. "Is this the last print dictionary?" *Cultural Weekly*. Oct. 19, 2011.
http://www.culturalweekly.com/is-this-the-last-print-dictionary.html
48. "The laws of English punctuation." *Visual Thesaurus.* Oct. 24, 2011.
http://www.visualthesaurus.com/cm/wc/3011/
49. "Talk like Shakespeare Day." *Cultural Weekly.* Oct. 27, 2011.
http://www.culturalweekly.com/talk-like-shakespeare-day.html
50. "Occupy Wall Street: Can the revolution be trademarked?" *Oxford University Press Blog.* Nov.
28, 2011. http://blog.oup.com/2011/11/occupy-trademark/
51. "Dennis Baron's Word of the Year for 2011: 'Volatility.'" *Visual Thesaurus.* Dec. 2, 2011.
http://www.visualthesaurus.com/cm/wc/3052/
52. "How to save an endangered language." *Oxford University Press Blog.* Dec. 4, 2011.
http://blog.oup.com/2011/12/endangered-language/

53. "The top language stories of 2011." *Visual Thesaurus.* Dec. 20, 2011.
http://www.visualthesaurus.com/cm/wc/3072

54. "Dictionary droids write definitions untouched by human hands." *Oxford Univ. Press Blog.* Jan.
24, 2012. http://blog.oup.com/2012/01/dictionary-droids-write-definitions-untouched-by-human-
hands/

55. "The Writer's Meme." *Cultural Weekly.* Feb. 22, 2012. http://www.culturalweekly.com/the-
writers-meme.html

56. "Alejandrina Cabrera should be on the San Luis City Council ballot." *Oxford Univ. Press Blog.*
Feb. 28, 2012. http://blog.oup.com/2012/02/alejandrina-cabrera-san-luis-city-council/

57. "Learning not to curse in Arizona." *Cultural Weekly.* Mar. 15, 2012.
http://www.culturalweekly.com/learning-not-to-curse-in-arizona.html

58. "The iPad: What's a Gutenberg moment, anyway?" *Visual Thesaurus,* March 7, 2010,
http://www.visualthesaurus.com/cm/wc/2240/

59. "The iPad: What's a Gutenberg moment, anyway?" *Oxford University Press Blog.* March 8, 2010.
http://blog.oup.com/2010/04/ipad/

60. "Yes, we want": Who owns global English? *Visual Thesaurus,* May 4, 2010,
http://www.visualthesaurus.com/cm/wc/2264/

61. "The New Technologies of the Word." Rpt. in *The Arlington Reader* (New York: Bedford St.
Martins, 2010.

62. "Don't read this: What Kindle's Highlights tell us about popular taste." The Visual Thesaurus.
July 2, 2010. http://www.visualthesaurus.com/cm/wc/2339/

63. "Revising our freedom: Digital archeology and Jefferson's rough draft of the Declaration of
Independence." Oxford University Press blog, July 9, 2010. http://blog.oup.com/2010/07/revising-
our-freedom/

64. "Robot teachers!!! Coming soon, to a classroom near you!!!" Oxford University Press blog, July
13, 2010. http://blog.oup.com/2010/07/robot-teachers; repost, io9.com, July 28, 2010.
http://io9.com/5599084/robot-teachers-coming-soon-to-a-classroom-near-you

65. "The gender-neutral pronoun: Still an epic(ene) fail." *Visual Thesaurus.* August 9, 2010.
http://www.visualthesaurus.com/cm/dictionary/2384/; OUP blog, Aug. 26, 2101,
http://blog.oup.com/2010/08/gender-neutral-pronoun/

66. "Technology update: Flying books can be dangerous." Oxford University Press blog, August 13,
2010. http://blog.oup.com/2010/08/ebooks-3/

67. "Is it 'Miss' or 'Ms'?" Oxford University Press blog. Aug. 16, 2010.
http://blog.oup.com/2010/08/miss-or-ms/; rpt. as "What's in a Name? For "Ms.," a Long History."
on *Ms. Magazine blog,* Aug. 27, 2010, http://msmagazine.com/blog/blog/2010/08/27/whats-in-a-
name-for-ms-a-long-history/

68. "Good grammar leads to violence at Starbucks?" *Visual Thesaurus.* August 17, 2010.
http://www.visualthesaurus.com/cm/wc/2394/

69. "Good grammar leads to violence at Starbucks?" *Oxford University Press* blog. Aug. 20, 2010.
http://blog.oup.com/2010/08/starbucks/

70. "Facebook says, 'All your face are belong to us.'" Oxford University Press blog, Aug. 31, 2010.
http://blog.oup.com/2010/08/facebook-trademark/

71. "Facebook says, 'All your face are belong to us.'" *Visual Thesaurus.* Sept. 9, 2010.
http://www.visualthesaurus.com/cm/dictionary/2414/

72. "The English Language Unity Act: Big government only a tea partier could love." *Oxford
University Press blog,* Sept. 24, 2010. http://blog.oup.com/2010/09/english-language-unity/; rpt
*Dallas Morning News,* Sept. 24, 2010. http://topics.dallasnews.com/article/0gsfem7buy0AM; rpt.
NPR quotes, Sept. 24, 2010. http://topics.npr.org/quote/0bqS3ST97z0yC; rpt. Latest Law News,
Sept. 24, 2010, http://www.tollfree800legal.com/news/latest-law-news.cfm?Next-News-
ID=3524647&start=51;

73. "It's alive! New computer learns language like a human, almost." *Oxford University Press blog.*
Oct. 11, 2010. http://blog.oup.com/2010/10/computer-learns-language/ Picked up by NPR, the
BBC, technorati, and techeye.

74. "Killer app: Seven dirty words you can't say on your iPhone." *Oxford University Press Blog.* Oct.
18, 2010. http://blog.oup.com/2010/10/dirty-words/

75. "Killer app: Will the iPhone monitor your language?" *The Visual Thesaurus.* Oct. 19, 2010.
http://www.visualthesaurus.com/cm/wc/2455/

76. "A Literal Paradox." *Visual Thesaurus.* Oct. 26, 2010.
http://www.visualthesaurus.com/cm/dictionary/2465/

77. "A Literal Paradox: *literally* generally means 'figuratively.' *Oxford Univ. Press Blog.* Oct. 29, 2010. http://blog.oup.com/2010/10/literal-paradox/

78. "All hail Goddess English." *Oxford University Press Blog.* Nov. 9, 2010.
http://blog.oup.com/2010/11/all-hail-goddess-english/

79. "The tweet police are watching." *The Visual Thesaurus.* Nov. 17, 2010.
http://www.visualthesaurus.com/cm/wc/2506/

80. " ☺ when you say that, pardner," – the tweet police are watching." *Oxford University Press Blog,* Nov. 22, 2010. http://blog.oup.com/2010/11/tweet-police/

81. "On the internet, nobody knows you can't spell." *Oxford University Press Blog,* Nov. 29, 2010. http://blog.oup.com/2010/11/you-cant-spell/

82. "The Noun Game: A simple grammar lesson leads to a clash of civilizations." Oxford Univ. Press blog. Dec. 10, 2010. http://blog.oup.com/2010/12/noun-game/

83. "President has Americans running to the dictionary." *Visual Thesaurus.* Dec. 13, 2011.
http://www.visualthesaurus.com/cm/dictionary/2531/

84. "Books by the numbers." *Visual Thesaurus.* Dec. 20, 2010.
http://www.visualthesaurus.com/cm/wc/2546/

85. "Books by the numbers." *Oxford Univ. Press Blog.* Jan. 6, 2011.
http://blog.oup.com/2011/01/books-by-the-numbers/

86. "Defending the language with bullets." *Oxford Univ. Press Blog.* Jan. 14, 2011.
http://blog.oup.com/2011/01/bullets/

87. "The government does not control your grammar." *Oxford Univ. Press Blog,* Jan. 28, 2011.
http://blog.oup.com/2011/01/grammar/

88. "The Supreme Court Debates: What does 'personal' mean?" *Visual Thesaurus.* Jan. 24, 2011.
http://www.visualthesaurus.com/cm/dictionary/2582/

89. "#twitterrevolution—reforming Egypt 140 characters at a time." *Oxford Univ. Press Blog,* Feb. 17, 2011. http://blog.oup.com/2011/02/twitter-revolution/

90. "The government's out-of-date definition of writing." *Visual Thesaurus.* Feb. 18, 2011.
http://www.visualthesaurus.com/cm/dictionary/2628/

91. "The government's definition of writing is seriously out of date." *Oxford Univ. Press Blog.* Feb. 28, 2011. http://blog.oup.com/2011/02/dictionary-act/

92. "Who cares about National Grammar Day? Or is it *whom?*" *Oxford Univ. Press Blog.* Mar. 4, 2011. http://blog.oup.com/2011/03/grammar-day

93. "When news breaks, people look it up in the dictionary." *Visual Thesaurus.* March 10, 2011.
http://www.visualthesaurus.com/cm/dictionary/2655/

94. "It's time for English teachers to stop teaching that the world is flat." *Oxford Univ. Press Blog.* Mar. 18, 2011. http://blog.oup.com/2011/03/english-teachers

95. "Happy birthday OK: the world's most-popular word turns 172," *Oxford Univ. Press Blog.* Mar. 23, 2011. http://blog.oup.com/2011/03/ok-day/

96. "OED Hearts OMG." *Visual Thesaurus*. April 11, 2011.
http://www.visualthesaurus.com/cm/dictionary/2815/

97. "TSA bans reading on international flights." *Indyposted,* Jan. 4, 2010.
http://indyposted.com/8627/tsa-bans-reading-on-international-flights/

98. "Say goodbye to the decade with no name." *Visual Thesaurus,* Dec. 18, 2009.
http://www.visualthesaurus.com/cm/wc/2100/

99. "English teachers council gives Glenn Beck the 'Doublespeak Award'." My statement was reprinted verbatim in a *Washington Post* article about the Doublespeak Award by Valerie Strauss, Nov. 23, 2009, http://voices.washingtonpost.com/answer-sheet/accountability/ncte-award-glenn-beck-the-doub.html

100. "The Noun Game." *The Visual Thesaurus.* Nov. 16, 2009.
http://www.visualthesaurus.com/cm/wc/2067/

101. "Technology reduces the value of old people, MIT computer guru warns." Oxford Univ. Press, OUPBlog, Nov. 11, http://blog.oup.com/2009/11/old-people/

**JA1466**

Dennis Baron, *Vita,*  9

102. "Happy belated 40th birthday to the internet." Oxford Univ. Press, OUPBlog, Nov. 3,
http://blog.oup.com/2009/11/40th-birthday-internet/

103. "Two thumbs up? Researchers predict that by 2013, we'll all be Tweeting." Oxford Univ. Press,
OUPBlog, Oct. 27 http://blog.oup.com/2009/10/universal_authorship/

104. "Blogging for pay." Oxford Univ. Press, OUPBlog, Oct. 8, http://blog.oup.com/2009/10/blogging-
for-pay/

105. "Amazon sales rank: I'm being outsold by a book on tattoos." Oxford Univ. Press, OUPBlog,
Sept. 25, http://blog.oup.com/2009/09/amazon-rank/

106. "The Spellings Commission, the ACT, and the ETS Just Don't Read America's Literacy Right."
*College Composition and Communication* 61.1 (Sept. 2009): W424-35.

107. "The Elements of Style at 50: If You Celebrate, Use the Active Voice." Visual Thesaurus, April 6,
2009, http://www.visualthesaurus.com/cm/dictionary/1805

108. " 'Tis Talk Like Shakespeare Day in Chicago, Methinks." Visual Thesaurus, April 23, 2009.
http://www.visualthesaurus.com/cm/dictionary/1827/

109. "Amazon Fail 2.0: Orwell Removed from Kindles." Visual Thesaurus, July 21, 2009.
http://www.visualthesaurus.com/cm/wc/1922/

110. "Amazon Fail 2.0: Bookseller's Big Brother removes Orwell's Big Brother from Kindles
everywhere." Oxford Univ. Press  OUPblog. July 21, 2009.
http://blog.oup.com/2009/07/amazon_fail2/

111. "Digital Text." Letters. *Wilson Quarterly* (winter, 2010), p. 6.

112. "Multitasking: Learning to teach and text at the same time." Oxford Univ. Press Blog, Jan. 25,
2010. http://blog.oup.com/2010/01/teach-and-text/#more-7305

113. "Will the iPad change your life?" Oxford Univ. Press Blog, Jan 28, 2010.
http://blog.oup.com/2010/01/will-the-ipad-change-your-life/

114. "Sliced Bread 2.0." Oxford Univ. Press Blog, Feb. 24, 2010. http://blog.oup.com/2010/02/sliced-
bread-2-0/

115. "Should everybody write? The destabilizing technologies of communication." Oxford Univ. Press
Blog, Mar. 16, 2010. http://blog.oup.com/2010/03/should-everybody-write/   a day later, there
were 25 reposts of the essay.

116. "Should everybody write?" *Visual Thesaurus.* Mar. 16, 2010.
http://www.visualthesaurus.com/cm/wc/2204/

117. "Multitasking: Learning to Teach and Text at the Same Time" *Quality Teacher* (a quarterly
journal of Bato Balani Foundation, the Philippines; forthcoming).

118. "The book, the scroll, and the web." Oxford Univ. Press Blog, April 2, 2010.
http://blog.oup.com/2010/04/scroll-book/

119. "March 10: The telephone is 133 years old today. Call me." *Visual Thesaurus.* March 10, 2009.
http://www.visualthesaurus.com/cm/dictionary/1768/

120. "Lincoln the writer at 200." *The Visual Thesaurus.* Feb 13, 2009.
http://www.visualthesaurus.com/cm/wc/1722/

121. "No Students Left Behind: Why Reports on the Literacy Crisis from the Spellings Commission,
the ACT, and the ETS Just Don't Read America's Literacy Right." *College Composition and
Communication* 61.1 (Sept. 2009): W424-35.

122. "Noah Webster at 250: A Visionary or a Crackpot?" *The Visual Thesaurus.* Oct. 16, 2008.
http://www.visualthesaurus.com/cm/dictionary/1576/

123. "Can commas shoot down gun control?" *Los Angeles Times,* March 22, 2007.  Rpt. *Oxford
Magazine* no. 264 (Oxford Univ.), Spring (second week, Trinity term) 2007, pp. 12-13.; also rpt.,
*The Green Bag,* second series, vol. 10, no. 40 (Quarterly Law review of the George Mason School
of Law), Summer 2007.

124. "Don't write off the pencil just yet." *Los Angeles Times,* Jan. 23, 2007, A15.

125. "No academic bill of rights?" *Inside Higher Education,* June 13, 2006. www.ihe.com.

126. "Churchill fallout: It's about academic freedom." *Inside Higher Education,* May 26, 2006.
www.ihe.com.

127. "I'm not really a professor, I just play one on TV." *Inside Higher Education,* Oct. 14, 2005.

128. "The College Board's New Essay Reverses Decades of Progress Toward Literacy." *Chronicle of
Higher Education.* May 6, 2005. Pp. B14-15; rpt. in *Newsletter of the Northeast Association of
Pre-Law Advisors,* Fall 2005.

Dennis Baron, *Vita,* 10

129. "The New Nativism: Language Policy and Linguistic Ideology in the United States." *Ryukyus Journal of American Studies* (April, 2005): 1-12.

130. "Not Searching for Skeletons." *Chronicle of Higher Education,* Jan. 14, 2005, C1;4.

131. "The Tongue Who Would Be King." *Science and Spirit,* November/December 2004, pp. 28-33.

132. "The President's Reading Lesson." *Education Week,* Sept. 8, 2004, p. 43.

133. "A Diverse Department." *Chronicle of Higher Education,* August 13, 2004, C2-3.

134. "Avoiding the Role of Straight Man." *Chronicle of Higher Education,* June 18, C1;4.

135. "Around the Clock." *Chronicle of Higher Education,* May 21, 2004, C1;4.

136. "It's Just Grammar. Whom Really Cares?" *Los Angeles Times,* May 7, 2004, B17; rpt., *Austin* (Texas) *American-Statesman, Adrian* (Michigan) *Daily Telegram,* May 12, 2004.

137. "What Am I Worth?" *Chronicle of Higher Education.* April 23, 2004, C1;4.

138. "Lessons in Department Budgeting." *Chronicle of Higher Education.* March 26, 2004, C2-3.

139. "Language and society." For PBS Documentary, "Do you speak American?" www.pbs.org/speak/words/sezwho/socialsetting.  [Rpt. in Insightful Writing, ed. David Sabrio and Mitchel Burchfield.  Boston: Houghton, Mifflin, 2008.

140. "No Translation Needed: 'Door Is Closed.'" *Los Angeles Times,* March 14, 2004, M5 [rpt. *Atlanta Journal-Constitution, Kansas City Star; Myrtle Beach* (South Carolina) *Sun-News;* Bryan-College Station (TX) *Eagle;* translated into Finnish for *Helsingin Sanomat* (Helsinki, Finland), March 28, 2004].

141. "New Programs, New Problems." *Chronicle of Higher Education.* Feb. 27, 2004. C1;4.

142. "Intervening in the Classroom." *Chronicle of Higher Education.* Jan. 30, 2004, C1;4

143. "Sharing Inside Information." *Chronicle of Higher Education.* Dec. 19, 2003, C1; 4.

144. "McLanguage Meets the Dictionary." *Chronicle of Higher Education.* Dec. 19, 2003, B14.

145. "Not What I Signed Up For." *Chronicle of Higher Education,* Nov. 21, 2003, C1; C4.

146. "Professors Behaving Badly." *Chronicle of Higher Education,* October 24, 2003, C3-4.

147. "Learning to Be a Department Head." *Chronicle of Higher Education,* Sept. 22, 2003, C5.

148. "Life After Tenure." *Chronicle of Higher Education,* July 21, 2003.

149. "When Tenure Fails." *Chronicle of Higher Education,* June 10, 2003.

150. "Teaching Grammar Doesn't Lead to Better Writing." *Chronicle of Higher Education,* May 16, 2003, B20.

151. "Promoting Late Bloomers." *Chronicle of Higher Education,* April 25, 2003.

152. "The Tenure Files: Getting Through the College." *Chronicle of Higher Education,* Feb. 14, 2003.

153. "External Reviewers." *Chronicle of Higher Education,* January 7, 2003.

154. "A Look at the Record." *Chronicle of Higher Education,* Nov. 7, 2002.

155. "I Teach English—and I Hate Reader's Guides." *Chronicle of Higher Education,* Oct. 4, 2002, p. B5.

156. "Good Grammar and the Career Network." *Chronicle of Higher Education,* July 31, *2002.*

157. "Language Use and Grammar." The September, 2002, module for "Teaching *Composition*," a listserv for the composition teaching community, published by McGraw-Hill. http://www.mhhe.com//socscience/english/tc.

158. "Getting Promoted." *Chronicle of Higher Education,* Sept. 5, 2002.

159. "The Job Search: You're the One." *Chronicle of Higher Education,* April 12, 2002.

160. "The Campus Visit." *Chronicle of Higher Education,* Feb. 24, 2002.

161. "Will Anyone Accept the Good News on Literacy?" *Chronicle of Higher Education,* Feb. 1, 2002, B10.

162. "The Job Interview." *Chronicle of Higher Education,* Jan. 21, 2002.

163. "To Whom It May Concern: Reading Job Applications." *Chronicle of Higher Education,* Dec, 21, 2001.

164. "The Hiring Season." *Chronicle of Higher Education,* Nov. 9, 2001.

165. "America Doesn't Know What the World Is Saying." Op-Ed essay, *The New York Times,* Oct. 27, 2001, A21. Rpt. *Cleveland Plain Dealer*, Oct. 30, 2001, B11.

166. "The End of Linguistics: a response" letter to the editor, *The American Scholar* (Spring, 2001): 155-56.

167. "The Official Secrets Act in Academic Publishing." *Chronicle of Higher Education*, Feb. 16, 2001, B5.

Dennis Baron, *Vita,* 11

168. "Literacy and technology." In Linda K. Shamoon, R. M. Howard, S. Jamieson, and R. A. Schwegler, eds., *Coming of Age: The Advanced Writing Curriculum.* Portsmouth, NH: Heinemann, Boynton/Cook, 2000 and on CD-rom. Approx. 8 pp.

169. "Ebonics and the Politics of English." *World Englishes* 19 (March, 2000): 5-19.

170. "Technology's Impact on Writing." Letter. *Chronicle of Higher Education*, Jan. 21, 2000, B11.

171. "To Sir, or Ma'am, with Love." *Education Week.* Sept. 8, 1999, 45.

**The Web of Language:** a blog running from 2007 to the present dealing with issues of language and technology: http://bit.ly/1B29f6v Over 1.5 million page views..

**Recent Invited Lectures, Workshops and Conference Presentations:**

1. "Corpus Linguistics and the Original Meaning of the Second Amendment." University of Chicago Law School, 12 January, 2021.

2. Author interviews, "What's Your Pronoun?" New York Public Library, 4 February, 2020; Politics and Prose Books (Washington, DC), 5 February; Cuyahoga County Public Library. 6 February; Kansas City Public Library (MO), 11 February; Town Hall Seattle, 16 February; Powells Books, Portland OR, 17 February; City Lights Books, San Francisco, 18 February.

3. "Guns and Grammar: Big Data and the Meaning of 'bear arms' in the Second Amendment." Conference on Law and Corpus Linguistics, Brigham Young Univ. Law School, Feb. 6-8, 2019.

4. "Corpus evidence and the meaning of 'bear arms.'" Symposium: *District of Columbia v. Heller* 10 years on, Hastings College of Law, San Francisco, CA, Jan. 18, 2019.

5. "What's Your Pronoun?" Language Policy Forum, Sheffield Hallam University, UK, June 1, 2018.

6. "America's War on Language," Invited Lecture, University of Pennsylvania, April 19, 2018.

7. "Guns and Grammar: The Linguistics of the Second Amendment," Neubauer Symposium on Historical Semantics, University of Chicago, April 13, 2018.

8. "Speak the Language of Your Flag: Language and Immigration in the US, 1918-2018," Language and Borders Conference, University of Bristol, UK, March 26, 2018.

9. "Pronoun Showdown," Invited lecture, University of Essex, UK, Nov. 23, 2017.

10. "Going native: Brexit prompts linguistic cleansing." Conference on UK Language Policy after Brexit. Sheffield Hallam University (Sheffield, UK), Sept. 15, 2016.

11. "Pronoun Showdown: Are nonbinary pronouns and singular *they* ruining the language or making English great again?" Univ. of Tennessee (Knoxville), April 11, 2016.

12. "Speak the language of your flag." Present-Day English Discussion Group, Modern Language Association. Jan. 9, 2014.

13. "#twitterrevolution: Destabilizing the world, 140 characters at a time." Univ. of Sussex (Brighton, UK). March 21, 2013.

14. "Speak the language of your flag." In "creative" conversation, with Michael Erard. *Modern Language Association.* Boston, Jan. 3, 2013. Speakers invited by MLA Executive Director Rosemary Feal.

15. "Official English from the school house to the White House." Englishes in Europe Conference. Univ. of Sheffield. April, 2012.

16. "#twitterrevolution: Destabilizing the world, 140 characters at a time." Temple Contemporary, Temple University Art Museum. Oct. 11, 2012.

17. "Guns and grammar: Linguistic authority and legal interpretation in *Washington, D.C., v. Heller"* Stanford University. Nov. 10, 2011.

18. "Should everybody write? The destabilizing technologies of communication." Univ. of Chicago Semiotics Workshop, March 11, 2010.

**19.** "Guns and grammar: The linguistics of the Second Amendment." Law and Society Annual Conference, Denver, CO, June 30, 2009.

**20.** "Let's go to the phones." Univ. of Michigan invited lecture. Dec. 5, 2008.

21. "Policing English in America from the White House to the schoolhouse." Conference on prescriptivism in language. Univ. of Paris VII (Sorbonne), Paris, FR. Nov. 15, 2007.

Dennis Baron, *Vita*, 12

22. "It's All Your Fault: Who's Really to Blame for the Literacy Crisis?" Conference on College Composition and Communication. New York City, March 2007.
23. "No University Student Left Behind: Writing and the Secretary of Education's Commission on Higher Education." Conference on College Composition and Communication. Chicago, March 2006.
24. "The Perils of the new SAT Writing Test." Conference on College Composition and Communication. San Francisco. March 17, 2005.
25. "Spanish, English and the New Nativism." Modern Language Association. Philadelphia. Dec. 30, 2004.
26. "Reading and Writing in the Digital Age." Invited presentation. Illinois Library Association, Chicago, September 30, 2004.
27. "Language Policies and Language Politics in the United States." "English and Minority Languages in the 2000 Census." Invited lectures, Univ. of Ryukyu, Okinawa, Japan, June, 2004.
28. "TeknoFear." Invited lecture, Northeastern Illinois University, April 15, 2004.
29. "Standards: They're Not for Everybody." Conference on College Composition and Communication. San Antonio, TX, March 25, 2004.
30. "The New Technologies of the Word." Plenary lecture. International Association of World Englishes Conference, Univ. of Illinois, October 17, 2002.
31. "Writing Effective Promotion Dossiers," Provost's Seminar, Univ. of Illinois, Sept. 7, 2001.
32. "Promotion and Tenure," a workshop for new executive officers, Association of Departments of English seminar, Monterey, California, June 29, 2001.
33. "From Pencils to Pixels: The New Technologies of Literacy." Invited lecture, UC Davis, March 2, 2001.
34. "The Illinois Professional Learning Partnership." Conference on College Composition and Communication, Denver, CO, March 15, 2001.
35. "Writing Effective Third-Year Faculty Reviews," Provost's Seminar, Univ. of Illinois, Feb. 26, 2001.
36. "Outreach for the Humanities," response to Graham Spanier; Chancellor's Conference, Univ. of Illinois, Jan. 31, 2001.
37. "Other Teachers' Students." Conference on College Composition and Communication, Minneapolis, MN, April 15, 2000.

**Recent Media Interviews**

1. Interviews for *What's Your Pronoun?* 2020-21: CBS Radio (NYC); NPR Weekend All Things Considered; CAP Radio (Sacramento, CA); Wisconsin Public Radio; KPBS San Diego; KWGS, Tulsa, OK; Slate: The Gist; KERA Radio; KATU TV, Portland, OR; KQED, San Francisco Public Radio; KPCC, Los Angeles; Talk the Talk (podcast); The Vocal Fries (podcast); That Word Chat (podcast).
2. "Tapestry," CBC-Radio "The Longing for Belonging," interview on pronouns, June 28, 2018.
3. "Air Talk," Larry Mantle, KPCC-NPR Los Angeles, Pronouns, Mar. 6, 2018.
4. "Do Official English laws work?" interview, KCBS, San Francisco. Aug. 24, 2017.
5. "Latinos in America." PBS documentary, aired October, 2013.
6. Various radio appearances on WILL-AM discussing language issues 1984-present.
7. "Extension 720" with Milt Rosenberg. WGN radio, Oct. 16, 2009. 2-hour interview about *A Better Pencil.*
8. Steve Fast, "The Classroom Connection" Oklahoma Public Radio, interview about *A Better Pencil.* Oct. 1, 2009.
9. Valerie Richardson Show. WPKN, Bridgeport CT, April 21, 2009. Half-hour interview about my work on usage and on technology.
10. Jim Brown, "The Current." CBC-Radio, Canada. July 15, 2008. Interview on Esperanto.
11. "The Peter Laufer Show", Green Radio 960 (San Francisco). 60 min. interview on Broadcast English, Dec. 28, 2008.

12. "Official English in Small Town America," *Eight Forty-Eight,* WBEZ-FM (Chicago public radio), June 13, 2007. Lead interview for the show, also featured on the WBEZ web site: http://www.wbez.org/Program_848_Segment.aspx?segmentID=11395
13. "The English Language." Focus 580, WILL-AM, multiple appearances each year from 1982-present.
14. "Good English." The Robin and Maynard Show. KQBZ-FM (Seattle), May 3, 2005.
15. "Pronunciation in American English." Interview by Avi Arditti and Roseann Skirble broadcast on "Coast to Coast" by Voice of America (4/24/03); posted on voanews.com/wordmaster.
16. "The English Language," The Joan Rivers Show, WOR-AM, New York, June 25, 2001.
17. "The *New Oxford Dictionary of English*," "Sandy Rios Live," WYLL-FM, Chicago, Aug. 14, 1998.

**Editorships and Commissions:**

Chair, Committee on Public Policy, Conference on College Composition and Communication, National Council of Teachers of English, 2003-06.
Member, Board of Advisors for the television series "Do You Speak American?" with Robert MacNeil.
Member, *PMLA* Advisory Committee, 1998-2001.
Member, editorial advisory board, *Liverpool Studies in Language and Discourse*, 1993-present.
Member, MLA Delegate Assembly, 1998-2003.
Chair, MLA Division on Language and Society, 2001-02.
Member, Commission on Language, National Council of Teachers of English, 1984-87; 1999-2002.
Editor, *Publication of the American Dialect Society* (monograph series) 1984-93.
Member, Committee on Language and the Schools, Linguistic Society of America, 1992-1997.
Associate Editor, *Publication of the American Dialect Society,* 1982-84.

**Memberships in Professional Organizations:**

American Dialect Society (life member; member, Committee on New Words, 1975-82; member, Committee on Usage, 1982-present; member, Centennial Publications Committee; Centennial Publicity Committee; Centennial Documentaries Committee).
Modern Language Association (member, Delegate Assembly, 1996-99).
National Council of Teachers of English (member, Commission on the English Language, two terms). Chair, Committee on Public Language, 2009-12.
Conference on College Composition and Communication.
Conference of Editors of Learned Journals, 1985-93.
Linguistic Society of America; member, Committee on Language in the Schools, 1992-94.
Illinois Association of Teachers of English (member, program committee, 1987-88).

**Biographical Notices:**

*Who's Who in America*
*Directory of American Scholars*
*Contemporary Authors*
*Who's Where Among Writers*
*International Authors and Writers Who's Who*
*International Linguistic Directory*
*Who's Who in American Education*

*Who's Who in the World*
*Who's Who in the Humanities*

**Consulting:**

*Legal consulting and expert witness reports and testimony for a variety of law firms and for the Sate of California Attorney General..*

*Media consulting for television, radio, and newspapers, including ABC's Nightline, Champaign-Urbana News-Gazette, The Chicago Tribune, Cincinnati Enquirer, Los Angeles Times, The McNeil-Lehrer Report, The New York Times, Newsweek, Orlando Sentinel,* Prentice-Hall, *Scripps-Howard Newspapers,* Scott-Foresman, Inc., *Springfield* (IL) *Register, USA Today, U.S. News and World Report***,** WICD-TV (Champaign, IL), William Safire**.**

*Professional consulting for numerous academic and university presses.*

# Exhibit 7

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
|      Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
|      Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
|      Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

**JA1474**

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## <u>DECLARATION OF LUCY P. ALLEN</u>

    I, LUCY P. ALLEN, hereby depose and state:

1.    I am over the age of 18 and am competent to testify to the matters stated
below based on personal knowledge.

**JA1475**

2.     I have attached a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.

    I declare under penalty of perjury on this ____25____ day of October, 2023, that the foregoing is true and correct.

_____
LUCY P. ALLEN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Expert Report of Lucy P. Allen**

June 16, 2023

---

I, Lucy P. Allen, the undersigned, declare as follows:

1.      I am a Senior Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice and Chair of NERA's Product Liability and Mass Torts Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.

2.      In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving economics and statistics. I have been qualified as an expert and testified in court on various economic and statistical issues relating to the flow of guns into the criminal market. I have testified at trials in Federal and State Courts, before the New York City Council Public Safety Committee, the American Arbitration Association, and the Judicial Arbitration Mediation Service, as well as in depositions.

3.      I have an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. My resume with recent publications and testifying experience is included as Exhibit A.

4.      I have been asked by the New Jersey Office of the Attorney General to address the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in self-defense[1] and (b) the outcomes when assault weapons and large-capacity magazines are used in public mass shootings, including the associated number of casualties. NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,150 per hour.  NERA's fees are not in any way contingent upon the outcome of this matter.

---

[1]    I have also been asked to analyze the percent of incidents in which rifles were used in self-defense according to The Heritage Foundation's "Defensive Gun Uses in the U.S." database.

**SUMMARY OF FINDINGS**

5.    Regarding the number of rounds fired by individuals using a gun in self-defense, I analyzed almost 1,000 real-life incidents of self-defense and found that it is extremely rare for a person, when using a firearm in self-defense, to fire more than 10 rounds. In particular, I performed an analysis of 736 incidents in the NRA Armed Citizen database, as well as our own systematic analysis of 200 Factiva news stories from a random sample of approximately 4,800 news stories describing incidents of self-defense with a firearm and found only 2 incidents where more than 10 rounds were used.[2]

6.    Regarding the outcomes when assault weapons and large-capacity magazines are used in public mass shootings, I analyzed almost 200 mass shootings from four different sources between 1982 and 2022 and found that: (1) assault weapons and large-capacity magazines are often used in mass shootings; (2) both injuries and fatalities were higher in mass shootings that involved assault weapons and/or large-capacity magazines than in other mass shootings; (3) it is common for offenders to fire more than 10 rounds when using an assault weapon or a large-capacity magazine in mass shootings; and (4) the majority of guns used in mass shootings were obtained legally. These findings are consistent with other studies that have analyzed mass shootings, including studies based on alternate sets of mass shootings, covering different years and defining mass shootings somewhat differently.

---

[2]    Note that these two incidents with more than 10 bullets fired by the defender were added to the NRA Armed Citizen database after an earlier analysis that I had conducted of the database in another case that was cited and relied upon by the court. See *Kolbe v. O'Malley,. 42 F. Supp. 3d 768 (D. Md. 2014)* ("Allen's use of the NRA database is appropriate and acceptable." The Court also found that "The defendants' expert, Lucy Allen, confirms that it is rare for a self-defender to fire more than ten rounds"). In addition, according to the news stories on these two incidents, the defenders did not appear to need to fire more than 10 shots to defend themselves. See "York County homeowner shoots at intruder," NRA-ILA Armed Citizen, December 12, 2016 and "Homeowner fired at intruders," NRA-ILA Armed Citizen, May 24, 2017.

<center>OPINIONS</center>

**A.    Use of Guns in Self-Defense**

**i.    The number of rounds used by individuals in self-defense**

7.    Plaintiffs claim the large-capacity magazines (magazines capable of holding more than ten rounds, "Large Capacity Magazines") and "assault weapons" covered by New Jersey Revised Statutes § 2C:39 and § 2C:58[3] are commonly used for lawful purposes, including for self-defense.[4]

8.    The number of rounds commonly needed by individuals to defend themselves cannot be practically or ethically determined with controlled scientific experiments and there is no source that systematically tracks or maintains data on the number of rounds fired by individuals in self-defense. Due to these limitations, I have analyzed available data sources to estimate the number of rounds fired by individuals to defend themselves. In particular, I have analyzed data from the NRA Institute for Legislative Action, as well as my own study of news reports on incidents of self-defense with a firearm. In all, I have analyzed almost 1,000 incidents of self-defense with a firearm and found that it is extremely rare for a person, when using a firearm in self-defense, to fire more than 10 rounds.

9.    The NRA maintains a database of "Armed Citizen" stories describing private citizens who have successfully defended themselves, or others, using a firearm ("NRA Armed Citizen database"). According to the NRA, the "Armed Citizen" stories "highlight accounts of law-abiding gun owners in America using their Second Amendment rights to defend self, home

---

[3]    Under New Jersey Revised Statutes § 2C:39-1(w), a firearm is classified as an assault weapon if it is one of the firearm types and models listed or is "substantially identical" to any of the listed firearms. Examples of assault weapons include the "Armalite AR-180 type," "Bushmaster Assault Rifle," and "Calico M-900." See, New Jersey Revised Statutes § 2C:39-1(w).

[4]    See, for example, Complaint for Declaratory and Injunctive Relief, filed July 1, 2022, (the "Ellman Complaint") ¶¶1, 24, First Amended Complaint for Declaratory and Injunctive Relief, filed July 14, 2022 (the "Cheeseman Complaint"), ¶¶2-3, and Amended Complaint for Declaratory and Injunctive Relief, filed October 28, 2022 (the "ANJRPC Complaint"), ¶¶1, 29.

and family."[5] Although the methodology used to compile the NRA Armed Citizen database of stories is not explicitly detailed by the NRA, the NRA Armed Citizen database is a useful data source in this matter for at least three reasons. First, the Armed Citizen database was the largest collection of accounts of citizen self-defense compiled by others that I was able to find.[6] Second, the incidents listed in the Armed Citizen database highlight the very conduct that Plaintiffs claim the New Jersey law impedes (*i.e.*, the use of firearms by law-abiding citizens for self-defense).[7] Third, the Armed Citizen database is compiled by an entity that actively opposes restrictions on magazine capacity and restrictions on the possession and use of firearms in general.[8] In light of the positions taken by the entity compiling the data, I would expect that any selection bias would be in favor of stories that put use of guns in self-defense in the best possible light and might highlight the apparent need of guns and/or multiple rounds in self-defense incidents.

      10.     My team and I performed an analysis of incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017.[9] For each incident, the city/county, state, venue (whether the incident occurred on the street, in the home, or elsewhere) and the number of shots fired were tabulated.[10] The information was gathered for each incident from

---

[5]   NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017.

[6]   Note that in 2020, after the time my research was conducted, The Heritage Foundation began an online database of its own sample of defensive gun use incidents (https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us).

[7]   See, for example, Ellman Complaint, ¶¶1, 24, Cheeseman Complaint, ¶¶2-3, and ANJRPC Complaint, ¶¶1, 29.

[8]   See, for example, NRA Civil Rights Defense Fund website, http://www.nradefensefund.org/current-litigation.aspx, accessed October 12, 2018.

[9]   My collection and coding of the NRA Armed Citizen stories was last performed in mid-2017.

[10]   The following incidents were excluded from the analysis: (1) duplicate incidents, (2) wild animal attacks, and (3) one incident where the supposed victim later pleaded guilty to covering up a murder. When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

both the NRA synopsis and, where available, an additional news story. An additional news story was found for over 95% of the incidents in the NRA Armed Citizen database.

9.      According to this analysis of incidents in the NRA Armed Citizen database, it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Out of 736 incidents, there were 2 incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets.[11] Defenders fired 2.2 shots on average.[12] In 18% of incidents the defender did not fire any shots; in 80% of incidents the defender fired 1 to 5 shots; in 2% of incidents the defender fired 6 to 10 shots; and in 0.3% of incidents the defender fired more than 10 shots. [13,14] These incidents highlight the fact that in many instances defenders are able to defend themselves without firing any shots. For example, according to one of the incidents in the NRA Armed Citizen Database:

> "A man entered a Shell station in New Orleans, La. and attempted to rob a cashier, by claiming he was carrying a gun. The cashier responded by retrieving a gun and leveling it at the thief, prompting the criminal to flee. (The Times Picayune, New Orleans, La. 09/02/15)"[15]

10.      The table below summarizes these findings. (Note that we did not perform a New Jersey-specific analysis, as there were only six incidents in the NRA Armed Citizen database that

---

[11] As discussed above, these two incidents with more than 10 shots fired by the defender were added to the NRA Armed Citizen database after an earlier analysis that I had conducted of the database. Further, the defenders in these two incidents did not appear to need to fire more than 10 shots to defend themselves. See footnote 2 above.

[12] Note that the analysis is focused on shots fired when using a gun in self-defense and therefore the average includes instances when no shots are fired. If one calculates the average excluding incidents of self-defense with a gun without firing shots, the average is still low, 2.6 shots when at least one shot is fired.

[13] The number of incidents, as well as the breakdown of incidents by number of shots fired, is similar for incidents inside the home vs. outside the home.

[14] A separate study of incidents in the NRA Armed Citizen database for an earlier period (the five-year period from 1997 through 2001) found similar results. Specifically, this study found that, on average, 2.2 shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. See, Claude Werner, "The Armed Citizen – A Five Year Analysis," https://tacticalprofessor.files.wordpress.com/2014/12/tac-5-year-w-tables.pdf, accessed January 26, 2023.

[15] "Gas station clerk scares off robber," NRA-ILA Armed Citizen, September 9, 2015.

occurred in New Jersey. We found no indication that more than 10 shots were fired in any of these New Jersey incidents.)

---

**Breakdown of Incidents in NRA Armed Citizen Database
by Number of Shots Fired
January 2011 - May 2017**

| # of Shots Fired | # of Incidents | % of Incidents |
|---|---|---|
| 0 | 134 | 18.2% |
| 1-5 | 587 | 79.8% |
| 6-10 | 13 | 1.8% |
| More than 10 | 2 | 0.3% |

*Average Number of Shots Fired: 2.2*

**Notes and Sources:**
Data from NRA Armed Citizen database covering 736 incidents from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

---

11.    In addition to our analysis of incidents in the NRA Armed Citizen database, we performed a systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, focusing on the same types of incidents as the NRA stories and covering the same time period.[16]

12.    To identify relevant news stories to include in our analysis, we performed a comprehensive search of published news stories using Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates news content from nearly 33,000

---

[16] This analysis was initially conducted to research issues regarding self-defense in the home, which was a focus of federal Second Amendment jurisprudence before the 2022 *New York State Rifle & Pistol Association v. Bruen* Supreme Court decision. The analysis of the NRA Armed Citizen incidents described above indicates that the number of shots fired in self-defense outside the home is similar to those inside the home.

sources.[17] The search was designed to return stories about the types of incidents that are the focus of the NRA Armed Citizen database and that Plaintiffs claim the New Jersey law impedes – in particular, the use of firearms for self-defense.[18] The search identified all stories that contained the following keywords in the headline or lead paragraph: one or more words from "gun," "shot," "shoot," "fire," or "arm" (including variations on these keywords, such as "shooting" or "armed"), plus one or more words from "broke in," "break in," "broken into," "breaking into," "burglar," "intruder," or "invader" (including variations on these keywords) and one or more words from "home," "apartment," or "property" (including variations on these keywords).[19] The search criteria matched approximately 90% of the NRA stories on self-defense with a firearm in the home, and an analysis of the 10% of stories that are not returned by the search shows that the typical number of shots fired in these incidents was no different than in other incidents. The search covered the same period used in our analysis of incidents in the NRA Armed Citizen database (January 2011 to May 2017). The region for the Factiva search was set to "United States." The search returned approximately 35,000 stories for the period January 2011 to May 2017.[20]

---

[17] Factiva is often used for academic research. For example, a search for the term "Factiva" on Google Scholar yields over 28,000 results. As another example, a search on Westlaw yields at least 83 expert reports that conducted news searches using Factiva.

[18] NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017. See, also Ellman Complaint, ¶¶1, 24, Cheeseman Complaint, ¶¶2-3, and ANJRPC Complaint, ¶¶1, 29.

[19] The precise search string used was: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"). An asterisk denotes a wildcard, meaning the search includes words which have any letters in place of the asterisk. For example, a search for shoot* would return results including "shoots," "shooter" and "shooting." The search excluded duplicate stories classified as "similar" on Factiva.

[20] The effect of using alternative keywords was considered. For example, removing the second category ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and including incidents in which the assailant was already inside the home and/or was known to the victim was considered. *A priori*, there was no reason to believe that a larger number of shots would be used in these incidents and based on an analysis of the NRA stories we found that the number of shots fired in incidents when defending against someone already in the home was not different than those with an intruder.

13.    Using a random number generator, a random sample of 200 stories was selected for each calendar year, yielding 1,400 stories in total.[21] These 1,400 stories were reviewed to identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a firearm in or near the home. This methodology yielded a random selection of 200 news stories describing incidents of self-defense with a firearm in the home out of a population of approximately 4,800 relevant stories.[22] Thus, out of the over 70 million news stories aggregated by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on incidents of self-defense with a firearm in the home. We analyzed a random selection of 200 of these stories.

14.    For each news story, the city/county, state and number of shots fired were tabulated. When tabulating the number of shots fired, we used the same methodology as we used to analyze stories in the NRA Armed Citizen database.[23] We then identified other stories describing the same incident on Factiva based on the date, location and other identifying information, and recorded the number of times that each incident was covered by Factiva news stories.

15.    To determine the average number of shots fired per *incident*, we first determined the average number of shots fired per *story* and then analyzed the number of stories per incident. According to our study of a random selection from approximately 4,800 relevant stories on Factiva describing incidents of self-defense with a firearm in the home, the average number of

---

[21]   The random numbers were generated by sampling with replacement.

[22]   The approximately 4,800 relevant news stories were estimated by calculating the proportion of relevant news stories from the 200 randomly selected stories each year and applying that proportion to the number of results returned by the search for each year of the analysis. For example, in 2017, 33 out of 200 (17%) randomly selected news stories involved incidents of self-defense with a firearm in the home. Applying that proportion to the 1,595 results from the Factiva search in 2017 yields 263 relevant news stories in 2017. This process was repeated every year to arrive at a total of 4,841 relevant news stories from 2011-2017.

[23]   When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

shots fired per story was 2.61. This is not a measure of the average shots fired *per incident*, however, because the number of stories covering an incident varies, and the variation is not independent of the number of shots fired. We found that there was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering the incident.[24] We found that on average the more shots fired in a defensive gun use incident, the greater the number of stories covering the incident. For example, as shown in the chart below, we found that incidents in Factiva news stories with zero shots fired were covered on average by 1.8 news stories, while incidents with six or more shots fired were covered on average by 10.4 different news stories.

---

[24] Based on a linear regression of the number of news stories as a function of the number of shots fired, the results were statistically significant at the 1% level (more stringent than the 5% level commonly used by academics and accepted by courts. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980).



16.     After adjusting for this disparity in news coverage, we find that the average

number of shots fired per incident covered is 2.34.[25] Note that this adjustment does not take into

account the fact that some defensive gun use incidents may not be picked up by *any* news story.

Given the observed relationship that there are more news stories when there are more shots fired,

one would expect that the incidents that are not written about would on average have fewer shots

than those with news stories. Therefore, the expectation is that these results, even after the

---

[25] The adjustment reflects the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home. The formula used for the adjustment is:

$$\frac{\sum_{i=1}^{n}\left(Shots\ Fired_i \times \frac{R_i}{C_i}\right)}{\sum_{i=1}^{n}\left(\frac{R_i}{C_i}\right)}$$

where:

$n$ = random selection of news stories on incidents of self-defense with a firearm in the home

$R_i$ = number of search results on Factiva in the calendar year of incident $i$

$C_i$ = number of news stories covering incident $i$

adjustment, are biased upward (*i.e.*, estimating too high an average number of shots and underestimating the percent of incidents in which no shots were fired).

17.    As shown in the table below, according to the study of Factiva news stories, in 11.6% of incidents the defender did not fire any shots, and simply threatened the offender with a gun. In 97.3% of incidents the defender fired five or fewer shots. There were no incidents where the defender was reported to have fired more than 10 bullets.

## Number of Shots Fired in Self-Defense in the Home Based on Random Selection of Articles from Factiva
### January 2011 - May 2017

|  | Incidents in the Home |
|---|---|
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with <=5 Shots Fired | 195 |
| Percent of Incidents with <=5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

**Notes and Sources:**

Based on news stories describing defensive gun use in a random selection of Factiva stories 2011 to May 2017 using search string (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property") with region set to United States and excluding duplicate stories classified as "similar."

Calculated using weights reflecting the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home.

18.    In sum, an analysis of incidents in the NRA Armed Citizen database, as well as my own study of a random sample from approximately 4,800 news stories describing incidents of self-defense with a firearm, indicates that it is extremely rare for a person, when using a firearm in self-defense, to fire more than 10 rounds. I have analyzed almost 1,000 incidents of

self-defense (736 incidents from the NRA Armed Citizen database and 200 stories from Factiva) and in only 2 incidents were more than 10 rounds used. [26] Thus, in only 0.2% of reported incidents of self-defense with a firearm were more than 10 rounds used. However, given that this rate excludes incidents with no news coverage, the 0.2% rate is an overestimation of the percent of self-defense incidents in which more than 10 rounds were used because fewer shots means less news coverage.

### ii. Percent of incidents in which rifles were used in self-defense according to the Heritage Defensive Gun Uses Database

19. I have been asked to analyze The Heritage Foundation's "Defensive Gun Uses in the U.S." database ("Heritage DGU Database"), a database of defensive gun incidents that was first published after my research on the number of rounds used by individuals in self-defense was performed.[27] In particular, I have been asked to analyze the percent of incidents in which rifles were used in self-defense according to the Heritage DGU Database. The analysis of the Heritage DGU Database indicates that it is rare for a rifle to be used in self-defense.

20. The Heritage Foundation is a think tank focused on "formulat[ing] and promot[ing] public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."[28] According to The Heritage Foundation, "[t]he right of the people to keep and bear arms is a fundamental part of American liberty, serving as an important individual defense against crime and a collective defense against tyranny."[29]

---

[26] As discussed above, these two incidents with more than 10 shots fired by the defender were added to the NRA Armed Citizen database after an earlier analysis that I had conducted of the database. Further, the defenders in these two incidents did not appear to need to fire more than 10 shots to defend themselves. See footnote 2 above.

[27] "Defensive Gun Uses in the U.S.," *The Heritage Foundation,* as of October 7, 2022, https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us.

[28] "About Heritage," *The Heritage Foundation*, https://www.heritage.org/about-heritage/mission.

[29] "Firearms," *The Heritage Foundation*, https://www.heritage.org/firearms.

21.     In April 2020, The Heritage Foundation began publishing and periodically updating a database of news stories describing incidents in the U.S. in which individuals purportedly defended themselves using firearms.[30] The Heritage Foundation notes that its database is not comprehensive but meant to "highlight" stories of successful self-defense.[31,32]

22.     As of October 7, 2022, the Heritage DGU Database included 2,714 incidents from January 1, 2019 through October 6, 2022.[33] The Heritage DGU Database codes the following information for each incident:[34]

- Date of the incident;
- Website link to the news story;
- Location (city and state);
- Context (e.g., domestic violence, home invasion, robbery, etc.);
- Whether the defender had a concealed-carry permit;
- Whether there were multiple assailants;
- Whether shots were fired; and
- Firearm type (handgun, shotgun, rifle, pellet rifle, long gun, or unknown).[35]

23.     I performed an analysis of all 2,714 incidents in the Heritage DGU Database as of October 7, 2022, to determine what number and percent of the incidents involved a rifle. I found there were 51 incidents indicating a rifle was involved. These 51 incidents represent 2% of all incidents in the database and 4% of incidents with a known gun type.[36] The table below shows the breakdown of incidents by coded firearm type for the 2,714 incidents.

---

[30] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[31] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[32] Note that a review of the news stories cited in the database indicates that a number of the incidents may not involve individuals defending themselves. For example, in one incident ("Two Burglary Suspects Caught By Victim's Brother And Friend, Held At Gunpoint For Police," *5NewsOnline*, February 11, 2019), a homeowner's brother and friend appear to have found and apprehended burglars on the roadside.

[33] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[34] "Defensive Gun Uses in the U.S.," *The Heritage Foundation.*

[35] A review of the data and linked news stories from the Heritage DGU Database indicates that the firearm type corresponds to the firearm associated with the defender.

[36] This analysis is based on The Heritage Foundation's coding of these incidents. We have not independently verified the coding of these incidents.

| | **The Heritage Foundation** | | |
| | **Defensive Gun Uses Database** | | |
| **Firearm Type** | **Incidents**[1] | **% of Total** | **% of Known** |
| **(1)** | **(2)** | **(3)** | **(4)** |
| Handgun | 1,113 | 41% | 90% |
| Shotgun | 78 | 3% | 6% |
| Rifle | 51 | 2% | 4% |
| Long Gun | 1 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,473 | 54% | |
| **Total known:** | **1,241** | | |
| **Total:** | **2,714** | | |

**Source:**

"Defensive Gun Uses in the U.S.," *The Heritage Foundation* .
Data as of October 7, 2022.

[1] Note that three incidents are coded as having more than one
firearm type and thus the sum by firearm type is larger than
the total number of incidents.

24.     I conducted the same analysis of the Heritage DGU Database excluding incidents
that occurred in states that had restrictions on assault weapons in 2022. In particular, I excluded
incidents in California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New
York, as well as Washington D.C.[37] In states without assault weapons restrictions, the Heritage

---

[37] See, "Assault Weapons," *Giffords Law Center*, https://giffords.org/lawcenter/gun-laws/policy-
areas/hardware-ammunition/assault-weapons/. Delaware is not excluded since restrictions in Delaware
were enacted in June 2022.  See, "Governor Carney Signs Package of Gun Safety Legislation,"
*Delaware.gov,* June 30, 2022, https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-
gun-safety-legislation/.

DGU Database has 48 incidents indicating a rifle was involved. These 48 incidents represent 2% of incidents in these states and 4% of incidents with a known gun type in these states. The table below shows the breakdown of incidents by coded firearm type for states that do not restrict assault weapons.

## The Heritage Foundation
## Defensive Gun Uses Database
## States Without Assault Weapon Restrictions

| Firearm Type (1) | Incidents[1] (2) | % of Total (3) | % of Known (4) |
|---|---|---|---|
| Handgun | 1,033 | 41% | 90% |
| Shotgun | 63 | 3% | 6% |
| Rifle | 48 | 2% | 4% |
| Long Gun | 0 | 0% | 0% |
| Pellet Rifle | 1 | 0% | 0% |
| Unknown | 1,357 | 54% | |
| **Total known:** | **1,142** | | |
| **Total:** | **2,499** | | |

**Source:**

"Defensive Gun Uses in the U.S.," *The Heritage Foundation*. Data as of October 7, 2022. Excludes the following states with assault weapon restrictions: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York as well as Washington D.C. Classification from Giffords Law Center. Incidents in Delaware not excluded as restrictions were enacted in June 2022.

[1] Note that three incidents are coded as having more than one firearm type and thus the sum of the individual firearm types is larger than the total number of incidents.

### B.   Public Mass Shootings

25.    We analyzed the use of assault weapons and Large-Capacity Magazines[38] in public mass shootings using four sources for identifying public mass shootings: Mother Jones,[39] the Citizens Crime Commission of New York City,[40] The Washington Post,[41] and The Violence Project.[42, 43] The analysis focused on public mass shootings because it is my understanding that the state of New Jersey is concerned about public mass shootings and enacted the challenged law, in part, to address the problem of public mass shootings.[44]

---

[38]  My analysis is based on the definitions of assault weapons ("Assault Weapons") provided by California law, specifically: California Penal Code sections 30510 and 30515, and California Code of Regulations, title 11, section 5499. California law defines Assault Weapons based on either their "make and model" or on certain "features." See, for example, California Department of Justice: "What is considered an assault weapon under California law?" and "What are AK and AR-15 series weapons?" https://oag.ca.gov/firearms/regagunfaqs, accessed October 25, 2018.

[39]  "US Mass Shootings, 1982-2022: Data From Mother Jones' Investigation," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data.

[40]  "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update. Additional details on the mass shootings were obtained from an earlier source by the Citizens Crime Commission. "Mass Shooting Incidents in America (1984-2012)," Citizens Crime Commission of New York City,  http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[41]  "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[42]  "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[43]  When I began research in 2013 on mass shootings, I found Mother Jones and Citizens Crime Commission to maintain the most comprehensive lists of relevant mass shootings. More recently, two additional sources, The Washington Post and The Violence Project, have compiled lists of public mass shootings. The Violence Project began work on its mass shootings database in September 2017 and its database first went online in November 2019, while The Washington Post first published its mass shootings database on February 14, 2018. There is substantial overlap between the mass shootings in all four sources. For example, the Mother Jones data contains 93% of the mass shootings in the Citizens Crime Commission data for the years covered by both data sources, 1984 to 2016, while The Washington Post contains 94% of the mass shootings in The Violence Project data for the years covered by both data sources, 1966 to 2019.

[44]  See, for example, State of New Jersey Senate Resolution No. 51, February 24, 2020, ("In 1990 New Jersey recognized that assault weapons posed a serious threat…").

26.    The type of incident considered a mass shooting is generally consistent across the four sources: all four sources consider an event a mass shooting if four or more people were killed in a public place in one incident, excluding incidents involving other criminal activity such as a robbery.[45]

---

[45] Citizens Crime Commission describes a mass shooting as "four or more victims killed" in "a public place" that were "unrelated to another crime (e.g., robbery, domestic violence)." Citizens Crime Commission notes that its sources include "news reports and lists created by government entities and advocacy groups." "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update.

Mother Jones describes mass shootings as "indiscriminate rampages in public places resulting in four or more victims killed by the attacker," excluding "shootings stemming from more conventionally motivated crimes such as armed robbery or gang violence." Although in January 2013 Mother Jones changed its definition of mass shooting to include instances when three or more people were killed, for this report we only analyzed mass shootings where four or more were killed to be consistent with the definition of the other three sources. "A Guide to Mass Shootings in America," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. See also, "What Exactly is a Mass Shooting," Mother Jones, August 24, 2012. http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

The Washington Post describes a mass shooting as "four or more people were killed, usually by a lone shooter" excluding "shootings tied to robberies that went awry" and "domestic shootings that took place exclusively in private homes." The Washington Post notes that its sources include "Grant Duwe, author of 'Mass Murder in the United States: A History,' Mother Jones and Washington Post research," as well as "Violence Policy Center, Gun Violence Archive; FBI 2014 Study of Active Shooter Incidents; published reports." "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

The Violence Project indicates that it uses the Congressional Research Service definition of a mass shooting: "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project notes that its sources include "Primary Sources: Written journals / manifestos / suicide notes etc., Social media and blog posts, Audio and video recordings, Interview transcripts, Personal correspondence with perpetrators" as well as "Secondary Sources (all publicly available): Media (television, newspapers, magazines), Documentary films, Biographies, Monographs, Peer-reviewed journal articles, Court transcripts, Law Enforcement records, Medical records, School records, Autopsy reports." "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/methodology/, accessed January 17, 2020.

27.     Each of the four sources contains data on mass shootings covering different time periods. The Mother Jones data covers 112 mass shootings from 1982 to October 13, 2022,[46] the Citizens Crime Commission data covers 80 mass shootings from 1984 to February 2018,[47] The Washington Post data covers 185 mass shootings from 1966 to May 12, 2021,[48] and The Violence Project data covers 182 mass shootings from 1966 to May 14, 2022.[49, 50]

28.     Note that the two more recently compiled sources of mass shootings, The Washington Post and The Violence Project, include additional mass shootings that were not covered by either Mother Jones or Citizens Crime Commission.  In general, we found that these additional mass shootings were less covered by the media and involved fewer fatalities and/or injuries than the ones previously identified by Mother Jones or Citizens Crime Commission. For example, using the mass shooting data for the period 1982 through 2019, we found that the median number of news stories for a mass shooting included in Mother Jones and/or Citizens

---

[46] "A Guide to Mass Shootings in America," Mother Jones, updated November 23, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. Excludes mass shootings where only three people were killed. Note this analysis of the Mother Jones data may not match other analyses because Mother Jones periodically updates its historical data.

[47] "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update.

[48] "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[49] "Mass Shooter Database," *The Violence Project* https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[50] Note that I have updated this mass shooting analysis to include more recent incidents, as well as more recently available details. In my 2017 declaration in *Duncan v. Bonta*, I included data on mass shootings through April 2017. In my 2018 declaration in *Rupp v. Becerra*, I updated the analysis to include data on mass shootings through September 2018. The analyses in both of these declarations included mass shootings only from Mother Jones and the Citizens Crime Commission. In my 2020 declaration in *James Miller v. Becerra*, I updated the analysis to include mass shootings through December 2019 and added mass shootings from two more sources, The Washington Post and The Violence Project. The number of mass shootings, as well as some details about the shootings, are not identical across these declarations for three main reasons. First, I have updated the analysis to include more recent incidents as well as more recently available details. Second, starting in 2020, I added two more sources (The Washington Post and The Violence Project), which include additional mass shootings and details not included in the initial sources. Third, even though Mother Jones included instances when three or more people were killed, for my declarations and reports starting in 2020, I only included mass shootings where four or more were killed to be consistent with the definition of the other three sources.

Crime Commission was 317, while the median for the additional mass shootings identified in The Washington Post and/or The Violence Project was 28.[51] In addition, using the mass shooting data through 2019, we found an average of 21 fatalities or injuries for a mass shooting included in Mother Jones and/or Citizens Crime Commission, while only 6 fatalities or injuries for the additional mass shootings identified in The Washington Post and/or The Violence Project.

29.    We combined the data from the four sources for the period 1982 through October 2022, and searched news stories on each mass shooting to obtain additional details on the types of weapons used and data on shots fired where available. We compared the details on the weapons used in each shooting to the list of prohibited firearms and features specified in California law to identify, based on this publicly available information, which mass shootings involved the use of Assault Weapons. In addition, we identified, based on this publicly available information, which mass shootings involved the use of Large-Capacity Magazines. See attached Exhibit B for a summary of the combined data, and Exhibit C for a summary of the weapons used in each public mass shooting based on Mother Jones, Citizens Crime Commission, The Washington Post, The Violence Project, and news reports.[52]

### i.    The use of Assault Weapons in public mass shootings

30.    Based on the 179 mass shootings through October 2022, we found that Assault Weapons are often used in public mass shootings. Whether an Assault Weapon was used in a mass shooting can be determined in 153 out of the 179 incidents (85%) considered in this analysis. Out of these 153 mass shootings, 36 (or 24%) involved Assault Weapons. Even assuming the mass shootings where it is not known whether an Assault Weapon was used *all* did not involve an Assault Weapon, 36 out of 179 mass shootings, or 20%, involved Assault Weapons.

---

[51] The search was conducted over all published news stories on Factiva. The search was based on the shooter's name and the location of the incident over the period from one week prior to three months following each mass shooting.

[52] Note that the Citizens Crime Commission data was last updated in February 2018 and The Washington Post was last updated in May 2021.

### ii.    The use of Large-Capacity Magazines in public mass shootings

31.    Based on the 179 mass shootings through October 2022, we found that Large-Capacity Magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in public mass shootings. Magazine capacity is known in 115 out of the 179 mass shootings (or 64%) considered in this analysis. Out of the 115 mass shootings with known magazine capacity, 73 (or 63%) involved Large-Capacity Magazines. Even assuming the mass shootings with unknown magazine capacity *all* did not involve Large-Capacity Magazines, 73 out of 179 mass shootings or 41% of mass shootings involved Large-Capacity Magazines.

### iii.    Casualties in mass shootings involving Assault Weapons or Large-Capacity Magazines

32.    Based on our analysis, casualties were higher in the mass shootings that involved Assault Weapons than in other mass shootings. In particular, we found an average number of fatalities or injuries of 36 per mass shooting with an Assault Weapon versus 10 for those without. Focusing on just fatalities, we found an average number of fatalities of 12 per mass shooting with an Assault Weapon versus 6 for those without.

33.    Based on our analysis, casualties were higher in the mass shootings that involved weapons with Large-Capacity Magazines than in other mass shootings. In particular, we found an average number of fatalities or injuries per mass shooting with a Large-Capacity Magazine was 25 versus 9 for mass shootings where a Large-Capacity Magazine was not used. Focusing on just fatalities, we found that the average number of fatalities per mass shooting with a Large-Capacity Magazine was 10 versus 6 for those without.

34.    In addition, we found that casualties were higher in the mass shootings that involved both Assault Weapons *and* Large-Capacity Magazines. In particular, we found an average number of fatalities or injuries of 40 per mass shooting with both an Assault Weapon and a Large-Capacity Magazine versus 8 for those without either. Focusing on just fatalities, we found an average number of fatalities of 13 per mass shooting with both an Assault Weapon and a Large-Capacity Magazine versus 6 for those without either. (See table below.)

## Numbers of Fatalities and Injuries in Public Mass Shootings
## 1982 – October 2022

| Weapon Used | # of Incidents | Average # of | | |
|---|---|---|---|---|
| | | Fatalities | Injuries | Total |
| Assault Weapon | 36 | 12 | 24 | 36 |
| No Assault Weapon | 117 | 6 | 4 | 10 |
| Unknown | 26 | 5 | 3 | 9 |
| Large-Cap. Mag. | 73 | 10 | 16 | 25 |
| No Large-Cap. Mag. | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |
| Assault Weapon & Large-Cap. Mag. | 31 | 13 | 27 | 40 |
| Large-Cap. Mag. Only[1] | 36 | 8 | 7 | 15 |
| No Assault Weapon or Large-Cap. Mag.[2] | 41 | 6 | 3 | 8 |
| Unknown[3] | 71 | 5 | 3 | 8 |

**Notes and Sources:**

Casualty figures exclude the shooter. Assault Weapon and large-capacity magazine classification and casualties updated based on review of stories from Factiva/Google searches.

[1] Shootings involving large-capacity magazine and no Assault Weapon.

[2] Shootings involving neither a large-capacity magazine nor Assault Weapon.

[3] Shootings where it is either unknown whether a large-capacity magazine was involved or unknown whether an Assault Weapon was involved.

35.     Our results are consistent with those of other studies that have analyzed mass shootings. Importantly, although the other studies are based on alternate sets of mass shootings, including covering different years and defining mass shootings somewhat differently, the results are consistent in finding that the number of fatalities and injuries is greater in mass shootings in which large capacity magazines and assault weapons are involved. A 2019 academic article published in the *American Journal of Public Health* by Klarevas et al. found that "[a]ttacks

involving LCMs resulted in a 62% higher mean average death toll."[53] This study found an average number of fatalities of 11.8 per mass shooting with a large-capacity magazine versus 7.3 for those without. The results in this study were based on 69 mass shootings between 1990 and 2017.[54] An analysis of the mass shootings detailed in a 2016 article by Gary Kleck yielded similar results: 21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without.[55] The Kleck study covered 88 mass shooting incidents between 1994 and 2013.[56] In a 2018 study, Koper et al. found that mass shootings involving assault weapons and large-capacity magazines resulted in an average of 13.7 victims versus 5.2 for other cases.[57] The Koper et al. study covered 145 mass shootings between 2009 and 2015.[58] The table below summarizes their results.

---

[53] Louis Klarevas, Andrew Conner, and David Hemenway, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health* (2019).

[54] The Klarevas et al. study defines mass shootings as "intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators" and, unlike my analysis, does not exclude incidents in private places or incidents involving other criminal activity such as robbery.

[55] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[56] The Kleck study defines a mass shooting as "one in which more than six people were shot, either fatally or nonfatally, in a single incident." See, Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[57] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2018).

[58] The Koper et al. study defined mass shootings as "incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed."

## Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings

| Source | Criteria | | Time Period | # of Incidents | Avg. # of Fatalities + Injuries / Fatalities | |
| | # Victims | Other Criteria | | | With LCM | Without LCM |
| --- | --- | --- | --- | --- | --- | --- |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2023)[1] | at least 4 killed[3] | Includes shootings "in a public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-October 2022 | 179 | 25 / 10 | 9 / 6 |
| Allen (2020)[2] | | | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[4] | more than 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[5] | at least 6 killed[3] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[6] | at least 4 killed[3] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

**Notes and Sources:**

[1] Exhibit B of this report.

[2] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.,* dated January 23, 2020.

[3] Excluding shooter.

[4] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).

[5] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).

[6] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

### iv.    The number of rounds fired in public mass shootings with Assault Weapons or Large-Capacity Magazines

36.    The data on public mass shootings indicates that it is common for offenders to fire more than 10 rounds when using an Assault Weapon. Of the 36 mass shootings we analyzed through October 2022 that are known to have involved an Assault Weapon, there are 24 in which the number of shots fired is known. Shooters fired more than ten rounds in *all* 24 incidents, and the average number of shots fired was 149. In contrast, the average number of shots fired in mass shootings that did not involve an Assault Weapon was 38.

37.    In addition, the data indicates that it is common for offenders to fire more than 10 rounds when using a gun with a Large-Capacity Magazine in mass shootings. Of the 73 mass shootings that are known to have involved a Large-Capacity Magazine, there are 49 in which the number of shots fired is known. Shooters fired more than ten rounds in 46 of the 49 incidents (or 94%), and the average number of shots fired was 99. In contrast, the average number of shots fired in mass shootings that did not involve a Large-Capacity Magazine was 16.

### v.    The percent of mass shooters' guns legally obtained

38.    The data on public mass shootings indicates that the majority of guns used in these mass shootings were obtained legally.[59] Of the 179 mass shootings analyzed through October 2022, there are 112 where it can be determined whether the gun was obtained legally. According to the data, shooters in 79% of mass shootings obtained their guns legally (89 of the 112 mass shootings) and 80% of the guns used in these 112 mass shootings were obtained legally (202 of the 252 guns). (Even if one assumed that the guns were illegally obtained in all of the mass shootings where this question of legality is unknown, then one would find that in 50% of the mass shootings the guns were obtained legally and that 62% of the guns themselves were obtained legally.)

### vi.    Trends in the number of mass shootings

39.    According to the data since 1982, the first year in our analysis, the number of public mass shootings per year has been increasing. The following chart shows the number of mass shootings per year during this period, along with a fitted trendline:

---

[59]   The determination of whether guns were obtained legally is based on Mother Jones and The Washington Post reporting.



40.    Focusing only on public mass shootings involving Large-Capacity Magazines, the data similarly shows that the number of public mass shootings with Large-Capacity Magazines has been increasing. The following chart shows the number of public mass shootings involving Large-Capacity Magazines per year, along with a fitted trendline:



**Trend in Public Mass Shootings <u>Involving Large-Capacity Magazines</u>
1982 - 2021**

**Notes and Sources:**
Data from Appendix B. The dotted line is calculated as a linear time series regression of the number of mass shootings involving large-capacity magazines from 1982 to 2021.

41.    Focusing on a broader set of shooting incidents also shows an upward trend over time. In particular, data from the Gun Violence Archive ("GVA") on shootings in which four or more victims were killed *or injured* in either a public place *or a home* shows that the number of shooting incidents within this broader category has also been increasing.[60] GVA maintains a "database of incidents of gun violence and gun crime," based on information from "police, media, data aggregates, government and other sources" and has data starting in 2014.[61] Note that the data indicates there is less news coverage for this broader set of shooting incidents versus public mass shootings and thus less information about the type of magazine used.[62] The

---

[60]    "General Methodology," *Gun Violence Archive Website*, accessed on April 19, 2023.

[61]    "General Methodology," *Gun Violence Archive Website*, accessed on April 19, 2023.

[62]    Analysis of the number of news stories covering shootings indicated that there is more news coverage on public mass shootings than mass shootings in the home. For example, our analysis indicated that the median number of news stories covering public mass shootings is approximately four times larger than for mass shootings in the home. See "Declaration of Lucy P. Allen," dated February 6, 2023, in

following chart shows the number of shootings with four or more fatalities or injuries per year according to the GVA data, along with a fitted trendline:



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Lucy P. Allen

---

*Oregon Firearms Federation, Inc., et al., v. Tina Kotek, et al.* In addition, the data indicates that when fatalities and/or casualties are higher there is more news coverage. For example, our analysis indicates that there are approximately four times more news stories covering mass shootings with six or more fatalities than those with fewer than six fatalities.

**NERA**
ECONOMIC CONSULTING

**Lucy P. Allen**
Senior Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

Exhibit A

# LUCY P. ALLEN
# SENIOR MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

| | |
|---|---|
| 1994-Present | **National Economic Research Associates, Inc.**<br>Senior Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.<br>Managing Director (2016-2023).<br>Senior Vice President (2003-2016).<br>Vice President (1999-2003).<br>Senior Consultant (1994-1999). |
| 1992-1993 | **Council of Economic Advisers, Executive Office of the President**<br>Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force. |
| 1986-1988<br>1983-1984 | **Ayers, Whitmore & Company (General Management Consultants)**<br>Senior Associate. Formulated marketing, organization, and overall business strategies including:<br>Plan to improve profitability of chemical process equipment manufacturer.<br>Merger analysis and integration plan of two equipment manufacturers.<br>Evaluation of Korean competition to a U.S. manufacturer. |

Lucy P. Allen

Diagnostic survey for auto parts manufacturer on growth obstacles. Marketing plan to increase international market share for major accounting firm.

Summer 1985    **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983    **Arthur Andersen & Company**
<u>Consultant</u>.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

**Teaching**
1989- 1992    <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

# Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Deposition Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2023.

Deposition Testimony before the United States District Court for the Southern District of Texas in *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.,* 2023.

Testimony and Deposition before the United States District Court for the District of Oregon in *Oregon Firearms Federation, Inc. et al. v. Tina Kotek et al.*, 2023.

Testimony and Depositions before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2023.

Deposition Testimony before the United States District Court for the District of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

4

Lucy P. Allen

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *Miller et al. v. Becerra et al.,* 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.,* 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

**JA1510**

Lucy P. Allen

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

6

## Exhibit B
## Public Mass Shootings Data
## 1982 – Oct. 2022

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s) Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 1. Raleigh spree shooting Hedingham, NC | 10/13/22 | MJ | - | - | 5 | 2 | 7 | - | - | 2 |
| 2. Highland Park July 4 parade shooting Highland Park, IL | 7/4/22 | MJ | Yes | - | 7 | 48 | 55 | 83[ba] | Yes | 1 |
| 3. Tulsa medical center shooting Tulsa, OK | 6/1/22 | MJ | - | - | 4 | 9[bb] | 13[bb] | 37[bc] | Yes | 2 |
| 4. Robb Elementary School massacre Uvalde, TX | 5/24/22 | MJ | Yes | Yes | 21 | 17 | 38 | 164[bd] | Yes | 1[be] |
| 5. Buffalo supermarket massacre Buffalo, NY | 5/14/22 | MJ/VP | Yes | Yes | 10 | 3 | 13 | 60[bf] | Yes | 1 |
| 6. Sacramento County church shooting Sacramento, CA | 2/28/22 | MJ | Yes | - | 4 | 0 | 4 | - | Yes[bg] | 1 |
| 7. Oxford High School shooting Oxford, MI | 11/30/21 | MJ/VP | Yes | No | 4 | 7 | 11 | 30[bh] | Yes[bi] | 1 |
| 8. San Jose VTA shooting San Jose, CA | 5/26/21 | MJ/VP | Yes | No | 9 | 0 | 9 | 39[bj] | Yes[bk] | 3 |
| 9. Canterbury Mobile Home Park shooting Colorado Springs, CO | 5/9/21 | WaPo | Yes | - | 6 | 0 | 6 | 17[bl] | - | 1 |
| 10. FedEx warehouse shooting Indianapolis, IN | 4/15/21 | MJ/VP/WaPo | Yes | Yes | 8 | 7 | 15 | - | Yes | 2[bm] |
| 11. Orange office complex shooting Orange, CA | 3/31/21 | MJ/VP/WaPo | - | - | 4 | 1 | 5 | - | - | 1 |
| 12. Essex Royal Farms shooting Baltimore County, MD | 3/28/21 | WaPo | - | - | 4 | 1 | 5 | - | Yes[bn] | 1 |
| 13. King Soopers supermarket shooting Boulder, CO | 3/22/21 | MJ/VP/WaPo | Yes | Yes | 10 | 0 | 10 | - | Yes | 2 |

JA1512

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 14. Atlanta massage parlor shootings, Atlanta, GA | 3/16/21 | MJ/VP/WaPo | Yes | - | 8 | 1 | 9 | - | Yes[bo] | 1 |
| 15. Hyde Park shooting, Chicago, IL | 1/9/21 | WaPo | - | - | 5 | 2 | 7 | - | - | 1 |
| 16. Englewood block party shooting, Chicago, IL | 7/4/20 | WaPo | - | - | 4 | 4 | 8 | - | - | - |
| 17. Springfield convenience store shooting, Springfield, MO | 3/15/20 | MJ/VP/WaPo | - | - | 4 | 2 | 6 | - | Yes[bp] | 2 |
| 18. Molson Coors shooting, Milwaukee, WI | 2/26/20 | MJ/VP/WaPo | - | - | 5 | 0 | 5 | 12[bq] | - | 2[br] |
| 19. Jersey City Kosher Supermarket, Jersey City, NJ | 12/10/19 | MJ/VP/WaPo | - | No | 4 | 3 | 7 | - | Yes | 5 |
| 20. Football-watching party, Fresno, CA | 11/17/19 | WaPo | - | No | 4 | 6 | 10 | - | - | 2 |
| 21. Halloween Party, Orinda, CA | 11/1/19 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 22. Tequila KC bar, Kansas City, KS | 10/6/19 | WaPo | - | No | 4 | 5 | 9 | - | No | 2 |
| 23. Midland-Odessa Highways, Odessa, TX | 8/31/19 | MJ/VP/WaPo | - | Yes | 7 | 25 | 32 | - | No | 1 |
| 24. Dayton, Dayton, OH | 8/4/19 | MJ/VP/WaPo | Yes | Yes | 9 | 27 | 36 | 41[f] | Yes | 1/2 |
| 25. El Paso Walmart, El Paso, TX | 8/3/19 | MJ/VP/WaPo | Yes | Yes | 22 | 26 | 48 | - | Yes | 1 |
| 26. Casa Grande Senior Mobile Estates, Santa Maria, CA | 6/19/19 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a,l] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e,f] | Number of Guns Offender(s)[f] |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 27. Virginia Beach Municipal Center Virginia Beach, VA | 5/31/19 | MJ/VP/WaPo | Yes | No | 12 | 4 | 16 | - | Yes | 2 |
| 28. Henry Pratt Co. Aurora, IL | 2/15/19 | MJ/VP/WaPo | - | No | 5 | 6 | 11 | - | No | 1 |
| 29. SunTrust Bank Sebring, FL | 1/23/19 | MJ/VP/WaPo | - | No | 5 | 0 | 5 | - | Yes | 1 |
| 30. Borderline Bar & Grill Thousand Oaks, CA | 11/7/18 | MJ/VP/WaPo | Yes | No | 12 | 1 | 13 | 50 [g] | Yes | 1 |
| 31. Tree of Life Synagogue Pittsburgh, PA | 10/27/18 | MJ/VP/WaPo | - | Yes | 11 | 6 | 17 | - | Yes | 4 |
| 32. T&T Trucking Bakersfield, CA | 9/12/18 | MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 33. Capital Gazette Annapolis, MD | 6/28/18 | MJ/VP/WaPo | - | No | 5 | 2 | 7 | - | Yes | 1 |
| 34. Santa Fe High School Santa Fe, TX | 5/18/18 | MJ/VP/WaPo | No | No | 10 | 13 | 23 | - | - | 2 |
| 35. Waffle House Nashville, TN | 4/22/18 | MJ/VP/WaPo | - | Yes | 4 | 4 | 8 | - | Yes | 1 |
| 36. Detroit Detroit, MI | 2/26/18 | VP | - | No | 4 | 0 | 4 | - | - | - |
| 37. Stoneman Douglas HS Parkland, FL | 2/14/18 | CC/MJ/VP/WaPo | Yes | No | 17 | 17 | 34 | - | Yes | 1 |
| 38. Pennsylvania Carwash Melcroft, PA | 1/28/18 | MJ/VP/WaPo | - | - | 4 | 1 | 5 | - | - | 3 [h] |
| 39. Rancho Tehama Rancho Tehama, CA | 11/14/17 | MJ/VP/WaPo | Yes | Yes | 4 | 10 | 14 | 30 [i] | No | 2 |

Page 3 of 18

JA1514

# Exhibit B
## Public Mass Shootings Data
## 1982 – Oct. 2022

| Case and Location | Date | Source | Large Capacity Mag.[a,g1] | Assault Weapon[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally[e] | Offender(s) Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 40. Texas First Baptist Church Sutherland Springs, TX | 11/5/17 | CC/MJ/VP/WaPo | Yes | Yes | 26 | 20 | 46 | 450 [j] | Yes | 1 |
| 41. Las Vegas Strip Las Vegas, NV | 10/1/17 | CC/MJ/VP/WaPo | Yes | Yes | 58 | 422 | 480 | 1100 [k] | Yes | 23 |
| 42. Taos and Rio Arriba counties Abiquiu, NM | 6/15/17 | WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 43. Fianma Workplace Orlando, FL | 6/5/17 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | - | 1 |
| 44. Marathon Savings Bank Rothschild, WI | 3/22/17 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |
| 45. Club 66 Yazoo City, MS | 2/6/17 | VP/WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 46. Fort Lauderdale Airport Fort Lauderdale, FL | 1/6/17 | CC/MJ/VP/WaPo | No | No | 5 | 6 | 11 | 15 [l] | Yes | 1 |
| 47. Cascade Mall Burlington, WA | 9/23/16 | CC/MJ/VP/WaPo | Yes | No | 5 | 0 | 5 | - | - | 1 |
| 48. Dallas Police Dallas, TX | 7/7/16 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 11 | 16 | - | Yes | 3 |
| 49. Walgreens Parking Lot Las Vegas, NV | 6/29/16 | WaPo | - | - | 4 | 0 | 4 | - | - | 1 |
| 50. Orlando Nightclub Orlando, FL | 6/12/16 | CC/MJ/VP/WaPo | Yes | Yes | 49 | 53 | 102 | 110 [m] | Yes | 2 |
| 51. Franklin Avenue Cookout Wilkinsburg, PA | 3/9/16 | VP/WaPo | Yes | Yes | 6 | 3 | 9 | 48 [n] | No | 2 |
| 52. Kalamazoo Kalamazoo County, MI | 2/20/16 | MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | - | Yes | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 53. San Bernardino, San Bernardino, CA | 12/2/15 | CC/MJ/VP/WaPo | Yes | Yes | 14 | 22 | 36 | 150 ᵒ | Yes | 4 |
| 54. Tennessee Colony campsite, Anderson County, TX | 11/15/15 | VP/WaPo | - | - | 6 | 0 | 6 | - | - | 1 |
| 55. Umpqua Community College, Roseburg, OR | 10/1/15 | CC/MJ/VP/WaPo | - | No | 9 | 9 | 18 | - | Yes | 6 |
| 56. Chattanooga Military Center, Chattanooga, TN | 7/16/15 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 2 | 7 | - | Yes | 3 |
| 57. Charleston Church, Charleston, SC | 6/17/15 | CC/MJ/VP/WaPo | Yes | No | 9 | 3 | 12 | - | Yes | 1 |
| 58. Marysville High School, Marysville, WA | 10/24/14 | CC/MJ/VP/WaPo | Yes | No | 4 | 1 | 5 | - | No | 1 |
| 59. Isla Vista, Santa Barbara, CA | 5/23/14 | MJ/VP/WaPo | No | No | 6 | 13 | 19 | 50 ᵖ | Yes | 3 |
| 60. Alturas Tribal, Alturas, CA | 2/20/14 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 61. Washington Navy Yard, Washington, D.C. | 9/16/13 | CC/MJ/VP/WaPo | No | No | 12 | 8 | 20 | - | Yes | 2 |
| 62. Hialeah, Hialeah, FL | 7/26/13 | CC/MJ/VP/WaPo | Yes | No | 6 | 0 | 6 | 10 �q | Yes | 1 |
| 63. Santa Monica, Santa Monica, CA | 6/7/13 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 3 | 8 | 70 ʳ | Yes | 2 |
| 64. Federal Way, Federal Way, WA | 4/21/13 | MJ/VP/WaPo | - | No | 4 | 0 | 4 | - | Yes | 2 |
| 65. Upstate New York, Herkimer County, NY | 3/13/13 | MJ/VP/WaPo | - | No | 4 | 2 | 6 | - | Yes | 1 |

JA1516

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 66. Newtown School Newtown, CT | 12/14/12 | CC/MJ/VP/WaPo | Yes | Yes | 27 | 2 | 29 | 154 | No | 4/3 |
| 67. Accent Signage Systems Minneapolis, MN | 9/27/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 2 | 8 | 46 | Yes | 1 |
| 68. Sikh Temple Oak Creek, WI | 8/5/12 | CC/MJ/VP/WaPo | Yes | No | 6 | 4 | 10 | - | Yes | 1 |
| 69. Aurora Movie Theater Aurora, CO | 7/20/12 | CC/MJ/VP/WaPo | Yes | Yes | 12 | 70 | 82 | 80 | Yes | 4 |
| 70. Seattle Café Seattle, WA | 5/30/12 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 2 |
| 71. Oikos University Oakland, CA | 4/2/12 | CC/MJ/VP/WaPo | No | No | 7 | 3 | 10 | - | Yes | 1 |
| 72. Su Jung Health Sauna Norcross, GA | 2/22/12 | MJ/WaPo | - | No | 4 | 0 | 4 | - | Yes | 1 |
| 73. Seal Beach Seal Beach, CA | 10/14/11 | CC/MJ/VP/WaPo | No | No | 8 | 1 | 9 | - | Yes | 3 |
| 74. IHOP Carson City, NV | 9/6/11 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 7 | 11 | - | Yes | 3 |
| 75. Akron Akron, OH | 8/7/11 | VP | No | No | 7 | 2 | 9 | 21[s] | - | - |
| 76. Forum Roller World Grand Prairie, TX | 7/23/11 | WaPo | - | No | 5 | 4 | 9 | - | - | 1 |
| 77. Grand Rapids Grand Rapids, MI | 7/7/11 | CC | Yes | No | 7 | 2 | 9 | 10 | - | 1 |
| 78. Family law practice Yuma, AZ | 6/2/11 | WaPo | - | - | 5 | 1 | 6 | - | - | 1 |

Page 6 of 18

JA1517

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s) Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 79. Tucson, Tucson, AZ | 1/8/11 | CC/MJ/VP/WaPo | Yes | No | 6 | 13 | 19 | 33 | Yes | 1 |
| 80. Jackson, Jackson, KY | 9/11/10 | VP | No | No | 5 | 0 | 5 | 12 [t] | - | - |
| 81. City Grill, Buffalo, NY | 8/14/10 | VP/WaPo | - | No | 4 | 4 | 8 | 10 [u] | - | 1 |
| 82. Hartford Beer Distributor, Manchester, CT | 8/3/10 | CC/MJ/VP/WaPo | Yes | No | 8 | 2 | 10 | 11 | Yes | 2 |
| 83. Yoyito Café, Hialeah, FL | 6/6/10 | CC/VP/WaPo | No | No | 4 | 3 | 7 | 9 [v] | - | - |
| 84. Hot Spot Café, Los Angeles, CA | 4/3/10 | VP/WaPo | - | No | 4 | 2 | 6 | 50 [w] | - | 1 |
| 85. Coffee Shop Police, Parkland, WA | 11/29/09 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | No | 2 |
| 86. Fort Hood, Fort Hood, TX | 11/5/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 32 | 45 | 214 | Yes | 1 |
| 87. Worth Street, Mount Airy, NC | 11/1/09 | VP/WaPo | - | Yes | 4 | 0 | 4 | 16 [x] | No | 1 |
| 88. Binghamton, Binghamton, NY | 4/3/09 | CC/MJ/VP/WaPo | Yes | No | 13 | 4 | 17 | 99 | Yes | 2 |
| 89. Carthage Nursing Home, Carthage, NC | 3/29/09 | CC/MJ/VP/WaPo | No | No | 8 | 2 | 10 | - | Yes | 2 |
| 90. Skagit County, Alger, WA | 9/2/08 | VP/WaPo | - | No | 6 | 4 | 10 | - | No | 2 |
| 91. Atlantis Plastics, Henderson, KY | 6/25/08 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |

Page 7 of 18

JA1518

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[g1] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 92. Black Road Auto, Santa Maria, CA | 3/18/08 | VP/WaPo | - | No | 4 | 0 | 4 | 17[y] | - | 1 |
| 93. Northern Illinois University, DeKalb, IL | 2/14/08 | CC/MJ/VP/WaPo | Yes | No | 5 | 21 | 26 | 54 | Yes | 4 |
| 94. Kirkwood City Council, Kirkwood, MO | 2/7/08 | CC/MJ/VP/WaPo | No | No | 6 | 1 | 7 | - | No | 2 |
| 95. Youth With a Mission and New Life Church | 12/9/07 | VP/WaPo | Yes | Yes | 4 | 5 | 9 | 25[z] | - | 3 |
| 96. Westroads Mall, Omaha, NE | 12/5/07 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 5 | 13 | 14 | No | 1 |
| 97. Crandon, Crandon, WI | 10/7/07 | CC/MJ/WaPo | Yes | - | 6 | 1 | 7 | 30[aa] | Yes | 1 |
| 98. Virginia Tech, Blacksburg, VA | 4/16/07 | CC/MJ/VP/WaPo | Yes | No | 32 | 17 | 49 | 176 | Yes | 2 |
| 99. Trolley Square, Salt Lake City, UT | 2/12/07 | CC/MJ/VP/WaPo | No | No | 5 | 4 | 9 | - | No | 2 |
| 100. Amish School, Lancaster County, PA | 10/2/06 | CC/MJ/VP/WaPo | No | No | 5 | 5 | 10 | - | Yes | 3 |
| 101. The Ministry of Jesus Christ, Baton Rouge, LA | 5/21/06 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | 1 |
| 102. Capitol Hill, Seattle, WA | 3/25/06 | CC/MJ/VP/WaPo | Yes | Yes | 6 | 2 | 8 | - | Yes | 4 |
| 103. Goleta Postal, Goleta, CA | 1/30/06 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | - | Yes | 1 |
| 104. Sash Assembly of God, Sash, TX | 8/29/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | - | 2 |

JA1519

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location (1) | Date (2) | Source (3) | Large Capacity Mag.[a],* (4) | Assault Weapon[b] (5) | Fatalities[c] (6) | Injuries[c] (7) | Total Fatalities & Injuries[c] (8) | Shots Fired[d] (9) | Gun(s) Obtained Legally[e]* (10) | Offender(s)' Number of Guns (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 105. Red Lake, Red Lake, MN | 3/21/05 | CC/MJ/VP/WaPo | No | No | 9 | 7 | 16 | - | No | 3 |
| 106. Living Church of God, Brookfield, WI | 3/12/05 | CC/MJ/VP/WaPo | Yes | No | 7 | 4 | 11 | - | Yes | 1 |
| 107. Fulton County Courthouse, Atlanta, GA | 3/11/05 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |
| 108. Damageplan Show, Columbus, OH | 12/8/04 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | 15 [ab] | Yes | 1 |
| 109. Hunting Camp, Meteor, WI | 11/21/04 | CC/VP/WaPo | Yes | Yes | 6 | 2 | 8 | 20 | - | 1 |
| 110. ConAgra Foods Plant, Kansas City, KS | 7/3/04 | VP/WaPo | - | No | 6 | 1 | 7 | 10 [ac] | - | 2 |
| 111. Stateline Tavern, Oldtown, ID | 10/24/03 | VP/WaPo | Yes | No | 4 | 0 | 4 | 14 [ad] | - | 1 |
| 112. Windy City Warehouse, Chicago, IL | 8/27/03 | CC/VP/WaPo | No | No | 6 | 0 | 6 | - | - | - |
| 113. Lockheed Martin, Meridian, MS | 7/8/03 | CC/MJ/VP/WaPo | - | No | 6 | 8 | 14 | - | Yes | 5 |
| 114. Labor Ready, Huntsville, AL | 2/25/03 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 115. Bertrand Products, South Bend, IN | 3/22/02 | VP/WaPo | - | No | 4 | 2 | 6 | - | - | 2 |
| 116. Burns International Security, Sacramento, CA | 9/10/01 | VP/WaPo | Yes | Yes | 5 | 2 | 7 | 200 [ac] | - | 2 |
| 117. Bookcliff RV Park, Rifle, CO | 7/3/01 | VP/WaPo | No | No | 4 | 3 | 7 | 6 [af] | - | 1 |

JA1520

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location (1) | Date (2) | Source (3) | Large Capacity Mag.[a1] (4) | Assault Weapon[b] (5) | Fatalities[c] (6) | Injuries[c] (7) | Total Fatalities & Injuries[c] (8) | Shots Fired[d] (9) | Gun(s) Obtained Legally[e] (10) | Offender(s)' Number of Guns (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 118. Navistar Melrose Park, IL | 2/5/01 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - | Yes | 4 |
| 119. Houston Houston, TX | 1/9/01 | VP | - | No | 4 | 0 | 4 | - | - | - |
| 120. Wakefield Wakefield, MA | 12/26/00 | CC/MJ/VP/WaPo | Yes | - | 7 | 0 | 7 | 37 | Yes | 3 |
| 121. Mount Lebanon Pittsburgh, PA | 4/28/00 | VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 122. Mi-T-Fine Car Wash Irving, TX | 3/20/00 | VP/WaPo | - | No | 5 | 1 | 6 | - | - | - |
| 123. Hotel Tampa, FL | 12/30/99 | CC/MJ/VP/WaPo | No | No | 5 | 3 | 8 | - | Yes | 2 |
| 124. Xerox Honolulu, HI | 11/2/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 0 | 7 | 28 | Yes | 1 |
| 125. Wedgwood Baptist Church Fort Worth, TX | 9/15/99 | CC/MJ/VP/WaPo | Yes | No | 7 | 7 | 14 | 30 | Yes | 2 |
| 126. Atlanta Day Trading Atlanta, GA | 7/29/99 | MJ/VP/WaPo | - | No | 9 | 13 | 22 | - | Yes | 4 |
| 127. Albertson's Supermarket Las Vegas, NV | 6/3/99 | VP/WaPo | - | No | 4 | 1 | 5 | - | - | 1 |
| 128. Columbine High School Littleton, CO | 4/20/99 | CC/MJ/VP/WaPo | Yes | Yes | 13 | 23 | 36 | 188 | No | 4 |
| 129. St. John Fellowship Baptist Church Gonzalez, LA | 3/10/99 | VP/WaPo | - | No | 4 | 4 | 8 | - | - | 1 |
| 130. Thurston High School Springfield, OR | 5/21/98 | CC/MJ/VP/WaPo | Yes | No | 4 | 25 | 29 | 50 | No | 3 |

Page 10 of 18

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.? [a] | Assault Weapon? [b] | Fatalities [c] | Injuries [c] | Total Fatalities & Injuries [c] | Shots Fired [d] | Gun(s) Obtained Legally? [e] | Offender(s) Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 131. Westside Middle School Jonesboro, AR | 3/24/98 | CC/MJ/VP/WaPo | Yes | No | 5 | 10 | 15 | 26 | No | 9/10 |
| 132. Connecticut Lottery Newington, CT | 3/6/98 | CC/MJ/VP/WaPo | Yes | No | 4 | 0 | 4 | 5 | Yes | 1 |
| 133. Caltrans Maintenance Yard Orange, CA | 12/18/97 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 2 | 6 | 144 | Yes | 1 |
| 134. Erie Manufacturing Bartow, FL | 12/3/97 | VP | - | No | 4 | 0 | 4 | 12 [ag] | - | - |
| 135. R.E. Phelon Company Aiken, SC | 9/15/97 | CC/MJ/VP/WaPo | No | No | 4 | 3 | 7 | - | No | 1 |
| 136. News and Sentinel Colebrook, NH | 8/20/97 | VP/WaPo | - | Yes | 4 | 4 | 8 | - | - | 2 |
| 137. Fire Station Jackson, MS | 4/25/96 | VP/WaPo | - | No | 5 | 3 | 8 | - | - | 3 |
| 138. Fort Lauderdale Fort Lauderdale, FL | 2/9/96 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | 14 [ah] | Yes | 2 |
| 139. Little Chester Shoes New York, NY | 12/19/95 | VP/WaPo | Yes | No | 5 | 3 | 8 | - | - | 1 |
| 140. Piper Technical Center Los Angeles, CA | 7/19/95 | CC/VP/WaPo | Yes | No | 4 | 0 | 4 | - | - | - |
| 141. Walter Rossler Company Corpus Christi, TX | 4/3/95 | CC/MJ/VP/WaPo | No | No | 5 | 0 | 5 | - | Yes | 2 |
| 142. Puppy creek Hoke County, NC | 12/31/94 | VP | - | - | 5 | 1 | 6 | - | - | - |
| 143. Air Force Base Fairchild Base, WA | 6/20/94 | CC/MJ/VP/WaPo | Yes | Yes | 4 | 23 | 27 | 50 [ai] | Yes | 1 |

JA1522

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?ᵃ | Assault Weapon?ᵇ | Fatalitiesᶜ | Injuriesᶜ | Total Fatalities & Injuriesᶜ | Shots Firedᵈ | Gun(s) Obtained Legallyᵉ | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 144. Chuck E. Cheese, Aurora, CO | 12/14/93 | CC/MJ/VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 145. Long Island Railroad, Garden City, NY | 12/7/93 | CC/MJ/VP/WaPo | Yes | No | 6 | 19 | 25 | 30 | Yes | 1 |
| 146. Unemployment Office, Oxnard, CA | 12/2/93 | VP/WaPo | - | - | 4 | 4 | 8 | - | - | - |
| 147. Family Fitness Club, El Cajon, CA | 10/14/93 | VP/WaPo | - | No | 4 | 0 | 4 | - | Yes | 1 |
| 148. Luigi's Restaurant, Fayetteville, NC | 8/6/93 | CC/MJ/VP/WaPo | No | No | 4 | 8 | 12 | - | Yes | 3 |
| 149. Washington County Bar, Jackson, MS | 7/8/93 | WaPo | - | - | 5 | 0 | 5 | - | - | 1 |
| 150. 101 California Street, San Francisco, CA | 7/1/93 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 6 | 14 | 75 | No | 3 |
| 151. Card club, Paso Robles, CA | 11/8/92 | VP/WaPo | - | No | 6 | 1 | 7 | - | - | 1 |
| 152. Watkins Glen, Watkins Glen, NY | 10/15/92 | CC/MJ/VP/WaPo | No | No | 4 | 0 | 4 | - | Yes | 1 |
| 153. Lindhurst High School, Olivehurst, CA | 5/1/92 | CC/MJ/VP/WaPo | No | No | 4 | 10 | 14 | - | Yes | 2 |
| 154. Phoenix, Phoenix, AZ | 3/15/92 | VP | - | - | 4 | 0 | 4 | - | - | - |
| 155. Royal Oak Postal, Royal Oak, MI | 11/14/91 | CC/MJ/VP/WaPo | Yes | No | 4 | 4 | 8 | - | Yes | 1 |
| 156. Restaurant, Harrodsburg, KY | 11/10/91 | VP/WaPo | No | No | 4 | 0 | 4 | 6 ᵍ⁾ | No | 1 |

Page 12 of 18

JA1523

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 157. University of Iowa Iowa City, IA | 11/1/91 | CC/MJ/VP/WaPo | No | No | 5 | 1 | 6 | - | Yes | 1 |
| 158. Luby's Cafeteria Killeen, TX | 10/16/91 | CC/MJ/VP/WaPo | Yes | No | 23 | 20 | 43 | 100 | Yes | 2 |
| 159. Post office Ridgewood, NJ | 10/10/91 | VP/WaPo | Yes | Yes | 4 | 0 | 4 | - | - | 2 |
| 160. GMAC Jacksonville, FL | 6/18/90 | CC/MJ/VP/WaPo | Yes | No | 9 | 4 | 13 | 14 | Yes | 2 |
| 161. Standard Gravure Corporation Louisville, KY | 9/14/89 | CC/MJ/VP/WaPo | Yes | Yes | 8 | 12 | 20 | 21 | Yes | 5 |
| 162. Stockton Schoolyard Stockton, CA | 1/17/89 | CC/MJ/VP/WaPo | Yes | Yes | 5 | 29 | 34 | 106 | Yes | 2 |
| 163. Montefiore School Chicago, IL | 9/22/88 | VP/WaPo | No | No | 4 | 2 | 6 | - | - | 1 |
| 164. Old Salisbury Road Winston-Salem, NC | 7/17/88 | VP/WaPo | - | No | 4 | 5 | 9 | - | - | 1 |
| 165. ESL Sunnyvale, CA | 2/16/88 | CC/MJ/VP/WaPo | No | No | 7 | 4 | 11 | - | Yes | 7 |
| 166. Shopping Centers Palm Bay, FL | 4/23/87 | CC/MJ/VP/WaPo | Yes | No | 6 | 14 | 20 | 40 [ak] | Yes | 3 |
| 167. United States Postal Service Edmond, OK | 8/20/86 | CC/MJ/VP/WaPo | No | - | 14 | 6 | 20 | - | Yes | 3 |
| 168. Anchor Glass Container Corporation South Connellsville, PA | 3/16/85 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |
| 169. Other Place Lounge Hot Springs, AR | 7/24/84 | VP/WaPo | No | No | 4 | 1 | 5 | - | - | 1 |

JA1524

## Exhibit B
## Public Mass Shootings Data
## 1982 – Oct. 2022

| (1) Case and Location | (2) Date | (3) Source | (4) Large Capacity Mag.?[a] | (5) Assault Weapon?[a,b] | (6) Fatalities[c] | (7) Injuries[c] | (8) Total Fatalities & Injuries[c] | (9) Shots Fired[d] | (10) Gun(s) Obtained Legally?[e] | (11) Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| 170. San Ysidro McDonald's San Ysidro, CA | 7/18/84 | CC/MJ/VP/WaPo | Yes | Yes | 21 | 19 | 40 | 257 | Yes | 3 |
| 171. Dallas Nightclub Dallas, TX | 6/29/84 | CC/MJ/VP/WaPo | Yes | No | 6 | 1 | 7 | - | No | 1 |
| 172. Alaska Mining Town Manley Hot Springs, AK | 5/17/84 | VP/WaPo | No | No | 7 | 0 | 7 | - | - | 1 |
| 173. College Station Collge Station, TX | 10/11/83 | VP | - | No | 6 | 0 | 6 | - | - | - |
| 174. Alaska Back-County McCarthy, AK | 3/1/83 | VP/WaPo | - | No | 6 | 2 | 8 | - | - | 2 |
| 175. Upper West Side Hotel New York, NY | 2/3/83 | VP | No | No | 4 | 1 | 5 | - | - | 1 |
| 176. The Investor Noyes Island, AK | 9/6/82 | WaPo | - | No | 8 | 0 | 8 | - | - | 1 |
| 177. Welding Shop Miami, FL | 8/20/82 | MJ/VP/WaPo | No | No | 8 | 3 | 11 | - | Yes | 1 |
| 178. Western Transfer Co. Grand Prairie, TX | 8/9/82 | VP/WaPo | - | No | 6 | 4 | 10 | - | - | 3 |
| 179. Russian Jack Springs Park Anchorage, AK | 5/3/82 | VP/WaPo | - | No | 4 | 0 | 4 | - | No | 1 |

Total: 1,272 | 1,417 | 2,689

Large-Capacity Magazine Average: 10 | 16 | 25 | 99
Non-Large-Capacity Magazine Average: 6 | 3 | 9 | 16

Assault Weapon Average: 12 | 24 | 36 | 149
Non-Assault Weapon Average: 6 | 4 | 10 | 38

Page 14 of 18

JA1525

**Exhibit B**

**Public Mass Shootings Data**

**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.? [a] | Assault Weapon? [b] | Fatalities [c] | Injuries [c] | Total Fatalities & Injuries [c] | Shots Fired [d] | Gun(s) Obtained Legally? [e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated October 14, 2022). MJ indicates

a mass shooting identified by Mother Jones.

The Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime

Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017). CC indicates a mass shooting identified by Citizens

Crime Commission of New York City data.

The Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting," updated May 12, 2021). WaPo indicates a mass shooting identified by

The Washington Post.

The Violence Project ("Mass Shooter Database," updated May 14, 2022). VP indicates a mass shooting identified by the Violence Project.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition. Stories from Factiva and Google searches reviewed to determine

whether an LCM was involved.

[b] See Exhibit C for details.

[c] Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

[d] Except where noted, all data on shots fired obtained from CC.

[e] The determination of whether guns were obtained legally is based on Mother Jones and The Washington Post reporting.

[ba] "'This is the norm in our country': Highland Park Mayor speaks to Senate committee about gun violence," *CBS Chicago*, July 20, 2022.

[bb] MJ reported "fewer than 10" injuries for this incident.

[bc] "Update: Man among those killed held door to allow others to escape, Tulsa police chief says," *TulsaWorld*, June 2, 2022.

# Exhibit B
# Public Mass Shootings Data
## 1982 – Oct. 2022

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

bd "The gunman in Uvalde carried more ammunition into Robb Elementary School than a U.S. soldier carries into combat," *CBS News*, May 27, 2022. Note the number of shots fired has been updated since Allen 2022 in Duncan v. Rob Bonta which listed 315 shots fired based on the number of rounds found at the school.

be "Uvalde gunman legally bought AR rifles days before shooting, law enforcement says," *The Texas Tribune*, May 25, 2022.

bf "Buffalo shooting suspect says his motive was to prevent 'eliminating the white race'," *NPR*, June 16, 2022.

bg "Sacramento Church Mass Shooting Follows Disturbing Trend of Domestic Violence, Mass Shooting Connection; Rise of Ghost Guns," *Everytown*, March 7, 2022.

bh "Oxford High School shooter fired 30 rounds, had 18 more when arrested, sheriff says," *Fox2Detroit*, December 1, 2021.

bi "Father of suspected Oxford High School shooter bought gun 4 days before shooting," *Fox 2 Detroit*, December 1, 2021.

bj "VTA shooter fired 39 rounds during attack; carried 32 high-capacity magazines," *KTVU Fox 2*, May 27, 2021.

bk "Sam Cassidy legally owned guns used in San Jose VTA shooting: Sheriff," *Kron4*, May 28, 2021.

bl "Colorado Springs shooter who killed 6 at party had "displayed power and control issues," police say," *The Denver Post*, May 11, 2021.

bm "Indianapolis FedEx Shooter Who Killed 4 Sikhs Was Not Racially Motivated, Police Say," *NPR*, July 28, 2021.

bn "Police Investigate Three Separate Fatal Shooting Incidents In Baltimore County," *Baltimore County Government Website*, March 29, 2021.

bo "Atlanta Shooting Suspect Bought Gun on Day of Rampage," *Courthouse News*, March 26, 2021.

bp "Search warrant reveals new information in Springfield Kum & Go shooting," *Springfield News-Leader*, April 8, 2020.

bq "'There was no warning this was going to happen,' Miller shooting witnesses told investigators," *WISN 12 News*, November 24, 2020.

br "Milwaukee Miller brewery shooting: Six Molson Coors workers, including shooter, dead in rampage," *Milwaukee Journal Sentinel*, February 26, 2020.

f "The Dayton gunman killed 9 people by firing 41 shots in 30 seconds. A high-capacity rifle helped enable that speed," *CNN*, August 5, 2019.

**Exhibit B**
**Public Mass Shootings Data**
**1982 – Oct. 2022**

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

g  "Authorities Describe 'Confusion And Chaos' At Borderline Bar Shooting In California," *NPR*, November 28, 2018.

h  "Suspect in quadruple killing at car wash dies," CNN, January 30, 2018.

i  "California gunman fired 30 rounds at elementary school, left when he couldn't get inside," *ABC News*, November 15, 2017.

j  "'Be quiet! It's him!' Survivors say shooter walked pew by pew looking for people to shoot," *CNN*, November 9, 2017.

k  "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal*, November 22, 2017

l  "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," *Washington Post*, January 9, 2017.

m  "We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," *The Telegraph*, June 13, 2016.

n  "Two men charged with homicide in connection with Wilkinsburg backyard ambush," *Pittsburgh's Action News*, June 24, 2016.

o  "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," *New York Times*, December 3, 2015.

p  "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," *Los Angeles Times*, June 4, 2014.

q  "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," *NBC News*, July 28, 2013.

r  "Police Call Santa Monica Gunman 'Ready for Battle,'" *New York Times*, June 8, 2013.

s  "Questions linger in slayings; investigation continues in rampage as community searches for answers on why gunman shot eight people," *The Beacon Journal*, August 14, 2011.

t  "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News*, September 13, 2010.

u  "Ex-gang member guilty of shooting 5 in deadly 17-second rampage," *NBC*, April 1, 2011.

v  "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," *Sun-Sentinel*, June 7, 2010.

## Exhibit B
## Public Mass Shootings Data
## 1982 – Oct. 2022

| Case and Location | Date | Source | Large Capacity Mag.?[a] | Assault Weapon?[b] | Fatalities[c] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired | Gun(s) Obtained Legally?[d] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

w "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press*, March 15, 2016.

x "4 Victims In Mount Airy Shooting Related, Police Say," *WXII 12 News*, November 2, 2009.

y "Arrested suspect might have warned of Santa Maria shooting", *Associated Press*, March 20, 2008.

z "Profile: New information released on Matthew Murray, gunman in church-related shootings in Colorado; Larry Bourbannais, wounded in one of the shootings, discusses his experience," NBC News, December 11, 2007.

aa "Small Town Grieves for 6, and the Killer," *Los Angeles Times*, October 9, 2007.

ab "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times*, January 15, 2005.

ac "Sixth person dies of injuries from shooting at Kansas meatpacking plant," *Associated Press*, July 3, 2004.

ad "Four Killed In Oldtown Shooting," *The Miner*, October 30, 2003.

ae "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press*, September 14, 2001.

af "Gunman kills 3, wounds 4 in Rifle rampage; mental patient is arrested," *The Denver Post*, April 2, 2015.

ag "Unfinished business," *Dateline NBC*, December 21, 2006.

ah "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times*, February 10, 1996.

ai "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times*, June 21, 1994.

aj "Man Killed Estranged Wife, Three Others as They Drove to Dinner," *Associated Press*, November 11, 1991.

ak "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune*, April 25, 1987.

## List of Firearms Used in Public Mass Shootings
### Oct

| | Case | Location | Date | Weapon Description From — Citizens Crime Commission[a] | Mother Jones | Washington Post[c] | Assault Weapon[d] |
|---|------|----------|------|---------|--------------|--------------------|-----------|
| 1. | Raleigh spree shooting | Hedingha , NC | 10 13 22 | | shotg n, se ia to atic handg n | | - |
| 2. | Highland Par J ly 4 parade shooting | Highland Par , IL | 7 4 22 | | AR-15 style rifle, possi ly odified for rapid fire | | - |
| 3. | T lsa edical center shooting | T lsa, OK | 6 1 22 | | AR-15 style rifle | | - |
| 4. | Ro Ele entary School assacre | Uvalde, T | 5 24 22 | | **semiautomatic rifles** | | Yes[ca] |
| 5. | B ffalo s per ar et assacre | B ffalo, NY | 5 14 22 | | **ushmaster M semiautomatic rifle** | | Yes |
| 6. | Sacra ento Co nty ch rch shooting | Sacra ento, CA | 2 28 22 | | AR-15-style "ghost g n" | | - |
| 7. | O ford High School shooting | O ford, MI | 11 30 21 | | Sig Sa er 9 pistol | | No [c] |
| 8. | San Jose TA shooting | San Jose, CA | 5 26 21 | | se ia to atic handg ns | | No [cc] |
| 9. | Canter ry Mo ile Ho e Par shooting | Colorado Springs, CO | 5 9 21 | | | S ith & Wesson handg n | - |
| 10. | FedE wareho se shooting | Indianapolis, IN | 4 15 21 | | **semiautomatic rifle** | R ger AR 556, M Defense M F Rifle | Yes[cd] |
| 11. | Orange office co ple shooting | Orange, CA | 3 31 21 | | se ia to atic handg n | Gloc se ia to atic handg n | - |
| 12. | Esse Royal Far s shooting | Balti ore Co nty, MD | 3 28 21 | | | - | - |
| 13. | King Soopers s per ar et shooting | Bo lder, CO | 3 22 21 | | **Ruger AR** | **Ruger AR istol, 9 pistol** | Yes [ce] |
| 14. | Atlanta assage parlor shootings | Atlanta, GA | 3 16 21 | | se ia to atic handg n | 9 handg n | - |
| 15. | Hyde Par shooting | Chicago, IL | 1 9 21 | | | .45-cali er pistol | - |
| 16. | Englewood loc party shooting | Chicago, IL | 7 4 20 | | | - | - |
| 17. | Springfield convenience store shooting | Springfield, MO | 3 15 20 | | SKS 7.62-cali er rifle Gloc 9 | Gloc 9 , SKS 7.62-cali er rifle | - |
| 18. | Molson Coors shooting | Milwa ee, WI | 2 26 20 | | se ia to atic handg n | Handg n | - |
| 19. | Jersey City Kosher S per ar et | Jersey City, NJ | 12 10 19 | | - | oss erg 12-ga ge .22-cali er r ger Mar I AR-15-style rifle R ger 9 se ia to atic pistol 9 gloc 17 | No |
| 20. | Foot all-watching party | Fresno, CA | 11 17 19 | | - | two se ia to atic handg ns | No |

JA1530

## List of Firearms Used in Public Mass Shootings
## Oct

| Case | Location | Date | Citizens Crime Commission [a] | Weapon Description From Mother Jones | Washington Post [c] | Assault Weapon [d] |
|---|---|---|---|---|---|---|
| 21. Halloween Party | Orinda, CA | 11 1 19 | - | - | - | - |
| 22. Te ila KC ar | Kansas City, KS | 10 6 19 | | | Handg n | No |
| 23. Midland-Odessa Highways | Odessa, T | 8 31 19 | | semiautomatic rifle | **AR style rifle** | Yes [e] |
| 24. Dayton | Dayton, OH | 8 4 19 | | **AR style rifle, with a round ca acity a nition dr** | 23 cali er anderson AM-15 pistol **modified to function like an AR rifle**, shotg n | Yes [cf] |
| 25. El Paso Wal art | El Paso, T | 8 3 19 | | **A style rifle, per a thorities** | 7.62 cali er A style rifle | Yes |
| 26. Casa Grande Senior Mo ile Estates | Santa Maria, CA | 6 19 19 | | - | - | - |
| 27. irginia Beach M nicipal Center | irginia Beach, A | 5 31 19 | | .45-cali er handg ns noise s ppressor silencer several high-capacity aga ines | .45 cali er handg n with noise s ppressor, .45 cali er handg n | No |
| 28. Henry Pratt Co. | A rora, IL | 2 15 19 | | S ith & Wesson handg n, with a green sighting laser | 40-cali er S ith & Wesson se ia to atic handg n | No |
| 29. S nTr st Ban | Se ring, FL | 1 23 19 | | 9 handg n | 9 se ia to atic handg n | No |
| 30. Borderline Bar & Grill | Tho sand Oa s, CA | 11 7 18 | | Gloc 21, .45 cali er high-capacity aga ine | Gloc 21, .45-cali er handg n | No |
| 31. Tree of Life Synagog e | Pitts rgh, PA | 10 27 18 | | **AR** Gloc .357 | Colt **AR** semiautomatic rifle three gloc .357 pistols | Yes [f] |
| 32. T&T Tr c ing | Ba ersfield, CA | 9 12 18 | | - | .50-cali er S ith & Wesson 500 | No [g] |
| 33. Capital Ga ette | Annapolis, MD | 6 28 18 | | 12-ga ge p p-action shotg n | 2 ga ge shotg n | No |
| 34. Santa Fe High School | Santa Fe, T | 5 18 18 | | shotg n .38 revolver | .38 cali er revolver, shotg n | No |
| 35. Waffle Ho se | Nashville, TN | 4 22 18 | | **AR** | **AR style semiautomatic rifle** | Yes [h] |
| 36. Detroit | Detroit, MI | 2 26 18 | | - | - | No |
| 37. Stone an Do glas HS | Par land, FL | 2 14 18 | | AR-15 | .223 cali er s ith & wesson M&P 15 se ia to atic ar 15 rifle | No [i] |
| 38. Pennsylvania Carwash | Melcroft, PA | 1 28 18 | | se ia to atic rifle and se ia to atic handg n | AR-15 .223-cali er se ia to atic rifle 9 handg n | - |
| 39. Rancho Tehа a | Rancho Tehа a, CA | 11 14 17 | | Two illegally odified rifles | t o semiautomatic rifles two handg ns | Yes |

**JA153**

Page 2 of 19

## List of Firearms Used in Public Mass Shootings (Oct...)

| Case | Location | Date | Citizens Crime Commission[a] | Mother Jones | Washington Post[c] | Assault Weapon[d] |
|---|---|---|---|---|---|---|
| | | | | Weapon Description From | | |
| 40. Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 | | **Ruger AR** ... Kelley also possessed semiautomatic handguns | 9... Glock pistol, R...ger .22-caliber **Ruger AR** | Yes [l] |
| 41. Las Vegas Strip | Las Vegas, NV | 10/1/17 | | **AR** style and A... style rifles and "a large cache of a...nition" fo...r **Daniel Defense DDM** rifles, three FN ...s and other rifles made ...y Sig Sauer. | - | Yes |
| 42. Taos and Rio Arri...a co...nties | A...i...i, NM | 6/15/17 | | - | .38 cali...er revolver | No |
| 43. Fia...a Wor...place | Orlando, FL | 6/5/17 | | se...ia to...atic handg...n | se...ia to...atic rifle...2...handg...n 2 | No |
| 44. Marathon Savings Ban... | Rothschild, WI | 3/22/17 | | - | Rifle, handg...n | No |
| 45. CI...66 | Ya...oo City, MS | 2/6/17 | | - | - | - |
| 46. Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | | Walther 9...se...i-a to...atic pistol | 9...se...ia to...atic handg...n | No |
| 47. Cascade Mall | B...rlington, WA | 9/23/16 | | R...ger .22-cali...er | R...ger .22-cali...er rifle | No [n] |
| 48. Dallas Police | Dallas, TX | 7/7/16 | | I...hmash Saiga ... mm A... style semiautomatic rifle with large capacity...aga ines Gloc... 9...handg...n, .25-cali...er se...ia to...atic handg...n | **S...S ty...e semiautomatic rifle** | Yes [o] |
| 49. Walgreens Par...ing Lot | Las Vegas, NV | 6/29/16 | | - | - | - |
| 50. Orlando Nightcl... | Orlando, FL | 6/12/16 | | **Sig Sauer MC... rifle Gloc...17** 9...high-capacity...aga ines 30 ro...nds | **cali...er Sig Sauer MC... semiautomatic rifle** 9...se...ia to...atic gloc...17 pistol | Yes [p] |
| 51. Fran...lin Aven...e Coo...o...t | Wil...ins...rg, PA | 3/9/16 | | - | A... style rifle, .40-cali...er handg...n | Yes |
| 52. Kala...a...oo | Kala...a...oo Co...nty, MI | 2/20/16 | | 9...handg...n a...o...sed nclear | Walther P-99 9...se...ia to...atic handg...n | No |
| 53. San Bernardino | San Bernardino, CA | 12/2/15 | | T...o semiautomatic AR style rifles one a **D MS A... the other a Smith... Wesson M...5**, ...oth with .223 cali...er a...nition. Two 9...se...ia to...atic handg...ns. High capacity...aga ines. | **D MS AR... style rifle Smith... Wesson M... AR... style rifle** Lla...a se...ia to...atic 9...pistol S...ith & Wesson 9...pistol se...ia to...atic 9...pistol | Yes |

JA1532

## List of Firearms Used in Public Mass Shootings

### Oct

| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones | Washington Post [c] | Assault Weapon [d] |
|------|----------|------|-------------------------------|--------------|---------------------|--------------------|
| | | | | Weapon Description From | | |
| 54. Tennessee Colony campsite | Anderson County, TX | 11 15 15 | | - | - | - |
| 55. Umpqua Community College | Roseburg, OR | 10 1 15 | | 9 Glock pistol, .40 caliber Smith & Wesson, .40 caliber Taurus pistol, .556 caliber Del-Ton a o details nuclear | rifle five pistols | No [r] |
| 56. Chattanooga Military Center | Chattanooga, TN | 7 16 15 | | AR , AR-15, and 30-round magazines 9 handgun | AR-15-style semiautomatic rifle 9 pistol **A ty e semiautomatic rifle** | Yes [s] |
| 57. Charleston Church | Charleston, SC | 6 17 15 | | .45-caliber Glock odel 41, with 13-round capacity magazine | .45-caliber glock 41 pistol | No |
| 58. Marysville High School | Marysville, WA | 10 24 14 | | Beretta .40-caliber handgun | .40-caliber Beretta pistol | No |
| 59. Isla Vista | Santa Barbara, CA | 5 23 14 | | Two Sig Sauer P226 semiautomatic pistols and Glock 34 pistol, and hundreds of rounds of a o. A 6-inch and 8-inch SRK and Boar Hunter hunting knives. | Sig Sauer P226s pistol Gloc 34 pistol Sig Sauer P226s pistol | No |
| 60. Alturas Tribal | Alturas, CA | 2 20 14 | | 9 se i-a to atic handgun | Un nown | No |
| 61. Washington Navy Yard | Washington, D.C. | 9 16 13 | | Remington 870 Express 12-gauge shotgun Beretta handgun | Beretta pistol Remington 970 Express 12-gauge shotgun | No |
| 62. Hialeah | Hialeah, FL | 7 26 13 | | Gloc 17 | Glock 17 pistol | No |
| 63. Santa Monica | Santa Monica, CA | 6 7 13 | | **cali er semi automatic assault rifle**, a o t 40 high capacity magazines, " lac powder" handgun ify eli yanti e | Black powder .33-caliber handgun AR ty e **cali er semiautomatic rifle** | Yes [t] |
| 64. Federal Way | Federal Way, WA | 4 21 13 | | .40 caliber i-a to atic handgun pistol grip shotgun | .40 caliber semi auto atic pistol pistol grip shotgun | No |
| 65. Upstate New York | Herkimer County, NY | 3 13 13 | | Un nown | Un nown | No [v] |

JA1533

Page 4 of 19

## List of Firearms Used in Public Mass Shootings, Oct...

| | | | Weapon Description From | | | Assault Weapon[d] |
|---|---|---|---|---|---|---|
| **Case** | **Location** | **Date** | **Citizens Crime Commission[a]** | **Mother Jones** | **Washington Post[c]** | |
| **66. Newtown School** | Newtown, CT | 12/14/12 | **An unknown make and model caliber rifle, a Bushmaster M caliber semiautomatic assault rifle e ipped with a 30-ro nd large capacity a mition aga inc, and a GLOCK 10 handg n were sed. According to the Dan ry State's Attorney, police also recovered in Lan a s possession a SIG SAUER P226 9 handg n and three loaded 30-ro nd large capacity a mition aga ines for the B sh aster. Si additional 30-ro nd large capacity a mition aga ines were recovered at the scene. A loaded n nown a e and odel 12-ga ge shotg n was fo nd in the passenger co part ent of the car later oved to the tr n y police . All of the g ns sed in the shooting were p rchased y Lan a s other.** | 10 Gloc , 9 SIG Sa er P226 se ia to atic handg ns ushmaster M E S semiautomatic rifle l h ash Saiga-12 12-ga ge se ia to atic shotg n | 9 SIG Sa er P226 pistol Savage Mar II olt-action .22-cali er rifle ushmaster M E S semiautomatic rifle l h ash Saiga 12-ga ge se ia to atic shotg n 10 Gloc pistol | Yes[w] |
| 67 Accent Signage Syste s | Minneapolis, MN | 9/27/12 | GLOCK 19 9 se ia to atic pistol e ipped with a 15-ro nd large capacity a mition aga inc. Engeldinger p rchased the firear one year efore the shooting at KGS G ns and A o in Minneapolis after passing a ac gro nd chec and o taining a per it to p rchase. Police reportedly fo nd pac aging for 10,000 ro nds of a mition and another handg n in Engeldinger s ho e. | 9 Gloc se ia to atic handg n | 9 gloc pistol | No |
| 68. Si h Te ple | Oa Cree , WI | 8/5/12 | Springfield Ar ory D M 9 se ia to atic handg n e ipped with a 19-ro nd large capacity a mition aga inc. Wee s efore the shooting, Wade legally p rchased the handg n and three 19-ro nd large capacity a mition aga ines fro a federal firear s licensed dealer in near y West Allis, WI. According to edia reports, Wade served in the U.S. Ar y fro 1992 ntil 1998, when he was given an other-than-honora le discharge or general discharge. In 1994, while stationed at Fort Bliss in Te as, he was arrested y El Paso police, and pled g ilty to a iside eanor charge of cri inal ischief. Federal law does not prohi it persons with convictions for iside eanors other than do estic violence iside eanors or persons who have een discharged fro the ilitary for reasons other than "dishonora ly" fro p rchasing firear s. | 9 Springfield Ar ory DM se ia to atic handg n | 9 springfield ar ory DM pistol | No |

JA1534

# List of Firearms Used in Public Mass Shootings

## Oct

| Case | Location | Date | Weapon Description From | | | Assault Weapon [d] |
|------|----------|------|------|------|------|------|
| | | | Citizens Crime Commission [a] | Mother Jones | Washington Post [c] | |
| 69. Aurora Movie Theater | Aurora, CO | 7 20 12 | A Smith Wesson M assault rifle equipped with a 100-round drum large capacity a nition aga ine, a Remington Model 870 12-ga ge p p shotg n, and two GLOCK .40 cali er handg ns, were recovered at the scene y police. In the onths leading to the shooting, Hol es p rchased the weapons and over the Internet. In addition to the weapons sed in the shooting, Hol es oo y-trapped his apart ent, rigging trip wire to detonate 30 plastic shells st ffed with g npowder, several glass ars filled with gasoline and g npowder, and 10 gallons of gasoline in canisters. | Two .40-cali er Gloc se ia to atic handg ns cali er Smith Wesson M semiautomatic rifle 12-ga ge Re ington 870 p p-action shotg n | .40-cali er gloc pistol 12-ga ge p p-action Re ington 870 shotg n cali er Smith Wesson M semiautomatic AR style rifle | Yes |
| 70. Seattle Café | Seattle, WA | 5 30 12 | | Two .45-cali er se ia to atic handg ns | .45-cali er pistol 2 | No |
| 71. Oi os University | Oa land, CA | 4 2 12 | | .45-cali er se ia to atic handg n | .45-cali er pistol | No |
| 72. S J ng Health Sa na | Norcross, GA | 2 22 12 | | .45-cali er se ia to atic handg n | - | No [aa] |
| 73. Seal Beach | Seal Beach, CA | 10 14 11 | | .45-cali er Hec ler & Koch, 9 Springfield se ia to atic handg ns .44 Magn S ith & Wesson revolver | - | No |
| 74. IHOP | Carson City, N | 9 6 11 | A ty e assault rifle e ipped with a 30-ro nd large capacity a nition aga ine. Two additional g ns and two ore aga ines were fo nd in his vehicle. | A Norinco Arms ariant A Romarm Cugir ariant rifles .38-cali er Colt revolver | A ariant semiautomatic rifle | Yes [y] |
| 75. A ron | A ron, OH | 8 7 11 | | - | - | No |
| 76. For Roller World | Grand Prairie, T | 7 23 11 | - | - | - | No [aa] |
| 77. Grand Rapids | Grand Rapids, MI | 7 7 11 | GLOCK 9 se ia to atic pistol n nown odel e ipped with a 30-ro nd large capacity a nition aga ine. | - | - | No |
| 78. Fa ily law practice | Y a, A | 6 2 11 | GLOCK 19 9 se ia to atic pistol e ipped with a 33-ro nd large capacity a nition aga ine. Lo ghner was also carrying two 15-ro nd large capacity a nition aga ines, and a nife. The ATF deter ined Lo ghner legally p rchased the GLOCK pistol with an e tended aga ine and one o of Winchester a nition on Nove er 30, 2010, fro Sports ans Wareho se in T cson. | - | - | - |
| 79. T cson | T cson, A | 1 8 11 | | 9 Gloc 19 se ia to atic handg n | 9 gloc 19 pistol | No |

JA1535

# List of Firearms Used in Public Mass Shootings Oct

| Case | Location | Date | Weapon Description From | | | Assault Weapon on [d] |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Citizens Crime Commission [a] | Mother Jones | Washington Post [c] | |
| 80. Jackson | Jackson, KY | 9 11 10 | | - | - | No [a] |
| 81. City Grill | Buffalo, NY | 8 14 10 | | | 9 pistol | No |
| 82. Hartford Beer Distributor | Manchester, CT | 8 3 10 | Two Ruger SR9 9 se ia to atic pistols e ipped with 17-ro nd aga ines. Thornton p rchased oth firear s legally fro an East Windsor, CT g n dealer. | Two 9 R ger SR9 se ia to atic handg ns | 9 R ger SR9 pistol 2 | No |
| 83. Yoyito Caf | Hialeah, FL | 6 6 10 | | .45-cali er Gloc pistol | .45-cali er Gloc pistol | No [ac] |
| 84. Hot Spot Caf | Los Angeles, CA | 4 3 10 | | - | - | No [ad] |
| 85. Coffee Shop Police | Parkland, WA | 11 29 09 | | 9 Gloc 17 se ia to atic handg n .38-cali er S ith & Wesson revolver | .38-cali er S ith & Wesson revolver 9 Gloc 17 pistol | No |
| 86. Fort Hood | Fort Hood, T | 11 5 09 | FN Herstal 5.7 Tactical Pistol e ipped with 20-ro nd large capacity a nition aga ine. When Hasan was apprehended, investigators fo nd in his possession 177-ro nds in 30-ro nd and 20-ro nd large capacity a nition aga ines, another handg n, a revolver, and two g nsights for different lighting conditions . Hasan p rchased the FN Herstal 5.7 Tactical Pistol legally at G ns Galore, a shop in Killeen, T | FN Five-seven se ia to atic handg n | FN Five-seven pistol | No |
| 87. Worth Street | Mo nt Airy, NC | 11 1 09 | - | - | High-powered assault style rifle | Yes |
| 88. Bingha ton | Bingha ton, NY | 4 3 09 | Beretta .45-cali er se ia to atic pistol, Beretta 9 se ia to atic pistol odels n nown , and two 30-ro nd large capacity a nition aga ines and two 15-ro nd large capacity a nition aga ines. | 9 Beretta, .45-cali er Springfield se ia to atic handg ns | 9 Beretta .45-cali er Springfield pistol | No |
| 89. Carthage N rsing Ho e | Carthage, NC | 3 29 09 | | Winchester 1300 p p-action shotg n .357 Magn revolver | .357 agn revolver Winchester 1300 p p-action shotg n lever-action winchester rifle, handg n | No |
| 90. S agit Co nty | Alger, WA | 9 2 08 | | - | - | No |
| 91. Atlantis Plastics | Henderson, KY | 6 25 08 | | .45-cali er Hi-Point se ia to atic handg n | .45-cali er Hi-Point pistol | No |
| 92. Blac Road A to | Santa Maria, CA | 3 18 08 | | - | se ia to atic handg n | No |

JA1536

ist of Firearms Used in u lic Mass Shootings
Oct

| Case | ocation | Date | Wea on Descri tion From | | | Assault Wea on [d] |
| | | | Citi ens Crime Commission [a] | Mother Jones | Washington ost [c] | |
|------|---------|------|------------------------------|--------------|------------------|---------------------|
| 93. Northern Illinois University | DeKal , IL | 2 14 08 | SIG SAUER K r 9  se ia to atic pistol, Hi-Point CF380 .380 cali er se ia to atic pistol, GLOCK 19 9 se ia to atic pistol, Re ington Sports an 48 12-ga ge shotg n, and 33-ro nd and 15-ro nd large capacity a nition aga ines. Ka ierc a p rchased all fo r weapons fro Tony s G n & A o in Cha paign, IL etween A g st 3, 2007 and Fe r ary 9, 2008. Ka ierc a also p rchased g n accessories fro a we site operated y TGSCOM, Inc., the sa e co pany patroni ed y the A Tech shooter. | 9  Gloc 19, Hi-Point CF380, 9  K r SIG Sa er P232 se ia to atic handg ns 12-ga ge Re ington Sports an 48 sawed-off shotg n | 12-ga ge Re ington Sports an 48 sawed-off shotg n 9 gloc 19 pistol 9 K r SIG Sa er P232 pistol Hi-Point CF380 pistol | No [ae] |
| 94. Kir wood City Co ncil | Kir wood, MO | 2 7 08 | | .40-cali er S ith & Wesson se ia to atic handg n .44 Magn S ith & Wesson Model 29 revolver | .40-cali er S ith & Wesson pistol .44 Magn S ith & Wesson Model 29 revolver | No |
| 95. Yo th With a Mission and New Life Ch rch | Colorado Springs, CO | 12 9 07 | | - | A pistol, cali er ushmaster M rifle, .40-cali er Beretta pistol | Yes |
| 96. Westroads Mall | O aha, NE | 12 5 07 | WASR semiautomatic assault rifle and two 30-ro nd large capacity a nition aga ines. | WASR Century Arms se ia to atic rifle | WASR Century Arms se ia to atic rifle | Yes [af] |
| 97. Crandon | Crandon, WI | 10 7 07 | GLOCK 19 9  se ia to atic pistol and Walther P22 .22-cali er se ia to atic pistol. Investigators fo nd a total of 17 e pty aga ines at the scene of the shooting, a i of several 15-ro nd, and 10-ro nd aga ines loaded with hollow-point ro nds llets with the tip hollowed o t, designed to e pand pon i pact . He possessed over 400 ro nds of a nition. Cho ordered the Walther P22 fro a we site operated y TGSCOM, Inc. Ka ierc a patroni ed the sa e co pany efore the NIU shooting. On Fe r ary 9, 2007, Cho pic ed p the pistol fro J-N-D Pawn o ers, located across the street fro the A Tech ca p s. In co pliance with the state law li iting handg n p rchases to one every 30 days, Cho p rchased the GLOCK 19 on March 13, 2007. He also p rchased five 10-ro nd aga ines fro eBay in March. Cho s p rchase of these firear s was in violation of federal law he was dis alified fro p rchasing or possessing a firear and a nition, eca se a special slice of the Montgo ery Co nty General District Co rt had fo nd hi to e a danger to hi self on Dece er 14, 2005. | AR-15 SWAT se ia to atic rifle | AR-15-style se ia to atic rifle | - [ag] |
| 98. irginia Tech | Blac s rg, A | 4 16 07 | | 9  Gloc 19, .22-cali er Walther P22 se ia to atic handg ns | .22-cali er Walther P22 pistol 9 Gloc 19 pistol | No |

JA1537

## ist of Firearms Used in u lic Mass Shootings
## Oct

| | Case | ocation | Date | Wea on Descri tion From | | | Assault Wea on [d] |
|---|---|---|---|---|---|---|---|
| | | | | Citi ens Crime Commission [a] | Mother Jones | Washington ost [c] | |
| 99. | Trolley S are | Salt La e City, UT | 2 12 07 | | Moss erg Maveric 88 Field shog n .38-cali er S ith & Wesson M36 revolver | .38-cali er S ith & Wesson M36 revolver Moss erg Maveric 88 Field shog n | No |
| 100. | A ish School | Lancaster Co nty, PA | 10 2 06 | | Springfield se ia to atic handg n .30-06 R ger olt-action rifle 12-ga ge Browning p p-action shotg n | 12-ga ge Browning p p-action shotg n .30-06 R ger olt-action rifle Springfield 9 se ia to atic handg n | No [ah] |
| 101. | The Ministry of Jes s Christ | Baton Ro ge, LA | 5 21 06 | | - | - | No [ai] |
| 102. | Capitol Hill | Seattle, WA | 3 25 06 | | .40-cali er R ger, one other se ia to atic handg n **ushmaster M E S semiautomatic rifle** 12-ga ge Winchester Defender p p-action shotg n with e tended t e and pistol grip | 12-ga ge p p-action Winchester Defender shotg n .40-cali er R ger pistol | Yes [a] |
| 103. | Goleta Postal | Goleta, CA | 1 30 06 | S ith & Wesson 915 9 se ia to atic handg n e ipped with a 15-ro nd large capacity a nition aga ine. San Marco p rchased the firear at a pawn shop in New Me ico in A g st 2005. | 9 S ith & Wesson 915 se ia to atic handg n | 9 S ith & Wesson 915 pistol | No |
| 104. | Sash Asse ly of God | Sash, T | 8 29 05 | | - | 9 se ia to atic pistol, .38-cali er revolver | No |
| 105. | Red La e | Red La e, MN | 3 21 05 | | .40-cali er Gloc 23, .22-cali er R ger se ia to atic handg ns 12-ga ge Re ington 870 shotg n | .22-cali er R ger pistol 2 12-ga ge Re ington 870 shotg n | No |
| 106. | Living Ch rch of God | Broo field, WI | 3 12 05 | | 9 Beretta se ia to atic handg n | 9 eretta pistol | No |
| 107. | F lton Co nty Co rtho se | Atlanta, GA | 3 11 05 | | 9 Beretta 92FS se ia to atic handg n | 9 pistol | No |
| 108. | Da ageplan Show | Col s, OH | 12 8 04 | | 9 Beretta 92FS se ia to atic handg n | 9 eretta 92FS pistol | No |
| 109. | H nting Ca p | Meteor, WI | 11 21 04 | **S S mm semiautomatic assault rifle** e ipped with a 20-ro nd large capacity a nition aga ine. | - | **mm S S semiautomatic rifle** | Yes [a] |
| 110. | ConAgra Foods Plant | Kansas City, KS | 7 3 04 | | - | 9 pistol, revolver | No |
| 111. | Stateline Tavern | Oldtown, ID | 10 24 03 | | - | se ia to atic pistol | No |
| 112. | Windy City Wareho se | Chicago, IL | 8 27 03 | | - | .38-cali er Walther pistol | No [al] |

**JA1538**

## List of Firearms Used in Public Mass Shootings
### Oct

| Case | Location | Date | Weapon Description From | | | Assault Weapon [d] |
|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission [a] | Mother Jones | Washington Post [c] | |
| 113. Lockheed Martin | Meridian, MS | 7 8 03 | | .45-caliber Ruger P90 semiautomatic handgun, .22-caliber rifle with scope, .223-caliber Ruger Mini-14 rifle 12-gauge Winchester 1300 shotgun .22 Magnum derringer | .223-caliber Ruger Mini-14 rifle 12-gauge Winchester 1300 shotgun | No [a] |
| 114. Lock n Ready | Huntsville, AL | 2 25 03 | | - | semiautomatic 9 pistol | No |
| 115. Bertrand Products | South Bend, IN | 3 22 02 | | - | .22-caliber rifle, sawed-off shotgun | Yes [an] |
| 116. Brms International Security | Sacramento, CA | 9 10 01 | | - | Army type semiautomatic rifle, 9 pistol | Yes [an] |
| 117. Boocliff RV Park | Rifle, CO | 7 3 01 | | - | .38 caliber Charter Arms revolver | No |
| 118. Navistar | Melrose Park, IL | 2 5 01 | | SKS 1954R, .30-caliber Winchester rifles 12-gauge Remington pump-action shotgun .38-caliber revolver | 12-gauge Remington pump-action shotgun SKS 1954R rifle .30-caliber Winchester rifle .38-caliber revolver | No [ao] |
| 119. Houston | Houston, TX | 1 9 01 | | | | No [ap] |
| 120. Wakefield | Wakefield, MA | 12 26 00 | Army type semiautomatic assault rifle, unknown model 12-gauge shotgun, unknown model and .32-caliber semiautomatic pistol, and 60-round large capacity ammunition magazine. | .32-caliber Retola a semiautomatic handgun Army variant semiautomatic rifle 12-gauge Winchester 1300 pump-action shotgun | .32-caliber Retola a pistol AK-47 variant semiautomatic rifle 12-gauge Winchester 1300 pump-action shotgun | - [a] |
| 121. Mount Lebanon | Pittsburgh, PA | 4 28 00 | | - | .357 Magnum revolver | No |
| 122. Mi-T-Fine Car Wash | Irving, TX | 3 20 00 | | - | semiautomatic .9 pistol | No |
| 123. Hotel | Tampa, FL | 12 30 99 | | 9 Lorcin semiautomatic handgun .38-caliber Charter Arms revolver | .38-caliber Charter Arms revolver 9 Lorcin pistol | No |
| 124. ero | Honolulu, HI | 11 2 99 | GLOCK 17 9 semiautomatic pistol and three 17-round large capacity ammunition magazines, loaded with hollow point bullets expand upon impact. Uyes illegally purchased the GLOCK in 1989. Ruger P85 9 semiautomatic pistol, unknown model .380 caliber semiautomatic pistol, and three 15-round large capacity ammunition magazines. Ash too legally acquired both weapons from federally licensed firearms dealers in 1992. | 9 Glock 17 semiautomatic handgun | 9 Glock 17 pistol | No |
| 125. Wedgwood Baptist Church | Fort Worth, TX | 9 15 99 | | .380-caliber, 9 Ruger P85 semiautomatic handguns | .380-caliber revolver 9 Ruger P85 pistol | No |

**JA1539**

## ist of Firearms Used in ublic Mass Shootings
Oct

| Case | ocation | Date | Citizens Crime Commission[a] | Mother Jones | Washington ost[c] | Assault Weapon[d] |
|------|---------|------|------------------------------|--------------|-------------------|-------------------|
| | | | | **Weapon Description From** | | |
| 126. Atlanta Day Trading | Atlanta, GA | 7 29 99 | | 45-cali er Colt 1911-A1, 9 Gloc 17, 25-cali er Raven Ar s MP-25 se ia to atic handg ns 22-cali er Harrington & Richardson revolver | 45-cali er Colt 1911-A1 pistol 22-cali er Harrington & Richardson revolver 25-cali er Raven Ar s Mp-25 pistol 9 Gloc 17 pistol | No |
| 127. Al ertson s S per ar et | Las egas, N | 6 3 99 | | - | 12-ga ge p p-action shotg n | No |
| 128. Col ine High School | Littleton, CO | 4 20 99 | **Sa age S ringfield gauge um action shotgun i oint Sa age Ste ens D gauge sa edoff shotgun i oint mm semiautomatic rifle INTRATEC TEC DC mm semiautomatic istol** and thirteen 10-ro nd aga ines one 52-, one 32-, one 28-ro nd large capacity a nition aga ines. Harris and Kle old illegally ac ired the shotg ns and Hi- Point rifle thro gh a "straw p rchase" a transaction in which a legal yer a es a p rchase for so eone who cannot legally p rchase the firear . Their friend, Ro yn Anderson, p rchased the three firear s at the Tanner G n Show fro nlicensed sellers in Dece er of 1998. A pi a shop e ployee, Mar Manes, illegally sold the the INTRATEC TEC-DC9. | **mm Intratec DC semiautomatic handgun mm i oint car ine rifle** 12-ga ge sawed-off Savage Stevens 311D, 12-ga ge sawed-off Savage Springfield 67H p p-action shotg ns | **mm i oint car ine** 12-ga ge sawed-off Savage Stevens 311D shotg n 12-ga ge sawed-off Savage Springfield 67H p p-action shotg n **mm Intratec DC machine istol** | Yes[ar] |
| 129. New St. John Fellowship Baptist Ch rch | Gon ale , LA | 3 10 99 | | - | se ia to atic pistol | No |
| 130. Th rston High School | Springfield, OR | 5 21 98 | GLOCK 19 9 se ia to atic pistol, R ger n nown odel .22-cali er se ia to atic pistol, R ger n nown odel .22-cali er rifle, and a 50-ro nd large capacity a nition aga ine. The GLOCK and rifle were legally p rchased y Kin els father. | 9 Gloc .22-cali er R ger se ia to atic handg ns, .22-cali er R ger rifle | 9 Gloc pistol .22-cali er R ger pistol .22-cali er R ger rifle | No[as] |
| 131. Westside Middle School | Jones oro, AR | 3 24 98 | Universal M1 Car ine 30-cali er replica, Davis Ind stries .38-cali er two-shot derringer, Do le De ce B ddie .22-cali er two-shot derringer, Charter Ar s .38-cali er revolver, Star .380-cali er pistol, FIE .380-cali er pistol, R ger Sec rity Si 357-cali er revolver, R ger .44 agn rifle, Re ington 742 .30-06-cali er rifle, 15-ro nd large capacity a nition aga ines, three 30-ro nd large capacity a nition aga ines, and over 150-ro nds of a nition. | FIE 380, .380-cali er Star se ia to atic handg ns .44 Magn R ger, 30-06 Re ington 742, 30-cali er Universal M-1 car ine replica rifles .38-cali er Charter Ar s, .357-cali er R ger Sec rity Si , 38-cali er S ith & Wesson revolvers .22-cali er Do le De ce B ddie two-shot, .38-cali er Davis Ind stries two-shot derringers | .22-cali er Do le De ce revolver .380-cali er Star pistol .357-cali er R ger Sec rity si revolver .44 Magn R ger revolver .30-cali er Universal M-1 car ine .38-cali er Charter Ar s revolver .38-cali er S ith & Wesson revolver FIE 380 pistol .30-06 Re ington 742 rifle | No[at] |

JA1540

### ist of Firearms Used in ublic Mass Shootings
### Oct

| Case | ocation | Date | Wea on Descri tion From — Citi ens Crime Commission [a] | Mother Jones | Washington ost [c] | Assault Wea on [d] |
|---|---|---|---|---|---|---|
| 132. Connecticut Lottery | Newington, CT | 3 6 98 | GLOCK odel n nown 9 se ia to atic pistole ipped with a 19-ro nd large capacity a nition aga ine. Bec had a per it for the 9 pistol sed in the shooting. | 9 se ia to atic handg n | 9 pistol | No |
| 133. Caltrans Maintenance Yard | Orange, CA | 12 18 97 | **Chinese made A ty e mm semiautomatic assault rifle and five 30-ro nd large capacity a nition aga ines.** Torres legally p rchased the rifle on April 30, 1988, fro B&B G n Sales in Orange Co nty, CA. | **mm A Chinese ariant semiautomatic rifle** | **mm A Chinese ariant semiautomatic rifle** | Yes |
| 134. Erie Man fact ring | Bartow, FL | 12 3 97 | - | - | - | No [a] |
| 135. R.E. Phelon Co pany | Ai en, SC | 9 15 97 | | 9 se ia to atic handg n | 9 pistol | No |
| 136. News and Sentinel | Cole roo , NH | 8 20 97 | | - | Mac 11 achine pistol, Tec 9 a to atic pistol, 45-cali er se ia to atic handg n | Yes [av] |
| 137. Fire Station | Jac son, MS | 4 25 96 | | - | **pistol, AR style rifle** | No |
| 138. Fort La derdale | Fort La derdale, FL | 2 9 96 | | 9 Gloc se ia to atic handg n .32-cali er revolver | 9 Gloc pistol .32-cali er revolver | No |
| 139. Little Chester Shoes | New Yor , NY | 12 19 95 | | - | .9 se ia to atic pistol | No [aw] |
| 140. Piper Technical Center | Los Angeles, CA | 7 19 95 | | 9 R ger se ia to atic handg n .32-cali er revolver | 9 Gloc se ia to atic pistol | No |
| 141. Walter Rossler Co pany | Corp s Christi, T | 4 3 95 | | 9 R ger se ia to atic handg n .32-cali er revolver | .32-cali er revolver 9 R ger pistol | No |
| 142. P ppy cree | Ho e Co nty, NC | 12 31 94 | | - | - | - |
| 143. Air Force Base | Fairchild Base, WA | 6 20 94 | **Chinese made Mak e semiautomatic assault rifle** e ipped with a 75-ro nd dr large capacity a nition aga ine. He p rchased the assa lt rifle on J ne 15, 1994, five days efore the shooting, and the following day p rchased 80 ro nds of 7.62 39 a nition and a 75-ro nd dr large capacity a nition aga ine. | **MA semiautomatic rifle** | **MA semiautomatic A style rifle** | Yes [a] |
| 144. Ch c E. Cheese | A rora, CO | 12 14 93 | | .25-cali er se ia to atic handg n | .25-cali er pistol | No |
| 145. Long Island Railroad | Garden City, NY | 12 7 93 | R ger P89 9 se ia to atic pistol and fo r 15-ro nd large capacity a nition aga ines. Ferg son legally ac ired the weapon in California at an o tlet of T mers O tdoors an. | 9 R ger P89 se ia to atic handg n | 9 R ger P89 pistol | No |
| 146. Une ploy ent Office | O nard, CA | 12 2 93 | | - | Rifle | - |
| 147. Fa ily Fitness Cl | El Ca on, CA | 10 14 93 | | - | 12-ga ge shotg n | No |

**JA1541**

Page 12 of 19

## List of Firearms Used in Public Mass Shootings Oct

| Case | Location | Date | Weapon Description From Citizens Crime Commission[a] | Mother Jones | Washington Post[c] | Assault Weapon[d] |
|---|---|---|---|---|---|---|
| 148. Luigi's Restaurant | Fayetteville, NC | 8/6/93 | | .22-caliber rifle, two 12-gauge shotguns | 12-ga. shotgun, 2 .22-caliber rifle | No[ay] |
| 149. Washington County Bar | Jackson, MS | 7/8/93 | | - | - | - |
| 150. 101 California Street | San Francisco, CA | 7/1/93 | Two INTRATEC TEC-DC9 semiautomatic pistols, Colt known model .45-caliber semiautomatic pistol, and 40-round and 50-round large capacity ammunition magazines loaded with a mix of Black Talon and standard ammunition. According to the Las Vegas Metropolitan Police Department, Ferri purchased the pistols from two stores in Las Vegas: Super Pawn and Pacific Tactical Weapons. | Two Intratec DC9, .45-caliber Colt semiautomatic handguns | .45-caliber Colt pistol, Intratec DC machine pistols | Yes[a] |
| 151. Cardzell | Paso Robles, CA | 11/8/92 | | - | - | No[a] |
| 153. Watkins Glen | Watkins Glen, NY | 10/15/92 | | 9 Llanase semiautomatic handgun | 9 Llana pistol | No |
| 155. Lindhurst High School | Olivehurst, CA | 5/1/92 | | .22-caliber sawed-off rifle 12-gauge pump-action shotgun | .22-caliber sawed-off rifle 12-ga. pump-action shotgun | No |
| 154. Phoenix | Phoenix, AZ | 3/15/92 | | - | - | - |
| 155. Royal Oak Postal | Royal Oak, MI | 11/14/91 | | .22-caliber Ruger sawed-off semiautomatic rifle | .22-caliber Ruger sawed-off semiautomatic rifle | No[c] |
| 156. Restaurant | Harrods burg, KY | 11/10/91 | | - | .357 Magnum | No |
| 157. University of Iowa | Iowa City, IA | 11/1/91 | | .38-caliber Taurus revolver | .38-caliber Taurus revolver | No |
| 158. Luby's Cafeteria | Killeen, TX | 10/16/91 | GLOCK 17 9 semiautomatic pistol, Ruger P89 semiautomatic pistol, and 17-round and 15-round large capacity ammunition magazines. Hennard legally purchased the weapons from Mike's Gun Shop in Henderson, NV, in February and March of 1991. | 9 Glock 17, 9 Ruger P89 semiautomatic handguns | 9 Glock 17 pistol 9 Ruger P89 pistol | No |
| 159. Post office | Ridgewood, NJ | 10/10/91 | | - | mm Uzi machine pistol, .22-cali er machine gun | Yes[r] |
| 160. GMAC | Jacksonville, FL | 6/18/90 | Universal M1 .30-caliber semiautomatic assault rifle, known make and model .38-caliber revolver, and a 30-round large capacity ammunition magazine. | .30-caliber Universal M1 carbine rifle .38-caliber revolver | .30-caliber Universal M1 carbine rifle .38-caliber revolver | No[d] |
| 161. Standard Gravure Corporation | Louisville, KY | 9/14/89 | Chinese made AK-type semiautomatic assault rifle, two INTRATEC MAC-11 semiautomatic pistols, SIG SAUER known model 9 semiautomatic pistol, known make and model .38-caliber revolver, and 30-round large capacity ammunition magazines. Wesbecker legally purchased the AK-47-type assault rifle from Tilford's Gun Sales in Louisville. | Two Intratec MAC-11, 9 semiautomatic handguns SIG Sauer semiautomatic rifle .38-caliber revolver | 9 SIG Sauer pistol A Chinese variant semiautomatic rifle Intratec MAC-11 pistol, .38-caliber revolver 9 SIG Sauer pistol | Yes |

## ist of Firearms Used in u lic Mass Shootings
### Oct

| Case | ocation | Date | Citi ens Crime Commission[a] | Mother Jones | Washington ost[c] | Assault Wea on[d] |
|------|---------|------|------------------------------|--------------|-------------------|-------------------|
| | | | | **Wea on Descri tion From** | | |
| 162. Stoc ton Schoolyard | Stoc ton, CA | 1 17 89 | **Chinese-made A ty e semiautomatic assault rifle.** Ta r s nown odel 9 se ia to atic pistol, a 75-ro nd large capacity a nition dr aga ine, a 75-ro nd large capacity a nition rotary aga ine, and fo r 35-ro nd large capacity a nition amana aga ines. P rdy legally p rchased the AK-47-type rifle at Sandy Trading Post, in Sandy, OR on A g st 3, 1988, and the Ta r s 9 pistol at H nter Loan and Jewelry Co. in Stoc ton, CA on Dece er 28, 1988. | 9 Ta r s se ia to atic handg n A **Chinese ariant semiautomatic rifle** | 9 Ta r s pistol A **Chinese ariant semiautomatic rifle** | Yes |
| 163. Montefiore School | Chicago, IL | 9 22 88 | | - | .38-cali er revolver | No |
| 164. Old Salis ry Road | Winston-Sale , NC | 7 17 88 | | | .22-cali er rifle | No |
| 165. ESL | S nyvale, CA | 2 16 88 | | .380 ACP Browning, 9 & Wesson se ia to atic handg ns R ger M-77 .22-250 oll-action rifle with scope Moss erg 12-ga ge p p-action, 12-ga ge Benelli se ia to atic shotg ns .357 Magn S ith & Wesson, .22 Sentinel WMR revolvers | .22 Sentinel WMR revolver 9 S ith & Wesson pistol Moss erg 12-ga ge p p-action shotg n R ger M-77 .22-250 oll-action rifle with scope .380 AP Browning pistol 12-ga ge Benelli se ia to atic shotg ns .357 Magn S ith & Wesson revolver | No[e] |
| 166. Shopping Centers | Pal Bay, FL | 4 23 87 | Str , R ger Mini-14 se ia to atic assa lt rifle e ipped with a 30-ro nd large capacity a nition aga ine, five 30-ro nd large capacity a nition aga ines, 180 ro nds of a nition, a shotg n n nown a c and odel, and a pistol n nown a c and odel. Cr s ordered the assa lt rifle on March 21, 1987. On April 17, 1987, he p rchased 100-ro nds of a nition and si 30-ro nd large capacity a nition aga ines. | Str , R ger Mini-14 se ia to atic rifle 20-ga ge Winchester p p-action shotg n .357 R ger Blac haw revolver | .357 R ger Blac haw revolver R ger Mini-14 se ia to atic rifle Str 20-ga ge Winchester p p-action | No[f] |
| 167. United States Postal Service | Ed ond, OK | 8 20 86 | | .22-cali er, two 45-cali er Colt Model 1911-A1 se ia to atic handg ns | .45-cali er Colt Model 1911-A1 pistol .45-cali er Colt Model 1911-A1 pistol .22-cali er pistol | -[g] |
| 168. Anchor Glass Container Corporation | So th Connellsville, PA | 3 16 85 | | - | .38-cali er sn -nosed revolver | No |
| 169. Other Place Lo nge | Hot Springs, AR | 7 24 84 | | - | .45-cali er se ia to atic pistol | No |

**JA1543**

## List of Firearms Used in Public Mass Shootings Oct

| | Case | Location | Date | Weapon Description From | | | Assault Weapon[d] |
|---|---|---|---|---|---|---|---|
| | | | | Citizens Crime Commission[a] | Mother Jones | Washington Post[c] | |
| 170. | San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | | 9mm Browning P35 Hi-Power semiautomatic handgun; 9mm Israeli Military Industries Uzi Model A carbine semiautomatic rifle 12-gauge Winchester 1200 pump-action shotgun | 9mm Israeli Military Industries Uzi Model A machine pistol; 12-gauge Winchester 1200 pump-action shotgun; 9mm Browning P35 Hi-Power pistol | Yes |
| 171. | Dallas Nightclub | Dallas, TX | 6/29/84 | | 9mm Smith & Wesson 459 semiautomatic handgun | 9mm Smith & Wesson 459 pistol | No[h] |
| 172. | Atlasta Mining Town | Manley Hot Springs, AK | 5/17/84 | | - | .30-06-caliber Ruger single-shot rifle | No[i] |
| 173. | College Station | College Station, TX | 10/11/83 | | - | - | No[i] |
| 174. | Atlas a Bac-County | McCarthy, AK | 3/1/83 | | - | .223-caliber Ruger Mini-14 semiautomatic rifle, .22-caliber pistol | No |
| 175. | Upper West Side Hotel | New York, NY | 2/3/83 | | - | - | No |
| 176. | The Investor | Noyes Island, AK | 9/6/82 | | - | .22-caliber | No |
| 177. | Welding Shop | Miami, FL | 8/20/82 | | Mossberg 500 Persuader pump-action shotgun with pistol grip | 12-gauge shotgun | No |
| 178. | Western Transfer Co. | Grand Prairie, TX | 8/9/82 | | - | .38-caliber revolver, .25-caliber semiautomatic pistol, carbine rifle | No |
| 179. | Russian Jack Springs Park | Anchorage, AK | 5/3/82 | | - | .38-caliber pistol | No |

**Notes and Sources**

Public Mass Shootings from Mother Jones "US Mass Shootings, 1982-2022: Data from Mother Jones Investigation," updated November 23, 2022, the Citizens Crime Commission of New York City "Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America 1984-2012 ," accessed June 1, 2017, Washington Post "The Terrible Numbers That Grow With Each Mass Shooting," updated May 12, 2021 and The Violence Project "Mass Shooter Database," updated May 14, 2022. Identified Assault Weapons are in bold.

[a] Description of weapons from "Citizens Crime Commission of New York City, Mass Shooting Incidents in America 1984-2012 ," accessed June 1, 2017,

Description of weapons from Mother Jones "US Mass Shootings, 1982-2022: Data from Mother Jones Investigation," updated November 23, 2022 .

[c] Description of weapons from Washington Post "The Terrible Numbers That Grow With Each Mass Shooting," updated May 12, 2021 .

[d] California Penal Code sections 30510 and 30515 and California Code of Regulations, title 11, section 5499.

[ca] "House Investigative Committee on the Role Elementary Shooting Texas House of Representatives Interim Report 2022," July 17, 2022 "DDM4 7", *Daniel Defense*, https: danieldefense.com ddm4-v7.ht l, accessed

Page 15 of 19

JA1544

## ist of Firearms Used in u lic Mass Shootings

Oct

| Case | ocation | Date | Citi ens Crime Commission[a] | Wea on Descri tion From Mother Jones | Washington ost[c] | Assault Wea on[d] |
|------|---------|------|------------------------------|--------------------------------------|-------------------|-------------------|
| | | | | | | Pistol 669 |

[c] "Sheriff: O ford High School shooter sed 9    pistol recently p rchased y father," *ClickOnDetroit* , Dece    er 1, 2021.    "SP2022 Nitron Carry," *Sig Sauer* , https: www.sigsa er.co    sp2022-nitron-carry-si e.ht  l,

accessed Jan ary 4, 2023.

[cc] "The San Jose g n an appeared to specifically target his victi s, sheriff says", *CNN*, May 28, 2021.

[cd] "HM DEFENSE HM15F-MB-556 DEFENDER M5 223 REM,5.56  45MM NATO 16" 30  1 BLACK HARD COAT ANODI  ED BLACK MIL-SPEC HM STOCK," *Carter's Country* ,

https: www.cartersco ntry.co    prod ct h  -defense-defender-  5-223-re  5.56-nato-16-301- lac -hard-coat-anodi ed- il-spec-h  -stoc , accessed Jan ary 5, 2023.

[ce] "Instr ction Man al for R ger AR-556 Pistol," https: r ger-docs.s3.a onaws.co    an als AR-556  Pistol-K94 g4d.pdf.

[cf] "Pro  Midland to Odessa, shooter c t a 64-  in te path of terror," *Houston Chronicle*, Septe    er 8, 2019.

The Pistol That Loo s Li e A Rifle: The Dayton Shooters G n," *npr* , A g st 8, 2019.

[f] 11 Killed in Synagog e Massacre S spect Charged With 29 Co nts," *New York Times* , Octo er 27, 2018.

[g] "Ba ersfield  ass shooting very calc lated, ca e after  gly divorce, officials say," *Los Angeles Times* , Septe    er 14, 2018  "Model S&W500," S ith & Wesson,

https: www.s ith-wesson.co    firear s    odel-sw500-0, accessed Septe    er 25, 2018.

[h] "A thorities sei ed Waffle Ho se shooting's spect's AR-15 after arrest, dad gave the    ac  ," *The Mercury News*, April 23, 2018  "Fa  ily of    rder victi  s Waffle Ho se s spect and his father for  100    illion,"

CBSWJT , J ly 11, 2018  "Fa  ily of Waffle Ho se victi  in Nashville's es acc sed shooters father," Re ters, May 15, 2018.

[i] "Florida shooting s spect  o ght g n legally, a thorities say," *USA Today* , Fe r ary 15, 2018  "Florida school shooters AR-15    ay have a    ed, saving lives, report says," *Miami Herald*, Fe r ary 27, 2018.

"S spect in    adr ple illing at car wash dies," *CNN* , Jan ary 30, 2018.

"California  ass shooter    ade his own rifles," *NBC News* , Nove    er 16, 2017  "California shooter    ilt his own illegal g ns, officials say," *USA Today* , Nove    er 15, 2017.

[l] "What we  now a o t the rifle  sed in the Te as ch rch    assacre," *CNN* , Nove    er 6, 2017  "The Latest: 2    en who p rs ed g n  an attend shooting vigil," *The Associated Press* , Nove    er 6, 2017  "R ger

AR-556," R ger, https: r ger.co    prod cts ar556 specSheets 8500.ht  1, accessed Octo er 22, 2018.

"List: G ns and evidence fro    Las  egas shooter Stephen Paddoc  s" *KTNV* , Jan ary 19, 2018  "47 g ns, loaded high-capacity    aga ines fo nd in  egas shooters hotel s ite and Nevada ho e," *ABC News* ,

Octo er 4, 2017  "The tric ed o t g ns Las  egas shooter  sed in   assacre," *New York Post*, Octo er 3, 2017.

[n] "Washington shooting victi s ranged in age fro    16 to 95, coroners say," *CNN*, Septe    er 27, 2016  Brown, Jason, "What Yo    Sho ld Know A o t.22 Ri  fire," NRA, A g st 16, 2017  R ger Ho    epage,

https: r ger.co , accessed Octo er 24, 2018.

[o] "E cl sive: Photo of the Saiga AK-74 Rifle Used at Dallas Shooting," *Law Officer*, J ly 10, 2016.

Jan ary 4, 2023.

## ist of Firearms Used in u lic Mass Shootings Oct

| Case | ocation | Date | Citi ens Crime Commission[a] | Mother Jones | Washington ost[c] | Assault Wea on[d] |
|---|---|---|---|---|---|---|
| | | | | Wea on Descri tion From | | |

[P] "Sig MC  Owners Man al: Handling & Safety Instr ctions," *Sig Sauer*, https: www.sigsa er.co  wp-content ploads 2016 07 MC  pdf, accessed Octo er 23, 2018  Sig Sa er we site,

https: www.sigsa er.co  prod cts firear s rifles  state co pliant 1103, accessed Octo er 24, 2018.

[r] "San Bernardino G ns Originally Bo ght Legally, Later Modified," *The Wall Street Journal*, Dece    er 4, 2015.

[r] "U  p  a Co        nity College 2015 shooting report: What we've learned," *The Oregonian*, Septe    er 8, 2017.

[s] "Chattanooga Shooting Reignites G n Control De ate After Moha    ad Yo ssef A d la ee  Used AK-47 Assa lt Weapon To Kill Marines," *International Business Times*, J ly 17, 2015  "P rple Hearts  st approved

for Marines and sailor targeted in Chattanooga attac  ; *The Washington Post*, Dece    er 17, 2015.

[t] "John  awahri, s spected g n  an in deadly Santa Monica shooting, left farewell note, police say," *CBS News*, J ne 14, 2013.

"Na  es of victi  s e  erge after deadly Federal Way shooting," *Federal Way Mirror*, April 24, 2013.

[v] Upstate New Yor  Shooting Update: K rt Myers, s spected g n  an,  illed  y police in shooto t," *CBS News*, March 14, 2013.

Fate of Sandy Hoo  laws it against g n  a er co ld  e decided  y a slingshot," *NBC News*, Nove    er 14, 2017  "E    argo firing a r n on R ssian- ade g ns: Added restrictions p t ar  s in short s pply,"

*San Antonio Express-News*, A  g st 11, 2014.

"A rora G n  an s Arsenal: Shotg n, Se  ia to  atic Rifle and, at the End, a Pistol," *New York Times*, J ly 24, 2012  "M&P15 Centerfire Rifles Safety & Instr ction Man al," *Smith & Wesson*,

https: www.s  ith-wesson.co  sites defa lt files owners- an als M  26P15  CF  Rifle Man al 10-20-15.pdf, accessed Octo er 25, 2018.

[y] "IHOP g n  an  sed illegally altered AK-47, sheriff says," *Las Vegas Review-Journal*, Octo er 5, 2011.

"The  ass  iller, the cop and the ar  ed citi en. THE AYOOB FILES ," *The American Handgunner*, Nove    er 1, 2013.

[aa] "6 Killed in Grand Prairie Roller Rin  Shooting," *CBS DFW*, J ly 23, 2011.

[a] "Kent  y Tragedy: Man Kills Wife, Five Others, in Ra    page Over Cold Eggs, Say Cops," *CBS News*, Septe    er 13, 2010.

[ac] "Hialeah: Only the Latest Mass Shooting  y a Concealed Carry Killer," H ffington Post, J ly 30, 2013 "Hialeat g n  an s rage over estranged wife leaves 5 dead," *Sun Sentinel*, J ne 7, 2010.

[ad] "Man convicted of  illing 4 at Los Angeles resta rant," *Associated Press*, March 15, 2016.

[ae] "Instr ctions for Operation and Care of the Re  ington Model 11-48, Sports  an-48 A toloading Shotg ns," https: www.re  ington.co  sites defa lt files Model  2011-48.pdf, accessed Octo er 24, 2018.

[af] "1 ages, s icide note released in  all  assacre," *Nation World News*, Dece    er 7, 2007  "Ro anian Kalashni ov Rifles," g ns.net, accessed at http:  www.g nsnet.net Lin  310  odel.ht  on J ly 28, 2005 via

the Internet Archive WayBac  Machine  accessed Septe    er 26, 2018 .

[ag] "What happened in Crandon on Oct. 7," *Los Angeles Times*, J ne 8, 2008.

[ah] "Firear s T torial: Ter inology," https: li rrary. ed. tah.ed  We Path TUTORIAL GUNS GUNTERM.ht  l, accessed Octo er 24, 2018.

JA1546

## List of Firearms Used in Public Mass Shootings

Oct

| Case | Location | Date | Citizens Crime Commission [a] | Mother Jones | Washington Post [c] | Assault Weapon [d] |
|------|----------|------|------------------------------|--------------|---------------------|--------------------|

ai "5 Dead After Louisiana Church Shooting," *New York Times*, May 21, 2006.

a "Police: Seattle shooter said plenty for everyone," *NBC News*, March 27, 2006.

a "Both sides cite anger, hostility in Killings Hearings begin with law officers testimony, grisly images," *Pioneer Press*, September 11, 2005.

al "Seven die in Chicago warehouse shooting," *CNN*, August 27, 2003.

a "Man Kills 5 Co-Workers at Plant and Himself," *New York Times*, July 9, 2013. "Instruction Manuals & Product History," Ruger, https://ruger.com service product History.html, accessed October 23, 2018. Ruger Mini-14 an als https://ruger-docs.s3.amazonaws.com an als ini14-180.pdf, https://ruger-docs.s3.amazonaws.com an als ini14-181-186.pdf, https://ruger-docs.s3.amazonaws.com an als ini14-580.pdf, accessed October 23, 2018. "What You Should Know About the .22 Rifle," *NRA*, August 16, 2017. Ruger Ho epage, https://ruger.com, accessed October 24, 2018.

an "Sacramento shooter unscathed before killing self, a topsy shows," *Associated Press*, September 14, 2001.

a Worplace Deaths Leave No One Unto uched," *Chicago Tribune*, February 7, 2001 "Update 1-So rce of guns used in US factory shootings so ght," *Associated Press*, February 6, 2011 "SKS Rifle: Simonov Type 56," Department of the Army, October 1969, http://pdf.ic tfiles.co an als FIREARMS s 56.pdf, accessed October 24, 2018 "Why 30-30 Winchester Will Never Die," *NRA*, Fe r ary 2, 2016 "Firearms T torial: Terminology," library. ed. tah.ed We Path TUTORIAL GUNS GUNTERM.ht l, accessed October 24, 2018.

ap "Houston Rampage Leaves 4 icti s, G n an Dead," *The Record*, January 10, 2001.

a "Man Charged in Killings Evaded Strict G n Laws," *New York Times*, December 28, 2000.

ar "How they were ipped that day," *Jefferson County Sheriff*, http://www.cn.co SPECIALS 2000 col ine.cd Pages EQUIPMENT TE T.ht , accessed September 26, 2018.

as "What You Should Know About the .22 Rifle," *NRA*, August 16, 2017, Kipland Philip Kin el v. Ro Persson, 13C13698 A155449 2018 R ger Ho epage, https:r ger.co , accessed October 24, 2018.

at "Powerf l, se ia to atic rifles in Jones oro illers arsenal," *Associated Press*, April 3, 1998 "Post WWII Co ercially Man fact red M1 Car ines," *Universal Firearms*, http: www. lcar inesinc.co car ine niversal.ht l, accessed October 24, 2018 "77-Series R ger 77 44," R ger, https: r ger.co prod cts 77Series7744 odels.ht l, accessed October 24, 2018 "Model 742," Re ington, https: www.re ington.co sites defa lt files Model742.pdf, accessed October 24, 2018.

a "Unfinished siness," *Dateline NBC*, December 21, 2006.

av "Explosive hoarded y illed of 4," *Chicago Tribune*, August 21, 1997

aw "High-Capacity A nition Maga ines are the Co on Thread R ming Thro gh Most Mass Shootings in the United States," *Violence Policy Center*, accessed September 9, 2018.

a "An Air ans Revenge: 5 Min tes of Terror," *The New York Times*, June 22, 1994.

ay "Soldier fro Pasco held in N.C. illings," *St. Peters rg Ti es*, August 8, 1993 "What Yo Sho ld Know A o t .22 Ri fire," *NRA*, A g st 16, 2017.

a "San Francisco assacre pro pts fa ilies s its," *The Las Vegas Review-Journal*, May 19, 1994 "Death Over the Co nter," *The Washington Post*, J ly 27, 1993 "TEC-DC9 Man al," Intratec Firear s,

Page 18 of 19

JA1547

## List of Firearms Used in Public Mass Shootings
### Oct

| Case | Location | Date | Weapon Description From | | | | Assault Weapon[d] |
|---|---|---|---|---|---|---|---|
| | | | Citizens Crime Commission[a] | Mother Jones | Washington Post[c] | | |

http: pdf te tfiles.co   an als FIREARMS intrate tec dc9-pdf, accessed Octo er 22, 2018.

[a] "Morro Bay changed forever y illings," *The Fresno Bee*, Nove er 10, 1992

"G n an ay have la ed teacher who fl n ed hi ." *Houston Chronicle*, May 3, 1992   "What Yo Sho ld Know A o t.22 Ri fire," *NRA*, A g st 16, 2017.

[c] "3 Killed, 8 In red in Shooting Ra page at Post Office Cri c," *Los Angeles Times*, Nove er 15, 1991   "A Pri er A o t Ri fire s. Centerfire A nition," *NRA*, Nove er 21, 2017   R ger Ho epage,

https: r ger.co , accessed Octo er 24, 2018.

[r] "Fo r Killed in Post Office, Ho e E -Postal E ployee In C study," *AP News*, Octo er 10, 1991.

[d] "Post WWII Co ercially Man fact red M1 Car ines," *Universal Firearms*, http: www. 1car inesinc.co car ine niversal.ht l, accessed Septe er 26, 2018.

[e] "Firear s T torial: Ter inology," https: li rary. ed. tah.ed We Path TUTORIAL GUNS GUNTERM.ht l, accessed Octo er 24, 2018.

Sales Of E otic Weapons Are Mostly Cash And Carry," *Orlando Sentinel*, May 18, 1987   "Instr ction Man als & Prod ct History," *Ruger*, https: r ger.co service prod ct History.ht l, accessed Octo er 23, 2018

nd R ger Mini-14   an als,

[g] https: r ger-docs.s3.a a onaws.co   an als ini14-180.pdf, https: https: r ger-docs.s3.a a onaws.co   an als ini14-181-186.pdf https: r ger-docs.s3.a a onaws.co   an als ini14-580.pdf, accessed

Octo er 23, 2018."A thorities Piece Together Tragedy G n an at Ed ond Post Office Knew Where to Shoot People," *The Oklahoman*, A g st 22, 1986.

[h] "6 Die in Dallas C1 as Enraged Man Fires Wildly," *New York Times*, J ne 30, 1984.

[i] "M ltiple charges filed in rder, idnapping spree," *UPI Archives*, Octo er 12, 1983.

"G n an ills fo r and wo nds a fifth at west side hotel," *The New York Times*, Fe r ary 4, 1983.

**JA1548**

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG,<br><br>    Plaintiffs,<br><br>v.<br><br>MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department,<br><br>    Defendants. | HON. PETER G. SHERIDAN<br><br><br>Civil Action No.<br>3:18-cv-10507 |
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | HON. RENEE M. BUMB<br><br><br>Civil Action No.<br>1:22-cv-4360 |

**JA1550**

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## <u>DECLARATION OF STEPHEN HARGARTEN</u>

    I, STEPHEN HARGARTEN, hereby depose and state:

1.    I am over the age of 18 and am competent to testify to the matters stated
below based on personal knowledge.

**JA1551**

2.    I have attached a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.


I declare under penalty of perjury on this _____ day of October, 2023, that the foregoing is true and correct.


_____
STEPHEN HARGARTEN

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br>& PISTOL CLUBS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

## Expert Report of Stephen Hargarten

1.      My name is Stephen W. Hargarten, M.D., M.P.H. I am an emergency medicine

specialist, having practiced emergency medicine for over 35 years. I have been board certified

across four decades. My curriculum vitae, which is attached as **Exhibit A**, documents my clinical,

educational, and research experience in detail.

2.      I am being compensated for my services in this case at the rate of $250/hour.

## BACKGROUND AND QUALIFICATIONS

3.      I received my Medical Degree from the Medical College of Wisconsin in 1975,

completed my internship at Gorgas Hospital, a U.S. Army hospital in the Canal Zone, Panama in

1976, and received my Master's Degree in Public Health at the Bloomberg School of Public Health

at The Johns Hopkins University in 1984.

4.      I was a clinically active emergency medicine physician in the Milwaukee area for

over 35 years, most recently serving as an Attending Physician at Froedtert Hospital until 2018. As

an emergency medicine physician, I treated patients who sustained gunshot wounds.

5.      In addition to practicing emergency medicine, I continue to  serve as  Professor of

Emergency Medicine at the Medical College  of Wisconsin (MCW).  I have served as Chairman of

the Department of Emergency Medicine and as the Associate Dean for Global Health at MCW. In

2001, I founded the Injury Research Center, which later was reorganized to become the

Comprehensive Injury Center at MCW, where I served as Founding Director and am now the

Senior Injury and Policy Advisor.

6.      The Comprehensive Injury Center focuses on the sciences of injury prevention and

control, including violence prevention, through a multidisciplinary public health approach. This

includes community engagement, research, education, and collaboration with multidisciplinary

partners. The Center conducts research in a variety of areas, including interpersonal violence, gun

violence, and opioid use.

#96825686v1

7.      I serve on a number of National and International Committees, including as a founding member of the Network to Prevent Gun Violence in the Americas (2020-present), Vice-Chair of the Community Preventive Services Task Force of the U.S. Department of Health and Human Services (CDC, 2018-present), and member of the Executive Committee of the Transportation Research Board of the National Academies of Science, Engineering, and Medicine, (2018-present). I have been a member of the National Academy of Medicine since 2011.

8.      Over the course of my career, I have been awarded more than $20 million in research grants and awards, including awards by the State of Wisconsin Department of Health Services, United States Department of Justice, National Institute of Justice, and the Centers for Disease Control and Prevention. In addition, I have published more than 100 original papers in journals such as *Academic Emergency Medicine*, *The Annals of Emergency Medicine*, and *The New England Journal of Medicine*.

9.      In the past four years, I have served as an expert in the following cases involving firearms regulations: *Viramontes v. The County of Cook*, Case No. 21-cv-04595 (N.D. Ill.), *National Association for Gun Rights v. City of Highland Park, Illinois*, Case No. 22-cv-04774 (N.D. Ill.)., and *Barnett v. Raoul*, Case No. 23-cv-00209 (S.D. Ill.). I have also reviewed medical-legal cases for attorneys representing healthcare providers and patients. In the past four years, I have served as an expert in that capacity in *Liebfried et al. v Caterpillar, Inc.*, Case No. 20-cv-1874 (E.D. Wis.).

10.     I hold my opinions to a reasonable degree of medical and scientific certainty. My opinions are based on my education, training, research, and clinical experience, as well as my knowledge of relevant medical literature and the application of scientific principles to wounding ballistics. Also relevant to the formation of my opinions is my knowledge of accepted standards of medical practice as they apply to emergency medicine.

#96825686v1

## OPINIONS

11.      Each year, more than 45,000 people die from gun-related injuries in the United

States.[1] Many shooting victims do not make it to the hospital, and those who survive are often left

with serious complications, lifelong disabilities, and psychological trauma.[2]

12.      Firearms and the bullets they carry, cause damage to a body by transferring kinetic

energy to the target, which ripples through tissues and organs. The bullet penetrates the body,

leaving a temporary and permanent cavity in its wake.[3] The amount of energy a bullet transfers into

a target is a function of the bullet's velocity and mass. The energy delivered to the target increases

geometrically along with increases in mass, and exponentially with increases in velocity. The larger

a projectile's surface area, the greater its ability to transfer its energy to the intended target.[4]

13.      Assault weapons[5] present an especially serious public health problem in the United

States.  Assault weapons release projectiles at a relatively high velocity and can fire more bullets

and thus release more kinetic energy per minute than other kinds of firearms. And due to a variety

of factors, including the velocity of the bullet, spin of the bullet, and size of the bullet, bullets fired

by assault weapons penetrate tissue to create relatively large temporary cavities and permanent

wound channels that are generally more severe than other kinds of weapons. Assault weapon bullets

---

[1] John Gramlich, "What the data says about gun deaths in the U.S.," Pew Research Center (April 26, 2023), available at https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says- about-gun-deaths-in-the-u-s/ (noting that "[i]n 2021, the nost recent year for which complete data is available, 48,830 people died from gun-related injuries in the U.S."),

[2] *See, e.g.*, Arlene Greenspan & Arthur L. Kellerman, "Physical and Psychological Outcomes 8 Months after Serious Gunshot Injury," *The Journal of Trauma* 53(4), at 709–16 (Oct. 2002).

[3] Alex Yablon, "The Simple Physics That Makes Some Bullets Deadlier Than Others," *The Trace* (June 21, 2017), available at https://www.thetrace.org/2017/06/physics-deadly-bullets-assault-rifles/.

[4] Id.

[5] For purposes of this declaration, I use "assault weapons" to refer to firearms like the AR-15, which typically are capable of firing rounds at relatively high velocity and with a high rate of delivery, are lightweight and easy to maneuver, have low recoil, and display a high degree of accuracy at long range. This kind of weapon is encompassed by the definition of "assault weapon" in Superior, Colo. Code § 10-9-20, Boulder, Colo. Rev. Code § 5-8-2, Boulder County, Colo. Ord. No. 2022-5 § 1(a), and Louisville, Colo. Code § 9.80.010.

4

cause extreme damage to the tissue and organs of shooting victims (especially to solid organs such as the liver and spleen), leading to relatively high fatality and complication rates in victims.[6]

**I.     The Energy Release of Bullets Fired by Assault Weapons Typically Results in More Destructive Potential than Other Weapons.**

14.     For the past two years, I have researched the energy release and damage to human tissue of different types of weapons at the Comprehensive Injury Center at MCW, in collaboration with the Department of Biomedical Engineering at MCW and Marquette University. Over the past several years, I, along with a group of collaborators, have sought to perform wound ballistics modeling with state-of-the-art video technology and sensors. Specifically, we designed an experiment to gain a greater understanding of how a bullet "behaves" and transfers energy in simulated human tissue (gelatin). We wanted to quantify the scope and nature of the energy release, as summarized by this equation: Kinetic Energy equals ½ mass times velocity squared.[7] We wanted to measure the size of the permanent and temporary cavities created by the bullet as it travels through the human body model. We sought to measure energy release and cavity size because both are wounding predictors in the human body.

15.     To do so, we partnered with the Wisconsin Crime Lab, Division of Firearms and Toolmark Examiners, in Milwaukee, Wisconsin, where we identified and utilized firearms and bullets from their laboratory. Specifically, we conducted biomechanical testing of the bullets released from several different types of firearms, with the standard ammunition associated with

---

[6] *See, e.g.*, Gina Kolata and C. J. Chivers, "Wounds from Military-Style Rifles? 'A Ghastly Thing to See'," *The New York Times* (Mar. 4, 2018), available at https://www.nytimes.com/2018/03/04/health/parkland-shooting-victims-ar15.html; Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic* (Feb. 22, 2018), available at https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/.

[7] Panagiotis K. Stefanopoulos *et al.*, "Wound ballistics of military rifle bullets: An update on controversial issues and associated misconceptions," *Journal of Trauma and Acute Care Surgery* 87(3), at 696 (Sept. 2019).

those weapons.[8] We used three handguns (all pistols with .25 caliber, .32 caliber, and .40 caliber rounds), a bolt-action Remington hunting rifle (.30-06 caliber), an AR-15 style rifle (5.56 NATO bullets), a Thompson Machine gun rifle (.45 caliber ACP bullet), and a musket model (musket ball). These weapons were chosen to compare the energy output and resulting cavity size from different types of weapons and bullets.

16.    The bullets were shot into gelatin. We chose to use gelatin because it simulates, with a similar projectile depth of penetration and permanent damage, the damage done to human soft tissue. Gelatin blocks allow researchers to measure and visualize the energy transfer, temporary cavity, and permanent wound channels created by a projectile.[9]

17.    When conducting the experiment, science leaders, technicians, and doctoral students from the Bio-Engineering Department of the Medical College of Wisconsin/Marquette University set up the video technology sensors and gelatin, while the Wisconsin Crime Lab personnel set up the stand for the firearms. The distance from the firearm to the gelatin was approximately 10 feet.

18.    We tested several bullets associated with different types of firearms to record and quantify the scope and nature of the permanent and temporary cavities and to quantify the energy release of the bullets with two energy sensors affixed into the gelatin. The system was set up so that when the bullet was released from the firearm, the passage of the bullet thru the gelatin was

---

[8] The size of the bullet can affect wound severity. In general, holding all else equal, larger caliber rounds are more likely to cause more severe injuries because they increase the surface area of affected tissue. *See, e.g.*, Anthony A. Braga & Philip J. Cook, "The Association of Firearm Caliber With Likelihood of Death From Gunshot Injury in Criminal Assaults," *JAMA Network Open* 1(3) (July 27, 2018), available at https://jamanetwork.com/journals/jamanetworkopen/ fullarticle/2688536.

[9] *See, e.g.*, D.J. Carr *et al.*, "The use of gelatine in wound ballistics research," *International Journal of Legal Medicine* 132(6), at 1659–64 (Apr. 25, 2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6208714/. For a helpful video demonstration of a similar gelatin experiment comparing a bullet fired by a 9mm handgun and one from an AR-15, see this *60 Minutes* episode "What makes the AR-15 style rifle the weapon of choice for mass shooters?" (May 29, 2022), available at https://www.cbsnews.com/news/ar-15-mass-shootings-60-minutes-2022-05-29/.

recorded by high-speed video technology and the energy release was quantified by the two energy sensors.

19.    The two pressure transducers with range 0 – 50 megapascals (Entran Sensors & Electronics, Fairfield, NJ) were inserted about ten millimeters deep into the gelatin, perpendicular to the bullet path and recorded at 300 kHz. One sensor, the near sensor, was close to the front of the gelatin block; the other sensor, the far sensor, was close to the back of the gelatin block. Data capture was triggered after the bullet was fired using a sound-triggering device (Woods Electronics, Poway, CA). Pressure was filtered at 2.5 kHz using a low-pass Butterworth filter (MATLAB, The MathWorks, Inc., Natick, Massachusetts) and analyzed over time to evaluate peaks for maximum pressure.

20.    The experiment measured a number of metrics; the results of the experiment are summarized in **Exhibit B**.  We are submitting our work for peer review publication.

21.    First, the experiment measured pressure caused by the bullet. Pressure, which was measured by the two different sensors at different points in the gelatin, represents the transferred energy of the bullet as it enters and travels through the gelatin (i.e., the simulated human tissue). The pressure readings show the amount of energy release that is exerted on human tissue.

22.    Second, the experiment measured the temporary cavity and permanent cavity formed by the bullet. A permanent cavity is formed by the mass of the bullet traveling through the gelatin, which causes direct crushing and tearing of the gelatin, similar to what occurs in human tissue and organs. The temporary cavity is formed by the dispersion of the kinetic energy radially from the permanent cavity path, resulting in the stretching and tearing of the gelatin, again similar to what occurs in human tissue and organs..

7

23.     Third, the experiment measured energy lost by the bullet as it transferred through the gelatin. This was measured by calculating the different energies from the first and second transducer, thus resulting in a calculated transfer of energy to the gelatin. This represents the energy that human tissue will absorb as the bullet passes through the body.

24.     Fourth, we measured the percentage of the bullet's energy transferred to the gelatin by the bullet. This was calculated by taking the energy transferred and comparing it to the kinetic energy of the bullet leaving the chamber. Occasionally a bullet will fragment when it enters the gelatin (which also occurs with human tissue). Energy transfer generally increases when a round fragments because energy is released into the fragments and spread over a greater surface area.

25.     We found that the energy release of a 5.56 NATO round fired by an AR-15 style rifle (1,055.05 joules) is significantly greater than that of a round fired by a handgun (54.13 joules for a .25 caliber, 108.73 joules for a .32 caliber, and 265.99 joules for a .40 caliber), a .45 caliber round fired by a Thompson Machine gun (301.81 joules), and a musket ball fired by a musket (111.27 joules). In fact, the energy release is approximately three times greater than a Thompson Machine gun bullet, approximately four to nineteen times greater than the handguns (depending on the caliber), and approximately ten times greater than a musket. The energy release is even larger in a 5.56 NATO round when the bullet fragments, which it did in our second testing of the 5.56 NATO (1,138.13 joules).

26.     Furthermore, the temporary cavity caused by the 5.56 NATO bullet was significantly larger than the cavity sizes caused by the handguns, Thompson Machine gun, and the musket. And again, the temporary cavity of the AR-15 increased, by nearly 2 inches, with fragmentation.

27.     The only bullet that came close to producing temporary cavities comparable to the 5.56 NATO round was the .30-06 round from the Remington hunting rifle, which released more

#96825686v1

energy than the 5.56 NATO round (2,126.55 joules) and is often used to hunt large game. However, a shooter firing an AR-15 style weapon is capable of firing substantially more rounds per minute than someone shooting the Remington hunting rifle for a variety of reasons, including because the hunting rifle requires the shooter to pull the bolt back before firing each round (i.e., the hunting rifle requires the shooter to manually cycle the round); the hunting rifle produces a higher recoil, which means the shooter typically must re-aim after each shot; and the hunting rifle has a magazine of only 3-5 rounds, which requires more frequent reloading. Because the shooter firing the AR-15 style weapon is capable of firing substantially more rounds per minute than the shooter firing the hunting rifle, the AR-15, in effect, releases significantly more energy on a per-minute basis than the hunting rifle.

28.    It is my opinion that the AR-15 style bullet's kinetic energy release with its associated greater permanent and temporary cavities is more destructive than those fired by the Thompson Machine gun rifle, handguns, and muskets.

29.    Additionally, when considering the number of rounds per minute that each type of firearm is capable of firing, it is my opinion that an AR-15 style weapon is capable of causing significantly more destruction than a hunting rifle.

30.    Large-capacity magazines increase this destructive potential by increasing the number of rounds someone can fire without having to reload, thereby increasing the number of bullets that can be fired during a given time period.

II.    **AR-15 Style Weapons Produce More Damage to the Human Body Than Other Weapons.**

31.    The significant differences in energy transfer and temporary and permanent cavity sizes associated with rounds fired by AR-15 style weapons as compared to rounds fired by other weapons (including on a per-minute basis) have direct implications for injury and death.

9

**JA1561**

32.     AR-15 style weapons are capable of inflicting enormous damage on the human body, especially for children. Specifically, critical solid organs are more at risk, and the relative proximity of vital organs to each other in children increases the likelihood of serious injury or death, from gunshot wounds caused by an AR-15 style weapons than those caused by a lower-velocity weapon. Organs such as the liver and spleen, which are relatively inelastic organs due to their cellular structures (versus lung tissue, which is very elastic due to its need to inflate and constrict) are more severely lacerated due to the greater temporary cavity formation by these bullets, resulting in veins and arteries torn, which increases the risk of catastrophic bleeding. In addition, bullets from AR-15 style rifles are more likely to cause significant damage to bones and skeletal structure due to their higher energy release.

33.     In my opinion, this reality is borne out by the experiences of those who have recently treated victims of mass shootings involving assault rifles. For example, a trauma surgeon who treated a victim of the Parkland shooting "opened a young victim in the operating room, and found only shreds of the organ that had been hit by a bullet from an AR-15. . . .  nothing was left to repair. . . ."[10]

34.     The damage to the human body of bullets fired by assault rifles is amplified when there are multiple bullet wounds and in smaller bodies such as children. In a multiple-gunshot case, there are multiple cavities with energy being transferred to different places inside the body, which means the victim's wounds are typically more complex, carry a higher likelihood of injury requiring

---

[10] Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *supra* note 6; *see also* Leana Wen, "What Bullets Do to Bodies," *The New York Times* (June 15, 2017), available at https://www.nytimes.com/2017/06/15/opinion/virginia-baseball- shooting-gun-shot- wounds.html?_r=1.

10

surgical intervention, and carry a higher likelihood of death at the scene or on arrival in an

emergency department.[11]

35.    In this study of Carr et al, they found that multiple gun shot wounds were associated

with higher mortality, more intensive care unit days, and longer hospital length of stay. Multiple

bullet wounding patterns seem to have increased morbidity and mortality associated with firearm

injuries as postulated by the researchers.

36.    Finally, while the likelihood of serious injury and death from a wound caused by an

assault weapon bullet is high for adult victims, the likelihood of serious injury or death for pediatric

victims is even greater. Because children have smaller torsos, relatively more compressed/adjacent

vital organs, and smaller blood reserves, the energy release and greater temporary and permanent

cavities associated with AR-15 style bullets are even more likely to cause serious damage to

children as compared to teenagers or adults. Not a single child wounded by an assault weapon bullet

at Sandy Hook survived, for example.[12] Those patients who do survive after having been struck by

these bullets often face surgical challenges, recurring operative procedures, and long-term recovery

and disability.

_____
Dr. Stephen W. Hargarten, M.D., M.P.H.

Dated:  June 7, 2023

---

[11] Brendan G. Carr *et al.*, "Outcomes related to the number and anatomic placement of gunshot wounds," *Journal of Trauma* 64(1), at 197–202 (Jan. 2008), available at https://pubmed.ncbi.nlm.nih.gov/18188121/.

[12] Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (Nov. 25, 2013) at p. 10, https://portal.ct.gov/-/media/DCJ/SandyHookFinalReportpdf.pdf.

11

Exhibit A

# CURRICULUM VITAE (Dec. 2022)
Professor of Emergency Medicine

| | |
|---|---|
| <u>Home Address:</u> | 2411 E. Menlo Boulevard<br>Shorewood, WI  53211 |
| <u>Office Address:</u> | The Hub for Collaborative Medicine<br>8701 W Watertown Plank Rd.<br>Milwaukee, WI  53226<br>Email: hargart@mcw.edu |
| <u>Birth date:</u> | January 5, 1949 |
| <u>Marital Status:</u> | Married, 1987 - Janis<br>Children:  Beth, Jordan, Leah |

<u>Education:</u>

| | |
|---|---|
| 1984 | MPH, Johns Hopkins School of Public Health and Hygiene |
| 1975 | MD, Medical College of Wisconsin |
| 1971 | BA, University of Wisconsin, Milwaukee |

<u>Postgraduate Training:</u>

| | |
|---|---|
| 1975-1976 | Rotating Internship, Gorgas Hospital, Canal Zone, Panama |

<u>Faculty Appointments:</u>

| | |
|---|---|
| 2020-present | Senior Injury and Policy Advisor, Comprehensive Injury Center at the Medical College of Wisconsin |
| 2017-2019 | Co-Director, Global Health Pathway, Medical College of Wisconsin |
| 2014-2016 | Faculty Representative, Board of Trustees, Medical College of Wisconsin |
| 2013-2017 | Director, Global Health Pathway, Medical College of Wisconsin |
| 2013-2017 | Adjunct Faculty, Joseph J. Zilber School of Public Health, University of Wisconsin |
| 2012-present | Graduate Faculty, Graduate School of Biomedical Sciences, Medical College of Wisconsin |
| 2010-2021 | Associate Dean, Global Health, Medical College of Wisconsin |
| 2010-2014 | Institute for Health and Society, Medical College of Wisconsin |
| 2008–present | Adjunct Professor, Department of Population Health Sciences<br>University of Wisconsin School of Medicine and Public Health |
| 2001-2020 | Director, Comprehensive Injury Center at the Medical College of Wisconsin |
| 1998-present | Professor, Department of Emergency Medicine, Medical College of Wisconsin |

**JA1565**

- 2 -
Stephen W. Hargarten, MD, MPH

| | |
|---|---|
| 1998-2018 | Chairman, Department of Emergency Medicine, Medical College of Wisconsin |
| 1998-2001 | Director, Wisconsin Injury Research Center, Department of Emergency Medicine, Medical College of Wisconsin |
| 1997-2002 | Director, Firearm Injury Center, Department of Emergency Medicine, Medical College of Wisconsin |
| 1994-1997 | Associate Professor, Interim Chairman, Department of Emergency Medicine, Medical College of Wisconsin |
| 1994-1996 | Instructional Academic Staff Preceptor, Physician Assistant Program, Department of Family Medicine & Practice, University of Wisconsin Medical School - Madison, WI |
| 1994-2004 | Health Policy Institute, Medical College of Wisconsin |
| 1989-1994 | Assistant Professor of Emergency Medicine, Medical College of Wisconsin |
| 1985-1988 | Assistant Clinical Professor, Department of Trauma and Emergency Medicine, Medical College of Wisconsin |

Hospital and Administrative Appointments:

| | |
|---|---|
| 1995-2018 | Attending Staff, Froedtert Hospital |
| 1992-1997 | Associate Attending Staff, Children's Hospital of Wisconsin |

Hospital Appointments: (past)

| | |
|---|---|
| 1989-1995 | Associate Attending Staff, John L. Doyne Hospital, Milwaukee, WI |
| 1985-1988 | Staff Physician, Emergency Department, St. Luke's Hospital |
| 1984-1985 | Staff Physician, Emergency Department, St. Joseph's Hospital |
| 1977-1983 | Staff Physician, Emergency Department, St. Mary's Hospital |
| 1976-1977 | Staff Physician, Emergency Department, St. Joseph's Hospital |

Other Appointments:

| | |
|---|---|
| 2014-2020 | President and CEO, Milwaukee Global Health Consortium, Milwaukee, WI |

Specialty Certification:

| | |
|---|---|
| 2000 | Board Re-certified, American Board of Emergency Medicine |
| 1991 | Board Re-certified, American Board of Emergency Medicine |
| 1987-2010 | Examiner, American Board of Emergency Medicine |

**JA1566**

- 3 -

Stephen W. Hargarten, MD, MPH

| 1987-2003 | Instructor, Advanced Trauma Life Support |
| 1983-2005 | Fellow, American College of Emergency Physicians |
| 1982 | Board Certified, American Board of Emergency Medicine |

Licensure:
National Board of Medical Examiners - July 1976 - #154341
State of Wisconsin - July 1976 - #20218

Awards/Honors

| 2019 | Distinguished Service Award, Medical College of Wisconsin |
| 2018 | Appointment to the Community Preventive Services Task Force (CPSTF) of the U.S. Department of Health and Human Services |
| 2017 | International Institute of Wisconsin's Dorothy Von Briesen World Citizen Award in recognition of dedication to the promotion of international cooperation and understanding between diverse cultural communities |
| 2016 | The Leonard Tow 2016 Humanism in Medicine Award in recognition of exemplary compassion, competence and respect in the delivery of care (presented by The Arnold P. Gold Foundation) |
| 2015 | Distinguished Achievement Award, Milwaukee Academy of Medicine |
| 2012 | Outstanding Pathways Advisor for the 2012 Academic Year Medical College of Wisconsin |
| 2012 | Outstanding Medical Student Teacher for the 2011-2012 Academic Year Medical College of Wisconsin |
| 2011 | Election to the National Academy of Medicine, (Formally the Institute of Medicine) of The National Academy of Sciences |
| 2011 | Selected to be a Johns Hopkins Scholar |
| 2008 | Outstanding Medical Student Teacher for the 2007-2008 Academic Year Medical College of Wisconsin |
| 2000 | Prevention Achievement Award – presented by the Brain Injury Association of Wisconsin |
| 2000 | President's Award, Milwaukee Academy of Medicine |
| 1996 | Contributions to the 1996 Healthy People 2000 Progress Review, and in recognition of leadership in the area of Violence Prevention, on behalf of the National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Washington, DC, November |
| 1995 | Public Citizen of the Year, National Association of Social Workers - Wisconsin Chapter |
| 1994 | Physician of the Year State Medical Society – Wisconsin |

**JA1567**

- 4 -

Stephen W. Hargarten, MD, MPH

1990                          Rookie of the Year Award (presented by the Emergency Medicine Residents, Medical
College of Wisconsin-MCWAH)

Memberships in Professional and Honorary Societies:

Society for Research Excellence
Community Preventive Services Task Force (US Dept of Health & Human Services)
The National Academy of Medicine (fka Institute of Medicine)
Johns Hopkins Society of Scholars
Society for Academic Emergency Medicine
American Public Health Association
Advocates for Highway and Auto Safety
Wisconsin Public Health Association
International Travel Medicine Society
Society for Advancement of Violence and Injury Research

Consultant:

Florida Department of Health
Colorado Department of Health

Journal Reviewer:

Academic Emergency Medicine
Annals of Emergency Medicine
Accident Analysis and Prevention
American Journal of Emergency Medicine
Journal of Global Health
Journal of the American Medical Association
Journal of Injury Prevention
Chinese Journal of Emergency Medicine, Editorial Board

Peer Grant Reviewer

NCIPC - Elimination of Health Disparities through Translation Research (R18), 2008

National Advisory Committees/Boards:

Chair, Network to Prevent Gun Violence in the Americas, 2020-present

Member, Global Violence Prevention Forum of the National Academies of Sciences, Engineering and
Medicine, 2019-present

Member, Community Preventive Services Task Force of the U.S. Department of Health and Human
Services, 2018-present

Member, Executive Committee, Transportation Research Board of the National Academies of
Sciences, Engineering and Medicine, 2018-present

Member, Executive Committee, Transportation Research Board of the National Academies, 2018-
present

**JA1568**

- 5 -

Stephen W. Hargarten, MD, MPH

Member, Scientific Committee, Consortium of Universities for Global Health, 2013

Special Government Employee, Board of Scientific Counselors, National Center for Injury
Prevention and Control, 2013-2017

Member, Institute of Medicine, Global Health Board, 2012-2018

Member, Scientific Advisory Committee, University of Michigan Injury Center, 2011-present

Board Member, Community Advocates, Urban Strategies, 2010-present

Board Member, Great Lakes Transportation Enterprise Institute, 2010-2013

Founding President, Society for Advancement of Violence and Injury Research, 2005-2007

President, Association of Academic Chairs of Emergency Medicine, 2004-2005

President, National Association of Injury Control Research Centers, 2004-2005

Member, Advisory Committee, National Center of Injury Prevention and Control, Acute Care
Research Committee, 2004-2005

Board Member, St. Charles Youth and Family Services, 2001-present

Participant, Injury Research Grant Review Committee, Centers for Disease Control and Prevention,
National Center for Injury Prevention and Control, June 7-8, 1998

Member, Senator Russ Feingold Health Care East Advisory Committee, 1999–2010

Co-Chair, Advocates for Highway & Auto Safety, 1998 – 2002

Public Health Task Force, Society for Academic Emergency Medicine 1998 - 2000

Member, Education Advisory Committee, Association for the Advancement of Automotive Medicine, 1996 –
1997

Board Member, Advocates for Highway & Auto Safety, 1994– present

Member, Public Health and Injury Prevention Committee - American College of Emergency Physicians,
1991-1995

Member, Program Committee, Society for Academic Emergency Medicine, 1993 - 1995

Board Member, Association for Advancement of Automotive Medicine, 1992 - 1995

Member, Public Health Committee - Society for Academic Emergency Medicine, 1990 - 1993

Member, Trauma Subcommittee American College of Emergency Physicians, 1990 – 1991


State/Local Advisory Committee/Boards:

Faculty Member, Board of Trustees, Medical College of Wisconsin, 2014-2016

Member, Committee on Inmate/Youth Death, Department of Corrections, 2005-2007

**JA1569**

- 6 -
Stephen W. Hargarten, MD, MPH

Member, Public Health Council, Department of Health and Family Services, 2004-2006

Task Force Member, Governors Task Force on Terrorism, 2001-2003

Chair, State Trauma Advisory Committee, 1999-2003

Chair, State Medical Society Council on Health of the Public, 1999-2000

Eastern Regional Health Care Advisory Committee of Senator Feingold, 1998-2000

Chair, Policies and Practice Work Group, Fighting Back, 1998

Board Member, Fighting Back, 1997-2000

Chair, State Medical Society Injury Control Commission, 1996 - 1999

Chair, Public Health and Education Committee, Milwaukee Academy of Medicine, 1993 – 1999

Tom Dooley Heritage - Board Member (Private, Voluntary Organization), 1981 - 1995

Chairman, Safe Transportation Commission Wisconsin State Medical Society, 1990 - 1994

Board Member, Wisconsin Division American Trauma Society, 1990 - 1993

President, Wisconsin Public Health Association, 1992 - 1993

Co-Chairman, Wisconsin Safety Belt Coalition, Madison, Wisconsin, 1986 - 1991

Milwaukee County Medical Society Public Health Committee, 1989 - 1991

Commissioner, Milwaukee Safety Commission, 1987 - 1990

Medical Director, St. Luke's International Travel Clinic, 1985 - 1988

Board Member/President, Wisconsin Indochina Refugee Relief (WICRR) – Wisconsin, 1980 - 1982

Wisconsin Indochina Refugee Relief (WICRR) (Private, Voluntary non-profit organization), Volunteer Physicians - Tom Dooley Memorial Hospital Thailand, 1980

Co-Founder, Board Member West of the River Community Center, Milwaukee, Wisconsin, 1977 – 1979

Research Grants, Contracts, and Awards:

1. "Remembering the Lost: How Investigation of Military Suicides Can Improve Prevention Resources"
   AWARD FOR FISCAL YEARS 2020-22
   $316,576
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
   FUNDING AGENCY: Advancing a Healthier Wisconsin Endowment

2. "Using Hospital Records of Patients Presenting to Froedtert Hospital to Predict Risk of Opioid Use Disorder (OUD), Fatal and Non-fatal Opioid Overdose, and ED Readmission"
   AWARD FOR FISCAL YEARS 2020-2021
   $50,000
   PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH

- 7 -

Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: Clinical and Translational Science Institute through Advancing a Healthier Wisconsin Endowment

3.  "Project Zero"
    AWARD FOR FISCAL YEARS 2021-2023
    $316,760
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Advancing a Healthier Wisconsin Endowment

4.  "Project Aware"
    AWARD FOR FISCAL YEARS 2019-2024
    $300,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: (Sub-contract) State of Wisconsin Department of Health Services

5.  "WVDRS and SUDORS Contract"
    AWARD FOR FISCAL YEARS 2019-2020
    $170,440
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: (Sub-contract) State of Wisconsin Department of Health Services

6.  FY20 DOC Contract
    AWARD FOR FISCAL YEARS 2019-2020
    $99,874
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Wisconsin Department of Corrections

7.  "Destination Zero: Zero Suicide in Fond du Lac County"
    AWARD FOR FISCAL YEARS 2018-2020
    $419,691
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Healthier Wisconsin Partnership Program

8.  "MCW Blue Center Research Award"
    INITIAL AWARD FOR FISCAL YEARS: 2017-2020
    $600,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Medical College of Wisconsin, Office of Research

9.  "Scudder Travel Scholarship"
    AWARD FOR FISCAL YEARS: 2017-2021
    $15,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Dr. James H. Taylor and Dr. Susan P. Taylor

10. "Dr. Elaine Kohler Summer Academy in Global Health Research and Electives"
    AWARD FOR FISCAL YEARS: 2017-2021
    TOTAL AWARD: $250,000
    PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: John Michael Kohler Family Foundation

11. "The Cardiff Model: Strengthening Community Capacity to Reduce Violence:
    AWARD FOR FISCAL YEARS 2016-2018
    $499,693
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH

**JA1571**

- 8 -
Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: US Department of Justice

12. "Developing a Community-Based Approach to Reduce Drug Overdoses in Milwaukee County"
AWARD FOR FISCAL YEAR 2016
TOTAL AWARD $25,000
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Milwaukee County

13. "Addressing Racial Disparities in the Ascertainment and Identification of Depression,
Suicidal Ideation, and Death by Suicide"
AWARD FOR FISCAL YEARS 2016-2017
TOTAL AWARD $37,347
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Charles E. Kubly Foundation

14. "Creating a Jackson County that Supports Mental Health"
AWARD FOR FISCAL YEARS 2015-2017
TOTAL AWARD: $374,504
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

15. "Wisconsin Violent Death Reporting System" (WVDRS)
AWARD FOR FISCAL YEAR 2015
AWARD: $69,773
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: (Sub-Contract) State of Wisconsin, Department of Health Services

16. "Integrating Emergency Data with Law Enforcement, Emergency Medical Service and
Community Data to Reduce Violence"
AWARD FOR FISCAL YEAR 2015
PRINCIPAL INVESTIGATORS: Stephen Hargarten, MD, MPH and Jennifer Hernandez-Meier, MSW
FUNDING AGENCY: National Institute of Justice

17. "Criminal Background Characteristics of Homicide Perpetrators and Victim's and
Suicide Decedents: A Model State Analysis"
AWARD FOR FISCAL YEARS 2014-2016
PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: New Venture Fund for a Safer Future

18. "Training Administration Support"
AWARD FOR FISCAL YEARS 2012-present
TOTAL AWARD: $6,200
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Varies

19. "M4 University of the Philippines College of Medicine Global Health Elective"
AWARD FOR FISCAL YEARS: 2012-2013
TOTAL AWARD: $1,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: David E. Engelhardt, MD

20. "Changing the Culture of Risky Drinking Behavior: Policy Change"
AWARD FOR FISCAL YEARS: 2012-2017
TOTAL AWARD: $748,267
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH

- 9 -
Stephen W. Hargarten, MD, MPH

FUNDING AGENCY:  Healthier Wisconsin Partnership Program

21. "Child Maltreatment and Partner Violence: Bridging the Medical/Social/Science Gap"
AWARD FOR FISCAL YEAR 2011-2012
TOTAL AWARD $7,142
FUNDING AGENCY: NICHHD/Sub-contract from Washington University-St. Louis

22.  "M4 Global Health Elective Travel Scholarship"
AWARD FOR FISCAL YEARS: 2011-2017
TOTAL AWARD: $70,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: St. Joseph's Hospital Professional Emergency Services, Inc. (PES) Fund Award

23. "M4 Global Health Elective Travel Scholarship"
AWARD FOR FISCAL YEARS: 2011-2017
TOTAL AWARD: $70,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Ewens WIcare Fund

24. "Dr. Elaine Kohler Summer Academy in Global Health Research and Electives"
AWARD FOR FISCAL YEARS: 2011-2016
TOTAL AWARD: $255,000
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: John M. Kohler Foundation

25. "Violence Prevention Initiative Research and Evaluation Team"
AWARD FOR FISCAL YEARS: 2010-2015
TOTAL AWARD: $1,241,473
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

26. "Strengthening Emergency Care in Belize"
AWARD FOR FISCAL YEARS: 2010-2012
TOTAL AWARD: $21,360
PRIMARY INVESTIGATOR: Stephen Hargarten, MD, MPH
FUNDING AGENCY: Wagner Foundation

27. Changing the Culture of Risky Drinking Behavior"
AWARD FOR FISCAL YEARS: 2009-2012
TOTAL AWARD: $300,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

28. "Elaine Kohler Nicaragua Award"
AWARD FOR FISCAL YEARS: 2008-2016
TOTAL AWARD: $5,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Julilly Kohler WI Care

29. "Kenosha County Suicide Prevention Initiative"
AWARD FOR FISCAL YEARS: 2008-2011
TOTAL AWARD: $450,000
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Healthier Wisconsin Partnership Program

- 10 -
Stephen W. Hargarten, MD, MPH

30. "Train the Trainer Alcohol Screening and Intervention"
    AWARD FOR PERIOD: June-September 2008
    TOTAL AWARD $20,000
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Wisconsin Department of Transportation

31. "Comprehensive Injury Center at the Medical College of Wisconsin"
    AWARD FOR FISCAL YEARS: 2007-2012
    TOTAL AWARD: $4,424,025
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Centers for Disease Control and Prevention

32. "Public Health Injury Surveillance and Program Development"
    AWARD FOR FISCAL YEAR: 2007-2008
    TOTAL AWARD: $106,034
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

33. "Changing the Culture of Risky Drinking Behavior"
    AWARD FOR FISCAL YEARS: 2007-2008
    TOTAL AWARD: $49,944
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Healthier Wisconsin Partnership Program

34. "Medical Student Training in Aging and Injury Research"
    AWARD FPR FOSCA: UEARS: 2007-2012
    TOTAL AWARD: $391,068
    CO-PROGRAM DIRECTOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: National Institutes of Health/National Institute on Aging

35. "Public Health Injury Surveillance and Program Development"
    AWARD FOR FISCAL YEAR: 2006-2007
    TOTAL AWARD: $68,870
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

36. "Strengthening Public Health Policymaking for a Healthier Milwaukee"
    AWARD FOR FISCAL YEARS: 2006-2008
    TOTAL AWARD: $49,816
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY:  Healthier Wisconsin Partnership Program

37. "Youth Suicide Prevention and Early Intervention"
    AWARD FOR FISCAL YEARS: 2006-2009
    TOTAL AWARD: $100,000
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Milwaukee Mental Health Association via Substance Abuse and Mental Health Services
    Administration

38. "Public Health Injury Surveillance and Program Development"
    AWARD FOR FISCAL YEAR: 2005-2006
    TOTAL AWARD: $93,228
    PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Injury Prevention Program, Wisconsin Dept of Health and Family Services

**JA1574**

- 11 -
Stephen W. Hargarten, MD, MPH

39. "Toward Regional Priorities for Injury Prevention"
   AWARD FOR FISCAL YEAR: 2003
   TOTAL AWARD: $22,727
   PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Wisconsin Department of Health and Family Services

40. "Deaths to US Travelers Abroad"
   AWARD FOR FISCAL YEAR: 2002
   TOTAL AWARD: $50,000
   PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Center for Disease Control and Prevention

41. "Annie E. Casey Foundation"
   AWARD FOR FISCAL YEAR: 2002
   TOTAL AWARD: $68,181
   PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Annie E. Casey Foundation

42. "Comprehensive Injury Center at the Medical College of Wisconsin"
   AWARD FOR FISCAL YEARS:  2001-2007
   TOTAL AWARD: $5,180,275
   PRIMARY INVESTIGATOR:  Stephen W. Hargarten MD, MPH
   FUNDING AGENCY: Centers for Disease Control and Prevention

43. "Grants for Injury Control Research Centers – Small Project 4"
   AWARD FOR FISCAL YEARS: 2001-2004
   TOTAL AWARD: $ 66,672
   CO-INVESTIGATOR: Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Centers for Disease Control and Prevention

44. "Grants for Injury Control Research Centers – Large Project 4"
   AWARD FOR FISCAL YEARS: 2001-2006
   TOTAL AWARD: $ 204,000
   PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Centers for Disease Control and Prevention

45. "Grants for Injury Control Research Centers – Large Project 3"
   AWARD FOR FISCAL YEARS: 2001-2006
   TOTAL AWARD: $100,000
   CO-INVESTIGATOR (IN KIND): Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Centers for Disease Control and Prevention

46. "Grants for Injury Control Research Centers – Core A"
   AWARD FOR FISCAL YEARS: 2001-2006
   TOTAL AWARD:  $ 137,380
   PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Centers for Disease Control and Prevention

47. "2nd Annual Emerging Injury Conference: International Travel Related Injury"
   AWARD FOR FISCAL YEARS: 2001-2002
   TOTAL AWARD:  $ 50,000
   PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
   FUNDING AGENCY: Centers for Disease Control and Prevention

48. "NVDRS – Intentional Injuries and Assaults"

**JA1575**

- 12 -
Stephen W. Hargarten, MD, MPH

AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD: $ 75,774
PRIMARY INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Wisconsin Office of Justice Assistance

49. "Improving Patient Safety: Health Systems Reporting, Analysis, and Safety Improvement Research
Demonstrations"
AWARD FOR FISCAL YEARS: 2001-2004
TOTAL AWARD: $1,418,594
CO-PI: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Agency for Healthcare Research and Quality

50. "International Injuries and Assaults"
AWARD FOR FISCAL YEARS: 2001-2002
TOTAL AWARD:  $ 68,196
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: State of Wisconsin

51. "Building a National Firearm Injury Reporting System"
AWARDED FOR FISCAL YEARS:  2000 - 2001
TOTAL AWARD:  $50,000
PRINCIPAL INVESTIGATOR:  Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Funder's Collaborative for Gun Violence Prevention by Harvard School of Public Health
National Violent Injury Statistics System (NVISS)

52. "Preventing Firearm Suicides and Unintentional Deaths"
AWARD FOR FISCAL YEARS:  2000-2001
TOTAL AWARD: $60,000
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Funder's Collaborative for Gun Violence Prevention by Johns Hopkins Center for Gun Policy
& Research

53. "A Comprehensive Model for Firearm Injury Reporting, Analysis and Information" – Joyce 5
AWARD FOR FISCAL YEARS: 1999-2002
TOTAL AWARD: $771,924
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
FUNDING AGENCY: Joyce Foundation

54. "Closing the Gap: Applying Injury Control Science to Patient Safety"
AWARD FOR FISCAL YEARS:  1999-2000
TOTAL AWARD:  $24,316 and $30,000
PRINCIPAL INVESTIGATOR:  Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Centers for Disease Control and Prevention

55. "In the Wake of a Gunshot"
AWARD FOR FISCAL YEARS:  1999-2000
TOTAL AWARD:  $10,000
PRINCIPAL INVESTIGATOR:  Stephen W. Hargarten, MD, MPH
FUNDING AGENCY:  Wisconsin Humanities Council and the National Endowment for the
Humanities

56. "Strategic Development of State Firearm Injury Reporting Systems"
AWARD FOR FISCAL YEARS: 1999-2000
TOTAL AWARD: $116,911
PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH

- 13 -
Stephen W. Hargarten, MD, MPH

FUNDING AGENCY: Open Society Institute

57. "Wisconsin Firearm Injury Reporting Systems (FIRS) – Joyce 4
    AWARD FOR FISCAL YEARS: 1998-1999
    TOTAL AWARD: $95,912
    PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Joyce Foundation

58. "Wisconsin Drug Abuse Emergency Room Registry"
    AWARD FOR FISCAL YEARS: 1998-1999
    TOTAL AWARD: $1500
    PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: State of Wisconsin, Dept. of Health & Family Services

59. "National Firearm Information Center" – Joyce 3
    AWARD FOR FISCAL YEARS: 1997-2000
    TOTAL AWARD: $391,581
    PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Joyce Foundation

60. "Firearm Injury Reporting System" – Joyce II
    AWARD FOR FISCAL YEARS: 1996-1998
    TOTAL AWARD: $194,538
    PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: Joyce Foundation

61. "Brief Strategies for Alcohol-Related Non-traffic Injuries"
    AWARD FOR FISCAL YEAR: 1996
    TOTAL AWARD: $10,904
    PRINCIPAL INVESTIGATOR: Stephen W. Hargarten, MD, MPH
    FUNDING AGENCY: University of Wisconsin – Madison

62. "Firearm Surveillance System - Wisconsin"
    AWARD FOR FISCAL YEAR: 1994-1997
    TOTAL AWARD:  $150,000
    CO-DIRECTOR:   Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Division of Health, State of Wisconsin

63. "Firearm Injury Reporting System"
    AWARD FOR FISCAL YEAR: 1994-95
    TOTAL AWARD: $50,000
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Faye McBeath Foundation

64. "Firearm Injury Reporting System" – Joyce II
    AWARD FOR FISCAL YEAR: 1994-95
    TOTAL AWARD: $79,997
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Joyce Foundation

65. "Emergency Room Drug Abuse Data"
    AWARD FOR FISCAL YEARS: 1992 - 2000
    TOTAL AWARD:  $5,000/yr.
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: State of Wisconsin

**JA1577**

66. "Crash Outcome Data Evaluation (CODES) in Wisconsin"
    AWARD FOR FISCAL YEAR: 1992-1993
    TOTAL AWARD: $15,000
    CO-INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: National Highway Traffic Safety Administration

67. "Partnerships in Health/EMS Training for Poland"
    AWARD FOR FISCAL YEARS: 1992-1994
    TOTAL AWARD: $2.4 million
    ASSOCIATE DIRECTOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: United States Agency for International Development

68. "Emergency Medical Services Course for Physicians"
    AWARD FOR FISCAL YEAR: 1992
    TOTAL AWARD: $29,789.00
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Wisconsin Department of Transportation

69. "Motorboat Propeller Injuries in Wisconsin 1987-1989"
    AWARD FOR FISCAL YEAR: 1991
    TOTAL AWARD: $2,000.00
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Institute for Injury Reduction

70. "Electronic Log System for Emergency Department"
    AWARD FOR FISCAL YEAR: 1990
    TOTAL AWARD: $40,356.00
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Wisconsin Department of Transportation

71. "Cost & Data Analysis of Motor Vehicle Trauma in Milwaukee County"
    AWARD FOR FISCAL YEAR: 1990
    TOTAL AWARD: $3,417.00.
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Wisconsin Department of Transportation

72. "Hunting Injuries and Illnesses in Montana 1990"
    AWARD FOR FISCAL YEAR: 1990
    TOTAL AWARD: $2,500.00
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Wilderness Medical Society

73. "Motor Vehicle Crashes - Emergency Physician Costs"
    AWARD FOR FISCAL YEAR: 1990
    TOTAL AWARD: $6,000.00
    PRINCIPAL INVESTIGATOR: Stephen Hargarten, MD, MPH
    FUNDING AGENCY: Wisconsin Safety Belt Coalition

Invited Lectures/Testimony:

1. "Gun Violence as a Biopsychosocial Disease," Midwest Injury Prevention Alliance Virtual Summit,
   December 9, 2020.

**JA1578**

- 15 -
Stephen W. Hargarten, MD, MPH

2. "Global Health from Neighborhoods to Nations", Milwaukee Academy of Medicine, Virtual Webinar, November 17, 2020.

3. "Impact of COVID-19 on the University's Global Health Programming," 7th Annual Midwestern Universities for Global Health, Virtual Webinar, September 30.

4. "Gun Violence in the Americas: Local Solutions to a Hemispheric Challenge," Consortium of Universities for Global Health, Virtual Webinar, July 16, 2020.

5. "Assault Weapons Ban in the Americas," Newtown Action Alliance, Virtual Webinar, July 9, 2020.

6. "Gun Violence in Mexico and Central America," Consortium of Universities for Global Health, Virtual Webinar, April 21, 2020.

7. "The Milwaukee Global Health Landscape Study," Milwaukee Global Health Consortium, Virtual Webinar, April 13, 2020.

8. "Gun Violence in the Americas Focus: Mexico," Consortium of Universities for Global Health, Virtual Webinar, March 24, 2020.

9. "Physician Advocacy," Medical College of Wisconsin Health Policy and Advocacy Course, Milwaukee, WI, March 23, 2020.

10. "Understanding the Biopsychosocial Aspects of Violence Involving Firearms," American Hospital Association Webinar Series on Gun Violence, Virtual Presentation, February 19, 2020.

11. "Gun Violence: A Biopsychosocial Disease," 2020 Comprehensive Injury Center Lecture Series, Medical College of Wisconsin, Milwaukee, WI, January 23, 2020.

12. Assembly Health Committee Public Hearing (Military Civilian Partnership + Cancer Clinical Trials Legislation), Madison, WI, January 7, 2020.

13. "Global Burden of Gun Violence," University of Wisconsin Population Health Seminar Series, University of Wisconsin, Madison, WI, December 2, 2019.

14. "Gun Violence: A Biopsychosocial Disease," Department of Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, September 27, 2019.

15. "Suicide in Wisconsin: Considerations for Prevention," Wisconsin State Legislature's Suicide Prevention Task Force Testimony, Milwaukee, WI, September 9, 2019.

16. "Gun Violence: A Biopsychosocial Disease," Department Conference, Department of Emergency Medicine, Medical College of Wisconsin, Milwaukee, WI, August 8, 2019.

17. "Road Traffic Injury Prevention and Violence Injury Prevention," International Congress on Emergency Medicine Meeting, Seoul, South Korea, June 12, 2019.

18. "Gun Violence Prevention: Dispelling Myths, Understanding Science, Strengthening Prevention, Programs, and Policies," Community Conversations, La Crosse, WI, April 24, 2019.

19. "Gun Violence: A Biopsychosocial Disease," Toward One Wisconsin Inclusivity Conference, Milwaukee, WI, April 11, 2019.

20. "Motor Vehicle Crash Deaths and Injury – Moving to Zero," Wisconsin Medical Society Physician Education Conference, Madison, WI, April 6, 2019.

- 16 -
Stephen W. Hargarten, MD, MPH

21. "Gun Violence: A Biopsychosocial Disease," Wisconsin Medical Society Physician Education Conference, Madison, WI, April 6, 2019.

22. "Injury as a Biopsychosocial Disease," Wisconsin Violence and Injury Prevention Program Summit, Madison, WI, April 4, 2019.

23. "Gun Violence: A Biopsychosocial Disease," Society for the Advancement of Violence and Injury Research Conference, Cincinnati, OH, April 2, 2019.

24. "Gun Violence: A Complex Biopsychosocial Disease," Grand Rounds, University of Wisconsin School of Medicine and Public Health, Madison, WI, February 21, 2019.

25. "Why Do Health Systems Have A Role?" NASEM: Health Systems Interventions to Prevent Firearm Injuries & Death – A Workshop, Washington DC, October 17, 2018

26. "Vision Zero – Emphasis on Public Health" Transportation Research Board Transportation Safety Management Mid-Year Meeting, Washington DC, July 30, 2018

27. "Gun Violence: A Biopsychosocial Disease: Myths, Science & Prevention", 2018 Preventive Medicine Annual Meeting, American College of Preventive Medicine, Chicago, ILL, May 24, 2018

28. "International Challenges and Higher Education", 39th Annual National Conference on Law & Higher Education.  Stetson University College of Law, Clearwater, FL, February 3, 2018

29. "Faculty promotion for global health" 4th Annual Midwest Universities for Global Health Meeting: Capacity Building in Global Health at Washington University Medical School, December 1, 2017.

30. "Gun Violence: A Biopsychosocial Disease: Physician Roles and Responsibilities", Grand Rounds, University of Michigan Emergency Medicine Residency Conference, Ann Arbor, MI, November 8, 2017.

31. "International Partnerships: Global Wisdom, Global Citizens" American Association of Medical Colleges, Boston, MA, November 5, 2017.

32. "Legal Characteristics of Emergency Medicine" Belize Medical and Dental Association XXXVI Congress, Belize City, Belize, October 17, 2017.

33. "Global Health Challenges: The Burden of Injury" University of Norte Dame Eck Institute for Global Health, Norte Dame, IN September 28, 2017.

34. "Gun Violence: Myths, Science, Opportunities", Underground Science Society, The Sugar Maple,
     i.   Milwaukee, WI, September 11, 2017.

35. "Gun Violence as a Biopsychosocial Disease Burden: Our Roles and Responsibilities" for The Violence Epidemic: Justice, Public Health and Ethics, Center for Bioethics and Medical Humanities, Medical College of Wisconsin, Milwaukee, WI, June 13, 2017.

36. "Global Burden of Road Traffic Injury: Opportunities and Strategies for Prevention and Control: Roles of Civil Society" Consortium of Universities for Global Health, Washington DC, April 8, 2017.

37. "Gun Violence: A Biosocial Disease" Keynote for Wisconsin Chapter of American College of Emergency Physician's 2017 Spring Symposium, Madison, WI, March 28, 2017.

38. "Global Burden of Injury" Hainan Medical University, Hainan, China, March 15, 2017.

**JA1580**

- 17 -
Stephen W. Hargarten, MD, MPH

39. "MCW's Impact on the World: From Milwaukee, Wisconsin to Around the Globe", MCW/Marquette Medical Alumni Association 51st Clinical Conference, Sonoma, CA, March 7, 2016.

40. "Global Health and Medical Education: The Ethics of Short-term International Electives" Advancing Global Health: Ethical and Logistical Issues, Bronx, NY, December 5, 2016.

41. "Global Emergencies" Belize Medical and Dental Association XXXV Congress, Belize City, Belize, November 17, 2016

42. "Shoot to Kill: Shooting Trends Across the Nation" Panel at Marquette University, Milwaukee, WI,
    i. October 14, 2016.

43. "Gun Violence: A Biosocial Disease", Sanford Trauma Symposium, South Dakota Department of Health, Sioux Falls, SD, October 11, 2016.

44. "Global Health from a Milwaukee Perspective" Marquette University Global Health Symposium, Milwaukee, September 30, 2016

45. "Study Abroad Student Safety", Wisconsin Association of Independent Colleges and Universities Student Safety Workshop, Milwaukee, September 28, 2016

46. "Global Health Challenges", Notre Dame University, Notre Dame, IN, September 1, 2016

47. "Beyond the Basics of Health, Safety, Security and Risk Management", Keynote Speaker for The Forum on Education Abroad Standards of Good Practice Institute, Northwestern University, Evanston, IL, June 23, 2016.

48. "Global Burden of Injury" University College of Dublin, Dublin, Ireland, June 8, 2016

49. "Global Health: The Ultimate Sustainable Challenge", Sustainability Summit, Milwaukee, May 13, 2016

50. "Medical Student Perspectives on Global Health" MCW Today, Tomorrow, and Beyond Symposium Alumni Weekend, Milwaukee, April 30, 2016

51. "Gun Violence: A Biosocial Disease" for Medical College of Wisconsin Nursing Trauma Conference, Milwaukee, WI, April 23, 2016.

52. "Gun Violence: A Biosocial Disease", Keynote Speaker for Gun Violence: A Public Health Symposium, Washington University – Institute for Public Health, St. Louis, MO, April 5, 2016.

53. "How Violence Impacts Public Health", Panel Participant for University of Wisconsin-Zilber School of Public Health, Milwaukee, WI, February 25, 2016.

54. "Programs and Policy: Addressing a Global Need for Surgery and Emergency Care" and "Global Burden of Injury", Global Health Conference Midwest, Creighton University, Omaha, NE, February 6, 2016.

55. "Inequality and Freedom from Violence: Community violence has identifiable causes and implementable cures" University of Wisconsin-Milwaukee Fireside Forum, Milwaukee, WI, February 2, 2016

56. "Global Health: Managing Health & Safety", 2nd Annual Midwestern Universities for Global Health, Rush University, Chicago, IL, December 2, 2015

57. "Global Burden of Injury" Visiting Professor, Notre Dame, Notre Dame, IN, October 15, 2015

58. "Global Burden of Injury" Visiting Professor, University of Wisconsin, Madison, WI, October 12, 2015

**JA1581**

- 18 -
Stephen W. Hargarten, MD, MPH

59. "Challenges and Opportunities in Academic Medicine: Collaborating for Global Health" Visiting Professor, Universidad Católica de Guayaquil, Guayaquil, Ecuador, May 6, 2015

60. "Disaster Preparedness & Response: An All Hazard Approach" Consortium of Universities for Global Health Annual Meeting, Boston, MA, March 26, 2015

61. "Injury Science and Geriatrics: Coming of Age Together", Visiting Professor, Weill Cornell Medical College, Division of Geriatrics & Palliative Medicine Grand Rounds, New York, NY, February 12, 2015

62. "Emergency Medicine and Injury Prevention and Control: A Room with a View", Visiting Professor, Weill Cornell Medical College, Divisions of Emergency Medicine and Geriatrics & Palliative Medicine Grand Rounds, New York, NY, February 11, 201.5

63. "Firearm Injuries", Community Memorial Hospital Medical Staff Education Program, Menomonee Falls, WI, January 16, 2015.

64. "Firearm Injuries", Institute of Medicine Forum on Violence, Washington, DC, December 17, 2014

65. "Global Health Managing Traveler Safety" Midwest Universities for Global Health Inaugural Meeting, University of Illinois at Chicago Center for Global Health, December 3, 2014

66. "Global Health and Medical Education: The Ethics of Short-term International Electives" Advancing Global Health: Education, Building, and Support, Albert Einstein College of Medicine, Bronx, New York, November 10, 2014

67. "Strengthening Emergency Care in Belize" 33rd Belize Medical and Dental Association International Congress, Belize City, Belize, October 31, 2014

68. "Triage Use and Implementation" 33rd Belize Medical and Dental Association International Congress, Belize City, Belize, October 31, 2014

69. "The Science of Injury Prevention and Control" University of Zagreb School of Medicine, Zagreb, Croatia, September 9, 2014

70. "Challenges and Opportunities in Academic Medicine: Collaborating for Global Health", University of Rzeszow Jubilee of Medical Faculty, Rzeszow, Poland, September 5, 2014

71. "Burden of Global Violence/Injury" for the 2014 World Affairs Seminar, Carroll University, Waukesha, Wisconsin, June 23, 2014

72. "Practical advice for implementing useful global health curricula and effective academic programs" USAID The Future of Global Health: Building Better Professionals & Programs, Washington DC, May 9, 2014

73. "Global Health and Partnerships" Shanghai Minhang Central Hospital, Shanghai, China, April 25, 2014

74. "Organizing Injury prevention and control programs" 2014 China- US-Japan Summit Forum of Emergency Medicine, Xinhua Hospital, Shanghai, China, April 25, 2014

75. "Technical Consultation for United Nations Office for Disarmament Affairs", Research and Information Gathering Participant, UN Headquarters, New York, NY, November 19, 2013.

76. "Gun Violence as a Public Health Issue", Tuesday Speaker for Milwaukee Rotary Club, War Memorial, Milwaukee, WI, October 29, 2013

- 19 -
Stephen W. Hargarten, MD, MPH

77. "Transportation Safety and Injury Prevention," Keynote Speaker for Midwest Conference of Institute of Transportation Engineers, Pfister Hotel, Milwaukee, WI, June 27, 2013.

78. "Patient Safety or Injury Control: Two Worlds or One?", Patient Safety Summit, Johns Hopkins, Baltimore, MD, June 21, 2013

79. "Gun-Related Violence", Guest Speaker for Milwaukee Forum, Haggerty Museum, Milwaukee, WI, January 17, 2013.

80. "Gun Policy Summit". Expert Panel Participant, Johns Hopkins University, Baltimore, MD, January 14-15, 2013.

81. "Emergency Medicine: Going Global", Guest Speaker for Klippel Lecture, Washington University School of Medicine, St. Louis, MO, December 4, 2012.

82. "Global Burden of Injury", Introduction to Public Health: Global Health, Carroll University, Waukesha, WI, November 30, 2012, April 20, 2012, November 11, 2011

83. "Gun Violence: The Strengths and Limits of the Disease Model", Guns in America: Conflicting Points of View, University of Wisconsin, Madison, WI, November 1, 2012.

84. "Increasing Utilization of NVDRS Data", National Violent Death Reporting System Reverse Site Visit, Atlanta, GA, September 13, 2011.

85. "Researching Car Crashes and Gun Shot Wounds: Products, Problems, Policies," and "Opportunities in Injury Research: Getting Started and Connecting the Dots", Visiting Lecturer for the University of Alberta, Canada, June, 2011.

86. "Congressional Briefing".  Expert Testimony, Association for Safe International Road Travel and the U.S. Congressional Caucus on Global Road Safety, United Nations Decade of Action for Road Safety 2011-2020 United Nations, Washington, DC, May 11, 2011.

87. "The Team Approach to Caring for Acutely Injured Patients", Jao Tong University, Xinhua Hospital, Shanghai, China, November 9, 2010.

88. "Trauma Evaluation and Management, TEAM" for 29th Belize Medical and Dental Association International Pre-Congress, Belize City, Belize, October 20, 2010.

89. "The Emergency Department and Systems Approach to Emergency Medicine" for 29th Belize Medical and Dental Association International Pre-Congress, Belize City, Belize, October 19, 2010.

90. "The Public Health Approach to Violence Prevention in Health Care Settings" for International Association for Healthcare Security and Safety Conference, Baltimore, MD, June 22, 2009.

91. "Epidemiology of Travel-Related Injury & Death" for 11th Conference of the International Society of Travel Medicine, Budapest, Hungary, May 26, 2009.

92. "Reducing Firearm Injuries and Death: A Public Health Approach" for Trauma Conference, Kent State University, Canton, OH, November 7, 2008.

93. "Guns and Cars: A Tale of Product Design Flaws Linked with Death & Injury" for Trauma Conference Kent State University, Canton, OH, November 7, 2008.

94. "Gun Violence" for Grand Rounds, Mount Sinai Hospital, Milwaukee, WI, October 17, 2008.

**JA1583**

- 20 -
Stephen W. Hargarten, MD, MPH

95. "Town Hall Meeting – Status of Impaired Driving in Wisconsin" for MADD, NHTSA, DOT in Middleton, WI, August 14, 2008.

96. "Guns and Cars: Stories for preventing car and gun related deaths" for Grand Rounds, Columbia-St. Mary's, Milwaukee, WI, June 13, 2008.

97. "Panel on Urban Studies Programs" for 2nd Annual Henry W. Maier State of Milwaukee Summit, Milwaukee, WI, April 30, 2008.

98. "The Public Health Approach to Reduce Alcohol Related Injury and Death" Noon Conference for Gundersen Lutheran Trauma & Emergency Center, LaCrosse, WI, November 1, 2007

99. "From the Bedside to the Community and Beyond: The Physician's Role in Injury Prevention and Control", Grand Rounds, Philadelphia, PA, October 23, 2007.

100. "Public Health Approach to Reducing the Burden of Suicide" Grand Rounds for Psychiatry, St. Joseph's Outpatient Conference Center, Milwaukee, WI, June 20, 2007.

101. "Violence is a Disease", 2007 Global Health and Social Justice Conference, University of Wisconsin-Milwaukee College of Nursing, Milwaukee, WI, March 29, 2007.

102. "Burden of Injury in Wisconsin: Spelling It Out", Injury Summit, Holiday Inn, Neenah, WI, October 25, 2006.

103. "Injury Policy Forum", EMSC Policy Forum, Monona Terrace, Madison, WI, March 21, 2006.

104. "To Be or Not to Be: Case Studies in Injury Control and Advocacy", Seminar on Gun Violence, University of Wisconsin, Population Health Institute, Madison, WI, December, 2005.

105. "Emergency Medicine Leadership", Yale University, Section of Emergency Medicine, April 2005

106. "Emergency Medicine Leadership," Brown University, Department of Emergency Medicine, March 2005

107. "Emergency Medicine Leadership", University of Alabama-Birmingham, Department of Emergency Medicine, November 2002

108. "Medical Examiner and Coroner Data for Public Health: A Model Linked System", Institute of Medicine Workshop on the Medicolegal Death Investigation System, Washington, DC, March 23-25, 2003.

109. "The National Violent Death Reporting System: It's About Time We're Connecting-the-Dots for Injury Prevention", University of North Carolina Injury Prevention Research Center Seminar, Chapel Hill, NC, March 17-19, 2003.

110. "Emergency Medicine Leadership in the 21st Century: Guns and Cars, Acute Care, and Injury Prevention", University of North Carolina Injury Prevention Research Center Seminar, Chapel Hill, NC, March 17-19, 2003.

111. "Medical Injury", Grand Rounds at the University of Western Ontario, Ontario, Canada, January 24, 2003.

112. "Planning for a State Violent Death Reporting System", National Violent Death Reporting System Implementation Training, Atlanta, Georgia, January 16-17, 2003.

113. "Advocacy in Emergency Medicine", Grand Rounds at the University of Alabama Birmingham, Birmingham, A., November 20, 2002.

114. "Causes of Gun Crime", American Society of Criminology Conference, Chicago, IL, November 12, 2002.

**JA1584**

- 21 -

Stephen W. Hargarten, MD, MPH

115. "Nonfatal Gun Injuries – What We Know, Don't Know and Need to Know", The 7th HELP Network Conference, Chicago, IL, October 27, 2002.

116. "Youths and Guns", Gun Violence Workshop, The National Academies National Research Council Institute of Medicine, Washington, D.C., September 16, 2002.

117. "Injury Prevention: Creating an Agenda for Action", Springfield, Illinois, July 31, 2002.

118. "The Public Health Approach to reducing firearm related deaths", Coalition Against Gun Violence, Cleveland, Ohio, June 6, 2002.

119. "The Physician Scientist as Advocate", The Spivey Lecture, Society for Academic Emergency Medicine Annual Meeting, St. Louis, MO, May 16, 2002.

120. "Firearm suicides: A two-state comparison", 6th World Conference on Injury Prevention and Control, Montreal, Quebec, Canada, May 12-15, 2002.

121. "Travel related injury prevention for students", NAFSA Conference, University of Wisconsin Milwaukee, Milwaukee, WI, April 18, 2002.

122. "Suicide among Wisconsin farmers", American Association of Suicidology, 35th Annual Conference, Bethesda, MD, April 10-13, 2002.

123. "The relationship between health providers and law enforcement: Information sharing and lessons learned in the Firearm Injury Reporting System", 30th Annual Conference on Value Inquiry – Values in Health Care: Past, Present and Future, Milwaukee, WI, April 4-6, 2002.

124. "The Public Health Approach to Reducing Firearm Injuries", 13th Annual Trauma Symposium for Coastal Area Health Education Center, Wilmington, NC, February 9, 2002.

125. "Emergency Medicine and Advocacy", Department of Emergency Medicine Grand Rounds at Johns Hopkins School of Medicine, Baltimore, MD, January 31, 2002.

126. "Gun Violence and Gun Policy Conference", Brookings Institute, Washington, D.C., January 25, 2002.

127. "Emergency Medicine Advocacy:  A Model Discussion", Northwestern University, Department of Emergency Medicine, December 2001.

128. "Emergency Medicine Advocacy", Northwestern University, Chicago, Illinois, December 19, 2001.

129. "Firearm suicide in Wisconsin 1999: Urban/rural and age-related patterns", Mobilizing for a Safe USA, Atlanta, GA, December 3-5, 2001.

130. "Improve Research Information and Data on Firearms", National Academy of Science Committee, 2nd Meeting, Irvine, CA, November 15, 2001.

131. "The Public Health Approach to Reducing Firearm Injuries", AMA Key Stakeholders Meeting, Oak Brook, IL, November, 2001.

132. "Linking the gun with homicides and suicides: A model analysis of the who, when, and where of the gun's first purchase", American Society of Criminology, Atlanta, GA, November 6-10, 2001.

133. "Firearm Injury Data Systems", AMA Science Reporters Conference, San Francisco, California, October 30, 2001.

**JA1585**

- 22 -

Stephen W. Hargarten, MD, MPH

134. "Firearm suicide: The Wisconsin experience, 1999", American Public Health Association, 129th Annual Meeting, Atlanta, Georgia, October 20-24, 2001.

135. "Relationship of household gun ownership to firearm suicide rates in Wisconsin communities", American Public Health Association, 129th Annual Meeting, Atlanta, Georgia, October 20-24, 2001.

136. "Firearm Homicide in Milwaukee and the Progress of the Firearm Injury Reporting System", The Milwaukee Fire and Police Commission, Milwaukee, Wisconsin, October 18, 2001.

137. "Identification and Classification of Homicide in Wisconsin 2000: A Comparison of Two Data Systems", Medical College of Wisconsin 2001 Student Research Forum, Milwaukee, Wisconsin, October 4, 2001.

138. "Demonstrating the Linkage of Data Sets from the Firearm Injury Center and the City of Milwaukee Using Geographic Information System Analysis" Medical College of Wisconsin 2001 Student Research Forum, Milwaukee, Wisconsin, October 4, 2001.

139. "The Public Health Challenge and the Model Firearm Injury Reporting System", Plenary Presentation, Aiming for Prevention: International Medical Conference on Small Arms, Helsinki, Finland, September 28-30, 2001.

140. "Highlights of the Firearm Injury Reporting System's first statewide report: Investigating regional differences", 13th Annual Milwaukee County Medical Examiners Office Forensic Science Seminar, Milwaukee, Wisconsin, September, 2001.

141. "What We Don't Know is Killing Us: The Need for Better Data about Firearm Injuries and Deaths", National Academy of Sciences Committee on Law and Justice, Washington, DC, August 30, 2001.

142. "Injury Control of Gun Shot Wounds", Advances in Trauma, American College of Surgeons, Kansas City, Missouri, December 8, 2000.

143. "Trauma Care in the State of Wisconsin", 2000 Annual Meeting of the Wisconsin Chapter of the American College of Surgeons, Waukesha, Wisconsin, December 2, 2000.

144. "Travel Health:  Clinical Issues for Occupational and Environmental Health Providers", American Occupational Health Conference, American College of Occupational and Environmental Medicine, Philadelphia, Pennsylvania, May 18, 2000.

145. "To Be or Not to Be a Physician Scientist Advocate:  That is the Question", Emergency Medicine Spring Research Forum, University of Michigan, Ann Arbor, May 2000.

146. "US Citizen Deaths Abroad:  What we know, don't know, and need to know to prevent them", Occupational Health Conference, Philadelphia, Pennsylvania, May 14, 2000.

147. "Firearms:  The Need for Better Information and Safer Guns", Commission for the Prevention of Youth Violence, American Medical Association, Houston Texas, May 9, 2000.

148. "Understanding State-of-the-Art Treatment & Prevention of Firearm Injuries", National Conference for Health Care Professionals, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, December 10-11, 1999.

149. "Better Data, Safer Guns Equals Fewer Injuries", Gun Violence Forum, Entertainment Industries Council, Los Angeles, California, November 3-4, 1999.

150. "Bridging the Gap between Information and Policy: A Public Health Approach to Reducing Firearm Injuries", Conference of Wisconsin Network for Health Policy Research, University of Wisconsin School of Medicine, Madison, WI, November 4-5, 1999.

- 23 -

Stephen W. Hargarten, MD, MPH

151. "Counting Firearm-related Deaths: A case study for better surveillance and knowledge through data linkage," Emergency Medicine New England Conference, Newport, Rhode Island, August 11-13, 1999.

152. "Guns, Cars & Death: A View from a Room," Department of Emergency Medicine and Division of Traumatology and Surgical Critical Care Grand Rounds, University of Pennsylvania Medical Center, Philadelphia, PA, July 9, 1999.

153. "The Scientist as Policy Advocate: Clarifying the Issues and Framing the Data for Effective Policy Development and Debate," 1999 Society for Academic Emergency Medicine Annual Meeting, Boston, MA, May 23, 1999.

154. "Firearm Injury Surveillance", The 5th Annual Citizens' Conference to Stop Gun Violence, The Educational Fund to End Handgun Violence, Washington DC, November 13-14, 1998.

155. "Public Health Strategies to Address Family Violence", National Advisory Council on Family Violence, Rosemont, IL, April 4, 1998.

156. "Rapid Deceleration Injuries Involving Recreational Vehicles", Flight for Life's Annual Emergency Services Conference: Trends and Issues 1998, Flight for Life, Milwaukee, WI, April 4, 1998.

157. "Rapid Deceleration Injuries Involving Recreational Vehicles", Flight for Life's Annual Emergency Services Conference: Trends and Issues 1998, Flight for Life, Milwaukee, WI, March 31, 1998.

158. "Taking Aim at Cars and Guns", Skills Fair 1998, Shared Governance Development Council, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, March 26, 1998.

159. "Preventing Firearm Injury: Protecting Our Children", Firearm Injury Prevention Training Conference, American Academy of Pediatrics, Chicago, IL, March 14-15, 1998.

160. "Scope and Nature of Firearm Injury Research: Issues and Challenges" Injury Prevention Research Center, The University of Iowa, Iowa City, IO, February 1998.

161. "Mechanism of Injury", Flight for Life's Trauma Nurse Specialist Course, Flight for Life, Milwaukee, WI, February 4, 1998.

162. "Scope and Nature of Firearm Injury Research: Issues and Challenges", University of Iowa Injury Prevention Research Center, Iowa City, IO, February 3, 1998.

163. "Adult Option of the Master's Program in Nursing" Medical College of Wisconsin, Fall Semester, Marquette University College of Nursing, Milwaukee, WI, August 24 - December 6, 1997.

164. National HELP Conference -Tracking the Firearm Epidemic National Conference, Washington DC, April 1997.

165. Lafollette Institute-Public Health Model for Reducing Firearm Injuries and Deaths, Madison, WI, April 1997.

166. "Futures in Emergency Medicine Research Conference, Macy Foundation, Washington D.C., March 1997 (invited as representing the Association of Academic Chairs in Emergency Medicine)

167. "Emergency/Trauma Medicine."  Sheboygan Memorial Medical Center, Knights of Columbus Center, Sheboygan, WI, February 18, 1997.

168. "Firearm Injury Prevention: A Model Strategy."  Medical College of Wisconsin, Winter Refresher Course for Family Physicians, Pfister Hotel, Milwaukee, WI, January 30, 1997.

169. The Johns Hopkins School of Public Health and Hygiene, Gun Policy and Research Center, Baltimore, MD December 3-6, 1996.

- 24 -
Stephen W. Hargarten, MD, MPH

170. "The Nature and Scope of Firearm Injury Research: Issues and Challenges." Visiting Professor, The Johns Hopkins School of Public Health and Hygiene, Gun Policy and Research Center, Baltimore, MD, December 3-6, 1996.

171. "The Milwaukee County Firearm Injury Reporting System." Healthy People, National Health Promotion and Disease Prevention Objectives, Violent and Abusive Behavior - 1996 Progress Review, Washington, DC, November 26, 1996.

172. "Violence Prevention." Tenth Annual Summer Trauma Symposium. Paper Valley Hotel & Conference Center, Appleton, WI, June 1996.

173. "Teenage Violence." Tenth Annual Summer Trauma Symposium. Paper Valley Hotel & Conference Center, Appleton, WI, June 1996.

174. Injury Prevention and Control for Emergency Medicine, Department of Emergency Medicine, University of Pittsburgh Medical Center, Pittsburgh, PA, May 1996.

175. "Firearm Injury Surveillance System." 1996 Attorney General's Law Enforcement Conference, Stevens Point, WI, May 1996.

176. "The Milwaukee County Firearm Injury Reporting System." Visiting Professor, Department of Emergency Medicine, University of Pittsburgh Medical Center, Pittsburgh, PA, May 1996.

177. "Tracking the Epidemic." Third Annual HELP Network Conference: Promoting Public Policy for the Public's Health, guest lecturer, Washington, DC, November 1995.

178. "Injury and Violence Prevention: Confronting the Crisis." 69th National School Health Conference of the American School Health Association, Milwaukee, WI, October 1995.

179. "Guns and Violence: The Tragic Cost." National Violence Prevention Conference, University of Iowa, Des Moines, IA, October 1995.

180. "Monitoring Firearm Injuries." National Violence Prevention Conference, University of Iowa, Des Moines, IA, October 1995.

181. "Rural Trauma/Rural Violence." Day of Country Medicine Conference, Howard Young Medical Center, Minocqua, WI, September 1995.

182. "Firearm Violence and Gun Control in America." Panel participant at the Wisconsin Surgical Society meeting, Lake Geneva, WI, September 1995.

183. "Milwaukee County Firearm Injury Reporting System: A Model for Injury Prevention." State of Wisconsin, Department of Health and Social Services, Milwaukee Managed Care Forum, Milwaukee, WI, August 1995.

184. "Firearm Injury Prevention for Primary Care Physicians." Family Practice Grand Rounds, Waukesha Memorial Hospital, August 1995.

185. "Strategies to Reduce Firearm Deaths." Wisconsin Council of Administrators of Special Services, Ltd., Madison, WI, May 1995.

186. "Violence Prevention." State Medical Society of Wisconsin Alliance, 66th Annual Convention, Milwaukee, WI, April 1995.

- 25 -
Stephen W. Hargarten, MD, MPH

187. "Emergency Medicine Research: A View from the Riverbank." Faculty Development Seminar Series, University of Illinois at Chicago, Department of Emergency Medicine, Chicago, IL, March 1995.

188. "Committee on Transportation and Infrastructure Subcommittee on Surface Transportation." Advocates for Highway and Auto Safety, Washington, DC, March 1995.

189. "Firearm Injuries and Deaths." Department of Psychiatry, University of Wisconsin - Madison Medical School, Milwaukee Campus, WI, March 1995.

190. "Firearms, Violence and Prevention." Public Issues Committee, Family Service of Milwaukee, Milwaukee, WI, March 1995.

191. "Injury Control." Grand rounds, Department of Emergency Medicine, William Beaumont Hospital, Department of Emergency Medicine, Royal Oak, MI, March 1995.

192. "Understanding How to Access Health Care Delivery Systems II Conference." Milwaukee Regional Medical Complex, Milwaukee, WI, March 1995.

193. "Proposal to Establish a Reporting System for Firearm Injuries." Public Issues Consortium, 12th Annual Legislative Breakfast, Milwaukee, WI, January 1995.

194. "Firearm Violence: A Public Health Issue." Marquette University College of Nursing, Milwaukee, WI, January 1995.

195. "Handgun Violence as a Public Health Problem in our Community." Social Development Commission, November 1994.

196. "Integrated Firearm Injury Reporting System: A Model for Communities." Second Annual HELP Conference, Chicago, IL, October 1994.

197. "Violence and Firearms: Reshaping the Discussion and Restructuring the Prevention Strategies." Forum on Youth Violence Conference, Wisconsin AODA Education Network, Stevens Point, WI, October 1994.

198. "Injury Control and Emergency Medicine." American College of Emergency Physicians Scientific Assembly, Orlando, Florida, September 1994.

199. "Trauma Systems." American College of Emergency Physicians Scientific Assembly, Orlando, Florida, September 1994.

200. "Firearm Injury and Death Problems in the United States, Wisconsin, and Milwaukee." Wisconsin Coroners & Medical Examiners Association, Oshkosh, WI, June 1994.

201. "Firearm Injuries and Deaths: Reshaping the Discussion." Department of Emergency Medicine, University of Missouri-Kansas City School of Medicine, Kansas City, MO, June 1994.

202. "Injury Prevention and Control and Emergency Medicine." Department of Emergency Medicine, University of Missouri-Kansas City School of Medicine, Kansas City, MO, June 1994.

203. "The Science of Injury Prevention: A Framework for Violence Prevention." The University of Wisconsin - Milwaukee, School of Nursing, Continuing Education and Outreach Program, Milwaukee, WI, March 1994.

204. "Firearm Injuries and Deaths: Reshaping the Discussion." Columbia Hospital Grand Rounds, Milwaukee, WI, February 1994.

205. "Injury Patterns of Motor Vehicle Crashes." Wisconsin EMT Association Annual Conference, Milwaukee, WI, January 1994.

**JA1589**

- 26 -
Stephen W. Hargarten, MD, MPH

206. "Firearm Injuries and Deaths: Reshaping the Discussion."  Milwaukee Forum, Milwaukee, WI, November 1993.

207. "Alcohol and Medicine: An Emergency Medicine Perspective."  Association of American Medical Colleges, Washington, DC, November 1993.

208. "Handguns:  Taking Aim at the Problem."  Emergency Nurses Association Annual Meeting, LaCrosse, WI, September 1993.

209. "Violence and the Elderly."  Wisconsin Chapter American College of Emergency Physicians Annual Conference, LaCrosse, WI, September 1993.

210. "Advocacy in Public Health Workshop."  Wisconsin Public Health Association Annual Conference, Appleton, WI, June 1993.

211. "State of the Art Session on Injury Control."  Society for Academic Emergency Medicine, San Francisco, CA, May 1993.

212. "Injury Prevention: A Crucial Aspect of Travel Medicine."  Third Biennial International Travel Medicine Society Meeting.  Paris, France, April 26, 1993.

213. "Firearms Deaths and Injuries."  Emergency Nurses Association - Milwaukee Chapter, Milwaukee, WI, January 1993.

214. "Facial Injuries: Epidemiology, Acute Care, and Prevention."  Wisconsin Emergency Medical Technician Association Annual Meeting, Milwaukee, WI, January 1993.

215. "Boating Injuries and Deaths: Challenges for Emergency Medical Services."  American Trauma Society - Wisconsin Division, Stevens Point, WI, December 1992.

216. "Firearm Injuries: Public Policy Issues, Data Sources for Firearms Injuries."  American Public Health Association, Washington, DC, November 1992.

217. "Data Sources for Firearms Injuries: Problems and Opportunities."  Milwaukee Academy of Medicine, Milwaukee, WI, November 1992.

218. "EMTs and Injury Prevention: It's in our job description."  American Trauma Society - Wisconsin Division, Milwaukee, WI, December 1991.

219. "Firearms and Children."  Wisconsin Nurse Practitioners Conference, Madison, WI, November 1991.

220. "Drownings:  Acute care and prevention."  American Red Cross - Milwaukee Chapter, Milwaukee, WI, January 1991.

221. "Fire-safe cigarettes."  Illinois Public Health Association, Chicago, IL, May 1990.

222. "Travel-related mortality."  Travel Medicine Update Conference, Seattle, WA, May 1990.

223. "Travel-related illness - Where have you been lately?"  Wisconsin Chapter, American College of Emergency Physicians, October 12, 1989.

224. "Travel-related mortality."  Travel Medicine Conference, Seattle, WA, May 1988.

225. "Motor Vehicle Crashes and Seat Belts."  Beloit Memorial Hospital, May 1987.

**JA1590**

- 27 -
Stephen W. Hargarten, MD, MPH

Exhibits:

    1.       Producer:  Photograph Exhibit - "Portraits of the Silent Epidemic" - Head Injury in Wisconsin, 1988.

Medical College Committees:

    Chair, Global Health Advisory Council, 2014-2019

    Chair, Milwaukee Regional Medical Center Strategic Planning for Global Health, 2014- 2015

    Chair, Global Health Department Liaisons, 2011- present

    Board Member, Medical College Physicians, 2000- 2017

    MCP Finance Committee, 2005-2007

    Froedtert Credential Committee, 2005-2007

    Chair, Global Health Program Advisory Council, 2010-2011

    Member Department of Medicine Search Committee, Medical College of Wisconsin, 2000

    Froedtert & Medical College Joint Management Cabinet, 1997-2000

    Faculty Career Development Advisory Committee, Medical College of Wisconsin, 1998 - 2003

    Chair, Ad Hoc Committee for M3/M4 Curriculum, 1998

    Intramural Review Committee, Department of Medicine, Medical College of Wisconsin, 1999

    Intramural Review Committee, Department of Family Medicine, Medical College of Wisconsin, 1997

    Clinical Practice Group Committee, Medical College of Wisconsin, 1995 - 2000

    Curriculum and Evaluation Committee, Medical College of Wisconsin, 1998 – 2000

    Executive Committee of the Faculty, Medical College of Wisconsin, 1994 – present

    Nominating Committee - Medical College of Wisconsin, 1992 – 1995

Medical College Teaching:

1.    MCW Faculty's Efforts in Low- and Middle-Income Countries" PhD in Public and Community Health Seminar, January 10, 2018

2.    "MCW's Impact on the World: From Milwaukee, Wisconsin to Around the Globe", Asthma/Allergy, and Clinical Immunology Grand Rounds, Children's Hospital of Wisconsin, September 22, 2017

**JA1591**

- 28 -

Stephen W. Hargarten, MD, MPH

3. "Global Health Electives: What to Consider with International Travel Health and Wellness" Global Health Elective Preparation, September 12, 2017

4. "MCW's Global Health Efforts and Opportunities for Pharmacy" School of Pharmacy, January 16, 2017

5. "Global Health Impact" Department of Pediatrics Division of Adolescent Medicine, January 20, 2017

6. "Local/Global Lens: Exploring the Impact of Medical Training Experiences in Low-Resource Settings" Pediatrics Grand Rounds, December 2, 2016

7. "The State of MCW Global Health and Opportunities for Neurosurgery" Neurosurgery Grand Rounds, December 2, 2016

8. "Global and Local Global Health" Neurology Grand Rounds, December 2, 2016

9. "Developing a Medical Elective in Nicaragua" Orthopedic Grand Rounds, November 30, 2016

10. "Global Health at MCW" Faculty Council Meeting, October 21, 2015

11. "Supporting Faculty's Global Health Efforts" Administrators Monthly Meeting, September 3, 2015

12. "Minimizing GME Global Health Rotation Risk" Graduate Medical Education Committee, April 20, 2015

13. "Injury Prevention and Management in Resource Limited Settings" Pediatrics Noon Conference, February 18, 2015

14. "Insight and Direction Global Health Nursing", Froedtert Global Health Nursing Committee, November 26, 2014

15. "Global Health Definitions, Implications", Physical Medicine and Rehabilitation Grand Rounds, December 5, 2014

16. "Establishing Partnerships to Promote Global Health" PhD in Public and Community Health Global Health Seminar, September 29, 2014

17. "Promoting Diversity and Inclusion with Global Health Efforts" Diversity and Inclusion Committee, January 28, 2014

18. "Growing a campus-wide Global Health Effort" Froedtert Hospital Operations Committee, Milwaukee, Wisconsin, January 22, 2014

19. "Growing a campus-wide Global Health Effort" Children's Hospital and Health System Leadership, Milwaukee, Wisconsin December 10, 2013

20. "Global Health Program and Faculty Partnerships" Women's Faculty Council, November 25, 2013

21. "Growing Global Health Opportunities" Neurology Faculty Meeting, October 10, 2013

22. "M4 Global Health Electives for MCW Students" Global Health Pathway Core Curriculum, April 25, 2013

23. "Move toward global health care, what new skills or knowledge will the physicians of the future need to master" Docere Panel, January 8, 2013

24. "Partnering with Faculty to Grow Global Health" Department of Ophthalmology, November 25, 2012

**JA1592**

- 29 -

Stephen W. Hargarten, MD, MPH

25.    "Global Burden of Injury," The Clinical and Translational Science Institute Seminar, September 20, 2012

26.    "Ethical Considerations of Defining Global Health" Bioethics Summer Course Poverty, Justice and Global Health, June 6, 2012

27.    "MCW's Global Health Program: An Exciting New Development" Pediatric Surgery Grand Rounds, May 4, 2012

28.    "Grand Rounds in Injury for the Master Clinician Pathway" M1, M2 & M3 students, Medical College of Wisconsin, March 29, 2012.

29.    "What is the Definition of Global Health" PhD in Public and Community Health Seminar Series, February 14, 2012

30.    "Global Burden of Injury," Global Health Pathway Program, January 5, 2012

31.    "Injury Prevention and Management in Resource Limited Settings" Pediatrics Noon Conference, November 30, 2011

32.    "Growing MCW's Global Health Program and Opportunities to Engage" Medical College of Wisconsin Global Health Organization, Student Interest Group, November 28, 2011

33.    "Faculty's Global Health Efforts" Global Health Pathway Program, May 13, 2019. "Wound Ballistics", Emergency Medicine Grand Rounds, Medical College of Wisconsin and Froedtert Hospital, March 10, 2011.

34.    Health Policy and Physician Advocacy" M4 Selective, Family Medicine, Medical College of Wisconsin, February 8, 2011

35.    "Alcohol and and Youth: Big Problem with a Hospital Based Intervention", Pediatric Trauma Grand Rounds, Children's Hospital and Health System, May 12, 2010

36.    "Reducing the Public Health Burden of Suicide: A View from the Room" for Department of Psychiatry and Behavioral Medicine Grand Rounds, Wheaton Franciscan Healthcare, Wauwatosa, WI, March 18, 2009

37.    "Alcohol Related Illness in the ED", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, December, 2008

38.    "Department Administrator Update", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, October, 2008

39.    "Firearm Related Injury: Myths, Physiology & Epidemiology", Pediatric Trauma Grand Rounds, Children's Hospital of Wisconsin, December 4, 2007

40.    "Gunshot Wounds: An Integrated Approach to a Biosocial Disease", Integrated Grand Rounds, Medical College of Wisconsin, November 2, 2007

41.    "Wound Ballistics", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July, 2008

42.    "Injury Prevention", Emergency Medicine Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July 5, 2007

43.    "Emergency Medicine Update", Grand Rounds Lecture, Medical College of Wisconsin and Froedtert Hospital, July 13, 2006

**JA1593**

- 30 -
Stephen W. Hargarten, MD, MPH

44.    "Firearm suicide: The Wisconsin experience 2000", 10th Annual Emergency Medicine Research Forum, Medical College of Wisconsin, April 16, 2002

45.    "Comprehensive Injury Center at MCW", EPI Seminar Series, Medical College of Wisconsin, October 18, 2001

46.    "Advanced Trauma Life Support", Instructor, Medical College of Wisconsin and Froedtert Hospital, June 21, 2000

47.    "Acute Trauma Care & Prevention", AIM Program, Medical College of Wisconsin, Milwaukee, WI, August, 1996, 1997, 1998, 1999

48.    "Epidemiology of Unintentional and Intentional Injuries", Course Director, Medical Student Lecture, Medical College of Wisconsin Graduate School, Milwaukee, WI, February-April 1998

49.    "Bags, Belts, and Bruises", Emergency Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, February 13, 1997

50.    "Mechanism of Injury", Trauma Nurse Specialist Course, Flight for Life, Milwaukee Regional Medical Center, Milwaukee, WI, January 29, 1997

51.    "Firearm Injuries and Deaths," Department of Epidemiology, medical student lecture, Medical College of Wisconsin, Milwaukee, WI, 1995, 1996, 1997, 1998, 1999

52.    "Firearm Injury Epidemiology," Epidemiology seminar of the Health Policy Institute, Medical College of Wisconsin, Milwaukee, WI, September 1996

53.    "Propeller Injuries," Flight for Life Lecture, Medical College of Wisconsin, Milwaukee, WI, March 1996

54.    "Mechanisms of Injury", Trauma Nurse Specialist Course.  Flight for Life, Milwaukee Regional Medical Center, Milwaukee, WI, February 1996

55.    "Scope and Nature of the Firearm Injury and Death Problem", Fourth Annual Firearms Seminar, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, January 1996

56.    "Violence as a Public Health Issue," First Annual Forum - The Changing Urban Health Care Environment: Ethical Implications, Sponsored by the Center for Ethics Studies, Marquette University, and the Center for the Study of Bioethics at the Medical College of Wisconsin, November 1995

57.    "Issues & Challenges of Gunshot Wound Research",  J. (Deke) Farrington, MD, Trauma Visiting Professorship presented by the Section of Trauma & Emergency Surgery of the Medical College of Wisconsin, the American Trauma Society (Wisconsin Division), ACS Wisconsin Committee on Trauma, and Flight for Life, Milwaukee, WI, November 1995

58.    "Firearm Injuries and Deaths: Epidemiology and Prevention", Pathology lecture to medical students.  Medical College of Wisconsin, Milwaukee, WI, November 1995

59.    "Patterns of Injury and Opportunities for Prevention."  Milwaukee Regional Medical Complex, Flight for Life, Milwaukee, WI, March 1995

60.    "Trauma Systems: Where Does Emergency Medicine Fit In?", Emergency Medicine Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, December 1994

61.    "Wound Management."  Medical Student Lecture/Workshop, Medical College of Wisconsin, Milwaukee, WI, December 1994, 1995, 1996, 1997, 1998, 1999

- 31 -
Stephen W. Hargarten, MD, MPH

62.  "Trauma Systems: Who, What, Where?", Surgery Grand Rounds, Medical College of Wisconsin, Milwaukee, WI, November 1994

63.  "Firearm Injury and Death Problems in the United States, Wisconsin, and Milwaukee," Medical College of Wisconsin (Firearms Seminar) January 1994

64.  "Injury Prevention."  Department of Pediatrics Research Seminar Series, Medical College of Wisconsin, Milwaukee, WI, January 1994

65.  POMP Students, 1992 – 1994

66.  Biostatistics & Epidemiology Course, First Year Medical Students at the Medical College of Wisconsin, March 1993

67.  Introduction to Clinical Medicine Lecture, Junior Medical Students, July 1993

68.  Advanced Trauma Life Support Instructor/Shock Lecture, Medical College of Wisconsin, June 1993

69.  Advanced Cardiac Life Support Instructor/Airway Management, Dysrhythmia Recognition, Medical College of Wisconsin, June 1993

70.  Biostatistics Course Lecturer, Freshman Students, March 1993

71.  "Alcohol and Health: Emergency Medicine View from the Bottom of the Bottle."  Medical College of Wisconsin Emergency Medicine Grand Rounds, Milwaukee, WI, December 7, 1993

72.  "The Epidemiology of Firearm Deaths and Injuries."  Surgery Grand Rounds, Froedtert Memorial Lutheran Hospital, Milwaukee, WI, July 1993

73.  "Firearm Deaths and Injuries: Lessons from the 1960s and the Corvair."  Health Policy Institute Seminar, Medical College of Wisconsin Alumni Center, Milwaukee, WI, June 10, 1993

74.  "Mechanisms of Injury", Trauma Nurse Specialist Course: Flight for Life, Milwaukee, WI, March 1993

75.  "Firearms and Children", Children's Hospital of Wisconsin Grand Rounds, Milwaukee, WI, July 1992

76.  Introduction to Advanced Cardiac, Life Support, Junior Students, July 1992

77.  Wound Management Course, Junior Students, 1991 – present

78.  Basic Trauma Life Support Course Director, 1989 1990, 1991, 1991

BIBLIOGRAPHY

Original Papers:

1.  Schneider, R.J., Willman, J., & Hargarten, S. (2023) Linking Police and EMS Records: An Approach to Strengthen Bicyclist Injury Reporting. *Transportation Research Record*, 03611981221151073.

2.  Kohlbeck, S. A., Quinn, K., deRoon-Cassini, T., Hargarten, S., Nelson, D., & Cassidy, L. (2022, December 22). "I've Given Up": Biopsychosocial Factors Preceding Farmer Suicide in Wisconsin. American Journal of Orthopsychiatry. Advance online publication. https://dx.doi.org/10.1037/ort0000662

**JA1595**

- 32 -
Stephen W. Hargarten, MD, MPH

3.  Timmer-Murillo, S.C., Schroeder, M.E., Trevino, C., Geier, T., Schramm, A.T., Brandolino, A.M., Hargarten, S., Holena, D., deMoya, M., Milia, D., & deRoon-Cassini, T.A. (In Press). Comprehensive Framework of Firearm Violence Survivor Care: A Review. *JAMA Surg.*

4.  Girasek, D.C., Hargarten, S. (2022). Prevention of and Emergency Response to Drowning. *N Engl J Med* 2022;387:1303-8.

5.  Sakran, J.V., Hargarten. S., Rivara, F.P. (2022). Coordinating a National Approach to Violence Prevention. *JAMA*, Sept. 28, 2022 Volume 328, Number 12

6.  Ehrlich, P.F., Pulcini, C.D., De Souza, H.G. Hall, M., Andrews, A., Zima, B.T., Fein, J.A., Chaudhary, S., Hoffmann, J.A., Fleegler, E.W., Jeffires, K.N., Goyal, M.K., Hargarten, S., Alpern, E.R. (2022). Mental Healthcare Following Firearm and Motor Vehicle Related Injuries: Differences Impacting Our Treatment Strategies. *Ann Surg.* 2022 June 28. doi: 10.1097/SLA.0000000000005557. Online ahead of print.PMID: 35762587

7.  Wyler, B.A., Young, H. M., Hargarten, S.W., Cahill, J.D. (2022) Risk of deaths due to injuries in travellers: A systematic review. *J Travel Med* 29.5 (2022): taac074.

8.  Kohlbeck, S., Schramm, A., deRoon-Cassini, T., Hargarten, S., Quinn, K. (2022). Farmer Suicide in Wisconsin: A Qualitative Analysis. *Journal of Rural Health*. Summer 2022. Volume 38, Issue 3: 546-553.

9.  Barron, A., Hargarten, S., & Webb, T. (2021). Gun violence education in medical school: a call to action. *Teaching and learning in medicine* 34.3 (2022): 295-300.

10. Dunton, Z. R., Kohlbeck, S. A., Lasarev, M. R., Vear, C. R., & Hargarten, S. W. (2021). The association between repealing the 48-hour mandatory waiting period on handgun purchases and suicide rates in Wisconsin. *Archives of suicide research* 26.3 (2022): 1327-1335.

11. Kohlbeck, S., Levas, M., Hernandez-Meier, J., & Hargarten, S. (2021). Implementing the Cardiff Model for violence prevention: using the diffusion of innovation theory to understand facilitators and barriers to implementation. *Injury Prevention* 28.1 (2022): 49-53.

12. Dunton, Z., Hargarten, S., Kohlbeck, S., & Osman, F. (2021). Homicide: a leading cause of death for black non-hispanics in Wisconsin. *WMJ (Wisconsin medical journal)*, *120*(S1), S6-S9.

13. Kohlbeck, S., deRoon-Cassini, T., Levas, M., Hargarten, S., Kostelac, C., Totoratis, M., ... & Smith, J. (2021). Multidisciplinary data-sharing for community violence prevention: shifting power to the community. *Injury prevention* 27.Suppl 3 (2021): A4-A4.

14. Martin, I. B., & Hargarten, S. (2020). The antiracist, propatient pledge of emergency medicine. *Academic Emergency Medicine*, *27*(9), 932-933.

15. McDougall, S., Annapureddy, P., Madiraju, P., Fumo, N., & Hargarten, S. (2020, December). Predicting Opioid Overdose Readmission and Opioid Use Disorder with Machine Learning. In *2020 IEEE International Conference on Big Data (Big Data)* (pp. 4892-4901). IEEE.

16. Hargarten, S. W. (2020). The Bullets He Carried. *Western Journal of Emergency Medicine*, *21*(5), 1036.

17. Kohlbeck, S, Hargarten, S, Cassidy, L. (2020). Age- and Sex-Specific Risk Factors for Youth Suicide: A Mixed Methods Review. *WMJ* 119.3 (2020): 165-170.

18. Zosel, A., Kohlbeck, S., Davis, C. S., Meurer, L., & Hargarten, S. (2020). Medical student education for injury prevention: closing the gap. *Injury Prevention* 27.2 (2021): 201-205.

**JA1596**

- 33 -
Stephen W. Hargarten, MD, MPH

19. Kohlbeck, S, Fumo, N, <u>Hargarten, S</u>. (2020). Systems Change for Suicide Prevention Among Adolescents: A Rural Wisconsin County Approach. *Injury Prevention* 27.2 (2021): 131-136.

20. Bonk C, Weston B, Davis C, Barron A, McCarty O, <u>Hargarten S</u>. (2019). Saving Lives with Tourniquets: A Review of Penetrating Injury Medical Examiner Cases. *Prehospital Emergency Care:* DOI: <u>10.1080/10903127.2019.1676344</u>

21. Hernandez-Meier J, Akert B, Zheng C, Guse C, Layde P, <u>Hargarten S</u>. (2019). Status of Legal Firearm Possession and Violent Deaths: Methods and Protocol for a Retrospective Case-Control Study. *Injury Prevention* 25.Suppl 1 (2019): i49-i58.

22. <u>Hargarten SW</u>, Lerner EB, Gorelick M, Brasel K, deRoon-Cassini T, Kohlbeck S.  Gun Violence: A Biopsychosocial Disease. *Western Journal of Emergency Medicine: Integrating Emergency Care with Population Health*, 2018; 19(6), 1024-1027.

23. Levas M, Hernandez-Meier J, Kohlbeck S, Piotrowski N, <u>Hargarten S</u>. Integrating Population Health Data on Violence into the Emergency Department: A Feasibility and Implementation Study.  *Journal of Trauma Nursing*: May/June 2018 – Vol 25 – Issue 3/149-158

24. Rajan S, Branas CC, <u>Hargarten S</u>, Allegrante JP: Funding for Gun Violence Research Is Key to the Health and Safety of the Nation. *American Journal of Public Health*, Am J Public Health. 2018 Feb;108(2):194-195. doi: 10.2105/AJPH.2017.304235.  PMID: 29320291

25. <u>Hargarten, S</u>: Firearm Injury in the United States: Effective Management Must Address Biophysical and Biopsychosocial Factors. *Ann Intern Med*. 2016 Dec 20;165(12):882-883. doi: 10.7326/M16-2244. Epub 2016 Oct 18. PMID: 27750331

26. Bloemen EM, Rosen T, Schiroo JC, Clark S, Mulcare MR, Stern ME, Mysliwie R, Flomenbaum NE, Lachs MS, <u>Hargarten S</u>. Photographing injuries in the acute care setting: Development and evaluation of a standardized protocol for research, forensics, and clinical Practice. *Acad Emerg Med* May 2016; 23(5):653-9. Doi:10.1111/acem.12955. Epub 2016 Apr 13.

27. Rosen T, <u>Hargarten S</u>, Flomenbaum NE, Platts-Mills TF. Identifying elder abuse in the Emergency Department: Toward a multi-disciplinary team-based approach. *Ann Emerg Med*; 63(3):378-82; Sept 2016.

28. Guse CE, <u>Hargarten S</u>. Limitations of travel data for rate computations.  Injury Prevention: Journal of the International Society for Child and Adolescent Injury Prevention. 2015; 21(e1):e153.

29. Vu A, Duber HC, Sasser SM, Hansoti B, Lynch C, Khan A, Johnson T, Modi P, Clattenburg EJ, <u>Hargarten S</u>. Emergency Care Research Funding in the Global Health Context: Trends, Priorities, and Future Directions. *Academic Emergency Medicine* December 2013 20(12):1259-63.

30. Myers SR, Salhi RA, Lerner EB**,** Gilson R, Mehrotra A, Kraus A, Kelly JJ, <u>Hargarten S</u>, Carr BG:  Pilot Study Describing Access to Emergency Care in 2 States Using a Model Emergency Care Categorization System.  *Academic Emergency Medicine* <u>Volume 20, Issue 9,</u> pages 894–903, September 2013.

31. Hanlin ER, Delgado-Rendón A, Lerner EB**,** <u>Hargarten S</u>, Farías R: Fall Risk and Prevention Needs Assessment in an Older Adult Latino Population: A Model Community Global Health Partnership.  *Progress in Community Health Partnerships: Research, Education, and Action* 2013; 7(2):191-9.

32. Kowalenko T, Gore R, Sachs CS, Barata IA, Gates D, <u>Hargarten SW</u>, Josephson EB, Kamat S, Kerr HD, McClain A, Cunningham RM.  Workplace Violence in Emergency Medicine: Current Knowledge and Future Directions, *Journal of Emergency Medicine* 43.3 (2012): 523-531.

33. Galvin S, Robertson R, <u>Hargarten S</u>. Injuries Occurring in Medical Students during International Medical Rotations: A Strategy towards Maximizing Safety. *Family Medicine* 2012; Jun 44(6):404-7.

- 34 -
Stephen W. Hargarten, MD, MPH

34. Webb T, Winthrop A, Klingbeil F, Hein L, Czinner M, Christiansen A, Hargarten S, Simpson D. Using an Inter professional Approach to Teach about the Disease of Injury. *Wisconsin Medical Journal*, 2011.

35. Schlotthauer AE, Guse CE, Brixey S, Corden TE, Hargarten SW, Layde PM. Motor Vehicle Crashes Associated with Alcohol: Child Passenger Injury and Restraint Use, *Am J Prev Med*, 2011 Mar 40(3): 320-3.

36. Villaveces A, Christiansen A, Hargarten SW. Developing a Global Research Agenda on Violence and Injury Prevention: A Modest Proposal, *Injury Prevention* 16.3 (2010): 190-193.

37. Pribble JM, Fowler EF, Karmat SV, Wilkerson WM, Goldstein KM, Hargarten SW. Communicating Emerging Infectious Disease Outbreaks to the Public Through local Television News: Public Health Officials as Potential Spokespeople, *Disaster Medicine and Public Health Preparedness*, 2010; (4) 220-5.

38. Runyan CW, Hargarten S, Hemenway D, Peek-Asa C, Cunningham RM, Costich J, Gielen AC. An Urgent Call to Action in Support of Injury Control Research Centers, *Am J Prev Med*, 2010; 39(1)89-92.

39. Houry D, Cunningham RM, Hankin A, James T, Bernstein E, Hargarten, S. Violence Prevention in the Emergency Department: Future Research Priorities, *Journal of Acad Emerg Med*, November 2009; 16(11),1089-95.

40. Tonellato DJ, Guse CE, Hargarten SW. Injury Deaths of US Citizens Abroad: New Data Source, Old Travel Problem. *J Travel Med* 16.5 (2009): 304-310.

41. Wanta BT, Schlotthauer AE, Guse CE, Hargarten SW. The Burden of Suicide in Wisconsin's Older Population. *Wisconsin Medical Journal* 2009; 108(2), 87-93.

42. Hanrahan R, Layde P, Zhu S, Guse C, Hargarten S. The Association of Driver Age with Traffic Injury Severity in Wisconsin. *Traffic Injury Prevention*, 2009; 10(4), 361-367.

43. Cunningham R, Knox L, Fein J, Harrison S, Frisch K, Walton M, Dicker R, Calhoun D, Becker M, Hargarten SW. Before and After the Trauma Bay: The Prevention of Violent Injury Among Youth. *Ann Emerg Med*. April 2009; 53(4) 490-500.

44. Meisel ZF, Hargarten S, Vernick J. Addressing Prehospital Patient Safety Using the Science of Injury Prevention and Control. *Prehospital Emergency Care*. 2008; 12:4, 411-16.

45. Layde PM, Meurer LN, Guse CE. Yang H, Laud P, Meurer JR, Grube J, Brasel KJ, Hargarten S. Confidential Performance Feedback and Organizational Capacity Building to Improve Hospital Patient Safety: Results of a Randomized Trial. In *Advances in Patient Safety: New Directions and Alternative Approaches*. AHRQ Publication No. 08-0034- 2. August 2008. Vol. 2. Culture and Redesign; pp. 1-12. Agency for Healthcare Research and Quality, Rockville, MD.

46. Pribble JM, Trowbridge MJ, Kamat SV, Fowler EF, Goldstein KM, Hargarten SW: Injury Reporting on Local TV News: A Prime-Time Opportunity for Prevention, May 2008; 34(5), 420-23.

47. Pan S, Hargarten S, Zhu S. School Bus and Traffic Safety. *Chinese Journal of Tramaology*. August 2007.

48. Guse C, Cortés L, Hargarten S, Hennes H. Fatal injuries of US citizens abroad. *J Travel Med*. 2007; 14 (5), 279–287.

49. Phelan MB, Falimirski ME, Simpson, Czinner ML, Hargarten SW. Competency-based strategies for injury control and prevention curricula in undergraduate medical education. *Injury Prevention*. 2007; 13(1):6-9.

**JA1598**

50. Heng K, Hargarten SW, Craven A, Layde P, Zhu S.  Motor vehicle crashes and moderate alcohol Intake – Conflict Between Health Advantage and At-Risk Use.  *Alcohol & Alcoholism*. 2006;41:451-54

51. Cortes LM, Hargarten SW, Hennes HM.  Recommendations for water safety and drowning prevention for travelers.  *J Travel Med*. 2006; 13(1): 21-34.

52. Zhu S, Layde P, Guse C, Laud P, Pintar F, Nirula R, Hargarten S.  Obesity and risk for death due to motor vehicle crashes.  *American Journal of Public Health*, April 2006;94(4):#1-6.

53. Allen S, Zhu S, Sauter C, Layde P, Hargarten S.  A Comprehensive Statewide Analysis of Seatbelt Non-Use with Injury and Hospital Admissions: New Data, Old Problem. *Academic Emergency Medicine*. 2006;13:427-34.

54. Glysch RL, Hale, LJ, Nie C, Hargarten SW. Wisconsin's violent death reporting system: Monitoring and responding to Wisconsin's violent deaths.  *WMJ* 2005;104 (1);17-19.

55. Layde PM, Meurer LN, Guse CE, Meurer JR, Yang H, Laud P, Kuhn EM, Brasel KJ, Hargarten SW. Medical injury identification using hospital discharge data. In *Advances in Patient Safety: From Research to Implementation*. AHRQ Publication No. 0500021(1-4) February 2005. Vol 2; pp.119-132. Agency for Healthcare Research and Quality, Rockville, MD.

56. Meurer JR, Meurer LN, Grube J, Brasel KJ, McLaughlin C, Hargarten SW, Layde PM. Combining performance feedback and evidence-based educational resources: A model to promote medical injury prevention. In *Advances in Patient Safety: From Research to Implementation*. AHRQ Publication No. 050021 (1-4). February 2005. Vol 4; pp 237-252. Agency for Healthcare Research and Quality, Rockville, MD.

57. Pan S, Chen E, Zhu S, Layde P, Pirrallo R, Hargarten S.  Epidemiology Characteristics of Road Traffic Injury in China. Chin J Emerg Med. 2005;14(9):709-14.

58. Sauter C, Zhu S, Allen S, Hargarten S, Layde P: Increased Risk of Death or Disability in Unhelmeted Wisconsin Motorcyclists. *WMJ*.  2005; 104 (2): 39-44.

59. Shiffler T, Hargarten SW, Withers RL. The burden of suicide and homicide of Wisconsin's children and youth. *WMJ* 2005;104(1):62-67.

60. Vernick JS, O'Brien M, Hepburn LM, Johnson SB, Webster DW, Hargarten SW. Unintentional and undetermined firearm-related deaths: a preventable death analysis for three safety devices. Injury Prevention 2003;9:307-311.

61. Milne JS, Hargarten SW, Kellerman AL, Wintemute GJ: Effect of current federal regulations on handgun safety features. *Ann Emerg Med* January 2003; 41(1):1-9.

62. Hargarten SW: *The Physician's Role in Preventing Small Arms Injury.* Medicine Conflict and Survival. 18(4): 389-393, Oct.-Dec. 2002.

63. Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ, Hargarten SW.  *Missing the target: A comparison of buyback and fatality-related guns*.  Injury Prevention 8:143-146, 2002.

64. Layde P, Maas L, Teret S, Brasel K, Kuhn E, Mercy J, Hargarten SW. *Patient Safety Efforts Should Focus on Medical Injuries*. JAMA 287(15):1993-7, 2002.

65. Hargarten SW. *Docs and cops: A collaborating or colliding partnership?* Ann Emerg Med 2001; 38:438-440.

66. Hargarten SW. *Three shots, two dead, five errors, one gun: A recipe for prevention?* Ann Emerg Med 2001; 37:340-341.

67. Cortes L, Hargarten SW. *Preventive care in the emergency department: a systematic literature review on emergency department-based interventions that address smoke detectors in the home.* [Review] [21 refs] Academic Emergency Medicine. 8(9):925-9, 2001.

68. Nie C, Hargarten SW. *Wisconsin needs to support death investigation: Here's why.* Wis Med J 2001;100(2): 60-62.

69. Brasel K, Layde P, Hargarten SW. *Evaluation of Error Medicine: Application of a Public Health Model.* Academic Emergency Medicine November 2000; 7: 1298-1300.

70. Hargarten SW, Kuhn EM, Mercy JA, Withers RL, Nie CL, O'Brien ME. *Suicide guns: why collect the information?* Injury Prevention 2000;6:245-246.

71. Barber C, Hemenway D, Hargarten SW, Kellermann A, Azrael D, Wilt S. *"Call to arms" for a national reporting system on firearm injuries.* Am J Public Health. 2000;90:1191-93.

72. Hootman JM, Annest JL, Mercy JA, Ryan GW, Hargarten SW: *National estimates of non-fatal firearm related injuries other than gunshot wounds.* Jour Inj Prev 6(4):263-267, 2000.

73. Cisler RA, Hargarten SW: *Public health strategies to reduce and prevent alcohol-related illness, injury and death in Wisconsin and Milwaukee County.* WMJ, June 2000, 71-78.

74. Withers RL, Mercy JA, Hargarten SW: *Public health: A successful paradigm applied to firearm injuries.* WMJ 99(1):48-50, 2000.

75. Milne J, Hargarten SW: *Handgun safety features: A review for physicians.* J Trauma: Injury, Infection and Critical Care 47(1):145-150, 1999.

76. Vernick JS, Meisel ZF, Teret SP, Milne JS, Hargarten SW: *"I didn't know the gun was loaded": an examination of two safety devices that can reduce the risk of unintentional firearm injuries.* Journal of Public Health Policy 20(4):427-440, 1999.

77. Milne J, Hargarten SW: *The availability of extrinsic handgun locking devices in a defined metro area.* WMJ 98(7):25-28, 1999.

78. Wolff M, Pirrallo RG, Hargarten SW: *Strengthening emergency medicine in Poland: A training and partnership model.* Acad Emerg Med 5(12):1187-1192, 1998.

79. Freed LH, Vernick JS, Hargarten SW: *Prevention of firearm-related injuries and deaths among youth—a product orientated approach.* Pediatric Clinics of North America 45(2):427-438, 1998.

80. Fox J, Stahlsmith L, Remington P, Tymus T, Hargarten S: *The Wisconsin firearm-related injury surveillance system.* Am J Prev Med 15(3S):101-108, 1998.

81. Teret SP, Defrancesco S, Hargarten SW, Robinson KD: *Making Guns Safer.* Issues in Science and Technology, 14(4): 37-40, 1998.

82. Mannenbach M, Hargarten SW, Phelen MB: *Alcohol use among injured patients aged 12 to 18 years.* Acad Emerg Med 4(1): 40-44, 1997.

**JA1600**

- 37 -

Stephen W. Hargarten, MD, MPH

83. Yoganandan N, Pintar FA, Kumaresan S, Maiman DJ, Hargarten SW. *Dynamic Analysis of Penetrating Trauma*. Journal of Trauma-Injury Infection & Critical Care 42(2):266-72, 1997.

84. Hargarten SW, Haskins L, Stehlsmith L, Chatterjee B, Morgan J, Remington P, Nashold R, Peterson P, Karlson T: *Firearm-related deaths and hospitalizations - Wisconsin, 1994*. CDC M&M Wkly Report, Sept 6, 1996: 45(35): 757-759.

85. Pollock G, Brady W, Hargarten S, DeSilvey D, Carner CT: *Hypoglycemia manifested by sinus bradycardia: A report of three cases*. Acad Emerg Med 3(7): 700-707, 1996.

86. Tymus TA, O'Brien ME, Hargarten SW: *Wisconsin firearm injury surveillance system development: A comparison of medical examiner/coroner data*. WMJ 95(5):277-282, 1996.

87. Hargarten SW, Anderson A, Walker J, Barboriak JJ.: *Travel of U.S. citizens after coronary artery bypass surgery*. J Travel Med 1996; 3(1): 7-10.

88. Hargarten SW, Karlson TA, O'Brien ME, Hancock J, Quebbeman E: *Characteristics of firearms involved in fatalities*. JAMA 275(1): 42-45, 1996.

89. Meldon S, Hargarten SW: *Ligamentous injuries of the wrist*. JEM 13(2): 217-225, 1995.

90. Wang-Cheng R, Dillig K, Buthie E, Gilson I, Greaves W, Hargarten S, Nannis P: *Public health strategies: To reduce firearm injuries and deaths in Milwaukee county* - Executive Summary. WI Med J 572-584,1995.

91. Pirrallo RG, Wolff M, Simpson DE, Hargarten SW: *Analysis of an international EMS train-the-trainer program*. Ann Emerg Med 25(5): 656-659, 1995.

92. Hargarten SW, Karlson T: *Motor vehicle crashes and seat belts: A study of emergency physicians' procedures, charges, and documentation*. Ann Emerg Med 24(5): 857-860, 1994.

93. Kellermann A, Conway C, et al: *Access of Medicaid recipients to outpatient care*. New Eng J Med 1994; pp1426-1430.

94. Hargarten SW, O'Brien M: *Trends in motor vehicle and firearm deaths in Wisconsin: An analysis for examining prevention strategies*. WI Med J 93(10): 521-524, 1994.

95. Garrison HG, Runyan CW, Tintinalli JE, Barber CW, Bordley WC, Hargarten SW, Pollock DA, Weiss HB: *Emergency department surveillance: An examination of issues and proposal for a national strategy*. Ann Emerg Med 24(5): 849-856, 1994.

96. Aufderheide T, Apprahamian C, Mateer J, Rudnick E, Manchester EM, Lawrence SW, Olson SW, Hargarten SW: *Emergency airway management in hanging victims*. Ann Emerg Med 24(5): 879-884, 1994.

97. Kefer MP, Hargarten SW, Jentzen J: *Death after discharge from the emergency department*. Ann Emerg Med 24(6): 1102-1107, 1994.

98. Hargarten SW, Karlson T, Vernick JS, Aprahamian C: *Motorboat propeller injuries in Wisconsin: Enumeration and prevention*. J Trauma 37(2): 187-190, 1994.

99. Hargarten SW: *Injury prevention: A crucial aspect of travel medicine*. J Trvl Med 1(1): 48-50, 1994.

100. Meldon S, Hargarten SW: *Airplane vacuum toilets: An uncommon travel hazard*. J of Trvl Med 1(2):104-105, 1994.

**JA1601**

- 38 -
Stephen W. Hargarten, MD, MPH

101. Bernstein E, Goldfrank LR, Kellerman AL, Hargarten SW, Jui J, Fish SS, Herbvert BH, Flores C, Caravati ME, Krishel S, et al: *A public health approach to emergency medicine in preparing for the twenty-first century*. Acad Emerg Med 1(3): 277-286, 1994.

102. Weesner CL, Hargarten SW, Aprahamian C, Nelson DR: *Fatal childhood injury patterns in an urban setting: The case for primary prevention*. Ann Emerg Med 23(2): 231-236, 1994.

103. Hargarten SW: *Injury control*. Acad Emerg Med 1(2): 168-171, 1994.

104. Hargarten SW, Bouc GT: *Emergency air medical transport of United States citizen tourists: 1988-1990*. Air Med J 12(10): 398-402, 1993.

105. Hargarten SW, Karlson T: *Injury control: A crucial aspect of emergency medicine*. Emerg Med Clin N Amer 11(1):255-262, 1993.

106. Lambrecht CJ, Hargarten SW: *Hunting-related injuries and deaths in Montana: The scope of the problem and a framework for prevention*. J of Wilderness Med 4: 175-182, 1993.

107. Walker B, Hargarten SW: *Another drug-related death*. J of Emerg Med 10(5): 649-650, 1992.

108. Hargarten SW, Roberts MJ, Anderson AJ: Cancer Presentation in the Emergency Department: A Failure of Primary Care. Am J Emerg Med, 10(4):290-293, 1992.

109. Hargarten SW: *Availability of safety devices in rental cars: An international survey*. Trvl Med Interntl 1992; 10(3): 109-110.

110. Hargarten SW, Hanel DP: *Volar metacarpal phalangeal joint dislocation: A rare and often missed injury*. Ann Emerg Med 21(9): 1157-1159, 1992.

111. Baker T, Hargarten SW, Guptill KS: *Uncounted dead: Americans dying overseas*. Public Health Reports 107(2): 155-159, 1992.

112. Grunert BK, Hargarten SW, Matloub HS, Sanger JR, Hanel DP, Yousif NJ: *Predictive value of psychological screening in acute hand injuries*. J Hand Surg –Am Vol 17(2): 196-199, 1992.

113. Hargarten SW: *International travel and motor vehicle crash deaths: The problem, risks, and prevention*. Trvl Med Interntl 9(3): 106-110, 1991.

114. Hargarten SW, McKinney WP: *Malaria in Wisconsin 1981-1989: A review of cases and update on chemoprophylaxis*. WI Med J 90(5): 215-217, 1991.

115. Hargarten SW: *All terrain vehicle mortality in Wisconsin: A case study in injury control*. Amer J Emerg Med 9(2): 149-152, 1991.

116. Hargarten SW, Baker TD, Guptill K: *Overseas fatalities of United States citizen travelers, 1975 and 1984: An analysis of deaths related to international travel*. Ann Emerg Med 20(6): 622-626, 1991.

117. Guptill KS, Hargarten SW, Baker TD: *American travel deaths in Mexico: Causes and prevention strategies*. West J Med 154:169-171, 1991.

118. Hargarten SW, Baker T, Baker TD: *Injury deaths and American travelers*. Travel Medicine: Proceedings of the First Conference on International Travel Medicine 1-64, 1988.

- 39 -
Stephen W. Hargarten, MD, MPH

119. <u>Hargarten SW</u>, Baker SP: *Fatalities in the Peace Corps: A retrospective study: 1962-1983.*  JAMA
<u>254(10)</u>: 1326-1329, 1985.

<u>BOOKS/CHAPTERS/MONOGRAPHS/NON PEER-REVIEWED ARTICLES:</u>

1.  Kohlbeck S., Pederson L., <u>Hargarten S.</u> (2020) Defining Gun Violence Using a Biopsychosocial
    Framework: A Public Health Approach. In: Geffner R., White J.W., Hamberger L.K., Rosenbaum A.,
    Vaughan-Eden V., Vieth V.I. (eds) Handbook of Interpersonal Violence and Abuse Across the Lifespan.
    Springer, Cham. https://doi.org/10.1007/978-3-319-62122-7_308-1

2.  Keystone, JS, Kozarsky, PE, Freedman, DO, Nothdruft, HD, and Connor, BA, <u>Hargarten S</u>. Chapter 47:
    "Injuries and Injury Prevention", <u>Travel Medicine</u> 3rd Edition, El Sevier.

3.  Yonas MA, Frattaroli S, Liller KD, Christiansen A, Gielen AC, <u>Hargarten S</u>, Olsen LM. Moving Child and
    Adolescent Injury Prevention and Control Research into Practice: A Framework for Translation.  <u>Injury</u>
    <u>Prevention for Children and Adolescents:  Research, Practice, and Advocacy</u> (2nd edition). American Public
    Health Association, 2012 Print ISSN: 0090-0036 | Electronic ISSN: 1541-0048.

4.  <u>Hargarten SW</u>, Lerner EB: Injury Prevention and Control. <u>Rosen's Emergency Medicine</u> 7th Edition
    2009;37:286-294

5.  <u>Hargarten SW</u>: Injuries and Injury Prevention. In <u>Health Problems While Traveling</u>  pp 485-491, 2008.

6.  Runge J, <u>Hargarten SW</u>:  Injury Prevention and Control.  In <u>Emergency Medicine: Concepts and Clinical</u>
    <u>Practice</u>, Marx J, Hockberger S, Walls R., 6th ed, Mosby, Vol 1, pp 940-951, 2006.

7.  <u>Hargarten SW</u>, Grenfell R: Travel-related Injuries: Epidemiology and Prevention.  In <u>the Textbook of</u>
    <u>Travel Medicine and Health</u>, HL DuPont, MD and R Steffen, MD, 2nd Edition, B.C. Decker Inc., 1999.

8.  Freed LH, Vernick JS, <u>Hargaten SW</u>:  Prevention of Firearm-related Injuries and Deaths Among
    Youths:  A Product-Oriented Approach.  In <u>Pediatric Clinics of North America</u>, Saunders, <u>45(2)</u>: 427-
    438, 1998.

9.  Runge J, <u>Hargarten SW</u>:  Injury Control.  In <u>Emergency Medicine: Concepts and Clinical Practice</u>,
    Rosen, Barkin, 4th ed, Mosby, Vol 1, pp 397-406, 1997.

10. Karlson T, <u>Hargarten SW</u>:   <u>Reducing Injury and Death: A Public Health Sourcebook on Guns</u>.
    Rutgers University Press, 1997

11. <u>Hargarten SW</u>, Gursu KG: The Travel Related Injuries, Epidemiology, and Prevention.  In <u>Textbook</u>
    <u>of Travel Medicine and Health</u>, H.L. DuPont, MD and R. Steffen, MD, ed, B.C. Decker Inc., 1997.

12. <u>Hargarten SW</u>, Williams JM:  Injury Prevention and the Role of the EMS Provider.  In <u>Basic Trauma</u>
    <u>Life Support for Paramedics and Advanced EMS Providers</u>, John Emory Campbell, MD, FACEP
    (Ed), American College of Emergency Physicians, Brady, Prentice Hall, New Jersey, 1995.

13. Swart GL, <u>Hargarten SW</u>:  Emergency Department Management of Intoxication with Drugs of Abuse.
    In <u>Pharmacological Therapies in Drug and Alcohol Disorders</u>, N.S. Miller, ed.  Marcel-Dekker, Inc,
    New York, 1994.

14. Martinez R, Gardner J, et al.:  "Applying an Injury Control Model to the Treatment of Motor Vehicle-
    Related Injuries.  American College of Emergency Physicians, Dallas, Texas, 1994.

- 40 -
Stephen W. Hargarten, MD, MPH

15. <u>Hargarten SW:</u>   The Epidemiology of Travel-Related Deaths.   In <u>Travel Medicine Advisor.</u>  E. Jong and J. Keystone, eds.  American Health Consultants, Atlanta, Georgia, 1990.

16. Sheridan DP, Winogrond IR, et al: <u>The Preventive Approach to Patient Care.</u>  Elsevier Science Publishing, 1987.


<u>COMMENTARY, EDITORIALS AND LETTERS TO THE EDITOR:</u>

1. <u>Hargarten, Stephen W.</u> Lerner, E. Brooke Gorelick, Marc Brasel, Karen deRoon-Cassini, Terri Kohlbeck, Sara. Commentary - Gun Violence:  A Biopsychosocial Disease.  West J Emerg Med. Sept 10, 2018;19(6)

2. <u>Hargarten S., MCJATLANTA</u> Editorial: Dr. Stephen Hargarten: Gun Violence a 'Public Health Issue' Milwaukee Community Journal, March 5, 2018

3. <u>Hargarten SW.</u>Editorial: Firearm Injury in the US: Effective Management Must Address Biophysical and Biosocial Factors. *Annals of Internal Medicine,* 2016 Dec 21; 24(65).

4. <u>Hargarten S</u>. Reflections on a 37 Years of EM Clinical Practice. *Academic Emergency Medicine*, 2016.

5. <u>Hargarten S</u>. Reflections on a Mass Shooting. *Academic Emergency Medicine*, 2015.

6. <u>Hargarten S</u>. Opinion Editorial: The Global Burden of Gun Violence. Milwaukee Journal-Sentinel, January 30, 2016.

7. <u>Hargarten S</u>. Reflections on Leaving the Bedside. *Academic Emergency Medicine*, December 2015; 23(1):113.

8. <u>Hargarten S</u>, Halverson J. Opinion Editorial: Reducing Gun Violence in Milwaukee. *Milwaukee Journal-Sentinel*, May 9, 2015.

9. Guse C, <u>Hargarten S</u>. Correspondence: Limitations of Travel Data for Rate Computations. *Injury Prevention*, February 21, 2014.

10. <u>Hargarten S</u>, Martin IBK, Hauswald M, Hirshon JM. Executive Summary: Global Health and Emergency Care – What Do We Need to Know to Address the Burden of Illness and Injury? *Academic Emergency Medicine*, December 2013; 20(12):1213-15.

11. <u>Hargarten S</u>. Using Alcohol as an Excuse to Walk Away from the Patient. Milwaukee Journal-Sentinel, March 6, 2010.

12. <u>Hargarten S</u>, Reed J.  First Step in Preventing Violent Deaths: Data.  Milwaukee Journal-Sentinel, Jun 21, 2008.

13. Corden T, <u>Hargarten</u> S, Brixey S, Clementi B, Peterson N. Booster Seats: Inform Parents. Milwaukee Journal-Sentinel, Nov 15, 2007.

14. <u>Hargarten SW</u>. Docs and cops: A collaborating or colliding partnership? Ann Emerg Med October 2001;38:438-440.

15. <u>Hargarten SW</u>, Cortes LM. Landmines: Not Just Another Travel Risk. Journal of Travel Medicine. 8(5):229-231.

**JA1604**

- 41 -
Stephen W. Hargarten, MD, MPH

16. <u>Hargarten SW</u>. Three shots, two dead, five errors, one gun: a recipe for prevention? Ann Emerg Med March 2001;37:340-341.

17. <u>Hargarten, SW</u>, Kuhn EM, Mercy JA, Withers RL, Nie CL, Obrien ME:  Suicide guns:  Why collect this information?  Jour Inj Prev 6(4):245-246, 2000.

18. Barber C, Hemenway D, <u>Hargarten S</u>, Kellermann A, Azrael D, Wilt S:  "A Call to Arms" for a National Reporting System on Firearm Injuries.   Editorial.  American Journal of Public Health 90:8:1191-1193, 2000.

19. Withers RL, Mercy JA, <u>Hargarten SW</u>:  Public health: A successful paradigm applied to firearm injuries. WI Med Journal, Jan/Feb 2000.

20. <u>Hargarten SW</u>: Emporiatric Medicine—Growing into the 21st century:  From patient care to population care.  Editorial.  J Travel Med 6(2):59, 1999.

21. <u>Hargarten SW</u>:  Alcohol-related injuries:  Do we really need more proof?  Editorial; comment.  Ann Emerg Med <u>33(6)</u>:699-701,1999.

22. <u>Hargarten SW</u>: Injury control research and wilderness medicine: a babe dangling in the woods. Editorial.   Wilderness & Env Med <u>10(1)</u>:2, 1999.

23. <u>Hargarten SW</u>:  Alcohol-related research and advocacy:  Much to do, many places to do it! Editorial. Ann Emerg Med <u>31(5)</u>: 638-639, 1998

24. Withers R, <u>Hargarten SW</u>.  Real data needed on firearms and firearm safety. Editorial. Wisconsin Lawyer 71(4), 1998.

25. <u>Hargarten SW</u>, Olson L, Sklar D: Emergency Medicine and injury control research:  Past, present, and future.  Editorial.  Acad Emerg Med <u>4(4)</u>: 243-244, 1997.

26. <u>Hargarten SW</u>: So, just do it...  Go upstream.  Acad Emerg Med <u>3(4)</u>: 293-294,1996.

27. Rubens AJ, <u>Hargarten SW</u>, Oleckno WA:  Comparison between emergency department and inpatient E-codes.  Letter.  Acad Emerg Med <u>3(4)</u>: 385-3866,1996.

28. <u>Hargarten SW</u>:  Atlanto-occipital dislocation.  J Emerg Med <u>11(6)</u>:760-761, 1993.

29. <u>Hargarten SW</u>: Travel related diseases:  Injury and infectious disease prevention.  J Wilderness Medicine <u>4(4)</u>: 464-465,1993.

30. Quebbeman EJ, <u>Hargarten SW</u>: The black talon: A new risk for percutaneous injury.  Letter.  J Trauma <u>35(3)</u>: 489, 1993.

31. Jameson SJ, <u>Hargarten SW</u>: Calcium pretreatment to prevent Verapamil induced hypotension in patients with SVT.  Editorial.  Ann Emerg Med <u>21(1)</u>: 68,1992.

32. Schultz CH, <u>Hargarten SW</u>, Babbitt <u>J</u>: Inhalation of a coin and a capsule from metered-dose inhalers. Letter.  New Engl J Med <u>325(6)</u>: 431-432,1991.

33. <u>Hargarten SW</u>:  Injuries in Wisconsin.  Letter.  WI Med J 89(4):158,1990.

34. <u>Hargarten SW</u>:  Injury prevention in emergency medicine.  J Emerg Med <u>6(3)</u>:248, i. 1988

**JA1605**

- 42 -

Stephen W. Hargarten, MD, MPH

35. <u>Hargarten SW</u>, Sanders AB:  Injury prevention in medical school curriculums.  Ann Emerg Med <u>15(2)</u>: 226, 1986.

<u>ABSTRACTS:</u>

1.  Rajan S, Branas C, <u>Hargarten S</u>, Allegrante  J: Funding for Gun Violence Research Is Key to the Health and Safety of the Nation. *American Journal of Public Health*, January 10, 2018

2.  Kopatich D, Hernandez-Meier J, <u>Hargarten S</u>: Geographic Fluctuations of Violent Deaths in Children and Youth over Time. 2015 Injury Prevention (21).

3.  Meurer LN, Bernstein R, Brousseau DC, <u>Hargarten S</u>, Treat R: Primary care match is associated with scholarly concentrations focused on underserved local and global communities.  2015 AAMC Medical Education Meeting, Baltimore, MD, November 2015

4.  Oswald J, Kostic M, Gummin D, Kopp B, <u>Hargarten S.</u> *Poison Center Consultation Decreases Hospital Length of Stay and Inpatient Charges*, North American Congress of Clinical Toxicology, Denver, CO, October, 2010

5.  Woods LA, Kuhn EM, Nie CL, <u>Hargarten SW</u>. *Losing Wisconsin dairy farmers to suicide.* American Public Health Association 130th Annual Meeting and Exposition, Philadelphia, Pennsylvania, November 9-13, 2002.

6.  Woods LA, Kuhn EM, Nie CL, Jashinsky LA, <u>Hargarten SW.</u> *Suicide among Wisconsin farmers.* American Association of Suicidology, 35th Annual Conference, Bethesda, MD, April 10-13, 2002.

7.  Kuhn EM, Mercy JA, Nie CL, O'Brien ME, Withers RL, <u>Hargarten SW</u>:  Firearm homicide in relation to location of public housing in the City of Milwaukee.  American Society of Criminology, San Francisco, CA, Nov 15-18, 2000.

8.  O'Brien M, Nie C, Kuhn E, <u>Hargarten S</u>, Withers R: Criminal history and firearm ownership of firearm homicide perpetrators.  American Society of Criminology, San Francisco, Nov 15-18, 2000.

9.  <u>Hargarten SW</u>, Kuhn EM, Nie C, O'Brien, Withers R:  Analysis of firearm type, caliber, and manufacturer associated with homicides and suicides in a defined geographic region. APHA, Boston, Nov 12-16, 2000.

10. Nie CL, Kuhn EM, Mercy JA, O'Brien ME, <u>Hargarten SW</u>: Characteristics of firearms involved in family and intimate partner homicides: Milwaukee County, 1991-1998.  National Conference on Health Care and Domestic Violence, San Francisco, Oct 13-14, 2000.

11. Milne JS, Nie CL, O'Brien M, et al: Homicide and Suicide Handguns: Two Unique Populations, Emergency Medicine Forum, Medical College of Wisconsin, Milwaukee, WI, April 18, 2000.

9.  <u>Hargarten SW</u>, Kuhn EM, Nie CL, Withers RL, Wintemute GJ:  Homicide Gun Characteristics Before and After the 1994 Crime Bill. American Public Health Association, 127th Annual Meeting, Chicago, Illinois, Nov 7-11, 1999

10. O'Brien ME, <u>Hargarten SW</u>, Nie CL, Withers RL, Kuhn EM. *Linking the gun with the death: the who, when, and where of the gun's first purchase.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

**JA1606**

- 43 -
Stephen W. Hargarten, MD, MPH

11.　Milne JS, Nie CL, O'Brien ME, <u>Hargarten SW</u>. *Effect of the Bureau of Alcohol, Tobacco, and Firearm (ATF) Factoring Criteria on Homicide and Suicide Handguns.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

12.　Withers RL, Reza A, <u>Hargarten SW</u>. *A Survey of State Reporting Statutes for Gunshot Wounds.* American Society of Criminology, Toronto, Canada, November 17-20, 1999.

13.　<u>Hargarten SW</u>, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Homicide gun characteristics before and after the 1994 Crime Bill.* American Society of Criminology Conference, Toronto, Ontario, Nov 17-20, 1999

14.　Milne JS, Nie CL, O'Brien ME, <u>Hargarten SW</u>. *Effect of the Bureau of Alcohol, Tobacco, and Firearm (ATF) Factoring Criteria on Homicide and Suicide Handguns.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

15.　O'Brien ME, <u>Hargarten SW</u>, Nie CL, Withers, RL, Kuhn EM. *Linking the gun with the death: The who, when, and where of the gun's first purchase.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

16.　Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ, <u>Hargarten SW</u>:  A comparison of buyback and fatality-related guns. American Public Health Association, 127th Annual Meeting, Chicago, Illinois, Nov 7-11, 1999 and American Society of Criminology Conference, Toronto, Ontario, Nov 17-20,1999.

17.　Withers RL, Reza A, <u>Hargarten SW</u>. *A survey of state reporting statutes for gunshot wounds.* American Public Health Association, 127th Annual Meeting, Chicago, IL, November 7-11, 1999.

18.　<u>Hargarten SW</u>, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Homicide gun characteristics before and after the 1994 Crime Bill.* Second Wisconsin Health Services Research Conference: Health Services Policy Practice and Research: Making Connections, Madison, WI, November 4-5, 1999.

19.　Nie CL, Kuhn EM, O'Brien ME, Withers RL, <u>Hargarten SW</u>. *Firearm homicide-suicide events in Southeastern Wisconsin.* American Association of Suicidology, Houston, Texas, April 15-17, 1999.

20.　Kuhn EM, Nie CL, O'Brien ME, Withers RL, <u>Hargarten SW</u>. *Firearms used in Southeastern Wisconsin suicides.* American Association of Suicidology, Houston, Texas, April 15-17, 1999.

21.　Nie CL, <u>Hargarten SW</u>. *Reducing Firearm Injuries: Health Providers and Survivors Working Together.* The Fifth National HELP Network Conference, San Francisco, California, February 5-6, 1999.

22.　<u>Hargarten SW</u>, O'Brien ME, Quebbeman EJ, Nie CL, Kuhn EM. *Integrated firearm injury reporting system.* Eastern Association for the Surgery of Trauma, 12th Annual Meeting, Orlando, FL, January 13-16, 1999.

23.　Kuhn EM, Nie CL, O'Brien ME, <u>Hargarten SW</u>. *Firearm-related suicides in Southeastern Wisconsin.* American Public Health Association, 126th Annual Meeting, Washington, DC, November 15-19, 1998.

**JA1607**

- 44 -
Stephen W. Hargarten, MD, MPH

24.    Nie CL, Kuhn EM, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* American Public Health Association, 126th Annual Meeting, Washington, DC, November 15-19, 1998.

25.    Hargarten SW, Kuhn EM, Nie CL, O'Brien ME, Withers RL, Wintemute GJ. *Magazine capacity and number of wounds for Milwaukee County Homicides before and after the 1994 Crime Bill.* American Society of Criminology, 50th Annual Meeting, Washington, DC, November 11-14, 1998.

26.    O'Brien ME, Hargarten SW, Nie CL. *Linking the Gun with the Death: the Who, When, and Where of the Gun's First Purchase.* American Society of Criminology, 50th Annual Meeting, Washington, DC, November 11-14, 1998.

27.    Nie CL, Kuhn EM, O'Brien ME, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* American College of Emergency Physicians Research Forum, San Diego, California, October 11-12, 1998.

28.    Nie CL, Kuhn EM, O'brien ME, Withers RL, Hargarten SW. *Urban versus rural firearm homicides and suicides in youth.* 12th Annual California Childhood Injury Control Conference, Sacramento, California, September 14-16, 1998.

29.    Kuhn EM, Nie CL, O'Brien ME, Withers RL, Hargarten SW. *Firearm-related suicides in Southeastern Wisconsin.* Violence Data Exchange Team (VDET), First National Conference, Washington, DC, June 24-25, 1998.

30.    Kuhn EM, Nie CL, O'Brien ME, Hargarten SW. *Firearm-related suicides in Southeastern Wisconsin.* Wisconsin Public Health Association, Waukesha, WI, June 4-5, 1998.

31.    Wolff M, Hargarten SW, Pirrallo RG: An Analysis of a US-based Project to Strengthen Prehospital Emergency Medical Services (EMS) in Poland.  Ann Emerg Med 23(4): 925, 1994.

32.    Shepherd D, Hargarten SW: Alcohol Screening in the Emergency Department: Blood Versus Saliva.  Ann Emerg Med 23(2): 612, 1994.

33.    Robertson ME, Hodel D, et al: Minimizing hypothermia: Comparison of the effluent temperature of blood using three delivery methods and cold and pre-warmed starts.  J Emerg Nursing 19(5):  468, 1993.

34.    Orsay EM, Muelleman RL, Peterson TD, et al: Motorcycle helmets and spinal injuries: Dispelling the myth.  Ann Emerg Med 21(5): 655, 1992.

35.    Weesner CL, Apprahamian C, Hargarten SW: Fatal childhood injury patterns in an urban setting: The case for primary prevention.  Ann Emerg Med 21(5): 608, 1992.

36.    Bergstein JM, Robertson ME, Hedell D, et al.: Rapid resuscitation may contribute to hypothermia despite blood warmer use.  Ann Emerg Med, 21(5): 597, 1992.

37.    Hargarten SW, Karlson T, Oldham G:  Alcohol and injuries in the ED: Patients, places, and problems.  Ann Emerg Med 20(4): 477, 1991.

Exhibit B

# Crime Lab Tests

## August 2021

JOINT DEPARTMENT OF
BIOMEDICAL
ENGINEERING

JA1610





**Thompson .45 Auto**



Entrance Velocity: 292.6 m/s

Exit Velocity: 212.4 m/s

**JA1611**





# Thompson .45 Auto



Bottom view. Bullet travelled right to left.



Lateral view. Bullet travelled right to left.



JA1612

JOINT DEPARTMENT OF
BIOMEDICAL
ENGINEERING

# Thompson .45 Auto



JA1613





**5.56 NATO**



Entrance Velocity: 826.0 m/s

Exit Velocity: 208.8 m/s

JA1614





# 5.56 NATO



Bottom view. Bullet travelled right to left.




Lateral view. Bullet travelled right to left.

JOINT DEPARTMENT OF
BIOMEDICAL
ENGINEERING

JA1615

5.56 NATO

JA1616





Entrance Velocity: 796.0 m/s

Exit Velocity: 358.8 m/s

JA1617

.30-06





**.30-06**



Bottom view. Bullet travelled right to left.





Lateral view. Bullet travelled right to left.

JA1618

**.30-06**

JA1619



# Summary

| Round Type | Pressure [kPa], Initial Peak, Near Sensor (2500Hz Filter) | Pressure [kPa], Initial Peak, Far Sensor (2500Hz Filter) | Peak Diameter of Temporary Cavity [inches] | Bullet Mass [g] | Energy Lost by Bullet while Passing thru Gel [J] | % Energy Transferred |
|---|---|---|---|---|---|---|
| .25 Caliber | 18.2 | 32.8 | 1.0 | 3.240 | 54.13 | 83 |
| .32 Caliber | 138.3 | 251.7 | 1.5 | 4.601 | 108.73 | 8 |
| .40 Caliber | *756.9 | 361.2 | *3.3 | 11.664 | 265.99 | 7 |
| 5.56 NATO | 712.7 | 774.4 | 5.4 | 3.564 | 1,055.05 | 67.6 |
| Musket Ball | *267.6 | 107.7 | *3.1 | 3.531 | 111.27 | 77 |
| Thompson .45 | 205.3 | 206.3 | 2.1 | 14.904 | 301.81 | 47 |
| 5.56 NATO | 568.8 | 2360.6 | 7.2 | 3.564 | 1,138.13 | *93 |
| .30-06 | *1568.3 | 1387.2 | *8.0 | 8.424 | 2,126.55 | 79 |

\* Denotes peak pressures and temporary cavities that were located closer to the near sensor.

\* Peak cavity extended beyond range of camera view. Listed value is from bottom of cavity to top of frame. Estimated cavity is closer to 11.8 in.

\* Bullet fragmented. This likely increased the energy transfer.

JA1620



# Exhibit 9

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## DECLARATION OF LOUIS KLAREVAS

    I, LOUIS KLAREVAS, hereby depose and state:

1.    I am over the age of 18 and am competent to testify to the matters stated
below based on personal knowledge.

**JA1623**

2.   I have attached a copy of an expert report I prepared, dated June 13, 2023,
     and a copy of my Curriculum Vitae (attached as Exhibit A of my expert report).
     The opinions expressed in this report are based on my knowledge, skill,
     experience, training, and education, and I hold these opinions to a
     reasonable degree of professional certainty. I hereby adopt and incorporate
     my report in this declaration as if set forth in full.

     I declare under penalty of perjury on this ___31ˢᵗ___ day of October, 2023,
that the foregoing is true and correct.

                                        _____
                                        LOUIS KLAREVAS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br>     Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br>     Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br>     Defendants. | Civil Action No. 3:22-cv-04397 |

---

## Expert Report of Louis Klarevas

---

1

**JA1625**

I, Louis Klarevas, declare:

1.      This report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this report.

**PROFESSIONAL QUALIFICATIONS**

2.      I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York.  I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3.      I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  During the course of my nearly 25-year career as an academic, I have served on the faculties of George Washington University, the City University of New York, New York University, and the University of Massachusetts.  I have also served as Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

4.      My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that focuses on reducing intentional shootings at elementary and secondary schools.

5.      In addition to having made over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces.  In 2019, my peer-reviewed article on the effectiveness of restrictions on large-capacity magazines (LCMs) in reducing high-fatality mass shootings that result in six or more victims killed was published in the *American Journal of Public Health*.[2]  This study found that jurisdictions with

---

[1] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed February 11, 2023).

2

LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans. Despite being over 3 years old now, this study continues to be one of the highest impact studies in academia. It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

6.      Since January 1, 2019, I have been deposed, testified in court, or testified by declaration in the following cases (all in federal court), listed alphabetically by state:

**California – Central District**
*Rupp v. Bonta*                                                    8:17-cv-00746-JLS-JDE
**California – Eastern District**
*Wiese v. Bonta*                                                   2:17-cv-00903-WBS-KJN
**California – Southern District**
*Duncan v. Bonta*                                                  17-cv-1017-BEN-JLB
*Jones v. Bonta*                                                   19-cv-01226-L-AHG
*Miller v. Bonta*                                                  3:19-cv-1537-BEN-JBS
*Nguyen v. Bonta*                                                  3:20-cv-02470-WQH-MDD
**Colorado**
*Gates v. Polis*                                                   1:22-cv-01866-NYW-SKC
**Connecticut**
*National Association for Gun Rights v. Lamont*                    3:22-cv-01118-JBA
**Hawaii**
*National Association for Gun Rights v. Lopez*                     1:22-cv-404-DKW-RT
**Illinois – Northern District**
*Viramontes v. Cook County*                                       1:21-cv-04595
*National Association for Gun Rights v. Highland Park*             22-cv-04774
*Herrera v. Raoul*                                                 1:23-cv-00532
**Illinois – Southern District**
*Harrel v. Raoul*[*]                                              23-cv-141-SPM
*Langley v. Kelly*[*]                                             23-cv-192-SPM
*Barnett v. Raoul*[*]                                             23-cv-209-SPM
*Federal Firearms Licensees of Illinois v. Pritzker*[*]           23-cv-215-SPM
*Kenneally v. Raoul*                                              3:23-cv-50039

---

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed February 11, 2023). According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies. Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans. They helped build the foundation for future studies while overcoming the limitations of previous research." *Ibid.*

**Massachusetts**
*National Association for Gun Rights v. Campbell*          1:22-cv-11431-FDS
**Oregon**
*Oregon Firearms Federation v. Kotek*[†]                   2:22-cv-01815-IM
*Fitz v. Rosenblum*[†]                                     3:22-cv-01859-IM
*Eyre v. Rosenblum*[†]                                     3:22-cv-01862-IM
*Azzopardi v. Rosenblum*[†]                                3:22-cv-01869-IM
**Washington – Eastern District**
*Brumback v. Ferguson*                                     1:22-cv-03093-MKD
*Banta v. Ferguson*                                        2:23-cv-00112-MKD
**Washington – Western District**
*Hartford v. Ferguson*                                     3:23-cv-05364-RJB

[*]Non-Consolidated Cases on the Same Briefing Schedule / [†]Consolidated Cases

7.     In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20.  I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

8.     I have also submitted declarations in the following state court cases: *People of Colorado v. Sgaggio*, District Court, El Paso County, Colorado, 2022M005894 (Criminal); and *Guardian Arms v. Inslee*, Superior Court, Grant County, Washington, 23-2-00377-13 (Civil).

9.     A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this report.

10.    I am being compensated at a rate of $480/hour for my work on this report, $600/hour for any testimony in connection with this matter, and $120/hour for travel required to provide testimony.

4

**JA1628**

## OPINIONS

11.     It is my professional opinion, based upon my analysis of the data reviewed herein, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, often related to the use of assault weapons and LCMs; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs.  Based on these findings, it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of gun massacres.[4]

---

[4] For purposes of this report, mass shootings are defined in a manner consistent with my book *Rampage Nation*, *supra* note 1 (*see* Excerpt Attached as **Exhibit B**).  "Mass shootings" are shootings resulting in four or more victims being shot (fatally or non-fatally), regardless of location or underlying motive.  As a subset of mass shootings, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more victims being shot to death, regardless of location or underlying motive.  The data on high-fatality mass shootings is from a data set that I maintain and continuously update.  This data set is reproduced in **Exhibit C**.  Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in Sections I, II, and VI of this report are drawn from **Exhibit C**.

5

## I.    MASS SHOOTINGS ARE A GROWING THREAT TO PUBLIC SAFETY

12.    Examining mass-casualty acts of violence in the United States since 1991 points to two disturbing patterns.[5]  First, as demonstrated in Table 1, the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings.  Second, as displayed in Figures 1-2, the problem of high-fatality mass shooting violence is on the rise.  To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%.  However, when the number of people killed in high-fatality mass shootings in the 1990s is compared to the number killed in such incidents in the 2010s, it reflects an increase of 260%.  In other words, the rise in gun massacre violence has far outpaced the rise in national population—by a factor of 13.  The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1.  The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

|   | Deaths | Date | Location | Type of Violence |
|---|--------|------|----------|------------------|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

---

[5] Because the analysis in Section VI of this report necessarily uses data from 1991 through 2022, for purposes of consistency (and to avoid any confusion), the analyses in Sections I and II also use data from 1991 through 2022.

6

**JA1630**

**Figure 1.  Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2.  Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

7

**JA1631**

## II. THE USE OF ASSAULT WEAPONS AND LCMS ARE MAJOR FACTORS IN THE RISE OF MASS SHOOTING VIOLENCE

13.     In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres.[6] As shown in Figures 3-4, based on high-fatality mass shootings where details allow a determination on the use of assault weapons and LCMs are available, over half of all incidents in the last four years involved assault weapons and all incidents in the last four years involved LCMs having a capacity greater than 10 bullets. As shown in Figures 5-6, a similar pattern emerges when examining deaths in high-fatality mass shootings in the last four years, with 62% of deaths resulting from incidents involving assault weapons and 100% of deaths resulting from incidents involving LCMs having a capacity greater than 10 bullets. These trends demonstrate that, among perpetrators of gun massacres, there is a growing preference for using assault weapons and LCMs to carry out their attacks.[7]

---

[6] Assault weapons are generally semiautomatic firearms that fall into one of the following three categories: assault pistols, assault rifles, and assault shotguns. For purposes of this report, unless otherwise stated, assault weapons and LCMs are defined and coded in a manner consistent with the definitions used in **Exhibit C**. As stated in **Exhibit C**: "For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban or (2) the statutes of the state where the shooting occurred. For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device with a capacity of more than 10 bullets."

[7] Out of all 93 high-fatality mass shootings in the United States between 1991 and 2022, it cannot be determined whether LCMs were used in 14 of those incidents. Furthermore, for two of these 14 incidents, it is also not possible to determine whether they involved assault weapons. Therefore, the tables, figures, and percentages discussed in this section of this report are based on calculations that only use data points from the incidents in which the involvement of assault weapons and/or LCMs could be determined.

8

**Figure 3.  Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Figure 4.  Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

**Figure 5.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 5 exclude incidents in which the firearms used are unknown.

**Figure 6.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 6 exclude incidents in which it is unknown if LCMs were used.

10

14.     The growing use of assault weapons to carry out high-fatality mass shootings is an obvious theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another clear theme.  Based on National Sport Shooting Foundation (NSSF) and federal government data, "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform firearms—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly-available data (24.4 million out of an estimated 461.9 million firearms).[8]  And, in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement and security agencies, firearms retailers, and possibly prohibited possessors (e.g., violent criminals) in the United States.[9]  But even using this estimate, if assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 5% of all high-fatality mass shootings would involve assault weapons.  However, as seen in Figure 3 above, civilian ownership rates and mass-shooter use rates are not similar.  Indeed, the

---

[8] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data.  The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available).  NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023).  In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation in the United States.  NSSF, *Firearm Production in the United States with Firearm Import and Export Data*, Industry Intelligence Report, 2020, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023).  According to ATF data, in 2019 and 2020, an additional 28.0 million firearms entered the civilian stock nationwide.  ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (2022), at 181, 188, 193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (last accessed January 3, 2023).  Assuming these figures reported by the NSSF and ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to approximately 461.9 million.  The ownership rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9 million total firearms equals approximately 5.3%.

[9] ATF, 2022, *supra* note 8, at 12; NSSF, 2020, *supra* note 8, at 2-3.

current difference is approximately ten-fold, with the rate at which assault weapons are now used to commit gun massacres far outpacing the rate at which modern sporting rifles circulate amongst civilians in the United States.[10]

15.      Another pattern that stands out when examining the relationship between assault weapons use and gun massacre violence reflects the disproportionately greater lethality associated with the use of assault weapons and LCMs.  For instance, returning to the aforementioned list of the seven deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass shootings, six of the seven incidents (86%) involved assault weapons and LCMs, as shown in Table 2.  When examining all high-fatality mass shootings since 1991, the relationship between assault weapons use, LCM use, and higher death tolls is striking.  In the past 32 years, assault weapons and LCMs with an ammunition capacity greater than 10 rounds have been used, respectively, in 34% and 77% of all high-fatality mass shootings.  However, as the fatality thresholds of such incidents increase, so too do the shares of incidents involving assault weapons and LCMs.  For instance, assault weapons and LCMs were used, respectively, in 75% and 100% of all mass shootings resulting in more than 20 deaths (Figures 7-8).  As the data show, there is an association between mass shooting lethality and the use of assault weapons and LCMs.

---

[10] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar comparison using LCMs instead of modern sporting rifles.

**Table 2.  The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapons | Involved LCMs ( > 10 Rounds ) |
|--------|------|----------|--------------------------|-------------------------------|
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

**Figure 7.  Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 7 exclude incidents in which the firearms used are unknown.

13

**Figure 8.  Percentage of High-Fatality Mass Shootings Involving LCMs (Ammunition Capacity Greater Than 10 Rounds) by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 8 exclude incidents in which it is unknown if LCMs were used.

16.     Of the 91 high-fatality mass shootings since January 1, 1991, in which the type of firearm used is known, 31 involved assault weapons, resulting in 425 deaths.  The average death toll for these 31 incidents is 13.7 fatalities per shooting.  By contrast, the average death toll for the 60 incidents in which it is known assault weapons were not used (which resulted in 490 fatalities) is 8.2 fatalities per shooting (Table 3).  Furthermore, of the 79 high-fatality mass shootings since January 1, 1991, in which LCM use was determined, 61 involved LCMs with an ammunition capacity greater than 10 rounds, resulting in 704 deaths.  The average death toll for these 61 incidents is 11.5 fatalities per shooting.  The average death toll for the 18 incidents in which it is known LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting (Table 4).  In other words, in the last 32 years, the use of assault weapons and LCMs in gun massacres has resulted, correspondingly, in 67% and 58% increases in average fatalities per incident (Tables 3-4).

14

17.     Table 5 shows the average death tolls per high-fatality mass shooting incident that are attributable to assault weapons beyond deaths associated with the use of LCMs.  When LCMs with an ammunition capacity greater than 10 rounds are not used, the average death toll is 7.3 fatalities.  When LCMs are used, but not in conjunction with assault weapons, the average death toll is 9.2 fatalities.  When LCMs are used with assault weapons, the average death toll is 14.0 fatalities.  The data show that using LCMs without an assault weapon resulted in a 26% increase in the average death toll.  However, using LCMs with an assault weapon resulted in a 52% increase in the average death toll associated with incidents that involved LCMs without assault weapons and a 92% increase in the average death toll associated with incidents that involved neither LCMs nor assault weapons.

18.     This review of the data suggests that assault weapons and LCMs are force multipliers when used in mass shootings.

**Table 3.  The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

15

**Table 4. The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Table 5. The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

16

III.    **Double-Digit-Fatality Mass Shootings Are a Post-World War II Phenomenon in American History And They Increasingly Involve Assault Weapons**

19.    I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 6 and Figure 9).[11]  In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949.  In other words, for 70% of its 247-year existence as a nation, the United States did not experience a *single* mass shooting resulting in double-digit fatalities.  They are relatively modern phenomena in American history.[12]

20.    After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966.  The third such mass shooting then occurred nine years later, in 1975.  And the fourth such incident occurred seven years after, in 1982.  Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era.  Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 6 and Figure 10).[13]

---

[11] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022).  The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607.  Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[12] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[13] Figures 9-10 are reproduced in larger form as **Exhibit D** of this report.

17

**JA1641**

**Table 6.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**

|  | Date | Location | Deaths | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NJ | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe, TX | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators.  An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 Federal Assault Weapons Ban or (2) the statutes of the state where the gun massacre occurred.  An incident was coded as involving an LCM if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets.

**Figure 9.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**



**Figure 10.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1949-2022**



19

21.    The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years (Table 6 and Figure 10). This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). But this cluster of incidents was followed by a 20-year period in which only two double-digit-fatality mass shootings occurred (Figure 10). This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

22.    It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[14] Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern. In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities (a frequency rate of one incident every 5.6 years). In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings (a frequency rate of one incident every 0.9 years). In other words, the frequency rate has increased over six-fold since the Federal Assault Weapons Ban expired (Table 6 and Figure 10). (The 1994 Federal Assault Weapons Ban and its impact on mass shooting violence is discussed in further detail in Section VI of this report.)

---

[14] *See*, for example, Louis Klarevas, *supra* note 1 (Relevant Excerpt Attached as **Exhibit E**); Louis Klarevas, et al., *supra* note 2 (Attached as **Exhibit F**); Charles DiMaggio, et al., "Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data," 86 *Journal of Trauma and Acute Care Surgery* 11 (2019) (Attached as **Exhibit G**); Lori Post, et al., "Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis," 7 *JMIR Public Health and Surveillance* (2021) (Attached as **Exhibit H**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (Attached as **Exhibit I**).

20

23.    Over three-quarters of the mass shootings resulting in 10 or more deaths involved assault weapons and/or LCMs (Table 6).  As also shown in the analyses of mass shootings in Section II, death tolls in double-digit-fatality mass shootings are related to the use of firearm technologies like assault weapons and LCMs that, in terms of mass shootings, serve as force multipliers.

**IV.    ASSAULT WEAPONS ARE ALMOST NEVER USED BY PRIVATE CITIZENS IN SELF-DEFENSE DURING ACTIVE SHOOTINGS**

24.    An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them?  As shown above in Section II, assault weapons have been used in approximately one-third of high-fatality mass shootings in the past 32 years (Figure 3).  And in the past eight years, the share of high-fatality mass shootings that have involved assault weapons has risen to approximately half (Figure 3).

25.    The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[15]  According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[16]  A simple way to conceptualize active shooter incidents is to think of them as attempted

---

[15] All of the information in this section, including definitions and data, are publicly available from the FBI.  *See* FBI, "Active Shooter Safety Resources," *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed January 2, 2023).

[16] FBI, *Active Shooter Incidents in the United States in 2022*, April 2023, at 1, *available at* https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2022-042623.pdf/view (last accessed May 4, 2023).  The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms.  The *active* aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome."  *Ibid.* (emphasis in original).  In addition to the report on incidents in 2022, the FBI has published seven other reports on active shooter incidents covering the following seven time-periods: 2000-2013, 2014-2015, 2016-2017, 2018, 2019, 2020, and 2021.  All of these reports are available at the FBI's "Active Shooter Safety Resources" website, *supra* note 15.

21

mass shootings.  As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

26.    In the 23 years between January 1, 2000, and December 31, 2022, the FBI has identified 456 active shootings occurring in the United States.  Out of these 456 active shooter incidents, 18 incidents (3.9%) involved defensive gun uses (DGUs) by civilians, excluding law enforcement or armed security.[17]  Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one assault rifle).[18]  In other words, out of the 17 incidents where an armed civilian intervened and it was possible to identify the DGU firearm, only one incident (5.9%) involved an assault weapon.[19]  Within the broader context of all active shooter incidents, only one incident out of 456 in the past 23 years (0.2%) is known to have involved an armed civilian intervening with an assault weapon.[20]

---

[17] In 17 of the 18 DGU-involved active shooter incidents, there was an exchange of gunfire.  For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased.  FBI, *supra* notes 15 and 16.

[18] All 14 DGU incidents that involved handguns also involved armed civilians who held valid concealed-carry permits or were legally carrying their handguns.  *Ibid*.  In 12 of these 14 incidents, details about the types of handguns used in self-defense were available in news media accounts or in news media photographs from the crime scene.  In two of the 14 incidents, the use of concealed handguns was inferred based on details about the shooting reported in news media accounts.  There is no evidence that either of these two DGU incidents involved an assault pistol.

[19] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident.  *Ibid*.  Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun.  *See* Carla Field, "Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says," WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023).  Adding this incident to the 17 DGU-involved incidents where the type of firearm was identifiable would mean that 5.6% (as opposed to 5.9%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[20] FBI, *supra* notes 15 and 16.  The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas.  In that incident, an armed private citizen

22

27.    The bottom line is that assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.[21]

## V.    OWNERSHIP RATES OF "MODERN SPORTING RIFLES" AND LCMS IN THE U.S.

28.    As noted above in Para. 14, based on the most recent publicly-available NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform firearms— appear to make up as many as 5.3% of all firearms in circulation in American society (24.4 million out of an estimated 461.9 million firearms), although this is likely an over-estimate due to the apparent inclusion of modern sporting rifles in the possession of law enforcement and security agencies, firearms retailers, and prohibited owners (such as criminals and domestic abusers).  It is also likely that the NSSF's estimate includes firearms that have been illegally trafficked to other countries, especially neighboring Mexico.[22]  Based on NSSF figures, 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles.[23]  In other words, less than 8% of all civilian gun owners

---

used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene. While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him.  *See* Adam Roberts, "Man Who Shot Texas Gunman Shares His Story," KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

[21] Given the limitations of the active shooter incident data reported by the FBI, it is not possible to discern whether any of the civilian DGUs involved an armed civilian using a firearm with an LCM at the time of the intervention.  As such, it is not possible to perform a similar comparison between mass shootings perpetrated with LCM-equipped firearms and mass shootings thwarted with LCM-equipped firearms.

[22] *See*, for example, Liz Mineo, "Stopping Toxic Flow of Guns from U.S. to Mexico," *Harvard Gazette*, February 18, 2022, *available at* https://news.harvard.edu/gazette/story/2022/02/stopping-toxic-flow-of-gun-traffic-from-u-s-to-mexico (last accessed May 31, 2023).

[23] In its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.  NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at*

23

---

in the United States own modern sporting rifles.[24]  In terms of the total population of the United
States, estimated by the Census Bureau to be approximately 333 million people in 2022, less
than 2% of all Americans own a modern sporting rifle.[25]

29.    In addition to the NSSF's estimate that there are 24.4 million modern sporting
rifles in civilian circulation in the United States as of the end of 2020, the Plaintiffs draw on a
survey conducted by William English to support their estimates about the number of AR-15-style
rifles in American society.[26]  According to English, "about 24.6 million people" have owned "an
AR-15 or similar styled rifle."[27]  In surveying ownership rates, English also found that 0.3% of

---

https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last
accessed January 16, 2023).  The estimate that approximately 6.4 million gun owners possess
what the NSSF considers to be modern sporting rifles is calculated by dividing the 3.8 average
number of such rifles that each modern sporting rifle owner possesses into the 24.4 million such
rifles estimated to be in civilian circulation.  This calculation (24.4 million divided by 3.8) equals
6.4 million.  Based on survey data, 81 million American adults are estimated to own guns.  Andy
Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight,"
PolitiFact, The Poynter Institute, August 3, 2022, *available at*
https://www.politifact.com/factchecks/2022/aug/03/instagram-posts/proposed-assault-weapons-
ban-wont-turn-gun-owners- (last accessed January 16, 2023).

[24] The finding that less than 8% of all gun owners possess modern sporting rifles is
calculated by dividing the 6.4 million modern sporting rifle owners by the 81 million American
adults estimated to be gun owners.  Taking 6.4 million and dividing it by 81 million equals 7.9%.

[25] The Census Bureau's total population estimate for 2022 is 333,287,557 persons.  U.S.
Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-
19 Pandemic," December 22, 2022, *available at* https://www.census.gov/newsroom/press-
releases/2022/2022-population-
estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last
accessed January 16, 2023).  The finding that less than 2% of all Americans possess modern
sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333
million persons in United States.  Taking 6.4 million and dividing it by 333 million equals 1.9%.

[26] Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief,
*Cheeseman, et al. v. Platkin, et al.*, 1:22-cv-04360-RMB-AMD (D.N.J.), July 14, 2022, ECF No.
4, at 15, citing William English, "2021 National Firearms Survey: Updated Analysis Including
Types of Firearms Owned," Unpublished Paper (May 13, 2022; Revised September 22, 2022),
*available at* https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=4283305 (last accessed
March 7, 2023).

[27] English, *supra* note 26.

24

respondents "indicate owning over 100" AR-15 styled rifles.[28]  Assuming English correctly estimates that 24.6 million people have owned an AR-15 or similarly styled rifle, his survey results indicate that approximately 74,000 people own over 100 such rifles.  Moreover, English also reports that 1.3% of all AR-15 style rifle owners (approximately 320,000 people) own between 11 and 100 such rifles.[29]  Even if, for the sake of argument, these 74,000 people all owned only 101 AR-15s and these additional 320,000 people all owned 11 AR-15s—the lowest possible number in the range that they identified as best capturing the number of AR-15 styled rifles they own—that would mean that, *at the very least, approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners*.[30]  As a reminder, 11 million AR-15 style rifles is a conservative estimate calculated using the absolute minimum numbers in the reported ranges of 11-to-100 and 101-or-more.[31]

---

[28] *Ibid.*

[29] *Ibid.*

[30] As a reminder, the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.  NSSF, *supra* note 23.  While the NSSF, unlike the English survey, does not report whether respondents in its surveys of modern sporting rifle owners happen to own more than 10, let alone more than 100, modern sporting rifles, NSSF has detected a growing trend toward increased ownership of multiple modern sporting rifles.  For instance, in its 2010 survey, it found that 40% of modern sporting rifle owners owned only 1 modern sporting rifle and 60% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned being 2.6.  In its 2013 survey, it found that 35% of modern sporting rifle owners owned only 1 modern sporting rifle and 65% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing to 3.1.  In its most recent, 2021 survey, the NSSF found that 24% of modern sporting rifle owners owned only 1 modern sporting rifle and 76% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing yet again to 3.8.  This speaks to a growing trend in which modern sporting rifles are being purchased by gun owners who already own a modern sporting rifle, resulting in modern sporting rifles being concentrated, relatively speaking, in the hands of those who already own modern sporting rifles.  *Ibid.*

[31] While the English survey is discussed in an unpublished academic paper that is publicly available online, there are significant concerns with the study, which call into question the findings reported in the paper.  Arguably, the biggest problem with the English survey (as reported in the unpublished paper) is that it appears to be in serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research

25

30.     In deriving its estimates, the NSSF often relies on United States government data, particularly ATF data.[32]  According to the ATF, from 1986 through 2020 (which reflects the most currently-available data), the civilian stock of firearms in the United States has been made up predominantly of handguns.[33]  As Figure 11 shows, handguns account for 50% of the civilian stock of firearms, rifles account for 33%, and shotguns account for 17%.

31.     According to ATF data, handguns are the most common firearms in civilian circulation; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.[34]

---

(AAPOR).  *See* "AAPOR Code of Professional Ethics and Practices," April 2021 (Attached as **Exhibit J**).  Among the ways that the English survey seemingly runs afoul of AAPOR canons, it fails to identify the source of sponsorship funding and it fails to fully and openly disclose the measurement tools (Rules III.A.2-3).  The former is vital to assuring that the survey was not designed and conducted to further the political or economic interests of particular people or organizations.  The latter allows independent observers and researchers to assess if, among other factors, question order, question wording, or answer options biased responses.  The latter is also crucial to assuring that select findings were not suppressed because they would, if publicized, undermine the agenda of the survey's sponsor(s).  Without release of the entire questionnaire and the full results to the public, it cannot be confirmed that questions and corresponding responses were not suppressed.

[32] NSSF, 2020, *supra* note 8.

[33] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, *see* ATF, *supra* note 8.  For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the United States: Annual Statistical Update, 2021*, *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 16, 2023).

[34] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles.

26

**Figure 11. Share of Firearms in Civilian Circulation in the United States, 1986-2020**



## VI. RESTRICTIONS ON ASSAULT WEAPONS AND LCMs REDUCE THE INCIDENCE OF GUN MASSACRES, RESULTING IN LIVES SAVED

### VI.A. THE OPERATIVE MECHANISM OF ASSAULT WEAPONS BANS: SUPPRESSION AND SUBSTITUTION EFFECTS

32. As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 12).[35] The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements. This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[36]

**Figure 12. The Trinity of Violence**



---

[35] Klarevas, *supra* note 1, at 27-29, 229-238.

[36] *Ibid*.

27

33.     Bans are law-based concepts that prohibit certain behaviors by criminalizing

them.[37]  Bans on assault weapons and LCMs generally make it illegal to manufacture, import,

transfer, own, or possess certain firearms and certain magazines.  Bans work in relation to two of

the three elements of the Trinity of Violence: dissuasion and denial.  With regard to perpetrators,

bans use the threat of criminal penalty to *deter potential offenders* from engaging in the

prohibited behavior.  In the case of bans on assault weapons and LCMs, they threaten conviction,

imprisonment, and/or fines should an individual manufacture, import, transfer, or possess a

prohibited assault weapon or LCM.  One mechanism at work here centers around dissuading

potential shooters from trying to build or otherwise acquire banned firearm technologies.  But

another mechanism focuses on the assault weapon or LCM itself: *deprive potential instruments

of violence*.  Knowing that someone who is willing to commit murder might not be deterred from

violating another criminal law, like possessing a prohibited item, bans on assault weapons and

LCMs also threaten punishment against anyone who tries to transfer (through sale, gift, or loan)

a restricted item to someone who is prohibited from acquiring it.  In essence, the former strategy

seeks to dissuade the offender and the latter strategy seeks to deny the instruments of violence.

34.     Ideally, someone intent on committing a mass shooting with an assault weapon

and/or LCM would be dissuaded from going on a rampage by the fact that their means of choice

are not available.  In such a scenario, the attack would be quashed.  This *suppression effect* is

akin to what economists and psychologists refer to as a positive spillover effect, where one

desirable outcome produces a second, loosely-related desirable outcome.[38]  A real-world

---

[37] Philip J. Cook, "Research in Criminal Deterrence: Laying the Groundwork for the
Second Decade," 2 *Crime and Justice* 211 (1980); and Daniel S. Nagin, "Deterrence in the
Twenty-First Century," 42 *Crime and Justice* 199 (2013).

[38] Paul Dolan and Mateo M. Galizzi, "Like Ripples on a Pond: Behavioral Spillovers and
Their Implications for Research and Policy," 47 *Journal of Economic Psychology* 1 (2015); K.
Jane Muir and Jessica Keim-Malpass, "Analyzing the Concept of Spillover Effects for Expanded
Inclusion in Health Economics Research," 9 *Journal of Comparative Effectiveness Research* 755
(2020).

example of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun (that did not have an LCM). At the time of the crime in 2003, the Federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle and LCMs. In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse." He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on a rampage and "killed as many people as I possibly could." As he noted, "because I didn't have an assault weapon, that didn't happen."[39] In this case, the unavailability of an assault weapon due to the federal ban appears to have suppressed the perpetrator's impulse to commit a mass shooting.

35.      Of course, some potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable. They will instead replace their desired instruments of violence with available alternatives. This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[40] A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California. In that attack, the gunman appears to have been unable to acquire an assault rifle and LCMs due to California's ban on both. Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines. As a result, the gunman quickly ran out of bullets, and while pausing to reload—which appears to have been extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a

---

[39] "Inside the Mind of a Killer," CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023).

[40] Philip J. Cook, "The Effect of Gun Availability on Violent Crime Patterns," 455 *Annals of the American Academy of Political and Social Science* 63 (1981); Anthony A. Braga, et al., "Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?" 4 *Annual Review of Criminology* 147 (2021).

congregant chased him away, preventing him from continuing his attack.[41]  In this incident, which resulted in one death, California's ban on assault weapons and LCMs worked exactly as intended.  It deprived the active shooter of the mechanisms that might have allowed him to kill enough people to surpass the fatality threshold of a mass shooting.  Stated differently, if you examine data sets that identify shootings resulting in mass murder, you will not find the Poway synagogue attack on their lists.

36.    It might seem perverse to think that restrictions on certain instruments of violence operate on the premise that, if an act of violence cannot be averted, then it will proceed with an alternative instrument.  Nevertheless, this is exactly how bans on assault weapons and LCMs work in theory.  They suppress the inclinations of potential mass shooters to go on killing rampages in the first place because their means of choice are unavailable.  And, should deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous, prohibited ones, reducing the casualty tolls of attacks when they do occur.

### VI.B.    THE OPERATIVE MECHANISM OF LCM BANS: FORCING PAUSES IN ACTIVE SHOOTINGS

37.    Restrictions on assault weapons and LCMs also address the multiple advantages LCMs provide to active shooters.  Offensively, LCMs increase kill potential.  Basically, the more bullets a shooter can fire at a target within a finite amount of time, the more potential wounds they can inflict.  Furthermore, the more bullets that strike a victim, the higher the odds that that person will die.  These two factors—sustained-fire capability and multiple-impact capability— allow LCMs to increase a shooter's kill potential.

38.    When inserted into either a semiautomatic or fully-automatic firearm, an LCM facilitates the ability of an active shooter to fire a large number of rounds at an extremely quick

---

[41] Elliot Spagat and Julie Watson, "Synagogue Shooter Struggled with Gun, Fled with 50 Bullets," Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

rate without pause. This phenomenon—sustained-fire capability—comes in handy when a target is in a gunman's line of sight for only a few seconds. For example, sustained-fire capability allows a reasonably competent shooter to fire three rounds per second with a semiautomatic firearm and ten rounds per second with an automatic firearm. That results in numerous chances to hit a target in a short window of opportunity, especially when ammunition capacity is large.

39.    LCMs also facilitate the ability of a shooter to strike a human target with more than one round. This phenomenon—multiple-impact capability—increases the chances that the victim, when struck by multiple rounds, will die. At least two separate studies have found that, when compared to the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than one bullet were over 60 percent higher.[42] The implication is straightforward: being able to strike human targets with more than one bullet increases a shooter's chances of killing their victims. In essence, LCMs are force multipliers when it comes to kill potential—and the evidence from gun massacres supports this conclusion (*see* Section II).

40.    In addition to offensive advantages, LCMs also provide the defensive advantage of extended cover. During an active shooting, a perpetrator is either firing their gun or not firing their gun. While pulling the trigger, it is difficult for those in harm's way to take successful defensive maneuvers. But if the shooter runs out of bullets, there is a lull in the shooting. This precious downtime affords those in the line of fire with a chance to flee, hide, or fight back.

41.    There are several examples of individuals fleeing or taking cover while active shooters paused to reload. For instance, in 2012, several first-graders at Sandy Hook Elementary School in Newtown, Connecticut, escaped their attacker as he was swapping out magazines,

---

[42] Daniel W. Webster, et al., "Epidemiologic Changes in Gunshot Wounds in Washington, DC, 1983–1990," 127 *Archives of Surgery* 694 (June 1992); Angela Sauaia, et al., "Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000–2013," 315 *JAMA* 2465 (June 14, 2016).

31

allowing them to exit their classroom and dash to safety.[43]  Other well-known examples include

the 2007 Virginia Tech and the 2018 Borderline Bar and Grill rampages.[44]  There is also the

possibility that someone will rush an active shooter and try to tackle them (or at the very least try

to wrestle their weapon away from them) while they pause to reload.[45]  In recent history, there

have been numerous instances of gunmen being physically confronted by unarmed civilians

while reloading, bringing their gun attacks to an abrupt end.  Prominent examples include the

1993 Long Island Rail Road, the 2011 Tucson shopping center, the 2018 Nashville Waffle

House, and the 2022 Laguna Woods church shooting rampages.[46]  When there are pauses in the

shooting to reload, opportunities arise for those in the line of fire to take life-saving action.

---

[43] *See* Dave Altimari, et al., "Shooter Paused and Six Escaped," *Hartford Courant*, December 23, 2012 (Attached as **Exhibit K**).

[44] Virginia Tech Review Panel, Mass Shootings at Virginia Tech, April 16, 2007: Report of the Virginia Tech Review Panel Presented to Governor Kaine, Commonwealth of Virginia, Revised with Addendum, November 2009, available at https://scholar.lib.vt.edu/prevail/docs/April16ReportRev20091204.pdf (last accessed February 1, 2023); "California Bar Shooting: Witnesses Describe Escaping as Gunman Reloaded," CBS News, December 7, 2018, available at https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in (last accessed February 1, 2023).

[45] The longer a shooter can fire without interruption, the longer they can keep potential defenders at bay.  The longer potential defenders are kept from physically confronting a shooter, the more opportunity there is for the shooter to inflict damage.

[46] *See*, Rich Schapiro, "LIRR Massacre 20 Years Ago: 'I Was Lucky,' Says Hero Who Stopped Murderer," *New York Daily News*, December 7, 2013, *available at* http://www.nydailynews.com/new-york/nyc-crime/lirr-massacre-20-years-lucky-hero-stopped-murderer-article-1.1540846 (last accessed February 1, 2023); Sam Quinones and Nicole Santa Cruz, "Crowd Members Took Gunman Down," *Los Angeles Times*, January 9, 2011, *available at* https://www.latimes.com/archives/la-xpm-2011-jan-09-la-na-arizona-shooting-heroes-20110110-story.html (last accessed February 1, 2023); Brad Schmitt, "Waffle House Hero: Could You Rush Toward a Gunman Who Just Killed People?" *The Tennessean*, April 24, 2018, *available at* https://www.tennessean.com/story/news/crime/2018/04/24/waffle-house-hero-could-you-rush-toward-gunman-who-just-killed-people/543943002 (last accessed February 1, 2023); "Parishioners Stop Gunman in Deadly California Church Attack," NPR, May 16, 2022, *available at* https://www.npr.org/2022/05/16/1099168335/parishioners-stop-gunman-in-california-church-shooting (last accessed February 1, 2023).

32

**VI.C.**    **BANS ON ASSAULT WEAPONS AND LCMS IN PRACTICE**

42.     In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons and LCMs in an effort to reduce the occurrence and lethality of such deadly acts of firearm violence.  Prominent among these measures was the 1994 Federal Assault Weapons Ban.  In September 1994, moved to action by high-profile shooting rampages that occurred the previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons and LCMs that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[47]

43.     Like the state bans on assault weapons and LCMs that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[48]  Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand.  As Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004. In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[49]

44.     The legislative intent of the State of New Jersey in enacting the laws being challenged in the present case is similar to that of other legislative bodies that have restricted assault weapons and LCMs: reducing gun violence, especially the frequency and lethality of

---

[47] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[48] Christopher Ingraham, "The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked," *Washington Post*, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

[49] *See* sources cited *supra* note 14.

33

mass shootings.  Because, on average, the use of assault weapons and LCMs results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons and LCMs is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

45.    Currently, 32% of the U.S. population is subject to a ban on both assault weapons and LCMs.  The following is a list of the 11 state-level jurisdictions that presently restrict both assault weapons and LCMs: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); California (January 1, 2000); New York (November 1, 2000); the District of Columbia (March 31, 2009); Connecticut (April 4, 2013); Delaware (August 29, 2022); Illinois (January 10, 2023); and Washington (April 25, 2023).[50]  As a reminder, from September 13, 1994 through September 12, 2004, the entire country was also subject to federal ban on both assault weapons and LCMs.

46.    In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect.  This measure, known as the incidence rate, allows public health experts to identify discernable differences, while accounting for variations in the population, over a set period of time.  Relevant to the present case, calculating incidence rates across states, in a manner that captures whether or not bans on both assault weapons and LCMs were in effect during the period of observation, allows for the assessment of the effectiveness of such bans.  In addition, fatality rates—the number of deaths, per population, that result from particular events

---

[50] The dates in parentheses mark the effective dates on which the listed states became subject to bans on both assault weapons and LCMs.

34

across different jurisdictions—also provide insights into the impact bans on assault weapons and LCMs have on mass shooting violence.[51]

47.    Since September 1, 1990, when New Jersey became the first state to ban both assault weapons and LCMs, through December 31, 2022, there have been 93 high-fatality mass shootings in the United States (**Exhibit C**).[52]  Calculating incidence and fatality rates for this time-period, across jurisdictions with and without bans on both assault weapons and LCMs, reveals that states subject to such bans experienced a 56% decrease in high-fatality mass shooting incidence rates.  They also experienced a 66% decrease in high-fatality mass shooting fatality rates, regardless of whether assault weapons or LCMs were used (Table 7).[53]

48.    When calculations go a step further and are limited to mass shootings involving assault weapons or LCMs, the difference between the two jurisdictional categories (non-ban and ban states) is even more pronounced.  In the time-period from January 1, 1991, through December 31, 2022, accounting for population, states with bans on both assault weapons and LCMs experienced a 62% decrease in the rate of high-fatality mass shootings involving the use of assault weapons or LCMs.  Similarly, jurisdictions with such bans in effect experienced a 72%

---

[51] For purposes of this report, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control.  *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).

[52] There were no state bans on both assault weapons and LCMs in effect prior to September 1, 1990.  Therefore, January 1, 1991, is a logical starting point for an analysis of the impact of bans on assault weapons and LCMs.  As there were no high-fatality mass shootings in the last four months of 1990, extending the analysis back to September 1, 1990, would make no difference.

[53] Between September 13, 1994, and September 12, 2004, the Federal Assault Weapons Ban was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that restricted assault weapons and LCMs.  As such, the entire country is coded as being under a ban on both assault weapons and LCMs during the timeframe that the Federal Assault Weapons Ban was in effect.

35

decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs (Table 7).

49.    All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons and LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons or LCMs, where the impact is most striking.

50.    The main purpose of bans on assault weapons and LCMs is to restrict the availability of assault weapons and LCMs.  The rationale is that, if there are fewer assault weapons and LCMs in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost.

51.    Moreover, forcing active shooters to reload creates critical pauses in an attack. These pauses provide opportunities for people in the line of fire to take life-saving measures (such as fleeing the area, taking cover out of the shooter's sight, and fighting back), which in turn can help reduce casualties.

52.    The epidemiological data lend support to the policy choices of New Jersey that seek to enhance public safety through restrictions on civilian access to certain firearms and magazines.  While imposing constraints on assault weapons and LCMs will not prevent every mass shooting, the data suggest that legislative efforts to restrict such instruments of violence should result in lives being saved.

36

Table 7. Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Bans on Assault Weapons and LCMs Were in Effect, 1991-2022

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All High-Fatality Mass Shootings | | | | | |
| Non-Ban States | 162.0 | 68 | 1.31 | 720 | 13.89 |
| Ban States | 135.8 | 25 | 0.58 | 208 | 4.79 |
| Percentage Decrease in Rate for Ban States | | | 56% | | 66% |
| High-Fatality Mass Shootings Involving Assault Weapons or LCMs | | | | | |
| Non-Ban States | 162.0 | 47 | 0.91 | 575 | 11.09 |
| Ban States | 135.8 | 15 | 0.35 | 135 | 3.11 |
| Percentage Decrease in Rate for Ban States | | | 62% | | 72% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

Executed on June 13ᵗʰ, 2023, at Nassau County, New York.

/s/ Louis Klarevas

# EXHIBIT A

# Louis J. Klarevas

**Email: ljk2149@tc.columbia.edu**

## Education

Ph.D.   International Relations, 1999
        School of International Service
        American University
        Washington, DC

B.A.    Political Science, *Cum Laude*, 1989
        School of Arts and Sciences
        University of Pennsylvania
        Philadelphia, PA

## Author

*Rampage Nation: Securing America from Mass Shootings*

## Current Positions

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

## Professional Experience

*Academic Experience (Presented in Academic Years)*

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

_Professional Experience (Presented in Calendar Years)_

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*
Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*
American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti,* University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey,*" *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

## Commentaries and Correspondence

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993

**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007


**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009


**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011


**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)


**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Preventive Medicine*

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Participant, Minnesota Chiefs of Police Association, Survey of Measures to Reduce Gun Violence, 2023

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Expert Witness Service**

Town of Superior, Colorado, 2023-

City of Boulder, Colorado, 2023-

City of Louisville, Colorado, 2023-

County of Boulder, Colorado, 2023-

State of Connecticut, 2023-

State of Hawaii, 2023-

State of Illinois, 2023-

State of Massachusetts, 2023-

State of New Jersey, 2023-

State of Oregon, 2023-

City of Highland Park, Illinois, 2022-

County of Cook, Illinois, 2022-

State of Washington, 2022-

Government of Canada, 2021-2022

Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019

State of California, 2017-

State of Colorado, 2016-2017, 2022-

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Branas and Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT B

LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS






Prometheus Books

59 John Glenn Drive
Amherst, New York 14228

48    PART 1: PROBLEM

### Table 2.1. The Concept of a Mass Shooting.

**Definition of a Mass Shooting:**

Any violent attack that results in four or more individuals incurring gunshot wounds.

**Categories of Mass Shooting:**

1. *Nonfatal*
   Mass shootings in which no one dies.

2. *Fatal*
   Mass shootings in which at least one victim dies.

3. *High-Fatality / Gun Massacre*
   Mass shootings in which six or more victims die.

★ ★ ★

It's easy to dismiss conceptual discussions and debates as exercises in Ivory Tower intellectualism. But how we identify and think about mass shootings impacts which attacks capture national attention and which are disregarded—something which has far-reaching policy consequences. Thus, coming up with the best possible definition and conceptualization is a vital first step toward explaining and preventing rampage violence. As the Socratic adage reminds us, "The beginning of wisdom is the definition of terms."[43]

# EXHIBIT C

**Exhibit C**
**High-Fatality Mass Shootings in the United States, 1991-2022**

|  | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 1 | 1/26/1991 | Chimayo | NM | 7 | N | N |
| 2 | 8/9/1991 | Waddell | AZ | 9 | N | N |
| 3 | 10/16/1991 | Killeen | TX | 23 | N | Y |
| 4 | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N | N |
| 5 | 1/8/1993 | Palatine | IL | 7 | N | N |
| 6 | 5/16/1993 | Fresno | CA | 7 | Y | Y |
| 7 | 7/1/1993 | San Francisco | CA | 8 | Y | Y |
| 8 | 12/7/1993 | Garden City | NY | 6 | N | Y |
| 9 | 4/20/1999 | Littleton | CO | 13 | Y | Y |
| 10 | 7/12/1999 | Atlanta | GA | 6 | N | U |
| 11 | 7/29/1999 | Atlanta | GA | 9 | N | Y |
| 12 | 9/15/1999 | Fort Worth | TX | 7 | N | Y |
| 13 | 11/2/1999 | Honolulu | HI | 7 | N | Y |
| 14 | 12/26/2000 | Wakefield | MA | 7 | Y | Y |
| 15 | 12/28/2000 | Philadelphia | PA | 7 | N | Y |
| 16 | 8/26/2002 | Rutledge | AL | 6 | N | N |
| 17 | 1/15/2003 | Edinburg | TX | 6 | Y | U |
| 18 | 7/8/2003 | Meridian | MS | 6 | N | N |
| 19 | 8/27/2003 | Chicago | IL | 6 | N | N |
| 20 | 3/12/2004 | Fresno | CA | 9 | N | N |
| 21 | 11/21/2004 | Birchwood | WI | 6 | Y | Y |
| 22 | 3/12/2005 | Brookfield | WI | 7 | N | Y |
| 23 | 3/21/2005 | Red Lake | MN | 9 | N | Y |
| 24 | 1/30/2006 | Goleta | CA | 7 | N | Y |
| 25 | 3/25/2006 | Seattle | WA | 6 | N | N |
| 26 | 6/1/2006 | Indianapolis | IN | 7 | Y | Y |
| 27 | 12/16/2006 | Kansas City | KS | 6 | N | N |
| 28 | 4/16/2007 | Blacksburg | VA | 32 | N | Y |
| 29 | 10/7/2007 | Crandon | WI | 6 | Y | Y |
| 30 | 12/5/2007 | Omaha | NE | 8 | Y | Y |
| 31 | 12/24/2007 | Carnation | WA | 6 | N | U |
| 32 | 2/7/2008 | Kirkwood | MO | 6 | N | Y |
| 33 | 9/2/2008 | Alger | WA | 6 | N | U |
| 34 | 12/24/2008 | Covina | CA | 8 | N | Y |
| 35 | 1/27/2009 | Los Angeles | CA | 6 | N | N |
| 36 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y | Y |
| 37 | 3/29/2009 | Carthage | NC | 8 | N | N |
| 38 | 4/3/2009 | Binghamton | NY | 13 | N | Y |

| | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 39 | 11/5/2009 | Fort Hood | TX | 13 | N | Y |
| 40 | 1/19/2010 | Appomattox | VA | 8 | Y | Y |
| 41 | 8/3/2010 | Manchester | CT | 8 | N | Y |
| 42 | 1/8/2011 | Tucson | AZ | 6 | N | Y |
| 43 | 7/7/2011 | Grand Rapids | MI | 7 | N | Y |
| 44 | 8/7/2011 | Copley Township | OH | 7 | N | N |
| 45 | 10/12/2011 | Seal Beach | CA | 8 | N | N |
| 46 | 12/25/2011 | Grapevine | TX | 6 | N | N |
| 47 | 4/2/2012 | Oakland | CA | 7 | N | N |
| 48 | 7/20/2012 | Aurora | CO | 12 | Y | Y |
| 49 | 8/5/2012 | Oak Creek | WI | 6 | N | Y |
| 50 | 9/27/2012 | Minneapolis | MN | 6 | N | Y |
| 51 | 12/14/2012 | Newtown | CT | 27 | Y | Y |
| 52 | 7/26//2013 | Hialeah | FL | 6 | N | Y |
| 53 | 9/16/2013 | Washington | DC | 12 | N | N |
| 54 | 7/9/2014 | Spring | TX | 6 | N | Y |
| 55 | 9/18/2014 | Bell | FL | 7 | N | U |
| 56 | 2/26/2015 | Tyrone | MO | 7 | N | U |
| 57 | 5/17/2015 | Waco | TX | 9 | N | Y |
| 58 | 6/17/2015 | Charleston | SC | 9 | N | Y |
| 59 | 8/8/2015 | Houston | TX | 8 | N | U |
| 60 | 10/1/2015 | Roseburg | OR | 9 | N | Y |
| 61 | 12/2/2015 | San Bernardino | CA | 14 | Y | Y |
| 62 | 2/21/2016 | Kalamazoo | MI | 6 | N | Y |
| 63 | 4/22/2016 | Piketon | OH | 8 | N | U |
| 64 | 6/12/2016 | Orlando | FL | 49 | Y | Y |
| 65 | 5/27/2017 | Brookhaven | MS | 8 | Y | Y |
| 66 | 9/10/2017 | Plano | TX | 8 | Y | Y |
| 67 | 10/1/2017 | Las Vegas | NV | 60 | Y | Y |
| 68 | 11/5/2017 | Sutherland Springs | TX | 25 | Y | Y |
| 69 | 2/14/2018 | Parkland | FL | 17 | Y | Y |
| 70 | 5/18/2018 | Santa Fe | TX | 10 | N | N |
| 71 | 10/27/2018 | Pittsburgh | PA | 11 | Y | Y |
| 72 | 11/7/2018 | Thousand Oaks | CA | 12 | N | Y |
| 73 | 5/31/2019 | Virginia Beach | VA | 12 | N | Y |
| 74 | 8/3/2019 | El Paso | TX | 23 | Y | Y |
| 75 | 8/4/2019 | Dayton | OH | 9 | Y | Y |
| 76 | 8/31/2019 | Midland and Odessa | TX | 7 | Y | Y |
| 77 | 3/15/2020 | Moncure | NC | 6 | U | U |
| 78 | 6/4/2020 | Valhermoso Springs | AL | 7 | Y | Y |
| 79 | 9/7/2020 | Aguanga | CA | 7 | U | U |

C 2

**JA1687**

| | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 80 | 2/2/2021 | Muskogee | OK | 6 | N | U |
| 81 | 3/16/2021 | Acworth and Atlanta | GA | 8 | N | Y |
| 82 | 3/22/2021 | Boulder | CO | 10 | Y | Y |
| 83 | 4/7/2021 | Rock Hill | SC | 6 | Y | Y |
| 84 | 4/15/2021 | Indianapolis | IN | 8 | Y | Y |
| 85 | 5/9/2021 | Colorado Springs | CO | 6 | N | Y |
| 86 | 5/26/2021 | San Jose | CA | 9 | N | Y |
| 87 | 1/23/2022 | Milwaukee | WI | 6 | N | U |
| 88 | 4/3/2022 | Sacramento | CA | 6 | N | Y |
| 89 | 5/14/2022 | Buffalo | NY | 10 | Y | Y |
| 90 | 5/24/2022 | Uvalde | TX | 21 | Y | Y |
| 91 | 7/4/2022 | Highland Park | IL | 7 | Y | Y |
| 92 | 10/27/2022 | Broken Arrow | OK | 7 | N | U |
| 93 | 11/22/2022 | Chesapeake | VA | 6 | N | U |

Note: High-fatality mass shootings are mass shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or motive.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban or (2) the statutes of the state where the shooting occurred.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device with a capacity of more than 10 bullets.  Incidents in gray shade are those incidents that occurred at a time when and in a state where legal prohibitions on both assault weapons and large-capacity magazines were in effect statewide or nationwide.

Sources: Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022); and "Gun Violence Archive," *available at* https://www.gunviolencearchive.org (last accessed January 3, 2023).  The Gun Violence Archive was only consulted for identifying high-fatality mass shootings that occurred since January 1, 2018.

C 3

# EXHIBIT D



Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)

JA1690



**Mass Shootings Resulting in Double-Digit Fatalities in American History (1949-2022)**

Deaths per Incident

● Assault Weapons and Large-Capacity Magazines Involved
● Large Capacity Magazine Involved (But Not Assault Weapon Involved)
● No Large-Capacity Magazines or Assault Weapons Involved

JA1691

# EXHIBIT E



LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS






**PB** Prometheus Books

59 John Glenn Drive
Amherst, New York  14228



in a class all by itself. No other advanced, Western democracy experiences the magnitude of gun violence that presently afflicts American society.[28] This is particularly true when it comes to mass shootings.[29]



*  *  *

The United States does little to regulate firearms, especially at the federal level.[30] While it goes to great lengths to restrict access to WMDs and IEDs, the same can't be said for its efforts to keep firearms out of the hands of high-risk individuals. Indeed, the American experience with gun control nationwide is so limited that it can actually be chronicled in a few bullet points:

- The National Firearms Act of 1934: Heavily regulated machine guns, short-barrel rifles and shotguns, and silencers.
- The Federal Firearms Act of 1938: Established a federal licensing system to regulate manufacturers, importers, and dealers of firearms.
- The Omnibus Crime Control and Safe Streets Act of 1968: Prohibited anyone under twenty-one years of age from purchasing a handgun.
- The Gun Control Act of 1968: Required that all interstate firearms transfers or sales be made through a federally licensed firearms dealer and prohibited certain categories of people— felons (indicted or convicted), fugitives, drug abusers, mentally ill persons (as determined by adjudication), illegal aliens, dishonorably discharged servicemen, US-citizenship renouncers, and domestic abusers—from possessing firearms.[31]
- The Firearm Owners Protection Act of 1986: Barred the purchase or transfer of automatic weapons without government approval.
- The Undetectable Firearms Act of 1988: Required that all firearms have at least 3.7 oz. of metal that can be detected by a metal detector.
- The Gun-Free School Zones Act of 1990: Criminalized possession or discharge of a firearm in a school zone.
- The Brady Handgun Violence Prevention Act of 1993: Required



that anyone attempting to purchase a firearm from a federally licensed dealer pass a background check.[32]

• The Federal Assault Weapons Ban of 1994: Banned the sale and possession of semiautomatic assault weapons and extended-capacity magazines not grandfathered prior to the enactment of the law.[33]

Of all of these measures, the National Firearms Act of 1934 and the Assault Weapons Ban of 1994 (AWB) were the only ones instituted primarily in an effort to reduce the carnage of mass shootings. The former was passed in response to a series of bloody gangland executions, including the infamous 1929 St. Valentine's Day massacre in Chicago.[34] While there are still machine guns in circulation, the National Firearm Act, in conjunction with the Firearm Owners Protection Act of 1986, sharply cut the availability of machine guns, which likely explains the complete elimination of massacres perpetrated with such automatic-fire weapons.



Like the National Firearms Act, the AWB was introduced following several high-profile mass shootings in the early 1990s: the Luby's restaurant, 101 California Street office complex, and Long Island Railroad train car massacres.[35] Signed into law by President Bill Clinton, the AWB went into effect on September 13, 1994. At the insistence of the gun-rights lobby, however, the bill contained a ten-year sunset provision. As Congress never renewed the ban, it automatically expired on September 13, 2004.

The decade the law was in effect nonetheless resulted in a unique experiment, allowing us to discern what impact, if any, the ban had on gun violence in general and mass shootings in particular. As to the former, the academic consensus seems to be that the AWB had a minimal impact on reducing violent crime.[36] This hardly comes as a surprise. After all, most crimes don't involve assault weapons. The real test should be: Did it succeed in its intended purpose of reducing rampage violence? The answer is a resounding yes.

Let's take a closer look.

The best way to assess the impact of something is to conduct what, in social science, we commonly refer to as a time-series analysis. Basically, that's a fancy name for a before-and-after test. Figures 7.1





Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.

Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.

JA1696

242    PART 3: PRESCRIPTION



Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.

| | Decade Before AWB | Decade During AWB | Decade After AWB |
|---|---|---|---|
| Incidents | 19 | 12 | 34 |
| Deaths | 155 | 89 | 302 |

**JA1697**



and 7.2 provide a look at the before-and-after pictures. In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death toll of 8.2 fatalities per incident. During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident.[37] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[38] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980).[39] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm. As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance. In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8.9 fatalities per incident.[40] These numbers paint a clear picture: America's experiment, while short-lived, was also extremely successful.[41]

## ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives. But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights.

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders. In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws. A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions.[42] That

# EXHIBIT F

# The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017

*Louis Klarevas, PhD, Andrew Conner, BS, David Hemenway, PhD*

*Objectives.* To evaluate the effect of large-capacity magazine (LCM) bans on the frequency and lethality of high-fatality mass shootings in the United States.

*Methods.* We analyzed state panel data of high-fatality mass shootings from 1990 to 2017. We first assessed the relationship between LCM bans overall, and then federal and state bans separately, on (1) the occurrence of high-fatality mass shootings (logit regression) and (2) the deaths resulting from such incidents (negative binomial analysis). We controlled for 10 independent variables, used state fixed effects with a continuous variable for year, and accounted for clustering.

*Results.* Between 1990 and 2017, there were 69 high-fatality mass shootings. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

*Conclusions.* LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality mass shootings. (*Am J Public Health.* 2019;109:1754–1761. doi: 10.2105/AJPH.2019.305311)

The recent spate of gun massacres in the United States has re-energized the debate over how to prevent such tragedies.[1] A common response to high-profile acts of gun violence is the promotion of tighter gun legislation, and there is some evidence that laws imposing tighter restrictions on access to firearms have been associated with lower levels of mass shootings.[2] One proposal that has received renewed interest involves restricting the possession of large-capacity magazines (LCMs).[3–5] This raises an important question: what has been the impact of LCM bans on high-fatality mass shootings?

In an attempt to arrest an uptick in mass shooting violence in the early 1990s, Congress in 1994 enacted the federal assault weapons ban, which, among other things, restricted ownership of certain ammunition-feeding devices.[6,7] The law, which contained a sunset provision, was allowed to expire a decade later. Pursuant to that ban (18 USC §921(a) [1994]; repealed), it was illegal to possess LCMs—defined as any ammunition-feeding device holding more than 10 bullets—unless the magazines were manufactured before the enactment of the ban. LCM restrictions are arguably the most important component of assault weapons bans because they also apply to semiautomatic firearms without military-style features.[8,9]

Beginning with New Jersey in 1990, some states implemented their own regulations on LCMs. Today, 9 states and the District of Columbia restrict the possession of LCMs. The bans vary along many dimensions, including maximum bullet capacity of permissible magazines, grandfathering of existing LCMs, and applicable firearms. Moreover, overlaps sometimes exist between assault weapons bans and LCM bans, but not in all states. For example, California instituted a ban on assault weapons in 1989, but LCMs remained unregulated in the state until 1994, when the federal ban went into effect. In 2000, California's own statewide ban on LCMs took effect as a safeguard in the event the federal ban expired, which happened in 2004.[10,11]

LCMs provide a distinct advantage to active shooters intent on murdering numerous people: they increase the number of rounds that can be fired at potential victims before having to pause to reload or switch weapons. Evidence shows that victims struck by multiple rounds are more likely to die, with 2 studies finding that, when compared with the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than 1 bullet were more than 60% higher.[12,13] Being able to strike human targets with more than 1 bullet increases shooters' chances of killing their victims. Analyses of gunshot wound victims at level I trauma centers have suggested that this multiple-impact capability is often attributable to the use of LCMs.[14,15]

In addition, LCMs provide active shooters with extended cover.[16] During an attack, perpetrators are either firing their guns or not firing their guns. While gunmen are firing, it is extremely difficult for those in the line of fire to take successful defensive maneuvers. But if gunmen run out of bullets, there are lulls in the shootings, as the perpetrators are forced to pause their attacks to reload or change weapons. These pauses provide opportunities for people to intervene and disrupt a shooting. Alternatively, they provide individuals in

### ABOUT THE AUTHORS
*Louis Klarevas is with the Teachers College, Columbia University, New York, NY. Andrew Conner is with the Frank H. Netter, MD, School of Medicine, Quinnipiac University, North Haven, CT. David Hemenway is with the Harvard T. H. Chan School of Public Health, Harvard University, Boston, MA.*

*Correspondence should be sent to Louis Klarevas, Research Professor, Office of the Provost, Teachers College, Columbia University, 525 W 120th St, New York, NY 10027 (e-mail: ljk2149@tc.columbia.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted July 22, 2019.*

*doi: 10.2105/AJPH.2019.305311*

harm's way with a chance to flee or hide. Legislative endeavors that restrict access to LCMs are implemented with the express objective of reducing an active shooter's multiple-impact capability and extended cover.[10]

Although mass shootings have received extensive study, there has been little scholarly analysis of LCM bans.[17–24] The studies undertaken that have broached the subject of ammunition capacity have primarily concentrated on the effect of LCM bans on violent crimes other than mass shootings or on the impact of the assault weapons bans on mass shootings.[25–27]

Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings.[10,20,28] Proponents of LCM bans believe that without LCMs, fewer people will be killed in a mass shooting, other things equal. In turn, fewer shootings will cross the threshold required to be classified as what we call a "high-fatality mass shooting" (≥ 6 victims shot to death). If LCM bans are effective, we should expect to find that high-fatality mass shootings occur at a lower incidence rate when LCM bans are in place, and fewer people are killed in such attacks. But have LCM bans actually saved lives in practice? To our knowledge, the impact of LCM bans has never been systematically assessed. This study fills that void.

## METHODS

Mass shootings have been defined in a variety of ways, with some analyses setting the casualty threshold as low as 2 people wounded or killed and others requiring a minimum of 7 gunshot victims.[18,22,29] We focused on high-fatality mass shootings—the deadliest and most disturbing of such incidents—which are defined as intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators.[20,30,31] After an exhaustive search, we identified 69 such incidents in the United States between 1990 and 2017. We then discerned whether each high-fatality mass shooting involved an LCM—unless otherwise stated, defined consistent with the 1994 federal ban as a detachable ammunition-feeding device capable of holding more than 10 bullets. (See Table 1 for a list of incidents and for additional details on

the search and identification strategy we employed.)

The first state to enact an LCM ban was New Jersey in 1990. Since then, another 8 states and the District of Columbia have enacted LCM bans (Table A, available as a supplement to the online version of this article at http://www.ajph.org).[10] With no LCM bans in effect before 1990, a priori we chose that year to begin our analysis to avoid inflating the impact of the bans. Our data set extends 28 years, from 1990 through 2017. As a secondary analysis, we used a 13-year data set, beginning in 2005, the first full year after the federal assault weapons ban expired.

Our primary outcome measures were the incidence of high-fatality mass shootings and the number of victims killed. We distinguished between high-fatality mass shootings occurring with and without a ban in effect. Because the federal ban was in effect nationwide from September 13, 1994, through September 12, 2004, we coded every state as being under an LCM ban during that 10-year timeframe.

Our interest was in the effect of LCM bans. We ran regression analyses to determine if any relationship between LCM bans and high-fatality mass shootings can be explained by other factors. In our state–year panel multivariate analyses, the outcome variables were (1) whether an LCM-involved high-fatality mass shooting occurred, (2) whether any high-fatality mass shooting occurred, (3) the number of fatalities in an LCM-involved high-fatality mass shooting, and (4) the number of fatalities in any high-fatality mass shooting. Our analyses first combined and then separated federal and state LCM bans.

Consistent with the suggestions and practices of the literature on firearm homicides and mass shootings, our explanatory variables are population density; proportion of population aged 19 to 24 years, aged 25 to 34 years, that is Black, and with a college degree; real per-capita median income; unemployment rate; and per-capita prison population.[2,26,27,32] We also added a variable for percentage of households with a firearm. All regression models controlled for total state population. When the dependent variable reflected occurrences of incidents (ordered choice data), we used logit regression; we ran probit regression as a sensitivity analysis. We had multiple observations for individual

states. To control for this, we utilized cluster-robust standard errors to account for the clustering of observations. When the dependent variable reflected deaths (count data), we used negative binomial regression; Gius used a Poisson regression, and we used that approach as a sensitivity analysis.[26] We included state fixed effects. We used a continuous variable for year because the rate of high-fatality mass shootings has increased over time. For purposes of sensitivity analysis, we also replaced the linear yearly trend with a quadratic function. We performed multivariate statistical analyses by using Stata/IC version 15.1 (StataCorp LP, College Station, TX).

Population data came from the US Census Bureau, unemployment data came from the Bureau of Labor Statistics, and imprisonment data came from the Bureau of Justice Statistics. The percentage of households with a firearm was a validated proxy (the percentage of suicides that are firearm suicides) derived from Centers for Disease Control and Prevention National Vital Statistics Data.[33]

## RESULTS

Between 1990 and 2017, there were 69 high-fatality mass shootings (≥ 6 victims shot to death) in the United States. Of these, 44 (64%) involved LCMs, 16 did not (23%), and for 9 (13%) we could not determine whether LCMs were used (Table 1). The mean number of victims killed in the 44 LCM-involved high-fatality mass shootings was 11.8; including the unknowns resulted in that average falling to 11.0 (not shown). The mean number of victims killed in high-fatality mass shootings in which the perpetrator did not use an LCM was 7.3 (Table B, available as a supplement to the online version of this article at http://www.ajph.org); including the unknowns resulted in that average falling to 7.1 (not shown). When we excluded unknown cases, the data indicated that utilizing LCMs in high-fatality mass shootings resulted in a 62% increase in the mean death toll.

Data sets of mass shooting fatalities by their nature involve truncated data, with the mode generally being the baseline number of fatalities required to be included in the data set (6 fatalities in the current study). Our data

TABLE 1—High-Fatality Mass Shootings in the United States, 1990–2017

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|----------|------|------|-------|-----|-------------|---------------|------------------------------|
| 1 | Jun 18, 1990 | Jacksonville | FL | Y | 9 | N | N |
| 2 | Jan 26, 1991 | Chimayo | NM | N | 7 | N | N |
| 3 | Aug 9, 1991 | Waddell | AZ | N | 9 | N | N |
| 4 | Oct 16, 1991 | Killeen | TX | Y | 23 | N | N |
| 5 | Nov 7, 1992 | Morro Bay and Paso Robles | CA | N | 6 | N | N |
| 6 | Jan 8, 1993 | Palatine | IL | N | 7 | N | N |
| 7 | May 16, 1993 | Fresno | CA | Y | 7 | N | N |
| 8 | Jul 1, 1993 | San Francisco | CA | Y | 8 | N | N |
| 9 | Dec 7, 1993 | Garden City | NY | Y | 6 | N | N |
| 10 | Apr 20, 1999 | Littleton | CO | Y | 13 | Y | Y |
| 11 | Jul 12, 1999 | Atlanta | GA | U | 6 | Y | Y |
| 12 | Jul 29, 1999 | Atlanta | GA | Y | 9 | Y | Y |
| 13 | Sep 15, 1999 | Fort Worth | TX | Y | 7 | Y | Y |
| 14 | Nov 2, 1999 | Honolulu | HI | Y | 7 | Y | Y |
| 15 | Dec 26, 2000 | Wakefield | MA | Y | 7 | Y | Y |
| 16 | Dec 28, 2000 | Philadelphia | PA | Y | 7 | Y | Y |
| 17 | Aug 26, 2002 | Rutledge | AL | N | 6 | Y | Y |
| 18 | Jan 15, 2003 | Edinburg | TX | U | 6 | Y | Y |
| 19 | Jul 8, 2003 | Meridian | MS | N | 6 | Y | Y |
| 20 | Aug 27, 2003 | Chicago | IL | N | 6 | Y | Y |
| 21 | Mar 12, 2004 | Fresno | CA | N | 9 | Y | Y |
| 22 | Nov 21, 2004 | Birchwood | WI | Y | 6 | N | N |
| 23 | Mar 12, 2005 | Brookfield | WI | Y | 7 | N | N |
| 24 | Mar 21, 2005 | Red Lake | MN | Y | 9 | N | N |
| 25 | Jan 30, 2006 | Goleta | CA | Y | 7 | Y | N |
| 26 | Mar 25, 2006 | Seattle | WA | Y | 6 | N | N |
| 27 | Jun 1, 2006 | Indianapolis | IN | Y | 7 | N | N |
| 28 | Dec 16, 2006 | Kansas City | KS | N | 6 | N | N |
| 29 | Apr 16, 2007 | Blacksburg | VA | Y | 32 | N | N |
| 30 | Oct 7, 2007 | Crandon | WI | Y | 6 | N | N |
| 31 | Dec 5, 2007 | Omaha | NE | Y | 8 | N | N |
| 32 | Dec 24, 2007 | Carnation | WA | U | 6 | N | N |
| 33 | Feb 7, 2008 | Kirkwood | MO | Y | 6 | N | N |
| 34 | Sep 2, 2008 | Alger | WA | U | 6 | N | N |
| 35 | Dec 24, 2008 | Covina | CA | Y | 8 | Y | N |
| 36 | Jan 27, 2009 | Los Angeles | CA | N | 6 | Y | N |
| 37 | Mar 10, 2009 | Kinston, Samson, and Geneva | AL | Y | 10 | N | N |
| 38 | Mar 29, 2009 | Carthage | NC | N | 8 | N | N |
| 39 | Apr 3, 2009 | Binghamton | NY | Y | 13 | Y | N |
| 40 | Nov 5, 2009 | Fort Hood | TX | Y | 13 | N | N |
| 41 | Jan 19, 2010 | Appomattox | VA | Y | 8 | N | N |

*Continued*

**TABLE 1—Continued**

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|----------|------|------|-------|-----|-------------|---------------|------------------------------|
| 42 | Aug 3, 2010 | Manchester | CT | Y | 8 | N | N |
| 43 | Jan 8, 2011 | Tucson | AZ | Y | 6 | N | N |
| 44 | Jul 7, 2011 | Grand Rapids | MI | Y | 7 | N | N |
| 45 | Aug 7, 2011 | Copley Township | OH | N | 7 | N | N |
| 46 | Oct 12, 2011 | Seal Beach | CA | N | 8 | Y | N |
| 47 | Dec 25, 2011 | Grapevine | TX | N | 6 | N | N |
| 48 | Apr 2, 2012 | Oakland | CA | N | 7 | Y | N |
| 49 | Jul 20, 2012 | Aurora | CO | Y | 12 | N | N |
| 50 | Aug 5, 2012 | Oak Creek | WI | Y | 6 | N | N |
| 51 | Sep 27, 2012 | Minneapolis | MN | Y | 6 | N | N |
| 52 | Dec 14, 2012 | Newtown | CT | Y | 27 | N | N |
| 53 | Jul 26, 2013 | Hialeah | FL | Y | 6 | N | N |
| 54 | Sep 16, 2013 | Washington | DC | N | 12 | Y | N |
| 55 | Jul 9, 2014 | Spring | TX | Y | 6 | N | N |
| 56 | Sep 18, 2014 | Bell | FL | U | 7 | N | N |
| 57 | Feb 26, 2015 | Tyrone | MO | U | 7 | N | N |
| 58 | May 17, 2015 | Waco | TX | Y | 9 | N | N |
| 59 | Jun 17, 2015 | Charleston | SC | Y | 9 | N | N |
| 60 | Aug 8, 2015 | Houston | TX | U | 8 | N | N |
| 61 | Oct 1, 2015 | Roseburg | OR | Y | 9 | N | N |
| 62 | Dec 2, 2015 | San Bernardino | CA | Y | 14 | Y | N |
| 63 | Feb 21, 2016 | Kalamazoo | MI | Y | 6 | N | N |
| 64 | Apr 22, 2016 | Piketon | OH | U | 8 | N | N |
| 65 | Jun 12, 2016 | Orlando | FL | Y | 49 | N | N |
| 66 | May 27, 2017 | Brookhaven | MS | U | 8 | N | N |
| 67 | Sep 10, 2017 | Plano | TX | Y | 8 | N | N |
| 68 | Oct 1, 2017 | Las Vegas | NV | Y | 58 | N | N |
| 69 | Nov 5, 2017 | Sutherland Springs | TX | Y | 25 | N | N |

*Note.* LCM = large-capacity magazine; N = no; U = unknown; Y = yes. From September 13, 1994, until and including September 12, 2004, each and every state, including the District of Columbia, was subject to a ban on LCMs pursuant to the federal assault weapons ban. To collect the data in Table 1, we searched the following news media resources for every shooting that resulted in 6 or more fatalities: America's Historical Newspapers, EBSCO, Factiva, Gannett Newsstand, Google News Archive, Lexis-Nexis, Newspaper Archive, Newspaper Source Plus, Newspapers.com, Newswires, ProQuest Historical Newspapers, and ProQuest Newsstand. We also reviewed mass shooting data sets maintained by *Mother Jones*, the *New York Times*, and *USA Today.* In addition to news media sources, we reviewed reports on mass shootings produced by think tank, policy advocacy, and governmental organizations, including the US Federal Bureau of Investigation Supplementary Homicide Reports, the crowdsourced Mass Shooting Tracker, and the open-source databases maintained by the Gun Violence Archive and the Stanford University Geospatial Center. Finally, when it was relevant, we also reviewed court records as well as police, forensic, and autopsy reports. As a general rule, when government sources were available, they were preferred over other sources. Furthermore, when media sources conflicted on the number of casualties or the weaponry involved, the later sources were privileged (as later reporting is often more accurate).

set of high-fatality mass shootings was no exception. As such, the median average number of fatalities for each subset of incidents—those involving and those not involving LCMs—was necessarily lower than the mean average. Nevertheless, like the mean average, the median average was higher when LCMs were employed—a median average of 8 fatalities per incident compared with 7 fatalities per incident for attacks not involving LCMs.

For the 60 incidents in which it was known if an LCM was used, in 44 the perpetrator used an LCM. Of the 44 incidents in which the perpetrators used LCMs, 77% (34/44) were in nonban states. In the 16 incidents in which the perpetrators did not use LCMs, 50% (8/16) were in nonban states (Table B, available as a supplement to the online version of this article at http://www.ajph.org). Stated differently, in nonban states, 81% (34/42) of high-fatality mass shooting perpetrators used LCMs; in LCM-ban states, only 55% (10/18) used LCMs.

The rate of high-fatality mass shootings increased considerably after September 2004 (when the federal assault weapons ban expired). In the 10 years the federal ban was in effect, there were 12 high-fatality mass shootings and 89 deaths (an average of 1.2 incidents and 8.9 deaths per year). Since then, through 2017, there have been 48 high-fatality mass shootings and 527 deaths (an average of 3.6 incidents and 39.6 deaths per year in these 13.3 years).

Of the 69 high-fatality mass shootings from 1990 to 2017, 49 occurred in states without an LCM ban in effect at the time and 20 in states with a ban in effect at the time. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 11.7 per billion population; the annual incidence rate for high-fatality mass shootings in states with an LCM ban was 5.1 per billion population. In that 28-year period, the rate of high-fatality mass shootings per capita was 2.3 times higher in states without an LCM ban (Table 2).

Non–LCM ban states had not only more incidents but also more deaths per incident (10.9 vs 8.2). The average annual number of high-fatality mass shooting deaths per billion population in the non–LCM ban states was

127.4. In the LCM ban states, it was 41.6 (Table 2).

For the time period beginning with the first full calendar year following the expiration of the federal assault weapons ban (January 1, 2005–December 31, 2017), there were 47 high-fatality mass shootings in the United States. Of these, 39 occurred in states where an LCM ban was not in effect, and 8 occurred in LCM ban locations. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 13.2 per billion population; for states with an LCM ban, it was 7.4 per billion population (Table 2). During this period, non–LCM ban states had not only more incidents but also more deaths per incident (11.4 vs 9.4). In terms of high-fatality mass shooting deaths per billion population, the annual number of deaths in the non–LCM ban states was 150.6; in the LCM ban states it was 69.2 (Table 2).

When we limited the analysis solely to high-fatality mass shootings that definitely involved LCMs, the differences between ban and nonban states became larger. For example, for the entire period of 1990 to 2017, of the 44 high-fatality mass shootings that involved LCMs, the annual incidence rate for LCM-involved high-fatality mass shootings

in nonban states was 8.1 per billion population; in LCM-ban states it was 2.5 per billion population. The annual rate of high-fatality mass shooting deaths in the non–LCM ban states was 102.1 per billion population; in the LCM ban state it was 23.3. In terms of LCM-involved high-fatality mass shootings, we also found comparable wide differences in incidence and fatality rates between ban and nonban states for the post–federal assault weapons ban period (2005–2017; Table 2).

We found largely similar results in the multivariate analyses (1990–2017). States that did not ban LCMs were significantly more likely to experience LCM-involved high-fatality mass shootings as well as more likely to experience any high-fatality mass shootings (regardless of whether an LCM was involved). States that did not ban LCMs also experienced significantly more deaths from high-fatality mass shootings, operationalized as the absolute number of fatalities (Table 3).

When the LCM bans were separated into federal and state bans, both remained significantly related to the incidence of LCM-involved high-fatality mass shooting events and to the number of LCM-involved high-fatality mass shooting deaths. The associations between federal and state bans and

**TABLE 2—High-Fatality Mass Shootings (≥ 6 Victims Shot to Death) by Whether LCM Bans Were in Effect: United States, 1990–2017**

| | Average Annual Population, No. (Millions) | Total Incidents, No. | Annual Incidents per Billion Population, No. | Total Deaths, No. | Annual Deaths per Billion Population, No. | Deaths per Incident, No. |
|---|---|---|---|---|---|---|
| **All high-fatality mass shootings, 1990–2017 (28 y)** | | | | | | |
| Non–LCM ban states | 149.7 | 49 | 11.7 | 534 | 127.4 | 10.9 |
| LCM ban states | 140.7 | 20 | 5.1 | 164 | 41.6 | 8.2 |
| **All high-fatality mass shootings, 2005–2017 (13 y)** | | | | | | |
| Non–LCM ban states | 227.8 | 39 | 13.2 | 446 | 150.6 | 11.4 |
| LCM ban states | 83.4 | 8 | 7.4 | 75 | 69.2 | 9.4 |
| **LCM-involved high-fatality mass shootings, 1990–2017 (28 y)** | | | | | | |
| Non–LCM ban states | 149.7 | 34 | 8.1 | 428 | 102.1 | 12.6 |
| LCM ban states | 140.7 | 10 | 2.5 | 92 | 23.3 | 9.2 |
| **LCM-involved high-fatality mass shootings, 2005–2017 (13 y)** | | | | | | |
| Non–LCM ban states | 227.8 | 28 | 9.5 | 369 | 124.6 | 13.2 |
| LCM ban states | 83.4 | 4 | 3.7 | 42 | 38.7 | 10.5 |
| **Non-LCM high-fatality mass shootings, 1990–2017 (28 y)** | | | | | | |
| Non–LCM ban states | 149.7 | 8 | 1.9 | 56 | 13.4 | 7.0 |
| LCM ban states | 140.7 | 8 | 2.0 | 60 | 15.2 | 7.5 |

*Note.* LCM = large-capacity magazine.

**TABLE 3—Multivariate Results of the Relationship Between LCM Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Combined Federal and State Large Capacity Magazine Bans: United States**

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| All LCM bans (federal and state) | −2.217 (−3.493, −0.940) | −5.912 (−9.261, −2.563) | −1.283 (−2.147, −0.420) | −3.660 (−5.695, −1.624) |
| Population density | −0.011 (−0.052, 0.031) | 0.013 (−0.068, 0.095) | 0.001 (−0.003, 0.006) | 0.011 (−0.005, 0.026) |
| % aged 19–24 y | −0.480 (−1.689, 0.730) | −2.496 (−5.893, 0.901) | 0.283 (−0.599, 1.164) | −0.585 (−2.666, 1.495) |
| % aged 25–34 y | −0.801 (−1.512, −0.089) | −2.390 (−4.391, −0.388) | −0.337 (−0.871, 0.197) | −1.114 (−2.463, 0.235) |
| % Black | −0.227 (−1.062, 0.607) | −0.654 (−2.831, 1.522) | −0.163 (−0.703, 0.377) | −0.261 (−1.391, 0.870) |
| % with a bachelor's degree or higher | −0.009 (−0.492, 0.474) | −0.469 (−1.590, 0.652) | 0.143 (−0.214, 0.501) | 0.183 (−0.715, 1.081) |
| Percentage of households with a firearm (proxy) | −0.047 (−0.195, 0.101) | −0.147 (−0.546, 0.251) | −0.020 (−0.131, 0.091) | −0.084 (−0.368, 0.200) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.072 (−0.293, 0.149) | −0.476 (−1.081, 0.129) | 0.041 (−0.135, 0.216) | −0.182 (−0.628, 0.263) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.012, 0.001) | −0.007 (−0.017, 0.004) | −0.001 (−0.006, 0.003) | −0.003 (−0.012, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.31 | 0.16 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.49.
[a]Logit regression.
[b]Negative binomial regression.

the overall incidence of all high-fatality mass shootings as well as the total number of victims in these events remained strongly negative but was only sometimes statistically significant (Table 4).

In terms of sensitivity analyses, using probit instead of logit gave us similar results (not shown). When the outcome variable was the number of high-fatality mass shooting deaths, we obtained largely similar results concerning the association between LCM bans and the outcome variables, regardless of whether we used Poisson or negative binomial regression (not shown). Moreover, replacing the linear yearly trend with a quadratic function did not change the major results of the analyses (not shown). Variance inflation factors for all the independent variables never exceeded 10.0, with the variance inflation factor for LCM ban variables always being less than 2.0, indicating that there were no significant multicollinearity issues (Tables 3 and 4).

## DISCUSSION

In the United States, LCMs are disproportionately used in high-fatality mass shootings (incidents in which ≥ 6 victims are shot to death). In at least 64% of the incidents

since 1990, perpetrators used LCMs. (For 23%, we determined that they did not involve LCMs, and a determination could not be made for the remaining 13%.) Previous research has shown that LCM firearms are used in a high share of mass murders (typically defined as ≥ 4 homicides) and murders of police.[9]

We could not find reliable estimates of LCM firearms in the US gun stock. However, it is likely much lower than 64%, given that commonly owned firearms such as revolvers, bolt-action rifles, and shotguns are not typically designed to be LCM-capable. During the decade the federal assault weapons ban was in effect, no firearms were legally manufactured with LCMs for sale in the United States. In the postban era, semiautomatic firearms, especially pistols, are often sold with factory-issue LCMs, but firearms that are not semiautomatic are not sold with such magazines.

Why do we find LCMs so prominent among high-fatality mass shootings? We suspect there are 2 main reasons. The first is that perpetrators probably deliberately select LCMs because they facilitate the ability to fire many rounds without having to stop to reload. The second reason is that the ability of shooters to kill many victims—especially the 6 victims required to be included in our data set—may be reduced if LCMs are not

available. In other words, the first explanation is that shooters perceive LCMs to be more effective at killing many people; the second explanation is that LCMs are indeed more effective at killing many people.

High-fatality mass shootings are not common, even in the United States. Between 1990 and 2017, there has been an average of 2.5 incidents per year, with an average of 25 people killed annually in such attacks. However, the number of incidents and the number of people killed per incident have been increasing since the end of the federal assault weapons ban.

In our study, we found that bans on LCMs were associated with both lower incidence of high-fatality mass shootings and lower fatality tolls per incident. The difference in incidence and overall number of fatalities between states, with and without bans, was even greater for LCM-involved high-fatality mass shootings.

The multivariate results are largely consistent with these bivariate associations. When we controlled for 10 independent variables often associated with overall crime rates, as well as state and year effects, states with LCM bans had lower rates of high-fatality mass shootings and fewer high-fatality mass shooting deaths. When we investigated federal and state bans separately in the multiple

TABLE 4—Multivariate Results of the Relationship Between Large Caliber Magazine Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Separate Federal and State Large Caliber Magazine Bans: United States

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| Federal LCM ban | –1.434 (–2.622, –0.245) | –3.571 (–7.103, –0.038) | –0.895 (–1.806, 0.016) | –2.570 (–4.902, –0.238) |
| State LCM bans | –2.603 (–4.895, –0.311) | –8.048 (–15.172, –0.925) | –1.277 (–2.977, 0.422) | –3.082 (–7.227, 1.064) |
| Population density | –0.012 (–0.055, 0.030) | –0.001 (–0.085, 0.083) | 0.001 (–0.003, 0.006) | 0.009 (–0.007, 0.024) |
| % aged 19–24 y | –0.311 (–1.499, 0.878) | –2.589 (–6.057, 0.879) | 0.342 (–0.551, 1.236) | –0.531 (–2.759, 1.698) |
| % aged 25–34 y | –0.812 (–1.532, –0.093) | –2.660 (–4.848, –0.471) | –0.323 (–0.864, 0.217) | –0.848 (–2.236, 0.539) |
| % Black | –0.229 (–1.101, 0.643) | –0.770 (–3.232, 1.693) | –0.150 (–0.698, 0.398) | –0.154 (–1.321, 1.013) |
| % with a bachelor's degree or higher | –0.031 (–0.447, 0.509) | –0.479 (–1.577, 0.618) | 0.156 (–0.199, 0.511) | 0.269 (–0.567, 1.106) |
| Percentage of households with a firearm (proxy) | –0.055 (–0.210, 0.101) | –0.227 (–0.651, 0.196) | –0.019 (–0.133, 0.094) | –0.107 (–0.399, 0.186) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | –0.061 (–0.284, 0.162) | –0.420 (–1.041, 0.201) | 0.046 (–0.132, 0.224) | –0.157 (–0.619, 0.305) |
| Imprisonment rate (per 100 000 population) | –0.006 (–0.013, 0.000) | –0.012 (–0.026, 0.002) | –0.002 (–0.007, 0.003) | –0.003 (–0.014, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.30 | 0.15 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.45.
[a]Logit regression.
[b]Negative binomial regression.

regressions, both were significantly associated with the incidence of LCM-involved high-fatality mass shootings as well as the number of victims in LCM-involved attacks. The relationship between these bans, considered separately, and all high-fatality mass shooting incidence and deaths is often not statistically significant, although this may be attributable to lack of statistical power (number of observations) to find a statistically significant effect.

Our analysis provides answers to 4 important questions:

1. How often are LCMs used in high-fatality mass shootings? At minimum, 64% of high-fatality mass shootings perpetrated between 1990 and 2017 involved LCMs.
2. Are more people killed when LCMs are used? Yes, and the difference in our data set is substantial and statistically significant (11.8 vs 7.3). We should add that our results likely underestimate the difference because we have a truncated sample (we only examined incidents with at least 6 victim fatalities), compounded by the fact that the number of homicide incidents fell as the number of victims increased.
3. Do states with LCM bans experience high-fatality mass shootings involving LCMs at a lower rate and a lower fatality

count than those states with no such bans in effect? Yes. In fact, the effect is more pronounced for high-fatality mass shootings involving LCMs than for those not involving LCMs.
4. Do states with LCM bans experience high-fatality mass shootings (regardless of whether they involve LCMs) at a lower rate and a lower fatality count than states with no such bans in effect? Yes.

## Limitations

Our study had various limitations. First, although we carefully searched for every high-fatality mass shooting, it is possible that we might have missed some. Nevertheless, we suspect that this is unlikely, because it would mean that others who compiled lists have also missed the same ones, for we checked our list against multiple sources.

Second, our definition of a high-fatality mass shooting is a shooting that results in 6 or more fatal victims. A different threshold criterion (e.g., 6 or more people shot; 5 or more victims killed), might lead to somewhat different results. We expect that as the number of victims in a shooting increases, the likelihood that the perpetrator used an LCM

also increases. Indeed, of the 13 high-fatality mass shootings with 10 or more fatalities in our data set, 12 (92%) involved an LCM.

Third, although many high-fatality mass shootings tend to be widely publicized, in 13% of the incidents we reviewed, we could not determine whether an LCM was used. As a sensitivity analysis, we assessed the assumptions that all of the unknown cases first did, and then did not, involve LCMs. Neither assumption appreciably changed our main results (not shown).

Fourth, as a general rule, clustering standard errors is most appropriate when there is a large number of treated units. Although during the decade of the federal assault weapons ban all 50 states plus the District of Columbia regulated LCMs, during the remaining time periods under examination, only 8 jurisdictions regulated LCMs. As a result, there is the possibility that standard errors were underestimated in our analyses.[34]

Fifth, there were only 69 events that met our criterion for a "high-fatality mass shooting." Although 69 is a horrific number of incidents, for statistical purposes, it is a relatively small number and limits the power to detect significant associations. For example, we did not have the statistical power (and thus did not even try) to determine whether

different aspects of the various LCM laws might have differential effects on the incidence of high-fatality mass shootings. Moreover, because of suboptimal statistical power, there is also the possibility that the magnitude of the effects detected was overestimated.[35]

## Public Health Implications

LCMs increase the ability to fire large numbers of bullets without having to pause to reload. Any measure that can force a pause in an active shooting—creating opportunities for those in the line of fire to flee, take cover, or physically confront a gunman—offers a possibility of reducing the number of victims in such an attack. To put it in different terms, if the only firearms available were 18th-century muskets, it is doubtful that mass shootings would be the social problem they are today.

The impact of individual state firearm laws is reduced by the fact that guns often move across state lines—occasionally purchased in locales with more permissive laws and taken to states with more restrictive laws. This is partly why efforts aimed at reducing the frequency and lethality of mass shootings must necessarily be multifaceted and multi-disciplinary. Legal restrictions on firearms are merely a part of this broader, public health approach. That being said, the theory behind reducing the availability of LCMs to reduce the number of victims in mass shootings makes sense, and our empirical results, consistent with much of the limited literature on mass shootings, suggest that LCM bans have been effective in saving lives. **AJPH**

## CONTRIBUTORS

L. Klarevas and D. Hemenway designed the study, collected the data, and contributed equally to all parts of the study. A. Conner ran the statistical analyses and helped construct the tables that report the results of the multivariate analyses. All authors approved the final article as submitted.

## ACKNOWLEDGMENTS

The authors would like to thank John Berrigan, research assistant at the Harvard Injury Control Research Center, for his assistance with the undertaking of this study.

## CONFLICTS OF INTEREST

L. Klarevas has, in the past 2 years, served as an expert to the states of Colorado and California in civil litigation that involved the constitutionality of state restrictions on large-capacity magazines. The authors have no additional conflicts of interest to report.

## HUMAN PARTICIPANT PROTECTION

No protocol approval was needed because no human participants were involved in this study.

## REFERENCES

1. Wintemute GJ. How to stop mass shootings. *N Engl J Med*. 2018;379(13):1193–1196.

2. Reeping PM, Cerda M, Kalesan B, Wiebe DJ, Galea S, Branas CC. State gun laws, gun ownership, and mass shootings in the US: cross sectional time series. *BMJ*. 2019; 364(8190):l542–l548.

3. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. October 5, 2017. Available at: https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed June 10, 2019.

4. Kamerow D. Guns don't kill crowds, people with semi-automatics do. *BMJ*. 2011;342(1):d477.

5. Barry CL, Webster DW, Stone E, Crifasi CK, Vernick JS, McGinty EE. Public support for gun violence prevention policies among gun owners and non–gun owners in 2017. *Am J Public Health*. 2018;108(7): 878–881.

6. Lenett MG. Taking a bite out of violent crime. *Univ Dayton Law Rev*. 1995;20(2):573–617.

7. Muchnick JY. The assault weapons ban: saving lives. *Univ Dayton Law Rev*. 1995;20(2):641–651.

8. Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001;17(1):33–74.

9. Koper CS, Johnson WD, Nicholas JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. *J Urban Health*. 2018;95(3):313–321.

10. Giffords Law Center to Prevent Gun Violence. Large capacity magazines. Available at: http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines. Accessed June 10, 2019.

11. Giffords Law Center to Prevent Gun Violence. Assault weapons. Available at: https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons. Accessed June 10, 2019.

12. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. *Arch Surg*. 1992;127(6): 694–698.

13. Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. *J Quant Criminol*. 2001;17(1):81–88.

14. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. *J Trauma Acute Care Surg*. 2014;76(1):2–9.

15. Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. *J Trauma Acute Care Surg*. 2017;84(1):58–65.

16. McCullough J. *The Ultimate Guide to US Army Combat Skills, Tactics and Techniques*. New York, NY: Skyhorse; 2012.

17. Fox JA, DeLateur MJ. Mass shootings in America: moving beyond Newtown. *Homicide Stud*. 2014;18(1): 125–145.

18. Krouse WJ, Richardson DJ. Mass murder with firearms: incidents and victims, 1999–2013. CRS Report R.44126. Washington, DC: Congressional Research Service; 2015.

19. Wilson LC. *The Wiley Handbook of the Psychology of Mass Shootings*. Hoboken, NJ: Wiley; 2016.

20. Klarevas L. *Rampage Nation: Securing America From Mass Shootings*. Amherst, NY: Prometheus; 2016.

21. Schildkraut J, Elsass HJ. *Mass Shootings: Media, Myths, and Realities*. Denver, CO: Praeger; 2016.

22. Schildkraut J. *Mass Shootings in America: Understanding the Debates, Causes, and Responses*. Denver, CO: ABC-CLIO; 2018.

23. Rocque M, Duwe G. Rampage shootings: an historical, empirical, and theoretical overview. *Curr Opin Psychol*. 2018;19(1):28–33.

24. Phaneuf SW. Mass shootings: understanding the complexities. In: Hilinski-Rosick CM, Lee DR, eds. *Contemporary Issues in Victimology: Identifying Patterns and Trends*. New York, NY: Lexington; 2018.

25. Moody CE, Marvell TB. Clustering and standard error bias in fixed effects panel data regressions. *J Quant Crim*; 2018:1–23.

26. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Appl Econ Lett*. 2015;22(4):281–284.

27. Blau BM, Gorry DH, Wade C. Guns, laws and public shootings in the United States. *Appl Econ*. 2016;48(49): 4732–4746.

28. Follman M, Aronsen G, Pan D. A guide to mass shootings in America. *Mother Jones*. May 31, 2019. Available at: https://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed June 10, 2019.

29. Kleck G. Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages. *Justice Res Policy*. 2016;17(1):28–47.

30. Webster DW, Donohue JJ, Klarevas L, et al. Firearms on college campuses: research evidence and policy implications. Report of the Johns Hopkins University Center for Gun Policy and Research. Baltimore, MD: Johns Hopkins Bloomberg School of Public Health; 2016.

31. Kleck G. *Targeting Guns: Firearms and Their Control*. Hawthorne, NY: Aldine de Gruyter; 1997.

32. Hemenway D. *Private Guns, Public Health*. Ann Arbor, MI: University of Michigan Press; 2017.

33. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership: measurement, structure and trends. *J Quant Criminol*. 2004;20(1):43–62.

34. Conley TG, Taber CR. Inference with "difference in differences" with a small number of policy changes. *Rev Econ Stat*. 2011;93(1):113–125.

35. Button KS, Ioannidis JPA, Mokrysz C, et al. Power failure: why small sample size undermines the reliability of neuroscience [erratum *Nat Rev Neurosci*. 2013;14(6):451]. *Nat Rev Neurosci*. 2013;14(5):365–376.

# EXHIBIT G

AAST 2018 PODIUM PAPER

Downloaded from https://journals.lww.com/jtrauma by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D1AQ2EqmDas+a/RO3k5DOHm8nPOp+12M9YsBK0dY6Y= on 01/07/2019

# Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data

**Charles DiMaggio, PhD, MPH, Jacob Avraham, MD, Cherisse Berry, MD, Marko Bukur, MD, Justin Feldman, ScD, Michael Klein, MD, Noor Shah, MD, Manish Tandon, MD,** *and* **Spiros Frangos, MD, MPH**, *New York, New York*

---

## AAST Continuing Medical Education Article

### Accreditation Statement

This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education through the joint providership of the American College of Surgeons and the American Association for the Surgery of Trauma. The American College of Surgeons is accredited by the ACCME to provide continuing medical education for physicians.

### AMA PRA Category 1 Credits™

The American College of Surgeons designates this journal-based CME activity for a maximum of 1 *AMA PRA Category 1 Credit*™. Physicians should claim only the credit commensurate with the extent of their participation in the activity.

Of the *AMA PRA Category 1 Credit*™ listed above, a maximum of 1 credit meets the requirements for self-assessment.

### Credits can only be claimed online



AMERICAN COLLEGE OF SURGEONS
*Inspiring Quality:*
*Highest Standards, Better Outcomes*
100+*years*

### Objectives

After reading the featured articles published in the *Journal of Trauma and Acute Care Surgery*, participants should be able to demonstrate increased understanding of the material specific to the article. Objectives for each article are featured at the beginning of each article and online. Test questions are at the end of the article, with a critique and specific location in the article referencing the question topic.

### Claiming Credit

To claim credit, please visit the AAST website at http://www.aast.org/ and click on the "e-Learning/MOC" tab. You must read the article, successfully complete the post-test and evaluation. Your CME certificate will be available immediately upon receiving a passing score of 75% or higher on the post-test. Post-tests receiving a score of below 75% will require a retake of the test to receive credit.

### System Requirements

The system requirements are as follows: Adobe® Reader 7.0 or above installed; Internet Explorer® 7 and above; Firefox® 3.0 and above, Chrome® 8.0 and above, or Safari™ 4.0 and above.

### Questions

If you have any questions, please contact AAST at 800-789-4006. Paper test and evaluations will not be accepted.

### Disclosure Information

In accordance with the ACCME Accreditation Criteria, the American College of Surgeons, as the accredited provider of this journal activity, must ensure that anyone in a position to control the content of *J Trauma Acute Care Surg* articles selected for CME credit has disclosed all relevant financial relationships with any commercial interest. Disclosure forms are completed by the editorial staff, associate editors, reviewers, and all authors. The ACCME defines a `commercial interest' as "any entity producing, marketing, re-selling, or distributing health care goods or services consumed by, or used on, patients." "Relevant" financial relationships are those (in any amount) that may create a conflict of interest and occur within the 12'months preceding and during the time that the individual is engaged in writing the article. All reported conflicts are thoroughly managed in order to ensure any potential bias within the content is eliminated. However, if you'perceive a bias within the article, please report the circumstances on the evaluation form.

Please note we have advised the authors that it is their responsibility to disclose within the article if they are describing the use of a device, product, or drug that is not FDA approved or the off-label use of an approved device, product, or drug or unapproved usage.

### Disclosures of Significant Relationships with Relevant Commercial Companies/Organizations by the Editorial Staff

Ernest E. Moore, Editor: PI, research support and shared U.S. patents Haemonetics; PI, research support, Instrumentation Laboratory, Inc.; Co-founder, Thrombo Therapeutics. Associate Editors David Hoyt, Ronald V. Maier and Steven Shackford have nothing to disclose. Editorial staff and Angela Sauaia have nothing to disclose.

### Author Disclosures

The authors have nothing to disclose.

### Reviewer Disclosures

The reviewers have nothing to disclose.

### Cost

For AAST members and *Journal of Trauma and Acute Care Surgery* subscribers there is no charge to participate in this activity. For those who are not a member or subscriber, the cost for each credit is $25.

---

From the Department of Surgery, Division of Trauma and Critical Care Surgery (C.D., J.A., C.B., M.B., J.F., M.K., N.S., M.T., S.F.), New York University School of Medicine, New York, New York.

Address for reprints: Charles DiMaggio, PhD, MPH, Department of Surgery, New York University School of Medicine, 462 First Ave, NBV 15, New York, NY 10016-9196; email: Charles.DiMaggio@nyumc.org.

77th Annual Meeting of AAST and the World Trauma Congress, Sep 26 - 29, 2018, San Diego, California.

DOI: 10.1097/TA.0000000000002060

JA1709

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

DiMaggio et al.

*J Trauma Acute Care Surg*
Volume 86, Number 1

| | |
|---|---|
| **BACKGROUND:** | A federal assault weapons ban has been proposed as a way to reduce mass shootings in the United States. The Federal Assault Weapons Ban of 1994 made the manufacture and civilian use of a defined set of automatic and semiautomatic weapons and large capacity magazines illegal. The ban expired in 2004. The period from 1994 to 2004 serves as a single-arm pre-post observational study to assess the effectiveness of this policy intervention. |
| **METHODS:** | Mass shooting data for 1981 to 2017 were obtained from three well-documented, referenced, and open-source sets of data, based on media reports. We calculated the yearly rates of mass shooting fatalities as a proportion of total firearm homicide deaths and per US population. We compared the 1994 to 2004 federal ban period to non-ban periods, using simple linear regression models for rates and a Poison model for counts with a year variable to control for trend. The relative effects of the ban period were estimated with odds ratios. |
| **RESULTS:** | Assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8–88.9) in 44 mass-shooting incidents. Mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides (coefficient for year, 0.7; $p = 0.0003$), with increment in year alone capturing over a third of the overall variance in the data (adjusted $R^2 = 0.3$). In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides ($p = 0.03$). Mass-shooting fatalities were 70% less likely to occur during the federal ban period (relative rate, 0.30; 95% confidence interval, 0.22–0.39). |
| **CONCLUSION:** | Mass-shooting related homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004. (*J Trauma Acute Care Surg.* 2019;86: 11–19. Copyright © 2018 American Association for the Surgery of Trauma.) |
| **LEVEL OF EVIDENCE:** | Observational, level II/IV. |
| **KEY WORDS:** | Firearms; mass-shootings; assault weapons; epidemiology. |

Increases in firearm-related injuries, particularly mass-shooting related fatalities, in the United States have contributed to a polarizing and sometimes contentious debate over gun ownership and limiting weapons characterized as assault weapons.[1,2] Despite the increasing sense that there is an epidemic of indiscriminate firearm violence in our schools and public spaces, there is a paucity of public health evidence on the topic. Among a number of recommendations, a federal Assault Weapons Ban (AWB) has been proposed as a way to prevent and control mass shootings in the United States. In this article, we assess evidence for the effectiveness of such a ban in preventing or controlling mass-shooting homicides in the United States.

While mass shootings occur in other industrialized nations, the United States is particularly prone to these crimes. In a recent 30-year period, the United States had double the number of mass-shooting incidents than the next 24 industrialized nations combined.[3] Any public perception of recent increases in the number of these events is borne out by analysis of available data.[4] By one measure, there have been more deaths due to mass shootings in the United States in the past 18 years than in the entire 20th century.[5] While there is some debate about the role of mental illness in mass shootings,[6–8] many high-profile recent mass shootings (Aurora, CO; Roseburg, OR; San Bernadino, CA; Newtown, CT; Orlando; Las Vegas; Sutherland Springs, TX) have been characterized by the use of semiautomatic assault rifles,[9] leading some to advocate for restrictions on the manufacture and sale of these weapons.

While survey results indicate that researchers in criminology, law and public health rank an assault weapons ban as one of the most effective measures to prevent mass shootings, and that 67% of the US general population support such a ban,[10] the existing evidence on banning assault weapons is scant and sometimes contradictory. Most evidence is related to the Federal AWB of 1994, which made illegal the manufacture and use by civilians of a defined set of automatic and semiautomatic weapons and large capacity magazines. Formally known as "The Public Safety and Recreational Firearms Use Protection Act", the AWB was part of the broader "Violent Crime Control and Law Enforcement Act of 1994. The ban lasted 10 years, expiring in 2004 when the US Congress declined to renew it.

In a study soon following the implementation of the 1994 ban, researchers reported a 55% decrease in the recovery of assault weapons by the Baltimore City Police in the first 6 months of 1995, indicating a statistically significant 29 fewer such firearms in the population.[11] In a 2009 study based on ICD9 external cause of injury codes for patients younger than 18 years in the United States, 11 states with assault and large-capacity magazine bans, as well as other firearm laws, were compared with 33 states without such restrictions. The incidence of firearm injuries per 1,000 total traumatic injuries was significantly lower in states with restrictive laws, 2.2 compared with 5.9.[12] In contrast, a comprehensive 2001 evaluation of the AWB itself concluded that there was "no evidence of reductions in multiple-victim gun homicides or multiple-gunshot wound victimizations". The authors cautioned their results should be "interpreted cautiously" because of the short period since the ban's inception, and that future assessments were warranted.[13] More recent studies, while not primarily addressing the US Federal AWB have found results generally consistent with its effectiveness in preventing mass-shooting fatalities.[14,15]

We believe sufficient time has passed and enough data have accumulated to treat the period from 1994 to 2004 as a naturalistic pre-post observational comparison period for the association of the AWB with changes in mass-shootings in the United States. Because there is no authoritative source or registry, or even a widely agreed upon definition for these incidents, we obtained data from three open source references and restricted our analyses to only those incidents confirmed by all three sources. We assess evidence for the potential effectiveness of such a ban in preventing and controlling mass-shooting homicides in the United States. We hypothesized that the implementation of the Federal AWB contributed to a reduction in mass shooting deaths as measured by the number and rate of mass shooting fatalities before, during, and after the federal AWB.

## METHODS

Mass incident shooting data were obtained from three independent, well-documented and referenced online sources: Mother Jones Magazine, the Los Angeles Times and Stanford

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

University.[16–18] These sources have each been the basis for a number of previous studies.[19–26] Data from the three open-source references were combined. Analyses were restricted to incidents reported by all three sources. Entries were further restricted to those for which four or more fatalities (not including the shooter) were reported, which meets the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Yearly homicide data were obtained from the US Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) an online database of fatal and nonfatal injury.[29] Because 2017 data were not yet available in the WISQARS system, data for firearm-related homicide data for that year were obtained from a separate online source.[30]

A variable was created to indicate the 1994 to 2004 period as the federal ban period. We attempted to identify incidents involving assault weapons. An assault weapon has been defined as semiautomatic rifle that incorporates military-style features such as pistol grips, folding stocks, and high-capacity detachable magazines.[31] In this study, assault weapons were identified using the text search terms "AK," "AR," "MCX," "assault," "assault," or "semiautomatic" in a text field for weapon details. These terms were based on descriptions of the federal assault ban legislative language.[32] The total number of mass shooting fatalities and injuries were aggregated by year and merged with the yearly firearm homicide data.

The rate of mass shooting fatalities per 10,000 firearm homicide deaths was calculated. For the years covered by the data sources, we calculated (1) the total and yearly number of mass-shooting incidents that met the strictest criteria and were confirmed by all three sources, (2) the number of all weapon (assault and nonassault weapons) mass-shooting fatalities, and (3) the case-fatality ratio of all-weapon mass-shooting fatalities per 100 total mass-shooting fatalities and injuries. The yearly case-fatality ratio was plotted with overlying Loess line for trend and standard error limits. We also plotted the yearly rate of mass shooting fatalities per 10,000 firearm-related homicides with an overlying simple linear model with year as the predictor for (1) the total period, and (2) for preban, ban, and postban periods.

We evaluated assumptions of normality and linearity of the data using graphical methods such as density plots and Q-Q normal plots as well as summary statistics. We tested the hypothesis that the federal ban period was associated with a decrease in the number and rate of mass-shooting fatalities in the United States with a multiple linear regression model, with total homicide-based mass-shooting fatality rate as the outcome variable, a dichotomous indicator variable for the federal ban period as the predictor variable, and year as a control variable for trend over time. We calculated the relative risk of mass shooting fatalities during the federal ban period compared to nonban periods by using the "epitab" function of the R "epitools" package. This estimate is based on the ratio of the fatality rate during the ban period divided by the fatality rate during the nonban period. All results are presented with two-sided *p* values with a significance level of 0.05 and/or 95% confidence intervals (CI). We conducted subgroup analysis with data restricted to incidents in which an assault-type weapon was explicitly noted.

We conducted analyses to test the sensitivity of our results to the choice of denominator with linear regression models controlling

for trend with yearly rates based on (1) CDC WISQARS homicide data ending in 2016, (2) extrapolated CDC WISQARS homicide data for 2017, and (3) population denominator-based rates. We tested the robustness of our underlying modeling assumptions with an alternate mixed-effects generalized linear model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion.

The study was determined to be exempt as nonidentifiable data. The study data and analytic code are available for download at http://www.injuryepi.org/styled-2/.

## RESULTS

The three data sources listed incidents ranging in number from 51 (LA Times) to 335 (Stanford) and in dates from 1966 (Stanford) to 2018 (LA Times). There were a total of 51 reported cases of mass shootings between 1981 and 2017 confirmed by all three sources. Forty-four of these incidents met the strictest criteria for mass shootings (4 or more killed), totaling 501 all-weapon fatalities. In total 1,460 persons were injured or killed over the 37-year period, for a total case-fatality ratio of 34.3% (95% CI, 31.9–36.8). The overall rate of mass shooting fatalities per 10,000 firearm-related homicides was 10.2 (95% CI, 9.4–11.2). There was an increase in the all-weapon yearly number of mass-shooting fatalities in the United States during the study period, (Fig. 1) and evidence of a decrease in case fatality in the post-2010 period (Fig. 2). Incidents in which weapons were characterized as assault rifles accounted for 430 or 85.8% of mass-shooting fatalities (95% CI, 82.8–88.9). Weapons characterized as assault rifles accounted for *all* mass-shooting fatalities in 15 (62.5%) of the 24 (95% CI, 42.6–78.9) years for which a mass-shooting incident was reported, accounting for a total of 230 fatalities in those years.

Between 1981 and 2017, mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides, with increment in year accounting for nearly 32% of the overall variance in the data. During the years in which the AWB was in effect, this slope decreased, with an increase in the slope of yearly mass-shooting homicides in the postban period



**Figure 1.** Mass shooting deaths. United States 1981–2017.

© 2018 American Association for the Surgery of Trauma.

13

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*



**Figure 2.** Case fatality per 100 total mass-shooting injuries with loess smoothing line for trend and standard error bounds. United States 1981–2017.

(Fig. 3). A similar pattern was evident in data restricted to those incidents characterized as involving assault weapons (Fig. 4).

In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting–related deaths per 10,000 firearm homicides per year (Table 1). The model indicated that year and federal ban period alone accounted for nearly 40% of all the variation in the data (adjusted $R^2 = 0.37$). A subanalysis



**Figure 3.** Mass shooting deaths per 10,000 firearm-related homicides with linear trends for preban, ban, and postban periods. United States 1981–2017.



**Figure 4.** Mass-shooting shooting deaths per 10,000 firearm-related homicides restricted to incidents involving assault weapons with linear trends for preban, ban, and postban periods. United States 1981–2017.

restricted to just those incidents characterized by the use of an assault weapon indicated that seven preventable deaths during the ban period were due to assault weapons alone (Table 2).

The risk of mass shooting fatalities during the federal van period was 53 per 140,515 total firearm homicides compared with 448 per 348,528 during the nonban periods, for a risk ratio of 0.30 (95% CI, 0.22–0.39). The calculated risk ratio for the association of the federal ban period with mass-shooting fatalities as a proportion of all firearm-related homicides was 0.29 (95% CI, 0.22–0.29), indicating that mass shooting fatalities were 70% less likely to occur during the federal ban period.

The results of our sensitivity analyses were consistent with our main analyses for total mass shooting fatalities. In a linear regression analysis controlling for yearly trend and restricted to the period ending in 2016 using just CDC WISQARS homicide data as the denominator, the effect of ban period was associated with a statistically significant eight fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.0; $p = 0.05$). In a similar model using extrapolated CDC WISQARS homicide data for 2017 instead of Online Gun Violence Archive data as the denominator, the effect of ban

**TABLE 1.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | $t$ | $p$ |
|---|---|---|---|---|
| (Intercept) | −1409.4 | 333.0 | −4.2 | 0.0002 |
| Year | 0.7 | 0.2 | 4.3 | 0.0001 |
| Ban Period | −8.6 | 3.9 | −2.2 | 0.03 |

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

**TABLE 2.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths Characterized by Use of Assault Weapon per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | *t* | *p* |
|---|---|---|---|---|
| (Intercept) | −1219.7 | 333.9 | −3.7 | 0.0009 |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.6; $p = 0.03$). A model based on the total yearly US population as the denominator, the effect of ban period was associated with a statistically significant 0.4 fewer mass shooting related deaths per 10,000,000 population (coefficient for ban period, 0.4; $p = 0.02$).

The results of a mixed-effects generalized linear Poisson model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion were very similar whether the offset variable was the number of total firearm deaths or the population size. In either case, the assault weapons ban period was associated with an approximately 85% reduction in mass shooting fatalities (Table 3).

## DISCUSSION

Recently, 75% of members of the American College of Surgeons Committee on Trauma endorsed restrictions to "civilian access to assault rifles (magazine fed, semiautomatic, i.e., AR-15),"[33] and 76% of the Board of Governors were in favor of a limit to "… civilian access to ammunition designed for military or law enforcement use (that is, armor piercing, large magazine capacity)."[34] In 2015, the American College of Surgeons joined seven of the largest most prestigious professional health organizations in the United States and the American Bar Association to call for "restricting the manufacture and sale of military-style assault weapons and large-capacity magazines for civilian use."[35] This analysis adds evidence to support these recommendations.

No observational epidemiologic study can answer the question whether the 1994 US federal assault ban was causally related to preventing mass-shooting homicides. However, this study adds to the evidence by narrowly focusing our question on the potential effect of a national assault weapon ban on mass shootings as measured through the lens of case fatality. While the data are amenable to a number of additional analyses, such as stratification by location (e.g. school vs. nonschool) or by characterization of large-capacity magazines versus non large-capacity magazine, we chose to focus only on year of occurrence and total number of fatalities. In this way, we relied on the least subjective aspects of the published reports. We believe our results support the conclusion that the ban period was associated with fewer overall mass-shooting homicides. These results are also consistent with a similar study of the effect of a 1996 ban on assault type weapons in Australia after which mass-shooting fatalities dropped to zero.[36]

While the absolute effects of our regression analyses appears modest (7 to 9 fewer deaths per 10,000 firearm-homicides),

it must be interpreted in the context of the overall number of such fatalities, which ranges from none to 60 in any given year in our data. However, if our linear regression estimate of 9 fewer mass shooting–related deaths per 10,000 homicides is correct, an assault weapons ban would have prevented 314 of the 448 or 70% of the mass shooting deaths during the nonban periods under study. Notably, this estimate is roughly consistent with our odds ratio estimate and Poisson model results.

Our results add to the documentation that mass shooting–related homicides are indeed increasing, most rapidly in the postban period, and that these incidents are frequently associated with weapons characterized as assault rifles by the language of the 1994 AWB. We did not find an increase in the case fatality ratio of mass-shooting deaths to mass-shooting injuries. This might at first seem counterintuitive and paradoxical. The destructive effect of these weapons is unequivocal. They are engineered to cause maximum tissue damage rapidly to the greatest number of targets. However, it may be that the use of these kinds of weapons results in indiscriminate injury with additional rounds more likely to injure more people increasing the denominator in a case-fatality ratio. By contrast, the use of nonassault weapons may result in more precise targeting of victims. It is also possible that improvements in trauma care are driving down case fatality.[37] Also, it is worth noting that in absolute terms, there were many more fatalities outside the ban period and that survivable injury comes with its own physical, emotional, and economic costs, which have been estimated at US $32,237 per hospital admission.[38]

Despite US federal funding restrictions on firearm-related research dating to 1996,[39,40] there is a small but growing number of analyses of mass shooting violence in the United States. Many articles have focused on the mental health aspects of these incidents,[41–43] or on social effects like increased firearm acquisition following mass shootings.[44,45] However, fewer studies have taken a strictly public health or clinical approach. Among these, an autopsy-based study of the incidence and severity of mass-shooting casualties concluded the wound patterns differed sufficiently from combat injuries to require new management strategies, indicating there is much to be learned from a systematic epidemiological perspective.[46] Recently, there have been calls to remove such funding restrictions from both academics and elected officials from across the political spectrum.[47,48]

Our choice of data and analytic approach may reasonably be debated. We chose to base our analyses on the yearly rate of mass shooting fatalities per 10,000 overall firearm homicides. This is not a population-based risk estimate, but is in fact as commonly used in the epidemiologic literature which is essentially a probability statement, that is, the number of events

**TABLE 3.** Exponentiated Coefficients Generalized Linear Poisson Model

| Variable | Homicide Offset | | Population Offset | |
|---|---|---|---|---|
| | Estimate | 95% CI | Estimate | 95% CI |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

Effect of 1994–2004 federal assault weapon ban on mass-shooting death counts. United States, 1981–20017.

© 2018 American Association for the Surgery of Trauma.

15

JA1713

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

DiMaggio et al.

that occurred over the number of times that event could occur. It is the risk of a homicide occurring as a result of a mass shooting. It may be considered a strong assumption to build mass shooting death rates based on the overall firearm homicide rate. The demographics of most homicide victims may differ appreciably from those of mass shooting victims. We selected this approach from among a number of imperfect potential denominators, believing that basing the rates on the number of firearm-homicides partly controls for secular trends in overall homicides and firearm availability. Our sensitivity analyses indicate that our results were robust to most any choice of denominator. We chose linear regression as our primary model because it was straightforward, accessible to most readers, accounted for linear trends in the data, and returned results in the metric in which we were most interested, that is, changes in the rate of fatalities. Our comparative Poisson model results were essentially consistent with the primary model.

These analyses are subject to a number of additional limitations and caveats, primary among which is that there is no authoritative source of data on mass shooting, and any one source may be biased and incomplete. It was for this reason that we chose to combine three independent sources of data, each with its own strengths and weaknesses, and base our analyses only on those numbers that were verified by all three sources. We further restricted our analyses to only the number of fatalities and the year in which the incident occurred, and to the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Even with this approach, the data remain imprecise and subject to differing definitions. We attempted to compensate for this by framing our questions as precisely as possible, following the advice of the scientist and statistician John Tukey to pursue, "… an approximate answer to the right question ...(rather) than the exact answer to the wrong question..."

In this study, we failed to falsify the hypothesis that the AWB was associated with a decrease in mass shooting fatalities in the United States. However, it is important to note that our model did not include important and potentially confounding factors like state-level and local differences in assault weapon laws following the sun downing of the federal AWB. Additional analyses including such variables and using approaches like propensity score matching and regression discontinuity[49] with data further aggregated to state and local levels are necessary to test the strength and consistency of our results.

Federally referenced denominator data were not available for the last year of the study. We chose to use data from the Online Gun Violence Archive to account for firearm homicide in 2017. This resource is a nonpartisan not-for-profit group founded and maintained by a retired computer systems analyst and gun advocate.[50] The alternative would have been to extrapolate from the CDC data, but the 15,593 firearm-related homicides reported by the Online Gun Violence Archive in 2017 was more consistent with the 14,415 reported by CDC in 2016 compared with the 11,599 predicted by an extrapolation and returned more conservative estimates of the increased rate of recent mass shootings. We note there were many years in which the number of mass-shooting fatalities is listed as zero. There were, in fact, fatalities and incidents in those years that could meet a definition of mass shooting, but they were not reported by all three sources, or did not meet the strict criteria we set for this analysis.

An assault weapon ban is not a panacea, nor do our analyses indicate that an assault weapon ban will result in fewer overall firearm-related homicides. It is important to recognize that suicides make up the majority of firearm-related deaths in the United States, accounting for 60.7% of 36,252 deaths from firearms in 2015.[51] However, while this is a critically important issue in its own right, suicides differ fundamentally from mass-shootings, and are unlikely to be affected by an assault weapons ban. Also, compared with the 501 mass-shooting fatalities we counted, there were 489,043 firearm-related homicides in the United States. Public health efforts should be directed at reducing all gun violence and must be multipronged, including targeted initiatives to address mental illness and reducing access to weapons in those with a propensity for violence. However, taken in the context of the increase in mass shootings in the United States, these results support the conclusion that the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States.

## DISCLOSURE

The authors have no conflicts of interest to declare.
There are no federal or nonfederal funding sources associated with this study.

## REFERENCES

1. Wolchover N. Why gun control is so contentious in the US. *LiveScience*. 20 July 2012 https://www.livescience.com/21741-gun-control-second-amendment.html. Accessed 10 August 2018.
2. Bond S. Students take the lead in US gun control debate. *Financial Times*. 23 February 2018. https://www.ft.com/content/9341021e-1818-11e8-9376-4a6390addb44. Accessed 10 August 2018.
3. Lemieux F. 6 things to know about mass shootings in America. *Scientific American*. 13 June 2016. https://www.scientificamerican.com/article/6-things-to-know-about-mass-shootings-in-america/. Accessed 6 June 2018.
4. Webster DW. The true effect of mass shootings on Americans. *Annals of Internal Medicine*. 16 May 2017. The http://annals.org/aim/fullarticle/2624992/true-effect-mass-shootings-americans. Accessed 6 June 2018.
5. Katsiyannis A, Whitford DK, Ennis RB. Historical examination of United States intentional mass school shootings in the 20th and 21st centuries: implications for students, schools, and society. *Child Fam Stud*. (19 April 2018). https://doi.org/10.1007/s10826-018-1096-2.
6. Follman M. Mass shootings: maybe what we need is a better mental-health policy. *Mother Jones*. 9 November 2012. https://www.motherjones.com/politics/2012/11/jared-loughner-mass-shootings-mental-illness/. Accessed 11 August 2018.
7. Carey B. "Are mass murderers insane? Usually not, researchers say". *New York Times*. 8 November 2017. https://www.nytimes.com/2017/11/08/health/mass-murderers-mental-illness.html. Accessed 11 August 2018.
8. Duwe G, Rocque M. Actually, there is a clear link between mass shootings and mental illness. *Los Angeles Times*. 23 February 2018. http://www.latimes.com/opinion/op-ed/la-oe-duwe-rocque-mass-shootings-mental-illness-20180223-story.html. Accessed 11 August 2018.
9. Gillin J, Greenberg J, Jacobson L, Valverde M. The facts on mass shootings in the United States. *Politifact*. 8 November 2017. http://www.politifact.com/truth-o-meter/article/2017/nov/08/facts-mass-shootings-united-states/. Access 6 June 2018.
10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. 5 October 2017. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed 6 June 2018.

© 2018 American Association for the Surgery of Trauma.

JA1714

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

11. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. *Am J Public Health*. 1997;87(2):297–298.

12. Safavi A, Rhee P, Pandit V, Kulvatunyou N, Tang A, Aziz H, Green D, O'Keeffe T, Vercruysse G, Friese RS, et al. Children are safer in states with strict firearm laws: a national inpatient sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150; discussion 150–1.

13. Koper CS, Roth JA. The impact of the 1994 Federal Assault Weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001; Vol. 17, No. 1.

14. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Applied Economics Letters*. 2015;22(4):281–284.

15. Lemieux F, Bricknell S, Prenzler T. Mass shootings in Australia and the United States, 1981-2013. *Journal of Criminological Research, Policy and Practice*. 1(3):131–142.

16. Follman M, Aronsen G, Pan D, Caldwell M. US mass shootings, 1982-2018: data from mother Jones' investigation. *Mother Jones*. 2012; https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. Accessed 3 June 2018.

17. The Los Angeles times staff. "Deadliest U.S. mass shootings", 1984-2017. *Los Angeles Times*. Oct 1, 2017, timelines latimes.com/deadliest-shooting-rampages/. Accessed 29 August 2018.

18. Stanford mass shootings in America, courtesy of the Stanford Geospatial Center and Stanford libraries. 2016. Available at: https://library.stanford.edu/projects/mass-shootings-america. Accessed 29 August 2018.

19. Fox JA, Levin J, Fridel EE. *Extreme Killing: Understanding Serial and Mass Murder*. Sage Publications; 2018.

20. Dillon L. *Mass Shootings in the U.S.: An Exploratory Study of the Trends from 1982–2012*. PhD thesis; 2014.

21. Lankford A. Public mass shooters and firearms: a cross-national study of 171 countries. *Violence Vict*. 2016;31(2):187.

22. Lowe SR, Galea S. The mental health consequences of mass shootings. *Trauma Violence Abuse*. 2017;18(1):62–82.

23. Fox JA, Fridel EE. The tenuous connections involving mass shootings, mental illness, and gun laws. *Violence Gend*. 2016;3(1):14–19.

24. Luca M, Malhotra DK, Poliquin C. The impact of mass shootings on gun policy. *Harvard Business School NOM Unit Working Paper No*. 2016;1:16–126.

25. Buchholtz LK. Command-directed mental health evaluations and mental health related discharges from the U.S. military: an argument for command authority. *J Health Care Finance*. 2016.

26. Bradley K. Code blue: the expanding field of tactical/battlefield medicine. *J Law Enforcement*. 2017;6(2).

27. Smart R. Mass shootings: definitions and trends. RAND Corporation. https://www.rand.org/research/gun-policy/analysis/supplementary/mass-shootings.html. Accessed 2 June 2018.

28. Krouse WJ, Richardson DJ. *Mass Murder with Firearms: Incidents and Victims, 1999–2013*. Washington, D.C.: Congressional Research Service, R44126 2015.

29. Centers for Disease Control and Prevention. CDC's WISQARS (web-based injury statistics query and reporting system). https://www.cdc.gov/injury/wisqars/fatal.html. Accessed 12 February 2018.

30. The online gun violence archive: past summary ledgers. http://www.gunviolencearchive.org/past-tolls. Accessed 12 February 2018.

31. Studdert DM, Donohue JJ, Mello MM. Testing the immunity of the firearm industry to tort litigation. *JAMA Intern Med*. 2017;177(1):102–105.

32. Public Safety and Recreational Firearms Act. P.L. 103-322, Title XI. 103rd Cong. (1994).

33. Kuhls DA, Campbell BT, Burke PA, Allee L, Hink A, Letton RW, Masiakos PT, Coburn M, Alvi M, Lerer TJ, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury: consensus and opportunities. *J Trauma Acute Care Surg*. 2017;82(5):877–886.

34. Puls M, Kuhls D, Campbell B, Burke P, Michelassi F, Stewart R. Survey of the American College of Surgeons Board of governors on firearm injury prevention: consensus and opportunities. *Bull Am Coll Surg*. 2017; 102(10):30–36.

35. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, Wilkerson D, Benjamin GC, Hubbard WC. Firearm-related injury and death in the U.S.: a call to action from 8 health professional organizations and the American Bar Association. *Ann Intern Med*. 2015;162(7):513–516.

36. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3):291–299.

37. DiMaggio C, Ayoung-Chee P, Shinseki M, Wilson C, Marshall G, Lee DC, Wall S, Maulana S, Leon Pachter H, Frangos S. Traumatic injury in the U.S.: in-patient epidemiology 2000-2011. *Injury*. 2016;47(7):1393–1403.

38. Peek-Asa C, Butcher B, Cavanaugh JE. Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the U.S. *Inj Epidemiol*. 2017; 4(1):20.

39. Wexler L. "gun shy: how a lack of funds translates to inadequate research on gun violence in America". *Hopkins Bloomberg Public Health Fall*. 2017; https://magazine.jhsph.edu/2017/fall/features/cassandra-crifasi-hopkins-moderate-gun-owner-gun-policy-researcher/how-the-dickey-amendment-affects-gun-violence-research.html. Access 5 June 2018.

40. Greenberg J. Spending bill's gun research line: does it nullify dickey amendment? *Politifact*. 27 March 2018. http://www.politifact.com/truth-o-meter/article/2018/mar/27/spending-bills-gun-research-line-does-it-matter/. Accessed 6 June 2018.

41. Pinals DA, Anacker L. Mental illness and firearms: legal context and clinical approaches. *Psychiatr Clin North Am*. 2016;39(4):611–621.

42. Leiner M, De la Vega I, Johansson B. Deadly mass shootings, mental health, and policies and regulations: what we are obligated to do!. *Front Pediatr*. 2018;6:99.

43. Swartz MS, Bhattacharya S, Robertson AG, Swanson JW. Involuntary outpatient commitment and the elusive pursuit of violence prevention. *Can J Psychiatry*. 2017;62(2):102–108.

44. Studdert DM, Zhang Y, Rodden JA, Hyndman RJ, Wintemute GJ. Handgun acquisitions in California after two mass shootings. *Ann Intern Med*. 2017; 166(10):698–706.

45. Stroebe W, Leander NP, Kruglanski AW. The impact of the Orlando mass shooting on fear of victimization and gun-purchasing intentions: not what one might expect. *PLoS One*. 2017;12(8):e0182408.

46. Smith ER, Shapiro G, Sarani B. The profile of wounding in civilian public mass shooting fatalities. *J Trauma Acute Care Surg*. 2016;81(1):86–92.

47. Behrman P, Redding CA, Raja S, Newton T, Beharie N, Printz D. Society of Behavioral Medicine (SBM) position statement: restore CDC funding for firearms and gun violence prevention research. *Transl Behav Med*. 2018.

48. Wong S. "GOP chairman: congress should rethink CDC ban on gun violence research". *The Hill*. 15 February 2018 http://thehill.com/homenews/house/374149-gop-chairman-congress-should-rethink-cdc-ban-on-gun-violence-research. Accessed 5 June 2018.

49. Basu S, Meghani A, Siddiqi A. Evaluating the health impact of large-scale public policy changes: classical and novel approaches. *Annu Rev Public Health*. 2017;38:351–370.

50. Drange M. The Kentucky gun owner who developed his own count of gun violence in the US. *The Guardian*. 23 April 2016. https://www.theguardian.com/world/2016/apr/23/kentucky-gun-owner-gun-violence-archive-mark-bryant. Accessed 5 June 2018.

51. Murphy SL, Xu J, Kochanek KD, Curtin SA, Elizabeth Arias E. *National Vital Statistics Reports*. Volume 66, Number 6 November 27, 2017. Deaths: Final Data for 2015. Centers for Disease Control and Prevention.

## DISCUSSION

**Ernest E. "Gene" Moore, MD** (Denver, Colorado): Thank you, Dr. Rotondo and Dr. Reilly. Can I please have the discussion video. [sounds of a gun shooting] Well, that is the AR15 rifle. Literally, 30 potential lethal shots delivered within 10 seconds. Is this safe to have in our society?

I congratulate Dr. DiMaggio and his colleagues from NYU for their superb presentation on a very timely issue. The AAST has had a long-term interest in reducing gun violence in the United States, and has recently published our 14-point approach. Access to assault rifles is one of them. At a reductionist level, mass shootings are the net result of (1) a deranged person intending to kill random individuals in a populated area, and (2) the use of an assault rifle. Since we seem to be unable to identify

© 2018 American Association for the Surgery of Trauma

17

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*DiMaggio et al.*

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

the active shooter preemptively, we are left with the alternative solution of eliminating the weapon.

The presentation today provides evidence that a federal assault weapon ban can reduce mass shootings. According to our recent national trauma surgeon surveys, three-fourths of us in the audience, including me, would like to believe the analysis; but I think we need to consider some of the potential limitations.

Many of these issues relate to the fact that research support for gun violence control in the United States remains frustratingly suppressed and fundamentally inadequate. The general lack of information, low quality of data, and need to merge data sets from diverse sources – medical, coroner, police, legal, and behavioral – compounded by scarce funding and public controversy, undermine research to inform policy and enlighten the public. The fact that you had to compare three open-access databases to be certain that the reported mass shootings occurred underscores this deficiency.

Furthermore, there is no definition of a mass shooting, although you employed perhaps the most acceptable at the moment – the FBI's definition. Could you explain for us the rationale for this definition?

You present an analysis of 44 events with four or more deaths, including the shooter, from 1981 to 2017 – a 36-year period; whereas, others suggest a much higher incidence, such as Klaveras, who reported 69 shootings of six or more over the past 27 years.

Identifying all known mass shootings per year during a study period would be useful to appreciate the overall trends, as your data somewhat understates the magnitude of mass shootings in the United States.

You employed the Gun Violence Archive to estimate homicides in 2017. Why did you not use this source for mass shootings? The Archive has reported an alarming 261 mass shootings – defined as six or more shot – thus far in 2018. Nonetheless, in the sample you studied, assault rifles accounted for greater than 85 percent of the fatalities, and this is the key issue.

You have evaluated the impact of the federal assault rifle ban by analyzing the rate of mass shootings per 10,000 firearm homicide deaths per year to adjust for confounders. This would assume that the factors influencing mass shootings are the same as those for homicides, which seems very unlikely. You have idicated that you analyzed mass-shooting fatalities per population per year; perhaps you could elaborate more about this analysis.

Another confounder as acknowledged in the presentation is the impact of individual state limitations on magazine capacity. The first state to enforce these limitations was New Jersey in 1990, and now at least eight states and Washington, D.C., have these restrictions in effect. How can we distinguish the effects of this policy? And could this be a potential bridge to ultimately reestablish a national assault rifle ban?

You have also calculated the case fatality of all weapons in mass shootings per 100 total shootings, finding a decrease since 2010. While you conjecture this may be due to indiscriminate injury from assault rifles or possibly attributed to better trauma care, I am uncertain how this is relevant to the issue of banning assault rifles. The Las Vegas shooting is a cogent example of how these data may be misleading.

Finally, there is the issue of so-called falsification that could be addressed by examining other causes of trauma mortality during this time period.

In sum, this study adds to overwhelming evidence that assault rifles are an essential component in the dramatic escalation of mass shootings in the United States. While the scientific data to support a federal ban on civilian assault rifles is imperfect due to inadequate research support, I submit collectively the existing information argues strongly for enactment of this measure, and compliment the authors for their timely contribution.

**Sheldon H. Teperman, MD** (Bronx, New York): Dr. DiMaggio, your home institution, Bellevue, plays a seminal role in the trauma center safety of our nation.

In fact, right now, your trauma medical director is not present with us, but he is at home on guard for the U.N. General Assembly. But in New York, we don't see long-gun injuries. New York has the Safe Act, and there is an assault weapons ban. So why is it so important to America's trauma center – Bellevue – that we see a national ban on assault rifles?

**Charles E. Lucas, MD** (Detroit, Michigan): Thank you for your nice presentation. How many of these incidents occurred in an inner-city environment, where most of the victims that we treat have received multiple wounds which were purposely inflicted in order to compete competitively for the distribution of heroin and other drugs? Also, how many of the assailants were African-American?

**Martin A. Croce, MD** (Memphis, Tennessee): Thank you. I want to commend the authors for an excellent study, and really, not so much to ask any questions but I rise to put out a plea to the membership that this issue is a public health problem.

This is not a right versus left problem, this is not a Second Amendment problem. This is a public health problem.

And to quote Wayne Meredith at one of the recent Board meetings, "Our primary goal is to reduce the number of bullet holes in people." So I implore the Membership to correct this dearth of research that is going on about gun violence in order to promote a public health approach, so that we can reduce the number of bullet holes in people.

**Deborah A. Kuhls, MD** (Las Vegas, Nevada): And to carry on that thought, I would urge the authors to incorporate the public health data from the CDC when it is available, because part of the methodological issues for this paper is that one data set was used for a certain period of time.

But for the last year, the CDC data was not used because it was not available, so I would urge you to not only do that analysis, but I would also urge the Journal of Trauma to consider an update to that article when that is available. Thank you.

**Charles DiMaggio, MPH, PhD** (New York, New York): Thank you very much for all these comments and questions.

Dr. Moore, so with regard to your observation about the reductionist approach to looking at this particular issue, that puts me in the mind very much of the traditional epidemiologic triad of agent, host, and environment, and if you break one link in that connection, you can break the transmission. In this case, we could call assault weapons one link, whether it's agent or host, we can decide.

With regards to the rationale for the definition, I think it's reflective of the lack of research in this area.

A case definition is an essential and critical first step in any epidemiologic investigation, and you can see that we are barely there. I think the FBI definition makes sense, I think it's the oldest one, I think it's informed by expert consensus.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

And I think all the other definitions are based in some form on that, which is why we chose it. And I would urge that if we are going to be doing this research going forward, probably it would be best if we all had the consensus that that be the definition.

Why did we not use the Gun Violence Archive to estimate some of these results, and why are our numbers so much smaller than some of the other numbers? I have to agree, our numbers are very much an under-count.

We restricted our analysis to these three databases. And so the limiting factor was the one database. And I can tell you it was the LA Times – they had the fewest number. And if it wasn't in the LA Times, then the other databases didn't contribute to this data set.

We felt that the important aspect of this particular study was to demonstrate the relative effects, merits or associations with the assault weapon ban as opposed to documenting the absolute numbers.

So the Gun Archive, for example, defines mass shootings as four or more deaths or injuries. That really raises the number of deaths that can be included. We didn't include it, but I think going forward we absolutely should.

With regard to the analysis using population denominators, we agree, actually, that gun homicides are an imperfect denominator. We also felt that population was an imperfect denominator. And again, as we keep on circling around, it has to do with the data in this case.

We did feel that gun homicides captured something about gun availability and criminality in the United States, although homicides themselves differ very much from these mass shooting fatalities.

We do note that our population-based results essentially mirrored the gun homicide results, indicating that, at least for the relative effects and benefits of the assault weapons ban, the results are robust and invariant to the choice of denominator in this case.

Can we distinguish local effects, and could this possibly be a bridge to reestablishing an assault rifle ban? The short answer is yes and yes. We can distinguish local effects.

We took a very broad approach on this particular study as a first pass on the data. But, there are data sources (and even within the data sources we used) where you can tease out local, municipal and state policies.

Also, we can link our data to other sources that have those variables. There are statistical methods available that will not only account for those variables, but also allow us to measure or estimate in some way the contribution of local or regional variation in these policies to the overall effectiveness.

The issue of the case fatality rate is very interesting and challenging. I want to note that there was a paper in JAMA on September 11th – just a couple of weeks ago – looking at mass shooter fatalities, that came essentially to the same conclusion – that there has been this recent decrease.

In our paper, in this write-up, we look at three potential explanations, and one of them is, first of all, it's just a matter of denominator. These are indiscriminate weapons.

You have someone shooting at a large group of people, and there are going to be more injuries and more casualties, and it just inflates the denominator in this case.

The second thing is, the obverse of that, is single-fire weapons, guns, are very personal weapons. They're usually characterized by someone who knows who they want to kill. And finally, we feel that perhaps there may be some improvement by the folks in this room in treating these.

I'm going to close at this point, given the time constraints.

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT H

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                                        Post et al

Original Paper

# Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis

Lori Post[1], PhD; Maryann Mason[1], PhD; Lauren Nadya Singh[1], MPH; Nicholas P Wleklinski[2], MD; Charles B Moss[3], PhD; Hassan Mohammad[1]; Tariq Z Issa[2], BA; Adesuwa I Akhetuamhen[2], MD; Cynthia A Brandt[4], MD, MPH; Sarah B Welch[1], MPH; James Francis Oehmke[1], PhD

[1]Buehler Center for Health Policy and Economics, Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[2]Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[3]Institute of Food and Agricultural Sciences, University of Florida, Gainsville, FL, United States
[4]Yale Center for Medical Informatics, Yale School of Medicine, Yale University, New Haven, CT, United States

**Corresponding Author:**
Lori Post, PhD
Buehler Center for Health Policy and Economics
Feinberg School of Medicine
Northwestern University
420 E Superior
Chicago, IL, 60611
United States
Phone: 1 203 980 7107
Email: lori.post@northwestern.edu

## Abstract

**Background:** Public mass shootings are a significant public health problem that require ongoing systematic surveillance to test and inform policies that combat gun injuries. Although there is widespread agreement that something needs to be done to stop public mass shootings, opinions on exactly which policies that entails vary, such as the prohibition of assault weapons and large-capacity magazines.

**Objective:** The aim of this study was to determine if the Federal Assault Weapons Ban (FAWB) (1994-2004) reduced the number of public mass shootings while it was in place.

**Methods:** We extracted public mass shooting surveillance data from the Violence Project that matched our inclusion criteria of 4 or more fatalities in a public space during a single event. We performed regression discontinuity analysis, taking advantage of the imposition of the FAWB, which included a prohibition on large-capacity magazines in addition to assault weapons. We estimated a regression model of the 5-year moving average number of public mass shootings per year for the period of 1966 to 2019 controlling for population growth and homicides in general, introduced regression discontinuities in the intercept and a time trend for years coincident with the federal legislation (ie, 1994-2004), and also allowed for a differential effect of the homicide rate during this period. We introduced a second set of trend and intercept discontinuities for post-FAWB years to capture the effects of termination of the policy. We used the regression results to predict what would have happened from 1995 to 2019 had there been no FAWB and also to project what would have happened from 2005 onward had it remained in place.

**Results:** The FAWB resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries. We estimate that the FAWB prevented 11 public mass shootings during the decade the ban was in place. A continuation of the FAWB would have prevented 30 public mass shootings that killed 339 people and injured an additional 1139 people.

**Conclusions:** This study demonstrates the utility of public health surveillance on gun violence. Surveillance informs policy on whether a ban on assault weapons and large-capacity magazines reduces public mass shootings. As society searches for effective policies to prevent the next mass shooting, we must consider the overwhelming evidence that bans on assault weapons and/or large-capacity magazines work.

*(JMIR Public Health Surveill 2021;7(4):e26042)*  doi: 10.2196/26042



JMIR PUBLIC HEALTH AND SURVEILLANCE

Post et al

## KEYWORDS

firearm surveillance; assault weapons ban; large-capacity magazines; guns control policy; mass shootings; regression lines of discontinuity

## Introduction

### Background

Approximately 44,000 people are killed and an additional 100,000 people are injured by a gun each year in the United States [1,2]. Mass shooting fatalities, as a particular type of gun injury event, account for <1% of all gun deaths [3] and have largely been ignored until recently [4,5]; yet, mass shooting events occur multiple times per year [6]. This information is based on insights from firearm surveillance performed by a variety of researchers, and state and federal agencies on incidence, prevalence, risk factors, injuries, deaths, and precipitating events, similar to the surveillance of infectious diseases such as COVID-19 [7-21]. Teutch and Thacker [22] defined public health surveillance as

> the ongoing systematic collection, analysis, and interpretation of health data, essential to the planning, implementation, and evaluation of public health practice, closely integrated to the dissemination of these data to those who need to know and linked to prevention and control.

Not only do surveillance systems generate hypotheses to test but they also provide the data to test them.

The Federal Assault Weapons Ban (FAWB, also known as the Public Safety and Recreational Firearms Use Protection Act) included a ban on the manufacture for civilian use or sale of certain semiautomatic firearms defined as assault weapons as well as certain large-capacity magazines (LCMs). The Act was in effect for 10 years from 1994 until it sunsetted in 2004. Semiautomatic weapons (rapid fire) and assault weapons (second grip plus other features) are distinct; however, the two are often incorrectly conflated as similar [23-26]. Semiautomatic weapons are defined as weapons that automatically load another cartridge into a chamber, preparing the weapon for firing, but requiring the shooter to manually release and press the trigger for each round [23-26]. By contrast, automatic weapons are similarly self-loading, but allow for a shooter to hold the trigger for continuous fire [27]. Furthermore, the FAWB also prohibited certain ammunition magazines that were defined as "large-capacity" cartridges [28] containing more than 10 bullets [29]. These LCMs can feed ammunition to semiautomatic weapons that do not meet the criteria of being considered assault weapons. Furthermore, LCMs are considered one of the most important features of the FAWB as research has found a relationship between bans on LCMs and casualty counts at the state level [30-34]. The 10-year federal ban was signed into law by President Clinton on September 13, 1994 [28].

Firearm surveillance data have been used to test potential policy responses to prevent mass shootings, including the FAWB [32,34-39], Extreme Risk Protection Orders (also known as red flag laws) [40-45], and federal and state LCM bans [31,32,46]. In particular, it seems likely that the FAWB and LCM bans have potential to affect mass shootings because they regulate weapons and ammunition formats that are designed to enable rapid discharge, which is a key feature in mass shooting incidents [24,47]. Other types of gun deaths may not be responsive to the FAWB or LCM bans. As an example, Extreme Risk Protection Orders or "Red Flag" orders [43,48], which temporarily prohibit at-risk individuals from owning or purchasing firearms, may be effective for preventing firearm suicides or domestic violence homicides [49] but less effective for public mass shooters [50,51]. The prohibition of LCMs may have no impact on firearm suicide because suicide decedents only require one bullet to kill themselves [52].

Several studies during and after the FAWB attempted to determine if gun policy that restricts the production and sale of assault weapons and LCMs decreased gun deaths [53,54]. These initial studies make meaningful contributions to the literature because they describe what constitutes assault weapons, magazine capacity, ballistics, and loopholes in the FAWB legislation [3,53-57]. However, these studies have found little to no evidence that these policies have had any overall effect on firearm homicides, gun lethality, or overall crime [58-61]. Since deaths from public mass shootings comprise less than 1% of all homicides based on our definition, testing whether or not the FAWB/LCM ban has an impact on homicide would wash out the effect. Since the FAWB/LCM ban may be effective at specific types of gun deaths, sampling must be limited to specific types of shooters over overall gun deaths or tests for lethality [62,63]. Finally, the variation in research findings is related to differences in research design, sampling frame, and case definition of a public mass shooting [3,53-56,64,65].

Our study differs from other studies that evaluated the efficacy of the FAWB because we used economic methods and a different outcome variable. Specifically, we focused on whether the FAWB resulted in fewer public mass shooting "events," whereas other studies evaluated the number of gun injuries and deaths that occurred during the course of a mass shooting.

### Objective

The aim of this study was to test whether curbing *access to certain types of guns and magazines* will decrease mass shooting *events*. We sought to empirically answer if there was a relationship between the FAWB and a reduction in mass shooting events.

## Methods

### Data Source

We created a firearm surveillance system based on the National Institute of Justice–funded Violence Project dataset, which culled mass shooting events from 1966 to 2019 [6]. Consistent with earlier studies, we rely on the original Federal Bureau of Investigation (FBI) definition of a massacre, specifically where 4 or more people are killed within a single timeframe. We differentiate our mass shootings from others in that our inclusion criteria require the shootings to have occurred in a public setting.



We adapted this definition to only include massacres that involved gun deaths of 4 or more victims to isolate a particular type of mass shooter [66]. Many firearm surveillance systems that include mass shootings use a lower threshold of persons shot and many do not include deaths. An FBI report on active shooters in mass shooting events identified planning and preparation behaviors that are central to prevention [67]. This more narrow definition isolates premeditation, whereas broader definitions may include shooters that are more reactive [68]. Our case definition does not include family annihilators or felony killers because *familicides are defined by the victim-offender relationship, public massacres are defined by location, and felony killings are distinguished by motive* [69]. This differentiation is consistent with other mass shooting studies [70-72].

We examined the annual number of public mass shootings occurring between 1966 and 2019 that resulted in 4 or more fatalities. The hypothesis was that the FAWB reduced the number of public mass shootings per year during the period of the ban. We used regression discontinuity analysis to test the hypothesis. Regression discontinuity analysis is a standard economist tool used in policy analysis taking advantage of quasi-experimental designs [65,73].

**Analyses**

Regression discontinuity analysis allows for discontinuities or shifts in both the intercept and the slope of the trend line at both the onset and sunset of the FAWB. That is, we introduced intercept shift parameters in 1995 and 2005, and trend shift parameters for the periods 1995-2004 and 2005-2019. A statistically significant shift in a parameter indicates a discontinuity (ie, a finding that the FAWB had a statistically significant effect on the number of public mass shootings). We tested for statistical significance of the intercept and trend shift parameters both independently and jointly. All statistical inference was based on a significance level set at .05. We used the Huber-White robust residuals, which attenuate problems of autocorrelation, heteroscedasticity, and some types of model misspecification [74].

We then used the estimated model for two types of counterfactual analysis. First, we used the model to predict the number of public mass shootings that would have occurred had the FAWB not been in place. The difference between this counterfactual prediction and the modeled number of incidents with the FAWB in place provided an estimate of the number of public mass shootings that the FAWB prevented.

Second, we projected forward the number of public mass shootings that would have occurred had the FAWB been permanent (ie, continued from 2004 through to the end of the sample period). We note that in some sense, this is an "out of

sample" exercise because even though the sample extends to 2019, the FAWB ended in 2004; thus, this exercise would not pick up events in the past 15 years that would have augmented or compromised the effects of the FAWB. The difference between the modeled number of public mass shootings and the projected counterfactual number of public mass shootings could provide an estimate of the number of public mass shootings that the FAWB prevented.

We performed a regression of the 5-year moving average of public mass shootings on the US population in millions, the homicide rate, and discontinuity variables to capture both the effects of the FAWB and its discontinuation. We did not introduce a trend line for the entire sample period because it is highly collinear with the population variable. For the period of the FAWB's implementation, we originally introduced an intercept shift, time trend, and shift in the homicide rate; for the post-FAWB period, we introduced an intercept shift and a time trend. Due to collinearity, we retained only the trend shift in the final model for the FAWB period; for the post-FAWB period, we retained both the intercept and the trend shift.

## Results

We identified a total of 170 public mass shooting events, the primary outcome variable, with 4 or more fatalities between 1966 and 2019. The 5-year cumulative number of public mass shootings is shown in Figure 1, providing a visualization of the impacts of the FAWB on the number of shootings. The first mass shooting occurred in 1966; hence, the first data point for the cumulative number of shootings over the previous 5 years occurs in 1970. For 1966 and 1967, the cumulative number of public mass shootings was 3. This number then increased to 12 in 1993 and declined to 3 in 2004. After 2004, the cumulative number of public mass shootings increased to 81 in 2019. The last year of the ban, 2004, experienced the fewest public mass shootings through 2019.

The regression results showed excellent explanatory power ($R^2$=0.94). The coefficient on population was positive and statistically significant (.044, $P$<.001). This coefficient means that for every increase in population of 1 million people, there are an additional .044 public mass shooting events per year. The coefficient on the homicide rate was negative and statistically significant (–.249, $P$=.01). The coefficient on the time trend for the FAWB period captures the effect of the FAWB; this coefficient was negative and statistically significant (–.187, $P$=.001). Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. The intercept discontinuity for 2005-2019 was negative and statistically significant (–2.232, $P$=.001), and the trend coefficient was positive and statistically significant (.081, $P$=.001).



JMIR PUBLIC HEALTH AND SURVEILLANCE

Post et al

**Figure 1.** Public mass shooting trend line using five year moving averages (1966-2019).



These results are graphed in Figure 2 in which the black stars represent the actual data and the green line represents the predicted numbers of public mass shootings from the regression discontinuity model. A bending of the trend during the FAWB period to become downward sloping at the end of the period is apparent, as is the return of the upward trajectory upon expiration of the FAWB. The red squares represent the projected numbers of public mass shootings during the FAWB period had there been no FAWB. The difference between the red squares

and the green lines represents the predicted number of public mass shootings averted by the FAWB. The model predicts that 11 public mass shootings were averted over the period of 1995-2004.

The blue diamonds represent the projected effects of a continuation of the FAWB through 2019 based on the observed trend from 1995 to 2004. This projection indicates that 30 public mass shootings would have been prevented from 2005 to 2019 had the FAWB been left in place.

**Figure 2.** Regression lines from discontinuity analysis of the federal assault weapons ban (1994-2004).





JMIR Public Health Surveill 2021 | vol. 7 | iss. 4 | e26042 | p. 4
*(page number not for citation purposes)*

## Discussion

### Principal Findings

In total, 1225 people were killed in a mass shooting over the past 53 years with more than half occurring in the last decade, a function of increases in mass shootings and weapon lethality [62,63,75]. Public mass shooting fatalities and injuries far outpace population growth [75]. Between 1966 and 2019, the US population increased by 67% [76], whereas public mass shooting deaths increased by over 5-fold. The rise in public mass shootings throughout the sample period is in fact partially a function of population growth and homicide rate, along with the effects of the FAWB and its removal. An increase in the US population of 1 million people was associated with an increase of .040 ($P$<.005) public mass shootings per year. During the post-FAWB period, the increase in population from approximately 300 million in 2005 to 330 million in 2019 should be associated with an increase of 1.2 public mass shootings per year, compared to the actual increase of 4 public mass shootings per year in the data (5-year moving average). After controlling for population growth and homicide rate, a positive and statistically significant coefficient (.081, $P$=.001) on the 2005-2018 trend was seen. This further indicates a separate, nonpopulation trend of increasing violence operating during the post-FAWB period. The negative coefficient on the homicide rate invalidates the hypothesis that decreases in the numbers of public mass shootings are simply reflections of an overall decreasing homicide rate. The negative intercept discontinuity is consistent with an effect of the FAWB that persists somewhat beyond the immediate end of the ban. The positive trend coefficient is consistent with the hypothesis that the FAWB was associated with a decrease in the number of public mass shootings, as the expiration of the FAWB was associated with a shift from a downward trend to an upward trend in the number of public mass shootings per year.

The most striking finding from this study is that there was a reduction in the number of public mass shooting events while the FAWB was in place. Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. By projecting what would have happened if the FAWB remained in place, we found that there would have been significantly fewer public mass shootings if the FAWB had remained in place to 2019. Remarkably, although it is intuitive that the removal of assault weapons and magazine clips will reduce the lethality of a mass shooting, we observed an inverse relationship between weapons/ammunition and mass shooting events, meaning that mass shooters may be less likely to perpetrate a mass shooting without rapid fire military-style weapons. This is an independent effect, which indirectly leads to fewer injuries and deaths. DiMaggio et al [64] also found evidence of a decrease in public mass shootings during the ban; however, their study period was shorter and was restricted to 51 public mass shootings. Unlike our study, they implicitly modeled public mass shootings as a random instance of general gun homicides that had a high death count [64]. In contrast, our findings suggest that public mass shootings are a unique type of premeditated gun violence. We found that prior to enactment of the FAWB, the rate of public

mass shootings was increasing. During enactment of the FAWB, there was a downward trend of mass shooting events. After the FAWB was lifted, public mass shootings increased dramatically. Firearm homicides in general follow no such patterns.

This effect was not found in the work of Koper, Roth, and colleagues [53-55]; however, their inclusion of all gun homicides masks the ban's effect on mass shootings. Even though Peterson and Densley's [77] work focused on perpetrator histories and not the FAWB, their findings that ease of gun access is characteristic of public mass shooters further supports our study. We restricted the inclusion criteria to public mass shootings to specifically test the effectiveness of the FAWB on public mass shooting events.

Regardless of the FAWB, bringing a semiautomatic rifle with high magazine capacity to a massacre significantly increases the number of fatalities and injuries. The increase in deaths is a function of rapid fire and increased ballistic energy. The increase in injuries is also a function of rapid fire and high-capacity magazines, enabling the shooter to shoot more people in crowded venues quickly before the crowd can disperse or hide. When controlling for the FAWB, the use of assault rifles decreased by half during implementation of the ban and tripled after the ban was lifted. This is a particularly important finding given that the FAWB had loopholes and that overall violent crime is decreasing [78]. First, all people with an assault weapon prior to the FAWB were allowed to retain their semiautomatic weapons [54,64]. Second, without a buyback program, semiautomatic weapons remained in the community [54,64]. Third, the ban did not target some military assault-like weapons [54,64]. Finally, a major loophole found in gun control legislation is that buyers can bypass background checks by purchasing their weapons and ammunition from gun shows, through illegal purchasing, or legally purchasing their guns and ammunition from another gun owner [57,63,79-87]. Even with these loopholes and issues, there was still a significant reduction in public mass shootings during the FAWB. These loopholes indicate that most people who purchase assault weapons do not become mass shooters; however, mass shooters require assault weapons and LCMs to carry out a mass shooting. Ban effectiveness might have improved if all assault weapons were included in the FAWB.

Some recent studies have specifically analyzed the effects of LCM bans on the incidence of public mass shootings. In a review of state legislation, Webster et al [88] found that bans of LCMs were associated with a significant reduction in the incidence of fatal public mass shootings. This study shows that the FAWB, which included a ban on LCMs, was associated with fewer fatalities and injuries during mass shootings in addition to fewer public mass shooting events. Koper et al [27] previously reported that 19% of public mass shootings resulting in 4 or more fatalities included the use of LCMs, while only 10% involved an assault weapon. Klarevas et al [29] found a similar pattern in shootings of 6 or more people, in which 67% of shooters utilized LCMs, whereas only 26% utilized an assault weapon. Because our study only looked at effects of the FAWB, which included an LCM ban, we were only able to determine the combined effects of limiting assault weapons and LCMs. To be clear, the reduction in the number of public mass



JMIR PUBLIC HEALTH AND SURVEILLANCE                                    Post et al

shootings, and resulting fatalities and injuries, may be a function of the ban on assault weapons, assault weapons plus LCMs, or only LCMs. We cannot separate out their independent effects at the national level.

Unlike our study, Webster et al [88] did not evaluate the incidence of assault weapons used in public mass shootings. Rather, they focused on fatalities from public mass shootings vs public mass shooting events. Although Webster et al [88] utilized the FBI Supplemental Homicide Report as their dataset, which is a voluntary reporting measurement system prone to errors in reporting, their findings are applicable to our analysis.

## Limitations

Although we found statistically significant decreases during the FAWB, we cannot isolate aspects of the policy that are attributed to the decline. Most notably, the FAWB also included LCMs during the ban. It may be that the type of gun and/or the type of magazine resulted in a decline. Indeed, assault weapons and LCMs provide the means to carry out a mass shooting; however, there are likely other factors beyond this study that partially explain the radical increase in public mass shootings in the post-FAWB period. For example, the FAWB was in place from 1994 to 2004, which is the same time period that the US population largely adopted the internet, along with associated social communication software and websites. This may have

resulted in better tracking of public mass shootings or increased media coverage. Because our study specifically targeted the federal legislation, we omitted state-level gun policies such as state-level prohibitions on certain types of guns, LCMs, or more lethal types of bullets. It is likely that the internet serves as a contagion and as a guide to potential mass shooters, allowing them to access weapons and multiple stories about other mass shooters [62,67,89,90].

## Conclusions

In summary, public mass shootings are a unique and specific type of homicide by a gun. We found evidence that public mass shootings are qualitatively different from general homicides because after the FAWB expired, mass shooting events increased while general homicides decreased. The increase in public mass shootings was more dramatic in the final 10 years of the study period following the end of the FAWB. We suspect that these outcomes may be improved by removing existing semiautomatic weapons with large bullet capacity by creating a buyback program for all rapid-firing weapons. Moreover, the legislation would be strengthened if it closed loopholes that allow gun buyers to get around the background check legislation and other purchase prohibitions by exempting gun shows and internet or person-to-person purchases, which were exempted from the FAWB and LCM ban [87].

## Acknowledgments

The Violence Project Mass Shooter database generated data for our surveillance. This study was financially supported by the Buehler Endowment at Feinberg School of Medicine.

## Conflicts of Interest

None declared.

## References

1. Web-based Injury Statistics Query and Reporting System. Centers for Disease Control and Prevention, Injury Prevention and Control. 2020 Jul 01. URL: https://www.cdc.gov/injury/wisqars/index.html [accessed 2021-01-15]
2. Christenson AJ, Cunningham R, Delamater A, Hamilton N. Introduction to the special issue on gun violence: addressing a critical public health challenge. J Behav Med 2019 Aug;42(4):581-583. [doi: 10.1007/s10865-019-00075-8] [Medline: 31367923]
3. Drake B. Mass shootings rivet national attention, but are a small share of gun violence. Pew Research Center. 2013 Sep 17. URL: https://www.pewresearch.org/fact-tank/2013/09/17/mass-shootings-rivet-national-attention-but-are-a-small-share-of-gun-violence/ [accessed 2020-12-10]
4. Bowers TG, Holmes ES, Rhom A. The nature of mass murder and autogenic massacre. J Police Crim Psych 2009 Nov 7;25(2):59-66. [doi: 10.1007/s11896-009-9059-6]
5. Delisi M, Scherer AM. Multiple homicide offenders. Crim Justice Behav 2016 Jun 30;33(3):367-391. [doi: 10.1177/0093854806286193]
6. Mass shooter database. The Violence Project. 2020. URL: https://www.theviolenceproject.org/ [accessed 2021-01-14]
7. Shelby D. Association between adult alcohol misuse, adult mental health, and firearm storage practices in households with children: findings from the Behavioral Risk Factor Surveillance System (BRFSS). MPH Thesis. ScholarWorks @ Georgia State University. 2021 Dec 09. URL: https://scholarworks.gsu.edu/iph_theses/725 [accessed 2021-01-08]
8. Loder R, Mishra A, Atoa B, Young A. Spinal injury associated with firearm use. Cureus 2021 Mar 16;13(3):e13918 [FREE Full text] [doi: 10.7759/cureus.13918]
9. Mueller KL, Trolard A, Moran V, Landman JM, Foraker R. Positioning public health surveillance for observational studies and clinical trials: The St. Louis region-wide hospital-based violence intervention program data repository. Contemp Clin Trials Commun 2021 Mar;21:100683 [FREE Full text] [doi: 10.1016/j.conctc.2020.100683] [Medline: 33385095]



JA1724

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                    Post et al

10. Horn DL, Butler EK, Stahl JL, Rowhani-Rahbar A, Littman AJ. A multi-state evaluation of the association between mental health and firearm storage practices. Prev Med 2021 Apr;145:106389. [doi: 10.1016/j.ypmed.2020.106389] [Medline: 33385422]

11. Gunn JF, Boxer P. Gun laws and youth gun carrying: results from the youth risk behavior surveillance system, 2005-2017. J Youth Adolesc 2021 Mar;50(3):446-458. [doi: 10.1007/s10964-020-01384-x] [Medline: 33420890]

12. Rozel J, Soliman L, Jain A. The gun talk: how to have effective conversations with patients and families about firearm injury prevention. In: Zun LS, Nordstrom K, Wilson MP, editors. Behavioral Emergencies for Healthcare Providers. Switzerland: Springer; Jan 05, 2021:465-473.

13. Keyes KM, Kandula S, Olfson M, Gould MS, Martínez-Alés G, Rutherford C, et al. Suicide and the agent–host–environment triad: leveraging surveillance sources to inform prevention. Psychol Med 2021 Mar 05;51(4):529-537. [doi: 10.1017/s003329172000536x]

14. Bluestein G, Hallerman T. Future directions for firearm injury intervention, policy, and research. In: Lee LK, Fleeger EW, editors. Pediatric Firearm Injuries and Fatalities: The Clinician's Guide to Policies and Approaches to Firearm Harm Prevention. Switzerland: Springer; Feb 06, 2021:223-234.

15. Oehmke J, Moss C, Singh L, Oehmke T, Post L. Dynamic panel surveillance of COVID-19 transmission in the United States to inform health policy: observational statistical study. J Med Internet Res 2020 Oct 05;22(10):e21955 [FREE Full text] [doi: 10.2196/21955] [Medline: 32924962]

16. Oehmke J, Oehmke T, Singh L, Post L. Dynamic panel estimate-based health surveillance of SARS-CoV-2 infection rates to inform public health policy: model development and validation. J Med Internet Res 2020 Sep 22;22(9):e20924 [FREE Full text] [doi: 10.2196/20924] [Medline: 32915762]

17. Post L, Benishay E, Moss C, Murphy R, Achenbach C, Ison M, et al. Surveillance metrics of SARS-CoV-2 transmission in central Asia: longitudinal trend analysis. J Med Internet Res 2021 Feb 03;23(2):e25799 [FREE Full text] [doi: 10.2196/25799] [Medline: 33475513]

18. Post LA, Issa TZ, Boctor MJ, Moss CB, Murphy RL, Ison MG, et al. Dynamic public health surveillance to track and mitigate the US COVID-19 epidemic: longitudinal trend analysis study. J Med Internet Res 2020 Dec 03;22(12):e24286 [FREE Full text] [doi: 10.2196/24286] [Medline: 33216726]

19. Post LA, Lin JS, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 wave two surveillance in East Asia and the Pacific: longitudinal trend analysis. J Med Internet Res 2021 Feb 01;23(2):e25454 [FREE Full text] [doi: 10.2196/25454] [Medline: 33464207]

20. Post L, Marogi E, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 surveillance in the Middle East and North Africa: longitudinal trend analysis. J Med Internet Res 2021 Jan 15;23(1):e25830 [FREE Full text] [doi: 10.2196/25830] [Medline: 33302252]

21. Post LA, Argaw ST, Jones C, Moss CB, Resnick D, Singh LN, et al. A SARS-CoV-2 surveillance system in Sub-Saharan Africa: modeling study for persistence and transmission to inform policy. J Med Internet Res 2020 Nov 19;22(11):e24248 [FREE Full text] [doi: 10.2196/24248] [Medline: 33211026]

22. Teutsch S, Thacker S. Planning a public health surveillance system. Epidemiol Bull 1995 Mar;16(1):1-6. [Medline: 7794696]

23. Jacobs J, Fuhr Z. The Safe Act: New York's ban on assault weapons and large capacity magazines. Crim Law Bull 2017 Jun 29;53(1):4 [FREE Full text]

24. Wallace EG. Assault weapon myths. South Ill Univ Law J 2018 Nov 18;43:193. [doi: 10.4135/9781452229300.n127]

25. Kopel D, Lowy J, Rostron A. Heller and "Assault Weapons". Campbell Law Rev 2018 Feb 02;40(2):461-480 [FREE Full text]

26. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 20;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

27. Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. J Urban Health 2018 Jun;95(3):313-321 [FREE Full text] [doi: 10.1007/s11524-017-0205-7] [Medline: 28971349]

28. United States Congress House Committee on the Judiciary. Subcommittee on Crime and Criminal Justice. Public Safety and Recreational Firearms Use Protection Act. In: Hearing before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, second session, on H.R. 3527. Washington, DC: US Government; Apr 25, 1994.

29. Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990–2017. Am J Public Health 2019 Dec;109(12):1754-1761. [doi: 10.2105/ajph.2019.305311]

30. Kleck G. Large-capacity magazines and the casualty counts in mass shootings. Justice Res Policy 2016 Jun 01;17(1):28-47. [doi: 10.1177/1525107116674926]

31. Abbasi J. Large-capacity magazine bans linked with fewer mass shootings, deaths. JAMA 2020 Jan 14;323(2):108-109. [doi: 10.1001/jama.2019.20457] [Medline: 31851333]

32. Koper CS. Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high - capacity semiautomatic firearms. Criminol Public Policy 2020 Jan 10;19(1):147-170. [doi: 10.1111/1745-9133.12485]



JA1725

JMIR PUBLIC HEALTH AND SURVEILLANCE                                      Post et al

33. Towers S, Wallace D, Hemenway D. Temporal trends in public mass shootings: high-capacity magazines significantly increase fatality counts, and are becoming more prevalent. medRxiv preprint server. 2019 Dec 15. URL: https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 [accessed 2021-04-17]

34. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

35. Lowy J. Comments on assault weapons, the right to arms, and the right to live. Harv J Law Public Policy 2020;43(2):375-386 [FREE Full text]

36. Kim A. United States gun policy and the effect on mass shootings. California State University Northridge Scholarworks Open Access Repository. Northridge, CA: CSU Northridge University Library; 2020 Aug 25. URL: http://hdl.handle.net/10211.3/217278 [accessed 2020-12-06]

37. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 20;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

38. Balakrishna M, Wilbur KC. How the Massachusetts Assault Weapons Ban Enforcement Notice changed firearm sales. SSRN J 2021 Feb 4:1-51 [FREE Full text] [doi: 10.2139/ssrn.3779510]

39. Soto L, Chheda S, Soto J. Reducing fatalities in mass attacks and the related matter of gun control policy following the El Paso August 2019 shooting. Tex Hisp J Law Policy 2020;26:85.

40. Nagin DS, Koper CS, Lum C. Policy recommendations for countering mass shootings in the United States. Criminol Public Policy 2020 Jan 10;19(1):9-15. [doi: 10.1111/1745-9133.12484]

41. Gay C. 'Red Flag' laws: how law enforcement's controversial new tool to reduce mass shootings fits within current Second Amendment jurisprudence. Boston Coll Law Rev 2020 Apr 30;61(4):1491-1533 [FREE Full text]

42. Nielsen D. Disarming dangerous persons: how Connecticut's Red Flag Law saves lives without jeopardizing constitutional protections. Quinnipiac Health Law J 2020;23(3):253.

43. Blocher J, Charles J. Firearms, extreme risk, and legal design: "Red Flag" laws and due process. Virginia Law Rev 2020 Oct 19;106(6):1285.

44. Kopel DB. Red Flag Laws: proceed with caution. Law Psychol Rev 2020 Jul 16:forthcoming [FREE Full text] [doi: 10.2139/ssrn.3653555]

45. Blodgett S. Dementia, guns, Red Flag laws: Can Indiana's Statute balance elders' constitutional rights and public safety? NAELA J 2020 Sep;16:1-22 [FREE Full text]

46. Kerr S. "What We Need Is Bullet Control": could regulation of bullets reduce mass shootings? In: Crews G, editor. Handbook of Research on Mass Shootings and Multiple Victim Violence. Hershey, PA: IGI Global; Oct 2019:432-446.

47. Moore EE. Another mass shooting: Time to ban the assault rifle. J Trauma Acute Care Surg 2018 Jun;84(6):1036. [doi: 10.1097/TA.0000000000001863] [Medline: 29799817]

48. Delaney GA, Charles JD. A double-filter provision for expanded Red Flag laws: a proposal for balancing rights and risks in preventing gun violence. J Law Med Ethics 2020 Dec;48(4_suppl):126-132. [doi: 10.1177/1073110520979412] [Medline: 33404308]

49. Honberg RS. Mental illness and gun violence: research and policy options. J Law Med Ethics 2020 Dec;48(4_suppl):137-141. [doi: 10.1177/1073110520979414] [Medline: 33404306]

50. Laqueur HS, Wintemute GJ. Identifying high‐risk firearm owners to prevent mass violence. Criminol Public Policy 2019 Dec 16;19(1):109-127. [doi: 10.1111/1745-9133.12477]

51. Pallin R, Schleimer JP, Pear VA, Wintemute GJ. Assessment of extreme risk protection order use in California from 2016 to 2019. JAMA Netw Open 2020 Jun 01;3(6):e207735 [FREE Full text] [doi: 10.1001/jamanetworkopen.2020.7735] [Medline: 32556258]

52. Hurka S, Knill C. Does regulation matter? A cross‐national analysis of the impact of gun policies on homicide and suicide rates. Regul Gov 2018 Dec 21;14(4):787-803. [doi: 10.1111/rego.12235]

53. Koper C, Roth J. The impact of the 1994 Federal Assault Weapon Ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. J Quant Criminol 2001 Mar;17(1):33-74.

54. Koper C, Woods D, Roth J. Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003. Report to the National Institute of Justice, United States Department of Justice. 2004 Jul. URL: https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf [accessed 2020-12-11]

55. Roth J, Koper C, Adams W, Johnson S, Marcotte J, McGready J, et al. Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report. Urban Institute. Washington, DC: The Urban Institute; 1997 Mar 13. URL: https://www.urban.org/research/publication/impact-evaluation-public-safety-and-recreational-firearms-use-protection-act-1994/view/full_report [accessed 2021-02-10]

56. Webster D, Vernick J, McGinty E, Alcorn T. Regulating Gun Sales: An Excerpt from Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press; 2013.

57. Jacobs J. Can Gun Control Work? (Studies in Crime and Public Policy). Oxford: Oxford University Press; Oct 14, 2004.



JA1726

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                    Post et al

58.    Lee LK, Fleegler EW, Farrell C, Avakame E, Srinivasan S, Hemenway D, et al. Firearm laws and firearm homicides: a systematic review. JAMA Intern Med 2017 Jan 01;177(1):106-119. [doi: 10.1001/jamainternmed.2016.7051] [Medline: 27842178]

59.    Gius M. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl Econ Lett 2013 Nov 26;21(4):265-267. [doi: 10.1080/13504851.2013.854294]

60.    Cook P, Goss K. The Gun Debate: What Everyone Needs to Know. New York: Oxford University Press; May 01, 2014.

61.    Cook P, Goss K. The Gun Debate: What Everyone Needs to Know, 2nd Edition. New York: Oxford University Press; Apr 16, 2020.

62.    Lankford A, Silver J. Why have public mass shootings become more deadly? Criminol Public Policy 2019 Dec 16;19(1):37-60. [doi: 10.1111/1745-9133.12472]

63.    Schiff M. IZA Discussion Paper 12784: Greater US gun ownership, lethality and murder rates: analysis and policy proposals. IZA Institute of Labor Economics. 2019 Nov 27. URL: https://www.iza.org/publications/dp/12784/greater-us-gun-ownership-lethality-and-murder-rates-analysis-and-policy-proposals [accessed 2021-04-17]

64.    DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019 Jan;86(1):11-19. [doi: 10.1097/ta.0000000000002060]

65.    World Telecommunication/ICT Indicators Database 2020 (24th Edition). International Telecommunications Union. Geneva: International Telecommunications Union; 2021 Jan. URL: https://www.itu.int/en/ITU-D/Statistics/Pages/publications/wtid.aspx [accessed 2021-04-17]

66.    Lopez G. America's unique gun violence problem, explained in 17 maps and charts. Vox. 2021 Mar 23. URL: https://www.vox.com/policy-and-politics/2017/10/2/16399418/boulder-colorado-mass-shooting-gun-violence-statistics-charts [accessed 2021-03-29]

67.    Silver J, Simons A, Craun S. A study of the pre-attack behaviors of active shooters in the United States between 2000 and 2013. FBI Documents. Washington, DC: US Department of Justice, Federal Bureau of Investigations; 2018. URL: https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view [accessed 2020-10-25]

68.    DeFoster R, Swalve N. Guns, culture or mental health? Framing mass shootings as a public health crisis. Health Commun 2018 Oct;33(10):1211-1222. [doi: 10.1080/10410236.2017.1350907] [Medline: 28841045]

69.    Fridel EE. A multivariate comparison of family, felony, and public mass murders in the United States. J Interpers Violence 2021 Feb;36(3-4):1092-1118. [doi: 10.1177/0886260517739286] [Medline: 29294976]

70.    Duwe G. Mass murder in the United States: a history. Jefferson, NC: McFarland & Company; Jan 07, 2007.

71.    Fox J, Levin J. Mass confusion concerning mass murder. Criminologist 2015;40(1):8-11 [FREE Full text] [doi: 10.4135/9781412950619.n277]

72.    Fox JA, Levin J. Firing back: the growing threat of workplace homicide. An Am Acad Pol Soc Sci 2016 Sep 08;536(1):16-30. [doi: 10.1177/0002716294536001002]

73.    Stevenson AJ, Flores-Vazquez IM, Allgeyer RL, Schenkkan P, Potter JE. Effect of removal of Planned Parenthood from the Texas Women's Health Program. N Engl J Med 2016 Mar 03;374(9):853-860. [doi: 10.1056/nejmsa1511902]

74.    Freedman DA. On the so-called "Huber Sandwich Estimator" and "Robust Standard Errors". Am Statistician 2006 Nov;60(4):299-302. [doi: 10.1198/000313006x152207]

75.    Duwe G. Mass shootings are getting deadlier, not more frequent. Politico Magazine. 2017 Oct 04. URL: https://www.politico.com/magazine/story/2017/10/04/mass-shootings-more-deadly-frequent-research-215678/ [accessed 2021-01-30]

76.    Population Trends. United States Census Bureau. 2019. URL: https://www.census.gov/ [accessed 2019-08-26]

77.    Peterson J, Densley J. We have studied every mass shooting since 1966. Here's what we've learned about the shooters. Los Angeles Times. 2019 Aug 04. URL: https://www.latimes.com/opinion/story/2019-08-04/el-paso-dayton-gilroy-mass-shooters-data [accessed 2020-02-01]

78.    Klingner DE, Williams E. Topic: Public Safety. Public Integrity 2019 Mar 06;21(2):220-224. [doi: 10.1080/10999922.2019.1565268]

79.    Hand C. Gun control and the Second Amendment. Minneapolis, MN: ABDO; Dec 15, 2016.

80.    Popovits A. Dominican University of California Political Science & International Studies (Senior Thesis). 2020 May. URL: https://tinyurl.com/se3vrmd6 [accessed 2020-12-01]

81.    Miller SV. What Americans think about gun control: evidence from the General Social Survey, 1972-2016. Soc Sci Quart 2018 Nov 18;100(1):272-288. [doi: 10.1111/ssqu.12555]

82.    Kellner D. School shootings, societal violence and gun culture. In: Shapiro H, editor. The Wiley Handbook on Violence in Education: Forms, Factors, and Preventions. Medford, MA: John Wiley & Sons, Inc; 2018:53-68.

83.    Schildkraut J. Assault weapons, mass shootings, and options for lawmakers. Rockefeller Institute of Government. 2019 Mar 22. URL: https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/ [accessed 2021-02-11]

84.    Jacobs J, Fuhr Z. The potential and limitations of universal background checking for gun purchasers. Wake Forest J Law Policy 2017;7(2):537-583.



JA1727

85.   Braga AA, Brunson RK, Cook PJ, Turchan B, Wade B. Underground gun markets and the flow of illegal guns into the
      Bronx and Brooklyn: a mixed methods analysis. J Urban Health 2020 Sep 04:online ahead of print. [doi:
      10.1007/s11524-020-00477-z] [Medline: 32888157]

86.   Chai C. Gun control: can we take a shot at it? AMASS 2019;24(2):34-36.

87.   Goldberg J. The case for more guns (and more gun control). The Atlantic. 2012 Dec. URL: https://www.theatlantic.com/
      magazine/archive/2012/12/the-case-for-more-guns-and-more-gun-control/309161/ [accessed 2020-11-20]

88.   Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design,
      sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi:
      10.1111/1745-9133.12487]

89.   Lankford A, Madfis E. Media coverage of mass killers: content, consequences, and solutions. Am Behav Sci 2018 Mar
      20;62(2):151-162. [doi: 10.1177/0002764218763476]

90.   Kien S, Begay T, Lee A, Stefanidis A. Social media during the school shooting contagion period. Violence Gender 2019
      Dec 01;6(4):201-210. [doi: 10.1089/vio.2019.0043]

## Abbreviations

**FAWB:** Federal Assault Weapons Ban
**FBI:** Federal Bureau of Investigation
**LCM:** large-capacity magazine

*Edited by G Eysenbach, T Sanchez; submitted 19.02.21; peer-reviewed by T Alcorn; comments to author 12.03.21; revised version
received 24.03.21; accepted 30.03.21; published 22.04.21*

*Please cite as:*
*Post L, Mason M, Singh LN, Wleklinski NP, Moss CB, Mohammad H, Issa TZ, Akhetuamhen AI, Brandt CA, Welch SB, Oehmke JF*
*Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*
*JMIR Public Health Surveill 2021;7(4):e26042*
*URL: https://publichealth.jmir.org/2021/4/e26042*
*doi: 10.2196/26042*
*PMID: 33783360*

©Lori Post, Maryann Mason, Lauren Nadya Singh, Nicholas P Wleklinski, Charles B Moss, Hassan Mohammad, Tariq Z Issa,
Adesuwa I Akhetuamhen, Cynthia A Brandt, Sarah B Welch, James Francis Oehmke. Originally published in JMIR Public Health
and Surveillance (https://publichealth.jmir.org), 22.04.2021. This is an open-access article distributed under the terms of the
Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution,
and reproduction in any medium, provided the original work, first published in JMIR Public Health and Surveillance, is properly
cited. The complete bibliographic information, a link to the original publication on https://publichealth.jmir.org, as well as this
copyright and license information must be included.



# EXHIBIT I

Opinion



# Regulating Assault Weapons and Large-Capacity Magazines for Ammunition

**Philip J. Cook, PhD**
Duke University,
Durham,
North Carolina.

**John J. Donohue, PhD, JD**
Stanford University,
Stanford, California.



Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201



Supplemental content

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an outsized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

## History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required submachine guns and other firearms capable of fully

Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semiautomatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions but has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

**JAMA** September 27, 2022  Volume 328, Number 12  **1191**

© 2022 American Medical Association. All rights reserved.

JA 1730

Opinion    Viewpoint

## Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved banned weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

## The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shoot-

ing in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were ultimately relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semiautomatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

## Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

## Conclusions

In 2017, the *New York Times* polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger since then.[10]

---

ARTICLE INFORMATION

**Conflict of Interest Disclosures:** Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

REFERENCES

**1.** Cook PJ, Goss KA. *The Gun Debate: What Everyone Needs to Know.* 2nd ed. Oxford University Press; 2020.

**2.** Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

**3.** Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

**4.** Smart R, Morral AR, Smucker S, et al. *The Science of Gun Policy.* RAND; 2020.

**5.** Duwe G. Patterns and prevalence of lethal mass violence. *Criminol Public Policy.* 2020;19(1):17-35. doi:10.1111/1745-9133.12478

**6.** Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

**7.** Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://

www.theviolenceproject.org/mass-shooter-database/

**8.** Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

**9.** Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA.* 2016;316(3):291-299. doi:10.1001/jama.2016.8752

**10.** Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

---

© 2022 American Medical Association. All rights reserved.

JA1731

# EXHIBIT J

**The Code of Professional Ethics and Practices**

We—the members of the American Association for Public Opinion Research (AAPOR) and its affiliated chapters—subscribe to the principles expressed in this document, the AAPOR Code of Professional Ethics and Practices ("the Code"). Our goals are to support sound and ethical practice in the conduct of public opinion and survey research and promote the informed and appropriate use of research results.

The Code is based in fundamental ethical principles that apply to the conduct of research regardless of an individual's membership in AAPOR or any other organization. Adherence to the principles and actions set out in the Code is expected of all public opinion and survey researchers.

As AAPOR members, we pledge to maintain the highest standards of scientific competence, integrity, accountability, and transparency in designing, conducting, analyzing, and reporting our work, and in our interactions with participants (sometimes referred to as respondents or subjects), clients, and the users of our research. We pledge to act in accordance with principles of basic human rights in research. We further pledge to reject all tasks or assignments that would require activities inconsistent with the principles of this Code.

The Code sets the standard for the ethical conduct of public opinion and survey research at the time of publication. Recommendations on best practices for research design, conduct, analysis, and reporting are beyond the scope of the Code but may be published separately by AAPOR Executive Council.

**Definitions of Terms Used in the Code**

1. "Public opinion and survey research" refers to the systematic collection and analysis of information from or about individuals, groups, or organizations concerning their behaviors, cognitions, attitudes or other characteristics. It encompasses both quantitative and qualitative research methods, traditional or emerging.

2. "Participants" refers to individuals whose behaviors, cognitions, attitudes, or other characteristics are measured and analyzed. Participants can include individuals representing groups or organizations, and individuals such as minors or those unable to consent directly, for whom a parent, legal guardian, or other proxy makes participation decisions or provides information.

3. "Personally identifiable information" refers to (i) measurements, records, or other data that can be used alone or in combination to distinguish or trace an individual's identity and (ii) any other information that is linkable to an individual (e.g., employment information, medical history, academic records).

**I. Principles of Professional Responsibility in Our Research**

A. Responsibilities to Participants

1. We will avoid practices or methods that may harm, endanger, humiliate, or unnecessarily mislead participants and potential participants.

1

JA1733

2. We will not misrepresent the purpose of our research or conduct other activities (such as sales, fundraising, or political campaigning) under the guise of conducting research.

3. We recognize that participation in our research is voluntary except where specified by regulation or law. Participants may freely decide, without coercion, whether to participate in the research, and whether to answer any question or item presented to them.

4. We will make no false or misleading claims as to a study's sponsorship or purpose and will provide truthful answers to participants' questions about the research. If disclosure of certain information about the research could endanger or cause harm to persons, could bias responses, or does not serve research objectives, it is sufficient to indicate, in response to participants' questions about the research, that some information cannot be revealed.

5. We recognize the critical importance of protecting the rights of minors and other vulnerable individuals when obtaining participation decisions and conducting our research.

6. We will act in accordance with laws, regulations, and the rules of data owners (providers of research or administrative records previously collected for other purposes) governing the collection, use, and disclosure of information obtained from or about individuals, groups, or organizations.

B. Responsibilities When Collecting Personally Identifiable Information

1. We recognize the right of participants to be provided with honest and forthright information about how personally identifiable information that we collect from them will be used.

2. We recognize the importance of preventing unintended disclosure of personally identifiable information. We will act in accordance with all relevant best practices, laws, regulations, and data owner rules governing the handling and storage of such information. We will restrict access to identifiers and destroy them as soon as they are no longer required, in accordance with relevant laws, regulations, and data owner rules.

3. We will not disclose any information that could be used, alone or in combination with other reasonably available information, to identify participants with their data, without participant permission.

4. When disclosing personally identifiable data for purposes other than the current research, we will relay to data users any conditions of their use specified in the participant permission we have obtained.

5. We understand that the use of our research results in a legal proceeding does not relieve us of our ethical obligation to protect participant privacy and keep confidential all personally identifiable data, except where participants have permitted disclosure.

C. Responsibilities to Clients or Sponsors

1. When undertaking work for a client, we will hold confidential all proprietary information obtained about the client and about the conduct and findings of the research undertaken for the client, except when the dissemination of the information is expressly authorized by the client.

2. We will inform those (partners, co-investigators, sponsors, and clients) for whom we conduct publicly released research studies about AAPOR's Standards for Disclosure in Section III of the Code, and provide information on what should be disclosed in their releases.

2

**JA1734**

3. We will be mindful of the limitations of our expertise and capacity to conduct various types of research and will accept only those research assignments that we can reasonably expect to accomplish within these limitations.

D. Responsibilities to the Public

1. We will disclose to the public the methods and procedures used to obtain our own publicly disseminated research results in accordance with Section III of the Code.

2. We will correct any errors in our own work that come to our attention which could influence interpretation of the results. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentation or distortions. If such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible to original data dissemination.

3. We will correct factual misrepresentations or distortions of our data or analysis, including those made by our research partners, co-investigators, sponsors, or clients. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentations or distortions, and if such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible. We also recognize that differences of opinion in the interpretation of analysis are not necessarily factual misrepresentations or distortions and will exercise professional judgment in handling disclosure of such differences of opinion.

E. Responsibilities to the Profession

1. We recognize the importance to the science of public opinion and survey research of disseminating as freely as practicable the ideas and findings that emerge from our research.

2. We can point with pride to our membership in AAPOR and adherence to the Code as evidence of our commitment to high standards of ethics in our relations with research participants, our clients or sponsors, the public, and the profession. However, we will not cite our membership in the Association nor adherence to this Code as evidence of professional competence, because the Association does not certify the professional competence of any persons or organizations.

**II. Principles of Professional Practice in the Conduct of Our Work**

A. We will exercise due care in developing research designs, samples, and instruments, and in collecting, processing, and analyzing data, taking all reasonable steps to assure the reliability and validity of results.

1. We will recommend and employ only those tools and methods of analysis that, in our professional judgment, are fit for the purpose of the research questions.

2. We will not knowingly select research tools and methods of analysis that yield misleading conclusions.

3. We will not knowingly make interpretations of research results that are inconsistent with the data available, nor will we tacitly permit such interpretations. We will ensure that any findings we report, either privately or for public release, are a balanced and accurate portrayal of research results.

4. We will not knowingly imply that interpretations are accorded greater confidence than the data warrant. When we generalize from samples to make statements about populations, we will only make claims of precision and applicability to broader populations that are warranted by the sampling frames and other methods employed.

3

**JA1735**

5.  We will not engage in data fabrication or falsification.

6.  We will accurately describe and attribute research from other sources that we cite in our work, including its methodology, content, comparability, and source.

B. We will describe our methods and findings accurately and in appropriate detail in all research reports, adhering to the standards for disclosure specified in Section III of the Code.

## III. Standards for Disclosure

Broadly defined, research on public opinion can be conducted using a variety of quantitative and qualitative methodologies, depending on the research questions to be addressed and available resources. Accordingly good professional practice imposes the obligation upon all public opinion and survey researchers to disclose sufficient information about how the research was conducted to allow for independent review and verification of research claims, regardless of the methodology used in the research. Full and complete disclosure for items listed in Section A will be made at the time results are released, either publicly or to a research client, as the case may be. As detailed below, the items listed in Section B, if not immediately available, will be released within 30 days of any request for such materials. If the results reported are based on multiple samples or multiple modes, the preceding items (as applicable) will be disclosed for each.

### A. Items for Immediate Disclosure

1.  **Data Collection Strategy:** Describe the data collection strategies employed (e.g. surveys, focus groups, content analyses).

2.  **Who Sponsored the Research and Who Conducted It.** Name the sponsor of the research and the party(ies) who conducted it. If the original source of funding is different than the sponsor, this source will also be disclosed.

3.  **Measurement Tools/Instruments.** Measurement tools include questionnaires with survey questions and response options, show cards, vignettes, or scripts used to guide discussions or interviews. The exact wording and presentation of any measurement tool from which results are reported as well as any preceding contextual information that might reasonably be expected to influence responses to the reported results and instructions to respondents or interviewers should be included. Also included are scripts used to guide discussions and semi-structured interviews and any instructions to researchers, interviewers, moderators, and participants in the research. Content analyses and ethnographic research will provide the scheme or guide used to categorize the data; researchers will also disclose if no formal scheme was used.

4.  **Population Under Study.** Survey and public opinion research can be conducted with many different populations including, but not limited to, the general public, voters, people working in particular sectors, blog postings, news broadcasts, an elected official's social media feed. Researchers will be specific about the decision rules used to define the population when describing the study population, including location, age, other social or demographic characteristics (e.g., persons who

access the internet), time (e.g., immigrants entering the US between 2015 and 2019). Content analyses will also include the unit of analysis (e.g., news article, social media post) and the source of the data (e.g., Twitter, Lexis-Nexis).

5. **Method Used to Generate and Recruit the Sample.** The description of the methods of sampling includes the sample design and methods used to contact or recruit research participants or collect units of analysis (content analysis).

   a.  Explicitly state whether the sample comes from a frame selected using a probability-based methodology (meaning selecting potential participants with a known non-zero probability from a known frame) or if the sample was selected using non-probability methods (potential participants from opt-in, volunteer, or other sources).

   b.  Probability-based sample specification should include a description of the sampling frame(s), list(s), or method(s).

      i.  If a frame, list, or panel is used, the description should include the name of the supplier of the sample or list and nature of the list (e.g., registered voters in the state of Texas in 2018, pre-recruited panel or pool).

      ii.  If a frame, list, or panel is used, the description should include the coverage of the population, including describing any segment of the target population that is not covered by the design.

   c.  For surveys, focus groups, or other forms of interviews, provide a clear indication of the method(s) by which participants were contacted, selected, recruited, intercepted, or otherwise contacted or encountered, along with any eligibility requirements and/or oversampling.

   d.  Describe any use of quotas.

   e.  Include the geographic location of data collection activities for any in-person research.

   f.  For content analysis, detail the criteria or decision rules used to include or exclude elements of content and any approaches used to sample content. If a census of the target population of content was used, that will be explicitly stated.

   g.  Provide details of any strategies used to help gain cooperation (e.g., advance contact, letters and scripts, compensation or incentives, refusal conversion contacts) whether for participation in a survey, group, panel, or for participation in a particular research project. Describe any compensation/incentives provided to research subjects and the method of delivery (debit card, gift card, cash).

6. **Method(s) and Mode(s) of Data Collection.** Include a description of all mode(s) used to contact participants or collect data or information (e.g., CATI, CAPI, ACASI, IVR, mail, Web for survey; paper and pencil, audio or video recording for qualitative research, etc.) and the language(s) offered or included. For qualitative research such as in-depth interviews and focus groups, also include length of interviews or the focus group session.

7. **Dates of Data Collection.** Disclose the dates of data collection (e.g., data collection from January 15 through March 10 of 2019). If this is a content analysis, include the dates of the content analyzed (e.g., social media posts between January 1 and 10, 2019).

5

JA1737

8. **Sample Sizes (by sampling frame if more than one frame was used) and (if applicable) Discussion of the Precision of the Results.**

   a. Provide sample sizes for each mode of data collection (for surveys include sample sizes for each frame, list, or panel used).

   b. For probability sample surveys, report estimates of sampling error (often described as "the margin of error") and discuss whether or not the reported sampling error or statistical analyses have been adjusted for the design effect due to weighting, clustering, or other factors.

   c. Reports of non-probability sample surveys will only provide measures of precision if they are defined and accompanied by a detailed description of how the underlying model was specified, its assumptions validated, and the measure(s) calculated.

   d. If content was analyzed using human coders, report the number of coders, whether inter-coder reliability estimates were calculated for any variables, and the resulting estimates.

9. **How the Data Were Weighted.** Describe how the weights were calculated, including the variables used and the sources of the weighting parameters.

10. **How the Data Were Processed and Procedures to Ensure Data Quality.** Describe validity checks, where applicable, including but not limited to whether the researcher added attention checks, logic checks, or excluded respondents who straight-lined or completed the survey under a certain time constraint, any screening of content for evidence that it originated from bots or fabricated profiles, re-contacts to confirm that the interview occurred or to verify respondent's identity or both, and measures to prevent respondents from completing the survey more than once. Any data imputation or other data exclusions or replacement will also be discussed. Researchers will provide information about whether any coding was done by software or human coders (or both); if automated coding was done, name the software and specify the parameters or decision rules that were used.

11. **A General Statement Acknowledging Limitations of the Design and Data Collection.** All research has limitations and researchers will include a general statement acknowledging the unmeasured error associated with all forms of public opinion research.

B. Additional Items for Disclosure. After results are reported, we will make the following items available within 30 days of any request for such materials:

   1. Procedures for managing the membership, participation, and attrition of the panel, if a pool, panel, or access panel was used. This should be disclosed for both probability and non-probability surveys relying on recruited panels of participants.

6

JA1738

2. Methods of interviewer or coder training and details of supervision and monitoring of interviewers or human coders. If machine coding was conducted, include description of the machine learning involved in the coding.

3. Details about screening procedures, including any screening for other surveys or data collection that would have made sample or selected members ineligible for the current data collection (e.g., survey, focus group, interview) will be disclosed (e.g., in the case of online surveys if a router was used).

4. Any relevant stimuli, such as visual or sensory exhibits or show cards. In the case of surveys conducted via self-administered computer-assisted interviewing, providing the relevant screen shot(s) is strongly encouraged, though not required.

5. Summaries of the disposition of study-specific sample records so that response rates for probability samples and participation rates for non-probability samples can be computed. If response or cooperation rates are reported, they will be computed according to AAPOR Standard Definitions. If dispositions cannot be provided, explain the reason(s) why they cannot be disclosed, and this will be mentioned as a limitation of the study.

6. The unweighted sample size(s) on which one or more reported subgroup estimates are based.

7. Specifications adequate for replication of indices or statistical modeling included in research reports.

7

**JA1739**

C. Access to Datasets

1  Reflecting the fundamental goals of transparency and replicability, AAPOR members share the expectation that access to datasets
2  and related documentation will be provided to allow for independent review and verification of research claims upon request. In order
3  to protect the privacy of individual respondents, such datasets will be de-identified to remove variables that can reasonably be
4  expected to identify a respondent. Datasets may be held without release for a period of up to one year after findings are publicly
5  released to allow full opportunity for primary analysis. Those who commission publicly disseminated research have an obligation to
6  disclose the rationale for why eventual public release or access to the datasets is not possible, if that is the case.
7
8

D. AAPOR Standards Complaint

9  If any of our work becomes the subject of a formal investigation of an alleged violation of this Code, undertaken with the approval of
10  the AAPOR Executive Council, we will provide additional information on the research study in such detail that a fellow researcher
11  would be able to conduct a professional evaluation of the study.
12
13
14    .

8

JA1740

# EXHIBIT K

Newspapers
_by_ ancestry
https://www.newspapers.com/image/264424206

Hartford Courant (Hartford, Connecticut) · Sun, Dec 23, 2012 · Page A1

Downloaded on Oct 19, 2022



# AMERICA'S OLDEST CONTINUOUSLY PUBLISHED NEWSPAPER

# Hartford Courant

VOLUME CLXXVI  NUMBER 358  |  COURANT.COM • MOBILE.COURANT.COM  |  SUNDAY, DECEMBER 23, 2012

**STARTING OVER**

# NEW SCHOOL, MADE FAMILIAR

## Hundreds Of Volunteers Help Ease Transition For Sandy Hook Kids

**By BRIAN DOWLING**
bdowling@courant.com

Sandy Hook Elementary School students will find that volunteers have painted the walls of their new school green and white, their school colors. The movers set furniture, desks, computers and supplies in the same places as their old classrooms in Newtown. Volunteers pinned the same posters to new classroom walls.

The re-creation of Sandy Hook Elementary at Chalk Hill School in Monroe involved hundreds of people over the past week. Locksmiths, plumbers, electricians, custodians, experts in fire suppression and security systems, as well as residents with paint brushes, all volunteered time to create an around-the-clock renovation team, which peaked at 500 workers.

Thanks to that effort, the surroundings will be
**CHALK HILL, A4**



**THE WELCOME** sign is ready at Chalk Hill School in Monroe, where Sandy Hook students will begin classes Jan. 3.

WFSB | POOL



**ADAM LANZA**

# Shooter Paused, And Six Escaped

**By DAVE ALTIMARI, EDMUND H. MAHONY and JON LENDER**
daltimari@courant.com

As many as a half-dozen first-graders may have survived Adam Lanza's deadly shooting spree at Sandy Hook Elementary School because he stopped firing briefly, perhaps to reload his rifle or because it jammed, according to law enforcement officials familiar with the events.

A source said that the Bushmaster rifle that Lanza used in the shootings is at the state police forensic laboratory undergoing several tests, including tests to determine whether it jammed.

The children escaped from the first-grade classroom of teacher Victoria Soto, one of the six educators Lanza killed in Newtown after shooting his way through a glass door with the .223-caliber semiautomatic rifle on the morning of Dec. 14.

On Friday, detectives obtained and began examining records related to psychiatric care Lanza had received
**RIFLE, A6**

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers™
POWERED BY

Case 1:18-cv-10507-RMB-JBD   Document 184-1   Filed 11/03/23   Page 762 of 831
PageID: 4867

Newspapers
by ancestry

Hartford Courant (Hartford, Connecticut) · Sun, Dec 23, 2012 · Page A6

https://www.newspapers.com/image/264424215

Downloaded on Oct 19, 2022

A6   SUNDAY, DECEMBER 23, 2012   THE HARTFORD COURANT

**TRAGEDY IN NEWTOWN**

# Rifle

*Continued from Page A1*



Copyright © 2022 Newspapers.com. All Rights Reserved.

POWERED BY
Newspapers
.com

# Exhibit 10

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### TRENTON  ICINA  E

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as S perintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Depart ent, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Par  Ridge Police Depart ent, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as S perintendent of the New Jersey | |

**JA1745**

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Glo cester Co nty Prosec tor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean Co nty
Prosec tor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as S perintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Depart ent, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Depart ent,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## <u>DEC ARATION OF DANIE W WE STER</u>

I, DANIEL W. WEBSTER, here y depose and state:

1.     I a over the age of 18 and a co petent to testify to the atters stated elow ased on personal nowledge.

2.    I have attached a copy of an e pert report I have prepared, together with a copy of  y C rric l     itae attached as E hi it A of  y e pert report . The opinions e pressed in this report are  ased on  y  nowledge, s ill, e perience, training, and ed cation, and I hold these opinions to a reasona le degree of professional certainty.  I here y adopt and incorporate  y report in this declaration as if set forth in f ll.

I declare  nder penalty of per ry on this **20th**       day of Octo er, 2023, that the foregoing is tr e and correct.

Daniel Webster  Digitally signed by Daniel Webster
                Date: 2023.10.20 15:00:50 -04'00'

DANIEL W. WEBSTER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Expert Report of Daniel W. Webster**

---

1

Pursuant to 28 U.S.C. § 1746, I, Daniel W. Webster, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this report, and testify based on my personal knowledge and information.

2.      I am Bloomberg Professor of American Health in Violence Prevention in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.  For 21 years, I served as director or co-director of an academic center focused on research to inform firearm policy.  I currently serve as Distinguished Scholar for the Johns Hopkins Center for Gun Violence Solutions.  I previously served as Co-Director of the Johns Hopkins Center for the Prevention of Youth Violence.

3.      I have been asked by the Attorney General's Office for the state of New Jersey to provide information about current research on gun violence and its prevention, particularly as it relates to policies to restrict large capacity magazines and assault weapons.  I have provided my services at the hourly rate of $600.

## BACKGROUND AND QUALIFICATIONS

4.      I began my career in public safety research in 1985 as a Research Associate at the University of Michigan's School of Public Health, and I have devoted most of my research since then to gun-related violence and its prevention.  I have a Master of Public Health degree from the University of Michigan and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health.  This graduate training included many advanced courses in epidemiology, research methods, and statistical analysis.

5.      Immediately prior to joining the faculty at Johns Hopkins, I directed a program on violence research at the Washington (D.C.) Hospital Center.  I joined the faculty of the Johns Hopkins School of Public Health in 1992, and since 2010 have been a tenured Professor of

2

**JA1749**

Health Policy and Management. I teach graduate courses on violence prevention. Previously, I taught courses in research and evaluation methods at Johns Hopkins, directed the Ph.D. program in Health and Public Policy, and served on the steering committee of a pre- and post-doctoral training program in violence prevention research funded by the National Institutes of Health.

6. I have directed numerous studies related to gun violence and its prevention. I have published 149 scientific articles and nine invited commentaries in academic peer-reviewed journals, the vast majority of these addressed some aspect of violence and/or firearm injuries and their prevention. I am the lead editor of a book entitled *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* by Johns Hopkins University Press (2013), and I am the lead author for two chapters and co-author on three other chapters in this book. In addition, I recently served as special editor or co-editor of three special issues on gun violence for top tier public health journals. A true and correct copy of my curriculum vitae, detailing my qualifications and these publications, is attached as Exhibit A to this report.

**OPINIONS**

I. **Large-Capacity Magazines and Features of Assault Weapons Increase Victimization from Mass Shootings and Fatal Shootings of Law Enforcement Officers**

7. There are data that indicate that design and capabilities of firearms can potentially affect the likelihood that an intended target or bystander at a shooting will be wounded as well as the severity of wounds resulting from criminal shootings. Particularly relevant is the capacity of a firearm's ammunition feeding device. In comparison to other magazines which feed ammunition to semi-automatic firearms, large capacity magazines (LCMs)—often defined as those that hold more than 10 rounds—increase the number of rounds that can be fired without the shooter having to take the time to reload.

3

8.     Assault weapons have been defined in laws as semi-automatic firearms capable of accepting LCMs in addition to one or more deemed useful in military or criminal applications, especially mass shootings.  These include pistol grips on rifles, folding rifle stocks (to make rifles more concealable), threaded barrels for attaching silencers, and barrel shrouds on pistols.

9.     There is evidence that the design features of assault weapons make them especially appealing to criminals and to those who commit mass shootings.  When mass shootings occur in public, especially shootings that take place in public places, the shooter often selects an assault weapon or another firearm with an LCM.  Data on 15 public mass shootings in the U.S. from 1984 to 1993 collected by Gary Kleck revealed that six (40%) involved assault weapons or other firearms equipped with LCMs.[1,2]  A collection of data by Mother Jones magazine on 62 mass shootings in public places by lone shooters from 1982 through 2012 found that 33 perpetrators (53.2%) used firearms or LCMs that were or would have been banned by the federal ban of assault weapons and LCMs.[3]

10.     Reviewing data on fatal mass shootings (4 or more victim fatalities) compiled by Everytown for Gun safety for the period 2009-2020, an assault weapon was used in at least 30 of these events resulting in 347 deaths (25% of all victims killed in mass shootings) and 719 individuals with nonfatal gunshot wounds (76% of the total). Fatal mass shootings during this

---

[1] Kleck, Gary. Targeting Guns: Firearms and Their Control. New York: Aldine de Gruyter, pp. 124-126 (1997).

[2] Koper, Christopher S. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*. Philadelphia: University of Pennsylvania. p. 14 (2004).

[3] Mother Jones Magazine, US Mass Shootings, 1982-2012.  Data from Mother Jones' Investigation, available at http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (2014).

4

**JA1751**

time period that were carried out with an assault weapon accounted for 6 times as many people

shot as fatal mass shootings committed with other firearms.[4] In these same data, a total of 42

fatal mass shootings were committed with firearms with an LCM, resulting in 422 deaths and an

additional 710 with nonfatal gunshot wounds. In comparison with the 34 fatal mass shootings in

which there was information indicating that the firearm did not have an LCM, the average

number of people shot was 4.4 times higher in shootings with firearms with LCMs (26.6 vs. 6.0).

11.     Similarly, criminologist Christopher Koper's re-analysis of data from Mother

Jones magazine's study of public mass murders with firearms from 1982 to2012 revealed that

mass shootings with assault weapons, compared with mass shootings with other firearms,

involved more fatalities per incident (a mean of 10.4 vs. 7.4) and more victims with nonfatal

gunshot wounds (mean of 13.5 vs. 6.4).[5] Luke Dillon's 2013 research also reported that,

compared with assaults carried out with firearms that did not have LCMs, mass shootings in

which firearms with LCMs were used had 60% more fatalities on average (a mean of 10.19 vs.

6.35) and more than 3 times as many persons with nonfatal gunshot wounds (12.39 vs. 3.55).

These findings are consistent with those from a study of criminal shootings in Jersey City, NJ,

which found that, compared to shootings with revolvers, shootings with semi-automatic pistols—

---

[4] Everytown Research & Policy. Mass Shootings in America.
https://everytownresearch.org/maps/mass-shootings-in-america/#mass-shootings-involving-assault-weapons-or-high-capacity-magazines-were-far-deadlier

[5] Dillon, Luke, Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012, Thesis for Master of Arts in Criminology, Law and Society, George Mason University, September 2013; Koper, Christopher S., Supplemental affidavit submitted on January 6, 2014 in *Shew v. Malloy*, Civil Action No. 3:13-CV-00739-AVC (D. Conn).

**JA1752**

which tend to hold significantly more bullets than revolvers—had more shots fired and more victims wounded.[6]

12.    A 2017 study led by Dr. Koper and colleagues gather a variety of kinds of data from law enforcement agencies on the use of LCMs and assault weapons in various types of crime.[7] This study found that firearms with LCMs accounted for 15 to 36% of firearms recovered by law enforcement across ten cities with detailed data on firearm characteristics between 2001 and 2014, 40.6% of firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings involving 4 or more victim deaths for the period 2009-2015.  In this same study, Dr. Koper and his colleagues reported that assault weapons accounted for between 2.6 and 8.5% of firearms recovered by 10 large city police departments between 2001 and 2014, 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally 2009-2015.  In a separate study published in *Criminology & Public Policy* in 2019 that drew upon a wider set of data on fatal mass shootings, Dr. Koper found that about half of all firearms used in fatal mass shootings[8] and two-thirds of the

---

[6] Reedy, Darin C., and Christopher S. Koper, Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers, *Injury Prevention* 9:151-155 (2003).

[7] Koper, Christopher S., William D. Johnson, Jordan L. Nichols, Ambrozine Ayers, and Natalie Mullins. Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources. *Journal of Urban Health* (2017), DOI 10.1007/s11524-017-0205-7

[8] Koper, Christopher S. Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms. *Criminology & Public Policy*. 19(1): 147-170 (2020), https://doi.org/10.1111/1745-9133.12485

most deadly shootings were committed with semiautomatic firearms with LCMs.[9]  When details

on the weapons used in fatal mass shootings was available, just over one quarter involved the use

of an assault weapon.[10]

13.    As a point of comparison, it is estimated that assault weapons accounted for about

3 percent of all firearms in civilian hands in 2013.  Thus, the research discussed above indicates

semiautomatic firearms with LCMs and assault weapons specifically are used in crime, lethal

violence against law enforcement officers, and in fatal mass shootings at percentages five to ten

times higher than would be by chance or if weapon features played no role in these acts of

violence.  A study using data from handgun purchasers in California and subsequent crimes

committed with those handguns prior to the state banning assault-style pistols found that the

share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal

history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a

previous criminal gun charge, and 10% for those who had previously been charged with two or

more serious violent offenses.[11]  These findings are consistent with the thesis that design features

of assault style firearms, including LCMs, are attractive to those who are most likely to use

firearms in crime.

---

[9] Klarevas, Louis. *Rampage Nation: Securing America from Mass Shootings*. Amherst, NY:
Prometheus Books (2016).

[10] Koper (2019) and Klarevas (2016) in footnotes 8 and 9.

[11] Wintemute, Garen J, Mona A Wright, Carrie A Parham, Christiana M Drake, and James J
Beaumont. (1998) Criminal activity and assault-type handguns: A study of young adults. *Annals
of Emergency Medicine* 32(1):44-50. doi.org/10.1016/S0196-0644(98)70098-8

## II.    BANS OF LARGE-CAPACITY MAGAZINES AND ASSAULT WEAPONS REDUCE FATAL MASS SHOOTINGS

14.    Available evidence indicates that bans of LCMs and assault weapons reduce the incidence of fatal mass shootings and the number of people shot in such shootings.  In a study that I led that was published in *Criminology & Public Policy* (a journal of the American Society of Criminology) my team analyzed data on fatal mass shootings by state over the period 1984-2017 to assess independent associations between state and federal firearm laws and the incidence of fatal mass shootings.  Using regression analyses to control for other factors in addition to firearm laws, we found that state bans on LCMs were associated with a statistically significant 48 percent lower incidence of fatal mass shootings when contrasted with state-years in which there was no LCM ban.[12]  Our statistical models also indicated that LCM bans were associated with 70% fewer deaths from fatal mass shootings per capita; however, there was a wide confidence interval around that estimate.  Another study, using similar data and methods also published in 2020 likewise found that LCM bans were associated with significantly lower rates of fatal mass shootings.[13]  In 2019, Dr. Louis Klarevas led a study published in the American Journal of Public Health using data from 1990-2017 and reported that the incidence of high-fatality mass shootings (6 or more victim deaths) in non-LCM ban states was more than double the rate than in LCM ban states; the annual number of deaths from these shootings per capita was more than 3 times higher.  Statistical models also found a significant association between LCM

---

[12] Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marisa Doll Booty, and Elizabeth A. Stuart. Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States. *Criminology & Public Policy*, 19:171–212 (2020), doi.org/10.1111/1745-9133.12487.

[13] Siegel M, Goder-Rieser M, Duwe G, Rocque M, Fox JA. The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018. *Law and Human Behavior*. 44(5): 34t-360 (2020), http://dx.doi.org/10.1037/lhb0000378

bans and lower rates of high-fatality mass shootings.[14]  From the available research evidence, I conclude that state bans of LCMs are associated with lower rates of fatal mass shootings and mass shooting deaths.

15.     I have also conducted and synthesized research on the estimated effects of bans of assault weapons on fatal mass shootings.  First, there is evidence that the federal ban of assault weapons and LCMs reduced the incidence of the criminal use of banned guns.  Christopher Koper and colleagues' study of the federal ban that used a variety of data revealed about a one third reduction in the share of crime guns recovered and traced by law enforcement that were assault weapons.[15]

16.     The study that I led on firearm laws and fatal mass shootings estimated the independent association between state assault weapons bans and fatal mass shootings.  Our point estimates suggested that assault weapon bans were associated with a 29 to 36% lower rate of fatal mass shootings after controlling for the effects of LCM bans and other firearm laws. However, there was significant uncertainty surrounding those estimates and they were not statistically significant. The relatively large confidence interval surrounding these estimates for the effect of state bans of assault weapons is likely due to 1) the relatively few (three) state assault weapons bans that were not enacted simultaneously with LCM bans; and 2) the large number of policies whose effects were simultaneously assessed in the statistical models. Another study that was more narrowly focused on the effects of assault weapons bans generated estimates

---

[14] Klarevas, Louis, A Conner, David Hemenway. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *American Journal of Public Health*. 109(12):1754-1761 (2019), doi: 10.2105/AJPH.2019.305311

[15] Christopher S. Koper, Daniel J. Woods, and Jeffrey A. Roth, "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003," National Institute of Justice, US Department of Justice (June 2004).

9

that were statistically significant.  In a 2015 study of public fatal mass shootings during 1982-2011 and the association with federal and state assault weapon bans, economist Mark Gius found statistically significant negative associations between assault weapon bans and fatalities from public mass shootings.[16]

17.    A recent study used the most comprehensive data collected to date on fatal mass shootings in public places[17] to assess the effects of the federal ban on assault weapons and LCMs and the sunsetting of that law in 2004.  In a 2022 study, prominent firearm policy researchers Philip Cook and John Donohue found that fatalities from shootings with banned weapons decreased during the second half of the ban and then surged after the ban expired.  From 2015 to 2019, five of the top ten deadliest mass public shootings in U.S. history occurred and each was committed with an assault weapon.  The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat (Figure below).[18]

---

[16] Mark Gius. The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings. *Applied Economics Letters* 22(2):281–284 (2015).

[17] Violence Project. Mass shooter database: version 5.0. https://www.theviolenceproject.org/mass-shooter-database/

[18] Cook, Philip J. and John J. Donohue. Regulating Assault Weapons and Large-Capacity Magazines for Ammunition. *JAMA*. 2022;328(12):1191-1192 (2022), doi:10.1001/jama.2022.17120



**eFigure.** Victim counts for mass public shootings in the United States, overall and by Assault Weapons

Data from The Violence Project (7); Mass public shootings are defined as 4 or more fatalities per incident. Data shown in 5-year intervals. Mass shooting periods begin and end in September of the preceding year to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place (For example, 1985 to 1989 covers 9/13/1984 to 9/12/1989).

18.    Researchers Lori Post and colleagues recently published a research article using data on fatal mass shootings (four or more victim deaths) in public places with data from The Violence Project for the years 1966-2019.  The researchers used a regression discontinuity study design and controlled for population growth and homicides, in general, to estimate discontinuities in levels and trends in fatal mass shootings in public places associated with the beginning and the end of the Federal ban on assault weapons and LCMs.[19] The statistical models

---

[19] Post, Lori, Maryann Mason, Lauren Nadya Singh, and colleagues. (2021) Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis. *JMIR Public Health Surveillance*, 22;7(4):e26042. DOI: https://doi.org/10.2196/26042

explained 94% of the variation in the annual number of fatal mass shootings in public places and estimated that the Federal ban of assault weapons and LCMs resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries during the decade the ban was in place. The statistical models estimated that if the Federal ban had been continued after 2004, there would have been 30 fewer public mass shootings, 339 fewer people murdered in those shootings, and 1,139 fewer people injured in those shootings.

19.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ____June 7, 2023_        *Daniel W Webster*

DANIEL W. WEBSTER

12

**JA1759**

# Exhibit A

## CURRICULUM VITAE

## Daniel William Webster, ScD, MPH

**PROFESSIONAL DATA**

| | |
|---|---|
| *Business Address:* | Johns Hopkins Bloomberg School of Public Health |
| | Department of Health Policy & Management |
| | 624 N. Broadway, Room 580, Baltimore, MD  21205 |
| | office: 410.955.0440 |
| *E-mail:* | dwebster@jhu.edu |
| *Twitter:* | @DanielWWebster1 |

**EDUCATION AND TRAINING**

| | |
|---|---|
| *Doctor of Science, 1991* | The Johns Hopkins University School of Hygiene and Public Health |
| | Department of Health Policy and Management |
| *Masters of Public Health, 1985* | The University of Michigan School of Public Health |
| | Department of Health Planning and Administration |
| *Bachelors of Arts, 1982* | The University of Northern Colorado Psychology |

**PROFESSIONAL EXPERIENCE**

*Johns Hopkins University*

*Academic Appointments*

Bloomberg Professor of American Health in Violence Prevention, 2018 – present

Professor, Health Policy & Management, Bloomberg School of Public Health, 2010 – present

Professor, Division of Public Safety Leadership, School of Education, 2010 – present

Associate Professor, Health Policy & Management, Bloomberg School of Public Health, 2001-2010

Assist Professor, Health Policy & Management, Bloomberg School of Public Health, 1995-2001

Instructor, Health Policy & Management, Bloomberg School of Public Health, 1992-1995

*Academic Leadership*

Director, Health & Public Policy PhD Program, Bloomberg School of Public Health, 2013 – 2015

Team Co-Lead, Violence Prevention Workgroup, Bloomberg American Health Initiative, 2016 – 2022

*Research Center Positions*

Co-Director (2022) and Distinguished Scholar (2023- ), Johns Hopkins Center for Gun Violence Solutions.

Webster 2
*May 2023*

Director, Center for Gun Violence Prevention and Policy/Center for Gun Policy and Research, Bloomberg School of Public Health, 2012 – 2022.

Co-Director, Center for Gun Policy and Research, 2001-2012

Core Faculty, Center for Mental Health and Substance Abuse Policy Research, 2016 – present

Deputy Director for Research, Center for the Prevention of Youth Violence, 2005 – 2017

Core Faculty, Center for the Prevention of Youth Violence, 2000 – 2017

Core Faculty, Center for Injury Research and Policy, 1992 – present

Co-Director, Center for Gun Violence Solutions, Bloomberg School of Public Health, 2001 – 2012

### *Other Non-JHU Professional Experience*

Director of Violence Research, Washington Hospital Center, Trauma, Surgical Critical Care, and Emergency Medicine Department, Washington, DC., 1990 – 1992

Guest Researcher, National Institute on Aging; Epidemiology, Demography, and Biometry Program, Bethesda, MD, 1988

Injury Control Analyst, American National Red Cross, Washington, DC., 1986 – 1987

Research Associate II, Program for Urban Health Research, Department of Epidemiology, School of Public Health, The University of Michigan, Ann Arbor, 1985 – 1986

Research Associate I, Systems Analysis Division, The University of Michigan Transportation Research Institute, Ann Arbor, 1984 – 1985

Research Assistant I, Department of Health Behavior and Health Education, School of Public Health, The University of Michigan, Ann Arbor, 1983 – 1984

Social Worker, Department for Social Services, Cabinet for Human Resources, Commonwealth of Kentucky, Warsaw, Kentucky, 1982 – 1983


## PROFESSIONAL ACTIVITIES

### *Society Membership and Leadership - Participation on Advisory Panels and Boards*

Scientific and Expert Advisory Board, Building Blocks DC and Washington, DC's Office of Gun Violence Prevention., 2021-present.

Member, Council on Criminal Justice, Violent Crime Working Group, 2021- present.

Co-Chair of Policy Workgroup and Executive Session Member, West Creek Community of Practice for a Fair and Just Response to Gun Violence, 2019-present.

John Jay College Research Advisory Group on Preventing and Reducing Community Violence, 2020

Expert Panel on Firearms Data Infrastructure for NORC of the University of Chicago, 2019-2020

Founding member and Co-Chair, advisory board for Safe Streets Baltimore, Baltimore City Health Department and Mayor's Office for Criminal Justice, 2016 - 2020

Director, Johns Hopkins-Baltimore Collaborative for Violence Reduction, 2016 –2019

Director, Baltimore Homicide Review Commission.  City of Baltimore, 2014 – 2015

Advisory Committee on Violent Media and Gun Violence to the Directorate of the Social, Behavioral and Economic Sciences Division, National Science Foundation, 2013

Institute of Medicine, Planning Committee for Workshop on Evidentiary Base for Violence Prevention across the Lifespan and Around the World, 2012-2013

Invited participant to the Baltimore City GunStat project to provide technical assistance to law enforcement officials on gun law enforcement strategies, 2007 – present

Expert reviewer, Child Death Review Capacity Building Project, Harborview (University of Washington) Injury Prevention and Research Center, 2006

Advisory Council, California Department of Justice for planning gun violence prevention campaign, 2005 - 2009

Lethality Assessment Committee, advisory group for the Maryland Network Against Domestic Violence to develop a model lethality assessment protocol for police and providers of services to victims of intimate partner violence, 2003 - 2009

Johns Hopkins Univ. President's Council on Urban Health, Violence Working Group, 1998-2000

Baltimore City Task Force on Gunshot Wound Lethality, 1996-1997


## EDITORIAL AND OTHER PEER REVIEW ACTIVITIES

*Journal Peer Review Activities*

American Journal of Epidemiology

American Journal of Preventive Medicine

American Journal of Public Health

Annals of Emergency Medicine

Annual Reviews of Public Health, Special Symposium Editor, 2014-2015

Archives of Pediatric and Adolescent Medicine Canadian Medical Association Journal

Epidemiologic Reviews, Special Issue Editor 2015-2016

Guide to Clinical and Preventive Services

Health Education and Behavior, Special Issue Editorial Board Member

Health Education Research

Injury Prevention, Editorial Board, 2005-2010

JAMA, Journal of the American Medical Association

Journal of Crime and Delinquency

Journal of Criminal Justice

Journal of General and Internal Medicine

Journal of Health Politics, Policy, and Law

Journal of Interpersonal Violence

Journal of Policy Analysis & Management

Journal of Quantitative Criminology

Journal of Trauma

Journal of Urban Health

Journal of Women's Health

New England Journal of Medicine

Pediatrics

Politics and Policy

Preventive Medicine, Co-editor, special issue on gun violence, 2015; co-editor special issue on gun violence 2022

Social Science & Medicine

Sothern Economic Journal

Western Criminology Review


### *Grant Review*

National Center for Injury Control and Prevention, Centers for Disease Control and Prevention, Youth Violence Prevention Through Community-Level Change, April 2004

National Center for Injury Control and Prevention, Centers for Disease Control and Prevention, May 2001

National Institutes of Health, Clinical Sciences Special Emphasis Panel, Small Business Innovation Research Program, March 1999

National Center for Injury Control and Prevention, Centers for Disease Control Review Panel, June 1998

National Institute for Mental Health, Behavioral Science Track Award for Rapid Transition B/START Program, April 1998


## HONORS AND AWARDS

Inaugural (Endowed) Bloomberg Professor of American Health, 2018

Johns Hopkins University Distinguished Alumni Award, 2017

Injury Free Coalition for Kids, Pioneer Award, 2017

Leon Robertson Award for best 2016 article in Injury Epidemiology, co-author, 2017

Baltimore City Health Equity Leadership Award, 2016

David Rall Award for Science-Based Advocacy, American Public Health Association, 2015

Finalist for The Baltimore Sun's award for Marylander of the Year, 2013

Selected for Institute of Medicine Planning Committee for the Evidentiary Base for Violence Prevention Across the Lifespan and Around the World Workshop, 2012

Delta Omega Honorary Society in Public Health – Alpha Chapter, Johns Hopkins Bloomberg School of Public Health, Faculty induction, 2005

Education Award from the Maryland Network Against Domestic Violence, 2004

Delta Omega Honorary Society - Alpha Chapter Certificate of Merit, 1989

William Haddon Memorial Fellowship, The Johns Hopkins School of Public Health, 1988-1989

Public Health Traineeship, The Johns Hopkins School of Public Health, 1987-1989


# PUBLICATIONS

## *Journal Articles, Peer Reviewed*

150.  Examining a hypothesized causal chain for the effects of the 2007 repeal of the permit-to-purchase licensing law in Missouri: homicide guns recovered in state and within a year of purchase. *Journal of Urban Health*, 2023

149.  Ward JA, Uzzi M, Hudson T, **Webster DW**, Crifasi CK. Differences in perceptions of gun-related safety by race and gun ownership in the United States. *Journal of Law, Medicine, and Ethics*, 2023; 51:14-31.

148.  Kagawa R, Charbonneau, McCort C, McCourt A, Vernick J, **Webster D**, Wintemute G. Effects of comprehensive background check policies on firearm fatalities in four states. *American Journal of Epidemiology*, accepted Dec. 22, 2022.

147. **Webster DW**, Richardson J Jr., Meyerson N, St. Vil C, Topazian R. Observations and recommendations based on a review of research on the effects of hospital-based violence intervention programs on risks for future violence. *ANNALS of Political and Social Sciences*, forthcoming in 2023.

146.  Stone EM, Crifasi CK, Ward JA, Vernick JS, **Webster DW**, McGinty EE, Barry CL. National Support for Gun Policies Among U.S. Adults in 2019 and 2021. *Preventive Medicine*, 2022 Sep 7:107242. doi: 10.1016/j.ypmed.2022.107242. Online ahead of print. PMID: 36087625.

145. **Webster DW**, Gostin LO. The Supreme Court Expands Second Amendment Rights as the Nation Experiences Historic Levels of Firearms Violence. *JAMA*, 2022; 328(12):1187-1188. doi: 10.1001/jama.2022.14073. PMID: 36166019

144.  Doucette ML, McCourt AD, Crifasi CK, **Webster DW**. Impact of Changes to Concealed Carry Weapons Laws on Fatal and Non-Fatal Violent Crime, 1980-2019. *American Journal of Epidemiology*, 2022 Sep 14:kwac160. doi: 10.1093/aje/kwac160. Online ahead of print. PMID: 36104849

143.  Ward JA, McGinty EE, Hudson T, Stone EM, Barry CL, **Webster DW**, Crifasi CK. Reimagining public safety: Public opinion on police reform and gun violence prevention by race and gun ownership in the United States. *Preventive Medicine* 2022; 107180, ISSN 0091-7435, https://doi.org/10.1016/j.ypmed.2022.107180

142. Doucette ML, Ward JA, McCourt AD, **Webster D**, Crifasi CK. Officer-involved shootings and concealed carry firearm laws: An analysis of Gun Violence Archive data, 2014-2020. *J Urban Health*. 2022 Jun;99(3):373-384. doi: 10.1007/s11524-022-00627-5. PMID: 35536393 **-Awarded best article of the year in J Urban Health (2022)**

141.  Crifasi CK, William RG, Booty MD, Owens-Young JL, **Webster DW**, Buggs SAL. Community Perspectives on Gun Violence and Safety: The Role of Policing in Baltimore City. *Journal of Criminal Justice*. 2022 https://doi.org/10.1016/j.jcrimjus.2022.101964

140.  Crifasi CK, Ward JA, McGinty EE, Barry CL, **Webster DW**. Public Opinion on Laws Regulating Public Gun Carrying. *Preventive Medicine*. 2022; vol. 159 https://doi.org/10.1016/j.ypmed.2022.107067.

139.  **Webster DW**. Public health approaches to reducing community gun violence. *Daedalus,* Reimagining Justice: The Challenges of Violence & Punitive Excess. (Winter) 2022; 151:38-48. https://doi.org/10.1162/DAED_a_01886

138.  Crifasi CK, Ward JA, McGinty EE, **Webster DW**, Barry CL. Gun purchasing behaviours during the initial days of the COVID-19 pandemic, March to mid-July 2020. *International Review of Psychiatry*. 2021 Nov;33(7):593-597. doi: 10.1080/09540261.2021.1901669

137. Crifasi CK, Ward JA, McGinty EE, **Webster DW**, Barry CL. Public Opinion on Gun Policy by Race and Gun Ownership Status. *Preventive Medicine*. 2021; 149:106607. doi: 10.1016/j.ypmed.2021.106607. .PMID: 33984373

136. Zeoli AM, Paruk J, Branas CC, Carter PM, Cunningham R, Heinze J, **Webster DW**. Use of Extreme Risk Protection Orders to Reduce Gun Violence in Oregon. *Criminology & Public Policy* 2021; 20:243-261. https://doi.org/10.1111/1745-9133.12544

135. Crifasi CK, Ward JA, McGinty EE, **Webster DW**, and Barry CL. Gun Purchasing Behaviors during the Initial Phase of the COVID-19 Pandemic, March to mid-July 2020. International Review of Psychiatry, Published online 24 June 2021

https://doi.org/10.1080/09540261.2021.1901669

134. Merrill-Frances M, McGinty EE, Barry CL, **Webster DW**, Crifasi CK. Association between gun owner attitudes and their behavior in private firearm sales. Preventive Medicine 2021 Feb 10;147:106454. doi: 10.1016/j.ypmed.2021.106454. Online ahead of print.PMID: 33581183

133. Buggs SAL, **Webster DW**, Crifasi CK.  Using synthetic control methodology to estimate effects of a Cure Violence intervention in Baltimore, Maryland. Injury Prevention Published Online First: 08 February 2021. http://dx.doi.org/10.1136/injuryprev-2020-044056

132. Frattaroli S, Zeoli AM, **Webster DW**. Armed, Prohibited and Violent at Home: Implementation and enforcement of restrictions on gun possession by domestic violence offenders in four U.S. localities. Journal of Family Violence, 2021 https://doi.org/10.1007/s10896-020-00241-6

131. Crifasi CK, Boot MD, Buggs SAL, **Webster DW**, Sherman SG. Worth the risk? Gun carrying and perceived criminal justice responses in Baltimore. Injury Prevention, 2020 injuryprev-2020-043917. doi: 10.1136/injuryprev-2020-043917. Online ahead of print. PMID: 33303560

130. Abelow H, Crifasi C, **Webster DW**.  The legal and empirical case for firearm purchaser licensing. The Journal of Law, Medicine & Ethics, 2020; 48(S2):17-24. doi: 10.1177/1073110520979397. PMID: 33404297

129. McCourt AD, Crifasi CK, Stuart ES, Vernick JS, Kagawa RMC, Wintemute GJ, **Webster DW**. Effects of Purchaser Licensing and Point-of-Sale Background Check Laws on Firearm Homicide and Suicide in Four States.  American Journal of Public Health 2020;110:1546-1552. doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PMID: 32816544

128. **Webster DW**, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States. Criminology & Public Policy, 2020;19:171–212. doi.org/10.1111/1745-9133.12487

127. Trangenstein P, Eck R, Lu Y, **Webster D**, Jennings JM, Latkin C, Milam AJ, Furr-Holden D, Jernigan DH.  The Violence Prevention Potential of Reducing Alcohol Outlet Access in Baltimore, MD.  Journal of Studies on Alcohol and Drugs 2020; 81:24-33. doi: 10.15288/jsad.2020.81.24. PMID: 32048598

126. Crifasi CK, Buggs SAL, Booty MD, **Webster DW**, Sherman SG. Baltimore's Underground Gun Market: availability of and access to guns.  Violence and Gender 2020  https://doi.org/10.1089/vio.2019.0054

125. Booty M, O'Dwyer J, **Webster D**, McCourt A, Crifasi C. Describing a "mass shooting": the role of databases in understanding burden. Injury Epidemiology, 2019;6:47. doi:10.1186/s40621-019-0226-7

124. Stone E, Barry CL, Crifasi CK, **Webster DW**, Vernick JS, McGinty EE.  Support for Gun Policies among Young Adults in the U.S., 2017-2019.  Preventive Medicine 2020;135:106094. doi: 10.1016/j.ypmed.2020.106094

123. Castillo-Carniglia A, **Webster DW**, Wintemute GJ. Effect on background checks of newly enacted comprehensive background check policies in Oregon and Washington: a synthetic control approach. Injury Epidemiology. 2019;6:45. Published 2019 Nov 27. doi:10.1186/s40621-019-0225-8

122. Barry CL, Stone E, Crifasi CK, Vernick JS, **Webster DW**, McGinty EE. Trends in Americans' Support for Gun Policies.  Health Affairs 2019; 38:1727-34. doi: 10.1377/hlthaff.2019.00576

121. Crifasi CK, Stone EM, McGinty B, Vernick JS, Barry CL, **Webster DW**. Differences in public support for handgun purchaser licensing. Injury Prevention 2019 Sep 6. pii: injuryprev-2019-043405. doi: 10.1136/injuryprev-2019-043405

120. Crifasi CK, O'Dwyer JK, McGinty EE, **Webster DW**, Barry CL. Desirability of personalized guns among current gun owners.  American Journal of Preventive Medicine. 2019 Jun 7. pii: S0749-3797(19)30155-2. doi: 10.1016/j.amepre.2019.02.024. [Epub ahead of print] PMID: 31196718

119. Hasegawa RB, **Webster DW**, Small DS.  Bracketing in the Comparative Interrupted Time-Series Design to Address Concerns about History Interacting with Group: Evaluating Missouri's Handgun Purchaser Law.  Epidemiology 2019 May;30(3):371-379. doi: 10.1097/EDE.0000000000000989. PMID: 30969945 Paper was runner-up for Rothman Prize for best article in 2019

118. Zeoli AM, **Webster DW**.  Firearm policies that work. JAMA. 2019 Feb 25. doi: 10.1001/jama.2019.0706

117. Decker MR, Wilcox HC, Holliday CN, **Webster DW**.  An integrated public health approach to interpersonal violence and suicide prevention and response.  Public Health Rep. 2018 Nov/Dec;133(1_suppl):65S-79S. doi: 10.1177/0033354918800019.  PMID: 30426878

116. Crifasi CK, McCourt AD, Booty MD, **Webster DW**. Polices to Prevent Illegal Acquisition of Firearms: Impacts on Diversions of Gun for Criminal Use, Violence, and Suicide. Current Epidemiology Reports 2019; 6:238–247

115. Castillo -Carniglia A, **Webster DW**, Cerdá M, Kagawa R, Vernick JS, Wintemute GJ, Crifasi CK. California's comprehensive background check and misdemeanor violence prohibition policies, and firearm mortality.  Annals of Epidemiology 2019; 30:50-56. doi: https://doi.org/10.1016/ j.annepidem.2018.10.001

114. Trangenstein PJ, Curriero FC, **Webster D**, Jennings JM, Latkin C, Eck R, Jernigan DH.  Outlet type, access to alcohol, and violent crime. Alcoholism: Clinical and Experimental Research 2018 Nov;42(11):2234-2245. doi: 10.1111/acer.13880. Epub 2018 Sep 26. PMID: 30256427

113. Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, **Webster DW**. Association between Firearm Laws and Homicide in Large, Urban U.S. Counties, Journal of Urban Health 2018 Jun;95(3):383-390. doi: 10.1007/s11524-018-0273-3.  Correction: Oct 2018; 95 (5):773-776.  10.1007/s11524-018-0306-y

112. Barry CL, **Webster DW**, Stone E, Crifasi CK, Vernick JS, McGinty EE.  Five Years after Newton: Public Support for Gun Violence Prevention Policies among Gun Owners and Non-Gun Owners. American Journal of Public Health. Published online ahead of print May 17, 2018: e1-e4. Doi:10.2105/AJPH.2018.304432)

111. Crifasi CK, McGinty EE, Douchette M, **Webster DW**, Barry CL. Storage practices of U.S. gun owners in 2016. American Journal of Public Health, 2018; 108:532-537. doi: 10.2105/AJPH.2017.304262. Epub 2018 Feb 22.  PMID: 29470124

110. Crifasi CK, Frances M, Vernick JS, **Webster DW**. Changes in the legal environment and enforcement of firearm transfer laws in Pennsylvania and Maryland.  Injury Prevention January 13, 2018 [Epub ahead of print] as 10.1136/injuryprev-2017-042582

109. Zeoli AM, McCourt A, Buggs S, Lilley D, Frattaroli S, **Webster DW**. Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their impact on intimate partner homicide.  American Journal of Epidemiology 2018;187(11):2365–2371. doi: 10.1093/aje/kwy174

108. Kagawa RM, Rudolph KE, Cerda M, Castillo AC, Shev BA, **Webster D**, Vernick JS, Crifasi CK, Wintemute GJ. Repeal of comprehensive background check policies and firearm homicide and suicide. Epidemiology 2018;29:494-502. doi: 10.1097/EDE.0000000000000838. PMID: 29613872

107. Castillo AC, Kagawa RM, **Webster DW**, Vernick JS, Cerda M, Wintemute GJ.  Comprehensive Background Check Policy and Firearm Background Checks in Three States.  Injury Prevention 2017; doi:10.1136/injuryprev-2017-042475

106. **Webster DW**, Buggs SAL.*  Can an Efficacious Strategy for Curtailing Illegal Drug Sales Be Counted on to Reduce Violent Crime?  Criminology & Public Policy 2017;16: 821-825

105. Stuart EA, Crifasi C, McCourt A, Vernick JS, **Webster D**.  Differing perspectives on analyzing data related to firearms and suicide.  American Journal of Public Health. 2017 Aug;107(8):e26. doi: 10.2105/AJPH.2017.303890

104. Crifasi CK, Choksey S, Buggs S,* **Webster DW**.  The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore.  The Russel Sage Foundation Journal for the Social Sciences 2017;3(5):128-140. https://www.jstor.org/stable/10.7758/rsf.2017.3.5.06

103. Crifasi CK, Pollack K, **Webster DW**. Assaults against U.S. law enforcement officers in the line-of-duty: Situational context and predictors of lethality. Injury Epidemiology 2016; 3:29. PMID: 27885587

102. Tung GJ, Vernick JS, Stuart EA, **Webster DW**, Gielen AC. Federal Actions to Incentivize State Adoption of 0.08g/dl Blood Alcohol Concentration Laws. Injury Prevention 2016 Oct 31. doi: 10.1136/injuryprev-2016-042087. PMID: 27799290

101. Milam AJ, Buggs S* Furr-Holden CD, Leaf P, Bradshaw CP, **Webster D**.  Changes in Attitudes towards Guns and Shootings following Implementation of the Baltimore Safe Streets Intervention. *J Urban Health*, 2016 Aug;93(4):609-26. doi: 10.1007/s11524-016-0060-y PMID: 27294969

100. Masho SW, Schoeny M, Sigel E, **Webster D**. Outcomes, data, and indicators of violence at the community level. Journal of Primary Prevention 2016;37:121-39. doi: 10.1007/s10935-016-0429-4

99. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**.  Firearms and the incidence of arrest among respondents to domestic violence restraining orders. Injury Epidemiology, 2015; 2:14. doi: 10.1186/s40621-015-0047-2

98. Riedel LE, Barry CL, McGinty EE, Bandara SN, **Webster DW**, Toone RE, Huskamp HA. Improving Health Care Linkages for Persons: The Cook County Jail Medicaid Enrollment Initiative.  J Correct Health Care. 2016 Jul;22(3):189-99. doi: 10.1177/1078345816653199.  PMID: 27302704

97. Messing JT, O'Sullivan CS, **Webster D**, Campbell J. Are Abused Women's Protective Actions Associated with Reduced Threats, Stalking, and Violence Perpetrated by their Male Intimate Partners? Violence Against Women 2016 Apr 26. pii: 1077801216640381. [Epub ahead of print] PMID: 27118689

96. Parker EM, Gielen AC, Castillo R, **Webster D**, Glass N.  Intimate partner violence and patterns of safety strategy use among women seeking temporary protective orders: a latent class analysis. Violence Against Women 2016 Mar 6. pii: 1077801216631436. [Epub ahead of print] PMID: 26951307

95. Messing JT, Campbell J, **Webster DW**, Brown S, Patchell B, Wilson JS.  The Oklahoma lethality assessment study: A quasi-experimental evaluation of the Lethality Assessment Program.  Social Service Review 2015: 89: 499-530.  DOI: 10.1086/683194

94. **Webster DW**, Cerdá M, Wintemute GJ, Cook PJ.  Epidemiologic evidence to guide the understanding and prevention of gun violence.  Epidemiologic Reviews 2016; 38(1):1-4. doi: 10.1093/epirev/mxv018. Epub 2016 Feb 10. PMID: 26905892

93. Milam AJ, Furr-Holden CD, Leaf P, **Webster D**.  Managing Conflicts in Urban Communities: Youth Attitudes Regarding Gun Violence.  J Interpersonal Violence 2016; Mar 27. pii: 0886260516639584. [Epub ahead of print] PMID: 27021734

92. Bushman BJ, Newman K, Calvert SL, Downey G, Drezde M, Gottfredson M, Jablonski NG, Masten AS, Morrill C, Neil DB, Romer D, **Webster DW**.  Youth violence: what we know and what we need to know. American Psychologist 2016;71:17-39. doi: 10.1037/a0039687

91. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**.  Firearms and the incidence of arrest among respondents to domestic violence restraining orders.  Injury Epidemiol. 2015;2(1):14. Epub 2015 Jun 23. PMID: 27747746

90. Bandara SN, Huskamp HA, Riedel LE, McGinty EE, **Webster D**, Toone RE, Barry CL. Leveraging the Affordable Care Act to enroll justice-involved populations in Medicaid: an inventory of state and local efforts.  Health Affairs 2015;34:2044-51. doi: 10.1377/hlthaff.2015.0668. PMID: 26643624

89. Crifasi CK, Pollack K, **Webster DW**.  The influence of state-level policy changes on the risk environment for law enforcement officers.  Injury Prevention 2016; 22:274-8. doi: 10.1136/injuryprev-2015-041825.  PMID: 26718550

88. Kennedy-Hendricks A, Richey M, McGinty EE, Stuart EA, Barry CL, **Webster DW**. Opioid Overdose Deaths and Florida's Crackdown on Pain Clinics. Am J Public Health 2015 Dec 21:e1-e8. [Epub ahead of print] PMID: 26691121

87. Rutkow L, Chang HY, Daubresse M, **Webster DW**, Stuart EA, Alexander GC.  Effect of Florida's prescription drug monitoring program and pill mill laws on opioid prescribing and use.  JAMA Internal Med 2015; online August 17, 2015. doi:10.1001/jamainternmed.2015.3931

86. Crifasi CK, Meyers JS, Vernick JS, **Webster DW**. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates.  Preventive Med. Jul 23, 2015. pii: S00917435(15)00229-7. doi: 10.1016/j.ypmed.2015.07.013. [Epub ahead of print] PMID: 26212633

85. McGinty EE, Sell TK, Wolfson JA, **Webster DW**.  Political communication about firearm policy in the United States: Competing news media messages about background check proposals in the year following the Newtown shooting. J Health Politics, Policy, and Law, 2015 Nov 13. pii: 3445592. [Epub ahead of print] PMID: 26567381

84. Barry CL, Kennedy Hendricks A, Gollust SE, Niederdeppe J, Bachhuber MA, **Webster D**, McGinty EE. Understanding Americans' Views on Opioid Pain Reliever Abuse.  Addiction. 2015 Jul 25. doi: 10.1111/add.13077. [Epub ahead of print] PMID: 26212522

83. Rudolph KE, Stuart EA, Vernick JS, **Webster DW**.  Association between Connecticut's permit-to-purchase handgun law and homicides. American Journal of Public Health, 2015;105(8):e49-54. doi:10.2105/AJPH.2015.302703

82. Barry C, McGinty EE, Vernick JS, **Webster DW**.  Two Years after Newtown - Public Opinion on Gun Policy Revisited.  Preventive Medicine 2015 May 18. pii: S0091-7435(15)00166-8. doi: 10.1016/j.ypmed.2015.05.007

81. **Webster DW**, Wintemute GJ.  Effects of policies designed to keep firearms from high-risk individuals.  Annual Reviews of Public Health.  2015;36:21-37.  PMID: 25581152

80. McGinty EE, Frattaroli S, Appelbaum P, Bonnie R, Grilley A, Horwitz J, Swanson J, **Webster DW**.  Using research evidence to reframe the policy debate around mental illness and guns: Process and recommendations.  Am J Public Health. 2014;104(11):e22-6. doi: 10.2105/AJPH.2014.302171

79. **Webster DW**, Crifasi CK, Vernick JS.  Effects of the repeal of Missouri's handgun purchaser licensing law on homicides.  J Urban Health 2014;91:293-302. Erratum: J Urban Health 2014; 91:598-601

78. McGinty EE, **Webster DW**, Jarlenski ML, Barry CL News media framing of serious mental illness and gun violence in the United States, 1997-2012 Am J Public Health 2014;104:406-13. doi: 10.2105/AJPH.2013.301557

77. Cavanaugh CE, Messing JT, Amanor-Boadu Y, O'Sullivan CS, **Webster D**, Campbell J.  Intimate partner sexual violence: a comparison of foreign-born versus U.S.-born physically abused Latinas.  J Urban Health 2014;91:122-35. PMID: 23959640

76. McGinty EE, **Webster DW**, Barry CL. Gun policy and serious mental illness: Priorities for future research and policy. Psychiatric Services 2014;65:50-8. doi: 10.1176/appi.ps.201300141

75. Tung GJ, Vernick JS, Stuart EA, **Webster DW**. Political factors affecting the enactment of clean indoor air laws.  Am J Public Health. 2014;104(6):e92-7. doi: 10.2105/AJPH.2013.301689

74. Whitehill JM, **Webster DW**, Frattaroli S, Parker EM. Interrupting violence: How the CeaseFire program prevents imminent gun violence through conflict mediation. J Urban Health 2014;91:84-95. doi: 10.1007/s11524-013-9796-9

73. Wintemute GJ, Frattaroli S, Wright MA, Claire BE, Vittes KA, **Webster DW**. Identifying armed respondents to domestic violence restraining orders and recovering their firearms: process evaluation of an initiative in California. Amer J Public Health 2014;104:e113-8. doi: 2013.301484. PMID:  24328660

72. Vittes KA, **Webster DW**, Frattaroli S, Claire BE, Wintemute GJ. Removing guns from batterers: Findings from a survey of domestic violence restraining order recipients in California. Violence Against Women 2013; 19:602-16. doi: 10.1177/1077801213490561

71. Milam AJ, Furr-Holden D, Bradshaw CP, **Webster DW**, Leaf PJ.  Alcohol environment, perceived safety, and exposure to alcohol, tobacco, and other drugs in early adolescence.  Journal of Community Psychology 2013;41:867-883

70. McGinty EE, **Webster DW**, Barry CL. Dangerous People or Dangerous Guns? Effects of news media messages about mass shootings on attitudes toward persons with serious mental illness and public support for gun control policies. American Journal of Psychiatry 2013;170:494-501

69. Barry CL, McGinty EE, Vernick JS, **Webster DW**.  After Newtown – public opinion on gun policy and mental illness.  New England Journal of Medicine 2013;368:1077-1081. doi: 10.1056

68. Vittes KA, Vernick JS, **Webster DW**.  Common sense gun policy reforms for the United States. British Medical Journal 2012; 345:e8672. doi: 10.1136 /bmj.e8672

67. Alexander GC, **Webster DW**, Kruszewski SP.  Rethinking opioid prescribing to protect patient ]safety and public health.  JAMA 2012;308:1865-6. doi: 10.1001 /jama.2012.14282

66. Whitehill JM, **Webster DW**, Vernick JS. Street conflict mediation to prevent youth violence: conflict characteristics and outcomes.  Injury Prev 2013; 19:204-9. doi: 10.1136 /injuryprev-2012-040429

65. Vittes KA, Vernick JS, **Webster DW**. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership.  Injury Prevention 2013;19:26-31. doi: 10.1136/injuryprev-2011-040290

64. Kercher C, Swedler DI, Pollak KM, **Webster DW**.  Homicides of law enforcement officers responding to domestic disturbance calls.  Injury Prevention 2013; 19:331-5

63. **Webster DW**, Whitehill JM, Vernick JS, Curriero FC. Effects of Baltimore's Safe Streets Program on gun violence: a replication of Chicago's CeaseFire program. J Urban Health 2013;90:27-40. doi: 10.1007/s11524-012-9731-5

62. **Webster DW**, Vernick JS, Bulzacchelli MT, Vittes KA.  Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee.  J Urban Health 2012;89:87-97

61. Yang C, German D, **Webster DW**, Latkin C. Experiencing violence as a predictor of drug use relapse among former drug users in Baltimore, Maryland. J Urban Health 2011;88:1044-51

60. Vernick JS, Rutkow L, **Webster DW**, Teret SP. Changing the constitutional landscape for firearms: the Supreme Court's recent second amendment decisions.  Amer. J Public Health 2011;101;2021-6

59. Franklin FA II, Pan WK, **Webster DW**, LaVeist TA.  Alcohol outlets and violent crime in the nation's capital. Western Journal of Emergency Medicine 2010;11:283-290

58. Wintemute GJ, Hemenway D, **Webster DW**, Pierce G, Braga AA.  Gun shows and gun violence: fatally flawed study yields misleading results. American Journal of Public Health 2010;100:1856-60

57. Wright MA, Wintemute GJ, **Webster DW**.  Factors affecting a recently-purchased handgun's risk for use in crime under circumstances that suggest gun trafficking.  J Urban Health 2010; 87:352-364

56. Zeoli AM, **Webster DW**.  Effects of domestic violence policies, alcohol taxes and police staffing levels on intimate partner homicide in large U.S. cities.  Injury Prevention 2010;16:90-95

55. **Webster DW**, Frattaroli S, Vernick JS, O'Sullivan C, Roehl J, Campbell JC. Women with protective orders report failure to remove firearms from their abusive partners: Results from an exploratory study.  Journal of Women's Health 2010;19:93-98

54. **Webster DW**, Vernick JS. Keeping firearms from drug and alcohol abusers. Injury Prevention 2009;15:425-7

53. **Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of state-level firearm seller accountability policies on firearms trafficking.  Journal of Urban Health 2009;86:525-537. doi: 10.1007/s11524-009-9351-x. Epub 2009 May 29.PMID: 19479382

52. Snider C, **Webster D**, O'Sullivan CS, Campbell JC.  Intimate partner violence: Development of a Brief Risk Assessment for the Emergency Department.  Academic Emergency Medicine 2009;16:1-8

51. Rutkow L, Vernick JS, **Webster DW**, Lennig DJ.  Violence against women and the Supreme Court:  recent challenges and opportunities for advocates and practitioners. Violence Against Women 2009; 15:1248-1258

50. Campbell JC, **Webster DW**, Glass N.  The Danger Assessment:  Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide.  J Interpersonal Violence 2009;24:653-674

49. Hu G, **Webster DW**, Baker SP.  Hidden homicide trends in the U.S., 1999-2004.  J Urban Health 2008;85:597-606

48. Bulzacchelli MT, Vernick JS, Sorock GS, **Webster DW**, Lees PS. Circumstances of Fatal Lockout/Tagout- Related Injuries in Manufacturing. Amer J Industrial Medicine 2008;51:728-734

47. Outwater A, Campbell JC, **Webster DW**, Mgaya E. Homicide death in Sub-Saharan Africa: A review 1970-2004. African Safety Promotion 2008;5:31-44

46. Vernick JS, Hodge J , **Webster DW**.  The ethics of restrictive licensing for handguns: Comparing the United States and Canadian approaches to handgun regulation.  Journal of Law, Medicine, and Ethics 2007;35:668-678

45. Bulzacchelli MT, Vernick JS, **Webster DW**, Lees PS. Effects of OSHA's Control of Hazardous Energy (Lockout/Tagout) Standard on Rates of Machinery- Related Fatal Occupational Injury. Injury Prevention 2007;13:334-338

44. Vernick JS, **Webster DW**. Policies to prevent firearms trafficking. Injury Prevention 2007;13:78-79

43. Weiner J, Wiebe DJ, Richmond TS, and other including **Webster D**. Reducing firearm violence: a research agenda. Injury Prevention 2007;13:80-84

42. Vernick JS, **Webster DW**, Bulzacchelli MT.  Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement.  J Law Med and Ethics 2006;34:765-775

41. Vernick JS, Teret SP, Smith GA, **Webster DW**.  Counseling About Firearms: Proposed Legislation is a Threat to Physicians and Their Patients.  Pediatrics 2006; 118:2168-72

40. Manganello J, **Webster DW**, Campbell JC.  Intimate partner violence and health provider training and screening in the news.  Journal of Women's Health 2006; 43:21-40

39. **Webster DW**, Zeoli AM, Bulzacchelli MT, Vernick JS.  Effects of police stings of gun dealers on the supply of new guns to criminals.  Injury Prevention 2006;12:225-230

38. **Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of a gun dealer's change in sales practices on the supply of guns to criminals.  Journal of Urban Health 2006; 83:778-787.

37. Koziol-McLain J, **Webster DW**, MacFarlane J, Block CR, Glass N, Campbell JC. Risk factors for femicide-suicide in abusive relationships: results from a multi-site case control study. Violence & Victims 2006;21:3-21

36. Vernick JS, Johnson SB, **Webster DW**.  Firearm suicide in Maryland: characteristics of older versus younger suicide victims.  Maryland Medicine, 2005; 6(3):24-2

35. Lewin NL, Vernick JS, Beilenson PL, Mair JS, Lindamood LM, Teret SP, **Webster DW**.  Using local public health powers as a tool for gun violence prevention: the Baltimore youth ammunition initiative. American Journal of Public Health 2005; 95:762-765

34. **Webster DW**, Vernick JS, Zeoli AM, Manganello JA.  Effects of youth-focused firearm laws on youth suicides. JAMA 2004; 292:594-601

33. Vernick JS, O'Brien M, Hepburn LM, Johnson SB, **Webster DW**, Hargarten SW.  Unintentional and undetermined firearm deaths: a preventable death analysis of 3 safety devices. Injury Prev 2003; 9:307-11

32. Vernick JS, Pierce MW, **Webster DW**, Johnson SB, Frattaroli S.  Technology to detect concealed weapons: 4th Amendment limits on a public health and law enforce tool.  J Law, Med. and Ethics 2003; 31:567-579

31. Campbell JC, **Webster DW**, Koziol-McLain J, et al.  Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study.  Am J Public Health 2003; 93:1089-97.

30. Campbell JC, **Webster DW**, Koziol-McLain J, et al.  Assessing risk factors for intimate partner homicide.  NIJ Journal 2003;250:14-19

29. Roche KM, **Webster DW**, Alexander CS, Ensminger ME.  Neighborhood variations in the salience of parental support to boys' fighting.  Adolescent and Family Health 2003;3:55-63

28. Solomon BS, Duggan AK, **Webster DW**, Serwint JR.  Pediatric resident firearm safety counseling during adolescent health maintenance visits. Arch Pediatric and Adolescent Med 2002;156:769-775

27. **Webster DW**, Vernick JS, Hepburn LM.  Effects of Maryland's law banning Saturday night special handguns on homicides.  American Journal of Epidemiology 2002;155:406-412

26. **Webster DW**, Freed LH, Frattaroli S, Wilson MH.  How delinquent youth acquire guns: Initial versus most recent gun acquisitions. Journal of Urban Health 2002;79:60-69

25. Frattaroli S, **Webster DW**, Teret SP.  Unintentional gun injuries, firearm design, and prevention: A perspective on urban health.  Journal of Urban Health 2002;79:49-59

24. Sachs CJ, Kosiol-McLain J, Glass N, **Webster DW**, Campbell JC.  A population-based survey assessing support for mandatory domestic violence reporting by healthcare personnel.  Women and Health 2002;35:121-133

23. **Webster DW**, Vernick JS, Hepburn LM.  The relationship between licensing, registration and other state gun sales laws and the source state of crime guns.  Injury Prevention 2001;7:184-189

22. Sharps PW, Campbell JC, Campbell D, Gary F, **Webster D**.  The role of alcohol use in intimate partner femicide.  American Journal on Addictions, 2001;10:122-135

21. Freed LH, **Webster DW**, Longwell JJ, Carrese J, Wilson MH.  Deterrents to gun acquisition and carrying among incarcerated adolescent males.  Arch Pediatric and Adoles Med 2001;155:335-341

20. **Webster DW**, Starnes M.  Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children, Pediatrics, 2000;106:1466-1469

19. Vernick JS, **Webster DW**, Hepburn LM.  Maryland's law banning Saturday night special handguns:  Effects on crime guns.  Injury Prevention 1999; 5:259-263

18. Howard KA, **Webster DW**, Vernick JS.  Beliefs about the risks of firearms in the home: Analysis of a national survey (U.S.A.).  Injury Prevention 1999;5:284-289

17. Teret SP, **Webster DW**.  Reducing gun deaths in the United States: Personalized guns would help – and would be achievable.  British Medical Journal 1999:318:1160-1161

16. Teret SP, **Webster DW**, Vernick JS, et al.  Public support for innovative gun policies: The results of two national surveys.  New England Journal of Medicine 1998;339:813-818

15. **Webster DW**, Vernick JS, Ludwig J.  No proof that right-to-carry laws reduce violence, American Journal of Public Health, 1998;88:982-983

14. **Webster DW**, Vernick JS, Ludwig J, Lester KJ.  Flawed gun policy research could endanger public safety.  American Journal of Public Health 1997;87:918-921

13. Vernick JS, Teret SP, **Webster DW**.  Regulating firearm advertising promising home protection: The legal basis for a public health intervention.  JAMA 1997;277:1391-1397

12. **Webster DW**, Wilson MEH.  Gun violence among youth and the pediatrician's role in primary prevention.  Pediatrics 1994;94:617-622

11. **Webster DW**.  The unconvincing case for school-based conflict resolution programs for adolescents.  Health Affairs 1993;12(4):126-141

10. **Webster DW**, Gainer PS, Champion HR.  Weapon carrying among inner-city junior high school students:  Defensive behavior vs aggressive delinquency.  Amer J Public Health 1993; 83:1604-1608

9. Gainer PS, **Webster DW**, Champion HR.  A youth violence prevention program description and preliminary evaluation.  Archives of Surgery 1993;128:303-308

8. **Webster DW**, Champion HR, Gainer PS, Sykes L.  Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990.  Archives of Surgery 1992;127:694-698

7. Oschner MG, Hoffman AP, DiPasquale D, Cole FJ, **Webster DW**, Champion HR.  Associated aortic rupture-pelvic fracture: an alert for orthopedic and general surgeons. J Trauma, 1992;33:429-34

6. **Webster DW**, Wilson MEH, Duggan AK, Pakula LC.  Parents' beliefs about preventing gun injuries to children.  Pediatrics 1992;89:908-914

5. **Webster DW**, Wilson MEH, Duggan AK, Pakula LC.  Firearm injury prevention counseling:  a study of pediatricians' beliefs and practices.  Pediatrics 1992;89:902-907

4. Harburg E, DiFrancesco W, **Webster DW**, Gleiberman L, Schork MA:  Familial transmission of alcohol use: II. Imitation of and aversion to parent drinking (1960) by adult offspring (1977); Tecumseh, Michigan.  Journal of Studies on Alcohol 1990;51:245-256

3. **Webster DW**, Harburg E, Gleiberman L, Schork MA, DiFrancesco W:  Familial transmission of alcohol use:  I. Parent and adult offspring alcohol use over 17 years, Tecumseh, Michigan.  Journal of Studies on Alcohol 1989;50:557-566

2. Wagenaar AC, **Webster DW**, Maybee RG:  Effects of child restraint laws on traffic fatalities in eleven states.  Journal of Trauma 1987;27:726-732

1.Wagenaar AC, **Webster DW**:  Preventing injuries to children through compulsory automobile safety seat use. Pediatrics 1986;78:662-*672*


*Invited Commentaries in Scientific Journals*

10. South EC, Hemenway D, **Webster DW**. Gun violence research is surging to inform solutions to a devastating public health crisis. *Preventive Medicine* 2022 Oct 27:107325. doi: 10.1016/j.ypmed.2022.107325.


9. Zeoli AM, **Webster DW**.  Firearm policies that work. JAMA 2019 Feb 25. doi: 10.1001/jama.2019.0706. [Epub ahead of print]

8. **Webster DW**, Buggs SAL.  Can an efficacious strategy for curtailing illegal drug sales be counted on to reduce violent crime? Criminology & Public Policy 2017; 16:821-825. DOI: 10.1111/17459133.12326

7. **Webster DW**.  The true impact of mass shootings on Americans.  Annals of Internal Medicine. 2017; Annals of Internal Medicine. 2017 May 2. doi: 10.7326/M17-0943. PMID: 28462426

6. McGinty EE, **Webster DW**. The role of alcohol and drugs in firearm violence. JAMA Internal Med. 2017 Jan 3. doi: 10.1001/jamainternmed.2016.8192. [Epub ahead of print] PMID: 28055044

5. **Webster DW**.  Lessons from Australia's National Firearms Agreement.  JAMA. 2016;316:279-81. doi: 10.1001/jama.2016.8819. PMID: 27332736

4. Hemenway D, **Webster DW**.  Increasing knowledge for the prevention of firearm violence

3. Preventive Medicine, Jun 8, 2015. pii: S0091-7435(15)00198-X. doi: 10.1016/j.ypmed.2015.06.001

2. **Webster DW**. Commentary: Evidence to guide gun violence prevention in America.  Annual Reviews of Public Health. 2015;36:1-4. PMID: 25581156

1. Frattaroli S, Wintemute GJ, **Webster DW**. Implementing a public health approach to gun violence prevention: The importance of physician engagement.  Ann Internal Medicine, 2013; 159:306-7


*Journal Articles Not Peer-Reviewed*

2. **Webster DW**, Chaulk CP, Teret SP, Wintemute GJ.  Reducing firearm injuries.  Issues in Science & Technology 1991; 7 (Spring): 73-79

1. **Webster DW**. Suicide in the subway:  case consultation:  suicide and mass transit: commentary.  Journal of Suicide and Life-Threatening Behavior 1991;21:209-212

### *Books and Book Chapters*

12. McGinty EE, **Webster DW**. "Defining the problem: the relationship between mental illness and gun violence," in Gold LH, Simon RI., eds. Gun Violence and Mental Illness. Arlington, VA: American Psychiatric Press, 2015.

11. **Webster DW**, Vernick JS, Eds.  Updated Evidence and Policy Developments on Reducing Gun Violence in America. Baltimore, MD: Johns Hopkins University Press, 2014.

10. **Webster DW**, Vernick JS, Eds. Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press, 2013.

9. Chapters contributed to in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press, 2013:

8. Vittes KA, **Webster DW**, Vernick JS.  "Reconsidering the Adequacy of Current Conditions on Legal Firearm Ownership," pp. 65-76.

7. **Webster DW**, Vernick JS, McGinty EE, Alcorn T. "Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws," pp. 109-122.

6. **Webster DW**, Vernick JS. "Spurring Responsible Firearms Sales Practices through Litigation: The Impact of New York City's Lawsuits Against Gun Dealers on Interstate Gun Trafficking," p. 123-32.

5. Vernick JS, **Webster DW**.  "Curtailing Dangerous Practices by Licensed Firearm Dealers: Legal Opportunities and Obstacles." pp. 133-142.

4. McGinty EE, **Webster DW**, Vernick JS, Barry CL.  "Public Opinion on Proposals to Strengthen U.S. Gun Laws: Findings from a 2013 Survey," pp. 239-257.

3. Vernick JS, **Webster DW**, Vittes KA.  "Law and Policy Approaches to Keeping Guns from High-Risk People" in Culhane J. ed. Reconsidering Law and Policy Debates: A Public Health Perspective. New York: Cambridge University Press, 2011.

2. Vernick JS, **Webster DW**.  Amicus Brief to U.S. Supreme Court regarding District of Columbia vs. Heller for the petitioner. Written on behalf of American Public Health Assoc., American College of Preventive Medicine, American Trauma Society, and the American Assoc. of Suicidology, Jan. 2008

1. **Webster DW**. Child Access Prevention (CAP) Laws.  In Gregg Lee Carter (Ed.) Entry in Encyclopedia of Guns in American Society.  Santa Barbara, CA:  ABC-CLIO, 2003

### *Reports*

27. John Jay College Research Advisory Group on Preventing and Reducing Community Violence, **Webster DW** – member. Reducing Violence Without Police: A Review of Research Evidence. New York, NY: Research and Evaluation Center, John Jay College of Criminal Justice, City University of New York, November 2020. https://johnjayrec.nyc/2020/11/09/av2020/

26. Expert Panel on Firearms Data Infrastructure, **Webster DW** – member, and John Roman. A Blueprint for Firearms Data Infrastructure: Recommendations from NORC's Expert Panel on Firearms Data Infrastructure. NORC at the University of Chicago, October 2020

25. **Webster DW**, Crifasi CK, Williams RG, Booty MD, Buggs SAL.  Reducing Violence and Building Trust: Data to Guide Gun Law Enforcement in Baltimore. Johns Hopkins Center for Gun Policy and Research, June 2020.

24. Expert Panel on Firearms Data Infrastructure, **Webster DW** – member. The State of Firearms Data in 2019, NORC at the University of Chicago, January 2020

23. Crifasi CK, McCourt AD, **Webster DW**.  Impact of Handgun Purchaser Licensing on Gun Violence. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, 2019

22. Crifasi CK, McCourt A, **Webster DW**.  Policies to Reduce Gun Violence in Illinois: Research, Policy Analysis and Recommendations. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, February 2019

21. **Webster DW**, Buggs SAL, Crifasi CK.  Estimating the Effects of Law Enforcement and Public Health Interventions to Reduce Gun Violence in Baltimore.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, January 2018.

20. **Webster DW**, Crifasi CK, Vernick JS, McCourt A.  Concealed Carry of Firearms: Facts vs. Fiction.  Johns Hopkins Center for Gun Policy and Research, November 2017

19. **Webster DW**, Donohue JJ III, Klarevas L, Crifasi CK, Vernick JS, Jernigan D, Wilcox HC, Johnson SB, Greenberg S, McGinty EE.  Firearms on College Campuses:  Research Evidence and Policy Implications.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins University, October 15, 2016

18. Braga AA, **Webster DW**, White MD, Saizow H.  Gun Violence: Smart Policing Initiative Spotlight on Evidence-Based Strategies and Impacts. Alexandria, VA: CNA Analysis & Solutions, Mar. 2014

17. Bushman B, Newman K, Calvert S, Downey G, Dredze M, Gottfredson M, Jablonski NG, Masten A, Morrill C, Neil DB, Romber D, **Webster D**.  Predictors of Youth Violence.  Report prepared at the request of the National Sciences Foundation, December 2013

16. American Psychological Association Panel of Experts Report – Cornell D, Evans AC Jr., Guerra NG, Kinscherff R, Mankowski E, Randazzo MR, Scrivner E, Sorenson SB, Tynan WD, **Webster DW**.  Gun Violence: Prediction, Prevention and Policy.  American Psychological Association, Washington, DC, December 2013

15. Consortium for Risk-Based Firearm Policy, **DW Webster** contributing member. Guns, Public Health, and Mental Illness: An Evidence-Based Approach to State Policy.  December 2013

14. Consortium for Risk-Based Firearm Policy, **DW Webster** contributing member. Guns, Public Health, and Mental Illness: An Evidence-Based Approach to Federal Policy.  December 2013

13. **Webster DW**.  Evaluation of Baltimore's Strategies for Reducing Gun Violence. Report prepared for the Baltimore Police Department, Smart Policing Initiative grant, U.S. Bureau of Justice Assistance, Aug. 2013

12. **Webster DW**, Vernick JS, Vittes KA, McGinty EE, Teret SP, Frattaroli S.  The Case for Gun Policy Reforms in America.  Johns Hopkins Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, October 2012

11. **Webster DW**. Whitehill JM, Vernick JS, Parker E.  Evaluation of Baltimore's Safe Streets Program: Effects on Attitudes, Participants' Experiences, and Gun Violence. Johns Hopkins Center for the Prevention of Youth Violence, January 2012

10. **Webster DW**, Illangasekare SL.  Best Practices for the Prevention Youth Homicide and Serious Violence.  Johns Hopkins Urban Health Institute, October 2010

9. **Webster DW**, Vernick JS, Mendel J.  Interim Evaluation of Baltimore's Safe Streets Program. Johns Hopkins Center for the Prevention of Youth Violence, Jan. 2009

8. **Webster DW**, Vittes KA. Using GunStat Data to Assess Progress on the Prosecution of Gun Cases in Baltimore City. Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, December 2009

7. **Webster DW**, Mendel J.  Effects of Baltimore's Operation Safe Kids on Re-Arrest.  Johns Hopkins Center for the Prevention of Youth Violence, June 2008

6. **Webster DW**.  Interventions to reduce deaths and injuries associated with youth violence. White paper commissioned by the Robert Wood Johnson Foundation.  May 2006

5. **Webster DW**.  Preventing intimate partner violence.  White paper commissioned by the Robert Wood Johnson Foundation.  June 2006

4. **Webster DW**, Vernick JS, Teret SP.  How Cities Can Reduce Illegal Guns and Gun Violence.  Johns Hopkins Center for Gun Policy and Research, April 2006. Updated January 2008

3. Campbell JC, **Webster DW**, O'Sullivan C, Roehl J, Mahoney P, White M, Guertin K.  Intimate Violence Risk Assessment Validation Study. Report submitted to the National Institute of Justice, September 2004. 2000WTVX0011

2. **Webster DW**, Kim A.  Evaluation of the Maryland Gun Violence Act of 1996: Effects on the Illicit Gun Market. Prepared for the U.S. Bureau of Alcohol, Tobacco, and Firearms, September 2003

1. **Webster DW**, Vernick JS, Kaljee L, Cameron DD, Frattaroli S, Johnson S.  Public attitudes About New Law Enforcement Technologies and Related to Strategies to Reduce Gun Violence.  Report by the Johns Hopkins Center for Gun Policy and Research to the National Institute of Justice, 2002

### *Consultations or Collaborations with Policymakers, Community Groups, and Other Stakeholders*

13. Firearm Data Infrastructure Working Group. Safe States Alliance, 2022- present.

12. Center for Research and Evaluation of the John Jay College for Criminal Justice, Research Advisory Group on Preventing and Reducing Community Violence, 2020.

11. National Opinion Research Center, University of Chicago, 2019-2020.  Expert advisor on project to develop recommendations for building a data infrastructure for gun violence research. Funded by the National Collaborative for Gun Violence Research.

10. Consultant and Participant, Square One Justice Project to Reimagine Criminal Justice, Columbia University, 2019-2020.

9. Violence Prevention Research Program, University of California, Davis, 2014–2018.  Identify state background check policies for firearm purchasers and develop plans for evaluating the laws' effects on violence and injuries

8. John Jay School of Criminal Justice, 2017 –2019. Advise team evaluating Cure Violence public health interventions in New York to reduce shootings and other serious violence

7. Police Executive Research Forum, 2012-2014.  Advise PERF and law enforcement officials in four cities on strategies to combat gun violence as part of a USDOJ Bureau of Justice Assistance project

6. California Dept. of Justice, Firearms Division, 2005-2006.  Provide advice about how the state should use funds from its litigation against Wal-Mart to advance gun violence prevention

5. The Robert Wood Johnson Foundation, 2005-2006.  Prepare advice and white papers on the prevention of youth violence and the prevention of intimate partner violence

4. National Association for the Advancement of Colored People, 1999-2000.  Assistance with gun violence victimization survey of NAACP members for use in lawsuit against the gun industry

3. Duke University and Georgetown University, 1998-1999.  Consultation on project to estimate the economic costs associated with firearm injuries

2. Consortium of Virginia Urban Municipalities on strategies to reduce violence, 1992

1. Center to Prevent Handgun Violence, Washington, DC, 1991-1993. Conducted survey of pediatricians on materials being developed for education families about firearm injury prevention

### *Media Dissemination*

Frequently interviewed and quoted by major news media outlets including *CNN, MSNBC, CBS, PBS News Hour, National Public Radio, The New York Times, The Washington Post, USA Today, US News and World Report, TIME, Newsweek, The Guardian, Newsweek, Vox, Newsy.*

**PART II**

**TEACHING**

*Academic Advisees,* **Johns Hopkins University**

Erin Boguski, MPH (parttime), 2021 – present

Jennifer Styles, MPH (parttime), 2021 – present

Yaniris Gomez, MPH (parttime), 2021 – present

Simimidele Badero, MPH (parttime), 2021 - present

Rev. Wendy Calderon-Payne, MPH (parttime), 2021 – present

Kristina Singleton, MPH (parttime) 2021 - present

Lyndsey O'Rourke, MPH (parttime), 2021 – Present

Carly Pysher, MPH (parttime), 2021 - Present

Caroline Palmer (parttime), MPH, 2021 – Present

Nargus Narounzadeh (parttime), MPH, 2021 - Present

Cailin Crocket, MPH (parttime), 2020 – Present

Nicholas Meyerson, PhD, 2020 – Present

Don Hedrick, DrPH, 2020 – Present

Eric Cumberbach, MPH, 2020 – Present

Kelly Burke, MPH (parttime), 2019 – Present

Josh Peterson, MPH (parttime), 2018 – 2022

Amanda Capitummino, MPH 2018-2019

Alexander McCourt, PhD, 2014-2018

Christine McKenna, MPH, 2013-2014

Shani Buggs, PhD, 2013 – 2018

Cassandra Kercher, PhD, 2011–2014

Dara Johnson, MPH, 2011 – 2012

Janis Sethness, MPH, 2011 – 2012

Donald Chalfin, MPH, 2010 – 2014

Jeane Garcia Davis, MPH, 2008-2011

Summer Venable, MPH, 2008-2010

Jillian Fry, PhD, 2007 – 2012

Gayle Nelson, MPH, 2007-2009

James Saltzman, MPH, 2007-2008

**JA1779**

Webster 20
*May 2023*

Jennifer Mendel Whitehill, PhD, 2006 – 2011

Elizabeth Saylor, PhD candidate, 2003 - 2007

April Zeoli, PhD, 2002 – 2007

Allegra Kim, PhD 2001 – 2006

Jennifer Manganello, PhD, 1999-2003

Kim Ammann Howard, PhD, 1997

### *Co-Advisees,* Johns Hopkins University

Julia Ward, PhD, 2019 – 2023

Emma (Beth) McGinty, PhD, 2010 – 2013

Rachel Garfield (MHS Health Policy), 1998 –

Leonardo Goe (MHS Health Policy), 1997-98

### *Thesis Committees,* Johns Hopkins University

Sara Solomon, DrPH, 2023
John Thorn, PhD, 2020
Pamela Trangenstein, PhD, 2019
Joceyln Kelly, 2015
Erin Person, PhD, 2015
Lian-Yu Chen, PhD, 2014
Nicole Lunardi, MSPH, 2014
Elizabeth Parker, PhD, 2013
Michael Kim, PhD, 2013
Gregory Tung, PhD, 2012
Lareina La Flair, PhD, 2012
Mahua Mandel, PhD, 2012
Susan Ganbarpour, DrPH, 2011
Vanessa Kuhn, PhD in HPM, 2010
Donna Ansara, PhD in PFHS, 2008
Anne Outwater, PhD in Nursing, 2007
April Zeoli, PhD in HPM, 2007
Maria Bulzacchelli, PhD in HPM, 2006
Swapnil P. Maniar, PhD in PFHS, 2005
Lisa Hepburn, PhD in HPM, 2001
Marsha Rosenberg, PhD in Mental Hygiene,2001
Li-Hui Chen, PhD in HPM, 1999
Shannon Frattaroli, PhD in HPM, 1998
Kathleen Roche, PhD in MCH, 1998

### *Preliminary Oral Exam Committees,* Johns Hopkins University

**JA1780**

Shannon Frattaroli, Marguerite Roe, Li-Hui Chen, Mary Beth Skupien, Monique Shepard, Beth Hooten, Farfifteh Duffy, Mary Garza, Lisa Hepburn, Marc Starnes, Jennifer Manganello, Allegra Kim, Christina Pallitto, Swapnil Maniar, Christine Koth, Maria Bulzacchelli, Margaret Haynes, Frank Franklin, Donna Ansara, Vanessa Kuhn, Susan Ghanbarpour, Greg Tung, Adam, Milam, Michael Kim, Beth McGinty, Erin Pearson

### *Post-Doctoral Mentoring,* **Johns Hopkins University**

Lareina LaFlair, NIDA Drug Dependency Epidemiology, 2012-2013

Erica Sutton, MD, NIMH Violence Research Fellow, 2003-2005

Barry Solomon, MD, Pediatric Fellow, 1999-2002

Shannon Frattaroli, Kellogg Community Health Scholar, 1999-2000

Lorraine Freed, MD, MPH, RWJ Clinical Scholar 1996-98

### *Online Instruction,* **Johns Hopkins University**

Lead Instructor; Reducing Gun Violence in America: Evidence for Change, Coursera, 2019 – Present

### *Classroom Instruction,* **Johns Hopkins University**

Instructor; Understanding and Preventing Violence, 1993 – Present

Instructor; Crafting Effective Solutions to Gun Violence: Problem Solving Seminar, 2021 – Present

Instructor; Graduate Seminar in Injury Research and Policy, 2005 – 2018

Instructor; Graduate Seminar in Health and Public Policy, 2012 – 2014

Co-Instructor; Research and Evaluation Methods for Health Policy, 2008 – 2010

Lead Instructor; Research and Evaluation Methods for Health Policy, 2011-2015

### *Lecturer,* **Johns Hopkins University**

Epidemiology and Evidence-Based Policy Public Health Policy

Health Policy I: Social & Economic Determinants of Health

Proposal Writing (Health Policy & Management)

Introduction to Urban Health

Suicide as a Public Health Problem

Adolescence and Adolescent Health

Issues in Injury and Violence Prevention

Methodological Issues in Injury and Violence

Applications in Program Monitoring and Evaluation

Alcohol, Society, and Health

Baltimore and "The Wire": A Focus on Major Urban Issues

Community Health Practicum

***Program Management & Training Program Involvement,*** **Johns Hopkins University**

Core Faculty, Drug Dependency Epidemiology Program (pre- and post-doctoral training program funded by NIDA), 2011 – Present

Program Head, PhD program in Health and Public Policy, 2006–2007; 2012 -2014

Executive Committee and Core Faculty, Interdisciplinary Research Training Program on Violence Research, pre- and post-doctoral training program funded by NICHD, 2008-2015

Faculty Director, Certificate Program in Injury Control, 1999- 2012

Executive Committee and Core Faculty, Interdisciplinary Research Training Program on Violence (pre- and post-doctoral training program funded by NIMH), 1999-2008

Resource Faculty, Alcohol, Injury and Violence Training Program (pre-doctoral training program funded by NIAAA), 2001-2007

## RESEARCH GRANT PARTICIPATON

**Research and Training to Advance Equitable Solutions to Reduce Gun Violence that are Supported by Impacted Communities**

| | |
|---|---|
| Dates: | 11/15/22 – 11/14/27 |
| Sponsoring Agency: | Robert Wood Johnson Foundation |
| Amount: | $5,000,000 |
| Principal Investigator: | Co-PIs: Daniel Webster, Cassandra Crifasi |
| Effort: | 10% year 1, 15% year 2, 20% years 3-5 |
| Main Objectives: | Increase diversity, equity, and inclusion in gun violence prevention research. Complete several research projects at the intersection of gun violence prevention and equity. |

**Evaluating and Enhancing Community Violence Intervention Effectiveness in the Nation's Capital City**

| | |
|---|---|
| Dates: | 1/1/2023 – 12/31/2027 |
| Sponsoring Agency: | Arnold Ventures |
| Amount: | $1,841,961 |
| Principal Investigator: | CoPIs: Daniel Webster, Joseph Richardson, Jr. |
| Effort: | 25% year 1, 30% years 2-4 |
| Main Objectives: | Describe community violence intervention implementation, assess CVI workers' and program participants' experiences, and estimate program effects on gun violence. |

Webster 23
*May 2023*

**Estimating the Effects of Handgun Purchaser Licensing and Right to Carry Laws on Arrests, Incarceration, and Racial Disparities**

Dates:                          1/1/22 – 12/31/23

Sponsoring Agency:   The Joyce Foundation

Role:                          PI

Effort:                        15%

Main Objectives:      Derive valid estimates of the association between permit-to-purchase handgun laws and right to carry laws on arrests for weapons and violent offenses, incarceration, and racial disparities in these outcomes.

**The Role of Permit-to-Purchase in the Primary Prevention of Multiple Forms of Violence**

Dates:                          09/30/2021 – 09/29/2024

Sponsoring Agency:   Centers for Disease Control and Prevention (CDC) - 1U01CE003368-01

Amount:                      $1,049,998

Role:                          Co-Investigator (Cassandra Crifasi, PI)

Main Objective:        To assess the impact of Permit-to-Purchase laws on youth violence victimization and perpetration, youth suicide, intimate partner homicide, and familicide.

**Forecasting the impacts of permit-to-purchase handgun laws on firearm-related mortality in Oregon for Effective Gun Violence Prevention Advocacy**

Dates:                          7/1/22 – 6/30/24

Sponsoring Agency:   Bloomberg American Health Initiative

Amount:                      $382.070

Principal Investigator:  Co-PI: Daniel Webster and Joshua Horwitz

Effort:                        $25% in year 1

Main Objective:        Generate data on estimated effects of handgun purchaser licensing law in Oregon based on effects of PTP in Connecticut and provide evidence-based advocacy for effective policies to prevent gun violence in Oregon.

**Review of Research Relevant to the Effectiveness of Hospital-based Violence Intervention Programs with Recommendations for Future Research and Policy**

Dates:                          1/1/21 – 12/31/21

Sponsoring Agency:    Arnold Ventures

Principal Investigator:  Daniel W. Webster

Amount:                      $83,167

Role/Effort:                PI / 15%

**JA1783**

Webster 24
*May 2023*

Main Objectives:     Evaluate the scientific rigor of studies to evaluate the impacts of hospital-

based violence intervention programs, synthesize findings from those studies,

and develop recommendations for enhancing the programs and research.

**Expanding and Improving Data on Nonfatal Gun Crime Incidents for Research on Gun Violence and Its Prevention**

Dates:                          9/1/2020 – 6/30/2023

Principal Investigator: Daniel W. Webster

Sponsoring Agency:   National Collaborative for Gun Violence Research

Amount:                      $255,247

Effort:                         20%

Main Objectives:     Expand data on nonfatal criminal shootings, estimate biases in the FBI's UCR

data on nonfatal gun crime, estimate gun law effects on nonfatal gun violence.

**Estimating the Effects of Community Violence Intervention on Gun Violence in Baltimore City**

Dates:                          10/1/21 – 9/30/22

Sponsoring Agency:    Baltimore City Mayor's Office for Neighborhood Safety and Engagement

Amount:                      $126,429

**Impact of Criminal Justice and Community-Based Interventions on Gun Violence Reduction**

Dates:                          12/01/2020 – 5/31/2023

Principal Investigator: Daniel W. Webster (for subaward from Urban Institute)

Sponsoring Agency:   New York City's Mayor's Office for Criminal Justice

Amount:                      $255,247

Effort:                         25%

Main Objectives:     Estimate the impact of community prevention programs and law enforcement initiatives to reduce
gun violence.

**Comprehensive Background Check Policies and Firearm Violence: Identifying Effective Design, Implementation, and Enforcement Strategies - subaward**

Dates:                          7/1/2019 – 6/30/2022

Principal Investigator: Daniel W. Webster (of subaward)

Sponsoring Agency:   University of California, Davis - the National Collaborative for Gun Violence Research

Amount:                      $122,612

**JA1784**

| | |
|---|---|
| Effort: | 5% |
| Main Objectives: | Identify aspects of systems for background checks that affect efforts to prevent high-risk individuals from acquiring firearms. |

### Evaluating the Effects of Legal Standards for Civilian Concealed Gun Carrying

| | |
|---|---|
| Dates: | 4/11/2018 – 8/31/2021 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Amount | $407,000 |
| Effort: | 20% |
| Main Objectives: | Estimate the impacts of various type of state laws governing civilian gun carrying in relations to legal qualifications and standards of legal carriers. |

### Effects of Permitless Concealed Carry-On Violent Crime

| | |
|---|---|
| Dates: | 10/1/2019 - 3/31/2021 |
| Principal Investigator: | Cassandra Crifasi |
| Sponsoring Agency: | New Venture Fund – Fund for Safer Future |
| Amount: | $250,000 |
| Effort: | 5% |
| Main Objective: | To assess the impacts of deregulating civilian gun carrying on violent crime. |

### Development and Testing of a Virtual Reality Experience for Civilian Carriers of Concealed Firearms

| | |
|---|---|
| Dates: | 1/1/2020 – 12/31/2021 |
| Principal Investigator: | Cassandra Crifasi |
| Sponsoring Agency: | The Davide and Lucille Packard Foundation |
| Amount: | $500,000 |
| Effort: | 5% |
| Main Objective: | Develop and test a system for evaluating the performance of civilian gun carriers under realistic situations. |

### Core Support for Johns Hopkins Center for Gun Policy and Research and Youth Education on Evidence-Based Gun Violence Prevention

| | |
|---|---|
| Dates: | 7/1/2018 – 6/30/2020 |

Webster 26
*May 2023*

| | |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | David and Lucille Packard Foundation |
| Amount: | $750,000 |
| Effort: | 25% |
| Main Objectives: | Conduct and translate research to inform gun violence prevention. Develop Open Online Course and Summer Youth Institute on gun violence prevention. |

**Johns Hopkins-Baltimore Collaborative for Violence Reduction**

| | |
|---|---|
| Dates: | 1/1/16 – 9/30/19 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Abell Foundation and The Annie E. Casey Foundation |
| Funding Level: | $875,000 |
| Effort: | 30% |
| Main Objectives: | Assess police efforts to reduce violent crime and enhance training to promote more effective policing. |

**Study of Baltimore's Underground Gun Market**

| | |
|---|---|
| Dates: | 7/1//15 –6/30/17 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Everytown for Gun Safety |
| Funding Level: | $240,245 |
| Effort: | 15% |
| Main Objectives: | Collect and analyze data from surveys of offenders, crime gun trace data, and gun-related arrests to describe Baltimore's underground gun market and assess evidence that 2013 state gun laws affected the diversion of guns to criminals. |

**Effects of Universal Background Check Laws for Handgun Sales in Maryland and Pennsylvania**

| | |
|---|---|
| Dates: | 8/1//15 – 7/31/18 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $357,000 |
| Effort: | 18% |
| Main Objectives: | Describe the implementation and enforcement of universal background check laws for handgun purchases in Maryland and Pennsylvania and estimate the effects of the laws and enforcement practices on gun violence. |

**JA1786**

**Estimating Effects of Gun Policies on Intimate Partner Homicides**

Dates:                                8/1/15 – 6/30/17

Principal Investigator:    Daniel W. Webster, subcontract to Michigan State University

Sponsoring Agency:        The Joyce Foundation

Funding Level:                  $267,276

Effort:                                 10%

Main Objectives:             To estimate the impact of firearm sales laws on intimate partner homicides and examine factors relevant to successful enforcement of those laws.


**Promoting Evidence-based Policies to Reduce Domestic Violence Involving Guns**

Dates:                                7/1/15 – 6/30/16

Principal Investigator:    Daniel W. Webster

Sponsoring Agency:        Norman Raab Foundation

Funding Level:                  $25,000

Effort:                                 2%


**Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and their Impact on Intimate Partner Homicide**

Dates:                                8/1/15 – 1/31/18

Principal Investigator:     Daniel W. Webster

Sponsoring Agency:        The Joyce Foundation

Funding Level:                  $176,389

Effort:                                 10%

Main Objectives:             Describe the implementation and enforcement of domestic violence related firearm laws and their impact on intimate partner homicides.


**Baltimore Homicide Review Commission**

Dates:                                9/1/14 – 12/31/15

Principal Investigator:    Daniel W. Webster

Sponsoring Agency:        Baltimore City Mayor's Office

Funding Level:                  $135,000

Effort:                                 15%

| | |
|---|---|
| Main Objectives: | Conduct in-depth reviews of homicides in three police districts in Baltimore to identify determinants of lethal violence and develop recommendations for policies, procedures, and programs to prevent homicides. |

**Study of Baltimore's Underground Gun Market**

| | |
|---|---|
| Dates: | 7/1//14 – 6/30/15 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Norman Raab Foundation |
| Funding Level: | $50,000 |
| Effort: | 5% |
| Main Objectives: | Gather data about how criminals access firearms, how they connect with suppliers, what barriers they face, and their perceptions of gun laws. |

**Effects of Drug and Gun Law Enforcement on Violence in Baltimore**

| | |
|---|---|
| Dates: | 1/1/14 – 12/31/15 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Abell Foundation |
| Funding Level: | $144,918 |
| Effort: | 15% |
| Main Objectives: | Estimate the effects of law enforcement activities directed at drug and gun law violations on violent crime in Baltimore from 1986 through 2012. |

**Gun Owners Perspectives on Safe Gun Ownership and Sales Practices**

| | |
|---|---|
| Dates: | 10/01/2013 – 03/31/16 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Harold B. Simmons Foundation |
| Funding Level: | $411,421 |
| Effort: | 20% |
| Main Objectives: | Study gun owners' attitudes relevant to safe firearm sales and storage. |

**Johns Hopkins Center for the Prevention of Youth Violence**

| | |
|---|---|
| Dates: | 9/15/11 – 9/14/16 |
| Principal Investigator: | Philip Leaf |

| Sponsoring Agency: | Centers for Disease Control and Prevention |
|---|---|
| Funding Level: | $6 million |
| Effort: | 20% to 25% |
| Main Objectives: | Develop, implement, and evaluate a comprehensive community intervention to prevent youth violence in the Park Heights neighborhood of Baltimore. |

**Prescription Opioid Addiction Research Study**

| Dates: | 9/01/2012 – 8/31/2014 |
|---|---|
| Principal Investigator: | Colleen L. Barry |
| Sponsoring Agency: | AIG |
| Funding Level: | $430,655 |
| Effort: | 10% |
| Main Objectives: | To assess of the growing problem of prescription opioid addiction, and to identify promising policy and clinical approaches to address the problem. |

**National Gun Violence Research Center - subcontract**

| Dates: | 5/01/13 – 5/31/14 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Police Executive Research Forum |
| Funding Level: | $41,762 |
| Effort: | 20% |
| Main Objectives: | Assist PERF with designing and conducting studies of innovative policing strategies to combat gun violence. |

**Evaluation of the Effects of Permit to Purchase Handgun Laws**

| Dates: | 9/1/12 - 8/31/14 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $222,242 |
| Effort: | 25% |
| Main Objectives: | To evaluate the effects of changes in permit to purchase handgun laws in Connecticut and Missouri on homicides and the diversion of guns to criminals. |

**Gun Violence Reduction Program**

| | |
|---|---|
| Dates: | 1/01/11 – 12/31/13 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Bloomberg Philanthropies |
| Funding Level: | $500,000 |
| Effort: | 5% to 40% |
| Main Objectives: | Conduct research, policy analysis, and technical assistance to inform efforts to reduce the availability of illegal guns and gun violence. |

**Evaluation of Baltimore Policing Strategies to Reduce Gun Violence**

| | |
|---|---|
| Dates: | 10/1/2010 – 3/31/2012. |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | U.S. Dept. of Justice, Bureau of Justice Assistance |
| Funding Level: | $60,000 |
| Effort: | 15% |
| Main Objectives: | Develop unbiased estimates of the impact of 3 strategies being implemented by Baltimore police to reduce violence. |

**Impact of Safe Streets' Outreach Workers on the Lives of Their Clients**

| | |
|---|---|
| Dates: | 12/1/09 – 6/30/10 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Baltimore City Health Department |
| Funding Level: $ | 72,000 |
| Effort: | 25% |
| Main Objectives: | Measure the impact of the Safe Streets program on program participants and analyze of the relationships between program activities and gun violence. |

**Effects of the Lethality Assessment Program on Intimate Partner Violence**

| | |
|---|---|
| Dates: | 3/15/10 – 3/14/12 |
| Principal Investigator: | Daniel Webster |
| Sponsoring Agency: | Centers for Disease Control and Prevention (through Center grant to JHU) |
| Funding Level: | $388,282 |
| Effort: | 20% |

**JA1790**

Main Objectives:     Estimate the effects of the Maryland Lethality Assessment program on intimate partner homicide and repeat intimate partner violence.

**Gun Violence Reduction Program**

Dates:                     1/01/08 – 12/31/10

Principal Investigator:     Daniel W. Webster

Sponsoring Agency:          Anonymous donor

Funding Level:              $500,000

Effort:                     25%

Main Objectives:            Conduct research, policy analysis, and technical assistance to inform efforts to reduce the availability of illegal guns and gun violence.

**Analyzing and Developing Policies to Limit Firearm Access by High-Risk People**

Dates:                     5/1/09 – 4/30/11

Principal Investigator:     Daniel W. Webster

Sponsoring Agency:          The Joyce Foundation

Funding Level:              $179,971

Main Objectives:            Research and describe state laws pertaining the potential public safety gains for expanding current prohibition categories for firearm purchase and possession.

**Data for Combating Illegal Guns**

Dates:                     1/01/08 – 12/31/08

Principal Investigator:     Daniel W. Webster

Sponsoring Agency:          Maryland Governor's Office for Crime Control and Prevention

Funding Level:              $75,419

Main Objectives:            Assist Baltimore and Maryland State Police to collect and analyze data on crime guns and illegal gun trafficking.

**Analyzing & Assisting Innovative City-Level Efforts to Prevent Gun Violence**

Dates:                     5/1/07 – 4/30/09

Principal Investigator:     Daniel W. Webster

Sponsoring Agency:          The Joyce Foundation

Funding Level:              $175,000

Webster 32
*May 2023*

Main Objectives:       Analyze data on illegal gun trafficking and provide consultation to enhance data to inform efforts
                       to stem gun trafficking in Milwaukee. Case study of Chicago Police Department's efforts to
                       thwart gun trafficking.

**Evaluation of the California Firearms Domestic Violence Intervention Project**

Dates:                 1/15/07 – 1/14/10

Principal Investigator: Garen Wintemute (UC Davis) and Shannon Frattaroli (JHBSPH)

Sponsoring Agency:     California Department of Justice

Funding Level:         $31,481 subcontract from UC Davis for first year

Effort:                10%

Main Objectives:       Evaluate a program in 2 California counties to enhance implementation of state laws prohibiting
                       certain domestic violence offenders from possessing firearms.

**Baseline Data for Evaluating a Community Initiative to Reduce Youth Homicides**

Dates:                 3/01/07 – 2/28/09

Principal Investigator: Daniel W. Webster

Sponsoring Agency:     Baltimore City Health Department

Funding Level:         $75,122

Effort:                6%

Main Objectives:       Collect and analyze baseline data on violent crime and youths' attitudes relevant to gun violence
                       in intervention and comparison neighborhoods.

**Evaluation of a community gun violence prevention initiative in Baltimore.**

Dates:                 9/1/05 – 8/31/10

Principal Investigator: Daniel W. Webster

Sponsoring Agency:     Centers for Disease Control and Prevention

Funding Level:         $745,352

Effort:                25%-30%

Main Objectives:       Estimate the impact of the initiative on youth gun violence victimization and perpetration and
                       attitudes and behaviors of high-risk youth.

**Effects of a Formal Danger Assessment and Risk Communication Intervention on Actions Taken to Reduce Risks
of Intimate Partner Violence**

Dates:                 9/1/04 – 8/31/09

**JA1792**

| Principal Investigator: | Daniel W. Webster |
|---|---|
| Sponsoring Agency: | Centers for Disease Control and Prevention |
| Funding Level: | $485,000 |
| Effort: | 20%-25% |
| Main Objectives: | Determine whether a formal, quantitative assessment of danger, and a standard protocol for communicating the assessed risk of future partner violence and scientific support for protection strategies is more effective than current procedures in motivating protective actions and lowers risk for future violence. |

### Reducing Illegal Gun Trafficking Through Research and Technical Assistance

| Dates: | 5/1/05 – 4/30/08 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Joyce Foundation |
| Funding Level: | $181,117 |
| Effort: | 25%-30% |
| Main Objective: | Disseminate research findings to law enforcement agencies, advocates, and the media on policies shown to reduce illegal gun trafficking. |

### Effects of Police Stings of Gun Dealers on the Illegal Gun Market

| Dates: | 11/1/03 - 10/31/04 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The Overbrook Foundation |
| Funding Level: | $37,000 |
| Effort: | 20% |
| Main Objectives: | Assess the impact of police stings of 12 gun dealers suspected of making illegal gun sales in Chicago on the flow of new guns into the illicit gun market. |

### Evaluating and Developing Policies to Regulate Licensed Gun Dealers

| Dates: | 4/1/02 - 3/31/04 |
|---|---|
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | The John D. and Catherine T. MacArthur Foundation |
| Funding Level: | $260,000 |
| Effort: | 35% |
| Main Objectives: | 1) Document state policies and practices for regulation and oversight of licensed gun dealers; 2) Assess effects of those measures on gun trafficking; and 3) Recommend strategies for deterring diversions of guns to criminals. |

**Working with Health Commissioners to Reduce Gun Violence**

Dates:                        7/01/03 - 6/30/04

Principal Investigator:   Jon S. Vernick

Sponsoring Agency:     Richard and Rhoda Goldman Fund

Funding Level:            $100,000

Effort:                       15%

Main Objective:          Identify and provide technical assistance to city or county health commissioners in order to use
                             public health powers to shut down corrupt gun dealers who endanger the public's health.


**Separating Kids from Guns Program**

Dates:                        10/01/01 - 9/30/03

Principal Investigator:   Shannon Frattaroli

Co-PI:                       Daniel W. Webster

Sponsoring Agency: The David and Lucille Packard Foundation

Funding Level:            $300,000

Effort:                       25%

Main Objective:          Conduct research, perform policy analysis, disseminate information relevant to protecting
                             children and adolescents from unsupervised access to guns.


**Johns Hopkins Center for Gun Policy and Research**

Dates:                        01/01/99 - 4/30/04

Sponsoring Agency:     The Joyce Foundation

Principal Investigator:   Stephen P. Teret (1995-2001), Jon S. Vernick (2001-present)

Co-Prin. Invest.:         Daniel W. Webster (2001-present)

Funding Level:            2001-2003: $600,000

Effort:                       15% (05/01/03 - 4/30/04)

                             35% (05/01/01 - 4/30/03)

                             25% (01/01/00 - 4/30/01)

                             35% (01/01/96 - 12/31/99)

                             20% (01/01/95 - 12/31/96)

Main Objective:          Develop and analyze policies to reduce firearm injuries.

Responsibilities:    Co-direct Center, initiate and conduct research and analysis relevant to gun policy; develop and analyze gun policy surveys; assist groups working to reduce gun violence; serve as resource to media and policymakers.

**Effects of Minimum Age Restrictions on Handgun Purchase and Possession – Center for the Prevention of Youth Violence**

Dates:    10/01/00 - 9/30/05

Principal Investigator:    Daniel W. Webster

Sponsoring Agency:    Centers for Disease Control and Prevention

Funding Level:    $306,695

Main Objective:    Estimate the effects of minimum age restrictions on handgun purchases and possession on youth homicide offending and suicides

**Evaluation of Instruments to Assess Risk for Intimate Partner Violence**

Dates:    8/01/00 - 3/31/04

Principal Investigator:    Jacquelyn C. Campbell

Sponsoring Agency:    National Institute of Justice

Funding Level:    $619,792

Effort:    20%

Main Objective:    Determine the sensitivity, specificity, and predictive value of four instruments designed to assess future risk for violent victimization by an intimate partner.

**The Center for Injury Research and Policy:**

Dates:    1987-2005

Sponsoring Agency:    Centers for Disease Control and Prevention

Principal Investigator:    Ellen MacKenzie

Funding Level:    1999-2003: $750,000 per year

Effort:    10% (09/03/03 - 8/31/04)

10% (09/01/00 - 8/31/01)

20% (09/01/99 - 8/31/00)

10% (09/01/98 - 08/31/99)

25% (09/01/94 - 08/31/98)

20% (04/01/94 - 08/31/94)

50% (07/01/92 - 03/31/94)

**JA1795**

|                          |                                                      |
|--------------------------|------------------------------------------------------|
|                          | 100% (04/01/92 - 06/30/93)                           |
| Main Objective:          | One of the eight regional injury control research centers. |
| Responsibilities:        | Evaluate state-level gun policies, direct study of risk factors for serious injuries from intimate partner assaults, develop research proposals, serve as resource to students, media, practitioners, and policy makers. |

### Developing and Analyzing Data for Effective Gun Law Enforcement

| | |
|---|---|
| Dates: | 3/01/01 - 2/28/02 |
| Principal Investigator: | Daniel W. Webster |
| Sponsoring Agency: | Governor's Office of Crime Control and Prevention |
| Funding Level: | $102,911 |
| Effort: | 35% |
| Main Objective: | Develop databases for information about the sources of crime guns and the prosecution of gun crimes |

### Developing a Dataset of State Gun Laws

| | |
|---|---|
| Dates: | 12/01/00 - 11/30/01 |
| Principal Investigator: | Jon S. Vernick |
| Sponsoring Agency: | Annie E. Casey Foundation |
| Funding Level: | $45,000 |
| Effort: | 10% |
| Main Objective: | Determine the presence and effective dates of specific types of gun laws in each of the 50 U.S. states and the DC and share with interested researchers. |

**Effects of Personalized Guns in Maryland**

| | |
|---|---|
| Dates: | 9/1/99 - 8/31/00 |
| Sponsoring Agency: | The Abell Foundation |
| Funding Level: | $40,533 |
| Principal Investigator: | Stephen Teret |
| Effort: | 10% |
| Main Objective: | Assess likely effects of a law to require personalized guns in Maryland |

**Risk Factors for Homicide in Violent Intimate Relationships**

| | |
|---|---|
| Dates: | 9/01/96 - 2/28/00 |
| Sponsoring Agency: | NIDA, NIMH, CDC, NIJ, NIA |
| Principal Investigator: | Jacquelyn Campbell |
| Funding Level: | $1,267,744 |
| Effort: | 10% (09/01/99 - 02/28/00) |
| | 25% (09/01/98 - 08/31/99) |
| | 10% (09/01/97 - 08/31/98) |
| | 15% (09/01/96 - 08/31/97) |
| Main Objective: | Determine risk factors for homicide or attempted homicide among women involved in violent intimate relationships and develop predictive screening devices for clinicians, shelter workers, and the courts. |

**Preventing Firearm Suicide and Unintentional Deaths Through Safer Gun Design**

| | |
|---|---|
| Dates: | 1/01/00 - 12/31/00 |
| Principal Investigator: | Jon S. Vernick |
| Sponsoring Agency: | Funders' Collaborative for Gun Violence Prevention |
| Funding Level: | $176,755 |
| Effort: | 10% |
| Main Objective: | Evaluate potential benefits of safer gun designs |

**Public Attitudes About New Law Enforcement Technologies**

| | |
|---|---|
| Dates: | 06/01/97 – 05/31/99 |
| Sponsoring Agency: | National Institute of Justice |
| Principal Investigator: | Daniel W. Webster |

Funding Level:      $266,625

Main Objectives:    Assess public attitudes relevant to law enforcement strategies to detect concealed weapons in high-crime areas including the use of new technology, concerns about safety, privacy, and fairness in the way that law enforcement officials apply new technology. Qualitative study of residents of a high-crime neighborhood in Baltimore and a national phone survey of urban residents.

**Evaluation of the California Violence Prevention Initiative**

Dates:                  7/01/93 - 4/15/96

Sponsoring Agency:      The California Wellness Foundation

Principal Investigator: Stephen P. Teret

Co-Prin. Investigator:  Daniel W. Webster Funding

Level:                  $3.1 million

Effort:                 50%

Main Objectives:        Conduct process and outcome evaluation of a statewide violence prevention initiative.

**Evaluation of Violence Prevention Public Education Campaign**

Dates:                  4/01/94 - 3/31/95

Sponsoring Agency:      The California Wellness Foundation

Principal Investigator: Daniel W. Webster

Funding Level:          $40,000

Effort:                 20%

Main Objectives:        The describe all facets of the campaign and the political and social context in which the campaign is conducted and evaluate the effects of the campaign on public opinion, opinion leaders, the media, and policy makers.

**Planning "The Consortium on Gun Policy and Information"**

Dates:                  4/01/94 - 10/31/94

Sponsoring Agency:      The Joyce Foundation

Principal Investigator: Stephen P. Teret

Funding Level:          $40,000

Effort:                 10%

Main Objectives:        To assess the need for a "Consortium on Gun Policy and Information" that would provide factual information on firearms and the public's health to various consumers.

**ACADEMIC SERVICE**

**Johns Hopkins University**

Finance Committee, Health Policy and Management, 2020 – Present

Appointments and Promotions Committee, School of Public Health, 2012 – 2015

Conflict of Interest Committee, School of Public Health, 2011 – 2012

Academic Policy and Admissions Committee, Health Policy and Management, 2006 – 2007, 2012 – 2014

Faculty Development Committee, Health Policy and Management, 2010 – Present

Qualifying Exam Committee, Health Policy and Management, 1998- 1999, 2001 – 2008

Qualifying Exam Committee, Health Policy and Management, Chair 2004 – 2008

Health Policy and Management, Doctoral Admissions Committee, 2006 – 2007

Affirmative Action Committee, School, 2005 – 2010

9 Ad Hoc Committees for Appointments and Promotions, 2006 – Present

Search Committee, Leon Robertson Chair in Injury Control, 2005 – 2006

Academic Policy and Admissions Committee, Health Policy and Management, 1997- 1999

Ad-Hoc Committee on Statistics Training, Health Policy and Management, 1997-1998

Research Policy Committee, Health Policy and Management, 1995-97

**PRESENTATIONS**
*Scientific Meetings*

**Webster DW.** Evidence-Based Public Health Approaches to Reducing Violence with Less Reliance on Police and Prisons. Presentation before the Workshop on Addressing the Drivers of Criminal Justice Involvement to Advance Racial Equity for the Committee on Reducing Racial Inequalities in the Criminal Justice System, National Academy of Science, Engineering, and Medicine, March 2021.

**Webster DW.** The Role of Firearms and Firearm Policy in Fatal Shootings by Police. Annual FACTS (Firearm Safety Among Children and Teens) Symposium, the University of Michigan, 2020.

**Webster DW.** Strengthening the science of firearm policy evaluations. Research Symposium: Preventing Firearm Injuries among Children and Teens: The State of the Science. University of Michigan, October 2019.

**Webster DW.** Public Health Approaches to Preventing Gun Violence. Plenary session presentation at the Annual meeting of the American Society of Criminology, Atlanta, GA, November 2018.

**Webster DW.** Research and public safety collaborations focused on reducing gun violence in Baltimore. Presented at the Annual meeting of the American Society of Criminology, New Orleans, November 2016.

**Webster DW.** What have we learned about the impact of states' gun policies. Plenary session presentation at the annual meeting of the American Public Health Association, Denver, Nov. 2016.

**Webster DW,** Crifasi CK, Meyers JS, Vernick JS.  Effects of changes in permit-to-purchase handgun laws on suicide rates.  Presented at the Annual Meeting of the American College of Epidemiology, Atlanta, GA, September 29, 2015.

**Webster DW**, Meyers JS, Buggs S.  Access to firearms among youth in the United States: Patterns, consequences, and prevention strategies. Presented at the Institute of Medicine's Forum on Global Violence Prevention, Workshop on Lethal Means of Violence, Washington, DC, December 18, 2014.

**Webster DW**.  State of the science and need for additional research to prevent gun violence in America.  Presentation at the Martha May Elliott Forum at the American Public Health Association Annual Meetings, New Orleans, November 2014.

**Webster DW**.  Community Involvement in the Evaluation of Baltimore's Safe Streets Program to Reduce Youth Violence.  Presented at the annual meetings of the Society for Prevention Research, Washington, DC May 29, 2014.

**Webster DW**.  Mental health and means of violence.  Presented at Workshop on Violence and Mental Health: Opportunities for Prevention and Early Intervention, Institute of Medicine's Forum on Global Violence Prevention, February 26, 2014.

**Webster DW**.  Effects of Missouri's permit to purchase handgun licensing law on the diversion of firearms to criminals and homicides.  Presented at the annual meetings of the American Public Health Association, Boston, November 2013.

Vittes KA, **Webster DW**, Vernick JS.  Associations between state gun sales laws and the source of criminals' handguns they used to commit crime. Presented at the annual meetings of the American Public Health Association, Boston, November 2013.

**Webster DW**.  Effects of Baltimore's Safe Streets Program on Gun Violence and Youth Attitudes toward Resolving Conflicts with Guns.  Presented at the World Health Summit, Berlin, Germany, October 2013.

**Webster DW**.  Safe Streets Baltimore – program effects on gun violence, youth attitudes, and the lives of program participants.  Presented at the meetings of the Society for the Advancement of Violence and Injury Research, Baltimore, June 2013.

Parker EM, Gielen AC, Castillo R, **Webster DW**. Intimate Partner Violence and Patterns of Safety Strategy Use among Women Seeking Temporary Protective Orders: A Latent Class Analysis. Presented at the meetings of the Society for the Advancement of Violence and Injury Research, Baltimore, June 2013.

**Webster DW**.  Priorities for public health efforts to reduce gun violence.  Presentation to the Institute of Medicine's Workshop on Priorities for Public Health Research Agenda to Reduce Firearm-Related Violence, Washington, DC, April 2, 2013

**Webster DW**.  State gun laws' effects on the intra- and interstate diversion of guns used by criminals.  Presented at the annual meetings of the American Society of Criminology, Washington, DC, November 2011.

**Webster DW**.  Effects of state gun sales laws on the exportation of guns used by criminals.  Presented at the annual meetings of the American Public Health Association Meetings, Washington, DC, November 2011.

**Webster DW**, Mendel JS, Vernick. Evaluating Baltimore's Safe Streets Program's effects on violence.  Presented at the annual meetings of the Amer. Public Health Assoc., Denver, Nov. 2010.

**Webster DW**, Vernick JS, Mendel JS.  Interim evaluation of Baltimore's Safe Streets initiative: Effects on gun violence.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**.  Impact of danger assessment screening and safety education on abused women's perceived risk of serious re-abuse.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Mendel JS, **Webster DW**, Vernick JS.  Street outreach to prevent gun violence in Baltimore: An analysis of high-risk conflict mediation.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

Vernick JS, **Webster DW**.  An environmental approach to preventing firearm violence: targeting illegal gun trafficking.  Annual Meetings of Amer. Public Health Assoc., Philadelphia, Nov. 2009.

Vittes KA, **Webster DW**.  Potential effects of expanding firearm prohibitions in the U.S.: analysis of data from a national survey of prisoners.  Presented at the Annual Meetings of the American Public Health Association, Philadelphia, November 2009.

**Webster DW**, Vernick JS, Bulzacchelli MT.  Effects of Policies to Promote Firearm Dealer and Owner Accountability on Firearm Trafficking.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**. Firearm violence roundtable: Data collection, data quality, and data access.  Roundtable discussion led at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Vernick JS.  Implementation of a Community Gun Violence Prevention Program: A Focus on Outreach Workers' Efforts.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S, Stockman J.  Factors associated with seeking a long term protective order and staying away among women seeking temporary protective orders against a male partner.  Presented at the Annual Meeting of the American Public Health Association, Washington, DC, November 2007.

**Webster DW**, Mahoney P, Campbell JC, Ghanbarpou S.  Communicating empirically-based information about risks and protection strategies to survivors of intimate partner violence. Presented at the Annual Meeting of the American Public Health Association, Washington, DC, Nov. 2007.

**Webster DW**, Vernick JS, Bulzacchelli MT.  Association Between Regulations and Oversight of Firearm Dealers and Gun Trafficking.  Presented at the Annual Meeting of the American Society of Criminology, Atlanta, November 2007.

Campbell JC, O'Sullivan C, Roehl J, **Webster DW**, Mahoney P, White M, Eliacin J, Guertin K. What battered women know and do to protect themselves from abuse: results and methodological challenges from the domestic violence risk assessment validation experiment. Paper presented at the 9th International Family Violence Research Conference, Portsmouth, NH, July 2005.

**Webster DW**, Vernick JS, Manganello JA, Zeoli AM. Effects of youth-focused firearm laws on youth suicides. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Vernick JS, **Webster DW**, Pierce MW, Johnson SB, Frattaroli S. Judging the constitutionality of injury interventions using empirical data: The case of concealed weapons detectors. Paper presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

Vernick JS, Lewin NL, Beilenson PL, Mair JS, Lindamood MM, Teret SP, **Webster DW**. Using local public health powers as a tool for gun violence prevention: The Baltimore Youth Ammunition Initiative. Paper to be presented at the annual meeting of the American Public Health Association, Washington, DC, November 2004.

**Webster DW**. Cracking down on corrupt gun dealers in Chicago: Effects on the illicit gun market. Paper presented at the annual meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Mahoney P, Rhoel J, O'Sullivan C. Domestic violence risk assessment and history of injury. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Kim A, **Webster DW**. Effects of a one-gun-a-month purchase limit on illicit gun trafficking and availability. Presented at the Annual Meeting of the American Public Health Association, San Francisco, November 2003.

Campbell JC, **Webster DW**, Chouaf K, et al. "If I can't have you, no one can": Further exploration of estrangement increasing risk of intimate partner femicide. Presented at the Annual Meetings of the American Society of Criminology, Chicago, November 2002.

Kim A, **Webster DW**. The effects of the 1996 Maryland Gun Violence Prevention Act on Illicit Gun Markets. Presented at the Annual Meeting of Amer. Public Health Assoc., Philadelphia, Nov. 2002.

**Webster DW**, Vernick JS, Hepburn L. The association between licensing, registration, and other gun sales laws and the state-of-origin of crime guns. Presented at the National Association for Injury Control Research Centers meeting, Pittsburgh, May 2001.

**Webster DW**, Vernick JS, Hepburn L. The association between licensing, registration, and other complementary gun sales laws and the state-of-origin of crime guns. Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

Campbell JC, **Webster DW**, et al. Risk factors for intimate partner femicide among women in physically abusive relationships. Presented at the annual meetings of the American Public Health Association, Boston, November 2000.

**Webster DW**, Vernick JS, Hepburn L. Can comprehensive gun control and enforcement keep guns from being used in crime? Presented at the annual meetings of the American Society of Criminology, Toronto, Ont., November 1999.

Roche K, **Webster DW**, Alexander C, Ensminger M. Neighborhood effects on the association between parenting and youth fighting. Presented at the American Sociological Association Annual Meetings, 1999.

**Webster DW**. Assessing sources of data on risk factors for intimate partner homicide: Proxy respondent surveys versus police records. Femicide Research Working Meeting, Chapel Hill NC, February 1999.

**Webster DW**, Campbell JC, Curry MA. Issues of using proxy informants in femicide research. Annual meetings of the American Society of Criminology, Washington DC, November 1998.

McFarlane J, **Webster DW**, Campbell JC, Block CR, Ulrich Y. Femicide with and without suicide by an intimate partner: A comparative analysis. Annual meetings of the American Society of Criminology, Washington DC, November 1998.

**Webster DW**, Vernick JS, Huang K. The effects of Maryland's law banning Saturday Night Specials on homicides. American Public Health Assoc. Annual Meeting, Washington DC, Nov. 1998. Vernick JS, Webster DW, Huang K. Maryland's 1988 law banning Saturday Night Special handguns: Effects on intermediate outcomes. American Public Health Association Annual Meeting, Washington DC, November 1998.

**Webster DW**. Investigating a sudden increase in the lethality of shootings in Baltimore: A case study. American Public Health Association Annual Meeting, Indianapolis IN, November 1997.

Freed LH, Wilson MHS, Longwell JJ, Carrese J, **Webster DW**. Deterrent to gun carrying among incarcerated adolescent males. Presented at the Annual Meeting of the Robert Wood Johnson Clinical Scholars Meeting, November 1998.

**Webster DW**, Kaljee L, Vernick JS, Cameron DD. Attitudes about new law enforcement technologies and strategies for detecting concealed weapons in a high-crime urban community. Presented at the National Institute of Justice Annual Research and Evaluation Meetings, Washington DC, July 1998.

**Webster DW**, Campbell JC. Issues in using case-control methods in homicide research. Annual Meetings of the American Society of Criminology, San Diego CA, November 1997.

**Webster DW**. Methodological challenges to evaluating the Brady Law. Annual Meetings of the Homicide Research Working Group, Shepherdstown, WV, June 9 1997.

**Webster DW**. Modifying guns tor reduce child and adolescent mortality: A Risk Analysis. American Public Health Association Annual Meeting, New York, November 1996.

**Webster DW**. School-based efforts to reduce adolescent violence. Presented at Children Harmed and Harmful: Risks and Risk-Taking Among 10-15 Year-Olds, Working Conference. Chicago, September 1994.

**Webster DW**. Tackling the problem of gun carrying among youth: Behavior change vs. environmental change. Paper presented at the National Conference on Risk-Taking Behaviors Among Children and Adolescents. Arlington, VA, June 1994.

**Webster DW**.  Individual vs. community perspective on the study and prevention of youth weapon carrying.  Public Health Service Annual Professional Meetings, Baltimore, MD, April 1994.

**Webster DW**, Wilson MEH.  The role of primary care pediatricians in preventing firearm injuries to children and youth. Johnson & Johnson Pediatric Institute Conference on the Pediatrician's Role in Violence Prevention, Dulles, VA, March 1994.

**Webster DW**, Gainer PS, Champion, HR.  Determinants of weapon carrying within a sample of inner city junior high school students.  Paper to be presented at the American Public Health Association Annual Meetings, Washington, DC, November 1992.

**Webster DW**.  Short-term effects of a primary prevention program for youth violence.  American Psychiatric Association Annual Meetings, Washington, DC, May 1992.

**Webster DW**, Sykes L, Champion HR, Gainer PS.  The effects of Washington D.C.'s epidemic of gun violence on trauma center admissions and wound profiles.  American Public Health Association Annual Meetings, Atlanta, GA, November 1991.

Champion HR, Oschner MG, **Webster DW**.  A retrospective review of over 300 abdominal gunshot wounds at an urban Level I trauma center.  International Society of Surgery Conference, Stockholm, Sweden, August 1991.

Wilson MEH, **Webster DW**, Duggan AK, Pakula LC.  Firearm injury prevention counseling:  are pediatricians and parents ready?  American College of Physicians Annual Meetings, April 1991.

**Webster DW**, Wilson MEH, Duggan AK.  Parental beliefs and practices concerning firearm injury prevention.  American Public Health Association Annual Meetings, New York, October 1990.

**Webster DW**, Wilson MH, Duggan AK. Determinants of pediatrician firearm injury prevention counseling practices. American Public Health Assoc. Annual Meetings, New York, October 1990.

**Webster DW**, Wilson MH, Duggan AK. Pediatrician attitudes and practices concerning firearm injury prevention counseling. Amer. Pediatric Soc./Soc. Pediatric Research Meetings, Chicago, 1990.

Waller AE, **Webster DW**, Baker SP.  Homicide and suicide among children, United States, 19801985.  American Public Health Association Annual Meeting, Chicago, October 1989.
Keyl PM, **Webster DW**, Smith GS, Baker SP.  The effect of Maryland's seat belt law on fatality risks.  SAE Conference on the Evaluation of Trends in Auto Safety, National Highway Traffic Safety Administration, Washington, DC, May 1989.

*Invited Presentations, Seminars & Webinars*

**Public Health Models and Evidence to Guide the Prevention of Gun Violence.**  2nd Annual Sarah and Erin Braner Endowed Lecture for the Department of Pediatrics at Oregon Health and Science University's (OHSU) Doernbecher Children's Hospital, Portland. November 2019.

**JA1804**

Webster 45
*May 2023*

**A Roadmap for Reducing Gun Violence in America**. 28th Annual Herbert Lourie Memorial Lecture on Health Policy, Maxwell School of Citizenship and Public Affairs, Syracuse University, Oct. 2016.

**Gun Violence in America: How Culture and Politics Shape Our Response.  Public Health Models for Reducing Gun Violence.** 22nd Annual Rosemary Flanigan Lecture, Center for Practical Bioethics, KU School of Medicine, The University of Kansas, August 2016.

**Lessons from Baltimore's Safe Streets Program on Community Efforts to Reduce Gun Violence.**  National Academies of Science, Engineering, and Medicine Workshop on Community Violence Prevention.  Brooklyn, NY, June 16, 2016.

**Effects of Extending Background Check Requirements to Firearm Sales by Private Gun Owners**.  White House meeting for state and local officials on strategies to reduce gun violence.  Washington, DC, May 24, 2016.

**Priorities for Advancing Research on Gun Violence.** American Association for the Advancement of Science Forum on Science and Technology Policy, Washington, DC, April 2016.

**Evidence to Guide Public Health Efforts to Reduce Gun Violence.**  Keynote presentation, Gun Violence: A Public Health Crisis Symposium, Washington University of St. Louis, April 5, 2016.

**Effects of Drug Law Enforcement Practices on Gun Violence**, Baltimore, 2003-2015.

**Presentation,** 2016 National High-Intensity Drug Trafficking Areas Conference, Washington, DC, Feb. 18, 2016.

**Public Health Approaches to Reducing Gun Violence in America Presentation,** Moving from Crisis to Action: A Public Health Approach to Reducing Gun Violence, Mother Emanuel A.M.E. Church, Charleston, SC, Dec. 4, 2015.

**Evidence on Policies to Keep Guns from High-Risk Individuals**, The Brady Center for Gun Violence Prevention and the American Public Health Association's Summit. Washington, DC, Oct. 27, 2015.

**Charting a Course Toward Fewer Gun Deaths in America**, National Public Health Week Grand Rounds Lecture, Drexel University, School of Public Health, Philadelphia, April 8, 2015.

**Evidence to Guide Gun Violence Prevention in America**, National Public Health Week Grand Rounds, University of Delaware, Newark, DE, April 6, 2015

**Research on Policies to Keep Firearms from Dangerous People Forum on Gun Violence Prevention**, American Public Health Association and Brady Campaign to Prevent Gun Violence.  Washington, DC, March 2, 2015.

**Why Collective Efficacy Makes us Safer than "Good Guys with Guns."** Q Commons Baltimore. Baltimore. February 26, 2015.

**Evidence that State Gun Policies Can Reduce Gun Availability to Criminals and Gun Violence.** Gun Violence Prevention Summit for State Legislators, Arlington, VA, December 9, 2014.

**JA1805**

**Opportunities and Challenges for Prosecutors Combatting Gun Violence in America.** Keynote presentation to the first meeting of Prosecutors Against Gun Violence, Atlanta, Oct. 21, 2014.

**Evidence-Based Strategies to Reduce Gun Violence in America.** Presentation as part of the Distinguished Guest Faculty Seminars, University of Michigan Injury Research Center, Ann Arbor, Oct. 21, 2014.

**Evidence-Based Strategies for Reducing Gun-Related Violence and Injuries Among Youth.** Grand Rounds Presentation, Department of Pediatrics and Adolescent Medicine, Johns Hopkins University, School of Medicine. Sept. 24, 2014.

**America's Path to Fewer Gun Deaths.** Presented at TEDMED Conference, Washington, DC, Sept. 10, 2014.

**Evidence-Based Policies to Reduce Gun Violence in America.** George Mason University, Center for Evidence-Based Crime Policy's 2014 Symposium, June 23, 2014.

**Using Research Evidence to Strengthen Maryland's Gun Laws.** Mid-Atlantic Public Health Grand Rounds, Johns Hopkins Bloomberg School of Public Health, June 18, 2014.

**Evidence to Support Efforts to Reform America's Gun Laws.** The Brady Campaign Summit. Washington, DC, November 2013.

**A Way Forward for Policies to Reduce Gun Violence in America**. Invited to be a William J. Clinton Distinguished Lecturer for the Clinton School of Public Service, University of Arkansas, Little Rock, Sept. 10, 2013.

**Public Health Approaches to Reducing Gun Violence.** The Group Dynamics Seminar Series, Institute for Social Research, University of Michigan, Ann Arbor, MI, October 7, 2013.

**Preventing Intimate Partner Homicides by Keeping Firearms from Perpetrators of Domestic Violence.** Summit on Civil Protection Orders, National Council of Juvenile and Family Court Judges, Washington, DC, June 2013.

**Data and Informatics needs for gun violence prevention research.** Webinar for the Public Health Informatics Working Group for the American Medical Informatics Association. June 2013.

**Gun Violence: The Healthcare Providers Role in Prevention, National Healthcare Collaborative on Violence and Abuse**. Webinar, June 2013.

**Firearm Policy and Gun Violence Prevention.** Webinar for California Public Health Grand Rounds, May 2013.

**Public Health Interventions to Reduce Gun Violence to Youth.** Keynote session, Pediatric Academic Societies Annual Meeting, May 2013.

**Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence: Workshop.** Institute of Medicine, Washington, DC, April 2013.

**Preventing Violence with Policies to Keep Guns from High-Risk People.** George Washington University, School of Public Health, Forum – From Dialogue to Action: Preventing Gun Violence, April 5, 2013.

**Research to Inform Policies to Keep Guns from High Risk People.**  The United States General Accountability Office, April 3, 2013.

**Policy Priorities for Reducing Youth Gun Violence: A Way Forward.**  Semi-annual meeting of the Maternal and Child Health Section of the American Public Health Association, February 2013.

**Importance of Assessing Threats to Study Validity: Cautions About Applying Questionable Evidence to Policies and Programs to Reduce Violence**. Evidence for Violence Prevention Across the Lifespan and Around the World: A Workshop of the Forum on Global Violence Prevention, Institute of Medicine, Washington, DC, January 23-24, 2013.

**Preventing Gun Violence to Youth**.  Keynote presentation, King Holiday Celebration, Martin Luther King, Jr. Center for Non-Violence, New York, NY, January 2013.

**Changing the Code of the Street in Baltimore's Most Violent Neighborhoods: Evaluation of a CeaseFire-like Intervention.**  Patricia F. Waller Lecture. University of North Carolina, October 2012.

**Reducing Risk for Re-assault of Victims of Intimate Partner Violence**. Network for Public Health Law's Eastern Region Symposium.  University of Maryland Law School, Baltimore, June 26, 2012.

**Firearm Seller Accountability Measures and the Diversion of Guns to Criminals**.  Congressional briefing organized by George Mason University's Center for Evidence Based Crime Policy, Washington, DC, February 2012.

**Research with Victims of Intimate Partner Violence:  Risks, Benefits, and Safety Strategies**.  Plenary session, Advancement of Ethical Research Conference, National Harbor, MD, December 2011.

**Evaluating Baltimore's Replication of Chicago's CeaseFire Program:  Effects on Youth Attitudes and Gun Violence.**  Centers for Disease Control and Prevention, Atlanta, January 7, 2010.

**Public Health Approaches to Gun Violence Prevention**.  Conference on Promoting Community Safety and Preventing Violence: Integrating Lessons from Research and Practice.  Ohio State University, Columbus, OH, June 2009.

**Keys to States Keeping Guns from Criminals and Reducing Gun Violence**.  Meeting of State Legislators Against Gun Violence, Gracie Mansion, New York, May 8, 2009.

**Effects of Baltimore's Safe Streets Program: A Public Health Approach to Reducing Gun Violence**. Trauma Seminar Series, Johns Hopkins Hospital, March 2009.

**Effective Strategies for Combating Illegal Guns and Gun Violence**. Roundtable on Gun Violence Prevention, International Association of Chiefs of Police, Chicago, IL, November 2008.

**Research Supporting the Lethality Assessment Program**. Maryland Judicial Conference, Linthicum Heights, MD, June 20, 2008.

**Evidence-Based Strategies for Reducing Illegal Guns and Gun Violence**. Seminar for the Baltimore Police Department Command Staff Training, Baltimore, May 22, 2008.

**Preventing Gun Violence**. Invited seminar for the Baltimore City Circuit Court Judges, April 2008.

**How Cities Can Reduce Gun Violence**. Mid-Atlantic Regional Meeting, Mayors Against Illegal Guns, March 2007.Strategies to Reduce Illegal Gun Trafficking.  Harvard Injury Control Research Center, January 2007.

**Expert Panel, Midwest meeting of Mayors Against Illegal Guns**, Chicago, October 2006.

**Expert Panel for Mayors Against Illegal Guns Summit**, New York, April 2006.

**Promising Approaches for Violence Prevention**.  Association of Baltimore Area Grantmakers, Baltimore, March 2006.

**Evidence of the Effectiveness of Gun Policies**.  Graduate Seminar in Injury Research and Policy, Johns Hopkins Bloomberg School of Public Health, February 2004.

**Recent Research on Gun Violence Prevention**.  Seminar at the 2003 Child Advocacy Leadership Institute, Advocates for Children and Youth, Washington, DC, November 2003.

**Gun Policy: Understanding the Research and Defending the Data**.  Seminar at 2002 Child Advocacy Leadership Institute, National Association of Child Advocates, Washington, DC, November 2002.

**Preventing Gun Violence Among Youth**. Seminar for the University of Maryland Journalism Fellowship in Child and Family Policy, Washington, DC, November 2002.

**Opportunities for Preventing Gun Violence**, the U.S.  Robert W. Leraas Lecture, St. Olaf College, Northfield MN, October 2002.

**The Impact of Gun Safe Storage Laws on Firearm Mortality Risks among Youth**. National Academy of Sciences, Institute of Medicine Meeting on Youth and Gun Violence. Washington, DC, Sept 2002.

**Recent Research on the Effectiveness of Gun Policies**. Citizens' Conference to Stop Gun Violence.  Arlington, VA, February 2002.

**How Criminally-Involved Youth Obtain Their Guns**. Citizens' Conference to Stop Gun Violence.  Arlington, VA, February 2002.

**The Role of Alcohol in Interpersonal Violence**. Johns Hopkins University, Center for Injury Research and Policy Seminar, October 2001.

**Risk Factors for Near Fatal Intimate Partner Assaults**. Johns Hopkins University, Department of Mental Hygiene's Seminar Series on Violence Research, September 2001.

**Effects of Child Access Prevention Gun Laws on Unintentional Gun Deaths to Children**. Presented at the annual meeting of the Handgun Epidemic Lowering Plan (HELP) Network, Atlanta, April 2001.

**Public Health Models for Reducing Gun Violence**. Grand rounds presentation at George Washington University School of Medicine, Washington, DC, April 2000.

**Methodological Challenges to Studying Risk Factors for Intimate Partner Homicide**. Seminar for the Center for Injury Research and Policy, Johns Hopkins School of Public Health, March 1999.

**School-Based Interventions to Reduce Youth Violence: Do Our Programs Fit the Problem?**  Annual conference of Maryland State School Health Council, Ocean City MD, April 1998.

**The Role of Health Professionals in the Prevention of Youth Violence**. Continuing medical education seminar at Bethesda Memorial Hospital, Boynton Beach, FL, February 1998.

**Determinants of Youth Violence and Scientific Support for Interventions**. Best Practices in Adolescent Health Conference, Annapolis MD, May 1996.

**Media Advocacy and Public Health: A Case Study of a Campaign to Increase Support for Handgun Restrictions**. Johns Hopkins University School of Public Health Seminar, April 1995.

**The Evaluation of the Policy Program of the California Wellness Foundation's Violence Prevention Initiative**, MPH Seminar, November 1995.

**The Limitations of Skill-Focused Conflict Resolution Curricula for Reducing Youth Violence**.  Handgun Epidemic Lowering Plan (HELP) Network Annual Meeting.  Chicago, September 1994.

**Promising Public Health Approaches to Violence Prevention**. Presentation to the Board of Directors, Physicians for Social Responsibility, Bethesda, MD, March 1994.

**The Ability of Gun Laws to Reduce Deaths and Injuries**. Presentation to the Maryland State Office of Strategic Drug Enforcement Coordination, Columbia, MD, January 1994.

**The Limitations of Conflict Resolution Curricula for Adolescents**. National Symposium on Violence, Safety, and Health in Urban Schools.  Sponsored by the Council of Great City Schools, Washington, DC, December 1993.

**The Role of Public Health in Violence Prevention**. JHU Seminar sponsored by the Department of Mental Hygiene and The Injury Prevention Center, December 1993.

**Research on Strategies to Prevent Youth Violence. Creative Solutions to Problem of Urban Violence**. Symposium sponsored by the Baltimore Urban League and the YMCA. Baltimore, April 6, 1993.

**Public Health Professionals' Role in Reducing Injuries from Violence.  Preventive Medicine in Minority Communities:  First or Last Resort?** Symposium sponsored by the Student National Medical Association of The Johns Hopkins School of Medicine.  Baltimore, MD, April 3, 1993.

**Health Professionals' Role in Limiting Children's Access to Firearms**. Surgeon General's Invitational Workshop. Keeping Kids Safe:  Strategies for Preventing Violence and Injury, Columbia, MD, November 19, 1992.

**A Legislative Agenda for Violence Reduction**. Consortium of Virginia Urban Municipalities, Williamsburg, VA, July 10, 1992.

**The Epidemiology of Violence and Public Health Approaches to the Problem**. Keynote Address, 13th Annual Institute of the Virginia Organization of Health Care Social Workers, Richmond, June 1992.

## ADDITIONAL INFORMATION

*Personal Statement*

that synthesizes your research, policy, and practice goals, objectives and impact  [This section allows you to "tell your story" and "connect the dots" – very important, particularly for faculty doing a wide range of tasks that are not captured through traditional "academic metrics". Keep it concise (no more than half a page)]

*Keywords*

violence, violence prevention, firearm injuries, gun policy, domestic violence, substance abuse

*Research Objectives*

To study the causes and prevention of interpersonal and self-inflicted violence and associated injuries; to study the effectiveness interventions intended to reduce severe forms of violence; to develop and assess instruments designed to assess the risk for future violence.

*Community Involvement*

Coach, Bethesda-Chevy Chase Baseball Youth League 2001- 2010

Served as Co-Chair of Social Justice Committee and as a member of the Board of Trustees at Temple Emanuel, Kensington, MD, 2004- 2007

# Exhibit B

## Cases on which Dr. Daniel W. Webster produced reports 2018-2023.

---

**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF WASHINGTON.**
NATIONAL SHOOTING SPORTS FOUNDATION, INC., Plaintiff, v. ROBERT W.
FERGUSON, Attorney General of the State of Washington, Defendant. Case No. 2:23-cv-00113-
MKD.

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA.**
ANDREW HANSON, *et al.*, Plaintiffs v. DISTRICT OF COLUMBIA*, et al.*, Defendants. Case
No. 1:22-cv-02256-RC.

**CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT SANGAMON COUNTY,
ILLINOIS – CHANCERY DIVISION.** GUNS SAVE LIFE, INC., Plaintiff, v. KWAME
RAOUL (Attorney General for Illinois) and BRENDAN KELLY (Acting Director of the Illinois
State Police) Defendants. Case No. 2019 CH 180.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO.**
DOE BRANDEIS, et al., Plaintiffs, **v.** ROB BONTA (Attorney General of California),
Defendant. Case No. 37-2019-00038820-CU-TT-CTL.

**UNITED STATES DISTRICT COURT FOR the WESTERN DISTRICT OF TEXAS, San
Antonio Division.** Holcombe et al. vs. the United States of America. Case No. 5:18-CV-
00555-XR (consolidated cases).

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND.**
MARYLAND SHALL ISSUE, INC.*, et al.*, Plaintiffs v. LAWRENCE HOGAN, *et al.,
Defendants.* Case No. 16-cv-3311-ELH.

**JA1812**

# Exhibit 11

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
| Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
| Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
| Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A. HOFFMAN, in her official capacity as Acting Gloucester County Prosecutor, and BRADLEY D. BILLHIMER, in his official capacity as Ocean County Prosecutor,

    Defendants.

---

BLAKE ELLMAN, THOMAS R. ROGERS, and ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, LT. RYAN MCNAMEE, in his official capacity as Officer in Charge of the Chester Police Department, and KENNETH BROWN, JR., in his official capacity as Chief of the Wall Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No. 3:22-cv-04397

## <u>DECLARATION OF JAMES E. YURGEALITIS</u>

    I, JAMES E. YURGEALITIS, hereby depose and state:

1.     I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2.   I have attached a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.

I declare under penalty of perjury on this ___24th___ day of October, 2023, that the foregoing is true and correct.

JAMES E. YURGEALITIS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br> Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br> Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PLATKIN, et al., <br><br> Defendants. | Civil Action No. 3:22-cv-04397 |

**Expert Report of James E. Yurgealitis**

I, James E. Yurgealitis, declare as follows:

1.     I am currently Self Employed as a Legal and Forensic Consultant providing firearms related technical and public policy consulting, forensic case reviews and testing and training services to corporations, legal counsel, and the public sector. During my previous 26-year career as a Federal Law Enforcement Officer, I have been recognized, and testified as, an expert witness in numerous local, state and federal courts. I have toured numerous firearms and ammunition manufacturer's facilities both in the United States and overseas. I maintain a personal library of firearms and ammunition related books and periodicals and maintain contact with other recognized experts in the field. My final assignment in government service was as Senior Special Agent / Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, a position I held for nine years. During that time, I was responsible for all Bureau firearms and forensic firearms related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

2.     My credentials, training, background and experience are stated in my curriculum vitae, a true and correct copy of which is attached as Exhibit A. My credentials, training, background and experience as an expert witness are detailed on my Statement of Qualifications, a true and correct copy of which is attached as Exhibit B.

3.     I have been retained by the Office of the Attorney General of the State of New Jersey to provide expert testimony in litigation challenging various aspects of New Jersey Statute 2C, Section 39-1 (the "Statute"). As of the date of this declaration, the scope of my engagement includes providing expert testimony in the following cases: *Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al.*, Docket No. 3:18-cv-10507; *Cheeseman et al. v. Platkin et al.*, Docket No. 1:22-cv-04360; *Ellman et al. v. Platkin et al.*, Docket No. 3:22-cv-04397. I have

reviewed the provisions of the Statute being challenged in these cases. I am being compensated at a rate of $400 per hour for my work in these cases, and $1600 per travel + work day.

## OPINIONS

4.     As discussed in this report, many of the firearms covered by the Statute can directly trace their origins to weapons developed for use in combat. As such, they were never initially intended for general distribution / sale to the public.

5.     As tragically demonstrated by recent mass shootings such as the Pulse Nightclub in Orlando Florida in 2016 (49 fatalities, 50+ wounded), the 2017 Las Vegas shooting (60 fatalities, 400+ wounded), the 2022 Uvalde Texas School shooting (21 fatalities, 17 wounded) and the July 4th 2022 shooting in Highland Park (7 fatalities, 48 wounded), the "assault firearms" as defined under the Statute (also commonly referred to as assault weapons) are capable of inflicting significant carnage upon civilians in a short period of time, especially in conjunction with large capacity magazines.

6.     Additionally, assault weapons as prohibited under the Statute pose a significant risk to law enforcement officers. It has been my experience that soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" National Institute of Justice (NIJ) protection rating. These two ratings are suitable for protection against most handgun bullets as those projectiles range up to a 1200FPS (+ or -) velocity. Rifle caliber assault weapons (AR & AK type) can, as stated in more detail below in this report, achieve muzzle velocities of 3200FPS (+ or -) which can readily penetrate Level II & IIIA Body Armor (as well as some Level III hard body armor which is not universal standard issue amongst law enforcement agencies nationwide). Not only do the firearms banned under the Statute pose a threat to overall public safety, but they also increase the likelihood that first responders charged with stopping such a threat may be injured or killed in the performance of their duty.

## **DISCUSSION**

I.      **Firearms Terminology, Types, And Operation.**

      **A.  Handguns And Long Guns.**

7.      Modern firearms as currently manufactured for civilian ownership fall into two general types: handguns and long guns (or shoulder weapons).

      **i.  Handguns.**

8.      **Handguns.** Handguns are generally defined as a firearm having a short stock (grip), and are designed to be held, and fired, with one hand. The term "handgun" defines two distinct types of modern firearms: the revolver and the semi-automatic pistol.

9.      **Revolver.** A revolver is a handgun designed and manufactured with a revolving cylinder to contain, chamber, and feed multiple rounds of ammunition. In a modern double action revolver, pulling the trigger rotates the cylinder bringing an unfired cartridge of ammunition in line with the barrel and firing pin. Pulling the trigger also cocks the hammer and then releases it either directly (or indirectly via a firing pin) to strike the primer of the cartridge initiating the firing sequence as stated previously. In this type of revolver, the trigger must again be pulled to rotate the cylinder in order to fire another cartridge. When all cartridges have been fired, the cylinder is unlocked from the frame and swings out to facilitate removal of expended cartridge casings and insertion of unfired cartridges. The cylinder is then closed and relocked within the frame and the handgun is again ready to fire when the trigger is pulled.

10.     **Semi-automatic pistol.** A semi-automatic pistol is a handgun designed and manufactured with the firing chamber as an integral part of the barrel and utilizes a "box" magazine to contain and feed multiple rounds of ammunition. In this type of handgun, generally, the box magazine is inserted into the firearm, the slide or bolt is pulled back and released which springs forward and a loads a cartridge into the chamber. When the trigger is pulled, a firing pin

or striker is released which impacts the primer of the cartridge and initiates the firing sequence of the ammunition. In most pistols, a portion of the recoil or gas pressure generated by firing the cartridge is utilized to move the slide rearward, extracts and ejects the expended cartridge case and chambers another round from the magazine. This sequence can be repeated by pulling the trigger once for each shot. The pistol can then be reloaded by removing the empty magazine and inserting a loaded magazine.

### ii. Long Guns.

11.    In terms of modern firearms manufacture, long guns are generally of two distinct types: rifles and shotguns.

12.    **Rifle.** A rifle is a firearm which is designed and intended to be fired from the shoulder.  It fires a single shot through a rifled bore for each pull of the trigger.

13.    **Shotgun.**  A shotgun is a firearm that is also designed and intended to be fired from the shoulder. It fires either a number of ball shot (commonly termed "buckshot" or "birdshot") or a single projectile (commonly termed a "slug") through a smooth (non rifled) bore for each pull of the trigger.

14.    In terms of "types" of rifle there are numerous variations. All of these variations, generally speaking, are defined and distinguished by the way they are loaded and reloaded.

15.    **Single-shot rifle.**  For example, single-shot rifles fire one shot for each pull of the trigger. They have no internal or external magazine capacity and must be reloaded with a new unfired cartridge by hand for each consecutive shot. Many of these have a hinged or "break open" receiver to facilitate loading and unloading.

16.    **Pump Action rifle.**  A pump action rifle requires the operator to manually manipulate a forearm piece which is traditionally found underneath the barrel. After firing, the forearm is pulled backward which unlocks the bolt, extracts and ejects the fired cartridge case.

Pushing the slide forward feeds an unfired cartridge from the magazine, cocks the firearm

mechanism and locks the bolt for a successive shot. Pump action rifles have been manufactured

with both tubular and detachable box magazines.

17.    **Bolt Action rifle.**  Bolt action rifles require the operator to manually manipulate the

bolt of the rifle.  After firing, the bolt is first unlocked from the chamber and then moved

rearward. This action also extracts and ejects the expended cartridge case. The bolt is then moved

forward which feeds an unfired cartridge from the magazine into the chamber. Once the bolt is

then again locked by the operator, it is ready to fire. Bolt action rifles usually have an internal

fixed magazine or tubular magazine which will facilitate reloading via manipulation of the bolt

until that capacity is exhausted. Bolt action rifles were generally the choice among hunters and

military forces through the end of World War II.

18.    **Lever Action rifle.**  A lever action rifle is similar to the bolt action rifle in that the

operator is required to manipulate the mechanism of the firearm. A lever at the bottom of the

receiver of the rifle is manipulated in and up and down motion in order to unlock the bolt and

move it rearward, extract and eject the expended cartridge case, feed an unfired cartridge into the

chamber and lock it. This action is required by the operator for each shot fired through the rifle.

Generally speaking lever action rifles have historically been manufactured with tubular magazines

which will vary in capacity depending on the caliber of the firearm.

19.    **Semi-automatic rifle.**  A semi-automatic rifle utilizes the energy generated by the

firing of the cartridge to power the cycle of fire. This is accomplished by siphoning off a portion

of the gases generated by firing to operate the mechanism or by utilizing the recoil generated by

firing much as in a semi-automatic pistol as described previously. Once loaded, the operation of

this cycle of fire is not dependent on the operator to effect any portion of the process other than to

pull the trigger. Semi-automatic rifles are, and have been previously, manufactured with both

fixed internal magazines and a capacity to accept detachable external magazines. As such this type of rifle is capable of firing with each pull of the trigger until the supply of ammunition is exhausted. As stated previously, the majority of military firearms through World War II were bolt action. The exception to this rule was the United States entering the war with the semi-automatic M1 (Garand) .30-06 caliber rifle as standard issue. The Garand had a fixed internal magazine with an eight round capacity.

20.    Modern shotguns, as stated previously in regard to rifles, are generally classified by their operating system, (i.e. the manner in which they function, are loaded and are reloaded). Additionally, in the case of shotguns with multiple barrels they are defined by placement or orientation of same.

21.    **Single-shot shotguns**.  Single-shot shotguns function similarly to the single-shot rifle. They may have a hinged receiver which allows the operator to open the action at chamber area to facilitate loading and unloading of the firearm. There are also single shot models that are loaded and unloaded through a bolt action mechanism and have no additional magazine capacity.

22.    **Bolt action shotguns.** Bolt action shotguns are manufactured, as stated above for rifles, as single shot, or with internal or detachable magazines to facilitate easier and faster reloading. They function in the same way as a bolt action rifle and require manual manipulation of the bolt by the operator to unload and reload.

23.    **Level action shotguns.** Level action shotguns again function in the same fashion as a similarly designed rifle. Manual manipulation of the lever is required for successive shots.

24.    **Pump action shotguns.** Pump action shotguns have the same general operating system as a similarly designed rifle. The "action" of the shotgun must be worked forward and back by the operator to unlock the bolt, extract and eject the expended shotgun shell, reload and relock the bolt for firing.

25.    **Semi-automatic shotguns.** Semi-automatic shotguns, as with their rifle caliber counterparts, utilize energy (either recoil or gas pressure) generated by firing ammunition to "power" the operating system of the firearm. These are manufactured with a number of different magazines, both internal and fixed, as well as external and detachable. They are capable of firing a single shot with each pull of the trigger until the supply of ammunition in the magazine is exhausted.

26.    **Break open, double barrel, and "tip up" shotguns.** Break open, double barrel, and "tip up" shotguns have a hinged receiver which facilitates access to the rear of the chamber for unloading and reloading. They are manufactured in single shot and double barrel variations. Double barrel variations are further delineated by the placement of their barrels. Side-by-side shotguns have two barrels situated next to one another in a horizontal arrangement. Over-and-under shotguns have two barrels superimposed upon one another in a vertical plane. The mechanisms in each of these allow staggered firing of each of the two barrels with a separate pull of the trigger. When the hinged action is opened, the expended shotgun shell hulls can be manually extracted by the operator although more complex designs with auto ejectors perform that function when "opened."

### B.  General Firearms Definitions.

27.    In discussing modern firearms, it is important to understand how they are defined under statute, how they function and the differences between types commonly found and available to the public.

28.    Additional terms often used when discussing modern firearms are semi-automatic, full-automatic, select fire, rifling, caliber and gauge.  I define these terms as follows:

29.    **Semi-Automatic.** Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot.

30.    **Full-automatic.** Full-automatic refers to a firearm that will continuously fire successive shots when the trigger is pulled and will only stop when the trigger is released or the supply of ammunition is exhausted. Commonly referred to, and defined and classified as a machine gun, under N.J.S.A. 2C:39-1(i).

31.    **Select Fire.** A select fire firearm is capable of switching between and functioning in either full- or semi-automatic fire mode.

32.    **Rifling**. Rifling refers to a series of grooves cut or impressed inside the barrel in a spiral pattern. The "high" portions of these patterns are called "lands." The "lower" portion of this pattern are called "grooves." When a projectile (or bullet) is fired in a "rifled" firearm, it comes into contact with the lands as it leaves the chamber and begins to travel down the barrel. Because the lands are oriented in a spiral pattern, the rifling imparts a spin to the projectile which improves stability and accuracy.

33.    **Caliber**. Caliber is a dimensional measurement of the inside (or bore) of a rifled barrel. In the United States, caliber is traditionally expressed in fractions of an inch. For example, a .22 caliber firearm is designed to chamber and fire a projectile which measures .22 inches (or slightly less than a quarter of an inch). A .50 caliber firearm chambers and fires a projectile which is approximately a half inch in diameter.[1]

---

[1] In Europe, and. the majority of other countries utilizing the metric system, caliber has historically been expressed in millimeters (mm). Therefore a 9mm firearm is designed to chamber and fire a projectile with a diameter of 9mm. European caliber designations may also include measurement of the length of the cartridge case (9x19mm, 7.62x39mm etc.). A number of firearm calibers widely manufactured have two separate caliber designations, one in inch measurements and one in metric, which are equivalent and interchangeable. For example .380 ACP caliber ammunition in the US is referred to as 9x17mm caliber in Europe.

34.    It is important to note for the purposes of this report that the caliber designation of any given ammunition cartridge usually refers only to the diameter of the projectile (bullet) and not the relative "power" of the cartridge itself (in terms of muzzle energy, effective range and muzzle velocity). For example, there is an important distinction between cartridges commonly referred to as .22 caliber and cartridges commonly referred to as .223 caliber.

35.    .22 caliber ammunition is a popular and relatively low power cartridge developed in the 1880's. It is also known as ".22 rimfire" as the primer mixture in the cartridge is seated in the rim of the cartridge and not contained in a separate primer cup in the cartridge base. It is commonly used for target shooting as well as hunting small game and can be fired from both handguns and rifles chambered in that caliber. Bullet weights for .22 caliber projectiles / bullets are typically between 30-60 grains (0.08 to 0.13 ounces). Muzzle velocities are usually in the 1100-1300 feet per second (fps) range.

36.    .223 caliber ammunition by comparison is a high velocity cartridge developed in the 1950's in part for use in the original AR-15 and M-16 assault rifles. It is a "centerfire cartridge." Although the diameter of the projectile / bullet is only slightly greater (approximately the width of a human hair) than the .22 caliber cartridge mentioned previously, it is a vastly more powerful cartridge in terms of muzzle velocity and range. This caliber ammunition is also somewhat interchangeable with 5.56mm ammunition. Here is a side-by-side comparison of .223 (left) and .22 caliber cartridges (right) with a quarter for size reference:



37.    Common bullet weights for .223 / 5.56mm caliber projectiles are 50 to 62 grains +
or- (0.11 to 0.14 ounces)—heavier than .22 caliber projectiles.  Common muzzle velocities are
approximately 3,200 to 3,500 feet per second—about three times as fast as .22 caliber projectiles.
A heavier bullet and increased velocity equate to more of the cartridge's energy being transferred
to the target. The National Rifle Association (NRA) American Rifleman Magazine tested the U.S.
Army's new .223 caliber cartridge (M855Al) in 2014 and the results are published here:

https://www.americanrifleman.org/content/testing-the-army-s-m855a1-standard-ball-cartridge/.

38.    **Gauge.** Gauge is a dimensional measurement which is traditionally used to denote
the bore of a non-rifled or "smoothbore" firearm (i.e. a shotgun). Shotguns were initially designed
to fire a mass of round shot as opposed to one solid projectile, and therefore a caliber designation
is not readily applicable. Gauge refers to the number of lead spheres which will fit inside the bore
and equal one pound. For example, in a 12 gauge shotgun, you can fit 12 spheres of lead, which
are approximately 18.52mm or .73 inches in diameter, the total weight of which will equal one
pound. If the diameter of the spheres are increased, it will require less of them to equal one pound.

Therefore the smaller the "gauge" the larger the dimension of the bore. The exception to this

measurement system is the .410 gauge shotgun which is actually a caliber designation.

II.    **Recent Development And Evolution Of Firearms With Features
Designed for Military Purposes.**

39.    In recent years, there has been an increase in the popularity and availability of semi-

automatic rifles, pistols, and shotguns with features initially designed (or patterned after those

designed) for a military purpose. It is important to discuss the history of the development and

evolution of firearms with these features. In regard to the design and manufacture of military

small arms it is important to note that 'form follows function' and the design and inclusion of

features are intended to increase the effectiveness of the individual combatant in battle.

### A.  Assault Rifle Development and Evolution.

40.    The first "assault rifle" or "assault weapon" was the German StG 44 (Sturmgewehr

Model 1944), which appeared in production form late in World War II. Earlier pre-production

variants included the MP 42 and MP 43 (Machinenpistol 1942 and 1943 respectively). The

Germans termed the rifle "Sturmgewehr," literally "Storm Rifle," and a number of the features

included utilization of a portion of the gas generated by the burning cartridge propellant to operate

the rifle, extensive use of steel stampings in its construction, a detachable magazine, a separate

pistol style grip (not integrated with the shoulder stock), a bayonet mounting jug and a threaded

barrel to facilitate the attachment of a grenade launcher. It fired a cartridge that was smaller

dimensionally and less "powerful" (in terms of muzzle velocity and foot pounds of energy) than

the standard 8mm Mauser cartridge in use by the German Army in their issued bolt action Mauser

K-98 rifles.



`                                                                    2

41.    It is important to note that the features designed into the German StG 44 were

intended to increase the effectiveness of the individual soldier in combat and allow for simplified

manufacture:

42.    **Gas-powered semiautomatic fire**. Gas-powered semiautomatic fire enabled more

rapid fire than was possible using standard-issue bolt action rifles.

43.    **Steel stampings.** Steel stampings made for a lighter weapon increasing the amount

of ammunition an individual combatant could carry and / or increasing mobility. Additionally

they were easier and less expensive to manufacture than machined steel forgings.

44.    **Detachable magazine.** Detachable magazines allow more rapid re-loading than

previous standard issue bolt action firearms.

45.    **Separate pistol style grip.**  A separate pistol style grip enhanced the ability of

combat soldiers to quickly maneuver their firearms into firing position and retain stability for

subsequent shots.

---

[2] Image source –Peter Suciu, "Sturmgewehr, the First Assault Rifle," Recoil: The Ultimate Firearms Destination for the
Gun Lifestyle, June 19, 2016, available at https://www.recoilweb.com/sturmgewehr-the-first-assault-rifle-100907.html

46. **Barrel shroud.** A barrel shroud encircles and protects the end of the barrel, keeping the barrel safe from damage caused by collision with objects and giving the soldier using the firearm an auxiliary grip on the barrel without burning his hand.

47. **Bayonet mounting lug.** This feature provided combat soldiers with an additional weapon for use in close combat.

48. **Threaded Barrel.** A threaded barrel allowed for the attachment of grenade launcher (on this particular rifle), providing combat soldiers with an additional weapon, albeit for use at a greater distance.

49. Following the end of the war, captured StG 44's were analyzed by the Allies and although there was reluctance to move to a smaller caliber cartridge, a number of the features of the StG 44 found favor in the design of successive European, American, and Eastern Bloc military rifles. Noted firearm expert and historian Jim Supica wrote in his forward to the book "Guns":

> Most military establishments hesitated to "downsize" the range and power of their primary rifles in the early Cold War years. The semi-auto detachable magazine concept was an obvious success and there was something to be said for full auto capability.[3]

He further writes:

> However the assault rifle concept wouldn't go away. The Soviet Union accepted the lower power round idea in its fixed magazine semi-auto chambered for an intermediate power 7.62 x 39 mm round in 1945, the SKS, which saw wide distribution and production in Soviet client states.[4]

50. Two years later in 1947, the USSR followed the SKS with what Supica terms "the quintessential assault rifle - the Kalashnikov designed AK-47."[5]

---

[3] Supica, Guns (TAJ Books 2006). PP. 26-28
[4] *Id.*
[5] *Id.*

51.    The design of the AK-47 carried forward a number of the features introduced on the German StG 44. These features include a gas powered operating system, use of steel stampings in its construction, a separate pistol grip, separate shoulder stock, a detachable magazine, a bayonet lug and provision for attachment of a grenade launcher. Due to the separate stock and pistol grip the AK, much like the StG 44, also utilized a barrel shroud / or foregrip on the forward third of the rifle. Some variations of the early AK-47s (AKM) also featured a "compensator" at the muzzle that deflected gas upward and to the right to compensate for the rifle's tendency to kick up and to the right with every shot.

52.    In the 1950's, many countries sought to replace World War I and World War II vintage bolt action and semi-automatic rifles with these newer and more effective designs. With the birth of the North Atlantic Treaty Organization (NATO) however, utilization of Soviet Bloc AK or SKS assault rifles was not possible. Accordingly, a number of firearms manufacturers outside the Soviet sphere of influence developed military rifles that carried forward these same features to one extent or another. Fabrique Nationale (FN) of Herstal, Belgium and Heckler Koch (HK) of Oberndorf, Germany are two noteworthy examples.

53.    FN developed the FN-FAL (Fusil Automatique Leger) and HK the G3 which found a ready market amongst nations that did not favor the Soviet AK type designs. Both incorporated features which like the AK, were derived directly from the StG 44. Their designs featured some parts made from metal stampings as opposed to heavier and more expensive machined steel pieces. A separate pistol grip, shoulder stock, detachable magazine, and barrel shroud followed the basic design of the StG 44. A flash hider and / or muzzle brake have appeared in production variations of both rifles. These rifles were destined from inception to become widely exported as the domestic market in both countries was relatively limited. The FN-FAL and G3 have been in

production since the 1950's and both FN and HK have licensed production to numerous countries in South America, Africa, and the Middle East.

54.    In the United States, progress in this arena moved at a significantly slower pace.  The prevailing wisdom in the United States was to stay away from lighter, smaller rifle calibers and cartridges as the .30-06 cartridge used in the M-1 Garand Rifle during World War II had proven to be more than successful. Their initial answer to the burgeoning move towards assault rifles was a variation of the basic M-1 Garand operating system, the T44, or M-14. Outwardly, the M-14 retained a full length wood stock as did the Garand; however, it featured a detachable magazine, select fire (both semi-automatic and full automatic) capability, and a flash hider. It competed directly against the FN-FAL (designated T88) in U.S. Army trials and was selected in 1957.

55.    In the mid 1950's, Eugene Stoner, the chief Engineer of the American company ArmaLite Corporation, developed a number of lightweight assault rifle designs which resulted in the AR-10 in .308 caliber. Its design closely followed what was now becoming standard assault rifle design, i.e., light weight (aluminum forged receivers as opposed to machined steel), separate pistol grip and shoulder stock, foregrip / barrel shroud, detachable magazine, and numerous flash hider / muzzle brake variations. ArmaLite continued to refine the basic design of the AR-10 which resulted in the AR-15. The AR-15 was designed to chamber and fire the 5.56 x 45mm cartridge (somewhat interchangeable with .223 Remington caliber).

56.    In 1961, the Department of Defense purchased a quantity of AR-15 rifles from Colt for evaluation. A number of these were subsequently shipped to US Army advisors in Vietnam to test their suitability for issue to South Vietnamese Army forces. Following the field evaluation the Department of Defense Advanced Research Projects Agency prepared a report (AD-343778, dated August 20, 1962) summarizing the results. Amongst the data compiled via surveys of the US Army Advisors are a number of comments regarding actual use in the field and the results.

These comments describe various catastrophic injuries to Viet Cong Combatants who were shot by AR-15, including severing of limbs and decapitation.[6]

57.    This rifle was adopted as standard issue by the U.S. Army in the mid 1960's. The production of the rifle had been licensed to Colt, and initially the model designation was, as produced, AR-15. Later, after a series of engineering changes, the standard U.S. military designation was changed to M-16. When first deployed as a standard issue rifle for US Military Forces, the AR-15 / M-16 platform was maligned as unreliable and prone to jamming. This was due, in part, to inadequate maintenance by the operators themselves. Once the problems were addressed and rectified, the rifle proved to be as reliable and accurate as the AK type rifles deployed by the North Vietnamese and Viet Cong.

58.    The 5.56mm cartridge has a muzzle velocity of approximately 3200 feet per second (fps) (for reference a 9mm pistol cartridge has a muzzle velocity of approximately 1100 fps). 5.56mm bullets, upon contacting tissue will "yaw" (begin to rotate on its axis) which contributes to the creation of both temporary and permanent large wound cavities. Handgun bullets, because they are heavier and travelling at a lower velocity, do not typically yaw upon contact with tissue and do not create as large of a wound cavity nor commensurate destruction of tissue. The yaw movement of a 5.56mm / .223 caliber bullet can also cause it to fragment upon striking bone which contributes to additional tissue damage not immediately adjacent to the cavity itself.

---

[6] Advanced Research Projects Agency, Office of the Secretary of Defense, Field Test Report, AR-15 Armalite Rifle, at 24 (July 31, 1962), available at https://apps.dtic.mil/sti/pdfs/AD0343778.pdf.

17

59.    Noted Wound Ballistics expert Vincent DiMaio in "Gunshot Wounds" writes:

As the bullet enters, the body, there is 'tail splash' or backward hurling of injured tissue.  This material may be ejected from the entrance.  The bullet passes through the target, creating a large temporary cavity whose maximum diameter is up to 11-12.5 times the diameter of the projectile.  The maximum diameter of the cavity occurs at the point at which the maximum rate of loss of kinetic energy occurs.  This occurs at the point where the bullet is at maximum yaw, i.e., turned sideways (at a 90-degree angle to the path) and / or when it fragments.  If fragmentation does not occur and the path is long enough, the yawing continues until the bullet rotates 180 degrees and ends up in a base-forward position.  The bullet will continue traveling base first with little or no yaw as this position puts the center of mass forward.[7]

The temporary cavity will undulate for 5-10 msec before coming to rest as a permanent track.  Positive and negative pressures alternate in the wound track, with resultant sucking of foreign material and bacteria into the track from both entrance and exit.  In high-velocity centerfire rifle wounds, the expanding walls of the temporary cavity are capable of doing severe damage.  There is compression, stretching and shearing of the displaced tissue.  Injuries to blood vessels, nerves, or organs not struck by the bullet, and a distance from the path, can occur as can fractures of bones, though, in the case of fractures, this is relatively rare.  In the author's experience, fractures usually occur when the bullet perforates an intercostal space fracturing ribs above and below the bullet path.[8]

60.    Demaio further states,

Projectile fragmentation can amplify the effects of the temporary cavity increasing the severity of a wound.  This is the reason for the effectiveness of the 5.56 x 45-mm cartridge and the M-16 rifle.[9]

61.    This video graphically illustrates the temporary wound cavity as described by

DeMaio: https://www.youtube.com/watch?v=8HM96wpPVoQ.

---

[7] DiMaio, Gunshot Wounds, 2d (CRC Press LLC, 1999).  P. 54
[8] *Id.*, P.55
[9] *Id.,* P.56

62.     Because of the propensity of the 5.56mm/.223 caliber round to create significant damage upon impacting living tissue, it is not generally considered nor favored as a hunting cartridge.

### B.  Pistol Caliber Firearms Evolution And Development.

63.     It is important in terms of this particular case also to address the evolution and development of firearms that chamber and fire pistol caliber ammunition, including those known as submachine guns. Submachineguns are defined as machineguns that fire "sub caliber" (i.e. pistol caliber) ammunition. A number of the handguns that are banned under the Statute are direct evolutionary descendants of submachine guns initially designed and produced for military use.

64.     Many of the construction and design features attributed to assault weapons, and the StG 44, were first utilized in the design and manufacture of mid-20th century submachine guns. Nazi Germany entered World War II with the Innovative Maschinenpistole 38 (MP38). It was chambered in 9mm and later, after a number of engineering changes, re-designated as the MP40. It has design features commonly found in later assault weapons including an adjustable stock, separate pistol grip, a detachable magazine and use of steel stampings in its construction.



10

---

10 Image source: http://firearmshistory.blogspot.com/2015/09/the-mp40-submachine-gun.html

65.    While the United States initially entered World War II with a military variant of the
Thompson .45 caliber sub machinegun, it was heavy and expensive to manufacture because a
number of the major components were machined from solid steel. Before the end of the war, the
Thompson had been supplemented by the M3 "Greasegun" initially produced by General Motors.
The receiver was a stamped and welded sheet metal assembly with an adjustable sliding shoulder
stock. Like the MP38 / MP40, it had a separate pistol grip, a sliding / adjustable shoulder stock
and a detachable box magazine with a 30 round capacity. In a utilitarian sense it was as effective
as the Thompson and, at approximately $20, it was less than half as expensive.

66.    The United Kingdom produced over one million Sten submachine guns during
World War II. A rugged and reliable firearm made largely from welded steel stampings, it was
utility, reliability and ease of manufacture both combined and perfected. Features shared with the
M3 and MP38/MP40 included an adjustable shoulder stock, separate detachable box magazine
and, on  some variations, a barrel shroud allowing the operator to utilize the area surrounding the
barrel as an auxiliary grip point without touching a heated barrel.

67.    Prior to and during World War II, a number of other nations developed submachine
guns which followed the same design and construction philosophy. Notable examples include the
Soviet PPSH41, the Italian Beretta Model 38/42, and the Swedish Carl Gustav Model 45.

68.    Following World War II, most new submachine gun designs continued the design
philosophy which combined utility, ease of manufacture and the features of wartime firearms. In
the early 1960's, HK introduced the MP5 which became an immensely popular choice for military
and law enforcement agencies worldwide due to its inherent reliability and accuracy. It was
produced in multiple iterations to include a semi-automatic civilian version as well as a pistol
variant without a provision for a shoulder stock (HK SP89).



11

69.    Israeli Military Industries also successfully marketed their UZI sub machinegun for export in select fire, and in civilian semi-automatic variants.



Military-Today.com  12

70.    Additionally, a number of submachine gun designs proved unsuccessful in terms of military and government sales but nonetheless found a ready market when re-engineered as a

---

11 Image source: https://www.gunsinternational.com/guns-for-sale-online/pistols/9mm-pistols/excellent-condition-factory-german-hk-sp89-9mm-pistol.cfm?gun_id=101037518

12 Image source: https://www.military-today.com/firearms/uzi_pistol.htm

semiautomatic pistol. Notable examples include the Cobray MAC-10 (and successive variants)
and the Intratec TEC-9, which began life as a Swedish designed submachine gun, the
Interdynamic MP-9.



13



14

---

[13] Image source: https://www.armslist.com/posts/11522946/st-louis-missouri-handguns-for-sale--vulcan-mac-10

[14] Image source: https://www.egunner.com/intratec-tec-dc9-9mmpara,name,11952922,auction_id,auction_details

### C.  Proliferation of the AR & AK Platforms for the civilian market

71.    Since the late 1950's through the late 1960's the move towards adoption of semiautomatic and select fire rifles by military forces became a global phenomenon. Soviet Bloc nations rearmed with AK type rifles (and their variants) while NATO Nations adopted a number of designs from Colt, HK and FN, as stated previously, around a standardized caliber rifle cartridge.

72.    Several companies adapted these weapons, without changing their basic construction or design features, for civilian use. For example, in the early 1960's, Colt sought to capitalize on the military acceptance of the AR-15 /M-16 andbegan to produce rifles, incorporating the same construction techniques and configuration as the AR-15 for sale on the civilian market. The only difference between the Colt-produced military and civilian versions was removal of select fire capability and relocation of assembly/ disassembly pins in the lower receiver as stated previously.

73.    These civilian versions, including the Colt·AR-15, retained the performance capacities of the military weapons they were based on, including the effective range, muzzle velocity and semiautomatic rate of fire. In addition, the weapons retained the capability to accommodate large capacity magazines (more than ten rounds) as originally issued for military use. Again however, the basic configuration, appearance, construction and operation of the internal gas operating system (as designed) has remained unchanged since its initial design and introduction as a military weapon.

74.    The expiration of Colt's patents in the late 1970's naturally spawned competition in the marketplace. Throughout the design's lifespan many of the internal fire control components have remained unchanged and their specifications standardized industry wide. There are multiple internal parts that are completely interchangeable between military M16's manufactured in the 1960's by Colt and an AR-15 type rifle produced today by any one of hundreds of U.S.

manufacturers that produce either receivers or internal operating parts. For example, a Bolt

Carrier manufactured in 1967 by Colt will fit, and function as designed, in an AR copy

manufactured in 2023. Additionally, the overall configuration of "copycat" AR rifles remains

essentially identical to the original production design of the early 1960's. The overall design

configuration (two piece hinged receiver (shown below), shoulder stock in line with the chamber

and barrel, placement of the magazine, external switches and other features) are identical or

nearly so.

75.    While employed at the ATF NLC I was a custodian of the Laboratory's Firearms

Reference Collection. The firearms in the collection were regularly used by students in the

National Firearms Examiner Academy and often required repair. I have personally replaced

internal parts in older Colt AR type rifles and Eastern Bloc manufactured AK rifles with recently

manufactured parts from aftermarket vendors. The parts fit without issue and the firearms

functioned as designed after the repair.

76.    Due to their modular construction AR type rifles are easily constructed / configured

with parts made by other manufacturers to suit the owner's personal preference. The rifle receiver

itself is designed as a two-piece unit and the "upper receiver" and "lower receiver" can be

swapped out for other interchangeable pieces made by the same or another manufacturer with

ease. The design also facilitates replacement of internal fire control components and assemblies.

77.    Individual component pieces can be purchased allowing the individual to build a

custom AR type rifle from the "ground up" as opposed to purchasing a complete firearm due to the

standardization and interchangeability of parts and subassemblies (under Federal Law the lower

receiver of the AR platform is considered the "firearm" and requires a serial number). A good

illustration of this ease of customization, and the plethora of interchangeable parts and accessories,

is the fact that Brownell's Inc., an established gun supply retailer in Iowa, currently devotes the

first 107 pages of their "Big Book" (74th edition) catalog of parts and accessories to AR type rifles alone. [15]

78.    The same holds true for AK type rifles and, more recently, pistols available in the civilian market. Although the design (and variants) of the AK-47 are more numerous than the AR type rifle (as far as military production and use is concerned), it lags behind the AR in regard to domestic civilian popularity. Nonetheless whether the AK Type rifle is of Russian, Chinese or other former Eastern Bloc manufacture, there is a robust secondary market in the United States for accessories, parts, sub- assemblies etc. Although not as easily modified as an AR style rifle due to its less "modular" design there are customization options available including a variety of shoulder stocks, sighting and illumination, etc.

79.    Additionally, much as with AR type rifles, there are numerous vendors selling all the necessary component parts needed for an individual to build an AK style rifle from "the ground up" as opposed to purchasing a complete rifle and subsequently modifying the firearm. In actuality, the receiver of many AK rifles is simply a stamped metal "flat" which is available from numerous vendors online for as little as $14.99.



16

---

[15] Links to view the catalog are available at this website:  https://www.brownells.com/order-a-catalog/

[16] Image source: https://www.buymilsurp.com/ak-receiver-flat-and-rails-p-3028.html

25
**JA1841**

80.    The AK 'flat' is bent into the correct configuration using a jig which can also be found from numerous vendors.



17

81.    As with the AR, the general configuration and specifications of internal AK operating parts and assemblies have remained consistent. Regardless of the place of manufacture there are numerous internal fire control, feeding and gas operating system components that are interchangeable between AK rifles produced by manufacturers over the past 40-plus years. Again, as with AR type rifles, the overall configuration of the AK rifle receiver, internal operating systems and their parts, and performance (in terms of semiautomatic rate of fire, muzzle velocity, range etc.) are comparable to the military versions from which they evolved.

82.    As stated previously, the expiration of Colt's AR patent in the late 1970's spawned numerous "copycat" rifles from other vendors. A similar situation occurred with respect to AK type rifles on an international scale. These foreign manufacturers, Norinco (China), Romarm (Romania) and Valmet (Finland), were or still are state owned enterprises and tens of thousands of complete AK copies were imported into the U.S. by a number of foreign manufacturers before

---

[17] Image source: https://ak-builder.com/images/detailed/1/ak_builder_flat_bending_die_set.jpg

additional Federal regulation, Title 18, Section 922(r), required that a certain percentage of the rifle's parts be manufactured domestically.

83. Regulation of imports however has not slowed the demand for AK "copycat rifles" and numerous domestic manufacturers are producing rifles in the U.S. based on the original design and operating system.

84. In my opinion, the performance characteristics of Assault Firearms in regard to semi automatic rate of fire, muzzle velocity, effective range have not changed since their initial incarnation as military weapons.

### D. Marketing of Assault Weapons

85. Contrary to claims of political contrivance, the term "assault weapon" had already entered common use in the firearms community as early as 1986 when the "Gun Digest Book of Assault Weapons" was first published. Edited by Jack Lewis the front cover states that it contains: "A detailed analysis of Assault Type Weapons: Test Reports – Firing the latest in full and Semi Autos, centerfires, rimfires and shotguns."



86. On Pages 88-93 Lewis reviews and test fires the Springfield SAR-48 which is a reproduction of the Fabrique Nationale (FN) FAL Rifle mentioned above. In the article on page 89 he refers to it as "a weapon of war."

87.    On Page103, Lewis states:  "Whatever a shooter's reasons may be for wanting one, he'll be able to find one of these civilian-legal semi-auto assault weapons on dealer's shelves. A number of them are detailed on the following pages."

88.    The firearms industry has also promoted the similarities between semi automatic versions of their full / select fire battle rifles for marketing purposes.



---

18 Image source: https://gearsofguns.com/old-ar-15-ads/



*117. From the first Colt AR-15 brochure, produced in a desperate attemp[t] to interest somebody - anybody - in the merits of the AR-15's "unmatche[d] superiority".*

19

[19] Image source: "The Black Rifle," P.98.

89.    Essentially Assault Weapons can be simply defined (under numerous State and local statutes) as semi automatic copies of fully automatic (or select fire) firearms designed and intended for use by the military. They retain features and performance characteristics (in terms of muzzle velocity, range etc.) originally designed and intended for use on the battlefield.

90.    Following the passage of the Federal and numerous State and local Assault Weapon Bans in the 1990's, the firearm industry via the National Shooting Sports Foundation (NSSF, a firearm industry trade and lobbying organization) reversed course and coined the moniker "Modern Sporting Rifle" to describe semi automatic variants of the fully automatic / select fire M-16.

### E.  Military origins of Large Capacity Magazines

91.    Large capacity magazines were not initially designed or intended for the civilian marketplace. The lineage and refinement of large capacity detachable magazines and belt feeding mechanisms can be traced directly to a military heritage. Various belt & clip fed medium machine gun designs by Hiram Maxim (1885) and John Browning (1890) debuted before the end of the 19th Century;[20] however, it wasn't until the advent of WWI that development and refinement of large capacity feeding devices for machineguns gained increased importance.

92.    In regard to standard issue rifles, the U.S. and other combatant nations entered, deployed, and exited WWI with bolt action rifles as standard issue to the individual soldier.

93.    By contrast, magazine fed semi-automatic pistols first appeared in the early 1890s. Numerous models designed and manufactured by Salvator Dormus, Hugo Borchardt and Paul Mauser featured both internal fixed and detachable box magazines of varying capacities although only Mauser's C96 (1896) design proved commercially viable and was manufactured until the late

---

[20] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 83-99

1930's. Initially designed with a 10 round internal fixed magazine later variants included the ability to accept detachable magazines.[21]

94.    In addition to use of the Mauser C98 in WWI, Germany also issued the P08 (1908) "Luger" pistol with an 8 round detachable magazine. Similarly U.S. Forces fielded the Colt Model 1911 with a 7 round detachable magazine. One exception to the "under 10" magazine capacity was the introduction of the Belgian FN "Hi-Power" (1935) 9mm pistol which featured a detachable magazine holding 13 rounds.[22]

95.    In the interwar years, a number of advancements in arms technology & design facilitated practical semi-automatic rifles for standard issue. Accordingly, the U.S. Forces in WWII were issued the Springfield Armory M-1 "Garand' rifle with an 8 round internal magazine. The U.S. also deployed the M-1 carbine in .30 caliber which featured a 15 round detachable box magazine; however, this was intended for issue to support personnel behind the front lines. It was not until the M-14 was adopted in the late 1950s that a rifle with a detachable magazine was adopted for standard issue to front line troops. The M-14 was issued with a 20 round magazine.[23]

96.    When the AR-15 (later designated M-16) was first purchased and issued to U.S. Forces in the early 1960s it was intended to be utilized, and was issued, with 20 round detachable magazines.[24]

97.    However, when the first semi-automatic variants of the M-16, the Colt AR-15 SP1 Sporter, became available for sale to the public in 1964 it came supplied with two five round magazines, not the military issue 20 round magazines.

[21] Zhuk, A.B., The Illustrated Encyclopedia of Handguns, (Greenhill Books, 1995), PP. 207-211

[22] Hogg, Ian V., The Story of the Gun, (St. Martin's Press, 1996), PP. 115-122

[23] Hogg, Ian V. & Weeks, John S., Military Small Arms of the 20th Century, 7th Ed., (Krause Publications, 2000), P. 291

[24] Stevens, R. Blake & Ezell, Edward C., The Black Rifle (Collector Grade Publications, 2004), P. 108



25

98.   As stated by Christopher R. Bartocci in his book The Black Rifle II:

Initially, Colt simply added a five round limitation spacer to the 20-round
magazine which could be installed or removed at will by simply removing
the floor plate of the magazine. This was primarily intended for hunters, in
compliance with the laws in most states which limit magazines in the field
to a five-round capacity for hunting. With the introduction of the Colt
Sporter series, the configuration of this magazine was altered by the
addition of a permanent rivet in the floorplate to prevent the removal of
the spacer, thus making this a magazine of dedicated five-round capacity
for hunting applications. [26]

---

[25] Source: https://thecoltar15resource.com/1964-catalog/

[26] Bartocci, Christopher R., The Black Rifle II (Collector Grade Publications, 2004), P. 263



| MODEL NO. | MODEL | CALIBER | BBL LENGTH (inches) | FINISH | APPROX. WEIGHT (lbs.) | O/A LENGTH (inches) | SIGHT RADIUS (inches) | ROUNDS MAG. |
|---|---|---|---|---|---|---|---|---|
| R6600DH | AR-15A2 DELTA H-BAR w/scope and acces. | 223 Rem (5.56mm) | 20 | M | 10 | 39 | 19.75 | 5 |
| R6600 | AR-15A2 H-BAR | 223 Rem (5.56mm) | 20 | M | 8.0 | 39 | 19.75 | 5 |
| R6500 | AR-15A2 SPORTER II | 223 Rem (5.56mm) | 20 | M | 7.5 | 39 | 19.75 | 5 |
| R6420 | AR-15A2 CARBINE | 223 Rem (5.56mm) | 16 | M | 5.8 | 35 extended 32 closed | 14.5 | 5 |

Rifles

© 1986 Colt Industries Inc
Printed in U.S.A.

15

99.  As shown in the image above, Colt continued to provide five round magazines with their AR-15 rifles as late as 1987.[27]

100.  Postwar development of semi-automatic pistols continued after WWII; however, magazine capacities generally remained under 10 rounds. Notable examples include the Beretta Model 1951 (8 rounds), Sig Sauer P220 (1975, 7-10 rounds depending on caliber), Heckler Koch P7 (1978, 8 rounds).

101.  It was not until the early 1980s the U.S. Military sought to replace the Colt 1911, a .45 ACP caliber pistol with a seven round magazine, and standardize the sidearms (handguns) issued to U.S. Forces in a caliber common to all NATO member nations. The resultant winner of numerous competitions was the Beretta Model 92SB, a 9mm caliber pistol with a 15 round magazine. Following a few minor functional changes, the Beretta was accepted and designated the M-9.[28]

102.  During the latter half of the 1980s, numerous manufacturers, both domestic and foreign, began developing and offering numerous semi-automatic models with magazine capacities equaling, or exceeding, that of the Beretta M-9.

---

[27] Colt Firearms 1987 Catalog, (Colt Industries Inc., 1986), P.15

[28] Wilson, R.L., The World of Beretta, An International Legend, (Random House, 2000), PP. 227-253

103.  In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act, (which included provisions also known as the Federal Assault Weapons Ban or "AWB"), which limited the maximum capacity of a detachable magazine to ten rounds.[29] As a result, numerous firearm manufacturers, as well as aftermarket magazine manufacturers, initiated production of what were colloquially termed "post ban" magazines to conform to the new legislation. Magazines with a capacity of over ten rounds were termed "Large Capacity Magazines."[30] The post ban magazines were modified, or retooled, versions of existing large capacity magazines in order to keep their dimensions identical and ensure that the 10-round magazines functioned identically to existing magazines of 11 rounds or more in their firearms. For example, pictured below is a 'pre ban' 10-round magazine for a Browning 9mm caliber "Hi Power" semi-automatic pistol:



[31]

---

[29] https://www.congress.gov/bill/103rd-congress/house-bill/3355/text

[30] The definition of "Large Capacity Magazine" under the Federal AWB included any magazine with a capacity of over 10 rounds where under Colorado Law it defines a magazine with a capacity of over 15 rounds.

[31] Image source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-high-capacity

104.  And shown below is a 'post ban' magazine for the same pistol. You will note the 10-round magazine differs as a portion of the metal magazine body is replaced with a molded polymer plug. This modification effectively limits the interior volume and capacity of the magazine to 10 rounds. Manufacturers have also utilized various other methods to restrict magazine capacity, including dimpling the lower quadrant of the magazine body inwards, placing rivets in the magazine body, or thickening the walls of polymer bodied magazines to reduce capacity.



32

105.  Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation, which also contained magazine capacity limitations. As a result, many manufacturers of popular semi-automatic handguns and rifles during the Federal

---

32 Image Source: https://www.brownells.com/magazines/handgun-magazines/magazines/magazine-10-round-browning-high-power

Assault Weapons Ban continued to offer "state compliant" versions to customers in states so affected. Manufacturers such as Glock, Sig Sauer (SIG), FN USA, Beretta, and Smith & Wesson, among numerous others, offer handguns and rifles compliant with individual state regulations. Most major firearm manufacturers offer models that come "standard" with 10-round magazines.

106.  Shown here is a page from the online catalog of FN USA (the U.S. based subsidiary of Belgian arms manufacturer Fabrique Nationale) showing the "California Compliant" version of their "Five-seveN" pistol.



107.  This is a page from Smith & Wesson's online catalog showing their AR-15 type rifle which is marketed as a "compliant" model and is sold with a 10-round capacity magazine:

---

[33] Image Source: https://fnamerica.com/catalog-and-wallpapers/



34

108.  And a "California Compliant" Glock Model 19 9mm pistol available from

Sportsman's Warehouse:



35

---

34 Image Source: https://www.smith-wesson.com/product/m-p-15-sport-ii-compliant

35 Image Source: https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/glock-19-9mm-luger-402in-black-nitrite-pistol-101-rounds-california-compliant/p/1155366

109. Additionally, there are numerous well respected aftermarket manufacturers who offer 10-round magazines specifically for use in handguns that come with LCMs. Mec-Gar and ProMag are two of many:

36

37

[36] Image Source: https://mec-gar.com/shop/magazines/sig-sauer/sig-sauer-p229-1-9mm-10-round/

[37] Image Source: https://promagindustries.com/fits-the-glock-model-17-19-26-9mm-10-rd-black-polymer/

110.  In my opinion, the ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat or the military would not have incorporated this feature. Less time required to reload can equate to more time spent acquiring targets or shooting. As stated previously form follows function in regard to equipment designed and intended for military use.

### III.    Features of Assault Rifles/Assault Weapons Under the Statute.

111.  Based on my experience and my training and research regarding the conception, design, history, and purpose of assault weapons, the assault weapons as described in the Statute are ill-suited for civilian self-defense.

112.  Many of the assault weapons available for purchase by the public and prohibited by the Statute, are near identical copies of military firearms, save for the lack of select fire capability. As such, they retain a number of features originally designed to maximize their effectiveness in battle. Other firearms available to the public and prohibited by the Statute, which were not initially intended for sale to government or military customers, incorporate features which mimic those found on military firearms. Moreover, there are countless accessories available to add to firearms traditionally considered "sporting firearms" (i.e. those initially designed and manufactured for target shooting or hunting), which brings their functionality more towards the military side of the spectrum and away from the sporting side.

### A.  Prohibited Firearms And Features Under the Statute.

#### i.  Prohibited Firearms

113.  The Statute, enumerates 36 specific types of weapons that are considered "assault firearms," including AR-15 style and AK type rifles. N.J. Stat. Ann. § 2C:39-1(w)(1).

114.  The types of firearms classified as assault firearms under the Statute, including AR and AK type rifles, are direct developmental descendants of Military weapons designed for use in

combat. The 'civilian' AR-15 type rifles in .223 / 5.56mm retain the same performance

characteristics (in terms of muzzle velocity, range, etc.) as does the military M-16 and its variants

(M-16A2, M-4 etc.). For example, according to the US Army Manual 3-22.9 "Rifle

Marksmanship M-16A1, M-16A2/3, M-16A4, and M4 Carbine, April 2003," the maximum range

of these rifles is 2650-3000 meters. They were not designed, nor are they suitable, for home

defense in short range close quarter situations.



FM 3-22.9(FM 23-9)

**CHAPTER 2**
**CHARACTERISTICS, AMMUNITION, AND ACCESSORIES**

*This chapter describes the general components, characteristics, ammunition, and accessories for the M16 and M4-series weapons to include a brief explanation of how to mount the various accessories.*

**2-1.  CHARACTERISTICS**
The M16-/M4-series weapons are 5.56-mm, magazine-fed, gas-operated, air-cooled, shoulder-fired weapons. This section describes the general characteristics (Table 2-1) and the components of the M16-/M4-series weapons. Table 2-2 (page 2-2) shows the characteristics of various accessories.

| CHARACTERISTIC | M16A1 | M16A2/A3 | M16A4 | M4 |
|---|---|---|---|---|
| **WEIGHT (pounds):** | | | | |
| Without magazine and sling | 6.35 | 7.78 | 9.08 | 6.49 |
| With sling and loaded: | | | | |
| 20-round magazine | 6.75 | 8.48 | 9.78 | 7.19 |
| 30-round magazine | 7.06 | 8.79 | 10.09 | 7.50 |
| Bayonet knife, M9 | 1.50 | 1.50 | 1.50 | 1.50 |
| Scabbard | 0.30 | 0.30 | 0.30 | 0.30 |
| Sling, M1 | 0.40 | 0.40 | 0.40 | 0.40 |
| **LENGTH (inches):** | | | | |
| Rifle w/bayonet knife | 44.25 | 44.88 | 44.88 | N/A |
| Overall rifle length | 30.00 | 39.63 | 39.63 | N/A |
| Buttstock closed | N/A | N/A | N/A | 29.75 |
| Buttstock open | N/A | N/A | N/A | 33.0 |
| **OPERATIONAL CHARACTERISTICS:** | | | | |
| Barrel rifling-right hand 1 twist (inches) | 12 | 7 | 7 | 7 |
| Muzzle velocity (feet per second) | 3,250 | 3,100 | 3,100 | 2,970 |
| Cyclic rate of fire (rounds per minute) | 700-800 | 700-900 | 800 | 700-900 |
| **MAXIMUM EFFECTIVE RATE OF FIRE:** | | | | |
| Semiautomatic (rounds per minute) | 45-65 | 45 | 45 | 45 |
| Burst (3-round bursts) (rounds per minute) | N/A | 90 | 90 | 90 |
| Automatic (rounds per minute) | 150-200 | 150-200 A3 | N/A | N/A |
| Sustained (rounds per minute) | 12-15 | 12-15 | 12-15 | 12-15 |
| **RANGE (meters):** | | | | |
| Maximum range | 2,653 | 3,600 | 3,600 | 3,600 |
| Maximum effective range | | | | |
| Point target | 460 | 550 | 550 | 500 |
| Area target | N/A | 800 | 600 | 600 |

**Table 2-1. Characteristics of the M16-/M4-series weapons.**

**NOTE:**  For further technical information, refer to TM 9-1005-319-10 and TM 9-1005-249-10.

2-1

115.  The Statute also bans certain weapons based on magazine capacity. I discuss

magazine capacity below.

116.  Finally, the Statute restricts shotguns with revolving cylinders. Such shotguns are

known as "street sweeper" shotguns, and are of a design that has not been accepted or adopted for

military or law enforcement use by any nation or agency that I am aware of.  In terms of legitimate

sporting use for either hunting or target shooting or self-defense, I cannot conceive of it having

any utility. Shotguns of this type have been classified as a "Destructive Device" by ATF and are subject to additional restrictions under the National Firearms Act of 1935.

### ii. Prohibited Features

117.  Included in the Statute's definition of "Assault firearm," at N.J.S.A. 2C:39-1(w)(2) to (5), are a number of features which, when added to certain firearms, bring those firearms under the statutory definition of Assault weapons. The Statute, at under N.J.S.A. 2C:39-1(w)(2) states that a weapon is an assault firearm if it is "substantially identical" to any of the 36 types of weapons listed in N.J. Stat. Ann. § 2C:39-1(w)(1).

118.  In 1996, the New Jersey Attorney General issued Guidelines "to provide guidance to the prosecutors" about when a semi-automatic firearm should be considered to be "substantially identical" to a named assault weapon in N.J.S.A. 2C:39-1(w)(1).

https://www.state.nj.us/lps/dcj/agguide/assltf.htm

119.  The Guidelines mirror the definition of "semiautomatic assault weapons" in the 1994 federal "Public Safety and Recreational Firearms Act" which was part of a larger omnibus crime reduction act. Commonly known as the Federal "Assault Weapons Ban" (AWB) the act banned the possession, transfer or importation of "semiautomatic assault weapons."

120.  Specifically, the Guidelines state that when two or more of certain listed features are present in a weapon, it should be considered "substantially identical" to an assault firearm under N.J.S.A. 2C:39-1(w)(1) and (2).

121.  As I explain below, each of the features listed in the Statute and Guidelines, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a combat scenario.

122.  **A pistol grip or thumbhole stock** (for rifles and shotguns).  A semiautomatic rifle or shotgun that includes a pistol grip (or does not include a shoulder stock) somewhat increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator).

123.  **Forward handgrip** (rifles, shotguns, pistols). Forward handgrips allow increased stability of the firearm by the operator. This allows the operator to better control recoil and muzzle climb thus increasing the hit probability of successive shots. A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK based rifles; however, it was not until the advent of the Rail Attachment Systems (RAS) and acceptance by the US Military of  same that foregrips for semi-automatic rifles became more widespread. A foregrip on a pistol is considered "any other weapon" under the National Firearms Act and subject to more restrictive controls to include registration in a national database.

124.  **Folding/telescoping stocks** (rifles and shotguns). Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder.  U.S. Military origins for this type of stock can be found on the M1 carbine in World War II when modified for paratrooper use.

125.  **Flash suppressors**. A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low light conditions and also helps to conceal the flash from view.  This allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position.

126. **Grenade launchers**. Without question a grenade launcher has neither a sporting

lineage nor a practical application on a civilian firearm. Obviously a grenade is an offensive

military weapon which could result in mass casualties if deployed during a civilian event or public

space.

127. **Barrel shroud**. Military semi-automatic and select fire rifles have featured a shroud

or hand guard that encircles the barrel since before the onset of World War II. The M1 "Garand"

Rifle utilized by the US Military during that conflict incorporated a traditional wooden stock

similar to most hunting and sporting rifles of the period. However, it also featured a wooden

handguard which covered the top 2/3rds of the barrel. Therefore this design feature is not a recent

development. Enclosing the barrel in a shroud serves multiple purposes. In a modern gas operated

semi-automatic military rifle, it serves to protect the gas tube / piston mechanism from inadvertent

damage.  It also provides additional grip space for the operator to steady and control the rifle

during rapid, repeat firing without getting burned by the hot barrel.

128. **Threaded barrel**. A threaded barrel allows for attachment of a suppressor

(commonly referred to as a silencer) which allows the operator to better conceal themselves from

their target by reducing the report of their firearm. It also allows the attachment of some flash

suppressors with the resultant effect mentioned previously.

129. **Buffer tube, arm brace, or the like**. Attachment of a brace, when affixed to a rifle

caliber pistol effectively mimics the characteristics of a short-barreled rifle (a type of weapon

restricted under the National Firearms Act) as it can allow the operator to fire it from the shoulder

increasing stability while maintaining concealability.

130. "**Bump stocks**." A bump stock is a device which replaces the shoulder stock on a

firearm and utilizes the recoil generated by firing to rapidly 'bump' the trigger against the

operators finger. The resultant effect is a dramatic increase in the cyclic rate (number of rounds

fired per minute) above that which would be normally be achieved by the unmodified firearm. For example, a semi-automatic AR type rifle equipped with a bump stock can fire between 600-700 rounds per minute, a cyclic rate which is roughly equivalent to that of a full-automatic M-16.

### B.  Prohibited "Large Capacity Magazines" Under The Statute.

131.  The Statute further defines an "assault firearm" as "[a] semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds." N.J. Stat. Ann. § 2C:39-1(w)(4). And the Statute separately prohibits possession of large-capacity magazines, which are ammunition magazines capable of holding more than 10 rounds of ammunition. *Id*. § 2C: 39-1(y).

132.  Generally speaking, modern semi-automatic rifles that are designed, manufactured and marketed as "hunting rifles" traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example, the Browning BAR in .30-06 caliber as currently manufactured has an internal magazine capacity of four (4) rounds. The Remington Model 1100, a semi-automatic shotgun, has an internal magazine capacity of 5 rounds.

133.  Semi-automatic pistols from numerous manufacturers are sold with magazines that would be permitted under the Statute.  For example, 9mm caliber pistols are available with standard magazines with a capacity of 15, 10, or as few as 7 rounds. https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/handguns/c/cat-9mm-luger-pistols

134.  Detachable magazines are available with varying capacities from 5-100 rounds. Generally speaking any firearm designed for a detachable magazine with a capacity exceeding 10 rounds will function as designed with a magazine with a smaller maximum capacity.

IV.    **Rifle Caliber Assault Firearms and Self / Home Defense.**

135.  At numerous points throughout their complaint the Plaintiffs allege that self-defense is one of the primary reasons for the purchase of a firearm regulated by the Statute. It is my opinion that an AR, AK, or other banned assault weapon is a poor choice for this task.

136.  I have been asked on numerous occasions over the past 35 years what firearm I would recommend for home or self-defense. My recommendation is based upon my inquiry in return regarding the individual's (and their family members') personal experience and comfort level with firearms. In over 25-plus years, I have never recommended an AR, AK or other rifle as a home defense weapon.

137.  Home defense and / or self-defense situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Assault firearms banned under the Statute were designed to be effective at battlefield ranges of up to 500 yards. The typical muzzle velocity of a .223 caliber bullet is 3,200 feet per second (+ or -). Projectiles travelling at velocities found in banned weapons pose a serious risk of over-penetration in most home construction materials such as gypsum board / sheet rock, and typical 2x4 lumber. When this cartridge was designed for the AR-16 / M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards not dozens of feet.

138.  In August 2014 the National Rifle Association's "American Rifleman" published an article by Stanton Wormley: "The AR-15 for Home Defense: Penetration Tests."[38] Wormley conducted penetration tests on nine different types of .223 / 5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board / sheet rock and wooden 2x4 studs. When fired at a 90-degree angle to the walls all nine (including "frangible" rounds designed to

---

[38] https://www.americanrifleman.org/content/the-ar-15-for-home-defense-penetration-tests/

disintegrate when hitting a hard surface) easily penetrated the wall section as well as water jugs

placed three feet behind:

> But just how much energy did the penetrating projectiles carry? All
> the loads, including the Glaser, exploded one-gallon water jugs
> placed 3 feet behind the wall sections.[39]

139.  The tests conducted by Wormley also included firing longitudinally through the wall

sections resulting in the penetration of three successive 2" thick 2x4 studs by a number of the

projectiles. These tests vividly highlight the inherent dangers of utilizing assault weapons with

high velocity ammunition in a home defense scenario.

140.  In reference to the NRA American Rifleman article mentioned earlier in this report,

current U.S. Army issue .223 caliber ammunition is capable of penetrating 3/8" hardened steel at

350 yards. Potential over-penetration in a confined environment is problematic in terms of risk to

bystanders or family members outside the target location. Most jacketed commercially available

.223 / 5.56mm ammunition has impressive penetration capabilities in this regard. Additionally,

the (former) NATO issue M855 SS109 5.56mm is readily available for purchase by civilians. This

ammunition was designed to penetrate up to 3mm of "soft," (non-hardened) steel. This capability

is certainly unnecessary and poses substantial risks to individuals in adjoining rooms, neighboring

apartments or other attached dwelling units.

141.  In my opinion, assault firearms, as defined under the Statute, are a poor choice for

home defense or personal protection. Many enumerated in the Statute require two hands to

effectively aim and shoot. In a home defense situation, an individual may be required to use one

hand to call 911 while attempting to operate a "two handed" firearm with one hand. Such a

situation would also preclude the homeowner from utilizing their "non-gun hand" to pick up or

guide a small child, elderly, or vulnerable adult during such an event. During a stressful situation

---

[39] *Id.*

such as a home invasion or break-in, there may be multiple steps required by the operator to bring

the weapon from a "safe" condition to a firing condition. Manipulation of a charging handle,

safety switch, or inserting a magazine may be difficult to accomplish under stress, particularly if

the operator has not adequately trained or practiced with their firearm. Other family members may

not be familiar with bringing the weapon to a firing condition or fail to complete adequate steps to

do so under duress.

142.  Unloaded, an AR-platform rifle weighs approximately 6.5 to 7 pounds. It also

requires two hands to aim and fire. In a home-defense scenario, a homeowner would likely be

attempting to call 911 while addressing the intruder, which is difficult if not impossible while

wielding their AR-15 effectively and safely. Additionally, it would hamper, if not prevent, leading

a vulnerable adult away from danger or guiding/carrying a small child. By comparison, common

handgun weights are between 2 and 3 pounds and require only one hand to operate.

143.  While employed as a Special Agent with ATF, the agency transitioned to an AR type

rifle in the early 2000's. Each Agent was required to attend, and successfully complete, a one

week / 40 plus hour transition training class in order to familiarize themselves, and qualify, with

the firearm. The training included repetitive live fire drills under stressful conditions.

Additionally, we were required to requalify with these firearms quarterly and repeat the same

drills as during the initial transition training. Nonetheless, I witnessed Agents make errors that

resulted in a failure of the weapon to fire during those drills, even though those Agents had

performed the drills repeatedly under stress. It is worth noting here that the M4 carbines issued to

ATF Field Offices were select fire rifles (i.e. machineguns capable of full automatic fire) that

were converted to semi-automatic fire only.

144.  Additionally, I am not of the opinion that an abundance of ammunition is a substitute

for weapons familiarization and shot placement. Repeated practice and shooting with your chosen

firearm will make you a more effective deterrent than the capability to fire more rounds, should deadly force be required. The operation (or cycle of fire) of any firearm designed and manufactured to accept a detachable magazine will function regardless of the maximum capacity of the magazine itself.

145.  For example, firearms such as the Glock Model 17 semi-automatic pistol and AR-15 type semi-automatic rifle will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity. Generally speaking, any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity legal under the statute. This includes the vast majority of handguns and shoulder-fired firearms designed and manufactured to utilize detachable magazines. Magazine capacity is not a determinant of firearm operability.

146.  Home defense and / or street / commercial robbery situations between citizens and criminals are rarely lengthy protracted shootouts with extensive exchanges of gunfire. The National Rifle Association Institute for Legislative Action (NRA ILA) regularly publishes newsclips on their "Armed Citizen" webpage highlighting examples of defensive use of firearms by citizens.[40]

147.  Claude Werner, a firearm instructor and writer, conducted a detailed statistical analysis of 482 incidents provided by the NRA ILA on their website from 1997 to 2001. He determined, from the information provided, that the average number of shots fired by an armed citizen in a defensive scenario was 2.2.[41]

---

[40]  https://www.nraila.org/gun-laws/armed-citizen/

[41]  https://www.defensivecarry.com/attachments/tac-5-year-w-tables-pdf.107045

148.  Lucy Allen conducted a similar statistical analysis of the "Armed Citizen" newsclips for the period January 2011 – May 2017. Her analysis revealed that the average number of shots fired in a self-defense scenario was identical to that determined by Werner: 2.2 shots.

149.  I am of the opinion that an overabundance of ammunition and a "spray and pray" mentality is a poor substitute for training and competent marksmanship with your chosen self-defense firearm. In fact accurate shot placement will prove a more effective deterrent than the number of rounds in your magazine should deadly force be required.

150.  If the individual preferred shoulder weapons, I have recommended, depending on what is legal in the appropriate jurisdiction, a pump action 12 or 20-gauge shotgun (Remington 870, Mossberg 500 etc.) loaded with 00 Buckshot and stored with the "hammer dropped" on an empty chamber, safety off. The only action required to bring the shotgun from a safe unloaded condition to a firing condition is to work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power, low probability of over penetration (as compared to rifle caliber and velocity projectiles) and zero manipulation of safety mechanisms required in high stress situations. The loading / chambering process itself is an audible deterrent. Training and familiarization with this type of a firearm is simple and straightforward.

151.  For a handgun, my first inclination is to recommend an eight shot revolver in .38 +P caliber / .357 Magnum (Similar to S&W Model 627, Taurus Model 608, etc.) loaded with hollow point bullets, depending on what is legal in each jurisdiction. As with my rationale for recommending a pump action shotgun there are no complicated safety mechanisms to manipulate in a high stress situation, low probability of over penetration and ease of reloading with a speed loader should more than eight shots be required. Revolvers are also easier and less complicated for other family members to learn to operate especially if they have less familiarity with firearms.

152.  In terms of a carry handgun, I value concealability over ammunition capacity. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario, I believe the best course of action is to quickly extricate yourself from the "kill zone" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF, we were issued a Sig Sauer P229 in .40 S&W caliber as a primary duty weapon. We were also given the choice of a Sig Sauer P239 in .40 S&W or a five shot Smith and Wesson Model 640 in .357 Magnum as a backup firearm. When off duty, I carried the S&W 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that ten (10) rounds was an adequate amount of ammunition to enable me, or myself and my wife, or child, to extricate myself from a street or retail location robbery should I encounter one. Consequently, I have most often recommended either a lightweight small revolver (S&W Bodyguard, Ruger LCR, Smith and Wesson Model 36, 640 or variant) carried with a speed loader or a low profile small semiautomatic pistol (Sig Sauer P236, Ruger LCP, Colt Pocketlite etc.) with a spare magazine.

153.  In my opinion, based upon my training, knowledge, experience and research, assault firearms were not designed for traditional hunting purposes. Pistol caliber firearms (.380, 9mm, .45) are not a popular hunting caliber. Neither was the .223/ 5.56 caliber cartridge developed for civilian hunting applications. Due to .223 caliber / 5.56 mm bullets proven record of causing considerable tissue damage (when fired from an AR type rifle or pistol) it is a counterintuitive choice.

## V.    Assault Weapons As A General Threat To Public Safety

154.  As mentioned previously in this report, many of the firearms prohibited by statute directly trace their origins to those developed for use in combat. As such they were never initially intended for general distribution / sale to the public.

155.  As tragically demonstrated by recent mass shootings such as the Pulse Nightclub in

Orlando Florida in 2016 (49 fatalities, 50+ wounded), the 2017 Las Vegas shooting (60 fatalities,

400+ wounded), the 2022 Uvalde Texas School shooting (21 fatalities + 17 wounded) and the

July 4th 2022 shooting in Highland Park (7 fatalities + 48 wounded), the assault weapons (in

conjunction with high capacity magazines) as defined under the Statute are capable of inflicting

significant carnage upon civilians in a short period of time.

156.  Rifle caliber Assault Firearms as regulated under the Statute pose a significant risk to

Law Enforcement Officers. It has been my experience that soft body armor issued to most

Uniformed Officers has a "Level II" or "Level IIIA" National Institute of Justice (NIJ) protection

rating. These two ratings are suitable for protection against most handgun bullets as those

projectiles range up to a 1200FPS (+ or -) velocity. Rifle caliber Assault Weapons (AR & AK

type) can, as stated previously in this report, achieve muzzle velocities of 3200FPS (+ or -) which

can readily penetrate Level II & IIIA Body Armor (as well as some Level III hard body armor

which is not universal standard issue amongst Law Enforcement Agencies nationwide). Not only

do the firearms subject to the Statute pose a threat to overall public safety they increase the

likelihood that first responders charged with stopping such a threat, or attending to wounded

citizens, may be injured or killed in the performance of their duty.

157.  This online video illustrates the capability of commonly available .223 / 5.56mm

caliber ammunition to penetrate Level III body armor. The author / narrator states that this test

was performed at a distance of "about seven yards."

https://www.youtube.com/watch?v=oMYkEMhPsO8

158.  The argument that commercially available AR type rifles are somehow less

dangerous or lethal simply because they fire only in semi-automatic mode is misleading. They

retain the identical performance capabilities and characteristics (save full-automatic capability) as

initially intended for use in combat. With even minimal training an operator can fire 40-50 shots per minute in semi-automatic mode. According to the US Army Manual referenced earlier in this report the most effective use of the M-16 at ranges beyond 25 yards is rapid semi-automatic fire. Not full- automatic fire.

**7-8.    RAPID SEMIAUTOMATIC FIRE**

The most important firing technique during modern, fast moving combat is rapid semiautomatic fire. Rapid-fire techniques are the key to hitting the short exposure, multiple, or moving targets described previously. If properly applied, rapid semiautomatic fire delivers a large volume of effective fire into a target area. The soldier intentionally fires a quick series of shots into the target area to assure a high probability of a hit. (Figure 7-10, page 7-8 shows the current training program for rapid semiautomatic fire.)

**Figure 7-10. Rapid semiautomatic fire training program.**

a.    **Effectiveness of Rapid Fire.** When a soldier uses rapid semiautomatic fire properly, he sacrifices some accuracy to deliver a greater volume of effective fire to hit more targets. It is surprising how devastatingly accurate rapid fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures (shots per target, trigger pulls per hit, and even time to hit). The decrease in accuracy when firing faster is reduced with proper training and repeated practice.

159.  In my opinion, such capability combined with the performance characteristics of .223 / 5.56 ammunition originally intended for combat can, and have, resulted in catastrophic civilian mass casualty events.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _June 15, 2023_ at Manchester, Maryland.

_James E. Yurgealitis_

James E. Yurgealitis

Exhibit A

# James E. Yurgealitis

5004 Roller Rd., Manchester, Maryland 21102
24 Hour Mobile: (443) 452-7248
Email: jyurgealitis@gmail.com

_____

SUMMARY:

Self employed as a Legal and Public Policy Consultant providing Technical Firearms and Forensic Consulting, Testing and Policy Research / Training Services to Corporations, Legal Counsel and the Public Sector

EDUCATION:

B.A., Political Science and Psychology, St. John Fisher University, Rochester, New York – May 1985

PROFESSIONAL EXPERIENCE:

December 2012 to Present: Independent Legal and Policy Consultant / Subject Matter Expert

Currently provide independent consulting services to Corporations, Legal Counsel and Governmental entities in regard to Public Policy and Technical matters relating to Firearms, Firearms Policy, Forensics and Law Enforcement. Current and former clients include the Office of the District Attorney for Cook County Illinois, The City of Sunnyvale, California, The City of Highland Park, Illinois, The Office of the Attorney General for the Commonwealth of Massachusetts and the Center for American Progress, Washington D.C. I have provided sound policy and technical assistance for my clients to include expert testimony which successfully endured the opposition's legal appeals to the U.S. Circuit Court of Appeals and the U.S. Supreme Court.

December 2003 to December 2012: Senior Special Agent / Program Manager for Forensic Services ATF National Laboratory Center (NLC), Beltsville, Maryland. U. S Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)

Directed the administration and management of ATF's Forensic Training Programs to include the National Firearms Examiner Academy (NFEA) a 12-month training program for State and Local Forensic Firearm Examiner Trainees. Also managed two additional forensic training programs. Administered a $1M + budget in accordance with strict ATF and National Institute of Justice (NIJ) guidelines and reporting requirements. Responsible for oversight of all Forensic Firearms related research at the NLC. Supervised a full and part time cadre of fifty-two (52) instructors and administrative personnel. Maintained liaison with commercial firearms and ammunition manufacturers and subject matter experts and ensure that lesson plans and curriculum reflected the latest technical developments in firearms manufacture, forensics and their application to federal and state law. Applied for, received and managed in excess of $2M in external grants to facilitate uninterrupted delivery of training during internal budget shortfalls. Detailed to the Department of Homeland Security Command Center in 2005 with overall responsibility to coordinate and direct Federal, State and Local Law Enforcement assets during and following Hurricanes "Irene" and "Katrina" and again in 2010 for "Andrew" and "Danielle".

June 1997 - December 2003:  Special Agent / Violent Crime Coordinator, ATF Baltimore Field Division, Baltimore, Maryland

-1-

Responsible for management of ATF's "Project Disarm", a joint law enforcement initiative between ATF, The United States Attorney's office for the District of Maryland (USAO), the Baltimore City Police Department, the Baltimore City States Attorney's Office and the Maryland State Police. Duties included reviewing over 400 state and local firearms related arrests annually for subsequent referral to the USAO and Federal Prosecution. Managed a caseload of 75 – 100 criminal cases annually. Responsible for selection, referral, follow - up investigation and subsequent indictment and prosecution of armed career criminals. Testified in front of Federal Grand Juries in excess of 75 times annually. Was recognized, and testified, as an expert witness in the Identification, Operability and origin of Firearms and Ammunition in three Federal Judicial Districts. Toured over 25 firearms and ammunition manufacturing facilities in Europe and the United States. Temporarily assigned in 2001 for three months to the 9-11 Task Force investigation in conjunction with FBI Assets. Temporarily assigned to the D.C. Sniper Task Force Intelligence Group in 2002 for two months.

June 1990 – June 1997:
Special Agent, ATF Baltimore Field Division, Baltimore, Maryland

Served in various capacities as a street-level Special Agent.  Acted as Group Supervisor and Assistant Special Agent in Charge on numerous occasions. Served on the Washington – Baltimore High Intensity Drug Trafficking Area (HIDTA) task force from 1995 – 1999.  Investigated armed narcotics trafficking organizations, seized assets, authored and executed Federal and state search and arrest warrants, conducted surveillance, interviews / interrogations, testified in Federal and state courts as a fact witness, purchased firearms, explosives and narcotics while in an undercover capacity, investigated fatal bombings and arsons, firearms trafficking, alcohol and tobacco trafficking, homicide, fraud and gun store burglaries. Also while detailed for 8 months as the Public Information Officer authored press releases, provided interviews to local and national print and television media outlets and made presentations to local and national public and special interest groups and associations.

April 1989 – June 1990 and July 1986 – March 1987: Special Agent, United States Department of State, Diplomatic Security Service (DSS), Washington Field Office, Rosslyn, VA

Conducted investigations of violations of Federal Law under the department's purview to include Passport and Visa Fraud, Illegal trafficking of restricted firearms and war materials to prohibited countries, human trafficking, seized assets, authored and executed State, local and Federal Arrest and Search Warrants,  testified in Federal Court as a fact witness, detailed on an as needed basis to the Dignitary Protection Division as Agent in Charge of  multiple protective details for visiting and resident foreign dignitaries, temporarily assigned to support Physical and Personal Protective Security in various U.S. Embassies overseas on an as needed basis, detailed to the Secretary of State Protective Division on an as needed basis to supervise agents assigned to augment the permanent protective detail.

March 1987-February 1989: Special Agent, DSS, Secretary of State Protective Division, Washington, DC

Served in various capacities as Acting Agent in Charge, Acting Shift Leader, Lead Advance Agent and Shift Agent. Responsibilities included close personal protection of the Secretary of State both domestically and overseas, extensive foreign travel to facilitate and prepare security arrangements for overseas visits to include Presidential Summit meetings, liaison with foreign host government officials to plan and solicit assistance with security arrangements, supervision of agents temporarily assigned to augment the detail, liaison with U.S Government Intelligence Agencies and other Federal, State and Local Law Enforcement Agencies to identify and protect against potential threats to the Secretary of State.

-2-

**JA1871**

CLEARANCES:  Top Secret March 1986 valid through February 2015. Numerous prior SCI Clearances.

TEACHING EXPERIENCE:

- Instructed at the Federal Law Enforcement Training Center (FLETC), for ATF and other Federal Law Enforcement Agencies
- Instructed at the International Law Enforcement Academy (ILEA) in Budapest, Hungary
- Instructed for numerous State, local and / or regional law enforcement agencies both in the United States, Canada and Central America

LINKEDIN PROFILE AND ENDORSEMENTS:

https://www.linkedin.com/in/james-jim-yurgealitis-68618464?trk=nav_responsive_tab_profile_pic

REFERENCES:

Available upon request

-3-

**JA1872**

Exhibit B

**Professional Qualifications of James E. Yurgealitis**
**Independent Legal, Public Policy and Forensic Consultant**

I, James E. Yurgealitis, being duly sworn, depose and state:

1.) That I was previously employed as a Senior Special Agent / Program Manager with the Bureau of Alcohol, Tobacco Firearms & Explosives, (ATF) United States Department of Justice, and had been so employed since 1990. Prior to 1990 I was employed as a Special Agent with the Bureau of Diplomatic Security, (DSS) United States Department of State and had been so employed since 1986.

2.) I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher College, Rochester, New York.

3.) I am a graduate of the Federal Law Enforcement Training Center, Glynco, Georgia, the Criminal Investigator Training Program, Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program.

4.) I have completed the Firearms Interstate Nexus Training Program conducted by the Firearms Technology Branch, ATF Headquarters, Washington, D.C.

5.) I have completed both Advanced Interstate and European Nexus Training conducted by ATF in conjunction with several domestic and European firearm manufacturers.

6.) I have testified in excess of 200 times before Federal Grand Juries regarding the classification, operability, and commerce of firearms and / or ammunition.

7.) I have previously qualified as an expert witness regarding the origin, operability / classification and interstate movement of firearms and ammunition in U.S. District Court for the District of Maryland, U.S. District Court for the District of Delaware and the Circuit Court For Baltimore City, Maryland.

8.) I have conducted regular training for local, state and federal law enforcement agencies both domestically and overseas regarding firearms classification, operability and firearms statutes.

9.) I maintain a personal library of books, printed material and documents that relate to the field of firearms, ammunition, and firearms classification, attend local and national trade shows and professional association meetings, and regularly review periodicals relating to firearms and ammunition.

10.) I attend trade shows, maintain contact with, and regularly consult with other persons, to include published authors and recognized experts in the origin, identification and classification of firearms and ammunition.

11.) I have, during my tenure with ATF, personally examined in excess of five thousand

 Qualifications Of  James E. Yurgealitis contd.

firearms to determine their origin and classification and operability, and to facilitate
the tracing of those firearms.

I have toured production facilities for numerous firearms and ammunition manufacturers. The
tours were conducted by corporate historians, corporate officers, or production engineering
personnel.

Domestic Firearm Manufacturers:
Bushmaster Firearms, Ilion, NY, USA
Colt, New Haven CT, USA (4x)
H&R 1871 Inc., Chicopee, MA, USA (2x)
Marlin, North Haven CT, USA (4x)
O.F. Mossberg & Sons, North Haven, CT, USA (4x)
Remington Firearms, Ilion, NY, USA
Savage Arms Inc., Westfield, MA, USA (4x)
Sig-Sauer / SIGARMS Inc., Exeter, NH, USA (3x)
Smith and Wesson, Springfield, MA, USA (4x)
Sturm Ruger, Newport, NH, USA (4x)
Yankee Hill Machining, Florence, MA, USA

Foreign Firearm Manufacturers:
Carl Walther GmbH, Ulm, Germany
Ceska Zbrojovka (CZ), Uhersky Brod, Czech Republic
Fegarmy (FEG), Budapest, Hungary
F.N Herstal S.A., Herstal, Belgium
Glock GmbH, Deutsch-Wagram, Austria
Heckler & Koch GmbH, Oberndorf au Neckar, Germany
J.P. Sauer & Sohn GmbH, Eckernforde, Germany

Domestic Ammunition Manufacturers:
Fiocchi Ammunition, Ozark, MO, USA
PMC, Boulder City, NV, USA
Remington, Lonoke, AR, USA (4x)
Sierra, Sedalia, MO, USA
Starline Brass, Sedalia, MO, USA

European Proof Houses
Beschussamt Ulm, (Ulm Proofhouse) Ulm, Germany
Beschusstelle Eckernforde, (Eckernforde Proofhouse) Eckernforde, Germany
Czech Republic Proofhouse, Uhersky Brod, Czech Republic
Liege Proofhouse, Liege, Belgium

Qualifications Of  James E. Yurgealitis contd.

I have been allowed regular access to the following reference collections:
Bureau of Alcohol, Tobacco Firearms and Explosives Reference Collection, Martinsburg, West
Virginia, USA consisting of 5,000+ firearms

Liege Proofhouse, Liege, Belgium consisting of 1,000+ ammunition cartridges

Springfield Armory National Historic Site Firearms Collection, Springfield, MA, USA
consisting of 10,000+ Firearms

Smithsonian Institution (Museum of American History) Firearms Reference Collection
Washington, DC, USA, consisting of 4000+ firearms

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum)
Koblenz, Germany consisting of 10,000+ Firearms

I have toured the following museums:
Heeresgeschichtliches Museum, (Museum of Military History), Vienna, Austria
Hungarian Military Museum, Budapest, Hungary
Springfield Armory National Historic Site, Springfield, MA, USA
United States Air Force Museum, Dayton, OH, USA
United States Army Ordnance Museum, Aberdeen Proving Ground, Aberdeen, MD, USA
United States Military Academy Museum, West Point, NY, USA
United States Naval Academy Museum, Annapolis, MD, USA
Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum)
Koblenz, Germany

Membership in Professional Organizations:

Member, International Ammunition Association (IAA)
Technical Advisor (pending approval), Association of Firearm and Toolmark Examiners (AFTE)
Member, Federal Law Enforcement Officers Association (FLEOA)

-3-

**JA1876**

# Exhibit 12

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and MARC WEINBERG, | HON. PETER G. SHERIDAN |
|     Plaintiffs, | Civil Action No. 3:18-cv-10507 |
| v. | |
| MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, RYAN MCNAMEE, in his official capacity as Chief of Police of the Chester Police Department, and JOSEPH MADDEN, in his official capacity as Chief of Police of the Park Ridge Police Department, | |
|     Defendants. | |

| | |
|---|---|
| MARK CHEESEMAN, TIMOTHY CONNELLY, and FIREARMS POLICY COALITION, INC., | HON. RENEE M. BUMB |
|     Plaintiffs, | Civil Action No. 1:22-cv-4360 |
| v. | |
| MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey | |

State Police, CHRISTINE A.
HOFFMAN, in her official capacity as
Acting Gloucester County Prosecutor,
and BRADLEY D. BILLHIMER, in
his official capacity as Ocean County
Prosecutor,

    Defendants.

BLAKE ELLMAN, THOMAS R.
ROGERS, and ASSOCIATION OF
NEW JERSEY RIFLE & PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney
General of New Jersey, PATRICK J.
CALLAHAN, in his official capacity
as Superintendent of the New Jersey
Division of State Police, LT. RYAN
MCNAMEE, in his official capacity as
Officer in Charge of the Chester Police
Department, and KENNETH BROWN, JR.,
in his official capacity as Chief of the Wall
Township Police Department,

    Defendants.

HON. PETER G. SHERIDAN

Civil Action No.
3:22-cv-04397

## <u>DECLARATION OF BRIAN DELAY</u>

    I, BRIAN DELAY, hereby depose and state:

1.     I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2.      I have attached a copy of an expert report I have prepared, together with a copy of my Curriculum Vitae (attached as Exhibit A of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty.  I hereby adopt and incorporate my report in this declaration as if set forth in full.

I declare under penalty of perjury on this _____ day of October, 2023, that the foregoing is true and correct.

_____
BRIAN DELAY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br>& PISTOL CLUBS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Rebuttal Expert Report of Brian DeLay**

---

**JA1881**

I, Brian DeLay, the undersigned, declare as follows:

## BACKGROUND AND QUALIFICATIONS

1.      I am an Associate Professor of History and the Preston Hotchkis Chair in the History of the United States at the University of California, Berkeley.  I received my B.A. from the University of Colorado, Boulder (1994), and my M.A. (1998) and Ph.D. (2004) from Harvard University.  My first book, *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War* (Yale University Press, 2008), underwent blind peer-review before publication and won best book prizes from several scholarly organizations.  Since 2008, I have been working on three interrelated projects about the historic arms trade: a monograph about the arms trade in the era of American Revolutions (under contract with W.W. Norton and scheduled to be published in 2025); a second monograph about guns, freedom, and domination in the Americas from 1800-1945 (also under contract with W.W. Norton); and a database tracking the global trade in arms and ammunition between the end of the Napoleonic Wars and start of World War I.  These projects are grounded in primary-source research in archives in the United States, England, Spain, and Mexico.

2.      I have delivered around three dozen invited presentations on firearms history at academic conferences and universities in the U.S. and abroad, including Harvard University, the University of Chicago, Stanford University, Oxford University, Cambridge University, the University of Melbourne, Doshisha University in Kyoto, Japan, and the Zentrum für Interdisziplinäre Forschung (ZIF), in Bielefeld, Germany.  I have given a number of interviews on the history of firearms and the gun business for the British Broadcasting Service (BBC), as well as for the Australian Broadcasting Corporation (ABC), and public radio stations in the United States. In September 2023, my 21,000-word article "The Arms Trade & American Revolutions" will be featured in the *American Historical*

*Review*, the flagship journal of the history profession. In addition to scrutiny from the journal's editor and members of the board of editors (all prominent academic historians), this article underwent two rounds of double-blind peer review where it was critiqued by seven experts in the field before being accepted for publication. This will be my second article published in the *AHR*.

3.      My research on the history of firearms has been supported by grants from the American Philosophical Society, the British Academy, the American Council of Learned Societies (twice), and the Stanford Humanities Center, among other organizations.  In 2019, I was awarded a Guggenheim fellowship.

4.      In addition to my work on this case, I've served as an expert witness in *Hanson v. District of Columbia*, 22-cv-02256 (D.D.C.); *Arnold v. Tina Kotek, et al.*, No. 22CV41008 (Harney Cty. Cir. Ct.); *Oregon Firearms Federation, et al., v. Tina Kotek, et. al.*, 22-cv-01815 (D. Ore.)[1]; *Harrel v. Raoul*, 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Kenneally v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.); *William Wiese, et al., v. Rob Bonta, et al.*, 2:17-cv-00903 (E.D. Cal); *Gabriella Sullivan, et al., v. Bob Ferguson, et al.*, 3:22-cv-05403 (W.D. Wash); and *Rocky Mountain Gun Owners et al., v. The Town of Superior et al.*, 22-cv-2680 (D. Col.)  A true and correct copy of my curriculum vitae is attached as Exhibit A to this report. I am being compensated at a rate of $250/hour.

**SUMMARY OF OPINIONS**

---

[1] *Oregon Firearms Federation et al., v. Tina Kotek et. al.*, has been consolidated with three other actions:  *Fitz v. Rosenblum et al.*, 3:22-cv-01859 (D. Ore.), *Eyre v. Rosenblum et al.*, 3:22-cv-01862 (D. Ore.), and *Azzopardi v. Rosenblum et al.*, 3:22-cv-01869 (D. Ore.).

5.       In order to respond to the report submitted on behalf of the plaintiffs by
Ashley Hlebinsky on June 16, 2023 (hereinafter "Hlebinsky Report"), I have been asked to
provide my understanding of the history and regulation of firearms in the United States, with
an emphasis on repeating firearms and the years surrounding 1791 and 1868.  My most
important conclusions are easy to summarize. Despite centuries of experimentation, repeating
arms remained flawed curios when the Second Amendment was ratified, and were exceedingly
rare in the United States. I am unaware of a repeating arm ever being used in combat or for
personal self-defense in the U.S. prior to the nineteenth century. By the time reliable repeating
firearms began entering the consumer market, all of the men who signed the U.S. Constitution
were dead, save James Madison (who passed away a few months after Samuel Colt secured a
U.S. patent for his new revolver). These new repeating firearms represented dramatic
technological changes, changes that provoked unprecedented social concerns. Legislatures
across the nation responded to these concerns with new regulations.

6.       Reliable repeating firearms with capacities greater than ten rounds only
became available in the 1860s, and only accounted for less than 0.002% of the nation's
firearms when the Fourteenth Amendment was ratified. Even these impressive new weapons
were different from those at issue in the current case, in one very critical regard: they were
slow to load. Semi-automatic firearms with detachable magazines that allow shooters to fire
continuously with only brief pauses to reload first began making inroads among U.S.
consumers in the early twentieth century. Once again, dramatic technological change provoked
unprecedented social concern, leading to a wave of regulatory legislation across the country.

7.       My report responds to the June 16, 2023 report of Ashley Hlebinsky and is
organized into four main sections.  Section I explains why repeating firearms were merely

experimental and, consequently, vanishingly rare in the United States in 1791, and discusses

the extent of firearms regulation in America leading up to 1791.  Section II describes how

reliable repeating firearms with fixed magazines holding more than 10 rounds first came on the

market in the 1860s and how they still accounted for a miniscule percentage of total guns in

the U.S. in 1868.  Section III explains that automatic and semiautomatic firearms with

removable large-capacity magazines began coming under state and federal regulation soon

after they first became commercially available throughout the United States in the 1920s and

1930s. Finally, Section IV corrects other errors of fact and interpretation in Ms. Hlebinsky's

report regarding differences between military and civilian firearms.

## I.    Repeating Firearms Were Flawed, Experimental Curiosities in 1791

8.    Ms. Hlebinsky observes correctly that gunsmiths began experimenting with

repeat-fire weapons hundreds of years ago, but her report obscures the degree to which these

weapons remained unreliable and/or niche luxury items prior to the nineteenth century.

Inventive gunsmiths had been trying to design dependable, effective firearms capable of

shooting multiple rounds without reloading since at least the sixteenth century.  Evidence for

their efforts can be found in personal and public archives, in patent records, and occasionally

in actual weapons still preserved in museums and private collections today.  But such weapons

were flawed, experimental curiosities prior to the founding of the United States.  They were

both dangerous (to the shooter, as well as to the target) and highly unusual.  Most of these

weapons never advanced beyond proof of concept.  Only a small minority of repeating firearm

inventions ever moved past the design or prototype stage, and none achieved commercial

significance or military relevance prior to 1791.  This centuries-long history of inventive

failure has a context, one that ought to be borne in mind when evaluating claims about the

historic regulation of firearms—or lack thereof.

**A.    The elusive quest for reliable repeating firearms prior to the nineteenth century**

9.    Europeans began engaging with gunpowder and its potential military applications in the thirteenth century.  By then, European states had long been in competition with one another for military and economic advantage.  As the design and efficacy of artillery, bombs, and handheld firearms improved, and as these improvements forced leaders to reconsider venerable military traditions, states began spending more and more on their militaries.  Intensifying competition between sovereigns created powerful incentives for craftspeople and inventors to improve on existing military technology.[2]

10.    Sovereign competition helped fueled innovation.  Three of the most important innovations in the seventeenth and eighteenth centuries were: (a) gradual improvements in gunpowder corning, a process that made powder burn more evenly and enabled producers to better modulate its power; (b) the substitution of the cumbersome matchlock ignition system for the more reliable flintlock system in the late seventeenth century; and (c) the development of the socket bayonet (also in the late seventeenth century), which, for the first time, enabled infantry to act both as musketeers and pikemen.  All three breakthroughs had significant consequences for the development and use of firearms around the world.[3]  Still, most improvements to firearms technology were incremental during the Renaissance and early modern era.  Meaningful breakthroughs were very rare.

---

[2] Geoffrey Parker, *The Military Revolution: Military Innovation and the Rise of the West, 1500-1800*, 2nd ed. (Cambridge University Press, 1996).

[3] These and other developments are clearly described in Bert S. Hall, *Weapons and Warfare in Renaissance Europe: Gunpowder, Technology, and Tactics* (Johns Hopkins University Press, 1997).

11.      Because of the military benefits associated with repeat fire (including increased killing potential), it was probably the most coveted but elusive of the gun-making world's aspirations.  Safe and reliable increased rate of fire would have been an invaluable force multiplier for militaries before the nineteenth century.  States would have paid handsomely to acquire such a comparative advantage, and that prospect incentivized centuries of experimentation.  Four basic solutions had come into view as early as the sixteenth century.  Each attracted generations of talented gunsmiths, and each had distinct virtues and limitations.  The first solution achieved repeat fire with a revolving breech; one innovative design along these lines emerged in Germany in the early sixteenth century.  The second approach employed multiple barrels.  A seventeenth-century Scot built a gun with a single, fixed breech and fifty barrels arrayed around an axis, for instance.  A third design incorporated an internal magazine housing enough powder and (sometimes) balls for multiple shots.  Most such arms employed a rotating breechblock to cycle a single powder charge and (sometimes) a single ball into the chamber, before sealing the chamber for firing.[4]

12.      The fourth approach, the so-called superposed load or stacked charge method, fired multiple rounds loaded into a single barrel. This was probably the earliest method for achieving repeat fire, and it had two basic types. The first functioned like a roman candle. Lead balls would be drilled through, like beads.  Their central canal would be filled with gunpowder or another, slower- burning compound.  A regular gunpowder load would then be

---

[4] M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology, 1492-1792* (Washington: Smithsonian Institution Press, 1980), 50 (Germany), 100 (Scotland). Of early magazine repeaters, a respected authority says "as all were basically impractical and many quite hazardous to use they were produced in extremely limited quantities and hence all are considered great collector's prizes."  Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values*, Ninth edition (Iola, WI: Gun Digest Books, 2007), 691.

packed into the barrel of the gun, followed by one of the tightly-fitting pierced rounds, then
more gunpowder, then another pierced round, and so on, the loader being exceedingly careful
to perfectly align the canals of the individual rounds.  Upon firing, the first round (the one
closest to the muzzle, would ignite the material inside the bore of the second round, which, a
fraction of a second later, would communicate flame to the second powder charge (behind
the second pierced ball), and so on, until all shots had left the gun. The second type of
superposed load design also employed a barrel loaded with multiple rounds, but allowed the
shooter more control over the pace of firing. This was achieved either through the use of
multiple locks or of a sliding lock that would enable the user to fire the load in two or more
different bursts.[5]

13.    Master gunsmiths made exquisite varieties of repeating arms from the
sixteenth through the eighteenth centuries, at high cost.  Designs with rotating breeches or
multiple barrels seldom exceeded a ten-round capacity, but early magazine or superposed
firearms could.  Regardless of type, gunmakers often decorated multi-fire weapons lavishly,
and sold or gifted them to a tiny stratum of elite consumers across Europe.  But most of these
weapons remained gorgeous curiosities, usually more suited to admire than to shoot.  Prized
more than used, early repeating firearms survive at far, far higher rates than do the era's
ordinary, single-shot firearms that did actual work in the world.  While produced in very small
quantities annually, therefore, they accumulated over the centuries of production so that today
the world's museums and collectors possess many intriguing specimens. Writing about early

---

[5] Lewis Winant, *Firearms Curiosa* (New York: Greenberg Publisher, 1955), 166-93. For
discussion of some particularly ingenious superposed load designs, see M. L. Brown, *Firearms
in Colonial America: The Impact on History and Technology, 1492-1792* (Washington:
Smithsonian Institution Press, 1980), 104–6.

magazine arms, W. W. Greener, one of the nineteenth century's preeminent authorities on firearms, remarked that "the peculiar complication of the various mechanisms, and the general inutility of the weapons themselves, render a detailed description of little value to the inventor or the general reader; but the connoisseur will find several varieties in the Paris Museum."[6]

14.    Notwithstanding often brilliant work, then, no repeating firearm design functioned well enough to become militarily and commercially significant before the nineteenth century.  Ms. Hlebinsky seems to believe that militaries scorned repeating firearms because of "tactics, government bureaucracy, and expense." (Hlebinsky Report, p. 15). Those issues mattered, but were not remotely as important as the fact that these weapons were unreliable prior to the nineteenth century. If early repeating arms had worked well, militaries had all of the incentives they needed to adjust tactics, bureaucracy, and budgets to incorporate them. But the ideas behind repeating firearms were simply too far ahead of their times. Greener put it this way: "The advantages of the repeating principle thus appear to have been observed at an early date, and the inventive genius of the gun-maker would have been equal to producing weapons of the desired type if only the skill and tools of the workman had allowed of a perfect mechanically fitting joint being obtained."[7]  Most rotating breech mechanisms were complex and exceedingly difficult to make well before moving parts could be built with machine precision.  Long-guns festooned with several barrels were too heavy and cumbersome to be practical handheld weapons.  Early magazine guns demanded an even higher level of craftsmanship in order to create a perfect seal between the rotating breechblock

---

[6] W. W. Greener, *The Gun and Its Development*, 9th ed. (London: Cassell and Company, LTD, 1910), 81.

[7] *Id.*, 80.

and the stored powder, lest the combustion in the chamber ignite the magazine.  The best, like

those made by the Florentine Michele Lorenzoni in the late seventeenth and early eighteenth

centuries, minimized these dangers through slow, precise craftsmanship.  But early magazine

guns were perilous even in the hands of expert gunmakers.  Lorenzoni's countryman, the

famed gunmaker Bartolomo Girardoni, reportedly lost his left hand in a magazine explosion.[8]

15.    As for muskets with superposed loads, they were mechanically simpler than

the alternatives.  But roman-candle style bursts of fire had limited utility on the battlefield and

no utility off of it.  Worse, like all but the best-made magazine arms, superposed load systems

were notoriously perilous to the shooter on account of having so much explosive gunpowder

packed into a single firearm.  If the sequencing between rounds was off, the barrel could

explode like a tubular grenade in the shooter's hands.  Hence one scholar's conclusion that

"the dread of misfires was reason enough for the lack of sustained enthusiasm for any of the

superposed load guns."[9] Still, if more reasons were needed, smoke was another one.  In the

gunpowder era, even regular, single-shot muskets produced clouds of acrid white smoke that

obscured battlefield targets.  Firing a superposed load just once made that problem five, ten,

or twenty times worse (depending on the number of loads).  Superposed load firearms were

painfully slow to load, with the practical consequence that a shooter could only expect to fire

one barrel full of rounds before having to abandon the weapon during battle. The final major

drawback to most superposed load designs was that even when everything went according to

plan, the shooter had little or no control over the pace of firing.  All he could do was point the

---

[8] For Girardoni's accident, see Eldon G. Wolff, *Air Guns*, Milwaukee Public Museum
Publications in History 1 (Milwaukee, WI: North American Press, 1968), 27.

[9] Winant, *Firearms Curiosa*, 178.

gun, say a prayer, brace himself for an epic recoil, pull the trigger once, and hope that the eight or ten or twenty charges inside the barrel went in the right direction. Such weapons had little utility outside of formal warfare, and their dangerous drawbacks meant that they were seldom used in martial combat, either. Lewis Winant, an authority on historic firearms from the mid-twentieth century, put it well when he wrote that "of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[10]

16.    Few early repeating arms have provoked as much modern interest as the "Puckle gun," a weapon which exemplifies both just how strange and flawed most examples of early repeaters really were. Elaborating on what by the early eighteenth century were established rotating breech designs, Puckle devised a clever multi-fire, flintlock ignition gun. It consisted of a long barrel mounted to a tripod, and three removable, rotating breeches. Each of the three breeches had different purposes. One was designed for shooting "grenadoes," by which Puckle apparently meant shrapnel; one fired standard round balls; and one fired shots cast in the shape of ice-cubes. Puckle intended the balls to be used on Christians, and the cubes to be used against Muslim Turks. Needless to say, this was a design that privileged mystical sectarian posturing over battlefield effectiveness (and aerodynamism). The bulky gun required at least two men to carry and position, making it more like light artillery than a handheld firearm. Sometimes misleadingly billed as the first machine-gun, Puckle's exotic firearm was not self-loading – the user had to reposition the breech with a hand crank in-between each round. Compared to actual machine guns, it had a glacial rate of fire. Once it had discharged its seven cube-loads, for example, the breech had

---

[10] Winant, *Firearms Curiosa*, 166.

to be removed; each chamber had to be re-loaded with powder, wadding, and shot; the breech

had to be carefully re-attached to the gun; and the touch-hole of each chamber had to be re-

primed as it came into position prior to each shot.  Under serene conditions, a practiced

operator might have been able to fire all seven cube-shots in a chamber in under a minute.

But given that an average soldier fired two or three shots a minute from a smoothbore musket,

the Puckle Gun hardly represented a revolution in firearms technology.

17.    And that modest assessment assumes that the firearm reliably worked.

Charles Ffoulkes, the researcher who re-discovered the Puckle Gun in 1936, had his doubts.

Like all rotating breech designs made before the Industrial Revolution, the breech of the

Puckle Gun could not be fully gas-proof.  In fact, Ffoulkes found the design even more faulty

than others with rotating breeches, because the closeness of the chambers heightened the risk

of a chain-fire (one charge prematurely igniting the others).  The British military seems to

have shared Ffoulkes' skepticism.  The inventor formed a company to raise investment

around his gun, but it never got off the ground.  "Fear not, my friends, this terrible machine,"

quipped one wry contemporary, "they're only wounded who have shares therein."[11]

18.    To be fair to James Puckle, the fundamental material and technological

hurdles were beyond anyone's solving in the eighteenth century.  To be durable, reliable,

affordable, and safe enough to achieve popularity, the experimental designs required

metallurgical techniques and a level of machine precision unknown until well into the

nineteenth century.  Not until the advent of these and other breakthroughs (including the

---

[11] Charles Ffoulkes, *Arms and Armament*, 1945, 82–85.  Quote is from W. Y. Carman, *A History of Firearms: From Earliest Times to 1914* (Mineola, N.Y.: Dover Publications, 2004), 80. Final quote from Winant, *Firearms Curiosa*, 221.

adoption of percussion-cap ignition in the 1830s and metallic cartridges in the 1850s) could repeating firearms become practical weapons of mass production, widespread military adoption, and commercial viability.[12]

19.    Neither hustling arms inventors looking to make a fortune nor military and political leaders hunting for battlefield advantage knew that, of course. Hope sprung eternal, on both sides. That is why numerous historic designs for repeating firearms exist, despite the technical and material limitations that prevented any of them from achieving commercial or military relevance.

**B.    Repeating arms in the colonies and early United States**

20.    Advances in repeating firearm technology arose in Europe prior to the nineteenth century, and most of these rare weapons stayed in Europe. Very occasionally, however, repeating firearms appear in the documentary record of early America. Ms. Hlebinsky mentions a firearm associated with a gunsmith in Boston named James Pim. (Hlebinsky Report, p. 23). Pim appears to have been an Englishman who had been trained in the rarified tradition of producing repeat fire weapons for elite consumers before emigrating to Massachusetts in the early eighteenth century.[13] A later nineteenth century account claims that in the early 1720s colonial authorities had entertained an Iroquois delegation "with the sight of a curious gun, made by Mr. Pim of Boston – a curious piece of workmanship, --

---

[12] For a summary of the basic technological hurdles and how they were finally overcome in the nineteenth century, see Joseph Bradley, *Guns for the Tsar: American Technology and the Small Arms Industry in Nineteenth-Century Russia* (DeKalb, Ill.: Northern Illinois University Press, 1990), 12–19.

[13] See Brown, *Firearms in Colonial America*, 255.

which though loaded but once, yet was discharged eleven times following."[14] Ms. Hlebinsky attributes a different repeating arm to another Boston gunsmith, named Samuel Miller. But if we follow the citations to the primary source, an advertisement placed in the New England Weekly Journal, it becomes clear that Miller was probably Pim's apprentice and was still living in the elder gunmaker's house soon after Pim died. Miller advertised "a Gun with one Barrel and Lock, that will discharge twenty Balls at once Loading." Interested parties were invited to "view the Same for Nine pence, and see it discharged paying Two Shillings a shot."[15] It is likely that guns mentioned in both sources were superposed load firearms, and it is entirely possible that they were one and the same weapon. Either way, it is notable that in neither case were repeating firearms being offered for sale, used for self-defense, or employed in combat. Instead, they were curious showpieces, designed to draw and wow a crowd.

21.    Another of Ms. Hlebinsky's examples from early America comes from 1756, when gunmaker John Cookson advertised a nine-shot magazine firearm for sale in Boston that he seems to have built in the Lorenzoni style.[16] The most recent scholarship on Cookson concludes that he was a skilled gunsmith from England who emigrated to Boston at the end of the seventeenth century. Finding little demand in the colonies for the high-end custom guns he had been trained to make, he embarked on a heterogenous career as a merchant, chimney sweep, and, occasionally, gunsmith. A few guns with his name survive in London,

---

[14] *See* Samuel Niles, *A Summary Historical Narrative of the Wars of New England*, *in Collections of the Massachusetts Historical Society*, Vol. 5 (4th Series 1861), 347.

[15] *New England Weekly Journal*, (Mar. 2, 1730).

[16] Cookson's advertisement appeared in the *Boston Gazette*, April 12, 1756.

and they are very skillfully done.[17] But Cookson does not seem to have continued making magazine firearms in America. The advertisement in question is for a single gun, and my search of period newspapers suggests he placed no other such advertisements during his lifetime.[18] In his eighties by 1756, he seems to have decided to finally sell his prized magazine arm that he had made in England in his youth, had brought with him to America, and had kept all these years.[19] In other words, Cookson's gun wasn't an example of American-made repeating arms, much less an indication of a craft industry of building and selling such arms in Boston. Instead, it was a unique memento of the calling Cookson had left behind in England.

22.    The Pim/Miller and Cookson repeaters appeared in the early eighteenth century. Examples from the founding generation are necessary to substantiate Ms. Hlebinsky claim "that numerous types of repeating firearms existed leading up to, around, and directly after the time of the ratification of the Second Amendment, which, in some cases, had direct ties to Founding Fathers." (Hlebinsky Report, p. 27). Two examples she offers are a repeater associated with Joseph Belton and a Girardoni air rifle.  Put into proper context, these two guns make it clear that the founding generation could only have thought of repeating firearms as flawed curios.

---

[17] David S. Weaver and Brian Godwin, "John Cookson, Gunmaker," *Arms & Armour* 19, no. 1 (January 2, 2022): 43–63.

[18] Using the Readex collection *America's Historical Newspapers*, I searched in all available newspapers for "Cookson" between 1690-1790. The *Boston Gazette* advertisement above was the only instance that he (Boston gunmaker John Cookson) appeared in the results.

[19] Weaver and Godwin, "John Cookson, Gunmaker," 60.

23.      Joseph Belton has come to occupy a particularly prominent position in

debates over the history of repeating arms in the United States, because a weapon of his

design seems to be the only repeater that American leaders considered using during the

Revolution. That given, it is important to get the history right. Ms. Hlebinsky asserts that

Belton invented a repeating fusil in 1758. That is almost certainly incorrect. Belton graduated

from the College of Rhode Island – today Brown University – in 1769, so he would have still

been a child in 1758.[20] Rather than an established gunsmith offering a mature product to

revolutionary leaders, Belton seems to have been an ambitious and resourceful young

craftsman who saw an opportunity for lucrative military contracts with the outbreak of the

American Revolution.  In 1775 he pitched an idea for a submersible with cannons that he

claimed would sink British ships.  Benjamin Franklin recommended Belton and his

submersible idea to George Washington, but still the proposal went nowhere.[21]

24.      The failure of his submersible idea prompted this inventor-on-the-make to

pitch a repeating firearm in another attempt to secure a wartime contract. He informed the

Continental Congress that he had "discover'd an improvement, in the use of Small Armes…

which I have kept as yet a secret." This was clever self-promotion. It seems that the gun

Belton "discover'd" was in fact a relatively conventional superposed load firearm of the type

---

[20] See the note from the editors of the Franklin Papers, at
https://founders.archives.gov/?q=joseph%20belton&s=1111311111&sa=&r=1&sr=

[21] See Benjamin Franklin to Silas Deane, Philadelphia, Aug. 27, 1775, and editors'
footnote #2, available here: https://founders.archives.gov/?q=joseph%20belton&s=1111311111
&sa=&r=1&sr=, accessed Jan. 27, 2023; Benjamin Franklin to George Washington,
Philadelphia, July 22, 1776, and editors' footnote #1, available here: https://founders.
archives.gov/?q=joseph%20belton&s=1111311111&sa=&r=3&sr=, accessed Jan. 27, 2023; and
George Washington to Benjamin Franklin, New York, July 30, 1776, available here:
https://founders.archives.gov/?q=joseph%20belton&s=1111311111&sa=&r=4&sr=, accessed
Jan. 27, 2023.

that Europeans had tinkered with for centuries. Ms. Hlebinsky incorrectly states that

Washington placed an order for 100 of these guns. (Hlebinsky Report, p. 25). Period

documentation (all readily available online) makes it clear that Washington had nothing to do

with it. Rather, it was members of the Continental Congress that asked Belton to construct

100 of these "new improved" guns.  They cancelled the order a few days after extending it,

however, and refused to ever reconsider notwithstanding Belton's increasingly desperate

appeals.[22]

25.     Ms. Hlebinsky doesn't explain *why* Congress cancelled the order, but that

question is worth asking. After all, the nation was engaged in an existential struggle. Why

would it scorn a significant military advantage? It seems that Congress changed its mind once

it heard Belton's exorbitant demands for compensation.  Belton initially requested £1000

from each state, only to cut the price in half as soon as Congress balked. Either figure

amounted to a significant sum at the time.[23]  But the Continental Congress issued about $200

*million* in currency during the Revolutionary War (worth somewhere between $5 billion and

$22 billion today).[24]  It clearly had the wherewithal to hire Belton if it had wanted to.

---

[22] The relevant correspondence has been digitized and transcribed, and is available here:
https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress, accessed Jan. 27, 2023.

[23] See Joseph Belton to John Hancock, Philadelphia, May 8, 1777, at
https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress, accessed Feb. 4, 2023.

[24] For wartime currency, see Stephen Mihm, "Funding the Revolution: Monetary and
Fiscal Policy in Eighteenth-Century America - Google Search," in *The Oxford Handbook of the
American Revolution* (Oxford; New York: Oxford University Press, 2013), 334.  For present-day
value, see https://www.measuringworth.com/calculators/uscompare/relativevalue.php, accessed
Jan. 27, 2023.

Congress could and would have paid his price *if* it believed he and his guns would deliver a meaningful military advantage. That delegates evidently did not believe this tells us much about the quality of the arms on offer. Buying 100 superposed load arms for a reasonable price might have made sense. Anything more than that was clearly not worth Congress's time.[25]

26.     Given the technical challenges afflicting repeat-fire gunpowder weapons, whether rotating breech-, multi-barrel-, magazine-, or superposed load-designs, it is little wonder that one of the only repeating weapons from the period that enjoyed even limited, experimental military use in a European army was not a true firearm, but rather an air-gun. Using highly compressed air as the propellant, rather than gunpowder, eliminated many of the problems that had long bedeviled the quest for repeating arms. It was a relatively simple enhancement to attach a fixed tubular magazine to the side or underside of the air-gun's barrel, and to feed balls into the chamber (using gravity, by tipping the barrel up), one-by-one with a lever. The shooter could then fire as many rounds as the magazine would hold before needing to reload the fixed magazine. Depending on the size and pressure of the compressed air reservoir, the shooter might even be able to empty the magazine more than once before needing to refill the propellant. As with other categories of repeaters, air-guns had been produced since at least the sixteenth century and probably earlier.

---

[25] In the mid-1780s, a firm called "Jover & Belton" produced a small number of sliding-lock superposed load arms in London. It is possible that this was the same man who made the pitch to Congress in 1775/1777. But Lewis Winant reminds us "we have no reason to assume there is more than coincidence in the fact the name Belton appears as maker of both the 1777 American repeater and the 1786 English repeater. The name is not uncommon." Winant, *Firearms Curiosa*, 176.

27.     The most impressive air-gun of the period was developed in Vienna by one-handed Bartolomeo Girardoni, shortly after the American Revolution.[26]  Following his gruesome accident working with magazine firearms, he decided he'd had enough of gunpowder weapons and transitioned to air-guns.  Girardoni made a number of improvements to existing designs, most especially an elegant breechblock mechanism for chambering balls from the attached magazine.  Multi-shot air-rifles of his design saw limited service in the Austrian military between the 1790s and 1810s, a special corps of hundreds of snipers being equipped with the weapon.  Air-rifles had numerous advantages over gunpowder weapons.  In addition to the ease with which they were configured for multi-fire, they required no gunpowder (not always easy to obtain), and the absence of gunpowder meant that their bores required little cleaning and that shots produced no smoke and little noise.[27]

28.     Nonetheless, air-guns had major drawbacks that consigned them to the status of military oddities and niche consumer items, notwithstanding their significant advantages.  Period technology made it difficult to achieve air pressures commensurate with black powder, so power was one concern. As an article in the *Sportsman's Cyclopedia* from 1831 put it, "for buck or deer shooting the best air gun is not sufficiently powerful; for rook shooting it is very well calculated."[28]  The weapons were time-consuming and onerous to prime. Girardoni's air-rifles had to be pumped fifteen-hundred times to fully pressurize one reservoir.  Cannisters of pressurized air can explode, much like early gunpowder magazines, producing grenade-like

---

[26] Wolff, *Air Guns*, 5–13.  Girardoni's name is commonly misspelled Girandoni.  For background on his air rifle, see the learned essay by Robert D. Beeman, "New Evidence on the Lewis and Clark Air Rifle – an "Assault Rifle" of 1803," https://www.beemans.net/lewis-assault-rifle.htm, accessed Feb. 4, 2023.

[27] For advantages, see Wolff, *Air Guns*, 25–30.

[28] Cited in *Id.*, 22.

effects.  The craft and expense involved in building reliable air-guns greatly exceeded even

the considerable skill required to build fine firearms.  Air-tight reservoirs, pumps, valve

housings and valve seats had to be made with a degree of precision unknown in most

manufactured goods from the era.  These material and technical demands greatly increased

costs.  Moreover, even a craftsman of Girardoni's caliber did not yet have the materials or

tools necessary to build the critical components of his design durably and with absolute

precision.  The air-gun's various delicate parts could easily fall out of order, as for instance

when leather gaskets failed or any of the system's metal threads (necessary for attaching the

removable air-reservoir to the valve assembly and the valve assembly to the gun) came out of

alignment.  Competent repairs were hard to secure because the requisite skills were so

unusual.  According to one of the few book-length studies of historic air-guns, the high cost of

these arms and their various limitations made them "a novelty used by people of wealth who

had sufficient funds to go in for the unusual."[29]

29.     For all of these reasons, air-guns were exceedingly rare in eighteenth-

century America.  Indeed, they were so rare that owners could charge people to see them.

Two months after the Second Amendment was ratified, a museum proprietor in New York

named Gardiner Baker took out ads in the city's newspapers to promote his latest

acquisition: "an air gun, made by a young man, a native of Rhode-Island."  According to its

new owner, the gun would "do execution twenty times, without renewing the charge,"

suggesting that it was a single-shot weapon capable of firing twenty individually loaded

---

[29] For disadvantages, see Wolff, 30–33.  Quote from p. 31.  See also John Paul Jarvis,
"The Girandoni Air Rifle: Deadly Under Pressure," March 15, 2011,
https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure, accessed
Feb. 4, 2023.

rounds before needing to renew the compressed air supply. Baker explained that he had purchased the gun "at a very considerable price, with a view eventually to make it the property of the American museum." In order to recoup his investment, he announced that he would "exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence."[30]

30.    Meriwether Lewis brought a Girardoni Air Rifle on his famous expedition across the continent with William Clark for a similar purpose. The Corps of Discovery seems never to have fired the gun offensively or defensively. None of the more than twenty references to the air-rifle in the expedition's journals involve combat.[31] Instead, like virtually every other repeating firearm from that period, this unusual weapon was employed as a show piece. Lewis brought the air-rifle on the expedition precisely because it was so uncommon. He hoped a gun that would fire multiple times without powder, flash, smoke, or much noise, would impress Native Peoples. It did. He happily reported that it "excited great astonishment," which is itself a testament to the weapon's novelty.[32]

31.    But Indigenous people weren't the only ones fascinated with this exotic air-gun. At the very outset of the expedition near Pittsburgh, "some gentlemen" asked for a demonstration. Lewis obliged, firing the air-gun seven times. But when one of the men took

---

[30] "To the Curious," *The Weekly Museum* (New York, NY), Feb. 11, 1792. A copy of this article is attached as Exhibit B.

[31] For a discussion of the air gun and the expedition, see Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla: The Arthur H. Clark Company, 2012), 91–103.

[32] April 18, 1806 entry by Meriwether Lewis, *Journals of the Lewis & Clark Expedition*, https://lewisandclarkjournals.unl.edu/item/lc.jrn.1806-04-18#lc.jrn.1806-04-18.01, accessed Feb. 4, 2023.

hold of the weapon, he accidentally squeezed off an eighth shot that hit a woman forty yards

away, in the head.  To his great relief, Lewis found the woman's "wound by no means mortal,

or even dangerous."[33]  Ms Hlebinsky writes that the Girardoni could fire forty rounds before

its air reservoir needed to be refilled. But the weapon Lewis brought with him seemed to lose

power far more rapidly. That the gun's eighth round inflicted only a minor wound at forty

yards suggests it lost pressure quickly and might not have actually been able to fire more than

ten effective rounds.

32.    Air-guns remained rare curiosities elsewhere in the U.S. in the early

nineteenth century.  Just a few months before Lewis and Clark set out, the museum in

Connecticut's State House advertised an air-gun as one of its three prime attractions (the

others being a wampum cloak and a sixteen-foot-long snake skin from South America).  In no

sense were these weapons commonly used at the time.[34]

33.    In sum, notwithstanding the great desire of states for military advantage, the

great incentives that they held out for inventors who could deliver it, and the centuries of

skillful effort that went into chasing those incentives, repeating firearms remained militarily

and commercially irrelevant throughout the eighteenth and early nineteenth centuries.  On

those very rare occasions when such weapons were deployed by European militaries, they

were issued to dozens or hundreds of men in wars involving tens or hundreds of thousands of

combatants.  Commercially, the best (and most expensive) examples of repeating firearms

---

[33] August 30, 1803 entry by Meriwether Lewis, *Journals of the Lewis & Clark Expedition*, https://lewisandclarkjournals.unl.edu/item/lc.mult.1803-08-30kloefkorn, accessed Feb. 4, 2023.

[34] James Steward's advertisement "Museum," in *The Connecticut Courant*, April 27, 1803.  A copy of this advertisement is attached as Exhibit C.

22

circulated among a paper-thin slice of Europe's political and economic elite. For almost

everyone else at the time, these guns were unknown and irrelevant.

34.      I have spent the past fifteen years researching the historic international arms

trade in the archives of multiple countries. I have never come across any evidence in primary

sources that repeating firearms were anything other than exotic curios in this era. Few alive at

the time had ever laid eyes on one. Single-shot muzzle-loading smoothbore muskets, rifles,

and pistols remained the only handheld firearms that the vast majority of people ever owned,

used, or encountered in the late-eighteenth and early-nineteenth centuries. That fact ought to

be borne in mind when assessing the absence of laws regulating repeating firearms and

ammunition capacity at the time the Second Amendment was adopted.

### C.      Firearms regulation in America prior to 1791

35.      Ms. Hlebinsky's report has little to say about firearms regulation in the colonial

and early national eras, other than to observe that "while the Founding Fathers were aware of

them [repeating firearms], manufacturers could continue to produce those designs, to my

knowledge, without regulations, unlike the fire safety laws that were enacted to regulate

gunpowder." (Hlebinsky Report, p. 27). This raises an important question: why didn't the

Founders regulate repeating firearms? We have an incomplete understanding of the history of

firearm regulation in the United States. Electronically searchable compendia of historic laws

have only captured part of our legal tradition. They are particularly lacking when it comes to

local ordinances, where (as today) much regulation and enforcement originated.[35] Still, even

the incomplete record reveals a rich regulatory tradition that went far beyond fire safety laws.

---

[35] Joseph Blocker & Eric Ruben, "Originalism-by-Analogy and Second Amendment
Adjudication," p.56 *Yale Law Review* (forthcoming 2023).

This regulatory tradition emerged in the name of public safety – public safety as authorities at the time defined it. A quick tour of this tradition provides important context for understanding why the Founders did not regulate repeating firearms.

36.     Lawmakers in British North America and in the early United States passed hundreds of laws that directly or indirectly regulated firearms prior to 1791. Sometimes these concerns look familiar to our own times. For instance, states passed laws regulating the carrying[36] or brandishing[37] of particular weapons; forbidding discharge in sensitive times[38] and places;[39] and sentence enhancements for crimes committed with arms.[40] Regulations of all these types were enacted in the decade before the ratification of the Second Amendment, and they reflect public safety concerns familiar to twenty-first century Americans.

---

[36] *See, e.g.*, An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (1786), *available at* https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-forbidding-and-punishing-affrays/ (last visited June 1, 2023).

[37] *See, e.g.*, An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, 1786 Mass. Sess. Laws (1786), *available at* https://firearmslaw.duke.edu/laws/1786-mass-sess-laws-an-act-to-prevent-routs-riots-and-tumultuous-assemblies-and-the-evil-consequences-thereof/ (last visited June 1, 2023).

[38] *See, e.g.*, An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81, 1784–1785 N.Y. Laws 152 (1785), *available at* https://firearmslaw.duke.edu/laws/1784-1785-n-y-laws-152-an-act-to-prevent-firing-of-guns-and-other-firearms-within-this-state-on-certain-days-therein-mentioned-ch-81/ (last visited June 1, 2023).

[39] See the 1788 Ohio Law 42, "An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4, 1788–1801 Ohio Laws 42 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-42-an-act-for-suppressing-and-prohibiting-every-species-of-gaming-for-money-or-other-property-and-for-making-void-all-contracts-and-payments-made-in-furtherance-thereof-ch-13/ (last visited June 1, 2023).

[40] *See, e.g.*, the 1788 Ohio Laws 20, A Law Respecting Crimes and Punishments…, ch. 6, 1788_1801 Ohio Laws 20 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-20-a-law-respecting-crimes-and-punishments-ch-6/ (last visited June 1, 2023).

37.     But regulating gun violence between subjects (or, after independence,

citizens) was not as significant a policy concern in early America as it is today.  Prior to the

widespread availability of breechloading weapons and metallic cartridges in the mid-

nineteenth century, firearms were awkward tools either for perpetrating or resisting crimes of

passion.  They were notoriously inaccurate at range and had to be muzzle-loaded with

gunpowder and ball before every shot, either by pouring ammunition directly into the barrel or

packing in a pre-made paper cartridge loaded with powder and ball.  That took time and focus.

Moreover, such guns could not be kept safely armed and at the ready for any extended period

because black powder corroded iron barrels so quickly.  Partly for these reasons, firearms

usually played a relatively small role in murders between white people in North America

before the era of the Civil War.  Randolph Roth, the nation's foremost scholar of the history of

homicide in North America, has found for example that only 10-15% of family and intimate

partner homicides involved a firearm prior to the mid-nineteenth century.  More generally,

rates of gun violence rose and fell in step with political instability and shifts in faith in

government, justice, and social hierarchy.  At its worst, firearms were never used in more than

two-fifths of homicides between unrelated white people before the Civil War era.  By way of

comparison, in 2021 approximately four-fifths of all homicides in the United States involved a

firearm.[41]

---

[41] For homicide and arms technology, see Randolph Roth, "Why Guns Are and Are Not
the Problem: The Relationship between Guns and Homicide in American History," in *A Right to
Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment*,
ed. Jennifer Tucker, Barton C. Hacker, and Margaret Vining (Washington D.C.: Smithsonian
Scholarly Press, 2019), 113–34.  For 2021 homicides, see John Gramlich, "What the Data Says
about Gun Deaths in the U.S.," *Pew Research Center* (blog), April 26, 2023,
https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-
the-u-s/, accessed May 3, 2023.

38.     Although interpersonal gun violence was not a significant policy concern at the time, the large majority of pre-1791 laws pertaining to firearms reflected public safety concerns that *did* dominate at the time and which are (thankfully) alien to our own times. These concerns followed from the two systemic forms of violent predation that preoccupied generations of European colonists and American citizens, including most of the founders: dispossessing Native People of their land and terrorizing and enslaving people of African descent (nearly a fifth of the population on the eve of the Revolution). Neither project could have been sustained without a weapons gap. Moreover, European rivals (the Dutch, French, Spanish, and, after Independence, British) controlled parts of eastern North America and periodically threatened the ambitions and security of British colonists and U.S. citizens. During wartime, these rivals also threatened to arm the Indigenous and African-descent victims of the British and early U.S. project. Anglo authorities before and after Independence used law to try and answer these interconnected challenges to the safety of the white public.

39.     To address these public safety concerns, the largest category of relevant legislation implemented by Anglo authorities consisted of hundreds of militia laws. Among other things, militia laws sought to encourage and regulate firearm possession, upkeep, and practice by white men throughout the colonies and states in the early national era. The militia was the primary vehicle for public safety in the colonial and early national era, tasked with collective security needs of a white slaveholding, settler-colonial public periodically menaced by European rivals. Authorities in colonial America passed more than six hundred militia laws before the Revolution, laws mandating how these bodies were to be constituted, mobilized,

equipped, led, disciplined, and armed.[42]  Research in militia returns, census data, and probate

records makes it clear that government exerted a powerful influence on the geography of gun

ownership in the British colonies, and that it did so primarily through the mechanism of militia

laws.  Gun ownership was highest in those colonies where governments energetically

encouraged and supported militia service.  These were places where the violence of slavery

and settler colonialism, and/or the threat of nearby imperial rivals inevitably resulted in

security concerns.  In such places, colonial authorities mandated gun ownership and, in times

of heightened anxiety, took steps to equip militiamen who lacked their own arms.[43]

40.    Colonial and early national legislatures also passed numerous laws aimed at

depriving Indigenous and enslaved people of access to arms and ammunition.[44]  Courts have

painful decisions to make about these discriminatory laws.[45] They are manifestly bigoted and

hateful, and there is something not just objectionable but degrading about giving them any

---

[42] Several hundred of these laws were anthologized by the Selective Service System in the mid-twentieth century. See Arthur Vollmer, ed., *Military Obligation: The American Tradition; A Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789* (Washington: Selective Service System, 1947).

[43] See K. Sweeney, "Firearms, Militias, and the Second Amendment" in *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller*, by Saul Cornell and Nathan Kozuskanich (Amherst & Boston: University of Massachusetts Press, 2013), 310–82; James Lindgren and Justin L. Heather, "Counting Guns in Early America," *William and Mary Law Review* 43 (2001): 1777; Michael Lenz, *"Arms Are Necessary": Gun Culture in Eighteenth-Century American Politics and Society* (Köln: Böhlau, 2010).

[44] For laws targeting Native and enslaved people, see examples in John C. (John Codman) Hurd, *The Law of Freedom and Bondage in the United States* (Boston: Little, Brown & Co., 1858), 1:234, 243–44, 257, 288, 302–6; Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Cambridge, Mass.; London: Harvard University Press, 2003), 37.

[45] The dilemma is sensitively described, with examples of differing solutions, in Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 STAN. L. REV. ONLINE __ (forthcoming 2023).

form of deference today. One option, then, is to simply exclude them from consideration of our nation's tradition of firearms regulation. As a historian of early America, though, that strikes me as folly. Racism and white supremacy are too marbled through our history, too fundamental to explaining it, for courts to indulge the notion that we can ignore law touched by bigotry and hope to have anything coherent left afterward. Historic legislation did not target Black and Native people because gun regulation was racist. Legislation targeted Black and Native people because early American society was racist. We can be clear-eyed about the reprehensible aspects of our past generally, and the discriminatory intent of many historic firearm regulations specifically, without ignoring them.[46]

41.    Crucially, colonial and early national authorities were absolutely willing to deprive white people of firearms, too, when moved by concerns for public safety.  This is what happened in the early stages of the American Revolution.  Patriot committees began disarming white political opponents as early as the fall of 1775.  Events in the colony of New York illustrate the pattern.  Patriots in Brookhaven, New York, resolved in September 1775 to disarm anyone who dared "deny the authority of the Continental or of this Congress, or the Committee of Safety, or the Committees of the respective Counties, Cities, Towns, Manors, Precincts, or Districts in this Colony."  At this point in the rebellion most residents of New York were likely either loyalists or vainly hoping to remain neutral in the spiraling conflict with Britain, so such disarmament orders theoretically applied to a vast population.  In January, 1776, the Continental Congress ordered several hundred-armed minutemen into Queen's County in New York to disarm loyalists.  George Washington ordered General

---

[46] For an illuminating consideration of the history of racist gun law and how it has been instrumentalized in court cases, see Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary*, 43 CARDOZO L. REV. 1343 (2022).

Charles Lee to disarm everyone in Long Island "whose conduct, and declarations have render'd them justly suspected of Designs unfriendly to the Views of Congress." General Philip Schuyler disarmed "malignants" in the Hudson Valley, mostly Scotch Highlanders loyal to the king. In March of 1776, Congress concluded that nearly the entire population of Staten Island consisted of "avowed Foes" and ordered a general disarmament there.[47]

42.    Disarmament was not confined to New York. Frustrated at the results of more targeted efforts, the Continental Congress called for a general ban of gun ownership among loyalists on March 14, 1776. It recommended to all the individual colonies that they immediately "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies."[48] In addition to New York, Patriot leaders ordered loyalists disarmed in Connecticut[49], North Carolina[50], New Jersey[51], South

---

[47] New York examples drawn from Thomas Verenna, "Disarming the Disaffected," *Journal of the American Revolution*, Aug. 26, 2014.

[48] See Congressional resolutions of Tuesday, Jan. 2, 1776, in Worthington Chauncey Ford, ed., *Journals of the Continental Congress, 1774-1789, Edited from the Original Records in the Library of Congress* (Washington, D.C.: Government Printing Office, 1904), 4:205.

[49] "An Act for restraining and punishing Persons who are inimical to the Liberties of this and the rest of the United Colonies," Connecticut Assembly, Dec. 14, 1775, AA: 4:270-72.

[50] "Extract of a Letter from the Provincial Council of North Carolina, March 5, 1776," in M. St. Claire Clarke and Peter Force, eds., *American Archives: Consisting of a Collection of Authentick Records, State Papers, Debates, and Letters and Other Notices of Publick Affairs, the Whole Forming a Documentary History of the Origin and Progress of the North American Colonies; of the Causes and Accomplishment of the American Revolution; and of the Constitution of Government for the United States, to the Final Ratification Thereof. In Six Series* ..., 4 (Washington D.C., 1837), 5:59. [Hereafter AA]. See also AA 5:67.

[51] "July 1, All persons who refuse to bear arms to be disarmed," AA 6:1634.

Carolina[52], Pennsylvania[53], Massachusetts[54], Maryland[55], and Virginia.[56]

43.　　　There were two obvious motivations for the Founding Fathers and likeminded Americans to orchestrate a nationwide disarmament campaign against white political opponents.  First, loyalists could of course use their weapons to resist the insurgency and fight for the king.  Second, patriot forces were perilously under-armed and needed whatever guns they could find.  This is the reason that George Washington argued for a broad confiscation program in at least one Pennsylvania county, targeting those who "claimed the Right of remaining Neuter" as well as those actively fighting for the crown.  Washington insisted that "we ought not to hesitate a Moment in taking their arms, which will be so much wanted in furnishing the new Levies."[57]

44.　　　Indeed, patriot forces were so desperate for guns early in the war that they sometimes disarmed whites regardless of their political affiliation.  In early 1776, Georgia (a tenth colony to add to the list above) dispatched men to search the homes of all "overseers and negroes" throughout the colony, and even those across the river in southern South Carolina, in

---

[52] South Carolina Congress, March 13, 1776, AA 5:592.  South Carolina went further, ordering that if anyone previously disarmed shall arm himself again, that person would be incarcerated.

[53] See resolves of the Pennsylvania Assembly for April 6, 1776, AA 5:714.

[54] See notes from the Massachusetts Council, May 1, 1776, AA 5:1301.

[55] See notes from the Baltimore County Committee, March 8, 1776, AA 5:1509.

[56] Extracts from the Votes of the Assembly [VA], April 6, 1776, AA 6:881.

[57] George Washington to the Pennsylvania Council of Safety (Dec. 15, 1776), at https://founders.archives.gov/documents/Washington/03-07-02-0276

order to seize all guns and ammunition they found, leaving behind only "one gun and thirteen cartridges for each overseer."[58]

45.    From Massachusetts in the north to Georgia in the south, then, guns were taken away from white Americans in the name of public safety–public safety as the founding generation defined it. The emergency of the Revolution obviously made it easier for lawmakers to justify taking guns from white people, but the conviction that the state had regulatory authority to do so did not begin with the Revolution, nor end with it. In 1786, a tax uprising erupted in western Massachusetts. "Shay's Rebellion," as it came to be known, helped convince nationalists to convene the Constitutional Convention in 1787. That same year the uprising also moved the Massachusetts Assembly to pass a law disarming not only persons who take up arms against the state, but also those "who have given or may hereafter give them counsel, aid, comfort or support, voluntarily, with intent to encourage the opposition to the government."[59]

46.    In sum, early America had a diverse and extensive tradition of regulating firearms in the name of public safety.  Why, then, do we find no period laws regulating repeating firearms or restricting the size of firearm magazines?  Ms. Hlebinsky writes that there was a "centuries long trail of innovations that gradually and continually advanced firearms technology," and that "modern-day firearms are the direct descendants" of this trail. She argues that individuals at the time of the Founding Era could see this; that they knew "that

---

[58] Allen Daniel Candler, ed., *The Revolutionary Records of the State of Georgia* (Atlanta, Ga.: The Franklin-Turner Company, 1908), 92.

[59] See Massachusetts Act of Feb. 16, 1787, ch. VI, 1787 Mass Acts 555 (1787), *available at* https://firearmslaw.duke.edu/laws/act-of-feb-16-1787-ch-vi-1787-mass-acts-555/ (last visited June 1, 2023).

firearm technology previously underwent and would in the future undergo significant change and innovation." (Hlebinsky Report, p. 10). The implication seems to be that the Founders were already living in an era of repeating firearms, understood that such firearms would inevitably become more effective and deadly, and declined to regulate them, anyway, presumably because they were ideologically opposed to regulating firearms.

47.     If that is indeed the implication, it is unconvincing. It is unconvincing because, as I've suggested above, early American lawmakers had never considered guns beyond the reach of their regulatory authority. It is unconvincing because repeating firearms were extremely rare and notoriously unreliable in the United States in 1791. It is unconvincing because all of the major designs for repeat-fire weapons then existing had been introduced more than a century earlier, and as of 1791 all of them were still subject to the same stubborn drawbacks that had for generations consigned them to being little more than niche curiosities. The history of firearms innovation may be "a continuum of gradual advancements in technology," (Hlebinsky Report, p. 36), in other words, but most of those advancements had been stalled for generations pending the breakthroughs associated with the Industrial Revolution.

48.     Finally, it is unconvincing because legislators concern themselves with what is, rather than what might be.  Like their counterparts today, lawmakers from early America focused their efforts on actual social phenomena, not the possible implications of experimental technologies.  They didn't spend their time scouring international patent filings or European publications for news about experimental firearms technology. They didn't hold lengthy debates about the social implications of weapons that few of them had ever seen, and that were not known to have ever been militarily or commercially consequential anywhere in the world.

It mattered not at all to them whether "technologies often associated with modern day have roots back as far as the 1400s in some respect." (Hlebinsky Report, p. 10). What mattered was the consequences that repeating firearms had in their present. And repeating firearms had no consequences in their present.

49.     Even if they had been aware that a Philadelphia gunmaker had a secret method of firing twenty superimposed loads with a single pull of a trigger, in other words, or that a museum proprietor in New York was charging people to see a repeater that fired compressed air, lawmakers in the colonial and early national eras would have had no incentive to craft legislative solutions to these technologies because these technologies had created no social problems.  They remained flawed curiosities.  The simplest and most accurate explanation for the absence of regulation, therefore, is that repeating firearms were much too rare and too irrelevant to public safety to attract regulatory attention in 1791.

50.     An appropriate modern-day analogy might be personal jetpacks.  Much as repeating firearms did during the eighteenth century, personal jetpacks have held appeal both for militaries and private consumers for more than a hundred years.  That appeal has generated competition in research and development.  But jetpacks remain an expensive and experimental curiosity to this day, because of stubborn technological, safety, and practical challenges, including cost.  A future historian (or jurist) discovering evidence that a patent was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by the technology throughout the century (indeed, they still are); and that the jetpack commanded enduring popular interest, could conclude that the absence of public regulation reflected an ideological disposition against regulating jetpacks.  But the simpler and most

accurate explanation would be that jetpacks remained too rare to attract regulatory attention

in 2023.[60]

## II.    Large-Capacity Repeating Firearms Were Exceedingly Rare at the Time of Reconstruction

51.    Firearms technology would undergo huge changes after 1791.  Advances in

metallurgy, machine tooling, and mass-production associated with the Industrial Revolution

enabled gifted firearms innovators and engineers to finally overcome many of the challenges

that had frustrated the quest for reliable repeat fire in earlier centuries.  New innovations built

on one another, such that the period from the 1820s through the 1860s became one of the most

productive and dynamic in the history of firearms technology.  Nonetheless, even this era of

breakneck innovation had its limits.  As I explain below, reliable hand-held arms with

capacities greater than ten rounds remained exceedingly rare in the United States when the

Fourteenth Amendment was ratified in 1868.

### A.    False starts and repeat-fire pistols

52.    The evolution of firearms technology had its false starts after the ratification

of the Second Amendment.  In 1792, while the new federal government was reeling from a

series of catastrophic military defeats at the hands of Indigenous warriors in the Ohio

Country, a Pennsylvanian named Joseph Chambers tried to interest Secretary of State Thomas

Jefferson in a superposed load repeater of his design.[61]  "Every nation desiring to possess the

---

[60] Anthony Quinn, "The Fall and Rise of Jetpacks," Aug. 16, 2022, Royal Aeronautical Society Website, https://www.aerosociety.com/news/the-fall-and-rise-of-jetpacks/#:~:text=The%20concept%20of%20a%20jetpack,never%20built%20or%20even%20prototyped, accessed Feb. 4, 2023.

[61] To Thomas Jefferson from Joseph G. Chambers, 13 August 1792, *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-24-02-0274.  [Original source: *The Papers of Thomas Jefferson*, vol. 24, *1 June–31 December 1792*, ed. John

means of destroying the greatest number possible of their enemies," Jefferson responded

enthusiastically, "your discovery, if found effectual in experiment, will not want patronage

anywhere."[62]  Put differently, if Chambers could deliver, the inventor would become a very

wealthy and influential man.  But, like so many who came before (and after) him, Chambers

was unable to convince Jefferson or others in the new U.S. government that his firearm was

"effectual in experiment."  Chambers had more success during the War of 1812, when the

new Department of the Navy purchased a few hundred of his weapons (different designs all

employing superposed loads).  Though it isn't clear any of the guns were ever put to use, the

designs were sufficiently intriguing that multiple foreign governments made inquiries.  These

inquiries concluded that the dangers and disadvantages of superposed loads still outweighed

their advantages.[63]

    53.    In 1821, another American gunmaker, Isaiah Jennings of New York,

obtained a patent for a gun with a sliding lock that enabled the shooter to fire superposed

loads one at a time–an elaboration on a very old idea.  Jennings had two basic models: one

that fired four shots, and another, rarer design that fired ten.  A distinct, all-metal variant,

made in even smaller quantities than the others, held twelve rounds.  Several hundred arms

---

Catanzariti. Princeton: Princeton University Press, 1990, pp. 290–293.]

[62] From Thomas Jefferson to Joseph G. Chambers, 5 November 1792, *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-24-02-0539.  [Original source: *The Papers of Thomas Jefferson*, vol. 24, *1 June–31 December 1792*, ed. John Catanzariti. Princeton: Princeton University Press, 1990, p. 580.]

[63] For Chambers' proposal in context, see Andrew Fagal, "The Promise of American Repeating Weapons, 1791-1821," published online at *Age of Revolutions,* Oct. 20, 2016, https://ageofrevolutions.com/2016/10/20/the-promise-of-american-repeating-weapons-1791-1821/, accessed Feb. 4, 2023.

of the Jennings design were made under contract for the state of New York in the late

1820s.[64]  While well-made, these select-fire superposed load flintlocks were expensive,

mechanically complex, and still prone to the same catastrophic dangers that afflicted all

superposed load designs.  Gunmakers would continue to experiment with superposed load

firearms for decades. But they were ultimately technological dead-ends with no meaningful

military or commercial impact.[65]

      54.     But more lasting changes in firearms technology were underway.  One of the

most important was the development of the percussion-cap ignition system.  Around the turn

of the century, European chemists developed a new class of highly explosive compounds,

dubbed fulminates.  Though the potential military applications of these compounds were

tantalizing, early experiments demonstrated that they were much too powerful to be used in

firearms or artillery as an alternative propellant to gunpowder.  In 1805, Englishman

Alexander Forsyth had the insight that while fulminates could not yet be used for propulsion,

in very small quantities they could be used for ignition.  Others soon improved on his idea.  By

the 1810s, multiple inventors were developing "percussion caps"–small, sealed caps (usually

made of copper) filled with fulminate.[66]  It was a simple matter to redesign gun locks so that

instead of a vice holding a flint, hammers looked like actual hammers.  Rather than a pan filled

with priming powder, the newly designed hammer would fall upon an iron nipple topped with

a percussion cap.  The percussion would ignite the fulminate, which would in turn ignite the

---

[64] *Flayderman's Guide* (9e), characterizes the Jennings Repeating Flintlock as "one of the great military rarities and oddities" (p. 608).

[65] Winant, *Firearms Curiosa*, 178-93.

[66] W. Y. Carmen, *A History of Firearms: From Earliest Times to 1914* (Mineola, Dover Publications, 2004), 162, 176.

main gunpowder charge inside the barrel.  Percussion caps were inexpensive to mass produce,
and far more reliable than flints as a source of ignition.  Over the next few decades, militaries
around the world would convert their stockpiles of firearms from flintlocks to percussion
locks.[67]

55.     The advent of percussion cap ignition opened the way for reliable repeating
pistols.[68] Relieved of cumbersome hammer-vices, flints, and priming pans filled with loose
powder, arms designers saw a path to using the old ideas of multiple, rotating barrels or
rotating breeches to make practical weapons for the first time.  Improvements in
manufacturing and machine tooling made it possible both to build arms from nearly identical
component parts, and to manufacture them at greater speed and less cost than ever before.  In
decades prior, such designs would have still faced severe manufacturing obstacles to large-
scale production because it was so difficult to make precision component parts by hand. But
by the 1830s, Springfield Armory and some of its biggest contractors had become world-
leaders the use of automatic milling machines to produce parts so uniformly as to be
interchangeable. This "American system of manufacture" as the rest of the world would soon
call it, combined with other advances in metallurgy and machine tooling made it possible both
to build complex arms from nearly identical component parts, and to manufacture them at
greater speed and less cost than ever before.[69]

---

[67] Daniel R. Headrick, *The Tools of Empire: Technology and European Imperialism in
the Nineteenth Century* (New York: Oxford University Press, 1981), 85-87.

[68] Flintlock revolvers never could overcome the design challenges. For example, Elisha
H. Hollier devised an elegant flintlock revolver in 1818. Hlebinsky asserts vaguely (and without
a source) that this firearm was "ordered in bulk" (p. 23). But according to Flayderman, only
around 150 were ever made. *Flayderman's Guide*, p. 712.

[69] William Hardy McNeill, *The Pursuit of Power: Technology, Armed Force, and Society*

56.    By the 1830s, two types of repeating pistols were entering the market.  The
first type, skillfully refined and aggressively patented by the inventor Samuel Colt, featured a
single barrel with a multi-chambered, rotating breech.  Percussion caps were affixed to the
rear of each chamber in the breech.  The chamber rotated mechanically so that the cap affixed
to successive chambers would assume position to receive the hammer's blow and ignite the
powder inside each chamber.  The second type, pioneered by Ethan Allen, featured three or
more barrels that rotated around an axis (either manually or mechanically), the charge for each
barrel ignited by a separate percussion cap.  Also referred to as "revolvers" early on, these
arms eventually came to be known as "pepperboxes."[70]

57.    Unlike repeat-fire curiosities in the eighteenth century, pepperboxes and
revolvers had actual social consequences.  And these social consequences generated
legislation.  Responding to rising public safety concerns over the increase in gun violence and
the proliferation of concealable weapons (repeating pistols as well as single-shot, percussion-
cap pistols, bowie knives, and other weapons), lawmakers across the country sought to
regulate conceal-carry.  Saul Cornell, one of the nation's preeminent historians of gun law in
early America, calls this "the first wave of modern-style American gun-control laws."  More
than thirty such laws were enacted around the country between the ratifications of the Second
and Fourteenth Amendments.[71]

_Since A.D. 1000_ (Chicago: University of Chicago Press, 1982), 233-34; Merritt Roe Smith,
_Harpers Ferry Armory and the New Technology: The Challenge of Change_ (Ithaca: Cornell
University Press, 1977), 219-51.

[70] For pepperboxes and revolvers, see Louis A. Garavaglia and Charles G. Worman,
_Firearms of the American West, 1803-1865_ (Niwot, Colo.: University Press of Colorado, 1998),
95–104, 139–52, 203–20.

[71] For law, see Saul Cornell, "Limits on Armed Travel under Anglo- American Law:

58.     While recognizing the new firepower that repeat pistols made available to U.S. consumers, it is important to be mindful of two important limitations of pepperboxes and revolvers by the middle of the nineteenth century.  The first was capacity.  It is true that gunmakers occasionally designed versions capable of firing more than ten rounds.[72] But these were extraordinarily unusual and produced in tiny quantities.  Whether the firearm had rotating chambers or rotating barrels, there simply were practical design limits to how many shots it could fire from a single loading.  Guns with too many barrels or chambers became too heavy, clunky, and hard to manage.  The *vast* majority of revolvers and pepperboxes produced in the nineteenth century held seven or fewer rounds.  *Flayderman's Guide to Antique American Firearms and Their Values*, now in its 9th edition, is considered a gold standard reference for historic American firearms.  That authoritative guide lists only three nineteenth-century revolvers with greater than ten-round capacity.  All of them were made in quantities best characterized as "experimental"– probably fewer than three hundred, combined.[73]

---

Change and Continuity over the Constitutional Longue Durée, 1688-1868," in *A Right to Bear Arms? The Contested Role of History in Contemporary Debate on the Second Amendment*, ed. Jennifer Tucker, Barton C. Hacker, and Margaret Vining (Washington: Smithsonian Institution, 2019), 79.  Spitzer, "Gun Law History," Table 1, 59-60; 63-64.  For the relevant laws, see Mark Anthony Frassetto, "Firearms and Weapons Legislation up to the Early 20th Century," (unpublished manuscript, 2013) 20–24. Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2200991

[72] For three examples, see Lewis Winant, *Pepperbox Firearms* (New York: Greenberg, 1952), pp. 104, 124, 137.

[73] (1) The Aaron C. Vaughn Double Barrel Revolver, made in the early 1860s and characterized as "one of the most rare and unusual of American percussion revolvers," held fourteen rounds.  Total production: twenty or fewer.  (2) The John Walch Navy Model 12 Shot Revolver, made in 1859-1860, chambered twelve rounds (six chambers, each with a double load).  Total production: around 200.  (3) The Charles E. Sneider two-cylinder revolver, made in the 1860s, held fourteen rounds (in two, seven-shot cylinders).  "Quantity unknown; very

59.     The second important limitation from mid-nineteenth-century pistols and pepperboxes is that they took a very long time to load.  To load a cap-and-ball revolver, the shooter had to fill each chamber with the appropriate measure of gunpowder, insert a ball, compact the ball into the powder charge with a ramming rod, cap the chamber with grease to avoid chain-fire (optional but recommended), and then individually attach percussion caps to each nipple at the back of the chamber.[74]  Pepperboxes had comparably laborious loading procedures.  Paper cartridges containing powder and ball could be used to slightly expedite the process, but reloading could still take a minute to a minute and a half.

60.     In terms of the damage that a single person can inflict with a firearm (or two), limited shot capacity and lengthy reload times made cap-and-ball revolvers and pepperboxes fundamentally different from today's semi-automatic pistols with detachable, large-capacity magazines.  For comparison's sake, consider the handguns used by the killer in the Virginia Tech massacre on April 6, 2007. Using a Glock 19 and a Walther P22 and equipped with multiple magazines (of 15- and 10-round capacities, respectively) Seung-Hui Cho fired 174 shots in 9 minutes, killing 33 people and wounding 17 others before taking his own life.[75] Mass-murderers in the mid-nineteenth century could hardly have conceived of that kind of firepower.

**B.     The slow spread of the first successful large-capacity firearm**

---

limited. Extremely rare."  See Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values*, 374–75, 514.

[74] For a demonstration, see https://www.youtube.com/watch?v=B84wI2MKZ2s

[75] Violence Policy Center, "Background on Pistols Used in Virginia Tech Shooting," April, 2007, https://vpc.org/studies/vatechgunsbackgrounder.pdf, accessed Feb. 1, 2023.

61.     The technological and manufacturing advances that made repeat-fire pistols
practical weapons for the first time also enabled new breakthroughs in long arms. Innovations
in breech-loading and metallic cartridges proved particularly important. Loading a firearm
muzzle-first had three disadvantages. It was hard to do while lying prone, and rising up to
reload made one an easier target during combat. It meant that rifles were slow and difficult to
load, because lead balls had to be nearly as large as the diameter of the barrel bore if they were
to engage the internal grooves (rifling) that gave the round its spin. And it meant that repeat-
fire was difficult to achieve, since the only way to feed more rounds into the barrel was
through the muzzle. Guns loaded at the breech solved all of these problems.[76] As with so
many other innovative designs, breech-loading was a very old idea. But it was very difficult to
build well prior to the Industrial Revolution, mainly because it was so hard to make the breech
accessible but also sufficiently sealable to contain explosive gases. Multiple, practical
solutions to this problem emerged in the first half of the nineteenth century. In the U.S. alone,
inventors patented 135 breech-loading firearm designs between 1811-1860.[77]

62.     Metallic cartridges represented another breakthrough. Soldiers, especially, had
used paper cartridges of powder and ball for generations. But such cartridges were notoriously
delicate: liable to get wet and ruined, and far too fragile to use in any kind of ammunition-
feeding device. Once percussion caps came into common use, however, it took little
imagination to envision a single, metal object that contained primer, powder, and ball all in
one. By the 1850s, inventors began moving from concept to practical application. Within a

---

[76] For the breech-loading revolution, see Headrick, *Tools of Empire*, 96-104.

[77] Alexander Rose, *American Rifle: A Biography* (New York, N.Y: Delacorte Press,
2008), 134.

decade, they realized that in addition to serving as a durable container for primer, powder, and ball, properly-designed metallic cartridges could help overcome stubborn limitations with breech-loading, by completely sealing the breech when fired.[78]

63.     Flawed but clever designs began to appear that combined attached or internal magazines, metallic cartridges, and mechanisms for the chambering of cartridges and ejection of spent cases.  This line of innovation culminated in 1860 with the world's first reliable firearm with a greater than ten-shot capacity.  It was developed by Oliver Winchester's New Haven Arms Company.[79]  The "Henry," named after Winchester's brilliant gunmaker, Benjamin Tyler Henry, was an ingenious breech-loading, lever-action rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen from an attached, tubular magazine).  Refinements to the Henry resulted in an even better gun: the Winchester Model 1866.[80]

64.     Throughout the 1860s, none of the viable alternatives fired more than ten rounds. Practically speaking, then, Henrys and Winchesters were the only large-capacity firearms in circulation in the years surrounding the ratification of the Fourteenth Amendment. How many were there?

65.     The McCracken Research Library (part of the Buffalo Bill Center of the West like Ms. Hlebinsky's former institution, the Cody Firearms Museum) possesses a huge archive of material from the Winchester Repeating Arms Company. I had the good fortune to do

---

[78] Headrick, *Tools of Empire*, 98.

[79] The Spencer Repeating Rifle, also introduced in 1860 and also destined for military and commercial success, was a seven-shot, lever-action rifle.

[80] Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 42-46.

research in that archive in 2011, while studying the history of the international arms trade.

During my research I consulted a letter written by Tom Hall, the longtime curator of the

Winchester Museum and a person with an unmatched understanding of the company's history.

Responding to a query he had received, Hall's letter enumerated the company's early

production totals. According to his figures, the firm produced 74,000 Henrys and Winchester

1866s between 1861 and 1871.[81]  Notwithstanding the Winchester's ubiquity in Hollywood

westerns, the vast majority of these weapons were made to order for foreign armies and

exported abroad.  The Ottoman Empire alone purchased 50,000 Model 1866s, and another

14,706 went to military purchasers in Europe, Latin America, and Japan during these years.[82]

Based on the Winchester's production figures, that would have left only 9,294 large-capacity

firearms for domestic consumption in the United States before 1872.  Of those, 8,500 were

Henrys purchased by or issued to Union soldiers during the Civil War.[83]  These figures

suggest (a) that large-capacity firearms went almost exclusively to military buyers through the

early 1870s, and (b) that very few were in the hands of private persons that might have used

them in ways that attracted regulatory attention.

---

[81] Specifically, Hall wrote that there were approximately 11,000 Henrys made from 1861-March, 1863; 3,000 rifles with King's improvements, but without company name, from April 1866-March 1867; and 60,000 M1866s between 1866-1871.  See Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[82] Export numbers are drawn from Houze, *Winchester Repeating Arms Company*, 21, 36–41, 51, 59, 65–66, 71, 73, 75.

[83] For Henrys used in the Civil War, see Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016), 81.

66.     The figures also tell us that even a few years after the ratification of the Fourteenth Amendment, large-capacity firearms constituted a tiny percentage of firearms in the United States.  How tiny?  Some numbers offer perspective.  In 1859, on the eve of the Civil War, the U.S. Ordnance Department counted 610,262 shoulder arms in federal arsenals.  Combined, the arsenals of individual states likely contained hundreds of thousands more.  Domestic producers made 2.5 to 3 million firearms for the Union during the war, while Union purchasing agents imported 1,165,000 European muskets and rifles.[84]  The Confederacy imported several hundred-thousand firearms as well.[85]  The scale of private gun ownership is less clear, though the U.S. may have had the most heavily armed civilian population in the world after the Civil War.  As the figures above make clear, there were certainly more than five million firearms in the U.S. by the early 1870s—perhaps twice as many.  But even with the implausibly low figure of five million, that would have meant that large-capacity firearms constituted less than 0.002% of all firearms in the United States as late as 1872.

67.     Again, if indeed the total number of guns in circulation in 1872 was considerably higher than five million, large-capacity firearms would have constituted an even more miniscule percentage of all guns in the U.S.  Whether the figure was 0.002% or something much lower than that, firearms with magazines holding over 10 rounds were not commonly used for self-defense or for any other purpose in the United States in the 1860s.

### III.     The Late Arrival and Rapid Regulation of Automatics and Semi-Automatics

---

[84] Carl L. Davis, *Arming the Union; Small Arms in the Civil War* (Port Washington, N.Y: Kennikat Press, 1973), 39, 64, 106.

[85] C. L. Webster III, *Entrepôt: Government Imports into the Confederate States* (Roseville: Edinborough Press, 2009), 318-20.

## A.    The era of the slow-load large-capacity firearm, 1870-1900

68.    While lever-action rifles took time to make inroads into the U.S. consumer market, they became increasingly popular in the last third of the nineteenth century. Winchester continued to dominate the market.  Most other firms that tried to compete in lever-action rifles failed on their own, or were bought out or otherwise outmaneuvered by Winchester's ruthless corporate savvy (the gunmaker Marlin being the only major exception).[86] Other rifle makers experimented with alternative designs.  For example, Colt's popular Lightning Slide Action Rifle (around 126,000 produced between 1884-1904) had a twelve- or fifteen-round tube magazine and used a pump-action to cycle rounds into the chamber.[87] Another ingenious Winchester competitor retained the lever-action but incorporated a novel, rotating internal magazine that held twenty-eight or thirty-four rounds.  Even with the highest capacity of any repeating rifle ever marketed in the U.S., though, the Evans Lever-Action Rifle enjoyed only modest success in its six-year production run (12,000 produced between 1873-1879).[88]

69.    The late nineteenth century was an era of slow-load large-capacity firearms. Winchester lever-action rifles and their large-capacity competitors in the last third of the nineteenth century had fixed magazines.  Once a fixed magazine was empty, the shooter had to reload each round, one by one.  As with Colt revolvers (which transitioned away from the laborious cap and ball system to faster-loading metallic cartridges in the 1870s, more than a

---

[86] For Winchester's dominance, see Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

[87] Greener, *The Gun*, 720-21.

[88] For the Lightning Slide Action and the Evans, see *Flayderman's Guide,* 122–23, 694. Of the Evans, Flayderman writes: "Earliest specimens (extreme rarities with no examples known) held 38 rounds."

decade after its competitor Smith & Wesson had done so), this round-by-round loading

process put a ceiling on the damage a single shooter could inflict on a group of people.

Notwithstanding the success of lever-action large-capacity firearms, that ceiling had not gotten

dramatically higher since the 1830s.  The magazines of most large-capacity rifles held

somewhere between ten to fifteen rounds.  A person armed with a pair of seven-shot revolvers

could fire fourteen rounds without reloading.  With the exception of the remarkable but

expensive and short-lived Evans rifle, then, a shooter from the time with a repeating rifle had

roughly the same capabilities as a shooter with two revolvers in his hands.  There were trade-

offs, of course.  The repeating rifle often had somewhat more power and always had more

range and accuracy.  Pistols were concealable and easier to use in some circumstances.

(Neither arm had the power, range, or accuracy of bolt-action, single-shot rifles that the U.S.

and the strongest European militaries continued to favor.)[89]

70.    In other words, the advent of Winchester repeaters and their competitors did

not provoke fundamentally different social problems than those that had been accelerating in

the U.S. since the proliferation of revolvers and pepperboxes earlier in the century.  The

changes were of degree, rather than kind.  State lawmakers continued to regulate firearms in the

name of public safety, as they had since the colonial era.  At least forty-eight new laws were

passed in the United States between 1868-1903 restricting firearm carry, for example.[90]  By the

turn of the century, most Americans living in the nation's most populous urban areas were

---

[89] For the U.S. Military, see for example David F. Butler, *United States Firearms: The First Century, 1776-1875* (New York: Winchester Press, 1971), 152-93.

[90] Frassetto, "Firearms and Weapons Legislation," 24-34.

subject to some form of restrictive carry regulations.  (Twenty-one more such laws would be enacted between 1900-1934).[91]

71.　　　Rather than target lever-action rifles, though, lawmakers in this regulatory era usually lumped them together with other kinds of firearms when crafting law.  Rifles are invoked alongside other kinds of weapons in Montana's 1879 prohibition against dueling, for instance; in North Carolina's 1869 law against hunting on the Sabbath; in Florida's 1881 law criminalizing the sale of weapons to minors and to those with "unsound minds;" and in unlawful discharge laws in Texas (1871), Wyoming (1879), New Mexico (1886), and Rhode Island (1892).[92] Exciting new historical scholarship on nineteenth-century firearms regulation has made it increasingly clear not only that America has a robust tradition of regulating arms in the name of public safety, but that we have a great deal left to unearth about the breadth and depth of that tradition.[93]

---

[91] Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis L. Rev.* 55 (2021): 2591–96.

[92] Frassetto, "Firearms and Weapons Legislation," Montana: 39; North Carolina: 92; Florida: 76; Texas: 98; Wyoming: 99; New Mexico: 12; Rhode Island: 97.  For a nuanced examination of state and local firearm regulations in the second half of the nineteenth century, one attentive to regional difference and minority viewpoints, see Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (Amherst, New York: Prometheus Books, 2018), 122–65.

[93] The historian Brennan Gardner Rivas is producing some of the nation's most exciting and important new scholarship on nineteenth-century firearms regulation. *See e.g.*, Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836–1900*, 121 *Southwestern Historical Quarterly* 284 (2017); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study Symposium: The 2nd Amendment at the Supreme Court: '700 Years of History' and the Modern Effects of Guns in Public*, 55 *U.C. Davis Law Review*, 2603 (2022); Brennan Gardner Rivas, *Perspective:| In the Past, Americans Confronted Gun Violence by Taking Action*, *Washington Post* (June 3, 2022), *available at*  https://www.washingtonpost.com/outlook/2022/06/03/past-americans-confronted-gun-violence-by-taking-action/.

72.      As slow-load large-capacity firearms, lever-action rifles continue to be popular in the United States today.  I am unaware of any law in the nation subjecting to special regulation, notwithstanding their large capacities.  Numerous firearms from the late nineteenth century had capacities exceeding ten, in other words, but their slow-load quality made them very different from the firearms commonly subject to regulation today.

73.      The era of slow-load large-capacity firearms was different from our own times. To appreciate how different, consider the fact that none of the arms that were commercially available in the United States prior to the twentieth century would have been subject to regulation in New Jersey under the laws in question. Both the large-capacity magazine limitation and the assault weapon regulations pertain to semi-automatic firearms, which, as I explain below, only began entering the market at the very end of the nineteenth century.[94]

74.      Slow-load large-capacity rifles seldom attracted particular regulation because, in an era when revolvers had already become so common, they did not represent a fundamental change in how a single armed individual could threaten public safety.  But automatic and semi-automatic weapons with detachable magazines, the world's first viable fast-load large-capacity firearms, did.

**B.      The era of fast-load large-capacity firearms**

75.      Lever-action or pump-action rifles require energy transferred from human muscle through an internal mechanism to eject a spent casing and chamber a new round.  The same is true of single-action revolvers, which require the shooter to pull back the hammer in

---

[94] Semi-automatic rifles and shotguns were not introduced into the market until the early twentieth century.  Two successful semi-automatic pistols predate the turn of the century (the Borchardt C-93, introduced in 1893, and the Mauser C-96, introduced in 1896). But neither of these German-made guns seems to have been popular consumer items in the United States before the turn of the century.

order to rotate the chamber and position a new round for firing.  (Double-action revolvers transfer all this work to the trigger, which when squeezed both rotates the chamber and releases the hammer).  Automatic and semi-automatic firearms don't rely on human muscle.  Instead, their great innovation is to enlist some of the energy released by the first round to eject the spent casing and chamber the next round.

76.     Automatic and semi-automatic firearms first started coming on the market in the 1890s (automatic arms continue to fire as long as the trigger is depressed, while semi-automatic arms require the shooter to squeeze the trigger for each round fired).  In addition to advances in machine production, materials science, and precision parts, these revolutionary weapons incorporated three specific innovations.  The first was the invention of a reliable mechanism using springs and levers to capture the recoil energy of a fired round in order to chamber the next round.  That discovery belongs to Hiram Maxim, creator of the famous Maxim machine gun in 1884.[95]  The heavy Maxim gun required at least two people to carry and position, but the idea of using recoil to chamber another round was transferrable to smaller, handheld firearms.

77.     Smokeless powder was the second innovation.  When fired, black powder leaves residue behind that fouls barrels.  This was a manageable annoyance in the era before guns could fire several times a second.  With the astonishing rates of fire made possible through Maxim's invention (up to six hundred rounds per minute), fouling would be so rapid as to quickly render an automatic fire weapon inoperable.[96]  Serendipity intervened to solve

---

[95] Carmen, *A History of Firearms*, 85-88.

[96] Julia Keller, *Mr. Gatling's Terrible Marvel: The Gun That Changed Everything and the Misunderstood Genuis who Invented It* (New York: Viking, 2008), 222.

this particular problem.  In the mid-1880s, right when Maxim was making his breakthrough in harnessing recoil energy, researchers in France perfected a chemical propellant (based on nitrocellulose) that was three times as powerful as black powder, gave off very little smoke, and left behind almost no residue in the barrel.  Smokeless powder meant that automatic fire would be a practical technology.[97]

78.     Third and finally, automatic- and semi-automatic firearms required a method of feeding cartridges into the weapon.  Maxim's machine gun (a heavy device usually placed atop a wheeled carriage) used belts of bullets, stored in crates or boxes.  For semi-automatic firearms designed to fire one shot at a time, it would be far more practical to have a magazine.  One option was for the weapon to have a fixed magazine: an integral component of the weapon itself, as with the tubular magazines of lever-action rifles.  Fixed magazines were impractical for fully automatic weapons, because their high rate of fire would exhaust a fixed magazine almost instantaneously and then the shooter would have to reload, bullet by bullet.  But some of the earliest semi-automatic handguns would be designed around fixed box magazines – the Mauser C96, for example (a German arm introduced in 1896).[98]

79.     By the time gunmakers began turning their attention to semi-automatic arms in earnest, however, they had another, more appealing option: detachable magazines.  Like self-loading mechanisms and smokeless powder, detachable magazines first emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century.

---

[97] For the development of smokeless powder, see René Amiable, "Scientific Reasoning and the Empircal Approach at the Time of the European Invention of Smokeless Powder," in Brenda J. Buchanan, ed., *Gunpowder, Explosives, and the State: A Technological History* (Aldershot: Ashgate, 2006), 343-54.

[98] John Walter, *Hand Gun Story* (Barnsley: Frontline Books, 2008), 196-98.

The first successful firearm with a detachable magazine had been developed by James Paris

Lee, to be used with bolt-action rifles. What made detachable magazines so advantageous is

that they dramatically accelerated loading. Rather than reloading a weapon bullet-by-bullet

(as with lever-action rifles or revolvers), the shooter simply ejected the spent magazine,

inserted a full magazine, and resumed firing.[99]

      80.     By the early 1890s, then, gunmakers had at their disposal a trio of potent new

design features that would become characteristic of most modern automatic and semi-

automatic firearms – self-loading mechanisms, smokeless powder ammunition, and detachable

magazines. The first pistol to successfully combine all three elements was the Borchardt C-

93. Made in Germany in 1893, the Borchardt C-93 had a detachable, 8-round magazine.[100]

Competitors were quick to enter the market. John Browning, arguably the most inventive and

important of all U.S. gunmakers, finished his first design for a semi-automatic pistol in 1895.

Slow to grasp the huge importance of these new guns, Colt declined Browning's design

because the firm did not think there would be a domestic market for it. Browning tinkered

some more and sold the design to Belgium's Fabrique Nationale ("FN"). FN produced the

gun starting in 1900, with a 7-round detachable magazine, and would go on to sell more than

---

[99] Bolt-action rifles with detachable magazines were adopted by world militaries in the late 1880s and 1890s—though even as late as 1910, neither the United States Army nor any European army used magazines that exceeded ten rounds as standard service weapons. In the ninth edition of his authoritative treatise *The Gun and its Development* (London: Cassell & Co., 1910), W.W. Greener compared the standard service arms of nineteen countries. Only four (Turkey, Switzerland, Great Britain, and Belgium) employed arms with detachable magazines. See table on pp. 736-37.

[100] Walter, *Hand Gun Story*, 140-44.

700,000 of them over the next decade.[101]  Colt soon realized its mistake and revived its

partnership with Browning, marketing better and better versions of his semi-automatic pistols

starting in 1900.  These culminated with the M1911, a handgun with a 7-round detachable

magazine.  The most copied and influential of all modern handguns, several million M1911s

have been sold in the past century.  Variations of the gun are still in production today.[102]

81.    American firms also helped lead the way in the production of semi-automatic

rifles.  Winchester and Remington both had models out early in the century.  As with the early

semi-automatic handguns, some designs had fixed magazines and others had detachable

magazines.  Light, fully automatic guns (so-called "sub-machine guns"), migrated from the

battlefield to the U.S. civilian market.  The most notorious was the Thompson submachine

gun, aka the "Tommy Gun," which had been designed for use in World War I and entered the

U.S. market in the 1920s.  It was a select fire weapon, meaning it could be set either to

automatic or semi-automatic fire.  Tommy Guns had box magazines ranging from twenty to

thirty rounds, and drum magazines as large as one hundred rounds.  Its high price discouraged

civilian sales.  But this legal, fast-load large-capacity firearm became much sought-after by

criminals and law enforcement.[103]

82.    Because their detachable magazines enabled shooters to load and reload all at

once, rather than round by round, the new fast-load firearms empowered individual shooters to

inflict far more damage on more people than had been possible with earlier technologies.  So,

---

[101] *Id*., 220–28.

[102] *Flayderman's Guide*, 118.

[103] John Ellis, *The Social History of the Machine Gun* (Baltimore: Johns Hopkins
University Press, 1975), 149-77.

as they had with the advent of multi-fire pistols in the nineteenth century, lawmakers

responded to the novel threat to public safety with legislation.  Between 1925 and 1933, at

least twenty-eight states passed laws against fully automatic firearms.[104]

83.    Despite the great variety of models produced, prior to the 1930s surprisingly

few of the new firearms came with magazines that held more than ten rounds.  Perhaps partly

because large-capacity magazines were so unusual at this time, lawmakers worried about the

implications of semi-automatic weapons for public safety do not seem to have conceived of

magazines as something they could productively regulate separately from the guns

themselves.  And yet many clearly thought that the magazine capacity of these firearms was

one of the things that made them so dangerous.  So those states that did act regulated the arms

themselves, often addressing magazine capacity in the process.[105]

84.    Of the seven states that passed laws restricting semi-automatic weapons

during the 1920s and 1930s, five of them incorporated capacity ceilings into the law.

Different states set different limits, presumably reflecting the different circumstances and

views prevailing among their constituents.  For Ohio the limit was eighteen.  Michigan put

it at sixteen.  Rhode Island set the limit at twelve.  Virginia's limit was seven.  South

Dakota forbade guns "from which more than five shots or bullets may be rapidly, or

automatically, or semi-automatically discharged from a magazine."  Three other states –

South Carolina, Louisiana, and Illinois – crafted laws that leave ambiguity as to whether

they only applied to automatic firearms.  But all three chose the relatively low figure of

---

[104] Spitzer, "Gun Law History," 67.

[105] *Id.*, 68-71.

eight rounds for their ceiling, something fully automatic weapons could spit out in a single

second.  That strongly suggests that they, too, had decided to respond to the novel public

safety implications of semi-automatic firearms by regulating them.[106]

85.    In so doing, these lawmakers acted consistently with American tradition

and practice dating back to the early colonial era.

## IV.    The Changing Distinction between Civilian and Military Arms in the United States

86.    Ms. Hlebinsky's report contains several assertions about the relationship

between civilian and military firearms. I want to conclude by addressing an important error

of fact and interpretation in her report: the claim that "until recently, civilians often had

superior firearms than the military." Neither part of that statement is correct. Before turning

to her timing error, let me explain why it is misleading to frame the issue as one involving

superior vs. inferior arms.

87.    Firearms are tools. Hammers aren't superior to screwdrivers in any absolute

sense. Hammers are only superior to screwdrivers for particular uses. Similarly, while the

firearms most commonly owned by civilians during the colonial and early national eras

were different from those most commonly used by the military, they weren't superior to

military arms in any absolute sense. They were just intended for different uses. The

essential question, then – one largely absent from Ms. Hlebinsky's report – is *superior for*

*what*?

88.    In the eighteenth century, most European militaries equipped soldiers with

relatively heavy, large-caliber, smoothbore long-arms designed to accept a bayonet. For

instance, the standard service arm for most of Britain's eighteenth-century army, the Long

---

[106] *Id.*

Land Pattern Musket (the "Brown Bess"), weighed around eleven pounds, had a forty-six

inch, .760 -.780 caliber barrel. This clunky but formidable weapon was designed to

withstand the rigors of campaigning, to deliver significant stopping power, and to accept a

socket bayonet so that musketeers could double as pikemen in battle.[107] Most civilians

during the colonial and early national period had other priorities. They wanted firearms that

were easier to handle, had milder recoil, weighed less than a Brown Bess (often just over

half as much), and had smaller calibers and therefore generally consumed less powder per

shot. Such "fowlers," "fusils," "firelocks," and "trade guns" also cost less than "muskets," a

term informed observers of the day usually reserved for military long-arms.[108] Settlers in

western Pennsylvania and Virginia often had rifles, too. Skilled gunsmiths in these regions

were producing distinctive, high-quality rifles by the eighteenth century, often with

imported locks (though not from "parts kits ordered from overseas" (Hlebinsky Report, p.

17), which didn't exist in this era). Rifles had greater range and accuracy but took two-three

times as long to reload as smooth-bore weapons.[109] That trade-off made sense if the goal

was hunting deer. But painfully slow reloading times could be deadly in combat unless the

shooter had reliable cover.

     89.     Which type of arm was superior? Given their needs, most civilians thought

that lighter arms were superior to muskets. But colonial and early national leaders trying to

organize forces against regular armies had different needs, and complained bitterly about

---

[107] For an authoritative discussion of the evolution and variations, see De Witt Bailey, *Small Arms of the British Forces in America, 1664-1815* (Woonsocket: Andrew Mowbray, Inc., 2009), 13-23.

[108] Sweeney, "Firearms, Militias, and the Second Amendment," 330-31.

[109] *Id.*, 342.

the inferiority of most civilian arms. During the Seven Years' War, for example, one despairing official reported that the arms "which belong to private persons are mostly poor and undersized and unfit for an expedition."[110] A little more than a decade later, when he was first trying to forge a revolutionary army out of New England's militiamen, General Washington complained that "of Arms those brought in by the Soldiers are So very indifferent that I Cannot place Confidence in them."[111]

90.    Superiority was context dependent, in other words. So, if the purpose was pest control or small game hunting, lighter guns were superior. The same was true for patrolling slave plantations or waging long-distance campaigns through woodlands against Indigenous people. If the purpose was prevailing in battle against European armies, the bulkier muskets were superior. If the purpose was hunting large game, defending a fort or stockade against attackers, or targeting specific, high-value individuals on a battlefield, rifles were superior. While they were all but nonexistent in America at the founding, even the era's flawed repeating arms were superior in certain contexts. If the purpose was entertaining and impressing rich friends at your English country estate, a polished, inlaid Lorenzoni magazine repeater would certainly have been superior (for the few who could find and afford one). If the purpose was murdering a large number of strangers in a school or a church or at a public event, nothing would have sufficed. There was no functioning firearm then in existence that would enable someone to do that.

---

[110] Quote is from *Id.*, 331.

[111] Washington to Major General Richard Montgomery, Cambridge, January 12, 1776, https://founders.archives.gov/documents/Washington/03-03-02-0051

91.     In sum, early Americans recognized a distinction between military and civilian arms. The line between the two was porous, partly because the most important differences were in degree rather than kind. In a context where few had ever laid eyes on a repeating firearm, virtually every gun one might encounter was a single-shot muzzle-loader that was time-consuming to reload. While civilians preferred lighter arms and militaries preferred heavier arms, the differences and trade-offs were modest. Arms favored by civilians were sometimes put to military use, and arms favored by militaries were sometimes owned by civilians.

92.     The porous boundary between civilian and military arms endured through the nineteenth century, when firearms technology underwent dramatic change. The War Department (today known as the Department of Defense) periodically auctioned off decommissioned firearms from federal stores. Many were scooped up by wholesalers who then exported them abroad. But huge numbers (nearly all of them single-shot muskets or rifles) wound up in civilian hands.[112] Some important innovations (percussion ignition, breech loading, and metallic cartridges, for example) found their way into civilian and military arms alike. Occasionally innovations held far more appeal for one sector than the other – not because they were superior in any general sense, but because they were better suited to particular purposes. Pepperbox pistols, for example, appealed to some civilians because they conferred concealable repeat fire capabilities and were effective in close quarters. But most pepperboxes lacked the range or power that would make them remotely as appealing to soldiers or cavalry as the more expensive Colt revolvers. Lever-action rifles

---

[112] Such auctions even predate the Constitution. See for example the *Journals of the Continental Congress* for Friday, July 30, 1784 (p. 613).

became popular consumer items in the last third of the century, and were esteemed by cavalry in numerous countries. But they did not have the same appeal for the world's top infantries, who prized the greater range and power delivered by the best bolt-action rifles.[113]

93.      The soft boundary between military and civilian arms began to harden in the early twentieth century, when the dramatic technological change of automatic and semi-automatic weapons brought about unprecedented social concerns. Contrary to Ms. Hlebinsky's assertion, it was not the 1986 Hughes Act that began to limit civilian access to military weaponry. That happened much earlier. As explained above, dozens of states passed laws regulating automatic and semi-automatic firearms during the 1920s and 1930s. None of these laws applied to the U.S. military.

94.      In 1934, Congress hardened the boundary even further with the National Firearms Act. Among other things, the NFA created a tax and licensing regime designed to all but eliminate certain types of weapons from civilian life in the United States. Elaborated upon with subsequent legislation, and enhanced by numerous state-level laws, the NFA has been highly consequential. Among other things, federal law regulates the importation and sale of machine guns; silencers; tracer, incendiary, and armor-piercing ammunition; and certain large-caliber weapons. It also regulates the importation and sale of a large swath of weapons under the umbrella of "destructive devices," including grenades, grenade launchers, and artillery.[114] None of these regulations have ever applied to the U.S. military.

---

[113] See note 97, *supra*.

[114] See U.S. Code, Title 26, Chapter 53, "Machine Guns, Destructive Devices, and Certain Other Firearms," available here: https://www.law.cornell.edu/uscode/text/26/subtitle-E/chapter-53

Therefore, more than a half-century earlier than Ms. Hlebinsky claims, state and federal governments began limiting civilian access to weapons used by our military.

95.    Have these regulations, which have shaped the U.S. domestic arms market for nearly a century now, deprived civilians of the most "superior" firearms? As has been true throughout our nation's history, that depends entirely on what civilians want to do with their weapons. If the aim is to be equipped to hunt, target shoot, provide for home defense, or carry a gun outside the home for self-protection, then there are superior firearms available than those that the law has long reserved for the military. If the aim is to be equipped to quickly inflict devastating injuries on a large number of people, then these regulations have indeed been an obstacle.

96.    When I read complaints about civilians lacking access to "superior" weaponry, therefore, I reflect on our nation's long history of regulating firearms in the name of public safety and wonder, superior for *what*?

I declare that the foregoing is true and correct to the best of my knowledge.

Brian DeLay

Dated: July 11, 2023

# EXHIBIT A

# Brian DeLay

University of California
3229 Dwinelle Hall
Berkeley, CA 94720-2550
https://history.berkeley.edu/brian-delay
delay@berkeley.edu

## ACADEMIC POSITIONS

- Preston Hotchkis Chair in the History of the United States, UC Berkeley:    2016-Present
- Associate Professor of History, University of California, Berkeley:    Fall 2010 - Present
- Assistant Professor of History, University of California, Berkeley:    Fall 2009 – Spring 2010
- Assistant Professor of History, University of Colorado, Boulder:    Fall 2004 – Spring 2009
- Lecturer in History, Harvard University:    Spring 2004

## EDUCATION

- Ph.D., Harvard University, Cambridge, MA:    March, 2004
- MA, Harvard University:    June, 1998
- B.A., University of Colorado, Boulder, *summa cum laude:*    December, 1994

## WORK IN PROGRESS:

- "The Myth of Continuity in American Gun Culture," law-review article in-progress.
- "Aim at Empire: American Revolutions through the Barrel of a Gun, 1750-1825," book project under contract with W.W. Norton. 167k words drafted as of 6/22.
- "Means of Destruction: Guns, Freedom, and Domination in the Americas before World War II," book manuscript under contract with W.W. Norton. Research nearly complete.
- "PATH: The Project on Arms Trade History." Since 2008, I have been working with student research assistants to quantify the global arms trade, from the Napoleonic Wars to WWI. We have been extracting detailed import and export data from manuscript sources and, especially, from annual customs reports published by the main arms-exporting states: The United Kingdom, the United States, Belgium, and France (Germany and Spain still underway). We are nearly finished locating sources and doing the laborious work of data entry. Our relational database now has nearly 112,000 entries capturing the global movement of all kinds of war material, from percussion caps to artillery, from 1815-1915. We will soon shift to data analysis and begin applying for external funding to turn the dataset into an online tool freely available to researchers around the world.

## PUBLICATIONS AND RESEARCH

### Refereed Publications

- "The Arms Trade & American Revolutions," forthcoming (Sept. 2023) in the *American Historical Review*.
- "Foreign Relations between Indigenous Polities, 1820-1900," in Kristin Hoganson and Jay Sexton, eds., *The Cambridge History of America and the World*, Vol 2: 1812-1900 (Cambridge University Press, 2022), 387-411.
- "Indian Polities, Empire, and Nineteenth-Century American Foreign Relations" *Diplomatic History* 39:5 (December 2015), 927-42.

**Refereed Publications (cont.)**
- "Watson and the Shark," chapter in Brooke Blower and Mark Philip Bradley, eds., *The Familiar Made Strange: American Icons and Artifacts after the Transnational Turn* (Ithaca: Cornell University Press, 2015).
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," in Juliana Barr and Edward Countryman, eds., *Contested Spaces of Early America*, University of Pennsylvania Press, 2014, pp. 229-256.
- Editor, *North American Borderlands*. Routledge, 2012.
- *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War*. New Haven: Yale University Press, 2008 [paperback, 2009].
- "The Wider World of the Handsome Man: Southern Plains Indians Invade Mexico, 1830-1846," *Journal of the Early Republic* 27 (March, 2007), 83-113
- "Independent Indians and the U.S.-Mexican War," *American Historical Review* 112 (Feb., 2007), 35-68.

**Other Publications:**
- "American Guns, Mexico's Trials," *Bulletin of the American Academy of Arts and Sciences*, Spring, 2020
- "A Misfire on the Second Amendment," extended review of Roxanne Dunbar-Ortiz, *Loaded: A Disarming History of the Second Amendment* for *Reviews in American History* 47:3, Sept. 2019
- Co-author with James West Davidson, William E. Gienapp, Christine Leigh Heyrman, Mark H. Lytle, and Michael B. Stoff, *Experience History: Interpreting America's Past* [Formerly *Nation of Nations: A Narrative History of the American Republic*], McGraw-Hill (9th ed., 2019). *Concise version: *US/A History* (9th ed., 2022).
- "How the U.S. Government Created and Coddled the Arms Industry," *The Conversation*, October 2017
- "How Not to Arm a State: American Guns and the Crisis Of Governance In Mexico, Nineteenth and Twenty-First Centuries" [24th Annual W.P. Whitsett Lecture], *Southern California Quarterly* 95:1 (Spring 2013), pp. 5-23.
- "Oportunismo, ansiedad, idealismo: los impulsos Estadunidenses durante la intervención Francesa en México," in Jean Meyer, ed., *Memorias del Simposio Internacional 5 de Mayo*, El Colegio de Puebla, 2013, pp 269-288.
- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,'" in Charles Faulhaber, ed., *The Bancroft Library at 150: A Sesquicentennial Symposium*, Berkeley: University of California Press, 2011.
- "How Indians Shaped the Era of the U.S.-Mexican War," abbreviated version of Independent Indians and the U.S.-Mexican War," in Pekka Hämäläinen and Benjamin H. Johnson, eds., *Major Problems in the History of North American Borderlands*, Wadsworth, 2011.
- Response to Daniel Walker Howe, Andrés Reséndez, Ned Blackhawk, and Leonard Sadosky's essays in H-SHEAR roundtable on *War of a Thousand Deserts*, Nov. 2010.

**Other Publications (cont.)**
- Top Young Historian essay, Historians News Network, October 2010.
- "Forgotten Foes," *Berkeley Review of Latin American Studies* (Fall 2010), 14-19.
- "James Madison and the Scolds," Review of J. C. A. Stagg, *Borderlines in the Borderlands: James Madison and the Spanish American Frontier, 1776-1821*, *Passport* 40:3 (January 2010).
- "Why Mexico Fought," review of Timothy J. Henderson, *A Glorious Defeat: Mexico and its War with the United States*, *Diplomatic History* 33:1 (January 2010).
- "19th Century Lessons for Today's Drug War Policies," *The Chronicle Review*, Tuesday, July 28, 2009,
- "It's Time We Remembered the Role of Indians in the U.S.-Mexican War," *History News Network*, 3/9/2009
- "War of a Thousand Deserts," on *The Page 99 Test*,
- "Navajo," "Popé," and "Pueblo Indians," in Billy G. Smith, ed. *Colonization and Settlement (1585-1763)*, Volume 2 in the 10-volume *Facts on File Encyclopedia of American History* (2003)
- "Narrative Style and Indian Actors in the Seven Years' War," *Common-Place: The Interactive Journal of Early American History*, 1 (1), September 2000.

## PRIZES, HONORS, & AWARDS
- Visiting Scholar, University of Melbourne, October 2017
- Fulbright Distinguished Lecturer, Doshisha American Studies Seminar (Kyoto), 2014
- Bryce Wood Book Award for the outstanding book on Latin America in the social sciences and humanities published in English, Latin American Studies Association, 2010
- HNN "Top Young Historian," November 2010
- W. Turrentine Jackson (biennial) Award for best first book on any aspect of the history of the American West, Western History Association, 2009
- Robert M. Utley Award for best book published on the military history of the frontier and western North America, Western History Association, 2009
- Southwest Book Award, sponsored by the Border Regional Library Association, 2009
- James Broussard Best 1st book prize, Society for Historians of the Early American Republic, 2008
- Norris and Carol Hundley Best Book Award, Pacific Coast Branch of the AHA, 2008
- The Sons of the Republic of Texas Summerfield G. Roberts Best Book Award, 2008
- Finalist, Francis Parkman Prize from the Society of American Historians, 2008
- Finalist for the Clements Prize for the Best Nonfiction Book on Southwestern Americana, 2008
- Honorable Mention, TSHA Kate Broocks Bates Award for Historical Research, 2008
- Finalist for the PROSE Award in the U.S. History and Biography/Autobiography category, sponsored by the Association of American Publishers, 2008
- Organization of American Historians Distinguished Lecturer, 2008-2011
- Bolton-Cutter Award for best borderlands article, Western History Association, 2008
- Robert F. Heizer Prize for the best article in the field of ethnohistory, 2008

**PRIZES, HONORS, & AWARDS (cont.)**
- CLAH Article Prize, Conference on Latin American History, 2008
- Stuart Bernath Article Prize, Society for Historians of American Foreign Relations, 2008
- Phi Alpha Theta/Westerners International Prize for Best Dissertation, 2005
- Harold K. Gross Prize from Harvard University for the dissertation "demonstrating the greatest promise of a distinguished career in historical research," 2004
- University of Colorado Residence Life Academic Teaching Award, 2005
- Derek Bok Center Awards for Excellence in Teaching, Spring 1999 and Fall 1999

**GRANTS AND FELLOWSHIPS**
- John Simon Guggenheim Foundation Fellowship, 2019-2020
- Marta Sutton Weeks Fellow, Stanford Humanities Center, 2019-2020
- Center for Advanced Studies in Behavioral Sciences Fellowship, 2019-2020 (declined)
- American Council of Learned Societies Fellowship, 2017-2018
- Harry Frank Guggenheim Foundation Fellowship, 2013-14'
- UC Humanities Research Fellowship Grant, 2013-14'
- UC Berkeley CORE Research Bridging Grant, 2012-14'
- Charles A. Ryskamp Research Fellowship, American Council of Learned Societies, 2010-2011
- Donald T. Harrington Fellowship, UT Austin, 2009-2010 (Declined).
- University of Colorado Graduate Committee on the Arts and Humanities Research Grant, 2008.
- American Philosophical Society / British Academy Fellowship, 2008.
- Junior Faculty Development Award, University of Colorado, 2007.
- Bill and Rita Clements Research Fellowship for the Study of Southwestern Americana, Full Year, Clements Center, Southern Methodist University, Dallas, TX, 2005-2006.
- Postdoctoral Fellowship, Full Year, Huntington Library, San Marino, CA, 2005-2006 (Declined)
- Postdoctoral Fellowship, Full Year, Newberry Library, Chicago, IL, 2005-2006 (Declined)
- Packard Foundation Dissertation Finishing Grant, 2002-2003
- American Philosophical Society, Philips Fund Grant for Native American Research, 2001
- David Rockefeller Center for Latin American Studies Summer Grant 2001
- Department of Education Foreign Language Area Studies Grant, 2000-01
- Mellon Summer Field Research Travel Grants, 1999, 2000, 2001
- Harvard History Department Summer Travel Grant, 2000, 2001
- Graduate Society Term Time Research Fellowship, Spring 2000
- Harvard Graduate Student Council Summer Travel Grant, 1999
- The Charles Warren Center Fellowships for Summer Research, 1998, 1999
- The Graduate Society's Summer Fellowship, Harvard University, 1998
- General Artemas Ward Fellowship, Harvard University, 1996-97, 1997-98

**BOOK REVIEWS**

- Review of Jonathan Grant, *Between Depression and Disarmament: The International Armaments Business, 1919-1939*, in the *American Historical Review* 25:3, June 2020
- Review of David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America*, in the *American Historical Review*, Oct. 2017
- Review of Rachel St. John, *Line in the Sand: A History of the Western U.S.-Mexico Border*, in the *Pacific Historical Review*, Aug. 2012.
- Review of *Bridging National Borders in North America: Transnational and Comparative Histories*, Edited by Benjamin H. Johnson and Andrew R. Graybill, *Hispanic American Historical Review*, Feb. 2012.
- Review of *Fiasco: George Clinton Gardner's Correspondence from the U.S.-Mexico Boundary Survey, 1849-1854*. Edited David J. Weber and Jane Lenz Elder, *New Mexico Historical Review* 86:3, Summer 2011, 526-28.
- Review of Juliana Barr's *Peace Came in the Form of a Woman: Indians and Spaniards in the Texas Borderlands*, for the *American Historical Review* 113 (June 2008), 878-79.
- Review of Samuel Truett's *Fugitive Landscapes: The Forgotten History of the U.S.-Mexican Borderlands*, for *Labor: Studies of Working-Class History of the Americas* 4:4 (2007), 130-32.
- Review of Gary Clayton Anderson's *The Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875*, for the *Journal of American History* 93:2 (2006), 530-31.
- Review of Samuel Truett and Elliott Young, eds., *Continental Crossroads: Remapping U.S.-Mexican Borderlands History*, for the *Hispanic American Historical Review* 86:4 (2006), 864-65.
- Review of Rosemary King's *Border Confluences: Borderland Narratives from the Mexican War to the Present*, for *New Mexico Historical Review*, Fall 2005.
- Review of Edward A. Goodall, *Sketches of Amerindian Tribes, 1841-1843*, for *Itinerario: The European Journal of Overseas History*, Fall 2004 (28:3).
- Combined review of Alex D. Krieger's *We Came Naked and Barefoot: The Journey of Cabeza de Vaca Across North America* and Rolena Adorno's and Patrick Charles Pautz's *The Narrative of Cabeza de Vaca* for the *Southwestern Historical Quarterly*, April 2004.
- Review of Richard Flint's *"Great Cruelties Have Been Reported:" The 1544 Investigation of the Coronado Expedition*, for the *Southwestern Historical Quarterly*, October 2003.
- Review of Allen G. Hatley's *The Indian Wars in Stephen F. Austin's Texas Colony*, 1822-1835, for the *Southwestern Historical Quarterly*, October 2001.

**PRESENTATIONS & INVITED TALKS**

- "What a Junk-Shop Musket has to say about the American Revolution," presentation at Approaching American Revolutions Symposium, USC, May 2023
- "Why Dragging Canoe Sold Kentucky," paper presentation at the Western History Association Conference, San Antonio, TX Oct. 2022
- Roundtable participant for "After 1800: Rethinking Revolution and Counter-Revolution in the Atlantic World," USC/Écoles des Hautes Études en Sciences Sociales, June 2022

DeLay CV    5

**JA1945**

**PRESENTATIONS & INVITED TALKS (cont.)**

- Roundtable participant for "Empire and U.S. Foreign Relations," Society for Historians of American Foreign Relations, June 2022
- "Tribe and Nation in North America," comment for roundtable on Sumit Guha's *Tribe and State in Asia through Twenty-Five Centuries*, Institute for Historical Studies, UT Austin, November 2021.
- "What is History Now," Roundtable participant at UC Berkeley History Colloquium, October 2021
- "Tsiyu Gansini's Predicament: Guns, Ammunition, & Cherokee Choices before the Revolution," Rocky Mountain Seminar in Early American History, Oct., 2021
- "Aim at Empire," talk at the UC Berkeley Institute for International Studies, Sept. 2021
- Roundtable participant in "the U.S.-Mexican Borderlands" for Janet Napolitano and Daniel Sargent's class "Intro to Security Policy," GSP, Berkeley, Sept. 2021
- "Arms Trading and American Revolutions," paper for roundtable on Transnational Revolutionary History, Society for Historians of the Early American Republic, July 2021
- Roundtable on Armed Conflict and Military History, Society for Historians of American Foreign Relations annual conference, June 2021.
- "Guns Across Borders," presentation at Revolutions Across Borders symposium, Newberry Library, June, 2021.
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" American Historical Association, Jan. 2021
- "Arms Trading and the Fates of American Revolutions," invited paper given in the Cambridge University American History Seminar, March 1, 2021
- "Indigenous Agency, Whiggish History, and 'the Conquest of Mexico,'" Conference on Latin American History, Jan. 2021
- "Aim at Empire," presentation at the Stanford Humanities Center, December 2019
- "America's Guns, Mexico's Trials," Morton Mandel Public Lecture given at the invitation of the American Academy of Arts and Sciences, Berkeley, CA, Nov. 20, 2019
- "Arms Trading & New World Decolonization," paper presented at University College, London, May 2019.
- "The Texas Gun Frontier & the Travails of Mexican History," keynote at the 1st Biennial Symposium on Borderlands & Borders, Texas A&M University, San Antonio, April 2019
- "Guns and Revolution: The Arms Trade and the First Global Wave of Decolonization," Boston College, September 2018
- "Migration and the History of Immigration Enforcement on the U.S.-Mexican Border," at conference on Borders, Borderlands, and Migration, Institute of Slavic, East European, and Eurasian Studies and the Central European University, UC Berkeley, Sept. 2018
- "Shoot the State," roundtable presentation at the Western History Association, Nov. 2017
- "The Texas Gun Frontier and the Travails of Mexican History," Gary L. Nall Lecture, West Texas A&M, October 2017
- "Guns and Revolution: The Arms Trade and the Making of American Revolutions, 1774-1825," University of Melbourne, October 2017

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Dam-Breaking: How the Arms Trade Enabled the First Global Wave of Decolonization, 1775-1825," New York University, September 2017
- "The Most Dangerous Man You've Never Heard Of," invited presentation at symposium "Small Arms, Big Business: Trading Arms - Political, Cultural and Ethical Dimensions in Historical and Global Perspectives," Zentrum für Interdisziplinäre Forschung (ZIF), Bielefeld, Germany, June 2017.
- Organizer/chair and presenter for roundtable "Arsenal to the World: The Missing History of the American Arms Trade," OAH April 2017
- "The Ungovernable Rio Grande," Cal History Homecoming talk, February 2017
- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," CENFAD Colloquium, Temple University, January 2017
- "The Texas Gun Frontier and the Travails of Mexican History, or, No More Weapons! (Unless they're for Us)," University of Connecticut, October, 2016
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Harvard University, October 2016
- "How Transimperial Arms Bazaars Stabilized Instability in the Greater Caribbean," Rothermere Institute, Oxford University, May 2016
- "The International Arms Trade and the Brittle State in Mexico, 1810-1920," University of Chicago Latin American Seminar, December 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Northwestern University, December 2015
- "Guns and the Making of the Modern Americas," Stanford University, November 2015
- "The Texas Gun Frontier and the Travails of Mexican History," UT Austin, November 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," University of Cincinnati, September 2015
- "Dambreaking: Guns, Capitalism, and the Independence of the Americas," Society for Historians of American Foreign Relations, Conference Keynote, June 2015
- "War of a Thousand Deserts," San Jacinto Symposium, Houston, TX, April 2015
- "Dambreaking: Guns, Mercantilism, and the Demolition of Europe's America," the James P. Jones endowed lecture, Florida State University, March 2015
- "Dambreaking: Mercantilism, Armaments, and the Demolition of Europe's America," Indiana University, October 10, 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Doshisha University, Kyoto, Japan, July 25, 2014
- "How Borderland Indians Shaped the Era of the U.S.-Mexcan War," Keynote address for the 2014 Doshisha American Studies Seminar, Kyoto, July 26, 2014
- "War and Trade," Roundtable on new histories of trade, Society for Historians of American Foreign Relations, Lexington, June 2014
- "Gotham's Gun Barons: New York City Arms the Americas, 1865-1934," Cambridge University, November 25, 2013
- "A Protest of Arms: Guns and the Brittle State in Mexico, 1810-1920," Cambridge University Borderlands Workshop, November 11, 2013

## PRESENTATIONS & INVITED TALKS (cont.)

- "Gotham's Gun Barons: New York City Arms the Americas," Oxford University, Oct 2013
- "Marcellus Hartley: The Most Dangerous Man You've Never Heard Of," OAH April 2013
- "A Good Story," invited presentation to admitted students at Cal Day, April 20, 2013
- "Beware the Metanarrative; or, How I Acquired My Resistance to Resistance," Kaplan Lecture, University of Pennsylvania, March 2013
- "Domestic Dependent Notions: American Indians and the First Few Pages of American Empire," American Studies Association meeting, San Juan, Nov. 2013
- "Indian History and the History of American Foreign Relations," Society for Historians of American Foreign Relations annual conference, June 2012
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Society for Historians of American Foreign Relations annual conference, June 2012
- "Opportunism, Anxiety, and Idealism: U.S. Impulses during the French Intervention in Mexico," invited paper at el Simposio Internacional 5 de Mayo de Mexico, Biblioteca Palafoxiana, Puebla, Mexico, May 2012.
- "How Not to Arm a State: American Guns and the Mexican National Project, 1810-1920," Organization of American Historians annual conference, April 2012
- Chair, roundtable on the state of the field in U.S.-Mexico Borderlands History, Organization of American Historians annual conference, April 2012
- "So Far From God, So Close to the Gun Store: Borderlands Arms Trading and the Travails of Mexican History," 26th Annual W.P. Whitsett Lecture, CSU Northridge, March 2012
- "War of a Thousand Deserts," at the Tattered Cover Bookstore, Denver, CO, March 2012
- "Frontiers, Borderlands, and Transnational History," Huntington Library symposium on the Significance of the Frontier in an Age of Transnational History, Feb. 2012 [Audio in file#2]
- "Sailing Backwards on Mexico's 'Iron River of Guns': The Political Economy of the Arms Trade in the 19th and 21st Century's, Harvard Kennedy School, Feb. 2012
- "The Drug War and Borderlands History," Cal Alumni Day, Oct. 2011.
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," invited presentation at Stanford University's Comparative Wests Seminar, April 2011
- "Blood Talk: Violence and Belonging in the Navajo-New Mexican Borderland," invited talk for round two of Contested Spaces in Early America symposium, Clements Center for Southwest Studies, Southern Methodist University, Dallas, TX, April, 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk at UCLA's American Indian Studies Center, March 2011
- "Blood Talk: People and Peoples in the Navajo-New Mexican Borderland," invited talk presentation the USC-Huntington Early Modern Studies Institute and the Autry Museum of Western Heritage, March 2011
- "People and Peoples in Borderland Relations: Blood Talk in New Mexico," invited talk for Contested Spaces in Early America symposium, McNeil Center for Early American Studies, University of Pennsylvania, Philadelphia, PA October 2010
- "How Indians Shaped the U.S.-Mexican War," invited talk for the Bay Area Latin America Forum, Berkeley, CA September 2010
- "Indians and the U.S.-Mexican War," invited talk at University of North Texas, Sept. 2010

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Patterns of Violence in Navajo-New Mexican Relations," Pacific Coast Branch of the American Historical Association annual meeting, Santa Clara CA, August 2010
- "States and Stateless Peoples in George Herring's *From Colony to Superpower*," Society for Historians of American Foreign Relations annual meeting, Madison, WI, June 2010
- "Indians, Politics, and 19th-Century American Empire," UC Berkeley-Stanford-UC Davis faculty dinner, April 2010
- "War of a Thousand Deserts," invited Keynote Address to the James Rawley Conference in the Humanities, University of Nebraska, Lincoln, April 2010
- "19th Century Lessons for Today's Drug War Policies," History as a Resource for Decision Making, UC Berkeley, March 2010
- "Comanches in the Cast: Recovering Mexico's 'Eminently National War, 1830-1846," Bancroft Sesquicentennial Symposium, Berkeley, CA, March 2010.
- "Mexico, Native Polities, and the Continuous 19th Century American Empire," invited talk for the Harvard Symposium on 19th Century Empire, Cambridge, MA April 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented to the El Paso History Museum, February 2009
- "War of a Thousand Deserts: How Indians Shaped the Era of the U.S.-Mexican War," paper presented at the Texas Community College Teachers Association Conference, Austin, Feb. 2009
- "Putting Indians into the U.S.-Mexican War," paper presented at the Organization of American Historians annual meeting, New York, March 2008.
- "Military History and Non-State Peoples," roundtable paper presented at the American Historical Association conference, Washington D.C., Jan. 2008.
- "The French and Indian War," public talk for the High Plains Chautauqua, Greeley, CO, Aug. 8, 2007
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the University of San Diego Trans-Border Institute, April. 2007.
- "The Comanche Lens: Seeing Nation States through Tribes on the U.S.-Mexican Borderlands," invited talk at the George and Anne Richards Civil War Era Center, Penn State University, Jan. 2007.
- "Independent Indians, the U.S.-Mexican War, and the Reshaping of North America," paper presented at the American Historical Association conference, Atlanta, GA, Jan. 2007 (*Panel organizer*)
- "Opportunity Costs: Southern Comanches between Mexico and Texas, 1836-1846," paper presented at the Filson Institute's Comparative Borderlands Conference, Louisville, KT, Oct. 2006.
- "The War of a Thousand Deserts: Indians, the U.S.-Mexican War, and the Reshaping of North America," Clements Center Brown Bag series, Southern Methodist University, Feb. 2006.
- "Independent Indians and Borderlands Scholarship in the Americas" roundtable presentation at the Conference on Latin American History, Philadelphia, PN, Jan. 2006.

**PRESENTATIONS & INVITED TALKS (cont.)**

- "Comanches in the Cast: Remembering Mexico's 'Eminently National War,' 1830-1846," paper at the Latin American Studies Association Conference, Los Vegas, NV Oct. 2004
- Invited comment on Marie Duggan's "Franciscan Missions as Institutions of Economic Development: The Case of California, 1769-1832," at the Boston Area Latin American Seminar, Dec. 2003
- Invited comment on David J. Weber's "Spaniards and their Savages in the Age of Enlightenment," at the Boston Area Latin American Seminar, Oct. 2002.
- "Mexicans, Indians, and Anglo-Americans: Ethnic Conflict and Territorial Expansion, 1776-1854," paper presented at the Harvard Ethnic Studies Conference, Cambridge, MA, Feb. 2002.
- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at the American Historical Association conference, San Francisco, Jan. 2002.
- "The War of a Thousand Deserts: Indian Power & the Contest for Mexico, 1835-1854," paper presented at the Conference on Latin American History, San Francisco, Jan. 2002
- "Indian Power and the Fragmentation of Northern Mexico, 1835-1846," paper presented at the Western History Association Conference, San Diego, CA, Oct. 2001. (*Panel organizer*).
- "Americans Watching: Savage Indians, Suffering Mexicans, and Manifest Failures, 1835-1854," paper presented at Global America: The New International History Conference, Harvard, April 2001.
- Commentator at roundtable discussion of Fred Anderson's *Crucible of War* at the Charles Warren Center for Studies in American History, Harvard University, Feb. 2000.

**CONSULTING**

- Washington D.C.
  - Submitted declaration for the Attorney General's Office of Washington D.C. in defense of district law limiting high-capacity gun magazines in Hanson et al., v. District of Columbia, Case No. 22-cv-02256 (D.D.C.), Nov. 2022.
- Oregon
  - Submitted declaration as expert witness for the Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in Joseph Arnold et al., v. Tina Kotek, et al., No. 22CV41008 (Harney Cnty. Cir. Ct.), Dec. 2022. Testified remotely in preliminary injunction trial, Dec. 2022.
  - Submitted declaration for Attorney General's Office of the State of Oregon in defense of state law limiting high-capacity gun magazines in *Oregon Firearms Federation et al. v. Tina Kotek et. al.*, 2:22-cv-01815-IM (D. Ore.) (lead case); Mark Fitz, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01859-IM (D. Ore.) (trailing case); Katerina B. Eyre, et al., v. Ellen F. Rosenblum et al., 3:22-cv-01862-IM (D. Ore.) (trailing case); and Daniel Azzopardi, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01869-IM (D. Ore.) (trailing case). Feb. 2023. Deposed March 14, 2023. Testified in Federal District Court trial in Portland, June 2013.

DeLay CV  10

**CONSULTING, cont.**
- Illinois
  - Submitted declaration for Attorney General's Office of the State of Illinois in defense of its law limiting assault weapons and high-capacity magazines in Harrel v. Raoul, Case No. 23-cv-141-SPM (S.D. Ill.); Langley v. Kelly, Case No. 23-cv-192-NJR (S.D. Ill.); Barnett v. Raoul, 23-cv-209-RJD (S.D. Ill.); Federal Firearms Licensees of Illinois v. Pritzker, 23-cv-215-NJR (S.D. Ill.); Herrera v. Raoul, 23-cv-532 (N.D. Ill.); and *Kenneally v. Raoul, et al.*, 23-cv-50039 (N.D. Ill.). March, 2023.
- California
  - Submitted declaration for Attorney General's Office of the State of California in defense of its law limiting high-capacity magazines in William Wiese, et al., v. Rob Bonta, et al., 2:17-cv-00903-WBA-KJN (E.D. Cal.), May 2023.
- Washington (state)
  - Submitted declaration for Attorney General's Office of the State of Washington in defense of its law limiting high-capacity magazines in Gabriella Sullivan, et al., v. Bob Ferguson, et al., (W.D. Wash.), 3:22-cv-05403, May 2023.
- Colorado
  - Submitted expert report for the Town of Superior, Cities of Superior and Boulder, and Board of County Commissioners of Boulder County in defense of their laws limiting certain firearms and high-capacity magazines in Rocky Mountain Gun Owners et al., v. the Town of Superior et al., (D. Colo.), 22-cv-2680, May 2023.


**TEACHING**
**Classes Offered at UC Berkeley**
- HIST 7a: Lower-division lecture – *North America through Reconstruction,* 2011, 2012, 2015, 2018, 2020, 2021 (always in fall)
- HIST 100: Upper-Division Lecture - *American Encounters,* Fall 2009
- HIST 101: Undergraduate Research Seminar - *Senior Thesis Seminar* Spring 2010; Spring 2012, Spring 2013, Fall 2014, Spring 2022, Spring 2023
- HIST 103: Undergraduate Reading Seminars:
  - *Borderlands in North America*, Fall 2009
  - *The U.S. and Latin America in the 19th C.*, Spring 2012
  - *The Border* (reading seminar), Fall 2016
- HIST 104: Undergrad lecture/seminar- *The Craft of History*, Spring 2015, Spring 2017
- HIST 135B: Upper-division lecture - *Encounter and Conquest in Indigenous America*, Spring 2019, Spring 2022, Spring 2023
- HIST 280: Graduate Reading Seminars:
  - *Borderlands in World History,* Fall 2011
  - *The Making of the Modern World, through the Age of Revolutions* (Sem.), Fall 2014 (co-taught with Daniel Sargent)
  - *The Making of the Modern World, since the Age of Revolutions* (Sem.) Spring 2015 (co-taught with Daniel Sargent)
  - *Borderlands in North America* (reading seminar), Spring 2015

DeLay CV 11

**Classes Offered at UC Berkeley, cont.**
- o *Native North American History* (reading seminar), Spring 2021
- HIST 285: Graduate Research Seminars:
  - o *American History before 1900*, Spring 2013, Fall 2015
  - o *Topics in American History*, Fall 2018
- HIST 375: Graduate Sem: *Teaching History at the University* (pedagogy), Spring 2021

**Classes Offered at the University of Colorado**
- HIST 1015*: Lower-Division lecture - U.S. History to 1865*, Fall 07', Fall 08'
- HIST 1035*: Lower-Division lecture - Honors: United States History to 1865*, Fall 04'
- HIST 2015*: Lower-Division lecture - Early America*, Fall 06'
- HIST 3050: Undergraduate seminar - *The Arms Trade in World History,* Spring 09'
- HIST 3317*: UG sem. - Interethnic Borderlands in the American West*, Fall 04', Fall 07
- HIST 4115: Upper-Div. lec – *Natives & Newcomers in the Americas,* Fall 06', Spring 08'
- HIST 4327*: Upper-Division lecture - Novelty, Conflict, and Adaptation in the American Southwest,* Spring 05', Spring 08'
- HIST 4617*: Upper-Division lecture - Native North American History: Origins to 1815*, Spring 05', Spring 07', Spring 09'
- HIST 5106: Graduate Reading seminar - *Colloquium: U.S. History to 1865,* Fall 08'
- HIST 6030: Grad. Reading sem - *Frontiers and Borderlands in the Americas*, Spring 07'

**PhD Students** (1) = advisor/co-advisor; (2) 2nd reader
- **Current Students:**
  - o Sophie FitzMaurice (1)
    - ▪ Dissertation: "The Material Telegraph: Technology, Environment, and Empire in North America, 1846-1920."
  - o J.T. Jamieson (2)
    - ▪ Dissertation: "'A Mere Change of Location': Emigration and American Culture, 1800-1860."
  - o Russ Weber
    - ▪ Dissertation: Emotions and the political history of the early republic.
  - o Kyle Jackson (1)
    - ▪ Dissertation: New Orleans and Pan-Americanism before WWI
  - o Noah Ramage (1)
    - ▪ Dissertation: The Cherokee Nation in the late 19th Century
  - o Annabel LaBrecque (1)
    - ▪ "Deep Histories of Salt in North America"
  - o Julia Frankenbach (1)
    - ▪ Indigenous labor in the Bay Area during the Mission Era
- **Former PhD Students:**
- Ariel Ron (2), Glenn M. Linden Associate Professor of the U.S. Civil War Era, Southern Methodist University
  - o Dissertation: "Developing the Country: 'Scientific Agriculture' and the Roots of the Republican Party" (2012)

DeLay CV  12

**JA1952**

**Former PhD students, cont.**

- Mattie Harper, Grantmaking Officer, Bush Foundation
  - Dissertation (Ethnic Studies): "French Africans in Ojibwe Country: Negotiating Marriage, Identity, and Race, 1780-1890" (2012)
- Melisa Galván (2), Associate Professor, California State University, Northridge
  - Dissertation: "From Contraband Capital to Border City: Matamoros, 1746-1848," (2013)
- Allie McLafferty, History Instructor, St. Stephens Episcopal School, Austin, TX
  - Dissertation: "'A Plumb Craving for the Other Color': White Men, Non-White Women, and the Sexual Crisis in Antebellum America," (2013)
- Jennifer Carlson, Associate Professor of Sociology and Government & Public Policy, University of Arizona
  - Dissertation (Sociology): "Clinging to their Guns?: The New Politics of Gun Carry in Everyday Life," 2013
- Delia Hagen (1), Founder & Director of Hagen Historical Consulting, Missoula, Montana
  - Dissertation: "Northern Plains Borders and the People In Between, 1860-1940" 2015
- Bathsheba Demuth (2), Dean's Associate Professor of History and Environment & Society, Brown University
  - Dissertation: "The Power of Place: Ideology and Ecology in the Bering Strait, 1848-1988" (2016)
- Alberto Garcia (2), Assistant Professor, San José State University
  - Dissertation: "The Politics of Bracero Migration" (2016)
- Robert Lee (2), University Lecturer, Cambridge University
  - Dissertation: "Louisiana Purchases: The U.S.-Indian Treaty System in the Missouri River Valley" (2017)
- Erica Lee (1), Management and Program Analyst at FDIC, Washington, D.C.
  - Dissertation: "Sanctuaries into Fortresses: Refugees and the Limits of Obligation in Progressive-Era America" (2017)
- Javier Cikota (2), Assistant Professor, Bowdoin College
  - Dissertation: "Frontier Justice: State, Law, and Society in Patagonia, 1880-1940" (2017)
- David Tamayo (2), Assistant Professor, University of Michigan
  - Dissertation: "Serving the Nation: Rotary and Lions Clubs, the Mexican Middle Classes, and the Post-Revolutionary State, 1920s-1960s" (2018)
- Julia Lewandowski (1), Assistant Professor, California State University, San Marcos
  - Dissertation: "Small Victories: Indigenous Proprietors Across Empires in North America" (2019)
- Franklin Sammons (1), Assistant Professor, Washington & Lee
  - Dissertation: "Yazoo's Settlement: Finance, Law, and Dispossession in the Southeastern Borderlands, 1789-1820"

**SERVICE**
**University of California, Berkeley History Department**
- Search Committees:
  - Native North American History Search Committee, 2021-22'
  - US West Search Committee, 2018-19'
  - 20th Century Latin America Search Committee, 2014-15'
  - U.S. History Search Committee (Chair), 2012-13'

**University of California, Berkeley History Department Service, Cont.**
  - Latin America Search Committee, 2011-12'
- Endowed Chairs Committee, 2021-22'
- AC-5 Grad Admissions Committee, 2020-21', 2022-23'
- Governance Task Force Committee, 2014-15'
- Committee on the History Undergraduate Major,
  - 2011-12' (chair, spring 2012); 2015-16';  2016-17' (chair)
- Honors Committee, 2009-10'
- Admissions Committee, US Field, 2009-10'
- Reentry and Disabled Student Advisor, 2009-10'
- Faculty co-sponsor, with Daniel Sargent, of the Berkeley International and Global History Conference (BIG-H), 2011-2017
- Co-founder (with Daniel Sargent) and co-organizer (since 2021 with Rebecca Herman) of the Berkeley Global History Seminar, 2010-Present.

**University of California, Berkeley, Campus Service**
- Senate Liaison for external review of UC Berkeley Department of Ethnic Studies, 2021
- Letters & Sciences Executive Committee, 2020-2023
  - L&S Executive Committee Liaison for the external review of UC Berkeley Department of Slavic Languages & Literatures, 2022
- Berkeley Institute for International Studies (IIS)
  - IIS Directorship Search Committee, 2021
  - IIS Faculty Board, 2020-present
  - IIS Simpson Award Committee, 2012; 2013; 2015 (chair); 2016-2019.
- Bancroft Library
  - Friends of the Bancroft Library Council, 2021-present
  - Bancroft Library Prize Committee, 2015, 2016, 2017, 2019, 2020
- Academic Senate Committee on Committees, 2015 – 2017
- American Cultures Senate Subcommittee, 2011-12'

**University of Colorado History Department**
- Departmental Undergraduate Studies Committee, 2007-08'
- Departmental Executive Committee, 2006-07'
- Robert G. Athearn Lecture organizer, 2006
- Judge for Colorado History Day, Spring 2005
- History Department Graduate Studies Committee, 2004-05', 2008-09'

DeLay CV  14

**SERVICE, cont.**
- Phi Alpha Theta/History Club Advisor, Fall 2004

**Professional Service, Memberships, K-12 and Public Outreach**
- Professional Service:
  - Series Editor with Steven Hahn and Amy Dru Stanley for University of Pennsylvania Press book series, "America in the Nineteenth Century", 2014-present. Within the series, I have had served as faculty editor for the following books, working closely with their authors throughout the process:
    - William Kiser, *Borderlands of Slavery: The Struggle Over Captivity and Peonage in the American Southwest* (2017)
    - Noelani Arista, *The Kingdom and the Republic: Sovereign Hawai'i and the Early United States* (2019)
    - Katherine Bjork, *Prairie Imperialists: The Indian Country Origins of American Empire* (2019)
    - Alaina Roberts, *I've been Here All the While: Black Freedom on Native Land* (2021)
    - Paul Conrad, *The Apache Diaspora: Four Centuries of Displacement and Survival* (2021)
    - William Kiser, *Illusions of Empire: The Civil War and Reconstruction in the U.S.-Mexico Borderlands* (2021)
    - William Kiser, *Illusions of Empire: The Civil War and Reconstruction in the U.S.-Mexican Borderlands* (2021)
    - Sarah Keyes, *American Burial Ground: A New History of the Overland Trail* (2023)
  - Editorial Board Service:
    - *Reviews in American History*, 2019-2022
    - *Journal of the Early Republic*, 2020-2022
    - *Journal of the Civil War Era*, 2016-2018
    - *Pacific Historical Review*, 2012-2015
    - *Ethnohistory*, 2009-2012
  - Prize Committees:
    - Robert M. Utley Award Com., Western History Association, 2022-2025
    - Ray Allen Billington Prize Committee, Organization of American Historians, 2017-2019.
    - David J. Weber-Clements Center Prize Committee, Western History Association, 2016-2018.
    - Bernath Lecture Prize Committee, Society for Historians of American Foreign Relations, 2015-2018.
    - Louis Knott Koontz Memorial Award committee, Pacific Coast Branch of the American Historical Association, 2012-15
    - CLAH Article Prize Committee (Chair), Conference on Latin American History, 2012
    - John Ewers Book Prize Committee, Western History Association, 2012

- o **Prize Committees, cont.**
  - ▪ Sons of the Republic of Texas, Summerfield G. Roberts Book Award Committee, 2010-2012
  - ▪ Western History Association's Huntington-WHA Ridge Prize Committee, 2009-2011.
- o Conference Committees:
  - ▪ Conference Planning Committee, Society for Historians of the Early American Republic, 2021
  - ▪ Society for Historians of American Foreign Relations, Conference Planning Committee, 2012 and 2013
  - ▪ Organization of American Historians, Conference Planning Com., 2012
  - ▪ Society for Historians of the Early Republic, Conference Planning Committee, 2012
  - ▪ Local Arrangements Committee, Western History Association Annual Conference, Denver, 2009
  - ▪ American Society for Ethnohistory, Conference Planning Com., 2005
- o Manuscript Reviewer for *American Historical Review, Ethnohistory, Western Historical Quarterly*, the *Journal of American History*, *Modern American History*, *Law and History Review*, *Economics and Human Biology*, *History: the Journal of the Historical Association*, *Journal of the Early Republic*; *Enterprise & Society*; *William & Mary Quarterly*; *the Southwestern Historical Quarterly*; Oxford University Press, Harvard University Press, Princeton University Press, University of Pennsylvania Press, University of California Press, University of Arizona Press, Basic Books, Yale University Press, University of Colorado Press, University of Kansas Press, Cornell University Press, Palgrave & Macmillan; University of North Carolina Press, Duke University Press, University of Virginia Press, University of Tennessee Press, Texas A&M University Press; University of Nebraska Press, Blackwell Publishing, and Rourke Publishing.
- o Other Professional Service:
  - ▪ Co-Chair, Taskforce on Conference Conduct and Sexual Harassment, 2019, Society for Historians of American Foreign Relations
  - ▪ Nominating Committee, Western History Association, 2019-2021
  - ▪ External Reviewer for UC Davis Undergraduate Program Review, 2017
  - ▪ Secretary and then Chair, Borderlands & Frontiers Studies Committee, Conference on Latin American History, 2011-2012
  - ▪ Grant/Fellowship reviews for: National Science Foundation; Comisión Nacional de Investigación científica y tecnológica (Chile)
  - ▪ Evaluations and nominations for the MacArthur Fellowship Program
- • Member: American Historical Association; Org. of American Historians; Conference on Latin American History; Society for Historians of American Foreign Relations; Society for Historians of the Early American Republic; Western History Association.
- • K-12 and Public Outreach:
  - o Academic Advisor, Teaching American History Grant "American Democracy in Word and Deed," Mt. Diablo School District, CA, 2009-2013.

DeLay CV  16

**Professional Service and Public Outreach, cont.**

- o Presenter at Teaching American History Grant workshops in Oakland, CA, Dec. 2009, May 2010, and Oct. 2010.
- o Lead Presenter at Teaching American History or Gilder-Lehrman workshops for primary-school teachers in:
  - o Hartford, Delaware, June 2012
  - o New Orleans / San Antonio, June 2012
  - o Chicago, IL (June 2011)
  - o Deer Valley, AZ (Feb., 2010)
  - o Crescent City, CA (Jan., 2009 and April, 2010);
  - o Eureka, CA (Jan., 2009);
  - o Huntsville, Alabama (June 2008 and June 2009)
- Media:
  - o Hour-long interview with the History of California Podcast, Oct. 2020
  - o On-air interview for BBC News World Service on gun law following the massacres in Gilroy, El Paso, and Dayton, August 10, 2019
  - o On-air interview for extended program "The American Gun Industry: A Billion Dollar Business," Australian Broadcasting Corp., March, 2018
  - o On-air interview for BBC Newsday on Remington's bankruptcy, March 27, 2018
  - o On-air interview for "City Visions," KALW San Francisco, on youth protests against gun violence, March 26, 2018
  - o On-air interview, BBC Radio 5 on America's gun business, Feb. 26, 2018
  - o On-air interview for "The Attitude," Pacifica Network, on America's gun business, February 20, 2018
  - o "Gotham's Gun Baron," Spoken essay for BBC Radio Three program *The Essay*, January 2017
  - o On-screen consultant for German documentary on the U.S. presidency, "Die US-Präsidenten und der Krieg," produced by Westdeutscher Rundfunk and aired nationally in Germany in November 2016.
  - o "Guns, Capitalism, and Revolution in the Americas," 2015 SHAFR keynote address filmed and broadcast on CSPAN's American History TV, (first aired August 1, 2015).
  - o Interview with Deborah Lawrence and Jon Lawrence for Contesting the Borderlands: Interviews on the Early Southwest (University of Oklahoma Press, 2016), 182-200.
  - o Guest of NPR's Backstory, with the American History Guys, January 17, 2014
  - o Invited essay for the *New York Times*' Room for Debate feature, July 2, 2013
  - o Guest on NPR's "On Point with Tom Ashbrook," Nov. 7, 2012.
  - o Guest on PRI's "The World," April 12, 2011
  - o On-screen consultant for "The Mexican-American War," Oct. 29, 2006, History Channel
  - o KERA "Think" radio interview on *War of a Thousand Deserts*, 2008.

DeLay CV 17

# EXHIBIT B

## To the CURIOUS.

AN AIR GUN, made by a young man, a native of Rhode-Island, but now resident in this city, and which has been purchased by the subscriber, at a very considerable price, with a view eventually to make it the property of the American Museum but wishes to reimburse himself in the following manner, viz.

He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence.

This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13, Maiden-lane, every day in the week, from ten to twelve o'clock in the forenoon, and from three to five in the afternoon, Tuesday and Friday afternoons excepted, at which time it may be seen at the Museum.

GARDINER BAKER,

February 11, 1792.          *Keeper of the Museum.*

# EXHIBIT C

# MUSEUM.

JOSEPH STEWARD, respectfully informs the public that he still continues to make additions to his collection in the State House in Hartford. Among which are several entertaining paintings. One large historic painting containing fourteen figures.

Among the natural curiosities is the skin of a large snake, from South America, 16 feet in length.

A curious savage Priest's cloak, wrought with wampum and bells after their manner.

An air-gun, shot with great force by air instead of powder.

The attention of gentlemen sailing to foreign parts, is requested, to collect curiosities; and every attention of this kind will be gratefully received and suitably rewarded.

*Portrait Painting* performed by said Steward as usual, at the Museum, and every attention paid to render it agreeable.

Hartford, April 11th, 1803.                    94

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br>& PISTOL CLUBS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Correction to Rebuttal Expert Report of Brian DeLay**

---

I, Brian DeLay, the undersigned, declare as follows:

1.      I have reviewed my declaration dated July 11, 2023, and I have determined that I made a clerical error in that declaration. At paragraphs 6, 66, and 67, I estimated that high capacity firearms constituted approximately 0.002% of firearms in the United States in the period after the ratification of the 14th Amendment. This figure is erroneous. The correct figure is 0.2%.

2.      The calculation is based on the figures I set forth in the declaration itself.  Specifically, in paragraph 65 I explained that there were approximately 9,294 high-capacity firearms (Henrys and Winchester 1866s) in circulation in the United States in the period leading up to 1872.  I further estimated, conservatively, that there were at least 5 million firearms in the United States at that time (paragraph 66). 9,294 divided by 5,000,000 equals 0.0018588; or, rounded, up, 0.002. I erroneously reported this decimal figure as the percentage. Correctly rendered, 0.002 amounts to 0.2%.

I declare that the foregoing is true and correct to the best of my knowledge.

_Brian DeLay_
Brian DeLay

Dated:  September 21, 2023

# Exhibit 13



# The Peregrine Corporation

Specialists in Defense Dynamics

June 15, 2023

Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, NJ 07450

<div align="center">

**Re.:**    **Ellman, et al. v. Platkin, et al., and Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin, et al.**

</div>

Dear Attorney Schmutter:

I am writing to provide my expert report in the two above-referenced cases.

**Preparation.**  In preparation, I have reviewed materials you have provided, including the Complaint for Declaratory and Injunctive Relief in the case of Blake Ellman, et al. v. Matthew Platkin, et al., the Amended Complaint for Declaratory and Injunctive Relief in the case Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Matthew Platkin, et al., lists of firearms and firearms features prohibited by New Jersey law, and various materials from my own library which are cited below.

**Qualifications for Rendering Opinions.**  In addition, I am of course also relying on my own education, training and experience, amassed throughout a lifetime of using and working with firearms, both personally and professionally, as described in detail below.

I am an expert, consultant, instructor and expert witness in matters including firearms, ballistics, shooting scene reconstruction, firearms safety, firearms training, police training and tactics, self-defense, and the use of force. I have been retained by the plaintiffs in the two above-referenced cases to provide expert opinion testimony regarding the design, usage, utility, safety features, and lethality of modern semiautomatic rifles, including but not limited to the AR-15

type rifle in its common configurations discussed below, as well as semiautomatic shotguns.  I have personal knowledge of the facts stated herein, and if called as a witness, I could competently testify to these facts.

I have been a professional instructor and instructor-trainer (an "instructor-trainer" being one who trains and certifies instructors) in firearms, tactics, self-defense, and use of force, for law enforcement and security officers, police instructors, law enforcement agencies, military personnel, and private (i.e., non-law enforcement) individuals throughout the United States, and occasionally in other countries, over approximately the past 44 years.  I estimate that I have trained over 17,000 individuals in these skills and topics.

I have been certified as a firearms instructor by the Federal Bureau of Investigation ("FBI"), National Rifle Association ("NRA"), New Jersey Police Training Commission, Pennsylvania Municipal Police Officers Education & Training Commission, Glock, Heckler & Koch ("HK"), and others.  My instructor certifications cover rifles of all sorts, handguns, and shotguns, and cover the training of police, security personnel and civilians in the recreational and defensive use of firearms.  I am also certified as a Chief Range Safety Officer, that being someone who is trained to supervise other instructors on a multi-range facility, and to oversee the operations of the facility from a safety standpoint. I was an instructor at the Burlington County (New Jersey) Police Academy from approximately 1986 to 1995, and was an instructor at the Allentown (Pennsylvania) Police Academy from 1999 to 2007.  I taught a course I developed entitled "Police Use of Force" in the Criminal Justice Department of Indiana University in Bloomington, Indiana for two years while I lived in Indiana.  I instructed in a three-year series of Senior Firearms Instructor Classes for the federal Bureau of Alcohol, Tobacco & Firearms, taught at various locations on the East and West Coasts, including Orlando, Los Angeles, San Francisco, and San Diego.  I have regularly been a presenter on firearms-related topics at annual and regional training conferences of the International Association of Law Enforcement Firearms Instructors ("IALEFI"), the International Law Enforcement Educators & Trainers Association ("ILEETA"), and in past years the American Society of Law Enforcement Trainers ("ASLET").

Law enforcement agencies for which I have conducted instructor-level training in firearms include the New York State Police (multiple courses), Oregon State Police, Louisiana State Police, Missouri Highway Patrol, Washington D.C. Metropolitan Police (two courses), the Maryland National Capital Park Police, Massachusetts Metropolitan Police, the Massachusetts Criminal Justice Training Council, the Tennessee Bureau of Investigation, the North Carolina Justice Academy (multiple classes), the Connecticut State Police Academy (multiple classes), Henrico County (VA), Yellowstone County (MT), Billings (MT), the San Francisco Sheriff's Office, El Cajon (CA), Yolo County (CA) Sheriff's Office, Snohomish County (WA) Sheriff's Office, Toronto Metropolitan Police Service (Emergency Task Force and Dignitary Protection Unit), Calgary Police Service Tactical Unit, Salt Lake County Sheriff's Office, Nevada State Fire Marshal's Office, and the Police Departments of Philadelphia, Baltimore, Dallas (two courses), Phoenix (multiple courses), Miami, Jacksonville (two courses), St. Petersburg, Seattle, Tacoma, and many others.

In New Jersey, in addition to my teaching as a staff instructor at the Burlington County Police Academy, I have conducted law enforcement instructor-level training in firearms and/or armorer training, for the police departments of Jersey City, Trenton, Atlantic City (multiple courses), Mt. Laurel, Midland Park, Ramsey, Jefferson Township, the Cape May County Police Academy, the Middlesex County Police Academy, the Essex County Police Academy, the Bergen County Police Academy, the New Jersey Department of Corrections, and the New Jersey Division of Fish & Wildlife Law Enforcement Bureau, among others. I co-instructed a police counter-sniper rifle course at Fort Dix, hosted by the New Jersey State Police, and two Senior Firearms Instructor Courses for the Union County Prosecutor's Office. For all but one of the past 33 years I have conducted Police Firearms Instructor Recertification Courses annually for the Atlantic County Prosecutor's Office, attended by all law enforcement firearms instructors in Atlantic County.

Training I have conducted in New Jersey for non-police includes programs for the New Jersey Armored Motor Carriers Association, programs for three armored car companies and one precious metals company, training for executive protection and estate security personnel, and self-defense firearms classes, including training with handguns, shotguns and rifles, for non-law

enforcement individuals in Ledgewood, Sussex, New Egypt, Berkeley Township, Princeton Junction, and Pleasantville, and several armed security officer training programs conducted in East Brunswick.

I have consulted extensively for years for the Pennsylvania Municipal Police Officers Education & Training Commission ("MPOETC"). Among other things, I served on the curriculum development committee that wrote the firearms and use of force curriculum that was used at police academies throughout the Commonwealth of Pennsylvania for some 18 years. I conducted instructor-training courses for the MPOETC at the Pennsylvania State Police Academy at Hershey, at Fort Indiantown Gap, and at other locations; have served as a subject matter expert that established Patrol Rifle Guidelines ("patrol rifles" being AR-15 type rifles and other semiautomatic rifles) distributed to law enforcement agencies throughout Pennsylvania, and most recently served on the MPOETC committee that created a mandatory in-service Use of Force training program (including teaching the pilot course and an instructor-training course) that was presented to over 24,000 police officers throughout the Commonwealth of Pennsylvania.

I have served for some 35 years on the IALEFI Board of Directors, and for about the past 10 years have been First Vice President of that association. IALEFI publishes authoritative materials and guidelines for law enforcement training, and conducts police firearms and use of force training programs, including a week-long Annual Training Conference attended by hundreds of law enforcement firearms instructors from all parts of the United States and various foreign countries. IALEFI also conducts regional, instructor certification, and master instructor development firearms training programs each year at locations throughout the country, as well as occasional international programs in other countries.

I have served as a sworn, armed reserve deputy sheriff or special deputy sheriff for two sheriff's departments over the past 25 years, have served as a firearms and use of force instructor at both of those departments, and have had first-hand experience in a wide range of law enforcement activities, up to and including the arrest of criminals at gunpoint, and dealing with barricaded gunman situations. I have been qualified with, and have carried and used AR-15 rifles in my service with both of those departments.

- 4 -

Concerning my experience, knowledge, and expertise with semiautomatic rifles in general and AR-15 type rifles in particular, I have owned and used semiautomatic rifles since I was sixteen, that is, for the past 55 years. I have hunted with a semiautomatic rifle since I was sixteen. I have, since the 1970's, owned and used Ruger Mini-14 rifles. The Mini-14 is a semiautomatic, .223 (5.56mm) caliber rifle that is functionally virtually identical to the AR-15 rifle in terms of its ballistics, rate of fire, and other capabilities, although most of the Mini-14's variants have not had some of the AR-15's military-looking features that the New Jersey legislation on "assault weapons" (called "assault firearms" in New Jersey law) finds objectionable, such as the pistol grip and flash suppressor. I currently own several Ruger Mini-14 rifles, and I have personally carried Mini-14 rifles for defensive purposes on three continents. I have owned and used AR-15 rifles since the 1980's. I served as the Line Judge for Colt Firearms at the first Colt Cup rifle competition ever held, which was fired with AR-15 rifles in Connecticut. I have been certified as an AR-15 Armorer by Colt, and as an FN-15 Armorer by FN (Fabrique Nationale). An armorer is an individual trained and certified to inspect, maintain, and repair a certain model or category of firearms by the manufacturer of the firearms. Certification as an armorer means I am fully conversant with the internals parts and workings of the AR-15, its design and function. The FN-15 is an AR-15 clone, manufactured by FN and functionally identical to the Colt AR-15. It is used as a patrol rifle by my sheriff's department. I have written several published articles about the AR-15 and other semiautomatic rifles, and have on at least two occasions worked as a consultant to manufacturers of such rifles. I currently own several AR-15 rifles, as well as M1A rifles, M1 Garand rifles, US M1 Carbines, Mini-14s, semi-automatic variants of the AK-47 rifle, an SKS rifle, a Ruger 10/22, an AR-7 survival rifle, and other semiautomatic rifles that the New Jersey legislation in question might categorize as "assault weapons." I have also owned and used other semiautomatic rifles, including the Steyr AUG, the FN-FAL, several semiautomatic .22 rimfire rifles, an H&K 91, and several IWI Tavor rifles. I assisted IWI in the development of its Police Armorer Course for the Tavor rifle, and in preparation of its Armorer Manual. I have also at times worked as a consultant to Sturm, Ruger & Co., Steyr, and Lancer Systems, all of which are manufacturers of semiautomatic rifles and of what the New Jersey legislation would call "assault firearms" and "large capacity ammunition magazines."

I have taught police user-level and instructor level courses in what police call "patrol rifle" (i.e., AR-15 type rifle) in 1999, 2003, 2004, 2009, 2010, 2012, 2017 and 2018, have taught a "Shoulder Weapon Selection" course at the Connecticut State Police Academy in 1994, Counter-sniper Rifle Courses at Ft. Dix (NJ) and at the Glastonbury Police Department in Connecticut, Special Weapons and SWAT Team courses addressing the AR-15 rifle at the Atlantic County (NJ) and Cape May County (NJ) Police Academies, assisted in conducting AR-15 rifle training and qualification sessions for my sheriff's departments in Indiana and Pennsylvania, and for the Berks-Lehigh Regional Police in Pennsylvania, and was a presenter on the Patrol Rifle Panel at the ILEETA Annual Conference in St. Louis in 2017.

I achieved competitive rankings as a Junior Smallbore Rifle Expert and Light Rifle Expert in my teenage years, and have thereafter been certified as a High Power Rifle Expert, Patrol Rifle Expert, Patrol Rifle Instructor, and Police Precision Rifle Instructor. I successfully graduated from the NRA's Police Rifle Instructor Development Course taught at USMC Base Quantico, Virginia, from the NRA's Precision Rifle Instructor School held at The Crucible in Fredericksburg, Virginia, from the IACP's Counter-Sniper Rifle Course at Fort Dix, New Jersey, from Gunsite's General Rifle Course (using an M1A semiautomatic rifle) with an Expert rating, from the Thunder Ranch "Urban Rifle" course (using and AR-15 rifle and a Steyr AUG semiautomatic rifle), and from the U.S. Army Marksmanship Training Unit's Counter-Sniper Rifle Course at Fort Benning, Georgia. With handgun, I have held the rating of Distinguished Expert, which is a higher rating than expert, and I was an "A" Class IPSC Combat Pistol Shooter and qualified for the Indiana "Governor's Twenty."

I began to shoot shotguns in my early teenage years, and I have hunted with shotguns for the past 55 years in locations including Connecticut, New York, New Jersey, Pennsylvania, South Carolina and Louisiana. I have participated, and sometimes competed, in the clay pigeon sports of skeet, trap and sporting clays, and have fired shotguns in Three Gun Competition and Combat Shotgun events. I am certified to teach shotgun both to law enforcement and to "civilians" (i.e., non-law enforcement). I have placed on a winning team with shotgun in a national event. My firearms inventory contains several dozen shotguns, including semiautomatic shotguns that, because of their specific features, would be prohibited by the New Jersey "assault

weapon" statute.  I own or have owned shotguns of all other common types, including break-open (hinge action) single-barrel and double-barrel shotguns, pump-action shotguns, and bolt-action shotguns in all gauges from 10-gauge through .410. I have taught shotgun to law enforcement and to "civilians" in Massachusetts, Connecticut, New York, New Jersey, Pennsylvania, Indiana, Virginia, Florida, Utah, Washington D.C., Canada, and Africa.  I helped to develop and teach a Police Shotgun Armorer's Program for O. F. Mossberg & Sons, the world's largest manufacturer of shotguns.  I am certified as a shotgun armorer not only by Mossberg, but by Benelli for its semiautomatic shotguns.

In addition to the AR-15s and other semiautomatic rifles mentioned above, I have owned and used bolt-action rifles, lever-action rifles, break-open single shot ("hinge action") rifles and combination guns, pump-action rifles, and black powder muzzle-loading rifles.  In addition, I have owned and used select-fire M16 rifles (which are true "machine guns" capable of fully automatic fire), as well as select-fire submachine guns of various brands and types, also capable of fully automatic fire.  I have also fired other fully-automatic firearms, including military belt-fed machine guns and automatic weapons fed from large box magazines.  I have received armorer training, and have worked as an expert witness, in two cases involving the GAU-17 and other motor-driven, fully automatic "mini-guns," typically mounted on helicopter gunships, military patrol boats, and other military vehicles, capable of cyclic rates of fire ranging from 2,000 to 4,000 rounds per minute. I am thus conversant with all types of rifles, their designs and functioning characteristics, their capabilities, ballistics, and features, and have actual, first-hand knowledge of the differences between true military weapons and the semi-automatic rifles, shotguns and handguns addressed by the New Jersey legislation. I have also written over 30 published articles about handguns, handgun ammunition, and handgun technique, and at least seven published articles on shotguns (including semiautomatic shotguns), shotgun ammunition, and shotgun technique.  I have served as a consultant on design features to major manufacturers of rifles, shotguns and handguns.

I have been a regular presenter at state, regional, national and international conferences of law enforcement instructors, including but not limited to ASLET, IALEFI, and ILEETA.  I taught classes at last year's IALEFI Annual Training Conference in Melbourne, Florida and at an

ILEETA Conference in St. Louis, Missouri, where I was a panelist on both the ILEETA Deadly Force Panel of Experts and the ILEETA Active Shooter Panel of Experts. I have previously been a presenter at ILEETA Annual Conferences in St. Louis, and before that when they were held in the Chicago area.  I have been a panelist on several other expert panels at these instructor training conferences.

I have authored over 125 published articles in the firearms and tactics field. I was Technical Editor of <u>The Police Marksman</u> magazine, where I performed technical reviews and evaluations of firearms, ammunition, and firearms accessories of all sorts. I am the principal author of <u>Firearms Training Standards for Law Enforcement Personnel</u>, the Associate Editor of <u>Standards & Practices Guide for Law Enforcement Firearms Instructors,</u> and the principal author of the <u>IALEFI Guidelines for Simulation Training Safety</u>, originally published in 2004 with a recently-published revision in 2023.

In total, I have trained what I estimate to be some 17,000 students in my classes.  I have watched them fire literally millions of rounds of ammunition from rifles (mainly AR-15s and other semiautomatic rifles), handguns of all sorts, shotguns, submachine guns, and machine guns. I have watched others fire many millions more rounds from such firearms in training classes, qualification exercises, competitions, and firearms demonstrations. I myself have fired hundreds of thousands of rounds of ammunition from such weapons.  I have owned and/or used firearms, including select-fire and fully automatic firearms, with suppressors ("silencers"), flash suppressors, detachable box magazines, drum magazines, pistol-grip stocks, folding stocks, telescoping stocks, barrel shrouds, and other features addressed by the legislation in question. I will next be involved in police AR-15 training and qualification within the next few weeks for my sheriff's department here in Pennsylvania. I have actual – not just theoretical or academic – hands-on experience with all of the types of firearms and firearms design features addressed by the legislation in question in these lawsuits.

I have over the past 55-plus years visited at least many hundreds, if not thousands, of stores and shops where firearms, ammunition, and firearms accessories are sold, gunsmithing shops, firearms factories, firearms industry trade shows, and gun shows where firearms and

firearms accessories are bought and sold.  The stores range from small local gun shops in all parts of the United States where I have traveled to large national chains like Cabela's, Bass Pro, Academy, Gander Mountain, Sportsman's Warehouse, and Walmart.  The shows range from local gun shows to the annual SHOT Show in Las Vegas, hosting over 2,400 exhibitors from all over the world and attended by over 60,000 people.  I am thus very familiar with the firearms and firearms accessories, including such things as folding and telescoping stocks, flash suppressors, and magazines, that exist on the market and that are used by legitimate purchasers throughout the country.

I have served as an expert witness in numerous courts since 1984.  In total, I have served as an expert in over 400 cases, and have testified roughly 100 times in criminal and civil trials in state and federal trial courts throughout the United States, in addition to testimony before grand juries, police boards, administrative courts and tribunals (including the U.S. Government Accountability Office or "GAO"), state and city legislative committees, and before committees of both Houses of the United States Congress on firearms issues.  In total, I have been qualified and have testified as an expert in some 15 federal courts in 13 states, and in some 45 state courts in 22 states.  I have testified as an expert in U.S. District Courts in Pennsylvania (all three districts), Connecticut, New York, New Jersey, California, Maryland, Tennessee, Louisiana, Arkansas, Florida, Montana, Illinois, and Oregon. In 2020-2021, I testified as a firearms expert before the U.S. District Court for the Southern District of California in <u>Miller v. Becerra</u>, a case concerning California's "assault weapons" law that involved many issues similar to those in this case. I have also served as an expert in many cases that have been dismissed, settled, plea bargained, or for some other reason have not gone to trial or have not required my trial testimony, in at least 23 other states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Canada.

In New Jersey, I have testified as a firearms expert in the U.S. District Court, in Superior Courts in Essex, Union, Camden, Burlington, Atlantic, and Cape May counties, in Camden City Municipal Court, before several grand juries, and in hearings before the New Jersey Office of Administrative Law.  These matters have included civil cases, and criminal cases in which I have testified sometimes as a defense expert witness, and other times as a prosecution expert witness.

- 9 -

JA1973

Throughout the country, I have served as an expert in several cases involving AR-15s and other semiautomatic rifles, as well as in many cases involving shotguns.

Further details of my training, experience and qualifications are contained in my curriculum vitae, attached as **Exhibit 1** hereto.

## OPINIONS AND ANALYSIS

**Semiautomatic Firearms: Function and History.**  A semiautomatic firearm uses the power of the firing cartridge, typically either through diverting some of the pressurized gas from the cartridge's burning propellant gunpowder, or through the rearward recoil produced when the projectile moves forward out of the cartridge case, to operate the gun's mechanism, extracting and ejecting the fired cartridge case and bringing a fresh cartridge into position for firing. In a semiautomatic firearm, the trigger must be pulled separately for each shot. A semiautomatic firearm differs from a manually operated repeating firearm, such as a bolt-action, lever-action, or pump-action firearm, in which the user manually operates the mechanism to bring a fresh cartridge into position for firing.  The semiautomatic also differs from a fully automatic ("automatic") firearm – such as a "machine gun" -- in which holding the trigger depressed will result in a continuous, rapid series of shots until the trigger is released or the ammunition supply is exhausted.  Semiautomatic firearms are not a new invention.  Semiautomatic rifles, shotguns, and handguns were all developed before 1900, and were in common use in the early 1900's.  Our military first adopted a semiautomatic pistol (the Colt .45 caliber Model 1911) in the year 1911.

Armalite, an American small arms engineering firm located in California, developed the AR-15 in the 1950's.  It was designed in large part by Eugene ("Gene") Stoner, a famous American firearms designer whom I met and spoke with several times. In 1959, due to financial and production problems, Armalite sold its rights to its AR-10 and AR-15 designs to Colt's Manufacturing.  The model designation "AR-15" stands for "Armalite Rifle, Model 15," not for "assault rifle" as some uninformed individuals maintain. A version of the rifle, in "select-fire"

- 10 -

**JA1974**

form (meaning it could, by operation of a selector switch, be fired either semiautomatically, i.e., one shot for each pull of the trigger, or fully-automatically, i.e., continuous firing as long as the trigger was held depressed), was first used by our military in the Vietnam War as the M-16. AR-15 type rifles, also called "MSRs" or "Modern Sporting Rifles," are today among the most popular rifles sold and used in the United States. They have been manufactured by literally hundreds of companies, including Colt, FN, Ruger, Remington, Bushmaster, Rock River Arms, Wilson Combat, Barrett, DPMS Panther Arms, H&K, Lewis Machine, Olympic Arms, Palmetto State Armory, and Mossberg. The National Shooting Sports Foundation (NSSF), a firearms industry trade group, estimated about five years ago that there were, at that time, between 5 and 10 million AR-15 rifles in civilian hands in the United States. In recent years popularity and sales of the AR-15 have increased greatly, and it has now become one of the most popular rifles and widely-used rifles in the country. AR-15s are made or assembled and sold by many manufacturers, ranging in size from one-man shops to large companies such as Colt, Ruger, Remington, Mossberg, SigArms, Rock River Arms, and others. Current estimates of AR-15 and AK-type semiautomatic firearms in civilian hands in the United States are in the range of 25 million or more. The "AK" stands for Automat Kalashnikova, or Kalashnikov Automatic Rifle. First produced as a Soviet military rifle in 1947 (thus "AK-47"), the AK was the invention of Russian firearms designer Mikhail Kalashnikov. The AK became one of the most widely-used rifles in the world, with semiautomatic versions being sold in the United States and other countries for civilian use. While made in a number of calibers, the most commonly seen caliber for the AK rifles is 7.62 x 39mm, a larger caliber than is used in the standard AR-15 rifle, which fires the .223 Remington or 5.56mm NATO cartridge.

For the sake of clarity, I must emphasize that while I have discussed the military "select fire" M16 rifle above, as well as the semiautomatic-only civilian AR-15 rifle, the challenged version of the New Jersey "assault firearms" law has nothing to do with the military M16 select-fire rifle, only with the AR-15, the civilian semiautomatic version that fires one single shot for each separate pull of the trigger, just as all other semiautomatic firearms do. The select-fire ("fully automatic") M16 version of the rifle is heavily regulated under federal law and other New Jersey statutes, and is not involved in this case.

**Semiautomatic Rifle and Pistol Magazines.**    The AR-15 uses a detachable box magazine for the .223 Remington or 5.56mm NATO cartridge.   These two rounds are very similar, and can be used interchangeably in many AR-15s.  The most common magazine size for the AR-15, and the size of the great majority of magazines manufactured and sold for the AR-15, is 30 rounds.  The next most commonly seen magazine size is 20 rounds. Magazines of 5, 10 and 40 rounds are also available, as well as other sizes, but are relatively rare.  Over the past decades I have personally seen tens of thousands of 30-round AR-15 magazines, perhaps a thousand 20-round AR-15 magazines, and fewer than 100 AR-15 magazines of all other sizes combined.  The New Jersey law is incorrect and misleading when it describes 20-round and 30-round AR-15 magazines as "large capacity ammunition magazines."  They are, to the contrary, the standard-sized magazines for the AR-15.

The AK-type firearms also use detachable box magazines. Far and away the most commonly seen and commonly available magazine for the AK firearms holds 30 rounds, although both smaller capacity and larger capacity magazines are available.  The most widely-available and commonly seen magazines for other semiautomatic rifles, including the Ruger Mini-14, Steyr AUG, M1A, Galil and others are 20 to 30 rounds.  Standard-size magazines for the M1 Carbine are 15 and 30 rounds.

With an estimated 25 million AR-15 and AK-type firearms in civilian hands in the United States, there are certainly many times that number of 20-round and 30-round magazines in private ownership as well.  In my opinion, estimates that there are currently 100 million or more 30-round AR-15 magazines in circulation and quite credible. Magazines are relatively inexpensive, with either metal or plastic 30-round AR-15 magazines commonly selling for $10 to $15 each, whereas the rifles in which the magazines are used may cost $600 to $1,000 or more.  It is not unusual to see literally several thousand 30-round AR-15 and AK magazines for sale at a modest-sized weekend gun show.

The New Jersey law's limit of handgun magazine size to 10 rounds imposes an unreasonable restriction on New Jersey gun owners, especially (but not only) those with concealed carry permits.  Many popular semiautomatic pistols have greater magazine capacities.

- 12 -
**JA1976**

Examples include the Glock 17 (17 rounds), the SIG P320 (17 rounds), and the Smith & Wesson M&P9 2.0 (17 rounds). Even the compact versions of these pistols – specifically, the Glock 19, the SIG P320 Compact, and the S&W M&P9 Compact, all have magazine capacities of 15 rounds. Some of the most popular "micro-9" pistols have magazine capacities that exceed the New Jersey limit, such as the Springfield Hellcat (11-round and 13-round magazines), the S&W Shield Plus (10-round and 13-round magazines), and the SIG P365 (10, 12, 15 and 17-round magazines). For many individuals carrying a concealed handgun for self-protection, carrying an extra magazine to compensate for the New Jersey law's magazine size limit imposes and uncomfortable, and in some cases impossible, burden. Most police nationwide, including in New Jersey, carry handguns that hold 16-18 rounds, plus between one and three additional loaded magazines on their persons. If police officers need that many rounds to protect themselves and the public, why should gun owners in New Jersey be limited to fewer rounds to protect themselves and their loved ones?

**Use and Advantages of the AR-15 Rifle.** AR-15 rifles are commonly used for both formal and informal target shooting (including each year at the National Matches at Camp Perry, Ohio), for hunting, by farmers and ranchers for control of predators and pest animals, and for self-defense. They are also widely used by law enforcement agencies as "patrol rifles," in many parts of the country all but completely replacing the 12-gauge shotgun as the shoulder weapon carried in most police cars. Anyone visiting a retail gun store in most states will likely see many AR-15 rifles for sale, as well as displays of magazines, accessories, and ammunition for these rifles. Similarly, someone taking a trip to most outdoor shooting ranges, and indoor ranges with rifle capability as well, will find many people target shooting with AR-15 rifles.

The AR-15 is especially popular because of its light weight, very mild recoil, and good ergonomics, all of which make it well suited to younger shooters, female shooters, and other shooters of smaller stature, as well as an easy rifle for larger, stronger individuals to use. All of these design features of the AR-15 – its light weight, mild recoil, and good ergonomics – as well as the adjustable length of its buttstock when fitted with a telescoping buttstock (as it commonly is), the effectiveness of its cartridge for self-defense use, and its better continuity of fire when used with its most commonly available 20-round and 30-round magazines, make the AR-15, in

- 13 -

**JA1977**

many cases, a much better choice of shoulder weapon for self-defense by a female user or other smaller-statured user than the 12-gauge or other shotguns that have often been recommended for that purpose in the past. The shotgun, in fact, is much harder for most women (as well as most other shooters) to use, too heavy, ill-fitting in its commonly available stock configurations, and has recoil which is far too punishing, discouraging practice and resulting in poor competence and many safety problems. For the same reasons that the AR-15 has largely replaced the shotgun in police use, it is a better choice as a self-defense weapon for many private individuals as well. Other semiautomatic rifles which would be prohibited by the New Jersey legislation are similarly good choices as self-defense shoulder weapons for women and men alike.

A major disadvantage of the shotguns often recommended for defense in the home is the shotgun's considerable recoil. Used with the type of shotgun usually recommended for defensive use, the typical 12-gauge shotgun often has 25 foot pounds or more of free recoil when fired, which makes firing more than a few shots unpleasant or painful for many shooters. Even in police training programs, this much recoil becomes problematic, limiting the amount of shooting that can be done, and the familiarity and skill level with the shotgun that can be achieved. Also, the spreading pattern of shotgun pellets, whether birdshot or buckshot, creates a danger due to the possibility of pellets missing the intended target, even with a properly-aimed shot. In contrast, the AR-15 and similar semi-automatic rifles have little perceptible recoil, and are therefore much more pleasant to shoot. More shots can therefore be fired in training, and better familiarity with the firearm and accurate results can thus be more easily obtained. In many thousands of law enforcement agencies nationwide, the switch from shotguns to AR-15s and similar semiautomatic rifles as shoulder weapons has resulted in officers handling the guns with greater confidence and competence, and firing with accuracy, even at distances of 50 yards and more, far exceeding the accuracy most officers were ever able to achieve with shotguns. This results not only in greater effectiveness when the rifle must be used for self-defense, but greater safety as well, not only for the user but for any others who may be in the area. The same effectiveness and safety should be available to non-police officers as to police officers.

**Use of the AR-15 and Similar Rifles for Self-Defense.** My opinion that AR-15s and similar semiautomatic rifles are suitable for self-defense use by private individuals is supported

- 14 -

by many examples of such use. For example, a pregnant mother used an AR-15 to save the life of her husband, killing one of the two intruders who were terrorizing her family. Attached hereto as **Exhibit 2** is a true and correct copy of the digital article "Pregnant Florida Mom Uses AR-15 to Kill Home Intruder.

Another example was in Glen St. Mary, Florida in 2018, where seven home invaders were fought off by their would-be victim using an AR-15. One of the seven invaders was killed, and five others were arrested. The defender fired over thirty (30) shots in the process, underscoring the need for magazines that hold more than a few rounds of ammunition. Attached hereto as **Exhibit 3** is a true and correct copy of the digital article, "Deputies: 30 Rounds Fired From AR-15 in Deadly Florida Home Invasion."

In another case, in Oswego, Illinois, a man named Dave Thomas, who was in legal possession of an AR-15, used it without the need to fire a single shot to stop a man who was repeatedly stabbing one of his neighbors. Attached hereto as **Exhibit 4** is a true and correct copy of the digital article "Man Armed With AR-15 Stops Attack By Neighbor in Oswego."

In the highly-publicized 2017 active shooter event at the First Baptist Church in Sutherland Springs, Texas, in which the gunman killed 27 people and wounded 20 others, a 55-year-old plumber living across the street from the church, alerted by his daughter that a man was shooting people at the church, got his AR-15 out of his gun safe, loaded it, and exchanged shots with the gunman, hitting him twice, and then flagged down a passing motorist to pursue the gunman together when the gunman attempted to flee from the scene. Attached hereto as **Exhibit 5** is a true and correct copy of the digital article, "Texas Hero Reportedly Used His Own AR to Confront the Sutherland Springs Shooter."

In a case in Harris County, Texas in 2013, a 15-year-old boy, at home with his little sister, used an AR-15 to drive off two burglars who had broken a window to enter the house. They fled, leaving a trail of blood. Attached hereto as **Exhibit 6** is a true and correct copy of the digital article, "Harris County Deputy's Son Shoots One of Two Intruders."

- 15 -

**JA1979**

Also in 2013, a man with a .223 AR-15-type rifle in Montgomery County, Pennsylvania, successfully defended himself and his wife against an intruder, who died later in the hospital. Attached hereto as **Exhibit 7** is a true and correct copy of the digital article, "Elkins Park Man Killed After Forcing His Way Into Apartment."

In 2017 in Broken Arrow, Oklahoma, three masked intruders were shot and killed by 23-year-old Zach Peters, the son of the home's owner, using an AR-15 rifle. The shooting was ruled justifiable. Attached hereto as **Exhibit 8** is a true and correct copy of the digital article, "Shooting Deemed Justifiable: Authorities Say Zach Peters Acted Lawfully When He Shot, Killed Three Intruders."

Numerous other cases in which the AR-15 and other semi-automatic rifles have been used in self-defense can be found. The fact that several of the above examples are cases in which a homeowner or other private citizen has had to fight off multiple attackers is significant in explaining the need for semiautomatic firearms and magazines that hold 20-30 rounds of ammunition.

It is incorrect, and in fact a common myth, that the .223/5.56mm projectile fired by the AR-15 and other rifles under consideration is too penetrative to be used safely for self-defense inside and around homes, businesses, farms and ranches. If that were the case, police would not be using AR-15 "patrol rifles" nationwide, including in urban and suburban areas, and as entry weapons for indoor searches and arrests. The fact is that with properly selected ammunition, the .223/5.56mm actually presents less danger of overpenetrating walls, floors, ceilings and criminal attackers than conventional self-defense handgun bullets in calibers such as 9mm, .40 S&W, and .45 Auto. This is because the .223/5.56mm has a much higher muzzle velocity and fires a much smaller, lighter projectile which, if properly selected as to projectile type (e.g., the self-defense type rounds that are widely available where ammunition is sold), will fragment easily and will be unlikely to penetrate as many sheetrock partitions or other common building elements as many common handgun bullets. I have demonstrated this to classes of police and others by firing through sheetrock and other materials, and many published studies confirm the same results. See attached hereto as **Exhibit 9** an article by R.K. Taubert (FBI, Ret.), "About .223 Penetration,"

- 16 -

**JA1980**

**Exhibit 10** "Real World Testing: .223/5.56 Penetration Tests vs. .40 S&W and 12 ga. Slug," and **Exhibit 11** "Why 'High-Powered' 5.56 NATO/.223 AR-15 is Safer for Home Defense (FBI Overpenetration Testing)," Prepared Gun Owners, July 14, 2016.

    <u>**Features of the AR-15 and Other So-Called "Assault Weapons."**</u> The New Jersey statute, in addition to listing a number of prohibited "assault weapons," identifies several features that supposedly distinguish "assault weapons" – as it defines that term -- from ordinary semiautomatic firearms. In actuality, the term "assault weapon" (unlike "assault rifle," which is a compact, lightweight select-fire rifle firing an intermediate-powered cartridge) is a pejorative term created by legislative draftsmen which has no technical definition in the firearms field. See <u>Standards & Practices Reference Guide for Law Enforcement Firearms Instructors</u>, P. Covey and E. Kapelsohn, 1995, "assault rifle" and "assault weapon," p. 5 ff.

    The New Jersey statute categorizes as "substantially identical" to the banned firearms, and thus also banned, semiautomatic rifles that have the ability to accept a detachable magazine, and at least two of the following features:

1. a folding or telescoping stock;
2. a pistol grip that protrudes conspicuously beneath the action of the weapon;
3. a bayonet mount;
4. a flash suppressor, or a threaded barrel designed to accommodate a flash suppressor; or
5. a grenade launcher.

    The statute also prohibits a semiautomatic shotgun that has at least two of the following features:

1. a folding or telescoping stock;
2. a pistol grip that protrudes conspicuously beneath the action of the weapon;
3. a fixed magazine capacity in excess of 5 rounds; or
4. an ability to accept a detachable magazine.

- 17 -

**JA1981**

Having extensive personal experience as a user, as a firearms instructor, and as a consultant, with all of the design features identified by the legislation, and with their practical effects on the capabilities of firearms, I will address these features below.

**Pistol Grips.**   One of the New Jersey law's prohibited features is a "pistol grip that protrudes conspicuously beneath the action of the weapon."  The AR-15 is, as discussed above, a semiautomatic version of the select-fire military M16 and its predecessor, the Armalite Rifle Model 15 ("AR-15").  The M16 is designed, as its "select-fire" description indicates, to fire either semiautomatically, or automatically ("full-auto") by the positioning of its safety/selector lever for one or the other mode of fire.  When firing automatically ("full-auto"), the military M16 has a cyclic rate of fire of 750-900 rounds per minute.  In practical effect, with the most commonly used 30-round magazines, a shooter firing an M16 full-auto may actually be able to discharge roughly 250-300 rounds per minute, although not necessarily with good accuracy.  In order to allow military users of the M16 to fire it full-auto while staying on target, rather than having significant "muzzle climb" while firing, the M16, and similar fully-automatic or select-fire rifles, employ what is termed a "straight-line design," meaning that the rifle's barrel and its stock, which is placed on the user's shoulder when firing, are in a straight line, so that recoil is transmitted straight rearward into the user's shoulder along the axis of the bore, which is the axis of recoil. Attached hereto as **Exhibit 12** is a diagram of a standard AR-15/M16, showing this straight-line design. In order to make the straight-line design possible, the front and rear sight assemblies of the M16 and AR-15 are raised considerably (about 2-1/2 inches) above the line of the rifle's bore (barrel), so that they will be in line with the shooter's eye for aiming, when the rifle's buttstock is seated on the user's shoulder in firing position.  This differs from the conventional design of sporting rifles and shotguns (generally wooden-stocked), in which the sights are mounted much closer to the axis of the bore/axis of recoil, and the buttstock angles downward significantly to reach the user's shoulder.  Because the buttstock and the point of shoulder support is thus significantly below the axis of recoil, such conventionally-stocked rifles exhibit a great deal of "muzzle rise" when each shot is fired.  This slows down even semiautomatic or manually-operated shots from conventionally-stocked rifles, and would make it very hard to keep them on target if they could be made to fire full-auto.  The purpose of the M16's straight-line design is to

eliminate this muzzle rise from shot to shot. However, because the M16 and AR-15 have a stock which comes straight back from the rifle's receiver to the user's shoulder, it then becomes necessary to provide a "pistol grip" that protrudes downward from the rifle's receiver ("action," per the New Jersey statute). Otherwise, the user would have to raise his or her dominant arm uncomfortably high to grip the rifle, operate the manual safety, and pull the trigger. In such a position, the dominant hand could interfere with aiming the rifle, in addition to which the trigger and trigger guard of the M16 and AR-15 are not located in a position that would make this contorted arm and hand position easily performable. The design purpose of the M16/AR-15's pistol grip is to position the user's hand properly and comfortably behind the trigger and trigger guard of the rifle – a position which would not be feasible for the user to assume without the pistol grip – and, in the case of the M16 when fired full-auto in military use, to provide better control of the rifle in full-auto fire.

Even when the rifle is fired semiautomatically, in the normal manner for the "civilian" AR-15, the straight-line stock design and the pistol grip reduces muzzle rise, allowing more accurate fire and faster follow-up shots.

Contrary to the claims of some anti-gun activists, a pistol grip on a rifle stock does not allow the rifle to be "wildly spray fired" in all directions. Certainly our Department of Defense would not want our military rifles, including our M16 and later evolved M4 rifles, to be so equipped. Neither would law enforcement agencies all over the United States, which are concerned with the accuracy and safety with which their AR-15 patrol rifles can be fired, including in areas which may be densely populated with innocent bystanders. The pistol grip on the AR-15 stock, and pistol grips on the stocks of other semiautomatic rifles and shotguns, also do not allow these rifles to be reloaded any faster than similar firearms without pistol grips. Instead, pistol grips on semiautomatic rifles and shotguns simply provide an appropriate and comfortable way of gripping these firearms, without contorting one's hand, wrist and arm into an unnatural position.

Largely because pistol grip stocks on semiautomatic rifles have proven to be so comfortable, and to permit good control of the weapon and its controls, pistol grip stocks have in

recent years grown in popularity on semiautomatic and pump-action shotguns as well.  As with pistol grip stocks on semiautomatic rifles, pistol grip stocks on semiautomatic or other shotguns do not especially permit or induce "spray firing" (whatever that means), or faster reloading of the firearms.  Pistol grip stocks, commonly used on rifles and shotguns throughout most of the United States, are simply a feature the New Jersey legislature seems to have chosen to identify rifles and shotguns it wishes to make illegal.

**Folding or Telescoping Stocks.**   Another of the prohibiting features for both semiautomatic rifles and shotguns in New Jersey, is the firearm having a "folding or telescoping stock."  While the AR-15 can be equipped with a solid (that is, not telescoping) buttstock, telescoping buttstocks are far more popular, and are in fact standard on most AR-15 rifles sold today throughout the country, as well as on many other models of semiautomatic rifles.

What telescoping buttstocks do is allow for the rifle stock to be adjusted to properly fit the user.  The U.S. military's current telescoping buttstock for its M4 rifle (the modern evolution of the M16) allows the stock to be set for any of four to six different lengths. This allows the rifle to be used comfortably and fired accurately by shorter-statured shooters, including female shooters among others.  It also allows the rifle to be adjusted for comfortable, accurate firing from different shooting positions, as a stock length that works well in the standing position may be too long for optimum use from a sitting or kneeling position.  The telescoping stock also allows the stock to be shortened when the shooter is wearing heavy clothing, as in wintertime, and lengthened when lighter clothing is worn in warmer weather.  Telescoping-style adjustable stocks are used for these same reasons on many other firearms other than semiautomatic rifles, including both pump-action and semiautomatic shotguns, for example the Mossberg pump-action Model 500 Tactical and ATI Tactical shotguns.

Folding stocks, in contrast to telescoping stocks, offer law-abiding firearms users the advantage of storing the firearm more conveniently, and transporting it to and from the range in a more compact carrying case.

**Bayonet Mounts.**  Another prohibited feature is a "bayonet mount," sometimes called a "bayonet lug."  This is typically a small steel block, welded to the barrel of a firearm a few inches back from the muzzle, which can be used to attach a bayonet to the rifle or shotgun.  In fact, bayonet mounts are common on many types of civilian rifles and shotguns.   Again, the New Jersey statute's prohibiting of bayonet mounts, while sensational, is largely superfluous.

**Flash Suppressors and Threaded Muzzles.**   Another of the prohibited features is a "flash suppressor," or a threaded barrel designed to accommodate a flash suppressor. A flash suppressor is a fixture on the end of a rifle's barrel that divides and diverts the muzzle flash through several slots or holes, most commonly arranged radially around the axis of the bore.  The most common type of flash suppressor on AR-15 rifles is probably the Mil Spec A2 birdcage type, which has four slots from about the nine o'clock to three o'clock positions (that is, around the top 180 degrees of the suppressor), but is solid on the bottom in order not to raise clouds of dust or dirt when firing from a prone position on dry ground. Attached hereto as **Exhibit 13** is a picture of an A2 birdcage flash suppressor. Flash suppressors are not expensive accessories; for example, the Aero Precision A2 birdcage-type suppressor shown in Exhibit 13 retails for $7.99. Flash suppressors are used on the vast majority of the millions of AR-15s and similar semiautomatic rifles throughout the United States.

The major advantages of a flash suppressor on a rifle's barrel are: (1) the reduction of muzzle flash so as not to temporarily blind a shooter who is firing in a darkened environment, whether in a defensive situation or on an indoor shooting range, and (2) the reduction of muzzle flash from a military rifle, so as to minimize the illumination of the shooter, which might reveal his location to enemy troops in darkened environments.  The flash suppressor also serves to protect the muzzle of the rifle from dirt, mud, sand, etc., which could dangerously plug the muzzle if it were to touch the ground outdoors.   Purpose (1) above is important in a rifle used for self-defense by civilians, and legislation that prohibits flash suppressors makes rifles less suitable for self-defense use by civilians.  Law enforcement statistics indicate that a high percentage of violent crime occurs during the hours of darkness, or in otherwise darkened environments (poorly lighted indoor areas, for example). Attached hereto as **Exhibit 14** is a digital article from Security Magazine, "Violent Crimes Most Likely to Occur At Night."  The use of a rifle without a flash

suppressor under those circumstances is likely to temporarily blind the user, or at least seriously impair the user's vision, placing the law-abiding user at a disadvantage to a criminal attacker, and increasing the danger to the public if the vision-impaired user must fire the rifle before his or her normal visual abilities return after an unsuppressed muzzle flash in the dark. **Exhibit 15** provides an example of the difference between an AR-15's muzzle flash with no flash suppressor (Exh. 15A), and the muzzle flash when a suppressor is used (Exh. 15B).

The value of the flash suppressor in protecting the rifle's muzzle from being damaged, or from being plugged with mud, dirt or sand if the rifle's muzzle touches the ground, is significant, and is stressed by some instructors in defensive rifle classes. I have personally seen a firearm's barrel burst upon firing when the muzzle was plugged with mud after inadvertent contact with the ground. Luckily no one was injured, but the results could have been catastrophic.

A great many rifles today come standard from the manufacturers with threaded muzzles, with the threads protected by screw-off metal caps. These threaded muzzles will allow the attachment of various muzzle devices, including flash suppressors, recoil-reducing muzzle brakes, or sound suppressors (so-called "silencers"). While sound suppressors are prohibited for civilian ownership in New Jersey, they are legal, with proper federal licensing, in many other states, including nearby Pennsylvania. Contrary to their portrayal on television and in movies as instruments of crime, sound suppressors do no make the report of most firearms nearly inaudible, and the suppressors have many legitimate purposes on semiautomatic rifles used for defensive purposes, whether by police or private individuals. The most important of those legitimate purposes is to allow the user to fire the rifle, especially in indoor environments, without suffering permanent hearing loss from the sound of shots. This can occur because, unlike shooting on a firing range while wearing hearing protectors, firing a .223 rifle without hearing protection, as would likely be the case in a self-defense situation, can in many cases result in some degree of permanent hearing loss. For this reason, police departments today are often equipping their AR-15 patrol rifles with sound suppressors to protect the hearing of their police officers.

Even though sound suppressors are not legal for civilian ownership in New Jersey, and regardless of whether or not the user wishes to, or can legally, attach a flash suppressor to the

muzzle of the rifle, the fact that New Jersey's "assault firearm" statute prohibits rifles with threaded muzzles eliminates many excellent threaded-muzzle firearms from being able to be sold, purchased or possessed in New Jersey.

One of the muzzle devices a threaded muzzle allows the user to attach to a rifle is a muzzle brake, which is a recoil-reducing device. Muzzle brakes are advantageous, are preferred by many shooters, and are perfectly legal under New Jersey. But because the New Jersey law lists threaded muzzles as one of the prohibiting features, it makes it much more difficult, if not in some cases impossible, for a New Jersey gun owner to make use of a muzzle brake for his semiautomatic rifle.

**Prohibited Pistol Features.**    The New Jersey statute also prohibits semiautomatic pistols that have the ability to accept detachable magazines and have at least two of the following features:

1. A magazine that attaches to the pistol outside of the pistol grip;
2. A threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;
3. A shroud that is attached to, or partially or completely encircles, the barrel and permits the shooter to hold the firearm with the non-trigger hand without being burned; or
4. A manufactured weight of 50 ounces or more when the pistol is unloaded.

The attachment point of the pistol's magazine (item 1 above) has nothing to do with the pistol's safety. Like other features discussed above, this is a common firearm feature that is only useful as a means of criminalizing certain firearms the State wishes to ban.

Threaded barrels (item 2) have already been discussed above. Increasing numbers of handguns today come from the factory with threaded muzzles. The advantages of a flash suppressor have already been discussed, and will not be covered again here. Flash suppressors are, in any event, rarely used on handguns. Silencers are illegal for ownership by private

individuals in New Jersey, so it seems fairly senseless to prohibit a pistol with a threaded barrel simply because that feature might allow the pistol to be fitted with a silencer. A "barrel extender" is usually a purely cosmetic feature, affecting only the appearance of the handgun. A forward handgrip may allow some people to hold pistol more firmly and fire it more accurately.

A barrel shroud (item 3 above) serves to protect the shooter's hand from being burned by a barrel that has become hot from firing. Barrel shrouds have been commonly used on rifle and shotgun barrels since the early 1900's, and are available on many rifles and shotguns today.

The total weight of the handgun (item 4 above), at 50 ounces when unloaded, makes the described firearm unusually large and heavy for a handgun. This, in turn, makes the handgun less easily concealed and carried. It is difficult to see how this forms a valid basis for prohibiting a firearm.

**Shotgun Magazine Capacity.** Another of the prohibited features is a semiautomatic shogun with a fixed magazine capacity of over five rounds. Many semiautomatic shotguns intended for self-defense use have magazine capacity of over five rounds. The Mossberg 930 (8-shot capacity) and several of the excellent Benelli tactical shotguns are examples. Because shotguns with fixed (i.e., tubular) magazines must be reloaded one round at a time – a slow and difficult process at best in a stressful self-defense situation – the magazine capacity of the shotgun is an important feature, as larger capacity reduces the likelihood that reloading during the midst of a self-defense shooting incident will be necessary.

## Conclusion

New Jersey's so-called "assault weapon" legislation appears to focus primarily on cosmetic features of firearms. In fact, the AR-15 is just another semiautomatic rifle, a type of firearm that has existed since about 1900. The AR-15 is, in many cases, an excellent rifle for law-abiding citizens to use for self-defense, as well as for target shooting, recreational shooting, and hunting or control of predators, rodents and other pest animals where game laws permit. Features such as flash suppressors, threads at the muzzle end of the barrel, pistol grips, telescoping or folding stocks, bayonet mounts, and the other features discussed above serve to criminalize rifles and shotguns, widely used by the tens of millions throughout most of the United States, that are

useful, accurate, and safe for law-abiding citizens to use. Pistol grips, flash suppressors, threaded muzzles, telescoping or folding stocks, detachable magazines for semiautomatic rifles, and shotgun magazine capacity in excess of five rounds, all have legitimate advantages to the law-abiding user. It appears that this legislation is either ill-informed, or that its intent is to prohibit some of the most widely used – because they are the most useful – firearms in existence in the United States, which are regularly chosen by law-abiding Americans to protect themselves and their loved-ones from violent crime.

Among the specific facts and opinions I have expressed in the foregoing report are the following:

1. Semi-automatic handguns, rifles and shotguns are not new, "evil" creations, but have been in use since before 1900.

2. The AR-15, AK-type, and similar semiautomatic rifles are owned and used by millions of law-abiding Americans for lawful purposes including self-protection, recreational shooting, hunting, and pest control.

3. 20-round and 30-round semiautomatic rifle magazines are not "large capacity ammunition magazines," as the New Jersey law misleadingly states. To the contrary, these are the standard-sized magazines for many of the semiautomatic rifles addressed in this lawsuit.

4. Similarly, semiautomatic pistol magazines with capacities greater than 10 rounds are not "large capacity ammunition magazines," but are, in many cases, the standard-sized magazines for those pistols.

5. AR-15 rifles and similar rifles are accurate, reliable, safe and easy to use effectively, which is why these rifles are often the firearms chosen by law enforcement and by private individuals for defensive use.

6. Limiting New Jersey gun owners to 10-round magazines for their semiautomatic rifles and pistols imposes an unreasonable and arbitrary disadvantage on them, which negatively affects their ability to defend themselves and their loved ones against violent criminal attack.

7. Pistol grips on semiautomatic rifles and shotguns are not "evil" features, but have

practical advantages in allowing the firearms to be controlled and fired accurately. On the AR-15, for example, these advantages are why Eugene Stoner, one of the world's foremost firearms designers, designed the AR-15 with a pistol grip rather than with some other kind of stock.

8. Telescoping stocks are not "evil" features, but can be adjusted to allow rifles and shotguns to be handled and fired effectively by shooters of various statures, in various shooting positions, and when wearing various types of clothing or equipment.

9. Folding and telescoping stocks for rifles and shotguns allow the firearms to be stored more conveniently, and transported more easily. Prohibiting bayonet mounts makes many excellent rifles and shotgun unavailable for sale to or ownership by New Jersey gun users.

10. Flash suppressors, which are very commonly possessed and used throughout the United States on AR-15s and other semiautomatic rifles, have a valuable purpose, make the rifles safer to use in dim light, and improve public safety as well.

11. The prohibition of threaded muzzles makes many excellent firearms unavailable for sale to or ownership by New Jersey gun users. The prohibition of threaded muzzles also makes it difficult or impossible for New Jersey gun users to use muzzle brakes – a perfectly legal device which valuable recoil-reducing advantages – on their firearms.

12. Some of the prohibited features in the handgun section of the law, such as barrel shrouds, provide specific, legitimate advantages to the firearms user. Other prohibited handgun features, such as where the magazine attaches to the handgun, or whether the handgun has a barrel extender, are arbitrary. The overall effect of the handgun section is simply to criminalize various handguns, based on an arbitrary list of features.

13. Especially given the slowness and difficulty of reloading a tubular-magazine shotgun during the stress of a self-defense confrontation, the limitation of semiautomatic shotguns to a capacity of 5 rounds places New Jersey gun users at a significant disadvantage in confrontations with violent criminal attackers.

All of the facts and opinions I have expressed in this report are accurate to a reasonable degree of professional certainty in my fields of expertise.

Very truly yours,

Emanuel Kapelsohn, President

# EXHIBIT "1"

**CURRICULUM VITAE:  EMANUEL KAPELSOHN**

<u>**PERSONAL DATA:**</u>        Born:  April 23, 1952.  Newark, NJ
Marital Status:  Married, two children
Address:  1636 N. Cedar Crest Blvd. #320, Allentown, PA 18104
Telephone:  610-360-7053
Email:  peregrine@ptd.net

<u>**ACADEMIC DEGREES:**</u>    Yale University.  B.A.  <u>cum</u> <u>laude</u>.  English Literature (1974)
  Activity:  Varsity Heavyweight Crew (earned Varsity Letter)

Harvard Law School.  Juris Doctor (1977)
  Activity:  Harvard Prison Legal Assistance Project

<u>**EMPLOYMENT:**</u>

1985 -    President.  The Peregrine Corporation.  Design, evaluation and implementation of training programs for police, security, and other armed personnel and civilians throughout the United States and abroad, including use of force, firearms, defensive tactics, executive protection, and specialized training; instructor and armorer training and certification; consulting with regard to the selection of firearms and other equipment; technical evaluation and consulting regarding design and function of firearms and related products; security surveys and risk assessments; litigation consulting and expert witness services; production of videotape training programs, written training materials, training aids, product literature and warnings; writing articles for publication in law enforcement and firearms periodicals.

2009-10   Adjunct Instructor, Criminal Justice Department, Indiana University, Bloomington, IN. Taught Senior Seminar, "Police Use of Force" (2009, 2010)

2007 -    Attorney. Lesavoy Butz & Seitz LLC.  Allentown, PA.  Civil litigation, municipal law, general practice, risk management.  2007 to present.

2006-7    Associate.  Lamm Rubenstone Lesavoy Butz & David LLC.  Allentown, PA .  Civil litigation, municipal law, general practice.

1994 -
2006     Associate.  Blank Rome LLP, Allentown, PA.  Civil litigation, including state and federal court practice.  Bar admissions:  Pennsylvania Supreme Court, Federal District Courts for the Eastern and Middle Districts of Pennsylvania and the Northern District of New York.

1982-5    Firearms Training Consultant (self-employed).  Firearms instruction for police, security and other armed personnel and civilians; consulting and expert witness services; writing articles for publication in firearms periodicals.

1984-5    Director of Security.  Jasna Polana, Princeton, NJ.  Private estate security, executive protection and protection of valuables in transit.  Responsibilities included hiring and training armed security officers, scheduling, design and implementation of operational procedures, supervision, planning of special operations, dealing with vendors of security equipment and services, and interfacing with law enforcement and other public agencies.

1979-83   Operative.  The Spiesman Agency, New York, NY.  Occasional part-time detective work including surveillance, criminal and civil investigations, interviewing of witnesses, process service, and bodyguarding.

**JA1993**

Curriculum Vitae:
Emanuel Kapelsohn
Page 2

1977-82        Associate; Senior Associate.  Friedman & Gass, P.C., 99 Park Avenue, New York, NY.
               Commercial litigation, including trial and appellate practice in state and federal courts
               throughout the United States for major domestic corporations.  Bar admissions:  New
               York Supreme Court; Federal District Courts for the Southern and Eastern Districts of
               New York, Western District of Pennsylvania, and District of Utah; U.S. Court of Appeals
               for the 10th Circuit; U.S. Armed Services Board of Contract Appeals, Washington, D.C.

**FIREARMS
TRAINING
QUALIFICATIONS:**  FBI-Certified Firearms Instructor
               Instructor, Burlington County (NJ) Police Academy (1986-1995)
               Instructor, Allentown (PA) Police Academy (1999-2007)
               Technical Editor, The Police Marksman Magazine (1987-1990)
               Contributing Editor, Special Weapons and Tactics Magazine (1983-1986)
               Editor, The Firearms Instructor (1994-1995)
               Editorial Committee, The Firearms Instructor (1988-94, 1996-97, 2001- 2002)

               International Association of Law Enforcement Firearms Instructors (IALEFI)
               Active Member (1984-   );  Member, Board of Directors (1987-   ); Third Vice
               President (1991- 2011 ); Second Vice President (2012-2015); First Vice-
               President (2015-    )Chairman, Firearms Training Criteria Committee (1995-
               2016 ); Chairman, Corporate Sponsorship Committee (1987-1990); Chairman,
               Instructor Certification Committee (1988-1990); Chairman, Safety Committee
               (1995- 2003);  Member, Safety   Committee (2003-   ); Member, Legal
               Committee (1987-1999); Chairman, Legal Committee (1999-  ); Chairman,
               Editorial Committee (1994-1995); Member, Editorial Committee (1988-1994,
               1996-1997; 2001-2003); Chairman, Firearms Training Standards Subcommittee
               (1992-95); Member, Instructor Criteria Committee (1996-    ); Member, By-
               Laws Committee (1999-2002; 2016-   ); Member, Ethics Committee (2003-  ).
               Principal Author or Associate Editor of several IALEFI publications – see
               below.  Originator, IALEFI Handgun Safety Check.  Designer, IALEFI Q target
               series. Member, Instructor Certification Committee (2010 - 2011).  Chairman,
               Instructor Criteria Committee (2020 -      ).

               Member, National Advisory Board, Police Marksman Association (1986-2006)
               Special Police Officer, Lawrence Twp. Police Department (1986)
               Reserve Deputy Sheriff, Cleveland County Sheriff's Office (1988-1991)
               Reserve Lieutenant, Albee-Maple Grove Police Department (1989-1990)
               Special Deputy Sheriff, Salt Lake County Sheriff's Office (1992-2006)
               Special Deputy Sheriff, Berks County (PA) Sheriff's Department (1997-    )
               Reserve Deputy Sheriff, Greene County (IN) Sheriff's Reserve (June 2008-2012)
               Staff Instructor in Pistol, Shotgun, and Rifle at the American Pistol Institute
                 (Col. Jeff Cooper, Director)  (1980-1982)
               Senior Affiliate Instructor, Defense Training International (John S. Farnam,
                 President); DTI Instructor Update (2020)
               Instructor, Executive Security International (Aspen, Colorado 1986-1988)
               NJ Police Training Commission-Certified Firearms Instructor
               Pennsylvania Municipal Police Officers Education & Training Commission -
                 Certified Instructor (MPI # 1360, General Instruction, Special Instruction -

**JA1994**

Curriculum Vitae:
Emanuel Kapelsohn
Page 3

Firearms, Application of Force)
NRA-Certified Police Firearms Instructor
NRA-Certified Security Firearms Instructor
NRA-Certified Law Enforcement Rifle Instructor
NRA-Certified Practical Firearms Instructor (Personal Protection)
NRA-Certified Pistol Instructor
NRA- Certified Rifle Instructor
NRA-Certified Shotgun Instructor
NRA-Certified Law Enforcement Submachine Gun Instructor
NRA-Certified Home Firearms Responsibility Instructor
NRA-Certified Police Tactical Firearms Instructor
NRA-Certified Chief Range Safety Officer
NRA-Certified Police Precision Rifle Instructor
H&K-Certified MP-5 User
H&K-Certified MP-5 Instructor
SIG Pistol Armorer
Glock Pistol Armorer
Glock Pistol Armorer Trainer
Mossberg Shotgun Armorer
Mossberg Shotgun Armorer Trainer.  Developed and presented armorer training
    programs for O.F. Mossberg & Sons, Inc. for Models 500, 590 and 590DA
    shotguns, including consulting on revisions of Armorer's Manual and
    development of related training materials including student handouts, written
    and practical examinations, visual aids, etc.  Trained other Armorer-Instructors
    for Mossberg.
Colt Rifle and Submachine Gun Armorer
NLETC-Certified Lindell Handgun Retention Systems Intermediate Trainer
Glock Authorized Transitional Training Consultant.  Designed and taught
    armorers and firearms instructor courses on a contract basis for Glock, Inc.
    from approximately 1987 through 1993, including development of instructor
    notebook and related materials, student handouts, written tests, qualification
    standards, visual aids, etc.  (See below for specific course dates and locations.)
Justice System Training Assoc.-Certified Psycho-Motor Skill Design Instructor
Certified Police Defensive Tactics Instructor
Firearms Instructor and Safety Officer, U.S. Treasury Department Pistol
    Club, New York, NY (1980-83)
"A" Class IPSC Pistol Competitor
Executive Protection Specialist License (State of Colorado)
Certified Agent, Pennsylvania Lethal Weapons Act (Act 235)
Certified ASP Baton Instructor
OCAT-Certified Pepper-Spray Instructor
Certified FATS Instructor Trainer
NTOA - Certified Less Lethal Impact Munitions Instructor
Taser Master Instructor
Light Rifle Expert (NRA Rating)
Smallbore Rifle Expert (NRA Rating)
General Rifle Expert (API Rating)
Pistol Expert (NRA and API Ratings)
Revolver Expert (NRA Rating)

**JA1995**

Curriculum Vitae:
Emanuel Kapelsohn
Page 4

Handgun Distinguished Expert (NRA Rating)
Shotgun Expert (NRA and API Ratings)
Submachine Gun Expert (NRA Rating)
Federal Firearms Licensee and Class III Licensee
Designer and copyright holder, IALEFI-Q,  IALEFI-QP, IALEFI-QR  and
derivative targets (millions used by numerous law enforcement agencies, and
academies nationwide; used worldwide by U.S. Marine Corps Security Detail –
U.S. Embassy security; Wyoming Law Enforcement Academy target; Wisconsin
DOJ training target; Commonwealth of Massachusetts Training Target, et al.)

Testified regarding firearms before the United States Senate Judiciary
  Committee (Subcommittee on the Constitution), United States House of
  Representatives Judiciary Committee (Subcommittee on Crime), New York
  City Council, New Jersey Assembly Committee on Law and Public Safety,
  Massachusetts General Assembly Committee on Law and Public Safety, and
  Florida  Legislature Committee on Law and Public Safety, California DOJ

Selected by Citizen Ambassador Program as Delegation Leader for American
  Law Enforcement Firearms Instructors Exchange Program to China, planned
  for Spring 1988 (trip did not occur).

Consultant to Sturm, Ruger & Co. regarding law enforcement firearms and
  development of law enforcement firearms training programs.  Presented several
  demonstrations and familiarization courses with Ruger service pistols at police
  academies and agencies in Canada, including RCMP Academy, Regina, Canada

Consultant to Springfield Armory regarding development of self-defense
  handguns for the civilian consumers.

Boy Scouts of America, Merit Badge Counselor for Rifle and Shotgun
New York State IPSC Championships (1979):  5th place overall
Second Chance Competition (Central Lake, Michigan 1983):  Shot pump-action
  shotgun on 3-man  team that place high nationally, winning rifles.
National Tactical Invitational, Harrisburg, PA (1992):  7th place overall
National Tactical Invitational, Harrisburg, PA (1993):  4th place overall
IALEFI Stephen House Memorial Match, Reno, NV (1993):  6th place overall
IALEFI Stephen House Memorial Match, Amarillo, TX (1994):  11th place o/a

As a firearms instructor and/or consultant in training and use of force, or as a
  sworn, armed reserve deputy sheriff or special deputy, have spent many
  hundreds of hours accompanying police and security officers and/or engaging
  in patrol and enforcement activities throughout the United States and several
  foreign countries, in activities including routine patrol, traffic enforcement,
  armored transport, security of facilities and protection of persons and valuables,
  vehicular and foot pursuits, K-9 searches, response to crimes in progress, raids
  and warrant service, arrests, response to shootings and other violent events,
  arrests at gunpoint, searches of vehicles and persons, response to threatened
  suicides, alarm response, prisoner transports, road blocks and checkpoints,
  domestic disturbances, barricaded gunman, mentally ill or emotionally disturbed

**JA1996**

Curriculum Vitae:
Emanuel Kapelsohn
Page 5

persons, response to vehicle accidents, traffic control, policing public events.

Qualified as expert witness by state courts in Connecticut, New York, New Jersey, Pennsylvania, Maryland, Delaware, Tennessee, Georgia, Florida, Louisiana, Arizona, Wisconsin, Minnesota, Michigan, Ohio, Illinois, Iowa, Mississippi, Kentucky, West Virginia and California, and federal courts in Connecticut, California, New York, New Jersey, Pennsylvania, Tennessee, Florida, Louisiana, Maryland, Illinois, Arkansas, Oregon and Montana; consulted and testified on subjects including firearms, firearms training, safety, use, functioning, operability, maintenance and design; inspection and testing of firearms; holster design and weapon retention; firearms accidents; involuntary muscular contraction and unintentional discharge of firearms; physiological and perceptual/psychological effects of gunfight stress ("adrenalin dump," "fight or flight syndrome" or "body alarm reaction") including tunnel vision, auditory exclusion, time distortion, tachypsychia, schema; distinguishing toy guns, airguns and other objects from firearms; firearms-related tactics and police procedures; covering of suspects at gunpoint; defensive tactics; use of force in correctional facilities; training psychomotor skills; gunfight statistics and conditions; written training and use materials, including warnings and user's manuals; ammunition and ballistics, including bullet trajectories, trajectories through glass; ricochets, bullet penetration and expansion, gunshot wound ballistics, ability of individuals to continue physical activity after being shot; behavior of projectiles upon striking steel and other surfaces, cartridge pressures, cartridge case ejection patterns, muzzle flash, and gunshot noise; reaction time and action vs. reaction; time for suspect to turn his body compared to time required for officer to fire shot ("suspects shot in back"); threat level assessment and justification for use of deadly and non-deadly force; movements, police pursuits and use of force during police pursuits; tactics; arrest procedures; firearms history and development; firearms recoil; firearms toolmarks; non-powder guns; vision, threat assessment and shooting under reduced light conditions; performance of human eye when aiming and firing firearms; concealability of firearms; firing range design, safety and maintenance; paintball and other non-powder guns; ammunition reloading and inspection; home storage of firearms; so-called "Saturday Night Specials;" knife threats; use of "OC" (pepper spray); Taser; speed of firing shots; "21 Foot Rule" and time to cover distances; action vs. reaction, reconstruction of shooting scenes; muzzle to target proximity; powder stippling and other close-range ballistic effects; video evidence, improvised impact weapons, etc.

Clients and parties on behalf of whom cases have been undertaken have included the U.S. Department of Justice, Department of Energy, and Drug Enforcement Administration; Judge Advocate General Corps; Attorney General's Offices of Pennsylvania, Wyoming, South Dakota, and Louisiana; Atlantic County (NJ) Prosecutor's Office;  Monroe County (PA) District Attorney's Office; Cumberland County (PA) and Centre County (PA) District Attorney's Offices; Kenosha County (WI) District Attorney's Office; State of Georgia (Atlanta Judicial District);  Cities of Pittsburgh (PA), Newark (NJ), Bridgeport (CT), Egg Harbor City (NJ); Town of East Haven (CT); Chicago; New York; San Diego (City and County); Jacksonville; Nashville; Milwaukee; Public Defender's

**JA1997**

Curriculum Vitae:
Emanuel Kapelsohn
Page 6

Offices of Monroe County, Clarion County and Lycoming County (PA); State's
Attorney's Office in Devil's Lake (ND); State of Delaware Public Defender's
Office; Delaware Department of Justice; Bianchi International; Safariland, Inc.;
Glock, Inc., O. F. Mossberg & Sons, Para-Ordnance Mfg, Inc., SigArms, Inc.;
Remington Arms; private attorneys representing defendants in criminal and
administrative proceedings, and private attorneys representing plaintiffs and
defendants in civil cases.

Advisory Board Member, Firearm Injury Research Project (national research
  project conducted through FICAP at University of Pennsylvania) 2001-2005
Member, Firearms Section (formerly Firearms Committee), American
  Society of Law Enforcement Trainers (2000-2003)
Consultant to Pennsylvania Municipal Police Officers Education and
  Training Commission (pro bono) on development of new firearms and
  use of force curriculum for use at police academies throughout the state;
  revision of firearms and use of force curriculum in 2015 after 14 years of
  statewide use; development of use of force mandatory in-service training
  program (2015), including pilot program and instructor-training program.
Consultant to Allentown Jewish Community Center on security issues
  (pro bono, 1998-2000)
Consultant to The Swain School, Allentown, PA, on school security issues
  (pro bono, 1999-2003)
Consultant to Faith Church, Trexlertown, PA on security issues (pro bono, 2017-)
Para-Ordnance Armorer-Trainer and Instructor-Trainer.  Under contract with
  Para-Ordnance Mfg. Co., developed and presented armorer and instructor
  training programs.
Kimber Pistol Armorer-Trainer and Instructor-Trainer.  Under contract with the
  City of Tacoma, and as authorized by Kimber Mfg. Co., developed and
  presented law enforcement armorer and instructor training programs, including
  writing armorer notebook, instructor notebook, and related materials.
Hunter since age 10:  varmints and small game (New Jersey, Pennsylvania,
  Indiana); deer (New York, New Hampshire, Pennsylvania, Alabama, Louisiana,
  Indiana); pheasant and partridge (Pennsylvania, New Jersey); ducks Louisiana);
  dove (Pennsylvania); woodcock (Connecticut); wild boar (NH, TX, OH).
Handloader and reloader of ammunition, including bullet casting (1978 -    )
Oregon Department of Public Safety Standards & Training – Certified Firearms
  Instructor (2002)
Commonwealth of Pennsylvania, Municipal Police Officers Education &
  Training Commission, subject matter expert - member of standing Firearms
  Committee developing guidelines, policy and standards on firearms issues;
  member of committee developing state-wide standards for police patrol rifle
  (2003 -    )
Good Shepherd Hospital Charity Sporting Clays Tournament (2002, 2004, 2005)
Consultant to City of Easton regarding Easton Police Department firearms
  training, policies and procedures, and Easton SWAT Team (2005).
Certified Benelli Shotgun Armorer (2006)
Chairman, Firearms Committee, Berks County Sheriff's Department.  Chaired
  departmental committee hearings, making determinations with regard to
  intentional and accidental shootings.

**JA1998**

Curriculum Vitae:
Emanuel Kapelsohn
Page 7

Consultant to Lehigh County Municipal Emergency Response Team ("MERT")
   regarding use of force policies (2006-2007).
Consultant to California U. of Pennsylvania re. firearms and use of force policy
U.S. Department of Justice:  included on list of attorneys selected to provide
   emergency interim legal representation of federal agents involved in shootings
   (2000-    ).
Invited by Chinese government to travel to China to teach police firearms
   instructors (2010; declined invitation)
"Governor's Award," Indiana Police Firearms Training Association (2010)
Recipient, 2012 IALEFI "Charlie Smith Award" ("In recognition of your tireless
   efforts and unwavering loyalty to the goals, ideals, and members of our
   organization.")
Appointed to Advisory Board, Armed Citizens Legal Defense Network (2012)
Consultant to PA MPOETC in revision of police academy curriculum (2014-15),
   and development of Mandatory In-Service "Use of Force" program taught to
   25,000 police officers statewide, including teaching of pilot program and
   conducting instructor-training program.
FASTER-certified Intervention Specialist (Chris Cerino and Andrew Blubaugh,
   Instructors, Rittman, Ohio 2018)
Rangemaster-certified Firearms Instructor (Tom Givens, Instructor, Xenia, Ohio
   2018)
Advanced Force Science Specialist, Force Science Institute (2018) (see below)
UTM Professional Training Organization ("PTO") certification
Realistic De-Escalation Instructor, Force Science Institute (2021) (see below)

**TRAINING
COURSES
ATTENDED:**

API Basic Pistol Course (1979):  Expert rating; finished second in class
API Special Pistol Course (1980):  Expert rating; finished first in class
API Defensive Shotgun Course (1981):  Expert rating; finished second in class.
API Rifle Course (1983):  Expert rating; finished third in class.
American Small Arms Academy, Submachine gun tutorial, Chuck Taylor (1981)
Police Marksman Association Police Officer Advanced Street Survival Seminar
   (Instructors Massad Ayoob, Ray Chapman, Jim Morell, et al., 1983):  Certif.
Defense Training International, Defensive Handgun/Defensive Submachine Gun
   (1983): Certificate
Red Cross First Aid Course (1984):  Certificate
Red Cross CPR Course (1984):  Certificate
Red Cross CPR Course (1991):  Certificate
New Jersey Hunter Safety Courses (1966, 1967, 1968):  Certificates
NRA Security Firearms Instructor School (FBI Academy, Quantico, VA 1984):
   Pistol Expert, Revolver Expert, and Shotgun Expert:  Certificates
Law Enforcement Training - Survival 3 Seminar (1984):  Certificate
International Police Academy - Morell-Trained Instructors Seminar
   (Instructors Jim Morell and John Desmedt, 1984):  Certificates of Training
   in Principles of Control and in Advanced Instructor Training
BSR Counter-Terrorist Driving School (Summit Point Raceway, West Virginia,
   1984):  Certificate

**JA1999**

Curriculum Vitae:
Emanuel Kapelsohn
Page 8

International Police Academy - Defensive Tactics Instructor Level 1
  (Sampson Technical College, Clinton, NC 1984):  Certificate
FBI Firearms Instructors Course (Burlington County Police Academy, 1985):
  Certificate
International Police Academy - Master Instructors Seminar (Instructors Morell,
  Desmedt, et al., 1985):  Certificate and Guest Instructor Award
  1984 National Training Conference, International Association of Law
  Enforcement Firearms Instructors (Nashville, TN):  Certificate
91st Annual Conference, International Association of Chiefs of Police
  (Salt Lake City, UT 1984)
LAPD Ordnance Exposition (Los Angeles 1984):  Seminars on Handgun
  Survival; Firearms Evidence; Officer-Involved Shooting Incidents: Certificates
ESI Advanced Executive Protection Program (Aspen, CO 1985):  Certificate
  and State of Colorado Executive Protection Specialist License
1985 National Training Conference, International Association of Law
  Enforcement Firearms Instructors (Philadelphia, Police Academy):  Certificate.
  Presented instructor-level class on close-range shooting techniques
U.S. Marshal Service Automatic Weapons and Officer Survival Course
  (North Carolina 1985):  Certificate
Tactical Response Association Ordnance Exposition (Las Vegas, 1986):
  Attended seminars on Rapelling SAS Method, Shooting Simulation Response
  Course, Satanic Cults and Crimes, Terrorism Perspective 1986, and
  International Terrorism Symposium:  Certificates
NRA Law Enforcement Rifle Instructor School (U.S. Marine Base, Quantico,
  VA 1986):  Scored 99.33% on firing test:  Certificate
1986 National Training Conference, International Association of Law
  Enforcement Firearms Instructors (Orlando, FL):  Certificate.  Presented
  instructor-level classes on Dim-Light Handgun Shooting; Police Shotgun
International Police Academy - Straight Baton Class (Instructor Jim Morell,
  Allentown, PA  1986):  Certificate
Department of Defense Tactical Team Training Seminar (ARDEC, 1986):
  Certificate
Calibre Press Street Survival Seminar (Atlantic City, NJ 1986):  Certificate
Tactical Response Association World Conference on Terrorism (Washington,
  D.C. 1987):  Attended seminars on GSG 9 Tactics, Hostage Negotiation, and
  Making of SWAT Teams:  Certificate
Glock Armorer's Course (Beltsville, MD 1987):  Certificate
Ordnance Expo '87 (Chicago, IL):  Attended seminars on Vicarious Liability
  for Law Enforcement/Psychological Screening of Officers; Indoor and Outdoor
  Range Design; Tactical Load-Bearing Vests for Special Operations; and
  Revolvers vs Semi-automatic Pistols
NLETC Lindell Handgun Retention System Course (1987):  Intermediate
  Trainer Certification
1987 National Training Conference, International Association of Law
  Enforcement Firearms Instructors (Mesa, AZ):  Certificate.  Presented
  instructor-level classes on tactical use of cover.
NRA Law Enforcement Semi-Automatic Pistol Seminar (U.S. Marine Base,
  Quantico, VA 1987).  Attended and served as Chief Instructor for this course.

**JA2000**

Curriculum Vitae:
Emanuel Kapelsohn
Page 9

NRA National Instructors Conference (Orlando, FL 1988):  Attended sessions
 on NRA Personal Protection Course and on Modern Rifle Training Techniques
Tactical Operations Seminar (Law Enforcement Defensive Systems.  New Jersey
 1988.  Instructor Robert J. O'Brien):  Certificate
AAI Corporation Law Enforcement Chemical Munitions Training Program
 (New Jersey 1988):  Certificate
Factory Tours and Visits:  Colt Firearms (Hartford, CT); Smith & Wesson
 (Springfield, MA); Mossberg (North Haven, CT); U.S. Repeating Arms
 Co. (New Haven, CT); Sturm Ruger & Co. (New Hampshire and
 Prescott, AZ); Winchester (East Alton, IL); Swartklip Munitions
 (South Africa); Glock Gesmbh. (Austria); AV Technologies (Fairfax, VA);
 Second Chance Body Armor (Michigan); Para-Ordnance (Toronto); Keystone
 Sporting Arms (Milton, PA); Kimber Mfg. Co. (New York);
 Mossberg/Maverick Arms (Eagle Pass, TX); Glock, Inc.  (Smyrna, GA 1989,
 2014 and subsequent); Gould & Goodrich Holsters (Lillington, NC) 2017.
SHOT Shows and NRA Annual Shows: attended various years 1984-2016 et seq.
Museums visited (arms and armor collections) include Winchester Gun Museum
 (New Haven, CT), Museum of the Confederacy (Richmond, VA), Arms and
 Armor Museum (Kutztown, PA), Metropolitan Museum Arms and Armor
 Collection (New York, NY), National Firearms Museum (Fairfax, VA), U.S.
 Marine Corps Museum (Quantico, VA 1987), West Point Museum (West Point,
 NY),   Pennsylvania State Police Weapons Collection (Hershey, PA), U.S.
 Army Ordnance Museum (Aberdeen Proving Grounds, MD), Texas Rangers
 Museum (San Antonio, TX), and private tour of Division Balistique,
 Laboratoire de Police Scientifique at Police Headquarters, Paris, France
 (ballistics laboratory and weapons collection); National Museum of the Marine
 Corps (Quantico, VA 2008).
Visit to G.I.G.N. Headquarters to observe firearms training and facilities
 (French Gendarmerie Counter-terrorist and Hostage Rescue Team), Versailles,
 France (2008)
SIGARMS Law Enforcement Firearms Familiarization Course (October 1988):
 Certificate
1988 National Training Conference, International Association of Law
 Enforcement Firearms Instructors (St. Augustine, Florida):  Certificate.
 Presented instructor-level class on dim-light assault rifle and shotgun
 techniques; moderated panel discussion on semi-auto pistol transition training.
Second International Training Seminar, American Society of Law Enforcement
 Trainers (Kansas City, Missouri 1989):  Certificate.  Presented instructor-level
 classes on draw and close-range handgun techniques; attended classes on
 training female officers, straight baton techniques, maximization of revolver
 skills, and teaching psychomotor skills
Wound Ballistics Seminar (Instructors Dr. Martin L. Fackler, M.D., et al.)
 Phoenix, Arizona 1989):  Certificate
1989 National Training Conference, International Association of Law
 Enforcement Firearms Instructors (Salt Lake City, Utah):  Certificate.
 Presented instructor-level class on dim-light assault rifle/shotgun techniques
NRA Law Enforcement Submachine Gun Instructor Development School
 (Burlington County NJ Police Academy 1989):  Certificate
H&K MP-5 Submachine Gun Course (Sterling, VA 1989):  Certificate

**JA2001**

Curriculum Vitae:
Emanuel Kapelsohn
Page 10

H&K MP-5 Instructor Course (Sterling, VA 1989):  Certificate

SIG Pistol Armorer's School (Richmond, VA 1990):  Certificate

1990 Annual Training Conference, International Association of Law
Enforcement Firearms Instructors (Washington, D.C.):  Certificate.  Attended
courses on range control, use of cover, and shotgun.  Presented instructor-level
classes on concealed carry handgun, auto-pistol transitional training, and dim-
light handgun and shotgun; participated in panel discussion of police handgun
caliber selection and effectiveness

IALEFI Regional Training Conference (Dutchess County, NY 1991):  Presented
classes on cover mode and involuntary discharge; advanced shotgun
techniques.  Attended classes on use of lethal force (Lt. James Garside) and
advanced auto-pistol techniques (S&W Academy Staff)

1991 Annual Training Conference, Internat'l Association of Law Enforcement
Firearms Instructors (Mesa, AZ):  Certificate.  Attended courses on concealed
carry, range training vs. real world, utilization of steel targets, Berkeley
shooting incident, wound ballistics (Fackler), perception vs. reality in use of
lethal force (Garside), and handgun inspection.  Courses taught:  see below

Police Long Rifle Certification Course, International Association of Chiefs
of Police (Ft. Dix, NJ 1991)

American Society of Law Enforcement Trainers Fifth International Training
Seminar (Milwaukee 1992):  Certificate.  Attended courses on wound
ballistics (Marshall), dealing with the hostile learner, principles of adult
learning.  Courses taught:  see below

IALEFI Regional Training Conference (Dutchess County, NY 1992):  Attended
classes on bullet performance (Ayoob), semi-automatic police shotgun (Felter),
and tactical handgun (Hackathorn):  Certificate.  Courses taught:  see below

IALEFI Regional Training Conference (Long Island, NY 1992):  Attended
class on counter-sniper rifle:  Certificate.  Courses taught:  see below

Ken Hackathorn Tactical Firearms Course (Pottsville, PA 1992) for handgun,
shotgun, and submachine gun:  Certificate

1992 IALEFI Annual Training Conference (Tampa, FL):  Certificate.  Attended
courses on tactical handgun (Halleck/Odle); Close Quarters Firearms Control
Tactics (Klugiewicz); Reaction vs. Precision Shooting (Rogers); Tactical
Planning Principles/Cover Utilization (Casavant).  Courses taught:  see below

Police Counter-Sniper Rifle Course, Instructor Group, U.S. Army Marksmanship
Training Unit (Ft. Benning, GA 1992):  Certificate

Real Life Personal Security Program (Dale Yeager, Instr. Pottstown, PA 1993)

1993 IALEFI Annual Training Conference (Reno, NV):  Certificate.  Attended
courses on Tactical Handgun (Campbell), Planning for Critical Incidents
(Cassavant), Gunfight Dynamics (Repass, et al.).  Courses taught:  see below

IALEFI Regional Training Conference (Nassau County, NY 1993):  Certificate.
Attended classes on use of force continuum and perception (Garside);
realistic knife defense.  Courses taught:  see below.

Aerosol Chemical Restraint User Class (Wernersville Police Department, 1993):
Certificate

1994 IALEFI Annual Training Conference, Orlando, FL:  Certificate.  Attended
courses on Dynamic Teaching Techniques (R. Lindsey); Defensive Tactics
for Women (Sgt. Pam Miller).  Coordinated safety for all training events.
Courses taught:  see below

**JA2002**

Curriculum Vitae:
Emanuel Kapelsohn
Page 11

Search & Rescue Tracking, Ashmore Enterprises (CT (1994):  Certificate
Management of Workplace Violence, ASIS, Reading, PA (1994).

CPR and Emergency Cardiac Care Provider course, American Heart
Association, and Oxygen Therapy Emergency Response Training, SOS
Technologies (OTI authorized) (1995, recert. 1996, 1999)

Colt Armorer Course (Ct. 1995):  Certificate

LFI-1:  Judicious Use of Deadly Force (Lethal Force Institute, Massad
Ayoob, Instr. 1995):  Certificate

1995 IALEFI ATC, Amarillo, TX:  Certificate.  Attended course on Law
Enforcement Officers Flying Armed (FAA approved course:  Certificate)

OCAT Oleoresin Capsicum Aerosol Instructor Training, Harrisburg Area
Community College (1996):  Certificate

Concealed Carry Handgun Course, Arizona Law Enforcement Firearms Instr.
Annual Training Conference, Mesa, AZ (1996):  Mark Fricke, Instructor

NRA Law Enforcement Tactical Firearms Instructor School, U.S. Marine Base,
Quantico, VA (1996):  Certificate

Urban Rifle Course, Thunder Ranch, TX (Clint Smith, Instr. 1996):  Certificate

1996 IALEFI ATC, Mesa, AZ:  Certificate.  Attended courses on Weapon
Defense (Klugiewicz); Officer Survival (FBI).  Coordinated safety for all
events.  Courses taught:  see below

Defensive Tactics/Personal Weapons Course, Paradigm Training (1997):
Certificate

FATS Instructor-Trainer Certification Course (MPOETC, Harrisburg, PA
1997):  Certificate

1997 IALEFI ATC, Columbia, Missouri:  Certificate.  Attended courses on
Protective Detail Training (Wilt); Sharpening the Warrior's Edge
(Bruce Siddle); Use of the Handgun In A Hostile Environment
(Spaulding); and The Bulletproof Mind (Lt. Col. Dave Grossman).
Coordinated safety for all events.  Courses taught:  see below

NTOA Tactical Technologies Expo (Philadelphia, 1998):  Attended courses
on Domestic Terrorism, Less Lethal Projectiles, and U.S. Military's
Warfighting Laboratory Project.  Certificate

Security for Overseas Travel.  Vance International, Reading, PA, 1998

NTOA Less Lethal Impact Munitions Instructor Course, Bucks County
Police Academy (1998):  Certificate

Oleoresin Capsicum Aerosol User's Course, Paradigm Consulting Corp.
(1998):  Certificate

Monadnock Expandable/Straight Baton Advanced Course (Tim Lynch,
Instr.) 1998:  Certificate

1998 IALEFI ATC, West Palm Beach, FL:  Certificate.  Attended courses on
Training Injuries and Deaths (Kat Kelly/Robert Bragg); Confined Space
Weapons Engagement (Slowik); The Bulletproof Mind (Lt. Col. D. Grossman)

Taser Master Instructor Course (Instructor Rick Smith. VA, 1999):  Certificate

IALEFI RTC, Philadelphia Police Academy, PA (1999):  Certificate.  Attended
courses on Patrol Rifle Course Design; Practical Shotgun Skills; and Dim Light
Training Techniques

Pennsylvania Hunter Safety Course (1999):  Certificate

1999 IALEFI ATC, Phoenix, AZ:  Certificate.  Attended courses on Innovative
Training on a Limited Budget; Mental Preparation for Armed Confrontations

**JA2003**

Curriculum Vitae:
Emanuel Kapelsohn
Page 12

(Croty); Edged Weapons (Lynn Thompson); Instructor Development (Wilt);
and Recreation of Officer-Involved Shootings (Westrick)

2000 ASLET International Training Seminar, Richmond, VA:  Certificate.
Attended courses on Patrol Rifle Training Programs; Building Search (contin.)
Tactics; Use of Deadly Force; Maximizing Time & Budget in Firearms
Training; Post-Shooting Procedures (Grassi); Backup & Contact/Cover
Principles; Firearm Retention & Disarming (Demetriou); Advanced
Firearms Instructor Training (FBI Training Cadre); Training Female
Shooters; Protocol for Major Use of Force Investigations (Michael
Stone, Esq.); Point Shooting (Lovette).  Trained on use of force
simulators (FATS, Caswell AIS, American Laser Technologies)

IALEFI RTC, Philadelphia Police Academy (2000):  attended courses on
Response to Active Shooters in Schools (L. Glick); Dim-Light Shotgun
Skills (Boyle).  Courses taught:  see below

Gunshot Wounds Seminar, Reading, PA 2000.  J. Holliman, M.D., Instructor

2000 IALEFI ATC, Tampa, FL:  Certificate.  Attended courses on Urban
Rifle (Farnam), Ultimate Shotgun (Hoffner), Point Shooting (Chiodo and
Lovette), and Bulletproof Mind (Grossman).  Coordinated safety for all
events.  Courses taught:  see below.

Patrol Response to Active Shooters in Schools and Public Buildings, NTOA
(Exeter Twp. Police Dept., PA, April 2001, L. Glick, Instructor): Certificate.

NRA Police Precision Rifle Instructor Development School.  The Crucible,
Fredericksburg, VA (2001):  certificate of successful completion

2001 IALEFI ATC, Reno, NV:  Certificate.  Attended courses on Gender-Based
Learning Differences (V. Farnam), Simulation Training and Munitions
(Klugiewicz).  Assistant Safety Coordinator for all events.  Courses taught:  see
below.

Glock Armorer Course (Recertification):  Wind Gap, PA (2002):  Certificate

GAU/17 7.62mm NATO ("GE Mini-Gun") Training, Patrick Air Force Base,
Melbourne, Florida (2002)

GAU/17 7.62 mm NATO Training, Crane Naval Surface Warfare Center,
(Crane Air Force Base) Indiana (2002)

2002 IALEFI ATC, San Diego, CA:  Certificate.  Attended course on Dim-Light
Survival Techniques (Ken Good, Instructor).  Chief safety coordinator for all
events.  Course taught:  see below.

2003 IALEFI ATC, Orlando, FL:  Certificate.  Attended courses on Advanced
Tactical Rifle Techniques, Shoothouse Instructor Development, Rapid
Response to Active Shooters, Vehicle Stop Response Tactics, Stress Analysis
Shooting Situations, Mental Conditioning and Mindset (Capt. Joe Robinson),
and Blackhawk Down Lecture (Col. Danny McKnight).  Attended trade show
and hands-on weapons demonstrations.

Price's American Kenpo Karate Center.  Leesport, PA.  Student in Kenpo Karate
(2003-2004)

Threat Analysis Seminar, Reading, PA (2003):  Certificate.  Instructor Richard L.
Ault, Ph.D., Academy Group, Inc., former SA, FBI Behavioral Science Unit

Warrior Arts Seminar (Stick and Knife Fighting).  Al McLuckie, Instructor.
Leesport, PA (2004).

ATF Dim Light Firearms Training.  Los Angeles Police Academy. (2004)

Taser Master Instructor Recertif. Course.  Fogelsville, PA (2004).  Certificate

Curriculum Vitae:
Emanuel Kapelsohn
Page 13

2004 IALEFI ATC, Dayton, Ohio.  Certificate.  Attended classes on Performance
    Under Stress (Ernest Langdon), Use of Laser Sighting Devices (Hackathorn),
    Pistol Skills (D. Carroll), and presentation on training principles (CSM Eric
    Haney).  Assisted with Handgun Safety Check.  Course taught:  see below.
Berks County Sheriff's Department, semi-annual training and qualification
    sessions with handgun, shotgun and/or patrol rifle (1997-2004)
Disaster Planning:  Meridian Bank Fire.  ASIS Lehigh Valley Chapter.  (2005)
SHOT Show (Las Vegas, 2005).  Attended industry trade show.
2005 IALEFI ATC, Reno, Nevada.  Certificate.  Attended classes on Officer
    Involved Shooting (Marcus Young);  Research on Firearms Ejection Patterns,
    Reaction Time, Perceptual Distortions Under Stress, and Other Physio-
    Psychological Gunfight Reactions (Dr. Wm. Lewinsky);  The Winning Mind
    (Brian Willis);  Innovative Low-Light Training;  Finishing the Fight (Jeff Hall);
    Use of Force Options & Policy (Jon Blum); Close-Range Point Shooting (Matt
    Tempkin);  Application of Marksmanship;  Training at the Speed of Life
    (Ken Murray).  Course taught:  see below.
Repetitive Strain Injuries (Somerset, NJ  2005)
Use of Force in Pennsylvania (Philadelphia 2006).  6 CLE credit hrs.  Certificate
SHOT Show (Las Vegas, 2006).  Attended industry trade show.
2006 IALEFI ATC, West Palm Beach, FL.  Certificate.  Attended classes on
    Patrol Rifle, Survival Vision; Handgun Light Instructor, Cops on the 4th
    Generation Warfare Battleground (DuVernay); Concealed Carry;  Managing
    Use of Force Training (Albert Lee);  Mindsighting (Dr. Michael Asken).
Benelli Shotgun Armorer's Course (West Paterson (NJ) Police Department 2006)
BATF Training Classes, "Characteristics of Armed Suspects," "Firearms
    Identification," and "ATF Firearms Trace Program."  Alvernia College (2007)
SHOT Show (Orlando, FL 2007).  Attended industry trade show.
Mastering the Defensive Folding Knife.  Northeastern Tactical Schools.  Michael
    de Bethencourt, Instructor.  (Hellertown, PA 2007)  Certificate.
Firearm Retention, Disarming and Recovery.  Northeastern Tactical Schools.
    Michael de Bethencourt, Instructor.  (Hellertown, PA 2007)  Certificate.
CDT Personal Protection Training.  (Reading, PA 2007)  Level 1 Certificate.
2007 IALEFI ATC, San Antonio, TX.  Certificate.  Attended classes on Tactical
    Anatomy (James Williams, MD), Patrol Rifle (D. Alwes), Close Quarters
    Handgun Techniques (H. Iverson), Hojutsu-Ryu (J. Hall), Handgun Light
    Instructor, Virtual Reality Training (Livefire Interactive), Legal Standard –
    Objective Reasonableness (T. Harper, Esq.).
Seminar, "Police Involved Shootings – When the Smoke Clears."  Westchester
    County Detectives Association (Yorktown Heights, NY 2007).  Instructors
    Michael Baden, MD (Chief Forensic Pathologist, NYSP), Thomas Martin
    (Sr. Investigator, Forensic Ident.Unit, NYSP), ADA Michael Hughes
    (Public Integrity Bureau, Westchester DA's Office), Det. Michael Palladino,
    and Emanuel Kapelsohn (see below).  Certificate
SHOT Show (Las Vegas, 2008).  Attended industry trade show.  Attended
    seminar on proper firearms retailing procedures to comply with legal and
    regulatory requirements, and seminar on advances in, testing and selection of
    OC aerosol devices.
2008 IALEFI ATC, Reno, NV.  Certificate.  Attended classes on Combat
    Mindset, Response to Active Shooters (rifle and handgun), One-Shot

Curriculum Vitae:
Emanuel Kapelsohn
Page 14

Qualifications, Treatment of Medical Emergencies for Firearms Instructors, Mental Preparation. Competed in Memorial Match. Classes taught-see below.

Indiana Pre-Basic Law Enf. Officers Course. 2008. Successfully completed.

Indiana Basic Firearms Course. Greene County Sheriff's Department (2008). Qualified with SIG P229 handgun (expert rating) and Remington 870 shotgun.

Indiana Basic Defensive Tactics Course. Greene County Sheriff's Department (2008). Successfully completed.

Response to Active Shooters. Greene County, IN (2008). Presented by Crane Naval Surface Warfare Center. Successfully completed.

Shooting Scene Reconstruction Course, Eugene (OR) Police Department, 2008. Mike Haag, Instructor. Certificate

2009 Conference, International Law Enforcement Educators & Trainers Association ("ILEETA"), Chicago, IL. Attended courses: New Paradigms in Firearms Training (Conti), Human Factors and Stress in Lethal Confrontations (Darrell Ross, Ph.D., et al.), Active Shooter Update (Alwes), Taser Training Overview/Update, Tracking Down Valid Firearms Training (G. Morrison, Ph.D.), plus trade show and handgun competition. Taught course on use of force policy (see below).

2009 IALEFI ATC, West Palm Beach, FL. Certificate. Attended industry trade show; shot in IALEFI Memorial Match. Attended lectures and classes: Von Maur Shooting; Firearms Training for Active Shooter Response; Law Enforcement Legal Liability; Tactical Response to Lethal Threats (Allen & G. Lee); Teaching Female Shooters; A Collaborative Approach (L. Hamblin, C. Schroeder, et al.); Teaching Female Shooters; Expert Witness Preparation for the Firearms Instructor; Benefits and Risks of Verbalization in Deadly Force Encounters (G. Klugiewicz). Course taught: see below.

Tactical Treatment of Gunshot Wounds. Anthony M. Barrera, M.D. (Lebanon, IN 2009. Certificate.)

Active Shooter Response. Greene County, IN (2009). Presented by personnel from Crane NSWC.

Force Science Certification Course. Milwaukee County Sheriff's Office, Milwaukee, WI. Force Science Institute. Dr. Bill Lewinski, Dr. Anthony Pinizzotto, Dr. Joan Vickers, Dr. Ed Geiselman, Dr. Alexis Artwohl, Dr. Richard Schmidt, Dr. Matthew Sztajnkrycer (2009. Certificate.)

2010 Conference, International Law Enforcement Educators & Trainers Association ("ILEETA"), Chicago, IL. Attended courses: Handgun Retention and Disarm Instructor (certificate); Characteristics of Exceptional Trainers; Critical Combative Concepts; Smart Use of Force; Heroic Cynicism – How to Live Life in the Arena (Van Brocklin); Stress in Law Enforcement (Artwohl); In Pursuit of Personal Excellence (Brian Willis); Warriors, Force and Winning (certificate). Attended law enforcement products trade show.

"The Bulletproof Mind," Lt. Col. Dave Grossman. Boone County Sheriff's Department (2010)

2010 IALEFI Annual Training Conference, San Antonio, TX. Attended law enforcement products trade show. Conducted Handgun Safety Check for 120 first-time attendees. Attended courses: Begged, Borrowed, Stolen; So You're Qualified – Now What?; Off-Duty Weapons (M. Boyle); Excited Delirium; Diagnosing Shooters (A. Stallman). Course taught: see below. Certificate.

Indiana Hunter Education/Hunter Safety Course (2010). Passed, issued card.

**JA2006**

Curriculum Vitae:
Emanuel Kapelsohn
Page 15

Police Defensive Tactics Refresher (2011). Greene County Sheriff's Department Emergency Vehicle Operations Course (2011). Greene County Sheriff's Dept.

2012 SHOT Show, Las Vegas, NV. Attended trade show, and courses on Low Light Equipment and Techniques (Instructor J. Meyer) and "Train the Trainer, Below 100," (Instructors Dale Stockton, et al.)

Terminal Ballistics & Field Trauma Care, Greene County Sheriff's Dept. (2012)

2012 ILEETA Conference, Chicago, IL. Attended courses: Law Enforcement/Media Relations; Taser Training & Updates; Range Emergencies; Advanced Firearms Training on a Limited Budget; Police Use of Force Training & Preparation (Chudwin); Deadly Force Training Performance & Officer Safety; Designing Stress-Exposure Training; Swarming, Flash Mobs & the OODA Loop; Verbal Defense & Influence ("Verbal Judo") (Klugiewicz); Street-Level Counter-Terrorism; Use of Force Accountability (Brave); Positive Relations – Law Enforcement & Armed Citizens; Deadly Force Panel of Experts (panelist). Also attended industry trade show.

2012 IALEFI Annual Training Conference, Nashville, TN. Attended courses: Arrest and Control Tactics (Beckley); Simple Martial Art for Self-Defense (Albert Lee); Patrol Rifle Basics; Sports Physiology Approach to Firearms Training; Filling the Tank; Warriors & Leaders; Great American Gunfights. Instructed: Firearms Instructor as Expert Witness. Also, attended industry trade show and hands-on firearms demonstrations.

2013 IALEFI Annual Training Conference, Mobile, AL. Attended courses: Confined Space Engagement (Farren); Vision-Based Shooting (Stimmell). Also attended industry trade show. Courses taught: see below.

Glock Armorer's Course, Old Bridge, NJ (2013).

Knife Defense/Knife Fighting Seminar, Hank Hayes, Instructor. No Lie Blades. Allentown, PA (2013) (class audited only, due to injury)

2014 SHOT Show, Las Vegas, NV. Attended industry trade show.

2014 ILEETA Conference, Lombard, IL. Attended courses: Shots Fired, Suspect Down (John Bostain); Critical Combative Concepts (Charles Humes); Force Related Policies & Issues (Mike Brave); Critical Look at Firearms Qualifications (David McGaha); Police Use of Force Tactics and Law (Chudwin); Gunman in the Lobby, Officer Down (Joe Ferreira); Verbalization Skills (Klugiewicz); Path to Self-Discovery (Bob Lindsey); Street Officer Medical Tactics (Eric Dickinson); Embrace the Suck- Winning Strategies For Trainers (Brian Willis); "Heroes Behind the Badge"; Deadly Force Expert Panel (Ayoob, et al.); Choose Your Words Wisely (Joanne Ryan and Thomas McGreal); Coaching Mental Toughness (Quinn Cunningham); Sharpening the Winning Edge (Brian McKenna); Interactive Firearms Training (Lt. Dan Marcou). Course taught: See below.

2014 IALEFI Annual Training Conference, Amarillo, TX. Attended courses: Surviving the First Three Seconds (Tpr. Hensley); Extended Range Off-Duty Handgun Operation (Michael Johnson); Vision-Based Shooting (Jim Stimmell); Identifying the Limits of Firefight Performance; Threat Pattern Recognition Firearms Training System (Bruce Siddle, Human Factor Research Group) Classes Taught: see below.

NRA Personal Protection Outside the Home (2014): certificate

2015 SHOT Show, Las Vegas, NV. Attended industry trade show.

Glock factory tour and armorer-trainer update. Smyrna, GA (2015)

Curriculum Vitae:
Emanuel Kapelsohn
Page 16

Winning Mind Seminar, Dave Smith, Instr. ,PA State Police Academy (2015)

2015 ILEETA Conference, Wheeling, IL. Attended courses:  Deadly Force Panel
of Experts (panelist, see below); Creating Training Miracles; Understanding
Response Time in Law Enforcement; Emergency Preparedness for Law
Enforcement Families; Ambush – Preparing Officers for the #1 Killer;
Defensive Knife (Halleck); Down to Zero – Unintentional Discharges in Law
Enforcement; Becoming Knights – Teaching Warrior Mindset; Mistake of Fact
Shootings (Santos); Use of Force Report Writing; Active Shooter Panel
Discussion (panelist, see below); Use of Force and Liability; Blended Learning;
Lifesaving Made Easy; Think Like a Soldier, Act Like a Cop

2015 IALEFI Annual Training Conference, West Palm Beach, FL.  Attended
courses:  Lecture on Leadership (Col. Danny McKnight); Current Issues for
Firearms Instructors (Alwes); Developing Courses of Fire (Marrs);
Contaminated Combat (Liske, audited only); Reflex Sights (Martello); Close
Quarter Transitions (Jeff Prather).

Gun Law Seminar, U.S. Law Shield, Allentown, PA (2015)

Tavor Level 1 Armorer's Course, including 9mm Conversion and Right/Left
Hand Conversion.  Harrisburg Area Community College. Certificate (2015).

FN15 Armorer Course, Berks County Prison, Leesport, PA (2015).  Certificate.

IALEFI Regional Training Conference, Freeport Police Range, Long Island, NY
(2015). Certificate.  Attended classes on Use of Force (Chief James Garside),
Lateral Vascular Neck Restraint (Thomas Graham); and Master Pistol Instructor
Skill Builder Class (Steve Gilcreast, Sig Sauer Academy).. Class taught:  see
below.

2016 ILEETA Conference, Rosemont, IL.  Attended courses:  Deadly Force
Panel of Experts (panelist, see below); Active Shooter Panel Discussion; Use of
Force Panel Discussion; How to Survive and Win In An Ambush (Shaykhet);
Lights, Sights & Lasers (Wes Doss); Patrol Rifle (John Farnam); Responding to
the Officer-Involved Shooting (Burke, IMPD); Human Factors in Training and
Performance (John Bennett); Video Evidence (NV DPS); Guardians are
Warriors (Mahoney); Body  Searches (Cpl. Julie Johnson); Black Lives Matter
(Ron Martinelli); Lessons From the Great Law Dogs in History (Lt. Dan
Marcou).

Video Evidence Class, Force Science Institute, Chicago, IL (2016, Certificate)

2016 IALEFI Annual Training Conference, Mobile, AL.  Attended Courses:
Surviving the First Three Seconds (Tpr. Robert Robertson, NC Highway
Patrol); Active Shooter Training in the Shoothouse (Alwes); Handgun
Snatching (Albert Lee/Wilkie); ALERT Training - Civilian Response to Active
Shooter Events (Instructor Certificate).  Course taught:  see below.

Hojutsu-Ryu Class, Phillipsburg NJ and Easton PA, taught by Soke Jeff Hall.
Awarded brown belt (2016).

Colt .45/Model "O" (1911) Armorer Class, Colt's Manufacturing Company,
Ohio Peace Officers Training Academy, London, Ohio (2016). Certificate

2017 SHOT Show, Las Vegas, NV.  Attended industry trade show.

Improving Tactical Performance by Enhancing Vision, SHOT Show Law
Enforcement Education Program, Dr. Alan Reichow (2017)

Rangemaster Tactical Conference, Little Rock, AR (2017).  Attended classes:
Between a Harsh Word and a Gun (OC, Chuck Haggard); Church Security
(Moses); Police-Citizen Contacts (Weems); Gun Accidents (J. Farnam); Just

**JA2008**

Curriculum Vitae:
Emanuel Kapelsohn
Page 17

Enough Jitsu (Cecil Burch); Defining the Threat (T. Givens); Law of Self-Defense (A. Branca); The Firearms Instructor as Expert Witness (Ayoob/Hayes); Street Encounter Skills (Murphy).

2017 ILEETA Conference, St. Louis, MO.  Attended courses:  Deadly Force Panel of Experts (panelist, see below); Patrol Rifle Panel (panelist, see below); Tactical Duty Knife (Fletch Fuller); Six Myths of Motor Learning & How This Affects Your Training (Robert Bragg); Proxemics-Based Curriculum Development (Marie D'Amico); Facilitated After-Action Reviews (Joseph Willis): Camera-Friendly Compliance & Control Techniques That Work (Hetrick): "After Force Experience Beyond the Incident (Patrick Shaver); Pre-Indicators of An Assault (Mark Sawa).

2017 IALEFI Annual Training Conference, West Palm Beach, FL.  Attended courses:  The Pulse Nightclub Shooting; In-Extremis Advanced Tactical Handgun (Wes Dobbs); Police Shotgun (Mike Johnson); Officer Survival Mindset (Alex and Daniel Cobb); Bulletproof Mind (Lt. Col. Dave Grossman). Also attended industry trade show and hands-on product demonstrations.

2018 SHOT Show, Las Vegas, NV.  Attended industry trade show, including Industry Day at the Range.

2018 ILEETA Annual Conference, St. Louis, MO.  Attended trade show, and courses:  Active Shooter Panel (panelist); Deadly Force Expert Panel (panelist); A Nearly Fatal Range Shooting (DuVernay); Recognizing & Responding to Mental Illness; Terminal Ballistics (Ed Santos); Threat Pattern Recognition (Joe Ferrera).

2018 IALEFI Annual Training Conference, Houston, TX.  Attended trade show, and courses: Aurora, Colorado Theater Shooting; Basic Patrol Rifle Fundamentals (Pickering and French); Low Light Operations (J. Meyer); IADLEST National Certification Program; Reactive v. Precision Shooting (T. Fletcher); Officer Survival Mindset (Cobb); Dallas Sniper Incident & Mexican Drug Cartels (ATF).

FASTER Course, Rittman, OH. Chris Cerino & Andrew Blubaugh, Instrs. (2018)

Rangemaster Firearms Instructor Development & Certification Course, Xenia, Ohio, Tom Givens, Chief Instructor (2018)

Force Science Advanced Specialist Course, Force Science Institute, April-August 2018. Course syllabus included required reading in three textbooks (on human movement, physical training and performance and reaction time; vision; and human error) and dozens of scholarly articles and research papers, lectures by several noted authors, doctors, scientists and professors; multiple oral and written presentations; teleconference and in-person classes; and formal written work, comprising in total several hundred hours of coursework at the graduate school level.

2019 SHOT Show, Las Vegas, NV.  Attended industry trade show, including Industry Day at the Range.

"Police Misconduct" Continuing Legal Education Program (2/11/2019).

2019 NRA Convention, Indianapolis, IN. Attended industry trade show.

2019 IALEFI Annual Training Conference, West Palm Beach, FL:  Attended classes and presentations by Dr. William Lewinski ("Force Science Update"), Don Alwes ("Active Shooter Response For Firearms Instructors"); Don Smith ("Sniper Overwatch"); LouAnn Hamblin ("Active Shooter Handgun Training"). Also attended industry trade show, helped conduct Handgun Safety Check, and

Curriculum Vitae:
Emanuel Kapelsohn
Page 18

       helped conduct Memorial Match.  Class taught:  see below.
"Preparing for an Armed Intruder," Eastern University, St. Davids, PA (2019)
American Heart Association "Heartsaver First Aid CPR AED" Training
   Certification    12/8/2019
2020 SHOT Show, Las Vegas, NV.  Attended industry trade show.
Active Shooter Response, Trexlertown, PA, March 2020.  Thanos Milios, Lead
   Instructor.  Classroom and reality-based training scenarios using Simunitions
   guns with role-players.
"Safely Engaging Psychopaths & Sociopaths," Public Agency Training Council
   Webinar, April 2020.
"Police Response to Armed Suicidal Subjects," Dr. Andrew T. Young, Instructor,
   Public Agency Training Council - Webinar, June 23, 2020
Defensive Handgun 1, 2, 3 & 4, Marksmanship Matters (Larry Mudgett
   Instructor), Lehi, Utah, July 2020
Defensive Handgun and Patrol Rifle, Defense Training International, John
   Farnam, Instructor.  Sussex, NJ, October 2020.
Certificate, DTI Urban Rifle.  Certificate, DTI
   Instructor Update.  (Assisted in instructing, see below.)
UTM Professional Training Organization ("PTO") Certification Class.
Certificate (2020)
Glock Armorer's Course – Update and Recertification (Smyrna, GA 2020)
IALEFI Virtual Training Conference, January 2021.
Metal-Tec Metal Detector Instructor Course.  Certification 2021.
Principles of De-Escalation, Pennsylvania State Police (Sgt. Timothy Fetzer, Jan.
   2021)
Realistic De-Escalation Instructor Course, Force Science Institute, Maplewood,
   Minnesota.  IADLEST-Certified Course, Certificate (2021)
"Officer-Involved Shootings:  The Aftermath" ("I've Been In An Officer
   Involved Shooting – Now What?"  Instructor Laura Scarry, Esq.  Webinar 2021
   (Certificate)
Stop the Bleed Training, St. Luke's Hospital, Easton, PA 2021 (Certificate)
ILEETA Annual Training Conference, St. Louis, MO (2021). The Neuroscience
   of De-Escalation (Verplanck and Smarro, Instructors); Tactical Disadvantages
   (Green); Risk Assessment (Horine); Small Unit Tactics for Active Shooter
   Response (Scott Hyderkamp); Sharpening Your Agency's Knife Program (Zane
   Nickell); Surviving the Officer-Involved Shooting (Brian Gonzales); Robert
   Peel's Principles (Casavant); How to Use Personality Science to Enhance
   Training (Kerry Mensior); What Excited Delirium is Not (Ellis Amdur);
   Simulator Scenarios: Virtra, Milo, Ti Systems; Active Shooter Panel of
   Experts (panelist and attendee); Deadly Force Panel of Experts (panelist
   and attendee).  Courses taught: see below.
Defensive Cane Course ("Introduction to Cane-Fu"), Powhatan, Virginia, Tom
   Ashmore, Instructor.  2021 (Certificate)
IALEFI Annual Training Conference, Melbourne, FL.  2021 (Certificate)
"Legal Issues in Use of Force," LLRMI (Legal & Liability Risk Management
   Institute). Instructor:  Jack Ryan, Esq. (2022)
IALEFI Annual Training Conference, Las Vegas, NV.  2022 (Certificate)
   Attended classes on the Mandalay Bay Shooting (LVMPD); Single Officer
   Vehicle Tactics (LVMPD); Unconventional Rifle Fighting Positions; FACES

Curriculum Vitae:
Emanuel Kapelsohn
Page 19

of Concealed Carry; NRA LE's Creating a Red Dot Transition Program for Your Agency; Special Purpose Rifle Program (LVMPD); Gunshot Wound Trauma Care; Human Factors & Firearms Instructors (Sgt. Jamie Borden).

NRA Annual Conference, Houston, TX (2022). Attended industry trade show. Attended seminars: Training for Concealed Carry: Focusing on Developing Essential Skills (Jeff Gonzales); Evidence-Based Defensive Firearms Training: A Discussion for Instructors and Those Who Actually Train (John Correia).

Instructor Update, DTI Urban Rifle, Sussex, NJ (John Farnam, Instructor (2022)

SHOT Show, Las Vegas, NV (2023): Attended firearms/law enforcement industry trade show.

NRA Convention, Indianapolis, IN (2023). Attended firearms trade show; attended classes on Bulletproof Mind (Lt. Col. Dave Grossman); Myths of Concealed Carry (John Correia).

IALEFI Annual Training Conference, Houston, TX (2023). Attended classes on the Uvalde School Shooting (ALERRT); Red Dot Pistol Optic Instructor Training.

**PROFESSIONAL ASSOCIATIONS & MEMBERSHIPS:**

American Bar Association (Member 1978-1997)
Association of the Bar of the City of New York (Member 1978-1998)
Pennsylvania Bar Association (Member 1994-2007, 2012-present)
Bar Association of Lehigh County (Member 1994-2007, 2012-present)
Pennsylvania Trial Lawyers Association (Member through 2004)
Association of Trial Lawyers of America (Member through 2004)
American Inns of Court (Member 2000-2007)
Barristers Inn, Allentown, PA (2012-present)
Muhlenberg College Board of Associates
National Rifle Association (Endowment Member)
International Association of Chiefs of Police (Associate Member 1985-1992)
International Association of Law Enforcement Firearms Instructors (see above)
Police Marksman Association (Member, Nat'l Advisory Board 1987-2004)
American Society for Industrial Security (Member)
Tactical Response Association (former Charter Member)
Justice System Training Association (former Member)
American Society of Law Enforcement Trainers (former Charter Member)
Outdoor Writers Association of America (Member 1987-1990)
U.S. Practical Shooting Association (former Member)
U.S. Revolver Association (Member 1983-1989)
Pennsylvania Chiefs of Police Association (former Associate Member)
Pennsylvania Sheriff's Association (former Associate Member)
Appointed Senior Research Associate, Carnegie Mellon University Center for the Advancement of Applied Ethics (1994)
Appointed to Advisory Board, AWARE (1995)
Appointed as Fellow, Defensive Handgun Training Institute (1996)
Appointed to Pennsylvania Municipal Police Officers Education and Training

Curriculum Vitae:
Emanuel Kapelsohn
Page 20

Commission Committee to develop standards and curriculum for decision-making training simulator/judgmental use of force mandatory in-service training program (1997-98); Curriculum Development Committee for revision of Act 120 Police Academy curriculum used statewide; patrol rifle training standards (2004-  ); revision of Act 120 Police Academy lesson plans, training videos, and related materials used at all police academies in PA (2015); and development of Mandatory In-Service Training Program on "Use of Force" (2015 development for 2016 presentation statewide) .

National Tactical Officers Association (former and current Member)
Associate Member, Fraternal Order of Police (Linton, Indiana Chapter 2008-12)
Member, International Law Enforcement Educators and Trainers Association (2009 -    )

Member, Advisory Board, Armed Citizens Legal Defense Network (2012 - )
Member, Leadership Group, Safe Team, Faith Church, Trexlertown, PA (2017- )
Member, Security Committee, Temple Beth El, Allentown, PA (2019-  )

## SELECTED MEDIA REFERENCES
## AND ACKNOWLEDGMENTS:

EMANUEL KAPELSOHN interviewed, mentioned and pictured in THE GUN DIGEST BOOK OF COMBAT HANDGUNNERY by J. Lewis and J. Mitchell (Northfield, IL 1983).  Quote from p. 117:"His research and personal experience in self-defense firearms training make [Kapelsohn] one of the most qualified people in the business."

EMANUEL KAPELSOHN interviewed on subject of firearms self-defense on ABC Television show "What's Up, America?" (1980 and re-run)

"Midland Park Hires Weapons Specialist," The Sunday News (Ridgewood, NJ. March 1984)

"Firearms Trainer to be Hired," Suburban News (Wayne NJ. March 21, 1984)

"Midland Park Will Hire Firearms Pro for 9mm Courses," The Northwest News (Midland Park, NJ. March 22, 1984)

"Gun Expert Rated High," The Sunday News (Ridgewood NJ. April 8, 1984)

"Crime Rise Has Women Taking Up Arms," The Times (Trenton NJ. March 10, 1985)

"Union Launches Training Program to Upgrade Skills for Police," The Star-Ledger (Newark, NJ. November 20, 1985)

Guest Instructor Appreciation Award, International Police Academy, Master Instructor Seminar (1985)

"Gun Law Won't Stop Terrorists," The Times (Trenton, NJ. May 20, 1986)

**JA2012**

Curriculum Vitae:
Emanuel Kapelsohn
Page 21

"Expert Hits Police Training," The Lawrence Ledger (Lawrenceville, NJ.
  October 24, 1986)

"Lawrence Resident's Love of Firearms Becomes Career," The Star-Ledger
  (Newark, NJ.  December 12, 1986)

"Committee Takes Aim at Detector-Proof Guns," The Star-Ledger (Newark, NJ.
  December 12, 1986)

"Gun Lobbyists Oppose Passage of Bill to Ban Non-Metal Guns," The Times
  (Trenton, NJ.  December 12, 1986)

"Plastic Gun Bill Demolished by Expert's Testimony," NRA Monitor
  (Washington, D.C. Vol. 14, No. 1 January 15, 1987)

"Detection Systems, Not Guns Should Be Focus of Legislation, Says Firearms
  Expert," NRA Monitor (Washington, D.C. Vol. 14, No. 3 February 15, 1987)

"Using Training Consultants" by Bill Clede, Law and Order (March 1987)

"Taking Humanistic Approach to Firearms," Newsday (New York, NY.
  July 20, 1987)

"New Yorkers Learn to Protect Themselves at Gun School," The New York
  Times (New York, NY.  July 20, 1987)

"Citizens Learn to Shoot in Face of Crime," The Sun (Melbourne, Australia.
  August 1, 1987)

"New York's Itchy Trigger Finger," The Advertiser (South Australia.
  July 31, 1987)

"Bill Banning Plastic Guns Debated,"  (Associated Press AAA wire release
  under this or similar title, July 28, 1988, describing Emanuel Kapelsohn's
  Senate Judiciary Committee subcommittee testimony, printed on July 29 in
  hundreds of U.S. newspapers, including the following:

        Alexandria, LA Daily Town Talk
        New Haven, CT Register  (continued, next page)
        Dayton, OH News/Journal Herald
        Wilmington, NC Star
        Cheyenne, WY Eagle
        Delaware, OH Gazette
        August, GA Herald
        Bennington, VT Banner
        Johnstown, PA Tribune-Democrat
        Erie, PA News
        Lynchburg, VA News and Daily Advance
        Bluefield, WV Telegraph

**JA2013**

Curriculum Vitae:
Emanuel Kapelsohn
Page 22

        Mattoon, IL <u>Journal-Gazette</u>
        Casper, WY <u>Morning Star Tribune</u>
        Belleville, IL <u>News-Democrat</u>
        Newark, OH <u>Advocate</u>
        Anchorage, AK <u>News</u>
        Kenton, OH <u>Times</u>
        Canton, OH <u>Repositor</u>
        Waterbury, CT <u>American</u>
        East Liverpool, OH <u>Review</u>
        FT. Walton Beach, FL <u>Playground News</u>
        Vero Beach, FL <u>Press-Journal</u>
        Modesto, CA <u>Bee</u>
        Vallejo, CA <u>Times-Herald</u>
        Newport News, VA <u>Times-Herald</u>
        Marysville, OH <u>Journal-Tribune</u>
        Paducah, KY <u>Sun</u>
        Toms River, NJ <u>Observer</u>
        Springfield, OH <u>News-Sun</u>
        Logan, OH <u>News</u>
        Piqua, OH <u>Call</u>
        Lawton, OK <u>Press</u>
        San Diego, CA <u>Union</u>

"Witness Upstages Metzenbaum at Hearings," <u>Gun Week</u> (Buffalo, New York.
  August 14, 1987)

"Neal Knox Report:  Gun Bills Moving," <u>Shotgun News</u> (Hastings, NE.
  September 1, 1987)

"Kapelsohn Gets September Gun Rights Defender Award," <u>Point Blank</u>
  (Bellevue, WA September 1987)

"Firearms Expert Wins Person of the Month," <u>NRAction</u> (Washington, D.C.
  September 1987)

<u>Selecting the Police Pistol</u> by Doug Wicklund, <u>The American Rifleman</u>
  (December 1987)

<u>Mesa, Arizona:  The IALEFI Convention</u> by Tony Lesce, <u>Arizona Police Officer</u>
  (Phoenix, AZ Winter 1988)

<u>International Association of Law Enforcement Firearms Instructors Seventh
  Annual National Training Conference</u> by Chris Pollack, <u>Special Weapons and
  Tactics</u> (March 1988)

<u>Modern Techniques of Defensive Pistolcraft:  An Exceptional Handgun Course
  Taught by John Farnam and Emanuel Kapelsohn</u> by Barrie Bergman,
  <u>Practical Shooting International</u> (Emmetsburg, IA.  March 1988)

**JA2014**

Curriculum Vitae:
Emanuel Kapelsohn
Page 23

"Hughes Goes Private With Hearing Witness," Gun Week (Buffalo, NY.
  January 8, 1988)

" 'Plastic Gun' Ban Brewing," NRAction (Washington, D.C. January 1988)

Gaping Holes in Airport Security by Peter Cary, U.S. News & World Report
  (April 1988).  Quote from page 28:

> "Emanuel Kapelsohn, a police weapons expert, astonished a
> congressional subcommittee by demonstrating how guns could be
> smuggled through certain metal detectors . . ."

Police Defensive Handgun Use and Encounter Tactics by Brian A. Felter
  (Prentice-Hall, Inc. Englewood Cliffs, NJ 1988).  Quote from p. 6:

> "In defensive firearms training today, the information and defensive
> instructors exist -- five of the most talented being Massad Ayoob,
> Ray Chapman, John Farnam, Emanuel Kapelsohn, and Chuck Taylor --
> and from a resource pool of defensive information that the law
> enforcement community must make use of."

"U.S. Firearms Consultant Due Next Week," Trinidad Guardian (Port of
  Spain, Trinidad.  July 16, 1988)

Shooting Schools:  A Second Look by James L. Winter (Albany, New York
  1985).  Quote from page 92:  "API's staff includes such nationally famous
  personalities as . . . writer Manny Kapelsohn."

An Overview of the Police Marksman National Advisory Board by Brian
  McKenna.  The Police Marksman (September/October 1988).  Professional
  biography of Emanuel Kapelsohn

"Semiautomatics or 6-shooters?" by Ken Valenti.  Gannett Westchester
  Newspapers.  (Westchester County, N.Y. January 15, 1989)

"Gun Control Opponents Lock Horns With Graves" by Donna Leusner
  (The Star Ledger, February 7, 1989)

Interviewed on "Geraldo" (Geraldo Rivera Show) NBC television, March 6,
  1989, on subject of gun availability and gun control.

Seek Out the Expert by Joseph J. Truncale, Ph.D., The ASLET Journal (January/
  February 1989).  Quote from p. 12:

> "If you wish to know more about guns and shooting, talk to those who
> are recognized experts in this area.  Massad Ayoob, Ray Chapman, John
> Farnam, Emanuel Kapelsohn, Dennis Tueller, along with many others,
> can guide you to schools and programs which are well known for their
> professionalism."

**JA2015**

Curriculum Vitae:
Emanuel Kapelsohn
Page 24

Glock by Sgt. Paul Palank.  Blue Line Police Magazine (March/April 1989).
  Quote from p. 24:

> "The success that we in Miami have had with the Glock pistol is due
> not only to the advanced design of the weapon, but the "state of the
> art" instruction provided by Glock Incorporated in the forms of
> Emanuel Kapelsohn (Peregrine Corporation) and Peter Tarley
> (Rockwell Corporation).  The training provided by these gentlemen
> to the transitional training instructors superbly mated the Glock's
> ingenious technology with their equally progressive training program."

Glock Continues To Be An Innovator by E.B. Hulsey, Police Marksman
  (March/April 1990).  Quote from p. 58:

> "The instructor . . . was Emanuel Kapelsohn, who made the class a
> very interesting learning experience.  Mr. Kapelsohn is an example of
> the quality instructors which Glock has retained to teach these courses."

Glock Pistol:  Perspective From The Field by Massad Ayoob.  Guns
  (September 1990).  Quote from p. 77:

> "The best money you can spend on your Glock is for training.  The firm
> retains Manny Kapelsohn, Peter Tarley, and Cathy and Jerry Lane for
> their police transition and armorer's instruction programs . . . These
> are among the finest combat handgun trainers in America; Glock chose
> them well.  I . . . believe that the superb training of these four master
> instructors has been more responsible for the Glock's success in the field
> and in sales than most people realize."

Emanuel Kapelsohn and Peregrine Corporation cited, quoted and acknowledged
  in "Semi-Automatic Pistol Manual Safety Restrictions," U.S. Border
  (continued) Patrol Academy, Glynco, GA, presented at U.S. Marshal's Service
  Semi-Automatic - Revolver Handgun Symposium, Feb. 21-22, 1990.  (Emanuel
  Kapelsohn described as an "expert trainer" on p. 16.)

"Fearing Drug Wars, Suburban Police Swap 6-Shooters for Semiautomatics"
  by B.J. Phillips.  Philadelphia Inquirer (September 9, 1990)

Interviewed in "Entrevistas" column of Magnum.  May-June 1991
  (Caracas, Venezuela)

Peregrine Corporation training materials cited in published lesson plans of
  Federal Law Enforcement Training Center (Glynco, GA) on semi-automatic
  pistol training, clearing of pistol malfunctions, etc.

Emanuel Kapelsohn mentioned and quoted in study by Federal Law
  Enforcement Training Center on instructor:  student ratios for firearms training
  (V. Atkins. Glynco, GA 1991)

Curriculum Vitae:
Emanuel Kapelsohn
Page 25

Emanuel Kapelsohn and Peregrine cited as offering 'a strong major in "how" and a strong minor in "when" [to shoot] in "Deadly Force - When Is It Justified?" by Massad Ayoob, Guns & Ammo's <u>Handguns for Home Defense</u>, Vol. 9, No. 5 (1991)

"The Police Marksman Advisory Board" by Guy A. Rossi, <u>Police Marksman</u> (Jan./Feb. 1992). "Innovator, tactician, expert . . . [Emanuel Kapelsohn is] considered one of the country's leading authorities on semi-automatic, long gun and submachine gun training . . ."

"IALEFI'S ATC" by Chris Pollack, <u>SWAT</u> (May 1993)

Appreciation Award, Calgary Police Service Tactical Unit (1993)

Appreciation Award, International Association of Law Enforcement Firearms Instructors ("for your dedication, time and personal effort towards the development of the Firearms Training Standards") (1993)

"Newsclippings," <u>The Firearms Instructor</u>, Issue 13 (1994)

"Shotgun Key In Acquittal of Garron," Atlantic City Press, Nov. 13, 1994. Quote:

"They found the weapon's safety device could disengage if it was merely brushed -- just as Emanuel Kapelsohn, the defense firearms expert, had testified, the jurors said."

<u>Glock, The New Wave in Combat Handguns</u> by Peter Kasler (Boulder, CO 1992), page 296.

Acknowledged in <u>Stealth</u> (1989) and <u>Extreme Prejudice</u> (1991) by Guy Durham (Putnam, New York)

Acknowledged in <u>The Street Smart Gun Book</u> by John Farnam (Police Bookshelf, 1986)

Acknowledged in <u>Handgun Stopping Power, The Definitive Study</u> by Evan Marshall and Ed Sanow (Paladin Press, Boulder 1992)

Acknowledged in <u>The Farnam Method of Defensive Handgunning</u> by John S. Farnam (Seattle 1994): "These are the ones who have advanced the art and prepared it to be passed to the next generation: Manny Kapelsohn . . ."

"Modern Training, The Professional's Edge" by Michael J. Scanlan, <u>Protection News</u>, Vol. 11, No. 2 (Fall 1995), Internat'l Foundation of Protection Officers, Bellingham, WA. Quote: "Manny Kapelsohn's obvious enthusiasm along with his vast knowledge of the subject

Curriculum Vitae:
Emanuel Kapelsohn
Page 26

matter and genuine interest in imparting that knowledge to us,
stimulated our interests, motivated us to excel and created a learning
environment for the entire class."

"Post-Training Dry Drills" by Det. Bill Kaiser, The Firearms Instructor,
Vol. 17 (1995)

"IALEFI 1995 Training Conference" by C. Pollack, The Firearms Instructor,
Vol. 17 (1995)

"Gun Control and Economic Discrimination:  The Melting Point Case-In-Point"
by Markus Funk, 85 Journal of Criminal Law & Criminology 764-806
(Northwestern U. School of Law, 1995):  Emanuel Kapelsohn cited repeatedly
throughout article.

"IALEFI '95 Annual Training Conference" by C. Pollack, SWAT (June 1996)

"Search for qualified firearms instructor didn't last very long," Reading Eagle,
April 20, 1997, p. B1

"Sheriff, deputies begin targeting weapons training," Reading Eagle,
April 20, 1997, p. B1

"Professional Firearms Instruction for the Protective Specialist" by Mike
Scanlan, Executive OPS International (Dec. 1997).  Quote:  " . . . I contacted
Manny Kapelsohn, the world class firearms instructor and IALEFI Vice
President."

Item in Business "Players," Allentown Morning Call, January 4, 1999.
Quote:  "Emanuel Kapelsohn of Bowers has been re-elected as Third Vice
President of the International Association of Law Enforcement Firearms
Instructors."

"Kapelsohn is Re-Elected by Police Association," Allentown Morning Call,
December 30, 1999.

"Degree of Guilt Decided for Smith," The Inquirer, Philadelphia,
July 30, 1998, p. B1

Appreciation Award from Pennsylvania Municipal Police Officers' Education &
Training Commission, for "outstanding contribution" toward the development,
from 1997-1999, of the Commission's new Use of Force - Judgmental Training
Program.

"Police Shooting Headed to Jury," New Haven Register, March 9, 2000.
Quote:  "Standing before a rapt jury, Kapelsohn demonstrated a number of
stabbing and slashing techniques with the small knife, narrating as he
did so."

**JA2018**

Curriculum Vitae:
Emanuel Kapelsohn
Page 27

Emanuel Kapelsohn and The Peregrine Corporation cited and acknowledged
numerous times in Commonwealth of Pennsylvania firearms training
curriculum for Basic Police Academy Course taught at police academies
throughout the state (2000).

"MPOETC Conducts Firearms Instructor Training Seminar," Pennsylvania
MPOETC Newsletter, Vol. 23, Issue 2, Sept. 2000.  Quote:  "The lead
instructor for the seminar was Emanuel Kapelsohn, a nationally recognized
firearms instructor and use of force expert."

"Experts Claim Wife Grabbed Accused's Gun," by William Doolittle, Pocono
Record, November 28, 2000.  "…Emanuel Kapelsohn, an Allentown attorney
and firearms expert, argued that a crescent of black residue pictured on the back
of Rhonda Kammer's hand was caused by discharge from the cylinder gap of
the .38 caliber revolver used in the killing. … Kapelsohn said pictures of the
woman's hand showed marks on her hand that "could not have been produced
by the muzzle blast."

Cited by Lt. Col. David Grossman as "an awesome warrior-trainer-lawyer" in
publication of his national e-mail network on subject of involuntary muscular
contraction (2002).

Recipient, City of Allentown Proclamation (commendation) for participation on
Advisory Board of University of Pennsylvania (FICAP/MPAP) study on
reducing gunshot injuries and deaths (2002)

"New Trial Ordered for Officer Convicted in a Suspect's Death," The New York
Times, October 18, 2002.

"Pa. Court Rejects Appeal by Ex-Teacher," by William Doolittle, Pocono
Record, December 14, 2002.  "During the trial, Emanuel Kapelsohn testified as
a crime scene and firearms expert.  The Superior Court said, "The record
contains abundant evidence from which the trial court could conclude that
Kapelsohn had reasonable pretension to specialized knowledge about
reconstruction of the scene of a crime involving a firearm."

Commonwealth of Pennsylvania v. Youngken, 2002 WL 32351935,
Pennsylvania Superior Court, December 5, 2002:  "Clearly the qualifications of
Mr. Kapelsohn indicate that the trial court did not abuse its discretion in
qualifying him as an expert witness in firearms and crime scene reconstruction
involving firearms."

Teaching Women to Shoot by V. Farnam and D. Nicholl (Copyright 2002,
Boulder, CO).  Emanuel Kapelsohn quoted and cited extensively on pages 46-
47 on subjects of trigger finger placement, covering suspects at gunpoint, and
accidental discharges of firearms.

Acknowledgement in Training at the Speed of Life: The Definitive Textbook for

Curriculum Vitae:
Emanuel Kapelsohn
Page 28

Military and Law Enforcement Reality Based Training, by Kenneth R. Murray (2004): "Special Thanks to my Technical Editor, Emanuel Kapelsohn: Scholar, Trainer, and Friend.  Thank you for your patience, fine eye, tireless effort, boundless knowledge, and dedication to detail."

"Sharpton:  Monroe Shooting an 'outrage,'" Allentown Morning Call, April 22, 2004.

"Independent Investigator Looking Into Fatal Shooting," Pocono Record, April 23, 2004.

"Shooting scrutinized by victim's family,"  Pocono Record, April 23, 2004.  Quote:  "Monroe County District Attorney David Christine has also appointed Emanuel Kapelsohn, an Allentown attorney and weapons expert, to conduct an Independent investigation into the shooting."

The Concealed Handgun Manual by Chris Bird, 4th Ed., San Antonio, TX 2004.  Emanuel Kapelsohn acknowledged in Introduction (p. ix) and on p. 352.

"Strategies for Safer Weapons Training and Use," David Olsen, Law Enforcement Technology, Jan. 2004, pp. 52-60.

"Two New Publications from IALEFI," Police Marksman (Sept./Oct. 2004) p. 55 "Rethinking Gun Safety Rules Based on Accidental Discharges," by Chris Bird.  GUN WEEK, Sept. 1, 2004, p. 6.  "I outline his qualifications to show that when Kapelsohn says something about firearms, he is worth listening to."

"Safety Strategies for Realistic Firearms Training," by Ken Murray.  Police & Security News, Vol. 21, Issue 1 (Jan./Feb. 2005).  Emanuel Kapelsohn cited and quoted extensively on safety-related issues.

"Consultants to study Easton SWAT Team,"  The Morning Call, May 25, 2005 (Allentown, PA).  "The city two weeks ago retained Emanuel Kapelsohn, a nationally recognized firearms expert and consultant …"

"Easton Hires Outsiders for Police Policy Review," by E. Sieger, The Express-Times, Easton, PA, May 25, 2005.  "The city has hired attorney and firearms expert Emanuel Kapelsohn to help the police department develop firearms policies and procedures."

"Police Get Good News in Report,"  by E. Sieger, The Express-Times, Easton, PA, July 15, 2005.  "In May, the city hired attorney and firearms expert Emanuel Kapelsohn to help the police department develop firearms policies and procedures."

"More First Hand Information," The Gun Zone, http://thegunzone.com/ayoob/magliato-kapelsohn.html.  Comments on the Magliato case.

**JA2020**

Curriculum Vitae:
Emanuel Kapelsohn
Page 29

CNN "Paula Zahn Now" Show, August 8, 2005.  Emanuel Kapelsohn
interviewed in segment on civilian intervention tactics in armed robberies.

"Victim of Stray Shot Thinks Allentown's Still Safe," by S. Kraus, The Morning
Call, August 18, 2005.  "Ballistics expert Emanuel Kapelsohn …"

"Dead Man's Family Waits for Ruling in Drug Bust Shooting," by E. Mark,
Pocono Record , August 13, 2005.  "[District Attorney] Christine appointed
Emanuel Kapelsohn, an Allentown attorney and ballistic expert, as an
independent investigator to look into Wright's death."

"Wright Shooting Justified, DA Says," by E. Mark, Pocono Record, 9/16/05

"Fatal Shooting Justified, Monroe DA Says," by J. McDonald, The Morning
Call, September 16, 2005.  "The decision, announced Thursday by District
Attorney E. David Christine, Jr., was based in part on a recently completed
report by an Allentown attorney who is a firearms expert.  "Barron Wright's
death, while regrettable, resulted from his own actions in defying the agents'
commands, resisting arrest, and attempting to escape by driving his vehicle in
a manner that placed everyone around him in deadly danger," said Emanuel
Kapelsohn, with the Allentown office of Blank Rome."

"Easton Officer Loses Handgun," by Tracy Jordan, The Morning Call, Nov. 24,
2005.  "The city is waiting for a fourth report on the department's firearms
procedures from [E]manuel Kapelsohn, a nationally recognized firearms expert
and consultant who practices law with Blank, Rome, Comisky and McCauley in
Allentown."

 "Report says Easton violated own gun policies," by Tracy Jordan, The Morning
Call, Jan. 20, 2006.

"Police Seek Answers in Deadly Shooting," by Brian McNeill, Connection
Newspapers (Fairfax County, VA), February 9, 2006.

"Woman Questions Police Role in Husband's Shooting Death," by John Boyle,
Citizen-Times, West Asheville, NC, March 5, 2006.

"Findings Expected in Probe of Officer's Death," by Joe McDonald, The
Morning Call, March 22, 2006.

"No Charges in Shooting;  Easton Police Slammed," by Joe McDonald, The
Morning Call, March 23, 2006.  "... [Captain] Gibiser said corrective steps have
been taken based on recommendations from a study done by Allentown lawyer
and firearms expert Emanuel Kapelsohn."

"Mother Sues Attorney General's Office in Son's Death," by Joe McDonald, The
Morning Call, April 8, 2006.

"Getting More Bang – Harlingen Police Department Upgrading Firepower," by

Curriculum Vitae:
Emanuel Kapelsohn
Page 30

Joann Deluna, <u>Valley Morning Star</u>, May 8, 2006.

"Expert Defends Police Shooting," by Jason Cato, <u>Tribune-Review</u>, August 10, 2007.

"Firearms Expert:  Cop Justified for Use of Lethal Force," by Jason Cato, <u>Valley Independent</u>, August 10, 2007.

"Former Officer Recounts Shooting," by Christine Haines, <u>Herald Standard</u>, August 10, 2007.

Consultant and guest presenter, "Conspiracy Theory" TV program for The Discovery  Channel on the assassination of Martin Luther King, Jr.;  aired several times during September 2007 and thereafter.

"'08 Revelers Are Warned to Hold Fire" by Laurie Lucas, <u>The Press-Enterprise</u>, Riverside, CA, December 31, 2007, quoting Emanuel Kapelsohn, "a nationally recognized firearms expert."

<u>The Concealed Handgun Manual</u> by Chris Bird, 5th Ed., San Antonio, TX 2008. Emanuel Kapelsohn and The Peregrine Corporation cited as a recommended source for firearms training.

"Lawyer:  Troopers Justified in Shooting" by Joe McDonald, <u>The Morning Call</u>, Allentown, PA, November 23, 2008.

"Shootings Remind Police Officers of Dangers They Face," by Jacqueline Koch, <u>Chattanooga Times Free Press</u>, July 21, 2009.

"Excessive Force Use Questioned in Fatal Shooting," by Jacqueline Koch, <u>Chattanooga Times Free Press</u>, August 5, 2009.

"Manny Kapelsohn: Officer Involved Shootings," interview by Betsy Brantner-Smith on PoliceOneTV (<u>www.policeone.com</u>).  Premiered November 2, 2009.

"Armed and Ready" by Michael Malik, Bloomington, Indiana <u>Herald-Times</u>, November 29, 2009.

"Vest saves officer from injury after shooting" by Rachel Cook, Idaho Falls <u>Post Register</u> (June 18, 2011)

"Officers, news reporters try their hands at police scenario simulators, by Laura Lane, Bloomington <u>Herald –Times</u>, Bloomington, IN (July 7, 2011).  Opening sentence:  "Manny Kapelsohn  saw an opportunity for rural law enforcement officers to experience sophisticated firearms training at no cost …"

"County law officers receive specialized firearm training at no cost," Greene County <u>Daily World</u> (July 7, 2011).

Curriculum Vitae:
Emanuel Kapelsohn
Page 31

Glock: The Rise of America's Gun by Paul Barrett (2012), pp. 53-59.

"Top Gun," THE WEEK, March 9, 2012.  Article cites and quotes E. Kapelsohn

"Linton Police Department's Citizens Academy gives participants a chance to experience crime-fighting techniques" by Lisa Trigger, TribStar.com, 4/01/2012

"Kapelsohn Joins Network Advisory Board," ACLDN Journal, December 2012

"Training for a Shootout:  How High-Tech Simulations Are Enhancing Emergency Response," by Nate Rawlings.  TIME Magazine, Time U.S., January 1, 2013.

"Banning Assault Weapons Won't Make Nation's Schools Safer," Opinion Editorial by E. Kapelsohn, MORNING CALL, January 6, 2013.

E. Kapelsohn a panelist on "Business Matters," Channel 69 (Allentown, PA), February 4, 2013.  Show about active shooters, assault weapons, and legislation.

"Adam Lanza's Arsenal," by Benjamin Wallace-Wells, NEW YORK magazine, February 11, 2012.  E. Kapelsohn featured and quoted in the article.

"Report details how FBI agent Barry Bush died in friendly-fire shooting," by Doug Brill, EXPRESS TIMES LehighValleyLive.com, March 7, 2013.  E. Kapelsohn quoted.

"Pittsburgh Police Bullets Not Lacking in Power, FBI Test Shows," by M. Harding. Pittsburgh Tribune-Review, April 23, 2013. E. Kapelsohn quoted.
E. Kapelsohn guest co-host on ESPN-LV radio show, "The Water Cooler," Sept. 22, 2013.  Broadcast from Easton, PA on 1230 and 1320 AM.  Topics included the Washington Navy Yard Shooting, what to do in an active shooter situation, and assuming responsibility for one's own personal safety.

E. Kapelsohn mentioned in "Why Are Police Shootings of Innocents on the Rise?" by Steven Yoder,  The American Prospect magazine, October 31, 2013

"City of Pittsburgh Police Are Waiting for New Ammo," by Margaret Harding. Pittsburgh Tribune-Review, Feb. 23, 2014.  E. Kapelsohn quoted.

"Surge in gun sales subsiding in Lehigh Valley region," by J. Sheehan. The Morning Call, Allentown, PA. March 17, 2014.  E. Kapelsohn quoted

"Experts Differ on Path of bullet; Closing Arguments Today in Bonacci Murder Trial," by Rebekah Brown, thetimestribune.com, May 8, 2014

"Attorneys Offer Conflicting Views of the Man Accused of Killing Frank Bonacci," thetimestribune.com, May 9, 2014

"Murder Trial Testimony Ends," by Stacy Lange, WNEP.com, May 7, 2014

Curriculum Vitae:
Emanuel Kapelsohn
Page 32

"Closing Arguments set for Tuesday in Arundel road-rage Murder Case," by
Pamela Ward, The Baltimore Sun, July 28, 2014.

"Experts Give Differing Opinions in Road-Rage Murder Trial," by Tim Pratt,
CapitalGazette.com, July 29, 2014.

"Troubling Times for Pa. State Police," by Jessica Parks, Philadelphia Inquirer,
October 5, 2014.  E. Kapelsohn quoted.

"State police struggle in dealing with multiple crises," by Jessica Parks, The
Morning Call, October 6, 2014.

"Jury Finds Connellsville man not guilty in fatal shooting of his cousin," by
 Susan Kelly, Herald-Standard, December 11, 2014.  E. Kapelsohn quoted
 extensively.

"No Charges for Milwaukee Officer Who Shot Man 14 Times,"
 www.USAToday.com, December 22, 2014, Aamer Madhani

"Milwaukee Officer Won't Face Charges for Killing Mentally Ill Man,"
 UPI.Com, December 22, 2014, Frances Burns

"Former Milwaukee Police Officer Won't Be Charged," www.NYTimes.com,
 Monica Davey, December 22, 2014.  Emanuel Kapelsohn cited as "a leading
 expert on use-of-force reviews."

"Building a case for Lisa Mearkle: Did she have reasonable cause to fear for her
life?" by Ivey DeJesus, March 25, 2015.  E. Kapelsohn quoted extensively.

"Deadly Force:  Police who kill rarely face criminal charges; Hummelstown case
is rare," by Ivey DeJesus, March 27, 2015.

"OIS Question:  Is a "non-threatening" gun really non-threatening?"  Force
Science News #279, April 2015.

"When Chicago Cops Shoot," by Steve Bogira, Chicago Reader, May 20, 2015.
"15 Ways The iPhone Gun Case Could Go Very, Very Wrong," by Tara Haelle,
Forbes, http://www.forbes.com/sites/tarahaelle/2015/07/08/15-ways-the-iphone-
gun-case-could-go-very-very-wrong/

"Beachgoer discovers gun-replica phone case 'not a smart idea'" by Katie May,
 Winnipeg Free Press, August 12, 2015.

Emanuel Kapelsohn interviewed on "Morning Wave in Busan," Radio FM 90.5,
Busan, South Korea, on subjects of firearms safety and firearms laws,
October 5, 2015.

"Questions Linger After Police Shooting in Chester" by Caitlin McCabe,
Philadelphia Inquirer and philly.com, February 21, 2016.

**JA2024**

Curriculum Vitae:
Emanuel Kapelsohn
Page 33

"Defendant testifies in Manchester rep men case," by Heather Mongilio, Carroll
County Times, May 19, 2016.

"Pulse Families Get Some Answers from Autopsies," Orlando <u>Sentinel</u>, August
5, 201.  (also see <u>Sun Sentinel</u> Broward Edition, 8/6/16; 90.7 WMFE radio
interview by Abe Aboraya, and other extensive media coverage.)
"Forensics experts:  Rubber bullet did not kill protester Justin Carr," <u>The
Charlotte Observer</u>, by Michael Gordon, et al., November 18, 2016.

"CMPD officer was cleared in Keith Lamont Scott shooting, but will it still cost
the city?" by Fred Clasen-Kelly, charlotteobserver.com, December 6, 2016. E.
Kapelsohn quoted and cited as expert on police use of force.
"Good Samaritan Kills Active Shooter in Texas Sports Bar: Police" by Phil
McCausland, NBCNews.com, May 4, 2017, 10:20 p.m. ET.

"Yanez takes stand, 'I thought I was going to die' during confrontation with
Castile," C. Xiong, et al., Star Tribune, June 10, 2017.

"Case file in Philandro Castile shooting to be made public; family intends to
Sue," B. Stahl, Star Tribune, June 20, 2017 ("She said the most believable
witness was Emanuel Kapelsohn …")

"Police Training Experts Testify in Philip Brailsford Trial,"
[www.abc15.com/news](http://www.abc15.com/news), November 28, 2017.

"Prosecution rests:  defense of ex-Mesa cop begins," azfamily.com. November
27, 2017.

"Attorney for ex-Mesa police officer Philip Brailsford," amp.azcentral.com,
September 8 and September 9, 2016.

"Expert witness for prosecution: Brown Deer officer was not justified in
shooting, wounding of man," A. J. Bayatpour, Fox6News.com, Feb. 14, 2018.

"Attorneys present opening statements in trial of Brown Deer officer accused of
shooting suspect," Peter Zervakis, MJMJ TV Milwaukee, Feb. 14, 2018.

"Brown Deer officer on trial for 2016 shooting of bus passenger," Bruce
Vielmetti, <u>Milwaukee Journal Sentinel</u>, Feb. 12. 2018.

"State's expert says Brown Deer officer not justified in shooting unruly bus
passenger on ground," Bruce Vielmetti, <u>Milwaukee Journal Sentinel</u>, Feb. 14,
2018.

"Brown Deer officer charged in shooting," Gina Barton and Ashley Luthern,
<u>Milwaukee Journal Sentinel</u>, October 21, 2016.

"Police use-of-force expert:  Rialmo was right to shoot LeGrier," by Sam

Curriculum Vitae:
Emanuel Kapelsohn
Page 34

Charles, chicago.suntimes.com/news/police-use-of-force-expert, 6/22/2018.

"Chicago cop justified in shooting bat-wielding teen, use of force expert testifies," by Dan Hinkel, www.chicagotribune.com/news, 6/22/2018.

"Police use of force expert testifies in Quintonio Legrier wrongful death case," by Leah Hope, http://abc7chicago.com/3638265/.    6/22/2018.

http://www.nbcchicago.com/news/local/Use-of-Force-Expert-Testifies-in-- 486326581.html

https://wgntv.com/2018/06/22/defense-witness-says-rialmos-use-of-force-was-in- line-with-standards/

"Noor trial: Rusczyk silent before shot; closing arguments Monday," MPR News, Minneapolis, April 26, 2019.

"Two Minnesota police shooting trials, two very different verdicts," by Jon Collins, MPR News, Minneapolis, May 1, 2019.

"Former Minneapolis police officer fund guilty in Justine Ruszcyk's death," CNN, May 1, 2019.

"What we learned Friday in court at Mohamed Noor's trial," Minneapolis Star Tribune, April 26, 2019.

"Don't Shoot at the Sky!  A Common-Sense Reminder After A Stray Shot Hits Boy at IronPigs Game," by Steve Novak, Lehighvalleylive.com, July 30, 2019.

"Ugly racism:  Full acquittal in fatal Pittston Shooting," Patrick Kernan, Times Leader, October 5, 2018.

"CMPD Shooting is legally justified, some experts say, but raises 'serious questions,' " by Ames Alexander, Charlotte Observer, April 15-16, 2019.

"For Years, CMPD has pledged improved training.  It hasn't been enough," by Fred Clasen-Kelly, James Webster, Ames Alexander, and Danielle Chemtob, Charlotte Observer, April 16, 2019.

"Jonathan Roselle, former South Whitehall officer, charged in shooting, takes stand; expert witnesses defend his actions," Michelle Merlin, The Morning Call, March 18, 2020.  E. Kapelsohn cited and quoted.

"Police Training Expert Says 'I Can't Breathe' Resolution Is Redundant Under MPD Policy, Others Disagree," by Bryan Polcyn, Fox6Now.com, June 16, 2020.

"What Milwaukee Police Policies Really Say (and Why It Matters)" by Amanda St. Hilaire, Fox6Now.com, June 22, 2020.

Curriculum Vitae:
Emanuel Kapelsohn
Page 35

"Use of Force Expert Gives His Take on Video Showing Officer Kneeling On Man in Allentown," by Bo Koltnow, Lehigh Valley Regional News, July 13, 2020.

"The Devil You Know" TV Episode 2021, regarding the Barbara Rogers/Stephen Mineo incident, episode aired April 26, 2021.

"Man Paralyzed in Accidental Shooting in Poconos Reaches $5.5 Million Settlement," by Hannah Phillips, <u>Pocono Record</u>, September 14, 2021.

"Grand Rapids Officer Charged with Careless Gunfire Wants Case Thrown Out" by Susan Samples, Target 8 News, Grand Rapids, posted Jne 16, 2022, 8:18 p.m. EDT.  And TV:  New at 6:  Target 8 Investigates, Newsclip: Officer Greg Bauer.

## PARTIAL LIST OF FIREARMS-RELATED PUBLICATIONS:

<u>SWAT TEST THE DETONICS MC-2 .45 AUTO</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (October 1983)

<u>TEST & EVALUATION:  COLT "GOV'T" .380 AUTO</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (March 1984)

<u>BUCKSHOT PATTERNS:  THE MYTH/THE REALITY</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (March 1984)

<u>TEST & EVALUATION:  IVER JOHNSON .380 AUTO</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (March 1984)

<u>BEST BUY" OUT-OF-THE-BOX POCKET .45</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (June 1984)

<u>WINCHESTER'S WINNING RIOT SHOTGUN</u> by Emanuel Kapelsohn, <u>Special Weapons</u> (Fall 1984)

<u>TEST AND EVALUATION:  STEYR GB 9mm SEMIAUTOMATIC PISTOL</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (August 1984)

<u>PRODUCT REPORT:  HANSEN .22 RIMFIRE AMMUNITION</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (August 1984)

<u>FIELD TEST:  STEYR GB 9mm PISTOL</u> by Emanuel Kapelsohn, <u>The Police Marksman</u> (May/June 1984)

<u>SHOOTING THROUGH COAT POCKETS</u> by Emanuel Kapelsohn, <u>Survival Weapons and Tactics</u> (<u>SWAT</u>) (September 1984)

Note:  The above article was also reprinted in part, and research results

**JA2027**

Curriculum Vitae:
Emanuel Kapelsohn
Page 36

summarized, in "Pocketing a Pistol Poses Problems for Your Officers," by Bill
Clede, Training Aids Digest, Vol. 11 No. 12., Washington Crime News
Services (December 1986)

BUCKSHOT BREAKTHROUGH by Emanuel Kapelsohn, Survival Weapons
and Tactics (SWAT) (October 1984)

TEST & EVALUATION: KFC M-250 AUTOLOADING SHOTGUN
by Emanuel Kapelsohn, Survival Weapons and Tactics (SWAT)
(December 1984)

BALLISTIC AND RIOT SHIELDS by Emanuel Kapelsohn,
The Police Marksman (September/October 1984)

FIELD TEST: FEDERAL "PREMIUM" COPPER-PLATED BUCKSHOT
by Emanuel Kapelsohn, The Police Marksman (November/December 1984)

FIELD TEST: MANURHIN MODEL PPK/S .380 PISTOLS by Emanuel
Kapelsohn, The Police Marksman (Nov/Dec 1984)

RUGER MODEL 77/22: A RIMFIRE WITH CLASS by Emanuel Kapelsohn,
Survival Weapons and Tactics (SWAT) (April 1985)

FIRST IMPRESSIONS: RUGER XGI RIFLE by Emanuel Kapelsohn,
Survival Weapons and Tactics (SWAT) (April 1985)

THE AMAZING AUG by Emanuel Kapelsohn, Survival Weapons and Tactics
(SWAT) (June 1985)

FIELD TEST: COLT .45 OFFICER'S ACP by Emanuel Kapelsohn,
The Police Marksman (May/June 1985)

FIELD TEST: RUGER REDHAWK .41 MAGNUM REVOLVER
by Emanuel Kapelsohn, The Police Marksman (May/June 1985)

GETTING OUT OF A GUN JAM by Emanuel Kapelsohn, Soldier of Fortune
(July 1985)

HIGH-QUALITY, LOW-COST HANDGUN TRAINING AMMUNITION
by Emanuel Kapelsohn, The Police Marksman (July/August 1985)

POLISHING PUMP-GUN TECHNIQUE by Emanuel Kapelsohn,
Soldier of Fortune (October 1985)

FIELD TEST: PRO-SHOT TIMER AND PRO TIMER II by Emanuel
Kapelsohn, The Police Marksman (January/February 1986)

FIELD TEST: HECKLER & KOCH P7 M13 PISTOL by Emanuel Kapelsohn,
The Police Marksman (January/February 1986)

**JA2028**

Curriculum Vitae:
Emanuel Kapelsohn
Page 37

POLICE FIREARMS REQUALIFICATION:  READY, AIM, FIRE?
  by J. Maddaloni, Jr. and E. Kapelsohn, New Jersey Municipalities (Nov. 1985)

SHOTGUN PATTERNS, CHOKES, AND PERFORMANCE by Emanuel
  Kapelsohn, The Police Marksman (September/October 1985)

LOW-LIGHT SHOOTING by Emanuel Kapelsohn, Soldier of Fortune
  (April 1986)

SPRINGFIELD ARMORY'S "NEW" 1911-A1 PISTOL by Emanuel Kapelsohn,
  Special Weapons and Tactics, (SWAT) (April 1986)

PROGRESSIVE FIREARMS TRAINING by Emanuel Kapelsohn,
  Security Management (February 1986)

STEYR'S SPACE-AGE AUG by Emanuel Kapelsohn, Gun Digest Book of
  Assault Weapons (Chapter 4) J. Lewis, Ed. (DBI Books, Northbrook, IL 1986)

THE GLOCK STRIKES by Emanuel Kapelsohn, Guns Magazine Annual Digest
  (1987 Vol. 33)

U.S. LAW ENFORCEMENT VS. TERRORISM:  PUTTING A LID ON
  VIOLENCE BEFORE IT STRIKES by Emanuel Kapelsohn, Terrorism
  (September 1986)

FIREARMS OWNERS PROTECTION ACT AFFECTS AUTOMATIC
  WEAPONS OWNERSHIP AND INTERSTATE TRANSPORTATION OF
  FIREARMS by Emanuel Kapelsohn, The Police Marksman (July/August 1986)

THE MAGNIFICENT GLOCK 17 PISTOL by Emanuel Kapelsohn, The Police
  Marksman (September/October 1986)

BORN IN THE USA:  COLT REINTRODUCES THE SMG by Emanuel
  Kapelsohn, Soldier of Fortune (March 1987)

THE GLOCK 17 9mm PISTOL by Emanuel Kapelsohn, Law and Order
  (October 1986)

POWER FROM A DISTANCE:  COLT'S NEW COUNTER-SNIPER RIFLE,
  THE DELTA H-BAR by Emanuel Kapelsohn, Police (February 1987)

COLT 9mm SMG by Emanuel Kapelsohn, Police (February 1987)

PREVIEWING COLT'S NEW DELTA H-BAR:  THE AR-15 COUNTER-
  SNIPER RIFLE by Emanuel Kapelsohn, Special Weapons and Tactics
  (SWAT) (February 1987)

FIELD TEST:  SPRINGFIELD ARMORY 1911-A1 PISTOL by Emanuel

Curriculum Vitae:
Emanuel Kapelsohn
Page 38

Kapelsohn, The Police Marksman (January/February 1987)

IALEFI by Emanuel Kapelsohn, The Police Marksman (Jan./Feb. 1987)

COLT'S 10mm DELTA ELITE:  MAGNUM POWER IN AN AUTOLOADER
    by Emanuel Kapelsohn, Police (August 1987)

TRANSITIONAL HANDGUN TRAINING:  SWITCHING TO SEMI-
    AUTOMATICS by Emanuel Kapelsohn, Law Enforcement Technology
    (May/June 1987)

1987 IALEFI NATIONAL TRAINING CONFERENCE SCHEDULED FOR
    MESA, ARIZONA by Emanuel Kapelsohn, Law and Order (August 1987)

AN INSTRUCTOR'S LOOK AT DEA FIREARMS TRAINING by Emanuel
    Kapelsohn, The Police Marksman (May/June 1988)

GLOCK 19:  THE IDEAL 9mm FOR THE ONE GUN CONCEPT by Emanuel
    Kapelsohn, The Police Marksman (September/October 1988)

RELOADING THE SEMI-AUTOMATIC PISTOL - PART ONE by Emanuel
    Kapelsohn, International Association of Law Enforcement Firearms Instructors
    Newsletter (February 1989)

COMBAT TEST:  THE NEW GLOCK 20 by Emanuel Kapelsohn, Combat
    Handguns (June 1990)

THE NEW 10mm GLOCK 20:  MAGNUM POWER IN A DOUBLE-ACTION
    SERVICE PISTOL by E. Kapelsohn, The Police Marksman (May/June 1990)

BERETTA 85F .380 PISTOL by Emanuel Kapelsohn, The Police Marksman
    (November/December 1990)

THE UNIVERSAL COVER MODE, OR HOW TO NOT SHOOT PEOPLE
    by Emanuel Kapelsohn, The Firearms Instructor (May 1991 and August 1991)

THE UNIVERSAL COVER MODE, OR HOW TO NOT SHOOT PEOPLE
    by Emanuel Kapelsohn, reprinted in Newsletter of Georgia Association of
    Law Enforcement Firearms Instructors, Vol. 1, Quarter 4 (Oct. 1991)

"Introduction to the Glock Pistol" videotape produced by The Peregrine
    Corporation and featuring Emanuel Kapelsohn (48 mins., in police and
    civilian versions) Glock, Inc., Smyrna, GA 1991

GLOCK PREVENTIVE MAINTENANCE MANUAL by Emanuel
    Kapelsohn (Glock, Inc., Smyrna, GA 1991)

FIREARMS TRAINING STANDARDS FOR LAW ENFORCEMENT
    PERSONNEL (IALEFI, Laconia, NH 1993).  E. Kapelsohn, principal

**JA2030**

Curriculum Vitae:
Emanuel Kapelsohn
Page 39

author and editor

GIVING THE COMMAND TO HOLSTER by Emanuel Kapelsohn
 The Firearms Instructor (Winter 1993)

STANDARDS & PRACTICES REFERENCE GUIDE FOR LAW
 ENFORCEMENT FIREARMS INSTRUCTORS, E. Kapelsohn, Associate
 Editor (IALEFI, Laconia, NH 1994)

SMITH & WESSON SIGMA by E. Kapelsohn, Law & Order  (Oct. 1994)

GLOCK MODELS 26 & 27 SUBCOMPACT PISTOLS by Emanuel Kapelsohn,
 Police Marksman (Nov./Dec. 1995)

IALEFI APPROVES ITS FIRST TARGET - THE IALEFI-Q by Emanuel
 Kapelsohn, The Firearms Instructor, Vol. 17 (1995)

WHAT'S IN A TARGET?  INTRODUCING THE IALEFI-Q by Emanuel
 Kapelsohn, Police Marksman (May/June 1996)

P95:  INTRODUCING RUGER'S FIRST POLYMER-FRAME SERVICE
 PISTOL by Emanuel Kapelsohn, Police Marksman (July/August 1996)

P239:  SIG'S NEW COMPACT 9mm PISTOL by Emanuel Kapelsohn,
 Police Marksman (July/August 1996)

RAPID ACQUISITION TARGETING SYSTEMS LASER SIGHT
 by Emanuel Kapelsohn, Police Marksman (July/August 1997)

"IALEFI Handgun Safety Check" videotape, written by and featuring
 E. Kapelsohn, produced by North Carolina Justice Academy (IALEFI 1997)

IALEFI HANDGUN SAFETY CHECK booklet, Emanuel Kapelsohn,
 principal author (IALEFI 1998)

FIELD TEST:  SPEER GOLD DOT 125-GRAIN .38 SPECIAL AMMUNITION
 by Emanuel Kapelsohn, Police Marksman (March/April 1998)

THE PATROLLER POLICE VEHICLE by Emanuel Kapelsohn,
 Law & Order (March 1998)

FBI INSTITUTES NEW CONTROLS FOR SCENARIO TRAINING
 by Emanuel Kapelsohn, The Firearms Instructor, Issue 26 (1999)

SAFETY TIP by Emanuel Kapelsohn, The Firearms Instructor, Issue 26 (1999)

FOR GUN SAFETY, STICK TO FOUR RULES, BUT WATCH OUT FOR
 THE FOUR MYTHS by Emanuel Kapelsohn, Allentown Morning Call,
 (October 22, 1999)

**JA2031**

Curriculum Vitae:
Emanuel Kapelsohn
Page 40

Handgun Shooting Fundamentals section, Basic Police Academy
  curriculum lesson plan, Pennsylvania Municipal Police Officers
  Education and Training Commission. Emanuel Kapelsohn, author (2000)

THE FIREARMS INSTRUCTOR'S RANGE BAG by Emanuel Kapelsohn,
  The Firearms Instructor, Issue 29 (2000)

FIELD TEST: SIGARMS SSG3000 TACTICAL PRECISION RIFLE by
  Emanuel Kapelsohn, Police Marksman (July/August 2000)

IALEFI Q-TARGET UPDATE by Emanuel Kapelsohn, The Firearms Instructor,
  Issue 30 (2001)

PARA-ORDNANCE LDA PISTOL ARMORERS MANUAL (2001 and rev.)

PARA-ORDNANCE LDA FIREARMS INSTRUCTOR NOTEBOOK  (2001)

KIMBER PISTOL ARMORER'S NOTES (2001)

KIMBER PISTOL INSTRUCTOR WORKSHOP NOTEBOOK (2001)

GUIDELINES FOR SIMULATION AND "FORCE ON FORCE" TRAINING
  (Draft, IALEFI, Gilford, NH 2001).  Emanuel Kapelsohn, principal author.

AVOIDING TRAINING DEATHS: SAFETY CONSIDERATIONS IN ROLE
  PLAYING EXERCISES by Emanuel Kapelsohn, The Firearms Instructor, Issue
  31 (2002)

REDMAN PROVIDES SIMULATION TRAINING POSTER by Emanuel
  Kapelsohn, The Firearms Instructor, Issue 32 (2003)

Contributor to RedMan Firearms Simulation Safety Poster (2003)

Bobcat Weapons BW-5 Operator's Manual.  Emanuel Kapelsohn, author. (2004)

FIREARMS TRAINING STANDARDS FOR LAW ENFORCEMENT
  PERSONNEL (IALEFI, Gilford, NH 2004 Rev.).  E. Kapelsohn, principal
  author

IALEFI GUIDELINES FOR SIMULATION TRAINING SAFETY.  E.
  Kapelsohn, principal  author.  (IALEFI, Gilford, NH 2004)

"More First Hand Information," by Emanuel Kapelsohn.  The Gun Zone.
  http://www.thegunzone.com/ayoob/magliato-kapelsohn.html

COURSES OF FIRE – PENNSYLVANIA BASIC HANDGUN
QUALIFICATION COURSE by Emanuel Kapelsohn, The Firearms Instructor,
Issue 42 (2007).  Also reprinted in excerpted form in Pennsylvania MPOETC

Curriculum Vitae:
Emanuel Kapelsohn
Page 41

Training Bulletin, Fall 2007.

QUALIFICATION COURSES OF FIRE:  PENNSYLVANIA'S ADVERSE
LIGHT QUALIFICATION COURSE by Emanuel Kapelsohn, The Firearms
Instructor, Issue 44 (2008).

GETTING AND STOCKING A "GO BAG" by Emanuel Kapelsohn, The
Firearms Instructor, Issue 53 (2012).

"Banning Assault Weapons Won't Make Nation's Schools Safer" by E.
Kapelsohn, Allentown Morning Call, Op-Ed, January 6, 2013

"No Prepping,"  Letter to the Editor, HANDGUNS Magazine, April/May 2014.

"The Glock Model 43:  New 9mm Micro-Pistol," by Emanuel Kapelsohn.
 Law and Order magazine, August 2015.

"There Are No Safe Guns," by Emanuel Kapelsohn.  The Firearms Instructor,
 Issue 58 (2016)

"Pennsylvania State Police Firearms Instructor Criminally Charged in Training
 Death of Trooper," by Emanuel Kapelsohn.  The  Firearms Instructor, Issue 58
 (2016)

 "Baltimore Police Firearms Instructor Convicted of Reckless Endangerment in
 Accidental Shooting During Simunitions Training," by Emanuel Kapelsohn.
 Anticipated publication date:  The Firearms Instructor, Issue 59 (2017)

"Civilian Response To Active Shooter Events," by Emanuel Kapelsohn, Network
 Magazine, January 2017

"For the Record" (letter to the Editor concerning the Yanez shooting incident and
 trial.  Concealed Carry Magazine, August/September 2017. Vol. 14, Issue 6.

"Safety With Dropped Guns" by Emanuel Kapelsohn, IALEFI Press-Check
 (2021) and PA MPOETC Newsletter.

"To Score Or Not To Score:  That Is The Question" by Emanuel Kapelsohn,
The Press Check, IALEFI (2021)

"Safety Guidelines for Simulation Training," by Emanuel Kapelsohn, 2023
 Revision, IALEFI, Gilford, NH.

**SELECTED LIST
OF AGENCIES
TRAINED AND
COURSES TAUGHT:**

Basic Pistol and Special Pistol courses, American Pistol Institute

**JA2033**

Curriculum Vitae:
Emanuel Kapelsohn
Page 42

(Paulden, AZ 1980-1982):  staff instructor.

Firearms Safety, Basic Handgun and Defensive Handgun courses,
  U.S. Treasury Department Pistol Club, New York, NY (1980-1983).

Defensive Handgun Training, The Spiesman Agency, New York, NY
  (1980-83):  provided handgun training for detective agency.

Defensive Handgun Training and Qualification, Danbee Investigations
  (New Jersey 1983):  provided handgun training for detective agency
  personnel.

Officer Survival Instructor Course.  Massachusetts Criminal Justice Training
  Council.  (1984):  taught the firearms portion of this instructor-level course.

Close-Range Handgun Techniques:  Sampson Technical College, Clinton,
  NC (1984).  Taught this defensive handgun class.

Borough of Midland Park Police Department (NJ 1985):  conducted semi-
  automatic pistol transitional training for this department.

Union County (New Jersey) Prosecutor's's Office (Senior Firearms Instructor
  Course.  1985):  co-instructed three separate week-long courses for firearms
  instructors from every police department in Union County under contract with
  Rockwood Corporation, Police Training Division.

International Police Academy - Master Instructors Seminar (Morell,
  Desmedt, et al.):  guest instructor (Toms River, NJ 1986)

Connecticut State Police Academy.  (Senior Firearms Instructor Course.
  Meriden, CT, 1986 and 1988):  guest instructor under contract with Rockwood
  Corporation, Police Training Division.

NRA Law Enforcement Firearms Instructor School (U.S. Marine Base,
  Quantico, VA 1986):  instructor.

Hilltown Township Police Department (PA 1986):  conducted semi-automatic
  pistol transitional training for this department.

Glock Familiarization Course, Middlesex County, NJ 1987:  taught a one-day
  familiarization course for police firearms instructors from multiple agencies.

1987 Glock International Training Symposium.  (Kansas City, Kansas):  headed
  a team of four instructors in conducting this training conference for some 70
  participants.

Police Counter-Sniper Rifle Course.  (Fort Dix, New Jersey 1987):  co-instructed
  this course for police and military counter-snipers.

Curriculum Vitae:
Emanuel Kapelsohn
Page 43

Borough of Ramsey Police Department (NJ 1987): conducted semi-automatic
pistol transitional training program for this department.

International Association of Law Enforcement Firearms Instructors (IALEFI),
National Training Conferences (see above): conducted instructor-level
programs on Drawing the Handgun and Close-Range Shooting Techniques
(Philadelphia 1985); Dim Light Shooting Techniques, and Combat Shotgun
Characteristics (Orlando, FL 1986); Tactical Use of Cover (Mesa, Arizona
1987); Dim-Light Assault Rifle and Shotgun Techniques, and Semi-Automatic
Pistol Transitional Training (St. Augustine, FL 1988); Dim-Light Shotgun and
Rifle Techniques (Salt Lake City 1989); Concealed Carry Handgun, Auto-
Pistol Transitional Training, Dim-Light Handgun and Shotgun, and Police
Handgun Caliber Selection and Effectiveness (panel) (Washington, D.C. 1990);
Firearms Safety; Involuntary Muscular Contraction and Unintentional
Discharge (co-instructed with Dr. Roger Enoka) (Mesa, AZ 1991); Developing
Dynamic Training Exercises for the Patrol Officer (co-instructed with Peter
Tarley) (Tampa, FL 1992); Development of Dynamic Training Exercises for
Patrol Officers (co-instructed with Peter Tarley) (Reno, NV 1993); Dynamics
of a Gunfight (Orlando, FL 1994); Training Handgun Skills (Amarillo, TX '95).

Basic and Advanced Defensive Handgun Courses (1982-1993): co-instructed
(with John Farnam) courses in locations including Fort Mead (MD),
Norristown (PA), Ledgewood (NJ), Berkeley Township (NJ), Princeton
Junction (NJ), Pipersville (PA), Dutchess County (NY), New York City (NY),
Salt Lake City (UT), Bradford (RI), Elroy (WI), East Stroudsburg (PA), and
Atlantic City (NJ).

New Jersey Armored Motor Carriers Association (1987): guest speaker on
subject of firearms training for the armored car industry.

Defensive Shotgun Course (East Stroudsburg, PA 1987).

Armored Motor Service Corp. (Trenton, NJ 1985-88): conducted handgun
training and qualification.

Princeton Armored Service (Trenton, NJ 1986-1990): conducted handgun
training and qualification.

Eastern Armored Service (Trenton, NJ 1991-1997): conducted handgun
training and qualification.

Berkleigh Career School (East Brunswick, NJ 1988-1989): conducted firearms
training program for security officer trainees.

NRA Law Enforcement Semi-Automatic Pistol Seminars. Helped to design,
and served as chief instructor for these courses taught at U.S. Marine Base,
Quantico, VA (1987); Florida Law Enforcement Training Center at Lively
(1988); Oklahoma City Police Academy (1988); Port Huron, Michigan (1988);
and Alamo Area Law Enforcement Academy, San Antonio, TX (1988).

Curriculum Vitae:
Emanuel Kapelsohn
Page 44

Miami (FL) Police Department (Firearms Instructor Course, 1987):  trained
  MPD firearms instructors as part of this agency's transition from revolver to
  semi-automatic.

New Jersey Department of Environmental Protection, Bureau of Law
  Enforcement (Firearms Instructor Workshop, 1987):  trained NJDEP instructors
  for this agency's transition from revolver to semi-automatic.

National Armored Car Association (Annual Meeting.  New York, NY 1987):
  guest speaker on subject of current trends in firearms training and training-
  related liability.

Atlantic City Police Academy.  (Police Handgun Instructor Workshop, 1987.
  Police Shotgun Instructor Workshop, 1987.  Police Special Weapons Course,
  1987.  Glock 17 Familiarization Course, 1987).

New Jersey Correctional Officers Training Academy, Training Advisory Council
  (1988):  guest speaker on progressive firearms training and training liability.

Jacksonville (FL) Police Department (Firearms Instructor Course, 1988):
  conducted handgun and shotgun instructor course.

Tennessee Bureau of Investigation (Firearms Instructor Course, 1988):
  trained TBI firearms instructors in preparation for agency's transition
  from revolver to semi-automatic pistol.

Metropolitan Toronto Police (Auto-pistol Workshop.  Toronto, Canada 1988):
  conducted transitional pistol training for members of this agency's police
  academy, Emergency Task Force, and dignitary protection unit.

NRA Annual Meeting (Orlando, FL 1988):  guest speaker before the
  Legislative Affairs Committee and the opening session of the General Meeting.

Burlington County (NJ) Police Academy (Semi-Automatic Pistol Instructor
  Workshops, 1985-1987; Shotgun Instructor Workshop, 1987; Officer Survival
  Course, 1988; Firearms Instructor Update, 1991).

Atlantic City Police Department (Firearms Instructor Course, 1988):  trained
  ACPD instructors to conduct agency's transition from revolvers to pistols.

Professional Conference, "Law and Management in the Security Industry."
  University of the West Indies, St. Augustine, Trinidad.  July 1988.  Featured
  guest lecturer on topic "Current Trends in Firearms Training."

New Jersey Department of Corrections (1988):  conducted semi-automatic pistol
  survey course as part of this agency's process of selecting a service pistol.

Takoma Park Police Department (Maryland, 1988):  conducted instructor-level

Curriculum Vitae:
Emanuel Kapelsohn
Page 45

transitional training course.

Police Counter-Sniper Rifle Course (Glastonbury, Connecticut. 1988):
co-instructed this course for police counter-snipers.

SWAT Team Training Course. (Cape May County Police Academy, 1988:
conducted tactical team training in handgun, shotgun, assault rifle, and
submachine gun.

Lecture presentation: "Police Use of Lethal Force: Legal and Tactical
Considerations." Emanuel Kapelsohn and Sgt. Evan Marshall. (Mt. Laurel,
New Jersey. 1988).

Jacksonville (Florida) Police Department (Firearms Instructor Workshop, 1988):
conducted transitional training instructor course preliminary to this agency's
switch to semi-automatic pistols.

Conducted Glock Armorer Courses in Atlantic City, Boston, Sacramento,
San Francisco, San Diego, Carson City (Nevada), Washington, Chicago,
Trenton, New York City, Philadelphia, Indianapolis, Baltimore, Spokane,
Atlanta, Greensboro, Carlisle (PA), Phoenix, Oklahoma City, Seattle,
San Antonio, Jersey City, St. Thomas, Barbados, Billings (MT), Springfield
(MO), Wenatchee (WA), Jersey City (NJ), Bergen County (NJ) Police
Academy, Wyandotte (MI), Essex County (NJ) Police Academy, Overland
(MO), Irvington (NJ) Police Department, San Antonio (TX), Miami (FL), South
Carolina Justice Academy, North Carolina Justice Academy, St. Petersburg
(FL), Jacksonville (FL), Toronto, Barbados, Chapin (SC), Smyrna (GA),
Louisiana State Police Academy, and other locations (1987-1993).

Conducted Glock Firearms Instructor Workshops for/at Fulton County Sheriff's
Office (NY), Yellowstone County Sheriff's Office (MT), Middlesex County
(NJ) Police Academy, Bergen County (NJ) Police Academy, El Cajon (CA)
Police Department, Barbados Police Service, St. Petersburg (FL) Police
Department, North Platte (NE) Police Department, Overland (MO), Chapin
(SC), Essex County (NJ) Police Academy, Springfield (MO) Police
Department, Wenatchee (WA), Spokane (WA) Police Academy, Snohomish
County (WA) Sheriff's Office, Louisiana State Police Academy, Jersey City
(NJ) Police Department, Smyrna (GA), and others (1987-1993).

Conducted Glock Armorer Classes and Glock Firearms Instructor Workshops at
Glock facility in Smyrna, Georgia, 1988-1993 (multiple classes).

Massachusetts Metropolitan Police (Boston, Massachusetts. 1988): trained
firearms instructors to conduct this agency's transition to semi-auto pistols.

Sacramento Municipal Utilities District (California, 1988: trained nuclear
security firearms instructors for Rancho Seco nuclear power facility.

American Society of Law Enforcement Trainers, Second Annual International

**JA2037**

Curriculum Vitae:
Emanuel Kapelsohn
Page 46

Training Seminar (Kansas City, Missouri. 1989):  conducted instructor-level workshop on concealed handgun draw techniques and close-range defensive tactics.

Metropolitan Police (Washington, D.C., 1989):  conducted two programs to train firearms instructors and armorers to implement this agency's transition to semi-automatic pistols.

Camp Smith, NY (1989):  Speaker at Westchester County Firearms Instructors Seminar on Semi-Automatic Pistol Transitional Training. Topic: "Safety In The Transitional Training Program."

Trenton (New Jersey) Police Department (1989):  trained firearms instructors and armorers to conduct agency's transition to semi-automatic pistols.

New York Legal Aid Society (New York City, 1989?):  co-instructed (with Firearms Examiner D. Frangipani) firearms evidence lecture for attorneys.

Philadelphia Police Department (1989):  trained firearms instructors and armorers to conduct agency's transition to semi-automatic pistols.

Trinidad-Tobago Police Academy (Port-of-Spain, 1990):  presented firearms instructor workshop in conjunction with handgun training program conducted at Teteron Military Base.

Louisiana State Police Academy, Baton Rouge, LA (1990):  conducted submachine gun instructor school.

New York State Police (1990):  performed a contract to conduct a series of programs at five locations throughout New York State to train NYSP firearms instructors to conduct agency's transition to semi-automatic pistols.

IALEFI Regional Training Conference (Long Island NY. 1990):  conducted dim-light handgun training class.

Henrico County Police Department (Virginia, 1990):  conducted two training programs to prepare agency's instructors to conduct transition to semi-automatic pistols.

Virgin Islands Police Department (St. Thomas, 1990):  conducted semi-automatic pistol instructor training program.

Developed police shotgun armorer training program for O. F. Mossberg & Sons, and conducted first Mossberg Shotgun Armorer Courses in Burbank, Tacoma, Philadelphia, North Haven (CT), South Carolina Criminal Justice Academy, North Carolina Justice Academy, Skokie (IL), Kansas City, San Antonio, Louisiana State Police Academy, Salt Lake City, and other locations (1990-1992).  Course revised 2000, below.

Curriculum Vitae:
Emanuel Kapelsohn
Page 47

Baltimore City Police Department (1990):  conducted semi-automatic pistol instructor training program.

Missouri State Highway Patrol (1990):  presented training program to prepare agency's instructors to conduct transition to semi-automatic pistols.

Atlantic County's Prosecutor's Office:  conducted Firearms Instructors Recertification Course for all police firearms instructors in county (1990-2001)

Phoenix Regional Police Academy (1991):  conducted armorer and semi-automatic pistol instructor training program.

Maryland National Capital Park Police (1991):  conducted semi-automatic pistol instructor training program.

IALEFI Regional Training Conference (Dutchess County, N.Y. 1991): taught classes on cover mode and involuntary discharge; advanced shotgun techniques.

DSIP (Caracas, Venezuela.  1991):  conducted firearms training program for bodyguard detail of President of Venezuela, and for members of drug task force and elite counter-terrorist unit.

Oregon State Police (1991):  conducted training program to prepare agency's instructors to conduct transition to semi-automatic pistols.

Clients for which Mr. Kapelsohn has provided training and consulting services, both domestically and abroad from 1983 through the present time, include investigative agencies, executive protection details, armored car and precious metal companies, corporations involved in newspaper publishing, advertising, finance, pharmaceuticals, insurance, defense manufacturing, mining, firearms and related products, steel, the movie/television industry, and manufacturing industries; police departments, federal agencies, cities, and state law enforcement training commissions.

Kutztown Jaycees (1991):  conducted firearms safety and BB gun marksmanship training class for 8-12 year olds.

Seattle Police Department (1991):  conducted semi-auto pistol instructor program

American Society for Industrial Security (Schuylkill Valley Chapter, 1992):  presented lecture on current trends in security and law enforcement firearms training.

NJ Department of Corrections, Glock 18 (select-fire pistol) Course for Witness Protection Detail, Atlantic City Police Range (1992)

American Society of Law Enforcement Trainers Fifth International Training Seminar (Milwaukee 1992):  presented instructor-level classes on involuntary muscular contraction and involuntary discharge.

Curriculum Vitae:
Emanuel Kapelsohn
Page 48

IALEFI Regional Training Conference (Dutchess County, NY 1992):  presented
lecture on training-related liability, documentation of training, and written
agency firearms policy.

IALEFI Regional Training Conference (Long Island, NY 1992):  conducted
classes on tactical handgun and dim-light handgun.

Reading Area Community College (1992):  Police Semi-Automatic Pistol
Instructor Workshop.

National Tactical Invitational, Lewisberry, PA 1992:  taught class, "Legal
Considerations in the Use of Deadly Force."

Northeastern Berks Regional Police Department (1992):  Semi-Automatic Pistol
Training Program.

Salt Lake County Sheriff's Department (1992):  trained armorers and firearms
instructors to conduct transition to semi-automatic pistols.

Tactical Shotgun Course (1993):  Pleasantville (NJ) Police Range.

IALEFI Regional Training Conference (Nassau County, NY 1993):  conducted
class on firearms-related liability, written departmental firearms policies,
and documentation of training.

Dallas Police Department (1993):  conducted police firearms instructors course.

North Carolina Justice Academy, Statewide Firearms Instructors Conference
(1993):  Presented classes: Involuntary Muscular Contraction & Unintentional
Discharge; Developing Dynamic Training Exercises for Patrol Officers.

Jacksonville (FL) Police Department (1993):  conducted police firearms
instructors course.

Carnegie Mellon University Police Department (Pittsburgh 1993):  conducted
transitional training program and handgun instructor workshop.

Calgary Police Service Tactical Unit (1993):  taught special weapons course
including submachine gun, shotgun, rifle, and handgun.

Yardley, PA (1994):  Instructed Defensive Handgun Course.

Guest Speaker on topic "Should I Carry a Gun?" at JCK Show, Las Vegas,
NV (June 1994).

Connecticut Police Academy, Meriden, CT.  Co-instructed senior instructor
program "Selecting a Shoulder Weapon" (April 1994).

**JA2040**

Curriculum Vitae:
Emanuel Kapelsohn
Page 49

"Firearms Training Liability and Trends," Lehigh Valley Chapter, American
Society for Industrial Security (1994).

Kutztown Police Department (1994):  conducted handgun and shotgun
training.

Defensive Shotgun Courses, Pittsburgh, PA and Harvard, Mass. (1995).

Handgun training and qualifications, Eastern Armored Service (Trenton,
NJ  1994-1996).

Guest speaker, Firearms Committee, Pennsylvania Municipal Police Officers
Education and Training Council (Hershey, PA  1995).

Connecticut Police Academy, Meriden, CT.  Co-instructed Tactical Shotgun
Instructor course (1995).

"Trends in Police Firearms Training," Pennsylvania Burglar and Fire Alarm
Association, Allentown, PA  (1995).

Senior Firearms Instructor Course, Allentown Police Academy (PA 1995).

Defensive Handgun Course, Lehigh County District Attorney's Office,
Allentown, PA (1996).

Firearms Instructor Recertification Course, Dallas Police Department, Dallas,
TX (1996).

Glock 19 Transition Courses, Princeton Armored Service, Trenton, NJ (1995-6)

Lecture:  "Firearms Training-Related Liability," Annual Conference, Arizona
Law Enforcement Firearms Instructors Association, Mesa, AZ (1996).

Firearms Safety Program, Cub Scouts of America, Topton, PA (1996).

Basic Personal Protection Handgun Courses, Topton (PA) Fish & Game
Association Range (1994-1996).

IALEFI Handgun Safety Check, IALEFI Regional Training Conference,
Philadelphia Police Academy (1996).

Legal and Practical Aspects of Firearms Self-Defense for Civilians, Muhlenberg
Township Recreation Department (1996-1997).

American Society of Law Enforcement Trainers Regional Training Conference,
Bergen County (NJ) Police Academy (1996):  conducted instructor-level
courses on Tactical Handgun Skills; Dim-Light Handgun.

1996 IALEFI Annual Training Conference, Mesa, AZ.  Co-instructed instructor-

Curriculum Vitae:
Emanuel Kapelsohn
Page 50

level courses on Training-Related Liability; Safety and Use of Reactive Steel Targets.

North Carolina Justice Academy Statewide Instructors Conference:  conducted instructor-level lectures on firearms safety, dim-light firing techniques, and one-handed firearms manipulation (1997).

Berks County Sheriff's Department: conducted revolver-to-semiautomatic pistol transitional training for this 38-officer agency (1997).

IALEFI Regional Training Conference (Oklahoma City Sheriff's Office 1997): conducted instructor-level program, "Developing Dynamic Range Exercises for Patrol Officers."

Berks County Sheriff's Department:  assisted in conducting in-service handgun and shotgun training, remedial training, and qualification (1997-2007, 2012).

IALEFI Annual Training Conference (Columbia, Missouri, 1997): co-instructed instructor-level program, "Legal Liability Update"; conducted IALEFI Handgun Safety Check for over 100 students; chief safety coordinator for this 6-day conference involving some 500 participants (students, instructors, vendors) in day and night training activities, displays, and competitions.  Courses attended:  see above.

Lehigh County (PA) District Attorney's Office (1997):  conducted handgun training course.

Kutztown (PA) Police Department:  conducted in-service handgun and shotgun training and qualification (1997, 2000, 2001, 2002, 2003).

Harrisburg Area Community College:  Co-instructed pilot judgmental use of force class for Pennsylvania MPOETC (1998).

Allentown (PA) Kiwanis Club:  Guest speaker on "Firearms Safety and Self-Defense" (1998).

U.S. Department of Health & Human Services, Office of the Inspector General.  Training and consulting contract to assist agency in updating its firearms training program for Special Agents (1998).

Northeastern Berks Regional Police Department (1998):  Conducted handgun and shotgun qualifications and remedial training.

Berks County Postmasters Association:  Guest speaker on "Personal Security" (1998).

Less Lethal 12-Gauge Impact Munitions User Certification Course (Berks County, PA, 1998).

**JA2042**

Curriculum Vitae:
Emanuel Kapelsohn
Page 51

Camp Cadet, Oley, PA (1998):  Firearms safety presentation for 10-14 year
olds at summer camp sponsored by Pennsylvania State Police.

O.C. Civilian Users Certification Courses:  Conducted a series of courses for
employees and for security officers of Fortune 500 company (1998-2001).

IALEFI Annual Training Conference (West Palm Beach, FL, 1998):  Presented
instructor-level program, "Designing and Using Performance Objectives in
Firearms Training"; conducted IALEFI Handgun Safety Check for over 100
students; chief safety coordinator for this 6-day conference involving some
500 participants (students, instructors, vendors) in day and night training
activities, displays, and competitions.  Courses attended:  see above.

Harrisburg Area Community College:  Assisted in presenting judgmental
use of force instructor certification course for Pennsylvania MPOETC (1999).

Police Patrol Rifle Users and Instructors Courses (Muhlenberg Twp. Police
Department 1999).

Presentations to Allentown, PA Chapter, American Inns of Court, on "Firearms,
Tactics and the Law" (Sept. 1999) and "Use of Experts in Firearms Cases"
(Oct. 1999).

IALEFI Annual Training Conference (Phoenix, 1999):  Conducted IALEFI
Handgun Safety Check for over 100 students; chief safety coordinator
for this 6-day conference involving some 400 participants (students,
instructors, vendors) in day/night training classes, displays and competitions.

Allentown (PA) Police Academy: Basic Recruit Training Academy classroom
instructor on "Use of Force in Law Enforcement;" assistant range instructor in
firearms (1999-2007).  "Laws of Arrest" and "Criminal Procedure" (2007).

Firearms Overview Course (Allentown Police Academy, 1999):  presented
classroom and range program to researchers and doctors from University
of Pennsylvania (FICAP) study on gunshot injuries.

IALEFI RTC (Philadelphia Police Academy, 2000):  taught two courses
on Tactical Shotgun.

Eddie Eagle Firearms Safety Program taught to approx. 120 children,
grades K through 2, at The Swain School (Allentown, PA, 2000).

Firearms Instructor Update (Pennsylvania State Police Academy, 2000):
presented instructor-level program for Pennsylvania Municipal
Police Officers Education and Training Commission.

2000 IALEFI ATC, Tampa, FL:  conducted IALEFI Handgun Safety Check
for over 100 students; chief safety coordinator for this 6-day event involving

**JA2043**

Curriculum Vitae:
Emanuel Kapelsohn
Page 52

nearly 500 participants (students, instructors, vendors) in day and night
training activities, displays and competitions; taught Mossberg Shotgun
Armorer Certification Course.

Lehigh County (PA) District Attorney's Office (2000): conducted training
course, "Introduction to Firearms for Prosecutors" (CLE accredited) at
Allentown Police Academy.

Mossberg Shotgun Armorer Certification Courses (North Haven, CT, 2000):
presented two courses for police and military armorers. Consultant to
Mossberg re. revision of Armorer's Manual.

"Legal and Practical Aspects of Firearms Self-Defense" (Topton, PA, 2000):
presented two courses at East Penn Outdoor Sportsmen's Expo.

Eastern Armored Service (PA, 2000): conducted Glock pistol transitional
training for armored car personnel.

Mossberg Shotgun Armorer Certification Course (Fairfax, VA, 2000): taught
course for police armorers.

Guest Speaker at graduation dinner, Allentown (PA) Police Academy (2001)

Para-Ordnance LDA Pistol Armorer Certification Courses (Orange County, CA
and Oak Lawn, IL, 2001): taught courses for police and civilian armorers.

Para-Ordnance LDA Pistol Firearms Instructor Workshop (Oak Lawn, IL, 2001):
taught course for police firearms instructors in conjunction with agency's
transition to this model of semi-automatic pistol.

Para-Ordnance LDA Pistol Armorer Certification Course, Rhode Island (2001).

Guest Speaker, "Firearms in the Home," Allentown Rotary Club (2001)

Mossberg Shotgun Armorer Certification Course, Lisle, IL (2001): taught
course for police armorers.

Firearms Training and Qualification, Berks-Lehigh Regional Police Department
(PA, 2001). Conducted user-level training for this newly-formed agency with
pistol, shotgun, patrol rifle, and less lethal impact munitions.

Guest Instructor, Citizens Police Academy, Exeter Township Police Department
(PA, 2001). Presented demonstration/discussion of concealed weapons and
related topics.

Personal Protection Course, Carpenter Technology Corporation, Reading, PA
(2001). Taught personal protection course (including pepper spray and hand-
to-hand self defense) to executives of Fortune 500 company and their spouses.

**JA2044**

Curriculum Vitae:
Emanuel Kapelsohn
Page 53

Firearms Instructor Update (Northeast Counter-Drug Training Center, Ft.
Indiantown Gap, PA 2001): presented instructor-level program for
Pennsylvania Municipal Police Officers Education and Training Commission.

Tacoma Police Department (WA, 2001). Developed and taught Kimber Pistol
Armorer's Workshop and Kimber Pistol Instructor Course for this agency.

Las Vegas Metro Police Department (NV, 2001). Taught Mossberg Shotgun
Armorer Certification Course.

Mossberg Shotgun Armorer Certification Courses (North Haven, CT 2001).
Taught two armorer courses for O.F. Mossberg & Sons.

Mossberg Shotgun Armorer Certification Course (Utah County Sheriff's Office,
UT 2001). Taught law enforcement armorer's course.

"Legal and Practical Aspects of Firearms Self-Defense" (Topton, PA 2001):
taught course at East Penn Outdoor Sportsmen's Expo.

Para-Ordnance LDA Pistol Armorer Certification Course (North Attleboro
Police Department, MA 2001).

2001 IALEFI Annual Training Conference, Reno, NV: conducted IALEFI
Handgun Safety Check for some 80 students; assistant safety coordinator for
this 6-day event involving nearly 400 participants; taught Mossberg Shotgun
Armorer Certification Course; panelist in panel discussion, "Point Shooting vs.
Aimed Fire."

Presenter at Muhlenberg Twp. Police Dept. "Firearms and Home Safety" Class
(Temple, PA 2001): Lecture to mixed audience of adults and Boy Scouts.

Mossberg Shotgun Armorer Certification Course (Branson Police Department,
Branson, Missouri 2001). Taught law enforcement armorer's course.

Mossberg Shotgun Armorer Certification Course, Fairfax, Virginia 2001. Taught
Law Enforcement armorer's course to police and military personnel.

Para-Ordnance LDA Pistol Armorer Certif. Course (Southampton, PA 2001)

Mossberg Shotgun Armorer Certification Course, Massachusetts State Police
Headquarters, Framingham, MA 2002.

Mossberg Shotgun Armorer Certification Course, Clearwater Police Department,
Clearwater, FL 2002.

Beretta DAO Pistol Training Course and Use of Force Legal Issues Class,
Bloomsburg University Police Department, Bloomsburg, PA 2002: Trained and
certified university police department to carry firearms.

**JA2045**

Curriculum Vitae:
Emanuel Kapelsohn
Page 54

Mossberg Shotgun Armorer Certification Course, Linn County Sheriff's
  Office, Albany, Oregon 2002

Mossberg Shotgun Armorer Certification Course, Shawnee County Sheriff's
  Department, Topeka, Kansas 2002.

Para-Ordnance LDA Pistol Armorer Certification Course, Kansas Highway
  Patrol, Emporia, Kansas 2002.

Citizen's Police Academy, Exeter Township Police Department (PA),
  Guest instructor, training segment on weapons concealability (2002-2004).

Firearms Instructor Update, Berks County Sheriff's Department,
  Reading, Pennsylvania (2002)

Mossberg Shotgun Armorer Certification Course, New York City Police
  Department, Ballistics Section (2002)

Introduction to Firearms for Juvenile Probation Officers, Allentown
  Police Academy (2002)

Mossberg Shotgun Armorer Certification Course, Watertown Police Department,
  Watertown, CT (2002)

Mossberg Shotgun Armorer Certification Course, Carol Stream, Illinois (2002)

2002 IALEFI Annual Training Conference, San Diego, CA.  Chief safety
  coordinator for this 6-day event involving over 300 participants in day and night
  training activities, trade show, demonstrations and shooting competitions.  Co-
  instructed course on safety issues and procedures in simulation and role-playing
  training exercises.

Mossberg Shotgun Armorer Certification Course, Martin County Sheriff's
  Office, Stuart, Florida (2002).

Mossberg Shotgun Armorer Certification Course, Fairfax, VA (2002).

Bureau of Alcohol, Tobacco & Firearms, Firearms Instructor Seminar, Orlando,
  FL (2002).  Guest Instructor.

Berks-Lehigh Regional Police Department, remedial dim-light training.  (2003)

Guest Lecturer, University of Pennsylvania class, "Injury and the Public's
  Health," School of Medicine/School of Public Health. Professor Charles
  Branas, Ph.D. (2003)

Patrol Rifle Instructor Course, Reading, PA (2003)

Patrol Rifle Operator's Course, Reading, PA (2003)

**JA2046**

Curriculum Vitae:
Emanuel Kapelsohn
Page 55

Bureau of Alcohol, Tobacco & Firearms, Firearms Instructor Seminar, San Diego
CA (2003).  Guest Instructor.

Citizen's Police Academy, Allentown Police Academy, Allentown, PA.
Instructor in Use of Force in Law Enforcement, Laws of Arrest (2003-5)

Bureau of Alcohol, Tobacco & Firearms. Firearms Instructor Seminar, Orlando,
FL (2003).  Guest Instructor

IALEFI Annual Training Conference, Orlando, FL (2003).  Assistant range
officer in Advanced Tactical Rifle class.

Mossberg Shotgun Armorer Certification Course.  Rockland County (NY) Police
Academy (2003).  Instructor.

Firearms Instructor Recertification Course.  Atlantic County, NJ (2002, 2003).
Instructor

Defensive Shotgun Course.  Reading, PA (2003).  Instructor

Firearms Instructor Updates/Requalifications.  Berks County Sheriff's
Department, Reading, PA (2003-2005).

Guest  Instructor, Lehigh County Municipal Emergency Response Team
Training, DeSalles University (2004)

Bureau of Alcohol, Tobacco & Firearms. Firearms Instructor Seminar, Orlando,
FL (2004).  Guest Instructor

Patrol Rifle Instructors Course.  Reading, PA (2004).  Instructor

Patrol Rifle User's Course.  Reading, PA (2004).  Instructor

Bureau of Alcohol, Tobacco & Firearms. Firearms Instructor Seminar, Los
Angeles, CA (2004).  Guest Instructor

IALEFI Annual Training Conference, Dayton, Ohio (2004).  Taught class
"Legal Update for Firearms Instructors."

Patrol Rifle/Shotgun Workshop.  Reading, PA (2004).  Instructor

Atlantic County Prosecutor's Office, Firearms Instructor Update.  Atlantic
County, NJ (2004).  Presented 3-day range and classroom instructor update.

Lecture, "Firearms, Firearms Safety and Self-Defense," Lions Club, Bowers, PA
(2004).  Guest lecturer.

Defensive Handgun & Shotgun Class.  Hellertown, PA (2004).  Instructor

**JA2047**

Curriculum Vitae:
Emanuel Kapelsohn
Page 56

Bureau of Alcohol, Tobacco & Firearms. Firearms Instructor Seminar, San
Francisco, CA (2005).  Guest Instructor

Tactical Team Commanders Course, Jefferson Township (NJ) Police
Department, for Fox Valley Technical College/ Team One Network,
Guest Instructor (2005).

Advanced Defensive Handgun Class.  Hellertown, PA (Spring 2005).  Instructor.

Firearms Safety and Tactics Workshop.  Salisbury Township Police Department,
Allentown, PA (2005).  Instructor.

Bureau of Alcohol, Tobacco & Firearms. Firearms Instructor Seminar, San
Diego, CA (2005).  Guest Instructor.

2005 IALEFI Annual Training Conference, Reno, NV.  Co-instructed instructor-
level class on fast, accurate handgun shooting and target-focused fire.
Conducted Handgun Safety Check for approx. 100 new attendees.  Chief
Safety Officer coordinating safety for this 6-day training conference, involving
over 400 attendees in classroom and firing range   courses, firearms ompetition,
trade show with hands-on firearms demonstrations, etc.

Atlantic County Prosecutor's Office, Firearms Instructor Update.  Atlantic
County, NJ (2005).  Presented 3-day range and classroom instructor update.

O.C. ("Pepper Spray") Users Courses (Pennsylvania 2005).  Presented training
courses for security officers of major pharmaceutical manufacturer.
Patrol Rifle Operators Refresher Course (Berks County Sheriff's Dept. 2005).

Advanced Defensive Handgun Course.  Hellertown, PA.  (Fall 2005).  Instructor.

Defensive Handgun & Shotgun Training  (Pennsylvania 2005, 2006, 2007, 2008,
2009).  Presented a series of firearms training courses for security officers of a
major pharmaceutical manufacturer.

"Home Firearms Safety and Self-Defense" lecture/demonstration for 35th
Anniversary Charter Night, Lions Club, Bowers, PA (2006).

North Carolina 2006 Police Firearms Instructors Conference, North Carolina
Justice Academy (2006).  Featured presenter: lectured to 250 law enforcement
firearms instructors on safety in simulation training; involuntary muscular
contraction and unintentional discharge of firearms; police deaths and
administrative gun handling safety considerations;  and mental conditioning and
tactics in officer- involved shootings.

2006 IALEFI Annual Training Conference, West Palm Beach, FL.  Moderator of
panel discussion, "Panel of Experts on Firearms Topics," including techniques
for covering suspects at gunpoint, manipulation of manual safeties, use of

Curriculum Vitae:
Emanuel Kapelsohn
Page 57

weapon-mounted lights, etc.  Assisted in conducting Handgun Safety Check for
participants;  monitored classes on Patrol Rifle, Concealed Carry Handgun.

Allentown Police Tactical Pistol League.  Conducted training session for police
officers.  (2006)

Patrol Rifle Workshop.  Hellertown, PA.  (2006)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ (2006).  Presented classroom and range instructor update.

IALEFI Regional Training Conference, Ocean City, Maryland (2006).  "Tactical
Handgun Overview."  Featured instructor at regional police training conference.

"Use of Force in Law Enforcement."  Two classes; Kutztown Police
Department, Kutztown, PA (2007)

"Legal & Practical Aspect of Self-Defense with Firearms," Hellertown, PA
(Winter 2007).  Lecture/demonstration presentation to some 100 attendees.

"Use of Force Legal Concepts," Reading, PA (2007).  Conducted instruction on
principles of justification for use of force, etc. for Carpenter Technology
security officers.

Glock Pistol Transitional Training, Eastern Armored Services (2007).
Conducted transitional training classes for armored car personnel.

Pepper Spray User's Course.  Conducted pepper spray user training and
certification for corporate/industrial security officers.  (2007)

IALEFI 2007 Annual Training Conference, San Antonio, TX.  Assisted in
conducting handgun safety check for 175 firearms instructors.

"Police Involved Shootings – When the Smoke Clears," Westchester County
Detectives Association, Yorktown Heights, NY (2007).  Lecture presentation to
160 attendees on subjects including psychological and perceptual distortions
and stress reactions of officers involved in shootings;  involuntary muscular
contraction and accidental discharge of firearms;  liability and safety issues of
weapon-mounted lights and lasers;  officer reluctance to fire;  etc.

"Use of Force Legal Theory" class and "Glock Pistol User's Class" conducted
for California University of Pennsylvania Police Department.  (California, PA
2007). Consulted, and conducted classroom and range instruction for this
university police department in its adoption of a service pistol.

Legal & Practical Aspects of Self-Defense with Firearms, Hellertown, PA (Fall
2007). Lecture/demonstration presentation to 30 attendees.

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.

Curriculum Vitae:
Emanuel Kapelsohn
Page 58

Atlantic County, NJ (2007).  Presented 3-day firearms instructor update (classroom and range) for approximately 30 police firearms instructors.

Pepper Spray User's Course.  Conducted pepper spray user training and certification for corporate/industrial security officers. (2008, 2010)

Defensive Handgun, Shotgun and Use of Force Training (Pennsylvania 2008 - 2012).   Conducted training for security officers of a major pharmaceutical manufacturer.

2008 IALEFI ATC, Reno, Nevada.  Conducted IALEFI Handgun Safety Check for approximately 125 shooters on range.  Taught classes on "Shotgun Instructor Skills."

Defense Training International, Women's Handgun Class.  Rochester, Indiana (2008). Served as adjunct instructor for this women-only class.

"Covering Suspects at Gunpoint and Involuntary Muscular Contraction." Training segment conducted for Greene County Sheriff's Reserve (2008)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course. Atlantic County, NJ (2008).  Presented 3-day firearms instructor update (classroom and range) for approximately 25 police firearms instructors.

Greene County Sheriff's Department.  Assistant range instructor for dim light Handgun & rifle qualification;  assisted in developing dim light rifle qualification course; provided remedial instruction as needed. (2009-2012)

"How Close is Too Close?"  Training segment conducted for Greene County Sheriff's Reserve (2009)

"Ammunition Inspection Procedures," "Dry Practice Safety Procedures," and "Safety in Gun Cleaning" training segments conducted for Greene County Sheriff's Reserve (2009)

Indiana University (Bloomington, IN), Criminal Justice Department.  Taught 3-credit senior seminar, "Police Use of Force."  (2009, 2010)

2009 Conference, International Law Enforcement Educators & Trainers Association (Chicago, IL):  taught course, "Bulletproofing Your Agency's Use of Force Policies."

2009 IALEFI Annual Training Conference, West Palm Beach, Florida. Conducted IALEFI Handgun Safety Check (range drills) for 70-plus trainees;  taught course, "Management and Investigation of Officer-Involved Shootings" (two sessions).

Intermediate Defensive Handgun.  Trained female student in defensive handgun skills in intensive 2-day program.  Hellertown, PA. (2009)

**JA2050**

Curriculum Vitae:
Emanuel Kapelsohn
Page 59

Remedial Handgun Training.  Provided series of remedial training sessions for
two female law enforcement officers.  (Indiana 2009)

Police Patrol Rifle Instructor Course, Reading, PA.  (2009)

Prosecutor's Training, "Police Use of Force," Greene County, IN. (2009)
Developed and presented this mandatory training course for police from
agencies throughout the county.

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ (2009).  Presented 3-day firearms instructor update
(classroom and range) for approximately 35 police firearms instructors.

"Police Use of Force."  Citizens' Police Academy, Linton Police Department,
Indiana (2010).

Firearms Safety & Home Firearms Storage Safety; Distinguishing Toy Guns and
Airguns from "Real" Guns; Dry Practice Safety Protocols; Drawing the

Handgun.  Training segments conducted for Greene County Sheriff's Reserve
(2010).

Moderator and Panelist, Panel Discussion:  "Current Issues in Firearms & Tactics
Training, 2010 IALEFI Annual Training Conference, San Antonio, TX.  Also,
conducted Handgun Safety Check for 120 first-time attendees.

Patrol Rifle Instructor & User's Course, Reading, PA (2010).

Police Firearms Instructor Update, Allentown (PA) Police Academy (2010).

Prosecutor's Training, "Police Use of Force Update," Greene County, IN (2010)

"Use of Force Law & Policy," Berks County (PA) Sheriff's Department (2010)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ (2010).  Presented two 3-day firearms instructor update
courses (classroom and range) for approximately 45 police firearms instructors.

Judgmental Use of Force Training.  Designed and conducted a judgmental use of
force training program for law enforcement officers in Greene County, Indiana.
Program utilized FATS video simulator, firearms, OC spray, Taser, verbal
challenges, use of cover, verbalization with suspects and fellow   officers,
preparing and debriefing after writing an incident report on one of the scenarios
the trainee experienced, etc.  (Bloomfield, IN 2011)

Judgmental Use of Force Instructor Certification Class.  Trained a cadre of
instructors to teach a judgmental use of force program, including the FATS
system, report writing, etc.  (Bloomfield, IN 2011)

**JA2051**

Curriculum Vitae:
Emanuel Kapelsohn
Page 60

Clearing Handgun Stoppages.  Training conducted for Greene County
  Sheriff's Reserve (2011).

One-handed Handgun Operation.  Training conducted for Greene County
  Sheriff's Reserve (2012)

Police Use of Force, Citizens Police Academy, Linton, IN (2012)

Panelist, Use of Force "Panel of Experts" at 2012 ILEETA Conference, Chicago.

Patrol Rifle Instructor Course, Berks County, PA (2012)

FATS Judgmental Firearms Training Program, Greene County, IN (2012).
  Designed and helped to conduct FATS simulator training for law enforcement
  officers from countywide agencies.

IALEFI 2012 Annual Training Conference, Nashville, TN. Taught class,
  "The Firearms Instructor as Expert Witness."

Live-Fire Decision Making Shooting Exercises, Greene County, IN (2012).

IALEFI Shotgun Master Instructor Development Progam, Monroeville, PA
  (2012)

Firearms Instructor Update & Recertification, Atlantic County, NJ (2012)

Legal & Practical Aspects of Self Defense With Firearms.  Hellertown
  Sportsmen's Association, Hellertown, PA (2012)

Police Explorers firearms training class.  Berks County, PA (2012)

Berks County Sheriff's Department training and qualification (2012)

North Carolina Justice Academy, Firearms Instructor Update. Lecture "Post
  Shooting Procedures, Policies and Concerns" (2012).  Presentation to 125
  firearms instructors representing law enforcement agencies statewide.

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
  Atlantic County, NJ (2012).  Presented two 3-day firearms instructor update
  courses (classroom and range) for approximately 45 police firearms instructors.

2013 IALEFI Annual Training Conference, Mobile, AL.  Conducted IALEFI
  Handgun Safety Check for approx.. 90 attendees; Presented class:
  "Encouraging Off-Duty Carry."

Legal & Practical Aspects of Firearms Self-Defense.  Hellertown, PA (2013)

IALEFI Regional Training Conference, Harrisburg Area Community College,

Curriculum Vitae:
Emanuel Kapelsohn
Page 61

Piccola Law Enforcement Training Center.  Conference Coordinator.  Taught courses, "Officer-Involved Shootings:  Policies, Procedures & Concerns" and "Lethal Force Confrontations Instructor."  Assisted in presenting Tavor Rifle Armorer Level I Class.  (2013)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.  Atlantic County, NJ (2013).  Presented two 2-day firearms instructor update courses (classroom and range) for approximately 50 police firearms instructors.

Norfolk Southern Railroad Police Training Seminar, "Bulletproofing Your Agency's Use of Force Policy" and "Officer-Involved Shootings:  Policies, Procedures and Concerns."  Brosnan Forest, SC (2014).

Deadly Force Expert Panel, 2014 ILEETA Conference, Lombard, IL. Panelist.

2014 IALEFI Annual Training Conference, Amarillo, TX.  Conducted IALEFI Handgun Safety Check for approximately 90 attendees; presented class "Using Firearms Experts in Officer-Involved Shooting Cases."

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.  Atlantic County, NJ (2014).  Presented two separate 2-day firearms instructor update  courses (classroom and range) for police firearms instructors county-wide.

Police Patrol Rifle Instructor Course.  Hosted by Allegheny Township Police Department, Duncansville, PA. (2014)

2015 ILEETA Conference, Panelist, "Deadly Force Panel of Experts;" Panelist, "Active Shooter Panel." Wheeling, IL.

2015 IALEFI Annual Training Conference, West Palm Beach, FL. Taught two classes for 76 students, "Training Gone Wrong."

Police Firearms Instructor Course.  Hosted by Martinsburg Police Department, PA. (2015)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.  Atlantic County, NJ (2015).  Presented 2-day firearms instructor update courses (classroom and range) for police firearms instructors county-wide.

Pilot program, "Police Use of Force," Piccola Law Enforcement Training Center, Harrisburg Area Community College (2015).  Co-instructed this pilot program for mandatory in-service training class to be presented in 2016 to approximately 25,000 police officers throughout the Commonwealth of Pennsylvania.

IALEFI Regional Training Conference, Freeport Police Range, Long Island, NY (2015).  Taught two instructor-level classes on current law enforcement use-of-force issues and cases.  Classes attended: see above.

**JA2053**

Curriculum Vitae:
Emanuel Kapelsohn
Page 62

MPOETC Instructor Training Class for 2016 Mandatory In-Service Training
("MIST") "Police Use of Force" Class.  Co-instructed this instructor-training
class for the Pennsylvania MPOETC for approximately 40 instructors at the
Montgomery County Law Enforcement Training Center, Conshohocken, PA
(2015).

Basic Defensive Handgun Course, Hellertown, PA 2016.
"Deadly Force Panel of Experts" panelist, 2016 ILEETA Conference, Rosemont,
IL.

Moderator and Panelist, Panel Discussion, "Firearms Training and Use of Deadly
Force," 2016 IALEFI Annual Training Conference, Mobile, AL.

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ (2016).  Presented two 2-day firearms instructor update
courses (classroom and range) for police firearms instructors county-wide.

Civilian Response to Active Shooter Events (CRASE) Training, Lehigh Valley
Consortium of Professional Organizations (2016)  Presented this Texas State
University program for approximately 40 attendees.

Use of Force and Firearms Training, Upper Macungie Township Police
Department, Pennsylvania.  Provided classroom and range instruction for
this municipal police department (2016).

Firearms Instructor Workshop and Remedial Handgun Training for Northampton
County Sheriff's Department, Pennsylvania (2016).

Rangemaster Tactical Conference, lecture presentation, "Use of Force Legal
Cases: Lessons Learned."  Little Rock, Arkansas (2017).

"Deadly Force Panel of Experts" panelist, 2017 ILEETA Conference, St. Louis,
MO.

"Patrol Rifle Panel" panelist, 2017 ILEETA Conference, St. Louis, MO.

North Carolina Justice Academy, IALEFI Regional Training Conference, lecture
presentation, "Officer-Involved Shootings: When Tiny Details Become
Critical," 2017.

IALEFI 2017 Annual Training Conference, West Palm Beach, FL.  Lecture
presentation, "Legal Update on Officer-Involved Shootings: The Expert
Witness Viewpoint."

Armed Security Officers Training Program, Reading, PA.  Classroom and range
training for two groups of armed security officers for Reading Hospital/Reading
Health System. (2017)

Patrol Rifle Instructor Course, hosted by Muhlenberg Township Police

**JA2054**

Curriculum Vitae:
Emanuel Kapelsohn
Page 63

Department, Reading, PA. (2017)

Firearms training and consulting for church security team.  Berks and Lehigh
County, PA 2017-2021.

Use of force and firearms training and consulting for synagogue security team.
Lehigh County, PA 2017-2021.

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ (2017).  Presented firearms instructor update
course (classroom and range) for police firearms instructors county-wide (two
classes) 2017.

"Deadly Force Panel of Experts" panelist, 2018 ILEETA Conference, St. Louis,
MO.

"Active Shooter Panel" panelist, 2018 ILEETA Conference, St. Louis, MO.

"Review of Recent Officer-Involved Shootings," IALEFI ATC, Houston, TX
2018.

Patrol Rifle Instructor Course for Assistant Chief of Upper Macungie Township
Police Department, 2017-2018 (multiple sessions).

Pepper gel classes, taught for security team members of religious congregations.
(2018, 2019)

Class on tactical first aid, including use of Israeli battle dressings, tourniquets,
Combat Gauze, and occlusive dressings, taught for teachers and staff of
religious congregation.  (2018)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ.  Presented two firearms instructor update courses
(classroom  and range) for police firearms instructors county-wide (2018).

Pepper gel class, taught for employees and family members of professional firm.
(2018)

IALEFI ATC, West Palm Beach, FL (2019):  Taught instructor-level course on
"Officer-Involved Shootings" to approximately 35 instructors.

Firearms training and tactical first aid classes, taught to security group of
religious congregation in Allentown, PA (2019)

Active Shooter/Left of Bang:  Coordinated and assisted in two large lecture
presentations on these subjects at Trexlertown, PA, and at Harrisburg Area
Community College, Law Enforcement Training Complex for approximately 100
attendees each, with lead lecturer Don Alwes (2019).

Curriculum Vitae:
Emanuel Kapelsohn
Page 64

Active Shooter/Left of Bang:  Hellertown, PA. Hands-on active shooter response
class, Airsoft simulation scenarios and live fire training, co-instructed with Don
Alwes.  (2019)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ.  Presented firearms instructor update courses (classroom
and range) for police firearms instructors county-wide, two sessions (2019).

Active Shooter Preparation and Response:  St. John's Church on Morgan Hill,
Easton, PA.  Presentation to Consistory Group (2019)

Active Shooter Response and the Law:  Presentation for Allentown Barrister's
Inn (attorneys, prosecutors and judges).  PACLE Credit-approved. (2019)
"Firearms Safety, Legal Justification for Use of Force, and Policy" presented for
approximately 30 members of church security team.  Allentown, PA (2020)

Pepper gel training, presented for staff and religious school teachers of a house of
worship.  Allentown, PA (2020)

M4 Carbine Use of Cover and M9 Pistol Training for military personnel at Fort
Myer (Joint Base Myer – Henderson Hall), VA (2020)

Police Firearms Instructor Course, Berks County, PA.  Hosted by Berks County
Sheriff's Office. (2020)

Defensive Handgun and Patrol Rifle, Defense Training International, Sussex, NJ
October 2020.  Assisted in teaching this course.  (John Farnam, chief instructor)

Defensive Handgun Training/Qualification for members of house of worship
security team.  Berks County (2020).

Police Firearms Instructor Course, Blair County, PA.  Hosted by Martinsburg
Police Department (2020).

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ.  Presented firearms instructor update courses (classroom
and range) for police firearms instructors county-wide, two sessions (2020).

Classroom and range defensive handgun training for security officers of a mining
operation.  Pennsylvania (2021).

"Firearms Safety, Legal Justification for Use of Force, and Policy" presented for
approximately 35 members of church security team.  Allentown, PA (2021)

"Training an Armed Congregant House of Worship Protective Team," "Active
Shooter Discussion Panel" (panel member), and "Deadly Force Discussion
Panel" (panel member), ILEETA Annual Conference, St. Louis, MO (2021)

Curriculum Vitae:
Emanuel Kapelsohn
Page 65

DTI Defensive Handgun Course, Sussex, New Jersey (2021). Served as an
Assistant Instructor in this 2-day program for 27 attendees.

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ. Presented firearms instructor update courses (classroom
and range) for police firearms instructors county-wide, two sessions (2021).

Defensive Handgun for House of Worship Protective Team Members,
Allentown, PA (2022). Lead instructor.

IALEFI Annual Training Conference, Las Vegas, NV (2022). Conducted Safety
Check for Attendees. Courses attended, see above.

Firearms Video Simulator Training, Lead Instructor, 3 days, for 35 police and
security officers, Allentown, PA (2022)

Defensive Handgun Training and Qualification for house of worship security
team members, Lead Instructor, Topton, PA (2022)

Armed Security Officers Training Program, Lehigh County, PA. Wrote Firearms
and Use of Force Policy, Designed Training Program, and conducted classroom
and range training for armed security officers of large, multi-state public utility
company (2020-2022)

DTI Urban Rifle Course, Sussex, NJ, Adjunct Instructor (2022)

Atlantic County Prosecutor's Office, Firearms Instructor Recertification Course.
Atlantic County, NJ. Presented firearms instructor update courses for police
firearms instructors county-wide, two sessions (2022).

Defensive Handgun Training and Qualification for house of worship security
team members, Lead Instructor, Topton, PA (2023)

IALEFI Annual Training Conference, Houston, TX (2023). Conducted Handgun
Safety Check for Attendees. Courses attended, see above.

Handgun Qualification/Use of Force Refresher Corporate Security Officers,
Allentown, PA (2023)

Handgun Qualification/Use of Force Refresher for Estate Security Officers,
Topton, PA (2023)

Plus, numerous basic through advanced and remedial training sessions for
individual students and small groups, including private individuals, corporate
executives and dignitaries, executive protection personnel, security officers,
private investigators, military, federal agents and law enforcement officers at all
levels. (1978 to present)

**JA2057**

Curriculum Vitae:
Emanuel Kapelsohn
Page 66


**<u>REFERENCES</u>:**     Personal and professional references available on request.

# EXHIBIT "2"

NEWS

# Pregnant Florida mom uses AR-15 to kill home intruder

By Joe Tacopino                                                                November 4, 2019 | 12:05am | Updated



Shutterstock

A pregnant woman is credited with saving the lives of her husband and daughter after she used an AR-15 to fatally gun down a home intruder, a report said.

The hero mom sprung into action when two intruders entered the family's Lithia, Fla. home last week and pistol whipped her husband while violently grabbing their daughter, according to the Hillsborough County Sheriff's Office.

"They came in heavily hooded and masked," the husband, Jeremy King, told Bay News 9.

"As soon as they had got the back door opened, they had a pistol on me and was grabbing my 11-year-old daughter."

The robbers then pistol-whipped King and kicked him while the man's wife, who is eight months pregnant, retreated into the bedroom.

"When he came toward the back door in her line of sight, she clipped him," King told the outlet. "He made it from my back door to roughly 200 feet out in the front ditch before the AR did its thing."

JA2060

Police said in a press conference that they found the man's dead body lying in the ditch nearby. The second suspect was on the loose.

The homeowner said he took a "severe beating," but credited his wife for saving him.

"I've got a fractured eye socket, a fractured sinus cavity, a concussion, 20 stitches and three staples in my head," said King.

"Them guys came in with two normal pistols and my AR stopped it. [My wife] evened the playing field and kept them from killing me."

The sheriff's office added that the firearm was in the home legally.

FILED UNDER  **FLORIDA**, **HOME INVASION**

Recommended by

JA2061

# EXHIBIT "3"

Case 1:18-cv-10507-RMB-JBD    Document 184-3    Filed 11/03/23    Page 187 of 277
PageID: 5187
11/18/2019                    Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion

 

🌦 57°F

WEATHER ALERT    Weather Alert: 8 advisories in effect for 5 counties in the area

**NEWS**

# Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion

Incident stemmed from ongoing feud between two groups, investigators say

**Garrett Pelican**, Digital executive producer
Published: Apr. 17 2018, 7:16 pm
Updated: Apr. 17 2018, 7:20 pm

Tags: **Florida, Baker County, Weird News, News, Glen St Mary**



*(Left to right: Bell, Watkins, Cayden Lauramore, Albino)*



**GLEN ST. MARY, Fla** – Three men say they were asleep inside a mobile home in Glen St. Mary about 4 a.m. Sunday when they heard a voice outside yell "Sheriff's Office!" before the front door burst open.

In stormed a masked gunman who fired off a single round before two of the men inside, one armed with an AR-15 rifle and the other with a handgun, emerged from two bedrooms and opened fire.

Gunfire ripped into the masked gunman and two other intruders, who crumpled to the floor with multiple gunshot wounds.

Those details surfaced Tuesday when the Baker County Sheriff's Office released an arrest report linked to **this weekend's home invasion turned deadly triple shooting**.

Five people are charged in the case. Investigators suspect the home invasion escalated from an ongoing feud between two groups that was stoked by social media threats.

The victims told deputies they acted in self-defense when they turned their guns on the intruders, with one of them estimating he fired over 30 rounds from an AR-15 before the threat was over.

Afterward, the victims retreated to another part of the home before they dialed 911, according to the report. None of them was hurt during the shooting.

The same cannot be said for the intruders, **several of whom were inside a vehicle deputies intercepted as it sped away** from the mobile home off County Road 125.

One of them, Corey Lauramore, died of gunshot wounds to the head. An unidentified 16-year-old remains hospitalized, and a third suspect, William Lauramore, was treated and released to police.

Investigators found a heavy amount of dried blood caked on the front steps of the home, a bloodstained mask with a bullet hole through it and a .380 caliber handgun lying nearby, the report said.

They also recovered an AR-15 rifle and a 9MM handgun inside the home.

The Sheriff's Office said the **five individuals charged in the case were among a group of seven that went to the mobile home that morning to confront and fight** the group staying there.

William Lauramore, 24; Joseph Albino, 24; Zachary Bell, 20; Christian Watkins, 19; and Cayden Lauramore, 15, are charged with home invasion. But additional charges are possible.

Albino, Bell and Watkins provided conflicting details about their involvement in the shooting, but all three said they had no idea others in their group had brought weapons along, according to the report.

*Copyright 2018 by WJXT News4Jax - All rights reserved.*

MOST LIKED ∨   NEWEST                                                        FOLLOW ◯   0 COMMENTS

Guest

Type your comment here...

**JA2064**

# EXHIBIT "4"

# Man armed with AR-15 stops attack by neighbor in Oswego

POSTED 5:37 AM, FEBRUARY 27, 2018, BY NANCY LOO AND CHARLES HAYES, *UPDATED AT 12:59PM, FEBRUARY 27, 2018*



*This is an archived article and the information in the article may be outdated. Please look at the time stamp on the story to see when it was last updated.*

**Man armed with AR-15 stops attack by neighbor in Oswego**



OSWEGO, Ill. -- A man armed with an AR-15 rifle helped stop a knife attack during an argument in Oswego.

It happened on Monday at an apartment building on Harbor Drive.

Police say it all began when someone with a knife attacked another person during an argument.

Neighbor Dave Thomas, who witnessed the attack, went into his home, got his rifle and ordered the suspect to stop.

"I ran back into the home, into my house and grabbed my AR-15. Grabbed the AR-15 over my handgun. It's just a bigger gun. I think a little bit more than an intimidation factor definitely played a part in him actually stopping."

No shots were fired.

The suspect was able to get away briefly, before police captured him.

The stabbing victim was taken to a hospital, and is expected to recover.

Police say Thomas has a valid firearm owner's identification card and a concealed carry permit. Thomas says he is also a firearms instructor.

"The AR-15 is my weapon of choice for home protection," Thomas said. "It's light, it's maneuverable. If you train and know how to use it properly, it's not dangerous. And this is just a perfect example of good guy with an AR-15 stopped a bad guy with a knife. And there were no lives taken, so all in all it was a good day."

NEWS

**Pregnant mom used AR-15 to kill burglar, save husband during home invasion**

NEWS

# EXHIBIT "5"

THE CORNER

POLITICS & POLICY

# Texas Hero Reportedly Used His Own AR to Confront the Sutherland Springs Shooter

By **DAVID FRENCH** | November 6, 2017 10:54 PM

During today's press conference about the Texas mass shooting, the regional director of the Texas Department of Public Safety indicated that the Texas Good Samaritan, Stephen Willeford, engaged the Sutherland Springs shooter with his own AR:

> He armed himself with an AR assault rifle and engaged the suspect. They engaged in gunfire here at the church. We know that the suspect was shot, when he dropped his assault rifle and jumped in his Ford Expedition and fled the scene.

Given what we know from other reports, this makes a great deal of sense. After all, Willeford apparently fired with a great deal of precision. Here's an account from CNN, taken from an interview of his cousin:

> And what he did, according to his cousin, is exchange fire with the gunman, hitting him in the side and twice in the neck.

> "He saw that the guy was wearing body armor, and there was a velcro strap, from the back to the front," detailed Leonard, speaking live on Monday. "He knew from that ... that the vulnerable spot was going to be in the side. And so that's where he shot him."

An AR is an easy-to-use, extraordinarily accurate weapon, and one can see how it would enable a surprised civilian to engage the shooter so quickly and effectively.

We keep hearing that AR's are useless for self-defense, that they're simply "weapons of war," useful only for mass killing. This is simply not true. Earlier this year, an Oklahoma man used an AR-15 to kill three home intruders, and multiple self-defense experts have long pegged AR-style rifles as their "home defense weapon of choice." I have one in my own home, and I feel far more comfortable using it than even one of my handguns.

While Willeford obviously didn't prevent the massacre, he did stop the shooter and prevented him from harming anyone else. He did so with exactly the kind of weapon that the gun control lobby would like to deny to law-abiding Americans. That's a fact worth noting.

JA2069

11/18/2019    Texas Hero Reportedly Used His God Art to Comfort the Sutherland Springs Shooter | National Review



**RETURN TO THE CORNER**



**DAVID FRENCH** is a senior editor of *The Dispatch*. **@davidafrench**

**JA2070**

# EXHIBIT "6"

https://www.chron.com/news/houston-texas/article/Harris-County-deputy-s-son-shoots-one-of-two-1712908.php

# Harris County deputy's son shoots one of two intruders

**15-year-old and sister, 12, were alone when pair entered, so he got dad's rifle**

MIKE GLENN
, HOUSTON CHRONICLE  **Published 5:30 am CDT, Wednesday, June 30, 2010**

The teenage son of a Harris County deputy constable opened fire with his father's automatic rifle Tuesday after burglars forced their way into the family's home, authorities said.

The boy, 15, and his sister, 12, were alone about 2:30 p.m. when they heard glass breaking downstairs at the home in the 2600 block of Royal Place Court in northwest Harris County.

The boy went downstairs with the rifle and spotted the two burglars in the living room.

He fired several shots and struck one of the intruders, said Lt. **Jeff Stauber** with the Harris County Sheriff's Office.

"He was concerned with protecting his younger sister — that's exactly what he did," Stauber said.





The suspect who was shot -- identified as **Kinzy Evans**, 17, -- was struck several times by gunfire. Police said his accomplice was a 16-year-old who they would not identify because he is a juvenile.

Sheriff's investigators were tipped off when the suspected burglars quickly showed up at **Methodist Willowbrook Hospital**.

"Anytime you get a gunshot victim in the hospital, they're going to notify law enforcement," Stauber said.

Case 1:18-cv-10507-RMB-JBD    Document 184-3    Filed 11/03/23    Page 197 of 277
PageID: 5197
11/18/2019                          Harris County deputy's son shoots one of two intruders - Houston Chronicle

Evans was taken by Life Flight helicopter to Memorial Hermann-The Texas Medical Center in unknown condition.

Your California Privacy Rights    Interest Based Ads    Privacy Notice    Advertising    Terms of Use    Contact Us    X

Sheriff's deputies said the burglars came into the house after breaking out a window in the living room area.

"They left the same way they came in - through the broken window," Stauber said.

### 'A little shaken up'

Family members at the scene declined to comment about the incident.

"The main thing is that the kids are OK. They're a little shaken up," said a man who identified himself as the deputy constable's brother.

Neighbors said several homes in the area also have been broken into during the daylight hours.

"There have been a lot of robberies. It's good that they caught them," said Ushantha Kawmini, whose home down the street was burglarized about a month ago.

### Break-in concerns

Another neighbor was concerned that the burglars would be brazen enough to break into a home belonging to a law enforcement officer.

"Now they're doing it to the police officers. What about regular people?" said the neighbor.

She identified herself only as Mary because she feared retaliation from other burglars.

"I'm sure they (the suspects) have got friends," the neighbor said.

The two have been charged with burglary of a habitation, officials said.

mike.glenn@chron.com

© 2019 Hearst Communications, Inc.

HEARST

# EXHIBIT "7"

Case 1:18-cv-10507-RMB-JBD   Document 184-3   Filed 11/03/23   Page 199 of 277
PageID: 5199
11/18/2019                        Elkins Park man killed after forcing his way into apartment

**The Philadelphia Inquirer**

Unlimited Access        Log In

NEWS   SPORTS   BUSINESS   OPINION   POLITICS   ENTERTAINMENT   LIFE   FOOD   HEALTH   REAL ESTATE   OBITUARIES

# Elkins Park man killed after forcing his way into apartment

by Sam Wood, PHILLY.COM, Posted: April 22, 2013

An Elkins Park man was killed late Friday after he forced his way into a stranger's apartment in Cheltenham Township.

Jasper Brisbon, 32, wandered up to a couple late Friday at the Lynnewood Apartments as the pair spoke outside their unit. Brisbon, they told police, appeared to be on drugs. He stared at the pair for several minutes before the couple decided to go into their apartment, police said.

But as they entered their home Brisbon jumped between them, forcing his way in.

The male of the couple ran to get a semi-automatic AR-15 rifle and insisted Brisbon leave. Brisbon refused. Instead, as the man yelled "Stop! Stop Stop!" Brisbon moved menacingly toward the man, police said.

The man fired a shot striking Brisbon in the torso and immediately called 911, police said.

An ambulance rushed Brisbon to Abington Memorial Hospital where doctors pronounced him dead. According to court records, Brisbon was awaiting trial on a charge of aggravated assault stemming from an incident in December.

**INQUIRER MORNING NEWSLETTER**

Get the news you need to start your day

your@email.com                                                Sign Up

Police said the residents of the apartment were cooperating with police, did not know Brisbon and that the AR-15 was legally purchased.

*Contact Sam Wood at 215-854-2796, @samwoodiii or samwood@phillynews.com*

Posted: April 22, 2013 - 1:46 PM

Sam Wood, PHILLY.COM

## Never Miss a Story

Subscribe

JA2075

# EXHIBIT "8"

https://www.tulsaworld.com/communities/wagoner/news/shooting-deemed-justifiable-authorities-say-zach-peters-acted-lawfully-
when/article_ad51c988-72d3-556f-be54-6c9404a5fbab.html

# Shooting deemed justifiable: Authorities say Zach Peters acted lawfully when he shot, killed three intruders

By JOSH ALLEN Staff Writer   Apr 3, 2017





First Assistant District Attorney Jack Thorp told reporters Zach Peters acted "lawfully," within "his rights as an Oklahoma citizen,"
when he shot and killed three masked intruders with an AR-15 inside his home after they broke in on Monday, March 27. JOSH
ALLEN/AMERICAN-TRIBUNE

## Related content

Audio: Listen to edited version of audio of the 911 call

Alleged getaway driver in home invasion triple homicide reportedly knew man who shot 3 teens

VIDEO: 911 call released: Man who fired AR-15 on teen intruders tells dispatcher 'I shot two of them'

The latest: Friends in disbelief over deaths of three teens during home-invasion

Case 1:18-cv-10507-RMB-JBD    Document 184-3    Filed 11/03/23    Page 202 of 277
PageID: 5202

11/18/2019          Shooting deemed justifiable: Authorities say Zach Peters acted lawfully when he shot, killed three intruders | News | tulsaworld.com

Woman arrested after Broken Arrow-area man fatally shoots three Intruders

Wagoner County officials said Monday the 23-year-old who shot and killed three masked intruders inside his home on March 27 acted justifiably and would not be charged with any crime.

At a press conference on Monday, First Assistant District Attorney Jack Thorp read an official letter from the DA's office, which said Peters "acted in accordance with his rights as an Oklahoma citizen."

The DA's office sent the official letter declining to prosecute or pursue any charges against Peters to the Wagoner County Sheriff's Office on Monday, April 3.

"Upon my review of his interview, it appears that he (Peters) was in fear for his life as he perceived the intruders and discharged his weapon at the intruders," District Attorney Brian Kuester states in the letter.

Kuester concludes Peters acted in accordance with the Oklahoma statue entitled Physical or Deadly Force Against Intruder (21 O.S. 1289.25).

"My deputies have worked tirelessly on this case ever since it happened to make sure we do a good job," Wagoner County Sheriff Chris Elliott said Monday. "They've investigated this meticulously, diligently, and we've looked at every piece of evidence."

Thorp said at Monday's press conference that Elizabeth Marie Rodriguez, 21, who was arrested for her involvement in the home invasion and subsequent deaths, has officially been charged with three counts of first-degree murder by the DA's office.

The range of punishment for murder in the first degree, Thorp said, includes three possible punishments; death, life without the possibility of parole or life.

She also faces a first-degree burglary charge and a second degree burglary charge, according to court records.

"Like every other jurisdiction in the country, we too have seen burglaries ... an increased number of burglaries happening in Wagoner County," Elliott said. "We are working diligently with other law enforcement agencies and the community to try and thwart these burglaries."

JA2078

Case 1:18-cv-10507-RMB-JBD   Document 184-3   Filed 11/03/23   Page 203 of 277
PageID: 5203

11/18/2019        Shooting deemed justifiable: Authorities say Zach Peters acted lawfully when he shot, killed three intruders | News | tulsaworld.com

Rodriguez was arrested after she turned herself in to authorities shortly following the home invasion and shooting. She stated to investigators that she had "planned the robbery and drove the vehicle," according to authorities.

On Thursday, she told reporters in an interview from the jail that she was sorry for her part in the crime, claiming she did not plan to kill any of them but did admit to her part in the robbery attempt.

Jaykob Woodriff, 16, Jacob Redfearn, 17, and Maxwell Cook, 19, were wearing all-black and masks when they broke into Peters' home on Monday, March 27 around noon.

After hearing loud noises that woke Peters, who was at the home alone at the time, he encountered the three intruders inside his home. Armed with an AR-15 assault rifle, Peters fired, killing all three.

Authorities said one was armed with brass knuckles and another had a knife.

"At the sheriff's office, we're very troubled by this. We don't want to see this in our county," Sheriff Elliott said. "But we support the right of our citizens ... the right to bear arms and to defend their homes in this county."

"In this such, we feel strongly that that's what took place here," he continued. "We don't want to see this type of thing in our county, obviously, but we are also in the United States and in a state that affords our citizens the right to defend themselves."

Within minutes of firing the shots, Peters called 911 and requested medical personnel for the wounded intruders, telling the dispatcher "one of 'em's shot bad."

"Our condolences are extended to the families (of Woodriff, Redfearn and Cook)" Thorp said on Monday.

Originally it was reported that Rodriguez may have personally known Peters, however, she confirmed to authorities last week that "she had no connection" with him, according to Deputy Nick Mahoney, spokesman for the sheriff's office.

After waiving her right to an attorney, Rodriguez told investigators Wednesday that "she did not know Zach Peters," but said she "indirectly became aware of Peters' father."

"She said she determined Peters had money and expensive belongings, and that was why she selected his home, to 'hit a lick,'" Mahoney said.

"Hit a lick," Mahoney explained, "is a term some criminals use to describe getting a significant amount of money in a short period of time."

An arrest affidavit had previously indicated that Rodriguez "had previous knowledge of the house and the homeowner."

After Peters shot the intruders, who had broken in through a back glass door, two of them died inside, while one made it out to the driveway before collapsing.

Rodriguez told investigators that, after she heard shots fired, the injured suspect who ran outside tried to get back into her vehicle, but she said she drove away, leaving him in the driveway, Mahoney said.

Rodriguez also told investigators that she and the three deceased suspects had went to the residence prior to the shooting and burglarized a spare apartment on the property. She said they then returned later to burglarize the main house, Mahoney said.

Another witness contacted authorities last week with alleged additional information regarding the home invasion, according to Mahoney.

"Investigators have made contact with her and are currently in the process of talking with her," Mahoney said last week.

Though specific details about what she knows about the case were not revealed, he said investigators were "taking her seriously."

"She is a witness, not a suspect," Mahoney clarified.

Her name is not being released at this time. At Monday's press conference, authorities did not comment on her involvement or the information she may have provided to investigators, but Sheriff Elliott said she was a juvenile.

"We're not going to release any information on that," Elliott said referring to the witness, who may have been in the back seat of the car that Rodriguez drove to the residence prior to the home invasion. "This case is still an open investigation."

Rodriguez will go before Associate District Judge Dennis Shook on April 5 for an initial appearance hearing.

MORE INFORMATION

*Autopsy reveals drugs in two of three teens killed in Wagoner County home invasion*

**JA2081**

# EXHIBIT "9"

Detailed Information Regarding Penetration Of .223 Ammunition
### by R.K. Taubert
*About the author: A recently retired FBI Agent with over 20 years experience in SWAT and Special Operations, he conducted extensive counter-terrorism and weapons research while in the Bureau.*

*Reprinted and edited with permission.*

### Close Quarter Battle Reputation
Several interesting but inconclusive articles examining the feasibility of the .223 caliber, or 5.56x45mm round, for CQB events, such as hostage rescue and narcotics raids, have recently been featured in a variety of firearms and police publications. However, for more than 20 years, conventional law enforcement wisdom generally held that the .223 in any configuration was a deeply penetrating round and, therefore, totally unsuited for CQB missions in the urban environment. Partly because of this erroneous, but long held perception, and other tactical factors, the pistol caliber submachine gun (SMG) eventually emerged as the primary shoulder &quot;entry&quot; weapon for the police and military SWAT teams.

Although new revelations about the .223 are beginning to slowly circulate throughout the Special Operations community, a number of law enforcement agencies are in the process of acquiring the next generation of &quot;advanced&quot; SMGs in 10mm and .40 S&W calibers. Could they and the public be better served by a .223 caliber weapons system and at less expense? Please read on and judge for yourself.

### FBI Ballistic Tests
As a result of renewed law enforcement interest in the .223 round and in the newer weapons systems developed around it, the FBI recently subjected several various .223 caliber projectiles to 13 different ballistic tests and compared their performance to that of SMG-fired hollow point pistol bullets in 9mm, 10mm, and .40 S&W calibers.

Bottom Line: In every test, with the exception of soft body armor, which none of the SMG fired rounds defeated, the .223 penetrated less on average than any of the pistol bullets.

These tests were conducted by the FBI's Firearms Training Unit (FTU), at the request of the Bureau Tactical and Special Operations personnel. Located at the FBI academy in Quantico, VA, this is the same unit with the encouragement of forensic pathologist Dr. Martin Fackler and other ballistic experts, that dramatically advanced the testing of modern handgun rounds to estimate their wounding effectiveness and potential lethality. Ultimately, this entity confirmed that permanent crush cavities, or &quot;wound-channels,&quot; and deep penetration were the primary factors for handgun-fired projectiles. The FTU further determined that under various target engagement circumstances, a depth of penetration in soft tissue of between 12 to 18 inches was required for a handgun bullet to be effective.

### Equipment Employed / Rounds Tested
For these series of tests the following firearms, ammunition and equipment were employed:

• Sealed, match grade test barrel to determine 25 yard, 10-shot group accuracy and 20-round velocity potential.
• 20&quot; barreled, M16A1 rifle to stabilize and test rounds ranging from 40 to 55 grains in weight.
• 20&quot; barreled, M16A2 rifle to stabilize and test rounds ranging from 62 to 69 grains in weight.
• Oehler Model 85 chronograph.
• Ransom type rifle rest, with laser bore sighting.
• Numerous blocks of Kind and Knox 250-A, 10% gelatin, to simulate living tissue.
• Federal's 40-grain &quot;Blitz&quot; hollow point, 55-grain soft point and 69-grain hollow point; 9mm 147-grain Hydra-Shok, 10mm and .40 S&W 180-grain, jacketed hollow points.
• Winchester's 55- and 62-grain full metal case, NTO-military spec. rounds.

As indicated, both rifles were fired from a mechanical rest. Ten-shot groups and 20-round velocity tests were fired for each round. 13 penetration tests were conducted. 95 rounds were fired for each type of round tested. A total of 760 rounds were tested and recorded for this project.

**Test Protocol**
Tests 1-6:
Bare gelatin, heavy clothing, automobile sheet metal, wallboard, plywood, and vehicle windshield safety glass, were shot a distance of 10 feet from the muzzle. The vehicle safety glass was set at an angle of 45 degrees to the horizontal, with the line of bore of the rifle/SMG offset 15 degrees to the side resulting in a compound angle of impact for the bullet upon the glass, which simulates a shot directed at the driver of a car closely missing the shooter. Furthermore, the gelatin was covered with light clothing and set back 18 inches behind the glass. All gelatin blocks, with the exception of the body armor barrier, were set 18 inches behind each solid obstacle shot.

Tests 7-13:
All involved shots through heavy clothing, safety glass and bare gelatin at 50 to 100 yards, concluding with internal walls, external walls and body armor at 10 feet. Test eight however, involved safety glass at 20 yards, shot dead-on, without the 15 degree offset, to simulate a shot at a car's driver bearing down on the shooter.

For the connivance of the reader, test results are summarized in the following chart. Please note that the data displayed represents the average penetration of these rounds as measured in 10% ballistic gelatin (see tables 1 and 2).

Considering that the average person's torso is 9 inches thick, front to back, all the .223 rounds ranging in weight from 55 to 69 grains appear to be adequate performers on soft targets where frontal shots are involved. Although the majority of target engagements are frontal, profile shots can and do occur. A .223 round that is required to pass through an arm before entering the rib cage mat, upon striking bone, fragment, and while possibly shattering the appendage, would most likely not be successful in producing a sufficiently deep body cavity wound to be decisive. In this, as with any CQB encounter, &quot;controlled pairs,&quot; or rapid-repeat hits may be

required to ensure target neutralization.

**Defeating Ballistic Garments**
Soft body armor appears to have little effect on the calibers ability to penetrate and actually seemed to enhance the 40-grain Blitz's depth of penetration in soft tissue.

From a law enforcement standpoint, the ability of the .223 caliber round to defeat soft body armor, military ballistic helmets and many ballistic shields is a &quot;double-edged sword.&quot; The criminal use of body armor is rare, but increasing. Possessing the ability to penetrate and adversary's protective vest is obviously desirable. However, this round will also defeat law enforcement vests, so great care must be exercised in laying out and observing fields of fire in training and during operations. With this concern over potential fratricide in mind, voices have been raised in some quarters regarding this bilateral tactical attribute. A number of veteran officers strongly embrace The traditional concept that a department's duty rounds should not exceed the capabilities of their vests. Arguably, this is a sound approach for any law enforcement agency to take for its non-tactical response personnel. However, SWAT, because of its specialized missions, may be a different matter and this later concern, while important, should not dominate the rationale supporting weapons selection by highly competent tactical units.

Although it has been reported that less that 1% of all serious crimes involve long guns and less than 8% of long gun related crimes involve rifles, law enforcement is being confronted more frequently by criminals with weapons and munitions that are capable of defeating all but the heaviest ballistic protection. The FBI's Uniform Crime Reporting Section indicates, for example, that rifles were involved in 13% of the assaults on police officers during 1992. The incident a Waco, Texas, is a recent example of this problem. For forced entry teams, the need for higher levels of ballistic protection is essential.

For safe training of specialized law enforcement teams, the development of a lead-free, low penetration, short-range 5.56mm/.223 caliber training round that will (1) not penetrate ballistic vests and helmets, (2) destroy &quot;shooting house&quot; walls, (3) crater, or perforate steel-reactive targets, is extremely important. Fortunately, it appears that private industry is responding to these demands and such munitions are currently being developed.

**Vehicle Interaction**
With the exception of the full metal case and the 69-grain JHP rounds, it appears inadvisable to select lighter weight, soft or hollow point versions of this caliber when automobiles are likely to be engaged during planned raids and arrests. Penetration against automobile windshield safety glass is generally very poor and is only slightly better on sheet steel. Although terrorists from the insurgent New Peoples' Army were able to blast their way through an armored limousine in the Philippines and murder a highly regarded U.S. military official with concentrated M-16 rifle fire, the SMG-fired pistol round demonstrates at least a theoretical, if not practical, edge against such hardened targets.

Interestingly, while penetration on auto glass and sheet steel is marginal, .223 projectiles will readily perforate and breach mild steel such as standard pepper poppers, that pistol rounds will

only slightly dimple. However, very little of the .223's mass is retained, so after defeating mild steel, significant wound potential is severely diminished upon exit.

## Barriers and Structures

The Bureau's research also suggests that common household barriers such as wallboard, plywood, internal and external walls are also better attacked with pistol rounds, or larger caliber battle rifles, if the objective is to &quot;dig out&quot; or neutralize people employing such object as cover or concealment. Although it is usually not advisable to fire at targets you can't see in urban settings, it is done and some subjects have been stopped in this manner. Conversely, the ability of some pistol rounds to penetrate barriers tested puts innocent bystanders and fellow team members at greater risk in CQB scenarios. If an operator misses the intended target, the .223 will generally have less wounding potential than some pistol rounds after passing through a wall or similar structure. The close range penetration tests conducted indicated that high velocity .223 rounds were initially unstable and may, depending on their construction, disintegrate when they strike an object that offers some resistance. When concrete, brick or macadam are struck at an angle at close range, .223 rounds tent to fragment or break up, and ricochets are generally less hazardous. The .223 could consequently be considered safer for urban street engagements, because of its inherent frangibility within the cross-compartments created by street environments. In other words, in most shootings, the round would probably strike something, hopefully a hard object, break up and quickly end its potentially lethal odyssey.

As a point of interest, the rifled shotgun slug, while not possessing the .223's flat trajectory, is still capable of attaining a maximum range of 900 yards. This fact illustrates that any errant law enforcement round regardless of caliber, or maximum range, is potentially dangerous to the community.

## .223 Wounding Characteristics

Ballisticians and Forensic professionals familiar with gunshot injuries generally agree that high velocity projectiles of the .223 genre produce wounds in soft tissue out of proportion to their calibers, i.e. bullet diameter. This phenomenon is primarily attributed to the synergistic effects of temporary stretch cavity (as opposed to the relatively lower velocity stretching which typifies most pistol rounds) and bullet fragmentation on living tissue.

Distinguished forensic pathologist Dr. Martin L. Fackler, observed when he was conducting wound research for the U.S. Army several years ago (&quot;Wounding Patterns of Military Rifles,&quot; International Defense Review, Volume 22, January, 1989), that in tissue simulants such as ballistic gelatin, , the 55-grain, M-193 military bullet lost stability, yawed (turned sideways) 90 degrees, flattened and broke at the cannelure (groove around the bullet into which the cartridge case is crimped) after penetrating about four to five inches. The forward portion of the bullet generally remained in one piece, accounting for 60% of its originally weight. The rear, or base portion of the bullet, broke into numerous fragments that may also penetrate tissue up to a depth of three inches. Dr. Fackler also noted that a relatively large stretch cavity also occurred, violently stretching and weakening tissue surrounding the primary wound channel and its effect was augmented by tissue perforation and further weakening by numerous fragments. An enlarged permanent cavity significantly larger than the bullet diameter resulted by severing

**About .223 Penetration**

and detaching tissue pieces. However, as the range increases, the degree of bullet fragmentation and temporary cavitation decreases because terminal velocity diminishes. At 100 meters, Fackler observed that the bullet, upon penetrating tissue, breaks at the cannelure, forming two large fragments. However, beyond 200 meters, it no longer looses its integrity, although flattening continues to somewhat occur out to 400 meters.

In his study, Fackler remarked that in abdominal shots, &quot;There will be increased tissue disruption (beyond the bullet diameter wound channel) from the synergistic effect of the temporary cavitation acting on tissue that has been weakened by bullet fragmentation. Instead of observing a hole consistent with the size of the bullet in hollow organs such as the intestines, we typically find a void left by missing tissue up to three inches in diameter.&quot; However, &quot;unless a extremity (peripheral hit) is sufficiently thick like a thigh, or the bullet does not strike bone, the round may pass through an arm for instance, causing little damage from a puncture type wound.&quot;

Regarding NATO's 62-grain FMC M-855 (SS109) .223 caliber round Dr. Fackler observed that the bullet produces a wound profile similar to the M-193's, particularly where abdominal or thigh wounds were involved. Other sources indicate this bullet, with a [steel] core penetrator, exhibits 10% greater fragmentation and retains its ability to fragment at slightly longer ranges than the 55-grain military bullet. *[Keep in mind that the M-855 round, because of its steel core, has a length comparable to a 73-grain lead core bullet, and should be shot out of longer barrels (18+ inches) with tighter twists in order to retain good practical accuracy]*                          ,

Hollow and soft point bullets in this caliber can be expected to upset and fragment much sooner and more consistently that full metal case (FMC) bullets. In light of this more consistent performance, Fackler recommends hollow points over &quot;ball&quot; ammunition for police use, providing the HP bullet penetrates deep enough to disrupt something vital. However, in his candid opinion the most effective round currently available for law enforcement operations is the 64-grain, Winchester-Western, pointed soft point, currently referred to as &quot;Power Point&quot;. This bullet has a heavier jacket than those tested by the FBI, resists hyper-fragmentation, penetrates well and &quot;expands like a .30 caliber rifle round.&quot; Subsequent FBI tests of this round fired from Colt's 14.5-inch barreled Mk-IV carbine bore this out and bullet expansion was &quot;impressive.&quot;

Dr. Fackler also advised that the synergistic effects of fragmentation and high velocity temporary cavitation cannot be scientifically measured in gelatin because that medium is too elastic. More Accurate results can be obtained by examination of fresh animal tissue soon after it is shot.

**Range Limitations**
Federal's Blitz round, because of its very high velocity, low weight and frangible construction, demonstrated extremely poor overall penetration in the FBI tests. If it is considered for CQB use, it should be fired from ultra-short barreled weapons, such as Heckler & Koch's, 8.85-inch barreled HK-53. Shorter barrels would bleed off excessive velocity to reliably fragment and produce good temporary stretch cavities at close range. Because of this velocity loss, the maximum effective range on personnel would most likely be 100 yards or less. To ensure that

About .223 Penetration

.223 caliber bullets perform as previously described by Dr. Fackler, it appears that a minimum target striking velocity of 2,500 feet per second (fps) is required. Bullets over 50 grains in weight may not accelerate to this critical velocity in barrels less than 10 to 11 inches in length. Tactical teams should therefore carefully select the appropriate barrel length for their CQB weapon, to ensure that the round they employ will deliver minimum terminal ballistic velocities at the ranges desired and balance it against maneuverability requirements *[Also remember that dr. Fackler's data is based on the FMJ ball ammo results and that hollow point ammunition will be as effective with lower velocities]*

&quot;Bull pup&quot; configured carbines, such as the Steyr AUG, enjoy a distinct advantage here, because they retain long barrel lengths with relatively compact overall dimensions and are as flexible as an SMG in confined areas. In fact, a Steyr AUG compares favorably to H&K's MP5-SD SMG in overall length and with a 16-inch barrel, is only an inch longer overall than a 14-inch barreled Remington 870 raid shotgun.

*[At this point, Mr. Taubert's article goes into extreme range shooting and barrel length. His suggestion is to have a barrel at least 14-18 inches long for CQB use as this allows for useful terminal ballistics at around 150-200 yards with 60+ grain bullets. I disagree with Mr. Taubert's point of view for the simple fact that we are discussing Close Quarters firearms, and not long range sniping firearms. In these instances, a barrel length of 6-10 inches is practical for entry team use as it allows for greater maneuverability and acceptable ballistic performance with 55-grain hollow point ammunition. Also, a lot of Mr. Taubert's information is based off of Dr. Fackler's research using FMJ ammunition. Most of my information is based upon real-world shootings and actual testing of commercial ammunition in short barreled firearms designed for this application.]*

A recent review of major U.S. ammunition manufacturers' pricing indicates that commercially loaded .223 ammunition is slightly less expensive than similarly configured premium hollow point pistol ammunition. With millions of rounds of surplus military .223 ammunition possibly available to law enforcement, because of numerous base closures and through low cost channels, training with this caliber could be highly cost effective.

The .223 carbine is able to satisfy both close and intermediate range requirements and presents a good argument for eliminating the necessity for the law enforcement SMG. This one-gun concept will not only stretch departmental funds in this respect and reduce training requirements, but in some cases the difference in price between a single-fire carbine and a select-fire SMG often amounts to several hundreds of dollars. The need for full automatic fire with the M-16 carbine is debatable and two single-fire versions can often be purchased by police agencies for the cost of one top-of-the-line SMG. *[This is a fact that I have been preaching for a long time. Another fact that Mr. Taubert does not touch on is that the M-16/AR-15 family of rifles use a split receiver system that allows the rapid exchange of differently configured uppers. This allows one officer to carry a 16&quot; CAR-15 in is patrol vehicle as his secondary firearm, and a 6&quot; upper receiver unit in his trunk for tactical entry use]*

As a result of contemporary research, such as that conducted by the first FBI's Wound Ballistic Workshop, some law enforcement agencies have expressed the opinion that concerns about

JA2088

pistol bullet over penetration were exaggerated. They cite the toughness and flexibility of the human skin in resisting bullet exit and the fact that police officers historically missed their intended targets most of the time in actual shootings. While poor hit ratios and over penetration may not be critical to some for individual gun battles that occur in the street, these marksmanship realities can become real planning and safety concerns when establishing fields of fire during raids, hostage rescues and other tactical operations.

Typically, these operations involve confined areas, where officers occupy positions in close proximity to each other. In close combat operations, every round expended must be accounted for. It is imperative that that rounds fired hit their intended targets and not pass through them to endanger other officers and innocent bystanders. If misses occur, it is desirable that once the stray round strikes a solid object, it expends its energy and disintegrates into relatively harmless pieces. If deep, barrier penetration is necessary, special ammunition or projectiles *[or weapons]* possessing this attribute can be selected.

### Shootout Results

It was late in the morning on a hot July day in 1993, when members of a major Western cities' police tactical unit executed a search and arrest warrants in connection with a narcotics raid on a &quot;biker residence.&quot; The tactical officers were armed with Sig-Sauer 9mm P-226 pistols and 16-inch barreled Steyr AUG .223 caliber carbines with optical sights. The Steyr, loaded per SOP, with 28 Federal 55-grain HP rounds was the primary entry weapon for several officers on the team. Steyr carbines were selected for this raid, because the team leaders anticipated shots &quot;out to 25 yards.&quot;

The team was required to knock and announce, effectively negating the element of surprise. Approximately 92 seconds into the raid, the officer involved in the following shooting incident was in the process of cuffing a subject when two Rottweiler dogs attacked. While the other officers were dealing with the dogs by employing OC aerosol, a 6-foot-tall, 201-pound subject, high on &quot;speed&quot;, suddenly burst into the room occupied by the police through a locked door and leveled a 9mm pistol at one of the tactical officers. The distance between the adversaries was approximately 20 feet. With his back essentially to the subject, the involved officer acquired the threat in his peripheral vision, whirled around and commanded, &quot;Police, put your hands up,&quot; while clearing the Steyr's safety and mounting the weapon. The subject then shifted his pistol, held by one hand in a bladed stance, towards the reacting officer. In &quot;less than a second&quot; the subject's hostile action was countered by the officer by firing two fast, sighted, tightly controlled pairs, for a total of four rounds at the subject. Rounds one and two missed, but were contained by the structure. Round three connected, penetrated and remained in the subject. Round four grazed his upper chest and exited as he spun and fell. Round three was quickly effective. The collapsing subject ceased all motor movement and expired within 60 seconds. The involved officer was aware of each round fired and simultaneously moved to cover. Tactical members were then confronted by a female accomplice armed with a double-barreled shotgun. However, the involved officer also successfully negotiated her surrender. All .223 rounds that missed the subject struck parts of the building's internal structure, fragmented and remained inside.

When the autopsy was performed, the forensic pathologist was amazed at the degree of

**About .223 Penetration**

internal devastation caused b the .223 round. There was a two-inch void of tissue in the chest, with a literal &quot;snowstorm&quot; of bullet fragments and secondary bone fragments throughout the upper left chest area. The round struck the subject 11 inches below the top of his head and inflicted the following wounds:

- Penetrated the top of the left lung, left carotid and subclavian arteries.
- The collar bone and first rib were broken. Cavity measured 5x6 centimeters.

What is significant about this &quot;instant one-shot stop&quot; was that the round did not strike the subject at the most effective or optimum angle and did not involve any direct contact with the heart or central nervous system. It is doubtful that this type o terminal ballistic performance could have been achieved by any of the police service pistol/SMG rounds currently in use.

Although this is only one incident and could be an aberration, police tactical teams require this type of terminal ballistic performance to enhance their safety and survival particularly during CQB engagements, when criminals most often enjoy a positional and action-versus-reaction time advantage.

The FBI study clearly demonstrates the following: (1) that .223 rounds on average, penetrate less than the hollow point pistol rounds evaluated, (2) concern for over penetration of the .223 round, at close range, has been greatly exaggerated, (3) with the exception of soft ballistic garment penetration, the .223 round appears to be relatively safer for employment in CQB events than the hollow point bullets tested.

Observations and experience indicate that high velocity rifle bullets generally produce more serious wounds in tissue than pistol bullets, regardless of range.

Violent temporary cavitation, in conjunction with bullet yaw and fragmentation, are essential wounding components for high velocity rifle projectiles.

As range and bullet stability increases and velocity decreases, rifle caliber wound severity decreases and penetration increases.

Where soft target penetration requirements exist and over penetration concerns are prevalent, police should employ hollow point bullets in this caliber.

Full metal case or heavier soft point bullets may be more appropriate for hard target penetration in this caliber.

The .223 and the current carbine systems available for it are highly versatile and well suited for urban as well as rural operations. However, because of enhanced terminal ballistic performance, rifles are recommended if targets are expected to be engaged beyond 200 meters. *[The .223 round itself should not be used in law enforcement applications at any ranges outside of 300 yards/meters. Long distance shots should be left to highly trained sniper units using medium caliber center fire rifle ammunition. e.g. .308/7.62 NATO. Also, the majority of*

**JA2090**

*police sniper shots occur within 100 yards/meters.]*

The ability to train with one shoulder weapon and caliber for both CQB and open air options simplifies logistics and training, makes training more effective and is cost effective. *[Again, one upper for general, secondary weapon usage, and one upper for CQB]*

Under current pricing, police agencies can realize significant savings by purchasing single-fire carbines instead of select-fire machine guns.

Because of the &quot;political&quot; considerations and perhaps the concern over the possibility of more serious injuries caused by errant &quot;friendly fire,&quot; the highly versatile and powerful .223 carbine may not be a suitable CQB firearm for some departments. However, if the above factors are not involved, the .223 carbine is an extremely flexible and effective anti-personnel weapon with, in many cases, handling characteristics actually superior to many contemporary SMGs. It offers the advantages of reduced logistics, lower costs and reduced training time when compared to agencies employing multiple specialty weapons. The caliber in its current offering is far from perfect, but in spite of some shortcomings, I anticipate that in the future it will eventually replace pistol caliber SMGs in many police departments and law enforcement agencies.

*It has been a recently growing trend to see law enforcement departments exchanging their issue shotguns for the police carbine in 9mm, .40 S&W, and .45 ACP. And many departments have found that these carbines do not serve their needs as they expected. However, they are fearful to switch, or in many cases purchase, .223 carbines because &quot;they will go through 10 people and 3 city blocks before they stop!&quot; As you can see, this is not the case, and is in fact, completely the opposite. I hope that this article helps to clear all false truths and misnomers about this very versatile and serviceable cartridge.*

ALL OF THE INFORMATION IN THIS ARTICLE IS BASED UPON THE PERSONAL EXPERIENCE OF INDIVIDUALS WHO MAY BE USING SPECIAL TOOLS, PRODUCTS, EQUIPMENT AND COMPONENTS UNDER PARTICULAR CONDITIONS AND CIRCUMSTANCES, SOME OR ALL OF WHICH MAY NOT BE REPORTED, NOR OTHERWISE VERIFIED IN THIS ARTICLE. NOTHING HEREIN IS INTENDED TO CONSTITUTE A MANUAL FOR THE USE OF ANY PRODUCT OR THE CARRYING OUT OF ANY PROCEDURE OR PROCESS. THE WRITERS, EDITORS, AND PUBLISHERS OF THIS ARTICLE ACCEPT NO RESPONSIBILITY FOR ANY LIABILITY, INJURIES OR DAMAGES ARISING OUT OF ANY PERSON'S ATTEMPT TO RELY UPON ANY INFORMATION CONTAINED HEREIN.

**JA2091**

# EXHIBIT "10"

## .223 / 5.56 Penetration Tests vs.

## .40 S&W and 12 ga. Slug

### Overview

The research on the penetration of .223 ammunition has been completed. In an effort to make research more meaningful, testing consisted of handgun and shotgun ammunition in the same testing medium. The final results were that the .223 demonstrated less penetration capability than the 12 gauge slug and the .40S&W [handgun round].

### Testing Medium

Type 250A Ordnance Gelatin was cast into blocks, 6"x6"x16";. The process used is that which is recommended by Col. M. Fackler, Director of the US Army Wound Ballistics Laboratory. This is a 10% mixture, 1Kg of gelatin to 9000ml of H2O. This type of gelatin accurately simulates human body tissue in terms of bullet penetration.

A small piece of wall was constructed to duplicate the standard exterior walls found in [the Pacific Northwest] area. This piece of wall was sheeted with ½" wafer board, covered with a 2nd piece of ½" wafer board to simulate siding. This wall was built using a 2x4 frame and finished on the inside with ½" sheet rock. The interior [of the wall] was lined with fiberglass insulation.

### Weapons Used

CAR-15, cal .223 Rem./5.56x45mm with a 16" barrel.
Glock M22, cal .40S&W.
Remington 870, 12 ga.

### Ammunition Used

Federal .223 Remington, 55 grain HP.
Winchester .40S&W, 180 grain HP.
Federal 12 ga., 2 ¾", rifled slug.

**Real World .223 Testing**

**Procedure**

All rounds were fired from a distance of 12 feet. After each round was fired, its penetration was recorded and bullet performance noted. After a bullet was fired into the [bare] gelatin, another bullet of the same type was fired through the section of wall and into the gelatin. This was done in order to determine its penetration potential in the event a stray round were to hit the wall of a building.

**Results**

| Caliber | Testing medium | Penetration | Condition of bullet |
|---------|----------------|-------------|---------------------|
| .223 Rem. | gelatin only | 9.5&quot; | two pieces |
| .223 Rem. | wall & gelatin | 5.5&quot; * | fragmented |
| .40S&W | gelatin only | 13.5&quot; | mushroomed |
| .40S&W | wall & gelatin | 22&quot; * | no deformation |
| .40S&W | wall & gelatin | 22&quot; * | no deformation |
| .40S&W | wall & gelatin | 19.5&quot; * | slight deformation |
| 12 ga. | wall & gelatin | 27.5&quot; | mushroomed |

* these measurements do not include penetration of the 6&quot; wall.
CCI Gold Dot.

**Summary**

The 55 grain HP .223 has less penetration than any of the other ammunition tested. Based on the results of this testing, there appears to be no basis for concern regarding the over penetration of the .223 [HP] round. In fact, it seems even safer in this regard than .40 S&W handgun ammunition.

The hollow point cavity in the .40S&W round filled with material when shot through the wall. This caused [these bullets] to fail to expand when they entered the gelatin. As a result, they penetrated 8.5&quot; farther than when shot directly into the gelatin.

When the .223 [HP] was shot through he wall it began to fragment and as a result penetrated the gelatin only 5.5&quot;.

Because the .223 [HP] begins to break up on impact, it has less potential for damage or injury than the 12 ga. in the event of a ricochet. The .223 [HP] is obviously safer in an urban environment than the 12 ga. with slugs or buckshot.

**JA2094**

**Real World .223 Testing**

Additional testing conducted proved that the .223 would penetrate a car door or glass. The .223 rounds fired into windshields began to break up after entering the glass and did not retain much energy. In most cases these rounds split in two.

**The Call-Out Bag**

# by Gunsite Training Center Staff

**A Comparison of .223 Penetration vs. Handgun Calibers**

The .223 shoulder-fired weapon systems (e.g., AUG, CAR) have received some recent interest as indoor tactical weapons for special operations teams. increased power, longer effective distances, and greater tactical flexibility have been cited as positive factors of the .223 systems over 9me SMG-type weapon systems. Other authors (Fackler, et all) have postulated greater capability for tissue damage and incapacitation of the .223 rifle cartridge over the 9mm projectile fired from handguns or SMGs. Negative considerations for the indoor use of the .223 weapon systems focus on over-penetration of projectiles and possible subsequent liability.

Our effort was made to compare the penetration characteristics of various .223 bullets to various handgun bullets fired into test barriers representing indoor and outdoor building walls. We felt that the following test might mimic shots fired from inside a building, through the internal rooms, out the exterior wall, and into another similar building nearby. A comparison of wall penetration effects by a variety of handgun calibers versus the effects of .223 FMJ ball, .223 SP, and .223 HP, under these same conditions, was expected to substantiate other findings reported or provide new information to those interested in this area of ballistics.

Two interior test walls were constructed using a wood 2x4 frame with standard drywall board attached to both sides. Two exterior test walls were made using wooden frames with drywall board attached to one side and exterior grade T1-11 wooden siding attached on the other (exterior) side. R-19 fiberglass insulation batting (Dow Coming) was stapled inside the two exterior test walls. To maintain test medium consistency, no wooden cross beams, electrical

**JA2095**

**Real World .223 Testing**

fixtures, conduits, or electrical wiring were placed in any of the test walls.

The test walls were placed in the following sequence to mimic shots fired from. inside a building, through two internal rooms, out the building, and into another similarly constructed building:

**A.** Interior wall #1 was placed 8 feet from the shooting position.

**B.** Interior wall #2 was placed 8 feet beyond interior wall #1.

**C.** Exterior wall #1 was placed 8 feet beyond interior wall #2. (Exterior side facing away from the shooter.)

**D.** Exterior wall #2 was placed 15 feet beyond exterior wall #1. (Exterior side facing toward the shooter.)

All calibers tested were fired from a position 8 feet in front of interior wall #I, so the bullet trajectory would travel in sequence through each of the succeeding test walls. Each caliber tested was chronographed and all firing results were videotaped for archive files.

The following results were obtained:

1. All handgun calibers exited exterior wall #1. This means they exited the &quot;house&quot; after passing through two interior &quot;rooms,&quot; then entered another &quot;house&quot; to impact into the berm. The handgun caliber which demonstrated the least penetration was .22 LR Lightning.
2. The only calibers which did NOT exit the &quot;house&quot; were .223 (5.56) soft point and hollow point loaded bullets.
3. All projectiles demonstrated directional changes in their trajectory after passing through the first interior wall. The greatest directional changes (10 inches+ yaw) were shown by 9mm and .40 S&W projectiles.
4. Directional changes in bullet trajectory appeared to increase in magnitude with each test

**JA2096**

**Real World .223 Testing**

wall the projectile passed through.

The penetration characteristics of projectiles have long been believed to be primarily determined by a relationship of bullet mass, bullet shape, bullet velocity, and bullet construction. The penetration differences of .223 soft point and hollow point projectiles versus the effects from .223 full metal jacket may be due to differences in bullet construction. The differential effects on penetration due to bullet construction shown with the .223 are different and appear greater in magnitude than those encountered when handgun bullet construction is modified. Since .223 projectile velocities are threefold greater than those of handgun projectiles, the increased magnitude of bullet velocity might account for the differences in bullet trajectory and penetration distance. The deviated trajectory of hollow point handgun projectiles was also greater than the deviation found with full metal jacketed handgun bullets; again, possibly due to contact point deformation. The preceding study more than ever identifies the need for a personal emphasis of marksmanship and tactical fundamentals. The shooter is responsible for the bullets that go downrange. Practice, be aware, manage your trigger, and watch your front sight!

*Many thanks to Jack Furr, Ron Benson, Pete Wright, and Seth Nadel, U.S. Customs, for conducting and reporting this test.*

| | | |
|---|---|---|
| .22 LR 40 gr Lightning | 899 fps | Captured in exterior wall #2 |
| 9mm 147gr Win JHP | 948 fps | Captured in exterior wall #2 |
| 9mm 147 gr Win JHP | 1004 fps | Exited exterior wall #2 |
| .40 S&W 180 gr FMJ | 941 fps | Exited exterior wall #2 |
| .40 S&W 180 gr Black Talon JHP | 880 fps | Exited exterior wall #2 |
| .45 ACP 230 gr Win FMJ Ball | 863 fps | Captured in exterior wall #2 |
| .45 ACP 230 gr HydraShok JHP | 854 fps | Exited exterior wall #2 |
| .223 (5.56) 55 gr Fed FMJ Ball | 2995 fps | Exited exterior wall #2 |
| .223 (5.56) 55 gr Rem SP | 3019 fps | Captured in exterior wall #2 |
| .223 (5.56) 55 gr Fed JHP | 3012 fps | Captured in exterior wall #2 |

ALL OF THE INFORMATION IN THIS ARTICLE IS BASED UPON THE PERSONAL EXPERIENCE OF INDIVIDUALS WHO MAY BE USING SPECIAL TOOLS, PRODUCTS, EQUIPMENT AND COMPONENTS UNDER PARTICULAR CONDITIONS AND CIRCUMSTANCES, SOME OR ALL OF WHICH MAY NOT BE REPORTED, NOR OTHERWISE VERIFIED IN THIS ARTICLE. NOTHING HEREIN IS INTENDED TO CONSTITUTE A MANUAL FOR THE USE OF ANY PRODUCT OR THE CARRYING OUT OF ANY PROCEDURE OR PROCESS.

**JA2097**

Real World .223 Testing

THE WRITERS, EDITORS, AND PUBLISHERS OF THIS ARTICLE ACCEPT NO
RESPONSIBILITY FOR ANY LIABILITY, INJURIES OR DAMAGES ARISING
OUT OF ANY PERSON'S ATTEMPT TO RELY UPON ANY INFORMATION
CONTAINED HEREIN.

**JA2098**

# EXHIBIT "11"

Case 1:18-cv-10507-RMB-JBD    Document 184-3    Filed 11/03/23    Page 224 of 277
PageID: 5224
11/18/2019          Why "High Powered" 5.56 NATO/.223 AR-15 Ammo is Safer For Home Defense (FBI overpenetration testing) - Prepared Gun Owners

# Why "High Powered" 5.56 NATO/.223 AR-15 Ammo is Safer For Home Defense (FBI overpenetration testing)

By **Caleb** - Jul 14, 2016



6
Shares



If you listen to the mainstream media, then the standard 5.56 NATO/.223 Remington cartridges the AR-15 shoots are "high powered assault weapon" rounds that have no place in civilian hands.

(I hope you are catching the sarcasm as I'm pouring it on)

Yet, as we've discussed previously, the AR-15 is a GREAT choice for Home Defense.

And what's even more amazing, is that it may be one of the "safest" bullets you can shoot from a gun in a home when it comes to overpenetration concerns.

## Home Defense and The Risks of Over-Penetration

The truth is that almost everyone, once they start thinking about home defense, starts to think about overpenetration.

In other words: what if I miss the bad guy? Where will the bullet go? Is it going to go through a wall and hit other members of my family?

That's what they call "over penetration".

The truth is: almost any round that will penetrate deeply enough to hit vital organs in the human body (and stop an attacker) will penetrate typical interior home walls.

That's because most walls are made up of little more than a couple 2×4 wood studs and drywall on each side. And maybe some insulation depending on the part of the country.

Although this fact remains, that ANY adequate self-defense round will penetrate a wall because you need it to penetrate human flesh, we still want to limit our penetration as much as possible.

## Shotgun VS Pistol VS Rifle Home Defense Penetration

Your typical choices for home defense weapons are a pistol, the shotgun, or a rifle.

Now, when most people think of overpenetration risks they assume that pistol bullets would penetrate less than the rifle or shotgun.

That's actually dead wrong.

**JA2100**

Case 1:18-cv-10507-RMB-JBD    Document 184-3    Filed 11/03/23    Page 225 of 277
PageID: 5225

11/18/2019          Why "High Powered" 5.56 NATO/.223 AR-15 Ammo is Safer for Home Defense (FBI overpenetration testing) - Prepared Gun Owners

Pistol bullets consistently penetrate the most.

Shotgun is next.

And rifles, at least the so-called "high powered assault weapon" AR-15 in 5.56 NATO/.223 Rem penetrates the LEAST.

## FBI and Independent Testing Has Consistently Shown .223/5.56 NATO Fired From AR-15's Do Not Over Penetrate More Than Pistol/Shotgun

First up is this older article by R.K. Taubert, a retired FBI agent with over 20 years experience who conducted extensive counter-terrorism and weapons research while with the Bureau.

To quote Mr Taubert, (emphasis mine) " ... *As a result of renewed law enforcement interest in the .223 round and in the newer weapons systems developed around it, the FBI recently subjected several various .223 caliber projectiles to 13 different ballistic tests and compared their performance to that of SMG-fired hollow point pistol bullets in 9mm, 10mm, and .40 S&W calibers.*

*"Bottom Line:* **In every test, with the exception of soft body armor, which none of the SMG fired rounds defeated, the .223 penetrated less on average than any of the pistol bullets.***"*

—–-

And again on this page, there is testing by Gunsite Training Center Staff which found in a comparison of handgun calibers (9mm, .40 S&W, .22 LR, .45 ACP), and rifle caliber .223 (5.56) that:

*"The only calibers which did NOT exit the "house" were .223 (5.56) soft point and hollow point loaded bullets."*

—–-

Then there are the "Box O' Truth" tests with great pictures where they found, "... *Common pistol rounds easily penetrated all 4 walls spaced out at room distances ... The 12 gauge shotgun went through 4 walls like they were not there ... The 5.56 rounds deviated greatly from the original flight path once they started tumbling. This occurred after the second wall."*

—–-

And this drywall testing concluded, "*Moving away from rifle rounds takes us from fascinating discoveries into the realm of mythbusting. Handgun rounds, for instance, may penetrate less than rifle rounds–but only if the rifle rounds in question are full-power ball ammo.* **The relatively slow speed and heavy weight of handgun bullets make them a poor choice for limiting interior wall penetration, which is why professional door-kicker types have abandoned pistol-caliber submachineguns in favor of .223 carbines.***"*

—–-

And this interesting test at outdoorub found "*The pistol rounds were seemingly unaffected by the drywall and/or wood barriers. There was no observable deviation or fragmentation of the 9mm projectiles. You'd be safe counting on a pistol round to keep going, and going, and going ... Even though the .223 rounds start with a lot more energy, they tend to lose it quickly when encountering the barriers in this test ... Moral of the story?* **Don't trust the mainstream media. Those high-powered, so called "assault weapons" may be safer than your average pistol for inside-the-home defense.***"*

(NOTE: many of the rounds tested at outdoohub are found on the "approved list" of AR-15 self-defense ammo here.)

## When It Comes To Home Defense, The AR-15 Rifle Ammo Is Less Likely To Over-Penetrate

The truth is that AR-15 ammo is less likely to overpenetrate. Yet it is highly effective at stopping threats. Sounds like a good choice for Home Defense to me.

Please Note: that all this "rifle vs shotgun vs pistol" testing is comparing the AR-15 in standard 5.56/.223 to the pistols and shotguns ...

That means that "other rifles" such as AK-47's in 7.62×39, .308 hunting rifles or AR-10 style semi-autos, etc are not included in these tests. THOSE rifle bullets would most likely penetrate much, much further because they are bigger, heavier bullets (though I'm not aware of much actual testing).

**JA2101**

**The bottom line to remember in all of this though is to still be aware of your target and what is around/beyond it because ALL bullets that will penetrate deep enough to stop an attacker will still penetrate at least one interior wall. And even a bullet, like the .223 that tends to lose steam and deviate after a wall or two can still be deadly to your family/innocents.**

Check out these other articles for more on excellent performing 5.56 NATO/.223 ammo:

– The "Approved List" Of 5.56 NATO/.223 Rem Self-Defense/Duty Ammo

– The Best Home Defense Ammo For Your AR-15?

Anyways, I hope this clears up some misconceptions when it comes to choosing home defense ammo (or a gun) that will be least likely to penetrate.

### Caleb

Caleb Lee is the #1 best-selling author of "Concealed Carry 101" and founder of PreparedGunOwners.com. He is a civilian (no law enforcement or military experience) who shares information about self-defense and becoming more self-reliant. He's a 1st degree black belt in Taekwondo, NRA Certified Basic Pistol & Personal Protection Inside The Home Instructor, Concealed Carry Academy Instructor certified & also a graduate of the Rangermaster firearms instructor course. He's also the author of numerous online courses including the UndergroundAssaultRifle.com course.

# EXHIBIT "12"



BOLT   GAS KEY   BOLT CARRIER

GAS BLOCK   GAS PORT   GAS TUBE   BUFFER   ACTION SPRING

RECOILWEB.COM

**JA2104**

# EXHIBIT "13"



MidwayUSA.com
1-800-243-3220
5875 West Van Horn Tavern Rd.
Columbia, MO 65203

# AR-STONER Flash Hider A2 1/2"-28 Thread AR-15

★★★★☆ 29 Reviews | Write a Review

Product #: 691158     Manufacturer #: A2-FLASH-556





Our Price: $7.99
**Available**

Ships tomorrow from MidwayUSA

Made in USA

Quantity: 1

✉ Email to Friend   [f] [t] [p]

SUGGESTED PRODUCTS



**AR-STONER Crush Washer AR-15...**

★★★★★ 2 Reviews

$2.49

Add to Cart



**AR-STONER Flash Hider A2 5/8"-24...**

★★★★☆ 17 Reviews

$9.99

Add to Cart

**Wilson Combat A2 Birdcage Flash...**

★★★★☆ 18 Review

$8.95

Add to Cart

›

Product Overview

The AR-STONER™ A2 Flash Hider with 1/2" - 28
threads is an effective option for reducing muzzle
flash from AR-15 rifle barrels. This high quality, matte
steel, flash hider is ready for installation on your AR-
15 rifle.

**Note:** The use of a crush washer is recommended



JA2105

# EXHIBIT "14"

# SECURITY

## Violent Crimes Most Likely to Occur At Night



*June 14, 2019*

When are criminals active during the day? The Crimes at Night: Analyzing Police Incident Reports in Major Cities reveals that violent crimes occur most often at night.

In 2017, an estimated 1,247,321 violent crimes occurred nationwide, a decrease of 0.2 percent from the 2016 estimate, according to FBI data.

**More than half of police incidents took place during the day:**

This website requires certain cookies to work and uses other cookies to help you have the best experience. By visiting this website, certain cookies have already been set, which you may delete and block. By closing this message or continuing to use our site, you agree to the use of cookies. Visit our updated privacy and cookie policy to learn more.

Particularly, theft, drug violations, simple assaults, and property crimes were slightly more likely to happen while the sun was up and people were at work, home, or driving while impaired,

murder, rape/sexual assault, and robbery were more frequently reported at night.

### Percentage of Police Incident Reports, by Offense Type

| Offense | At Night Percentage | During the Day Percentage |
|---|---|---|
| DWI/DUI | 87% | 13% |
| Murder & Negligent Manslaughter | 65% | 35% |
| Rape/Sexual Assault | 59% | 41% |
| Robbery | 56% | 44% |
| Aggravated Assault | 54% | 46% |
| Motor Vehicle Theft | 51% | 49% |
| Burglary | 50% | 50% |
| Property Crime | 48% | 52% |
| Simple Assault | 47% | 53% |
| Drug Violation | 43% | 57% |
| Larceny/Theft | 40% | 60% |

**Police incidents tend to happen between Monday and Friday.**

- Friday experienced the highest peak in known crime reports during the day, with an average of 755 police incidents per 10,000 residents. Alternatively, Sunday had the fewest incidents during the day – an average of 595 per every 10,000 individuals.
- When are violent crimes most likely to happen? Unfortunately, midnight was the peak hour for violent crimes like rape and sexual assault, while 2 a.m. was the ideal time to stay off the roads – DWI/DUI police incidents happened the most then.
- Murder peaked at 9 p.m. and aggravated assault peaked just an hour after.

KEYWORDS: crime rates  robbery  violent crimes

# Share This Story

**This website requires certain cookies to work and uses other cookies to help you have the best experience. By visiting this website, certain cookies have already been set, which you may delete and block. By closing this message or continuing to use our site, you agree to the use of cookies. Visit our updated privacy and cookie policy to learn more.**

# Related Articles

# EXHIBIT "15A"

AR15 shot without flash hider.









**JA2113**

# EXHIBIT "15B"



## EMANUEL KAPELSOHN - Recent Deposition and Trial Testimony

1. Commonwealth of Pennsylvania v. Jeremy Hamborsky, Court of Common Pleas, Fayette County (2014).  Trial Testimony (2014).

2. Estate of Shafer v. City of Elgin, Eric Kilpatrick, et al., U.S.D.C., District of Oregon, Pendleton Division, Case No. 2:12-cv-00407-SU.  Trial testimony (2014).

3. Schuoler v. Dupnik, et al., Superior Court, State of Arizona, Pima County, No. C-20140079 Deposition (2014).

4. Leapers, Inc. v. SMTS, LLC, d/b/a TUFF ZONE, et al., U.S. District Court, Eastern District of Michigan, Southern Division, Civ. No. 2:14:cv-12290-RHC-DRG.  Deposition testimony (2015).

5. Leone v. Towanda Borough;, et al., U.S. District Court, Middle District of Pennsylvania, Case No. 3:2-AT-06000.  Trial testimony (2015).

6. Adams v. Sheriff Ric L. Bradshaw, Palm Beach County Sheriff's Office, U.S. District Court, Southern District of Florida, Case No. 9:14-CV-80403.  Deposition (2015).

7. Antoquan Watson Shooting case, Atlantic County MCU Case No. MCU 14-019.  Testimony before Atlantic County Grand Jury (2015).

8. Pickett v. City of Chicago, et al., U.S. District Court, Northern District of Illinois, Eastern Division, No. 12C-4118. Deposition (2015).

9. Shaun Brown Shooting. Testimony before Atlantic County Grand Jury (Sept. 29, 2015).

10. Chavez v. Glock, Inc., et al., Superior Court, State of California, County of Los Angeles, Central Division, Case No. BC394135.  Deposition  (2015).

11. McDonald v. Dupnik, Pima County, et al., Superior Court of State of Arizona, County of Pima, Case No. C20142895.  Deposition (2015).

12. Schuoler v. Nanos, et al., Superior Court of State of Arizona, County of Pima, Case No. C20140079.  Trial testimony (2015).

13. Commonwealth of Pennsylvania v. Michael Miller, Centre County Court of Common Pleas, Bellefont, PA.  Trial testimony (2015).

14. Tremaine Dantzler Shooting.  Testimony before Atlantic County Grand Jury (December 10, 2015).

335055-1

15. Roxette Ojeda v. City of Fort Pierce, et al., Circuit Court, 19th Judicial District, in and for St. Lucie County, FL, Case No: 56:2014-CA-001732 (NS). Deposition (2016).

16. Commonwealth v. John Elliott Torres, York County Court of Common Pleas, No. CP-67-CR-3515-2014. Trial testimony (2016).

17. Commonwealth of Pennsylvania v. Baur, Court of Common Pleas, Philadelphia County, PA, No. CR-10543-2014. Trial testimony (2016).

18. Little v. Academy, Ltd, Bushnell, et al., 334th Judicial District, Harris County, TX, Cause No. 2014-52373. Deposition (2016).

19. Russell Hicks v. Camden County Correctional Facility, New Jersey Office of Administrative Law, OAL Docket No. CSR 13494-2012-S. Hearing testimony (2016).

20. State of Maryland v. James Cooper, Circuit Court, Carroll County, No. 06K15046865. Trial testimony, 2016.

21. State of New Jersey v. Stephen Schweizer, Superior Court, Cape May County, Indictment #15-04-00334-I. Trial testimony (2016).

22. State of Maryland v. Wesley Cagle, Circuit Court, Baltimore City, Case No. 115246012. Trial testimony (2016).

23. Chatman v. City of Chicago, U.S. District Court, Northern District of Illinois, Eastern Division, Case No. 13 CV 5697. Trial testimony (2016).

24. State of Iowa v. Steve W. Fordyce II, District Court, Black Hawk County, Crim. No. FECR208081. Trial testimony (2016).

25. State of Louisiana v. Jody Ledoux, Fourth Judicial District, Parish of Oachita, No. 15-F-000153. Trial testimony (2016).

26. Jones v. Allen, U.S. District Court, District of Maryland, C.A. No. 8:15-cv-01173-GJH. Trial testimony (2016).

27. S.R. Nehad, et al. v. Shelley Zimmerman and City of San Diego, et al., U.S. District Court, Southern District of California, Case No. 15-cv-1386-WQH-NLS. Deposition (2017)

28. Green v. City of Chicago, Circuit Court of Cook County, IL, No. 2013 L 014041. Deposition and trial testimony (2017).

29. Schueller v. Cordrey, et al., Superior Court of the State of Delaware, Case. No.: N14C-10-201 EMD. Trial testimony (February 23, 2017).

335055-1

30. Pratt v. City of Camden, et al., U.S. District Court, District of New Jersey, Docket No.
1:13-cv-06830-JBS-AMD. Deposition (2017).

31. State of Minnesota v. Yanez, Ramsey County District Court, No. 62-CR-16-8110. Trial
testimony (2017).

32. Williamson v. Chicago Police Officer Wilfredo Ortiz, et al., U.S. District Court, Northern
District of Illinois, Eastern Division, No. 14 CV 6397. Deposition (2017)

33. State of New Jersey v. Sergio DeRosa, Superior Court, Atlantic County, NJ. Trial testimony
(2017)

34. Estate of Angel Lopez v. City of San Diego, U.S. District Court, Southern District of
California, Case No. 13cv2240 GPC (MDD). Trial testimony (2017)

35. State of Ohio v. Robert Burry, Lake County Court of Common Pleas. Trial testimony (2017)

36. State of Arizona v. Philip Mitchell Brailsford, Maricopa County Superior Court, No.
CR2016-004743-001 DT (2017). Trial testimony (2017)

37. Wallace v. City of Alexander, et al., U.S. District Court, Eastern District of Arkansas, No.
4:13-CV-00748-BRW (2017). Trial testimony (2017).

38. State of Wisconsin v. Devon Kraemer. Circuit Court, Milwaukee County, Criminal
Division. Case number 2016-CF-005003. Trial testimony (2018).

39. Mason v. City of Lafayette, et al., U.S. District Court, Western District of Louisiana. Civil
Action No. 6:12-CV-02939. Trial testimony (2018)

40. State of Minnesota v. Carl Patrick Anderson, Chisago County District Court, Tenth Judicial
District, File No. 13-CR-17-159. Trial testimony (2018)

41. Velazquez v. City of Camden, et al. Superior Court, Camden County, New Jersey. Docket
No. CAM-L-1350-10. Trial testimony (re-trial after appeal, 2018).

42. LeGrier v. City of Chicago, et al., Circuit Court, Cook County, Illinois, No. 15 L 12964.
Trial testimony (2018).

43. Washington, D.C. Metropolitan Police Trial Board Hearing in Shooting of Terrence Sterling
by Police Officer Brian Trainer. Hearing testimony (2018).

44. Michael Rogers v. Trooper Matthew Morgan and State of Delaware, Delaware Superior
Court, C.A. No. N15C-07-259 WCC. Trial testimony (2018).

335055-1

45. Commonwealth of Pennsylvania v. Razawn Moore, Court of Common Pleas, Dauphin County, No. 2228CR2016. Trial testimony (2018).

46. Commonwealth of Pennsylvania v. Stephen Spencer, Court of Common Pleas, Luzerne County, Criminal Division, No. 2491 of 2017. Trial testimony (2018).

47. Cockerham v. City of Chicago, et al., Circuit Court of Cook County, IL, Case No. 16 L 1682. Deposition and trial testimony (December 2018).

48. Siler v. City of Kenosha, et al., U.S. District Court, Eastern District of Wisconsin, Case #17-CV-1324. Deposition (December 2018).

49. Garrit v. City of Chicago, et al., U.S. District Court, Northern District of Illinois, Eastern Division, Case. No. 16-C-7319. Deposition (2019).

50. Commonwealth v. Barbara Rogers, Court of Common Pleas, Monroe County, PA. Docket No. 2045 CR 2017. Trial testimony (March 2019).

51. Stephens v. Ric Bradshaw, Sheriff, Palm Beach County Sheriff's Office, et al., Claims Bill Hearing before Special Masters of the Florida Legislature. Hearing testimony (March 2019).

52. Golatte v. City of Chicago, U.S District Court, Northern District of Illinois, Eastern Division, No. 17 CV 929. Deposition (2019).

53. State of Minnesota v. Mohamed Noor, Hennepin County District Court, Minneapolis, MN, MNCIS No. 27-CR-18-6859. Trial testimony (2019).

54. In the Matter of Charges Filed Against Police Officer Robert Rialmo, Case No. 18 PB 2950 Before the Police Board of the City of Chicago. Hearing testimony (2019).

55. Etheredge v. City of Chicago, et al., Circuit Court, Cook County, Illinois, County Department, Law Division, No. 17 L 2841. Deposition (2019).

56. Commonwealth of Pennsylvania v. Idean Fulton, Court of Common Pleas, Philadelphia County, PA, Docket No. CP-51-CR-0012441-2010. Trial testimony (2019).

57. State of New Hampshire v. Joseph Brown, Superior Court, Grafton County, Docket No. 215-2019-CR-204. Deposition (2020).

58. Commonwealth of Pennsylvania v. Jonathan Robert Roselle, Court of Common Pleas, Lehigh County, PA, Criminal Division, Case No. CR-4106-2018. Trial testimony (2020).

59. Testimony by invitation before the Pennsylvania General Assembly, House Judiciary Committee, hearing on Police Use of Force and Department Accreditation. Sept. 15, 2020.

335055-1

60. Miller v. Becerra, U.S. District Court, Southern District of California, Case No. 3:19-cv-01537-BEN-JLB. Live and videoconference hearing and trial testimony (2020, 2021).

61. Haywire Outfit v. City of Yakima, et al., Superior Court, State of Washington, Yakima County, Case No. 19-2-01964-39 (deposition, 2020).

62. State of New Hampshire v. Joseph Brown, Superior Court, Grafton County, Docket No. 215-2019-CR-204.  Hearing (2021).

63. Sperling v. Clark Rifles, Superior Court, State of Washington, Clark County, No. 16 2 024312,  Deposition (2021).

64. Taylor v. Barsony Holsters & Belts, Inc., U.S. District Court, District of Nebraska, No. 8:18-cv-00210.  Deposition (2021).

65. Estate of Sean O'Brien v. City of Livingston, et al., U.S. District Court, District of Montana, Billings Division, No. CV-18-106-BLG-SPW-TJC.  Trial Testimony (2021).

66. Estate of Sean O'Brien v. City of Livingston, et al., U.S. District Court, District of Montana, Billings Division, No. CV-18-106-BLG-SPW-TJC.  Trial Testimony (2021; re-trial after mistrial).

67. State of Mississippi v. Eaton, Circuit Court of Tippah County, Cause No. 2019-068, 2019-133.  Trial Testimony (2021).

68. Commonwealth of Kentucky v. Cundiff, Muhlenberg Circuit Court, Case No. 20-CR-00066. Trial Testimony (2021).

69. In re. the Matter of the Welfare of Logan D. Keranen, District Court, Seventh Judicial District of Minnesota, Criminal Division, File No. 03-JV-20-1872.  Trial Testimony (2022).

70. Commonwealth of Pennsylvania v. Luis Daniel Ortiz, Court of Common Pleas, Northampton County, Criminal Division.  Trial Testimony ((2022)

71. State of West Virginia v. Thomas McCallister, Circuit Court, Cabell County (Huntington), WV.  Trial Testimony (2022).

72. Caravana v. On Q Protection and Investigation Services, et al., Circuit Court, Cook County, IL, County Dept., Law Division, No. 19 L 7900. Deposition (2022)

73. Commonwealth of Pennsylvania v. Christopher McKenzie, Court of Common Pleas, Greene County.  Trial Testimony (2023).

335055-1

74. State of New Jersey v. James Ray III, Essex County Superior Court, Indictment 19-0200437, Trial Testimony (2023).

75. Roman v. City of Chicago, et al., U.S. District Court, Northern District of Illinois, Eastern Div., Case No.: 20 CV 01717, Deposition (2023).

76. Coxie v. Academy Ltd. d/b/a Academy Sports and Outdoors, Court of Common Pleas, Seventh Judicial Circuit, State of South Carolina, County of Spartanburg, Civil Action No. 2018-CP-42-04297.  Deposition (2023).

335055-1

**Fee Schedule – The Peregrine Corporation – ANJRPC Cases:**

The Peregrine Corporation will charge as follows for work in the above-referenced cases:

| | |
|---|---|
| For case preparation time by Emanuel Kapelsohn: | $400 per hour |
| For in-transit travel time over 3 hours each way: | $275 per hour |
| For in-person attendance or participation by Emanuel Kapelsohn at depositions or trials: | $3,750 per 10-hour day or part |
| For video depositions taken within 20 miles of Allentown, PA: | Charged hourly, at $400/hr. |
| Paraprofessional Assistant's time: | $85 per hour |

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program SentinelOne Agent, version 22.2.4.558, has been run on the file and no virus was detected.

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy