# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

————————

ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC. ; et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

(*additional captions listed on inside cover*)

————————

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1-18-cv-10507, 1-22-cv-04397, 1:22-cv-04360

————————

## JOINT APPENDIX
## Vol. VIII of XIII (pgs. JA4167-JA4870)

————————

DANIEL M. VANNELLA
OFFICE OF ATTORNEY
  GENERAL OF NEW JERSEY
25 Market Street
Trenton, NJ 08625
(609) 376-2850
daniel.vannella@law.njoag.gov

*Counsel for Appellees-Cross-
Appellants State of New Jersey,* et al.

ERIN E. MURPHY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellants-Cross-Appellees
Blake Ellman, Thomas R. Rogers, Marc
Weinberg, and Association of New Jersey
Rifle & Pistol Clubs, Inc.*

BRADLEY LEHMAN
GELLERT SEITZ BUSENKELL & BROWN
1201 N. Orange Street
Wilmington, DE 19801
(302) 416-3344
blehman@gsbblaw.com

*Counsel for Appellants-Cross-Appellees Mark
Cheeseman, Timothy Connelly, and Firearms
Policy Coalition, Inc.*

(*additional counsel listed on inside cover*)

November 18, 2024

---

MARK CHEESEMAN, TIMOTHY CONNELLY, FIREARMS POLICY COALITION, INC.,

*Appellants-Cross-Appellees,*

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

---

BLAKE ELLMAN; THOMAS R. ROGERS; ASSOCIATION OF NEW JERSEY
RIFLE & PISTOL CLUBS, INC.,

*Appellants-Cross-Appellees,*

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

---

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

PAUL D. CLEMENT
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

[*] Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers,
Marc Weinberg, and Association of New Jersey Rifle & Pistol Clubs*

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
*Counsel for Appellants-Cross-Appellees Mark Cheeseman,
Timothy Connelly, and Firearms Policy Coalition, Inc.*

# TABLE OF CONTENTS

## Volume I

*ANJRPC* and *Ellman* Plaintiffs' Notice of Appeal, Nos. 18-cv-10507, 22-cv-4397 (Aug. 18, 2024), Dkt.234[1] ................................................................JA1

*Cheeseman* Plaintiffs' Notice of Appeal, No. 22-cv-04360 (July 30, 2024), *Cheeseman* Dkt.82 ......................................................................................JA3

State Defendants' Notice of Cross-Appeal, Nos. 18-cv-10507, 22-cv-4397, 22-cv-04360 (Aug. 5, 2024), *Cheeseman* Dkt.84 ......................JA7938

Order and Judgment (July 30, 2024), Dkt.229 ......................................................JA5

Memorandum Opinion (July 30, 2024), Dkt.228 ..................................................JA9

## Volume II

District Court Docket Sheet, No. 18-cv-10507 (D.N.J.) ....................................JA78

District Court Docket Sheet, No. 22-cv-04360 (D.N.J.) ..................................JA110

District Court Docket Sheet, No. 22-cv-04397 (D.N.J.) ..................................JA124

*ANJRPC* Amended Complaint (Oct. 28, 2022), Dkt.122 ................................JA134

*Cheeseman* Amended Complaint (July 14, 2022), No. 22-cv-04360 Dkt.4 ........................................................................................................................JA150

    Exhibit A - New Jersey Assault Firearms Guidelines, No. 22-cv-04360 Dkt.4-1 ........................................................................JA182

*Ellman* Complaint (July 1, 2022), No. 22-cv-04397 Dkt.1 ..............................JA186

*Cheeseman* Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174 ......................................................................................................................JA202

    Brief in Support of *Cheeseman* Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-1 ........................................................................JA205

---

[1] ECF numbers are to *ANJRPC* docket (No. 18-cv-10507) unless otherwise indicated.

Exhibit 1 – Declaration of Mark Cheeseman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-2 ....................................................................JA251

Exhibit 2 – Declaration of Timothy Connolly in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-3 ....................................................................JA254

Exhibit 3 – Declaration of Brandon Combs on Behalf of Firearms Policy Coalition, Inc. in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-4 ............................JA257

Exhibit 4 – Excerpts from Frank Miniter, *The Future of the Gun* (2014), Dkt.174-5 ...........................................................JA261

Exhibit 5 – Excerpts from Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (2022), Dkt.174-6 ....................................................................JA267

*Cheeseman* Statement of Undisputed Material Fact in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-7 ..............JA272

*ANJRPC* and *Ellman*'s Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175 .....................................................................JA303

Declaration of Blake Ellman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-1 .....................................JA306

Declaration of Marc Weinberg in Support of Motion for Summary Judgment (Oct. 6, 2024), Dkt.175-2 .....................................JA309

Declaration of Thomas Rogers in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-3 .....................................JA312

Declaration of Scott Bach in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-4......................................JA315

Declaration of Emanuel Kapelsohn in Support of Motion for Summary Judgment with Accompanying Exhibits (Oct. 6, 2023), Dkt.175-5 .......................................................JA319

Declaration of Ashley Hlebinsky in Support of Motion for Summary Judgment with Accompanying Exhibits (Oct. 6, 2023), Dkt.175-6.................................................................JA479

*ANJRPC* and *Ellman*'s Brief in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-7.......................................JA634

*ANJRPC* and *Ellman*'s Statement of Undisputed Material Facts (Oct. 6, 2023), Dkt.175-8 .......................................................JA682

## **Volume III**

State's Notice of Cross-Motion for Summary Judgment (Nov. 3, 2023), Dkt.183 .........................................................JA740

State's Combined Brief in Opposition to Motions for Summary Judgment and in Support of State's Cross-Motion for Summary Judgment (Nov. 3, 2023), Dkt.183-1 .......................................JA743

State's Counter-Statement of Material Facts Not in Dispute (Nov. 3, 2023), Dkt.183-2.................................................JA837

State's Response to *ANJRPC* and *Ellman*'s Statement of Undisputed Material Facts (Nov. 3, 2023), Dkt.183-3 ...........................JA881

State's Response to *Cheeseman*'s Statement of Undisputed Material Facts (Nov. 3, 2023), Dkt.183-4 .............................................JA943

Declaration of Daniel Vannella in Support of Cross-Motion for Summary Judgment, Motion to Exclude Testimony of Emanuel Kapelsohn & Clayton Cramer, and State's Opposition to Motion to Exclude Certain Expert Testimony (Nov. 3, 2023), Dkt.184............................JA969

Exhibits 1-5 (May 15, 2023), Dkt.184-1 ...............................JA982

## **Volume IV**

Exhibits 6-10 (May 15, 2023), Dkt.184-1 ...........................JA1412

Exhibit 11 – Declaration and Expert Report of James Yurgealitis with Accompanying Exhibits (June 7, 2023), Dkt.184-2.....................JA1813

Exhibits 12-13 (May 15, 2023), Dkt.184-3 .........................JA1877

### Volume V

Exhibits 14 (May 15, 2023), Dkt.184-3 ...............................................JA2123

Exhibit 15 – Supplemental Letter with Accompanying Exhibits
from Emanuel Kapelsohn to *ANJRPC* Plaintiffs (July 31, 2023),
Dkt.184-4 .............................................................................................JA2154

Exhibit 16 – Transcript of Emanuel Kapelsohn Deposition with
Exhibits Introduced During Deposition (Aug. 4, 2023),
Dkt.184-5 .............................................................................................JA2345

### Volume VI

Exhibit 16 (Continued) – Transcript of Emanuel Kapelsohn
Deposition with Exhibits Introduced During Deposition
(Aug. 4, 2023), Dkt.184-5 ....................................................................JA2849

Exhibits 17 (May 15, 2023), Dkt.184-6 ...............................................JA3382

### Volume VII

Exhibits 18-19 (May 15, 2023), Dkt.184-6 ..........................................JA3483

Exhibit 20 – Transcript of Clayton Cramer's Deposition with
Exhibits Introduced During Deposition (Aug. 21, 2023),
Dkt.184-7 .............................................................................................JA3901

### Volume VIII

Exhibit 20 (Continued) – Transcript of Clayton Cramer's
Deposition with Exhibits Introduced During Deposition (Aug.
21, 2023), Dkt.184-7............................................................................JA3901

Exhibits 21-44 (May 15, 2023), Dkt.184-8 ..........................................JA4466

Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.195............................JA4706

Cheeseman's Reply to State's Response to Statement of
Undisputed Material Fact in Support of *Cheeseman* Motion for
Summary Judgment (Dec. 15, 2023), Dkt.195-1 ..................................JA4766

## Volume XI

Cheeseman's Response to State's Counter-Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.195-2 .................JA4871

Declaration of Bradley Lehman in Support of Exhibits to
Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.196............................JA4961

    Exhibits 1-12 (Dec. 15, 2023), Dkt.196-1 ...........................................JA4980

    Exhibits 13-28 (Dec. 15, 2023), Dkt.196-2 ........................................JA5462

    Exhibits 29 (Dec. 15, 2023), Dkt.196-3 ..............................................JA5583

## Volume X

    Exhibits 30-43 (Dec. 15, 2023), Dkt.196-3 ........................................JA5609

    Exhibits 44-50 (Dec. 15, 2023), Dkt.196-4 ........................................JA5750

    Exhibits 51-60 (Dec. 15, 2023), Dkt.196-5 ........................................JA6242

## Volume XI

    Exhibits 61 (Dec. 15, 2023), Dkt.196-5 ..............................................JA6344

    Exhibits 62-72 (Dec. 15, 2023), Dkt.196-6 ........................................JA6348

    Exhibits 73-86 (Dec. 15, 2023), Dkt.196-7 ........................................JA6481

    Exhibits 87-99 (Dec. 15, 2023), Dkt.196-8 ........................................JA6629

    Exhibits 100-105 (Dec. 15, 2023), Dkt.196-9 ....................................JA6808

## Volume XII

    Exhibits 106-115 (Dec. 15, 2023), Dkt.196-9 ....................................JA7048

    Exhibits 116-124 (Dec. 15, 2023), Dkt.196-10 ..................................JA7341

*ANJRPC* and *Ellman*'s Reply Brief in Support of Motion for
Summary Judgement and in Opposition to State's Cross-Motion for
Summary Judgment (Dec. 15, 2023), Dkt.197 ..............................................JA7569

Reply Declaration and Rebuttal Expert Report of Emanuel
Kapelsohn (Dec. 15, 2023), Dkt.197-1................................................JA7608

*ANJRPC* and *Ellman*'s Response to State's Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.197-2 .................JA7641

## <u>Volume XII</u>

*ANJRPC* and *Ellman*'s Brief in Opposition to State's Motion to
Exclude Expert Testimony of Emanuel Kapelsohn & Clayton
Cramer and in Reply in Further Support of Daubert Motion
(Dec. 15, 2023), Dkt.197-3....................................................................JA7712

*ANJRPC* and *Ellman*'s Amended Response to State's Statement of
Material Facts Not in Dispute (Dec. 16, 2023), Dkt.198...............................JA7739

Declaration and Rebuttal Expert Report of Clayton Cramer
(Dec. 15, 2023), Dkt.200 ...............................................................................JA7817

# Rebuttal Expert Report of Clayton Cramer

## July 17, 2023

**Exhibit
0001**

## I.    Qualifications

My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller* (2008), *McDonald v. Chicago* (2010), *Jones v. Bonta* (9th Cir. 2022), *Young v. State* (9th Cir. 2021), *State v. Sieyes* (Wash. 2010), *Senna v. Florimont* (N.H. 2008), *Mosby v. Devine* (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

In several cases, my work has been cited in defense of laws limiting firearms ownership: *State v. Roundtree* (Wisc. 2021), *State v. Christen* (Wisc. 2021), *King v. Sessions* (E.D.Penn. 2018).

I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert reports and declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

My CV is attached hereto as Exhibit A.

## II.    Saul Cornell

This Rebuttal to Prof. Cornell reveals multiple errors that demonstrate a limited knowledge of the colonial period and legal history.

### A.    Carrying Over English Common Law

At p. 3, Cornell asserts "Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law

that had been in effect in the English colonies for generations." His footnote lists "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804)."

"9 STATUTES AT LARGE OF PENNSYLVANIA 29-30" carried over English law but with the important provision:

> all and every person and persons whosoever are hereby enjoined and required to yield obedience to the said laws as the case may require *until the said laws or acts of general assembly respectively, shall be repealed or altered* or until they expire by their own limitation and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted.[1] [emphasis added]

Certainly, the Pennsylvania Constitution of 1790, with its guarantee of a right to keep and bear arms,[2] qualifies as alteration of English common law concerning arms.

"FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792)." The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[3] North Carolina's 1776 Constitution guarantees "That the people have a right to bear arms, in defense of the State"[4] Again, this guarantee concerning the right to bear arms overrode English

---

[1] 9 STATUTES AT LARGE OF PENNSYLVANIA 30 (1903).
[2] Penn. Const., Art. IX, § 21 (1790).
[3] Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA iii (1792).
[4] North Carolina Const. Art. XVII (1776).

common law. Furthermore pp. 60-61 in Martin's collection is the Statute of Northampton disqualified for relevance by *Bruen*.[5]

When the North Carolina Supreme Court heard State v. Newsom (1844), one of the claims made by the black defendant was that the 17th article the Bill of Rights of North Carolina protected his right to carry a shotgun. The North Carolina Supreme Court in deciding in this case, did not question whether the right to keep and bear arms was individual in nature. Instead, they ruled that the defendant's color was the deciding principle, taking precedence over the text. Referring to the authors of the North Carolina Constitution: "They must have felt the absolute necessity of the existence of a power somewhere, to adopt such rules and regulations, as the safety of the community might, from time to time, require."[6]

*Commonwealth v. Leach*, 1 Mass. 59 (1804)": The decision did nothing to make English common law applicable in Massachusetts:

> Hooker, for the prosecution, conceded that justices of the peace were officers created by statute, and that their jurisdiction and powers were wholly dependent upon the statutes; 2 Hawk. P. C. c. 8, 13 , &c. But he contended that their jurisdiction here was not limited to those offences which are expressly, and by name in our own statutes, made cognizable by them; on the contrary, that it extended to all cases in which justices of the peace in *England* had jurisdiction by any of the statutes of that country which were passed previous to the emigration of our ancestors; which were to be considered as a part of our common law; that this was strongly implied in the act for establishing Courts of General Sessions of the Peace, passed July 3, 1782, (stat. 1782, c. 14 ,) by the first section of which" they are empowered to hear and determine all matters relative to the conservation of the peace, and the punishment of such offences as are cognizable* by them at common law, or by the acts and laws of the legislature, and to give judgment, &c.

> In this act, the term *common law* cannot mean the common law of *England*, because justices of the peace there are not common law officers; it must,

---

[5] *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111, 2139, 2140 (2022).
[6] *State v. Newsom*, 27 N.C. (5 Ired.) 250, 255 (1844).

therefore, mean our common law; and on this subject, our common law must be precisely what the *statute* law of *England* was at the time of the emigration of our ancestors from that country. The statutes which were previous to that time enacted in England, and which define or describe the authorities, powers, and jurisdiction of justices of the peace, give to them, expressly, cognizance of divers offences which were offences at common law; among which are trespasses.[7] [emphasis in original]

Clearly, only *some* parts of English law were common with Massachusetts law.  Where Massachusetts law had differed, English law was no longer valid.

A later digest of Massachusetts decisions includes "*Commonwealth v. Leach*, 1 Mass. 59 (1804)" in its list of "English Statutes Adopted Here."[8]  Only individual s*tatutes*, not necessarily all of common law applied in Massachusetts, or there would be no need to have a detailed list.

Cornell has attributed this carryover of English law as it was in 1776 to "[e]ach of the new states" from sources in three states, none of which fits his claim.  Cornell does not understand his sources.

The U.S. Supreme Court has also emphasized how little significance English common law has compared to a constitution: "Legislation is the exercise of sovereign authority. High and important powers are necessarily vested in the Legislative body; whose acts, under some forms of government, are irresistible and subject to no control. In England, from whence most of our legal principles and legislative notions are derived, the authority of the Parliament is transcendent and has no bounds."[9]

---

[7] *Commonwealth v. Leach*, 1 Mass. 59 (1804).
[8] 2 MASSACHUSETTS DIGEST: BEING A DIGEST OF THE DECISIONS OF THE SUPREME JUDICIAL COURT OF MASSACHUSETTS, FROM THE YEAR 1804 TO THE YEAR 1857. 661 (1863).
[9] *Vanhorne's Lessee v. Dorrance*, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).

## B.    Conserving the Peace

Prof. Cornell on p. 3 quotes Blackstone's COMMENTARIES about how the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."  True enough, but Blackstone's quote is from a discussion of:

> [S]ubordinate magistrates, whom I am to consider justices of the peace…  Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[10]

While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective description, and irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defense…"[11]  Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

> The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[12]

If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

---

[10] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).
[11] *Id*., at 143.
[12] *Id*., at 121.

At p. 6:

> The most basic right of all at the time of Founding was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power. The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms. Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." The term police encompassed more than law enforcement, it also included the right of the people to legislate for the common good.

The Pennsylvania Constitution included a guarantee of a right to keep and bear arms,[13] a guarantee "[N]o part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives"[14] and a guarantee of "a right to freedom of speech, and of writing, and publishing their sentiments."[15] These seem to be pretty large exceptions to Cornell's imagined right "to legislate for the common good." Perhaps Cornell's understanding of state police power is wrong or at least more limited than he imagines?

Pennsylvania Supreme Court decisions portray the state's police power somewhat more narrowly than Cornell: "Its exercise may be limited by the frame or constitution of a particular government, but its natural limitations, in the absence of a written constitution, are found in the situation and necessities of the state, and these must be judged of in the first instance by the government itself."[16]

What the people, and ideally the legislature as well, consider "laws to promote public health and safety" has been restrained by both state constitution bills of rights and the U.S. Bill of Rights from the very beginning. Rep. James Madison, author of the Bill of Rights, is also

---

[13] Penn. Const. Art. 11 (1776).
[14] Penn. Const. Art. 8 (1776).
[15] Penn. Const. Art. 12 (1776).
[16] *Commonwealth v. Vrooman*, 164 Pa. 306, 316 (Penn. 1894).

6

remembered for his MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN arguing that Virginia should disestablish the Anglican Church:

> Either then, we must say that the will of the Legislature is the only measure of their authority, and that, in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: either we must say that they may control the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary powers of the State; nay, that they may despoil us of our right of suffrage, and erect themselves into an independent and hereditary assembly: or, we must say, that they have no authority to enact into law the bill under consideration.[17]

If Cornell really believes in this police power "to promote the common good," I look forward to his stalwart defense of state laws mandating racially segregated public schools and public accommodations, censorship of dirty books, prohibitions on sodomy, one man/one woman marriage laws, and bans on transgender sports. It is hard to consider a person a legal scholar or historian who does not understand that the American experiment in democracy has always been restrained by a recognition that majorities can and do make mistakes. This is the reason that every state constitution today, many of the Revolutionary state constitutions, and the U.S. Constitution has a Bill of Rights.

At pp. 8-9, Cornell quotes the Second Amendment and asserts, "Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state." The first clause of the Second Amendment references not well-regulated arms but a "well-regulated militia."

*Heller* pointed out that, "The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but

---

[17] James Madison, A MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN; WRITTEN IN 1784-5, AT THE REQUEST OF THE RELIGIOUS SOCIETY OF BAPTISTS IN VIRGINIA 41 (1828).

rather announces a purpose."[18]  Either Cornell is misreading the Second Amendment's text or he is unfamiliar with the *Heller* decision.  In either case, he has demonstrated his lack of expertise in this subject.

Cornell at pp. 7-8 cites the Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term.  If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject.[19]

At p. 8, quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property."  The relevance of this quote to this case seems confused.  The plaintiffs are not arguing for no government or a "destitution of all law," but a disagreement about *this* law.  Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

At p. 11, Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."  What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power.  The recent consequences of panic after 9/11 should be a reminder that even well-intentioned polity's can blow it.

Cornell continues: "In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping

---

[18] *D.C. v. Heller*, 554 U.S. 570, 577 (2008).
[19] Richard Burn and John Burn, A NEW LAW DICTIONARY 79 (1792).

track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order." Mustering the militia required no such recordkeeping. Colonial and state militia laws did not keep track of who was armed. They imposed a duty to be armed and to show up with those arms on muster day or face fines for failure.[20] I am unaware of any safe storage laws of this period, and Cornell cites only a secondary source for a rather important claim. I have a pretty complete collection of colonial and Revolutionary militia laws[21] and there are no such provisions that I can find.

At pp. 12-13: "The plain text of the Second Amendment not only protects the right to keep and bear arms, it acknowledges that this right is designed to encourage the security of a free state. Actions that undermine this security are clearly not protected by the Amendment." It is unclear to what Cornell refers. Mass murder (the posited purpose the assault weapons ban) certainly endangers individuals; in no way does it endanger "the security of a free state."

It is certainly true that a group of men who violently overthrew their lawful government had a strong sympathy for the right of put-upon citizens to rise up in rebellion. The New Hampshire Constitution of 1784: "The doctrine of non-resistance against arbitrary power, and oppression, is absurd, slavish, and destructive of the good and happiness of mankind."[22]

James Madison, author of the Second Amendment, articulated a revolutionary model of arms ownership in *Federalist* 46. At the time, Madison was arguing that the widely demanded Bill of Rights as a limit on the new government's powers were unnecessary: "The only refuge left

---

[20] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall bare Arms that are above the age of sixteen years except they do tender a sufficient excuse [to] the Corte & the Cort allow the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 25-26 (1857) ("It is ordered that every one that bares arms shall be completely furnished with arms (viz), a musket, a sword, bandoleers, a rest, a pound of powder, 20 bullets fitted to their musket, or 4 pound of pistol shot or swan shot at least, and be ready to show them in the market place upon Monday the 16th of this Month before Captain Turner and Lieutenant Seely under the penalty 20 s fine for every default or absen[ce].")
[21] Clayton E. Cramer, *Militia Statutes*, https://claytoncramer.com/primary/primary.html#MilitiaLaws, last accessed July 15, 2023/
[22] New Hampshire Const. Part I, .Art. 10 (1784).

9
**JA4176**

for those who prophesy the downfall of the State governments is the visionary supposition that the federal government may previously accumulate a military force for the projects of ambition." His response to why this was not a serious danger?

> Extravagant as the supposition is, let it however be made. Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government; still it would not be going too far to say, that the State governments, with the people on their side, would be able to repel the danger. *The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million of citizens with arms in their hands, officered by men chosen from among themselves, fighting for their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops*. Those who are best acquainted with the last successful resistance of this country against the British arms, will be most inclined to deny the possibility of it. *Besides the advantage of being armed, which the Americans possess over the people of almost every other nation*, the existence of subordinate governments, to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of. *Notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as the public resources will bear, the governments are afraid to trust the people with arms.* And it is not certain, that with this aid alone they would not be able to shake off their yokes. But were the people to possess the additional advantages of local governments chosen by themselves, who could collect the national will and direct the national force, and of officers appointed out of the militia, by these governments, and attached both to them and to the militia, it may be affirmed with the greatest assurance, that the throne of every tyranny in Europe would be speedily overturned in spite of the legions which surround it.[23] [emphasis added]

Responding to Shays' Rebellion in 1786, Jefferson argued that it was not such a bad thing:

> et where does this anarchy exist? Where did it ever exist, except in the single instance of Massachusetts? And can history produce an instance of a rebellion so honorably conducted? I say nothing of its motives. They were founded in ignorance, not wickedness. God forbid we should ever be 20 years without such a rebellion. The people cannot be all, and always, well informed. The part which

---

[23] James Madison, *Federalist* 46.

is wrong will be discontented in proportion to the importance of the facts they misconceive. If they remain quiet under such misconceptions it is a lethargy, the forerunner of death to the public liberty. We have had 13. states independent 11 years. There has been one rebellion. That comes to one rebellion in a century and a half for each state. What country before ever existed a century and half without a rebellion? *And what country can preserve its liberties if their rulers are not warned from time to time that their people preserve the spirit of resistance? Let them take arms. The remedy is to set them right as to facts, pardon and pacify them. What signify a few lives lost in a century or two?* The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants. It is its natural manure.[24] [emphasis added]

To summarize, if that national government created a standing army, it would be grossly outnumbered by the armed population who with the assistance of state governments directing it would rapidly overthrow such a project of ambition.

If Cornell is arguing that assault weapons might be a danger to the security of the government, James Madison and Thomas Jefferson would certainly agree and likely applaud. This is doubtless unpleasant news to those in charge of our current governments, but it was clearly part of the Founders' mindset.

At p. 10: "The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties."

In 1777, Pennsylvania responded to concerns that Loyalists might be a fifth column by passing a law that provided that those of militia age refusing to swear an oath of loyalty to the Revolutionary governments were prohibited from "holding any office or place of trust in this state, serving on juries, suing for any debts, electing or being elected, buying, selling or transferring any lands, tenements or

---

[24] Thomas Jefferson to William Smith, Nov. 13, 1787, Library of Congress, https://www.loc.gov/exhibits/jefferson/105.html, last accessed July 17, 2023.

hereditaments, and shall be disarmed by the lieutenant or sub-lieutenant of the city or counties respectively."

Massachusetts' similar Test Act:

> That every male person above sixteen years of age, resident in any town or place in this colony, who shall neglect or refuse to subscribe a printed or written declaration, of the form and tenor hereinafter prescribed, upon being required thereto by the committee of correspondence, inspection and safety, shall be disarmed, and have taken from him, in manner hereafter directed, all such arms, ammunition and warlike implements, as, by the strictest search, can be found in his possession or belonging to him…[25]

Like its cousins in other states, refusing the oath disqualified one for any public office, work as a minister, voting, or teaching.[26]  Cornell could easily use these wartime emergency acts as justification today for restrictions on transferring property, voting, teaching, or preaching the gospel.

Abuses of civil liberties were widespread during the chaos of the Revolution.  Thomas Jefferson drafted a bill of attainder passed by the Virginia Legislature in 1778.[27]  In Cornell's model, the U.S. Constitution's prohibition on Bills of Attainder[28] can be safely ignored.

## C.    Arms vs. Accoutrements[29]

### 1. Cartridge-Boxes Are Not Magazines

At pp. 13-15, Cornell seeks to distinguish magazines from arms, by observing that cartridge-boxes were considered accoutrements, not arms.  This I do not dispute.  A rifleman of 1791 could easily dispense with a cartridge-box and carry cartridges in his pocket.  He might simply carry black powder in a powder horn and bullets in his pocket.  A 1791 cartridge-box is

---

[25] 5 Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay 479 (1886), ch. 21.
[26] Ibid. 481.
[27] William M. Burwell, Address Delivered Before the Society of Alumni of the University of Virginia 446-47 (1847).
[28] U.S. Const., Art. I, § 9, cl. 3.
[29] This section applies equally to the report and contentions of Dennis Baron.

functionally identical to a modern cartridge box. It is a place where you store ammunition until you are ready to use it. No amount of clever use of search terms in large bodies of text will change this.

### 2. Magazines Are Part of the Firearm

Magazines in a semiautomatic firearm (or even a lever action or bolt-action firearm) regardless of capacity or if they are detachable are a fundamental part of the weapon. Without a magazine, you must reload for every shot. This is a slow and inconvenient process. For target shooting, this might be an acceptable choice. For self-defense or hunting, this is impractical. If the court doubts this, ask your bailiff if he would want to maintain order in the courtroom with a single-shot pistol.

All semiautomatic firearms come with a magazine, either detachable or as part of the gun for fixed-magazine firearms (usually shotguns and some rifles). I have never seen a semiautomatic firearm sold without a magazine; it is part of the gun. And, in fact, the very New Jersey magazine law being challenged in this lawsuit defines "Large capacity ammunition magazine" in terms of its function to feed ammunition "continuously and directly therefrom into a semi-automatic firearm." N.J.S. 2C:39-1(y). The banned magazines are feeding devices and are part of the firearms. They are nothing like cartridge boxes.

If the question is whether a Large Capacity Magazine or a detachable magazine is necessary, again, ask a bailiff or any police officer. While the risks they face are more common than an ordinary citizen, they are not fundamentally different in quality. Someone who breaks into your home or assaults you on the street may require more than one shot to cause them to cease being a threat to your life. Under the stress of a life-threatening incident, not every shot will hit

your attacker; not every shot that hits your attacker will be sufficiently well-placed to stop the attack.  If there are multiple attackers, a ten round magazine may not be sufficient.

Even with an LCM ban, the effectiveness of LCM bans for reducing mass murder is not well-established.  In the aftermath of the 2018 Parkland shooting:

> Several state legislators who visited the school with crime-scene investigators said they learned from police that Cruz's rifle was not top-of-the-line, perhaps explaining the malfunction.
>
> The "weapon and bullets were not high quality and were breaking apart," one of the legislators, state Sen. Lauren Book, D-Plantation, told the Herald.
>
> Cruz went in with only 10-round magazines because larger clips would not fit in his duffel bag, Book said.[30]

Nearly any shooter can with a few minutes practice do magazine swaps in less than a second.  Limiting magazines to a 10-round capacity would be of very limited value for reducing mass murder.  The only circumstances in which a 10-round limit might matter would be if a courageous bystander took advantage of the second or less required for a magazine swap.  While such interventions have happened, the circumstances are a bit more complex than portrayed by advocates of LCM bans: "[murderer's name redacted] fired all 31 bullets in the magazine and was reloading when a woman in the crowd, already wounded, attempted to grab the gun from him. He finally changed the magazine and tried to fire, but the gun jammed. Meanwhile, two men from the crowd grabbed him and subdued him, officials said."[31]

Similarly, the Clackamas Mall shooting in December, 2012, ended with fewer dead than was likely the murderer's intentions because: "[The sheriff] said the death toll would have been

---

[30] Nicholas Nehamas and David Smiley, *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report Says,* MIAMI HERALD, Feb. 27, 2018.
[31] Sam Quinones and Michael Muskal, *Jared Loughner to be charged in Arizona shootings targeting Gabrielle Giffords,* Los Angeles Times, Jan. 9, 2011.

higher had the shooter's assault rifle not jammed and law enforcement not responded within minutes of the first shot."[32]

I would add from personal experience that many larger magazines, if loaded to full stated capacity, often jam on the first few rounds until the magazine spring has had a chance to "set" in the fully compressed state after a few months fully loaded. Experienced shooters know this. Noteworthy is that the Clackamas Mall shooter stole the AR-15 "the day before from someone he knew,"[33] and likely did not know this. Giffords' shooter was using a 31-round magazine,[34] which is larger than the factory magazine, and others in the crowd may have survived because the next magazine he loaded jammed the gun. They at least suggest LCMs are exaggerated in their dangerousness.

### 3. Pistols in Colonial America

At p. 19: "Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates."

Bayonets are not a firearms technology, nor are they regularly included with a firearm for sale. I have certainly never seen one included with a gun, nor does this case involve bayonet regulation. (I cannot recall reading of any mass murders involving bayonets in recent years.)

Cornell's assumption of who owned pistols and why reflects, I think, Cornell's single source, a book about dueling by people in national politics. 47. How common were pistols before

---

[32] John Bacon, *Oregon mall shooter, victims identified, USA Today*, Dec. 11, 2012.
[33] *Id.*
[34] Sam Quinones and Michael Muskal, *Jared Loughner to be charged in Arizona shootings targeting Gabrielle Giffords,* Los Angeles Times, Jan. 9, 2011.

the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was a civilian market for them in at least some cities; and that pistol ownership was unremarkable. An analysis of all Plymouth Colony probate inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[35]

On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Calvarymen were obligated to provide themselves with "a case of pistols, and a carabine."  Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols." [36] (How many pistols were in one case?  At least one.)

While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige.  Only a few pre-Revolutionary War American-made pistols have survived.[37]  Surviving pistols made for William Smith of Farmington, Connecticut by Medad Hills in 1771, were equipped with American-made barrels, and apparently English locks.[38]

---

[35] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.
[36] Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840).
[37] Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792 312 (1980); Frank Klay, THE SAMUEL E. DYKE COLLECTION OF KENTUCKY PISTOLS 4-15 (1972); Felicia Johnson Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 34 (1948).
[38] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).

Advertising and news reports show that merchants offered pistols for sale in Colonial America. Such ads appear in the *Boston Gazette* as early as 1720. Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[39]

A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749. A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as they said, got the six Pair at some other Place."[40] In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[41] as did Henry Deabarear, who sold "pistols for holsters and the pocket…." Philadelphia merchants advertised pistols for sale repeatedly from 1744 onward.[42] A 1745 ad in the PENNSYLVANIA GAZETTE, offered "ship muskets, *pistols*, cut lashes and poleaxes, gunpowder, lead, shot and bullets, English and French gun flints."[43] [emphasis added]

Pistols appear in journals and newspaper articles throughout the colonial period—and while the crimes committed with them are sometimes shocking, the *presence* of pistols is never remarkable. Governor John Winthrop made several references to pistols in New England in the nineteen years that his journal covers. One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire) that led the factions to arm themselves and march, at least one member

---

[39] BOSTON GAZETTE issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742, May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

[40] PENNSYLVANIA GAZETTE, August 31, 1749.

[41] September 4, 1772 and September 14, 1773, WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).

[42] *Pennsylvania Gazette*, November 1, 1744; September 26, 1745; October 3, 1745; October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748; September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759; February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764; August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.

[43] *Just imported by Hamilton, Wallace and Company, in the Ship*, PENNSYLVANIA GAZETTE, Sep. 26, 1745, Oct. 3, 1745.

identified as armed with a pistol.  There were murders with pistols at Stamford, Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at Cape Sable in 1646.[44]  Pistols appear in other places in Winthrop's Journal.[45]  Winthrop never expressed any surprise over the presence of pistols.

An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[46] [emphasis in original]

Many eighteenth century accounts also mention pistols.  Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[47]  In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopped on the Road, and his Money demanded, by two Men with Pistols…."[48]  There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse of and accidental deaths from pistols; they are never described as surprising.[49]  Pistols appear among the South Carolina

---

[44] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153, 180, 275 (1908).
[45] *Id.*, at 95, 151,
[46] *NEW YORK, October 28. Monday Evening last a very melancholy*, PENNSYLVANIA GAZETTE, OCT. 31, 1745.
[47] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).
[48] *By the last Post from New York…*, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[49] *Monday Evening last a very melancholy…*, PENNSYLVANIA GAZETTE, Oct. 31, 1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr. 20, 1749.

Regulators and the criminals to whom they administered frontier justice.[50]   Nor was there any

surprise when pistols appear in the hands of the law-abiding, such as a description of Rev.

Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols

on Account of the Indians…."[51]

Pistols appear in news reports: This came from New York in 1775, describing events

before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which was refused
> him; and whilst struggling to enter the door, he received a blow upon his head,
> which leveled him with the ground: Having recovered a little, he arose and
> discharged a *pistol* among the opposers, and commanded the Court party to fire
> also; when, as Mr. Langdon supposes, about five of them fired. Mr. French, one
> of the opposers, was killed by a ball's being lodged in his head, and two more of
> the same party were also wounded. The sheriff and the Court party then entered
> the courthouse. The populace without discharged a gun and two *pistols*.[52]
> [emphasis added]

Many news accounts report pistols being used by people far removed from "wealthy,

powerful, and influential."[53]

A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the

Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not

proofed (as English law required) thus creating a risk to his reputation.[54]   A 1766 ad in the

SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass

barrel pistols."[55]

---

[50] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).
[51] *Last Monday Capt. Tyng in the Massachusetts…*, PENNSYLVANIA GAZETTE, Aug. 15, 1745.
[52] *MR. Mark Langdon, from Westminster, in the…*, VIRGINIA GAZETTE, Apr. 22, 1775.
[53] BY THE LAST POST FROM NEW YORK…, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[54] *To the Publick,* SOUTH CAROLINA GAZETTE, DEC. 26, 1743.
[55] *GUERIN & WILLIAMSON,Have just imported in the London,* SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY
JOURNAL, Jun. 24, 1766, Jul. 1, 1766, Jul. 8, 1766

Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities. This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off any handgun, pistol, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province...."[56]



PAUL REVERE'S VERY COMPACT POCKET PISTOL    [57]

My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[58]  Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers, still it is pretty apparent that Cornell's

---

[56] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, Dec. 28, 1774.
[57] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[58] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

claim about the scarcity of pistols outside of those being used by the elite for dueling is utterly

wrong and shows a limited knowledge of the period for which he has "expert" opinions.

### 4. Black Powder

At p. 18:

Limits in Founding-era firearms technology also militated against the use of
guns as effective tools of interpersonal violence in this period. Eighteenth-
century muzzle-loading weapons, especially muskets, took too long to load and
were therefore seldom used to commit crimes. Nor was keeping guns loaded a
viable option because the black powder used in these weapons was not only
corrosive, but it attracted moisture like a sponge…. The preference for storing
them unloaded also meant they posed fewer dangers to children from accidental
discharge.

This is a perfectly logical statement, but the documents left by colonial Americans show

that they did not follow it very consistently.  As mentioned above, people unloaded firearms in

public places with tragic results.  Massachusetts Governor Winthrop's journal reports several

accidental deaths or injuries caused by colonists failing to follow this very logical action:

At a training at Watertown, a man of John Oldham's, having a musket, which
had been long charged with pistol bullets, not knowing of it, gave fire, and shot
three men, two into their bodies, and one into his hands; but it was so far off, as
the shot entered the skin and stayed there, and they all recovered.[59]

And:

Three men coming in a shallop from Braintree, the wind taking them short at
Castle Island, one of them stepping forward to hand the sail, caused a fowling
piece with a French lock, which lay in the boat, to go off. The whole charge went
through the thigh of one man within one inch of his belly, yet missed the bone,
then the shot (being goose shot) scattered a little and struck the second man
under his right side upon his breast, so as above 40 shot entered his body, many
into the capacity of his breast.[60]

---

[59] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.
[60] *Id*. 2:55.

And with reference to Cornell's claim at p. 18: "The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge":

> It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[61] [emphasis added]

And:

> One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[62]

These four incidents of firearms kept loaded when not in active use resulting in serious misadventure are in *one* book. How many of these loaded firearms sat quietly in their place, never accidentally discharging? How many incidents are in books that I have not read? Perhaps if Cornell was well-read in colonial documents, he would know enough to know about colonial practices to be an expert. The relevance of this claim to the proposed law is unclear. Did Cornell just copy and paste this section from a declaration where this was relevant?

Finally, there is one more piece of evidence that Americans kept firearms loaded when not ready for use. In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

---

[61] *Id.*, 2:317.
[62] *Id.*, 2:72.

The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town…

You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

Cornell knows about this ordinance; he first brought it to my attention by email some years back.

## D.    Firearms Regulation in Antebellum America

At p. 32, Cornell makes a misleading reference to *Brown v. Maryland*, (1827): The regulation of firearms and ammunition was singled out as the quintessential example of state police power." The decision involved not gunpowder or even police power, but a state requirement

> [T]hat all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spirituous liquors, &c. and other persons selling the same by wholesale, bale or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license, as by the original act is directed, for which they shall pay fifty dollars…[63]

---

[63] *Brown v. Maryland*, 25 US 419, 436 (1827).

The *Brown* decision was based on the Dormant Commerce Clause.  The reference to gunpowder was in response to a hypothetical by Maryland: "He may sell by retail, at auction, or as an itinerant pedlar. He may introduce articles, as gunpowder, which endanger a city, into the midst of its population; he may introduce articles which endanger the public health, and the power of self-preservation is denied."  Chief Justice Marshall's decision quoted by Cornell was: "The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States."[64]  It was "a branch of the police power," not "the quintessential example."  The hazard of storing gunpowder in a crowded city is clear; it may explode without human agency and represents an enormous risk to persons perhaps far removed from the gunpowder.  If Cornell wants to liken the risk of assault weapon or LCM ownership to gunpowder storage, he needs a much clearer explanation of that parallel.

At 35, Cornell also quotes from the *License Cases* (1847) to justify what seems to be a nearly unlimited police power of the state:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.

This understanding of the nearly unlimited authority of the state by invoking the magic incantation "new and vicious indulgences" makes the entire Bill of Rights null and void.  If a state decided that sodomy and divorce were "new and vicious indulgences," the state would enjoy unlimited power to prohibit these actions.

---

[64] *Id*. at 443.

Cornell at p. 35 quotes selectively from *State v. Reid* (Ala. 1840) to claim that "'The terms in which this provision is phrased,' the court noted, 'leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."

The following paragraph of *Reid* admits

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, *under the presence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.*[65] [emphasis added]

I do not see how Cornell missed this utter rejection of his claim, two sentences later.

At p. 35 n. 121: "Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 95, at 91." Cornell might have benefitted from reading the primary sources, as historians try to do, instead of relying on a clearly flawed secondary source. Of course, this would require Cornell becoming familiar with the subject than he has along with *Bliss*, many other decisions decided the "scope of state power to regulate arms," often explicitly recognizing a right to open carry based on their state constitutions, and in some cases the Second Amendment, not the rarely mentioned "police power."[66]

---

[65] *State v. Reid*, 1 Ala. 612, 616, 617, 35 Am. Dec. 44 (1840).

[66] Just a *few* examples: *Bliss v. Commonwealth*, 2 Littell 90, 13 Am. Dec. 251 (Ky. 1822) (struck down a ban on carrying concealed weapons based on state constitution);. *Simpson v. State*, 5 Yerg. 356 (Tenn. 1833) (struck down a conviction for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make," because "the freemen of this state have a right to keep and to bear arms for their common defense." Tenn. Const. Article 11, sec. 26); *Aymette v. State*, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840) (upheld a ban on concealed carry of a Bowie knife because the Tennessee Constitution only protected weapons of war: "The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution."); *State v. Reid*, 1 Ala. 612 (1840) (" A statute which, under

### E.    Post-1868 Evidence

Cornell insists at pp. 38-39: "As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good."  Had Cornell read *McDonald v. Chicago* (2010) he would know that it was precisely the racial discrimination of the Black Codes that caused the 14th Amendment to limit state authority in this area.[67]  This was the basis by which *McDonald* incorporated the Second Amendment against the states.[68]

### F.    Summary

Cornell misrepresents the broadness of the carryover of English law to the American colonies.  He lists three states that apparently must stand in for all thirteen former colonies and even these two of these three are clear that later statutes (presumably including post-Revolutionary state constitutions) take precedence.  In Massachusetts, only a few aspects of English law carried over to the new state.

He misrepresents Blackstone about the importance of conserving the peace; argues for a unlimited democracy that the Bill of Rights exists to prevent; He misrepresents how the militia laws and the Test Acts worked.

---

the presence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional."); *Owen v. State*, 31 Ala. 387 (1858) (upheld a ban on concealed carry, but "That section was not designed to destroy the right, guaranteed by the constitution to every citizen, "to bear arms in defense of himself and the State"; nor to require them to be so borne, as to render them useless for the purpose of defense."); 3 Iredell 418, 423 (N.C. 1843) (Upholding a conviction of a bully running around armed and threatening people: "For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.")
[67] *McDonald v. City of Chicago*, 561 U.S. 742, 779 (2010)
[68] *Id*. at 790.

He misrepresents *State v. Reid* (Ala. 1840); misuses Dormant Commerce Clause cases to argue for an unlimited power of the states to regulate everything with no power of the Bill of Rights to counter such abuses of majority power.

Cornell attempts to use post-1868 laws contrary to *Bruen's* clear instructions.

## III.    Louis Klarevas

This Rebuttal to Louis Klarevas demonstrates that his claims about mass murder rate change are very questionable.

### A.    Intentional Criminal Acts

At ¶11: "It is my professional opinion, based upon my extensive review and analysis of the data, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide." This is one of those claims that on its face is so obviously wrong that he must be leaving something out of his claim. There have been 543 mass murders since 2006 (of which some do not involve firearms) with 2,829 dead.[69] (I picked 2006 because there was an available dataset.) Yet the FBI reports there were 13,477 homicide incidents in 2021, 17,815 murders in 2020, 14,548 in 2019, with the lowest number since 2011 being 12,312 in 2014.[70] There were 170,206 total murders 2011 through 2021. Somehow mass murders from all years 2006 through 2021 are 1.7% of the *total* murders in the years 2011 through 2021, and mass murders are the biggest threat of "individual acts of intentional criminal violence"?

---

[69] *Mass killing database: Revealing trends, details and anguish of every US event since 2006*, USA Today, Mar. 29, 2023. *See Number of mass killing victims killed per year*. In 2022, there were 24 non-gun mass murder victims; in 2021, 18; in 2020, 18.
[70] FBI, *Expanded Homicide Offense Counts in the United States*, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/shr, last accessed April 1, 2023. FBI, Crime Data Explorer for 2021 Homicide, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/crime-trend, last accessed July 15, 2023.

## B.    Errors of History

At ¶11: "mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, largely related to the use of assault weapons and LCMs": Mass murders with double-digit fatalities without LCMs are surprisingly common in American history[71] and not a recent phenomenon.  Here the "expert" shows the questionable nature of his database.

The mass murderer at the University of Texas in 1966 murdered fourteen people.[72]  He was a skilled marksman using a very traditional hunting rifle: a Remington 700.  He also had two more rifles, a shotgun, and three pistols with him.[73]  The Navy Yard mass murderer used a pump-action Remington 870 shotgun to murder 12.[74]

## C.    Those Other Mass Murders Do Not Count

At ¶11, "high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs…"  By similar incidents, I presume he means firearms mass murders *only*.

Of course, mass murder does not require a firearm of any sort.  Non-firearm double-digit mass murders are by no means particularly modern aspects of American history.  On Christmas Eve, 1913, a man shouted, "Fire! Fire!  Everybody rush!" in the Italian Hall where striking miners and their families were having a Christmas party.  (There was no fire.)  As the crowd attempted to

---

[71] 150 dead in the 1873 Colfax, La., Massacre, 140 dead in the Mountain Meadows, Utah Massacre, 74 dead in the Calumet, Mich. Trampling incident; at least 100 killed in the 1921 Tulsa riot; 95 murdered in an arson of a school in 1958 Chicago,

[72] Charles Bowden, *The Men Who Stopped a Mass Murderer,* Esquire, Aug. 26, 2021, https://www.esquire.com/news-politics/a36890935/charles-whitman-mass-shooting-university-of-texas/, last accessed February 6, 2023.

[73] Craig Hlavaty, *Rifle Reported To Be Used In Charles Whitman Killing Spree Up For Sale*, Houston Chronicle, Sep. 24, 2014, https://www.chron.com/news/houston-texas/texas/article/Rifle-reported-to-be-used-in-Charles-Whitman-5777479.php,    last accessed February 6, 2023.

[74] Greg Botelho and Joe Sterling, FBI: *Navy Yard shooter 'delusional,' said 'low frequency attacks' drove him to kill*, CNN, Sep. 26. 2013.

exit the hall through an inadequate exit, seventy-four people (mostly children) were trampled to death.[75] One account ascribed the false claim to "a drunken" man,[76] but considering the murder of strikebreakers in Calumet a few weeks before in the middle of a fierce labor dispute,[77] this seems unlikely as the cause.[78]  11. June 24, 1973: The murderer took revenge for being expelled from the UpStairs Lounge, a gay bar.  He walked down the street and bought a bottle of cigarette lighter fluid, killing 33 people.[79]

The five largest mass murders in U.S. history have been with airplanes,[80] explosives,[81] and flammable liquids.[82]  Klarevas cannot discount these other mass murders as terrorist acts as he includes terrorist firearms mass murders at Fort Hood, TX and San Bernardino, CA in his Table 6 of mass shootings.

This unwillingness to include non-firearms mass murders is questionable.  Other experts on mass murder have responded to my list of early American mass murders by discounting the mass murders of children:

> The husband who attacked his family with an axe in Clarksburg, Virginia, in 1805 killed only one adult, his wife.  His other eight victims were his children. And the husband who attacked his family with a knife in Hallowell, Maine, in 1806 killed only one adult, his wife. His other 7 victims were his children. Cramer's evidence does not show that edged and blunt weapons are effective tools for committing mass murder. It shows instead that infants and children are not capable of defending themselves against attacks by adults.  That conclusion is consistent with the extensive literature in contemporary criminology that

---

[75] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

[76] *Day of Joy is One of Sorrow*, [Valley City, N.D.] *Weekly Times-Record*, Jan. 1, 1914, 6.

[77] *Strike Breakers Taken to Mines at Point of Pistols*, *Omaha Daily Bee*, Jan. 11, 1914, 1 (based on U.S. Dept. of Labor report).

[78] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

[79] Elisabeth Dias with Jim Down, *The Horror Upstairs*, TIME, Jul. 1, 2013.

[80] David B. Caruso, *Official 9/11 death toll grows by 1 nearly a decade later*, HOUSTON CHRONICLE, Jun. 17, 2011. (2,753 dead at World Trade Center); *Accused 9/11 plotter Khalid Sheikh Mohammed faces New York trial*, CNN, November 13, 2009. (146 at Pentagon).

[81] Elizabeth Chuck, *Twenty Years Later: The People in the Oklahoma City Bombing*, NBC NEWS, Apr. 18, 2015.

[82] Richard W.Bukowski, P.E. and Robert C. Spetzler, *Analysis Of The Happyland Social Club Fire With Hazard I*, 4(4) JOURNAL OF FIRE PROTECTION ENGINEERING, 117-131,(1992), (87 dead); *Dupont Plaza Hotel Fire Puerto Rico 1986*, NIST ENGINEERING LABORATORY, https://www.nist.gov/el/dupont-plaza-hotel-fire-puerto-rico-1986, last accessed November 17, 2017. (98 dead).

shows that young children are killed in the overwhelming majority of cases with weapons other than firearms, because adults can kill children so easily with physical force or everyday household objects.[83]

I guess we can ignore mass murders of children in justifying LCM bans.

## 1.    Effectiveness of Assault Weapon Bans

At ¶11: "states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs": He points to his own work for this claim.  I point to the National Institute of Justice report, commissioned by Congress as part of the 1994 federal assault weapons ban:

> A central argument for special regulation of assault weapons and large capacity magazines is that they facilitate the rapid firing of high numbers of shots, which allows offenders to inflict more wounds on more persons in a short period of time, thereby increasing the expected number of injuries and deaths per criminal use. The study examined trends in the following consequences of gun use: gun murders, victims per gun homicide incident, wounds per gunshot victim, and, to a lesser extent, gun murders of police.

> There were several reasons to expect, at best, a modest ban effect on criminal gun injuries and deaths. First, studies before the ban generally found that between less than 1 and 8 percent of gun crimes involved assault weapons, depending on the specific definition and data source used. Although limited evidence suggests that semiautomatics equipped with large capacity magazines are used in 20 to 25 percent of these gun crimes, it is not clear how often large capacity magazines actually turn a gun attack into a gun murder.  Second, offenders could replace the banned guns with legal substitutes or other unbanned semiautomatic weapons to commit their crimes. …

> However, other analyses using a variety of national and local data sources found no clear ban effects on certain types of murders that were thought to be more closely associated with the rapid-fire features of assault weapons and other semiautomatics equipped with large capacity magazines. The ban did not produce declines in the average number of victims per incident of gun murder or gun murder victims with multiple wounds.[84]

A follow-up study near the end of the ban produced interesting results concerning LCMs:

---

[83] Randolph Roth, Supplemental Sur-Rebuttal Expert Report And Declaration Of Randolph Roth, Rupp v. Bonta (C.D.Cal. 2017).
[84] Jeffrey A. Roth and Christopher S. Koper, *Impacts of the 1994 Assault Weapons Ban: 1994-96*, NCJ 173405, (Washington: National Institute of Justice, 1999), 1, 7, 8.

Specific data on shots fired in gun attacks are quite fragmentary and often inferred indirectly, but they suggest that relatively few attacks involve more than 10 shots fired.  Based on national data compiled by the FBI, for example, there were only about 19 gun murder incidents a year involving four or more victims from 1976 through 1995…. The few available studies on shots fired show that assailants fire less than four shots on average (see sources in Table 9-1 and Goehl, 1993), a number well within the 10-round magazine limit imposed by the AW-LCM ban, but these studies have not usually presented the full distribution of shots fired for all cases, so it is usually unclear how many cases, if any, involved more than 10 shots.[85]

As to the data from one city in particular, Jersey City, the authors were careful to observe:

*Caution is warranted in generalizing from these results because they are based on a very small number of incidents (6) from one sample in one city.* Further, it is not known if the offenders in these cases had LCMs (gun model and magazine information was very limited); they may have emptied small magazines, reloaded, and continued firing. But subject to these caveats, the findings suggest that the ability to deliver more than 10 shots without reloading may be instrumental in a small but non-trivial percentage of gunshot victimizations. On the other hand, *the Jersey City study also implies that eliminating AWs and LCMs might only reduce gunshot victimizations by up to 5%. And even this estimate is probably overly optimistic because the LCM ban cannot be expected to prevent all incidents with more than 10 shots.* Consequently, any effects from the ban (should it be extended) are likely to be smaller and perhaps quite difficult to detect with standard statistical methods (see Koper and Roth, 2001a), especially in the near future, if recent patterns of LCM use continue.[86] [emphasis added]

Curiously, when attempting to evaluate effects of lethal and injurious gun violence, the authors pointed to the decline in murder rates during the ban period, but:

Attributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that *crimes with LCMs appear to have been steady or rising since the ban*. For this reason, we do not undertake a rigorous investigation of the ban's effects on gun violence…. But a more casual assessment shows that *gun crimes since the ban have been no less likely to cause death or injury than those before the ban,* contrary to what we might expect if crimes with AWs and LCMs had both declined. For instance, the percentage of

---

Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* 90 (Jul. 2004).
[86] *Id*. at 91.

violent gun crimes resulting in death has been very stable since 1990 according
to national statistics on crimes reported to police.[87] [emphasis added]

If a nationwide ban on manufacture and sale of LCMs seems to have no noticeable effect,
what would the actions of one state do?

### 2. Cherry-Picking Data

For several years, I have been gathering American mass murders from the 17th century
forward.  I am currently working my way through the 1960s; I have 792 mass murder incidents
with 5,325 dead from all weapon types.  I have a very incomplete collection past 1960, but
complete enough to see that Klarevas cherry-picks his data.

Klarevas' Table 1 (page 6) lists "The Deadliest Acts of Intentional Criminal Violence in
the U.S. since 9/11."  This seems to be an arbitrarily picked date: it excludes the Happyland Social
Club arson mass murder of 87 (1990); the Oklahoma City explosives mass murder of 168 (1995);
the Dupont Plaza Hotel arson mass murder of 98 (1986); and the elephant in the room, the largest
mass murder in U.S. history: on 9/11 (2001). All of these far exceed the fatality count of the most
deadly event in his Table 1. His Exhibit C, "High-Fatality Mass Shootings in the United States,
1991-2022," by setting 1991 as his starting date again excludes several mass shootings that would
otherwise make the list and would alter his Figure 2 (page 7), "Annual Trends in High-Fatality
Mass Shooting Fatalities, 1991-2022."  Firearm mass murders that he leaves out because they are
before 1991 raise serious questions about his claim "the problem of high-fatality mass shooting
violence is on the rise," is less persuasive, at least to anyone with a knowledge of America's long
history of mass murder before 1991.

---

[87] *Id*. at 92.

The Texas Tower mass murder of 1966; 17 people died.[88]  The murderer was a skilled marksman using a very traditional hunting rifle: a Remington 700.  He also had two more rifles, a shotgun, and three pistols with him.[89]

Jul. 18, 1990: A convicted felon who was perhaps upset about repossession of his car six months earlier, went into a General Motors Acceptance Corp. offices and murdered nine.[90]

Sep. 15, 1989: An employee of Standard Gravure printing plant had a grudge against his employer, in his opinion, because of his mental illness.  (He had voluntarily sought mental health treatment in the past.)  He murdered seven people and wounded many others.  He left in his home a copy of *Time* open to an article about the Stockton mass murderer.[91]

Feb. 16, 1988: A murderer upset that his stalking had been spurned shot his way into her place of employment, in Santa Clara, Cal. killing seven and wounding four with a shotgun.[92]

Apr. 23, 1987: A retired librarian described by neighbors as having "a bad temper and a sick wife… and maybe a little crazy" murdered six and wounded 14.  He used a shotgun, pistol, and rifle.  He had a history of shooting at neighborhood kids who walked across his lawn.[93]  A bystander distracted the murderer by returning fire, "which allowed people to escape" from a grocery store where the shooting was taking place.[94]

---

[88] Gary M. Lavergne, *University of Texas Tower Shooting (1966)*, Texas State Historical Association,
[89] Craig Hlavaty, *Rifle Reported To Be Used In Charles Whitman Killing Spree Up For Sale*, *Houston Chronicle*, Sep. 24, 2014,https://www.chron.com/news/houston-texas/texas/article/Rifle-reported-to-be-used-in-Charles-Whitman-5777479.php, last accessed February 6, 2023.
[90] Ronald Smothers, "Florida Gunman Kills 8 And Wounds 6 in Office," *New York Times*, Jun. 19, 1990; "10th Death in Office Shooting," *New York Times*, Jun. 28, 1990.
[91] Ronald Smothers, "Disturbed Past of Killer of 7 is Unraveled," *New York Times*, Sep. 16, 1989, https://www.nytimes.com/1989/09/16/us/disturbed-past-of-killer-of-7-is-unraveled.html, last accessed November 24, 2018.
[92] Dan Morain and Mark A. Stein, "Unwanted Suitor's Fixation on Woman Led to Carnage," *Los Angeles Times*, Feb. 18, 1988.
[93] Barry Bearak, "6 Dead and 14 Hurt in Rampage: Florida Shooting Suspect 'Meanest Man on Block'," *LOS ANGELES TIMES*, Apr. 25, 1987, http://articles.latimes.com/1987-04-25/news/mn-990_1_palm-bay-police, last accessed November 24, 2018.,"
[94] John A. Torres, "Palm Bay Killer Far From Execution 20 Years Later." [Lakeland, Fla.] *Ledger,* Apr. 30, 2007, https://www.theledger.com/news/20070430/palm-bay-killer-far-from-execution-20-years-later, last accessed November 24, 2018.

There a number of other high-fatality firearm mass murders before 1991: 14 murdered in a post office in 1986[95]; 20 murdered in a McDonald's in 1984[96]; nine murdered in Manley Hot Springs, Alaska in 1984[97]; eight murdered in Miami in 1982[98]; nine murdered in Midland Co., Mich. In 1982[99]; seven murdered at Cal State University, Fullerton in 1976[100]; 11 murdered in Hamilton, Ohio in 1975[101].

The number of high-fatality firearm mass murders *before* 1991 make his rising linear trend-line in Figure 2 very likely to change. In addition, Klarevas' Figure 1 makes no allowance for U.S. population growth from 1991 to 2022. The 1991 population was 251,000,000;[102] in 2022, it was 332,403,650.[103] The U.S. had 32% more people in 2022 than in 1991. You can expect the number of incidents and dead to rise in proportion to the population. This is why criminologists express crime rates per 100,000 population. Failure to account for population growth and his misleading choice of start date utterly discredits Klarevas' Figures 1 and 2.

Klarevas' focus on mass *shootings* ignores the largest mass murders in American history, which did not use guns. The previously mentioned arson and explosives mass murders are in that category. Ignoring these alternative methods of "intentional criminal violence" in is just dishonest if you are concerned about reducing mass murder.

---

95 "Massacre at a Post Office," *New York Times*, Aug. 24. 1986.,"
96 "Coast Man Kills 20 in Rampage at a Restaurant." *New York Times,* Jul. 19, 1984; "Police Defended in Macdonald's Case," *New York Times,* Aug. 3, 1984.,"
97 "Memories of Springtime Murders Chill Small Alaskan Town," *New York Times*, Nov. 11, 1984.
98 George Volsky, "Gunman in Miami Kills 8 in Rampage," *New York Times,* Aug. 21, 1982.
99"Michigan Man is Guilty of Killing 7 in Family," *New York Times,* Oct. 9, 1982; Gus Burns, "Police say infamous Farwell killer, Robert Lee Haggart, strangled and raped Midland woman in 1977," *Saginaw News,* Jul. 24, 2009.
100 Maria Bovsun, "Mass Murderer Who Killed 7 At Cal State Fullerton Begs to be Freed From Psychiatric Hospital," New York Daily News, Jun. 11, 2016.
101 Flowers and Flowers, Murders in the United States, 76.
102 U.S. Census, *National Intercensal Tables: 1990-2000*, 1991.
103 U.S. Census, *U.S. Population Estimated at 332,403,650 on Jan. 1, 2022.*

At ¶13: "In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres."  He further claims in Figure 4 (page 9) that 85% of high-fatality mass shooting events in the last 16 years involved LCMs. And in Figure 5 (page 10) that 53% of high-fatality mass shooting deaths in the last 16 years involved assault weapons. These are pretty amazing (and wrong) claims.

The USA Today database published in 2018 found that only ¾ of mass murders used guns.[104]  Of that ¾, some murders were a combination of weapons: shooting, stabbing, blunt force.[105]

- 49.6% were semiautomatic handguns (some of which *could* have used LCMs);

- 22.4% were revolvers, so no LCMs possible, and not "assault weapons";

- 0.9% were described as "automatic (assault) pistols" (automatic weapons are not subject to the New Jersey law);

- 8.6% were semiautomatic rifles (only some of which qualify as "assault weapons"; there are a lot of inexpensive .22 rimfire semiautomatic rifles in America);

- 9.5% were single-shot rifles (so no LCMs and not "assault weapons");

- 0.4% were "automatic rifle" (not subject to the New Jersey law).

- 8.6% were shotguns.  While there *are* magazine-fed shotguns that could be fitted with LCMs, the only shotguns identified by type that I have ever seen in news

---

Behind the Bloodshed: The Untold Story of America's Mass Killings, USA Today, Apr. 16, 2015, https://www.gannett-cdn.com/GDContent/mass-killings/index.html#title, last accessed April 2, 2023.
*Id.*, https://www.gannett-cdn.com/GDContent/mass-killings/index.html#explore, *see* Dec. 15. 2014 Souderton, Pa.

reports of mass murders are a pump-action Remington 870 shotgun to murder 12

at the Navy Yard in 2013.[106]

Even ignoring the non-firearms mass murders, the firearms used 2006-2015 that could not

have been "assault weapons" include the 22.4% of revolvers, 9.5% of single-shot rifles, and 8.6%

of shotguns.  At least 40.5% of 2006-2018 firearms mass murders could *not* have used an LCM.

The last 16 years before 2022 is the period 2006-2022.  Even including use of LCMs in

automatic weapons would require that to get to Klarevas' 85% of high-fatality mass shooting

events using LCMs would require that in the period 2017-2022 the previous 40.5% of non-LCM

mass shooting victims fell to 15% of the total.

Klarevas' Exhibit C lists the 2018 Parkland shooting as using an LCM.  There seems to

be some question about that:

> Several state legislators who visited the school with crime-scene investigators
> said they learned from police that Cruz's rifle was not top-of-the-line, perhaps
> explaining the malfunction.
>
> The "weapon and bullets were not high quality and were breaking apart," one of
> the legislators, state Sen. Lauren Book, D-Plantation, told the Herald.
>
> Cruz went in with only 10-round magazines because larger clips would not fit
> in his duffel bag, Book said.[107]

I confess that I was not even aware that there were 10-round AR-15 magazines available,

until this question was first raised.

---

Greg Botelho and Joe Sterling, FBI: Navy Yard shooter 'delusional,' said 'low frequency attacks' drove him to kill, CNN, Sep. 26.
2013 https://www.cnn.com/2013/09/25/us/washington-navy-yard-investigation/index.html, last accessed February 3, 2023.
[107] Nicholas Nehamas and David Smiley, *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report Says,* Miami
Herald, Feb. 27, 2018.

### D.    Summary

The current effort to restrict semiautomatic rifles of an often military appearance and what prohibitionists call Large Capacity Magazines (LCMs) started in 1989 after a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment, ended his suffering by committing mass murder and with an AK-47 pattern rifle.  He received a Social Security disability check which enabled him to buy guns and ammunition while remaining homeless.  As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference.  However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[108]

Drawing chalk marks around bodies, postmortems and providing counselling for the survivors is cheaper?  It was still many lives wasted by California's confused and irrational mental health policy that subsequently spread across the country in the 1970s.

A contributing factor to mass murders is media coverage:

> Three shootings with multiple victims shook California over the last few days. The shootings Monday at two farms in Half Moon Bay, Calif., closely followed over the weekend at a dance hall in Monterey Park, Calif.

> That's no surprise, say scientists who study mass shootings. Research shows that these incidents usually occur in clusters and tend to be contagious. Intensive media coverage seems to drive the contagion, the researchers say.

> Back in 2014 and 2015, researchers at Arizona State University analyzed data on cases of mass violence. They included *USA Today*'s data on mass killings (defined as four or more people killed using any means, including guns) from 2006 to 2013, data on school shootings between 1998 and 2013, and mass shootings (defined as incidents in which three people were shot, not necessarily

---

[108] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings*, October, 1989, 19, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

killed) between 2005 and 2013 collected by the <u>Brady Campaign to Prevent Gun Violence</u>.

The lead researcher, <u>Sherry Towers</u>, a faculty research associate at Arizona State University, had spent most of her career modeling the spread of infectious diseases — like Ebola, influenza and sexually transmitted diseases. She wanted to know whether cases of mass violence spread contagiously, like in a disease outbreak.

So, she plugged each data set into a mathematical model.

"What we found was that for the mass killings — so these are high-profile mass killings where there's at least four people killed — there was significant evidence of contagion," says Towers. "We also found significant evidence of contagion in the school shootings."

In other words, school shootings and other shootings with four or more deaths spread like a contagion — each shooting tends to spark more shootings….

Towers and her colleagues also found that what set apart shootings that were contagious was the amount of media coverage they received. "In the incidences where there were four or more people killed, and even school shootings, those tended to get national and even international media attention," says Towers.[109]

Nonetheless, no one would seriously suggest controls on "assault media" because they can provoke copycat mass murders.

Untreated mental illness started this current campaign and many of the subsequent mass murders have had at their root mental illness which was unseen, ignored, or where the laws or policies made involuntary commitment impossible.[110]

The Secret Service published a report in 2018 analyzing mass murders with three or more dead and concluded.

Nearly two-thirds of the attackers (n = 18, 64%) experienced mental health symptoms prior to their attacks. The most common symptoms observed were related to psychosis (e.g., paranoia, hallucinations, or delusions) and suicidal thoughts…. Further, some

---

[109] Rhitu Chatterjee, *Mass Shootings Can Be Contagious, Research Shows*, NPR, Jan. 24, 2023.
[110] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 CONN. L.R. 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) for how we got here.

attackers (n = 7, 25%) had been hospitalized for treatment or prescribed psychiatric medications prior to their attacks.[111]

This should be no surprise: if you are hallucinating that you are surrounded by flesh-eating zombie Congressmen (as with the shooter at the U.S. Capitol in 1999[112]), then mass murder makes perfect sense; indeed failing to do so would be a sign of insanity.

A 2000 *New York Times* examination of mass murderers concluded:

> The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help, and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.
>
> Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population.
>
> However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [113]

In this respect, mentally ill mass murderers are not terribly different from their more mundane individual murder counterparts: the mentally ill are overrepresented among murderers. It should not be surprising that severe mental illness and murder is strongly correlated, as are severe mental illness and other violent crimes across multiple nations and multiple decades. The severely mentally ill commit about 10% of all violent felonies.[114]  A 1999 study of U.S. prisoners found

---

[111] United States Secret Service, Mass Attacks in Public Spaces – 2017, Mar. 2018, available at https://mentalillnesspolicy.org/wp-content/uploads/secret_service_64_attacks_MI.pdf.

[112]  Bill Miller, *Capitol Shooter's Mind-Set Detailed*, Washington Post, Apr. 23, 1999, available at https://www.washingtonpost.com/wp-srv/national/longterm/shooting/stories/weston042399.htm

[113] Laurie Goodstein and William Glaberson, "The Well-Marked Roads to Homicidal Rage," *New York Times*, April 10, 2000.

[114] Arthur Zitrin, Anne S. Hardesty, Eugene I. Burdock & Ann K. Drossman, Crime and Violence Among Mental Patients, 133 Am. J. Psychiatry 142-9 (1976) (deinstitutionalized New York City mental patients had disproportionate arrest rates for rape, burglary, and aggravated assault); Larry Sosowsky, Crime and Violence Among Mental Patients Reconsidered in View of the New Legal Relationship Between the State and the Mentally Ill, 135 *Am. J. Psychiatry* 33-42 (1978) (San Mateo County, California, mental patients showed grossly disproportionate arrest rates for murder, rape, robbery, aggravated assault, and burglary; 55

that 16.2 percent of state prison inmates, 7.4 percent of federal prison inmates, and 16.3 percent of jail inmates, were mentally ill.[115]  A study of Indiana murder convicts found that 18 percent were severely mentally ill, suffering from "schizophrenia or other psychotic disorder, major depression, mania, or bipolar disorder."[116]  The Indiana murder convicts diagnosed with schizophrenia were 3.7 percent of the murder convicts,[117] compared to 1.1 percent of the U.S. adult population.[118]

Untreated mental illness started this current campaign and many of the subsequent mass murders have had at their root mental illness which was unseen, ignored, or where state laws or policies made involuntary commitment impossible.[119]

---

times more likely to be arrested for murder than the general population in 1973; 82.5 times more likely to be arrested to be arrested for murder in 1972; nine times more likely to be arrested for rape, robbery, aggravated assault, and burglary than the general population); Larry Sosowsky, Explaining the Increased Arrest Rate Among Mental Patients: A Cautionary Note, 137 *Am. J. Psychiatry* 1602-5 (1980)  (even mental patients with no pre-hospitalization arrests were five times as likely to be arrested as the general population for violent crimes); H. Richard Lamb & Linda E. Weinberger, Persons with Severe Mental Illness in Jails and Prisons: A Review, 49 Psychiatric Services 483-92 (1998); Jeanne Y. Choe, Linda A. Teplin & Karen M. Abram, Perpetration of Violence, Violent Victimization, and Severe Mental Illness: Balancing Public Health Concerns, 59 *Psychiatric Services* 153-164 (Feb. 2008) (Studies in Denmark and Sweden found that psychotics are disproportionately violent offenders); Eric B. Elbogen & Sally C. Johnson, The Intricate Link Between Violence and Mental Disorder: Results From the National Epidemiologic Survey on Alcohol and Related Conditions, 66 *Archives of General Psychiatry* 152-161 (2009) ("violence and violent victimization are more common among persons with severe mental illness than in the general population.")

[115] Paula M. Ditton, Bureau of Justice Statistics, Mental Health and Treatment of Inmates and Probationers (Washington: U.S. Department of Justice, 1999), NCJ 174463, available at https://bjs.ojp.gov/library/publications/mental-health-and-treatment-inmates-and-probationers

[116] Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder, 36 *J. Am. Acad. Psychiatry & Law* 74, 76 (2008).

[117] Id. at 80.

[118] National Institute of Mental Health, *Schizophrenia* (August 21, 2013), http://www.nimh.nih.gov/statistics/1schiz.shtml.

[119] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 *Conn. L.R.* 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill* (2012) for how we got here.

Fix the root problem or mass murderers will use the weapons they have historically used in the United States: arson,[120] vehicles,[121] explosives,[122] hammers,[123] axes,[124] poison,[125] aircraft,[126] and train derailments.[127]   Or they might use the weapons mass murderers use in other nations: arson;[128] vehicles;[129] explosives,[130] sharp objects,[131] hammers;[132] poison gas,[133] and of course, in spite of much stricter firearms laws, guns.[134]

---

[120] 3 Teamsters Charged in San Juan Hotel Fire," *Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018 (97 dead); Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, NEW YORK TIMES, Mar. 26, 1990 (87 dead); Phil Luciano, *9-year-old arraigned on murder charges in deadly Goodfield arson fire*, PEORIA JOURNAL STAR, Oct. 21, 2019 (5 dead).

[121]  Lauren del Valle, Ray Sanchez and Eric Levenson, *Terror suspect accused of killing 8 people on NYC bike path still believes in ISIS, defense attorney says*, CNN, January 9, 2023.

[122] FBI, *Oklahoma City Bombing*, https://www.fbi.gov/history/famous-cases/oklahoma-city-bombing, last accessed January 31, 2023 (168 dead); *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] EVENING STAR, May 19, 1927, 1; *Los Angeles, on Election Eve, in Ferment Over Confession of the McNamaras*, [Chicago, Ill.] THE DAY BOOK, Dec. 2, 1911, 1 (21 dead); *Seven Detectives and Three Miners Dead*, SEATTLE STAR, Jul. 26, 1912, 1 (10 dead).

[123] *A Family Slain*, KANSAS CITY JOURNAL, Mar. 4, 1899, 1 (5 dead).

[124] *Five Battered With An Axe*, [Keokuk, Ia.] DAILY GATE CITY, Oct. 17, 1911, 1 (5 dead); *Mystery of 30 Axe-Murders is Believed Near Its Solution*, ALBUQUERQUE MORNING JOURNAL, Mar. 22, 1915, 1 (police believed one man murdered 29 people in five families over three years).

[125] *A Modern Borgia*, NASHVILLE UNION AND AMERICAN, Oct. 27, 1868, 1 (the maid murdered a family of seven).

[126] FBI, CRIME IN THE UNITED STATES: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf (3047 dead); Id., (184 dead); Id., (40 dead); Judith Cummings, *Kin of Suspect Defiant and Contrite*, NEW YORK TIMES, Dec. 11, 1987 (44 dead).

[127] *Crack Flyer Jumps Track*, [De Kalb, Illinois] DAILY CHRONICLE, Mar. 17, 1941, 1 (5 dead).

[128] *A Decade On, Childers Remembers Hostel Fire Tragedy*, BRISBANE [Australia] TIMES, Jun. 23, 2010 (15 dead); Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears*, [U.K.] DAILY MAIL, Sep. 8, 2014. (11 dead); Makiko Inoue, Motoko Rich and Hikari Hida, 24 Dead in Suspected Arson at Office Building in Japan, N.Y. TIMES, Dec. 16, 2021.

[129] *Toronto is the most recent of many deliberate attacks involving vehicles*, USA TODAY, Apr. 23, 2018 (10 dead in Toronto attack, 14 dead in Barcelona, Spain, 8 on London Bridge, 12 in Berlin, Germany); *Nice attack: Trial for Bastille Day massacre which killed 86 begins*, BBC, Sep. 5, 2022 (86 dead); *Australian who rammed and killed six pedestrians jailed for life*, REUTERS, Feb. 21, 2019 (6 dead); Alex Johnson, *A Short History of Vehicles Being Used as Deadly Weapons*, NBC News, Jul. 15, 2016 (8 dead).

[130] Andrew Higgins and Kimiko De Freytas-Tamura, *In Brussels Bombing Plot, a Trail of Dots Not Connected*, NEW YORK TIMES, March 26, 2016 (33 dead); Sylvia Hui, *Bomber's brother gets 55 years for Manchester concert attack*, Associated Press, Aug. 20, 2020 (22 dead)

[131] Jason Van Rassel, *Police officer's son charged in city's worst mass murder*, CALGARY [Alberta] HERALD, Apr. 17, 2014 (5 dead); Jonathan Pearlman, *Eight Children Murdered In Mass Stabbing In Australia*, [U.K.] TELEGRAPH, Dec. 19, 2014 (8 dead); Robert Foyle Hunwick, *Why Does China Have So Many School Stabbings?, New Republic*, Nov. 2, 2018 (summarizing 14 knife mass murders in two incidents); David Mercer, *Canada mass stabbing: Trudeau urges public to 'be careful' over two men suspected of killing 10 people*, SKY NEWS, Sep. 5, 2022 (10 dead).

[132] Jamelle Wells, *Robert Xie Trial: Lin Family 'Murdered With Hammer Bought From $2 Shop*, ABC [Australia], May 12, 2014 (5 dead)

[133] *Japan marks 25 years since deadly Aum sarin attack on Tokyo subway*, Japan Times, Mar. 20, 2020 (14 dead).

[134]  *Gunman's Rampage in France Leaves 14 Dead, Los Angeles Times*, Jul. 13, 1989; *Teen-Age Gunman Kills Himself and 12 Others in France, New York Times*, Sep. 25, 1995; Nick Caistor, *Profile of a Teenage Killer, BBC News*, Apr. 28, 2002; *18 Dead in German School Shooting, BBC News*, Apr. 26, 2002; *Brazil School Shooting: Twelfth Child Dies, SkyNews*, Apr. 8, 2011; James Graff, *Politics Under the Gun, Time*, Mar. 31, 2002 (8 dead; 18 wounded in France); *Safety Council To Investigate Gun Laws*, *DutchNews.nl*, Apr. 12, 2011, http://www.dutchnews.nl/news/archives/2011/04/safety_council_to_investigate.php, last accessed May 21, 2011; *Schutter was al eerder suicidaal, NOS Nieuws*. Apr. 10, 2011, http://nos.nl/artikel/232127-schutter-was-al-eerder-suicidaal.html, last accessed May 21, 2011.

## IV.      Randolph Roth

This section analyzes Prof. Roth's Expert Report concerning the "history of homicides and mass murders in the United States. I take particular exception to his interpretation of the influence of firearms technology on murder and mass murder in particular.

### A.      Homicide and Firearms in the Colonial Era (1688-1763)

#### 1.      Regional and Cultural Variation

Starting at ¶20 Roth provides a plausible set of explanations for changing murder rates by region and over time.  He misses several explanations that might significantly contribute to murder rates, single or mass murder and regardless of weapon type: imported cultural traditions; religious beliefs, and population density.

The early British settlements in America established patterns of family life and acceptable individual behavior, and these cultural patterns persisted into the nineteenth century, often influencing regional levels of violence.  As David Hackett Fischer has exhaustively documented, four distinctive British folkways dominated eighteenth- and early nineteenth-century American society, and still influence it today: Puritan New England; Cavalier Virginia; Quaker Pennsylvania; and back country Scots-Irish.  Nor is this a recent discovery: the British novelist Frederick Maryatt visiting America in 1837, identified this country as still constituting distinct cultures: "[T]he puritan of the east, the Dutch descent of the middle states, the cavalier of the south . . . nearly as marked and distinct now, as at the first occupation of the country; softened down indeed, but still distinct.  Not only are the populations of the various states distinct, but even those of the cities. . . ."[135]

---

[135]. Frederick Marryat, *Diary in America*, ed. Jules Zanger 36 (1839)

Puritan New England was disproportionately settled by entire families, many of them representatives of "the sturdy middle class of England."[136]  With its emphasis on family life, self-discipline, and the consequences of sin, Puritan New England set a pattern that replicated itself as Yankees migrated west across the continent.[137]  This cultural pattern of self-discipline and social order appears to have played a part in keeping serious violent crimes rare in Boston and New York City until the 1830s, when large numbers of Irish immigrants arrived, ending the cultural homogeneity of these cities.[138]

The Quakers, while attaching less importance to marriage than the Puritans,[139] shared the Puritan desire for social order and peace. Frances Wright, describing 1820 Philadelphia, observed the Quaker influence in "the orderly behaviour of the citizens.  You not only see no riots in the streets, but no brawls. . . ."[140]  While the Quaker ideal of social order was different from that of the Puritans, the Quaker system of punishments was even more severe (except for capital punishment, which the Quakers opposed).[141]  Even after the Quakers had ceased to control the Delaware Valley, their culture persisted.  Not surprisingly, migrants heading west from the Delaware Valley carried these values about peace and social order with them.[142]

Cavalier Virginia, because of the commercial motivations that underlaid the colony and because of high female death rates (caused by an unhealthy combination of temperature,

---

[136] David Hackett Fischer, ALBION'S SEED: FOUR BRITISH FOLKWAYS IN AMERICA 26-31 (1989); Virginia Dejohn Anderson, *Migrants and Motives: Religion and the Settlement of New England, 1630-1640*, 58 NEW ENGLAND QUARTERLY 339-383 (1985), in Stanley N. Katz, John M. Murrin, and Douglas Greenberg, eds., COLONIAL AMERICA: ESSAYS IN POLITICS AND SOCIAL DEVELOPMENT 102-106 (4th ed. 1993).
[137] David T. Courtwright, *Violent Land: Single Men and Social Disorder from the Frontier to the Inner City* 48-49 (1996).
[138] James F. Richardson, *Urban Police in the United States* 19 (1974); Roger Lane, *Policing the City: Boston 1822-1885 26-38* (1967); Frances Wright, *Views of Society and Manners in America*, ed. Paul R. Baker 16-18 (1963).
[139] Fischer, ALBION'S SEED, 487-488.
[140] Frances Wright, VIEWS OF SOCIETY, 236.
[141] Fischer, ALBION'S SEED, 494-499, 584-589.
[142]. Fischer, *Albion's Seed* 594-595.

mosquitoes, and swamps), was dominated by single young men.  The culture that developed there was disordered and violent in a way that the Puritan and Quaker cultures were not.  A consequence of this single male culture was the South's emphasis on honor—and the use of violence to avenge insults to honor.[143]

Nor is this a later interpolation.  As early as the 1830s, at least one traveler through the Old Southwest observed that the surplus of single young men caused an increase in violence and dueling.[144]  While of a somewhat later era (1850s Nevada and postbellum California), Roger McGrath statistically demonstrated that violent crime rates in the wildest frontier mining camps of the Sierra Nevada were low in every category except for murder, where single males fought to the death because of "honor, pride, and courage."  In many respects, McGrath's description of this culture sounds very southern—or perhaps the problems of single young men transcend culture.[145]

Perhaps the most important of these cultural factors arrived between 1717 and 1775, when a vast swarm of British immigrants arrived for whom violence was not a consequence of too many

---

[143]. Courtwright, *Violent Land*, 27-30; Edward L. Ayers, *Vengeance and Justice: Crime and Punishment in the 19th-Century American South* 20-21 (1984).  Bertram Wyatt-Brown, SOUTHERN HONOR: ETHICS AND BEHAVIOR IN THE OLD SOUTH 166-174 (1982) , provides examples of how southern culture glorified fighting and dueling, even at the expense of young men's lives.

    Wyatt-Brown, SOUTHERN HONOR 20, argues that dueling had been common in the North before the Revolution but declined in response to Beecher's attacks on dueling.  But a minority viewpoint, articulated in Bruce Baird, "The Social Origins of Dueling in Virginia," in Michael Bellesîles, ed., LETHAL IMAGINATION: VIOLENCE AND BRUTALITY IN AMERICAN HISTORY (1999), 87-112, argues that colonial Virginia was not a particularly violent culture until shortly before the Revolution, when back country Scots-Irishmen become an increasingly important influence on the tidewater Cavaliers.

[144]. Joseph Holt Ingraham, 2 *The South-West: By a Yankee* 45-9 (1835).

[145]. Roger D. McGrath, *Gunfighters, Highwaymen, and Vigilantes: Violence on the Frontier* 247-255 (1984).

single young men but was a fundamental part of their way of life.  Often called Scots-Irish,[146] these settlers came from the English and Scottish border counties, sometimes after a stay in Ulster.[147]

Like the Puritans, these immigrants were likely to arrive as family units.  Sometimes, entire communities emigrated together.[148]  Unlike Virginia cavalier culture, gender ratio should not have made these immigrants peculiarly violent.  Instead, they brought a culture of violence with them.  Two differing theories have been offered to explain this level of violence: In some ways, they are complementary not competing theories.

One theory holds that the absence of effective government created a culture in which private violence, both defensive and offensive, was the only practical way to survive.  From the eleventh century to the close of the eighteenth century, the borderlands between Scotland and England were the scene for continual warfare and private criminal behavior.  Ambrose Bierce's cynical definition of a pacifist as a "dead Quaker" suggests at least one reason why defensive and offensive violence became a part of the culture: In an area where rape, torture, and murder were common and no effective legal system existed, those reluctant to use deadly force would be at a serious disadvantage.  The inhabitants developed a callous disregard for law and the lives of others; survivors pass on their culture much more effectively than the dead.  These values became a part of the Scots-Irish culture.[149]

---

[146]. Fischer, *Albion's Seed*, 618-621, does an effective job of demonstrating the misleading nature of the term "Scots-Irish."  Alas, the term is so thoroughly ingrained in the American lexicon that it seems beyond hope to call them "borderlanders."

[147]. James G. Leyburn, *The Scotch-Irish: A Social History* 157 (1962), says that 250,000 immigrated just from Ulster during this period.

[148]. Fischer, *Albion's Seed*, 608-610.  One example of this Scots-Irish family group migration is the 1730 arrival of the McConnell, Young, and Setlington families from northern Ireland.  Ethel McConnell Bartindale, *History of the McConnell Family* 6-7 (1923).  The McConnells were my *very* peaceful and civilized ancestors.

[149]. Fischer, *Albion's Seed*, 621-632; Ayers, *Vengeance and Justice*, 21-23.  Leyburn, *The Scotch-Irish*, 3-13, describes the causes for this culture of violence in greater detail than Fischer, though arguing that the level of violence significantly decreased by 1610, even though the cultural values associated with it persisted.

Another theory argues that the Scots-Irish culture of violence was a product of an economy based on herding on marginal agricultural lands. Where poor soils or a lack of rain make lands marginal for farming, herding takes its place, as it did in both Scotland and many of the mountainous and arid parts of the American South. Herding and its cause, poor agricultural lands, carry with it three closely related problems that lead to a culture of honor and violence: portability of goods, poverty caused by poor soils, and an absence of effective government because of a limited tax base.

Because a herder's livelihood is dependent on a readily transportable form of property, he is much more likely to suffer theft than a farmer. Crops cannot be cajoled into walking away, unlike sheep or cattle. Crops are often less valuable per weight, and therefore the incentive to steal crops is less. Consider how widespread the problem of cattle rustling was in the American West, while there is no equivalent specialized term for the theft of wheat "on the hoof." A herder must then be able and willing to defend his livestock from theft—and in remote settings where he may have little or no assistance from government.

Rustlers will attack whom they perceive as the weakest herdsman to steal his livestock. Members of a herding culture must therefore be sensitive to insult, "to preserve the individual's reputation for being willing and able to carry out violence if needed."[150] Hence, the culture of honor exists—one in which how others perceive your willingness to defend what is yours matters very much. This would suggest that in exchange for reduced property crimes, such a society experiences increased crimes of violence as herdsmen demonstrate this willingness to fight. Not surprisingly, with such a tradeoff, property crimes appear to have been rare in the South relative

---

[150]. Richard E. Nisbett and Dov Cohen, *Culture of Honor: The Psychology of Violence in the South* 89 (1996).

to crimes of violence.[151]  Perhaps the southerner's willingness to use force to protect property explains why property crimes were rare and crimes of violence were common.

At the same time, the poverty of a region dependent on herding makes it more likely that thieves will risk injury or death to steal livestock because the alternative may be hunger or even starvation.  Agricultural societies usually have sufficient surpluses (assuming equivalent distribution of wealth) that stealing is not necessary to avoid hunger.  Not only must the herder have the ability to defend his herd from theft, but his need to protect his livestock is likely higher as well because of the poverty of a herding society.

Finally, herding societies, because of their limited tax base, often have limited criminal justice systems.  The herder must therefore deal with problems of theft himself if he wishes to protect his livelihood.[152]  Whether the herding economic base caused the culture of honor in Scotland or not, herding dominated the economy in the antebellum southern uplands, with farming a sideline—as had been the case for centuries in the borderlands whence came the Scots-Irish.[153]

## 2.    Homicide in Colonial America

Prof. Roth in ¶17 argues that "Violence among colonists was not a pressing problem on the eve of the Revolution."  I would completely agree that this was true, but I disagree strongly with his reasons for why.

> First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.

---

[151] Grady McWhiney, Cracker Culture: Celtic Ways in the Old South 166-7 (1988).
[152] Nisbett and Cohen, *Culture of Honor*, 5-11, 88-90.
[153] McWhiney, CRACKER CULTURE, 51-56, 64-78. Malcolm J. Rohrbough, THE TRANS-APPALACHIAN FRONTIER: PEOPLE, SOCIETIES, AND INSTITUTIONS 1775-1850 288 (1978), also notes the emphasis on herding, not farming, in the Old Southwest.

Roth's source is Roth's book American Homicide 63. This is not evidence; it is "trust me, I know what I am doing." Review of that chapter in Roth's book has a lot of very plausible arm-waving but not evidence that would persuade someone who did not already share Roth's assumptions or trust in…Randolph Roth. Roth provides no evidence to show that political stability increased, that patriotism increased or trust in government increased.

We need to examine Roth's definitions. These homicide rates are not *murder* rates, which makes comparison to current murder rates invalid. First of all, Roth repeatedly indicates that he is looking at homicides by "unrelated adults."[154] About 6% of murder victims in 2019 were under 18.[155] It seems likely that murder of minors (which at that time would have included all under 21 years) would have been similarly common. "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[156]

Damaging comparability the other direction, Roth tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[157] About 6% of recent civilian homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable. Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon

---

[154] Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).
[155] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).
[156] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).
[157] Randolph Roth, AMERICAN HOMICIDE xii (2009).

any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[158]

Roth at ¶17: "By the late 1750s and early 1760s, the rates at which *adult* colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England." These are rates not terribly different from current U.S. murder rates. Roth's numbers however understate murder rates. This gives a warmer and cozier picture of colonial America than it was.

> New England especially was doing *something* right, but what? Roth at p. 10 has a second explanation, but one that explains too much:
> Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era. They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading. They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.

One blackpowder muzzle loading firearm of the time could fire large numbers of bullets without reloading: the blunderbuss. Often portrayed in cartoon representations of Pilgrim hunting:

---

[158] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).



159

The blunderbuss was a shotgun with a belled muzzle intended to distribute shot at close range where it would be devastating.  Soldiers often used them to repel boarders at sea or while boarding ships at sea.  They were also "the preferred weapon of coach guards… and defense of close spaces such as buildings and in dealing with unruly crowds."[160]  They were loaded with up to 20 pellets of buckshot.  #0 buckshot is .33 caliber.[161]  At close range, they would be firing 20 lead balls the diameter of a modern 9mm bullet.  While likely less lethal beyond 20 yards (hunting distance for fowl), the state of medical knowledge would likely have made them as fatal as being attacked with a modern pistol.

Were blunderbusses commonly owned?  They appear for sale in ads,[162] in murder cases,[163] and inventories of confiscated weapons.  When General Gage ordered the citizens of Boston turn

---

[159] *Blunderbuss, the "Thunder Box" of the Battlefield*, American Revolution Institute of the Society of the Cincinnati, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/, last accessed February 5, 2023.
[160] Spencer C. Tucker, INSTRUMENTS OF WAR: WEAPONS OF TECHNOLOGY THAT HAVE CHANGED HISTORY 72-73 (2015).
[161] Chris Baker, *Buckshot*, https://www.luckygunner.com/lounge/stuff-you-should-know-about-buckshot-part-1/, last accessed February 5, 2023.
[162] *Boston Gazette*, May 30, 1720.
[163] In 1630, ten years after his arrival at Plymouth, John Billington, who had been in continual trouble at Plymouth, was convicted of murdering John Newcomen with a blunderbuss, after some quarrel now lost to history. George F. Willison, SAINTS AND STRANGERS 308 (1981)/

in their firearms after the unpleasantness at Lexington, the more gullible citizens turned in thousands of weapons including 38 blunderbusses.[164]

The single shot nature of a muzzle loader certainly would have deterred their use for mass murder. There are many other plausible explanations for the rarity of homicides in that time. There were no cities. Even today, population density in America is strongly correlated with murder: Metropolitan Statistical Areas have 5.1/100,000 murders, compared to 4.5 for cities outside metropolitan areas and 3.9 for Nonmetroplitan counties.[165] And few nonmetropolitan counties in America today could even begin to compare to any New England county for population. Murder rates in New England today remain among the lowest in the nation (Maine: 1.5/100,000; New Hampshire: 2.2; Vermont: 1.8; compared to the U.S.: 5.0),[166] even with until recently some of the most relaxed gun laws in America (Giffords Law Center to Prevent Gun Violence Annual Gun Law Scorecard: Maine: F; New Hampshire F; Vermont C-).[167] Many other states are awash in modern guns, relaxed gun laws, and murder rates that are only slightly worse than colonial New England. My home state, Idaho, which does not even require a license to carry, and has no machine gun regulation, is 2.0/100,000; South Dakota (1.9); Wyoming (2.2).[168] All three states get an F from Giffords. [169] Considering that Roth's homicide rates undercount murders by excluding children and murders by relatives, none of these states with *very* relaxed gun laws and widespread availability of modern firearms seem to be doing much worse today than colonial New England. Perhaps Roth needs to consider other explanations?

---

[164] Richard Frothingham, HISTORY OF THE SIEGE OF BOSTON, AND OF THE BATTLES OF LEXINGTON, CONCORD, AND BUNKER HILL 94-95 (6th ed., 1903).
[165] FBI, CRIME IN THE UNITED STATES 2019 Table 2.
[166] FBI, CRIME IN THE UNITED STATES 2019 Table 4.
[167] Giffords Law Center to Prevent Gun Violence, *Annual Gun Law Scorecard*, https://giffords.org/lawcenter/resources/scorecard/, last accessed July 16, 2023.
[168] FBI, Crime in the United States: 2019, Table 4.
[169] Giffords Law Center to Prevent Gun Violence, *Annual Gun Law Scorecard*, https://giffords.org/lawcenter/resources/scorecard/, last accessed July 16, 2023.

### 3.    Black Powder

At ¶19, Roth suggests an explanation for why a society where guns were widespread did

not have a substantial gun murder problem:

> And muzzle-loading guns were difficult to keep loaded for any length of time,
> because black powder absorbed moisture and could corrode the barrel or firing
> mechanism or make the charge liable to misfire. The life of a charge could be
> extended by storing a gun in a warm, dry place, typically over a fireplace, but even
> there, moisture from boiling pots, drying clothes, or humid weather could do
> damage. That is why most owners stored their guns empty, cleaned them regularly,
> and loaded them anew before every use.

This would be a persuasive and logical argument except for what the people who lived then

tell us.  Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries

caused by colonists failing to follow this very logical action:

> And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle
> Island, one of them stepping forward to hand the sail, caused a fowling piece with
> a French lock, which lay in the boat, to go off. The whole charge went through the
> thigh of one man within one inch of his belly, yet missed the bone, then the shot
> (being goose shot) scattered a little and struck the second man under his right side
> upon his breast, so as above 40 shot entered his body, many into the capacity of his
> breast.[170]

> Children were not safe from these rarely loaded firearms:

> It is observable that this man had gathered some providences about such as were
> against them, as that Mr. Winslow's horse died, as he came riding to Boston; that
> *his brother's son (a child of eight years old) had killed his own sister (being ten*
> *years of age) with his father's piece*, etc., and his great trouble was, least this
> providence which now befell him, should be imputed to their cause.[171] [emphasis
> added]

> And:

> One Richard Sylvester, having three small children, he and his wife going to the
> assembly, upon the Lord's day, left their children at home. The eldest was without

---

[170] Id. 2:55.
[171] Id., 2:317.

doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[172]

These four incidents of firearms kept loaded when not in actual use resulting in serious misadventure are in *one* book. How many of these loaded firearms sat quietly in their place, never accidentally discharging? How many incidents are in books that I have not read?

Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use. In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town…

You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded. Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded? Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

Roth at ¶ 21 asserts: "Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training." His source is himself. Almost every

---

[172] Id., 2:72.

colony required colonists to carry arms to church for security against either Indian attack or slave rebellion, or while travelling out of the colony.[173]  It is certainly possible that except when ordered to do so, colonists were not generally armed.  Roth needs more than his say-so.  That so many

---

[173] 1770 Georgia: "An act for the better security of the inhabitants by obliging the male white persons to carry fire arms to places of public worship."  19(part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA (1910), :137-140. this law required all white male inhabitants to carry either a long gun or a pair of pistols to church Id. at 138; "That the church warden or church wardens of each respective parish, and the deacons, elders or select men... to examine all such male persons" to make sure that they were armed." Id. at 138, 139.

1642 Maryland: ""Noe man able to bear arms to goe to church or Chappell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott."  3 ARCHIVES OF MARYLAND 103  (1885);

1630/1 Massachusetts: "Further, it is ordered, that noe pson shall travel single betwixte theis plantation & Plymouthe, nor without some armes, though 2 or 3 togeathr." 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 85 (1853); 1636/7 Because of the danger of Indian attack, and because much of the population was neglecting to carry guns, every person above eighteen years of age (except magistrates and elders of the churches) were ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12d. for every default".  And no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12d. for every default." Id. at 190.

1646 New Haven Colony When militiamen were called by the beating of the drum "to the publique worship of God" they were to show up "with their armes compleat, their guns ready charged, with their match for their matchlocks and flints ready fitted in their firelocks".  RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 `32 (1857);

1641 Plymouth Colony "It is enacted That every Towneship within this Government do carry a competent number of pieeces fixd and compleate with powder shott and swords every Lord's day to the meetings--one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."  THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 70 (1836); 1658: ordered 1/4 of the militia "carry theire armes" to church every Sunday, defined as "some serviceable peece and sword and three charges of powder and bullets" or be fined "2 shillings and six pence...." Id. at 115; 1681: Also, the statute of 1658 requiring 1/4 of the militia to bring their guns to church every Sunday was updated to require "six charges of powder same shott" from "beginning of Aprill to the end of October yearly...." Id. at 192, 193;

1639 Rhode Island "It is ordered, that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."  There was a fine of five shillings for failing to be armed in either circumstance." 1  RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (1856); 1643 reiterated an earlier order "for every man to have so much powder, and so many bullets, and so the forwarning is to stand still in force; and also that every man do come armed unto the meeting upon every sixth day" 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 79, 80 (1856);

1743 South Carolina required: "That within three months from the time of passing this Act , every white male inhabitant of this Province , (except travellers and such persons as shall be above sixty years of age, ) who, by the laws of this Province is or shall be liable to bear arms in the militia of this Province, either in times of alarm or at common musters, who shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province , and shall not carry with him a gun or a pair of horse pistols , in good order and fit for service, with at least six charges of gun- powder and ball , and shall not carry the same into the church or other place of divine worship as aforesaid , every such person shall forfeit and pay the sum of twenty shillings" 7 THE STATUTES AT LARGE OF SOUTH CAROLINA: EDITED UNDER AUTHORITY OF THE LEGISLATURE 417 (1840);

1619 Virginia "All persons whatsoever upon the Sabaoth daye shall frequente divine service and sermons both forenoon and afternoon, and all suche as beare armes shall bring their pieces swordes, poulder and shotte. And every one that shall transgresse this lawe shall forfaicte three shillinges a time to the use of the churche." NARRATIVES OF EARLY VIRGINIA 1606-1625 273 (1907).

colonists were regularly carrying loaded firearms without murdering each other suggests technology was not the reason for colonial New England's peace.

### C.    Homicide in the Early Republic/Population Density

Most baffling is Roth's apparent indifference to the role of population density.  At ¶24: "By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year."  New York City had 123,706 people at the 1820 census; Philadelphia 63,802.  These were the two largest cities in America.[174]  The anonymity of large cities makes it far easier for a murderer to escape justice; this is such a large oversight as to make me scratch my head in wonder that he could compare areas of such radically different densities with no apparent awareness that population density might explain these murder rate differences.

At ¶24, Roth claims: "And the proportion of domestic and nondomestic homicides committed with firearms was similarly low—between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia."  We now that they did not go around armed because they were not murdering each other?  This is circular reasoning.  Perhaps there were few reasons to kill each other.  In many states today, most of the adult population is allowed to carry concealed firearms without a license and many are regularly armed and we still have low murder rates.

---

[174] U.S. Census, *1820 Fast Facts*, https://www.census.gov/history/www/through_the_decades/fast_facts/1820_fast_facts.html, last accessed February 6, 2023.

At ¶26, more circular reasoning: "Because gun use was generally limited to hunting, controlling vermin, or serving in the militia, there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels."  Or people generally behaved themselves, so there was no need to regulate the practice.  That legislatures passed surety bond laws suggests that not everyone behaved themselves, so there was *some* regulation.

At ¶27:

Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states, where violence among citizens increased after the Revolution to extremely high levels. Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year. Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.

Since Roth cites me as a source for part of this, I find it curious that he did not consider the evidence I found that this murder problem was an outgrowth of the backcountry honor culture, which was also the origin of the dueling problem that by Roth's admission in the previous sentence was the target of Northern legislation.  It was also the target of much Southern legislation and involved not just "Poor and middle-class whites" but people held back from legislative, judicial, and militia positions by "dueling oaths" requiring them to swear that they had not participated in a duel after a particular, often frequently changing date.[175]

"The justices of the Louisiana Supreme Court echoed these sentiments—'unmanly' men carried concealed weapons to gain 'secret advantages' over their adversaries."  He cites his book

---

[175] Example: LAWS OF THE STATE OF INDIANA, PASSED AND PUBLISHED AT THE SECOND SESSION OF THE GENERAL ASSEMBLY 362-365 (1818).

instead of a Louisiana Supreme Court decision. And his book cites my book. Why not look up the decision itself?[176] This is not terribly persuasive evidence of scholarship.

At ¶31, Roth describes Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons." He then buries in a footnote that the law did not survive the Georgia Supreme Court. This seems like rather a big deal. While *Nunn v. State* upheld the concealed carry ban part of the law, the decision also ruled that: "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such, merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree…" This is a rather important point.

Roth recounts likely causes of changes in murder rates but makes no attempt to quantify relationships between these changes and murder rate changes. Many of his likely causes are not prone to quantification. Nonetheless, some are. If slavery drove high murder rates in the South, an obvious test would be to attempt to draw a correlation between slaves per 100,000 population by state, or even more ideally, by county. A perhaps more subtle measure might be what percentage of slave holders were "planters," those holding 20 or more slaves. It is hard to take seriously claims about relationships of various factors to murder rates when not even this basic statistical analysis has been demonstrated.

### D.    From the Mexican War through the Early Twentieth Century

Roth opens ¶33 with a statement that is utterly false. "By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession." No state banned concealed firearms, or even placed restrictions on possession. Concealed carry was heavily regulated. In the footnote he observes: "

---

[176] State v. Chandler, 5 La. An. 489, 490, 491 (1850).

These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

What makes this claim in the footnote misleading is that the Vermont Supreme Court overturned a Rutland ordinance that banned concealed carry, while upholding the state law which required that the carrier did so "with the intent or avowed purpose of injuring a fellow man." Without that criminal intent, the Court ruled, the Vermont Constitution's right to keep and bear arms provision took precedence over a city ordinance.[177]

Another misleading part of this claim is that some states passed concealed carry bans and then repealed them. California banned the carrying of concealed weapons in 1864.[178] It then repealed the law in 1870.[179] Newspapers that hailed the new law also hailed its repeal. The reason has some relevance to Roth's claims. One editorial argued that the law:

bothers the good and assists the bad. It disarms the orderly citizen and places no obstruction in the way of the robber. Homicides were very common some years ago in California, and their frequency was partly due to the general custom among the miners of carrying revolvers and large knives. They were mostly single men, who would occasionally drink freely, and under the influence of strong liquor they did not hesitate to take life in case of a quarrel. But of late years, families have increased, dissipation has decreased, and drunken affrays are more rare. At the same time, robbery on the highway, and especially in this city, is more frequent.[180]

Roth at ¶34 then observes that with respect to homicide:

But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South

---

[177] State v. Rosenthal, 75 Vt. 295, 55 A. 610 (1903)
[178] 1 GENERAL LAWS OF THE STATE OF CALIFORNIA, FROM 1850 TO 1864, INCLUSIVE 1585 (1870).
[179] California sess. Laws ch. 63 (1869-70).
[180] *The Carrying of Concealed Weapons*, DAILY ALTA CALIFORNIA, Mar. 13, 1869, 2.

and the Southwest, where rates had already risen in the early national period, but in the North.

Most curious people would ask which was the direction of causality between widespread passage of bans on concealed weapon carrying and a rising homicide rate.  Both directions are plausible, if that editorial from the Daily Alta California is to be believed.  It is apparent that Prof. Roth did not consider that possibility.

At ¶36: "Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun. But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession."  Yes, there was evolution of firearms technology during the early Republic, but Colt's important advances receive too much attention from Roth.  From the late 18th century, gun makers made repeating handguns called pepper-boxes.

The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[181]  The development of the percussion cap certainly made them more practical.  While a percussion cap could certainly be detonated by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.

Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL

---

[181] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[182]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[183]

While pepper-box pistols had a poor reputation for being more hazard to the shooter than the target, perhaps based on the necessarily dangerous flintlock method of firing, you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[184]

At ¶37: "Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway."  Perhaps Roth should consider whether the homicide crisis was because of revolvers or was the homicide crisis the cause of revolver popularity.  By his own admission in ¶35: "Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons."  The current issue with "assault weapons" and LCMs may be more a symptom of larger problems.  If you do not address those root causes, you may only change the method of murder.

At ¶38: "Smith and Wesson had created a near-perfect murder weapon. It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time."  They had also created a near-perfect weapon of self-defense.  That also describes the sidearm carried by every police officer and millions of law-abiding Americans.  Roth has just admitted his biases.

---

[182] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.
[183] *English Transitional Pepperbox Revolver*, FORGOTTEN WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.
[184] *Antique Pepperbox Pistol 1850's Washington Arms Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

At ¶40: Easily concealed, [revolvers] became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards."  Also, for estranged spouses or romantic partners, sheriffs, constables, or police officers, targets of self-styled toughs, and intended victims of mass murderers.  "CHICAGO, Apr. 5. Two men were killed and three wounded today when a former employee of the W. A. Foundry & Machine Company walked into the offices of the concern and began firing with two pistols.  He was then shot and killed by the plant superintendent, who opened fire in return."[185]

At ¶40, Roth tells us: "As modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction."  Again, Roth's insistence on including lawful defensive killings in "homicides" tells us nothing about whether this changing homicide rate was good or bad.  If toughs, estranged lovers, or criminals using clubs or fists were the dead and the shooters were their intended victims, it could just as well explain "the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time."  Roth's data is interesting from an epidemiological standpoint but perhaps not useful for understanding murder.

¶40: "Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history."  Since Roth has repeatedly shown us data on unrelated homicides for colonial America, he should show us some actual data on this change,

---

[185] "Former Employe[sic] Kills 2; Wounds 3," Bisbee [Ariz.] Daily Review, Apr. 6, 1922, 1.

rather than just opening the sentence with "Ominously." Certainly, there was no shortage of mass murders in families in this period using non-firearms. "Here are just a *few* examples: axes,[186] hammers,[187] knives,[188] poison,[189] drowning,[190] and strangling.[191] I have hundreds more depressing examples.

Starting at ¶41, Roth reaches to laws passed after 1868, the cutoff line as far as *Bruen* is concerned.

Prof. Roth argues in ¶22 that the Founding Generation believed public safety threats "could be checked only by statutes that placed limits on basic rights." I do not dispute this claim, but if Revolutionary standards are a basis for current laws, what will Prof. Roth's response be to a 1792

---

[186] *Trial of Abel Clements*, [Richmond, Va.] *Virginia Argus,* Jul. 19, 1806, 2 (man murdered wife and eight children).

[187] *Murdered Her Children*, [Jonesboro, Tenn.] HERALD AND TRIBUNE, Jun. 11, 1874, 1 (Woman bashes her husband in the back of the head with a cooper's adze (a specialized type of hammer), an injury expected to be eventually fatal. While seeking medical and police assistance, the woman beat to death her three children with an iron); *A Family Slain*, KANSAS CITY JOURNAL, Mar. 4, 1899, 1 (The missing father apparently beat to death his wife and their four children with a hammer.); *Insane Farmer Kills His Family,* Butler [Mo.] Weekly Times, Mar. 19, 1903, 7 (A farmer murdered his wife and six children with a sledgehammer then used it on himself); *Four Men Killed*, SAVANNAH MORNING NEWS, Aug. 18, 1903, 1 (Physician "[c]razed by drink" attacked his wife; when she returned he had beaten their three children to death with a claw hammer.)

[188] *Three murdered and a Suicide*, MUSCATINE [IOWA] WEEKLY JOURNAL, Jan. 11, 1861, 1 (Murderer, "after a social interview with some of his neighbors, which ended with singing and prayer" murdered his wife, a son, and a daughter with a knife.); *Shocking Murder in York County, Pennsylvania*, [Richmond, Va.] DAILY DISPATCH, Jun. 22, 1866, 1 (Robber murdered farmer George Squibb, his wife, and granddaughter with a knife.); *A Wife and Three Children Murdered by the Husband-Father*, CAIRO [ILL.] EVENING BULLETIN, Dec. 3, 1869, 1 (Man murders his wife and three children, cutting their throats.)

[189] *A Modern Borgia*, NASHVILLE UNION AND AMERICAN, Oct. 27, 1868, 1 (Servant girl poisons family of seven with Paris green, an arsenic rat poison.); *Families Poisoned*, [Austin, Minn,] MOWER COUNTY TRANSCRIPT, May 2, 1872, 1 (A boarder poisoned three of Mrs. Tibner's children because Mrs. Tibner would not lend him $1; he later confessed to his crime, and the murder of his wife and their child.); *A Shoemaker Named Geistlach…*, [Winsboro, S.C.] NEWS AND HERALD, Jun. 18, 1878, 1 (Mrs. Geistlach and her two children found dead from chloroform poisoning. Because she was illiterate, investigators considered her suicide note a forgery. Her husband, an out of work shoemaker, had disappeared, leading to suspicion that he was the actual killer.); *An Inhuman Step-Mother*, [Washington, D.C.] EVENING STAR, Jun. 15, 1869, 1; [Franklin, La.] PLANTERS' BANNER, Sep. 1, 1869, 1 (Stepmother drowns three children from husband's previous marriage out of jealousy. The river was only two feet deep, so she held them under "until life was extinct.")

[190] *Caucasian Cruelty*, ST. PAUL DAILY GLOBE, Dec. 16, 1888, 1 (Man murders his wife and two children, drowning them with iron weights.); *Drowned Her Six Children*, ADAMS COUNTY NEWS [Ritzville, Wash.] Feb. 27, 1901, 4 (A woman threw her six children down a 30 foot deep well, "then jumped into the well, and, the belief is, held their heads under water until all were drowned.")

[191] *State Specials*, DALLAS DAILY HERALD, Apr. 16, 1881, 1 (Mrs. John Simmons, her four year-old son and her mother-in-law" were murdered. Mrs. Simmons had been "outraged" before the cutting of her throat; the mother-in-law strangled and the son murdered by dashing "the brains of his little son out upon the rocks.")

"An act for the punishment of lewdness, adultery and polygamy?"[192]  Would New York State's

capital punishment of buggery[193] and Massachusetts' "An Act Against Sodomy[194] have a similar

claim?  Would the Pennsylvania Constitution 1776 provision:

> And each member, before he takes his seat, shall make and subscribe the following
> declaration, viz:
>
> I do believe in one God, the creator and governor of the universe, the rewarder of
> the good and the punisher of the wicked. And I do acknowledge the Scriptures of
> the Old and New Testament to be given by Divine inspiration.[195]

If you intend to murder several people in a short period of time, an ax or a knife remains a

sufficient weapon.  They are cheap and silent.  They draw no attention to your actions or provide

warning to other potential victims.

### E.    Irrelevant Laws

Roth at ¶26-27 discusses the development of concealed weapon regulation, much of it

directed at knives, and sometimes leaving firearms completely unregulated, such as Tennessee's

1838 law.[196]  If Roth's point is that the early Republic found acceptable the regulation of concealed

carry of deadly weapons, its relevance to possession or sale of LCMs and "assault weapons" (most

of which would be concealable only by ten-foot-tall criminals), as is the objective of the New

Jersey law, seems unclear.

---

[192] *Laws of the State of New-Hampshire* 257-8 (1792).; Laurel Thatcher Ulrich, *A Midwife's Tale: The Life of Martha Ballard, Based on her Diary, 1785-1812*, (New York, Random House, 1990)*,* 291-307; Horrid Murder! At an early hour on Wednesday morning last, the inhabitants of this town were alarmed with the dreadful information…, (Augusta, Me., 1806), 1 (murdered his wife and seven of his eight children with an axe or knife); "Miscellaneous Clippings," Wyandot [Ohio] Pioneer, Feb. 27, 1863, 2 (Woman murdered three stepchildren with an ax); "The Philadelphia Horror," Chicago Tribune, Apr. 3, 1869, 2; "Horrible Murder," [Irasburgh, Vt.] Orleans Independent Standard, Apr. 13, 1869, 3; "The Late Terrible Tragedy in Philadelphia," [Washington, D.C.] Evening Star, Apr. 1, 1869, 1 (A man with ax murdered his wife and two children)
[193] 1 *Laws of the State of New-York 336 (*1792).
[194] *Perpetual Laws of the Commonwealth of Massachusetts* 187 (1789).
[195] Pennsylvania Const. § 10 (1776).
[196] *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8* ch. 137 at 200-201 (1838),

Even conceding antebellum constitutionality of regulation of concealed carry, the Tennessee Supreme Court decision upholding the 1838 concealed knife law has something to say about "weapons of war":

> To make this view of the case still more clear, we may remark, that the phrase, "*bear arms*," is used in the Kentucky constitution as well as in our own, and implies, as has already been suggested, their military use. The *28th section of our bill of rights* provides, "that no citizen of this State shall be compelled to *bear arms*, provided he will pay in equivalent, to be ascertained by law." Here we know that the phrase has a military sense, and no other; and we must infer that it is used in the same sense in the *26th section*, which secures to the citizen the *right to bear arms*. A man in the pursuit of deer, elk and buffaloes, might carry his rifle every day, for forty years, and, yet, it would never be said of him, that he had *borne arms*, much less could it be said, that a private citizen *bears arms*, because he has a dirk or pistol concealed under his clothes, or a spear in a cane. So that, with deference, we think the argument of the court in the case referred to, even upon the question it has debated, is defective and inconclusive.[197]

If only military arms are protected, then these weapons that we are told are "weapons of war," must be protected arms. This must be what that James Madison, author of the Second Amendment, meant when in Federalist 46 he wrote about the potential danger of a tyrannical national government:

> Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government; still it would not be going too far to say, that the State governments, with the people on their side, would be able to repel the danger. The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million of citizens with arms in their hands,…

Roth speaks approvingly of *Nunn v. State* (Ga. 1846) and its acceptance of concealed carry regulation but misses its important protection for arms possession and carry:

> The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used

---

[197] *Aymette v. State*, 21 Tenn. (2 Hump.) 154, 161 (1840)/

by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all of this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.   Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this right, originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, reestablished by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own Magna Charta! And Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans, plead eloquently for this interpretation![198]

Also Roth refers to "prohibitions against carrying certain concealable weapons…"  It was only if the weapons were *concealed*, not concealable.  A pistol or Bowie knife might well be concealable, but if openly carried, it was still lawful.  Tennessee prohibited sale of fighting knives and concealed carry, but open carry remained lawful with an added penalty if the bearer injured another party with no apparent requirement that the knife be concealed.[199]

¶27 Roth asserts that in the 1830s several states "passed laws … that restricted the use or ownership of certain types of weapons."  I can find no laws restricting ownership, only prohibitions on concealed carry with sentence enhancements for criminal use while carrying openly (Texas,[200] Tennessee[201]).  Many of these statutes prohibited or taxed prohibitively the sale or transfer of such weapons (Alabama,[202] Georgia,[203] Tennessee.[204]) without prohibiting ownership.

At ¶28 n. 55, Roth informs us that "These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See An Act Against*

---

[198] *Nunn v. State*, 1 Ga. 243, 250, 251 (1846).
[199] 1838 Tenn. Ch. 137 § 4.
[200] See *Cockrum v. State*, 24 Tex. 394, 402 (1859).
[201] 1838 Tenn. Ch. 137 § 4.
[202] 1837 Ala. Ch. 11, § 2.
[203] *Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837* (Milledgeville: P. L. Robinson, 1838), 90-91 § 1.
[204] 1838 Tenn. Ch. 137 § 1.

Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892)."

An Andrew Rosenthal was convicted in Rutland City Court of violating city ordinance No. 10, "prohibiting a person from carrying within the city any brass knuckles, pistol, slung shot, or weapon of similar character, or any weapon concealed on his person, without permission of the mayor or chief of police," though in what way, and with what arms, is not told by the headnotes or the decision. The Vermont Supreme Court struck down the ordinance based on the Vermont Constitution "art. 16, [which] declares that the people have a right to bear arms for the defense of themselves and the state," and that the ordinance in question "so far as it relates to the carrying of a pistol under any circumstances without such consent, is repugnant to the Constitution, and to that extent void."

Vermont Statutes §4922 prohibited the carrying of arms, "with the intent or avowed purpose of injuring a fellow man":

> Under the general laws, therefore, a person not a member of a school may carry a dangerous or deadly weapon, openly or concealed, unless he does it with the intent or avowed purpose of injuring another; and a person who is a member of a school, but not in attendance upon it, is at liberty, in a similar way, to carry such weapons.[205]

The Court pointed out that the Rutland ordinance banned any carrying of a weapon concealed, whether a criminal intent was present or not, and was therefore contrary to the "Constitution and the general laws of the state." The Court emphasized that while other parts of the Rutland ordinance might be also invalid, these were "questions not now before the court."[206]

---

[205] *State* v. *Rosenthal*, 75 Vt. 295, 55 Atl. 610, 611 (1903).
[206] *Id.*

Roth at ¶28, informs us that "the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse." This is a strong assertion, in desperate need of evidence. The only sources listed are Roth and a paper co-authored by Roth about Old West Homicide rates, which paper makes no reference to revolvers, Colt, pistol, or handgun.[207] Referencing your own claims is unpersuasive.

Because Colt production for the commercial market started in 1848,[208] with the apparent swarm of murder rate data in Roth's possession, one might expect a table showing the steady rise in murder rates starting in 1848. Where is it? This increase in production was not subtle and should be considered cumulative in its effects; firearms are quite durable. This page from the Colt factory shows an order by *one* distributor for 200 7-shot revolvers per week:

---

[207] Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195.
[208] David A. Hounshell, *From the American System to Mass Production 1800-1932: The Development of Manufacturing Technology in the United States* 47 (1984).

43

62 673.                    Hartford Conn. Dec. 31. 1874.

Mess Schuyler Hartley & Graham
        1760 New York.
              Gentlemen
                    Your favor of the 29 th inst
came to hand this Am. and in reply would say,
that the stock of new Pocket that we have on hand
and in the works cannot exceed 2000 Pistols of these
about 1500 are finished. The remainder are in the
works, of those on hand there are about an equal
quantity of 4½, 5½ and 6½ inch. In altering
them over into Breech Loaders we could make them
all 4½ inch if desired. We will let the "Allies" have
them as they are (P&B) at 4.00 Ea. net or we will
alter them into Breech Loaders at 5.00 Ea net.
It would require about 60 days to alter 12 to 1500.
We are prepared to act on the 38 & 44/cals when we
hear or receive any encouragement from the Allies
and as stated to Mr Moore when in Hartford.
With the Compliments of the season. We remain.
                         Yours truly
                    (Signed)   Hugh Harrison Treas.

209

**JA4235**

At ¶34, Roth claims:

By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico. Homicide rates whipsawed, however, in the South. They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.

With all these advanced technology firearms on the market and cumulatively in private hands, it seems odd that murder rates fell in most of the country while rising in the South. Perhaps it was not the firearms, but the social upheaval of the end of Reconstruction and the rise of Jim Crow that caused increasing murder rates there? Having grabbed onto his preference for blaming revolvers, he suddenly loses interest in the larger social changes that were heavily concentrated in the one region where murder rates were rising. Worse for Roth's argument, in ¶¶35-36, he recounts how Texas, Tennessee, and Arkansas adopted increasingly strict gun carrying laws over the period in which he tells us murder rates were rising in the South. Somehow more revolvers caused more murders in the gun control leading South but the opposite in the rest of America.

After describing how California repealed its ban on concealed carrying of weapons, he asserts that "public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves." Roth cites an article on which I was co-author but somehow missed the quote from one of the newspapers that applauded the repeal:

Homicides were very common some years ago in California, and their frequency was partly due to the general custom among the miners of carrying revolvers and large knives. They were mostly single men, who would occasionally drink freely, and under the influence of strong liquor they did not hesitate to take life in case of a quarrel. *But of late years, families have increased, dissipation has decreased, and*

*drunken affrays are more rare.* At the same time, robbery on the highway, and especially in this city, is more frequent.[210] [emphasis added]

California had become less violent because of demographic changes and only seemed to need armed citizens to discourage robbery.

More evidence that Roth is not reading carefully is ¶45 n. 95:

Note that the title of the Cramer and Olson essay is misleading. It does not refer to the origins of the laws discussed here or to the ways in which they were enforced. It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

Yet his source for the "laws discussed here" is the paper that "does not refer to the origins of the laws discussed here…"  Somehow he missed "C.California's First Concealed Weapon Law," and "A.California's Second Concealed Weapon Law & Pancho Villa," and "B.California's Third Concealed Weapon Law."

## F.    Roth's Irrelevant Technical Errors

At ¶58, Roth goes into a technical discussion of the M-16 and compares it to the ArmaLite [*sic*] AR-15 as "the civilian version of the M-16."  While many parts are common between the two weapons, and a few intentionally incompatible, the most relevant aspects are the cartridge and speed of fire.  While 3,300 feet per second suggests an enormously powerful bullet, it is less powerful than many common hunting rifles.  The muzzle energy of the metal case 55 grain cartridge is 1,282 foot-pounds.  The widely used for hunting .308 Winchester is 2,648 foot-pounds. Both are quite lethal, but the .308 Winchester is more destructive at 200 yards than the .223 Remington at the muzzle.[211]  If the speed or power of the AR-15's cartridge is relevant, it is a

---

[210] *The Carrying of Concealed Weapons*, Daily Alta (San Francisco) California 2 Mar. 13, 1869.
[211] Sportsman's Guide, *Rifle Ballistics Charts*, https://www.sportsmansguide.com/ballisticscharts/rifle, last accessed February 6, 2023.

reminder that a hunting rifle expertly fired is quite deadly. The mass murderer at the University of Texas in 1966 murdered fourteen people.[212] He was a skilled marksman using a very traditional hunting rifle: a Remington 700. He also had two more rifles, a shotgun, and three pistols with him.[213]

A shortage of LCMs can always be solved by carrying more guns. Two examples: The mass murderer at ESL in Sunnyvale in 1988 arrived at the scene carrying "three handguns, including 9mm Browning semiautomatic pistol and a .380-cal. semiautomatic pistol, a .30-06 high-powered rifle and a 12-gauge shotgun -- the weapon used in all the killings."[214] The .30-06 is a standard hunting rifle caliber; I doubt that it used detachable magazines.

In 1913, a former teacher showed up at a Bremen, Germany, Catholic school "armed with six loaded revolvers." He killed one teacher, two children, "three children were gravely injured and three other children were slightly wounded." The article described him as "demented."[215] Depending on whether they were they were 5-shot, 6-shot, or 9-shot revolvers (all still common today) he could have fired 30, 36, or 54 shots without reloading.

At ¶62:

> Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms. The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.

---

[212] Charles Bowden, *The Men Who Stopped a Mass Murderer,* Esquire, Aug. 26, 2021, https://www.esquire.com/news-politics/a36890935/charles-whitman-mass-shooting-university-of-texas/, last accessed February 6, 2023.
[213] Craig Hlavaty, *Rifle Reported To Be Used In Charles Whitman Killing Spree Up For Sale, Houston Chronicle*, Sep. 24, 2014, https://www.chron.com/news/houston-texas/texas/article/Rifle-reported-to-be-used-in-Charles-Whitman-5777479.php, last accessed February 6, 2023.
[214] Jay Mathews, *Sudden Death In Sunnyvale*, *Washington Post*, Feb. 18, 1988.
[215] *Maniac Shot Many People*, BARRE [VT.] DAILY TIMES, Jun. 20, 1913, 1.

There are differences in other parts: hammers, bolt carrier, and lower receiver.  If Roth is trying to suggest that there is some easy conversion between the two weapons, see 26 USC § 5845(b ).[216]  Any parts collection capable of that conversion is *already* a machine gun.

The rubber band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  There is nothing specific to the AR-15 or any other "assault weapon" about this; it works on any semiautomatic firearm.  New Jersey by refusing to ban all semiautomatic firearms demonstrates that this is a cosmetic law that can be easily defeated.  "The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger."  The cited source makes no such claim.  Firearm manufactures engage in a continual battle between lighter triggers to improve accuracy and safety requirements to avoid unintentional firing.  The idea that firearms manufacturers are intentionally reducing trigger pull to facilitate the rubber band solution is in need of evidence.  Curiously, BATF has already made possession of a shoelace and a semiautomatic weapon (even if not an "assault weapon" into a felony.[217]

¶67: "What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two."  My research has involved mass *murders*, not just mass *shootings*.  (I consider mass murder a bad thing, not just when committed with firearms.)  This includes a number of mass murders since 1965 with very high death counts.

**New Orleans, La. (1973)**

---

[216]    *Full   Auto   vs   Semi   Auto   AR15   Bolt   Carrier   Group   Comparison*, https://www.youtube.com/watch?v=MO3LWqaw_Wg&t=53s, last accessed February 6, 2023.
[217] See Bureau of Alcohol, Tobacco, and Firearms letter, Sep. 30, 2004, https://claytoncramer.com/ATF-shoestring-machine-gun-2004.jpg, last accessed February 6, 2023.

06/24/1973: The murderer took revenge for being expelled from the UpStairs Lounge, a gay bar. He walked down the street and bought a bottle of cigarette lighter fluid, killing 33 people.[218]

### Los Angeles, Cal. (1987)

12/7/1987: The airline fired passenger agent for theft; he used his employee ID to smuggle a gun on board, murdered his former supervisor, then killed the flight crew. He crashed the airliner crashes; killing 45. He blamed his lack of promotion on racism.[219]

### San Juan, P.R. (1986)

12/31/1986: Three Teamsters attempted to negotiate a better labor contract with their employer by setting a fire that murdered 97 people.[220]

### New York, N.Y. (1990)

3/25/1990: Angry at his girlfriend, the murderer used $1 of gasoline and a match to set fire to her place of employment, murdering 87 people, leaving three survivors.[221]

### Oklahoma City, Okla. (1995)

4/19/1995: The murderer set off a bomb in front of the federal building killing 168 people and injuring hundreds more. This was retaliation for the 1993 deaths of dozens at the Branch Davidian compound that the murderer blamed on criminal behavior by the federal government.[222]

### New York, N.Y. (2001)

---

[218] Elisabeth Dias with Jim Down, *The Horror Upstairs*, *Time*, Jul. 1, 2013.
[219] Judith Cummings, *Kin of Suspect Defiant and Contrite*, *New York Times*, Dec. 11, 1987.
[220] *3 Teamsters Charged in San Juan Hotel Fire*, *Chicago Tribune*, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.
[221] Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, *New York Times*, Mar. 26, 1990.
[222] Flowers and Flowers, *Murders in the United States*, 56-7.

9/11/2001: Terrorists fly two commercial airliners into the World Trade Center killing 3047 people, wounding far more and plunging the U.S. into war.[223]

**Arlington Co., Va. (2001)**

9/11/2001: Same terrorist group flies an airliner into the Pentagon killing 184 people and wounding far more. [224]

**Somerset Co., PA (2001)**

9/11/2001: Same terrorist group fights for control of an airliner against determined and courageous crew and passengers, crashing the plane into the ground before reaching their D.C. target.  Forty people murdered.[225]

Roth's claim that recent mass *shootings* never involve more than two is *mostly* correct. One recent group mass *shooting* took place on Oct. 31, 2019, in Orinda, Cal. A conflict between gangs led to a shooting in which the murderers shot to death five people and "several others were injured.[226]  Mass *murders,* however, often involve larger groups such as those aforementioned.

### G.    Mass Murder: My Current Research Project

#### 1.    Defining Mass Murder

Since 2019, I have been researching the history of mass murder in the United States.  The definition of mass murder does not have a universal definition.  The FBI's definition of mass murder is four or more dead (including the killer) in one event, in one location.[227]  Other agencies,

---

[223] FBI, Crime in the United States: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf
[224] FBI, Crime in the United States: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf
[225] FBI, Crime in the United States: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf
[226]  Annie Sciacca, *'It Was A Bloodbath': Orinda Halloween Shooting Investigation Reveals Gang Connections*, San Jose Mercury-News, Nov. 17, 2019.
[227] FBI, Serial Murder: Multidisciplinary Perspectives for Investigators 8 (2008), distinguishing mass murder from serial murderers. "Generally, mass murder was described as a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murders."

such as the U.S. Secret Service use the term "mass attacks" in which "three or more people are harmed."[228]

For my research, I have adapted the Secret Service's definition. For purposes of this research, I slightly extended the FBI definition to include at least two murder victims committed in multiple locations within 24 hours and use the Secret Service's "three or more people harmed." The suicide or lawful killing of the mass murderer or murderers is not included in the total dead.

A more widely used definition of mass murder is four or more killed, making comparison with FBI and Secret Service data a bit more difficult.  Throughout this report, I will provide information using both definitions.

I have excluded multiday mass murders committed in riots, such as the New York City Draft Riots of 1863, and many of the race riots of the 20th century because they were not in one location.  Determining when these murders took place precludes easy classification. I also have excluded crimes such as the Colorado cannibalism murders in 1874, because it is unclear over what period the victims were murdered.

There are deaths that might qualify as mass murder, but which have circumstances that might also qualify as lawful self-defense and are thus not included.[229]  There are mass murders that appear to be gang-related; I have excluded many of those because determining if they were defensive in nature or not requires confidence in the integrity of the participants, who often have reason to lie.

Obviously, mass murder does not include acts of war.  Mass murders committed by governments as official policy are outside the legal definition of murder.  Other horrifying mass

---

[228] U.S. Secret Service, Mass Attacks in Public Spaces – 2019, 6 (August, 2020).
[229] *Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act*, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1.

killings outside our definition include those performed by non-state actors with the acquiescence, assistance, or encouragement of local, regional, or national governments.  Some mass murders were not official acts but were assisted by governmental disarming of the victims.  Example: the East St. Louis race riot of 1916, where police and state militia disarmed blacks in advance of a non-governmental mass murder.

**East St. Louis, Ill. (1916)**

7/7/1916: "Cowardly Police and Militia Search Negroe's [*sic*] Homes, Disarm Them, and Then Turn Them Over to the Blood-Thirsty Demons Clamoring For Their Lives.  Without Arms or Protection 38 are Killed, More Than 200 Wounded and 325 Negro Homes are Burned and Looted." [230]  "'I killed seventeen last night,'" he said, grinning as he shifted an ax he was carrying from one hand to the other.  "And I am going to get a few more if I get a chance."[231]

Category: public.

Suicide: No

Cause: Racism

Weapon: at least 17 by ax.[232]

Also excluded are governmentally supported acts of mass murder committed outside the rules of land warfare. The bombing of the Soo Locks on the Great Lakes shortly after U.S. entry into World War I, which would otherwise meet the criteria of mass murder, smells suspiciously like German sabotage and I therefore excluded it.[233] This also excludes one of the earliest American mass murders: ten murdered by Lenape Indians at a school in 1764 Greencastle,

---

[230] "Fiends Incarnate!" *Kansas City Sun*, Jul. 7, 1917, 1.
[231] "Listen, Men!" *Kansas City Sun*, Jul. 7, 1917, 1.
[232] "Fiends Incarnate!" *Kansas City Sun*, Jul. 7, 1917, 1.
[233] *Attempt Made To Wreck Soo Locks,* EAST OREGONIAN, May 16, 1917, 1.

Pennsylvania,[234] as well as the many thousands (at least) killed in various Indian wars (such as the hundreds killed during the Dakota War of 1862).

I have excluded *most* mass murders of Indians by Indians because most were outside the civil society of America, and the records of such crimes are thus necessarily incomplete. The Criminal Justice Research Center's data on Colonial and Revolutionary New England murders contains examples of Indian mass murders for which we have data and I have included these.[235] I have included incidents here where a mass murder (by white or Indian and regardless of the victim's race) was clearly *not* a part of warfare, such as those motivated by robbery or kidnapping with the goal of ransom.

There are mass murders where the victim count includes people killed because a felony was taking place. Because of the felony-murder rule, I have included people killed lawfully during a felony as mass murder victims, such as happened in the Johnson County War.[236] I have excluded incidents in which all the dead were felons.[237]

There are incidents which might be best categorized as mutual combat, where armed groups attacked each other with great loss of life but determining who were the victims and who were the murderers is not easy from surviving news coverage, such as the struggle between Democratic and Republican campaign workers in Clayhole Voting Precinct in 1922. The ensuing gunfight killed at least five people and wounded ten to thirteen others.[238]

---

[234] Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017).

[235] Criminal Justice Research Center, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797,* https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england.

[236] *A War in Wyoming,* [Maysville, Ky.] *Evening Bulletin,* Apr. 13, 1892, 1.

[237] *Nevada Mining Boss Besieged in His Office, Kalispell Bee,* Jan. 09, 1903, 1.

[238] Some Facts About Clayhole, [Lancaster, Ky.] *Central Record,* Jul. 20, 1922, 1.

I have excluded a small number of cases where trial found the killer not guilty of what were clearly mass murders. Example: Miss Verna Ware opened fire in the Gatesville courthouse in 1909, killing the man she accused of seducing her, two others not involved in the case and wounding a fourth.[239]

## 2. Finding Mass Murders

How do you find historical mass murders? The phrase "mass murder" is quite rare in historical documents. Using the *ngram* tool in books.google.com for books published 1600-2000 shows essentially zero matches until 1952,[240] and many of the rare pre-1952 matches are actually abbreviations of Massachusetts such as "Mass. Murder" or "Mass., murder."[241] The abbreviation "Mass." causes similar problems when searching the Library of Congress' collection of 1789-1963 newspapers for the words "mass" and "murder" within five words of each other.[242] An additional problem is the use of the phrase to describe governmentally sanctioned and indeed government-operated warfare.[243]

Searching the Library of Congress' *Chronicling America* collection of newspapers for the words "murders", "murdered", "killed", "slain", "dead" in association with numbers found a sea

---

[239] *Woman to Face Murder Charge*, Waxahachie [Tex.] *Daily Light*, Feb. 8, 1909, 1; *Four People Wounded, Palestine* [Tex.] *Daily Herald*, Feb. 4, 1909, 2; *Jury Verdict Not Guilty*, Liberty [Tex.] *Vindicator*, Feb. 11, 1910, 1.
[240] https://books.google.com/ngrams/graph?content=%27mass+murder%27&year_start=1600&year_end=2000&corpus=17&smoothing=3&share=&direct_url=t1%3B%2C%27%20mass%20murder%20%27%3B%2Cc0, last accessed June 12, 2018.
[241] Examples: Michigan State Prison, *Biennial Report of the Board of Control and Officers of the State House of Correction and Branch Prison of State Prison in Upper Peninsula...* 22, 41, 65 (1916),; R.W. Bligh, comp., *New York Herald Almanac: Financial, Commercial and Political Register 1874 87* (1874).
[242] https://chroniclingamerica.loc.gov/search/pages/results/?state=&dateFilterType=yearRange&date1=1789&date2=1963&language=&ortext=&andtext=&phrasetext=&proxtext=mass+murder&proxdistance=5&rows=20&searchType=advanced; Examples: *'Joe is a Good Boy,' Declares Ettor's Parents*, [Chicago, Ill.] *The Day Book*, Oct. 25, 1912; 14; *Queries Pour in on J. Frank Hickey*, [Chicago, Ill.] *The Day Book*, Dec. 4, 1912, 28; *Written Authority to Walk in Your Own Town*, [Chicago, Ill.] *The Day Book*, Feb. 5, 1912.
[243] Jos. Veltman, *Do Workers Want War?* [letter to the editor] [Chicago, Ill.] *The Day Book*, Jan. 17, 1916, 23.

of matches, most of which needed to be read before discarding.  In many cases, similar or identical news stories appeared in multiple newspapers.  If the same facts appeared repeatedly, and there were hundreds of references to an event, I did not read every newspaper account of that event.

There are several frustrating limitations of the *Chronicling America* collection:

1. Copyright restrictions make post-1922 newspaper collections incomplete.
2. Many of these mass murders, in addition to appearing in many different newspapers, sometimes appear in only one or two newspapers, far removed from the crime, both geographically and temporally.  One example is a mass murder of three in Tamworth, N.H. in 1857 which appeared only in an 1858 summary of the previous year's events, which was published in Pennsylvania.[244]  This made it difficult to gather additional data on the crime.
3. Nineteenth century accounts often used the word "murders" rather far afield from its legal meaning, or in reference to general social problems such as alcohol.  This produced so many thousands of matches that I have often settled for detailed examination of the first 100 front page news stories.  Newspapers in the nineteenth century also published many foreign news accounts and fiction.  Limiting searches to the front pages thus reduced false positives which would have to be laboriously examined for location and fiction status. (If it didn't make the front page, it seems unlikely it could be either a specific crime, or something as shocking as a mass murder.)

Defining a mass murder by the number of dead can understate mass murders, if either police or civilian intervention interrupts the murderer.  (There are some examples in my list of mass murders cut short, although not short enough, by such actions.)  In addition, some of the events gathered here list crimes in which the immediate coverage includes persons wounded so seriously that the coverage describes them as "probably fatally."[245]  When considering the nature of medical and surgical care available until my lifetime, it seems a good guess that those described as "probably fatally" wounded can be properly included among the dead.

One limitation of my research project is that, as my father used to tell me, "Newspapers are the first draft of history."  They may miss mass murders because of location, loss of newspapers

---

[244] *Principal Events of General and Local Interest During the Year 1857*, *Lewiston [Penn.] Gazette,* Jan. 21, 1858, 1.
[245] *Maniacal Unknown in Attempt to Exterminate Whole Family*, *Bisbee [Ariz.] Daily Review*, Apr. 6, 1922, 1.

from the historical record, and sometimes intentional editorial refusal to cover barbarous behavior (which has been demonstrated to promote copycat mass murders, even to the choice of manufacturer of the weapon used).[246]

There is a well-established pattern of copycat crimes inspired by news coverage. One example: An 1887 murder (although with only two victims and thus not in the database) was unmistakably a copycat of a recently reported mass murder.  A mechanic read an article about a mass murder committed in part with Rough on Rats, a poison,[247] to his wife:

> His wife listened to the account of the… murder and then bade her husband read it. He went over it a third time and then she took the paper to the neighbors and had it read twice more. Thursday she sent her mother for yeast, and took a heavy dose of Rough on Rats and forced a dose of the poison down the throat of her babe…. The woman died in great agony and her babe expired soon after.[248]

Along with *Chronicling America*, I have made extensive use of the commercial site *Newspapers.com* and a few secondary sources.

Another valuable source was the list of "Homicide among Adults in Colonial and Revolutionary New England, 1630-1797," compiled by Randolph Roth and Cornelia Hughes Dayton.[249]  While this is a list of *all* murders, not just mass murders, it provided an additional source of incidents.

### 3.    Group Activity

Roth's claim at ¶15 is that before modern firearms technology, mass murder "because of the limitations of existing technologies, were carried out by large groups of individuals acting in

---

[246] Clayton E. Cramer, *Ethical Problems of Mass Murder Coverage in the Mass Media*, 9:1 *Journal of Mass Media Ethics* 26-42 (Winter, 1993-94).
[247] "A Maniac Mother," *St. Paul Daily Globe*, Apr. 24, 1886, 1.
[248] "Rough on Rats," *Austin Weekly Statesman*, Feb. 3, 1887, 7.
[249] Randolph Roth and Cornelia Hughes Dayton, comp., *Homicide among Adults in Colonial and Revolutionary New England, 1630-1797*, Oct. 2009, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england, last accessed June 12, 2018.

concert, rather than by individuals or small groups." The supposed distinction between modern individual mass murder and group mass murder of earlier centuries does not stand careful examination. Mass murder is *still* sometimes a group activity. Such happened at Littleton, Colo. on Apr. 20, 1999[250] and the terrorist attacks of September 11, 2001. Other recent group mass murders include one on Oct. 31, 2019, in Orinda, Cal. A conflict between gangs led to a shooting in which the murderers shot to death five people and "several others were injured."[251] On Dec. 31, 1986, in San Juan, P.R. three Teamsters attempted to negotiate a better labor contract with their employer by setting a fire that murdered 97 people.[252]

Before 1961, when "assault weapons" and LCMs were rare, there were 216 non-firearms incidents with four or more dead and a single murderer for a total of 1,353 dead or 6.26/incident. With firearms only, there were 172 incidents with 825 dead or 4.80/incident.

As this report later shows, individual mass murder is neither particularly modern not dependent on technological advances.

### 4.    Data Limitations

It would be very useful to be able to extract data identifying which were group mass murders and which were individual. When I started this project, this seemed an unnecessary detail and so I did not gather it. I have since gone back and coded mass murder incidents based on whether they were committed by an individual or a group. In some cases, it is impossible to

---

[250] R. Barri Flowers and H. Loraine Flowers, *Murders in the United States: Crimes, Killers and Victims of the Twentieth Century 59* (2001).
[251] Annie Sciacca, *"It was a bloodbath": Orinda Halloween shooting investigation reveals gang connections*, *San Jose Mercury-News,* Nov. 17, 2019.
[252] *3 Teamsters Charged in San Juan Hotel Fire*, *Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

determine this.  Often news accounts, confessions, or suicide notes clearly identify that this was the act of an individual.  In some cases, there is ambiguity, such as train derailments.

When gathering this data, I only recorded if a particular weapon was used rather than counting deaths by weapon.  In older news accounts, there is no breakdown of deaths by weapon. In many cases, the state of forensic medicine would make it impossible to determine if the ax to the head or the subsequent knife to the throat was the fatal injury.  It would make little difference which caused a victim's death: the murderer's punishment would be the same.

A few examples of mass murders when firearms technology was not used:

Clarksburg, Va.: Nov. 10, 1805: Man murdered his wife and eight children.  While found guilty, there was substantial evidence of mental illness. Weapon: ax.[253]

Hallowell, Me.: Jul. 9, 1806, The father murdered his wife and seven of his eight children with an axe or knife before killing himself with a knife.  The cause was unclear, but the murderer mentioned poverty in a suicide note.  Weapon: ax.[254]

Uniontown, Wash. Feb. 25, 1901: A woman threw her six children down a 30 foot deep well, "then jumped into the well, and, the belief is, held their heads under water until all were drowned."[255]  "She is violently insane.  The woman's husband died a year ago, and she has been supported by the county and charity of neighbors."[256]  Reporter interview supports evidence of insanity: "[S]he gave him incoherent reasons for slaying her little ones…. [s]he had read of the Chinese war and the terrible atrocities committed in the Orient, and had warning that the Chinese

---

[253] *Trial of Abel Clements*, [Edinburgh, Scotland] *Caledonian Mercury,* Aug. 25, 1806, 4.
[254] Laurel Thatcher Ulrich, *A Midwife's Tale: The Life of Martha Ballard, Based on her Diary, 1785-1812* 291-307 (1990),; *Horrid Murder! At An Early Hour On Wednesday Morning Last, The Inhabitants Of This Town Were Alarmed With The Dreadful Information… 1* (1806).
[255] *Drowned Her Six Children, Adams County News* [Ritzville, Wash.] Feb. 27, 1901, 4.
[256] *Washington Standard* [Olympia, Wash.], Mar. 1, 1901, 3.

were coming today to burn her house and slay her children… Mr. Rustemeyer… was well acquainted with the family… He said… Mrs. Wurzer was never considered just right in her mind, and thinks she should have been restrained of her liberty long ago." Weapon: drowning.[257]

> Roth has elsewhere argued that children should not be included as victims of mass murder:

> > But Cramer's claim that axes, clubs, and knives can kill or wound are effective tools for committing mass murder is misleading…. The husband who attacked his family with an axe in Clarksburg, Virginia, in 1805 killed only one adult, his wife. *His other eight victims were his children.* And the husband who attacked his family with a knife in Hallowell, Maine, in 1806 killed only one adult, his wife. *His other 7 victims were his children. Cramer's evidence does not show that edged and blunt weapons are effective tools for committing mass murder.* It shows instead that infants and children are not capable of defending themselves against attacks by adults. That conclusion is consistent with the extensive literature in contemporary criminology that shows that young children are killed in the overwhelming majority of cases with weapons other than firearms, because adults can kill children so easily with physical force or everyday household objects.[258] [emphasis added]

**Belvidere, N.J. (1843)**

Two (perhaps three) men murdered John Castner, his wife, one of their children, "and an old bachelor brother-in-law." The purpose was believed to be either robbery or inheritance of the land by one of the murderers. Weapon: blunt object[259]

Before 1960, there were 807 non-firearm mass murders: 3,812 dead: an average of 4.72 dead per incident; 866 exclusively firearms mass murders, 3,740 dead: an average of 4.31 dead per incident. (For four or more dead: 393 non-firearm incidents, 2,590 dead, an average of 5.59 dead per incident. Firearms incidents: 313 with 2,110 dead; 5.74 average.) Firearms mass murders were not rare, even with "primitive" technology:

---

[257] *Killed Her Children*, *Cottonwood* [Ida.] *Report*, Mar. 1, 1901, 1.

[258] Supplemental Sur-Rebuttal Expert Report And Declaration Of Randolph Roth, Rupp v. Bonta, (C.D.Cal. 2023), 6-7.

[259] *The Warren Tragedy*, AMERICAN REPUBLICAN AND BALTIMORE DAILY CLIPPER, Jan. 23, 1845. 1.

**Swan River, Minn. Terr. (1860)**

Early 1860 or late 1859: A very complex incident.  One Chippewa warrior ("A") murdered another Chippewa ("B").  A few days later, B's squaw ("C") saw A, and shot him.  A's brother ("D") shot C.  C's brother ("E") shot D.

Category: public

Suicide: no

Cause: revenge

Weapon: firearm[260]

**Coldwater, Mich. (1865)**

Jan. 30, 1865: Young man becomes engaged to a woman in Lorain Co., Ohio.  This is a problem, because his wife in Coldwater, Mich., is about to give birth, so he returns home, where his wife lives with the young man's parents.  In the midst of giving birth, the young man murdered his wife.  When the young man's father and mother showed up, he shot them to death.  (Other accounts identify the town as Woodstock, and that the murder of his wife and unborn child followed the murder of his parents.)  His behavior after arrest, as newspaper coverage described, "suggests the charitable conjecture that the man is insane."  He confessed the crime and signed autographs for the crowd around the jail that described himself as "murderer of his wife, father and mother."  He invited his friends in Lorain County to visit him in jail "where they would find him 'playing checkers with his nose, on the jail windows.'"

Category: family

Suicide: no

Cause: mental illness

_____

[260] *Indian revenge*, *Muscatine* [Iowa] *Weekly Journal*, Jan. 27, 1860, 1.

Weapon: firearm[261]

**Sleepy Hollow, N.Y. (1870)**

Jan. 1. 1870: Farmer murdered his wife, and two of his neighbors, father and son, who appear to have visited the murderer's wife in his absence. The murderer had a reputation for being too fond of rum.

Category: public

Suicide: no

Cause: jealousy?

Weapon: firearm[262]

**Glenville, Minn. (1889)**

Feb. 15, 1889: Murderer, relative of the victims, shot to death, "Mary Chemeieck, aged six, and her sister Rose, aged eleven…" Apparently, his niece, Rose, had spurned his advances. He then murdered their mother with a shotgun and committed suicide.

Suicide: yes

Cause: unknown

Weapon: pistol, shotgun[263]

A mass murder that is *not* part of my database shows how "primitive" firearms technology is not a barrier to school mass murder. A former teacher showed up at a Bremen, Germany, Catholic school "armed with six loaded revolvers." He killed one teacher, two children, "three children were gravely injured and three other children were slightly wounded." The article

---

[261] *A Triple Murder*, [Plymouth, Ind.] *Marshall County Republican*, Feb. 16, 1865, 1.
[262] *A Triple Murder at Sleepy Hollow*, *Wilmington* [N.C.] *Journal*, Jan. 14, 1870, 1.
[263] *He was a Rejected Lover*, *St. Paul Globe*, Feb. 17, 1889, 1.

described him as "demented."[264]  Depending on whether they were they were 5-shot, 6-shot, or 9-shot revolvers (all still common today) he could have fired 30, 36, or 54 shots without reloading.

Firearms became more common weapons by the 1920s.  Axes and hatchets as mass murder weapons declined as wood stoves became less common.  While I have not categorized the poison mass murders as precisely as I might do if I were starting from scratch, "illuminating gas" and "Rough on Rats" (both were commonly used to wipe out spouses and children) declined as automobile exhaust poisoning rose.

This should be no surprise; mass murderers use what is available.  A May 20, 1931, Mattoon, Ill. incident catches this improvisational nature well.  A former employee of her late husband attempted to burn to death the woman and her two daughters with whom he had recently moved to Illinois.  They escaped the burning house.  He then shot to death the mother, attempted to strangle the daughters, then shot them and beat them to death with an automobile starter crank.  Weapons: firearm, strangle, blunt.[265]  Similarly, May 30, 1840: The husband, murdered his mother-in-law and her five children.  Cause: robbery.  Weapon: strangulation; stone; axe, rifle; knife.  He confessed after the first hanging failed.[266]

Even today's gun mass murderers are not as narrowly focused as the popular imagination sees them.  May 24, 2014, Isla Vista, Cal.: College student, upset about his sex life (or rather its absence) stabbed to death his three roommates, shot three women at a sorority (two of whom died), shot another student, injured two bicyclists by ramming them with his car, and shot and wounded four pedestrians.[267]

---

[264] *Maniac Shot Many People*, *Barre* [Vt.] *Daily Times*, Jun. 20, 1913, 1.
[265] *Woman Shot. Tots Choked, Brownsville Herald,* May 20, 1931, 1.
[266] *Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children* 6-7, 9-10 (1841).
[267] Shelby Lin Erdman and Greg Botelho, *Timeline: A killer's rampage through a California college town*, *CNN*, May 27, 2014, https://www.cnn.com/2014/05/24/us/california-rampage-timeline/, last accessed November 27, 2018.

For the following table, some of these weapon types require explanation.

UNKNOWN means the weapon type was not identified in the article.

AIRCRAFT is for murders committed with an airplane (not all of which took place on Sep. 11, 2001).  (Bombing of planes is in the EXPLOSIVE weapon type.)

TRAIN involves intentional derailment of trains to cause loss of life.  The motivation for most of these crimes is uncertain.  One was insurance fraud; authorities alleged "that the men entered into the plot to get rid of their wives and at the same time to collect damages from the railroad company."  One of the murderers collected $500 from the railroad for injuries to his wife.[268]  Another, on Dec. 27, 1934: Police charged three men with the intentional derailment of a train, in the hopes that one of the train crew would lose his job, so that one of the three would get that job.  The crash killed three employees and injured 16 passengers.[269]

Incident count by weapon type for mass murders before 1960 where only one weapon type was used:

| method | count_incident | total_dead |
| --- | ---: | ---: |
| arson | 72 | 466 |
| ax | 93 | 419 |
| blunt | 91 | 363 |
| drown | 24 | 82 |
| explosive | 34 | 278 |
| firearm_unknown | 408 | 2063 |
| hang | 40 | 149 |
| hatchet | 19 | 63 |
| knife | 49 | 178 |
| machine_gun | 7 | 37 |
| other | 13 | 122 |
| othersharp | 28 | 106 |

---

[268] *Plot to Kill Their Wives*, [Maysville, Ky.] *Evening Bulletin,* Mar. 26, 1896, 1.
[269] *Trio Held In Wreck Accused Of Murder*, [Washington, D.C.] *Evening Star,* Mar. 10, 1935, 1.

| method | count_incident | total_dead |
|--------|---------------:|-----------:|
| personal | 2 | 9 |
| pistol | 201 | 693 |
| poison | 67 | 260 |
| rifle | 119 | 451 |
| shotgun | 84 | 307 |
| strangle | 16 | 54 |
| train | 15 | 76 |

### H.    Killing People Without Modern Firearms Technology

How do you kill lots of people without modern firearms technology?  Before 1960, there are four incidents with more than 50 dead.  Colfax, Louisiana (1873) where the KKK murdered 150 black civil rights activists using firearms; Mountain Meadows, Utah (1857) where Mormons with firearms of type unknown murdered 140 settlers moving west; Tulsa, Okla. (1921), at least 89 murdered by a mob, with a variety of weapons, Calumet, Mich. (1913) where one person provoked a panic that killed 74 people, mostly trampled to death.

By comparison, my database, while incomplete after 1960, has six mass murders with more than 50 dead after 1960: San Juan, P.R. (1986), 97, dead by arson committed by three men; New York City (1990), 87 dead by arson by one person; Oklahoma City (1995), 168, dead by explosive committed by two (only one was given a capital sentence); New York City (2001), 3047, dead by aircraft, and Arlington, Va. (2001), 184, dead by aircraft with 19 murderers from both events; Las Vegas (2017), 58, dead by one rifleman.

### 1.    Explosives

One popular method was explosives.

**Sells, Ark. (1900)**

Oct. 15, 1900: "[F]ather, mother, and four young children blown to atoms" by dynamite explosion. "It is believed that a dispute over a homestead claim prompted the outrage."

Category: family non-resident

Suicide: no

Cause: greed

Weapon: explosives[270]

**Cripple Creek, Colo. (1904)**

Jun. 5, 1904: Someone set off a bomb under a train station platform where non-union men were waiting for a train during a strike. Twelve died "and a score or more injured..." Subsequently, "Forty shots were fired in a crowd in the street. Two men were killed and at least six persons wounded." One of the dead "by blow from revolver." Then the National Guard troops showed up and attempted to restore order.

Category: public

Suicide: no

Cause: labor

Weapon: explosives, firearm, blunt [271]

**Mullins, W.Va. (1909)**

5/16/1909: Organized crime group The Black Hand used dynamite to blow up an Italian boarding house. One of the victims broke faith with the Black Hand. The explosion killed four and injured three.

Category: residential

---

[270] *Whole Family Murdered*, [St. Genevieve, Mo.] *Fair Play*, Oct. 20. 1900, 1.
[271] *Terrorism and Death Dominate Colorado*, *Saint Paul Globe*, Jun. 7, 1904, 1.

Suicide: no

Cause: gang

Weapon: explosives[272]

### Mudlow, W.Va. (1912)

7/26/1912: Striking miners dynamited a machine gun operated by agents of the Baldwin detective agency, killing three miners and seven detectives.

Category: public

Suicide: no

Cause: labor

Weapon: explosives[273]

### Superior, Penn. (1914)

11/15/1914: Someone blew up the Kanaza general store, which was also the Kanaza residence, with two separate dynamite bombs, killing Kanaza's three children and two other men. Five others suffered injuries. Mr. Kanaza believed the motive was revenge for a lawsuit.

Category: family

Suicide: no

Cause: revenge

Weapon: explosives[274]

### San Francisco, Cal. (1916)

Feb. 22, 1916: Someone set off a dynamite bomb during the "Preparedness Day Parade," in preparation for World War I. While the identity of the murderers is uncertain (California Governor Culbert Olson many years later pardoned those originally convicted as evidence of

---

[272] *Black Hand Kills Four By Dynamite*, *Bluefield* [W.Va.] *Evening Leader*, May 17, 1909, 1.
[273] *Seven Detectives and Three Miners Dead*, *Seattle Star*, Jul. 26, 1912, 1.
[274] *Dynamite Kills Five In Spite Act*, *New-York Tribune*, Nov. 16, 1914, 1.

perjury at the trial accumulated), circumstances suggests that it was the work of anarchists, hostile

to U.S. involvement in the war.

Category: public

Suicide: no

Cause: terrorism

Weapon: dynamite[275]

**New York, N.Y. (1920)**
09/16/1920: Anarchists set off a bomb in Wall Street, killing 31 and injuring 125 others.

Category: public

Suicide: No

Cause: terrorism

Weapon: TNT[276]

**Germantown, Md. (1920)**
11/18/1920: Two neighbors had a longstanding feud.  On Election Day, one shot the other

in the neck.  The farmer shot in the neck took revenge with 50 pounds of dynamite, killing his

neighbor, the housekeeper and her two children.

Category: family non-resident

Suicide: no

Cause: revenge

Weapon: explosives[277]

---

[275] *Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb, Bemidji* [Minn.] *Daily Pioneer*, Jan. 3, 1917, 1;
*Preparedness Day Bombing*, https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_investigations.
[276] *Bomb Batters Wall Street; 31 Slain, 125 Hurt, The Sun and the New York Herald*, Sep. 17, 1920, 1.
[277] *Bomb Wrecks Farmers Home Killing Three,* [Salem, Ore.] *Capital Journal,* Nov. 19, 1920, 1.

**Pittsburgh, Penn. (1925)**

May 6. 1925: Two bombs destroyed three buildings, killing eight people immediately, and fatally injuring two others.  One of the buildings housed a grocer who had been the victim of extortion threats by a Black Hand society.

Category: residential

Suicide: no

Cause: extortion

Weapon: explosive[278]

**Bath, Michigan (1927)**

May 18, 1927: Treasurer of the local school board was angered by his property tax increase to pay for a new school building that he had opposed.  He placed a dynamite bomb in the basement of the school, by which method he murdered 37 children and six adults as well as seriously injuring 44 others.  Only a wiring mistake prevented other charges from taking down the rest of the building which endangered 150 more students.  The murderer had already beaten his wife to death at their home before blowing up their house.  He blew himself up in his car in front of the school 30 minutes after the school explosion.

Category: public

Suicide: yes

Cause: revenge

Weapon: explosive, blunt object[279]

---

[278] *Eight Are Killed In Blasted Homes*, [Washington, D.C.] *Evening Star,* May 06, 1925, 1.
[279] *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] *Evening Star,* May 19, 1927, 1.

**New York, N.Y. (1927)**

Oct. 8, 1927: Someone set off a dynamite bomb demolishing a four-story apartment building, killing five and injuring eleven. Why did police assume a dynamite bomb? "Finding of 20-Pound Unexploded Bomb Leads Police to Suspect Infernal Machine."

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[280]

**Newton, Mass. (1928)**

01/31/1928: Someone used dynamite to destroy a building containing "extensive liquor making apparatus in the basement." Six people died.

Category: private

Suicide: no

Cause: gang?

Weapon: explosive[281]

**Seat Pleasant, Md. (1930)**

01/01/1930: A belated and misdelivered Christmas gift was dynamite and exploded as the family unwrapped it. The explosion killed an expectant mother and two siblings, her mother, and injured two other siblings. The family was new to the community with no known enemies.

Category: family non-resident

Suicide: no

Cause: unknown

---

[280] *Four Killed In Bomb Explosion In Tenement District Of New York*, [Douglas, Ariz.] *Douglas Daily Dispatch*, Oct. 09, 1927, 1; *Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement*, *New York Times*, Oct. 9, 1927, 1.
[281] *Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story*, *Brownsville Herald*, Jan. 31, 1928, 1.

Weapon: explosives[282]

**Chesterton, Ind. (1933)**

10/10/1933: A bomb explosion in the cargo compartment aboard a United Airlines flight ripped the plane apart, killing seven people.  Motive remained uncertain.

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[283]

**Denver, Colo. (1955)**

11/1/1955: The 23-year-old son of passenger Daisie E. King eventually confessed that he placed a 25-stick dynamite bomb in her luggage, blowing up her airliner, killing 44 people.  The murderer had taken out life insurance policies on his mother and was expecting to receive a "substantial inheritance" upon her death.

Category: public

Suicide: no

Cause: greed

Weapon: explosives[284]

Since 1960, this technology, despite attempts to regulate explosives, remain a big dead per incident killer.  Using fertilizer, a murderer on Apr. 20, 1995, set off a truck bomb in front of the Oklahoma City Federal Building killing 168 people and injuring hundreds more.

---

[282] *Gift Package Bomb Kills Woman; 5 Hurt,* [Washington, D.C.] *Evening Star,* Jan. 01, 1930, 1; *Bomb Survivors Tell Of Explosion,* [Washington, D.C.] *Evening Star,* Jan. 12, 1930, 1.
[283] *Ill-Fated Plane Wrecked By Bomb US Prober Says*, *Indianapolis Times,* Oct. 14, 1933, 1.
[284] Flowers And Flowers, *Murders In The United States*, op cit. 30-1; FBI, *Jack Gilbert Graham*, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham, last accessed October 5, 2022.

Category: public

Suicide: no

Cause: terrorism

Weapon: explosives[285]

## 2.    Arson

Arson is also a common and very low technology method to cause lots of suffering.

### New York, N.Y. (1903)

11/1/1903: Police and coroner believed that a tenement building fire that killed 26 people

was "of incendiary origin."

Category: residential

Suicide: no

Cause: unknown

Weapon: arson[286]

### Boston, Mass. (1913)

Dec. 3, 1913: A lodging house refused a man a room "for want of 15 cents." He lit the

structure on fire, killing 27 lodgers in a dangerously renovated structure.

Category: residential

Suicide: no

Cause: revenge

Weapon: arson[287]

---

[285] Flowers and Flowers, *Murders in the United States*, 56-7.
[286] *Tenement House Fire*, [Maysville, Ky.] *Evening Bulletin*, Nov. 2, 1903, 4.
[287] *Burns Lodging House When Refused Room; 27 Homeless Men Died*, [New York, N.Y.] *Evening World*, Dec. 3, 1913, 1.

**San Francisco, Cal. (1944)**

03/27/1944: Over a period of four hours, five San Francisco skid row hotels "burst into flames" following a previous weekend of 11 fires in Oakland hotels. The New Amsterdam Hotel fire killed 22 and injured 27. "Authorities noted an odor of kerosene or gasoline." One tenant, 33, showed injuries from the fire and was held in the "hospital psychopathic ward."

Category: public

Suicide: no

Cause: mental illness

Weapon: arson[288]

**Tulsa, Okla. (1921)**

05/01/1921: The police arrested a young black man for what later appears to have been an accidental touching of a white female elevator operator. Rumors spread that police charged him with sexual assault. A lynch mob arrived at the county jail. The sheriff and deputies prevented seizure of the young man. A group of armed black men offered to help the sheriff defend the jail. This display of arms by black men inflamed white public sentiment leading to the destruction of Greenwood, the black section of Tulsa. More than one thousand homes were burned and *at least* 89 dead. Newspapers and public officials removed news accounts and official records about the riot from files. The Tulsa Race Riot Commission in 2001 "concluded that between 100 and 300 people were killed and more than 8,000 people made homeless over those 18 hours in 1921," with many bodies buried in unmarked mass graves.

Category: public

Suicide: no

_____

[288] *22 Killed In Hotel Fire In San Francisco*, [Santa Cruz, Cal.] *Santa Cruz Sentinel*, Mar. 29, 1944, 1.

Cause: racism

Weapon: firearms, arson, unknown?[289]

**Chicago, Ill. (1958)**

Dec. 1, 1958: Our Lady of the Angels school burned, killing 95.[290]  Several years later, a 13-year-old confessed while on a lie detector that he had started the fire: "because he hated school, rebelled at the authority of teachers, liked to hear the sound of fire sirens and to watch fire engines race along the street."[291]

After 1960, there have been several arson mass murders with equal or larger death counts, and this remains a common method of mass murder in other nations. In Australia, an arsonist burned the Childers, Queensland's Palace Backpackers Hostel in 2000, killing 15.[292]  The 2011 Quakers Hill Nursing Home fire killed eleven, set by a nurse after police questioned him about drug abuse.[293]  Japan had several arson mass murders in late 2021, killing 24, 17, and 33 in separate incidents.[294]  These required no advanced firearms technology or even firearms.  The previously mentioned San Juan, P.R. arson mass murder killed 97.[295]  The March 25, 1990, Happyland Social Club fire killed 87 people, leaving three survivors.  Angry at his girlfriend, the murderer used $1 of gasoline and a match to set fire to her place of employment.[296]

---

[289] *Tulsa Race Riots*, https://www.history.com/topics/roaring-twenties/tulsa-race-massacre, last accessed July 5, 2021.

[290] Our Lady of the Angels School fire, https://en.wikipedia.org/wiki/Our_Lady_of_the_Angels_School_fire

[291] *Boy Admits Fire Fatal To 95*, *Miami News*, January 16, 1962, 1.

[292] *A Decade On, Childers Remembers Hostel Fire Tragedy*, *Brisbane* [Australia] *Times*, Jun. 23, 2010.

[293] Candace Sutton, Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears, [U.K.] *Daily Mail*, Sep. 8, 2014.

[294] Makiko Inoue, Motoko Rich and Hikari Hida, *24 Dead in Suspected Arson at Office Building in Japan*, *N.Y. Times*, Dec. 16, 2021, https://www.nytimes.com/2021/12/16/world/asia/japan-fire-osaka.html, last accessed November 21, 2022.

[295] *3 Teamsters Charged in San Juan Hotel Fire, Chicago Tribune*, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

[296] Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, *New York Times*, Mar. 26, 1990.

**New Orleans, La. (1973)**

Jun. 24, 1973: The murderer took revenge for being expelled from the UpStairs Lounge, a gay bar. He walked down the street and bought a bottle of cigarette lighter fluid, killing 33 people.[297]

**Chicago, Ill. (1976)**

01/30/1976: An employee of Wincrest Nursing Home with a mental illness problem (pyromania) started a fire in a clothing wardrobe, which killed 22 residents. The employee was charged with arson.[298]

### 3.     Brutal Misuse of Tools

Mass murders do not even require purpose-built tools.

**Villisca, IA. (1912)**

Sep. 9, 1912: It appears that a business competitor and member of the Iowa State Senate murdered Joseph Moore, his wife Sarah, their four children and two visiting children "with an ax." An "itinerant minister" was charged. The Iowa Attorney-General "sought to commit" the minister "to an insane asylum, a step that would bar the prosecution of any other person suspected of the crime."

Relatives of the victims claimed that the Attorney-General blamed the wrong person; in response, the Iowa legislature passed a law prohibiting public discussion of the crime. This led to an "injunction against J.N. Wilkerson, a detective, whose four years' investigation of the murders cast suspicion on a prominent state senator." The public meeting by Villisca residents took place in Omaha, Neb., instead.

---

[297] Elisabeth Dias with Jim Down, *The Horror Upstairs, Time,* Jul. 1, 2013.
[298] National Fire Protection Association, *Preliminary Report NFPA Fire Analysis Department Wincrest Nursing Home*, 1, 4, https://oac.cdlib.org/view?docId=hb9v19p0sd&doc.view=frames&chunk.id=div00008&toc.id=0, last accessed November 27, 2022; *Woman Indicted in Chicago Blaze*, *New York Times*, Feb. 4, 1976.

Category: greed

Suicide: no.

Cause: greed

Weapon: ax[299]

### 4.    Panic

While a less common mass murder weapon, panic can lead to trampling murders.

**Calumet, Mich. (1913)**

Dec. 24, 1913: A man shouted, "Fire! Fire!  Everybody rush!" in the Italian Hall where striking miners and their families were meeting for a Christmas party.  (There was no fire.)  As the crowd attempted to exit the hall through an inadequate exit, seventy-four people (mostly children) were trampled to death.[300]  One account ascribed the false claim to "a drunken" man,[301] but considering the murder of strikebreakers in Calumet a few weeks before in the middle of a fierce labor dispute,[302] this seems unlikely as the cause.

Category: public

Suicide: no

Cause: labor

Weapon: mouth[303]

### I.    Causes

The focus of the State on the *method* of mass murder might be better spent on solving the problem by solving underlying causes.

---

[299] *Villisca Ax Murders to Be Discussed in Mass Meeting, Omaha Daily Bee*, Jul. 6, 1917, 1.
[300] *Ore Miner Charged Eight-Seven Cents for Month's Labor, Omaha Daily Bee*, Feb. 12, 1914, 1.
[301] *Day of Joy is One of Sorrow*, [Valley City, N.D.] *Weekly Times-Record*, January 1, 1914, 6.
[302] *Strike Breakers Taken to Mines at Point of Pistols, Omaha Daily Bee*, Jan. 11, 1914, 1 (based on U.S. Dept. of Labor report).
[303] *Ore Miner Charged Eight-Seven Cents for Month's Labor, Omaha Daily Bee,* Feb. 12, 1914, 1.

The following table shows the proximate cause of all mass murders in my database before 1960. (After 1960, the data is not yet complete.) The following bullet points describe the abbreviations that are used in the table:

- **Rob** is a mass murder performed as part of a robbery or to eliminate witnesses to the robbery.
- **MI** (Severe mental illness, primarily psychoses and other illnesses that cut off the sufferer from reality) includes all crimes where either contemporary accounts describe the murderer as insane, or where the nature of the crime makes other explanations implausible (this is necessarily a judgment call, on which my experience with mentally ill relatives and friends informs my opinion).

  The legal definition of mental illness is much narrower than the medical definition. Through most of U.S. history, the McNaughton Rule (sometimes spelled M'Naughten) defined legal insanity as: "at the time of committing the act, the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know what he was doing was wrong."[304] A person who did not know he was doing wrong, was insane.

  Persons who are mentally ill sometimes know that they are doing wrong and try to escape arrest and conviction (perhaps because the "aliens," or the CIA or KGB "agents" that they have just murdered are still after them). Such persons are legally sane, while in any conventional sense, they are as "mad as hatters."
- **MI?** are persons whose sanity seems questionable but for which contemporary accounts are less than persuasive.
- **PPD** (Postpartum Depression): Tragically, many mentally ill or possibly mentally ill incidents (not included in the MI or MI? category) are mass murders by mothers with recently born babies. In cases where the murders are by recent mothers and where news accounts provide no other explanation I have categorized these as **postpartum depression**. Some news accounts identified the mother as 'temporarily insane" with no previous history of mental illness. In a few cases the news accounts report on previous mental illness hospitalizations associated with previous births.
- Many cases I have listed as "**PPD?**" because this is a plausible explanation when no other seems more likely.
- **Resist** is a criminal resisting arrest.
- **Unknown** describes a very large number of crimes where either the motivation is unclear or the newspaper coverage is silent; this also includes some mass murders where the inability to identify the murderer makes cause impossible to determine.

---

[304] *The insanity defense and Diminished Capacity*, https://www.law.cornell.edu/background/insane/insanity.html

- **Religion** is mass murders committed as part of religious persecution. (And yes, in America!)
- **Racism** is its frequent cousin. In some cases, these include revenge or retribution against Indians for crimes not, or at least not clearly committed by the victims.
- **Politics** are murders committed to advance a political cause.
- **Terror** are mass murders committed to cause mass fear for purposes of political change outside elections. Example: 9/11.
- **Revenge** are mass murders committed to take revenge for real or perceived injuries by the murderer, his family, or acquaintances.
- **Ind** are crimes between Indians and settlers that are not official acts of war, but that might have been seen that way by the murderers. I have classified all attacks against peaceful travelers, settlers, and Indians in this cause. (In some cases, the killers openly admitted that the victims were "peaceful," but were supplying guns to less friendly tribes.) [305]
- **Financial** is a strange subclass of family murders committed, usually by a parent concerned their family is about to become impoverished, who then "protect" them from that suffering by mass murder. In some cases, this seems to be a form of mental illness: at least one example involved a mass murderer who was in no danger of impoverishment.
- **Labor** are crimes committed during labor disputes, sometimes against strikebreakers, sometimes against labor unionists.
- **Quarrel** are incidents that start out as some relatively minor dispute before escalating into disproportionate response.
- **Cult** refers to mass murders committed by oddball religious cults; I was surprised how widespread these were in the early 20th century (the Church of the Sacrifice slaughtered entire families, often with the family's own ax).
- **Rape** are mass murders committed to eliminate witnesses to a rape.
- **Greed** are mass murders carried out to obtain wealth other than by robbery, often by inheritance from the deceased.
- **Divorce** is an alternative form of **Revenge**; divorce has been or is in the process and someone is seeking retribution. This includes separated spouses attempting reconciliation.
- **Adultery**: a variant of **Revenge**.
- **Jealousy**: should be obvious.
- **Intoxication** are crimes attributed to alcohol or drug-induced stupidity. The strong overlap between **mental illness** and **substance abuse** (one often causing the other) makes some of these hard to distinguish, especially 150 years after the crime.

---

[305] *From California and Oregon*, [Washington, D.C.] *Evening Star*, Mar. 21, 1860, 2.

- **Bullying** is a recent category, and one that I suspect reflects some deeper mental illness; I was bullied as a child, had access to low-grade explosives (nerds have peculiar hobbies), and never even *thought* of mass murder (or even low-intensity revenge).

- **Stalker**: someone did not get their attentions rewarded as they saw fit.

- **Witnesses**: Eliminating witnesses to some crime other than rape or robbery.

| Lookup to ca | incidents | dead |
|---|---|---|
| ADULTERY | 3 | 11 |
| CULT | 9 | 41 |
| CULT? | 2 | 9 |
| DIVORCE | 75 | 271 |
| FINANCIAL | 55 | 221 |
| GANG | 32 | 119 |
| GREED | 38 | 254 |
| IND | 24 | 191 |
| INTOX | 54 | 203 |
| JEALOUSY | 35 | 121 |
| LABOR | 46 | 465 |
| LYNCH | 92 | 350 |
| MI | 182 | 756 |
| MI? | 102 | 457 |
| OTHER | 27 | 120 |
| POLITICS | 21 | 143 |
| QUAR | 175 | 624 |
| RACISM | 18 | 270 |
| RAPE | 19 | 66 |
| RELIGION | 3 | 175 |
| RESIST | 35 | 154 |
| REVENGE | 95 | 428 |
| REVENGE? | 1 | 3 |
| ROB | 152 | 643 |
| SLAVERY | 1 | 4 |
| STALKER | 1 | 3 |
| TERROR | 14 | 284 |
| UNKNOWN | 435 | 1754 |
| WITNESSES | 4 | 28 |
| EXTORTION | 6 | 43 |
| PRISON BREAK | 17 | 79 |
| PPD | 17 | 71 |
| PPD? | 61 | 205 |

- Plotting the causes without UNKNOWN shows the high frequency causes:



incidents by cause before 1960

- 

Incidents by cause before 1960 where dead are four or more:

| incidents by cause before 1960 dead >= 4 | | |
|---|---|---|
| Lookup to cause | incidents | dead |
| ADULTERY | 1 | 5 |
| CULT | 9 | 41 |
| CULT? | 1 | 6 |
| DIVORCE | 21 | 104 |
| FINANCIAL | 22 | 120 |
| GANG | 11 | 57 |
| GREED | 21 | 206 |
| IND | 21 | 182 |
| INTOX | 23 | 109 |
| JEALOUSY | 14 | 62 |

| incidents by cause before 1960 dead >= 4 | | |
| --- | --- | --- |
| Lookup to cause | incidents | dead |
| LABOR | 30 | 417 |
| LYNCH | 33 | 173 |
| MI | 85 | 459 |
| MI? | 38 | 178 |
| OTHER | 10 | 69 |
| POLITICS | 14 | 122 |
| QUAR | 56 | 272 |
| RACISM | 13 | 254 |
| RAPE | 6 | 26 |
| RELIGION | 2 | 172 |
| RESIST | 17 | 103 |
| REVENGE | 37 | 263 |
| ROB | 70 | 373 |
| SLAVERY | 1 | 4 |
| TERROR | 11 | 275 |
| UNKNOWN | 182 | 1007 |
| WITNESSES | 3 | 25 |
| EXTORTION | 4 | 37 |
| PRISON BREAK | 9 | 55 |
| PPD | 10 | 50 |
| PPD? | 16 | 70 |

Before 1960 at least four dead, excluding UNKNOWN:



It should surprise no one that mental illness and likely mental illness are a high frequency category. While most mentally ill people are primarily a hazard to themselves, severely mentally ill people are overrepresented in murder and other violent crimes.[306] Deinstitutionalization of the mentally ill starting with New York in 1964 and California in 1969 played significant roles in increased homelessness and violent crime rates.[307]

Professor Bernard E. Harcourt points out that the rise in murder rates in the 1960s, and their decline in the 1990s correlated with the change in the percentage of the population that was institutionalized: those who were confined to either a mental hospital or prison. According to Harcourt, sociologists examining the expansion of imprisonment in the 1990s, the so-called "incarceration revolution," missed the even more important component of institutionalization:

---

[306] See Clayton E. Cramer, *Mental Illness and the Second Amendment*. 46 CONNECTICUT LAW REVIEW 1301-6 (May 2014):(collecting studies).

[307] See Clayton E. Cramer, *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill* (2012) and Jean Isaac Rael and Virginia C. Armat, *Madness In The Streets: How Psychiatry And The Law Abandoned The Mentally Ill* (1990) for how beautiful abstract theories and fanaticism created the tragic urban landscape of modern America.

mental hospitals and then prisons, as mentally ill persons became guests of the state for serious crimes.  When adding mental hospital inmates to prisoners, Harcourt found an astonishingly strong negative correlation between the institutionalization rate, and the murder rate: -0.78.  Harcourt found that even when adjusting for changes in unemployment and the changing fraction of the population that was at their peak violent crime ages, the negative correlation remained strong, and did a better job of predicting both the 1960s rise and the 1990s decline in murder rates than other models.[308]

Steven P. Segal of the University of California, Berkeley studied state-to-state variations in murder rates and mental health care, controlling for socioeconomic, demographic, and geographic data. He concluded that "[l]ess access to psychiatric inpatient-beds and more poorly rated mental health systems were associated with increases in the homicide rates of 1.08 and 0.26 per 100,000, respectively." (Since the national average homicide rate was 7.4 per 100,000 people for 2020,[309] more access to beds is clearly quite important in reducing homicide rates; "poorly rated mental health systems" matter, but not as dramatically.)

Segal observed an even greater difference from the variation in involuntary civil commitment (ICC) laws. "Broader ICC-criteria were associated with 1.42 less homicides per 100,000" or bit more than one-fourth of the national homicide rate. In short, states where involuntary commitment of the mentally ill was relatively easy had significantly fewer murders than states where it was very hard.[310]

---

[308] Bernard E. Harcourt, *From the Asylum to the Prison: Rethinking the Incarceration Revolution*, 84 TEXAS LAW REVIEW 1766-75 (2006).

[309] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 3, 2022 12:51:23 PM

[310] Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, Social Psychiatry and Psychiatric Epidemiology, November 10, 2011, https://web.archive.org/web/20170323153646/http://kendras-law.org/national-studies/commitmenthomiciderates.pdf, last accessed August 19, 2022.

A 2000 *New York Times* examination of mass murderers concluded:

> The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help, and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

> Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population.

> However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [311]

A few representative cases from the period before 1960:

**New Haven, Conn. (1930)**
Jun. 21, 1930: The father had been involuntarily committed to a mental hospital.  He escaped, threw his four children and wife from a 400-foot cliff, then jumped.

Category: family

Suicide: yes

Cause: mental illness

Weapon: other[312]

**New York, N.Y. (1953)**
Apr. 01, 1953: A college professor, 52, under psychiatric care, strangled his wife and their two children, then stabbed himself to death.

Category: family

---

[311] Laurie Goodstein and William Glaberson, *The Well-Marked Roads to Homicidal Rage*, *New York Times*, Apr. 10, 2000.
[312] *Maniac Veteran Kills His Family*, *New Britain Herald,* Jun. 23, 1930, 9.

Suicide: yes

Cause: mental illness

Weapon: strangled[313]

**Eleva, Wisc. (1909)**
Feb. 2. 1909: The father stabbed to death his four children, then "stabbed himself and then jumped from the barn loft with a rope around his neck.  At the same time he hurled a fire brand into the stable, firing the barn."

Category: family

Suicide: Yes.

Cause: ̈[Father] was recently released from an insane asylum."

Weapon: knife[314]

**J.    Summary**

Mass murder, by groups, or by individuals is not new.  It has often involved non-firearms and continues to do so today.  The focus on firearms ignores the underlying causes, often severe mental illness not recognized or treated.

As noted above, untreated mental illness started this current campaign and many of the subsequent mass murders have had at their root mental illness which was unseen, ignored, or where the laws or policies made involuntary commitment impossible.[315]  Fix the root problem or mass

---

[313] *Triple Murder, Suicide Apparent,* [Parsons, Kansas] *Parsons Sun,* Apr. 04, 1953, 7.
[314] *Murders Whole Family and Then Kills Self,* [Pendleton, Ore.] *East Oregonian,* Feb. 22, 1909, 8.
[315] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 Conn. L.R. 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill (2012) for how we got here.

murderers will use the weapons they have historically used in the United States: arson,[316] vehicles,[317] explosives,[318] hammers,[319] axes,[320] poison,[321] aircraft,[322] and train derailments.[323]  Or they might use the weapons mass murderers use in other nations: arson;[324] vehicles;[325] explosives,[326] sharp objects,[327] hammers;[328] poison gas,[329] and of course, in spite of much stricter firearms laws, guns.[330]

---

[316] 3 Teamsters Charged in San Juan Hotel Fire," *Chicago Tribune,* Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018 (97 dead); Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911,* NEW YORK TIMES, Mar. 26, 1990 (87 dead); Phil Luciano, *9-year-old arraigned on murder charges in deadly Goodfield arson fire,* PEORIA JOURNAL STAR, Oct. 21, 2019.

[317]  Lauren del Valle, Ray Sanchez and Eric Levenson, *Terror suspect accused of killing 8 people on NYC bike path still believes in ISIS, defense attorney says,* CNN, January 9, 2023.

[318] FBI, *Oklahoma City Bombing,* https://www.fbi.gov/history/famous-cases/oklahoma-city-bombing, last accessed January 31, 2023 (168 dead); *Fate Saves Scores in Blast When Maniac's Plot Kills 43,* [Washington, D.C.] EVENING STAR, May 19, 1927, 1; *Los Angeles, on Election Eve, in Ferment Over Confession of the McNamaras,* [Chicago, Ill.] THE DAY BOOK, Dec. 2, 1911, 1 (21 dead); *Seven Detectives and Three Miners Dead,* SEATTLE STAR, Jul. 26, 1912, 1 (10 dead).

[319] *A Family Slain,* KANSAS CITY JOURNAL, Mar. 4, 1899, 1 (5 dead).

[320] *Five Battered With An Axe,* [Keokuk, Ia.] DAILY GATE CITY, Oct. 17, 1911, 1 (5 dead); *Mystery of 30 Axe-Murders is Believed Near Its Solution,* ALBUQUERQUE MORNING JOURNAL, Mar. 22, 1915, 1 (police believed one man murdered 29 people in five families over three years).

[321] *A Modern Borgia,* NASHVILLE UNION AND AMERICAN, Oct. 27, 1868, 1 (the maid murdered a family of seven).

[322] FBI, CRIME IN THE UNITED STATES: 2001, Section 5, https://ucr.fbi.gov/crime-in-the-u.s/2001/01sec5.pdf (3047 dead); Id., (184 dead); Id., (40 dead); Judith Cummings, *Kin of Suspect Defiant and Contrite,* New York Times, Dec. 11, 1987 (44 dead).

[323] *Crack Flyer Jumps Track,* [De Kalb, Illinois] DAILY CHRONICLE, Mar. 17, 1941, 1 (5 dead).

[324] *A Decade On, Childers Remembers Hostel Fire Tragedy,* BRISBANE [Australia] TIMES, Jun. 23, 2010 (15 dead); Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears,* [U.K.] DAILY MAIL, Sep. 8, 2014. (11 dead).

[325] *Toronto is the most recent of many deliberate attacks involving vehicles,* USA TODAY, Apr. 23, 2018 (10 dead in Toronto attack, 14 dead in Barcelona, Spain, 8 on London Bridge, 12 in Berlin, Germany) (10 dead); *Nice attack: Trial for Bastille Day massacre which killed 86 begins,* BBC, Sep. 5, 2022 (86 dead); *Australian who rammed and killed six pedestrians jailed for life,* REUTERS, Feb. 21, 2019 (6 dead); Alex Johnson, *A Short History of Vehicles Being Used as Deadly Weapons,* NBC News, Jul. 15, 2016 (8 dead).

[326] Andrew Higgins and Kimiko De Freytas-Tamura, *In Brussels Bombing Plot, a Trail of Dots Not Connected,* NEW YORK TIMES, March 26, 2016 (33 dead); Sylvia Hui, *Bomber's brother gets 55 years for Manchester concert attack,* Associated Press, Aug. 20, 2020 (22 dead)

[327] Jason Van Rassel, *Police officer's son charged in city's worst mass murder,* CALGARY [Alberta] HERALD, Apr. 17, 2014 (5 dead); Jonathan Pearlman, *Eight Children Murdered In Mass Stabbing In Australia,* [U.K.] TELEGRAPH, Dec. 19, 2014 (8 dead); Robert Foyle Hunwick, *Why Does China Have So Many School Stabbings?, New Republic,* Nov. 2, 2018 (summarizing 14 knife mass murders in two incidents); David Mercer, *Canada mass stabbing: Trudeau urges public to 'be careful' over two men suspected of killing 10 people,* SKY NEWS, Sep. 5, 2022 (10 dead).

[328] Jamelle Wells, *Robert Xie Trial: Lin Family 'Murdered With Hammer Bought From $2 Shop,* ABC [Australia], May 12, 2014 (5 dead)

[329] *Japan marks 25 years since deadly Aum sarin attack on Tokyo subway,* Japan Times, Mar. 20, 2020 (14 dead).

[330] *Gunman's Rampage in France Leaves 14 Dead, Los Angeles Times,* Jul. 13, 1989; *Teen-Age Gunman Kills Himself and 12 Others in France, New York Times,* Sep. 25, 1995; Nick Caistor, *Profile of a Teenage Killer, BBC News,* Apr. 28, 2002; *18 Dead in German School Shooting, BBC News,* Apr. 26, 2002; *Brazil School Shooting: Twelfth Child Dies, SkyNews,* Apr. 8, 2011; James Graff, *Politics Under the Gun, Time,* Mar. 31, 2002 (8 dead; 18 wounded in France); *Safety Council To Investigate Gun Laws, DutchNews.nl,* Apr. 12, 2011, http://www.dutchnews.nl/news/archives/2011/04/safety_council_to_investigate.php, last accessed May 21, 2011; *Schutter was al eerder suicidaal, NOS Nieuws.* Apr. 10, 2011, http://nos.nl/artikel/232127-schutter-was-al-eerder-suicidaal.html, last accessed May 21, 2011.

As long as we as a society focus on *methods* rather than *causes*, we are engaged in unneeded polarization while still not solving the problem.

_____

Clayton E. Cramer

As long as we as a society focus on *methods* rather than *causes*, we are engaged in unneeded polarization while still not solving the problem.

Clayton E. Cramer

# EXHIBIT A

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  | Sonoma State University, Rohnert Park, California |
|---|---|
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
|---|---|
|  | First Place, Undergraduate Division |

**TEACHING EXPERIENCE:**

| Fall, 2020 - present | ***Adjunct Faculty***: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
|---|---|

Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**.

ical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**.

e University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**.

d Professor Peter Mellini in his course "Twentieth Century World." I graded quizzes, exams, and answered weekly written questions from students. I also prepared and lectured about the rise of totalitarianism in the period between the world wars.

**BOOKS:**

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

**SELECTED PUBLICATIONS:**

"Assauly Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:issue 1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

## WORKS CITED IN COURT DECISIONS:

JA4283

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine,* 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance. I also have an unusually

detailed knowledge of the physical sciences (for an historian), a
deep interest in the history of science and technology, and how
both influence society.



Exhibit
0002

# Clayton Cramer.

Conservative. Idaho. Software engineer. Historian. Trying to prevent *Idiocracy* from becoming a documentary.

Email complaints/requests about copyright infringement to clayton @ claytoncramer.com. Reminder: the last copyright troll that bothered me went bankrupt.

"And we know that all things work together for good to them that love God, to them who are the called according to his purpose." -- Rom. 8:28

Home     About     Popular Articles     Scholarly Journals     Books     Upcoming Events

**T u e s d a y ,   A p r i l   2 ,   2 0 1 9**

## A *Major* Victory in California

Duncan v. Becerra, (S.D.Cal. 2019) struck down California's large capacity magazine ban for violating the Second Amendment.  It points to examples where victims with large capacity magazines successfully used them against multiple attackers and one where the victim had a low capacity magazine, and the other hand using a cellphone to call 911.  I've never been trained on how to change magazines without a free hand: have you?  A number of nice touches:

> Individual liberty and freedom are not outmoded concepts. "The judiciary is — and is often the only — protector of individual rights that are at the heart of our democracy." -- Senator Ted Kennedy, Senate Hearing on the Nomination of Robert Bork, 1987.

The decision points to how rare mass murders are relative to other crimes:

> Who has not heard about the Newtown, Connecticut, mass shooting at Sandy Hook Elementary School, or the one at a high school in Parkland, Florida? But an individual
> victim gets little, if any, media attention, and the attention he or she gets is local and short-lived.  For example, who has heard about the home invasion attack on Melinda Herman and her twin nine-year old daughters in Georgia only a month after the Sandy
> Hook incident?15 Who has heard of the attacks on Ms. Zhu Chen or Ms. Gonzalez and her husband?16 Are the lives of these victims worth any less than those lost in a
> mass shooting? Would their deaths be any less tragic? Unless there are a lot of individual victims together, the tragedy largely goes unnoticed.

And this little dig:

> The magazine ban admits no exceptions, beyond those for law enforcement officers, armored truck guards, and movie stars.

Quoting a decision calling a 10 round limit only a minor burden because there are other options:

> Accordingly, a prohibition on possession of magazines having a capacity to accept more than ten rounds applies only the most minor burden on the Second Amendment."). But describing as minor, the burden on responsible, law-abiding citizens who may not possess a 15-round magazine for self defense because there are other arms permitted with 10 or fewer rounds, is like saying that when government closes a Mormon church it is a minor burden because next door there is a Baptist church or a Hindu temple.

Of course the 9th Circuit will hear the appeal, but Judge Reinhardt has recently been demoted to Hell, so who knows?  A great victory from my friend Chuck Michel.  The deeper I  read, the more impressed I get.  On appeal, California's argument is going to be reduced to "It's not fair!"

Posted by Clayton Cramer at 3:43 PM    

Labels: **gun rights**

**Amazon Search**

As an Amazon Associate I earn from qualifying purchases. Use this link to get there, and it will put some money in my pocket.

**PayPal Button**



**Labels**

2012 Presidential candidates (126)  abortion (48)  astrophotography (97)  cars (174)  child abuse (82)  concealed carry (137)  crony capitalism (42)  decline and fall of the West (61)  Democratic Party corruption (38)  drug laws (69)    economics    (60)    education    (84)  environmentalism (58)  films (84)  global warming (188)  gun rights (377)  health care (148)  healthy    living    (129)    history    (563)  homosexuality (240)  humor (124)  Idaho politics (32)  immigration (188)  Java    (20)  litigation reform (72)  machining (375)  mental illness (263)  my    books    (45)  PCs (249)  scenic    Idaho    (125)    telescopes    (172)  terrorism (268)  the dread poison gluten (10)

**Total Pageviews**

 7,512,927

**Popular Posts**

Mirror Cell
Traditional mirror cells hold the mirror in place with clips that are flat metal with a 90 degree bend. One part is held to the outside of t...

I Was Discussing the Madness With My Wife and Bang
There are characteristics and behaviors that we generally associate with boys or girls.  Boys who like to pretend to cook or paint pictures ...

Low-Trust Societies
7/25/23 Christian Science Monitor article about Seattle is collapsing into mass shoplifting problem the other Democrat cities are having. I...

Environmentalists Want to Eliminate Hydropower
7/22/23 Moscow Daily News : "Conservation groups intend to ask judge to breach Snake River dams Coalition says breaching is needed to p...

# Clayton Cramer.

**Exhibit
0003**

**Conservative. Idaho. Software engineer. Historian. Trying to prevent *Idiocracy* from becoming a documentary.**

Email complaints/requests about copyright infringement to clayton @ claytoncramer.com. Reminder: the last copyright troll that bothered me went bankrupt.

"And we know that all things work together for good to them that love God, to them who are the called according to his purpose." -- Rom. 8:28

| Home | About | Popular Articles | Scholarly Journals | Books | Upcoming Events |

---

**Tuesday, May 22, 2012**

## Would You Like To Kill "May-Issue" Concealed Weapon Permit Laws?

I need six to ten activists willing to commit about three to four hours each to help with a research project. This is in support of an amicus brief that our experts believe is likely to reach the U.S. Supreme Court. My take is that the particular fact pattern and law being challenged makes this an exceptionally strong case for striking down "may-issue" concealed weapon permit laws in the few benighted states that have not yet gone "shall-issue." If I sounds like I am a little too sure of myself: remember, *D.C.* v. *Heller* (2008) and *McDonald* v. *Chicago* (2010) both cite my work, and I was an active participant with the malcontents that won those suits.

While preparing my part of this brief, I found a body of evidence that is relatively large, but will enable us to demolish the arguments advanced in support of "may-issue" laws. However: it's a lot of data, and I need some activists interested in spending some time Googling (and ideally, using Nexis if you have access to it) for some specific information. You will not need any specialized knowledge to do this; I can explain what we need, and how to do it, quite quickly. I would like to have everyone get this done by the end of Memorial Day weekend.

This will be a freestanding paper, which the amicus brief will reference because it would otherwise make the brief too long. Everyone who assists on this freestanding paper will be credited as research associates.

For obvious reasons, I am not going to explain what you will be doing in a public forum. Please email me at *Firstname* at *FirstnameLastname*.com, and tell me something that shows me you are a serious gun rights person, and not part of the enemy camp.

Posted by Clayton Cramer at 10:28 PM

Labels: gun rights

---

## No comments:

## Post a Comment

To leave a comment, click the button below to sign in with Google.

SIGN IN WITH GOOGLE

| Newer Post | Home | Older Post |

Subscribe to: Post Comments (Atom)

---

### Amazon Search

As an Amazon Associate I earn from qualifying purchases. Use this link to get there, and it will put some money in my pocket.

### PayPal Button





### Labels

2012 Presidential candidates (126) abortion (48) astrophotography (97) cars (174) child abuse (82) concealed carry (137) crony capitalism (42) decline and fall of the West (61) Democratic Party corruption (38) drug laws (69) economics (60) education (40) environmentalism (58) films (84) global warming (188) **gun rights (377)** health care (148) healthy living (129) **history (563)** homosexuality (240) humor (124) Idaho politics (32) immigration (188) Java (20) litigation reform (72) **machining (375)** **mental illness (263)** my books (45) PCs (249) scenic Idaho (125) telescopes (172) **terrorism (268)** the dread poison gluten (10)

### Total Pageviews

7,512,869

### Popular Posts

**Mirror Cell**
Traditional mirror cells hold the mirror in place with clips that are flat metal with a 90 degree bend. One part is held to the outside of t...

**I Was Discussing the Madness With My Wife and Bang**
There are characteristics and behaviors that we generally associate with boys or girls. Boys who like to pretend to cook or paint pictures ...

**Low-Trust Societies**
7/25/23 Christian Science Monitor article about Seattle is collapsing into mass shoplifting problem the other Democrat cities are having. I...

**Environmentalists Want to Eliminate Hydropower**
7/22/23 Moscow Daily News : "Conservation groups intend to ask judge to breach Snake River dams Coalition says breaching is needed to p...

[search box]  More                                                                    Create Blog   Sign In

# Clayton Cramer.



**Exhibit
0004**

Conservative. Idaho. Software engineer. Historian. Trying to prevent *Idiocracy* from becoming a documentary.

Email complaints/requests about copyright infringement to clayton @ claytoncramer.com. Reminder: the last copyright troll that bothered me went bankrupt.

"And we know that all things work together for good to them that love God, to them who are the called according to his purpose." -- Rom. 8:28

Home     About     Popular Articles     Scholarly Journals     Books     Upcoming Events

**F r i d a y ,   M a r c h   4 ,   2 0 1 6**

## Headed to 1919

NRA is paying me to time travel to 1919 North Carolina!  It's ugly there, but finding truth has its risks.

Posted by Clayton Cramer at 12:47 PM

Labels: gun rights

---

## No comments:

## Post a Comment

To leave a comment, click the button below to sign in with Google.

**SIGN IN WITH GOOGLE**

Newer Post                              Home                              Older Post

Subscribe to: Post Comments (Atom)

---

**Amazon Search**

As an Amazon Associate I earn from qualifying purchases. Use this link to get there, and it will put some money in my pocket.

**PayPal Button**



**Labels**

2012 Presidential candidates (126)  abortion (48)  astrophotography (97)  cars (174)  child abuse (82)  concealed carry (137)  crony capitalism (42)  decline and fall of the West (61)  Democratic Party corruption (38)  drug laws (69)  economics (60)  education (40)  environmentalism (58)  films (84)  global warming (188)  gun rights (377)  health care (148)  healthy living (129)  history (563)  homosexuality (240)  humor (124)  Idaho politics (32)  immigration (188)  Java (20)  litigation reform (72)  machining (375)  mental illness (263)  my books (45)  PCs (249)  scenic Idaho (125)  telescopes (172)  terrorism (268)  the dread poison gluten (10)

**Total Pageviews**

 7,512,935

**Popular Posts**

Mirror Cell
Traditional mirror cells hold the mirror in place with clips that are flat metal with a 90 degree bend. One part is held to the outside of t...

I Was Discussing the Madness With My Wife and Bang
There are characteristics and behaviors that we generally associate with boys or girls.  Boys who like to pretend to cook or paint pictures ...

Low-Trust Societies
7/25/23 Christian Science Monitor article about Seattle is collapsing into mass shoplifting problem the other Democrat cities are having. I...

Environmentalists Want to Eliminate Hydropower
7/22/23 Moscow Daily News : "Conservation groups intend to ask judge to breach Snake River dams Coalition says breaching is needed to p...

# Clayton Cramer.

**Exhibit 0005**

Conservative. Idaho. Software engineer. Historian. Trying to prevent *Idiocracy* from becoming a documentary.

Email complaints/requests about copyright infringement to clayton @ claytoncramer.com. Reminder: the last copyright troll that bothered me went bankrupt.

"And we know that all things work together for good to them that love God, to them who are the called according to his purpose." -- Rom. 8:28

| Home | About | Popular Articles | Scholarly Journals | Books | Upcoming Events |

---

**Tuesday, December 8, 2015**

## Shocking: the LA. Times is Editorializing Against Obama's No-Fly List

Dec. 7, 2015 *Los Angeles Times*:

How certain is it that the people on the two lists are dangerous? Well, we don't really know, because the no-fly-list and the broader watch list are government secrets. People are not notified when they are put on, nor why, and they usually don't discover they have been branded suspected terrorists until they try to travel somewhere.

But serious flaws in the list have been identified. According to the American Civil Liberties Union, which is suing the government over the no-fly list, the two lists include thousands of names that have been added in error, as well as the names of family members of suspected terrorists. The no-fly list has also been used to deny boarding passes to people who only share a name with a suspected terrorist. Former Sen. Ted Kennedy (D-Mass.) was famously questioned at airports in 2004 because a terror suspect had used the alias "T. Kennedy." It took the senator's office three weeks to get his name cleared.

What's more, it's not clear how much impact Feinstein's law would have. The broader watch list, which is actually a database maintained by the FBI's Terrorist Screening Center, apparently had about 480,000 names on it in 2011, according to the FBI, and it has since swelled to about 1.1 million names, according to the ACLU. Of those, the vast majority are noncitizens living overseas; the number of American citizens on the list is believed to be fewer than 10,000 people.

That's important because federal law already bars gun sales to most people who are not U.S. citizens or lawful permanent residents or holders of valid visas, which means the vast majority of the people on the suspected terror list would already be barred from buying a firearm in the U.S. even without Feinstein's law. That leaves us with about 10,000 American citizens (and some legal residents) who, under the proposed law, would be barred from exercising a constitutional right. That gives us pause.

From reading the comments it is clear that many progressives regard Gitmo as sufficient reason to ignore due process along with the vast majority of Democrats who voted for this harebrained scheme of Feinstein's. The more I read of these progrssive comments justifying "unorthodox procedures" in time of war, the more I am glad I have 10,000 rounds stockpiled.

Posted by Clayton Cramer at 3:10 PM 

Labels: gun rights, terrorism

---

## No comments:

## Post a Comment

### Amazon Search

As an Amazon Associate I earn from qualifying purchases. Use this link to get there, and it will put some money in my pocket.

### PayPal Button



### Labels

2012 Presidential candidates (126) abortion (48) astrophotography (97) cars (174) child abuse (82) concealed carry (137) crony capitalism (42) decline and fall of the West (61) Democratic Party corruption (38) drug laws (69) economics (60) education (40) environmentalism (58) films (84) global warming (188) gun rights (377) health care (148) healthy living (129) history (563) homosexuality (240) humor (124) Idaho politics (32) immigration (188) Java (20) litigation reform (72) machining (375) mental illness (263) my books (45) PCs (249) scenic Idaho (125) telescopes (172) terrorism (268) the dread poison gluten (10)

### Total Pageviews

 7,512,916

### Popular Posts

**Mirror Cell**
Traditional mirror cells hold the mirror in place with clips that are flat metal with a 90 degree bend. One part is held to the outside of t...

**I Was Discussing the Madness With My Wife and Bang**
There are characteristics and behaviors that we generally associate with boys or girls. Boys who like to pretend to cook or paint pictures ...

**Low-Trust Societies**
7/25/23 Christian Science Monitor article about Seattle is collapsing into mass shoplifting problem the other Democrat cities are having. I...

**Environmentalists Want to Eliminate Hydropower**
7/22/23 Moscow Daily News : "Conservation groups intend to ask judge to breach Snake River dams Coalition says breaching is needed to p...

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al., <br><br>         Plaintiffs, <br> v. <br><br> PLATKIN, et al., <br><br>         Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al., <br><br>         Plaintiffs, <br> v. <br><br> PLATKIN, et al., <br><br>         Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al., <br><br>         Plaintiffs, <br> v. <br><br> PLATKIN, et al., <br><br>         Defendants. | Civil Action No. 3:22-cv-04397 |

---

**Expert Report of Saul Cornell**

---

Exhibit
0006

## I.    INTRODUCTION

I have been asked by the Office of the Attorney General for the State of New Jersey to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. I have also been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

## II.    BACKGROUND AND QUALIFICATIONS

I received my BA from Amherst College and MA and PhD from the University of Pennsylvania. I currently hold the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American History. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law

2

School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers v. City of Boulder*, No. 2018-cv-30581 (Colo. D. Ct., Boulder Cty.); *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.); *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226 (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537 (S.D. Cal.); and *Duncan v. Bonta*, No. 3:17-cv-01017 (S.D. Cal.); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal.); *Boland v. Bonta*, No. 8:22-cv-1421 (C.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-746

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

**JA4292**

(C.D. Cal.); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718 (S.D. Cal.); *NAGR v. Campbell*, No.1:22-cv-11431  (D. Mass.); *NAGR v. Lamont*, No. 3:22-cv-0118 (D. Conn.); *NAGR v. Lopez*, No. 1:22-cv-404 (D. Haw.); *Rhode Island v. Ortiz*, No. 19-0672AG (R.I. Super.); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn.)

I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports; $1000 per hour for depositions and court appearances. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## III.    SUMMARY OF OPINIONS

Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding. It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights.

In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4] Each of the new states, either by statute or judicial decision, adopted multiple

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

4

**JA4293**

aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]

The concept of the peace was central to common law.[6] As one early American justice of the peace manual noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7] Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8] The use of Blackstone as an authority on how early Americans understood their inheritance from England has been reiterated by the Supreme Court.[9] Thus, the dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[10]

---

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).; *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012). The phrase was an example of the archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016). The proper rendering of the term thus becomes "unusually dangerous."

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally*

5

**JA4294**

The most basic right of all at the time of Founding was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[11] The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[12] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." The term police encompassed more than law enforcement, it also included the right of the people to legislate for the common good.[13]

Thus, any argument that rights must be understood as they were at the time of founding, such as the right to bear arms, must also apply to the scope of the right of the people to regulate their internal police by enacting laws to promote the security and welfare of the people. The history of regulation, including guns, in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point about the scope of legislative authority in this area.

In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the people of the individual states exercised their right to regulate to address longstanding issues and novel problems created by firearms in American

---

JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[11] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[12] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[13] Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government (2005); Gary Gerstle, Liberty and Coercion: The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015).

6

**JA4295**

society. Over the eighteenth and nineteenth century, American regulation increased with the advancement of firearm technology, from the manufacturing, storage, and sale of gunpowder, to regulating where firearms and other dangerous weapons cannot be carried.  The response of states to the emergence of new firearms that threatened the peace was more regulation. When faced with changes in technology and consumer behavior, as well as novel threats to public safety, the individual states enacted laws to address these problems. In every instance apart from a few outlier cases in the Antebellum South, courts upheld such limits on the unfettered exercise of the right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about infringement: whether the law negated the ability to act in self-defense.[14] In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition. Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment. The Founding generation and their successors sought to create a well-regulated society in which ordered liberty, not anarchy prevailed.[15]

IV.     **The Right to Keep and Bear Arms in Historical Context:  Liberty and Regulation in Founding Era Constitutional Thought.**

### A.  The Difficulty of a Historical Inquiry In This Context

The United States Supreme Court's decisions in *Heller*, *McDonald*,[16] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. Legal texts must not be read in a

---

[14] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[15] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[16] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

7

decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Similarly, a mechanistic strategy of digital searching for historical gun laws would be incapable of answering the historical inquiries required under *Bruen*. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts—how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, responded to societal ills created by those changes.[17]

In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[18] Indeed, such research is still ongoing and new materials continue to emerge; and even since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[19]

Each provision of the Bill of Rights, including the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. *Bruen*, 142 S. Ct. at 2131; *Heller*, 554 U.S. at 635. Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to

---

[17] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[18] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[19] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

regulate arms to promote the goals of preserving a free state. Although rights and regulations are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[20] In Founding-era American English, the word "infringement" meant to "violate" or "destroy." In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the conduct protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying right. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.

John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the

---

[20] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201. This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

**JA4298**

common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True freedom, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted ordered liberty. Regulation was the indispensable correlate of rights in Founding era constitutionalism.[21]

Similarly, Nathan Bailey's Dictionarium Britannicum (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[22] And his 1763 New Universal Dictionary repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[23] Samuel Johnson's Dictionary of the English Language (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[24] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[25] And Noah Webster's An American Dictionary of the English Language (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[26] Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The Founding generation was far more nuanced in distinguishing between the differences between these two terms.

For the framers, ratifiers, and other relevant legal actors in the Founding era, robust regulation was not understood to be an "infringement" of the right to bear arms, but rather the

---

[21] *Liberty,* A NEW LAW DICTIONARY (1792) *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[22] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[23] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[24] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[25] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[26] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

**JA4299**

necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[27] As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having no government, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property."[28] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[29]

The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text. The inclusion of rights guaranteed in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause

---

[27] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

[28] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[29] *See generally* Quentin Skinner, *Liberty Before Liberalism* (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

11

**JA4300**

and only with consent of the body politic."[30] Thus, rather than limiting rights, regulation was the essential means of preserving rights, including self-defense.[31]

In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[32] The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.[33] Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[34] The plain text of the Second Amendment not only protects the right to keep and bear arms, it acknowledges that this right is

---

[30] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. & CRIMINOLOGY 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[31] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017); SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[32] H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002).

[33] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 CONST. COMMENT. 228–30 (1999).

[34] *Id.*

**JA4301**

designed to encourage the security of a free state. Actions that undermine this security are clearly not protected by the Amendment.

In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and encourage the equally vital goal of promoting public safety. The proper metric for deciding if such laws were constitutional was and remains the same today: whether a regulation infringes on the core right protected by the Second Amendment.[35]

### B.  Arms And Accoutrements: Taking Founding-Era Texts Seriously

The text of the Second Amendment references arms. In Founding Era American English the term arm did not include "ammunition" or any of the other "accoutrements" essential to militia service. Thus, the claim that, as a matter of history and original meaning, modern large capacity magazines (LCMs) are either lineal descendants or analogs to the Founding era arms protected by the Second Amendment is false. As a matter of history, it is my opinion that these items indisputably do not fall under the Second Amendment's protections.  Indeed, the Second Amendment and early American militia laws acknowledge that government had both a compelling interest and ample authority to regulate and proscribe the types of arms, ammunition, and accoutrements that may be purchased in the marketplace. The Founding era term that incorporates all three of these parts of the equipment of a militiaman was "a stand of arms." The Second Amendment references arms, not "a stand of arms." [36]   In his dictionary, Noah Webster

---

[35] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[36]  *See* the relevant entries in Noah Webster,  A DICTIONARY OF THE ENGLISH LANGUAGE (1832) *s.v.*

13

**JA4302**

defined "a stand of arms as follows: "A stand of *arms* consists of a musket, bayonet, cartridge-box and belt, with a sword. But for common soldiers a sword is not necessary."[37]

A search of the phrase "arms and accoutrements" in the Brigham Young University Corpus of Founding Era English, a standard source in any originalist inquiry into constitutional meaning yields close to nine hundred occurrences of these two terms. A computer search of the Founders Online archive, another standard source consulted by originalist scholars also reveals hundreds of uses that underscore the irrefutable fact that arms and accoutrements were two distinct categories of military items.

One need not depend on the methods of corpus linguistics alone to document this basic fact about how "arms," "ammunition," and "accoutrements" were typically used in Founding era English.  William Duane's important military dictionary published during the Founding era made it clear that arms and accoutrements were distinct categories of equipage: "Accoutrements, by contrast, refers to equipage, including 'belts, pouches, and cartridges.'"[38] Similarly, ammunition, which was sometimes combined with accoutrements into a single category, was distinct from arms. The definition of ammunition from the Founding period included "all sorts of powder and ball, shells, bullets cartridges, and grape shot."[39]

Accoutrements were often listed separately from arms and ammunition. This order from General Washington underscores the seriousness with which the Continental Army scrutinized the condition of Arms, ammunition, and accoutrements in the possession of its soldiers:

> Twice a week (Wednesdays and Saturdays) the officers of each company are
> carefully to inspect the arms, ammunition, and accoutrements of their men, to

---

[37] 1 Encyclopædia Britannica: Or, a Dictionary of Arts, Sciences, and Miscellaneous Literature; Enlarged and Improved (1823) at 673.

[38] William Duane, MILITARY DICTIONARY (1810) at 2-3.

[39] *Id.*

14

**JA4303**

see that they are in perfect order and that nothing is wanting. At the first inspection they are to take an exact account of every article belonging to each man; and if afterwards any be missing, they are immediately to report the same to the officer commanding their regiment, that the matter may be enquired into, if he judges it proper, by a regimental court martial, and the delinquent punished if deserving it, and charged with the articles lost, to be deducted from his wages.[40]

Further evidence of the importance of the distinction between arms, ammunition, and accoutrements can be gleaned from the range of fines levied for failing to appear at muster adequately armed and accoutered. Persons too indigent to purchase these items were supplied out of the public arms and this included arms, ammunition, and accoutrements.[41]

Fines levied by Massachusetts for Deficient Equipment [42]

| Item | Category | Fine |
| --- | --- | --- |
| Musket | Arms | One dollar |
| Cartridge Box | Ammunition | Thirty Cents |
| Cartridges | Ammunition | Thirty Cents |
| Good Powder | Ammunition | Thirty Cents |
| Flints | Accoutrements | Twenty Cents |
| Wire Brush | Accoutrements | Twenty Cents |

---

[40] General Orders, 11 October 1777," Founders Online, National Archives, https://founders.archives.gov/documents/Washington/03-11-02-0488. [Original source: The Papers of George Washington, Revolutionary War Series, vol. 11, 19 August 1777–25 October 1777, ed. Philander D. Chase and Edward G. Lengel. Charlottesville: University Press of Virginia, 2001, pp. 480–482.]

[41] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[42] Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836 (1836) at 120. See also, Acts and Laws of the State of Connecticut, in America. United States (1784). "Table of Fines, Forfeitures, and Penalties," A Collection of All Such Acts of the General Assembly of Virginia of a Public and Permanent Nature as Have Passed Since the Session of (1808) at 223.

### C. From Muskets To Pistols: Change And Continuity In Early American Firearms Regulations

Guns have been regulated from the dawn of American history.[43] At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[44] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*.[45]

Anglo-American law venerated the natural right of self-defense but the legal understanding of this doctrine had been shaped by centuries of common law adjudication. The right of self-defense protected by Anglo-American law was not unlimited; it was shaped by the need to preserve human life and promote the peace.[46] Statutory law, both in England and America functioned to further these inter-related goals. The use of deadly force was extremely limited. At the time of the Second Amendment, retreat, not stand your ground was the legal norm.[47] Given these indisputable facts the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[48] To deny such an authority would be to convert the Constitution into a suicide pact and not a charter

---

[43] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[44] *Id.*

[45] Ruben & Miller, *supra* note 18, at 1.

[46] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[47] The three notable exceptions to this principle were the "castle doctrine," defense against threat when there was no opportunity to escape or seek help, and defense against felonious assault, see the arguments made by John Adams in his defense of the soldiers in the Boston Massacre trial, "Adams' Argument for the Defense: 3–4 December 1770," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016. [Original source: *The Adams Papers*, Legal Papers of John Adams, vol. 3, *Cases 63 and 64: The Boston Massacre Trials*, ed. L. Kinvin Wroth and Hiller B. Zobel. Cambridge, MA: Harvard University Press, 1965, pp. 242–270

[48] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

of government. In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[49]

*Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[50] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[51]

Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[52]

The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[53] Levels of interpersonal gun violence among those of white

---

[49] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[50] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[51] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[52] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009). Roth's data makes clear that gun violence was not a major problem at the Founding.

[53] It is important to recognize that there were profound regional differences in early America. *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988). These differences also had important consequences for the evolution of American law. *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF

17

**JA4306**

European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the almost constant state of war that existed between the tribal populations of the region and their American neighbors.

Limits in Founding-era firearms technology militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[54] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses. Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[55] Simply put, there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[56] The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that these types of firearms were less likely to be used in crimes of passion. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

---

LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

[54] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061 (last visited June 2, 2023).

[55] Sweeney, *supra* note 41.

[56] HAAG, *supra* note 50.

In short, the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America. Rather, they faced a different, but no less serious problem: American reluctance to purchase the type of weapons needed to effectively arm their militias. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[57] Killing pests and hunting were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[58]

Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by the military tactics of the time. A gun had to be able to receive a bayonet and serve as a bludgeon if necessary. The light-weight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin, but were not well suited to eighteenth-century ground wars. In particular, fowling pieces, loaded with shot, not bullets or musket balls were especially useful in a predominantly agrarian society.[59] When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved. Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[60]

---

[57] Sweeney, *supra* note 41.

[58] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

[59] Sweeney, *supra* note 41.

[60] *Id.*

As a result, the government took an active role in encouraging the manufacturing of arms and had a vested interest in determining what types of weapons would be produced. The American firearms industry in its infancy was thus largely dependent on government contracts and subsidies. The industry was also regulated to prevent sub-standard weapons from being sold and from military weapons being diverted from the militia. [61]

One important form of government regulation of the firearms industry, a practice that began in the era of the Second Amendment and persisted throughout the nineteenth century included inspection of weapons and Government-imposed safety standards on the firearms industry. Indeed, without such interventions it is likely that the industry would never have survived. The danger posed by defective arms, or poorly manufactured ones could be catastrophic. A burst barrel of a musket or fowling piece could turn a firearm into a pipe bomb, maiming or killing an unfortunate user.

In 1805 Massachusetts enacted a law requiring all guns to be inspected before they could be sold in the Commonwealth.[62] As stated in the law's preamble, the law's purpose was to prevent harm to residents from the sale of unsafe firearms. The law required the appointment of inspectors, up to two per county, who would "prove," i.e. test and inspect, all musket barrels and pistol barrels. The law detailed the manner in which these inspections were to be conducted, which included testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance. If the firearm passed inspection, then the inspector would stamp it with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. Only firearms that passed inspection and were stamped could be sold, and the sale of firearms without a stamp was subject to a fine. The standards that all muskets and pistols had to meet to pass inspection were

---

[61] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[62] 1804 Mass. Acts. 111, ch. 81, "An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth."

20

**JA4309**

updated in 1814.[63]

Maine imposed a similar requirement on firearms in 1821, and continued the practice through the end of the century.[64] Similar to the Massachusetts proving law, the Maine law required the governor to appoint inspectors of firearms who would then ensure that firearms met certain safety standards and stamped prior to their sale. The Maine and Massachusetts laws persisted throughout the nineteenth century.[65]

The federal armory in Springfield, Massachusetts, began producing muskets in 1794. The presence of the armory served as a spur to innovation among local gun smiths. In fact, this confluence of factors helped Western Massachusetts become the leading small arms producer in America on the eve of the War of 1812. The Springfield armory, a federal entity, was governed by federal law (not Massachusetts law) but it nonetheless extensively scrutinized and inspected all arms made at its facilities and any arms produced by local gunsmiths under government contract. The quality of these weapons, literally being stamped with government approval, made these guns particularly valuable in the civilian arms market when government surplus guns were sold to consumers in times of peace.[66] Federal weapons not made in Massachusetts were also stamped to discourage theft. In 1776, George Washington ordered all Continental Army firearms stamped

---

[63] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . .. ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according to the provisions of the first section of the act.")

[64] "An Act to Provide for the Proof of Fire Arms," 2 Laws State of Maine (1821) at 685-86.

[65] 1 The General Statutes of the Commonwealth of Massachusetts: Enacted December 28, 1859, to Take Effect June 1, 1860 (2d ed., William A. Richardson & George P. Sanger, eds.) 255 (1873).

[66] Lindsay Schakenbach Regele, *Manufacturing Advantage: War, The State, And The Origins Of American Industry*, 1776–1848 (2019) at 63-65.

with an insignia: "U.S.XIII." Government marked weapons in this fashion to make it easier to identify cases where arms were being illegally sold in a secondary market to private individuals or sold to person who were not allowed to own firearms.[67] In 1780, George Washington also ordered that the Continental Army ensure all gun barrels were sufficiently proved to avoid buying poor quality guns.[68]

Stamping and marking firearms aided government efforts to keep track of weapons and enforce manufacturing standards.  These types of policies were understood at the time of the Second Amendment and its various state analogs to be perfectly consistent with the right to keep and bear arms.[69]

The market for firearms in early America shared very few features with the contemporary world of firearms commerce. Today's Americans have a myriad of choices of the type and style of weapon when they wish to acquire a firearm. Gun shows, gun supermarkets, and internet sales are a few of the many ways Americans acquire firearms today. Although estimates vary, it is likely that there are now more guns than people in contemporary America.[70]

Early American firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production.[71] Apart from the wealthiest Americans, most households could not afford to own multiple weapons. Local gun smiths, not big box stores such as Walmart, were responsible for selling most firearms.

---

[67] E. Wayne Carp, *To Starve The Army At Pleasure: Continental Army Administration And American Political Culture, 1775-1783* (1984) at 66-67.

[68] Letter from George Washington to Henry Knox (Nov. 30, 1780), *in* The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, *ed.*) ("I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. ... Lee charges Mr. Deane[']s Agent with purchasing.")

[69] Regele, *supra* note 61.

[70] Terry L. Schell, Samuel Peterson, Brian G. Vegetabile, Adam Scherling, Rosanna Smart, and Andrew R. Morral, State-Level Estimates of Household Firearm Ownership. Santa Monica, CA: RAND Corporation, 2020. https://www.rand.org/pubs/tools/TL354.html.

[71] Merritt Roe Smith, Harpers Ferry Armory and the New Technology: The Challenge of Change (1977).

**JA4311**

Fire Arms ownership in New England During the Era of the Second Amendment, 1770-1798[72]

| Years | % Inventories with firearms | % Inventories with muskets | % Inventories with pistols |
|-------|----------------------------|----------------------------|----------------------------|
| 1770-1775 | 51 | .9 | 5 |
| 1783-1786 | 46 | .5 | 2.5 |
| 1795-1798 | 32 | 1.5 | 1.5 |

Most sellers and buyers of firearms in early America were members of the same community. Moreover, given the nature of eighteenth-century firearms technology gun owners needed to maintain an on-going relationship with their local gun smith to keep their guns in good working order. The informal ties of kin and community that defined the close-knit communities of early America meant that individuals were effectively vetted and monitored by their neighbors in ways that share little with the largely anonymous world of modern firearms commerce.[73]

The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[74] The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[75] The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints -- common items in many homes -- also transformed American gun culture.[76] These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common. The culmination of this gradual evolution in both firearms and

---

[72] Data adapted from Sweeney, *supra* note 41. Probate data does not perfectly correlate with total number of weapons in circulation so these figures must be used with some caution. In some cases, arms were passed on to family members before probate. These numbers do, however, offer a useful way to capture the relative number of different categories of arms owned by the population.

[73] Scott Paul Gordon, *The Ambitions of William Henry*, 136 PENNSYLVANIA MAGAZINE OF HISTORY AND BIOGRAPHY 253 (2012). Pennsylvania was one of the main regions of early American gunsmithing. M.L. Brown, *Firearms In Colonial America: The Impact On History And Technology*, 1492-1792 (1980).

[74] Cornell, *supra* note 3, at 745.

[75] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

[76] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY (Eric Foner ed., 1990).

ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican-American War.[77] Economic transformation was accompanied by a host of profound social changes that gave rise to America's first gun violence crisis. As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity. The change in behavior was most noticeable in the case of handguns. [78]

### D. The Myth of Founding Era Repeaters

Virtually all firearms in common use in the era of the Second Amendment were single-shot, muzzle-loading black powder weapons. Guns capable of firing more than a single round, repeaters, could best be described as exceedingly rare and exotic. Thus, the claim that firearms capable of firing more than ten rounds without reloading "are nothing new" and the related claim that such weapons were familiar to Americans in the Founding era is deceptive at best. The existence of such weapons did not mean that they were common, nor did it mean that the average American would have understood that such weapons were generally understood to fall within the protection of the Second Amendment. There is no evidence to support such a conclusion.

Moreover, the claim that "repeaters" and other rare weapons were widely believed to be protected by the Second Amendment is not consistent with the originalist framework employed in *Bruen*. An analysis of history, text, and tradition requires a contextually sensitive assessment of what types of weapons were in common use at the time and which weapons were singled out by governments for heighted forms of legal protection or treated simply as property subject to the normal range of regulation.[79] Thus, the relevant historical question is not what firearms

---

[77] William N. Hosley, *Colt: The Making of an American Legend* (1st ed. 1996).

[78] Cornell, *supra* note 3, at 716.

[79] Kevin Sweeney and Saul Cornell, *All Guns Are Not Created Equal*, CHRONICLE OF HIGHER EDUCATION. January 28, 2013; Priya Satia, *What Guns Meant in Eighteenth-century Britain* 5 PALGRAVE COMMUN 104 (2019).

technology existed at the time of the Second Amendment. The constitutionally pertinent question is: did the average reader of the Constitution and the first ten amendments understand repeaters to be among those weapons the Second Amendment was intended to protect?[80]

Few if any Americans would have ever encountered these types of weapons and even fewer owned such weapons, an indisputable fact that makes the argument that these types of weapons were encompassed by the Second Amendment highly improbable.[81]

The best way to understand the historical importance (or irrelevance) of these weapons is to analyze the discussion of arms in the print culture of the period, paying close attention to how repeating weapons were discussed in newspapers, books, and to a lesser extent private correspondence.[82] If one consults the standard sources associated with originalist scholarship and jurisprudence the silence is deafening. These types of weapons were rarely mentioned and when they were discussed they were described as rare and "curious."[83] Founding era newspapers often contained advertisements for the sale of firearms. Although one must approach data gained from this type of digital searching with some historical sophistication and caution, the evidence clearly shows that "repeating" weapons were neither common nor readily available in the period between the American Revolution and enactment of the Second Amendment. Given this fact it strains credulity to claim that such weapons were originally understood to be encompassed within the protections afforded by the Second Amendment. During the almost two-decade period between the Declaration of Independence and the adoption of the Second Amendment

---

[80] William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 LAW & HISTORY REVIEW 809-820 (2019).

[81] See discussion below *infra* Section IV.D.

[82] Saul Cornell, *Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning Id.*, 821–45.

[83] See discussion below *infra* Section IV.D.

**JA4314**

there were a total of five advertisements for the sale of air rifles in American newspapers.[84] In the same period there were over four thousand advertisements for the sale of guns of various types, most notably muskets of one type or another.    The advertisement reproduced in Figure One below illustrates the exotic nature of these weapons, which were described as "singular" and "curious."[85]

Figure One[86]



These guns were so rare and expensive that a New York Museum from the period decided to showcase an air gun alongside other curiosities such as mammoth bones and a full-size working guillotine.  For an additional fee beyond the price of admission one could purchase an opportunity to fire one these "singular" weapons.[87]

---

[84]  [New York] Royal Gazette October 1, 1783  at 3;  Pennsylvania Packet  July 21, 1789 at 3 ; *id*.  July 28, at 1;  *id*., July 31 at 1; *id*., August 13, at 1.

[85] "To be Sold at Private Sale," [New York] ROYAL GAZETTE October 1, 1783  at 3
[86] *Id.*
[87] Lawrence W. Levine, *Highbrow/Lowbrow* (2009) at 149.

**JA4315**

Figure Two [88]



The notion that the Second Amendment was widely understood to protect weapons that were rarely advertised for sale and that generally recognized to be of a "singular" and "curious" nature is not credible; nor is such a claim consistent with Heller and Bruen's originalist methodology which requires that texts be interpreted according to their ordinary public meaning in the eighteenth century. Weapons described as "singular and curious" are a poor choice for understanding the ordinary meaning of the term "arms" in Founding era English.

Visitors to today's NRA's museum of firearms may be treated to an impressive exhibit featuring the type of Girondoni air rifle that Lewis and Clark carried on their Expedition of Discovery. [89] Although modern gun rights advocates and antiquarian firearms enthusiasts are well acquainted with this weapon, few Americans in the era of Lewis and Clark could make a comparable claim. Indeed, in the first published account of the Corps of Discovery's mission there are less than a handful of references to the air gun carried by Lewis and Clark. The

___

[88] "To the Curious," [New York] DAILY ADVERTISER, February 9, 1792.
[89] https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-8-romance-of-the-long-rifle/girardoni-air-rifle-as-used-by-lewis-and-clark.aspx (last visited on 6/1/23).

primary use of the weapon was not for war, hunting, or individual self-defense, but the weapon

was a show piece used to impress the different Indian nations the Corps encountered with the

superiority of American technology.[90] But, few Americans at the time of the Lewis and Clark

exhibition would have had the opportunity to ever see one of these weapons or any other

repeating gun up close.

Under ideal conditions priming the Girardoni air gun required 1500 strokes of a pump.

The Austrian military, one of the few armed forces in the world to purchase these types of

weapons, quickly abandoned them because they were ill suited to battle-field conditions.  In

1789, an Austrian officer complained that the weapons were of little military value because of

the difficulty of using them and their tendency to malfunction:

> Due to their construction, these guns were much more difficult to
> use effectively than normal, as one had to handle them much more
> cautiously and carefully. In addition, the soldiers using them had to
> be supervised extremely carefully, as they were unsure about the
> operation. The guns became inoperable after a very short time—so
> much so that after a while no more than one-third of them were still
> in a usable state. We needed the whole winter to repair and replace
> them.[91]

William Duane's popular military dictionary (1810) devoted a short entry to air guns, noting that

the gun's performance was so unreliable, "it has long been out of use among military men."[92]

### E.  The Police Power And Firearms Regulation

The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to

bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the

people of this State have the sole, exclusive and inherent right of governing and regulating the

---

[90]  2 History of the Expedition Under the Command of Captains Lewis and Clark...in
Two (ed., Paul Allen, 1814) at 136, 28,364. For a discussion of the Corps of Discovery's use of
technology to over-awe Indian peoples and impress upon them the superiority of American
technology, see James P. Rhonda, LEWIS AND CLARK AMONG THE INDIANS (1984) at
225.

[91] Frederick J. Chiaventone, *The Girardoni Air Rifle: The Lewis and Clark
Expedition's Secret Weapon* 14 MILITARY HERITAGE (2015), 19.

[92] William Duane, A MILITARY DICTIONARY (1810) at 5.

internal police of the same."[93] The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[94] By the early nineteenth century, the term "police" was a fixture in American law.[95] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[96] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[97] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority,

---

[93] PA. CONST. OF 1776, Ch. I, art iii.

[94] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV. For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[95] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[96] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[97] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

29

**JA4318**

including the authority to regulate guns and gun powder.[98]

Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible. Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[99] Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[100]

State police power authority was at its pinnacle in matters relating to guns or gun powder.[101] Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the substance's dangerous potential to detonate if exposed to fire or heat. Firearms were also subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons.[102]

Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[103] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

---

[98] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[99] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[100] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[101] Cornell and DeDino, *supra* note 35.

[102] *Id.*

[103] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

**JA4319**

[I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[104]

New Hampshire enacted a law in 1825 penalizing the sale or offer to sell "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."[105]

Other examples of state laws delegating authority to local governments to regulate the sale of gunpowder for public safety include but are not limited to:

a. 1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

b. An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder);

c. An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8, pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

The purpose of these gunpowder regulations was to promote public safety. Early American governments recognized the danger posed by gun powder and regulated every aspect of its production, sale, and storage. Early American governments also regulated shooting galleries for

---

[104] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, 2 Laws Of The State Of New-York, Comprising The Constitution, And The Acts Of The Legislature, Since The Revolution, From The First To The Fifteenth Session, Inclusive at 191-2 (Thomas Greenleaf, ed., 1792).

[105] 1825 N.H. Laws 74, ch. 61, § 5

**JA4320**

similar reasons.[106]

There were also laws that required the inspection of gunpowder. In 1809, Massachusetts established requirements for the quality and composition of gunpowder; authorized the appointment of inspector. Before being placed in any public magazine gunpowder that passed inspection was placed in a cask and marked with the inspector's initials; gunpowder that was marked condemned or that had not yet passed inspection could not be sold.[107] Four other states, including Rhode Island, New Jersey, New Hampshire, and Pennsylvania, adopted similar gunpowder inspection laws in the late eighteenth and early nineteenth centuries.[108]

The regulation of firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[109] This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning

---

[106] John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 80 (1848); Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220 (1854); Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149-150 (1856) ; Rhode Island: 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement, §§ 1-2; Samuel Ames, The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State Page 204-205(1857); William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149 (1863*); Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council. New Edition Page 257 (1870).*
[107] 1808 Mass. Acts 444, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder.
[108] 1776 R.I. Pub. Laws 25 (Oct. Sess.); 1776-77 N.J. Laws 6-7, ch. 6; 1820 N.H. Laws 274, ch. 25; 1794 Pa. Laws 764, ch. 337.
[109] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

**JA4321**

with the Marshall Court and continuing with the Taney Court.[110]  Nor was Chief Justice John

Marshall unique in highlighting the centrality of this idea to American law. [111] The ubiquity of

the police power framework for evaluating the constitutionality of legislation regarding firearms

reflected the centrality of this approach to nearly every question of municipal legislation

touching health or public safety in early America.[112] Massachusetts Judge Lemuel Shaw, one of

the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential

1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers,

judges, and legislators looking for guidance on the meaning and scope of the police power.

Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and
> establish all manner of wholesome and reasonable laws, statutes and
> ordinances, either with penalties or without, not repugnant to the constitution,
> as they shall judge to be for the good and welfare of the commonwealth, and
> of the subjects of the same. It is much easier to perceive and realize the
> existence and sources of this power, than to mark its boundaries, or prescribe
> limits to its exercise. There are many cases in which such a power is exercised
> by all well-ordered governments, and where its fitness is so obvious, that all
> well regulated minds will regard it as reasonable. Such are the laws to prohibit
> the use of warehouses for the storage of gunpowder.[113]

In short, there was unanimous agreement among leading antebellum jurists, at both the

---

[110] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice.
The Marshall Court Period covered the years 1801-1835. For a brief overview, *see The Marshall
Court, 1801-1835*, SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022),
https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-
history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years
1836-1864**.** See *The Taney Court, 1836-1864*, SUPREME COURT HISTORICAL SOCIETY (last visited
Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-
of-the-courts-history-of-the-courts-the-taney-court-1836-1864/**.**

[111] In the extensive notes he added as editor of the 12th edition of James Kent's classic
*Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms
was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN
LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[112] FREUND, *supra* note 95, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE:
LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996).

[113] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion
of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures. Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[114] A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[115]

No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged. This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[116] Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[117] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

---

[114] CORNELL, THE POLICE POWER, *supra* note 31.

[115] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

[116] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[117] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[118]

One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[119] The case is a classic example of antebellum police power jurisprudence. The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[120] In the court's view, the regulation of arms was at the very core of state police power.[121] The judicial determination was straightforward: was the challenged law a legitimate exercise of the police power or not?

Modern-day legislative efforts to ban large-capacity magazines, semi-automatic weapons, and machine guns fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror. During American's first gun violence crisis in the Jacksonian era, states targeted pistols that were easily concealed, and in the New Deal era, states singled out gangster weapons such as the notorious Thompson sub-machine gun (or "Tommy Gun"), treating these weapons as sufficiently dangerous or unusual to warrant extensive regulation,

---

[118] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[119] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[120] *Id.* at 616.

[121] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 95, at 91.

**JA4324**

or prohibition.  The same imperatives and constitutional logic guided both regulatory regimes.[122]

### F.  Reconstruction And State Police Power To Regulate Firearms (1863-1877)

Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were textually distinct in the Founding era but were mutually reinforcing in both theory and practice: both were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.[123] This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.[124] As a result, state constitutions no longer included positive affirmations of a police right. Secondly, the constitutional "mischief to be remedied" had changed as well.[125] Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.[126] By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical

---

[122] Spitzer, *supra* note 43.
[123] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).
[124]  See Knapp *supra* note 11.
[125]  The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).
[126] Noah. Shusterman, ARMED CITIZENS: THE ROAD FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

36

Stuart Kings using their standing army to oppress American colonists. In place of these older fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[127]

The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[128] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[129] Texas was not an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[130] Americans living in the newly organized western states and newly reconstructed states of the former Confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[131]

---

[127] On the change in state constitutional arms bearing provisions, *See McDonald*, 561 U.S. at 767–68. For an analysis of the different mischiefs shaping the structure of state arms bearing provisions in these two periods, see Cornell, *supra* note 123.

[128] Cornell, *supra* note 123.

[129] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[130] Cornell, *supra* note 123, at 75–76.

[131] *Id.*

This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies. The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[132]

Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[133]

Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government. The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[134] As long as state and local laws were racially neutral and favored no person over any

---

[132] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[133] Robert J. Kaczorowski*, Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[134] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [135]

It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[136] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[137] The expansion of regulation did not represent a new constitutional principle, but it did embody a new application that represented an adaptation to changed circumstances of post-Civil War America.

Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[138] Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that the "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[139]

In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral

---

[135] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[136] *See* Spitzer, *supra* note 43, at 59–61 tbl. 1.

[137] *Id.*

[138] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[139] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

regulations aimed at public safety. Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[140] The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction. The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[141]

The laws adopted to address these problems underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty and the use of police power to promote public safety.

## V.    CONCLUSION: The Scope Of Permissible Regulation

The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.[142] Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American

---

[140] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

[141] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

[142] Spitzer, *supra* note 43.

law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[143] States and localities have regulated arms and ammunition since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[144] The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture. Weapons have been subject to regulation since before the Founding and this power has been at the core of state police power from time immemorial.[145]

I declare that the foregoing is true and correct to the best of my knowledge.

_Saul Cornell_
_____
Saul Cornell

June 2, 2023
_____
Date

---

[143] *Id.*

[144] GERSTLE, *supra* note 13.

[145] Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum* 34 UCLA L. REV. 1713, 1769 (1986-1987).

41

**JA4330**

# Exhibit 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| **Book Publications** |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

## Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"
 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace," 80 Law and Contemporary Problems (2017): 11-54

"Half Cocked': The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment," 107 Northwestern Journal of Criminal Law 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward 92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae 84 (2015): 1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

**JA4334**

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" <u>UCLA Law Journal</u> 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" <u>Ohio-State Law Journal</u> 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the <u>Cambridge</u> <u>History of A merican Law</u> (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" <u>Albany Government Law Review</u> 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u> (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u> (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," <u>Law and History Review</u> (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u> 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," <u>Stanford Law and</u> <u>Policy Review</u> (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," <u>Fordham Law Review</u> 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political</u> <u>History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1[st] and 2[nd] Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed: The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

**JA4335**

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story</u>" <u>American  Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contextualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age</u> <u>of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

## Book Reviews:

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>American Studies</u> <u>Journal of the Early Republic</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>American Quarterly</u>
- <u>American Journal of Legal History</u>
- <u>Law and History Review</u>

## Journal Manuscript Referee:

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>Diplomatic History</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>Law and History Review</u>
- <u>Harvard Law Review</u>

- Stanford Law Review
- Yale Law Journal

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment,"
Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium,
   November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns
   in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth
   Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the
   Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History,"
   Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to
   the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the
   Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment,"
   Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell
   College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists"
   Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture,
   Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early
American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of
Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University,
(2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead
Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson
Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional
Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History,
Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment
Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of
Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies
Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British
Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:  The New Constitutional Historicism and the Enduring
Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center,
Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?"
Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego
(2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional
Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania
Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate," American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation, NRA/ GMU Student's For the Second Amendment Symposium (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History," Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?" University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and Early American History," SHEAR Brown University (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate," Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C. (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment" "Gun Control: Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms: The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

**JA4340**

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

<u>**Interviews, Editorials, Essays, Podcasts:**</u>

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
    SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved" *Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"    To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

---

## Other Professional Activities

- Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, American Quarterly (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

---

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

### Federal Courts:

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:
Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]
Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]
Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]
Amicus Brief, Young v. State of Hawaii  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, Flanagan vs. Becerra, Central District of California Case  (2018) [2nd Amendment]
Amicus Brief, Gill v. Whitford (US Supreme Court, 2017)  [Partisan Gerrymandering]
Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

**JA4345**

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


## Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).


## Law Review Symposia Organized

### Second Amendment:

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

### New Originalism:

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE<br>& PISTOL CLUBS, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:18-cv-10507 |
| CHEESEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 1:22-cv-4360 |
| ELLMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>PLATKIN, et al.,<br><br>    Defendants. | Civil Action No. 3:22-cv-04397 |

**Expert Report of Louis Klarevas**

1

Exhibit
0007

I, Louis Klarevas, declare:

1.    This report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this report.

## PROFESSIONAL QUALIFICATIONS

2.    I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York.  I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3.    I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  During the course of my nearly 25-year career as an academic, I have served on the faculties of George Washington University, the City University of New York, New York University, and the University of Massachusetts.  I have also served as Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

4.    My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that focuses on reducing intentional shootings at elementary and secondary schools.

5.    In addition to having made over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces.  In 2019, my peer-reviewed article on the effectiveness of restrictions on large-capacity magazines (LCMs) in reducing high-fatality mass shootings that result in six or more victims killed was published in the *American Journal of Public Health*.[2]  This study found that jurisdictions with

---

[1] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed February 11, 2023).

2

LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans.  Despite being over 3 years old now, this study continues to be one of the highest impact studies in academia.  It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

      6.     Since January 1, 2019, I have been deposed, testified in court, or testified by declaration in the following cases (all in federal court), listed alphabetically by state:

| | |
|---|---|
| **California – Central District** | |
| *Rupp v. Bonta* | 8:17-cv-00746-JLS-JDE |
| **California – Eastern District** | |
| *Wiese v. Bonta* | 2:17-cv-00903-WBS-KJN |
| **California – Southern District** | |
| *Duncan v. Bonta* | 17-cv-1017-BEN-JLB |
| *Jones v. Bonta* | 19-cv-01226-L-AHG |
| *Miller v. Bonta* | 3:19-cv-1537-BEN-JBS |
| *Nguyen v. Bonta* | 3:20-cv-02470-WQH-MDD |
| **Colorado** | |
| *Gates v. Polis* | 1:22-cv-01866-NYW-SKC |
| **Connecticut** | |
| *National Association for Gun Rights v. Lamont* | 3:22-cv-01118-JBA |
| **Hawaii** | |
| *National Association for Gun Rights v. Lopez* | 1:22-cv-404-DKW-RT |
| **Illinois – Northern District** | |
| *Viramontes v. Cook County* | 1:21-cv-04595 |
| *National Association for Gun Rights v. Highland Park* | 22-cv-04774 |
| *Herrera v. Raoul* | 1:23-cv-00532 |
| **Illinois – Southern District** | |
| *Harrel v. Raoul*[*] | 23-cv-141-SPM |
| *Langley v. Kelly*[*] | 23-cv-192-SPM |
| *Barnett v. Raoul*[*] | 23-cv-209-SPM |
| *Federal Firearms Licensees of Illinois v. Pritzker*[*] | 23-cv-215-SPM |
| *Kenneally v. Raoul* | 3:23-cv-50039 |

---

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed February 11, 2023).  According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies.  Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans.  They helped build the foundation for future studies while overcoming the limitations of previous research."  *Ibid.*

**Massachusetts**
*National Association for Gun Rights v. Campbell*                    1:22-cv-11431-FDS
**Oregon**
*Oregon Firearms Federation v. Kotek*[†]                    2:22-cv-01815-IM
*Fitz v. Rosenblum*[†]                    3:22-cv-01859-IM
*Eyre v. Rosenblum*[†]                    3:22-cv-01862-IM
*Azzopardi v. Rosenblum*[†]                    3:22-cv-01869-IM
**Washington – Eastern District**
*Brumback v. Ferguson*                    1:22-cv-03093-MKD
*Banta v. Ferguson*                    2:23-cv-00112-MKD
**Washington – Western District**
*Hartford v. Ferguson*                    3:23-cv-05364-RJB

[*]Non-Consolidated Cases on the Same Briefing Schedule / [†]Consolidated Cases

7.      In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20.  I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

8.      I have also submitted declarations in the following state court cases: *People of Colorado v. Sgaggio*, District Court, El Paso County, Colorado, 2022M005894 (Criminal); and *Guardian Arms v. Inslee*, Superior Court, Grant County, Washington, 23-2-00377-13 (Civil).

9.      A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this report.

10.      I am being compensated at a rate of $480/hour for my work on this report, $600/hour for any testimony in connection with this matter, and $120/hour for travel required to provide testimony.

4

**JA4350**

## OPINIONS

11.     It is my professional opinion, based upon my analysis of the data reviewed herein, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, often related to the use of assault weapons and LCMs; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs.  Based on these findings, it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of gun massacres.[4]

---

[4] For purposes of this report, mass shootings are defined in a manner consistent with my book *Rampage Nation*, *supra* note 1 (*see* Excerpt Attached as **Exhibit B**).  "Mass shootings" are shootings resulting in four or more victims being shot (fatally or non-fatally), regardless of location or underlying motive.  As a subset of mass shootings, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more victims being shot to death, regardless of location or underlying motive.  The data on high-fatality mass shootings is from a data set that I maintain and continuously update.  This data set is reproduced in **Exhibit C**.  Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in Sections I, II, and VI of this report are drawn from **Exhibit C**.

# I.    MASS SHOOTINGS ARE A GROWING THREAT TO PUBLIC SAFETY

12.    Examining mass-casualty acts of violence in the United States since 1991 points to two disturbing patterns.[5]  First, as demonstrated in Table 1, the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings.  Second, as displayed in Figures 1-2, the problem of high-fatality mass shooting violence is on the rise.  To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%.  However, when the number of people killed in high-fatality mass shootings in the 1990s is compared to the number killed in such incidents in the 2010s, it reflects an increase of 260%.  In other words, the rise in gun massacre violence has far outpaced the rise in national population—by a factor of 13.  The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1.  The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

|   | Deaths | Date | Location | Type of Violence |
|---|--------|------|----------|------------------|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

---

[5] Because the analysis in Section VI of this report necessarily uses data from 1991 through 2022, for purposes of consistency (and to avoid any confusion), the analyses in Sections I and II also use data from 1991 through 2022.

**Figure 1.  Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2.  Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

7

## II.    THE USE OF ASSAULT WEAPONS AND LCMs ARE MAJOR FACTORS IN THE RISE OF MASS SHOOTING VIOLENCE

13.    In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres.[6]  As shown in Figures 3-4, based on high-fatality mass shootings where details allow a determination on the use of assault weapons and LCMs are available, over half of all incidents in the last four years involved assault weapons and all incidents in the last four years involved LCMs having a capacity greater than 10 bullets.  As shown in Figures 5-6, a similar pattern emerges when examining deaths in high-fatality mass shootings in the last four years, with 62% of deaths resulting from incidents involving assault weapons and 100% of deaths resulting from incidents involving LCMs having a capacity greater than 10 bullets.  These trends demonstrate that, among perpetrators of gun massacres, there is a growing preference for using assault weapons and LCMs to carry out their attacks.[7]

---

[6] Assault weapons are generally semiautomatic firearms that fall into one of the following three categories: assault pistols, assault rifles, and assault shotguns.  For purposes of this report, unless otherwise stated, assault weapons and LCMs are defined and coded in a manner consistent with the definitions used in **Exhibit C**.  As stated in **Exhibit C**: "For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban or (2) the statutes of the state where the shooting occurred.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device with a capacity of more than 10 bullets."

[7] Out of all 93 high-fatality mass shootings in the United States between 1991 and 2022, it cannot be determined whether LCMs were used in 14 of those incidents.  Furthermore, for two of these 14 incidents, it is also not possible to determine whether they involved assault weapons.  Therefore, the tables, figures, and percentages discussed in this section of this report are based on calculations that only use data points from the incidents in which the involvement of assault weapons and/or LCMs could be determined.

8

**JA4354**

**Figure 3. Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Figure 4. Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

9

**Figure 5.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 5 exclude incidents in which the firearms used are unknown.

**Figure 6.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 6 exclude incidents in which it is unknown if LCMs were used.

10

14.     The growing use of assault weapons to carry out high-fatality mass shootings is an obvious theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another clear theme.  Based on National Sport Shooting Foundation (NSSF) and federal government data, "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform firearms—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly-available data (24.4 million out of an estimated 461.9 million firearms).[8]  And, in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement and security agencies, firearms retailers, and possibly prohibited possessors (e.g., violent criminals) in the United States.[9]  But even using this estimate, if assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 5% of all high-fatality mass shootings would involve assault weapons.  However, as seen in Figure 3 above, civilian ownership rates and mass-shooter use rates are not similar.  Indeed, the

---

[8] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data.  The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available).  NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023).  In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation in the United States.  NSSF, *Firearm Production in the United States with Firearm Import and Export Data*, Industry Intelligence Report, 2020, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023).  According to ATF data, in 2019 and 2020, an additional 28.0 million firearms entered the civilian stock nationwide.  ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (2022), at 181, 188, 193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (last accessed January 3, 2023).  Assuming these figures reported by the NSSF and ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to approximately 461.9 million.  The ownership rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9 million total firearms equals approximately 5.3%.

[9] ATF, 2022, *supra* note 8, at 12; NSSF, 2020, *supra* note 8, at 2-3.

current difference is approximately ten-fold, with the rate at which assault weapons are now used to commit gun massacres far outpacing the rate at which modern sporting rifles circulate amongst civilians in the United States.[10]

15.    Another pattern that stands out when examining the relationship between assault weapons use and gun massacre violence reflects the disproportionately greater lethality associated with the use of assault weapons and LCMs.  For instance, returning to the aforementioned list of the seven deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass shootings, six of the seven incidents (86%) involved assault weapons and LCMs, as shown in Table 2.  When examining all high-fatality mass shootings since 1991, the relationship between assault weapons use, LCM use, and higher death tolls is striking.  In the past 32 years, assault weapons and LCMs with an ammunition capacity greater than 10 rounds have been used, respectively, in 34% and 77% of all high-fatality mass shootings.  However, as the fatality thresholds of such incidents increase, so too do the shares of incidents involving assault weapons and LCMs.  For instance, assault weapons and LCMs were used, respectively, in 75% and 100% of all mass shootings resulting in more than 20 deaths (Figures 7-8).  As the data show, there is an association between mass shooting lethality and the use of assault weapons and LCMs.

---

[10] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar comparison using LCMs instead of modern sporting rifles.

12

**Table 2.  The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapons | Involved LCMs ( > 10 Rounds ) |
|--------|------|----------|--------------------------|-------------------------------|
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

**Figure 7.  Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 7 exclude incidents in which the firearms used are unknown.

13

**Figure 8.  Percentage of High-Fatality Mass Shootings Involving LCMs (Ammunition Capacity Greater Than 10 Rounds) by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 8 exclude incidents in which it is unknown if LCMs were used.

16.     Of the 91 high-fatality mass shootings since January 1, 1991, in which the type of firearm used is known, 31 involved assault weapons, resulting in 425 deaths.  The average death toll for these 31 incidents is 13.7 fatalities per shooting.  By contrast, the average death toll for the 60 incidents in which it is known assault weapons were not used (which resulted in 490 fatalities) is 8.2 fatalities per shooting (Table 3).  Furthermore, of the 79 high-fatality mass shootings since January 1, 1991, in which LCM use was determined, 61 involved LCMs with an ammunition capacity greater than 10 rounds, resulting in 704 deaths.  The average death toll for these 61 incidents is 11.5 fatalities per shooting.  The average death toll for the 18 incidents in which it is known LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting (Table 4).  In other words, in the last 32 years, the use of assault weapons and LCMs in gun massacres has resulted, correspondingly, in 67% and 58% increases in average fatalities per incident (Tables 3-4).

14

17.     Table 5 shows the average death tolls per high-fatality mass shooting incident that are attributable to assault weapons beyond deaths associated with the use of LCMs.  When LCMs with an ammunition capacity greater than 10 rounds are not used, the average death toll is 7.3 fatalities.  When LCMs are used, but not in conjunction with assault weapons, the average death toll is 9.2 fatalities.  When LCMs are used with assault weapons, the average death toll is 14.0 fatalities.  The data show that using LCMs without an assault weapon resulted in a 26% increase in the average death toll.  However, using LCMs with an assault weapon resulted in a 52% increase in the average death toll associated with incidents that involved LCMs without assault weapons and a 92% increase in the average death toll associated with incidents that involved neither LCMs nor assault weapons.

18.     This review of the data suggests that assault weapons and LCMs are force multipliers when used in mass shootings.

**Table 3.  The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

15

JA4361

**Table 4.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Table 5.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

16

**JA4362**

III.    **DOUBLE-DIGIT-FATALITY MASS SHOOTINGS ARE A POST-WORLD WAR II
PHENOMENON IN AMERICAN HISTORY AND THEY INCREASINGLY INVOLVE
ASSAULT WEAPONS**

19.    I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 6 and Figure 9).[11]  In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949.  In other words, for 70% of its 247-year existence as a nation, the United States did not experience a *single* mass shooting resulting in double-digit fatalities.  They are relatively modern phenomena in American history.[12]

20.    After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966.  The third such mass shooting then occurred nine years later, in 1975.  And the fourth such incident occurred seven years after, in 1982.  Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era.  Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 6 and Figure 10).[13]

---

[11] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022).  The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607.  Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[12] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[13] Figures 9-10 are reproduced in larger form as **Exhibit D** of this report.

17

**JA4363**

**Table 6.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**

|   | Date | Location | Deaths | Involved Assault Weapon(s) | Involved LCM(s) |
|---|------|----------|--------|----------------------------|-----------------|
| 1 | 9/6/1949 | Camden, NJ | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe, TX | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators.  An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 Federal Assault Weapons Ban or (2) the statutes of the state where the gun massacre occurred.  An incident was coded as involving an LCM if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets.

18

**JA4364**

**Figure 9.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**



**Figure 10.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1949-2022**



19

**JA4365**

21.     The distribution of double-digit-fatality mass shootings changes in the early

1980s, when five such events took place in a span of just five years (Table 6 and Figure 10).

This timeframe also reflects the first time that assault weapons were used to perpetrate mass

shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an

AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi

pistol and resulting in 21 deaths).  But this cluster of incidents was followed by a 20-year period

in which only two double-digit-fatality mass shootings occurred (Figure 10).  This period of time

from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm

Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994

Federal Assault Weapons Ban.

22.     It is well-documented in the academic literature that, after the Federal Assault

Weapons Ban expired in 2004, mass shooting violence increased substantially.[14]  Mass shootings

that resulted in 10 or more deaths were no exception, following the same pattern.  In the 56 years

from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit

fatalities (a frequency rate of one incident every 5.6 years).  In the 18 years since 2004, there

have been 20 double-digit-fatality mass shootings (a frequency rate of one incident every 0.9

years).  In other words, the frequency rate has increased over six-fold since the Federal Assault

Weapons Ban expired (Table 6 and Figure 10).  (The 1994 Federal Assault Weapons Ban and its

impact on mass shooting violence is discussed in further detail in Section VI of this report.)

---

[14] *See*, for example, Louis Klarevas, *supra* note 1 (Relevant Excerpt Attached as **Exhibit
E**); Louis Klarevas, et al., *supra* note 2 (Attached as **Exhibit F**); Charles DiMaggio, et al.,
"Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons
Ban: Analysis of Open-Source Data," 86 *Journal of Trauma and Acute Care Surgery* 11 (2019)
(Attached as **Exhibit G**); Lori Post, et al., "Impact of Firearm Surveillance on Gun Control
Policy: Regression Discontinuity Analysis," 7 *JMIR Public Health and Surveillance* (2021)
(Attached as **Exhibit H**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons
and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (Attached as
**Exhibit I**).

23.    Over three-quarters of the mass shootings resulting in 10 or more deaths involved assault weapons and/or LCMs (Table 6).  As also shown in the analyses of mass shootings in Section II, death tolls in double-digit-fatality mass shootings are related to the use of firearm technologies like assault weapons and LCMs that, in terms of mass shootings, serve as force multipliers.

IV.    **ASSAULT WEAPONS ARE ALMOST NEVER USED BY PRIVATE CITIZENS IN SELF-DEFENSE DURING ACTIVE SHOOTINGS**

24.    An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them?  As shown above in Section II, assault weapons have been used in approximately one-third of high-fatality mass shootings in the past 32 years (Figure 3).  And in the past eight years, the share of high-fatality mass shootings that have involved assault weapons has risen to approximately half (Figure 3).

25.    The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[15]  According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[16]  A simple way to conceptualize active shooter incidents is to think of them as attempted

_____

[15] All of the information in this section, including definitions and data, are publicly available from the FBI.  *See* FBI, "Active Shooter Safety Resources," *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed January 2, 2023).

[16] FBI, *Active Shooter Incidents in the United States in 2022*, April 2023, at 1, *available at* https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2022-042623.pdf/view (last accessed May 4, 2023).  The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms.  The *active* aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome."  *Ibid.* (emphasis in original).  In addition to the report on incidents in 2022, the FBI has published seven other reports on active shooter incidents covering the following seven time-periods: 2000-2013, 2014-2015, 2016-2017, 2018, 2019, 2020, and 2021.  All of these reports are available at the FBI's "Active Shooter Safety Resources" website, *supra* note 15.

21

**JA4367**

mass shootings. As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

26.     In the 23 years between January 1, 2000, and December 31, 2022, the FBI has identified 456 active shootings occurring in the United States. Out of these 456 active shooter incidents, 18 incidents (3.9%) involved defensive gun uses (DGUs) by civilians, excluding law enforcement or armed security.[17] Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one assault rifle).[18] In other words, out of the 17 incidents where an armed civilian intervened and it was possible to identify the DGU firearm, only one incident (5.9%) involved an assault weapon.[19] Within the broader context of all active shooter incidents, only one incident out of 456 in the past 23 years (0.2%) is known to have involved an armed civilian intervening with an assault weapon.[20]

_____

[17] In 17 of the 18 DGU-involved active shooter incidents, there was an exchange of gunfire. For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased. FBI, *supra* notes 15 and 16.

[18] All 14 DGU incidents that involved handguns also involved armed civilians who held valid concealed-carry permits or were legally carrying their handguns. *Ibid*. In 12 of these 14 incidents, details about the types of handguns used in self-defense were available in news media accounts or in news media photographs from the crime scene. In two of the 14 incidents, the use of concealed handguns was inferred based on details about the shooting reported in news media accounts. There is no evidence that either of these two DGU incidents involved an assault pistol.

[19] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident. *Ibid*. Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun. *See* Carla Field, "Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says," WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023). Adding this incident to the 17 DGU-involved incidents where the type of firearm was identifiable would mean that 5.6% (as opposed to 5.9%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[20] FBI, *supra* notes 15 and 16. The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas. In that incident, an armed private citizen

27. The bottom line is that assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.[21]

## V.    OWNERSHIP RATES OF "MODERN SPORTING RIFLES" AND LCMS IN THE U.S.

28. As noted above in Para. 14, based on the most recent publicly-available NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform firearms—appear to make up as many as 5.3% of all firearms in circulation in American society (24.4 million out of an estimated 461.9 million firearms), although this is likely an over-estimate due to the apparent inclusion of modern sporting rifles in the possession of law enforcement and security agencies, firearms retailers, and prohibited owners (such as criminals and domestic abusers). It is also likely that the NSSF's estimate includes firearms that have been illegally trafficked to other countries, especially neighboring Mexico.[22] Based on NSSF figures, 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles.[23] In other words, less than 8% of all civilian gun owners

---

used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene. While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him. *See* Adam Roberts, "Man Who Shot Texas Gunman Shares His Story," KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

[21] Given the limitations of the active shooter incident data reported by the FBI, it is not possible to discern whether any of the civilian DGUs involved an armed civilian using a firearm with an LCM at the time of the intervention. As such, it is not possible to perform a similar comparison between mass shootings perpetrated with LCM-equipped firearms and mass shootings thwarted with LCM-equipped firearms.

[22] *See*, for example, Liz Mineo, "Stopping Toxic Flow of Guns from U.S. to Mexico," *Harvard Gazette*, February 18, 2022, *available at* https://news.harvard.edu/gazette/story/2022/02/stopping-toxic-flow-of-gun-traffic-from-u-s-to-mexico (last accessed May 31, 2023).

[23] In its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle. NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at*

23

in the United States own modern sporting rifles.[24]  In terms of the total population of the United

States, estimated by the Census Bureau to be approximately 333 million people in 2022, less

than 2% of all Americans own a modern sporting rifle.[25]

29.    In addition to the NSSF's estimate that there are 24.4 million modern sporting

rifles in civilian circulation in the United States as of the end of 2020, the Plaintiffs draw on a

survey conducted by William English to support their estimates about the number of AR-15-style

rifles in American society.[26]  According to English, "about 24.6 million people" have owned "an

AR-15 or similar styled rifle."[27]  In surveying ownership rates, English also found that 0.3% of

---

https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last
accessed January 16, 2023).  The estimate that approximately 6.4 million gun owners possess
what the NSSF considers to be modern sporting rifles is calculated by dividing the 3.8 average
number of such rifles that each modern sporting rifle owner possesses into the 24.4 million such
rifles estimated to be in civilian circulation.  This calculation (24.4 million divided by 3.8) equals
6.4 million.  Based on survey data, 81 million American adults are estimated to own guns.  Andy
Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight,"
PolitiFact, The Poynter Institute, August 3, 2022, *available at*
https://www.politifact.com/factchecks/2022/aug/03/instagram-posts/proposed-assault-weapons-
ban-wont-turn-gun-owners- (last accessed January 16, 2023).

[24] The finding that less than 8% of all gun owners possess modern sporting rifles is
calculated by dividing the 6.4 million modern sporting rifle owners by the 81 million American
adults estimated to be gun owners.  Taking 6.4 million and dividing it by 81 million equals 7.9%.

[25] The Census Bureau's total population estimate for 2022 is 333,287,557 persons.  U.S.
Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-
19 Pandemic," December 22, 2022, *available at* https://www.census.gov/newsroom/press-
releases/2022/2022-population-
estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last
accessed January 16, 2023).  The finding that less than 2% of all Americans possess modern
sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333
million persons in United States.  Taking 6.4 million and dividing it by 333 million equals 1.9%.

[26] Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief,
*Cheeseman, et al. v. Platkin, et al.*, 1:22-cv-04360-RMB-AMD (D.N.J.), July 14, 2022, ECF No.
4, at 15, citing William English, "2021 National Firearms Survey: Updated Analysis Including
Types of Firearms Owned," Unpublished Paper (May 13, 2022; Revised September 22, 2022),
*available at* https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=4283305 (last accessed
March 7, 2023).

[27] English, *supra* note 26.

respondents "indicate owning over 100" AR-15 styled rifles.[28]  Assuming English correctly estimates that 24.6 million people have owned an AR-15 or similarly styled rifle, his survey results indicate that approximately 74,000 people own over 100 such rifles.  Moreover, English also reports that 1.3% of all AR-15 style rifle owners (approximately 320,000 people) own between 11 and 100 such rifles.[29]  Even if, for the sake of argument, these 74,000 people all owned only 101 AR-15s and these additional 320,000 people all owned 11 AR-15s—the lowest possible number in the range that they identified as best capturing the number of AR-15 styled rifles they own—that would mean that, *at the very least, approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners*.[30]  As a reminder, 11 million AR-15 style rifles is a conservative estimate calculated using the absolute minimum numbers in the reported ranges of 11-to-100 and 101-or-more.[31]

---

[28] *Ibid*.

[29] *Ibid*.

[30] As a reminder, the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.  NSSF, *supra* note 23.  While the NSSF, unlike the English survey, does not report whether respondents in its surveys of modern sporting rifle owners happen to own more than 10, let alone more than 100, modern sporting rifles, NSSF has detected a growing trend toward increased ownership of multiple modern sporting rifles.  For instance, in its 2010 survey, it found that 40% of modern sporting rifle owners owned only 1 modern sporting rifle and 60% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned being 2.6.  In its 2013 survey, it found that 35% of modern sporting rifle owners owned only 1 modern sporting rifle and 65% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing to 3.1.  In its most recent, 2021 survey, the NSSF found that 24% of modern sporting rifle owners owned only 1 modern sporting rifle and 76% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing yet again to 3.8.  This speaks to a growing trend in which modern sporting rifles are being purchased by gun owners who already own a modern sporting rifle, resulting in modern sporting rifles being concentrated, relatively speaking, in the hands of those who already own modern sporting rifles.  *Ibid*.

[31] While the English survey is discussed in an unpublished academic paper that is publicly available online, there are significant concerns with the study, which call into question the findings reported in the paper.  Arguably, the biggest problem with the English survey (as reported in the unpublished paper) is that it appears to be in serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research

25

30.    In deriving its estimates, the NSSF often relies on United States government data, particularly ATF data.[32]  According to the ATF, from 1986 through 2020 (which reflects the most currently-available data), the civilian stock of firearms in the United States has been made up predominantly of handguns.[33]  As Figure 11 shows, handguns account for 50% of the civilian stock of firearms, rifles account for 33%, and shotguns account for 17%.

31.    According to ATF data, handguns are the most common firearms in civilian circulation; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.[34]

---

(AAPOR).  *See* "AAPOR Code of Professional Ethics and Practices," April 2021 (Attached as **Exhibit J**).  Among the ways that the English survey seemingly runs afoul of AAPOR canons, it fails to identify the source of sponsorship funding and it fails to fully and openly disclose the measurement tools (Rules III.A.2-3).  The former is vital to assuring that the survey was not designed and conducted to further the political or economic interests of particular people or organizations.  The latter allows independent observers and researchers to assess if, among other factors, question order, question wording, or answer options biased responses.  The latter is also crucial to assuring that select findings were not suppressed because they would, if publicized, undermine the agenda of the survey's sponsor(s).  Without release of the entire questionnaire and the full results to the public, it cannot be confirmed that questions and corresponding responses were not suppressed.

[32] NSSF, 2020, *supra* note 8.

[33] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, *see* ATF, *supra* note 8.  For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the United States: Annual Statistical Update, 2021*, *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 16, 2023).

[34] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles.

**Figure 11.  Share of Firearms in Civilian Circulation in the United States, 1986-2020**



## VI.    RESTRICTIONS ON ASSAULT WEAPONS AND LCMS REDUCE THE INCIDENCE OF GUN MASSACRES, RESULTING IN LIVES SAVED

### VI.A.    THE OPERATIVE MECHANISM OF ASSAULT WEAPONS BANS: SUPPRESSION AND SUBSTITUTION EFFECTS

32.    As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 12).[35]  The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements.  This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[36]

**Figure 12.  The Trinity of Violence**



---

[35] Klarevas, *supra* note 1, at 27-29, 229-238.

[36] *Ibid*.

27

33.     Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[37]  Bans on assault weapons and LCMs generally make it illegal to manufacture, import, transfer, own, or possess certain firearms and certain magazines.  Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial.  With regard to perpetrators, bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior.  In the case of bans on assault weapons and LCMs, they threaten conviction, imprisonment, and/or fines should an individual manufacture, import, transfer, or possess a prohibited assault weapon or LCM.  One mechanism at work here centers around dissuading potential shooters from trying to build or otherwise acquire banned firearm technologies.  But another mechanism focuses on the assault weapon or LCM itself: *deprive potential instruments of violence*.  Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons and LCMs also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who is prohibited from acquiring it.  In essence, the former strategy seeks to dissuade the offender and the latter strategy seeks to deny the instruments of violence.

34.     Ideally, someone intent on committing a mass shooting with an assault weapon and/or LCM would be dissuaded from going on a rampage by the fact that their means of choice are not available.  In such a scenario, the attack would be quashed.  This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely-related desirable outcome.[38]  A real-world

---

[37] Philip J. Cook, "Research in Criminal Deterrence: Laying the Groundwork for the Second Decade," 2 *Crime and Justice* 211 (1980); and Daniel S. Nagin, "Deterrence in the Twenty-First Century," 42 *Crime and Justice* 199 (2013).

[38] Paul Dolan and Mateo M. Galizzi, "Like Ripples on a Pond: Behavioral Spillovers and Their Implications for Research and Policy," 47 *Journal of Economic Psychology* 1 (2015); K. Jane Muir and Jessica Keim-Malpass, "Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research," 9 *Journal of Comparative Effectiveness Research* 755 (2020).

example of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun (that did not have an LCM). At the time of the crime in 2003, the Federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle and LCMs. In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse." He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on a rampage and "killed as many people as I possibly could." As he noted, "because I didn't have an assault weapon, that didn't happen."[39] In this case, the unavailability of an assault weapon due to the federal ban appears to have suppressed the perpetrator's impulse to commit a mass shooting.

35.     Of course, some potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable. They will instead replace their desired instruments of violence with available alternatives. This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[40] A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California. In that attack, the gunman appears to have been unable to acquire an assault rifle and LCMs due to California's ban on both. Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines. As a result, the gunman quickly ran out of bullets, and while pausing to reload—which appears to have been extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a

---

[39] "Inside the Mind of a Killer," CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023).

[40] Philip J. Cook, "The Effect of Gun Availability on Violent Crime Patterns," 455 *Annals of the American Academy of Political and Social Science* 63 (1981); Anthony A. Braga, et al., "Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?" 4 *Annual Review of Criminology* 147 (2021).

congregant chased him away, preventing him from continuing his attack.[41]  In this incident, which resulted in one death, California's ban on assault weapons and LCMs worked exactly as intended.  It deprived the active shooter of the mechanisms that might have allowed him to kill enough people to surpass the fatality threshold of a mass shooting.  Stated differently, if you examine data sets that identify shootings resulting in mass murder, you will not find the Poway synagogue attack on their lists.

36.     It might seem perverse to think that restrictions on certain instruments of violence operate on the premise that, if an act of violence cannot be averted, then it will proceed with an alternative instrument.  Nevertheless, this is exactly how bans on assault weapons and LCMs work in theory.  They suppress the inclinations of potential mass shooters to go on killing rampages in the first place because their means of choice are unavailable.  And, should deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous, prohibited ones, reducing the casualty tolls of attacks when they do occur.

### VI.B.   THE OPERATIVE MECHANISM OF LCM BANS: FORCING PAUSES IN ACTIVE SHOOTINGS

37.     Restrictions on assault weapons and LCMs also address the multiple advantages LCMs provide to active shooters.  Offensively, LCMs increase kill potential.  Basically, the more bullets a shooter can fire at a target within a finite amount of time, the more potential wounds they can inflict.  Furthermore, the more bullets that strike a victim, the higher the odds that that person will die.  These two factors—sustained-fire capability and multiple-impact capability— allow LCMs to increase a shooter's kill potential.

38.     When inserted into either a semiautomatic or fully-automatic firearm, an LCM facilitates the ability of an active shooter to fire a large number of rounds at an extremely quick

---

[41] Elliot Spagat and Julie Watson, "Synagogue Shooter Struggled with Gun, Fled with 50 Bullets," Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

rate without pause.  This phenomenon—sustained-fire capability—comes in handy when a target

is in a gunman's line of sight for only a few seconds.  For example, sustained-fire capability

allows a reasonably competent shooter to fire three rounds per second with a semiautomatic

firearm and ten rounds per second with an automatic firearm.  That results in numerous chances

to hit a target in a short window of opportunity, especially when ammunition capacity is large.

39.    LCMs also facilitate the ability of a shooter to strike a human target with more

than one round.  This phenomenon—multiple-impact capability—increases the chances that the

victim, when struck by multiple rounds, will die.  At least two separate studies have found that,

when compared to the fatality rates of gunshot wound victims who were hit by only a single

bullet, the fatality rates of those victims hit by more than one bullet were over 60 percent

higher.[42]  The implication is straightforward: being able to strike human targets with more than

one bullet increases a shooter's chances of killing their victims.  In essence, LCMs are force

multipliers when it comes to kill potential—and the evidence from gun massacres supports this

conclusion (*see* Section II).

40.    In addition to offensive advantages, LCMs also provide the defensive advantage

of extended cover.  During an active shooting, a perpetrator is either firing their gun or not firing

their gun.  While pulling the trigger, it is difficult for those in harm's way to take successful

defensive maneuvers.  But if the shooter runs out of bullets, there is a lull in the shooting.  This

precious downtime affords those in the line of fire with a chance to flee, hide, or fight back.

41.    There are several examples of individuals fleeing or taking cover while active

shooters paused to reload.  For instance, in 2012, several first-graders at Sandy Hook Elementary

School in Newtown, Connecticut, escaped their attacker as he was swapping out magazines,

---

[42] Daniel W. Webster, et al., "Epidemiologic Changes in Gunshot Wounds in
Washington, DC, 1983–1990," 127 *Archives of Surgery* 694 (June 1992); Angela Sauaia, et al.,
"Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000–2013," 315 *JAMA*
2465 (June 14, 2016).

allowing them to exit their classroom and dash to safety.[43]  Other well-known examples include

the 2007 Virginia Tech and the 2018 Borderline Bar and Grill rampages.[44]  There is also the

possibility that someone will rush an active shooter and try to tackle them (or at the very least try

to wrestle their weapon away from them) while they pause to reload.[45]  In recent history, there

have been numerous instances of gunmen being physically confronted by unarmed civilians

while reloading, bringing their gun attacks to an abrupt end.  Prominent examples include the

1993 Long Island Rail Road, the 2011 Tucson shopping center, the 2018 Nashville Waffle

House, and the 2022 Laguna Woods church shooting rampages.[46]  When there are pauses in the

shooting to reload, opportunities arise for those in the line of fire to take life-saving action.

---

[43] *See* Dave Altimari, et al., "Shooter Paused and Six Escaped," *Hartford Courant*, December 23, 2012 (Attached as **Exhibit K**).

[44] Virginia Tech Review Panel, Mass Shootings at Virginia Tech, April 16, 2007: Report of the Virginia Tech Review Panel Presented to Governor Kaine, Commonwealth of Virginia, Revised with Addendum, November 2009, available at https://scholar.lib.vt.edu/prevail/docs/April16ReportRev20091204.pdf (last accessed February 1, 2023); "California Bar Shooting: Witnesses Describe Escaping as Gunman Reloaded," CBS News, December 7, 2018, available at https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in (last accessed February 1, 2023).

[45] The longer a shooter can fire without interruption, the longer they can keep potential defenders at bay.  The longer potential defenders are kept from physically confronting a shooter, the more opportunity there is for the shooter to inflict damage.

[46] *See*, Rich Schapiro, "LIRR Massacre 20 Years Ago: 'I Was Lucky,' Says Hero Who Stopped Murderer," *New York Daily News*, December 7, 2013, *available at* http://www.nydailynews.com/new-york/nyc-crime/lirr-massacre-20-years-lucky-hero-stopped-murderer-article-1.1540846 (last accessed February 1, 2023); Sam Quinones and Nicole Santa Cruz, "Crowd Members Took Gunman Down," *Los Angeles Times*, January 9, 2011, *available at* https://www.latimes.com/archives/la-xpm-2011-jan-09-la-na-arizona-shooting-heroes-20110110-story.html (last accessed February 1, 2023); Brad Schmitt, "Waffle House Hero: Could You Rush Toward a Gunman Who Just Killed People?" *The Tennessean*, April 24, 2018, *available at* https://www.tennessean.com/story/news/crime/2018/04/24/waffle-house-hero-could-you-rush-toward-gunman-who-just-killed-people/543943002 (last accessed February 1, 2023); "Parishioners Stop Gunman in Deadly California Church Attack," NPR, May 16, 2022, *available at* https://www.npr.org/2022/05/16/1099168335/parishioners-stop-gunman-in-california-church-shooting (last accessed February 1, 2023).

**VI.C.    BANS ON ASSAULT WEAPONS AND LCMS IN PRACTICE**

42.    In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons and LCMs in an effort to reduce the occurrence and lethality of such deadly acts of firearm violence.  Prominent among these measures was the 1994 Federal Assault Weapons Ban.  In September 1994, moved to action by high-profile shooting rampages that occurred the previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons and LCMs that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[47]

43.    Like the state bans on assault weapons and LCMs that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[48]  Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand.  As Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004.  In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[49]

44.    The legislative intent of the State of New Jersey in enacting the laws being challenged in the present case is similar to that of other legislative bodies that have restricted assault weapons and LCMs: reducing gun violence, especially the frequency and lethality of

---

[47] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[48] Christopher Ingraham, "The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked," *Washington Post*, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

[49] *See* sources cited *supra* note 14.

33

mass shootings.  Because, on average, the use of assault weapons and LCMs results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons and LCMs is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

45.    Currently, 32% of the U.S. population is subject to a ban on both assault weapons and LCMs.  The following is a list of the 11 state-level jurisdictions that presently restrict both assault weapons and LCMs: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); California (January 1, 2000); New York (November 1, 2000); the District of Columbia (March 31, 2009); Connecticut (April 4, 2013); Delaware (August 29, 2022); Illinois (January 10, 2023); and Washington (April 25, 2023).[50]  As a reminder, from September 13, 1994 through September 12, 2004, the entire country was also subject to federal ban on both assault weapons and LCMs.

46.    In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect.  This measure, known as the incidence rate, allows public health experts to identify discernable differences, while accounting for variations in the population, over a set period of time.  Relevant to the present case, calculating incidence rates across states, in a manner that captures whether or not bans on both assault weapons and LCMs were in effect during the period of observation, allows for the assessment of the effectiveness of such bans.  In addition, fatality rates—the number of deaths, per population, that result from particular events

---

[50] The dates in parentheses mark the effective dates on which the listed states became subject to bans on both assault weapons and LCMs.

across different jurisdictions—also provide insights into the impact bans on assault weapons and LCMs have on mass shooting violence.[51]

47.     Since September 1, 1990, when New Jersey became the first state to ban both assault weapons and LCMs, through December 31, 2022, there have been 93 high-fatality mass shootings in the United States (**Exhibit C**).[52]  Calculating incidence and fatality rates for this time-period, across jurisdictions with and without bans on both assault weapons and LCMs, reveals that states subject to such bans experienced a 56% decrease in high-fatality mass shooting incidence rates.  They also experienced a 66% decrease in high-fatality mass shooting fatality rates, regardless of whether assault weapons or LCMs were used (Table 7).[53]

48.     When calculations go a step further and are limited to mass shootings involving assault weapons or LCMs, the difference between the two jurisdictional categories (non-ban and ban states) is even more pronounced.  In the time-period from January 1, 1991, through December 31, 2022, accounting for population, states with bans on both assault weapons and LCMs experienced a 62% decrease in the rate of high-fatality mass shootings involving the use of assault weapons or LCMs.  Similarly, jurisdictions with such bans in effect experienced a 72%

---

[51] For purposes of this report, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control.  *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).

[52] There were no state bans on both assault weapons and LCMs in effect prior to September 1, 1990.  Therefore, January 1, 1991, is a logical starting point for an analysis of the impact of bans on assault weapons and LCMs.  As there were no high-fatality mass shootings in the last four months of 1990, extending the analysis back to September 1, 1990, would make no difference.

[53] Between September 13, 1994, and September 12, 2004, the Federal Assault Weapons Ban was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that restricted assault weapons and LCMs.  As such, the entire country is coded as being under a ban on both assault weapons and LCMs during the timeframe that the Federal Assault Weapons Ban was in effect.

35

decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs (Table 7).

49.     All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons and LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons or LCMs, where the impact is most striking.

50.     The main purpose of bans on assault weapons and LCMs is to restrict the availability of assault weapons and LCMs.  The rationale is that, if there are fewer assault weapons and LCMs in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost.

51.     Moreover, forcing active shooters to reload creates critical pauses in an attack. These pauses provide opportunities for people in the line of fire to take life-saving measures (such as fleeing the area, taking cover out of the shooter's sight, and fighting back), which in turn can help reduce casualties.

52.     The epidemiological data lend support to the policy choices of New Jersey that seek to enhance public safety through restrictions on civilian access to certain firearms and magazines.  While imposing constraints on assault weapons and LCMs will not prevent every mass shooting, the data suggest that legislative efforts to restrict such instruments of violence should result in lives being saved.

Table 7.  Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Bans on Assault Weapons and LCMs Were in Effect, 1991-2022

|  | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All High-Fatality Mass Shootings |  |  |  |  |  |
| Non-Ban States | 162.0 | 68 | 1.31 | 720 | 13.89 |
| Ban States | 135.8 | 25 | 0.58 | 208 | 4.79 |
| Percentage Decrease in Rate for Ban States |  |  | 56% |  | 66% |
| High-Fatality Mass Shootings Involving Assault Weapons or LCMs |  |  |  |  |  |
| Non-Ban States | 162.0 | 47 | 0.91 | 575 | 11.09 |
| Ban States | 135.8 | 15 | 0.35 | 135 | 3.11 |
| Percentage Decrease in Rate for Ban States |  |  | 62% |  | 72% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

Executed on June 13th , 2023, at Nassau County, New York.

/s/ Louis Klarevas

37

**JA4383**

# EXHIBIT A

# Louis J. Klarevas

**Email: ljk2149@tc.columbia.edu**

## Education

Ph.D.   International Relations, 1999
School of International Service
American University
Washington, DC

B.A.   Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania
Philadelphia, PA

## Author

*Rampage Nation: Securing America from Mass Shootings*

## Current Positions

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

## Professional Experience

*Academic Experience (Presented in Academic Years)*

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

1

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*                                                    *Undergraduate*
Counter-Terrorism and Homeland Security              American Government and Politics
International Political Economy                       European-Atlantic Relations
International Politics in a Post-Cold War Era         International Political Economy
International Security                                International Relations
Machinery and Politics of American Foreign Policy    Transnational Terrorism
Role of the United States in World Affairs            United States Foreign Policy
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy


**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

## Commentaries and Correspondence

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993

**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007

**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)


**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Preventive Medicine*

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Participant, Minnesota Chiefs of Police Association, Survey of Measures to Reduce Gun Violence, 2023

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Expert Witness Service**

Town of Superior, Colorado, 2023-

City of Boulder, Colorado, 2023-

City of Louisville, Colorado, 2023-

County of Boulder, Colorado, 2023-

State of Connecticut, 2023-

State of Hawaii, 2023-

State of Illinois, 2023-

State of Massachusetts, 2023-

State of New Jersey, 2023-

State of Oregon, 2023-

City of Highland Park, Illinois, 2022-

County of Cook, Illinois, 2022-

State of Washington, 2022-

Government of Canada, 2021-2022

Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019

State of California, 2017-

State of Colorado, 2016-2017, 2022-

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Branas and Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT B

LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS





Prometheus Books

59 John Glenn Drive
Amherst, New York 14228

48    PART 1: PROBLEM

### Table 2.1. The Concept of a Mass Shooting.

**Definition of a Mass Shooting:**

Any violent attack that results in four or more individuals incurring gunshot wounds.

**Categories of Mass Shooting:**

1. *Nonfatal*
   Mass shootings in which no one dies.

2. *Fatal*
   Mass shootings in which at least one victim dies.

3. *High-Fatality / Gun Massacre*
   Mass shootings in which six or more victims die.



It's easy to dismiss conceptual discussions and debates as exercises in Ivory Tower intellectualism. But how we identify and think about mass shootings impacts which attacks capture national attention and which are disregarded—something which has far-reaching policy consequences. Thus, coming up with the best possible definition and conceptualization is a vital first step toward explaining and preventing rampage violence. As the Socratic adage reminds us, "The beginning of wisdom is the definition of terms."[43]

# EXHIBIT C

**Exhibit C**
**High-Fatality Mass Shootings in the United States, 1991-2022**

|    | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|----|------|------|-------|--------|--------------|---------------|
| 1  | 1/26/1991 | Chimayo | NM | 7 | N | N |
| 2  | 8/9/1991 | Waddell | AZ | 9 | N | N |
| 3  | 10/16/1991 | Killeen | TX | 23 | N | Y |
| 4  | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N | N |
| 5  | 1/8/1993 | Palatine | IL | 7 | N | N |
| 6  | 5/16/1993 | Fresno | CA | 7 | Y | Y |
| 7  | 7/1/1993 | San Francisco | CA | 8 | Y | Y |
| 8  | 12/7/1993 | Garden City | NY | 6 | N | Y |
| 9  | 4/20/1999 | Littleton | CO | 13 | Y | Y |
| 10 | 7/12/1999 | Atlanta | GA | 6 | N | U |
| 11 | 7/29/1999 | Atlanta | GA | 9 | N | Y |
| 12 | 9/15/1999 | Fort Worth | TX | 7 | N | Y |
| 13 | 11/2/1999 | Honolulu | HI | 7 | N | Y |
| 14 | 12/26/2000 | Wakefield | MA | 7 | Y | Y |
| 15 | 12/28/2000 | Philadelphia | PA | 7 | N | Y |
| 16 | 8/26/2002 | Rutledge | AL | 6 | N | N |
| 17 | 1/15/2003 | Edinburg | TX | 6 | Y | U |
| 18 | 7/8/2003 | Meridian | MS | 6 | N | N |
| 19 | 8/27/2003 | Chicago | IL | 6 | N | N |
| 20 | 3/12/2004 | Fresno | CA | 9 | N | N |
| 21 | 11/21/2004 | Birchwood | WI | 6 | Y | Y |
| 22 | 3/12/2005 | Brookfield | WI | 7 | N | Y |
| 23 | 3/21/2005 | Red Lake | MN | 9 | N | Y |
| 24 | 1/30/2006 | Goleta | CA | 7 | N | Y |
| 25 | 3/25/2006 | Seattle | WA | 6 | N | N |
| 26 | 6/1/2006 | Indianapolis | IN | 7 | Y | Y |
| 27 | 12/16/2006 | Kansas City | KS | 6 | N | N |
| 28 | 4/16/2007 | Blacksburg | VA | 32 | N | Y |
| 29 | 10/7/2007 | Crandon | WI | 6 | Y | Y |
| 30 | 12/5/2007 | Omaha | NE | 8 | Y | Y |
| 31 | 12/24/2007 | Carnation | WA | 6 | N | U |
| 32 | 2/7/2008 | Kirkwood | MO | 6 | N | Y |
| 33 | 9/2/2008 | Alger | WA | 6 | N | U |
| 34 | 12/24/2008 | Covina | CA | 8 | N | Y |
| 35 | 1/27/2009 | Los Angeles | CA | 6 | N | N |
| 36 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y | Y |
| 37 | 3/29/2009 | Carthage | NC | 8 | N | N |
| 38 | 4/3/2009 | Binghamton | NY | 13 | N | Y |

C 1

**JA4408**

| | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 39 | 11/5/2009 | Fort Hood | TX | 13 | N | Y |
| 40 | 1/19/2010 | Appomattox | VA | 8 | Y | Y |
| 41 | 8/3/2010 | Manchester | CT | 8 | N | Y |
| 42 | 1/8/2011 | Tucson | AZ | 6 | N | Y |
| 43 | 7/7/2011 | Grand Rapids | MI | 7 | N | Y |
| 44 | 8/7/2011 | Copley Township | OH | 7 | N | N |
| 45 | 10/12/2011 | Seal Beach | CA | 8 | N | N |
| 46 | 12/25/2011 | Grapevine | TX | 6 | N | N |
| 47 | 4/2/2012 | Oakland | CA | 7 | N | N |
| 48 | 7/20/2012 | Aurora | CO | 12 | Y | Y |
| 49 | 8/5/2012 | Oak Creek | WI | 6 | N | Y |
| 50 | 9/27/2012 | Minneapolis | MN | 6 | N | Y |
| 51 | 12/14/2012 | Newtown | CT | 27 | Y | Y |
| 52 | 7/26//2013 | Hialeah | FL | 6 | N | Y |
| 53 | 9/16/2013 | Washington | DC | 12 | N | N |
| 54 | 7/9/2014 | Spring | TX | 6 | N | Y |
| 55 | 9/18/2014 | Bell | FL | 7 | N | U |
| 56 | 2/26/2015 | Tyrone | MO | 7 | N | U |
| 57 | 5/17/2015 | Waco | TX | 9 | N | Y |
| 58 | 6/17/2015 | Charleston | SC | 9 | N | Y |
| 59 | 8/8/2015 | Houston | TX | 8 | N | U |
| 60 | 10/1/2015 | Roseburg | OR | 9 | N | Y |
| 61 | 12/2/2015 | San Bernardino | CA | 14 | Y | Y |
| 62 | 2/21/2016 | Kalamazoo | MI | 6 | N | Y |
| 63 | 4/22/2016 | Piketon | OH | 8 | N | U |
| 64 | 6/12/2016 | Orlando | FL | 49 | Y | Y |
| 65 | 5/27/2017 | Brookhaven | MS | 8 | Y | Y |
| 66 | 9/10/2017 | Plano | TX | 8 | Y | Y |
| 67 | 10/1/2017 | Las Vegas | NV | 60 | Y | Y |
| 68 | 11/5/2017 | Sutherland Springs | TX | 25 | Y | Y |
| 69 | 2/14/2018 | Parkland | FL | 17 | Y | Y |
| 70 | 5/18/2018 | Santa Fe | TX | 10 | N | N |
| 71 | 10/27/2018 | Pittsburgh | PA | 11 | Y | Y |
| 72 | 11/7/2018 | Thousand Oaks | CA | 12 | N | Y |
| 73 | 5/31/2019 | Virginia Beach | VA | 12 | N | Y |
| 74 | 8/3/2019 | El Paso | TX | 23 | Y | Y |
| 75 | 8/4/2019 | Dayton | OH | 9 | Y | Y |
| 76 | 8/31/2019 | Midland and Odessa | TX | 7 | Y | Y |
| 77 | 3/15/2020 | Moncure | NC | 6 | U | U |
| 78 | 6/4/2020 | Valhermoso Springs | AL | 7 | Y | Y |
| 79 | 9/7/2020 | Aguanga | CA | 7 | U | U |

C 2

**JA4409**

| | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 80 | 2/2/2021 | Muskogee | OK | 6 | N | U |
| 81 | 3/16/2021 | Acworth and Atlanta | GA | 8 | N | Y |
| 82 | 3/22/2021 | Boulder | CO | 10 | Y | Y |
| 83 | 4/7/2021 | Rock Hill | SC | 6 | Y | Y |
| 84 | 4/15/2021 | Indianapolis | IN | 8 | Y | Y |
| 85 | 5/9/2021 | Colorado Springs | CO | 6 | N | Y |
| 86 | 5/26/2021 | San Jose | CA | 9 | N | Y |
| 87 | 1/23/2022 | Milwaukee | WI | 6 | N | U |
| 88 | 4/3/2022 | Sacramento | CA | 6 | N | Y |
| 89 | 5/14/2022 | Buffalo | NY | 10 | Y | Y |
| 90 | 5/24/2022 | Uvalde | TX | 21 | Y | Y |
| 91 | 7/4/2022 | Highland Park | IL | 7 | Y | Y |
| 92 | 10/27/2022 | Broken Arrow | OK | 7 | N | U |
| 93 | 11/22/2022 | Chesapeake | VA | 6 | N | U |

Note: High-fatality mass shootings are mass shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or motive.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban or (2) the statutes of the state where the shooting occurred.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device with a capacity of more than 10 bullets.  Incidents in gray shade are those incidents that occurred at a time when and in a state where legal prohibitions on both assault weapons and large-capacity magazines were in effect statewide or nationwide.

Sources: Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022); and "Gun Violence Archive," *available at* https://www.gunviolencearchive.org (last accessed January 3, 2023).  The Gun Violence Archive was only consulted for identifying high-fatality mass shootings that occurred since January 1, 2018.

# EXHIBIT D

## Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)



JA4412



**Mass Shootings Resulting in Double-Digit Fatalities in American History (1949-2022)**

JA4413

# EXHIBIT E



LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS






**Prometheus Books**

59 John Glenn Drive
Amherst, New York 14228



in a class all by itself. No other advanced, Western democracy experiences the magnitude of gun violence that presently afflicts American society.[28] This is particularly true when it comes to mass shootings.[29]



∗ ∗ ∗

The United States does little to regulate firearms, especially at the federal level.[30] While it goes to great lengths to restrict access to WMDs and IEDs, the same can't be said for its efforts to keep firearms out of the hands of high-risk individuals. Indeed, the American experience with gun control nationwide is so limited that it can actually be chronicled in a few bullet points:

- The National Firearms Act of 1934: Heavily regulated machine guns, short-barrel rifles and shotguns, and silencers.
- The Federal Firearms Act of 1938: Established a federal licensing system to regulate manufacturers, importers, and dealers of firearms.
- The Omnibus Crime Control and Safe Streets Act of 1968: Prohibited anyone under twenty-one years of age from purchasing a handgun.
- The Gun Control Act of 1968: Required that all interstate firearms transfers or sales be made through a federally licensed firearms dealer and prohibited certain categories of people—felons (indicted or convicted), fugitives, drug abusers, mentally ill persons (as determined by adjudication), illegal aliens, dishonorably discharged servicemen, US-citizenship renouncers, and domestic abusers—from possessing firearms.[31]
- The Firearm Owners Protection Act of 1986: Barred the purchase or transfer of automatic weapons without government approval.
- The Undetectable Firearms Act of 1988: Required that all firearms have at least 3.7 oz. of metal that can be detected by a metal detector.
- The Gun-Free School Zones Act of 1990: Criminalized possession or discharge of a firearm in a school zone.
- The Brady Handgun Violence Prevention Act of 1993: Required



240    PART 3: PRESCRIPTION

that anyone attempting to purchase a firearm from a federally
licensed dealer pass a background check.[32]

• The Federal Assault Weapons Ban of 1994: Banned the sale and
possession of semiautomatic assault weapons and extended-
capacity magazines not grandfathered prior to the enactment
of the law.[33]

Of all of these measures, the National Firearms Act of 1934 and
the Assault Weapons Ban of 1994 (AWB) were the only ones insti-
tuted primarily in an effort to reduce the carnage of mass shootings.
The former was passed in response to a series of bloody gangland
executions, including the infamous 1929 St. Valentine's Day mas-
sacre in Chicago.[34] While there are still machine guns in circulation,
the National Firearm Act, in conjunction with the Firearm Owners
Protection Act of 1986, sharply cut the availability of machine guns,
which likely explains the complete elimination of massacres perpe-
trated with such automatic-fire weapons.

Like the National Firearms Act, the AWB was introduced fol-
lowing several high-profile mass shootings in the early 1990s: the
Luby's restaurant, 101 California Street office complex, and Long
Island Railroad train car massacres.[35] Signed into law by President
Bill Clinton, the AWB went into effect on September 13, 1994. At
the insistence of the gun-rights lobby, however, the bill contained
a ten-year sunset provision. As Congress never renewed the ban, it
automatically expired on September 13, 2004.

The decade the law was in effect nonetheless resulted in a unique
experiment, allowing us to discern what impact, if any, the ban had
on gun violence in general and mass shootings in particular. As to
the former, the academic consensus seems to be that the AWB had
a minimal impact on reducing violent crime.[36] This hardly comes
as a surprise. After all, most crimes don't involve assault weapons.
The real test should be: Did it succeed in its intended purpose of
reducing rampage violence? The answer is a resounding yes.

Let's take a closer look.

The best way to assess the impact of something is to conduct
what, in social science, we commonly refer to as a time-series analysis.
Basically, that's a fancy name for a before-and-after test. Figures 7.1

**JA4417**



BREAKING THE TRINITY    241



Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.

Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.



242    PART 3: PRESCRIPTION



Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.

and 7.2 provide a look at the before-and-after pictures. In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death toll of 8.2 fatalities per incident. During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident.[37] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[38] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980).[39] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm. As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance. In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8.9 fatalities per incident.[40] These numbers paint a clear picture: America's experiment, while short-lived, was also extremely successful.[41]

## ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives. But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights.

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders. In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws. A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions.[42] That

# EXHIBIT F

# The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017

*Louis Klarevas, PhD, Andrew Conner, BS, David Hemenway, PhD*

*Objectives.* To evaluate the effect of large-capacity magazine (LCM) bans on the frequency and lethality of high-fatality mass shootings in the United States.

*Methods.* We analyzed state panel data of high-fatality mass shootings from 1990 to 2017. We first assessed the relationship between LCM bans overall, and then federal and state bans separately, on (1) the occurrence of high-fatality mass shootings (logit regression) and (2) the deaths resulting from such incidents (negative binomial analysis). We controlled for 10 independent variables, used state fixed effects with a continuous variable for year, and accounted for clustering.

*Results.* Between 1990 and 2017, there were 69 high-fatality mass shootings. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

*Conclusions.* LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality mass shootings. (*Am J Public Health.* 2019;109:1754–1761. doi: 10.2105/AJPH.2019.305311)

The recent spate of gun massacres in the United States has re-energized the debate over how to prevent such tragedies.[1] A common response to high-profile acts of gun violence is the promotion of tighter gun legislation, and there is some evidence that laws imposing tighter restrictions on access to firearms have been associated with lower levels of mass shootings.[2] One proposal that has received renewed interest involves restricting the possession of large-capacity magazines (LCMs).[3–5] This raises an important question: what has been the impact of LCM bans on high-fatality mass shootings?

In an attempt to arrest an uptick in mass shooting violence in the early 1990s, Congress in 1994 enacted the federal assault weapons ban, which, among other things, restricted ownership of certain ammunition-feeding devices.[6,7] The law, which contained a sunset provision, was allowed to expire a decade later. Pursuant to that ban (18 USC §921(a) [1994]; repealed), it was illegal to possess LCMs—defined as any ammunition-feeding device holding more

than 10 bullets—unless the magazines were manufactured before the enactment of the ban. LCM restrictions are arguably the most important component of assault weapons bans because they also apply to semiautomatic firearms without military-style features.[8,9]

Beginning with New Jersey in 1990, some states implemented their own regulations on LCMs. Today, 9 states and the District of Columbia restrict the possession of LCMs. The bans vary along many dimensions, including maximum bullet capacity of permissible magazines, grandfathering of existing LCMs, and applicable firearms. Moreover, overlaps sometimes exist between assault weapons bans and LCM bans, but not in all states. For example, California instituted a ban

on assault weapons in 1989, but LCMs remained unregulated in the state until 1994, when the federal ban went into effect. In 2000, California's own statewide ban on LCMs took effect as a safeguard in the event the federal ban expired, which happened in 2004.[10,11]

LCMs provide a distinct advantage to active shooters intent on murdering numerous people: they increase the number of rounds that can be fired at potential victims before having to pause to reload or switch weapons. Evidence shows that victims struck by multiple rounds are more likely to die, with 2 studies finding that, when compared with the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than 1 bullet were more than 60% higher.[12,13] Being able to strike human targets with more than 1 bullet increases shooters' chances of killing their victims. Analyses of gunshot wound victims at level I trauma centers have suggested that this multiple-impact capability is often attributable to the use of LCMs.[14,15]

In addition, LCMs provide active shooters with extended cover.[16] During an attack, perpetrators are either firing their guns or not firing their guns. While gunmen are firing, it is extremely difficult for those in the line of fire to take successful defensive maneuvers. But if gunmen run out of bullets, there are lulls in the shootings, as the perpetrators are forced to pause their attacks to reload or change weapons. These pauses provide opportunities for people to intervene and disrupt a shooting. Alternatively, they provide individuals in

**ABOUT THE AUTHORS**

*Louis Klarevas is with the Teachers College, Columbia University, New York, NY. Andrew Conner is with the Frank H. Netter, MD, School of Medicine, Quinnipiac University, North Haven, CT. David Hemenway is with the Harvard T. H. Chan School of Public Health, Harvard University, Boston, MA.*

*Correspondence should be sent to Louis Klarevas, Research Professor, Office of the Provost, Teachers College, Columbia University, 525 W 120th St, New York, NY 10027 (e-mail: ljk2149@tc.columbia.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted July 22, 2019.*

*doi: 10.2105/AJPH.2019.305311*

harm's way with a chance to flee or hide. Legislative endeavors that restrict access to LCMs are implemented with the express objective of reducing an active shooter's multiple-impact capability and extended cover.[10]

Although mass shootings have received extensive study, there has been little scholarly analysis of LCM bans.[17–24] The studies undertaken that have broached the subject of ammunition capacity have primarily concentrated on the effect of LCM bans on violent crimes other than mass shootings or on the impact of the assault weapons bans on mass shootings.[25–27]

Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings.[10,20,28] Proponents of LCM bans believe that without LCMs, fewer people will be killed in a mass shooting, other things equal. In turn, fewer shootings will cross the threshold required to be classified as what we call a "high-fatality mass shooting" (≥ 6 victims shot to death). If LCM bans are effective, we should expect to find that high-fatality mass shootings occur at a lower incidence rate when LCM bans are in place, and fewer people are killed in such attacks. But have LCM bans actually saved lives in practice? To our knowledge, the impact of LCM bans has never been systematically assessed. This study fills that void.

## METHODS

Mass shootings have been defined in a variety of ways, with some analyses setting the casualty threshold as low as 2 people wounded or killed and others requiring a minimum of 7 gunshot victims.[18,22,29] We focused on high-fatality mass shootings—the deadliest and most disturbing of such incidents—which are defined as intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators.[20,30,31] After an exhaustive search, we identified 69 such incidents in the United States between 1990 and 2017. We then discerned whether each high-fatality mass shooting involved an LCM—unless otherwise stated, defined consistent with the 1994 federal ban as a detachable ammunition-feeding device capable of holding more than 10 bullets. (See Table 1 for a list of incidents and for additional details on

the search and identification strategy we employed.)

The first state to enact an LCM ban was New Jersey in 1990. Since then, another 8 states and the District of Columbia have enacted LCM bans (Table A, available as a supplement to the online version of this article at http://www.ajph.org).[10] With no LCM bans in effect before 1990, a priori we chose that year to begin our analysis to avoid inflating the impact of the bans. Our data set extends 28 years, from 1990 through 2017. As a secondary analysis, we used a 13-year data set, beginning in 2005, the first full year after the federal assault weapons ban expired.

Our primary outcome measures were the incidence of high-fatality mass shootings and the number of victims killed. We distinguished between high-fatality mass shootings occurring with and without a ban in effect. Because the federal ban was in effect nationwide from September 13, 1994, through September 12, 2004, we coded every state as being under an LCM ban during that 10-year timeframe.

Our interest was in the effect of LCM bans. We ran regression analyses to determine if any relationship between LCM bans and high-fatality mass shootings can be explained by other factors. In our state–year panel multivariate analyses, the outcome variables were (1) whether an LCM-involved high-fatality mass shooting occurred, (2) whether any high-fatality mass shooting occurred, (3) the number of fatalities in an LCM-involved high-fatality mass shooting, and (4) the number of fatalities in any high-fatality mass shooting. Our analyses first combined and then separated federal and state LCM bans.

Consistent with the suggestions and practices of the literature on firearm homicides and mass shootings, our explanatory variables are population density; proportion of population aged 19 to 24 years, aged 25 to 34 years, that is Black, and with a college degree; real per-capita median income; unemployment rate; and per-capita prison population.[2,26,27,32] We also added a variable for percentage of households with a firearm. All regression models controlled for total state population. When the dependent variable reflected occurrences of incidents (ordered choice data), we used logit regression; we ran probit regression as a sensitivity analysis. We had multiple observations for individual

states. To control for this, we utilized cluster-robust standard errors to account for the clustering of observations. When the dependent variable reflected deaths (count data), we used negative binomial regression; Gius used a Poisson regression, and we used that approach as a sensitivity analysis.[26] We included state fixed effects. We used a continuous variable for year because the rate of high-fatality mass shootings has increased over time. For purposes of sensitivity analysis, we also replaced the linear yearly trend with a quadratic function. We performed multivariate statistical analyses by using Stata/IC version 15.1 (StataCorp LP, College Station, TX).

Population data came from the US Census Bureau, unemployment data came from the Bureau of Labor Statistics, and imprisonment data came from the Bureau of Justice Statistics. The percentage of households with a firearm was a validated proxy (the percentage of suicides that are firearm suicides) derived from Centers for Disease Control and Prevention National Vital Statistics Data.[33]

## RESULTS

Between 1990 and 2017, there were 69 high-fatality mass shootings (≥ 6 victims shot to death) in the United States. Of these, 44 (64%) involved LCMs, 16 did not (23%), and for 9 (13%) we could not determine whether LCMs were used (Table 1). The mean number of victims killed in the 44 LCM-involved high-fatality mass shootings was 11.8; including the unknowns resulted in that average falling to 11.0 (not shown). The mean number of victims killed in high-fatality mass shootings in which the perpetrator did not use an LCM was 7.3 (Table B, available as a supplement to the online version of this article at http://www.ajph.org); including the unknowns resulted in that average falling to 7.1 (not shown). When we excluded unknown cases, the data indicated that utilizing LCMs in high-fatality mass shootings resulted in a 62% increase in the mean death toll.

Data sets of mass shooting fatalities by their nature involve truncated data, with the mode generally being the baseline number of fatalities required to be included in the data set (6 fatalities in the current study). Our data

TABLE 1—High-Fatality Mass Shootings in the United States, 1990–2017

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| 1 | Jun 18, 1990 | Jacksonville | FL | Y | 9 | N | N |
| 2 | Jan 26, 1991 | Chimayo | NM | N | 7 | N | N |
| 3 | Aug 9, 1991 | Waddell | AZ | N | 9 | N | N |
| 4 | Oct 16, 1991 | Killeen | TX | Y | 23 | N | N |
| 5 | Nov 7, 1992 | Morro Bay and Paso Robles | CA | N | 6 | N | N |
| 6 | Jan 8, 1993 | Palatine | IL | N | 7 | N | N |
| 7 | May 16, 1993 | Fresno | CA | Y | 7 | N | N |
| 8 | Jul 1, 1993 | San Francisco | CA | Y | 8 | N | N |
| 9 | Dec 7, 1993 | Garden City | NY | Y | 6 | N | N |
| 10 | Apr 20, 1999 | Littleton | CO | Y | 13 | Y | Y |
| 11 | Jul 12, 1999 | Atlanta | GA | U | 6 | Y | Y |
| 12 | Jul 29, 1999 | Atlanta | GA | Y | 9 | Y | Y |
| 13 | Sep 15, 1999 | Fort Worth | TX | Y | 7 | Y | Y |
| 14 | Nov 2, 1999 | Honolulu | HI | Y | 7 | Y | Y |
| 15 | Dec 26, 2000 | Wakefield | MA | Y | 7 | Y | Y |
| 16 | Dec 28, 2000 | Philadelphia | PA | Y | 7 | Y | Y |
| 17 | Aug 26, 2002 | Rutledge | AL | N | 6 | Y | Y |
| 18 | Jan 15, 2003 | Edinburg | TX | U | 6 | Y | Y |
| 19 | Jul 8, 2003 | Meridian | MS | N | 6 | Y | Y |
| 20 | Aug 27, 2003 | Chicago | IL | N | 6 | Y | Y |
| 21 | Mar 12, 2004 | Fresno | CA | N | 9 | Y | Y |
| 22 | Nov 21, 2004 | Birchwood | WI | Y | 6 | N | N |
| 23 | Mar 12, 2005 | Brookfield | WI | Y | 7 | N | N |
| 24 | Mar 21, 2005 | Red Lake | MN | Y | 9 | N | N |
| 25 | Jan 30, 2006 | Goleta | CA | Y | 7 | Y | N |
| 26 | Mar 25, 2006 | Seattle | WA | Y | 6 | N | N |
| 27 | Jun 1, 2006 | Indianapolis | IN | Y | 7 | N | N |
| 28 | Dec 16, 2006 | Kansas City | KS | N | 6 | N | N |
| 29 | Apr 16, 2007 | Blacksburg | VA | Y | 32 | N | N |
| 30 | Oct 7, 2007 | Crandon | WI | Y | 6 | N | N |
| 31 | Dec 5, 2007 | Omaha | NE | Y | 8 | N | N |
| 32 | Dec 24, 2007 | Carnation | WA | U | 6 | N | N |
| 33 | Feb 7, 2008 | Kirkwood | MO | Y | 6 | N | N |
| 34 | Sep 2, 2008 | Alger | WA | U | 6 | N | N |
| 35 | Dec 24, 2008 | Covina | CA | Y | 8 | Y | N |
| 36 | Jan 27, 2009 | Los Angeles | CA | N | 6 | Y | N |
| 37 | Mar 10, 2009 | Kinston, Samson, and Geneva | AL | Y | 10 | N | N |
| 38 | Mar 29, 2009 | Carthage | NC | N | 8 | N | N |
| 39 | Apr 3, 2009 | Binghamton | NY | Y | 13 | Y | N |
| 40 | Nov 5, 2009 | Fort Hood | TX | Y | 13 | N | N |
| 41 | Jan 19, 2010 | Appomattox | VA | Y | 8 | N | N |

*Continued*

TABLE 1—Continued

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| 42 | Aug 3, 2010 | Manchester | CT | Y | 8 | N | N |
| 43 | Jan 8, 2011 | Tucson | AZ | Y | 6 | N | N |
| 44 | Jul 7, 2011 | Grand Rapids | MI | Y | 7 | N | N |
| 45 | Aug 7, 2011 | Copley Township | OH | N | 7 | N | N |
| 46 | Oct 12, 2011 | Seal Beach | CA | N | 8 | Y | N |
| 47 | Dec 25, 2011 | Grapevine | TX | N | 6 | N | N |
| 48 | Apr 2, 2012 | Oakland | CA | N | 7 | Y | N |
| 49 | Jul 20, 2012 | Aurora | CO | Y | 12 | N | N |
| 50 | Aug 5, 2012 | Oak Creek | WI | Y | 6 | N | N |
| 51 | Sep 27, 2012 | Minneapolis | MN | Y | 6 | N | N |
| 52 | Dec 14, 2012 | Newtown | CT | Y | 27 | N | N |
| 53 | Jul 26, 2013 | Hialeah | FL | Y | 6 | N | N |
| 54 | Sep 16, 2013 | Washington | DC | N | 12 | Y | N |
| 55 | Jul 9, 2014 | Spring | TX | Y | 6 | N | N |
| 56 | Sep 18, 2014 | Bell | FL | U | 7 | N | N |
| 57 | Feb 26, 2015 | Tyrone | MO | U | 7 | N | N |
| 58 | May 17, 2015 | Waco | TX | Y | 9 | N | N |
| 59 | Jun 17, 2015 | Charleston | SC | Y | 9 | N | N |
| 60 | Aug 8, 2015 | Houston | TX | U | 8 | N | N |
| 61 | Oct 1, 2015 | Roseburg | OR | Y | 9 | N | N |
| 62 | Dec 2, 2015 | San Bernardino | CA | Y | 14 | Y | N |
| 63 | Feb 21, 2016 | Kalamazoo | MI | Y | 6 | N | N |
| 64 | Apr 22, 2016 | Piketon | OH | U | 8 | N | N |
| 65 | Jun 12, 2016 | Orlando | FL | Y | 49 | N | N |
| 66 | May 27, 2017 | Brookhaven | MS | U | 8 | N | N |
| 67 | Sep 10, 2017 | Plano | TX | Y | 8 | N | N |
| 68 | Oct 1, 2017 | Las Vegas | NV | Y | 58 | N | N |
| 69 | Nov 5, 2017 | Sutherland Springs | TX | Y | 25 | N | N |

*Note.* LCM = large-capacity magazine; N = no; U = unknown; Y = yes. From September 13, 1994, until and including September 12, 2004, each and every state, including the District of Columbia, was subject to a ban on LCMs pursuant to the federal assault weapons ban. To collect the data in Table 1, we searched the following news media resources for every shooting that resulted in 6 or more fatalities: America's Historical Newspapers, EBSCO, Factiva, Gannett Newsstand, Google News Archive, Lexis-Nexis, Newspaper Archive, Newspaper Source Plus, Newspapers.com, Newswires, ProQuest Historical Newspapers, and ProQuest Newsstand. We also reviewed mass shooting data sets maintained by *Mother Jones*, the *New York Times*, and *USA Today*. In addition to news media sources, we reviewed reports on mass shootings produced by think tank, policy advocacy, and governmental organizations, including the US Federal Bureau of Investigation Supplementary Homicide Reports, the crowdsourced Mass Shooting Tracker, and the open-source databases maintained by the Gun Violence Archive and the Stanford University Geospatial Center. Finally, when it was relevant, we also reviewed court records as well as police, forensic, and autopsy reports. As a general rule, when government sources were available, they were preferred over other sources. Furthermore, when media sources conflicted on the number of casualties or the weaponry involved, the later sources were privileged (as later reporting is often more accurate).

set of high-fatality mass shootings was no exception. As such, the median average number of fatalities for each subset of incidents—those involving and those not involving LCMs—was necessarily lower than the mean average. Nevertheless, like the mean average, the median average was higher when LCMs were employed—a median average of 8 fatalities per incident compared with 7 fatalities per incident for attacks not involving LCMs.

For the 60 incidents in which it was known if an LCM was used, in 44 the perpetrator used an LCM. Of the 44 incidents in which the perpetrators used LCMs, 77% (34/44) were in nonban states. In the 16 incidents in which the perpetrators did not use LCMs, 50% (8/16) were in nonban states (Table B, available as a supplement to the online version of this article at http://www.ajph.org). Stated differently, in nonban states, 81% (34/42) of high-fatality mass shooting perpetrators used LCMs; in LCM-ban states, only 55% (10/18) used LCMs.

The rate of high-fatality mass shootings increased considerably after September 2004 (when the federal assault weapons ban expired). In the 10 years the federal ban was in effect, there were 12 high-fatality mass shootings and 89 deaths (an average of 1.2 incidents and 8.9 deaths per year). Since then, through 2017, there have been 48 high-fatality mass shootings and 527 deaths (an average of 3.6 incidents and 39.6 deaths per year in these 13.3 years).

Of the 69 high-fatality mass shootings from 1990 to 2017, 49 occurred in states without an LCM ban in effect at the time and 20 in states with a ban in effect at the time. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 11.7 per billion population; the annual incidence rate for high-fatality mass shootings in states with an LCM ban was 5.1 per billion population. In that 28-year period, the rate of high-fatality mass shootings per capita was 2.3 times higher in states without an LCM ban (Table 2).

Non–LCM ban states had not only more incidents but also more deaths per incident (10.9 vs 8.2). The average annual number of high-fatality mass shooting deaths per billion population in the non–LCM ban states was 127.4. In the LCM ban states, it was 41.6 (Table 2).

For the time period beginning with the first full calendar year following the expiration of the federal assault weapons ban (January 1, 2005–December 31, 2017), there were 47 high-fatality mass shootings in the United States. Of these, 39 occurred in states where an LCM ban was not in effect, and 8 occurred in LCM ban locations. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 13.2 per billion population; for states with an LCM ban, it was 7.4 per billion population (Table 2). During this period, non–LCM ban states had not only more incidents but also more deaths per incident (11.4 vs 9.4). In terms of high-fatality mass shooting deaths per billion population, the annual number of deaths in the non–LCM ban states was 150.6; in the LCM ban states it was 69.2 (Table 2).

When we limited the analysis solely to high-fatality mass shootings that definitely involved LCMs, the differences between ban and nonban states became larger. For example, for the entire period of 1990 to 2017, of the 44 high-fatality mass shootings that involved LCMs, the annual incidence rate for LCM-involved high-fatality mass shootings in nonban states was 8.1 per billion population; in LCM-ban states it was 2.5 per billion population. The annual rate of high-fatality mass shooting deaths in the non–LCM ban states was 102.1 per billion population; in the LCM ban state it was 23.3. In terms of LCM-involved high-fatality mass shootings, we also found comparable wide differences in incidence and fatality rates between ban and nonban states for the post–federal assault weapons ban period (2005–2017; Table 2).

We found largely similar results in the multivariate analyses (1990–2017). States that did not ban LCMs were significantly more likely to experience LCM-involved high-fatality mass shootings as well as more likely to experience any high-fatality mass shootings (regardless of whether an LCM was involved). States that did not ban LCMs also experienced significantly more deaths from high-fatality mass shootings, operationalized as the absolute number of fatalities (Table 3).

When the LCM bans were separated into federal and state bans, both remained significantly related to the incidence of LCM-involved high-fatality mass shooting events and to the number of LCM-involved high-fatality mass shooting deaths. The associations between federal and state bans and

**TABLE 2—High-Fatality Mass Shootings (≥ 6 Victims Shot to Death) by Whether LCM Bans Were in Effect: United States, 1990–2017**

| | Average Annual Population, No. (Millions) | Total Incidents, No. | Annual Incidents per Billion Population, No. | Total Deaths, No. | Annual Deaths per Billion Population, No. | Deaths per Incident, No. |
|---|---|---|---|---|---|---|
| All high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 49 | 11.7 | 534 | 127.4 | 10.9 |
| LCM ban states | 140.7 | 20 | 5.1 | 164 | 41.6 | 8.2 |
| All high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non–LCM ban states | 227.8 | 39 | 13.2 | 446 | 150.6 | 11.4 |
| LCM ban states | 83.4 | 8 | 7.4 | 75 | 69.2 | 9.4 |
| LCM-involved high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 34 | 8.1 | 428 | 102.1 | 12.6 |
| LCM ban states | 140.7 | 10 | 2.5 | 92 | 23.3 | 9.2 |
| LCM-involved high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non–LCM ban states | 227.8 | 28 | 9.5 | 369 | 124.6 | 13.2 |
| LCM ban states | 83.4 | 4 | 3.7 | 42 | 38.7 | 10.5 |
| Non-LCM high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 8 | 1.9 | 56 | 13.4 | 7.0 |
| LCM ban states | 140.7 | 8 | 2.0 | 60 | 15.2 | 7.5 |

*Note.* LCM = large-capacity magazine.

TABLE 3—Multivariate Results of the Relationship Between LCM Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Combined Federal and State Large Capacity Magazine Bans: United States

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
| --- | --- | --- | --- | --- |
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| All LCM bans (federal and state) | −2.217 (−3.493, −0.940) | −5.912 (−9.261, −2.563) | −1.283 (−2.147, −0.420) | −3.660 (−5.695, −1.624) |
| Population density | −0.011 (−0.052, 0.031) | 0.013 (−0.068, 0.095) | 0.001 (−0.003, 0.006) | 0.011 (−0.005, 0.026) |
| % aged 19–24 y | −0.480 (−1.689, 0.730) | −2.496 (−5.893, 0.901) | 0.283 (−0.599, 1.164) | −0.585 (−2.666, 1.495) |
| % aged 25–34 y | −0.801 (−1.512, −0.089) | −2.390 (−4.391, −0.388) | −0.337 (−0.871, 0.197) | −1.114 (−2.463, 0.235) |
| % Black | −0.227 (−1.062, 0.607) | −0.654 (−2.831, 1.522) | −0.163 (−0.703, 0.377) | −0.261 (−1.391, 0.870) |
| % with a bachelor's degree or higher | −0.009 (−0.492, 0.474) | −0.469 (−1.590, 0.652) | 0.143 (−0.214, 0.501) | 0.183 (−0.715, 1.081) |
| Percentage of households with a firearm (proxy) | −0.047 (−0.195, 0.101) | −0.147 (−0.546, 0.251) | −0.020 (−0.131, 0.091) | −0.084 (−0.368, 0.200) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.072 (−0.293, 0.149) | −0.476 (−1.081, 0.129) | 0.041 (−0.135, 0.216) | −0.182 (−0.628, 0.263) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.012, 0.001) | −0.007 (−0.017, 0.004) | −0.001 (−0.006, 0.003) | −0.003 (−0.012, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.31 | 0.16 | 0.26 | 0.11 |

Note. CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.49.
[a]Logit regression.
[b]Negative binomial regression.

the overall incidence of all high-fatality mass shootings as well as the total number of victims in these events remained strongly negative but was only sometimes statistically significant (Table 4).

In terms of sensitivity analyses, using probit instead of logit gave us similar results (not shown). When the outcome variable was the number of high-fatality mass shooting deaths, we obtained largely similar results concerning the association between LCM bans and the outcome variables, regardless of whether we used Poisson or negative binomial regression (not shown). Moreover, replacing the linear yearly trend with a quadratic function did not change the major results of the analyses (not shown). Variance inflation factors for all the independent variables never exceeded 10.0, with the variance inflation factor for LCM ban variables always being less than 2.0, indicating that there were no significant multicollinearity issues (Tables 3 and 4).

## DISCUSSION

In the United States, LCMs are disproportionately used in high-fatality mass shootings (incidents in which ≥ 6 victims are shot to death). In at least 64% of the incidents

since 1990, perpetrators used LCMs. (For 23%, we determined that they did not involve LCMs, and a determination could not be made for the remaining 13%.) Previous research has shown that LCM firearms are used in a high share of mass murders (typically defined as ≥ 4 homicides) and murders of police.[9]

We could not find reliable estimates of LCM firearms in the US gun stock. However, it is likely much lower than 64%, given that commonly owned firearms such as revolvers, bolt-action rifles, and shotguns are not typically designed to be LCM-capable. During the decade the federal assault weapons ban was in effect, no firearms were legally manufactured with LCMs for sale in the United States. In the postban era, semiautomatic firearms, especially pistols, are often sold with factory-issue LCMs, but firearms that are not semiautomatic are not sold with such magazines.

Why do we find LCMs so prominent among high-fatality mass shootings? We suspect there are 2 main reasons. The first is that perpetrators probably deliberately select LCMs because they facilitate the ability to fire many rounds without having to stop to reload. The second reason is that the ability of shooters to kill many victims—especially the 6 victims required to be included in our data set—may be reduced if LCMs are not

available. In other words, the first explanation is that shooters perceive LCMs to be more effective at killing many people; the second explanation is that LCMs are indeed more effective at killing many people.

High-fatality mass shootings are not common, even in the United States. Between 1990 and 2017, there has been an average of 2.5 incidents per year, with an average of 25 people killed annually in such attacks. However, the number of incidents and the number of people killed per incident have been increasing since the end of the federal assault weapons ban.

In our study, we found that bans on LCMs were associated with both lower incidence of high-fatality mass shootings and lower fatality tolls per incident. The difference in incidence and overall number of fatalities between states, with and without bans, was even greater for LCM-involved high-fatality mass shootings.

The multivariate results are largely consistent with these bivariate associations. When we controlled for 10 independent variables often associated with overall crime rates, as well as state and year effects, states with LCM bans had lower rates of high-fatality mass shootings and fewer high-fatality mass shooting deaths. When we investigated federal and state bans separately in the multiple

TABLE 4—Multivariate Results of the Relationship Between Large Caliber Magazine Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Separate Federal and State Large Caliber Magazine Bans: United States

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| Federal LCM ban | –1.434 (–2.622, –0.245) | –3.571 (–7.103, –0.038) | –0.895 (–1.806, 0.016) | –2.570 (–4.902, –0.238) |
| State LCM bans | –2.603 (–4.895, –0.311) | –8.048 (–15.172, –0.925) | –1.277 (–2.977, 0.422) | –3.082 (–7.227, 1.064) |
| Population density | –0.012 (–0.055, 0.030) | –0.001 (–0.085, 0.083) | 0.001 (–0.003, 0.006) | 0.009 (–0.007, 0.024) |
| % aged 19–24 y | –0.311 (–1.499, 0.878) | –2.589 (–6.057, 0.879) | 0.342 (–0.551, 1.236) | –0.531 (–2.759, 1.698) |
| % aged 25–34 y | –0.812 (–1.532, –0.093) | –2.660 (–4.848, –0.471) | –0.323 (–0.864, 0.217) | –0.848 (–2.236, 0.539) |
| % Black | –0.229 (–1.101, 0.643) | –0.770 (–3.232, 1.693) | –0.150 (–0.698, 0.398) | –0.154 (–1.321, 1.013) |
| % with a bachelor's degree or higher | –0.031 (–0.447, 0.509) | –0.479 (–1.577, 0.618) | 0.156 (–0.199, 0.511) | 0.269 (–0.567, 1.106) |
| Percentage of households with a firearm (proxy) | –0.055 (–0.210, 0.101) | –0.227 (–0.651, 0.196) | –0.019 (–0.133, 0.094) | –0.107 (–0.399, 0.186) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | –0.061 (–0.284, 0.162) | –0.420 (–1.041, 0.201) | 0.046 (–0.132, 0.224) | –0.157 (–0.619, 0.305) |
| Imprisonment rate (per 100 000 population) | –0.006 (–0.013, 0.000) | –0.012 (–0.026, 0.002) | –0.002 (–0.007, 0.003) | –0.003 (–0.014, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.30 | 0.15 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.45.
[a]Logit regression.
[b]Negative binomial regression.

regressions, both were significantly associated with the incidence of LCM-involved high-fatality mass shootings as well as the number of victims in LCM-involved attacks. The relationship between these bans, considered separately, and all high-fatality mass shooting incidence and deaths is often not statistically significant, although this may be attributable to lack of statistical power (number of observations) to find a statistically significant effect.

Our analysis provides answers to 4 important questions:

1. How often are LCMs used in high-fatality mass shootings? At minimum, 64% of high-fatality mass shootings perpetrated between 1990 and 2017 involved LCMs.
2. Are more people killed when LCMs are used? Yes, and the difference in our data set is substantial and statistically significant (11.8 vs 7.3). We should add that our results likely underestimate the difference because we have a truncated sample (we only examined incidents with at least 6 victim fatalities), compounded by the fact that the number of homicide incidents fell as the number of victims increased.
3. Do states with LCM bans experience high-fatality mass shootings involving LCMs at a lower rate and a lower fatality

count than those states with no such bans in effect? Yes. In fact, the effect is more pronounced for high-fatality mass shootings involving LCMs than for those not involving LCMs.
4. Do states with LCM bans experience high-fatality mass shootings (regardless of whether they involve LCMs) at a lower rate and a lower fatality count than states with no such bans in effect? Yes.

## Limitations

Our study had various limitations. First, although we carefully searched for every high-fatality mass shooting, it is possible that we might have missed some. Nevertheless, we suspect that this is unlikely, because it would mean that others who compiled lists have also missed the same ones, for we checked our list against multiple sources.

Second, our definition of a high-fatality mass shooting is a shooting that results in 6 or more fatal victims. A different threshold criterion (e.g., 6 or more people shot; 5 or more victims killed), might lead to somewhat different results. We expect that as the number of victims in a shooting increases, the likelihood that the perpetrator used an LCM

also increases. Indeed, of the 13 high-fatality mass shootings with 10 or more fatalities in our data set, 12 (92%) involved an LCM.

Third, although many high-fatality mass shootings tend to be heavily publicized, in 13% of the incidents we reviewed, we could not determine whether an LCM was used. As a sensitivity analysis, we assessed the assumptions that all of the unknown cases first did, and then did not, involve LCMs. Neither assumption appreciably changed our main results (not shown).

Fourth, as a general rule, clustering standard errors is most appropriate when there is a large number of treated units. Although during the decade of the federal assault weapons bans all 50 states plus the District of Columbia regulated LCMs, during the remaining time periods under examination, only 8 jurisdictions regulated LCMs. As a result, there is the possibility that the standard errors were underestimated in our analyses.[34]

Fifth, there were only 69 events that met our criterion for a "high-fatality mass shooting." Although 69 is a horrific number of incidents, for statistical purposes, it is a relatively small number and limits the power to detect significant associations. For example, we did not have the statistical power (and thus did not even try) to determine whether

different aspects of the various LCM laws might have differential effects on the incidence of high-fatality mass shootings. Moreover, because of suboptimal statistical power, there is also the possibility that the magnitude of the effects detected was overestimated.[35]

## Public Health Implications

LCMs increase the ability to fire large numbers of bullets without having to pause to reload. Any measure that can force a pause in an active shooting—creating opportunities for those in the line of fire to flee, take cover, or physically confront a gunman—offers a possibility of reducing the number of victims in such an attack. To put it in different terms, if the only firearms available were 18th-century muskets, it is doubtful that mass shootings would be the social problem they are today.

The impact of individual state firearm laws is reduced by the fact that guns often move across state lines—occasionally purchased in locales with more permissive laws and taken to states with more restrictive laws. This is partly why efforts aimed at reducing the frequency and lethality of mass shootings must necessarily be multifaceted and multidisciplinary. Legal restrictions on firearms are merely a part of this broader, public health approach. That being said, the theory behind reducing the availability of LCMs to reduce the number of victims in mass shootings makes sense, and our empirical results, consistent with much of the limited literature on mass shootings, suggest that LCM bans have been effective in saving lives. AJPH

## CONTRIBUTORS

L. Klarevas and D. Hemenway designed the study, collected the data, and contributed equally to all parts of the study. A. Conner ran the statistical analyses and helped construct the tables that report the results of the multivariate analyses. All authors approved the final article as submitted.

## ACKNOWLEDGMENTS

The authors would like to thank John Berrigan, research assistant at the Harvard Injury Control Research Center, for his assistance with the undertaking of this study.

## CONFLICTS OF INTEREST

L. Klarevas has, in the past 2 years, served as an expert to the states of Colorado and California in civil litigation that involved the constitutionality of state restrictions on large-capacity magazines. The authors have no additional conflicts of interest to report.

## HUMAN PARTICIPANT PROTECTION

No protocol approval was needed because no human participants were involved in this study.

## REFERENCES

1. Wintemute GJ. How to stop mass shootings. *N Engl J Med*. 2018;379(13):1193–1196.

2. Reeping PM, Cerda M, Kalesan B, Wiebe DJ, Galea S, Branas CC. State gun laws, gun ownership, and mass shootings in the US: cross sectional time series. *BMJ*. 2019;364(8190):l542–l548.

3. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. October 5, 2017. Available at: https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed June 10, 2019.

4. Kamerow D. Guns don't kill crowds, people with semi-automatics do. *BMJ*. 2011;342(1):d477.

5. Barry CL, Webster DW, Stone E, Crifasi CK, Vernick JS, McGinty EE. Public support for gun violence prevention policies among gun owners and non–gun owners in 2017. *Am J Public Health*. 2018;108(7):878–881.

6. Lenett MG. Taking a bite out of violent crime. *Univ Dayton Law Rev*. 1995;20(2):573–617.

7. Muchnick JY. The assault weapons ban: saving lives. *Univ Dayton Law Rev*. 1995;20(2):641–651.

8. Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001;17(1):33–74.

9. Koper CS, Johnson WD, Nicholas JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. *J Urban Health*. 2018;95(3):313–321.

10. Giffords Law Center to Prevent Gun Violence. Large capacity magazines. Available at: http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines. Accessed June 10, 2019.

11. Giffords Law Center to Prevent Gun Violence. Assault weapons. Available at: https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons. Accessed June 10, 2019.

12. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. *Arch Surg*. 1992;127(6):694–698.

13. Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. *J Quant Criminol*. 2001;17(1):81–88.

14. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. *J Trauma Acute Care Surg*. 2014;76(1):2–9.

15. Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. *J Trauma Acute Care Surg*. 2017;84(1):58–65.

16. McCullough J. *The Ultimate Guide to US Army Combat Skills, Tactics and Techniques*. New York, NY: Skyhorse; 2012.

17. Fox JA, DeLateur MJ. Mass shootings in America: moving beyond Newtown. *Homicide Stud*. 2014;18(1):125–145.

18. Krouse WJ, Richardson DJ. Mass murder with firearms: incidents and victims, 1999–2013. CRS Report R44126. Washington, DC: Congressional Research Service; 2015.

19. Wilson LC. *The Wiley Handbook of the Psychology of Mass Shootings*. Hoboken, NJ: Wiley; 2016.

20. Klarevas L. *Rampage Nation: Securing America From Mass Shootings*. Amherst, NY: Prometheus; 2016.

21. Schildkraut J, Elsass HJ. *Mass Shootings: Media, Myths, and Realities*. Denver, CO: Praeger; 2016.

22. Schildkraut J. *Mass Shootings in America: Understanding the Debates, Causes, and Responses*. Denver, CO: ABC-CLIO; 2018.

23. Rocque M, Duwe G. Rampage shootings: an historical, empirical, and theoretical overview. *Curr Opin Psychol*. 2018;19(1):28–33.

24. Phaneuf SW. Mass shootings: understanding the complexities. In: Hilinski-Rosick CM, Lee DR, eds. *Contemporary Issues in Victimology: Identifying Patterns and Trends*. New York, NY: Lexington; 2018.

25. Moody CE, Marvell TB. Clustering and standard error bias in fixed effects panel data regressions. *J Quant Crim*; 2018:1–23.

26. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Appl Econ Lett*. 2015;22(4):281–284.

27. Blau BM, Gorry DH, Wade C. Guns, laws and public shootings in the United States. *Appl Econ*. 2016;48(49):4732–4746.

28. Follman M, Aronsen G, Pan D. A guide to mass shootings in America. *Mother Jones*. May 31, 2019. Available at: https://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed June 10, 2019.

29. Kleck G. Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages. *Justice Res Policy*. 2016;17(1):28–47.

30. Webster DW, Donohue JJ, Klarevas L, et al. Firearms on college campuses: research evidence and policy implications. Report of the Johns Hopkins University Center for Gun Policy and Research. Baltimore, MD: Johns Hopkins Bloomberg School of Public Health; 2016.

31. Kleck G. *Targeting Guns: Firearms and Their Control*. Hawthorne, NY: Aldine de Gruyter; 1997.

32. Hemenway D. *Private Guns, Public Health*. Ann Arbor, MI: University of Michigan Press; 2017.

33. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership: measurement, structure and trends. *J Quant Criminol*. 2004;20(1):43–62.

34. Conley TG, Taber CR. Inference with "difference in differences" with a small number of policy changes. *Rev Econ Stat*. 2011;93(1):113–125.

35. Button KS, Ioannidis JPA, Mokrysz C, et al. Power failure: why small sample size undermines the reliability of neuroscience [erratum *Nat Rev Neurosci*. 2013;14(6):451]. *Nat Rev Neurosci*. 2013;14(5):365–376.

# EXHIBIT G

Downloaded from https://journals.lww.com/jtrauma by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D1AwnYQp/IQrHD3i3D1AwnYQp/IQrHD3i3D1AwnYQp/IQrHD3i3D1AwnYQp 3D1AwnYQp/IQrHD3i3D1AwnYQp on 01/07/2019

# Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data

**Charles DiMaggio, PhD, MPH, Jacob Avraham, MD, Cherisse Berry, MD, Marko Bukur, MD, Justin Feldman, ScD, Michael Klein, MD, Noor Shah, MD, Manish Tandon, MD,** *and* **Spiros Frangos, MD, MPH**, *New York, New York*

## AAST Continuing Medical Education Article

### Accreditation Statement

This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education through the joint providership of the American College of Surgeons and the American Association for the Surgery of Trauma. The American College of Surgeons is accredited by the ACCME to provide continuing medical education for physicians.

### AMA PRA Category 1 Credits™

The American College of Surgeons designates this journal-based CME activity for a maximum of 1 *AMA PRA Category 1 Credit™*. Physicians should claim only the credit commensurate with the extent of their participation in the activity.

Of the *AMA PRA Category 1 Credit™* listed above, a maximum of 1 credit meets the requirements for self-assessment.

### Credits can only be claimed online



AMERICAN COLLEGE OF SURGEONS
*Inspiring Quality:*
*Highest Standards, Better Outcomes*
100+*years*

### Objectives

After reading the featured articles published in the *Journal of Trauma and Acute Care Surgery*, participants should be able to demonstrate increased understanding of the material specific to the article. Objectives for each article are featured at the beginning of each article and online. Test questions are at the end of the article, with a critique and specific location in the article referencing the question topic.

### Claiming Credit

To claim credit, please visit the AAST website at http://www.aast.org/ and click on the "e-Learning/MOC" tab. You must read the article, successfully complete the post-test and evaluation. Your CME certificate will be available immediately upon receiving a passing score of 75% or higher on the post-test. Post-tests receiving a score of below 75% will require a retake of the test to receive credit.

### System Requirements

The system requirements are as follows: Adobe® Reader 7.0 or above installed; Internet Explorer® 7 and above; Firefox® 3.0 and above, Chrome® 8.0 and above, or Safari™ 4.0 and above.

### Questions

If you have any questions, please contact AAST at 800-789-4006. Paper test and evaluations will not be accepted.

### Disclosure Information

In accordance with the ACCME Accreditation Criteria, the American College of Surgeons, as the accredited provider of this journal activity, must ensure that anyone in a position to control the content of *J Trauma Acute Care Surg* articles selected for CME credit has disclosed all relevant financial relationships with any commercial interest. Disclosure forms are completed by the editorial staff, associate editors, reviewers, and all authors. The ACCME defines a `commercial interest' as "any entity producing, marketing, re-selling, or distributing health care goods or services consumed by, or used on, patients." "Relevant" financial relationships are those (in any amount) that may create a conflict of interest and occur within the 12'months preceding and during the time that the individual is engaged in writing the article. All reported conflicts are thoroughly managed in order to ensure any potential bias within the content is eliminated. However, if you'perceive a bias within the article, please report the circumstances on the evaluation form.

Please note we have advised the authors that it is their responsibility to disclose within the article if they are describing the use of a device, product, or drug that is not FDA approved or the off-label use of an approved device, product, or drug or unapproved usage.

### Disclosures of Significant Relationships with Relevant Commercial Companies/Organizations by the Editorial Staff

Ernest E. Moore, Editor: PI, research support and shared U.S. patents Haemonetics; PI, research support, Instrumentation Laboratory, Inc.; Co-founder, Thrombo Therapeutics. Associate Editors David Hoyt, Ronald V. Maier and Steven Shackford have nothing to disclose. Editorial staff and Angela Sauaia have nothing to disclose.

### Author Disclosures

The authors have nothing to disclose.

### Reviewer Disclosures

The reviewers have nothing to disclose.

### Cost

For AAST members and *Journal of Trauma and Acute Care Surgery* subscribers there is no charge to participate in this activity. For those who are not a member or subscriber, the cost for each credit is $25.

From the Department of Surgery, Division of Trauma and Critical Care Surgery (C.D., J.A., C.B., M.B., J.F., M.K., N.S., M.T., S.F.), New York University School of Medicine, New York, New York.

Address for reprints: Charles DiMaggio, PhD, MPH, Department of Surgery, New York University School of Medicine, 462 First Ave, NBV 15, New York, NY 10016-9196; email: Charles.DiMaggio@nyumc.org.

77th Annual Meeting of AAST and the World Trauma Congress, Sep 26 - 29, 2018, San Diego, California.

DOI: 10.1097/TA.0000000000002060

JA4431

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

DiMaggio et al.

| BACKGROUND: | A federal assault weapons ban has been proposed as a way to reduce mass shootings in the United States. The Federal Assault Weapons Ban of 1994 made the manufacture and civilian use of a defined set of automatic and semiautomatic weapons and large capacity magazines illegal. The ban expired in 2004. The period from 1994 to 2004 serves as a single-arm pre-post observational study to assess the effectiveness of this policy intervention. |
|---|---|
| METHODS: | Mass shooting data for 1981 to 2017 were obtained from three well-documented, referenced, and open-source sets of data, based on media reports. We calculated the yearly rates of mass shooting fatalities as a proportion of total firearm homicide deaths and per US population. We compared the 1994 to 2004 federal ban period to non-ban periods, using simple linear regression models for rates and a Poison model for counts with a year variable to control for trend. The relative effects of the ban period were estimated with odds ratios. |
| RESULTS: | Assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8–88.9) in 44 mass-shooting incidents. Mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides (coefficient for year, 0.7; $p = 0.0003$), with increment in year alone capturing over a third of the overall variance in the data (adjusted $R^2 = 0.3$). In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides ($p = 0.03$). Mass-shooting fatalities were 70% less likely to occur during the federal ban period (relative rate, 0.30; 95% confidence interval, 0.22–0.39). |
| CONCLUSION: | Mass-shooting related homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004. (*J Trauma Acute Care Surg.* 2019;86: 11–19. Copyright © 2018 American Association for the Surgery of Trauma.) |
| LEVEL OF EVIDENCE: | Observational, level II/IV. |
| KEY WORDS: | Firearms; mass-shootings; assault weapons; epidemiology. |

Increases in firearm-related injuries, particularly mass-shooting related fatalities, in the United States have contributed to a polarizing and sometimes contentious debate over gun ownership and limiting weapons characterized as assault weapons.[1,2] Despite the increasing sense that there is an epidemic of indiscriminate firearm violence in our schools and public spaces, there is a paucity of public health evidence on the topic. Among a number of recommendations, a federal Assault Weapons Ban (AWB) has been proposed as a way to prevent and control mass shootings in the United States. In this article, we assess evidence for the effectiveness of such a ban in preventing or controlling mass-shooting homicides in the United States.

While mass shootings occur in other industrialized nations, the United States is particularly prone to these crimes. In a recent 30-year period, the United States had double the number of mass-shooting incidents than the next 24 industrialized nations combined.[3] Any public perception of recent increases in the number of these events is borne out by analysis of available data.[4] By one measure, there have been more deaths due to mass shootings in the United States in the past 18 years than in the entire 20th century.[5] While there is some debate about the role of mental illness in mass shootings,[6–8] many high-profile recent mass shootings (Aurora, CO; Roseburg, OR; San Bernadino, CA; Newtown, CT; Orlando; Las Vegas; Sutherland Springs, TX) have been characterized by the use of semiautomatic assault rifles,[9] leading some to advocate for restrictions on the manufacture and sale of these weapons.

While survey results indicate that researchers in criminology, law and public health rank an assault weapons ban as one of the most effective measures to prevent mass shootings, and that 67% of the US general population support such a ban,[10] the existing evidence on banning assault weapons is scant and sometimes contradictory. Most evidence is related to the Federal AWB of 1994, which made illegal the manufacture and use by civilians of a defined set of automatic and semiautomatic weapons and large capacity magazines. Formally known as "The Public Safety and Recreational Firearms Use Protection Act", the AWB was part of the broader "Violent Crime Control and Law Enforcement Act of 1994. The ban lasted 10 years, expiring in 2004 when the US Congress declined to renew it.

In a study soon following the implementation of the 1994 ban, researchers reported a 55% decrease in the recovery of assault weapons by the Baltimore City Police in the first 6 months of 1995, indicating a statistically significant 29 fewer firearms in the population.[11] In a 2009 study based on ICD9 external cause of injury codes for patients younger than 18 years in the United States, 11 states with assault and large-capacity magazine bans, as well as other firearm laws, were compared with 33 states without such restrictions. The incidence of firearm injuries per 1,000 total traumatic injuries was significantly lower in states with restrictive laws, 2.2 compared with 5.9.[12] In contrast, a comprehensive 2001 evaluation of the AWB itself concluded that there was "no evidence of reductions in multiple-victim gun homicides or multiple-gunshot wound victimizations". The authors cautioned their results should be "interpreted cautiously" because of the short period since the ban's inception, and that future assessments were warranted.[13] More recent studies, while not primarily addressing the US Federal AWB have found results generally consistent with its effectiveness in preventing mass-shooting fatalities.[14,15]

We believe sufficient time has passed and enough data have accumulated to treat the period from 1994 to 2004 as a naturalistic pre-post observational comparison period for the association of the AWB with changes in mass-shootings in the United States. Because there is no authoritative source or registry, or even a widely agreed upon definition for these incidents, we obtained data from three open source references and restricted our analyses to only those incidents confirmed by all three sources. We assess evidence for the potential effectiveness of such a ban in preventing and controlling mass-shooting homicides in the United States. We hypothesized that the implementation of the Federal AWB contributed to a reduction in mass shooting deaths as measured by the number and rate of mass shooting fatalities before, during, and after the federal AWB.

## METHODS

Mass incident shooting data were obtained from three independent, well-documented and referenced online sources: Mother Jones Magazine, the Los Angeles Times and Stanford

© 2018 American Association for the Surgery of Trauma

JA4432

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

University.[16–18] These sources have each been the basis for a number of previous studies.[19–26] Data from the three open-source references were combined. Analyses were restricted to incidents reported by all three sources. Entries were further restricted to those for which four or more fatalities (not including the shooter) were reported, which meets the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Yearly homicide data were obtained from the US Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) an online database of fatal and nonfatal injury.[29] Because 2017 data were not yet available in the WISQARS system, data for firearm-related homicide data for that year were obtained from a separate online source.[30]

A variable was created to indicate the 1994 to 2004 period as the federal ban period. We attempted to identify incidents involving assault weapons. An assault weapon has been defined as semiautomatic rifle that incorporates military-style features such as pistol grips, folding stocks, and high-capacity detachable magazines.[31] In this study, assault weapons were identified using the text search terms "AK," "AR," "MCX," "assault," "assault," or "semiautomatic" in a text field for weapon details. These terms were based on descriptions of the federal assault ban legislative language.[32] The total number of mass shooting fatalities and injuries were aggregated by year and merged with the yearly firearm homicide data.

The rate of mass shooting fatalities per 10,000 firearm homicide deaths was calculated. For the years covered by the data sources, we calculated (1) the total and yearly number of mass-shooting incidents that met the strictest criteria and were confirmed by all three sources, (2) the number of all weapon (assault and nonassault weapons) mass-shooting fatalities, and (3) the case-fatality ratio of all-weapon mass-shooting fatalities per 100 total mass-shooting fatalities and injuries. The yearly case-fatality ratio was plotted with overlying Loess line for trend and standard error limits. We also plotted the yearly rate of mass shooting fatalities per 10,000 firearm-related homicides with an overlying simple linear model with year as the predictor for (1) the total period, and (2) for preban, ban, and postban periods.

We evaluated assumptions of normality and linearity of the data using graphical methods such as density plots and Q-Q normal plots as well as summary statistics. We tested the hypothesis that the federal ban period was associated with a decrease in the number and rate of mass-shooting fatalities in the United States with a multiple linear regression model, with total homicide-based mass-shooting fatality rate as the outcome variable, a dichotomous indicator variable for the federal ban period as the predictor variable, and year as a control variable for trend over time. We calculated the relative risk of mass shooting fatalities during the federal ban period compared to nonban periods by using the "epitab" function of the R "epitools" package. This estimate is based on the ratio of the fatality rate during the ban period divided by the fatality rate during the nonban period. All results are presented with two-sided $p$ values with a significance level of 0.05 and/or 95% confidence intervals (CI). We conducted subgroup analysis with data restricted to incidents in which an assault-type weapon was explicitly noted.

We conducted analyses to test the sensitivity of our results to the choice of denominator with linear regression models controlling

for trend with yearly rates based on (1) CDC WISQARS homicide data ending in 2016, (2) extrapolated CDC WISQARS homicide data for 2017, and (3) population denominator-based rates. We tested the robustness of our underlying modeling assumptions with an alternate mixed-effects generalized linear model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion.

The study was determined to be exempt as nonidentifiable data. The study data and analytic code are available for download at http://www.injuryepi.org/styled-2/.

## RESULTS

The three data sources listed incidents ranging in number from 51 (LA Times) to 335 (Stanford) and in dates from 1966 (Stanford) to 2018 (LA Times). There were a total of 51 reported cases of mass shootings between 1981 and 2017 confirmed by all three sources. Forty-four of these incidents met the strictest criteria for mass shootings (4 or more killed), totaling 501 all-weapon fatalities. In total 1,460 persons were injured or killed over the 37-year period, for a total case-fatality ratio of 34.3% (95% CI, 31.9–36.8). The overall rate of mass shooting fatalities per 10,000 firearm-related homicides was 10.2 (95% CI, 9.4–11.2). There was an increase in the all-weapon yearly number of mass-shooting fatalities in the United States during the study period, (Fig. 1) and evidence of a decrease in case fatality in the post-2010 period (Fig. 2). Incidents in which weapons were characterized as assault rifles accounted for 430 or 85.8% of mass-shooting fatalities (95% CI, 82.8–88.9). Weapons characterized as assault rifles accounted for *all* mass-shooting fatalities in 15 (62.5%) of the 24 (95% CI, 42.6–78.9) years for which a mass-shooting incident was reported, accounting for a total of 230 fatalities in those years.

Between 1981 and 2017, mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides, with increment in year accounting for nearly 32% of the overall variance in the data. During the years in which the AWB was in effect, this slope decreased, with an increase in the slope of yearly mass-shooting homicides in the postban period



**Figure 1.** Mass shooting deaths. United States 1981–2017.

© 2018 American Association for the Surgery of Trauma.

13

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*



**Figure 2.** Case fatality per 100 total mass-shooting injuries with loess smoothing line for trend and standard error bounds. United States 1981–2017.

(Fig. 3). A similar pattern was evident in data restricted to those incidents characterized as involving assault weapons (Fig. 4).

In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting–related deaths per 10,000 firearm homicides per year (Table 1). The model indicated that year and federal ban period alone accounted for nearly 40% of all the variation in the data (adjusted $R^2 = 0.37$). A subanalysis



**Figure 4.** Mass-shooting shooting deaths per 10,000 firearm-related homicides restricted to incidents involving assault weapons with linear trends for preban, ban, and postban periods. United States 1981–2017.

restricted to just those incidents characterized by the use of an assault weapon indicated that seven preventable deaths during the ban period were due to assault weapons alone (Table 2).

The risk of mass shooting fatalities during the federal van period was 53 per 140,515 total firearm homicides compared with 448 per 348,528 during the nonban periods, for a risk ratio of 0.30 (95% CI, 0.22–0.39). The calculated risk ratio for the association of the federal ban period with mass-shooting fatalities as a proportion of all firearm-related homicides was 0.29 (95% CI, 0.22–0.29), indicating that mass shooting fatalities were 70% less likely to occur during the federal ban period.

The results of our sensitivity analyses were consistent with our main analyses for total mass shooting fatalities. In a linear regression analysis controlling for yearly trend and restricted to the period ending in 2016 using just CDC WISQARS homicide data as the denominator, the effect of ban period was associated with a statistically significant eight fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.0; $p = 0.05$). In a similar model using extrapolated CDC WISQARS homicide data for 2017 instead of Online Gun Violence Archive data as the denominator, the effect of ban



**Figure 3.** Mass shooting deaths per 10,000 firearm-related homicides with linear trends for preban, ban, and postban periods. United States 1981–2017.

**TABLE 1.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | $t$ | $p$ |
|---|---|---|---|---|
| (Intercept) | −1409.4 | 333.0 | −4.2 | 0.0002 |
| Year | 0.7 | 0.2 | 4.3 | 0.0001 |
| Ban Period | −8.6 | 3.9 | −2.2 | 0.03 |

© *2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

**TABLE 2.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths Characterized by Use of Assault Weapon per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | t | p |
|---|---|---|---|---|
| (Intercept) | −1219.7 | 333.9 | −3.7 | 0.0009 |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.6; $p = 0.03$). A model based on the total yearly US population as the denominator, the effect of ban period was associated with a statistically significant 0.4 fewer mass shooting related deaths per 10,000,000 population (coefficient for ban period, 0.4; $p = 0.02$).

The results of a mixed-effects generalized linear Poisson model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion were very similar whether the offset variable was the number of total firearm deaths or the population size. In either case, the assault weapons ban period was associated with an approximately 85% reduction in mass shooting fatalities (Table 3).

## DISCUSSION

Recently, 75% of members of the American College of Surgeons Committee on Trauma endorsed restrictions to "civilian access to assault rifles (magazine fed, semiautomatic, i.e., AR-15),"[33] and 76% of the Board of Governors were in favor of a limit to "… civilian access to ammunition designed for military or law enforcement use (that is, armor piercing, large magazine capacity)."[34] In 2015, the American College of Surgeons joined seven of the largest most prestigious professional health organizations in the United States and the American Bar Association to call for "restricting the manufacture and sale of military-style assault weapons and large-capacity magazines for civilian use."[35] This analysis adds evidence to support these recommendations.

No observational epidemiologic study can answer the question whether the 1994 US federal assault ban was causally related to preventing mass-shooting homicides. However, this study adds to the evidence by narrowly focusing our question on the potential effect of a national assault weapon ban on mass shootings as measured through the lens of case fatality. While the data are amenable to a number of additional analyses, such as stratification by location (e.g. school vs. nonschool) or by characterization of large-capacity magazines versus non large-capacity magazine, we chose to focus only on year of occurrence and total number of fatalities. In this way, we relied on the least subjective aspects of the published reports. We believe our results support the conclusion that the ban period was associated with fewer overall mass-shooting homicides. These results are also consistent with a similar study of the effect of a 1996 ban on assault type weapons in Australia after which mass-shooting fatalities dropped to zero.[36]

While the absolute effects of our regression analyses appears modest (7 to 9 fewer deaths per 10,000 firearm-homicides),

it must be interpreted in the context of the overall number of such fatalities, which ranges from none to 60 in any given year in our data. However, if our linear regression estimate of 9 fewer mass shooting–related deaths per 10,000 homicides is correct, an assault weapons ban would have prevented 314 of the 448 or 70% of the mass shooting deaths during the nonban periods under study. Notably, this estimate is roughly consistent with our odds ratio estimate and Poisson model results.

Our results add to the documentation that mass shooting–related homicides are indeed increasing, most rapidly in the postban period, and that these incidents are frequently associated with weapons characterized as assault rifles by the language of the 1994 AWB. We did not find an increase in the case fatality ratio of mass-shooting deaths to mass-shooting injuries. This might at first seem counterintuitive and paradoxical. The destructive effect of these weapons is unequivocal. They are engineered to cause maximum tissue damage rapidly to the greatest number of targets. However, it may be that the use of these kinds of weapons results in indiscriminate injury with additional rounds more likely to injure more people increasing the denominator in a case-fatality ratio. By contrast, the use of nonassault weapons may result in more precise targeting of victims. It is also possible that improvements in trauma care are driving down case fatality.[37] Also, it is worth noting that in absolute terms, there were many more fatalities outside the ban period and that survivable injury comes with its own physical, emotional, and economic costs, which have been estimated at US $32,237 per hospital admission.[38]

Despite US federal funding restrictions on firearm-related research dating to 1996,[39,40] there is a small but growing number of analyses of mass shooting violence in the United States. Many articles have focused on the mental health aspects of these incidents,[41–43] or on social effects like increased firearm acquisition following mass shootings.[44,45] However, fewer studies have taken a strictly public health or clinical approach. Among these, an autopsy-based study of the incidence and severity of mass-shooting casualties concluded the wound patterns differed sufficiently from combat injuries to require new management strategies, indicating there is much to be learned from a systematic epidemiological perspective.[46] Recently, there have been calls to remove such funding restrictions from both academics and elected officials from across the political spectrum.[47,48]

Our choice of data and analytic approach may reasonably be debated. We chose to base our analyses on the yearly rate of mass shooting fatalities per 10,000 overall firearm homicides. This is not a population-based risk estimate, but is in fact a risk as commonly used in the epidemiologic literature which is essentially a probability statement, that is, the number of events

**TABLE 3.** Exponentiated Coefficients Generalized Linear Poisson Model

| Variable | Homicide Offset | | Population Offset | |
|---|---|---|---|---|
| | Estimate | 95% CI | Estimate | 95% CI |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

Effect of 1994–2004 federal assault weapon ban on mass-shooting death counts. United States, 1981–20017.

© 2018 American Association for the Surgery of Trauma.

15

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

that occurred over the number of times that event could occur. It is the risk of a homicide occurring as a result of a mass shooting. It may be considered a strong assumption to build mass shooting death rates based on the overall firearm homicide rate. The demographics of most homicide victims may differ appreciably from those of mass shooting victims. We selected this approach from among a number of imperfect potential denominators, believing that basing the rates on the number of firearm-homicides partly controls for secular trends in overall homicides and firearm availability. Our sensitivity analyses indicate that our results were robust to most any choice of denominator. We chose linear regression as our primary model because it was straightforward, accessible to most readers, accounted for linear trends in the data, and returned results in the metric in which we were most interested, that is, changes in the rate of fatalities. Our comparative Poisson model results were essentially consistent with the primary model.

These analyses are subject to a number of additional limitations and caveats, primary among which is that there is no authoritative source of data on mass shooting, and any one source may be biased and incomplete. It was for this reason that we chose to combine three independent sources of data, each with its own strengths and weaknesses, and base our analyses only on those numbers that were verified by all three sources. We further restricted our analyses to only the number of fatalities and the year in which the incident occurred, and to the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Even with this approach, the data remain imprecise and subject to differing definitions. We attempted to compensate for this by framing our questions as precisely as possible, following the advice of the scientist and statistician John Tukey to pursue, "… an approximate answer to the right question ...(rather) than the exact answer to the wrong question..."

In this study, we failed to falsify the hypothesis that the AWB was associated with a decrease in mass shooting fatalities in the United States. However, it is important to note that our model did not include important and potentially confounding factors like state-level and local differences in assault weapon laws following the sun downing of the federal AWB. Additional analyses including such variables and using approaches like propensity score matching and regression discontinuity[49] with data further aggregated to state and local levels are necessary to test the strength and consistency of our results.

Federally referenced denominator data were not available for the last year of the study. We chose to use data from the Online Gun Violence Archive to account for firearm homicide in 2017. This resource is a nonpartisan not-for-profit group founded and maintained by a retired computer systems analyst and gun advocate.[50] The alternative would have been to extrapolate from the CDC data, but the 15,593 firearm-related homicides reported by the Online Gun Violence Archive in 2017 was more consistent with the 14,415 reported by CDC in 2016 compared with the 11,599 predicted by an extrapolation and returned more conservative estimates of the increased rate of recent mass shootings. We note there were many years in which the number of mass-shooting fatalities is listed as zero. There were, in fact, fatalities and incidents in those years that could meet a definition of mass shooting, but they were not reported by all three sources, or did not meet the strict criteria we set for this analysis.

An assault weapon ban is not a panacea, nor do our analyses indicate that an assault weapon ban will result in fewer overall firearm-related homicides. It is important to recognize that suicides make up the majority of firearm-related deaths in the United States, accounting for 60.7% of 36,252 deaths from firearms in 2015.[51] However, while this is a critically important issue in its own right, suicides differ fundamentally from mass-shootings, and are unlikely to be affected by an assault weapons ban. Also, compared with the 501 mass-shooting fatalities we counted, there were 489,043 firearm-related homicides in the United States. Public health efforts should be directed at reducing all gun violence and must be multipronged, including targeted initiatives to address mental illness and reducing access to weapons in those with a propensity for violence. However, taken in the context of the increase in mass shootings in the United States, these results support the conclusion that the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States.

## DISCLOSURE

The authors have no conflicts of interest to declare.
There are no federal or nonfederal funding sources associated with this study.

## REFERENCES

1. Wolchover N. Why gun control is so contentious in the US. *LiveScience*. 20 July 2012 https://www.livescience.com/21741-gun-control-second-amendment.html. Accessed 10 August 2018.

2. Bond S. Students take the lead in US gun control debate. *Financial Times*. 23 February 2018. https://www.ft.com/content/9341021e-1818-11e8-9376-4a6390addb44. Accessed 10 August 2018.

3. Lemieux F. 6 things to know about mass shootings in America. *Scientific American*. 13 June 2016. https://www.scientificamerican.com/article/6-things-to-know-about-mass-shootings-in-america/. Accessed 6 June 2018.

4. Webster DW. The true effect of mass shootings on Americans. *Annals of Internal Medicine*. 16 May 2017. The http://annals.org/aim/fullarticle/2624992/true-effect-mass-shootings-americans. Accessed 6 June 2018.

5. Katsiyannis A, Whitford DK, Ennis RB. Historical examination of United States intentional mass school shootings in the 20th and 21st centuries: implications for students, schools, and society. *Child Fam Stud*. (19 April 2018). https://doi.org/10.1007/s10826-018-1096-2.

6. Follman M. Mass shootings: maybe what we need is a better mental-health policy. *Mother Jones*. 9 November 2012. https://www.motherjones.com/politics/2012/11/jared-loughner-mass-shootings-mental-illness/. Accessed 11 August 2018.

7. Carey B. "Are mass murderers insane? Usually not, researchers say". *New York Times*. 8 November 2017. https://www.nytimes.com/2017/11/08/health/mass-murderers-mental-illness.html. Accessed 11 August 2018.

8. Duwe G, Rocque M. Actually, there is a clear link between mass shootings and mental illness. *Los Angeles Times*. 23 February 2018. http://www.latimes.com/opinion/op-ed/la-oe-duwe-rocque-mass-shootings-mental-illness-20180223-story.html. Accessed 11 August 2018.

9. Gillin J, Greenberg J, Jacobson L, Valverde M. The facts on mass shootings in the United States. *Politifact*. 8 November 2017. http://www.politifact.com/truth-o-meter/article/2017/nov/08/facts-mass-shootings-united-states/. Access 6 June 2018.

10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. 5 October 2017. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed 6 June 2018.

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

11. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. *Am J Public Health*. 1997;87(2):297–298.

12. Safavi A, Rhee P, Pandit V, Kulvatunyou N, Tang A, Aziz H, Green D, O'Keeffe T, Vercruysse G, Friese RS, et al. Children are safer in states with strict firearm laws: a national inpatient sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150; discussion 150–1.

13. Koper CS, Roth JA. The impact of the 1994 Federal Assault Weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001; Vol. 17, No. 1.

14. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Applied Economics Letters*. 2015;22(4):281–284.

15. Lemieux F, Bricknell S, Prenzler T. Mass shootings in Australia and the United States, 1981-2013. *Journal of Criminological Research, Policy and Practice*, 1(3):131–142.

16. Follman M, Aronsen G, Pan D, Caldwell M. US mass shootings, 1982-2018: data from mother Jones' investigation. *Mother Jones*. 2012; https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. Accessed 3 June 2018.

17. The Los Angeles times staff. "Deadliest U.S. mass shootings", 1984-2017. *Los Angeles Times*. Oct 1, 2017, timelines latimes.com/deadliest-shooting-rampages/. Accessed 29 August 2018.

18. Stanford mass shootings in America, courtesy of the Stanford Geospatial Center and Stanford libraries. 2016. Available at: https://library.stanford.edu/projects/mass-shootings-america. Accessed 29 August 2018.

19. Fox JA, Levin J, Fridel EE. *Extreme Killing: Understanding Serial and Mass Murder*. Sage Publications; 2018.

20. Dillon L. *Mass Shootings in the U.S.: An Exploratory Study of the Trends from 1982–2012*. PhD thesis; 2014.

21. Lankford A. Public mass shooters and firearms: a cross-national study of 171 countries. *Violence Vict*. 2016;31(2):187.

22. Lowe SR, Galea S. The mental health consequences of mass shootings. *Trauma Violence Abuse*. 2017;18(1):62–82.

23. Fox JA, Fridel EE. The tenuous connections involving mass shootings, mental illness, and gun laws. *Violence Gend*. 2016;3(1):14–19.

24. Luca M, Malhotra DK, Poliquin C. The impact of mass shootings on gun policy. *Harvard Business School NOM Unit Working Paper No*. 2016;1:16–126.

25. Buchholtz LK. Command-directed mental health evaluations and mental health related discharges from the U.S. military: an argument for command authority. *J Health Care Finance*. 2016.

26. Bradley K. Code blue: the expanding field of tactical/battlefield medicine. *J Law Enforcement*. 2017;6(2).

27. Smart R. Mass shootings: definitions and trends. RAND Corporation. https://www.rand.org/research/gun-policy/analysis/supplementary/mass-shootings.html. Accessed 2 June 2018.

28. Krouse WJ, Richardson DJ. *Mass Murder with Firearms: Incidents and Victims, 1999–2013*. Washington, D.C.: Congressional Research Service, R44126 2015.

29. Centers for Disease Control and Prevention. CDC's WISQARS (web-based injury statistics query and reporting system). https://www.cdc.gov/injury/wisqars/fatal.html. Accessed 12 February 2018.

30. The online gun violence archive: past summary ledgers. http://www.gunviolencearchive.org/past-tolls. Accessed 12 February 2018.

31. Studdert DM, Donohue JJ, Mello MM. Testing the immunity of the firearm industry to tort litigation. *JAMA Intern Med*. 2017;177(1):102–105.

32. Public Safety and Recreational Firearms Act. P.L. 103-322, Title XI. 103rd Cong. (1994).

33. Kuhls DA, Campbell BT, Burke PA, Allee L, Hink A, Letton RW, Masiakos PT, Coburn M, Alvi M, Lerer TJ, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury: consensus and opportunities. *J Trauma Acute Care Surg*. 2017;82(5):877–886.

34. Puls M, Kuhls D, Campbell B, Burke P, Michelassi F, Stewart R. Survey of the American College of Surgeons Board of governors on firearm injury prevention: consensus and opportunities. *Bull Am Coll Surg*. 2017; 102(10):30–36.

35. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, Wilkerson D, Benjamin GC, Hubbard WC. Firearm-related injury and death in the U.S.: a call to action from 8 health professional organizations and the American Bar Association. *Ann Intern Med*. 2015;162(7):513–516.

36. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3): 291–299.

37. DiMaggio C, Ayoung-Chee P, Shinseki M, Wilson C, Marshall G, Lee DC, Wall S, Maulana S, Leon Pachter H, Frangos S. Traumatic injury in the U.S.: in-patient epidemiology 2000-2011. *Injury*. 2016;47(7):1393–1403.

38. Peek-Asa C, Butcher B, Cavanaugh JE. Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the U.S. *Inj Epidemiol*. 2017; 4(1):20.

39. Wexler L. "gun shy: how a lack of funds translates to inadequate research on gun violence in America". *Hopkins Bloomberg Public Health Fall*. 2017; https://magazine.jhsph.edu/2017/fall/features/cassandra-crifasi-hopkins-moderate-gun-owner-gun-policy-researcher/how-the-dickey-amendment-affects-gun-violence-research.html. Access 5 June 2018.

40. Greenberg J. Spending bill's gun research line: does it nullify dickey amendment? *Politifact*. 27 March 2018. http://www.politifact.com/truth-o-meter/article/2018/mar/27/spending-bills-gun-research-line-does-it-matter/. Accessed 6 June 2018.

41. Pinals DA, Anacker L. Mental illness and firearms: legal context and clinical approaches. *Psychiatr Clin North Am*. 2016;39(4):611–621.

42. Leiner M, De la Vega I, Johansson B. Deadly mass shootings, mental health, and policies and regulations: what we are obligated to do!. *Front Pediatr*. 2018;6:99.

43. Swartz MS, Bhattacharya S, Robertson AG, Swanson JW. Involuntary outpatient commitment and the elusive pursuit of violence prevention. *Can J Psychiatry*. 2017;62(2):102–108.

44. Studdert DM, Zhang Y, Rodden JA, Hyndman RJ, Wintemute GJ. Handgun acquisitions in California after two mass shootings. *Ann Intern Med*. 2017; 166(10):698–706.

45. Stroebe W, Leander NP, Kruglanski AW. The impact of the Orlando mass shooting on fear of victimization and gun-purchasing intentions: not what one might expect. *PLoS One*. 2017;12(8):e0182408.

46. Smith ER, Shapiro G, Sarani B. The profile of wounding in civilian public mass shooting fatalities. *J Trauma Acute Care Surg*. 2016;81(1):86–92.

47. Behrman P, Redding CA, Raja S, Newton T, Beharie N, Printz D. Society of Behavioral Medicine (SBM) position statement: restore CDC funding for firearms and gun violence prevention research. *Transl Behav Med*. 2018.

48. Wong S. "GOP chairman: congress should rethink CDC ban on gun violence research". *The Hill*. 15 February 2018 http://thehill.com/homenews/house/374149-gop-chairman-congress-should-rethink-cdc-ban-on-gun-violence-research. Accessed 5 June 2018.

49. Basu S, Meghani A, Siddiqi A. Evaluating the health impact of large-scale public policy changes: classical and novel approaches. *Annu Rev Public Health*. 2017;38:351–370.

50. Drange M. The Kentucky gun owner who developed his own count of gun violence in the US. *The Guardian*. 23 April 2016. https://www.theguardian.com/world/2016/apr/23/kentucky-gun-owner-gun-violence-archive-mark-bryant. Accessed 5 June 2018.

51. Murphy SL, Xu J, Kochanek KD, Curtin SA, Elizabeth Arias E. *National Vital Statistics Reports*. Volume 66, Number 6 November 27, 2017. Deaths: Final Data for 2015. Centers for Disease Control and Prevention.

## DISCUSSION

**Ernest E. "Gene" Moore, MD** (Denver, Colorado): Thank you, Dr. Rotondo and Dr. Reilly. Can I please have the discussion video. [sounds of a gun shooting]. Well, that is the AR15 rifle. Literally, 30 potential lethal shots delivered within 10 seconds. Is this safe to have in our society?

I congratulate Dr. DiMaggio and his colleagues from NYU for their superb presentation on a very timely issue. The AAST has had a long-term interest in reducing gun violence in the United States, and has recently published our 14-point approach. Access to assault rifles is one of them. At a reductionist level, mass shootings are the net result of (1) a deranged person intending to kill random individuals in a populated area, and (2) the use of an assault rifle. Since we seem to be unable to identify

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

the active shooter preemptively, we are left with the alternative solution of eliminating the weapon.

The presentation today provides evidence that a federal assault weapon ban can reduce mass shootings. According to our recent national trauma surgeon surveys, three-fourths of us in the audience, including me, would like to believe the analysis; but I think we need to consider some of the potential limitations.

Many of these issues relate to the fact that research support for gun violence control in the United States remains frustratingly suppressed and fundamentally inadequate. The general lack of information, low quality of data, and need to merge data sets from diverse sources – medical, coroner, police, legal, and behavioral – compounded by scarce funding and public controversy, undermine research to inform policy and enlighten the public. The fact that you had to compare three open-access databases to be certain that the reported mass shootings occurred underscores this deficiency.

Furthermore, there is no definition of a mass shooting, although you employed perhaps the most acceptable at the moment – the FBI's definition. Could you explain for us the rationale for this definition?

You present an analysis of 44 events with four or more deaths, including the shooter, from 1981 to 2017 – a 36-year period; whereas, others suggest a much higher incidence, such as Klaveras, who reported 69 shootings of six or more over the past 27 years.

Identifying all known mass shootings per year during a study period would be useful to appreciate the overall trends, as your data somewhat understates the magnitude of mass shootings in the United States.

You employed the Gun Violence Archive to estimate homicides in 2017. Why did you not use this source for mass shootings? The Archive has reported an alarming 261 mass shootings – defined as six or more shot – thus far in 2018. Nonetheless, in the sample you studied, assault rifles accounted for greater than 85 percent of the fatalities, and this is the key issue.

You have evaluated the impact of the federal assault rifle ban by analyzing the rate of mass shootings per 10,000 firearm homicide deaths per year to adjust for confounders. This would assume that the factors influencing mass shootings are the same as those for homicides, which seems very unlikely. You have idicated that you analyzed mass-shooting fatalities per population per year; perhaps you could elaborate more about this analysis.

Another confounder as acknowledged in the presentation is the impact of individual state limitations on magazine capacity. The first state to enforce these limitations was New Jersey in 1990, and now at least eight states and Washington, D.C., have these restrictions in effect. How can we distinguish the effects of this policy? And could this be a potential bridge to ultimately reestablish a national assault rifle ban?

You have also calculated the case fatality of all weapons in mass shootings per 100 total shootings, finding a decrease since 2010. While you conjecture this may be due to indiscriminate injury from assault rifles or possibly attributed to better trauma care, I am uncertain how this is relevant to the issue of banning assault rifles. The Las Vegas shooting is a cogent example of how these data may be misleading.

Finally, there is the issue of so-called falsification that could be addressed by examining other causes of trauma mortality during this time period.

In sum, this study adds to overwhelming evidence that assault rifles are an essential component in the dramatic escalation of mass shootings in the United States. While the scientific data to support a federal ban on civilian assault rifles is imperfect due to inadequate research support, I submit collectively the existing information argues strongly for enactment of this measure, and compliment the authors for their timely contribution.

**Sheldon H. Teperman, MD** (Bronx, New York): Dr. DiMaggio, your home institution, Bellevue, plays a seminal role in the trauma center safety of our nation.

In fact, right now, your trauma medical director is not present with us, but he is at home on guard for the U.N. General Assembly. But in New York, we don't see long-gun injuries. New York has the Safe Act, and there is an assault weapons ban. So why is it so important to America's trauma center – Bellevue – that we see a national ban on assault rifles?

**Charles E. Lucas, MD** (Detroit, Michigan): Thank you for your nice presentation. How many of these incidents occurred in an inner-city environment, where most of the victims that we treat have received multiple wounds which were purposely inflicted in order to compete competitively for the distribution of heroin and other drugs? Also, how many of the assailants were African-American?

**Martin A. Croce, MD** (Memphis, Tennessee): Thank you. I want to commend the authors for an excellent study, and really, not so much to ask any questions but I rise to put out a plea to the membership that this issue is a public health problem.

This is not a right versus left problem, this is not a Second Amendment problem. This is a public health problem.

And to quote Wayne Meredith at one of the recent Board meetings, "Our primary goal is to reduce the number of bullet holes in people." So I implore the Membership to correct this dearth of research that is going on about gun violence in order to promote a public health approach, so that we can reduce the number of bullet holes in people.

**Deborah A. Kuhls, MD** (Las Vegas, Nevada): And to carry on that thought, I would urge the authors to incorporate the public health data from the CDC when it is available, because part of the methodological issues for this paper is that one data set was used for a certain period of time.

But for the last year, the CDC data was not used because it was not available, so I would urge you to not only do that analysis, but I would also urge the Journal of Trauma to consider an update to that article when that is available. Thank you.

**Charles DiMaggio, MPH, PhD** (New York, New York): Thank you very much for all these comments and questions.

Dr. Moore, so with regard to your observation about the reductionist approach to looking at this particular issue, that puts me in the mind very much of the traditional epidemiologic triad of agent, host, and environment, and if you break one link in that connection, you can break the transmission. In this case, we could call assault weapons one link, whether it's agent or host, we can decide.

With regards to the rationale for the definition, I think it's reflective of the lack of research in this area.

A case definition is an essential and critical first step in any epidemiologic investigation, and you can see that we are barely there. I think the FBI definition makes sense, I think it's the oldest one, I think it's informed by expert consensus.

*© 2018 American Association for the Surgery of Trauma*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

And I think all the other definitions are based in some form on that, which is why we chose it. And I would urge that if we are going to be doing this research going forward, probably it would be best if we all had the consensus that that be the definition.

Why did we not use the Gun Violence Archive to estimate some of these results, and why are our numbers so much smaller than some of the other numbers? I have to agree, our numbers are very much an under-count.

We restricted our analysis to these three databases. And so the limiting factor was the one database. And I can tell you it was the LA Times – they had the fewest number. And if it wasn't in the LA Times, then the other databases didn't contribute to this data set.

We felt that the important aspect of this particular study was to demonstrate the relative effects, merits or associations with the assault weapon ban as opposed to documenting the absolute numbers.

So the Gun Archive, for example, defines mass shootings as four or more deaths or injuries. That really raises the number of deaths that can be included. We didn't include it, but I think going forward we absolutely should.

With regard to the analysis using population denominators, we agree, actually, that gun homicides are an imperfect denominator. We also felt that population was an imperfect denominator. And again, as we keep on circling around, it has to do with the data in this case.

We did feel that gun homicides captured something about gun availability and criminality in the United States, although homicides themselves differ very much from these mass shooting fatalities.

We do note that our population-based results essentially mirrored the gun homicide results, indicating that, at least for the relative effects and benefits of the assault weapons ban, the results are robust and invariant to the choice of denominator in this case.

Can we distinguish local effects, and could this possibly be a bridge to reestablishing an assault rifle ban? The short answer is yes and yes. We can distinguish local effects.

We took a very broad approach on this particular study as a first pass on the data. But, there are data sources (and even within the data sources we used) where you can tease out local, municipal and state policies.

Also, we can link our data to other sources that have those variables. There are statistical methods available that will not only account for those variables, but also allow us to measure or estimate in some way the contribution of local or regional variation in these policies to the overall effectiveness.

The issue of the case fatality rate is very interesting and challenging. I want to note that there was a paper in JAMA on September 11th – just a couple of weeks ago – looking at mass shooter fatalities, that came essentially to the same conclusion – that there has been this recent decrease.

In our paper, in this write-up, we look at three potential explanations, and one of them is, first of all, it's just a matter of denominator. These are indiscriminate weapons.

You have someone shooting at a large group of people, and there are going to be more injuries and more casualties, and it just inflates the denominator in this case.

The second thing is, the obverse of that, is single-fire weapons, guns, are very personal weapons. They're usually characterized by someone who knows who they want to kill. And finally, we feel that perhaps there may be some improvement by the folks in this room in treating these.

I'm going to close at this point, given the time constraints.

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT H

JMIR PUBLIC HEALTH AND SURVEILLANCE

Original Paper

# Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis

Lori Post[1], PhD; Maryann Mason[1], PhD; Lauren Nadya Singh[1], MPH; Nicholas P Wleklinski[2], MD; Charles B Moss[3], PhD; Hassan Mohammad[1]; Tariq Z Issa[2], BA; Adesuwa I Akhetuamhen[2], MD; Cynthia A Brandt[4], MD, MPH; Sarah B Welch[1], MPH; James Francis Oehmke[1], PhD

[1]Buehler Center for Health Policy and Economics, Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[2]Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[3]Institute of Food and Agricultural Sciences, University of Florida, Gainsville, FL, United States
[4]Yale Center for Medical Informatics, Yale School of Medicine, Yale University, New Haven, CT, United States

**Corresponding Author:**
Lori Post, PhD
Buehler Center for Health Policy and Economics
Feinberg School of Medicine
Northwestern University
420 E Superior
Chicago, IL, 60611
United States
Phone: 1 203 980 7107
Email: lori.post@northwestern.edu

## Abstract

**Background:** Public mass shootings are a significant public health problem that require ongoing systematic surveillance to test and inform policies that combat gun injuries. Although there is widespread agreement that something needs to be done to stop public mass shootings, opinions on exactly which policies that entails vary, such as the prohibition of assault weapons and large-capacity magazines.

**Objective:** The aim of this study was to determine if the Federal Assault Weapons Ban (FAWB) (1994-2004) reduced the number of public mass shootings while it was in place.

**Methods:** We extracted public mass shooting surveillance data from the Violence Project that matched our inclusion criteria of 4 or more fatalities in a public space during a single event. We performed regression discontinuity analysis, taking advantage of the imposition of the FAWB, which included a prohibition on large-capacity magazines in addition to assault weapons. We estimated a regression model of the 5-year moving average number of public mass shootings per year for the period of 1966 to 2019 controlling for population growth and homicides in general, introduced regression discontinuities in the intercept and a time trend for years coincident with the federal legislation (ie, 1994-2004), and also allowed for a differential effect of the homicide rate during this period. We introduced a second set of trend and intercept discontinuities for post-FAWB years to capture the effects of termination of the policy. We used the regression results to predict what would have happened from 1995 to 2019 had there been no FAWB and also to project what would have happened from 2005 onward had it remained in place.

**Results:** The FAWB resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries. We estimate that the FAWB prevented 11 public mass shootings during the decade the ban was in place. A continuation of the FAWB would have prevented 30 public mass shootings that killed 339 people and injured an additional 1139 people.

**Conclusions:** This study demonstrates the utility of public health surveillance on gun violence. Surveillance informs policy on whether a ban on assault weapons and large-capacity magazines reduces public mass shootings. As society searches for effective policies to prevent the next mass shooting, we must consider the overwhelming evidence that bans on assault weapons and/or large-capacity magazines work.

*(JMIR Public Health Surveill 2021;7(4):e26042)* doi: 10.2196/26042



JA4441

JMIR PUBLIC HEALTH AND SURVEILLANCE                                    Post et al

**KEYWORDS**

firearm surveillance; assault weapons ban; large-capacity magazines; guns control policy; mass shootings; regression lines of discontinuity

## Introduction

### Background

Approximately 44,000 people are killed and an additional 100,000 people are injured by a gun each year in the United States [1,2]. Mass shooting fatalities, as a particular type of gun injury event, account for <1% of all gun deaths [3] and have largely been ignored until recently [4,5]; yet, mass shooting events occur multiple times per year [6]. This information is based on insights from firearm surveillance performed by a variety of researchers, and state and federal agencies on incidence, prevalence, risk factors, injuries, deaths, and precipitating factors, similar to the surveillance of infectious diseases such as COVID-19 [7-21]. Teutch and Thacker [22] defined public health surveillance as

> *the ongoing systematic collection, analysis, and interpretation of health data, essential to the planning, implementation, and evaluation of public health practice, closely integrated to the dissemination of these data to those who need to know and linked to prevention and control.*

Not only do surveillance systems generate hypotheses to test but they also provide the data to test them.

The Federal Assault Weapons Ban (FAWB, also known as the Public Safety and Recreational Firearms Use Protection Act) included a ban on the manufacture for civilian use or sale of certain semiautomatic firearms defined as assault weapons as well as certain large-capacity magazines (LCMs). The Act was in effect for 10 years from 1994 until it sunsetted in 2004. Semiautomatic weapons (rapid fire) and assault weapons (second grip plus other features) are distinct; however, the two are often incorrectly conflated as similar [23-26]. Semiautomatic weapons are defined as weapons that automatically load another cartridge into a chamber, preparing the weapon for firing, but requiring the shooter to manually release and press the trigger for each round [23-26]. By contrast, automatic weapons are similarly self-loading, but allow for a shooter to hold the trigger for continuous fire [27]. Furthermore, the FAWB also prohibited certain ammunition magazines that were defined as "large-capacity" cartridges [28] containing more than 10 bullets [29]. These LCMs can feed ammunition to semiautomatic weapons that do not meet the criteria of being considered assault weapons. Furthermore, LCMs are considered one of the most important features of the FAWB as research has found a relationship between bans on LCMs and casualty counts at the state level [30-34]. The 10-year federal ban was signed into law by President Clinton on September 13, 1994 [28].

Firearm surveillance data have been used to test potential policy responses to prevent mass shootings, including the FAWB [32,34-39], Extreme Risk Protection Orders (also known as red flag laws) [40-45], and federal and state LCM bans [31,32,46]. In particular, it seems likely that the FAWB and LCM bans have potential to affect mass shootings because they regulate weapons and ammunition formats that are designed to enable rapid discharge, which is a key feature in mass shooting incidents [24,47]. Other types of gun deaths may not be responsive to the FAWB or LCM bans. As an example, Extreme Risk Protection Orders or "Red Flag" orders [43,48], which temporarily prohibit at-risk individuals from owning or purchasing firearms, may be effective for preventing firearm suicides or domestic violence homicides [49] but less effective for public mass shooters [50,51]. The prohibition of LCMs may have no impact on firearm suicide because suicide decedents only require one bullet to kill themselves [52].

Several studies during and after the FAWB attempted to determine if gun policy that restricts the production and sale of assault weapons and LCMs decreased gun deaths [53,54]. These initial studies make meaningful contributions to the literature because they describe what constitutes assault weapons, magazine capacity, ballistics, and loopholes in the FAWB legislation [3,53-57]. However, these studies have found little to no evidence that these policies have had any overall effect on firearm homicides, gun lethality, or overall crime [58-61]. Since deaths from public mass shootings comprise less than 1% of all homicides based on our definition, testing whether or not the FAWB/LCM ban has an impact on homicide would wash out the effect. Since the FAWB/LCM ban may be effective at specific types of gun deaths, sampling must be limited to specific types of shooters over overall gun deaths or tests for lethality [62,63]. Finally, the variation in research findings is related to differences in research design, sampling frame, and case definition of a public mass shooting [3,53-56,64,65].

Our study differs from other studies that evaluated the efficacy of the FAWB because we used economic methods and a different outcome variable. Specifically, we focused on whether the FAWB resulted in fewer public mass shooting "events," whereas other studies evaluated the number of gun injuries and deaths that occurred during the course of a mass shooting.

### Objective

The aim of this study was to test whether curbing *access to certain types of guns and magazines* will decrease mass shooting *events*. We sought to empirically answer if there was a relationship between the FAWB and a reduction in mass shooting events.

## Methods

### Data Source

We created a firearm surveillance system based on the National Institute of Justice–funded Violence Project dataset, which culled mass shooting events from 1966 to 2019 [6]. Consistent with earlier studies, we rely on the original Federal Bureau of Investigation (FBI) definition of a massacre, specifically where 4 or more people are killed within a single timeframe. We differentiate our mass shootings from others in that our inclusion criteria require the shootings to have occurred in a public setting.



We adapted this definition to only include massacres that involved gun deaths of 4 or more victims to isolate a particular type of mass shooter [66]. Many firearm surveillance systems that include mass shootings use a lower threshold of persons shot and many do not include deaths. An FBI report on active shooters in mass shooting events identified planning and preparation behaviors that are central to prevention [67]. This more narrow definition isolates premeditation, whereas broader definitions may include shooters that are more reactive [68]. Our case definition does not include family annihilators or felony killers because *familicides are defined by the victim-offender relationship, public massacres are defined by location, and felony killings are distinguished by motive* [69]. This differentiation is consistent with other mass shooting studies [70-72].

We examined the annual number of public mass shootings occurring between 1966 and 2019 that resulted in 4 or more fatalities. The hypothesis was that the FAWB reduced the number of public mass shootings per year during the period of the ban. We used regression discontinuity analysis to test the hypothesis. Regression discontinuity analysis is a standard economist tool used in policy analysis taking advantage of quasi-experimental designs [65,73].

**Analyses**

Regression discontinuity analysis allows for discontinuities or shifts in both the intercept and the slope of the trend line at both the onset and sunset of the FAWB. That is, we introduced intercept shift parameters in 1995 and 2005, and trend shift parameters for the periods 1995-2004 and 2005-2019. A statistically significant shift in a parameter indicates a discontinuity (ie, a finding that the FAWB had a statistically significant effect on the number of public mass shootings). We tested for statistical significance of the intercept and trend shift parameters both independently and jointly. All statistical inference was based on a significance level set at .05. We used the Huber-White robust residuals, which attenuate problems of autocorrelation, heteroscedasticity, and some types of model misspecification [74].

We then used the estimated model for two types of counterfactual analysis. First, we used the model to predict the number of public mass shootings that would have occurred had the FAWB not been in place. The difference between this counterfactual prediction and the modeled number of incidents with the FAWB in place provided an estimate of the number of public mass shootings that the FAWB prevented.

Second, we projected forward the number of public mass shootings that would have occurred had the FAWB been permanent (ie, continued from 2004 through to the end of the sample period). We note that in some sense, this is an "out of sample" exercise because even though the sample extends to 2019, the FAWB ended in 2004; thus, this exercise would not pick up events in the past 15 years that would have augmented or compromised the effects of the FAWB. The difference between the modeled number of public mass shootings and the projected counterfactual number of public mass shootings could provide an estimate of the number of public mass shootings that the FAWB prevented.

We performed a regression of the 5-year moving average of public mass shootings on the US population in millions, the homicide rate, and discontinuity variables to capture both the effects of the FAWB and its discontinuation. We did not introduce a trend line for the entire sample period because it is highly collinear with the population variable. For the period of the FAWB's implementation, we originally introduced an intercept shift, time trend, and shift in the homicide rate; for the post-FAWB period, we introduced an intercept shift and a time trend. Due to collinearity, we retained only the trend shift in the final model for the FAWB period; for the post-FAWB period, we retained both the intercept and the trend shift.

## Results

We identified a total of 170 public mass shooting events, the primary outcome variable, with 4 or more fatalities between 1966 and 2019. The 5-year cumulative number of public mass shootings is shown in Figure 1, providing a visualization of the impacts of the FAWB on the number of shootings. The first mass shooting occurred in 1966; hence, the first data point for the cumulative number of shootings over the previous 5 years occurs in 1970. For 1966 and 1967, the cumulative number of public mass shootings was 3. This number then increased to 12 in 1993 and declined to 3 in 2004. After 2004, the cumulative number of public mass shootings increased to 81 in 2019. The last year of the ban, 2004, experienced the fewest public mass shootings through 2019.

The regression results showed excellent explanatory power ($R^2$=0.94). The coefficient on population was positive and statistically significant (.044, $P$<.001). This coefficient means that for every increase in population of 1 million people, there are an additional .044 public mass shooting events per year. The coefficient on the homicide rate was negative and statistically significant (–.249, $P$=.01). The coefficient on the time trend for the FAWB period captures the effect of the FAWB; this coefficient was negative and statistically significant (–.187, $P$=.001). Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. The intercept discontinuity for 2005-2019 was negative and statistically significant (–2.232, $P$=.001), and the trend coefficient was positive and statistically significant (.081, $P$=.001).

XSL·FO
RenderX

**Figure 1.** Public mass shooting trend line using five year moving averages (1966-2019).



These results are graphed in Figure 2 in which the black stars represent the actual data and the green line represents the predicted numbers of public mass shootings from the regression discontinuity model. A bending of the trend during the FAWB period to become downward sloping at the end of the period is apparent, as is the return of the upward trajectory upon expiration of the FAWB. The red squares represent the projected numbers of public mass shootings during the FAWB period had there been no FAWB. The difference between the red squares

and the green lines represents the predicted number of public mass shootings averted by the FAWB. The model predicts that 11 public mass shootings were averted over the period of 1995-2004.

The blue diamonds represent the projected effects of a continuation of the FAWB through 2019 based on the observed trend from 1995 to 2004. This projection indicates that 30 public mass shootings would have been prevented from 2005 to 2019 had the FAWB been left in place.

**Figure 2.** Regression lines from discontinuity analysis of the federal assault weapons ban (1994-2004).





JA4444

## Discussion

### Principal Findings

In total, 1225 people were killed in a mass shooting over the past 53 years with more than half occurring in the last decade, a function of increases in mass shootings and weapon lethality [62,63,75]. Public mass shooting fatalities and injuries far outpace population growth [75]. Between 1966 and 2019, the US population increased by 67% [76], whereas public mass shooting deaths increased by over 5-fold. The rise in public mass shootings throughout the sample period is in fact partially a function of population growth and homicide rate, along with the effects of the FAWB and its removal. An increase in the US population of 1 million people was associated with an increase of .040 (*P*<.005) public mass shootings per year. During the post-FAWB period, the increase in population from approximately 300 million in 2005 to 330 million in 2019 should be associated with an increase of 1.2 public mass shootings per year, compared to the actual increase of 4 public mass shootings per year in the data (5-year moving average). After controlling for population growth and homicide rate, a positive and statistically significant coefficient (.081, *P*=.001) on the 2005-2018 trend was seen. This further indicates a separate, nonpopulation trend of increasing violence operating during the post-FAWB period. The negative coefficient on the homicide rate invalidates the hypothesis that decreases in the numbers of public mass shootings are simply reflections of an overall decreasing homicide rate. The negative intercept discontinuity is consistent with an effect of the FAWB that persists somewhat beyond the immediate end of the ban. The positive trend coefficient is consistent with the hypothesis that the FAWB was associated with a decrease in the number of public mass shootings, as the expiration of the FAWB was associated with a shift from a downward trend to an upward trend in the number of public mass shootings per year.

The most striking finding from this study is that there was a reduction in the number of public mass shooting events while the FAWB was in place. Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. By projecting what would have happened if the FAWB remained in place, we found that there would have been significantly fewer public mass shootings if the FAWB had remained in place to 2019. Remarkably, although it is intuitive that the removal of assault weapons and magazine clips will reduce the lethality of a mass shooting, we observed an inverse relationship between weapons/ammunition and mass shooting events, meaning that mass shooters may be less likely to perpetrate a mass shooting without rapid fire military-style weapons. This is an independent effect, which indirectly leads to fewer injuries and deaths. DiMaggio et al [64] also found evidence of a decrease in public mass shootings during the ban; however, their study period was shorter and was restricted to 51 public mass shootings. Unlike our study, they implicitly modeled public mass shootings as a random instance of general gun homicides that had a high death count [64]. In contrast, our findings suggest that public mass shootings are a unique type of premeditated gun violence. We found that prior to enactment of the FAWB, the rate of public

mass shootings was increasing. During enactment of the FAWB, there was a downward trend of mass shooting events. After the FAWB was lifted, public mass shootings increased dramatically. Firearm homicides in general follow no such patterns.

This effect was not found in the work of Koper, Roth, and colleagues [53-55]; however, their inclusion of all gun homicides masks the ban's effect on mass shootings. Even though Peterson and Densley's [77] work focused on perpetrator histories and not the FAWB, their findings that ease of gun access is characteristic of public mass shooters further supports our study. We restricted the inclusion criteria to public mass shootings to specifically test the effectiveness of the FAWB on public mass shooting events.

Regardless of the FAWB, bringing a semiautomatic rifle with high magazine capacity to a massacre significantly increases the number of fatalities and injuries. The increase in deaths is a function of rapid fire and increased ballistic energy. The increase in injuries is also a function of rapid fire and high-capacity magazines, enabling the shooter to shoot more people in crowded venues quickly before the crowd can disperse or hide. When controlling for the FAWB, the use of assault rifles decreased by half during implementation of the ban and tripled after the ban was lifted. This is a particularly important finding given that the FAWB had loopholes and that overall violent crime is decreasing [78]. First, all people with an assault weapon prior to the FAWB were allowed to retain their semiautomatic weapons [54,64]. Second, without a buyback program, semiautomatic weapons remained in the community [54,64]. Third, the ban did not target some military assault-like weapons [54,64]. Finally, a major loophole found in gun control legislation is that buyers can bypass background checks by purchasing their weapons and ammunition from gun shows, through illegal purchasing, or legally purchasing their guns and ammunition from another gun owner [57,63,79-87]. Even with these loopholes and issues, there was still a significant reduction in public mass shootings during the FAWB. These loopholes indicate that most people who purchase assault weapons do not become mass shooters; however, mass shooters require assault weapons and LCMs to carry out a mass shooting. Ban effectiveness might have improved if all assault weapons were included in the FAWB.

Some recent studies have specifically analyzed the effects of LCM bans on the incidence of public mass shootings. In a review of state legislation, Webster et al [88] found that bans of LCMs were associated with a significant reduction in the incidence of fatal public mass shootings. This study shows that the FAWB, which included a ban on LCMs, was associated with fewer fatalities and injuries during mass shootings in addition to fewer public mass shooting events. Koper et al [27] previously reported that 19% of public mass shootings resulting in 4 or more fatalities included the use of LCMs, while only 10% involved an assault weapon. Klarevas et al [29] found a similar pattern in shootings of 6 or more people, in which 67% of shooters utilized LCMs, whereas only 26% utilized an assault weapon. Because our study only looked at effects of the FAWB, which included an LCM ban, we were only able to determine the combined effects of limiting assault weapons and LCMs. To be clear, the reduction in the number of public mass



JMIR PUBLIC HEALTH AND SURVEILLANCE                                                    Post et al

shootings, and resulting fatalities and injuries, may be a function of the ban on assault weapons, assault weapons plus LCMs, or only LCMs. We cannot separate out their independent effects at the national level.

Unlike our study, Webster et al [88] did not evaluate the incidence of assault weapons used in public mass shootings. Rather, they focused on fatalities from public mass shootings vs public mass shooting events. Although Webster et al [88] utilized the FBI Supplemental Homicide Report as their dataset, which is a voluntary reporting measurement system prone to errors in reporting, their findings are applicable to our analysis.

## Limitations

Although we found statistically significant decreases during the FAWB, we cannot isolate aspects of the policy that are attributed to the decline. Most notably, the FAWB also included LCMs during the ban. It may be that the type of gun and/or the type of magazine resulted in a decline. Indeed, assault weapons and LCMs provide the means to carry out a mass shooting; however, there are likely other factors beyond this study that partially explain the radical increase in public mass shootings in the post-FAWB period. For example, the FAWB was in place from 1994 to 2004, which is the same time period that the US population largely adopted the internet, along with associated social communication software and websites. This may have

resulted in better tracking of public mass shootings or increased media coverage. Because our study specifically targeted the federal legislation, we omitted state-level gun policies such as state-level prohibitions on certain types of guns, LCMs, or more lethal types of bullets. It is likely that the internet serves as a contagion and as a guide to potential mass shooters, allowing them to access weapons and multiple stories about other mass shooters [62,67,89,90].

## Conclusions

In summary, public mass shootings are a unique and specific type of homicide by a gun. We found evidence that public mass shootings are qualitatively different from general homicides because after the FAWB expired, mass shooting events increased while general homicides decreased. The increase in public mass shootings was more dramatic in the final 10 years of the study period following the end of the FAWB. We suspect that these outcomes may be improved by removing existing semiautomatic weapons with large bullet capacity by creating a buyback program for all rapid-firing weapons. Moreover, the legislation would be strengthened if it closed loopholes that allow gun buyers to get around the background check legislation and other purchase prohibitions by exempting gun shows and internet or person-to-person purchases, which were exempted from the FAWB and LCM ban [87].

## Acknowledgments

The Violence Project Mass Shooter database generated data for our surveillance. This study was financially supported by the Buehler Endowment at Feinberg School of Medicine.

## Conflicts of Interest

None declared.

## References

1. Web-based Injury Statistics Query and Reporting System. Centers for Disease Control and Prevention, Injury Prevention and Control. 2020 Jul 01. URL: https://www.cdc.gov/injury/wisqars/index.html [accessed 2021-01-15]
2. Christensen AJ, Cunningham R, Delamater A, Hamilton N. Introduction to the special issue on gun violence: addressing a critical public health challenge. J Behav Med 2019 Aug;42(4):581-583. [doi: 10.1007/s10865-019-00075-8] [Medline: 31367923]
3. Drake B. Mass shootings rivet national attention, but are a small share of gun violence. Pew Research Center. 2013 Sep 17. URL: https://www.pewresearch.org/fact-tank/2013/09/17/mass-shootings-rivet-national-attention-but-are-a-small-share-of-gun-violence/ [accessed 2020-12-10]
4. Bowers TG, Holmes ES, Rhom A. The nature of mass murder and autogenic massacre. J Police Crim Psych 2009 Nov 7;25(2):59-66. [doi: 10.1007/s11896-009-9059-6]
5. Delisi M, Scherer AM. Multiple homicide offenders. Crim Justice Behav 2016 Jun 30;33(3):367-391. [doi: 10.1177/0093854806286193]
6. Mass shooter database. The Violence Project. 2020. URL: https://www.theviolenceproject.org/ [accessed 2021-01-14]
7. Shelby D. Association between adult alcohol misuse, adult mental health, and firearm storage practices in households with children: findings from the Behavioral Risk Factor Surveillance System (BRFSS). MPH Thesis. ScholarWorks @ Georgia State University. 2021 Dec 09. URL: https://scholarworks.gsu.edu/iph_theses/725 [accessed 2021-01-08]
8. Loder R, Mishra A, Atoa B, Young A. Spinal injury associated with firearm use. Cureus 2021 Mar 16;13(3):e13918 [FREE Full text] [doi: 10.7759/cureus.13918]
9. Mueller KL, Trolard A, Moran V, Landman JM, Foraker R. Positioning public health surveillance for observational studies and clinical trials: The St. Louis region-wide hospital-based violence intervention program data repository. Contemp Clin Trials Commun 2021 Mar;21:100683 [FREE Full text] [doi: 10.1016/j.conctc.2020.100683] [Medline: 33385095]



JA4446

10.  Horn DL, Butler EK, Stahl JL, Rowhani-Rahbar A, Littman AJ. A multi-state evaluation of the association between mental health and firearm storage practices. Prev Med 2021 Apr;145:106389. [doi: 10.1016/j.ypmed.2020.106389] [Medline: 33385422]

11.  Gunn JF, Boxer P. Gun laws and youth gun carrying: results from the youth risk behavior surveillance system, 2005-2017. J Youth Adolesc 2021 Mar;50(3):446-458. [doi: 10.1007/s10964-020-01384-x] [Medline: 33420890]

12.  Rozel J, Soliman L, Jain A. The gun talk: how to have effective conversations with patients and families about firearm injury prevention. In: Zun LS, Nordstrom K, Wilson MP, editors. Behavioral Emergencies for Healthcare Providers. Switzerland: Springer; Jan 05, 2021:465-473.

13.  Keyes KM, Kandula S, Olfson M, Gould MS, Martínez-Alés G, Rutherford C, et al. Suicide and the agent–host–environment triad: leveraging surveillance sources to inform prevention. Psychol Med 2021 Mar 05;51(4):529-537. [doi: 10.1017/s003329172000536x]

14.  Bluestein G, Hallerman T. Future directions for firearm injury intervention, policy, and research. In: Lee LK, Fleeger EW, editors. Pediatric Firearm Injuries and Fatalities: The Clinician's Guide to Policies and Approaches to Firearm Harm Prevention. Switzerland: Springer; Feb 06, 2021:223-234.

15.  Oehmke J, Moss C, Singh L, Oehmke T, Post L. Dynamic panel surveillance of COVID-19 transmission in the United States to inform health policy: observational statistical study. J Med Internet Res 2020 Oct 05;22(10):e21955 [FREE Full text] [doi: 10.2196/21955] [Medline: 32924962]

16.  Oehmke J, Oehmke T, Singh L, Post L. Dynamic panel estimate-based health surveillance of SARS-CoV-2 infection rates to inform public health policy: model development and validation. J Med Internet Res 2020 Sep 22;22(9):e20924 [FREE Full text] [doi: 10.2196/20924] [Medline: 32915762]

17.  Post L, Benishay E, Moss C, Murphy R, Achenbach C, Ison M, et al. Surveillance metrics of SARS-CoV-2 transmission in central Asia: longitudinal trend analysis. J Med Internet Res 2021 Feb 03;23(2):e25799 [FREE Full text] [doi: 10.2196/25799] [Medline: 33475513]

18.  Post LA, Issa TZ, Boctor MJ, Moss CB, Murphy RL, Ison MG, et al. Dynamic public health surveillance to track and mitigate the US COVID-19 epidemic: longitudinal trend analysis study. J Med Internet Res 2020 Dec 03;22(12):e24286 [FREE Full text] [doi: 10.2196/24286] [Medline: 33216726]

19.  Post LA, Lin JS, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 wave two surveillance in East Asia and the Pacific: longitudinal trend analysis. J Med Internet Res 2021 Feb 01;23(2):e25454 [FREE Full text] [doi: 10.2196/25454] [Medline: 33464207]

20.  Post L, Marogi E, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 surveillance in the Middle East and North Africa: longitudinal trend analysis. J Med Internet Res 2021 Jan 15;23(1):e25830 [FREE Full text] [doi: 10.2196/25830] [Medline: 33302252]

21.  Post LA, Argaw ST, Jones C, Moss CB, Resnick D, Singh LN, et al. A SARS-CoV-2 surveillance system in Sub-Saharan Africa: modeling study for persistence and transmission to inform policy. J Med Internet Res 2020 Nov 19;22(11):e24248 [FREE Full text] [doi: 10.2196/24248] [Medline: 33211026]

22.  Teutsch S, Thacker S. Planning a public health surveillance system. Epidemiol Bull 1995 Mar;16(1):1-6. [Medline: 7794696]

23.  Jacobs J, Fuhr Z. The Safe Act: New York's ban on assault weapons and large capacity magazines. Crim Law Bull 2017 Jun 29;53(1):4 [FREE Full text]

24.  Wallace EG. Assault weapon myths. South Ill Univ Law J 2018 Nov 18;43:193. [doi: 10.4135/9781452229300.n127]

25.  Kopel D, Lowy J, Rostron A. Heller and "Assault Weapons". Campbell Law Rev 2018 Feb 02;40(2):461-480 [FREE Full text]

26.  Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 29;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

27.  Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. J Urban Health 2018 Jun;95(3):313-321 [FREE Full text] [doi: 10.1007/s11524-017-0205-7] [Medline: 28971349]

28.  United States Congress House Committee on the Judiciary. Subcommittee on Crime and Criminal Justice. Public Safety and Recreational Firearms Use Protection Act. In: Hearing before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, second session, on H.R. 3527. Washington, DC: US Government; Apr 25, 1994.

29.  Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990–2017. Am J Public Health 2019 Dec;109(12):1754-1761. [doi: 10.2105/ajph.2019.305311]

30.  Kleck G. Large-capacity magazines and the casualty counts in mass shootings. Justice Res Policy 2016 Jun 01;17(1):28-47. [doi: 10.1177/1525107116674926]

31.  Abbasi J. Large-capacity magazine bans linked with fewer mass shootings, deaths. JAMA 2020 Jan 14;323(2):108-109. [doi: 10.1001/jama.2019.20457] [Medline: 31851333]

32.  Koper CS. Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high‐capacity semiautomatic firearms. Criminol Public Policy 2020 Jan 10;19(1):147-170. [doi: 10.1111/1745-9133.12485]



JA4447

33.  Towers S, Wallace D, Hemenway D. Temporal trends in public mass shootings: high-capacity magazines significantly increase fatality counts, and are becoming more prevalent. medRxiv preprint server. 2019 Dec 15. URL: https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 [accessed 2021-04-17]

34.  Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

35.  Lowy J. Comments on assault weapons, the right to arms, and the right to live. Harv J Law Public Policy 2020;43(2):375-386 [FREE Full text]

36.  Kim A. United States gun policy and the effect on mass shootings. California State University Northridge Scholarworks Open Access Repository. Northridge, CA: CSU Northridge University Library; 2020 Aug 25. URL: http://hdl.handle.net/10211.3/217278 [accessed 2020-12-06]

37.  Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 26;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

38.  Balakrishna M, Wilbur KC. How the Massachusetts Assault Weapons Ban Enforcement Notice changed firearm sales. SSRN J 2021 Feb 4:1-51 [FREE Full text] [doi: 10.2139/ssrn.3779510]

39.  Soto L, Chheda S, Soto J. Reducing fatalities in mass attacks and the related matter of gun control policy following the El Paso August 2019 shooting. Tex Hisp J Law Policy 2020;26:85.

40.  Nagin DS, Koper CS, Lum C. Policy recommendations for countering mass shootings in the United States. Criminol Public Policy 2020 Jan 10;19(1):9-15. [doi: 10.1111/1745-9133.12484]

41.  Gay C. 'Red Flag' laws: how law enforcement's controversial new tool to reduce mass shootings fits within current Second Amendment jurisprudence. Boston Coll Law Rev 2020 Apr 30;61(4):1491-1533 [FREE Full text]

42.  Nielsen D. Disarming dangerous persons: how Connecticut's Red Flag Law saves lives without jeopardizing constitutional protections. Quinnipiac Health Law J 2020;23(2):253.

43.  Blocher J, Charles J. Firearms, extreme risk, and legal design: "Red Flag" laws and due process. Virginia Law Rev 2020 Oct 19;106(6):1285.

44.  Kopel DB. Red Flag Laws: proceed with caution. Law Psychol Rev 2020 Jul 16:forthcoming [FREE Full text] [doi: 10.2139/ssrn.3653555]

45.  Blodgett S. Dementia, guns, Red Flag laws: Can Indiana's Statute balance elders' constitutional rights and public safety? NAELA J 2020 Sep;16:1-22 [FREE Full text]

46.  Kerr S. "What We Need Is Bullet Control": could regulation of bullets reduce mass shootings? In: Crews G, editor. Handbook of Research on Mass Shootings and Multiple Victim Violence. Hershey, PA: IGI Global; Oct 2019:432-446.

47.  Moore EE. Another mass shooting: Time to ban the assault rifle. J Trauma Acute Care Surg 2018 Jun;84(6):1036. [doi: 10.1097/TA.0000000000001863] [Medline: 29799817]

48.  Delaney GA, Charles JD. A double-filter provision for expanded Red Flag laws: a proposal for balancing rights and risks in preventing gun violence. J Law Med Ethics 2020 Dec;48(4_suppl):126-132. [doi: 10.1177/1073110520979412] [Medline: 33404308]

49.  Honberg RS. Mental illness and gun violence: research and policy options. J Law Med Ethics 2020 Dec;48(4_suppl):137-141. [doi: 10.1177/1073110520979414] [Medline: 33404306]

50.  Laqueur HS, Wintemute GJ. Identifying high‐risk firearm owners to prevent mass violence. Criminol Public Policy 2019 Dec 16;19(1):109-127. [doi: 10.1111/1745-9133.12477]

51.  Pallin R, Schleimer JP, Pear VA, Wintemute GJ. Assessment of extreme risk protection order use in California from 2016 to 2019. JAMA Netw Open 2020 Jun 01;3(6):e207735 [FREE Full text] [doi: 10.1001/jamanetworkopen.2020.7735] [Medline: 32556258]

52.  Hurka S, Knill C. Does regulation matter? A cross‐national analysis of the impact of gun policies on homicide and suicide rates. Regul Gov 2018 Dec 21;14(4):787-803. [doi: 10.1111/rego.12235]

53.  Koper C, Roth J. The impact of the 1994 Federal Assault Weapon Ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. J Quant Criminol 2001 Mar;17(1):33-74.

54.  Koper C, Woods D, Roth J. Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003. Report to the National Institute of Justice, United States Department of Justice. 2004 Jul. URL: https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf [accessed 2020-12-11]

55.  Roth J, Koper C, Adams W, Johnson S, Marcotte J, McGready J, et al. Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report. Urban Institute. Washington, DC: The Urban Institute; 1997 Mar 13. URL: https://www.urban.org/research/publication/impact-evaluation-public-safety-and-recreational-firearms-use-protection-act-1994/view/full_report [accessed 2021-02-10]

56.  Webster D, Vernick J, McGinty E, Alcorn T. Regulating Gun Sales: An Excerpt from Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press; 2013.

57.  Jacobs J. Can Gun Control Work? (Studies in Crime and Public Policy). Oxford: Oxford University Press; Oct 14, 2004.



JA4448

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                    Post et al

58.   Lee LK, Fleegler EW, Farrell C, Avakame E, Srinivasan S, Hemenway D, et al. Firearm laws and firearm homicides: a
      systematic review. JAMA Intern Med 2017 Jan 01;177(1):106-119. [doi: 10.1001/jamainternmed.2016.7051] [Medline:
      27842178]

59.   Gius M. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates.
      Appl Econ Lett 2013 Nov 26;21(4):265-267. [doi: 10.1080/13504851.2013.854294]

60.   Cook P, Goss K. The Gun Debate: What Everyone Needs to Know. New York: Oxford University Press; May 01, 2014.

61.   Cook P, Goss K. The Gun Debate: What Everyone Needs to Know, 2nd Edition. New York: Oxford University Press; Apr
      16, 2020.

62.   Lankford A, Silver J. Why have public mass shootings become more deadly? Criminol Public Policy 2019 Dec 16;19(1):37-60.
      [doi: 10.1111/1745-9133.12472]

63.   Schiff M. IZA Discussion Paper 12784: Greater US gun ownership, lethality and murder rates: analysis and policy proposals.
      IZA Institute of Labor Economics. 2019 Nov 27. URL: https://www.iza.org/publications/dp/12784/
      greater-us-gun-ownership-lethality-and-murder-rates-analysis-and-policy-proposals [accessed 2021-04-17]

64.   DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated
      with the 1994–2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019
      Jan;86(1):11-19. [doi: 10.1097/ta.0000000000002060]

65.   World Telecommunication/ICT Indicators Database 2020 (24th Edition). International Telecommunications Union. Geneva:
      International Telecommunications Union; 2021 Jan. URL: https://www.itu.int/en/ITU-D/Statistics/Pages/publications/wtid.
      aspx [accessed 2021-04-17]

66.   Lopez G. America's unique gun violence problem, explained in 17 maps and charts. Vox. 2021 Mar 23. URL: https://www.
      vox.com/policy-and-politics/2017/10/2/16399418/boulder-colorado-mass-shooting-gun-violence-statistics-charts [accessed
      2021-03-29]

67.   Silver J, Simons A, Craun S. A study of the pre-attack behaviors of active shooters in the United States between 2000 and
      2013. FBI Documents. Washington, DC: US Department of Justice, Federal Bureau of Investigations; 2018. URL: https://
      www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view [accessed 2020-10-25]

68.   DeFoster R, Swalve N. Guns, culture or mental health? Framing mass shootings as a public health crisis. Health Commun
      2018 Oct;33(10):1211-1222. [doi: 10.1080/10410236.2017.1350907] [Medline: 28841045]

69.   Fridel EE. A multivariate comparison of family, felony, and public mass murders in the United States. J Interpers Violence
      2021 Feb;36(3-4):1092-1118. [doi: 10.1177/0886260517739286] [Medline: 29294976]

70.   Duwe G. Mass murder in the United States: a history. Jefferson, NC: McFarland & Company; Jan 07, 2007.

71.   Fox J, Levin J. Mass confusion concerning mass murder. Criminologist 2015;40(1):8-11 [FREE Full text] [doi:
      10.4135/9781412950619.n277]

72.   Fox JA, Levin J. Firing back: the growing threat of workplace homicide. An Am Acad Pol Soc Sci 2016 Sep 08;536(1):16-30.
      [doi: 10.1177/0002716294536001002]

73.   Stevenson AJ, Flores-Vazquez IM, Allgeyer RL, Schenkkan P, Potter JE. Effect of removal of Planned Parenthood from
      the Texas Women's Health Program. N Engl J Med 2016 Mar 03;374(9):853-860. [doi: 10.1056/nejmsa1511902]

74.   Freedman DA. On the so-called "Huber Sandwich Estimator" and "Robust Standard Errors". Am Statistician 2006
      Nov;60(4):299-302. [doi: 10.1198/000313006x152207]

75.   Duwe G. Mass shootings are getting deadlier, not more frequent. Politico Magazine. 2017 Oct 04. URL: https://www.
      politico.com/magazine/story/2017/10/04/mass-shootings-more-deadly-frequent-research-215678/ [accessed 2021-01-30]

76.   Population Trends. United States Census Bureau. 2019. URL: https://www.census.gov/ [accessed 2019-08-26]

77.   Peterson J, Densley J. We have studied every mass shooting since 1966. Here's what we've learned about the shooters. Los
      Angeles Times. 2019 Aug 04. URL: https://www.latimes.com/opinion/story/2019-08-04/
      el-paso-dayton-gilroy-mass-shooters-data [accessed 2020-02-01]

78.   Klingner DE, Williams E. Topic: Public Safety. Public Integrity 2019 Mar 06;21(2):220-224. [doi:
      10.1080/10999922.2019.1565268]

79.   Hand C. Gun control and the Second Amendment. Minneapolis, MN: ABDO; Dec 15, 2016.

80.   Popovits A. Dominican University of California Political Science & International Studies (Senior Thesis). 2020 May. URL:
      https://tinyurl.com/se3vrmd6 [accessed 2020-12-01]

81.   Miller SV. What Americans think about gun control: evidence from the General Social Survey, 1972-2016. Soc Sci Quart
      2018 Nov 18;100(1):272-288. [doi: 10.1111/ssqu.12555]

82.   Kellner D. School shootings, societal violence and gun culture. In: Shapiro H, editor. The Wiley Handbook on Violence
      in Education: Forms, Factors, and Preventions. Medford, MA: John Wiley & Sons, Inc; 2018:53-68.

83.   Schildkraut J. Assault weapons, mass shootings, and options for lawmakers. Rockefeller Institute of Government. 2019
      Mar 22. URL: https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/ [accessed
      2021-02-11]

84.   Jacobs J, Fuhr Z. The potential and limitations of universal background checking for gun purchasers. Wake Forest J Law
      Policy 2017;7(2):537-583.



JA4449

85. Braga AA, Brunson RK, Cook PJ, Turchan B, Wade B. Underground gun markets and the flow of illegal guns into the Bronx and Brooklyn: a mixed methods analysis. J Urban Health 2020 Sep 04:online ahead of print. [doi: 10.1007/s11524-020-00477-z] [Medline: 32888157]

86. Chai C. Gun control: can we take a shot at it? AMASS 2019;24(2):34-36.

87. Goldberg J. The case for more guns (and more gun control). The Atlantic. 2012 Dec. URL: https://www.theatlantic.com/magazine/archive/2012/12/the-case-for-more-guns-and-more-gun-control/309161/ [accessed 2020-11-20]

88. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

89. Lankford A, Madfis E. Media coverage of mass killers: content, consequences, and solutions. Am Behav Sci 2018 Mar 20;62(2):151-162. [doi: 10.1177/0002764218763476]

90. Kien S, Begay T, Lee A, Stefanidis A. Social media during the school shooting contagion period. Violence Gender 2019 Dec 01;6(4):201-210. [doi: 10.1089/vio.2019.0043]

## Abbreviations

**FAWB:** Federal Assault Weapons Ban
**FBI:** Federal Bureau of Investigation
**LCM:** large-capacity magazine

*Edited by G Eysenbach, T Sanchez; submitted 19.02.21; peer-reviewed by T Alcorn; comments to author 12.03.21; revised version received 24.03.21; accepted 30.03.21; published 22.04.21*

*Please cite as:*
*Post L, Mason M, Singh LN, Wleklinski NP, Moss CB, Mohammad H, Issa TZ, Akhetuamhen AI, Brandt CA, Welch SB, Oehmke JF*
*Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*
*JMIR Public Health Surveill 2021;7(4):e26042*
*URL: https://publichealth.jmir.org/2021/4/e26042*
*doi: 10.2196/26042*
*PMID: 33783360*

©Lori Post, Maryann Mason, Lauren Nadya Singh, Nicholas P Wleklinski, Charles B Moss, Hassan Mohammad, Tariq Z Issa, Adesuwa I Akhetuamhen, Cynthia A Brandt, Sarah B Welch, James Francis Oehmke. Originally published in JMIR Public Health and Surveillance (https://publichealth.jmir.org), 22.04.2021. This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Public Health and Surveillance, is properly cited. The complete bibliographic information, a link to the original publication on https://publichealth.jmir.org, as well as this copyright and license information must be included.



JA4450

# EXHIBIT I

VIEWPOINT

# Regulating Assault Weapons and Large-Capacity Magazines for Ammunition

**Philip J. Cook, PhD**
Duke University,
Durham,
North Carolina.

**John J. Donohue, PhD, JD**
Stanford University,
Stanford, California.

← Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201

+ Supplemental content

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an outsized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

## History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required submachine guns and other firearms capable of fully

> Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semiautomatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions that has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

jama.com

© 2022 American Medical Association. All rights reserved.

JA4452

## Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved banned weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

## The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shoot-

ing in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were voluntarily relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semiautomatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

## Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

## Conclusions

In 2017, the *New York Times* polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger since then.[10]

ARTICLE INFORMATION

Conflict of Interest Disclosures: Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

REFERENCES

1. Cook PJ, Goss KA. *The Gun Debate: What Everyone Needs to Know.* 2nd ed. Oxford University Press; 2020.

2. Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

3. Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

4. Smart R, Morral AR, Smucker S, et al. *The Science of Gun Policy.* RAND; 2020.

5. Duwe G. Patterns and prevalence of lethal mass violence. *Criminal Public Policy.* 2020;19(1):17-35. doi:10.1111/1745-9133.12478

6. Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

7. Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://

www.theviolenceproject.org/mass-shooter-database/

8. Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

9. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA.* 2016;316(3): 291-299. doi:10.1001/jama.2016.8752

10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

© 2022 American Medical Association. All rights reserved.

JA4453

# EXHIBIT J

1    **The Code of Professional Ethics and Practices**

2    We—the members of the American Association for Public Opinion Research (AAPOR) and its affiliated chapters—subscribe to the
3    principles expressed in this document, the AAPOR Code of Professional Ethics and Practices ("the Code"). Our goals are to support
4    sound and ethical practice in the conduct of public opinion and survey research and promote the informed and appropriate use of
5    research results.

6    The Code is based in fundamental ethical principles that apply to the conduct of research regardless of an individual's membership in
7    AAPOR or any other organization. Adherence to the principles and actions set out in the Code is expected of all public opinion and
8    survey researchers.

9    As AAPOR members, we pledge to maintain the highest standards of scientific competence, integrity, accountability, and
10   transparency in designing, conducting, analyzing, and reporting our work, and in our interactions with participants (sometimes
11   referred to as respondents or subjects), clients, and the users of our research. We pledge to act in accordance with principles of
12   basic human rights in research. We further pledge to reject all tasks or assignments that would require activities inconsistent with the
13   principles of this Code.

14   The Code sets the standard for the ethical conduct of public opinion and survey research at the time of publication.
15   Recommendations on best practices for research design, conduct, analysis, and reporting are beyond the scope of the Code but may
16   be published separately by AAPOR Executive Council.

17   **Definitions of Terms Used in the Code**

18
19   1. "Public opinion and survey research" refers to the systematic collection and analysis of information from or about individuals,
20   groups, or organizations concerning their behaviors, cognitions, attitudes or other characteristics. It encompasses both quantitative
21   and qualitative research methods, traditional or emerging.
22   2. "Participants" refers to individuals whose behaviors, cognitions, attitudes, or other characteristics are measured and analyzed.
23   Participants can include individuals representing groups or organizations, and individuals such as minors or those unable to consent
24   directly, for whom a parent, legal guardian, or other proxy makes participation decisions or provides information.
25   3. "Personally identifiable information" refers to (i) measurements, records, or other data that can be used alone or in combination to
26   distinguish or trace an individual's identity and (ii) any other information that is linkable to an individual (e.g., employment information,
27   medical history, academic records).

28
29   **I. Principles of Professional Responsibility in Our Research**

30
31   A. Responsibilities to Participants
32       1.  We will avoid practices or methods that may harm, endanger, humiliate, or unnecessarily mislead participants and potential
33           participants.

1

JA4455

2. We will not misrepresent the purpose of our research or conduct other activities (such as sales, fundraising, or political campaigning) under the guise of conducting research.

3. We recognize that participation in our research is voluntary except where specified by regulation or law. Participants may freely decide, without coercion, whether to participate in the research, and whether to answer any question or item presented to them.

4. We will make no false or misleading claims as to a study's sponsorship or purpose and will provide truthful answers to participants' questions about the research. If disclosure of certain information about the research could endanger or cause harm to persons, could bias responses, or does not serve research objectives, it is sufficient to indicate, in response to participants' questions about the research, that some information cannot be revealed.

5. We recognize the critical importance of protecting the rights of minors and other vulnerable individuals when obtaining participation decisions and conducting our research.

6. We will act in accordance with laws, regulations, and the rules of data owners (providers of research or administrative records previously collected for other purposes) governing the collection, use, and disclosure of information obtained from or about individuals, groups, or organizations.

B. Responsibilities When Collecting Personally Identifiable Information

1. We recognize the right of participants to be provided with honest and forthright information about how personally identifiable information that we collect from them will be used.

2. We recognize the importance of preventing unintended disclosure of personally identifiable information. We will act in accordance with all relevant best practices, laws, regulations, and data owner rules governing the handling and storage of such information. We will restrict access to identifiers and destroy them as soon as they are no longer required, in accordance with relevant laws, regulations, and data owner rules.

3. We will not disclose any information that could be used, alone or in combination with other reasonably available information, to identify participants with their data, without participant permission.

4. When disclosing personally identifiable data for purposes other than the current research, we will relay to data users any conditions of their use specified in the participant permission we have obtained.

5. We understand that the use of our research results in a legal proceeding does not relieve us of our ethical obligation to protect participant privacy and keep confidential all personally identifiable data, except where participants have permitted disclosure.

C. Responsibilities to Clients or Sponsors

1. When undertaking work for a client, we will hold confidential all proprietary information obtained about the client and about the conduct and findings of the research undertaken for the client, except when the dissemination of the information is expressly authorized by the client.

2. We will inform those (partners, co-investigators, sponsors, and clients) for whom we conduct publicly released research studies about AAPOR's Standards for Disclosure in Section III of the Code, and provide information on what should be disclosed in their releases.

2

**JA4456**

3.  We will be mindful of the limitations of our expertise and capacity to conduct various types of research and will accept only those research assignments that we can reasonably expect to accomplish within these limitations.

D. Responsibilities to the Public

1.  We will disclose to the public the methods and procedures used to obtain our own publicly disseminated research results in accordance with Section III of the Code.

2.  We will correct any errors in our own work that come to our attention which could influence interpretation of the results. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentation or distortions. If such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible to original data dissemination.

3.  We will correct factual misrepresentations or distortions of our data or analysis, including those made by our research partners, co-investigators, sponsors, or clients. We will make good faith efforts to identify and issue corrective statements to all parties who were presented with the factual misrepresentations or distortions, and if such factual misrepresentations or distortions were made publicly, we will correct them in a public forum that is as similar as possible. We also recognize that differences of opinion in the interpretation of analysis are not necessarily factual misrepresentations or distortions and will exercise professional judgment in handling disclosure of such differences of opinion.

E. Responsibilities to the Profession

1.  We recognize the importance to the science of public opinion and survey research of disseminating as freely as practicable the ideas and findings that emerge from our research.

2.  We can point with pride to our membership in AAPOR and adherence to the Code as evidence of our commitment to high standards of ethics in our relations with research participants, our clients or sponsors, the public, and the profession. However, we will not cite our membership in the Association nor adherence to this Code as evidence of professional competence, because the Association does not certify the professional competence of any persons or organizations.

## II. Principles of Professional Practice in the Conduct of Our Work

A. We will exercise due care in developing research designs, samples, and instruments, and in collecting, processing, and analyzing data, taking all reasonable steps to assure the reliability and validity of results.

1.  We will recommend and employ only those tools and methods of analysis that, in our professional judgment, are fit for the purpose of the research questions.

2.  We will not knowingly select research tools and methods of analysis that yield misleading conclusions.

3.  We will not knowingly make interpretations of research results that are inconsistent with the data available, nor will we tacitly permit such interpretations. We will ensure that any findings we report, either privately or for public release, are a balanced and accurate portrayal of research results.

4.  We will not knowingly imply that interpretations are accorded greater confidence than the data warrant. When we generalize from samples to make statements about populations, we will only make claims of precision and applicability to broader populations that are warranted by the sampling frames and other methods employed.

5. We will not engage in data fabrication or falsification.

6. We will accurately describe and attribute research from other sources that we cite in our work, including its methodology, content, comparability, and source.

B. We will describe our methods and findings accurately and in appropriate detail in all research reports, adhering to the standards for disclosure specified in Section III of the Code.

## III. Standards for Disclosure

Broadly defined, research on public opinion can be conducted using a variety of quantitative and qualitative methodologies, depending on the research questions to be addressed and available resources. Accordingly good professional practice imposes the obligation upon all public opinion and survey researchers to disclose sufficient information about how the research was conducted to allow for independent review and verification of research claims, regardless of the methodology used in the research. Full and complete disclosure for items listed in Section A will be made at the time results are released, either publicly or to a research client, as the case may be. As detailed below, the items listed in Section B, if not immediately available, will be released within 30 days of any request for such materials. If the results reported are based on multiple samples or multiple modes, the preceding items (as applicable) will be disclosed for each.

A. Items for Immediate Disclosure

1. **Data Collection Strategy:** Describe the data collection strategies employed (e.g. surveys, focus groups, content analyses).

2. **Who Sponsored the Research and Who Conducted It.** Name the sponsor of the research and the party(ies) who conducted it. If the original source of funding is different than the sponsor, this source will also be disclosed.

3. **Measurement Tools/Instruments.** Measurement tools include questionnaires with survey questions and response options, show cards, vignettes, or scripts used to guide discussions or interviews. The exact wording and presentation of any measurement tool from which results are reported as well as any preceding contextual information that might reasonably be expected to influence responses to the reported results and instructions to respondents or interviewers should be included. Also included are scripts used to guide discussions and semi-structured interviews and any instructions to researchers, interviewers, moderators, and participants in the research. Content analyses and ethnographic research will provide the scheme or guide used to categorize the data; researchers will also disclose if no formal scheme was used.

4. **Population Under Study.** Survey and public opinion research can be conducted with many different populations including, but not limited to, the general public, voters, people working in particular sectors, blog postings, news broadcasts, an elected official's social media feed. Researchers will be specific about the decision rules used to define the population when describing the study population, including location, age, other social or demographic characteristics (e.g., persons who

4

JA4458

access the internet), time (e.g., immigrants entering the US between 2015 and 2019). Content analyses will also include the
unit of analysis (e.g., news article, social media post) and the source of the data (e.g., Twitter, Lexis-Nexis).

5. **Method Used to Generate and Recruit the Sample.** The description of the methods of sampling includes the sample design
and methods used to contact or recruit research participants or collect units of analysis (content analysis).

   a. Explicitly state whether the sample comes from a frame selected using a probability-based methodology (meaning
selecting potential participants with a known non-zero probability from a known frame) or if the sample was selected
using non-probability methods (potential participants from opt-in, volunteer, or other sources).

   b. Probability-based sample specification should include a description of the sampling frame(s), list(s), or method(s).

     i. If a frame, list, or panel is used, the description should include the name of the supplier of the sample or list
and nature of the list (e.g., registered voters in the state of Texas in 2018, pre-recruited panel or pool).

     ii. If a frame, list, or panel is used, the description should include the coverage of the population, including
describing any segment of the target population that is not covered by the design.

   c. For surveys, focus groups, or other forms of interviews, provide a clear indication of the method(s) by which
participants were contacted, selected, recruited, intercepted, or otherwise contacted or encountered, along with any
eligibility requirements and/or oversampling.

   d. Describe any use of quotas.

   e. Include the geographic location of data collection activities for any in-person research.

   f. For content analysis, detail the criteria or decision rules used to include or exclude elements of content and any
approaches used to sample content. If a census of the target population of content was used, that will be explicitly
stated.

   g. Provide details of any strategies used to help gain cooperation (e.g., advance contact, letters and scripts,
compensation or incentives, refusal conversion contacts) whether for participation in a survey, group, panel, or for
participation in a particular research project. Describe any compensation/incentives provided to research subjects and
the method of delivery (debit card, gift card, cash).

6. **Method(s) and Mode(s) of Data Collection.** Include a description of all mode(s) used to contact participants or collect data
or information (e.g., CATI, CAPI, ACASI, IVR, mail, Web for survey; paper and pencil, audio or video recording for qualitative
research, etc.) and the language(s) offered or included. For qualitative research such as in-depth interviews and focus
groups, also include length of interviews or the focus group session.

7. **Dates of Data Collection.** Disclose the dates of data collection (e.g., data collection from January 15 through March 10 of
2019). If this is a content analysis, include the dates of the content analyzed (e.g., social media posts between January 1 and
10, 2019).

5

JA4459

8. **Sample Sizes (by sampling frame if more than one frame was used) and (if applicable) Discussion of the Precision of the Results.**

   a. Provide sample sizes for each mode of data collection (for surveys include sample sizes for each frame, list, or panel used).

   b. For probability sample surveys, report estimates of sampling error (often described as "the margin of error") and discuss whether or not the reported sampling error or statistical analyses have been adjusted for the design effect due to weighting, clustering, or other factors.

   c. Reports of non-probability sample surveys will only provide measures of precision if they are defined and accompanied by a detailed description of how the underlying model was specified, its assumptions validated, and the measure(s) calculated.

   d. If content was analyzed using human coders, report the number of coders, whether inter-coder reliability estimates were calculated for any variables, and the resulting estimates.

9. **How the Data Were Weighted.** Describe how the weights were calculated, including the variables used and the sources of the weighting parameters.

10. **How the Data Were Processed and Procedures to Ensure Data Quality.** Describe validity checks, where applicable, including but not limited to whether the researcher added attention checks, logic checks, or excluded respondents who straight-lined or completed the survey under a certain time constraint, any screening of content for evidence that it originated from bots or fabricated profiles, re-contacts to confirm that the interview occurred or to verify respondent's identity or both, and measures to prevent respondents from completing the survey more than once. Any data imputation or other data exclusions or replacement will also be discussed. Researchers will provide information about whether any coding was done by software or human coders (or both); if automated coding was done, name the software and specify the parameters or decision rules that were used.

11. **A General Statement Acknowledging Limitations of the Design and Data Collection.** All research has limitations and researchers will include a general statement acknowledging the unmeasured error associated with all forms of public opinion research.

B. Additional Items for Disclosure. After results are reported, we will make the following items available within 30 days of any request for such materials:

   1. Procedures for managing the membership, participation, and attrition of the panel, if a pool, panel, or access panel was used. This should be disclosed for both probability and non-probability surveys relying on recruited panels of participants.

6

**JA4460**

2.  Methods of interviewer or coder training and details of supervision and monitoring of interviewers or human coders. If machine coding was conducted, include description of the machine learning involved in the coding.

3.  Details about screening procedures, including any screening for other surveys or data collection that would have made sample or selected members ineligible for the current data collection (e.g., survey, focus group, interview) will be disclosed (e.g., in the case of online surveys if a router was used).

4.  Any relevant stimuli, such as visual or sensory exhibits or show cards. In the case of surveys conducted via self-administered computer-assisted interviewing, providing the relevant screen shot(s) is strongly encouraged, though not required.

5.  Summaries of the disposition of study-specific sample records so that response rates for probability samples and participation rates for non-probability samples can be computed. If response or cooperation rates are reported, they will be computed according to AAPOR Standard Definitions. If dispositions cannot be provided, explain the reason(s) why they cannot be disclosed, and this will be mentioned as a limitation of the study.

6.  The unweighted sample size(s) on which one or more reported subgroup estimates are based.

7.  Specifications adequate for replication of indices or statistical modeling included in research reports.

7

**JA4461**

C. Access to Datasets

Reflecting the fundamental goals of transparency and replicability, AAPOR members share the expectation that access to datasets and related documentation will be provided to allow for independent review and verification of research claims upon request. In order to protect the privacy of individual respondents, such datasets will be de-identified to remove variables that can reasonably be expected to identify a respondent. Datasets may be held without release for a period of up to one year after findings are publicly released to allow full opportunity for primary analysis. Those who commission publicly disseminated research have an obligation to disclose the rationale for why eventual public release or access to the datasets is not possible, if that is the case.

D. AAPOR Standards Complaint

If any of our work becomes the subject of a formal investigation of an alleged violation of this Code, undertaken with the approval of the AAPOR Executive Council, we will provide additional information on the research study in such detail that a fellow researcher would be able to conduct a professional evaluation of the study.

.

8

JA4462

# EXHIBIT K

Case 1:18-cv-10507-RMB-JBD   Document 184-7   Filed 11/03/23   Page 564 of 565
PageID: 7588

Newspapers
by ancestry

https://www.newspapers.com/image/264424206

Hartford Courant (Hartford, Connecticut) · Sun, Dec 23, 2012 · Page A1

Downloaded on Oct 19, 2022





# Hartford Courant

AMERICA'S OLDEST CONTINUOUSLY PUBLISHED NEWSPAPER

VOLUME CLXXVI   NUMBER 358 | COURANT.COM • MOBILE.COURANT.COM | SUNDAY, DECEMBER 23, 2012

**STARTING OVER**

# NEW SCHOOL, MADE FAMILIAR

## Hundreds Of Volunteers Help Ease Transition For Sandy Hook Kids

**By BRIAN DOWLING**
bdowling@courant.com

Sandy Hook Elementary School students will find that volunteers have painted the walls of their new school green and white, their school colors. The movers set furniture, desks, computers and supplies in the same places as their old classrooms in Newtown. Volunteers pinned the same posters to new classroom walls.

The re-creation of Sandy Hook Elementary at Chalk Hill School in Monroe involved hundreds of people over the past week. Locksmiths, plumbers, electricians, custodians, experts in fire suppression and security systems, as well as residents with paint brushes, all volunteered time to create an around-the-clock renovation team, which peaked at 500 workers.

Thanks to that effort, the surroundings will be **CHALK HILL, A4**



**THE WELCOME** sign is ready at Chalk Hill School in Monroe, where Sandy Hook students will begin classes Jan. 3.

WFSB | POOL



**ADAM LANZA**

# Shooter Paused, And Six Escaped

**By DAVE ALTIMARI, EDMUND H. MAHONY and JON LENDER**
daltimari@courant.com

As many as a half-dozen first-graders may have survived Adam Lanza's deadly shooting spree at Sandy Hook Elementary School because he stopped firing briefly, perhaps to reload his rifle or because it jammed, according to law enforcement officials familiar with the events.

A source said that the Bushmaster rifle that Lanza used in the shootings is at the state police forensic laboratory undergoing several tests, including tests to determine whether it jammed.

The children escaped from the first-grade classroom of teacher Victoria Soto, one of the six educators Lanza killed in Newtown after shooting his way through a glass door with the .223-caliber semiautomatic rifle on the morning of Dec. 14.

On Friday, detectives obtained and began examining records related to psychiatric care Lanza had received

**RIFLE, A6**

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY
.com

Case 1:18-cv-10507-RMB-JBD    Document 184-7    Filed 11/03/23    Page 565 of 565
PageID: 7589

Newspapers by ancestry

https://www.newspapers.com/image/264424215

Hartford Courant (Hartford, Connecticut) · Sun, Dec 23, 2012 · Page A6

Downloaded on Oct 19, 2022



Copyright © 2022 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers.com

# Exhibit 21

**From:** Daniel Vannella
**Sent:** Tuesday, August 8, 2023 8:33 PM
**To:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>; blehman@gsbblaw.com
<BLehman@gsbblaw.com>; law.rmd@gmail.com <law.rmd@gmail.com>
**Cc:** Nicholas Kant <Nicholas.Kant@law.njoag.gov>
**Subject:** ANJRPC/Ellman/Cheeseman v. Platkin - 8/8/23 letter requesting records

Dan:

Attached please find State Defendants' letter re-asserting certain records requests made on the
record during the 8/4/23 deposition of Mr. Kapelsohn.

**Daniel M. Vannella**
Assistant Attorney General
Litigation Practice Group
Division of Law
25 Market St. | P.O. Box 112
Trenton, N.J. 08625
t: 609-376-2776
daniel.vannella@law.njoag.gov



PHILIP D. MURPHY
*Governor*

**State of New Jersey**
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET STREET
PO Box 112
TRENTON, NJ 08625-0112

MATTHEW J. PLATKIN
*Attorney General*

SHEILA Y. OLIVER
*Lt. Governor*

MICHAEL T.G. LONG
*Director*

August 8, 2023

**<u>VIA EMAIL</u>**
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Attorney for *ANJRPC* and *Ellman* Plaintiffs

> Re:  *Association Of New Jersey Rifle & Pistol Clubs,*
> *Inc. et al. v. Platkin et al. ("ANJRPC")*
> Docket No. 3:18-cv-10507
> *Cheeseman et al. v. Platkin et al.*
> Docket No. 1:22-cv-04360
> *Ellman et al. v. Platkin et al.*
> Docket No. 3:22-cv-04397

Dear Mr. Schmutter,

As you know, this office represents State Defendants in the above-referenced actions. Pursuant to Federal Rules of Civil Procedure 26(a)(2)(B)(ii) and 26(e)(2), this letter confirms and reiterates the following records requests State Defendants made during the August 4, 2023 deposition of Emanuel Kapelsohn. State Defendants request receipt of all records responsive to the below requests, or (if appropriate) confirmation that none responsive to a particular request(s) exists, by August 11, 2023.

Please note that, whereas State Defendants made additional requests for records on the record during the deposition, in a show of good faith they are now limiting their requests to just those enumerated below. Please also note that, with regard to certain of the below requests, and as an additional show of good faith, State



HUGHES JUSTICE COMPLEX • TELEPHONE: (609) 376-3202 • FAX: (609) 292-0690
*New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable*

**JA4468**

August 8, 2023
Page 2

Defendants limit the scope of their request more narrowly than what they had put on the record during the deposition. In short, please respond to the requests below, and limited to the scope of the requests as set forth below.

1.  Copies of any tests, reports, data, videos and any other materials related tests or experiments by Mr. Kapelsohn related to bullets passing through walls or other objects. (*See* 8/4/23 Deposition Transcript, T:46-5 to -9; T:46-17 to 47-2).[1]

2.  Any National Shooting Sports Foundation (NSSF) documents that Mr. Kapelsohn relied upon for his report regarding the number of AR-15 rifles in civilian hands in the United States. (*See id.*, T:77-4 to 78-6).

3.  Any "FBI uniform crime report" or other specific "studies" Mr. Kapelsohn was referring to in response to the questions about Exhibit 14 of his June 15, 2023 report (Kapelsohn-1). (*See id.*, T:162-13 to 163-12).

4.  The name and address of any individuals with whom Mr. Kapelsohn has spoken about Revolutionary War era arms and accoutrements, but specifically and limited to any such individuals with whom he spoke in preparation for any of his expert reports and/or his August 4, 2023 deposition testimony in these matters. (*See id.*, T:178:21 to 179-5).

5.  The names and addresses of any "reenactors" of "Revolutionary [and/or] Civil War battles" with whom Mr. Kapelsohn has spoken, but specifically and limited to any such individuals with whom he spoke in preparation for any of his expert reports and/or his August 4, 2023 deposition testimony in these matters. (*See id.*, T:183-6 to 184-16).

6.  The results of any "ballistic testing" performed by Mr. Kapelsohn for "the past 45 years." (*See id.*, T:184-21 to 186-1).

7.  The names and addresses of any "firearms expert[s]" with whom Mr. Kapelsohn spoke—***but specifically and limited to*** any such individuals with whom he spoke in preparation for any of his expert reports and/or his August 4, 2023 deposition testimony in these matters—who consider the .25 auto and

---

[1] A courtesy copy of the August 4, 2023 deposition testimony is attached hereto.

**JA4469**

August 8, 2023
Page 3

the .32 auto (the .25 or also called .25 ACP, the ACP standing for Automatic Colt Pistol, and .32 auto or .32 ACP) to be inadequate for self-defense use. (*See id.*, T:195-3 to 196-4).

Sincerely yours,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    /s/ Daniel M. Vannella_____
Daniel M. Vannella
Assistant Attorney General

Encl.

cc: All counsel of record

# Exhibit 22

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Thursday, August 31, 2023 8:44 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** Bradley P. Lehman <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] ANJRPC v. Platkin; Ellman v. Platkin; Cheeseman v. Platkin

Dan –

Attached please find my letter of today's date describing today's supplemental production. The production can be found at the following link:

https://app.box.com/s/z2kbhjbelg23d8wrslciancosylex463

Please let me know if you have any difficulty accessing the documents.

Thanks.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:   (201) 967-8040
Fax:   (201) 967-0590
www.hartmanwinnicki.com

# Exhibit 23

LAW OFFICES

# HARTMAN & WINNICKI, P.C.

Dariusz M. Winnicki *°
Richard L. Ravin *°□
Daniel L. Schmutter*
Andrew T. Wolfe*

74 PASSAIC STREET
RIDGEWOOD, NEW JERSEY 07450

Phone: (201) 967-8040
Fax:    (201) 967-0590

* * *

———————
* New York and New Jersey Bars
° Florida Bar
□ Washington, D.C. Bar
◊ New Jersey Bar

WEBSITE
www.hartmanwinnicki.com

———————
Porter E. Hartman (1920-2009)
Charles R. Buhrman (1938-1994)
William T. Marsden (1943-1993)
Cyrus D. Samuelson (1911-1998)

August 31, 2023

**VIA EMAIL**
Daniel M. Vannella Esq.
Assistant Attorney General
25 Market St., P.O. Box 112
Trenton, NJ 08625

Re:    **Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC") v. Platkin,
et al. - 3:18-cv-10507-PGS-LHG
Ellman v. Platkin - 3:22-cv-04397-PGS-LHG
Cheeseman v. Platkin - 1:22-cv-04360-PGS-LHG**

Dear Dan:

ANJRPC Plaintiffs and Ellman Plaintiffs hereby amend their discovery responses
including but not limited to their answers to interrogatories and document requests and their
expert disclosures to produce the following contained in the "The Box" cloud server link
provided in the accompanying email:

1)    Errata Sheet from the deposition of Emanuel Kapelsohn pursuant to Fed. Civ. P. 30(e);

2)    Deposition signature page for Emanuel Kapelsohn;

3)    ANJRPC Plaintiffs', Ellman Plaintiffs', and Emanuel Kapelsohn's responses to the Letter
of Daniel M. Vannella dated August 8, 2023 ("Kapelsohn Response");

4)    All attachments identified in the Kapelsohn Response with the exception of the NSSF
"News", July 20, 2022, "Commonly Owned: NSSF Announces Over 24 Million MSRS In
Circulation," NSSF, Newtown, CT which can be found at the following link:

https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-
circulation/

P0176337

**JA4474**

August 31, 2023
Page 2


5)      Corrected CV of Clayton Cramer.


                                        Very truly yours,

                                        /s/ Daniel L. Schmutter
                                        DANIEL L. SCHMUTTER

DLS/lks
Cc:     Bradley Lehman

# Exhibit 24



# The Peregrine Corporation

Specialists in Defense Dynamics

August 29, 2023

Daniel L. Schmutter, Esq.
Hartman & Winnicki PC
74 Passaic Street
Ridgewood, NJ 07450

                    Re:    **Association of New Jersey Rifle & Pistol Club Cases**

Dear Attorney Schmutter:

Following are my responses to the questions posed by Attorney Vannella in his letter of August 8, 2023. My responses are numbered in keeping with the numbering of his questions.

1.  Provided are (1) a video of my testing of ballistic film for use on glass doors and windows by firing through it with 9mm pistol and AR-15 rifle; (2) data from ballistic testing of micro-9 pistols with various types of ammunition, including chronographing, accuracy testing, and firing bullets into ballistic gelatin; (3) a page of rough notes from my ballistic testing (chronographing and firing at ballistic gelatin blocks) of two brands of paint marking cartridges used for law enforcement simulation training; (4) a video I made for this case, showing penetration of sheetrock walls by several types of projectiles fired from handgun, shotgun and AR-15 rifle; and (5) a typed page detailing the specifics of the ammunition used for (4) above, and the chronographed velocities of the projectiles. I do not typically keep ballistic testing results after cases or projects I am working on are concluded. Also, I have many times done ballistic demonstrations for classes of officers or instructors, such as firing at, into or through sheetrock wall sections, automobile glass or autobodies, other glass, ballistic gelatin, etc., without recording or otherwise documenting the results of the tests, which are done for the purpose of demonstration and education, not research or publication.

2.  NSSF "News", July 20, 2022, "Commonly Owned: NSSF Announces Over 24 Million MSRS In Circulation," NSSF, Newtown, CT. Also, NSSF's "Modern Sporting Rifle Comprehensive Consumer Report." Copies of both are enclosed.

3.  For studies and statistics to the effect that most violent crime occurs during the hours of darkness, see, e.g., New York City Police Department, "Analysis of Police Combat Situations", 1981 (available on the internet); and "Police Officer's Guide to Operating and Surviving in Low-Light and No-Light Conditions," ("The majority of crimes and officer shootings occur at night in diminished light or no-light settings. The Federal

Bureau of Investigation reports that during a 9-year period (1985-1994), almost 63 percent of police officer deaths occurred between 6:00 p.m. and 6:00 a.m.").  Also see, e.g., "Officer-Involved Shootings: What We Didn't Know Has Hurt Us," Tom Aveni, Police Policy Studies Council.

4.  Richard C. Metzger, 217 Raymond St., Reading, PA.
    Mike Jessberger, Warminster, PA.
    Dixon's Muzzleloading Shop, Inc., 9952 Kunkels Mill Rd., Kempton, PA 19529
    Lyman Products Corp., 475 Smith St., Middletown, CT 06457 (Technical Services Dept.)
    Harold Coleman, National Muzzle Loading Rifle Association, P.O. Box 67, Friendship, IN 47021
    Tony Vance, Rush Creek Round Balls, P.O. Box 327, Rushlyvania, OH 43347
    Curator at Washington Crossing Historic Park, 1112 River Road, Washington Crossing, PA 18977 Washington Crossing, PA 18977
    Several Revolutionary War re-enactors (names unknown), spoken with and photographed in their uniforms at Washington Crossing Historic Park, 1112 River Road, Washington Crossing, PA 18977
    Jennifer Bolton, Park Ranger, Acting Lead Historic Weapons Supervisor, Valley Forge National Historical Park, (U.S. National Park Serive), 100 North Outer Line Drive, King of Prussia, PA 19406
    "Luke" (Lucien) Haag, P.O. Box 5347 Carefree, Arizona 85377

5.  Richard C. Metzger (see above)
    Mike Jessberger (see above)

6.  See #1 above.  I do not typically keep results of ballistic testing on cases that are closed, and I often do not document, video-record, or otherwise memorialize ballistic demonstrations I perform for classes of officers, police instructors, or others.  However, another example of "results" of ballistic testing I did within the past few years was as follows:  I worked for Pacific Power & Light Company ("PP&L") as an expert in a civil case in which a Yakima, Washington, Police Department SWAT Team sniper fired a .30 caliber rifle bullet in training at the shooting range (specifically, a .308 Winchester, I think a Federal Cartridge Co., product number 308M, 168 grain Sierra boat-tail hollowpoint bullet, if I remember correctly).  The bullet the police sniper fired missed the range backstop, and broke a high-voltage electric transmission line several hundred yards away.  The falling, sparking transmission line resulted in a wildfire that burned for three days, took numerous ground crews and firefighting helicopters to contain and extinguish, and damaged the properties of seven property owners, who sued the police and PP&L.  An issue in the case was whether the rifle bullet in question could, in fact, break the power line at the distance involved.  To prove this, I obtained a quantity of the uninsulated, 3-strand copper electrical cable from PP&L.  I strung this cable between two utility poles at the Muhlenberg Township (PA) Shooting Range.  I had one end of the cable run over a large steel pulley, and I suspended hundreds of pounds of weight from the end of the cable passing over the pulley, to produce the appropriate amount of strain (tension) on the cable that would be created by the weight of the cable in the span between the two involved transmission line towers, the amount of current passing

**JA4478**

through the cable (which creates heat) and the ambient temperature at the time of the incident. I determined the amount of tension by working with a PP&L transmission line engineer. Then I used equivalent .308 Winchester match-grade sniper ammunition, downloaded and chronographed so that, at the shorter distance on the shooting range, it would impact the copper cable at approximately the same velocity as the police bullet that had traveled several hundred yards by the time it impacted the actual cable in Yakima. All of this required careful ballistic calculation, and trial and error in downloading and chronographing the ammunition below the velocity of a standard .308 loading. Having done the foregoing, I was able to break the cable with a bullet fired at the shooting range. The ballistic damage to the copper strands of the cable in my testing was comparable in appearance to the ballistic damage to the actual cable that started the wildfire, which had been photographed and preserved as evidence by the Washington Department of Environmental Protection, the agency that managed the firefighting effort and investigated the fire.

7. I did not speak with other firearms experts **"specifically and limited to any such individuals with whom he spoke in preparation"** for my expert reports, opinions, or deposition to the effect that the .25 ACP and .32 ACP are widely considered by experts and other knowledgeable individuals to be generally inadequate calibers for self-defense use. My opinions, reports, and/or deposition testimony to that effect are based on my lifetime of study of these matters, my many decades of reviewing the professional literature about wound ballistics and the effectiveness or ineffectiveness of various firearms calibers for self-defense use, my previous work, communication and experience (prior to my involvement in this case) with other firearms experts and instructors, my attendance at numerous training programs and conferences, and my review of numerous shooting incidents, all performed over more than four decades of work in this field.\\

Very truly yours,

Emanuel Kapelsohn, President

# Exhibit 25

Fed'l For F —

5/3-21

427
43n
464

Glock 17T
T1A126

435
331
321
314

LOT
2AE17-L22

+ bounces off Clear Ballostic w/ only tiny dimple —

UTM
346
352
328

SIG P228
V426 194

364
340

01-0976 RED
UMR20G167-010   0768

+ bounces off Clear Ballistic —

SIMUNITIONS — FX
GLOCK 17T
RED   LOT FAB12

402
397
379
404
412

JA4481

|  |  | End | Muzzle Velocity |  |
|---|---|---|---|---|
| Glock 19 | Federal HST | 14 | 1181 | |
| | Hornady CD | 13.75 | 1132 | |
| | Speer GoldDot +P | 15.75 | 1284 | 1212.5 |
| | Speer Short Barrel | 15.4 | 1253 | |
| | Remington UD Full | 15.5 | 1011 | |
| | Remington UD Compact | 14 | 1039 | |
| | Federal HST | 15 | 1072 | |
| Sig P365 | Federal HST Micro | 16 | 853 | |
| | Federal HST Micro | 17.25 | 873 | 1014 |
| | Hornady CD | 13.75 | 1073 | |
| | Speer GoldDot +P | 16 | 1177 | 1089.75 |
| | Speer Short Barrel | 16 | 1161 | |
| | Speer Short Barrel | 15.25 | 1174 | |
| Kahr PM9 | Speer Short Barrel | 13.75 | ERR | 1165.5 |
| | Speer Short Barrel | 14.15 | 1168 | |
| | Speer Short Barrel | 14.875 | 1159 | |

|  | Remington UD Full | Remington UD Compact | Federal HST |
|---|---|---|---|
| Glock 19 | - | - | 1181 |
| Sig P365 | 1011 | 1039 | 1072 |
| Kahr PM9 | - | - | - |

JA4482

|  | Remington UD | | |
|---|---|---|---|
|  | 1 | 2 | 3 |
| Glock 19 5' | 1104 | 1149 | 1128 |
| 7' | 1089 | 1133 | 1114 |
| Glock 43 5' | | | |
| 7' | | | |
| Kahr PM9 5' | | | |
| 7' | | | |

**JA4483**



| Federal HST Micro | Hornady CD | Speer GoldDot +P | Speer Short Barrel |
|---|---|---|---|
| - | 1132 | 1284 | 1253 |
| 863 | 1073 | 1177 | - |
| - | - | - | 1165.5 |

| | | Speer Short Barrel | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Remington UD Compact | | | | | Federal HST | | | | |
| Full | | 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 5 |
| 4 | 5 | | | | | | | | | | |
| 1105 | 1097 | | | | | | | | | | |
| 1090 | 1085 | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**JA4485**

| Federal HST Micro | | | | | Hornady CD | | | | | Spe | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 5 | 1 | 2 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**JA4487**

JA4488

| er GoldDot +P | | | Speer Short Barrel | | | | |
|---|---|---|---|---|---|---|---|
| 3 | 4 | 5 | 1 | 2 | 3 | 4 | 5 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**JA4489**

## Mike

| | FMJ | FMJ | FMJ | HST | HST | HST | HST | Speer GD | Speer GD | Speer GD | AVG FMJ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Glock 43 | 1.32 | 2.52 | 2.78 | 3.37 | 2.16 | 2.16 | 3.85 | 2.04 | 2.28 | 2.206667 |
| Sig P365 | 6.37 | 3.01 | 2.3 | 2.8 | 2.66 | 2.6 | 2.26 | 3.18 | 3.91 | 3.893333 |
| MP Shield | 1.89 | 1.6 | 3.25 | 1.97 | 3.23 | 3.98 | 3.27 | 2.5 | 2.35 | 2.246667 |
| Kahr #1 | 4.72 | 4.83 | 4.12 | 5.68 | 6.29 | 6.06 | 3.75 | 6.5 | 5.23 | 4.556667 |
| Kahr #2 | 3.13 | 2.7 | 2.51 | 5.77 | 3.19 | 5.23 | 3.51 | 3.49 | 2.6 | 2.78 |
| Ruger LC9 | 3.73 | 3.5 | 2.89 | 6.45 | 5.52 | 2.54 | 4.77 | 3.61 | 2.68 | 3.373333 |
| SCCY CPX-2 | 2.75 | 3.78 | 4.23 | 2.73 | 2.08 | 3.22 | 3.45 | 5.94 | 3.62 | 3.586667 |

## Dad

| | FMJ | FMJ | FMJ | HST | HST | HST | HST | Speer GD | Speer GD | Speer GD | AVG FMJ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Glock 43 | 2.75 | 2.75 | 2.85 | 2.42 | 3.18 | 2.98 | 2.09 | 5.14 | 4.3 | 2.783333 |
| Sig P365 | 3.6 | 1.83 | 2.26 | 2.13 | 1.71 | 2.02 | 2 | 3.68 | 4.14 | 2.563333 |
| MP Shield | 3.59 | 3.68 | 2.54 | 2.06 | 2.91 | 3.72 | 2.2 | 3.2 | 4.05 | 3.27 |
| Kahr #1 | 6.56 | 5.62 | 6.42 | 5.5 | 7.25 | 7 | 7.61 | 7.06 | 6.52 | 6.2 |
| Kahr #2 | 3.32 | 3.47 | 3.47 | 8.07 | 5.11 | 5.49 | 4.39 | 3.27 | 4.21 | 3.42 |
| Ruger LC9 | 5.1 | 2.99 | 4.72 | 2.94 | 6.35 | 3.28 | 4.58 | 3.75 | 4.39 | 4.27 |
| SCCY CPX-2 | 3.61 | 7.76 | 5.74 | 5.51 | 5.08 | 3.4 | 6.875 | 5.94 | 2.12 | 5.703333 |

AVERAGE

| | |
|---|---|
| Glock 43 | 2.83 | 0.904434 |
| MP Shield | 2.888333 | 0.769433 |
| Sig P365 | 2.914444 | 1.133938 |
| Kahr #1 | 5.928889 | 4.990278 | 1.566126 |
| Kahr #2 | 4.051667 | |
| Ruger LC9 | 4.099444 | 1.207157 |
| SCCY CPX-2 | 4.324167 | 1.655257 |


Glock 43

**JA4490**

| Sig P365 |
| MP Shield |
| Kahr #1 |
| Kahr #2 |
| Ruger LC9 |
| SCCY CPX- |

**JA4491**



## Group Size Averages by St[...]

Chart: AVG 15 YARD GROUP SIZE (INCHES) vs HANDGUN MODEL

- Glock 43: 2.50, 3.16
- Sig P365: 2.60, 3.23
- MP Shield: 2.67, 3.11
- Kahr #1: 5.24, 6.62
- Kahr #2: 3.57, 4.53
- Ruger L: 3.97, 4.2



## Micro Pistol 15-Yard Group Sizes Br[...]
## Ammunition Types

5.93

JA4492

| AVG HST | AVG Speer GD | Overall Average |
|---|---|---|
| 2.563333 | 2.723333 | 2.497778 |
| 2.686667 | 3.116667 | 3.232222 |
| 3.06 | 2.706667 | 2.671111 |
| 6.01 | 5.16 | 5.242222 |
| 4.73 | 3.2 | 3.57 |
| 4.836667 | 3.686667 | 3.965556 |
| 2.676667 | 4.336667 | 3.533333 |

| AVG HST | /G Speer GD | Overall Average |
|---|---|---|
| 2.86 | 3.843333 | 3.162222 |
| 1.953333 | 3.273333 | 2.596667 |
| 2.896667 | 3.15 | 3.105556 |
| 6.583333 | 7.063333 | 6.615556 |
| 6.223333 | 3.956667 | 4.533333 |
| 4.19 | 4.24 | 4.233333 |
| 4.663333 | 4.978333 | 5.115 |

| AVG FMJ | AVG HST | AVG Sped | Overall Averag |
|---|---|---|---|
| 2.50 | 2.71 | 3.28 | 2.83 |

| | | | | | |
|---|---|---|---|---|---|
| 3.23 | 2.32 | 3.20 | 2.91 | | |
| 2.76 | 2.98 | 2.93 | 2.89 | | |
| 5.38 | 6.30 | 6.11 | 5.93 | | |
| 3.10 | 5.48 | 3.58 | 4.05 | | |
| 3.82 | 4.51 | 3.96 | 4.10 | | |
| 4.65 | 3.67 | 4.66 | 4.32 | | |

Chart data — 15-YARD GROUP SIZE (in), MICRO PISTOL MODELS:

| | Glock 43 | Sig P365 | MP Shield | Kahr #1 |
|---|---|---|---|---|
| AVG FMJ | 2.50 | 3.23 | 2.76 | 5.38 |
| AVG HST | 2.71 | 2.32 | 2.98 | 6.30 |
| AVG Speer GD | 3.28 | 3.20 | 2.93 | 6.11 |
| Overall Average | 2.83 | 2.91 | 2.89 | 5.93 |

JA4493

## ooter

5.12

3.53

23

C9    SCCY CPX-2

■ Expert 1
■ Expert 2

## eakdown by



4.05

4.10

4.32



**JA4494**



| | Kahr #2 | Ruger LC9 | SCCY CPX-2 |
|---|---|---|---|
| | 3.10 | 3.82 | 4.65 |
| | 5.48 | 4.51 | 3.67 |
| | 3.58 | 3.96 | 4.66 |
| | 4.05 | 4.10 | 4.32 |

**JA4495**

**Association of New Jersey Rifle & Pistol Club Cases – ANJRPC v Platkin; Ellman v. Platkin**

**Details on Firearms and Ammunition Used in Ballistic Testing (Sheetrock Wall Penetration) on 8/26/23 at Topton Fish & Game Association Range, Topton, PA.**

**Chronographing done 8 feet from muzzle using Caldwell Ballistic Precision chronograph, between 5:00 p.m. and 6:00 p.m., approximate ambient air temperature 80 degrees F.**

**Handgun:**  Smith & Wesson Model 586 .357 Magnum revolver, 4" barrel, ser. #AAL8096.

Federal .357 Magnum Hi-Shok 125 gr. jacketed hollow point ammunition,
Product No. 357B, Lot No. 1215553693.
Average velocity 1,263.8 fps. (range 1,154 to 1,380 fps.).

Speer .38 Special +P, 125 gr. Gold Dot hollow point ammunition,
Part No. 53720, Lot No. C20A203. Average velocity 1,002.5 fps.,
(range 989 to 1,023 fps.).

**Shotgun:**  Remington 870 Wingmaster, 12 ga. pump-action shotgun, 20" barrel, ser. #67498V.

Federal 12 ga. 2-3/4" 9-pellet 00 buckshot, Power-Shok, Product No. F127 00,
Lot No. 153Z107.  Average velocity 1,298.3 fps. (range 1,295 to 1,302 fps.).

**Rifle:** Bushmaster Model XM15-E2S, cal. .223-5.56mm, 20" barrel, ser. #L105981.

Hornady "Superformance Varmint" 35 gr. NTX, Product #83266, Lot #3214339.
Average velocity 3,719,4 fps. (range 3,672 to 3,786 fps.).

# Exhibit 26



# SHEETROCK WALL PENETRATION TESTING

## 8/26/2023

Sheetrock Wall Penetration Testing








Shooting Glass Video 1 of 2



Case 1:19-cv-10652-RMB-AMD   Doc/Filed 01/4-B   Copyright 2024   Page 35 of 230
PageID: 2628

Shooting Glass Video 2 of 2

# Exhibit 27



NSSF® The Firearm Industry Trade Association

*NSSF® Report*

# MODERN SPORTING RIFLE

## COMPREHENSIVE CONSUMER REPORT

**Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles**

JA4502

**Copyright:** ©2022 National Shooting Sports Foundation

For all client unique research, copyright is assigned to said client. All report findings contained within are the property of the client (NSSF), who is free to use this information as desired. However, it is recommended that the client contact *Sports Marketing Surveys*, prior to reproduction or transmission for clarification of findings, analysis, or recommendations.

**Disclaimer:**

While proper due care and diligence has been taken in the preparation of this document, *Sports Marketing Surveys* cannot guarantee the accuracy of the information contained and does not accept any liability for any loss or damage caused as a result of using information or recommendations contained within this document.

Sports Marketing Surveys USA

6650 West Indiantown Road, Suite 220,

Jupiter,

Florida 33458, USA

www.sportsmarketingsurveys.com

+1 561 427 0647

c. 772 341 6711

JA4503

# Table of Contents

Executive Summary........................................................... 3

Methodology.................................................................... 9

1. Experience with MSRs................................................... 10

2. Most Recently Acquired MSR........................................ 18

3. MSR Usage and Activities............................................. 39

4. MSR User Profiles........................................................ 51

5. Clusters/Segmentation................................................. 61

6. Sample Profile............................................................. 71

JA4504

# Executive Summary

## EXPERIENCE WITH MSRs

- Ownership & Platform: The median MSR user owns nearly 4 MSRs, with 97% of owners saying they own an AR-platform MSR. 38% own another MSR platform and 27% own an AK platform MSR.

- When MSR was first owned: Over 40% obtained their first MSR since 2009, with 11% obtaining their first MSR within the last 2 years.  while 20% of MSR owners obtained their first MSR prior to 1999.

- Other Firearms Owned First: 99% of MSR owners used or obtained another firearm before an MSR; the most popular firearm owned is a handgun, which 88% of MSR owners held before obtaining a MSR.

- Introduction to MSRs: One-third of MSR owners became interested through their own personal accord. About 21% first gained interest through military or their job, and another 20% through family & friends.

- Range membership: 52% of MSR owners are current members of a shooting range. 28% have never been a member, with the final 20% being former members.

- Reasons for ownership: Recreational target shooting was rated as the most important reasons for owning an MSR.  Big game hunting and professional/job-related use were rated as least important.

## MOST RECENTLY ACQUIRED MSR

- When Acquired: 48% of MSR owners said they obtained their most recently acquired MSR within the last two years (2021 or 2021), with 31% saying they obtained a MSR in 2021.

- Platform: Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

4

JA4505

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- New/Used MSR: 83% of MSR owners said they bought their most recent MSR by purchasing it new.

- Place of purchase: 30% of owners bought their most recent MSR from an independent (mom & pop) retail store. 22% assembled their MSR using purchases of different parts, and 19% used the internet/website. The most popular retailers & online sites used were Palmetto State Armory, Gunbroker.com, Cabela's, and Sportsman's Warehouse.

- Price: The average price for a new MSR paid by owners was $1,071; half of MSR owners paid between $500 and $1000 for their most recently acquired MSR.

- Brand: Survey data indicates the MSR market is highly fragmented. 11% of MSR owners said Palmetto was the brand of their most recently acquired MSR.

- Caliber – 60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm.

- Reasons for buying– MSR owners said reliability, accuracy, and fun were the most important reasons for purchasing their most recently acquired MSR. The least important reasons were recommendations from a retailer and MSRs owned by family/friends.

- Accessories: 86% of MSR owners have their most recently acquired MSR customized to some extent, with 70% having 1-3 accessories. 75% of those with accessories added them to their MSR within 12 months after purchase. The average spent for accessories by owners on their most recently acquired MSR is $618.

- Optics used: 61% of MSR owners have a scope equipped as a primary optics, while 55% utilize a red dot.

**JA4506**

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- <u>Scope</u>: the most common scopes used by MSR owners are the 3-9x power scope and the 1-4x power scope.

- <u>Magazine capacity</u>: Over half (52%) of MSR owners stated the magazine capacity of their MSR is 30 rounds. When asked why they chose their respective capacity, most frequent responses were related to popularity/standard and being readily available.

- <u>Stock</u>: Approximately two-thirds of MSR owners have a collapsible/folding stock on their MSR.

- <u>Receiver</u>: 81% of owners have a flat top upper receiver.

- <u>Handguard</u>: The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

- <u>Finish color</u>: 3 out of 4 owners have a black finish color on their MSR.

- <u>Barrel</u>: 67% have a threaded barrel on their MSR.

- <u>Barrel accessories</u>: Most used barrel accessories are flash hider (39% of MSR owners) and muzzle brake/compensator (37%).

- <u>Barrel length</u>: 75% have a MSR with a barrel length of 16" to 20".

- <u>Operating system</u>: The most recently acquired MSR for 59% of owners operates by direct gas impingement.

JA4507

# Executive Summary

## MOST RECENTLY ACQUIRED MSR (cont.)

- Storage: 67% store their MSR unloaded and secured in a safe, lock box, or with a trigger lock. An additional 19% store their MSR loaded and secured in a safe, lock box, or with a trigger lock.

- Likelihood to buy: On a scale from 1 to 10, where 1 is "not at all likely" and 10 is "very likely," the average likelihood rating given by MSR owners that they'll buy a MSR in the next 12 months is 6.2, slightly more to the 'likely' end of the scale.

- Accessories owned: The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and a soft carrying case. The accessory MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer. About 70% of MSR owners do not own and do not plan on buying a laser designator or night vision/thermal scope in the next 12 months.

## USAGE AND ACTIVITIES

- Use: 88% of MSR owners used/shot their MSR(s) in the last 12 months. The average number of times used was 14, just over once a month. Compared to the 12 months before that, 41% said their MSR use was "about the same" while 38% said it was less.

- Desired usage: 75% of MSR owners said they did not use their MSR as much as they would like over the past 12 months. The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

- Activities: The most popular activity by MSR owners is target shooting — 54% said they did target shooting at a private range, while 49% said they did target shooting at a public range.

- Ammo used: Roughly 70% of MSR owners used budget factory and premium factory loads in the last 12 months. The ammo breakdown for an average MSR user is made up of 42% budget factory loads, 32% premium factory loads, 17% handloads/reloads, and 9% import ammo. The average number of rounds used by MSR owners in the last 12 months is 907 rounds. In the next 12 months, MSR owners project they'll fire 984 rounds.

JA4508

# Executive Summary

## USAGE AND ACTIVITIES (cont.)

- <u>Ammo purchases</u>: The average number of ammo rounds typically purchased by MSR owners is 637.

- <u>Ammo on hand</u>: Nearly half (45%) of MSR owners own/keep more than 1,000 rounds on hand.

- <u>Ammo reloads</u>: 6 out of 10 MSR owners do not reload their own ammunition. Of the 40% who do, the average percentage of ammunition they reload is 53%.

- <u>Activities – Distance</u>: The most frequent distance that MSR owners hunt/target shoot is at 100-300 yards.

- <u>Target shooting alone vs with others</u>: 43% of MSR owners who go target shooting typically go with 1 other person. 27% go alone.

- <u>Favorite part about owning MSR</u>: MSR owners said their favorite part about owning a MSR was: fun/enjoyment of shooting, exercising freedom/2A rights, ease of use, and reliability.

## RESPONDENT PROFILE

- Organizations: 61% of MSR owners are members of or recently donated to the NRA, the most frequently chosen organization. 21% of MSR owners are not members of or recently donated to any firearm organizations. 12% are members or recently donated to the NSSF.

- Military/Law-Enforcement: 38% of MSR owners are active/retired member of law enforcement or the military.

- Age/Gender/Race: 96% of MSR owners are Male. The average age of MSR owners is 55 years old. 88% are White/Caucasian.

- Marital status: 74% of MSR owners are married. Of these MSR owners, over half say their spouse accompanies them for target shooting. 24% say their spouse has no interest in target shooting or firearms.

# Executive Summary

## RESPONDENT PROFILE (cont.)

- Education: 45% of MSR owners have attained at least a bachelors degree. One-quarter have attended some college, but did not graduate.

- Income: The average yearly household income for MSR owners is $110,934. More than half are in households with an annual income of greater than $85,000.

- Children in Household: 62% of MSR owners do not have any children living with them.

- State: The states with the most respondents were Texas (9%), California (5%), and Florida (5%).

JA4510

# Methodology

In 2020, the National Shooting Sports Foundation (NSSF) contracted Sports Marketing Surveys for an online consumer survey on modern sporting rifles (MSRs) that was last carried out in 2013. Due to the COVID pandemic and personnel changes at NSSF, this survey was not able to be administered until December 2021. The aim is to provide the NSSF and manufacturers insights on current consumer needs and uses of MSRs as well as educate those influencing public policy in the effort to preserve our constitutional rights.

The online survey covered various aspects of MSR ownership, behavior, and attitudes. The NSSF promoted the survey via a partner email distribution list. A random drawing to win one of four $250 Mastercard prepaid gift cards was included to incentivize participation. The term "Modern Sporting Rifle" was clearly defined as AR– or AK-platform rifles such as AR-15, AR-10, AK-47, AK-74 and did not include non-rifle firearms such as AR pistols, etc. Photographs of both AR– and AK-platform MSRs were shown on the survey landing page. All responses from those under 18 years old or said they did not own at least 1 MSR were removed from the analysis.

The survey was live from December 9, 2021 to January 2, 2022.

- **Completed Surveys: 2,421**
- **Usable responses for analysis: 2,185**

JA4511



Section 1: Experience with Modern Sporting Rifles

JA4512

# Modern Sporting Rifle Ownership: Platforms

## Average number of MSRs owned: 3.8

- AR – 2.6
- Other – 0.8
- AK – 0.4

Median of all MSRs owned: 3

(may own zero of one or more platform, but must at least own one MSR)



**Number of MSRs owned**

| | | | |
|---|---|---|---|
| 24.0% | 20.5% | 14.3% | 41.2% |
| 1 | 2 | 3 | 4+ |

## Trend – Average Number of MSRs owned

2010: 2.6
2013: 3.1
2021: 3.8

**MSR Platforms Owned**



% of users owning platform

AR platform: 97%
Other platform: 38%
AK platform: 27%



| Platform | Average Number of MSRs owned (must own at least one of specified platform) |
|---|---|
| AR platform | 2.7 |
| Other platform | 2.3 |
| AK platform | 1.5 |

**JA4513**

# Modern Sporting Rifle Ownership: Experience

## When did you obtain your FIRST MSR?





By Number of MSRs Owned

| | 1 MSR | 2 | 3 | 4 | 5+ |
|---|---|---|---|---|---|
| 2021 | 14% | 3% | 3% | 1% | 1% |
| 2020 | 13% | 7% | 3% | 1% | 2% |
| 2019 | 9% | 7% | 5% | 4% | 2% |
| 2018 | 9% | 7% | 5% | 5% | 3% |
| 2017 | 8% | 5% | 5% | 4% | 3% |
| 2016 | 7% | 8% | 8% | 6% | 3% |
| 2015 | 7% | 8% | 6% | 3% | 5% |
| 2014 | 5% | 7% | 3% | 4% | 3% |
| 2013 | 3% | 5% | 6% | 4% | 4% |
| 2012 | 4% | 4% | 4% | 7% | 5% |
| 2011 | 2% | 4% | 4% | 4% | 4% |
| 2010 | 2% | 4% | 7% | 4% | 6% |
| 2005 – 2009 | 8% | 13% | 15% | 15% | 19% |
| 2000 – 2004 | 3% | 4% | 7% | 9% | 11% |
| Prior to 1999 | 7% | 13% | 20% | 28% | 30% |

- **20% of MSR owners obtained their first MSR before 1999. Over 40% have owned theirs since 2009.**

- **11% obtained their first MSR within the last two years.**

- **26% of those who own 1 MSR obtained it in 2020 or 2021.**

JA4514

# Modern Sporting Rifle Ownership: Experience



**Firearms Used/Owned BEFORE obtaining a MSR**

- Handguns are the most popular firearm used/owned before obtaining an MSR, with 88% of MSR owners selecting.

- Traditional rifles were also first used/owned by 82% of MSR owners.

- Younger MSR owners show less ownership of other firearm types before a MSR compared to other age groups.



JA4515

# Modern Sporting Rifle Ownership: Experience

**Introduction to MSRs: where did you first gain interest?**



**Introduction to MSRs (Grouped)**



- One-third of MSR owners became interested through their own personal accord.

- About 21% first gained interest through the military or their job, and another 20% through family/friends.

# Modern Sporting Rifle Ownership: Experience



## Introduction to MSRs: where did you first gain interest?



### Introduction to MSRs (Grouped)

- **One-third of MSR owners became interested through their own personal accord.**

- **About 21% first gained interest through the military or their job, and another 20% through family/friends.**

# Modern Sporting Rifle Ownership: Shooting Ranges

**Do you currently have a membership at a shooting range?**



- About half of MSR owners are current members of a shooting range.

- 28% have never been a member of a shooting range.

17

JA4518

# Modern Sporting Rifle Ownership: Reasons for Ownership

Respondents were asked to rate how important each of the following reasons are to owning an MSR. They rated each reason on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."

**Rating: How important are these reasons to owning an MSR?**

| Reason | Rating |
|---|---|
| Recreational target shooting | 8.7 |
| Home/self-defense | 8.3 |
| Collecting | 6.3 |
| Varmint Hunting | 5.8 |
| Competition shooting (i.e. 3. Gun) | 5.6 |
| Big Game Hunting | 4.9 |
| Professional use / Job-related | 3.4 |

*Scale:*
*1=Not at all important,  10= very important*

- Recreational target shooting was rated as the most important reason for owning an MSR.

- Big game hunting and professional/job-related use were given the lowest importance ratings.



| | MSR Owned | | | | | Age | | | | Usage Frequency | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | 3 times or less | 4 to 11 times | 12 to 23 times | 24+ times |
| Recreational target shooting | 8.4 | 8.7 | 8.8 | 8.6 | 9 | 8.4 | 8.8 | 8.9 | 8.5 | 8.8 | 9 | 9.1 |
| Home/self-defense | 7.9 | 8.2 | 8.2 | 8.3 | 8.7 | 8.4 | 8.3 | 8.2 | 8 | 8.3 | 8.5 | 8.7 |
| Collecting | 5.2 | 5.8 | 6.6 | 6.7 | 7.1 | 6.9 | 6.5 | 5.8 | 5.9 | 6.2 | 6.4 | 7 |
| Varmint Hunting | 5.2 | 5.5 | 5.8 | 5.9 | 6.3 | 5.7 | 5.8 | 5.8 | 5.2 | 5.7 | 6.2 | 7 |
| Competition shooting (i.e. 3. Gun) | 4.6 | 5.3 | 5.6 | 6 | 6.4 | 6 | 5.8 | 5.2 | 4.9 | 5.4 | 6.3 | 7 |
| Big Game Hunting | 4.3 | 4.4 | 4.9 | 5.4 | 5.5 | 5.2 | 4.9 | 4.7 | 4.4 | 4.9 | 5.2 | 6 |
| Professional use / Job-related | 2.8 | 3 | 3.7 | 3.5 | 3.9 | 4 | 3.4 | 3 | 3 | 3.2 | 3.6 | 4.5 |

JA4519



# Section 2: Most Recently Acquired Modern Sporting Rifle

Case 1:18-cv-TSSF MSR Consumer Study – Report of Findings Page 55 of 240

JA4520

# Most Recently Acquired MSR: Platform, When Acquired

**Platform - Most Recent MSR Obtained**



**Year of Most Recently Acquired MSR**



- Nearly 9 out of 10 MSR owners said the most recent MSR they acquired was an AR platform.

- Nearly one-third of MSR owners said they acquired their most recent one in 2021, nearly 50% within the last two years (2021 or 2020).

7/14/22

20

JA4521

# Most Recently Acquired MSR: How? Where?

**How did you obtain your most recently acquired MSR?**



- 83% of MSR owners acquired their most recent MSR by purchasing it new.

**Place of Purchase**



- For those purchasing a new or used MSR, the most common place of purchase was an independent retail store.

- Popular retailers & online sites used: Palmetto State Armory, Gunbroker.com, Cabela's, Sportsman's Warehouse,

7/14/22

21

**JA4522**

# Most Recently Acquired MSR: Place of Purchase

| | Total | Number of MSRs Owned | | | | | Age | | | Range Membership | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5+ | Under 45 | 45 to 54 | 55+ | Member | Non-member |
| Independent (Mom & Pop) Retail Store | 30.3% | 31.9% | 30.5% | 31.1% | 29.8% | 28.9% | 26.6% | 35.1% | 30.1% | 33.9% | 26.5% |
| Purchases of different parts | 22.2% | 12.0% | 18.8% | 24.8% | 29.3% | 28.6% | 25.4% | 25.8% | 19.0% | 21.3% | 23.2% |
| Internet/Website | 19.3% | 18.6% | 21.1% | 16.2% | 19.1% | 20.2% | 24.3% | 14.1% | 19.1% | 18.1% | 20.7% |
| Other | 9.5% | 11.4% | 11.2% | 9.6% | 8.0% | 7.3% | 6.1% | 7.8% | 11.9% | 8.9% | 10.1% |
| Chain or Big Box Retail Store | 9.2% | 16.2% | 10.1% | 7.6% | 5.3% | 5.2% | 7.9% | 8.8% | 9.9% | 7.9% | 10.5% |
| Purchased as a kit | 5.8% | 5.6% | 4.6% | 6.3% | 5.8% | 6.4% | 7.0% | 4.6% | 5.6% | 5.9% | 5.6% |
| Gun Show | 3.7% | 4.2% | 3.7% | 4.3% | 2.7% | 3.5% | 2.7% | 3.8% | 4.2% | 4.0% | 3.4% |

7/14/22

JA4523

# Most Recently Acquired MSR: Price

- Half of MSR owners paid between $500 and $1000 for their most recently purchased MSR, both those who bought a new MSR and those who bought a used MSR.
- Average price for last MSR: $1,071.

| | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Overall average** | **$1,083** | **$1,058** | **$1,071** |
| AR-platform (new) | | $1,112 | $1,057 |
| AR platform (used) | | | $992 |
| AK platform (new) | | $711 | $1,086 |
| AK platform (used) | | | $1,218 |

JA4524



# Most Recently Acquired MSR: Brand



**Brand of Most Recently Acquired AR**

- Survey data indicates the MSR market is highly fragmented. 11% of MSR owners said Palmetto was the brand of their most recently acquired MSR — the highest among the options available.

Commonly mentioned brands included in "Other":
- ATI
- Battle Arms Development
- MBX
- Sharp Bros
- Tavor
- WBP

*50+ other brands were selected by less than 1 % of respondents; full list available upon request*

**JA4525**

# Most Recently Acquired MSR: Caliber



**Caliber of Most Recently Acquired MSR**

- 60% of respondents said the caliber of their most recently acquired MSR is .223 / 5.56 mm

- Of the 5% selecting "other," the most frequently mentioned calibers included:
  - 6.5 Grendel
  - .458 SOCOM
  - .224 Valkyrie

*7 other calibers were selected by less than 1% of respondents*

# Most Recently Acquired MSR: Reasons for Buying

For the 94% of respondents that purchased their MSR new or used, they were asked to rate how important each of the following reasons are for selecting their most recently acquired MSR on a scale from 1 to 10, where 1 is "not at all important" and 10 is "very important."

- MSR owners rated reliability, accuracy, and fun as the most important reasons for purchasing their most recently acquired MSR.

- The least important reasons as rated by MSR owners include recommendations from a retailer and MSRs owned by family/friends.

**Rating: Most Important Reasons for Buying Most Recently Purchased MSR**



| Reason | Rating |
|---|---|
| Reliable | 9.0 |
| Accuracy | 8.8 |
| Fun | 8.7 |
| Easy to shoot | 8.4 |
| Good ergonomics, easy access to safety, fits my body | 8.1 |
| Reputation of manufacturer | 8.1 |
| Availability of ammunition in this caliber | 8.1 |
| Availability of parts | 7.5 |
| Ability to accessorize | 7.4 |
| For home/self-defense | 7.0 |
| Aesthetically pleasing | 7.0 |
| Potential to avoid any potential future ownership ban | 6.8 |
| Low cost of ammunition | 6.6 |
| Price | 6.6 |
| Light weight | 6.5 |
| Low recoil | 5.2 |
| Ability to shoot competitively | 5.1 |
| To hunt | 3.7 |
| Taught to use a similar firearm in military / law enforcement | 3.3 |
| Recommended by retailer | 3.2 |
| My friends / family had one | 3.2 |

*Scale:*
*1=Not at all important,  10= very important*

26

JA4527

# Most Recently Acquired MSR: Accessories

**MSR - Use of Accessories**



Heavily accessorized (4+ accessories), 16%

Out of the box (no accessories), 14%

Have a few accessories (1 – 3 accessories) , 70%

**When have you added accessories to your MSR?**



- 86% of have their most recently acquired MSR customized to some extent, 70% having 1-3 accessories.

- For those with accessories on their most recently acquired MSR, 75% added accessories within 12 months after purchase. Nearly a quarter added accessories at the time of purchase.

27

JA4528

# Most Recently Acquired MSR: Accessories - Spend

**Spend on After-Market Customization to Most Recently Acquired MSR**



|  | 2010 | 2013 | 2021 |
|---|---|---|---|
| **Average spent** | **$436** | **$381** | **$618** |

- Of the MSR owners who have added accessories to their most recently acquired MSR, nearly half, or 48%, have spent between $201 and $600 on after-market customization.

- The average spent for accessories by owners on their most recently acquired MSR by owners is $618.



JA4529

# Most Recently Acquired MSR: Optics

**Optics Used on Most Recently Acquired MSR**

- 61% of MSR owners have a scope equipped as a primary optic on their most recently acquired MSR.

- Iron sights are the most common secondary aiming device, equipped on two-thirds of respondents' MSRs.



JA4530

# Most Recently Acquired MSR: Scope



**Type of Scope on MSR**

- The most common scopes used by MSR owners are the 3–9x power scope (21%) and the 1–4x power scope (20%).

- Of the 10% who selected "Other," the most frequently mentioned scopes were:
  - 1-8x variable power scope
  - 1-10x variable power scope

# Most Recently Acquired MSR: Magazine Capacity



**Magazine Capacity on MSR**

| Magazine Capacity | Percentage |
|---|---|
| 30 round capacity | 52% |
| 20 round capacity | 17% |
| 10 round capacity | 17% |
| 5 round capacity | 5% |
| 15 round capacity | 3% |
| 25 round capacity | 2% |
| 40 round capacity | 2% |
| Other | 1% |

- Half (52%) of MSR owners stated the magazine capacity of their most recently acquired MSR is 30 rounds.

- When asked why they chose their respective magazine capacity, the most frequent responses were:
  - Common/standard
  - Readily available

31

7/14/22

# Most Recently Acquired MSR: Type of Stock



**Type of Stock on MSR**

- Collapsible / Folding — 65%
- Fixed — 22%
- Precision — 6%
- Arm brace — 5%
- Other — 2%
- I don't know — 1%

- 65%, or approximately two-thirds, of MSR owners have a collapsible/folding stock on their most recently purchased MSR.

# Most Recently Acquired MSR: Type of Upper Receiver



**Type of Upper Receiver on MSR**

- 81% have a flat top upper receiver on their most recently acquired MSR.

JA4534

33

# Most Recently Acquired MSR: Type of Handguard



**Type of Handguard on MSR**

- The most common type of handguard is a free floating with rails handguard, used by 43% of respondents on their most recently acquired MSR.

JA4535

# Most Recently Acquired MSR: Finish Color

**Finish Color on MSR**



- 3 out of 4 MSR owners have a black finish color.

35

JA4536

# Most Recently Acquired MSR: Barrels – Type, Accessories, Length



**Barrel Accessories on MSR**



**Type of Barrel on MSR**

**Barrel Length on MSR**

- Two-thirds of MSR owners have a threaded barrel.

- Most common accessories: flash hider (39%), muzzle brake/compensator (37%)

- 75% have a barrel length of 16–20%

JA4537

36

# Most Recently Acquired MSR: Operating System, Storage

- 59% of MSR owners indicated their most recently acquired MSR is operated by direct gas impingement.

- 67%, or two–thirds, of MSR owners store their MSR secured and unloaded.



**Operating System on MSR**



**MSR Storage**

**JA4538**

37

# Most Recently Acquired MSR: Likelihood to Buy a MSR in Next 12 Months



**Likelihood to Buy a MSR in Next 12 Months**

Avg: **6.2**

Scale: 1= Very Unlikely 10=Very Likely

- Average likelihood to buy an MSR in the next 12 months is a 6.2 out of 10, slightly more to the "likely" end of the scale.

- 25%, or one-fourth of respondents, said they are "very likely" to buy an MSR in the next 12 months.

**JA4539**

38

# Most Recently Acquired MSR: Accessories Owned

| | Owned | Plan to buy in next 12 months | Don't own, don't plan to buy |
|---|---|---|---|
| Gun Cleaning Kit | 94% | 9% | 3% |
| Extra Magazines | 87% | 23% | 6% |
| Targets | 84% | 26% | 5% |
| Soft Carrying Case | 84% | 9% | 12% |
| Rifle Sling | 81% | 21% | 8% |
| Gun Safe | 78% | 14% | 13% |
| Rifle Scope | 76% | 23% | 14% |
| Hard Carrying Case | 69% | 12% | 25% |
| Gun Lock | 64% | 4% | 32% |
| Backup sights | 55% | 20% | 31% |
| Bipod | 55% | 21% | 34% |
| Railed Handguard | 54% | 13% | 36% |
| Spotting Scope | 52% | 19% | 31% |
| Mounted Flashlight | 46% | 27% | 36% |
| Trigger Upgrade | 45% | 26% | 39% |
| Range Finder | 43% | 25% | 37% |
| Vertical Fore-grip | 41% | 14% | 49% |
| Stock Upgrade | 37% | 17% | 49% |
| Suppressor/silencer | 19% | 37% | 53% |
| Laser Designator | 17% | 12% | 72% |
| Night Vision/Thermal | 13% | 26% | 67% |
| Other | 6% | 4% | 43% |

- The most common accessories currently owned by MSR owners are gun cleaning kits, extra magazines, targets, and soft carrying case.

- The accessory that MSR owners most frequently said they planned to buy in the next 12 months is a suppressor/silencer.

- Roughly 70% of MSR owners do not own and do not plan to buy a laser designator or night vision/thermal scope in the next 12 months.

JA4540



Section 3: Modern Sporting Rifle Usage & Activities

JA4541

# MSR Usage and Activities

## Used Your MSR(s) in the last 12 months?



No 12%
Yes 88%

## MSR Usage: Number of Times in Last 12 Months

1 to 4 times — 33%
5 to 11 times — 32%
12 to 23 times — 17%
24 or more times — 18%

Avg: 14 occasions

## MSR Use in Last 12 Months Compared to Previous 12 Months



More 20%
About the same 41%
Less 38%

- 88% of MSR owners used/shot their MSR(s) in the last 12 months. Compared to the 12 months before that, 41% said their MSR use was "about the same." 38% said it was less.

- Of those who used their MSR, the average number of times respondents used it in the last 12 months is 14.

41

JA4542

# MSR Usage and Activities: Factors Preventing Usage

**Used MSR As Much As You Would Like in Last 12 Months?**



**Rating: How important are the following in preventing you from using your MSR as much as you'd like?**



| Factor | Rating |
|---|---|
| Lack of ammunition availability | 8.0 |
| Cost of ammunition | 7.8 |
| Not enough free time | 6.2 |
| Distance I must travel for a suitable place to shoot | 4.5 |
| Cost of range fees | 3.4 |
| No one to go with | 3.2 |
| Other | 3.0 |

*Scale:*
*1=Not at all important, 10= very important*

- 3 out of 4 MSR owners said they did not use their MSR as much as they would like over the past 12 months.

- The most important factors preventing owners from using their MSR more are related to ammunition: lack of availability and cost.

7/14/22

42

JA4543

# MSR Usage and Activities



**MSR Activities in Last 12 Months**

- The most popular activity by MSR owners is target shooting; 54% said they did at a private range, while 49% said they did at a public range.

# MSR Usage and Activities: Ammunition Used - Type

**Ammo Used (% of MSR Owners Using)**



- Across all MSR owners, roughly 70% of used budget factory loads and premium factory loads in the last 12 months.

**Ammo Profile - Average % Breakdown Per MSR Owner**



- The ammo breakdown per MSR owner shows that 42% of ammo they used in the past 12 months are factory loads/bulk packs.

# MSR Usage and Activities: Ammunition Used - Amount

**Rounds of Ammo Fired Through MSR In Last 12 Months**



**Rounds of Ammo Fired (Grouped)**



- The average number of rounds used by MSR owners in the last 12 months is 907.

- Approximately half of MSR owners fired between 1 and 400 shots in the last 12 months, the other half shooting more than 400 rounds.

# MSR Usage and Activities: Ammunition Used – Projected Amount

**Projected Rounds of Ammo Fired Through MSR In Next 12 Months**



**Projected Rounds of Ammo Fired (Grouped)**



- The average number of rounds that MSR owners project they will fire in the next 12 months is 984.

- Over one-third of MSR owners anticipate firing more than 800 rounds of ammunition in the next 12 months.

# MSR Usage and Activities: Ammunition Quantity Purchased, Kept On Hand

**Quantity of MSR Ammo Typically Purchased**



**Number of MSR Rounds Owned/Kept on Hand**



- When purchasing ammunition, the average number of ammo rounds typically purchased by MSR owners is 637.

- 36% of MSR owners typically purchase between 500-1,999 rounds.

- Nearly half of MSR owners own/keep more than 1,000 rounds on hand.

JA4548

# MSR Usage and Activities: Ammunition Reloads

**Do you reload your own ammunition?**



- 6 out of 10 MSR owners do not reload their own ammunition.

- Of the 40% who do, the average percentage of their ammunition they reload is 53%.

**Percentage of Ammo Reloaded**



48

**JA4549**

# MSR Usage and Activities: Firearms Used



- 95% of respondents used their MSR to rifle target shoot.

# MSR Usage and Activities: Target Shooting/Hunting



**Typical Distance When Using MSR for Hunting/Target Shooting**

- Under 100 yards: 30%
- 100 - 300 yards: 59%
- 301 - 500 yards: 7%
- 501 - 1,000 yards: 3%
- More than 1,000 yards: 0%
- I don't know: 1%

**Target Shooting - Do you generally go alone or with others?**

- With 1 other person: 43%
- Alone: 27%
- With 2 - 4 other people: 26%
- With 5+ other people: 4%

- The most frequent distance that MSR owners hunt/target shoot at is 100–300 yards.

- 43% generally go target shooting with one other person. 27% go alone.

JA4551

# Respondent Profile: Favorite Part About Owning MSR

Respondents were asked in an open-ended question to explain their favorite part of owning an MSR. Common themes in answers include:

**FUN/ENJOYMENT OF SHOOTING**
- General enjoyment of shooting; relaxing
- Challenge of target shooting, hunting; improving
- Camaraderie with others, quality time with loved ones
- Ability to customize/building from parts

**EXERCISING FREEDOM/2A RIGHTS**
- Represents freedom and America
- Tradition and history

**EASE OF USE**
- Lightweight
- Low-recoil
- Accurate, versatile
- Instills confidence

**RELIABLE**
- Craftsmanship and engineering
- Peace of mind — excellent for home defense

JA4552



# Section 4: MSR Owner Profiles

JA4553

# Profile: Single MSR Owners vs Multi-MSR Owners

Multiple-MSR owners are relatively more likely to be:

- Ages 55+
- Non-range members
- Those who used MSR 11 or less times in the last 12 months
- Not from a military/law enforcement background
- Those with an income under $65k, though there is fairly even distribution across ranges
- Users of MSR for target shooting
- Those with no kids at home
- Owners of a MSR(s) for home defense purposes
- Those who plan to buy MSR accessories in the next 12 months

JA4554

# Profile: Range vs Non-Range Member



MSR owners who are shooting range members are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- Occasional users of MSRs – 4 to 11 times times in the last 12 months

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who plan to buy MSR accessories in the next 12 months

JA4555

# Profile: Infrequent vs Avid MSR Users



Avid MSR owners are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55+

- A member of a shooting range

- Not from a military/law enforcement background

- Those with an income over $110k

- Users of MSR for target shooting and hunting

- Those with no kids at home

- Owners of a MSR(s) for home defense, hunting, competition shooting

- Those who recently bought a MSR in 2020 or 2021, plan to buy accessories or a new MSR in the next 12 months

55

JA4556

Case 1:18-cv-10507-RMB-JBD Document 184-8 Filed 11/03/23 Page 92 of 240 PageID: 7681

# Profile: Target Shooters vs Hunters

Target shooters and hunters have similar profiles. Hunters are slightly more likely to be:

- Owners of multiple MSRs
- Under 45 years old
- A frequent or avid user of MSRs
- Those without a bachelors degree
- Users of MSR for target shooting and hunting
- Those with kids at home
- Owners of a MSR(s) for home defense, hunting, competition shooting
- Those who are likely to buy a new MSR in the next 12 months

JA4557

# Profile: Owners Who Haven't Used MSR In Last 12 Months



**Non-MSR users are relatively more likely to be:**

- Owners of multiple MSRs

- Ages 55 & older

- Not a member of a shooting range

- Those with a household income of less than $110k

- Those with no kids at home

- Owners of a MSR(s) for home defense, some hunting

- Those who plan to buy accessories for their MSR in the next 12 months

57

JA4558

# Profile: Premium Buyers (>$1500 spent on MSR) vs Non-Premium Buyers

Premium MSR buyers are relatively more likely to be:

- Owners of multiple MSRs

- Ages 55 & older

- A member of a shooting range

- Regular users of MSRs, using 4 to 11 times a year

- Those with a household income greater than $110k

- With a bachelors degree or more

- Using MSR for target shooting, competition shooting, and hunting.

- Owners of a MSR(s) for home defense, competition shooting, hunting

- Recent buyers (purchased MSR in 2021 or 2020), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.



# Profile: Heavily Accessorized (4+ accessories) MSR Owners



Owners of heavily accessorized MSRs are relatively more likely to be:

- Owners of multiple MSRs
- Under 45 years old
- A member of a shooting range
- Frequent/avid users of MSRs
- Those with a household income greater than $110k
- With a bachelors degree or more
- Using MSR for target shooting, competition shooting, and hunting.
- Owners of a MSR(s) for home defense, competition shooting, hunting
- Premium MSR buyers (>$1500 spent on last MSR), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

Case 1:18-cv-10507-RMB-JBD Document 184-8 Filed 11/03/23 Page 96 of 240 PageID: 7685

# Profile: Likely MSR buyers

Likely MSR buyers are relatively more likely to be:

- Owners of multiple MSRs
- Under 45 years old
- Frequent/avid users of MSRs
- Those with a household income greater than $110k
- With a bachelors degree or more
- Using MSR for target shooting, competition shooting, and hunting.
- Owners of a MSR(s) for home defense, competition shooting, hunting
- Premium MSR buyers (>$1500 spent on last MSR), high-spenders on accessories ($600+) and very likely to buy new MSR in the next 12 months.

JA4561

# Profile: Military/Law Enforcement vs Non-Military/Law Enforcement

MSR owners with a military/law-enforcement background are relatively more likely to be:

- Owners of multiple MSRs
- 55 years old or older
- Frequent/avid users of MSRs
- Those with a household income of $65-$110k
- Those without a bachelors degree or more
- Using MSR for competition shooting or work
- Owners of a MSR(s) for home defense or professional/job-related purpose

JA4562



Section 5: Clusters/Segmentation

JA4563

# Clusters Analysis/Market Segmentation Explained

A Cluster Analysis is method used in market segmentation to help marketers identify specific consumer groups based on a specific set and sub-set of demographic and specific product usage patterns. Market segmentation means dividing the market into distinct groups of individual segments or clusters with similar wants or needs and behaviors.

A market segment or cluster is a sub-set of a people, in this case, MSR owners with one or more characteristics that cause them to demand similar product and/or services based on qualities of those products — such as usage activity and demographics. A true market segment meets all of the following criteria: it is distinct from other segments (different segments have different needs), it is homogeneous within the segment (exhibits common needs), and responds similarly to market stimulus and media.

In the MSR Study, we used the following variables to establish clusters:
- Age
- Reasons for owning an MSR
- Annual Household Income
- Number of MSRs Owned
- Military/Law-Enforcement Affiliation

JA4564

Case 1:18-cv-10507-RMB-JBC Document 184-8 Filed 11/07/23 Page 100 of 240

# MSR Clusters Summary

| | 1. Law Enforcement & Competition | 2. Casual Hunter | 3. Affluent Gun Enthusiast | 4. Low-Use Home Defense | 5. Hunting Aficionado |
|---|---|---|---|---|---|
| % of owners | 18% | 17% | 23% | 21% | 21% |
| % of MSRs | 24% | 13% | 27% | 11% | 25% |
| Number of MSRs Owned | 3+ | 1 | 3+ | 1 | 3+ |
| Age | Under 45 | Under 45 | 45 to 54 | 55+ | 55+ |
| Reasons for Owning a MSR | Professional use/job-related, competition | Hunting | Competition shooting | Home defense | Hunting |
| Annual Household Income | $65 to $110k | <$65k | >$110k | <$65k | >$110k |
| Military/Law-Enforcement Affiliation | Military/L.E. | Non-Military/L.E. | Non-Military/L.E. | Slightly more Military/L.E. | Slightly more non-Military/L.E. |
| MSR usage frequency (last 12 months) | More than 24 times | 3 times or less | 12 to 23 times | 3 times or less | 4 to 11 times |
| Range Member | Slightly more likely to be a range member | Non-member | Range Member | Non-member | Non-member |
| Education | Slightly more likely to not have a bachelors | No bachelors | Bachelors+ | Both bachelors+/no bachelors | Bachelors+ |
| Introduction to MSRs | Military/job, Other | Family/friends, personal interest | Shooting Range | Media/internet, military/job | Family/friends, personal interest |
| MSR Activities In Last Year | Use MSR for work, competition shooting | Hunting, long-range shooting | Competition shooting | Not Used MSR | Hunting |
| MSR Purchase Behavior | Very likely to buy MSR in next year, premium MSR buyer (>$1500 for MSR), High-spend accessories, heavily accessorized, recent buyer | Very likely to buy MSR in next 12 months, plans on buying accessories | Premium MSR buyer (>$1500), heavily accessorized MSR, high-spend on accessories, recent buyer | Slightly less likely to plan to buy accessories in next year | Recent buyer (obtained MSR in 2020 or 2021) |
| Place of Purchase | Mom & Pop Retail Store | Gun Show | Gun show, custom built | Chain/Big-Box Retail | Bought as kit/custom-built |

JA4565

64

Case 1:18-cv-10507-RMB-JBC Document 104-8 Filed 1/3/2020 Page 101 of 240

# MSR Clusters Summary

## Clusters: Makeup of MSR Owners & Total MSRs Owned



JA4566

Case 1:18-cv-10507-RMB-JBD Document 194-9 Filed 11/22/23 Page 102 of 240
NSSF MSR Consumer Study – Report of Findings

## How to Read Cluster Graphs

In the cluster graphs, the overall MSR sample profile is represented by a value of 0. The index is calculated by dividing the profile of the cluster (percentage of that cluster for a category) by the profile of the total MSR population. An index of 20 means the cluster is 20% more likely to exhibit that behavior or be a part of that group. For examples, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45 —this means a MSR owner in this cluster is 37% relatively more likely to be under 45 years old compared to the overall MSR user population.

We describe this as a relative measure since it does not account for the percentage of the MSR owner population. Using our previous example, MSR owners in Cluster 1 (Law Enforcement & Competition) have an index of 37 for ages under 45; this does not mean MSR owners under 45 form the majority of Cluster 1, only that they're over-represented compared to the overall MSR owner population.

JA4567

Case 1:19-cv-40083-PBS JFK Document 184-8 Filed 11/22/21 Page 103 of 240

# Cluster 1: Law Enforcement & Competition

*Index (All MSR Owners = 0)*

The **Law Enforcement & Competition** Cluster accounts for 18% of MSR owners. They tend to be:

- Owners of 3+ MSRs
- Under 45 years old
- Avid users of MSR
- From a military/law enforcement background
- Those with income of $65k to $110k
- Users of MSR for work/law, competition shooting
- Those with kids at home
- Very likely to buy new MSR in next 12 months, a premium buyer of MSRS (spending more than $1500 most recently acquired MSR), high-spenders on accessories

| Category | Item | Value |
|---|---|---|
| MSRs owned | Own 1 MSR | -67 |
| | Own 2 MSR | -33 |
| | Own 3+ MSR | 41 |
| Age | Under 45 | 37 |
| | 45 to 54 | 17 |
| | 55+ | -28 |
| Range | Range Member | 3 |
| | Non-member | -4 |
| Usage Frequency | 3 times or less | -27 |
| | 4 to 11 times | -19 |
| | 12 to 23 times | 23 |
| | More than 24 times | 97 |
| Military/L.E. | Military/L.E. | 56 |
| | Non-Military L.E. | -34 |
| Income | <$65k | -43 |
| | $65k to $110k | 22 |
| | >$110.1k | 7 |
| Education | No bachelors | -4 |
| | Bachelors+ | 3 |
| Activities | Target Shoot MSR | 71 |
| | Competition Shoot | 51 |
| | Hunting Using MSR | 61 |
| | Long-range shooting MSR | 271 |
| | Use MSR for Work/Law | |
| | Not Used MSR Last 12 Months | -39 |
| Kids | Kids in home | 25 |
| | No kids in home | -17 |
| Purchases | Recent Buyer | 9 |
| | Premium MSR Buyer (>$1500) | 38 |
| | Heavily Accessorised MSR | 37 |
| | High Spend Accessories | 37 |
| | Very Likely to Buy New MSR | 73 |
| | Plan to Buy Accessories | 2 |
| Reason for owning MSR | Home defense | 33 |
| | Hunting | 86 |
| | Professional/job-related | 295 |
| | Competition shooting | 129 |

Case 1:18-cv-4048-RWS-JPB Document 184-9 Filed 11/2020 Page 104 of 240

# Cluster 2: Casual Hunter



*Index (All MSR Owners = 0)*

The **Casual Hunter** Cluster accounts for 17% of MSR owners. They tend to be:

- Owners of 1 MSR

- Under 45 years old

- Not members of a shooting range

- Casual users, using their MSR 3 times or less in the past 12 months

- Not from a military or law enforcement background

- Those with income less than $65k

- Those without a bachelors degree

- Users of MSRs for hunting and long-range shooting

- Those without kids at home

- Very likely to buy new MSR in next 12 months and plan to buy accessories.

- Owners of MSRs for hunting and self-defense

JA4569

# Cluster 3: Affluent Gun Enthusiast

*Index (All MSR Owners = 0)*

The **Affluent Gun Enthusiast** Cluster accounts for 23% of MSR owners. They tend to be:

- Owners of 3+ MSR

- 45 to 54 years old

- Members of a shooting range

- Frequent users, using their MSR 12 to 23 times in the last 12 months

- Not from a military or law enforcement background

- Those with income greater than $110k

- Those with a bachelors degree

- Users of MSRs for competition shooting

- Premium MSR Buyers (>$1500 on most recent MSR, heavily accessorized and high spender on accessories

- Owners of MSRs for competition shooting



JA4570

# Cluster 4: Low-Use Self Defense



*Index (All MSR Owners = 0)*

The **Low-Use Self Defense** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 1 MSR

- 55 years old or older

- Not members of a shooting range

- Infrequent users, using their MSR 3 times or less in the last 12 months

- Slightly more likely to be from a military or law enforcement background

- Those with income less than $65k

- Those who did not use their MSR in the last 12 months

- Those with no kids at home

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for home defense

**JA4571**

Case 1:18-cv-10507-RMB-JBD   Document 194-9   Filed 11/02/23   Page 107 of 240

# Cluster 5: Hunting Aficionado



*Index (All MSR Owners = 0)*

The **Hunting Aficionado** Cluster accounts for 21% of MSR owners. They tend to be:

- Owners of 3+ MSRs

- 55 years old or older

- Not members of a shooting range

- Occasional MSR users, using their MSR 4 to 11 times in the last 12 months

- Slightly more likely to not be from a military or law enforcement background

- Those with income of greater than $110k

- Those with a bachelors degree

- Those used their MSR for hunting in the last 12 months

- Recent buyers of a MSR (in 2020 or 2021)

- Less likely to buy new MSR or be a premium buyer

- Owners of MSRs for hunting

JA4572



# Section 6: Sample Profile

JA4573

# Respondent Profile: Organizations

## Current Membership or Recent Donation to Organizations



- When asked what organizations they are a member of or recently donated to, the most-selected organization was the NRA (61%), chosen more than twice as much as any other organization.

- 21% of MSR owners are not members of or recently donated to any organizations listed.

- 12% are members or recently donated to the NSSF.

- Of the 19% who selected "Other" organizations, the most common mentions were:
  - Firearms Policy Coalition
  - Liberal Gun Club/Liberal Gun Owners
  - Second Amendment Foundation
  - National Skeet Shooting Foundation
  - National Sporting Clays Association

National Rifle Association (NRA) — 61%
Gun Owners of America (GOA) — 25%
None of the above — 21%
Other — 19%
USCCA/Delta Defense (U.S. Concealed Carry Association) — 17%
The National Shooting Sports Foundation (NSSF) — 12%
Ducks Unlimited — 10%
International Defensive Pistol Association (IDPA) — 9%
United States Practical Shooting Association (USPSA) — 9%
Rocky Mountain Elk Foundation — 7%
National Wild Turkey Federation — 6%
North American Hunting Club — 6%
Pheasants Forever — 5%
International Practical Shooting Confederation (IPSC) — 3%
Whitetails Unlimited — 3%
Buckmasters — 3%
Safari Club — 2%

JA4574

# Respondent Profile: Military/Law-Enforcement



## Active or Veteran/Retired Member of Law Enforcement/Military

Yes 38%
No 62%

### Military/Law Enforcement Affiliation

| | Military/Law Enforcement Affiliation |
|---|---|
| Army (veteran) | 34% |
| Air Force (veteran) | 19% |
| Local Law Enforcement (veteran) | 17% |
| Navy (veteran) | 17% |
| Marines (veteran) | 13% |
| National Guard (veteran) | 11% |
| Reserves (veteran) | 9% |
| Local Law Enforcement (active) | 7% |
| Other Law Enforcement (veteran) | 6% |
| State Law Enforcement (veteran) | 6% |
| Federal Law Enforcement (veteran) | 5% |
| Army (active) | 5% |
| State Law Enforcement (active) | 3% |
| Federal Law Enforcement (active) | 3% |
| National Guard (active) | 3% |
| Other Law Enforcement (active) | 2% |
| Air Force (active) | 2% |
| Coast Guard (veteran) | 2% |
| Reserves (active) | 2% |
| Navy (active) | 2% |
| Marines (active) | 2% |
| Coast Guard (active) | 2% |
| Space Force (active) | 2% |
| Space Force (veteran) | 1% |

| Military/law-enforcement (grouped) | % of those |
|---|---|
| Veteran military | 82% |
| Veteran law enforcement | 26% |
| Active law enforcement | 11% |
| Active military | 9% |

7/14/22

74

JA4575

Case 1:18-cv-10507-RMB-JBD Document 184-9 Filed 11/27/23 Page 111 of 240
NSSF MSR Consumer Study – Report of Findings

# Respondent Profile: Age, Gender







- 96% of respondents are Male.

- The average age of respondents is 55 years old. Only 27% are under the age of 45.

- 88% of respondents are White/Caucasian.

JA4576

# Respondent Profile: Martial Status, Shooting Activities with Spouse



**Marital Status**

- Married: 74%
- Single or Never married: 13%
- Separated or Divorced: 9%
- Prefer not to say: 3%
- Widowed: 2%

**MSR Activities with Spouse**

- Goes target shooting with me: 57%
- Does not own an MSR, and has no interest in owning one: 31%
- Has no interest in target shooting or firearms: 24%
- Owns his/her own MSR: 22%
- Does not own an MSR, but is interested in purchasing one: 10%

- **74% of respondents are married.**

- Of these MSR owners, over half (57%) say their spouse accompanies them for target shooting. Nearly a quarter, 24%, say their spouse has no interest in target shooting or firearms.

JA4577

Case 1:19-cv-1069-RMB-JFD   Document 104-9   Filed 11/7/22   Page 113 of 240
NSSF MSR Consumer Study – Report of Findings

# Respondent Profile: Education

**Highest Level of Education Completed**



- 45% of respondents have attained at least a bachelors degree (29% have bachelors, 16% post-graduate).

- One-quarter of MSR owners have attended some college but did not graduate.

JA4578

# Respondent Profile: Income

**Estimated Yearly Household Income**



Avg: **$110,934**

$85k or less: 37%
More than $85k: 52%

- The average yearly household income for respondents is $110,934.

- More than half of MSR owners are in households with an annual income of greater than $85,000.

JA4579

Case 1:18-cv-10507-RWB-JBD Document 184-8 Filed 11/29/23 Page 115 of 240

NSSF MSR Consumer Study – Report of Findings

# Respondent Profile: State, Household Children

**Do you have any children living with you?**





- Nearly two-thirds of respondents do not have any children living with them.

- The states with the most respondents are Texas (9%), California (5%), and Florida (5%).



JA4580

# Respondent Profile: State, Household Children



JA4581

**NSSF**
*The Firearm Industry*
*Trade Association*

**JA4582**

© 2022 National Shooting Sports Foundation, Inc. All Rights Reserved

7/22   Item #33101-21

# Exhibit 28

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al. | ) ) ) ) |
| *Plaintiffs*, | ) Civil Action No. 3:18-cv-10507-PGS-LHG ) |
| v. | ) |
| MATTHEW PLATKIN, et al. | ) ) ) |
| *Defendants*. | ) ) ) |

_____

| | |
|---|---|
| MARK CHEESEMAN, et al. | ) ) |
| *Plaintiffs*, | ) Civil Action No. 3:22-cv-4360-PGS-LHG ) |
| v. | ) ) |
| MATTHEW PLATKIN, et al. | ) ) ) |
| *Defendants*. | ) ) ) |

_____

| | |
|---|---|
| BLAKE ELLMAN, et al. | ) ) |
| *Plaintiffs*, | ) Civil Action No. 1:22-cv-4397-PGS-LHG ) |
| v. | ) |
| MATTHEW PLATKIN, et al. | ) ) |

*Defendants*.

**JA4584**

**ERRATA SHEET FOR DEPOSITION OF EMANUEL KAPELSOHN PURSUANT TO FED. R. CIV. P. 30(e)**

**TO:**    Daniel M. Vannella Esq.
        Assistant Attorney General
        25 Market St., P.O. Box 112
        Trenton, NJ 08625

ANJRPC Plaintiffs and Ellman Plaintiffs hereby produce the following errata sheet for the deposition of Emanuel Kapilson pursuant to the Federal Rules of Civil Procedure 30(e):

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 5 | 12 | Emmanuel | Emanuel | Misspelled |
| 17 | 21 | Emmanuel | Emanuel | Misspelled |
| 24 | 17 | manufactures | manufacturers | Mistranscribed |
| 29 | 25 | reserved | reserve | Mistranscribed |
| 31 | 25 | firearms related to | firearms-related | Incorrect |
| 33 | 2 | HR | HB | Mistranscribed |
| 36 | 5 | son | son-in-law | I misspoke |
| 36 | 8 | son | son-in-law | I misspoke |
| 36 | 9 | son | son-in-law | I misspoke |
| 37 | 6 | you're | here | Mistranscribed |
| 46 | 5 | any report | my report | Mistranscribed |
| 46 | 15 | I made it | I make it | Mistranscribed |
| 60 | 25 | bear | bare | Misspelled |
| 62 | 24 | that | that's | Error |
| 64 | 16 | a | an | Error |
| 70 | 9 | have to | have | mistranscribed |
| 71 | 20-25 | Oh, I would have to go back and look, … (and ff) | Semiautomatic rifles invented before 1900 included Hiram Maxim's recoil-operated rifle in 1883; Ferdinand Mannlicher's rifle models 85, 91, 93 and 95, and Horace Updegraff's 1885 rifle. Also the Remington Model 8 (FN Model 1900), a John M. Browning | Refreshed my recollection |

| | | | design, patented in 1900 and thus likely invented before 1900.<br><br>Semiautomatic shotguns invented before 1900 include the extremely popular Browning A-5, ("Auto 5") designed by John M. Browning in 1898, and manufactured in large quantities from about 1902 to 1998. Semiautomatic pistols invented before 1900 include, among others, the FN Browning M1900 (invented by John Moses Browning about 1896), the Mauser Model 1896 ("Broomhandle Mauser"), the Borchardt C-93, the Schwarzlose Model 1898, and I believe others. | |
|---|---|---|---|---|
| 72 | 5 | investors | inventors | Mistranscribed |
| 72 | 19 | I can't tell you that from memory, no | In addition to the rifles mentioned above, the Winchester Model 1903 (rimfire) and Model 1905 (centerfire) were widely sold to the civilian market in the United States. | Refreshed my recollection |
| 76 | 16 | What evidence are you relying on? | Among other things, the widespread and widely-documented sale of the Browning A-5 shotgun from about 1902 to 1998. | Supplied the requested information |

|  |  |  | This is evidenced, among other things, in many books in my firearms library, and on the internet.  See, as just one of dozens of sources, "Browning A5: A History", by Will Poston, Split Reed, for Browning Firearms. |  |
|---|---|---|---|---|
| 78 | 15 | moderate | modern | Mistranscribed |
| 79 | 24 | moderate | modern | Mistranscribed |
| 85 | 21 | AK-46s | AK-47s | Mistranscribed |
| 96 | 1 | Sometime in the 1970s…But I need to look to be exact. But that's the approximate range of years. | Sometime in the 1960s.  Specifically, it was offered to the civilian market by Colt Firearms Division in the fall of 1964.  I have in my library a copy of the American Rifleman magazine from, I believe, October 1964 that advertises this rifle for sale to the public, with 20-round magazines shown in the ad, and an emphasis on use of the rifle for hunting. | Corrected my approximation of the time period – supplied additional information |
| 96 | 20 | but I think that very soon after that, if that's the case, larger magazines were available | My own recollection, upon further thought, is that the early magazines sent out by Colt with the AR15's sold to the public had bent sheet metal "spacers" in their 20-round magazines, that reduced magazine capacity to 5 rounds for | Remembered correct information |

| | | | hunting in those states that limited capacity to 5 rounds for hunting. The spacers were easily removed in the same manner as one would disassemble the magazine for routine cleaning, to restore the magazine to its 20-round capacity. I have heard that some magazines were sent out by Colt with the sheet metal spacers riveted in place, perhaps for states whose game laws required this, but I never saw any magazines of that type at the time. | |
|-----|-----|-----|-----|-----|
| 98 | 4 | feild | field | Misspelled |
| 102 | 5 | manufactures | manufacturers | Misstrascribed |
| 111 | 5 | manufactures | manufacturers | Mistranscribed |
| 113 | 11 | their | there | Misspelled |
| 113 | 24 | .9 millimeter | 9 millimeter | Mistranscribed |
| 121 | 17 | protected | prohibited | Mistranscribed |
| 126 | 19 | control | patrol | Mistranscribed |
| 139 | 19 | feet, small | violent crimes committed with rifles are a small number in comparison | Phrase omitted |
| 140 | 25 | criminal firearms every year | criminal firearms uses every year | Words omitted bad audio transmission? |
| 143 | 11 | recommends as | recommends, as | Needs punctuation for clarity |
| 145 | 8 | .44 caliber | .45 caliber | Mistranscribed |
| 147 | 6 | .9 millimeter | 9 millimeter | Mistranscribed |
| 149 | 11 | we've about | we've been | Mistranscribed |
| 154 | 24 | Gun Sight | Gunsite | misspelled |
| 159 | 25 | rifle use | rifle bayonet use | Word omitted |
| 161 | 7 | type of | typo | Wrong transcription |
| 166 | 13 | protected | prohibited | Mistranscribed – bad transcription |

| 167 | 6 | positive | larger | Mistranscribed – bad transcription |
|-----|-----|----------|--------|-----------------------------------|
| 167 | 11 | firearms | firearm's | Mistranscribed – bad transcription |
| 167 | 12 | reglued | reblued | Mistranscribed – bad transcription |
| 183 | 23 | 10 | 100 | Mistranscribed – bad transcription |
| 190 | 14 | building and trees | building entries | Mistranscribed – bad transcription |
| 216 | 8 | But it's | That's it | Mistranscribed – bad transcription |
| 233 | 15 | are are | are there | Incorrect word |
| 241 | 7 | switch | switched | Correction to the transcript- minor typos |
| 242 | 24 | perpetrator | perpetrators | Correction to the transcript- minor typos |

Page 248

```
 1
 2                    ACKNOWLEDGMENT OF DEPONENT
 3
 4     I, EMANUEL KAPELSOHN  do hereby certify that
 5     I have read the foregoing pages ___1___ to _244_ and
 6     that the same is a correct transcription of the
 7     answers given by me to the questions therein
 8     propounded, except for the corrections or changes
 9     in form or substance, if any, noted in the
10     attached Errata Sheet.
11
       8-29-2023
12     DATE            SIGNATURE
13
14
15     _____
16     Subscribed and sworn to before me this
17
18     29th day of August           of 2023.
19     My commission expires:  September 21, 2023
20
21
22     _____
       Notary Public
23
24
25
```

Commonwealth of Pennsylvania - Notary Seal
Edward H. Butz, Notary Public
Lehigh County
My commission expires September 21, 2023
Commission number 1021379
Member, Pennsylvania Association of Notaries

# Exhibit 29

JA4591

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Thursday, August 31, 2023 11:59 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** Bradley P. Lehman <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] RE: ANJRPC v. Platkin; Ellman v. Platkin; Cheeseman v. Platkin

Dan –

Attached is the Supplemental Rebuttal Expert Report of Clayton Cramer.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:  (201) 967-8040
Fax:  (201) 967-0590
www.hartmanwinnicki.com

**From:** Daniel L. Schmutter
**Sent:** Thursday, August 31, 2023 8:44 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** Bradley P. Lehman <BLehman@gsbblaw.com>
**Subject:** ANJRPC v. Platkin; Ellman v. Platkin; Cheeseman v. Platkin

Dan –

Attached please find my letter of today's date describing today's supplemental production. The production can be found at the following link:

https://app.box.com/s/z2kbhjbelg23d8wrslciancosylex463

Please let me know if you have any difficulty accessing the documents.

Thanks.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:  (201) 967-8040
Fax:  (201) 967-0590

**JA4592**

www.hartmanwinnicki.com

# Exhibit 30

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF CLAYTON CRAMER**

Dear Dan:

I decided to re-run Klarevas' data with my own pre-1991 high fatality mass shootings incidents. While paragraph 12 of his declaration acknowledges population growth and even then understates it by comparing population from 1990s to 2010s, not 1991 to 2022 when it rose 32%: "To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%." Klarevas' Figure 1 is a count only of deaths per year:



Picking 1991 as his starting point is cherry-picking his data. I took his data and filled in high-fatality (six or more dead) mass shooting incidents from 1902 through 1990. All of these are mass murders in which the murderer only used firearms (excluding incidents where multiple weapons types were used) and there was only a single mass murderer.

Another problem with Klarevas' data is that Klarevas' Figure 1 makes no allowance for U.S. population growth from 1991 to 2022. The 1991 population was 251,000,000;[1] in 2022, it was 332,403,650.[2] The U.S. had 32% more people in 2022 than in 1991.

Adding the earlier mass fatality mass shooting deaths per million population[3] shows a much flatter trend line. And not necessarily all that recent.

---

[1] U.S. Census, *National Intercensal Tables: 1990-2000*, 1991.
[2] U.S. Census, *U.S. Population Estimated at 332,403,650 on Jan. 1, 2022*.
[3] US Census Bureau, *1900-1989: Historical National Population Estimates, 1990-1999: Intercensal Estimates, 2000-2009: Intercensal Resident Population Estimates, 2010-2020: Monthly Population Estimates*



The rate per million population does indeed show an increase but much of it caused by population growth.  This graph only goes through 2017, an outlier year because of the Las Vegas mass shooting.  Last minute technical issues preventing fixing this last minute analysis.  Note also the high fatality mass shooting events early in the 20th century.

### High-Fatality Mass Shootings 1900-1990

**Jefferson Co., Miss. (1902)**
Before 6/19/1902: While father was at church, mother shot to death her six children with a rifle, then attempted suicide as a search party approached her the next day.  She claimed no memory of what had happened.  "Those who know her and her family believe that she committed the crime while mentally deranged."
Category: family
Suicide: no
Cause: postpartum?
Weapon: rifle[4]

**Winfield, Kan. (1903)**
8/13/1903: "[A] crazy man" with a double-barrelled shotgun opened fire on a crowd at an outdoor concert killing six, with recovery of five others "doubtful."  He wounded another 28 before committing suicide.
Category: public
Suicide: yes
Cause: mental illness

---

[4] "Killed Her Six Children," [Sumter, S.C.] *Watchman And Southron*, Jun. 25, 1902, 1.

Weapon: shotgun[5]

**Blackfeet Reservation, Mont. (1903)**

Before 10/21/1903: Murderer confessed in court to "the murder of seven Indians and the wounding another two." He blamed his actions on alcohol.

Category: residential
Suicide: no
Cause: intoxication
Weapon: rifle[6]

**Farmersville, Cal. (1907)**

5/7/1907: Carpenter living in a boarding house "in a fit of insanity" shot to death six other residents with a double-barreled shotgun. He dropped his gun when confronted by a 17-year-old girl who looked like his own daughter. Police eventually distracted him long enough in conversation to sneak up behind him and restrain him.

Category: residential
Suicide: no
Cause: mental illness
Weapon: shotgun[7]

**Brunswick, Ga. (1915)**

3/6/1915: "[A] local real estate and timber dealer, 'ran amuck'" with a "[semiautomatic] shotgun," murdering at least six, with two expected to die, and 30 others wounded. Murderer was former mayor of Brunswick, apparently because of "financial reverses." Lawyer Eustis C. Butts shot him dead while he was firing on others. While described as insane, no evidence presented of previous mental illness.

Category: public
Suicide: no
Cause: unknown
Weapon: shotgun[8]

**Willseyville, N.Y. (1918)**

08/17/1918: Someone burned down a house. Seven died. Because authorities found only one intact skull in the remains near a shotgun, that of the mother, they concluded that the mother "while temporarily insane" had blown the heads off the rest of her family before dying in the flames.

Category: family
Suicide: yes
Cause: mental illness

---

[5] "Shoots into Crowd Murdering Three," Butte [Mont.] Inter Mountain, Aug. 14, 1903, 1; "Twigg's Seventh Victim," *Macon* [Miss.] *Beacon*, 1.
[6] "Indian Murderer Confesses," [Fort Benton, Mont.] *River Press*, .Oct. 21, 1903, 1.
[7] "Maniac Amuck with Gun Murders Six," [Newport News, Va.] *Daily Press*, May 8, 1907, 1.
[8] "Georgian, Crazed, Kills 5, Injures 32," [Washington] *Evening Star*, Mar. 7, 1915, 11.

Weapon: shotgun[9]

**Gilcrest, Colo. (1919)**
12/21/1919: Former farmhand shot to death Adam Schank, his wife, and four children.
Category: family non-resident
Suicide: no
Cause: quarrel
Weapon: revolver[10]

**Mayfield, Ky. (1921)**
06/25/1921: Farmer murdered his wife, three children, his brother-in-law, his wife, their three children, and the brother-in-law's brother.  Police were at first uncertain of the weapon used to commit the murders because the farmer burned down the house around them.  Neighbors reported hearing multiple gunshots before the fire.  The farmer's behavior after a beating by a police officer years before suggested mental illness.
Category: family
Suicide: yes
Cause: mental illness
Weapon: firearm[11]

**Ormsby, Minn. (1921)**
09/05/1921: The father chloroformed his wife and their five children and shot them.  He then committed suicide.  There were no obvious rational reasons for this murder-suicide.  He had quit his job as a bank cashier six weeks before; he gave the bank no explanation for his resignation.  His accounts were in order according to the bank.  The day before the murders, he went around town paying all outstanding debts in cash.  The article: "Temporary insanity is the only explanation friends make."
Category: family
Suicide: yes
Cause: mental illness
Weapon: pistol[12]

**Drew, Miss. (1923)**
12/15/1923: During a quarrel between a tenant farmer and the landlord, the tenant shot his landlord through the heart then engaged in a drawn-out gun battle with the several hundred man posse sent out to arrest him.  He shot to death six men of the posse, wounding three others.  Because of his skill with a shotgun and pistol, the posse only ended the standoff with a machine gun.
Category: public

---

[9] "Six Believed Murdered Before House Burned," *Richmond Times-Dispatch,* Aug. 19, 1918, 1.

[10] "Colorado Family Is Butchered By Unknown Fiend," *Albuquerque Morning Journal,* Dec. 22, 1919, 1.

[11] "Working On Theory," [Mt. Vernon, Ohio] *Democratic Banner,* Jan. 28, 1921, 1; "Mysterious Fire Burns 11 To Death," *Omaha Daily Bee,* Jun. 27, 1921, 1.

[12] "Entire Family Found Murdered; Wife And Five Children Victims Of Father; Woman Finds Bodies," [Great Falls, Mont.] *Great Falls Tribune,* Sep. 06, 1921, 1.

Suicide: no
Cause: quarrel
Weapon: pistol, shotgun[13]

**Stockton, Cal. (1926)**

03/18/1926: Wife seeks divorce; husband murders her, her sister, her lawyer's wife, a man who had testified against him in a horse stealing case, the attorney's wife, and their daughter.  He drove off the road while fleeing a posse, then shot himself in the head.  While the newspaper account mentioned "possible insanity" but cited no other evidence of mental illness.
    Category: family non-resident
    Suicide: yes
    Cause: divorce
    Weapon: firearm[14]

**Youngstown, Ohio (1927)**

09/03/1927: Unemployed steel worker quarreled with wife, then shot and killed her, her son's wife, and six children of the two families.  When the police arrived, he wounded two officers.
    Category: family
    Suicide: no
    Cause: quarrel
    Weapon: pistol[15]

**El Dorado, Kan. (1928)**

04/20/1928: The 17-year-old son argued with his father about use of the family car.  After police had cleared him of suspicion, he confessed to shooting his entire family (father, mother, and five siblings) with a rifle, "then set fire to the farmhouse to destroy evidence of the deed."
    Category: family
    Suicide: no
    Cause: quarrel
    Weapon: rifle[16]

**Columbus, Ohio (1930)**

05/05/1930: The woman's second husband had just gone to penitentiary, and she took two jobs (perhaps full-time) to care for her twelve children.  She decided this was more of a burden than she could bear, so she shot seven to death with a .22 caliber rifle, then attempted suicide.
    Category: family
    Suicide: no
    Cause: financial
    Weapon: rifle[17]

---

[13] "Machine Gun Used In The Capture Of A Murderer," *New Britain Herald,* Dec. 15, 1923, 1.
[14] "Man Takes His Life After Shooting Six," *Bismarck Tribune,* Mar. 19, 1926, 1.
[15] "Seven Are Killed By Man Out Of Job," [Washington, D.C.] *Evening Star,* Sep. 04, 1927, 1.
[16] "Slew Own Family, Boy Says," *Brownsville Herald,* May 05, 1928, 1.
[17] "Mother Kills 7 Oh Her 12 Children, Then Shoots Self," *Indianapolis Times,* May 07, 1930,  1.

**Wagener, S.C. (1931)**

10/26/1931: A farmer was apparently angry about his wife's recent separation, provoked it appears by his shooting her. After threatening his mother-in-law, he attended a gathering of his family, where he shot and killed two of his uncles, an aunt, and three cousins. The murderer had quarreled with and shot one of the uncles ten years earlier.

    Category: family

    Suicide: no

    Cause: divorce? Mentally ill?

    Weapon: pistol, shotgun[18]

**Mount Vernon, Ky. (1935)**

01/08/1935: News reports blamed "[a] family quarrel over land." The murderer killed his wife and four of her family, two other persons, and wounded an eighth before committing suicide.

    Category: family

    Suicide: yes

    Cause: quarrel

    Weapon: firearm[19]

**Center, Tex. (1938)**

03/17/1938: The mother was ill and "unable to provide for her family" so she kissed six of her nine children as they slept and shot them to death. "I did not kill the oldest one… because he is big enough to work for himself."

    Category: family

    Suicide: no

    Cause: financial

    Weapon: firearm[20]

**Plum City, Wisc. (1942)**

01/15/1942: Farmer murdered wife and their five children with a rifle then shot himself.

    Category: family

    Suicide: yes

    Cause: unknown

    Weapon: rifle[21]

**Albertville, Ala. (1943)**

05/18/1943: Apparently estranged from his wife, the murderer went to her parents' house and shot to death his wife, and their five children with a pistol. He attempted suicide.

    Category: family

    Suicide: yes

    Cause: divorce

---

[18] "Farmer Kills Six In Sudden Frenzy," [Washington, D.C.] Evening Star, Oct. 26, 1931, 2.

[19] "Slayer Of Seven Takes Own Life," [Washington, D.C.] *Evening Star,* Jan. 09, 1935, 1.

[20] "Mother Slays Six Children," [Pauls Valle, Okla.] *Pauls Valley Democrat,* Mar. 17, 1938, 1.

[21] "Man Kills Wife, 5 Children, Self," *Chattanooga Daily Times,* Jan. 17, 1942, 10.

Weapon: pistol[22]

**Camden, N.J. (1949)**

09/05/1949: Howard Unruh murdered 13 people at random in his neighborhood. He "never went to trial for his deadly crimes." Later determined to be schizophrenic, he was committed.

Category: public
Suicide: no
Cause: mental illness
Weapon: pistol[23]

**Malaga, N.J. (1950)**

11/18/1950: Angered about a restraining order that prohibited him from seeing his kids, the father, "armed with four guns," shot his estranged wife, then went on to other homes where he murdered his wife's mother, father, grandmother, uncle, and aunt. He also wounded his wife's brother and sister-in-law and a cousin. After arrest, police held him for a psychiatric evaluation.

Category: family
Suicide: no
Cause: divorce
Weapon: pistols[24]

**Lenoir, N.C. (1951)**

05/02/1951: An impending divorce may have precipitated the mass murder. Neighbors reported the father had "been acting peculiar lately." He beat the eight children into unconsciousness, shot the children to death, lit the house on fire, then killed himself with a shotgun.

Category: family
Suicide: yes
Cause: divorce, mental illness
Weapon: shotgun[25]

**Parsippany, N.J. (1954)**

06/08/1954: Police believed that the father, 44, murdered his wife and their sons before committing suicide. A daughter who did not live at home called police and requested a welfare check after a serious argument.

Category: family
Suicide: yes
Cause: quarrel
Weapon: pistol[26]

---

[22] "Alabaman Goes Berserk: Kills Wife, 5 Children," [Havre, Montana] *Havre Daily News,* May 18, 1943, 1.

[23] Flowers and Flowers, *Murders in the United States*, 28; "The Story of the First Mass Murder in U.S. History," *Smithsonian*, Oct. 14, 2015, https://www.smithsonianmag.com/history/story-first-mass-murder-us-history-180956927/, last accessed August 9, 2022.

[24] "Crazy Gunman Murders 5 In New Jersey," *Salt Lake Telegram,* Nov. 18, 1950, 3.

[25] "Man Shoots Eight Children And Self," [Rocky Mount, North Carolina] *Rocky Mount Telegram,* May. 03, 1951, 1.

[26] "Four Of Family Found Shot To Death In Home," [Moberly, Missouri] *Moberly Monitor-Index,* Jun. 08, 1954, 10.

**Austin, Tex. (1966)**

8/1/1966: Sniper opens fire from a tower at the University of Texas, killing 14, and wounding another 33, after having killed his wife and mother.

Category: public

Suicide: no

Cause: likely mental illness, caused by brain tumor; murderer requested autopsy to look for evidence

Weapon: rifle[27]

**Amityville, N.Y. (1974)**

11/13/1974: Ronald DeFeo "possessed by Satan" murdered six members of his family.

Category: family

Suicide: no

Cause: mental illness

Weapon: rifle[28]

**Hamilton, Ohio (1975)**

3/30/1975: James Ruppert murdered eleven family murders.

Category: family

Suicide: no

Cause: unknown

Weapon: firearm[29]

**Fullerton, Cal. (1976)**

07/12/1976: California State University, Fullerton custodian shot and killed seven people, wounding two.

Category: school

Suicide: no

Cause: mental illness

Weapon: rifle[30]

**Midland Co., Mich. (1982)**

02/16/1982: A man unhappy about his pending divorce murdered his wife, "her sister and parents, three nieces and a nephew." DNA evidence many years later proved he raped and murdered a young woman some years before.

Category: family

Suicide: no

[27] Kirk Heilbrun, Joel Dvoskin, and Anna Heilbrun, "Toward Preventing Future Tragedies: Mass Killings on College Campuses, Public Health, and Threat/Risk Assessment," *Journal of Psychological Injury and Law* 2:94 (2009); J.M. Prutting, "Symposium On Medical Progress and the Postmortem," *Bulletin of the New York Academy of Medicine*, July, 1968, 794.
[28] Flowers and Flowers, Murders in the United States, 75.
[29] Flowers and Flowers, Murders in the United States, 76.
[30] Maria Bovsun, "Mass Murderer Who Killed 7 At Cal State Fullerton Begs to be Freed From Psychiatric Hospital," New York Daily News, Jun. 11, 2016.

Cause: divorce
Weapon: shotgun[31]

**Miami, Fla. (1982)**

8/20/1982: Man angry about repair work on a lawnmower murders eight employees and bystanders with a shotgun, rides away on a bicycle, and dies when he threatens pursuers with the shotgun, who hit him with the car.

Category: public
Suicide: no
Cause: revenge
Weapon: shotgun[32]

**Manley Hot Springs, Alaska (1984)**

5/20/1984: Recent arrival from Illinois was wanted for a murder in Fairbanks. He murdered nine people.

Category: public
Suicide: no
Cause: unknown
Weapon: firearm[33]

**San Ysidro, Cal. (1984)**

7/18/1984: After an argument with his wife, the murderer went to a McDonald's, murdering 20 with a pistol, Uzi rifle, and a shotgun, and wounding 16 others, before dying from a police sniper's shot. He had called a mental health clinic earlier in the day seeking help.

Category: public
Suicide: no
Cause: mental illness
Weapon: pistol, shotgun, rifle[34]

**Edmond, Okla. (1986)**

8/21/1986: Postman known as "Crazy Pat" to his neighbors went to his employer, the U.S. Postal Service, and murdered 14 co-workers and wounded six others.

Category: workplace
Suicide: yes
Cause: unknown
Weapon: pistols[35]

---

[31]"Michigan Man is Guilty of Killing 7 in Family," *New York Times,* Oct. 9, 1982; Gus Burns, "Police say infamous Farwell killer, Robert Lee Haggart, strangled and raped Midland woman in 1977," *Saginaw News,* Jul. 24, 2009.
[32] George Volsky, "Gunman in Miami Kills 8 in Rampage," *New York Times,* Aug. 21, 1982.
[33] "Memories of Springtime Murders Chill Small Alaskan Town," *New York Times,* Nov. 11, 1984.
[34] "Coast Man Kills 20 in Rampage at a Restaurant." *New York Times,* Jul. 19, 1984; "Police Defended in Macdonald's Case," *New York Times,* Aug. 3, 1984.,"
[35] "Massacre at a Post Office," *New York Times,* Aug. 24. 1986.,"

**Palm Bay, Fla. (1987)**

4/23/1987: Retired librarian described by neighbors as having "a bad temper and a sick wife… and maybe a little crazy" murdered six and wounded 14.  He used a shotgun, pistol, and rifle.  He had a history of shooting at neighborhood kids who walked across his lawn.[36]  In spite of being convicted, he was later determined to be mentally incompetent.  A bystander distracted the murderer by returning fire, "which allowed people to escape" from a grocery store where the shooting was taking place.[37]

Category: public
Suicide: no
Cause: mental illness
Weapon: shotgun, pistol, rifle[38]

**Algona, Ia. (1987)**

Before 12/31/1987: A 40-year-old murdered his parents, sister, "and her three children."
Category: family
Suicide: yes
Cause: unknown
Weapon: firearm[39]

**Sunnyvale, Cal. (1988)**

2/16/1988: Murderer upset that his stalking had been spurned shot his way into her place of employment, killing seven and wounding four.
Category: workplace
Suicide: no
Cause: stalker
Weapon: shotgun[40]

**Louisville, Ky. (1989)**

9/15/1989: Employee of Standard Gravure printing plant had a grudge against his employer, in his opinion, because of his mental illness, bipolar disorder.  (He had voluntarily sought mental health treatment in the past.)  He murdered seven people and wounded many others.  He left in his home a copy of *Time* open to an article about the Stockton mass murderer.
Category: workplace
Suicide: yes
Cause: mental illness

---

[36] Barry Bearak, "6 Dead and 14 Hurt in Rampage: Florida Shooting Suspect 'Meanest Man on Block'," LOS ANGELES TIMES, Apr. 25, 1987, http://articles.latimes.com/1987-04-25/news/mn-990_1_palm-bay-police, last accessed November 24, 2018.,"

[37] John A. Torres, "Palm Bay Killer Far From Execution 20 Years Later." [Lakeland, Fla.] *Ledger,* Apr. 30, 2007, https://www.theledger.com/news/20070430/palm-bay-killer-far-from-execution-20-years-later, last accessed November 24, 2018.

[38] Barry Bearak, "6 Dead and 14 Hurt in Rampage: Florida Shooting Suspect 'Meanest Man on Block'," LOS ANGELES TIMES, Apr. 25, 1987, http://articles.latimes.com/1987-04-25/news/mn-990_1_palm-bay-police, last accessed November 24, 2018.,"

[39] Associated Press, "Son Kills 6 in Family, Then Self, Iowa Police Believe," *Los Angeles Times,* Dec. 31, 1987, http://articles.latimes.com/1987-12-31/news/mn-7942_1_shooting-spree. Last accessed November 24, 2018.

[40] Dan Morain and Mark A. Stein, "Unwanted Suitor's Fixation on Woman Led to Carnage," *Los Angeles Times,* Feb. 18, 1988.

Weapon: rifle, pistol[41]

**Jacksonville, Fla. (1990)**

6/18/1990: Murderer (a convicted felon) was perhaps upset about repossession of his car six months earlier, so after murdering two other people the previous day, he went into a General Motors Acceptance Corp. offices and murdered nine more and wounding five others.

Category: public
Suicide: yes
Cause: unknown
Weapon: rifle, pistol[42]

August 31, 2023

41 Ronald Smothers, "Disturbed Past of Killer of 7 is Unraveled," *New York Times*, Sep. 16, 1989, https://www.nytimes.com/1989/09/16/us/disturbed-past-of-killer-of-7-is-unraveled.html, last accessed November 24, 2018.

42 Ronald Smothers, "Florida Gunman Kills 8 And Wounds 6 in Office," *New York Times*, Jun. 19, 1990; "10th Death in Office Shooting," *New York Times*, Jun. 28, 1990.

# Exhibit 31

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Wednesday, September 20, 2023 8:02 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** BLehman@gsbblaw.com <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] ANJRPC v. Platkin/Ellman v. Platkin

Dan –

Attached please find:

Errata sheet of Ashley Hlebinsky
Deposition signature page of Ashley Hlebinsky
Armax Article requested at deposition of Ashley Hlebinsky.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:   (201) 967-8040
Fax:   (201) 967-0590
www.hartmanwinnicki.com

# Exhibit 32

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al. | ) ) ) |
| *Plaintiffs*, | ) ) Civil Action No. 3:18-cv-10507-PGS-LHG ) |
| v. | ) ) |
| MATTHEW PLATKIN, et al. | ) ) ) |
| *Defendants*. | ) ) ) |
| _____ | ) |
| MARK CHEESEMAN, et al. | ) ) |
| *Plaintiffs*, | ) ) Civil Action No. 3:22-cv-4360-PGS-LHG ) |
| v. | ) ) |
| MATTHEW PLATKIN, et al. | ) ) ) |
| *Defendants*. | ) ) |
| _____ | ) |
| BLAKE ELLMAN, et al. | ) ) |
| *Plaintiffs*, | ) ) Civil Action No. 1:22-cv-4397-PGS-LHG ) |
| v. | ) ) |
| MATTHEW PLATKIN, et al. | ) ) |
| *Defendants*. | ) ) |

**ERRATA SHEET FOR DEPOSITION OF ASHLEY LYNN
HLEBINSKY PURSUANT TO FED. R. CIV. P. 30(e)**

**JA4609**

**TO:**   Daniel M. Vannella Esq.
Assistant Attorney General
25 Market St., P.O. Box 112
Trenton, NJ 08625

ANJRPC Plaintiffs and Ellman Plaintiffs hereby produce the following errata sheet for the deposition of Ashley Hlebinsky pursuant to the Federal Rules of Civil Procedure 30(e):

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| 10 | 3 | I've | I have | Transcription Error |
| 13 | 10-22 | A: I'm not sure of the exact date. If I recall correctly, the submission was June 15th. So it would have been – I think that was the correct date for the submission, so it would have been sometime that week. Q. Okay. So not – not prior to the week of June 15, 2023, at least? A. What do you mean by "not prior to the week"? Q. So sometime in the week of June 15, 2023 is when you completed this report? A. If that was the submission date for the report, then, yerh, it was that week | June 15, 2023 | Refreshed my memory |
| 14 | 1-4 | Mr. Schmutter: And Dan, I'll just suggest if you need an exact date, just let us know and we'll get you one. Mr. Vannella: All right, thank you | Delete | Corrected above so this is not necessary |
| 15 | 11 | For the preparatory | For the preparation | Corrected word |
| 16 | 12 | Collectors | Collectors' | Punctuation error |

**JA4610**

| 23 | 8-10 | And I don't know the exact percentage breakdown, but typically, the bulk of my work has focused on museums | In 2022, about 50% of my work involved museums, 25% involved historical consultation for auction houses, 16% expert witness testimony – all completed after the June 2022 Bruen decision, and 10% writing, guest speaking and television. | Reviewed my tax statements |
| --- | --- | --- | --- | --- |
| 23 | 13 | Typically, they've been spread out, few and far between, throughout my career. | Prior to the Bruen decision, I had only worked on two 2nd Amendment related cases, the rest dealt with historical firearms and ammunition, but not challenges to the 2nd Amendment | More complete information |
| 24 | 20 | On my own time | Volunteer-based | Clarity |
| 25 | 11 | In my fashion | career | Wrong word |
| 25 | 13 | That gun community | The gun collector community | Clarity |
| 27 | 4 | A so gray area | Such a gray area | Transcription error |
| 27 | 13 | is | has | Transcription error |
| 27 | 17-18 | You typically see Ph.Ds, in my world | You typically only see Ph.Ds, in my field | Clarity |
| 29 | 17-18 | I probably have a copy of it in a journal in my house somewhere | I do | Request; Article Attached |
| 30 | 19 | Part of a kind of | Part of a | Clarity |
| 32 | 1 | definitional | definition | Transcription error |
| 32 | 14 | of | from | Transcription error |
| 33 | 20 | All goes all | Goes all | Transcription error |
| 34 | 12 | Things | Thing | Transcription error |
| 35 | 4 | 23 | 20,000 | Transcription error; clarity |
| 43 | 15 | contents | content | Transcription error |
| 47 | 15 | in | and | Transcription error |
| 51 | 11-18 | I'm trying to think of a specific | One example of a sensitive topic in | Refreshed my memory |

| | | example…what the example was | which we worked with experts as well as parties affected by that history was of our Native American histories. We discussed and drafted content that was respectful of those communities who have suffered at point in history. | |
|---|---|---|---|---|
| 55 | 10 | Veterans Affairs | Cheyenne Veterans Affairs | Clarifying |
| 55 | 19 | Classes, with firearms | Education classes with firearms | Punctuation error |
| 57 | 9 | Holder is in that | Holder in that | Transcription error |
| 58 | 10 | FFL storage | Firearm storage | Clarifying |
| 58 | 17-19 | Alexander – I'm spacing on his last name. I'm not a paid employee, so – I can remember his last name but Alexander is also | Alexander Adams. He is also | Clarity |
| 66 | 20-21 | Out here | To Phoenix | clarity |
| 76 | 24 | Speaking about | Speaking about that | clarity |
| 78 | 16 | Work with at | Work at | Transcription error |
| 79 | 3 | I first studying guns | I first started studying guns | Clarity |
| 82 | 6 | More ESPN | ESPN | Transcription error |
| 91 | 14 | also | always | Transcription error |
| 93 | 9 | firearms | firearm | Transcription error |
| 93 | 22 | quotes | Air quotes | clarity |
| 94 | 20 | are | is | clarity |
| 99 | 8 | Have either | follow | clarity |
| 100 | 6 | Absent of | Separate from | clarity |
| 112 | 16 | piece | magazine | clarity |
| 112-113 | 21-3 | And so it …you're doing it | The Belton firearms had different variations, but the initial design was a superimposed repeater with one lockplate that would slide as you fired it. You had to move the lockplate for | Refreshed memory and clarity |

| | | | each shot. However, the improved Beltons had a rapid-fire mode of function utilizing portfire, in which the user ignores the trigger and pulls the lockplate back as fast as they can to fire the gun similar to that of a semi-automatic or double action. There are other variations, such as the Chambers musket that only needed one trigger pull to fire all stacked rounds in succession. | |
|---|---|---|---|---|
| 114 | 23 | Consistent production scheduling | Standardized production capabilities | Clarity |
| 115 | 5-10 | But the Lorenzoni…firing process | The Lorenzoni has a magazine that houses the projectiles and another that houses the powder. A lever is worked to seat each powder and projectile into the chamber of the gun. | Clarity |
| 118 | 1-6 | It follows…recall on that | It follows the Lorenzoni style of design, so yes. | Refreshed my memory |
| 115 | 17-19 | I don't think so…but I could be wrong | The lever was used to chamber the ammunition each time. | Correction |
| 119 | 16 | And putting it in there yourself | And manually chambering it | clarity |
| 119 | 18 | Moving it | Moving the cartridge | clarity |
| 121 | 9 | was | had | clarity |
| 122 | 15 | has | had | typo |
| 125 | 4-8 | Firearms-wise…had access to | Firearm-wise that the military would have developed that the civilian market would have had access to | Correction. Civilians do own tanks |

| 126 | 15 | stopped | Stopped making the plug bayonet | Clarity |
| 129 | 23 | Breach loaders | Breech-loaders | Transcription error |
| 136 | 10 | Breach-loading | Breech-loading | Transcription error |
| 139 | 20 | Breach-loading | Breech-loading | Transcription error |

September 20, 2023

Page 149

1   Blake Ellman, Et Al. v. Matthew Platkin, Et Al.

2   Ashley Hlebinsky (#6040712)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Ashley Hlebinsky, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____           09|20|2023

12   Ashley Hlebinsky                        Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15            _____ DAY OF _____, 20___.

16

17

18            _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

# Exhibit 33

**From:** Daniel L. Schmutter <DSchmutter@hartmanwinnicki.com>
**Sent:** Wednesday, September 20, 2023 8:02 PM
**To:** Daniel Vannella <Daniel.Vannella@law.njoag.gov>
**Cc:** BLehman@gsbblaw.com <BLehman@gsbblaw.com>
**Subject:** [EXTERNAL] ANJRPC v. Platkin/Ellman v. Platkin

Dan –

Attached please find:

Errata sheet of Ashley Hlebinsky
Deposition signature page of Ashley Hlebinsky
Armax Article requested at deposition of Ashley Hlebinsky.

Dan

_____
Daniel L. Schmutter, Esq.
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
Tel.:   (201) 967-8040
Fax:   (201) 967-0590
www.hartmanwinnicki.com

# Exhibit 34

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *Plaintiffs,* | Civil Action No. 3:18-cv-10507-PGS-LHG |
| v. |  |
| MATTHEW PLATKIN, et al. |  |
| *Defendants.* |  |

_____

| MARK CHEESEMAN, et al. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
|---|---|
| *Plaintiffs,* | Civil Action No. 3:22-cv-4360-PGS-LHG |
| v. |  |
| MATTHEW PLATKIN, et al. |  |
| *Defendants.* |  |

_____

| BLAKE ELLMAN, et al. | ) ) ) ) ) ) ) ) ) |
|---|---|
| *Plaintiffs,* | Civil Action No. 1:22-cv-4397-PGS-LHG |
| v. |  |
| MATTHEW PLATKIN, et al. |  |

*Defendants.*

**JA4619**

# ERRATA SHEET FOR DEPOSITION OF CLAYTON CRAMER PURSUANT TO FED. R. CIV. P. 30(e)

**TO:**        Daniel M. Vannella Esq.
        Assistant Attorney General
        25 Market St., P.O. Box 112
        Trenton, NJ 08625

ANJRPC Plaintiffs and Ellman Plaintiffs hereby produce the following errata sheet for the deposition of Clayton Cramer pursuant to the Federal Rules of Civil Procedure 30(e):

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| 23 | 2 | Uniform Handgun – let's Handgun Act | Unsafe Handgun Act | Mistranscribed |
| 25 | 16 | The children shall | Roth argued the children should | Mistranscribed |
| 28 | 17 | The issue | The question | I misspoke |
| 31 | 12 | But | | I misspoke |
| 33 | 8 | , it | | Incorrect |
| 33 | 17 | I did not do | I did | Mistranscribed |
| 45 | 4 | In deed | Indeed | Mistranscribed |
| 50 | 12 | Breach | increased | Mistranscribed |
| 52 | 4 | Projections | Protections | Mistranscribed |
| 57 | 24 | Courts | courts | Mistranscribed |
| 58 | 8 | 479.1 | In 1791 | Mistranscribed |
| 58 | 20 | Say | Say that | Mistranscribed |
| 58 | 25 | Disqualifies | Disqualifiers of | Mistranscribed |
| 60 | 5 | Others, when | Others.  When | Mistranscribed |
| 61 | 5 | Commonly | Commonly owned | error |
| 62 | 7 | A | | mistranscribed |
| 63 | 4 | There's | | I misspoke |
| 63 | 10 | Seek | Sneak | Mistranscribed |
| 64 | 21 | Work | Worked | Mistranscribed |
| 69 | 24 | From | For | Mistranscribed |
| 84 | 25 | Staring | starting | Mistranscribed |
| 85 | 25 | Text | | Mistranscribed |
| 88 | 11 | Shooters | Shooter | Mistranscribed |
| 88 | 22 | Spotty record | Spotty record of outpatient treatment | I misspoke |
| 88 | 25 | They wanted | They went on | Mistranscribed |
| 90 | 2 | Stayed in the United | Stayed in that state | Mistranscribed |

| 90 | 14 | Nipples | Nickels | Mistranscribed |
|----|----|---------|---------|----------------|
| 96 | 19 | I've everything | Everything | Mistranscribed |
| 103 | 1 | Is what | As to what | Mistranscribed |
| 105 | 7 | Pretty fundamental | Pretty fundamental errors | I misspoke |
| 108 | 14 | Statures | Statutes | Mistranscribed |
| 109 | 22 | Compile | Compiler | Mistranscribed |
| 113 | 4 | Supreme Court | State Constitution | I misspoke |
| 113 | 5 | It's | Its | Mistranscribed |
| 117 | 24 | Automatic | semiautomatic | Mistranscribed |
| 121 | 9 | Opposed | Created | I misspoke |
| 124 | 1 | Expressive | Persuasive | Mistranscribed |
| 127 | 21 | Instills | Commits | I misspoke |
| 127 | 16 | Step | Set | Mistranscribed |
| 134 | 11 | But she's | But she has not | I missoke |
| 137 | 25 | Credibly detailed valuation | Incredibly detailed evaluation | Mistranscribed |
| 138 | 25 | Range data | Data | Mistranscribed |
| 144 | 14 | Algorithm | n-gram | Mistranscribed |
| 145 | 20 | Somebody | some number | Mistranscribed |
| 149 | 24 | Malice and forethought | Malice aforethought | Mistranscribed |
| 159 | 24 | | I have since acquired his data and recharted his graphs with early mass fatality incidents before 1991 in a more complete answer dated August 31, 2023. | More complete answer |
| 164 | 20 | Right | They did not involve assault weapons or LCMs | I misspoke |
| 174 | 19 | Not fragmentary strong | Fragmentary and not strong | Mistranscribed |
| 183 | 6 | Him | It | Mistranscribed |
| 185 | 4 | That | | Mistranscribed |
| 190 | 11 | Stopped | Started | I misspoke |
| 242 | 24 | perpetrator | perpetrators | Correction to the transcript- minor typos |

# Exhibit 35

Page 201

1    Daniel L. Schmutter, Esq.

2    dschmutter@hartmanwinnicki.com

3                          August 22, 2023.

4    RE: Blake Ellman, Et Al. v. Matthew Platkin, Et Al.

5        8/21/2023, Clayton E. Cramer (#6058311)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com.

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22              Yours,

23              Veritext Legal Solutions

24

25

Page 202

1    Blake Ellman, Et Al. v. Matthew Platkin, Et Al.

2    Clayton E. Cramer (#6058311)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____      _____

24   Clayton E. Cramer                    Date

25

**JA4624**

Page 203

1    Blake Ellman, Et Al. v. Matthew Platkin, Et Al.

2    Clayton E. Cramer (#6058311)

3              ACKNOWLEDGEMENT OF DEPONENT

4        I, Clayton E. Cramer, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____          9/22/23

12   Clayton E. Cramer                 Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   _____ DAY OF _____, 20____.

16

17

18            _____

19            NOTARY PUBLIC

20

21

22

23

24

25

# Exhibit 36

xiij.

force & Þrue en toutz pointz; et outre ceo est auxint assentuz q̃ si ascun alien eit purchacez ou desore purchace ascun benefice de Seinte Esglise Dignite ou autre & en ppre psone Pigne possession dicelle ou loccupie de fait, deinz mesme le Roialme, soit il a son oeps ppre, ou al oeps dautri sanz especiale congie du Roi, soit il compris en mesme lestatut, & outre ceo encourge en toutz pointz tielx peines & forfaiture come sont ordeignez p un autre estatut fait en lan xxv° del regne luy noble Roi E. aiel nr̃e ẽ le Roi qore est, contre ceux qi purchacent prisions dabbeies ou Priories; et enoutre au fyn q̃ tielx licences ne se facent desore enavant, le Roi voet & comande a toutz ses lieges & autres qils lour abstiegnent de cy enavant de luy prier dascuna tiels licences doner; et si voet auxi le Roi luy mesmes abstiegner de doner ascune tiele licence, durantes les guerres horspris au Cardinal de Naples ou a autre especiale psone a qi le Roi soit p especiale cause tenuz.

Item est ordeignez & assentuz & le Roi defende q̃ desoremes null hõme chivache deinz le Roialme armez, encontre la forme de lestatut de Norhamptoñ sur ce fait, ne ovesq̃ lancegay deinz mesme le Roialme, les queux lancegayes soient de tout oustez deinz le dit Roialme come chose defendue p nr̃e f̃ le Roi, sur peine de forfaiture dicelx lancegaies armures & auls herneys quelconqes et mayns & possession de celluy qi les port'a desore deinz mesme le Roialme contre cestz estatut & ordinances sanz especiale congie de Roi nr̃e f̃.

xiiij.

Item es briefs de p̃munire fac̃ est assentuz & accordez q̃ ceux q̃a queux tielx briefs sont portez, & qi sont de p̃sent hors de Roialme & sont de bone fame & aient faitz lo' gefials atto'nes devant lo' depir, q̃ le Chaunceller [Denglet're'] pur le temps esteant, p ladvis des Justices purra g'ntier q̃ mesmes les psones purront apparoir & respondre & faire & resceivre ce q̃ la ley demande, p lo' gefials atto'nes avantdiz siavant come es autres cas & quereles; et ceux psones qi decy enavant passeront p'ison contre f̃ le Roi & soient auxint de bone fame, q̃ a lo' requeste le dit Chaunceller p ladvis des Justices lour purra g'ntier defaire lo' gefials atto'nes en la Chaunctllerie p patent du Roi devant lo' passer, [a respondre'] sibn es ditz briefs de p̃munire fac̃, come en auls quereles en quel cas toutes voies soit exphse mencion [faite'] des briefs & quereles de p̃munire fac̃; et celle patente ensi faite, purront des lors les ditz atto'nes en absence de lo' Meistres, respondre p eux & auls atto'nes desouz eux, devant quelconq̃, juge du Roialme & faire & resceivre el dit cas, siavant come en null autre cas nientcontresteant ascun estatut fait a contr'ie avant ces heures.

Item sur la grevouse pleinte qest faite des meynteno's des quereles & chaumpto's; est ordeignez & assentuz q̃ lestatute est faitz en les ans du regne le Roi Edward aiel nr̃e dit f̃ le Roi primer & quart, et auxint en lan de nr̃e f̃ le Roi qore est primer, soient tenuz & gardez & duement executa en toutz pointz.

Item est assentuz & le Roi defende estroitement q̃ decy enavant nulle psone aliene ou denazein de quelconq̃, estat ou condicion qil soit amesne ou envoie ou face amener ou envoier p f̃re ou p meer hors du Roialme Denglet're as ascunes pties Descoce en prive ne en appt ascune malle darmure de blee de bree ne dautre vitaille ou dautre refresshchement quelconq̃, sur peine de forfaiture de mesmes les vitailles armures & des autres choses avantdites ensemble avec les niefs vesseulx charettes & chivalx qi les portent ou amesment, ou de la Þroie value dicelles, si ensi ne soit q̃ le

⟨ * * Interlined on the Roll.

Force and Effect in all Points; and moreover it is assented, That if any Alien have purchased, or from henceforth shall purchase any Benefice of Holy Church, Dignity, or other Thing, and in his proper Person take Possession of the same, or occupy it himself within the Realm, whether it be to his own proper Use, or to the Use of another, without especial Licence of the King, he shall be comprised within the same Statute; and moreover shall incur all Pains and Forfeitures in all Points as is before ordained by another Statute made the Five and twentieth Year of the noble King Edward the Third, Grandfather to our Lord the King that now is, against them that purchase Provisions of Abbeys or Priories; and to the Intent that such Licences shall not be from henceforth made, the King willeth and commandeth to all his Subjects and other, that they shall abstain them from henceforth to pray him for any such Licence to be given; and also the King himself will refrain to give any such Licence during the Wars, except to the Cardinal of Naples, or to some other special Person to whom the King is beholden for a special Cause.

who shall also be liable to the Penalties of 25 Ed. III. st. 5. c. 22.

The King's Licence to the contrary shall not be asked for.

ITEM, It is ordained and assented, and also the King doth prohibit, That from henceforth no Man shall ride in Harness within the Realm, contrary to the Form of the Statute of Northampton thereupon made, neither with Launcegay within the Realm, the which Launcegays be clearly put out within the said Realm, as a Thing prohibited by our Lord the King, upon Pain of Forfeiture of the said Launcegays, Armours, and other Harness, in whose Hands or Possession they be found that bear them within the Realm, contrary to the Statutes and Ordinances aforesaid, without the King's special Licence.

XIII.
No Man shall ride armed contrary to the Statute 2 Edw. III. chapter 3.

ITEM, In Writs of Præmunire facias, It is assented and agreed, That they against whom such Writs be sued, and who at this Time be out of the Realm, and be of good Fame, and have made their general Attornies before their departing, that the Chancellor of England for the Time being, by the Advice of the Justices, may grant, that the same Persons may appear to answer, to do, and to receive that Thing which the Law demandeth, by their general Attornies aforesaid, as well as in other Causes and Quarrels; and those Persons which from henceforth shall pass by the King's Licence, and be of good Fame, that at their Request the Chancellor, by the Advice of the Justices, may grant to them to make their general Attornies in the Chancery by the King's Patent, before their Passage, to answer as well in the said Writs of Præmunire facias, as in other Writs and Plaints; in which Case express Mention shall be made at all Times of the Writs and Plaints of Præmunire facias; and this Patent so made, the said Attornies from henceforth, in Absence of their Masters, may answer [for them, and make'] other Attornies under them, before any Judge of the Realm, [to'] do and receive in the said Case as much as in any other Case or Matter, notwithstanding any Statute made to the contrary heretofore.

XIV.
For enabling Parties out of the Realm to appoint Attornies in Writs of Præmunire.

ITEM, For the grievous Complaint that is made of Maintainers of Quarrels, and Champertors; It is ordained and assented, That the Statutes thereof made in the First and Fourth Years of King Edward, Grandfather to our Lord the King that now is, and also in the First Year of our Lord the King that now is, shall be holden and kept, and duly executed in all Points.

XV.
Statutes
2 Edw. III.
stat. 2. c. 14;
4 E III c 11;
1 Ric.II. c 4;
against Maintenance, &c.
confirmed.

ITEM, It is assented, and the King straitly defendeth, That from henceforth no Person, Alien nor Denizen, of whatsoever Estate or Condition that he be, shall carry nor send, nor do to be carried nor sent, by Land nor by Sea, out of the Realm of England, to any Parts of Scotland, privily nor apertly, any Manner of Armour, Corn, Malt, or other Victuals, or any other refreshing, upon Pain of Forfeiture of the same Victuals, Armours, and other Things aforesaid, together with the Ships, Vessels, Carts, and Horses which shall bring or carry the same, or of the very Value of the same, except so it be

XVI.
No Armour or Victual shall be sent into Scotland without Licence of the King; on Pain of Forfeiture thereof.

' by themselves and 　　　' and

# Exhibit 37

1

# 20 Ric. 2, 93, ch. 1 (1396)

|

First, whereas in a Statute made the Seventh Year of the Reign of the King that now is, it is ordained and assented, That no Man shall ride armed within the Realm, against the form of the Statute of Northampton thereupon made, nor with Launcegays within the same Realm, and that the said Launcegays shall by utterly put out within the said Realm, as a Thing prohibited by the King, upon Pain of Forfeiture of the same Launcegays, Armours, or any other Harness, in the Hands and Possession of them that bear them, form henceforth within the same Realm against the same Statutes and Ordinances without the King's special License. Our Lord the King, considering the great clamour made to him in this present Parliament, because that the said Statute is not holden, hath ordained and established in the said Parliament, That the said Statutes shall be fully holden and kept, and duly executed; and that the said Launcegayes shall be clear put out upon the Pain contained in the said Statute of Northampton, and also to make Fine and Ransom to the King. And moreover, that no Lord, Knight nor other, little nor great, shall go nor ride by Night nor by Day armed, nor bear [Sallet] nor Skull of Iron, nor [of] other Armour, upon the pain aforesaid; save and except the King's Officers and Ministers in doing their Office. And Moreover, the King will and hath ordained, that the statute made the First Year of his Reign, of Liveries of Hats, shall be holden and kept upon the pain contined in the same Statute, and upon Pain to be imprisoned, and make Fine and Ransom of the King.

**JA4629**

# Exhibit 38

VI.
Proviso as to
Persons whose
Wives wear
Velvets, &c.
[See § I.]

AND be it pryded and enacted by autᵉtie aforesaid, that if the Wif of any pson oᵉ psons were any velvet in the lynyng or other part of her gowne other then in the cuffes or purfels of suche gowneſ, or elſᵉ were any velvet in her kyrtell or were any peticote of silke, that then the husbande of eᵛᵉy suche Wiſſ shall fynde one stoned horse of the stature above in this acte resyted, or shall incurre the aboveſaide penaltie and forſaiture of tenne poundes to be levyed and recoᵛed as is afore declared : Provyded also that this Acte or any thing therin conteyned shall not extende to charge any pson or psons whose Wif or Wiſſes shall were any of the appareil or thingᵗ above rehersed during the tyme such Wif or Wyſſes shalbe devorsyd from her or ther husbonde or huſbondes, or shall willingly absent her self from her said huſbound and daringe suche absence shall were any of the apparell or other thyngᵗ afore resyted : Provyded alwaies that heires wᵗin age being wardes whose landes teᶥtᵗ and hereditamentᵗ amount to the yerely value of CC li. shall not be compelled by autᵉtie of this acte till they cūme to ther full age to kepe any horses, althoughe the wiſſes of suche heires wᵗin age were any gowne of Sylke or any Frenche hood or Bonet of Velvet wᵗ any habilyment past or egge of Gold Perle or Stone or any chayne of gold about ther nekkᵗ or in ther plettᵗ or in any apparell of ther bodie ; Any thing in this Acte to the contrary notwᵗstonding.

VII.
Proviso for
replacing Horses
killed in War, &c.

PROVYDED also that if all or any the horses kept by vertue of this acte shall happen to be kyllyd maymyd or lost in the ſvice of the Kingᵗ warres, That then in eᵛy suche case the owners of suche horse or horses so kyllyd maymed pisshed or lost in the warres shall have libᵗie, by the space of twoo yeres next after suche chaunce of kylling maymyng pisshing or losing ther horses, to pvide other horses in the stede and place of the horses so kylled maymed pisshed or lost in the Warres, wᵗout any daunger losse or penalᵗie of this acte ; Any thing in this acte to the contrary therof notwᵗstonding.

VIII.
Cart-Horses and
Sumpter-Horses.

PROVYDED also that cart horses or sumpter horses shall not be takyn reputed or reckned for any suche horses whiche any pson is or shalbe bounden to kepe by vertu of this acte.

# CHAPTER VI.

## AN ACTE concerning Crosbowes and Handguns.

Recital of Stat.
33 H.VIII. c. 17.
against shooting
with Cross-bows
and Hand-guns :

Violation thereof ;

WHERE in the Parliament holden at Westiᵐ the fyftenthe daye of Januarie in the twenty fyve Yere of the Kinges most gracious Raigne, and there contynued and kepte untill the thirtieth daye of Marche then next ensuynge, amonge diᵛse and sondrie holsome and lawdable Actᵗ Statutᵗ and ordyn'acᵗ one Statute and Ordyn'nce was made and ordeyned for the avoydinge and eschewinge of shotinge in Crosbowes and Handguns; synce the makinge of whiche Acte diᵛse malicious and evill disposed psons not only ꝑsumynge wilfullye and obstynatlye the violaᶜon and breach of the saide Acte, but also of their malicious and evill disposed myndes and purposes have wilfully and shamefully cōmytted ꝑpetrated and done diᵛse detestable and shamefull murthers roberies felonyes ryotᵗ and routᵗ with Crosbowes little shorte handguns and little hagbuttᵗ, to the great pill and contynuall feare and daunger of the Kingᵗ most lovinge subjectᵗ, and also diᵛse Kepers of Forestᵗ Chases and Parkᵗ aswell of our saide Soveraigne Lorde as other his Nobles and Cōmons and diᵛse Gentlemen Yomen and Servingmen nowe of late have layde aparte the good and laudable eˣcise of the longe bowe, whiche alwaye heretofore hathe bene the suertie savegarde and contynuall defence of this Realme of Englande, and an inestimable dread and terror to the Enemyes of the same, and nowe of late the saide evill disposed psons have used and yet don daylie use to ryde and goe in the Kingᵗ highe Wayes and elswhere, havinge with them Crosbowes and little handguns, ready furnished with Quarrellᵗ Gunpowder fyer & touche to the great pill and feare of the Kingᵗ most lovinge Subjectᵗ : FOR REFORMAᶜON wherof be it enacted ordeyned and established by the Kinge our Soveraigne Lorde the Lordes sꝑuall and temporall and the Cōmons

Penalty on Persons,
having less than
₤100. per Annum,
keeping or using
Cross-bows, &c.
₤10.

in this ꝑsent Parliament assembled and by thauctoriᵗie of the same, in maner and fourme followinge That ye to saye ; that noe pson or psons of what estate or degree he or they be, excepte he or they in their owne right or in the right of his or their Wyeffᵗ to his or their owne uses or any other to the use of any suche pson or psons, have landes teᶥtᵗ fees annuyties or Officᵗ to the yerely value of one hundred poundᵗ, from or after the laste daye of June next cōmynge, shall shote in any Crosbowe handgun hagbutt or demy hake, or use or kepe in his or their houses or elswhere any Crosbowe handgun hagbut or demy hake, otherwise or in any other manner then ye hereafter in this ꝑsent Acte declared, uppon payne to forfeyt for everie tyme that he or they so offendinge contᵉrie to this Acte tenne poundes.

II.
Length of
Hand-guns, &c.
to be kept.

Those of less
Length may be
seized and
destroyed by
Persons having
₤100. a Year.

AND furthermore be it enacted by thauctoriᵗie aforesaide that no pson or psons, of what estate or degree soever he or they be, from or after the saide laste daye of June shall shote in carye kepe use or have in his house or els where any handgune other then suche as shalbe in the stock and gonne of the lenghe of one hole Yarde, or any hagbutt or demyhake other then suche as shalbe in the stock and gune of the lenghe of thre quarters of one Yarde, uppon payne to forfeyt for everie tyme that he or they shall carie use or have anye suche Gun being not of the lenghe of one whole Yarde or hagbutt or demyhake beinge not of the lenghe of thre quarters of a Yarde, Tenne poundᵗ sterlinge. And that it shalbe laufull to everie pson and psons, wᶜʰ have landes teᶥtᵗ fees annuyties or officᵗ to the yerelye value of one hundred poundᵗ as ys aforesaide, to seise and take everie suche Crosbowe, and also everie handgun beinge in stock and gune shorter in lenghe then one whole Yarde and everie hagbutt and demyhake beinge shorter in lenghe then thre quarters of a Yarde, or any of them; from the Kepinge or possession of everie suche Offendor contᵉrie to the forme of this Acte, and the same Crosbowe or Crosbowes to kepe and reteyne to his or their owne

me, and also the same handguns hagbutt̃ and demyhak̃ so seised and taken within twenty dayes next after the same seisure or takinge to breake and distroye, upon peyne of fourtye Shilling̃ for everie Gune so seised and not broken and destroyed, and the same so broken and destroyed to kepe & reteyne to his or their owne use.

And it is further enacted by thauctoritie aforesaide, that noe p̃son or p̃sons, other then suche as have land̃ teñt̃ rent̃ fees annuyties or Offic̃ to the yerely value of one hundred Pound̃ as ys aforesaide, from or after the saide laste daye of June, shall carrie or have, in his or their Jorney goinge or ridinge in the King̃ highe waye or elswhere, any Crosbowe bent or Gune charged or furniabed withe Powder fier or touche for the same, Except it be in tyme and Service of Warre, upon payne to forfeyt for everie suche Offence tenne pound̃ ; this p̃sent Acte or any thinge therin conteyned to the contr̃ie notwithstandinge.

III.
Penalty upon unqualified Persons riding, &c. with Guns charged, &c.

And be it further enacted by thauctoritie aforesaide, that no p̃son or p̃sons from the saide laste daye of June shall in anywise shote in or withe anye handgune demyhake or hagbutt at any thinge at lardge, within any Cittie Boroughe or Markett Towne or within one quarter of a myle of anny Cittie Boroughe or Markett Towne, excepte it be at a Butt or Banck of earth in place convenient, or for the defence of his p̃son or house, upon payne to forfeyte for everie suche Shott tenne poundes; this p̃sent Acte or anny thinge therin conteyned to the contrarie notwithstandinge.

IV.
None shall shoot at large in Cities, &c.

And be it further enacted by thauctoritie aforesaide, that noe p̃son or p̃sons of what estate or degre soever he or they be, shall from or after the saide laste daye of June cõmaunde any of his or their servaunt̃ to shote in any Crosbowe handgune hagbutt or demyhake of his or their saide Masters or of any other p̃sons, at any deare fowle or other thinge excepte it be only at a butt or bank of Earth or in the tyme of Warre as ys abovesaide, upon payne to forfeyt for everie suche offence tenne pound̃ : The one moytie of all w̃ forfeytures and penalties in this p̃sent Acte above specified ahalbe to the Kinge our Soveraigne Lorde his heires and Successors, and thother moytie thereof to the partie that will sue for the same by bill playnt acc̃õn of Debte or Informac̃õn in anny of the King̃ Court̃ of Recorde in whiche auyte noe Essoyne p̃tecc̃õn nor Wager of lawe shalbe allowed.

V.
None shall order their Servants to shoot at Deer, &c. with Hand-guns.

Application of Penalties.

Provided alwaye and be it enacted by thauctoritie aforesaide, that it shalbe laufull from henceforthe to all Gentlemen Yeomen and Servingemen of everie Lorde or Lord̃ s̃uall or temporall and of all Knight̃ Esquiers and Gentlemen, and to all the Inhabitaunt̃ of Citties Boroughes and Markett Townes of this Realme of Englande, to shote withe any handgune Demyhake or hagbutt at anye butt or bank of Earth onlye in place convenient for the same, so that everie suche handgune Demyhake or hagbutt be of the seṽall lenghes aforesaide and not under ; and that it shalbe laufull to everie of the saide Lorde and Lord̃ Knight̃ Esquiers and Gentlemen, and the Inhabitaunt̃ of everie Cittie Boroughe and Markett Towne, to have and kepe in everie of their houses any suche handgune or handgunes of the lenghe of one whole Yarde, or any hagbutt or Demyhake of the lenghe of thre quarters of a Yarde as ys aforesaide and not under, to thintent to use and shote in the same at a butt or banke of Earthe onlye, as ys abovesaid, wherbye they and everie of them by thẽcise thereof in forme abovesaid may the better syde and assist to the defence of this Realme when nede shall requyre ; this p̃sent Acte or any thinge therein conteyned to the contr̃ie notwithstandinge.

VI.
Shooting at Butts with Hand-guns allowed.

And be it further enacted by thauctoritie aforesaide, that it shalbe laufull to everie p̃son and p̃sons whiche dwelleth and inhabiteth in anye house standinge and being sett distant twoo furlong̃ from any Cittie Boroughe or Towne, to kepe and have in his saide house for the onelye defence of the same handgunes hagbutt̃ and demyhakes beinge of the severall lenghes aforesaide and not under, & to use and exc̃ise to shote in the same at any butt or bancke of earthe nere to his house and not otherwise ; Any thinge conteyned in this Acte to the contr̃ie notwithstandinge.

VII.
Hand-guns allowed out of Cities for Defence of Houses, &c.

And furthermore the King̃ most lovinge Subject̃ the Lordes s̃uall and temporall and the Cõmons in this p̃sent Parliament assembled, most humblye doe beseche the King̃ Majestie that it be further enacted by thauctoritie aforesaide, that all tres patent̃ Fraternyties, and also all other placard̃ lycences and bill̃ assigned heretofore had made or signed by his Highnes or by any other authorised by his Highnes tres patent̃ under his Great Seale to give licence and placarde to shote in Crosbowes & handgunes or any of them, shalbe from and after the saide laste daye of June frustrate voyde and of none effecte.

VIII.
Patents, &c. to shoot in Crosbowes, &c. declared void. [*But see* § XIV.]

And also that it may be further enacted by thauctoritie aforesaide that the saide Statute made in the saide xxṽ Yere of the King̃ most gracious Raigne, and all other Statut̃ heretofore made and p̃vided for thavoydinge and restreynt in shotinge of Crosbowes and handguns or for any of them, or for the us̃inge and kepinge of the same, be from henceforth utterlie voyde and of none effecte : Provided alwayes that everie p̃cesse auyte or Informac̃õn conceaved cõmenced and nowe dependinge for any Offence done contr̃ie to the forme of the saide Statute made in the said xxṽ Yere of the King̃ moste noble Raigne, or of any other Statute made (') p̃vyded for and concerninge the shotinge in Crosbowes and handguns, not repealed, and for the kepinge of the same, shalbe as good and effectuall to the parties that have comenced the (') and shall stande and be in suche forme effecte and condic̃õn as if this Acte had never bene made.

IX.
25 H. VIII. c. 17, &c. repealed ;

Except as to Suits depending.

Provided also that this Acte or any thinge therin conteyned be not in any wise hurtfull or p̃judiciall to any p̃son or p̃sons nowe beinge or that hereafter shalbe appoynted by the King̃ Highnes, to kepe receyve or take any Crosbowes or Handguns that shalbe forfeyted or taken within the precinc̃te or l̃btye of the King̃ forrest̃ park̃ or chaces, but that he or they may laufully kepe and reteyne the same Crosbowes or Handguns from tyme to tyme untill suche tyme

X.
Proviso for Persons keeping Crosbowes, &c. seized in Forests :

' or *O.* * same *O.*

**for Makers of Crosbows, &c.**

at the further pleasure of the Kingꝭ Highnes in that behalfe be to eṽy suche pson shewed & declared: Provided also that this Acte extende not to the makers of Crosbowes or Handguns, but that they may laufully kepe Crosbowes and Handguns Hagbuttꝭ and Demyhakes in their houses, and shott in the same onlye for provinge & assayinge of them at a butt or bank of earthe in the place convenient and not otherwise, so that the saide Handguns Hagbuttꝭ & Demyhakꝭ be of the seṽall lenghes in Stock and Gune as ys above lymitted: Provided also that this Acte nor any thinge therin conteyned extende not or be pꝛjudiciall to any Marchauntꝭ whiche have or shall have any Crosbowes Handguns Hagbuttꝭ and Demyhakꝭ or any of them to sell within this Realme and to none other use, so that the same Handguns Hagbuttꝭ and Demyhakꝭ be of the seṽall lenghes in Gune and Stocke as ys above lymitted and not under.

**and Merchants dealing therein.**

**XI. Proclamation of the Act in each County.**

PROVIDED also that noe manner of parson rune in any daunger or take hurte by reason of any penaltye or forfeiture conteyned in this Acte untill suche tyme as pclamaꝛon be made of the same Acte, within the Countye where the partie that shall or maye offende cont̄rie to this Acte dwelleth, by the space of twentye dayes nexte after the makinge of the saide pclamaꝛon.

**XII. Housekeepers not liable to Penalty for their Lodgers keeping Crossbows, &c.**

PROVIDED also that yf any manner of pson bringe or cause to be brought withe him into his lodginge or in or to any other mans house any Crosbowe or Handgune, that then the penaltye and forfeyture, yf any suche be or hereafter shalbe forfeited by reason of this Acte, to rune and be onely upon the bringer of the saide Crosbowe and Handgune and not to the owner of the same lodginge or house, yf the saide [hownse ¹] of the said lodging or house cause thes aide bringer thereof to take & carrie awaye the saide Crosbowe or Handgune agayne withe him at his departinge; anye thinge in this Acte made to the cont̄rie notwithstandinge.

**XIII. Offenders may be arrested by any Persons.**

AND be it also enacted by thauctoritie of this p̄sent parliament that if any pson or psons, from or after the laste daye of June next comynge, see or fynde any pson or psons offendinge or doinge cont̄rie to the forme and effecte of this Acte, that then it shalbe laufull to everie suche pson or psons pceyvinge fyndinge or seinge anye suche pson or psons so offendinge cont̄rie to the fourme of this acte, to arrest and attache eṽy suche offendor or offendors and to bringe or convey the same to the next Justice of Peace of the same Countye where the said offendor or offendors shalbe founde soe offendinge; And that the same Justice of Peace upon a due exāꝛon and proeff thereof before him had or made by his discreꝛon shall have full power and aucthoritie to sende or cōmytt the same offendor or offendors to the next Gaole, there to remayne till suche tyme as the saide penaltye or forfeyture shalbe trulye contented and paide by the saide offendor; the one moytie of the same penaltye to be paide to the Kingꝭ Highnes and thother moytie thereof to the first bringer or conveyer of the saide offendor to the same Justice of Peace.

**XIV. Licences, if given, (for § VIII.) shall specify at what floats, &c. the Party licensed may shoot; and he shall give Security to obey such Regulations.**

AND be it further enacted by thauctoritie aforesaide, that yf any pson or psons doe at any tyme hereafter obteyne gett or purchase, of the Kingꝭ Majestie his heires or successors, any placarde licence or bill assigned to shote in any Crosbowe Handgun Hagbutt or Demyhake cont̄rie to the tenor purporte and effecte of this p̄sent acte, that then there shalbe conteyned in everie suche placarde licence and bill assigned, at what beastꝭ fowles or other thinges the saide pson or psons so obteyninge any suche placarde licence or bill assigned shall shote, withe any Crosbowe Handgune Hagbutt or Demyhake, or els that everie suche placarde licence and bill assigned hereafter to be obteyned gotten or purchased shalbe clerely voyde fruatrate and of none effecte: And also that everie suche pson or psons so obteyninge any suche placarde licence or bill assigned, before they shote in any suche Crosbowe Handgun Hagbutt or Demyhake, in any suche manner or forme as shalbe mencioned in any suche placarde licence or bill assigned, shalbe bounden in the Kingꝭ Courte of Chauncerie by recognizaunce in the some of twenty poundꝭ to the Kingꝭ use withe and upon condiꝛon that he so obteyninge or havinge the saide licence placarde or bill assigned, shall not shote in any Crosbowe Handgune Hagbutt or Demyhake at any other beastꝭ or fowles then in any suche placarde licence or bill assigned shalbe conteyned and specified, and els all suche placardes licencꝭ and billꝭ assigned so hereafter to be made to any pson or psons not beinge so bounden by recognizaunce in the Courte of Chauncerie as is aforesaide, to be utterlie voide and of none effecte.

**XV. Recovery and Application of Penalties.**

AND be it further enacted by thauctoritie aforesaide, that it shalbe laufull to all Justicꝭ of Peace in their sessions and to all Stewardes and Baylieffꝭ in their seṽall leetꝭ and lawe dayes to enquyre heare and determyne eṽy suche offence after the saide laste daye of June to be cōmytted and done cont̄rie to the tenor of this p̄sent Acte; So that alwayes noe lesse fyne then tenne poundes be assessed upon everie suche p̄sentment and conviꝛon made accordinge to the due course of the lawe; the same fyne so by the same Justicꝭ of Peace upon everie suche p̄sentment and conviꝛon made before them in their Sessions, to be payde and levyed onely to the Kingꝭ use; and the one moytie of everie fyne to be assessed by the Stewardꝭ or Baylyffꝭ of any leete or lawe daye, upon everie p̄sentment and conviꝛon before them, to be payde and levyed to the use of the Kinge our Soveraigne Lorde, and (¹) the other moytie the one halfe to the owner of the saide leete or lawe daye by distresse or acꝛon of debte, and thother halfe of the same seconde moytie of the same fyne, to be to the partie that will pursue for the same in any of the Kingꝭ Courtꝭ by bill playnte informaꝛon or acꝛon of debte, in the whiche none Essoyne pteꝛon nor wager of lawe shalbe allowed.

**XVI. Penalty on Jurors charged to enquire into Offences, who shall conceal the same, 20 s.**

AND be it further enacted, that yf any Jurie beinge sworne and charged to enquyre for the Kinge our Soṽaigne Lorde before anye Justicꝭ of the Peace or Stewardꝭ of leetꝭ or lawdayes, of any offencꝭ cōmytted or done cont̄rie to this p̄sent Acte, doe wilfullie conceale any of the same offencꝭ, that then the saide Justicꝭ Stewardꝭ or Baylliffꝭ before whom any concealment shalbe had and done, shall have auctoritie by vertue of this p̄sent Acte from tyme to tyme to chardge and sweare an other Jurie of twelve or mo good and substantiall honest psons to enquire of everie suche concealment, and if any suche concealment be founde and presented by the saide Jurie so chardged to enquyre of the same, that

¹ owner O.                                    * of O.

then everie one of the saide fyrste Jurie that so did conceale the same, shall leese and forfeyt for everie suche concealement of e<sup>v</sup>y suche offence twenty shilling͠t ; All whiche forfeytures and penaltyes of twentye shilling͠t for everie such concealment of everie suche offence so found and p̃sented before the same Justic͠t of Peace shall holye be levyed and payde to the King͠t use, and the moytie of all the same forfeytures and penaltyes of twenty shilling͠t, so founde and p̃sented before the Steward͠t or Bayliff͠t of any leete or lawdaye, shalbe levied and paide to the use of the owner of the saide leete or lawdaye by distresse or ac͠con of debte, and thother moytie thereof to be to the partie or parties that will sue for the same by ac͠con informa͠con bill or playnte in any of the King͠t Court͠t, in the whiche ac͠cons informa͠cons bill͠t or playnt͠t no wager of lawe essoyne nor p̃tec͠con shalbe allowed.

PROVIDED alwaies and be it enacted by thauctoritie aforesaide, that yf any p̃son or p̃sons hereafter in any parte do offende or do contr̃ie to the purrewe and remedy of this Acte, whereupon cause of Ac͠con for the same offence shalbe geven to the Kinge his heires or successors or to any other p̃son or p̃sons that will sue by vertue of this Acte for the punyshment of the saide offence or forfeytures, that yf the Kinge our Soveraigne Lorde his heires or successors within one yere next and ymediatlye after suche offenc͠t and forfeytures had and made do not pursue their ac͠con or ac͠cons so given by this Acte or cause exãla͠con upon suche default͠t and offenc͠t to be had and made before their counsaile, or other p̃sentment͠t thereof to be had accordinge to the meanynge of the same Acte, and everie other p̃son whiche hereafter by vertue of this Acte maye have ac͠con or ac͠cons suyte or informa͠con upon this Statute within halfe a yere next and ymediatlye after suche offenc͠t or forfeitures had and made do not comence their suyt͠t informa͠con ac͠cons or p̃sentment͠t of and upon the said forfeyt͠t by ac͠con or otherwise as in this p̃sent Acte ys lymited and declared, that then aswell the Kinge our So<sup>v</sup>aigne Lorde his heires and successors, after one yere next after suche offenc͠t and forfeyt͠t had and made yf no suyte in his or their name be taken by ac͠con or otherwise as ys before exp̃sed before the same yere ended & det̃myned, as everie other p̃son after halfe yere next after like Offenc͠t had and done in the fourme aforesaide yf noe suyte thereupon be taken by none of them in fourme above declared, be utterly excluded and debarred of their saide suyt͠t ac͠cons Informa͠cons and exãia͠cons to them gyven by vertue of the saide Acte, and the partyes and e<sup>v</sup>y of them so offendinge shalbe of all suche Offenc͠t and forfeyt͠t clerely dischardged and quytt ; Any thinge in this Acte comprised to the contr̃ie notwithstandinge.

PROVIDED alwayes and be it enacted by thauctoritie aforesaide that this p̃sent Acte ne any thinge therin conteyned shall in anywise extende or be p̃judiciall unto the King͠t Subject͠t resident or inhabitinge nere unto the Coast͠t of the Sea in any parte of this Realme, their houses beinge not above fyve myles distant from the same Cost͠t, nor also to any of the saide Subject͠t inhabitinge within twelve myles of the borders of Scotlande, nor to any the King͠t Subject͠t Inhabitaunt͠t of the Towne and Marches of Callice, nor to any of the Inhabit'unt͠t of the Isles of Jersey Gernesey Anglesey and the Isles of Weight and Man, but that it shalbe laufull for everie of the saide Inhabitaunt͠t at all tymes hereafter to have ex͠cise and use their handguns hagbutt͠t and demyhakes of the lenghes abovesaide within the lymytt͠t and Isles abovesaide, so that it be at noe manner of Dere heron Shoveler fesant partriche Wild Swanne or Wilde Elke or any of them ; this p̃sent Acte or any thinge therin conteyned to the contr̃ie notwithstandinge.

PROVIDED also that this Acte ne any thinge therin conteyned be in anywise hurtfull or p̃judiciall to any s̃v'nte or p̃son that hereafter, from the saide laste daye of June, shall bend beare carrie charge use or assaye anye Crosbowe or any handgun demyhake or hagbutt of the lenghes abovesaide, by the cõmaundment of his Lorde [and '] Master so that the saide s̃v'nte or p̃son doe not shote at any fowle Dere or other Game of what Kynd or nature soever they be ; nor also to any suche s̃v'nte p̃son or p̃sons that shall after the saide last daye of June beare or convey any Crosbowe handgun hagbutt or Demyhake of the lenghes aforesaide to any place or places, by the comaundment of his lorde or master that maye shote by auctoritie of this Acte, to be amended repayred delyvered or assayed ; so that the saide Servaunte or other p̃son so bringinge or conveyinge the saide Crosbowe handgun hagbutt or demyhake have redye to shewe to e<sup>v</sup>y p̃son requiring the sight thereof one licence in Writinge sealed or subscribed by his saide Lorde or Master to carrie and convey the same Crosbowe handgun hagbutt or demyhake to thintent to be amended repayred assayed or delivered as ys aforesaide.

PROVIDED alwaies that this Acte or any thinge conteyned therein shall not extende to any Owner of any Shippe, for having or kepinge of any handgun hagbutt or demyhake of the sev̄all lenghes in this Acte exp̃sed or under, only to be had and occupied within their Shippe or other Vessell, or for the carriage and recarriage of them or any of them on lande, or kepinge of them for the onlye ex͠cise and occupyinge of them within their saide Shippe or Vessell ; Anye thinge in this Acte to the contr̃ie in any wise notwithstandinge.

XVII.
Limitation of Prosecutions ; One Year to the King, and Half a Year to others.

XVIII.
Proviso for Inhabitants near the Sea Coasts, Scotland, Calais, Jersey, &c.

XIX.
Proviso for Servants under Orders of their Masters.

XX.
Proviso for Owners of Ships, &c.

' or *O*.

# Exhibit 39



DATE DOWNLOADED: Wed May 10 12:07:29 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1784 627 .

ALWD 7th ed.
, , 1784 627 .

Chicago 17th ed.
"," New York - 7th Legislative Session : 627-629


AGLC 4th ed.
" New York - 7th Legislative Session 627

OSCOLA 4th ed.
" 1784 627          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# LAWS

OF THE

# STATE OF NEW-YORK,

PASSED AT THE

FIRST MEETING OF THE SEVENTH SESSION OF THE LEGISLATURE
OF SAID STATE.

## CHAP. 1.

AN ACT to lay a duty of tonnage on vessels for defraying the
expence of the lighthouse at Sandy Hook.

PASSED the 12th of February, 1784.

I. *Be it enacted by the People of the State of New York represented in* Duty
*Senate and Assembly and it is hereby enacted by the authority of the same,* levied.
That a duty of four pence per ton shall be levied and collected on all
vessels which shall arrive from sea into the port of New York excepting
vessels the property of citizens of this State while actually employed on
whaling or coasting voyages, and all vessels the entire property of citi-
zens of any of the United States, which shall not exceed the burthen of
sixty tons carpenters tonnage.

That for the orderly collection of the said duty it shall be lawful for Clerk to be
the master and wardens of the port of New York, who are or shall be appointed
appointed by the council of appointment, to appoint a clerk to execute to collect
the duties enjoined upon him by this act.

That every master or commander of a vessel claiming an exemption Masters
from the said duty shall if required make oath before the said clerk or claiming
in his absence before any of the said wardens who are hereby respect- to make
ively empowered to administer the same. That according to the best oath.
of his knowledge and belief such vessel is a whaling or a coasting vessel for failure
entitled to exemption from the said duty, according to the true intent to report
meaning of this act; and in case of refusal to take the said oath such arrival.
master or commander shall be liable not only to the duty of tonnage
the penalties in such cases to be imposed by this act.   That every mas-
ter of a vessel subject to the said duty who shall not within twenty-four

74

*And be it further enacted by the authority aforesaid* That whenever any ·Warrant person shall refuse to appear and make affidavit in pursuance of such ·to issue against summons, a warrant shall issue from such judge or magistrate to com- ·witnesses refusing pel his appearance, and if on his appearance he shall refuse to make ·to appear. affidavit, or affirmation if a Quaker, of the fact which may be within his knowledge touching the matters in question, he shall be committed to the common gaol of the county, there to remain without bail or mainprise for the term of six callender months.

# CHAP. 27.

AN ACT to repeal an act entitled An act to revive and amend an act entitled an act more effectually to prevent robberies within this State.

PASSED the 10th of April, 1784.

*Be it enacted by the People of the State of New York, represented in* ·Act named *Senate and Assembly, and it is hereby enacted by the authority of the same,* ·repealed. That the act entitled "An act to revive and amend an act entitled an act more effectually to prevent robberies within this State," passed the first day of July, one thousand seven hundred and eighty, shall be, and the same is hereby repealed.

# CHAP. 28.

AN ACT to prevent the danger arising from the pernicious prac- tice of lodging gun powder in dwelling houses, stores, or other places within certain parts of the city of New York, or on board of vessels within the harbour thereof.

PASSED the 13th of April, 1784.

WHEREAS the storing of gun powder within the city of New York is ·Preamble. dangerous to the safety thereof.

*Be it therefore enacted by the People of the State of New York, repre-* ·Unlawful to keep *sented in Senate and Assembly, and it is hereby enacted by the authority of* ·gunpow- *the same,* That from and after the passing of this act, it shall not be ·der in quantities lawfull for any merchant, shopkeeper, or retailer, or any other person, or ·exceeding persons whatsoever, to have or keep any quantity of gun powder exceed- ·twenty- eight ing twenty-eight pounds weight, in any one place, less than one mile to ·pounds except in the northward of the city hall of the said city, except in the public mag- ·public azine at the Fresh-water, and the said quantity of twenty-eight pounds ·magazine, etc. weight, which shall be lawfull for any person to have and keep at any place within this city, shall be seperated into four stone jugs or tin can- nisters, which shall not contain more than seven pounds each, on pain of forfeiting all such gun powder, and the sum of fifty pounds for every hundred weight, and in that proportion for a greater or lesser quantity, ·Penalty. and upon pain of forfeiting such quantity which any person may lawfully keep as aforesaid, and which shall not be seperated as above directed, with full costs of suit to any person, or persons, who will inform and sue for the same, by any action, bill, or information, in any of the courts of record, in this city, who are hereby impowered, and required, to give special judgment in such action bills or informations, to be brought

by virtue of this act, as well for the recovery of the value of such gun powder in specie, as for the penalty aforesaid, besides costs, and to award, effectual execution thereon, provided always that all suits, actions, or prosecutions to be brought, commenced, or prosecuted, against any person or persons, for any thing done in pursuance of this act, shall be commenced and prosecuted without willful delay, within two callender months next after the fact was committed, and not otherwise.

*And whereas* vessels arriving from sea, and having onboard as part of their cargo a quantity of gun powder.

Gunpow-
der on
vessels to
be landed
before
vessel
hauls
alongside
of wharf,
etc.

*Be it enacted by the authority aforesaid,* That the commander, or owner or owners, of all such ships or vessels, having gun powder onboard, shall, within twenty-four hours after her arrival in the harbour, and before they hawl along side of any wharf, pier or key within the city, land the said gun powder, by means of their boat or boats, or any other craft, at any place along the ship yards on the East river, or at any place to the northward of the air furnace on the North river, which may be most contigious to the magazine at Fresh water, and shall cause the same o be stored there, or in any other proper magazine, which now is or ereafter may be built for that purpose, at any place to the northward thereof, on pain of forfeiting all such gun powder, to any person or persons, who will inform and sue for the same, in like manner, as is herein before directed, with respect to the having and storing of gun

How gun-
powder to
be trans-
ported
through
streets of
city.

powder within the city as aforesaid. And in order to prevent any fatal consequences which may arise, from the carriage of gun powder, in and through the streets of the city of New York, by carts, carriages, or by hand, or otherways, it shall be in tight cask, well headed and hooped, and shall be put into bags or leather-cases, and intirely covered therewith, so as that none be spilt or scattered in the passage thereof, on pain of forfeiting all such gun powder, as shall be conveyed through any of the streets aforesaid in any other manner than is herein directed, and it shall and may be lawfull for any person or persons, to seize the same to his or their own use and benefit — provided the person or persons so offending, be thereof lawfully convicted, before the mayor, recorder, or

Warrant
to search
in day
time for
gun pow-
der unlaw-
fully
stored
may be
issued,
etc.

any two justices of the city aforesaid. And that it shall and may be lawfull, for the mayor recorder, or any two justices of the peace of the city and county of New York, upon demand made by any inhabitant or inhabitants of the said city, who assigning a reasonable cause of suspicion on oath, of the sufficiency of which the said mayor or recorder, or justices, is and are to judge, to issue his or their warrant or warrants, under his or their hands and seals, for searching in the day time for gun powder in any building or place whatsoever, within the limits aforesaid, or any ship or vessel within forty eight hours after her arrival in the harbour, or at any time after any such ship or vessel shall and may have hawled alongside of any wharf pier or key within the limits aforesaid, and that upon any such search, it shall be lawfull for the searchers or persons finding the same, immidiatly to seize, and at any time within twelve hours after such seizure, to cause the same to be removed to the magazine at Fresh water, or to any other proper magazine, which now is or hereafter may be at any place north of Fresh water aforesaid, and the same being so removed, it shall be lawfull to detain and keep the same untill it shall be determined by the mayor, recorder or any two of the justices of the peace of the city and county aforesaid, whether the same shall be forfeited by virtue of this act, and the person or persons so detaining the same, shall not be subject or liable to any action or suit, for the detention thereof, provided always that nothing in the act con-

tained, shall be construed to authorize any person, having such warrant to take advantage of the same, for serving any civil process of any kind whatsoever.

*And be further enacted by the authority aforesaid,* That if any gun powder, exceeding the quantity which any person by this act may lawfully keep in his custody, shall be found during any fire, or alarm of fire, in the said city, by any of the firemen of the said city, it shall be lawful for him to seize the same, without warrant from a majestrate, and to hold and have the same to his own use, any thing in this act to the contrary notwithstanding. This act to be and continue in force from the passing thereof, untill the twenty-eight day of February in the year of our Lord one thousand, seven hundred and eighty six. *If found during any fire may be seized without warrant.*

# CHAP. 29.

AN ACT to lengthen the terms of the inferior courts of common pleas and general sessions of the peace, in the counties of Westchester, Queens and Richmond; and for other purposes therein mentioned.

PASSED the 13th of April, 1784.

WHEREAS the duration of the terms of the inferior courts of common pleas and general sessions of the peace, in the counties of Westchester, Queens and Richmond; which, in the county of Westchester, continue from the fourth Tuesday in May until the Friday following, and from the first Tuesday in November until the Friday following, in every year; in Queens county, from the third Tuesday in May until the Friday following, and from third Tuesday in September until the Friday following, in every year; and in Richmond county, from the first Tuesday in May until the Friday following, and from the last Tuesday in September until the Friday following, in every year, are found from experience, to be too short for the discharge of the necessary business in the said respective courts. *Preamble.*

*Be it therefore enacted by the People of the State of New York represented in Senate and Assembly, and it is hereby enacted by the authority of the same,* That the terms of the inferior courts of common pleas and general sessions of the peace in the county of Westchester, shall hereafter commence on the fourth Monday in May and first Monday in November, in every year, and shall continue until the several Saturdays next following, inclusive; that the terms of the inferior courts of common pleas and general sessions of the peace in Queens county, shall commence on the third Mondays in May and September, in every year, and shall continue until the several Saturdays next following, inclusive; and that the inferior courts of common pleas and general sessions of the peace in the county of Richmond, shall commence on the first Monday in May and last Monday in September, in every year, and shall continue until the several Saturdays next following, inclusive. That all process issued out of the said respective courts, and made returnable on the usual return days, and all recognizances by which any person or persons shall be bound to appear on the said usual return days, shall be deemed good and valid on such days, although such days of return and appearance, are by this act, respectively altered. *Terms of the courts, when to commence and when to close.* *Process issued returnable turnable on usual return days valid.*

# Exhibit 40



# ACTS AND RESOLVES

OF

## MASSACHUSETTS.

### 1782-83.

[REPRINTED UNDER CHAPTER 104 OF THE RESOLVES OF 1889.]

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the Authority of the same,* That a Sum not exceeding *Two Thousand Pounds* be raised by a Lottery or Lotteries, for and to the Purpose of re-building the said Mills; and that *John Pitts* and *John White*, Esquires, and Mr. *William Paine*, or any two of them, shall be Managers of the said Lottery or Lotteries, who shall be sworn to the faithful Performance of their Trust; which said Managers shall make and publish in such News Papers as they shall judge proper, a Scheme for the said Lottery or Lotteries, as soon as may be; and they shall also publish therewith all necessary Rules and Regulations for the Management thereof. And all Prizes which may be drawn in the said Lottery or Lotteries, shall be paid without any Deduction, provided they are demanded within Six Months after the Drawing of the said Lottery or Lotteries, otherwise the Money arising from such Prizes, shall be appropriated to the Purpose aforesaid.

£2000 to be raised by Lottery.

Names of the Managers.

*And be it further enacted,* That if any Person shall forge, counterfeit, or alter any Lottery Ticket issued by Virtue of this Act, or shall pass or utter any such forged, counterfeited or altered Ticket, knowing the same to be false, forged, counterfeited or altered, or shall advise or assist in forging, altering, or counterfeiting the same, every Person so offending, and being thereof convicted before the Supreme Judicial Court of this Commonwealth, shall be punished by being set on the Gallows for the Space of one Hour, with a Rope round his Neck, or shall pay a Fine not exceeding *One Hundred Pounds*, to the Use of this Commonwealth, or suffer not more than Twelve Months Imprisonment, nor less than Two, or be publicly whipped, not exceeding Thirty-nine Stripes, at the Discretion of the said Supreme Judicial Court, according to the Nature and Circumstances of the Offence.

Persons guilty of Forgery.

Penalty.

*February 26, 1783.*

## 1782. — Chapter 46.

[January Session, ch. 13.]

AN ACT IN ADDITION TO THE SEVERAL ACTS ALREADY MADE FOR THE PRUDENT STORAGE OF GUN POWDER WITHIN THE TOWN OF *BOSTON.*

*Chap.* 46

*Whereas the depositing of loaded Arms in the Houses of the Town of* Boston, *is dangerous to the Lives of those who*

Preamble.

*are disposed to exert themselves when a Fire happens to break out in the said Town:*

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the Authority of the same,* That if any Person shall take into any Dwelling House, Stable, Barn, Out House, Ware House, Store, Shop, or other Building within the Town of *Boston,* any Cannon, Swivel, Mortar, Howitzer, Cohorn, or Fire Arm, loaded with, or having Gun Powder in the same, or shall receive into any Dwelling House, Stable, Barn, Out House, Store, Ware House, Shop, or other Building, within the said Town, any Bomb, Grenade, or other Iron Shell, charged with, or having Gun Powder in the same, such Person shall forfeit and pay the Sum of *Ten Pounds,* to be recovered at the Suit of the Firewards of the said Town, in an Action of Debt, before any Court proper to try the same; one Moiety thereof to the Use of the said Firewards, and the other Moiety to the Support of the Poor of the Town of *Boston.*

*And be it further enacted by the Authority aforesaid,* That all Cannon, Swivels, Mortars, Howitzers, Cohorns, Fire Arms, Bombs, Granades, and Iron Shells of any Kind, that shall be found in any Dwelling House, Out House, Stable, Barn, Store, Ware House, Shop, or other Building, charged with, or having in them any Gun Powder, shall be liable to be seized by either of the Firewards of the said Town : And upon Complaint made by the said Firewards to the Court of Common Pleas, of such Cannon, Swivels, Mortars, or Howitzer, being so found, the Court shall proceed to try the Merits of such Complaint by a Jury; and if the Jury shall find such Complaint supported, such Cannon, Swivel, Mortar, or Howitzer, shall be adjudged forfeit, and be sold at public Auction ; and one Half of the Proceeds thereof shall be disposed of to the Firewards, and the other Half to the Use of the Poor of the Town of *Boston.* And when any Fire Arms, or any Bomb, Granade, or other Shell, shall be found in any House, Out House, Barn, Stable, Store, Warehouse, Shop, or other Building, so charged, or having Gun Powder in the same, the same shall be liable to be seized in Manner aforesaid ; and on Complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of as is above provided for Cannon.

*Be it further enacted,* That Appeals shall be allowed in Prosecutions upon this Act as is usual in other Cases.

*March 1, 1783.*

Persons prohibited taking into their Dwellings, &c. any piece of Ordnance loaded with Gun Powder.

Penalty.

Pieces of Ordnance charged with Gun Powder found in any Dwelling-House,&c. liable to be seized.

How disposed of in Cases of Forfeiture.

Appeals allowed.

# Exhibit 41



**HEINONLINE**

DATE DOWNLOADED: Fri Jan 27 13:50:59 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Laws of the State of Maine (1830).

ALWD 7th ed.
. Ls of the State of Maine (1830).

APA 7th ed.
(1830). Laws of the State of Maine. Hallowell, Glazier, Master & Co.

Chicago 17th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co.

McGill Guide 9th ed.
Ls of the State of Maine (Hallowell: Glazier, Master & Co., 1830)

AGLC 4th ed.
Laws of the State of Maine (Glazier, Master & Co., 1830

MLA 9th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co. HeinOnline.

OSCOLA 4th ed.
Laws of the State of Maine. Hallowell, Glazier, Master & Co.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

**JA4646**

cial Court, to parties and witnesses, as are allowed in the
regular Courts of law ; and that the said two Justices, *quorum unus*, shall have the same fees, and be allowed the same
sums for the trial aforesaid, as are allowed to Justices in the
process of forcible entry and detainer.

[*Approved March* 8, 1821.]

## CHAPTER XXV.

### An Act for the prevention of damage by Fire, and the safe keeping of Gunpowder.

SEC. 1. **B**E *it enacted by the Senate and House of Representatives, in Legislature assembled,* That the Selectmen of each
town within this State, containing not less than fifteen hundred
inhabitants, be, and they hereby are, authorized and empowered to make rules and regulations, from time to time, in conformity with which, all gunpowder which is or may be within such town, shall be kept, had or possessed therein ; and no
person or persons shall have, keep or possess within such
town, any gunpowder, in any quantity, manner, form or
mode, other than may be prescribed by the rules and regulations aforesaid.

*Selectmen to make regulations as to the keeping of gunpowder in certain towns.*

SEC. 2. *Be it further enacted,* That any person or persons who shall keep, have or possess any gunpowder, within
any town, contrary to the rules and regulations which shall
be established by the Selectmen of such town, according to
the provisions of this Act, shall forfeit and pay a fine of not
less than twenty dollars, and not exceeding one hundred dollars, for each and every offence, to be recovered by action of
debt in any Court proper to try the same.

*Penalty for violating such regulations.*

*Mode of recovery.*

SEC. 3. *Be it further enacted,* That all gunpowder which
shall be had, kept or possessed, within any town, contrary to
the rules and regulations which shall be established by the
Selectmen of such town, according to the provisions of this
Act, may be seized by any one or more of the Selectmen of
such town, and shall within twenty days next after the seizure
thereof, be libelled, by filing with any Justice of the Peace
in such town, a libel, stating the time, place and cause of seizure, and the time and place when and where trial shall be had
before said Justice, and a copy of said libel shall be served
by the Sheriff, or his deputy, on the person or persons, in
whose possession the said gunpowder shall have been seized
by delivering a copy thereof to each such person, or leaving
such copy at his or her usual place of abode, seven days at
least, before the time which shall be specified in said libel,
for the trial thereof, that such person may appear, and show
cause why the gunpowder, so seized or taken, should not be
adjudged forfeit ; and if any person shall appear to show
cause why the same should not be adjudged forfeit, such ap-

*Powder kept contrary to regulations may be seized and libelled.*

*Proceedings on such libel.*

**99**

pearance shall be entered on record, by said Justice; and if the gunpowder, seized as aforesaid, shall be adjudged forfeit, the person or persons, whose appearance shall have been recorded as aforesaid, shall pay all costs of prosecution, and execution shall issue therefor: *Provided however,* That the person or persons, whose appearance shall have been recorded, may appeal from the judgment rendered by said Justice of the Peace, to the next Court of Common Pleas to be holden for the County where such town is situated: and the party so appealing, before such appeal shall be allowed, shall recognize, with sufficient surety or sureties to the libellant, to prosecute his said appeal and to pay all such costs as may arise after said appeal; and no further proceedings shall be had upon the judgment appealed from; and in case the party appealing shall neglect to enter his appeal, the Court appealed to, may, upon complaint, proceed to affirm the judgment of the Justice, with additional costs. *[Appeal from Justice's judgment, after proceedings.]*

SEC. 4. *Be it further enacted,* That any person who shall suffer injury by the explosion of any gunpowder, had or possessed, or being within any town, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, may have an action of the case in any Court proper to try the same, against the owner or owners of such gun powder, or against any other person or persons, who may have had the possession or custody of such gunpowder, at the time of the explosion thereof, to recover reasonable damages for the injury sustained. *[Persons damaged by explosion of powder illegally kept, may obtain redress.]*

SEC. 5. *Be it further enacted,* That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gunpowder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law. *[Selectmen may enter buildings to search for powder.]*

SEC. 6. *Be it further enacted,* That when any stove, chimney or stove pipe, within any town containing not less than fifteen hundred inhabitants, shall be defective, or out of repair, or so constructed or placed, that any building, or other property shall be in danger of fire therefrom, the Selectmen of said town shall give notice in writing, to the possessor or possessors of such stove, chimney or stove pipe, to remove or repair the same; and if such possessor shall for the term of six days after the giving of such notice, unnecessarily neglect to remove, or effectually repair such stove, chimney or stove pipe, such possessor shall, for each and every such neglect, forfeit and pay a fine of not less than ten dollars, nor more than fifty dollars, to be recovered by action of the case, in any Court proper to try the same. *[Penalty for suffering stoves, chimnies or stove pipes to be defective, &c. Action of case.]*

SEC. 7. *Be it further enacted,* That the fines, forfeitures

100                          CRACKERS, &c.—FIRE ENGINES.

*Appropriation of fines, &c.* and penalties, which shall arise under this Act, shall accrue, one moiety thereof to the use of the town within which the offence shall be committed, and the other moiety to the use of the person who shall prosecute or sue for the same.

*Above regulations not to be in force till published by Selectmen, &c.* Sec. 8. *Be it further enacted,* That the rules and regulations, which shall be established in any town, according to the provisions of this Act, shall be of no force or effect, until such rules and regulations, together with this Act, shall have been published by the Selectmen of such town, three weeks successively, by printing in some newspaper printed within the County, or by posting up attested copies in three several public places in said town.

[*Approved March* 19, 1821.]

## CHAPTER XXVI.

### An Act to prevent damage from firing Crackers, Squibs, Serpents and Rockets, within this State.

**B**E *it enacted by the Senate and House of Representatives, in Legislature assembled,* That if any person shall offer *Crackers, squibs, &c. not to be fired without license.* for sale, set fire to, or throw any lighted cracker, squib, rocket or serpent within this State, without the license of the Selectmen of the several towns, respectively, first obtained therefor, he shall forfeit, for every such offence, the sum of *Punishment.* five dollars ; one moiety to the use of the poor of that town, in which the offence shall be committed, and the other moiety to the use of the prosecutor ; to be recovered by action of debt, or by information before any Justice of the Peace of the County, in which the offence shall be committed, with the costs of suit.

[*Approved February* 20, 1821.]

## CHAPTER XXVII.

### An Act more effectually to secure Fire Engines from being injured.

**B**E *it enacted by the Senate and House of Representatives, in Legislature assembled,* That if any person shall wantonly or *Persons wantonly injuring fire engines,* maliciously, spoil, break, injure, damage or render useless, any engine, or any of the apparatus thereto belonging, prepared by any town, society, person or persons, for the extinguishment of fire, and shall be convicted thereof, *punished on conviction in S. J. Court.* before the Supreme Judicial Court, he shall be punished by a fine not exceeding five hundred dollars, or by imprisonment, not exceeding two years, at the discretion of the Court ; and be further ordered to recognize, with sufficient surety or sureties, for his good behaviour for such term as the Court shall order.

[*Approved March* 2, 1821.]

JA4649

# Exhibit 42



# OFFICE OF THE GOVERNOR
## NEWS RELEASE

CN-001                                    TRENTON, N.J. 08625
Contact:                                  Release:
      Emma Byrne                          Wednesday
      609/292-8956                        May 30, 1990

## FLORIO SIGNS NATION'S TOUGHEST ASSAULT WEAPON LAW

PATERSON -- Keeping a promise made during the campaign, Governor Jim Florio today signed a bill banning the sale and sharply restricting current possession of assault weapons in New Jersey, making it the toughest law in the nation.

Florio signed the bill during a ceremony in Paterson, the home of the late state Senator Frank Graves, the bill's original sponsor.

"One of our most basic rights is to be safe. But when the police are outgunned and innocent people can be gunned down in vast numbers, all of our other rights become meaningless," Governor Florio said. "I promised that I would ban assault weapons in New Jersey and I am proud to sign this bill into law today. It's the toughest law in the nation. It's right. It's fair, and it will make New Jersey a better place."

Under the law, no person will be able to legally purchase an assault weapon in the state. Unlike a California assault weapon ban, which exempts all current owners, the New Jersey law severely restricts possession of any assault weapon not used for legitimate collecting or target-shooting purposes.

"This is a common sense bill -- one that recognized that hunters don't need Uzis to shred their prey, and law abiding citizens don't need 'street-sweepers'," Florio said. "The ban on military-style assault weapons was Frank Graves' last fight. He believed, as I do, that guns capable of wholesale destruction are a direct threat to our police, our citizens and especially our children."

Current owners have one year to either sell their weapon or render it inoperable by certifying that the parts necessary to fire the weapon have been removed from his immediate possession, making it purely a collector's piece. Owners also have seven months to join a chartered rifle/pistol club, but may do so only if their firearm was purchased as of May 1, 1990, and is included on a list

currently being drawn up by the Attorney General based on those weapons used in U.S. Army-sanctioned competitions.

"This bill says that no one can walk off the street and purchase a gun that is designed to wipe out the greatest number of people in the shortest possible time," Florio said. "I call that common sense. So do the majority of people in New Jersey and so does the State Legislature."

# # #

# Exhibit 43

# LAWS AND ORDINANCES

GOVERNING THE

## CITY OF CHICAGO,

JANUARY 1, 1866,

WITH AN

## APPENDIX,

CONTAINING THE

## FORMER LEGISLATION

RELATING TO THE CITY,

AND NOTES OF

### DECISIONS OF THE SUPREME COURT OF ILLINOIS,

RELATING TO CORPORATIONS.

PRINTED AND PUBLISHED BY AUTHORITY OF THE COMMON COUNCIL OF THE CITY.

COMPILED AND ARRANGED BY

JOSEPH E. GARY,

ONE OF THE JUDGES OF THE SUPERIOR COURT OF CHICAGO.

E. B. MYERS AND CHANDLER,

LAW BOOKSELLERS AND PUBLISHERS,

No. 111 Lake Street.

1866.

Generated on 2023-05-19 03:58 GMT  /  https://hdl.handle.net/2027/uiug.30112108865186
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

# CHAPTER XI.

### GUNPOWDER AND GUN-COTTON.

SECTION
1. Dealers in gunpowder and gun-cotton
   to have permits; proviso.
2. Application for permit; register;
   quantity and how kept; sale at
   night; sign; penalty.
3. Carrying through streets; penalty.
4. Vessels laden with, not to land or
   discharge within certain limits;
   penalty.

SECTION
5. Mayor may cause removal of vessel;
   penalty.
6. When permits expire; persons to
   whom not granted; charge for.
7. Officers to report violations.
8. Appropriation of penalties.

SECTION 1. No person shall keep, sell or give away gun- Permit required. powder or gun-cotton, in any quantity, without permission in writing, signed by the mayor and clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: *Provided,* Any person may keep for his own Proviso. use not exceeding one pound of gunpowder or gun-cotton at one and the same time.

SEC. 2. All applications for permits shall be made to Application for permit. the mayor. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot by the common council. When issued, the clerk shall make an entry Register. thereof in a register to be provided for the purpose, which entry shall state the name and place of business, and date of permit. Persons to whom permits may be issued shall Quantity. not have or keep at their place of business, or elsewhere within the city, a greater quantity of gunpowder or gun- How kept. cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor shall any person sell Sale at night. or weigh any gunpowder or gun-cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given, to keep a sign at the front door of his place of Sign. business, with the words "gunpowder" painted or printed thereon in large letters. A violation of any clause of this

Digitized by Google

Original from
UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

# Exhibit 44

# IN  THE  UNITED  STATES  DISTRICT  COURT
# FOR  THE  EASTERN  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| WILLIAM WIESE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) **CASE NO.** | |
| | ) 2:17-cv-00903-WBS-KJN | |
| ROB BONTA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEPOSITION OF
JAMES CURCURUTO

**DATE:**      Thursday, August 3, 2023

**REPORTER:**      Althea L Miller, CSR No. 33553/RPR/CCRR

## VIA REMOTE VIDEO TECHNOLOGY



## HINES REPORTERS

**INTERNATIONAL TOWER**

**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**

**866.432.4300; 213.688.7887**

**WWW.HINESREPORTERS.COM**

IN THE UNITED STATES DISTRICT COURT


FOR THE EASTERN DISTRICT OF CALIFORNIA


SACRAMENTO DIVISION


WILLIAM WIESE, et al.,        )
                              )
          Plaintiffs,         )
                              )
v.                            )   No. 2:17-cv-00903-WBS-KJN
                              )
ROB BONTA, et al.,            )
                              )
          Defendants.         )
_____)


DEPOSITION OF:  JAMES CURCURUTO

TAKEN ON:       August 3, 2023

APPEARING REMOTELY FROM MIDDLEBURY, CONNECTICUT


STENOGRAPHICALLY REPORTED BY:
ALTHEA L. MILLER
CSR No. 3353, RPR, CCRR No. 149
File No. 107482
APPEARING REMOTELY FROM LOS ANGELES COUNTY,
CALIFORNIA

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 194 of 240
PageID: 7783

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

**Page 2**

1  REMOTE DEPOSITION OF JAMES CURCURUTO,

2  taken on behalf of the Defendants, with

3  all parties, by agreement, attending the

4  deposition remotely in Los Angeles

5  and San Francisco counties, California, on

6  Thursday, August 3, 2023, at 9:33 A.M., before

7  Althea L. Miller, CSR No. 3353, RPR,

8  CCRR No. 149.

9

10  APPEARANCES:

11    For the Plaintiffs:

12    SEILER EPSTEIN LLP
      BY:  GEORGE M. LEE, ESQ.
13    Four Embarcadero Center
      14th Floor
14    San Francisco, California 94111
      (415) 979-0500
15    gml@seilerepstein.com

16

17    For the Defendants:

18    OFFICE OF THE ATTORNEY GENERAL
      OF THE STATE OF CALIFORNIA
19    BY:  ROBERT L. MEYERHOFF,
           Deputy Attorney General
20         JOHN D. ECHEVERRIA,
           Deputy Attorney General
21    300 South Spring Street
      Suite 1702
22    Los Angeles, California 90013-1230
      (213) 269-6177
23    Robert.Meyerhoff@doj.ca.gov
      John.Echeverria@doj.ca.gov

24

25  ///

**Page 3**

1               I N D E X

2  WITNESS                         PAGE

3

4  JAMES CURCURUTO

5    BY MR. MEYERHOFF          5, 180

6

7    BY MR. LEE               172

8

9           E X H I B I T S

10  DEPOSITION                    PAGE

11  EXHIBIT 1  Copy of the "Notice of        11
      Deposition of James Curcuruto,"
12    three pages

13  EXHIBIT 2  Copy of "Plaintiffs'         21
      Objections to Defendants'
14    Notice of Deposition of
      James Curcuruto," three pages
15

16  EXHIBIT 3  Copy of "Declaration of James    26
      Curcuruto in Support of Plaintiffs'
17    Motion for Temporary Restraining
      Order and Issuance of
18    Preliminary Injunction,"
      six pages

19  EXHIBIT 4  17-page document titled on    74
      page 1 "Outdoor Stewards of
20    Conservation Foundation"

21  EXHIBIT 5  Two-page document titled      103
      "Southwick Associates
22    Honored for Groundbreaking
      Research"

23

24  EXHIBIT 6  Copy of the deposition of     115
      James Curcuruto, taken on
25    January 11, 2018, 174 pages
    ///

**Page 4**

1            E X H I B I T S

2  DEPOSITION                    PAGE

3  EXHIBIT 7  Copy of the deposition of     141
      James Curcuruto, taken on
4     January 24, 2014, 250 pages

5  EXHIBIT 8  14-page document titled      155
      "Ethical Guidelines for
6     Statistical Practice"

7  EXHIBIT 9  Copy of a two-page declaration   164
      of James Curcuruto in the
8     Rocky Mountain Gun Owners
      versus The Town of Superior

9

10

11

12

13    I N F O R M A T I O N   R E Q U E S T E D

14              (None.)

15

16

17

18

19

20    Q U E S T I O N S   M A R K E D

21              (None.)

22

23  ///

24  ///

25  ///

**Page 5**

1  REPORTED REMOTELY FROM LOS ANGELES COUNTY,

2    CALIFORNIA

3    August 3, 2023

4    9:33 A.M.

5

6              -oOo-

7

8    JAMES CURCURUTO,

9    having declared under penalty

10    of perjury to tell the truth, was

11    examined and testified as follows:

12

13  THE WITNESS:  I do.

14  THE REPORTER:  Thank you.

15  THE WITNESS:  You're welcome.

16

17            EXAMINATION

18  BY MR. MEYERHOFF:

19    Q  Good morning.

20      My name is Rob Meyerhoff.  I'm a Deputy

21  Attorney General with the Department of Justice.  I

22  represent the defendants in this case.

23      Why don't we just start with some ground

24  rules relating to the deposition.

25      You understand you're testifying under oath

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 195 of 240
PageID: 7784
Wiese, et al. vs. Bonta, et al.                                        Deposition of James Curcuruto

**Page 6**

1  today, Mr. Curcuruto?
2      A  I do.
3      Q  And you understand that even though we're
4  in the informal setting on the Zoom call, the oath
5  that you just took has the same sanctity as if we
6  were in a court of law?
7      A  Yes.
8      Q  And do you understand the same penalties
9  for giving untrue testimony apply?
10     A  Yes.
11     Q  Even though the deposition is proceeding
12  over Zoom, the court reporter won't be able to take
13  down nonverbal responses like head nods or shakes.
14  You'll need to give verbal answers to each question.
15     Do you understand that?
16     A  Yes.
17     Q  If you don't understand a question, please
18  just ask me to clarify and I can try to restate the
19  question.
20     If you answer a question I ask, people
21  reading the transcript later will assume you
22  understood the question.
23     Does that make sense?
24     A  Yes.
25     Q  Also, from time to time, Mr. Lee may make

**Page 7**

1  objections.
2      Do you understand that?
3      A  Yes.
4      Q  If you need to take a break, please let me
5  know.  We can take a break whenever you want or
6  whenever Mr. Lee or the court reporter needs one.
7      However, I'll ask if there's a question
8  pending -- I've asked a question -- I just ask that
9  you answer the question before taking a break.
10     Does that make sense?
11     A  Yes.
12     Q  Do you have any questions about the
13  procedures we're going to be following today?
14     A  Not now, no.
15     Q  Is there any reason you feel like you can't
16  give your best testimony today?
17     A  No.
18     Q  Are you suffering from any medical problems
19  that would prevent you from doing so?
20     A  No.
21     Q  Are you under the influence of any
22  prescription medications that would prevent you from
23  doing so?
24     A  I am not.
25     Q  Are you under the influence of drugs or

**Page 8**

1  alcohol at this time?
2      A  I am not.
3      Q  You've been deposed before; correct?
4      A  Correct.
5      Q  And you are -- was your first deposition
6  the Wilson versus Cook County case?
7      A  I don't recall the order of them.  I've
8  been deposed maybe a half dozen times, but I don't
9  recall the order.
10     Q  But you recall being deposed in that case;
11  correct?
12     A  Which one was that?
13     Q  Wilson versus Cook County in 2013.
14     A  Sounds familiar, yes, sir.
15     Q  Do you recall the subject matter of that
16  case?
17     A  Not specifically, but for the most part,
18  all the cases I've been deposed in had to do with
19  either the high-capacity magazines or the AR-15
20  model firearm.
21     Q  Do you recall being deposed in the Kolbe
22  versus O'Malley case?
23     A  Yes.  I was deposed in that one.
24     Q  And Friedman v City of Highland Park as
25  well?

**Page 9**

1      A  Correct.  Yes.
2      Q  You were also deposed in the Worman case;
3  is that correct?
4      A  Was that Worman --
5      Q  V Healey.
6      A  -- v Healey?
7      Okay.  Massachusetts, I think, yeah.
8      Q  You were also deposed in two California
9  cases; correct?
10     A  I know I've -- Duncan v Becerra was one of
11  them, and I'm not sure if there's another Becerra
12  one, but --
13     Q  Would it refresh your recollection if I
14  told you you were deposed in a case called Miller?
15     A  Okay.
16     Q  Can you recall any other depositions that
17  you had taken?
18     A  Let's see.
19     We covered Worman, Kolbe, Duncan, and you
20  said -- was there a Highland Park one too or did you
21  cover that?
22     Q  The Friedman versus the City of
23  Highland Park?
24     A  I think that's about it.  Six or seven of
25  them.

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 196 of 240
PageID: 7785
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  Q  And in each of those cases, you testified
2  on behalf of plaintiffs; is that correct?
3  A  Correct.
4  Q  And in each of those cases, plaintiffs were
5  seeking to invalidate a firearms restriction;
6  correct?
7  A  The cases were, I think, to show the
8  commonality of either the AR platform modern
9  sporting rifle or the high-capacity magazine, I
10 think defined as holding 11-plus rounds.
11 Q  But to the best of your recollection, in
12 each of those cases, plaintiffs were seeking to
13 invalidate some kind of firearms restriction;
14 correct?
15 A  Yeah.
16    I think they wanted to be able to possess
17 one or two of those -- either the firearm or the
18 magazine.
19 Q  And to the best -- I'm sorry.
20 A  I'm sorry.  Legally possess, yeah.
21 Q  And in each of those cases, there was a
22 local, state, or federal restriction preventing them
23 from doing so; correct?
24 A  I believe so, yes.
25 Q  I'm going to pull up a document that I'd

Page 10

1  like to mark as Exhibit 1.
2    (The document referred to was marked as
3    Deposition Exhibit 1 by the Reporter.)
4  BY MR. MEYERHOFF:
5  Q  And throughout the deposition,
6  Mr. Curcuruto, I'm going to pull up exhibits.  The
7  way to work over Zoom is I'll screen-share them.
8  You are unable to control the scrolling function.
9  I'll show you the document and you let me know when
10 you want me to scroll down.
11 A  Sounds good.
12 Q  Can you see the document up on the screen?
13 The first words at the top are on 1 "Rob Bonta,
14 Attorney General of California"?
15 A  Yes.
16 Q  And you see in the middle of the page,
17 "Notice of Deposition of James Curcuruto"?
18 A  Correct; yeah.
19 Q  I'm pronouncing your name correct; is that
20 correct?
21 A  Very good.
22 Q  Thank you.
23    I'm going to have you review -- this is
24 just a three-page document.
25    I'll have you review the whole thing.  I'll

Page 11

1  ask you some questions about it.
2    Please just review it and let me know when
3  you want me to scroll down.
4  A  Okay.  Wiese versus Bonta.  He's the
5  Attorney General, I believe; right?
6    You can scroll down.  That's good.
7    I'm at line 14.  If you can scroll up or
8  down.
9    Okay.  You can go to the next page up.
10   Okay.
11 Q  So that's the end of the document.  I'll
12 scroll back up to the first page.
13   So this document is entitled
14 "Notice of Deposition of James Curcuruto."
15   Mr. Curcuruto, have you seen this document
16 before?
17 A  I have.
18 Q  When did you see it?
19 A  I don't know.  Mr. Lee had sent it to me
20 recently.  I don't know the exact date.
21 Q  Would you say within the past week?
22 A  Past week or two probably.  Yeah.  Within
23 the past week or two.
24 Q  Have you reviewed this document in full
25 prior to today?

Page 12

1  A  I have read it, yes, sir.
2  Q  Did you discuss it with Mr. Lee?
3  A  I did.
4  Q  What was the substance of your discussion
5  with Mr. Lee about this document?
6  A  Just to make sure I had received it and
7  read it and also the request for documents.
8    You know, I -- I do not have access to any
9  past documents after a job change.
10 Q  And what, if anything else, did Mr. Lee say
11 about this document?
12 A  Not much.  Not much in the document.
13 Q  Did he ask you if you had access to any of
14 the documents mentioned in the requests?
15 A  He did.  He asked me to look to see what I
16 could find.
17 Q  Let's scroll down to that on page 3.
18   Do you see where it says "Individual
19 Requests" 1:
20   "All non-privileged documents,
21   data, or information in electronic
22   form that you received, reviewed, or
23   relied upon in forming your opinions
24   in this litigation"?
25   Do you see that?

Page 13

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 197 of 240
PageID: 7786

Wiese, et al. vs. Bonta, et al.                    Deposition of James Curcuruto

Page 14

1    A  Yes.
2    Q  So -- do any documents exist that are
3  responsive to that request?
4    A  I believe the original deposition I had
5  done in 2017 concerning this case.  I had -- Mr. Lee
6  had sent that to me as well and I had reviewed that
7  and that had, I believe, one exhibit which was the
8  Magazine Chart I had helped create back in 2017 or
9  '16.
10       I think it was when I was with the
11  National Shooting Sports Foundation.
12    Q  Are there any documents that exist that are
13  responsive to this request?
14    A  They exist but not in my possession.
15    Q  And what are those documents that exist
16  that are not in your possession?
17    A  Just one -- Request No. 1?  Is that the one
18  we're looking at?
19    Q  That's correct.
20    A  Opinions of this litigation.
21       So materials I had used to create that
22  one-page document, I'm sure there are records of
23  those somewhere but not in my possession.
24    Q  What were those materials that I had used
25  to create the one-page document?

Page 15

1    A  I believe, according to that original
2  declaration or deposition in 2017, to help create
3  that one-page NSSF Magazine Chart, I use sources
4  such as the U.S. ITC, the International
5  Trade Commission's import/export data and the ATF's
6  AFMER reports, which, I believe are --
7       THE REPORTER:  I'm sorry.  What is that?
8       THE WITNESS:  AFMER, A-F-M-E-R.  Annual
9  Firearms Manufacturing Export Reports.
10       So those are -- you know, there's documents
11  of those, I'm sure available somewhere that I used
12  as a basis to create that one pager.
13       I just don't have them anymore.
14  BY MR. MEYERHOFF:
15    Q  And are there any other documents that
16  exist that you received, reviewed, or relied upon in
17  creating the Magazine Chart?
18    A  Not that I'm aware of.
19       I -- I don't have any in my possession.
20    Q  But do any -- do any other documents, other
21  than the U.S. ITC documents, the ATF AFMER
22  documents, exist in your possession or not that you
23  relied upon in creating the Magazine Chart?
24    A  Not that I'm aware of.  You know, it was
25  created whenever it was -- 2016, 2017.

Page 16

1       And I had left the NSSF in 2021; so I
2  assume any documents, you know, that were in my
3  office at the time are probably long gone, but I
4  don't have knowledge if they are there or -- or
5  gone.
6    Q  But to the best of your knowledge in
7  creating the Magazine Chart, you only relied on
8  physical documents from the U.S. ITC and ATF AFMER;
9  correct?
10    A  Correct.
11       For the most part, those documents form the
12  basis and then I created a draft report and
13  discussed that with some coworkers to -- that had
14  expertise in the industry to make sure I was on the
15  right track and wasn't going to put anything out
16  that wasn't as correct as it can be.
17    Q  Looking at Request No. 2:
18       "All opinions, reports, and
19       similar documents that you have
20       provided in other lawsuits,
21       arbitrations, or administrative
22       proceedings, or any other judicial or
23       quasi-judicial proceedings, that
24       involve issues or topics similar to
25       those on which you have provided

Page 17

1       opinions in this case."
2       Do you have any such documents?
3    A  I do not.
4    Q  But other such documents exist; correct?
5    A  Same answer as before.  There may or may
6  not be documents that NSSF -- actually, the building
7  that, you know, I had an office in was sold and I --
8  I have a feeling that they have -- you know, they
9  don't have a lot of documents.
10       But I'm 100 percent unaware of what exists
11  or doesn't exist that NSSF -- or aware, if they do
12  exist, where they might be.
13    Q  But to be clear, you filed declarations in
14  other cases; correct?
15    A  I have, yes.
16    Q  And it's fair to say, based on your
17  previous answer, that you haven't retained copies of
18  any of those declarations; correct?
19    A  I have not.
20    Q  Going to Request No. 3:
21       "All non-privileged information
22       and documents received or acquired by
23       you from any source concerning this
24       litigation."
25       Do you have any such documents in your

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 198 of 240
PageID: 7787
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 18

1 possession?
2    A   The only other document Mr. Lee had sent me
3 was, I think, a memo or memorandum of this case,
4 about a 40-page document.
5    Q   And do you know was this a memo that
6 Mr. Lee prepared?
7    A   I am not sure who prepared it.  It's just
8 kind of a review of the case.
9    Q   Any other documents received from anyone
10 else?
11    A   No.
12    Q   What did you do to prepare for this
13 deposition?
14    A   I did read the three documents we
15 discussed, the original deposition from 2017, the
16 three-page declaration, and then I reviewed the
17 40-page -- I think it was a memo of points, and I
18 had a phone call with Mr. Lee earlier in the week.
19    Q   What did you discuss on that phone call
20 with Mr. Lee?
21    A   Sort of a refresher of, you know, how the
22 day would go.  Again, it'd be an online Zoom meeting
23 and go through the points of the documents received.
24    Q   Did Mr. Lee tell you any questions you
25 should expect?

Page 19

1    A   We discussed -- yeah.  We discussed that,
2 yes.
3    Q   And what questions did Mr. Lee tell you to
4 expect?
5    A   State your name, your background, what your
6 current position is, and knowledge, then, of the
7 Magazine Chart.
8    Q   Did you discuss the substance of your
9 opinions with Mr. Lee on that phone call?
10    A   Not in depth.
11    Q   But generally?
12    A   Yeah.
13        In regards to the -- the one exhibit, the
14 Magazine Chart.
15    Q   And what did you tell Mr. Lee about the
16 Magazine Chart?
17    A   It was something I had created when I was
18 with the National Shooting Sports Foundation, and we
19 discussed it; it had been updated and if I had any
20 records of that to which I replied I'd look, and I
21 was unable to find any updated documents.
22    Q   And you only had that one phone call with
23 Mr. Lee with regard to this deposition; correct?
24    A   With regard to the deposition -- we had one
25 previously when he asked if I would be interested in

Page 20

1 helping out.
2    Q   When did that phone call when he asked if
3 you would be interested in helping out occur?
4    A   I'm not sure.  Maybe a month ago.
5    Q   What did you tell Mr. Lee when he asked if
6 you would be willing to help out?
7    A   I said "Sure."  So I'm here.
8    Q   Did you speak with anyone else about this
9 deposition?
10    A   I have not.
11    Q   You haven't spoken to any friends about
12 this deposition?
13        MR. LEE:  Asked and answered.
14        You may answer.
15        THE WITNESS:  Oh.  Not really.  I mean,
16 just -- you know, my -- my main job is keeping me
17 busy and that's my main focus with the company that
18 I'm with now.
19        This is just something that seemingly was
20 going to be a quick request and -- to corroborate
21 what had happened in 2017 with that one exhibit;
22 so --
23 BY MR. MEYERHOFF:
24    Q   You said "Not really."  I just want to be
25 absolutely clear.

Page 21

1        Have you mentioned this deposition to
2 anyone else other than Mr. Lee?
3    A   I -- about a half hour ago, before -- my
4 17-year-old son woke up and I said "Don't come
5 downstairs."  He asked why I was all dressed up.  I
6 said "I'm going to go do a deposition" but didn't
7 get into any of the details.
8    Q   And I'll take it that that was the only
9 person that you've mentioned it to?
10    A   Correct.
11        MR. MEYERHOFF:  I want to pull up a
12 document that I'll mark as Exhibit 2.
13        (The document referred to was marked as
14        Deposition Exhibit 2 by the Reporter.)
15 BY MR. MEYERHOFF:
16    Q   Do you see this document?  The first line
17 is -- says Number 1 and then it says "George M. Lee"
18 at the top?
19    A   Yes.
20    Q   I will -- it's a three-page document.  I'll
21 just give you a chance to review the whole thing; so
22 if you want to review it and then when you want me
23 to scroll down, just let me know.
24    A   Okay.  You can scroll down a little bit.
25        Okay.

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 199 of 240
PageID: 7788
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1     Okay.
2     Q  I'm only going to ask you questions about
3 the first two pages.
4     A  Okay.
5     Q  So scroll back up to page 2.
6     Do you see the second sentence on page 2?
7 It says:
8       "Plaintiffs have not yet retained
9     or disclosed Mr. Curcuruto as an
10     expert witness, but reserve the right
11     to so designate and disclose as such
12     within the time provided by
13     Federal Rule of Civil Procedure
14     26(a)(2)(D)(i)."
15     Do you see that?
16     A  I do.
17     Q  Is it an accurate statement that the
18 plaintiffs have not yet retained you as an expert
19 witness?
20     A  Correct.
21     Q  So you have no written agreement with
22 plaintiffs; correct?
23     A  No.
24     Q  And are you being compensated by plaintiffs
25 for your time here today?

Page 22

1     A  I am not.
2     Q  Are you being compensated by anyone for
3 your time here today?
4     A  I am not.
5     Q  So you have not been retained as an expert
6 witness.
7     Is it your understanding that you are
8 giving expert testimony here today?
9     A  I think I'm just providing my opinion and
10 corroborating or -- what had taken place back in --
11 when I submitted that original document and kind of
12 tell you -- answer any questions about how that
13 original document came about.
14     MR. LEE:  And let me just interpose an
15 objection.  Lacks foundation.  Calls for
16 speculation.
17 BY MR. MEYERHOFF:
18     Q  Have you reviewed the original Complaint
19 filed by plaintiffs in this case?
20     A  Unless it was one of those three documents,
21 no.
22     Q  And just to be -- I'm sorry.  I
23 interrupted.
24     A  Just the three documents I mentioned
25 earlier, just to clarify.

Page 23

1     Q  Just to be clear, the memo, the points and
2 authorities that Mr. Lee provided you, and what were
3 the other two documents?  Sorry.
4     A  The original deposition; I think about a
5 six-page document; and then the declaration, the
6 three-page document about today's declaration [as
7 spoken].
8     Q  To be clear, when you say "the original
9 deposition," do you actually mean the original
10 declaration that you filed in this case in 2017?
11     A  It was a six-page document and it had the
12 one attached exhibit, with the Magazine Chart.  I'm
13 not sure if it was -- getting confused on
14 "declaration" versus "deposition."
15     MR. LEE:  And objection -- I object to the
16 question.  Assumes facts.  He didn't file anything.
17 BY MR. MEYERHOFF:
18     Q  And then the other document you're
19 referring to, is that the Notice of Deposition that
20 we looked at earlier as Exhibit 1?
21     A  The three-page document?
22     Q  Yeah.  That's correct.
23     A  Yes.
24     Q  Do you recall when you first became
25 involved in this case?

Page 24

1     A  Going back to the 2017 filing or --
2     Q  Was the 2017 filing the first time you were
3 involved in this case?
4     A  I'm not sure.  You know, this case is, I
5 think, different than the original 2017 one.  We
6 were talking about that one exhibit.
7     I'm a little confused on, you know, this
8 case versus other cases.
9     Q  To the best of your recollection, has
10 Mr. Lee ever been the plaintiffs' attorney in
11 another case that you participated in?
12     A  Yes.  I believe so.
13     Q  Okay.  Do you recall when the first time --
14 let me rephrase.
15     When was the first time you've heard about
16 this specific case?
17     A  If you want to name this case for me?  This
18 is the Wiese/Bonta one?  Was it known as something
19 previously?
20     Q  When was the first time you heard about the
21 Wiese case, previously known as Wiese v Becerra, now
22 known as Wiese versus Bonta?
23     A  I'm not sure.
24     I know I got refreshed on it with Mr. Lee
25 recently, but I'm not sure if I had dealt with it

Page 25

Wiese, et al. vs. Bonta, et al.                              Deposition of James Curcuruto

---

1 previously.
2    Q  Do you know how you first became aware of
3 this case, the Wiese case?
4    A  I'm not sure specifically how I became
5 aware of this case.
6    Q  Do you recall who you first spoke with
7 about this case?
8    A  I do not.
9    MR. MEYERHOFF:  I want to go ahead and pull
10 up what I'm going to mark as Exhibit 3.
11    (The document referred to was marked as
12    Deposition Exhibit 3 by the Reporter.)
13 BY MR. MEYERHOFF:
14    Q  It's a six-page document entitled
15 "Declaration of James Curcuruto in Support of
16 Plaintiffs' Motion for Temporary Restraining Order
17 and Issuance of a Preliminary Injunction."
18    Do you see that towards the middle of the
19 page?
20    A  I do.
21    Q  Is this the six-page document you were
22 referring to previously?
23    A  If you could just -- I think the one that I
24 had seen had an exhibit at page 6 and dated 2017; so
25 if you could just kind of scroll down so I could see

Page 26

---

1 the rest of it?
2    Q  Sure.
3    A  They all look the same.
4    Okay.  You can keep going.
5    Okay.  You can keep going.
6    Okay.  Yeah.  2017.
7    So it was just a different defendant, I
8 suppose, at the time; is that correct?  Same
9 plaintiff?
10    A  Yeah.  It's -- Becerra was the
11 Attorney General.
12    A  Okay.  So this, I believe, was the first
13 time I had heard of this and I'm not sure, you know,
14 if -- the process at NSSF, when I was there, if
15 someone needed help, usually -- you know, Mr. Lee
16 probably would have probably went through our
17 government relations team and then they would have
18 contacted me.
19    That was the standard practice back then.
20    Q  So looking at this document on the middle
21 of page 4 of the pdf, it says:
22    "I declare under penalty of
23    perjury that the foregoing is true
24    and correct.  Executed within the
25    United States on June 9, 2017."

Page 27

---

1    Do you see that?
2    A  Correct.  Yes.
3    Q  And do you see below that, there's a
4 signature?
5    A  That's me, yeah.
6    Q  And that's your signature; correct?
7    A  It is.
8    Q  And do you recall signing this document?
9    A  I do.
10    Q  Did you write this document?
11    A  I believe so.
12    Q  And did plaintiffs' counsel provide you
13 with any edits to this document?
14    A  I do not recall.
15    Q  Do you recall reviewing this document with
16 plaintiffs' counsel before signing it?
17    A  I do not recall, but it, most likely, would
18 have been reviewed by the plaintiffs' side before
19 getting submitted -- being submitted.
20    Q  You submitted declarations in other cases;
21 correct?
22    A  Correct.
23    Q  And is that a similar -- let me rephrase.
24    Is that the general practice with the
25 declarations you have submitted?

Page 28

---

1    A  There was a very similar process, you know,
2 of requests would come in, again, normally filtered
3 through our government relations team, and then they
4 would reach out to me and ask if, you know, the --
5 we had materials that were available and time
6 available to support any effort.
7    And then I would be in contact with the
8 plaintiffs' attorney and submit a declaration and
9 then go on from there.
10    Q  Did you discuss this declaration with
11 anyone at NSSF?
12    A  Oh, I'm sure, yeah.
13    Q  Who do you think you would have discussed
14 it with?
15    A  We had two associate general counsels
16 during my time at NSSF.  The first one I worked with
17 was Jeff Yue, I think Y-u-e, and then I'm not sure
18 when he left.  Maybe -- might have been before or
19 after this one.
20    And then Benjamin -- can't remember his
21 last name -- was the second associate general
22 counsel that I worked with on declarations like
23 these.
24    Ben -- hmm.  Sorry.  I can't remember his
25 last name.

Page 29

---

1 Q  Would you have discussed it with anyone
2 other than the associate general counsels at NSSF?
3 A  I'm sure I informed my direct superior, you
4 know, just on -- update on what type of work I
5 was -- had on my plate.
6 Q  And who was your direct superior at the
7 time you wrote this declaration?
8 A  Most likely, Randy Clark.  If not
9 Randy Clark, maybe Chris Dolmack, D-o-l-m-a-c-k.
10 I can't think of Ben's last name, but it
11 will come to me.
12 Q  So is it fair to say that you drafted this
13 declaration within the scope of your employment at
14 NSSF?
15 A  Yes.
16 Q  You drafted it on company time; correct?
17 A  Correct.
18 Q  Were you paid any additional money beyond
19 your salary to draft this declaration?
20 A  I was not.
21 Q  I want to shift gears and ask you --
22 actually, let me ask you another question.
23 You wrote this declaration in 2017;
24 correct?
25 A  Correct.

Page 30

1 blue at the top of the page.  It's got two lines on
2 top of each other.
3 BY MR. MEYERHOFF:
4 Q  Do you have any understanding of what those
5 blue lines represent?
6 A  I believe they are just -- show the -- I
7 can't even read it.
8 But -- maybe just an overview of what the
9 document is.
10 Q  Do you know why there is two lines
11 superimposed over each other?
12 A  I do not.
13 MR. LEE:  Objection.  Calls for
14 speculation.
15 Well, never mind.
16 BY MR. MEYERHOFF:
17 Q  Are you aware that this declaration was
18 filed a second time?
19 A  I don't recall.
20 Q  In your conversations with Mr. Lee -- I
21 believe there's been two conversations within
22 approximately the last month with Mr. Lee; correct?
23 A  Correct.
24 Q  And have you spoken with Mr. Ray DiGuiseppe
25 about this case?

Page 32

1 Q  And were you aware that this declaration
2 was subsequently filed by the plaintiffs in the
3 Wiese case?
4 A  I believe -- yeah.  That was the process at
5 the time.  I believe that had taken place.
6 Q  So you testified previously that you spoke
7 with Mr. Lee approximately a month ago and he asked
8 about your willingness to -- to be deposed in this
9 case; correct?
10 A  Yes.
11 Q  When, previous to that time a month ago,
12 was the last time you had spoken with Mr. Lee about
13 this case?
14 A  May have been back in '17.
15 Q  But it hadn't been the past year; correct?
16 A  I don't believe so.
17 Q  Looking at this document, the top of the
18 page, page 4, do you see the purple writing at the
19 top of the page?
20 A  The share has gone away from my computer.
21 MR. MEYERHOFF:  I'm sorry.  Let me share
22 that again.
23 THE WITNESS:  Good old modern technology.
24 I do see that -- it's back on.  I do see it
25 but it's almost doubled up here.  I can't read that

Page 31

1 A  I do not believe so.
2 Q  In either of your conversations with
3 Mr. Lee over the past month, did he tell you that
4 your declaration had been refiled this year?
5 A  I do not recall.
6 Q  So to be clear, at no point within the past
7 year did Mr. Lee contact you and ask you whether the
8 opinions included in this declaration filed in 2017
9 were still your opinions today; correct?
10 A  Did he ask me if they were still my
11 opinions?
12 Q  Yes.  That's correct.
13 A  On the Magazine Chart or this declaration?
14 Q  Yes.
15 A  Yeah.  We discussed that.
16 Q  All right.  You discussed that a month ago;
17 correct?
18 A  Correct.
19 Q  Prior to that, did Mr. Lee ask that
20 question?
21 A  Not to my knowledge.
22 Q  You graduated from college; correct,
23 Mr. Curcuruto?
24 A  I did.
25 Q  You graduated from UNC Wilmington; correct?

Page 33

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

| | |
|---|---|
| 1  A  Correct. | 1  Q  And is it fair to say that the goal at |
| 2  Q  What degree did you obtain there? | 2  Scholastic, Inc., was new client acquisition? |
| 3  A  A Bachelor's in business administration. | 3  A  No.  Not from my position. |
| 4  Q  And did you attend graduate school? | 4  Q  What was the goal of your position? |
| 5  A  I did not. | 5  A  Just trying to determine the most |
| 6  Q  At UNC Wilmington, did you take any | 6  cost-effective campaigns. |
| 7  statistics classes? | 7  Q  And who were your clients at Scholastic, |
| 8  A  Just the one to help meet the requirements | 8  Inc.? |
| 9  of -- the course requirements for that degree. | 9  A  I just worked for the company, Scholastic. |
| 10  Q  So it's your testimony today that you took | 10  They were a book publisher.  Like "Harry Potter" was |
| 11  a statistics class at UNC Wilmington? | 11  their big book at the time, but I worked in their |
| 12  A  I believe so.  It was 1991.  I think it was | 12  continuity program division. |
| 13  part of the curriculum. | 13  Q  What does -- what does the continuity |
| 14  Q  And do you recall specifically what was | 14  division do? |
| 15  taught in that class? | 15  A  You may recall offers where, you know, you |
| 16  A  No.  Just general. | 16  buy one book for one dollar and then you sign up and |
| 17  Q  Okay.  Let me talk a little bit about your | 17  you get six free but then you've got to buy, you |
| 18  employment history. | 18  know, five more at $5.00, and they were children's |
| 19     You served as a marketing manager at the | 19  book titles, "Dr. Seuss," Disney. |
| 20  Other List Company; correct? | 20     Golden books were the ones I really worked |
| 21  A  Correct. | 21  with. |
| 22  Q  And that was from 1996 to 2005; correct? | 22  Q  I remember the Scholastic book fair. |
| 23  A  It's about -- sounds about right. | 23  A  Right. |
| 24  Q  What did you do as a marketing manager at | 24  Q  And -- and so the clients of Scholastic, |
| 25  the Other List Company? | 25  Inc., are end users; right?  Consumers; correct? |
| Page 34 | Page 36 |
| 1  A  I was responsible -- there was some new | 1  A  Correct. |
| 2  client acquisition and transactions between clients. | 2  Q  Just going back up a second. |
| 3  Q  What does "new client acquisition" mean? | 3     Why did you leave the Other List Company? |
| 4  A  You know, we would try to sign on new | 4  A  Just was looking to increase my revenue |
| 5  clients to add to our -- our existing clients. | 5  and, you know, try something different. |
| 6  Q  What did the Other List Company do? | 6  Q  You were not terminated from the |
| 7  A  They were a direct marketing firm focused | 7  Other List Company; correct? |
| 8  on direct mail campaigns. | 8  A  Correct. |
| 9  Q  Were you successful in your new client | 9  Q  And then why did you leave Scholastic, |
| 10  acquisition? | 10  Inc.? |
| 11  A  Yes. | 11  A  They were going through a transition period |
| 12  Q  And then you next were at Scholastic, Inc.; | 12  and had to reduce payroll.  It was probably the |
| 13  correct? | 13  start of people not reading books anymore.  Not a |
| 14  A  Correct. | 14  good business decision. |
| 15  Q  And you were a marketing manager there as | 15  Q  So it's fair to say you were laid off; |
| 16  well? | 16  correct? |
| 17  A  Correct. | 17  A  Correct. |
| 18  Q  And you were there from approximately 2005 | 18  Q  To the best of your knowledge, did that |
| 19  to 2006; correct? | 19  layoff have to do with any performance-related |
| 20  A  Yes. | 20  issues on your part? |
| 21  Q  And what did you do in your role as | 21  A  I don't believe so. |
| 22  marketing manager at Scholastic, Inc.? | 22  Q  After Scholastic, Inc., you served as |
| 23  A  Did some analysis of the programs they had | 23  executive director at Marketing Memories, LLC; |
| 24  there and worked with their marketing team to test | 24  correct? |
| 25  some of the campaigns to see which performed better. | 25  A  Correct. |
| Page 35 | Page 37 |

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  Q  And you did that from approximately 2006 to
2  2009; correct?
3  A  Correct.
4  Q  And you were also the owner of this
5  company; correct?
6  A  I was.
7  Q  Were you the sole owner of the company?
8  A  Yes.
9  Q  And how many employees did you have at
10 Marketing Memories?
11 A  Just me.
12 Q  And is it fair so say that the -- the
13 business of Marketing Memories was about selling
14 personalized engraved products?
15 A  Yes.
16 Q  So you were sort of -- I imagine you were a
17 jack-of-all-trades at the -- at the company;
18 correct?
19 A  Correct.
20 Q  Did you have any other jobs before you
21 joined NSSF that we haven't previously mentioned?
22 A  Oh, yeah.  I had plenty of jobs growing up
23 and previous to, I think, the first one you
24 mentioned was -- was the Other List Company.
25 Q  Were those jobs in the service industry?

Page 38

1  Q  Do you have an understanding of why the
2  Sports Authority decided to start selling firearms
3  around 1995?
4        MR. LEE:  Objection.  Lacks foundation.
5  Calls for speculation.
6  BY MR. MEYERHOFF:
7  Q  You can answer.
8  A  Okay.  Then no, I did not.
9  Q  Do you recall what type of firearms the
10 Sports Authority sold while you worked there?
11 A  I believe they had long guns, which -- you
12 know, shotguns and rifles.
13 Q  Do you recall if they sold magazines while
14 you worked there?
15 A  I do not.
16 Q  So before your employment at NSSF, is it
17 fair to say that your primary professional focus was
18 marketing?
19 A  Yes.  Marketing, sales.
20 Q  Prior to your time at NSSF, have you had
21 any experience with companies in the firearms
22 industry?
23 A  A few of our clients at the
24 Other List Company were in the outdoor space and
25 then also, obviously, the Sports Authority which we

Page 40

1  A  Sure.  Everything from a paper route to
2  landscaping to working at retail stores.
3  Q  Did any of those retail stores sell
4  firearms?
5  A  Yes.
6  Q  Which one or ones?
7  A  The Sports Authority.
8     And Track -- I worked at companies that no
9  longer exist.
10 Q  This deposition is a trip down memory lane.
11 Sports Authority, Scholastic.
12    Were you -- at the Sports Authority, were
13 you involved in the sale of firearms?
14 A  I was not.  I had worked there part-time at
15 nights for a couple years.  They brought the
16 firearms toward the end.  They were not there in my
17 store for very long.
18 Q  When you say they brought them in at the
19 end, you mean at the beginning of your employment,
20 they did not sell firearms and then towards the end
21 of your employment, they did; correct?
22 A  Correct.
23 Q  Do you recall what year this was or years
24 when you were employed at the Sports Authority?
25 A  1995-ish.

Page 39

1  already discussed.
2  Q  When you say "the outdoor space," what do
3  you mean?
4  A  Hunting, fishing, camping, shooting.
5  Q  So in 2009, you started your employment at
6  NSSF; correct?
7  A  Correct.
8  Q  What does "NSSF" stand for?
9  A  The National Shooting Sports Foundation.
10 Q  And how did you first become aware of the
11 role you were eventually hired for at NSSF?
12 A  I believe I saw the ad in a -- in a local
13 newspaper or potentially an online website job
14 board.
15 Q  And why did you decide to apply for this
16 role?
17 A  Couple reasons:  One, the company that I
18 had owned was, you know -- wasn't as successful as I
19 was hoping it would be.
20    Second, I had grown up hunting, fishing,
21 camping, and the NSSF was in that space.
22    So those were the two primary reasons.
23 Q  And can you describe briefly what the
24 interview and hiring process was like for NSSF for
25 that role?

Page 41

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 204 of 240
PageID: 7793
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  A  Sure.
2      Best of my recollection, submitted paper
3  interview; mailed it in.
4      Resume.  Cover letter.  Mailed it in.
5      I was contacted by -- I think they had used
6  a third party to kind of sort through all the
7  applicants and I made it past that initial review
8  and then had interviews, several interviews, with
9  staff at NSSF.
10  Q  And you were initially hired as the
11  director of industry research and analysis; correct?
12  A  Correct.
13  Q  And you had testified previously that your
14  main area of professional focus, prior to joining
15  NSSF, was in marketing; correct?
16  A  Correct.
17  Q  To the best of your knowledge, why do you
18  think NSSF hired you for this
19  industry-research-and-analysis role?
20      MR. LEE:  Objection.  Calls for
21  speculation.  Lacks foundation.
22      You can answer.
23      THE WITNESS:  I believe, you know, my
24  knowledge of the industry, my just personal
25  experiences with the industry, my background in

Page 42

1  marketing.
2      Also encompassed when I worked at
3  Scholastic, the analysis part of it.
4  BY MR. MEYERHOFF:
5  Q  The Scholastic you mentioned was the -- you
6  had testified previously about the analysis of
7  programs was something you did at Scholastic?
8  A  Correct.
9  Q  What do you mean by analysis of programs?
10  A  Again, with those continuity programs, we
11  would do some AB testing with different titles and
12  different offers, and I was the person that would
13  then say "Okay.  Offer A outperformed Offer B.
14  Let's now test Offer B versus Offer C."
15  Q  So it was an analysis -- let me just -- so
16  at Scholastic, the analysis of programs was mainly
17  geared towards sales?  Is that a fair statement?
18  A  Yes.  Which offers outperformed others.
19  Looking at numbers and developing a few formulas and
20  projecting overall sales for a campaign and then
21  determining which one was more cost effective than
22  another.
23  Q  And have you done any research in
24  professional roles prior to joining NSSF?
25  A  You know, with my -- the organization I

Page 43

1  formed, the Marketing Memories, framed that
2  movement.  And I had to research which particular
3  market I thought would be best for the personalized
4  products, that sort of stuff.
5  Q  And what sources of information did you
6  look at in making that determination?
7  A  Let me think back.  Just a lot of, I guess,
8  internet searches and looking up -- I remember --
9  you know, the markets we were looking at were birth
10  rate, death rate, number of anniversaries, number of
11  weddings.
12      When you were making -- when we were making
13  personalized products, we wanted to know why people
14  would buy those and they were mainly for birthdays,
15  anniversaries, births, deaths.
16      We kind of analyzed how many people were
17  born a year, how many people died a year.
18  Obviously, birthdays are easy to figure out.  That
19  type of stuff.
20  Q  When you worked at the Other List and at
21  Scholastic, were there research directors at either
22  company?
23  A  I don't recall.
24  Q  Do you recall receiving any research
25  training at either job?

Page 44

1  A  Just standard job training.  Somebody
2  taught me a little bit about getting me up to speed
3  on the spreadsheets at Scholastic, and I was on my
4  own at Marketing Memories.
5  Q  But nothing specific about these are the
6  best practices to engage in in research; correct?
7  A  Correct.
8  Q  And did you work with any statisticians at
9  the Other List Company or Scholastic?
10  A  At Scholastic there were statisticians or
11  at least they had some other analysis staff.
12  Q  And did you receive training from those
13  statisticians?
14  A  I did learn from them.
15  Q  Do you recall what you learned?
16  A  Just, again, some of the formulas -- the
17  Excel formulas to do forecasting so we could make
18  decisions quicker.
19      We didn't have to wait for a program to --
20  to end all the way out.  We would just forecast the
21  ones we thought would make the most money so then we
22  could move on to the next offer.
23  Q  Is it fair to say that that training was
24  mostly related to formulas in Excel?
25  A  Yes.

Page 45

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 205 of 240
PageID: 7794
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 46

1    Q  And when you ran Marketing Memories, did
2  you employ any -- I guess you testified previously
3  there were no other employees.
4       Did you ever contract with any
5  statisticians with Marketing Memories, LLC?
6    A  I did not.
7    Q  Did you ever contract with any outside
8  research organizations while you were with
9  Marketing Memories, LLC?
10    A  No.
11    Q  So returning to NSSF, when you served as
12  director of administrative research and analysis,
13  you reported to the director of business
14  development; correct?
15    A  Correct.
16    Q  And --
17    A  It might have been the manager of business
18  development.  I'm not sure of the title.
19    Q  And that was Randy Clark; correct?
20    A  Correct.
21    Q  And can you describe what the business
22  development department did at NSSF?
23    A  They had a couple of divisions -- I don't
24  know divisions but parts to it.
25       There were member services.  So NSSF is a

Page 47

1  member-based organization; so they had staff that
2  supported member needs; they had some programs --
3  programs division where they would help try to
4  increase participation in hunting, target shooting;
5  and then the research division was myself and my
6  associate researcher.
7    Q  Do you recall receiving annual reviews for
8  performance at NSSF?
9    A  I do, yes.
10    Q  And those reviews were given by Mr. Clark;
11  correct?
12    A  Correct.
13    Q  And do you recall what the rubrics were for
14  those reviews?
15    A  Just standard forms with, you know, the --
16  maybe ten -- ten questions on poor to excellent.
17    Q  If you recall, generally, what those
18  categories were.
19    A  I do not recall specifically, but generally
20  they would have been, like, you know, works well
21  with coworkers, met goals, that type of stuff.
22    MR. MEYERHOFF:  I see we're past an hour.
23  Mr. Curcuruto, Ms. Miller, Mr. Lee, would you like a
24  break?
25    THE WITNESS:  I'm okay.

Page 48

1    THE REPORTER:  I would like one.
2    MR. MEYERHOFF:  How long?
3    THE REPORTER:  Five minutes is great.
4    (A brief recess was taken.)
5  BY MR. MEYERHOFF:
6    Q  So when we broke, we were discussing your
7  role as director of industry research and analysis
8  at NSSF.
9       Can you briefly describe what that role
10  entailed?
11    A  Sure.
12       I was responsible for most -- conducting
13  most of the research for NSSF, and NSSF is a
14  business-to-business trade association for the
15  firearms industry; so what we tried to do is provide
16  research to our members that would help them make
17  better business decisions.
18    Q  And then in 2016, you became director of
19  research and market development; is that correct?
20    A  Correct.
21    Q  Would that be considered a promotion?
22    A  And some added responsibilities.
23    Q  And added compensation?
24    A  I think it was just a title change.
25    Q  What were the added responsibilities that

Page 49

1  came with becoming the director of research and
2  market development?
3    A  I took over what we call R3, which is
4  recruit new people, retain the ones we have, and
5  reactivate lapsed participants.
6       And that R3 dealt with overall
7  participation in hunting and target shooting; so we
8  tried to increase participation, and that kind of
9  then fell under my responsibilities.
10    Q  Did you -- did you lose any of the
11  responsibilities that you previously had when you
12  took on this new role?
13    A  I -- the only thing that I had taken off my
14  plate was I had ran an executive management seminar
15  at our -- one of our conferences; so somebody else
16  took that responsibility over.
17    Q  What was the -- was it a seminar?
18    A  Correct.  Yeah.
19       I brought in paid speakers that -- NSSF
20  owned and operated a large business-to-business
21  show, which was called the Shot Show, and at that
22  show, we would provide our attendees education; so
23  the education that -- that program that I developed
24  was for executives just to help them, you know,
25  improve their skill set.

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 206 of 240
PageID: 7795
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1    Q   And these are executives of firearms
2  companies?
3    A   Correct.
4       The attendees of Shot Show were primarily
5  firearm manufacturers, ammunition manufacturers, and
6  any businesses that had to do with that market.
7  Retailers, ranges, parts manufacturers.
8    Q   Who did you report to in your role as
9  director of research and market development?
10    A   At the time I believe it was still
11  Randy Clark and I'm not sure of the time.
12       He had left the organization and then I had
13  reported to Chris Dolmack, and I'm not sure how --
14  how long I had reported to Randy in my new role and
15  then transferred over reporting to somebody else.
16    Q   Is it fair to say that the whole time you
17  were at NSSF, you were within the business
18  development division?
19    A   Correct.
20    Q   When was your last day of employment at
21  NSSF?
22    A   Early January 2021. I don't recall the
23  specific date.
24    Q   Why did you leave NSSF?
25    A   They had staff reductions due to losing --

Page 50

1  during COVID, the -- the show that they held, the
2  Shot Show, was canceled and that was a big chunk of
3  their revenue; so they had to have some staff
4  reductions and budget reductions.
5       So I got caught up in that.
6    Q   Is that the reason they told you you were
7  being let go?
8    A   Correct.
9    Q   Did they mention any other reasons that
10  they told you you were being let go?
11    A   They did not.
12    Q   Who took over your responsibilities, to the
13  best of your knowledge, after you were let go?
14    A   I had a research assistant that, I assume,
15  most of the responsibilities went to and then I
16  think they had divvied up a lot of other
17  responsibilities among the remaining staff there.
18    Q   Who was that research assistant?
19    A   Dianne, with two n's, Vrablic,
20  V-r-a-b-l-i-c.
21    Q   Do you know why you were let go and
22  Miss Vrablic was not?
23       MR. LEE: Objection. Calls for
24  speculation.
25       THE WITNESS: Most likely financially. I

Page 51

1  had a larger salary and -- and controlled a few
2  budgets that she did not.
3  BY MR. MEYERHOFF:
4    Q   Do you know that -- do you know if NSSF
5  ever hired another director of research and market
6  development?
7    A   I do not believe they have.
8    Q   Are you familiar with an individual named
9  Salam Fatohi?
10    A   He was a coworker at the time. I'm not
11  sure. Maybe we were there for two years together.
12       He had worked, I believe, in the government
13  relations division, but at the time we were all home
14  officed to -- due to COVID; so I didn't really have
15  many in-person interactions with Salam.
16    Q   Have you had any interactions with him, in
17  person or otherwise, since you've left NSSF?
18    A   I have not.
19    Q   Do you know what Mr. Fatohi's role was in
20  the government relations division?
21    A   I believe he was an assistant researcher on
22  the government side of things, politics.
23       But I didn't really delve too much into
24  that. I was busy with my own responsibilities to
25  learn what his were.

Page 52

1    Q   What -- so I take it that NSSF has a
2  government relations division?
3    A   Correct.
4    Q   And what does that division do?
5    A   They -- they mostly focus on the political
6  side of things.
7    Q   When you say "focus on the political side
8  of things," what do you mean?
9    A   I know that they had started a government
10  relations office in Washington, D.C., to try to help
11  the industry side of politics and, again, I didn't
12  get too involved in that.
13    Q   Did you ever discuss -- did you ever
14  discuss the declaration that you submitted in this
15  case with anyone in the government relations
16  division?
17    A   The original declaration from 2017?
18    Q   That's correct.
19    A   Sure.
20       That's where I would have worked with that
21  associate general counsel who was part of the
22  government relations team. Ben Erwin. Ben Erwin.
23       THE REPORTER: What was -- I'm sorry. What
24  is it?
25       THE WITNESS: E-r-w-i-n.

Page 53

Wiese, et al. vs. Bonta, et al.                                          Deposition of James Curcuruto

---

1      He was the associate general counsel that I
2  worked with on some of the declarations after the
3  original one left.
4      Sorry.
5  BY MR. MEYERHOFF:
6      Q   And when you say you worked with the
7  associate general counsels on these declarations,
8  what do you mean?
9      A   They would, you know, help walk through the
10 process with me and, you know, I would -- I had all
11 the research and filled out the declarations and
12 they would be, you know, kind of the liaison between
13 folks like Mr. Lee.
14     Q   Did the associate general counsels at NSSF
15 ever provide comments on these declarations?
16     A   I know we discussed them and they probably
17 provided some comments, general comments, on
18 grammar, that type of stuff.
19     Q   To the best of your recollection, did NSSF
20 oppose California's restrictions on large-capacity
21 magazines while you were there?
22     A   To the best of my knowledge, I know NSSF
23 overall would be opposed to anything seen as, you
24 know, I guess anti-gun or anti-industry; so things
25 like the high-capacity magazine bans or bans on what

Page 54

---

1  provided with any other rationales as to why NSSF
2  opposed the restrictions on large-capacity
3  magazines?
4      A   No.  That was the premise of it, you know,
5  helping our members stay in business.
6      Q   So after you left NSSF in 2021, you formed
7  a company called Outdoor Insights, LLC; is that
8  correct?
9      A   Correct.  Yeah.  Just kind of did some
10 consulting.  Just -- and then decided to try to
11 figure out what I want to do.
12     Q   What you want to do when you grow up.
13     A   Exactly.
14     Q   And what kind of companies did you consult
15 for?
16     A   A few companies within the firearms
17 industry.
18     I did some -- wrote some articles.  Some
19 folks paid me to write some articles.  The U.S. Fish
20 and Wildlife Service was a company that asked me to
21 write articles, you know, focused on the outdoors
22 and conservation.
23     Q   Did any of the firearms companies that you
24 consulted with -- do any of them sell large-capacity
25 magazines?

Page 56

---

1  they called modern sporting rifles, which was the AR
2  platform, they would have been opposed to.
3      I don't know, again, if they -- how -- how
4  in depth or what they did to oppose them, but I know
5  that was discussed.
6      Q   Do you recall if they ever told you why
7  NSSF opposed restrictions on large-capacity
8  magazines?
9      MR. LEE:  Objection.  Vague.  Vague as to
10 the term "they."
11     You may answer.
12     THE WITNESS:  Okay.  Yeah.  I think there
13 were discussions.
14     From what I recall, I had discussions on,
15 you know, getting rid of a product that our members
16 sold was bad for our members and we are a
17 member-based trade association; so we would do what
18 is best for our members and that would be the --
19 keep allowing them to sell -- make the products that
20 they were selling.
21     MR. MEYERHOFF:  Can you read back that last
22 answer for me, Ms. Miller?
23     (The record was read.)
24 BY MR. MEYERHOFF:
25     Q   To the best of your recollection, were you

Page 55

---

1      A   I do not believe so, no.
2      Q   Did any of the articles you've written
3  while at Outdoor Insights, LLC, concern
4  large-capacity magazines?
5      A   I don't believe so.
6      Q   You're also the executive director of
7  Outdoor Stewards of Conservation Foundation; is that
8  right?
9      A   Correct.
10     Q   And you -- is it fair to say that you
11 formed that organization?
12     A   I did.
13     Q   And you formed it in 2021 as well?
14     A   Correct.
15     Q   What does that organization do?
16     A   We are a 501(c)(3) nonprofit organization,
17 and our mission is to help recruit the next
18 generation of what we call HATS, which are hunters,
19 anglers, trappers, and shooters, and promote the
20 fact that HATS are primary funders and stewards of
21 land, fish, and wildlife conservation in America.
22     Is that too long?
23     Q   No.  That's -- thank you.
24     Does Outdoor Stewards of Conservation
25 Foundation have a position on legality of

Page 57

---

Case 1:18-cv-10507-RMB-JBD     Document 184-8     Filed 11/03/23     Page 208 of 240
PageID: 7797
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1 large-capacity-magazine restrictions?
2    A   We do not.
3       We're conservation focused and we've got
4 some programs that we're -- which is our primary
5 focus.
6    Q   And I'm sorry.  You told me this already,
7 but what is the -- what is the mission of
8 Outdoor Stewards of Conservation Foundation?
9    A   That's to use the research-based
10 communication and engagement programs to help
11 recruit the next generation of hunters, anglers,
12 trappers, and shooters and promote the fact that
13 they are the primary funders of land, fish, wildlife
14 conservation in America.
15    Q   Do you think that restrictions on
16 large-capacity magazines interfere with recruiting
17 the next generation of hunters and anglers?
18    A   I have not thought too much about that,
19 but, you know, the less options you have to do
20 anything, I suppose would -- would hurt recruitment
21 efforts.
22    Q   But it's not something you spent time
23 thinking about; correct?
24    A   I have not.
25    Q   Prior to your time at NSSF, you had never
Page 58

1 conducted any research on firearm magazines;
2 correct?
3    A   Correct.
4    Q   And -- and in your prior employment we
5 mentioned prior to NSSF, you hadn't designed or
6 conducted studies as part of those positions, had
7 you?
8    A   I had not.
9    Q   And you mentioned briefly -- and if you
10 could just refresh my recollection.  In your
11 positions prior to NSSF, what had been your
12 professional involvement with firearms'
13 manufacturers?
14    A   No direct contact with the manufacturers.
15    Q   Other than your salary from NSSF, in the
16 past five years, have you received any payments or
17 funds or income from the firearms industry?
18    A   A few of my clients with the consulting
19 business, I had -- I had received some compensation
20 for work I had done after NSSF.
21    Q   And anything beyond that?
22    A   Directly from the firearm manufacturers?
23    Q   That's correct.
24    A   With Outdoor Stewards of Conservation
25 Foundation, one of our programs is called "Fill a
Page 59

1 bag while filling your tag," and we provide
2 biodegradable bags to people that hunt, fish, and
3 shoot so when they are outdoors they can take trash
4 out of the woods and waters, and we sell those bags
5 to state wildlife agencies, outdoor organizations.
6       Some of the folks that have bought those
7 bags are firearm manufacturers.
8    Q   Do you own any shares or stocks in any
9 firearms manufacturing companies?
10    A   I have a retirement account that has, you
11 know, the different funds, and I have -- I don't
12 know if any of them have shares in that.
13       You know, my -- my son has an account to
14 kind of -- I teach him to play with and in that
15 account, he owns shares of Smith & Wesson, yes.  I
16 think.  I'm not sure of the symbol.
17    Q   But you personally don't own any shares of
18 Smith & Wesson or any other firearms manufacturer,
19 independent of what may be in your retirement fund?
20    A   Correct.
21    Q   Do you personally own any large-capacity
22 magazines?
23    A   So is that -- that's 11-plus?  Is that --
24 just to define it?
25    Q   A magazine capable of holding more than
Page 60

1 10 rounds.
2    A   Okay.  I do.
3    Q   Approximately how many do you own?
4    A   I believe three.
5    Q   Do you own any standard-capacity magazines
6 or magazines capable of holding 10 rounds or less?
7    A   I do.
8       MR. LEE:  Well, hang on a second.
9       THE WITNESS:  Oh, sorry.
10       MR. LEE:  Counsel, which is it?
11 Standard-capacity magazine or magazines capable of
12 holding 10 or fewer rounds?
13       MR. MEYERHOFF:  I mean, I'm calling it a
14 standard-capacity magazine.  I think the witness
15 knows what I mean.
16       MR. LEE:  Standard -- you said do you own
17 any standard-capacity magazines or magazines capable
18 of holding 10 rounds or less.
19       Did you not apply that 10 -- that
20 standard-capacity magazines are magazines that hold
21 10 or fewer rounds?
22       So the question is vague and ambiguous.
23       MR. MEYERHOFF:  That's your objection?
24       MR. LEE:  Yes.
25 ///
Page 61

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 209 of 240
PageID: 7798
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

BY MR. MEYERHOFF:

Q   Mr. Curcuruto, do you own any magazines capable of holding no more than 10 rounds?

A   I do.

Thanks for the clarification.

Q   You do know for purposes of this deposition, when I say "standard-capacity magazine," I mean a magazine capable of holding 10 rounds or less?

A   And I do understand that.

MR. LEE:  I object to the question --

THE WITNESS:  Oh, sorry.

MR. LEE:  That -- that's not a term that I recognize, and the term that has been used in this litigation, standard-capacity magazine, by others including plaintiffs, including General Youngman, including just about anyone else that you would talk to in the country -- a standard-capacity magazine is a magazine that typically holds more than 10 rounds.

So to the extent you're trying to mislead this witness by getting him to adopt the idea that a standard-capacity magazine as that term has been used in this litigation means a California legal magazine, I'm going to have to object to that.

MR. MEYERHOFF:  Ms. Miller, can you read

Page 62

back the last question and answer.

(The record was read.)

BY MR. MEYERHOFF:

Q   How many magazines, approximately, do you own that are capable of holding no more than 10 rounds?

A   Approximately 10.

Q   For the large-capacity magazines that you own, what is the maximum number of rounds that those are capable of holding?

A   15.

Q   And are all 3 of those magazines capable of holding 15?

A   Yes.

Q   What state do you live in, Mr. Curcuruto?

A   Connecticut.

Q   Do you know if Connecticut has any restrictions on large-capacity magazines?

A   They do.

Q   Do you know what -- do you know what that restriction is?

A   I believe no more than 10.

Q   Do you know if there is some kind of grandfather provision that makes your possession of those magazines legal?

Page 63

A   There is.

I believe back in early 2022, '23, I had to sign some sort of paperwork that said how many do you own?

Q   Is it your understanding that under Connecticut law, you cannot acquire more capacity magazines?

A   I believe that's correct.

It's hard to keep up with the laws in Connecticut.

MR. LEE:  Object to the question as calls for a legal opinion, legal conclusion.

BY MR. MEYERHOFF:

Q   If Connecticut's law were invalidated, would you go purchase more large-capacity magazines?

MR. LEE:  Objection.  Lacks foundation. Calls for speculation.

You may answer.

THE WITNESS:  So I would -- if I had the legal ability to buy a magazine that held more than 11 -- 11-or-more rounds, I, most likely, would.

BY MR. MEYERHOFF:

Q   Why would you buy another magazine capable of holding more than 10 rounds?

A   A lot of firearm manufacturers, when you

Page 64

buy a gun, they come with that.

In other states, I believe, they come with 11-plus and if I were to go buy a new gun and it came with that magazine, I would be purchasing it, I guess.

Q   Any other reasons?

A   You know, I -- hopefully, when I have some free time, I'll do some target shooting.  Right now, I'm just focusing on getting the business up and running, and it's just -- when you do do target shooting, it's easier to load one magazine, you know, with 15 rounds than 3 magazines with 10, you know -- 2 15-round magazines versus 3 10-round magazines.  Just makes it easier, more enjoyable when you're at the target-shooting range.

Q   I take it you do a -- you like to target shoot; correct?

A   I do.

Q   Are there any other reasons, other than the fact that if you purchased another firearm, it may come with a large-capacity magazine and the fact that large-capacity magazines make target shooting easier, that you would want to purchase a large-capacity magazine?

A   Again, just to clarify the "large capacity"

Page 65

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  being an 11-plus, you know, I do have a conceal
2  carry license, and right now the maximum in
3  Connecticut is that under-10 capacity; so if I
4  were -- if the law allowed it and I was legally
5  allowed to do it and carry a firearm concealed, I
6  would carry one with 11 or more rounds, most likely.
7      Q   There are 30-round magazines commercially
8  available for sale in other states.
9          Do you know if that's true?
10     A   I believe so, yes, sir.
11     Q   And would you want to purchase a 30-round
12  magazine?
13     A   I don't -- I -- I haven't really thought
14  about it, but I would if they weren't illegal.
15     Q   How many firearms do you own?
16     A   Approximately 20.
17     Q   Do you own any revolvers?
18     A   I do.
19     Q   And why do you own revolvers?
20     A   I just -- I just like all different types
21  of guns.
22     Q   But no specific reason that you -- that you
23  own revolvers?
24     A   Just collecting, target shooting, personal
25  protection.

Page 66

1          Those are some of the reasons I own all
2  types of guns.
3      Q   So it's fair to say that you own revolvers
4  for, among other reasons, personal protection;
5  correct?
6      A   Correct.
7      Q   And when you say "personal protection," is
8  it fair to say you mean that if someone were to
9  confront you and you had a revolver, you would
10  potentially use that for self-defense; correct?
11     A   Correct.
12     Q   Do you own any guns that are -- that are
13  fixed-magazine systems?
14     A   So not attachable?  Just to clarify.
15     Q   Yeah.
16         Not -- that have a magazine that is not
17  detachable.
18     A   I do not.
19     Q   Do you have any firearms that are capable
20  of accepting magazines capable of holding more than
21  15 rounds?
22     A   More than 15?
23     Q   For example, are -- do you possess any
24  firearms that are capable of holding magazines which
25  can accept 30 rounds?

Page 67

1      A   I believe so, yes.
2      Q   What is one of those firearms?
3      A   Well, like, you know, a Ruger 10/22, which
4  is a rifle, has a little box magazine which most of
5  them are -- are 10 rounds but they have other
6  magazines that would hold more -- 11-plus.
7          I'm not sure up to 30, but certainly 15.
8      Q   Do you know if any -- do you know if the
9  Ruger 10/22 you could purchase a magazine capable of
10  holding more than 15 rounds?
11     A   I'm not familiar with that.
12         I would -- if I had to venture a guess, I
13  would say yes.
14     Q   Do you own any firearms which are referred
15  to alternatively as assault weapons or modern
16  sporting rifles?
17     A   I have one AR platform rifle that we used
18  to call, at NSSF, a modern sporting rifle.
19  Connecticut-compliant edition.
20     Q   And when did you purchase that AR platform
21  rifle?
22     A   I'm not sure of the exact date but several
23  years ago.
24     Q   Did you purchase that rifle, to the best of
25  your knowledge, before Connecticut's restrictions on

Page 68

1  large-capacity magazines went into effect?
2      A   I believe after because I -- I do -- I
3  couldn't -- I don't have any magazines that hold
4  more than 10 rounds for that firearm; so I would
5  assume at the time, if I could have bought more than
6  10 rounds, I would have or it would have come with
7  it.
8      Q   You testified previously, I believe, that
9  the Ruger 10/22 firearm is capable of accepting a
10  magazine holding more than 10 rounds; correct?
11     A   Correct.
12     Q   Do you own any other -- do you own any
13  detachable magazine firearms for which you only have
14  a magazine capable of holding more -- no more than
15  10 rounds?
16     A   Yes.
17         I own several firearms with magazines that
18  are 10 or less.
19     Q   What do you use those firearms for?
20     A   Mostly target shooting, collecting,
21  personal home defense.
22         I don't think any of them are -- they are
23  not hunting related.  Those aren't my hunting
24  firearms.
25     Q   So is it fair to say that you believe that

Page 69

**H I N E S   R E P O R T E R S**                                **18 (66 - 69)**

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 211 of 240
PageID: 7800

Wiese, et al. vs. Bonta, et al.                              Deposition of James Curcuruto

1 those firearms are appropriate for home defense?
2     MR. LEE: Objection. Misstates testimony.
3     You may answer.
4     THE WITNESS: They -- they can be used for
5 home defense.
6 BY MR. MEYERHOFF:
7   Q I believe -- and correct me if I'm wrong --
8 but I believe one of the reasons you possess one of
9 the revolvers you have is for home defense; correct?
10   A Correct.
11   Q And did you also say for personal
12 protection?
13   A For the revolvers, home defense, personal
14 protection, yes.
15   Q For the revolvers you have, what is the
16 maximum number of rounds you can fire before you
17 need to reload?
18   A The maximum in the revolvers I own, there
19 are 6.
20   Q Do you know what I mean firearms for
21 which -- start again.
22     Do you own any firearms that you can only
23 shoot 5 or fewer rounds before you need to reload?
24   A Well, I do have some -- for -- for when you
25 water fowl hunt and you duck hunt in Connecticut and
                                                    Page 70

1     MR. LEE: Objection. Calls for an opinion.
2     You may answer.
3     THE WITNESS: You know, it's always been
4 that way since I've been hunting. I'm sure there's
5 times if I had a fourth bullet, I would have been
6 able to get more dinner, but, you know, it's -- it's
7 just the way it is and I follow the regulations.
8 BY MR. MEYERHOFF:
9   Q It sounds like -- and obviously correct me
10 if I'm wrong -- you've discharged a firearm before;
11 correct?
12   A Correct.
13   Q Why have you discharged firearms in the
14 past?
15   A For target shooting and hunting.
16   Q Have you ever discharged a firearm for any
17 other reason?
18   A Not that I can recall.
19   Q Have you ever discharged a firearm at
20 another person?
21   A I have not.
22   Q We discussed previously depositions you had
23 given in other cases; correct?
24   A Yes.
25   Q Have you ever testified at trial in any
                                                    Page 72

1 I think most places, the most you are allowed to
2 have is 3 bullets in the gun; so you have to -- if
3 the gun would -- is capable of holding more, you
4 have to include what they call a plug; so, you know,
5 you have to just take the gun apart to be able to
6 put more than 3 bullets in it.
7     So I have some water fowl guns right now
8 with plugs in them; so the maximum amount of shells
9 I can put in them are 3.
10   Q Do you know, to the best of your knowledge,
11 why Connecticut has that restriction?
12     MR. LEE: Objection. Lacks foundation.
13 Lacks foundation. Calls for speculation. And calls
14 for a legal opinion.
15     You may answer.
16     THE WITNESS: It's just a federal
17 regulation for duck hunting, the maximum is 3. For
18 most types of duck hunting, there is a lot of
19 different regulations. Snow geese, you can have a
20 lot more than 3 and -- but they go down a rabbit
21 hole.
22 BY MR. MEYERHOFF:
23   Q Do you think that restriction on the number
24 of rounds you can fire without reloading while
25 duck/fowl hunting interferes with hunting?
                                                    Page 71

1 case?
2   A I did -- I believe it was a California
3 case, and it was during COVID; so it was virtual.
4     I took the virtual stand.
5   Q Have you ever testified at trial in any
6 non-firearms cases?
7   A I have not.
8   Q Have you ever been deposed in any
9 non-firearms cases?
10   A The magazines, I -- I would assume, would
11 fall under that, but nothing other than firearms and
12 magazines.
13   Q What is your definition of a sportsman?
14   A A sportsman.
15     Let's see. I don't really have a
16 definition handy, but I assume someone that enjoys
17 going outdoors hunting, fishing, trapping, shooting.
18   Q Would you consider yourself a sportsman?
19   A I would under that definition.
20   Q Do you consider California's restriction on
21 large-capacity magazines to be anti-sportsman?
22     MR. LEE: Objection. Calls for an opinion.
23     You may answer.
24     THE WITNESS: You know, since I live in a
25 state that has similar restrictions on the amount of
                                                    Page 73

1 capacity in a firearm in a magazine, you know, I
2 would assume it's -- if I had to define if it's
3 pro-sportsman or anti-sportsman, I guess it would be
4 anti-sportsman just because you couldn't -- you
5 know, it just restricts what you can do as a
6 sportsman.
7    MR. MEYERHOFF:
8    Q  And any restriction on what you can do as a
9 sportsman is anti-sportsman?
10   A  I'm sure -- maybe it restricts, you know,
11 our ability to do the things that we should be able
12 to do or may want to do; so --
13   Q  Please.  I interrupted you.
14   A  No.  Go ahead.  I'm sorry.  Just getting my
15 water.
16       MR. MEYERHOFF:  I'm going to pull up
17 another doc- -- document I'll mark as Exhibit 4.
18       And let me figure out how to screen share.
19       (The document referred to was marked as
20       Deposition Exhibit 4 by the Reporter.)
21 BY MR. MEYERHOFF:
22   Q  Can you see the document that I have on my
23 screen now?  The icon in the upper left-hand corner
24 has the LinkedIn logo?
25   A  Correct.  Yeah.

Page 74

1    A  Yes.
2    Q  And I believe we discussed this earlier,
3 but correct me if I'm wrong, it's fair to say that
4 you have -- in firearms cases that you've been a
5 part of, you've only submitted declarations or been
6 deposed on behalf of the plaintiffs; correct?
7    A  Correct.
8    Q  And reading this statement from your
9 LinkedIn page, is it fair to say that you would not
10 be available as an expert witness for defendants in
11 cases where firearms restrictions are being
12 challenged?
13       MR. LEE:  Objection.  Calls for
14 speculation.
15       THE WITNESS:  No.
16       I don't -- I would -- I don't think that's
17 true.
18       I could be an expert witness, I think, on
19 either side, depending on the -- the content.
20 BY MR. MEYERHOFF:
21   Q  But here you're advertising your services
22 as an expert witness specifically for the firearms
23 industry; correct?
24   A  Correct.
25   Q  And do you see here where it says in the

Page 76

1    Q  And the document is 17 pages.
2       So I'll just start with -- I'll just have
3 you look at page 1 and if you -- well, I'll ask
4 specific questions and obviously if at any time you
5 want to review the whole thing, just let me know.
6       Does that work?
7    A  Sure.
8    Q  So do you recognize the first page of this
9 document?
10   A  I do.
11   Q  What do you recognize it to be?
12   A  It appears to be a screenshot of my
13 LinkedIn profile.
14   Q  And do you maintain your LinkedIn profile?
15   A  I do.
16   Q  I'm going to scroll down.
17       Do you see where I've scrolled to?  It says
18 "President Outdoor Insights, LLC."
19   A  Correct.
20   Q  And do you see maybe ten lines down, there
21 is a carat?  It says "Available as Expert
22 Witness..."?
23   A  Correct.
24   Q  And it says "Available as Expert Witness
25 for the firearms industry"; correct?

Page 75

1 middle of the page, "National Shooting Sports
2 Foundation"?
3    A  I do.
4    Q  And do you see the -- the third carat down
5 in there?  It says:
6       "Serve as an expert witness in
7       depositions representing industry
8       against anti-sportsman legislation"?
9    A  Yes.
10   Q  So is it fair so say that you believe that
11 restrictions on magazines capable of holding more
12 than 10 rounds are anti-sportsman?
13   A  Well, as we discussed before, it kind of
14 limits what you can do; so that would be
15 anti-sportsman.
16   Q  Is it your opinion that a restriction on
17 magazines capable of holding more than 30 rounds
18 would be anti-sportsman?
19       MR. LEE:  Objection.  Calls for an opinion.
20       THE WITNESS:  I have -- yeah.  I don't have
21 any experience with magazines holding more than 30;
22 so I haven't really -- I don't really have a
23 personal opinion on using them or others using them.
24 BY MR. MEYERHOFF:
25   Q  So you don't have a strong opinion that

Page 77

Case 1:18-cv-10507-RMB-JBD   Document 184-8   Filed 11/03/23   Page 213 of 240
PageID: 7802

Wiese, et al. vs. Bonta, et al.                    Deposition of James Curcuruto

1 those should be unrestricted?
2     A  I do not have a strong opinion on that.
3     Q  Do you have a strong opinion on whether --
4 I'll just rephrase.
5         Do you have any opinion on whether
6 magazines capable of holding more than 100 rounds
7 should be restricted?
8     A  Again, I haven't really had any experience
9 with that, no personal or professional experience
10 firing or using that product or much knowledge of
11 that at all; so I don't have much of an opinion on
12 magazines holding more than 100 rounds.
13     Q  Do you have any opinion on them?
14     A  I -- I -- from the limited experience I
15 have with them, I -- I don't really -- I don't
16 really have an opinion at this time on those.
17     Q  In your opinion, would it be fair to
18 describe magazines as a firearm accessory?
19     A  Yes.
20     Q  Are you familiar with what are called
21 silencers?
22     A  Suppressor, silencer, I believe that just
23 gets connected to the top of the barrel for noise
24 abatement.  If so -- if that's your definition of
25 what you're talking about, yes, I do have knowledge

Page 78

1 of those.
2     Q  Do you own any silencers?
3     A  I do not.
4     Q  Why not?
5     A  It is just a complicated process to
6 purchase and own them here in Connecticut, and I
7 just haven't taken the time to go through that.
8     Q  Do you think restrictions on silencers
9 would be anti-sportsman?
10     A  I think so.
11         When you're hunting, you know, and use ear
12 protection without a silencer, you know, is a smart
13 move; but, you know, in other countries, it's kind
14 of -- they want you to use silencers for -- for the
15 noise, not disturb, you know, anybody close by
16 and -- and to protect your hearing.
17         So not allowing silencers is kind of
18 anti-sportsman.
19     Q  You've been deposed in a number of cases;
20 correct?
21     A  Yes.
22     MR. LEE:  Asked and answered.
23 BY MR. MEYERHOFF:
24     Q  Do you know if you've ever been found
25 qualified as an expert by any court?

Page 79

1     A  I don't -- I'm not sure I understand that.
2         I haven't heard that I'm qualified or
3 unqualified, I believe, by any court.
4     Q  Have you personally ever been a party to a
5 lawsuit?
6     A  I have not.
7     Q  Have any of the entities that you've
8 controlled been a party to a lawsuit?
9     A  Can you just specify which entities?
10     Q  I believe previously we discussed --
11 have -- so I believe that you exercise control over
12 Outdoor Stewards of Conservation Foundation and
13 Outdoor Insights; correct?
14     A  Correct.
15     Q  And I believe previously you testified that
16 you were the owner of Marketing Memories, LLC;
17 correct?
18     A  Yes, sir.  Yes.
19     Q  Have you ever owned any other businesses?
20     A  No.
21     Q  Have you ever run any other nonprofits?
22     A  I have not.
23     Q  So have any of those three entities either
24 been -- have any of those three entities ever been a
25 party to a lawsuit?

Page 80

1     A  They have not.
2     Q  One more question on Exhibit 4.
3         Do you see where it says "Executive
4 Director, Marketing Memories, LLC" in bold?
5     A  Yes, sir.
6     Q  And then the dates it lists October 2006 to
7 November 2012; correct?
8     A  Correct.
9     Q  So is it fair to say that your employment
10 with NSSF overlapped with your role as executive
11 director at Marketing Memories, LLC?
12     A  It did.
13     Q  And so how did you manage both roles at the
14 same time?
15     A  The Marketing Memories was the business I
16 had started after Scholastic and prior to NSSF, it
17 was my full-time job.
18         When I started at NSSF, that was my
19 full-time job and -- and Marketing Memories was just
20 kind of residual.  If an order came in, I would fill
21 it, but not a lot -- unfortunately, not a lot of
22 business came in during the time it overlapped with
23 NSSF.
24     Q  Have you ever been charged with a crime?
25     A  I have not.

Page 81

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 214 of 240
PageID: 7803
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 82

1  Q  Have you ever been the victim of a crime?
2  A  Not that I know of.
3  Q  I'm going to return to what's been marked
4  as Exhibit 3, which is your declaration.
5      Do you see in paragraph 2, you write that
6  the NSSF's:
7      "... mission is to promote,
8      protect and preserve hunting and the
9      shooting sports"?
10  A  Correct.
11  Q  How does NSSF do that?
12  A  When I was with NSSF, and I'm not sure if
13  their mission has changed -- but to promote,
14  protect, preserve hunting and the shooting sports,
15  they -- you know, I think one of the best things
16  they did was provide research to learn how to
17  increase participation in the activities of hunting
18  and shooting sports.
19      And as a trade association, if we could
20  grow new customers that are members, which were
21  business based, you know, it would increase their
22  sales and -- and customer bases as well.
23  Q  So was the ultimate goal to increase sales?
24  A  Well, the goal for the NSSF for at least,
25  you know, what I thought was there, was to provide

Page 83

1  them, you know, with better -- our members with
2  better information so they could make better
3  decisions and for them to increase, you know, their
4  businesses, grow their businesses.
5  Q  And when you say "grow their businesses,"
6  you mean increase revenue; correct?
7  A  It means -- you know, it could be increase,
8  you know, the amount of employees that they have to,
9  you know, pay some new people; bring some new people
10  into hunting and shooting sports, new customers; and
11  then also, you know, sell -- sell more products,
12  sell to more customers.
13  Q  And in your declaration, you write at the
14  time:
15      "... NSSF has a membership of
16      12,000 manufacturers, distributors,
17      firearms retailers, shooting ranges,
18      sportsmen's organizations and
19      publishers."
20      Do you know the approximate breakdown in
21  terms of number of members within those different
22  categories?
23  A  I do not.
24      I think the -- the biggest portion of the
25  membership at the time that I was there was the

Page 84

1  retailers and the ranges; but I don't have any
2  specifics.
3      I wasn't in the membership.  It wasn't part
4  of my responsibilities to determine the numbers of
5  members or the individual types of memberships.
6  Just knowledge of the overall numbers of members we
7  had.
8  Q  Do you know how NSSF funded its operations?
9      MR. LEE:  Objection.  Lacks foundation.
10  Calls for speculation.
11      You can answer.
12      THE WITNESS:  To the best of my knowledge,
13  NSSF funded their operations primarily by the
14  ownership of the Shot Show that was a
15  business-to-business consumer trade show.  That
16  brought in a lot of revenue for them.
17      They also were able to bring in revenue via
18  memberships.  Since it was a, you know,
19  business-to-business-based organization, they had
20  members as outlined here.
21      Manufacturers would pay a membership fee as
22  well as retailers, ranges.
23      Also, NSSF made a little bit of money
24  selling some research products but it wasn't a huge
25  chunk of their overall budgets.

Page 85

1  BY MR. MEYERHOFF:
2  Q  How did NSSF make money with the Shot Show?
3  A  Again, I wasn't on the Shot Show team, but
4  it's my understanding that exhibitors, and they had
5  a couple thousand exhibitors, would pay to exhibit
6  at the Shot Show and then attendees would pay to
7  attend the Shot Show.  That's how they made money
8  during the trade show.
9      THE REPORTER:  May I take a little break?
10  My doorbell rang and there is nobody else here and I
11  need to check.
12      THE WITNESS:  I'll take a chance to go to
13  the restroom.
14      MR. MEYERHOFF:  Why don't we take a
15  five-minute break.
16      (A brief recess was taken.)
17  BY MR. MEYERHOFF:
18  Q  Mr. Curcuruto, are you ready to proceed?
19  A  Yes, sir.  I am.
20  Q  I believe you testified previously that
21  members of NSSF paid membership dues; is that
22  correct?
23  A  Yes.
24  Q  And do you -- to the best of your
25  understanding, did all 12,000 members pay the exact

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 215 of 240
PageID: 7804
Wiese, et al. vs. Bonta, et al.                                      Deposition of James Curcuruto

1  same amount in dues?
2      MR. LEE: Objection. Lacks foundation.
3      THE WITNESS: No. I was not in membership,
4  but I know there were different levels of
5  membership; different pricing tiers. I don't know
6  the specifics of them, though.
7      Sorry.
8  BY MR. MEYERHOFF:
9    Q  Would it be fair to say that, to the best
10 of your knowledge, the larger firearms manufacturers
11 paid more than the other members?
12   A  I believe that was the case.
13   Q  And to the best of your knowledge,
14 manufacturers, distributors, and firearm retailers
15 all have the primary goal of selling more firearms
16 and firearms-related accessories; correct?
17   A  I -- you know, I did not work for a retail
18 or range or manufacturers, so I'm not sure what
19 their goals were, but I assume any business that
20 wants to stay in business would like to sell -- sell
21 to their customers and have more customers.
22   Q  And do you think it's fair to say that
23 shooting ranges, sportsmen's organizations, and
24 publishers all benefit from more firearm and
25 firearm-accessory sales?

Page 86

1  question. It's compound many times over.
2      You may answer.
3      THE WITNESS: Yeah.
4      Just what we wanted to do, at least my
5  division, we wanted to grow our own ranks which
6  was -- or membership; right? We wanted to have more
7  members as a trade organization which, I think, is
8  standard for any trade organization.
9      And of course we want our members to be
10 successful; so, you know, I assume if they went out
11 of business, they would no longer be members of the
12 NSSF.
13 BY MR. MEYERHOFF:
14   Q  Did you know -- during the time you were at
15 NSSF, did you know who any members of the board of
16 directors were?
17   A  I did.
18   Q  At the time you were at NSSF, was the chair
19 of the board of directors Robert L. Scott?
20   A  I believe so.
21   Q  And did you know -- do you know if
22 Mr. Scott is also the chairman of Smith & Wesson?
23   A  At the time that I was with NSSF and
24 Mr. Scott was on our board, I believe he worked in
25 some capacity with Smith & Wesson, but I do not know

Page 88

1    A  Well, I'm not sure.
2      Again, on an individual level, sportsman
3  organizations -- sometimes those are, you know,
4  private clubs that don't want more. They like to
5  have their own amount or even less sometimes.
6      So I don't know if that statement is true
7  for all -- everybody.
8    Q  Do you think it's fair to say that the main
9  purpose of NSSF was to promote the sale of firearms
10 and firearm accessories?
11   A  No.
12     You know, in my opinion, when I was there,
13 our main goal was just to, you know, grow overall --
14 the overall market which includes participation and
15 the amount of people purchasing anything from the
16 firearm to, you know, targets and ear protection and
17 all the accessories that go with it, all the hunting
18 decoys and stuff.
19     We just wanted to grow the overall market.
20   Q  So would it be fair to say that the goals
21 of NSSF, in your opinion, were to increase the sale
22 of firearms and firearm accessories, increase
23 participation, and increase the purchasing of
24 firearm accessories such as targets, et cetera?
25     MR. LEE: Objection to the form of the

Page 87

1  what capacity.
2    Q  Do you know if Smith & Wesson manufactures
3  large-capacity magazines?
4    A  If Smith & Wesson manufactures
5  large-capacity magazines?
6      I'm not sure. I don't believe they do. I
7  think they are a firearm manufacturer, but I'm
8  unaware if they do or do not manufacture magazines
9  that would go in firearms that they make.
10   Q  Smith & Wesson -- would you just consider
11 Smith & Wesson to be a large firearms manufacturer?
12   A  Yes.
13   Q  Is it your testimony that you're not sure
14 whether Smith & Wesson manufactures magazines that
15 go along with the firearms themselves?
16   A  Right.
17     I'm not sure if they manufacture them or if
18 they bought them from another manufacturer to
19 include them, you know, with a firearms they sold.
20   Q  But it's your understanding that
21 Smith & Wesson typically sells firearms -- typically
22 sells magazines along with the individual firearm
23 they sell?
24   A  I believe when you purchase a firearm from
25 Smith & Wesson or, you know, any other manufacturer

Page 89

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 216 of 240
PageID: 7805
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

that makes a firearm that needs a detachable
magazine, that manufacturer is going to not just
sell the firearm but the firearm will come with
either one or two detachable magazines, whether it's
Smith & Wesson or another manufacturer.

Q  At the time you were at NSSF, was the
co-vice chairman of the board Stephen Hornady?

A  So Stephen Hornady was on NSSF's board
while I was working at NSSF. I'm not sure what
capacity he was there.

Q  And are you aware if he is the president of
Hornady Manufacturing Co.?

A  When I was with NSSF, and, to my knowledge,
Steve Hornady was working with Hornady
Manufacturing. I don't know what his capacity was
there.

I believe he was an owner. His name is on
it; so --

Q  Do you know what that company manufactures?

A  Primarily ammunition.

Q  At the time you were at NSSF, was the other
co-vice chairman of the board Jeff Reh, R-e-h?

A  Mr. Reh. Or Reh, R-e-h. He was on NSSF's
board. I'm not sure what his title was.

I did not have a lot of direct contact

Page 90

with, you know, board meetings or anything like
that.

Q  And are you aware if Mr. Reh is affiliated
in any way with Beretta USA, Corp.?

A  I believe, you know, during the time I was
with NSSF, Mr. Reh was with Beretta.

Q  What does Beretta do?

A  They are a manufacturer of firearms.

Q  And at the time you were at NSSF, were you
aware that Josh Dorsey was on the board?

A  Yes.

When I was with NSSF, I believe Mr. Dorsey
was on NSSF's board.

Q  And are you aware that Mr. Dorsey at the
time was affiliated with GLOCK?

A  Yes. When I was NSSF, Mr. Dorsey was on
our board and, to my knowledge, he was working for
the company GLOCK at the time.

Q  And what does GLOCK do?

A  They are a firearm manufacturer.

Q  Sitting here today, do you recall any other
members of the NSSF board of directors at the time
you worked there?

A  I do.

Q  Were any of those individuals affiliated

Page 91

with firearms manufacturers?

A  You know, the one that just popped into my
head was a retail owner or worked at a retail shop,
but I don't want to use my memory to try to recall
who else was on the board.

If you had a list there, I might be able to
remember them, but I know the board was primarily
made up of larger organizations from firearms,
ammunition and accessory and I think publishing
companies.

Q  Would it be fair to say, based on your
recollection of the board's composition today, that
the NSSF board was controlled by firearms
manufacturers?

MR. LEE: Objection. Argumentative. Lacks
foundation. Calls for speculation.

THE WITNESS: I believe they had a mix of
representatives from firearms, ammunition, retail.

I think maybe -- shooting ranges and, at
one point, media. I'm not sure how their make-up is
today.

BY MR. MEYERHOFF:

Q  Would it be fair to say that, at NSSF, your
role is to support the member organizations in
generating revenue?

Page 92

A  My primary thought process was to, you
know, provide our members with as much quality
information as possible so they could make the best
business decisions.

MR. MEYERHOFF: I'm going to go ahead and
share my screen.

BY MR. MEYERHOFF:

Q  Can you see what's on my screen now,
Mr. Curcuruto? It appears to be a YouTube page and
below the video it says "NSSF research -
Jim Curcuruto 2016 Shot Show TV Studio"?

A  I do see it, yeah.

Q  And did a Shot Show convention take place
in 2016?

A  Yeah.

The Shot Show is -- the trade show is every
year, usually January, once a year.

Q  And what would the Shot Show TV studio be?

A  That was run by the NSSF media department
and they would do kind of on-site interviews of
people attending the show.

Q  And do you recall ever participating in the
TV studio?

A  I did, yes.

I did several interviews over the years.

Page 93

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 217 of 240
PageID: 7806
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 94

1    Q  I'm going to play this video and then ask
2  you a few questions about it or I'm going to play a
3  segment of the video.
4       "MS. KOPCZYK:  Welcome back to Shot Show
5       TV.  I'm your host, Rachel Kopczyk,
6       coming to you live from the Shot Show TV
7       studio, and I'm joined now by Jim
8       Curcuruto.  He is the director of
9       industry research for NSSF.
10      MR. CURCURUTO:  Thank you for having me.
11      MS. KOPCZYK:  It's great to have you
12      here and speak about this.  So your
13      research and analysis and sometimes our
14      eyes kind of glaze but you guys are
15      actually doing really important work.
16      MR. CURCURUTO:  Thank you.
17      MS. KOPCZYK:  And it's actually very
18      important for business success.
19      MR. CURCURUTO:  Right.
20      MS. KOPCZYK:  So what's your most
21      popular research elements that you have?
22      Publications?
23      MR. CURCURUTO:  We have a ton of
24      research every year.  And now some of
25      the big more popular ones are our

Page 95

1       industry reference guide.  We actually
2       call it our Bible.  It's 200 pages worth
3       of source material that will give you a
4       real good idea of what's happening in
5       the industry from the background check
6       data that the FBI puts out on a monthly
7       basis, to firearm production every year,
8       how many hunting licenses are sold
9       and -- and, of course, the all-important
10      economic data on the -- you know, the
11      size of the industry.
12      MS. KOPCZYK:  All right.  Give us a --
13      give us some stats.  Give us some info.
14      MR. CURCURUTO:  Sure.  Well, we've had a
15      good run here the last couple years as
16      the 60,000 goers here will tell you and
17      we finished the year strong.  The FBI
18      background checks; had a good November
19      and December and that is up 8.8% over
20      the year.  We were expecting about a 5%
21      increase, but that -- that strong finish
22      really helped push us over the edge."
23  BY MR. MEYERHOFF:
24   Q  That was you in the video that we just
25  played; correct?

Page 96

1    A  I believe, yes.
2       That suit I would not fit in anymore.
3    Q  And do you recall giving this interview?
4    A  I do.
5    Q  And this was at the 2016 Shot Show;
6  correct?
7    A  Correct.
8    Q  And you were representing NSSF at that
9  Shot Show; correct?
10   A  Yes.
11   Q  When you say in the video -- a moment ago
12  you said "we finished the year strong."
13      What did you mean by that?
14   A  It was -- you know, one of the indicators
15  that we rely on is firearm sales and participation;
16  so those two -- I believe 2016 was a good year for
17  both increasing participation and hunting in the
18  shooting sports and overall sales increases.
19   Q  How would you have measured increased
20  participation?
21   A  Each year, we conducted several studies on
22  participation.
23      We also reviewed data from sources like --
24  I'm speaking slow now.  I heard myself speaking
25  slow.  U.S. Fish and Wildlife Service had certified

Page 97

1  hunting license sales.
2       We had done a couple of studies on target
3  shooting participation.
4       We purchased data from other sources like
5  the National Sporting Goods Association.
6       They had an annual report on a bunch of
7  different activities, including hunting and
8  target-shooting participation; so we tried to
9  monitor, the best we could, how participation rates
10  were and used other sources to monitor, the best we
11  could, sales data as well.
12   Q  And then later in the video, you said we
13  "had a good November and December."
14      What did you mean by that?
15   A  Probably focusing on, from my
16  recollection -- and what I know -- the best -- one
17  of the best indicators we had or more current was
18  every month the FBI would release their unadjusted
19  background check data on firearm sales; so we would
20  look at that, and each month, we would keep a tally
21  and measure it versus, you know, year-over-year and
22  keep historical records of that.
23      And 2016 had a strong, I guess, holiday
24  season -- October, November, December end-of-year
25  season for the background check data.

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 218 of 240
PageID: 7807
Wiese, et al. vs. Bonta, et al.                                        Deposition of James Curcuruto

1  Q And when you say there was "a strong finish
2 really helped push us over the edge," is that
3 firearm sales as well?
4  A Oh, I don't really know what I was
5 referring to, "push us over the edge."
6  Most likely, what I was referring to was
7 the firearms sales because that, you know --
8 January, 2020 -- or 2016, we would have had just
9 received the December data; so we would have had the
10 full year and be able to say that 2016 was stronger
11 than 2015 in -- in looking at the background check
12 data.
13  Q When you were saying "we," did you mean
14 NSSF?
15  A I'm sure I -- "we" -- I -- I might have
16 spoken for NSSF as saying "we," yeah. Or -- or the
17 industry.
18  I think I had referenced the 60,000 people
19 there; so maybe I was all-encompassing.
20  Q I'm going to return to your declaration
21 now.
22  In paragraph 3 of your declaration, you
23 write that you directed:
24  "... the activities of an
25  internal research coordinator...."

Page 98

1  Do you see that?
2  A Yes.
3  Q Who was that internal research coordinator?
4  A That was Dianne Vrablic who we referenced
5 earlier.
6  Q And did Miss Vrablic ever assist you with
7 research on firearm magazines?
8  A Most likely, I handled the bulk of that and
9 then, you know, the -- the analysis or the data
10 collection on firearm magazines, and she would help
11 create the charts and promote that type of stuff,
12 but I think I did most of the data-crunching on
13 that.
14  Q Do you know if Miss Vrablic created the
15 Magazine Chart that was attached as an exhibit to
16 your declaration in this Wiese case?
17  A She may have created it in, you know, Excel
18 or PowerPoint but the data to create it was under my
19 responsibilities.
20  Q And to the best of your knowledge, is
21 Miss Vrablic still with NSSF?
22  A I believe she is.
23  It's been a while since we've spoken, but
24 the last time we spoke, within the last six months,
25 she was still there.

Page 99

1  Q And in your discussions with her, did you
2 discuss large-capacity magazines?
3  A We did not.
4  Q In paragraph 3, you also state that you
5 directed:
6  "... outside companies retained
7  to conduct research and gather market
8  and consumer information useful to
9  NSSF members."
10  Which outside companies did you retain to
11 do that?
12  A Well, we worked with several companies.
13 Southwick Associates, Responsive Management,
14 Sports Marketing Surveys, InfoManiacs were some of
15 the top organizations that we would contract to help
16 us conduct market research.
17  MR. MEYERHOFF: Miss Miller, can you just
18 read back his answer for me.
19  (The record was read.)
20  MR. MEYERHOFF: Thank you.
21 BY MR. MEYERHOFF:
22  Q Did Southwick Associates ever assist you
23 with research on firearm magazines?
24  A They did. I believe so, yes.
25  Not on this chart that's in -- that's in

Page 100

1 the exhibit on this, but --
2  Q How did they assist you?
3  A I believe we contracted them to do a quick
4 survey or a study on consumers' ownership of -- of
5 magazines.
6  They also ran an internal survey of
7 consumers, and they tracked a lot of different
8 purchases from people that purchased firearms,
9 ammunition, magazines.
10  I believe magazines may have been one of
11 the things they tracked, but I'm not sure at the
12 time if -- if that was one that we had, you know,
13 purchased from them or not.
14  Q Did you ever contract with Responsive --
15 did -- did Responsive Management ever assist you
16 with research on firearm magazines?
17  A Responsive Management we hired several
18 times to do participation studies and -- and several
19 other studies -- we would contract them a few times
20 a year.
21  I don't recall anything specific to
22 magazine ownership, but there may have been a
23 question in -- in some of the surveys that we had
24 contracted them out that had to do with magazine
25 ownership or purchasing or usage.

Page 101

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 219 of 240
PageID: 7808
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Q  What about Sports Marketing Surveys?

A  Sports Marketing Surveys -- I believe we contracted to do a study on the modern sporting rifle consumer, and in that study, there was questions on purchases of firearms and accessories and, I believe, some of the accessories were magazines; so I believe they were involved in that.

Q  And what about InfoManiacs?

A  We used them quite often on specific projects -- first-time gun buyers, women gun owners.

But I don't think we ever got too deep involved in specifics on any of their projects, but we had done so many things over 10, 11 years, I don't want to say we did not, but I don't believe we used InfoManiacs to do anything specific to magazine ownership.

Q  Can you describe what kind of -- can you describe what Southwick Associates does as a company?

A  They are a market research organization; so they -- their services -- they would get contracted out by folks or companies, like NSSF, to do specific market research products, for the most part, and they had internal data as well that you could purchase from them.

Page 102

Q  Would it be fair to say that you have a high opinion of Southwick Associates?

A  Yeah.

We -- we wouldn't work with companies that we didn't have a good opinion on; so all -- all four of those companies I mentioned, I had a high opinion on.

Certainly would not have hired them if I didn't.

MR. MEYERHOFF:  I'm going to pull up what I want to mark as Exhibit 5.

(The document referred to was marked as Deposition Exhibit 5 by the Reporter.)

BY MR. MEYERHOFF:

Q  It's just a two-page document.  I'll give you a moment to review it.  You can tell me when to scroll down.

A  2011?

You can scroll down.  Hmm.

Scroll up a little bit, please.

Q  Up or down?  I'm sorry.

A  Oh, down.  Yeah.  Okay.  That's good.

All right.  Let's see what Rob said here.

Helping --

Report.  Yeah.  They did a lot.

Page 103

Q  Have you ever seen this press release before, Mr. Curcuruto?

A  I recall giving them the award and I know that we had some media ad on it.

This looks like it came directly from Southwick.

I normally just tracked NSSF releases on it; so I'm aware of the award, but I may not have seen this particular release 12 years ago.

Q  And you're quoted as saying:

"'The awards are well deserved. NSSF's research would not be where it is today without them.'"

Do you recall saying that?

A  Yes.

Q  And is that statement true?

A  It is.

Q  Why did you not hire Southwick Associates to create the Magazine Chart attached to your declaration as Exhibit 1?

A  That was something that, you know, I could do internally; so there were certain things that we, you know -- with two people on staff, we could only do a certain amount internally; so we would hire those organizations to do -- help us with other

Page 104

things.

When we could do things in-house, we did them in-house and the Magazine Chart is one we did in-house.

Q  To be clear, you testified earlier that Southwick tracked the purchases of accessories including magazines; correct?

A  Again, I believe I said -- I was pretty sure they tracked magazines, but I wasn't sure, but they tracked a lot of consumer purchases in the firearms industry.  Not -- not sure if magazines was part of them, but I think they were.

Q  Did -- at the time you were there, did NSSF track magazine purchases?

A  Not internally.  We would use outside sources for, like -- if Southwick had that data, we would use them or contract them to see if we could learn a little bit more about a particular product.

Q  I'm going to go back to your declaration.

In paragraph 4 you state that the purpose of the research you conducted at NSSF was for NSSF members "use in their business decisions"; correct?

A  For use in their business decisions, yes.

Q  How would the members use the data you provided to them in their business decisions?

Page 105

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 220 of 240
PageID: 7809
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

**Page 106**

1  MR. LEE: Objection. Lacks foundation.
2  THE WITNESS: Well, so overall, you know,
3  when I first started in 2009, there wasn't a lot of
4  data for -- for the outdoor industry for hunting and
5  target shooting; so we tried to, you know, figure
6  out what holes needed to be filled and, you know,
7  participation data was a big one; so if we could
8  have trend data that showed our members, "Well,
9  hunting is increasing" or "target shooting is
10  increasing" or "hunting is decreasing," those are
11  the types of things we felt would help them make
12  better business decisions.
13  You know, if sales of firearms were going
14  up or sales of firearms were going down, we wanted
15  to try to provide that information as quickly and
16  accurately as we could to our members, thinking that
17  they would be able to use that data to make better
18  decisions, you know, contracted out some of those
19  companies we talked about.
20  We would get the consumer opinions and, you
21  know, the more you know about your consumer, we felt
22  our customers could then -- or NSSF members could
23  make better decisions when they understood their
24  customers a little bit more.
25  ///

**Page 107**

1  BY MR. MEYERHOFF:
2  Q  Do you know if NSSF members used the
3  Magazine Chart in their decisions?
4  A  I do not know specifically or don't recall.
5  I do remember thinking that people should
6  use our data. Our members should use our data more
7  than they did because I would get questions from
8  some members, "Hey. Do we have any information on
9  this?" and something that we had done previously,
10  like, "Yes. We have it. We haven't used it
11  before," but that -- just personally, I thought
12  that, you know, we should have our research being
13  used more than it was.
14  But going back to your original question
15  there, I'm not -- I would hope that the research we
16  provided them on magazines was used by some of our
17  members, but I don't recall specifically any of them
18  stating that their -- their use of it.
19  Q  How would an NSSF member use the
20  Magazine Chart in their business decisions?
21  MR. LEE: Objection. Lacks foundation.
22  Calls for speculation.
23  You can answer.
24  THE WITNESS: The way I tried to look at it
25  is what would I like to know? And I would want to

**Page 108**

1  know as much as possible if I was, you know --
2  whether somebody that was writing articles on, you
3  know, the outdoor industry or somebody owned a
4  shooting range or somebody that owned a retail shop,
5  to better understand, you know, what kind of
6  products I should carry.
7  And if they can see in the trends are one
8  way for a certain product, whether that's magazines,
9  and maybe they would know better what to carry in
10  their stores.
11  If they see that, you know, magazines under
12  10 rounds were more popular than magazines over
13  10 rounds, you know, they would -- they would make
14  decisions like that.
15  I never made those decisions because I
16  wasn't working at those companies, but I tried to
17  think like them and provide them with as much
18  information as I could.
19  BY MR. MEYERHOFF:
20  Q  The Magazine Chart was submitted as an
21  exhibit to your declaration. Is that -- would it be
22  fair to say that?
23  A  Correct.
24  Q  And would it be fair to say that your
25  declaration was submitted in this case as part of an

**Page 109**

1  effort to invalidate California's restrictions on
2  magazines capable of holding more than 10 rounds?
3  Would it be fair to say that?
4  A  I think, you know, the primary reason that
5  I conducted research for NSSF was, you know, for our
6  members and then when lawsuits started to happen and
7  people realized do we have any information on
8  magazines or -- or modern sporting rifles, then
9  that's when they, you know, became used for -- as
10  exhibits for these cases to, you know, show the
11  other side or -- or try to prove whatever NSSF's
12  were -- or the plaintiffs were trying to prove.
13  Q  Is it your testimony, sitting here today,
14  that the Magazine Chart was created prior to any
15  litigation regarding large-capacity magazines?
16  A  I'm not sure. When you say "any
17  litigation," I really don't know when it started but
18  I know the purpose of all the research that NSSF or
19  at least under -- when I was there, the primary
20  reason was not for legislation issues or lawsuits
21  but to provide our members with information so they
22  could just make their best business decision.
23  Q  I want to focus specifically on the
24  Magazine Chart.
25  A  Okay.

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 221 of 240
PageID: 7810
Wiese, et al. vs. Bonta, et al.                              Deposition of James Curcuruto

1  Q  So sitting here today, what is your best
2  recollection of why the one-page Magazine Chart
3  attached to your declaration was created?
4  A  Probably -- again, going off my memory of
5  what I think at the time, we had done a couple of
6  studies on the modern sporting rifle consumer and I
7  want to say maybe we had done them in 2013, but
8  maybe the first one, and in that -- whenever you do
9  one bit of research, there is always, you know,
10 questions about "Hey.  Did you learn anything about
11 X, Y, or Z?" and then my assumption was somebody --
12 one of our members said "Hey.  Do you have any more
13 information on magazines that," you know, "go into
14 the firearms?"
15     So that's -- that would have been why we
16 created it in the first place.
17     Q  Do you recall any specific member asking
18 you to create this chart?
19     A  I do not.
20     We had created so many things for so many
21 reasons that, unfortunately, I don't know the exact
22 reason why we created all this stuff again.
23     Q  Do you have -- to the best of your
24 knowledge, has this chart been disseminated to
25 members of NSSF?

Page 110

1  A  Yeah.
2     I believe -- you know, when you played that
3  video and I referenced our industry reference guide
4  which was 200 pages, that was kind of our catch-all.
5     We would put as much stuff as we could into
6  that one document -- you know, the background check
7  data, the participation data, economic impact of
8  hunting and target shooting, and then we would have
9  put things like this Magazine Chart in there.
10    You mentioned silencers earlier.  We
11 tracked 4 and 4 -- I think they were 4 and 4's --
12 for, you know, the amount of suppressors.
13    We had a lot of things that we tracked so
14 that we, again, just tried to provide as much
15 information to our members as possible.
16    Q  So is it fair to say you may -- NSSF may
17 have included this chart in some kind of year-end
18 report to -- to members?
19    A  Correct.
20    I would assume -- it wasn't given to them.
21 It was a product that was sold and it was kind of
22 behind a firewall.
23    We would put out dozens of pieces of
24 information a year from full reports from those
25 outside agencies, like the Southwick Associates, and

Page 111

1  we would pay them to do those reports.
2     So sometimes we would charge our members
3  for certain reports.
4     And then, again, I mentioned there were
5  different levels of membership; so some -- the
6  highest levels of membership got a lot of free
7  research, and different levels had to pay different
8  amounts for some of the research we provided.
9     Q  Do you know when -- do you know when the
10 Magazine Chart was first included in NSSF's year-end
11 report?
12    A  I would -- if it was included, it probably
13 would have been around 2016 or 2017.
14    We tried to update that report as much as
15 possible on an annual basis, but there were years we
16 skipped it just because, you know, two people,
17 200-page report, there was a lot in there and we
18 couldn't -- just couldn't manage everything to
19 update every single page.
20    A lot of times we would just update what we
21 had available to us.
22    So earliest it would have been in there
23 would have been 2017, if it was in there.
24    Q  But sitting here today, you can't be
25 positive of whether or not it was in there?

Page 112

1  A  I cannot.
2     Q  And NSSF distributed this year-end report
3  prior to 2016; correct?
4     A  Yeah.
5     We -- I guess we called it the industry
6  reference guide and we tried to update it every --
7  at the end of every year; so I guess you could call
8  it a year-end report.
9     But, yeah, it was on an annual basis as
10 best as we could.
11    Q  And do you have any understanding of why,
12 prior to 2016, this Magazine Chart, or a version of
13 it, was not included in that industry reference
14 guide year-end report?
15    A  Just from my recollection, you know, doing
16 that modern sporting rifle consumer study, if that
17 was in '13 and people had questions and -- we might
18 have just done it for the first time in '15.
19    I'm not sure.  I don't recall, you know,
20 the first time I ever created that chart, but it was
21 probably in the vicinity of 2015.
22    Q  To be clear, are you aware of any other use
23 of this Magazine Chart outside of litigation
24 involving large-capacity magazines?
25    A  Well, I'm not aware, but I would hope its

Page 113

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 222 of 240
PageID: 7811
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 114

1  intended purpose of helping some of our 10- or
2  12,000 members at the time -- hopefully some of them
3  used it.
4      Q  Going to paragraph 4, the last sentence
5  says:
6          "Research conducted by the NSSF
7      and under my direction demonstrates
8      that detachable ammunition magazines
9      are very popular and are commonly
10     owned by millions of persons in the
11     United States for a variety of lawful
12     purposes, including, but not limited
13     to, recreational and competitive
14     target shooting, home defense,
15     collecting and hunting."
16     Do you see that?
17     A  Yes.
18     Q  Do you have a breakdown of the number of
19 persons in the United States who -- who commonly own
20 large -- who commonly own detachable ammunition
21 magazines for each of those purposes?
22     A  I do not.
23     MR. MEYERHOFF:  I'm going to pull up what
24 I'll mark as Exhibit 6.
25 ///

Page 115

1          (The document referred to was marked as
2      Deposition Exhibit 6 by the Reporter.)
3      MR. MEYERHOFF:  And I'm going to screen
4  share it.
5  BY MR. MEYERHOFF:
6      Q  Do you see the document that we marked as
7  Exhibit 6?  At the very top it says
8  "James Curcuruto, January 11, 2018."
9      Do you see that?
10     A  I do.
11     Q  Do you recall giving a deposition in
12 White Plains, New York, on January 11, 2018?
13     A  I'm sure I did, but I don't recall for some
14 reason.  White Plains which isn't too far from where
15 I was.  I'm trying to think of where that was.
16     I'm sure I did.  I just don't recall being
17 in White Plains in January of 2018.
18     Q  I'm going to scroll down to what in the
19 document itself is page 117.
20     And I'll start at line -- could you read
21 from line 8 to line 25 of that page.
22     A  Is there any way you could make it a little
23 bigger?  Get rid of that stuff on the left.  My
24 eyes -- ah.  Much better.
25     Where am I starting?

Page 116

1      Q  Line 8, where it says:
2          "Q  Have you conducted any
3      study...."
4      A  Okay.
5      Q  Through the end of the page, please.
6      A  All right.  Wait one second here.  I'm
7  losing track of it.
8      Okay.
9      Q  So is it fair to say in paragraph 4, when
10 you talk about common ownership for "lawful
11 purposes," that's an extrapolation from the total
12 number of magazines in your Magazine Chart?
13 Correct?
14     A  You know, obviously, you're not using a
15 magazine by itself.  You're using it within the
16 firearm, and I know we had some discussion on, you
17 know -- there's -- we had done a study on consumers
18 on modern sporting rifles which told us, I think,
19 within that study that they used magazines with the
20 firearm; so I don't want to say that it was only
21 from that Magazine Chart that we were saying they
22 were popular, the magazines that can hold 11 more
23 rounds, but there was, you know -- pretty clear-cut
24 that there are millions of them owned out there and
25 being used for a lot of legal, lawful purposes or

Page 117

1  several legal, lawful purposes.
2      MR. LEE:  Counsel, may I ask you to
3  represent whether that Exhibit 006 -- I'm sorry --
4  may I ask you to represent whether defense Exhibit 6
5  constitutes the entire transcript of the deposition?
6      MR. MEYERHOFF:  Yeah.  Looks like it.
7      MR. LEE:  In other words, it wasn't
8  excerpted?
9      MR. MEYERHOFF:  Yeah.  It's the whole
10 thing.
11 BY MR. MEYERHOFF:
12     Q  So, I mean, is it fair to say that your
13 conclusion that millions of Americans use detachable
14 ammunition magazines for a variety of lawful
15 purposes is based on the fact that -- never mind.
16 I'll -- I'll strike that.
17     In paragraph 6, you state that you are:
18         "... not aware of any singular
19     public source providing reliable
20     figures identifying exactly how many
21     ammunition magazines are manufactured
22     or imported for sale within the
23     United States each year."
24     Is that -- is that true?
25     A  Yeah.

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 223 of 240
PageID: 7812
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1    MR. LEE: Sorry. Are you asking the
2 witness whether that was true then or true now?
3 BY MR. MEYERHOFF:
4    Q  Was that true at the time that you made the
5 statement?
6    A  Yes.
7    Q  And since that time, have you become aware
8 of any singular public source providing such
9 reliable figures?
10    A  I have not.
11    Q  Are there any singular public sources
12 providing unreliable figures?
13    A  No. Not that I'm aware of.
14    Q  Are there any private public sources that
15 would provide those reliable figures?
16    A  Not that I'm aware of then or now.
17    That's why I created the Magazine Chart and
18 did some of the studies on usage, just to get that
19 information since we didn't have a reliable source
20 for it.
21    Q  I believe you testified earlier that
22 Southwick Associates tracked the sale of accessories
23 and including, to the best of your knowledge,
24 magazines.
25    A  I believe they -- I believe they did.

Page 118

1 Southwick Associates to gather this information
2 because of cost?
3    A  No.
4    I -- I like to do things like this when I
5 have -- I'm familiar with the data sources
6 available, and I have the means and the time to do
7 it.
8    I just kind of like to dig in and figure
9 out things like this; so just at the time I must
10 have had the time and the -- the sources -- enough
11 sources where I felt I could create something
12 reliable.
13    Q  And I don't want to misstate your
14 testimony, but to -- correct me if I'm wrong -- but
15 I believe what you testified previously was that you
16 synthesized the information contained in the
17 Magazine Chart and then Mrs. Vrablic
18 [pronunciation] --
19    A  Vrablic.
20    Q  -- Vrablic created the actual document
21 itself; is that right?
22    A  I'm not sure. I think I stated I wasn't
23 sure if she created the document or I did or we both
24 did.
25    I mean at the time, you know, I was the

Page 120

1 Perhaps not at the time when we were collecting all
2 of this. You know, Southwick Associates had the
3 ability to add, you know, products that they were
4 tracking at the request of their clients. It made
5 sense for them because if they had the information
6 and somebody wanted it, they could then sell it.
7    So I would assume that Southwick Associates
8 added products and categories to their consumer
9 questionnaire as they were going so they could, you
10 know, reach whatever demand they were wanting.
11    And I don't recall, unfortunately, if they
12 did track it. It would have made my life easier if
13 I had a reliable source for it so I wouldn't have to
14 create it myself.
15    I assume they did not have it; therefore, I
16 had to create one myself.
17    Q  Are you aware of any obstacle they would
18 have faced if NSSF had paid them to gather that
19 information?
20    MR. LEE: Objection. Lacks foundation.
21 Calls for speculation.
22    THE WITNESS: No. I'm not aware of any
23 obstacle.
24 BY MR. MEYERHOFF:
25    Q  Was the reason NSSF did not ask

Page 119

1 primary one that conducted how to come up with the
2 Magazine Chart and get all the data and look at the
3 sources and come up with the reliable estimates and
4 then I would have supplied that either to her to
5 make a chart or myself to make the chart, but one of
6 the two of us would have made the -- the chart that
7 you see that you have here as an exhibit.
8    Q  Who else, if anyone, helped you develop
9 this chart?
10    A  Well, I did -- I was responsible for the
11 bulk of the concept in creating it and digging
12 through all the sources that we had and then when I
13 came up with what I thought was a good plan and had
14 to do it or came up with a number, one of my go-to
15 sources to check with things was the president of
16 NSSF, Steve Sanetti. He has, you know, a wealth of
17 knowledge on the industry; one of the smartest or
18 most well-informed folks I've known in my 14 years
19 in the industry.
20    So I might have created the initial chart
21 but before releasing it to anybody, I wanted to run
22 it by him and give him my methodology and
23 corroborate and see if it needed any tweaks, but he
24 was somebody I relied on to help with it.
25    Q  Did you rely on anyone else to help with

Page 121

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 224 of 240
PageID: 7813
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  it?
2      A   No.
3          You know, nobody that I can remember having
4  detailed conversations, but, you know, I'm -- you
5  know, part of my process was to double-check and
6  triple-check and have, you know, reliance on people
7  that I -- I don't recall if I had done so with this
8  Magazine Chart, but it's -- there is a possibility I
9  might have ran it by a few others, say "Hey. Here's
10 what I did. Here's how I do it. Here's what I got.
11 What do you think?"
12         But not as in depth as with Mr. Sanetti.
13     Q   And what was Mr. Sanetti's role at NSSF?
14     A   He was the president of NSSF when I was
15 there.
16     Q   Is he still the president, to the best of
17 your knowledge?
18     A   I believe he retired four years ago.
19 Three, four years ago.
20         THE REPORTER:  Do you have the spelling on
21 his name, please?
22         THE WITNESS:  S-a-n-e-t-t-i.
23         THE REPORTER:  Thank you.
24         THE WITNESS:  You're welcome.
25 ///
                                                    Page 122

1          "... the Chart further shows
2      magazines capable of holding more
3      than 10 rounds of ammunition
4      accounted for approximately
5      115 million or approximately half of
6      all magazines owned"?
7      Do you see that?
8      A   I do.
9      Q   And then in paragraph 9, you mention the
10 sources of information you used to reach that
11 conclusion; correct?
12         (The record was read.)
13         THE WITNESS:  Yes.  That is correct.
14 BY MR. MEYERHOFF:
15     Q   And the three sources of information you
16 used for this data are, 1, the ATF's AMFER report;
17 2, documents from the International Trade
18 Commission; and, 3, the opinions of firearm industry
19 professionals.  Correct?
20     A   Not documents from the ITC, but they had
21 a -- a data web that was -- so you could query the
22 system; so they weren't documents.  They were a
23 query system.
24     Q   Okay.  So the three sources of information
25 you relied on were the ATF AFMER report, information
                                                    Page 124

1  BY MR. MEYERHOFF:
2      Q   Did Mr. Sanetti ever express his opinion to
3  you, if any, on laws restricting large-capacity
4  magazines?
5      A   I don't recall any discussions, but it's
6  possible that we did have some.
7      Q   Sitting here today, are you aware of
8  Mr. Sanetti's position, if any, on restrictions on
9  large-capacity magazines?
10     A   I cannot speak for him, unfortunately.  I'm
11 not a mind reader, but -- and I know he was -- owned
12 firearms and, worked for fire- -- in the industry
13 for a long time, but I don't want to guess at what
14 his positions are.
15     Q   In paragraph 8, you state that:
16         "The NSSF Magazine Chart
17     estimates that 230 million pistol and
18     rifle magazines were in the
19     possession of United States consumers
20     between 1990 and 2015."
21         Was that statement accurate, to the best of
22 your knowledge, when you made it in 2017?
23     A   It was.
24     Q   And then you also -- do you see where it
25 says in 8:
                                                    Page 123

1  from the U.S. ITC, and opinions of firearm industry
2  professionals; correct?
3      A   Correct.
4      Q   And in paragraph 10, you state:
5          "The ATF AFMER" report "data
6      provide historical figures for
7      pistols by caliber (i.e., the
8      specific ammunition cartridge for
9      which a firearm is chambered) and
10     rifles produced in the United States
11     for consumer purchase."
12         Do you see that?
13     A   Yes.
14     Q   So is it fair to say that AFMER data
15 includes the number of firearms by category that are
16 manufactured in a given year?
17     A   They do provide different categories.
18         U.S. manufacturers are required to report
19 their production to the ATF, and I believe the
20 categories are pistols, revolvers, shotguns, rifles,
21 miscellaneous.  I think those are the primary
22 categories within the AFMER reports.
23     Q   And the AFMER report deals specifically
24 with manufacture; correct?
25     A   U.S. manufacture; correct.
                                                    Page 125

Wiese, et al. vs. Bonta, et al.                          Deposition of James Curcuruto

1    Q   And so it doesn't tell you how many
2   firearms were actually purchased in a given year;
3   correct?
4    A   Correct.
5    Q   And it doesn't tell you how many firearms
6   were actually purchased by private individuals, does
7   it?
8    A   It does not.
9    Q   So firearms that are manufactured in a
10  given year and cataloged in AFMER could come into
11  the possession of law enforcement agencies; correct?
12   A   I believe the AFMER report does not
13  include, like, military, but it would include some
14  law enforcement, but I'm a little -- I don't recall
15  if there was a threshold now, if they included all
16  firearms that could be purchased by law
17  enforcement -- certainly by an individual law
18  enforcement person -- but I'm not sure if it
19  included firearms produced for law enforcement
20  offices.
21   Q   So is it fair to say that firearms
22  manufactured in a given year and cataloged in AFMER
23  could come into the possession of some law
24  enforcement agencies; correct?
25   A   I believe so, yes.

                                              Page 126

1    Q   And firearms that are manufactured in a
2   given year and cataloged in AFMER could come into
3   the possession of private security organizations;
4   correct?
5    A   Yes.
6    Q   And firearms that are manufactured in a
7   given year and cataloged in AFMER could come into
8   the possession of firearms wholesalers; correct?
9    A   Correct.
10   Q   And firearms that are manufactured in a
11  given year and cataloged into AFMER could come into
12  the possession of firearms retailers; correct?
13   A   Correct.
14   Q   AFMER data does not track how many firearms
15  are -- are illegally trafficked from the
16  United States into other countries, does it?
17   A   I'm sorry.  Can you repeat that one?  I
18  want to make sure --
19   Q   AFMER data does not track how many
20  firearms, if any, are illegally trafficked from the
21  United States to another country; correct?
22   A   Correct.
23   Q   AFMER data does not track numbers of
24  magazines at all; correct?
25   A   Correct.

                                              Page 127

1    Q   The ITC data that you relied on -- it
2   doesn't tell you how many firearms were actually
3   purchased by private citizens in a given year;
4   correct?
5    A   Correct.
6    Q   And it doesn't tell you how many firearms,
7   if any, were imported in a given year, cataloged by
8   ITC and then came into the possession of some law
9   enforcement agencies; correct?
10   A   Correct.
11   Q   And firearms that are imported in a given
12  year and cataloged by ITC could come into the
13  possession of private security organizations;
14  correct?
15   A   Correct.
16   Q   Firearms that were imported in a given year
17  and cataloged by the ITC could come into the
18  possession of firearm wholesalers; correct?
19   A   Correct.
20   Q   Firearms that are imported in a given year
21  and cataloged by ITC could come into the possession
22  of firearms retailers; correct?
23   A   Correct.
24   Q   And the ITC does not track how many
25  firearms, if any, are illegally trafficked from the

                                              Page 128

1   United States into another country; correct?
2    A   To the best of my knowledge, they do not.
3    Q   Does AFMER data track firearm attrition
4   rates, meaning the rate of firearms that cease to be
5   functional due to loss, destruction, or
6   deterioration?
7    A   It does not.
8    Q   Does ITC data track that?
9    A   It does not.
10   Q   And ITC doesn't track magazines, does it?
11   A   I don't believe so.  They have hundreds and
12  hundreds of codes and, you know, for the purpose of
13  this one, we were just looking at the firearms
14  imported minus exported, and, you know, I don't
15  recall that they -- the ITC tracks magazines or, at
16  least at the time, we didn't identify a code that
17  did.
18   Q   Are you aware of anyone in the firearms
19  industry who tracks how many people actually own
20  LCMs?
21   A   Just to confirm, LCM, large capacity
22  magazine, referring to 11-plus?
23       No.  I'm not aware of anybody.  That
24  doesn't mean that somebody doesn't.
25   Q   So in paragraph 11, you state:

                                              Page 129

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 226 of 240
PageID: 7815
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  "The ATF AFMER and ITC data
2  provided estimates of approximately
3  67.7 million pistols and 42.6 million
4  rifles capable of holding a magazine
5  were available to United States
6  consumers between 1990 and 2015."
7  Do you see that?
8  A  Correct.  Yeah.
9  Q  What do you mean when you say "were
10 available to United States consumers"?
11 A  That are available for purchase.
12 Q  These numbers of 67.7 million pistols and
13 42.6 million rifles -- does that account for
14 firearms that may have been purchased by law
15 enforcement agencies?
16 A  It may -- does it account for them?  Are
17 they included in it?  Or could they be included?
18   If you could rephrase that.
19 Q  Sure.
20   So the number of "approximately
21 67.7 million pistols and 42.6 million rifles capable
22 of holding a magazine were available to
23 United States consumers between 1990 and 2015" -- do
24 you think it's likely that some of the firearms
25 imported into the United States were purchased by

Page 130

1  law enforcement agencies?
2  A  I believe it's possible.  I'm not sure
3  likely, but possible, yeah.
4  Q  And do these figures for pistols and rifles
5  account for any magazine -- excuse me -- any
6  firearms that were purchased by law enforcement
7  agencies and thus would not be available to
8  United States consumers?
9  A  I guess I just want to confirm.  Like, you
10 know, an off-duty law enforcement that purchased a
11 firearm, that's a consumer.
12   But other than that, you know, there is a
13 possibility that -- you know, that that service
14 weapon is only used, you know, by that law
15 enforcement professional for work purposes, I
16 suppose.
17 Q  Let me ask the question a different way.
18   So previously when I asked you about the
19 AFMER data and ITC data, I asked you about firearms
20 that could have come into the possession of some law
21 enforcement agencies, private security
22 organizations, firearm wholesalers, firearm
23 retailers, and firearms that were illegally
24 trafficked from the United States.
25   Do you recall me asking those questions?

Page 131

1  A  I do.
2  Q  And so the figures in paragraph 11, the
3  67.7 million pistols and 42.6 million rifles, do
4  those numbers account for any of those
5  possibilities?
6  A  Well, these numbers, you know, came from
7  the AFMER and ITC; so they could have had law
8  enforcement purchase some of these firearms.
9    Obviously the wholesalers and the retailers
10 would.
11 Q  To be clear, the 67.7 million pistols and
12 the 42.6 million rifles is -- the data you
13 obtained -- is the data you obtained based on your
14 analysis of the AFMER and ITC data; correct?
15 A  Right.
16   For the -- yeah.  Adding up the U.S.
17 production from ATF AFMER and International Trade
18 Commission data, that's how we came up with the 67
19 million pistols and the 42 million rifles capable of
20 holding a magazine available to the U.S. consumer
21 market between those -- 1990 and 2015, yeah.
22 Q  And you didn't make any adjustments to
23 that?
24 A  No.
25   Those were the hard numbers coming from the

Page 132

1  AFMER and the ITC on the firearm production and
2  imports.
3  Q  Thank you.
4    And then in the second sentence of
5  paragraph 11, you write:
6    "Firearm industry professionals
7    with knowledge of the pistol and
8    rifle magazine market then allocated
9    magazines to the totals to complete
10   the data provided in the NSSF
11   Magazine Chart."
12   Who were the firearm industry professionals
13 you're mentioning there?
14 A  Myself and Steve Sanetti were the two that
15 I can recall.
16   There may or may not have been some others
17 that I asked to take a quick look at the data.
18   Again, we're not going to put out anything
19 to our members that we don't think is going to be as
20 accurate as possible.
21   And as referenced earlier, without a direct
22 source for this, we had to merge the ATF and the ITC
23 data and then discuss, you know -- apply how many
24 magazines for pistols and how many for firearms that
25 we think would be the best estimate to create the

Page 133

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 227 of 240
PageID: 7816
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1 Magazine Chart.
2    Q  I'm sorry.  Just to clarify.
3       Why do you believe that
4 Southwick Associates did not have that accurate
5 source?
6    A  They were just not somebody that I needed
7 to use at the time.  I felt confident that using the
8 ATF data and the ITC data -- we could get some hard
9 numbers and, you know, applying a percentage between
10 Steve and myself, and if any others were involved, I
11 felt we didn't need to go outside and -- and hire
12 anybody to do it.  It was one of the things we could
13 do inside.
14    Q  At the time you consulted with Mr. Sanetti,
15 he was your boss; correct?
16    A  He was the president.  I didn't directly
17 report to him.  I was a couple levels below him, but
18 he was very open and willing to assist, you know,
19 any time I needed help.
20    Q  What, if anything, do you recall
21 Mr. Sanetti saying about the Magazine Chart you
22 created?
23    A  You know, he was -- you know, I told him
24 the purpose was, you know, to get us outdoor members
25 and make sure they had a reliable source, and I

Page 134

1 but I don't know if they manufactured them
2 themselves or if -- if they purchased them from an
3 outside manufacturer to include with the sale of
4 their firearms.
5    Q  I'm going to draw your attention to
6 Exhibit A of your declaration.
7       Is this the Magazine Chart that you created
8 with Mr. Sanetti's input?
9    A  It is.
10    Q  Did you list Mr. Sanetti anywhere on this
11 Magazine Chart?
12    A  I did not.  I always like to try to put a
13 source line and it looks like the source line says
14 "ATF AFMER, International Trade Commission figures
15 combined with NSSF and fire industry estimates."
16       So he would be part of that last portion of
17 it but not specifically naming him, no.
18    Q  Do you recall why you didn't specifically
19 name him?
20    A  I just -- I don't know if people would have
21 known who -- who he was if I put him on there.
22       I never put an individual person as a
23 source.  I would always use that kind of tag line.
24       If it was Southwick Associates or whoever
25 helped me conduct the study, I always liked to put

Page 136

1 didn't want to put anything out that, you know, I
2 didn't think was inaccurate or he didn't think was
3 inaccurate; so he was fine with the conclusions that
4 we came up with.
5       Again, the last thing we want to do is give
6 incorrect data to the people that are paying us to
7 be our members, and if they make the wrong decision
8 based on that data, they wouldn't be happy with us,
9 you know.
10    Q  Did Mr. Sanetti tell you what specific
11 sources of data he relied on in allocating magazines
12 for the Magazine Chart?
13    A  I think it was just his personal knowledge.
14       He had worked for one of the larger
15 manufacturers.  I think he was the president of
16 Sturm, Ruger, which is a large firearm manufacturer,
17 for many years and just had a very good knowledge of
18 firearms and components and parts that go in and
19 around the firearm, including magazines.
20       Someone I had a high trust in.
21    Q  Do you know if Sturm, Ruger produces large
22 capacity magazines?
23    A  Again, similar to Smith & Wesson, you know,
24 they produce firearms that would be capable of
25 holding all different types of detachable magazines,

Page 135

1 some sort of information on there, but I don't think
2 I've ever put an individual's name specifically on a
3 source.
4    Q  But would it be fair to say, when on the
5 sources you list firearm industry estimates, you
6 really mean Mr. Sanetti's estimates, don't you?
7    A  Myself, his, and, like I said, it's very
8 possible I had to ask others but just not in the
9 capacity that I had asked Mr. Sanetti.
10    Q  So to be clear on the process, you
11 essentially told Mr. Sanetti "There is X number of
12 pistols out there.  How many do you think come with
13 a magazine holding more than 10 rounds?"
14       Is that a fair assessment?
15    A  Yeah.
16       The conversation I recall "Here is what I
17 had done so far.  Used the AFMER and the ITC data.
18 Here's the numbers I came up with for the amount of
19 pistols that will hold the magazine."  Doesn't
20 matter what, you know quantity, and "Here is the
21 number of rifles."
22       And then we -- we tried to break that down.
23       The AFMER does give some information on
24 caliber and -- and obviously, you know, long guns,
25 we -- we didn't include shotguns or lever-action

Page 137

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 228 of 240
PageID: 7817
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 138

1  guns or pump-action guns.
2      You know, we just counted the guns that
3  could hold the magazine and then Mr. Sanetti and I
4  went out and figured out, "Okay. How many of
5  those," you know, "magazines that are in that type
6  of firearm would be under 10," you know, "10 or
7  over," and then for the -- there's only really the
8  two categories for pistols.
9      For the rifles, we decided to do 10 and
10 under, 11 to 29, and then that 30-plus.
11     You know, I'm just recalling, you know,
12 when I would put stuff out, sometimes I would get
13 called on it and somebody would say "That doesn't
14 look right," but when we put this out, I don't
15 recall anybody ever saying to take another look at
16 it.
17     So, you know, including those industry
18 estimates are -- whoever had seen that -- right? --
19 they would have said "Give me a call. That doesn't
20 look right, Jim. How the heck did you come up with
21 that number?"
22     If that had ever happened, I would have
23 went back and revised it with their input, but we
24 did not receive any such feedback on this one.
25     So pretty confident that this was a good

Page 139

1  estimate that our members could use to make a decent
2  business decision.
3  Q  Would it be fair to say that the expertise
4  employed in creating this chart was really with the
5  allocation of magazines to a particular firearm?
6  Correct?
7  A  I would like to think that not too many
8  people could do what I've done with the ATF and the
9  ITC data unless it would have been done and saved me
10 all the trouble; so I think that's my expertise.
11     And then being able to, you know, know the
12 right people to run it by and, you know, takes a
13 certain amount of expertise.
14     And certainly Mr. Sanetti's -- I considered
15 him very knowledgeable about that, but it wasn't --
16 wasn't easy to do any -- any of the three parts of
17 it or -- you know, from start to finish, it was
18 something that was a challenge and I -- I like
19 digging into those type of things and looking at
20 numbers probably more than I should.
21 Q  Would it be fair to say that the
22 allocations of magazines to the firearms identified
23 in the AFMER and ITC reports was based on
24 Mr. Sanetti's expertise?
25 A  Yeah.

Page 140

1      A combination of his and mine. We were on
2  the same page, from what I recall.
3      Like, I wasn't thinking it's, you know, two
4  per firearm and he was thinking 10 per firearm. I
5  think we were on the same page, ballpark, when we
6  did discuss this.
7  Q  But would it ultimately be fair to say that
8  you deferred to Mr. Sanetti in allocating the number
9  of magazines for the firearms reflected in the AFMER
10 and ITC data?
11 A  I don't recall deferring because, like I
12 said, we were on the same page.
13     Now, if we were way off, I would have taken
14 his opinion over mine, but on this one, I think we
15 were in pretty good agreement.
16     MR. MEYERHOFF: I want to mark --
17     THE WITNESS: Maybe after this line of
18 questioning, we can take a break. I just need to
19 hit the restroom. Are we near the end?
20     MR. MEYERHOFF: We're just a couple minutes
21 away if that's --
22     THE WITNESS: Okay. Keep going if that's
23 okay with everybody else.
24     MR. MEYERHOFF: So I want to go ahead
25 and -- let's see -- mark as Exhibit 7 the following

Page 141

1  document.
2      (The document referred to was marked as
3      Deposition Exhibit 7 by the Reporter.)
4  BY MR. MEYERHOFF:
5  Q  Can you see this document on your screen?
6  It's entitled "Transcript of James Curcuruto," Date:
7  January 24, 2014. Case Kolbe, et al., versus
8  O'Malley, et al."
9      Do you see that?
10 A  I do.
11 Q  Do you recall giving a deposition in this
12 case?
13 A  I do, yes.
14 Q  Okay. I'm going to scroll down.
15     MR. MEYERHOFF: And I will represent to
16 plaintiffs' counsel that this is the entire -- the
17 entire deposition transcript.
18 BY MR. MEYERHOFF:
19 Q  So we can start at paragraph -- excuse me.
20 We can start at page 40, line 10.
21     Do you see that, Mr. Curcuruto?
22 A  I do.
23     I mean, if you can, make the screen bigger.
24 I don't know if you can. I can see it pretty good.
25 Q  Yeah. Let me see.

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 229 of 240
PageID: 7818
Wiese, et al. vs. Bonta, et al.                                              Deposition of James Curcuruto

1   Can you see it now?
2   A  It just cut it off.  I don't know if you
3   can get rid of that arrow on the left or get rid of
4   that part of it.
5   Q  Yes.  I wish I was more tech savvy.
6   Let's see.
7   Okay.  How about that?
8   A  That may be just -- if you can make the
9   font bigger now, we should be good.
10  Oops.  Wrong way.
11  Q  Can you see it now?
12  A  Perfect.
13  Starting at line 10, is that where you
14  want?
15  Q  Yes.
16  A  Okay.  Okay.  Yeah.
17  Q  And I'll just stop at line 6 where it says:
18      "Well, it's something of a
19      hypothetical because, again, I relied
20      on Mr. Sanetti's so I didn't question
21      his."
22  A  Yes.  I see the line above that.  I would
23  consider myself an expert, not as much as
24  Mr. Sanetti, which is true.
25  Q  Okay.  So do you see at line 3 where it

Page 142

1   says:
2       "Q  So, with respect to your
3       expertise, then, how would you go
4       about estimating how many pistol
5       magazines there will be?  We'll start
6       there."
7       "A  Well, it's somewhat
8       hypothetical because, again, I relied
9       on Mr. Sanetti/s so I didn't question
10      his."
11  Do you see that?
12  A  Yes.
13  Q  Was that testimony accurate when you gave
14  it in 2014?
15  A  Yeah.
16  Everything that I just read that included
17  I'd consider myself an expert but not as much as an
18  expert as Mr. Sanetti's; correct.
19  Q  But in this case -- excuse me, not in this
20  case.
21  With regard to the Magazine Chart, you
22  relied on Mr. Sanetti's expertise as to allocating
23  the number of magazines per firearm; correct?
24  A  Along with my own, yes.  I relied on his,
25  and luckily we came to the same conclusion.

Page 143

1   Q  I'm just a little confused because when you
2   were deposed in 2014 and you were asked how did you
3   go about estimating how many pistol magazines there
4   would be, you said "Well, it's somewhat hypothetical
5   because I relied on Mr. Sanetti's so I didn't
6   question his."
7   MR. LEE:  Objection.  Misstates testimony.
8   THE WITNESS:  Again, you're correct.
9   As we read before, I consider myself an
10  expert but not as much as Mr. Sanetti and it even
11  said before that, I was part of a process that got
12  it going.
13  So it does seem like you're just trying to
14  cherrypick over and over which, you know, I don't
15  think that's, you know, the right thing to do in
16  this instance, but I think you know that too.
17  BY MR. MEYERHOFF:
18  Q  Well, I guess I'm wondering what you mean
19  by "it's somewhat hypothetical."
20  A  In 2014, I have no idea what I meant by
21  that at this point.  Probably answering the same
22  question four times and got a little tired, maybe.
23  MR. LEE:  I'll also state for the record
24  that that answer also seemed like it was cut off.
25  ///

Page 144

1   BY MR. MEYERHOFF:
2   Q  We can go down further.  The question says:
3       "Q  Let me make sure I
4       understand.  You're saying that you
5       never considered yourself what you
6       would estimate that breakdown to be;
7       is that right?"
8       And then you say:
9       "A  I did, I'm sure at the time,
10      but, again, I referred it to
11      Mr. Sanetti because I knew his
12      opinion on this or estimation on it
13      would be more accurate than mine.
14      But I can't recall, you know, what I
15      thought, if I looked at the
16      100 million and said, well, let me
17      ask him first, and then there's
18      really no need for me to supercede
19      his estimate."
20      Do you see that there?
21  A  I do.
22  Q  And was that testimony accurate in 2014?
23  A  It looks to be again we met.  I had given
24  him what I had so far.  He probably had a little
25  tweak to it and I'm going to take his ideas over

Page 145

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 230 of 240
PageID: 7819

Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

Page 146

1  mine.
2      But from what I recall, we were on the same
3  page.  We were not way of or anything near there.
4      Q   And I think that portion of the deposition
5  transcript that we just looked at was referring to
6  pistol magazines.
7      Did you engage in the same process for
8  rifle magazines that you did for pistol magazines?
9      A   Correct.  At the same time.
10     MR. MEYERHOFF:  We can take a break now.  I
11 don't want to hold you longer.
12     THE WITNESS:  All right.  I only need a
13 couple minutes.
14     (A brief recess was taken.)
15 BY MR. MEYERHOFF:
16     Q   I'm going to put your declaration back up
17 on the screen, Mr. Curcuruto.
18     And so in paragraph 11, you provide the
19 number of "67.7 million pistols and 42.6 million
20 rifles capable of holding a magazine" that "were
21 available to United States consumers between 1990
22 and 2015."
23     Do you see that?
24     A   I do.
25     Q   And the total number of magazines that you

Page 147

1  estimated were in possession of United States
2  consumers during that period were 230 million
3  magazines; correct?
4      A   Correct.
5      Q   So would you agree with me that
6  67.7 million pistols and 42.6 million rifles would
7  total 110.3 million firearms?  Correct?
8      A   Sounds right.
9      Q   So would you agree that to get to
10 approximately 230 million magazines based on that
11 data, you would need to allocate 2.085 magazines per
12 rifle and pistol?
13     A   Correct.
14     Q   So was there a specific formula you used
15 when creating the chart to -- let me step back.
16     So the numbers you provided in your
17 declaration, there was approximately 120 million
18 more magazines available to American consumers
19 during that time period than firearms; correct?
20     A   Correct.
21     Q   So how did you allocate that approximately
22 additional 120 million magazines to, you know, the
23 110 million firearms?
24     A   To the best of my recollection, Mr. Sanetti
25 and I determined that it would be about 2 magazines

Page 148

1  per firearm that's capable of holding a magazine and
2  whether that's, you know -- that comes with the
3  purchase or bought after market where the firearm --
4  most firearms would come with either 1 or 2 and then
5  there's the option for the consumer to purchase
6  additional magazines from firearm retailers and
7  other sources.
8      Q   Do you recall why you didn't just say
9  2 magazines per firearm and reach a total of
10 approximately 220 million magazines?
11     A   I do not recall.
12     Q   Do you recall, was there a specific formula
13 you used to reach the 230 million magazine number?
14     A   If you go to that chart again, I think we
15 had certain -- we didn't just say 2 per firearm.  We
16 looked at -- I believe there's 5 categories on
17 pistols.  We had 2 categories, 10 and under,
18 11-plus, and then on the rifles, we had the 3
19 categories.  I believe it's 10 and under, 11 to 29,
20 and 30-plus.
21     So we looked at those 5 different breakouts
22 and tried to apply what number we thought was best
23 and, you know, came up with that total of
24 230 million that we put out to our members, again,
25 without wanting to provide them with anything that

Page 149

1  we didn't think accurate, and we did not receive any
2  feedback from any of our members that may or may not
3  have seen this and said that they didn't think that
4  it looked correct to them [as spoken].
5      Q   Do you recall receiving any type of
6  feedback from your members with regard to this
7  Magazine Chart?
8      A   I do not recall any specific feedback on
9  this.
10     Q   Is that -- was that unusual with -- with
11 information you put out to your members?
12     A   We put out dozens, if not hundreds, of
13 pieces of information on an annual basis; so if one
14 did not receive any feedback, it was not unusual.
15     We did receive a lot of feedback on reports
16 and data that we put out thanking us for it putting
17 it out, because, you know, we requested that our
18 members not just solely rely on what we put out, but
19 they also use it with their internal sources.
20     You know, there are professionals that work
21 with each one of our member organizations and they
22 would take the data that they had and the data we
23 had and any outside information to help them make
24 those best-informed business decisions.
25     Q   So looking at the chart for pistol

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 231 of 240
PageID: 7820
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1 magazines, there's two bars. One is for pistol
2 magazines, 10 rounds or less, and another is for
3 pistol magazines, 11-plus rounds.
4     Do you see that?
5     A  Yes.
6     Q  And would it be fair to say the total
7 numbers, 81,240,000 and 54,160,000 -- those numbers
8 combined are essentially the number of pistols
9 available to consumers between 1990 and 2015 as you
10 ascertained from AFMER data and ITC data multiplied
11 by 2?
12    A  Can you make the chart bigger? I can't
13 read the numbers there.
14    So you were referencing the pistol
15 magazines, 10 or less, 81.2 million, and the pistol
16 magazines, 11-plus, 54.1 million?
17    Q  That's right.
18    A  And then what was the question after that?
19    Q  The question is I have that total being
20 135,400,000.
21    Is it fair to say that overall number was
22 obtained simply by multiplying the number of pistols
23 that you determined were available to American
24 consumers during the time period by 2?
25    A  I do not recall specifically if that's how

Page 150

1 I had done that at the time.
2     Q  And do you recall specifically how you
3 allocated, among that 135,400,000 pistol magazines
4 you estimated -- how you allocated how many were
5 10 rounds or less and how many were more than --
6 11 rounds or over?
7     A  That was with a conversation I had with
8 Mr. Sanetti and these were the numbers that we came
9 up with and put out in good faith to our members to
10 help them make better business decisions.
11    Q  And moving over to the right, there's three
12 columns for rifle magazines.
13    Do you know how you came up with the total
14 number of rifle magazines in U.S. consumer
15 possession 1990 to 2015?
16    A  That would have been with the conversation
17 with Mr. Sanetti and anybody else that I may have
18 spoken with on the topic.
19    Q  And do you have any formula for how you
20 allocated the total number of rifle magazines within
21 these three categories, 10 rounds or less, 11 to 29
22 rounds, and 30-plus rounds?
23    A  I don't recall specifically, but I know
24 Mr. Sanetti and I came up with the allocation that
25 we thought would be best to be able to put out

Page 151

1 accurate data to our membership.
2     Q  Do the numbers contained in this
3 Magazine Chart reflect attrition in the number of
4 magazines due to loss, destruction, or deterioration
5 that may have occurred?
6     A  Not to my knowledge, it does not.
7     Q  This Magazine Chart doesn't contain any
8 information on why someone would purchase an LCM,
9 does it?
10    A  On why somebody would purchase?
11    No, it does not.
12    Q  And would it be fair to say that this chart
13 tracks sales of magazines, not possession of them?
14    A  It -- let's see. The chart is labeled
15 "Consumer Possession 1990 - 2015."
16    So the chart makes the assumption that
17 these are in consumer possession during that time
18 period.
19    Q  And the data that you relied on to
20 determine the overall number of magazines in
21 possession was the AFMER and ITC data; correct?
22    A  Correct.
23    Which is the firearm production in the U.S.
24 and the import data from the ITC, assuming that, you
25 know, companies aren't going to manufacture

Page 152

1 something each year without selling it.
2     Q  Does this chart account for magazines that
3 may have been exported from the United States?
4     A  It does not include any export of
5 magazines.
6     Q  If you had to do the chart over again,
7 would you include an analysis of how many -- or what
8 an analysis of magazines that had fallen into disuse
9 or been exported be a part of that analysis?
10    A  This chart is seven years old. There would
11 be -- I would probably look at any new source data
12 that's out there.
13    I know whenever we put out things that are
14 estimates and it does say "Estimated" on the chart,
15 that we erred on the side of caution and put out a
16 lower number than what, quite possibly, could be --
17 could be more.
18    This is the minimum amount that we felt
19 comfortable with. We didn't want to overstate
20 anything, but it's possible that there are more than
21 230 million. Just to be cautious, we didn't want to
22 overshoot anything.
23    Q  Would it be fair to describe the NSS- --
24 NSSF Magazine Chart -- would it -- sorry. I'll
25 rephrase.

Page 153

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 232 of 240
PageID: 7821
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1 Would it be fair to describe your work on
2 this chart, in part, as involving statistical
3 analysis?
4 A Not complex statistical analysis but
5 certainly math involved.
6 Q Would it be fair to say it's simple
7 statistical analysis?
8 A I don't, as I referenced before.
9 Maybe not everybody could have understood
10 the process and the resources available or the
11 sources available to come up with it, but it is
12 certainly not complex.
13 Q Would you describe the number of total
14 magazines in consumer possession from 1990 to 2015
15 as a statistic?
16 A The 230 million total magazines available
17 for consumer possession between 1990 and 2015 could
18 be considered a statistic, sure.
19 Q And the same thing with the subcategories
20 of rifle magazines and pistol magazines; correct?
21 A As referenced in the chart?
22 Q Sure.
23 A Correct.
24 Q Are you familiar with an organization
25 called the American Statistical Association?

Page 154

1 A Correct.
2 Q I'm going to direct your attention to
3 page 4 [as spoken]," and I'll zoom in at
4 paragraph 2.
5 Do you see where it says "The ethical
6 statistical practitioner"?
7 A Yes.
8 Q And do you see Number 2 where it says:
9 "Uses methodology and data that
10 are valid, relevant, and appropriate
11 without favoritism or prejudice, and
12 in a manner intended to produce valid
13 interpretable, and reproducible
14 results"?
15 Do you see that?
16 A I do.
17 Q Do you agree with the position taken by
18 this document, namely, that an ethical statistical
19 practitioner should use "methodology and data that
20 are valid, relevant, and appropriate without
21 favoritism or prejudice, and in a manner, intended
22 to produce valid, interpretable, and reproducible
23 results"?
24 MR. LEE: I will object to the question.
25 It lacks foundation.

Page 156

1 A I am not.
2 MR. MEYERHOFF: I'm going to mark as
3 Exhibit 7, I believe --
4 THE REPORTER: No. 8 is next.
5 MR. LEE: 8.
6 (The document referred to was marked as
7 Deposition Exhibit 8 by the Reporter.)
8 BY MR. MEYERHOFF:
9 Q Do you see a document on a screen called
10 "Ethical Guidelines for Statistical Practice"?
11 A Is it dated February 2022?
12 Q Yes. That's correct.
13 A I do see it, yes.
14 Q And you just testified a moment ago that
15 you're not familiar with this organization; correct?
16 A Correct.
17 Q So it would be fair to say you're not a
18 member; correct?
19 A Not to my knowledge. Unless they offer
20 free membership for everybody.
21 Q So would it be fair to say you've never
22 seen this document, "Ethical Guidelines for
23 Statistical Practice" prepared by the Committee on
24 Professional Ethics of the American Statistical
25 Association?

Page 155

1 This witness has indicated he's never seen
2 this document. There is -- so he can't authenticate
3 this document and without foundation, you're asking
4 him to agree or disagree with something that he's
5 never seen before.
6 So I'm going to object on the grounds that
7 it lacks foundation.
8 BY MR. MEYERHOFF:
9 Q You can answer the question.
10 A I'm going to have to review the document in
11 more detail.
12 Q Let me ask a question not about the
13 document.
14 Do you believe that an ethical statistical
15 practitioner should use methodology and data that
16 are valid, relevant, and appropriate without
17 favoritism or prejudice and in a manner intended to
18 produce valid and interpretable and reproducible
19 results?
20 MR. LEE: Objection. Lacks foundation.
21 And it's compound many times over.
22 THE WITNESS: I believe, you know,
23 statisticians should put out accurate and timely
24 data that's going to help support their members'
25 needs and that's what I did at NSSF whenever we put

Page 157

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 233 of 240
PageID: 7822
Wiese, et al. vs. Bonta, et al.                    Deposition of James Curcuruto

1  out any report, whether internal or external.
2      We're not going to give it out to our
3  members. The last thing we're going to do is give
4  our members bad data. If we put out data that said
5  230 million magazines, why would we give them
6  information that we don't believe is valid? That
7  would be very hurtful to our members and they
8  wouldn't be members and we wouldn't have an
9  organization anymore.
10      So doesn't make much sense what you're --
11  what you're trying to get at, I don't think.
12  BY MR. MEYERHOFF:
13      Q  Would it be possible for another individual
14  to reproduce the statistical analysis that you did
15  in the magazine chart?
16      A  Not in the same exact way that I had done.
17      Q  NSSF is a membership-based organization
18  that includes manufacturers of magazines; correct?
19      A  They most likely do.
20      I don't know the -- every -- the make-up of
21  every member of -- out of the 12,000 when I was with
22  the organization.
23      I don't know all of them, but there is a
24  good possibility that manufacturers of magazines
25  were members of NSSF.

Page 158

1      Q  Are you aware if any were at the time?
2      A  I am not.
3      Q  Do you think it's in the business interests
4  of NSSF members to have California's restrictions on
5  large-capacity magazines invalidated?
6      MR. LEE: Objection. It calls for an
7  opinion well beyond the scope of what he was asked
8  to do.
9      You may answer.
10      THE WITNESS: I haven't really thought that
11  through. I don't have much of an opinion on that
12  right now.
13  BY MR. MEYERHOFF:
14      Q  Would you agree with the statement that an
15  ethical statistical practitioner discloses conflicts
16  of interest, financial or otherwise, and manages or
17  resolves them according to established policies,
18  regulations, and laws?
19      MR. LEE: Objection. Lacks foundation.
20      Object to the form of the question.
21      You can answer.
22      THE WITNESS: What was the question?
23  BY MR. MEYERHOFF:
24      Q  Do you believe that an ethical -- I'll
25  simplify the question.

Page 159

1      Do you believe that an ethical statistical
2  practitioner discloses conflicts of interest?
3      MR. LEE: Still calls for an opinion.
4      THE WITNESS: My opinion is everybody
5  should be -- should be ethical, not just
6  statisticians.
7  BY MR. MEYERHOFF:
8      Q  Do you believe --
9      A  Lawyers included.
10      Q  I'm sorry. I interrupted you.
11      A  I said lawyers included.
12      Q  Do you believe there were any conflicts of
13  interest involved in creating the Magazine Chart?
14      A  I do not.
15      Q  Your position at NSSF was funded, in part,
16  by firearms manufacturers. Would it be fair to say
17  that?
18      A  I suppose it would.
19      They were dues-paying members and that's
20  how we got -- NSSF had received revenue; so that's
21  how they paid their staff.
22      Q  Would it be fair to say that at least some
23  of NSSF's members would benefit financially from the
24  ability to sell large-capacity magazines into states
25  such as in California?

Page 160

1      MR. LEE: Objection. Calls for
2  speculation.
3      THE WITNESS: I would assume that if a
4  manufacturer of magazines that holds more rounds,
5  had more customers that they could legally sell to,
6  then it would benefit and if they were members of
7  NSSF, that would, then, benefit NSSF members.
8  BY MR. MEYERHOFF:
9      Q  So why is that not a conflict of interest?
10      MR. LEE: Objection. Lacks foundation.
11  Calls for speculation.
12      THE WITNESS: I think we talked about
13  ethics; about the last thing that I'm going to do is
14  put out misinformation.
15      If that number was wrong and a member made
16  a decision and went out of business, that doesn't
17  help NSSF at all; so -- probably helps you guys if
18  it ever went out of business, but we weren't in the
19  business of providing misinformation to our member
20  base.
21      MR. LEE: Also object to the question on
22  the grounds that it lacks foundation.
23      I mean ethical -- conflict of interest
24  presumes or assumes that -- implies that there is a
25  duty of some type. Duty to whom? Some type of

Page 161

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 234 of 240
PageID: 7823
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1 legal duty?
2      So I'm going to object to the question that
3 it calls for a legal opinion as to conflict of
4 interest.
5      I'm not aware that you've identified a
6 duty, specific duty, that he has, and, if so, to
7 whom.
8      So I don't think the question makes sense.
9      MR. MEYERHOFF: Can you read back the
10 answer, Ms. Miller.
11      (The record was read.)
12 BY MR. MEYERHOFF:
13   Q  So based on that answer -- and correct me
14 if I'm wrong -- that only -- that conflicts of
15 interest should only be disclosed when the person
16 releasing the information believes that it may be
17 incorrect?
18      MR. LEE: Objection. Misstates testimony.
19      THE WITNESS: I mean, I -- can you -- I'll
20 pass on that question.
21      Your conflict of interest, you know, goes a
22 lot of ways for a lot of different things.
23 Different -- you'll have to clarify that question.
24 BY MR. MEYERHOFF:
25   Q  So you believe there is no conflict of

Page 162

1 interest request NSSF putting out a chart -- let me
2 rephrase.
3      So you believe there were no conflicts of
4 interest implicated by NSSF's release of this chart;
5 correct?
6   A  We put out that chart to help our members
7 make better business decisions. That was our
8 primary goal of all the research we put out there.
9   Q  I'm going to return to your declaration.
10      In paragraph 13, you state:
11      "While the figure of 115 million
12      magazines with a capacity greater
13      than 10 rounds in circulation is an
14      estimation based on extrapolation
15      from indirect sources and cannot be
16      confirmed as unequivocally accurate,
17      it is safe to say that whatever the
18      actual number of such magazines in
19      United States consumers' hands, it is
20      in the ten of millions, even under
21      the most conservative estimates."
22      Do you see that?
23   A  I do.
24   Q  The first part of that sentence:
25      "While the figure of 115 million

Page 163

1      magazines with a capacity greater
2      than 10 rounds in circulation is an
3      estimation based on extrapolation
4      from indirect sources and cannot be
5      confirmed as unequivocally
6      accurate" --
7      Do you recall why you included that phrase
8 in your declaration?
9   A  Just to clarify that, again, this was not
10 an absolute number that came from one source that
11 was indisputable, but I wanted to clarify that, you
12 know, it was an estimate and we're not saying that
13 it's an exact figure at all, just an estimate, and
14 we came up with it in the best way we could, using
15 the best sources, and put it out to our members so
16 they could make informed decisions.
17      MR. MEYERHOFF: I'm going to go ahead and
18 pull up something that I'll mark as --
19      THE REPORTER: Exhibit 9.
20      MR. MEYERHOFF: -- Exhibit 9. Thank you.
21 Thank you.
22      (The document referred to was marked as
23 Deposition Exhibit 9 by the Reporter.)
24 BY MR. MEYERHOFF:
25   Q  Do you see the top of the document? It

Page 164

1 says "In the United States District Court for the
2 District of Colorado"?
3   A  I do, yeah.
4   Q  And I'll just give you a moment to review
5 this document. You can let me know when to scroll
6 down.
7   A  Can you just make the font bigger, please?
8   Q  Sure.
9   A  Scroll down a little bit.
10      Okay.
11      Okay.
12   Q  In this declaration, you did not include
13 the line "While the figure of X million magazines
14 with a capacity greater than 10 rounds in
15 circulation is an estimation based on an
16 extrapolation from indirect sources and cannot be
17 confirmed as unequivocally accurate"; correct?
18   A  I did not see it.
19   Q  Did you use the same process for making
20 this determination that you did in the Wiese case?
21   A  Can you repeat that?
22   Q  I'll just ask a simpler question.
23      Why did you not include that -- that line
24 in this declaration?
25   A  I don't recall.

Page 165

**Wiese, et al. vs. Bonta, et al.**                                    **Deposition of James Curcuruto**

Q  The -- the Magazine Chart attached as Exhibit -- as an exhibit to your declaration in the Wiese case reflects consumer possession of magazines between 1990 and 2015; is that correct?

A  Correct.

Q  So it doesn't reflect any data from 2016 to the present; correct?

A  Not to my knowledge.

Q  And you were not asked in this case to submit a -- an updated version of this chart, were you?

A  I was asked to look to see what was available and I did not find anything.

Q  You mentioned previously that you hunt; is that correct?

A  Yes.

Q  And how long have you hunted for?

A  Probably 40 years.

Q  And -- so would it be fair to say that you began hunting in approximately 1980?

A  '82.

Q  And when you first started hunting, do you recall what kind of rifle you used?  Or did you use a rifle or a pistol or a shotgun?

A  Rifle and shotgun.

Page 166

Q  Did those rifles that you used have detachable magazines?

A  I don't recall.  Possible.

Q  When was the first time you recall hunting with a detachable magazine firearm?

A  Probably squirrel hunting with, like, a Ruger 10/22, which had a detachable magazine, and I'm not sure when that would have been.  '80s or '90s.

Q  Do you recall what capacity magazine you hunted with that Ruger firearm?

A  I believe it was 10.

Q  To the best of your recollection, do you recall why you didn't use a larger capacity magazine?

A  I do not recall.

Q  Do you recall when you first purchased a large-capacity magazine?

A  When I purchased -- first purchased a large-capacity magazine?

I don't recall if I've ever purchased one.

Q  I believe you previously testified that you possess 3 large-capacity magazines; is that right?

A  It is correct.

Q  How did you acquire those?

Page 167

A  My grandfather had served in World War II.  He was provided with a service rifle, a 30 Carbine, and that held 15 rounds of 30 caliber Carbine, and he had -- when he got back, I think he either purchased a service rifle or my father ended up getting that, and then I ended up getting that for some time and then I think it's at my cousin's house.

Just a family heirloom that's been passed around with those 15-round magazine capacity.

So I didn't purchase them.  And I don't recall if I've purchased any other magazine with more than 10-round capacity.

Q  So all three of those magazines were initially issued to the original owner by the military.  Is that fair to say?

A  I don't know the full story where my grandfather -- if he bought them after he returned home, to have a similar firearm and magazines that he carried, you know, during the war.

I don't know the full story, but I know it's kind of a family heirloom.  It's made its way down three generations and soon to be four.

Q  But all three large-capacity magazines you possess are all family heirlooms; correct?

Page 168

A  There are four that -- the 30 Carbine firearm that my grandfather had carried or been -- similar firearm to what he carried in World War II.

Q  I think you had previously testified that Connecticut had some restrictions on magazine capacity; correct?

A  I believe the max is 10 and I think that was about 2013 when that came into effect and then we had to sign some sort of paperwork that said "if you own any."

Q  And do you -- why did you not purchase any large-capacity magazines prior to 2013?

A  I didn't have the need for them.

I'm not saying that I didn't because, you know, some firearms that I had purchased may have come with 10-plus or 11-plus, but I don't recall any that did.

Q  When you say you "didn't have the need for them," what do you mean?

A  I have, you know, plenty of a collection of firearms and magazines and accessories for all the things that I am currently doing now.

Q  Correct me if I'm wrong, but that is mainly hunting and target shooting; correct?

Page 169

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 236 of 240
PageID: 7825
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1    A  Correct.
2    Q  So from the period you first started
3  shooting in 1982 until large-capacity magazines
4  became restricted in Connecticut in 2013, you've
5  never felt the need to purchase a large-capacity
6  magazine; is that correct?
7    A  Again, not to my knowledge.  Some of the
8  handguns may have come with 11-plus capacity, but,
9  you know, they are not in my possession anymore.
10     It wasn't something that was a big deal or
11  tracked.  If you had it, you had it, but it
12  wasn't -- I mean, it wasn't as big of a deal as it
13  is nowadays.
14    Q  So it sounds like -- it sounds like you
15  may, prior to 2013, have come into possession of
16  large-capacity magazines simply by virtue of buying
17  a firearm that came with one; correct?
18    A  Correct.
19    Q  And is that -- do you think that's a common
20  occurrence, that someone purchases a firearm and it
21  happens to come with a large-capacity magazine?
22    A  It's possible and there's aftermarket, as
23  well, where people can pick up additional magazines
24  to go with their firearm.
25    Q  You're educating me, but I'm asking the

Page 170

1  sell what they were asking for, and if that customer
2  was asking for, you know 2 -- 2 magazines with each
3  purchase or 1 magazine with each purchase or 11-plus
4  magazine, I think just like any -- any business
5  sector, they listen to their customers and try to
6  provide the product that that customer wants.
7    Q  Just to be clear, the Magazine Chart
8  attached to your declaration at Exhibit A does not
9  indicate how many Americans own large-capacity
10  magazines; correct?
11    A  Correct.
12    Q  And it doesn't contain any information on
13  why Americans may own large-capacity magazines;
14  correct?
15    A  Correct.
16    MR. MEYERHOFF:  I've got nothing further at
17  this time.
18    MR. LEE:  I have a few questions.
19
20     EXAMINATION
21  BY MR. LEE:
22    Q  Mr. Curcuruto, when we approached you way
23  back in 2017 and we asked you to do something in
24  connection with this case, what was it that we asked
25  you to do?

Page 172

1  question do you think your experience is a common
2  one that individuals purchase a firearm and come
3  into possession of a large-capacity magazine simply
4  by virtue of it being included with the firearm?
5    A  I think that happens in several instances,
6  you know, where legal, and I know it's a lot more
7  complicated for retailers and manufacturers to sell
8  in different states.  They have got to make sure
9  they are in compliance so they are not going to get
10  into trouble themselves or their customers in
11  trouble.
12    Q  You have 40 years of experience with
13  firearms; correct?
14    A  Correct.
15    Q  Is it fair to say that large-capacity
16  magazines have become more prevalent over the past
17  40 years?
18    A  I would think so, yes.
19    Q  And is part of the reason they have become
20  more prevalent because, as in your case, they were
21  included with the firearm that was sold?
22    A  I think on the pistol side, in my opinion,
23  manufacturers -- different -- depending on the
24  consumer demand, the manufacturers would then, you
25  know, listen to their customer and -- and make and

Page 171

1     In other words, what was the scope of what
2  we were asking you to do?
3    A  Look at NSSF data and see if we had
4  anything available to help with your case.
5    Q  And -- and in terms of data, that is to
6  look at the numbers and try to extrapolate the
7  numbers of magazines in Americans' hands as of that
8  time?
9    A  I think, yeah, in regard to the -- what we
10  call large-capacity magazines, which is the 11-plus,
11  to provide any data we may have on that topic.
12    Q  Did we ask you to provide any other
13  opinions in connection with this case?
14    A  I don't believe so.
15    Q  Did we ask you to provide any opinions with
16  regard to the -- the effectiveness -- effectiveness
17  of California's laws?
18    A  I don't recall.  I don't believe so.
19    Q  Did we ask you to provide any opinion with
20  regard to the utility of large-capacity magazines
21  for purposes such as self-defense?
22    A  I don't believe so.
23    Q  Did we ask you to provide any opinions as
24  to the constitutionality of California's
25  large-capacity magazine laws?

Page 173

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 237 of 240
PageID: 7826
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1    A   I don't believe so.
2    Q   Is it fair to say that the only opinions
3 that we asked you to provide in this case are
4 summarized in paragraph 8 of your declaration which
5 is that 230 million magazines are in American hands,
6 of which one half of those are approximated to be
7 large-capacity magazines?
8    A   Correct.
9    Q   And that was your opinion in 2017?
10    A   It was.
11    Q   And from 2017 to 2023, has anything
12 occurred in the industry that would change your
13 opinion with regard to the millions of magazines in
14 Americans' hands?
15    A   Nothing has happened that would change my
16 opinion on the chart that we originally put out,
17 but, obviously, in six years, there has been
18 additional firearms and accessories, including
19 magazines of all types that have been manufactured
20 and purchased.
21    Q   And -- and as part of your work in the
22 firearms industry for NSSF, it was your job to keep
23 track of trends in the industry overall in terms of
24 consumer trends?  Is that true?
25    A   It is correct.

Page 174

1    Q   And so did you keep track of trends in
2 general in the firearm industry, consumer trends?
3    A   We did.
4    Q   In general, from 2017 to the present, did
5 firearm sales increase, decrease, or remain the same
6 since you first gave that opinion?
7    A   From 2017 to 2023, where we are now,
8 without looking at, you know, all the -- all
9 the data I had available to me over time, I believe
10 that firearm-accessory sales have increased over the
11 past six, seven years.
12    Q   And what is NICS, N-I-C-S.
13    A   The FBI, the Federal Bureau of
14 Investigation, has NICS, which is National Instant
15 Criminal Background Check System, and they put out
16 data on a monthly basis that records the amount of
17 checks to that system and a check would be when a
18 firearm retailer or a state agency, such as a state
19 police, would log into the FBI NICS system and do a
20 background check or somebody that is looking to
21 purchase or transfer a firearm, whether that's at a
22 retail -- traditional brick-and-mortar retail
23 establishment, and now I think there's, you know,
24 other ways that system is being used as well.
25        When you pawn a gun or redeem a gun at a

Page 175

1 pawnshop, the system catches those as well.
2    Q   You said the FBI puts out NICS data every
3 month?
4    A   Correct.
5        Usually within the first week; so, for
6 example, you know, we're at August 3rd.  July data
7 would be out about now.  July -- you know, the month
8 before, within a week.
9    Q   And NICS data records the number of
10 background checks.  Is that fair?
11    A   Correct.
12    Q   Is NICS data used to extrapolate the number
13 of firearms purchases in any given period of time,
14 such as a month or a year?
15    A   It has been used by several organizations
16 and maybe outlets.
17        You know, at NSSF, we adjusted that FBI
18 data to take out things that we didn't think had to
19 do with the sale or transfer of the firearm to get a
20 little bit more accurate picture, but we used that
21 as an indicator of sales, and since we had been
22 going on for 20-plus years on a monthly basis, it
23 provided pretty good trend data to our members.
24    Q   And so if I wanted to look at the firearm
25 trend in general in terms of firearm purchases from

Page 176

1 2017 to the present, I could look at NICS data as
2 one indicator?
3    A   Correct.
4        And we always tried to caution to just
5 don't look at one thing -- the NICS data, all the
6 other indicators that we provided and their own
7 industry knowledge.
8    Q   Is there anything in -- within the -- your
9 knowledge of the firearm trends in general, since
10 2017, or the NICS data -- is there anything in that
11 that would change your opinion as to the millions of
12 firearms that are held in American hands presently?
13    A   Nothing that changed my opinion on -- on
14 what we had submitted for this case.
15        I would assume there's just -- that number
16 has grown probably substantially over the past seven
17 years.
18    Q   Do you know what percentage of firearm
19 sales from 2017 through the present are
20 semiautomatic firearms?
21    A   I do not know that.  I don't have that
22 offhand.
23    Q   Do you -- did you -- do you have an
24 estimate as to the number -- the breakdown between
25 semiautomatics and other types of firearms?

Page 177

Case 1:18-cv-10507-RMB-JBD    Document 184-8    Filed 11/03/23    Page 238 of 240
PageID: 7827
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  MR. MEYERHOFF: Objection. Asked and
2  answered.
3      THE WITNESS: I do not have a -- I wouldn't
4  want to provide an incorrect statement there. I was
5  talking for a couple hours how I always like to put
6  out accurate data; so I don't want to put out
7  anything incorrect right now.
8      Sorry about that.
9  BY MR. LEE:
10     Q  No worries.
11         Now, the NSSF was a trade organization for
12 the firearms industry; correct?
13     A  Correct.
14     Q  And there is no secret that it's a trade
15 industry for the firearm association; right?
16     A  Correct.
17     Q  And we never -- I don't think, to our
18 knowledge, we have ever tried to hide the fact that
19 it's associated with the firearms industry.
20         Have you ever heard anyone try to hide that
21 fact from anybody?
22     A  On the contrary, they like to tout that
23 they are the trade association for the firearm
24 industry. I think that is their latest tag line.
25     Q  And you were a member of the firearms

Page 178

1  industry for 14 years as a member -- as an employee
2  of NSSF; is that correct?
3      A  11 years. From '09 to '21, yeah.
4      Q  And you are still part of the firearm
5  industry. Is that fair?
6      A  Yeah.
7          We're focused on conservation, but
8  obviously when we're dealing with hunters and target
9  shooters, firearms are involved.
10     Q  Because Mr. Meyerhoff, I don't know, spent
11 maybe two hours asking you to verify, I think, that
12 which is not disputed which is that you are
13 affiliated with the firearms industry.
14         Is that fair?
15     A  It is, yes.
16     Q  Are you aware of any other source that the
17 firearms industry relies upon to measure the number
18 of magazines in circulation besides the NSSF data?
19     A  I am not aware. I would hope that it's out
20 there; that we have evolved a little or somebody
21 else has done it, but I'm not aware of any.
22     MR. LEE: Thank you very much. That is all
23 the questions I have.
24     MR. MEYERHOFF: I'll just ask a few
25 questions on redirect.

Page 179

1  FURTHER EXAMINATION
2  BY MR. MEYERHOFF:
3      Q  Mr. Lee asked you if your opinions that you
4  were asked for in this case were only those
5  contained in your declaration you filed; correct?
6      A  Correct.
7          The original one from '17; correct.
8      Q  And then he asked you a number of questions
9  about your opinions unrelated to your declaration;
10 correct?
11     A  Correct.
12     Q  He asked about firearm sales; correct?
13     A  Correct.
14     Q  He asked about magazine sales?
15     A  I think we discussed magazines, but I'd
16 have to go back and look at the document to see
17 specifically what he asked.
18     Q  You left NSSF in 2021; correct?
19     A  Yes.
20     Q  And I believe you testified at the
21 beginning of this deposition that after you left --
22 left NSSF, you lacked access to the documents and
23 information that you -- that you used while you were
24 at NSSF; correct?
25     A  Correct.

Page 180

1      Q  You -- Mr. Lee mentioned the NICS database;
2  correct?
3      A  He did.
4      Q  But you mentioned when you worked at NSSF
5  that you adjusted the numbers in that database;
6  correct?
7      A  We did.
8      Q  And you cautioned not just to look at the
9  NIS- -- NICS data; correct?
10     A  Standard practice for our members that we
11 would say "There's not just one thing to look at."
12 We want them to, you know, try to get as much
13 information as they could and then make their
14 decisions, which is just helpful -- trying to be
15 helpful if you say "Don't just look at one thing,"
16 but I think most people know that that is not a good
17 business move.
18     Q  Sure. Sure.
19         And so to do right by your members, you
20 would look at other sources of data other than the
21 NICS; correct?
22     A  Correct.
23     Q  And what other sources of information would
24 you look at?
25     A  Well, that we had referenced a few. The

Page 181

Case 1:18-cv-10507-RMB-JBD     Document 184-8     Filed 11/03/23     Page 239 of 240
PageID: 7828
Wiese, et al. vs. Bonta, et al.                                    Deposition of James Curcuruto

1  ATF AFMER data, the International Trade Commission,
2  import/export.
3       ATF also put out a report on the number of
4  FFLs or firearm -- federal firearm retail -- or
5  licenses out there.
6       There was government source data on
7  silencers or suppressors that we talked about.
8       I mean, dozens and dozens of different
9  sources out there in the participation data on
10  hunting and target shooting, economic impact and
11  jobs and all that sort of stuff; so we tried to
12  provide as much as we could but certainly not just
13  one thing.
14   Q  And would it be fair to say that to provide
15  the most accurate data, the most accurate trend
16  lines, that you would want to look at those dozens
17  and dozens of sources?  Correct?
18   A  That's what we would recommend to our --
19  our members, to say, you know, "Here is everything
20  that we have," you know, whatever topic that you're
21  looking at.  "Make sure you utilize all the
22  resources that we have" because, again, we were
23  trying to put out stuff that was timely and accurate
24  for them to make good business decisions.
25       Last thing we wanted to do was put out

Page 182

1       MR. LEE:  Objection.  Asked and answered.
2  Beyond the scope.
3  BY MR. MEYERHOFF:
4   Q  But you can answer.
5   A  If it was asked and answered, I would have
6  to go back and ask -- to review my answer.
7   Q  I'm just asking, sitting here in this
8  moment, do you recall if you were aware that
9  plaintiffs' refiled your declaration in March of
10  this year?
11       MR. LEE:  Same objections.
12       THE WITNESS:  Same answer.
13  BY MR. MEYERHOFF:
14   Q  So you don't recall.
15   A  I guess we could ask the court reporter to
16  go back and find that question and -- and read the
17  response for you.
18       MR. LEE:  Do you want a stipulation,
19  Counsel?
20       MR. MEYERHOFF:  No.  I just want to know if
21  the witness was aware that his declaration was
22  refiled --
23       MR. LEE:  You asked him.
24       MR. MEYERHOFF:  -- in March of 2023, this
25  year.

Page 184

1  something that we thought was wrong or didn't think
2  that, you know, was going to help our membership.
3   Q  Would you submit a declaration in this case
4  saying that "Based on NICS data alone, I believe
5  that the number of magazine sales in the
6  United States have increased over the last six
7  years"?
8       MR. LEE:  Objection.  Calls for
9  speculation.
10       THE WITNESS:  You know, the NICS data is --
11  helps people understand the trends in sales of
12  firearms and pistols and long guns.
13       It doesn't really break down too much more
14  into those categories; so it would not just be the
15  sole source to rely on, I don't believe.
16       I would -- if I was doing it, I would use a
17  few other sources as we discussed.
18  BY MR. MEYERHOFF:
19   Q  I just want to be clear on one thing.  Were
20  you aware that your 2017 declaration was refiled in
21  support of Plaintiffs' Motion for Summary Judgment
22  in this case --
23       MR. LEE:  Objection.
24  BY MR. MEYERHOFF:
25   Q  -- in 2023?

Page 183

1       MR. LEE:  Right.
2  I'll stipulate to that fact.  But if you're
3  trying to establish it for something, you did ask
4  that question already.
5       MR. MEYERHOFF:  Okay.
6  Sorry, Ms. Miller.  Can you go back through
7  the transcript and see if you can find the word
8  refile?
9       (The following question and answer was
10  read:
11       "Q  In either of your
12  conversations with Mr. Lee over the
13  past month, did he tell you that your
14  declaration had been refiled this
15  year?
16       "A  I do not recall.")
17       MR. MEYERHOFF:  I don't have any other
18  questions at this time.
19       MR. LEE:  Thank you.
20       THE REPORTER:  Mr. Lee, are you purchasing
21  a certified copy of the transcript?
22       MR. LEE:  Yes.
23
24       (The deposition concluded at 2:28 P.M.)
25  ///

Page 185

Case 1:18-cv-10507-RMB-JBD   Document 184-8   Filed 11/03/23   Page 240 of 240
PageID: 7829
Wiese, et al. vs. Bonta, et al.                              Deposition of James Curcuruto

I, JAMES CURCURUTO, declare under
penalty of perjury that the foregoing
is true and correct, to the best of
my ability.



Dated this ___ day of
_____, 2023, at
_____,
Connecticut.




————————————————————
JAMES CURCURUTO

I, ALTHEA L. MILLER, CSR NO. 3353, RPR,
CCRR NO. 149 certify:  That the foregoing proceedings
were taken before me at the time and place herein set
forth; at which time the witness, JAMES CURCURUTO, was
duly sworn; and that the transcript is a true record of
the testimony so given.
    Witness review, correction, and signature
was
( ) by Code.            ( ) requested.
( ) waived.            (X) not requested.

    The dismantling, unsealing, or unbinding of
the original transcript will render the Reporter's
Certificate null and void.
    I further certify that I am not financially
interested in the action, and I am not a relative or
employee of any attorney of the parties, nor of any
of the parties.

    Dated this 13th day of August, 2023.


_____
ALTHEA L. MILLER, CSR NO. 3353, RPR, CCRR NO. 149

///

Bradley P. Lehman (NJ #129762014)
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
Phone: 910-713-8804
Email: law.rmd@gmail.com
(Admitted *pro hac vice*)

*Attorneys for Cheeseman Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 3:18-cv-10507-PGS-LHG |

| | |
|---|---|
| MARK CHEESEMAN, et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 1:22-cv-04360-PGS-LHG <br><br> **Plaintiffs' Combined Brief in Opposition to State Defendants' Cross-Motion for Summary Judgment and Reply to State Defendants' Opposition to Cheeseman Plaintiffs' Motion for Summary Judgment** |
| BLAKE ELLMAN et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 3:22-cv-04397-PGS-LHG |

## COMBINED BRIEF IN OPPOSITION TO STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO STATE DEFENDANTS' OPPOSITION TO CHEESEMAN PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

I.    **Introduction**……………………………………………………………1

II.   **As the State Implicitly Concedes, the Second Amendment Plainly Covers the Possession and Use of the So-Called "Assault Firearms."**……………………………………………………………….2

III.  **The *Proper* "Common Use" Test Dispositively Resolves the Motions for Summary Judgment in Favor of Plaintiffs and Against the State.**……………………………………………………………6

    **A. Common Possession for Lawful Purposes is the Correct Focus, Not How Often or How Many Rounds People Happen to Use in Self-Defense**……………………………………………………………6

        **1.  "In Common Use" Means Common *Possession*.** ………………7

        **2.  The State's Criticisms of This Test Are Irrelevant and Unfounded.** ……………………………………………………...12

    **B. The State's Claims About Increased Risks of "Lethality" Are Overblown, and *Heller* and *Bruen* Have Already Taken Account of All Relevant Risks.** ……………………………………………14

    **C. Because These Arms Are in Common Use, They Are Necessarily *Not* Dangerous and Unusual and Cannot be Subjected to the State's Ban.** ……………………………………………………………19

        **1.  The Banned Arms Are Ubiquitously Owned and Possessed for Lawful Purposes, Including for Self-Defense.** ………………...20

        **2.  Any Ban of These Commonly Used Arms is Untenable.** ………27

IV.   **Any Additional Historical Analysis Can Only Further Cement the Fate of the Challenged Law as an Unconstitutional Arms Ban.** ……..30

i

**A. The State is Not Entitled to Any Leniency Under the *Bruen* Standards, Whether Under "a More Nuances Approach" or Otherwise.** ……………………………………………………31

**1. No "Dramatic Technological Changes" Are in Play Here.** ……34

**2. No "Unprecedented Societal Concerns" Are in Play Either.** ….38

**B. In All Events, The State Cannot Carry Its Burden Under *Bruen*.**..43

**V.    Summary Judgment Must Be Entered Against *All* Defendants.** …….48

**VI.    Conclusion** …………………………………………………………..49

ii

# TABLE OF AUTHORITIES

**Cases**

*Anchorage Assocs. V. Virgin Islands Bd. Of Tax Rev.*, 922 F.2d 168 (3d Cir. 1990)……………………………………………………………………48

*Arroyo v. Pleasant Garden Apartments*, 14 F. Supp. 2d 696 (D. N.J. 1998)………..48

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen.*, 974 F.3d 237……………........38

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018)…………………………………………………………….2, 12

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345 (D.N.J. Sept. 28, 2018)………………………………….11

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)……………………………8, 22, 28

*Delaware State Sportsmen's Association, Inc. v. Delaware Dept. of Safety and Homeland Security*, __ F. Supp. 3d __, 2023 WL 2655150 (3d Cir. 2023)…………12

*District of Columbia v. Heller*, 554 U.S. 570…………………………………*passim*

*Duncan v. Becerra,* 19 F.4th 1087 (9th Cir. 2021)………………………………….37

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017)………………………..11

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)………………………………….37

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)………………………………...2

*Gamble v. United States*, 139 S. Ct. 1960 (2019)…………………………………45

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)………...9, 13, 19, 45

iii

*Ind. H. B. R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174 (7th Cir. 1990)…………..21

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)……………………………………13, 14

*Konigsberg v. State Bar of Cal.,* 366 U.S. 36 (1961)…………………………....1, 45

*Lockhart v. McCree*, 476 U.S. 162 (1986)…………………………………………20

*McDonald v. Chicago*, 561 U.S. 742 (2010)…………………………………17, 31, 45

*Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021)……………………………11

*Muscarello v. United States*, 524 U.S. 125 (1998)…………………………………7

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)…...8

*New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1 (2022)….*passim*

*Ocean State Tactical LLC v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022)……3

*Staples v. United States*, 511 U.S. 600 (1994)…………………………………19, 28

*State v. Huntly*, 25 N.C. 418 (1843)………………………………………………9

*Stenberg v. Carhart*, 530 U.S. 914 (2000)………………………………………...2

*Wiesmueller v. Kosobucki*, 547 F.3d 740 (7th Cir. 2008)………………………...20

**Statutes**

18 U.S.C. § 922……………………………………………………………………48

**Rules**

Fed. R. Evid. 201…………………………………………………………………..20

iv

**JA4711**

**Other Authorities**

Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008*, Bureau of Just. Stats. NCJ 236018 (Nov. 2011)………………………………………23

Anna Codutti, *Tulsa Race Massacre graves search: 'Major scientific breakthrough' made in DNA investigation*, Tulsa World (Apr. 12, 2023)…………………………39

Amy Swearer, *If You Can't Beat 'Em, Lie About 'Em: How Gun Control Advocates Twist Heritage's Defensive Gun Use Database in the "Large-Capacity" Magazine Debate*, The Heritage Foundation (May 17, 2023)………………………………...23

*Assault Rifle Legality by State 2023*, World Population Review…………………...22

*Crime Data Explorer*, FBI, U.S. Dep't. of Just. (2020)……………………………18

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381 (1994)……………………………………………………………...25

David B. Kopel, *The Costs and Consequences of Gun Control*, CATO Institute (Dec. 1, 2015)……………………………………………………………………………26

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015)………………………………………………………..37, 38

David E. Petzal, *The 8 Best Lever Action Rifles Ever Made*, Field & Stream (Nov. 3, 2022)………………………………………………………………………………36

v

Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171 (2020)…………………………………………………………………...41

Dictionary.com……………………………………………………………………..7

E. Gregory Wallace, *Assault Weapon Myths*, 43 S. Ill. U. L. J. 193 (2018)…………………………………………………………………………...25

*Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, Rand Corp. (Jan. 10, 2023)…………………………………………………..40

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018*, *Crime in the United States*, FBI, U.S. Dep't of Just. (2018)………………………………41

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. Dep't. of Just. (2019)……………………………...18

*Firearms Retailer Survey Report*, NSSF (2021)…………………..………………..21

Frank Miniter, *The Future of the Gun* at 35 (2014)………………………………24

Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 J. Res. & Pol'y 28 (2016)………………………...40

Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997)……………18

Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Of Crim. L. & Criminology 150 (1995)……………23

vi

James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 Homicide Studies 125 (2013)……………………………………………41

John B. Deans, *The Penn's Creek Massacre, Union County Sesquicentennial: The Story of a County, 1813–1963* (1963)………………………………………………...39

Joshua J. Mark, *Indian Massacre of 1622*, World History Encyclopedia (Mar. 2, 2021)………………………………………………………………………………39

Joseph G. Bilby, *A Revolution in Arms* 44 (2015)…………………………………36

Joseph von Benedikt, *Winchester Model 1873 Rifle Review*, Shooting Times (June 18, 2013)……………………………………………………………………………..36

Katharina Bucholz, *Where Military-Style Weapons Are Banned in the United States*, Statista (Jan. 11, 2023)………………………………………………………………22

Kenneth Culp Davis, *Facts in Lawmaking*, 80 Colum. L. Rev. 931 (1980)……….20

Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894* (1985)……………………………………………………………………..37

*M61A1/M61A2 20mm Automatic Gun*, Military Analysis Network ………………7

Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates,* 2016 at 5 tbl. 3, U.S. Dept. of Just., Off. Of Just. Progs., Bureau of Just. Stats. (Jan. 2019)…………………………………………………19

*Mass Shooting Incidents in America (1984–2012)*, Citizens Crime Commission of New York City (2017)………………………………………………………………40

vii

Matthew Larosiere, *Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions* (July 17, 2018)……………………………………………………..26

Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022)…………………………………21, 22

Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (2013)……21

Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (April 6, 2021)………………………………………………………………………………21

Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022)…………………………………………………21

Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*……………………………………………………………………………..21

Nicholas J. Johnson, *et al.*, *Firearms Law and the Second Amendment* 1148 (2d ed. 2018)………………………………………………………………………………37

Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, Rand Corp. (Apr. 15, 2021)…………………………………………………………………….40

Samuel Niles, *A Summary Historical Narrative of the Wars in New England* 347 (1837)…………………………………………………………………………...38

Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, The Trace (Jan. 6, 2016)……………………………………………………………..41

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (Google Books ed. 2022)…………………………………………………………………………35

*The Herrin Massacre*, Southern Illinois University (2009)………………………..39

U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats., *Victimization During Household Burglary*…………………………………………………………………….23

Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* 196 (2nd ed. 1999)…………………………………..35

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022)……………………………………………20

**Constitutional Provisions**

U.S. Const. amend. II……………………………………………………………*passim*

U.S. Const. amend. XIV…………..……………………………………………..44

ix

# I.    Introduction

As emphasized in the *Cheeseman* Plaintiffs' initial briefing, the first question to ask in resolving a Second Amendment challenge is whether "the Second Amendment's plain text covers [the] conduct" that the challenged law restricts. *New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 17 (2022). If it does, that conduct is "presumptively protect[ed]" by the Second Amendment. *Id*. Then, it becomes the burden of the State to demonstrate that the restrictions imposed on the exercise of that conduct are consistent with "this Nation's historical tradition of firearm regulation" so as to fall outside of the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 17 (citing *Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 50 n.10 (1961)). The analysis in this case is very simple: binding Supreme Court precedent has already established the relevant contours of the historical tradition that a court must examine when the Court declared that arms in common use for lawful purposes cannot be banned because, by definition, they cannot be both dangerous *and* unusual. The challenged law at issue here does just that, banning scores of arms in common use for lawful purposes around the country, and thus it must fall as necessarily *in*consistent with the Nation's historical tradition of firearms regulation.

The State's opposition and cross-motion for summary judgment ("D-MSJ") and related Statement of Undisputed Material Facts ("D-SOUMF") only cement this

conclusion by starkly illustrating how even an in-depth analysis of the entire relevant historical period compels the same result of summary judgment for Plaintiffs.

## II.   As the State Implicitly Concedes, the Second Amendment Plainly Covers the Possession and Use of the So-Called "Assault Firearms."

While the State unpersuasively claims that the banned "large-capacity" magazines (LCMs) are not "arms" under the Second Amendment,[1] D-MSJ at 15-21, it makes no *textual* argument at all about the numerous firearms it bans under the pejorative label of "assault firearms" or "assault weapons."[2] In fact, the State finds itself forced to concede this point in arguing for an interpretation of the Second Amendment's text that excludes LCMs. *See e.g.*, D-MSJ at 16 ("the word 'arms' was understood in the 18th and 19th centuries to encompass weapons like firearms . . .");

---

[1]   Although the LCM ban is beyond the scope of this particular suit, the law of this circuit is already settled against the State. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("Because ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[C]aselaw supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable.").

[2]   Although New Jersey's statutory label for these weapons is "assault firearms," the State borrows from the gun control lexicon to use the more popular label of "assault weapons" in arguing its case for upholding its bans against the prohibited firearms and LCMs. This "is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of an undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation omitted).

2

*id.* at 18–19 (quoting *Ocean State Tactical LLC v. Rhode Island*, 646 F. Supp. 3d 368, 387–88 (D.R.I. 2022) (" 'The word 'Arms' was a general term for weapons such as swords, knives, rifles, and pistols . . .' ")). This concession punctuates the obvious: the Second Amendment's plain text covers Plaintiffs' proposed course of conduct—simply being able to acquire and possess such arms for lawful purposes without being subject to criminal prosecution—as one can neither "keep [nor] bear Arms," U.S. CONST. amend. II, if one cannot acquire the arms in the first place. As the *Heller* Court explained, "[t]he 18th-century meaning is no different from the meaning today …. '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *District of Columbia v. Heller*, 554 U.S. 570, 581 (quoting 1 A New and Complete Law Dictionary). There cannot be—and has not been—any dispute that the banned "assault firearms" fall within the broad category of "bearable arms" protected by the text of the Second Amendment. *Id.* at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

Rather, the State's theory that Plaintiffs' proposed course of conduct "falls outside the scope of the right" to keep and bear arms is that it's Plaintiffs' burden to show—as an additional "predicate" to *textual* protection under the Second Amendment—that the banned firearms are "in common use for self-defense today."

3

**JA4719**

D-MSJ at 15. Setting aside for the moment the State's fundamental distortion of the "common use" test itself—twisting it into one where Plaintiffs must supposedly prove that "law-abiding citizens *commonly* employ assault weapons or fire more than 10 bullets in acts of self-defense," D-MSJ at 22-23—the common use test is not an element of the textual analysis. This prong of the analysis focuses solely on the "plain text" of the Second Amendment, as *Bruen* made clear: "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17; *id.* at 24. Indeed, nothing in *Heller* or *Bruen* suggests that commonality is even relevant, much less a "predicate" to an arm's textual protection.

Instead, the question of commonality is relevant to the *historical* prong, and thus it's a matter on which the *government* carries the burden of proof. Following the methodology later made explicit in *Bruen*, *Heller* began by analyzing the scope of the text of the Second Amendment. *See Heller*, 554 U.S. at 576–600. It construed the term "arms" to embrace "all instruments that constitute bearable arms," without regard to commonality. *Id.* at 582. *Heller* then analyzed the history of firearm regulation to assess potential limits on the right and held that *history* disclosed an "important limitation on the right to keep and carry arms," namely, that "*the historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons' " showed that "the sorts of weapons protected were those 'in common use.' " *Id.* at

4

JA4720

627 (emphasis added). Thus, this was a rule developed from "*the historical understanding* of the scope of the right." *Id.* at 625 (emphasis added). The handguns that were the subject of the District of Columbia's challenged ban were not "dangerous and unusual weapons," but rather "the most popular weapon chosen by Americans for self-defense in the home," thus they could not be banned. *Id.* at 629. Moreover, in *Bruen*, as the Supreme Court set out to clarify the methodology exemplified in *Heller*, it stated plainly that *Heller*'s conclusion that firearms "in common use" are protected by the Second Amendment was "[d]raw[n] from . . . *historical tradition*" and comported with the enactments of colonial legislatures that *Bruen* analyzed in its own historical review. 597 U.S. at 47 (emphasis added).

It is the job of the State, and the State alone, to demonstrate that the challenged regulation comports with the Nation's tradition of firearms regulation. *Bruen*, 597 U.S. at 24 ("When the Second Amendment's plain text covers an individual's conduct," "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). At the textual level, where the focus is solely on the plain text of the Second Amendment, Plaintiffs' proposed course of conduct of acquiring and possessing the banned "assault firearms" for lawful purposes is unquestionably protected and, on that point, the State does not claim otherwise. Therefore, the textual analysis is complete and "the Constitution presumptively protects that conduct." *Id.* at 17.

5

III.    The *Proper* "Common Use" Test Dispositively Resolves the Motions for Summary Judgment in Favor of Plaintiffs and Against the State.

Under *Bruen*, courts must analyze history, but in this case—which involves an arms ban just as *Heller* did—the Supreme Court has already done the historical work and has provided the rule of decision for this case: only "dangerous and unusual" arms could be banned historically, so that means that arms "in common use" today cannot be banned. The arms at issue are indisputably "in common use." This alone dismantles the challenged laws, compelling judgment for Plaintiffs.

A.    Common Possession for Lawful Purposes is the Correct Focus, Not How Often or How Many Rounds People Happen to Use in Self-Defense.

As noted, the State defines the "common use" test as a determination of whether "law-abiding citizens *commonly* employ assault weapons or fire more than 10 bullets in acts of self-defense," D-MSJ at 22–23, such that the focus is on actual "*use* for self-defense, not common *ownership* or possession," *id.* at 35. This is wrong. For all the State's own surmising about "hopelessly circular" and "absurd" results of focusing on common ownership or possession, *id.* at 36–38, the *legal doctrine* it cites in support of this construct directly undermines this position: the State points to *Bruen* for the principle that, "[i]t is weapons that actually 'facilitate armed self-defense' that fall within the protection of the 'central component of the Second Amendment right,' " *id.* at 35 (quoting *Bruen*, 597 U.S. at 28). More specifically, what the Supreme Court said was that the "general definition [of 'arms']

6

covers modern instruments that facilitate armed self-defense." 597 U.S. at 28. The plain meaning of "facilitate" is simply "to make easier or less difficult; help forward (an        action,        a        process,        etc.)."        Dictionary.com, https://www.dictionary.com/browse/facilitate. Clearly, ownership or possession of an arm *facilitates* armed self-defense, by enabling the owner or possessor to use the weapon for such purposes if and when the need for such action arises—i.e., as a matter of *preparedness* in maintaining one's personal security against threats which *may* call for armed defensive actions. At any rate, *Bruen* did not purport to *limit* the definition of "arms" to those that facilitate self-defense; rather, it was simply necessary for the Court to clarify that arms that "facilitate armed self-defense" are protected because, under the New York law at issue, carrying a handgun for "self-defense" purposes alone was insufficient "cause" to obtain a carry license. *See Bruen*, 597 U.S. at 15-16 (Plaintiff Nash's application for an unrestricted license was denied because he "did not claim any unique danger to his personal safety," and instead "simply wanted to carry a handgun for self-defense").

### 1.    "In Common Use" Means Common *Possession*.

As *Heller* explained, the word "bear" in the phrase "keep and bear Arms" means " 'being armed and *ready for* offensive or defensive action in a case of conflict with another person.' " *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (emphasis added). And, as

*Bruen* explained in reaffirming *Heller*, the Second Amendment " 'guarantee[s] the individual right to possess and carry weapons *in case of* confrontation' that does not depend on service in the militia." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592) (emphasis added). Otherwise, absurdly, the protections of the Second Amendment would not kick in until the moment a person is compelled to fire upon another person as a means of repelling force. So, it is clear that, under the proper test for "common use," *possession* is what the Supreme Court meant. *Bruen*, 597 U.S. at 27 (quoting *Heller*, 554 U.S. at 627 ("[T]he Second Amendment protects *the possession and use* of weapons that are " 'in common use at the time.' ") (emphasis added); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (the "*relevant statistic* is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears *may lawfully possess* them in 45 states") (emphasis added); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (focusing solely on the fact that "Americans *own* millions of the firearms that the challenged legislation prohibits" to find that "the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*") (emphasis added).

The Court in *Heller* specifically recognized that the Second Amendment protects those firearms "typically *possessed* by law-abiding citizens for *lawful purposes*." 554 U.S. at 625 (emphasis added). Not only does this cement the

8

**JA4724**

conclusion that the common use test focuses on possession, but it also highlights that the Second Amendment secures more than armed *self-defense*, contrary to the State's suggestion. While the scope of the protection *includes* self-defense, the right also extends to other "lawful purposes." *See Bruen*, 597 U.S. at 48 & n.15 (approvingly citing *State v. Huntly*, 25 N.C. 418, 422–23 (1843), where the North Carolina Supreme Court stated that " 'the citizen is at perfect liberty to carry his gun' '[f]or any lawful purpose,' of which 'business' and 'amusement' were then mentioned" and "contrasted these 'lawful purpose[s]' with the 'wicked purpose . . . to terrify and alarm' "); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("*Heller II*") ("Of course, the Court also said the Second Amendment protects the right to keep and bear arms for other 'lawful purposes,' such as hunting . . .") (citing *Heller*, 554 U.S. at 630). Further, consider all the collectible antique firearms, hunting or competition target shooting rifles, and even handguns that are virtually useless or at least relatively impractical for use as self-defense weapons. Their protection under the Second Amendment certainly is not in question. The Supreme Court plainly did not envision that lower courts in the wake of *Heller* and *Bruen* would decide on a case-by-case basis whether individual firearms, in their views, were "legitimate" or "ideal" self-defense weapons. Instead, bearable arms are protected and cannot be banned if they are in common use for any lawful purpose.

9

JA4725

Just the same, the Supreme Court did not envision that states would be deciding when and how a particular firearm otherwise lawfully owned or possessed is *necessary* for self-defense, nor how many shots must be fired or how often before the arm is entitled to protection against a ban. The State's position is not only absurd, but it also effectively attempts to elevate its policy judgments—and the paid judgments of its experts—over "the balance struck by the founding generation." *Bruen*, 597 U.S. at 29 n.7. That is, the State is purportedly legislating the *necessity* of this fundamental right, by deciding for itself whether or to what extent "the right is *really worth* insisting upon." *Contra Heller*, 554 U.S. at 634. That is forbidden. The Supreme Court's opinion in *Bruen* was designed to eliminate any further use of such means-end, interest balancing that focuses on whether a firearm regulation burdens the Second Amendment right " 'in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 634). *Heller* left no doubt that the People choose what is useful for self-defense and that *whatever* reason they have for it is good enough:

> It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those

10

without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Heller*, 554 U.S. at 629.

Thus, the evidence the State has developed through another of its paid experts, Lucy Allen, that individuals on average fire 2.2 bullets when using handguns in self-defense, Def. Ex. 7 (Dkt No. 184-1) at ¶¶ 9-10, is simply irrelevant. Moreover, Allen's analysis, based on an NRA magazine report self-titled "NRA Armed Citizens database," is not supported with statistical reliability. First, she admits that the data in this report has not been updated since 2017. *Id.* ¶ 9, n.5. Second, the purported "NRA Armed Citizens database" is just a collection of magazine articles, and Allen has admitted in multiple other cases that this study was not compiled scientifically. *See Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1129 (S.D. Cal. 2017); *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1044-45 (S.D. Cal. 2021) ("As she acknowledged in her declaration submitted in *Duncan v. Becerra*, the NRA-ILA Armed Citizen Database is not compiled scientifically."), vacated and remanded, 2022 WL 3095986 (9th Cir. Aug. 1, 2022); *id.* at 1042-45 ("Allen's opinion about the number of shots fired in self-defense is entitled to little weight and fails the scientific method."); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:17-cv-10507-PGS-LHG, 2018 WL 4688345 ("*ANJRPC*"), at *5 (D.N.J. Sept. 28, 2018) ("Allen

11

**JA4727**

conceded that the NRA Armed Citizen Database is not a scientific study and is not representative of overall statistics on the use of arms in self-defense."), aff'd sub nom. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018); *id.* at *12 (finding that Allen had not "provided a clear analysis" based on the various studies).

### 2.    The State's Criticisms of This Test Are Irrelevant and Unfounded.

The State certainly cannot expect to upend this settled law based on its complaints about supposedly untenable consequences of adhering to the true test. These complaints are meritless anyway. The State harps that "under Plaintiffs' ownership tally test, machine guns would be entitled to Second Amendment protection, since there are roughly '176,000 legal civilian owned machine guns in the United States.' " D-MSJ at 38 (quoting *Delaware State Sportsmen's Association, Inc. v. Delaware Dept. of Safety and Homeland Security*, __ F. Supp. 3d __, 2023 WL 2655150, at *5, appeal pending, No. 23-1633 (3d Cir. 2023)). But even looking solely at the numbers, it is far from clear that an arm over 10 percent less common than the 200,000 stun guns in circulation—which may well represent the lower bar of constitutional protection—qualifies as "in common use." Moreover, according to the Supreme Court, fully automatic machine guns are not "widely accepted as lawful possessions," *Staples v. United States*, 511 U.S. 600, 612 (1994), even if roughly 176,000 are in civilian circulation, *see* 18 U.S.C. § 922(o)(2)(b).

Of course, the numbers of both Tasers and machine guns owned by law-abiding Americans are dwarfed by the number of firearms that the State dubs "assault firearms," which are owned by *millions* of Americans, as demonstrated in Plaintiffs' opening brief and in further detail below; *see also* Pltf. Resp. to D-SOUMF Nos. 39, 42, 44, 49, 57 (further distinguishing machine guns as a distinct class of arms). So, even if the floor for common use is above 200,000, this case raises no thorny concerns about the limits of the scope of the right. *See, e.g.*, *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR–15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.").

The State also charges that this test is circular or creates a race between regulators and manufacturers, because it "would permit prohibiting a weapon simply because the State banned the weapon before it ever became commercially available" and would allow "regulated parties" to "game" the system because "manufacturers would only need to 'flood[] . . . the market' before any restrictions could be enacted to forever insulate a weapon from restrictions." D-MSJ at 36-37 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017)). But Justice Breyer made this very argument in *Heller*, contending in his dissenting opinion that applying a test focused

13

on common possession would mean, "if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so." 554 U.S. at 720–21. And "the *Heller* majority was obviously unmoved by it." *Kolbe*, 849 F.3d at 153 (Traxler, J., dissenting). Similarly, it's not true that a state's regulation would be *per se* valid any time it outlaws a firearm before the firearm comes into common use. To be banned, a firearm must be "dangerous *and* unusual," as discussed further in the opening brief and below here. A firearm may be infrequently owned (therefore unusual numerically) yet no more dangerous than arms that are in common use (therefore not dangerous). "Common use" is a sufficient but not necessary condition to prohibit the State from banning its possession.

**B.    The State's Claims About Increased Risks of "Lethality" Are Overblown, and *Heller* and *Bruen* Have Already Taken Account of All Relevant Risks.**

The State's attempt to paint the banned firearms as weapons of war "disproportionately used by criminals to perpetrate mass shootings," D-MSJ at 28-34, is another red herring. The State's main focus here is the AR-style rifle—in particular the AR-15—and its potential for causing lethal injuries in the hands of criminals. Of course, *all* firearms possess such potential—as they must in order to serve their core purpose of facilitating *armed* self-defense—and *Heller's* primary analysis of the Second Amendment already took account for the main concerns about

14

**JA4730**

the misuse of firearms in society. *See* 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution."). In fact, Justice Breyer spilled considerable ink writing about these potentialities in much the same light as the State does here. *See id.* at 682 (Breyer, J., dissenting) (defending the District of Columbia's handgun ban on the basis that handguns "are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals"); *id.* at 694–95 (pressing the District of Columbia's statistics that "guns were 'responsible for 69 deaths in this country each day,' for a total of '[a]pproximately 25,000 gun-deaths . . . each year,' along with an additional 200,000 gun-related injuries," and " '[a] crime committed with a pistol,' the [House] Committee [on the District of Columbia] reported, 'is 7 times more likely to be lethal than a crime committed with any other weapon' "). A central idea behind the District of Columbia's handgun ban, stressed in Justice Breyer's dissent, was in fact " 'to reduce the potentiality for gun-related violence.' " *Id.* at 695.

In the face of this, the *Heller* majority noted that "[u]ndoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem." 554 U.S. at 636. Yet, the majority was unshaken in its adherence to "the true meaning of the right to keep and bear arms,"

15

JA4731

*id.* at 624, and in its resolve that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table," including "the absolute prohibition of handguns held and used for self-defense in the home," *id.* at 636. Thus, the *Heller* majority considered the essential concerns that the State presses here in lamenting the potential "to inflict carnage" when AR-style rifles are in the wrong hands. D-MSJ at 32-34. But the Court found them irrelevant to whether the arms at issue were protected, because that does not turn on whether arms are misused by criminals; it turns on, *inter alia*, whether law-abiding citizens commonly own and use them for lawful purposes, and it was enough in *Heller* to secure constitutional protection that handguns are *typically* possessed for lawful purposes. 544 U.S. at 624–25.

The extent to which any of the arms at issue might be used for harmful purposes in the hands of criminals or wrongdoers cannot justify the restrictions being imposed against those who indisputably wish to use such arms for the *lawful* purposes secured for law-abiding citizens under the Second Amendment. Criminals misusing firearms will always have a tactical advantage bestowed by their planning and forethought. It is those reacting to an aggressor who are limited by what they can carry in the course of their everyday lives. The actions of criminals do not affect the rights of those who wish to avail themselves of the advantages that common firearms offer for defense of self, others, and home. Just as the State could not justify

16

a general ban against the use of popular fora for free speech (like Facebook and Instagram) based on the risk that *some* may misuse those fora to perpetrate or facilitate criminal conduct, it cannot justify a general ban against "assault firearms" just because some use them to commit criminal acts.

Likewise, attempting to justify the general ban against the targeted "assault firearms" based on the State's interest in combating such risks runs afoul of *Bruen's* clear mandate that courts must abandon any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.' " *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 634.) *Bruen* also took account for such risks and expressly set them aside: The Court noted "the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms." *Id.* at 17 n.3. Much like the State does here, "[t]he dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use." *Id.* "But, as Members of the Court have already explained, '[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications.' " *Id.* (quoting *McDonald v. Chicago*, 561 U.S. 742, 783 (2010)). Therefore, the State is not only misguided in its heavy emphasis on the potential dangers of firearms falling into the wrong hands,

17

**JA4733**

but these assertions of fact about such risks are irrelevant and immaterial to the issues in dispute.

Moreover, to the extent the State's claim that AR-style firearms are "disproportionately used by criminals to perpetrate mass shootings" is intended to suggest such weapons are *commonly* used in crime, D-MSJ at 32-34, this is not just irrelevant, it is wrong: "assault" rifles are used extremely rarely in crime, underscoring that AR-15s and other banned rifles are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of guns used in crime] are 'assault rifles.' " Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997). From 2015 through 2020, only 2.4% of murders were committed with *any* type of rifle. *See Crime Data Explorer*, FBI, U.S. Dep't. of Just. (2020), https://bit.ly/3AA8Qwj; *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. Dep't. of Just. (2019), https://bit.ly/31WmQ1V (72,781 total murders; 1,573 with rifles). Murder by "hands, fists, feet, etc." was more than twice as common, at 3,346 occurrences, over the same time period—and murder by handgun, at over 30,000 occurrences, was approximately *20 times* as common. *Id.* Even if a different semiautomatic rifle had been used in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million of them in circulation in the United States during that time period—around .01 percent—would have been used for that

18

unlawful purpose. More broadly, as of 2016, only 0.8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates,* 2016 at 5 tbl. 3, U.S. Dept. of Just., Off. Of Just. Progs., Bureau of Just. Stats. (Jan. 2019), https://bit.ly/31VjRa9. And, as for the exceedingly rare instances of "mass shootings" perpetrated with "assault weapons" that the State cites in justification for the challenged bans, again, this is nothing but fodder for improper interest balancing and an appeal to emotions instead of legal reasoning.

## C. Because These Arms Are in Common Use, They Are Necessarily *Not* Dangerous and Unusual and Cannot be Subjected to the State's Ban.

Semiautomatic firearms of the very kind that the State bans as "assault firearms" "*traditionally have been widely accepted as lawful possessions*." *See Staples*, 511 U.S. at 612 (so categorizing an AR-15 semiautomatic rifle) (emphasis added), and "[t]here is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles" for these purposes, *Heller II*, 670 F.3d at 1269–70. While some exterior physical attributes may differ— wood versus metal stocks and furniture, the number and/or location of grips, bare muzzles versus muzzle devices, different barrel lengths, etc.—they are, in all relevant respects, the same. They are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are

19

functionally semiautomatic in nature. They are all common firearms that have the same cyclical rate of fire: one round fired per pull of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions. They are all common under the same jurisdictional analysis. Further, they are all subject to the same constitutionally relevant history.

### 1.    The Banned Arms Are Ubiquitously Owned and Possessed for Lawful Purposes, Including for Self-Defense.

A recent survey of gun owners indicates that about 24.6 million Americans have owned up to 44 million AR-15 or similar rifles. *See* William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw ("English Survey").[3] And according to

---

[3]    The State's evidentiary objections to the English Survey as inadmissible and unauthenticated and "double-hearsay," D-MSJ at 39, are unfounded. The Survey contains statements of "legislative fact" or facts "which have relevance to the legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court in the enactment of a legislative body." Fed. R. Evid. 201, 1972 Advisory Committee Note. The rules of evidence do not apply to legislative facts. *See, e.g.*, *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (Posner, J., in chambers). Thus, it is irrelevant that the Survey is offered for the truth of the matter asserted—after all, sources of legislative facts will *frequently* be hearsay. "[E]ven though nothing in the Rules provides that they are limited to adjudicative facts," "[t]he hearsay provisions of the Federal Rules of Evidence clearly should not apply (Rule 803(8), for instance)" to legislative facts. Kenneth Culp Davis, *Facts in Lawmaking*, 80 Colum. L. Rev. 931, 941 (1980); *see* Fed. R. Evid. 201, 1972 Advisory Committee Note (relying on Professor Davis's framework of legislative facts and adjudicative facts to explain why a judge may rely on legislative facts without taking judicial notice of them, as they are not the type of facts to which the Rules apply); *see also* *Lockhart v. McCree*, 476 U.S. 162, 168 n.3 (1986). Because the Rules of Evidence do not apply, legislative

industry sources, even ten years ago more than one out of every five firearms sold was a rifle of the type banned by New Jersey. Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (2013) at 11, https://www.nssf.org/articles/nssf-updates-firearms-retailer-survey-results/; *see also* Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/; Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf; Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report* (April 6, 2021), https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf; Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020*, https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf.[4]

---

facts can be and frequently are found in "books and other documents not prepared specially for litigation or refined in its fires." *Ind. H. B. R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990). The Survey is one such proper source.

[4]    Notably, the State's own expert evidence relies on this NSSF data along with data from ATF in distilling the actual ownership statistics. *See e.g.*, Expert Report of Luis Klarevas, Def. Ex. 9 (Dkt No. 184-1) at ¶ 14 ("The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available)."); *id.* ("Assuming these figures reported by the NSSF and ATF are accurate. . ."). In so doing, the State neutralizes its own claim that the NSSF data are unreliable, D-MSJ

Further, it is also indisputable that these firearms are in common use for lawful purposes, including for self-defense. The fact that these devices are perfectly lawful in the vast majority of states speaks volumes alone. *See Assault Rifle Legality by State 2023*, World Population Review (last accessed Dec. 13, 2023), https://worldpopulationreview.com/state-rankings/assault-rifle-legality-by-state ("[T]he overwhelming majority of states allow assault rifles to be purchased within their borders."); Katharina Bucholz, *Where Military-Style Weapons Are Banned in the United States*, Statista (Jan. 11, 2023), https://www.statista.com/chart/18924/states-without-a-ban-on-assault-rifles-and-large-capacity-magazines/ ("The vast majority of U.S. states do not restrict the sale of assault weapons or high-capacity magazines[.]"). In addition to lawful uses such as hunting and target shooting, studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck,

---

39-40, and it also neutralizes its objections to the English Survey as unreliable and inadmissible since the Survey is independently corroborated by the NSSF's data. Even accepting the speculation that the NSSF reports "*appear to* include sales to law enforcement, firearm retailers, and 'possibly prohibited possessors' as well as straw buyers," D-MSJ at 40 (emphasis added), the State fails to show how any inclusion of these categories materially alters the analysis: Even just one million of the more than 24 million firearms documented as being in circulation is quintuple the number that Justice Alito deemed sufficient to be "common" in *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (finding stun guns common because civilians own 200,000 of them).

Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. of Crim. L. & Criminology 150, 164 (1995); *see also* English Survey, *supra* at 5 (finding 31.1% of firearms owners, or about 25.3 million adult Americans, have used a firearm in self-defense, and 1.67 million defensive firearm uses a year).

Encounters with criminal intruders in the home are not uncommon. According to a report by the U.S. Department of Justice, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats., *Victimization During Household Burglary*, at 1 (Sept. 2010), https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf. Indeed, 51.2 percent of all self-defense incidents annually involve two or more attackers, while 20.4 percent of such incidents involve three or more attackers. English Survey at 15. "[M]ultiple-offender homicides in particular are becoming increasingly common: In 2008, roughly one of every five homicides involved multiple offenders." Amy Swearer, *If You Can't Beat 'Em, Lie About 'Em: How Gun Control Advocates Twist Heritage's Defensive Gun Use Database in the "Large-Capacity" Magazine Debate*, The Heritage Foundation, at 7 (May 17, 2023), https://www.heritage.org/firearms/report/if-you-cant-beat-em-lie-about-em-how-gun-control-advocates-twist-heritages (citing Alexia Cooper & Erica L. Smith, *Homicide Trends in the United States, 1980–2008*, Bureau of Just.

23

JA4739

Stats. NCJ 236018, at 24 (Nov. 2011)); *see also* Pltf. Resp. to D-SOUMF Nos. 11, 189 (further detailing how these firearms are particularly useful in such confrontations).

The firearms that the State bans undoubtedly *facilitate* these lawful purposes for which law-abiding citizens own and possess them around the country, including self-defense, in particular *because* of the common utilitarian features that the State uses to label them as prohibited "assault firearms." For example, most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. *See Modern Sporting Rifle Comprehensive Consumer Report*, *supra*, at 18 (noting self/home-defense is the second most important reason Americans reported for owning AR-style firearms, second only to recreational target shooting); Frank Miniter, *The Future of the Gun*, at 35 (2014) (the caliber of the AR-15 "makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls"). "ARs are popular with civilians and law enforcement around the world because they're accurate, light, portable and modular. . . . It's also easy to shoot and has little recoil, making it popular with

women." *Id.* In fact, "[t]he AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." *Id.* Thus, despite the pejorative labels, an AR-15 rifle chambered for 5.56x45mm NATO ammunition is an optimal firearm for self-defense encounters.

The same is true for the specific utilitarian features and combination of features that the State targets through its arms ban. A flash suppressor, for example, not only reduces the chances that an attacker will mark his victim's position, but it also helps protect an individual against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 397 (1994). Similarly, folding and telescoping stocks increase maneuverability in tight home quarters, *id.* at 398–99, as well as enabling safe storage of defense instruments in accessible spaces. A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively. *Id.* Thus, they increase the likelihood of successful home defense by making the rifle maneuverable in confined spaces as well as permitting safe storage of defense instruments in accessible spaces. *Id.* Additionally, pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id.* at 396; E. Gregory Wallace, *Assault Weapon Myths*, 43 S. Ill. U. L. J. 193, 228–34 (2018). A thumbhole stock is

nothing more than an ordinary stock with a hole drilled through the grip area. It promotes accuracy by improving comfort and stability in handling a firearm. *Id.*

Further, most all common semiautomatic firearms, including those banned under New Jersey law, accept a detachable magazine. David B. Kopel, *The Costs and Consequences of Gun Control*, CATO Institute (Dec. 1, 2015), https://www.cato.org/policy-analysis/costs-consequences-gun-control#high-capacity-magazines ("This is the norm for shotguns. For many rifles, and almost all handguns that use magazines, the magazine is detachable."). Detachable magazines not only help law-abiding shooters to reload their weapon in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to remedy malfunctions safely and quickly. *See* Matthew Larosiere, *Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions* (July 17, 2018), https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions#a-magazine-is-not-just-a-nbsp-box ("[M]agazine malfunctions are the primary source of breakdowns in self-loading weapons."). Detachable magazines have the same benefits in hunting and sport shooting as they do in home defense—improved reloading and remedying of malfunctions. Similarly, these features, which the State claims are attractive to users likely to engage in crime, are neither nefarious nor unique to "assault firearms," as they also facilitate the lawful activities of hunting and sport shooting: folding and telescoping stocks, for

26

example, allow for safe transportation, including in a hiking pack, an ATV, or a boat; both telescoping stocks and protruding grips open hunting and sport shooting to those for whom recoil represents a high barrier to entry; and flash suppressors certainly promote accuracy in target shooting and hunting (especially at dawn). Pltf. Resp. to D-SOUMF Nos. 11, 179 (further detailing how these features make these firearms particularly well suited for self-defense).

### 2.    Any Ban of These Commonly Used Arms is Untenable.

Again, it is clear—and dispositive in this case—that for a *ban* of a type of arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is both "dangerous and unusual." *Bruen*, 597 U.S. at 47; *Heller*, 554 U.S. at 625. In other words, New Jersey can enact and enforce such a ban *only* if the targeted arms are *not* "the sorts of weapons . . . in common use at the time," so that the regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Heller*, 554 U.S. at 627 (cleaned up). Significantly, the State does not argue otherwise. Instead, it attempts to evade the issue by supplanting its own standard—in a footnote no less—which transmogrifies the well-established dangerous *and* unusual test into a *disjunctive* "unusually dangerous" test. D-MSJ at 55–56 n.16.

There is no historical tradition of banning dangerous arms—just a historical basis for banning "*dangerous and unusual*" arms. *See Bruen*, 597 U.S. at 21

27

(emphasis added). Indeed, all arms are dangerous or else they would not be arms; a weapon that poses no danger is useless. Further, "that an item is 'dangerous,' in some general sense, does not necessarily suggest, as the State seems to assume, that it is not also entirely innocent." *Staples*, 511 U.S. at 611. In 2016, Justice Alito wrote in *Caetano*: "As the per *curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual. Because the Court rejects the lower court's conclusion that stun guns are unusual, it does not need to consider the lower court's conclusion that they are also dangerous." 577 U.S. at 417 (Alito, J., concurring) (emphasis in original). If the Supreme Court had ever intended lower courts to consider whether various arms were dangerous *or* unusual and to uphold bans based solely on one or the other, it would have said so. It has not.

The State nevertheless asserts that the targeted arms may be banned under this "unusually dangerous" label, extrapolating this "disjunctive" concept to mean weapons that are "particularly dangerous or susceptible to disproportionate criminal misuse," which it then uses as the foundation for its claim that the ban is part of "a longstanding national tradition of restricting" such weapons. D-MSJ at 55. First, this assertion seeks subtly to prod the Court back into the forbidden territory of interest balancing. The fact that a legislature may be particularly concerned with the potential dangerousness of arms is immaterial and entitled to no deference when the arms are in common use for lawful purposes, as these targeted arms are here. *Caetano*, 577

28

JA4744

U.S. at 418 (Alito, J. concurring) ("[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."). Second, any supposed "tradition" of restricting arms *solely* based on their dangerousness would carry no weight because the test is in fact *conjunctive*— i.e., whether New Jersey will admit it or not, states may ban only those arms "highly unusual in society at large" *in addition to* being dangerous. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). Third, whatever the State means by weapons that are "unusually dangerous"—or "particularly dangerous or susceptible to disproportionate criminal misuse"—weapons in common use for *lawful purposes* necessarily cannot reasonably be seen as fitting such a mold. Substantially more people are killed each year in this country with bare hands, knives, or blunt objects (individually, not collectively) than by rifles of *any* kind. *See* FBI (2019), *Expanded Homicide Data Table 8, Murder Victims by Weapon, 2015-2019*, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls (last accessed December 8, 2023). Notably, these arms are exactly as "dangerous" as the semiautomatic arms that are not banned by the State since they function in the same way and can fire the same cartridges.

"Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Bruen*, 597 U.S. at 70. They have confined

themselves to prohibiting only those arms that are "*not* typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). Thus, the reality is, it makes no difference whether these or similar arms would have been understood as "dangerous and unusual" in olden days, as *Bruen* made clear:

> [E]ven if … colonial laws prohibited the carrying of [certain types of arms] because they were considered 'dangerous and unusual weapons' [*then*], they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 597 U.S. at 47 (emphasis added) (quoting *Heller*, 554 U.S. at 627).

Ultimately, *Heller's* distinction, reiterated by *Bruen*, between protected weapons "in common use at the time" and those that are "dangerous and unusual" loses all meaning if a state can ban a weapon in common use merely because the legislature concludes the weapon is potentially more dangerous relative to some other weapon. The dangerous *and* unusual test controls. Because the State cannot show that the so-called "assault firearms" are "dangerous and *unusual* weapons," as is necessary to enact "a 'complete prohibition' " on a type of firearm "*consistent with* the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24 (emphasis added), that is the end of the analysis and the end of road for this law.

## IV.    Any Additional Historical Analysis Can Only Further Cement the Fate of The Challenged Law as an Unconstitutional Arms Ban.

"[T]he traditions of the American people . . . demand[] our unqualified deference," *Bruen*, 597 U.S. at 26, and the tradition here is that law-abiding citizens

30

JA4746

may keep and bear arms that are commonly possessed for lawful purposes. That *is* the historical test—i.e., the key inquiry under *Bruen*—and it forecloses the State's effort to ban these commonly possessed arms. Summary judgment can and should issue on this basis alone. However, should the Court go further, the State's historical arguments can only underscore why the ban must be stricken.

## A.    The State is Not Entitled to Any Leniency Under the *Bruen* Standards, Whether Under "a More Nuanced Approach" or Otherwise.

In order to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, the State must identify, through "analogical reasoning," "a well-established and representative historical analogue" to the challenge regulation, *id.* at 30. This requires the State to show a historical tradition "relevantly similar" to the challenged regulation in both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767).

The States strives for leniency here in claiming this Court should apply " 'a more nuanced approach' when evaluating historical analogues here," because the challenged law " 'implicat[es] unprecedented societal concerns or dramatic technological changes,' " D-MSJ at 41 (quoting *Bruen*, 597 U.S. at 27), without

31

**JA4747**

venturing to explain how or in what way the analysis should be altered. In all events though, the Supreme Court's discussion of "a more nuanced approach" does not create any sort of analytical offramp from the "analogical inquiry" mandated in *Bruen*, and this case does not even involve "unprecedented societal concerns or dramatic technological changes" that would require a "nuanced approach" anyway.

At the outset, a "more nuanced approach" makes no difference when the analogy has *already been drawn* by the Supreme Court and, in any event, the specific rule the Supreme Court has derived for cases like this one—that arms "in common use" today are protected against bans—inherently accounts for technological and social changes on which the State places so much emphasis. Indeed, in explaining why "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," the court cited its recognition in *Heller* that "the Second Amendment's historically fixed meaning applies to new circumstances" and specifically that, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. In other words, the Court's own illustration of this "more nuanced approach" was applied to further explain the holding in *Heller* that " 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.' " *Id.* (quoting *Heller*, 554 U.S. at 582). So,

32

the concept was discussed in explaining the *expansive* reach of the Second Amendment's protection, not to *shrink* its protective scope as the State suggests.

At no point did the Supreme Court suggest that the existence of any "unprecedented societal concerns or dramatic technological changes" would somehow untether the analysis from the required analogical inquiry. To the contrary, when the court went on to discuss in this very context the process of "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," it reaffirmed that doing so "requires a determination of whether the two regulations are 'relevantly similar,' " just the same as any other regulation. *Bruen*, 597 U.S. at 28-29. Nevertheless, the State distorts *Bruen's* discussion of "a more nuanced approach" into the foundation for its lengthy exposition about the supposedly dramatic technological advancements leading to the development of the arms at issue, which, in turn, it claims, have left "the country now grappl[ing] with" the "unprecedented societal concerns" of "mass shootings." D-MSJ 41-55. The clear driving force behind this exposition is an effort to demonstrate the importance of the challenged laws in advancing the State's firearms policies. But under *Bruen*, interest-balancing arguments are out of bounds, and this Court must guard against giving credence to such arguments, however presented. *See Bruen*, 597 U.S. at 29.

33

### 1.    No "Dramatic Technological Changes" Are in Play Here.

Moreover, any argument based on the notion of dramatic-technological-changes-resulting-in-unprecedented-societal-concerns is a non-starter. First, as the above principles make clear, the Supreme Court's Second Amendment doctrine *embraces* relevant technological change to *ensure the protection* of modern arms in common use even if they may differ considerably from arms of old. *Heller*, 554 U.S. at 582 ("Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). *Bruen* eliminated any doubt about that when it explicitly held that handguns could not be banned even if they *were* considered "dangerous and unusual" at the founding, because what matters is whether they are "in common use *today*." *Bruen*, 597 U.S. at 47 (emphasis added). Thus, any argument that begins with a comparison to commonality at the founding never gets off the ground.

Second, the essential premise behind the State's "dramatic technological changes" argument is that modern semiautomatic firearms, and in particular AR-15 rifles, enable a person "to inflict substantially greater lethality" than one could inflict with firearms of the colonial age, which is not only fundamentally misleading from a factual perspective but also seriously distorts the legal issues before the Court by

34

focusing on the conduct of mass murderers and other violent criminals. D-MSJ at 44-48. According to a renowned forensic pathologist, former medical examiner, and former member of the Justice Department's National Commission on Forensic Science, "[o]ne of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895)." *See* Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* 196 (2nd ed. 1999). Further, the bullets fired by an AR-style rifle are far smaller than those used since before the founding: "Muskets, which were being transitioned from matchlocks to flintlocks, were typically .75 caliber. That was a powerful, deadly weapon that could create a three-quarters-of-an-inch wound." Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* 104 (Google Books ed. 2022). "By comparison, today's AR-15 rifle typically fires a .223 caliber bullet, which is less than a quarter of an inch in diameter. In other words, the seventeenth-century musket fired a bullet three times larger in diameter than the bullet usually fired by the AR-15." *Id.* All semiautomatic firearms have exactly the same inherent rate of fire since the number of bullets that exit the muzzle in a unit of time depends entirely on how fast its operator pulls the trigger: "Once one pulls the trigger and fires a round, another round loads itself and

35

may be fired by another pull of the trigger." *Id.* at 206; *see also* Pltf. Resp. to D-SOUMF Nos. 44, 48, 67, 71–73, 75–76, 180–81 (further detailing how the core functionality of AR-style rifles is the same as any other semiautomatic firearm).

Semiautomatic firearms were invented in the 1880s, with modern box magazines following in the 1890s. Joseph G. Bilby, *A Revolution in Arms* 44 (2015). As recounted by one of the State's own experts, "[b]y the early 1890s, then, gunmakers had at their disposal a trio of potent new design features that would become characteristic of most modern automatic and semiautomatic firearms—self-loading mechanisms, smokeless powder ammunition, and detachable magazines." Def. Ex. 12 (Report of Brian DeLay) at ¶ 80. "These culminated with the M1911, a handgun with a 7-round detachable magazine. The most copied and influential of all modern handguns, several million M1911s have been sold in the past century." *Id.* The "first really successful centerfire repeating rifle," the Winchester Model 1873, "was an accurate, ergonomic, reliable rifle chambered for revolver-compatible cartridges so that shooters could carry one type of ammo for both their long gun and their sidearm." Joseph von Benedikt, *Winchester Model 1873 Rifle Review*, Shooting Times (June 18, 2013), https://www.shootingtimes.com/editorial/winchester-model-1873-rifle-review/99446. Other popular repeaters, despite being from over a century ago, "are still the best lever action rifles ever produced." David E. Petzal, *The 8 Best*

*Lever Action Rifles Ever Made*, Field & Stream (Nov. 3, 2022), https://www.fieldandstream.com/guns/best-lever-action-rifles/.

These were not novelty firearms even then. "Cartridge-fed," "repeating" firearms in particular came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, which was a full-size lever-action rifle capable of carrying 17 rounds," which "could fire 18 rounds in half as many seconds." *Duncan v. Becerra*, 970 F.3d 1133, 1148 (9th Cir. 2020) reh'g en banc granted, opinion vacated, 19 F.4th 1087 (9th Cir. 2021); *see* Nicholas J. Johnson, *et al.*, *Firearms Law and the Second Amendment* 1148 (2d ed. 2018); Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894* 128 (1985); David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854-55 (2015). In short, the semiautomatic firearms and ammunition feeding devices of the sort targeted by New Jersey's ban do not represent "dramatic technological changes," as the State claims, but rather have been part of the fabric of American life for more than 150 years *without* any tradition of prohibiting law-abiding citizens like Plaintiffs from possessing them. *See also* Resp. to D-MSJ Nos. 16-18, 21-23, 28, 34-35 (further detailing the centuries-long history of detachable magazines, multi-shot arms, and repeaters in American life). The first firearm that could fire more than ten rounds without reloading was

37

invented around 1580. Kopel, 78 Alb. L. Rev. at 85.  11-shot repeaters were sold in the United States as early as the 1720s. Samuel Niles, *A Summary Historical Narrative of the Wars in New England* 347 (1837), https://bit.ly/3tflRev. The 1820s saw the invention of a repeater whose "number of charges may be extended to fifteen or even twenty" and which was marketed for "private use." *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen.*, 974 F.3d 237, 255 (Matey, C.J., dissenting) (citation omitted)). In fact, the leading air rifle of the mid-1800s could shoot upwards of 20 rounds via a gravity-fed, tubular magazine. Kopel, *The History of Firearm Magazines*, *supra* at 854–56. Repeating arms, capable of firing as many and even more rounds than the arms banned by the State are nothing new.

### 2.    No "Unprecedented Societal Concerns" Are in Play Either.

To the extent the State seeks to excuse the relative novelty of banning such commonplace arms by pointing to the "unprecedented societal concerns" of "the spate of mass shooting events," *see Bruen*, 597 U.S. at 27, that argument fails too. Even accepting the dubious proposition of a causal link between the arms the State has banned and the horrific acts on which its briefing has focused,[5] the unfortunate reality is that mass killings are not novel phenomena. For example, on March 22,

---

[5]    *See* Pltf. Resp. to D-SOUMF Nos. 138, 144, 148, 151–54, 164–75, 177–78 (further explaining the inherent unreliability of the State's evidence intended to draw a link between "mass shootings" and the banned "assault firearms" and LCMs, either in terms of a causal connection or the frequency of their involvement in such crimes).

1622, Native Americans killed 347 English settlers, wiping out over a quarter of the Jamestown population. Joshua J. Mark, *Indian Massacre of 1622*, World History Encyclopedia (Mar. 2, 2021), https://www.worldhistory.org/Indian_Massacre_of_1622/. A Lenape raid in October 1755 claimed fourteen lives along Penn's Creek, Pennsylvania. John B. Deans, *The Penn's Creek Massacre, Union County Sesquicentennial: The Story of a County, 1813–1963* (1963), https://archive.org/details/unioncountysesqu00dean. Many were killed by firearms and other media in the infamous Tulsa Race Massacre of 1921. *See* Anna Codutti, *Tulsa Race Massacre graves search: 'Major scientific breakthrough' made in DNA investigation*, Tulsa World (Apr. 12, 2023), https://tulsaworld.com/news/local/racemassacre/tulsa-race-massacre-graves-search-major-scientific-breakthrough-made-in-dna-investigation/article_2ed50126-d93e-11ed-abd1-b7cb157513c8.html. The Herrin Massacre of 1922 resulted in the killings of 21 people, in what President Warren Harding called "a shocking crime, barbarity, butchery, rot and madness." *The Herrin Massacre*, Southern Illinois University (2009), https://www.cs.siu.edu/csday/2009_1/herrin_massacre.htm.

Further, whether "mass shootings" before and after the assault weapon ban "increased dramatically," D-MSJ at 54, is a matter of opinion, not fact. Even more fundamentally, it's unclear what the State even means by "mass shootings." Not only is there "no standard definition of what constitutes a mass shooting," with "different

39

data sources—such as media outlets, academic researchers, and law enforcement agencies—frequently us[ing] different definitions when discussing and analyzing mass shootings," the soundness of the State's statistical observation dispositively turns on what they choose to define as a "mass shooting." Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, Rand Corp. (Apr. 15, 2021), https://bit.ly/3L9kzH4. A Rand Corporation study found that "[e]vidence that high-capacity magazine bans may decrease mass shootings is limited." *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, Rand Corp. (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/ban-assault-weapons/mass-shootings.html. But, even if mass shootings could be definitively defined, they involve so many factors that their lethality cannot be broadly traced to the capacity of a particular magazine. For example, *every single mass shooter*, as defined by a 2017 study, who used a so-called large capacity magazine between 1994 and 2013 also brought to the scene of the shooting multiple firearms and magazines—an average of 5.78 magazines in each instance. Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 J. Res. & Pol'y 28, 31–32, 40–42 (2016); *see also Mass Shooting Incidents in America (1984–2012)*, Citizens Crime Commission of New York City at 6, 8 (2017), http://www.nycrimecommission.org/mass-shooting-incidents-

40

america.php. By contrast, citizens plainly do not and cannot go about the demands of everyday life with multiple firearms and six magazines on their person.

The reality is, handguns, and not "assault firearms," regardless of magazine capacity, are the most common firearm used in mass shootings, *see* James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newton*, 18 Homicide Studies 125, 136 (2013); *accord* Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171, 188 (2020), consistent with their being overwhelmingly the weapons of choice for criminals generally, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018*, *Crime in the United States*, FBI, U.S. Dep't of Just. (2018), https://bit.ly/2p0bw4D (64% of murders in 2018 committed with handguns); *see also, e.g.,* Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, The Trace (Jan. 6, 2016), https://bit.ly/41tIDv7 (showing that, of the top 20 firearms seized by Chicago Police in 2014, *all 20* were handguns); Pltf. Resp. to D-SOUMF No. 155, 156 (citing additional statistics on the comparatively low percentage of mass shootings that have been perpetrated with semiautomatic of "assault"-style rifles as opposed to handguns, as well as the infinitesimally small percentage of such incidents involving them when compared to the number of such rifles in circulation for lawful purposes).

41

More generally, the abuse of firearms and firearm violence, including those that use magazines, is neither new nor unprecedented. *Bruen*, 597 U.S. at 27 (firearm violence is "a general societal problem that has persisted since the 18th century"). In fact, for most of the 17th century, the "peacetime murder rate for adult colonists . . . ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States" in 2009. Randolph Roth, *American Homicide* 27, 219 (2009),                https://www.hoplofobia.info/wp-content/uploads/2020/07/2009-Randolph_Roth-American_Homicide.pdf; *see also* Pltf. Resp. to D-SOUMF Nos. 107, 108, 116, 133, 135 (detailing statistics of homicides and mass violence, including with firearms, during the colonial era).

Despite the reality that criminal misuse of firearms, including mass killings, has been a persisting phenomenon, before the 1990s there were almost no efforts to restrict semiautomatic arms. Nor, more importantly, has there ever been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they *could* inflict in the hands of someone bent on misusing them. To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm. *See Bruen*, 597 U.S. at 27-28; *Heller*, 554 U.S. at 627. In fact, a central tenet of the Supreme Court's decision in *Heller* is that handguns are protected from bans like the one New Jersey has imposed against "assault firearms"

42

*even though* handguns are overwhelmingly the firearm of choice by criminals. *Heller*, 554 U.S. at 628. The State's arms ban flies in the face of this longstanding tradition.

**B.    In All Events, the State Cannot Carry Its Burden Under *Bruen*.**

Again, regardless of whether the challenged regulation is purportedly designed to address "unprecedented societal concerns or dramatic technological changes," the State must still survive the analogical inquiry under *Bruen* requiring it to demonstrate a proper historical analogue for the challenged regulation. By the same token, the State cannot expect to survive this scrutiny by claiming a "tradition" of governments being granted "significant leeway to choose the manner of regulation for the dangerous instrument at issue." D-MSJ at 68. As the Supreme Court has made clear, "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* This the State cannot do.

The weapons restrictions that the State proffers as purported historical analogues fall far short of the mark. At the outset, all the restrictions from yesteryear concerning trap guns, bowie knives, slungshots and clubs, pistols, and various other bearable instruments as "dangerous" weapons at various times in various localities, D-MSJ at 57–58, 60–63, are not controlling because—once again—the weapons at

43

issue here are in common use for lawful purposes *today* and thus are not dangerous and unusual so as to be subject to a ban. *Bruen*, 597 U.S. at 32 (emphasis added) (quoting *Heller*, 554 U.S. at 627) (any colonial laws that prohibited the carrying of certain weapons as "dangerous and unusual" at the time can "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today").

Not only are these weapons restrictions all misfits when we are dealing with the right of *law-abiding* citizens to possess and use weapons in common use for *lawful* purposes, which New Jersey has *banned*, but many come too late in time as they were not enacted until the mid to late nineteenth century. D-MSJ at 57-63. The Supreme Court was clear that "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. Foremost, " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " *Id.* at 34 (quoting *Heller*, 554 U.S. at 634–35). While "[s]trictly speaking," the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," adopted in 1868, "we have generally assumed that the scope of the protection applicable to the federal government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* And while *Bruen* flagged this scholarly debate for possible future Supreme Court consideration, lower courts are bound to look to 1791 given the

44

JA4760

Court's repeated holdings that 1791 is the key date for interpreting the Bill of Rights against the federal government, *see, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019), and that incorporated provisions of the Bill of Rights have the same meaning when applied against the states as applied against the federal government, *see, e.g.*, *McDonald*, 561 U.S. at 765.

For this reason, regulations hailing from later periods—like the mid-to-late 19th and 20th century periods that the State seeks to harness—are not part of the tapestry establishing "this Nation's historical tradition of firearm regulation" to the extent they are " '*inconsistent* with the original meaning of the constitutional text,' " *Bruen*, 597 U.S. at 36 (quoting *Heller II*, 670 F.3d at 1274 n.6) (Kavanaugh, J., dissenting)), or otherwise "contradict[] earlier evidence" of the meaning of the Second Amendment at the time it was adopted, *id.* at 2153. This "original meaning" forms the Amendment's " 'unqualified command,' " *id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. at 50 n.10), which ultimately "demands our unqualified deference," *id.* at 2131; *see also id.* at 2040 n.11 (while the 1686 *Sir John Knight's Case* may "only 'arguably' support[]" the view that the proper-cause requirement was inconsistent with the Nation's tradition, "[t]o the extent there are multiple plausible interpretations of *Sir John Knight's Case*, we will favor the one that is more consistent with the Second Amendment's command").

It follows that, despite the State's claims about the "uniquely probative" value that "Twentieth-Century history" regulations can supposedly provide, D-MSJ at 75, the various cited twentieth-century regulations on semiautomatic firearms, *id.* at 64–66, carry no real weight, particularly because they are *inconsistent* with the Nation's tradition of firearm regulation which has otherwise permitted the possession and use of such arms by law-abiding citizens for lawful purposes, including self-defense.[6]

And, anyway, they all fail to compare on the two relevant metrics of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Indeed, we are not dealing with restrictions on the manner or place of carrying or using a weapon at all, but rather a ban on mere *possession*. *See* Pltf. Resp. to D-SOUMF Nos. 86, 87, 88, 91, 92, 93, 94, 99 (further distinguishing the "how" and "why" of these regulations and pointing out the inaccuracies about and mischaracterizations of them in the reports of the State's experts). Far from showing that firearms, even concealable handguns, could be banned as the State has banned "assault firearms," these regulations "reveal[] a consensus that States could *not* ban public carry altogether," *Bruen*, 597 U.S. at 53, *despite* the existence of policies in certain localities that sought to reduce their prevalence over concerns about their potential for misuse when in the wrong hands.

---

[6]    It must be noted as well that the majority of the regulations the State cites in this context concern *automatic* firearms, not semiautomatic firearms of the type at issue. D-MSJ at 64-66. Automatic firearms are of a different class, as detailed above.

46

**JA4762**

Lastly, as for the gunpowder regulations that the State cites, D-MSJ at 58–59, once again, its own description of these regulations eliminates any serious claim to relevant similarity, as it explains that states regulated the possession, storage, and transfer of gunpower "because of the risk that it posed to public safety in the event of fire or explosion." *Id.* Neither the "how" nor the "why" of the burdens these regulations imposed on a law-abiding citizen's right to armed self-defense— regulations on the *storage* of gunpowder to reduce the incidence of fires and explosions from unmonitored stockpiles housed in towns built almost entirely from wood—could demonstrate that a broad prohibition against the firearms and LCMs otherwise in common use for lawful purposes, i.e., for purposes that do *not* inflict any societal harm, is "part of an enduring American tradition of state regulation." *Bruen*, 597 U.S. at 69. In fact, examples of these gunpowder regulations show that they did not *blanketly* prohibit or compel forfeitures of offending stockpiles, but rather provided an opportunity for a hearing, at which the owner was allowed "to appear, and show cause why the gun powder, so seized or taken, should not be adjudged forfeit," before the supply would be deemed forfeited or the owner would be penalized. *See e.g.*, 1821 Me. L. chap. 25, p. 98-100; 1832 Conn. L. chap. 25, p. 391-2. Notably, the State makes no attempt to actually argue that these regulations imposed a "comparable burden" or were "comparably justified" in this context, as it

47

**JA4763**

must to establish "a *well-established and representative* historical analogue." *Bruen*, 597 U.S. 30 (emphasis altered).

## V.    Summary Judgment Must Be Entered Against *All* Defendants

Plaintiffs brought and served their motion for summary judgment against *all* Defendants, specifically setting forth the basis for their claims against the County Defendants, Christine A. Hoffman in her official capacity as Gloucester County Prosecutor ("Defendant Hoffman"), and Bradley D. Billhimer in his official capacity as Ocean County Prosecutor ("Defendant Billhimer"). Dkt. No. 174. *State* Defendants filed a combined brief in opposition to this motion along with a cross-motion for summary judgment in their favor. State Defendants made clear in their briefing that they were acting solely on behalf of themselves and not on behalf of County Defendants. Dkt. Nos. 183 & 183-1. County Defendants have not opposed Plaintiffs' motion in any fashion; nor have they even joined in the State's opposition to Plaintiffs' motion. They have taken no action within the timeframes specified in the Court's scheduling order for the briefing on the cross-motions. "If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court 'will accept as true all material facts set forth by the moving party with appropriate record support.' " *Arroyo v. Pleasant Garden Apartments*, 14 F. Supp. 2d 696, 699 (D. N.J. 1998) (quoting *Anchorage Assocs. V. Virgin Islands Bd. Of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990)).

48

JA4764

As detailed above, those facts compel judgment in Plaintiffs' favor. Therefore, judgment should be entered against all Defendants.

## VI.    Conclusion

Given that the Second Amendment presumptively protects the conduct Plaintiffs wish to engage in, and that the State cannot carry the burden necessary to sustain this law, summary judgment must be granted in favor of Plaintiffs and against the State.

                              Respectfully submitted,

Dated: December 15, 2023        */s/ Bradley P. Lehman*
                              Bradley P. Lehman
                              Gellert Scali Busenkell & Brown, LLC
                              1201 N. Orange Street, Suite 300
                              Wilmington, DE 19801
                              Phone: 302-416-3344
                              Email: blehman@gsbblaw.com

                              *Attorneys for Cheeseman Plaintiffs*

49

**JA4765**

Bradley P. Lehman (NJ #129762014)
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com

Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
116 N. Howe Street, Suite A
Southport, NC 28461
Phone: 910-713-8804
Email: law.rmd@gmail.com
(Admitted *pro hac vice*)

*Attorneys for Cheeseman Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 3:18-cv-10507-PGS-LHG |

1

| | |
|---|---|
| MARK CHEESEMAN, et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 1:22-cv-04360-PGS-LHG <br><br> **Cheeseman Plaintiffs' Reply to Defendants' Response to Statement of Undisputed Material Fact in Support of Plaintiffs' Motion for Summary Judgment** |
| BLAKE ELLMAN et al, <br><br> Plaintiffs, <br><br> v. <br><br> MATTHEW J. PLATKIN, in his official capacity as Acting Attorney General of New Jersey, et al, <br><br> Defendants. | Civil Action No. 3:22-cv-04397-PGS-LHG |

## CHEESEMAN PLAINTIFFS' REPLY TO STATE DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

In support of their contemporaneously filed motion for summary judgment, the Cheeseman Plaintiffs (hereinafter, "Plaintiffs") respectfully submit this reply to State Defendants' Response to Plaintiffs' Statement of Undisputed Materials Facts ("SOUMF") (Dkt. No. 183-4).

As to County Defendants, they have not opposed Plaintiffs' motion for summary judgment or responded to Plaintiffs' SOUMF in any fashion; nor have they

2

even joined in the State Defendants' opposition to Plaintiffs' motion or in any of the State Defendants' responses to Plaintiffs' SOUMF. They have taken no action within the timeframes specified in the Court's scheduling order for the briefing on the cross-motions. "If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court 'will accept as true all material facts set forth by the moving party with appropriate record support.' " *Arroyo v. Pleasant Garden Apartments*, 14 F.Supp.2d 696, 699 (D. N.J. 1998) (quoting *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990)). So it should be here: as a consequence of County Defendants' failure to oppose Plaintiffs' motion and to respond to any of the Plaintiffs' SOUMF, all the same should be accepted as true and as established as to County Defendants.

## SOUMF No. 1

Former New Jersey Attorney General Peter Verniero issued "Guidelines Regarding the 'Substantially Identical' Provision in the State's Assault Firearms Laws" dated August 19, 1996, https://www.nj.gov/lps/dcj/agguide/assltf.htm ("Guidelines"), which the current Attorney General (Defendant Platkin) and Superintendent of the New Jersey State Police (Defendant Callahan) continue to enforce.

*Supporting Citations*:

- Ans. to FAC ¶¶ 15, 18 (Admitted that Defendant Platkin "continues to publish the Guidelines").

| Defendants' Response to No. 1 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed. | Therefore, this statement stands undisputed. |

## SOUMF No. 2

The Guidelines direct that they "should be followed by all county prosecutors and all law enforcement officers in this State so that the State's assault firearms laws will be uniformly enforced throughout the State."

*Supporting Citations*:

- *Guidelines* at 3

- Ans. to FAC ¶ 17 (Admitted)

| Defendants' Response to No. 2 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that the Guidelines include this quoted statement. | Therefore, this statement stands undisputed. |

## SOUMF No. 3

4

The exceptions are largely limited to exemptions for: (1) those in the military or law enforcement, § 2C:39-6(a), (j); (2) rifles that the Attorney General designates as "legitimate" target-shooting firearms (which can only qualify for such designation if registered and owned by an individual who has been a member of a rifle or pistol club since at least 1990), § 2C:58-12; (3) "assault firearms" rendered "inoperable" (or else voluntarily surrendered or transferred to an exempt person or entity), § 2C:58-13; and (4) those who satisfy the statutory criteria for a license to purchase, possess, and carry an assault firearm, § 2C:58-5(a)-(b).

*Supporting Citations*:

- Ans. to FAC ¶ 19 (State Defendants do not deny the exemptions are limited as stated).

| Defendants' Response to No. 3 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that the statute contains limited exemptions. | Therefore, this statement stands undisputed. |

## SOUMF No. 4

To lawfully purchase, possess, or carry any *operable* firearm falling within the classification of an "assault firearm" under this scheme—other than an "assault firearm" deemed "legitimate" by the Attorney General for target-shooting

purposes—an ordinary, law-abiding person must demonstrate to the satisfaction of a judge that such a license is *required* in the interest of public safety and welfare.

*Supporting Citations*:

- Ans. to FAC ¶ 19 (State Defendants do not deny this interpretation of the law)

| Defendants' Response to No. 4 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that the statute contains limited exemptions. | Therefore, this statement stands undisputed. |

## SOUMF No. 5

The New Jersey Legislature has recognized that this statutory scheme operates as a general "ban" on the so-called "assault firearms."

*Supporting Citations*:

- *Statement of the New Jersey State Legislature on Assembly Concurrent Resolution No. 106*, 220th Leg. (2022), https://www.njleg.state.nj.us/bill-search/2022/ACR106/bill-text?f=ACR&n=106_I1 ("in 1990 New Jersey enacted legislation *banning* assault weapons and certain large capacity ammunition feeding devices") (italics added).

6

| Defendants' Response to No. 5 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that the 2022 statement reads, in part, that "in 1990 New Jersey enacted legislation banning assault weapons and certain large capacity ammunition feeding devices." | Therefore, this statement stands undisputed. |

## SOUMF No. 6

The Attorney General's Office itself characterizes the regulatory scheme in this way on its public website.

*Supporting Citations*:

- State of New Jersey, Department of Law & Public Safety, Office of the Attorney General, https://nj.gov/njsp/firearms/firearms-faqs.shtml (FAQ No. 15: "What type of firearms are considered assault weapons in New Jersey? [¶] "A complete list of *banned* firearms can be found in N.J.S. 2C:39-1.w as well as N.J.A.C. 13:54-1.2.") (italics added)

- Readington Township Police Department, New Jersey, Frequently Asked Questions, https://www.readingtontwpnj.gov/firearms/firearms-faq (FAQ No. 17: characterizing the scheme in the same way)

| Defendants' Response to No. 6 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed only that the cited web pages include the statements quoted in the "Supporting Citations." Disputed that the website for the Readington Township Police Department is "The Attorney General's Office itself," or speaks on behalf of it. | Therefore, it is undisputed that: <br><br> 1.  The website of the State of New Jersey, Department of Law & Public Safety, Office of the Attorney General, characterizes the arms targeted by the Attorney General's regulatory scheme as "*banned firearms.*" <br><br> 2.  The website of the Readington Township Police Department, New Jersey characterizes the arms targeted by the Attorney General's regulatory scheme in the same way. Further, the essential statement of fact that the Attorney General's Office itself characterizes the regulatory scheme as a "ban" is not subject to any reasonable dispute particularly given State Defendants' |

8

|  | acknowledgement in response to SOUMF No. 5 that the New Jersey Legislature has itself recognized that this statutory scheme operates as a general "ban." |
|--|--|

**SOUMF No. 7**

Courts in New Jersey and elsewhere have also recognized this scheme as a general "ban."

*Supporting Citations*:

- *See e.g.*, *Coalition of New Jersey Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D. N.J. 1990) ("the prohibition is de facto, for that person [seeking to purchase an 'assault firearm'] must go through the extremely rigorous qualification process required for receiving a license[,]" and, "[t]his regulatory scheme vests unbridled discretion over the licensing process with the State"); *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 207 (1st Cir. 2002) ("The New Jersey law examined in *Coalition* [*of New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 673 n. 10] was effectively a ban on assault weapons.")

| Defendants' Response to No. 7 | Plaintiffs' Reply to Response |
|--|--|

| Undisputed that the cases contain the language cited. | Therefore, this statement stands undisputed.<br><br>Further, this statement is not subject to any reasonable dispute particularly given State Defendants' acknowledgement in response to SOUMF No. 5 that the New Jersey Legislature has itself recognized that this statutory scheme operates as a general "ban." |
| --- | --- |

**SOUMF No. 8**

Anyone who "manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm" in violation of the scheme "is guilty of a crime of the third degree." N.J. Stat. Ann. § 2C:39-9(g).

*Supporting Citations*:

- Ans. to FAC ¶ 24 (admitted)

| Defendants' Response to No. 8 | Plaintiffs' Reply to Response |
| --- | --- |
| Undisputed that the statute includes the language quoted. | Therefore, this statement stands undisputed. |

10

**<u>SOUMF No. 9</u>**

One who knowingly possesses such an arm illegally "is guilty of a crime of the second degree." N.J. Stat. Ann. §§ 2C:39-5(f).

*Supporting Citations*:

- Ans. to FAC ¶ 25 (admitted)

| Defendants' Response to No. 9 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion, and/or mischaracterizes and/or offers argument and/or improper opinion concerning the meaning of laws, and mischaracterizes the State Defendants' answer to the complaint. In any event, the pertinent laws speak for themselves. | State Defendants' objections are unfounded and their claim that the SOUMF No. 9 "mischaracterizes the State Defendants' answer to the complaint" is wrong because the State in fact admitted this to be true: ¶ 25 of the FAC states the relevant law as follows: "Any person who knowingly has in his possession an assault firearm is guilty of a crime of the second degree except if the assault firearm is licensed pursuant |

11

|  | to N.J.S. 2C:58-5; registered pursuant to section 11 of P.L. 1990, c.32 (C. 2C:58-12); or rendered inoperable pursuant to section 12 of P.L. 1990, c.32 (C. 2C:58-13). N.J. STAT. ANN. §§ 2C:39-5(f)." |
|  | In turn, ¶ 25 of State Defendants' Answer to the FAC states: "Admitted." |
|  | Further, this statement is not subject to any reasonable dispute particularly given State Defendants' concessions and acknowledgments in response to SOUMF Nos. 6, 7, 8, and 10. |
|  | Therefore, the statement that, "One who knowingly possesses such an arm illegally 'is guilty of a crime of the second degree,' " is not disputed or reasonably subject to dispute. |

**SOUMF No. 10**

A crime in the second degree generally carries a term of imprisonment of five to ten years and a fine of up to $150,000, and a crime in the third degree generally carries a term of imprisonment of three to five years and a fine of up to $15,000. §§ 43-3(a)-(b), 43-6(a).

*Supporting Citations*:

- Ans. to FAC ¶ 26 (not denied)

| Defendants' Response to No. 10 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that N.J. Stat. Ann. § 2C:43-3 and -6 contain the maximum fines and sentence ranges for second and third degree crimes in the State of New Jersey. | Therefore, this statement stands undisputed. |

**SOUMF No. 11**

Moreover, a conviction would result in a lifetime ban on the possession of firearms and ammunition under federal and state law. *See* 18 U.S.C. § 922(g).

*Supporting Citations*:

13

JA4778

- Ans. to FAC ¶ 27 (not denied)

| Defendants' Response to No. 11 | Plaintiffs' Reply to Response |
|---|---|
| This paragraph calls for legal conclusion and is not a proper statement of material fact. | State Defendants' response does not dispute the asserted statement but instead avoids responding at all, on the basis that "the statement calls for legal conclusion and is not a proper statement of material fact." The basis for their non-responsiveness is incorrect and, in any event, does not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession. *See New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014) ("Indeed, where, as in this case, a party fails to respond to the movant's statement of undisputed |

**JA4779**

material facts with a point-by-point indication whether the stated fact is undisputed or, if disputed, with a citation to the factual record where contrary evidence exists, and where no contrary fact is readily apparent in the opponent's evidence, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion."). Therefore, this statement is effectively undisputed.

Further, the statement is not subject to any reasonable dispute given the plain meaning and effect of 18 U.S.C. § 922(g) and the related laws and regulations that come into operation upon such a conviction.

15

**SOUMF No. 12**

Plaintiff Cheeseman is a law-abiding resident of Gloucester County, New Jersey.

*Supporting Citations*:

- Decl. of Mark Cheeseman (Ex. 1) ¶ 1

| Defendants' Response to No. 12 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion that Plaintiff Cheeseman is "law-abiding." Subject to those objections, undisputed. | The meaning of "law-abiding" is well-established and not subject to reasonable dispute or objection as calling for a legal conclusion. *See New York State Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) ("the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *Range v. Attorney General*, 69 F.4th 96, 114 (3d Cir. 2023) (Shwartz, J., dissenting) |

16

("[T]here is no question that one who has a felony or felony-equivalent conviction is not law abiding. Thus, the Supreme Court's jurisprudence tells us that the right to bear arms is limited to law abiders, and that felon bans are presumptively lawful."); *Holloway v. Attorney General*, 948 F.3d 164, 175 (3d Cir. 2020) ("whether labeled a felon or misdemeanant, those who commit serious crimes are not the kinds of 'law-abiding' citizens whose rights *Heller* vindicated") (abrogated on other grounds in *Range*, 69 F.4th at 100).

State Defendants' objection to the use of "law-abiding" here is also disingenuous given that they have readily conceded to SOUMF No. 4

17

|  | without any such objection when SOUMF No. 4 uses the same term. Further, any such objection does not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
|---|---|

## SOUMF No. 13

Plaintiff Connolly is a law-abiding resident of Ocean County, New Jersey.

*Supporting Citations*:

- Decl. of Connolly (Ex. 2) ¶ 1

18

| Defendants' Response to No. 13 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion that Plaintiff Connolly is "law-abiding." Subject to those objections, undisputed. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 12, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 13. |

## SOUMF No. 14

Plaintiff Cheeseman is not disqualified from possessing and acquiring firearms under federal and state law.

*Supporting Citations*:

- Decl. of Mark Cheeseman (Ex. 1) ¶ 1

| Defendants' Response to No. 14 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion. | State Defendants' response does not dispute the asserted statement but instead avoids responding at all, on the basis that "the statement calls for legal conclusion." The basis for their non-responsiveness is incorrect and, |

|  | in any event, does not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). Therefore, this statement is effectively undisputed. |
|---|---|

**SOUMF No. 15**

Plaintiff Connolly is not disqualified from possessing and acquiring firearms under federal and state law.

*Supporting Citations*:

- Decl. of Connolly (Ex. 2) ¶ 1

20

| Defendants' Response to No. 15 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 14, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 15. |

## SOUMF No. 16

Plaintiff Cheeseman is a member of Plaintiff FPC.

*Supporting Citations*:

- Ex. 1 ¶ 2

| Defendants' Response to No. 16 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed. | Therefore, this statement stands undisputed. |

## SOUMF No. 17

Plaintiff Connolly is a member of Plaintiff FPC.

*Supporting Citations*:

- Ex. 2 ¶ 2

21

JA4786

| Defendants' Response to No. 17 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed. | Therefore, this statement stands undisputed. |

## SOUMF No. 18

Plaintiff Cheeseman intends and desires to exercise his rights to keep and bear firearms classified as "assault firearms" under New Jersey's Ban, including but not limited to an AR-15 style rifle, for lawful purposes, especially for home defense, target shooting, and proficiency training.

*Supporting Citations*:

- Ex. 1 ¶ 3

| Defendants' Response to No. 18 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion, including as to "New Jersey's Ban" and the scope of the "rights to keep and bear firearms." | State Defendants' response does not dispute the asserted statement but instead avoids responding at all, on the basis that the statement "calls for a legal conclusion and/or argument and/or improper opinion." The basis for their non-responsiveness is incorrect, and the use of the terms |

22

|  | "and/or" renders the actual nature of the objections vague and ambiguous. In any event, the stated objections do not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). Therefore, this statement is effectively undisputed. |
|---|---|

**SOUMF No. 19**

Plaintiff Connolly intends and desires to exercise his rights to keep and bear firearms classified as "assault firearms" under New Jersey's Ban, including but not limited to an AR-15 style rifle, for lawful purposes, especially for home defense, target shooting, and proficiency training.

*Supporting Citations*:

- Ex. 2 ¶ 3.

| Defendants' Response to No. 19 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion, including as to "New Jersey's Ban" and the scope of the "rights to keep and bear firearms." | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 18, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 19. |

**SOUMF No. 20**

But for the Ban, Plaintiff Cheeseman would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns.

*Supporting Citations*:

- Ex. 1 ¶ 4

| Defendants' Response to No. 20 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed to the extent Plaintiff Cheeseman attests interest in acquiring and using "assault firearms." | Therefore, this statement stands undisputed. |

**SOUMF No. 21**

But for the Ban, Plaintiff Connolly would acquire, purchase, and/or receive, and lawfully use this firearm, and other "assault firearms," including prohibited shotguns and handguns.

*Supporting Citations*:

- Ex. 2 ¶ 4

| Defendants' Response to No. 21 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed to the extent Plaintiff Connolly attests interest in acquiring and using "assault firearms." | Therefore, this statement stands undisputed. |

25

**SOUMF No. 22**

The Ban nonetheless renders it illegal for either of them to do so.

*Supporting Citations*:

- Ex. 1 ¶¶ 3-4

- Ex. 2 ¶¶ 3-4

| **Defendants' Response to No. 22** | **Plaintiffs' Reply to Response** |
|---|---|
| Undisputed that New Jersey law prohibits non-exempt individuals from acquiring and using "assault firearms." | Therefore, this statement stands undisputed. |

**SOUMF No. 23**

In light of the State's enforcement of this Ban, Plaintiff Cheeseman continues to refrain from acquiring, possessing, and using for self-defense and other lawful purposes any AR-15 rifle, any other firearm prohibited under the Ban, or any "substantially identical" firearm as defined under the Guidelines, based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Ban.

*Supporting Citations*:

- Ex. 1 ¶ 5

| Defendants' Response to No. 23 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Undisputed as to Plaintiff Cheeseman's attested reasons for not acquiring an "assault firearm." | Therefore, this statement stands undisputed as to Plaintiff Cheeseman's attested reasons for not acquiring an "assault firearm" as those reasons are articulated herein. Further, in having not disputed Plaintiff Cheeseman's attested reasons for not acquiring an "assault firearm," State Defendants have conceded the essential fact underlying SOUMF No. 23 and thereby negated the effect of any objections to the statement as "call[ing] for a legal conclusion and/or argument and/or improper opinion." In any event, such objections are vague and ambiguous in their use of the terms "and/or," and they do not excuse the obligation |

27

|  | to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
|---|---|

**SOUMF No. 24**

In light of the State's enforcement of this Ban, Plaintiff Connolly continues to refrain from acquiring, possessing, and using for self-defense and other lawful purposes any AR-15 rifle, any other firearm prohibited under the Ban, or any "substantially identical" firearm as defined under the Guidelines, based on the reasonable fear and threat of arrest, confiscation, prosecution, fine, and imprisonment for violating the Ban.

*Supporting Citations*:

28

- Ex. 2 ¶ 5

| Defendants' Response to No. 24 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Undisputed as to Plaintiff Connolly's attested reasons for not acquiring an "assault firearm." | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 23, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 24. |

## SOUMF No. 25

Plaintiff FPC is a nonprofit membership organization, the purposes of which include defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom.

*Supporting Citations*:

- Decl. of Brandon Combs (Ex. 3) ¶ 2

| Defendants' Response to No. 25 | Plaintiffs' Reply to Response |
|---|---|
| | |

29

| | |
|---|---|
| Undisputed that FPC is a nonprofit membership organization whose self-described purposes are as stated. | Therefore, this statement stands undisputed. |

## SOUMF No. 26

Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

*Supporting Citations*:

- Ex. 3 ¶ 2

| Defendants' Response to No. 26 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that FPC's self-described mission is as stated. | Therefore, this statement stands undisputed. |

## SOUMF No. 27

Plaintiff FPC brings this action on behalf its New Jersey resident members, including Plaintiffs Cheeseman and Connolly, who seek to exercise their right to keep and bear common semi-automatic arms for lawful purposes in New Jersey but who are prohibited from doing so under the Ban.

*Supporting Citations*:

- Ex. 3 ¶ 3.

| Defendants' Response to No. 27 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms. Disputed as to the remainder of the paragraph. Plaintiff FPC has produced no evidence that, aside from the individually named Plaintiffs Cheeseman and Connolly, any of their other members would possess semiautomatic firearms in their homes, whether or not New Jersey law permitted it. Further, when asked in interrogatories if any | Therefore, it is undisputed that "Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms" as stated in SOUMF No. 27. The objections on the grounds that this "calls for a legal conclusion and/or argument and/or improper opinion" are not only vague and ambiguous as to their meaning, but they do not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New* |

31

| | |
|---|---|
| of its members has applied for a license to possess an assault firearm in New Jersey, Plaintiff ANJRPC responded on May 4, 2023, "[u]nknown at this time." Cheeseman Interrogatory Response #9. | *Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). Moreover, Plaintiff FPC has indeed presented evidence that "other members would possess semiautomatic firearms in their homes, whether or not New Jersey law permitted it," through the Declaration of Brandon Combs on behalf of FPC, which clearly states its other members "intend and desire to, inter alia, acquire, receive, transport, possess, lawfully use, and dispose of various semiautomatic rifles, shotguns, and handguns labeled by the State as 'assault firearms,' " and but for the enactment and enforcement of the |

32

**JA4797**

| | ban at issue, they would do so. Pltf. Ex. 3 (Dkt No. 174-4) ¶¶ 3-6. |
| | Lastly, the reference to the discovery response of Plaintiff *ANJRPC* not only does not create any material fact in dispute here, but is also irrelevant as inapplicable to the *Cheeseman* Plaintiffs. |
| | Therefore, State Defendants' response does not generate any material fact in dispute here. |

**SOUMF No. 28**

Law-abiding New Jersey resident members of Plaintiff FPC intend and desire to, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of various semiautomatic rifles, shotguns, and handguns labeled by the State as "assault firearms," but they are subject to, adversely affected by, and prevented from doing so under the prohibitions of the Ban against "assault firearms."

*Supporting Citations*:

- Ex. 3 ¶ 4

| Defendants' Response to No. 28 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 27, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 28. |

## SOUMF No. 29

But for the enactment and enforcement of the Ban, these FPC members would forthwith, *inter alia*, acquire, receive, transport, possess, lawfully use, and dispose of such rifles, shotguns, and handguns targeted under the Ban.

*Supporting Citations*:

- Ex. 3 ¶ 5

| Defendants' Response to No. 29 | Plaintiffs' Reply to Response |
|---|---|

| | |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 27, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 29. |

## SOUMF No. 30

However, they cannot and do not do so because the weapons are labeled "assault firearms," such that they reasonably fear and face a threat of arrest, confiscation, prosecution, fine, and imprisonment in light of the Ban's prohibitions.

*Supporting Citations*:

- Ex. 3 ¶ 5

| Defendants' Response to No. 30 | Plaintiffs' Reply to Response |
|---|---|

35

| | |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing certain semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 27, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 30. |

**SOUMF No. 31**

But for the enactment and enforcement of this Ban, and the criminal penalties (including a life-long ban on the individuals' exercise of their Second Amendment protected rights) associated with violations of the Ban, these members of Plaintiff FPC would exercise their right to keep and bear the banned firearms for lawful purposes, including self-defense, without the fear or risk of arrest and prosecution for engaging in otherwise protected, lawful conduct.

36

*Supporting Citations*:

- Ex. 3 ¶ 6

| Defendants' Response to No. 31 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Subject to those objections, undisputed only that individual Plaintiffs Cheeseman and Connolly have each attested interest in possessing certain semi-automatic firearms. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 27, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 31. |

## SOUMF No. 32

The injuries suffered by these members are germane to the core purposes of Plaintiff FPC.

*Supporting Citations*:

- Ex. 3 ¶ 7

| Defendants' Response to No. 32 | Plaintiffs' Reply to Response |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. Disputed as to the remainder of the paragraph for the same reasons set forth in the State's Response to #27. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 27, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 32. |

## SOUMF No. 33

As Attorney General of New Jersey, Defendant Platkin is the head of the State's Office of the Attorney General and Department of Law and Public Safety, which includes the New Jersey State Police, and this Office holds statewide criminal jurisdiction to investigate and prosecute any indictable offense.

*Supporting Citations*:

- *See* State of New Jersey, Department of Law & Public Safety website, https://www.njoag.gov/about/ ("the Attorney General oversees the New Jersey State Police (NJSP), the state's largest law enforcement agency, and the Division of Criminal Justice (DCJ), which has statewide authority to investigate and prosecute criminal offenses")

38

JA4803

| Defendants' Response to No. 33 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed. | Therefore, this statement stands undisputed. |

**SOUMF No. 34**

In this official capacity, Defendant Platkin is thus responsible for executing, delegating, and/or supervising the laws and regulations governing the possession of firearms and magazines and impose criminal sanctions for violations of the same, including the "assault firearms" regulatory scheme at issue in this case.

*Supporting Citations*:

- *See* State of New Jersey, Department of Law & Public Safety website, https://www.njoag.gov/about/ ("the Attorney General oversees the state's 21 County Prosecutors, and may assume responsibility for, or 'supersede,' investigations or prosecutions handled by a County Prosecutor's Office")

- *Kendrick v. Bruck*, 586 F. Supp. 3d 300, 307 (D. N.J. 2022) (the Attorney General oversees the Division of State Police, "which is responsible for executing and enforcing New Jersey's laws and regulations governing the possession of firearms")

39

**JA4804**

- Ans. to FAC ¶ 9 (admitting that "Defendant Platkin is the Acting
  Attorney General of New Jersey, and serves as the head of the New
  Jersey Office of the Attorney General and Department of Law and
  Public Safety, which includes the New Jersey State Police")

| Defendants' Response to No. 34 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that the Attorney General of New Jersey is the chief law enforcement officer of the State. | Therefore, this statement stands undisputed. |

## SOUMF No. 35

Defendant Callahan is the Superintendent of the New Jersey Division of State Police, which is responsible for executing and enforcement of all criminal laws in the State, including those regulating the possession of firearms and magazines.

*Supporting Citations*:

- *See* State of New Jersey, Department of Law & Public Safety, State Police website, https://www.nj.gov/njsp/about/core-functions.shtml (the New Jersey Division of State Police performs "all functions associated with the statewide enforcement of laws, the prevention of crime, the pursuit and apprehension of offenders, and the gathering of legal evidence to ensure conviction of such offenders")

- *Kendrick*, 586 F. Supp. 3d at 307

- Ans. to FAC ¶ 10 (admitting that "Defendant Patrick J. Callahan is the Superintendent of the New Jersey State Police")

| Defendants' Response to No. 35 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed. | Therefore, this statement stands undisputed. |

## SOUMF No. 36

Defendant Callahan's division acts under the general oversight and supervision of the Attorney General.

*Supporting Citations*:

- Plaintiffs incorporate the citations in support of SOUMF No. 35 as equally applicable and supportive here.

| Defendants' Response to No. 36 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed. | Therefore, this statement stands undisputed. |

## SOUMF No. 37

Defendant Hoffman is the County Prosecutor of Gloucester County, where Plaintiff Cheeseman resides.

41

**JA4806**

*Supporting Citations*:

- https://www.gloucestercountynj.gov/Directory.aspx?did=69

- Ex. 1 ¶ 1

| Defendants' Response to No. 37 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that Christine A. Hoffman is the Acting County Prosecutor of Gloucester County. | Therefore, this statement stands undisputed. |

**SOUMF No. 38**

Defendant Billhimer serves as the County Prosecutor for Ocean County, where Plaintiff Connolly resides.

*Supporting Citations*:

- https://ocponj.gov/staff/bradley-d-billhimer/

- Ex. 2 ¶ 1

| Defendants' Response to No. 38 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that Bradley D. Billhimer is the County Prosecutor of Ocean County. | Therefore, this statement stands undisputed. |

42

**SOUMF No. 39**

As the County Prosecutors for their respective counties, Defendants Hoffman and Billhimer are "responsible for the prosecution of crimes committed in the county" and have "authority to use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws."

*Supporting Citations*:

- *Yurick v. State*, 875 A.2d 898, 903 (N.J. 2005) (quotations omitted).

| Defendants' Response to No. 39 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that county prosecutors generally are responsible for the prosecution of crimes committed in their respective county. | Therefore, this statement stands undisputed. |

**SOUMF No. 40**

In addition, they would be responsible for preparing the necessary investigation and recommendation to law enforcement as to any individual in their respective counties who applies through the Superior Court for a license to purchase, possess, and carry any of otherwise prohibited "assault firearms."

*Supporting Citations*:

- N.J. Stat. Ann. §§ 2C:58-5(a)

43

| Defendants' Response to No. 40 | Plaintiffs' Reply to Response |
|---|---|
| This paragraph contains improper legal argument. The text of N.J. Stat. Ann. §§ 2C:58-5(a) provides: "Any person who desires to purchase, possess and carry a machine gun or assault firearm in this State may apply for a license to do so by filing in the Superior Court in the county in which he resides, or conducts his business if a nonresident, a written application setting forth in detail his reasons for desiring such a license. The Superior Court shall refer the application to the county prosecutor for investigation and recommendation. A copy of the prosecutor's report, together with a copy of the notice of the hearing on the application, shall be served upon | The statutory language that State Defendants quote here demonstrates that the statement asserted in SOUMF No. 40 is not truly disputed or subject to any reasonable dispute, thereby negating any objection that the statement "contains improper legal argument." Indeed, it contains no "argument" at all and merely neutrally summarizes the meaning of the language State Defendants quote. Moreover, it is disingenuous to contest this statement on any basis when it is not subject to any reasonable dispute particularly given State Defendants' concessions and acknowledgements in response to SOUMF Nos. 2 and 39. |

44

**JA4809**

| | |
|---|---|
| the superintendent and the chief police officer of every municipality in which the applicant intends to carry the machine gun or assault firearm, unless, for good cause shown, the court orders notice to be given wholly or in part by publication." | Additionally, in limiting their response to nothing more than an objection, State Defendants have failed to provide any actual response, and the mere assertion of an objection does not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |

**SOUMF No. 41**

Accordingly, Defendants Hoffman and Billhimer would be responsible for prosecuting Plaintiff Cheeseman and Plaintiff Connolly, respectively, for any violation of the Ban that they may be accused of committing in their respective counties of residence.

*Supporting Citations*:

- Plaintiffs incorporate the citations in support of SOUMF Nos. 37-40 as equally applicable and supportive here.

| Defendants' Response to No. 41 | Plaintiffs' Reply to Response |
| --- | --- |
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. | The State Defendants' admissions and acknowledgements in response to SOUMF Nos. 37 – 40 above refute the legitimacy of any objections to SOUMF No. 41 as "call[ing] for a legal conclusion and/or argument and/or improper opinion" or as being otherwise objectionable. Rather, based on the facts State Defendants admit or acknowledge in response to SOUMF |

Nos. 37 – 40, the statement in
SOUMF No. 41 logically must also
be true and thus is not subject to any
reasonable dispute.

Additionally, in limiting their
response to nothing more than an
objection, State Defendants have
failed to provide any actual
response, and the mere assertion of
an objection does not excuse the
obligation to affirmatively dispute
the asserted fact in order to avoid an
implied concession and the resulting
assumption that State Defendants
have "no evidence raising a genuine
dispute with the movant's stated fact
for purposes of this motion." *New
Jersey Carpenters Pension Fund v.
Housing Auth. and Urban*

47

| | *Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
|---|---|

## SOUMF No. 42

Similarly, Defendants Hoffman and Billhimer would be responsible for the investigation and recommendation as to Plaintiff Cheeseman and Connolly, respectively, concerning any application for a license to purchase, possess, and carry any "assault firearm."

*Supporting Citations*:

- Plaintiffs incorporate the citations in support of SOUMF Nos. 37-40 as equally applicable and supportive here.

| **Defendants' Response to No. 42** | **Plaintiffs' Reply to Response** |
|---|---|
| The State objects that this paragraph calls for a legal conclusion and/or argument and/or improper opinion. The complete text of N.J. Stat. Ann. §§ 2C:58-5(a) is above at paragraph 40. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 41, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 42. |

**SOUMF No. 43**

The Court has jurisdiction over this case and controversy, with the full power to adjudicate all claims for relief in the FAC, pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, and venue properly lies in this district for purposes of adjudicating these claims, pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

*Supporting Citations*:

- Ans. to FAC ¶¶ 4-5 (not disputing jurisdiction or venue)

| Defendants' Response to No. 43 | Plaintiffs' Reply to Response |
| --- | --- |
| The State objects that this paragraph calls for a legal conclusion. To the extent the paragraph contains any alleged facts, they are undisputed. | This statement is not subject to any reasonable dispute, as exemplified by State Defendants' Answer to the FAC on the same point. Further, any objection on the grounds that this statement purportedly "calls for a legal conclusion" does not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State |

49

|  | Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
|--|--|

## SOUMF No. 44

The term "assault firearm" (or "assault weapon," as used in other states that have enacted similar weapons bans) is a pejorative term that does not refer to any identifiable class of firearms.

*Supporting Citations*:

- "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted).

| Defendants' Response to No. 44 | Plaintiffs' Reply to Response |
|--|--|
| The State objects that this paragraph calls for a legal conclusion and/or | Notwithstanding State Defendants' vague and ambiguous objection(s) |

argument and/or improper opinion. Disputed that the term "assault weapon" or "assault firearm" does not refer to "any identifiable class of firearms." See Decl. of Daniel Vannella, Ex. 11, Rpt. of James Yurgealitis ¶ 85 (documenting firearms industry use of "assault weapons" as early as the 1980s); id. ¶ 89; id. ¶¶ 113-130 (describing defined features).

on the grounds that this statement "calls for a legal conclusion and/or argument and/or improper opinion," their response actually concedes the essential point that "the term 'assault weapon' did not exist in the lexicon of firearms" until the 1980s.

Further, State Defendants do not specifically object to or address the additional statement included in SOUMF No. 44, that the term "assault weapon" "is a political term, developed by anti-gun publicists." The failure to specifically respond, or the mere assertion of an objection in response, does not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants

51

|  | have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
|---|---|

**SOUMF No. 45**

It is semiautomatic firearms that the State bans and that Plaintiffs seek to acquire.

*Supporting Citations*:

- Ex. 1 ¶¶ 3-4

- Ex. 2 ¶¶ 3-4

- Ex. 3 ¶¶ 3-6

| **Defendants' Response to No. 45** | **Plaintiffs' Reply to Response** |
|---|---|
| Undisputed that Plaintiffs allege they seek to acquire prohibited firearms. | Therefore, this statement stands undisputed. |

52

**SOUMF No. 46**

Unlike an automatic firearm, a semiautomatic firearm will not fire continuously with one pull of its trigger. Instead, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round.

*Supporting Citations*:

- *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994)

| Defendants' Response to No. 46 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed, except to the extent that a semiautomatic firearm outfitted with certain additional features prohibited under New Jersey law may simulate automatic fire. | Therefore, it is undisputed as a general matter that "a semiautomatic firearm will not fire continuously with one pull of its trigger" and instead "requires the user to pull the trigger each time he or she wants to discharge a round." As for State Defendants' claim that "a semiautomatic firearm outfitted with certain additional features prohibited under New Jersey law may simulate automatic fire," first, this contradicts their admission that, |

fundamentally, a semiautomatic firearm "will *not* fire continuously with one pull of its trigger" and instead "*requires* the user to pull the trigger each time he or she wants to discharge a round."

Second, State Defendants' assertion here cannot logically be squared with their admission to SOUMF No. 71, where they cite their own expert's explanation that "[s]emi-automatic fire refers to a repeating firearm *that fires one shot for each pull of the trigger* until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot." Yurgealitis Rpt. ¶ 29 (italics added).

54

| | Therefore, this statement stands undisputed or is not subject to any reasonable dispute based on State Defendants' own admissions. |
|---|---|

## SOUMF No. 47

Semiautomatic firearms have "traditionally have been widely accepted as lawful possessions."

*Supporting Citations*:

- *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994)

| Defendants' Response to No. 47 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that the quoted case states that possession of semiautomatic firearms in general has been lawful. | Therefore, this statement stands undisputed. More specifically, the *statement itself* stands undisputed—not just the fact that the quoted case contains this assertion—because a proper response requires "a point-by-point indication whether the stated fact is undisputed or, if disputed, with a citation to the |

|  | factual record where contrary evidence exists, and where no contrary fact is readily apparent in the opponent's evidence, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
| --- | --- |

## SOUMF No. 48

Indeed, semiautomatic firearms have been commercially available for over a century.

*Supporting Citations*:

- *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational

*Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. 381,

413 (1994), https://davekopel.org/2A/LawRev/rational.htm

| Defendants' Response to No. 48 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed that semiautomatic firearms became commercially available in the beginning of the 20th Century. See Decl. of Daniel Vannella, Ex. 4, Rpt. of Professor Robert Spitzer ¶ 38; Decl. of Daniel Vannella, Ex. 12, Rpt. of Professor Brian DeLay ¶¶ 6; 76. The State objects to Plaintiffs' use of inadmissible hearsay. | Therefore, this statement stands undisputed. As for State Defendants' objection "to Plaintiffs' use of inadmissible hearsay," they fail to identify which statements within which of the cited sources form the basis of their claim that Plaintiffs are "us[ing] … inadmissible hearsay." Because State Defendants' objection leaves Plaintiffs and the Court to simply speculate about the basis of it, the objection must be disregarded or summarily overruled. Further, as Plaintiffs contend in their briefing, there is "a clear record of legislative facts" already |

|  | establishing the ubiquitous availability, possession, and use of semiautomatic firearms for lawful purposes throughout the rest of the country, and the normal rules of evidence, including the "hearsay" rule, do not apply and thus do not operate as any bar to the admission of such legislative facts. *See* Pltf. Brief ISO MSJ (Dkt. No. 174-1) at 29-30. |
|--|--|

**SOUMF No. 49**

Apart from the now-expired ten-year federal "assault weapons" ban, the federal government has not banned semiautomatic firearms.

*Supporting Citations*:

- Associated Press, *Congress lets assault weapons ban expire*, Sept. 8, 2004, https://www.nbcnews.com/id/wbna5946127

| Defendants' Response to No. 49 | Plaintiffs' Reply to Response |
|--|--|

| Undisputed that the Public Safety and Recreational Firearms Use Protection Act expired on September 13, 2004, and that law is not currently in effect. | Therefore, this statement stands undisputed. |
|---|---|

**SOUMF No. 50**

The only states that have enacted bans on "assault weapons" (with varying definitions of that term) are California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Delaware, New York, and Washington.

*Supporting Citations*:

- *See* Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02

| Defendants' Response to No. 50 | Plaintiffs' Reply to Response |
|---|---|
| Disputed that the laws of each of these states "bans" assault firearms. The State objects to Plaintiffs' use of inadmissible hearsay and mischaracterization of the statutes of the states listed. | As for State Defendants' objection "to Plaintiffs' use of inadmissible hearsay," they fail to identify which statements within which of the cited sources form the basis of their claim that Plaintiffs are "us[ing] … |

inadmissible hearsay." Similarly, State Defendants provide no explanation for their conclusory assertion that Plaintiffs have "mischaracteriz[ed]" the effect of these other laws.

Because State Defendants' objections leave Plaintiffs and the Court to simply speculate about the basis of them, the objections must be disregarded or summarily overruled. Further, the cited laws of other states are a proper matter for judicial notice and the text of those laws speak for themselves in showing that the statement herein is not subject to any reasonable dispute.

**SOUMF No. 51**

An AR-15 can only fire as often as a person can pull its trigger, while an M249 light machine gun, commonly used by the U.S. military, can fire 750 to 1,000 rounds per minute.

*Supporting Citations*:

- *See Squad Automatic Weapon (SAW), M249 Light Machine Gun*, Military Analysis Network, https://bit.ly/3tsQGtd

| Defendants' Response to No. 51 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record. | Once again, State Defendants fail to identify which statements within which of the sources cited on this point form the basis of their claim that Plaintiffs are "us[ing] … inadmissible hearsay." They also fail to explain the basis of their objection to Plaintiffs' "use of materials not in the record" by not identifying which "materials" are supposedly objectionable on this basis. |

61

Further, as Plaintiffs contend in their briefing, there is "a clear record of legislative facts" already establishing the nature and function of AR-15 rifles as contrasted with machine guns, and the normal rules of evidence, including the rules regarding hearsay and foundation, do not apply and thus do not operate as any bar to the admission of such legislative facts. *See* Pltf. Brief ISO MSJ (Dkt. No. 174-1) at 29-30.

Moreover, in having responded with nothing more than objections here, State Defendants have provided no response at all. Again, their failure to specifically respond, or the mere assertion of an objection in response, does not excuse the obligation to affirmatively dispute the asserted

62

|  | fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
|---|---|

**SOUMF No. 52**

"Heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute).

*Supporting Citations*:

- *See M61A1/M61A2 20mm Automatic Gun, Military Analysis Network*, https://bit.ly/3ttnemV

| Defendants' Response to No. 52 | Plaintiffs' Reply to Response |
|---|---|
|  |  |

| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 51, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 52. |
|---|---|

**SOUMF No. 53**

Most AR-style firearms are chambered for 5.56 x 45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and very common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target.

*Supporting Citations*:

- *See Modern Sporting Rifle Comprehensive Consumer Report*, National Shooting Sports Foundation (NSSF) ("*Comprehensive Consumer Report*"), https://bit.ly/3GLmErS (noting that self/home-defense is the second most important reason that Americans reported for owning AR-style firearms, second only to recreational target shooting)

- FRANK MINITER, *The Future of the Gun* at 35 (2014) (Ex. 4) ("ARs are popular with civilians and law enforcement around the world because they're accurate, light, portable and modular. . . . It's also easy to shoot and has little recoil, making it popular with women.")

| Defendants' Response to No. 53 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record. The State objects to the reliability of the methodology employed in the cited documents. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 51, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 53 as it relates to their objections to Plaintiffs' supposed "use of inadmissible hearsay and use of materials not in the record." State Defendants' objection "to the reliability of the methodology employed in the cited documents" is similarly defective. Such an objection is far too general and conclusory in reference to the |

65

supporting citations which consist of lengthy studies, extensive data and analyses, and multiple "methodologies" concerning the subjects studied in these sources. In the absence of any specificity as to "the methodology employed in the cited documents" with which State Defendants purport to take issue and in the absence of any explanation as to how or why this information is unreliable, it is impossible to discern the actual basis of the objection and thus it must be disregarded or summarily overruled.

Further, as in the other instances where State Defendants asserted merely an objection without any response to the point at issue, the effect is an implied concession and a

<table>
<tr><td></td><td>

resulting assumption that they have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014).

And there is no reasonable dispute over the facts stated in SOUMF No. 53 anyway, because they are already established within the clear record of legislative facts. *See* Pltf. Brief ISO MSJ (Dkt. No. 174-1) at 29-30.

</td></tr>
</table>

## SOUMF No. 54

A telescoping or folding stock is merely an adjustable shoulder stock, which allows one to change the length of his gun to fit his stature, in the same way that he can change the height of an adjustable chair; some people have shorter arms than

others, so it promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position.

*Supporting Citations*:

- *See* E. Gregory Wallace, *Assault Weapon Myths*, 43 S. ILL. U. L. J. 193, 232                                                   (2018), https://scholarship.law.campbell.edu/cgi/viewcontent.cgi?article=1265&context=fac_sw;

- STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 at 8 (2022) (Ex. 5)

| Defendants' Response to No. 54 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "Folding and / or telescoping stocks allow the operator to more easily conceal or maneuver the rifle in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions | Therefore, it is undisputed that a telescoping or folding stock serves the utilitarian purposes described in SOUMF No. 54. As for State Defendants' objection to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation," they provide no explanation of the basis of these |

| | |
|---|---|
| other than the shoulder. U.S. Military origins for this type of stock can be found on the M1 carbine in World War II when modified for paratrooper use." Yurgealitis Rpt. ¶ 124. | objections as to either of the sources cited, both of which are densely packed with information and "materials" concerning this subject. In the absence of any specificity as to which statements State Defendants claim constitute inadmissible "hearsay," which "materials" Plaintiffs are "us[ing]" that are "not in the record," and which materials are "lacking in foundation," it is impossible to discern the actual basis for these exceedingly broad and conclusory objections. Therefore, they must be disregarded or summarily overruled. |

**SOUMF No. 55**

Similarly, a pistol grip makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and thus also promotes accuracy and reduces the risk of stray shots.

*Supporting Citations*:

- *See* Wallace, *Assault Weapon Myths* at 228; Kopel, *Rational Basis*, *supra*, 20 J. CONTEMP. L. 381, 396 (1994)

| Defendants' Response to No. 55 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that a "semiautomatic rifle or shotgun that includes a pistol grip (or does not include a shoulder stock) somewhat increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in confined space such as a vehicle. The pistol grip also facilitates easier | Therefore, it is undisputed that a pistol grip serves the utilitarian purposes described in SOUMF No. 55. As for State Defendants' objection to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation," they provide no explanation of the basis of these objections as to either of the sources cited both of which are densely |

70

| | |
|---|---|
| firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator)." Yurgealitis Rpt. ¶ 122. | packed with information and "materials" concerning this subject. In the absence of any specification as to which statements State Defendants claim constitute inadmissible "hearsay," which "materials" Plaintiffs are "us[ing]" that are "not in the record," and which materials are "lacking in foundation," it is impossible to discern the actual basis for these exceedingly broad and conclusory objections. Therefore, they must be disregarded or summarily overruled. |

**SOUMF No. 56**

A flash suppressor is merely a device that reduces the flash of light from firing a round, "prevent[ing] the night-time home defender from being blinded by her own muzzle flash."

*Supporting Citations*:

71

- *Miller*, 542 F. Supp. 3d at 1035;

- *See also* Wallace, *Assault Weapon Myths* at 233–34

| Defendants' Response to No. 56 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low light conditions and also helps to conceal the flash from view. This allows the operator to more easily acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position." Yurgealitis Rpt. ¶ 125. | Therefore, it is undisputed that a flash suppressor serves the utilitarian purposes described in SOUMF No. 56. As for State Defendants' objection to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation," they provide no explanation of the basis of these objections as to either of the sources cited both of which are densely packed with information and "materials" concerning this subject. In the absence of any specification as to which statements State Defendants claim constitute |

72

|  | inadmissible "hearsay," which "materials" Plaintiffs are "us[ing]" that are "not in the record," and which materials are "lacking in foundation," it is impossible to discern the actual basis for these exceedingly broad and conclusory objections. Therefore, they must be disregarded or summarily overruled. |
|---|---|

## SOUMF No. 57

Most common semiautomatic firearms, including those banned under the State's law, can accept a detachable magazine.

*Supporting Citations*:

- NRA Shooting Sports USA, *Handgun Operation: Types Of Semi-Automatic Pistol Mechanisms*, https://www.ssusa.org/content/handgun-operation-types-of-semi-automatic-pistol-mechanisms/ ("Most semi-automatic firearms use detachable box magazines, which afford one of the main advantages of such arms")

73

**JA4838**

| Defendants' Response to No. 57 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that most firearms regulated by the statutes at issue can accept a detachable magazine. Yurgealitis Rpt. ¶¶ 131-34. | Therefore, the statement in SOUMF No. 57 stands undisputed. As for State Defendants' objection to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation," they provide no explanation of the basis of these objections as to either of the sources cited both of which are densely packed with information and "materials" concerning this subject. In the absence of any specification as to which statements State Defendants claim constitute inadmissible "hearsay," which "materials" Plaintiffs are "us[ing]" that are "not in the record," and which materials are "lacking in |

|  | foundation," it is impossible to discern the actual basis for these exceedingly broad and conclusory objections. Therefore, they must be disregarded or summarily overruled. |
|--|--|

## SOUMF No. 58

Detachable magazines not only help law-abiding shooters to reload their weapon in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to remedy malfunctions safely and quickly.

*Supporting Citations*:

- *See* Dennis Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles* 29-30 (Oct. 5, 2021) (working paper), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3436512 (explaining the propensity of self-loading weapons to overheat and malfunction)

| Defendants' Response to No. 58 | Plaintiffs' Reply to Response |
|--|--|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of | State Defendants' response does not dispute the asserted statement but instead avoids responding at all, on |

| | |
|---|---|
| materials not in the record and lacking in foundation. | the basis of their objection to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation." However, any such objections do not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). In any event, State Defendants provide no explanation of the basis of these objections as to the cited |

JA4841

source which is densely packed with information and "materials" concerning this subject. In the absence of any specificity as to which statements State Defendants claim constitute inadmissible "hearsay," which "materials" Plaintiffs are "us[ing]" that are "not in the record," and which materials are "lacking in foundation," it is impossible to discern the actual basis for these exceedingly broad and conclusory objections. Therefore, they must be disregarded or summarily overruled.

And there is no reasonable dispute over the facts stated in SOUMF No. 58, because they are already established within the clear record of legislative facts to which the rules of

| | evidence do not apply anyway. *See* Pltf. Brief ISO MSJ (Dkt. No. 174-1) at 29-30. |
| --- | --- |

**SOUMF No. 59**

The AR-15 is America's "most popular semi-automatic rifle."

*Supporting Citations*:

- *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting)

| Defendants' Response to No. 59 | Plaintiffs' Reply to Response |
| --- | --- |
| Undisputed that then-Judge Kavanaugh's dissent in Heller II contains the quoted statement. | Therefore, this statement stands undisputed. More specifically, the *statement itself* stands undisputed—not just the fact that the quoted case contains this assertion—because a proper response requires "a point-by-point indication whether the stated fact is undisputed or, if disputed, with a citation to the factual record where contrary evidence exists, and where no |

| | contrary fact is readily apparent in the opponent's evidence, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |
|---|---|

**SOUMF No. 60**

In recent years, the AR-15 has been "the best-selling rifle type in the United States."

*Supporting Citations*:

- Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1494634

| Defendants' Response to No. 60 | Plaintiffs' Reply to Response |
|---|---|

| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. | State Defendants' response does not dispute the asserted statement but instead avoids responding at all, on the basis of their objection to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation." However, any such objections do not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). |

**JA4845**

Further, as with State Defendants'
other exceedingly broad and
conclusory objections asserted
without any specificity as to what
within the lengthy cited source is
truly objectionable on the stated
grounds, it is impossible to discern
the actual basis for the objections
and thus they must be disregarded or
summarily overruled.

Moreover, the facts stated in
SOUMF No. 60 are not subject to
reasonable dispute, because they are
already established within the clear
record of legislative facts to which
the rules of evidence do not apply
anyway. *See* Pltf. Brief ISO MSJ
(Dkt. No. 174-1) at 29-30.

**SOUMF No. 61**

Today, the number of AR-rifles and other similar "modern sporting rifles" in circulation in the United States exceeds *twenty-four million*.

*Supporting Citations*:

- *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv

- *See also* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1–2 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles)

| Defendants' Response to No. 61 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State objects to the reliability of the methodology employed in the cited documents. As to the NSSF Survey, the State specifically objects to the reliability of its methodology. James | State Defendants' general objections to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation," are defective and must be disregarded or summarily overruled for the same reasons that their other exceedingly broad and conclusory objections without any |

Curcuruto, a former director of research and market development at NSSF, testified in another case that he and Steve Sanetti, the president of NSSF, essentially made estimates between themselves, and that Mr. Sanetti's personal knowledge was the "sources of data" relied upon when they published statistics related to the number of firearm magazines in circulation. Vannella Decl. Ex. 44, Dep. of James Curcuruto, Wiese v. Bonta, 2:17-cv-00903- WBS-KJN (E.D. Ca.). at T:133:4-140:15. Even if the NSSF survey is admissible, the State disputes any conclusion that it shows the weapons in question are commonly owned. The NSSF figures also do not represent civilian

explanation of their basis must be disregarded or summarily overruled. Further, whatever the basis of these general objections, they do not excuse the obligation to affirmatively dispute the asserted fact in order to avoid an implied concession and the resulting assumption that State Defendants have "no evidence raising a genuine dispute with the movant's stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014).

State Defendants' specific objections to the NSSF Survey and the English Survey are unfounded. As detailed in Plaintiffs' briefing,

83

**JA4848**

ownership, as the figures appear to include law enforcement and security agencies, firearms retailers, and possibly prohibited possessors (e.g. violent criminals). See Decl. of Daniel Vannella, Ex. 9, Rpt. of Professor Louis Klarevas ¶ 14. The surveys and reports by the NSSF also don't necessarily account for AR-15s being amassed in the hands of a relative few. Klarevas Rpt. ¶ 29. Based on the NSSF's own data and Census Bureau statistics, less than 2% of all Americans own a modern sporting rifle. Klarevas Rpt. ¶ 38. As to the English survey, the State specifically objects to the reliability of its methodology. Klarevas Rpt. ¶ 29, n.31 (noting serious violation of Code of Professional Ethics and

these surveys contain clearly established legislative facts to which the rules of evidence do not apply. *See* Pltf. Brief ISO MSJ (Dkt. No. 174-1) at 29-30.

Moreover, the State's own expert evidence relies on this NSSF data along with data from ATF in distilling the actual ownership statistics. *See e.g.*, Expert Report of Luis Klarevas, Def. Ex. 9 (Dkt No. 184-1) at ¶ 14 ("The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available)."); *id.* ("[a]ssuming these figures reported by the NSSF and ATF are accurate"). In so doing, the State

Practices of the American Association for Public Opinion Research); Dep. of Gary D. Kleck, Oregon Firearms Fed'n v. Kotek, No. 22-cv-1815 (D. Or.), ECF 175-7 at 12-13 (plaintiff-side expert stating he "would not rely" on it "for any purpose"). Even if the English survey is admissible, the State disputes any conclusion that it shows the weapons in question are commonly owned. The study results indicate that approximately 74,000 people own over 100 such rifles. A conservative calculation of the English study results show that approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners. Klarevas Rpt. ¶ 29.

neutralizes its own claim that the NSSF data are unreliable, D-MSJ 39-40, and it also neutralizes its objections to the English Survey as unreliable and inadmissible since the Survey is independently corroborated it by the NSSF's data. Even accepting the speculation that the NSSF reports "*appear to* include sales to law enforcement, firearm retailers, and 'possibly prohibited possessors' as well as straw buyers," D-MSJ at 40 (emphasis added), the State fails to show how any inclusion of these categories materially alters the analysis: Even just one million of the more than 24 million documented as being in circulation is quintuple the number that Justice Alito deemed sufficient to be

85

| | "common" in *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (finding stun guns common because 200,000 civilians own them). |
|---|---|

**SOUMF No. 62**

In recent years they have been the second- most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns.

*Supporting Citations*:

- *See 2021 Firearms Retailer Survey Report* at 9, NSSF (2021), https://bit.ly/3gWhI8E

| Defendants' Response to No. 62 | Plaintiffs' Reply to Response |
|---|---|
| The State repeats its objection in Paragraph 61. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 61, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 62. |

**SOUMF No. 63**

And the English survey is not limited to the semiautomatic firearms that the State enumerates by name, but rather extends to the "AR-15 *or similarly styled rifle[s]*."

*Supporting Citations*:

- *National Firearms Survey*, *supra*, at 33

| Defendants' Response to No. 63 | Plaintiffs' Reply to Response |
|---|---|
| The State repeats its objection in Paragraph 61. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 61, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 63. |

**SOUMF No. 64**

Just like the rifles, handguns are semiautomatic firearms and semiautomatic firearms are indisputably common.

*Supporting Citations*

- *See, e.g.*, *Firearms Retailer Survey Report*, *supra*, at 9, NSSF

JA4852

| Defendants' Response to No. 64 | Plaintiffs' Reply to Response |
|---|---|
| The State repeats its objection in Paragraph 61. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 61, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 64.<br><br>Additionally, State Defendants' objection to SOUMF No. 61, concerning AR-rifles and other similar "modern sporting rifles," is inapposite to the statement in SOUMF No. 64, concerning semiautomatic handguns, insofar as the objection to No. 61 relates solely to the data on AR-rifles and similar "modern sporting rifles." |

## SOUMF No. 65

The legislative facts documenting the ubiquity of detachable magazines associated with these firearms further illustrate the commonality of the banned arms.

*Supporting Citations*:

- *See e.g., ANJRPC*, 910 F.3d at 116 (finding that magazines capable of holding more than ten rounds are owned by the "millions, . . . often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense");

- *National Firearms Survey*, *supra*, at 23–25 (documenting that approximately 39 million Americans have owned at least one magazine capable of owning more than 10 rounds and that Americans have owned as many as 542 million of such magazines).

| Defendants' Response to No. 65 | Plaintiffs' Reply to Response |
|---|---|
| The State repeats its objection in Paragraph 61. | *See* Plaintiffs' Reply to State Defendants' Response to SOUMF No. 61, incorporated herein as equally applicable to State Defendants' Response to SOUMF No. 65. |

| | Additionally, State Defendants' objection to SOUMF No. 61, concerning AR-rifles and other similar "modern sporting rifles," is inapposite to the statement in SOUMF No. 65, concerning the ubiquity of detachable magazines, insofar as the objection to No. 61 relates solely to the data on AR-rifles and similar "modern sporting rifles. |
|---|---|

**SOUMF No. 66**

It is clear that these arms (detachable magazines) are overwhelmingly used for lawful purposes.

*Supporting Citations*:

- *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (Ex. 6) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'")

| Defendants' Response to No. 66 | Plaintiffs' Reply to Response |
|---|---|

| | |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper legal argument. The State's undisputed fact evidence regarding the prevalence of LCMs in crime are as follows:<br><br> a. A study by Christopher Koper in 2017 Journal of Urban Health showed that across ten different cities in the United States, firearms with LCMs accounted for between 15 and 36% of firearms recovered by law enforcement between 2001 and 2014. Vannella Decl. Ex. 10, Rpt. of Daniel Webster ¶ 12.<br><br>b. Firearms with LCMs accounted for 40.6% of the firearms used to | State Defendants' general objections on the grounds of hearsay, "use of materials not in the record," lack of foundation, and "improper legal argument" are, like the rest of their exceedingly broad and conclusory objections, far too general and non-specific for anyone to discern the actual basis of the objections and thus they must be disregarded or summarily overruled.<br><br>Moreover, State Defendants' discussion of their evidence regarding "the prevalence of LCMs in crime are as follows" is inapposite to the statement in SOUMF No. 66, which is that "these arms (detachable magazines) are overwhelmingly used for lawful purposes," an assertion that State Defendants do not dispute. |

91

**JA4856**

murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings with 4 or more fatalities for the period of 2009 to 2015. Webster Rpt. ¶ 12.

c. Assault weapons accounted for between 2.6 and 8.5% of firearms recovered by law enforcement officers from crime scenes in the same ten cities between 2001 and 2014. Webster Rpt. ¶ 12.

d. Assault weapons also accounted for 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally between 2009 and 2015. Webster Rpt. ¶ 12.

e. A study by Wintermute et al. (1998) in Annals of Emergency

Indeed, even accepting the truth of the evidence that the State cites regarding the use of some LCMs for criminal purposes, that does not and cannot *negate* the evidence that they are "*overwhelmingly used* for lawful purposes." Again, State Defendants do not claim otherwise. Thus, *regardless* of any prevalence of LCMs *in crime*, State Defendants have effectively conceded the factual statement actually at issue—that detachable magazines are "overwhelmingly used for lawful purposes." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). Significantly, *this* fact is all that's relevant in this case concerning the

92

**JA4857**

Medicine, using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses. Webster Rpt. ¶ 13.

f. A study of mass shooting events from 1982 to October 2022 showed that there were 115 mass shooting events for which magazine capacity was known. Out of those 115 events,

Second Amendment rights of *law-abiding* citizens like Plaintiffs to possess and use such magazines. State Defendants' evidence and argument concerning the supposed prevalence of LCMs in crime are irrelevant, as they are merely an attempt to uphold the challenged ban on the basis of the State's policy judgments and interests about what it believes necessary or prudent in the name of public safety. It's all just a backdoor way of seeking application of the interest-balancing analysis squarely rejected in *Bruen*.

Moreover, to the extent one were to (improperly) focus on the *misuse* of these arms by criminals, abundant evidence shows the opposite of the picture State Defendants try to paint:

there were 73 where the perpetrator used large-capacity magazines (63%). Mass shooting was defined as one where four or more people were killed in a public place in one incident, excluding incidents related to other crimes such as robberies and domestic violence. Decl. of Daniel Vannella, Ex. 7, Rpt. of Lucy Allen ¶¶ 30-31.

g. A study of high-fatality mass shootings (defined as events resulting in 6 or more victims being shot to death) between 1991 and 2022 where magazine capacity used was known showed the percentage of such shootings where the perpetrator employed a large-capacity magazine (with greater than 10 rounds of capacity) has

it is exceedingly rare for the banned magazines and firearms to be used in crime, as detailed in Plaintiffs' briefing. *See* Pltf. Combined Brief Opp. to D-MSJ & Reply to Def. Opp. to P-MSJ at 18-19.

94

**JA4859**

| | |
|---|---|
| increased. The overall rate of use of LCMs in such high fatality mass shootings is 77%, but rose to 100% over the past 4 years. Klarevas Rpt. ¶ 13.<br><br>h. Several statistical studies of defensive gun use showed that it is extremely rare for a person, when using firearms in self-defense, to fire more than 10 rounds. Allen Rpt. ¶¶ 9-15 & n.4; Yurgealitis Rpt. ¶ 147. | |

**SOUMF No. 67**

According to FBI statistics, in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects.

*Supporting Citations*:

- *See Expanded Homicide Table 8, Crime in the United States* (FBI 2019), https://bit.ly/3HdolNd

| Defendants' Response to No. 67 | Plaintiffs' Reply to Response |
|---|---|
| Disputed that the FBI UCR report cited to in the "Supporting Citations" concerns "homicides" (which include, but are not limited to, murders), because on its face it is addressing only "Murder Victims." It is also unclear what this report defines as "Other guns" (45 known murders in 2019); or "Firearms, type not stated" (3,281 known murders in 2019). Otherwise, undisputed that this report provides the statistics highlighted in this paragraph. To the extent this paragraph contains any other alleged facts, they are disputed; and Cheeseman Plaintiffs have identified no non-hearsay and otherwise admissible evidence in support. | Therefore, it is undisputed that this report provides the statistics highlighted in this paragraph. More specifically, the essential fact that significantly more homicides were perpetrated by means other than a rifle during the given year stands undisputed, such that the meaning of "homicide," "Other guns," and "Firearms, type," which State Defendants question, are irrelevant to the point at issue and do not generate any sort of material dispute. Further, State Defendants' assertion that "Cheeseman Plaintiffs have identified no non-hearsay and otherwise admissible evidence in support" *implies* that they have relied on "hearsay" and other |

96

|  | *in*admissible evidence in support of the statement in SOUMF No. 67, but *without* specifying saying so. State Defendants do not specify the evidence that they claim constitutes hearsay or that is otherwise inadmissible, and any such evidence could not include the FBI UCR report cited in SOUMF No. 67, since State Defendants' response is that they do *not* dispute the statistics provided in this report. Therefore, these objections are only baseless but also have no bearing on the point at issue, which stands undisputed. |
| --- | --- |

**SOUMF No. 68**

According to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases.

**JA4862**

*Supporting Citations*:

- https://bjs.ojp.gov/content/pub/pdf/vdhb.pdf

| Defendants' Response to No. 68 | Plaintiffs' Reply to Response |
|---|---|
| Undisputed only that the September 2010 Special Report by the Bureau of Justice Statistics listed in the "Supporting Citations" states that from the time period of 2003 to 2007, a household member was present for a household burglary approximately 27.6% of the time; and "[o]n average, household members became victims of violent crimes in about 266,560 burglaries annually" (or, approximately 7.2% of the time). | While State Defendants purport to confine their concession here to the fact that "from the time period of 2003 to 2007, a household member was present for a household burglary approximately 27.6% of the time; and '[o]n average, household members became victims of violent crimes in about 266,560 burglaries annually' (or, approximately 7.2% of the time)," they have failed to provide any response to the actual statement in SOUMF No. 68, that "household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases." |

State Defendants have not even asserted any objections to this statement or any reasons why they are not required to affirmatively address it. Because they have failed to affirmatively address the statement, we must "assume[] that [Defendants] ha[ve] no evidence raising a genuine dispute with the [Plaintiffs'] stated fact for purposes of this motion." *New Jersey Carpenters Pension Fund v. Housing Auth. and Urban Development Agency*, 68 F.Supp.3d 545, 549 (3d Cir. 2014). Thus, the statement stands undisputed.

99

<u>**SOUMF No. 69**</u>

Studies on the frequency of defensive gun uses in the United States have determined that up to 2.5 million instances occur each year in which civilians use firearms to defend themselves or their property.

*Supporting Citations*:

- Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6853&context=jclc

- *See also* English, *National Firearms Survey*, *supra* at 5 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

| Defendants' Response to No. 69 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also objects to this sentence as improper | Again, State Defendants provide no explanation in support of their exceedingly broad and conclusory objections on the basis of "hearsay," "use of materials not in the record," |

| | |
|---|---|
| legal argument. The State repeats its objections contained in paragraph 61. | lack of foundation, and "improper legal argument." In the absence of any specificity as to which statements or aspects of the extensive materials contained in the cited sources are supposedly objectionable on these bases and why, it is impossible to discern the actual basis of the objections, and they must be disregarded or summarily overruled.

Moreover, the facts cited in this statement are clearly established legislative facts to which the rules of evidence do not apply. *See* Pltf. Brief ISO MSJ (Dkt. No. 174-1) at 29-30. Additionally, State Defendants' objection to SOUMF No. 61, concerning AR-rifles and other similar "modern sporting rifles," is |

101

JA4866

| | inapposite to the statement in SOUMF No. 69, concerning "defensive gun uses," insofar as the objection to No. 61 relates solely to the data on AR-rifles and similar "modern sporting rifles." |
|---|---|

**SOUMF No. 70**

At least a third of all gun owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning semiautomatic firearms like those banned by the State.

*Supporting Citations*:

- *See Modern Sporting Rifle Comprehensive Consumer Report* and *Sport Shooting Participation in the U.S. in 2020*, *supra*

| Defendants' Response to No. 70 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. The State also | *See* Plaintiffs's Reply to State Defendants' Response to SOUMF No. 69, incorporated herein as equally applicable to State |

102

| objects to this sentence as improper legal argument. The State repeats its objections contained in paragraph 61. | Defendants' Response to SOUMF No. 70. |
|---|---|

## **SOUMF No. 71**

All semiautomatic firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally semiautomatic in nature the same cyclical rate of fire: one round fired per pull of the trigger until ammunition is exhausted or the firearm or feeding device malfunctions.

*Supporting Citations*:

- *Staples*, 511 U.S. at 602 n.1 ("We use the term 'semiautomatic' to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.")

- Wallace, *Assault Weapon Myths* at 216 ("Because a semiautomatic firearm fires only one round with each pull of the trigger, it can fire only as fast as the individual shooter can pull the trigger.")

103

| Defendants' Response to No. 71 | Plaintiffs' Reply to Response |
|---|---|
| The State objects to Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation. Undisputed that "Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot." Yurgealitis Rpt. ¶ 29. | Therefore, this statement stands undisputed. As for State Defendants' objections to "Plaintiffs' use of inadmissible hearsay and use of materials not in the record and lacking in foundation," they are inapposite in light of State Defendants' concession to the essential facts in this statement. Moreover, again, these objections are improper and should be disregarded or summarily overruled since State Defendants have failed to provide the minimal degree of specificity necessary to determine the actual basis for their claims that Plaintiffs' evidence includes "inadmissible hearsay" and the "use of materials not in the |

| | record," or matters "lacking in foundation." |
|---|---|

Respectfully submitted,

Dated: December 15, 2023

/s/ *Bradley P. Lehman*
Bradley P. Lehman
Gellert Scali Busenkell & Brown, LLC
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-416-3344
Email: blehman@gsbblaw.com

**JA4870**

**IDENTICAL PDF AND HARD COPY CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

**VIRUS SCAN CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program SentinelOne Agent, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy