# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

———————————

ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC. ; et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

(*additional captions listed on inside cover*)

———————————

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1-18-cv-10507, 1-22-cv-04397, 1:22-cv-04360

———————————

## JOINT APPENDIX
## Vol. XI of XIII (pgs. JA6344-JA7047)

———————————

DANIEL M. VANNELLA
OFFICE OF ATTORNEY
  GENERAL OF NEW JERSEY
25 Market Street
Trenton, NJ 08625
(609) 376-2850
daniel.vannella@law.njoag.gov

*Counsel for Appellees-Cross-Appellants State of New Jersey, et al.*

ERIN E. MURPHY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle & Pistol Clubs, Inc.*

BRADLEY LEHMAN
GELLERT SEITZ BUSENKELL & BROWN
1201 N. Orange Street
Wilmington, DE 19801
(302) 416-3344
blehman@gsbblaw.com

*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connelly, and Firearms Policy Coalition, Inc.*

(*additional counsel listed on inside cover*)

November 18, 2024

---

MARK CHEESEMAN, TIMOTHY CONNELLY, FIREARMS POLICY COALITION, INC.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

---

BLAKE ELLMAN; THOMAS R. ROGERS; ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

*Appellants-Cross-Appellees,*

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants*.

---

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

PAUL D. CLEMENT
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle & Pistol Clubs*

DAVID H. THOMPSON
PETER A. PATTERSON
WILLIAM V. BERGSTROM
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connelly, and Firearms Policy Coalition, Inc.*

# TABLE OF CONTENTS

## Volume I

*ANJRPC* and *Ellman* Plaintiffs' Notice of Appeal, Nos. 18-cv-10507, 22-cv-4397 (Aug. 18, 2024), Dkt.234[1] ...............................................................JA1

*Cheeseman* Plaintiffs' Notice of Appeal, No. 22-cv-04360 (July 30, 2024), *Cheeseman* Dkt.82.......................................................................................JA3

State Defendants' Notice of Cross-Appeal, Nos. 18-cv-10507, 22-cv-4397, 22-cv-04360 (Aug. 5, 2024), *Cheeseman* Dkt.84 ......................JA7938

Order and Judgment (July 30, 2024), Dkt.229 ......................................................JA5

Memorandum Opinion (July 30, 2024), Dkt.228 ..................................................JA9

## Volume II

District Court Docket Sheet, No. 18-cv-10507 (D.N.J.) ....................................JA78

District Court Docket Sheet, No. 22-cv-04360 (D.N.J.) ..................................JA110

District Court Docket Sheet, No. 22-cv-04397 (D.N.J.) ..................................JA124

*ANJRPC* Amended Complaint (Oct. 28, 2022), Dkt.122 ................................JA134

*Cheeseman* Amended Complaint (July 14, 2022), No. 22-cv-04360 Dkt.4........................................................................................................................JA150

    Exhibit A - New Jersey Assault Firearms Guidelines, No. 22-cv-04360 Dkt.4-1........................................................................JA182

*Ellman* Complaint (July 1, 2022), No. 22-cv-04397 Dkt.1 .............................JA186

*Cheeseman* Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174........................................................................................................................JA202

    Brief in Support of *Cheeseman* Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-1 ....................................................................JA205

---

[1] ECF numbers are to *ANJRPC* docket (No. 18-cv-10507) unless otherwise indicated.

i

Exhibit 1 – Declaration of Mark Cheeseman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-2......................................................................JA251

Exhibit 2 – Declaration of Timothy Connolly in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-3......................................................................JA254

Exhibit 3 – Declaration of Brandon Combs on Behalf of Firearms Policy Coalition, Inc. in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-4............................JA257

Exhibit 4 – Excerpts from Frank Miniter, *The Future of the Gun* (2014), Dkt.174-5 ............................................................JA261

Exhibit 5 – Excerpts from Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (2022), Dkt.174-6......................................................................JA267

*Cheeseman* Statement of Undisputed Material Fact in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.174-7 ..............JA272

*ANJRPC* and *Ellman*'s Notice of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175 ..................................................................JA303

Declaration of Blake Ellman in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-1 .....................................JA306

Declaration of Marc Weinberg in Support of Motion for Summary Judgment (Oct. 6, 2024), Dkt.175-2 .....................................JA309

Declaration of Thomas Rogers in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-3 .....................................JA312

Declaration of Scott Bach in Support of Motion for Summary Judgment (Oct. 6, 2023), Dkt.175-4....................................JA315

Declaration of Emanuel Kapelsohn in Support of Motion for Summary Judgment with Accompanying Exhibits (Oct. 6, 2023), Dkt.175-5 .......................................................JA319

Declaration of Ashley Hlebinsky in Support of Motion for
Summary Judgment with Accompanying Exhibits (Oct. 6,
2023), Dkt.175-6.....................................................................JA479

*ANJRPC* and *Ellman*'s Brief in Support of Motion for Summary
Judgment (Oct. 6, 2023), Dkt.175-7......................................JA634

*ANJRPC* and *Ellman*'s Statement of Undisputed Material Facts
(Oct. 6, 2023), Dkt.175-8 ......................................................JA682

## **Volume III**

State's Notice of Cross-Motion for Summary Judgment
(Nov. 3, 2023), Dkt.183 .........................................................JA740

State's Combined Brief in Opposition to Motions for Summary
Judgment and in Support of State's Cross-Motion for Summary
Judgment (Nov. 3, 2023), Dkt.183-1 ......................................JA743

State's Counter-Statement of Material Facts Not in Dispute
(Nov. 3, 2023), Dkt.183-2........................................................JA837

State's Response to *ANJRPC* and *Ellman*'s Statement of
Undisputed Material Facts (Nov. 3, 2023), Dkt.183-3 ...........JA881

State's Response to *Cheeseman*'s Statement of Undisputed
Material Facts (Nov. 3, 2023), Dkt.183-4 ..............................JA943

Declaration of Daniel Vannella in Support of Cross-Motion for
Summary Judgment, Motion to Exclude Testimony of Emanuel
Kapelsohn & Clayton Cramer, and State's Opposition to Motion to
Exclude Certain Expert Testimony (Nov. 3, 2023), Dkt.184............JA969

Exhibits 1-5 (May 15, 2023), Dkt.184-1 ................................JA982

## **Volume IV**

Exhibits 6-10 (May 15, 2023), Dkt.184-1 ............................JA1412

Exhibit 11 – Declaration and Expert Report of James Yurgealitis
with Accompanying Exhibits (June 7, 2023), Dkt.184-2.....................JA1813

Exhibits 12-13 (May 15, 2023), Dkt.184-3 .........................JA1877

### Volume V

Exhibits 14 (May 15, 2023), Dkt.184-3 ...............................................JA2123

Exhibit 15 – Supplemental Letter with Accompanying Exhibits
from Emanuel Kapelsohn to *ANJRPC* Plaintiffs (July 31, 2023),
Dkt.184-4 .........................................................................................JA2154

Exhibit 16 – Transcript of Emanuel Kapelsohn Deposition with
Exhibits Introduced During Deposition (Aug. 4, 2023),
Dkt.184-5 .........................................................................................JA2345

### Volume VI

Exhibit 16 (Continued) – Transcript of Emanuel Kapelsohn
Deposition with Exhibits Introduced During Deposition
(Aug. 4, 2023), Dkt.184-5 .................................................................JA2849

Exhibits 17 (May 15, 2023), Dkt.184-6 ...............................................JA3382

### Volume VII

Exhibits 18-19 (May 15, 2023), Dkt.184-6 ..........................................JA3483

Exhibit 20 – Transcript of Clayton Cramer's Deposition with
Exhibits Introduced During Deposition (Aug. 21, 2023),
Dkt.184-7 .........................................................................................JA3901

### Volume VIII

Exhibit 20 (Continued) – Transcript of Clayton Cramer's
Deposition with Exhibits Introduced During Deposition (Aug.
21, 2023), Dkt.184-7..........................................................................JA3901

Exhibits 21-44 (May 15, 2023), Dkt.184-8 ..........................................JA4466

Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.195............................JA4706

Cheeseman's Reply to State's Response to Statement of
Undisputed Material Fact in Support of *Cheeseman* Motion for
Summary Judgment (Dec. 15, 2023), Dkt.195-1 .................................JA4766

## Volume XI

Cheeseman's Response to State's Counter-Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.195-2 ..................JA4871

Declaration of Bradley Lehman in Support of Exhibits to
Cheeseman's Brief in Opposition to State's Cross-Motion for
Summary Judgment and Reply to State's Opposition to *Cheeseman*
Motion for Summary Judgment (Dec. 15, 2023), Dkt.196 ............................JA4961

    Exhibits 1-12 (Dec. 15, 2023), Dkt.196-1 ...........................................JA4980

    Exhibits 13-28 (Dec. 15, 2023), Dkt.196-2 .........................................JA5462

    Exhibits 29 (Dec. 15, 2023), Dkt.196-3 ..............................................JA5583

## Volume X

    Exhibits 30-43 (Dec. 15, 2023), Dkt.196-3 .........................................JA5609

    Exhibits 44-50 (Dec. 15, 2023), Dkt.196-4 .........................................JA5750

    Exhibits 51-60 (Dec. 15, 2023), Dkt.196-5 .........................................JA6242

## Volume XI

    Exhibits 61 (Dec. 15, 2023), Dkt.196-5 ..............................................JA6344

    Exhibits 62-72 (Dec. 15, 2023), Dkt.196-6 .........................................JA6348

    Exhibits 73-86 (Dec. 15, 2023), Dkt.196-7 .........................................JA6481

    Exhibits 87-99 (Dec. 15, 2023), Dkt.196-8 .........................................JA6629

    Exhibits 100-105 (Dec. 15, 2023), Dkt.196-9 .....................................JA6808

## Volume XII

    Exhibits 106-115 (Dec. 15, 2023), Dkt.196-9 .....................................JA7048

    Exhibits 116-124 (Dec. 15, 2023), Dkt.196-10 ...................................JA7341

*ANJRPC* and *Ellman*'s Reply Brief in Support of Motion for
Summary Judgement and in Opposition to State's Cross-Motion for
Summary Judgment (Dec. 15, 2023), Dkt.197 ...............................................JA7569

Reply Declaration and Rebuttal Expert Report of Emanuel
Kapelsohn (Dec. 15, 2023), Dkt.197-1.................................................JA7608

*ANJRPC* and *Ellman*'s Response to State's Statement of
Material Facts Not in Dispute (Dec. 15, 2023), Dkt.197-2 .................JA7641

## **Volume XII**

*ANJRPC* and *Ellman*'s Brief in Opposition to State's Motion to
Exclude Expert Testimony of Emanuel Kapelsohn & Clayton
Cramer and in Reply in Further Support of Daubert Motion
(Dec. 15, 2023), Dkt.197-3....................................................................JA7712

*ANJRPC* and *Ellman*'s Amended Response to State's Statement of
Material Facts Not in Dispute (Dec. 16, 2023), Dkt.198...............................JA7739

Declaration and Rebuttal Expert Report of Clayton Cramer
(Dec. 15, 2023), Dkt.200 ................................................................................JA7817

# EXHIBIT 61

JA6345

# FIREARMS
## IN
# AMERICAN HISTORY

1600 to 1800

BY

CHARLES WINTHROP SAWYER

PUBLISHED BY THE AUTHOR

BOSTON, U. S. A.

46814

46814

46814

LEGISLATIVE LIBRARY
ONTARIO

LEGISLATIVE LIBRARY
ONTARIO

*Copyright,* 1910
By Charles Winthrop Sawyer

*As the Sawyer collection of firearms lacked a number of pieces necessary to illustrate this work, application was made to several other collectors for permission to photograph arms in their collections. To Messers Mark Field, Charles D. Cook, Dr. J. B. Thornton, W. A. Lawrence, J. M. Scrafford, and Francis R. Bangs, grateful acknowledgment is made for their exceeding kindness, courtesy, and generosity.*

*The Plimpton Press Norwood Mass. U.S.A.*

JA6346

JA6347

FIREARMS IN AMERICAN HISTORY    81

as sharpshooters to pick off any British soldiers or officers who were incautious in exposing themselves. This they did to perfection. There is mention of a British soldier shot at 250 yards when only half his head was visible; of ten men, three of whom were officers, killed one day while reconnoitering; of a rifleman who, seeing some British on a scow at a distance of fully half a mile, found a good resting place on a hill and bombarded them until he potted the lot.

And so on, until General Howe, thinking that his statement of casualties and American marksmanship might need proof at home, gave orders for the capture alive of one of the curiosities complete with his shooting-iron, and offered a reward. Finally he got one and sent him to England rifle and all, and the marksman was made to perform there and exhibited as a curiosity. This bit of stage-play had an effect upon the British public that perhaps Howe did not anticipate — and perhaps he did, for he was accused of being lukewarm to the King's policy — that of frightening the British public, through the newspapers, to such an extent that enlistments in the army, difficult to get before, absolutely stopped for a period, and the only new recruits were those forced into service by the German princes of whom King George the Third hired them.

EXHIBIT 62

# HISTORY

OF

# BUCKS COUNTY,

## PENNSYLVANIA;

INCLUDING

AN ACCOUNT OF ITS ORIGINAL EXPLORATION; ITS RELATION TO THE SETTLEMENTS
OF NEW JERSEY AND DELAWARE; ITS ERECTION INTO A SEPARATE COUNTY,
ALSO ITS SUBSEQUENT GROWTH AND DEVELOPMENT, WITH SKETCHES OF
ITS HISTORIC AND INTERESTING LOCALITIES, AND BIOGRAPHIES
OF MANY OF ITS REPRESENTATIVE CITIZENS.

EDITED BY J. H. BATTLE.

ILLUSTRATED.

PHILADELPHIA, PA., CHICAGO, ILL.:
A. WARNER & CO., PUBLISHERS.
1887.

JA6349

F
157
,6863

Copyright, 1887, by A. WARNER & CO.

PHILADELPHIA:
COLLINS PRINTING HOUSE,
705 Jayne Street.

**JA6350**

220                    HISTORY OF BUCKS COUNTY.

of the building. Within, a spacious passageway, open to the ceiling of the second story and floored with encaustic tiles laid in a somewhat elaborate pattern, gives access to the four offices below, and to the entrance of the court-room. On the left are the offices of prothonotary and recorder, and above them, on the second floor, are two rooms occupied by the commissioners. On the right are the offices of the clerk of the orphans' court, and the register, and above them on the second floor are the arbitration room and the Historical Society's room. The upper offices are reached by an iron stairway and a gallery which leads to the various rooms. An alcove in the second story over the vestibule admits to the offices that here flank the tower and to a spiral iron stairway that permits the visitor to ascend to the clock room. A short passageway connects the two parts of the building and ushers the visitor into a large amphitheatre, the further side of which is cut off by the "bench" and the partition walls that reserve the rear of the building for retiring rooms for the judge and lawyers, waiting rooms for witnesses, the law library, several jury rooms, and a hallway that leads to a rear entrance. The appointments of the court-room and offices are characterized by good taste and durability, while the stained-glass windows of the upper corridor, and of the court-room add a touch of elegance that is striking without being extravagant. Beneath the building is a capacious cellar with ample room for the storage of fuel and many archives, beside a steam apparatus that supplies the means of heating the whole building.

The demand for a new jail at this time was scarcely less urgent than the one for a new court-house. The equipment was behind the necessity of the times, and it had fallen into a state of "general debility" that demanded constant repairs to delay the day of final dissolution. In 1877 a fire did considerable damage, as if to emphasize the contrast with the new court-house in course of construction, but the usual patching of old garments with new cloth prolonged its term of service. This state of things began at last to find reflection in the reports of the grand juries, and a round of changes was rung upon the phrase, "everything found in as good order as the old fabric will admit of." At the February session of 1882 the grand jury made a new departure, and declared themselves "unanimously of the opinion that the present building used for the purposes of a jail, is entirely unfit for the purposes for which it is used, and

Over the entrance to the court-room the following may be seen:—

|   |   |   |
|---|---|---|
| Samuel Keller: | | Hutton & Ord, |
| And⁂ J. Solomon: | County | Architects. |
| Edmund Goddard: | | James B. Doyle, |
| Commissioners. | Buildings. | Builder. |
| William Closson | | H. D. Livezey and |
| Clerk. | 1877. | Francis Adelman |
| | | Superintendents. |

Lewis Emick, Stone Mason.

JA6351

# EXHIBIT 63

# THE CRAVEN HALL NEWSLETTER

## CRAVEN HALL HISTORICAL SOCIETY, THE JOHN FITCH STEAMBOAT MUSEUM & THE CRAVEN-VANSANT BURYING GROUND



## VOLUME 19, ISSUE 1, MARCH 2021

Erik Fleischer - President
Laura Martin - VP, Treasurer
Bernice Graeter-Reardon - VP, Secretary
Jennifer Burns - VP, Public Relations, Editor
Kent Sloan - Photographer



**In This Issue:**
President's Letter
Internet Project & Website Rebranding
The Craven Hall Historical Society Has Authors
Pandemic Activities at Craven Hall
18th Century Clock/Educational Programs
Tales from the Burying Ground
The Battle of Crooked Billet
Upcoming Events 2021
Memberships & Donations

# PRESIDENT'S LETTER

Welcome to 2021 and goodbye to 2020 – we won't miss you!

While the pandemic has changed our lives significantly during the past year, the Society was able to function reasonably well with the hosting of 2/3rds of our Elementary Program for 4th graders before being shut down. Unfortunately, our steam/ model steamboat program with Centennial Middle Schools was cancelled. We were able to conduct many of our monthly House and Museum tours with special protocols – face masks and social distancing.

Looking to the future, our Board authorized the establishment of three Vice-President positions; namely, Vice-President/Treasurer, Laura Martin; Vice-President/Secretary, Bernice Graeter-Reardon, and Vice-President/ Public Relations – Jennifer Burns. The persons selected to these positions were members of a management task force established in 2019 to chart our path forward. One of the prime tasks of the management team was to establish a vision for the future and the initial result was the establishment of a new branding – namely, The CRAVEN HALL HISTORIC SITE to reflect not only Craven Hall, the building, but also the The John Fitch Steamboat Museum and the Craven/Vansant Burying Ground. To highlight our rebranding, the team developed a new logo to reflect the change and our members and supporting businesses will receive a decal (with adhesive backing) and a refrigerator magnet as shown below.

In conclusion, we want to again thank our member supporters and businesses that make it possible for us to keep "History Alive" in our community. Please consider taking out or renewing your membership in our Society. We've raised the membership fee to $15 to be able to offer you an adhesive decal and refrigerator magnet. Donations are also deeply appreciated and your contributions are tax deductible as we are a registered 501-c-3 non-profit corporation.



As we move forward into 2021 and beyond, we hope to be able to reactivate our school programs in 2021 and once again present a program series on history topics with guest presenters, another craft brew session with Moss Mill Brewing of Southampton, PA, and a character presentation of "residents" of the Craven/Vansant Burying Ground. In the meantime, stay safe and well – hopefully we are on the path to a more normal lifestyle.

-Erik Fleischer, President

# CRAVEN HALL & THE JOHN FITCH STEAMBOAT MUSEUM GIFTED INTERNET ACCESS THROUGH HISTORIC PARTNERSHIP

Thanks to Ray Cline of Libertas Consulting of Ivyland, PA and Low Voltage Nation, a consortium of internet providers across the nation, Craven Hall and the John Fitch Steamboat Museum now have access to high-speed internet. The equipment and installation, valued at over $30,000, was almost completely donated by Libertas Consulting and members of Low Voltage Nation, along with financial contributions from local supporters.

Craven Hall also received a grant from Visit Bucks for $1,500 to use for the project. The project came about through a local Chamber of Commerce scholarship meeting held at Craven Hall where Ray Cline, owner of Libertas Consulting, learned about the educational programs on local history conducted annually for local school students since 1996 and saw a need and opportunity to help advance the efforts of Craven Hall and the John Fitch Steamboat Museum. Craven Hall and the John Fitch Steamboat Museum can now offer free internet access to visitors and guest presenters and provide a 30-person meeting hall with internet access for other groups. In addition, this new service will provide the capability to enhance our museum exhibits and other offerings.

Words alone make it difficult to express our deep appreciation for all the vendors who donated equipment and the numerous installers who had to find appropriate places to install the equipment while protecting the historic fabric of an 1845 mansion house. It was a monumental effort completed over a single weekend without a hitch. To all who participated and/or made a contribution, a huge THANK YOU!!



# THE CRAVEN HALL HISTORICAL SOCIETY HAS AUTHORS

Craven Hall Historical Society is proud to announce it has two published authors on its board! Abraham Lincoln historian and author, Fred Antil, and local historian and author, Jennifer Burns (Rogers), have published books on topics they are both very passionate about — Fred, *A Lincoln Treasure Trove*, and Jennifer, *Hidden History of Bucks County*.

For Lincoln enthusiasts and experts alike, *A Lincoln Treasure Trove* is fun, informative, and engaging, and offers some of the most interesting, unknown stories and lesser-known facts about our nation's 16th president. *Hidden History of Bucks County* dives into the rich history beautiful Bucks County has to offer, from stories of our county's founders and famous and influential families, to historic, Revolutionary War-era taverns and inns, cemeteries, and more.

Purchase your copy of *A Lincoln Treasure Trove* or *Hidden History of Bucks County* online at Amazon.com, Barnes and Noble, and local book stores near you.

# CRAVEN HALL LAUNCHES REBRANDED, MOBILE-FRIENDLY WEBSITE

In Fall 2020, we announced the launch of our new mobile-friendly website, built by our VP of Public Relations, Jennifer Burns, and her brother, Brian Rogers, a senior web developer from a local digital advertising agency. We also recently partnered with Blu Echo Design, based out of Langhorne, Bucks County, for a logo redesign and rebranding. We chose to rebrand our organization as The Craven Hall Historic Site to encompass Craven Hall, the John Fitch Steamboat Museum, and our historic burying ground which dates back to the pre-Revolutionary War era.



Our previous website, built before the age of mobile browsing, showcased our years of work dedicated to the preservation of local history through stories, articles, and photographs. Everything was successfully transferred to our new website and additional features were added including a contact form, donation form, and more. Later this year, we are planning on launching our eLibrary, providing access to over one hundred books and documents. We will continue to add to our eLibrary database as we acquire more historic documents and books for our archives. A huge thank you to Brian for his help on this project!

Visit our rebranded website at:
www.craven-hall.org

## JOHN FITCH - STEAMBOAT INVENTOR - HE GETS NO RESPECT!

For those readers who have visited the John Fitch Steamboat Museum here in Warminster, PA, you may have heard one of our docents reference John Fitch as the Rodney Dangerfield of his day. The lack of respect for John Fitch is wide spread – a marker for his birthplace was placed on an adjacent property because the lot owners didn't want it on their property!



We are indebted to Kathy Hernard of Slidell, LA for yet another example of the lack of respect for the steamboat inventor. Ms. Hernard is the granddaughter of renowned Chicago sculptor, Frederick C Hibbard. He is best known for his statues of Mark Twain and Tom Sawyer/Huck Finn in Hannibal, MO, along with a number of Civil War statues. Mr. Hibbard attempted to memorialize John Fitch with a number of model sculptures as seen here but apparently could not gain any sponsors to support his proposed sculptures. Just another example of how little respect John Fitch has received even though his invention paved the way for modern transportation.



# PANDEMIC ACTIVITIES AT CRAVEN HALL

Our maintenance "crew" of Kent Sloan, Otto Blavier, and writer, Erik, have undertaken the opportunity during our current shutdown to do a major "refreshment" of Craven Hall along with some needed yard work.

Kent and Erik "refreshed" the Library and Museum rooms and upstairs hallway in Craven Hall – scraping, plastering and repainting walls and woodwork. In addition, 15 sets of 2nd floor shutters were repaired, repainted, and rehung.

Our "refreshment" activities were supported by additional volunteers, Bernice Graeter-Reardon, Mary Ann Casele, Laura Martin and Jen Burns and her parents, Cindy and Ray Rogers.

Additional cleaning/repainting projects are planned for 2021.


Museum Room


Shutter Repair and Repainting

Otto Blavier cut down our large log pile in preparation for splitting and removed two storm damaged apple trees in preparation for our Christmas Tree sales this fall/winter. Otto can and will do almost anything but draws the line when it comes to painting! We have excused him from painting projects as his other skills are invaluable!

We hope the current shutdown will soon be lifted but in the interim we will continue our efforts to accomplish needed work on the property.


Apple Tree Removal

# 18TH CENTURY CLOCK INSTALLED IN VANSANT PARLOR

Craven Hall has a new addition to our collection thanks to the clock repair and restoration skills of Orland Bergere. The 30-hour clock is of English origin and dates circa 1780. The wood case is walnut and the dial is hand painted. There is no chime or bell but the clock workings originally had an alarm bell. The writer bought the clock at an auction in Virginia because of the handsome walnut case and beautiful dial without realizing the "workings" were in very poor condition. We are most appreciative of Orland Bergere's many volunteer hours of repair and restoration that has brought this fine wall clock back to working order.




# EDUCATION PROGRAMS ON LOCAL HISTORY IMPACTED BY PANDEMIC

The year 2020 is one we probably all want to forget as it caused the cancellation of many programs. Fortunately, we were able to complete two thirds of our program for 4th graders on local history. All twelve classes for McDonald Elementary and Davis Elementary were completed before schools closed due to the pandemic. Unfortunately, we didn't get a chance to host any classes from Willow Dale Elementary.

The program on the importance of steam and the model steamboat competition by students of Klinger Middle School and Log College were also cancelled by the pandemic. Since these classes are held in May, we still have hope that we may be able to conduct them in May 2021. We normally schedule our Elementary Programs beginning in December and we hold out hope that this program can restart in December 2021.

We are considering the possibility to video tape some portions of the Elementary Program in that event that student visits to Craven Hall are delayed until December 2022.

# TALES FROM THE 1769 VANSANT/CRAVEN BURYING GROUND

## Part 1 - James (Jacobus) "Cobe" Scout

The historic 1769 Craven/Vansant Burying Ground contains over 60 graves and several of the "residents" have interesting stories to tell. Probably the most interesting "resident" is James (Jacobus) Scout, or "Cobe" Scout as he was known by his friends and associates. His gravestone had the unusual inscription, "he shot an English soldier at 900 yards and killed him," and "he was an intimate friend of Thomas Paine." The original gravestone has long been gone but a 1912 postcard of the graveyard confirms the inscriptions. While not recorded on his gravestone, "Cobe" was also a close friend of John Fitch and he allowed Fitch to use his shop to build his first steamboat models. The story of shooting an English soldier is recorded in WWH Davis's *History of Bucks County*. "Cobe" apparently was "mocked" with a gesture by an English or Hessian solder on the New Jersey side of the Delaware River as "Cobe" and his companions stood on the Pennsylvania shoreline. "Cobe" raised his rifle (he was a rifle-maker), fired a shot and the soldier dropped – thus the story.

"Cobe" was also involved in the Revolutionary War incident known as the Paoli Massacre where colonial troops were set upon at night by British soldiers with disastrous results for the colonials. "Cobe" was making his escape when he heard a horseman bearing down on him and thought he was a "goner." At that moment, a shot rang out and the rider fell from his horse. "Cobe" managed to grab on to the horse and escape. He found two pistols and a pair of horseshoes in the saddlebags on the horse. He sold the pistols but kept the horseshoes. His neighbors in Warminster always thought him a little strange which may explain his friendship with another "strange" fellow – John Fitch.

## Part 2 - Abraham Sutphin

Abraham Sutphin is one of 11 Revolutionary War veterans who "reside" in the Craven-Vansant Burying Ground. Our "Troubles" with Mother England that erupted in the spring of 1775 prompted Abraham in 1777 to join Captain Bingley's unit of the Pennsylvania Militia. That unit was part of Captain Issac Longstreth's brigade and assigned to General Lacey's Corp.



Gravestone of Jacobus Scout

On the night of April 30, 1778, he was assigned sentry duty at the south end of Crooked Billet (Hatborough) and observed an enemy force advancing on the town. He claims to have quickly fired a warning shot to alert Gen. Lacey and his forces and as such he claimed to have saved Gen. Lacey and others from being captured or killed. The battle, known as the Battle of Crooked Billet, was a rout of the militia forces with many militia captured or killed. Abraham was fortunate to escape capture. Abraham's brother-in-law was none other than James (Jacobus) Scout.

*The Craven/Vansant Burying Ground is accessible from the back parking lot of the Fox Run Apartments on Newtown Road.*

**JA6359**



Gravestone of Abraham Sutphin

# THE BATTLE OF CROOKED BILLET: MAY 1, 1778

On May 1, 1778, the Battle of Crooked Billet took place near the Crooked Billet Tavern in present-day Hatboro, Montgomery County. A skirmish in the Philadelphia Campaign of the American Revolutionary War, British forces, led by General William Howe and under the command of Major John Graves Simcoe, attacked Brigadier General John Lacey and three Pennsylvania militia regiments. John Lacey, of Buckingham, became a military officer when he was appointed brigadier general in January 1778 at the age of 23. General George Washington, quartered at Valley Forge, fearing the British would raid Bucks County and surrounding areas for food and supplies, sent Lacey two objectives to meet by spring 1778: guard the roads leading to Philadelphia, and protect the Patriots throughout the countryside.

General Lacey's forces continued to shrink despite the promise of one thousand men at all times. Lacey's camp shrunk to just six hundred men, and then to about 400 at the time of battle. In April, Simcoe gained permission to launch a surprise attack on Lacey, and on April 30, a joint force of Hessians and British troops marched from Philadelphia to Second Street Pike, up through Horsham, cornering Lacey at his encampment in Hatboro. Lacey, caught off guard because a Lieutenant ordered to keep watch fell asleep at his post, had to quickly retreat and pull his troops to a nearby wooded area. Abraham Sutphin (our burying ground "resident") claims to have fired a warning shot to alert General Lacey, possibly saving Lacey and others from being captured or killed.

The British wreaked havoc, stealing supplies, burning crops, and committing atrocious crimes against the Americans. According to the Royal Pennsylvania Gazette, between 80-100 Americans were killed, at least 50 more captured, forcing Lacey and his troops to retreat into Warminster.

If you are interested in learning more about the battle, please be sure to visit our Battle of Crooked Billet display during your next visit to Craven Hall.



Painting of the Battle of Crooked Billet. See this at your next visit to Craven Hall.

# We Thank You for Your Continued Support!

To stay up to date on Craven Hall, and to learn more about Colonial America and local history, visit **Facebook.com/CravenHallHistoricalSociety Instagram.com/HistoricCravenHall**, and **Medium.com/@cravenhall**

  



# MEMBERSHIPS & DONATIONS

NAME: _____   STREET: _____

CITY/STATE/ZIP: _____   TELEPHONE: _____

EMAIL ADDRESS: _____

## APPLICATION FOR MEMBERSHIP

**Membership:**
- ☐ Individual or Family: $15 (Includes decal and refrigerator magnet)
- ☐ Donation assistance for additional displays - John Fitch Hall - $_____ *Thank You.*

**Volunteers:**
- ☐ Restoration/Repairs:
- ☐ Fundraising:
- ☐ Historic Research/Library:
- ☐ Centralizing Records:
- ☐ Docent (Tour Guide):
- ☐ Membership/Public Relations:
- ☐ Special Events:
- ☐ Gravestone Restoration:
- ☐ Other: _____

*If you are interested in volunteering, please check a box. We need you. Thank you.*

- ☐ **Contribution to the John Fitch Museum**   Amount: _____ *Thank you.*

**DVD of Craven Hall**   ☐ Amount by check: $17.50 (to address below)
☐ Amount by pick-up: $15.00 (Please call to arrange: 215-675-4698)

Contributions to aid in the restoration and operation of Craven Hall are always welcome. Please make your check payable to: **Craven Hall Society, Inc. P.O. Box 2042, Warminster, PA 18974.**

The Society is a non-profit corporation registered in Pennsylvania. Your contribution is tax deductible.



**Craven Hall 1900's**
Craven Hall Historical Society
P.O. Box 2042
Street and Newtown Roads
Warminster, PA 18974
(215) 675-4698



# EXHIBIT 64

ORIGINAL ARTICLE

# Patient-reported Outcomes at 6 to 12 Months Among Survivors of Firearm Injury in the United States

*Juan Pablo Herrera-Escobar, MD, MPH,*✉* Elzerie de Jager, MBBS(Hons),** *Justin Conrad McCarty, DO, MPH,** *Stuart Lipsitz, ScD,** *Adil H. Haider, MD, MPH,** *Ali Salim, MD,†* *and Deepika Nehra, MD†*

**Objective:** Assess outcomes in survivors of firearm injuries after 6 to 12 months and compared them with a similarly injured trauma population.

**Background:** For every individual in the United States who died of a firearm injury in 2017, three survived, living with the burden of injury. Current firearm research largely focuses on mortality and short-term health outcomes, while neglecting the long-term consequences.

**Methods:** We contacted adult patients with a moderate-to-severe injury from a firearm or motor vehicle crash (MVC) treated at 3 level I trauma centers in Boston between 2015 and 2018. Patients were contacted 6 to 12 months postinjury to measure: presence of daily pain; screening for post-traumatic stress disorder (PTSD); new functional limitations; return to work; and physical and mental health-related quality of life. We matched each firearm injury patient to MVC patients using Coarsened Exact Matching. Adjusted Generalized Linear Models were used to compare matched patients.

**Results:** Of 177 eligible firearm injury survivors, 100 were successfully contacted and 63 completed the study. Among them, 67.7% reported daily pain, 53.2% screened positive for PTSD, 38.7% reported a new functional limitation in an activity of daily living, and 59.1% have not returned to work. Compared with population norms, overall physical and mental health-related quality of life was significantly reduced among firearm injury survivors. Compared with matched MVC survivors (n = 255), firearm injury survivors were significantly more likely to have daily pain [adjusted odds ratio (OR) 2.30, 95% confidence interval (CI) 1.08−4.87], to screen positive for PTSD (adjusted OR 3.06, 95% CI 1.42−6.58), and had significantly worse physical and mental health-related quality of life.

**Conclusions:** This study highlights the need for targeted long-term follow-up care, physical rehabilitation, mental health screening, and interventions for survivors of firearm violence.

**Keywords:** firearm injury, functional outcomes, long-term outcomes, mental health, post-traumatic stress disorder, quality of life

*(Ann Surg 2021;274:e1247–e1251)*

Rates of firearm-related deaths in the United States exceed those of all other 25 high-income nations combined.[1] Firearm-related injuries represent 4% of all patients treated at US trauma centers, and firearm-related deaths account for 17% of deaths due to injury.[2,3] However, the burden of firearm-related injuries is not limited to those who die. For every individual in the United States who died of a firearm injury in 2017, three survived. These individuals are left living with the burden of their injury.[4] Current firearm research

From the *Center for Surgery and Public Health, Brigham and Women's Hospital, Boston, MA; and †Division of Trauma, Burn and Surgical Critical Care, Brigham and Women's Hospital, Boston, MA.

✉jherrera@hsph.harvard.edu.

Funding: The present original work was funded by the Center for Surgery and Public Health own resources.

Disclosure: The authors have no conflicts of interest to disclose.

Copyright © 2020 Wolters Kluwer Health, Inc. All rights reserved.

ISSN: 0003-4932/20/27406-e1247

DOI: 10.1097/SLA.0000000000003797

largely focuses on mortality and short-term health outcomes,[5,6] while neglecting the long-term consequences.[7]

Survivors of injury as a whole commonly suffer from reduced quality of life, poor functional outcomes, psychological disturbances, chronic pain, and social disintegration long after their injury.[8–12] Two attempts to collect long-term outcomes data for injured patients in the United States, the National Study on Cost and Outcomes of Trauma (NSCOT), and the Functional Outcomes and Recovery after Trauma Emergencies (FORTE) project found that 40% to 45% of injured individuals had not returned to work 1 year after injury.[8,9] Additionally, these patients have a high prevalence of chronic pain, functional limitations, and mental health disturbances such as post-traumatic stress disorder (PTSD) and depression.[8]

Survivors of firearm-related violence have been shown to have significant long-term declines in physical and mental health.[13] More than 80% of screened firearm-injury survivors at 8 months postinjury report moderate or severe symptoms of post-traumatic stress.[14] One in 6 will be readmitted to a hospital,[14] and 1 in 11 will be readmitted with acute stress disorder/PTSD within 6 months of their injury.[15] The average yearly costs of these hospitalizations exceed $2.8 billion.[14] In addition to increased healthcare utilization, victims have increased rates of disability, work loss, and deterioration in quality of life.[16] The societal cost of which is estimated to be approximately $229 billion.[14]

It is imperative that we better understand the recovery trajectories of survivors of firearm-related injury to shift the discussion towards strategies to improve long-term outcomes. How survivors of firearm-related violence compare with similarly injured survivors of nonfirearm-related trauma is not known. Herein, we compare the long-term outcomes for survivors of firearm-related violence with similarly injured survivors of a motor vehicle crash (MVC). We compare groups with regards to presence of daily pain, screening for PTSD, new functional limitations, return to work, and physical and mental health-related quality of life after 6 to 12 months postinjury. Our hypothesis is that firearm-injured patients have worse long-term outcomes compared with MVC survivors.

## METHODS

### Setting

This study was conducted using data from the FORTE project registry. The FORTE project is a prospective multicenter effort between 3 Boston level I trauma centers to collect postdischarge patient-reported outcome measures (PROMs) for traumatically injured patients. This initiative started in December, 2015 at Brigham and Women's Hospital (BWH), and in June, 2016 at Massachusetts General Hospital (MGH) and Boston Medical Center (BMC). Further details of the development and design of the FORTE project have been published elsewhere.[17]

### Participants and Study Design

We included adult (18−64 years) English or Spanish-speaking trauma patients with a moderate to severe injury [injury severity

JA6364

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

score (ISS) ≥9) from a firearm or MVC treated at the participating institutions between 2015 and 2018. Eligible patients were sent opt-out letters 6 to 12 months after discharge, explaining the purpose of the study and informing them that they would be contacted by telephone to collect information about their recovery. In addition, they were provided a pamphlet with details about the study and its significance, and also steps to opt out of the study or to provide updated contact information. Patients who sustained a firearm injury as a result of self-harm and those who were incarcerated or deceased at the time of follow-up were excluded.

Patients were contacted via telephone, and interviews were completed by a trained researcher or completed by the patient via e-mail or paper format after obtaining verbal consent. The interview consisted of an initial screening followed by a series of survey questions to assess functional and PROMs, and also other relevant aspects of the patient recovery experience. For the present study, the outcomes were: presence of daily pain; screening for PTSD; new functional limitations; return to work; and physical and mental health-related quality of life.

## Study Variables

### Patient Demographics and Clinical Information

Patient demographic and clinical information from the index hospitalization were obtained from institutional trauma registries. Clinical variables extracted from the trauma registry included age, sex, race, prior psychiatric illness, mechanism of injury, ISS, intensive care unit (ICU) length of stay, hospital length of stay (LOS), in-hospital complications, prior substance abuse disorder, surgical procedures, and discharge disposition. Education level was asked in the follow-up interviews.

### Exposure

Patients were divided into firearm and MVC survivors based on the mechanism of injury reported in the institutional trauma registries. In cases where this information was missing, the data were extracted manually from the patients' medical records.

### Outcome Measures

*Daily Pain.* Daily pain was defined as a positive answer ("strongly agree" or "agree" on the 5-point Likert scale) to the Trauma Quality-of-Life instrument (T-QoL)[18] item "I have pain on a daily basis".

*Screening for PTSD.* Positive screening for PTSD was defined as having at least 4/7 positive responses in the Breslau questionnaire.[19] The Breslau questionnaire was derived from the modified National Institute of Mental Health Diagnostic Interview Schedule and the World Health Organization Composite International Diagnostic Interview, version 2.1.

*Functional Limitations.* Functional limitation was defined as the new need for assistance with any of the 8 daily activities from the functional engagement domain of the T-QoL. The activities included are: drive, walk upstairs, walk on flat surfaces, dress, shower, eat, go to the bathroom, and cook.

*Return to Work.* Two questionnaire items were used to assess return to work. Patients were asked whether they were working or not the month before the injury and at the time of the interview. Only individuals working before injury were included in the return to work analyses.

*Physical and Mental Health-related Quality of Life.* Health-related quality of life was assessed using the physical (PCS) and mental (MCS) component summary scores of the Short-Form-12 (SF-12) Health Survey version-2. PCS and MCS are represented as t-scores with a population mean of 50 and a standard deviation (SD) of 10, in which 0 represents the lowest level of health and 100 the highest.

## Data Analysis

Descriptive statistics were used to describe patient demographics, clinical characteristics, and study outcomes. Participants' and nonparticipants' demographic and clinical characteristics were compared using parametric tests (*t* tests) or nonparametric tests (Wilcoxon rank-sum test) for continuous variables, and chi-square tests or Fisher exact tests for categorical variables, as appropriate. Mean SF-12 PCS and MCS were described and compared with the US population mean score of 50.

Outcome analyses were conducted in 2 stages. First, we matched each firearm injury patient to between 1 and 4 MVC patients using Coarsened Exact Matching (CEM).[20] The groups were matched on age, sex, race, education level, and psychiatric illness diagnosis; the number of MVC matches per firearm patient was based on the number of similar matches that the CEM algorithm found. The CEM approach to matching has been shown to have optimal statistical properties in finding matches. Further, it has shown to be superior to other matching methods in its ability to reduce imbalance, model dependence, estimation error, bias, and other criteria.[20] Second, we used Generalized Linear Models (CEM-weighted) adjusted for ISS, substance abuse disorder, and discharge disposition to compare matched patients on 6 to 12-month outcomes.

Interviews with missing data on the predictor or covariates were searched in the patients' medical records. In cases where the information could not be found (<3%), interviews were excluded, consistent with a complete case analysis approach. Statistical significance was set at *P* < 0.05 (2-sided). Stata version 14.0 was used for analysis. Partners Healthcare Institutional Review Board approval was obtained.

## RESULTS

Among 177 eligible firearm injury survivors, 63 participated in the study and 1 patient was unmatched (Fig. 1). Mean age of firearm survivors (n = 62) was 28.9 years (SD 9.6), 85.5% were male, 69.4% black, and all patients had some form of healthcare insurance at the time of injury. There were no significant differences in demographic or injury-related characteristics between firearm participants and eligible nonpatients (Table 1). Of firearm injury survivors, 67.7% reported daily pain, 53.2% screened positive for PTSD, 38.7% reported a new functional limitation in an activity of daily living, and 59.1% of patients previously working (n = 44) have not returned to work. Compared with population norms, overall physical and mental health-related quality of life was significantly reduced among firearm injury survivors: SF-12 PCS—41.0 (SD 12.5, *P* < 0.001); and SF-12 MCS—41.1 (SD 15.1, *P* < 0.001). Seventy-six per cent of survivors of firearm-related injury had at least 1 of these aforementioned negative outcomes.

Sixty two firearm injury survivors were matched to 255 out of a pool of 1072 eligible MVC survivors (Table 2). Compared with matched MVC survivors (CEM-weighted), firearm injury survivors were more likely to report daily pain [adjusted odds ratio (OR) 2.30, 95% confidence intyerval (CI) 1.08, 4.87)], to screen positive for PTSD [adjusted OR 3.06, 95% CI 1.42, 6.58), and had worse SF-12 PCS [adjusted mean difference −4.33, 95% CI −8.36, −0.31) and MCS [adjusted mean difference −7.89, 95% CI −12.84, −2.93)] (Table 3). No significant differences were found in regards to new functional limitations or return to work.

© 2020 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.



**FIGURE 1.** Flowchart diagram.

## DISCUSSION

Using data from a large multicenter long-term trauma outcomes registry, we found that physical and mental health outcomes for survivors of firearm violence were significantly worse than a comparable population of MVC survivors. Specifically, firearm injury survivors had a higher prevalence of chronic pain, were more likely to screen positive for PTSD, and had worse physical and mental health-related quality of life.

With an increasing focus on the long-term outcomes of injured patients, it is apparent that as a whole, these individuals often struggle with regards to functional recovery, social reintegration, and mental health.[8–12] Previous studies have reported a high prevalence of PTSD in the general trauma population (18%–20%),[8–9] after MVCs

(6%–45%),[21] for those with a traumatic brain injury (27%),[22] and for survivors of a burn (2%–40%).[23] Similarly, rates of chronic pain oscillate between 33% and 50% in the general trauma population, traumatic brain injury, and burn groups.[24–26] Although these rates reported in more than 60 studies are, in themselves, very high, they are all well below the rates we found for survivors of firearm injuries.

There is a dearth of literature on the long-term impact of surviving a firearm-related injury. The few studies that do exist have often focused on very specific injury types, have combined firearm survivors with other injury mechanisms to analyze larger groups, or have focused on the economic impact of firearm-related injury.[6,15,27–29] In 2002, Greenspan and Kellermann[13] studied the health status and psychologic distress of gunshot-related injury

**TABLE 1.** Firearm Survivors' Demographic and Clinical Characteristics by Participation Status

|  | Nonparticipants (n = 115) | Participants (n = 62) | *P* |
|---|---|---|---|
| Age, mean (SD), yrs | 27.5 (9.2) | 28.9 (9.6) | 0.37 |
| Male sex, n (%) | 107 (93) | 53 (85.5) | 0.10 |
| Black or African-American race, n (%)* | 82 (71.3) | 43 (69.4) | 0.79 |
| High school or lower education, n (%) | Not available | 48 (77.4) | — |
| Previous psychiatric illness, n (%) | 13 (11.5) | 3 (4.8) | 0.15 |
| Injury severity score, mean (SD) | 15.8 (10.0) | 18.4 (9.8) | 0.10 |
| Intensive care unit length of stay, median (IQR), d | 2 (0–6) | 3 (0–6.5) | 0.17 |
| Hospital length of stay, median (IQR), d | 6 (4–14) | 8 (5–17) | 0.10 |
| Any in-hospital complication, n (%) | 22 (19.1) | 18 (29) | 0.13 |
| Substance abuse disorder, n (%) | 47 (40.9) | 31 (50) | 0.24 |
| Any surgical procedure, n (%) | 63 (54.8) | 37 (59.7) | 0.53 |
| Discharge disposition, n (%) |  |  | 0.08 |
|   Home | 85 (73.9) | 46 (74.2) |  |
|   Inpatient rehabilitation facility | 14 (12.2) | 13 (21) |  |
|   Other | 16 (13.9) | 3 (4.8) |  |
| Time to follow-up, mean (SD), d | Not applicable | 322.9 (87.6) | — |

*Patient race was classified upon self-report or identified by a family member.

© *2020 Wolters Kluwer Health, Inc. All rights reserved.*

**JA6366**
Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

**TABLE 2.** Patient Demographic and Clinical Characteristics

| | Unweighted Unmatched Sample | | | Weighted Matched Sample | | |
|---|---|---|---|---|---|---|
| | Firearm Survivors (n = 63) | MVC Survivors (n = 511) | P | Firearm Survivors (n = 62) | MVC Survivors (n = 255) | P |
| Matched variables | | | | | | |
| Age, mean (SD), yrs | 28.8 (9.5) | 46 (19.1) | <0.001 | 28.9 (9.6) | 29.7 (10.4) | 0.58 |
| Male sex, n (%) | 54 (85.7) | 321 (62.8) | <0.001 | 53 (85.5) | 85.5% | 1 |
| Black or African-American race, n (%) | 43 (71.7) | 84 (18.1) | <0.001 | 43 (69.4) | 69.4% | 1 |
| High school or lower education, n (%) | 48 (76.2) | 261 (51.5) | <0.001 | 48 (77.4) | 77.4% | 1 |
| Previous psychiatric illness, n (%) | 4 (6.3) | 81 (16.3) | 0.038 | 3 (4.8) | 4.8% | 1 |
| Other variables | | | | | | |
| Injury severity score, mean (SD) | 18.6 (9.8) | 17.1 (9) | 0.23 | 18.4 (9.8) | 17.8 (9.8) | 0.67 |
| Intensive care unit length of stay, median (IQR), d | 3 (0–6.5) | 2 (0–4) | 0.03 | 3 (0–6.5) | 0 (0–3) | 0.002 |
| Hospital length of stay, median (IQR), d | 8 (5–17) | 5 (3–10) | <0.001 | 8 (5–17) | 5 (2–10) | <0.001 |
| Any in-hospital complication, n (%) | 19 (30) | 123 (24.1) | 0.29 | 18 (29) | 23.5% | 0.37 |
| Substance abuse disorder, n (%) | 31 (49.2) | 59 (11.6) | <0.001 | 31 (50) | 29.5% | 0.002 |
| Any surgical procedure, n (%) | 38 (60.3) | 246 (48.1) | 0.07 | 37 (59.7) | 47.1% | 0.08 |
| Discharge disposition, n (%) | | | 0.003 | | | 0.136 |
| Home | 47 (74.6) | 255 (49.9) | | 46 (74.2) | 62% | |
| Inpatient rehabilitation facility | 13 (20.6) | 207 (40.5) | | 13 (21) | 34.3% | |
| Other | 3 (4.8) | 46 (9) | | 3 (4.8) | 3.8% | |
| Time to follow-up, mean (SD), d | 324.1 (87.3) | 299 (94.7) | 0.051 | 322.9 (87.6) | 326.8 (85.6) | 0.75 |

victims 8 months after hospital discharge and found that mean SF-36 scores at follow-up were significantly lower than preinjury scores and that symptoms of PTSD were common. More recently, Joseph et al[15] reported a high readmission rate for survivors of firearm-related injury and that survivors of a semiautomatic rifle or shotgun-related injury had higher odds of developing acute stress disorder or PTSD upon readmission compared with survivors of a handgun-related injury. Our results resonate with previous reports on the significant burden experienced by survivors of firearm-related injury. However, we importantly demonstrate that survivors of firearm-related injury fare even worse than similarly injured survivors of MVC, in end points that matter to the patient. Of note, 59.1% of firearm survivors who were working before the injury have not returned to work 6 to 12 months after injury. Although this rate was not statistically significantly higher than the 1 for MVC survivors (38.1%), it is hard to tell whether this finding is a true reflection of a lack of difference between the groups or may be the product of a lack of statistical power due to the small sample utilized for this

specific analysis. Regardless, it is worth noting that close to two-thirds of firearm survivors have not yet reintegrated back into society in this meaningful way.

The contributing factors to the differential rates in physical and mental health outcomes after discharge among MVC and firearm survivors are likely multifactorial. A greater perceived threat to life and the context in which most violence-related firearm injuries occur may be key factors. In addition, firearm survivors often come from more vulnerable socioeconomic neighborhoods which can make access to postdischarge care and resources a challenge. Poor social support networks may also contribute to poor recovery trajectories.[12,30]

This study has implications both on the patient and public health level. Although firearm injuries are a significant public health problem in the United States, what happens to the vast majority of patients who survive their injuries is largely unknown. To improve long-term outcomes in this patient population, robust data sources are needed to better understand the risk factors and drivers of their poor outcomes. In addition, a more comprehensive view of trauma systems is needed that

**TABLE 3.** Comparison of Outcomes Between Firearm and Motor Vehicle Crash Survivors at 6 to 12 Months Postinjury

| | Firearm Survivors (n = 62) | Motor Vehicle Crash Survivors (n = 255) | Adjusted Odds Ratio [95% Confidence Interval]* | P |
|---|---|---|---|---|
| Daily pain, n (%)† | 42 (67.7%) | 145 (56.9%) | 3.10 (1.26, 7.60) | **0.01** |
| Positive screening for PTSD, n (%)‡ | 33 (53.2%) | 59 (23.1%) | 2.50 (1.07, 5.81) | **0.03** |
| New functional limitations, n (%)§ | 24 (38.7%) | 65 (25.5%) | 2.26 (0.95, 5.42) | 0.07 |
| Have not returned to work¶ | 26 (59.1%) | 80 (38.1%) | 1.67 (0.68, 4.10) | 0.26 |
| | Mean (SD) | Mean (SD) | Adjusted Difference in Mean Scores [95% Confidence Interval]* | P |
| SF-12 MCS‖ | 41.1 (SD 15.1) | 49.1 (SD 11.9) | −6.77 (−12.45, −1.10) | **0.02** |
| SF-12 PCS‖ | 41 (SD 12.5) | 44.4 (SD 11.6) | −5.09 (−9.27, −0.92) | **0.02** |

Boldface indicates statistical significance [*P* < 0.05 (2-sided)].
*Reference group: motor vehicle crash survivors.
†Defined as a positive answer to the Trauma Quality-of-Life instrument (T-QoL) item "I have pain on a daily basis".
‡Defined as having at least 4/7 positive responses in the Breslau questionnaire.
§Defined as the new need for assistance with any of the eight daily activities from the functional engagement domain of the T-QoL.
¶Analyses were conducted on the subset of patients who were working before the injury: firearm survivors (n = 44) and MVC survivors (n = 210).
‖Physical (PCS) and mental (MCS) component summary scores. Population mean score of 50 with a standard deviation of 10, where 0 represents the lowest level of health and 100 the highest.

© 2020 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

encompasses the continuum of care from the point of injury through rehabilitation. Current trauma systems often fall short in ensuring that injured patients continue a successful recovery and rehabilitation after discharge, which ends up primarily affecting vulnerable populations such as survivors of firearm-related trauma.

This study is not without limitations and must be interpreted in the context of the study design. First, as with any other prospective cohort study, there is a possibility of selection bias due to the loss to follow-up. Although the magnitude of this risk is unknown, we did not identify any significant differences between participants and non-participants, at least, in measurable baseline demographic and clinical characteristics. Second, the lack of data on the presence of prior injuries, and baseline mental and physical health poses unique limitations that come with studying long-term outcomes after injury. We attempt to address this by inquiring with patients about baseline functional status, by adjusting for the presence of a diagnosed psychiatric illness before the injury, and by using population norms to put our results into context. However, we recognize the possibility of recall bias, the presence of undiagnosed mental health illness in the population, and that our population baseline health status may differ from the average US population. Third, the Breslau screening scale for PTSD has limitations, such as the nonuse of clinical assessments for its validation[20]; and ISS may underestimate the severity of injury in penetrating trauma. Lastly, this study was conducted in multiple institutions, but all of them are within 1 geographical region, and as such, the results may not be generalizable to other populations.

## CONCLUSIONS

Survivors of firearm-related injury far worse long-term compared with similarly injured survivors of a MVC. There is a pressing need for targeted long-term follow-up care, physical rehabilitation, mental health screening, and interventions for survivors of firearm violence. This study informs the dialog for the firearm injury public health crisis in the United States in an area that has been previously neglected.[5] Firearm injuries are about more than the lives lost and the initial medical care; we must also recognize the long-term burden born by survivors.

## ACKNOWLEDGMENTS

*The authors would like to thank George Velmahos, MD, PhD (Division of Trauma, Emergency Surgery, and Surgical Critical Care, Massachusetts General Hospital, Boston, Massachusetts), Haytham MA Kaafarani, MD, MPH (Division of Trauma, Emergency Surgery, and Surgical Critical Care, Massachusetts General Hospital, Boston, Massachusetts) and Sabrina Sanchez, MD, MPH (Division of Trauma, Acute Care Surgery & Surgical Critical Care, Boston University School of Medicine, Boston, Massachusetts) for their generous collaboration with and support of this work. None of the persons mentioned above received compensation for their contributions to this work.*

## REFERENCES

1. Krug EG, Mercy JA, Dahlberg LL, et al. The world report on violence and health. *Lancet*. 2002;360:1083–1088.

2. Kuhls DA, Campbell BT, Burke PA, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury. *J Trauma Acute Care Surg*. 2017;82:877–886.

3. Xu J, Murphy SL, Kochanek KD, Bastian B, Arias E. National Vital Statistics Reports Volume 67, Number 5 July 26, 2018, Deaths: Final Data for 2016. Vol. 67, National Vital Statistics Reports; 2018.

4. Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2017 on CDC WONDER Online Database, released December, 2018. Data are from the Multiple Cause of Death Files, 1999-2017, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Available at: http://wonder.cdc.gov/ucd-icd10.html. Accessed March 12, 2019.

5. The Global Burden of Disease 2016 Injury Collaborators. Global Mortality From Firearms, 1990-2016. JAMA 2018;320:792–814.

6. Alarcon LH, Germain A, Clontz AS, et al. Predictors of acute posttraumatic stress disorder symptoms following civilian trauma: highest incidence and severity of symptoms after assault. *J Trauma Acute Care Surg*. 2012;72:629–635 [discussion 635–637].

7. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS) [online]; 2005. Available at: https://webappa.cdc.gov/sasweb/ncipc/nfirates.html. Accessed April 25, 2019.

8. Zatzick D, Jurkovich GJ, Rivara FP, et al. A National US Study of posttraumatic stress disorder, depression, and work and functional outcomes after hospitalization for traumatic injury. *Ann Surg*. 2008;248:429–437.

9. Haider AH, Herrera-Escobar JP, Al Rafai SS, et al. Factors associated with long-term outcomes after injury: results of the Functional Outcomes and Recovery after Trauma Emergencies (FORTE) multi-center cohort study. *Ann Surg*. 2018.

10. Gabbe BJ, Simpson PM, Harrison JE, et al. Return to work and functional outcomes after major trauma: who recovers, when, and how well? *Ann Surg*. 2016;263:623–632.

11. Gabbe BJ, Simpson PM, Cameron PA, et al. Long-term health status and trajectories of seriously injured patients: a population-based longitudinal study. *PLoS Med*. 2017;14:e1002322.

12. Herrera-Escobar JP, Rivero R, Apoj M, et al. Long-term social dysfunction after trauma: what is the prevalence, risk factors, and associated outcomes? *Surgery*. 2019;166:392–397.

13. Greenspan AI, Kellermann AL. Physical and psychological outcomes 8 months after serious gunshot injury. *J Trauma*. 2002;53:709–716.

14. Spitzer SA, Staudenmayer KL, Tennakoon L, et al. Costs and financial burden of initial hospitalizations for firearm injuries in the United States, 2006-2014. *Am J Public Health*. 2017;107:770–774.

15. Joseph B, Hanna K, Callcut RA, et al. The hidden burden of mental health outcomes following firearm-related injures. *Ann Surg*. 2019;270:593–601.

16. Fowler KA, Dahlberg LL, Haileyesus T, et al. Firearm injuries in the United States. *Prev Med*. 2015;79:5–14.

17. Rios-Diaz AJ, Herrera-Escobar JP, Lilley EJ, et al. Routine inclusion of long-term functional and patient-reported outcomes into trauma registries: The FORTE project. *J Trauma Acute Care Surg*. 2017;83:97–104.

18. Wanner JP, deRoon-Cassini T, Kodadek L, et al. Development of a trauma-specific quality-of-life measurement. *J Trauma Acute Care Surg*. 2015;79:275–281.

19. Breslau N, Peterson EL, Kessler RC, et al. Short screening scale for DSM-IV posttraumatic stress disorder. *Am J Psychiatry*. 1999;156:908–911.

20. Iacus SM, King G, Porro G. Causal inference without balance checking: coarsened exact matching. *Political Analysis*. 2012;20:1–24.

21. Heron-Delaney M, Kenardy J, Charlton E, et al. A systematic review of predictors of posttraumatic stress disorder (PTSD) for adult road traffic crash survivors. *Injury*. 2013;44:1413–1422.

22. Haarbauer-Krupa J, Taylor CA, Yue JK, et al. Screening for post-traumatic stress disorder in a civilian emergency department population with traumatic brain injury. *J Neurotrauma*. 2017;34:50–58.

23. Giannoni-Pastor A, Eiroa-Orosa FJ, Fidel Kinori SG, et al. Prevalence and predictors of posttraumatic stress symptomatology among burn survivors: a systematic review and meta-analysis. *J Burn Care Res*. 2016;37:e79–e89.

24. Velmahos CS, Herrera-Escobar JP, Al Rafai SS, et al. It still hurts! Persistent pain and use of pain medication one year after injury. *Am J Surg*. 2019;218:864–868.

25. Sullivan-Singh SJ, Sawyer K, Ehde DM, et al. Comorbidity of pain and depression among persons with traumatic brain injury. *Arch Phys Med Rehabil*. 2014;95:1100–1105.

26. Mayou R, Bryant B. Outcome in consecutive emergency department attenders following a road traffic accident. *Br J Psychiatry*. 2001;179:528–534.

27. Payne JE, Berne TV, Kaufman RL, et al. Outcome of treatment of 686 gunshot wounds of the trunk at Los Angeles County-USC Medical Center: implications for the community. *J Trauma*. 1993;34:276–281.

28. Benzel EC, Day WT, Kesterson L, et al. Civilian craniocerebral gunshot wounds. *Neurosurgery*. 1991;29:67–72.

29. Holbrook TL, Anderson JP, Sieber WJ, et al. Outcome after major trauma: discharge and 6-month follow-up results in the Trauma Recovery Project. *J Trauma*. 1998;45:315–324.

30. Herrera-Escobar JP, Seshadri AJ, Rivero R, et al. Lower education and income predict worse long-term outcomes after injury. *J Trauma Acute Care Surg*. 2019;87:104–110.

JA6368
Copyright © 2021 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT 65

An official website of the United States government. Here's how you know

Home • Crime in the U.S. • 2019 • Crime in the U.S. 2019 • Tables • Expanded Homicide Data Table 8



U.S. DEPARTMENT OF JUSTICE • FEDERAL BUREAU OF INVESTIGATION • CRIMINAL JUSTICE INFORMATION SERVICES DIVISION

Criminal Justice Information Services Division    Feedback | Contact Us | Data Quality Guidelines | UCR Home

**Home**    Offenses Known to Law Enforcement    Violent Crime    Property Crime    Clearances    Persons Arrested    Police Employee Data

Expanded Homicide Data Table 8

**Murder Victims**
by Weapon, 2015–2019

Download Excel

| Weapons | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Total** | **13,847** | **15,355** | **15,206** | **14,446** | **13,927** |
| Total firearms: | 9,143 | 10,398 | 11,014 | 10,445 | 10,258 |
| Handguns | 6,194 | 6,778 | 7,052 | 6,683 | 6,368 |
| Rifles | 215 | 300 | 389 | 305 | 364 |
| Shotguns | 248 | 247 | 263 | 237 | 200 |
| Other guns | 152 | 172 | 178 | 164 | 45 |
| Firearms, type not stated | 2,334 | 2,901 | 3,132 | 3,056 | 3,281 |
| Knives or cutting instruments | 1,533 | 1,562 | 1,608 | 1,542 | 1,476 |
| Blunt objects (clubs, hammers, etc.) | 438 | 466 | 474 | 455 | 397 |
| Personal weapons (hands, fists, feet, etc.)[1] | 651 | 668 | 715 | 712 | 600 |
| Poison | 8 | 12 | 15 | 6 | 16 |
| Explosives | 1 | 1 | 0 | 4 | 3 |
| Fire | 63 | 78 | 93 | 76 | 81 |
| Narcotics | 70 | 119 | 112 | 102 | 93 |
| Drowning | 12 | 9 | 8 | 9 | 7 |
| Strangulation | 96 | 97 | 90 | 75 | 64 |
| Asphyxiation | 105 | 93 | 112 | 92 | 92 |
| Other weapons or weapons not stated | 1,727 | 1,852 | 965 | 928 | 840 |

[1] Pushed is included in personal weapons.

NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

# EXHIBIT 66

# Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms

**r** reason.com/2018/10/31/neither-capacity-nor-power-distinguishes

October 31, 2018



Ruger Mini-14 Tactical Rifle

Ruger Mini-14 Ranch Rifle

These two weapons fire the same ammunition at the same rate with the same muzzle velocity and have the same capacity. But the first is listed by name as a banned gun in Sen. Feinstein's latest bill, while the second is specifically exempted.

Joanna Andreasson / Reason

In an underlined editorial published the day after the shooting that killed 11 people at a Pittsburgh synagogue on Saturday, *The New York Times* erroneously claimed that so-called assault weapons like the Colt AR-15 rifle used in that attack are distinguished by their "high capacity." In a news story posted yesterday, *Times* reporter Richard A. Oppel Jr. suggests that AR-15-style rifles are especially "powerful," which also is not true.

Unlike, say, Barack Obama or Hillary Clinton, Oppel acknowledges that an AR-15, like any other semi-automatic, "fires one bullet at a time." Still, he says, "it is a powerful weapon: light, easy to hold and to fire, with limited recoil, its bullets shooting out of the muzzle more than twice as fast as most handgun rounds." The only part of that description that is related to "power" is the part about muzzle velocity, and here Oppel pulls the time-honored trick of comparing the rifles Dianne Feinstein hates with handguns instead of other rifles. Bullets fired from rifles generally move faster than bullets fired from pistols, mainly because a longer barrel gives them more room to accelerate. But that tells us nothing about the difference between the rifles Feinstein wants to ban—which are distinguished by features such as folding stocks, pistol grips, and barrel shrouds—and the ones she is willing to leave on the market.

<div align="center">JA6372</div>

If the comparison is limited to long guns, the .223-caliber round typically fired by AR-15-style rifles does have a relatively high muzzle velocity. But other cartridges, fired by guns that are not considered "assault weapons," equal or surpass it. Furthermore, muzzle velocity is not the only factor in a bullet's lethality; size also matters, and so-called assault weapons fire smaller rounds than many hunting rifles.

Oppel adds that "the standard AR-15 magazine holds 30 bullets and can be swapped out quickly, allowing a shooter to fire more than a hundred rounds in minutes." The ability to accept "high-capacity" magazines does not distinguish "assault weapons" from other guns, and Oppel's point about how quickly magazines can be switched undermines the argument that a 10-round limit would make mass shootings less deadly. In any case, any semi-automatic gun can fire "more than a hundred rounds in minutes," which would require, at most, pulling the trigger about once per second.

The *Times* has been helping to perpetuate the myth that there is something uniquely deadly about "assault weapons" for decades. But it also has intermittently published articles pointing out that the distinctions drawn by politicians like Feinstein make little sense, or at least acknowledging that perspective. Critical readers, even if they had no other source of information about "assault weapons," should be able to figure out that there is something fishy about the case for banning these guns. It's too bad there are not more of those on the paper's editorial board or reporting staff.

**JA6373**

# EXHIBIT 67

# Gunshot Wound Review

**Martin L Fackler, MD**

Dr Fackler is president of the
International Wound Ballistics
Association.

Received for publication
July 25, 1994. Revisions received
October 10, 1994, and
February 8 and July 27, 1995.
Accepted for publication
April 26, 1996.

Copyright © by the American College
of Emergency Physicians.

There is no serious argument about the wounding potential of
various kinds of penetrating projectiles. The laws of physics in
concert with modern bullet testing have clarified and quantified
the mechanisms by which bullets disrupt tissue. Despite this
scientific background, much misinformation persists in the
wound-ballistics literature. This article reviews the interaction of
penetrating projectiles with human tissue. Understanding of
wound ballistics allows the emergency physician to become a
more informed reader of its literature, as well as a more reliable
provider of care to the wounded patient.

[Fackler ML: Gunshot wound review. *Ann Emerg Med* August
1996;28:194-203.]

## INTRODUCTION

From the Revolutionary War to the settling of our western
frontier, small-arms use has been inextricably entwined
with American history. Widespread use of firearms has
induced scientists and physicians to define the basic princi-
ples of wound ballistics. Over the past century, the mecha-
nisms by which penetrating projectiles injure living tissue
have been extensively studied and explained. Yet mistaken
ideas about bullet effects are still held today. The most com-
mon misconception about gunshot wound treatment is that
the penetration of any "high-velocity" bullet causes enig-
matic "shock waves" and cavitation that will doom tissues
even far from the bullet path. The purpose of this review is
to scientifically discuss wound ballistics, refute misconcep-
tions, and present the pathophysiology to support a rational
strategy for the treatment of gunshot wounds.

## CONTROVERSIES REGARDING WOUNDING POTENTIAL

In 1967, a group reported the wounds caused by M-16 rifle
bullets in Vietnam as "massively destructive"[1] and possess-
ing "devastating wounding power . . . tremendous wound-

ing and killing power".[2] Because the 3,100 foot/second (945 m/second) muzzle velocity of the M-16 bullet was higher than that of previous military bullets, "high velocity" became synonymous with "devastating wounding power."

These subjective descriptions attracted the attention of Swedish researchers.[3] In 1974, a Swedish wound-ballistics researcher claimed that the tissues surrounding wounds caused by "high-velocity" projectiles were "subjected to the formation of the temporary cavity [which was] 30 times the diameter of the projectile" and that these tissues "will not survive."[4] Implicit in this claim was that in the treatment of any wound caused by a "high-velocity" projectile the surgeon must excise a cylinder of tissue at least 30 times the diameter of that projectile: To treat a wound caused by a 30-caliber bullet (such at that fired by the AK-47 "assault rifle"), a surgeon would have to carve out a cylinder of tissue at least 9 inches in diameter. This procedure equates to performing amputation for practically any wound of the arm or leg.

Others have also claimed that assault weapon bullets cause massive injuries, including traumatic amputation.[5] In addition, many fallacies regarding bullet effects were presented in the 1975 edition of *The NATO Handbook: Emergency War Surgery,* including a description of the temporary cavity for "high-velocity missiles" as "30 to 40 times the size of the missile."[6] Although the Swedish findings were subsequently disproved[3] and a new objective and scientific chapter on missile-caused wounds was written for the 1988 edition of *The NATO Handbook*[7], widespread misinformation persists.

Delegates to the Tri-Service War Surgery conferences of 1970 and 1971[8] reported no unusual problems associated with "high-velocity" bullet wounds in Vietnam. There were no reports of rifle bullet wounds causing traumatic amputation of an extremity. No one recommended removal of an amount of tissue even remotely approaching a 9-inch-diam-eter cylinder from the wound caused by an AK-47 or any other rifle.

Other reports on rifle bullet wounds from Vietnam also gave a very different impression: "Uncomplicated perforating soft-tissue wounds were the most common bullet wounds of the extremities. They showed small entry and exit wounds and a clean soft-tissue track with little or no devitalization of tissue. Such wounds usually healed if left alone."[9]

## WOUNDING MECHANISMS

The objective measurement of a wound's dimensions, along with a clear and precise description of the tissue disruption (augmented by good-quality photographs including a measuring scale) is the only valid method of verifying the disruption caused by a given bullet. This method permits meaningful comparison of the disruptive effects caused by various bullets.[10]

Basic physics verifies that a projectile's potential to disrupt tissue is determined by both its mass and its velocity. Wounding potential is also determined to a great extent by a bullet's physical characteristics. Projectile construction and shape determine a bullet's tendency to deform, fragment, or change its orientation (by becoming unstable and "yawing," or turning sideways, relative to the line of flight). Such behavior in tissue greatly affects tissue disruption. For example, an expanding soft-point or hollow-point bullet causes more tissue disruption than a similar but nonexpanding one, as demonstrated by comparison of Figures 1 and 2.

Many current textbooks of surgery, however, claim that a bullet's velocity determines the severity of the wound it causes.[11-17] For wounds caused by presumed high-velocity missiles, these texts recommend extensive excision of tissue from around the projectile path, whereas if the wound was presumed to have been caused by a low-velocity projectile, little or no excision of tissue is recom-

**Figure 1.**
*Wound profile produced by the American 7.62 NATO full metal jacket bullet. This bullet does not deform in tissue and begins to yaw after an average penetration of about 16 cm. Note that the large temporary cavity forms as a result of the blunt shape of the bullet traveling sideways.*



mended. The history of small-arms development, the physics of penetrating projectiles, findings of laboratory testing, and measurements of wounds prove the fallacy of this concept.

About 1880, the velocity of small-arms projectiles was doubled from about 1,300 feet/second (396 m/second) to more than 2,400 feet/second (731 m/second). This was the largest velocity increase in the history of small-arms development, made possible by the inventions of the jacketed bullet (in which the soft lead core was covered with a jacket of harder metal) and smokeless gunpowder. If current textbooks are correct in their assertion that a projectile's velocity alone determines its wounding capacity, such a large increase in velocity would have caused a large increase in wound severity. In fact, just the opposite effect occurred. A striking decrease in wounding effect was reported from all battlefields on which the new bullets were used.[18-21] The reason is made clear when the wound profiles of the bullets involved are studied. These profiles were made by shooting into ordnance gelatin calibrated against living pig muscle[22] and validated by measurements taken during human autopsies.[23]

Figure 3 shows the wound profile of a typical example of the last generation of bullets made from solid lead. The velocity of such a bullet was about that of present day 22-caliber rimfire bullets, with diameters ranging from 41 to 45 caliber (10.4 to 11.4 mm). These bullets weighed from 300 to 500 grains (19.4 to 32.4 g). When these large, soft lead bullets struck flesh, they flattened, assuming a mushroom shape: This enlarged the diameter to 60 to 80 caliber (13.4 to 20.3 mm). In addition to making a larger hole, the blunted shape of the flattened bullet caused temporary cavities as large as those caused by modern M-16 rifle bullets (compare Figures 3 and 4).

Figure 5 shows the behavior of the 6.5-mm Mannlicher-Carcano bullet, typical of the first jacketed bullets. Its diameter and mass were only about half those of previous lead bullets. The jacketed bullets' much higher velocity required a decrease in bullet mass; otherwise recoil would have been excessive. The most striking characteristic of these long, round-nosed, small-caliber bullets was the tendency to travel point-forward in soft tissue until about 24 inches (61 cm) was penetrated. The jacketed bullets did not flatten or deform in human soft tissue but made small, punctate holes, disrupting little tissue (unless one struck bone, in which case it might become deformed or yaw).

The fear that these new bullets would prove insufficient to incapacitate enemy soldiers was realized by the British, in India, in 1895. They modified the bullets (at

**Figure 2.**

*Wound profile produced by the 7.62 NATO cartridge loaded with a soft-point hunting bullet. This cartridge is more commonly known as the .308 Winchester in civilian circles. This bullet expands to more than double its original diameter and loses about one third of its weight in fragments, within an inch or so of striking tissue. These fragments cause multiple perforations of the tissue surrounding the bullet path, penetrating up to 9 cm radially. The large temporary cavity then displaces this tissue, which has been weakened by multiple perforations by fragments. The synergy between fragmentation and cavitation results in detachment of pieces of muscle and increases the permanent-cavity dimensions.*



**Figure 3.**

*Wound profile produced by the Vetterli bullet. This bullet is typical of those used by military forces in the last half of the 19th century (the Vetterli was used by the Swiss and Italian armies from about 1870 to 1890). It flattens on striking tissue, expanding its diameter and giving it a blunt shape that allows it to produce a substantial temporary cavity despite its "low" velocity. The 44 Magnum hollow-point rifle bullet is one modern bullet that produces a wound profile similar to that of the Vetterli.*



the Dum-Dum arsenal) by grinding off some of the hard jacket at the bullet's tip. This modification caused the bullets to expand on striking flesh and to produce increased disruption. The Hague Peace Conference of 1899, however, prohibited the Dum-Dum modification for use in military conflicts.[24]

Later military rifle bullets, with pointed noses, traveled shorter distances in the body point-forward than did the earlier round-nosed ones (compare Figures 1, 4 and 6 with Figure 5). The farther a nondeforming bullet travels

**Figure 4.**
*Three variations in the wound profile produced by the M-16A1 full metal jacket bullet. All the military bullet wound profiles (Figures 2–4) shown are of the average profile; in about 7 of 10 cases the distance before yaw will be within ±25% of that shown. This figure shows the variations in distance of penetration before yaw and the concomitant variations in wounding pattern seen with the M-16A1 military rifle bullet. The middle profile is the average one, seen in about 70% of cases; the top and bottom profiles each occur in about 15% of cases. In other, occasional cases, yaw occurs earlier or later than in those shown. Some observers in Vietnam believed the M16 was "terribly destructive," whereas others considered it less disruptive than needed. Most observers had seen few if any gunshot wounds before, and their knowledge of the circumstances surrounding the shootings was incomplete at best. Add to this the inherent variation illustrated in this figure, and it is easy to see why there was confusion.*



point-forward in tissue, the less tissue it disrupts.[25] Figure 7 shows the distance various military rifle bullets travel in tissue before they yaw.

The Russian AK-47/Chinese SKS military bullet (7.62 × 39 mm) is considerably more stable in tissue than other modern military rifle bullets. The path of an AK-47 bullet through the body is generally not long enough for yaw; most cause no greater tissue disruption than common handgun bullets.[9,10]

The myth that "shock waves" generated by a bullet cause tissue damage was laid to rest in 1947 when Harvey et al examined the differences between the two types of pressure waves produced by penetrating projectiles.[26] The first, commonly known as the "shock wave" but more properly called the sonic pressure wave, is simply the sound of the projectile striking the surface of the tissue or tissue simulant. This sound wave travels ahead of the bullet: The speed of sound in tissue is approximately 4,750 feet/second (1,450 m/second), considerably faster than the speed at which bullets penetrate tissue. In the studies by Harvey et al, these sonic waves, produced in water when a $^3/_{16}$-inch (4.7- mm) steel sphere struck at 3,000 feet/second (914 m/second), produced pressures up to 60 atm but their duration was but a few microseconds. These sonic waves did not move the water perceptibly.

A second pressure wave follows the penetrating projectile. Termed "temporary cavity," it results when the penetrating projectile strikes tissue, which then accelerates radially away (like a splash) from where the projectile struck, obeying Newton's laws of motion.[27] The temporary cavity pressure produced by Harvey et al was about 4 atm; it pulsated a few times and lasted 4 or 5 milliseconds per pulsation.[26,28] In these experiments the temporary cavity did move tissue, and it could be a significant wounding mechanism, depending on its size and the characteristics of the tissue it dislodged.[26,28-31] Inelastic tissues such as liver are far more susceptible to disruption by the temporary cavity than are more flexible body tissues such as muscle, bowel wall, and lung.[29,30-31]

The observation by Harvey et al that the sonic pressure wave does not move tissue perceptibly but that the temporary cavity does is consistent with predictions from basic physics. Compare the impulse (the capacity to change the momentum of, or move, a body) available in each of these waves by multiplying its pressure by the duration: the sonic wave might reach 60 atm but only lasts a few microseconds (60 × 3=180); the temporary cavity might only reach 4 atm but lasts several pulsations of 4 or 5 milliseconds each, a total of about

**GUNSHOT WOUNDS**
*Fackler*

12,000 microseconds (4 × 12,000=48,000). Therefore temporary cavity pressure waves produce between 200 and 300 times more capacity to move tissue than the sonic wave.

Harvey et al[26] explained the difficulties posed by the coexistence of the two kinds of pressure waves by separating the sonic wave from the temporary cavitation. They used two methods. First, they shot into a steel plate placed against the water surface in a water tank; the sonic wave passed through the plate and into the water, but the projectile was stopped, essentially eliminating temporary cavity–caused motion in the water. They also suspended frog hearts in water, shot spheres near them, and recorded the sequence with high-speed imaging equipment. Because the sonic wave precedes the projectile and the temporary cavity follows it, Harvey et al were able to observe that the disruption of tissue accompanied the pressure changes caused by the temporary cavity, not those of the sonic wave.

Between 1987 and 1990, five papers by Swedish researchers were published[32-36] that purported to show evidence that Harvey et al were wrong and that sonic pressure ("shock") waves generated by .24-inch (6-mm) steel spheres shot at 3,937 to 4,922 feet/second (1,200 to 1,500 m/second) into the legs of 20-kg pigs caused damage to various distant parts of the pigs' nervous systems. These investigators ascribed their results to the sonic wave, but failed to consider the far more likely

possibility that tissue movement from transmitted temporary cavitation was the causative factor. High-speed cinematographic films of small pigs shot with various bullets show that the entire body of the animal can be moved by the pulsating temporary cavity caused by the projectiles used in the aforementioned studies.[32-36]

Two studies by French and American investigators provided the opportunity to search for nervous system dysfunction and other "distant effects" resulting from sonic waves or transmitted cavitation.[31,37] No indication of nervous system dysfunction was seen, and no evidence of injury "distant" from the bullet path was found at autopsy in either study.

In March 1994 American researchers claimed to have identified shock waves as a mechanism of tissue damage in 326 cases (2% of the 16,316 gunshot wound cases they reported).[38] This appears to be the first report in which any investigator has claimed to have detected damage in human beings caused by the shock waves produced by bullets. These investigators apparently did not confuse shock waves with temporary cavitation; they listed cavitation as another mechanism of tissue damage. Unfortunately, this group failed to describe their criteria for determining that tissue had been injured by shock waves.

A modern researcher wishing to study the sonic pressure wave could avoid the confounding effects of cavitation by using a lithotriptor. The lithotriptor generates sonic pressure waves without using a projectile, therefore

---

**Figure 5.**

*Wound profile produced by the 6.5 Mannlicher-Carcano full metal jacket bullet. Note that this bullet does not deform in tissue and that it penetrates an average 61 cm before beginning to yaw, accounting for its deep penetration. This is the bullet used to assassinate President John F Kennedy. Had the wound profile illustrating the penetration potential of this bullet been available at the time of the investigation into the murder it would have allayed doubts about the capacity of a single 6.5-mm bullet to have passed through the base of the president's neck, then continued through the chest of Texas Governor John Connally and then through Connally's wrist (including the distal radius) before penetrating his thigh.*



**JA6379**

yielding no temporary cavity. Despite the fact that the sonic waves generated by the lithotriptor have three times the amplitude of those produced by small-arms projectiles, and as many as 2,000 waves might be used during a single treatment session for the treatment of renal calculi, these sonic waves do not significantly harm the surrounding tissues.[39,40]

In contrast, the damage caused in the human body by a bullet's temporary cavity can vary greatly, depending on the size of the cavity and its anatomic location. The forces of the temporary cavity follow the path of least resistance, separating tissue planes and tearing tissues where they are fixed and cannot be displaced. For instance, the cavity caused by most expanding handgun bullets is about 9 cm in diameter (Figure 8). To determine tissue movement surrounding the permanent bullet path, first subtract the 2-cm permanent bullet path. Then divide the remaining 7 cm diameter by 2 to obtain the radius, 3.5 cm (the distance in question). In a shot through the abdomen, the temporary cavity forces move a loop of small bowel only about 3.5 cm (1.4 inches). This 9-cm-diameter cavity is also likely to be absorbed in muscle or lung tissue without any damage. In the liver, however, it could cause serious damage because of the tissue's inelasticity. In the cranial cavity a 9-cm temporary cavity will most likely cause instant death as a result of the inability of brain tissue (restrained by the cranial vault) to move aside.

When—as a result of increased projectile size, increased velocity, or both—the temporary cavity is large enough to damage muscle tissue, the damage is patchy and not necessarily correlated with its distance from the permanent wound path. Microscopic sections were made and studied in conjunction with the study reported in reference 31 (14-cm diameter cavities in the thighs of 90-kg pigs). These sections showed patchy tears of muscle tissue and torn small blood vessels in the muscle. The muscle damage and blood vessel damage often were not found in the same area (Fackler MJ, Breteau JPL, Unpublished data, 1988). When one recognizes that the temporary cavity simply pushes tissue aside momentarily, it becomes clear that the location and arrangement of the small blood vessels in the tissue displaced largely determine which ones will be most susceptible to being torn. The microscopic finding of patchy bleeding from torn small vessels is what one would expect knowing the mechanism causing the damage and the variation in the anatomy of the blood supply to the skeletal musculature.

Fractures from cavitation are rare in the human being: I have seen but two (both from short-range shotgun blasts) and have not seen a verified report of any in the literature. When a bone is broken by cavitation, the fracture is a simple one. A gunshot fracture with multiple bone fragments separated by several centimeters and usually mixed with fragments of the projectile is a clear sign that the bone was struck by the bullet and not damaged by temporary cavitation.

To date, no study has scientifically or objectively demonstrated any change in the human gunshot victim that cannot be explained by the well-recognized wounding mechanisms of tissue crush resulting from a direct hit by the penetrating projectile or tissue displacement from temporary cavitation.

**Figure 6.**
*Wound profile produced by the Russian AK-47/Chinese SKS military bullet (7.62×39 mm) full metal jacket bullet. This is the most widely used "assault rifle" bullet in the world. It does not deform in tissue and travels about 26 cm before beginning to yaw. This explains the clinical finding that most wounds caused by this bullet resemble those made by much lower velocity handgun bullets.*



## COMMUNICATION PROBLEMS IN WOUND BALLISTICS

Failure to adhere to the basic precepts of scientific method is the common denominator of misconceptions in wound ballistics.[41] Good science is impossible without precise and clear communication, but the authors of most papers appearing in the wound-ballistics literature continue to use terms that are the antithesis of precision and clarity. These include the following.

**High velocity** The British draw their line between low and high velocity at 1,100 feet/second (335 m/second), which is the speed of sound in air. Various American researchers draw the line at 2,000, 2,500, or 3,000 feet/second (610, 762, and 914 m/second, respectively). In contemporary papers the terms "high velocity" and "low velocity" are often used without definition.[32,33] Velocity should be expressed in numbers, or a numerical velocity range (eg, 900 to 1,200 feet/second).

**High energy** Users of this popular but ambiguous term never give it a numeric definition.[32-36] Some wound-ballistics researchers fire 6-mm steel spheres into 20-kg pigs at about 3,200 feet/second (975 m/second) and call it a "high-energy" trauma model.[42] Yet their "high-energy" sphere has only about 340 foot-pounds (461 joules) of kinetic energy. Many handgun bullets possess that much energy, but they are considered by most to be "low-energy" projectiles.[41] The use of the imprecise "high" and "low" makes no more sense in the description of energy than it does in the description of velocity. Researchers who feel compelled to write about energy should at least describe it numerically.

**Kinetic energy** Tissue disruption is often discussed in terms of "local dissipation of kinetic energy."[43] A valid explanation of how the penetrating projectile disrupts tissue would be more appropriate. Was the wounding mechanism predominantly one of crushing, as would be caused by an 18-mm (71 caliber) sphere traveling in the 500- to 800-foot/second (152- to 244-m/second) range; or was it predominantly tissue tearing from being displaced and stretched beyond its elastic limits by temporary cavitation, as might be caused by a 6-mm (24 caliber) sphere traveling in the 3,000- to 3,300-foot/second (914- to 1,006-m/second) range? The amount of kinetic energy possessed by each of these projectiles might be the same, yet the pattern and type of damage they would produce are distinctly dissimilar.

"Kinetic energy" may sound erudite; however, it reveals nothing about the magnitude, type, and location of tissue disruption or the forces that cause tissue disruption—the essence of wound ballistics—and diverts attention from these critical elements. The force interactions between penetrating projectile and tissue remain hidden behind the abstract "kinetic energy" discussions.

**Debridement** The term "débridement" has been used by the French for several centuries: It means "to relieve tension and establish drainage by incision."[44] During World War I, the word was adopted into English, but its meaning was confused in the transition. American writers use it sometimes as a synonym for "excision" and sometimes as a catch-all term implying that "something was done"

---

**Figure 7.**
*Average distances traveled point-forward in soft tissue before yawing by some common military rifle bullets.*

6.5-mm Mannlicher-Carcano: 61 cm
Russian AK-47/Chinese SKS (7.62×39 mm): 26 cm
7.62 NATO (American version): 16 cm
M-16A1 (M-193 bullet): 12 cm
M-16A2 (M-855 bullet): 10 cm
AK-74: 8 cm

These distances are averages: about 70% of bullets yaw within 25% of this average distance, whereas about 15% yaw at a shallower penetration depth and the other 15% at a greater depth of penetration.

---

**Figure 8.**
*Wound profile produced by the 38 Special 158-grain lead hollow-point bullet. This bullet was the standard load used by the Federal Bureau of Investigation for many of the years that a revolver was used as the duty weapon. This bullet expands on striking tissue, and its diameter increases by about 50%. It produces a larger permanent cavity than non-expanding handgun bullets and a larger temporary cavity. Still, the temporary cavity it produces is not large enough to add significantly to the bullet's disruption except in tissues, such as liver, that lack elasticity.*



38 Spec FBI Load
158 gr lead HP
vel—880 ft/sec (4 in brl)

Permanent Cavity

15 mm

Temporary Cavity

0 cm    5    10    15    20    25    32

---

**JA6381**

to a gunshot wound. Saying "the wound was debrided" communicates nothing about the specifics of what was done, yet the details of how a wound was treated are crucial to meaningful communication about wound care. "Debride" and "debridement" should be avoided in scientific discourse in favor of more precise terms such as "incision" and "excision."[31]

## PATHOPHYSIOLOGY OF GUNSHOT WOUND TREATMENT

There is little disagreement in the wound-ballistics literature about how to treat penetrating projectile wounds of the chest and abdomen or those that disrupt major blood vessels or bones. Ironically, most of the dispute and misunderstanding concerns treatment of the least lethal injuries: uncomplicated extremity wounds. Central to this dispute is how to manage the soft-tissue disruption.

Knowledge of the pathophysiology of penetrating projectile wounds is needed to choose the best treatment methods. Tissue disruption provokes increased local inflow of blood and migration of white cells and fluid through the walls of small blood vessels to combat the bacteria and to clean up devitalized tissue.[45,46] Local swelling, which in some cases can be counterproductive and even pose a threat to life and limb (eg, a compartment syndrome) may result. Increase in compartment pressure can be prevented by wide opening of the wound path and excision of all devitalized tissue. It can also be prevented with the much simpler and less costly (in terms of surgical resources and patient complications) procedure fasciotomy, which is the closest thing in English to the original French meaning of "debridement." Tissue swelling might not pose a problem where (1) tissue disruption is minimal, or (2) even in the face of considerable tissue disruption if cavitation caused by the bullet splits open the skin, muscle, and fascia, thereby providing excellent decompression and drainage.[31]

If the tissue damage along the bullet path is so minimal that the body defense mechanisms can absorb it, as is the case with wounds from most handgun bullets (and military rifle bullets in the portion of their path before they have yawed), most of these wounds heal without intervention.

The trauma caused by penetrating projectiles stimulates new capillaries to grow into the disrupted area.[45,46] This increasing blood supply takes a few days to provide increased resistance to bacteria and is the reason behind the most basic tenet of surgical care of gunshot wounds:

leaving the wound open after the initial surgery and closing it after 4 to 7 days. Wartime experience has shown that immediate closure of these wounds results in a high infection rate, whereas leaving them open until the local blood supply has been augmented by ingrowth of new capillaries results in far better healing.[31] All gunshot wounds are contaminated with bacteria. On occasion one still hears the myth that bullets reach such a high temperature in the gun barrel that they are sterilized by being fired. This was proved false by LaGarde in 1892[47], whose findings were more recently verified by Thoresby and Darlow.[48]

The bacteria brought in by the bullet multiply in proportion to the amount of tissue that has been devitalized or severely damaged. When too much devitalized tissue is present for the body to absorb, the bacterial load is too great, or both, the body tries to wall off the bacteria-laden devitalized tissue by laying down a fibrin barrier.[45,46] If the wound is open, this walled-off necrotic mass is simply expelled after about 10 days.[31] If access to the outside is not available for the necrotic mass to be expelled, it will become an abscess. The treatment for an abscess is simple incision and dependent drainage. If incision and drainage is not performed, sufficient pressure may build up in the abscess for it to spread by breaking through its fibrin walls; erosion into blood vessels and invasive bacteremia may result. The body's defensive fibrin barriers can also be dissolved by the enzyme fibrinolysin, formed by the group A β-hemolytic streptococcus bacteria. This bacteria's capacity to spread by enzymatic action is why throughout history it has been the significant killer of the battlefield wounded.[49,50] Since World War II, however, β-hemolytic streptococcus has nearly disappeared from battlefields because antibiotics have been used to treat virtually all wounded by projectiles. Fortunately, the streptococcus has remained very sensitive to penicillin spectrum antibiotics. An adequate blood level of a penicillin spectrum antibiotic will prevent life-threatening invasive bacteremia caused by a group A β-hemolytic streptococcus, and penicillin remains effective against the clostridial species of bacteria that cause gas gangrene.[51-53]

Ideally, all dead and injured tissue surrounding the bullet path should be excised within a few hours of injury. This excision would decrease the work of the body's defenses and allow the ingrowth of new capillaries to progress unimpeded so that after 4 to 7 days the wound may be closed and uncomplicated healing expected. It is seldom possible, however, for even the most experienced surgeon to be able to identify with certainty the line of demarcation between tissue that will survive and that which will not.

The "four Cs" (color, consistency, contractility, and circulation) have been taught to help surgeons differentiate viable from nonviable muscle. Those who support this method[54, 55], however, fail to advise whether abnormality in only one of these Cs indicates nonviability or whether two, three, or all four criteria must be fulfilled. During the Korean conflict, an attempt was made to measure the accuracy with which surgeons could evaluate muscle viability on the basis of the 4 Cs.[54] Biopsy specimens taken by surgeons were graded for muscle disruption by a pathologist. A "statistically significant" correlation was found for all but color. Their data, however, were not convincing: Although contractility deficits were found in all 22 of the severely disrupted muscle biopsy specimens, they were also found in 16 of the 18 judged to have been minimally disrupted. "Consistency" had the best correlation: It was judged normal in only 1 of the 22 severely disrupted specimens but was also judged normal in only 8 of the 18 minimally disrupted ones. The samples were taken an average of 6 hours after injury. Applicability to patients seen early after injury is questionable. Blood flow to tissues surrounding bullet paths can change markedly in the first few hours after wounding.[31] Delineation of where the body will draw the line on nonviable tissue can be compounded by severe hemodynamic shock and massive injury, which can compromise body defenses.

A reasonable way of dealing with this dilemma is to remove tissue that has been partially detached or severely disrupted and then examine the open wound after 2 days, by which time it will be obvious if more tissue must be excised. This method should be suitable for most civilian trauma centers.

In the military setting, however, the goal of getting the wound to heal rapidly has led many to handle the dilemma with a more radical excision of tissue. In an attempt to remove all potentially nonviable tissue, military surgeons often use an en bloc dissection of all dead, injured, and questionable tissue along with a margin of normal tissue—a procedure akin to excision of a malignancy. The danger of carrying this approach to extremes is easy to recognize.[4] Proponents of the "when in doubt, cut it out" school often preach that their method is necessary to avoid death resulting from invasive bacteremia or gas gangrene. This untrue; antibiotics and the far simpler surgical incision to relieve pressure and establish dependent drainage will do that.[31,56]

The great majority of civilian gunshot wounds are caused by handgun bullets. These bullets usually cause punctate extremity wounds that disrupt so little tissue that the body's defenses handle it well without the need for surgery. Military surplus weapons and ammunition are commonly available[57], and information given to the treating physician by those wounded and and their confreres about weapon and bullet type and the circumstances surrounding a shooting are notoriously inaccurate. Therefore perforating extremity wounds from military rifle bullets have undoubtedly been interpreted as handgun wounds in many cases and treated as such, with good results. The damage caused by the military rifle bullet before it yaws (Figures 1, 4-6) cannot be differentiated from that caused by a handgun bullet even by the most expert.[25,41,58,59]

It is possible for a bullet wound to be punctate at its entrance and exit, and yet have caused serious muscle disruption deep in the central part of the extremity. There should be no problem, however, in separating these wounds (which might well need to be opened wide) from those with minimal disruption. Any significant buried tissue disruption in the human extremity should be easily diagnosed by physical examination and roentgenographic studies.

Modern wound ballistics is a paradox. Its fundamentals are strongly supported by the laws of physics, well illustrated, and clarified by current bullet-testing techniques and verified by centuries of observations made on battlefields. Yet its literature remains a minefield of misconceptions. Objective data explaining the basis of wound ballistics aid the physician in understanding injury potential. Wounds result when penetrating projectiles crush tissue, displace it, or both. Projectile mass, velocity, shape, and construction, as well as the characteristics and anatomic constraints of the tissue penetrated, determine the amount, type, and location of tissue disruption. No matter how expert one might be in understanding wound ballistics, understanding the medical consequences of bullet wounds is often challenging. Unknown and unexpected variables, such as contact wounds (where powder gases can add greatly to the tissue disruption) and a bullet passing through an intermediate target before impact, can change the morphology of a wound from a given weapon. The basic rule for every health care provider to remember in caring for gunshot victims is to evaluate objectively the location, extent, and type of tissue disruption and base treatment on these findings. Dr Douglas Lindsey puts it best in his advice: "Treat the wound and not the weapon."[7]

## REFERENCES

1. Rich NM, Johnson EV, Dimond FC Jr: Wounding power of missiles used in the Republic of Vietnam. *JAMA* 1967;199:157-161, 168.

2. Dimond FC Jr, Rich NM: M-16 rifle wounds in Vietnam. *J Trauma* 1967;7:619-625.

3. Parks WH: Political-legal factors in small arms research and development. *Wound Ballistics Rev* 1992;1:16-17.

4. Rybeck B: Missile wounding and hemodynamic effects of energy absorption. *Acta Chir Scand* 1974;450(suppl):5-32.

5. Trunkey D: Affidavit in opposition to plaintiffs' motion for preliminary injunction. Sworn on 4 September 1990. No. 9008-04628, Oregon State Shooting Assn., et al., Plaintiffs, v. Multnomah County, et al., Defendants. Circuit Court of Oregon, Multnomah County.

6. Whelan TJ Jr: Missile-caused wounds, in *Emergency War Surgery: NATO Handbook*, US revision 1. Washington DC: US Government Printing Office, 1975:9-17.

7. Bowen TE: Missile-caused wounds, in *Emergency War Surgery: NATO Handbook*, US revision 2. Washington DC: US Government Printing Office, 1988:13-34.

8. War surgery, in *Proceedings of the Commander in Chief Pacific Fifth Conference on War Surgery*. Tokyo, 1971:33.

9. King KF: Orthopaedic aspects of war wounds in South Vietnam. *J Bone Joint Surg* 1969;51B:112-117.

10. Fackler ML, Malinowski JA, Hoxie SW, et al: Wounding effects of the AK-47 rifle used by Patrick Purdy in the Stockton, California, schoolyard shooting of January 17, 1989. *Am J Forens Med Pathol* 1990;11:185-189.

11. Davis JH, Drucker WR, Foster RS, et al: *Clinical Surgery*. St Louis: Mosby, 1987.

12. Dufour D, Kroman Jensen S, Owen-Smith M, et al: *Surgery for Victims of War*. Geneva: International Committee of the Red Cross, 1988.

13. Owen-Smith MS: *High Velocity Missile Wounds*. London: Edward Arnold Limited, 1981:21-32.

14. Ochsner MG, Jaffin JH: Complications of wounding agents, in Mattox KL (ed): *Complications of Trauma*. New York: Churchill Livingstone, 1993:267.

15. Swan KG, Swan RC: *Gunshot Wounds: Pathophysiology and Management*, ed 2. Chicago: Year Book, 1989:9.

16. Sheehy SB, Jimmerson CL: *Manual of Clinical Trauma*, ed 2. St Louis: Mosby, 1994:25.

17. Sedwitz MM, Shackford SR: Vascular trauma, in Cuschieri A, Giles GR, Moossa AR (eds): *Essential Surgical Practice*, ed 2. London: Wright, 1988:305.

18. MacCormack W: Some points of interest in connexion with the surgery of war. *Lancet* 1895;2:290-292.

19. Longmore T: *Gunshot Injuries*, ed 2. London: Longmans & Green, 1895:157.

20. Stevenson WF: *Wounds in War*. London: Longmans, Green & Company, 1897:107.

21. Keith A, Rigby HM: Modern military bullets: A study of their destructive effects. *Lancet* 1899;2:1499-1507.

22. Fackler ML, Malinowski JA: The wound profile: A visual method for quantifying gunshot wound components. *J Trauma* 1985;25:522-529.

23. Fackler ML: The wound profile and the human body: Damage pattern correlation. *Wound Ballistics Rev* 1994;1:12-19.

24. Greenwood C: The political factors, in Warner K (ed): *Gun Digest*, ed 34. Chicago: Follett, 1980:161-168.

25. Fackler ML: Wounding patterns of military rifle bullets. *Int Def Rev* 1989;22:59-64.

26. Harvey EN, Korr IM, Oster G, et al: Secondary damage in wounding due to pressure changes accompanying the passage of high velocity missiles. *Surgery* 1947;21:218-239.

27. Newton IS: *The Motion of Bodies*, Cajori revision of the Motte 1729 translation. Berkeley: University of California Press, 1934:13.

28. Harvey EN, McMillen JH, Butler EG, et al: Mechanism of wounding, in *Coates JB Jr, Beyer JC* (eds): *Wound Ballistics*. Washington DC: US Government Printing Office, 1962.

29. Fackler ML, Surinchak JS, Malinowski JA, et al: Wounding potential of the Russian AK-74 assault rifle. *J Trauma* 1984;24:263-266.

30. Mendelson JA, Glover JL: Sphere and shell fragment wounds of soft tissues: Experimental study. *J Trauma* 1967;7:889-914.

31. Fackler ML, Breteau JPL, Courbil LJ, et al: Open wound drainage versus wound excision in treating the modern assault rifle wound. *Surgery* 1989;105:576-584.

32. Suneson A, Hansson HA, Seeman T: Peripheral high-energy missile hits cause pressure changes and damage to the nervous system: Experimental studies on pigs. *J Trauma* 1987;27:782-789.

33. Suneson A, Hansson HA, Seeman T: Central and peripheral nervous damage following high-energy missile wounds in the thigh. *J Trauma* 1988;28(suppl 1):S197-S203.

34. Suneson A, Hansson HA, Lycke E, et al: Pressure wave injuries to rat dorsal root ganglion cells in culture caused by high-energy missiles. *J Trauma* 1989;29:10-18.

35. Suneson A, Hansson HA, Seeman T: Pressure wave injuries to the nervous system caused by high-energy missile extremity impact. I. Local and distant effects on the peripheral nervous system: A light and electron microscopic study on pigs. *J Trauma* 1990;30:281-294.

36. Suneson A, Hansson HA, Kjellstrom BT, et al: Pressure waves caused by high-energy missiles impair respiration of cultured dorsal root ganglion cells. *J Trauma* 1990;30:484-488.

37. Fackler ML, Breteau JPL, Sendowski ICP, et al: Perforating wounds of the abdomen by the modern assault rifle. Chungking, China: Proceedings of the Sixth International Wound Ballistics Symposium. *J Trauma (China)* 1990;6(suppl):192-199.

38. Ordog GJ, Balasubramanian S, Wasserberger J, et al: Extremity gunshot wounds. I. Identification and treatment of patients at high risk of vascular injury. *J Trauma* 1994;36:358-368.

39. Kahnoski RJ, Lingeman JE, Coury TA, et al: Combined percutaneous and extracorporeal shock wave lithotripsy for staghorn calculi: An alternative to anatrophic nephrolithotomy. *J Urol* 1986;135:679-681.

40. Kuwahara M, Kambe K, Kurosu S, et al: Extracorporeal stone disintegration using chemical shock waves. *J Urol* 1986;135:814-817.

41. Fackler ML: Wound ballistics: A review of common misconceptions. *JAMA* 1988;259:2730-2736.

42. Almskog B, Risberg B, Teger-Nilsson AC, et al: Early local and systemic fibrinolytic response to high energy missile trauma. *Acta Chir Scand* 1982;suppl 508:327-336.

43. Saunders CE, Ho MT: *Current Emergency Diagnosis and Treatment*, ed 4. Norwalk, Connecticut: Appleton-Lange, 1992:280.

44. LeDran H: Traité ou reflexions tirées de la pratique sur les playes d'armes a feu. Paris: Osmont, 1737:54.

45. Nealon TF Jr, Grossi CE: Principles of operative surgery: General considerations, in Nora PF (ed): *Operative Surgery*, ed 2. New York: Lea & Febiger, 1973:5-6.

46. Kumar V, Cotran RS, Robbins SL: *Basic Pathology*, ed 5. Philadelphia: Saunders, 1992:47-59.

47. LaGarde LA. *Gunshot Injuries*, ed 2. New York: William Wood & Company, 1916:132.

48. Thoresby FP, Darlow HM: The mechanisms of primary infection of bullet wounds. *Br J Surg* 1967;54:359-361.

49. Reyer C: Antiseptische und offene Wundbehandlung. *Arch Klin Chir* 1876;19:712-727.

50. Franz C: *Lehrbuch der Kriegschirurgie*, ed 3. Berlin: Springer, 1942:63.

51. Altemeier WA, Furste WL, Culbertson WR: Chemotherapy in gas gangrene. *Arch Surg* 1947;55:668-680.

52. Owen-Smith MS, Matheson JM: Successful prophylaxis of gas gangrene of the high-velocity missile wound in sheep. *Br J Surg* 1968;55:36-39.

53. Porritt AE: Penicillin Therapy and Control in 21 Army Group. British Army of the Rhine, May 1945.

54. Scully RE, Artz CP, Sako Y: The criteria for determining the viability of muscle in war wounds, in Howard JM (ed): *Battle Casualties in Korea: Studies of the Surgical Research Team. Vol III. The Battle Wound: Clinical Experiences*. Washington DC: Walter Reed Army Medical Center, 1955:181-187.

55. Zajtchuk R (ed): *Textbook of Military Medicine, Part I: Warfare, Weaponry, and the Casualty*, vol 5, *Conventional Warfare: Ballistic, Blast and Burn Injuries*. Washington DC: US Government Printing Office, 1990.

56. Fackler ML, Lindsey D: Wounds and injuries of the soft tissues, in Bowen TE: *Emergency War Surgery: NATO Handbook*. Washington DC: US Government Printing Office, 1988.

57. *Shotgun News*: Issue 10, vol 50, April 1996.

58. Fackler ML: Ballistic injury. *Ann Emerg Med* 1986;15:1451-1455.

59. Fackler ML: Physics of penetrating trauma, in McSwain NE Jr, Kerstein MD (eds): *Evaluation and Management of Trauma*. Norwalk, Connecticut: Appleton-Century-Crofts, 1987.

Reprint no. 47/1/74504

Address for reprints:

Martin L Fackler, MD

Rural Route 4, Box 264

Hawthorne, Florida 32640

352-481-5661

JA6384

# EXHIBIT 68

# Firearms Chimera: The Counter Producti e Campai n to Ban the AR-15 Rifle

## Dennis P. Chapman

Introduction ........................................................................................ 191
I.     The Function of the Ri ht to Keep and Bear Arms in American Society ................................................................ 194
II.    The Mo in oal Posts of the un Control Mo ement 199
III.   Firearms E olution and the Emer ence of a Uni uely Military Firearms Capability ............................................. 201
I .    Misconstruin the AR-15 as a Military Weapon ............. 204
       .    iolent Crime and Combat are not E ui alent Phenomena ................................................................ 208
       I.     Is the AR-15 Uni uely Suited to Killin Lar e Number of People ............................................................... 208
       II.    Hi h Capacity Ma a ines: Superfluous for Criminals, Essential for Self Defense. ............................................. 213
       III.   AR-15 Rifles are Commonly Used for Lawful Purposes 216
I .    A Final Obstacle: The Potential for Abuse .................... 221
Conclusion .......................................................................................... 223

## Introduction

I have always been a collector. During my childhood, I collected comic books, butterflies, coins, and stamps, with a few tentative forays into other areas as well. These interests faded over the course of military service and the other endeavors of adulthood, but my collecting impulse was merely dormant, not extinct, and has long since revived. Among its chief

---

Attorney, irginia; Colonel (Retired), U.S. Army; BS, United States Military Academy; JD, Thomas M. Cooley Law School. Colonel Chapman served with the 10th Mountain Division during Operation *Restore Hope*, Somalia, and as head of a U.S. military advisory team with 3rd Brigade, 4th Division, Iraqi Army during Operation *Iraqi Freedom*.

191

Electronic copy available at: https://ssrn.com/abstract=3466567

ob ects now are old, arcane, or noteworthy books. Having settled into the
practice of law after military retirement, a few obscure old law books have
naturally found their way onto my shelves.

One such book is *The Revised Statutes of Michigan*, 1838. Among
the enactments of the state s early legislative sessions was one providing
that    p ersons going about armed with dirk, &c.,  sic  may be required to
find sureties of the peace,  [1] and that    i f any person shall go armed with a
dirk, dagger, sword, pistol, or other offensive and dangerous weapon,
without reasonable cause to fear an assault or other in ury, or violence to his
person, or to his family or property, he may, on complaint of any person
having reasonable cause to fear an in ury, or breach of the peace, be
required to find sureties for keeping the peace, for a term not exceeding six
months, with the right of appealing.  [2] Another of my old volumes, the 1849
*Code of Virginia*, contains a similar provision.[3] These could be considered
early versions of today s *red flag laws*  statutes enacted to facilitate the
pre-emptive abridgment of a particular person s right to keep and bear arms
upon the complaint of another private citi en. Like those today, these old
laws required, expressly or implicitly, a reasonable basis to fear that the
person sought to be restrained might do harm, and that said person be
allowed to contest the restraint upon their right to own or bear arms.[4]
Somewhat more restrictive was the 1852 *Code of Alabama*, which
provided:

> Any one who carries concealed about his person a pistol, or
> any other description of fire arms, not being threatened
> with, or having good reason to apprehend an attack, or
> travelling, or setting out on a  ourney, must, on conviction,
> be fined not less than fifty nor more than three hundred
> dollars.[5]

Yet, even Alabama s more restrictive code permitted unrestricted
open carry and allowed concealed carry when travelling or when reasonably
in fear of attack.[6] Thus, there can be no doubt that at the time they enacted
these laws, the citi ens of these states took it as given that the right to keep
and bear arms was a private right individually vested in every peaceable
citi en and that the view taken by some of their grandchildren (that the right

---

1. THE RE ISED STATUTES OF THE STATE OF MICHI AN 707 (E. B.
Harrington & E. J. Roberts eds., Detroit, John S. Bagg, Printer to the State, 1838).

2. *Id.* at 657 58.

3. THE CODE OF    IR INIA 756 (Richmond, William F. Ritchie, Public
Printer, 1849).

4. *Id.*; THE RE ISED STATUTES OF THE STATE OF MICHI AN, *supra* note 1.

5. THE CODE OF ALABAMA   3274 (John J. Ormond et al eds., Montgomery,
Brittain and De Wolf, State Printers, 1852).

6. *Id.*  3274 75.

Electronic copy available at: https://ssrn.com/abstract=3466567

to keep and bear arms is a collective right only, vested in such militia as the legislature might deign to organi e, with private ownership of arms for other purposes allowed at sufferance only) would have been heresy. This is confirmed by the states  constitutional provisions in force when they enacted the laws mentioned above. The Constitution of Alabama provided that  e very citi en has the right to bear arms in defence  sic  of himself and the State.  [7] Michigan s Constitution contained a similar provision.[8] The  irginia Bill of Rights, adopted June 12th, 1776, and incorporated by reference into the  irginia Constitution in force at the time of the above-cited enactments, provided   t hat a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence  sic  of a free state.  [9] As Michigan Chief Justice Thomas Cooley explained:

> I f the right  to keep and bear arms  were limited to those enrolled  in the militia , the purpose of this guaranty might be defeated altogether by the action or neglect to act of the government it was meant to hold in check. The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose. But this enables the government to have a well-regulated militia; for to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.[10]

Yet these hardy and independent citi ens,  ealous of their liberties, saw no inconsistency between an individual right to keep and bear arms and the imposition of a limited abridgment of that right in specific cases where a person posed a credible threat of a breach of the peace.[11]

The revival of such laws is one proposal put forward to cope with the outrageous mass public shootings that beset us today. On its face, there would seem to be merit to the idea: it emerges in the aftermath of many such shootings where family, friends, or the authorities had good cause for

---

7.   ALA. CONST. of 1819, art. I,  23.
8.   MICH. CONST. of 1835, art. I,  13.
9.    A. CONST., art. I,  13;   A. CONST. of 1830, art. I.
10.  THOMAS M. COOLEY, THE  ENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (Boston, Little, Brown, and Co. 1880).
11.  *See* THE RE ISED STATUTES OF THE STATE OF MICHI AN, *supra* note 1, at 657 58; *see also* COOLEY, *supra* note 10, at 271.

Electronic copy available at: https://ssrn.com/abstract=3466567

concern about the shooter beforehand, but failed to act.[12] A carefully drafted statute, with an appropriate standard of proof, and fair, reasonable, and prompt due process protections for the person purported to be a threat, might have prevented some attacks. However, many American gun owners vigorously resist such proposals, attracting the criticism that they oppose any firearms restrictions at all, including gun control advocates own supposedly  common sense gun safety  proposals.

un control advocates take this opposition as proof of pro-Second Amendment advocates being in the thrall of the  gun lobby.  This misses the mark, however, for as David Hardy has shown, gun owners have ample reason to be skeptical of gun control advocates  proposals.[13] This is unfortunate, for the natural impulse of gun rights advocates ought to be to support such laws: As a group, gun owners tend to be conservative, to value law and order, to favor tough-on-crime policies, to be strong supporters of law enforcement, and at least one researcher has found that they also tend to be relatively non-violent.[14] This paper examines one source of this inconsistency: the argument over whether to ban the AR-15 rifle and similar firearms and the impact of that proposal on the overall gun violence debate.

## I  THE FUNCTION OF THE RIGHT TO  EEP AND  EAR ARMS IN AMERICAN SOCIETY

The American tradition of arms and the private right to keep and bear arms, which is one of its political manifestations, is complex and multifaceted. It encompasses a wide range of functions. These include practical personal applications, such as subsistence, sport, and self-defense; collective applications such as defense of the community and resistance to tyranny; and potent political, cultural, historical, and mythological functions. In the American political tradition, private ownership of arms finds its highest and most fundamental function in serving as a badge of sovereignty. According to Max Weber, the  state is a human community that (successfully) claims the monopoly of the legitimate use of physical force within a given territory. [15] In many political systems, the embodiment

---

12. *Cf.* Will  arbe et al., *Dayton Shooting: Oregon District gunman left decade of red flags*, Dayton Daily News (Aug. 9, 2019)  https:  perma.cc 9F  - WRPD  (stating family and friends of a mass shooter had previous red flag s regarding shooter s behavior and mental state).

13. David A. Hardy, *Gun Owners, Gun Legislation, and Compromise*, 31 T.M. COOLEY L. RE  . 33, 35 (2014).

14. *See* John R. Lott & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. LE  AL STUD. 1, 2  3 (1997).

15. Max Weber, Lecture: Politics as a  ocation, 1 (1918) (transcript available at   http:  anthropos-lab.net wp wp-content uploads 2011 12 Weber-Politics-as-a- ocation.pdf  https:  perma.cc 5  AF-9  5T ) (emphasis omitted).

Electronic copy available at: https://ssrn.com/abstract=3466567

of the state and the locus of sovereignty is a political party, a monarch or autocrat, or a political institution, such as parliament or the army.[16] However, under the American political creed as expressed in its founding documents, the state is the mere agent of the People, governing at their sufferance, with the People themselves remaining the locus of sovereignty.[17] As the collective sovereign, they retain for themselves a private right to maintain the means of physical force, separate and apart from that entrusted to the state, as manifested in the Constitutional right to keep and bear arms.[18]

This is evident in the attitudes toward the bearing of arms by slaves during the antebellum period and by the Freedmen following the Civil War.[19] Among the most regrettable relics of the Antebellum period is Chief Justice Roger B. Taney s infamous opinion in *Dred Scott v. Sandford*, arguably the most odious holding ever emitted by the courts of any Common Law country. One of *Dred Scott's* principal holdings was that neither Congress nor the states had the power to naturali e African slaves or their descendants.[20] Among the litany of Taney s ob ections to such naturali ation was that conferring citi enship upon slaves or their descendants would give them the right, among other things, to keep and

---

16. *See id.* at 1 2 (charismatic or personal rule), and 8 (parliamentary supremacy). For an example of the Army as the locus of sovereignty, consider the Revolutionary Army of Mexico from 1910 to 1940; *see* Edwin Lieuwen, *Mexican Militarism: The Political Rise and Fall of the Revolutionary Army* (The University of New Mexico Press, 1968), page xii.

17. The U.S. Declaration of Independence provides,  That to secure these rights,   overnments are instituted among Men, deriving their  ust powers from the consent of the governed,    That whenever any Form of   overnment becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new   overnment, laying its foundation on such principles and organi ing its powers in such form, as to them shall seem most likely to effect  sic  their Safety and Happiness.  The U.S. Constitution provides, in the Preamble, that  **We the People** of the United States, in Order to form a more perfect Union, establish  ustice, insure domestic Tranquility, provide for the common defence  sic , promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, **do ordain and esta lish this Constitution for the United States of America**  (emphasis added). *See also* ALA. CONST. of 1819, *supra* note 7, at art. I,  2,  All political power is inherent in the people, and all free governments are founded on their authority ; MICH. CONST. of 1835, *supra* note 8, at art. 1,  1,  a ll political power is inherent in the people;  THE CODE OF   IR INIA, *supra* note 3, at 32,  all power is vested in, and consequently derived from, the people; that Magistrates are their trustees and servants, and at all times amenable to them.

18.  *See* U.S. CONST. amend. II.

19. Scott v. Sandford, 60 U.S. 393, 417 (1857), *superseded by constitutional amendment,* U.S. CONST. amend.  I  ; David B. Kopel, THE SECOND AMENDMENT IN THE NINETEENTH CENTURY, 1998 BYU L. RE  . 1359, 1452  54 (1998).

20.  *Scott*, 60 U.S. at 420.

Electronic copy available at: https://ssrn.com/abstract=3466567

carry arms wherever they went. [21] By contrast, after the Civil War, the Republican-controlled Congress adopted the opposite policy during Reconstruction.[22] Congress enacted measures, such as the Freedmen s Bureau Act of 1866, which provided that the right to have full and equal benefit of all laws and proceedings concerning personal liberty, and personal security including the Constitutional right be bear arms, shall be secured to and en oyed by all the citi ens of such State or district without respect to race or color or previous condition of slavery. [23] Furthermore, t he framers intended and opponents recogni ed the Fourteenth Amendment to guarantee the right to keep and bear arms **as a right and attri ute of citi enship** that no State government could infringe. [24] They also intended that the Fourteenth Amendment would extend these rights to the Freedmen. As Stephen Halbrook argued:

> The arms that the Fourteenth Amendment s framers believed to be constitutionally protected included the latest firearms of all kinds, from military muskets (which were fitted with bayonets) and repeating rifles to shotguns, pistols, and revolvers. The right of the people to keep arms meant the right of an individual to possess arms in the home and elsewhere; the right to bear arms meant to carry arms on one s person. The right to have arms implied the right to use them for protection of one s life, family, and home against criminals and terrorist groups of all kinds, whether attacking Klansmen or lawless law enforcement. Far from being restricted to official militia activity, the right to keep and bear arms could be exercised by persons against the state s official militia when it plundered and killed the innocent.[25]

While the importance of each has waxed and waned over time according to the conditions prevailing in the country at any given moment, each facet of the private right to keep and bear arms has shaped American

---

21. *Id.* at 417.

22. *See Congress Profiles: 39th Congress (1865–1867)*, HISTORY, ART & ARCHI ES: UNITED STATES HOUSE OF REPRESENTATI ES, https: history.house.gov Congressional-Overview Profiles 39th  https: perma.cc L6HR-57YW ; STEPHEN P. HALBROOK, FREEDMAN, THE FOURTEENTH AMENDMENT, AND THE RI HT TO BEAR ARMS, 1866-1876, at 40 41 (1998).

23. HALBROOK, *supra* note 22, at 40 41 (emphasis omitted).

24. *Id.* at 42 (emphasis added).

25. *Id.* at 43.

Electronic copy available at: https://ssrn.com/abstract=3466567

culture and history in its turn and continues to do so to a greater or lesser degree today.[26]

The use of ranging weapons for subsistence hunting dates back tens or even hundreds of thousands of years.[27] Nonetheless, it seems unlikely

---

26. These functions do not merely fade in importance over time; they sometimes wax more important. See, for example, Walter . Libber, *Every Citizen A Rifleman*, NATIONAL SER ICE WITH THE INTERNATIONAL MILITARY DI EST, Apr. 1919, at 207-09 (deploring the fact that while  t he American is traditionally a rifleman,  with the growth of our population,  centered in the towns,   our skill and confidence in the use of firearms gradually decreased,  even to the point that it became  a deplorable fact that shortly before signing the armistice  ending WWI during the operations of the Argonne American soldiers were sent into the front lines who had never fired a rifle,  and that  it is a well-known fact that our urban population is cut off from any opportunity of learning the use of the rifle  ); compare this to the situation one hundred years later, where firearms use has dramatically rebounded to the point that  m ore people participate in target shooting than play tennis, soccer or baseball,  with shooting sports generating over 16 billion in retail sales annually (National Sports Shooting Foundation, *Target Shooting in America, A Force for Conservation*, 2019), and National Public Radio reporting that, notwithstanding high profile incidents of gun violence, shooting ranges in the United States are booming, with the National Sports Shooting Foundation listing  hundreds and hundreds of shooting ranges in the United States, including more than 1,800 that have special programs for women and young people. Linton Weeks, *Are Shooting Ranges The New Bowling Alleys?* NPR, https: www.npr.org 2013 01 31 170391799 are-shooting-ranges-the-new-bowling-alleys, retrieved Sept. 5th, 2020. Consider also the changing face of competition shooting in the United States, which was driven largely by state militia organi ations in the 19th Century (see generally James B. Tefethen and James E. Serven, *Americans and  Their Guns,* Stackpole Books, 1967), as compared with the contemporary sports shooting scene, in which competition shooting has expanded considerably to include large numbers of civilian shooters of both sexes (see *Frontsight*, the maga ine of the USPSA, cited elsewhere in this work), also discussed at Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles*, cited elsewhere in this paper. Furthermore, even when the role of a particular shooting application does fade in prominence, it rarely if ever fades to the point of irrelevance. Consider, for example, hunting: In *Sport Hunting and Conservation, 1880 – 1920*, EN IRONMENTAL RE IEW: ER  ol. 12, No. 1 (Spring, 1988), at 51-60, Thomas R. Dunlap discusses the transition from  pot hunting to sport hunting  (page 53), and the subsequent decline in hunting popularity in recent generations; but notwithstanding said change, hunting remains a ma or component of American culture. Consider that there were nearly 11.5 million hunters in the United States as of 2016, a number exceeding the populations of 43 states, and that these hunters spent  27.1 billion pursuing their sport that year (National Sports Shooting Foundation, *Hunting in America: An Economic Force for Conservation*, 2018). For discussion of how the AR-15 has displaced earlier firearms platforms in pursuit of these activities, see Chapman, *Features and Lawful Common Uses of Semi-Automatic Rifles*; the ATF s Ronald Turk; and AR15Hunter.com, all cited elsewhere in this paper.

Electronic copy available at: https://ssrn.com/abstract=3466567

that many Western Europeans were still dependent upon subsistence hunting by the time firearms technology emerged and took hold with sedentism, herding, and agriculture having emerged in the Fertile Crescent 12,000 years ago and spread across Europe from 8,800 to 5,500 years ago, millennia before the invention of firearms.[28]

However, the very different conditions prevalent in North America made the earliest English colonists here heavily dependent upon firearms for their survival, with the Native American tribes becoming dependent upon the same technology themselves in due course.[29] Thus, the J ger rifles, made by  erman gunsmiths as the accoutrement of European sportsmen, became the Pennsylvania or Kentucky long rifle  a tool of practical necessity for daily life  when those gunsmiths migrated to the New World.[30] Economic and technical developments have since rendered subsistence hunting obsolete.[31] As hunting author, Norman Strung, once noted:  Since man first learned to use weapons, he has hunted to obtain food. But  e xcept in the remotest corners of the world, hunting is no longer necessary for survival. [32]

Privately-owned firearms were decisively important to the collective defense of the community in North America in a way never contemplated in Europe.[33] In North America,  defense of country and laws  would  be secured through the Militia  civilians primarily, soldiers on occasion  who  when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time. [34] However, the growth of the Army National  uard has largely displaced the individual, armed citi en in the role of collective defense of the local community.[35]

---

27. Corey A. O Driscoll & Jessica C. Thompson, *The Origins and Early Elaboration of Projectile Technology*, E OLUTIONARY ANTHROPOLO Y, Jan. Feb. 2018 at 30, 31, 35, 41.

28. *See* Solange Rigaud, *Ornaments Reveal Resistance of North European Cultures to the Spread of Farming*, Plos One (Apr. 8th, 2015), https: ournals.plos.org plosone article id 10.1371 ournal.pone.0121166    (last visited Sept. 5th, 2020).

29. DA ID HARSANYI, FIRST FREEDOM: A RIDE THROU H AMERICA S ENDURIN HISTORY WITH THE UN 24 25, 49 (1st Threshold ed. Hardcover Oct. 2018).

30. *Cf. id.* at 26 30 (discussing the evolution of the Kentucky rifle).

31. *See* NORMAN STRUN , DEER HUNTIN : TACTICS AND UNS FOR HUNTIN ALL NORTH AMERICAN DEER 7 (J.B. Lippincott Co. 1973).

32. *Id.*

33. *See* HARSANYI, *supra* note 29, at 20.

34. United States v. Miller, 307 U.S. 174, 179 (1939).

35. *See generally* Christopher R. Brown, *Been There, Doing That in a Title 32 Status: The National Guard Now Authorized to Perform Its 400-Year Old Domestic Mission in Title 32 Status*, ARMY LAW., May 2008, at 23, 23, 26, 35 (discussing how the National  uard s role has changed).

Electronic copy available at: https://ssrn.com/abstract=3466567

Although the foregoing applications of privately owned arms are no longer a practical necessity for daily survival, they are still valuable and important. As Strung has observed:    A  heritage stretching for eons can t be denied by a paltry few centuries of  civili ation. [36] Additionally, the nearly miraculous growth and development of the United States since achieving independence does not rule out the revival of the day to day importance of these shooting applications in the event of future emergency.[37] Nonetheless, the applications of privately-owned firearms that are of greatest practical importance to Americans today are sporting purposes and, most importantly, personal self-defense against violent attack.[38]

## II  THE MO ING GOAL POSTS OF THE GUN CONTROL MO EMENT

The stated aim of red flag laws is to get guns out of the hands of the imminently violent, while leaving them in the hands of peaceable citi ens. Notwithstanding this, many gun owners vigorously oppose red flag laws. Sadly, this opposition is neither unreasonable nor, regrettably, un ustified. For gun control advocates have given American gun owners ample reason to view all of their proposals, no matter how benign they may seem, as a mere Tro an horse, offered to gain a foothold from which to enact ever more draconian gun control measures.[39] From the perspective of reducing gun violence, today s American-gun-control lobby agenda is counterproductive in the extreme, being almost perfectly calibrated to generate the implacable opposition of American gun owners to any proposals that might be put forward  a constituency at least some of whose support will be essential to pass any reform.[40]

---

36. STRUN , *supra* note 31, at 7.

37. Having served in the relief effort in Homestead, Florida following devastation of Hurricane Andrew, and having observed the dystopian societal collapse of Somalia triggered by that country s suicidal civil war in the early 1990s via my service there during Operation Restore Hope in 1992 and 1993, I can attest from personal observation to the fragility of our civili ed existence. For a visual depiction of the devastation caused by Hurricane Andrew, see THE BI  ONE: HURRICANE ANDREW (Andrews & McNeel, 1992). For a discussion of the savage brutality of the Somali civil war and the dystopian nightmare that followed it, see LIDWIEN KAPTEIJNS, CLAN CLEANSIN : THE RUINOUS LE ACY OF 1991 (University of Pennsylvania Press, 2013); for accounts of the U.S. military involvement in Somalia, see Martin Stanton, *Somalia on $5.00 a Day: A Soldier's Story* (Presidio, 2001); and LAWRENCE E. CASPER, FALCON BRI ADE: COMBAT AND COMMAND IN SOMALIA AND HAITI (Lynne Rienner, 2001).

38.   ARY A. KLECK, POINT BLANK:  UNS AND  IOLENCE IN AMERICA 41  42 (Aldine De  ruyer 1991).

39. Hardy, *supra* note 13, at 37  39, 42, 46.

40. *Id.* at 39, 42, 45  46.

Electronic copy available at: https://ssrn.com/abstract=3466567

No single gun policy proposal has done more to discredit gun control advocates in the eyes of American gun owners than the obsession with banning the most popular rifle in the United States, the AR-15.[41] In their quest to ban the AR-15, gun control advocates have discredited themselves by candidly admitting that their true aim is not so much the elimination of that particular rifle, but the opening up of an aperture through which further, more extreme restrictions might be pursued.[42] As early as 1989, the  iolence Policy Center noted that  assault weapons are quickly becoming the leading topic of America s gun control debate and will most likely remain the leading gun control issue for the near future. Such a shift will not only damage America s gun lobby, ____r_____ ____d__r__r_____. [43] The *Washington Post* admitted in 1994 that  t he  crime  bill also includes a ban on assault weapons . . . but no one should have any illusions about what was accomplished. Assault weapons play a part in only a small percentage of crime. The provision is mainly symbolic*; its virtue will be if it turns out to be, as hoped, a stepping stone to broader gun control.* [44] As criminologist  ary Kleck has noted,

---

41. Examples of this single minded focus on AR-15s and similar rifles in recent years abound: Popular horror writer Stephen King, an outspoken advocate for gun control, calls for the banning of  the sale of assault weapons such as the Bushmaster and the AR-15,  while assuring us that he has no designs on our other guns:    uys, gals, now hear this: no one wants to take away your hunting rifles. No one wants to take away your shotguns. No one wants to take away your revolvers, and no one wants to take away your automatic pistols, as long as said pistols hold no more than 10 rounds  (also note how  he seems not recogni e that the  Bushmaster  is not a separate category of firearm, but merely one brand under which the AR-15 platform is sold)  *See* Stephen King*, Stephen King: Why the US Must Introduce Limited Gun Controls*, THE   UARDIAN (Feb. 1, 2013, 8:27 AM), https: www.theguardian.com books 2013 feb 01 stephen-king-pulled-book-gun-controls  https: perma.cc E5  P-9  U  ; When asked about  gun owners who feel that  a Biden Administration means they re going to come for my guns,  former  ice President, Joe Biden, replied,  Bingo, you re right if you have an assault weapon.  David Harsanyi, *Of Course Joe Biden Wants to Take Your Guns Away*, THE  CORNER  -- NAT L  RE . Online, Mar. 10th, 2020, https: www.national review.com corner  oe-biden-second-amendment-of-course-he-wants-to-take-your-guns-away  retrieved September 5th, 2020); and presidential candidate Beto O Rourke declared that  hell, yes, we are going to take your AR-15, your AK-47 (Todd J.  illman, *Beto 'Hell yes' O'Rourke's endorsement has Joe Biden fending off allegation that he's a gun-grabber*, The Dallas Morning News,March 10th, 2020,        https: www.dallasnews.com news politics 2020 03 10 beto-hell-yes-orourkes-endorsement-has- oe-biden-fending-off-allegation-that-hes-a-gun-grabber  (last visited Sept. 5th, 2020).

42. Editorial, *Hyping the Crime Bill*, WASH. POST., Sept. 15, 1994, at A16.

43. *Assault Weapons and Accessories in Americ*a, THE   IOLENCE POL Y CTR. (1988), https: www.vpc.org studies awaconc.htm  https: perma.cc 8  9A-FHW (emphasis added).

44. *Hyping the Crime Bill*, *supra* note 42.

Electronic copy available at: https://ssrn.com/abstract=3466567

Leaders of procontrol  sic  advocacy groups such as Handgun Control and the Coalition to Stop  un  iolence (previously the National Coalition to Ban Handguns) used to assure audiences that they were interested only in regulating handguns, so hunters and sport shooters who used rifles and shotguns had nothing to fear from them  . Yet, once  assault rifles  became a highly publici ed issue, leaders of these groups immediately pushed for strict controls on semi-automatic rifles     This kind of policy shift undercuts their credibility regarding their ultimate intentions, and feeds the worst paranoia of anticontrol extremists. In Don Kates  words, this sort of  extremism poisons the well,  making it all the harder to get people to seriously consider more reasonable alternatives. [45]

As Kleck further notes,

 i t would be unfair to generali e from such cases to all supporters of moderate controls as  u ndoubtedly, many of those who insist they are not interested in further controls are sincere ;  u nfortunately, it is impossible for gun owners to know for sure which gun control supporters are sincere, how numerous they are, whether they will continue in the future to adhere to their commitment to limited controls, and whether they will dominate the gun control movement in the future. There are uncomfortable historical parallels between the gun control movement and the Temperance movement. The latter movement was originally directed toward regulating alcohol and encouraging, as its name suggested, moderation in drinking and reduction in alcoholism. Yet it eventually evolved into the national Prohibition movement, which completely banned the production and sale of alcohol and thereby criminali ed millions of Americans (citation omitted).[46]

### III  FIREARMS E  OLUTION AND THE EMERGENCE OF A UNI  UELY MILITARY FIREARMS CAPA  ILITY

In pursuit of banning the AR-15  as a stepping stone to broader gun control,  gun control advocates have bet heavily on their view that  t he weapons  menacing looks, coupled with the public s confusion over fully automatic machine guns versus semi-automatic assault weapons  anything

---

45. KLECK, *supra* note 38, at 10.
46. *Id.* at 10  11.

Electronic copy available at: https://ssrn.com/abstract=3466567

that looks like a machine gun is assumed to be a machine gun can only increase the chance of public support for restrictions on these weapons. [47] However, they have not sat by and complacently waited for the AR-15 s martial appearance to carry the day for them. They have embarked upon a vigorous, unflagging disinformation campaign to frighten the public into demanding that the AR-15 be banned. One rhetorical device frequently deployed is to characteri e the AR-15 as a weapon of war. Notwithstanding the AR-15 s outward appearance, this characteri ation is groundless, resting in part upon the common misconception that m ost firearms, no matter what their current uses, derive directly or indirectly from firearms originally designed for the military. [48] However, not only have developments in civilian and military firearms technology been interrelated throughout history, but important technological advancements have often been accepted in civilian firearms long before being accepted for military applications.[49] This tendency toward military skepticism of new developments in firearms technology, even manifested itself to a small degree with respect to Armalite s ground breaking design that would become the AR-15 and later the M16, is evident from the Army s 1966 marksmanship field manual, which sniffed that the much-argued-for superiority of lightweight alloys, plastics, and glass compounds must be balanced against the yet-to-be-confirmed field observations of their wearing qualities and stress resistance. [50]

One noteworthy example of the lag in military acceptance of firearms technology developed for civilian use is the rifled barrel; gunsmiths in ermany were proficient in this technology as early as 1530,[51] and the first patent for such was issued as early as 1635.[52] Yet rifles were not widely accepted for military use for centuries after that. While rifles were successfully employed during the French and Indian War and the American Revolutionary War in North America,[53] the British were still relying on the smoothbore Brown Bess as their standard infantry arm at

---

47. *Assault Weapons and Accessories in America*, *supra* note 43.
48. KLECK, *supra* note 38, at 70.
49. *See generally* Dennis Chapman, Features and Lawful Common Uses of Semi-Automatic Rifles 88-91 (July 16, 2019) (unpublished ms.) (on file with SSRN), https: ssrn.com abstract 3436512 https: perma.cc S5 -RSWK .
50. DEP T OF THE ARMY, FIELD MANUAL 23-71, RIFLE MARKSMANSHIP, 225 (December 1966).
51. *See* HARSANYI, *supra* note 29, at 29.
52. C.H.B PRIDHAM, SUPERIORITY OF FIRE: A SHORT HISTORY OF RIFLES AND MACHINE- UNS 8 (Hutchinson s Sci. and Tech. Publications 1945).
53. *Id.* at 8 10.

Electronic copy available at: https://ssrn.com/abstract=3466567

Waterloo.[54] Only in the Crimean War in 1854 was the rifle first generally used as a standard infantry arm by reat Britain.[55]

The introduction of semi-automatic firearms in the civilian market substantially preceded their military adoption. A gas-operated semi-automatic pistol emerged as early as 1863.[56] T he earlier semi-automatic rifles of the beginning of the modern type were introduced by the mid-1890s,[57] decades before the U.S. adopted the M1 arand, the first semi-automatic rifle adopted as a standard infantry arm.[58] Even the AR-15 itself, as David R. Hughes reports, owes its existence to civilian visionaries with civilian shooting applications in mind.[59] Though Eugene Stoner is famously credited with its invention, the AR-15 ultimately owes its space-age construction of aluminum, fiberglass, and polymers to avid hunter and firearms enthusiast Richard Boutelle, President of Fairchild Aircraft. Boutelle, among others, tasked Fairchild s Armalite Division with creating a line of high-end, lightweight sporting rifles made from the materials used in aircraft construction.[60] Only after the unexpected success of Armalite s AR-5 survival rifle did Armalite defer commercial work in favor of the military market.[61] Notwithstanding its distinctive appearance and unique aluminum, fiberglass, and plastic construction, the AR-15 s most groundbreaking feature was, arguably, its ammunition the intermediate .223 Remington and 5.56mm NATO rounds. Yet, even this feature was derived from a civilian antecedent.[62] It was based on the .222 Remington varmint cartridge developed in 1950 by Remington s Mike Walker.[63]

Only in the 20th century did automatic and selective fire technology the first shoulder-fired weapons technology (with trivial exceptions) conceived solely for military applications become firmly established. Selective fire technology gives the modern infantryman a capability not present in any civilian firearm: the option of firing either semi-automatically, that is, one round per pull of the trigger (a capability

---

54. *Id.* at 11.

55. John A. En lish & Bruce I. udmundsson, On Infantry 12 (Praeger Publishers rev. ed. 1994); Pridham, *supra* note 52, at 12.

56. Wilson, R.K., *Textbook of Automatic Pistols*, Small Arms Tech. Pub. Company, Plantersville, South Carolina, 1943; reprinted by Palladium Press for the Firearms Classics Library, 1999, p. 53.

57. Mel in M. Johnson Jr. & Charles T. Ha en, Automatic Arms: Their History, De elopment and Use 51 (William and Morrow Co. 1941).

58. *Id.* at 65 66.

59. Da id R. Hu hes, The History and De elopment of the M16 Rifle and its Cartrid e 254 55 (1990).

60. *Id.*

61. *Id.*

62. *Id.* at 23.

63. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

readily available in civilian firearms for well over a hundred years), or in automatic mode, firing multiple rounds with a single pull of the trigger.

Implicit in the characteri ation of the AR-15 as a  weapon of war is the assumption that it bears certain features useful in combat, and that those features are also useful in crime.[64] This, however, is faulty reasoning:   the logical problem with this position is that whatever technical attributes guns have that make them suitable for committing crimes necessarily make them useful in a variety of lawful applications. [65] Yet, the error is even greater than that. While capabilities that make a firearm useful in crime may also be useful in other shooting applications, the reverse is not true. This paper will demonstrate how applications useful in legitimate shooting activities are often, even usually, *irrelevant* in criminal applications.

## I    MISCONSTRUING THE AR    AS A MILITARY WEAPON

In *Kolbe v. Hogan*, the U.S. 4th Circuit Court of Appeals observed that   soldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations. [66] The court s assertion that semi-automatic fire may be more  accurate and lethal  than automatic fire is very dubious, especially as it regards lethality.[67] The court

---

64. Christopher S. Koper, William D. Johnson, Jordan L. Nichols, Ambro ine Ayers & Natalie Mullins, *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources*, 95 J. OF URB. HEALTH 313, 313 14 (2018); Jeffrey A. Roth & Christopher S. Koper, *Impacts of the 1994 Assault Weapons Ban: 1994-96*, NAT L INST. OF JUST. RES. IN BRIEF, Mar. 1999, at 2.

65. KLECK, *supra* note 38, at 14.

66. Kolbe v. Hogan, 849 F.3d 114, 125 (4th Cir. 2017).

67. The Court s assertion that semi-automatic fire is more accurate and lethal than automatic fire cannot bear scrutiny, as demonstrated by the effect of fully automatic machine guns in battle. See, e.g., PRIDHAM, *supra* note 52, at 47., describing an attack by a company of 200 Japanese troops upon a Russian position defended by two Maxim machineguns during the Russo-Japanese War, in which   the Japanese firing line was literally swept away;   see also John Ellis, writing of the Battle of the Somme, that   As before, British tactics were based upon the infantry charge, and the   erman upon the deployment of large numbers of machine guns. The forward positions were almost entirely entrusted to the battle-hardened machine gunners, whilst the bulk of the ordinary infantry was held further back to counter-attack or mop up the few enemy who managed to get beyond the front line;   Ellis then quotes Lloyd   eorge as observing that   o ur men advanced against the most terrible machine gun fire ever directed against troops     and fell by the thousands in every attack.   JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE   UN 141 (Johns Hopkins Univ. Press paperback ed. 1986).The fully automatic machinegun retains pride of place in the   infantry even today, thus refuting the Court s conclusion that automatic fire  is interchangeable with or even inferior to that of semi-automatic weapons:   The machinegun is one of the most

Electronic copy available at: https://ssrn.com/abstract=3466567

2020                          FIREARMS CHIMERA                          205

does correctly note that semi-automatic fire is the most appropriate mode of fire for individual soldiers and police in many law enforcement and military scenarios. From this, the court leaps to the conclusion that, because semi-automatic firing capability has military value, it is therefore unprotected by the Second Amendment. The court misapprehends the situation; however, semi-automatic fire is useful in law enforcement and military situations because it is useful in _all_ legitimate shooting applications. This is especially true about the AR-15, as well-stated by John Stokes in the left-leaning _Vox_:

> In the pre-AR-15 era, if you wanted a gun for shooting little groundhogs, a gun for shooting giant feral hogs, and a gun for home defense, you d buy three different guns in three different calibers and configurations. With the AR platform, a person with absolutely no gunsmithing expertise can buy one gun and a bunch of accessories, and optimi e that gun for the application at hand   So cops and civilians buy AR-15s because that one gun can be adapted to an infinite variety of sporting, hunting, and use-of-force scenarios by an amateur with a few simple tools **Anyone  ho tells you that the AR    is  ad for hunting and home defense has a  solutely no idea   hat they re tal ing a out  ecause  y definition an AR is a gun that can  e e  uisitely adapted for those niches and many others**   The AR-15 s incredible flexibility, accuracy, and ease-of-use combine with its status as the most thoroughly tested and debugged firearm in military history to make it massively popular with shooters of all stripes, **from hunters to home defense  uyers to competitors** to police.[68]

The same cannot be said about automatic fire; it exists for the purely military purpose of achieving fire superiority over an enemy force. Automatic and selective fire is _____ r  r  r_____ r. Stokes observes that   t here is no conceivable

---

potent weapons in a rifle company s armory. It can support the rifleman with a heavy volume of close and continuous fire in both the attack and the defense (Ma or Harlie R. Treat, _Machinegunners_,  Infantry, Nov-Dec 1983, page 38);  The two M60 machine guns in the light infantry platoon provide a significant portion of the unit s firepower  (FM 7-70, _Light Infantry Platoon/Squad_, Headquarters, Dep t of the Army, September 1986, page 7-1 );  The machine gun   is the platoon leader s means to decisively influence a combat situation  (_Id. at_ 7-35);  Whatever technique is in the defense, machine guns are the heart of it  (_Id._ at 7-41).

68.  John Stokes, _Why millions of Americans – including me – own the AR-15_, O  .COM, (June 20, 2016, 11:00 AM) https:  www.vox.com 2016 6 20 11975850 ar-15-owner-orlando  https: perma.cc T2  6-PHKF  (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3466567

circumstance in which a police officer     not even a SWAT team member
          would need to mow down hordes of people. [69] However, this cannot be
said about infantry combat. Combat is a truly distinctive shooting
application, wherein combatants employ fire and movement to gain
advantage over another force.[70] A key assumption in planning for infantry
combat is that the opposing force will have the ability to *offer meaningful
resistance*.[71] Overcoming such resistance is the purpose of automatic fire
and selective fire capability. On the offense, automatic fire enables an
attacker to direct such a high volume of fire at that enemy that he is
*suppressed*—that is to say, the intensity of the attacker s fire materially
degrades the defender s ability to return effective fire or to maneuver to
counter the attack.[72] Individual riflemen in combat often engage the enemy
in semi-automatic mode. However, that changes when they find themselves
acting in a support by fire (SBF) role, suppressing an enemy position so that
a maneuvering element can destroy it; as Conrad and Tinsley explain,

> The SBF element s focus is to gain fire superiority and
> cover the maneuver of the assaulting force as it gains a
> foothold onto an ob ective. Establishing the SBF is as
> critical to the deliberate attack as conducting the assault.
> Without the SBF, the assaulting element has to contend
> with an enemy that is presented with only one problem.
> When the assault element is covered by the SBF element,
> the enemy is now presented with a dilemma.[73]

In the military context, a  dilemma  is:

> a situation in which the enemy is presented with two or
> more equally bad alternatives . . . When presented with a
> dilemma, an enemy has two reactions. The first reaction is
> not knowing what to do as he attempts to decide between
> equally bad options. This effect is commonly termed
>  fixed. [74]

---

69.  *Id.*
70.  SFC Carter H. Conrad & SFC Johnny Tinsley, *The Art of Support by Fire*,
103 INFANTRY 2, Apr. - June 2014, at 28.
71.  Dennis P. Chapman, *Tactical Errors in the Dismounted Fight*, 113
ARMOR 20, 22 (July-Aug. 2004).
72.  *Id.* at 20  22; Dennis P. Chapman, *An Element of Strength: Reinvigorating
Small-Unit Training*, 113 Armor 35, 36  37 (May-June 2004).
73.  Conrad & Tinsley, *supra* note 70, at 28.
74.  DEP T OF THE ARMY, FIELD MANUAL 3-21.8 (FM 7-8), THE INFANTRY
RIFLE PLATOON AND S  UAD 1-22 (28 Mar. 2007).

Electronic copy available at: https://ssrn.com/abstract=3466567

The sources quoted above are all from the 21st Century, but this concept is not a new one. As early as 1945, the staff of the Allied 15th Army roup, under Lieutenant eneral Mark Clark in Italy, described what happens when a military unit allows itself to be caught on the horns of such a dilemma:

> Troops that . . . permitted themselves to be pinned down were inevitably sub ected to deadly mortar and artillery concentrations which very often caused excessive casualties . . . Our troops had a strong inclination, when fired upon, to dig in without returning the fire, inasmuch as they could see no suitable targets at which to fire. When they did return fire into the hostile area, the erman fire either materially decreased or stopped. Some units quickly learned that the proper procedure to take, when fired upon, was to return fire promptly, deploy a force sufficient to overcome the resistance, and keep on going.[75]

Conversely, the defender uses automatic fire to attempt to break the attacker s momentum by confronting him with a curtain of interlocking fires so intense that he cannot continue his attack without excessive losses.[76] As the Canadian officer, historian, and military theorist, John A. English, explained:

> A commander has a moral responsibility to keep his men alive and no commander is ever ustified in launching his troops to a direct attack on an enemy firmly in position. To do so under modern conditions would be to trigger, from even a do en enemy armed with assault rifles, an intense fire of roughly 6,000 rounds a minute during the last few hundred yards.[77]

In infantry combat, mow ing down lots of people is wholly in order and calls for a uniquely military capability: automatic or selective fire.

---

75. -3 SECTION HEAD UARTERS 15 ARMY ROUP. ITALY, A MILITARY ENCYCLOPEDIA BASED ON OPERATIONS IN THE ITALIAN CAMPAI NS 169 (1943-1945).

76. Chapman, *supra* note 72, at 37.

77. EN LISH & UDMUNDSSON, *supra* note 55, at 222.

Electronic copy available at: https://ssrn.com/abstract=3466567

### iolent Crime and Com at are not E ui alent Phenomena

In contrast to infantry combat, crime is an entirely different phenomenon wherein the assailant assumes that his victim *cannot* offer meaningful resistance. A criminal seeks out weak, isolated, vulnerable victims who pose little likelihood of resisting the attack.[78] Where the intended victim is able to place the attacker in an  initiative armament deficit,  thereby demonstrating that he *can* resist effectively, it is likely that the attacker will forgo that target, knowing that  there is probably someone a couple of blocks away who is unprepared and will make a far easier victim. [79]  Not only does this paradigm make automatic fire capability superfluous to a criminal, even a mass shooter, but it also renders all the firearms features that gun control advocates find so disturbing irrelevant in the criminal context. As Craig Douglas has noted, a criminal approaches his presumptively helpless target with two profound advantages. The first is  unequal initiative,  in that he chooses the time, place, and manner of his attack so as to place his victim at maximum disadvantage. The second is  unproportional armament,  bringing to bear some sort of weapon  often, but not always, a firearm  to multiply his strength vis- -vis the victim and to compel compliance.[80] *Under these circumstances, the specific features or qualities of any particular firearm become irrelevant*. In the criminal attack scenario, any marginal improvement in the effectiveness of one firearm versus another is simply subsumed within the overwhelming imbalance of power in the attacker s favor created by his possession of nearly any type of firearm at all.

The converse, however, *does not follow*. Having been taken at a disadvantage, the victim requires more than mere parity with his attacker to survive. Instead, he or she requires superiority in some capacity to break the assailant s momentum and regain the initiative. The most efficacious means to accomplish this is a firearm superior in quality and effectiveness to the attacker s weapon.

### I  Is the AR   Uni uely Suited to  illing Large Num er of People

un control advocates argue that the AR-15 is particularly well-suited to produce a high volume of fire and kill lots of people, making them ideal for mass shootings.[81] They typically ascribe this supposed excessive

---

78. Crai  Dou las, The Criminal Assault Paradi m, in Strai ht Talk on Armed Defense 92, 94 (Massad Ayoob ed., 2017).

79. *Id.* at 96.

80. *Id.* at 92  104.

81. *See,* e.g., Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rollin  Stone (Feb. 22, 2018 4:20PM ET), https: www.rollingstone.com politics politics-features all-american-killer-how-the-

Electronic copy available at: https://ssrn.com/abstract=3466567

lethality to pistol grips, hand-guards that encircle the barrel ( barrel shrouds ),[82] and so-called high capacity maga ines,[83] all of which gun control advocates allege enable a shooter to spray an area and kill large amounts of people, by stabili ing the weapon and protecting the shooter s hand from the heat generated by rapid firing.[84]

This claim does not withstand scrutiny. A comprehensive review of U.S. Army marksmanship doctrine from 1923 through 2012 demonstrates that neither pistol grips nor barrel shroud hand-guards are associated with spraying fire, from the hip, or otherwise.[85] Barrel shroud handguards are old technology. One of the earliest rifles equipped with them was the Short Maga ine Lee-Enfield (S.M.L.E.), introduced around the turn of the 20th Century.[86] These rifles served British forces through both World Wars. The S.M.L.E. was equipped with such a hand-guard to protect the soldier s hand from the heat generated by rapid firing.[87] But this rather debunks the gun control advocates claims than confirm them. The rapid firing of the S.M.L.E was only 15 rounds per minute, or one round every four seconds. This is a far cry from the fantastical rates of fire mistakenly attributed to the AR-15 by gun control advocates, as noted below.[88, 89] Furthermore, a 1975 Rock Island Arsenal study on the M16 rifle found that the barrel can reach temperatures high enough to cause in ury at rather low rates of fire, even at some points along the barrel, after the first round fired.[90] Thus, contrary to

---

ar-15-became-mass-shooters-weapon-of-choice-107819 https: perma.cc A36F-W L .

82. The term barrel shroud does not appear in any U.S. Army firearms literature, nor the literature of the shooting sports community, so far as I am aware. It appears to be a phrase coined by legislators, regulators, or gun control activists, rather than by those who actually design and use firearms.

83. COUNCIL OF THE DIST. OF COLOMBIA COMM. ON PUBLIC SAFETY AND THE JUDICIARY, REP. ON B. 17-843, FIREARMS RE ISTRATION AMENDMENT ACT OF 2008 at 7 (2008).

84. *Id.*; Johnathan Lowy, et al., *Panel 2: Are Semiautomatic Rifles, aka "Assault Weapons," Protected by the Second Amendment?*, THE FEDERALIST SOC Y, THE SECOND AMENDMENT IN THE NEW SUPREME COURT (Jan. 15, 2019), https: fedsoc.org conferences the-2nd-amendment-in-the-new-supreme-court agenda-item-panel-2-are-semiautomatic-rifles-aka-assault-weapons-protected-by-the-second-amendment.

85. *See* Chapman, *supra* note 49, at 34 68, for a more detailed account of the U.S. Army marksmanship doctrine as it relates to pistol grips and barrel shrouds.

86. PRIDHAM, *supra* note 52, at 16 17.

87. *Id.* at 17.

88. *Id.* at 56 57, 67.

89. As a bolt action rifle, the S.M.LE. can hardly be said to be capable of spraying fire anyway.

90. RONALD E. ELBE, E TERNAL BARREL TEMPERATURE OF THE M16A1 RIFLE 15 21 (1975); J.C. Lawrence & J.P. Bull, *Thermal Conditions Which Cause*

Electronic copy available at: https://ssrn.com/abstract=3466567

the claims of gun control advocates,  barrel shrouds  are an appropriate
safety feature in any legitimate shooting application, not  ust combat or
mass shootings.

While United States Army doctrine has provided for quick-kill, hip-
firing techniques for all the shoulder-fired arms adopted since World War I,
there is no correlation between the existence of such techniques and the
presence of pistol grips or  barrel shroud  hand-guards on the weapons.[91]
For example, one of the United States Army s earliest shoulder fired
automatic weapons was the selective fire M1918 Browning Automatic Rifle
(BAR). It had neither a  barrel shroud  nor a pistol grip, but its training
manual provided for  assault fire  from the hip.[92] The doctrine for the semi-
automatic M1  arand and M1 Carbine, as well as for the selective fire
M14, all contained hip-firing techniques. Yet while all these rifles had
 barrel shrouds,  none of them had pistol grips in their standard
configuration.[93] While the doctrine for both the Thompson and M3
submachine guns provided for hip firing and both had pistol grips, neither
had a  barrel shroud. [94] Furthermore, even to the extent that military
doctrine provided for hip firing techniques, these were niche techniques that
received very little attention or training. In fact, the doctrine sometimes
denigrated them. One doctrinal manual for the Thompson submachinegun
allowed for firing  from the hip while marching,  but dismissed it as a
 relatively ineffective  technique that  should rarely be used. [95] The
doctrine for the M3  rease  un  allowed for hip firing, but cautioned that
 the soldier must have a great deal of practice before he can do accurate
shooting  in this manner.[96]

---

*Skin Burns*, 5 E𝙽 𝙸𝙽𝙴𝙴𝚁𝙸𝙽  𝙸𝙽 M𝙴𝙳. 61, 61 (1976); A. R. Morit  & F. C.
Henriques, *Studies of Thermal Injury*, 1974 A𝙼. J. 𝙾𝙵 P𝙰𝚃𝙷𝙾𝙻𝙾 𝚈 695, 711.

91. War Dep t Training Regulation (TR) 150-30, Marksmanship, Automatic
Rifle, at 23 (November 21, 1923).

92. *Id.* at 23.

93. D𝙴𝙿 𝚃 𝙾𝙵 A𝚁𝙼𝚈 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻 23-5, U.S. R𝙸𝙵𝙻𝙴 C𝙰𝙻𝙸𝙱𝙴𝚁 .30, M1, at 4
(May 1965); D𝙴𝙿 𝚃 𝙾𝙵 A𝚁𝙼𝚈 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻 23-5, U.S. R𝙸𝙵𝙻𝙴 C𝙰𝙻𝙸𝙱𝙴𝚁 .30, M1, at
106  110 (Sept. 1958); W𝙰𝚁 D𝙴𝙿 𝚃 B𝙰𝚂𝙸𝙲 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻, U.S. C𝙰𝚁𝙱𝙸𝙽𝙴, C𝙰𝙻𝙸𝙱𝙴𝚁
.30, M1, at 2 (May 20, 1942); D𝙴𝙿 𝚃 𝙾𝙵 A𝚁𝙼𝚈 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻 23-7 D𝙴𝙿 𝚃 𝙾𝙵 𝚃𝙷𝙴
A𝙸𝚁 F𝙾𝚁𝙲𝙴 M𝙰𝙽𝚄𝙰𝙻 50-4, C𝙰𝚁𝙱𝙸𝙽𝙴 C𝙰𝙻𝙸𝙱𝙴𝚁 .30 M1, M1A1, M2, 𝙰𝙽𝙳 M3, at 1  6
(Jan. 1952); D𝙴𝙿 𝚃 𝙾𝙵 A𝚁𝙼𝚈 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻 23-8, U.S. R𝙸𝙵𝙻𝙴 7.62-MM M14, at
11, 25 (Dec. 1959); D𝙴𝙿 𝚃 𝙾𝙵 A𝚁𝙼𝚈 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻 23-8, US M14 𝙰𝙽𝙳 M14A1
R𝙸𝙵𝙻𝙴𝚂, at 5 and 133 (15 Apr. 1974).

94. W𝙰𝚁 D𝙴𝙿 𝚃 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻 34-35, T𝙷𝙾𝙼𝙿𝚂𝙾𝙽 S𝚄𝙱𝙼𝙰𝙲𝙷𝙸𝙽𝙴  𝚄𝙽,
C𝙰𝙻𝙸𝙱𝙴𝚁 .45, M19281A, 𝚆𝙸𝚃𝙷 𝙲𝙷𝙰𝙽 𝙴𝚂 1, 2, 3, & 4, at 2 (31 December 1941); FM
23-41, S𝚄𝙱𝙼𝙰𝙲𝙷𝙸𝙽𝙴  𝚄𝙽𝚂 C𝙰𝙻𝙸𝙱𝙴𝚁 .45 M3 𝙰𝙽𝙳 M3A1, at 5, 55 (July 1957)
 hereinafter FM23-41 .

95. W𝙰𝚁 D𝙴𝙿 𝚃 F𝙸𝙴𝙻𝙳 M𝙰𝙽𝚄𝙰𝙻 23-40, T𝙷𝙾𝙼𝙿𝚂𝙾𝙽 S𝚄𝙱𝙼𝙰𝙲𝙷𝙸𝙽𝙴  𝚄𝙽,
C𝙰𝙻𝙸𝙱𝙴𝚁 .45, M19281A, 𝚆𝙸𝚃𝙷 𝙲𝙷𝙰𝙽 𝙴𝚂 1, 2, 3, & 4, at 35 (31 Dec. 1941).

96. FM 23-41, *supra* note 94, at 54.

**JA6405**

Electronic copy available at: https://ssrn.com/abstract=3466567

Were the AR-15 s distinctive pistol grip and hand-guards intended to facilitate  spraying fire  from the hip, one would expect U.S. military doctrine to have further emphasi ed such firing techniques with the introduction of the semi-automatic AR-15 s selective-fire military analogue, the M16. Yet the opposite happened: while Army marksmanship doctrine retained them, it diluted the already limited importance of hip-firing techniques by incorporating quick fire techniques from the shoulder not long after the M16 s introduction.[97] By 2012, the Army had effectively admitted to the obsolescence of hip-firing firing techniques by acknowledging the primacy of firing from the shoulder, noting that   m odern short-range combat (SRC) techniques emphasi e carrying the rifle with the butt high, so the rifle sights can be brought into display as quickly as firing a hasty unaimed shot. In extremely dangerous moments, special reaction teams (SRTs) commonly advance with  **eapons shouldered** . [98] The Marine Corps marksmanship manual does not include any reference to hip firing at all.[99]

The principal voices populari ing this myth of spraying fire from the hip are governmental authorities seeking to  ustify firearms restrictions,[100] gun control advocates, and the creators of pop culture fiction. Examples of the latter include 1967 s *The St. Valentine's Day Massacre*, wherein Al Capone s  Tommy  un  wielding henchmen mow down his

---

97.  50359 ARMY TRAININ  TE T 23-71-1, PRINCIPLES OF  UICK KILL 13 (12 May 1967); JAMES W. DEES,  EOR E J. MA NER & MICHAEL R. MCCLUSKEY, HUMAN RESOURCES RESEARCH OR ANI ATION TECHNICAL REPORT 71-4, at 15, AN E PERIMENTAL RE IEW OF BASIC COMBAT RIFLE MARKSMANSHIP: MARKSMAN, PHASE I, at 15 (1971); DEP T OF ARMY FIELD MANUAL 23-8, M14 AND M14A1 RIFLES, AND RIFLE MARKSMANSHIP, at 152 (15 April 1974); FM 23-9, M16A1 RIFLE AND RIFLE MARKSMANSHIP, at 151-53  (June 1974); DEP T OF ARMY FIELD MANUAL 23-9, M16A1 AND M16A2 RIFLE MARKSMANSHIP, at 4-12 (3 July 1989).

98.  DEP T OF ARMY FIELD MANUAL 3-22.9(FM 23-9), RIFLE MARKSMANSHIP M16A1, M16A2 3, M16A4, AND M4 CARBINE, at 7-17 (April 2003) (C3 April 2005); DEP T OF ARMY FIELD MANUAL 3-22.9, RIFLE MARKSMANSHIP M16- M4-SERIES WEAPON, at 7-20 (August 2008)  hereinafter FM 3-22.9  (emphasis added).

99.  US MARINE CORPS, MCRP 3-01A, RIFLE MARKSMANSHIP (11 Oct. 2012).

100. COUNCIL OF THE D.C., COMM. ON PUB. SAFETY AND THE JUDICIARY, REP. ON BILL 17-843, *FIREARMS REGISTRATION AMENDMENT ACT OF 2008*, 7 (2008).  As stated in the above paragraph, assault weapons are military-style weapons made for offensive military use. They are designed with military features to allow rapid and accurate spray firing. They are not designed for sport, but to kill people quickly and efficiently. Assault weapons also have features such as pistol grips and the ability to accept a detachable maga ine. **Pistol grips help sta ili e the  eapon during rapid fire and allo  the shooter to spray fire from the hip position**. *Id.* (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3466567

enemies,[101] and 1983 s *Scarface*, where Al Pachino s Tony Montana cuts down his enemies with an M16 in the film s climactic scene.[102]

This is not the only false claim about the capabilities of the AR-15 in circulation. After the Pulse Nightclub shooting, Congressman Alan rayson claimed that the AR-15 could fire 700 rounds per minute.[103] Similarly, the 4th Circuit in *Kolby v. Hogan* absurdly claimed that there is little difference between automatic and semi-automatic fire.[104] Theoretically, the rate at which a semi-automatic weapon can fire is limited by the speed of its recoil cycle, but the rate at which a shooter can induce his weapon to expend ammunition is of little importance in itself.[105] As Johnson and Haven noted in 1941, what really matters is how fast one can fire *and still hit targets*.[106] As they observed,   i t is customary to consider rapid fire in terms of how many shots are fired in one minute. **This is unreal and  ery misleading**. The true criterion and measure of efficiency are expressed in terms of how many shots are necessary to fire the necessary number of effective shots. [107]

Referring again to the semi-automatic AR-15 s selective-fire military analogue, the M16, the maximum *effective* semi-automatic rate of fire is 45 rounds per minute and the sustained rate of fire of 12  15 rounds per minute.[108] Even if a shooter were able to replicate the fantastical rates of fire attributed to the semi-automatic AR-15 by Representative  rayson and others, his fire would be ineffective. Semi-automatic rifles have greater effective rates of fire than bolt action rifles, but they are still limited.[109] After conducting a study comparing the effective rates of fire for bolt action and semi-automatic rifles, Johnson and Haven found that firing a semi-automatic rifle at 10 rounds per 1.5 seconds produced *unaimed fire*.[110] This derives from the fundamental principles of marksmanship.[111] These principles include steady position, sight picture, breath control, and trigger squee e.[112] A shooter attempting to replicate fully automatic fire with a

---

101. THE ST.   ALENTINE S DAY MASSACRE (Twentieth Century Fox 1967).

102. SCARFACE (Universal Pictures 1983).

103. Douglas Ernst, *Alan Grayson claims AR-15s can fire '700 rounds in a minute' after Orlando attack*, THE WASHIN  TON TIMES (Monday, June 13, 2016), https: www.washingtontimes.com news 2016  un 13 alan-grayson-claims-ar-15-rifles-can-fire-700-roun  https: perma.cc  7  2-NMH9 .

104. Kolby v. Hogan, 849 F.3d 114, 125 (4th Cir. 2017).

105. JOHNSON & HA  EN, *supra* note 57, at 189.

106. *Id.*

107. *Id.* (emphasis added).

108. DEP  T OF ARMY FIELD MANUAL 3-22.9(FM 23-9), RIFLE MARKSMANSHIP M16A1, M16A2 3, M16A4, AND M4 CARBINE, at 2-1 (Apr. 2003)  hereinafter FM 3-22.9(FM23-9) .

109. JOHNSON & HA  EN, *supra* note 57, at 189  90.

110. *Id.* at 190.

111. FM 3-22.9, *supra* note 98, at 4  16.

112. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

semi-automatic rifle would, through the rapidity of his actions, fail to apply these principles correctly. Specifically, he or she would fail to properly apply the trigger squeeze fundamental, which requires careful, even depression of the trigger:[113]

> The most important single factor in marksmanship is trigger squeeze. Everything about your position and aim may be perfect, but, unless you squeeze the trigger correctly, your shot will not go where you have aimed. if you jerk the trigger, you lose control jerking the trigger will disturb the sites. Even a slight movement will spoil an otherwise good shot.[114]

A shooter attempting to replicate automatic fire with a semi-automatic rifle would jerk the trigger, moving the rifle slightly off target, thereby spoiling his aim. A selective fire rifle, such as the M16 in automatic mode, continuously fires rounds as long as the trigger remains depressed.[115] This eliminates the jerking effect of rapid, repeated trigger pulls and minimizes errors in applying the other marksmanship techniques while firing on automatic.

## II    HIGH CAPACITY MAGAZINES SUPERFLUOUS FOR CRIMINALS ESSENTIAL FOR SELF DEFENSE

One feature that might seem at first blush to materially enhance the lethality of a semi-automatic firearm are so-called high capacity magazines. This is based on the assumption that a shooter equipped with such magazines can fire more rounds without reloading, and thereby inflict more casualties.[116] However, upon scrutiny this hypothesis fails. Former Indiana Sheriff Ken Campbell, in a 2013 video demonstration, compared the amount of time that it took both experienced and inexperienced shooters to expend the same amount of rounds using different combinations of magazines of varying capacities.[117] He also performed a demonstration

---

113. *Id.* at 423; DEP'T OF ARMY FIELD MANUAL 23-5, U.S. RIFLE CALIBER .30, M1, at 110 (Sept. 1958).

114. DEP'T OF ARMY FIELD MANUAL 23-7 DEP'T OF AIR FORCE MANUAL 50-4, CARBINE CALIBER .30 M1, M1A1, M2, AND M3, at 157 (Jan. 1952).

115. FM 3-22.9(FM23-9), *supra* note 108, at 48.

116. Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17(I) JUST. RESEARCH AND POL'Y 28, 44 (2016).

117. Billy Hallowell, *Sheriff Debunks Gun Magazine 'Fallacies' in This Viral Vid (Plus:His Response to Biden's Shotgun Advice)*, The Blaze, (Mar. 1, 2013), https://www.theblaze.com/news/2013/03/01/sheriff-debunks-fallacies-surrounding-

Electronic copy available at: https://ssrn.com/abstract=3466567

where he simulated a bystander attempting to disarm a shooter during the interval when the shooter changes maga ines.[118] Sheriff Campbell demonstrated that shooters of any skill level can change maga ines so fast as to have no material impact upon the shooter s net rate of fire. Additionally, the demonstration showed that a shooter can change maga ines fast enough to defeat any attempt to rush and disarm him.[119] Commenting on firearms restrictions limiting maga ine capacity to 10 rounds, self-defense and firearms expert Massad Ayoob observed that

> Criminals bent on causing harm, on the other hand, even assuming they were impeded from obtaining maga ines holding over ten rounds due to the ordinance, could simply arm themselves with multiple weapons, and often do. Criminals have time to assess and plan shootings, whereas victims do not. Whitman, the Texas Tower mass murderer, literally brought a large box of rifles, handguns, a shotgun and ammunition to his sniper perch. Harris and Klebold had four firearms between them at Columbine. Holmes in Aurora brought rifle, shotgun, and pistol into the theater The likelihood of the mass murderer arriving on scene with multiple firearms also largely negates the theory that with fewer rounds in the gun, the killer could be more easily disarmed and subdued by unarmed citi ens when he first ran empty, before he could reload.[120]

iven the alacrity with which attackers can change maga ines, restrictions on maga ine capacity are not an effective way of curbing the lethality of their attacks. However, while maga ine capacity limits do little to constrain the damage done by criminal assailants, they do materially

---

gun-maga ines-in-this-viral-vid-plus-his-response-to-bidens-shotgun-advice
https: perma.cc 6BNM-H4     .

118. *Id.*

119. Regrettably, Sheriff Campbell resigned his post in 2014 after it was revealed that he had been involved in an affair with a known prostitute. While this regrettable lapse certainly reflects upon Sheriff Campbell s personal and professional values and udgment, it says nothing about the efficacy of the demonstrations described here. *See* Diana Penner & ic Ryckaert, *Boone County sheriff resigns amid prostitution investigation*, INDYSTAR. (9:22 p.m. ET Jun. 19, 2014), https: www.indystar.com story news crime 2014 06 19 boone-county-sheriff-resigns-amid-prostitution-probe 11015867 (last updated 1:20 p.m. ET Jun. 20, 2014) https: perma.cc K55D- 7UY .

120. Declaration of Massad Ayoob in Support of Motion for Preliminary In unction 19 22, at 7 8, S.F. eteran Police Officers Ass n v. City and Cty. of S.F., No. 13-C -13-5351 (N.D. Cal. 2014).

Electronic copy available at: https://ssrn.com/abstract=3466567

impair the ability of peaceable citi ens to defend themselves.[121] Ayoob explains:

> The homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally do not permit gathering multiple firearms or maga ines. Ideally, one hand would be occupied with the handgun itself, and the other, with a telephone to call the police. And, assuming they even had time for a maga ine change, most people do not sleep wearing clothing that would allow them to stow spare maga ines, etc. on their person. They would have only what was in the gun   The virtuous citi en, . . . cannot practically be expected to have accessible that many guns or that much ammunition at a moment s notice. The victimi ed citi en is the one who is, therefore, most deleteriously impacted by the maga ine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.[122, 123]

---

121. *Id.*    17 23, at 6 8.
122. *Id.*    19-22.
123.   un control advocates sometimes assert that 10 rounds ought to be enough to repel an attacker (for example, see Stephen King, *supra* note 41:   i f you can t kill a burglar with 10 shots, you need to go back to the shooting range. ) However, this is not a valid assumption. As shown by Marshall and Sanow, *post*, it often requires multiple rounds to stop an attacker. This is especially true where there are multiple assailants, and in such cases 10 rounds may not be nearly sufficient. *See* Stefani Okolie, *post*, reporting on a home invasion where  do ens of shots were fired  by home owner to repel five home invaders. *See also* the case of Susan   on ale   and her husband, reported by Masaad Ayoob, who were confronted by two home invaders. Mrs.   on ale  was armed with a Ruger 9mm pistol   designed to hold fifteen cartridges in the maga ine and one more in the firing chamber,  but which due to legal restrictions was loaded with a 10 round maga ine.  By the time she had expended 10 rounds, she had gravely in ured one attacker but the other was unhit; he disarmed her and stole the couple s vehicle in which both suspects fled, leaving Mrs.   on ale  and her husband lucky to be alive. Declaration of Massad Ayoob in Support of Motion for Preliminary In unction, San Francisco   eteran Police OfficersAss n , et al., v. The City and County of San Francisco, et al., U.S. District Court for the Northern District of California, San Francisco Division, Case No. 13-C  -13-5351, Document 17, filed December 27th, 2013, paragraphs 5   9.

Electronic copy available at: https://ssrn.com/abstract=3466567

ary Kleck confirmed Sheriff Campbell s results.[124] In a 2016 study, Kleck reviewed 24 mass shootings in which the shooter s effective rate of fire could be ascertained.[125] In the mass shooting events he analy ed, the average rate of fire was slower than the time needed to change maga ines.[126] Therefore, the changing of maga ines did not reduce the attackers  net effective rate of fire at all.[127]

Criminal assaults and military combat are not equivalent phenomena. Nonetheless, the law abiding citi en that hopes to cope successfully with a criminal attack can learn something from the American infantrymen who successfully coped with their own enemies in Italy, as noted by the staff of the 15th Army  roup in the Italian Theater during the Second World War:  It was shown repeatedly that units which pressed their attack vigorously suffered far fewer casualties and were more uniformly successful than those which hesitated or stopped when fired upon. [128]

It is here that a semi-automatic firearm equipped with a so-called  high capacity  maga ine becomes essential to a peaceable citi en defending himself. These tools enable a law-abiding citi en to respond vigorously to his attacker with equal or greater force than the attacker has brought to bear. This gives the citi en the chance to wrest the initiative back away from the criminal assailant.

### III  AR    RIFLES ARE COMMONLY USED FOR LAWFUL PURPOSES

So-called  assault  weapons and  high capacity  maga ines are not necessary to execute mass shootings.[129] Christopher Koper s findings indicate that so-called  assault weapons  are used in as few as 18% and as many as 57% of mass shooting incidents.[130] Therefore, many of these attacks are carried out with other firearms.[131] For example, shotguns were

---

124. Kleck, *supra* note 116.

125. *Id.*

126. *Id.*

127. Kleck, *supra* note 116, at 44.

128.   -3 SECTION HEAD  UARTERS 15 ARMY   RP., IT., *supra* note 75.

129. *See* Matthew Larosiere, *Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions*, LE  AL POL Y BULL., No. 3, July 17, 2018, at 8, 10 (arguing that, because mass shooters plan ahead, they can execute their murderous motivations using any weapon of choice).

130. Christopher S. Koper, et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, J. URB. HEALTH 313, 317  18, tbl.2 (2018).

131. Statista Research Dep t, *Weapon Types Used in Mass Shootings in the United States Between 1982 and February 2020*, STATISTA (May 4, 2020),

Electronic copy available at: https://ssrn.com/abstract=3466567

used in the Washington Navy Yard and Annapolis    a ette attacks.[132] Additionally, firearms are not the only weapons by which a spree killing can be executed. In Eighteenth and Nineteenth Century Malay culture, men would suddenly embark upon mass killing sprees, armed only with edged weapons.[133] This was known as the *amok* phenomenon.[134]

Not only are American gun owners confronted with a flood of false and deceptive information about the AR-15 from the gun control lobby, but they are also sub ect to a veritable gaslighting campaign.[135]  un control advocates such as Senator Diane Feinstein claim that the AR-15 is not commonly used for lawful purposes.[136] The AR-15 is only the *latest* target of this kind of advocacy. As Kleck has observed:

> many gun law proponents have narrowed their political efforts, targeting specific types of guns, which they argue are  good for only one thing  to kill.  These proponents differentiate  good  (or at least not-so-bad) types of guns, like the old family deer rifle, from  bad  types of guns. At various times, the especially dangerous,  bad  subcategory has been (1) handguns, (2) the cheap, small handguns known as  Saturday Night Specials,  (3) so-called  assault rifles,  (4) machine guns, and (5) plastic guns. Proponents argue that these weapons are only useful for committing crimes, and sometimes even imply that they are never used

---

https:  www.statista.com statistics 476409 mass-shootings-in-the-us-by-weapon-types-used   https:  perma.cc A454-H    5 .

132. JOHN M. RICHARDSON, DEP T OF THE NA Y, REPORT OF THE IN ESTI ATION INTO THE FATAL SHOOTIN  INCIDENT AT THE WASHIN TON NA Y YARD ON SEPTEMBER 16, 2013 AND ASSOCIATED SECURITY, PERSONNEL, AND CONTRACTIN  POLICIES AND PRACTICES 2, 40 (Nov. 8, 2013); Chase Cook, *Man Charged in Capital Gazette Shooting Asks for Time to Consider Insanity Plea*, CAPITAL  A ETTE (Aug. 15, 2018), https:  www.capitalga ette.com news crime ac -cn-ramos-plea-0816-story.html  https:  perma.cc    Y5-P5H9 .

133. JOHN C. SPORE, RUNNIN  AMOK: AN HISTORICAL IN UIRY (Ohio Univ. Ctr. for Int l Studies, 1988).

134. *Id.*

135. *See* Emily Miller, *Here Are the 5 Worst "Fake News" Reports on Guns in 2017*, THE DAILY SI NAL (Dec. 28, 2017), https:  www.dailysignal.com 2017 12 28 5-worst-fake-news-reports-guns-2017  https:  perma.cc    2 -N 25 ; David Stit , *"Gaslighting" and Gun Control*, THE INTELLI ENCER (Apr. 26, 2013, 12:15 A.M.), https:  www.theintell.com 88082ef6-f221-50cc-8f60-d2f9a51d2841. html  https:  perma.cc K7SM-JW9H .

136. Stephanie Mencimer, *Kavanaugh Defends Opinion That Assault Weapons Are "Common" and Can't Be Banned*, MOTHER JONES (Sept. 5, 2018), https:  www.mother ones.com politics 2018 09 kavanaugh-defends-opinion-that-assault-weapons-are-common-and-cant-be-banned    https:  perma.cc RH  2-37YT (this page contains a tweet and video clip).

Electronic copy available at: https://ssrn.com/abstract=3466567

for any legitimate purposes. Because the guns have no legitimate purposes, it is argued, there can be no ob ection to outlawing them.[137]

These claims are demonstrably false, as Ronald Turk, Associate Deputy Director (Chief Operating Officer) of the ATF, admitted in 2017:

> Since the sunset of the Assault Weapons ban in 2004, the use of AR-15s, AK-style, and similar rifles now commonly referred to as  modern sporting rifles  has increased exponentially in sport shooting. These firearm types are now standard for hunting activities. ATF could re-examine its almost 20-year-old study to bring it up to date with the sport shooting landscape of today, which is vastly different than what it was years ago. Action shooting sports and organi ations such as 3  un and the United States Practical Shooting Association (USPSA) have also drastically expanded in recent years. Restriction on imports serves questionable public safety interests, as these rifles are already generally legally available for manufacture and ownership in the United States.[138]

The AR-15 is the most popular rifle for competition shooting and is thoroughly integrated into competition shooting,[139] including Civilian Marksmanship Program and National Rifle Association Service Rifle and High Power competitions;[140] United States Practical Shooting Association

---

137. KLECK, *supra* note 38, at 14.

138. RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND E PLOSI ES (ATF), OPTIONS TO REDUCE OR MODIFY FIREARMS RE ULATION, 5 (Jan. 20, 2017).

139. It is not merely integrated into formal shooting competitions, but into the very fabric of recreational shooting. As my own observations show, the vast ma ority of rifles appearing at ranges for target shooting are AR-15s.

140. *See* NRA HI H POWER RIFLE RULES, 7 8 (Nat l Rifle Ass n of Am., 2020); CMP HI HPOWER RIFLE COMPETITION RULES, 33 36 (Civilian Marksmanship Program, 23d ed. 2019); Frank Melloni, *Intro to Service Rifle,* NRA SHOOTIN  SPORTS USA (June 5, 2019), https: www.ssusa.org articles 2019 6 5 intro-to-service-rifle  https: perma.cc 29FJ-LW  2 ; SUSSA Staff, *supra* note 135; Serena Juchnowski, *Why Shoot High Power Service Rifle?* NRA SHOOTIN  SPORTS USA (Nov. 19, 2018), https: www.ssusa.org articles 2018 11 19 why-shoot-high-power-service-rifle  https: perma.cc 4 5M-LSJ3 ; Dennis Santiago, *What You Need to Know About High Power Rifle Competition*, NRA SHOOTIN  SPORTS USA (Sept. 18, 2018), https: www.ssusa.org articles 2018 9 18 what-you-need-to-know-about-high-power-rifle-competition  https: perma.cc SJ3B-6KN5 .; *See* SUSSA Staff, *10 Essential Items You Need to Get Started in High Power Rifle*, NRA SHOOTIN  SPORTS USA (Sept. 20, 2017), https: www.ssusa.org

Electronic copy available at: https://ssrn.com/abstract=3466567

competitions;[141] and Three  un competitions.[142]    At the Three  un
competition, competitors shoot with pistol, shotgun, and rifle in the same
course.[143]

An unarmed person can be incapacitated or killed with relative ease
with nearly any improvised weapon that comes to hand; because humans
are relatively fragile compared to game animals, this tells us virtually
nothing about hunting, one of the archetypal American firearms activities.
Critici ing the methods used by Colonel Louis A. La arde in his classic
1914 study, *Gunshot Injuries* ,[144] Evan P. Marshall and Edwin J. Sanow
observed in 1992 that  steers are much harder to kill than humans, so
applying the results of shooting animals to how particular handgun loads
would work against humans was a hopeless task. [145] Because wild animals
are physically much more agile and robust than human beings, choice of
firearm is much more important when hunting wild game than when
committing violent crime against people.[146] As Montana hunting and
fishing guide Norman Strung explained in 1973:

---

articles 2017 9 20 10-essential-items-you-need-to-get-started-in-high-power-rifle
https: perma.cc 2RN6-SDEA  (photo caption).

141. *See* Jake Martens, *The JP Enterprises PCC [Pistol Caliber Carbine]
Midwest Championship*, 35 USPSA: THE OFFICIAL J. OF THE U.S. PRACTICAL
SHOOTIN  ASS N. STARTIN  PA  E NO., 40-42 (2019).

142. *See* Jeff Johnston and Phil Bour aily, *The Beginner's Guide to 3-Gun
Competition*, FIELD & STREAM (Sept. 30, 2019), https: www.fieldandstream.com
beginners-guide-3-gun-competition  https: perma.cc 4AMT-6LMS .

143. *See, e.g.*, John B. Holbrook, II, John Wick 3-  un, USPCA Maga ine,
July Aug. 2019, at 56; Aaron Bright, Review: A Couple of Carbines from Palmetto
State Armory, USPCA Maga ine, July Aug. 2019, at 42; Troy McManus, Cochin in
Steel Challenge, USPCA Maga ine, July Aug. 2019, at 9; Manny Bragg and Carole
Bryant, The   lock 2018 Area 6 Championship, Frontsight, July Aug. 2018, at 11;
Jessica Niet el, Multigun Nationals: What a Blast, Frontsight, July Aug. 2018, at
16, 18, 20, 22; Kristine Hayes, The Science of Competition: Is Knowing How to
Fail the Secret to Winning  Frontsight, July Aug. 2017, at 18; Cora Maglaya, 2017
USPSA Armscor Rock Island Multigun National Championship, Frontsight,
July Aug. 2017, at 22. *See also* Frontsight, July Aug. 1989; Frontsight, Mar. Apr.
1990; Frontsight, September October 1991; Frontsight, July Aug. 2001; Frontsight,
July Aug. 2002; Frontsight, Mar. Apr. 2010; Frontsight, Nov. Dec. 2010;
Frontsight, Sept. Oct. 2014; Frontsight, July Aug. 2015; Frontsight, July Aug. 2016;
Frontsight, May June 2017; Frontsight, July Aug. 2017; Frontsight, July Aug. 2018
(covers).

144. LOUIS A. LA  ARDE,   UNSHOT INJURIES: HOW THEY ARE INFLICTED,
THEIR COMPLICATIONS AND TREATMENT. 43 (William Wood & Co., 2d ed. 1916).
Le  arde used animals and cadavers to evaluate the lethality of various handgun
calibers and loads.

145. E  AN P. MARSHALL & EDWIN J. SANOW, HAND  UN STOPPIN  POWER:
THE DEFINITI  E STUDY 13 (Paladin Press, 1992).

146. *See* Will Drabold, *Here Are 7 Animals Hunters Kill Using an AR-15*,
TIME (July 6, 2016, 12:13 P.M.), https: time.com 4390506 gun-control-ar-15-

---

Electronic copy available at: https://ssrn.com/abstract=3466567

> t hat kind of country you are hunting in should be the determining factor in your choice of a rifle rather than the species you are hunting or the si e of your quarry. This is true of the caliber, the type of sight to use, and the action of the weapon.[147]

On the other hand, nearly any firearm will suffice in the hands of a criminal to kill as many people as he wants.[148] Contrary to the perceptions of some, semi-automatic rifles have long been recogni ed as superior hunting instruments in appropriate settings. Strung notes,

> Actions include bolt, lever, pump, and  semi automatic. Because of the sudden snap-shot nature of hunting deer in brushy country, the bolt action is the least desirable for this situation. . . . I also find this problem with the lever actions     Personally, I favor the  semi auto in the woodlands     I find being able to squee e off four fast shots     a real advantage.[149]

As AR-15 has become more popular generally, it has also become increasingly popular as a hunting platform.[150] In fact, Colt marketed the AR-15 as a  superb hunting partner  when it introduced the rifle to the civilian market in 1964.[151] *Time* recently profiled several hunters who use the AR-15 in various calibers to hunt everything from  ackrabbits to elk,[152] and *AR15Hunter.com* describes the use of the AR-15 as a hunting implement.[153] The AR-15 and other semi-automatic carbines are also increasingly the firearm of choice for many as a home defense weapon.[154]

---

semiautomatic-rifles     https: perma.cc UJF8-28     (recogni ing various gun choices to be used for hunting different wild animals and noting the agility of coyotes and the robust nature of boars).

147. STRUN  , *supra* note 31, at 168 69.

148. *See* Larosiere, *supra* note 129 (arguing that a murderer may use any firearm to kill).

149. *Id.* at 174.

150. *See* Drabold, *supra* note 146.

151. *American Rifleman*, Apr. 1964.

152. Drabold, *supra* note 146.

153. *About AR15 Hunter*, AR15 HUNTER (July 22, 2014, 8:26 P.M.), http: ar15hunter.com about-us  https: perma.cc PMJ9-3  L  .

154. Larosiere, *supra* note 129, at 12; Jim Wilson, *AR-15 Rifles for Home Defense?  Yes!* NRA FAMILY (June 13, 2019), https: www.nrafamily.org articles 2019 6 13 ar-15-rifles-for-home-defense-yes  https: perma.cc  499-DRU 8 .

Electronic copy available at: https://ssrn.com/abstract=3466567

For example, a resident used his semi-automatic AK-47 to repel five armed home invaders in a Houston incident in January 2019.[155]

un control advocates have mounted an effective disinformation campaign against the AR-15 by inaccurately stigmati ing it as a tool of warfare and crime, while ignoring the true basis of its popularity.[156] The true basis is that it is an extremely well-designed rifle readily mastered by shooters of all shapes, si es, and skill levels, and is easily adapted to all manner of legitimate shooting applications.[157] The gun control lobby has very effectively built public and political support for their position but at a steep cost.[158] In relying upon such false claims and misleading tactics, they have badly provoked many responsible American gun owners, aborting any reasoned discussion of the problem of gun violence in the process.

## I    A FINAL O STACLE  THE POTENTIAL FOR A USE

It is not merely the divisive tactics of the gun control movement that put gun owners on their guard about red flag laws. There are also real concerns about the potential for error and abuse in the implementation of such laws.[159] As Dave Workman of the Second Amendment Foundation has said,  It s a great idea on paper . . . . The problem is execution. [160] A dramatic example of  ust how red flag laws can go wrong in the  execution  is the case of  ary Willis. He was killed by Maryland police in Anne Arundel County after the police arrived at his home, shortly after 5:00 in the morning on November 5, 2018, to execute an *ex parte*  extreme risk protective order  (ERPO).[161] This order was issued at the request of his sister following a dispute over the care of their mother.[162] While it can be

---

155. Stefania Okolie, *5 Shot and 3 Killed After Homeowner Opens Fire on Suspects in East Houston*, ABC EYEWITNESS NEWS (Jan. 20, 2019), https: abc13.com 5-shot-and-3-dead-after-home-invasion-in-east-houston 509701 5  https: perma.cc F  43-63AP .

156. *See* KLECK, *supra* note 38, at 73; David B. Kopel, *Trust the People: The Case Against Gun Control*, 3 J. ON FIREARMS AND PUB. POL Y, 77, 77  78 (1990); Larosiere, *supra* note 129, at 5.

157. *See* Jon Schuppe, *America's Rifle: Why So Many People Love the AR-15*, NBC NEWS (Feb. 15, 2018, 7:08 A.M.), https: www.nbcnews.com news us-news america-s-rifle-why-so-many-people-love-ar-15-n831171  https: perma.cc 2CM -2BBA .

158. *See* David B. Kopel, *The Costs and Consequences of Gun Control*, POL Y ANALYSIS NO. 784 (Dec. 1, 2015), https: www.cato.org publications policy-analysis costs-consequences-gun-control  https: perma.cc 2WS8-  PF .

159. *See generally* Jacob Sullum, *States Are Depriving Innocent People of Their Second Amendment Rights*, REASON, Nov. 1991, at 47 51 (providing a concise overview of these concerns).

160. *Id.* at 51.

161. *Id.* at 47.

162. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

222                        *BELMONT LAW REVIEW*                        ol. 8: 191

fairly said that Mr. Willis contributed to this tragic outcome by his ill-
 udged obstinate behavior in response to the police attempt to enforce the
order, there would also seem to be some doubt as to whether an ERPO was
appropriate in the first place. According to family, Mr. Willis  wasn t
dangerous,  ust strongly opinionated. [163] His niece said that Mr. Willis
 like d  to speak his mind  but that he  wouldn t hurt anybody. [164] She
added that the incident had left her  ust dumbfounded now  and that the
police  didn t need to do what they did. [165] However, for the Anne Arundel
County Police Chief Timothy Altomare, the ambiguity of the situation
served more to  ustify than to cast doubt on the validity of the EPRO.
Altomare stated that  i f you look at this morning s outcome, it s tough for
us to say  Well, what did we prevent        b ecause we don t know what
we prevented or could ve prevented. What would ve happened if we didn t
go there at 5 a.m. [166] In response, *Reason*'s Jacob Sullum tartly observed
that  w ell, for one thing,  ary Willis probably would still be alive. [167]

     Also impeding real dialogue is a concern over other types of
potential government abuse of which gun owners are aware. One such is
eminent domain abuse. This was dramatically brought to the public s
consciousness by the Supreme Court s notorious holding in *Kelo v. City of
New London*,[168] dramati ed in the film *Little Pink House*.[169] Another is civil
asset forfeiture abuse, recently addressed by the U.S. Supreme Court in
*Timbs v. Indiana*.[170] Here, the Court held for the first time that the Eighth
Amendment s Excessive Fines clause is incorporated against the States via
the Fourteenth Amendment.[171] In this case, Tyson Timbs was convicted of
selling about  260 worth of heroine.[172] In addition to the sentence of one
year of home detention and five years  probation imposed by the trial court,
the State also sei ed his  40,000 SU  .[173] Philadelphia[174] and Chicago[175]

_____

    163. *Id.*

    164. *Id.*

    165. *Id.*

    166. Phil Davis, *Anne Arundel Police Chief: Shooting Was Evidence That
Month-Old "Red Flag" Law Is Needed*, TCA RE  L NEWS, Nov. 6, 2018.

    167. Sullum, *supra* note 159, at 47.

    168. Kelo v. City of New London, 545 U.S. 469 (2005) (holding that an
interpretation of  public use  may be broadened to  public purpose  within the
meaning of the Takings Clause).

    169. LITTLE PINK HOUSE (Korchula Productions 2017).

    170. Timbs v. Indiana, 586 S. Ct. 682, 684  87 (2019).

    171. *Id.* at 685  87.

    172. Kellie Hwang, *An Indiana Man Was Caught With $260 of Heroin. The
State Took His $42,000 Land Rover*, INDYSTAR (Nov. 30, 2018, 11:44 A.M.),
https:  www.indystar.com story news 2018 11 30 civil-forfeiture-timbs-v-indiana-
scotus-supreme-court 2148377002  https:  perma.cc   56S-9YFS .

    173. *Timbs*, 586 S. Ct. at 686.

    174. *See* DICK M. CARPENTER II, ET AL., INST. FOR JUST., POLICIN   FOR
PROFIT: THE ABUSE OF CI  IL ASSET FORFEITURE 19 (2d ed. Nov. 2015).

Electronic copy available at: https://ssrn.com/abstract=3466567

have implemented even more kafkaesque forfeiture regimes.  iven some municipalities  callous disregard of their citi ens  property rights, it is hardly inconceivable that states and municipalities, hostile to gun ownership, might abuse the power vested in them under red flag laws to harass law abiding gun owners and relieve them of their firearms, if only temporarily.[176]

## CONCLUSION

In warfare,  t reachery or  p erfidy  acts such as  feign ing surrender  or falsely  broadcast ing  to the enemy that an armistice has been agreed upon  are forbidden because they destroy  the basis for a restoration of the peace short of the complete annihilation of one belligerent by another. [177] The pro and anti-gun movements are not literally at war, of course.  Nonetheless,  the  gun  control  movement s  rhetoric mischaracteri ing the nature and capabilities of the AR-15; constantly shifting targets as to which guns are  bad  and merit proscription and which may be tolerated in private hands; and repeated, bra en insistence, against all evidence to the contrary, that the AR-15 neither has legitimate use nor is commonly used for any purposes but combat and mass murder  has gravely impeded constructive discourse on the question. The rhetorical excesses of gun control advocates have  destroy ed  the basis for [178] real, effective discussions about how to curb gun violence by convincing gun owners that the gun control lobby s true ob ectives are the total annihilation of America s firearms tradition and the *de facto*, if not *de jure*, repeal of the Second Amendment, and that any proposals that may be enacted will be  ust one more click on the implacable ratchet toward their goal of obliterating gun rights altogether.

Even worse is the impact that these false arguments have on members of the gun control movement itself. In focusing on certain weapons like the AR-15 as particularly  bad  compared to other firearms,

---

175. *See* Inst. for Justice, Chicago Impound: The Windy City Tows the Cars of Innocent People and Holds Them for Ransom, https:  i .org utility case-print  case-name 123791  https: perma.cc KUP8-HB6C ; John Pearley Huffman, *An Inside Look at Chicago's Seedy Car-Impound Netherworld*, CAR AND DRI ER (Aug. 25, 2019), https: www.caranddriver.com features a28776512 impounded-cars-chicago
  mkt_tok eyJpI oiTm1  MU1Ea RN  1  pT1R MiIsIn iOiJCUHN  kd T2JBa
  FC  lFlamNDc3JpMTNPWFBteForMU  d JoM  BSc  tWn  6c1RadUxySHA
  1RFdHa  4xR1wvSWtma  wvMUJmc0xsWHdl  FBcL1FiY  RlYTNwUFJm  dn
  U FNUkJMT  kwMDM3ekI  U1peStnNm5YWW5IYT  Rc0liaSJ9
  https:  perma.cc 6JL6-FW7A .

176. *See generally* CARPENTER II, ET AL., *supra* note 174, at 2  3 (providing an overview of the problem of civil asset forfeiture abuse).

177. DEP T OF THE ARMY, THE LAW OF LAND WARFARE 22 (July 1956).

178. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3466567

224                          *BELMONT LAW REVIEW*                    ol. 8: 191

the gun control movement has inculcated in its supporters the unrealistic belief that if only these particularly wicked firearms were eliminated, the problem of gun violence would be greatly reduced. This, in turn, has the effect of relieving states, municipalities, and the Federal overnment of the expensive, tedious, and time-consuming work that might really prevent some of these tragedies. As Kevin Williamson noted,

> What s missing is ordinary, unglamorous, labor-intensive law-enforcement and public-health work    We complain about straw buyers but rarely prosecute them; some federal prosecutors refuse as a matter of publicly stated policy to take a straw-buyer case unless it is part of a larger (sexier) organi ed-crime investigation.    On and on it goes: Ordinary crime and ordinary criminals, ordinary bureaucratic failure, and the occasional act of armed histrionics to keep the headlines churning.[179]

One of my favorite books as a youth was written by Soviet defector ladimir Bogdanovich Re u, writing pseudonymously as ictor Suvorov.[180] This book, *Inside the Soviet Army*, contains a very important leadership lesson that any soldier must learn: a fter some time you will come to understand the most important rules of all, one which you have never been taught respect your soldiers. [181] However, the real point is what he adds a few lines later: that respecting your soldiers means more than ust showing them respect. [182] A commander respects his soldiers by s how ing that he care s about them by meeting their needs whenever possible and by c onsider ing them as men with problems, hopes, and feelings ust like himself . [183] What relevance do these observations have for the debate over firearms in America Only this: in the aftermath of *District of Columbia v. Heller*,[184] gun control activists have been forced to

---

179. Kevin D. Williamson, *How to Spot a Serious Gun-Crime Proposal*, NAT L RE . (Sept. 3, 2019, 2:43 P.M.), https: www.nationalreview.com 2019 09 how-to-spot-a-serious-gun-crime-proposal https: perma.cc 2AM -4 N .

180. Luke Harding, *Will They Forgive Me? No": Ex-Soviet Spy Viktor Suvorov Speaks Out*, THE UARDIAN (Dec. 29, 2018), https: www.the guardian.com world 2018 dec 29 ex-soviet-spy-viktor-suvorov https: perma.cc 6 RYA-ABB4 .

181. IKTOR SU ORO , INSIDE THE SO IET ARMY 257 (Macmillan Publ g Co., Inc., 1982).

182. *Id.* at 257 58.

183. DANDRID E M. MALONE, SMALL UNIT LEADERSHIP: A COMMONSENSE APPROACH 33 (Presidio Press, 1983).

184. District of Columbia v. Heller, 554 U.S. 570, 602, 635 (2008) (holding that the Second Amendment protects an individual s right to keep and bear arms).

**JA6419**

Electronic copy available at: https://ssrn.com/abstract=3466567

pay grudging homage to the individual right to keep and bear arms.[185] However, American gun owners remember the contrary assertions of these same activists: that the Second Amendment did not codify such an *individual* right, but only a collective guarantee intended to  protect members of a state militia from being disarmed by the federal government, [186] and that  the ma ority of Americans **mista enly  elie e** that the Second Amendment of the Constitution guarantees the individual right to keep and bear arms. [187] Just as respecting Suvorov s soldiers meant more than merely treating them with respect,  respecting  the right to keep and bear arms means more than making an empty obeisance to it. Really respecting the right means taking the time to understand the true nature of firearms, developing proposals that are effective in reducing gun violence, and doing so in a way that really respects the rights of peaceable law-abiding gun owners. These have been notably absent on the pro-control side of the debate.[188]

Some gun control activists will never be satisfied until every last privately-owned firearm in the United States has been confiscated. By the same token, some gun rights advocates will never accept any firearms regulations whatsoever. Few people, however, fall into either of these extreme camps. Many gun owners are willing to consider measures that might actually contribute to a reduction in gun violence, as opposed to misguided and pointless proposals such as banning so-called  assault weapons  and  high-capacity  maga ines. Unfortunately, given the acrimony to which the debate over guns has descended, and given the extent to which it has become encumbered by misinformation and error, substantial assurances are needed to bring American gun owners to the table; bland assertions of respect for the Second Amendment will not suffice.

Serious progress on the problem of gun violence, including mass shootings, depends upon acceptance by all parties of certain fundamental principles: (1) the right to keep and bear arms is an individual right, as set forth in *Heller* and *McDonald v. City of Chicago*;[189] (2) the Second Amendment protects the rights of peaceable citi ens to acquire, possess, and use the firearms of their choice, including semi-automatic firearms such as the AR-15 and the maga ines designed for them by their manufacturers; and (3) that real and effective due process protections must be respected

---

185. *See* The Cato Institute, *The Right to Keep and Bear Arms: 10 Years After Heller*, CATO POL Y REP., Sept. Oct. 2018, at 16.

186. PETE SHIELDS,   UNS DON T DIE   PEOPLE DO 55 (Arbor House Publ g Co., 1981).

187. *Assault Weapons and Accessories in America*, *supra* note 43 (emphasis added).

188. *See* Kopel, *supra* note 158 ( Responsible firearms policies . . . do not attempt to infringe the constitutional rights of good persons. ).

189. McDonald v. City of Chicago, 561 U.S. 742, 749  50, 791 (2010).

Electronic copy available at: https://ssrn.com/abstract=3466567

226                    *Belmont Law Review*                    ol. 8: 191

before these rights may be abridged. Affirmation of these basic points by
the United States Supreme Court would clear away much of the detritus
clogging the debate about guns and violence and might facilitate the
implementation of real, practical solutions in a way that has heretofore
evaded us.

Electronic copy available at: https://ssrn.com/abstract=3466567

# EXHIBIT 69

# AMERICAN HOMICIDE

## RANDOLPH ROTH



**JA6423**

RANDOLPH ROTH

# American Homicide

THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England

**JA6424**

Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

First Belknap Press of Harvard University Press paperback edition, 2012

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
    American homicide / Randolph Roth.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 978-0-674-03520-1 (cloth : alk. paper)
    ISBN 978-0-674-06411-9 (pbk.)
    1. Homicide—United States—History.   I. Title.

HV6524.R68 2009
364.1520973—dc22        2009016830

**JA6425**

from property disputes, quarrels, ethnic and religious hatreds, and sexual assaults except the rate at which they occurred. In most cases, the murderers believed their fellow colonists were out to steal their property or had it in for them because of their class, nationality, or faith. The sense that other colonists were adversaries—that society was a war of all against all—put people on their guard and made them reluctant to show weakness under any circumstances. The sense that fellow colonists were adversaries had an even more dangerous impact on men who were deeply alienated or disturbed, like William Schooler and John Stoddard. It gave them license to prey on their neighbors: to take sex, money, or whatever else they wanted from those weaker than they were. Only when colonists came to see one another in a different light—as allies rather than antagonists—would these homicide rates decline.

One of the most telling signs of the wariness and hostility with which men approached one another was the rate at which they killed each other with guns. Colonists were well armed, but, unlike their counterparts in most of Europe, most chose guns over swords or daggers. Probably 60 percent of all households had at least one working gun. Guns were essential tools in the colonies. Men used them to hunt, to control vermin, and to defend themselves against Indians or people of other nationalities. Few men owned handguns; they needed the range and firepower that muskets afforded and the flexibility to fire shot or slugs, depending on the target. Muskets had their limits as murder weapons. They were inaccurate with slugs, impossible to conceal, and difficult to load. But if the would-be murderer had time to prepare his attack or had already loaded his gun for some other purpose, muskets were usually deadly, in no small part because there was no good medical care for the wounds they inflicted. They were the preferred weapons for killing not only Indians but also political rivals, trespassers, and old enemies. Through 1675, 38 percent of homicides among unrelated colonists in New England and New Netherlands were committed with guns; the figure was probably 40 percent in Maryland. Guns were not responsible for violence, which was rife among Europeans everywhere, but their availability may have made that violence more deadly in colonial America.[61]

The homicide problem among colonists was also exacerbated by indentured servitude, which disrupted the social hierarchy more than

CHAPTER 2

# "All Hanging Together"

*The Decline of Homicide in the Colonial Period*

In the final quarter of the seventeenth century the murder rate in the colonies suddenly dropped. The exact timing of the fall in the homicide rate in these years is uncertain because so many court records from the late seventeenth century have been lost, but it appears that between 1675 and 1693 the rate for European adults fell abruptly twice: once after Bacon's Rebellion (1675) and King Philip's War (1675–76) and again in the late 1680s and early 1690s, at the time of the Glorious Revolution in England. The rate remained low by historical and modern standards for nearly eighty years, until the revolutionary crisis of the 1760s and 1770s.

The patterns were very different for African Americans and Native Americans. African Americans were killed by unrelated adults at high rates in the late seventeenth and early eighteenth centuries, when racial slavery replaced indentured servitude as the primary source of bound labor in British North America. Native Americans in New England were killed by unrelated adults at high rates throughout the colonial period, especially between 1720 and 1760.

## European American Homicide

The decline in homicide rates among European Americans was dramatic. In Maryland the rate at which unrelated European adults killed

61

**JA6427**

colonists per year on the eve of the French and Indian War and 6 per 100,000 during the war.[68]

Homicide rates followed a more complex pattern in Pennsylvania, but they, too, ended up low on the eve of the French and Indian War, and they fell to an even lower level during the war (Figure 2.2). The colony, which was settled by Quakers, Moravians, and other pietists in the 1680s and 1690s, initially had a very low homicide rate—around 2 per 100,000 adults per year. That rate was largely due to the stability of the Quaker-dominated government, the pietists' solidarity and commitment to nonviolence, and the absence of a staple crop, which almost eliminated the need for slaves or indentured servants. Most of the inhabitants were also willing to live in peace with Native Americans and to abide by the terms of treaties.[69]

However, the homicide rate surged in Pennsylvania from the late 1710s to the early 1730s, to probably 9 or more per 100,000 adults per year—the rate that had prevailed in New England before King Philip's War. The primary cause was a sudden influx of settlers from northern Ireland, Germany, and elsewhere. The arrival of thousands of non-English and non-Quaker immigrants made Quakers and pietists a minority, and the moral and religious solidarity that had prevailed in the colony was destroyed. Quakers and pietists found this new diversity distressing and felt they had been "invaded." They debated whether newcomers should be granted political rights. Relations between established residents and "foreigners" were tense, as they were among newcomers of different nationalities, and many poor immigrants were profoundly alienated from everyone. Germans killed Irishmen, Scotsmen killed Welshmen, indentured servants killed masters or fellow servants, and criminal gangs committed robbery murders. Quakers and other pietists did not themselves become homicidal, but beyond the bounds of their communities Pennsylvania became more so, repeating the pattern that took hold in New England in the mid-seventeenth century, when the society outside the Puritan community became more homicidal.[70]

Matters were made worse in Pennsylvania by an economic recession caused by an act of Parliament that prescribed a uniform rate of exchange for foreign coins to prevent tampering. Pennsylvania obeyed the new law, thanks to the influence of the Penn family and of Philadelphia's Quaker merchants, who were currying favor with the royal

had governed with a
led to a brutal struggle
le in 1789 until 1802,
establishing a dicta-
ably ranged from 30
southern, and western
weak and citizens were
The homicide prob-
Paris, where the post-
But the actual homi-
to have been 40 per
cent and newspaper ac-

experience a dramatic
In England and in Swe-
cies are available, homi-
the 1830s. According to
appear to have doubled
rose to 20 per 100,000
elite crushed an upris-
es to the lower house
and political equality for
30 per 100,000 adults
authoritarian govern-
Canada, where politi-
of 1837, but they in-
ish in government, and

United States did not
counties studied inten-
over the Revolution di-
other words, homicide
between Tories and re-
armies—was most in-
City and Philadelphia,
from southwestern Vir-
reached seventeenth-
and order broke down,

and neighbor turned against neighbor. For most white Americans, the Revolution was profoundly disruptive and divisive, but in those areas it was a genuine civil war. The criminal justice system disbanded or became the partisan tool of whoever was in power locally. Vigilante and revenge killings ensued, some motivated by politics, some not. As in revolutionary France, the proliferation of politically charged homicides was matched by an increase in garden-variety homicides as individuals adopted the same hostile and predatory attitudes toward their neighbors that political partisans showed toward their opponents. The extremely high homicide rates persisted until the end of the War of 1812, when they finally returned to the levels that prevailed in the rest of the nation.

Homicide rates doubled even in places where the struggle for power between Tories and rebels was intermittent or short-lived and the criminal justice system remained effective, like New England and the Chesapeake. In colonies that experienced political violence during the imperial crisis of the 1760s and early 1770s, like Pennsylvania, Massachusetts, and North Carolina, the increase in homicide began before the Revolution as the withering of British patriotism and the erosion of loyalty to the governments imposed upon the colonies by the crown undermined the fellow feeling that had kept homicide in check since the late seventeenth century. And in most communities within those colonies, the revolutionary movement was too divisive for solidarity to be reestablished while the outcome of the Revolution remained in doubt. But in places like the Shenandoah Valley of Virginia, where the Revolution won broad support and caused little disruption, the homicide rate among unrelated white adults continued to fall in the late eighteenth century. Homicide rates also continued to fall for African Americans in the South and in New England. Blacks were less likely to be murdered by whites and by one another, in large part because of the vitality of the antislavery movement, which freed many slaves and increased humanitarian regard for blacks. The movement also forged greater solidarity among blacks and gave them hope for a better future.

Wherever government broke down, political, robbery, and revenge homicides proliferated. The political upheaval undermined existing loyalties and institutions and made people from all walks of life more impatient with legal and economic restraints and more sensitive to

personal slights. Ordinary men were suddenly more likely to kill to defend their reputations, property, or rights. Public men—politicians, military officers, attorneys, and newspaper editors—were particularly vulnerable to the Revolution's disruptive effects. In a republic that had yet to develop strong parties or political institutions, they were at the mercy of public opinion, and a surprising number of them died trying to defend their honor in duels.

The American Revolution might have had an even worse effect on the homicide rate if it had created a long-lasting economic crisis or a deep-seated disruption of the social hierarchy. Life was difficult for the poor in America's largest cities—Boston, New York, and Philadelphia—and the urban poor were especially restive and violent in the late eighteenth century.[3] But in small towns and in the countryside, most people were still able to form households and to buy their own shops or farms, thanks to the British victory in the French and Indian War, which had opened vast tracts of land to settlement. African Americans everywhere looked forward to new opportunities because of the decline of slavery. In the slaveholding South, revolutionary ideas would challenge the social hierarchy and lead to a permanent increase in homicides there, but almost everywhere else the Revolution's impact on homicide was confined to the years between 1764 and 1790, when government broke down and fellow feeling declined.

The increase in all kinds of homicides among unrelated adults began the moment conflict between colonists and the government turned violent. Homicide rates rose in Pennsylvania, North Carolina, and South Carolina after revolts broke out in the backcountry in the 1760s over Indian policy, land policy, and the failure to grant newly settled counties adequate representation in colonial assemblies (Figure 2.2). The turning point in New England was 1770, the year of the Boston Massacre (Figure 1.2). In the Chesapeake politics remained nonhomicidal until 1775, when fighting broke out between loyalist and patriot forces (Figure 1.3). Many of the homicides that occurred were political or war-related. In southern New England and the Chesapeake, where the homicide rate for whites doubled, such homicides were probably responsible for a third of the increase in the 1770s and early 1780s. On the Vermont frontier and in the southern and western backcountry, political homicides were responsible for more than half the increase.[4]

ers Barnett and Nicholas Davenport worked as farm laborers for a wealthy couple. One day they clubbed the couple to death, killed their three young grandchildren, looted their house, and set it on fire. Such cold-blooded murders, which had all but disappeared from New England after King Philip's War and from the Chesapeake after Bacon's Rebellion, reappeared once the revolutionary crisis began. Gun violence, where it can be measured, was also more common. In New England the proportion of political and nonpolitical homicides committed with guns rose from 13 percent before the Revolution to 52 percent.[20] The increase suggests that more of these homicides were premeditated.

Retaliatory and vigilante murders also increased, at least among whites. Occasionally these murders occurred among criminals. In 1779 Younger Hardwick apparently killed fellow gang member Erasmus Whitworth in Amelia County, Virginia, because Whitworth had stolen part of Hardwick's share of the loot. But most perpetrators and victims were law-abiding citizens. In Albemarle County, Virginia, a local man stepped into a tavern and imprudently told a table of "gamesters" that he had just collected a debt. When he left, one of the gamblers sneaked out after him. Several men took note and followed the gambler. They found their neighbor dead, his throat cut and his money gone. They tracked the gambler to a canebrake where he was washing blood from his hands and hanged him on the spot.[21]

Pennsylvania suffered a rash of deadly brawls and robberies from the mid-1760s into the early 1790s, most of which occurred among strangers. Travelers were waylaid, sailors stabbed, and merchants terrorized by a floating population of former soldiers, runaway servants, gang members, and war refugees, who had no qualms about cutting throats to steal whatever they could. But even for law-abiding citizens, the violent ways learned during the Revolution died hard. John Lacey was a fervent patriot from Bucks County who had once ordered his men to shoot on sight any farmer caught trading with the enemy in Philadelphia. After the war he got into a business dispute with a man named Joel Cooke, who he thought was trying to defraud him. Lacey shot Cooke dead behind a Quaker meetinghouse.[22]

Revenge homicides, robbery homicides, political homicides, and vigilante homicides had always been common on contested frontiers, where no government or coalition of governments could gain the up-

country, where it took decades to create strong, stable govern-
ments and where men created their own justice by killing people who
wronged them. From the Georgia Piedmont to the Ohio River Valley,
homicide rates were extremely high from the mid-1760s through the
War of 1812. Rates of 25 to 30 per 100,000 per year were common for
white adults in areas where county governments had been established
(Figures 4.1 and 4.2). In the backcountry, where settlers and Indians
(and the Spanish and British) were still fighting for control, rates
probably reached 200 or more per 100,000. Those numbers had not
been seen since the early seventeenth century.

Like previous frontiers that were politically unstable and lacked
strong institutions that could uphold law and order, the revolutionary
backcountry was plagued by vigilantism, revenge murders, political
murders, systematic violence by criminal gangs, and campaigns against
peaceable Native Americans who did not move on after they were de-
feated militarily. During the Revolution more backcountry whites took
the law into their own hands and killed to advance their interests or
defend their rights, lives, and property. This pattern would reappear
later in Florida, the Southwest Territory, the lower Mississippi Valley,
Texas, and California.



**Figure 4.1** Homicide rate in plantation counties in Georgia, 1790–1900 (per
100,000 adults per year). Franklin, Jasper, and Wilkes Counties.

assassinations and duels among public men reappeared. This constant political turmoil, with ideologues of all stripes warring over what form the government should take, was accompanied by an elevated homicide rate among unrelated adults. By World War I, France's homicide rate was double the rates in more politically stable and unified nations such as England, Wales, Sweden, and Norway.[3]

It was at this time that homicide rates in the United States truly diverged from rates elsewhere in the Western world. In the late 1840s and 1850s they exploded across the nation, not only in the plantation South and the Southwest, where higher rates already prevailed, but also in the mountain South and the North, which had previously had extremely low rates. The least homicidal places in the Western world suddenly became the most homicidal. By the end of the Civil War, homicide rates among unrelated adults were substantially higher in the North than in Canada or western Europe, and higher still by one or two orders of magnitude in the South and Southwest. All kinds of homicide increased: robbery murders, rape murders, and killings over insults, bar tabs, card games, property disputes, and small debts. Ethnically and racially motivated murders increased, as did murders in the workplace and along the nation's roads, railroads, and waterways. Everywhere and under all sorts of circumstances, Americans, especially men, were more willing to kill friends, acquaintances, and strangers.

Immigration, economic hardship, and the conquest of areas populated by Hispanic and Native peoples contributed to the rise in homicide in the late 1840s and 1850s. Irish, French Canadian, German, and Chinese immigrants were well represented both as victims and as perpetrators wherever substantial numbers of them worked as unskilled laborers; and Hispanic and Native peoples in the trans-Mississippi West saw their homicide rates rise because of dispossession, demoralization, and victimization by white settlers. Yet homicide rates also surged among native-born Protestants, and in most areas of the country their rates rose as quickly as those of immigrants or ethnic minorities.[4] Many native-born workers, particularly African Americans, saw their standard of living decline in cities around the nation as masses of immigrants flooded into the country from Ireland, Germany, and French Canada. But native-born murder rates continued to climb even in ru-

Confederates. They killed blacks, white Republicans, and one another at an alarming rate. They were responsible for the great disparity between the rates at which blacks and whites committed murder in Republican-governed states. In rural Louisiana, for example, sixteen times as many blacks were killed in interracial confrontations as whites, and whites killed one another at twice the rate blacks did (34 per 100,000 adults per year versus 18 per 100,000). Homicide rates were lower in plantation counties in Georgia and South Carolina, but the disparities between the rates at which whites and blacks committed homicide were similar. The contrast with Virginia, where former Confederates held onto power, was stark. Wherever reactionary whites remained in power, they killed at the same rates they had before the war. Where they lost power, they killed with abandon.[107]

Roughly three-fifths of the nonfamily, nonintimate homicides committed by whites in Louisiana and Georgia during Reconstruction grew out of political or economic disputes. Many of these killings were mass murders of Republicans or black laborers. In Georgia a dozen freedmen died when white militants attacked a Republican rally in Camilla and a polling station in Savannah, and perhaps a dozen more were killed in gang attacks on black farm workers in Henry and Columbia counties. In Louisiana hundreds died in the Colfax Massacre of 1873, the Coushatta affair of 1874, the Caledonia and Natchitoches riots of 1878, and the Bossier and Caddo riots of 1868. The latter two occurred when white militants in the Red River Valley retaliated against local blacks who had tried to arrest a white trader for shooting at a black man.[108]

Some of the violence was spontaneous, but much of it was organized by terror groups like the Ku Klux Klan that were determined to end Republican rule and return white-supremacist Democrats to power. These organizations, led by former Confederate officers and manned primarily by veterans of the Confederate army, were desperately opposed to emancipation, equal rights, and "Negro rule." They wanted to hold on to their cheap, exploitable workforce, but on a deeper level they were terrified of what might happen if black men became full participants in society. Southerners would become "a race of mulattoes . . . another Mexico; we shall be ruled out from the family of white nations. . . . It is a matter of life and death with the Southern people to keep their blood pure." One Georgia Republican observed sharply

Chinese, whose rate fell after World War I.[3] There are lower homicide rates among non-Hispanic whites in the North, the Southwest, and southern cities, higher homicide rates among whites in the rural South, and a divergence in intraracial homicide rates between non-Hispanic whites and the minorities that are most subject to discrimination (overt or institutional) in each region of the country.

## White Homicide in the North, 1877–1917

In the last two decades of the nineteenth century, homicide rates declined across the North (Figures 4.2 and 5.1–5.3), continuing a trend that had begun in most jurisdictions at the end of the Civil War. The rates bottomed out in the late 1880s or 1890s before inching up again in the late 1890s and early 1900s. On the eve of World War I, when a majority of states first met federal standards for death registration, the homicide rate (including family and intimate homicides) for adults of all races ranged from 1 to 4 per 100,000 in New England, 2 to 5 in prairie states, and 3 to 8 in the industrial states. With the exception of a few states with very low rates—Wisconsin, New Hampshire, Vermont, and Maine—the North was more homicidal than Canada or western Europe, but less so than it had been in the mid-nineteenth century.[4]

Homicide rates declined in the North in the late nineteenth century because of a drop in murders among unrelated whites. Labor violence increased, especially on railroads and docks, and around coal mines, steel mills, and logging camps, but it did not claim enough lives to have an appreciable effect on the white homicide rate. Most labor violence was instrumental, aimed at changing the behavior of employers, strikers, scabs, the militia, or the police, so the death toll was surprisingly low. Every other kind of homicide among unrelated whites decreased. Property disputes, tavern brawls, sexual assaults, robberies, and spontaneous quarrels claimed fewer lives than they did in the mid-nineteenth century.[5]

The decline in homicides probably escaped the notice of most northerners. They still read articles in the newspapers each week about murders in saloons and on city streets, and their neighbors could still turn on each other with shocking suddenness in arguments over felled trees, trampled crops, laundry bills, or fishing spots. George Poe, a carriage driver in Chillicothe, Ohio, got fed up with a drunken passenger,

# EXHIBIT 70

JA6436

# CONTRACT

BETWEEN

# HIS MOST CHRISTIAN MAJESTY.

AND THE

# UNITED STATES OF AMERICA,

ENTERED INTO BY THE

## COUNT DE VERGENNES, AND MR. FRANKLIN,

The 16th of July, 1782, and ratified by Congress the 22d of January 1783.

----●◐●----

**Motives for making a particular statement of the amount of pecuniary supplies furnished by France, and the mode of re-payment by the United States.**
THE king having been pleased to attend to the requests made to him in the name, and on behalf of the united provinces of North America, for assistance in the war and invasion under which they had for several years groaned ; and his majesty, after entering into a treaty of amity and commerce with the said confederated provinces, on the 6th of February, 1778, having had the goodness to support them, not only with his forces by land and sea, but also with advances of money, as abundant as they were effectual, in the critical situation to which their affairs were reduced : it has been judged proper and necessary to state exactly the amount of those advances, the conditions on which the king made them, the periods at which the congress of the United States have engaged to repay them to his majesty's royal treasury, and in fine, to state this matter in such a way as for the future to prevent all difficulties capable of interrupting the good harmony which his majesty is resolved to maintain and preserve between him and the said United States. For executing so laudable a purpose and with a view to strengthen the bands of amity and commerce which subsist between his majesty and the said United States ; we, Charles Gravier de Vergennes, &c. counsellor of the king in all his councils, commander of his orders, minister and secretary of state, and of his commands and finances, vested with full powers of his majesty to us given for this purpose : and we, Benjamin Franklin, minister plenipotentiary of the United States of North America, in like manner vested with full powers of the congress of the said states for the present purpose ; after duly communicating our respective powers, have agreed to the following articles :

## ARTICLE I.

**Amount of different loans.**
It is agreed and certified, that the sums advanced by his majesty to the congress of the United States, under the title of a loan, in the years 1778, 1779, 1780, 1781, and the present, 1782, amount to the sum of eighteen million of livres, money of France, according to the following twenty-one receipts of the

**JA6437**

Generated on 2023-12-08 16:06 GMT / https://hdl.handle.net/2027/nyp.33433008589750
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

# EXHIBIT 71

# *FAUX HISTOIRE* OF THE RIGHT TO BEAR ARMS:

## *YOUNG v. HAWAII* (9th Cir. 2021)

Stephen P. Halbrook[*]

### *CONTENTS*

Introduction
I.  THE TEXT OF THE SECOND AMENDMENT OVERRIDES SELECTIVE "HISTORY"
II.  HISTORICALLY, HAWAIIAN CARRY LAWS WERE ADVERSE TO THE RIGHT
III.  PEACEABLE CARRY WAS LAWFUL IN THE ENGLISH TRADITION
    A. The Royal Decrees Were Directed at Tumultuous Gatherings, Not Peaceable Carry
    B. The Statute of Northampton and Related Laws Applied to Affrays and Violent Crime
    C.  *Rex v. Knight*, the Decisive Precedent, Held that Going Armed was Lawful Unless Done in a Manner to Terrorize the Subjects
    D.  English Treatises Limited the Offense to Carrying Dangerous and Unusual Weapons
    E. The English Bill of Rights Confirmed the Ancient Right to Have Arms
IV.  AMERICA WAS FOUNDED ON A ROBUST RIGHT TO BEAR ARMS
    A. Colonial Laws Often Mandated the Carrying of Arms
    B. Post-Ratification Laws Only Banned Going Armed Offensively, to the Terror of the Citizens
    C. Nineteenth-Century Surety Laws Only Applied with a Showing of Reasonable Cause to Fear Injury or a Breach of the Peace
    D. Courts Upheld Concealed Carry Bans Only Because Open Carry was Lawful
    E. Slaves and Persons of Color Were Denied the Right to Bear Arms Because They Were Not Considered Citizens
    F.  None of the Early Treatises Countenanced a Carry Ban
    G. The Fourteenth Amendment Sought to Do Away with Black Code Requirements that African-Americans Obtain a License to Bear Arms Subject to an Official's Discretion
    H. Twentieth-Century Aberrations Teach Nothing about the Original Understanding
Conclusion

---

[*]J.D., Georgetown University Law Center; Ph.D., Philosophy, Florida State University. Books include *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*; *The Founders' Second Amendment*; *Securing Civil Rights: Freedmen, the Fourteenth Amendment, & the Right to Bear Arms*; *Firearms Law Deskbook*; and *That Every Man be Armed*.  Argued *Printz v. United States*, 521 U.S. 898 (1997), and other Supreme Court cases, and represented a majority of members of Congress as amici curiae in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  Attorney at Law, Fairfax, Va.; Senior Fellow, Independent Institute.  See www.stephenhalbrook.com.  Copyright © Stephen P. Halbrook 2021. All rights reserved.

1

**JA6439**

Electronic copy available at: https://ssrn.com/abstract=3885910

Introduction

The Ninth Circuit's en banc decision in *Young v. State of Hawaii* (2021) holding that no "right of *the people* to . . . *bear* arms" exists under the Second Amendment could perhaps win a contest for the most *faux histoire* of any judicial decision on a Bill of Rights guarantee.[1]  The Ninth Circuit previously held that no right exists to carry a concealed weapon.[2]  It now extends its ruling to the only other way to bear arms – open carry.  Without any linguistic analysis of the text of the Second Amendment, the majority essentially holds that the right to bear arms is outside "the historical scope" of the right to bear arms.[3]

To obtain a license to carry a firearm, Hawaii requires a person to show "the urgency or the need" to do so, a requirement not specified for *any* constitutional right.  Per the court's description, the applicant George Young only "relied upon his general desire to carry a firearm for self-defense," thus failing to show "the urgency or need."[4]  Thus, from the very beginning of the opinion, the court signaled that it did not consider "the right of the people to . . . bear arms" to be a right at all that one may exercise based on the desire to do so, but is a privilege that the government may grant or withhold based on its subjective assessment of whether the applicant has an "urgency or need" to exercise this fundamental constitutional right that is a non-constitutional right.  Imagine subjecting the right of free speech to whether the Ninth Circuit says an arm of government considers it urgent or needed for a citizen to speak.

The majority decision by Judge Jay Bybee has been subjected to withering criticism not only in the dissenting opinion by Judge Diarmuid O'Scannlain, joined by three other judges[5] – not unexpectedly – but also by Second Amendment scholars.  Professor Nelson Lund focuses on the general "fake originalism" of the decision,[6] which the court apparently saw as necessary to clothe the Amendment with its supposed original understanding.  Professors David Kopel and George Mocsary delve into the opinion's "errors of omission," based on the slicing out of critical

---

[1]*Young v. State of Hawaii*, 992 F.3d 765 (9th Cir. 2021) (*en banc*), petition for cert. filed, No. 12-17808 (U.S. May 25, 2021).

[2]*Id*. at 773, citing *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (*en banc*).

[3]*Id*. at 773.

[4]*Id*.

[5]*Id.* at 828 (O'Scannlain, J., dissenting).

[6]See Nelson Lund, "Fake Originalism and the Right to Bear Arms," *Law & Liberty*, April 12, 2021.  https://lawliberty.org/fake-originalism-and-the-right-to-bear-arms/

2

**JA6440**

Electronic copy available at: https://ssrn.com/abstract=3885910

words to distort historical quotations.[7]  Without replicating these very valid criticisms, this Article demonstrates that the *Young* decision is even worse.

## I.  THE TEXT OF THE SECOND AMENDMENT OVERRIDES SELECTIVE "HISTORY"

First a word on the text, which is AWOL from the majority opinion.  The Second Amendment provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."  What could be unclear about "the right" of "the people" to "bear arms"?  Everything, saith the court.  In fact, the court does not even purport to discuss those words.  Instead, the firearm restrictions in English and American history supposedly "reflect longstanding prohibitions," and "the conduct they regulate is therefore outside the historical scope of the Second Amendment."[8]  Pay no attention to the words behind the curtain.

This nullifies not only the literal words of the Amendment, but also the Supreme Court's analysis of those words in *District of Columbia v. Heller*, which decided: "At the time of the founding, as now, to 'bear' meant to 'carry.'"[9]  The Court added that the right to "bear arms" refers to a right to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person."[10]  The Court found the "inherent right of self-defense" to be "most acute" in the home, indicating that it is also acute outside the home.[11]  It noted that the decision did not "cast doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ."[12]  That comment obviously casts doubt on laws forbidding the carrying of firearms in *non-sensitive* places.

The *Young* court mentions, but sees nothing particularly significant or binding about, *Heller*'s above discussion.[13]  While the Amendment's text does not limit the right to the home,

---

[7]David B. Kopel & George A. Mocsary, "Errors of Omission: Words Missing from the Ninth Circuit's *Young v. State of Hawaii*," 2021 *U. Ill. L. Rev. Online* 172 (May 13, 2021).

[8]*Id*. at 773.

[9]*District of Columbia v. Heller,* 554 U.S. 570, 584 (2008) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

[10]*Id*.

[11]*Id*. at 628.

[12]*Id*. at 626.

[13]*Young*, 992 F.3d 782-83.

## JA6441

Electronic copy available at: https://ssrn.com/abstract=3885910

and *Heller* said that Americans valued the right "more important for self-defense and hunting" than for militia purposes,[14] *Young* thought that exercise of the right "outside the home is less clear," and that *Heller* only "implied" that "some right to bear arms may exist outside the home."[15]  Perhaps it is unclear that hunting and militia activities always take place outside the home, and that self-defense is frequently exercised outside the home.

As has been stated about passages from *Heller*: "This is the sort of message that, whether or not technically dictum, a court of appeals must respect, given the Supreme Court's entitlement to speak through its opinions as well as through its technical holdings."[16]

Judge O'Scannlain said it best in his dissent – "the majority reduces the right to 'bear Arms' to a mere inkblot."[17]  Instead of beginning with the constitutional text – as *Heller* did with its linguistic analysis of each word and phrase[18] – *Young* claimed that it would base its determination of whether "the challenged law affects conduct that is protected by the Second Amendment" on the "historical understanding of the scope of the right."[19]  While *Heller* indeed used that phrase about the historical understanding, it began with the language of the Amendment.  *Young* simply skipped that stage and jumped right into the history.  But it would be a combination of the wrong history and a distorted history.

*Young* begins its analysis of the historical scope of the Second Amendment by noting its prior decision in *Peruta* that "the Second Amendment does not protect the right of a member of the general public to carry concealed firearms in public."[20] No need exists to review *Peruta* here because it was based on the same *faux histoire* that *Young* uses to square the circle and conclude that no member of the general public has a right openly to carry firearms either.

The court goes on to say: "Our sister circuits have, in large part, avoided extensive historical analysis."[21]  It is certainly true that the circuits that have upheld carry bans have avoided the actual history.  But *Young* declares its ambition to write the definitive history: "We

---

[14]*Heller,* 554 U.S. at 599.

[15]*Young*, 992 F.3d at 783.

[16]*United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*).

[17]*Young*, 992 F.3d at 830 (O'Scannlain, J., dissenting).

[18]*Heller,* 554 U.S. at 576.

[19]*Young*, 992 F.3d at 783 (quoting *Heller,* 554 U.S. at 626).

[20]*Peruta v. County of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc).

[21]*Young*, 992 F.3d at 784.

4

**JA6442**

Electronic copy available at: https://ssrn.com/abstract=3885910

do not think we can avoid the historical record."[22]  It then announces its determination that "restrictions on carrying arms openly have long been a part of our legal tradition,"[23] from which it concludes that "the people" have no "right to . . . bear arms" at all.

## II.  HISTORICALLY, HAWAIIAN CARRY LAWS WERE ADVERSE TO THE RIGHT

Rather than limiting its analysis to the "historical scope" of the Second Amendment, *Young* deemed it relevant to trace in detail Hawaiian laws beginning when Hawaii was a monarchy, before its annexation by the United States.  The court quotes the Act of May 25, 1852, § 1, as imposing punishment on "[a]ny person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon."[24] But the sentence did not end there – it continued "unless good cause be shown for having such dangerous weapons . . . ."[25]

For all we know, a person's credible claim that he or she was carrying for self-defense, in the absence of evidence that the person was carrying for a nefarious purpose, would have been considered good cause.  Or would that have depended on the person's race or national origins?  At any rate, at that time, no state in the United States had any such ban, and no state delegated power to a legislature to "authorize" select persons the privilege of carrying arms.

Section 2 of the Act (of which the court quotes just a few words) provided in full: "The following persons are hereby declared to be authorized to bear arms, viz: – All persons holding official, military or naval rank either under this government or that of any nation at peace with this Kingdom, when worn for legitimate purposes."[26]  The contrast could not be more stark – the Second Amendment recognizes "the right of the people to . . . bear arms," while the law declared that only persons in government were "authorized to bear arms."

On the date of the above enactment, the 1840 Constitution of the Hawaiian Kingdom was in force.  It did not declare any right to bear arms.[27]  Hawaii's Constitution of 1852, enacted on June 14, 1852 – just a month after passage of the Act – included a Declaration of Rights, but it

---

[22]*Id.*

[23]*Id.* at 786.

[24]*Id.* at 774, citing 1852 Haw. Sess. Laws 19.

[25]§ 1, 1852 Haw. Sess. Laws 19.

[26]*Id.*, § 2.

[27]See text at http://hooilina.org/collect/journal/index/assoc/HASH0166.dir/5.pdf.

5

**JA6443**

Electronic copy available at: https://ssrn.com/abstract=3885910

said nothing even remotely about the right to bear arms.[28]  With provisions like the following, the 1852 Constitution was alien to American values: "The King is sovereign of all the chiefs and of all of the people; the kingdom is his."[29]  That recalls the infamous dictum of Louis XIV: "*L'état, c'est moi*."

According to *Young*, "Hawai'i's regulation of dangerous weapons remained in effect after Hawai'i consented to annexation as a U.S. territory in 1898."[30]  But the court neglected a significant liberalization of Hawaiian law that took place after the monarchy was overthrown and the Republic of Hawaii was proclaimed in 1894.  Under the new Constitution, all statutes in force at the time continued to be in force,[31] which meant that the 1852 law remained on the books.  However, a law was passed in 1896 providing for a license to carry a pistol or other firearm based on the payment of a fee, without any other qualification.[32]  As the following explains, a person with that license was not subject to the 1852 law.

In *Republic of Hawaii v. Clark* (1897) – which *Young* ignores – the Hawaiian Supreme Court quoted what was then Chapter 54, § 1, of the Penal Code, that "any person not authorized by law, who shall carry or be found armed with" a pistol or other dangerous weapon was subject to punishment "unless good cause be shown for having such dangerous weapon."[33]

But that was not the only pertinent law on the books.  Chapter 64, Laws of 1896, provided for an "annual fee for a license to possess, carry or use a pistol, rifle, carbine, shotgun or other fire-arm" of one dollar and stated that "no fire-arm shall be possessed, carried or used in the Republic without a license . . . ."[34]  The only qualification for the license was the payment of the fee.  The defendant in *Clark* was charged under Chapter 54, but had a license under Chapter 64 to carry a Smith & Wesson revolver.  The court reversed his conviction based on the following:

Upon comparison of Chap. 64, Laws of 1896, with Chap. 54 of the Penal Code, we are of opinion that this Act does not repeal Chap. 54 of the Penal Code;

---

[28]See text at http://hooilina.org/collect/journal/index/assoc/HASH01ce.dir/5.pdf.

[29]Haw. Const., Art. 36 (1852).

[30]*Young*, 992 F.3d at 774.

[31]Haw. Const., Art. 92, § 1 (1894).

[32]Ch. 64, §§ 59 & 60, *Laws of the Republic of Hawaii Passed by the Legislature at its Session, 1896*, at 224 (1896).

[33]*Republic of Hawaii v. Clark*, 10 Haw. 585, 585-86 (1897).

[34]*Id*. at 587, quoting §§ 59 & 60, Chapter 64, Laws of 1896.

6

**JA6444**

Electronic copy available at: https://ssrn.com/abstract=3885910

but, as its terms are explicit in giving a license to possess, carry and use fire-arms, a person who has complied with its terms and obtained a license thereunder can plead the same in justification under a criminal charge made against him for carrying deadly weapons under Chap. 54 of the Penal Code, and claim that he was authorized by the license law to carry the weapon, and the same would be a good defense and no conviction could be had.[35]

So *Young* left out a significant chapter in the history of Hawaiian law on the carrying of firearms. While no state in the United States had such a law, Hawaii allowed anyone to carry a pistol merely by paying a license fee.

As of 1913, *Young* tells us that Hawaiian law allowed a person to carry a pistol if he or she had "good cause" (which did not require a license) or was "authorized by law."[36] For all we know, "good cause" may have included a credible claim that the person was carrying a pistol for self-defense. Or the authorities may have tied "good cause" to one's race or national origins. And although not mentioned by *Young*, the law continued to provide that "[t]he following persons are hereby declared to be authorized to bear arms, viz.: all persons holding official, military, or naval rank . . . ."[37] Again, the conflict with the right of "the people" to bear arms in the Second Amendment was obvious.

Under a 1927 law, *Young* continues, a person needed a license to carry a "pistol or revolver concealed upon his person or to carry one elsewhere than in his home or office," which would be granted on showing a "good reason to fear an injury to his person or property, or . . . other proper reason for carrying a pistol or revolver."[38] The court states that this only applied to concealed carry, but in 1961, a law was enacted that to carry openly, one must demonstrate "the urgency of the need" and must be "engaged in the protection of life and property."[39]

Nothing in *Young* reflects how the above provisions were interpreted. Under the "good" or "proper" reason requirements, was a statement on the application form that the person wished to carry for self-defense sufficient to be issued a license?[40] Given that not a single Hawaiian case

---

[35]*Id.* at 587.

[36]*Young*, 992 F.3d at 774, citing 1913 Haw. Sess. Laws 25, act 22, § 1.

[37]§ 3090, Revised Laws of Hawaii 1123 (1905).

[38]*Young*, 992 F.3d at 774, citing 1927 Haw. Sess. Laws 209, 209–211.

[39]*Id.* at 775, citing 1961 Haw. Sess. Laws 215.

[40]See *Schubert v. DeBard*, 398 N.E. 2d 1339, 1341 (Ind. App. 1980) (holding that self-defense was "a proper reason" for a license to carry a handgun and that discretion by the issuing

7

**JA6445**

Electronic copy available at: https://ssrn.com/abstract=3885910

with those terms appears in the Westlaw databank, does the lack of litigation on the subject indicate that licenses were freely available?  It is noteworthy that virtually no Hawaiian decisions with the search terms "firearm" in the same sentence as "without a license" appear until the 1990s and 2000s.

Today, one must show "an exceptional case" and a "reason to fear injury to [his or her] person or property" for a license to carry concealed.[41] A license for open carry requires that "the urgency or the need has been sufficiently indicated" and that the applicant "is engaged in the protection of life and property."[42]  As the record reflects, no one gets licenses to carry concealed. As applied in Hawaii County, open carry licenses are available only to "private detectives and security guards."[43]

### III.  PEACEABLE CARRY WAS LAWFUL IN THE ENGLISH TRADITION

A. The Royal Decrees Were Directed at Tumultuous Gatherings, Not Peaceable Carry

As *Heller* stated, the Second Amendment codified a pre-existing right that we "inherited from our English ancestors."[44] But *Young* is intent on presenting every conceivable monarchial intrusion on the right rather than exploring the actual right as it evolved in spite of these violations.  It is biased in favor of the power of the kings and against the liberties of the often-oppressed subjects.  Its method would be analogous to detailing every royal law or decree that repressed the freedom of the press in order to show that the First Amendment freedom of the press is nugatory.

How fitting that *Young* begins with the royal decrees, the arbitrary diktats of often blood-thirsty monarchs who engaged in raw power struggles with their opponents and who treated their subjects as fodder to exploit and repress.  The Founders would be aghast that the Bill of Rights would be interpreted according to the tyrannical decrees of medieval English kings.

The court cites several royal decrees in the years 1299-1327 to the effect that "King Edward I and his successor, King Edward II, issued a series of orders to local sheriffs that

---

authority "would supplant a right with a mere administrative privilege").

[41] *Young*, 992 F.3d at 775, citing HRS § 134-9(a).

[42] *Id*.

[43] *Id*. at 776.

[44] *Young*, 992 F.3d at 786, quoting *Heller*, 554 U.S. at 599.

8

**JA6446**

Electronic copy available at: https://ssrn.com/abstract=3885910

prohibited 'going armed' without the king's permission."[45]  But the court is unsure about whether these decrees were, in fact, merely temporary: "Although the king regularly granted the sheriffs authority to disarm the people while in public, it is unclear from these royal orders whether that authority was absolute or if it was tied to times of potential upheaval and possible affray."[46]

*Young* neglects that the context of the term "going armed" in these decrees concerned disruptive, potentially violent behavior, not the mere carrying of defensive weapons by peaceable subjects.  For instance, the court partially quotes a decree of Edward I instructing the sheriff of York to prohibit "any knight, esquire or any other person from . . . going armed without the king's special licen[s]e."[47]  But the full text without deletions shows that the order instructed the sheriff more specifically to prohibit:

> any knight, esquire or any other person from tourneying, tilting (*burdeare*), making jousts, seeking adventures or otherwise going armed without the king's special licence, and to cause to be arrested the horses and armour of any persons found thus going with arms after the proclamation, as the king wills that no tournaments, tiltings or jousts shall be made by any persons of his realm without his special licence.[48]

The meaning of the above terms puts the term "going armed" in a completely different light than *Young* suggests.  The  *Dictionarium Anglo-Britannicum* provides this definition: "Turnament, (F.), Justing, or Tilting, a Warlike Exercise of armed Knights, or Gentlemen fighting with one another on Horse-Back, with Lances or Spears; a Sport much us'd in former Times, but now quite laid aside."[49]  Peaceably carrying a dagger or bow and arrow for self-defense would not be "going armed" in the above context.

In any event, these royal decrees are wholly irrelevant.  Edward I Longshanks was one of the most ruthless kings who is best known today for his cruelty toward the Scots (he ordered the indescribably gruesome execution of William Wallace of "Braveheart" fame).  His son Edward II fought against reforms by the barons and was eventually forced to abdicate, after which he was murdered.  The Founders would have held in contempt the idea that they must get "the king's license" to do anything, whether carry arms or speak freely.  Instead, they fired the shot heard

---

[45]*Id*. at 786.

[46]*Id*. at 787.

[47]*Id*. at 786, quoting 4 *Calendar Of The Close Rolls, Edward I, 1296–1302*, at 588 (July 16, 1302, Westminster) (H.C. Maxwell-Lyte ed., 1906).

[48]4 *Calendar* at 588.

[49]John Kersey, *Dictionarium Anglo-Britannicum or a General English Dictionary* (1708).

9

**JA6447**

Electronic copy available at: https://ssrn.com/abstract=3885910

'round the world to prevent the king's troops from confiscating their unlicensed firearms.

B. The Statute of Northampton and Related Laws Applied to Affrays and Violent Crime

"Any doubt as to the scope of government's authority to disarm the people in public was dispelled with Parliament's 1328 enactment of the Statute of Northampton," *Young* confidently announces, "which effectively codified the firearms restrictions that preceded it."[50]  "Firearms" restrictions?  The matchlock was the first functional gun, and it appeared around 1440 in Nuremberg and in other parts of Europe in the next thirty years.[51]  That aside, the Statute provided that no person shall "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere . . . ."[52]

Did this archaic language ban going armed per se, or did it do so only in affray of the peace?  English courts would read it in the latter manner, as discussed below.  But *Young* immediately takes a great leap forward and, citing a law review article, asserts: "To the majority of fourteenth-century Englishmen, the Statute of Northampton was generally understood to be 'a complete prohibition on carrying weapons in public, at least in populated areas.'"[53]  How would anyone know what "the majority" of Englishmen then understood about the Statute, if they were even aware of it?  The article's author makes no such bold claim about the public, and instead simply asserts that to have been the understanding of the Statute.  His proof?  Two other law review articles, one of which agreed and the other of which disagreed, stating that "the statute only prohibited going armed in defensive armor . . . ."[54]

---

[50]*Id.*

[51]Robert Held, *The Age of Firearms* 26 (1957).

[52]2 Edw. 3, 258, ch. 3 (1328).

[53]*Young*, 992 F.3d at 788, citing Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," 43 S. Ill. U. L.J. 61, 67 (2018).

[54]Frassetto ,"To the Terror of the People," at 67.  He cites, *id*. n.27, Patrick Charles, "The Faces of the Second Amendment Outside of the Home: History Versus Ahistorical Standards of Review," 60 CLEV. ST. L. REV. 1, 11 (2012); Clayton E. Cramer, "The Statute of Northampton (1328) and Prohibitions on the Carrying of Arms (Sept. 19, 2015) (unpublished manuscript) (available at SSRN: https://ssrn.com/abstract=2662910) (arguing the statute only prohibited going armed in defensive armor).

10

**JA6448**

Electronic copy available at: https://ssrn.com/abstract=3885910

*Young* next asserts, "The statute applied to anyone carrying arms, without specifying whether the arms were carried openly or secretly.  In 1350, Parliament specifically banned the carrying of concealed arms."[55]  For that, the court purports to quote 25 Edw. 3, 320, st. 5, c. 2, § 13 (1350), as follows: "[I]f percase any Man of this Realm ride armed [covertly] or secretly with Men of Arms against any other . . . it shall be judged . . . Felony or Trespass, according to the Laws of the Land." (alteration in original)."[56]

Astonishingly, the court deleted the essence of the crime, shown here in italics: "[I]f percase any Man of this Realm ride armed [covertly] or secretly with Men of Arms against any other, *to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance* . . . it shall be judged . . . Felony or Trespass, according to the Laws of the Land of old Times used . . . ."  The offense thus consisted of gangs riding with concealed arms to murder, rob, or kidnap.  It did not prohibit a peaceable person from carrying concealed arms.  The court overzealously manipulated the statute in an effort to prove what it cannot prove.  Had an attorney, an officer of the court, made such a misrepresentation, sanctions would be in order.

The Statute was expanded in 1396, *Young* continues, to encompass the bearing of a Sallet, Skull of Iron, or "other Armour."[57]  The Sallet and Skull of Iron were medieval combat helmets.[58]  Presumably, other armor would have been similar armor designed for the battlefield.  As discussed below, these were the kinds of warlike instruments that would create terror among the public, which is what the Statute aimed to discourage.  There is no evidence that it was aimed at burghers and peasants peaceably carrying arms to protect themselves from robbers and murderers.

*Young* next describes the enforcement of the Statute, but the orders given by Edward III again indicate that repression of roving bands of knights or criminals was the object.  The court quotes a November 1328 order to sheriffs "to cause the statute made in the late parliament at Northampton prohibiting men coming armed before justices or other ministers of the king, or going armed, etc., to be observed,"[59] but ignored the related order to investigate "the malefactors who have made assemblies of men-at-arms or have ridden or gone armed in his bailiwick,

---

[55] *Young*, 992 F.3d at 788.

[56] *Id.* at 788-89.

[57] *Id.* at 789, citing 20 Ric. 2, 92–93, ch. 1 (1396).

[58] "Medieval Helmets," https://www.pinterest.com/pin/210472982560782548/; "Medieval Helmet," https://medievalbritain.com/type/medieval-life/weapons/medieval-helmet/.

[59] *Young*, 992 F.3d at 789.

11

**JA6449**

Electronic copy available at: https://ssrn.com/abstract=3885910

contrary to the statute and the king's proclamation . . . ."[60]  Sheriffs were ordered to imprison "all those whom he shall find going armed, with their horses and armor."[61] That doesn't exactly sound like serfs carrying protective staffs or bows.

The court gives a snippet of a 1334 order "which reinforced the statute's exceptions for those on the king's errand,"[62] but leaves out the critical part informing that "the king has learned that several malefactors and disturbers of the peace, not respecting these statutes, making assemblies and illicit gatherings both by day and night in York, its suburbs and neighbourhood, go about armed and lie in wait for those coming and going to and from that city, and staying there, both the king's ministers and other lieges, and beat, wound and rob them . . . ."[63]  The law was aimed at these aggressors, not their victims.

*Young* claims that "restrictions on carrying also permeated public life,"[64] but its only proof is the example that on Friday before the Feast of St. Thomas, "All guests in hostelries were to be warned against going armed in the City."[65]  But this indicated that many guests may have arrived at the hostelries armed and were told to leave their arms there.  The Feast of St. Thomas was a major event[66] that was likely attended by the king and his ministers, so that this was likely just a temporary restriction.

The court ends its discussion of the enforcement of the Statute by noting Richard II's 1377 order to continue enforcing the Statute.[67]  But it left out the persons to which the Statute was aimed – those who "have gone and go armed and bearing arms wander hither and thither,

---

[60]1 *Calendar Of The Close Rolls, Edward III, 1327-1330*, at 420 (Nov. 10 and 11, 1328) (H.C. Maxwell-Lyte ed., 1896).

[61]2 *Calendar Of The Close Rolls, Edward III, 1330-1333*, at 131 (April 3, 1330, Woodstock) (H.C. Maxwell-Lyte ed., 1898).

[62]*Young*, 992 F.3d at 789.

[63]Letter to Mayor and Bailiffs of York (Jan. 30, 1334), in 3 H. Maxwell-Lyte ed., *Calendar of the Close Rolls, Edward III, 1333-1337*, at 294 (London: Her Majesty's Stationery Office, 1898).

[64]*Young*, 992 F.3d at 789.

[65]1 *Calendar of Plea & Memoranda Rolls of the City of London, 1323-1364*, at 156 (Dec. 19, 1343) (A.H. Thomas ed., 1898).

[66]"St. Thomas's Day," https://encyclopedia2.thefreedictionary.com/St.+Thomas%27s+Day.

[67]*Young*, 992 F.3d at 790.

12

**JA6450**

Electronic copy available at: https://ssrn.com/abstract=3885910

laying snares for men coming to or from the town and those dwelling therein, beating, wounding and evil treating them, robbing some of their property and goods, . . . in breach of the peace and to the terror of the people in those parts."[68]  It was not aimed at the potential victims of these crimes who might carry arms for protection.

So *Young* ends its discussion of enforcement of the Statute in 1377.  What's the significance of all of that detail?  The court appears to be lining up one item after another so that it has far more citations than the dissent.  What possible relevance are these orders of medieval monarchs to the Second Amendment and the Founders?  None at all.

### C. *Rex v. Knight*, the Decisive Precedent, Held that Going Armed was Lawful Unless Done in a Manner to Terrorize the Subjects

*Young* discusses two cases that bear on the Statute, the first of which is almost irrelevant and the second of which is dispositive of how the Statute was interpreted.  This discussion is a low point in the opinion, coming as it does from highly educated judges who routinely apply complex precedents to adjudicate cases.

The first is *Chune v. Piott* (1615), a case decided by the King's Bench which involved a plaintiff who sued a sheriff for an unlawful arrest arising out of the plaintiff's attempt to help a prisoner escape.  The Statute of Northampton was not involved.  Justice Croke, one of four judges who opined in the case, mentioned as an analogy that "the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, *in terrorem populi Regis*; he ought to take him, and arrest him, notwithstanding he doth not break the peace in his presence."[69]  Thus, the carrying of the weapon must be *in terrorem populi Regis* (to the terror of the King's subjects), and the arrest could be made even if the suspect did not break the peace in the sheriff's presence.

*Young* correctly states: "The phrase *in terrorem populi Regis*— "to the terror of the king's people'—might suggest one of two things: First, that there must be some proof of the carrier's *intent* to terrorize the people or, second, that there must be some proof of the *effect* (whether intended or not) on the people."[70]  But it then jumps to the conclusion that neither was an element of the offense because the sheriff could arrest the person just for carrying "notwithstanding he doth not break the peace."[71]  Not so.  *Chune* explicitly stated that if the sheriff "sees any one to

---

[68]1 *Calendar Of The Close Rolls, Richard II, 1377-1381*, at 34 (Dec. 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914).

[69]Chune v. Piott, 80 Eng. Rep. 1161, 1162 (K.B. 1615).

[70]*Young*, 992 F.3d at 790.

[71]*Id*.

13

**JA6451**

Electronic copy available at: https://ssrn.com/abstract=3885910

carry weapons in the high-way, *in terrorem populi Regis*," he could arrest him even if the person didn't separately "break the peace in his presence." The sheriff could not make an arrest if he only "sees any one to carry weapons in the high-way" peaceably and thus *not* "*in terrorem populi Regis*."

Hopefully the Ninth Circuit would not so sloppily misconstrue modern criminal laws in such a manner. If it did, massive numbers of criminal defendants could be convicted without any strict adherence to the actual elements of the offenses.

Next comes the court's misconstruction of the two reported cases concerning Sir John Knight, which constitute *the* definitive interpretation by the King's Bench of the Statute of Northampton. One version of the decision reported an information against Knight based on the Statute, which it characterized as having prohibited "going or riding armed in affray of peace . . . ." It was alleged that Knight "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects, *contra formam statuti*."[72] The case was tried before a jury and "the defendant was acquitted." The Chief Justice said that the meaning of the Statute "was to punish people who go armed to terrify the King's subjects. It is likewise a great offence at the common law, as if the King were not able or willing to protect his subjects . . . ."[73]

So the offense was going armed "in affray of peace," *i.e.*, in a manner "to terrify the King's subjects." But *Young* is unwilling to concede the obvious, ignoring those clear words and citing that part of the decision to conclude that "the meaning of the Statute of Northampton was to punish those who go armed." It adds that, based on the comment about the King being unable to protect his subjects – which in no way changes the elements of the crime – "perhaps that Knight was acquitted because he had not intended criticism of the king's authority or ability to keep the peace." The "authority" for that claim is the ever-ready law review article spin that invents the claim that "Knight defended himself on the grounds of his 'active loyalty' to the crown rather than by denying that he had created a public terror."[74] Nothing in the King's Bench opinion even remotely insinuates that.

The other version of the Knight opinion recited counsel for defendant's argument: "This statute was made to prevent the people's being oppressed by great men; but this is a private matter, and not within the statute." (Recall the turbulent times of Edward III with bodies of knights fighting it out.) The Chief Justice held: "But tho' this statute be almost gone in desuetudinem [disuse], yet where the crime shall appear to be malo animo [with evil intent], it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for

---

[72]*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686).

[73]*Id.*

[74]*Young*, 992 F.3d at 790, quoting Frassetto, 43 S. Ill. U. L.J. at 70.

14

**JA6452**

Electronic copy available at: https://ssrn.com/abstract=3885910

their security) . . . ."[75]  While ignoring this parenthetical, *Young* concedes that Knight's acquittal was due to his lack of "mal-intent to terrify the people."[76]

*Young* cites a third source on the Knight case, a diary kept by Narcissus Luttrell, which noted the charge that he was "goeing with a blunderbus in the streets, to the terrifyeing his majesties subjects," and that the jury acquitted him, "not thinking he did it with any ill design . . . ."[77]  This just confirms again that he was charged with going armed to the terror of the subjects, and the jury acquitted him because he did not do so with evil intent.

There are other original sources that the court does not cite, and they all speak with one voice.  It turns out that Knight was going armed for protection after being attacked.[78]  And yet *Young* implies that we just don't know what occurred – "[w]e cannot resolve this dispute in the original sources, much less in the academic literature" – and that the court bound him to his good behavior, "making Knight's 'acquittal' more of a conditional pardon."[79]  This final attempt to muddy the water just doesn't work.  "If the jury therefore find the prisoner not guilty, he is then for ever quit and discharged of the accusation," according to Blackstone.[80]  Courts still had a power to bind a person to keep the peace.[81]

*Young* doesn't bother to mention any subsequent English cases, including those that were right on point.  The King's Bench held in 1914 that the Statute of Northampton made it an offense "to ride or go armed without lawful occasion *in terrorem populi*," adding:

> The words "in affray of the peace" in the statute, being read forward into the "going armed," render the former words part of the description of the statutable offence.  The indictment, therefore, omits two essential elements of the offence – (1) That the going armed was without lawful occasion; and (2) that the act was *in*

---

[75]*Rex v. Knight*, Comb. 38, 90 Eng. Rep. 330 (K.B. 1686).

[76]*Young*, 992 F.3d at 790, quoting 1 Narcissus Luttrell, *A Brief Historical Relation of State Affairs, September 1678 to April 1714*, at 380, 389 (Oxford Univ. Press 1857).

[77]*Young*, 992 F.3d at 790-91.

[78]3 Roger Morrice, *The Entring Book of Roger Morrice 1677-1691*, at 307-08 (Woodbridge, England: Boydell Press, 2007).

[79]*Id.* at 791.

[80]4 Blackstone, *Commentaries* *335.

[81]*Id.* at *249.

15

**JA6453**

Electronic copy available at: https://ssrn.com/abstract=3885910

*terrorem populi.*[82]

An example of such violation, as another court held, was "firing a revolver in a public place, with the result that the public were frightened or terrorized."[83]  By contrast, the last decision ever to mention the Statute stated, "mere possession of a weapon, without threatening circumstances . . ., is not enough to constitute a threat of unlawful violence. So, for example, the mere carrying of a concealed weapon could not itself be such a threat."[84]

D.  English Treatises Limited the Offense to Carrying Dangerous and Unusual Weapons

*Young* begins its analysis of English treatises by reference to a guide to legal restrictions in London published in 1419 providing that only the privileged classes could carry arms.[85]  Imagine what our Founders would have thought of such monarchial tyranny.  In 1775, at Lexington and Concord, they essentially took arms against British orders not to go armed other than in the service of the King.

Next, *Young* acknowledges what William Hawkins – one of the greatest influences in the minds of the Founders – wrote on the subject.  It was an affray where "a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people," "no wearing of arms is within the meaning of this statute [of Northampton], unless it be accompanied with such circumstances as are apt to terrify the people," and thus that "persons of quality" did not violate the statute by wearing "common weapons . . . for their ornament or defence."[86]  That should end the discussion.

But *Young* falls off the wagon again.  A law review article to the rescue – ignoring Hawkins' general statements, the court asserted that only "certain classes of people could carry arms" in that "public carry was not threatening when it was done by the wealthy . . . ."[87]  The court goes on to misconstrue Hawkins to say that "proactive self-defense was not a good enough

---

[82]*Rex v. Smith*, 2 Ir. R. 190, 204 (K.B. 1914).

[83]*Rex v. Meade*, 19 L. Times Repts. 540, 541 (1903).

[84]*I v. Director Of Public Prosecutions*, 2 Cr. App. R. 14, 226 (Lords 2001).

[85]*Young*, 992 F.3d at 792, quoting John Carpenter, *Liber Albus: The White Book of the City of London* 335 (Henry Thomas Riley ed., 1862).

[86]*Id*., quoting 1 William Hawkins, *A Treatise of the Pleas of the Crown* 488-89 (John Curwood ed., 1824).

[87]*Id*., citing  Frassetto, 43 S. Ill. U. L.J. at 67–69.

16

**JA6454**

Electronic copy available at: https://ssrn.com/abstract=3885910

reason to go armed openly."[88]  But Hawkins stated: "[A] man cannot excuse the wearing [of] such armour in public, by alleging that such a one threatened him, and [that] he wears it for the safety of his person from his assault."[89] By "such armour," Hawkins meant unusual, warlike armor that would alarm the subjects; by contrast, on the same page, he wrote that "persons armed with privy coats of mail" for self-defense do not violate the Statute "because they do nothing in terrorem populi."[90]  Exactly – privy coats of mail could not be seen because they were worn under one's garments, and thus could not terrorize anyone.

*Young*'s next witness is Joseph Keble, but he is quoted just for saying "if a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed."[91] The court is confused about whether that refers to "unusual weapons" – the same sentiment expressed by Hawkins above – or "to common weapons worn when one would not expect it."[92]  Before this decision, who ever suggested the latter?

According to Blackstone, "[t]he offence of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the Statute of Northampton."[93] Ignoring the reference to dangerous or unusual weapons, *Young* changes this to mean that "the mere act of going armed in and of itself terrified the people."[94]  Lord Coke said that one could not "goe armed, by night or by day, &c. before the Kings Justices in any place whatsoever."[95]  But *Young* feels compelled to delete the context of being "before the Kings Justices" so that it reads "goe nor ride armed by night nor by day . . . in any place what[s]oever."[96]

---

[88]*Id*.

[89]*Id*., quoting 1 Hawkins, *A Treatise of the Pleas of the Crown* at 489.

[90]1 Hawkins at 489.

[91]*Young*, 992 F.3d at 792-93, quoting Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of their Duty* 147 (1689).

[92]*Id*. at 793.

[93]4 William Blackstone, *Commentaries* *148–49 (1769).

[94]*Young*, 992 F.3d at 793.

[95]Edward Coke, *The Third Part of the Institutes of the Laws of England* 160 (E. and R. Brooke ed., 1797).

[96]*Young*, 992 F.3d at 793.

17

**JA6455**

Electronic copy available at: https://ssrn.com/abstract=3885910

E. The English Bill of Rights Confirmed the Ancient Right to Have Arms

"The English Bill of Rights created, for the first time, a right for certain people to possess arms, but it was a conditional right. " *Young* informs us.[97]  Actually, it "created" nothing, and instead declared thirteen "true, ancient and indubitable rights," including the following: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Condition, and as are allowed by Law."[98]  The Second Amendment specified no such conditions on the right of all of "the people" to bear arms.  In his notes introducing the bill of rights in Congress, James Madison observed the fallacy "as to English Decl[aratio]n. of Rights" that it limited "arms to protest[an]ts."[99]  And St. George Tucker contrasted the English Declaration with the Second Amendment's wording that "the right of the people to keep and bear arms shall not be infringed," adding, "this without any qualification as to their condition or degree, as is the case in the British government."[100]

*Young* ignored relevant opinions by the English courts on questions of English law.  An English court gave the following jury instruction in an 1820 case: "But are arms suitable to the condition of people in the ordinary class of life, and are they allowed by law?  A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is traveling or going for the ordinary purposes of business."[101]

Blackstone characterized the right as "a public allowance under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."[102]  *Young* reduces this to a snippet about "due restrictions" only and attributes to Blackstone the averment that there was a "prohibition on publicly carrying weapons,"[103] which is not to be found in the general term "have Arms for their

---

[97]*Id.* at 793.

[98]An Act Declaring the Rights and Liberties of the Subject, 1 W. & M., Sess. 2, c.2, (1689).

[99]Madison, Notes for Speech in Congress, June 8, 1789, 12 *The Papers of James Madison*, Charles F. Hobson *et al.* eds., 193-94 (Charlottesville: University Press of Virginia, 1979).

[100]1 Blackstone, *Commentaries* *143-44 n.40 (St. George Tucker ed. 1803).

[101]*Rex v. Dewhurst*, 1 State Trials, New Series 529, 601-02 (1820).

[102]1 Blackstone, *Commentaries* *139.

[103]*Young*, 992 F.3d at 793.

18

**JA6456**

Electronic copy available at: https://ssrn.com/abstract=3885910

Defence"[104] and which ignores Blackstone's reference to "dangerous or unusual weapons."[105]

Finally, our Bill of Rights is not bound by the English Declaration. Just before discussing the right to arms, Blackstone addressed "the right of petitioning the king, or either house of parliament, for the redress of grievances." He added that no petition "for any alteration in church or state, shall be signed by above twenty persons, . . . nor shall any petition be presented by more than ten persons at a time. But, *under these regulations*, it is declared by the statute 1 W. & M. st. 2. c. 2, that the subject hath a right to petition . . . ."[106] St. George Tucker noted about this passage: "The right of petitioning is not subject to any limitation or restriction in the United States."[107] Would the Ninth Circuit limit our First Amendment right to petition to the more limited right to petition under the English Declaration?

## IV. AMERICA WAS FOUNDED ON A ROBUST RIGHT TO BEAR ARMS

### A. Colonial Laws Often Mandated the Carrying of Arms

"The colonists shared the English concern that the mere presence of firearms in the public square presented a danger to the community," *Young* asserts.[108] But the court presents no evidence that "the colonists" had any such concern. All it could dig up was a 1686 law of East New Jersey, which did not apply in West New Jersey, providing that no person may "privately . . . wear any pocket pistol" or certain other weapons – open carry was fine – and that "no planter shall ride or go armed" with certain weapons except when traveling.[109] Planters must have been deemed second-class subjects.

That law may not have survived the Glorious Revolution which led to the Declaration of Rights, as a 1694 East New Jersey law made it unlawful for a slave "to carry any gun or pistol" into the woods or plantations unless with the owner or a white man, which implied that the latter

---

[104]An Act Declaring the Rights and Liberties of the Subject, 1 W. & M., Sess. 2, c.2, (1689).

[105]4 William Blackstone, *Commentaries* *148–49 (1769).

[106]1 Blackstone, *Commentaries* *143 (St. George Tucker ed. 1803) (emphasis added). Blackstone cited 13 Car. II. st. 1. c. 5, for the limits on petitioning.

[107]*Id.* n.39 (Tucker ed.).

[108]*Young*, 992 F.3d at 794.

[109]*Id.*, quoting An Act against Swords, &c., 1686 N.J. Laws 289, 289-90, ch. IX.

19

**JA6457**

Electronic copy available at: https://ssrn.com/abstract=3885910

persons could carry such arms.[110]

   *Young*'s only other evidence was a Massachusetts Bay law of 1692 and a New Hampshire law of 1699 that prohibited going armed "offensively,"[111] not going armed peaceably. So much for "the colonists" being concerned about "the mere presence of firearms" in public.

   *Young* then pivots to "colonial laws that not only permitted public carry, but mandated it," such as when going to church, to public gatherings, and traveling. These many laws together with the virtually non-existent restrictions leads the court to assert that "the colonies assumed that they had the power to *regulate* – whether through *mandates* or *prohibitions* – the public carrying of arms."[112] But nothing in the power to require implies a power to ban. The fact that going armed was so often required only shows how commonplace it was for everyone to carry arms.

   Finally, the court mentions Virginia's 1786 statute providing that "no man, great nor small, . . . [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country."[113] But that required proof as an element of the offense not just that one went armed, but also that he did so "in terror of the Country." The law was drafted by a Committee of Revisors, of which Thomas Jefferson played the leading role.[114] Had it been read to ban the mere carrying of firearms, Jefferson would have been one of its biggest violators, as he regularly went armed and defended the right to do so.[115]

   The court skips over the history of the British attempts to disarm the Americans as a leading cause of the American Revolution, the proposal of the Constitution without a bill of rights that led to an outcry for recognition of the right to bear arms, and the discussion in the public sphere leading to the ratification of the Second Amendment. It's like nothing relevant was

---

   [110]An Act concerning Slaves, &c., § 1, East New Jersey Laws, October 1694, ch.II, L&S 340-342.

   [111]*Young*, 992 F.3d at 794-95, quoting An Act for the Punishing of Criminal Offenders, 1692 Mass. Laws No. 6, at 11–12, and 1699 N.H. Laws. 1.

   [112]*Young*, 992 F.3d at 795.

   [113]*Id*., quoting 1786 Va. Laws 33, ch. 21.

   [114]2 Jefferson, *The Papers of Thomas Jefferson*, Julian P. Boyd ed., 519-20 (Princeton: Princeton University Press, 1951).

   [115]See Stephen P. Halbrook, *The Founders' Second Amendment* 131, 260, 316-18 (Lanham, Md.: Rowman & Littlefield, 2008).

20

**JA6458**

Electronic copy available at: https://ssrn.com/abstract=3885910

said in the period 1768 to 1791 relevant to the right to bear arms.[116]  Better to focus on medieval monarchial decrees and East New Jersey's aberration to prove that no right to bear arms was recognized.  Especially don't look at the text behind the curtain.

<div align="center">

B. Post-Ratification Laws Only Banned Going Armed
Offensively, to the Terror of the Citizens

</div>

*Young* is eager to detail what it considers to be post-ratification laws in the states, but skipped over the state declarations of rights and lack of any restrictions during the ratification and early post-ratification period.  For instance, Pennsylvania's Declaration of Rights of 1776 provided: "That the people have a right to bear arms for the defense of themselves, and the state . . . ."[117]  It was strengthened in 1790 to say that the right "shall not be questioned."[118]  Like every other state, Pennsylvania had no law that restricted the peaceable carrying of arms.[119]  *Young* has no comment on this vast void and instead searches for what did not exist.

The court's first example is the alleged North Carolina law of 1792 that repeated the Statute of Northampton.  The court should have thought something was fishy when it noted that the law "did not even remove the references to the king . . . ."[120]  The fact is that the citation – 1792 N.C. Laws 60, ch. 3 – is bogus.  The actual source was a 1792 book by a lawyer who thought he was compiling the English statutes in force in North Carolina.[121]  Later compilers wrote that this work "was utterly unworthy" as "omitting many statutes, always in force, and inserting many others, which never were, and never could have been in force . . . ."[122]

The court's only other example is the Massachusetts law of 1795 that authorized the arrest of "such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[123]  Once again, this only prohibited going armed in an offensive manner

---

[116]See Halbrook, *The Founders' Second Amendment, passim*.

[117]Pennsylvania Declaration of Rights, Art. XIII (1776).

[118]Pennsylvania Declaration of Rights, Art. XXI (1790).

[119]See Stephen P. Halbrook, *A Right to Bear Arms: State and Federal Bills of Rights and Constitutional Guarantees* (1989) (analyzing the laws of the original states).

[120]*Young*, 992 F.3d at 797.

[121]François-Xavier Martin, *A Collection of the Statutes of the Parliament of England in Force in the State of North-Carolina* 60-61 (1792).

[122]"Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii (1855).

[123]*Young*, 992 F.3d at 797, quoting 1795 Mass. Acts 436, ch. 2.

<div align="center">

21

</div>

Electronic copy available at: https://ssrn.com/abstract=3885910

that would induce fear or terror, all being elements of the offense.

### C. Nineteenth-Century Surety Laws Only Applied with a Showing of Reasonable Cause to Fear Injury or a Breach of the Peace

*Young* finds early nineteenth-century statutes on the manner of going armed, but not on going armed per se.   Tennessee prohibited "go[ing] armed to the terror of the people, or privately carry[ing]" certain weapons; Louisiana banned having "any concealed weapon"; and Maine punished those who "ride or go armed offensively, to the fear or terror of the good citizens of this State."[124]

Tennessee later passed an outlier law against "carrying . . . belt or pocket pistols, either in public or in private,"[125] but it would have been considered unconstitutional under that state's high court ruling in *Simpson v. State* (1833), which held that "the people may carry arms" under the state guarantee, adding: "By this clause of the constitution, an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature . . . ."[126]  *Young* fails to mention this decision.

Massachusetts adopted a law in 1836 that, as *Young* states, "became a template for other states."  The credibility of the court's thesis stands or falls in how it represents this law.  The law stated:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault [sic] or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.[127]

This law simply did not apply to the peaceable carrying of arms.  One could go armed at will unless a complaint was made by a "person having reasonable cause to fear an injury, or breach of the peace," and a magistrate would have to find that such "reasonable cause" – not mere suspicion or speculation – existed.  Even if reasonable cause to fear injury or a breach of the peace was found, the person going armed would be justified if he had "reasonable cause to

---

[124]*Id*. at 798-99.

[125]*Id*. at 799.

[126]*Simpson v. State*, 13 Tenn. Reports (5 Yerg.) 356, 360 (1833).

[127]1836 Mass. Acts 750, ch. 134, § 16.

22

**JA6460**

Electronic copy available at: https://ssrn.com/abstract=3885910

fear" assault, injury, or violence to his person, family, or property.  If not, he would be required to find sureties to keep the peace, after which he could continue going armed as long as he kept the peace.

The Ninth Circuit routinely interprets complex statutes today, but seems baffled by this simple law.  Ignoring that there must first be a "complaint of any person having reasonable cause to fear an injury, or breach of the peace," the court averred that public carry was limited to "persons who could demonstrate their need to carry for the protection of themselves, their families, or their property.  In effect, the Massachusetts law provided that such weapons could not be carried in public unless the person so armed could show 'reasonable cause.'"[128] How could this sophisticated court ignore that anyone could go armed without getting to the issue of whether the person was "without reasonable cause to fear an assault [sic] or other injury," unless reasonable cause was first found that a specific person feared injury or breach of the peace from the person carrying arms?

Later in the opinion, *Young* returns to the Massachusetts law, but cannot get the procedure right.  It states: "If a person was found with one of the enumerated weapons, . . . then 'any person having reasonable cause to fear an injury, or breach of the peace' could file a complaint."[129]  That's upside down.  One could be found with a weapon anytime without consequence.  It was only when a person with reasonable cause to fear an injury filed a complaint that the process would begin.  The court further read the statute to say "that it gave permission to people to carry concealable arms if they had 'reasonable cause,' which the statute defined as fear of assault" or other injury.[130]  Not so.  The statute did not purport to "give permission" to carry – it had nothing to do with peaceable carry and only applied if the person threatened another and was not carrying for self-defense.

"A number of states followed Massachusetts and adopted some version" of the above, *Young* correctly states, citing several of them.[131]  That only further refutes the court's central thesis, as all of these laws require offensive behavior and complaints before carrying would be questioned.

Young next partially quotes part of an 1862 Pennsylvania law as follows: "*If any person, not being an officer on duty in the military or naval service of the state or of the United States,*

---

[128]*Young*, 992 F.3d at 799.

[129]*Id.* at 819.

[130]*Id.*

[131]*Id.* at 799-800.

23

**JA6461**

Electronic copy available at: https://ssrn.com/abstract=3885910

shall go armed with dirk, dagger, sword or pistol . . . ."[132] However, the deleted part includes the routine requirement of a "complaint of any person having reasonable cause to fear a breach of the peace therefrom," and the defense of "reasonable cause to fear an assault or other injury or violence to his family, person or property . . . ."[133]

Finally, *Young* recites a handful of postbellum statutes primarily in the "Wild West" states and territories that actually prohibited carrying certain weapons, whether openly or concealed, or which applied that rule to towns.[134] This time period is getting far afield from the Founding, and some of these laws were open to constitutional challenge.[135] But it is definitely not the case, as the court boldly asserts, that "the states broadly agreed that small, concealable weapons, including firearms, could be banned from the public square."[136] The court made no attempt to examine the law of each state nationwide – many of which had no regulation at all – and it read the laws of key states like Massachusetts completely wrong.

####    D.  Courts Upheld Concealed Carry Bans Only Because Open Carry was Lawful

As the court recognizes, most of the early precedents are "largely from Southern states,"[137] but it doesn't ask itself why – the answer being that there were largely no restrictions on peaceable carry in the Northern states. That confirmed that the right to bear arms was unquestioned, other than restrictions on carrying concealed, mostly in the Southern states. That of course refutes *Young*'s narrative that peaceable carry was largely banned.

Kentucky's Constitution provided: "That the right of the citizens to bear arms in defense of themselves and the State shall not be questioned."[138] Kentucky passed the first ban on concealed carry in 1813, and its high court in *Bliss v. Commonwealth* (1822) declared it unconstitutional, given that the right to bears arms "existed at the adoption of the constitution . . .

---

[132]*Id*. at 800, citing 1862 Pa. Laws 250, § 6 (emphasis added).

[133]The law originally passed as the Act of March 31, 1860, P.L. 427, § 6, 19 P.S. § 23. See *Commonwealth v. Rice*, 8 Pa. D. & C. 295, 297-98 (Quarter Sess. 1926) (noting the requirement of a "complaint of *any* person having reasonable cause to fear a breach of the peace").

[134]*Young*, 992 F.3d at 800-01.

[135]E.g., *In re Brickey*, 70 P. 609 (Idaho 1902) (declaring carry ban unconstitutional).

[136]*Young*, 992 F.3d at 801.

[137]*Id*. at 802.

[138]Ky. Const., Art. XII, § 23 (1792).

24

**JA6462**

Electronic copy available at: https://ssrn.com/abstract=3885910

[and] consisted in nothing else but in the liberty of the citizens to bear arms."[139] The guarantee was then revised to provide that "the general assembly may pass laws to prevent persons from carrying concealed arms."[140] This obviously solidified the right to open carry. *Young* gloats that "courts in Georgia, Alabama, and Louisiana deviated from *Bliss* by holding that restrictions on concealed weapons were permissible."[141]  But this shows only that the few states even to ban concealed carry saw open carry as a right that could not be infringed.

The Georgia high court held that a carry ban, to the extent it "contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void."[142]  It relied on the Second Amendment, as Georgia had no bill of rights guarantee.  Alabama's high court held that "the Legislature cannot inhibit the citizen from bearing arms openly . . . ."[143]  And the Louisiana high court reasoned that the right to carry arms openly "is the right guaranteed by the Constitution of the United States . . . ."[144]  *Young* discusses these cases in support of its thesis that total carry bans are constitutional, yet they only show that the courts in the small minority of states that banned concealed carry upheld the right to carry openly.[145]

*Young* finally finds the statute and the decision it was looking for, but both were outliers dated *eighty years* after ratification of the Second Amendment.  But it hid its eyes to an earlier decision by the same court under a stronger state constitutional guarantee.  In 1859, the Texas high court wrote in *Cockrum v. State*: "The right of a citizen to bear arms, in lawful defense of himself or the State, is absolute. . . . A law cannot be passed to infringe upon or impair it, because it is above the law, and independent of the law-making power."[146]  That case didn't make *Young*'s cut.

Instead, *Young* devotes a lengthy paragraph to *English v. State* (1871), in which the Texas high court upheld a ban on carrying pistols and certain other weapons (excluding long guns)

---

[139]*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822).

[140]Ky. Const., art. XIII, § 25 (1850).

[141]*Young*, 992 F.3d at 803.

[142]*Nunn v. State*, 1 Ga. 243, 251 (1846).

[143]*State v. Reid*, 1 Ala. 612, 619 (1840).

[144]*State v. Chandler*, 5 La. Ann 489, 490 (1850).

[145]*Young*, 992 F.3d at 803-05.

[146]*Cockrum v. State*, 24 Tex. 394, 401-02 (1859).

25

**JA6463**

Electronic copy available at: https://ssrn.com/abstract=3885910

unless one had reasonable grounds to fear an unlawful attack or was traveling.[147]  At that point, the Texas guarantee was watered down to recognize the right to bear arms only "under such regulations as the legislature may prescribe."[148]  Any restriction would be upheld under such a standard.  As for the Second Amendment, *Young* notes the holding in *English* that the Amendment's scope was limited to arms that were "useful and proper to an armed militia."[149]  Query whether *Young* would agree with *English*'s recognition of "the right to 'keep' such 'arms' as are used for purposes of war," which included not just the musket and pistol, but also "the field piece, siege gun, and mortar."[150]

    *Young* next discusses the Tennessee case of *Andrews v. State* (1871), but it conflicts with the thesis that a state may ban the bearing of arms.  Tennessee banned the carrying of a "belt or pocket pistol or revolver" except when on a journey.  The state's high court held this law to violate the right of the citizens "to bear arms for their common defense" as applied to a "pistol known as the repeater," which "is a soldier's weapon – skill in the use of which will add to the efficiency of the soldier."[151]  *Young* acknowledges the holding that "the carrying of [a repeater] could not be constitutionally prohibited."[152]

    In a later decision, the Tennessee court "upheld an indictment for carrying an army pistol that was not displayed in hand."[153]  Like Tennessee, Arkansas protected the right to bear arms "for the common defense," and its high court upheld a prohibition on the carrying of "such pistol as is used in the army or navy of the United States, in any manner, except uncovered, and in the hand."[154]  *Young* cites these cases to show that legislatures may regulate "the permissible manner

---

[147]*Young*, 992 F.3d at 805, citing *English v. State*, 14 Am. Rep. 374, 35 Tex. 473 (1871).

[148]Tex. Const., Art. I, § 13 (1868).  It has been said that *English* was decided by "a court established by a State constitution (that of 1869) which was the product of military occupation and the disfranchisement of most of the State's inhabitants . . . ."  *Masters v. State*, 653 S.W.2d 944, 947 (Tex. App. 1983) (Powers, J., concurring).  Selective enforcement of the law may have been the rule.

[149]*Id.*, quoting *English*, 35 Tex. at 474.

[150]*English* at 476-77.

[151]*Andrews v. State*, 50 Tenn. 165, 177, 186-87 (1871).

[152]*Young*, 992 F.3d at 806.

[153]*Id.* at 807, citing *State v. Wilburn*, 66 Tenn. 57 (1872).

[154]*Id.*, quoting *Haile v. State*, 38 Ark. 564, 565 (1882).

Electronic copy available at: https://ssrn.com/abstract=3885910

of carrying a weapon in public."[155]  But that cuts against the power to ban absolutely.  Would the Ninth Circuit hold that Hawaii, if it enacted such a law, could not ban the carrying of military handguns in the hand?

But the definitive Arkansas case was *Wilson v. State* (1878), and *Young* simply disregards it.  That state's high court overturned a conviction for carrying a revolver, reasoning thus: "But to prohibit the citizen from wearing or carrying a war arm . . . is an unwarranted restriction upon his constitutional right to keep and bear arms. . . . If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."[156]

*Young* ventures into the early twentieth century,[157] but that's too far removed from 1791.  Of the cases discussed, it correctly states that "the state courts generally agree that the legislature can prohibit the carrying of concealed weapons."[158]  It should be borne in mind that most Northern states had minimal restrictions on carry, which is why "the state courts" *Young* refers to are almost exclusively Southern.  This limited number of courts, *Young* continues, upheld restrictions on open carry in certain places, open carry of certain weapons, and open carry without a license.[159]  Yet other than the *English* decision from Texas, none of the precedents upheld a complete ban on the carrying of handguns.  The general rule was that while the manner of carrying could be regulated, a complete ban in public of all types of handguns would be unconstitutional.

### E.  Slaves and Persons of Color Were Denied the Right to Bear Arms Because They Were Not Considered Citizens

While purporting to analyze nineteenth century laws and judicial decisions, *Young* entirely disregards restrictions on African Americans, both slaves and free persons of color.  Because they were not considered as part of "the people" to whom the right to bear arms applied, the Southern states generally prohibited them from carrying arms at all or gave officials discretion to issue or not to issue carry licenses to them.  Sound familiar?

A Virginia law provided that "[n]o free negro or mulatto, shall be suffered to keep or carry any fire-lock of any kind, any military weapon, or any powder or lead, without first

---

[155]*Id.*

[156]*Wilson v. State*, 33 Ark. 557, 559-60, 34 Am. Rep. 52 (1878).

[157]*Young*, 992 F.3d at 807-08.

[158]*Id.* at 808.

[159]*Id.*

27

Electronic copy available at: https://ssrn.com/abstract=3885910

obtaining a license from the court" where he resided, "which license may, at any time, be withdrawn by an order of such court."[160]  As a Virginia court held, among the "numerous restrictions imposed on this class of people [free blacks] in our Statute Book, many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States," were "the restriction . . . upon their right to bear arms."[161]

In Georgia, it was unlawful "for any slave, unless in the presence of some white person, to carry and make use of fire arms," unless the slave had a license from his master to hunt.[162]  It was also unlawful "for any free person of colour in this state, to own, use, or carry fire arms of any description whatever . . . ."[163]  Georgia's high court held: "Free persons of color have never been recognized here as citizens; they are not entitled to bear arms . . . ."[164]

Delaware forbade "free negroes and free mulattoes to have, own, keep, or possess any gun [or] pistol," except that such persons could apply to a justice of the peace for a permit to possess a gun or fowling piece, which could be granted if "the circumstances of his case justify his keeping and using a gun . . . ."[165]  The police power was said to justify restrictions such as "the prohibition of free negroes to own or have in possession fire arms or warlike instruments."[166]

North Carolina made it unlawful "if any free negro, mulatto, or free person of color, shall wear or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger or bowie-knife, unless he or she shall have obtained a licence" from the court.[167]  This was upheld as constitutional partly on the ground that "the free people of color cannot be considered as citizens . . . ."[168]  The court added: "It does not deprive the free man of color of the right to carry arms about his person, but subjects it to the control of the County Court, giving them the power to say, in the exercise of a sound discretion, who, of this class of

---

[160]Va. 1819, c. 111, § 8.

[161]*Aldridge v. Commonwealth*, 2 Va. 447, 449 (Gen. Ct. 1824).

[162]Digest of the Laws of the State of Georgia 424 (1802).

[163]§ 7, 1833 Ga. Laws 226, 228.

[164]*Cooper v. Savannah*, 4 Ga. 72 (1848).

[165]Ch. 176, § 1, 8 Laws of the State of Delaware 208 (1841).

[166]*State v. Allmond*,  7 Del. 612, 641 (Gen. Sess. 1856).

[167]*State v. Newsom*, 27 N.C. 250, 250 (1844) (quoting Act of 1840, ch. 30).

[168]*Id*. at 254.

28

**JA6466**

Electronic copy available at: https://ssrn.com/abstract=3885910

persons, shall have a right to the licence, or whether any shall."[169]  This is reminiscent of today's judicial jargon that the right of the people to bear arms is not infringed by laws granting officials discretion to deny them that very right.

*Dred Scott v. Sanford* (1857) notoriously held that African Americans were not citizens and had no rights that must be respected.[170]  Chief Justice Taney wrote that, if African Americans were considered citizens, "it would give them the full liberty of speech . . .; to hold public meetings upon political affairs, and to keep and carry arms wherever they went."[171]

*Young* was unable to find a single nineteenth-century statute or judicial decision that subjected a person's right to bear arms to the discretion of a governmental official.  Yet it needed such precedents to support its thesis that this is permissible.  Had the court considered the plight of slaves and free persons of color, it would have found the precedents it sought – except that would demonstrate that its purported rule befitted only persons who were not considered citizens or among "the people."

### F. None of the Early Treatises Countenanced a Carry Ban

*Young* seeks support from a number of standard treatises.[172]  They flatly contradict the thesis that carrying arms may be generally banned or may be left to the discretion of an official.

The court begins with St. George Tucker, who stated that "[t]he right of self defence is the first law of nature"; *Young* adds, with no basis, that Tucker "is principally concerned with the regulation of military arms, such as muskets, rifles, or shotguns, which were prohibited for a time in England 'under the specious pretext of preserving the game.'"[173] Here's what Tucker actually said:

> The right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible. Wherever . . . the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink

---

[169]*Id.* at 253.

[170]*Scott v. Sanford*, 60 U.S. (19 How.) 393 (1857).

[171]*Id.* at 417.

[172]*Young*, 992 F.3d at 808-11.

[173]*Id.* at 809, quoting 1 St. George Tucker, *Blackstone's Commentaries*, at app'x 300.

### JA6467

Electronic copy available at: https://ssrn.com/abstract=3885910

of destruction.[174]

*Young* just invented the claim that Tucker "is principally concerned with the regulation of military arms," although that was a concern too, but the reference to self-defense indicates concern with handguns, and the reference to preserving the game indicates concern with hunting arms. All of these uses were included in Tucker's statement: "In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side."[175]

*Young* further quotes Joseph Story "on the logic that bearing arms acted as 'a strong moral check against the usurpation and arbitrary power of rulers.'"[176] Yet *Young*'s thesis is that those very rulers may ban the bearing of arms.

"Most nineteenth-century American authors assumed that the state had the right to regulate arms in the public square," *Young* boldly asserts, actually meaning "to ban" rather than "to regulate." But its quotation from William Rawle precludes that claim: "[E]ven the carrying of arms abroad by a single individual, *attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them*, would be sufficient cause to require him to give surety of the peace."[177] It quotes Francis Wharton, but leaves out the part about the crime being "where a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people . . . .*"[178]

*Young* further defeats itself by quoting Thomas Cooley, who said that "the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose."[179] *Young* argues that the people need permission and that it can be arbitrarily denied. It quotes passages from New York writer Benjamin Vaughan Abbott opining against careless gun handling and carrying for defense in settled areas,

---

[174]*Id.*, app'x 300.

[175]*Id.*, app'x 19

[176]*Young*, 992 F.3d at 809, quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* 746 (1833).

[177] William Rawle, *A View of the Constitution of the United States of America* at 126 (1829) (emphasis added).

[178]Francis Wharton, *A Treatise on the Criminal Law of the United States* 527–28 (Philadelphia: James Kay, 1846) (emphasis added).

[179]Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880).

30

**JA6468**

Electronic copy available at: https://ssrn.com/abstract=3885910

but ignores what Abbott said about the actual state of the law: "Carry a pistol if you please, but you shall carry it openly.  Hang it in a belt, or hold it in your hand, or keep it in sight so that people can see you go armed . . . ."[180]  New York itself did not pass a definitive ban on carrying a concealed firearm in cities without a license until 1910.[181]

Lastly, *Young* quotes John Ordronaux, who wrote that "the carrying of concealed weapons may be absolutely prohibited without the infringement of any constitutional right, while a statute forbidding the bearing of arms openly would be such an infringement."[182]  *Young* concedes that to be the rule set forth in some of the above cases from Georgia, Louisiana, and Tennessee, but incorrectly states that the conviction in *Andrews* was upheld for openly carrying.[183]  To the contrary, the indictment in *Andrews* was quashed because it only charged that he carried a pistol without specifying the type;[184] recall the holding that the state could not ban the carrying of a repeater of the type a soldier would carry.

*Young* concludes regarding the above treatises: "None of these commentaries, with the possible exception of Ordronaux, seriously questions the power of the government to regulate the open carrying of arms in public."[185]  To the contrary, *not a single one* of these commentators opined that the open carrying of arms in public could be banned.

G. The Fourteenth Amendment Sought to Do Away with Black Code Requirements that African-Americans Obtain a License to Bear Arms Subject to an Official's Discretion

*Young* seems persistently AWOL when it comes to dramatic parts of our constitutional history that definitively repudiate the claim that government officials may have discretion to decide who, if anyone, may be licensed to carry a firearm.  The black codes gave such discretion to officials as applied to the freedmen, Congress passed legislation to protect the right of African Americans to bear arms, and the Fourteenth Amendment was adopted in part to constitutionalize the right of all of the people at large to bear arms.

---

[180]Benjamin Vaughan Abbott, *Judge and Jury* 337 (New York: Harper and Brothers, 1880).

[181]N.Y. Penal Law § 1897 (1910), in *People v. Warden of City Prison*, 154 A.D. 413, 139 N.Y.S. 277, 280 (1913).

[182]John Ordronaux, *Constitutional Legislation in the United States* 242-43 (1891).

[183]*Young*, 992 F.3d at 811.

[184]*Andrews*, 50 Tenn. at 192.

[185]*Young*, 992 F.3d at 811.

31

**JA6469**

Electronic copy available at: https://ssrn.com/abstract=3885910

That issue came to the fore when slavery was abolished. As Frederick Douglass explained in 1865, "the black man has never had the right either to keep or bear arms."[186] The Southern states meant to keep it that way by enacting the black codes. The first state law noted by the Supreme Court in *McDonald v. Chicago* as typical of what the Fourteenth Amendment would invalidate required a license to have a firearm that an official had discretion to limit or deny. In 1865, Mississippi provided that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind . . . ."[187]

Second Amendment deprivations were debated in bills leading to enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866. Rep. Thomas Eliot, sponsor of the former, explained that the bill would invalidate laws like that of Opelousas, Louisiana, providing that no freedman "shall be allowed to carry fire-arms" without permission of his employer and as approved by the board of police.[188] He noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms . . . ."[189]

Senator Garret Davis said that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[190] Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[191] Yet violations persisted, such as in Alexandria, Virginia, which continued "to enforce the old law against them [freedmen] in respect to whipping and carrying fire-arms . . . ."[192]

Representative William Lawrence of Ohio discussed the need to protect freedmen, quoting General D. E. Sickles' General Order No. 1 of January 1, 1866, for the Department of South Carolina, which negated the state's prohibition on possession of firearms by blacks and, at the same time, recognized the right of all peaceable persons to carry arms:

---

[186]"In What New Skin Will the Old Snake Come Forth?" Address delivered in New York City, May 10, 1865, 4 *The Frederick Douglass Papers* 84 (1991).

[187]Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, quoted in *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010).

[188]Cong. Globe, 39th Cong., 1st Sess. 517 (1866).

[189]*Id*. at 657.

[190]*Id*. at 371.

[191]*Id*. at 1182.

[192]Report of the Joint Committee on Reconstruction, H.R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, at 21 (1866).

**JA6470**

Electronic copy available at: https://ssrn.com/abstract=3885910

The constitutional rights of all loyal and well disposed inhabitants to bear arms, will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons; nor to authorize any person to enter with arms on the premises of another without his consent.[193]

Introducing the Fourteenth Amendment in the Senate, Jacob Howard referred to "the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as . . . the right to keep and bear arms . . . ."[194]  The Amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[195]

James Lewis, a freedman in Mississippi, was arrested for carrying a musket without the required license.  Chief Justice Handy of Mississippi's highest court upheld the conviction, declaring the federal Civil Rights Act unconstitutional and holding that the state arms guarantee protected only citizens.[196]  In a separate case, Judge R. Bullock acquitted Wash Lowe and other freedmen for carrying firearms without a license, holding the requirement violative of the right to bear arms for self-defense, which was "a natural and personal right – the right of self-preservation."[197]  General Ulysses S. Grant noted these decisions in a report stating: "The statute prohibiting the colored people from bearing arms, without a special license, is unjust, oppressive, and unconstitutional."[198]

The Freedmen's Bureau Act was passed by the same two-thirds-plus members of Congress who voted for the Fourteenth Amendment.[199]  The Act declared that:

the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition

---

[193]Cong. Globe, 39th Cong., 1st Sess., 908-09 (1866).  See *McDonald*, 561 U.S. at 773 & n.21 (citing this order and commenting that "Union Army commanders took steps to secure the right of all citizens to keep and bear arms").

[194]Cong. Globe, 39th Cong., 1st Sess. 2765 (1866).

[195]*Id.* at 3210.

[196]"Mississippi . . .  The Civil Rights Bill Declared Unconstitutional by a State Court," *New York Times*, Oct. 26, 1866, at 2; see *McDonald*, 561 U.S. at 775 n.24.

[197]*Id.*

[198]Cong. Globe, 39th Cong., 2d Sess., 33 (1866).

[199]Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* 41-43 (1998).

33

**JA6471**

Electronic copy available at: https://ssrn.com/abstract=3885910

of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color or previous condition of slavery.[200]

The Civil Rights Act of 1871, which remains law today, provides for a civil action against a person who, under color of state law, subjects a citizen to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[201] The right to bear arms was one of the rights intended to be protected by the enactment.[202]

After passage of the Act, a Congressional investigation found widespread disarming of African Americans and a continuation of the old black codes whereby "a free person of color was only a little lower than a slave. . . . [and hence] forbidden to carry or have arms."[203] President Grant reported that Ku Klux Klan groups continued "to deprive colored citizens of the right to bear arms and of the right to a free ballot . . . ."[204] The Klan targeted the black person, Senator Daniel Pratt noted, who would "tell his fellow blacks of their legal rights, as for instance their right to carry arms and defend their persons and homes."[205]

*Young*'s silence about the above part of our constitutional history is deafening. Free citizens had a right to carry arms; slaves did not. Under slavery, free persons of color were prohibited from carrying arms without a license that was subject to the discretion of the authorities. Under the black codes, the same restriction was applied to all freedmen. The Civil Rights Act and Freedmen's Bureau Act of 1866 sought to negate these state infringements, and it took the Fourteenth Amendment to constitutionalize the right to bear arms for all persons.

H. Twentieth-Century Aberrations Teach Nothing about the Original Understanding

*Young* states: "We are not inclined to review twentieth-century developments in detail, in part because they may be less reliable as evidence of the original meaning of the American right to keep and bear arms."[206] In fact, they illustrate how some laws completely deviated from the

---

[200]§14, 14 Stat. 173, 176-77 (1866).

[201]17 Stat. 13 (1871). Section 1 survives as 42 U.S.C. § 1983.

[202]*McDonald*, 561 U.S. at 776, citing Halbrook, *Freedmen* 120-131.

[203]1 *Report of the Joint Select Committee to Inquire into the Condition of Affairs in the Late Insurrectionary States* 261-62 (Feb. 19, 1872).

[204]Ex. Doc. No. 268, 42nd Cong., 2d Sess., 2 (1872).

[205]Cong. Globe, 42nd Cong., 2d Sess., 3589 (1872).

[206]*Id.*

34

**JA6472**

Electronic copy available at: https://ssrn.com/abstract=3885910

original meaning.  The very first example is Massachusetts, which did not ban carrying a loaded pistol or revolver without authorization until 1906.[207]  Between its first settlement in 1628 and 1906, citizens could peaceably carry firearms freely.

In 1909, Alabama banned the carrying of a pistol off of one's premises. Through laws passed in 1911 and 1913, New York banned the carrying of handguns without a license. Those are *Young*'s only examples of outright bans on carrying firearms without a license.  California, Pennsylvania, and the other states *Young* cites only banned the carrying of unlicensed concealed handguns.[208]  Open carry remained the almost-universal rule nationwide.  The three outlier states *Young* cites, which did not even ban unlicensed carry until the twentieth century, teach nothing about the original meaning of the right to bear arms.

<center>Conclusion</center>

Young concludes its historical survey:

> Our review of more than 700 years of English and American legal history reveals a strong theme: government has the power to regulate arms in the public square. . . . [T]he overwhelming evidence from the states' constitutions and statutes, the cases, and the commentaries confirms that we have never assumed that individuals have an unfettered right to carry weapons in public spaces. Indeed, we can find no general right to carry arms into the public square for self-defense.[209]

The court has utterly failed to make any such historical case.  It begins with the false premise that the Second Amendment incorporates every medieval royal decree, it obscures the English rule that going armed was not an offense unless done so in a manner to terrify the subjects, and it reads the English Declaration of Rights in the narrowest fashion without recognizing that American freedoms are broader.  The period from the pre-Revolutionary period through the ratification of the Second Amendment is not even mentioned.  It fails to appreciate that peaceable carry was the rule in the nineteenth century as expressed in state statutes and court decisions, with restrictions on concealed carry being the primary exception.

The *Young* majority ignores the only antebellum laws that provided for discretionary licenses to carry – those applicable primarily to free persons of color.  And it ignores the impetus for the Fourteenth Amendment being to invalidate laws banning firearm carry to freedmen without, again, a discretionary license.

---

[207]1906 Mass. Acts 150, ch. 172, § 2.

[208]*Young*, 992 F.3d at 812-13.

[209]*Id*. at 813.

<center>35</center>

Electronic copy available at: https://ssrn.com/abstract=3885910

These historical failings are predictable, for most of all *Young* ignores the Second Amendment's text – "the *right* of *the people* to keep and *bear arms*, shall not be infringed." The court's premise is that no such right exists, that only the few have this privilege, that bearing arms is reserved for an elite, and that banning a right is not infringement. The "history" it presents supposedly shows that "carrying arms in public was not treated as a fundamental right,"[210] despite the right of the people to bear arms being in the text of the Constitution.

---

[210]*Id*. at 820.

Electronic copy available at: https://ssrn.com/abstract=3885910

# EXHIBIT 72

# At a GENERAL ASSEMBLY held at

Burlington from the Twentieth Day of November to the Twenty-firſt Day of December 1771, in the Twelfth Year of the Reign of King George the Third, the following Laws were paſſed.

## SESSION the FOURTH.

### CHAP. DXXXIX.

*An* ACT *to continue and amend an Act, entitled, An* Act *for better ſettling and regulating the* Militia *of this Colony of* New-Jerſey; *for the repelling Invaſions, and ſuppreſſing Inſurrections and Rebellions.** 

Paſſed Dec. 21, 1771.

WHEREAS the Act paſſed in the Nineteenth Year of the Reign *Preamble.* of our late Sovereign Lord King *George* the Second, entitled, *An* Act *for better ſettling and regulating the Militia of this Colony of* New-Jerſey; *for the repelling Invaſions, and ſuppreſſing Inſurrections and Rebellions,* will expire at the End of this Seſſion of Aſſembly;

Sect. 1. BE IT ENACTED *by the Governor, Council and General Aſſem- Limitation. bly, and it is hereby Enacted by the Authority of the ſame,* That the ſaid Act, entitled, *An* Act *for better ſettling and regulating the Militia of this Colony of* New-Jerſey; *for the repelling Invaſions, and ſuppreſſing Inſurrections and Rebellions,** ſhall be, and hereby is continued, and every Article and Clauſe therein contained ſhall be and remain in full Force, from the Publication hereof, to the firſt Day of *May* which will be in the Year of our Lord One Thouſand Seven Hundred and Seventy-ſeven, and from thence to the End of the next Seſſion of the General Aſſembly of this Colony, and no longer.

2. AND WHEREAS it has been a Cuſtom of late, in ſome of the Counties of this Colony, to chooſe the Militia Officers Conſtables; for preventing the ſame for the Future, BE IT ENACTED *by the Autho- Commiſſion- ity aforeſaid,* That, during the Continuance of this Act, it ſhall not be *ed Officers not to be cho-* lawful for any Court of General Quarter-Seſſions of the Peace, or for *ſen Conſta-* any of the Inhabitants of this Colony, at their annual Town-meetings, *bles.* to appoint or chooſe any commiſſioned Officer, while in Commiſſion, to be a Conſtable; any Law, Uſage or Cuſtom to the contrary notwithſtanding.

### CHAP. DXL.

*An* ACT *for the Preſervation of* Deer *and other Game, and to prevent treſpaſſing with Guns.*

Paſſed Dec. 21, 1771.

WHEREAS the Laws heretofore paſſed in this Colony for the *Preamble.* Preſervation of Deer and other Game, and to prevent treſpaſſ- ing

* Chap. CC.

JA6476

Digitized from Best Copy Available

ing with Guns, Traps and Dogs, have, by Experience, been found in-
fufficient to anfwer the falutary Purpofes thereby intended ; Therefore,

No Perfon to carry a Gun on Lands not his own, except, &c.

 Sect. 1. BE IT ENACTED *by the Governor, Council and General Af-*
*fembly of this Colony of* New-Jersey, *and it is hereby Enacted by the Au-*
*thority of the fame,* That if any Perfon or Perfons fhall prefume, at
any Time after the Publication hereof, to carry any Gun on any
Lands not his own, and for which the Owner pays Taxes, or is in his
lawful Poffeffion, unlefs he hath Licenfe or Permiffion in Writing from
the Owner or Owners or legal Poffeffor, every fuch Perfon fo offending,
and convicted thereof, either upon the View of any Juftice of the Peace
within this Colony, or by the Oath or Affirmation of one or more Wit-
neffes, before any Juftice of the Peace of either of the Counties, Cities or
Towns-corporate of this Colony, in which the Offender or Offenders
may be taken or refide, he, fhe or they, fhall, for every fuch Offence, for-
feit and pay to the Owner of the Soil, or his Tenant in Poffeffion, the

Penalty.

Sum of *Forty Shillings*, with Cofts of Suit ; which Forfeiture fhall
and may be fued for and recovered by the Owner of the Soil, or Te-
nant in Poffeffion, before any Juftice of the Peace in this Colony, for
the Ufe of fuch Owner or Tenant in Poffeffion.

No Perfon to drive Deer or other Game, except, &c.

 2. AND BE IT ENACTED *by the Authority aforefaid,* That if any
Perfon fhall prefume, at any Time after the Publication of this Act,
to hunt or watch for Deer with a Gun, or fet in any Dog or Dogs to
drive Deer, or any other Game, on any Lands not his own, and for
which the Owner or Poffeffor pays Taxes, or is in his lawful Poffeffion,
unlefs he hath Licenfe or Permiffion in Writing from fuch Owner or
Owners or legal Poffeffor ; every fuch Perfon fo offending, and being
convicted thereof in Manner aforefaid, fhall, for every fuch Offence,
forfeit and pay to the Owner of the Soil, or Tenant in Poffeffion, the

Penalty.

Sum of *Forty Shillings*, with Cofts of Suit ; provided, that nothing
herein contained fhall be conftrued to extend to prevent any Perfon
carrying a Gun upon the King's Highway in this Colony.

Penalty on Non-Refi-dents.

 3. AND BE IT FURTHER ENACTED *by the Authority aforefaid,* That
if the Perfon or Perfons offending againft this Act be Non-Refidents
of this Colony, he or they fhall forfeit and pay for every fuch Offence
*Five Pounds,* and fhall forfeit his or their Gun or Guns to any Perfon
or Perfons who fhall inform and profecute the fame to Effect, before
any Juftice of the Peace in any County of this Colony, wherein the
Offender or Offenders may be taken or apprehended.

Penalty for killing, &c. Deer out of Seafon.

 4. AND BE IT ENACTED *by the Authority aforefaid,* That if any
Perfon or Perfons fhall kill, deftroy, hunt or take any Doe, Buck,
Fawn, or any Sort of Deer whatfoever, at any other Time or Seafon,
except only between the firft Day of *September* and the firft Day of
*January* yearly and every Year, he, fhe or they fo offending, fhall for-
feit and pay the Sum of *Forty Shillings* for each and every Offence ;
to be fued for, recovered and applied as hereafter is directed.

What fhall be Evidence of fuch Kill-ing, &c.

 5. AND, for the better and more effectual convicting of Offenders
againft this Act, BE IT ENACTED *by the Authority aforefaid,* That any
and every Perfon or Perfons in whofe Cuftody fhall be found, or who
                     fhall

Digitized from Best Copy Available

fhall expofe to Sale, any green Deerfkins, or frefh Venifon killed at any Time after the firft Day of *January*, and before the firft Day of *September* aforefaid, and fhall be thereof convicted by the Oath or Affirmation of one or more credible Witneffes, fhall be deemed guilty of offending againft this Act, and be fubjected to the Penalties of killing Deer out of Seafon.

6. AND WHEREAS great Numbers of idle and diforderly Perfons make a Practice of hunting on the wafte and unimproved Lands in this Colony, whereby their Families are neglected, and the Publick is prejudiced by the Lofs of their Labour, BE IT THEREFORE ENACTED *by the Authority aforefaid*, That, from and after the firft Day of *January* next, no Perfon or Perfons whatfoever (except fuch Perfons as are by the Laws of this Colony qualified to vote for Reprefentatives in General Affembly, in Right of their Freeholds, and their Sons being of the Age of eighteen Years or upwards, and living with their Parent or Parents, or being Freeholders) fhall, on any Pretence whatever, hunt on the wafte and unimproved Lands in this Colony ; and if any Perfon or Perfons, not qualified as aforefaid, fhall prefume to hunt as aforefaid, he or they fo offending fhall forfeit and pay, for every fuch Offence, the Sum of *Twenty Shillings ;* to be recovered by Action of Debt, with Cofts, by any Perfon who fhall fue for the fame ; to be applied one Half to the Profecutor, and the other Half to the Ufe of the Poor of the Townfhip or Precinct where the Fact was committed. *Who may hunt on unimproved Lands.* *Penalty on Offenders.*

7. AND BE IT ENACTED *by the Authority aforefaid*, That if any Perfon or Perfons within this Colony fhall fet any Trap or other Device whatfoever, larger than what is ufually and commonly fet for Foxes and Mufkrats, fuch Perfon, fetting fuch Trap or other Device, fhall pay the Sum of *Five Pounds*, and forfeit the Trap or other Device, fhall fuffer three Months Imprifonment, and fhall alfo be liable to make good all Damages any Perfon fhall fuftain by fetting fuch Trap or other Device, and the Owner of fuch Trap or other Device, or Perfon to whom it was lent, fhall be efteemed the Setter thereof, unlefs it fhall be proved, on Oath or Affirmation, what other Perfon fet the fame, or that fuch Trap or other Device was loft by faid Owner or Perfon to whom it was lent, and abfolutely out of his Power ; and if the Setter of the Trap or other Device be a Slave, and it be his own voluntary Act, he fhall (unlefs the Mafter or Miftrefs fhall pay the Fine) in Lieu of fuch Fine, be publickly whipped with thirty Lafhes, and committed till the Cofts are paid ; and that the faid Trap or other Device fhall be broken and deftroyed in the View and Prefence of the Juftice of the Peace before whom they are brought : And if any Perfon or Perfons fhall have Poffeffion of, or there fhall be found in his or their Houfe, any Trap or Traps, Device or Devices whatfoever, for taking of Deer, fuch Perfon or Perfons fhall be fubjected to the fame Penalty as if he or they were convicted of fetting fuch Trap or Traps, or other Device. *Penalty on fetting Traps, &c.* *Penalty on a Slave fetting fuch Trap, &c.* *Penalty on keeping fuch Trap, &c.*

8. AND, for encouraging the Deftruction of fuch Traps and Devices, BE IT ENACTED *by the Authority aforefaid*, That if any Perfon fhall feize any Trap or other Device for the taking Deer, and fhall carry fuch Trap or other Device to any Magiftrate of the County where fuch Trap or Device was feized, fuch Perfon fhall be entitled to *Reward for feizing a Trap, &c.*

4 Q                                                                    an

Digitized from Best Copy Available

an Order from the faid Magiftrate to the Collector of fuch County, to pay him the Sum of *Ten Shillings*, out of any Money in his Hands raifed for the Ufe of the County ; which Sums fhall be allowed to fuch Collector on the Settlement of his Accounts.

*Penalty on a Smith making or mending fuch Trap, &c.*

9. AND BE IT FURTHER ENACTED *by the Authority aforefaid*, That every Smith or other Artificer, who fhall hereafter make or mend any fuch Trap or other Device aforefaid, he fhall forfeit and pay the Sum of *Forty Shillings* ; and the Perfon carrying fuch Trap or other Device to the Artificer aforefaid, fhall forfeit and pay the Sum of *Twenty Shillings*. And every Perfon who fhall bring into this Colony any fuch Trap or Device as aforefaid fhall forfeit and pay the Sum of *Forty Shillings*. And if the Perfon who fhall carry the fame to the Smith or Artificer fhall be fo poor as that he fhall not be able to pay the Forfeiture aforefaid, he fhall be committed to the common Gaol, until he fhall prove who is Owner of fuch Trap or Device, or who delivered the fame to him ; and in fuch Cafe the Forfeiture aforefaid fhall be levied on the Goods, or in Failure of Goods, on the Body of the Owner of fuch Trap or Device, or the Perfon who delivered the fame to the Pauper, and the Trap or Device fhall be forfeited and deftroyed.

*Penalty on bringing fuch Trap, &c. into the Colony.*

*Penalty for fetting loaded Guns.*

10. AND WHEREAS a moft dangerous Method of fetting Guns has too much prevailed in this Province, BE IT ENACTED *by the Authority aforefaid*, That if any Perfon or Perfons within this Colony fhall prefume to fet any loaded Gun in fuch Manner as that the fame fhall be intended to go off or difcharge itfelf, or be difcharged by any String, Rope, or other Contrivance, fuch Perfon or Perfons fhall forfeit and pay the Sum of *Six Pounds* ; and on Non-payment thereof fhall be committed to the common Gaol of the County for fix Months.

*Application of Penalties.*

11. AND BE IT FURTHER ENACTED *by the Authority aforefaid*, That the Fines and Forfeitures in this Act expreffed, and not particularly appropriated, fhall be paid, one Half to the Profecutor, and the other Half to and for the Ufe of the Poor of the Town, Precinct or Diftrict, where the Offence is committed ; and that the Execution of this Act, and every Part thereof, fhall be within the Cognizance and Jurifdiction of any one Magiftrate or Juftice of the Peace, without any Reference to the Act for Trial of fmall Caufes in this Colony.

*Jurifdiction given to one Magiftrate.*

*This Act not to affect Parks.*

12. AND BE IT ENACTED, That nothing in this Law fhall be conftrued to extend to reftrain the Owners of Parks, or of tame Deer, from killing, hunting or driving their own Deer.

*Penalty on Magiftrate neglecting his Duty.*

13. AND BE IT ALSO ENACTED *by the Authority aforefaid*, That if any Juftice of the Peace or other Magiftrate, within this Province, fhall have Information of any Perfons offending againft this Act, in killing Deer out of Seafon, fetting and making Traps, Non-Refidents killing Deer, and Perfons fetting of Guns, and fhall not profecute the fame to Effect within two Months after fuch Information, he fhall forfeit and pay the Sum or Sums to which the Offender againft this Act would have been liable.

14. AND

14. And be it Enacted *by the Authority aforesaid*, That the Justices at every Quarter-Sessions of the Peace shall cause this Act to be publickly read; and give in Charge to the Grand-Jury to particularly inquire and present all Persons for killing Deer out of Season, setting or making Traps, and all Non-Residents killing, destroying, hunting and taking any Sort of Deer, and all Persons setting of Guns; and, upon Conviction for either of the said Offences, the said Justices shall set and impose the Fines and Penalties herein before-mentioned, with Costs of Suit. *This Act to be published and executed.*

15. And be it Enacted *by the Authority aforesaid*, That if any Person or Persons whatsoever, whether the Accused or Accuser, Plaintiff or Defendant, shall think themselves aggrieved by any of the Judgments given by the said Justices or other Magistrates, for any Suit commenced by Virtue of this Act; then it shall and may be lawful for such Person or Persons to appeal, on giving sufficient Security for the Forfeitures and Costs, to the next Court of General Quarter-Sessions, held for such County where such Judgment shall be given; which Court is hereby empowered to hear and determine all and every such Appeal or Appeals. *Appeal given to next Sessions.*

16. And be it Enacted *by the Authority aforesaid*, That if any Person or Persons, within this Colony, shall, after the Publication of this Act, watch with a Gun, on any uninclosed Land within two Hundred Yards of any Road or Path, in the Night Time, whether the said Road is laid out by Law or not, or shall stand or station him or themselves upon or within two Hundred Yards of any Road as aforesaid, for shooting at Deer driven by Dogs, he or they so offending, shall, on Conviction, forfeit and pay the Sum of *Five Pounds* for every such Offence; to be recovered by Action of Debt, or Presentment of the Grand-Jury as aforesaid, and pay all Damages. *Penalty for watching in the Night near a Road.*

17. Provided always, That the sixth Section of this Act shall not be construed to affect any Native *Indian*; and that nothing in this Act shall be construed to prevent the Inhabitants of *Essex, Bergen, Morris* and *Sussex*, from making, having in their Houses, or setting Traps of five Pounds Weight or more for Bears, Wolves, Foxes, or any other wild Beasts, Deer only excepted. *Not to affect Indians, nor Essex, Bergen, Morris or Sussex.*

18. And be it further Enacted *by the Authority aforesaid*, That all former Laws made in this Colony for the Preservation of Deer and other Game, and to prevent trespassing with Guns, and regulating the Size of Traps, shall be, and they are hereby repealed. *Repeal of Former Laws.*

C H A P.    DXLI.

*An* A C T *declaring the River* Delaware *a common* Highway, *and for improving the* Navigation *in the said River*.

Passed Dec. 21, 1771.

Whereas the improving the Navigation in Rivers is of great Importance to Trade and Commerce; And whereas the River *Delaware* *Preamble.*

Digitized from Best Copy Available

# EXHIBIT 73

# LAWS

OF THE

# STATE OF INDIANA,

PASSED AT

## THE FORTIETH REGULAR SESSION

OF THE

## GENERAL ASSEMBLY,

BEGUN ON THE SIXTH DAY OF JANUARY, A. D. 1859.

BY AUTHORITY.

INDIANAPOLIS:
JOHN C. WALKER, STATE PRINTER,
1859.

**JA6482**

MISDEMEANOR.    **129**

## CHAPTER LXXVIII.

AN ACT to prevent carrying concealed or dangerous weapons, and to
provide punishment therefor.

### [Approved February 23, 1859.]

SECTION 1. *Be it enacted by the General Assembly of* Carrying con-
*the State of Indiana,* That every person not being a cealed weapons
prohibited.
traveler, who shall wear or carry any dirk, pistol,
bowie-knife, dagger, sword in cane, or any other dan-
gerous or deadly weapon concealed, or who shall carry
or wear any such weapon openly, with the intent or
avowed purpose of injuring his fellow man, shall, upon
conviction thereof, be fined in any sum not exceeding
five hundred dollars.

———

## CHAPTER LXXIX.

AN ACT to prevent the throwing or depositing any carrion or dead
animal into any running stream or lake of water in this State, and to
prevent the depositing or burying any carrion or dead animal on the
banks of the same, and prescribing the penalty for the violation
thereof.

### [Approved March 3, 1859.]

SECTION 1. *Be it enacted by the General Assembly of* Throwing carrion
*the State of Indiana,* That any person who shall throw in running
streams prohibit-
or deposit any dead animal or carrion in any running ed.
stream of water, or any lake within this State, or bury
or deposit any dead animal or carrion on the banks of
any running stream or lake of water within this State,
so that the water may become vitiated thereby, shall be
guilty of a misdemeanor, and upon conviction thereof
shall be fined in any sum not less than five dollars nor
more than twenty dollars.

9

**JA6483**

# EXHIBIT 74

# ORDINANCE

OF THE

# CITY OF NASHVILLE,

TO WHICH ARE PREFIXED THE

## State Laws Chartering and Relating to the City.

### WITH AN APPENDIX.

COMPILED BY

## WILLIAM K. McALISTER, Jr.,

CITY ATTORNEY.

NASHVILLE, TENN.:
MARSHALL & BRUCE, STATIONERS.
1881.

340                    ORDINANCES.

## CHAPTER 108.

### CARRYING PISTOLS, BOWIE-KNIVES, ETC.

SECTION

1. Penalty imposed for carrying pistols, bowie-knives, etc.
2. Duty of the police to arrest all persons carrying such weapons.
3. Penalty imposed on police officer for failing to arrest persons carrying deadly weapons.

SECTION

4. Police Commissioners instructed to increase number of patrolmen to thirty-four.
5. Provisions against carrying deadly weapons do not extend to police officers.

SECTION 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; *Provided, however,* That no ordinary pocket-knife and common walking-canes shall be construed to be deadly weapons.

SEC. 2. That it shall be the duty of every police officer who sees any person or persons with, or knows of any person carrying, such deadly weapons, to immediately arrest every such person, that they may be dealt with according to the provisions of this act.

SEC. 3. That every police officer who may refuse or neglect to immediately arrest every such person seen with or known to be carrying such deadly weapons, shall be deemed guilty of dereliction of duty, and, upon conviction thereof, shall be dismissed from service, and any two respectable citizens shall be deemed competent to prefer charges to the proper authorities against such police officer for such dereliction of duty.

SEC. 4. To the end that the provisions of this act may be more fully carried out, the Police Commissioners be, and are hereby, instructed to increase the number of patrolmen to thirty-four, to be uniformed, paid and controlled in accordance with the present police law.

SEC. 5. It is expressly understood that the provisions of this act relating to carrying such deadly weapons as are mentioned in the preceding sections, do not extend to police or other officers, or persons that are entitled by law to carry

**JA6486**

such deadly weapons, nor does it extend to the act of handling or moving such deadly weapons in any ordinary business way.

Sec. 6. That all laws and parts of laws in conflict with this act are hereby repealed, and this act to take effect from and after its passage, the public welfare requiring it.

Approved December 26, 1873.

---

## CHAPTER 109.

### SABBATH.

| SECTION | SECTION |
|---|---|
| 1. No water-craft to unload on Sunday. | keepers and apothecaries excepted. |
| 2. No vehicle to be laden on Sunday. | 4. Vendors of ice, ice-cream, soda water, cigars and tobacco excepted. |
| 3. No grocery or other place of ordinary business to be kept open on the Sabbath; tavern- | 5. No games allowed on Sunday. |

SECTION 1. That if any owner or owners of any steamboat, keel-boat, barge or other water-craft, should load or unload, or cause to be laden or unladen, any such steamboat, keel-boat, barge or other water-craft, on the Sabbath day, within the limits of the corporation of Nashville, unless by the written permission of the Mayor, every person so offending shall forfeit and pay, on conviction thereof, not less than twenty-five nor more than fifty dollars for every such offense.

SEC. 2. That if any person or persons shall load, or cause to be laden, any wagon, cart or dray on the Sabbath day, with any article or package of merchandise, cotton, tobacco or any produce of the country, or unload, or cause to be unladen, any such wagon, cart or dray, or shall receive into his, her or their house, store or warehouse, any such article or package of merchandise, cotton, tobacco, or produce of the country, every person so offending shall forfeit and pay the sum of one dollar for each and every offense.

SEC. 3. That no person or persons shall be allowed to keep his, her or their grocery, dram-shop, confectionery or other place of ordinary business open on the Sabbath day, nor to sell any spirituous liquors on said day, or to deal out the same

# EXHIBIT 75

JA6488

# DIGEST OF THE ORDINANCES

— OF THE —

# CITY OF NASHVILLE,

— TO WHICH ARE PREFIXED THE —

STATE LAWS INCORPORATING, AND RELATING
TO, THE CITY, WITH AN APPENDIX CON-
TAINING VARIOUS GRANTS
AND FRANCHISES.

COMPILED BY

CLAUDE WALLER, City Attorney,
and
FRANK SLEMONS, Assistant City Attorney

NASHVILLE, TENN.:
MARSHALL & BRUCE CO., STATIONERS AND PRINTERS.
1893.

REFORM CLUB,

representing money or property, or shall, at any such table or device, or at any game of chance, bet, win, or lose money or property, either in specie or by means of any thing representing the same, or shall suffer any such table or device, at which any game of chance is played, to be set up or used in any tenement in his possession or under his control, shall be deemed guilty of a misdemeanor.

735 (737). No person or persons shall erect or establish any gaming-table, wheel of the description commonly called or known by the name of the "wheel of fortune, equality, black and red," or of any other name or denomination whatever, within the limits of the corporation, under the penalty of fifty dollars for every twenty-four hours or less period such gaming-table or wheel be kept up.

736 (738). If any tavern-keeper or other householder within the limits of this corporation shall suffer or permit any of the before-mentioned gaming-tables or wheels to be erected, established, or kept in his, her, or their house, he, she, or they, so offending, shall forfeit and pay the sum of fifty dollars for every twenty-four hours, or any less period, which he, she, or they shall suffer or permit such gaming-table or wheel to be erected, established, or kept up; *Provided*, That nothing herein contained shall be so construed as to extend to backgammon boards.

737 (739). If any person or persons shall, at any time, in any tavern, ordinary or licensed house of entertainment, or grocery, within the corporation, or in any house attached thereto, or upon the lot or premises whereon such licensed house is or may be situated or erected, win or lose money, or any thing of value, at cards or any other game of hazard and address, every such person shall, on conviction thereof, forfeit and pay not less than five nor more than fifty dollars; and if any tavern-keeper, ordinary-keeper, or grocery-keeper shall suffer or permit any person or persons to lose money or any thing of value at any time in his, her, or their house, or on his, her, or their premises, at any game or games whatsoever, knowing the same, shall forfeit and pay for every such offense not less than five nor more than fifty dollars.

## III. THE CARRYING OF DEADLY WEAPONS.

SECTION.
738. Carrying pistols, etc.; penalty.
739. Duty of police in regard thereto.
740. Police may carry pistols.

SECTIONS.
741. Unlawful weapons to be seized and forfeited.

738 (742). Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly

JA6490

weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every such subsequent offense, shall be fined fifty dollars; *Provided, however*, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons.

**739 (743).** It shall be the duty of every police officer who sees any person or persons with, or knows of any person carrying such deadly weapons, to immediately arrest every such person, that they may be dealt with according to the provisions of this section.

**740 (744).** It is expressly understood that the provisions of the above sections, relating to carrying such deadly weapons, do not extend to police or other officers, or persons that are entitled by law to carry such deadly weapons; nor does it extend to the act of handling or moving such deadly weapons in any ordinary business way.

**741 (704).** All pistols, knives, and other weapons, the carrying of which upon the person is unlawful, which may be found upon the persons of individuals arrested by the metropolitan police, shall be seized by the captain of the metropolitan police, and shall be retained by him and forfeited to the Mayor and City Council, and shall, in no case, be returned to the individual from whom the same was taken, or to any one claiming the same.

### IV. LAWS IN REGARD TO BAWDY HOUSES AND SPORTING WOMEN.

| SECTION. | SECTION. |
|---|---|
| 742. Houses of ill fame prohibited; evidence of, what is. | sidewalks in front of their houses. |
| 743. Riding and walking with prostitutes prohibited. | 745. Proprietors not to allow minors in their houses. |
| 744. Prostitutes not to stand on the | 746. Penalty. |

**742 (727).** Any person or persons who shall keep within the limits of this corporation a house of ill fame, or who shall willfully permit any house owned by him, her, or them to be kept in a disorderly manner, viz.: a house to which men resort for the purpose of criminal intercourse with lewd women, such person or persons shall be subject to a fine of fifty dollars for such offense, and a like sum for every day such house may be so continued or kept; and it is hereby declared to be a sufficient evidence of such person or persons

# EXHIBIT 76



345.2
p9.

10 . 6 . / 2

# THE

# REVISED ORDINANCES

## OF

# PROVO CITY,

CONTAINING

## ALL THE ORDINANCES IN FORCE

ON THE FIRST DAY OF FEBRUARY, A. D. 1877, AND THE RULES AND
ORDER OF BUSINESS OF PROVO CITY COUNCIL.

TO WHICH IS PREFIXED

# THE ORGANIC ACT OF UTAH,

AND

THE CITY CHARTER, WITH AMENDMENTS THERETO.

Revised, Consolidated and Published

# BY AUTHORITY.

PRINTED AT THE DESERET NEWS STEAM PRINTING ESTABLISHMENT,
SALT LAKE CITY, UTAH,
1877.

JA6493

106                    REVISED ORDINANCES

## CHAPTER 6.—Offenses against the Peace of the City.

Riots.

SEC. 179. When three or more persons shall be riotously, unlawfully or tumultuously assembled, the Mayor or any Justice of the Peace, who shall have a knowledge or be informed thereof, is hereby authorized to make proclamation among the persons so assembled, or as near to them as he can safely approach, charging and commanding them immediately to disperse and peaceably depart to their habitations or lawful pursuits; and if, upon proclamation having been made, such persons shall not obey, the Mayor or Justice of the Peace may command the Marshal and any number of policemen, and all persons there being, and the full power of the city, and order that the offenders be brought before him to be dealt with according to law.

Proclamations.

Refusal to give prompt assistance.

SEC. 180. Every person who shall refuse to give prompt assistance, after proclamation and a call for his services have been made to secure an offender, as mentioned in the preceding section, is guilty of an offense.

Disturbing the quiet of street, etc.

SEC. 181. Every person who shall wilfully disturb the quiet of any street, alley, public or private building, neighborhood, private family or person or any lawful assembly or religious meeting, by giving false alarms of fire, by loud or unusual noises, ringing of bells, blowing of horns, or other instruments, or by indecent or obscene language, conversation or conduct, or by threatening or quarreling, or by any other device or means whatever, is guilty of an offense, and liable to a fine in any sum less than one hundred dollars.

SEC. 182. Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot,

JA6494

OF PROVO CITY.                107

false knuckles, bowieknife, dagger, or any other dan- *Carrying deadly weapons prohibited*
gerous or deadly weapon, is guilty of an offense, and
liable to a fine in any sum not exceeding twenty-five
dollars; *Provided*, that nothing in this section, shall *Proviso.*
be construed to apply to any peace officer, of the Unit-
ed States, the Territory of Utah, or of this city.

## CHAPTER 7.—Offenses against the Elective Franchise.

SEC. 183. Every person who shall vote more than *Fraudulent voting—changing ballots, etc.*
once at the same election, or knowingly offer to deposit
two or more ballots in the ballot box, or who shall
change any ballot, after the same has been deposited
in the ballot box; or who, after the election, adds or
attempts to add, any ballot to those legally polled, is
guilty of an offense, and liable to a fine in any sum
less than one hundred dollars, or imprisonment not ex-
ceeding one hundred days, or both.

SEC. 184. Every person who shall offer any bribe, *Bribing or intimidating electors.*
threat, or intimidation to any elector, for the purpose
of influencing his vote, or the vote of any elector, is
guilty of an offense, and liable to a fine in any sum less
than one hundred dollars, or imprisonment not exceed-
ing one hundred days, or both.

## CHAPTER 8.—Offenses against Good Morals.

SEC. 185. Every person who shall fish, hunt, or in- *Sunday, fishing, amusements and business prohibited on.*
dulge in any secular out-door amusements, or conspic-
uous or noisy secular labor, on the day of the week

JA6495

# EXHIBIT 77

# SESSION LAWS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

---

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

**JA6497**

16                    LAWS OF ARIZONA.

SEC. 3.    This Act shall take effect from and after its passage.

Approved March 18, 1889.

———————

No. 12.                    AN ACT

Concerning the Transaction of Judicial Business on Legal Holidays.

*Be it enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.    No Court of Justice shall be open, nor shall any Judicial business be transacted on any Legal Holiday, except for the following purposes:

1.    To give, upon their request, instructions to a Jury when deliberating on their verdict.

2.    To receive a verdict or discharge a Jury.

3.    For the exercise of the powers of a magistrate in a criminal action, or in a proceeding of a criminal nature; provided, that the Supreme Court shall always be open for the transaction of business; and provided further, that injunctions, attachments, claim and delivery and writs of prohibition may be issued and served on any day.

SEC. 2.    All Acts and parts of Acts in conflict with this Act are hereby repealed.

SEC. 3.    This Act shall be in force and effect from and after its passage.

Approved March 18, 1889.

———————

No. 13.                    AN ACT

Defining and Punishing Certain Offenses Against the Public Peace.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.    If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.

SEC. 2.    The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer

**JA6498**

LAWS OF ARIZONA.                    17

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3.   If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4.   The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5.   Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6.   Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7.   It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties

**18**                    LAWS OF ARIZONA.

shall notify the keepers of hotels, boarding houses and drink-
ing saloons in their respective Counties of their duties under
this law, and if after such notification any keeper of a hotel,
boarding house or drinking saloon, shall fail to keep notices
posted as required by this Act, he shall, on conviction thereof
before a Justice of the Peace, be fined in the sum of five dol-
lars to go to the County Treasury.

SEC. 8.   All Acts or parts of Acts in conflict with this Act
are hereby repealed.

SEC. 9.   This Act shall take effect upon the first day of
Apr 1, 1889.

Approved March 18, 1889.

---

No. 14.                 AN ACT

To Amend Paragraph 492, Revised Statutes.

*Be it Enacted by the Legislative Assembly of the Terrritory
of Arizona:*

SECTION 1.   That Paragraph 492, Chapter 5, Title 13, of
the R vised Statutes, be amended so as to read as follows: "If
he fail to attend in person or by deputy any term of the Dis-
trict Court. the Court may designate some other person to
perform the duties of District Attorney during his absence from
Court, who shall receive a reasonable compensation to be certi-
fied by the Court, and paid out of the County Treasury, which
the Court shall by order direct to be deducted from the salary
of the District Attorney, if the absence of such Attorney is
not excused by such Court."

SEC. 2.   That all Acts and parts of Acts in conflict with
this Act be, and the same are, hereby repealed.

SEC. 3.   That this Act shall take effect and be in force
from and after its passage.

Approved March 19, 1889.

---

No. 15.                 AN ACT

To Provide for the Payment of Boards of Supervisors of the
Counties within the Territory of Arizona.

*Be it Enacted by the Legislative Assembly of the Territory
of Arizona:*

SECTION 1.   Each member of the Board of Supervisors
within this Territory shall be allowed as compensation for their
services Five Dollars per day for each day's actual attendance
at the sitting of said Board, at which sitting any County busi-
ness is transacted; and twenty cents per mile actually traveled

**JA6500**

# EXHIBIT 78

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

JA6502

 

DATE DOWNLOADED: Fri Dec  8 11:45:15 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1890 412 .

ALWD 7th ed.
, , 1890 412 .

Chicago 17th ed.
"," Oklahoma - 1st Regular Session : 412-522

AGLC 4th ed.
'' Oklahoma - 1st Regular Session 412

OSCOLA 4th ed.
'' 1890 412           Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

**JA6503**

(2430) § **6.** Every person who, with intent to extort any
money or other property from another, sends to any person any Sending
letter or other writing, whether subscribed or not, expressing or threatening let-
implying, or adapted to imply, any threat, such as is specified in ter.
the second section of this article, is punishable in the same man-
ner as if such money or property were actually obtained by means
of such threat.

(2431) § **7.** Every person who unsuccessfully attempts by means Attempting to
of any verbal threat such as is specified in the second section of export money.
this article, to extort money or other property from another is
guilty of a misdemeanor.

ARTICLE 47.—CONCEALED WEAPONS.

SECTION.
1. Prohibited weapons enumerated.
2. Same.
3. Minors.
4. Public officials, when privileged.
5. Arms, when lawful to carry.

SECTION.
6. Degree of punishment.
7. Public buildings and gatherings.
8. Intent of persons carrying weapons.
9. Pointing weapon at another.
10. Violation of certain sections.

(2432) § **1.** It shall be unlawful for any person in the Terri- Prohibited
tory of Oklahoma to carry concealed on or about his person, sad- weapons enu-
dle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, merated.
slung-shot, sword cane, spear, metal knuckles, or any other kind
of knife or instrument manufactured or sold for the purpose of de-
fense except as in this article provided.

(2433) § **2.** It shall be unlawful for any person in the Terri- Same.
tory of Oklahoma, to carry upon or about his person any pistol,
revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles,
or any other offensive or defensive weapon, except as in this arti-
cle provided.

(2434) § **3.** It shall be unlawful for any person within this Minors.
Territory, to sell or give to any minor any of the arms or weapons
designated in sections one and two of this article.

(2435) § **4.** Public officers while in the discharge of their Public officials,
duties or while going from their homes to their place of duty, or when privileged.
returning therefrom, shall be permitted to carry arms, but at no
other time and under no other circumstances: *Provided, however,*
That if any public officer be found carrying such arms while under
the influence of intoxicating drinks, he shall be deemed guilty of
a violation of this article as though he were a private person.

(2436) § **5.** Persons shall be permitted to carry shot-guns or Arms, when
rifles for the purpose of hunting, having them repaired, or for kill- lawful to carry.
ing animals, or for the purpose of using the same in public muster
or military drills, or while travelling or removing from one place
to another, and not otherwise.

(2437) § **6.** Any person violating the provisions of any one of Degree of
the foregoing sections, shall on the first conviction be adjudged punishment.
guilty of a misdemeanor and be punished by a fine of not less than
twenty-five dollars nor more than fifty dollars, or by imprison-
ment in the county jail not to exceed thirty days or both at the
discretion of the court. On the second and every subsequent con-

CRIMES AND PUNISHMENT.

**Chap. 25.**

viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

*Public buildings and gatherings.*

(2438) § **7.**    It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

*Intent of persons carrying weapons.*

(2439) § **8.**    It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

*Pointing weapons at another.*

(2440) § **9.**    It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

*Violation of section seven.*

(2441) § **10.**    Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

ARTICLE 48.—FALSE PERSONATION AND CHEATS.

| SECTION. | SECTION. |
|---|---|
| 1.  False impersonation, punishment for. | 7.  False representation of charitable purposes. |
| 2.  False impersonation and receiving money. | 8.  Falsely representing banking corporations. |
| 3.  Personating officers and others. | 9.  Using false check. |
| 4.  Unlawful wearing of grand army badge. | 10.  Holding mock auction. |
| 5.  Fines, how paid. | |
| 6.  Obtaining property under false pretenses. | |

*Punishment for false impersonation.*

(2442) § **1.**    Every person who falsely personates another, and in such assumed character, either:

First.    Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second.    Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third.    Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth.    Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

# EXHIBIT 79

# LAWS

## OF THE

# STATE OF MARYLAND.

## MADE AND PASSED

At a Session of the General Assembly, begun and held at the
City of Annapolis, on the Third day of January, 1872,
and ended on the First day of April, 1872.

# 1872.

Published by  Authority.

## BALTIMORE:

### PUBLISHED BY JOHN MURPHY & CO.

*Publishers of the Maryland Code and Supplements, Maryland Reports, &c.*

### 182 BALTIMORE STREET.

S. S. MILLS, AND L. F. COLTON, State Printers.

### 1872.

**JA6507**

58                    LAWS OF MARYLAND.

Screw Dock Company," be and the same is hereby
revived, and shall continue in full force and effect
until the year eighteen hundred and ninety, and
until the end of the next session of the General As-
sembly that shall happen thereafter, to every intent
and purpose as if the corporate existence thereof had
not been interrupted, or the Act aforesaid had not
expired.

Re-organiza-    SEC. 2. *And be it enacted,* That the person or per-
tion.           sons holding stock in said corporation, shall, within
three months after the passage of this Act, meet for
the purpose of re-organizing the same at the office
last occupied by said corporation, for the transaction
of business, and at such meeting, of which the holder
or holders of all said stock shall be duly notified,
transfers of stock may be made by the holder or
holders thereof, on the books of the company, and
officers of the company may be elected, and such
other business transacted as may be necessary for
the interest of said corporation.

In force.       SEC. 3. *And be it enacted,* That this Act shall take
effect from the date of its approval by the Governor.

Approved February 26, 1872.

————————•◦•————————

CHAPTER 42.

AN ACT to add an additional section to article two
of the Code of Public Local Laws, entitled "Anne
Arundel county," sub-title "Annapolis," to pre-
vent the carrying of concealed weapons in said
city.

Additional      SECTION 1. *Be it enacted by the General Assembly of*
section.        *Maryland,* That the following section be added to
article two, of the Code of Public Local Laws, en-
titled "Anne Arundel county," sub-title "Annapolis:"

**JA6508**

WM. PINKNEY WHYTE, Esquire, Governor.    57

Sec. 246. It shall not be lawful for any person to <sup></sup>Concealed weapons. carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected as other fines and penalties are now collected; *provided*, the provisions of the section Proviso. shall not apply to any officer of the law, either of the State or city, where any pistol or other weapon is a part of the prescribed outfit of said officer, *and provided further*, that either party, feeling aggreived at the decision of said Justice of the Peace, shall have the right to appeal to the Circuit Court of Anne Arundel county.

Sec. 2. *And be it enacted*, That this Act shall take In force. effect from the date of its passage.

Approved February 26, 1872.

———————•◦•———————

## CHARTER 43.

AN ACT to amend an Act, entitled "An Act to in-corporate the President and Directors of the Maryland Fire Insurance Company of Baltimore," passed at January session, eighteen hundred and fifty-eight, by decreasing the capital stock and par value of the shares thereof, and by altering the mode of voting by the stockholders.

Section 1. *Be it enacted by the General Assembly of* Par value re-*Maryland*, That the par value of the shares of the duced. capital stock of the President and Directors of the Maryland Fire Insurance Company of Baltimore, be and the same is hereby reduced to five dollars per share, and the said Company may at any time here- Capital stock after increase its capital stock to the amount of two decreased.

# EXHIBIT 80

JA6510

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

SECOND AMENDMENT

## The legal history of bans on firearms and Bowie knives before 1900

**DAVID KOPEL** | 11.20.2022 12:55 PM

Bowie knives are back in constitutional law news these days, after a very long absence. The U.S. Supreme Court's *Bruen* decision instructs lower courts to look to U.S. legal history to see what sorts of restrictions on Second Amendment rights are consistent with the mainstream American legal tradition. According to the Court, the legal history of the Founding Era is the most important, the late nineteenth century much less so, and the twentieth century too late to create a tradition that contradicts the text of the Second Amendment.

Post-*Bruen*, some gun control advocates have been looking to Bowie knife laws as analogical justifications for bans on common modern rifles and magazines. In a separate post, *Bowie knife statutes 1837-1899*, I provide a state-by-state survey of all state Bowie knife laws through 1899. This post examines constitutional case law on Bowie knives, the history of such knives, and the history of pre-1900 bans on types of firearms.

Advertisement

AD

As described below, valid pre-1900 precedents on firearms prohibitions are non-existent. *Bruen* suggests that "dramatic technological changes may require a more nuanced approach" in drawing historical analogies to justify modern arms controls. Accordingly, there has been renewed interest in Bowie knives, which are said to be a new technology that appeared in the early 19th century. In the Fourth Circuit, Maryland Attorney General Frosh is defending a Maryland ban on many common rifles. In his recently-filed supplemental brief in *Bianchi v. Frosh*, Bowie knife laws are an important part of his argument, including with a citation to my article *Knives and the Second Amendment*, 47 U. Michigan J. of Law Reform 175 (2013) (with Clayton Cramer and Joseph Olson).

At a previous stage in the case, I coauthored an amicus brief in support of the plaintiffs' cert. petition, *Bianchi v. Frosh*. No. 21-902. The brief was on behalf of Professors of Second Amendment Law (including VC's Randy Barnett), Cato Institute, John Locke Foundation, Center to Keep and Bear Arms (Mountain States Legal Foundation), and Independence Institute.

The week after *Bruen*, the Supreme Court granted cert, vacated the decision below (the Fourth Circuit upholding the ban), and remanded for consideration in light of *Bruen*.

This post proceeds as follows:

- Part I summarizes *Bruen*'s rules for reasoning from historical analogies.
- Part II summarizes the pre-1900 American history of firearms bans. Four states enacted some sort of prohibitory law on particular types of firearms.
- Part III explains Bowie knives, and the infamous 1837 murder on the floor of the Arkansas legislature that may have spurred legislative action in several states.
- Part IV examines the three major state supreme court cases involving Bowie knives:
  - In Georgia, *Nunn v. State* (1844) held that a statute banning Bowie knives and handguns violated the Second Amendment.
  - In Tennessee, *Aymette v. State* (1840) upheld a ban on concealed carry of Bowie knives as not violating the state constitution. The court stated that the right to keep arms was individual, but the right to bear arms was only for military service, such as the militia. Mistakenly, the court said that a Bowie knife would be of no use to a militia. To the contrary, many militias used Bowie knives, before and after 1840.
  - *Cockrum v. State* (1859) applied the Texas Constitution and the Second Amendment and stated, "The right to carry a bowie-knife for lawful defense is secured, and must be admitted." However, enhanced sentencing for use of a Bowie knife in murder was constitutional.

The other post, <u>Bowie knife statutes 1837-1899</u>, excerpts and analyzes state 19th-century Bowie knife statutes. With very rare exceptions, states that chose to regulate Bowie knives treated them the same as other, older, types of fighting knives, namely dirks and/or daggers. As described in this post, "Bowie knives" were briefly considered to be a new type of arm, but they were not. Bowie knife laws turned into general laws about large knives, and so in statutes, "Bowie knife" was joined by other well-known fighting knives.

The knife category of Bowie knives plus dirks and/or daggers was frequently regulated at the same level as handguns. That is, prohibitions were rarities. The mainstream approach for handguns and knives was non-prohibitory for peaceable adults, such as laws forbidding concealed carry (while allowing open carry), prohibiting sales to minors, or specially punishing misuse.

Whatever 19th century handgun laws teach about permissible limits on the right to arms, the Bowie knife laws go no further. Because Bowie knives are so often *in pari materia* with 19th-century handgun regulations that they add little if anything to the very thin base of historical precedents for prohibitions on common arms.

The legal history of Bowie knives reinforces the U.S. Supreme Court's history-based holdings about permissible handgun regulation. Bowie knives were not some extraordinary category for which regulation was more severe than was typical for handgun control.

**I. Rules from *Bruen***

Further analysis of the material in this Part is in my article <u>Restoring the right to bear arms: New York State Rifle and Pistol Association v. Bruen</u>, 2021-22 Cato Supreme Court Review (Trevor Burrus ed., 2022).

*Bruen* affirmed that text, history, and tradition is the correct methodology in Second Amendment cases, not interest balancing:

> … *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

<u>142 S. Ct. 2111</u>, 2126-27 (2022). Courts may not engage in interest balancing, nor may they defer to legislative interest balancing:

> The Second Amendment "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

*Id.* at 2131 (quoting *Heller*).

Thus, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

Judges do not bear the burden of becoming legal history researchers. As with anything else that the government must prove, the government must present persuasive legal history to the court. "Courts are thus entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.5.

Sometimes, the government and its allies will win because there are many historic laws that are twins of modern ones—such as prohibiting reckless discharge of a firearm in populated areas. Additionally, the government can prove its case by "analogical reasoning." This means "a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133.

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* "[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* (quoting <u>Drummond v. Robinson</u>, 9 F.4th 217, 226 (3d Cir. 2021)).

If a historical arms control law is both "established" and "representative," the next step is to determine whether the modern gun control and the alleged historical analogue are "relevantly similar." *Bruen* does not purport to "exhaustively" define how judges may consider similarity. Instead, *Bruen* suggests that *Heller* and *McDonald* point to "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."

"How" means: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense."

"Why" means: "whether that burden is comparably justified." The second metric prevents historic, burdensome laws that were enacted for one purpose from being used as a pretext to impose burdens for other purposes. *Id.* at 2132-33.

How to deal with technological or societal changes? Per Justice Thomas:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

*Id.* at 2132 (quoting <u>McCulloch v. Maryland</u>). Some social problems have been around for a long time. Whether previous generations addressed a problem with restrictions on Second Amendment rights is an important question:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131.

Legal tradition is based on many places over many years. A few harsh laws in a few places do not negate the mainstream. For example, in *Bruen* the following were, cumulatively, insufficient to negate the general American tradition of a right to carry arms:

- A statute in the short-lived colony of East Jersey (half of present New Jersey) against frontiersmen ("planters") carrying handguns. The statute was in effect for "[a]t most eight years."
- An 1871 Texas ban against carrying handguns under most circumstances.
- In the latter nineteenth century, five western territories with statutes against handgun carrying in cities, or more broadly.

- Four colonial or Early Republic statutes that supposedly prohibited arms carrying. They actually did not, but the Court assumed *arguendo* that the description of the statutes in the amicus briefs of the anti-gun lobbies was accurate.

In general, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154.

Broad state restrictions on peaceable carry did become more common in the 20th century, most famously with the 1911 New York "Sullivan Act" at issue in *Bruen*. But, "[a]s with . . . late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 n.28.

According to *Bruen*, states may require licenses for bearing arms in public. Issuance must be based on narrow and objective criteria. The licensing systems may not have "lengthy wait times . . . or exorbitant fees." *Id*. at 2138 n.9.

## II. Firearms bans in the U.S. before 1900

Attorneys General who must defend recent state bans on various types of common firearms have a challenging task. There were very few bans of particular types of firearms during the nineteenth century, and all of them are plainly unconstitutional under modern doctrine.

### A. Georgia ban on handguns, Bowie knives, and other arms

The only firearms ban statute before the Civil War was enacted by Georgia. It outlawed possession, sale, open carry, and concealed carry of the vast majority of handguns. The statute also banned Bowie knives and certain other arms. In *Nunn v. State*, the Georgia Supreme Court held the statute entirely unconstitutional because of the Second Amendment, except as to concealed carry. *Nunn* is the historic case that is most extolled by the U.S. Supreme Court's *Heller* opinion. The case is discussed further in Part IV.

### B. Tennessee ban on many handguns

After the end of Reconstruction, the white supremacist legislature of Tennessee in 1879 banned the sale "of belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols"—that is, large handguns of the sort carried by military officers, artillerymen, etc. These big and well-made guns were already possessed in quantity by former Confederate soldiers. The army & navy handguns were more expensive than smaller pistols. The ban was upheld because it would help reduce the concealed carrying of handguns. *State v. Burgoyne*, 75 Tenn. (7 Lea) 173 (1881).

### C. Arkansas ban on many handguns, and Bowie knives

Arkansas followed suit with a similar law in 1881. That law also forbade the sale of Bowie knives, dirks (another type of knife), sword-canes (a sword concealed in a walking stick), or metal knuckles. In a prosecution for the sale of a pocket pistol, the Arkansas Supreme Court rejected a constitutional defense. The statute was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare." *Dabbs v. State*, 39 Ark. 353, 357 (1885).

The right to arms provision of the Tennessee Constitution, as adopted in 1870 and still in effect, states, "the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime." The 1868 Arkansas Constitution right to arms, also still in effect, states, "The citizens of this State shall have the right to keep and bear arms for their common defence."

In both states, the "common defense" language was interpreted by the courts as protecting an individual right of everyone, but only for militia-type arms. Such arms included the general types of handguns used in the U.S. military. When Congress was drafting the future Second Amendment, there was a proposal in the Senate to add similar "common defence" language. The Senate rejected the proposal. Senate Journal, 1st Cong., 1st Sess. 77 (Sept. 9, 1789).

Whatever the merits of the state courts' interpretations of the state constitutions, the Tennessee and Arkansas statutes are unconstitutional under the Second Amendment. The U.S. Supreme Court in *Heller* repudiated the notion that the Second Amendment is only for military-type arms. Dick Heller's 9-shot .22 caliber revolver was certainly not a military-type handgun.

### D. Florida licensing law for repeating rifles and handguns

The closest historic analogue to present bans on semiautomatic rifles is an 1893 Florida statute that required owners of Winchesters and other repeating rifles to apply for a license from the board of county commissioners. In 1901 the law was extended to also include handguns. As amended, "Whoever shall carry around with, or have in his manual possession, in any county in this State, any pistol, Winchester rifle, or other repeating rifle, without having a license from the county commissioners of the respective counties of this State," should be fined up to $100 or imprisoned up to 30 days.

The county commissioners could issue a two-year license only if the applicant posted a bond of $100. The commissioners were required to record "the maker of the firearm so licensed to be carried, and the caliber and number of the same." *Revised General Laws of Florida*, § 7202-03 (1927); 1893 Fla. Laws ch. 4147; 1901 Fla. Laws ch. 4928.

The bond of $100 was exorbitant. It was equivalent to over $3,400 today. (Fed. Reserve Bank of Minneapolis, <u>Consumer Price Index 1800-</u>. 2022 = 884.6. 1893 = 27. 1901 = 25. Avg. = 26.)

A 1909 case involved Giocomo Russo's petition for a writ of mandamus against county commissioners who had refused his application for a handgun carry license. Based on his name, Russo may have been an Italian immigrant. At the time, Italians were sometimes considered to be in a separate racial category. When Russo applied, the county commissioners said that they only issued licenses to applicants whom they knew personally, and they did not think the applicant needed to carry a handgun. Russo argued that the licensing statute was unconstitutional.

The Florida Supreme Court denied Russo's petition for a writ of mandamus. According to the Court, there were two possibilities: 1. If the statute is constitutional, then mandamus to the county commissioners would be incorrect, because they acted within their legal discretion. 2. If the statute is unconstitutional, then mandamus would be improper, because a writ of mandamus cannot order an official to carry out an unconstitutional statute. Either way, Russo was not entitled to a writ of mandamus. Pursuant to the doctrine of constitutional avoidance, the Court declined to opine on the statute's constitutionality. *State v. Parker*, 57 Fla. 170, 49 So. 124 (1909).

Decades later, a case arose as to whether a handgun in an automobile glove-box fit within the statutory language, "on his person or in his manual possession." By 5-2, the Florida Supreme Court held that it did not; no license was necessary to carry a handgun or repeating rifle in an automobile. *Watson v. Stone*, 148 Fla. 516, 4 So. 2d 700 (1941). A four Justice majority granted the defendant's petition for habeas corpus because of the rule of lenity: in case of ambiguity criminal statutes should be construed narrowly.

Justice Rivers H. Buford concurred in with the 4-Justice majority opinion. His opinion went straight to the core problem with the statute.

Born in 1878, Buford had worked from ages 10 to 21 in Florida logging and lumber camps. In 1899, at the suggestion of a federal judge who owned a logging camp, Buford began the study of law. He was admitted to the Florida bar the next year. In 1901, he was elected to the Florida House of Representatives. Later, he was appointed county prosecuting attorney, elected state's attorney for the 9th district, and elected state attorney general. He was appointed to the Florida Supreme Court in 1925. 3 *History of Florida: Past and Present* <u>156</u> (1923); Florida Supreme Court, <u>Justice Rivers Henderson Buford</u>. As of 1923, "His principal diversion is hunting." *History of Florida* at 156.

The Florida Constitution of 1885 had provided: "The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."

Concurring, Justice Buford wrote that the statute should be held to violate the Florida Constitution and the Second Amendment:

> I concur in the judgment discharging the relator because I think that Section 5100, R.G.S., § 7202, C.G.L., is unconstitutional because it offends against the Second Amendment to the Constitution of the United States and Section 20 of the Declaration of Rights of the Constitution of Florida.
>
> Proceedings in habeas corpus will lie for the discharge of one who is held in custody under a charge based on an unconstitutional statute. [citations omitted]
>
> The statute, supra, does not attempt to prescribe the manner in which arms may be borne but definitely infringes on the right of the citizen to bear arms as guaranteed to him under Section 20 of the Declaration of Rights of the Florida Constitution.

He explained the history of the exorbitant licensing laws of 1893 and 1901:

> I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.

*Watson*, 4 So.2d at 703.

Justice Buford had described some of the changed societal conditions underlying the 1893 and 1901 enactments. There may have been additional factors involved. Repeating rifles had been around for decades and had been widely available and affordable for many consumers since the 1860s. By the 1880s, manufacturing improvements had made such rifles affordable to many black people. They were using such rifles to drive off lynch mobs, such as in famous 1892 incidents in Paducah, Kentucky, and Jacksonville Florida. In Jacksonville,

> [W]hen a white man, having been killed by a negro, and threats of lynching the prisoner from the Duval County Jail being made, a large concourse, or mob of negroes, assembled around the jail and defied and denied the sheriff of the county ingress to the building. This mob, refusing to disburse upon the reading of the riot act by the sheriff, he called for assistance from the militia to aid him in enforcing the laws.

Report of the Adjutant-General for the Biennial Period Ending December 31, 1892, at 18, in [Florida] *Journal of the Senate* (1893); Nicholas J. Johnson, *Negroes and Gun: The Black Tradition of Arms* 110-12 (2014).

In sum, the 19th century history of firearms bans is not helpful for modern litigants seeking to justify prohibitions on semiautomatic rifles. The only pre-1900 statutory precedent for such a law is Florida in 1893, and it is a dubious precedent. Before that, there were three prior sales prohibitions that covered many or most handguns. One of these was held to violate the Second Amendment, and the other two are plainly unconstitutional under *Heller*.

Accordingly, renewed attention attention is being given to precedents involving Bowie knives, which we will examine next.

**III. Bowie knives and Arkansas toothpicks**

**A. What is a Bowie knife?**

Cites for some of the material in Part III.A & B are available in my Michigan *Knives and the Second Amendment* article. This part is supplemented by information from emails with Mark Zalesky, publisher of *Knife Magazine*.

Starting in 1837, several southern states enacted laws about Bowie knives. Some of these statutes also applied to the "Arkansas toothpick." Later, many other states adopted Bowie knife laws.

The term "Bowie knife" originated after frontiersman Col. Jim Bowie used one at a famous "Sandbar Fight" on the lower Mississippi River near Natchez, Mississippi,on September 19, 1827.

The knife had been made by Rezin Bowie, Jim's brother. According to Rezin, the knife was intended for bear hunting. He stated, "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved." Nothing about the knife was novel.

The initial and subsequent media coverage of the Sandbar Fight was often highly inaccurate. As "Bowie knife" entered the American vocabulary and then the British, manufacturers began labeling all sorts of large knives as "Bowie knives." Some of these were straight (like Rezin's) and other had curved blades. Rezin's knife was single-edged, but some "Bowie knives" were double-edged. Rezin's knife did not have a clip point, but some so-called "Bowie knives" did. Likewise, some had crossguards (to protect the user's hand), and others did not. "Bowie knife" more a sloppy marketing term than a description of a particular type of knife—just as some people today say "Coke" to mean many kinds of carbonated beverages. (The difference is that true "Coke" products, manufactured by the Coca-Cola Company, do exist; there never was a true Bowie

knife.) Manufacturers slapped the "Bowie knife" label onto wide variety of large knives that were highly suitable for hunting and self-defense. In words of knife historian Norm Flayderman, "there is no one specific knife that can be exactingly described as a Bowie knife." Norm Flayderman, *The Bowie Knife: Unsheathing an American Legend* 490 (2004).

The knife photo in this post is an 1850s knife manufactured in England and marketed as a "Bowie knife." It's a good match for what 20th century movies and television called as a "Bowie knife." There are many modern imitations, none of which are like the knife at the Sandbar Fight; nor are they the type that Rezin and Jim Bowie later ordered from custom cutlers. Visit today's websites of knife sellers, search for "Bowie knife," and you will find a quite a disparate variety.

From the beginning, laws about "Bowie knives" have been plagued by vagueness. For example, a Tennessee statute against concealed carry applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick . . . ." 22 Tenn. Gen. Assemb. Acts 200, ch. 137.

When Stephen Hayes was prosecuted for concealed carry, the witnesses disagreed about whether his knife was a Bowie knife. Some said that it was too small and slim to be a Bowie knife, and would properly be called a "Mexican pirate-knife." The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in shape or size resembling a bowie-knife." Note the disjunctive "form, shape *or* size." On appeal, the Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife" alone. A strict application of the letter of the law could result in injustices: "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick" and would thus be illegal. The Tennessee Supreme Court held that the statute must be construed "within the spirit and meaning of the law" and relied on the judge and jury to make this decision as a matter of fact. *Haynes v. State*, 24 Tenn. (5 Hum.) 120 (1844).

**B. What is an Arkansas toothpick?**

As for "Arkansas Toothpick," Flayderman say that it was mainly another marketing term for "Bowie knife." Flayderman at 265-74. However, he notes that some Mississippi tax receipts, and some other writings, expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."

Mark Zalesky, publisher of *Knife Magazine*, explained in Nov. 10 and 19 emails to me: "The idea of the 'Arkansas toothpick' being a large dagger seems to stem from Raymond Thorp's 1948 book *Bowie Knife* (Thorp actually did some good research, but much of the book is complete nonsense); *The Iron Mistress* novel and movie in 1951/52; and the subsequent interest in Bowie, Crockett, the Alamo etc. during the 1950s and early 1960s. You are dealing with a definition that has changed over the years." But as of 1840, "Most evidence supports the idea that 'Arkansas toothpick' was originally a 'frontier brag' of sorts, a casual nickname for any variety of bowie knife but particularly types that were popular in Arkansas."

Here is a drawing of what late 20th century Americans, based on contemporary movies and television, thought to be an Arkansas toothpick. It is sharpened on both edges (unlike the sandbar fight knife), with a triangular blade up to eighteen inches long.

The late 20th century idea of an Arkansas toothpick. By Rhonda Thorne Cramer. ( Rhonda L. Thorne Cramer)

**C. The crime in the Arkansas legislature**

The sandbar fight had taken place in 1827. Jim Bowie died on March 6, 1836, as one of the defenders of the Alamo. In 1840, he would become the namesake of Bowie County, the northeasternmost county in Texas. According to Zalesky, "we first see the term 'Bowie knife' beginning to come into use in 1835 and by mid-1836 it was everywhere. It is clear that such knives existed before the term for them became popular."

Perhaps the first legislation about Bowie knives, from Mississippi and Alabama in mid-1837, was about a continuing problem of criminal misuse. Legislative attention to the topic was surely intensified by an infamous crime in late 1837, which may have helped lead to the enactment of several laws in succeeding weeks. My frequent coauthor, historian Clayton Cramer, explains:

> Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J. J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.
>
> Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."Judge William F. Pope, *Early Days in Arkansas* 225 (Dunbar H. Pope ed., 1895); "The Murder in Arkansas," 54 *Niles' National Register* 258 (June 23, 1838). "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted." Raymond W. Thorp, *Bowie Knife* 4 (1991). While Wilson was expelled from the House, he was acquitted at trial, causing "the most intense indignation through the entire State." Pope, at 225-26; Thorp at 1-5; "General Assembly," *Arkansas State Gazette*, Dec. 12, 1837, at 2 (expulsion two days later); "The trial of John Wilson . . . .," (Milledgeville, Ga.) *Southern Recorder*, March 6, 1838; "The Murder in Arkansas," *Niles' National Register*, *supra.*.

**IV. Cases on Bowie knives**

In the nineteenth century, there were three major state supreme court constitutional cases on Bowie knives. The results of all three are consistent:

- Georgia: Prohibiting the sale of Bowie knives violates the Second Amendment. Prohibiting concealed carry does not.
- Tennessee: Prohibiting concealed carry of Bowie knives does not violate the state constitution.
- Texas: The state constitution and the Second Amendment guarantee the right to own and carry Bowie knives, but extra punishment for a crime committed with a Bowie knife is constitutional.

**A. *Nunn v. State***

Between 1800 and the beginning of the Civil War in 1861, there was one law enacted against particular types of firearms. The Georgia Supreme Court held it unconstitutional as a violation of the Second Amendment. <u>Nunn v. State</u>, 1 Ga. 243 (1846). The U.S. Supreme Court's 2008 *Heller* case extols *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 612 (2008).

Shortly after the infamous crime in the Arkansas legislature, an 1837 Georgia statute declared:

> that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.

*Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837*, pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

*Glossary*:

"Dirk": Originally, a Scottish fighting knife with one cutting edge. Harold L. Peterson, *Daggers & Fighting Knives of the Western World* 60 (1968). According to Zalesky, "Dirks in America were small stabbing weapons, usually small daggers but sometimes single edged." Many 19th century laws forbade concealed carry of "dirks" and/or "daggers."

"Sword-cane": a sword concealed in a walking stick.

"Horse pistols": the only type of handgun not banned in Georgia. These were large handguns, usually sold in a pair, along with a double holster that was meant to be draped over a saddle. They were too large for practical carry by a person who was walking.

Although section 1 of the act was prohibitory, Section 4 contained an exception allowing open carry of some of the aforesaid arms, not including handguns: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view…" The same section also allowed vendors to sell inventory they already owned, through the next year.

At the time, there was no right to arms in the Georgia Constitution. In 1846, the Georgia Supreme Court held the statute unconstitutional for *all* the enumerated arms, not just for handguns. The Court explained that the Second Amendment protected an inherent right, and nothing in the Georgia Constitution had ever authorized the state government to violate the right. For all the weapons, including handguns, the ban on concealed carry was upheld. The ban on handgun open carry was unconstitutional.

*Nunn* was among the many antebellum state court decisions holding that a right enumerated in the U.S. Bill of Rights was protected against state infringement. *See* Jason Mazzone, <u>*The Bill of Rights in Early State Courts*</u>, 92 Minn. L. Rev. 1 (2007); Akhil Reed Amar, *The Bill of Rights* 145-56 (1998) (discussing "the Barron contrarians").

**B.** *Aymette v. State*

In 1837, Tennessee prohibited concealed carry of Bowie knives and Arkansas toothpicks. 22 Tenn. Gen. Assemb. Acts 200, ch. 137 (1838). An 1838 bill to add pistols to the concealed carry ban was rejected. Tennessee Legislature, *Daily Republican Banner* (Nashville), Jan. 13, 1838, at 2. The Tennessee Supreme Court upheld the concealed carry ban in a famous 1840 case. <u>*Aymette v. State*</u>, 21 Tenn. (2 Hum.) 154 (1840).

The Tennessee Constitution's right to arms at the time was "the free white men of this State have a right to keep and to bear arms for their common defence." The racial exclusion to the original 1796 Constitution had been added in 1834. As noted above, the U.S. Senate had rejected inserting a "common defence" clause into the proposed Second Amendment.

According to the Tennessee Court, the right to *keep* arms was an individual right. But the right to *bear* arms was only for service in a militia. The right to bear arms "does not mean for *private defence*, but being armed, they may as a body, rise up to defend their just rights, and compel their rulers to respect the laws." The legislature could forbid arms that are "not usual in civilized warfare, or would not contribute to the common defence." *Aymette* at 157-59. According to the Court, Bowie knives "are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution." *Id.* at 158.

The *Aymette* court was very wrong on the facts. In 1836, the people of Texas had used Bowie knives to "rise up to defend their just rights," in their War of Independence from Mexico. The Texans won the war at the Battle of San Jacinto on April 21, 1836, when they stormed the Mexican breastworks, and used their Bowie knives to rout and put to flight the army of Mexican dictator Santa Ana. Kopel et al., <u>*Knives*</u>, at 189-90.

During the Civil War, Tennessee, Mississippi, and Alabama had to enact legislation to ameliorate the Bowie knife shortage that their laws had caused. The Tennessee legislature suspended the Bowie knife law for the duration. *See* Kopel, <u>*Bowie knife statutes 1837-1899*</u>. The militia of neighboring Mississippi often carried Bowie knives. Benson J. Lossing, 1 *Pictorial History of the Civil War in the United States of America* 479 n.2, 541 n.2 (1866) So did other soldiers, from every part of the nation. Flayderman at 125–68.

According to the U.S. Supreme Court in *Heller*, *Aymette* "erroneously, and contrary to virtually all other authorities," read the right to keep and bear arms as limited to the overthrow of a tyrannical government. *Heller*, 554 U.S. at 613. *Heller* held that the Second Amendment right to arms is not limited to the types of arms used by militia.

**C.** *Cockrum v. State*

After winning independence in 1836, the Republic of Texas joined the United States in 1845. A Texas state statute provided that a person convicted of manslaughter with a Bowie knife or dagger would be considered guilty of murder. For murder convictions in general, Texas law gave the jury discretion to impose a sentence of solitary confinement for life. In *Cockrum*, the judge had erroneously taken away the jury's discretion, and instructed them to impose solitary for life. Accordingly, a new trial was necessary. <u>*Cockrum v. State*</u>, 24 Tex. 394 (1859).

The *Cockrum* court rejected the defense attorney's argument that enhanced punishment for a crime with a Bowie knife violated the Texas Constitution right to arms and the Second Amendment. "The right to carry a bowie-knife for lawful defense is secured, and must be admitted," wrote the court. *Id.* at 402. But the right to own and carry a Bowie knife for lawful self-defense did not preclude enhanced punishment for using the weapon in a crime. *Id.* at 403.

**JA6519**

The court explained why Bowie knife crime was appropriate for enhanced sentencing:

> It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death.

*Id.* at 402–03 (emphasis added).

The Texas legislature had not infringed an iota on the right to possess and carry Bowie knives; but as be described in the companion article, *Bowie knife statutes 1837-1899*, a few other Southern legislatures enacted taxes discouraging Bowie knife possession by the poor.  In the antebellum era, not everyone could afford a firearm, but almost anyone could afford a large knife. As defense counsel in *Cockrum* had pointed out:

> A bowie-knife or dagger, as defined in the code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.

24 Tex. at 395-96. The Texas Supreme Court did not disagree with defense counsel's argument here. The court simply thought that extra punishment for violent criminals did not infringe the rights of peaceable poor people, or of anyone else.

In sum, two of the three antebellum right to arms cases involving Bowie knives stated that keeping and bearing such arms is a constitutional right. The *Aymette* decision was to the contrary, but it was based on the double error that the right to arms is for militia-type arms only, and that a Bowie knife is not such an arm.

As *Cockrum* illustrates, Bowie knife laws were not really about Bowie knives per se. Such laws amounted to generic laws about large knives, including very old-fashioned types such as butcher knives.

The discussion of Bowie knife statutes continues in *Bowie knife statutes 1837-1899*. In short, Bowie knives were quickly assimilated to lawmaking about old-fashioned knives, such as dirks and daggers. Often, these knives were regulated the same as handguns. Sales bans were rare, with Tennessee joined only by Arkansas, in 1881. The norm in other states was limits on concealed carry and sales to minors, and penalties for misuse.



To get the Volokh Conspiracy Daily e-mail, please sign up here.

**Email** *(Required)*

[ e.g. jane@example.cor ]    Submit

---

***NEXT:***  **Bowie knife statutes 1837-1899**

---

**DAVID KOPEL** is research director at the Independence Institute.

SECOND AMENDMENT    GUN CONTROL    CONCEALED CARRY    RIGHT TO CARRY

MEDIA CONTACT & REPRINT REQUESTS

💬 Show Comments (60)

**RECOMMENDED**

Fast reloading of guns in the 19th century

Washington Is Now the 10th State With an 'Assault Weapon' Ban

Why bans on so-called 'assault weapons' are unlikely to reduce mass shooting deaths

'Assault Weapon' Banners Assert False Distinctions Because the Real Ones Are Silly

**AR rifle ammunition is less powerful than most other rifle ammunition**

About

Browse Topics

Events

Staff

Jobs

Donate

Advertise

Subscribe

Contact

Media

Shop

Amazon



© 2023 Reason Foundation | Accessibility | Privacy Policy | Terms Of Use

This site is protected by reCAPTCHA and the Google **Privacy Policy** and **Terms of Service** apply.

# EXHIBIT 81

JA6522

# ACTS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN

## MILLEDGEVILLE,

AT AN

## *ANNUAL SESSION*

# NOVEMBER AND DECEMBER,

# 1860.

PUBLISHED BY AUTHORITY.

MILLEDGEVILLE :
BOUGHTON, NISBET & BARNES, STATE PRINTERS.
1861.

**JA6523**

Twelfth Section Thirteenth Division—Additional Section to the Thirteenth Division.

**Buying or receiving stolen goods of slaves or free negroes, Penitentiary offence from 1 to 4 years.** That from and after the passage of this act, if any free white person or persons, shall buy or receive any money, goods, chattels, or other effects, from any negro or free person of color, that has or have been stolen, or feloniously taken, knowing the same to have been so stolen or feloniously taken, such person or persons, so offending, shall be taken and deemed to be an accessory, or accessories, after the fact; and being convicted thereof, shall be punished by imprisonment and labor in the Penitentiary, for any time not less than one year, nor longer than four years.

Sec. II. Repeals conflicting laws.

Assented to 19th December, 1860.

## (No. 63.)

*An Act to amend the Twelfth Section of the Thirteenth Division of the Penal Code.*

**Twelfth Sec. of the Thirteenth Div. of Penal Code, amended.** Section I. *The General Assembly of the State of Georgia do enact,* That the Twelfth Section of the Thirteenth Division of the Penal Code, be, and the same is hereby amended, by striking out the following words, "whereby the health of such slave or slaves, may be injured or impaired." *

Assented to December 19th 1860.

* The 12th section of the 13th division of the Penal Code provides that "any owner or employer of a slave, who shall cruelly treat such slave or slaves, *by unnecessary or excessive whipping; by withholding proper food or sustenance; by requiring greater labor from such slave or slaves than he, she or they, are able to perform; or by not affording proper clothing,* whereby the health of such slaves may be injured and impaired, or cause or permit the same to be done; every such owner or employer, shall be guilty of a misdemeanor, &c."

In order to convict under the above section, as it heretofore stood, it was necessary to prove, in addition to the fact of cruel treatment. &c., also that *thereby the health of such slave or slaves was injured or impaired;* but hereafter, under the above amendment, in order to convict, it will be only necessary to prove the fact of cruel treatment, &c. See T. R. R. Cobb's New Digest, p. 827.

## (No. 64.)

*An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned.*

**Selling or furnishing weapons to slaves or free negroes, prohibited. Penalty.** Section I. *The General Assembly of the State of Georgia do enact,* That from and after the passage of this Act, any person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defence, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months, at the discretion of the Court; **Proviso as to owners and overseers, in certain cases.** *Provided,* That this Act shall not be so construed as to prevent owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer.

*Slaves employed on Rail Roads.—Bail for slaves in certain cases.*

SEC. II. *And be it further enacted,* That it shall be the duty of the several Judges of the Superior Courts of this State, to give special-ly in charge to the Grand Juries of the several Courts, the provis-ions of this act. <span style="float:right;font-size:small">Judges to give this Act in charge.</span>

SEC. 3. Repeals conflicting laws.

Assented to 19th December, 1860.

---

# TITLE XX.

---

## ROADS.

Moneys received in lieu of work on Roads by negroes employed by Rail Road Contractors, to be expended on such Roads.

### (No. 65.)

*An Act to repeal, [amend?] "an Act to exempt negroes employed by Contractors in the construction of Rail Roads, from liability to work on Roads, on certain conditions."*[*]

SECTION I. *Be it enacted, &c.,* That said recited Act, be so amended as to require the several Overseers of Roads, into whose hands any moneys may come by virtue of the provisions of said recited Act, to expend said moneys in hiring hands to work on the Roads, of which they are respectively overseers. <span style="float:right;font-size:small">Moneys received in lieu of work on Roads by negroes employed by R. R. contractors, to be expended on such Roads.</span>

SEC. II. Repeals conflicting laws.

Assented to 19th December, 1860.

[*]See Acts of 1859, p. 65.

---

# TITLE XXI.

---

## SLAVES AND FREE PERSONS OF COLOR.

| SECTION 1. Slaves committed to jail for crime may be admitted to bail—proviso. | SECTION 2. Slaves or free persons of color may be admitted to bail, in certain cases. |
|---|---|

### (No. 66.)

*An Act to authorize the owner, or owners, of Slaves charged with of-fences against the Laws, to give bail for such slave, or slaves.*

1. SECTION. I. *The General Assembly of the State of Georgia do enact,* That when any slave, or slaves, charged with the commission of any offence against the laws of this State, may be committed to Jail, it shall and may be lawful for the owner, or owners, of said <span style="float:right;font-size:small">Slaves committed to jail for crime, in certain cases, may be admitted to bail.</span>

# EXHIBIT 82

WOR IN DRAFT Su ect to change

# Not all istory is Created E ual

## In the ost *ruen* World the Critical eriod for istorical Analogues is hen the Second Amendment as Ratified in and not

Mar W. S ith

Mar W. S ith is a isiting Fellow in Phar ace tical P lic Policy and Law in the Depart ent of Phar acology, O ford University Presidential Scholar and Senior Fellow in Law and P lic Policy, The King s College Disting ished Scholar and Senior Fellow of Law and P lic Policy, Ave Maria School of Law. He also hosts the Fo r Bo es Diner Yo T e Channel, which addresses Second A end ent scholarship, history, and iss es. He is the a thor of ltiple oo s incl ding *First They Came for the un Owners The Campaign to Disarm You and Take Your Freedoms* Bo ardier Boo s 2019 and *Duped How the Anti-gun Lobby Exploits the Parkland School Shooting and How un Owners Can Fight Back* Post Hill Press 2018 .

Electronic copy available at: https://ssrn.com/abstract=4248297

# TA    E OF CONTENTS

   age

INTRODUCTION ................................................................................................... 1

I.    1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL
      UNDERSTANDING OF THE SECOND AMENDMENT. ............................................ 7

      A.  The    eaning and scope of each provision in the Bill of Rights is the sa   e whether
          applied against the states or against the federal govern   ent. ....................... 7

      B.  The    eaning of a constit  tional provision is fi   ed when it is adopted. ....................... 9

      C.  The p   lic   nderstanding of the Bill of Rights   y ratifiers in the Fo  nding period
          controls the    eaning of its provisions. ...................................................... 10

      D.  All three of the S  pre   e Co  rt s s    stantive interpretations of the Second
          A   end   ent assess its    eaning and scope   y loo   ing at the Fo  nding period. ......... 15

      E.  S  pre   e Co  rt    rispr  dence on all other provisions of the Bill of Rights loo  s to the
          Fo  nding Period, not 1868. .......................................................................... 17

      F.  If later   nderstandings contradict the original   nderstanding of the te   t, the original
              nderstanding controls. ............................................................................... 27

      G.  The Co  rt of Appeals   decisions cited to s  pport 1868 as the deter   inative year have
              een a  rogated or rely on an o  vio  s    isreading of McDonald. ............................... 31

II.   1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE
      BILL OF RIGHTS. ................................................................................................ 33

      A.  It is   nclear at   est that the ratifiers of the Fo  rteenth A   end   ent   elieved that they
          were incorporating against the states all of the provisions of the first eight
          a   end   ents. .............................................................................................. 33

      B.  The S  pre   e Co  rt disagreed that the Fo  rteenth A   end   ent incorporated the Bill
          of Rights thro  gh the Privileges or I        nities Cla  se. .............................................. 40

      C.  The individ  al right to    ear ar   s in the Second A   end   ent was   nderstood the sa   e
          way in 1868 as in 1791. ............................................................................... 41

III.  THE  SCHOLARLY DEBATE   REFERENCED IN THE *BRUEN* OPINION DOES
      NOT CHANGE THE SUPREME COURT S SETTLED INCORPORATION
      JURISPRUDENCE. ............................................................................................... 45

      A.  Professor Lash s approach is theoretically   nso  nd and   nli  ely to   e adopted. ...... 46

Electronic copy available at: https://ssrn.com/abstract=4248297

**WOR IN DRAFT Su ect to change**

B.  Professor A ar s approach contains si ilar flaws and his theories have een re ected
y Heller.................................................................................................................... 51

CONCLUSION......................................................................................................................... 57

iii

**JA6529**

Electronic copy available at: https://ssrn.com/abstract=4248297

**WOR  IN   DRAFT   Su  ect to change**

## INTRODUCTION

In J ne of 2022, the S pre e Co rt decided *New York State Rifle & Pistol Association, Inc  v  Bruen*,[1] its   ost significant case interpreting the scope of the Second A end ent since the land ar decision in *District of Columbia v  Heller* in 2008.[2]  *Bruen* was a  a or victory for the constit tional right to  eep and  ear ar s.  One conse ence of the decision has  een to send the g n control  ove ent scra ling for new ways to  nderc t the right to  ear ar s in a post-*Bruen* world.  Opponents of the Second A end ent have sei ed  pon a short passage  y J stice Tho as, a thor of the *Bruen* opinion, to arg e in the lower co rts that an originalist interpretation re ires co rts to loo at the  eaning of the Second A end ent  and th s, logically, all provisions of the Bill of Rights  when the Fo rteenth A end ent was ratified in 1868, not in 1791 when the Bill of Rights was ratified.  This approach, if accepted, wo ld revol tioni e not only Second A end ent law,  t also the Co rt s entire Bill of Rights  rispr dence.  It is nonsensical, contrary to the S pre e Co rt s precedents, and contradicts the e press te t of *Bruen*.

Before loo ing at what the *Bruen* opinion said  or did not say  on that s  ect, *Bruen* itself needs to  e placed in conte t.  *Heller* held that the Second A end ent confir s an individ al right to  eep and  ear ar s for lawf l p rposes s ch as self-defense.  It also re ected the  se of a  eans-ends  alancing test, s ch as levels of scr tiny, and instead relied on a  te t, history, and tradition  test.

In the fo rteen years  etween *Heller* and *Bruen*,   ost of the lower federal co rts largely disregarded *Heller* s historical   ethodology and instead applied a two-part interest  alancing

---

[1] 142 S.Ct. 2111  2022 .

[2] 554 U.S. 570  2008 .

1

**JA6530**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

test. The first part of the test loo ed at whether a partic lar an or restriction fell within the scope of the Second A end ent. If it did, the second part of the test was invo ed, and the lower co rts s ally applied an inter ediate scr tiny alancing test to render the Second A end ent s protections ineffect al. That re ained tr e even after the Co rt held in *McDonald v City of Chicago*[3] that the Second A end ent is a f nda ental individ al right that is incorporated against states and localities y the Fo rteenth A end ent s D e Process Cla se.

*Bruen* changed all of that. The Co rt e pressly re ected alancing tests. In the words of the Co rt, the second step was one step too any. [4] *Heller* and *McDonald*, the Co rt stated, do not s pport applying eans-end scr tiny in the Second A end ent conte t. [5] Rather, Second A end ent cases st e fir ly rooted in the te t and history of that A end ent. When the Second A end ent s plain te t covers an individ al s cond ct, the Constit tion pres ptively protects that cond ct, the Co rt held. To overco e that pres ption, the govern ent st affir atively prove that its firear s reg lation is part of the historical tradition that deli its the o ter o nds of the right to eep and ear ar s. [6] That eans that the govern ent has the rden of showing that there were reasona ly close historical analog es to the present-day restriction that is challenged.[7]

B t at what point in history sho ld co rts loo to deter ine if there were laws or restrictions analogo s to those eing challenged I ediately after *Bruen* was decided,

---

[3] 561 U.S. 742 2010 .

[4] *Bruen*, 142 S.Ct. at 2127.

[5] *Id*

[6] *Id*. at 2127, 2130.

[7] *Bruen* esta lished several i portant principles for the Second A end ent. In addition to stri ing down the two-part test for the Second A end ent, it esta lished that the Second A end ent protects the carrying of weapons o tside the ho e. It held that carry per it or license syste s are nconstit tional if they vest discretion in state or local officials instead of eing ased on o ective criteria. It also o tlined the proper ethodology for applying the Second A end ent ased pon reasoning y historical analogy.

2

**JA6531**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su  ect to change

govern  ent defendants  and their anti-g n a  ici  in Second A  end  ent cases  egan to arg  e

that in litigation against states and localities, as opposed to litigation against the federal

govern  ent, the relevant ti  e period is not 1791, when the Second A  end  ent was ratified,    t

1868, when the Fo  rteenth A  end  ent was ratified.[8]

Here is the passage in *Bruen* on which they  ase this arg  ent.  After reviewing the

historical  ethodology to  e  ployed  y co  rts in f t re Second A  end  ent cases, the Co  rt

 ade a final o  servation that:

> Strictly spea  ing, New Yor  is  o  nd to respect the right to  eep and  ear ar  s
>  eca  se of the Fo  rteenth A  end  ent, not the Second. See, *e g* , *Barron ex rel
> Tiernan v  Mayor of Baltimore*, 7 Pet. 243, 250  251  1833   Bill of Rights applies
> only to the Federal Govern  ent . Nonetheless, we have  ade clear that individ  al
> rights en  erated in the Bill of Rights and  ade applica  le against the States
> thro  gh the Fo  rteenth A  end  ent have the sa  e scope as against the Federal
> Govern  ent. citations o  itted  And we have *generally assumed* that the scope of
> the protection applica  le to the Federal Govern  ent and States is pegged to the
> p  lic  nderstanding of the right *when the Bill of Rights was adopted in*
> See, *e g*., *Crawford v  Washington*, 541 U.S. 36, 42  50  2004   Si  th
> A  end  ent  *Virginia v  Moore*, 553 U.S. 164, 168  169  2008   Fo  rth
> A  end  ent  *Nevada Comm  n on Ethics v  Carrigan*, 564 U.S. 117, 122  125
>  2011   First A  end  ent .
>
> We also *acknowledge* that there is an *ongoing scholarly debate* on whether co  rts
> sho  ld pri  arily rely on the prevailing  nderstanding of an individ  al right when
> the Fo  rteenth A  end  ent was ratified in 1868 when defining its scope  as well
> as the scope of the right against the Federal Govern  ent . See, *e g*., A. A.  ar, The
> Bill of Rights: Creation and Reconstr  ction  iv, 223, 243  1998   K. Lash, Re-
> Spea  ing the Bill of Rights: A New Doctrine of Incorporation  Jan. 15, 2021
>  an  script, at 2 , https:  papers.ssrn.co   sol3 papers.cf   a stract id  3766917
> When the people adopted the Fo  rteenth A  end  ent into e  istence, they

---

[8] See, *e g* , Br. of Def. John Harrington in S  pport of his Motion for S   ary J  dg  ent 24, *Worth v  Harrington*,
No. 0:21-C  -01348, Doc. 49  D. Minn. A  g. 4, 2022   Especially relevant  are laws that were in effect aro  nd
the ti  e the Fo  rteenth A  end  ent, which  ade the Second A  end  ent applica  le to the States, was ratified
Electronic A  ic  s Letter Br. of Everytown for G  n Safety 2, *Lara v  Commissioner Pennsylvania State Police*,
No. 21-1832, Doc. 61  3d Cir. A  g. 2, 2022   the  ost relevant ti  e period centers on 1868, when the Fo  rteenth
A  end  ent was ratified and  ade the Second A  end  ent applica  le to the states.  Proposed  A  ic  s Br. of
Everytown for G  n Safety in S  pport of Defendant s Opposition to Plaintiffs  Motion for a Preli  inary In  nction
7, *Antonyuk v  Bruen*, No. 1:22-cv-00734, Doc. 33  N.D.N.Y. A  g. 18, 2022   Th  s, when the people chose to
e  tend the Bill of Rights to the states in 1868, their  nderstanding of the scope of each right sho  ld control the
originalist analysis today.   . The specific arg  ents  ade in these and si  ilar cases are disc  ssed in Part G,  elow.

3

**JA6532**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT   Su ect to change

readopted the original Bill of Rights, and did so in a  anner that invested those original 1791 te ts with new 1868  eanings .[9]

That portion of the opinion concl ded that:  We need not address this iss e today  eca se, as we e plain  elow, the p  lic  nderstanding of the right to  eep and  ear ar s in  oth 1791 and 1868 was, for all relevant p rposes, the sa e with respect to p  lic carry. [10]

That has led g n control advocates to treat the iss e of whether 1791 or 1868 is the relevant ti e period as an open  estion and to arg e for 1868.  Undo  tedly that is  eca se there were  ore laws concerning firear s on the  oo s in 1868 than there were in 1791, and th s  ore opport nities to find historical  analog es  to restrict individ al rights.  Also, the Reconstr ction period is  n s al in A erican history  eca se the North was occ pying the So th with  ilitary force, and the So th was trying to disar  the newly freed  lac s.  S ch actions d ring that period are therefore not representative of either the Fo nding period or of the A erican historical tradition.

B t 1791 vs. 1868 is not an open  estion.  That the Fo nding period is the correct ti e to deter ine the original p  lic  eaning of an individ al right is not a  ere ass  ption,  as J stice Tho as stated in his respectf l nod to the  ongoing scholarly de ate.   It is an integral and controlling part of the Co rt s Bill of Rights  rispr dence.  As shown in this article, when history  st e cons lted to deter ine  eaning, it has  een the  niversal practice of the Co rt to loo  at the Fo nding period and relevant antecedents to deter ine original p  lic  nderstanding. No S pre e Co rt case has ever loo ed to 1868 as the principal period for deter ining the  eaning of an individ al right in the Bill of Rights.  If periods after 1791 are cons lted at all, it

---

[9] *Bruen*, 142 S.Ct. at 2137-38  e  phasis added . The SSRN article  y Professor Lash has now  een p  lished as K  rt Lash, *Respeaking the Bill of Rights  A New Doctrine of Incorporation*, 97 Ind. L.J. 1439  S  er 2022 .

[10] *Id*. at 2138.

4

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT   Su   ect to change

is only to confir   that s   se   ent a  thorities, generally very shortly after the Fo  nding,

re  ained consistent with the p   lic   nderstanding in 1791.

The S  pre  e Co  rt has held that the   eaning of the Constit  tion, incl  ding the Bill of

Rights, is fi  ed at the ti   e it was adopted, not later.  A provision of the Bill of Rights has only

one   eaning, whether applied against the federal govern  ent or the states.  And the ti  e period

for deter  ining that single   eaning, when history   st  e  a  ined, is 1791.  That is tr  e of the

three cases cited in the passage   oted a  ove fro   *Bruen*  it is tr  e of all of the S  pre  e Co  rt s

Second A  end  ent cases   eginning with *Heller*, incl  ding *Bruen* itself  and it is tr  e of

S  pre  e Co  rt cases e  a   ining other rights provisions of the Bill of Rights.  The Co  rt has also

clearly stated that if a later interpretation differs fro   the original   eaning at the ti  e of

ratification of the Bill of Rights, the later interpretation   st yield.

As shown in detail   elow, the cases cited   y post-*Bruen* defendants or a   ici in Second

A  end  ent litigation were either a  rogated   y *Bruen* itself, res  lted fro   a   isreading  later

corrected  of the *McDonald* decision   y a single Circ  it Co  rt of Appeals, or were those which

cited to that   ista  en decision.

Even if one e  a   ines the period of ratification of the Fo  rteenth A   end  ent, there is no

evidence that the ratifiers tho  ght the e  isting rights in the Bill of Rights so   ehow changed in

   eaning.  Rather, the Fo  rteenth A  end  ent s p  rpose was to incl  de African A  ericans

within the protections granted to citi  ens and to protect their rights against encroach  ents   y the

states.  In fact, it did not ta  e long for the S  pre  e Co  rt to decide that   privileges or

i      nities  of citi  ens of the United States were a very li  ited set of rights indeed.

This article concl  des with a description of the scholarly positions of Professors Lash and

A  ar regarding   se of the year 1868 to deter  ine the   eanings of the Bill of Rights.  Professor

5

Electronic copy available at: https://ssrn.com/abstract=4248297

**WOR   IN   DRAFT   Su   ect to change**

Lash s position wo  ld re    ire a co   plete overt  rning of S  pre   e Co   rt s Bill of Rights

 rispr  dence.  Professor A   ar s position is different, and his concerns, especially regarding the

Second A   end   ent,   ay have   een resolved   y *Heller*, which was decided ten years after his

cited   oo   was p   lished.

6

**JA6535**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

# I IS T E RO ER YEAR FOR DETERMININ T E ORI INA UNDERSTANDIN OF T E SECOND AMENDMENT

### A The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or against the federal government

The ey to nderstanding why *only* 1791 is the proper year for deter ining the original

p lic eaning of the Second A end ent, or of any other right of individ als en erated in the

Bill of Rights, is fo nd in *Bruen* itself: W e have ade clear that individ al rights en erated

in the Bill of Rights and ade applica le against the States thro gh the Fo rteenth A end ent

*have the same scope* as against the Federal Govern ent. [11] The Co rt does not apply two

different versions of the Second A end ent, or two versions of other incorporated provisions of

the first eight a end ents in the Bill of Rights. Specifically, it does not apply one eaning

when invo ed against potential federal infringe ent and a different eaning when invo ed

against a potential state or locality infringe ent.

This has een a f nda ental principle of Bill of Rights rispr dence for ore than five

decades.[12] That an incorporated right has only a single eaning was ade crystal clear in

*McDonald*, which oted *Malloy v Hogan* as esta lishing that the Co rt has:

> a andoned the notion that the Fo rteenth A end ent applies to the States only a
> watered-down, s ective version of the individ al g arantees of the Bill of
> Rights, stating that it wo ld e incongr o s to apply different standards
> depending on whether the clai was asserted in a state or federal co rt. [13]

Instead, as *McDonald* noted, the *Malloy* Co rt decisively held that incorporated Bill of

Rights protections are all to e enforced against the States nder the Fo rteenth A end ent

---

[11] *Bruen*, 142 S.Ct. at 2137 e phasis added .

[12] The concept that the federal govern ent and state govern ents are restrained e ally y the First A end ent, and y the incorporated First A end ent, appears to go ac even f rther. The First A end ent declares that Congress shall a e no law respecting an esta lish ent of religion or prohi iting the free e ercise thereof. The Fo rteenth A end ent has rendered the legislat res of the states *as incompetent as Congress* to enact s ch laws. *Cantwell v Connecticut*, 310 U.S. 296, 303 1940 e phasis added .

[13] *McDonald*, 561 U.S. at 765 oting *Malloy v Hogan*, 378 U.S. 1, 5 6 1964 .

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT    Su   ect to change

according to the sa   e standards that protect those personal rights against federal

encroach   ent. [14] The   eaning of a provision of the Bill of Rights is *identical* whether applied

against the states or the federal govern   ent. Si   ilarly, the Co  rt s   approach to Fifth

A   end  ent e   al protection clai   s has always   een precisely the sa   e as to e   al protection

clai   s   nder the Fo  rteenth A   end   ent. [15]

McDonald disc   ssed one ano   alo   s case, *Apodaca v  Oregon*,[16] which when *McDonald*

was decided allowed state cri   inal defendants to   e convicted of a serio   s cri   e   y a 10-2 vote

rather than only   y a   nani   o   s   ry as the Si   th A   end   ent re   ires in federal trials.  That

case has since   een overr   led in *Ramos v  Louisiana*, with the Co  rt noting that it has   long

e   plained   that incorporated provisions of the Bill of Rights   ear the sa   e content when

asserted against States as they do when asserted against the federal govern   ent. [17]  As a case

decided   st one year earlier stated,   if a Bill of Rights protection is incorporated, there is no

daylight   etween the federal and state cond   ct it prohi   its or re   ires. [18]  That   eans, however it

is interpreted, the Second A   end   ent   st apply *e   ually* against the states and the federal

govern   ent.

---

[14] *McDonald*, 561 U.S. at 765-66     oting *Malloy*, 378 U.S. at 10, and f   rther citing *Mapp v  Ohio*, 367 U.S. 643,
655  656  1961   *Ker v  California*, 374 U.S. 23, 33  34  1963   *Aguilar v  Texas*, 378 U.S. 108, 110  1964   *Pointer
v  Texas*, 380 U.S. 400, 406  1965   *Duncan v  Louisiana*, 391 U.S. 145, 149, 157  158  1968   *Benton v  Maryland*,
395 U.S. 784, 794  795  1969   and *Wallace v  Jaffree*, 472 U.S. 38, 48  49  1985   .

[15] *Weinberger v  Wiesenfeld*, 420 U.S. 636, 638 n.2  1975   .

[16] 406 U.S. 404  1972   .

[17] *Ramos v  Louisiana,* 140 S.Ct. 1390, 1397  2020   .

[18] *Timbs v  Indiana*, 139 S. Ct. 682, 687  2019    incorporating the E   cessive Fines Cla   se   .

8

JA6537

Electronic copy available at: https://ssrn.com/abstract=4248297

*B   The meaning of a constitutional provision is fixed when it is adopted*

*Bruen* e plained that the Constit tion s   eaning is fi ed according to the nderstandings of those who ratified it  .[19] Since the Bill of Rights is part of the Constit tion and was ratified  st three years after the  na ended Constit tion went into effect, its  eaning was fi ed as of that ti e.  Noting that the  Constit tion can, and   st, apply to *circumstances* eyond those *the Founders* specifically anticipated,[20] *Bruen*  oted fro  *United States v Jones*,[21] which concl ded that installation of a trac ing device on a vehicle was  a physical intr sion  that  wo ld have  een considered a  search  within the  eaning of the Fo rth A  end ent *when it was adopted*  e phasis added .[22] Circ  stances  ay change,  t the central  eaning is fi ed.

The conception that the Constit tion has a fi ed, original  eaning goes far  ac  in constit tional  rispr dence.  As J stice Tho  as noted in his conc rrence in *McIntyre v  Ohio Elections Comm n*:[23]

> When interpreting the Free Speech and Press Cla ses, we   st e g ided  y their original  eaning, for  t he Constit tion is a written instr  ent. *As such its meaning does not alter  That which it meant when adopted, it means now  South Carolina v  United States*, 199 U.S. 437, 448  1905 . We have long recogni ed that the  eaning of the Constit tion   st necessarily depend on the words of the constit tion  and  *the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions ... in the several* states.  *Rhode Island v  Massachusetts,* 37 U.S.  12 Pet.  657, 721  1838 .

---

[19] *Bruen,* 142 S.Ct. at 2132.

[20] *Id*

[21] 565 U.S. 400, 404  405  2012 .

[22] *Id*.  e  phasis added .

[23] 514 U.S. 334, 359  1995  e  phasis added .

9

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT  Su ect to change

Th s, as long ago as 1838, the concept of a historically fi ed eaning was an accepted proposition. It re ained an accepted proposition in 1905 when *South Carolina v United States* was decided and has re ained so to the present day.

C. *The public understanding of the Bill of Rights by ratifiers in the Founding period controls the meaning of its provisions*

As the a ove passages de onstrate, the relevant ti e period for ascertaining the *single* eaning of a provision of the Bill of Rights, as applied to the states and to the federal govern ent, is the ratification of those a end ents at the ti e of the Fo nding, not the ti e of incorporation of the right into the Fo rteenth A end ent. *Bruen* recogni ed that the Second A end ent s *historically fixed meaning* st date, li e the A end ent itself, to 1791, when the Co rt reaffir ed *Heller* s finding that the right applies to new circ stances, specifically that the Second A end ent s reference to ar s does not apply only to those ar s in e istence *in the th century* [24]

In the passage fro *Bruen* oted a ove regarding the ass ption that 1791 is the relevant ti e period, the Co rt cited three cases, all of which loo ed to the ti e of ratification of specific a end ents in 1791 to deter ine their original p lic eaning: *Crawford v Washington*, 541 U.S. 36 2004 Si th A end ent *Virginia v Moore*, 553 U.S. 164 2008 Fo rth A end ent and *Nevada Comm n on Ethics v Carrigan*, 564 U.S. 117 2011 First A end ent . Those cases all involve applications against the states of incorporated provisions of the Bill of Rights. The *Bruen* opinion stated that the Co rt had ass ed in those cases that the Fo nding was the relevant ti e period. B t, as those cases show, the Fo nding period is

---

[24] *Bruen*, 142 S.Ct. at 2132 oting *Heller*, 554 U.S. at 582 e phasis added .

10

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

e pressly stated to  e the period to  e e a  ined to deter  ine the  eaning of the provisions in

estion.[25]

Crawford is a Confrontation Cla se case.  Finding that the te t alone did not resolve the

specific  eaning and p rposes of that Cla se, the Co rt o served that  w e  st therefore t rn

to the historical  ac gro nd of the Cla se to  nderstand its  eaning. [26]  The Co rt then

e a  ined pertinent English legal history, colonial laws and practices, the co  on law as

nderstood at the ti e of the Fo nding, co para le provisions in eighteenth cent ry state

constit tions, and so e early nineteenth cent ry cases and co entary to deter ine its

eaning.  Thro gho t its historical review, the Co rt repeatedly  sed e pressions s ch as:

the Framers wo ld not have allowed ad  ission of testi  onial state ents of a witness

who did not appear at trial  nless he was  navaila le to testify...

The founding generation s i ediate so rce of the concept, however, was the co  on

law...

referring to certain evils  that English law s assertion of a right to confrontation was

eant to prohi it  and that the founding-era rhetoric decried. The Si th A end ent

st e interpreted with this foc s in ind.

e parte e a inations  ight so eti es e ad issi le nder  odern hearsay r les,

t the Framers certainly wo ld not have condoned the  .

---

[25] See also Heller, 554 U.S. at 576-77  stating that the nor  al  eaning of the words in the Second A end ent
e cl des  eanings  that wo ld not have  een  nown to ordinary citi ens in the founding generation  e phasis
added .

[26] Crawford, 541 U.S. at 43.

11

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

the Si  th A  end  ent   is   ost nat  rally read as a reference to the right of confrontation

at co     on law, ad   itting only those e  ceptions esta  lished *at the time of the*

*founding...*

the *common law in*        conditioned ad  issi  ility of an a  sent witness s e  a   ination

on   navaila  ility and a prior opport  nity to cross-e  a  ine. The Si  th A  end  ent

therefore incorporates those li   itations.

We do not infer fro    these that *the Framers* tho  ght e  ceptions wo   ld apply even to

prior testi   ony.

O  r cases have th  s re   ained faithf  l to *the Framers  understanding*

we do not thin    *the Framers*   eant to leave the Si  th A  end   ent s protection to the

vagaries of the r  les of evidence...  [27]

There is no indication whatsoever in *Crawford* that when the Si  th A  end   ent is

applied thro  gh the Fo  rteenth A  end  ent to a state, the p  lic  nderstanding of the Si  th

a  end  ent at the ti  e of ratification of the Fo  rteenth A  end  ent deter  ines its   eaning or

changes the 1791   eaning.  And the S  pre  e Co  rt s reliance on Fo  nding-era history in

*Crawford* was not a  ere ass   ption   it was insepara  le fro   its holding.

The  second  case  cited  is  *Virginia  v   Moore,*[28]  a  Fo  rth  A  end   ent  case,  where  the

protection  of  that  A  end   ent  was  asserted  against  a  state s  actions.  The  iss  e  was  whether a

police officer violates the Fourth Amendment by making an arrest based on probable cause but

prohibited by state law.[29]  The Co  rt loo  ed to the Fo  nding era for g  idance:

---

[27] *Id*  at 36, 43, 50, 51, 54, 56, 59, 61   e   phasis added .

[28] 553 U.S. 164  2008 .

[29] *Id*  at 166  2008 .

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT   Su   ect to change

In deter  ining whether a search or sei   re is   nreasona  le, we   egin with history. We loo   to the *statutes and common law of the founding era* to deter  ine the nor  s that the Fo  rth A   end  ent was   eant to preserve.[30]

The Co   rt stated that it was   aware of no historical indication that *those who ratified the Fourth Amendment*   nderstood it as a red  ndant g   arantee of whatever li   its on search and sei   re legislat  res   ight have enacted. [31]  Instead, the   i    ediate o   ect of the Fo  rth A   end  ent was to prohi  it the general warrants and writs of assistance that *English   udges had employed against the colonists*. [32]  E   phasi  ing the foc  s on the Fo  nding period, the Co   rt contin  ed,   n o early case or co     entary, to o  r   nowledge, s  ggested the A   end  ent was intended to incorporate s   se    ently enacted stat  tes,  and    n one of the early Fo  rth A   end  ent cases that scholars have identified so  ght to   ase a constit  tional clai   on a violation of a state or federal stat  te concerning arrest. [33]

According to the Co   rt, this is   not a case in which the clai   ant can point to   a clear *answer  that  existed in*       and has   een generally adhered to   y the traditions of o  r society ever since. [34]  As with *Crawford*, there was no indication in *Virginia v  Moore* that the   nderstanding of the ratifiers of the Fo  rteenth A   end  ent was relevant or sho  ld even   e considered.

In the third case, *Nevada Comm  n on Ethics v  Carrigan*,[35] the iss  e was whether a provision of the state s Ethics in Govern  ent Law re  iring legislators to rec  se the   selves fro    voting on certain   eas  res violated the First A   end  ent.  The Co  rt held that it did not

---

[30] *Id*  at 168   e   phasis added .

[31] *Id*   e   phasis added .

[32] *Id*  at 166-69   citations o   itted   e   phasis added .

[33] *Id*  at 169.

[34] *Id*  at 170-71     oting *Atwater v  Lago Vista*, 532 U.S. 318, 345   2001    cleaned  p   e   phasis added .

[35] 564 U.S. 117   2011 .

13

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

eca se voting y legislators does not i plicate a personal right of free speech,  t is an e ercise

of legislative power on ehalf of the citi enry. One of the arg ents in s pport of that

concl sion was that s ch rec sal laws had e isted at the ti e of the Fo nding and were not

considered to e restraints on speech.

As with *Crawford* and *Moore*, the Co rt never even considered whether the scope of the

First A end ent eaning sho ld e deter ined y the nderstanding of the ratifiers of the

Fo rteenth A end ent. Instead, it loo ed to the Fo nding period to deter ine whether a law

re iring rec sal violated the right to freedo of speech or e pression. The Co rt noted that

 Laws p nishing li el and o scenity are not tho ght to violate the freedo of speech to which

the First A end ent refers eca se s ch laws *existed in*  and have een in place ever

since. [36] The Co rt fo nd that rec sal r les li e the one at iss e in the case have e isted since

the fo nding of the Rep lic:

> E arly congressional enactments  provid e  contemporaneous and weighty
> evidence of the Constitution's meaning,  *Print  v United States*, 521 U.S. 898,
> 905 1997  oting *Bowsher v Synar*, 478 U.S. 714, 723 724 1986 . *That*
> *evidence is dispositive here  Within  years of the founding*,  oth the Ho se of
> Representatives and the Senate adopted rec sal r les The Ho se r le  to which
> no one is recorded as having o ected, on constit tional or other gro nds, see D.
> C rrie, The Constit tion in Congress: The Federalist Period 1789 1801, p. 10
>  1997  was adopted within a wee of that cha er s first achieving a or  .[37]

The Co rt o served that  The first Senate r les did not incl de a rec sal re ire ent,  t

Tho as Jefferson adopted one when he was President of the Senate  in 1801.[38] It also loo ed to

rec sal re ire ents for federal dges as early as 1792.[39]

---

[36] *Id*. at 122 e phasis added .

[37] *Id* e phasis added .

[38] *Id* at 123.

[39] *Id*

14

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT   Su  ect to change

When the S  pre  e Co  rt loo  s at history to deter  ine the intent of ratifiers, it always

loo  s to the Fo  nding era as the period of sole or pri  ary relevance.  In addition to the three

cases cited  y *Bruen*, decisions  nder the Second A  end  ent, and all of the other a  end  ents

that have  een incorporated, loo  to the Fo  nding period.[40]

>    D   *All three of the Supreme Court  s substantive interpretations of the Second*
>        *Amendment assess its meaning and scope by looking at the Founding period*

There have  een three S  pre  e Co  rt cases   *Heller*, *Caetano*, and *Bruen*    that have

applied the s  stantive  eaning of the Second A  end  ent  *McDonald*  s  rveyed the i  portance

of the right to  eep and  ear ar  s over o  r nation  s history to deter  ine if it sho  ld  e

incorporated thro  gh the Fo  rteenth A  end  ent.  B  t *McDonald* did not atte  pt to e  po  nd on

its e  act s  stantive  eaning  eca  se Chicago  s handg  n  an was clearly  nconstit  tional  nder

*Heller* if the Second A  end  ent was incorporated.  *Heller*, *Caetano*, and *Bruen* all  sed the

Fo  nding period to deter  ine the scope and  eaning of the Second A  end  ent.

*Heller* first analy  ed the  eaning of the te  t of the Second A  end  ent  y e  a  ining

so  rces that either preceded 1791 or were close eno  gh in ti  e thereafter to validly ascertain

what the lang  age  eant to the Fo  nding generation.[41]

While it is  nnecessary to review every citation  y *Heller* as evidence of  eaning in the

Fo  nding era, a few e  a  ples will ill  strate the point.  The Co  rt stated that in interpreting the

Second A  end  ent s te  t,  we are g  ided  y the principle that   t he Constit  tion was written

to  e  nderstood  y the voters  its words and phrases were  sed in their nor  al and ordinary as

disting  ished fro  technical  eaning.  Nor  al  eaning  ay of co  rse incl  de an idio  atic

---

[40] The Seventh A  end  ent has not  een incorporated generally against the states  eca  se it is a provision
governing trials in federal co  rts.

[41] *Heller*, 554 U.S. 577-592.

**JA6544**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT  Su  ect to change

eaning,  t it e cl des secret or technical  eanings that wo ld not have  een  nown to *ordinary citi ens in the founding generation*. [42]

To ascertain the  eaning of  ilitia,  the Co rt stated:  As we will descri e  elow, the  ilitia  in colonial A  erica consisted of a s  set of  the people  those who were  ale, a le  odied, and within a certain age range. [43] *Heller* loo ed at the *colonial*  ilitia, not the  ilitia as it e isted in 1868 or so  e later period.

For the  eaning of ar s,  *Heller* loo ed e cl sively at  id- to late eighteenth-cent ry dictionaries and so rces, s ch as Sa  el Johnson s fa ed dictionary.[44]  It concl ded that  The ter  was applied, *then as now*, to weapons that were not specifically designed for  ilitary  se .[45]  Then  refers to the Fo nding period.  The Co rt concl ded that  Altho gh one *founding-era* thesa r s li ited ar s  as opposed to weapons  to instr ents of offence generally  ade  se of in war,  even that so rce stated that all firear s constit ted ar s. [46]

Regarding the  eaning of  eep,  the Co rt again cited Johnson s Dictionary, with a confir atory reference to the early We ster definition.  The opinion noted that  The phrase  eep ar s  was not prevalent in the written doc ents *of the founding period* that we have fo nd,  t cited three e a ples, all of which preceded 1791.[47]  The Co rt constr ed  ear in the sa e way, stating,  fro  o r review of *founding-era sources*, we concl de that this nat ral  eaning which the Co rt had adopted was also the  eaning that  ear ar s  had in the 18th

---

[42] *Id* at 576-77  citations o itted  e phasis added .

[43] *Id* at 580.

[44] The opinion did contain a  see also  reference to Noah We ster s 1828 dictionary,  t it was  erely cited as  si ilar.  It also cited *State v Duke*, 42 Te . 455, 458  1874 ,  t noted only that that case cited state co rt decisions constr ing ar s.

[45] *Heller*, 554 U.S. at 581  e phasis added .

[46] *Id*  e phasis added .

[47] *Id* at 583  e phasis added .

16

JA6545

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

cent ry. [48] In the end, the Co rt concl ded that it was  adopt ing . . . the original  nderstanding of the Second A end ent  as its definitive interpretation.[49] That can only  ean the  nderstanding that prevailed at its ratification.

*Caetano* applied the Second A end ent against the Co  onwealth of Massach setts.[50] Altho gh this *per curiam* opinion did not itself engage in historical analysis, it e pressly relied on *Heller* s lang age and reasoning, which were rooted in the Fo nding period.  There was no s ggestion  y the Co rt that 1868 was the proper date, or that the  nderstanding of the ratifiers of the Fo rteenth A end ent was even pertinent,  ch less controlling.

*Bruen* again confir ed that the ti e of ratification of the Bill of Rights is the pertinent period.  Addressing New Yor s historical arg ents fro  edieval ti es to the end of the nineteenth cent ry, the Co rt o served that  not all history is created e al  and then reaffir ed *Heller* s state ent that  Constit tional rights are enshrined with the scope they were  nderstood to have when the people adopted the  . [51]  The Second A end ent was adopted in 1791, so that sho ld  e concl sive.

### E  Supreme Court  urisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not

As descri ed in *Bruen*, the  eaning of a constit tional provision is fi ed when adopted.  That incl des the provisions of the Bill of Rights, which have the sa e  eaning when incorporated against the states as when they apply directly to the federal govern ent.  In n ero s cases involving all of the a end ents in the Bill of Rights that have  een incorporated, the relevant ti e period has  een held to  e the Fo nding period.  None has loo ed

---

[48] *Id*  at 584  e phasis added .

[49] *Id*  at 625.

[50] *Caetano v  Massachusetts*, 577 U.S. 411  2016 .

[51] *Bruen*, 142 S.Ct. at 2136.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

pri arily to the post-Civil War period to deter ine the scope of a provision within the Bill of

Rights.  To the e tent late 19th cent ry interpretations have een disc ssed in these cases, it was

never eca se the nderstandings of the ratifiers of the Fo rteenth A end ent were fo nd to

prevail over those of the Fo nders in 1791.  Instead, disc ssions of late 19th cent ry history are

treated as confir ation of the 1791 nderstanding.  While the list here cannot e e ha stive,

so e e a ples will ill strate.

*First Amendment*

The *Nevada Commission on Ethics* case was one of the three cases cited y J stice

Tho as as showing that the Co rt had ass ed that 1791 is the proper period for deter ining

the scope and eaning of a provision of the Bill of Rights.[52]  As descri ed a ove, it was alleged

in that case that Nevada had infringed on respondent s right of freedo of speech.  The Co rt

loo ed to the Fo nding period, and an n ro en tradition since then, to deter ine that the

cond ct in estion was not speech protected y the First A end ent.

In *Near v Minnesota*,[53] applying the principles of the First A end ent regarding freedo

of the press against a state, the Co rt heavily e phasi ed the historical nderstanding of freedo

of the press in 1791 when stri ing down a state law that i posed prior restraint on a p lication

dee ed a p lic n isance.  The Co rt stated that The estion is whether a stat te a thori ing

s ch proceedings in restraint of p lication is consistent with the conception of the li erty of the

press as *historically conceived and guaranteed* [54] It all ded to the str ggle in England over

prior restraints efore the Fo nding era, oted fro Blac stone s *Commentaries* on the nat re

of the right, cited an early Massach setts case regarding the eaning of the right, relied on

---

[52] *Id* at 2137-38.

[53] 283 U.S. 697 1931 .

[54] *Near*, 283 U.S. at 713.

18

**JA6547**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT  Su ect to change

Madison s Report on the  irginia Resol tions to show differences  etween the right in England and in A erica, and incl ded an e tensive e cerpt fro  that Report.[55]  This was, of co rse, a case relying on incorporation against a state,  t there was no  ention of 1868 as p rportedly  eing the relevant ti e period for ascertaining the  eaning of freedo  of the press.

The fa  o s case of *Reynolds v  United States*[56] presented the  estion of whether a federal stat te governing the Territory of Utah co ld prohi it  iga y witho t violating the Free E ercise Cla se. Altho gh the case was p rely federal, the S pre e Co rt t rned to history at the ti e of the Fo nding and  efore, to deter ine the  eaning of religion and the scope of the right. The Co rt noted that:

> The word  religion  is not defined in the Constit tion. We  st go elsewhere, therefore, to ascertain its  eaning, and nowhere  ore appropriately, we thin , than to *the history of the times in the midst of which the provision was adopted*. The precise point of the in  iry is, what is the religio s freedo  which has  een g aranteed.[57]

The Co rt then reviewed so e colonial history in which religio s freedo  was circ scri ed, and considered in detail a disp te concerning a  ill in  irginia in 1784, regarding which Ja es Madison:

> prepared a  Me orial and Re onstrance,  which was widely circ lated and signed, and in which he de onstrated  that religion, or the d ty we owe the Creator,  was not within the cogni ance of civil govern ent. citation o itted . At the ne t session the proposed  ill was not only defeated,  t another,  for esta lishing religio s freedo , drafted  y Mr. Jefferson, was passed.[58]

The Co rt considered Jefferson s  ill and his views a o t religio s freedo  and reviewed the treat ent of that s ect in the Constit tional Convention and d ring the period of

---

[55] *Id*. at 713-17.

[56] 98 U.S. 145  1878 .

[57] *Reynolds*, 98 U.S. at 163.

[58] *Id*.

19

**JA6548**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR   IN   DRAFT   Su   ect to change

ratification of the Bill of Rights.[59]  There was no hint that the p    lic    nderstanding of the First

A    end   ent in 1868 was i    portant, let alone that passage of the Fo    rteenth A    end   ent

so   ehow retroactively changed the    eaning of the Free E   ercise Cla   se.

In *Hosanna-Tabor Evangelical Lutheran Church and School v  E E O C* ,[60] a case

involving a disp   te    etween a religio   s school and a teacher who was a    inister    at the school,

the EEOC    ro   ght s   it against the school, alleging that the    inister had    een    nlawf   lly

ter   inated    eca   se she had threatened litigation    nder the A    ericans with Disa   ilities Act.[61]

The Co   rt reviewed English, colonial, and Fo   nding era evidence as to the e   tent to which

A   erican govern   ents co   ld    e involved in personnel decisions in religio   s instit   tions.[62]  It

noted that    It was against this    ac   gro   nd that the First A    end   ent was *adopted*  [63]  A   ong

other things,   the *founding generation* so   ght to foreclose the possi   ility of a national

ch   rch   .  [64]  The Esta   lish   ent Cla   se prevents the Govern   ent fro    appointing    inisters,

and the Free E   ercise Cla   se prevents it fro    interfering with the freedo    of religio   s gro   ps to

select their own.   [65]

In a recent free e   ercise case, *Fulton v  City of Philadelphia* ,[66] the Co   rt s    a   ority

opinion fo   nd it    nnecessary to perfor    a historical analysis to deter   ine the    eaning of the

First A   end   ent s   te   t    eca   se the case co   ld    e decided    nder e   isting precedents.  However,

---

[59] *Id*

[60] 565 U.S. 171   2012 .

[61] *Id*  at 179-80.

[62] *Id*  at 182-83.

[63] *Id*. at 183

[64] *Id*.

[65] *Id*. at 184.

[66] 141 S.Ct. 1868   2021 .

20

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

J  stice Alito,  oined   y J  stices Tho   as and Gors  ch, conc  rred in the   dg   ent, and wrote a

lengthy analysis of the te  t and historical   eaning of the Free E  ercise Cla  se, which foc  sed

nearly entirely on the   eaning in 1791.[67] After   oting   ey words fro   the First A   end   ent,

the conc  rrence noted that those   words had essentially the sa   e   eaning *in*      as they do

today. [68] J  stice Alito wrote that, following *Heller* s lead,   we    st as   whether the Free

E  ercise Cla  se protects a right that was   nown *at the time of adoption to have defined*

*dimensions* [69] He noted that   critical state ratifying conventions approved the Constit  tion on

the   nderstanding that it wo  ld   e a   ended to provide e  press protection for certain

f  nda   ental rights, and the right to religio  s li  erty was   n   estiona  ly one of those rights. [70]

Beca  se of deeper constit  tional scholarship in recent years,   we are now in a good position to

e  a   ine how the free-e  ercise right was   nderstood *when the First Amendment was adopted* [71]

Lynch v  Donnelly*, a case involving whether a      nicipality co  ld incl  de a creche as part

of its Christ   as display, said that interpretation of the Esta  lish   ent Cla  se sho  ld co  port with

what history reveals was the conte   poraneo  s   nderstanding of its g  arantees. [72] It loo  ed to

the actions of the First Congress in 1789 in deter   ining the   eaning of that cla  se:   In the very

wee   that Congress approved the Esta  lish   ent Cla  se as part of the Bill of Rights for

s      ission to the states, it enacted legislation providing for paid chaplains for the Ho  se and

---

[67] *Fulton*, 141 S.Ct. at 1894-912.

[68] *Id*. at 1896.

[69] *Id*. at 1899.

[70] *Id*. at 1901.

[71] *Id* at 1899.

[72] *Lynch v  Donnelly*, 465 U.S. 668, 673   1984 .

21

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

Senate. [73]  The ti  e of the ratification of the Fo  rteenth A  end  ent played no s  ch role in interpreting the right.

*Fourth Amendment*

As descri  ed a  ove, another of the three cases cited   y J  stice Tho   as in s  pport of the Co  rt s loo  ing to the ti  e of the Fo  nding was *Virginia v  Moore*, a Fo  rth A  end  ent case. As noted, that case relied on the   stat  tes and co     on law of the fo  nding era,  and so  ght to deter  ine the   nderstanding of  those who ratified the Fo  rth A  end  ent. [74]  Other cases applying the Fo  rth A  end  ent against the states have si  ilarly loo  ed to the Fo  nding period, not the ti  e of ratification of the Fo  rteenth A  end  ent.

In *Wyoming v  Houghton*, the Co  rt said that to deter  ine whether govern  ent action violates Fo  rth A  end  ent rights,  we in  ire first whether the action was regarded as an   nlawf  l search or sei   re  nder the co     on law *when the Amendment was framed* [75] Si   ilarly, in *Wilson v  Arkansas*,  the Co  rt stated that in eval  ating the scope of Fo  rth A  end  ent rights,  we have loo  ed to the traditional protections against   nreasona  le searches and sei   res afforded   y the co     on law *at the time of the framing*. [76]  *Houghton* and *Wilson*, li  e *Moore*,   oth applied the Fo  rth A  end  ent to states,   t not a word was    entioned regarding 1868   eing the proper ti   e for assessing the scope or    eaning of the right.

---

[73] *Id*  at 674.

[74] *Virginia v  Moore*, 553 U.S. at 168.

[75] 526 U.S. 295, 299  1999   e  phasis added .

[76] 514 U.S. 927, 931  1995   e  phasis added .

22

**JA6551**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

## *Fifth Amendment*

In *Benton v  Maryland*,[77] the case that incorporated the Fifth A  end  ent s Do   le

Jeopardy Cla  se against the states, the Co  rt perfor  ed a  rief review of the history of that

concept s incl  sion in A  erican law, especially noting the Fo  nding period.  The right to  e free

of   ltiple prosec  tions:

> eca  e esta  lished in the *common law of England long before this Nation s*
> *independence*.  citations o  itted .  As with   any other ele  ents of the co     on
> law, it was carried into the   rispr  dence of this Co  ntry thro  gh the   edi   of
> Blac  stone, who codified the doctrine in his Co      entaries  .  Today, every State
> incorporates so  e for  of the prohi  ition in its constit  tion or co     on law   .
> The  nderlying principle against do   le  eopardy  has *from the very beginning*
> *been part of our constitutional tradition*.[78]

Si  ilarly, in   *amble v  United States*,[79]  the Co  rt recently e  a  ined the   eaning of the

d  al-sovereignty  doctrine in Fifth A  end  ent do   le  eopardy   rispr  dence.  The te  t of the

Fifth A  end  ent protects individ  als fro    eing twice p  t in  eopardy  for the sa  e offence.

Accordingly, the Co  rt loo  ed at the   eaning of the word   offence  in the Fo  nding period and

fo  nd that it  was co     only  nderstood *in*    to  ean transgression, that is,  the   iolation

or Brea  ing of a Law.   [80]  The Co  rt contin  ed,  As *originally understood*, then, an  offence  is

defined  y a law, and each law is defined  y a sovereign. So where there are two sovereigns,

there are two laws, and two  offences.   [81]  Altho  gh   *amble* was a federal case, the Co  rt

---

[77] 395 U.S. 784  1969 .

[78] *Id*  at 795-96  e   phasis added .

[79] 139 S.Ct. 1960  2019   citations o   itted, e   phasis added .

[80] *Id*  at 1965  e   phasis added .

[81] *Id*.

JA6552

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

recogni ed that thro gh incorporation the very sa e principles applied to the state co rt

proceedings nder which Ga le had already een convicted.[82]

*Sixth Amendment*

*Crawford v Washington*,[83] descri ed a ove, was a Si th A end ent Confrontation

Cla se case and one of the three cases noted y J stice Tho as in *Bruen* to have ass ed that

the Fo nding period is the relevant ti e for deter ining the scope of provisions of the Bill of

Rights. It repeatedly relied on evidence regarding the Fra ers, 1791, and the Fo nding period.

In *Ramos v Louisiana*,[84] the Co rt considered whether the incorporated Si th

A end ent right to a ry trial in state cri inal cases re ires a nani o s verdict. The Co rt

loo ed at precedents arising fro efore the Fo nding period, and practices aro nd the ti e the

Si th A end ent was ratified:

> The re ire ent of ror nani ity e erged in 14th cent ry England and was
> soon accepted as a vital right protected y the co on law. As Blac stone
> e plained, no person co ld e fo nd g ilty of a serio s cri e nless the tr th of
> every acc sation ... sho ld ... e confir ed y the nani o s s ffrage of twelve
> of his e als and neigh ors . [85]

> This sa e r le applied in the *young American States* Si State Constit tions
> e plicitly re ired nani ity. Another fo r preserved the right to a ry trial in
> ore general ter s. B t the variations did not atter ch consistent with the
> co on law, state co rts appeared to regard nani ity as an essential feat re of
> the ry trial.[86]

The Co rt f rther recogni ed that it was the original ti e of ratification that was pertinent for

deter ining the eaning of trial y ry, e plaining that:

---

82     *amble*, 139 S.Ct. at 1963, 1979.

83  *Crawford v Washington*, 541 U.S. 36 2004 .

84  140 S.Ct. 1390 2020 .

85  *Id*. at 1395.

86  *Id*. at 1396 e phasis added .

24

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

It was against this ac drop that Ja es Madison drafted and *the States ratified the Sixth Amendment in* By that ti e, nani o s verdicts had een re ired for a o t 400 years. If the ter trial y an i partial ry carried any eaning at all, it s rely incl ded a re ire ent as long and widely accepted as nani ity.[87]

In other Si th A end ent cases, the Co rt has also loo ed to the Fo nding period to deter ine the scope, eaning, or i portance of vario s provisions of that A end ent. *See*, *e g* , *Powell v Alabama,*[88] right to co nsel e a ining scope of right at English law in Fo nding period, Blac stone s re ection of English li itations on the right, and incl sion of right to co nsel in early A erican constit tions *Klopfer v North Carolina*[89] right to speedy trial reviewing early English law, Magna Carta, Co e s *Institutes* and the A erican fa iliarity with the at the ti e of the Fo nding, irginia s 1776 Declaration of Rights, and early state constit tions *In re Oliver,*[90] right to p lic trial relying on o r English co on law heritage and state constit tions in ost of the original states *Duncan v Louisiana,*[91] right to ry trial in all state cri inal cases in which s ch right wo ld e ist in federal co rt reviewing early English history and English Bill of Rights, Blac stone, Sta p Act Congress, First Continental Congress, Declaration of Independence, and constit tions of original states *Washington v Texas,*[92] Co p lsory Process Cla se stating that the Fra ers incl ded this cla se to overco e certain li its on who co ld testify at co on law .

---

[87] *Id*. e phasis added .

[88] 287 U.S. 45, 60-67 1932 .

[89] 386 U.S. 213, 223-25 1967 .

[90] 333 U.S. 257, 266 268 1948 .

[91] 391 U.S. 145, 151-54 1968 .

[92] 388 U.S. 14, 20, 23 1967 .

JA6554

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT  Su  ect to change

*Eighth Amendment*

In *Timbs v  Indiana*, to deter   ine whether the E  cessive Fines Cla  se was incorporated against the states, the Co  rt e  a  ined early English legal history fro   the ti  e of Magna Carta, Blac  stone, the a  ses   y the St  art   ings, the English Bill of Rights, and colonial and state constit  tions.[93]  It noted that the state   ents in the English Bill of Rights that  e  cessive Bail o  ght not to  e re  ired, nor e  cessive Fines i  posed nor cr  el and  n  s  al P  nish  ents inflicted,  were adopted al  ost ver  ati  first   y the   irginia Declaration of Rights and then in the Eighth A  end  ent itself.[94]  The Co  rt did disc  ss the period aro  nd ratification of the Fo  rteenth A  end  ent,   t only to note that then 35 of the 37 states had prohi  itions against e  cessive fines,   t that a  ses of fines to control  lac  people nevertheless contin  ed.[95]  As in *McDonald*, the incl  sion of post-  ell   nineteenth cent  ry develop  ents in the Co  rt s historical review was ai  ed only at deter   ining that the right is  f  nda  ental to o  r sche  e of ordered li  erty,  or  deeply rooted in this Nation s history and tradition. [96]  There was no s  ggestion that 1868 was the pri  ary period to deter   ine the   eaning of the cla  se, or that its   eaning was so   ehow changed   y the process of incorporation.  Indeed, given the deep roots into English and A  erican history not only of the principle   t the very lang  age prohi  iting e  cessive fines, that wo  ld have  een an  ntena  le e  ercise.

The a  thor has not fo  nd, and litigants in post-*Bruen* litigation have so far not pointed to, a *single* S  pre  e Co  rt case in which in which the S  pre  e Co  rt has loo  ed to the ti  e of ratification of the Fo  rteenth A  end  ent as the principal period for deter   ining the scope or

---

[93] 139 S.Ct. 682, 687-88  2019 .

[94] *Timbs,* 139 S. Ct. at 688.

[95] *Id*. at 688-99.

[96] *Id*  at 687      oting *McDonald* .

26

**JA6555**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su  ect to change

eaning of a provision of the Bill of Rights. [97]  The Second A  end  ent is not a  second class

right [98] and there is no reason for it to  e treated differently fro   the other provisions of the Bill

of Rights in this respect.  In addition, adoption of 1868 as the proper foc  s for deter  ining the

eaning of the Second A  end  ent wo  ld  ean that the S  pre  e Co  rt was  tterly wrong in

loo  ing to the Fo  nding period in *Heller*, *Caetano*, and *Bruen*.

> F   *If later understandings contradict the original understanding of the text, the original*
> *understanding controls*

*Heller*, *McDonald*, and *Bruen* all considered so  e a  o  nt of 19th cent  ry history.

*McDonald* did so not to discern the  eaning or scope of the right to  eep and  ear ar  s,  t

rather to deter  ine whether it has historically  een considered f  nda  ental to o  r sche  e of

ordered li  erty  and  deeply rooted in this Nation s history and tradition. [99]  *Caetano* relied on

the Fo  nding-era research and principles anno  nced in *Heller*.  B  t  oth *Heller* and *Bruen*

engaged in e  tensive historical analysis and provided so  e clear g  ideposts regarding the proper

ses of post-Civil War history.

The post Fo  nding-era history e  a  ined  y *Heller* and *Bruen* was  sed  y the Co  rt only

to confir  rather than to contradict the Fo  nding era  nderstanding. Regarding *Heller*, the *Bruen*

Co  rt o  served that:

> we  ade clear in  *amble*[100] that *Heller* s interest in  id- to late-19th-cent  ry
> co  entary was secondary. *Heller* considered this evidence  only after s  rveying
> what it regarded as a wealth of a  thority for its reading  incl  ding the te  t of the
> Second A  end  ent and state constit  tions.  In other words, this 19th-cent  ry

---

[97] Litigants have cited lower co  rt decisions that they clai   have done this, and I disc  ss the errors in those clai  s
in Part IG.

[98] *McDonald*, 561 U.S. at 780, 781-87.

[99] *McDonald*, 561 U.S. at 767.

[100]   *amble v  United States,* 139 S.Ct. 1960  2019 .

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

evidence was  treated as  ere confir ation of what the Co rt tho ght had already
een esta lished. [101]

*Bruen* itself fo nd that the te t of the Second A end ent plainly covers the right to

carry ar s in p lic.[102] It also caref lly noted that  to the e tent later history contradicts what

the te t says, the te t controls. [103]  It adopted the view of then-J dge Kavana gh in a D.C.

Circ it Second A end ent case that  post-ratification adoption or acceptance of laws that are

*inconsistent* with the original  eaning of the constit tional te t o  vio sly cannot overco e or

alter that te t. [104]  And, o  vio sly, the insistence  y so e scholars and advocates that 1868

sho ld control, is only of i  portance if they  elieve they can show that the 1868 nderstanding

was *different* fro  the 1791 nderstanding. B t if the 1868 nderstanding is different fro  that

of 1791, it  st e re ected eca se it is inconsistent with the te t and the original  eaning that

is fi ed according to the  nderstandings of those who ratified it. [105]

B t even if the arg ents that 1868 tr ps 1791 did not conflict with *Heller*, *Caetano*,

and *Bruen*, and the Co rt s entire incorporation rispr dence  which they plainly do  the

Co rt wo ld give the  little weight in any event, d e to the sheer re oteness in ti e of any

post-Civil War state ents, nderstandings, or legal develop ents. The Co rt warned against

giving  post-enact ent history ore weight than it can rightly ear, and reaffir ed *Heller* s

o servation that eca se post-Civil War disc ssions of the right to eep and ear ar s too

place 75 years after the ratification of the Second A end ent, they do not provide as ch

---

[101] *Bruen*, 142 S.Ct. at 2137  oting  amble, 139 S.Ct. at 1975-76 .

[102] *Id* at 2134.

[103] *Id*. at 2137.

[104] *Id*. at 2137  oting *Heller v District of Columbia*, 670 F.3d 1244, 1274, n.6  D.C. Cir. 2011  Kavana gh, J., dissenting .

[105] 142 S. Ct. at 2132.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

insight into its original eaning as earlier so rces. [106] In fact, faced with twentieth-cent ry

evidence that *did* contradict the Fo nding-era evidence, the *Bruen* Co rt re ected that evidence,

stating that the Co rt will not:

> address any of the 20th-cent ry historical evidence ro ght to ear y
> respondents or their *amici*. As with their late-19th-cent ry evidence, the 20th-
> cent ry evidence presented y respondents and their *amici* does not provide
> insight into the eaning of the Second A end ent when it contradicts earlier
> evidence.[107]

J stice Barrett, conc rring in *Bruen*, also ca tioned that today s decision sho ld not e

nderstood to endorse freewheeling reliance on historical practice fro the id-to-late 19th

cent ry to esta lish the original eaning of the Bill of Rights. [108] That is ite right *Bruen* s

analysis forecloses that type of reasoning.

An e a ple of the errors that can occ r when co rts engage in s ch freewheeling

reliance on id-to late 19th cent ry analog es is contained in a recent te porary restraining

order en oining enforce ent of so e of New Yor State s new restrictions on carry enacted after

the *Bruen* decision.[109] In that case, the District Co rt let stand a an on carrying concealed

firear s in places of worship, with so e e ceptions for eeping the peace, despite the fact that

*Bruen* did not incl de places of worship in its list of sensitive places. [110] The District Co rt

relied on only si analog es, which were state stat tes enacted etween 1870 and 1890.[111] B t

these alleged analog es co e far too late, as indicated y *Bruen* itself and y J stice Barrett s

conc rrence in *Bruen*. To ill strate, in 1740, So th Carolina re ired that every white ale

---

[106] *Id* at 2136 37 oting *Heller*, 554 U.S. at 614 .

[107] *Id* at 2154 n.28.

[108] *Id* at 2163 Barrett, J., conc rring .

[109] *Antonyuk v Hochul*, No. 1:22-C -0986, Doc. 27 N.D.N.Y. Oct. 6, 2022 *Antonyuk II* .

[110] *Bruen*, 142 S.Ct. at 2133.

[111] *Antonyuk II* at 33 n.25.

29

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

inha itant of this Province,  e cept travelers and s ch persons as shall  e a ove si ty years of

age,  who  is  lia le to  ear ar  s in the  ilitia of this Province,  who shall  go and resort to

any ch rch or any other p   lic place of divine worship,       st  carry with hi   a g  n or a pair of

horse-pistols  with at least si  charges of g  npowder and  all. [112]  In 1770, Georgia re   ired

that  every   ale white inha itant of this province,  the inha itants of the sea port towns only

e cepted who shall not   e o liged to carry any other than side ar  s  who is or shall  e lia le to

 ear ar  s in the  ilitia  and resorting  to any ch rch  shall carry with hi   a g  n, or a pair of

pistols. Each   an was re   ired to  ta  e the said g  n or pistols with hi   to the pew or seat,  and

these ar  s were to   e fit for i   ediate  se and service. [113]

As disc ssed, all S  pre  e Co rt cases on the Bill of Rights have loo ed to the Fo nding

Period for deter  ining   eaning, not to the late 19th cent ry.  If there is no analog e in the

Fo nding period, one cannot       p  as the New Yor  co rt did   to the late 19th cent ry to loo

for analog es in the first place. J stice Barrett in her conc rrence pointedly   oted fro

*Espino  a v  Montana Dept  of Revenue,* 140 S.Ct. 2246, 2258-2259  2020 , which stated that a

practice that  arose in the second half of the 19th cent ry ... cannot  y itself esta  lish an early

A  erican tradition  infor   ing o r  nderstanding of the First A  end  ent.[114]  If s  ch a practice

cannot esta  lish a pertinent A   erican tradition for the First A  end  ent, it cannot do so for the

Second A  end  ent, either.

---

[112] 7 David J. McCord, Stat  tes at Large of So  th Carolina 417-19  Col     ia, S.C.: A.S. Johnston, 1840   enacted
1740, re-enacted 1743 .

[113] Horatio Mar   ry and Willia    A. Crawford, Digest of the Laws of the State of Georgia, 241-42  1802   law of
Fe  . 27, 1770,   1 .

[114] *Bruen*, 142 S.Ct. at 2163.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

*The Court of Appeals decisions cited to support      as the determinative year have been abrogated or rely on an obvious misreading of McDonald*

The riefs s pporting the pro-g n control litigants in the *Worth*, *Lara*, and *Antonyuk* cases, *supra* n.8, rely on Co rt of Appeals cases that s pposedly esta lish that the ti e of ratification of the Fo rteenth A end ent is the ey ti e period for deter ining the scope and eaning of the Second A end ent. Even a c rsory review of those cases elies that contention.

The a ic s rief y Everytown for G n Safety in *Lara* offers a ore ro st arg ent than the defendant s rief in *Worth*. It contends that for the historical in iry:

> the ost relevant ti e period centers on 1868, when the Fo rteenth A end ent was ratified and ade the Second A end ent applica le to the states. Several circ its reached this concl sion in applying the first step of the pre-*Bruen* fra ewor .[115]

For this proposition, it provides the following footnote:

> *See ould v Morgan*, 907 F.3d 659, 669 1st Cir. 2018    Beca se the challenge here is to a state law, the pertinent point in ti e wo ld e 1868 when the Fo rteenth A end ent was ratified . ., *critici ed on other grounds by Bruen,* 142 S. Ct. at 2124, 2126-27 *E ell v City of Chicago*, 651 F.3d 684, 702 7th Cir. 2011 *McDonald* confir s that if the clai concerns a state or local law, the scope estion as s how the right was p licly nderstood when the Fo rteenth A end ent was proposed and ratified. *United States v reeno*, 679 F.3d 510, 518 6th Cir. 2012 following *E ell* see also Drummond v Robinson Twp., 9 F.4th 217, 227 3d Cir. 2021 T he estion is if the Second and Fo rteenth A end ents ratifiers approved the challenged reg lations . e phasis added *Binderup v Att y en* , 836 F.3d 336, 362 3d Cir. 2016 en anc Hardi an, J., conc rring in part and in the dg ents oting *E ell* .[116]

Ta ing these in order, *ould* was not critici ed on other gro nds y *Bruen*. *ould* was entirely a rogated y *Bruen*. It is a legal n llity. The *E ell* ote is acc rate. The pro le there is that *McDonald* did not state that if the clai involves a state or local law where the scope

---

[115] A ic s Letter Br. of Everytown for G n Safety, *Lara v Comm r Pa State Police*, No. 21-1832, Doc. 61, at 2 3d Cir. A g. 2, 2022 .

[116] *Id* at 2 3.

JA6560

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

estion as  s how the right was  nderstood when the Fo  rteenth A  end  ent was proposed and ratified.  The Seventh Circ  it in E  ell si  ply got it wrong.  For this proposition, it cites *McDonald*, 130 S.Ct. at 3038  47. [117]  B  t there is no s  ch holding in those pages of *McDonald*. They are si  ply part of the Co  rt s historical s  rvey of why the right is  f  nda  ental,  and do not specify 1868 as the ti  e period to deter  ine the e  tent of the right.  *Bruen* certainly did not read *McDonald* that way and instead foc  sed on 1791 in an approach that it asserted was consistent with all its other Second A  end  ent precedents, *McDonald* incl  ded.  And the Seventh Circ  it changed co  rse shortly after *E  ell* was decided, o  serving that  1791, the year the Second A  end  ent was ratified   is  the critical year for deter  ining the a  end  ent s historical   eaning, according to *McDonald v  City of Chicago*. [118]

*reeno* si  ply   oted the   ista  en lang  age in *E  ell*, apparently witho  t investigating its acc  racy.[119]  It was also a so   ewhat c  rsory  plain error  review in a cri  inal case  eca  se the defendant had not raised the Second A  end  ent iss  e at trial.[120]  The *Drummond* case did not hold that 1868 is the proper date.  It   erely stated, witho  t any ela  oration or citation of a  thority, that  f or the ri  -fire rifle r  le, the   estion is if the Second and Fo  rteenth A  end  ents  ratifiers approved reg  lations  arring training with co    on weapons in areas where firear   s practice was otherwise per  itted. [121]  It then cited a  thorities fro   1825, 1885, and 1895 as part of its analysis,   t did not atte  pt to deter  ine what the ratifiers of the Fo  rteenth A  end  ent   ay have  nderstood the right s scope to   e in 1868.[122]  The citation to

---

[117] *E  ell*, 651 F.3d at 702.

[118] *Moore v  Madigan*, 702 F.3d 933, 935  7th Cir. 2012 .

[119] 679 F.3d at 518.

[120] *Id*. at 516.

[121] 9 F.4th at 227.

[122] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

*Binderup* is to a conc  rrence, not the Co  r  s opinion, and it, too,    erely recites the    ista  en
lang  age of *E  ell*.[123]

    In short, litigants arg  ing for 1868 as the proper date for historical in    iry in
incorporation cases wo  ld have the lower co  rts overloo   the   n ro  en line of S  pre  e Co  rt
cases that the right    st  e the sa  e against   oth the federal govern   ent and the states  that the
right is fi  ed when the relevant Bill of Rights provision is adopted  and that the Fo  nding period
is the relevant period for deter   ining the    eaning of the Constit  tion generally and for partic  lar
provisions of the Bill of Rights.  In opposition to these fir    and consistent holdings   y the
S  pre  e Co  rt, they offer one a  rogated opinion   y one Co  rt of Appeals, a single Co  rt of
Appeals opinion that clearly    ade a    ista  e that was later corrected, and a series of cases that
relied on that    ista  e apparently witho  t f  rther investigation.

II       IS T  E CRITICA    ERIOD FOR DETERMININ   T  E MEANIN   OF
T  E  I   OF RI   TS

    A. *It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they
were incorporating against the states all of the provisions of the first eight
amendments*

    If those who advocate for 1868 as the proper year for deter   ining the    eaning of the
Second A   end   ent were to prevail, an i   portant conse   ence    st  e faced.  There is no
reason for the Second A   end   ent to   e different fro   any other provision of the Bill of Rights
in this respect.  It is not a   second class right   as *McDonald* pointedly o  served.[124]  So, if those
advocates were to   e s  ccessf  l, consistent application of the doctrine of incorporation    st loo
to 1868 for the p   lic    eaning of all of the provisions of the Bill of Rights, not    st the Second

---

[123] 836 F.3d at 362.

[124] 561 U.S. at 780, 781  87.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT  Su  ect to change

A  end  ent. F  rther  ore, those  eanings  st displace the original  nderstandings of 1791. As shown a ove,  oth of these propositions are flatly contradicted  y well-settled S  pre  e Co  rt lines of precedent.

B  t there is a f  rther pro  le  . If the  nderstanding of the ratifiers of the Fo  rteenth A  end  ent of each provision of the Bill of Rights  st ta  e precedence, then we  st  e certain that those ratifiers  nderstood that they were incorporating all of the provisions of the Bill of Rights against the states, and that those rights had a partic  lar, different  eaning to the  at the ti  e. This is not only contrary to logic and precedent,  t as a practical  atter i  possi  le, or nearly so.

The Fo  rteenth A  end  ent does not state that it is applying the first eight a  end  ents against the states. It does not even  ention the Bill of Rights. F  rther  ore, the D  e Process Cla  se was not the principal or stated  eans  y which the Fo  rteenth A  end  ent so  ght to give protection to  lac  freed  en to e  ercise the right to  eep and  ear ar  s. The operative lang  age considered critical at the ti  e was the Citi  enship Cla  se in the first sentence of Section 1 of the Fo  rteenth A  end  ent, co  pled with the Privileges or I  nities Cla  se in the second sentence. Together, they read:

> All persons  orn or nat  rali  ed in the United States, and s  ect to the  risdiction thereof, are citi  ens of the United States and of the State wherein they reside. No State shall  a  e or enforce any law which shall a  ridge the privileges or i  nities of citi  ens of the United States  .[125]

The first sentence was arg  a  ly necessary to overco  e the holding of the infa  o  s *Dred Scott* case, which held that African A  ericans were not citi  ens of the United States and

---

[125] U.S. CONST. AMEND.  I  ,  1.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

therefore co ld not ring s it in federal co rts, a ong other things.[126] The second sentence was to protect the privileges or i nities of citi ens against state infringe ent.

B t what did privileges or i nities of citi ens of the United States ean Thro gho t the Congressional de ates on the Fo rteenth A end ent, the Civil Rights Act of 1866, and other Congressional enact ents for which the Fo rteenth A end ent was intended to provide constit tional a thority, contradictory and vag e acco nts were given y e ers of Congress and others of the A end ent s eaning and effect.

Let s recall the state of the law regarding the Bill of Rights then. In *Barron v Baltimore*, the S pre e Co rt held that the Fifth A end ent s Ta ings Cla se provided a li it only on the federal govern ent and not on actions y state or local govern ents.[127] It was widely, tho gh not niversally, ass ed thereafter that none of the provisions of the first eight a end ents in the Bill of Rights applied against the states. In fact, that had een the prevailing view even efore *Barron*. At the ti e of ratification of the Fo rteenth A end ent, was it clear that that A end ent was eant to reverse *Barron* and apply all of the protections in the Bill of Rights against the states If that was not clear at the ti e, the ratifiers of the Fo rteenth A end ent wo ld have had no occasion to reconsider their nderstandings of the Bill of Rights, incl ding the Second A end ent.

The first diffic lty in loo ing at the li ely nderstanding of the ratifiers of 1868 is that privileges and i nities already had a widely accepted eaning. Article I , Sec. 2, the Co ity Cla se of the Constit tion, provides that t he Citi ens of each State shall e entitled to

---

[126] *Dred Scott v Sandford*, 60 U.S. 393 1857 . Also, had African A ericans een considered citi ens, *Dred Scott* presented a parade of horri les that wo ld have ens ed, incl ding that it wo ld give the right to eep and carry ar s wherever they went. *Id* at 417. As J stice Tho as o served for the Co rt in *Bruen*, even Chief J stice Taney recogni ed al eit nenth siastically in the case of lac s that p lic carry was a co ponent of the right to eep and ear ar s a right free lac s were often denied in ante ell A erica. *Bruen*, 142 S.Ct. at 2151.

[127] *Barron ex rel Tiernan v City of Baltimore*, 32 U.S. 243, 250 51 1833 .

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN   DRAFT  Su   ect to change

all Privileges and I      nities of Citi ens in the several States. [128]  The opinion of S  pre  e

Co  rt Associate J  stice B  shrod Washington, sitting as a   e   er of a circ  it co  rt, was widely

oted to interpret the   eaning of  privileges and i       nities.   In *Corfield v  Coryell* he wrote:

> The in   iry is, what are the privileges and i       nities of citi ens in the several
> states  We feel no hesitation in confining these e  pressions to those privileges
> and i       nities which are, in their nat  re, f  nda  ental  which   elong, of right, to
> the citi ens of all free govern   ents  and which have, at all ti  es,   een en oyed  y
> the citi ens of the several states which co   pose this Union, fro   the ti  e of their
>  eco  ing free, independent, and sovereign. What these f  nda  ental principles
> are, it wo  ld perhaps   e  ore tedio  s than diffic  lt to en  erate. They   ay,
> however,  e all co   prehended  nder the following general heads: Protection  y
> the govern   ent  the en oy  ent of life and li  erty, with the right to ac   ire and
> possess property of every   ind, and to p  rs  e and o  tain happiness and safety
> s   ect nevertheless to s  ch restraints as the govern   ent   ay  stly prescri  e for
> the general good of the whole. The right of a citi en of one state to pass thro  gh,
> or to reside in any other state, for p  rposes of trade, agric  lt  re, professional
> p  rs  its, or otherwise  to clai   the   enefit of the writ of ha  eas corp  s  to
> instit  te and   aintain actions of any   ind in the co  rts of the state  to ta  e, hold
> and dispose of property, either real or personal  and an e  e  ption fro   higher
> ta  es or i   positions than are paid   y the other citi ens of the state    ay  e
>     entioned as so   e of the partic  lar privileges and i       nities of citi ens, which
> are clearly e   raced   y the general description of privileges dee   ed to   e
> f  nda  ental: to which   ay   e added, the elective franchise, as reg  lated and
> esta  lished   y the laws or constit  tion of the state in which it is to   e e  ercised.
> These, and   any others which   ight  e  entioned, are, strictly spea  ing,
> privileges and i       nities .[129]

Nota  ly a  sent fro   this list is any direct reference to the provisions   a  ing  p the Bill

of Rights.  Of co  rse, the Bill of Rights was not written or ratified   ntil after the adoption of the

Constit  tion. B  t J  stice Washington wrote this passage in 1823. If  privileges and i       nities

enco   passed all of the provisions in the first eight a   end  ents, it see  s at least so   ewhat

---

[128] U.S. CONST. art. I   ,  2.

[129] 6 F. Cas. 546, 551  52  E.D. Pa. 1823 .

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

strange that he did not descri e any of the specific rights na ed in the Bill of Rights or state

analog es to those rights.[130]

In de ating the Civil Rights Bill of 1866, 42 U.S.C.  1981, Senator Ly an Tr ll of

Illinois co-a thor of the Thirteenth A end ent and Chair an of the Senate J diciary

Co ittee oted the portion of the *Corfield* decision set forth a ove.[131]  The Fo rteenth

A end ent, of co rse, was tho ght y so e to e necessary to provide constit tional a thority

for the Civil Rights Act. Tr ll descri ed the first section of the ill, which declared all

persons of African descent to e citi ens of the United States, and noted that there shall e no

discri ination in civil rights or i nities a ong the inha itants of any state on acco nt of

race, color, or previo s condition of slavery, as the asis for the whole ill.[132]  The other

provisions contained only necessary achinery for enforce ent. After reading alo d the

passage fro *Corfield*, Tr ll stated that it en erates the very rights elonging to a citi en

of the United States which are set forth in the first section of this ill.[133]  It was anything t

clear fro Tr ll s speech that privileges or i nities or civil rights or i nities was

eant to incl de wholesale the first eight a end ents in the Bill of Rights.

When the Fo rteenth A end ent itself was presented to the Senate on ehalf of a Joint

Ho se and Senate Co ittee, Senator Jaco Howard too a contrasting position. He again

oted the passage fro *Corfield* as constit ting privileges and i nities, t then said that

to these sho ld e added the personal rights g aranteed and sec red y the first eight

---

[130] The Co ity Cla se of Art. I , Sec. 2, was eant to precl de states fro denying to citi ens of other states the rights, processes, and privileges afforded its own citi ens within its o ndaries. That wo ld ean only those privileges or rights held y citi ens as part of state law and wo ld not incl de provisions s ch as those in the federal Bill of Rights that were designed to prevent federal overreach.

[131] CONG. GLOBE, 39th Cong., 1st Sess. 474 75 1866 .

[132] *Id*

[133] *Id*.

37

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR   IN   DRAFT   Su   ect to change

a   end   ents of the Constit   tion   s   ch as the freedo    of speech and of the press   the right of the

people to peacea   ly asse     le and petition the govern    ent for a redress of grievances        the

right to    eep and to    ear ar   s   the right to    e   e   pted fro    the    artering of soldiers in a ho   se

witho   t the consent of the owner,   and so forth down thro   gh the re   aining a   end   ents.[134] He

contin   ed:   The great o   ect of the first section of this a   end   ent is, therefore, to restrain the

power of the States and co   pel the    at all ti   es to respect these great f   nda   ental

g   arantees. [135]

Howard   s opinion that   privileges or i       nities e    raced the first eight a   end   ents

was   y no   eans   niversal.[136] Sen. Tho   as Hendric   s of Indiana stated that he had not    heard

any Senator acc   rately define, what are the rights and i       nities of citi   enship   or that   any

states   an has very acc   rately defined the   .   He descri   ed the ter   s as   not very certain   and

vag   e. [137]   Senator Reverdy Johnson of Maryland favored the citi   enship and d   e process

cla   ses,   t stated that   I thin   it   ite o   ectiona   le to provide that   no State shall   a   e or

enforce any law which shall a   ridge the privileges or i       nities of citi   ens of the United

States, si   ply   eca   se I do not   nderstand what will   e the effect of that. [138]   Rep. Ben a   in

Boyer of Pennsylvania fo   nd Section 1   o   ectiona   le also in its phraseology,   eing open to

a   ig   ity and ad   itting of conflicting constr   ctions. [139]

---

[134] *Id*. at 2765.

[135] *Id*. at 2766.

[136] Indeed, that was news to J   stice Feli    Fran   f   rter in 1947.  In his conc   rring opinion in *Louisiana ex rel   Francis v Resweber*, 329 U.S. 459, 467   68   1947  , J   stice Fran   f   rter wrote:   Not   ntil recently was it s   ggested that the D   e Process Cla   se of the Fo   rteenth A   end   ent was   erely a co   pendio   s reference to the Bill of Rights where   y the States were now restricted in devising and enforcing their penal code precisely as is the Federal Govern   ent   y the first eight a   end   ents.

[137] CONG. GLOBE, 39th Cong., 1st Sess. 3039   1866  .

[138] *Id*   at 3041.

[139] *Id*. at 2467.

38

JA6567

Electronic copy available at: https://ssrn.com/abstract=4248297

**WOR IN  DRAFT  Su  ect to change**

If the very    e    ers of Congress that were de  ating the Fo  rteenth A  end  ent disagreed as to its    eaning, or fo  nd it  vag  e  and open to  conflicting constr  ctions,  then deter  ining how the ratifiers in the states in 1868    nderstood the    eanings of each of the provisions of the first eight a  end  ents in 1868, partic  larly when it was    nclear that those eight a  end  ents were    eing incorporated wholesale against the states, is a very fra  ght endeavor  as well as an  n  stified one .

There is also a practical diffic  lty in deter  ining what the state ratifiers in 1868    ay have  nderstood.  There were thirty-seven states in 1868.  Few records e  ist on the ratification of the Fo  rteenth A  end  ent.  What little e  ists is fo  nd in    essages of governors who s    itted the Fo  rteenth A  end  ent to their state legislat  res, legislative de  ates  which were recorded in only Pennsylvania and Indiana , and co    ittee reports  Massach  setts, Te  as, and Wisconsin .  One controversy was whether the Constit  tion already protected  asic rights vers  s whether the Fo  rteenth A  end  ent was necessary.    oting rights were disc  ssed, which had generally  een held to  e a political right conferred    y a constit  tion or stat  te, rather than a nat  ral civil right.[140]

Finally, whatever the    eaning of  privileges or i        nities,  it is clear that the Fo  rteenth A  end  ent, and legislation that preceded and followed it, were    eant to c  r  a  ses of the rights of African A    ericans.  It is also clear that the drafters and ratifiers of the Fo  rteenth A  end  ent wanted to enforce those rights *against the states*.  They were not inventing new rights or changing what those rights    eant.  The proponents of the Fo  rteenth A  end  ent si    ply wanted the sa    e civil rights that white people already had to    e e  tended to African

---

[140] See STEPHEN P. HALBROOK, SECURING CI  IL RIGHTS 67  70  Updated ed. 2010 .

39

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su  ect to change

A  ericans and to prevent states fro  denying or infringing those rights or applying the laws in a discri  inatory fashion.

None of this is intended to cast do  t on the doctrine of incorporation, the Co  rt s incorporation thro  gh the D  e Process cla  se, or incorporation of the Second A  end  ent, all of which have  een decided.  It is only to point o  t that anyone see  ing to deter  ine the specific  nderstanding  y ratifiers of the Fo  rteenth A  end  ent in 1868 of each provision of Bill of Rights is li  ely to  e chasing a chi  era.  Using a ti  e period so long after the Fo  nding sho  ld not  e done for the Second A  end  ent or for any other specific rights in the first eight a  end  ents.

### B  The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill of Rights through the Privileges or Immunities Clause

Altho  gh there was disagree  ent in Congress a  o  t what  privileges or i      nities  eant, the  iggest disagree  ent was with the S  pre  e Co  rt.  In fact, the S  pre  e Co  rt re  ected the proposition that the A  end  ent incorporated the Bill of Rights at the first opport  nity it had to do so.  In the *Slaughter-House Cases*, the Co  rt held that the  privileges or i      nities  lang  age in the Fo  rteenth A  end  ent incl  ded only rights that depended on federal citi  enship, incl  ding:

> to co  e to the seat of govern  ent to assert any clai   he  ay have  pon that govern  ent, to transact any  siness he  ay have with it, to see  its protection, to share its offices, to engage in ad  inistering its f  nctions. He has the right of free access to its seaports, thro  gh which all operations of foreign co      erce are cond  cted, to the s  treas  ries, land offices, and co  rts of  stice in the several States.[141]

The Co  rt f  rther stated that:

> Another privilege of a citi  en of the United States is to de  and the care and protection of the Federal govern  ent over his life, li  erty, and property when on

---

[141] *Slaughter-House Cases*, 83 U.S. 36, 79  1872 .

40

### JA6569

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su  ect to change

the high seas or within the   risdiction of a foreign govern  ent. Of this there can
 e no do   t, nor that the right depends  pon his character as a citi  en of the
United States. The right to peacea  ly asse     le and petition for redress of
grievances, the privilege of the writ of ha  eas corp  s, are rights of the citi  en
g  aranteed   y the Federal Constit  tion. The right to   se the naviga  le waters of
the United States, however they    ay penetrate the territory of the several States,
all rights sec  red to o  r citi  ens   y treaties with foreign nations, are dependent
 pon citi  enship of the United States, and not citi  enship of a State. One of
these privileges is conferred   y the very article   nder consideration. It is that a
citi  en of the United States can, of his own volition,  eco   e a citi  en of any State
of the Union   y a   ona fide residence therein, with the sa   e rights as other
citi  ens of that State.[142]

Altho  gh the First A   end  ent right to peacea  ly asse     le and petition for redress of grievances

is incl  ded, no other rights   nder the Bill of Rights are    entioned, and the Co   rt did not s  ggest

that all of the rights in the first eight a   end  ents are protected fro    violation   y the states.

Even tho  gh there was widespread agree   ent in Congress that the Fo   rteenth

A   end  ent and conte   poraneo  s legislation was    eant to prevent the disar   ing of African

A  ericans, there is little evidence that the ratifiers of that a   end  ent had in    ind specific

 eanings for all of the first eight a   end  ents,    ch less that those    eanings differed fro    the

original    eanings of 1791. There wasn t even agree   ent on which rights in the Bill of Rights

wo  ld   e incorporated. Th  s, any atte   pt to shift the relevant period for deter   ining the

 eaning of the Bill of Rights fro    1791 to 1868 will   e fra  ght with diffic  lty, as well as having

no   asis in logic or in the S  pre   e Co  rt s incorporation   rispr  dence.

   C   *The individual* right *to bear arms in the Second Amendment was understood the same*
      *way in        as in*

The de   ate a  o  t whether 1791 or 1868 is the critical year   lti   ately only has

significance if there were i   portant differences in the   nderstandings of the ratifiers   etween

those two ti   e periods. B  t in the disco   rse that led to the Fo   rteenth A   end  ent, the right to

---

[142] *Id*  at 79  80.

41

**JA6570**

Electronic copy available at: https://ssrn.com/abstract=4248297

eep and ear ar s was represented as its te t dictates, consistent with the sa e eaning as at the Fo nding. The foc s of the disco rse was the need to ens re that newly freed slaves had the sa e right to possess firear s in their ho es and to carry the on the person as citi ens in general and to prevent the fro eing disar ed y the states.

Second A end ent deprivations were de ated in connection with ills leading to the enact ent of the Freed en s B rea Act and the Civil Rights Act of 1866. Rep. Tho as Eliot, sponsor of the for er, e plained that the ill wo ld invalidate laws li e that of Opelo sas, Lo isiana, providing that no freed an shall e allowed to carry fire-ar s witho t per ission of his e ployer and as approved y the oard of police.[143] He noted that in Kent c y the civil law prohi its the colored an fro earing ar s .[144] Accordingly, the Freed en s B rea ill g aranteed the right to have f ll and e al enefit of all laws and proceedings for the sec rity of person and estate, incl ding the constit tional right to ear ar s.[145]

Senator Garret Davis said that the Fo nding Fathers were for every an earing his ar s a o t hi and eeping the in his ho se, his castle, for his own defense.[146] Senator Sa el Po eroy co nted a ong the safeg ards of li erty the right to ear ar s for the defense of hi self and fa ily and his ho estead.[147] The A end ent was needed, Rep. George W. J lian arg ed, eca se So thern co rts declared the Civil Rights Act void and so e states ade it a isde eanor for colored en to carry weapons witho t a license.[148]

---

[143] CONG. GLOBE, 39th Cong., 1st Sess. 517  1866 .

[144] *Id*. at 657.

[145] *Id*  at 654.

[146] *Id*  at 371.

[147] *Id*  at 1182.

[148] *Id*  at 3210.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT    Su   ect to change

A co     on the  e in the   edia was that freed  en had the right to   ear ar   s   eca  se they were part of  the people.  The *American Citi  en*, a Pennsylvania newspaper,     oted the Second A  end   ent and wrote:  Now what is here   eant  y the people   We  ster defines it as  the   ody of persons who co  pose a co       nity, town, city or nation   .  So defined,  not a  lac  person in the So   th, or anywhere else in the co   ntry, can   e  e  cl  ded   nder it fro   the right to   ear ar   s,  and  if the negro   e not incl  ded in the   ilitia, they are pec  liarly the  people  of the nation, and   nder the words of the Constit  tion are entitled to   ear ar   s.  [149]

Far fro    changing the   eaning of the right to   eep and   ear ar   s, the Civil Rights Act and the Freed   en s B  rea  Act, prec  rsors of the Fo  rteenth A  end   ent,   sed phraseology ta  en fro   Blac  stone with which the Fo  nders were fa  iliar.  Representative Ja   es Wilson, Chair  an of the J  diciary Co    ittee, e  plained the   ac  gro  nd to the Civil Rights Bill s phraseology  civil rights and i        nities  and  f  ll and e   al   enefit of all laws and proceedings for the sec  rity of person and property   .  [150]  He e  ated those rights and i        nities with those en    erated  y Blac  stone, on which the Fo  nders also relied:

Blac  stone classifies the      nder three articles, as follows:

1.     The right of personal sec  rity  which, he says,   Consists in a person s legal and   ninterr  pted en  oy  ent of his life, his li      s, his   ody, his health, and his rep  tation.

2.     The right of personal li  erty  and this, he says,   Consists in the power of loco   otion, of changing sit  ation, or    oving one s person to whatever place one s own inclination   ay direct, witho  t i   prison   ent or restraint,   nless  y d  e co  rse of law.

3.     The right of personal property  which he defines to   e,  The free   se, en  oy   ent, and disposal of all his ac   isitions, witho  t any control or di   in  tion, save only  y the law of the land.  [151]

---

[149] *The Right to Bear Arms*, AMERICAN CITI  EN   B  tler, Pa.  , Nov. 7, 1866, at 4.

[150] CONG. GLOBE, 39th Cong., 1st Sess. 1117   1866  .

[151] *Id*. at 1118.

43

JA6572

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

Representative Wilson had the Second A end ent partly in ind when he stated that every right en erated in the federal Constit tion is e odied in one of the rights I have entioned, or res lts as an incident necessary to co plete defense and en oy ent of the specific right. [152] Indeed, the Freed en s B rea Act e plicitly declared that:

> the right to have f ll and e al enefit of all laws and proceedings concerning personal li erty, personal sec rity, and the ac isition, en oy ent, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall e sec red to and en oyed y all the citi ens of s ch State or district witho t respect to race or color, or previo s condition of slavery.[153]

The sa e Blac stonian concepts asic to the Fo nders, incl ding the right to ear and se ar s, were th s inherited and applied y the drafters of the Fo rteenth A end ent. There was no change in the eaning of the right itself instead, there was a change to who co ld e ercise the right and who was prevented fro restricting its e ercise.

That the nat re of the right was viewed as nchanging in 1868 is well ill strated y the S pre e Co rt s nearly conte poraneo s decision in *United States v Cruikshank*.[154] There the Co rt e plained that private infringe ent of the right to asse le was not a s ect for federal enforce ent:

> The right of the people peacea ly to asse le for lawf l p rposes e isted long efore the adoption of the Constit tion of the United States. In fact, it is, and always has een, one of the attri tes of citi enship nder a free govern ent . It was not, therefore, a right granted to the people y the Constit tion. The govern ent of the United States when esta lished fo nd it in e istence, with the o ligation on the part of the States to afford it protection. As no direct power over it was granted to Congress, it re ains s ect to State risdiction.[155]

---

[152] *Id*. at 1118 19.

[153] Freed en s B rea Act of 1866, 14, 14 Stat. 173, 176 77 1866 e phasis added .

[154] 92 U.S. 542 1875 .

[155] *Id*. at 551.

44

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN   DRAFT   Su   ect to change

The Co   rt fo  nd the co  nts of the indict   ent alleging private infringe  ent of the right to

ear ar   s   nder the Second A   end  ent to   e   ally defective,   e  plaining:

> The right there specified is that of    earing ar   s for a lawf  l p  rpose.  This is not
> a right granted   y the Constit  tion. Neither is it in any   anner dependent   pon
> that instr   ent for its e  istence. The second a   end  ent declares that it shall not
>   e infringed   t this, as has   een seen,   eans no   ore than that it shall not   e
> infringed   y Congress. This is one of the A   end   ents that has no other effect
> than to restrict the powers of the national govern   ent   .[156]

Li  e the right to asse   le, the right to   ear ar   s was a pre-e  isting and   nchanged right not

granted   y the Constit  tion    t g  aranteed against infringe  ent.

Th  s, the S  pre  e Co  rt in 1875 viewed the right to   eep and   ear ar   s as having the

sa  e conto  rs as at the Fo  nding period, which saw the right in the sa  e ter   s.  J  st as the

a  thors or ratifiers of the Second A   end  ent so  ght to g  arantee a pre-e  isting right, the

ratifiers of the Fo  rteenth A   end  ent so  ght only to *extend* that protection, not change the right

itself.

## III    T  E SC  O  AR  Y DE  ATE   REFERENCED IN T   E *BRUEN* O  INION DOES NOT C  AN   E T  E SU  REME COURT S SETT   ED INCOR  ORATION JURIS  RUDENCE

As previo  sly noted, the *Bruen* opinion stated that the Co  rt has   ass   ed   that the

scope of the protection applica   le to the Federal Govern   ent and States is pegged to the p    lic

  nderstanding of the right when the Bill of Rights was adopted in 1791.  The opinion went on to

ac  nowledge that   there is an ongoing scholarly de  ate on whether co  rts sho  ld pri  arily rely

on the prevailing   nderstanding of an individ  al right when the Fo  rteenth A   end  ent was

ratified in 1868 when defining its scope   as well as the scope of the right against the Federal

Govern   ent   .   [157]  The only two so  rces cited for the e  istence of this de  ate were K  rt Lash,

---

[156] *Id*. at 553.

[157] *Bruen*, 142 S. Ct. at 2138.

45

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT  Su  ect to change

*Respeaking the Bill of Rights  A New Doctrine of Incorporation*, 97 IND. L.J. 1439  2022  and A.

AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION  iv, 223, 243  1998 .

As descri  ed  elow, Professor Lash fran  ly see  s to   se 1868 as the definitive period for

deter  ining the   eaning and scope of all incorporated provisions of the Bill of Rights.  His

proposal is not    st a radical depart  re fro    the S  pre  e Co  rt s incorporation   rispr  dence

that has   een so caref  lly fo  ght over and event  ally wor  ed o  t over a period of   any decades.

Instead, it candidly contradicts and see  s to overt  rn, at least in principle and   ethodology,

every case in which history has   een  sed to deter  ine the   eaning of an incorporated provision

of the Bill of Rights.

Professor A   ar s approach is   ore n  anced.  In the wor   cited, he proposes to rely   ore

heavily on what he   elieves to   e the changed 1868   eaning of the Second A  end  ent in

partic  lar.  B  t any necessity for that is   nder  ined   y the decision in *Heller*  2008 , a decade

after Professor A   ar s   oo  was p  lished  1998 .

*A   Professor Lash s approach is theoretically unsound and unlikely to be adopted*

Professor Lash   elieves that if a provision of the Bill of Rights   eant so   ething different

to the ratifiers of the Fo  rteenth A  end  ent than it did to the ratifiers of the Bill of Rights, the

1868   eaning    st control.  At the o  tset of his article, he descri  es the con  ndr   s that

positing a different   eaning in 1868 wo  ld create.   Do incorporated rights have the sa   e

  eaning and scope as their co  nterparts in the 1791 a  end  ents, or does the original Free

Speech Cla  se have a different   eaning and scope than the  incorporated  Free Speech

Cla  se  [158]  He contends that if the   eanings are different, originalists   see   forced to either

a  andon originalis    or accept a world in which we have two Bills of Rights, one applica  le

---

[158] K  rt Lash, *Respeaking the Bill of Rights  A New Doctrine of Incorporation*, 97 IND. L.J. 1440  2022 .

46

**JA6575**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT  Su ect to change

against the federal govern ent and invested with 1791 earnings and one incorporated against the states and invested with 1868 earnings. [159] This is si ply not the case. If it t rns o t that a later earning has ostensi ly departed fro the original earning, one st re ect the later earning, as S pre e Co rt principles disc ssed a ove instr ct, and apply the original earning to the states.

Noting, as set forth in Part IA, a ove, that the S pre e Co rt has definitively and repeatedly held that the rights against the federal govern ent and the states st e the sa e, Lash in ires: If the earnings st e the sa e, are the original 1791 earnings carried *forward* into the 1868 a end ent, or are the nderstandings of the people of 1868 carried *backward* into the original Bill of Rights and applied against the federal govern ent y way of reverse incorporation [160] B t as st e plained, this is a pro le e cl sively of Lash s own a ing, which is divorced fro the act al intentions of the ratifiers of the Fo rteenth A end ent. They did not intend to alter the content of the Second A end ent they st wanted to e tend its protections to all citi ens against encroach ents y state govern ents.

Lash s answer to his own estion is that rights as nderstood in 1868 st e reverse incorporated into the Bill of Rights. He states that there is only one Freedo of Speech Cla se the one the people spo e into e istence in 1791 t then *respoke* in 1868. [161] The drafters views are secondary at est, according to Lash, eca se the legally operative nderstanding st e that of the ratifiers. Only the latter co nts as the voice of the people. [162] He arg es that w hen the people adopted the Fo rteenth A end ent, they readopted the

---

[159] *Id* at 1441.

[160] *Id* at 1440 e phasis in original .

[161] *Id* at 1441.

[162] *Id* at 1443.

47

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su  ect to change

original Bill of Rights, and did so in a   anner that invested those original 1791 te  ts with new 1868   eanings. [163]

There are   any iss es with this approach.  Until now,  reverse incorporation  has never involved  sing 1868   eanings of incorporated Bill of Rights provisions to revise or replace the original   eanings of the Bill of Rights at the ti  e of the Fo  nding.  In *Brown v  Bd  of Educ  of Topeka, Kan* ,[164] the Co  rt declared school segregation   nconstit  tional  ased on the Fo  rteenth A  end  ent s E  al Protection Cla  se.  B  t a co  panion case, *Bolling v  Sharpe,*[165] concerned school segregation in the District of Col      ia, a federal enclave.  The original Bill of Rights lac  ed an e  al protection cla  se.  So, the Warren Co  rt read the Fo  rteenth A  end  ent s E  al Protection Cla  se  ac  into the D  e Process Cla  se of the Fifth A  end  ent.  It was, plainly, a li  ited, *ad hoc* device for sidestepping a constit  tional i  pedi  ent to reaching the desired res  lt.[166]  So,  reverse incorporation   doesn t have    ch of a pedigree and it has not    een applied in other conte  ts.

There are at least five   a or pro  le  s with Professor Lash s approach.

First, his analysis is co  pletely contrary to S  pre  e Co  rt precedents.  As noted in Part IB, a  ove, constit  tional   eanings are fi  ed when they are ratified, and that incl  des the Bill of Rights, which was ratified in 1791.  F  rther, when it has   een necessary to cons  lt history to deter  ine the   eaning of incorporated provisions of the Bill of Rights, every S  pre  e Co  rt case has considered the Fo  nding era to   e the deter  inative period even tho  gh later evidence

---

[163] *Id*  at 1441.

[164] 347 U.S. 483  1954 .

[165] 347 U.S. 497  1954 .

[166] Note that the E  al Protection Cla  se of the Fo  rteenth A  end  ent was an e  press protection spelled o  t in Section 1.  The Co  rt did not  se the ostensi  le   eaning of an incorporated provision of the Bill of Rights to change the original   eaning of that provision.  Reverse incorporation has not e  tended past inserting  e  al protection  into the Fifth A  end  ent s D  e Process Cla  se.  See *Adarand Constructors, Inc  v  Pe  a,* 515 U.S. 200  1995 .

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT Subject to change

is sometimes examined for confirmation. And if later practice or understanding conflicts with the original understanding, the original understanding must prevail.

Second, there is no compelling, principled basis for concluding that the 1868 meaning, if different, ought to prevail. Is it just because 1868 is later in time than 1791? That does not preclude using the original meaning of the Bill of Rights, and simply applying those meanings to additional persons and entities: that is, in favor of African Americans, and against the states. And in fact, that is what the debates in 1868, to the extent they mentioned the first eight amendments, seemed to contemplate. See Part IIC, above.

Third, it is untrue that the ratifiers spoke into existence Bill of Rights provisions in 1791, but then respoke them in 1868. Although spoke into existence and respoke are intriguing metaphors, that is not what happened. Most of the provisions of the first eight amendments were either considered natural rights or rights inherited by English men at common law and then carried forward, possibly somewhat modified, into the new Republic. The Bill of Rights was largely a confirmation of existing rights, not an original grant of rights. And the drafters of the Fourteenth Amendment did not respeak them; they extended their protections to people who had previously been denied them and guaranteed them against governments that had previously not been limited by them.

In fact, speaking is a particularly inapt metaphor for Lash to choose, when there is *no* textual evidence in the Fourteenth Amendment that it was revising the Bill of Rights. As the Court explained in *Heller*, constitutional provisions must be given their normal and ordinary meaning, which may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation. [167]

---

[167] 554 U.S. at 576 77.

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

Lash is essentially arg ing for a secret, nspo en eaning, hidden in the Fo rteenth

A end ent.

Fo rth, Lash s reverse incorporation relies on the Privileges or I nities Cla se of

the Fo rteenth A end ent to incorporate the provisions of the Bill of Rights against the states.

The *Slaughterhouse Cases*[168] relegated the Privileges or I nities Cla se to a relative

ac water, and *Cruikshank*[169] declined to se that Cla se to incorporate First and Second

A end ent rights. Altho gh there is respecta le opinion that regards the Privileges or

I nities Cla se as a etter vehicle for incorporation than the Fo rteenth A end ent D e

Process Cla se, the Co rt has ref sed the invitation to recast its incorporation rispr dence

nder the r ric of the Privileges or I nities Cla se. When co nsel proposed d ring oral

arg ent in *McDonald* that the Privileges or I nities Cla se was the proper vehicle for

incorporation, Chief J stice Ro erts warned that, Of co rse, this arg ent is contrary to the

Sla ghter-Ho se Cases, which have een the law for 140 years it s a heavy rden for yo to

carry to s ggest that we o ght to overr le that decision. [170]

Finally, Lash hi self s ggests the reason his proposal is nli ely to find acceptance. He

writes that the 1868 respea ing of the Bill of Rights transfor s reverse incorporation fro a

proposition a o t e al protection and a single cla se of the Fifth A end ent into a proposition

a o t the entire content of the Bill of Rights. [171] One s spects that the S pre e Co rt will not

want to have the entirety of its Bill of Rights rispr dence transfor ed retroactively ased

---

[168] 83 U.S. at 79.

[169] 92 U.S. at 554 57.

[170] Transcript of Oral Arg ent at 4, *McDonald v City of Chicago*, 561 U.S. 742 2010 No. 08-1521 .

[171] K rt Lash, *Respeaking the Bill of Rights A New Doctrine of Incorporation*, 97 IND. L.J. 1441 42 2022 .

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN   DRAFT   Su   ect to change

pon an  nnecessary,  n  stified, and  nprecedented reliance on 1868 as the foc s for

deter  ining   eaning and scope of the Bill of Rights.

> B    Professor Amar s approach contains similar flaws and his theories have been
> re ected by Heller

T  rning to Professor A  ar s  oo ,[172] his e  phasis on 1868[173] is   ore s   tle and less

drastic than the wholesale reverse incorporation proposed  y Lash.  A  ar proposes a theory of

 refined incorporation  that wo ld allegedly reconcile the different approaches to incorporation

proposed  y J stices H go Blac , Willia   Brennan, and Feli  Fran f rter.[174] He co    ends

J stice Blac  s view  that *all* of the privileges and i    nities of citi ens recogni ed in the Bill

of Rights  are incorporated thro gh the Fo rteenth A  end ent.[175] B t he does not recogni e all

of the provisions of the Bill of Rights as   privileges or i    nities of citi ens,  stating that so  e

are   ore a  in to rights of states, and others are   alloyed provisions,  part citi en right and part

state right, that   ay have to  ndergo  refine  ent and filtration   efore their citi en-right

ele  ents can e  a sor ed   y the Fo rteenth A  end ent.[176] He also contends that other

provisions of the Bill of Rights  ay  eco  e less   a oritarian and pop list, and   ore

li ertarian, as they are repac  aged in the Fo rteenth A  end ent as li  eral civil rights

 privileges or i    nities  of individ als   rather than rep  lican political  right s  of the people

as in the original Bill.  [177]  He disagrees with the for   lation  y J stice Brennan that the  ey

---

[172] A. A  ar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION  iv, 223, 243  1998 .

[173] Professor A  ar typically refers to 1866, the year the Fo rteenth A  end  ent was drafted and proposed  y
Congress to the states for ratification.

[174] A  ar at  iv.

[175] A  ar at  iv e  phasis in original .

[176] *Id*

[177] *Id*  at  iv- v.

JA6580

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN DRAFT Su ect to change

estion for incorporation is whether the right is f nda ental. [178] He also disagrees with

J stice Fran f rter s insistence that incorporation t rned on a stract conceptions of

f nda ental fairness and ordered li erty as the sole lit s tests for incorporation. [179] Th s,

his refined incorporation differs in critical respects fro the Co rt s c rrent test, as stated in

*McDonald*: whether the right is f nda ental to o r sche e of ordered li erty, or as we have

said in a related conte t, whether this right is deeply rooted in this Nation s history and

tradition. [180]

A ar o serves that a partic lar principle in the Bill of Rights ay change its shape in

the process of a sorption into the Fo rteenth A end ent, that provisions in the Bill of Rights

ay e transfor ed when they co e into contact with the Fo rteenth A end ent, and that in

so e cases, the gravitational p ll of the Fo rteenth A end ent has altered the tra ectory of the

original Bill. [181] This is contrary to *Bruen* s asseverations that the Constit tion s eaning is

fi ed according to the nderstandings of those who ratified it. [182]

Moreover, A ar s oo was written ten years efore *Heller* was decided, and his specific

analysis of the Second A end ent rests on fo ndations that were re ected y *Heller*. In his

oo , A ar spends eighteen pages s ari ing his view on the ilitary a end ents Second

and Third A end ents as he thin s they were seen at the ti e of the Fo nding. He writes that:

> As with o r First A end ent, the te t of the Second is road eno gh to protect
> rights of private individ als and discrete inorities t, as with the First, the
> Second s core concerns are pop lis and federalis . At heart, the a end ent
> reflects a deep an iety a o t a potentially a sive federal ilitary .[183]

---

[178] *Id*. at iv.

[179] *Id*

[180] 561 U.S. at 767 citations o itted e phasis o itted .

[181] A ar at v.

[182] 142 S. Ct. at 2132.

[183] A ar at 46.

52

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT  Su  ect to change

He goes on to disc ss standing ar ies and the Fo nders distr st of the  . He states

ne ivocally that  t he  lti ate right to  eep and  ear ar  s  elongs to  the people,  not the

states,  and that   the people  at the core of the Second A  end  ent are the sa  e people at the

heart of the Prea  le and the First A  end  ent. [184] Th  s, he recogni  es the individ  al right to

ar  s,  t clai  s that at the ti  e of the Fo  nding protection of s  ch rights was not the  ain

p  rpose.  Indeed,  to see the  n-Reconstr  cted a  end  ent as pri  arily concerned with an

individ  al right to h  nt or to protect one s ho  e is li  e viewing the heart of the speech and

asse   ly cla  ses as the right of persons to  eet to play  ridge or to have se  . [185] The contrast

etween *Heller* s concl  sion that protecting one s ho  e was a central co  ponent of the right,

and A  ar s view, is star  .

Li  e Lash, he  elieves that the  eaning of the right to  eep and  ear ar  s had  een

transfor  ed  y the ti  e of the Fo  rteenth A  end  ent. Originally, the right was  inti  ately

connected with federalis   concerns a  o  t a federally controlled standing ar  y that  ight see  to

overawe state-organi  ed  ilitias. [186] He o  serves that,  By contrast, in 1866, John Bingha  ,

Jaco  Howard, Thadde  s Stevens and co  pany were hardly in the  ood to rail against a federal

standing ar  y  these  en, after all, wanted to  se precisely s  ch an ar  y to reconstr  ct

recalcitrant so  thern states. [187] F  rther  ore,  the people  in A  ar s view corresponded ro  ghly

with the  ilitia, and  political rights  s ch as voting rights, service on  ries, and eligi  ility for

p  lic office, were  li  e service in the  ilitia  largely li  ited to white  ales. B  t the Privileges

---

[184] A  ar at 51.

[185] A  ar at 49.

[186] A  ar at 216.

[187] *Id*.

53

Electronic copy available at: https://ssrn.com/abstract=4248297

**WOR  IN   DRAFT   Su   ect to change**

or I      nities Cla  se   spo  e of all citi  ens, pointedly incl  ding wo   en and children   .[188]

Th  s, the rights protected   y the Privileges or I      nities Cla  se foc  sed on  civil rights,  not

political rights.   Even tho  gh the right to   eep and   ear ar  s was a paradig  atic  privilege  of

citi  ens of the United States,   the  right in 1789 and the right in 1866    eant different things,

according to A   ar.[189]

He concl  des:

> Indeed, as the Second A   end  ent ill  strates, the very sa   e words  the right   to
>   eep and   ear ar   s  ta  e on a different coloration and n  ance when they are
> rela  eled  privileges or i      nities of citi  ens  rather than  the right of the
> people,  and when they are severed fro   their association with a well-reg  lated
>   ilitia.  To recast the te  t  al point as a historical one, the core applications and
> central   eanings of the right to   eep and   ear ar  s and other   ey rights were very
> different in 1866 than in 1789.  Mechanical incorporation A   ar s ter  for d  e
> process incorporation as advocated   y J  stice Blac   o  sc  red all this and,
> indeed,   ade it easy to forget *that when we   apply   the Bill of Rights against the
> states today, we must first and foremost reflect on the meaning and the spirit of
> the amendment of        , not the Bill of*        [190]

Th  s, in a   ore s   tle and less e  tre  e way, A   ar agrees with Lash that the ti   e of the

Fo  rteenth A  end  ent is   ore i   portant than the Fo  nding period for deter  ining the   eaning

of incorporated provisions of the Bill of Rights.

It is   nclear, at   est, whether A   ar s distinction   etween 1868 s rela  eling the right as a

privilege or i      nity of citi  ens, and 1791 s the   right of the people   in connection with the

  ilitia, has any contin  ing relevance in Second A   end  ent interpretation.  At the ti   e of

A   ar s  oo  , the Second A   end   ent had not   een incorporated, and was generally held   y

lower co  rts to relate only to   ilitia service.  The Co  rt s opinion in *Heller* caref  lly recogni  ed

the role of the citi  en   ilitia in the colonies and early Rep  lic,   t it acc  rately deter   ined that

---

[188] *Id*

[189] A   ar at 257.

[190] A   ar at 223   e  phasis added .

54

**JA6583**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT  Su  ect to change

the right was an individ al right for self-defense as well, the position for which A  ar see  s to

e contending. Th  s, *Heller*  ay have largely dispelled A  ar s concerns a o  t the nat re of the

right.  Critically, however, these findings in *Heller* did not depend in any way on the

nderstandings of the ratifiers in 1868,  t loo  ed to that general ti  e period only as

confir  ation of the nat  re of the right as  oth  ilitia-related and individ al,   st as it considered

so  e ante  ell   interpretations as confir  ation.

A  ar s analysis  ay  e re ected on gro  nds si  ilar to  tho  gh not identical with  those

on which Lash s  ay  e re ected: he relies on the Privileges or I     nities Cla  se for

incorporation  that reliance leads hi  to differ fro  the S  pre  e Co  rt as to what, e  actly, is

incorporated  and the test for incorporation is different fro  the S  pre  e Co  rt s test.  He does

not directly address whether the provisions of the Bill of Rights differ in s   stance when applied

against the federal govern  ent or against the states, tho  gh he see  ingly  elieves that they  ay

e different, stating that it is  h arder to  nderstand  Brennan s  insistence that once a provision

of the Federal Bill was dee  ed incorporated, it applied identically in state and federal

proceedings. [191] B  t that  estion has long ago  een resolved  y the Co  rt.

So  oth Lash and A  ar wo  ld shift the foc  s to 1868 rather than 1791, tho  gh A  ar

doesn t e  pressly state, as Lash does, that the 1868  nderstanding  st displace the 1791

nderstanding.  G  n control proponents will  ndo  tedly latch on to these positions, as the  riefs

cited a  ove do, to arg  e that  ore e  tensive restrictions on firear  s in 1868  and no do  t

thereafter  as opposed to the Fo  nding are the proper historical analog  es when eval  ating the

constit  tionality of present-day g  n laws.  B  t the reasoning  ehind the approaches of  oth of

these scholars flies in the face of  any decades of settled S  pre  e Co  rt precedent.  The Co  rt

---

[191] A  ar at 222.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WOR  IN   DRAFT  Su   ect to change**

is   nli  ely to reverse itself on its f  nda   ental incorporation doctrine principles and case law, and

the lower co  rts are   o  nd  y those decisions.  The alleged   scholarly disp  te  a  o  t the proper

ti   e for deter   ining the    eaning of an incorporated provision of the Bill of Rights really

consists of one scholarly dissent and one partial scholarly dissent fro   S  pre   e Co  rt

  rispr  dence that has definitively resolved this iss  e.

56

**JA6585**

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR IN  DRAFT  Su ect to change

**CONC USION**

The S pre e Co rt has held that provisions of the Bill of Rights have only a single

eaning, whether applied against the federal govern ent or against the states. That eaning is

fi ed at the ti e of adoption that is, in 1791. What a provision of the Constit tion eant then, it

eans now, even tho gh circ stances ight change.

The three cases cited y the *Bruen* opinion for the ass ption that 1791 is the critical

period all relied on Fo nding era history e tensively and as an integral part of their analyses. All

S pre e Co rt cases that have engaged in historical review of the Second A end ent to

deter ine its eaning have loo ed to 1791 as the pri ary period. Any e a ination of later

periods has een done only to confir the concl sion already reached regarding the original

eaning at the Fo nding. As the review in this article of S pre e Co rt cases constr ing other

provisions of the Bill of Rights shows, the Fo nding period is the e cl sive period for

deter ining eaning. The S pre e Co rt has never loo ed to 1868 as the pri ary period for

deter ining the eaning of provisions of the Bill of Rights, and its decisions generally do not

even ention that period. Neither litigants nor the scholars entioned in the Co rt s reference to

the ongoing scholarly de ate have pointed to a single S pre e Co rt case which deter ined

the eaning of a provision of the Bill of Rights ased pri arily on the ti e of ratification of the

Fo rteenth A end ent, and to the e cl sion of the 1791 nderstanding.

The lower co rt cases cited y litigants in c rrent litigation were either a rogated y

*Bruen* or relied on a ista e later corrected in the Seventh Circ it s *E ell* decision.

Reliance on the ostensi le p lic nderstanding of the Fo rteenth A end ent when it

was ratified even if s ch an approach did not contradict e isting S pre e Co rt precedent

regarding the deter inative period is fra ght with diffic lty. It is nclear that the ratifiers of

the Fo rteenth A end ent tho ght that they were incorporating all of the first eight

57

Electronic copy available at: https://ssrn.com/abstract=4248297

WOR  IN  DRAFT  Su   ect to change

a  end  ents against the states.  The Fo  rteenth A  end  ent doesn t   ention the Bill of Rights,

and there were conflicting interpretations at the ti  e regarding what that a  end  ent   eant and

did.  Most nota  ly, the S  pre   e Co  rt in the *Slaughterhouse Cases* and the *Cruikshank* case

i    ediately disagreed with what so   e of the proponents of the Fo  rteenth A  end  ent   elieved

to   e its effect.  In any event, there is little or no evidence that the ratifiers of the Fo  rteenth

A  end  ent   elieved that the Second A  end  ent   eant anything different than it had   eant

since the Fo  nding.

The   ongoing scholarly de  ate  a  o  t whether 1868 is the proper year a  o  nts to little.

Professor Lash s approach, in addition to   eing theoretically  ns  pported, wo  ld  pset the entire

S  pre   e Co  rt   rispr  dence on the Bill of Rights.  Professor A   ar s approach has li  ely   een

rendered  nnecessary   y *Heller*

In short, it can   e said with confidence that the S  pre   e Co  rt will not adopt 1868 as the

pri  ary or deter  inative period for constr  ing the   eaning of the Second A  end  ent or any

other provisions of the Bill of Rights.  For that reason, it is inadvisa  le, to say the least, for the

lower co  rts to loo   to 1868 --rather than 1791-- when searching for historical analog  es to

  stify   odern-day g  n control laws.

58

Electronic copy available at: https://ssrn.com/abstract=4248297

# EXHIBIT 83

# Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions

scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions

June 27, 2022

SYMPOSIUM

 By Saul Cornell

on Jun 27, 2022 at 5:05 pm



*This article is part of a symposium on the court's decision in New York State Rifle & Pistol Association v. Bruen.*

*Saul Cornell is the Paul and Diane Guenther chair in American history at Fordham University and adjunct professor of law at Fordham Law School.*

The majority opinion in *New York State Rifle & Pistol Association v. Bruen* invokes the authority of history but presents a version of the past that is little more than an ideological fantasy, much of it invented by gun-rights advocates and their libertarian allies in the legal academy with the express purpose of bolstering litigation such as *Bruen*. Rather than applying a history, text, and tradition approach, it would be more accurate to characterize Justice Clarence Thomas' decision as an illustration of the current Supreme Court's new interpretive model: "Fiction, Fantasy, and Mythology." Indeed, the distortion of the historical record, misreading of evidence, and dismissal of facts that don't fit the gun-rights narrative favored by Thomas are genuinely breathtaking in scope. Thomas has taken law-office history to a new low, even for the Supreme Court, a body whose special brand of "law chambers history" has prompted multiple critiques and been a source of amusement for generations of scholars and court watchers.

It is particularly noteworthy that Justice Stephen Breyer called out his colleagues for engaging in the most rank form of law-office history in his dissent. Although it has become common, almost routine, for scholars to catalog the embarrassing quality of the current Supreme Court's uses of history, it is unusual to see a sitting justice level this charge against others on the court in a published opinion. It is hard to dispute Breyer's negative

**JA6589**

characterization of his colleagues' tendentious, error-filled, and highly selective culling of evidence to vindicate their gun-rights agenda. <u>Bruen does mark a new low for the court.</u> Indeed, it seems appropriate that Thomas saw fit to quote <u>Dred Scott</u>, the court's worst decision in history, approvingly. Thomas not only treats the case as good legal authority but suggests the author of the most reviled opinion in American law captured the meaning of the Second Amendment better than any other judicial pronouncement in American history.

To describe the Thomas version of the past as a caricature understates the case. In the Bizzaro constitutional universe inhabited by Thomas, Shakespeare's England was filled with pistol-packin' peasants, a notion that most English historians would find bonkers. The characterization of early American firearms regulation is equally flawed, and Thomas rests his dismissal of antebellum enforcement of gun laws on an as yet unpublished and <u>error-filled</u> <u>account by one of his former clerks</u> — even as he dismisses the many counter-examples provided by New York as a slender reed upon which to rest their case.

 Perhaps the most egregious distortion of the historical record occurs in the majority's false claims about regulation during Reconstruction. Evidence of robust regulation of guns in public featured prominently in the briefs filed in the case, but the majority either dismisses contrary evidence as unrepresentative or simply ignores evidence it finds inconvenient. Here is what Thomas says about Texas, a state whose robust gun laws, he reluctantly concedes, undeniably support New York's approach to public safety. "We acknowledge," Thomas wrote, "that the Texas cases support New York's proper-cause requirement, which one can analogize to Texas' 'reasonable grounds' standard. But the Texas statute, and the rationales set forth in <u>English</u> and <u>Duke</u>, are outliers."

The originalist methodology applied by Thomas has one set of rules that apply to interpreting legal texts that support gun rights, and another more demanding set of standards that apply to those that undermine them. <u>The Thomas version of originalism</u> might be summarized as follows: No amount of evidence is enough to support gun control, but no iota of evidence is too little to legitimate gun-rights claims. If one of the goals of originalism was to limit judicial discretion (a value few originalists continue to espouse now that they have a supermajority on the court), then the Thomas rule does the opposite. It provides a license to cherry-pick evidence with reckless abandon if the materials support the ideological agenda of the Federalist Society.

Texas, it is worth stressing, was hardly alone in embracing a robust view of state police-power authority over regulation of arms in public. Georgia's 1868 arms-bearing provision declared that: "The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne." The reconstructed southern states and newly admitted western states all drafted new arms-bearing provisions in their state constitutions, casting aside the Founding-era focus on militias, substituting new language more individualistic in focus. Justice Samuel Alito recognized this fact in <u>McDonald v. City of Chicago</u> but stopped reading

<p style="text-align:center">**JA6590**</p>

the text of these provisions in mid-sentence because all these provisions went on to affirm the sweeping police-power authority of the states to regulate arms in public. In _District of Columbia v. Heller_, Justice Antonin Scalia read the Second Amendment backward, and in _McDonald_, Alito stopped reading the text mid-sentence. If anyone had any doubts that the new originalism was the Federalist Society's latest intellectual scam, then these two approaches to reading constitutional texts ought to dispel any lingering doubts. In the hands of this court, originalism is a constitutional "Etch A Sketch," in which judges can erase texts at will and read them backward if necessary.

Twelve million Americans during the Reconstruction period were living under state constitutional arms-bearing provisions that reflected this new regulatory paradigm, a model that forged an indissoluble link between the right to regulate and the right to bear arms. For Thomas, twelve million is too little to be consequential. The court's right-wing originalist supermajority, including Thomas, Alito, and their ideological co-conspirators, are making up the rules of evidence and historical interpretation on the fly, constantly shifting the burden of proof, to suit their agenda.

Even more galling, assuming that historical accuracy is still a value for the court's originalist ideologues, is the absence of any attention to local gun regulation, which increased dramatically during Reconstruction. Contrary to the patently false claims made by Thomas, states and localities acted on the language in the new state arms-bearing provisions, including enacting permit schemes based on a specified need for self-defense, precisely the type of regulatory regime at issue in _Bruen_. Thomas treats New York's law as if it emerged out of nowhere in the early 20th century, but the truth is that a host of localities had enacted similar laws starting in the 1870s, which means that New York's law was firmly rooted in Reconstruction-era conceptions of the scope of permissible regulation under the Second Amendment.

Many of these laws, excavated from obscure sources, were presented to the court in a remarkable appendix to a brief submitted by Air Force historian Patrick Charles. This evidence contradicts Thomas' facile claims that Texas-style gun control was an anomaly. Nor does Thomas acknowledge the evidence presented in the historians and law professors' brief submitted in _Bruen_. It discussed the spread of permit schemes in California and other parts of the nation after the Civil War. By the last decade of the 19th century, more than half the population of the state living in its cities and towns were living under these types of restrictions. Again, in the surreal originalist universe inhabited by Thomas and his colleagues, if 50% of a state lived under New York-style restrictions, this also fails to reach a sufficient threshold to provide historical evidence supporting gun regulation.

Nor were these restrictive public-carry regimes an exclusively western development. In 1873, Jersey City prohibited carrying dangerous weapons without a permit, which the city's municipal court could grant to people "from the nature of their profession, business or occupation, or from peculiar circumstances." Jersey City was hardly one of the "cattle towns"

**JA6591**

of the Old West, another body of evidence that Thomas simply discounts because it is inconsistent with his ideological agenda. The map below graphically underscores how wrong Thomas got the history in *Bruen*. It shows that millions of Americans were living under restrictive public-carry laws similar in scope to the New York law at issue in *Bruen* for decades before the Sullivan Act.

Distorting the past to further his ideological agenda has become a trademark feature of Thomas. What is more disheartening is that the court's newest originalists, Justices Neil Gorsuch and Amy Coney Barrett, signed on to this historical charade. Despite protestations that they are not ideological warriors and political hacks, Gorsuch and Barrett missed an opportunity to prove that originalism can be applied in a rigorous and neutral manner. Apparently, that claim continues to a be a promise as yet unfilled.



Graphic courtesy of Hastings Constitutional Law Quarterly, Saul Cornell, "History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?" (June, 2022).

Posted in Symposium on the court's ruling in New York State Rifle & Pistol Association v. Bruen, Merits Cases

Cases: New York State Rifle & Pistol Association Inc. v. Bruen

**Recommended Citation:** Saul Cornell, *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/

# EXHIBIT 84



Texas A&M Law Review

Volume 4 | Issue 1

2016

# The Law and Politics of Firearms Regulation in Reconstruction Texas

Mark Anthony Frassetto
mark.a.frassetto@gmail.com

Follow this and additional works at: https://scholarship.law.tamu.edu/lawreview

Part of the Constitutional Law Commons, Fourteenth Amendment Commons, Law and Politics Commons, and the Second Amendment Commons

**Recommended Citation**
Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 Tex. A&M L. Rev. 95 (2016).

This Article is brought to you for free and open access by Texas A&M Law Scholarship. It has been accepted for inclusion in Texas A&M Law Review by an authorized editor of Texas A&M Law Scholarship. For more information, please contact aretteen@law.tamu.edu.

# THE LAW AND POLITICS OF FIREARMS REGULATION IN RECONSTRUCTION TEXAS

*by Mark Anthony Frassetto\**

## TABLE OF CONTENTS

I. INTRODUCTION........................................... 95
II. TEXAS'S RECONSTRUCTION-ERA RESTRICTIONS ON
PUBLIC CARRY IN HISTORICAL CONTEXT............... 97
   A. *The Uniquely High Levels of Violence in Texas*..... 97
   B. *The Radical Republican Administration of Edmund
Davis* ............................................. 101
      1. Edmund Davis's Rise to Governor ............. 101
      2. The Davis Administration: 1870–1872 .......... 102
      3. The Davis Administration: 1873–1874 .......... 108
III. LEGAL CHALLENGES AND INTERPRETATION OF THE
1871 PROHIBITION ON PUBLIC CARRY .................. 110
   A. *The Texas State Constitution and Arms Bearing* .... 111
   B. *The Texas Supreme Court, 1867–1874*.............. 112
   C. *The Semicolon Court Cases* ........................ 113
   D. *The 'Redeemer' Court Cases* ....................... 118
IV. CONCLUSION ........................................... 121

## I. INTRODUCTION

The current state of scholarship on Second Amendment history paints post-Civil War firearms regulations as racist efforts by Southern states to prevent blacks from defending themselves against racial violence.[1] This reading distorts the historical record by ignoring the actors responsible for numerous gun laws across the former

\* Counsel, Everytown for Gun Safety, B.A. Marquette University, J.D. Georgetown University Law Center. I would like to thank Professor Darrell Miller, Professor Joseph Blocher, Professor Saul Cornell, Eric Ruben, Adam Skaggs, and Patrick Charles for their guidance in drafting this Article. I would like to especially thank Professor Robert Dykstra for his incredibly generous assistance with Part II, especially his assistance in calculating homicide rates, and his efforts to find homicide records for 1869. Opinions expressed in this Article are solely those of the Author and do not necessarily reflect the views of Everytown for Gun Safety.

1. *See, e.g.*, Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629 (1989) (discussing directly on the subject of this Article, but portraying the events described in a very anti-Republican manner); Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity—The Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307 (1995). Also, see Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17 (1995), which is especially inaccurate historically on this topic.

DOI: https://doi.org/10.37419/LR.V4.I1.3

Confederacy. This Article is, in part, an effort to respond to such accounts by presenting the first detailed analysis of the post-war legislative response to widespread firearm violence in Texas, as well as the judicial interpretations of that legislation.[2] More fundamentally, this Article provides an in-depth account of the political views of the Republican Unionists, who followed their ratification of the Fourteenth Amendment with strict regulation on publicly carrying firearms to protect freedmen from racial violence.

Given the Supreme Court's instruction in *District of Columbia v. Heller* that the historical understanding should inform how the right to keep and bear arms is understood today,[3] the views of those who wrote the Fourteenth Amendment (through which the Second Amendment applies to the states) are plainly relevant.[4] As this Article's account of Texas history makes clear, the Republican Unionists who ratified the Fourteenth Amendment held a narrow view of the right to carry firearms in public, and believed public carry could be broadly regulated. By contrast, it was the Southern Democrats—who had fought relentlessly against the Fourteenth Amendment after losing the Civil War—who advocated an expansive view of the right to carry guns in public, a view which gun rights proponents continue to espouse today.

Part II of this Article explains that Texas, like most Southern states, suffered widespread violence against freedmen and their Republican supporters during the Reconstruction period.[5] But unlike in many

---

2. Several major provisions of the laws discussed in this Article were repealed by the Texas state legislature during the 2015 legislative session. *See* Tex. H.B. 910, 84th Leg., R.S. (2015) (repealing S.B. 11, 84th Leg., R.S. (2015)). Everytown for Gun Safety opposed these changes.

3. *See* District of Columbia v. Heller, 554 U.S. 570, 626–28 (2008).

4. *See* McDonald v. City of Chicago, 561 U.S. 742, 771–80 (2010); Akhil Reed Amar, *The Second Amendment as a Case Study in Constitutional Interpretation*, 2001 UTAH L. REV. 889, 889–90 (2001); Clayton E. Cramer et al., *This Right is Not Allowed By Governments That Are Afraid of the People: The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823 (2010).

5. In this Article, the terms "Republican" or "Radical Republican" will be used to identify Unionists who generally supported black civil rights, the policies of Reconstruction, and the administration of Edmund J. Davis. "Democrat" will be used to refer to secessionists who opposed Reconstruction, black civil rights, and the administration of Edmund J. Davis. The political divisions in Reconstruction Texas were not nearly this clear cut, but a more detailed taxonomy would go beyond the level of detail necessary for this Article. Reconstruction refers to the period of Federal and Republican control in Texas from 1865–1874 and nationally from 1863–1877. Reconstruction is generally divided into two periods. The first, Presidential Reconstruction, during which the rebel states were treated indulgently by the federal government and the Southern pre-war political order generally remained in place, took place from 1865 to early 1867. The second period, known as Congressional Reconstruction, began when the Radical Republican majorities elected in 1866 took office. The Radical Republican Congress passed the Reconstruction Acts, which placed the rebel states under military control and excluded former Confederates from politics. During Congressional Reconstruction, control was eventually passed from federal military gover-

*FIREARMS REGULATION*

states, Republican Unionists in Texas confronted racist reactionaries' violence with strong legislative and executive action. On the heels of the Fourteenth Amendment—which Republicans drafted and ratified—Republicans in Texas enacted a law prohibiting the carrying of firearms under most circumstances.

Part III of this Article recounts the diverging outcomes of two legal challenges to Texas's broad restrictions on public carry, in which the Texas Supreme Court evaluated both federal and state constitutional attacks on the law. The first challenge, in 1872, was considered by a high court made up of Republicans and Unionists, who decisively upheld the law under both the Second Amendment and its analogue in the Texas Constitution. By 1874, when the Court heard the second challenge, its membership had completely changed. That Court—made up entirely of Democrats, four-fifths of whom were former Confederate officers—took a much broader view of the right to bear arms. However, even this Democrat-controlled Court concluded that the law did not infringe upon the right to bear arms.

The Republican Unionists may have lost political and judicial control in Texas, but their legacy lives on through the Fourteenth Amendment. As such, their philosophy on the role of government, the Constitution, and self-defense—including their narrow view of the right to carry arms in public—is a crucial part of the history of the Second Amendment. Justice Scalia's instructions in *Heller* to look to history in interpreting the Second Amendment means an accurate portrayal of historical gun regulations is of crucial importance. This Article is intended as an initial step in that direction.

## II. TEXAS'S RECONSTRUCTION-ERA RESTRICTIONS ON PUBLIC CARRY IN HISTORICAL CONTEXT

### A. *The Uniquely High Levels of Violence in Texas*

Texas was a uniquely violent place, both before and after the Civil War. While violence in every Confederate state far exceeded violence in the North, Texas's levels of violence stood out even among the Confederate states.[6] At the time of annexation in 1845, the homicide rate in lawless South Texas was a staggering 100 per 100,000 and a likely 50 per 100,000 in the slaveholding portion of East Texas.[7] As a reference

---

nors to Republican-controlled state governments, most of which included blacks. Reconstruction ended at different times in each state when control returned to conservative white Democrats known as "redeemers." *See generally* ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863–1877 (1988).

6. *See, e.g.*, HORACE V. REDFIELD, HOMICIDE, NORTH AND SOUTH: BEING A COMPARATIVE VIEW OF CRIME AGAINST THE PERSON IN SEVERAL PARTS OF THE UNITED STATES 11, 68 (Ohio State Univ. Press 2000) (1880).

7. RANDOLPH ROTH, AMERICAN HOMICIDE 234 (2009). Roth attributes this extremely high murder rate to the weak governance provided by Mexico and instability and conflict caused by the transition from Mexico, to the Republic of Texas, to the

point, the 2013 U.S. murder rate was 4.5 per 100,000.[8] Visitors to Texas before the Civil War often commented on the high levels of violence and how well-armed many Texans were. Frederick Law Olmstead, the famed landscape architect, wrote after touring Texas in the 1850s:

> The street affrays are numerous and characteristic. I have seen, for a year or more, a San Antonio weekly [newspaper], and hardly a number fails to have its fight or its murder. More often than otherwise, the parties meet upon the plaza by chance, and each, on catching sight of his enemy, draws a revolver, and fires away. . . . [I]t is, not seldom, the passers-by who suffer. Sometimes it is a young man at a quiet dinner in a restaurant, who receives a ball in the head; sometimes an old negro woman, returning from market, who gets winged.[9]

Violence continued in Texas during the War, especially against Unionists. In 1862, forty-two suspected Union sympathizers were lynched in Gainesville, while in 1863, German-American Unionists were massacred while attempting to flee to Mexico.[10]

A report commissioned by the 1868–69 Constitutional Convention (the "Convention Report") found that violence further increased in the period after the Civil War ended in 1865. Homicides had increased from a reported total of 98 in 1865 to 347 in 1867.[11] While the investigators admitted these numbers "came far short of representing the actual number," as they included full reports from only thirty of Texas's 127 counties, they showed the trend of increasing violence in Texas, much of it political.[12] Even with the Convention Report's under-inclusive numbers, the murder rate in Texas during the period from 1860 to 1868 was forty-five times that in New York.[13] Texas led

---

United States. This was especially true in South Texas where it is estimated at least 200 people were murdered by bandits between 1836 and 1845.

8. *Uniform Crime Reports: Murder*, Fed. Bureau of Investigation, http://1.usa.gov/1YNrV3N [https://perma.cc/8WFL-AYU2] (last visited July 12, 2016).

9. Frederick Law Olmsted, A Journey Through Texas: or, a Saddle-Trip on the Southwestern Frontier 158 (Univ. of Tex. Press 1978) (1857); *see also* Barry A. Crouch & Donaly E. Brice, The Governor's Hounds: The Texas State Police, 1870–1873 10 (2011) (describing a Texan's conversation with northern journalist Albert D. Richardson in which the Texan told Richardson, "if you want to obtain distinction in this country, kill somebody.").

10. *Great Hanging at Gainesville*, Tex. St. Hist. Ass'n, http://bit.ly/1W53ai6 [https://perma.cc/M2UZ-GPTC] (last visited July 12, 2016); Carl H. Moneyhon, Edmund J. Davis of Texas: Civil War General, Republican Leader, Reconstruction Governor 48 (2010).

11. Ann Patton Baenziger, *The Texas State Police During Reconstruction: A Reexamination*, 72 Sw. Hist. Q. 470, 471 (1969).

12. Crouch & Brice, *supra* note 9, at 20.

13. *Id.*; *see also* Tex. Constitutional Convention (1868–1869), Journal of the Reconstruction Convention: Which Met at Austin, Texas 501 (Tracy, Siemering & Co. 1870) (New York state, despite having a population five times the size of Texas, only suffered a total of forty-seven murders in 1867—300 less than the number of murders in Texas during the same year).

the nation in murders throughout the post-War period. In 1870, Texas had at least 323 murders, a staggering 195 more than the next-most-deadly state.[14] The Convention Report authors wrote they doubted "such a record of blood can be exhibited in any Christian or civilized State in the world in a time of peace."[15]

### MINIMUM HOMICIDE RATES IN RECONSTRUCTION TEXAS[16]

| Year | 1865 | 1866 | 1867 | 1868 | 1869 | 1870 |
|------|------|------|------|------|------|------|
| Total Population | 711,397 | 732,833 | 754,270 | 775,706 | 797,143 | 818,579 |
| White Population | 492,796 | 507,176 | 521,557 | 535,938 | 550,319 | 564,700 |
| Black Population | 218,193 | 225,249 | 232,306 | 239,362 | 246,416 | 253,700 |
| Reported Murders | 98 | 170 | 347 | 319 | N/A | 323 |
| White Victims | 47 | 75 | 173 | 182 | N/A | N/A |
| Black Victims | 51 | 95 | 174 | 137 | N/A | N/A |
| Overall Murder Rate (per 100,000) | 13.776 | 23.198 | 46.005 | 41.124 (70.498) | 49.6[17] | 39.45[18] |
| White Rate (per 100,000) | 9.537 | 14.788 | 33.17 | 33.216 (58.213) | N/A | N/A |
| Black Rate (per 100,000) | 23.374 | 42.176 | 74.901 | 57.235 (98.118) | N/A | N/A |

Texas was especially resistant to emancipation and Reconstruction, resulting in staggering levels of violence against blacks and Unionists. Presidential Reconstruction-era governor James Throckmorton even proposed a system of gradual emancipation be implemented, in clear

---

14. Baenziger, *supra* note 11, at 473.

15. CROUCH & BRICE, *supra* note 9, at 20.

16. These rates are calculated using Reconstruction Journal Records for the homicide numbers and 1860 and 1870 census information for the population numbers. The Convention Report records are clearly and admittedly under-inclusive, so these numbers provide only a minimum homicide rate during the period. The actual homicide rate may have been significantly higher—possibly double or triple the calculated rate. Populations are calculated by dividing the difference between the 1860 and 1870 census evenly and allocating across the ten years. Homicide Rates for 1868 were calculated using both the raw numbers, which included up to the end of July, and numbers adjusted for the remaining five months.

17. This rate is calculated using Freedmen's Bureau Records for 46 counties during the first quarter of 1869, adjusting for the population of those counties. It is impossible to determine whether these counties are representative of the state as a whole, and intuitively more anarchic counties seem less likely to accurately report their records. It is also impossible to determine whether the murder rate was subdued by relatively cold weather in the early part of the year. This data also does not account for the more tumultuous period surrounding the election at the end of 1869. The Author would like to again thank Robert Dykstra for locating these records and calculating the 1869 homicide rate.

18. This number was calculated based on statistics released by the Federal Census Bureau, and published in the Daily State Journal (Austin) in August 31, 1871. *See* Baenziger, *supra* note 11, at 473 n.13. *See also* ROTH, *supra* note 7, at 569 n.123 (estimating a homicide rate of 268 per 100,000 in South and West Texas).

violation of both the Emancipation Proclamation and Thirteenth Amendment.[19] Provisional military governor Andrew J. Hamilton in a letter to President Johnson described reports of "shooting and hanging of Negroes by the half dozens at a time, for the crime of leaving their former Masters."[20] General W.E. Strong described freedmen being treated "unmercifully, and shot down like wild beasts, without any provocation . . . ."[21] And fifth military district Commander Major General Joseph J. Reynolds reported "murder of negroes is so common as to render it impossible to keep an accurate account of them."[22] The Convention Report showed that between 1865 and 1867, for every white person murdered by a black person, thirty-seven black people were murdered by whites.[23] Many of the 460 murders of whites during that time period were also attacks on white Republicans by Democrats.[24]

Given the frequency of attacks on blacks and Republicans, the investigation and prosecution of these crimes left much to be desired. Abner Doubleday, a Civil War General stationed in Texas after the War, reported that not a single white man had been convicted of murder in Texas since it achieved independence from Mexico.[25] This was obviously an exaggeration, but the reality was only slightly less extreme. Of the approximately 1,000 homicides reported in Texas between 1865 and 1869, there were only 279 indictments, five convictions, and one execution (a freedman).[26] That meant only one of every 200 murderers was actually punished for his crime. The Convention Report stated bluntly why these numbers were so low: "It is our solemn conviction that the courts, especially juries, as a rule, will not convict ex-rebels for offenses committed against Union men and freedmen . . . ."[27] Even when a conviction was secured, justice was often still out of reach. In one case, a white man who had attacked and nearly beat to death a freedman was arrested by a Freedman's Bureau agent, turned over to civil authorities, and convicted; the punishment was a fine of one cent.[28] In 1870, a reported 702 murderers and 413 attempted murderers were on the loose in Texas.[29] Crime, especially directed toward blacks and Unionists, was out of control.

---

19. Moneyhon, *supra* note 10, at 77.
20. Crouch & Brice, *supra* note 9, at 11–12.
21. *Id.* at 12.
22. *Id.* at 21.
23. Tex. Constitutional Convention (1868–1869), *supra* note 13, at 194.
24. *Id.* at 195.
25. Crouch & Brice, *supra* note 9, at 15.
26. Baenziger, *supra* note 11, at 473. These numbers were not broken down by race, so it is possible Doubleday's statement about murder prosecutions was accurate during the post-War period.
27. Tex. Constitutional Convention (1868–1869), *supra* note 13, at 199.
28. *Id.*
29. Baenziger, *supra* note 11, at 473.

## B. *The Radical Republican Administration of Edmund Davis*

In 1869, Radical Republican Edmund Davis was elected Governor of Texas. Davis's administration would be defined by its effort to restore order in Texas in the face of Democratic opposition. As part of this effort, Davis would establish an integrated statewide police force, a state-funded public education system, and, most notably for this Article, a statewide ban on carrying firearms in public. Ultimately, in the face of widespread opposition, most of the efforts of Davis and his Radical Republican party were doomed. However, Davis's statewide ban on public carry remained in place for more than a century. The actions of his administration, especially regarding public carry of firearms, provide insights into the Radical Republicans' philosophy on guns, self-defense, and the role of government.

### 1. Edmund Davis's Rise to Governor

Prior to the Civil War, Davis served as a judge in South Texas and was a close political ally of Texas Revolution hero and Unionist, Sam Houston.[30] Davis opposed secession, and attempted to run for a position as a delegate to the secession convention in order to oppose leaving the Union.[31] After secession, Davis refused to swear a loyalty oath to the Confederacy and was removed from his judgeship.[32] Davis fled Texas and served as an officer in the Union army, rising to the rank of Brigadier General by the end of the War.[33]

After the War, Davis was elected as a delegate to the 1866 Texas Constitutional Convention as a Unionist who supported the proposals of military governor Andrew J. Hamilton.[34] During Presidential Reconstruction, Davis and the Unionists were in the distinct minority in the convention, which refused to ratify the Thirteenth and Fourteenth Amendments and essentially restored control to the secessionists who controlled the state during the War. At the convention, Davis was limited to procedural maneuvers to stall particularly egregious provisions and to introducing doomed provisions in protest. Notably, Davis proposed universal male suffrage for blacks, a position well out front of his party at the time.[35] In 1868, as a result of the Republican controlled Congress seizing control of Reconstruction policy, a new Con-

---

30. Carl H. Moneyhon, *Edmund Jackson Davis*, Tex. St. Hist. Ass'n, http://bit.ly/1XT3kLm [https://perma.cc/E4JK-8TV8] (last visited July 24, 2016).

31. *Id.*

32. Moneyhon, *supra* note 10, at 40–41. Sam Houston was also removed as governor for refusing to swear loyalty to the Confederacy, an action akin to removing George Washington from office. Thomas H. Kreneck *Samuel Houston*, Tex. St. Hist. Ass'n, http://bit.ly/1UnCfMQ [https://perma.cc/R2JB-66LW] (last visited July 24, 2016).

33. Moneyhon, *supra* note 10, at 59–72.

34. *Id.* at 79–80.

35. *Id.* at 82–83. Davis may have meant suffrage for blacks meeting educational or literacy thresholds.

stitutional Convention was called and Davis was selected as a compromise candidate between conservatives and Radical Republicans for convention president.[36] During the conference, Davis assumed leadership of the Radical Republicans. His able management of an extremely contentious conference propelled him to statewide prominence.[37]

In 1869 the federal government sought to return control of Texas to an elected state government. An election—in which former Confederate soldiers were generally prohibited from voting for the new government—was held to fill the state government created by the 1868 Constitutional Convention.[38] Davis was elected Governor of Texas by less than 800 votes in an election marred by violence against blacks seeking access to the polls.[39] This violence and intimidation was especially severe in Falls County, where white plantation owners marched their black employees to the polls, handed them a ballot of Davis's opponent, and watched as it was dropped into the ballot box. Blacks attempting to vote for Davis had their lives threatened and ballots ripped from their hands.[40] In Milam and Navarro counties, voting was discontinued after federal and local officials were attacked and mobs of whites stormed the polls in order to prevent blacks from voting.[41] After the election, racial violence continued in both counties, with blacks pistol-whipped in front of the courthouse in Navarro County in retribution for Davis's election.[42]

## 2. The Davis Administration: 1870–1872

In the midst of this chaos and widespread resistance, Davis began his term as governor. In his inaugural message, Davis called the legislature's attention to the "consideration of measures to establish law and order throughout the State, and the punishment or repression of crime."[43] Davis proposed several policies to reduce crime in Texas, including reorganizing the state militia, which had been disbanded under military rule; establishing a state police force; creating an impartial court system; and establishing free, state-funded, public schools (which Davis identified as a long-term crime prevention measure).[44]

---

36. *Id.* at 114–15. At the time, the primary dispute between the two factions was over the *ab initio* issue, which was whether the legislative and judicial acts of the secessionist governments should have continued validity.

37. *Id.* at 122. The convention collapsed without finalizing a state constitution.

38. *See generally* Dale Baum, *Chicanery and Intimidation in the 1869 Texas Gubernatorial Race*, 97 Sw. Hist. Q. 36 (1993).

39. *Id.* at 36.

40. *Id.* at 49.

41. *Id.* at 38–39 (stating that the discontinued voting in Milam and Navarro counties almost certainly did not swing the election results).

42. *Id.* at 40.

43. H.J. of Tex., 12th Leg., 1st C.S. 14 (1870) (inaugural address of Governor Edmund J. Davis).

44. *Id.* at 18–21.

The state legislature adopted all of these policies in one form or another.[45] As a first step, Davis created a racially integrated state police force to "follow up and arrest offenders" where the "authorities are too weak to enforce respect [for the law] or indisposed to do so."[46] The creation of the force drew sharp opposition from both Democrats and conservative Republicans, who claimed that creating the state police was an inappropriate transfer of power from local governments to the Governor. State Senator and former slave Matthew Gaines cut to the true heart of the opposition, stating it was not the result of fear over executive power, but rather opposition to the "idea of gentleman of my color being armed and riding around after desperadoes."[47]

The resistance, however, was insufficient to stop the establishment of Davis's force, which was granted powers not given to local law enforcement, including the authority to cross county lines and act independently of local law officers.[48] The chief of the state police was also granted power to command all local law enforcement when necessary to suppress crime and arrest offenders.[49] The force, which split approximately sixty percent white and forty percent black, was diverse to a level surpassing many modern police departments, including among its officers whites, freedmen, Tejanos, and Asians, as well as both former Union and Confederate soldiers.[50] This racial diversity was enough for Texas Democrats to dub the state police (when being polite) a "Negro Militia."[51]

During Davis's inaugural address, he also called for the prohibition on carrying handguns in public. Davis stated:

> I would, in this respect of prevention of crimes, call your attention
> to the provisions of section thirteen of the Bill of Rights, on the

---

45. Act approved June 24, 1870, 12th Leg., C.S., ch. 10, 1870 Tex. Gen. Laws 11, 11, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 185, 185 (1898); Act approved July 1, 1870, 12th Leg., C.S., ch. 13, 1870 Tex. Gen. Laws 19, 19, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 193, 193 (1898); Act approved July 2, 12th Leg., C.S., ch. 14, 1870 Tex. Gen. Laws 21, 21, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 195, 195 (1898); Act approved Aug. 13, 1870, 12th Leg., C.S., ch. 68, 1870 Tex. Gen. Laws 113, 113, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 287, 287 (1898). The school system adopted by the Davis administration provided equal funding for all students in the state, in contrast with the system in effect in Texas 100 years later and controversially upheld by the Supreme Court in *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973).

46. Baenziger, *supra* note 11, at 473.

47. *Id.* at 474.

48. Act approved July 1, 1870, 12th Leg., C.S., ch. 13, § 8, 1870 Tex. Gen. Laws 19, 20, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 193, 194 (1898).

49. Act approved July 1, 1870, 12th Leg., C.S., ch. 13, § 5, 1870 Tex. Gen. Laws 19, 19, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 193, 193 (1898).

50. *See* CROUCH & BRICE, *supra* note 9, app.; Baenziger, *supra* note 11, at 475. Crouch and Brice dispute the forty percent cited by Baenziger, and originally used as a criticism of the state police force, but do not dispute that the state police were integrated to a degree unprecedented at the time.

51. Baenziger, *supra* note 11, at 475.

subject of bearing arms. The Legislature is there given a control over the privilege of the citizen, in this respect, which was not in the old constitution. There is no doubt that to the universal habit of carrying arms is largely to be attributed the frequency of homicides in this State. I recommend that this privilege be placed under such restrictions as may seem to your wisdom best calculated to prevent the abuse of it. Other than in a few of the frontier counties there is no good reason why deadly weapons should be permitted to be carried on the person.[52]

That summer, the state legislature partially fulfilled Governor Davis's request by passing a law forbidding the carrying of any "bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind," at a variety of locations:

any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election . . . or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly.[53]

The fine for violating the new law was a whopping $50 to $500 (the modern equivalent of $1,000 to $10,000).[54]

While the prohibition on carrying firearms at public gatherings provided an important tool for the state police to maintain order, it proved insufficient to prevent and deter crime.[55] In a letter to the 1871 session of the state legislature, Governor Davis stated the law was "a very partial remedy" and went on to say "instances of personal violence occur almost daily" and "are within the experience of everybody."[56] Davis stated that a total prohibition on carrying arms rather than the limited prohibition enacted in the previous session would be "a great preventative of violence and bloodshed" and "essential to the complete suppression of lawlessness."[57] Confusion about the proper enforcement of the 1870 Law also contributed to one of the more serious crises faced by the Davis administration.

---

52. H.J. of Tex., 12th Leg., 1st C.S. 19 (1870). Handguns accounted for around two-thirds of the murders in Texas during the period, which is an aberrationally high percentage for the time. *See* Roth, *supra* note 7, at 356.

53. Act approved Aug. 12, 1870, 12th Leg., C.S., ch. 46, 1870 Tex. Gen. Laws 63, 63, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 237, 237 (Gammel Book Co. 1898); Crouch & Brice, *supra* note 9, at 26.

54. Calculated using inflation calculator at http://www.westegg.com/inflation/, which is based on consumer price index statistics going back to 1800 (last visited July 12, 2016).

55. Crouch & Brice, *supra* note 9, at 61 (discussing the arrest of Joseph Elliott for wearing arms in a public assembly during efforts to stop the notorious West Gang).

56. H.J. of Tex., 12th Leg., R.S. 57 (1871).

57. *Id.*

During the summer of 1870, Madison County was wracked by violence against freedmen. Tensions reached their peak on July 21, 1870, when a band of disguised men staged a jailbreak on the Madison County jail, releasing two murderers. In response, State Police Private John H. Patrick, a Republican with ambitions for higher office, assembled a group of black militia and began confiscating guns from any person carrying them, under color of the 1870 Act.[58] Patrick's confiscation order, along with the fact that blacks were enforcing laws against whites, led to widespread public outrage. A local deputy sheriff formed a posse with the ostensible purpose of arresting Patrick, but an actual intent to foment violence against politically active blacks and Republicans, based on the claim that blacks had joined Patrick's militia unit with the intention of murdering whites.[59] The posse sought Patrick at his home, but he was in Austin where a disciplinary hearing had been convened to look into his actions. The group instead killed two militia leaders.[60] In response to this incident and other chaos in the county—including militia members being killed, shot, and attacked, and freedmen being whipped by whites—Governor Davis ordered forty state police and three-hundred state guards into Madison County to restore order. Many of his opponents viewed these actions as tyrannical, and the event damaged the reputation of the state police and the Davis administration statewide.

In response to concerns about the effectiveness of the 1870 Act, and likely partially as a result of the confusion in Madison County, the Texas Legislature drafted a bill in 1871 that prohibited the carrying of any "pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife . . . [without] reasonable grounds for fearing an unlawful attack on his person . . . ."[61] The bill punished first offenses with confiscation of the weapon and a fine between \$25 and \$100 (approximately \$500–\$2,000 with inflation)[62] and up to sixty days in prison for a second offense.[63] The law's exception allowing publicly carrying a firearm when in fear of unlawful attack was further narrowed by requiring the defendant to show that the

---

58. CROUCH & BRICE, *supra* note 9, at 39–40 (Patrick would be fired in December 1870). Confusion does not seem to have been limited to Patrick. In one instance a district court judge, F.P. Wood, ordered anyone who carried a gun in town, not just those at public assemblies, to be arrested. *Id.* at 62.

59. *Id.* at 40.

60. *Id.*

61. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927 (1898).

62. Calculated using inflation calculator at http://www.westegg.com/inflation/, which is based on consumer price index statistics going back to 1800 (last visited July 12, 2016).

63. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927 (1898).

danger was "immediate and pressing," and "of such a nature as to alarm a person of ordinary courage," that "the weapon was borne openly and not concealed beneath the clothing," and that the claimed danger did not have "origin in a difficulty first commenced by the accused."[64] This clarified that the exception did not apply when a person had carried a firearm due to a generalized fear of crime, but rather only when a specific threat existed. The penalties for the 1870 Act were also amended to provide for confiscation of the weapon and imprisonment for up to 90 days for subsequent offenses.[65] The law granted the governor the power to exempt counties from the carry prohibition if they were dubbed a frontier county "liable to incursions of hostile Indians."[66] The law also included exceptions for people carrying weapons on their own property or in their place of business, members of the militia in active service, law enforcement officers, and the transportation of arms in the baggage of travelers.[67]

The bill titled "An Act to Regulate the Keeping and Bearing of Deadly Weapons," was introduced by Republican Representative Frederick Grothaus on January 24, 1871.[68] The bill passed out of the Judiciary Committee 5–3, receiving primarily Republican support.[69] On March 9, 1871, the House passed the bill by a margin of 60–12, with all twelve black representatives voting in favor of the bill.[70] On March 29, 1871, the Senate passed the bill by a 20–4 margin with support of both of the State's black Senators.[71] In both chambers opposition to the law consisted primarily of Democrats, and conservative

---

64. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 2, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927 (1898).

65. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25, 25–26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927–28 (1898).

66. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 4, 1871 Tex. Gen. Laws 25, 26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 928 (1898).

67. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927 (1898).

68. H.J. of Tex., 12th Leg., R.S. 95 (1871); Britney Jeffery, *Frederick Edward Grothaus*, Tex. St. Hist. Ass'n, http://bit.ly/1Llq64O [https://perma.cc/HY5L-X6JD] (last visited July 24, 2016).

69. H.J. of Tex., 12th Leg., R.S. 443–44 (1871) (Judiciary Committee Report dated February 28, 1871).

70. The black representatives who supported the measure were Richard Allen, D.W. Burley, Silas Cotton, Goldstein Dupree, Jeremiah J. Hamilton, Mitchell Kendall, David Medlock, John Mitchell, Henry Moore, Sheppard Mullens, Benjamin Franklin Williams, and Richard Williams. *See* H.J. of Tex., 12th Leg., R.S. 523–32 (1871).

71. G.T. Ruby and freedman Matthew Gaines were the two black senators who supported the Amendment. *See* S.J. of Tex., 12th Leg., R.S. 538 (1871).

Republicans, who had served in the Confederate Army.[72] Governor Davis signed the bill on April 12, 1871.[73]

The new prohibition on public carry was widely enforced across the State, especially by the state police.[74] Line police officers consistently sent their superiors reports of arresting those carrying weapons.[75] Local law enforcement also participated in arresting those carrying weapons illegally.[76] In fact, Governor Davis declared martial law in Limestone County, in part because of the aftermath of a shootout between police and a man they were trying to arrest for carrying a pistol.[77] Davis specifically mentioned the citizens' failure to obey the law against carrying pistols and other weapons as a reason for the declaration.[78]

While state and local law enforcement worked to carry out the ban, many citizens resisted. Some tried to circumvent the law by posing as state or local law enforcement that were exempted from the public carry restrictions. It was difficult to know who was lying, but in at least one case an imposter who was discovered carrying a revolver was ar-

---

72. Members of the House voting nay: Abbot (Democrat, Confederate Officer); English (Unknown Party, Confederate Officer); M.A. Gaston (Democrat); Hawkins (Conservative); F. Kyle (Democrat, Confederate Officer); J.W. Lane (Democrat); Jas. A. Miller (Democrat); W.C. Pierson (Radical/Democrat) (There is some dispute as to the political affiliation of W.C. Pierson he is listed as a Radical Republican in the Texas State Almanac from 1870, but his obituary states he was one of the few Democrats who served in the Texas House of Representatives during Reconstruction); Robb (Democrat, Confederate Officer); E. Ross (Democrat); Self (Unknown); G.H. Slaughter (Radical Republican). Members of the Senate voting nay: Bowers (Conservative, Confederate Officer); Cole (Democrat); Dillard (Democrat, Confederate Officer); Picket (Conservative). *See* H.J. of Tex., 12th Leg., R.S. 523–32 (1871); S.J. of Tex., 12th Leg., R.S. 538 (1871); Texas Almanac (1870) (for party affiliation information); *The Handbook of Texas*, Tex. St. Hist. Ass'n, https://tshaonline.org/handbook (for biographical information) (last visited July 12, 2016).

73. Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25, 25–26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 927, 927–28 (1898).

74. *See generally* State v. Clayton, 43 Tex. 410 (1875); State v. Duke, 42 Tex. 455 (1874); Young v. State, 42 Tex. 462 (1874); Smith v. State, 42 Tex. 464 (1874); Titus v. State, 42 Tex. 578 (1874); Waddell v. State, 37 Tex. 354 (1873); Baird v. State, 38 Tex. 599 (1873); English v. State, 35 Tex. 473 (1872); Jenkins v. State, 36 Tex. 638 (1872); McNell v. State, 14 S.W. 393 (Tex. Ct. App. 1890); Wilson v. State, 10 S.W. 749 (Tex. Ct. App. 1889); Cathey v. State, 5 S.W. 137 (Tex. Ct. App. 1887); Roberson v. State, 228 S.W. 236 (Tex. Crim. App. 1921); George v. State, 234 S.W. 87 (Tex. Crim. App. 1921); Mayfield v. State, 170 S.W. 308 (Tex. Crim. App. 1914); Harris v. State, 126 S.W. 890 (Tex. Crim. App. 1910); Davidson v. State, 45 S.W. 488 (Tex. Crim. App. 1898); Sexton v. State, 45 S.W. 920 (Tex. Crim. App. 1898); *Ex parte* Jones, 41 S.W. 626 (Tex. Crim. App. 1897).

75. Crouch & Brice, *supra* note 9, at 122.

76. *An Acting Officer Murdered*, Daily Herald (Dallas, Tex.), July 15, 1871, at 4; Weekly Democratic Statesman (Austin, Tex.) Sept. 21, 1871, at 4.

77. *A Negro Outrage at Springfield*, Weekly Democratic Statesman (Austin, Tex.), Oct. 5, 1871, at 3.

78. Crouch & Brice, *supra* note 9, at 108.

rested and fined.[79] Similarly, a few state police officers who were terminated for misconduct continued to fraudulently act as officers and on occasion were arrested for illegally carrying firearms.[80] Some efforts to enforce the law turned violent, including the Lampasas Massacre of 1873, the deadliest single incident in the brief existence of the state police. Four state police officers were murdered by members of a local cattle-rustling gang when they attempted to arrest a gang member who was violating the public carry ban.[81] Despite this resistance, law enforcement efforts to enforce the public carry prohibition continued.

### 3. The Davis Administration: 1873–1874

During the elections of 1872, a coalition of Democrats and conservative Republicans campaigned against Davis's policies and the Democrats retook control of the state legislature by an overwhelming margin. In Davis's 1873 address to the now extremely hostile Democratically-controlled House of Representatives, he stated the prohibition on public carry "had a most happy effect," and to further push for its enforcement, Davis "offered a standing reward for the arrest and conviction of violators of it."[82] The fate of Davis's law enforcement efforts was, however, in large measure, linked to the fate of the state police. In 1873, when the Democrats retook the House of Representatives and Senate, they immediately defunded and then disbanded Davis's police force.

Governor Davis vetoed the legislature's initial bill disbanding the state police, questioning the wisdom of dissolving the force at a time when lawlessness was "still rampant in parts of the state" and praising the bravery and efficacy of the state police. He offered to work with the legislature to prevent any future incidents of abuse of power, but the fate of the police was sealed on April 22, 1873, when the House of Representatives passed the repeal over Davis's veto in a 58–7 vote.[83] Between 1870 and 1872 the state police had made more than 6,000 arrests, effectively suppressed the Ku Klux Klan, and provided freedmen real protection against racial violence.[84] Democrats cheered the disbandment of the police as a great victory over Radical Republican oppression. In Georgetown and Waco, jubilant crowds stormed the jails and set free many of the prisoners arrested by the state police.[85] The abolishment of the state police threw sole responsibility for law

---

79. *Id.* at 120.
80. *Id.* at 124. In contrast to the strict enforcement of the prohibition on public carry, the state police opposed efforts by local Democratic law enforcement to disarm freedmen of their militia and special police weapons. *Id.* at 141.
81. *Id.* at 150–56.
82. H.J. of Tex., 13th Leg., R.S. 33–34 (1873).
83. Baenziger, *supra* note 11, at 488.
84. FONER, *supra* note 5, at 440.
85. Baenziger, *supra* note 11, at 488.

enforcement back into the hands of the local sheriffs and deputies who had failed so miserably to check crime prior to the police's creation. An Adjutant General's report at the end of the year reported "the 'arms law' [concerning personal weapons] except in the more populous counties, is being entirely disregarded . . . ."[86]

In December 1873, Davis lost his reelection bid for governor in an overwhelming defeat as former Confederate supporters were again allowed to vote and Texas saw a massive influx of immigrants from other southern states.[87] But shortly afterwards, the Texas Supreme Court invalidated the election because it had been conducted under an election statute passed by the Democratically-controlled state legislature in violation of the Texas Constitution of 1869.[88] In what was often derisively called "the semicolon case," the Court was tasked with interpreting Article 3, Section 6 of the Texas Constitution of 1869, which read "All elections for State, District and County officers shall be held at the county seats of the several counties, until otherwise provided by law; and the polls shall be opened for four days, from 8 o'clock A. M. until 4 o'clock P. M. of each day."[89] The Court held that the provision allowed the legislature to change the location of elections but not the times.[90] Because the election law had limited elections to a single day rather than the four days required by the 1869 Constitution, the Court tossed out the results of the entire election.[91]

Davis was faced with the unenviable choice of either ignoring a decision of the state Supreme Court (every member of which he had appointed) or refusing to recognize a governor and state legislature elected by a 2–1 margin. Davis knew that retaining the governorship was not feasible, but he also knew that the legal legitimacy of a state government elected through an election that had been invalidated by

---

86. *Id.* at 489.

87. FONER, *supra* note 5, at 549.

88. *See generally Ex parte* Rodriguez, 39 Tex. 705 (1873). Davis had signed the election law. *Id.* at 706.

89. Lance R. Cooper, *"A Slobbering Lame Thing"? The Semicolon Case Reconsidered*, 101 Sw. HIST. Q. 320, 323 (1998).

90. The *Rodriguez* decision, and the Davis administration generally, have been vilified in Texas history since Democrats regained full control in 1874. *See generally* T.R. FEHRENBACH, LONE STAR: A HISTORY OF TEXAS AND THE TEXANS (1968). One textbook used in a state-mandated government course at Texas colleges described the "injustice, oppression, and extravagance" of the Davis administration and the twelfth legislature as "undoubtedly, the worst in the history of the state." WILBOURN E. BENTON, TEXAS POLITICS: CONSTRAINTS AND OPPORTUNITIES (5th ed. 1984). However, the Court's reading of the state constitution seems reasonable, although bold in the context the decision was made. Cooper, *supra* note 89, at 339.

91. *See Ex parte* Rodriguez, 39 Tex. at 773–74. Similarly, another dispute existed surrounding the term of the governor because of inconsistent provisions in the State constitution as to the length of the Governor's term and the inauguration of a new governor. *See generally* Carl H. Moneyhon, *Edmund J. Davis in the Coke-Davis Election Dispute of 1874: A Reassessment of Character*, 100 Sw. HIST. Q. 130 (1996).

the state Supreme Court would be dubious.[92] Davis sought a statement of recognition from President Grant for the new legislature before it sat, but President Grant only gave a vague statement that it would be "prudent" and "right" to "yield to the will of the people."[93] Shortly afterwards, the newly elected legislature assembled and sought the recognition of Davis, who refused to grant it without some sort of recognition from the President or Congress. The legislature responded by inaugurating Richard Coke as governor. Davis refused to leave office without federal recognition for the new government, and believed his term ran an additional three months. He posted militia to guard the executive offices from a Democratic takeover.[94] The Democrats responded by placing their own militia to guard the legislative chamber. To avoid conflict, Davis agreed to send his militia forces away. Shortly afterwards, Davis agreed to vacate the governor's mansion under protest.[95] Davis leaving office marked the end of the Reconstruction period in Texas.

## III. Legal Challenges and Interpretation of the 1871 Prohibition on Public Carry

In the three years following enactment of the 1871 prohibition on public carry, two major legal challenges reached the Texas Supreme Court. The first was heard by a Court made up entirely of Davis appointees sympathetic to Reconstruction—the same Court that later invalidated the election of the Democratic legislature.[96] This "Semicolon Court" was held in such disrepute among Democratic "redeemers" that its opinions were only considered quasi-precedential among judges and attorneys in post-Reconstruction Texas.[97] The second challenge came in 1874, after the Democratic legislature, furious at the Court's ruling against the validity of its election, removed the entire bench from office and appointed a new Democratic slate of judges.[98]

---

92. *Id.* at 133–34.
93. *Id.* at 143.
94. *Id.* at 146.
95. *Id.* at 149.
96. There was one change in the Court membership between the *English* decision and the *Semicolon* case. *See* Hans W. Baade, *Chapters in the History of the Supreme Court of Texas: Reconstruction and "Redemption" (1866–1882)*, 40 St. Mary's L.J. 17, 78, 116 (2008).
97. *Id.* at 92. I use "Semicolon Court" here as shorthand for the Court appointed by Governor Davis. The designation has traditionally been used derisively, especially by Southern scholars critical of Reconstruction. Use of the designation here is for clarity only and is in no way intended to be critical of the Court. Similarly the use of the term "redeemers" is used only to be consistent with historical discussion of the period and in no way to imply the reassertion of conservative white control was a positive development.
98. *Semicolon Court*, Tex. St. Hist. Ass'n, http://bit.ly/1KQlYzG [https://perma.cc/5ADF-TNJS] (last visited July 24, 2016).

These two cases created a kind of natural experiment that isolated the cotemporaneous legal views on firearms rights of Republican Unionists and Democratic redeemers. Ultimately, both Courts ruled that the general prohibition on carrying firearms in public was constitutional, but they relied on radically different reasoning in doing so. The distinctions in their legal reasoning embody the difference in the jurisprudential approach to the right to bear arms of the Southern Democrats whose rebellion resulted in the passage of the Fourteenth Amendment and the Republican Unionists who supported and passed the Amendment.

## A.  *The Texas State Constitution and Arms Bearing*

The Texas Constitution has contained a Second Amendment analogue since the first Constitution of the Republic of Texas which read: "Every citizen shall have the right to bear arms in defense of himself and the Republic. The military shall at all times and in all cases be subordinate to the civil power."[99] In 1845, in the first Texas State Constitution, the two provisions of the 1836 Constitution were separated and the Second Amendment analogue was tweaked to read: "Every Citizen shall have the right to keep and bear arms, in the lawful defence of himself and the State."[100] This language remained consistent in both the 1861 Confederate State Constitution and the 1866 Presidential Reconstruction Constitution.[101]

After the takeover of Congress by Radical Republicans and the passage of the First Reconstruction Act, a new Texas Constitutional Convention was called in 1868. One of the major concerns facing the delegates was the growing lawlessness in Texas, especially that targeting freed slaves and Republicans.[102] In his opening message to the convention, then Governor Elisha Pease stated, "crime was never more prevalent in Texas [than now]."[103] Many delegates also likely had in mind the attempted lynching of sitting Supreme Court Justice Colbert Caldwell and the organization of the Ku Klux Klan in Texas, which had recently killed several blacks in a march through a freedmen's community.[104] In this lawless period, the delegates narrowed the scope of the firearms right to say: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."[105] This constitution was ratified in 1869, and its provision on the right to

---

99. REPUB. TEX. CONST. of 1836, Declaration of Rights, § 14.
100. TEX. CONST. of 1845, art. I, § 13.
101. TEX. CONST. of 1861, art. I, § 13; TEX. CONST. of 1866, art. I, § 13.
102. MONEYHON, *supra* note 10, at 48.
103. *Id.* at 116.
104. *Id.* at 117.
105. TEX. CONST. of 1869, art. I, § 13.

keep and bear arms was in force when both legal challenges to the
public carry law were heard.[106]

## B.  *The Texas Supreme Court, 1867–1874*

During the Reconstruction period, the Texas Supreme Court under-
went unprecedented upheaval. As a result of changes in federal policy
and state politics between 1866 and 1874, Texas went through four
different Supreme Courts.[107] During Presidential Reconstruction, in
the immediate aftermath of the Civil War, Texas Democrats adopted a
Constitution meant to change as little as possible without bringing
federal retribution. Under the terms of that constitution, a slate of five
Democratic Justices were elected, four of whom had served as officers
in the Confederate army.[108] With the advent of Congressional Recon-
struction, the federally appointed military governor of Texas ap-
pointed a new Court more sympathetic to the Union.[109] This Court sat
until the ratification of the Republican-drafted Constitution of 1869
and the inauguration of Edmund J. Davis as governor in 1870.

In 1870, Davis filled the now three-member state Supreme Court,
forming the so-called Semicolon Court. The Court's first three justices
were Lemuel Evans, Wesley Ogden, and Moses B. Walker, all of
whom had unionist sentiments and close ties to the North.[110] Evans
was a Tennessee-born conservative Republican who was forced to flee
Texas during the Civil War after opposing secession, ending up in
Washington D.C.[111] Ogden was born in New York and practiced law
in Ohio and New York before moving to Texas in 1849. Ogden was
also forced to flee Texas after opposing secession, but returned after
the War, serving in several judicial positions prior to being appointed
to the Court.[112] Walker was the only member of the Court who could
fairly be called a carpetbagger.[113] Prior to the War, Walker was a Yale-
educated Ohio attorney and failed politician who rose to the rank of
brevet brigadier general during the War. Walker remained in the mili-

---

106. *Constitution of 1869*, Tex. St. Hist. Ass'n, http://bit.ly/1IVwcsy [https://perma
.cc/Z8AQ-NAMP] (last visited July 24, 2016).

107. Baade, *supra* note 96, at 18.

108. *Id.* at 36–37.

109. *Id.* at 50.

110. In 1873, Justice Evans was replaced with pre-War unionist John David McA-
doo. Upon secession, McAdoo chose Texas over the Union and served in the Confed-
erate military—ultimately rising to the rank of Brigadier General. *See John David
McAdoo*, Tex. St. Hist. Ass'n, http://bit.ly/1OiKF3D [https://perma.cc/924J-SP2N]
(last visited July 24, 2016).

111. Baade, *supra* note 96, at 79–80.

112. *Id.* at 81.

113. Carpetbagger is a derogatory term for a person who moved from the North to
the South during reconstruction to take advantage of political opportunities, here the
term is intended to be merely descriptive. Foner, *supra* note 5, at 295 n.28.

tary after the War and was assigned to Texas, where he was appointed to the military Supreme Court.[114]

The 1873 election that unseated Davis also included a referendum on a state constitutional amendment to disband the State Supreme Court and replace it with a new Court made up of five Justices.[115] The newly elected Governor Coke appointed three justices who had previously served on the Confederate Texas Supreme Court and one justice who had served on the Court when Democrats controlled it during Presidential Reconstruction. Two of the Justices had been representatives at the Texas Secession convention. Thomas J. Devine, one of the associate justices appointed by Governor Coke, had the distinction of being one of only three people tried for treason after the Civil War.[116] The Fortieth edition of the Texas Reports pointedly acknowledged the transition to the "Redeemer" Court saying: "[w]ith this volume we pass to another era in the judicial history of Texas. Those who have before construed the laws of this [s]tate, and who have assisted in the effort to preserve constitutional freedom for its citizens, again constitute its court of last resort."[117]

## C.    *The Semicolon Court Cases*

The Semicolon Court's major case concerning firearms, *English v. State*, arose out of three prosecutions under the 1871 Texas public carry law. English had been convicted for carrying an unloaded "out of repair" pistol while intoxicated, and a second appellant was convicted of carrying a butcher knife at a religious assembly.[118] The appellants challenged both the 1871 general prohibition on carrying firearms in public as well as the specific restriction on carrying in enumerated public places first enacted in 1870. He and his co-defendants brought challenges, under both the federal Second Amendment and Article 1, Section 13 of the Texas Constitution of 1869.[119]

---

114. *Moses B. Walker*, Tex. St. Hist. Ass'n, http://bit.ly/1NcaN2f [https://perma.cc/D4P3-B2KT] (last visited July 24, 2016).

115. Although the Semicolon Court invalidated the election, the Democrats convened the legislature anyway, passing the Amendment by the required two-thirds vote in each chamber. Baade, *supra* note 96, at 121.

116. *Id.* at 123.

117. *Id.* at 124 (citing Alex W. Terrell & Alex S. Walker, *Preface* to 40 Tex., at v, v (1882)).

118. English v. State, 35 Tex. 473, 473–74, 480 (1872). No evidence of the circumstances of third prosecution is available, but the Supreme Court reversed the judgment in that appellant's case, which presumably means that that court's ruling was in conflict with the *English* decision. A request to the Texas State Archives—which houses Texas Supreme Court records for this period—for records related to the *English* and *Duke* cases resulted in an archivist informing the Author that the Court records for both cases had been lost at some time prior to 1944 when cases were indexed.

119. *Id.* at 474, 478.

Justice Walker wrote the opinion for a unanimous Court. The opinion first looked to whether the federal Second Amendment prevented Texas from prohibiting the carrying of firearms. Interestingly, the Court found that unlike other rights enumerated in the Bill of Rights, the Second Amendment, standing alone, applied equally to both state and local governments.[120] This interpretation relied exclusively on the work of New York legal commenter Joel Prentiss Bishop, with the opinion quoting two entire paragraphs from Bishop's treatise on Criminal Law.[121] Relying on Bishop, Walker adopted a militia-based view of the Second Amendment, finding that the only weapons protected were those used during service in the militia because "such only are properly known by the name of 'arms,' and such only are adapted to promote 'the security of a free State.'"[122]

Justice Walker's opinion further stated that under the Second Amendment "'bear' arms refers merely to the military way of using them, not to their use in bravado and affray."[123] Walker—who was quite familiar with firearms, having served as a Colonel for the Ohio volunteers during the Civil War, and having been shot three times during the battle of Chickamauga—decisively found that the law did not violate the Second Amendment, stating:

> No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the Constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the Legislature to punish and prohibit.[124]

The Court then went on to uphold the law under the Second Amendment, saying: "The act referred to makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover the wants of society."[125]

Next, the Court turned to consider the case under Article 1, Section 13 of the Texas State Constitution of 1869. The Court decided that the

---

120. *Id.* at 475 (citing JOEL PRENTISS BISHOP, *Carrying Weapons,* COMMENTARIES ON THE LAW OF STATUTORY CRIMES 493 (1873)).

121. *See generally* BISHOP, *supra* note 120. Notably, Bishop believed the Second Amendment applied to the states by its own terms rather than through either the due-process or privileges and immunities clauses of the Fourteenth Amendment.

122. *English*, 35 Tex. at 475; BISHOP, *supra* note 120, at 497.

123. *English*, 35 Tex. at 473, 475.

124. *Id.* at 476.

125. *Id.* at 477. Walker also made an interesting distinction between the right protected by the Second Amendment, and a pre-existing right to self-defense, stating: "There is no abridgement of the personal rights, such as may be regarded as inherent and inalienable to man, nor do we think his political rights are in the least infringed by any part of this law." *Id.*

term "arms" as used in the Texas State Constitution had the same meaning as in the Second Amendment and was limited to militia weapons.[126] It went on to state that the provision of section 13—making the right subordinate to the regulations prescribed by the state legislature—clearly allowed for the prohibition on publicly carrying firearms except in limited circumstances. Walker's opinion then clarified that even in the absence of the provision allowing regulation, the prohibition on public carry would be valid.[127]

Justice Walker next discussed how Texas's law was consistent with the laws enacted in other states. He observed that:

> This law is not peculiar to our own State, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the States of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration.[128]

While Walker did not cite the specific statutes he mentioned, he most likely referred to a series of laws primarily enacted in the North, which generally prohibited carrying a firearm or other dangerous weapon without reasonable cause to fear an attack on oneself or one's family. The laws of Maine, Massachusetts, Michigan, Minnesota, Oregon, Pennsylvania, Virginia, West Virginia, and Wisconsin all included such statutes.[129]

Justice Walker's opinion then shifted from legal analysis to a discussion of the relationship between individuals, their community, and government, stating in reference to the 1871 Act that:

> It will doubtless work a great improvement in the moral and social condition of men, when every man shall come fully to understand that, in the great social compact under and by which States and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the State for redress. We must not go back to the state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive.
>
> . . .

---

126. *Id.* at 478.

127. *Id.* at 478–79 ("But we do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the State or Federal Constitution.").

128. *Id.* at 479.

129. *See generally* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121, 130–32 (2015). *See also* 1841 Me. Laws 709, ch. 169, § 16; 1836 Mass. Acts 750, § 16; 1846 Mich. Pub. Acts 690, ch. 162, § 16; 1851 Minn. Laws 526, ch. 112, § 18; 1853 Or. Laws 218, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6; 1847 Va. Acts 127, ch. 14, § 15; 1870 W. Va. Acts 702, ch. 153, § 8; 1838 Wis. Sess. Laws 381, § 16.

The powers of government are intended to operate upon the civil conduct of the citizen; and whenever his conduct becomes such as to offend against public morals or public decency, it comes within the range of legislative authority.[130]

On this point, the Court quoted John Stuart Mill's *On Liberty*:

"It is one of the undisputed functions of the government, to take precautions against crime before it has been committed, as well as to detect and punish it afterwards. The right inherent in society, to ward off crimes against itself by antecedent precautions, suggests the obvious limitations to the maxim, 'that purely self-regarding misconduct cannot properly be meddled with in the way of prevention or punishment.'"[131]

Walker's opinion rejected the challenge to the portion of the law that prohibited carrying weapons at public assemblies even more vehemently. Justice Walker wrote for the Court that: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[132] The Court upheld the public assembly provision just as it had the general public carry prohibition.

The Semicolon Court had a few other opportunities to interpret the 1871 Act. In *Jenkins v. State*, the Court, again in a decision by Justice Walker, upheld the sufficiency of an indictment for carrying firearms. The Court found that the government was not required to plead that the defendant did not fall into the exceptions in the act; rather it was the defense's burden to prove the defendant fell within one of the laws exceptions.[133]

In *Waddell v. State*, the Court contrasted the right to keep arms for self-defense in the home, which it had recognized as protected in *English*, with carrying arms in public, which could be strictly regulated. In *Waddell*, it reversed a defendant's conviction for carrying a firearm when the defendant purchased two pistols, proceeded to several other stores in town seeking ammunition to fit his gun, and then travelled to his home fifteen miles out of town. The Court found the conduct within the statute's exception for keeping or bearing arms on one's own premises or on a journey, stating:

---

130. *English*, 35 Tex. at 477–78.

131. *Id.* at 478 (The reporter has the Court citing to pages 56 and 57 of John Stuart Mill's *On Liberty*, but the actual quotes appear between pages 172 and 175).

132. *Id.* at 478.

133. Jenkins v. State, 36 Tex. 638 (1872) (The headnotes for *Jenkins* describe the offense as "carrying concealed weapons" while the actual statute prohibits carrying weapons generally).

> he had a perfect right to purchase the arms, and for the purpose of obtaining ammunition to suit them, he had a right to take them with him, to any place where such ammunition was sold; and then he had a perfect right to take them to his home for any lawful purpose he may have intended to serve with them, such as guarding his house against thieves and robbers, defending himself and family against murderers or assassins.[134]

The Court then reaffirmed the validity of the law stating, "[W]e find nothing in the act which, rightly construed, takes away any right or abridges any reasonable and lawful privilege of the citizen."[135] The Court then advised prosecutors and lower courts against bringing similar cases, saying,

> if wrong constructions are placed upon this act, and absurd and vexatious prosecutions for acts not within the denunciation of the law are tolerated and entertained by the courts, the law itself must become unpopular, even odious, to a free people, and the Legislature will be driven by public indignation and protest to repeal the law.[136]

In contrast to *Waddell*, in *Baird v. State*, the Court upheld the conviction of a defendant who carried a handgun while hog hunting.[137] The defendant claimed his carrying was legal under the "place of business" exception because he hunted hogs in the forest every winter, which he claimed made it his regular business. The Court was unwilling to grant the exception such a broad interpretation, noting that if "place of business" included anywhere a person could conduct business, "every man could very plausibly set up the right to keep and bear arms on every occasion, for he could always claim to be at his own business . . . ."[138] The Court limited place of business to a particular location dedicated exclusively to a person's business. The Court also rejected a challenge that the prosecution had failed to show that the person was not on his own property at the time of the crime, saying whether a person owned the property where he was arrested for carrying is within the defendant's own knowledge and power of proof.[139] However, the Court again cautioned against overly zealous application of the law, saying:

---

134. Waddell v. State, 37 Tex. 354, 356 (1873). This is similar to language in the 1871 Tennessee case. *See also Andrews v. State*, 50 Tenn. 165, 178–79 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose, a man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.").

135. *Waddell*, 37 Tex. at 355.

136. *Id.*

137. Baird v. State, 38 Tex. 599 (1873).

138. *Id.* at 601.

139. *Id.* at 602.

The constitutionality of that act being admitted, its beneficial effects upon society have been quite fully demonstrated and placed almost beyond question. But while it is generally conceded that the execution of that law, in the spirit, and for the purposes intended by the law-making power, would greatly conduce to the peace and quiet of the citizens of the State, yet it must also be admitted that any attempt to prostitute that law from the purposes for which it was enacted into an instrument of oppression to annoy and harass any peaceful and law-abiding citizen, would greatly tend to bring that law into disfavor, and create and stimulate a demand for its repeal. It is therefore but just and reasonable that this law, as well as all others, should be executed in the spirit intended, for the good of the citizens generally, and not as a snare to entrap the unwary who intend no wrong, and believe they are exercising only their legitimate or inalienable rights.[140]

Possibly in response to these concerns, after laying down the rule that Baird's conduct violated the law, the Court reversed the conviction on a technical issue.[141]

## D.  *The 'Redeemer' Court Cases*

When the Redeemer Democrats took over the governorship, they reconstituted the Supreme Court and appointed Democratic judges to replace the Semicolon Court.[142] While the Democrats repealed most of the Davis administration's legislative accomplishments, they left in place the prohibition on public carry, although enforcement was sporadic.[143] The newly constituted Court heard several challenges to the 1871 Firearms Act during its first year and issued a series of three opinions interpreting the Act. Notably, while all three decisions reversed the defendant's conviction for carrying firearms, even the "Redeemer" Court concluded that the public carry prohibition was constitutional.

The first and most important case was *State v. Duke*, an appeal by the state after the district court had found an indictment under the 1871 law deficient on constitutional grounds.[144] The "Redeemer" Court upheld the law as the Semicolon Court had, although with very

---

140. *Id.* at 600–01. The Court seems to have wanted to avoid creating an excuse for the now Democratically controlled state legislature to repeal the public carry law.

141. *Id.* at 603.

142. Baade, *supra* note 96, at 121.

143. *See, e.g.*, The Weekly Democratic Statesman (Austin, Tex.) Mar. 26, 1874 at 3; *Row on Sunday*, The Waco Daily Examiner (Waco, Tex.) June 9, 1874 at 3; The Dallas Daily Herald (Dallas, Tex.) Nov. 13, 1874 at 4; *Judge Burford's Court*, The Dallas Daily Herald (Dallas, Tex.) at 4; Mayor's Court, The Dallas Daily Herald (Dallas, Tex.) June 17, 1875 at 4; *Bold Resistance – The Difficulties of Enforcing Laws*, The Dallas Weekly Herald, July 17, 1875 at 3; The Dallas prosecutions occurred under a Dallas City Ordinance with identical language to Texas's statewide law, *see Ordinances of the City of Dallas*, Dallas Herald (Dallas, Tex.) June 15, 1872 at 1.

144. State v. Duke, 42 Tex. 455 (1874).

different reasoning.[145] The first difference arose out of the applicability of the Second Amendment. The "Redeemer" Court found the Second Amendment did not apply to the states, citing *Barron v. Baltimore* and the *Slaughter-House Cases*.[146] While this decision was fully supported by law, and anticipated the next year's decision of the United States Supreme Court in *United States v. Cruikshank*, 92 U.S. 542 (1875), it is also consistent with the Democratic desire to minimize the role of the federal government and the reach of federal constitutional law within the state.

The Court then considered the statute under Article 1, Section 13 of the Texas Constitution of 1869. The Court disagreed with the Semicolon Court's militia-based reading of Section 13, noting that the Texas right excluded the Second Amendment's recitation of the well-regulated militia language, and instead stated:

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for defense of the State. If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection.[147]

The Court then stated:

> Regarding, then, some kinds of pistols as within the meaning of the word, we are of the opinion that the Act in question is nothing more than a legitimate and highly proper regulation of their use. . . . It undertakes to regulate the place where, and the circumstances under which, a pistol may be used; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business.[148]

However, the Court then went on to uphold the lower court's dismissal of the indictment on the grounds that the state failed to plead that the exceptions in the Act did not apply to the defendant's con-

---

145. *Id.* at 457.

146. *Id.* at 457–58 (citing *Barron v. Baltimore*, 32 U.S. 243 (1833) and *Slaughter-House Cases*, 83 U.S. 36 (1873)). The *Slaughter-House Cases* were decided after the *English* decision, but *English* did not rely on the Fourteenth Amendment for the applicability of the Second Amendment to the States.

147. *Id.* at 458–59. Notably, by making this distinction *Duke* does seem to interpret the Second Amendment as a militia based rather than individual right.

148. *Id.* at 459 (reversing the conviction because the prosecution had failed to assert that the defendant did not fall into the statutory exceptions).

duct. In doing so, the Court overturned the Semicolon Court's *Jenkins* decision which had come to the opposite conclusion.[149]

The Semicolon and "Redeemer" Courts also disagreed about the scope of citizens' self-defense rights. The Semicolon Court was adamant that citizens in a society relinquish the power to settle scores, and instead rely on the state to keep the peace. The "Redeemer" Court spoke of no such limitations. Rather, the Court essentially permitted citizens to decide the appropriate level of self-defense by upholding a right to keep "commonly kept" arms "appropriate for 'open and manly use in self-defense.'"[150] The Court went so far as to name several "commonly kept" arms protected by the state constitution, including pistols and double-barreled shotguns.[151]

In a pair of cases decided the same day as *Duke*, the "Redeemer" Court interpreted the exceptions to the public-carry ban, overturning convictions in both cases. In *Young v. State*, the Court reversed a conviction for carrying a pistol because the trial court judge had refused to let in evidence regarding threats made against the defendant.[152] The defendant claimed he only carried a pistol because he had previously been attacked, and his attacker after being restrained had yelled, "If I didn't kill you this time, damn you, I will do it yet."[153] The trial judge, in an extremely narrow reading of the exception, found as a matter of law that this statement was inadequate because the attacker was not physically present at the time defendant was arrested with the gun.[154] The Court disagreed, finding that the issue was a mixed matter of both fact and law that should have gone to a jury. The Court noted: "[i]t is easy to imagine circumstances under which the danger might be most imminent, though the person from whom it was threatened was not immediately present."[155]

---

149. *Id.* at 461. *See generally* Jenkins v. State, 26 Tex. 638 (1872); *see also* State v. Clayton, 43 Tex. 410 (1875) (finding the indictment valid, which read defendant "unlawfully carr[ied] on and about his person a certain pistol, he then and there having no reasonable grounds for fearing an unlawful attack on his person, nor was he then and there either a militiaman in actual service, or a peace officer, or a policeman, nor was he then and there on his own premises or at his own place of business." This was sufficient to plead the exceptions).

150. *Duke*, 42 Tex. at 458. For a discussion of the culture of honor and violence prevalent in the South, see BERTRAM WYATT-BROWN, SOUTHERN HONOR: ETHICS & BEHAVIOR IN THE OLD SOUTH (Oxford Univ. Press 1983).

151. *Duke*, 42 Tex. at 458–59.

152. Young v. State, 42 Tex. 462 (1874).

153. *Id.* at 463.

154. *Id.* at 463–64.

155. *Id.* at 464; *see also* Bailey v. Commonwealth, 74 Ky. 688, 692–93 (1876) (interpreting similar language to allow carry when a specific threat exists even if that threat is not actually present); Chatteaux v. State, 52 Ala. 388, 390 (1875) (continuing to carry a pistol concealed after passing through a dangerous area does not meet the exception for good reason to apprehend an attack).

In the second decision interpreting the law's exceptions, the Court reversed a conviction for carrying a pistol on two grounds.[156] First, the indictment did not state that the defendant lacked reasonable grounds to fear an unlawful attack.[157] Second, the defendant was traveling sixteen miles to a nearby town, a journey he expected to last two or three days.[158] The Court found this was sufficient to bring the defendant within the exception for travelers.[159] While these decisions seem reasonable, they do appear to be part of a pattern of finding technical flaws in indictments and prosecutions in order to avoid subjecting defendants to punishment under the 1871 Act.

However, the "Redeemer" Court did not overturn every firearms conviction that came before it.[160] In *Titus v. State*, the Court upheld a conviction for carrying a pistol while hunting. The Court made clear that the statute did not include an exception for hunting and that the use of pistols in hunting is neither "necessary or proper."[161] While the Semicolon Court's *Baird* decision was clearly on point, the Court did not cite it as precedent, but rather only stated that *Baird* "is a case similar to the present."[162]

IV. CONCLUSION

As the foregoing makes clear, at the time of the ratification of the Fourteenth Amendment, restrictions on publicly carrying firearms were not viewed by Texas Republicans as violative of any right. Rather, in 1870 and 1871, faced with a horrifying rate of violence, Texas's Republican state legislature did not feel constrained in taking action to protect the people of Texas. This resulted in a general prohibition on carrying firearms that was aggressively enforced by a newly created state police force. This restriction was consistent with the Republican view that individuals surrendered their personal right to avenge grievances by entrusting government to maintain societal order.

Contrary to the historical accounts presented by many scholars, these laws were obviously not enacted based on racial animus. Then, as now, gun violence weighed most heavily on the black commu-

---

156. Smith v. State, 42 Tex. 464 (1874).

157. *Id.* at 465.

158. *Id.*

159. *Id.* at 466.

160. At the time, every criminal defendant was entitled to an appeal as of right to the State Supreme Court. This proved burdensome to the Supreme Court, which resulted in the creation of the Texas Court of Criminal Appeals. Baade, *supra* note 96, at 126.

161. Titus v. State, 42 Tex. 578, 579 (1874).

162. *Id.* at 579. The Semicolon Court cases were held in such ill repute in "redeemed" Texas that attorneys practicing in Texas avoided citing them as precedent.

nity.[163] But, unlike the present day inaction of Congress and many state legislatures, in the face of aberrational homicide rates, the government of Texas under Governor Edmund Davis took action. This action was taken with the full support of the black community who it was intended to protect.[164] The law was also enforced in a racially neutral manner during the Davis administration.[165] The Texas state police was a fully integrated police force closely aligned with the Republican governor and fully committed to protecting freedmen from violence perpetrated by whites.

When interpreting the rights protected by the Fourteenth Amendment, scholars should look to the legal views of those who supported the enactment and ratification of the Fourteenth Amendment rather than those who fought to abscond from the constitutional system, and in the case of Texas Democrats, specifically rejected ratification of the Fourteenth Amendment.[166] The Republican-appointed Supreme Court did not struggle to uphold the prohibition on carrying firearms. Justice Walker, a former Union general, found the law consistent with the laws of the rest of the nation and self-evidently valid and beneficial. In contrast, the law was viewed with suspicion when it came before the "redeemed" Supreme Court, which expressed sympathy for a right to "manly self-defense." These differing views are representative of the differing Republican and Democratic views about gun rights, self-defense, and the role of government. The Republican view was enshrined in the Fourteenth Amendment after the North's victory in the Civil War. This view should be the guide in interpreting the scope of the Second Amendment now.

---

163. *See generally* Nate Silver, *Black Americans Are Killed at 12 Times the Rate of People in Other Developed Countries*, Five Thirty Eight (June 18, 2015, 5:33 PM), http://53eig.ht/1RdE3VR [https://perma.cc/Q4XS-KA3C].

164. *See supra* notes 71–72.

165. This Article does not speak to the enforcement of the laws in the post-Reconstruction period. While press accounts from the post-Reconstruction period seem to indicate that the law continued to be enforced against both the white and black population, it is virtually certain that blacks would have been treated unfairly.

166. Texas Democrats also rejected ratification of the Thirteenth Amendment. *Constitutional Convention of 1866*, Tex. St. Hist. Ass'n, http://bit.ly/1ZYBA6d [https://perma.cc/T5AQ-95M3] (last visited July 24, 2016).

# EXHIBIT 85

# STATUTES OF CALIFORNIA
## 1927

———

### CONSTITUTION OF 1879
AS AMENDED

### RESOLUTIONS
ADOPTED AT
### EXTRA SESSION OF FORTY-SIXTH LEGISLATURE
### 1926

### MEASURES SUBMITTED TO VOTE OF ELECTORS
1926

### GENERAL LAWS, AMENDMENTS TO CODES
### RESOLUTIONS
### CONSTITUTIONAL AMENDMENTS
PASSED AT THE
### REGULAR SESSION OF FORTY-SEVENTH LEGISLATURE
### 1927



CALIFORNIA STATE PRINTING OFFICE
SACRAMENTO, 1927

938                     STATUTES OF CALIFORNIA.           [Ch. 552

ness connected with this office; said traveling expenses not to
exceed one hundred dollars per year per supervisor.

**Jurors.**     15. For attending as a grand juror, or a trial juror in
criminal and civil cases in the superior court, for each day's
attendance, three dollars; for each mile actually traveled one
way as such grand juror, or trial juror, in the superior court,
under summons or order of the court, twenty-five cents. The
county clerk shall certify to the auditor the number of days'
attendance, and the number of miles traveled by each juror
and the auditor shall then draw his warrant therefor and the
treasurer shall pay the same.

**Effect of
act.**          SEC. 2.   The provisions of this act, so far as they are
substantially the same as existing statutes governing counties
of this class, must be construed as continuations thereof and
not as new enactments; and nothing in this act contained shall
be deemed to shorten or extend the term of office or employ-
ment of any person holding office or employment under the
provisions of such statutes.

———

### CHAPTER 552.

*An act to prohibit the possession of machine rifles, machine
guns and submachine guns capable of automatically and
continuously discharging loaded ammunition of any caliber
in which the ammunition is fed to such guns from or by
means of clips, disks, drums, belts or other separable
mechanical device, and providing a penalty for violation
thereof.*

[Approved by the Governor May 16, 1927.  In effect July 29, 1927.]

*The people of the State of California do enact as follows:*

**Possession
of machine
guns.**         SECTION 1. On and after the date upon which this act
takes effect every person, firm or corporation, who within
the State of California possesses any firearm of the kind com-
monly known as a machine gun shall be guilty of a public
offense and upon conviction thereof shall be punished by
imprisonment in the state prison not to exceed three years
or by a fine not to exceed five thousand dollars or by both
such fine and imprisonment.

*Provided, however,* that nothing in this act shall prohibit
police departments and members thereof, sheriffs, and city
marshals or the military or naval forces of this state or of
the United States from possessing such firearms for official
use in the discharge of their duties.

**"Machine
gun"
defined.**      SEC. 2.   The term machine gun as used in this act shall
be construed to apply to and include all firearms known as
machine rifles, machine guns or submachine guns capable of
discharging automatically and continuously loaded ammuni-
tion of any caliber in which the ammunition is fed to such gun
from or by means of clips, disks, drums, belts or other separa-
ble mechanical device.

**JA6625**

# EXHIBIT 86



# LAWS OF MISSOURI

PASSED AT THE SESSION OF THE

*Fifty-fifth General Assembly*

WHICH CONVENED AT THE CITY OF
JEFFERSON, WEDNESDAY, JANUARY 2, 1929
AND ADJOURNED WEDNESDAY, MAY 29, 1929

*Also Proposition No. 3, (For the issuance of
seventy-five million dollars [$75,000,000] of
additional road bonds), Approved by Vote of
the People at the General Election, Nov. 6, 1928*



MDCCCXX

*(By Authority)*

COMPILED BY

CHARLES U. BECKER

SECRETARY OF STATE

*In compliance with Section 7068, Revised
Statutes of Missouri, 1919*

170                                  CRIMINAL PROCEDURE

[H. B. 498.]
## CRIMES AND PUNISHMENT: Prohibiting the Sale Delivery, Transportation, Possession or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law.

AN ACT to prohibit the sale, delivery, transportation, possession or control of machine rifles, machine guns and sub-machine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical devices and providing a penalty for violation thereof.

| SECTION | SECTION |
|---|---|
| 1. Unlawful to sell, deliver, transport or have in possession any machine gun. | 2. The term "machine gun" defined. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

**Section 1. Unlawful to sell, deliver, transport or have in possession any machine gun.**—It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

**Sec. 2. The term "machine gun" defined.**—The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

Approved June 1, 1929.

---

[S. B. 438.]
## CRIMINAL PROCEDURE: Relating to Parole, Except for Certain Offenses.

AN ACT to repeal section 4157, article 18, chapter 25, of the Revised Statutes of Missouri, 1919, relating to parole, except for certain offenses; and, to enact a new section in lieu thereof to be known as section 4157, relating to the same subject.

| SECTION | SECTION |
|---|---|
| 1. Repealing section 4157, article 18, chapter 25, Revised Statutes of Missouri, 1919, and enacting new section. | 4157. Parole may be given, except for certain offenses. |

# EXHIBIT 87

# SESSION LAWS

OF THE

# STATE OF WASHINGTON

## TWENTY-THIRD SESSION

Convened January 9, Adjourned March 9

# 1933

Compiled in Chapters
Under the Direction of ERNEST N. HUTCHINSON, Secretary of State,
and Including Five Acts Passed by the People Under the
Initiative Provision of the State Constitution
at the General Election, Held
on November 8, 1932.

Marginal Notes and Index

BY

## G. W. HAMILTON

Attorney General

PUBLISHED BY AUTHORITY

OLYMPIA, WASH.
O. H. OLSON, PUBLIC PRINTER
1933

**JA6630**

## CHAPTER 64.

[S. B. 223.]

### MACHINE GUNS.

Aɴ Aᴄᴛ relating to machine guns, regulating the manufacture, possession, sale of machine guns and parts, and providing penalty for the violation thereof, and declaring an emergency.

*Be it enacted by the Legislature of the State of Washington:*

Sᴇᴄᴛɪᴏɴ 1.  That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: *Provided, however,* That such limitation shall not apply to any peace officer in the discharge of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

Machine guns banned.

Officers.

Sᴇᴄ. 2.  For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

Definition.

Sᴇᴄ. 3.  Any person violating any of the provisions of this act shall be guilty of a felony.

Violation, felony.

Sᴇᴄ. 4.  All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Wash-

Declared contraband.

336          SESSION LAWS, 1933.         [Ch. 65.

Seizure.

ington, to seize said machine gun, or parts thereof, wherever and whenever found.

Effective immediately.

SEC. 5. This act is necessary for the immediate preservation of the public health and safety, and shall take effect immediately.

Passed the Senate February 10, 1933.
Passed the House February 23, 1933.
Approved by the Governor March 6, 1933.

---

## CHAPTER 65.
### [H. B. 263.]

#### EMERGENCY RELIEF BONDS.

AN ACT to relieve the people of the state from hardships and suffering caused by unemployment, through the agency of the emergency relief administration, creating a debt, authorizing the issuance and sale of state bonds, creating a sinking fund to be known as the "General Obligation Bonds of 1933 Retirement Fund" and allocating a portion of receipts in the motor vehicle fund thereto for the payment of interest and principal of said bonds, providing for a tax levy to cover any deficiency therein, making an appropriation therefrom, declaring an emergency and that the act shall take effect immediately.

*Be it enacted by the Legislature of the State of Washington:*

SECTION 1. *Preamble.*—World wide economic depression has brought about unemployment of and distress to the citizens of the state. Their savings and reserves are becoming depleted. Hunger marches. Discontent, social unrest and incipient

Insurrection.

insurrection exist. Acts of insurrection are occurring. The moral resistance of the people is lessening. Government itself is imperiled and must be protected and preserved. Sovereignty implies sacrifice and imposes duty. It looks only to the perpetuity of our institutions as defined in our constitutions and in the hearts of men. It measures in terms of peace, good order and the common good.

**JA6632**

# EXHIBIT 88

Case 1:18-cv-10507-RMB-JBD   Document 196-8   Filed 12/15/23   Page 6 of 179
PageID: 9848
" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

 Search this website

# 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

## Subject(s):

- Dangerous or Unusual Weapons (https://firearmslaw.duke.edu/subjects/dangerous-or-unusual-weapons/)

## Jurisdiction(s):

- South Dakota (https://firearmslaw.duke.edu/jurisdictions/south-dakota/)

## Year(s):

1933

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation. § 2. Possession or use of

JA6634

a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years. § 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years. § 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof. § 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found. § 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive. § 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment. § 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

-  (https://twitter.com/dukefirearmslaw)

- (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)

- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

WP Twitter Auto Publish (https://xyzscripts.com/wordpress-plugins/twitter-auto-publish/compare) Powered By : XYZScripts.com (http://www.xyzscripts.com)

https://firearmslaw.duke.edu/laws/1933-s-d-sess-laws-245-47-an-act-relating-to-machine-guns-and-to-make-uniform-the-law-with-reference-thereto-ch…    3/3

# EXHIBIT 89

JA6638

# A C T S

#### OF THE

# GENERAL ASSEMBLY

#### OF THE

## STATE OF VIRGINIA

———

### EXTRA SESSION

*which commenced at the State Capitol on*
*Thursday, August 17, 1933*

———

RICHMOND:
DIVISION OF PURCHASE AND PRINTING
1933

**JA6639**

1934]                     ACTS OF ASSEMBLY                     137

CHAP. 95.—An ACT to empower the councils of cities and towns to release the
liability and liens for interest, penalties and accrued costs, or any part thereof,
on unpaid taxes due such cities and towns for any year or years to and in-
cluding 1933, provided such taxes are paid within one hundred and twenty
days after this act is in force.                                    [H B 48]

Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, That the
councils of cities and towns are hereby empowered to release all persons,
firms, associations and corporations from all liability, for interest,
penalties and accrued costs on any taxes due such respective cities and
towns for any year or years prior to and including the year nineteen
hundred and thirty-three, that are unpaid at the time the ordinance re-
lieving same goes into effect, provided such unpaid taxes are paid such
cities or towns within one hundred and twenty days after the date this
act shall be in force.

2. That nothing in this act contained shall empower any such coun-
cil to release any liability for interest, penalties and accrued costs, or
any part thereof, on such unpaid taxes as are not paid within the one
hundred and twenty days aforesaid.

3. By reason of the necessity of immediately granting said councils
power to grant taxpayers the above relief, an emergency is declared to
exist, and this act shall be in force from its passage.

———————

CHAP. 96.—An ACT to define the term "machine gun"; to declare the use and
possession of a machine gun, for certain purposes, a crime and to prescribe
the punishment therefor; to require manufacturers, dealers and other persons,
with certain exemptions, in possession thereof, to register all machine guns
with the Secretary of the Commonwealth; to keep records of and report
transfers and sales to the said Secretary; to allow inspection of records and
of machine guns by peace officers; to provide for seizures and search war-
rants; to prescribe rules of evidence and presumptions; to provide penalties,
and to repeal all inconsistent acts.                               [S B 110]

Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, as follows:
Section 1. Where used in this act:
(a) "Machine gun" applies to and includes a weapon of any descrip-
tion by whatever name known, loaded or unloaded, from which more
than seven shots or bullets may be rapidly, or automatically, or semi-
automatically discharged from a magazine, by a single function of the
firing device, and also applies to and includes weapons, loaded or un-
loaded, from which more than sixteen shots or bullets may be rapidly,
automatically, semi-automatically or otherwise discharged without re-
loading.
(b) "Crime of violence" applies to and includes any of the follow-
ing crimes or an attempt to commit any of the same, namely, murder,
manslaughter, kidnapping, rape, mayhem, assault with intent to maim,

138                    ACTS OF ASSEMBLY                    [VA.

disable, disfigure or kill, robbery, burglary, housebreaking, breaking and entering, and larceny.

(c) "Person" applies to and includes firm, partnership, association or corporation.

Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term of not less than twenty years.

Section 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

Section 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or

(d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence of a machine gun in any room, boat, or vehicle shall be *prima facie* evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. Nothing contained in this act shall prohibit or interfere with

First. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose. This act shall not apply to machine guns and automatic arms issued to the National Guard of Virginia by the United States or such arms used by the United States Army or Navy or in the hands of troops of the National Guards of other States or Territories of the United States passing through Virginia, or such arms as may be provided for the officers of the State Police or officers of penal institutions.

Second. The possession of a machine gun for scientific purposes, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

Third. The possession of a machine gun other than one adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber, for a purpose manifestly not aggressive or offensive.

Section 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him.   This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received.   Upon demand every manufacturer or dealer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection.   A violation of any provision of this section shall be punishable by a fine of not less than one hundred dollars nor more than one thousand dollars.

Section 8. Every machine gun now in this State adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber shall be registered in the office of the Secretary of the Commonwealth on the effective date of this act, and annually thereafter.   If acquired hereafter it shall be registered within twenty-four hours after its acquisition.   Blanks for registration shall be prepared by the Secretary of the Commonwealth, and furnished upon application.   To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired.   The Secretary of the Commonwealth shall immediately upon registration required in this section furnish the registrant with a certificate of registration, which shall be kept by the registrant and produced by him upon demand by any peace officer.   Failure to keep or produce such certificate for inspection shall be a misdemeanor and punishable by a fine of not less than five nor more than one thousand dollars, and any peace officer may, without warrant, seize the machine gun and apply for its confiscation as provided in section nine of this act.   The registration data shall not be subject to inspection by the public.   Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber possessed in violation of this act may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the Commonwealth's attorney, a police officer or conservator of the peace, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof.

Section 10. If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given

effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

Section 11. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 12. This act may be cited as the Uniform Machine Gun Act.

Section 13. All acts or parts of acts which are inconsistent with the provisions of this act are hereby repealed.

---

CHAP. 97.—An ACT to make effective the Constitutional provision to the effect that the General Assembly shall establish and maintain an efficient system of public free schools throughout the State, and to repeal all acts and parts of acts inconsistent with this act.                    [S B 153]

Approved March 7, 1934

Whereas, section one hundred and twenty-nine of the Constitution of Virginia provides that "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State," now, therefore,

1. Be it enacted by the General Assembly of Virginia, as follows:

Section 1. The school board of each and every school division in the State is hereby empowered and required to maintain the public free schools of such division for a period of at least eight months or one hundred and sixty teaching days in each school year. In order that each school division may have the funds necessary to enable the school board to maintain the elementary and high schools thereof for such minimum terms, it is hereby provided that when any county, city or town has legally complied with the existing laws with reference to local school levies, such school division or divisions shall be allotted out of the public school funds held in the treasury of the State for each group of twenty-five to forty pupils in average daily attendance, a sum equal to the amount to be derived by dividing said public school fund by the number of groups of twenty-five to forty pupils in average daily attendance in the State, depending upon the density of population, to be apportioned by the State Board of Education, as provided in section one hundred and thirty-five of the Constitution and in conformity with the provisions of the Code and of the Acts of the Assembly under such rules and regulations as may be set up by said State Board of Education.

Section 2. That in addition the counties and cities shall provide, from local school taxes, as provided in section one hundred and thirty-six of the Constitution of Virginia, for the supplementing of their instructional programs such amounts as will insure the services of properly prepared and effective teaching personnel, and to the degree that financial ability and community interest in education will permit; provided further, that the counties and cities shall provide, in keeping with the laws already existing, such funds as may be necessary for debt service, capital outlay, transportation, general operation and maintenance.

# EXHIBIT 90

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

 Search this website

# 1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

## Subject(s):

- Carrying Weapons (https://firearmslaw.duke.edu/subjects/carrying-weapons/)

## Jurisdiction(s):

- Massachusetts (https://firearmslaw.duke.edu/jurisdictions/massachusetts/)

## Year(s):

1927

. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

**JA6645**

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu
(mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu
(mailto:gunlaws@law.duke.edu).

Copyright © 2023. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

**JA6646**

# EXHIBIT 91

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1933 Cal. Stat. 1169

### Subject(s):

- Dangerous or Unusual Weapons (https://firearmslaw.duke.edu/subjects/dangerous-or-unusual-weapons/)

### Jurisdiction(s):

- California (https://firearmslaw.duke.edu/jurisdictions/california/)

### Year(s):

1933

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3: The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

Full text: HeinOnline (subscription required) [General (https://heinonline.org/HOL/P?h=hein.ssl/ssca0252&

**JA6648**

i=1279)] [Remote (https://heinonline.org/HOL/P?h=hein.ssl/ssca0252&i=1279&a=amVua2luc2xhdy5vcmc)]

-  (https://twitter.com/dukefirearmslaw)

- (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu
(mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu
(mailto:gunlaws@law.duke.edu).

Copyright © 2023. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

**JA6649**

# EXHIBIT 92

# ACTS

OF THE

# One Hundred and Forty=fourth Legislature

OF THE

## STATE OF NEW JERSEY

AND

# Seventy=Sixth Under the New Constitution



TRENTON, N. J.
MacCrellish & Quigley Co., State Printers.

1920

62                    CHAPTERS 30 & 31, LAWS OF 1920.

**Reimburse-
ments.**

contract, for labor, freight and materials. The State
of New Jersey, or its agencies, and in the case of mu-
nicipalities, including boards of chosen freeholders as
aforesaid, shall have the power by resolution or ordi-
nance to reimburse and pay said contractor or con-
tractors such sums of money as may be shown by said
contractor or contractors to have been paid for labor,
freight and materials over and above the prices pre-
vailing for the same at the time of the making of such

**Source of
payments.**

contract. Such payment shall be made out of any
moneys that may be available therefor, or from any
moneys appropriated or raised in any manner for the

**Emergent
payment.**

purposes of this act. Any payment made under this
act shall be considered as an emergency payment.

3. This act shall take effect immediately.

Approved March 22, 1920.

---

## CHAPTER 31.

An Act to amend an act entitled "An act for the pro-
tection of certain kinds of birds, game and fish, to
regulate their method of capture, and provide open
and close seasons for such capture and possession"
(Revision of 1903), approved April fourteenth, one
thousand nine hundred and three.

BE IT ENACTED *by the Senate and General Assembly
of the State of New Jersey:*

**Section 1
amended.**

1. Section one of the act of which this act is amenda-
tory be and the same is hereby amended to read as
follows:

**Unlawful
to hunt cer-
tain game
except with
gun.**

1. It shall be unlawful to pursue, with intent to kill
or injure, or in any manner to attempt to take or in-
jure, and it shall also be unlawful to kill or destroy or
injure any anatidæ, commonly known as swans, geese,
brant and river and sea ducks; rallidæ, commonly

CHAPTER 31, LAWS OF 1920.                    63

known as rails, gallinules, coots and mud-hens; limicolæ, commonly known as shore birds, surf snipe or bay snipe, among them being yellow legs, plovers, willets, sandpipers, dowitchers or robin snipe, brown backs, curlews, turnstones or calico backs, godwits or marlin, tattlers and woodcock; gallinæ, commonly known as wild turkeys, grouse, prairie chickens, pheasants, partridges and quails; and the species of icteridæ, commonly known as reed birds; or any hare, commonly known as rabbit; gray, black or fox squirrel; or any other game bird or game animal whatsoever, excepting in the manner usually known as hunting with a gun, the gun being not larger than ten guage and held at arm's length and fired from the shoulder without rest, and at such times as may be permitted in this act, under a penalty of twenty dollars for each offense.    Penalty.

2. Section six of the act of which this act is amendatory be and the same is hereby amended to read as follows:    Section 6 amended.

6. It shall be unlawful for any person hunting or gunning after geese, duck, or brant or other game birds to place the boat, sink-box or other vessel or construction in which such person may lie in wait to kill said geese, duck, brant or other game birds, at a distance of more than one hundred feet from ice, marsh or meadow, bar or bank, or heaped seaweed not covered with water; and it shall be unlawful for any person or persons, with intent to capture or kill geese, duck, brant, or other game birds to hunt after or pursue the same in any manner except between one-half hour before sunrise and sunset, under a penalty of twenty dollars for each offense.    Hunting web-footed wild fowl.    Penalty.

3. Section seven of the act of which this act is amendatory be and the same is hereby amended to read as follows:    Section 7 amended.

7. It shall be unlawful for any person to pursue any goose, duck, brant, or any kinds of game birds, whatsoever, or to shoot, or to shoot at, or kill, or wound the same from any boat or vessel propelled by any means other than by oars or paddles, or from any boat, vessel or other structure anchored or staked upon the waters of any of the bays, sounds, coves, ponds,    Pursuing web-footed wild fowl.

64                    CHAPTER 31, LAWS OF 1920.

rivers, creeks or streams of the State at a greater dis-
tance than one hundred feet from ice, marsh or meadow,
bar or bank, or heaped seaweed not covered with water,
under a penalty of twenty dollars for each offense. It
shall also be unlawful for any person while in an air-
plane, hydroplane or other device propelled in any
manner through the air to pursue, shoot, shoot at, kill
or injure any of the above-mentioned game birds, under
a penalty of one hundred dollars for each offense.

*Penalty.*
*Using airplane unlawful.*

*Penalty.*
*Section 8 amended.*

4. Section eight of the act of which this act is
amendatory be and the same is hereby amended to read
as follows:

*Unlawful to have certain game in pos- session, etc., except in open season.*

8. It shall be unlawful to capture, kill, injure, destroy
or have in possession any quail, rabbit, hare, squirrel,
raccoon, English or ring-neck pheasant, ruffed grouse,
prairie chicken, wild turkey, Hungarian partridge, reed
bird, wild swans, wood duck, wild geese, brant, wild
ducks, rails or marsh hens, gallinules, coot (commonly
known as crow duck), upland plover, black-bellied
plover, golden plover, greater or lesser yellowlegs, wil-
lets, sandpipers, dowitchers or robin snipe, brown
backs, curlews, turnstones or calico backs, godwits or
marlin tattlers, Wilson snipe or jacksnipe, wood-
cock or any other birds commonly known as shore birds,
surf snipe or bay snipe, except and unless an open
season is prescribed therefor, and then only during the
respective open seasons fixed by this section.

*Season for geese, ducks, etc.*

The open season for wild geese, brant, wild ducks
(except wood duck), coot, gallinules and Wilson snipe
or jacksnipe, shall be from October sixteenth to Jan-
uary thirty-first, following, both days inclusive.

*Season for plover, etc.*

The open season for black-bellied and golden plovers
and greater and lesser yellowlegs shall be from August
sixteenth to November thirtieth following, both days
inclusive.

*Season for marsh hen.*

The open season for Sora, marsh hen or mud hen and
other rails (other than coot and gallinules) shall be
from September first to November thirtieth following,
both days inclusive.

*Season for woodcock.*

The open season for woodcock shall be from October
first to November thirtieth following, both days inclu-
sive.

**JA6654**

CHAPTER 31, LAWS OF 1920.            65

The open season for reed birds shall be from September first to October thirtieth, both days inclusive. <span style="float:right">Season for reed birds.</span>

The open season for quail, rabbit, hare, squirrel, English or ring-neck pheasant, ruffed grouse, prairie chicken, wild turkey or Hungarian partridge shall be from November tenth to December fifteenth, both days inclusive. <span style="float:right">Season for quail, rabbits, pheasants, etc.</span>

The open season for raccoon shall be from October first to December fifteenth, both days inclusive. <span style="float:right">Season for raccoon.</span>

The birds and animals for which an open season is prescribed by this section may be possessed during the respective open seasons therefor and for the additional period of ten days immediately succeeding such open seasons. <span style="float:right">Time for possession.</span>

Any person violating any of the provisions of this section shall be liable to a penalty of twenty dollars for each bird or animal or part thereof unlawfully captured, killed, injured, destroyed or had in possession. <span style="float:right">Penalty.</span>

5. Section nine of the act of which· this act is amendatory be and the same is hereby amended to read as follows: <span style="float:right">Section 9 amended.</span>

9. It shall be unlawful to capture, kill, injure, destroy or have in possession in any one day more than ten quail, three English or ring-neck pheasants, three Hungarian partridge, six woodcock, three ruffed grouse, twenty-five in the aggregate of all kinds of duck (except wood duck), eight geese, eight brant, fifty Sora, fifty reed birds, twenty-five in the aggregate of all kinds of rails (except Sora), including marsh hens, coots and gallinules, fifteen in the aggregate of all kinds of black-bellied and golden plover and greater and lesser yellowlegs, twenty-five Wilson snipe or jack-snipe, or ten rabbits, under a penalty of twenty dollars for each bird or rabbit captured, killed, injured, destroyed or had in possession in excess of the number permitted by this section; *provided*, that nothing in this section contained shall apply to any proprietor of a hotel, restaurant or cafe having in possession at his or her hotel, restaurant or cafe at any time any game raised on licensed game preserves tagged or marked in accordance with law, or to any rabbit during the open <span style="float:right">Number of certain game that may be taken.</span> <span style="float:right">Penalty.</span> <span style="float:right">Proviso.</span>

**JA6655**

66                    CHAPTER 31, LAWS OF 1920.

season permitted by law, and for a period of ten days immediately succeeding such open season.

**Section 10 amended.**

6. Section ten of the act of which this act is amendatory be and the same is hereby amended to read as follows:

**Unlawful sale of game.**

10. It shall be unlawful to sell, offer for sale or possess for sale within this State, whether killed within or without this State, any of the dead bodies, or parts thereof, of squirrels of all species, wild deer of all species, and the dead bodies or parts thereof of any dead game birds or song birds belonging to any species or subspecies native to this State, protected by law, or belonging to any family, any species or subspecies of which is native to this State and protected by law, whether taken within or without this State, under a

**Penalty.**

penalty of twenty dollars for each squirrel, wild deer or birds above mentioned, so sold, offered for sale or

**Proviso.**

possessed for sale as aforesaid; *provided, however,* that the carcasses of deer and the unplucked carcasses of mallard, black and wood ducks, Canada geese, ruffed grouse, squirrels, quail and pheasants of all species raised on licensed game preserves and properly tagged, and the unplucked carcasses of Scotch grouse, European black grouse, European black plover, red-legged partridge and Egyptian quail coming from a foreign country, which are properly tagged by the State authorities, may be sold at any time for food purposes.

**Section 11 amended.**

7. Section eleven of the act of which this act is amendatory be and the same is hereby amended to read as follows:

**Bringing game into State.**

11. Whenever by the laws of any other State or country it shall be lawful to take out of the confines of the said State or country any game, whether the same be fowl or animal, it shall be lawful to bring such game

**Proviso.**

within the State of New Jersey; *provided, however,* that nothing herein contained shall permit the sale or

**Proviso.**

exposure for sale of any such game; *provided,* that Belgian hare and jackrabbits legally killed in another State may be brought into this State at any time for

**Penalty.**

possession, sale and consumption. Any person violating the provisions of this section shall be liable to a

**JA6656**

CHAPTER 31, LAWS OF 1920.                    67

penalty of twenty dollars for each fowl or animal so
sold or exposed for sale.

8. Section twelve of the act of which this act is amend- Section 12 amended.
atory be and the same is hereby amended to read as
follows:

12. It shall be unlawful to capture, kill, injure or Wild pigeons.
have in possession, living or dead, or attempt to capture,
kill or injure, any wild or passenger pigeon, or for any
person to destroy, attempt to destroy or interfere in any
manner with the nest or eggs of any wild or passenger
pigeon under a penalty of two hundred and fifty dollars Penalty.
for each offense.

9. Section thirteen of the act of which this act is Section 13 amended.
amendatory be and is hereby amended so as to read as
follows:

13. It shall be unlawful to use in hunting fowl or Gun.
animals of any kind any shotgun or rifle holding more
than two cartridges at one time, or that may be fired
more than twice without reloading, or to use any silencer
on any gun, rifle or firearm when hunting for game or
fowl, under a penalty of twenty dollars for each offense. Penalty.

10. Section fourteen of the act of which this act is Section 14 amended.
amendatory be and the same is hereby amended so as
to read as follows:

14. It shall be unlawful to sow, deposit or place any Luring with cereals.
rye, wheat, oats or corn or other cereal, except wild
celery and wild rice, in any of the salt or fresh waters
of this State, or to cause the same to be done, for the
purpose of luring, decoying or baiting any goose, duck,
swan, brant or any kind of water wild fowl whatsoever,
so that the same may be shot at, killed or captured while
feeding or attempting to feed where any rye, wheat,
oats or corn or other cereal, except wild celery or wild
rice, is known to have been sown, deposited or placed in
violation of this section, under a penalty of fifty dollars Penalty.
for each offense.

11. Section fifteen of the act of which this act is Section 15 amended.
amendatory be and the same is hereby amended so as to
read as follows:

15. It shall be unlawful to shoot into any squirrel's Penalty for shooting
nest at any time of the year, under a penalty of twenty squirrel's nest.
dollars for each offense.

68                    CHAPTER 31, LAWS OF 1920.

Section 16 amended.

12. Section sixteen of the act to which this act is amendatory be and the same is hereby amended so as to read as follows:

Hunting with ferrets unlawful.

16. It shall be unlawful to hunt, kill or destroy, or attempt to hunt, kill or destroy, any hare or rabbit with ferrets under a penalty of fifty dollars for each offense.

Section 19 amended.

13. Section nineteen of the act to which this act is amendatory be and the same is hereby amended to read as follows:

Penalty for taking excess trout, bass, etc.

19. It shall be unlawful to take, catch or kill in any one day more than twenty-five trout, ten salmon or ten black bass, under a penalty of twenty dollars for each trout, salmon or black bass so taken, caught or killed in excess of the number permitted by this section.

Section 21 amended.

14. Section twenty-one of the act of which this act is amendatory be and the same is hereby amended so as to read as follows:

Automobile forbidden in hunting.

21. It shall be unlawful for any person or persons while in an automobile to hunt for, pursue, shoot, shoot at, kill, capture, injure, or destroy any bird or animal in this State, or to hunt for, pursue, shoot, shoot at, kill, capture, injure or destroy any such bird or animal by the aid or use of any light or lights carried on or attached to

Penalty.

any such automobile, under a penalty of fifty dollars for each offense.

Section 22 amended.

15. Section twenty-two of the act of which this act is amendatory be and the same is hereby amended to read as follows:

Taking game from State.

22. It shall be unlawful to remove or attempt to remove from this State any animal or bird protected by

Provizo.

the laws of this State except deer; *provided, however,* that this section shall not apply to common carriers carrying from beyond the confines of this State in unbroken packages to some point beyond the confines of

Penalty.

this State any such protected animal or bird.  Any person guilty of any violation of this section shall be liable to a penalty of twenty dollars for each animal or

Proviso.

bird, removed or sought to be removed; *provided, however,* that this section shall not apply to English or ring-neck pheasants, mallard, black or wood ducks, Canada geese, ruffed grouse, rabbits, squirrels and quail, properly tagged, raised on game preserves, the owners or

**JA6658**

CHAPTER 31, LAWS OF 1920.                    69

lessees of which are duly licensed by the Board of Fish
and Game Commissioners; *and further provided,* that Proviso.
a nonresident holding a nonresidents' and aliens' hunt-
ing and fishing license may, in any one day, remove
from the State the number of animals or birds that
may be taken under the laws of this State in one day
by one person, but not more birds or animals may be
removed by one person in one calendar week than the
number that may be taken under the laws of this State
in two days by one person; *provided, however,* that no Proviso.
removal shall be made except the birds or rabbits be
exposed to open view.

16. Section thirty-eight of the act of which this act Section 38
is amendatory be and is hereby amended to read as amended.
follows:

38. Whenever in the act of which this act is amenda- Law applies
tory the possession or sale of fowl or game is prohibited, without State.
reference is had equally to such fowl or game coming
from without the State as to that taken within the
State.

17. The following acts are hereby repealed: Sundry acts
A supplement to an act entitled "An act for the pro- repealed.
tection of certain kinds of birds, game and fish, to reg-
ulate their method of capture, and provide open and
close seasons for such capture and possession (Revision
of 1903)," approved April fourteenth, one thousand
nine hundred and three, approved March twenty-fifth,
one thousand nine hundred and thirteen.

A supplement to an act entitled "An act for the pro-
tection of certain kinds of birds, game and fish, to regu-
late their method of capture, and provide open and
close seasons for such capture and possession (Revision
of 1903)," approved April fourteenth, one thousand
nine hundred and three, approved March twenty-fifth,
one thousand nine hundred and thirteen.

A supplement to an act entitled "An act for the pro-
tection of certain kinds of birds, game and fish, to
regulate their method of capture, and provide open and
close seasons for such capture and possession," approved
April fourteenth, one thousand nine hundred and three,
approved April thirteenth, one thousand nine hundred
and eight.

**JA6659**

70                   CHAPTER 31, LAWS OF 1920.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April fifteenth, one thousand nine hundred and eleven.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April twenty-seventh, one thousand nine hundred and eleven, approved April first, one thousand nine hundred and twelve.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April eighth, one thousand nine hundred and fifteen.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, and to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April seventh, one thousand nine hundred and eleven.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved March twenty-eighth, one thousand nine hundred and twelve.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thou-

sand nine hundred and three, approved April seven-
teenth, one thousand nine hundred and fourteen.

An act to prohibit the killing or pursuing of birds or
animals by the aid or use of an automobile, approved
February twenty-third, one thousand nine hundred and
eighteen.

An act to prohibit the hunting of rabbits or hares with
ferrets, approved April ninth, one thousand nine hun-
dred and ten.

A supplement to an act entitled "An act for the pro-
tection of certain kinds of birds, game and fish, to reg-
ulate their method of capture, and provide open and
close seasons for such capture and possession (Revision
of 1903)," approved April fourteenth, one thousand
nine hundred and three, approved March thirteenth, one
thousand nine hundred and twelve.

An act for the protection of the wild or passenger
pigeon, approved April ninth, one thousand nine hun-
dred and ten.

18. This act shall take effect immediately.

Approved March 22, 1920.

---

## CHAPTER 32.

An Act to amend an act entitled "An act concerning
counties," approved March fourth one thousand nine
hundred and eighteen.

BE IT ENACTED *by the Senate and General Assembly*
*of the State of New Jersey:*

1. Section eleven hundred twenty-eight, article eleven    Section 1128
of the act entitled "An act concerning counties," ap-    amended.
proved March fourth, one thousand nine hundred and
eighteen, be and the same is hereby amended to read
as follows:

# EXHIBIT 93

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.

Subject(s):

- Hunting (https://firearmslaw.duke.edu/subjects/hunting/)

Jurisdiction(s):

- North Carolina (https://firearmslaw.duke.edu/jurisdictions/north-carolina/)

Year(s):

1917

That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

-  (https://twitter.com/dukefirearmslaw)

**JA6663**

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu
(mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu
(mailto:gunlaws@law.duke.edu).

Copyright © 2023. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

**JA6664**

# EXHIBIT 94

# 1934 Supplement

## To

# Mason's Minnesota Statutes
## 1927

## (1927 to 1934)
### (Superseding Mason's 1931 Supplement)

Containing the text of the acts of the 1929, 1931, 1933 and 1933-34 Special Sessions of
the Legislature, both new and amendatory, and notes showing repeals,
together with annotations from the various courts, state, federal,
and the opinions of the Attorney General, construing the
constitution, statutes, charters and court
rules of Minnesota



Edited by

WILLIAM H. MASON, Editor-in-Chief
W. H. MASON, JR.
R. O. MASON          } Assistant Editors
J. S. O'BRIEN

CITER- DIGEST CO.
SAINT PAUL, MINNESOTA
1934

JA6666

CH. 98—CRIMES AGAINST MORALITY, DECENCY, ETC.    §10255-2

## RIGHTS OF SEPULTURE

**10227.  Dissection—When permitted.**

Insurer, held entitled to disinterment of body of insured for autopsy, where demand was seasonably made; and refusal to grant consent to such autopsy, held to defeat right to recover on policy.  Clay v. Aetna Life Ins. Co., (DC-Minn), 53F(2d)689.  See Dun. Dig. 2599, 2599a.

## SABBATH BREAKING, ETC.

**10235.  Things prohibited—Exceptions.**—All horse racing, gaming and shows; all noises disturbing the peace of the day; all trades, manufacturers, and mechanical employments, except works of necessity performed in an orderly manner so as not to interfere with the repose and religious liberty of the community; all public selling or offering for sale of property, and all other labor except works of necessity and charity are prohibited on the Sabbath day:

Provided, that meals to be served upon the premises or elsewhere by caterers, prepared tobacco in places other than where intoxicating liquors are kept for sale, fruits, confectionery, newspapers, drugs, medicines, and surgical appliances may be sold in a quiet and orderly manner.  In works of necessity or charity is included whatever is needful during the day for good order, health or comfort of the community; but keeping open a barber shop or shaving and hair cutting shall not be deemed works of necessity or charity, and nothing in this section shall be construed to permit the selling of uncooked meats, groceries, clothing, boots, or shoes.  Provided, however, that the game of baseball when conducted in a quiet and orderly manner so as not to interfere with the peace, repose and comfort of the community, may be played between the hours of one p. m. and six p. m. on the Sabbath day.  (R. L. '05, §4981; '09, c. 267, §1; G. S. '13, §8753; Apr. 23, 1929, c. 308, §1.)

Farmers may sell products on their properties near highways on Sundays.  Op. Atty. Gen., Aug. 8, 1933.

## CHAPTER 99

# Crimes Against Public Health and Safety

**10241.  Public nuisance defined.**

Logging railroad over highway under Mason's Minn. Stat. 1927, §25558-1, etc., is not a public nuisance under this section.  174M305, 219NW172.

A newspaper business conducted in violation of §§10123-1 to 10123-3 is a public nuisance.  174M457, 219 NW770.

Finding that school district was negligent in exposing school teacher to tuberculosis, sustained by evidence, but there was not sufficient evidence to show that it maintained a nuisance by its failure to make the school building sanitary, and it was not liable for damages under §3098.  177M454, 225NW449.

Act making possession of rot, offensive or injurious substance, compound or gas with wrongful intent a gross misdemeanor.  Laws 1931, c. 86.

Owner of private lake cannot construct and maintain a channel to a public lake if it injuriously affects the public lake.  Op. Atty. Gen., Sept. 26, 1929.

A misdemeanor.  Op. Atty. Gen., June 20, 1930.

Landowner removing rock on land supporting embankment for state highway is guilty of maintaining a public nuisance and is guilty of a misdemeanor.  State v. Nelson, 248NW751.  See Dun. Dig. 7240n, 58.

**10242.  Itinerant carnivals prohibited.**

174M457, 219NW770.

**10245.  Maintaining or permitting building as a nuisance.**

Owner of private lake cannot construct and maintain a channel to a public lake if it injuriously affects the public lake.  Op. Atty. Gen., Sept. 26, 1929.

**10250.  Adulteration or imitation of foods, etc.**

Whether milk was free from adulteration held question for jury.  174M320, 219NW159.

**10255.  Deadly weapons.**

There was no fatal variance where information charged carrying of a revolver and proof showed weapon to be an automatic pistol.  176M238, 222NW925.

There was no error in refusing to hold that weapon was not loaded nor admitting it in evidence against objection that, because the prosecuting witness had by force taken it from defendant, it would virtually be compelling defendant to furnish evidence against himself.  176M238, 222NW925.

The question of criminal intent of defendant in carrying automatic pistol, held so far doubtful as to require new trial.  176M238, 222NW925.

Does not prohibit the use or possession of a pistol in the absence of an intent to use it against another.  Clarine v. A., 182M310, 234NW295.  See Dun. Dig. 10200a (2).

A father who furnished him with the pistol cannot be held liable for accidental shooting by his son, in the absence of evidence that, because of youth, mental deficiency, recklessness, or other cause, it was unsafe to intrust the son with the weapon, and that the father was chargeable with knowledge of that fact.  Clarine v. A., 182M310, 234NW295.  See Dun. Dig. 10200.

A village constable has right to carry firearm.  Op. Atty. Gen., Feb. 10, 1933.

**10255-1.  Definitions.**—(a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of this Act.

(b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act.

(c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act.  But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more.  But if the same shall have been changed, altered or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.  (Act Apr. 10, 1933, c. 190, §1.)

**10255-2.  Application.**—This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted of or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not useable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers and showing a particular description of such machine gun now owned or possessed by them or shall make such report as to hereinafter acquired machine guns within 10 days of the acquisition thereof; nor to any person legally summoned to assist in making arrests or preserving peace, while said person so summoned is engaged

689

in assisting such officer; nor shall this Act apply to the armed forces of the United States or of the State of Minnesota. (Act Apr. 10, 1933, c. 190, §2.)

**10255-3.   Machine guns prohibited.**—Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony. (Act Apr. 10, 1933, c. 190, §3.)

**10263.   Failure to ring bell, etc.**

Liabilities for death resulting from failure to give signals. 173M7, 216NW245.

Failure to give crossing signal as proximate cause of collision at crossing. 178M322, 227NW45.

Evidence of failure to give signal. 179M480, 229NW 797.

Statutory signals for trains approaching crossing are immaterial when and where train is actually occupying crossing when automobile runs into side thereof. Crosby v. G., 187M263, 245NW31. See Dun. Dig. 8175.

**10278-1.   Peyote declared illegal.**—No person shall use, sell, transport or have in possession any peyote or preparation of peyote. (Act Apr. 20, 1933, c. 333, §1.)

**10278-2.   Violation a misdemeanor.**—The violation of this act shall be a misdemeanor. (Act Apr. 20, 1933, c. 333, §2.)

Sec. 3 of Act Apr. 20, 1933, cited, provides that the Act shall take effect from its passage.

**10278-3.   Definitions.**—A public bathing beach as the term is used in this act, shall be taken to mean any public land, road or highway adjoining public waters, which have been or may be used for bathing or swimming, or any privately owned place which the public is permitted to frequent or use for bathing. (Act Apr. 21, 1933, c. 364, §1.)

**10278-4.   Unlawful to bathe at public beaches at certain times.**—In all counties which now have or shall hereafter have a population of 450,000 or more, it shall be unlawful for any person to frequent a public bathing beach or public waters upon which the same immediately borders for the purpose of swimming or bathing, or congregating with others, or to swim or bathe or congregate thereat, between the hours of 10:30 p. m. and 5:00 a. m. of the day following. (Act Apr. 21, 1933, c. 364, §2.)

**10278-5.   Ordinances to regulate beaches.**—The governing bodies or boards of all counties having a population of more than 450,000, and all cities, villages and towns situated within such counties, shall have authority by ordinance, resolution or by-law, to regulate the use of public bathing beaches and public waters immediately bordering thereon for the purpose of bathing or swimming or congregating with the others thereat, within their respective territorial limits not inconsistent herewith. (Act Apr. 21, 1933, c. 364, §3.)

**10278-6.   May close beaches.**—If any such body or board shall reasonably determine that the safety, health, morals or general welfare of the public shall so require, it may by ordinance, resolution or by-law, provide that any such public bathing beach shall be closed to bathing, swimming and congregating after the hour of 9:00 p. m. or after any time between 9:00 p. m. and 10:30 p. m. of any day. (Act Apr. 21, 1933, c. 364, §4.)

**10278-7.   Act not restrictive.**—Nothing in this act shall limit or abrogate any of the existing powers of any body or governing board of any county, city, village or town. (Act Apr. 21, 1933, c. 364, §5.)

**10278-8.   Provisions separable.**—If any part or section of this act shall be held to be invalid, it shall not invalidate any of the other provisions hereof. (Act Apr. 21, 1933, c. 364, §6.)

**10278-9.   Violation a misdemeanor.**—Any person violating any of the provisions hereof shall be guilty of a misdemeanor. (Act Apr. 21, 1933, c. 364, §7.)

---

# CHAPTER 100
## Crimes Against Public Peace

**10286.   Prize fighting—Aiding—Betting or stakeholding.**

Repealed by Act Jan. 28, 1933, c. 7, §17, effective May 1, 1933, so far as inconsistent with the repealing act (§§3260-1 to 3260-18).

Since the enactment of Laws 1915, c. 363, contract for management of prize fighter is not illegal. Safro v. L., 184M336, 238NW641.

**10287.   Fight out of the state.**

Safro v. L., 184M336, 238NW641; note under §10286.

**10288.   Apprehension of person about to fight—Bail, etc.**

Safro v. L., 184M336, 238NW641; note under §10286.

**10291.   Use of firearms by minors.**

A father who furnished him with the pistol cannot be held liable for an accidental shooting by his son, in the absence of evidence that, because of youth, mental deficiency, recklessness, or other cause, it was unsafe to intrust the son with the weapon, and that the father was chargeable with knowledge of that fact. Clarine v. A., 182M310, 234NW295. See Dun. Dig. 4466, 10200.

---

# CHAPTER 101
## Crimes Against Property

**10302.   Misappropriation and falsification of accounts by public officers.**

Where a justice of the peace was elected in 1929 and due to the change in date of village elections his term expired and no successor was elected, and during such vacancy he continued to act and collect fines which he refused to turn over to the village, he might technically be prosecuted under §9971, but preferably under §10302. Op. Atty. Gen., Jan. 6, 1932.

**10303.   Other violations by officers.**

City treasurer did not commit an offense under this section by making deposits in excess of collateral securities given by a bank in lieu of a depository bond under §1973-1. 172M324, 215NW174.

**10305.   Officer interested in contract.**—Every public officer who shall be authorized to sell or lease any property, to make any contract in his official capacity, or to take part in making any such sale, lease, or contract, and every employee of such officer, who shall voluntarily become interested individually in such sale, lease, or contract, directly or indirectly, shall be guilty of a gross misdemeanor: provided, however, that any village or city council, town board, or school board, of any town, village or city of the fourth class, otherwise having authority to designate depositary for village, city, town or school district funds, of any town, village, or city of the fourth class, may designate a bank in which a member of such board is interested as a depositary for village, city, town or school funds of any town, village or city of the fourth class by a two-thirds vote of such board. (R. L. '05, §5032; G. S. '13, §8817; Apr. 20, 1931, c. 212.)

172M392, 215NW673.

When the funds are deposited in a bank of which the treasurer, being a member of the school board, is also an officer and stockholder, the exception to the general rule is inoperative. 173M428, 217NW496.

There being no over deposits when the depository banks failed, prior overdeposits or irregularities could not be proximate or any cause for any loss that may arise from the insolvency of the bank. County of Marshall v. Bakke, 182M10, 234NW1. See Dun. Dig. 2263b, 2323(77), 2699.

# EXHIBIT 95

Case 1:18-cv-10507-RMB-JBD    Document 196-8    Filed 12/15/23    Page 42 of 179
PageID: 9884

[CHAPTER 207.]

## AN ACT

To authorize transfer of the abandoned Indian-school site and building at Zeba, Michigan, to the L'Anse Band of Lake Superior Indians.

June 6, 1932.
[H. R. 208.]
[Public, No. 152.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior be, and he is hereby, authorized to convey by deed, without cost, to the L'Anse Band of Lake Superior Indians for community meetings and other like purposes, the abandoned Indian-school site and improvements thereon located at Zeba, Michigan, embracing approximately three-fourths of an acre of land within the east half of southeast quarter of southwest quarter of northwest quarter of section 19, township 51 north, range 32 west, Michigan meridian: *Provided,* That said conveyance shall be made to three members of the band duly elected by said Indians as trustees for the band and their successors in office.

L'Anse Band of Lake Superior Indians.
Abandoned Indian school, etc., at Zeba, Mich., transferred to.

*Proviso.*
Conveyance to trustees.

Approved, June 6, 1932.

---

[CHAPTER 208.]

## AN ACT

To authorize the exchange of a part of the Rapid City Indian School land for a part of the Pennington County Poor Farm, South Dakota.

June 6, 1932.
[H. R. 9254.]
[Public, No. 153.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior be, and he is hereby, authorized to exchange, under such rules and regulations as he may prescribe, an irregular tract of eighty-four and four-tenths acres, more or less, of the Rapid City Indian School land, located in the northwest quarter section 3, township 1 north, range 7 east of the Black Hills meridian, South Dakota, for thirty-eight and nine one-hundredths acres, more or less, of the Pennington County Poor Farm, in the adjoining north half of the southwest quarter of the same section, including all improvements thereon; transfer of title to the Indian School reserve land to be accomplished by deed.

Rapid City, S. Dak.
Exchange of part of Indian school land for portion of Pennington County Poor Farm, authorized.

Title transfer by deed.

Approved, June 6, 1932.

---

[CHAPTER 209.]

## AN ACT

To provide revenue, equalize taxation, and for other purposes.

June 6, 1932.
[H. R. 10236.]
[Public, No. 154.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act, divided into titles and sections according to the following Table of Contents, may be cited as the "Revenue Act of 1932":

REVENUE ACT OF 1932.

## TABLE OF CONTENTS

### TITLE I—INCOME TAX

#### SUBTITLE A—INTRODUCTORY PROVISIONS

Sec. 1. Application of title.
Sec. 2. Cross references.
Sec. 3. Classification of provisions.
Sec. 4. Special classes of taxpayers.

#### SUBTITLE B—GENERAL PROVISIONS

##### PART I—RATES OF TAX

Sec. 11. Normal tax on individuals.
Sec. 12. Surtax on individuals.
Sec. 13. Tax on corporations.
Sec. 14. Taxable period embracing years with different laws.

Table of contents.

Income tax, p. 173.

Introductory provisions, p. 173.

General provisions, p. 174.
Rates of tax, p. 174.

REVENUE ACT OF 1932.                    PART II—COMPUTATION OF NET INCOME
Net income comput-      Sec. 21. Net income.
ed, p. 178.             Sec. 22. Gross income.
                       Sec. 23. Deductions from gross income.
                       Sec. 24. Items not deductible.
                       Sec. 25. Credits of individual against net income.
                       Sec. 26. Credits of corporation against net income.

Credits against tax,               PART III—CREDITS AGAINST TAX
p. 185.
                       Sec. 31. Taxes of foreign countries and possessions of United States.
                       Sec. 32. Taxes withheld at source.
                       Sec. 33. Erroneous payments.

Accounting, p. 185.        PART IV—ACCOUNTING PERIODS AND METHODS OF ACCOUNTING

                       Sec. 41. General rule.
                       Sec. 42. Period in which items of gross income included.
                       Sec. 43. Period for which deductions and credits taken.
                       Sec. 44. Installment basis.
                       Sec. 45. Allocation of income and deductions.
                       Sec. 46. Change of accounting period.
                       Sec. 47. Returns for a period of less than twelve months.
Returns and pay-       Sec. 48. Definitions.
ment, p. 188.                        PART V—RETURNS AND PAYMENT OF TAX

                       Sec. 51. Individual returns.
                       Sec. 52. Corporation returns.
                       Sec. 53. Time and place for filing returns.
                       Sec. 54. Records and special returns.
                       Sec. 55. Publicity of returns.
                       Sec. 56. Payment of tax.
                       Sec. 57. Examination of return and determination of tax.
                       Sec. 58. Additions to tax and penalties.
                       Sec. 59. Administrative proceedings.
Miscellaneous provi-                 PART VI—MISCELLANEOUS PROVISIONS
sions, p. 190.
                       Sec. 61. Laws made applicable.
                       Sec. 62. Rules and regulations.
                       Sec. 63. Taxes in lieu of taxes under 1928 Act.
Effective date, p. 191. Sec. 64. Short title.
                       Sec. 65. Effective date of title.
Supplemental provi-              SUBTITLE C—SUPPLEMENTAL PROVISIONS
sions, p. 191.
Rates of tax, p. 191.                SUPPLEMENT A—RATES OF TAX

                       Sec. 101. Capital net gains and losses.
                       Sec. 102. Sale of mines and oil or gas wells.
                       Sec. 103. Exemptions from tax on corporations.
                       Sec. 104. Accumulation of surplus to evade surtaxes.
                       Sec. 105. Taxable period embracing years with different laws.
Net income comput-               SUPPLEMENT B—COMPUTATION OF NET INCOME
ed, p. 195.
                       Sec. 111. Determination of amount of gain or loss.
                       Sec. 112. Recognition of gain or loss.
                       Sec. 113. Adjusted basis for determining gain or loss.
                       Sec. 114. Basis for depreciation and depletion.
                       Sec. 115. Distributions by corporations.
                       Sec. 116. Exclusions from gross income.
                       Sec. 117. Net losses.
                       Sec. 118. Loss from wash sales of stock or securities.
                       Sec. 119. Income from sources within United States.
                       Sec. 120. Unlimited deduction for charitable and other contributions.
Credits against tax,                SUPPLEMENT C—CREDITS AGAINST TAX
p. 211.
                       Sec. 131. Taxes of foreign countries and possessions of United States.
                       Sec. 132. Payments under 1928 Act.
Returns and pay-                 SUPPLEMENT D—RETURNS AND PAYMENT OF TAX
ment, p. 213.
                       Sec. 141. Consolidated returns of corporations.
                       Sec. 142. Fiduciary returns.
                       Sec. 143. Withholding of tax at source.
                       Sec. 144. Payment of corporation income tax at source.
                       Sec. 145. Penalties.
                       Sec. 146. Closing by Commissioner of taxable year.
                       Sec. 147. Information at source.
                       Sec. 148. Information by corporations.
                       Sec. 149. Returns of brokers.
                       Sec. 150. Collection of foreign items.
Estates and trusts,                 SUPPLEMENT E—ESTATES AND TRUSTS
p. 219.
                       Sec. 161. Imposition of tax.
                       Sec. 162. Net income.
                       Sec. 163. Credits against net income.
                       Sec. 164. Different taxable years.
                       Sec. 165. Employees' trusts.
                       Sec. 166. Revocable trusts.
                       Sec. 167. Income for benefit of grantor.
                       Sec. 168. Capital net gains and losses.
                       Sec. 169. Net losses.
                       Sec. 170. Taxes of foreign countries and possessions of United States.

SUPPLEMENT F—PARTNERSHIPS

Sec. 181. Partnership not taxable.
Sec. 182. Tax of partners.
Sec. 183. Computation of partnership income.
Sec. 184. Credits against net income.
Sec. 185. Earned income.
Sec. 186. Capital net gains and losses.
Sec. 187. Net losses.
Sec. 188. Taxes of foreign countries and possessions of United States.
Sec. 189. Partnership returns.

SUPPLEMENT G—INSURANCE COMPANIES

Sec. 201. Tax on life insurance companies.
Sec. 202. Gross income of life insurance companies.
Sec. 203. Net income of life insurance companies.
Sec. 204. Insurance companies other than life or mutual.
Sec. 205. Net losses.
Sec. 206. Taxes of foreign countries and possessions of the United States.
Sec. 207. Computation of gross income.
Sec. 208. Mutual insurance companies other than life.

SUPPLEMENT H—NONRESIDENT ALIEN INDIVIDUALS

Sec. 211. Normal tax.
Sec. 212. Gross income.
Sec. 213. Deductions.
Sec. 214. Credits against net income.
Sec. 215. Allowance of deductions and credits.
Sec. 216. Credits against tax.
Sec. 217. Returns.
Sec. 218. Payment of tax.

SUPPLEMENT I—FOREIGN CORPORATIONS

Sec. 231. Gross income.
Sec. 232. Deductions.
Sec. 233. Allowance of deductions and credits.
Sec. 234. Credits against tax.
Sec. 235. Returns.
Sec. 236. Payment of tax.
Sec. 237. Foreign insurance companies.
Sec. 238. Affiliation.

SUPPLEMENT J—POSSESSIONS OF THE UNITED STATES

Sec. 251. Income from sources within possessions of United States.
Sec. 252. Citizens of possessions of United States.

SUPPLEMENT K—CHINA TRADE ACT CORPORATIONS

Sec. 261. Credit against net income.
Sec. 262. Credits against the tax.
Sec. 263. Affiliation.
Sec. 264. Income of shareholders.

SUPPLEMENT L—ASSESSMENT AND COLLECTION OF DEFICIENCIES

Sec. 271. Definition of deficiency.
Sec. 272. Procedure in general.
Sec. 273. Jeopardy assessments.
Sec. 274. Bankruptcy and receiverships.
Sec. 275. Period of limitation upon assessment and collection.
Sec. 276. Same—Exceptions.
Sec. 277. Suspension of running of statute.

SUPPLEMENT M—INTEREST AND ADDITIONS TO TAX

Sec. 291. Failure to file return.
Sec. 292. Interest on deficiencies.
Sec. 293. Additions to the tax in case of deficiency.
Sec. 294. Additions to the tax in case of nonpayment.
Sec. 295. Time extended for payment of tax shown on return.
Sec. 296. Time extended for payment of deficiency.
Sec. 297. Interest in case of jeopardy assessments.
Sec. 298. Bankruptcy and receiverships.
Sec. 299. Removal of property or departure from United States.

SUPPLEMENT N—CLAIMS AGAINST TRANSFEREES AND FIDUCIARIES

Sec. 311. Transferred assets.
Sec. 312. Notice of fiduciary relationship.

SUPPLEMENT O—OVERPAYMENTS

Sec. 321. Overpayment of installment.
Sec. 322. Refunds and credits.

# TITLE II—ADDITIONAL ESTATE TAX

Sec. 401. Imposition of tax.
Sec. 402. Credits against tax.
Sec. 403. Assessment, collection, and payment of tax.

Marginal notes:
REVENUE ACT OF 1932.
Partnerships, p. 222.
Insurance companies, p. 223.
Nonresident aliens, p. 228.
Foreign corporations, p. 229.
Possessions of the United States, p. 231.
China Trade Act corporations, p. 232.
Deficiencies, p. 233.
Interest and additions to tax, p. 238.
Transferees and fiduciaries, p. 240.
Overpayments, p. 242.
Additional estate tax, p. 243.

REVENUE ACT OF 1932.

Gift tax, p. 245.

### Title III—Gift Tax

Sec. 501. Imposition of tax.
Sec. 502. Computation of tax.
Sec. 503. Transfer for less than adequate and full consideration.
Sec. 504. Net gifts.
Sec. 505. Deductions.
Sec. 506. Gifts made in property.
Sec. 507. Returns.
Sec. 508. Records and special returns.
Sec. 509. Payment of tax.
Sec. 510. Lien for tax.
Sec. 511. Examination of return and determination of tax.
Sec. 512. Definition of deficiency.
Sec. 513. Assessment and collection of deficiencies.
Sec. 514. Jeopardy assessments.
Sec. 515. Claims in abatement.
Sec. 516. Bankruptcy and receiverships.
Sec. 517. Period of limitation upon assessment and collection.
Sec. 518. Suspension of running of statute.
Sec. 519. Additions to the tax in case of failure to file return.
Sec. 520. Additions to the tax in case of deficiency.
Sec. 521. Interest on extended payments.
Sec. 522. Interest on deficiencies.
Sec. 523. Interest on jeopardy assessments.
Sec. 524. Additions to the tax in case of nonpayment.
Sec. 525. Penalties.
Sec. 526. Transferred assets.
Sec. 527. Notice of fiduciary relationship.
Sec. 528. Refunds and credits.
Sec. 529. Laws made applicable.
Sec. 530. Rules and regulations.
Sec. 531. Definitions.
Sec. 532. Short title.

Manufacturers' excise taxes, p. 259.

### Title IV—Manufacturers' Excise Taxes

Sec. 601. Excise taxes on certain articles.
Sec. 602. Tax on tires and inner tubes.
Sec. 603. Tax on toilet preparations, etc.
Sec. 604. Tax on furs.
Sec. 605. Tax on jewelry, etc.
Sec. 606. Tax on automobiles, etc.
Sec. 607. Tax on radio receiving sets, etc.
Sec. 608. Tax on mechanical refrigerators.
Sec. 609. Tax on sporting goods.
Sec. 610. Tax on firearms, shells, and cartridges.
Sec. 611. Tax on cameras.
Sec. 612. Tax on matches.
Sec. 613. Tax on candy.
Sec. 614. Tax on chewing gum.
Sec. 615. Tax on soft drinks.
Sec. 616. Tax on electrical energy.
Sec. 617. Tax on gasoline.
Sec. 618. Definition of sale.
Sec. 619. Sale price.
Sec. 620. Sale of articles for further manufacture.
Sec. 621. Credits and refunds.
Sec. 622. Use by manufacturer, producer, or importer.
Sec. 623. Sales by others than manufacturer, producer, or importer.
Sec. 624. Exemption of articles manufactured or produced by Indians.
Sec. 625. Contracts prior to May 1, 1932.
Sec. 626. Return and payment of manufacturers' taxes.
Sec. 627. Applicability of administrative provisions.
Sec. 628. Rules and regulations.
Sec. 629. Effective date.

Miscellaneous taxes, p. 270.

### Title V—Miscellaneous Taxes

Telegraph, radio, etc., p. 270.

#### Part I—Tax on Telegraph, Telephone, Radio, and Cable Facilities

Sec. 701. Imposition.
Sec. 702. Returns and payments of tax.

Admissions tax, p. 271.

#### Part II—Admissions Tax

Sec. 711. Admissions tax.

Stamp taxes, p. 272.

#### Part III—Stamp Taxes

Sec. 721. Stamp tax on issues of bonds, etc.
Sec. 722. Stamp tax on issues of stock, etc.
Sec. 723. Stamp tax on transfer of stocks, etc.
Sec. 724. Stamp tax on transfer of bonds, etc.
Sec. 725. Stamp tax on conveyances.
Sec. 726. Stamp tax on sales of produce for future delivery.

Oil transportation by pipe lines, p. 275.

#### Part IV—Tax on Transportation of Oil by Pipe Line

Sec. 731. Tax on transportation of oil by pipe line.

PART V—TAX ON LEASES OF SAFE DEPOSIT BOXES

Sec. 741. Tax on leases of safe deposit boxes.

PART VI—TAX ON CHECKS, ETC.

Sec. 751. Tax on checks, etc.

PART VII—TAX ON BOATS

Sec. 761. Tax on use of boats.

PART VIII—ADMINISTRATIVE PROVISIONS

Sec. 771. Payment of taxes.
Sec. 772. Refunds and credits.
Sec. 773. Regulations.
Sec. 774. Applicability of administrative provisions.

## TITLE VI—ESTATE TAX AMENDMENTS

Sec. 801. Credit of gift tax on estate tax.
Sec. 802. 80 per centum credit.
Sec. 803. Future interests.
Sec. 804. Relinquishment of dower, etc., as consideration.
Sec. 805. Deductions.
Sec. 806. Prior taxed property.
Sec. 807. Deduction of bequests, etc., to charity.
Sec. 808. Extension of time for payment.
Sec. 809. Lien for taxes.
Sec. 810. Refunds.
Sec. 811. Future interests—Extension of time for payment of tax.

## TITLE VII—TAX ON TRANSFERS TO AVOID INCOME TAX

Sec. 901. Imposition of tax.
Sec. 902. Nontaxable transfers.
Sec. 903. Definition of "Foreign Trust".
Sec. 904. Payment and collection.

## TITLE VIII—POSTAL RATES

Sec. 1001. Postal rates.

## TITLE IX—ADMINISTRATIVE AND GENERAL PROVISIONS

Sec. 1101. Review of decisions of Board of Tax Appeals.
Sec. 1102. Board of Tax Appeals—Fees.
Sec. 1103. Limitations on suits by taxpayer.
Sec. 1104. Date of allowance of refund or credit.
Sec. 1105. Jeopardy assessment.
Sec. 1106. Refunds of miscellaneous taxes.
Sec. 1107. Adjustments of carriers' liabilities to conform to recapture payments.
Sec. 1108. Limitation on prosecutions for internal revenue offenses.
Sec. 1109. Special disbursing agents of Treasury.
Sec. 1110. Refund of taxes for taxable year 1918.
Sec. 1111. Definitions.
Sec. 1112. Separability clause.
Sec. 1113. Effective date of act.

# TITLE I—INCOME TAX

## SUBTITLE A—INTRODUCTORY PROVISIONS

### SEC. 1. APPLICATION OF TITLE.

The provisions of this title shall apply only to the taxable year 1932 and succeeding taxable years.  Income, war-profits, and excess-profits taxes for taxable years preceding the taxable year 1932 shall not be affected by the provisions of this title, but shall remain subject to the applicable provisions of prior revenue Acts, except as such provisions are modified by Title IX of this Act or by legislation enacted subsequent to this Act.

### SEC. 2. CROSS REFERENCES.

The cross references in this title to other portions of the title, where the word "see" is used, are made only for convenience, and shall be given no legal effect.

REVENUE ACT OF 1932.

Safe deposit boxes, leases, p. 276.
Checks, etc., p. 276.

Boats, p. 277.

Administrative provisions, p. 277.

Estate tax amendments, p. 278.

Tax on transfers to avoid income tax, p. 284.

Postal rates, p. 285.

Administrative and general provisions, p. 286.

INCOME TAX.

Introductory provisions.

Application of title.
To 1932, and succeeding years.

Previous years not affected.

Exceptions.
*Post,* p. 286.

Cross references.
Merely for convenience.

174    72d CONGRESS.   SESS. I.   CH. 209.   JUNE 6, 1932.

INCOME TAX

Classification of provisions.
Designations.

## SEC. 3. CLASSIFICATION OF PROVISIONS.

The provisions of this title are herein classified and designated as—

    Subtitle A—Introductory provisions,
    Subtitle B—General provisions, divided into Parts and sections,
    Subtitle C—Supplemental provisions, divided into Supplements and sections.

Special classes of taxpayers.
Application of general provisions and supplements.

## SEC. 4. SPECIAL CLASSES OF TAXPAYERS.

The application of the General Provisions and of Supplements A to D, inclusive, to each of the following special classes of taxpayers, shall be subject to the exceptions and additional provisions found in the Supplement applicable to such class, as follows:

Estates and trusts, p. 219.

(a) Estates and trusts and the beneficiaries thereof,—Supplement E.

Members of partnerships, p. 222.
Insurance companies, p. 223.
Nonresident aliens, p. 223.
Foreign corporations, p. 229.
Citizens of possessions, not citizens of United States, p. 231.
Citizens deriving large portion of income from United States possessions.
Post, p. 231.
China Trade Act corporations, p. 232.

(b) Members of partnerships,—Supplement F.
(c) Insurance companies,—Supplement G.
(d) Nonresident alien individuals,—Supplement H.
(e) Foreign corporations,—Supplement I.
(f) Individual citizens of any possession of the United States who are not otherwise citizens of the United States and who are not residents of the United States,—Supplement J.
(g) Individual citizens of the United States or domestic corporations, satisfying the conditions of section 251 by reason of deriving a large portion of their gross income from sources within a possession of the United States,—Supplement J.
(h) China Trade Act corporations,—Supplement K.

## SUBTITLE B—GENERAL PROVISIONS

General provisions.

### Part I—Rates of Tax

Rates of tax.

Normal tax on individuals.
Rates on net income.

## SEC. 11. NORMAL TAX ON INDIVIDUALS.

There shall be levied, collected, and paid for each taxable year upon the net income of every individual a normal tax equal to the sum of the following:

Post, p. 184.

(a) 4 per centum of the first $4,000 of the amount of the net income in excess of the credits against net income provided in section 25; and
(b) 8 per centum of the remainder of such excess amount.

Surtax on individuals.
Rates.

## SEC. 12. SURTAX ON INDIVIDUALS.

(a) RATES OF SURTAX.—There shall be levied, collected, and paid for each taxable year upon the net income of every individual a surtax as follows:

Upon a net income of $6,000 there shall be no surtax; upon net incomes in excess of $6,000 and not in excess of $10,000, 1 per centum of such excess.

$40 upon net incomes of $10,000; and upon net incomes in excess of $10,000 and not in excess of $12,000, 2 per centum in addition of such excess.

$80 upon net incomes of $12,000; and upon net incomes in excess of $12,000 and not in excess of $14,000, 3 per centum in addition of such excess.

$140 upon net incomes of $14,000; and upon net incomes in excess of $14,000 and not in excess of $16,000, 4 per centum in addition of such excess.

$220 upon net incomes of $16,000; and upon net incomes in excess of $16,000 and not in excess of $18,000, 5 per centum in addition of such excess.

$320 upon net incomes of $18,000; and upon net incomes in excess of $18,000 and not in excess of $20,000, 6 per centum in addition of such excess.

$440 upon net incomes of $20,000; and upon net incomes in excess of $20,000 and not in excess of $22,000, 8 per centum in addition of such excess.

$600 upon net incomes of $22,000; and upon net incomes in excess of $22,000 and not in excess of $24,000, 9 per centum in addition of such excess.

$780 upon net incomes of $24,000; and upon net incomes in excess of $24,000 and not in excess of $26,000, 10 per centum in addition of such excess.

$980 upon net incomes of $26,000; and upon net incomes in excess of $26,000 and not in excess of $28,000, 11 per centum in addition of such excess.

$1,200 upon net incomes of $28,000; and upon net incomes in excess of $28,000 and not in excess of $30,000, 12 per centum in addition of such excess.

$1,440 upon net incomes of $30,000; and upon net incomes in excess of $30,000 and not in excess of $32,000, 13 per centum in addition of such excess.

$1,700 upon net incomes of $32,000; and upon net incomes in excess of $32,000 and not in excess of $36,000, 15 per centum in addition of such excess.

$2,300 upon net incomes of $36,000; and upon net incomes in excess of $36,000 and not in excess of $38,000, 16 per centum in addition of such excess.

$2,620 upon net incomes of $38,000; and upon net incomes in excess of $38,000 and not in excess of $40,000, 17 per centum in addition of such excess.

$2,960 upon net incomes of $40,000; and upon net incomes in excess of $40,000 and not in excess of $42,000, 18 per centum in addition of such excess.

$3,320 upon net incomes of $42,000; and upon net incomes in excess of $42,000 and not in excess of $44,000, 19 per centum in addition of such excess.

$3,700 upon net incomes of $44,000; and upon net incomes in excess of $44,000 and not in excess of $46,000, 20 per centum in addition of such excess.

$4,100 upon net incomes of $46,000; and upon net incomes in excess of $46,000 and not in excess of $48,000, 21 per centum in addition of such excess.

$4,520 upon net incomes of $48,000; and upon net incomes in excess of $48,000 and not in excess of $50,000, 22 per centum in addition of such excess.

$4,960 upon net incomes of $50,000; and upon net incomes in excess of $50,000 and not in excess of $52,000, 23 per centum in addition of such excess.

$5,420 upon net incomes of $52,000; and upon net incomes in excess of $52,000 and not in excess of $54,000, 24 per centum in addition of such excess.

$5,900 upon net incomes of $54,000; and upon net incomes in excess of $54,000 and not in excess of $56,000, 25 per centum in addition of such excess.

$6,400 upon net incomes of $56,000; and upon net incomes in excess of $56,000 and not in excess of $58,000, 26 per centum in addition of such excess.

INCOME TAX
Surtax on individuals.
RATES—Contd.

INCOME TAX
Surtax on individ-
uals.
RATES—Contd.

$6,920 upon net incomes of $58,000; and upon net incomes in excess of $58,000 and not in excess of $60,000, 27 per centum in addition of such excess.

$7,460 upon net incomes of $60,000; and upon net incomes in excess of $60,000 and not in excess of $62,000, 28 per centum in addition of such excess.

$8,020 upon net incomes of $62,000; and upon net incomes in excess of $62,000 and not in excess of $64,000, 29 per centum in addition of such excess.

$8,600 upon net incomes of $64,000; and upon net incomes in excess of $64,000 and not in excess of $66,000, 30 per centum in addition of such excess.

$9,200 upon net incomes of $66,000; and upon net incomes in excess of $66,000 and not in excess of $68,000, 31 per centum in addition of such excess.

$9,820 upon net incomes of $68,000; and upon net incomes in excess of $68,000 and not in excess of $70,000, 32 per centum in addition of such excess.

$10,460 upon net incomes of $70,000; and upon net incomes in excess of $70,000 and not in excess of $72,000, 33 per centum in addition of such excess.

$11,120 upon net incomes of $72,000; and upon net incomes in excess of $72,000 and not in excess of $74,000, 34 per centum in addition of such excess.

$11,800 upon net incomes of $74,000; and upon net incomes in excess of $74,000 and not in excess of $76,000, 35 per centum in addition of such excess.

$12,500 upon net incomes of $76,000; and upon net incomes in excess of $76,000 and not in excess of $78,000, 36 per centum in addition of such excess.

$13,220 upon net incomes of $78,000; and upon net incomes in excess of $78,000 and not in excess of $80,000, 37 per centum in addition of such excess.

$13,960 upon net incomes of $80,000; and upon net incomes in excess of $80,000 and not in excess of $82,000, 38 per centum in addition of such excess.

$14,720 upon net incomes of $82,000; and upon net incomes in excess of $82,000 and not in excess of $84,000, 39 per centum in addition of such excess.

$15,500 upon net incomes of $84,000; and upon net incomes in excess of $84,000 and not in excess of $86,000, 40 per centum in addition of such excess.

$16,300 upon net incomes of $86,000; and upon net incomes in excess of $86,000 and not in excess of $88,000, 41 per centum in addition of such excess.

$17,120 upon net incomes of $88,000; and upon net incomes in excess of $88,000 and not in excess of $90,000, 42 per centum in addition of such excess.

$17,960 upon net incomes of $90,000; and upon net incomes in excess of $90,000 and not in excess of $92,000, 43 per centum in addition of such excess.

$18,820 upon net incomes of $92,000; and upon net incomes in excess of $92,000 and not in excess of $94,000, 44 per centum in addition of such excess.

$19,700 upon net incomes of $94,000; and upon net incomes in excess of $94,000 and not in excess of $96,000, 45 per centum in addition of such excess.

INCOME TAX
Surtax on individ-
uals.
RATES—Contd.

$20,600 upon net incomes of $96,000; and upon net incomes in excess of $96,000 and not in excess of $98,000, 46 per centum in addition of such excess.

$21,520 upon net incomes of $98,000; and upon net incomes in excess of $98,000 and not in excess of $100,000, 47 per centum in addition of such excess.

$22,460 upon net incomes of $100,000; and upon net incomes in excess of $100,000 and not in excess of $150,000, 48 per centum in addition of such excess.

$46,460 upon net incomes of $150,000; and upon net incomes in excess of $150,000 and not in excess of $200,000, 49 per centum in addition of such excess.

$70,960 upon net incomes of $200,000; and upon net incomes in excess of $200,000 and not in excess of $300,000, 50 per centum in addition of such excess.

$120,960 upon net incomes of $300,000; and upon net incomes in excess of $300,000 and not in excess of $400,000, 51 per centum in addition of such excess.

$171,960 upon net incomes of $400,000; and upon net incomes in excess of $400,000 and not in excess of $500,000, 52 per centum in addition of such excess.

$223,960 upon net incomes of $500,000; and upon net incomes in excess of $500,000 and not in excess of $750,000, 53 per centum in addition of such excess.

$356,460 upon net incomes of $750,000; and upon net incomes in excess of $750,000 and not in excess of $1,000,000, 54 per centum in addition of such excess.

$491,460 upon net incomes of $1,000,000; and upon net incomes in excess of $1,000,000, 55 per centum in addition of such excess.

(b) SALE OF MINES AND OIL OR GAS WELLS.—For limitation of surtax attributable to sale of mines and oil or gas wells, see section 102.

Sale of mines, etc.
Post, p. 192.

(c) CAPITAL NET GAINS AND LOSSES.—For rate and computation of tax in lieu of normal and surtax in case of net incomes of not less than $16,000, approximately, or in case of net incomes, excluding items of capital gain, capital loss, and capital deductions, of not less than $16,000, approximately, see section 101.

Capital net gains and losses.

Post, p. 191.

(d) EVASION OF SURTAXES BY INCORPORATION.—For tax on corporations which accumulate surplus to evade surtax on stockholders, see section 104.

Evasion by incorporation.
Post, p. 195.

## SEC. 13. TAX ON CORPORATIONS.

Tax on corporations.
Rate.

(a) RATE OF TAX.—There shall be levied, collected, and paid for each taxable year upon the net income of every corporation, a tax of 13¾ per centum of the amount of the net income in excess of the credit against net income provided in section 26.

(b) EXEMPT CORPORATIONS.—For corporations exempt from tax, see section 103.

Exempt corporations.
Post, p. 193.

(c) IMPROPER ACCUMULATION OF SURPLUS.—For tax on corporations which accumulate surplus to evade surtax on stockholders, see section 104.

Accumulating surplus to avoid surtax.
Post, p. 195.

## SEC. 14. TAXABLE PERIOD EMBRACING YEARS WITH DIFFERENT LAWS.

Period embracing years with different laws.
Computing tax.
Post, p. 195.

If a taxable period embraces portions of two calendar years for which the laws are different, the tax shall be computed as provided in section 105.

3051°—33——12

178                72d CONGRESS. SESS. I. CH. 209.    JUNE 6, 1932.

## Part II—Computation of Net Income

INCOME TAX.
Computation of net income.

**SEC. 21. NET INCOME.**

Net income.
Meaning of.

"Net income" means the gross income computed under section 22, less the deductions allowed by section 23.

Gross income.
General definition.

**SEC. 22. GROSS INCOME.**

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any Compensation of Presidents, judges. source whatever. In the case of Presidents of the United States and judges of courts of the United States taking office after the date of the enactment of this Act, the compensation received as such shall be included in gross income; and all Acts fixing the compensation of such Presidents and judges are hereby amended accordingly.

Items exempt from taxation.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this title:

Life insurance.

(1) LIFE INSURANCE.—Amounts received under a life insurance contract paid by reason of the death of the insured, whether in a single sum or in installments (but if such amounts are held by the insurer under an agreement to pay interest thereon, the interest payments shall be included in gross income);

Amounts from annuities.

(2) ANNUITIES, ETC.—Amounts received (other than amounts paid by reason of the death of the insured and interest payments on such amounts) under a life insurance, endowment, or annuity contract, but if such amounts (when added to amounts received before the taxable year under such contract) exceed the aggregate premiums or consideration paid (whether or not paid during the Transfers for value. taxable year) then the excess shall be included in gross income. In the case of a transfer for a valuable consideration, by assignment or otherwise, of a life insurance, endowment, or annuity contract, or any interest therein, only the actual value of such consideration and the amount of the premiums and other sums subsequently paid by the transferee shall be exempt from taxation under paragraph (1) or this paragraph;

Value of gifts, etc.

(3) GIFTS, BEQUESTS, AND DEVISES.—The value of property acquired by gift, bequest, devise, or inheritance (but the income from such property shall be included in gross income);

Interest on State bonds, etc.

Farm loan securities.

(4) TAX-FREE INTEREST.—Interest upon (A) the obligations of a State, Territory, or any political subdivision thereof, or the District of Columbia; or (B) securities issued under the provisions of the Federal Farm Loan Act, or under the provisions of such Act as Federal obligations, etc.
Statement required in returns. amended; or (C) the obligations of the United States or its possessions. Every person owning any of the obligations or securities enumerated in clause (A), (B), or (C) shall, in the return required by this title, submit a statement showing the number and amount of such obligations and securities owned by him and the income received therefrom, in such form and with such information as the Commissioner may require. In the case of obligations of the Limitation on Liberty bonds, etc. United States issued after September 1, 1917 (other than postal savings certificates of deposit), the interest shall be exempt only if and to the extent provided in the respective Acts authorizing the

issue thereof as amended and supplemented, and shall be excluded from gross income only if and to the extent it is wholly exempt to the taxpayer from the taxes imposed by this title; *INCOME TAX*

(5) COMPENSATION FOR INJURIES OR SICKNESS.—Amounts received, through accident or health insurance or under workmen's compensation acts, as compensation for personal injuries or sickness, plus the amount of any damages received whether by suit or agreement on account of such injuries or sickness; *Payment for personal injuries or sickness.*

(6) MINISTERS.—The rental value of a dwelling house and appurtenances thereof furnished to a minister of the gospel as part of his compensation; *Rent of ministers' dwelling.*

(7) MISCELLANEOUS ITEMS.—The following items, to the extent provided in section 116: *Miscellaneous items. Post, p. 204.*

Earned income from sources without the United States;
Salaries of certain Territorial employees;
The income of foreign governments;
Income of States, municipalities and other political subdivisions;
Receipts of shipowners' mutual protection and indemnity associations;
Dividends from China Trade Act corporations.

(c) INVENTORIES.—Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. *Inventories to determine income.*

(d) DISTRIBUTIONS BY CORPORATIONS.—Distributions by corporations shall be taxable to the shareholders as provided in section 115. *Distributions by corporations. Post, p. 203.*

(e) DETERMINATION OF GAIN OR LOSS.—In the case of a sale or other disposition of property, the gain or loss shall be computed as provided in sections 111, 112, and 113. *Determination of gain or loss on sale of property. Post, pp. 195, 196, 198.*

(f) GROSS INCOME FROM SOURCES WITHIN AND WITHOUT UNITED STATES.—For computation of gross income from sources within and without the United States, see section 119. *Sources within and without United States. Post, p. 208.*

**SEC. 23. DEDUCTIONS FROM GROSS INCOME.** *Deductions from gross income.*

In computing net income there shall be allowed as deductions: *Items specified.*

(a) EXPENSES.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. *Business expenses. Travel, etc., included.*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness, except (1) on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this title, or (2) on indebtedness incurred or continued in connection with the purchasing or carrying of an annuity. *Interest on debts. Exceptions.*

INCOME TAX
Taxes paid within taxable year.
Exceptions.
(c) TAXES GENERALLY.—Taxes paid or accrued within the taxable year, except—

(1) income, war-profits, and excess-profits taxes imposed by the authority of the United States;

(2) income, war-profits, and excess-profits taxes imposed by the authority of any foreign country or possession of the United States; but this deduction shall be allowed in the case of a taxpayer who does not signify in his return his desire to have to any extent the benefits of section 131 (relating to credit for taxes of foreign countries and possessions of the United States); and

Post, p. 211.

(3) taxes assessed against local benefits of a kind tending to increase the value of the property assessed; but this paragraph shall not exclude the allowance as a deduction of so much of such taxes as is properly allocable to maintenance or interest charges.

Accruement of estate, etc., taxes.
For the purpose of this subsection, estate, inheritance, legacy, and succession taxes accrue on the due date thereof, except as otherwise provided by the law of the jurisdiction imposing such taxes, and

Limitation.
shall be allowed as a deduction only to the estate.

Taxes of shareholder paid by corporation.
(d) TAXES OF SHAREHOLDER PAID BY CORPORATION.—The deduction for taxes allowed by subsection (c) shall be allowed to a corporation in the case of taxes imposed upon a shareholder of the corporation upon his interest as shareholder which are paid by the corporation without reimbursement from the shareholder, but in such cases no deduction shall be allowed the shareholder for the amount of such taxes.

Losses by individuals.
(e) LOSSES BY INDIVIDUALS.—Subject to the limitations provided in subsection (r) of this section, in the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

Business.
Not connected with trade or business.
(1) if incurred in trade or business; or
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or

Casualty losses not connected with business.
Disallowed if deducted for estate-tax purposes.
(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. No loss shall be allowed as a deduction under this paragraph if at the time of the filing of the return such loss has been claimed as a deduction for estate tax purposes in the estate tax return.

Losses by corporations.
(f) LOSSES BY CORPORATIONS.—Subject to the limitations provided in subsection (r) of this section, in the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

Basis for determining loss.
(g) BASIS FOR DETERMINING LOSS.—The basis for determining the amount of deduction for losses sustained, to be allowed under subsection (e) or (f), shall be the adjusted basis provided in section

Post, p. 201.
113 (b) for determining the gain or loss from the sale or other disposition of property.

Disallowance of loss on wash sales of stock, etc.
(h) LOSS ON WASH SALES OF STOCK OR SECURITIES.—For disallowance of loss deduction in the case of sales of stock or securities where within thirty days before or after the date of the sale the taxpayer

Post, p. 208.
has acquired substantially identical property, see section 118.

Net losses of prior year.
Post, p. 207.
(i) NET LOSSES.—The special deduction for net losses of a prior year, to the extent provided in section 117.

Worthless debts.
(j) BAD DEBTS.—Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner

may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

(k) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence. In the case of property held by one person for life with remainder to another person, the deduction shall be computed as if the life tenant were the absolute owner of the property and shall be allowed to the life tenant. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each.

(l) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. In the case of property held by one person for life with remainder to another person, the deduction shall be computed as if the life tenant were the absolute owner of the property and shall be allowed to the life tenant. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each. (For percentage depletion, see section 114(b) (3) and (4).)

(m) BASIS FOR DEPRECIATION AND DEPLETION.—The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114.

(n) CHARITABLE AND OTHER CONTRIBUTIONS.—In the case of an individual, contributions or gifts made within the taxable year to or for the use of:

(1) the United States, any State, Territory, or any political subdivision thereof, or the District of Columbia, for exclusively public purposes;

(2) a corporation, or trust, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual;

(3) the special fund for vocational rehabilitation authorized by section 12 of the World War Veterans' Act, 1924;

(4) posts or organizations of war veterans, or auxiliary units or societies of any such posts or organizations, if such posts, organizations, units, or societies are organized in the United States or any of its possessions, and if no part of their net earnings inures to the benefit of any private shareholder or individual; or

INCOME TAX

Exhaustion, etc., of business property.

Life estates.

Property in trust.

Mines, oil and gas wells, timber, etc.

Reasonable allowance for depletion, etc.

Revision of estimates allowed.

Leases.

Life estates.

Property in trust.

Post, p. 202.

Basis for depletion, etc.

Charitable, etc., contributions.
Gifts.

For public uses.

Corporations, community chests, religious, scientific, etc., organizations.

Vocational rehabilitation.
Vol. 43, p. 611.

War veterans' organizations, etc.

182                72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.

INCOME TAX

Fraternal societies, etc.
Condition.

(5) a fraternal society, order, or association, operating under the lodge system, but only if such contributions or gifts are to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals;

Limit.

Unlimited deductions, p. 210.

to an amount which in all the above cases combined does not exceed 15 per centum of the taxpayer's net income as computed without the benefit of this subsection. Such contributions or gifts shall be allowable as deductions only if verified under rules and regulations prescribed by the Commissioner, with the approval of the Secretary. (For unlimited deduction if contributions and gifts exceed 90 per centum of the net income, see section 120.)

Future expenses in case of casual sales of real property.
Allowance for future liabilities under contract.

(o) FUTURE EXPENSES IN CASE OF CASUAL SALES OF REAL PROPERTY.—In the case of a casual sale or other casual disposition of real property by an individual, a reasonable allowance for future expense liabilities, incurred under the provisions of the contract under which such sale or other disposition was made, under such regulations as the Commissioner, with the approval of the Secretary, may prescribe, including the giving of a bond, with such sureties and in such sum (not less than the estimated tax liability computed without the benefit of this subsection) as the Commissioner may require, conditioned upon the payment (notwithstanding any statute of limitations) of the tax, computed without the benefit of this subsection, in respect of any amounts allowed as a deduction under this subsection and not actually expended in carrying out the provisions of such contract.

Bond.

Dividends received by corporations.

From a domestic corporation.

From a foreign corporation, if more than 50 per cent derived from United States sources.

Post, p. 208.

(p) DIVIDENDS RECEIVED BY CORPORATIONS.—In the case of a corporation, the amount received as dividends—

(1) from a domestic corporation which is subject to taxation under this title, or

(2) from any foreign corporation when it is shown to the satisfaction of the Commissioner that more than 50 per centum of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the foreign corporation has been in existence) was derived from sources within the United States as determined under section 119.

Dividends from China Trade Act corporations, etc., excepted.
Post, p. 231.

The deduction allowed by this subsection shall not be allowed in respect of dividends received from a corporation organized under the China Trade Act, 1922, or from a corporation which under section 251 is taxable only on its gross income from sources within the United States by reason of its receiving a large percentage of its gross income from sources within a possession of the United States.

Pension trusts.
Contributions to.
Post, p. 221.

(q) PENSION TRUSTS.—An employer establishing or maintaining a pension trust to provide for the payment of reasonable pensions to his employees (if such trust is exempt from tax under section 165, relating to trusts created for the exclusive benefit of employees) shall be allowed as a deduction (in addition to the contributions to such trust during the taxable year to cover the pension liability accruing during the year, allowed as a deduction under subsection (a) of this section) a reasonable amount transferred or paid into such trust during the taxable year in excess of such contributions, but only if such amount (1) has not theretofore been allowable as a deduction, and (2) is apportioned in equal parts over a period of ten consecutive years beginning with the year in which the transfer or payment is made. Any deduction allowable under section 23 (q) of the Revenue Act of 1928 which under such section was apportioned to any taxable year subsequent to the taxable year 1931 shall be allowed as a deduction in the years to which so apportioned to

Allowances under a previous law.
Vol. 45, p. 802.

Page 57 of 179

INCOME TAX

the extent allowable under such section if it had remained in force with respect to such year.

(r) LIMITATION ON STOCK LOSSES.—

Limitation on stock losses.

(1) Losses from sales or exchanges of stocks and bonds (as defined in subsection (t) of this section) which are not capital assets (as defined in section 101) shall be allowed only to the extent of the gains from such sales or exchanges (including gains which may be derived by a taxpayer from the retirement of his own obligations).

Sales or exchanges.

*Post*, p. 191.

(2) Losses disallowed as a deduction by paragraph (1), computed without regard to any losses sustained during the preceding taxable year, shall, to an amount not in excess of the taxpayer's net income for the taxable year, be considered for the purposes of this title as losses sustained in the succeeding taxable year from sales or exchanges of stocks or bonds which are not capital assets.

Disallowances computed as losses sustained in succeeding taxable year.

(3) This subsection shall not apply to a dealer in securities (as to stocks and bonds acquired for resale to customers) in respect of transactions in the ordinary course of his business, nor to a bank or trust company incorporated under the laws of the United States or of any State or Territory, nor to persons carrying on the banking business (where the receipt of deposits constitutes a major part of such business) in respect of transactions in the ordinary course of such banking business.

Exceptions.
Dealer in securities.

Bank or trust company.

(s) SAME—SHORT SALES.—For the purposes of this title, gains or losses (A) from short sales of stocks and bonds, or (B) attributable to privileges or options to buy or sell such stocks and bonds, or (C) from sales or exchanges of such privileges or options, shall be considered as gains or losses from sales or exchanges of stocks or bonds which are not capital assets.

Gains or losses from short sales.
From short sales of stocks, etc.
Due to options to buy such stocks, etc.
From sales of such privileges, etc.

(t) DEFINITION OF STOCKS AND BONDS.—As used in subsections (r) and (s), the term " stocks and bonds " means (1) shares of stock in any corporation, or (2) rights to subscribe for or to receive such shares, or (3) bonds, debentures, notes, or certificates or other evidences of indebtedness, issued by any corporation (other than a government or political subdivision thereof), with interest coupons or in registered form, or (4) certificates of profit, or of interest in property or accumulations, in any investment trust or similar organization holding or dealing in any of the instruments mentioned or described in this subsection, regardless of whether or not such investment trust or similar organization constitutes a corporation within the meaning of this Act.

Stocks and bonds defined.
Shares of stock in a corporation.
Subscriptions.
Bonds, etc.

Certificates of profit.

## SEC. 24. ITEMS NOT DEDUCTIBLE.

Items not deductible.

(a) GENERAL RULE.—In computing net income no deduction shall in any case be allowed in respect of—

Objects specified.

(1) Personal, living, or family expenses;

Personal, etc., expenses.

(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate;

Property improvements.

(3) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made; or

Restoring property.

(4) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.

Life insurance premiums for employees.

INCOME TAX
Holders of life or ter-
minable interest.
Deductions on in-
come acquired by gift,
etc.

(b) HOLDERS OF LIFE OR TERMINABLE INTEREST.—Amounts paid under the laws of any State, Territory, District of Columbia, possession of the United States, or foreign country as income to the holder of a life or terminable interest acquired by gift, bequest, or inheritance shall not be reduced or diminished by any deduction for shrinkage (by whatever name called) in the value of such interest due to the lapse of time, nor by any deduction allowed by this Act (except the deductions provided for in subsections (k) and (l) of section 23) for the purpose of computing the net income of an estate or trust but not allowed under the laws of such State, Territory, District of Columbia, possession of the United States, or foreign country for the purpose of computing the income to which such holder is entitled.

*Ante*, p. 181.

Tax-free covenant
bonds.
*Post*, p. 215.

(c) TAX WITHHELD ON TAX-FREE COVENANT BONDS.—For tax withheld on tax-free covenant bonds, see section 143 (a) (3).

Credits allowed indi-
viduals against net in-
come.

**SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME.**

There shall be allowed for the purpose of the normal tax, but not for the surtax, the following credits against the net income:

Dividends.
From domestic cor-
porations.

(a) DIVIDENDS.—The amount received as dividends—

(1) from a domestic corporation which is subject to taxation under this title, or

Foreign corporation
with more than 50 per
cent of income from
United States sources.

(2) from a foreign corporation when it is shown to the satisfaction of the Commissioner that more than 50 per centum of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was derived from sources within the United States as determined under the provisions of section 119.

*Post*, p. 208.

From China Trade
Act corporations, etc.,
excepted.
*Post*, p. 231.

The credit allowed by this subsection shall not be allowed in respect of dividends received from a corporation organized under the China Trade Act, 1922, or from a corporation which under section 251 is taxable only on its gross income from sources within the United States by reason of its receiving a large percentage of its gross income from sources within a possession of the United States.

Interest on Federal
securities.
*Ante*, p. 178.

(b) INTEREST ON UNITED STATES OBLIGATIONS.—The amount received as interest upon obligations of the United States which is included in gross income under section 22.

Personal exemption.
Single persons.

(c) PERSONAL EXEMPTION.—In the case of a single person, a personal exemption of $1,000; or in the case of the head of a family or a married person living with husband or wife, a personal exemption of $2,500. A husband and wife living together shall receive but one personal exemption. The amount of such personal exemption shall be $2,500. If such husband and wife make separate returns, the personal exemption may be taken by either or divided between them.

Husband and wife
living together.

Separate returns.

Credit for depend-
ents.

(d) CREDIT FOR DEPENDENTS.—$400 for each person (other than husband or wife) dependent upon and receiving his chief support from the taxpayer if such dependent person is under eighteen years of age or is incapable of self-support because mentally or physically defective.

Change of status.
During taxable year.

(e) CHANGE OF STATUS.—If the status of the taxpayer, in so far as it affects the personal exemption or credit for dependents, changes during the taxable year, the personal exemption and credit shall be apportioned, under rules and regulations prescribed by the Commissioner with the approval of the Secretary, in accordance with the number of months before and after such change. For the purpose of such apportionment a fractional part of a month shall be disregarded unless it amounts to more than half a month in which case it shall be considered as a month.

Apportionment of
tax.

## SEC. 26. CREDITS OF CORPORATION AGAINST NET INCOME.

For the purpose only of the tax imposed by section 13 there shall be allowed as a credit against net income the amount received as interest upon obligations of the United States which is included in gross income under section 22.

INCOME TAX
Credits allowed corporations.
Interest on United States securities.
*Ante*, p. 178.

## Part III—Credits Against Tax

Credits against tax.

### SEC. 31. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

The amount of income, war-profits, and excess-profits taxes imposed by foreign countries or possessions of the United States shall be allowed as a credit against the tax, to the extent provided in section 131.

Taxes of foreign countries, etc.
Extent of credit for.
*Post*, p. 211.

### SEC. 32. TAXES WITHHELD AT SOURCE.

The amount of tax withheld at the source under section 143 shall be allowed as a credit against the tax.

Taxes withheld at source.
Credit for.
*Post*, p. 215.

### SEC. 33. ERRONEOUS PAYMENTS.

(a) CREDIT FOR OVERPAYMENTS.—For credit against the tax of overpayments of taxes imposed by this title for other taxable years, see section 322.

Erroneous payments.
Credit for overpayments.
*Post*, p. 242.

(b) FISCAL YEAR ENDING IN 1932.—For credit against the tax of amounts of tax paid for a fiscal year beginning in 1931 and ending in 1932, see section 132.

Credit for fiscal year ending in 1932.
*Post*, p. 213.

## Part IV—Accounting Periods and Methods of Accounting

Accounting periods and methods.

### SEC. 41. GENERAL RULE.

General rule.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. (For use of inventories, see section 22(c).)

Net income on basis of annual accounting period.

If no accounting period, on calendar year.

Inventories.
*Ante*, p. 179.

### SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED.

Gross income.

The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period.

Items for taxable year in which received.

### SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN.

The deductions and credits provided for in this title shall be taken for the taxable year in which "paid or accrued" or "paid or incurred", dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period.

Deductions and credits.
For taxable year in which "paid or accrued" or "paid or incurred."

### SEC. 44. INSTALLMENT BASIS.

Installment basis.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any tax-

Dealers in personal property may make returns on, of payments actually received.

**186**                72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

INCOME TAX

able year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

Returns of income from casual sales of personalty or of realty.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 40 per centum of the selling price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term " initial payments " means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

Computation of income on change to installment basis.

(c) CHANGE FROM ACCRUAL TO INSTALLMENT BASIS.—If a taxpayer entitled to the benefits of subsection (a) elects for any taxable year to report his net income on the installment basis, then in computing his income for the year of change or any subsequent year, amounts actually received during any such year on account of sales or other dispositions of property made in any prior year shall not be excluded.

Gain or loss upon disposition of installment obligations.

(d) GAIN OR LOSS UPON DISPOSITION OF INSTALLMENT OBLIGATIONS.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of

Basis.

such distribution, transmission, or disposition. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the

Transmission at death of installment obligations.

obligation satisfied in full. This subsection shall not apply to the transmission at death of installment obligations if there is filed with the Commissioner, at such time as he may by regulation prescribe, a bond in such amount and with such sureties as he may deem necessary, conditioned upon the return as income, by the person receiving any payment on such obligations, of the same proportion of such payment as would be returnable as income by the decedent if he had lived and had received such payment.

Allocation of income and deductions. Provisions if same interests control two or more businesses.

**SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.**

In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses.

Change of accounting period.
Net income computed on basis of new period.

**SEC. 46. CHANGE OF ACCOUNTING PERIOD.**

If a taxpayer changes his accounting period from fiscal year to calendar year, from calendar year to fiscal year, or from one fiscal year to another, the net income shall, with the approval of the Commissioner, be computed on the basis of such new accounting period, subject to the provisions of section 47.

## SEC. 47. RETURNS FOR A PERIOD OF LESS THAN TWELVE MONTHS.

(a) RETURNS FOR SHORT PERIOD RESULTING FROM CHANGE OF ACCOUNTING PERIOD.—If a taxpayer, with the approval of the Commissioner, changes the basis of computing net income from fiscal year to calendar year a separate return shall be made for the period between the close of the last fiscal year for which return was made and the following December 31. If the change is from calendar year to fiscal year, a separate return shall be made for the period between the close of the last calendar year for which return was made and the date designated as the close of the fiscal year. If the change is from one fiscal year to another fiscal year a separate return shall be made for the period between the close of the former fiscal year and the date designated as the close of the new fiscal year.

(b) INCOME COMPUTED ON BASIS OF SHORT PERIOD.—Where a separate return is made under subsection (a) on account of a change in the accounting period, and in all other cases where a separate return is required or permitted, by regulations prescribed by the Commissioner with the approval of the Secretary, to be made for a fractional part of a year, then the income shall be computed on the basis of the period for which separate return is made.

(c) INCOME PLACED ON ANNUAL BASIS.—If a separate return is made under subsection (a) on account of a change in the accounting period, the net income, computed on the basis of the period for which separate return is made, shall be placed on an annual basis by multiplying the amount thereof by twelve and dividing by the number of months included in the period for which the separate return is made. The tax shall be such part of the tax computed on such annual basis as the number of months in such period is of twelve months.

(d) CAPITAL NET GAINS AND LOSSES—EARNED INCOME.—The Commissioner with the approval of the Secretary shall by regulations prescribe the method of applying the provisions of subsections (b) and (c) (relating to computing income on the basis of a short period, and placing such income on an annual basis) to cases where the taxpayer makes a separate return under subsection (a) on account of a change in the accounting period, and it appears that for the period for which the return is so made he has derived a capital net gain, or sustained a capital net loss, or received earned income.

(e) REDUCTION OF CREDITS AGAINST NET INCOME.—In the case of a return made for a fractional part of a year, except a return made under subsection (a), on account of a change in the accounting period, the personal exemption and credit for dependents shall be reduced respectively to amounts which bear the same ratio to the full credits provided as the number of months in the period for which return is made bears to twelve months.

(f) CLOSING OF TAXABLE YEAR IN CASE OF JEOPARDY.—For closing of taxable year in case of jeopardy, see section 146.

## SEC. 48. DEFINITIONS.

When used in this title—

(a) TAXABLE YEAR.—"Taxable year" means the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the net income is computed under this Part. "Taxable year" includes, in the case of a return made for a fractional part of a year under the provisions of this title or under regulations prescribed by the Commissioner with the approval of the Secretary, the period for which such return is made. The first taxable year, to be called the taxable year 1932, shall be the calendar year 1932 or any fiscal year ending during the calendar year 1932.

---

*Marginal notes:*

INCOME TAX

Returns for less than a year.
Basis of computing when accounting period changes.

Income based on period of separate return.

Income placed on annual basis.
Computation of.

Application of capital net gains and losses, or earned income.

Reduction of personal credits for fractions of a year.

Closing of taxable year.
*Post,* p. 217.

Definitions.

"Taxable year."

First taxable year, calendar year 1932.

188                72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.

INCOME TAX
"Fiscal year."
(b) FISCAL YEAR.—" Fiscal year " means an accounting period of twelve months ending on the last day of any month other than December.

"Paid or incurred" and "paid or accrued."
(c) PAID, INCURRED, ACCRUED.—The terms " paid or incurred " and " paid or accrued " shall be construed according to the method of accounting upon the basis of which the net income is computed under this Part.

## Part V—Returns and Payment of Tax

Returns and payment.

### SEC. 51. INDIVIDUAL RETURNS.

Individual returns.
Sworn statement of gross income, deductions, and credits.
(a) REQUIREMENT.—The following individuals shall each make under oath a return stating specifically the items of his gross income and the deductions and credits allowed under this title—

Net income $1,000 or over, if single, etc.
(1) Every individual having a net income for the taxable year of $1,000 or over, if single, or if married and not living with husband or wife;

Net income $2,500 or over, if married and living with husband or wife.
Gross income $5,000 or over.
(2) Every individual having a net income for the taxable year of $2,500 or over, if married and living with husband or wife; and

(3) Every individual having a gross income for the taxable year of $5,000 or over, regardless of the amount of his net income.

Husband and wife living together.
(b) HUSBAND AND WIFE.—If a husband and wife living together have an aggregate net income for the taxable year of $2,500 or over, or an aggregate gross income for such year of $5,000 or over—

Separate.
Joint.
(1) Each shall make such a return, or

(2) The income of each shall be included in a single joint return, in which case the tax shall be computed on the aggregate income.

Persons under disability.
By agent.
(c) PERSONS UNDER DISABILITY.—If the taxpayer is unable to make his own return, the return shall be made by a duly authorized agent or by the guardian or other person charged with the care of the person or property of such taxpayer.

Fiduciaries.
Post, p. 214.
(d) FIDUCIARIES.—For returns to be made by fiduciaries, see section 142.

Corporation returns.
Requirement for making.

### SEC. 52. CORPORATION RETURNS.

(a) REQUIREMENT.—Every corporation subject to taxation under this title shall make a return, stating specifically the items of its gross income and the deductions and credits allowed by this title. The return shall be sworn to by the president, vice president, or other principal officer and by the treasurer or assistant treasurer.  In cases Receivers, trustees, etc. where receivers, trustees in bankruptcy, or assignees are operating the property or business of corporations, such receivers, trustees, or assignees shall make returns for such corporations in the same manner and form as corporations are required to make returns.  Any Collection of tax. tax due on the basis of such returns made by receivers, trustees, or assignees shall be collected in the same manner as if collected from the corporations of whose business or property they have custody and control.

Consolidated returns.
Post, p. 213.
(b) CONSOLIDATED RETURNS.—For provision as to consolidated returns of affiliated corporations, see section 141.

Time and place for filing returns.

### SEC. 53. TIME AND PLACE FOR FILING RETURNS.

(a) TIME FOR FILING.—

Time designated.
(1) GENERAL RULE.—Returns made on the basis of the calendar year shall be made on or before the 15th day of March following the close of the calendar year.  Returns made on the basis of a fiscal year shall be made on or before the 15th day of the third month following the close of the fiscal year.

Extension granted on application.
(2) EXTENSION OF TIME.—The Commissioner may grant a reasonable extension of time for filing returns, under such rules and

regulations as he shall prescribe with the approval of the Secretary. Except in the case of taxpayers who are abroad, no such extension shall be for more than six months.

(b) To Whom Return Made.—

(1) Individuals.—Returns (other than corporation returns) shall be made to the collector for the district in which is located the legal residence or principal place of business of the person making the return, or, if he has no legal residence or principal place of business in the United States, then to the collector at Baltimore, Maryland.

(2) Corporations.—Returns of corporations shall be made to the collector of the district in which is located the principal place of business or principal office or agency of the corporation, or, if it has no principal place of business or principal office or agency in the United States, then to the collector at Baltimore, Maryland.

**SEC. 54. RECORDS AND SPECIAL RETURNS.**

(a) By Taxpayer.—Every person liable to any tax imposed by this title or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe.

(b) To Determine Liability to Tax.—Whenever in the judgment of the Commissioner necessary he may require any person, by notice served upon him, to make a return, render under oath such statements, or keep such records, as the Commissioner deems sufficient to show whether or not such person is liable to tax under this title.

(c) Information at the Source.—For requirement of statements and returns by one person to assist in determining the tax liability of another person, see sections 147 to 150.

**SEC. 55. PUBLICITY OF RETURNS.**

Returns made under this title shall be open to inspection in the same manner, to the same extent, and subject to the same provisions of law, including penalties, as returns made under Title II of the Revenue Act of 1926.

**SEC. 56. PAYMENT OF TAX.**

(a) Time of Payment.—The total amount of tax imposed by this title shall be paid on the fifteenth day of March following the close of the calendar year, or, if the return should be made on the basis of a fiscal year, then on the fifteenth day of the third month following the close of the fiscal year.

(b) Installment Payments.—The taxpayer may elect to pay the tax in four equal installments, in which case the first installment shall be paid on the date prescribed for the payment of the tax by the taxpayer, the second installment shall be paid on the fifteenth day of the third month, the third installment on the fifteenth day of the sixth month, and the fourth installment on the fifteenth day of the ninth month, after such date. If any installment is not paid on or before the date fixed for its payment, the whole amount of the tax unpaid shall be paid upon notice and demand from the collector.

(c) Extension of Time for Payment.—At the request of the taxpayer, the Commissioner may extend the time for payment of the amount determined as the tax by the taxpayer, or any installment thereof, for a period not to exceed six months from the date prescribed for the payment of the tax or an installment thereof. In such case the amount in respect of which the extension is granted shall be paid on or before the date of the expiration of the period of the extension.

**Margin notes:**

Income tax

Limit.

To whom made.
By individuals, to collector of district.

At Baltimore, Md.

Corporations, to collector of district where principal office located.

At Baltimore, Md.

Records and special returns.
Required of taxpayer.

Statement to determine liability to tax.

Information at the source.
*Post*, pp. 218, 219.

Publicity of returns.

Open to inspection as in Revenue Act of 1926.
Vol. 44, p. 51.

Payment of tax.

Time designated.

Allowed in four installments.

Whole amount on default.

Extension allowed on request.

Payment on expiration.

**190**   72d CONGRESS. SESS. I. CH. 209.   JUNE 6, 1932.

INCOME TAX

Voluntary advance payment.
Post, p. 217.

Jeopardy payments.
Post, p. 217.

Tax withheld at source.
Post, pp. 215, 216.

Fraction of a cent disregarded.

Receipts on request.

Evidence of tax paid.

Surrender to creditor as payment on debt.

Examination of return and determination of tax.
To be made as soon as practicable.

Additions to tax and penalties.
Negligence, etc., p. 238.

Criminal penalties, p. 217.

Administrative proceedings.
Nonpayments, or overpayments.

Deficiencies, p. 233.

Additions, p. 238.

Transferees and fiduciaries, p. 240.

Overpayments, p. 242.

Miscellaneous provisions.

Laws made applicable.
Administrative provisions, etc., extended to.

(d) VOLUNTARY ADVANCE PAYMENT.—A tax imposed by this title, or any installment thereof, may be paid, at the election of the tax-payer, prior to the date prescribed for its payment.

(e) ADVANCE PAYMENT IN CASE OF JEOPARDY.—For advance payment in case of jeopardy, see section 146.

(f) TAX WITHHELD AT SOURCE.—For requirement of withholding tax at the source in the case of nonresident aliens and foreign corporations, and in the case of so-called "tax-free covenant bonds," see sections 143 and 144.

(g) FRACTIONAL PARTS OF CENT.—In the payment of any tax under this title a fractional part of a cent shall be disregarded unless it amounts to one-half cent or more, in which case it shall be increased to 1 cent.

(h) RECEIPTS.—Every collector to whom any payment of any income tax is made shall upon request give to the person making such payment a full written or printed receipt, stating the amount paid and the particular account for which such payment was made; and whenever any debtor pays taxes on account of payments made or to be made by him to separate creditors the collector shall, if requested by such debtor, give a separate receipt for the tax paid on account of each creditor in such form that the debtor can conveniently produce such receipts separately to his several creditors in satisfaction of their respective demands up to the amounts stated in the receipts; and such receipt shall be sufficient evidence in favor of such debtor to justify him in withholding from his next payment to his creditor the amount therein stated; but the creditor may, upon giving to his debtor a full written receipt acknowledging the payment to him of any sum actually paid and accepting the amount of tax paid as aforesaid (specifying the same) as a further satisfaction of the debt to that amount, require the surrender to him of such collector's receipt.

SEC. 57. EXAMINATION OF RETURN AND DETERMINATION OF TAX.

As soon as practicable after the return is filed the Commissioner shall examine it and shall determine the correct amount of the tax.

SEC. 58. ADDITIONS TO TAX AND PENALTIES.

(a) For additions to the tax in case of negligence or fraud in the nonpayment of tax or failure to file return therefor, see Supplement M.

(b) For criminal penalties for nonpayment of tax or failure to file return therefor, see section 145.

SEC. 59. ADMINISTRATIVE PROCEEDINGS.

For administrative proceedings in respect of the nonpayment or overpayment of a tax imposed by this title, see as follows:

(a) Supplement L, relating to assessment and collection of deficiencies.

(b) Supplement M, relating to interest and additions to tax.

(c) Supplement N, relating to claims against transferees and fiduciaries.

(d) Supplement O, relating to overpayments.

## Part VI—Miscellaneous Provisions

SEC. 61. LAWS MADE APPLICABLE.

All administrative, special, or stamp provisions of law, including the law relating to the assessment of taxes, so far as applicable, are hereby extended to and made a part of this title.

## SEC. 62. RULES AND REGULATIONS.

The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this title.

INCOME TAX

Rules and regulations.
To be prescribed and published.

## SEC. 63. TAXES IN LIEU OF TAXES UNDER 1928 ACT.

The taxes imposed by this title shall be in lieu of the corresponding taxes imposed by the sections of the Revenue Act of 1928 bearing the same numbers.

Taxes in lieu of 1928 Act.
Table.
Vol. 45, p. 795.

## SEC. 64. SHORT TITLE.

This title may be cited as the " Income Tax Act of 1932."

Short title.
"Income Tax Act of 1932."

## SEC. 65. EFFECTIVE DATE OF TITLE.

This title shall take effect as of January 1, 1932, except that sections 145 and 150, and this section, shall take effect on the enactment of this Act.

Effective date.
Exceptions.
Post, pp. 217, 219.

## SUBTITLE C—SUPPLEMENTAL PROVISIONS

Supplemental provisions.

### Supplement A—Rates of Tax

Rates of tax.

[Supplementary to Subtitle B, Part I]

## SEC. 101. CAPITAL NET GAINS AND LOSSES.

(a) TAX IN CASE OF CAPITAL NET GAIN.—In the case of any taxpayer, other than a corporation, who for any taxable year derives a capital net gain (as hereinafter defined in this section), there shall, at the election of the taxpayer, be levied, collected, and paid, in lieu of all other taxes imposed by this title, a tax determined as follows: A partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner as if this section had not been enacted and the total tax shall be this amount plus 12½ per centum of the capital net gain.

Capital net gains and losses.
Computation of tax of net gains.

(b) TAX IN CASE OF CAPITAL NET LOSS.—In the case of any taxpayer, other than a corporation, who for any taxable year sustains a capital net loss (as hereinafter defined in this section), there shall be levied, collected, and paid, in lieu of all other taxes imposed by this title, a tax determined as follows: a partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner as if this section had not been enacted, and the total tax shall be this amount minus 12½ per centum of the capital net loss; but in no case shall the tax of a taxpayer who has sustained a capital net loss be less than the tax computed without regard to the provisions of this section.

Of net loss.

(c) DEFINITIONS.—For the purposes of this title—

(1) " Capital gain " means taxable gain from the sale or exchange of capital assets consummated after December 31, 1921.

(2) " Capital loss " means deductible loss resulting from the sale or exchange of capital assets.

(3) " Capital deductions " means such deductions as are allowed by section 23 for the purpose of computing net income, and are properly allocable to or chargeable against capital assets sold or exchanged during the taxable year.

(4) " Ordinary deductions " means the deductions allowed by section 23 other than capital losses and capital deductions.

(5) " Capital net gain " means the excess of the total amount of capital gain over the sum of (A) the capital deductions and capital losses, plus (B) the amount, if any, by which the ordinary deductions exceed the gross income computed without including capital gains.

Meaning of terms.
"Capital gain."

"Capital loss."

"Capital deductions."
Ante, p. 179.

"Ordinary deductions."

"Capital net gain."

**192**                72d CONGRESS.   SESS. I.   CH. 209.   JUNE 6, 1932.

INCOME TAX

"Capital net loss."

"Ordinary net in-
come."

"Capital assets."

Property not includ-
ed.

Property received on
an exchange.

*Post*, p. 198.

Period of property
holding.

*Post*, p. 198.

Stock, etc., received
on a distribution.

Vol. 45, p. 818.
*Post*, p. 197.

Computing period
stock has been held.

Vol. 45, p. 826.
*Post*, p. 208.

Collection and pay-
ment of tax.

Sale of mines and oil
or gas wells.
Tax on selling price.

Limitation, p. 191.

(6) " Capital net loss " means the excess of the sum of the
capital losses plus the capital deductions over the total amount of
capital gain.

(7) "Ordinary net income " means the net income, computed
in accordance with the provisions of this title, after excluding all
items of capital gain, capital loss, and capital deductions.

(8) " Capital assets " means property held by the taxpayer for
more than two years (whether or not connected with his trade or
business), but does not include stock in trade of the taxpayer or
other property of a kind which would properly be included in the
inventory of the taxpayer if on hand at the close of the taxable
year, or property held by the taxpayer primarily for sale in the
course of his trade or business.   For the purposes of this
definition—

(A) In determining the period for which the taxpayer has
held property received on an exchange there shall be included
the period for which he held the property exchanged, if under
the provisions of section 113, the property received has, for
the purpose of determining gain or loss from a sale or exchange,
the same basis in whole or in part in his hands as the property
exchanged.

(B) In determining the period for which the taxpayer has
held property however acquired there shall be included the
period for which such property was held by any other person,
if under the provisions of section 113, such property has, for the
purpose of determining gain or loss from a sale or exchange,
the same basis in whole or in part in his hands as it would have
in the hands of such other person.

(C) In determining the period for which the taxpayer has
held stock or securities received upon a distribution where no
gain is recognized to the distributee under the provisions of
section 112 (g) of this Act or the Revenue Act of 1928, there
shall be included the period for which he held the stock or
securities in the distributing corporation prior to the receipt
of the stock or securities upon such distribution.

(D) In determining the period for which the taxpayer has
held stock or securities the acquisition of which (or the contract
or option to acquire which) resulted in the nondeductibility
(under section 118 of this Act or the Revenue Act of 1928, relat-
ing to wash sales) of the loss from the sale or other disposition
of substantially identical stock or securities, there shall be
included the period for which he held the stock or securities the
loss from the sale or other disposition of which was not
deductible.

(d) COLLECTION AND PAYMENT OF TAX.—The total tax determined
under subsection (a) or (b) shall be collected and paid in the same
manner, at the same time, and subject to the same provisions of law,
including penalties, as other taxes under this title.

SEC. 102. SALE OF MINES AND OIL OR GAS WELLS.

(a) In the case of a bona fide sale of mines, oil or gas wells, or
any interest therein, where the principal value of the property has
been demonstrated by prospecting or exploration and discovery
work done by the taxpayer, the portion of the tax imposed by sec-
tion 12 of this title attributable to such sale shall not exceed 16 per
centum of the selling price of such property or interest.

(b) For limitation to 12½ per centum rate of tax, see section 101.

## SEC. 103. EXEMPTIONS FROM TAX ON CORPORATIONS.

INCOME TAX

The following organizations shall be exempt from taxation under this title—

Exemptions from tax on corporations.

(1) Labor, agricultural, or horticultural organizations;

Labor, agricultural, etc.

(2) Mutual savings banks not having a capital stock represented by shares;

Mutual savings banks.

(3) Fraternal beneficiary societies, orders, or associations, (A) operating under the lodge system or for the exclusive benefit of the members of a fraternity itself operating under the lodge system; and (B) providing for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents;

Fraternal beneficiary societies.

(4) Domestic building and loan associations substantially all the business of which is confined to making loans to members; and cooperative banks without capital stock organized and operated for mutual purposes and without profit;

Domestic building and loan associations; cooperative banks.

(5) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual;

Mutual cemetery companies.

(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual;

Corporations, community chests, etc., for religious, etc., purposes.

(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual;

Business leagues, etc.

(8) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes;

Civic leagues, employees' associations, etc.

(9) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder;

Pleasure clubs.

(10) Benevolent life insurance associations of a purely local character, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 per centum or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses;

Local life insurance, mutual ditch, etc., companies.

(11) Farmers' or other mutual hail, cyclone, casualty, or fire insurance companies or associations (including interinsurers and reciprocal underwriters) the income of which is used or held for the purpose of paying losses or expenses;

Farmers' mutual casualty insurance companies.

(12) Farmers', fruit growers', or like associations organized and operated on a cooperative basis (a) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them, or (b) for the purpose of purchasing supplies and equipment for the use of members or other persons, and turn-

Farmers' cooperative associations. For marketing their products.

Purchasing supplies and equipment for members.

3051°—38——13

INCOME TAX

Capital stock associations restricted.

ing over such supplies and equipment to them at actual cost, plus necessary expenses. Exemption shall not be denied any such association because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the association; nor shall exemption be denied any such association because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose. Such an association may market the products of nonmembers in an amount the value of which does not exceed the value of the products marketed for members, and may purchase supplies and equipment for nonmembers in an amount the value of which does not exceed the value of the supplies and equipment purchased for members, provided the value of the purchases made for persons who are neither members nor producers does not exceed 15 per centum of the value of all its purchases;

Limitation on marketing products of nonmembers.

Purchases by nonmembers.

Organizations by exempt associations for financing crop operations of members.

(13) Corporations organized by an association exempt under the provisions of paragraph (12), or members thereof, for the purpose of financing the ordinary crop operations of such members or other producers, and operated in conjunction with such association. Exemption shall not be denied any such corporation because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the corporation, upon dissolution or otherwise, beyond the fixed dividends) is owned by such association, or members thereof; nor shall exemption be denied any such corporation because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose;

Dividend rate of stock.

Reserve allowed.

Corporations as trustees for exempted organizations.

(14) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt from the tax imposed by this title;

Federal land banks, etc.
Vol. 39, p. 360.
U. S. C., p. 298.

(15) Federal land banks, national farm-loan associations, and Federal intermediate credit banks, as provided in the Federal Farm Loan Act, as amended;

Voluntary employees' beneficiary associations.

(16) Voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents, if (A) no part of their net earnings inures (other than through such payments) to the benefit of any private shareholder or individual, and (B) 85 per centum or more of the income consists of amounts collected from members for the sole purpose of making such payments and meeting expenses;

Local teachers' retirement fund associations.

(17) Teachers' retirement fund associations of a purely local character, if (A) no part of their net earnings inures (other than through payment of retirement benefits) to the benefit of any private shareholder or individual, and (B) the income consists

solely of amounts received from public taxation, amounts received from assessments upon the teaching salaries of members, and income in respect of investments.

<div style="text-align:right">INCOME TAX</div>

### SEC. 104. ACCUMULATION OF SURPLUS TO EVADE SURTAXES.

Accumulation of surplus to evade surtaxes.

(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

Corporations amassing gains, etc., to avoid surtax to members.

Additional tax to corporation tax. *Ante*, p. 177.

(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

Evidence of a purpose of evasion.

(c) As used in this section the term "net income" means the net income as defined in section 21, increased by the sum of the amount of the dividend deduction allowed under section 23(p) and the amount of the interest on obligations of the United States issued after September 1, 1917, which would be subject to tax in whole or in part in the hands of an individual owner.

"Net income" defined.

*Ante*, pp. 178, 182.

(d) The tax imposed by this section shall not apply if all the shareholders of the corporation include (at the time of filing their returns) in their gross income their entire distributive shares, whether distributed or not, of the net income of the corporation for such year. Any amount so included in the gross income of a shareholder shall be treated as a dividend received. Any subsequent distribution made by the corporation out of the earnings or profits for such taxable year shall, if distributed to any shareholder who has so included in his gross income his distributive share, be exempt from tax in the amount of the share so included.

Additional tax not applicable if distributive share included in income of shareholders.

Subsequent distributions.

### SEC. 105. TAXABLE PERIOD EMBRACING YEARS WITH DIFFERENT LAWS.

Taxable period embracing years with different laws.

If it is necessary to compute the tax for a period beginning in one calendar year (hereinafter in this section called "first calendar year") and ending in the following calendar year (hereinafter in this section called "second calendar year") and the law applicable to the second calendar year is different from the law applicable to the first calendar year, then the tax under this title for the period ending during the second calendar year shall be in the sum of: (1) the same proportion of a tax for the entire period, determined under the law applicable to the first calendar year and at the rates for such year, which the portion of such period falling within the first calendar year is of the entire period; and (2) the same proportion of a tax for the entire period, determined under the law applicable to the second calendar year and at the rates for such year, which the portion of such period falling within the second calendar year is of the entire period.

Computation of tax for period in one calendar year and ending in the following.

### Supplement B—Computation of Net Income

[Supplementary to Subtitle B, Part II]

Computation of net income.

### SEC. 111. DETERMINATION OF AMOUNT OF GAIN OR LOSS.

Gain or loss.

(a) COMPUTATION OF GAIN OR LOSS.—Except as hereinafter provided in this section, the gain from the sale or other disposition of

Basis for determining, on disposal of property.

**196**          72d CONGRESS. SESS. I. CH. 209.   JUNE 6, 1932.

INCOME TAX

Adjusted basis.
*Post,* p. 201.
Computation of sums
from disposition of
property.

property shall be the excess of the amount realized therefrom over
the adjusted basis provided in section 113(b), and the loss shall be
the excess of such basis over the amount realized.

Recognition of gain
or loss on sale or ex-
change.

(b) AMOUNT REALIZED.—The amount realized from the sale or
other disposition of property shall be the sum of any money
received plus the fair market value of the property (other than
money) received.

(c) RECOGNITION OF GAIN OR LOSS.—In the case of a sale or
exchange, the extent to which the gain or loss determined under this
section shall be recognized for the purposes of this title, shall be
determined under the provisions of section 112.

Installment sales
taxable.

(d) INSTALLMENT SALES.—Nothing in this section shall be con-
strued to prevent (in the case of property sold under contract provid-
ing for payment in installments) the taxation of that portion of any
installment payment representing gain or profit in the year in which
such payment is received.

Gain or loss from
sales on exchanges.
Entire amount rec-
ognized.

Exceptions.

No gain or loss on ex-
changing for similar
uses.

## SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the
entire amount of the gain or loss, determined under section 111,
shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGES SOLELY IN KIND.—

(1) PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.—No
gain or loss shall be recognized if property held for productive
use in trade or business or for investment (not including stock in
trade or other property held primarily for sale, nor stocks, bonds,
notes, choses in action, certificates of trust or beneficial interest,
or other securities or evidences of indebtedness or interest) is ex-
changed solely for property of a like kind to be held either for
productive use in trade or business or for investment.

Similar stock in same
corporation.

(2) STOCK FOR STOCK OF SAME CORPORATION.—No gain or loss
shall be recognized if common stock in a corporation is exchanged
solely for common stock in the same corporation, or if preferred
stock in a corporation is exchanged solely for preferred stock in
the same corporation.

Substituted stock on
reorganization.

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall
be recognized if stock or securities in a corporation a party to a
reorganization are, in pursuance of the plan of reorganization,
exchanged solely for stock or securities in such corporation or in
another corporation a party to the reorganization.

Property for stock of
party to reorganiza-
tion.

(4) SAME—GAIN OF CORPORATION.—No gain or loss shall be rec-
ognized if a corporation a party to a reorganization exchanges
property, in pursuance of the plan of reorganization, solely for
stock or securities in another corporation a party to the reorgani-
zation.

Transfers for stock of
corporation under same
control.

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No
gain or loss shall be recognized if property is transferred to a
corporation by one or more persons solely in exchange for stock
or securities in such corporation, and immediately after the
exchange such person or persons are in control of the corporation;

Limitation.

but in the case of an exchange by two or more persons this para-
graph shall apply only if the amount of the stock and securities
received by each is substantially in proportion to his interest in
the property prior to the exchange.

Gain from exchanges
not solely in kind.
Receipts additional
to that on which none
recognized.

(c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—

(1) If an exchange would be within the provisions of subsection
(b) (1), (2), (3), or (5) of this section if it were not for the
fact that the property received in exchange consists not only of
property permitted by such paragraph to be received without the
recognition of gain, but also of other property or money, then

the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

INCOME TAX

(2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property.

Reorganization distribution construed as a taxable dividend.

Accumulations after February, 1913.
Tax on gain from property exchange.

(d) SAME—GAIN OF CORPORATION.—If an exchange would be within the provisions of subsection (b) (4) of this section if it were not for the fact that the property received in exchange consists not only of stock or securities permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then—

Reorganization with property and other stock received.

(1) If the corporation receiving such other property or money distributes it in pursuance of the plan of reorganization, no gain to the corporation shall be recognized from the exchange, but

No gain if distributed on reorganization.

(2) If the corporation receiving such other property or money does not distribute it in pursuance of the plan of reorganization, the gain, if any, to the corporation shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property so received, which is not so distributed.

Gain recognized.

Limitation.

(e) LOSS FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (b) (1) to (5), inclusive, of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain or loss, but also of other property or money, then no loss from the exchange shall be recognized.

No loss if property received other than that on which gain or loss recognized.

(f) INVOLUNTARY CONVERSIONS.—If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended.

Involuntary conversions.
No gain or loss, if involuntarily converted into similar property, etc.

Gain recognized on part not used.

(g) DISTRIBUTION OF STOCK ON REORGANIZATION.—If there is distributed, in pursuance of a plan of reorganization, to a shareholder in a corporation a party to the reorganization, stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such a corporation, no gain to the distributee from the receipt of such stock or securities shall be recognized.

Stock distribution on reorganization and holdings not surrendered.

No gain to distributee from receipt recognized.

(h) SAME—EFFECT ON FUTURE DISTRIBUTIONS.—The distribution, in pursuance of a plan of reorganization, by or on behalf of a corporation a party to the reorganization, of its stock or securities or stock or securities in a corporation a party to the reorganization, if

Stock distributed on reorganization not construed as earnings, etc.

**198**    72d CONGRESS. SESS. I. CH. 209.   JUNE 6, 1932.

INCOME TAX

*Post,* p. 203.

Reorganization.

Acts constituting.

Transfer.

"Party to a reorganization."

Ownership of stock constituting "control."

Foreign corporations. Not recognized if purpose is to evade Federal income taxes.

Basis for determining gain or loss.
Cost value; exceptions.
Inventory value.

Gifts after December 31, 1920.

Determination.

Fair market value.

no gain to the distributee from the receipt of such stock or securities was recognized by law, shall not be considered a distribution of earnings or profits within the meaning of section 115(b) for the purpose of determining the taxability of subsequent distributions by the corporation.

(i) DEFINITION OF REORGANIZATION.—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

(j) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

(k) FOREIGN CORPORATIONS.—In determining the extent to which gain shall be recognized in the case of any of the exchanges or distributions (made after the date of the enactment of this Act) described in subsection (b)(3), (4), or (5), or described in so much of subsection (c) as refers to subsection (b)(3) or (5), or described in subsection (d) or (g), a foreign corporation shall not be considered as a corporation unless, prior to such exchange or distribution, it has been established to the satisfaction of the Commissioner that such exchange or distribution is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

**SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.**

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

(1) INVENTORY VALUE.—If the property should have been included in the last inventory, the basis shall be the last inventory value thereof.

(2) GIFTS AFTER DECEMBER 31, 1920.—If the property was acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift. If the facts necessary to determine such basis are unknown to the donee, the Commissioner shall, if possible, obtain such facts from such donor or last preceding owner, or any other person cognizant thereof. If the Commissioner finds it impossible to obtain such facts, the basis shall be the fair market value of such property as found by the Commissioner as of the date or approximate date at which, according to the best information that the Commissioner is able to obtain, such property was acquired by such donor or last preceding owner.

(3) TRANSFER IN TRUST AFTER DECEMBER 31, 1920.—If the property was acquired after December 31, 1920, by a transfer in trust (other than by a transfer in trust by a bequest or devise) the basis shall be the same as it would be in the hands of the grantor, increased in the amount of gain or decreased in the amount of loss recognized to the grantor upon such transfer under the law applicable to the year in which the transfer was made.

INCOME TAX

Trust property acquired after December 31, 1920.

As in hands of grantor.

(4) GIFT OR TRANSFER IN TRUST BEFORE JANUARY 1, 1921.—If the property was acquired by gift or transfer in trust on or before December 31, 1920, the basis shall be the fair market value of such property at the time of such acquisition. The provisions of this paragraph shall apply to the acquisition of such property interests as are specified in section 402(e) of the Revenue Act of 1921, or in section 302(f) of the Revenue Act of 1924 or the Revenue Act of 1926 (relating to property passing under power of appointment) regardless of the time of acquisition.

Gift or transfer in trust before January 1, 1921.
Fair market value.

Under power of appointment.
Vol. 42, p. 279; Vol. 43, p. 305; Vol. 44, p. 71.

(5) PROPERTY TRANSMITTED AT DEATH.—If personal property was acquired by specific bequest, or if real property was acquired by general or specific devise or by intestacy, the basis shall be the fair market value of the property at the time of the death of the decedent. If the property was acquired by the decedent's estate from the decedent, the basis in the hands of the estate shall be the fair market value of the property at the time of the death of the decedent. In all other cases if the property was acquired either by will or by intestacy, the basis shall be the fair market value of the property at the time of the distribution to the taxpayer. In the case of property transferred in trust to pay the income for life to or upon the order or direction of the grantor, with the right reserved to the grantor at all times prior to his death to revoke the trust, the basis of such property in the hands of the persons entitled under the terms of the trust instrument to the property after the grantor's death shall, after such death, be the same as if the trust instrument had been a will executed on the day of the grantor's death.

Property transmitted by bequests, etc.

Transfer in trust with right to revoke.

(6) TAX-FREE EXCHANGES GENERALLY.—If the property was acquired upon an exchange described in section 112(b) to (e), inclusive, the basis shall be the same as in the case of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized upon such exchange under the law applicable to the year in which the exchange was made. If the property so acquired consisted in part of the type of property permitted by section 112(b) to be received without the recognition of gain or loss, and in part of other property, the basis provided in this paragraph shall be allocated between the properties (other than money) received, and for the purpose of the allocation there shall be assigned to such other property an amount equivalent to its fair market value at the date of the exchange. This paragraph shall not apply to property acquired by a corporation by the issuance of its stock or securities as the consideration in whole or in part for the transfer of the property to it.

Acquired on exchange.
Ante, p. 196.

Partly on exchange and partly by other property.

Stock issued as consideration excepted.

(7) TRANSFERS TO CORPORATION WHERE CONTROL OF PROPERTY REMAINS IN SAME PERSONS.—If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 50 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain

Transfers to corporation where control of property remains in same persons.
By a corporation after 1917.

72d CONGRESS. SESS. I.   CH. 209.   JUNE 6, 1932.

INCOME TAX

Stock issues excepted.

or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.  This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.

Property acquired by issuance of stock or as paid-in surplus.
By a corporation after 1920.
Issuance of stock controlled by transferor.
*Ante,* p. 196.

(8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—

(A) by the issuance of its stock or securities in connection with a transaction described in section 112(b)(5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

Paid-in surplus, etc.

(B) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

Tax - free distributions.
Stock distributed on reorganization after December 31, 1923.
*Ante,* p. 197.

(9) TAX-FREE DISTRIBUTIONS.—If the property consists of stock or securities distributed after December 31, 1923, to a taxpayer in connection with a transaction described in section 112(g), the basis in the case of the stock in respect of which the distribution was made shall be apportioned, under rules and regulations prescribed by the Commissioner with the approval of the Secretary, between such stock and the stock or securities distributed.

If acquired by involuntary conversion.

(10) INVOLUNTARY CONVERSION.—If the property was acquired as the result of a compulsory or involuntary conversion described in section 112(f), the basis shall be the same as in the case of the property so converted, decreased in the amount of any money received by the taxpayer which was not expended in accordance with the provisions of law (applicable to the year in which such conversion was made) determining the taxable status of the gain or loss upon such conversion, and increased in the amount of gain or decreased in the amount of loss to the taxpayer recognized upon such conversion under the law applicable to the year in which such conversion was made.

Wash sales of stock on which loss not allowed.
*Post,* p. 208.

(11) WASH SALES OF STOCK.—If the property consists of stock or securities the acquisition of which (or the contract or option to acquire which) resulted in the nondeductibility (under section 118 of this Act or corresponding provisions of prior income tax laws, relating to wash sales) of the loss from the sale or other disposition of substantially identical stock or securities, then the basis shall be the basis of the stock or securities so sold or disposed of, increased or decreased, as the case may be, by the difference, if any, between the price at which the property was acquired and the price at which such substantially identical stock or securities were sold or otherwise disposed of.

Basis.

Property acquired during affiliation.

(12) PROPERTY ACQUIRED DURING AFFILIATION.—In the case of property acquired by a corporation, during a period of affiliation, from a corporation with which it was affiliated, the basis of such property, after such period of affiliation, shall be determined, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, without regard to inter-company transactions in respect of which gain or loss was not recognized. For the purposes of this paragraph, the term "period of affiliation" means the period during which such corporations were affili-

Adjustment and determination of basis.

"Period of affiliation" defined.

ated (determined in accordance with the law applicable thereto) but does not include any taxable year beginning on or after January 1, 1922, unless a consolidated return was made, nor any taxable year after the taxable year 1928. The basis in case of property acquired by a corporation during any period, in the taxable year 1929 or any subsequent taxable year, in respect of which a consolidated return is made by such corporation under section 141 of this Act or the Revenue Act of 1928, shall be determined in accordance with regulations prescribed under section 141 (b) of this Act or the Revenue Act of 1928. The basis in the case of property held by a corporation during any period, in the taxable year 1929 or any subsequent taxable year, in respect of which a consolidated return is made by such corporation under section 141 of this Act or the Revenue Act of 1928, shall be adjusted in respect of any items relating to such period, in accordance with regulations prescribed under section 141 (b) of this Act or the Revenue Act of 1928, applicable to such period.

(13) PROPERTY ACQUIRED BEFORE MARCH 1, 1913.—In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis shall be such fair market value. In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date.

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

(A) for expenditures, receipts, losses, or other items, properly chargeable to capital account, including taxes and other carrying charges on unimproved and unproductive real property, but no such adjustment shall be made for taxes or other carrying charges for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years;

(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent allowed (but not less than the amount allowable) under this Act or prior income tax laws. Where for any taxable year prior to the taxable year 1932 the depletion allowance was based on discovery value or a percentage of income, then the adjustment for depletion for such year shall be based on the depletion which would have been allowable for such year if computed without reference to discovery value or a percentage of income;

(C) in respect of any period prior to March 1, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent sustained;

(D) in the case of stock (to the extent not provided for in the foregoing subparagraphs) for the amount of distributions previously made which, under the law applicable to the year in which the distribution was made, either were tax-free or were applicable in reduction of basis (not including distributions made by a corporation, which was classified as a personal service corporation under the provisions of the Revenue Act of 1918 or 1921, out of its earnings or profits which were taxable in

INCOME TAX

Basis in subsequent years.

Post, p. 213.
Vol. 45, p. 831.

Property acquired before March 1, 1913.

Fair market value of assets.

Adjusted basis for determining gain or loss.

General rule.
Adjustment to capital account.

Carrying charges on unimproved real property.

Depletion, etc., since February 28, 1913.

Maximum allowance.

Based on discovery value or percentage of income.

Any period prior to March 1, 1913.

Basis reduced by tax-free distributions.

202                72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.

INCOME TAX
Vol. 42, p. 245; Vol.
45, p. 82.
Substituted basis.
Determination of.

accordance with the provisions of section 218 of the Revenue Act of 1918 or 1921).

(2) SUBSTITUTED BASIS.—The term "substituted basis" as used in this subsection means a basis determined under any provision of subsection (a) of this section or under any corresponding provision of a prior income tax law, providing that the basis shall be determined—

> Provisions governing.

(A) by reference to the basis in the hands of a transferor, donor, or grantor, or

(B) by reference to other property held at any time by the person for whom the basis is to be determined.

> Basis of property.

Whenever it appears that the basis of property in the hands of the taxpayer is a substituted basis, then the adjustments provided in paragraph (1) of this subsection shall be made after first making in respect of such substituted basis proper adjustments of a similar nature in respect of the period during which the property was held by the transferor, donor, or grantor, or during which the other property was held by the person for whom the basis is to be determined. A similar rule shall be applied in the case of a series of substituted bases.

> Adjustments.

> Basis for deprecia-
> tion and depletion.
> Depreciation.
> Same as upon sale,
> etc.
> *Ante*, p. 201.

## SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(a) BASIS FOR DEPRECIATION.—The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain or loss upon the sale or other disposition of such property.

> Depletion.
> Allowance same as
> for sale, etc.
> *Ante*, p. 201.
> Exceptions.

(b) BASIS FOR DEPLETION.—

(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

> Discovery value in
> case of mines.
> Basis for depletion.
> Fair market value.

(2) DISCOVERY VALUE IN CASE OF MINES.—In the case of mines (other than metal, coal or sulphur mines) discovered by the taxpayer after February 28, 1913, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter, if such mines were not acquired as the result of purchase of a proven tract or lease, and if the fair market value of the property is materially disproportionate to the cost. The depletion allowance based on discovery value provided in this paragraph shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property upon which the discovery was made, except that in no case shall the depletion allowance be less than it would be if computed without reference to discovery value.

> Depletion allowance
> without reference to
> discovery value.
> Minerals included.

Discoveries shall include minerals in commercial quantities contained within a vein or deposit discovered in an existing mine or mining tract by the taxpayer after February 28, 1913, if the vein or deposit thus discovered was not merely the uninterrupted extension of a continuing commercial vein or deposit already known to exist, and if the discovered minerals are of sufficient value and quantity that they could be separately mined and marketed at a profit.

> Oil and gas allow-
> ance.

(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of

> Maximum.

Case 1:18-cv-10507-RMB-JBD    Document 196-8    Filed 12/15/23    Page 76 of 179
PageID: 9918

the property.  Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph.

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND SULPHUR.—The allowance for depletion shall be, in the case of coal mines, 5 per centum, in the case of metal mines, 15 per centum, and, in the case of sulphur mines or deposits, 23 per centum, of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.  Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance for the taxable year 1932 or 1933 be less than it would be if computed without reference to this paragraph.  A taxpayer making return for the taxable year 1933 shall state in such return, as to each property (or, if he first makes return in respect of a property for any taxable year after the taxable year 1933, then in such first return), whether he elects to have the depletion allowance for such property for succeeding taxable years computed with or without reference to percentage depletion.  The depletion allowance in respect of such property for all succeeding taxable years shall be computed according to the election thus made.  If the taxpayer fails to make such statement in the return, the depletion allowance for such property for succeeding taxable years shall be computed without reference to percentage depletion.  During the period for which property acquired after December 31, 1933, is held by the taxpayer—

(A) if the basis of the property in the hands of the taxpayer is, under section 113(a), determined by reference to the basis in the hands of the transferor, donor, or grantor, then the depletion allowance in respect of the property shall be computed with or without reference to percentage depletion, according to the method of computation which would have been applicable if the transferor, donor, or grantor had continued to hold the property, or

(B) if the basis of the property is, under section 113(a), determined by reference to the basis of other property previously held by the taxpayer, then the depletion allowance in respect of the property shall be computed with or without reference to percentage depletion, according to the method of computation which would have been applicable in respect of the property previously held if the taxpayer had continued to hold such property.

## SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this title (except in section 203 (a) (4) and section 208(c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits accumulated after February 28, 1913.

(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits.  Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913,

INCOME TAX

Limitation.

Percentage depletion for coal and metal mines and sulphur.

Maximum.

Exception.

Optional return for 1933.

If taxpayer makes no statement.

Basis of property acquired after 1933, determined by reference to property in transferor's hands.
*Ante,* p. 198.

Previously held property.
Method of computing depletion.

Distributions by corporations.
"Dividend," defined.
*Post,* pp. 224, 227.
Earnings, etc., after February 28, 1913, deemed dividends.
Insurance reserves excepted.

Sources.

Accumulations, etc., before March 1, 1913, tax free.

INCOME TAX
Conditions.
have been distributed, but any such tax-free distribution shall be applied against and reduce the basis of the stock provided in section 113.

Distributions in liquidation, to be in full payment for stock.
(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed in partial liquidation (other than a distribution within the provisions of section 112(h) of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits within the meaning of subsection (b) of this section for the purpose of determining the taxability of subsequent distributions by the corporation.

Gain or loss to distributee.
Ante, pp. 195, 196.
Partial liquidation distribution.

Distributions not out of increase in value before March 1, 1913, nor from earnings or profits.
(d) OTHER DISTRIBUTIONS FROM CAPITAL.—If any distribution (not in partial or complete liquidation) made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not out of earnings or profits, then the amount of such distribution shall be applied against and reduce the basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property.

Distributions by personal service corporations.
Exemptions.
(e) DISTRIBUTIONS BY PERSONAL SERVICE CORPORATIONS.—Any distribution made by a corporation, which was classified as a personal service corporation under the provisions of the Revenue Act of 1918 or the Revenue Act of 1921, out of its earnings or profits which were taxable in accordance with the provisions of section 218 of the Revenue Act of 1918 or section 218 of the Revenue Act of 1921, shall be exempt from tax to the distributees.

Vol. 42, p. 245; Vol. 44, p. 32.

Stock dividends not taxable.
(f) STOCK DIVIDENDS.—A stock dividend shall not be subject to tax.

Redemption of stock.
Treatment of proceeds of.
(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

"Amounts distributed in partial liquidation," construed.
(h) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term " amounts distributed in partial liquidation " means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

Exclusions from gross income.
Additional items exempt from tax.
Ante, p. 178.
SEC. 116. EXCLUSIONS FROM GROSS INCOME.

In addition to the items specified in section 22(b), the following items shall not be included in gross income and shall be exempt from taxation under this title:

Earned income of nonresident citizens, from sources without United States.
(a) EARNED INCOME FROM SOURCES WITHOUT UNITED STATES.—In the case of an individual citizen of the United States, a bona fide nonresident of the United States for more than six months during the taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income; but such individual shall not be allowed as a deduction from his gross income any

deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection. As used in this subsection the term " earned income " means wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income producing factors, a reasonable allowance as compensation for the personal services actually rendered by the taxpayer, not in excess of 20 per centum of his share of the net profits of such trade or business, shall be considered as earned income.

INCOME TAX
"Earned income" defined.
Exceptions.

(b) TEACHERS IN ALASKA AND HAWAII.—In the case of an individual employed by Alaska or Hawaii or any political subdivision thereof as a teacher in any educational institution, the compensation received as such. This subsection shall not exempt compensation paid directly or indirectly by the Government of the United States. Subsection (b) of section 5 of the Act entitled "An Act to provide a government for the Territory of Hawaii", approved April 30, 1900, as amended by the Act entitled "An Act to amend section 5 of the Act entitled 'An Act to provide a government for the Territory of Hawaii', approved April 30, 1900", approved April 12, 1930 [U. S. C., Sup. V, title 48, sec. 495 (b)], is repealed as of January 1, 1932.

Teachers in Alaska and Hawaii.
Federal compensation not exempted.
Former provisions repealed.
Vol. 46, p. 161, repealed.
Vol. 31, p. 141.
U. S. C., Supp. V, p. 680.

(c) INCOME OF FOREIGN GOVERNMENTS.—The income of foreign governments received from investments in the United States in stocks, bonds, or other domestic securities, owned by such foreign governments, or from interest on deposits in banks in the United States of moneys belonging to such foreign governments, or from any other source within the United States.

Income of foreign governments from investments in United States, etc.

(d) INCOME OF STATES, MUNICIPALITIES, ETC.—Income derived from any public utility or the exercise of any essential governmental function and accruing to any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, or income accruing to the Government of any possession of the United States, or any political subdivision thereof.

Income of States, etc., from public utilities.

Whenever any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, prior to September 8, 1916, entered in good faith into a contract with any person, the object and purpose of which is to acquire, construct, operate, or maintain a public utility—

If under prior contracts for operation thereof.

(1) If by the terms of such contract the tax imposed by this title is to be paid out of the proceeds from the operation of such public utility, prior to any division of such proceeds between the person and the State, Territory, political subdivision, or the District of Columbia, and if, but for the imposition of the tax imposed by this title, a part of such proceeds for the taxable year would accrue directly to or for the use of such State, Territory, political subdivision, or the District of Columbia, then a tax upon the net income from the operation of such public utility shall be levied, assessed, collected, and paid in the manner and at the rates prescribed in this title, but there shall be refunded to such State, Territory, political subdivision, or the District of Columbia (under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary) an amount which bears the same relation to the amount of the tax as the

Levy on proceeds prior to division thereof with State, etc.
Refunds.

**206** ·       72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

INCOME TAX

amount which (but for the imposition of the tax imposed by this title) would have accrued directly to or for the use of such State, Territory, political subdivision, or the District of Columbia, bears to the amount of the net income from the operation of such public utility for such taxable year.

If no part accruing to State, etc., the net income of persons taxable.

(2) If by the terms of such contract no part of the proceeds from the operation of the public utility for the taxable year would, irrespective of the tax imposed by this title, accrue directly to or for the use of such State, Territory, political subdivision, or the District of Columbia, then the tax upon the net income of such person from the operation of such public utility shall be levied, assessed, collected, and paid in the manner and at the rates prescribed in this title.

Bridges to be acquired by State, etc.

(e) BRIDGES TO BE ACQUIRED BY STATE OR POLITICAL SUBDIVISION.—Whenever any State or political subdivision thereof, in pursuance of a contract to which it is not a party entered into before the enactment of the Revenue Act of 1928, is to acquire a bridge—

Levy on operation proceeds, prior to division thereof.

(1) If by the terms of such contract the tax imposed by this title is to be paid out of the proceeds from the operation of such bridge prior to any division of such proceeds, and if, but for the imposition of the tax imposed by this title, a part of such proceeds for the taxable year would accrue directly to or for the use of or would be applied for the benefit of such State or political subdivision, then a tax upon the net income from the operation of such bridge shall be levied, assessed, collected, and paid in

Refund to State, etc.

the manner and at the rates prescribed in this title, but there shall be refunded to such State or political subdivision (under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary) an amount which bears the same relation to the amount of the tax as the amount which (but for the imposition of the tax imposed by this title) would have accrued directly to or for the use of or would be applied for the benefit of such State or political subdivision, bears to the amount of the net income from the operation of such bridge for such

Restriction.

taxable year. No such refund shall be made unless the entire amount of the refund is to be applied in part payment for the acquisition of such bridge.

If no part accruing to such State, etc., the net income from operation taxable.

(2) If by the terms of such contract no part of the proceeds from the operation of the bridge for the taxable year would, irrespective of the tax imposed by this title, accrue directly to or for the use of or be applied for the benefit of such State or political subdivision, then the tax upon the net income from the operation of such bridge shall be levied, assessed, collected, and paid in the manner and at the rates prescribed in this title.

Dividends from "China Trade Act" corporations.

(f) DIVIDENDS FROM "CHINA TRADE ACT" CORPORATION.—In the case of a person, amounts distributed as dividends to or for his benefit by a corporation organized under the China Trade Act, 1922, if, at the time of such distribution, he is a resident of China, and the equitable right to the income of the shares of stock of the corporation is in good faith vested in him.

Shipowners' mutual associations. Receipts.

(g) SHIPOWNERS' PROTECTION AND INDEMNITY ASSOCIATIONS.—The receipts of shipowners' mutual protection and indemnity associations not organized for profit, and no part of the net earnings of which inures to the benefit of any private shareholder; but such corporations shall be subject as other persons to the tax upon their net income from interest, dividends, and rents.

72d CONGRESS.    SESS. I.    CH. 209.    JUNE 6, 1932.    **207**

## SEC. 117. NET LOSSES.

*(a)* DEFINITION OF " NET LOSS."—As used in this section the term " net loss " means the excess of the deductions allowed by this title over the gross income, with the following exceptions and limitations:

*(1)* NON-BUSINESS DEDUCTIONS.—Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall be allowed only to the extent of the amount of the gross income not derived from such trade or business;

*(2)* CAPITAL LOSSES.—In the case of a taxpayer other than a corporation, deductions for capital losses otherwise allowed by law shall be allowed only to the extent of the capital gains;

*(3)* DEPLETION.—The deduction for depletion shall not exceed the amount which would be allowable if computed without reference to discovery value, or to percentage depletion under section 114(b)(3) or (4);

*(4)* DIVIDENDS.—The deduction provided for in section 23(p) of amounts received as dividends shall not be allowed;

*(5)* INTEREST.—There shall be included in computing gross income the amount of interest received free from tax under this title, decreased by the amount of interest paid or accrued which is not allowed as a deduction by section 23(b);

*(6)* NET LOSS NOT TO PRODUCE NET LOSS.—In computing the net loss for any taxable year a net loss for a prior year shall not be allowed as a deduction.

*(b)* NET LOSS AS A DEDUCTION.—If, for any taxable year, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount thereof shall be allowed as a deduction in computing the net income of the taxpayer for the succeeding taxable year (hereinafter in this section called " second year "); the deduction in all cases to be made under regulations prescribed by the Commissioner with the approval of the Secretary.

*(c)* CAPITAL NET GAIN IN SECOND YEAR.—If in the second year the taxpayer (other than a corporation) has a capital net gain, the deduction allowed by subsection (b) of this section shall first be applied as a deduction in computing the ordinary net income for such year. If the deduction is in excess of the ordinary net income (computed without such deduction) the amount of such excess shall then be applied against the capital net gain for such year.

*(d)* NET LOSSES FOR 1930 OR 1931.—If for the taxable year 1930 a taxpayer sustained a net loss within the provisions of the Revenue Act of 1928, the amount of such net loss shall not be allowed as a deduction in computing net income under this title. If for the taxable year 1931 a taxpayer sustained a net loss within the provisions of the Revenue Act of 1928, the amount of such net loss shall be allowed as a deduction in computing net income for the taxable year 1932 to the same extent and in the same manner as a net loss sustained for one taxable year is, under this Act, allowed as a deduction for the succeeding taxable year.

*(e)* FISCAL YEAR RETURNS.—If a taxpayer makes return for a period beginning in one calendar year (hereinafter in this subsection called " first calendar year ") and ending in the following calendar year (hereinafter in this subsection called " second calendar year ") and the law applicable to the second calendar year is different from the law applicable to the first calendar year, then his net loss for the period ending during the second calendar year shall be the sum of: (1) The same proportion of a net loss for the entire period,

### Marginal notes

INCOME TAX

"Net loss", defined.

Exceptions.
Losses not connected with business.

Capital losses.
Other than a corporation.

Depletion.
*Ante,* p. 202.

Dividends received by corporations not allowed.
*Ante,* p. 182.
Interest included in gross income.
*Ante,* p. 179.

Net loss for prior year not allowed.

Net loss to be deducted from tax for second year, etc.

Regulations prescribed.

Capital net gain or loss in second year.
Application of.

If in excess.

Net losses for 1930 or 1931.

Vol. 45, p. 825.

Fiscal years.
Returns, if period beginning in first calendar year and ending in second.

Computing net loss.

Pages 1926

**INCOME TAX**

**Proportion for different rates.**

determined under the law applicable to the first calendar year, which the portion of such period falling within such calendar year is of the entire period; and (2) the same proportion of a net loss for the entire period, determined under the law applicable to the second calendar year, which the portion of such period falling within such calendar year is of the entire period.

**Loss from wash sales of stock, etc.**

**Restriction on claim for, if taxpayer has acquired substantially identical stock within thirty days.**

## SEC. 118. LOSS FROM WASH SALES OF STOCK OR SECURITIES.

(a) In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange upon which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 23 (e) (2); nor shall such deduction be allowed under section 23 (f) unless the claim is made by a corporation, a dealer in stocks or securities, and with respect to a transaction made in the ordinary course of its business.

*Ante,* p. 180.
Allowance to a corporation, etc.

**Computation where property acquired is less than sold.**

(b) If the amount of stock or securities acquired (or covered by the contract or option to acquire) is less than the amount of stock or securities sold or otherwise disposed of, then the particular shares of stock or securities the loss from the sale or other disposition of which is not deductible shall be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

**Computation where property acquired is not less than sold.**

(c) If the amount of stock or securities acquired (or covered by the contract or option to acquire) is not less than the amount of stock or securities sold or otherwise disposed of, then the particular shares of stock or securities the acquisition of which (or the contract or option to acquire which) resulted in the nondeductibility of the loss shall be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

**Income from sources within United States. Items treated as.**

## SEC. 119. INCOME FROM SOURCES WITHIN UNITED STATES.

(a) GROSS INCOME FROM SOURCES IN UNITED STATES.—The following items of gross income shall be treated as income from sources within the United States:

**Interest on bonds, etc., of residents.**

(1) INTEREST.—Interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise, not including—

**Exceptions. Paid to persons not in business in United States.**

(A) interest on deposits with persons carrying on the banking business paid to persons not engaged in business within the United States and not having an office or place of business therein, or

**If less than 20 per cent from United States sources.**

(B) interest received from a resident alien individual, a resident foreign corporation, or a domestic corporation, when it is shown to the satisfaction of the Commissioner that less than 20 per centum of the gross income of such resident payor or domestic corporation has been derived from sources within the United States, as determined under the provisions of this section, for the three-year period ending with the close of the taxable year of such payor preceding the payment of such interest, or for such part of such period as may be applicable, or

**From bankers' acceptances.**

(C) income derived by a foreign central bank of issue from bankers' acceptances;

(2) DIVIDENDS.—The amount received as dividends—

(A) from a domestic corporation other than a corporation entitled to the benefits of section 251, and other than a corporation less than 20 per centum of whose gross income is shown to the satisfaction of the Commissioner to have been derived from sources within the United States, as determined under the provisions of this section, for the three-year period ending with the close of the taxable year of such corporation preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence), or

<span style="float:right">Dividends.<br>From domestic corporations.<br>Exceptions.<br>*Post*, p. 231.</span>

(B) from a foreign corporation unless less than 50 per centum of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was derived from sources within the United States as determined under the provisions of this section;

<span style="float:right">From foreign corporations.<br>Exceptions.</span>

(3) PERSONAL SERVICES.—Compensation for labor or personal services performed in the United States;

<span style="float:right">Personal services in United States.</span>

(4) RENTALS AND ROYALTIES.—Rentals or royalties from property located in the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using in the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like property; and

<span style="float:right">Rentals, royalties, etc., from United States sources.</span>

(5) SALE OF REAL PROPERTY.—Gains, profits, and income from the sale of real property located in the United States.

<span style="float:right">Real property sales.</span>

(b) NET INCOME FROM SOURCES IN UNITED STATES.—From the items of gross income specified in subsection (a) of this section there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of any expenses, losses, or other deductions which can not be allocated to some item or class of gross income. The remainder, if any, shall be included in full as net income from sources within the United States.

<span style="float:right">Deductions therefrom of designated expenses, etc., constitute net income from United States sources.</span>

(c) GROSS INCOME FROM SOURCES WITHOUT UNITED STATES.—The following items of gross income shall be treated as income from sources without the United States:

<span style="float:right">Gross income from without United States.</span>

(1) Interest other than that derived from sources within the United States as provided in subsection (a) (1) of this section;

<span style="float:right">Other interest.<br>*Ante*, p. 208.</span>

(2) Dividends other than those derived from sources within the United States as provided in subsection (a) (2) of this section;

<span style="float:right">Other dividends.</span>

(3) Compensation for labor or personal services performed without the United States;

<span style="float:right">Labor, etc., without United States.</span>

(4) Rentals or royalties from property located without the United States or from any interest in such property, including rentals or royalties for the use of or for the privilege of using without the United States, patents, copyrights, secret processes and formulas, good will, trade-marks, trade brands, franchises, and other like properties; and

<span style="float:right">Rentals, royalties, etc., without United States.</span>

(5) Gains, profits, and income from the sale of real property located without the United States.

<span style="float:right">Real estate sales without United States.</span>

(d) NET INCOME FROM SOURCES WITHOUT UNITED STATES.—From the items of gross income specified in subsection (c) of this section there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto, and a ratable part of any expenses, losses, or other deductions which can not definitely be allocated to some item or class of gross income. The remainder, if

<span style="float:right">Deductions therefrom of designated expenses, etc., constitute net income from sources without United States.</span>

3051°—33——14

INCOME TAX

Income from sources partly within and partly without United States.
Apportionment.

any, shall be treated in full as net income from sources without the United States.

(e) INCOME FROM SOURCES PARTLY WITHIN AND PARTLY WITHOUT UNITED STATES.—Items of gross income, expenses, losses and deductions, other than those specified in subsections (a) and (c) of this section, shall be allocated or apportioned to sources within or without the United States, under rules and regulations prescribed by the Commissioner with the approval of the Secretary. Where items of gross income are separately allocated to sources within the United States, there shall be deducted (for the purpose of computing the net income therefrom) the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of other expenses, losses or other deductions which can not definitely be allocated to some item or class of gross income. The remainder, if any, shall be included in full as net income from sources within the United States. In the case of gross income derived from sources partly within and partly without the United States, the net income may first be computed by deducting the expenses, losses, or other deductions apportioned or allocated thereto and a ratable part of any expenses, losses, or other deductions which can not definitely be allocated to some items or class of gross income; and the portion of such net income attributable to sources within the United States may be determined by processes or formulas of general apportionment prescribed by the Commissioner with the approval of the Secretary. Gains, profits, and income from—

From United States sources.

Computation of net income.

Processes, etc., for determination.

Gains from transportation or other services.

Sale of personal property within and without.

(1) transportation or other services rendered partly within and partly without the United States, or

(2) from the sale of personal property produced (in whole or in part) by the taxpayer within and sold without the United States, or produced (in whole or in part) by the taxpayer without and sold within the United States,

Purchase and sale of personal property.

shall be treated as derived partly from sources within and partly from sources without the United States. Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from sources within the country in which sold, except that gains, profits, and income derived from the purchase of personal property within the United States and its sale within a possession of the United States or from the purchase of personal property within a possession of the United States and its sale within the United States shall be treated as derived partly from sources within and partly from sources without the United States.

Exceptions.

Definitions.

(f) DEFINITIONS.—As used in this section the words "sale" or "sold" include "exchange" or "exchanged"; and the word "produced" includes "created," "fabricated," "manufactured," "extracted," "processed," "cured," or "aged."

Charitable contributions, etc.

**SEC. 120. UNLIMITED DEDUCTION FOR CHARITABLE AND OTHER CONTRIBUTIONS.**

Unlimited deduction allowed, if exceed 90 per cent of income.

*Ante*, p. 181.

In the case of an individual if in the taxable year and in each of the ten preceding taxable years the amount of the contributions or gifts described in section 23(n) plus the amount of income, war-profits, or excess-profits taxes paid during such year in respect of preceding taxable years, exceeds 90 per centum of the taxpayer's net income for each such year, as computed without the benefit of section 23(n), then the 15 per centum limit imposed by such section shall not be applicable.

72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.    **211**

## Supplement C—Credits Against Tax

<div style="text-align:right">INCOME TAX<br>Credits against tax.</div>

[Supplementary to Subtitle B, Part III]

### SEC. 131. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

<div style="text-align:right">Taxes of foreign countries, and United States possessions.</div>

(a) ALLOWANCE OF CREDIT.—If the taxpayer signifies in his return his desire to have the benefits of this section, the tax imposed by this title shall be credited with:

<div style="text-align:right">Allowances.</div>

(1) CITIZEN AND DOMESTIC CORPORATION.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war-profits, and excess-profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; and

<div style="text-align:right">Payments of citizens and domestic corporations.</div>

(2) RESIDENT OF UNITED STATES.—In the case of a resident of the United States, the amount of any such taxes paid or accrued during the taxable year to any possession of the United States; and

<div style="text-align:right">Resident, to United States possessions.</div>

(3) ALIEN RESIDENT OF UNITED STATES.—In the case of an alien resident of the United States, the amount of any such taxes paid or accrued during the taxable year to any foreign country, if the foreign country of which such alien resident is a citizen or subject, in imposing such taxes, allows a similar credit to citizens of the United States residing in such country; and

<div style="text-align:right">Alien resident to foreign countries allowing similar credit.</div>

(4) PARTNERSHIPS AND ESTATES.—In the case of any such individual who is a member of a partnership or a beneficiary of an estate or trust, his proportionate share of such taxes of the partnership or the estate or trust paid or accrued during the taxable year to a foreign country or to any possession of the United States, as the case may be.

<div style="text-align:right">Partnerships and estates, to a foreign country.</div>

(b) LIMIT ON CREDIT.—The amount of the credit taken under this section shall be subject to each of the following limitations:

<div style="text-align:right">Limit on credit.</div>

(1) The amount of the credit in respect of the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken, which the taxpayer's net income from sources within such country bears to his entire net income for the same taxable year; and

<div style="text-align:right">Proportionate credit for taxes paid to foreign country.</div>

(2) The total amount of the credit shall not exceed the same proportion of the tax against which such credit is taken, which the taxpayer's net income from sources without the United States bears to his entire net income for the same taxable year.

<div style="text-align:right">Limitation on total amount.</div>

(c) ADJUSTMENTS ON PAYMENT OF ACCRUED TAXES.—If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, or if any tax paid is refunded in whole or in part, the taxpayer shall notify the Commissioner, who shall redetermine the amount of the tax for the year or years affected, and the amount of tax due upon such redetermination, if any, shall be paid by the taxpayer upon notice and demand by the collector, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the provisions of section 322. In the case of such a tax accrued but not paid, the Commissioner as a condition precedent to the allowance of this credit may require the taxpayer to give a bond with sureties satisfactory to and to be approved by the Commissioner in such sum as the Commissioner may require, conditioned upon the payment by the taxpayer of any amount of tax found due upon any such redetermination; and the bond herein prescribed shall contain such further conditions as the Commissioner may require.

<div style="text-align:right">Adjustments if tax paid differs from credits claimed.</div>

<div style="text-align:right">Redetermination.</div>

<div style="text-align:right">Post, p. 242.</div>

<div style="text-align:right">Tax accrued but not paid.</div>

<div style="text-align:right">Bond required.</div>

INCOME TAX

Credits for foreign taxes may be taken in the year accrued.

Credits on same basis for subsequent years.

Proof of credits.

Evidence of foreign income.
*Ante*, p. 209.

Segregation of amounts.

Additional information necessary.

Taxes of foreign subsidiary.

Proportion of foreign tax on dividends received deemed to have been paid.

*Proviso.*
Limit on credit allowed.

Meaning of "accumulated profits."

Determination of, by Commissioner.

Accounting period for foreign corporation.

Corporations treated as foreign.

United States possessions.
*Post*, p. 231.

China Trade Act corporations.
*Post*, p. 232.

(d) Year in Which Credit Taken.—The credits provided for in this section may, at the option of the taxpayer and irrespective of the method of accounting employed in keeping his books, be taken in the year in which the taxes of the foreign country or the possession of the United States accrued, subject, however, to the conditions prescribed in subsection (c) of this section. If the taxpayer elects to take such credits in the year in which the taxes of the foreign country or the possession of the United States accrued, the credits for all subsequent years shall be taken upon the same basis, and no portion of any such taxes shall be allowed as a deduction in the same or any succeeding year.

(e) Proof of Credits.—The credits provided in this section shall be allowed only if the taxpayer establishes to the satisfaction of the Commissioner (1) the total amount of income derived from sources without the United States, determined as provided in section 119, (2) the amount of income derived from each country, the tax paid or accrued to which is claimed as a credit under this section, such amount to be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary, and (3) all other information necessary for the verification and computation of such credits.

(f) Taxes of Foreign Subsidiary.—For the purposes of this section a domestic corporation which owns a majority of the voting stock of a foreign corporation from which it receives dividends (not deductible under section 23(p)) in any taxable year shall be deemed to have paid the same proportion of any income, war-profits, or excess-profits taxes paid by such foreign corporation to any foreign country or to any possession of the United States, upon or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends bears to the amount of such accumulated profits: *Provided*, That the amount of tax deemed to have been paid under this subsection shall in no case exceed the same proportion of the tax against which credit is taken which the amount of such dividends bears to the amount of the entire net income of the domestic corporation in which such dividends are included. The term "accumulated profits" when used in this subsection in reference to a foreign corporation, means the amount of its gains, profits, or income in excess of the income, war-profits, and excess-profits taxes imposed upon or with respect to such profits or income; and the Commissioner with the approval of the Secretary shall have full power to determine from the accumulated profits of what year or years such dividends were paid; treating dividends paid in the first sixty days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise), and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings. In the case of a foreign corporation, the income, war-profits, and excess-profits taxes of which are determined on the basis of an accounting period of less than one year, the word "year" as used in this subsection shall be construed to mean such accounting period.

(g) Corporations Treated as Foreign.—For the purposes of this section the following corporations shall be treated as foreign corporations:

(1) A corporation entitled to the benefits of section 251, by reason of receiving a large percentage of its gross income from sources within a possession of the United States;

(2) A corporation organized under the China Trade Act, 1922, and entitled to the credit provided for in section 261.

JA6713

### SEC. 132. PAYMENTS UNDER 1928 ACT.

Any amount paid before or after the enactment of this Act on account of the tax imposed for a fiscal year beginning in 1931 and ending in 1932 by Title II of the Revenue Act of 1928 shall be credited toward the payment of the tax imposed for such fiscal year by this Act, and if the amount so paid exceeds the amount of such tax imposed by this Act, the excess shall be credited or refunded in accordance with the provisions of section 322.

*INCOME TAX*

*Payments under 1928 Act.*
*Credits or refunds.*
*Vol. 45, p. 862.*
*Post, p. 242.*

## Supplement D—Returns and Payment of Tax

[Supplementary to Subtitle B, Part V]

*Returns and Payment of Tax.*

### SEC. 141. CONSOLIDATED RETURNS OF CORPORATIONS.

(a) PRIVILEGE TO FILE CONSOLIDATED RETURNS.—An affiliated group of corporations shall, subject to the provisions of this section, have the privilege of making a consolidated return for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all the corporations which have been members of the affiliated group at any time during the taxable year for which the return is made consent to all the regulations under subsection (b) (or, in case such regulations are not prescribed prior to the making of the return, then the regulations prescribed under section 141(b) of the Revenue Act of 1928 in so far as not inconsistent with this Act) prescribed prior to the making of such return; and the making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

*Consolidated returns of corporations.*
*Affiliated corporations may make.*

*Consent required.*

*Returns made prior to proclaiming regulations.*
*Vol. 45, p. 831.*

*Fractional part of year.*

(b) REGULATIONS.—The Commissioner, with the approval of the Secretary, shall prescribe such regulations as he may deem necessary in order that the tax liability of an affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be determined, computed, assessed, collected, and adjusted in such manner as clearly to reflect the income and to prevent avoidance of tax liability.

*Regulations to determine tax liability.*

(c) COMPUTATION AND PAYMENT OF TAX.—In any case in which a consolidated return is made the tax shall be determined, computed, assessed, collected, and adjusted in accordance with the regulations under subsection (b) (or, in case such regulations are not prescribed prior to the making of the return, then the regulations prescribed under section 141(b) of the Revenue Act of 1928 in so far as not inconsistent with this Act) prescribed prior to the date on which such return is made; except that for the taxable years 1932 and 1933 there shall be added to the rate of tax prescribed by sections 13(a), 201(b), and 204(a), a rate of ¾ of 1 per centum.

*Computation and payment of tax.*

*Returns filed prior to making regulations.*
*Vol. 45, p. 831.*

*Exceptions.*
*Ante, p. 177.*
*Post, pp. 223, 225.*

(d) DEFINITION OF "AFFILIATED GROUP".—As used in this section an "affiliated group" means one or more chains of corporations connected through stock ownership with a common parent corporation if—

*"Affiliated group" defined.*

(1) At least 95 per centum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations; and

*Stock ownership of members.*

(2) The common parent corporation owns directly at least 95 per centum of the stock of at least one of the other corporations. As used in this subsection the term "stock" does not include nonvoting stock which is limited and preferred as to dividends.

*Of parent corporation.*

*Nonvoting stock not included.*

214                72d CONGRESS. SESS. I. CH. 209.   JUNE 6, 1932.

INCOME TAX

Applicable only for domestic corporations. Insurance companies not included.
*Post*, pp. 223, 225.
*Ante*, p. 177.

(e) A consolidated return shall be made only for the domestic corporations within the affiliated group. An insurance company subject to the tax imposed by section 201 or 204 shall not be included in the same consolidated return with a corporation subject to the tax imposed by section 13, and an insurance company subject to the tax imposed by section 201 shall not be included in the same consolidated return with an insurance company subject to the tax imposed by section 204.

China Trade Act corporations deemed not affiliated.

(f) CHINA TRADE ACT CORPORATIONS.—A corporation organized under the China Trade Act, 1922, shall not be deemed to be affiliated with any other corporation within the meaning of this section.

Corporations in United States possessions treated as foreign.

(g) CORPORATIONS DERIVING INCOME FROM POSSESSIONS OF UNITED STATES.—For the purposes of this section a corporation entitled to the benefits of section 251, by reason of receiving a large percentage of its income from possessions of the United States, shall be treated as a foreign corporation.

Subsidiary of domestic corporation formed to comply with foreign law, deemed domestic.

(h) SUBSIDIARY FORMED TO COMPLY WITH FOREIGN LAW.—In the case of a domestic corporation owning or controlling, directly or indirectly, 100 per centum of the capital stock (exclusive of directors' qualifying shares) of a corporation organized under the laws of a contiguous foreign country and maintained solely for the purpose of complying with the laws of such country as to title and operation of property, such foreign corporation may, at the option of the domestic corporation, be treated for the purpose of this title as a domestic corporation.

Suspension of running of statute of limitations.
*Post*, p. 233.

*Post*, p. 238.

(i) SUSPENSION OF RUNNING OF STATUTE OF LIMITATIONS.—If a notice under section 272 (a) in respect of a deficiency for any taxable year is mailed to a corporation, the suspension of the running of the statute of limitations, provided in section 277, shall apply in the case of corporations with which such corporation made a consolidated return for such taxable year.

Allocation of income and deductions.
*Ante*, p. 186.

(j) ALLOCATION OF INCOME AND DEDUCTIONS.—For allocation of income and deductions of related trades or businesses, see section 45.

Fiduciary returns. Sworn statements of income, etc., of beneficiaries.

SEC. 142. FIDUCIARY RETURNS.

(a) REQUIREMENT OF RETURN.—Every fiduciary (except a receiver appointed by authority of law in possession of part only of the property of an individual) shall make under oath a return for any of the following individuals, estates, or trusts for which he acts, stating specifically the items of gross income thereof and the deductions and credits allowed under this title—

With net income of $1,000 or over, and single, etc.

(1) Every individual having a net income for the taxable year of $1,000 or over, if single, or if married and not living with husband or wife;

Married, etc., with $2,500 or over.

(2) Every individual having a net income for the taxable year of $2,500 or over, if married and living with husband or wife;

Gross income of $5,000 or over.

(3) Every individual having a gross income for the taxable year of $5,000 or over, regardless of the amount of his net income;

Estates or trusts of $1,000 net income or over.

(4) Every estate or trust the net income of which for the taxable year is $1,000 or over;

Gross income of $5,000 or over.

(5) Every estate or trust the gross income of which for the taxable year is $5,000 or over, regardless of the amount of the net income; and

Nonresident alien beneficiaries.

(6) Every estate or trust of which any beneficiary is a nonresident alien.

By joint fiduciaries.

(b) JOINT FIDUCIARIES.—Under such regulations as the Commissioner with the approval of the Secretary may prescribe a return made by one of two or more joint fiduciaries and filed in the office of the collector of the district where such fiduciary resides shall be

sufficient compliance with the above requirement.  Such fiduciary shall make oath (1) that he has sufficient knowledge of the affairs of the individual, estate, or trust for which the return is made, to enable him to make the return, and (2) that the return·is, to the best of his knowledge and belief, true and correct.

(c) LAW APPLICABLE TO FIDUCIARIES.—Any fiduciary required to make a return under this title shall be subject to all the provisions of law which apply to individuals.

## SEC. 143. WITHHOLDING OF TAX AT SOURCE.

(a) TAX-FREE COVENANT BONDS.—

(1) REQUIREMENT OF WITHHOLDING.—In any case where bonds, mortgages, or deeds of trust, or other similar obligations of a corporation contain a contract or provision by which the obligor agrees to pay any portion of the tax imposed by this title upon the obligee, or to reimburse the obligee for any portion of the tax, or to pay the interest without deduction for any tax which the obligor may be required or permitted to pay thereon, or to retain there-from under any law of the United States, the obligor shall deduct and withhold a tax equal to 2 per centum of the interest upon such bonds, mortgages, deeds of trust, or other obligations, whether such interest is payable annually or at shorter or longer periods, if payable to an individual, a partnership, or a foreign corporation not engaged in trade or business within the United States and not having any office or place of business therein : *Provided*, That if the liability assumed by the obligor does not exceed 2 per centum of the interest, then the deduction and withholding shall be at the following rates: (A) 8 per centum in the case of a nonresident alien individual, or of any partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, (B) 13¾ per centum in the case of such a foreign corporation, and (C) 2 per centum in the case of other individuals and partnerships: *Provided further*, That if the owners of such obligations are not known to the withholding agent the Commissioner may authorize such deduction and withholding to be at the rate of 2 per centum, or, if the liability assumed by the obligor does not exceed 2 per centum of the interest, then at the rate of 8 per centum.

(2) BENEFIT OF CREDITS AGAINST NET INCOME.—Such deduction and withholding shall not be required in the case of a citizen or resident entitled to receive such interest, if he files with the with-holding agent on or before February 1 a signed notice in writing claiming the benefit of the credits provided in section 25 (c) and (d) ; nor in the case of a nonresident alien individual if so provided for in regulations prescribed by the Commissioner under section 215.

(3) INCOME OF OBLIGOR AND OBLIGEE.—The obligor shall not be allowed a deduction for the payment of the tax imposed by this title, or any other tax paid pursuant to the tax-free covenant clause, nor shall such tax be included in the gross income of the obligee.

(b) NONRESIDENT ALIENS.—All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States, having the control, receipt, custody, disposal, or payment of interest (except interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States and not having an office or place of business therein),

### Margin notes:

INCOME TAX
Oath required.

Subject to provisions applicable to individuals.

Withholding tax at source.
Tax-free covenant bonds.
By corporations agreeing to pay interest, free from tax, etc.

Tax withheld.

Proviso.
Rates.

From nonresident alien individual, etc.

From foreign corporations.
Other individuals, etc.

Unknown owners.

Exception on notice of credit withheld by individual.

Nonresident alien.
*Post,* p. 229.
*Ante,* p. 184.

Restriction on obligor and obligee.

Normal tax of nonresident aliens payable at source.

216          72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

INCOME TAX rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, of any nonresident alien individual, or of any partnership not engaged in trade or business within the United States and not having any office or place of business therein and composed in whole or in part of nonresident aliens, (other than

Exceptions.
*Ante*, p. 184. income received as dividends of the class allowed as a credit by section 25(a)) shall (except in the cases provided for in subsection (a) of this section and except as otherwise provided in regulations prescribed by the Commissioner under section 215) deduct and withhold from such annual or periodical gains, profits, and income

*Proviso.*
Interest of unknown owners. a tax equal to 8 per centum thereof: *Provided,* That the Commissioner may authorize such tax to be deducted and withheld from the interest upon any securities the owners of which are not known to the withholding agent.

Return and payment required. (c) RETURN AND PAYMENT.—Every person required to deduct and withhold any tax under this section shall make return thereof on or before March 15 of each year and shall on or before June 15, in lieu

*Ante*, p. 189. of the time prescribed in section 56, pay the tax to the official of the United States Government authorized to receive it. Every such person is hereby made liable for such tax and is hereby indemnified against the claims and demands of any person for the amount of any payments made in accordance with the provisions of this section.

Return by recipient of withheld tax. (d) INCOME OF RECIPIENT.—Income upon which any tax is required to be withheld at the source under this section shall be included in the return of the recipient of such income, but any amount of tax so withheld shall be credited against the amount of income tax as computed in such return.

Tax paid by recipient.
Not re-collectible. (e) TAX PAID BY RECIPIENT.—If any tax required under this section to be deducted and withheld is paid by the recipient of the income, it shall not be re-collected from the withholding agent; nor in cases in which the tax is so paid shall any penalty be imposed upon or collected from the recipient of the income or the withholding agent for failure to return or pay the same, unless such failure was fraudulent and for the purpose of evading payment.

Refunds and credits to withholding agent.
*Post*, p. 242. (f) REFUNDS AND CREDITS.—Where there has been an overpayment of tax under this section any refund or credit made under the provisions of section 322 shall be made to the withholding agent unless the amount of such tax was actually withheld by the withholding agent.

Deductions, etc., for prior periods. (g) Notwithstanding the provisions of subsections (a) and (b), the deduction and withholding for any period prior to the date of the enactment of this Act shall be at the rates of 12 per centum and 5 per centum in lieu of the rates of 13¾ per centum and 8 per centum prescribed in such subsections.

Payment at source. **SEC. 144. PAYMENT OF CORPORATION INCOME TAX AT SOURCE.**

By foreign corporations not in business within United States. In the case of foreign corporations subject to taxation under this title not engaged in trade or business within the United States and not having any office or place of business therein, there shall be deducted and withheld at the source in the same manner and upon

*Ante*, p. 215. the same items of income as is provided in section 143 a tax equal to 12 per centum thereof in respect of all payments of income made before the enactment of this Act, and equal to 13¾ per centum thereof in respect of all payments of income made after the enactment of this Act, and such tax shall be returned and paid in the same manner

*Proviso.*
Rate when interest granted free of tax. and subject to the same conditions as provided in that section: *Provided,* That in the case of interest described in subsection (a) of that section (relating to tax-free covenant bonds) the deduction and withholding shall be at the rate specified in such subsection.

INCOME TAX

## SEC. 145. PENALTIES.

Penalties.
Willful failure to pay
tax, make returns, etc.

(a) Any person required under this title to pay any tax, or required by law or regulations made under authority thereof to make a return, keep any records, or supply any information, for the purposes of the computation, assessment, or collection of any tax imposed by this title, who willfully fails to pay such tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution.

Punishment for.

(b) Any person required under this title to collect, account for, and pay over any tax imposed by this title, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

For willful failure to
collect tax, evade pay-
ment, etc.

Punishment for.

(c) The term "person" as used in this section includes an officer or employee of a corporation or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.

"Person" defined.

## SEC. 146. CLOSING BY COMMISSIONER OF TAXABLE YEAR.

Closing of taxable
year.

(a) TAX IN JEOPARDY.—If the Commissioner finds that a taxpayer designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein, or to do any other act tending to prejudice or to render wholly or partly ineffectual proceedings to collect the tax for the taxable year then last past or the taxable year then current unless such proceedings be brought without delay, the Commissioner shall declare the taxable period for such taxpayer immediately terminated and shall cause notice of such finding and declaration to be given the taxpayer, together with a demand for immediate payment of the tax for the taxable period so declared terminated and of the tax for the preceding taxable year or so much of such tax as is unpaid, whether or not the time otherwise allowed by law for filing return and paying the tax has expired; and such taxes shall thereupon become immediately due and payable. In any proceeding in court brought to enforce payment of taxes made due and payable by virtue of the provisions of this section the finding of the Commissioner, made as herein provided, whether made after notice to the taxpayer or not, shall be for all purposes presumptive evidence of the taxpayer's design.

Tax in jeopardy.
Immediate payment
demanded if acts of tax-
payer prejudice collec-
tion.

Notice of finding and
demand.

Finding of Commis-
sioner presumptive evi-
dence of design.

(b) SECURITY FOR PAYMENT.—A taxpayer who is not in default in making any return or paying income, war-profits, or excess-profits tax under any Act of Congress may furnish to the United States, under regulations to be prescribed by the Commissioner, with the approval of the Secretary, security approved by the Commissioner that he will duly make the return next thereafter required to be filed and pay the tax next thereafter required to be paid. The Commissioner may approve and accept in like manner security for return and payment of taxes made due and payable by virtue of the provisions of this section, provided the taxpayer has paid in full all other income, war-profits, or excess-profits taxes due from him under any Act of Congress.

Security accepted if
taxpayer not in default.

Acceptance    condi-
tional.

(c) SAME—EXEMPTION FROM SECTION.—If security is approved and accepted pursuant to the provisions of this section and such further or other security with respect to the tax or taxes covered

Suspension of en-
forcement on approval
of bond.

INCOME TAX

thereby is given as the Commissioner shall from time to time find necessary and require, payment of such taxes shall not be enforced by any proceedings under the provisions of this section prior to the expiration of the time otherwise allowed for paying such respective taxes.

Discretionary waiver of requirements as to citizens.

(d) CITIZENS.—In the case of a citizen of the United States or of a possession of the United States about to depart from the United States the Commissioner may, at his discretion, waive any or all of the requirements placed on the taxpayer by this section.

Aliens must furnish tax-paid certificates before departure.

(e) DEPARTURE OF ALIEN.—No alien shall depart from the United States unless he first procures from the collector or agent in charge a certificate that he has complied with all the obligations imposed upon him by the income, war-profits, and excess-profits tax laws.

Additional tax for violation thereof.

(f) ADDITION TO TAX.—If a taxpayer violates or attempts to violate this section there shall, in addition to all other penalties, be added as part of the tax 25 per centum of the total amount of the tax or deficiency in the tax, together with interest at the rate of 1 per centum a month from the time the tax became due.

Information at source.

### SEC. 147. INFORMATION AT SOURCE.

Persons making fixed payments to others of $1,000 or more to make returns thereof.

(a) PAYMENTS OF $1,000 OR MORE.—All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, and employers, making payment to another person, of interest, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income (other than payments described in

Exceptions.

section 148 (a) or 149), of $1,000 or more in any taxable year, or, in the case of such payments made by the United States, the officers or employees of the United States having information as to such payments and required to make returns in regard thereto by the regulations hereinafter provided for, shall render a true and accurate return to the Commissioner, under such regulations and in such form and manner and to such extent as may be prescribed by him with the approval of the Secretary, setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment.

Returns regardless of amount of payment. Interest on corporation bonds.

(b) RETURNS REGARDLESS OF AMOUNT OF PAYMENT.—Such returns may be required, regardless of amounts, (1) in the case of payments of interest upon bonds, mortgages, deeds of trust, or other similar

Collecting foreign coupons, etc.

obligations of corporations, and (2) in the case of collections of items (not payable in the United States) of interest upon the bonds of foreign countries and interest upon the bonds of and dividends from foreign corporations by persons undertaking as a matter of business or for profit the collection of foreign payments of such interest or dividends by means of coupons, checks, or bills of exchange.

Name and address of recipient.

(c) RECIPIENT TO FURNISH NAME AND ADDRESS.—When necessary to make effective the provisions of this section the name and address of the recipient of income shall be furnished upon demand of the person paying the income.

Not applicable to Federal obligations.

(d) OBLIGATIONS OF UNITED STATES.—The provisions of this section shall not apply to the payment of interest on obligations of the United States.

Information by corporations.

### SEC. 148. INFORMATION BY CORPORATIONS.

Specific return to be made.

(a) DIVIDEND PAYMENTS.—Every corporation subject to the tax imposed by this title shall, when required by the Commissioner, render a correct return, duly verified under oath, of its payments of dividends, stating the name and address of each shareholder, the number of shares owned by him, and the amount of dividends paid to him.

(b) PROFITS OF TAXABLE YEAR DECLARED AS DIVIDENDS.—There shall be included in the return or appended thereto a statement of such facts as will enable the Commissioner to determine the portion of the earnings or profits of the corporation (including gains, profits, and income not taxed) accumulated during the taxable year for which the return is made, which have been distributed or ordered to be distributed, respectively, to its shareholders during such year.

INCOME TAX

Statement of profits of taxable year declared as dividends.

(c) ACCUMULATED GAINS AND PROFITS.—When requested by the Commissioner, or any collector, every corporation shall forward to him a correct statement of accumulated gains and profits and the names and addresses of the individuals or shareholders who would be entitled to the same if divided or distributed, and of the amounts that would be payable to each.

Accumulated gains and profits.
Statement of persons entitled thereto.

## SEC. 149. RETURNS OF BROKERS.

Returns of brokers.

Every person doing business as a broker shall, when required by the Commissioner, render a correct return duly verified under oath, under such rules and regulations as the Commissioner, with the approval of the Secretary, may prescribe, showing the names of customers for whom such person has transacted any business, with such details as to the profits, losses, or other information which the Commissioner may require, as to each of such customers, as will enable the Commissioner to determine whether all income tax due on profits or gains of such customers has been paid.

Sworn report of all business transacted.

## SEC. 150. COLLECTION OF FOREIGN ITEMS.

Collection of foreign items.

All persons undertaking as a matter of business or for profit the collection of foreign payments of interest or dividends by means of coupons, checks, or bills of exchange shall obtain a license from the Commissioner and shall be subject to such regulations enabling the Government to obtain the information required under this title as the Commissioner, with the approval of the Secretary, shall prescribe; and whoever knowingly undertakes to collect such payments without having obtained a license therefor, or without complying with such regulations, shall be guilty of a misdemeanor and shall be fined not more than $5,000 or imprisoned for not more than one year, or both.

Licenses required for collecting foreign coupons, etc.

Punishment for violation.

### Supplement E—Estates and Trusts

Estates and trusts.

## SEC. 161. IMPOSITION OF TAX.

Income of, to be taxed.

(a) APPLICATION OF TAX.—The taxes imposed by this title upon individuals shall apply to the income of estates or of any kind of property held in trust, including—

(1) Income accumulated in trust for the benefit of unborn or unascertained persons or persons with contingent interests, and income accumulated or held for future distribution under the terms of the will or trust;

Accumulations in trust.

(2) Income which is to be distributed currently by the fiduciary to the beneficiaries, and income collected by a guardian of an infant which is to be held or distributed as the court may direct;

Periodical distributions.

(3) Income received by estates of deceased persons during the period of administration or settlement of the estate; and

Received during administration.

(4) Income which, in the discretion of the fiduciary, may be either distributed to the beneficiaries or accumulated.

Discretionary distribution.

(b) COMPUTATION AND PAYMENT.—The tax shall be computed upon the net income of the estate or trust, and shall be paid by the fiduciary, except as provided in section 166 (relating to revocable trusts) and section 167 (relating to income for benefit of the grantor). For return made by beneficiary, see section 142.

Computation and payment.
Payment by fiduciary; exception.
*Post*, p. 221.
*Ante*, p. 214.

Page 535

INCOME TAX
Net income.
Computation.

## SEC. 162. NET INCOME.

The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that—

Deductions allowed.
Charitable, etc., contributions.

(a) There shall be allowed as a deduction (in lieu of the deduction for charitable, etc., contributions authorized by section 23(n)) any part of the gross income, without limitation, which pursuant to the terms of the will or deed creating the trust, is during the taxable year paid or permanently set aside for the purposes and in the manner specified in section 23(n), or is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, or for the establishment, acquisition, maintenance or operation of a public cemetery not operated for profit;

Current distribution by fiduciary, etc.

(b) There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the beneficiaries, and the amount of the income collected by a guardian of an infant which is to be held or distributed as the court may direct, but the amount so allowed as a deduction shall be included in computing the net income of the beneficiaries whether distributed to them or not. Any amount allowed as a deduction under this paragraph shall not be allowed as a deduction under subsection (c) of this section in the same or any succeeding taxable year;

Payment made or credited to beneficiaries.

(c) In the case of income received by estates of deceased persons during the period of administration or settlement of the estate, and in the case of income which, in the discretion of the fiduciary, may be either distributed to the beneficiary or accumulated, there shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is properly paid or credited during such year to any legatee, heir, or beneficiary, but the amount so allowed as a deduction shall be included in computing the net income of the legatee, heir, or beneficiary.

To be included in income of beneficiary.

## SEC. 163. CREDITS AGAINST NET INCOME.

Credits against net income.
Normal tax personal exemption allowed heirs, etc.
Ante, p. 184.

(a) CREDITS OF ESTATE OR TRUST.—For the purpose of the normal tax the estate or trust shall be allowed the same personal exemption as is allowed to a single person under section 25(c), and, if no part of the income of the estate or trust is included in computing the net income of any legatee, heir, or beneficiary, then in addition the same credits against net income for dividends and interest as are allowed by section 25(a) and (b).

Credits of beneficiary in computing income.

(b) CREDITS OF BENEFICIARY.—If any part of the net income of an estate or trust is included in computing the net income of any legatee, heir, or beneficiary, such legatee, heir, or beneficiary shall, for the purpose of the normal tax, be allowed as credits against net income, in addition to the credits allowed to him under section 25, his proportionate share of such amounts of dividends and interest specified in section 25(a) and (b) as are, under this Supplement, required to be included in computing his net income. Any remaining portion of such amounts specified in section 25(a) and (b) shall, for the purpose of the normal tax, be allowed as credits to the estate or trust.

Ante, p. 184.

Credits allowed estate or trust.

Different taxable years.
Computation if taxable year of estate or trust and beneficiary differ.

## SEC. 164. DIFFERENT TAXABLE YEARS.

If the taxable year of a beneficiary is different from that of the estate or trust, the amount which he is required, under section 162(b), to include in computing his net income, shall be based upon

the income of the estate or trust for any taxable year of the estate or trust ending within his taxable year.

INCOME TAX

## SEC. 165. EMPLOYEES' TRUSTS.

A trust created by an employer as a part of a stock bonus, pension, or profit-sharing plan for the exclusive benefit of some or all of his employees, to which contributions are made by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan, shall not be taxable under section 161, but the amount actually distributed or made available to any distributee shall be taxable to him in the year in which so distributed or made available to the extent that it exceeds the amounts paid in by him. Such distributees shall for the purpose of the normal tax be allowed as credits against net income such part of the amount so distributed or made available as represents the items of dividends and interest specified in section 25(a) and (b).

Employees' trusts.
Profit-sharing trusts, etc., for employees, not taxed.

*Ante*, p. 219.
Distributees taxed on amount received.

Credits.

*Ante*, p. 184.

## SEC. 166. REVOCABLE TRUSTS.

Where at any time during the taxable year the power to revest in the grantor title to any part of the corpus of the trust is vested—

(1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or

(2) in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom,

then the income of such part of the trust for such taxable year shall be included in computing the net income of the grantor.

Revocable trusts.

Income therefrom computed with grantor's net income.

## SEC. 167. INCOME FOR BENEFIT OF GRANTOR.

(a) Where any part of the income of a trust—

(1) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, held or accumulated for future distribution to the grantor; or

(2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; or

(3) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, applied to the payment of premiums upon policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for the purposes and in the manner specified in section 23(n), relating to the so-called "charitable contribution" deduction);

then such part of the income of the trust shall be included in computing the net income of the grantor.

(b) As used in this section, the term "in the discretion of the grantor" means "in the discretion of the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of the part of the income in question".

Income for benefit of grantor, computed with grantor's net income.
When held for future distribution.

When distributed to grantor.

When applied to life insurance premiums.
Exception.

*Ante*, p. 181.

"In the discretion of the grantor" defined.

## SEC. 168. CAPITAL NET GAINS AND LOSSES.

In the case of an estate or trust, or of a beneficiary of an estate or trust, the proper part of each share of the net income which consists, respectively, of ordinary net income, capital net gain, or capital net loss, shall be determined under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary, and shall be separately shown in the return of the estate or trust, and shall be taxed to the beneficiary or to the estate or trust as

Capital net gains and losses.
Determination of; to be separately shown in returns.

222    72d CONGRESS. SESS. I. CH. 209.    JUNE 6, 1932.

INCOME TAX
*Ante*, p. 191.

provided in this Supplement, but at the rates and in the manner provided in section 101 (a) and (b), relating to capital net gains and losses.

Net losses.
Allowance of special deduction.
*Ante*, p. 207.

## SEC. 169. NET LOSSES.

The benefit of the special deduction for net losses allowed by section 117 shall be allowed to an estate or trust under regulations prescribed by the Commissioner with the approval of the Secretary.

Taxes of foreign countries, etc.

## SEC. 170. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

Allowance against tax of beneficiary.

The amount of income, war-profits, and excess-profits taxes imposed by foreign countries or possessions of the United States shall be allowed as credit against the tax of the beneficiary of an estate or trust to the extent provided in section 131.

*Ante*, p. 211.

Partnerships.

## Supplement F—Partnerships

## SEC. 181. PARTNERSHIP NOT TAXABLE.

Individual liability for tax.

Individuals carrying on business in partnership shall be liable for income tax only in their individual capacity.

Tax of partners.
Distributive share included in net income.

## SEC. 182. TAX OF PARTNERS.

(a) GENERAL RULE.—There shall be included in computing the net income of each partner his distributive share, whether distributed or not, of the net income of the partnership for the taxable year.

Computation.

If the taxable year of a partner is different from that of the partnership, the amount so included shall be based upon the income of the partnership for any taxable year of the partnership ending within his taxable year.

Partnership year embracing calendar years with different laws.

(b) PARTNERSHIP YEAR EMBRACING CALENDAR YEARS WITH DIFFERENT LAWS.—If a fiscal year of a partnership begins in one calendar year and ends in another calendar year, and the law applicable to the second calendar year is different from the law applicable to the first calendar year, then

Rates for year in which fiscal year begins.

(1) the rates for the calendar year during which such fiscal year begins shall apply to an amount of each partner's share of such partnership net income (determined under the law applicable to such calendar year) equal to the proportion which the part of such fiscal year falling within such calendar year bears to the full fiscal year, and

Rates for year in which fiscal year ends.

(2) the rates for the calendar year during which such fiscal year ends shall apply to an amount of each partner's share of such partnership net income (determined under the law applicable to such calendar year) equal to the proportion which the part of such fiscal year falling within such calendar year bears to the full fiscal year.

Computation of rates.

In such cases the part of such income subject to the rates in effect for the most recent calendar year shall be added to the other income of the taxpayer subject to such rates and the resulting amount shall be placed in the lower brackets of the rate schedule applicable to such year, and the part of such income subject to the rates in effect for the next preceding calendar year shall be placed in the next higher brackets of the rate schedule applicable to such year.

Partnership income.
Computation.
Exception.
Charitable contribution deduction not allowed.
*Ante*, p. 181.

## SEC. 183. COMPUTATION OF PARTNERSHIP INCOME.

The net income of the partnership shall be computed in the same manner and on the same basis as in the case of an individual, except that the so-called " charitable contribution " deduction provided in section 23 (n) shall not be allowed.

## SEC. 184. CREDITS AGAINST NET INCOME.

The partner shall, for the purpose of the normal tax, be allowed as a credit against his net income, in addition to the credits allowed to him under section 25, his proportionate share of such amounts of dividends and interest specified in section 25(a) and (b) as are received by the partnership.

INCOME TAX

Credits against net income.
Additional, from partnership exemptions.
*Ante,* p. 184.

## SEC. 185. EARNED INCOME.

In the case of the members of a partnership the proper part of each share of the net income which consists of earned income shall be determined under rules and regulations to be prescribed by the Commissioner with the approval of the Secretary and shall be separately shown in the return of the partnership and shall be taxed to the member as provided in this Supplement.

Earned income.
Determination of.

## SEC. 186. CAPITAL NET GAINS AND LOSSES.

In the case of the members of a partnership the proper part of each share of the net income which consists, respectively, of ordinary net income, capital net gain, or capital net loss, shall be determined under the rules and regulations to be prescribed by the Commissioner with the approval of the Secretary, and shall be separately shown in the return of the partnership and shall be taxed to the member as provided in this Supplement, but at the rates and in the manner provided in section 101(a) and (b), relating to capital net gains and losses.

Capital net gains and losses.
Additional from partnership exemptions.

*Ante,* p. 191.

## SEC. 187. NET LOSSES.

The benefit of the special deduction for net losses allowed by section 117 shall be allowed to the members of a partnership under regulations prescribed by the Commissioner with the approval of the Secretary.

Net losses.
Deduction from, allowed partners.
*Ante,* p. 207.

## SEC. 188. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

The amount of income, war-profits, and excess-profits taxes imposed by foreign countries or possessions of the United States shall be allowed as a credit against the tax of the member of a partnership to the extent provided in section 131.

Foreign taxes.
Credit for, allowed partners.
*Ante,* p. 211.

## SEC. 189. PARTNERSHIP RETURNS.

Every partnership shall make a return for each taxable year, stating specifically the items of its gross income and the deductions allowed by this title, and shall include in the return the names and addresses of the individuals who would be entitled to share in the net income if distributed and the amount of the distributive share of each individual. The return shall be sworn to by any one of the partners.

Partnership returns.
Sworn statement of gross income, etc.

### Supplement G—Insurance Companies

Insurance companies.

## SEC. 201. TAX ON LIFE INSURANCE COMPANIES.

(a) DEFINITION.—When used in this title the term " life insurance company " means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.

(b) RATE OF TAX.—In lieu of the tax imposed by section 13, there shall be levied, collected, and paid for each taxable year upon the net income of every life insurance company a tax as follows:

(1) In the case of a domestic life insurance company, 13¾ per centum of its net income;

Tax on life insurance companies.
"Life insurance company," defined.

Rate of tax on net incomes.
*Ante,* p. 177.

Domestic.

INCOME TAX
Foreign.

(2) In the case of a foreign life insurance company, 13¾ per centum of its net income from sources within the United States.

Gross income, life insurance companies.
"Gross income," defined.

## SEC. 202. GROSS INCOME OF LIFE INSURANCE COMPANIES.

(a) In the case of a life insurance company the term "gross income" means the gross amount of income received during the taxable year from interest, dividends, and rents.

"Reserve funds required by law."
Application of.

(b) The term "reserve funds required by law" includes, in the case of assessment insurance, sums actually deposited by any company or association with State or Territorial officers pursuant to law as guaranty or reserve funds, and any funds maintained under the charter or articles of incorporation of the company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use.

Net income.
Deductions from.

## SEC. 203. NET INCOME OF LIFE INSURANCE COMPANIES.

(a) GENERAL RULE.—In the case of a life insurance company the term "net income" means the gross income less—

Tax-free interest.
*Ante*, p. 178.

(1) TAX-FREE INTEREST.—The amount of interest received during the taxable year which under section 22(b) is exempt from the taxes imposed by this title;

Reserve funds required by law.

(2) RESERVE FUNDS.—An amount equal to 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year, except that in the case of any such reserve fund which is computed at a lower interest assumption rate, the rate of 3¾ per centum shall be substituted for 4 per centum. Life insurance companies issuing policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation, shall be allowed, in addition to the above, a deduction of 3¾ per centum of the mean of such reserve funds (not required by law) held at the beginning and end of the taxable year, as the Commissioner finds to be necessary for the protection of the holders of such policies only;

Policies of combined insurance.
Weekly payment plan.

Reserves not required by law.

Dividends from domestic corporations.
*Post*, p. 231.
From foreign corporations.

(3) DIVIDENDS.—The amount received as dividends (A) from a domestic corporation which is subject to taxation under this title, other than a corporation entitled to the benefits of section 251, and other than a corporation organized under the China Trade Act, 1922, or (B) from any foreign corporation when it is shown to the satisfaction of the Commissioner that more than 50 per centum of the gross income of such foreign corporation for the three-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the foreign corporation has been in existence) was derived from sources within the United States as determined under section 119;

*Ante*, p. 208.

Amount for reserves for deferred dividends.

(4) RESERVE FOR DIVIDENDS.—An amount equal to 2 per centum of any sums held at the end of the taxable year as a reserve for dividends (other than dividends payable during the year following the taxable year) the payment of which is deferred for a period of not less than five years from the date of the policy contract;

Investment expenses.
*Proviso.*
Limitation.

(5) INVESTMENT EXPENSES.—Investment expenses paid during the taxable year: *Provided*, That if any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed one-fourth of 1 per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year;

(6) REAL ESTATE EXPENSES.—Taxes and other expenses paid during the taxable year exclusively upon or with respect to the real estate owned by the company, not including taxes assessed against local benefits of a kind tending to increase the value of the property assessed, and not including any amount paid out for new buildings, or for permanent improvements or betterments made to increase the value of any property.  The deduction allowed by this paragraph shall be allowed in the case of taxes imposed upon a shareholder of a company upon his interest as shareholder, which are paid by the company without reimbursement from the shareholder, but in such cases no deduction shall be allowed the shareholder for the amount of such taxes;

INCOME TAX<br>Taxes, etc., on realty.<br>Exception.<br>If tax paid on shareholder's interest.

(7) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear of property, including a reasonable allowance for obsolescence; and

Depreciation of property.

(8) INTEREST.—All interest paid or accrued within the taxable year on its indebtedness, except on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from taxation under this title.

Interest on indebtedness.<br>Exception.

(b) RENTAL VALUE OF REAL ESTATE.—The deduction under subsection (a) (6) or (7) of this section on account of any real estate owned and occupied in whole or in part by a life insurance company, shall be limited to an amount which bears the same ratio to such deduction (computed without regard to this subsection) as the rental value of the space not so occupied bears to the rental value of the entire property.

Rental value of real estate.<br>Deduction of proportionate part of depreciation, etc., expenses.<br>Determination of.

(c) FOREIGN LIFE INSURANCE COMPANIES.—In the case of a foreign life insurance company the amount of its net income for any taxable year from sources within the United States shall be the same proportion of its net income for the taxable year from sources within and without the United States, which the reserve funds required by law and held by it at the end of the taxable year upon business transacted within the United States is of the reserve funds held by it at the end of the taxable year upon all business transacted.

Foreign life insurance companies.<br>Net income on business in United States.

## SEC. 204. INSURANCE COMPANIES OTHER THAN LIFE OR MUTUAL.

Insurance companies other than life or mutual.<br>Tax imposed.

(a) IMPOSITION OF TAX.—In lieu of the tax imposed by section 13 of this title, there shall be levied, collected, and paid for each taxable year upon the net income of every insurance company (other than a life or mutual insurance company) a tax as follows:

(1) In the case of such a domestic insurance company, 13¾ per centum of its net income;

Domestic companies.

(2) In the case of such a foreign insurance company, 13¾ per centum of its net income from sources within the United States.

Foreign companies.

(b) DEFINITION OF INCOME, ETC.—In the case of an insurance company subject to the tax imposed by this section—

Definition of terms.

(1) GROSS INCOME.—" Gross income " means the sum of (A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by ·the National Convention of Insurance Commissioners, and (B) gain during the taxable year from the sale or other disposition of property, and (C) all other items constituting gross income under section 22;

"Gross income."

(2) NET INCOME.—" Net income " means the gross income as defined in paragraph (1) of this subsection less the deductions allowed by subsection (c) of this section;

"Net income."

3051°—33——15

226                72d CONGRESS. SESS. I. CH. 209. ,JUNE 6, 1932.

INCOME TAX

"Investment income."

Sources of.

(3) INVESTMENT INCOME.—"Investment income" means the gross amount of income earned during the taxable year from interest, dividends, and rents, computed as follows:

To all interest, dividends and rents received during the taxable year, add interest, dividends and rents due and accrued at the end of the taxable year, and deduct all interest, dividends and rents due and accrued at the end of the preceding taxable year;

"Underwriting income."

(4) UNDERWRITING INCOME.—"Underwriting income" means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred;

"Premiums earned."

Computation of.

(5) PREMIUMS EARNED.—"Premiums earned on insurance contracts during the taxable year" means an amount computed as follows:

From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. To the result so obtained add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year;

"Losses incurred."

Computation of.

(6) LOSSES INCURRED.—"Losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year, and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year. To the result so obtained add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year;

"Expenses incurred."

Computation of.

(7) EXPENSES INCURRED.—"Expenses incurred" means all expenses shown on the annual statement approved by the National Convention of Insurance Commissioners, and shall be computed as follows:

To all expenses paid during the taxable year add expenses unpaid at the end of the taxable year and deduct expenses unpaid at the end of the preceding taxable year. For the purpose of computing the net income subject to the tax imposed by this section there shall be deducted from expenses incurred as defined in this paragraph all expenses incurred which are not allowed as deductions by subsection (c) of this section.

Net income.
Deductions allowed.

(c) DEDUCTIONS ALLOWED.—In computing the net income of an insurance company subject to the tax imposed by this section there shall be allowed as deductions:

Business expenses.
Ante, p. 179.

(1) All ordinary and necessary expenses incurred, as provided in section 23(a);

Interest.

(2) All interest as provided in section 23(b);

Taxes.

(3) Taxes as provided in section 23(c);

Losses.

(4) Losses incurred as defined in subsection (b) (6) of this section;

Losses from sales.

(5) Losses sustained during the taxable year from the sale or other disposition of property;

Worthless debts.

(6) Bad debts in the nature of agency balances and bills receivable ascertained to be worthless and charged off within the taxable year;

Dividends from corporations.

(7) The amount received as dividends from corporations as provided in section 23(p);

Exempt interest.
Ante, p. 178.

(8) The amount of interest earned during the taxable year which under section 22(b)(4) is exempt from the taxes imposed by this

title, and the amount of interest allowed as a credit under section 26; <span class="margin">INCOME TAX<br>*Ante*, p. 185.</span>

(9) A reasonable allowance for the exhaustion, wear and tear of property, as provided in section 23 (k). <span class="margin">Exhaustion, etc., of property.</span>

(d) DEDUCTIONS OF FOREIGN CORPORATIONS.—In the case of a foreign corporation the deductions allowed in this section shall be allowed to the extent provided in Supplement I. <span class="margin">Deductions allowed foreign corporations for United States business. *Post*, p. 229.</span>

(e) DOUBLE DEDUCTIONS.—Nothing in this section shall be construed to permit the same item to be twice deducted. <span class="margin">Duplications prohibited.</span>

## SEC. 205. NET LOSSES.

<span class="margin">Net losses.</span>

The benefit of the special deduction for net losses allowed by section 117 shall be allowed to insurance companies subject to the tax imposed by section 201 or 204, under regulations prescribed by the Commissioner with the approval of the Secretary. <span class="margin">Allowance of special deductions for. *Ante*, pp. 207, 223, 225.</span>

## SEC. 206. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

<span class="margin">Foreign taxes.</span>

The amount of income, war-profits, and excess-profits taxes imposed by foreign countries or possessions of the United States shall be allowed as a credit against the tax of a domestic insurance company subject to the tax imposed by section 201 or 204, to the extent provided in the case of a domestic corporation in section 131, and in such cases "net income" as used in that section means the net income as defined in this Supplement. <span class="margin">Credit for, allowed domestic insurance companies. *Ante*, pp. 223, 225.<br><br>*Ante*, p. 211.</span>

## SEC. 207. COMPUTATION OF GROSS INCOME.

<span class="margin">Gross income. Computation. *Ante*, pp. 208, 223, 225.</span>

The gross income of insurance companies subject to the tax imposed by section 201 or 204 shall not be determined in the manner provided in section 119.

## SEC. 208. MUTUAL INSURANCE COMPANIES OTHER THAN LIFE.

<span class="margin">Mutual insurance companies other than life.</span>

(a) APPLICATION OF TITLE.—Mutual insurance companies, other than life insurance companies, shall be taxable in the same manner as other corporations, except as hereinafter provided in this section. <span class="margin">Taxable as other corporations.</span>

(b) GROSS INCOME.—Mutual marine-insurance companies shall include in gross income the gross premiums collected and received by them less amounts paid for reinsurance. <span class="margin">Gross income, includes premiums less reinsurance.</span>

(c) DEDUCTIONS.—In addition to the deductions allowed to corporations by section 23 the following deductions to insurance companies shall also be allowed, unless otherwise allowed— <span class="margin">Additional deductions. *Ante*, p. 179.</span>

(1) MUTUAL INSURANCE COMPANIES OTHER THAN LIFE INSURANCE.—In the case of mutual insurance companies other than life insurance companies— <span class="margin">Mutual insurance companies.</span>

(A) the net addition required by law to be made within the taxable year to reserve funds (including in the case of assessment insurance companies the actual deposit of sums with State or Territorial officers pursuant to law as additions to guarantee or reserve funds); and <span class="margin">Addition to reserve funds.</span>

(B) the sums other than dividends paid within the taxable year on policy and annuity contracts. <span class="margin">Policy and annuity contracts.</span>

(2) MUTUAL MARINE INSURANCE COMPANIES.—In the case of mutual marine insurance companies, in addition to the deductions allowed in paragraph (1) of this subsection, unless otherwise allowed, amounts repaid to policyholders on account of premiums previously paid by them, and interest paid upon such amounts between the ascertainment and the payment thereof; <span class="margin">Mutual marine insurance companies. Repayments to policy holders.</span>

(3) MUTUAL INSURANCE COMPANIES OTHER THAN LIFE AND MARINE.—In the case of mutual insurance companies (including interinsurers and reciprocal underwriters, but not including mutual life or mutual marine insurance companies) requiring <span class="margin">Companies other than life and marine. Premium deposits returned.</span>

228                72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

INCOME TAX
their members to make premium deposits to provide for losses and expenses, the amount of premium deposits returned to their policyholders and the amount of premium deposits retained for the payment of losses, expenses, and reinsurance reserves.

## Supplement H—Nonresident Alien Individuals

*Nonresident alien individuals.*

*Normal tax. Rate.*
### SEC. 211. NORMAL TAX.

(a) GENERAL RULE.—In the case of a nonresident alien individual who is not a resident of a contiguous country, the normal tax shall be 8 per centum of the amount of the net income in excess of the credits against net income allowed to such individual.

*Residents in contiguous countries.*
(b) ALIENS RESIDENT IN CONTIGUOUS COUNTRIES.—In the case of an alien individual resident in a contiguous country, the normal tax shall be an amount equal to the sum of the following:

*Compensation for personal services in United States.*
(1) 4 per centum of the amount by which the part of the net income attributable to wages, salaries, professional fees, or other amounts received as compensation for personal services actually performed in the United States, exceeds the personal exemption and credit for dependents; but the amount taxable at such 4 per centum rate shall not exceed $4,000; and

*Maximum.*

*Additional in excess.*
(2) 8 per centum of the amount of the net income in excess of the sum of (A) the amount taxed under paragraph (1) of this subsection plus (B) the total credits against net income allowed to such individual.

*In lieu of normal tax. Ante, p. 174.*
(c) IN LIEU OF NORMAL TAX UNDER SECTION 11.—The tax imposed by this section shall be in lieu of the normal tax imposed by section 11.

*Gross income. Includes only United States sources.*
### SEC. 212. GROSS INCOME.

(a) GENERAL RULE.—In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States.

*Earnings from foreign ship operations exempt from taxation.*
(b) SHIPS UNDER FOREIGN FLAG.—The income of a nonresident alien individual which consists exclusively of earnings derived from the operation of a ship or ships documented under the laws of a foreign country which grants an equivalent exemption to citizens of the United States and to corporations organized in the United States, shall not be included in gross income and shall be exempt from taxation under this title.

*Deductions.*
### SEC. 213. DEDUCTIONS.

*Allowed only if connected with income from United States sources.*
(a) GENERAL RULE.—In the case of a nonresident alien individual the deductions shall be allowed only if and to the extent that they are connected with income from sources within the United States; and the proper apportionment and allocation of the deductions with respect to sources of income within and without the United States shall be determined as provided in section 119, under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

*Ante, p. 208.*

*Losses.*
(b) LOSSES.—

*Not connected with trade or business.*
(1) The deduction, for losses not connected with the trade or business if incurred in transactions entered into for profit, allowed by section 23 (e) (2) shall be allowed whether or not connected with income from sources within the United States, but only if the profit, if such transaction had resulted in a profit, would be taxable under this title.

*Ante, p. 180.*

*Casualty, etc., losses not connected with business.*
(2) The deduction for losses of property not connected with the trade or business if arising from certain casualties or theft, allowed by section 23 (e) (3), shall be allowed whether or not

72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.                    229

connected with income from sources within the United States, but only if the loss is of property within the United States.

(c) CHARITABLE, ETC., CONTRIBUTIONS.—The so-called "charitable contribution" deduction allowed by section 23 (n) shall be allowed whether or not connected with income from sources within the United States, but only as to contributions or gifts made to domestic corporations, or to community chests, funds, or foundations, created in the United States, or to the vocational rehabilitation fund.

**SEC. 214. CREDITS AGAINST NET INCOME.**

In the case of a nonresident alien individual the personal exemption allowed by section 25 (c) of this title shall be only $1,000. The credit for dependents allowed by section 25 (d) shall not be allowed in the case of a nonresident alien individual unless he is a resident of a contiguous country.

**SEC. 215. ALLOWANCE OR DEDUCTIONS AND CREDITS.**

(a) RETURN TO CONTAIN INFORMATION.—A nonresident alien individual shall receive the benefit of the deductions and credits allowed to him in this title only by filing or causing to be filed with the collector a true and accurate return of his total income received from all sources in the United States, in the manner prescribed in this title; including therein all the information which the Commissioner may deem necessary for the calculation of such deductions and credits.

(b) TAX WITHHELD AT SOURCE.—The benefit of the personal exemption and credit for dependents, and of the reduced rate of tax provided for in section 211 (b), may, in the discretion of the Commissioner and under regulations prescribed by him with the approval of the Secretary, be received by a nonresident alien individual entitled thereto, by filing a claim therefor with the withholding agent.

**SEC. 216. CREDITS AGAINST TAX.**

A nonresident alien individual shall not be allowed the credits against the tax for taxes of foreign countries and possessions of the United States allowed by section 131.

**SEC. 217. RETURNS.**

In the case of a nonresident alien individual the return, in lieu of the time prescribed in section 53 (a) (1), shall be made on or before the fifteenth day of the sixth month following the close of the fiscal year, or, if the return is made on the basis of the calendar year, then on or before the fifteenth day of June.

**SEC. 218. PAYMENT OF TAX.**

(a) TIME OF PAYMENT.—In the case of a nonresident alien individual the total amount of tax imposed by this title shall be paid, in lieu of the time prescribed in section 56 (a), on the fifteenth day of June following the close of the calendar year, or, if the return should be made on the basis of a fiscal year, then on the fifteenth day of the sixth month following the close of the fiscal year.

(b) WITHHOLDING AT SOURCE.—For withholding at source of tax on income of nonresident aliens, see section 143.

### Supplement I—Foreign Corporations

**SEC. 231. GROSS INCOME.**

(a) GENERAL RULE.—In the case of a foreign corporation gross income includes only the gross income from sources within the United States.

---

INCOME TAX

Charitable, etc., contributions allowed only to domestic corporations, etc.
*Ante*, p. 181.

Credits against net income.
Personal exemption.
*Ante*, p. 184.
For dependents if from contiguous country.

Allowance or deductions and credits.
Filing return of total income from United States sources.

Personal exemption credits, etc., by filing claim with withholding agent.
*Ante*, p. 228.

Credits against tax.
No allowance for, of foreign governments.
*Ante*, p. 211.

Returns.

Time for filing.
*Ante*, p. 188.

Payment of tax.
Time designated.
*Ante*, p. 189.

Withholding at source.
*Ante*, p. 215.

Foreign corporations.

Gross income.
From United States sources only.

---

230    72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.

INCOME TAX

Exemption of ships under foreign flag.
Conditions.

(b) SHIPS UNDER FOREIGN FLAG.—The income of a foreign corporation, which consists exclusively of earnings derived from the operation of a ship or ships documented under the laws of a foreign country which grants an equivalent exemption to citizens of the United States and to corporations organized in the United States, shall not be included in gross income and shall be exempt from taxation under this title.

Deductions.

SEC. 232. DEDUCTIONS.

Allowed only on income from United States sources.
Apportionment.

Ante, p. 208.

In the case of a foreign corporation the deductions shall be allowed only if and to the extent that they are connected with income from sources within the United States; and the proper apportionment and allocation of the deductions with respect to sources within and without the United States shall be determined as provided in section 119, under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

Allowance of deductions and credits.
Benefit of, only by filing return of all income from United States sources.

SEC. 233. ALLOWANCE OF DEDUCTIONS AND CREDITS.

A foreign corporation shall receive the benefit of the deductions and credits allowed to it in this title only by filing or causing to be filed with the collector a true and accurate return of its total income received from all sources in the United States, in the manner prescribed in this title; including therein all the information which the Commissioner may deem necessary for the calculation of such deductions and credits.

Credits against tax.
No allowance for, of foreign governments.
Ante, p. 211.

SEC. 234. CREDITS AGAINST TAX.

Foreign corporations shall not be allowed the credits against the tax for taxes of foreign countries and possessions of the United States allowed by section 131.

Returns.
Time for filing.

Ante, p. 188.

Return by agent.

SEC. 235. RETURNS.

In the case of a foreign corporation not having any office or place of business in the United States the return, in lieu of the time prescribed in section 53(a) (1), shall be made on or before the fifteenth day of the sixth month following the close of the fiscal year, or, if the return is made on the basis of the calendar year then on or before the fifteenth day of June. If any foreign corporation has no office or place of business in the United States but has an agent in the United States, the return shall be made by the agent.

Payment of tax.
Time specified.

Ante, p. 189.

SEC. 236. PAYMENT OF TAX.

(a) TIME OF PAYMENT.—In the case of a foreign corporation not having any office or place of business in the United States the total amount of tax imposed by this title shall be paid, in lieu of the time prescribed in section 56(a), on the fifteenth day of June following the close of the calendar year, or, if the return should be made on the basis of a fiscal year, then on the fifteenth day of the sixth month following the close of the fiscal year.

Withholding tax at source.
Ante, p. 215.

(b) WITHHOLDING AT SOURCE.—For withholding at source of tax on income of foreign corporations, see section 143.

Foreign insurance companies.
Special provisions.
Ante, p. 223.

SEC. 237. FOREIGN INSURANCE COMPANIES.

For special provisions relating to foreign insurance companies, see Supplement G.

Affiliation.
Foreign corporations.
Ante, p. 213.

SEC. 238. AFFILIATION.

A foreign corporation shall not be deemed to be affiliated with any other corporation within the meaning of section 141.

## Supplement J—Possessions of the United States

INCOME TAX
Possessions of the United States.

SEC. 251. INCOME FROM SOURCES WITHIN POSSESSIONS OF UNITED STATES.

*Income from sources within.*

(a) GENERAL RULE.—In the case of citizens of the United States or domestic corporations, satisfying the following conditions, gross income means only gross income from sources within the United States—

*Gross income of citizens, etc.*

(1) If 80 per centum or more of the gross income of such citizen or domestic corporation (computed without the benefit of this section), for the three-year period immediately preceding the close of the taxable year (or for such part of such period immediately preceding the close of such taxable year as may be applicable) was derived from sources within a possession of the United States; and

*If 80 per cent derived from United States sources.*

(2) If, in the case of such corporation, 50 per centum or more of its gross income (computed without the benefit of this section) for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States; or

*If corporation derived 50 per cent from business therein.*

(3) If, in case of such citizen, 50 per centum or more of his gross income (computed without the benefit of this section) for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States either on his own account or as an employee or agent of another.

*If citizen derived 50 per cent from active business therein.*

(b) AMOUNTS RECEIVED IN UNITED STATES.—Notwithstanding the provisions of subsection (a) there shall be included in gross income all amounts received by such citizens or corporations within the United States, whether derived from sources within or without the United States.

*Amounts received in United States.*
*Included in gross income.*

(c) DEFINITION.—As used in this section the term "possession of the United States" does not include the Virgin Islands of the United States.

*Status of Virgin Islands.*

(d) DEDUCTIONS.—

*Deductions.*

(1) Citizens of the United States entitled to the benefits of this section shall have the same deductions as are allowed by Supplement H in the case of a nonresident alien individual.

*Citizens allowed same benefits as nonresidents.*
*Ante, p. 228.*

(2) Domestic corporations entitled to the benefits of this section shall have the same deductions as are allowed by Supplement I in the case of a foreign corporation.

*Domestic corporations.*
*Ante, p. 229.*

(e) CREDITS AGAINST NET INCOME.—A citizen of the United States entitled to the benefits of this section shall be allowed a personal exemption of only $1,000 and shall not be allowed the credit for dependents provided in section 25(d).

*Credits against net income.*
*Personal exemption to citizens.*
*Ante, p. 184.*

(f) ALLOWANCE OF DEDUCTIONS AND CREDITS.—Citizens of the United States and domestic corporations entitled to the benefits of this section shall receive the benefit of the deductions and credits allowed to them in this title only by filing or causing to be filed with the collector a true and accurate return of their total income received from all sources in the United States, in the manner prescribed in this title; including therein all the information which the Commissioner may deem necessary for the calculation of such deductions and credits.

*Allowance of deductions by filing return of total income.*

(g) CREDITS AGAINST TAX.—Persons entitled to the benefits of this section shall not be allowed the credits against the tax for taxes of foreign countries and possessions of the United States allowed by section 131.

*Credits against tax.*
*No allowance for, of foreign countries.*
*Ante, p. 211.*

232    72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

INCOME TAX
Affiliation.
Applicability to corporations.
*Ante*, p. 213.

(h) AFFILIATION.—A corporation entitled to the benefits of this section shall not be deemed to be affiliated with any other corporation within the meaning of section 141.

Citizens of Possessions of United States.
Taxation of nonresident of United States if citizen of possession.

SEC. 252. CITIZENS OF POSSESSIONS OF UNITED STATES.

(a) Any individual who is a citizen of any possession of the United States (but not otherwise a citizen of the United States) and who is not a resident of the United States, shall be subject to taxation under this title only as to income derived from sources within the United States, and in such case the tax shall be computed and paid in the same manner and subject to the same conditions as in the case of other persons who are taxable only as to income derived from such sources.

Virgin Islands.
Payment of taxes in, not affected.
Vol. 42, p. 123.

(b) Nothing in this section shall be construed to alter or amend the provisions of the Act entitled "An Act making appropriations for the naval service for the fiscal year ending June 30, 1922, and for other purposes," approved July 12, 1921, relating to the imposition of income taxes in the Virgin Islands of the United States.

China Trade Act Corporations.

## Supplement K—China Trade Act Corporations

Credits against net income.
Computation and proportion of.

*Ante*, p. 177.


*Ante*, p. 208.

SEC. 261. CREDIT AGAINST NET INCOME.

(a) ALLOWANCE OF CREDIT.—For the purpose only of the tax imposed by section 13 there shall be allowed, in the case of a corporation organized under the China Trade Act, 1922, in addition to the credit provided in section 26, a credit against the net income of an amount equal to the proportion of the net income derived from sources within China (determined in a similar manner to that provided in section 119) which the par value of the shares of stock of the corporation owned on the last day of the taxable year by (1) persons resident in China, the United States, or possessions of the United States, and (2) individual citizens of the United States or China wherever resident, bears to the par value of the whole number of shares of stock of the corporation outstanding on such date: *Provided*, That in no case shall the amount by which the tax imposed by section 13 is diminished by reason of such credit exceed the amount of the special dividend certified under subsection (b) of this section.

*Proviso.*
Limitation.
*Ante*, p. 177.

Special dividends.
Conditions.

Credit subject to special dividend to residents of China, etc.

(b) SPECIAL DIVIDEND.—Such credit shall not be allowed unless the Secretary of Commerce has certified to the Commissioner—

(1) The amount which, during the year ending on the date fixed by law for filing the return, the corporation has distributed as a special dividend to or for the benefit of such persons as on the last day of the taxable year were resident in China, the United States, or possessions of the United States, or were individual citizens of the United States or China, and owned shares of stock of the corporation;

Additional to all other payments.

(2) That such special dividend was in addition to all other amounts, payable or to be payable to such persons or for their benefit, by reason of their interest in the corporation; and

Proportionate distribution to stock owned.

(3) That such distribution has been made to or for the benefit of such persons in proportion to the par value of the shares of stock of the corporation owned by each; except that if the corporation has more than one class of stock, the certificates shall contain a statement that the articles of incorporation provide a method for the apportionment of such special dividend among such persons, and that the amount certified has been distributed in accordance with the method so provided.

Definition of stock ownership.

(c) OWNERSHIP OF STOCK.—For the purposes of this section shares of stock of a corporation shall be considered to be owned by the

JA6733

person in whom the equitable right to the income from such shares is in good faith vested.

INCOME TAX

(d) DEFINITION OF CHINA.—As used in this section the term "China" shall have the same meaning as when used in the China Trade Act, 1922.

Meaning of "China." Vol. 42, p. 849.

## SEC. 262. CREDITS AGAINST THE TAX.

A corporation organized under the China Trade Act, 1922, shall not be allowed the credits against the tax for taxes of foreign countries and possessions of the United States allowed by section 131.

Credits against tax. No allowance for, of foreign countries. Ante, p. 211.

## SEC. 263. AFFILIATION.

A corporation organized under the China Trade Act, 1922, shall not be deemed to be affiliated with any other corporation within the meaning of section 141.

Affiliation. Not applicable to corporations hereof. Ante, p. 213.

## SEC. 264. INCOME OF SHAREHOLDERS.

For exclusion of dividends from gross income, see section 116.

Income of shareholders. Exclusion from gross income. Ante, p. 204.

### Supplement L—Assessment and Collection of Deficiencies

Assessment and collection of deficiencies.

## SEC. 271. DEFINITION OF DEFICIENCY.

As used in this title in respect of a tax imposed by this title "deficiency" means—

"Deficiency" defined.

(a) The amount by which the tax imposed by this title exceeds the amount shown as the tax by the taxpayer upon his return; but the amount so shown on the return shall first be increased by the amounts previously assessed (or collected without assessment) as a deficiency, and decreased by the amounts previously abated, credited, refunded, or otherwise repaid in respect of such tax; or

Amount tax imposed exceeds return by taxpayer.

(b) If no amount is shown as the tax by the taxpayer upon his return, or if no return is made by the taxpayer, then the amount by which the tax exceeds the amounts previously assessed (or collected without assessment) as a deficiency; but such amounts previously assessed, or collected without assessment, shall first be decreased by the amounts previously abated, credited, refunded, or otherwise repaid in respect of such tax.

Amount tax exceeds previous assessment.

## SEC. 272. PROCEDURE IN GENERAL.

(a) PETITION TO BOARD OF TAX APPEALS.—If in the case of any taxpayer, the Commissioner determines that there is a deficiency in respect of the tax imposed by this title, the Commissioner is authorized to send notice of such deficiency to the taxpayer by registered mail. Within 60 days after such notice is mailed (not counting Sunday as the sixtieth day), the taxpayer may file a petition with the Board of Tax Appeals for a redetermination of the deficiency. No assessment of a deficiency in respect of the tax imposed by this title and no distraint or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of such 60-day period, nor, if a petition has been filed with the Board, until the decision of the Board has become final. Notwithstanding the provisions of section 3224 of the Revised Statutes the making of such assessment or the beginning of such proceeding or distraint during the time such prohibition is in force may be enjoined by a proceeding in the proper court.

Procedure in general. Notice of deficiency to taxpayer.

Petition to Board of Tax Appeals for redetermination.

No assessment until notice mailed to taxpayer.

Or petition filed. Injunction to restrain assessment. R. S., sec. 3224, p. 619.

For exceptions to the restrictions imposed by this subsection, see—

Exceptions to restrictions.

(1) Subsection (d) of this section, relating to waivers by the taxpayer;

Waivers.

(2) Subsection (f) of this section, relating to notifications of mathematical errors appearing upon the face of the return;

Errors.

INCOME TAX
Jeopardy assessments, p. 235.
Bankruptcy, etc., p. 237.
Assessment of deficiency.
Vol. 44, pp. 109.
Collection of deficiency found by board.

(3) Section 273, relating to jeopardy assessments;

(4) Section 274, relating to bankruptcy and receiverships; and

(5) Section 1001 of the Revenue Act of 1926, as amended, relating to assessment or collection of the amount of the deficiency determined by the Board pending court review.

(b) COLLECTION OF DEFICIENCY FOUND BY BOARD.—If the taxpayer files a petition with the Board, the entire amount redetermined as the deficiency by the decision of the Board which has become final shall be assessed and shall be paid upon notice and demand from the collector. No part of the amount determined as a deficiency by the

Disallowance not collectible.

Commissioner but disallowed as such by the decision of the Board which has become final shall be assessed or be collected by distraint or by proceeding in court with or without assessment.

Payment on demand if petition not filed.

(c) FAILURE TO FILE PETITION.—If the taxpayer does not file a petition with the Board within the time prescribed in subsection (a) of this section, the deficiency, notice of which has been mailed to the taxpayer, shall be assessed, and shall be paid upon notice and demand from the collector.

Waiver of restrictions by taxpayer.

(d) WAIVER OF RESTRICTIONS.—The taxpayer shall at any time have the right, by a signed notice in writing filed with the Commissioner, to waive the restrictions provided in subsection (a) of this section on the assessment and collection of the whole or any part of the deficiency.

Increase of deficiency after notice mailed.

(e) INCREASE OF DEFICIENCY AFTER NOTICE MAILED.—The Board shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the tax-

Condition.

payer, and to determine whether any penalty, additional amount or addition to the tax should be assessed—if claim therefor is asserted by the Commissioner at or before the hearing or a rehearing.

Restriction hereafter on determining deficiency after notice.

(f) FURTHER DEFICIENCY LETTERS RESTRICTED.—If the Commissioner has mailed to the taxpayer notice of a deficiency as provided in subsection (a) of this section, and the taxpayer files a petition with the Board within the time prescribed

Exception.

in such subsection, the Commissioner shall have no right to determine any additional deficiency in respect of the same taxable year, except in the case of fraud, and except as provided in sub-

Post, p. 235.

section (e) of this section, relating to assertion of greater deficiencies before the Board, or in section 273 (c), relating to the making of jeopardy assessments. If the taxpayer is notified that,

Mathematical error not considered a notice of deficiency.

on account of a mathematical error appearing upon the face of the return, an amount of tax in excess of that shown upon the return is due, and that an assessment of the tax has been or will be made on the basis of what would have been the correct amount of tax but for the mathematical error, such notice shall not be considered (for the purposes of this subsection, or of subsection (a) of this section, prohibiting assessment and collection until notice of deficiency has

Post, p. 242.
Credits or refunds.

been mailed, or of section 322 (c), prohibiting credits or refunds after petition to the Board of Tax Appeals) as a notice of a deficiency, and the taxpayer shall have no right to file a petition with the Board based on such notice, nor shall such assessment or collection be prohibited by the provisions of subsection (a) of this section.

Jurisdiction over other taxable years.

(g) JURISDICTION OVER OTHER TAXABLE YEARS.—The Board in redetermining a deficiency in respect of any taxable year shall consider such facts with relation to the taxes for other taxable years

Limitation.

as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine

whether or not the tax for any other taxable year has been overpaid or underpaid.

(h) FINAL DECISIONS OF BOARD.—For the purposes of this title the date on which a decision of the Board becomes final shall be determined according to the provisions of section 1005 of the Revenue Act of 1926.

(i) PRORATING OF DEFICIENCY TO INSTALLMENTS.—If the taxpayer has elected to pay the tax in installments and a deficiency has been assessed, the deficiency shall be prorated to the four installments. Except as provided in section 273 (relating to jeopardy assessments), that part of the deficiency so prorated to any installment the date for payment of which has not arrived, shall be collected at the same time as and as part of such installment. That part of the deficiency so prorated to any installment the date for payment of which has arrived, shall be paid upon notice and demand from the collector.

(j) EXTENSION OF TIME FOR PAYMENT OF DEFICIENCIES.—Where it is shown to the satisfaction of the Commissioner that the payment of a deficiency upon the date prescribed for the payment thereof will result in undue hardship to the taxpayer the Commissioner, with the approval of the Secretary (except where the deficiency is due to negligence, to intentional disregard of rules and regulations, or to fraud with intent to evade tax), may grant an extension for the payment of such deficiency or any part thereof for a period not in excess of eighteen months, and, in exceptional cases, for a further period not in excess of twelve months. If an extension is granted, the Commissioner may require the taxpayer to furnish a bond in such amount, not exceeding double the amount of the deficiency, and with such sureties, as the Commissioner deems necessary, conditioned upon the payment of the deficiency in accordance with the terms of the extension.

(k) ADDRESS FOR NOTICE OF DEFICIENCY.—In the absence of notice to the Commissioner under section 312 (a) of the existence of a fiduciary relationship, notice of a deficiency in respect of a tax imposed by this title, if mailed to the taxpayer at his last known address, shall be sufficient for the purposes of this title even if such taxpayer is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

SEC. 273. JEOPARDY ASSESSMENTS.

(a) AUTHORITY FOR MAKING.—If the Commissioner believes that the assessment or collection of a deficiency will be jeopardized by delay, he shall immediately assess such deficiency (together with all interest, additional amounts, or additions to the tax provided for by law) and notice and demand shall be made by the collector for the payment thereof.

(b) DEFICIENCY LETTERS.—If the jeopardy assessment is made before any notice in respect of the tax to which the jeopardy assessment relates has been mailed under section 272(a), then the Commissioner shall mail a notice under such subsection within 60 days after the making of the assessment.

(c) AMOUNT ASSESSABLE BEFORE DECISION OF BOARD.—The jeopardy assessment may be made in respect of a deficiency greater or less than that notice of which has been mailed to the taxpayer, despite the provisions of section 272(f) prohibiting the determination of additional deficiencies, and whether or not the taxpayer has theretofore filed a petition with the Board of Tax Appeals. The Commissioner shall notify the Board of the amount of such assessment, if the petition is filed with the Board before the making of the assessment or is subsequently filed, and the Board shall have

INCOME TAX

Final decisions of Board.
Vol. 44, p. 110.

Prorating of deficiency to installments.

Extension for payments allowed, to avoid undue hardship.

Bond required.

Address for notice of deficiency.
Post, p. 312.

Jeopardy assessments.
Deficiency immediately assessed if jeopardized by delay.

Deficiency letters.
Notice to be mailed.

Amount assessable before decision of Board.

Board to redetermine on notice.

INCOME TAX

jurisdiction to redetermine the entire amount of the deficiency and of all amounts assessed at the same time in connection therewith.

Amount assessable after decision of Board.

(d) AMOUNT ASSESSABLE AFTER DECISION OF BOARD.—If the jeopardy assessment is made after the decision of the Board is rendered such assessment may be made only in respect of the deficiency determined by the Board in its decision.

Disallowed after Board's final decision, etc.

(e) EXPIRATION OF RIGHT TO ASSESS.—A jeopardy assessment may not be made after the decision of the Board has become final or after the taxpayer has filed a petition for review of the decision of the Board.

Bond to stay collection.

(f) BOND TO STAY COLLECTION.—When a jeopardy assessment has been made the taxpayer, within 10 days after notice and demand from the collector for the payment of the amount of the assessment, may obtain a stay of collection of the whole or any part of the amount of the assessment by filing with the collector a bond in such amount, not exceeding double the amount as to which the stay is desired, and with such sureties, as the collector deems necessary, conditioned upon the payment of so much of the amount, the collection of which is stayed by the bond, as is not abated by a decision of the Board which has become final, together with interest thereon as provided in section 297.

Conditions.
Post, p. 240.

Further conditions, if bond given before filing petition.

(g) SAME—FURTHER CONDITIONS.—If the bond is given before the taxpayer has filed his petition with the Board under section 272(a), the bond shall contain a further condition that if a petition is not filed within the period provided in such subsection, then the amount the collection of which is stayed by the bond will be paid on notice and demand at any time after the expiration of such period, together with interest thereon at the rate of 6 per centum per annum from the date of the jeopardy notice and demand to the date of notice and demand under this subsection.

Stay of collection of part covered by bond.

Effect of waiver of stay, etc.

(h) WAIVER OF STAY.—Upon the filing of the bond the collection of so much of the amount assessed as is covered by the bond shall be stayed. The taxpayer shall have the right to waive such stay at any time in respect of the whole or any part of the amount covered by the bond, and if as a result of such waiver any part of the amount covered by the bond is paid, then the bond shall, at the request of the taxpayer, be proportionately reduced. If the Board determines that the amount assessed is greater than the amount which should have been assessed, then when the decision of the Board is rendered the bond shall, at the request of the taxpayer, be proportionately reduced.

Collection of unpaid amounts.
When decision of Board final.

(i) COLLECTION OF UNPAID AMOUNTS.—When the petition has been filed with the Board and when the amount which should have been assessed has been determined by a decision of the Board which has become final, then any unpaid portion, the collection of which has been stayed by the bond, shall be collected as part of the tax upon notice and demand from the collector, and any remaining portion of the assessment shall be abated. If the amount already collected exceeds the amount determined as the amount which should have been assessed, such excess shall be credited or refunded to the taxpayer as provided in section 322, without the filing of claim therefor. If the amount determined as the amount which should have been assessed is greater than the amount actually assessed, then the difference shall be assessed and shall be collected as part of the tax upon notice and demand from the collector.

Credit or refund.
Post, p. 242.

Collection of greater assessment.

No other abatement claim to be filed.

(j) CLAIMS IN ABATEMENT.—No claim in abatement shall be filed in respect of any assessment in respect of any tax imposed by this title.

## SEC. 274. BANKRUPTCY AND RECEIVERSHIPS.

(a) IMMEDIATE ASSESSMENT.—Upon the adjudication of bankruptcy of any taxpayer in any bankruptcy proceeding or the appointment of a receiver for any taxpayer in any receivership proceeding before any court of the United States or of any State or Territory or of the District of Columbia, any deficiency (together with all interest, additional amounts, or additions to the tax provided for by law) determined by the Commissioner in respect of a tax imposed by this title upon such taxpayer shall, despite the restrictions imposed by section 272(a) upon assessments be immediately assessed if such deficiency has not theretofore been assessed in accordance with law. Claims for the deficiency and such interest, additional amounts and additions to the tax may be presented, for adjudication in accordance with law, to the court before which the bankruptcy or receivership proceeding is pending, despite the pendency of proceedings for the redetermination of the deficiency in pursuance of a petition to the Board; but no petition for any such redetermination shall be filed with the Board after the adjudication of bankruptcy or the appointment of the receiver.

(b) UNPAID CLAIMS.—Any portion of the claim allowed in such bankruptcy or receivership proceeding which is unpaid shall be paid by the taxpayer upon notice and demand from the collector after the termination of such proceeding, and may be collected by distraint or proceeding in court within six years after termination of such proceeding. Extensions of time for such payment may be had in the same manner and subject to the same provisions and limitations as are provided in section 272(j) and section 296 in the case of a deficiency in a tax imposed by this title.

## SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Except as provided in section 276—

(a) GENERAL RULE.—The amount of income taxes imposed by this title shall be assessed within two years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

(b) REQUEST FOR PROMPT ASSESSMENT.—In the case of income received during the lifetime of a decedent, or by his estate during the period of administration, or by a corporation, the tax shall be assessed, and any proceeding in court without assessment for the collection of such tax shall be begun, within one year after written request therefor (filed after the return is made) by the executor, administrator, or other fiduciary representing the estate of such decedent, or by the corporation, but not after the expiration of two years after the return was filed. This subsection shall not apply in the case of a corporation unless—

(1) Such written request notifies the Commissioner that the corporation contemplates dissolution at or before the expiration of such year; and

(2) The dissolution is in good faith begun before the expiration of such year; and

(3) The dissolution is completed.

(c) CORPORATION AND SHAREHOLDER.—If a corporation makes no return of the tax imposed by this title, but each of the shareholders includes in his return his distributive share of the net income of the corporation, then the tax of the corporation shall be assessed within four years after the last date on which any such shareholder's return was filed.

---

Marginal notes:

INCOME TAX

Bankruptcy and receiverships
Immediate assessment of tax deficiency in.

Adjudication of claim by court.

Unpaid claims.
Collection of claims allowed in court proceedings.

Time extensions.
*Ante*, p. 235; *Post*, p. 240.

Period of limitation upon assessment and collection.
*Post*, p. 238.

Assessment within two years.

Requests for prompt assessments.
By fiduciary representatives.

Applicability to corporations.

Exceptions.
Dissolution contemplated.

Dissolved in good faith before year expires.

Dissolution completed.

Corporation making no return.
Assessment in four years, after shareholder's returns.

238          72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

INCOME TAX

**SEC. 276. SAME—EXCEPTIONS.**

Exceptions.
False return or no return.
Assessment in case of.

(a) FALSE RETURN OR NO RETURN.—In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

Waivers.
At any time with written consent of Commissioner.
*Ante,* p. 237.

(b) WAIVERS.—Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

Collection after assessment.
By distraint.
Time limit.

Extension.

(c) COLLECTION AFTER ASSESSMENT.—Where the assessment of any income tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by distraint or by a proceeding in court, but only if begun (1) within six years after the assessment of the tax, or (2) prior to the expiration of any period for collection agreed upon in writing by the Commissioner and the taxpayer before the expiration of such six-year period. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

Statute of limitations.
Suspension of running of.

**SEC. 277. SUSPENSION OF RUNNING OF STATUTE.**

*Ante,* p. 233.

Until decision of Board, etc.

The running of the statute of limitations provided in section 275 or 276 on the making of assessments and the beginning of distraint or a proceeding in court for collection, in respect of any deficiency, shall (after the mailing of a notice under section 272(a) ) be suspended for the period during which the Commissioner is prohibited from making the assessment or beginning distraint or a proceeding in court (and in any event, if a proceeding in respect of the deficiency is placed on the docket of the Board, until the decision of the Board becomes final), and for 60 days thereafter.

Interest and additions to tax.

**Supplement M—Interest and Additions to the Tax**

Failure to file return.
Additional tax imposed.

**SEC. 291. FAILURE TO FILE RETURN.**

Exception.
If failure not willful neglect.

Collection.

In lieu of former levy.
R. S., sec. 3176, p. 610.

In case of any failure to make and file a return required by this title, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, 25 per centum of the tax shall be added to the tax, except that when a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not due to willful neglect no such addition shall be made to the tax. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.

Interest on deficiencies.
Assessment and rate.

**SEC. 292. INTEREST ON DEFICIENCIES.**

In case of waiver.

Interest upon the amount determined as a deficiency shall be assessed at the same time as the deficiency, shall be paid upon notice and demand from the collector, and shall be collected as a part of the tax, at the rate of 6 per centum per annum from the date prescribed for the payment of the tax (or, if the tax is paid in installments, from the date prescribed for the payment of the first installment) to the date the deficiency is assessed, or, in the case of a waiver under section 272(d), to the thirtieth day after the filing of such

waiver or to the date the deficiency is assessed whichever is the earlier.

INCOME TAX

## SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

Additions to tax in case of deficiency.
If due to negligence.

(a) NEGLIGENCE.—If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272 (i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable.

(b) FRAUD.—If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.

Due to fraud.

R. S., sec. 3176, p. 610.

## SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT.

Additions to tax in case of nonpayment.

(a) TAX SHOWN ON RETURN.—

(1) GENERAL RULE.—Where the amount determined by the taxpayer as the tax imposed by this title, or any installment thereof, or any part of such amount or installment, is not paid on or before the date prescribed for its payment, there shall be collected as a part of the tax, interest upon such unpaid amount at the rate of 1 per centum a month from the date prescribed for its payment until it is paid.

Interest prescribed.

(2) IF EXTENSION GRANTED.—Where an extension of time for payment of the amount so determined as the tax by the taxpayer, or any installment thereof, has been granted, and the amount the time for payment of which has been extended, and the interest thereon determined under section 295, is not paid in full prior to the expiration of the period of the extension, then, in lieu of the interest provided for in paragraph (1) of this subsection, interest at the rate of 1 per centum a month shall be collected on such unpaid amount from the date of the expiration of the period of the extension until it is paid.

If tax and interest not paid in full when extension granted.
Post, p. 240.

(b) DEFICIENCY.—Where a deficiency, or any interest or additional amounts assessed in connection therewith under section 292, or under section 293, or any addition to the tax in case of delinquency provided for in section 291, is not paid in full within ten days from the date of notice and demand from the collector, there shall be collected as part of the tax, interest upon the unpaid amount at the rate of 1 per centum a month from the date of such notice and demand until it is paid. If any part of a deficiency prorated to any unpaid installment under section 272 (i) is not paid in full on or before the date prescribed for the payment of such installment, there shall be collected as part of the tax interest upon the unpaid amount at the rate of 1 per centum a month from such date until it is paid.

Interest, if deficiency, etc., not paid on notice and demand.
Ante, p. 238.

Nonpayment of prorated installments.
Ante, p. 233.

(c) FIDUCIARIES.—For any period an estate is held by a fiduciary appointed by order of any court of competent jurisdiction or by will, there shall be collected interest at the rate of 6 per centum per annum in lieu of the interest provided in subsections (a) and (b) of this section.

Interest rate payable by fiduciaries

(d) FILING OF JEOPARDY BOND.—If a bond is filed, as provided in section 273, the provisions of subsections (b) and (c) of this section shall not apply to the amount covered by the bond.

Not applicable to amount covered by jeopardy bond.
Ante, p. 235.

INCOME TAX

**SEC. 295. TIME EXTENDED FOR PAYMENT OF TAX SHOWN ON RETURN.**

Time extended for payment of tax shown on return.
Interest.

If the time for payment of the amount determined as the tax by the taxpayer, or any installment thereof, is extended under the authority of section 56 (c), there shall be collected as a part of such amount, interest thereon at the rate of 6 per centum per annum from the date when such payment should have been made if no extension had been granted, until the expiration of the period of the extension.

Ante, p. 189.

**SEC. 296. TIME EXTENDED FOR PAYMENT OF DEFICIENCY.**

Time extended for payment of deficiency.
Interest for period of extension.

If the time for the payment of any part of a deficiency is extended, there shall be collected, as a part of the tax, interest on the part of the deficiency the time for payment of which is so extended, at the rate of 6 per centum per annum for the period of the extension, and no other interest shall be collected on such part of the deficiency for such period. If the part of the deficiency the time for payment of which is so extended is not paid in accordance with the terms of the extension, there shall be collected, as a part of the tax, interest on such unpaid amount at the rate of 1 per centum a month for the period from the time fixed by the terms of the extension for its payment until it is paid, and no other interest shall be collected on such unpaid amount for such period.

Additional, if not paid.

**SEC. 297. INTEREST IN CASE OF JEOPARDY ASSESSMENTS.**

Interest on jeopardy assessments.
Rate of, on amount collected.
Ante, p. 236.

In the case of the amount collected under section 273(i) there shall be collected at the same time as such amount, and as a part of the tax, interest at the rate of 6 per centum per annum upon such amount from the date of the jeopardy notice and demand to the date of notice and demand under section 273(i), or, in the case of the amount collected in excess of the amount of the jeopardy assessment, interest as provided in section 292. If the amount included in the notice and demand from the collector under section 273(i) is not paid in full within ten days after such notice and demand, then there shall be collected, as part of the tax, interest upon the unpaid amount at the rate of 1 per centum a month (or, for any period the estate of the taxpayer is held by a fiduciary appointed by any court of competent jurisdiction or by will, at the rate of 6 per centum per annum) from the date of such notice and demand until it is paid.

Additional, if amount of deficiency not paid in full.

**SEC. 298. BANKRUPTCY AND RECEIVERSHIPS.**

Bankruptcy and receiverships.
Interest, if not paid on demand.
Ante, p. 237.

If the unpaid portion of the claim allowed in a bankruptcy or receivership proceeding, as provided in section 274, is not paid in full within 10 days from the date of notice and demand from the collector, then there shall be collected as a part of such amount interest upon the unpaid portion thereof at the rate of 1 per centum a month from the date of such notice and demand until payment.

**SEC. 299. REMOVAL OF PROPERTY OR DEPARTURE FROM UNITED STATES.**

Removal of property.

For additions to tax in case of leaving the United States or concealing property in such manner as to hinder collection of the tax, see section 146.

Additions to tax for, etc.
Ante, p. 217.

## Supplement N—Claims against Transferees and Fiduciaries

Claims against transferees and fiduciaries.

**SEC. 311. TRANSFERRED ASSETS.**

Transferred assets.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the

Method of collection similar to deficiency collections.

INCOME TAX

same provisions and limitations as in the case of a deficiency in a tax imposed by this title (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds):

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this title.

Liabilities. Transferees.

(2) FIDUCIARIES.—The liability of a fiduciary under section 3467 of the Revised Statutes in respect of the payment of any such tax from the estate of the taxpayer.

Fiduciaries. R. S., sec. 3467, p. 687.

Any such liability may be either as to the amount of tax shown on the return or as to any deficiency in tax.

Amount determined.

(b) PERIOD OF LIMITATION.—The period of limitation for assessment of any such liability of a transferee or fiduciary shall be as follows:

Limitation periods.

(1) In the case of the liability of an initial transferee of the property of the taxpayer,—within one year after the expiration of the period of limitation for assessment against the taxpayer;

When initial transferee liable.

(2) In the case of the liability of a transferee of a transferee of the property of the taxpayer,—within one year after the expiration of the period of limitation for assessment against the preceding transferee, but only if within three years after the expiration of the period of limitation for assessment against the taxpayer;— except that if before the expiration of the period of limitation for the assessment of the liability of the transferee, a court proceeding for the collection of the tax or liability in respect thereof has been begun against the taxpayer or last preceding transferee, respectively,—then the period of limitation for assessment of the liability of the transferee shall expire one year after the return of execution in the court proceeding.

Transferee of transferee liable.

Exception. One year after court proceedings.

(3) In the case of the liability of a fiduciary,—not later than one year after the liability arises or not later than the expiration of the period for collection of the tax in respect of which such liability arises, whichever is the later.

Fiduciary liable.

(c) PERIOD FOR ASSESSMENT AGAINST TAXPAYER.—For the purposes of this section, if the taxpayer is deceased, or in the case of a corporation, has terminated its existence, the period of limitation for assessment against the taxpayer shall be the period that would be in effect had the death or termination of existence not occurred.

Provisions on death of taxpayer or terminated corporation.

(d) SUSPENSION OF RUNNING OF STATUTE OF LIMITATIONS.—The running of the statute of limitations upon the assessment of the liability of a transferee or fiduciary shall, after the mailing to the transferee or fiduciary of the notice provided for in section 272(a), be suspended for the period during which the Commissioner is prohibited from making the assessment in respect of the liability of the transferee or fiduciary (and in any event, if a proceeding in respect of the liability is placed on the docket of the Board, until the decision of the Board becomes final), and for 60 days thereafter.

Suspension of running of statute of limitations, after notice mailed, etc.

Ante, p. 233.

Until decision of Board, etc.

(e) ADDRESS FOR NOTICE OF LIABILITY.—In the absence of notice to the Commissioner under section 312(b) of the existence of a fiduciary relationship, notice of liability enforceable under this section in respect of a tax imposed by this title, if mailed to the person subject to the liability at his last known address, shall be sufficient for the purposes of this title even if such person is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

Address for notice of liability. Post, p. 242.

3051°—33——16

se 1:18-cv-10507-RMB-JBD    Document 196-8    Filed 12/15/23    Page 115 of
Page ID: 9957

INCOME TAX

"Transferee", defined.

Fiduciary relationship.

Liability of fiduciary until termination of.

Fiduciary of transferee.

Liability of.

*Ante,* p. 240.

Manner of notice.

Overpayments.

Of installment.

Credit, if installment payment exceeds correct amount.

Credit or refund for amount already paid.

Refunds and credits.

Credit against tax then due.

Limitation on allowance.

Period of.

Amount of credit or refund limited.

Petition to Board of Tax Appeals.

Effect of.

*Ante,* p. 233.

Exceptions.

Overpayments.

(f) Definition of "Transferee".—As used in this section, the term "transferee" includes heir, legatee, devisee, and distributee.

## SEC. 312. NOTICE OF FIDUCIARY RELATIONSHIP.

(a) Fiduciary of Taxpayer.—Upon notice to the Commissioner that any person is acting in a fiduciary capacity such fiduciary shall assume the powers, rights, duties, and privileges of the taxpayer in respect of a tax imposed by this title (except as otherwise specifically provided and except that the tax shall be collected from the estate of the taxpayer), until notice is given that the fiduciary capacity has terminated.

(b) Fiduciary of Transferee.—Upon notice to the Commissioner that any person is acting in a fiduciary capacity for a person subject to the liability specified in section 311, the fiduciary shall assume, on behalf of such person, the powers, rights, duties, and privileges of such person under such section (except that the liability shall be collected from the estate of such person), until notice is given that the fiduciary capacity has terminated.

(c) Manner of Notice.—Notice under subsection (a) or (b) shall be given in accordance with regulations prescribed by the Commissioner with the approval of the Secretary.

## Supplement O—Overpayments

## SEC. 321. OVERPAYMENT OF INSTALLMENT.

If the taxpayer has paid as an installment of the tax more than the amount determined to be the correct amount of such installment, the overpayment shall be credited against the unpaid installments, if any. If the amount already paid, whether or not on the basis of installments, exceeds the amount determined to be the correct amount of the tax, the overpayment shall be credited or refunded as provided in section 322.

## SEC. 322. REFUNDS AND CREDITS.

(a) Authorization.—Where there has been an overpayment of any tax imposed by this title, the amount of such overpayment shall be credited against any income, war-profits, or excess-profits tax or installment thereof then due from the taxpayer, and any balance shall be refunded immediately to the taxpayer.

(b) Limitation on Allowance.—

(1) Period of limitation.—No such credit or refund shall be allowed or made after two years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer.

(2) Limit on amount of credit or refund.—The amount of the credit or refund shall not exceed the portion of the tax paid during the two years immediately preceding the filing of the claim, or if no claim was filed, then during the two years immediately preceding the allowance of the credit or refund.

(c) Effect of Petition to Board.—If the Commissioner has mailed to the taxpayer a notice of deficiency under section 272(a) and if the taxpayer files a petition with the Board of Tax Appeals within the time prescribed in such subsection, no credit or refund in respect of the tax for the taxable year in respect of which the Commissioner has determined the deficiency shall be allowed or made and no suit by the taxpayer for the recovery of any part of such tax shall be instituted in any court except—

(1) As to overpayments determined by a decision of the Board which has become final; and

Case 1:18-cv-10507-RMB-JBD    Document 196-8    Filed 12/15/23    Page 116 of 179
PageID: 9958

(2) As to any amount collected in excess of an amount computed in accordance with the decision of the Board which has become final; and

(3) As to any amount collected after the period of limitation upon the beginning of distraint or a proceeding in court for collection has expired; but in any such claim for credit or refund or in any such suit for refund the decision of the Board which has become final, as to whether such period has expired before the notice of deficiency was mailed, shall be conclusive.

(d) OVERPAYMENT FOUND BY BOARD.—If the Board finds that there is no deficiency and further finds that the taxpayer has made an overpayment of tax in respect of the taxable year in respect of which the Commissioner determined the deficiency, the Board shall have jurisdiction to determine the amount of such overpayment, and such amount shall, when the decision of the Board has become final, be credited or refunded to the taxpayer. No such credit or refund shall be made of any portion of the tax paid more than two years before the filing of the claim or the filing of the petition, whichever is earlier.

(e) TAX WITHHELD AT SOURCE.—For refund or credit in case of excessive withholding at the source, see section 143(f)

# TITLE II—ADDITIONAL ESTATE TAX

## SEC. 401. IMPOSITION OF TAX.

(a) In addition to the estate tax imposed by section 301(a) of the Revenue Act of 1926, there is hereby imposed upon the transfer of the net estate of every decedent dying after the enactment of this Act, whether a resident or nonresident of the United States, a tax equal to the excess of—

(1) the amount of a tentative tax computed under subsection (b) of this section, over

(2) the amount of the tax imposed by section 301(a) of the Revenue Act of 1926, computed without regard to the provisions of this title.

(b) The tentative tax referred to in subsection (a) (1) of this section shall equal the sum of the following percentages of the value of the net estate:

Upon net estates not in excess of $10,000, 1 per centum.

$100 upon net estates of $10,000; and upon net estates in excess of $10,000 and not in excess of $20,000, 2 per centum in addition of such excess.

$300 upon net estates of $20,000; and upon net estates in excess of $20,000 and not in excess of $30,000, 3 per centum in addition of such excess.

$600 upon net estates of $30,000; and upon net estates in excess of $30,000 and not in excess of $40,000, 4 per centum in addition of such excess.

$1,000 upon net estates of $40,000; and upon net estates in excess of $40,000 and not in excess of $50,000, 5 per centum in addition of such excess.

$1,500 upon net estates of $50,000; and upon net estates in excess of $50,000 and not in excess of $100,000, 7 per centum in addition of such excess.

$5,000 upon net estates of $100,000; and upon net estates in excess of $100,000 and not in excess of $200,000, 9 per centum in addition of such excess.

---

*Side notes:*

INCOME TAX
Excess collections.

Collections after period of limitations.

Overpayment found by Board.

Credit or refund.

Tax withheld at source.
*Ante*, p. 216.

ESTATE TAX

Addition to tax imposed by Revenue Act of 1926.
Vol. 44, p. 69.
Computation.

Rates.

ESTATE TAX
Rates—Contd.

$14,000 upon net estates of $200,000; and upon net estates in excess of $200,000 and not in excess of $400,000, 11 per centum in addition of such excess.

$36,000 upon net estates of $400,000; and upon net estates in excess of $400,000 and not in excess of $600,000, 13 per centum in addition of such excess.

$62,000 upon net estates of $600,000; and upon net estates in excess of $600,000 and not in excess of $800,000, 15 per centum in addition of such excess.

$92,000 upon net estates of $800,000; and upon net estates in excess of $800,000 and not in excess of $1,000,000, 17 per centum in addition of such excess.

$126,000 upon net estates of $1,000,000; and upon net estates in excess of $1,000,000 and not in excess of $1,500,000, 19 per centum in addition of such excess.

$221,000 upon net estates of $1,500,000; and upon net estates in excess of $1,500,000 and not in excess of $2,000,000, 21 per centum in addition of such excess.

$326,000 upon net estates of $2,000,000; and upon net estates in excess of $2,000,000 and not in excess of $2,500,000, 23 per centum in addition of such excess.

$441,000 upon net estates of $2,500,000; and upon net estates in excess of $2,500,000 and not in excess of $3,000,000, 25 per centum in addition of such excess.

$566,000 upon net estates of $3,000,000; and upon net estates in excess of $3,000,000 and not in excess of $3,500,000, 27 per centum in addition of such excess.

$701,000 upon net estates of $3,500,000; and upon net estates in excess of $3,500,000 and not in excess of $4,000,000, 29 per centum in addition of such excess.

$846,000 upon net estates of $4,000,000; and upon net estates in excess of $4,000,000 and not in excess of $4,500,000, 31 per centum in addition of such excess.

$1,001,000 upon net estates of $4,500,000; and upon net estates in excess of $4,500,000 and not in excess of $5,000,000, 33 per centum in addition of such excess.

$1,166,000 upon net estates of $5,000,000; and upon net estates in excess of $5,000,000 and not in excess of $6,000,000, 35 per centum in addition of such excess.

$1,516,000 upon net estates of $6,000,000; and upon net estates in excess of $6,000,000 and not in excess of $7,000,000, 37 per centum in addition of such excess.

$1,886,000 upon net estates of $7,000,000; and upon net estates in excess of $7,000,000 and not in excess of $8,000,000, 39 per centum in addition of such excess.

$2,276,000 upon net estates of $8,000,000; and upon net estates in excess of $8,000,000 and not in excess of $9,000,000, 41 per centum in addition of such excess.

$2,686,000 upon net estates of $9,000,000; and upon net estates in excess of $9,000,000 and not in excess of $10,000,000, 43 per centum in addition of such excess.

$3,116,000 upon net estates of $10,000,000; and upon net estates in excess of $10,000,000, 45 per centum in addition of such excess.

Value of net estate.
Vol. 44, p. 72.

(c) For the purposes of this section the value of the net estate shall be determined as provided in Title III of the Revenue Act of

Exemption of $50,000.
Vol. 44, p. 73.

1926, as amended, except that in lieu of the exemption of $100,000 provided in section 303 (a) (4) of such Act, the exemption shall be $50,000.

**SEC. 402. CREDITS AGAINST TAX.**

ESTATE TAX

Credits against tax. State death taxes excluded. *Post*, p. 278.

(a) The credit provided in section 301(c) of the Revenue Act of 1926, as amended (80 per centum credit), shall not be allowed in respect of such additional tax.

Deduction of certain gift taxes allowed.

(b) (1) If a tax has been paid under Title III of this Act on a gift, and thereafter upon the death of the donor any amount in respect of such gift is required to be included in the value of the gross estate of the decedent for the purposes of this title, then there shall be credited against the tax imposed by section 401 of this Act the amount of the tax paid under such Title III with respect to so much of the property which constituted the gift as is included in the gross estate, except that the amount of such credit (A) shall not exceed an amount which bears the same ratio to the tax imposed by section 401 of this Act as the value (at the time of the gift or at the time of the death, whichever is lower) of so much of the property which constituted the gift as is included in the gross estate, bears to the value of the entire gross estate, and (B) shall not exceed the amount by which the gift tax paid under Title III of this Act with respect to so much of the property as constituted the gift as is included in the gross estate, exceeds the amount of the credit under section 301 (b) of the Revenue Act of 1926, as amended by this Act.

Limitation.

Maximum credit.

Computation of values.

(2) For the purposes of paragraph (1), the amount of tax paid for any year under Title III of this Act with respect to any property shall be an amount which bears the same ratio to the total tax paid for such year as the value of such property bears to the total amount of net gifts (computed without deduction of the specific exemption) for such year.

**SEC. 403. ASSESSMENT, COLLECTION, AND PAYMENT OF TAX.**

Assessment, collection, and payment. Same as estate tax.

Except as provided in section 402, the tax imposed by section 401 of this Act shall be assessed, collected, and paid, in the same manner, and shall be subject to the same provisions of law (including penalties), as the tax imposed by section 301 (a) of the Revenue Act of 1926, except that in the case of a resident decedent a return shall be required if the value of the gross estate at the time of the decedent's death exceeds $50,000.

Vol. 44, p. 69.

## TITLE III—GIFT TAX

GIFT TAX

**SEC. 501. IMPOSITION OF TAX.**

Imposition of.

Transfers for calendar year 1932 and thereafter.

(a) For the calendar year 1932 and each calendar year thereafter a tax, computed as provided in section 502, shall be imposed upon the transfer during such calendar year by any individual, resident or nonresident, of property by gift.

Application of tax.

(b) The tax shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible; but, in the case of a nonresident not a citizen of the United States, shall apply to a transfer only if the property is situated within the United States. The tax shall not apply to a transfer made on or before the date of the enactment of this Act.

Nonresidents.

Not retroactive.

Not applicable to transfers in trust.

(c) The tax shall not apply to a transfer of property in trust where the power to revest in the donor title to such property is vested in the donor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such property or the income therefrom, but the relinquishment or termination of such power (other than by the donor's death) shall be considered to be a transfer by the donor by gift of the property subject to such power, and any payment of the income therefrom

Relinquishment considered a transfer.

246    72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

GIFT TAXES

to a beneficiary other than the donor shall be considered to be a transfer by the donor of such income by gift.

Computation.

**SEC. 502. COMPUTATION OF TAX.**

The tax for each calendar year shall be an amount equal to the excess of—

Amounts.

(1) a tax, computed in accordance with the Rate Schedule hereinafter set forth, on the aggregate sum of the net gifts for such calendar year and for each of the preceding calendar years, over

(2) a tax, computed in accordance with the Rate Schedule, on the aggregate sum of the net gifts for each of the preceding calendar years.

Rate schedule.

GIFT TAX RATE SCHEDULE

Upon net gifts not in excess of $10,000, three-fourths of 1 per centum.

$75 upon net gifts of $10,000; and upon net gifts in excess of $10,000 and not in excess of $20,000, 1½ per centum in addition of such excess.

$225 upon net gifts of $20,000; and upon net gifts in excess of $20,000 and not in excess of $30,000, 2¼ per centum in addition of such excess.

$450 upon net gifts of $30,000; and upon net gifts in excess of $30,000 and not in excess of $40,000, 3 per centum in addition of such excess.

$750 upon net gifts of $40,000; and upon net gifts in excess of $40,000 and not in excess of $50,000, 3¾ per centum in addition of such excess.

$1,125 upon net gifts of $50,000; and upon net gifts in excess of $50,000 and not in excess of $100,000, 5 per centum in addition of such excess.

$3,625 upon net gifts of $100,000; and upon net gifts in excess of $100,000 and not in excess of $200,000, 6½ per centum in addition of such excess.

$10,125 upon net gifts of $200,000; and upon net gifts in excess of $200,000 and not in excess of $400,000, 8 per centum in addition of such excess.

$26,125 upon net gifts of $400,000; and upon net gifts in excess of $400,000 and not in excess of $600,000, 9½ per centum in addition of such excess.

$45,125 upon net gifts of $600,000; and upon net gifts in excess of $600,000 and not in excess of $800,000, 11 per centum in addition of such excess.

$67,125 upon net gifts of $800,000; and upon net gifts in excess of $800,000 and not in excess of $1,000,000, 12½ per centum in addition of such excess.

$92,125 upon net gifts of $1,000,000; and upon net gifts in excess of $1,000,000 and not in excess of $1,500,000, 14 per centum in addition of such excess.

$162,125 upon net gifts of $1,500,000; and upon net gifts in excess of $1,500,000 and not in excess of $2,000,000, 15½ per centum in addition of such excess.

$239,625 upon net gifts of $2,000,000; and upon net gifts in excess of $2,000,000 and not in excess of $2,500,000, 17 per centum in addition of such excess.

$324,625 upon net gifts of $2,500,000; and upon net gifts in excess of $2,500,000 and not in excess of $3,000,000, 18½ per centum in addition of such excess.

GIFT TAXES
Rate schedule—Con.

$417,125 upon net gifts of $3,000,000; and upon net gifts in excess of $3,000,000 and not in excess of $3,500,000, 20 per centum in addition of such excess.

$517,125 upon net gifts of $3,500,000; and upon net gifts in excess of $3,500,000 and not in excess of $4,000,000, 21½ per centum in addition of such excess.

$624,625 upon net gifts of $4,000,000; and upon net gifts in excess of $4,000,000 and not in excess of $4,500,000, 23 per centum in addition of such excess.

$739,625 upon net gifts of $4,500,000; and upon net gifts in excess of $4,500,000 and not in excess of $5,000,000, 24½ per centum in addition of such excess.

$862,125 upon net gifts of $5,000,000; and upon net gifts in excess of $5,000,000 and not in excess of $6,000,000, 26 per centum in addition of such excess.

$1,122,125 upon net gifts of $6,000,000; and upon net gifts in excess of $6,000,000 and not in excess of $7,000,000, 27½ per centum in addition of such excess.

$1,397,125 upon net gifts of $7,000,000; and upon net gifts in excess of $7,000,000 and not in excess of $8,000,000, 29 per centum in addition of such excess.

$1,687,125 upon net gifts of $8,000,000; and upon net gifts in excess of $8,000,000 and not in excess of $9,000,000, 30½ per centum in addition of such excess.

$1,992,125 upon net gifts of $9,000,000; and upon net gifts in excess of $9,000,000 and not in excess of $10,000,000, 32 per centum in addition of such excess.

$2,312,125 upon net gifts of $10,000,000; and upon net gifts in excess of $10,000,000, 33½ per centum in addition of such excess.

## SEC. 503. TRANSFER FOR LESS THAN ADEQUATE AND FULL CONSIDERATION.

Transfer for less than adequate, etc., consideration.

Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall, for the purpose of the tax imposed by this title, be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

Excess in value deemed a gift.

Computation of.

## SEC. 504. NET GIFTS.

Net gifts.

(a) GENERAL DEFINITION.—The term " net gifts " means the total amount of gifts made during the calendar year, less the deductions provided in section 505.

Definition.

(b) GIFTS LESS THAN $5,000.—In the case of gifts (other than of future interests in property) made to any person by the donor during the calendar year, the first $5,000 of such gifts to such person shall not, for the purposes of subsection (a), be included in the total amount of gifts made during such year.

Gifts less than $5,000.
Future interests.

## SEC. 505. DEDUCTIONS.

Deductions.

In computing net gifts for any calendar year there shall be allowed as deductions:

(a) RESIDENTS.—In the case of a citizen or resident—

Citizen or resident.

(1) SPECIFIC EXEMPTION.—An exemption of $50,000, less the aggregate of the amounts claimed and allowed as specific exemption for preceding calendar years.

Allowance for preceding calendar years.

(2) CHARITABLE, ETC., GIFTS.—The amount of all gifts made during such year to or for the use of—

Charitable, etc., gifts.

(A) the United States, any State, Territory, or any political subdivision thereof, or the District of Columbia, for exclusively public purposes;

For public purposes.

248    72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

GIFT TAXES
Corporation, community chest, etc., for religious, etc., purposes.

(B) a corporation, or trust, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals; no part of the net earnings of which inures to the benefit of any private shareholder or individual;

(C) a fraternal society, order, or association, operating under the lodge system, but only if such gifts are to be used exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals;

War veteran posts, etc.

(D) posts or organizations of war veterans, or auxiliary units or societies of any such posts or organizations, if such posts, organizations, units, or societies are organized in the United States or any of its possessions, and if no part of their net earnings inures to the benefit of any private shareholder or individual;

Vocational rehabilitation fund.
Vol. 43, p. 611.
Nonresident aliens.
Deductions.

(E) the special fund for vocational rehabilitation authorized by section 12 of the World War Veterans' Act, 1924.

(b) NONRESIDENTS.—In the case of a nonresident not a citizen of the United States, the amount of all gifts made during such year to or for the use of—

For public purposes.

(1) the United States, any State, Territory, or any political subdivision thereof, or the District of Columbia, for exclusively public purposes;

Domestic corporation, for religious, charitable, etc., purposes.

(2) a domestic corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals; no part of the net earnings of which inures to the benefit of any private shareholder or individual;

Community chest funds, etc.

Restriction.

(3) a trust, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals; but only if such gifts are to be used within the United States exclusively for such purposes;

Fraternal societies, etc.

Restriction.

(4) a fraternal society, order, or association, operating under the lodge system, but only if such gifts are to be used within the United States exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals;

War veteran organizations, etc.

Restriction.

(5) posts or organizations of war veterans, or auxiliary units or societies of any such posts or organizations, if such posts, organizations, units, or societies are organized in the United States or any of its possessions, and if no part of their net earnings inures to the benefit of any private shareholder or individual;

Vocational rehabilitation fund.
Allowances restricted.

(6) the special fund for vocational rehabilitation authorized by section 12 of the World War Veterans' Act, 1924.

(c) The deductions provided in subsection (a) (2) or (b) shall be allowed only to the extent that the gifts therein specified are included in the amount of gifts against which such deductions are applied.

Gifts made in property.
Value of, to be considered.

SEC. 506. GIFTS MADE IN PROPERTY.

If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift.

Returns.
Sworn statements in duplicate to be made.

SEC. 507. RETURNS.

(a) REQUIREMENT.—Any individual who within the calendar year 1932 or any calendar year thereafter makes any transfers by gift

(except those which under section 504 are not to be included in the total amount of gifts for such year) shall make a return under oath in duplicate.  The return shall set forth (1) each gift made during the calendar year which under section 504 is to be included in computing net gifts; (2) the deductions claimed and allowable under section 505; (3) the net gifts for each of the preceding calendar years; and (4) such further information as may be required by regulations made pursuant to law.

(b) TIME AND PLACE FOR FILING.  The return shall be filed on or before the 15th day of March following the close of the calendar year with the collector for the district in which is located the legal residence of the donor, or if he has no legal residence in the United States, then (unless the Commissioner designates another district) with the collector at Baltimore, Maryland.

## SEC. 508. RECORDS AND SPECIAL RETURNS.

(a) BY DONOR.—Every person liable to any tax imposed by this title or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe.

(b) To DETERMINE LIABILITY TO TAX.—Whenever in the judgment of the Commissioner necessary he may require any person, by notice served upon him, to make a return, render under oath such statements, or keep such records, as the Commissioner deems sufficient to show whether or not such person is liable to tax under this title.

## SEC. 509. PAYMENT OF TAX.

(a) TIME OF PAYMENT.—The tax imposed by this title shall be paid by the donor on or before the 15th day of March following the close of the calendar year.

(b) EXTENSION OF TIME FOR PAYMENT.—At the request of the donor, the Commissioner may extend the time for payment of the amount determined as the tax by the donor, for a period not to exceed six months from the date prescribed for the payment of the tax. In such case the amount in respect of which the extension is granted shall be paid on or before the date of the expiration of the period of the extension.

(c) VOLUNTARY ADVANCE PAYMENT.—A tax imposed by this title, may be paid, at the election of the donor, prior to the date prescribed for its payment.

(d) FRACTIONAL PARTS OF CENT.—In the payment of any tax under this title a fractional part of a cent shall be disregarded unless it amounts to one-half cent or more, in which case it shall be increased to 1 cent.

(e) RECEIPTS.—The collector to whom any payment of any gift tax is made shall, upon request, grant to the person making such payment a receipt therefor.

## SEC. 510. LIEN FOR TAX.

The tax imposed by this title shall be a lien upon all gifts made during the calendar year, for ten years from the time the gifts are made.  If the tax is not paid when due, the donee of any gift shall be personally liable for such tax to the extent of the value of such gift.  Any part of the property comprised in the gift sold by the donee to a bona fide purchaser for an adequate and full consideration in money or money's worth shall be divested of the lien herein imposed and the lien, to the extent of the value of such gift, shall attach to all the property of the donee (including after-acquired property) except any part sold to a bona fide purchaser for an

GIFT TAXES
*Ante*, p. 247.
Computing net gifts.

Deductions allowed.
Net gifts for preceding years.
Other information required.

Time and place for filing.

Records and special returns.
By donor.

Liability to tax.
Any person may be required to make returns.

Payment of tax.
Date when due.

Extension of time.

Voluntary advance payment.

Fractions of cent.

Collector's receipts.

Lien for tax.
Effect of.

Donee's liability.

Attachment in event of sale.

GIFT TAXES
Discretionary release.
adequate and full consideration in money or money's worth. If the Commissioner is satisfied that the tax liability has been fully discharged or provided for, he may, under regulations prescribed by him with the approval of the Secretary, issue his certificate, releasing any or all of the property from the lien herein imposed.

Correctness of return and tax.
### SEC. 511. EXAMINATION OF RETURN AND DETERMINATION OF TAX.

Determination, etc.
As soon as practicable after the return is filed the Commissioner shall examine it and shall determine the correct amount of the tax.

Deficiency.
Definition.
### SEC. 512. DEFINITION OF DEFICIENCY.

As used in this title in respect of the tax imposed by this title the term "deficiency" means—

Difference between tax imposed and that shown on return.
(1) The amount by which the tax imposed by this title exceeds the amount shown as the tax by the donor upon his return; but the amount so shown on the return shall first be increased by the amounts previously assessed (or collected without assessment) as a deficiency, and decreased by the amounts previously abated, refunded, or otherwise repaid in respect of such tax; or

Adjustment of previous assessments.

If no tax shown or return made.
(2) If no amount is shown as the tax by the donor upon his return, or if no return is made by the donor, then the amount by which the tax exceeds the amounts previously assessed (or collected without assessment) as a deficiency; but such amounts previously assessed, or collected without assessment, shall first be decreased by the amounts previously abated, refunded, or otherwise repaid in respect of such tax.

Assessment and collection of deficiency.
Notice to donor.
### SEC. 513. ASSESSMENT AND COLLECTION OF DEFICIENCIES.

Petition by donor to Board of Tax Appeals.
(a) PETITION TO BOARD OF TAX APPEALS.—If the Commissioner determines that there is a deficiency in respect of the tax imposed by this title, the Commissioner is authorized to send notice of such deficiency to the donor by registered mail. Within 60 days after such notice is mailed (not counting Sunday as the sixtieth day), the donor may file a petition with the Board of Tax Appeals for a redetermination of the deficiency. No assessment of a deficiency in respect of the tax imposed by this title and no distraint or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the donor, nor until the expiration of such 60-day period, nor, if a petition has been filed with the Board, until the decision of the Board has become final. Notwithstanding the provisions of section 3224 of the Revised Statutes the making of such assessment or the beginning of such proceeding or distraint during the time such prohibition is in force may be enjoined by a proceeding in the proper court.

Restriction on court proceeding.

R.S.,sec. 3224, p. 619, waived.

Exceptions.
Post, p. 251.
For exceptions to the restrictions imposed by this subsection see—

(1) Subsection (d) of this section, relating to waivers by the donor;

Post, p. 251.
(2) Subsection (f) of this section, relating to notifications of mathematical errors appearing upon the face of the return;

Post, p. 252.
Post, p. 253.
Vol. 44, p. 109.
(3) Section 514, relating to jeopardy assessments;

(4) Section 516, relating to bankruptcy and receiverships; and

(5) Section 1001 of the Revenue Act of 1926, as amended, relating to assessment or collection of the amount of the deficiency determined by the Board pending court review.

Collection of deficiency found by Board.
(b) COLLECTION OF DEFICIENCY FOUND BY BOARD.—If the donor files a petition with the Board, the entire amount redetermined as the deficiency by the decision of the Board which has become final shall be assessed and shall be paid upon notice and demand from the collector. No part of the amount determined as a deficiency by the Commissioner but disallowed as such by the decision of the Board

GIFT TAXES

which has become final shall be assessed or be collected by distraint or by proceeding in court with or without assessment.

(c) FAILURE TO FILE PETITION.—If the donor does not file a petition with the Board within the time prescribed in subsection (a) the deficiency, notice of which has been mailed to the donor, shall be assessed, and shall be paid upon notice and demand from the collector.

Failure to file petition.

(d) WAIVER OF RESTRICTIONS.—The donor shall at any time have the right, by a signed notice in writing filed with the Commissioner, to waive the restrictions provided in subsection (a) on the assessment and collection of the whole or any part of the deficiency.

Waiver of restrictions.

(e) INCREASE OF DEFICIENCY AFTER NOTICE MAILED.—The Board shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the donor, and to determine whether any additional amount or addition to the tax should be assessed, if claim therefor is asserted by the Commissioner at or before the hearing or a rehearing.

Increase of deficiency after notice mailed.

Board authorized to redetermine correct amount.

(f) FURTHER DEFICIENCY LETTERS RESTRICTED.—If the Commissioner has mailed to the donor notice of a deficiency as provided in subsection (a) of this section, and the donor files a petition with the Board within the time prescribed in such subsection, the Commissioner shall have no right to determine any additional deficiency in respect of the same calendar year, except in the case of fraud, and except as provided in subsection (e) of this section, relating to assertion of greater deficiencies before the Board, or in section 514(c), relating to the making of jeopardy assessments. If the donor is notified that, on account of a mathematical error appearing upon the face of the return, an amount of tax in excess of that shown upon the return is due, and that an assessment of the tax has been or will be made on the basis of what would have been the correct amount of tax but for the mathematical error, such notice shall not be considered (for the purposes of this subsection, or of subsection (a) of this section, prohibiting assessment and collection until notice of deficiency has been mailed, or of section 528(c), prohibiting credits or refunds after petition to the Board of Tax Appeals) as a notice of a deficiency, and the donor shall have no right to file a petition with the Board based on such notice, nor shall such assessment or collection be prohibited by the provisions of subsection (a) of this section.

Further notices restricted.

Exception in case of fraud.

Jeopardy assessments.
Post, p. 252.
Mathematical error.

Post, p. 258.

(g) JURISDICTION OVER OTHER CALENDAR YEARS.—The Board in redetermining a deficiency in respect of any calendar year shall consider such facts with relation to the taxes for other calendar years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other calendar year has been overpaid or underpaid.

Jurisdiction over other calendar years.

(h) FINAL DECISIONS OF BOARD.—For the purposes of this title the date on which a decision of the Board becomes final shall be determined according to the provisions of section 1005 of the Revenue Act of 1926.

Decisions of Board. Final date.
Vol. 44, p. 110.

(i) EXTENSION OF TIME FOR PAYMENT OF DEFICIENCIES.—Where it is shown to the satisfaction of the Commissioner that the payment of a deficiency upon the date prescribed for the payment thereof will result in undue hardship to the donor the Commissioner, with the approval of the Secretary (except where the deficiency is due to negligence, to intentional disregard of rules and regulations, or to fraud with intent to evade tax), may grant an extension for the payment of such deficiency or any part thereof for a period not in

Time extended for payment of deficiencies.

To avoid undue hardship.

GIFT TAXES

Bond required.

excess of eighteen months, and, in exceptional cases, for a further period not in excess of twelve months. If an extension is granted, the Commissioner may require the donor to furnish a bond in such amount, not exceeding double the amount of the deficiency, and with such sureties, as the Commissioner deems necessary, conditioned upon the payment of the deficiency in accordance with the terms of the extension.

Notice to last known address.
*Post*, p. 257.

(j) ADDRESS FOR NOTICE OF DEFICIENCY.—In the absence of notice to the Commissioner under section 527(a) of the existence of a fiduciary relationship, notice of a deficiency in respect of a tax imposed by this title, if mailed to the donor at his last known address, shall be sufficient for the purposes of this title even if such donor is deceased, or is under a legal disability.

Jeopardy assessments.

SEC. 514. JEOPARDY ASSESSMENTS.

Immediately assessed if collection jeopardized by delay.

(a) AUTHORITY FOR MAKING.—If the Commissioner believes that the assessment or collection of a deficiency will be jeopardized by delay, he shall immediately assess such deficiency (together with all interest, additional amounts, or additions to the tax provided for by law) and notice and demand shall be made by the collector for the payment thereof.

Deficiency letters. Notice to be mailed.

(b) DEFICIENCY LETTERS.—If the jeopardy assessment is made before any notice in respect of the tax to which the jeopardy assessment relates has been mailed under section 513(a), then the Commissioner shall mail a notice under such subsection within 60 days after the making of the assessment.

Amount assessable before Board's decision.

(c) AMOUNT ASSESSABLE BEFORE DECISION OF BOARD.—The jeopardy assessment may be made in respect of a deficiency greater or less than that notice of which has been mailed to the donor, despite the provisions of section 513(f) prohibiting the determination of additional deficiencies, and whether or not the donor has theretofore filed a petition with the Board of Tax Appeals. The Commissioner shall notify the Board of the amount of such assessment, if the petition is filed with the Board before the making of the assessment or is subsequently filed, and the Board shall have jurisdiction to redetermine the entire amount of the deficiency and of all amounts assessed at the same time in connection therewith.

Redetermination.

Amount assessable after decision of Board.

(d) AMOUNT ASSESSABLE AFTER DECISION OF BOARD.—If the jeopardy assessment is made after the decision of the Board is rendered such assessment may be made only in respect of the deficiency determined by the Board in its decision.

Not allowed after final decision, etc.

(e) EXPIRATION OF RIGHT TO ASSESS.—A jeopardy assessment may not be made after the decision of the Board has become final or after the donor has filed a petition for review of the decision of the Board.

Bond to stay collection.

(f) BOND TO STAY COLLECTION.—When a jeopardy assessment has been made the donor, within 10 days after notice and demand from the collector for the payment of the amount of the assessment, may obtain a stay of collection of the whole or any part of the amount of the assessment by filing with the collector a bond in such amount, not exceeding double the amount as to which the stay is desired, and with such sureties, as the collector deems necessary, conditioned upon the payment of so much of the amount, the collection of which is stayed by the bond, as is not abated by a decision of the Board which has become final, together with interest thereon as provided in section 523 or 524(b)(4).

Conditions.

*Post*, p. 255.
Further conditions, if bond given before filing petition.

(g) SAME—FURTHER CONDITIONS.—If the bond is given before the donor has filed his petition with the Board under section 513 (a), the bond shall contain a further condition that if a petition is not filed within the period provided in such subsection, then the amount the

GIFT TAXES

collection of which is stayed by the bond will be paid on notice and demand at any time after the expiration of such period, together with interest thereon at the rate of 6 per centum per annum from the date of the jeopardy notice and demand to the date of notice and demand under this subsection.

(h) WAIVER OF STAY.—Upon the filing of the bond the collection of so much of the amount assessed as is covered by the bond shall be stayed. The donor shall have the right to waive such stay at any time in respect of the whole or any part of the amount covered by the bond, and if as a result of such waiver any part of the amount covered by the bond is paid, then the bond shall, at the request of the donor, be proportionately reduced. If the Board determines that the amount assessed is greater than the amount which should have been assessed, then when the decision of the Board is rendered the bond shall, at the request of the donor, be proportionately reduced.

*Stay of collection over part covered by bond.*
*Effect of waiver of stay, etc.*

(i) COLLECTION OF UNPAID AMOUNTS.—When the petition has been filed with the Board and when the amount which should have been assessed has been determined by a decision of the Board which has become final, then any unpaid portion, the collection of which has been stayed by the bond, shall be collected as part of the tax upon notice and demand from the collector, and any remaining portion of the assessment shall be abated. If the amount already collected exceeds the amount determined as the amount which should have been assessed, such excess shall be credited or refunded as provided in section 528, without the filing of claim therefor. If the amount determined as the amount which should have been assessed is greater than the amount actually assessed, then the difference shall be assessed and shall be collected as part of the tax upon notice and demand from the collector.

*Collection of unpaid amounts.*
*When decision of Board has become final.*

*Credit or refund.*

*Post, p. 258.*
*Collection of greater assessment.*

## SEC. 515. CLAIMS IN ABATEMENT.

No claim in abatement shall be filed in respect of any assessment in respect of any tax imposed by this title.

*Claims in abatement.*
*Prohibition on filing.*

## SEC. 516. BANKRUPTCY AND RECEIVERSHIPS.

(a) IMMEDIATE ASSESSMENT.—Upon the adjudication of bankruptcy of any donor in any bankruptcy proceeding or the appointment of a receiver for any donor in any receivership proceeding before any court of the United States or of any State or Territory or of the District of Columbia, any deficiency (together with all interest, additional amounts, or additions to the tax provided for by law) determined by the Commissioner in respect of a tax imposed by this title upon such donor shall, despite the restrictions imposed by section 513(a) upon assessments be immediately assessed if such deficiency has not theretofore been assessed in accordance with law. Claims for the deficiency and such interest, additional amounts and additions to the tax may be presented, for adjudication in accordance with law, to the court before which the bankruptcy or receivership proceeding is pending, despite the pendency of proceedings for the redetermination of the deficiency in pursuance of a petition to the Board; but no petition for any such redetermination shall be filed with the Board after the adjudication of bankruptcy or the appointment of the receiver.

*Bankruptcy and receiverships.*
*Immediate assessment of deficiency.*

*Adjudication of claim.*

(b) UNPAID CLAIMS.—Any portion of the claim allowed in such bankruptcy or receivership proceeding which is unpaid shall be paid by the donor upon notice and demand from the collector after the termination of such proceeding, and may be collected by distraint or proceeding in court within six years after termination of such proceeding. Extensions of time for such payment may be had in

*Unpaid claims.*
*Collection of claims allowed in court proceedings.*

*Time extensions.*

GIFT TAXES the same manner and subject to the same provisions and limitations as are provided in sections 513(i), 521(b), and 524(b)(3) in the case of a deficiency in a tax imposed by this title.

Period of limitation upon assessment and collection. ## SEC. 517. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Assessment within three years. (a) GENERAL RULE.—Except as provided in subsection (b), the amount of taxes imposed by this title shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of three years after the return was filed.

Exceptions.
False return or no return. (b) EXCEPTIONS—

(1) FALSE RETURN OR NO RETURN.—In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

Collection after assessment. (2) COLLECTION AFTER ASSESSMENT.—Where the assessment of any tax imposed by this title has been made within the statutory period of limitation properly applicable thereto, such tax may be

By distraint. collected by distraint or by a proceeding in court, but only if

Within six years.
Or prior to expiration of collection period. begun (1) within six years after the assessment of the tax, or (2) prior to the expiration of any period for collection agreed upon in writing by the Commissioner and the donor.

Suspension of running of statute.
Period of. ## SEC. 518. SUSPENSION OF RUNNING OF STATUTE.

The running of the statute of limitations provided in section 517 on the making of assessments and the beginning of distraint or a proceeding in court for collection, in respect of any deficiency, shall

Ante, p. 250. (after the mailing of a notice under section 513 (a)) be suspended for the period during which the Commissioner is prohibited from making the assessment or beginning distraint or a proceeding in court (and in any event, if a proceeding in respect of the deficiency

Until final decision of Board. is placed on the docket of the Board, until the decision of the Board becomes final), and for 60 days thereafter.

Additions to tax in case of failure to file return. ## SEC. 519. ADDITIONS TO THE TAX IN CASE OF FAILURE TO FILE RETURN.

In case of any failure to make and file a return required by this title, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, 25 per centum of the tax shall be

Additional tax imposed.
If failure not willful neglect. added to the tax, except that when a return is filed after such time and it is shown that the failure to file it was due to reasonable cause and not due to willful neglect no such addition shall be made to

Manner of collection. the tax.  The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax.  The amount added to the tax under this section shall be

In lieu of former levy.
R. S., sec. 3176, p. 610.
U. S. C., 731. in lieu of the 25 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.

Tax in case of deficiencies.
Additions to, in case of negligence, etc. ## SEC. 520. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

Rate. (a) NEGLIGENCE.—If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 522, relating to interest on deficiencies, shall not be applicable.

(b) FRAUD.—If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.

GIFT TAXES
Due to fraud.
Rate.

R. S., sec. 3176, p.610.
U. S. C., p. 731.

## SEC. 521. INTEREST ON EXTENDED PAYMENTS.

Interest on extended payments.

(a) TAX SHOWN ON RETURN.—If the time for payment of the amount determined as the tax by the donor is extended under the authority of section 509 (b), there shall be collected as a part of such amount, interest thereon at the rate of 6 per centum per annum from the date when such payment should have been made if no extension had been granted, until the expiration of the period of the extension.

Tax on return.
Ante, p. 249.

(b) DEFICIENCY.—In case an extension for the payment of a deficiency is granted, as provided in section 513 (i), there shall be collected, as a part of the tax, interest on the part of the deficiency the time for payment of which is so extended, at the rate of 6 per centum per annum for the period of the extension, and no other interest shall be collected on such part of the deficiency for such period.

On extended deficiency payments.
Ante, p. 251.

## SEC. 522. INTEREST ON DEFICIENCIES.

Interest on deficiencies.
Determination, collections, etc.

Interest upon the amount determined as a deficiency shall be assessed at the same time as the deficiency, shall be paid upon notice and demand from the collector, and shall be collected as a part of the tax, at the rate of 6 per centum per annum from the due date of the tax to the date the deficiency is assessed, or, in the case of a waiver under section 513 (d), to the thirtieth day after the filing of such waiver or to the date the deficiency is assessed whichever is the earlier.

## SEC. 523. INTEREST ON JEOPARDY ASSESSMENTS.

Interest on jeopardy assessments
Ante, p. 252.

In the case of the amount collected under section 514 (f) there shall be assessed at the same time as such amount, and as a part of the tax, interest at the rate of 6 per centum per annum upon such amount from the date of the jeopardy notice and demand to the date of notice and demand under section 514 (i), or, in the case of an amount collected in excess of the amount of the jeopardy assessment, interest as provided in section 522.

Rate.

## SEC. 524. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT.

Additional taxes if nonpayment.

(a) TAX SHOWN ON RETURN—

(1) PAYMENT NOT EXTENDED.—Where the amount determined by the donor as the tax imposed by this title, or any part of such amount, is not paid on the due date of the tax, there shall be collected as a part of the tax, interest upon such unpaid amount at the rate of 1 per centum a month from the due date until it is paid.

Unpaid on due date, when payment not extended.

(2) PAYMENT EXTENDED.—Where an extension of time for payment of the amount so determined as the tax by the donor has been granted, and the amount the time for payment of which has been extended, and the interest thereon determined under section 521(a), is not paid in full prior to the expiration of the period of the extension, then, in lieu of the interest provided for in paragraph (1) of this subsection, interest at the rate of 1 per centum a month shall be collected on such unpaid amount from the date of the expiration of the period of the extension until it is paid.

When payment extended.

(b) DEFICIENCY—

(1) PAYMENT NOT EXTENDED.—Where a deficiency, or any interest assessed in connection therewith under section 522, or any addition to the tax provided for in section 3176 of the Revised

Deficiency.
Payment not extended.

GIFT TAXES

Statutes, is not paid in full within 10 days from the date of notice and demand from the collector, there shall be collected as part of the tax, interest upon the unpaid amount at the rate of 1 per centum a month from the date of such notice and demand until it is paid.

**Filing of jeopardy bond.**

(2) FILING OF JEOPARDY BOND.—If a bond is filed, as provided in section 514, the provisions of paragraph (1) of this subsection shall not apply to the amount covered by the bond.

**Payment extended.**

(3) PAYMENT EXTENDED.—If the part of the deficiency the time for payment of which is extended as provided in section 513(i) is not paid in accordance with the terms of the extension, there shall be collected, as a part of the tax, interest on such unpaid amount at the rate of 1 per centum a month for the period from the time fixed by the terms of the extension for its payment until it is paid, and no other interest shall be collected on such unpaid amount for such period.

**Unpaid jeopardy assessment stayed by bond.**

(4) JEOPARDY ASSESSMENT—PAYMENT STAYED BY BOND.—If the amount included in the notice and demand from the collector under section 514(i) is not paid in full within 10 days after such notice and demand, then there shall be collected, as part of the tax, interest upon the unpaid amount at the rate of 1 per centum a month from the date of such notice and demand until it is paid.

**Interest in case of bankruptcy and receiverships.**
*Ante,* p. 250.

(5) INTEREST IN CASE OF BANKRUPTCY AND RECEIVERSHIPS.—If the unpaid portion of the claim allowed in a bankruptcy or receivership proceeding, as provided in section 516, is not paid in full within 10 days from the date of notice and demand from the collector, then there shall be collected as a part of such amount interest upon the unpaid portion thereof at the rate of 1 per centum a month from the date of such notice and demand until payment.

**Penalties.**
**For willful failure to pay tax, make returns, etc.**

## SEC. 525. PENALTIES.

(a) Any person required under this title to pay any tax, or required by law or regulations made under authority thereof to make a return, keep any records, or supply any information, for the purposes of the computation, assessment, or collection of any tax imposed by this title, who willfully fails to pay such tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution.

**Willful evasion a felony.**

(b) Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony

**Punishment for.**

and, on conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

**Transferred assets.**
**Method of collection.**

## SEC. 526. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in the tax imposed by this title (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds);

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a donor, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed by this title.

GIFT TAXES

Liability of transferees of property of a donor.

(2) FIDUCIARIES.—The liability of a fiduciary under section 3467 of the Revised Statutes [U. S. C., title 31, sec. 192] in respect of the payment of any such tax from the estate of the donor.

Of a fiduciary.
R. S., sec. 3467, p. 687;
U. S. C., p. 987.

Any such liability may be either as to the amount of tax shown on the return or as to any deficiency in tax.

(b) PERIOD OF LIMITATION.—The period of limitation for assessment of any such liability of a transferee or fiduciary shall be as follows:

Period of limitation.

(1) Within one year after the expiration of the period of limitation for assessment against the donor.

(2) If a court proceeding against the donor for the collection of the tax has been begun within the period provided in paragraph (1),—then within one year after return of execution in such proceeding.

(c) PERIOD FOR ASSESSMENT AGAINST DONOR.—For the purposes of this section, if the donor is deceased, the period of limitation for assessment against the donor shall be the period that would be in effect had the death not occurred.

Period for assessment against donor.

If deceased.

(d) SUSPENSION OF RUNNING OF STATUTE OF LIMITATIONS.—The running of the statute of limitations upon the assessment of the liability of a transferee or fiduciary shall, after the mailing of the notice under section 513(a) to the transferee or fiduciary, be suspended for the period during which the Commissioner is prohibited from making the assessment in respect of the liability of the transferee or fiduciary (and in any event, if a proceeding in respect of the liability is placed on the docket of the Board, until the decision of the Board becomes final), and for 60 days thereafter.

Suspension of running of statute of limitations.

After notice mailed, etc.
*Ante*, p. 250.

(e) PROHIBITION OF SUITS TO RESTRAIN ENFORCEMENT OF LIABILITY OF TRANSFEREE OR FIDUCIARY.—No suit shall be maintained in any court for the purpose of restraining the assessment or collection of (1) the amount of the liability, at law or in equity, of a transferee of property of a donor in respect of any gift tax, or (2) the amount of the liability of a fiduciary under section 3467 of the Revised Statutes [U. S. C., title 31, sec. 192] in respect of any such tax.

Prohibition of suits to restrain enforcement of liability of transferee or fiduciary.

R. S., sec. 3467, p. 687;
U. S. C., p. 987.

(f) DEFINITION OF "TRANSFEREE".—As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee.

"Transferee" defined.

(g) ADDRESS FOR NOTICE OF LIABILITY.—In the absence of notice to the Commissioner under section 527(b) of the existence of a fiduciary relationship, notice of liability enforceable under this section in respect of a tax imposed by this title, if mailed to the person subject to the liability at his last known address, shall be sufficient for the purposes of this title even if such person is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

Address for notice of liability.

## SEC. 527. NOTICE OF FIDUCIARY RELATIONSHIP.

Notice of fiduciary relationship.
Effect of.

(a) FIDUCIARY OF DONOR.—Upon notice to the Commissioner that any person is acting in a fiduciary capacity such fiduciary shall assume the powers, rights, duties, and privileges of the donor in respect of a tax imposed by this title (except as otherwise specifically provided and except that the tax shall be collected from the estate of the donor), until notice is given that the fiduciary capacity has terminated.

3051°—33——17

258                        72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

GIFT TAXES ·

Fiduciary of transferee.
Effect of notice to Commissioner.

    (b) FIDUCIARY OF TRANSFEREE.—Upon notice to the Commissioner that any person is acting in a fiduciary capacity for a person subject to the liability specified in section 526, the fiduciary shall assume, on behalf of such person, the powers, rights, duties, and privileges of such person under such section (except that the liability shall be collected from the estate of such person), until notice is given that the fiduciary capacity has terminated.

Manner of notice.

    (c) MANNER OF NOTICE.—Notice under subsection (a) or (b) shall be given in accordance with regulations prescribed by the Commissioner with the approval of the Secretary.

Refunds and credits.

## SEC. 528. REFUNDS AND CREDITS.

Gift tax.

Overpayments, credited to.

    (a) AUTHORIZATION.—Where there has been an overpayment of any tax imposed by this title, the amount of such overpayment shall be credited against any gift tax then due from the taxpayer, and any balance shall be refunded immediately to the taxpayer.

Refund of any balance.
Limitation on allowance.
Period.

    (b) LIMITATION ON ALLOWANCE—
    (1) PERIOD OF LIMITATION.—No such credit or refund shall be allowed or made after three years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer.

Credit or refund.

    (2) LIMIT ON AMOUNT OF CREDIT OR REFUND.—The amount of the credit or refund shall not exceed the portion of the tax paid during the three years immediately preceding the filing of the claim, or if no claim was filed, then during the three years immediately preceding the allowance of the credit or refund.

Effect of taxpayer's petition to Board.
*Ante,* p. 250.

No credit, etc., allowed.

    (c) EFFECT OF PETITION TO BOARD.—If the Commissioner has mailed to the taxpayer a notice of deficiency under section 513(a) and if the taxpayer files a petition with the Board of Tax Appeals within the time prescribed in such subsection, no credit or refund in respect of the tax for the calendar year in respect of which the Commissioner has determined the deficiency shall be allowed or made and no suit by the taxpayer for the recovery of any part of such tax shall be instituted in any court except—

Exception.
Overpayments.

    (1) As to overpayments determined by a decision of the Board which has become final; and

Excess collections.

    (2) As to any amount collected in excess of an amount computed in accordance with the decision of the Board which has become final; and

After collection period expired.

    (3) As to any amount collected after the period of limitation upon the beginning of distraint or a proceeding in court for collection has expired; but in any such claim for credit or refund or in any such suit for refund the decision of the Board which has become final, as to whether such period has expired before the notice of deficiency was mailed, shall be conclusive.

Findings by Board.

    (d) OVERPAYMENT FOUND BY BOARD.—If the Board finds that there is no deficiency and further finds that the taxpayer has made an overpayment of tax in respect of the taxable year in respect of which the Commissioner determined the deficiency, the Board shall have jurisdiction to determine the amount of such overpayment, and such amount shall, when the decision of the Board has become final,

Credit or refund.

be credited or refunded to the taxpayer. No such credit or refund shall be made of any portion of the tax paid more than three years before the filing of the claim or the filing of the petition, whichever is earlier.

Laws made applicable.
Assessment, payment, etc., under prior Acts.

## SEC. 529. LAWS MADE APPLICABLE.

    All administrative, special, or stamp provisions of law, including the law relating to the assessment of taxes, so far as applicable, are hereby extended to and made a part of this title.

### SEC. 530. RULES AND REGULATIONS.

The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this title.

GIFT TAXES
Rules and regulations.
To be prescribed, etc.

### SEC. 531. DEFINITIONS.

For the purposes of this title—

(a) CALENDAR YEAR.—The term " calendar year " includes only the calendar year 1932 and succeeding calendar years, and, in the case of the calendar year 1932, includes only the portion of such year after the date of the enactment of this Act.

(b) PROPERTY WITHIN UNITED STATES.—Stock in a domestic corporation owned and held by a nonresident shall be deemed property situated within the United States.

Definitions.
"Calendar year."
Stock of domestic corporation.

### SEC. 532. SHORT TITLE.

This title may be cited as the " Gift Tax Act of 1932 ".

Short title.
"Gift Tax Act of 1932."

# TITLE IV—MANUFACTURERS' EXCISE TAXES

MANUFACTURERS' EXCISE TAXES

### SEC. 601. EXCISE TAXES ON CERTAIN ARTICLES.

(a) In addition to any other tax or duty imposed by law, there shall be imposed a tax as provided in subsection (c) on every article imported into the United States unless treaty provisions of the United States otherwise provide.

(b) The tax imposed under subsection (a) shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, except that—

(1) the value on which such tax shall be based shall be the sum of (A) the dutiable value (under section 503 of such Act) of the article, plus (B) the customs duties, if any, imposed thereon under any provision of law;

(2) for the purposes of section 489 of such Act (relating to additional duties in certain cases of undervaluation) such tax shall not be considered an ad valorem rate of duty or a duty based upon or regulated in any manner by the value of the article, and for the purposes of section 336 of such Act (the so-called flexible tariff provision) such tax shall not be considered a duty;

(3) such tax shall not be imposed upon any article imported prior to the date on which this title takes effect;

(4) no drawback of such tax (except tax paid upon the importation of an article described in subsection (c) (4), (5), (6), or (7)) shall be allowed under section 313 (a), (b), or (f) of the Tariff Act of 1930 or any provision of law allowing a drawback of customs duties on articles manufactured or produced with the use of duty-paid materials;

(5) such tax (except tax under subsection (c) (4) to (7), inclusive) shall be imposed in full notwithstanding any provision of law granting exemption from or reduction of duties to products of any possession of the United States; and for the purposes of taxes under subsection (c) (4) to (7), inclusive, the term " United States " includes Puerto Rico.

(c) There is hereby imposed upon the following articles sold in the United States by the manufacturer or producer, or imported into the United States, a tax at the rates hereinafter set forth, to be paid by the manufacturer, producer, or importer:

(1) Lubricating oils, 4 cents a gallon; but the tax on the articles described in this paragraph shall not apply with respect to the importation of such articles.

Taxes on certain articles.
Imported articles.
Assessment, collection, etc., of tax.
Vol. 46, p. 590.
Computation of value.
Vol. 46, p. 731.
Not considered rate of duty or regulating value of article.
Vol. 46, pp. 725, 701.
Articles exempt.
Drawback on articles of duty-paid materials not allowed.
Vol. 46, p. 693.
Tax on imports from possessions of United States.
Articles specified.
Lubricating oils.

MANUFACTURERS'
EXCISE TAX

Brewer's wort, malt,
etc.
Exception when sold
to baker or manufac-
turer.

Liquid malt.

(2) Brewer's wort, 15 cents a gallon. Liquid malt, malt syrup, and malt extract, fluid, solid, or condensed, made from malted cereal grains in whole or in part, unless sold to a baker for use in baking or to a manufacturer or producer of malted milk, medicinal products, foods, cereal beverages, or textiles, for use in the manufacture or production of such products, 3 cents a pound. For the purposes of this paragraph liquid malt containing less than 15 per centum of solids by weight shall be taxable as brewer's wort.

Grape concentrates,
etc.

Exceptions.

(3) Grape concentrate, evaporated grape juice, and grape syrup (other than finished or fountain syrup), if containing more than 35 per centum of sugars by weight, 20 cents a gallon. No tax shall be imposed under this paragraph (A) upon any article which contains preservative sufficient to prevent fermentation when diluted, or (B) upon any article sold to a manufacturer or producer of food products or soft drinks for use in the manufacture or production of such products.

Petroleum, fuel oil,
etc., derivatives.

Lubricating oils, gas-
oline excepted.

Tax on imports only.

(4) Crude petroleum, ½ cent per gallon; fuel oil derived from petroleum, gas oil derived from petroleum, and all liquid derivatives of crude petroleum, except lubricating oil and gasoline or other motor fuel, ½ cent per gallon; gasoline or other motor fuel, 2½ cents per gallon; lubricating oil, 4 cents per gallon; paraffin and other petroleum wax products, 1 cent per pound. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles.

Coal; coke and man-
ufactures.

Tax on imports only.

Imposed when ex-
ports to particular
country exceed imports.

(5) Coal of all sizes, grades, and classifications (except culm and duff), coke manufactured therefrom; and coal or coke briquettes, 10 cents per 100 pounds. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles, and shall not be imposed upon any such article if during the preceding calendar year the exports of the articles described in this paragraph from the United States to the country from which such article is imported have been greater in quantity than the imports into the United States from such country of the articles described in this paragraph.

Lumber.
Flooring excepted;
Japanese maple floor-
ing.

(6) Lumber, rough, or planed or dressed on one or more sides, except flooring made of maple (except Japanese maple), birch, and beech, $3 per thousand feet, board measure; but the tax on the articles described in this paragraph shall apply only with respect to the importation of such articles.

Copper ores and con-
centrates.
Vol. 46, pp. 613, 626,
627, 674, 675, 676.

Provisos.
Loss in processing
excepted.
Fluxing ores, etc.,
excepted.

Aggregate imports
limited.
Other copper articles.

Tax on imports only.

(7) Copper-bearing ores and concentrates and articles provided for in paragraph 316, 380, 381, 387, 1620, 1634, 1657, 1658, or 1659 of the Tariff Act of 1930, 4 cents per pound on the copper contained therein: Provided, That no tax under this paragraph shall be imposed on copper in any of the foregoing which is lost in metallurgical processes: Provided further, That ores or concentrates usable as a flux or sulphur reagent in copper smelting and/or converting and having a copper content of not more than 15 per centum, when imported for fluxing purposes, shall be admitted free of said tax in an aggregate amount of not to exceed in any one year 15,000 tons of copper content. All articles dutiable under the Tariff Act of 1930, not provided for heretofore in this paragraph, in which copper (including copper in alloys) is the component material of chief value, 3 cents per pound. All articles dutiable under the Tariff Act of 1930, not provided for heretofore in this paragraph, containing 4 per centum or more of copper by weight, 3 per centum ad valorem or ¾ of 1 cent per pound, whichever is the lower. The tax on the articles described in

this paragraph shall apply only with respect to the importation of such articles. The Secretary is authorized to prescribe all necessary regulations for the enforcement of the provisions of this paragraph.

### SEC. 602. TAX ON TIRES AND INNER TUBES.

There is hereby imposed upon the following articles sold by the manufacturer, producer, or importer, a tax at the following rates:

(1) Tires wholly or in part of rubber, 2¼ cents a pound on total weight (exclusive of metal rims or rim bases), to be determined under regulations prescribed by the Commissioner with the approval of the Secretary.

(2) Inner tubes (for tires) wholly or in part of rubber, 4 cents a pound on total weight, to be determined under regulations prescribed by the Commissioner with the approval of the Secretary.

*Tires and inner tubes.*

*Rubber tires. Rate.*

*Inner tubes. Rate.*

### SEC. 603. TAX ON TOILET PREPARATIONS, ETC.

There is hereby imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold: Perfumes, essences, extracts, toilet waters, cosmetics, petroleum jellies, hair oils, pomades, hair dressings, hair restoratives, hair dyes, tooth and mouth washes (except that the rate shall be 5 per centum), dentifrices (except that the rate shall be 5 per centum), tooth pastes (except that the rate shall be 5 per centum), aromatic cachous, toilet soaps (except that the rate shall be 5 per centum), toilet powders, and any similar substance, article, or preparation, by whatsoever name known or distinguished; any of the above which are used or applied or intended to be used or applied for toilet purposes.

*Toilet preparations, etc.*
*Rate.*

*Perfumes, essences, extracts, etc.*

*Dentifrices.*

*Soaps, powders, etc.*

### SEC. 604. TAX ON FURS.

There is hereby imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold: Articles made of fur on the hide or pelt or of which any such fur is the component material of chief value.

*Furs.*
*Rate.*

*Fur articles.*

### SEC. 605. TAX ON JEWELRY, ETC.

There is hereby imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold: All articles commonly or commercially known as jewelry, whether real or imitation; pearls, precious and semiprecious stones, and imitations thereof; articles made of, or ornamented, mounted or fitted with, precious metals or imitations thereof or ivory (not including surgical instruments or silver-plated ware, or frames or mountings for spectacles or eyeglasses); watches; clocks; parts for watches or clocks sold for more than 9 cents each; opera glasses; lorgnettes; marine glasses; field glasses; and binoculars. No tax shall be imposed under this section on any article used for religious purposes, or any article (other than watch parts or clock parts) sold for less than $3.

*Jewelry, etc.*
*Rate.*

*Articles of, whether real or imitation.*

*Ivory.*

*Opera glasses, lorgnettes, etc.*
*Minimum cost and articles for religious purposes excepted.*

### SEC. 606. TAX ON AUTOMOBILES, ETC.

There is hereby imposed upon the following articles sold by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold:

(a) Automobile truck chassis and automobile truck bodies (including in both cases parts or accessories therefor sold on or in connec-

*Automobiles.*

*Truck chassis and bodies.*

262                    72d CONGRESS.    SESS. I.    CH. 209.    JUNE 6, 1932.

MANUFACTURERS'
EXCISE TAX

tion therewith or with the sale thereof), 2 per centum.  A sale of an automobile truck shall, for the purposes of this subsection, be considered to be a sale of the chassis and of the body.

Other automobile chassis, etc.
Accessories included.
Tractors excepted.

(b)  Other automobile chassis and bodies and motor cycles (including in each case parts or accessories therefor sold on or in connection therewith or with the sale thereof), except tractors, 3 per centum.  A sale of an automobile shall, for the purposes of this subsection, be considered to be a sale of the chassis and of the body.

Parts and accessories not including tires and tubes.

(c)  Parts or accessories (other than tires and inner tubes) for any of the articles enumerated in subsection (a) or (b), 2 per centum.  For the purposes of this subsection and subsections (a) and (b), spark plugs, storage batteries, leaf springs, coils, timers, and tire chains, which are suitable for use on or in connection with, or as component parts of, any of the articles enumerated in subsection (a) or (b), shall be considered parts or accessories for such articles,

Automobile chassis and bodies excluded.
Applicability of tax.

whether or not primarily adapted for such use.  This subsection shall not apply to chassis or bodies for automobile trucks or other automobiles.  Under regulations prescribed by the Commissioner, with the approval of the Secretary, the tax under this subsection shall not apply in the case of sales of parts or accessories by the manufacturer, producer, or importer to a manufacturer or producer of

Resale.

any of the articles enumerated in subsection (a) or (b).  If any such parts or accessories are resold by such vendee otherwise than on or in connection with, or with the sale of, an article enumerated in subsection (a) or (b) and manufactured or produced by such vendee, then for the purposes of this section the vendee shall be considered the manufacturer or producer of the parts or accessories so resold.

Regulations for exemptions on resale.

(d)  Under regulations prescribed by the Commissioner, with the approval of the Secretary, the tax under subsection (a) or (b) shall not apply in the case of sales of bodies by the manufacturer, producer, or importer to a manufacturer or producer of automobile trucks or other automobiles to be sold by such vendee.  For the purposes of subsection (a) or (b) such vendee shall be considered the manufacturer or producer of such bodies.

Refund of tax paid on tires and tubes.

(e)  If tires or inner tubes on which tax has been imposed under this title are sold on or in connection with, or with the sale of, a chassis, body, or motor cycle, there shall (under regulations prescribed by the Commissioner, with the approval of the Secretary) be credited against the tax under this section an amount equal to, in the case of an automobile truck chassis or body, 2 per centum, and in the case of any other automobile chassis or body or motor cycle, 3 per centum—

Amounts.

Computation.

*Ante,* p. 261.

*Post,* p. 268.

(1) of the purchase price (less, in the case of tires, the part of such price attributable to the metal rim or rim base) if such tires or inner tubes were taxable under section 602 (relating to tax on tires and inner tubes) ; or

(2) if such tires or inner tubes were taxable under section 622 (relating to use by manufacturer, producer, or importer) then of the price (less, in the case of tires, the part of such price attributable to the metal rim or rim base) at which such or similar tires or inner tubes are sold, in the ordinary course of trade, by manufacturers, producers, or importers thereof, as determined by the Commissioner.

Refund of tax on tires, etc., held for sale after August 1, 1934.

(f) (1)  Where prior to August 1, 1934, any article subject to the tax imposed by this section or section 602, relating to tax on tires and inner tubes, has been sold by the manufacturer, producer, or importer, and is on such date held by a dealer and intended for sale,

72d CONGRESS.    SESS. I.    CH. 209.    JUNE 6, 1932.    263

MANUFACTURERS' EXCISE TAX

there shall be refunded to the manufacturer, producer, or importer the amount of the tax, or if the tax has not been paid, the tax shall be abated.

Terms construed. "Dealer." "Held by a dealer."

(2) As used in this subsection the term "dealer" includes a wholesaler, jobber, or distributor. For the purposes of this subsection, an article shall be considered as "held by a dealer" if title thereto has passed to such dealer (whether or not delivery to him has been made), and if for purposes of consumption title to such article or possession thereof has not at any time been transferred to any person other than a dealer.

Rules for balancing credits and refunds.

(3) Under regulations prescribed by the Commissioner, with the approval of the Secretary, the refund provided by this subsection— (A) may be applied as a credit against the tax shown by subsequent returns of the manufacturer, producer, or importer, and (B) may be made to the dealer instead of to the manufacturer, producer, or importer, if the manufacturer, producer, or importer waives any claim for the amount so to be refunded.

Dealer to receive credit.

(4) When the refund, credit, or abatement provided for in this subsection has been allowed to the manufacturer, producer, or importer, he shall remit to the dealer to whom was sold the article in respect of which the refund, credit, or abatement was allowed, so much of that amount of the tax corresponding to the refund, credit, or abatement, as was included in or added to the price paid or agreed to be paid by the dealer. Upon the failure of the manufacturer, producer, or importer to make such remission he shall be liable to the dealer for damages in the amount of three times the amount thereof, and the court shall include in any judgment in favor of the dealer in any suit for the recovery of such damages, costs of the suit and a reasonable attorney's fee to be fixed by the court.

Liability of importer, etc., when noncompliance. Amount of damages to dealer.

## SEC. 607. TAX ON RADIO RECEIVING SETS, ETC.

Radio receiving sets, etc. Rate.

There is hereby imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 5 per centum of the price for which so sold: Chassis, cabinets, tubes, reproducing units, power packs, and phonograph mechanisms, suitable for use in connection with or as part of radio receiving sets or combination radio and phonograph sets (including in each case parts or accessories therefor sold on or in connection therewith or with the sale thereof), and records for phonographs. A sale of any two or more of the above articles shall, for the purpose of this section, be considered a sale of each separately.

Radio sets and component parts.

## SEC. 608. TAX ON MECHANICAL REFRIGERATORS.

Mechanical refrigerators. Rate.

There is hereby imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 5 per centum of the price for which so sold:

(a) Household type refrigerators (for single or multiple cabinet installations) operated with electricity, gas, kerosene, or other means (including parts or accessories therefor sold on or in connection therewith or with the sale thereof).

Household type.

(b) Cabinets, compressors, condensers, expansion units, absorbers, and controls (hereinafter referred to as "refrigerator components") for, or suitable for use as part of or with, any of the articles enumerated in subsection (a) (including in each case parts or accessories for such refrigerator components sold on or in connection therewith or with the sale thereof) except when sold as component parts of complete refrigerators or refrigerating or cooling apparatus. Under regulations prescribed by the Commissioner, with the approval of the Secretary, the tax under this subsection shall not apply in the case

Refrigerator components. Exception when sold to manufacturer, etc.

Pages 9579

MANUFACTURERS'
EXCISE TAX
of sales of any such refrigerator components by the manufacturer, producer, or importer to a manufacturer or producer of refrigerators or refrigerating or cooling apparatus. If any such refrigerator components are resold by such vendee otherwise than on or in connection with, or with the sale of, complete refrigerators or refrigerating or cooling apparatus, manufactured or produced by such vendee, then for the purposes of this section the vendee shall be considered the manufacturer or producer of the refrigerator components so resold.

*Application when subsequent sale.*

*Sporting goods.*
*Rate.*

### SEC. 609. TAX ON SPORTING GOODS.

There is hereby imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold: Tennis rackets, tennis racket frames and strings, nets, racket covers and presses, skates, snowshoes, skis, toboggans, canoe paddles, polo mallets, baseball bats, gloves, masks, protectors, shoes and uniforms, football helmets, harness and uniforms, basket ball goals and uniforms, golf bags and clubs, lacrosse sticks, balls of all kinds, including baseballs, footballs, tennis, golf, lacrosse, billiard and pool balls, fishing rods and reels, billiard and pool tables, chess and checker boards and pieces, dice, games and parts of games (except playing cards and children's toys and games); and all similar articles commonly or commercially known as sporting goods.

*Articles specified.*

*Exceptions.*

*Firearms, shells, and cartridges.*
*Rate.*

### SEC. 610. TAX ON FIREARMS, SHELLS, AND CARTRIDGES.

There is hereby imposed upon firearms, shells, and cartridges, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold. The tax imposed by this section shall not apply (1) to articles sold for the use of the United States, any State, Territory, or possession of the United States, any political subdivision thereof, or the District of Columbia, or (2) to pistols and revolvers.

*Exception if for Governmental, etc., use.*

*Pistols and revolvers.*

*Cameras.*

### SEC. 611. TAX ON CAMERAS.

There is hereby imposed upon cameras (except aerial cameras), weighing not more than 100 pounds, and lenses for such cameras, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold.

*Rate.*
*Lenses.*

*Matches.*

### SEC. 612. TAX ON MATCHES.

There is hereby imposed upon matches, sold by the manufacturer, producer, or importer, a tax of 2 cents per 1,000 matches, except that in the case of paper matches in books the tax shall be ½ of 1 cent per 1,000 matches.

*Rate.*

*Paper matches.*

*Candy.*

### SEC. 613. TAX ON CANDY.

There is hereby imposed upon candy, sold by the manufacturer, producer, or importer, a tax equivalent to 2 per centum of the price for which so sold.

*Rate.*

*Chewing gum.*

### SEC. 614. TAX ON CHEWING GUM.

There is hereby imposed upon chewing gum or substitutes therefor, sold by the manufacturer, producer, or importer, a tax equivalent to 2 per centum of the price for which so sold.

*Rate.*

*Soft drinks.*

### SEC. 615. TAX ON SOFT DRINKS.

(a) There is hereby imposed—

(1) Upon all beverages derived wholly or in part from cereals or substitutes therefor, containing less than one-half of 1 per centum of alcohol by volume, sold by the manufacturer, producer, or importer, a tax of 1¼ cents per gallon.

*Beverages from cereals, etc.*

*Rate.*

(2) Upon unfermented grape juice, in natural or concentrated form (whether or not sugar has been added), containing 35 per centum or less of sugars by weight, sold by the manufacturer, producer, or importer, a tax of 5 cents per gallon.

(3) Upon all unfermented fruit juices (except grape juice), in natural or slightly concentrated form, or such fruit juices to which sugar has been added (as distinguished from finished or fountain syrups), intended for consumption as beverages with the addition of water or water and sugar, and upon all imitations of any such fruit juices, and upon all carbonated beverages, commonly known as soft drinks (except those described in paragraph (1)), manufactured, compounded, or mixed by the use of concentrate, essence, or extract, instead of a finished or fountain syrup, sold by the manufacturer, producer, or importer, a tax of 2 cents per gallon.

(4) Upon all still drinks (except grape juice), containing less than one-half of 1 per centum of alcohol by volume, intended for consumption as beverages in the form in which sold (except natural or artificial mineral and table waters and imitations thereof, and pure apple cider), sold by the manufacturer, producer, or importer, a tax of 2 cents per gallon.

(5) Upon all natural or artificial mineral waters or table waters, whether carbonated or not, and all imitations thereof, sold by the producer, bottler, or importer thereof, in bottles or other closed containers, at over 12½ cents per gallon, a tax of 2 cents per gallon.

(6) Upon all finished or fountain syrups of the kinds used in manufacturing, compounding, or mixing drinks commonly known as soft drinks, sold by the manufacturer, producer, or importer, a tax of 6 cents per gallon; except that in the case of any such syrups intended to be used in the manufacture of carbonated beverages sold in bottles or other closed containers the rate shall be 5 cents per gallon. Where any person conducting a soda fountain, ice cream parlor, or other similar place of business manufactures any syrups of the kinds described in this paragraph, there shall be levied, assessed, collected, and paid on each gallon manufactured and used in the preparation of soft drinks a tax of 6 cents per gallon; and where any person manufacturing carbonated beverages manufactures and uses any such syrups in the manufacture of carbonated beverages sold in bottles or other closed containers there shall be levied, assessed, collected, and paid on each gallon of such syrups a tax of 5 cents per gallon. The taxes imposed by this paragraph shall not apply to finished or fountain syrups sold for use in the manufacture of a beverage subject to tax under paragraph (1) or (4), nor to any article enumerated in section 601 (c) (3).

(7) Upon all carbonic acid gas sold by the manufacturer, producer, or importer, or by a dealer in such gas, to a manufacturer of any carbonated beverages, or to any person conducting a soda fountain, ice cream parlor, or other similar place of business, and upon all carbonic acid gas used by the manufacturer, producer, or importer thereof in the preparation of soft drinks, a tax of 4 cents per pound.

(b) Each manufacturer, producer, or importer of any of the articles enumerated in subsection (a) and each person who sells carbonic acid gas to a manufacturer of carbonated beverages or to a person conducting a soda fountain, ice cream parlor, or other

MANUFACTURERS' EXCISE TAX
Grape juice.
Rate.

Fruit juice.

Imitations, carbonated beverages, etc.

Rate.

If containing alcohol.

Rate.

Mineral and table waters, etc.

Rate.

Fountain syrups, etc.

Rate.
If sold to manufacturer.

When manufactured for soda fountain, etc., business.

Exception.
Ante, p. 260.

Carbonic acid gas.

Monthly returns required.

266                72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

MANUFACTURERS'
EXCISE TAX
similar place of business, shall make monthly returns under oath in duplicate and pay the tax imposed in respect of the articles enumerated in subsection (a) to the collector for the district in which is located his principal place of business, or, if he has no principal place of business in the United States, then to the collector at Baltimore, Maryland. Such returns shall contain such information and be made at such times and in such manner as the Commissioner, with the approval of the Secretary, may by regulations prescribe. The tax shall, without assessment by the Commissioner or notice from the collector, be due and payable to the collector at the time so fixed for filing the return. If the tax is not paid when due, there shall be added as part of the tax interest at the rate of 1 per centum a month from the time the tax became due until paid.

*Contents.*

*Payment.*

*Interest on overdue tax.*

*Certificate of registry.*

(c) Each person required to pay any tax imposed by subsection (a) shall procure and keep posted a certificate of registry in accordance with regulations to be prescribed by the Commissioner, with the approval of the Secretary. Any person who fails to register or keep posted any certificate of registry in accordance with such regulations shall be subject to a penalty of not more than $1,000 for each such offense.

*Penalty for failure to register.*

*Electrical energy.*
*Rate.*
*Payment.*

## SEC. 616. TAX ON ELECTRICAL ENERGY.

(a) There is hereby imposed a tax equivalent to 3 per centum of the amount paid on or after the fifteenth day after the date of the enactment of this Act, for electrical energy for domestic or commercial consumption furnished after such date and before July 1, 1934, to be paid by the person paying for such electrical energy and to be collected by the vendor.

*Collection.*

*Monthly returns by collector.*

(b) Each vendor receiving any payments specified in subsection (a) shall collect the amount of the tax imposed by such subsection from the person making such payments, and shall on or before the last day of each month make a return, under oath, for the preceding month, and pay the taxes so collected, to the collector of the district in which his principal place of business is located, or if he has no principal place of business in the United States, to the collector at Baltimore, Maryland. Such returns shall contain such information and be made in such manner as the Commissioner with the approval of the Secretary may by regulation prescribe. The Commissioner may extend the time for making returns and paying the taxes collected, under such rules and regulations as he shall prescribe with the approval of the Secretary, but no such extension shall be for more than 90 days. The provisions of sections 771 to 774, inclusive, shall, in lieu of the provisions of sections 619 to 629, inclusive, be applicable in respect of the tax imposed by this section.

*Information therein.*

*Regulations governing time extensions.*

*Post, p. 277.*

*Exception if furnished for governmental, etc., use.*

(c) No tax shall be imposed under this section upon any payment received for electrical energy furnished to the United States or to any State or Territory, or political subdivision thereof, or the District of Columbia. The right to exemption under this subsection shall be evidenced in such manner as the Commissioner with the approval of the Secretary may by regulation prescribe.

*Right to exemption.*

*Gasoline.*
*Rate.*
*Exception.*

## SEC. 617. TAX ON GASOLINE.

(a) There is hereby imposed on gasoline sold by the importer thereof or by a producer of gasoline, a tax of 1 cent a gallon, except that under regulations prescribed by the Commissioner with the approval of the Secretary the tax shall not apply in the case of sales to a producer of gasoline.

*When exception not applicable.*

(b) If a producer or importer uses (otherwise than in the production of gasoline) gasoline sold to him free of tax, or produced or

imported by him, such use shall for the purposes of this title be considered a sale.

MANUFACTURERS' EXCISE TAX

(c) As used in this section—

Terms construed.
"Producer."

(1) the term "producer" includes a refiner, compounder, or blender, and a dealer selling gasoline exclusively to producers of gasoline, as well as a producer.

(2) the term "gasoline" means gasoline, benzol, and any other liquid the chief use of which is as a fuel for the propulsion of motor vehicles, motor boats, or aeroplanes.

"Gasoline."

## SEC. 618. DEFINITION OF SALE.

"Sale."

For the purposes of this title, the lease of an article shall be considered the sale of such article.

## SEC. 619. SALE PRICE.

Sale price.

(a) In determining, for the purposes of this title, the price for which an article is sold, there shall be included any charge for coverings and containers of whatever nature, and any charge incident to placing the article in condition packed ready for shipment, but there shall be excluded the amount of tax imposed by this title, whether or not stated as a separate charge. A transportation, delivery, insurance, installation, or other charge (not required by the foregoing sentence to be included) shall be excluded from the price only if the amount thereof is established to the satisfaction of the Commissioner, in accordance with the regulations.

Coverings, containers, etc., included.
Tax imposed excluded.
Transportation, delivery, etc., charges.

(b) If an article is—

Computation of tax if article sold at less than fair market price.

(1) sold at retail;

(2) sold on consignment; or

(3) sold (otherwise than through an arm's-length transaction) at less than the fair market price;

the tax under this title shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner.

(c) In the case of (1) a lease, (2) a contract for the sale of an article wherein it is provided that the price shall be paid by installments and title to the article sold does not pass until a future date notwithstanding partial payment by installments, or (3) a conditional sale, there shall be paid upon each payment with respect to the article that portion of the total tax which is proportionate to the portion of the total amount to be paid represented by such payment.

Proportionate payment of tax, if article sold on installment plan, conditional sale, etc.

## SEC. 620. SALE OF ARTICLES FOR FURTHER MANUFACTURE.

Sale of articles for further manufacture.

Under regulations prescribed by the Commissioner with the approval of the Secretary, no tax under this title shall be imposed upon any article (other than a tire or inner tube, or an article taxable under section 604, relating to the tax on furs) sold for use as material in the manufacture or production of, or for use as a component part of, an article to be manufactured or produced by the vendee which will be taxable under this title or sold free of tax by virtue of this section. If the vendee resells an article sold to him free of tax under this section, then for the purposes of this title he shall be considered the manufacturer or producer of such article.

Tax exemptions.
Tires, tubes, and furs excepted.
Ante, p. 261.
Resale by vendee.

## SEC. 621. CREDITS AND REFUNDS.

Credits and refunds.

(a) A credit against tax under this title, or a refund, may be allowed or made—

To whom allowed.

(1) to a manufacturer or producer, in the amount of any tax under this title which has been paid with respect to the sale of

Manufacturer or producer when using taxed articles.

MANUFACTURERS'
EXCISE TAX
any article (other than a tire or inner tube) purchased by him and used by him as material in the manufacture or production of, or as a component part of, an article with respect to which tax under this title has been paid, or which has been sold free of tax by. virtue of section 620, relating to sales of articles for further manufacture.

Persons upon repos-
session of taxed article.
(2) to any person who has paid tax under this title with respect to an article, when the price on which the tax was based is readjusted by reason of return or repossession of the article or a covering or container, or by a bona fide discount, rebate, or allowance; in the amount of that part of the tax proportionate to the part of the price which is refunded or credited.

Regulations to be pre-
scribed.
(b) Credit or refund under subsection (a) shall be allowed or made only upon compliance with regulations prescribed by the Commissioner with the approval of the Secretary.

Interest not allowed.
(c) In no case shall interest be allowed with respect to any amount of tax under this title credited or refunded.

Proof necessary to es-
tablish right to receive
fund.
(d) No overpayment of tax under this title shall be credited or refunded (otherwise than under subsection (a)), in pursuance of a court decision or otherwise, unless the person who paid the tax establishes, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, (1) that he has not Tax not included in
sale price. included the tax in the price of the article with respect to which it was imposed, or collected the amount of tax from the vendee, or Repayment to ulti-
mate consumer. (2) that he has repaid the amount of the tax to the ultimate purchaser of the article, or unless he files with the Commissioner written consent of such ultimate purchaser to the allowance of the credit or refund.

Use by manufacturer,
producer, or importer.
## SEC. 622. USE BY MANUFACTURER, PRODUCER, OR IMPORTER.

If—

Computation of tax.
Exemptions.
(1) any person manufactures, produces, or imports an article (other than a tire or inner tube) and uses it (otherwise than as material in the manufacture or production of, or as a component part of, another article to be manufactured or produced by him which will be taxable under this title or sold free of tax by virtue Ante, p. 267. of section 620, relating to sale of articles for further manufacture) ; or

(2) any person manufactures, produces, or imports a tire or inner tube and sells it on or in connection with, or with the sale of, an article taxable under section 606(a) or (b), relating to the Ante, p. 261. tax on automobiles, or uses it;

he shall be liable for tax under this title in the same manner as if such article was sold by him, and the tax (if based on the price for which the article is sold) shall be computed on the price at which such or similar articles are sold, in the ordinary course of trade, by manufacturers, producers, or importers thereof, as determined by the Commissioner.

Sales by others.
## SEC. 623. SALES BY OTHERS THAN MANUFACTURER, PRODUCER, OR IMPORTER.

Liability for tax,
when acquiring right to
sell.
In case any person acquires from the manufacturer, producer, or importer of an article, by operation of law or as a result of any transaction not taxable under this title, the right to sell such article, the sale of such article by such person shall be taxable under this title as if made by the manufacturer, producer, or importer, and such person shall be liable for the tax.

72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932. 269

MANUFACTURERS'
EXCISE TAX

### SEC. 624. EXEMPTION OF ARTICLES MANUFACTURED OR PRODUCED BY INDIANS.

No tax shall be imposed under this title on any article of native Indian handicraft manufactured or produced by Indians on Indian reservations, or in Indian schools, or by Indians under the jurisdiction of the United States Government in Alaska.

*Exemption of articles manufactured by Indians.*
*When exempt.*

### SEC. 625. CONTRACTS PRIOR TO MAY 1, 1932.

(a) If (1) any person has, prior to May 1, 1932, made a bona fide contract for the sale, after the tax takes effect, of any article in respect of the sale of which a tax is imposed under this title, or in respect of which a tax is imposed under this subsection, and (2) such contract does not permit the adding to the amount to be paid under such contract, of the whole of such tax, then (unless the contract prohibits such addition) the vendee shall, in lieu of the vendor, pay so much of the tax as is not so permitted to be added to the contract price. If a contract of the character above described was made with the United States or with any person other than a dealer, no tax shall be collected under this title.

*Contracts prior to May 1, 1932.*
*Payment of tax by vendee, if addition to contract price not permitted.*
*Post, p. 302.*

*Government contracts exempt.*

(b) The taxes payable by the vendee shall be paid to the vendor at the time the sale is consummated, and shall be collected, returned, and paid to the United States by such vendor in the same manner as provided in section 702. In case of failure or refusal by the vendee to pay such taxes to the vendor, the vendor shall report the facts to the Commissioner, who shall cause collection of such taxes to be made from the vendee.

*Payment at consummation of sale.*

*If failure or refusal.*

### SEC. 626. RETURN AND PAYMENT OF MANUFACTURERS' TAXES.

(a) Every person liable for any tax imposed by this title other than taxes on importation (except tax under section 615, relating to tax on soft drinks) shall make monthly returns under oath in duplicate and pay the taxes imposed by this title to the collector for the district in which is located his principal place of business or, if he has no principal place of business in the United States, then to the collector at Baltimore, Maryland. Such returns shall contain such information and be made at such times and in such manner as the Commissioner, with the approval of the Secretary, may by regulations prescribe.

*Return and payment of manufacturers' taxes.*
*Monthly returns required.*
*Ante, p. 264.*

*Contents.*

(b) The tax shall, without assessment by the Commissioner or notice from the collector, be due and payable to the collector at the time so fixed for filing the return. If the tax is not paid when due, there shall be added as part of the tax interest at the rate of 1 per centum a month from the time when the tax became due until paid.

*Payment of tax.*

*Interest on overdue tax.*

### SEC. 627. APPLICABILITY OF ADMINISTRATIVE PROVISIONS.

All provisions of law (including penalties) applicable in respect of the taxes imposed by section 600 of the Revenue Act of 1926, shall, in so far as applicable and not inconsistent with this Act, be applicable in respect of the taxes imposed by this title.

*Applicability of administrative provisions.*
*Revenue Act of 1926.*
*Vol. 44, p. 93.*

### SEC. 628. RULES AND REGULATIONS.

The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of this title in so far as it relates to the taxes on articles sold by the manufacturer, producer, or importer. The Secretary shall prescribe and publish all needful rules and regulations for the enforcement of this title in so far as it relates to the taxes which under the provisions of section 601(b) are to be levied, assessed,

*Rules and regulations.*
*Prescribed by Commissioner, with approval of Secretary.*

*Publication.*

*Ante, p. 259.*

**270**                 72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.

MANUFACTURERS'
EXCISE TAX
collected, and paid in the same manner as duties imposed by the
Tariff Act of 1930.

Effective date.
**SEC. 629. EFFECTIVE DATE.**

This title shall take effect on the fifteenth day after the date of
the enactment of this Act, except that section 628, relating to rules
and regulations, and this section, shall take effect on the date of the
enactment of this Act.  No sale or importation after June 30, 1934
(or after July 31, 1934, in the case of articles taxable under section
606, relating to the tax on automobiles, etc., or section 602, relating
to the tax on tires and inner tubes, or after June 30, 1933, in the
case of articles taxable under section 617, relating to the tax on
gasoline), shall be taxable under this title.

Title V—Miscellane-
ous taxes.

# TITLE V—MISCELLANEOUS TAXES

Telegraph, telephone,
and cable facilities.

## Part I—Tax on Telegraph, Telephone, Radio, and Cable Facilities

Imposition.
Effective date.
**SEC. 701. IMPOSITION.**

(a) On and after the fifteenth day after the date of the enactment
of this Act, there shall be imposed—

Rates.
(1) in the case of each telegraph, telephone, cable, or radio
dispatch, message, or conversation, which originates on or after
such date and before July 1, 1934, within the United States, a
tax at the following rates:

Telephone conversa-
tions.
(A) Telephone conversations for which the charge is 50 cents
or more and less than $1, 10 cents; for which the charge is
$1 or more and less than $2, 15 cents; for which the charge is
$2 or more, 20 cents;

Telegraph messages.
(B) telegraph dispatches and messages, 5 per centum of the
amount charged therefor; and

Cable messages.
Only one payment
required.
(C) cable and radio dispatches and messages, 10 cents;
but only one payment of such tax shall be required, notwithstand-
ing the lines or stations of one or more persons are used for the
transmission of such dispatch, message, or conversation; and

Leased wire, etc.
(2) a tax equivalent to 5 per centum of the amount paid on or
after the fifteenth day after the date of the enactment of this
Act to any telegraph or telephone company for any leased wire
or talking circuit special service furnished on or after such date
and before July 1, 1934.  This paragraph shall not apply to the
amount paid for so much of such service as is utilized in the
conduct, by a common carrier or telephone or telegraph company
or radio broadcasting station or net work, of its business as such.

Payment for services
furnished the Govern-
ment, etc., exempt.
(b) No tax shall be imposed under this section upon any payment
received for services or facilities furnished to the United States
or to any State or Territory, or political subdivision thereof, or the
District of Columbia, nor upon any payment received from any
person for services or facilities utilized in the collection of news
for the public press or in the dissemination of news through the
public press, if the charge for such services or facilities is billed
Right to exemption.
in writing to such person.  The right to exemption under this sub-
section shall be evidenced in such manner as the Commissioner with
the approval of the Secretary may by regulation prescribe.

Returns and pay-
ment of tax.
Payment.
**SEC. 702. RETURNS AND PAYMENT OF TAX.**

(a) The taxes imposed by section 701 shall be paid by the person
paying for the services or facilities.

Collection.
(b) Each person receiving any payments specified in section 701
shall collect the amount of the tax imposed by such section from the

person making such payments, and shall on or before the last day of each month make a return, under oath, for the preceding month, and pay the taxes so collected, to the collector of the district in which his principal place of business is located, or if he has no principal place of business in the United States, to the collector at Baltimore, Maryland. Such returns shall contain such information and be made in such manner as the Commissioner with the approval of the Secretary may by regulation prescribe. The Commissioner may extend the time for making returns and paying the taxes collected, under such rules and regulations as he shall prescribe with the approval of the Secretary, but no such extension shall be for more than 90 days.

<div align="right">MISCELLANEOUS TAXES

Monthly returns required.

Contents.

Regulations governing time extentions.</div>

### Part II—Admissions Tax

<div align="right">Part II—Admissions tax.</div>

**SEC. 711. ADMISSIONS TAX.**

(a) Paragraph (1) of section 500(a) of the Revenue Act of 1926, as amended, is amended to read as follows:

<div align="right">Revenue Act of 1926, amendment.
Vol. 44, p. 91.</div>

"(1) A tax of 1 cent for each 10 cents or fraction thereof of the amount paid for admission to any place, including admission by season ticket or subscription, to be paid by the person paying for such admission; except that in case the amount paid for admission is less than 41 cents, no tax shall be imposed. In the case of persons (except bona fide employees, municipal officers on official business, and children under 12 years of age) admitted free or at reduced rates to any place at a time when and under circumstances under which an admission charge is made to other persons, an equivalent tax shall be collected based on the price so charged to such other persons for the same or similar accommodations, to be paid by the person so admitted. Amounts paid for admission by season ticket or subscription shall be exempt only if the amount which would be charged to the holder or subscribed for a single admission is less than 41 cents;"

<div align="right">Rate.

Persons admitted free or at reduced rates.

Admissions by season tickets or subscription.</div>

(b) Paragraph (2) of section 500(a) of the Revenue Act of 1926, as amended, is amended to read as follows:

<div align="right">Vol. 44, p. 91.</div>

"(2) Upon tickets or cards of admission to theaters, operas, and other places of amusement, sold at news stands, hotels, and places other than the ticket offices of such theaters, operas, or other places of amusement, at a price in excess of the sum of the established price therefor at such ticket offices plus the amount of any tax imposed under paragraph (1), a tax equivalent to 10 per centum of the amount of such excess; such tax to be returned and paid, in the manner and subject to the interest provided in section 502, by the person selling such tickets;"

<div align="right">Additional, on sales at advanced price at other than ticket offices.

Rate.</div>

(c) Section 500 of the Revenue Act of 1926, as amended, is amended by adding at the end thereof the following subdivision:

<div align="right">Vol. 44, p. 93.</div>

"(e) The exemption from tax provided by subdivision (b)(1)(A) shall not be allowed in the case of admissions to wrestling matches, prize fights, or boxing, sparring, or other pugilistic matches or exhibitions. The exemption from tax provided by subdivision (b)(1) shall not be allowed in the case of admissions to any athletic game or exhibition the proceeds of which inure wholly or partly to the benefit of any college or university (including any academy of the military or naval forces of the United States)."

<div align="right">Exempt entertainments.
Vol. 44, p. 92.

Pugilistic exhibitions not included.

Athletic games, etc.</div>

(d) Subsections (a) and (c) shall take effect on the fifteenth day after the date of the enactment of this Act.

<div align="right">Effective date.</div>

(e) Effective July 1, 1934, section 500(a)(1) of the Revenue Act of 1926, as amended by subsection (a) of this section, is amended

<div align="right">Vol. 44, p. 91.
Exemption effective July 1, 1934.</div>

MISCELLANEOUS TAXES by striking out "less than 41 cents" wherever appearing in such paragraph, and inserting in lieu thereof "$3 or less".

Part III—Stamp taxes.

## Part III—Stamp Taxes

Bond issues, etc.
Rate increased.
Vol. 44, p. 101.

**SEC. 721. STAMP TAX ON ISSUES OF BONDS, ETC.**

Not applicable to instrument, when payments by installment.

(a) Subdivision 1 of Schedule A of Title VIII of the Revenue Act of 1926 is amended by striking out "5 cents" and inserting in lieu thereof "10 cents", and by inserting at the end thereof a new sentence to read as follows: "The tax under this subdivision shall not apply to any instrument under the terms of which the obligee is required to make payment therefor in installments and is not permitted to make in any year a payment of more than 20 per centum of the cash amount to which entitled upon maturity of the instrument."

Effective date.

(b) Subsection (a) shall take effect on the 15th day after the date of the enactment of this Act.

Exemption effective July 1, 1934.

(c) Effective July 1, 1934, such subdivision 1, as amended by subsection (a) of this section, is amended by striking out "10 cents" and inserting in lieu thereof "5 cents".

Stock issues, etc.
Vol. 44, p. 101.

**SEC. 722. STAMP TAX ON ISSUES OF STOCK, ETC.**

(a) Subdivision 2 of Schedule A of Title VIII of the Revenue Act of 1926 is amended to read as follows:

Capital stock.
Original issue.

"2. Capital stock (and similar interests), issue: On each original issue, whether on organization or reorganization, of shares or certificates of stock, or of profits, or of interest in property or accumulations, by any corporation, or by any investment trust or similar organization (or by any person on behalf of such investment trust or similar organization) holding or dealing in any of the instruments mentioned or described in this subdivision or subdivision 1 (whether or not such investment trust or similar organization constitutes a corporation within the meaning of this Act), on each $100 of par or face value or fraction thereof of the certificates issued by such

Rate.
Proviso.
Issue without face value.

corporation or by such investment trust or similar organization (or of the shares where no certificates were issued), 10 cents: *Provided*, That where such shares or certificates are issued without par or face value, the tax shall be 10 cents per share (corporate share, or investment trust or other organization share, as the case may be), unless the actual value is in excess of $100 per share, in which case the tax shall be 10 cents on each $100 of actual value or fraction thereof of such certificates (or of the shares where no certificates were issued), or unless the actual value is less than $100 per share, in which case the tax shall be 2 cents on each $20 of actual value, or fraction thereof, of such certificates (or of the shares where no certificates were issued).

Attaching stamps.

"The stamps representing the tax imposed by this subdivision shall be attached to the stock books or corresponding records of the organization and not to the certificates issued."

Effective date.

(b) Subsection (a) shall take effect on the fifteenth day after the date of the enactment of this Act.

Tax rate effective July 1, 1934.

(c) Effective July 1, 1934, such subdivision 2, as amended by subsection (a) of this section, is amended by striking out "10 cents" wherever appearing in such subdivision and inserting in lieu thereof "5 cents", and by striking out "2 cents" and inserting in lieu thereof "1 cent".

Transfers of stocks, etc.
Vol. 44, p. 101.

**SEC. 723. STAMP TAX ON TRANSFER OF STOCKS, ETC.**

(a) Subdivision 3 of Schedule A of Title VIII of the Revenue Act of 1926 is amended to read as follows:

"3. Capital stock (and similar interests), sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to any of the shares or certificates mentioned or described in subdivision 2, or to rights to subscribe for or to receive such shares or certificates, whether made upon or shown by the books of the corporation or other organization, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale (whether entitling the holder in any manner to the benefit of such share, certificate, interest, or rights, or not), on each $100 of par or face value or fraction thereof of the certificates of such corporation or other organization (or of the shares where no certificates were issued), 4 cents, and where such shares or certificates are without par or face value, the tax shall be 4 cents on the transfer or sale or agreement to sell on each share (corporate share, or investment trust or other organization share, as the case may be): *Provided*, That in case the selling price, if any, is $20 or more per share the above rate shall be 5 cents instead of 4 cents: *Provided further*, That it is not intended by this title to impose a tax upon an agreement evidencing a deposit of certificates as collateral security for money loaned thereon, which certificates are not actually sold, nor upon the delivery or transfer for such purpose of certificates so deposited nor upon the return of stock loaned: *Provided further*, That the tax shall not be imposed upon deliveries or transfers to a broker for sale, nor upon deliveries or transfers by a broker to a customer for whom and upon whose order he has purchased same, but such deliveries or transfers shall be accompanied by a certificate setting forth the facts: *Provided further*, That the tax shall not be imposed upon deliveries or transfers from a fiduciary to a nominee of such fiduciary, or from one nominee of such fiduciary to another, if such shares or certificates continue to be held by such nominee for the same purpose for which they would be held if retained by such fiduciary, or from the nominee to such fiduciary, but such deliveries or transfers shall be accompanied by a certificate setting forth the facts: *Provided further*, That in case of sale where the evidence of transfer is shown only by the books of the corporation or other organization the stamp shall be placed upon such books; and where the change of ownership is by transfer of the certificate the stamp shall be placed upon the certificate; and in cases of an agreement to sell or where the transfer is by delivery of the certificate assigned in blank there shall be made and delivered by the seller to the buyer a bill or memorandum of such sale, to which the stamp shall be affixed; and every bill or memorandum of sale or agreement to sell before mentioned shall show the date thereof, the name of the seller, the amount of the sale, and the matter or thing to which it refers. Any person liable to pay the tax as herein provided, or anyone who acts in the matter as agent or broker for such person, who makes any such sale, or who in pursuance of any such sale delivers any certificate or evidence of the sale of any stock, share, interest or right, or bill or memorandum thereof, as herein required, without having the proper stamps affixed thereto, with intent to evade the foregoing provisions, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not exceeding $1,000, or be imprisoned not more than six months, or both."

(b) Subsection (a) shall take effect on the fifteenth day after the date of the enactment of this Act.

(c) Effective July 1, 1934, such subdivision 3, as amended by subsection (a) of this section, is amended by striking out "4 cents" wherever appearing in such subdivision and inserting in lieu thereof

*Side notes:*

MISCELLANEOUS TAXES

Capital stock, sales or transfers.

Rate.

Shares without face value.

*Provisos.*
Additional if selling price $20 or more per share.

Deposits as collateral exempt.

Brokers' deliveries, etc., exempt.

Deliveries in trust.

Stamps placed on corporation books.

On certificates.

On bill of sale.

Details required.

Punishment for sales without stamps.

Effective date.

Tax rate effective July 1, 1934.

3051°—33——18

274                     72d CONGRESS. SESS. I. CH. 209.   JUNE 6, 1932.

MISCELLANEOUS TAXES "2 cents ", and by striking out the following: " in case the selling price, if any, is $20 or more per share the above rate shall be 5 cents instead of 4 cents: *Provided further*, That ".

Bond transfers, etc.
Vol. 44, p. 103.

**SEC. 724. STAMP TAX ON TRANSFER OF BONDS, ETC.**

(a) Schedule A of Title VIII of the Revenue Act of 1926 is amended by adding at the end thereof a new subdivision to read as follows:

Bonds, etc., sales or transfers.

"9. Bonds, etc., sales or transfers: On all sales, or agreements to sell, or memoranda of sales or deliveries of, or transfers of legal title to any of the instruments mentioned or described in subdivision 1 and of a kind the issue of which is taxable thereunder, whether made by any assignment in blank or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale (whether entitling the holder in any manner to the benefit of such instrument or not), on each $100 of face value or fraction

Rate.
*Provisos.*
Deposits as collateral security exempt.

thereof, 4 cents: *Provided*, That it is not intended by this title to impose a tax upon an agreement evidencing a deposit of instruments as collateral security for money loaned thereon, which instruments

Transfer of bonds on reorganization.
*Ante*, p. 196.

are not actually sold, nor upon the delivery or transfer for such purpose of instruments so deposited: *Provided further*, That the tax shall not be imposed on deliveries or transfers of bonds in connection with a reorganization (as defined in section 112 of the Revenue Act of 1932) if any of the gain or loss from the exchange or distribution involved in the delivery or transfer is not recognized under the income tax law applicable to the year in which the delivery or trans-

Brokers' deliveries, etc.

fer is made: *Provided further*, That the tax shall not be imposed upon deliveries or transfers to a broker for sale, nor upon deliveries or transfers by a broker to a customer for whom and upon whose order he has purchased same, but such deliveries or transfers shall be accompanied by a certificate setting forth the facts: *Provided fur-*

Transfers in trust.

*ther*, That the tax shall not be imposed upon deliveries or transfers from a fiduciary to a nominee of such fiduciary, or from one nominee of such fiduciary to another, if such instruments continue to be held by such nominee for the same purpose for which they would be held if retained by such fiduciary, or from the nominee to such fiduciary, but such deliveries or transfers shall be accompanied by a certificate

Placing stamps on certificate.
On bill of sale.

setting forth the facts: *Provided further*, That where the change of ownership is by transfer of the instrument the stamp shall be placed upon the instrument; and in cases of an agreement to sell or where the transfer is by delivery of the instrument assigned in blank there shall be made and delivered by the seller to the buyer a bill or memorandum of such sale, to which the stamp shall be affixed;

Details required.

and every bill or memorandum of sale or agreement to sell before mentioned shall show the date thereof, the name of the seller, the

Punishment for sales without stamps.

amount of the sale, and the matter or thing to which it refers.  Any person liable to pay the tax as herein provided, or anyone who acts in the matter as agent or broker for such person, who makes any such sale, or who in pursuance of any such sale delivers any certificate or evidence of the sale of any such instrument, or bill or memorandum thereof, as herein required, without having the proper stamps affixed thereto, with intent to evade the foregoing provisions, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not exceeding $1,000, or be imprisoned not more than six months, or both."

Effective date.

(b) Subsection (a) shall take effect on the fifteenth day after the date of the enactment of this Act.

(c) Subdivision 9 of Schedule A of Title VIII of the Revenue Act of 1926, added to such schedule by subsection (a) of this section, is repealed effective July 1, 1934.

MISCELLANEOUS TAXES

Repeal effective July 1, 1934.

### SEC 725. STAMP TAX ON CONVEYANCES.

Schedule A of Title VIII of the Revenue Act of 1926 is amended by adding at the end thereof a new subdivision to read as follows:

Conveyances.
Vol. 44, p. 103.

Rates.

" 8. Conveyances: Deed, instrument, or writing, delivered on or after the 15th day after the date of the enactment of the Revenue Act of 1932 and before July 1, 1934 (unless deposited in escrow before April 1, 1932), whereby any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his, her, or their direction, when the consideration or value of the interest or property conveyed, exclusive of the value of any lien or encumbrance remaining thereon at the time of sale, exceeds $100 and does not exceed $500, 50 cents; and for each additional $500 or fractional part thereof, 50 cents. This subdivision shall not apply to any instrument or writing given to secure a debt."

### SEC. 726. STAMP TAX ON SALES OF PRODUCE FOR FUTURE DELIVERY.

Sales of produce for future delivery.

(a) Subdivision 4 of Schedule A of Title VIII of the Revenue Act of 1926 is amended by striking out " 1 cent " wherever appearing in such subdivision, and inserting in lieu thereof " 5 cents ".

Vol. 44, p. 102.
Rate.

(b) Subsection (a) shall take effect on the fifteenth day after the date of the enactment of this Act.

Effective date.

(c) Effective July 1, 1934, such subdivision 4, as amended by subsection (a) of this section, is amended by striking out " 5 cents " wherever appearing in such subdivision and inserting in lieu thereof " 1 cent ".

Exemption effective July 1, 1934.

### Part IV—Tax on Transportation of Oil by Pipe Line

### SEC. 731. TAX ON TRANSPORTATION OF OIL BY PIPE LINE.

Transportation of oil by pipe line.
Effective date.

(a) There is hereby imposed upon all transportation of crude petroleum and liquid products thereof by pipe line originating on or after the fifteenth day after the date of the enactment of this Act and before July 1, 1934—

(1) A tax equivalent to 4 per centum of the amount paid on or after the fifteenth day after the date of the enactment of this Act for such transportation, to be paid by the person furnishing such transportation.

Rate.

Payment.

(2) In case no charge for transportation is made, either by reason of ownership of the commodity transported or for any other reason, a tax equivalent to 4 per centum of the fair charge for such transportation, to be paid by the person furnishing such transportation.

If no transportation costs.

(3) If (other than in the case of an arm's length transaction) the payment for transportation is less than the fair charge therefor, a tax equivalent to 4 per centum of such fair charge, to be paid by the person furnishing such transportation.

If transportation cost less than fair charge.

(b) For the purposes of this section, the fair charge for transportation shall be computed—

Computation of fair charge.

(1) from actual bona fide rates or tariffs, or

(2) if no such rates or tariffs exist, then on the basis of the actual bona fide rates or tariffs of other pipe lines for like services, as determined by the Commissioner, or

276                72d CONGRESS. SESS. I. CH. 209.  JUNE 6, 1932.

MISCELLANEOUS TAXES

(3) if no such rates or tariffs exist, then on the basis of a reasonable charge for such transportation, as determined by the Commissioner.

Monthly returns required.

Contents.

(c) Every person liable for the tax imposed under subsection (a) shall make monthly returns under oath in duplicate and pay such taxes to the collector for the district in which is located his principal place of business or, if he has no principal place of business in the United States, then to the collector at Baltimore, Maryland.  Such returns shall contain such information and be made at such times and in such manner as the Commissioner, with the approval of the Secretary, may by regulations prescribe.

## Part V—Tax on Leases of Safe Deposit Boxes

Leases of safe deposit boxes.
Rate.
Effective date.

**SEC. 741. TAX ON LEASES OF SAFE DEPOSIT BOXES.**

(a) There is hereby imposed a tax equivalent to 10 per centum of the amount collected on or after the fifteenth day after the date of the enactment of this Act, for the use after such date of any safe deposit box, such tax to be paid by the person paying for the use of the safe deposit box.

Safe deposit box, construed.

(b) For the purposes of this section any vault, safe, box, or other receptacle, of not more than 40 cubic feet capacity, used for the safekeeping or storage of jewelry, plate, money, specie, bullion, stocks, bonds, securities, valuable papers of any kind, or other valuable personal property, shall be regarded as a safe deposit box.

Collection.

Monthly returns required.

Contents.

(c) Every person making any collections specified in subsection (a) shall collect the amount of tax imposed by such subsection from the person paying for the use of the safe deposit box, and shall on or before the last day of each month make a return, under oath, for the preceding month, and pay the tax imposed by subsection (a), to the collector for the district in which is located his principal place of business, or, if he has no principal place of business in the United States, then to the collector at Baltimore, Maryland.  Such returns shall contain such information and be made in such manner as the Commissioner, with the approval of the Secretary, may by regulations prescribe.

## Part VI—Tax on Checks, Etc.

Tax on checks, etc.

**SEC. 751. TAX ON CHECKS, ETC.**

Rate.
Effective date.

Payment.

(a) There is hereby imposed a tax of 2 cents upon each of the following instruments, presented for payment on or after the 15th day after the date of the enactment of this Act and before July 1, 1934: Checks, drafts, or orders for the payment of money, drawn upon any bank, banker, or trust company; such tax to be paid by the maker or drawer.

Collection.

Monthly returns required.

Contents.

Indemnification against claims.

(b) Every person paying any of the instruments mentioned in subsection (a) as drawee of such instrument shall collect the amount of the tax imposed under such subsection by charging such amount against any deposits to the credit of the maker or drawer of such instrument, and shall on or before the last day of each month make a return, under oath, for the preceding month, and pay such taxes to the collector of the district in which his principal place of business is located, or if he has no principal place of business in the United States, to the collector at Baltimore, Maryland.  Such returns shall contain such information and be made in such a manner as the Commissioner, with the approval of the Secretary, may by regulations prescribe.  Every person required to collect any tax

under this section is hereby indemnified against the claims and MISCELLANEOUS TAXES demands of any person for the amount of any payments made in accordance with the provisions of this section.

### Part VII—Tax on Boats

Tax on boats.

#### SEC. 761. TAX ON USE OF BOATS.

Effective dates.

(a) On and after July 1, 1932, and on July 1, 1933, and also at the time of the original purchase of a new yacht or other boat by a user, if on any other date than July 1 and before July 1, 1934, there is hereby imposed upon the use of yachts, pleasure boats, power boats, sailing boats, and motor boats with fixed or outboard engines, not used exclusively for trade, fishing, or national defense, a tax at the following rates:

Exceptions.

Rates.

(1) Length over 28 feet and not over 50 feet, $10.
(2) Length over 50 feet and not over 100 feet, $40.
(3) Length over 100 feet and not over 150 feet, $100.
(4) Length over 150 feet and not over 200 feet, $150.
(5) Length over 200 feet, $200.

(b) In the case of any of the foregoing if foreign built and not owned on January 1, 1926, by a citizen of the United States or by a domestic partnership or corporation, the tax under this section shall be twice the amount of the tax provided in subsection (a).

Additional, if foreign built, etc.

(c) In determining the length of any of the foregoing, the measurement of over-all length shall govern.

Determining length.

(d) In the case of a tax imposed at the time of the original purchase of a new yacht or boat on any other date than July 1, the amount to be paid shall be the same number of twelfths of the amount of the tax as the number of calendar months (including the month of sale) remaining prior to the following July 1.

Proportioning tax on use.

(e) This section shall not apply to any yacht or other boat which is used without profit by any benevolent, charitable, or religious organization, exclusively for furnishing aid, comfort, or relief to seamen.

Tax exempt boats.

(f) The taxes imposed by this section shall be collected and paid in such manner as the Commissioner, with the approval of the Secretary, shall by regulations prescribe.

Regulations governing payments to be prescribed.

(g) All provisions of law (including penalties) applicable in respect of the taxes imposed by section 702 of the Revenue Act of 1926 shall, in so far as applicable and not inconsistent with this Act, be applicable in respect of the taxes imposed by this section.

Provisions of Revenue Act of 1926 applicable.
Vol. 44, p. 95.

### Part VIII—Administrative Provisions

Administrative provisions.

#### SEC. 771. PAYMENT OF TAXES.

Payment of taxes.

The taxes imposed by Parts I, IV, V, and VI of this title shall, without assessment by the Commissioner or notice from the collector, be due and payable to the collector at the time fixed for filing the return. If the tax is not paid when due, there shall be added as part of the tax interest at the rate of 1 per centum a month from the time the tax became due until paid.

When due and payable.

Interest on overdue taxes.

#### SEC. 772. REFUNDS AND CREDITS.

Refunds and credits.

(a) Credit or refund of any overpayment of tax imposed by Part I, V, or VI of this title may be allowed to the person who collected the tax and paid it to the United States if such person establishes, to the satisfaction of the Commissioner, under such regulations as the Commissioner with the approval of the Secretary may pre-

Proof required.
Ante, pp. 270, 275, 276.

MISCELLANEOUS TAXES

scribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtained the consent of such person to the allowance of such credit or refund.

Refund credited to monthly return.

(b) Any person entitled to refund of tax under Part I, IV, V, or VI of this title paid, or collected and paid, to the United States by him may take credit therefor against taxes due upon any monthly return.

(c) Any person making a refund of any payment on which tax under Part I or V has been collected, may repay therewith the amount of tax collected on such payment, and the amount of tax so repaid may be credited against the tax under any subsequent return.

Regulations.

## SEC. 773. REGULATIONS.

The Commissioner, with the approval of the Secretary, shall prescribe and publish all needful rules and regulations for the enforcement of Parts I, IV, V, and VI of this title.

Applicability of administrative provisions.
Vol. 44, p. 91.

## SEC. 774. APPLICABILITY OF ADMINISTRATIVE PROVISIONS.

All provisions of law (including penalties) applicable in respect of the taxes imposed by section 500 of the Revenue Act of 1926, shall, in so far as applicable and not inconsistent with this Act, be applicable in respect of the taxes imposed by Parts I, IV, V, and VI of this title.

Title VI—Estate tax amendments.
Credit of gift tax on estate tax.

# TITLE VI—ESTATE TAX AMENDMENTS

## SEC. 801. CREDIT OF GIFT TAX ON ESTATE TAX.

Vol. 44, p. 69.

Section 301 of the Revenue Act of 1926 is amended by inserting after subdivision (a) a new subdivision to read as follows:

Credit allowed for gift taxes where gift property included in deceased donor's gross estate.

" (b) (1) If a tax has been paid under Title III of the Revenue Act of 1932 on a gift, and thereafter upon the death of the donor any amount in respect of such gift is required to be included in the value of the gross estate of the decedent for the purposes of this title, then there shall be credited against the tax imposed by subdivision (a) of this section the amount of the tax paid under such Title III with respect to so much of the property which constituted

Limit on amount of credit.

the gift as is included in the gross estate, except that the amount of such credit shall not exceed an amount which bears the same ratio to the tax imposed by subdivision (a) of this section as the value (at the time of the gift or at the time of the death, whichever is lower) of so much of the property which constituted the gift as is included in the gross estate, bears to the value of the entire gross estate.

Amount of gift taxes for which credit is allowable.

" (2) For the purposes of paragraph (1), the amount of tax paid for any year under Title III of the Revenue Act of 1932 with respect to any property shall be an amount which bears the same ratio to the total tax paid for such year as the value of such property bears to the total amount of net gifts (computed without deduction of the specific exemption) for such year."

80 per centum credit.
Vol. 44, p. 70.

## SEC. 802. 80 PER CENTUM CREDIT.

(a) Section 301(b) of the Revenue Act of 1926 is amended to read as follows:

Credit allowed for estate taxes of States, etc.
Ante, p. 245.

" (c) The tax imposed by subdivision (a) of this section shall be credited with the amount of any estate, inheritance, legacy, or succession taxes actually paid to any State or Territory or the District of Columbia, in respect of any property included in the gross estate (not including any such taxes paid with respect to the estate of a

72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.  279

person other than the decedent).  The credit allowed by this subdivision shall not exceed 80 per centum of the tax imposed by subdivision (a) (after deducting from such tax the credits provided by subdivision (b)), and shall include only such taxes as were actually paid and credit therefor claimed within four years after the filing of the return required by section 304, except that—

ESTATE TAX AMENDMENTS
Maximum allowance.
Credit claimed within four years.

"(1) If a petition for redetermination of a deficiency has been filed with the Board of Tax Appeals within the time prescribed in section 308, then within such four-year period or before the expiration of 60 days after the decision of the Board becomes final.

Additional time if petition for redetermination of deficiency filed.
Vol. 44, p. 75.

"(2) If, under subdivision (b) of section 305 or subdivision (i) of section 308, an extension of time has been granted for payment of the tax shown on the return, or of a deficiency, then within such four-year period or before the date of the expiration of the period of the extension.

Or granted to avoid undue hardship to estate.
Vol. 44, pp. 74, 75.

Refund based on the credit may (despite the provisions of section 319) be made if claim therefor is filed within the period above provided.  Any such refund shall be made without interest, except that where the overpayment was made prior to the enactment of the Revenue Act of 1932, then interest shall be allowed and paid on the amount refunded at the rate of 6 per centum per annum from the date of the overpayment to the date of such enactment."

Refund based on credit may be made if claim filed within period provided.
Vol. 44, p. 84, waived.
Interest.

(b) If any return required by section 304 of the Revenue Act of 1926 was filed more than three years before the enactment of this Act (except in cases where a petition for redetermination of a deficiency has been filed with the Board of Tax Appeals within the time prescribed in section 308) the credit for estate, inheritance, legacy, or succession taxes shall be determined as if this section had not been enacted.

Returns filed over three years ago.
Determination of credits.
Vol. 44, pp. 74, 75.

### SEC. 803. FUTURE INTERESTS.

Future interests.

(a) Section 302(c) of the Revenue Act of 1926, as amended by the Joint Resolution of March 3, 1931, is amended to read as follows:

Vol. 44, p. 70; Vol. 46, p. 1516, amended.

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth.  Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title."

Gross estate of decedent.
Determining value of.
Transfer in contemplation of death.
If income for life reserved.
If retains power of disposition.
Exception.
Disposition made within two years of death.

(b) Section 302(f) of the Revenue Act of 1926 is amended to read as follows:

Vol. 44, p. 71, amended.

"(f) To the extent of any property passing under a general power of appointment exercised by the decedent (1) by will, or (2) by deed executed in contemplation of or intended to take effect in possession or enjoyment at or after his death, or (3) by deed under which he has retained for his life or any period not ascertainable without reference to his death or for any period which does not in fact end

Property passing under a general power of appointment.
Unascertainable periods, added.

280         72d CONGRESS. SESS. I. CH. 209. JUNE 6, 1932.

ESTATE TAX AMEND-
MENTS
before his death (A) the possession or enjoyment of, or the right to the income from, the property, or (B) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth; and"

Vol. 44, p. 80, amended.
(c) The first sentence of section 315(b) of the Revenue Act of 1926 is amended to read as follows:

Lien on transfers.
Bona fide sales excepted.
"(b) If (1) except in the case of a bona fide sale for an adequate and full consideration in money or money's worth, the decedent makes a transfer, by trust or otherwise, of any property in contemplation of or intended to take effect in possession or enjoyment at

Unascertainable periods added.
or after his death, or makes a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (A) the possession or enjoyment of, or the right to the income from, the property, or (B) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom, or (2)

Life insurance.
if insurance passes under a contract executed by the decedent in favor of a specific beneficiary, and if in either case the tax in respect

Persons liable.
thereto is not paid when due, then the transferee, trustee, or beneficiary shall be personally liable for such tax, and such property, to the extent of the decedent's interest therein at the time of such transfer, or to the extent of such beneficiary's interest under such contract of insurance, shall be subject to a like lien equal to the amount of such tax."

Relinquishment of dower, etc.
Vol. 44, p. 73, amended.
**SEC. 804. RELINQUISHMENT OF DOWER, ETC., AS CONSIDERATION.**

Section 303(d) of the Revenue Act of 1926 is amended by adding at the end thereof a new sentence to read as follows:

Not held a consideration "in money or money's worth."
"For the purposes of this title, a relinquishment or promised relinquishment of dower, curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration 'in money or money's worth'."

Deductions from gross income.
Vol. 44, p. 72, amended.
**SEC. 805. DEDUCTIONS.**

Section 303(a)(1) of the Revenue Act of 1926, as amended, is amended to read as follows:

"(1) Such amounts—

Funeral expenses.
Administration expenses.
Claims against estate.
Unpaid mortgages, etc.
"(A) for funeral expenses,

"(B) for administration expenses,

"(C) for claims against the estate,

"(D) for unpaid mortgages upon, or any indebtedness in respect to, property where the value of decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate, and

Dependent's support during settlement.
"(E) reasonably required and actually expended for the support during the settlement of the estate of those dependent upon the decedent,

Items not included.
as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered, but not including any income taxes upon income received after the death of the decedent, or property taxes not accrued before his death, or any estate, succession, legacy, or inheritance taxes. The deduction herein allowed in the case of

Deductions limited to bona fide contracts.
claims against the estate, unpaid mortgages, or any indebtedness shall, when founded upon a promise or agreement, be limited to

72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.  **281**

the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth. There shall also be deducted losses incurred during the settlement of estates arising from fires, storms, shipwrecks, or other casualties, or from theft, when such losses are not compensated for by insurance or otherwise, and if at the time of the filing of the return such losses have not been claimed as a deduction for income tax purposes in an income tax return."

*ESTATE TAX AMEND-MENTS*

*Additional deductions.*

## SEC. 806. PRIOR TAXED PROPERTY.

*Prior taxed property Vol. 44, p. 72, amended.*

(a) Section 303(a)(2) of the Revenue Act of 1926 is amended to read as follows:

"(2) An amount equal to the value of any property (A) forming a part of the gross estate situated in the United States of any person who died within five years prior to the death of the decedent, or (B) transferred to the decedent by gift within five years prior to his death, where such property can be identified as having been received by the decedent from the donor by gift, or from such prior decedent by gift, bequest, devise, or inheritance, or which can be identified as having been acquired in exchange for property so received. This deduction shall be allowed only where a gift tax imposed under the Revenue Act of 1932, or an estate tax imposed under this or any prior Act of Congress, was finally determined and paid by or on behalf of such donor, or the estate of such prior decedent, as the case may be, and only in the amount finally determined as the value of such property in determining the value of the gift, or the gross estate of such prior decedent, and only to the extent that the value of such property is included in the decedent's gross estate. Where a deduction was allowed of any mortgage or other lien in determining the gift tax, or the estate tax of the prior decedent, which was paid in whole or in part prior to the decedent's death, then the deduction allowable under this paragraph shall be reduced by the amount so paid. The deduction allowable under this paragraph shall be reduced by an amount which bears the same ratio to the amounts allowed as deductions under paragraphs (1), (3), and (4) of this subdivision as the amount otherwise deductible under this paragraph bears to the value of the decedent's gross estate. Where the property referred to in this paragraph consists of two or more items the aggregate value of such items shall be used for the purpose of computing the deduction."

*Property received from prior decedent.*

*Gifts, etc.*

*Deduction if tax was paid by donor, etc.*

*Limitation.*

*Where deduction was allowed first estate but paid prior to second decedent's death.*

*Computation of.*

*Property consisting of two or more items.*

(b) Section 303(b)(2) of the Revenue Act of 1926 is amended to read as follows:

*Vol. 44, p. 73; Vol. 45, p. 862, amended.*

"(2) An amount equal to the value of any property (A) forming a part of the gross estate situated in the United States of any person who died within five years prior to the death of the decedent, or (B) transferred to the decedent by gift within five years prior to his death, where such property can be identified as having been received by the decedent from the donor by gift, or from such prior decedent by gift, bequest, devise, or inheritance, or which can be identified as having been acquired in exchange for property so received. This deduction shall be allowed only where a gift tax imposed under the Revenue Act of 1932, or an estate tax imposed under this or any prior Act of Congress, was finally determined and paid by or on behalf of such donor, or the estate of such prior decedent, as the case may be, and only in the amount finally determined as the value of such property in determining the value of the gift, or the gross estate of such

*Deduction from gross estate of nonresidents.*

*Property in United States received from prior decedents.*

*Allowable only where gift or estate tax paid.*

ESTATE TAX AMEND-
MENTS

prior decedent, and only to the extent that the value of such
property is included in that part of the decedent's gross estate
which at the time of his death is situated in the United States.

Where deduction was
allowed prior decedent.

Where a deduction was allowed of any mortgage or other lien in
determining the gift tax, or the estate tax of the prior decedent,
which was paid in whole or in part prior to the decedent's death,
then the deduction allowable under this paragraph shall be
reduced by the amount so paid.  The deduction allowable under

Computation of re-
duction.

this paragraph shall be reduced by an amount which bears the
same ratio to the amounts allowed as deductions under paragraphs
(1) and (3) of this subdivision as the amount otherwise deduct-
ible under this paragraph bears to the value of that part of the
decedent's gross estate which at the time of his death is situated

Property consisting
of two or more items.

in the United States.  Where the property referred to in this
paragraph consists of two or more items the aggregate value of
such items shall be used for the purpose of computing the
deduction."

Deduction of be-
quests, etc., to charity.
Vol. 44, p. 72, amend-
ed.

## SEC. 807. DEDUCTION OF BEQUESTS, ETC., TO CHARITY.

Sections 303 (a) (3) and 303 (b) (3) of the Revenue Act of 1926
are amended by inserting after the first sentence of each a new
sentence to read as follows:

Deduction limited to
actual amount devised.
Vol. 45, p. 86, re-
pealed.

" If the tax imposed by section 301, or any estate, succession, legacy,
or inheritance taxes, are, either by the terms of the will, by the law
of the jurisdiction under which the estate is administered, or by the
law of the jurisdiction imposing the particular tax, payable in whole
or in part out of the bequests, legacies, or devises otherwise
deductible under this paragraph, then the amount deductible under
this paragraph shall be the amount of such bequests, legacies, or
devises reduced by the amount of such taxes."

Extension of time for
payment.
Vol. 44, p. 74, amend-
ed.

## SEC. 808. EXTENSION OF TIME FOR PAYMENT.

(a) Section 305 (b) of the Revenue Act of 1926 is amended to read
as follows:

Eight years from due
date.

"(b) Where the Commissioner finds that the payment on the
due date of any part of the amount determined by the executor as
the tax would impose undue hardship upon the estate, the Commis-
sioner may extend the time for payment of any such part not to

Running of statute
suspended.
Vol. 44, p. 77, waived.

exceed eight years from the due date.  In such case the amount in
respect of which the extension is granted shall be paid on or before
the date of the expiration of the period of the extension, and the
running of the statute of limitations for assessment and collection,
as provided in sections 310 (a) and 311 (b), shall be suspended for
the period of any such extension.  If an extension is granted, the

Bond required.

Commissioner may require the executor to furnish a bond in such
amount, not exceeding double the amount in respect of which the
extension is granted, and with such sureties as the Commissioner
deems necessary, conditioned upon the payment of the amount in
respect of which the extension is granted in accordance with the
terms of the extension."

Vol. 44, p. 76, amend-
ed.

(b) Section 308 (i) of the Revenue Act of 1926 is amended to
read as follows:

Extension for four
years to avoid hardship
in deficiency payment.

"(i) Where it is shown to the satisfaction of the Commissioner
that the payment of a deficiency upon the date prescribed for the
payment thereof will result in undue hardship to the estate, the

Negligence.

Commissioner, with the approval of the Secretary (except where
the deficiency is due to negligence, to intentional disregard of rules
and regulations, or to fraud with intent to evade tax), may grant an

extension for the payment of such deficiency or any part thereof for a period not in excess of four years. If an extension is granted, the Commissioner may require the executor to furnish a bond in such amount, not exceeding double the amount of the deficiency, and with such sureties as the Commissioner deems necessary, conditioned upon the payment of the deficiency in accordance with the terms of the extension. In such case the running of the statute of limitations for assessment and collection, as provided in sections 310(a) and 311(b), shall be suspended for the period of any such extension, and there shall be collected, as a part of the tax, interest on the part of the deficiency the time for payment of which is so extended, at the rate of 6 per centum per annum for the period of the extension, and no other interest shall be collected on such part of the deficiency for such period. If the part of the deficiency the time for payment of which is so extended is not paid in accordance with the terms of the extension, there shall be collected, as a part of the tax, interest on such unpaid amount at the rate of 1 per centum a month for the period from the time fixed by the terms of the extension for its payment until it is paid, and no other interest shall be collected on such unpaid amount for such period.¨

**SEC. 809. LIEN FOR TAXES.**

(a) Section 315(a) of the Revenue Act of 1926, as amended, is amended by adding at the end thereof a new sentence to read as follows:

" If the Commissioner is satisfied that the tax liability of an estate has been fully discharged or provided for, he may, under regulations prescribed by him with the approval of the Secretary, issue his certificate, releasing any or all property of such estate from the lien herein imposed."

(b) Section 613(b) of the Revenue Act of 1928 (relating to liens for estate taxes) is repealed.

**SEC. 810. REFUNDS.**

(a) Section 319(b) of the Revenue Act of 1926 is amended to read as follows:

"(b) All claims for the refunding of the tax imposed by this title alleged to have been erroneously or illegally assessed or collected must be presented to the Commissioner within three years next after the payment of such tax. The amount of the refund shall not exceed the portion of the tax paid during the three years immediately preceding the filing of the claim, or if no claim was filed, then during the three years immediately preceding the allowance of the refund."

(b) The last sentence of section 319(c) of the Revenue Act of 1926 is amended to read as follows:

" No such refund shall be made of any portion of the tax paid more than four years (or, in the case of a tax imposed by this title, more than three years) before the filing of the claim or the filing of the petition, whichever is earlier."

(c) Title III of the Revenue Act of 1924 is amended by inserting after section 318 a new section to read as follows:

" SEC. 318½. The amount of any refund of the tax imposed by Part I of this title shall not exceed the portion of the tax paid during the four years immediately preceding the filing of the claim, or if no claim was filed, then during the four years immediately preceding the allowance of the refund."

*[Margin notes:]*

ESTATE TAX AMENDMENTS.
Bond required.

Running of statute waived.
Vol. 44, p. 77.

Interest.

Additional tax.

Lien for taxes.
Vol. 44, p. 80, amended.

Release.

Former provisions repealed.
Vol. 45, p. 875, repealed.
Refunds.
Vol. 44, p. 84, amended.

Period of limitation on.

Restriction.

Vol. 44, p. 85, amended.

Time restriction.

Vol. 43, p. 313, amended.

Limitation on refund.

ESTATE TAX AMENDMENTS
Claims filed prior hereto.
Vol. 44, p. 84, amended.

(d) Section 319(b) of the Revenue Act of 1926, as amended by this Act, and section 318½ of the Revenue Act of 1924, as added by this Act, shall not bar from allowance a claim for refund filed prior to the enactment of this Act which but for such enactment would have been allowable.

Future interests.

## SEC. 811. FUTURE INTERESTS—EXTENSION OF TIME FOR PAYMENT OF TAX.

Vol. 44, p. 74, amended.

(a) Section 305 of the Revenue Act of 1926 is amended by adding at the end thereof a new subdivision to read as follows:

Postponement of payment when value of reversionary interest included in gross estate.

"(e) Where there is included in the value of the gross estate the value of a reversionary or remainder interest in property, the payment of the part of the tax imposed by this title attributable to such interest may, at the election of the executor, be postponed until six months after the termination of the precedent interest or interests in the property, and the amount the payment of which is so postponed shall then be payable, together with interest thereon at

Interest.

the rate of 4 per centum per annum from eighteen months after the date of the decedent's death until such amount is paid. The postponement of payment of such amount shall be under such

Regulations governing.

regulations as the Commissioner with the approval of the Secretary may prescribe, and shall be upon condition that the executor, or any other person liable for the tax, shall furnish a bond in such

Bond required.

an amount, and with such sureties, as the Commissioner deems necessary, conditioned upon the payment within six months after the termination of such precedent interest or interests of the amount the payment of which is so postponed, together with interest thereon,

Credit against tax, subject to percentage limitation, allowed.

as above provided. Such part of any estate, inheritance, legacy, or succession taxes allowable as a credit against the tax imposed by this title as is attributable to such reversionary or remainder interest may be allowed as a credit against the tax attributable to such

Ante, p. 278.

interest, subject to the percentage limitation contained in section 301(c), if such part is paid, and credit therefor claimed, at any time prior to the expiration of 60 days after the termination of the precedent interest or interests in the property."

Provisions not retroactive.

(b) The amendment to section 305 of the Revenue Act of 1926 made by subsection (a) of this section, shall not apply, in the case of estates of decedents dying prior to the date of the enactment of this Act, to that part of any payment of Federal estate taxes made prior to such date which is attributable to a reversionary or remainder interest in property.

Tax on transfers to avoid income tax.

# TITLE VII—TAX ON TRANSFERS TO AVOID INCOME TAX

Imposition of tax.
Provisions for, extended.

## SEC. 901. IMPOSITION OF TAX.

There shall be imposed upon the transfer of stock or securities by a citizen or resident of the United States, or by a domestic corporation or partnership, or by a trust which is not a foreign trust, to a foreign corporation as paid-in surplus or as a contribution to capital, or to a foreign trust, or to a foreign partnership, an excise tax equal to 25 per centum of the excess of (1) the value of the stock or securities so transferred over (2) its adjusted basis in the hands of the transferor as determined under section 113 of this Act.

Nontaxable transfers.

## SEC. 902. NONTAXABLE TRANSFERS.

The tax imposed by section 901 shall not apply—

Exempt organizations.
Ante, p. 193.

(a) if the transferee is an organization exempt from income tax under section 103 of this Act; or

(b) if prior to the transfer it has been established to the satisfaction of the Commissioner that such transfer is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

**SEC. 903. DEFINITION OF "FOREIGN TRUST".**

A trust shall be considered a foreign trust within the meaning of this title if, assuming a subsequent sale by the trustee, outside the United States and for cash, of the property so transferred, the profit, if any, from such sale would not be included in the gross income of the trust under Title I of this Act.

**SEC. 904. PAYMENT AND COLLECTION.**

(a) The tax imposed by section 901 shall, without assessment or notice and demand, be due and payable by the transferor at the time of the transfer, and shall be assessed, collected, and paid under regulations prescribed by the Commissioner with the approval of the Secretary.

(b) Under regulations prescribed by the Commissioner with the approval of the Secretary the tax may be abated, remitted, or refunded if after the transfer it has been established to the satisfaction of the Commissioner that such transfer was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

(c) All administrative, special, or stamp provisions of law, including penalties and including the law relating to the assessment of taxes, so far as applicable, are hereby extended to and made a part of this title.

# TITLE VIII—POSTAL RATES

**SEC. 1001. POSTAL RATES.**

(a) On and after the thirtieth day after the date of the enactment of this Act and until July 1, 1934, the rate of postage on all mail matter of the first class (except postal cards and private mailing or post cards, and except other first class matter on which the rate of postage under existing law is 1 cent for each ounce or fraction thereof) shall be 1 cent for each ounce or fraction thereof in addition to the rate provided by existing law.

(b) On and after July 1, 1932, and until July 1, 1934, on the advertising portion of any publication entered as second-class matter subject to the zone rates of postage under existing law, the rates per pound or fraction thereof for delivery within the eight postal zones established for fourth-class matter shall be as follows:

For the first and second zones, 2 cents.
For the third zone, 3 cents.
For the fourth zone, 5 cents.
For the fifth zone, 6 cents.
For the sixth zone, 7 cents.
For the seventh zone, 9 cents.
For the eighth zone, and between the Philippine Islands and any portion of the United States, including the District of Columbia and the several Territories and possessions, 10 cents.

(c) Only 85 per centum of the gross postal receipts during the period the increased rate of postage provided in subsection (a) remains in force shall be counted for the purpose of determining the class of the post office or the compensation or allowances of postmasters or of postal employees of post offices of the first, second, and

*[Margin notes:]*
If not to evade tax laws.

"Foreign Trust" defined.

*Ante,* p. 173.

Payment and collection.
Due at time of transfer.

Regulations.

Abatement, etc., of tax, if transfer not evasion, etc.

Scope.

Postal rates.

Rate on first-class matter.
Duration.
Exceptions.

Rates on advertising portion of publications entered as second-class matter.

Compensation and allowances of postmasters, etc., of first three classes.
Basis for computing.

286                    72d CONGRESS. SESS. I. CH. 209.  JUNE 6, 1932.

Commissions of those of the fourth class. third classes.  For the purpose of determining the commissions (as distinguished from the compensation and the allowances based thereon) of postmasters of the fourth class, only 85 per centum of the applicable cancellations, collections, and receipts during such period shall be counted.

Administrative and general provisions.

# TITLE IX—ADMINISTRATIVE AND GENERAL PROVISIONS

Review of decisions of Board of Tax Appeals.

**SEC. 1101. REVIEW OF DECISIONS OF BOARD OF TAX APPEALS.**

Time for filing petition reduced.
Vol. 44, p. 109 amended.

(a) Section 1001(a) of the Revenue Act of 1926 (relating to time for filing petition for review of decisions of the Board of Tax Appeals) is amended by striking out " within six months after the decision is rendered " and inserting in lieu thereof " within three months after the decision is rendered ".

Applicable to decisions of this or future date.

(b) The amendment made by subsection (a) of this section shall not apply in respect of decisions of the Board of Tax Appeals rendered on or before the date of the enactment of this Act.

Board of Tax Appeals, fees.
Vol. 44, p. 110, amended.

**SEC. 1102. BOARD OF TAX APPEALS—FEES.**

Section 1004(b) of the Revenue Act of 1926 is amended to read as follows:

Fee authorized for copying, certifying, etc., records.

"(b) The Board is authorized to fix a fee, not in excess of the fee fixed by law to be charged and collected therefor by the clerks of the district courts, for comparing, or for preparing and comparing, a transcript of the record, or for copying any record, entry, or other paper and the comparison and certification thereof."

Limitation on suits by taxpayer.
Vol. 44, p. 116, amended.

**SEC. 1103. LIMITATIONS ON SUITS BY TAXPAYERS.**

(a) Section 3226 of the Revised Statutes, as amended, is amended to read as follows:

Suits to recover erroneously collected taxes, etc.

" SEC. 3226.  No suit or proceeding shall be maintained in any court for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected until a claim for refund or credit has been duly filed with the Commissioner of Internal Revenue, according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof; but such suit or proceeding may be maintained, whether or not such tax, penalty, or sum has been paid under protest or duress.  No such suit or proceeding shall be begun before the expiration of six months from the date of filing such claim unless the Commissioner renders a decision thereon within that time, nor after the expiration of two years from the date of mailing by registered mail by the Commissioner to the taxpayer of a notice of the disallowance of the part of the claim to which such suit or proceeding relates."

Claim for refund to be filed.

Time limitation.

Pending suits not affected.

(b) Suits or proceedings instituted before the date of the enactment of this Act shall not be affected by the amendment made by subsection (a) of this section to section 3226 of the Revised Statutes. In the case of suits or proceedings instituted on or after the date of the enactment of this Act where the part of the claim to which such suit or proceeding relates was disallowed before the date of the enactment of this Act, the statute of limitations shall be the same as provided by such section 3226 before its amendment by subsection (a) of this section.

Suits after enactment based on claims disallowed prior to date of Act.

### SEC. 1104. DATE OF ALLOWANCE OF REFUND OR CREDIT.

Where the Commissioner has (before or after the enactment of this Act) signed a schedule of overassessments in respect of any internal revenue tax imposed by this Act or any prior revenue Act, the date on which he first signed such schedule (if after May 28, 1928) shall be considered as the date of allowance of refund or credit in respect of such tax.

### SEC. 1105. JEOPARDY ASSESSMENT.

(a) If the Commissioner finds that a person liable for tax (other than income tax) under any provision of the internal-revenue laws designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein, or to do any other act tending to prejudice or to render wholly or partly ineffectual proceedings to collect such tax unless such proceedings be brought without delay, the Commissioner shall cause notice of such finding to be given such person, together with a demand for an immediate return and immediate payment of such tax, and such tax shall thereupon become immediately due and payable.

(b) If such person (i) is not in default in making any return or paying any tax under the internal-revenue laws, and (2) furnishes to the United States, under regulations to be prescribed by the Commissioner with the approval of the Secretary, security approved by the Commissioner that he will duly return and pay the tax to which the Commissioner's finding relates, then such tax shall not be payable prior to the time otherwise fixed for payment.

### SEC. 1106. REFUNDS OF MISCELLANEOUS TAXES.

(a) Subsection (a) of section 3228 of the Revised Statutes, as amended, is amended by adding at the end thereof the following:

" The amount of the refund (in the case of taxes other than income, war-profits, excess-profits, estate, and gift taxes) shall not exceed the portion of the tax, penalty, or sum paid during the four years immediately preceding the filing of the claim, or if no claim was filed, then during the four years immediately preceding the allowance of the refund."

(b) The amendment made by subsection (a) of this section to section 3228 of the Revised Statutes shall not bar from allowance a claim for refund filed prior to the enactment of this Act which but for such enactment would have been allowable.

### SEC. 1107. ADJUSTMENTS OF CARRIERS' TAX LIABILITIES TO CONFORM TO RECAPTURE PAYMENTS.

The Interstate Commerce Commission shall, as soon as practicable after its order with respect to the amount recoverable from any carrier under the provisions of section 15a of the Interstate Commerce Act, as amended, for any year or portion thereof has become final, and such amount, if any, has been paid, certify to the Commissioner of Internal Revenue the amount so paid. If the amount so paid by such carrier differs from the amount allowed as so recoverable in computing the income or excess profits tax liabilities for any taxable period of such carrier, or of any corporation whose income or excess profits tax liability is affected, the Commissioner of Internal Revenue shall determine any deficiency or overpayment attributable to such difference. Notwithstanding any other provision of law, (1) any such deficiency may be assessed within two years from the date of such certification, and, if so assessed, shall be paid upon notice and demand from the collector, and (2) any such overpayment may be credited or refunded within two years from the date of such certifica-

Date of allowance of refund or credit.
Considered as allowed when schedule of overassessments signed.

Jeopardy assessment.
Immediate collection under, if delay jeopardizes due date collection.

Notice to be given and demand made.

Postponement when security provided, etc.

Miscellaneous taxes.
Vol. 43, p. 342, vol. 44, p. 115.

Amount of refund limited.

Prior claims for refunds not barred.

Carriers' Tax Liabilities.
Adjustments of, to conform to recapture payments.
Vol. 41, p. 488, amended.

Where payment differs from that allowed as recoverable.

To be determined by Commissioner.

Assessment of deficiency.

Refund of overpayment.

Vol. 44, p. 113; Vol.
45, p 874; not affected. tion, but not after unless, before the expiration of such period, a claim therefor is filed.  This section shall not be held to affect the provisions of section 1106 (b) of the Revenue Act of 1926 or 606 of the Revenue Act of 1928.

Internal revenue of-
fenses. **SEC. 1108. LIMITATION ON PROSECUTIONS FOR INTERNAL REVENUE OFFENSES.**

Limit of time for
prosecuting, amended.
Vol. 23, p. 122; Vol.
43, p. 341; Vol. 44, p.
114; amended. (a) The Act entitled "An Act to limit the time within which prosecutions may be instituted against persons charged with violating internal revenue laws," approved July 5, 1884, as amended, and as reenacted by section 1110 of the Revenue Act of 1926, is amended to read as follows:

Three-year period al-
lowed for instituting
proceedings. "That no person shall be prosecuted, tried, or punished, for any of the various offenses arising under the internal revenue laws of the United States unless the indictment is found or the information instituted within three years next after the commission of the offense, except that the period of limitation shall be six years—

Six years, if offense
to defraud the Govern-
ment, etc. "(1) for offenses involving the defrauding or attempting to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner,

Willful attempt at
evading, etc., tax. "(2) for the offense of willfully attempting in any manner to evade or defeat any tax or the payment thereof, and

Willfully aiding or
assisting in presenting
false claims, etc. "(3) for the offense of willfully aiding or assisting in, or procuring, counseling, or advising, the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a false or fraudulent return, affidavit, claim, or document (whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document).

Conspiracy.
Vol. 35, p. 1096 "For offenses arising under section 37 of the Criminal Code, where the object of the conspiracy is to attempt in any manner to evade or defeat any tax or the payment thereof, the period of Absence from district
not included. limitation shall also be six years.  The time during which the person committing any of the offenses above mentioned is absent from the district wherein the same is committed shall not be taken as any part of the time limited by law for the commencement of such proceedings.  Where a complaint is instituted before a commissioner of the United States within the period above limited, the time shall be extended until the discharge of the grand jury at its next session within the district."

Applicable to offenses
whenever committed. (b) The amendment made by subsection (a) of this section shall apply to offenses whenever committed; except that it shall not Exceptions. apply to offenses the prosecution of which was barred before the date of the enactment of this Act.

Special Disbursing
Agents of Treasury. **SEC. 1109. SPECIAL DISBURSING AGENTS OF TREASURY.**

Internal revenue
agents in charge of
divisions may act as. The Secretary of the Treasury is authorized to designate agents in charge of divisions of internal revenue agents to act as special disbursing agents of the Treasury for the payment of all salaries and expenses of such divisions, on giving good and sufficient bond R. S., sec. 3144, p.602. in such form and with such security as the Secretary of the Treasury may approve, notwithstanding section 3144, Revised Statutes, as amended.

Refund of taxes for
taxable year 1918.
Vol. 44, p. 68, amend-
ed. **SEC. 1110. REFUND OF TAXES FOR TAXABLE YEAR 1918.**

Section 284(h) of the Revenue Act of 1926 is amended to read as follows:

Allowance of prior
claims, not barred. "(h) Except as provided in subdivision (d) this section shall not (1) bar from allowance a claim for credit or refund filed prior to

72d CONGRESS.  SESS. I.  CH. 209.  JUNE 6, 1932.                289

the enactment of this Act which but for such enactment would have been allowable, or (2) bar from allowance a claim in respect of a tax for the taxable year 1918, 1919, or 1920 if such claim is filed before the expiration of five years after the date the return was due."

## SEC. 1111. DEFINITIONS.

<span style="float:right">Definitions.</span>

(a) When used in this Act—

(1) The term "person" means an individual, a trust or estate, a partnership, or a corporation. <span style="float:right">"Person."</span>

(2) The term "corporation" includes associations, joint-stock companies, and insurance companies. <span style="float:right">"Corporation."</span>

(3) The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this Act, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization. <span style="float:right">"Partnership."</span>

(4) The term "domestic" when applied to a corporation or partnership means created or organized in the United States or under the law of the United States or of any State or Territory. <span style="float:right">"Domestic."</span>

(5) The term "foreign" when applied to a corporation or partnership means a corporation or partnership which is not domestic. <span style="float:right">"Foreign."</span>

(6) The term "fiduciary" means a guardian, trustee, executor, administrator, receiver, conservator, or any person acting in any fiduciary capacity for any person. <span style="float:right">"Fiduciary."</span>

(7) The term "withholding agent" means any person required to deduct and withhold any tax under the provisions of section 143 or 144. <span style="float:right">"Withholding agent."</span>

(8) The term "stock" includes the share in an association, joint-stock company, or insurance company. <span style="float:right">"Stock."</span>

(9) The term "shareholder" includes a member in an association, joint-stock company, or insurance company. <span style="float:right">"Shareholder."</span>

(10) The term "United States" when used in a geographical sense includes only the States, the Territories of Alaska and Hawaii, and the District of Columbia. <span style="float:right">"United States."</span>

(11) The term "Secretary" means the Secretary of the Treasury. <span style="float:right">"Secretary."</span>

(12) The term "Commissioner" means the Commissioner of Internal Revenue. <span style="float:right">"Commissioner."</span>

(13) The term "collector" means collector of internal revenue. <span style="float:right">"Collector."</span>

(14) The term "taxpayer" means any person subject to a tax imposed by this Act. <span style="float:right">"Taxpayer."</span>

(b) The terms "includes" and "including" when used in a definition contained in this Act shall not be deemed to exclude other things otherwise within the meaning of the term defined. <span style="float:right">"Includes" and "including."</span>

## SEC. 1112. SEPARABILITY CLAUSE.

<span style="float:right">Separability.</span>

If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act, and the application of such provisions to other persons or circumstances, shall not be affected thereby. <span style="float:right">Invalidity of any provision not to affect remainder of Act.</span>

## SEC. 1113. EFFECTIVE DATE OF ACT.

<span style="float:right">Effective date.</span>

Except as otherwise provided, this Act shall take effect upon its enactment.

Approved June 6, 1932, at 5 p.m.

3051°—33——19

**290**          72d CONGRESS.    SESS. I.    CHS. 210, 222, 223.    JUNE 6, 9, 1932.

[CHAPTER 210.]

June 6, 1932.
[H. J. Res. 341.]
[Pub. Res., No. 23.]

### JOINT RESOLUTION

Providing for the suspension of annual assessment work on mining claims held
by location in the United States and Alaska.

Mining claims, United States and Alaska.
*Post*, p. 474.
Provision requiring annual work on, suspended for fiscal year 1932.
R. S., sec. 2324, p. 425.
U. S. C., p. 955.

*Resolved by the Senate and House of Representatives of the United
States of America in Congress assembled*, That the provision of
section 2324 of the Revised Statutes of the United States which
requires on each mining claim located, and until a patent has been
issued therefor, not less than $100 worth of labor to be performed,
or improvements aggregating such amount to be made each year,
be, and the same is hereby, suspended as to all mining claims in the
United States, including Alaska, during the fiscal year from July 1,
1931, to July 1, 1932.

Approved, June 6, 1932.

[CHAPTER 222.]

June 9, 1932.
[S. 4401.]
[Public, No. 155.]

### AN ACT

To extend the times for commencing and completing the construction of a
bridge across the Missouri River at or near Farnam Street, Omaha, Nebraska.

Missouri River.
Time extended for bridging at Omaha, Nebr.
Vol. 46, pp. 544, 1102, amended.
*Post*, p. 903.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled*, That the times
for commencing and completing the construction of a bridge across
the Missouri River at or near Farnam Street, Omaha, Nebraska,
authorized to be built by the Omaha-Council Bluffs Missouri River
Bridge Board of Trustees by Act of Congress approved June 10,
1930, heretofore extended by an Act of Congress approved February 20, 1931, are hereby further extended one and three years, respectively, from June 10, 1932.

Amendment.

SEC. 2. The right to alter, amend, or repeal this Act is hereby
expressly reserved.

Approved, June 9, 1932.

[CHAPTER 223.]

June 9, 1932.
[S. 4581.]
[Public, No. 156.]

### AN ACT

To extend the times for commencing and completing the construction of a
bridge across the Saint Clair River at or near Port Huron, Michigan.

Saint Clair River.
Time extended for bridging, at Port Huron, Mich.
Vol. 46, pp. 809, 1458, amended.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled*, That the times for
commencing and completing the construction of the bridge across
the Saint Clair River at or near Port Huron, Michigan, authorized
to be built by the Great Lakes Bridge Commission by the Act of
Congress approved June 25, 1930, heretofore extended by an Act of
Congress approved February 28, 1931, are hereby further extended
one and three years, respectively, from June 25, 1932.

Amendment.

SEC. 2. The right to alter, amend, or repeal this act is hereby expressly reserved.

Approved, June 9, 1932.

# EXHIBIT 96

11/30/22, 12:28 PM Case 1:18-cv-10507-RMB-JBD 1927 Mich. Pub. Acts 888-89, An Act Document 196-8 to Regulate and License the Selling, Filed 12/15/23 Purchasing, Possessing Page 465 and Carrying of 179 of Certain Fire…

PageID: 10007

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

## Subject(s):

- Dangerous or Unusual Weapons (https://firearmslaw.duke.edu/subjects/dangerous-or-unusual-weapons/)

## Jurisdiction(s):

- Michigan (https://firearmslaw.duke.edu/jurisdictions/michigan/)

## Year(s):

1927

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

11/30/22, 12:05 PM    1927 Mich. Pub. Acts 888-89 An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Fire…

Case 1:18-cv-10507-RMB-JBD    Document 196-8    Filed 12/15/23    Page 166 of 179
PageID: 10008

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

WP Twitter Auto Publish (https://xyzscripts.com/wordpress-plugins/twitter-auto-publish/compare) Powered By : XYZScripts.com (http://www.xyzscripts.com)

# EXHIBIT 97



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

Search this website

# 1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1 and 2.

## Subject(s):

- Sentence Enhancement for Use of Weapon (https://firearmslaw.duke.edu/subjects/sentence-enhancement-for-use-of-weapon/)

## Jurisdiction(s):

- Rhode Island (https://firearmslaw.duke.edu/jurisdictions/rhode-island/)

## Year(s):

1927

§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz. murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and

Case 1:18-cv-10507-RMB-JBD   Document 196-8   Filed 12/15/23   Page 462 of 470
PageID: 10011

breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. § 2. If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act. In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence.

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

WP Twitter Auto Publish (https://xyzscripts.com/wordpress-plugins/twitter-auto-publish/compare) Powered By : XYZScripts.com (http://www.xyzscripts.com)

# EXHIBIT 98

1250                    PUBLIC LAWS—CH. 850—JUNE 30, 1938              [52 Stat.

[CHAPTER 850]

AN ACT

To regulate commerce in firearms.

June 30, 1938
[S. 3]
[Public, No. 785]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That as used in this Act—

Federal Firearms Act.
Definitions.
"Person."

(1) The term "person" includes an individual, partnership, association, or corporation.

"Interstate or foreign commerce."

(2) The term "interstate or foreign commerce" means commerce between any State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, but through any place outside thereof; or within any Territory or possession or the District of Columbia.

"Firearm."

(3) The term "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon.

"Manufacturer."

(4) The term "manufacturer" means any person engaged in the manufacture or importation of firearms, or ammunition or cartridge cases, primers, bullets, or propellent powder for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this Act.

"Dealer."

(5) The term "dealer" means any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breach[1] mechanisms to firearms, and the term "licensed dealer" means any such person licensed under the provisions of this Act.

"Licensed dealer."

"Crime of violence."

(6) The term "crime of violence" means murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year.

"Fugitive from justice."

(7) The term "fugitive from justice" means any person who has fled from any State, Territory, the District of Columbia, or possession of the United States to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal proceeding.

"Ammunition."

(8) The term "ammunition" shall include all pistol or revolver ammunition except .22-caliber rim-fire ammunition.

Unlawful acts.
Transportation, etc., of firearms or ammunition without license.

Sec. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce.

Knowingly receiving same.

(b) It shall be unlawful for any person to receive any firearm or ammunition transported or shipped in interstate or foreign commerce in violation of subdivision (a) of this section, knowing or having reasonable cause to believe such firearms or ammunition to have been transported or shipped in violation of subdivision (a) of this section.

Transportation, etc., to other than licensed manufacturer or dealer.

(c) It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearm in interstate or foreign commerce to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

[1] So in original.

**JA6799**

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions (including the Philippine Islands), or the District of Columbia of a crime of violence or is a fugitive [1] from justice.

Shipment to person under indictment, etc.

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime of violence or who is a fugitive [1] from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition.

Shipment by person under indictment, etc.

(f) It shall be unlawful for any person who has been convicted of a crime of violence or is a fugitive [1] from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this Act.

Receipt by person convicted of crime of violence, etc.

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm or ammunition, knowing, or having reasonable cause to believe, same to have been stolen.

Transportation of stolen firearms, etc.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or ammunition or to pledge or accept as security for a loan any firearm or ammunition moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe the same to have been stolen.

Traffic in stolen firearms.

(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act.

Transportation of firearms from which serial number has been removed.

Sec. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce shall make application to the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum.

Licenses, application, fee.

(b) Upon payment of the prescribed fee, the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of this Act: *Provided*, That no license shall be issued to any applicant within two years after the revocation of a previous license.

Issuance.

*Proviso.*
Issuance after revocation.

(c) Whenever any licensee is convicted of a violation of any of the provisions of this Act, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided*, That in the case of appeal from such conviction the licensee may furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secre-

Revocation on conviction of licensee.

*Proviso.*
Temporary continuance; bond.

[1] So in original.

1252                    PUBLIC LAWS—CHS. 850, 851—JUNE 30, 1938        [52 STAT.

tary of the Treasury shall suspend such license until he is notified by
the clerk of the court of last appeal as to the final disposition of
the case.

Dealers' records.    (d) Licensed dealers shall maintain such permanent records of
importation, shipment, and other disposal of firearms and ammuni-
tion as the Secretary of the Treasury shall prescribe.

Exemptions.    SEC. 4. The provisions of this Act shall not apply with respect to
the transportation, shipment, receipt, or importation of any firearm,

Federal, State gov-    or ammunition, sold or shipped to, or issued for the use of, (1) the
ernments, agencies,    United States or any department, independent establishment, or
etc.    agency thereof; (2) any State, Territory, or possession, or the Dis-
trict of Columbia, or any department, independent establishment,
agency, or any political subdivision thereof; (3) any duly commis-
sioned officer or agent of the United States, a State, Territory, or
possession, or the District of Columbia, or any political subdivision

Banks, carriers, etc.    thereof; (4) or to any bank, public carrier, express, or armored-truck
company organized and operating in good faith for the transporta-

Research laborato-    tion of money and valuables; (5) or to any research laboratory
ries.    designated by the Secretary of the Treasury: Provided, That such
Provisos.
Exemptions grant-    bank, public carriers, express, and armored-truck companies are
ed by Secretary of    granted exemption by the Secretary of the Treasury; nor to the
Treasury.
Antiques, curios,    transportation, shipment, or receipt of any antique or unserviceable
etc.    firearms, or ammunition, possessed and held as curios or museum
pieces: Provided, That nothing herein contained shall be construed to

Shipments to des-    prevent shipments of firearms and ammunition to institutions, organi-
ignated institutions
or persons.    zations, or persons to whom such firearms and ammunition may be
lawfully delivered by the Secretary of War, nor to prevent the trans-

Military training,    portation of such firearms and ammunition so delivered by their
etc.    lawful possessors while they are engaged in military training or in
competitions.

Penalty provisions.    SEC. 5. Any person violating any of the provisions of this Act or
any rules and regulations promulgated hereunder, or who makes any
statement in applying for the license or exemption provided for in
this Act, knowing such statement to be false, shall, upon conviction
thereof, be fined not more than $2,000, or imprisoned for not more
than five years, or both.

Effective date.    SEC. 6. This Act shall take effect thirty days after its enactment.
Rules and regula-    SEC. 7. The Secretary of the Treasury may prescribe such rules and
tions.    regulations as he deems necessary to carry out the provisions of this
Act.

Separability of pro-    SEC. 8. Should any section or subsection of this Act be declared
visions.    unconstitutional, the remaining portion of the Act shall remain in
full force and effect.

Short title.    SEC. 9. This Act may be cited as the Federal Firearms Act.
Approved, June 30, 1938.

-------

[CHAPTER 851]

AN ACT

June 30, 1938    To amend the part of the Act entitled "An Act making appropriations for the
[S. 1131]    naval service for the fiscal year ending June 30, 1921, and for other purposes",
[Public, No. 786]    approved June 4, 1920, relating to the conservation, care, custody, protection,
and operation of the naval petroleum and oil-shale reserves.

Be it enacted by the Senate and House of Representatives of the
Naval petroleum re-    United States of America in Congress assembled, That the part of the
serves.
41 Stat. 813.    Act entitled "An Act making appropriations for the naval service for
34 U. S. C. § 524.    the fiscal year ending June 30, 1921, and for other purposes",
approved June 4, 1920 (41 Stat. 813), relating to the conservation,
care, custody, protection, and operation of the naval petroleum and

JA6801

# EXHIBIT 99

1236        73d CONGRESS.  SESS. II.  CHS. 756, 757.  JUNE 26, 1934.

available to pay claims on account of any check, the amount of which has been included in any balance so covered into the surplus fund.

**Advances for land surveys.**
**U.S.C., title 43, sec. 863.**
Sec. 22. So much of the Act of August 18, 1894 (U.S.C., title 43, sec. 863), as authorizes the Governors of the States therein named to advance money from time to time for the survey of certain townships located within such States, which money shall be reimbursable, is hereby repealed.

**Moneys in U.S. court registries.**
Sec. 23. Moneys in, or payable into, the registry of any United States court, in the discretion of the court, may be deposited in official checking accounts with the Treasurer of the United States, subject to disbursement on order approved by the court.

**Survey of certain accounts to be made by Comptroller General.**
Sec. 24. The Comptroller General of the United States shall cause a survey to be made of all inactive and permanent appropriations and/or funds on the books of the Government and also funds in the official custody of officers and employees of the United States, in which the Government is financially concerned, for which no accounting is rendered to the General Accounting Office; and he shall submit **Report to Congress.** to the Congress annually, in a special report, his recommendations for such changes in existing law relating thereto as, in his judgment, may be in the public interest.

**Existing provisions not affected.**
Sec. 25. The provisions of this Act shall not be construed to alter or amend any existing authorization for an appropriation.

**Saving clause.**
Sec. 26. All Acts and/or parts of Acts inconsistent or in conflict with the provisions of this Act are hereby repealed to the extent of such inconsistency or conflict.

**Short title.**
Sec. 27. The short title of this Act shall be the "Permanent Appropriation Repeal Act, 1934."

Approved, June 26, 1934.

---

[CHAPTER 757.]

AN ACT

**June 26, 1934.**
**[H.R. 9741.]**
**[Public, No. 474.]**
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof.

*Be it enacted by the Senate and House of Representatives of the* **National Firearms Act.** *United States of America in Congress assembled,* That for the pur- **Limitation of terms for purposes of Act.** poses of this Act—

**"Firearm."**
(a) The term "firearm" means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

**"Machine gun."**
(b) The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

**"Person."**
(c) The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

**"Continental United States."**
(d) The term "continental United States" means the States of the United States and the District of Columbia.

**"Importer."**
(e) The term "importer" means any person who imports or brings firearms into the continental United States for sale.

**"Manufacturer."**
(f) The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

(g) The term " dealer " means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term " dealer " shall include wholesalers, pawnbrokers, and dealers in used firearms.

"Dealer."

Exceptions.

(h) The term " interstate commerce " means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or to the District of Columbia.

"Interstate commerce."

(i) The term " Commissioner " means the Commissioner of Internal Revenue.

"Commissioner."

(j) The term " Secretary " means the Secretary of the Treasury.

"Secretary."

(k) The term " to transfer " or " transferred " shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

"To transfer" or "transferred."

SEC. 2. (a) Within fifteen days after the effective date of this Act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the collector of internal revenue for each district in which such business is to be carried on his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $500 a year; dealers, other than pawnbrokers, $200 a year; pawnbrokers, $300 a year. Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

Registration requirements.

Taxes.

Fractional parts of year.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

Failure to register and pay tax unlawful.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm, such tax to be paid by the transferor, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

Transfer tax; stamps.

(b) All provisions of law (including those relating to special taxes, to the assessment, collection, remission, and refund of internal revenue taxes, to the engraving, issuance, sale, accountability, cancelation, and distribution of tax-paid stamps provided for in the internal-revenue laws, and to penalties) applicable with respect to the taxes imposed by section 1 of the Act of December 17, 1914, as amended (U.S.C., Supp. VII, title 26, secs. 1040 and 1383), and all other provisions of the internal-revenue laws shall, insofar as not inconsistent with the provisions of this Act, be applicable with respect to the taxes imposed by this Act.

Applicable administrative provisions of narcotic tax law to govern.

Vol. 38, p. 785; Vol. 44, p. 92.
U.S.C., Supp. VII, pp. 592, 644.

(c) Under such rules and regulations as the Commissioner, with the approval of the Secretary, may prescribe, and upon proof of the exportation of any firearm to any foreign country (whether exported as part of another article or not) with respect to which the transfer tax under this section has been paid by the manufacturer, the Commissioner shall refund to the manufacturer the amount of the tax so paid, or, if the manufacturer waives all claim for the amount to be refunded, the refund shall be made to the exporter.

Refund, if for exportation.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in

Unlawful transfers.

1238        73d CONGRESS.  SESS. II.  CH. 757.  JUNE 26, 1934.

*Proviso.*
Identification.

*Preparation and distribution of forms.*

*Identifying marks, etc., to be indicated in orders.*

*Transferor to transfer stamp-affixed order for each prior transfer.*

*Notice to Commissioner of transfers exempted.*

*Registered importers, etc.*

*Possessors of firearms to register with collector within 60 days.*

*Proviso.*
*Acquisitions after effective date need not be registered.*

*Prosecutions.*
*Presumption raised by possession.*

*Unlawfully receiving or possessing.*

*Seizure and forfeiture.*

blank in duplicate for that purpose by the Commissioner.  Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: *Provided*, That, if the applicant is an individual, such identification shall include fingerprints and a photograph thereof.

(b) The Commissioner, with the approval of the Secretary, shall cause suitable forms to be prepared for the purposes above mentioned, and shall cause the same to be distributed to collectors of internal revenue.

(c) Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner.  The original thereof with stamps affixed, shall be returned to the applicant.

(d) No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such person, in addition to complying with subsection (c), transfers therewith the stamp-affixed order provided for in this section for each such prior transfer, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

(e) If the transfer of a firearm is exempted from the provisions of this Act as provided in section 13 hereof, the person transferring such firearm shall notify the Commissioner of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its transfer, and shall file with the Commissioner such documents in proof thereof as the Commissioner may by regulations prescribe.

(f) Importers, manufacturers, and dealers who have registered and paid the tax as provided for in section 2(a) of this Act shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers or manufacturers if such dealers or manufacturers have registered and have paid such tax, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this Act.

SEC. 5. (a) Within sixty days after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided*, That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

(b) Whenever on trial for a violation of section 6 hereof the defendant is shown to have or to have had possession of such firearm at any time after such period of sixty days without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive.

SEC. 6. It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section 3 or 4 of this Act.

SEC. 7. (a) Any firearm which has at any time been transferred in violation of the provisions of this Act shall be subject to seizure and

JA6805

forfeiture, and (except as provided in subsection (b)) all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this Act, and the persons to whom this Act applies. <span style="float:right">*Provisions of internal-revenue laws extended.*</span>

(b) In the case of the forfeiture of any firearm by reason of a violation of this Act: No notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is in the possession of any officer of the United States except the Secretary, such officer shall deliver the firearm to the Secretary; and the Secretary may order such firearm destroyed or may sell such firearm to any State, Territory, or possession (including the Philippine Islands), or political subdivision thereof, or the District of Columbia, or retain it for the use of the Treasury Department or transfer it without charge to any Executive department or independent establishment of the Government for use by it. <span style="float:right">*Sale, etc., forbidden.* *Disposition of.*</span>

Sec. 8. (a) Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner. <span style="float:right">*Identification marks.*</span>

(b) It shall be unlawful for anyone to obliterate, remove, change, or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any firearm upon which such number or mark shall have been obliterated, removed, changed, or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury. <span style="float:right">*Obliteration, etc., unlawful.* *Possession of, deemed sufficient evidence for conviction.* *Exception.*</span>

Sec. 9. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this Act as the Commissioner, with the approval of the Secretary, may by regulations require. <span style="float:right">*Importers, manufacturers, etc., required to keep records.*</span>

Sec. 10. (a) No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary, any firearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such territory. <span style="float:right">*Regulation of traffic in firearms in places under control of United States.*</span>

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearm into the United States or any territory under its control or jurisdiction (including the Philippine Islands), in violation of the provisions of this Act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported or brought in contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury. <span style="float:right">*Unlawful acts. Fraudulent importations, possession, etc.* *Receiving, concealing, etc.* *Possession deemed sufficient evidence for conviction; exception.*</span>

Sec. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce. <span style="float:right">*Transportation in interstate commerce.*</span>

1240   73d CONGRESS. SESS. II. CHS. 757, 758. JUNE 26, 1934.

Rules, etc., to be prescribed.

SEC. 12. The Commissioner, with the approval of the Secretary, shall prescribe such rules and regulations as may be necessary for carrying the provisions of this Act into effect.

Transfers, when provisions not applicable.

SEC. 13. This Act shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner; (3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

Penalty provision.

SEC. 14. Any person who violates or fails to comply with any of the requirements of this Act shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court.

Excise taxes.
Firearms herein defined exempt from.
Vol. 44, p. 93; Vol. 47, p. 264.
U.S.C., Supp. VII, p. 604.

SEC. 15. The taxes imposed by paragraph (a) of section 600 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by section 610 of the Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which the tax provided by section 3 of this Act has been paid.

Saving clause.

SEC. 16. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

Effective date.

SEC. 17. This Act shall take effect on the thirtieth day after the date of its enactment.

Citation of title.

SEC. 18. This Act may be cited as the " National Firearms Act."

Approved, June 26, 1934.

---

[CHAPTER 758.]

AN ACT

June 26, 1934.
[H.R. 9769.]
[Public, No. 475.]

To amend the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes."

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes ", is hereby amended so as to permit the Secretary of the Interior, in his discretion, to sell under the provisions of said Act the coal and asphalt deposits referred to therein in tracts of less than nine hundred and sixty acres where such smaller tract or acreage adjoins a developed tract on which active mining operations are being conducted and is needed by the operator in further developing the existing mine: *Provided,* That where the sale of such smaller tract or acreage is not deemed advisable, the Secretary of the Interior may in his discretion, lease said tract under the same terms and conditions as developed tracts are leased under the Act of April 21, 1932 (47 Stat. 88), with the exception that the minimum tonnage requirement contained therein is hereby waived as to leases on such small tracts.

Choctaw and Chickasaw Indians, Okla.
Sales of coal and asphalt deposits authorized.
Vol. 46, p. 788.

*Proviso.*
Leases.

Vol. 47, p. 89.
Minimum tonnage requirement waived.

Approved, June 26, 1934.

# EXHIBIT 100

# THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE PROHIBITIONS

*David B. Kopel*\*

## I. INTRODUCTION

In recent years, the prohibition of firearms magazines has become an important topic of law and policy debate. This article details the history of magazines and of magazine prohibition. The article then applies the historical facts to the methodologies of leading cases that have looked to history to analyze the constitutionality of gun control laws.

Because ten rounds is an oft-proposed figure for magazine bans, Part II of the article provides the story of such magazines from the sixteenth century onward. Although some people think that multi-shot guns did not appear until Samuel Colt invented the revolver in the 1830s, multi-shot guns predate Colonel Colt by over two centuries.[1]

Especially because the Supreme Court's decision in *District of Columbia v. Heller*[2] considers whether arms are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes,"[3] the article also pays attention to whether and when particular guns and their magazines achieved mass-market success in the United States. The first time a rifle with more than ten rounds of ammunition did so was in 1866,[4] and the first time a

    \* Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. Research Director, Independence Institute, Denver, Colorado. Associate Policy Analyst, Cato Institute, Washington, D.C. Professor Kopel is the author of fifteen books and over ninety scholarly journal articles, including the first law school textbook on the Second Amendment. *See generally* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2012). Professor Kopel's website is http://www.davekopel.org. The author would like to thank Joseph Greenlee and Noah Rauscher for research assistance.

    [1] *See* Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008).
    [2] District of Columbia v. Heller, 554 U.S. 570 (2008).
    [3] *Id.* at 624–25, 627.
    [4] *See infra* notes 50–55 and accompanying text.

849

850                    Albany Law Review                    [Vol. 78.2

handgun did so was in 1935.[5]

The detailed history of various firearms and their magazines stops in 1979—a year which is somewhat ancient in terms of the current gun control debate. Back in 1979, revolvers still far outsold semiautomatic handguns.[6] No one was trying to ban so-called assault weapons,[7] although such guns were already well established in the market.[8]

For the post-1979 period, Part II briefly explains how technological improvements in recent decades have fostered the continuing popularity of magazines holding more than ten rounds

Part III of the article describes the history of magazine prohibition in the United States. Such prohibitions are of recent vintage, with an important exception: during prohibition, Michigan, Rhode Island, and the District of Columbia banned some arms that could hold more than a certain number of rounds; Ohio required a special license for such guns.[9] The Michigan and Rhode Island bans were repealed decades ago; the Ohio licensing law was repealed in 2014, having previously been modified and interpreted so that it banned no magazines.[10] The District of Columbia ban, however, remains in force today, with some revisions.[11]

The Supreme Court's Second Amendment decisions in *District of Columbia v. Heller* and *McDonald v. Chicago*[12] paid careful

---

[5]  *See infra* notes 102–03 and accompanying text.

[6]  The U.S. manufacturing figures were compiled by the Bureau of Alcohol, Tobacco & Firearms. Although they were public documents, they were not made widely available in the 1970s. The following are the full-year production data by U.S. manufacturers. The figures do not include production for sale to the military. 1973: 452,232 pistols, 1,170,966 revolvers; 1974: 399,011 pistols, 1,495,861 revolvers; 1975: 455,267 pistols, 1,425,833 revolvers; 1976: 468,638 pistols, 1,425,407 revolvers; 1977: 440,387 pistols, 1,423,984 revolvers; 1978: 499,257 pistols, 1,458,013 revolvers; 1979: 637,067 pistols, 1,531,362 revolvers; 1980: 785,105 pistols, 1,586,149 revolvers. *Statistical Tabulation of Firearms Manufactured in the United States— and Firearms Exported—as Reported Yearly by Bureau of Alcohol, Tobacco and Firearms on ATF Form 4483-A*, AM. FIREARMS INDUSTRY (Nov. 1981) at 28–29.

[7]  *See* David B. Kopel, *The Great Gun Control War of the Twentieth Century—and Its Lessons for Gun Laws Today*, 39 FORDHAM URB. L.J. 1527, 1578–79 (2012) (beginning of "assault weapon" issue in the mid- and late 1980s); L. Ingram, *Restricting of Assault-Type Guns Okd by Assembly Unit*, L.A. TIMES, Apr. 9, 1985, at 3.

[8]  Below, this article describes many models of semi-automatic rifles introduced since 1927. *See infra* notes 82–101 and accompanying text. All of them have been labeled an "assault weapon" by one or more proposed bills. *See, e.g.*, LEGAL CMTY. AGAINST VIOLENCE, BANNING ASSAULT WEAPONS—A LEGAL PRIMER FOR STATE AND LOCAL ACTION 59–60 (2004), *available at* http://smartgunlaws.org/wp-content/uploads/2012/05/Banning_Assault_Weapons _A_Legal_Primer_8.05_entire.pdf (proposing a model assault weapons law).

[9]  *See infra* notes 129–30, 134, 140 and accompanying text.

[10]  *See infra* notes 131–33, 135–39 and accompanying text.

[11]  *See infra* notes 140–45 and accompanying text.

[12]  McDonald v. City of Chi., 561 U.S. 742 (2010).

attention to history. Several post-*Heller* lower court opinions in Second Amendment cases have also examined history as part of their consideration of the constitutionality of gun control statutes. Part IV of this article examines the legality of magazine bans according to the various historical standards that courts have employed.

## II. THE HISTORY OF MAGAZINES HOLDING MORE THAN TEN ROUNDS

In *District of Columbia v. Heller*, the Supreme Court ruled that the District of Columbia's handgun ban was unconstitutional partly because handguns are in "common use."[13] The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes."[14]

Magazines of more than ten rounds are older than the United States.[15] Box magazines date from 1862.[16] In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.[17] Handgun magazines of more than ten rounds would become popular in the 1930s.[18]

### A. Why Consumers Have Always Sought to Avoid Having to Reload During Defensive Gun Use

When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm. The Second Amendment, of course, guarantees the right to an *operable* firearm.[19] As the *Heller* Court explained, the Council of the District of Columbia could not require that lawfully-possessed guns be kept in an inoperable status (locked or disassembled) in the home, because doing so negates their utility with respect to "the core lawful purpose of self-defense."[20]

When the defender is reloading, the defender is especially vulnerable to attack. When ammunition is low but not exhausted (e.g., two or three rounds remaining), that may be insufficient to

---

[13] District of Columbia v. Heller, 554 U.S. 570, 627–29 (2008).
[14] *Id.* at 625.
[15] *See infra* notes 21–24 and accompanying text.
[16] *See infra* note 65 and accompanying text.
[17] *See infra* notes 43–55, 172–73 and accompanying text.
[18] *See infra* notes 102–03 and accompanying text.
[19] *See Heller*, 554 U.S. at 630, 635 (declaring the District of Columbia's requirement that all firearms in the home be "rendered and kept inoperable at all times" as unconstitutional).
[20] *Id.*

Kopel                                                                                3/17/2015 11:41 AM

852                         Albany Law Review                    [Vol. 78.2

deter or control the threat, especially if the threat is posed by more than one criminal.  If the victim is attacked by a gang of four large people, and a few shots cause the attackers to pause, the victim needs enough reserve ammunition in the firearm to make the attackers worry that even if they rush the victim all at once, the victim will have enough ammunition to knock each attacker down. When guns are fired defensively, it is unusual for a single hit to immediately disable an attacker.

Accordingly, from the outset of firearms manufacturing, one constant goal has been to design firearms able to fire more rounds without reloading.

To this end, manufacturers have experimented with various designs of firearms and magazines for centuries.  While not all of these experiments were successful in terms of mass sales, they indicated the directions where firearms development was proceeding.  The first experiments to gain widespread commercial success in the United States came around the middle of the nineteenth century.

### B.  Magazines of Greater than Ten Rounds are More than Four Hundred Years Old

The first known firearm that was able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580, using "superposed" loads (each round stacked on top of the other).[21]  Multi-shot guns continued to develop in the next two centuries, with such guns first issued to the British army in 1658.[22] One early design was the eleven-round "Defence Gun," patented in 1718 by lawyer and inventor James Puckle.[23]  It used eleven preloaded cylinders; each pull of the trigger fired one cylinder.[24]

As with First Amendment technology (such as televisions or websites), the Second Amendment is not limited to the technology that existed in 1791.[25]  The *Heller* Court properly described such an asserted limit as "bordering on the frivolous."[26]  But even if *Heller*

---

[21]  *See* LEWIS WINANT, FIREARMS CURIOSA 168–70 (2009); *A 16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM (June 2014), http://www.nrapublications.org/index.php/17739/a-16-shot-wheel-lock/ (NRA member magazine).

[22]  Cramer & Olson, *supra* note 1, at 716.

[23]  *Id.* at 716 & n.94.

[24]  *See id.* at 716–17; *This Day in History: May 15, 1718*, HISTORY, http://www.historychannel.com.au/classroom/day-in-history/600/defence-rapid-fire-gun-patented (last visited Feb. 21, 2015).

[25]  *Heller*, 544 U.S. at 582.

[26]  *Id.* ("Some have made the argument, bordering on the frivolous, that only those arms in

had created such a rule, magazines of more than ten rounds are older than the Second Amendment.

At the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a twenty-two-shot magazine capacity.[27] Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition.[28] At the time, air guns were ballistically equal to powder guns in terms of bullet size and velocity.[29] The .46 and .49 caliber Girandoni rifles were invented around 1779 for use in European armies and were employed by elite units.[30] One shot could penetrate a one-inch thick wood plank or take down an elk.[31]

## C. The Nineteenth Century Saw Broad Commercial Success for Magazines Holding More than Ten Rounds

Firearm technology progressed rapidly in the 1800s. Manufacturers were constantly attempting to produce reliable firearms with greater ammunition capacities for consumers. One notable step came in 1821 with the introduction of the Jennings multi-shot flintlock rifle, which, borrowing the superposed projectile design from centuries before, could fire twelve shots before reloading.[32]

Around the same time, pistol technology also advanced to permit more than ten shots being fired without reloading. "Pepperbox"

---

existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citations omitted)).

[27] JIM SUPICA ET AL., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[28] JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 94 (2012).

[29] JOHN L. PLASTER, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).

[30] See SUPICA ET AL., supra note 27, at 31.

[31] Id. The Lewis and Clark gun is on display at the National Rifle Association's Sporting Arms Museum in Springfield, Missouri. Mark Yost, The Story of Guns in America, WALL ST. J., Sept. 3, 2014, at D5.

[32] NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 683 (9th ed. 2007) [hereinafter FLAYDERMAN'S GUIDE]. According to James S. Hutchins, historian emeritus at the National Museum of American History, Smithsonian Institution, Mr. Flayderman has been a "revered expert in antique American arms and a vast range of other Americana for half a century . . . ." James S. Hutchins, Foreword to NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING THE AMERICAN LEGEND 7 (2004). Mr. Flayderman has been appointed as historical consultant to the U.S. Army Museum, U.S. Marine Corps Museum, and the State of Connecticut's historic weapons collections. Andrea Valluzzo, E. Norman Flayderman, 84; Antique Arms Expert, ANTIQUES & ARTS WKLY. (July 2, 2013), http://test.antiquesandthearts.com/node/185567#.VMvRAGjF8YM.

pistols began to be produced in America in the 1830s.[33]  These pistols had multiple barrels that would fire sequentially.[34]  While the most common configurations were five or six shots,[35] some models had twelve independently-firing barrels,[36] and there were even models with eighteen or twenty-four independently-firing barrels.[37]  Pepperboxes were commercially successful and it took a number of years for Samuel Colt's revolvers (also invented in the 1830s) to surpass them in the marketplace.[38]

The 1830s through the 1850s saw a number of different firearm designs intended to increase ammunition capacity.  In 1838, the Bennett and Haviland Rifle was invented; it was a rifle version of the pepperbox, with twelve individual chambers that were manually rotated after each shot.[39]  This would bring a new chamber, preloaded with powder and shot, into the breach, ready to be fired.[40]  Alexander Hall and Colonel Parry W. Porter each created rifles with capacities greater than ten in the 1850s.[41]  Hall's design had a fifteen-shot rotating cylinder (similar to a revolver), while Porter's design used a thirty-eight-shot canister magazine.[42]

The great breakthrough, however, began with a collaboration of Daniel Wesson (of Smith and Wesson) and Oliver Winchester.  They produced the first metallic cartridge—containing the gunpowder, primer, and ammunition in a metallic case similar to modern ammunition.[43]  Furthermore, they invented a firearms mechanism that was well suited to the new metallic cartridge: the lever

---

[33] JACK DUNLAP, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 16 (1964).

[34] LEWIS WINANT, PEPPERBOX FIREARMS 7 (1952).

[35] *See, e.g.*, *Pocektsize Allen and Thurber Pepperbox Revolver*, ANTIQUE ARMS, http://aaawt.com/html/firearms/f102.html (last visited Feb. 21, 2015).

[36] DOE RUN LEAD COMPANY'S MUSEUM, CATALOGUE OF CONTENTS 66 (1912).

[37] DUNLAP, *supra* note 33, at 148–49, 167 (describing three European eighteen-shot models and one twenty-four-shot model); SUPICA ET AL., *supra* note 27, at 33 (describing the Marietta eighteen-shot model); WINANT, *supra* note 21, at 249–50 (describing a twenty-four-shot pepperbox).

[38] WINANT, *supra* note 34, at 28.

[39] FLAYDERMAN'S GUIDE, *supra* note 32, at 711.

[40] *See id.*

[41] *Id.* at 713, 716.

[42] *Id.*  The Porter Rifle was said to be able to fire up to sixty shots per minute.  Mary Moran, *P.W. Porter, Inventor of the Porter Rifle*, DEAD MEMPHIS TALKING (April 18, 2014), http://deadmemphistalking.blogspot.com/2014/04/pw-porter-inventor-of-porter-rifle.html (reprinting an article from New York Post).  About 1250 of these guns were produced.  S.P. Fjestad, *What's It Worth? The Porter Rifle*, FIELD & STREAM, http://www.fieldandstream.com/articles/guns/rifles/2009/01/whats-it-worth-porter-rifle (last visited Feb. 21, 2015).

[43] *See* FLAYDERMAN'S GUIDE, *supra* note 32, at 303 ("The self-contained cartridge was a special type, the hollowed out conical bullet containing the powder, and backed by the primer."); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 26–27 (1952).

action.[44]  Their company, the Volcanic Repeating Arms Company, introduced the lever action rifle in 1855.[45]  This rifle had up to a thirty-round tubular magazine under the barrel that was operated by manipulating a lever on the bottom of the stock.[46]  The lever-action allowed a shooter to quickly expel spent cartridges and ready the firearm for additional shots.[47]  An 1859 advertisement bragged that the guns could be loaded and fire thirty shots in less than a minute.[48]  In 1862, the Volcanic evolved into the sixteen-round Henry lever action rifle, lauded for its defensive utility.[49]

The Henry rifle further evolved into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name.[50]  Winchester touted the Model 1866 for defense against "sudden attack either from robbers or Indians."[51]  According to advertising, the M1866 "can . . . be fired thirty times a minute,"[52] or with seventeen in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds."[53]  The gun was a particularly big seller in the American West.[54]  There were over 170,000 Model 1866s produced.[55]

Next came the Winchester M1873, "[t]he gun that won the West."[56]  The Winchester M1873 and then the M1892 were lever actions holding ten to eleven rounds in tubular magazines.[57]  There were over 720,000 copies of the Winchester 1873 made from 1873 to

[44] *See Smith & Wesson History*, SMITH & WESSON, http://www.smith-wesson.com/webapp/wcs/stores/servlet/Category4_750001_750051_757941_-1_757938_757812_image (last visited Feb. 21, 2015).

[45] FLAYDERMAN'S GUIDE, *supra* note 32, at 304.

[46] *Id.* at 303; WILLIAMSON, *supra* note 43, at 13.

[47] WILLIAMSON, *supra* note 43, at 25.  Oliver Winchester had an ownership interest in Volcanic and acquired the company in 1857.  FLAYDERMAN'S GUIDE, *supra* note 32, at 300.

[48] WILLIAMSON, *supra* note 43, at 25.

[49] *See Id.*, at 28–31; Joseph Bilby, *The Guns of 1864*, AM. RIFLEMAN (May 5, 2014), http://www.americanrifleman.org/articles/2014/5/5/the-guns-of-1864/.  About 14,000 Henry rifles were sold in 1860–66.  FLAYDERMAN'S GUIDE, *supra* note 32, at 305.  The Henry Rifle is still in production today.  *See About Henry Repeating*, HENRY, http://www.henryrifles.com/about-henry-repeating/ (last visited Feb. 21, 2015).

[50] *See* WILLIAMSON, *supra* note 43, at 49.

[51] R.L. WILSON, WINCHESTER: AN AMERICAN LEGEND 32 (1991).

[52] WILLIAMSON, *supra* note 43, at 49.

[53] LOUIS A. GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 1866–1894, at 128 (1985).  The Winchester Model 1866 was produced until 1898.  FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

[54] WILSON, *supra* note 51, at 34.

[55] FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

[56] *Model 1873 Short Rifle*, WINCHESTER REPEATING ARMS, http://www.winchesterguns.com/products/catalog/detail.asp?family=027C&mid=534200 (last visited Feb. 21, 2015).

[57] *Id.*

856                         Albany Law Review                    [Vol. 78.2

1919.[58]  Over a million of the M1892 were manufactured from 1892 to 1941.[59]  The Italian company Uberti, which specializes in high-quality reproductions of western firearms, produces reproductions of all of the above Winchesters today.[60]  Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a fifteen-round capacity.[61]

Manufactured in Maine, the Evans Repeating Rifle came on the market in 1873.[62]  The innovative rotary helical magazine in the buttstock held thirty-four rounds.[63]  It was commercially successful for a while, although not at Winchester's or Colt's levels.  Over 12,000 copies were produced.[64]

Meanwhile, the first handgun to use a detachable box magazine was the ten-round Jarre harmonica pistol, patented in 1862.[65]  In the 1890s, the box magazine would become common for handguns.[66]

Pin-fire revolvers with capacities of up to twenty or twenty-one entered the market in the 1850s;[67] they were produced for the next half-century, but were significantly more popular in Europe than in America.[68]  For revolvers with other firing mechanisms, there were some models with more than seventeen rounds.[69]  The twenty-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity.[70]  Chain pistols did not win much market share, perhaps in part because the large

---

[58]  FLAYDERMAN'S GUIDE, *supra* note 32, at 307.  The Model 1873 was Pa Cartwright's gun on the 1959 to 1973 television series *Bonanza*.  SUPICA ET AL., *supra* note 27, at 108.

[59]  FLAYDERMAN'S GUIDE, *supra* note 32, at 311.  The Model 1892 was John Wayne's gun in many movies.  SUPICA ET AL., *supra* note 27, at 109.

[60]  2014 STANDARD CATALOG OF FIREARMS: THE COLLECTOR'S PRICE & REFERENCE GUIDE, 1237 (Jerry Lee ed., 2013).  The 1995 edition of this annually-published guide was relied on by the court in *Kirkland v. District of Columbia*, 70 F.3d 629, 635 n.3 (D.C. Cir. 1995).

[61]  The original Colt held up to fifteen rounds in calibers of .32–.20, .38–.40, and .44–.40. FLAYDERMAN'S GUIDE, *supra* note 32, at 122.  Uberti currently produces a modern replica of the Colt Lightning, medium frame model, of which 89,000 were produced between 1884 and 1902.  *Id.*

[62]  *Id.* at 694.

[63]  DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS 293–95 (rev. ed. 1997); FLAYDERMAN'S GUIDE, *supra* note 32, at 694.  A later iteration of the rifle held twenty-five or twenty-eight rounds in the buttstock.  DEMERITT, *supra*, at 301.  The American Society of Arms Collectors endorses the Demeritt book as "the definitive work for historians and collectors" of Maine guns.  DEMERITT, *supra*, at vi.

[64]  FLAYDERMAN'S GUIDE, *supra* note 32, at 694.

[65]  WINANT, *supra* note 21, at 244–45.  The magazine stuck out horizontally from the side of the firing chamber, making the handgun difficult to carry in a holster, which perhaps explains why the gun never had mass success.  SUPICA ET AL., *supra* note 27, at 33.

[66]  *See infra* notes 72–77 and accompanying text.

[67]  SUPICA ET AL., *supra* note 27, at 48–49; WINANT, *supra* note 21, at 67–70.

[68]  SUPICA ET AL., *supra* note 27, at 49.

[69]  *See, e.g.*, WINANT, *supra* note 21, at 62–63, 207–08.

[70]  *Id.* at 204, 206.

dangling chain was such an impediment to carrying the gun.[71]

The semiautomatic firearm and its detachable box magazine were invented before the turn of the century. It was the latest success in the centuries-old effort to improve the reliability and capacity of multi-shot guns.

In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s, selling nearly a million to civilians worldwide.[72] The most common configuration was in ten-round capacity, but there were a variety of models with capacities as low as six or as high as twenty.[73] The latter was the Cone Hammer pistol, with twenty-round box magazine.[74]

The Luger semiautomatic pistol was brought to the market in 1899 (although it is commonly known as the "1900").[75] Through many variants, it was very popular for both civilians and the military markets, and remained in production for nearly a century.[76] The most common magazines were seven or eight rounds, but there was also a thirty-two-round drum magazine.[77]

### D. Manufacturers in the Twentieth Century Continued the Trend of Increasing Ammunition Capacity and Reliability for Civilian Firearms.

The twentieth century saw improvements on the designs pioneered in the 1800s and expanding popularity for firearms with more than ten rounds.

---

[71] *See id.* at 205.

[72] JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR., SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING PISTOL 272 (1967) (production of 1,150,000, of which "almost a million" were sold on the commercial, non-military market); *see* John Elliot, *A Sweeping History of the Mauser C96 Broomhandle Pistol*, GUNS.COM (Jan. 26, 2012), http://www.guns.com/2012/01/26/a-sweeping-history-of-the-mauser-c96-broomhandl e-pistol/.

[73] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 708–09.

[74] *Id.*; BREATHED & SCHROEDER, *supra* note 72, at 23, 30–31, 38–39, 54–55. At least between 1896 and 1905, Mauser's direct sales to the United States were small. *Id.* at 266–67.

Spain's Astra brought out its own versions of the Mauser, with several models having twenty-round magazines starting in 1928. *Id.* at 208. But these do not appear to have had much distribution in the United States. *Id.* at 266–67.

[75] *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 650.

[76] Among the many models was the 1906 American Eagle. *Id.* at 653. George Luger's invention was licensed to many companies, including Mauser (Germany) and Vickers (England). *Id.* at 657–58. The gun was never manufactured under Luger's own name. *See id.* at 650–62.

[77] JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126–27 (1993); SUPICA ET AL., *supra* note 27, at 86.

858                          Albany Law Review                    [Vol. 78.2

Since the late 1890s, the Savage Arms Company has been one of the classic American firearms manufacturers.[78]   In 1911, the company introduced their bolt-action Model 1911, a twenty-shot repeater with a tubular magazine in .22 short caliber.[79]   The rifle was popular for boys and for shooting galleries.[80]

By the 1930s, American manufacturers such as Remington, Marlin, and Winchester were producing many tubular magazine rifles in .22 caliber.[81]   These firearms are classic rifles for "plinking" (casual target shooting), especially popular for young people.   Based on firearms catalogues from 1936 to 1971, there are over twenty such firearms models from major American manufacturers with magazines of sixteen to thirty rounds in one or more of the calibers.[82]

In 1927, the Auto Ordinance Company introduced their

---

[78] *See Savage Arms History*, SAVAGE ARMS, http://www.savagearms.com/history/ (last visited Feb. 21, 2015).

[79] JIM PERKINS, AMERICAN BOYS' RIFLES 1890–1945, at 191 (1976).

[80] *Id.*  Similarly, the Remington Model 12B Gallery Special was introduced in 1910, with an optional extended magazine that held twenty-five .22 shorts.  ROY MARCOT, REMINGTON, "AMERICA'S OLDEST GUN MAKER" 149 (James W. Bequette & Joel J. Hutchcroft eds. 1998).

[81] *See, e.g.*, 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 687–88, 870, 1343.

[82] Models listed in the 1936 *Shooter's Bible* include; Remington Model 34 bolt action, Remington Model 121 slide action, Remington Model 341 bolt action, Stevens No. 71 slide action, Savage Model 5 bolt action, Stevens Model 76 semiauto, Stevens-Springfield Model 86 bolt action, Winchester Model 62 slide action, and Winchester Model 61 slide action.  STOGER ARMS CORP., SHOOTER'S BIBLE, 1936, at 108–09, 112, 123–24, 126–27, 140 (photo. reprint 1974).

Some additional models include: Stevens Model 87 bolt action, Remington 550 semiauto, Mossberg Model 46B bolt action, Mossberg Model 46M bolt action, Winchester Model 74 semiautomatic, Marlin 39 A lever action, and Marlin Model 81 DL bolt action.  BOB BROWNELL, 2 THE GUNSMITHS MART, 1949–1950, at 212, 214, 216, 218, 221 (2011) (reprinting article from *Hunting & Fishing*, Oct. 1948).

The 1959 annual edition of the *Shooter's Bible* adds the semiautomatic Savage Model 6 to the above list.  STOGER ARMS CORP., SHOOTER'S BIBLE, 1959, at 103 (1959).  For some of the models previously mentioned, see *id.* at 80, 87, 91, 101.

Histories of Savage and Stevens firearms include the following not listed above: Stevens No. 66 bolt action, Stevens Model 46 bolt action, Model 1914 slide action, Savage Model 29 slide action, Savage Model 29 G slide action.  JAY KIMMEL, SAVAGE AND STEVENS ARMS COLLECTOR'S HISTORY 35 (1990); BILL WEST, SAVAGE AND STEVENS ARMS, at 11—12, 13—8, 14—44, 15—10, 16—10 (1971).  Savage purchased Stevens in 1920.  *Savage Arms History*, *supra* note 78.

For use of the *Shooter's Bible* by the courts, see United States v. Olson, No. 94-30387, 1995 U.S. App. LEXIS 36973, at *1–2 (9th Cir. Dec. 15, 1995) (stating that the book was properly used as a source for a Bureau of Alcohol, Tobacco, and Firearms agent's expert opinion); United States v. Fisher, 353 F.2d 396, 399 (5th Cir. 1965) (Gewin, J., dissenting) (considering information in the book to determine whether the evidence relied on by the trial court was sufficient to justify the trial court's holding); Potter v. United States, 167 Ct. Cl. 28, 48 n.1 (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms); United States v. Precise Imports Corp., 458 F.2d 1376, 1377 (C.C.P.A. 1972) (reviewing the record produced at the trial court, which included pages from the 1967 edition of the book).

semiautomatic rifle that used thirty-round magazines.[83]    These rifles are still in production today.[84]

The M-1 carbine was invented for the citizen solider of World War II.[85]    Thereafter, the M-1 carbine became and has remained a popular rifle for civilians in America.[86]    The U.S. government's Civilian Marksmanship Program, created by Congress, put nearly a quarter million of these guns into the hands of law-abiding American citizens starting in 1963, at steeply-discounted prices.[87] Partly using surplus government parts, the Plainfield Machine Company, Iver Johnson, and more than a dozen other companies cumulatively manufactured over 200,000 for the civilian market, starting in the late 1950s.[88]    The standard magazines are fifteen and thirty rounds.[89]

The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds.[90]    The AR-15 was brought to the market in 1963, with a

---

[83] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 84; *T1-C*, THOMPSON, www.auto-ordnance.com//firearms/thompson-t1-c.asp (last visited Feb. 21, 2015).

[84] *See T1-C*, *supra* note 83.

[85] *See* BRUCE N. CANFIELD, BRUCE CANFIELD'S COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163 (1999).

[86] *See id.* at 163, 279 (noting high desirability and demand for the firearm after the war ended); *see also* Joseph P. Tartaro, *The Great Assault Weapon Hoax*, 20 U. DAYTON L. REV. 619, 622 (1995) ("[T]he M1 carbine [is] beloved by millions of war veterans, collectors, and recreational shooters.").

[87] CANFIELD, *supra* note 85, at 163; LARRY L. RUTH, 2 WAR BABY! COMES HOME: THE U.S. CALIBER .30 CARBINE 575 (R. Blake Stevens ed., 1993); *About the CMP*, CIV. MARKSMANSHIP PROGRAM, http://thecmp.org/about/ (last visited Feb. 21, 2015).

[88] *See* CANFIELD, *supra* note 85, at 163, 279 (noting the large quantity of surplus carbine parts and that firms created commercial carbines using these parts in the 1950s and 1960s). The largest producers were Plainfield's 112,000 from 1962 to 1978 and Iver Johnson's 96,700 from 1978 to 1992. *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Iver Johnson Arms*, M1CARBINESINC.COM, http://www.m1carbinesinc.com/carbine_ij.html (last visited Feb. 21, 2015); *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Plainfield Machine Co., Inc.*, M1CARBINESINC.COM., http://www.m1carbinesinc.com/carbine_pl ainfield.html (last visited Feb. 21, 2015).    The U.S. Government sold 240,000 of its own surplus in 1963 into the Civilian Marksmanship Program. CANFIELD, *supra* note 85, at 163. Thereafter, the program (then known as "DCM"—Director of Civilian Marksmanship) sold M1s to Americans from the supply of World War II M1 carbines that had been exported to allied nations and subsequently returned to the United States when the allied nation switched to a newer type of rifle. *See* RUTH, *supra* note 87, at 575, 723.    As of 2014, the Civilian Marksmanship Program's supply of carbines for sale has been exhausted. *M1 Carbine*, CIV. MARKSMANSHIP PROGRAM, http://www.thecmp.org/Sales/carbine.htm (last visited Feb. 21, 2015).

[89] RUTH, *supra* note 87, at 575.

[90] *See* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 12, 809 (2012) (noting the wide range of uses for the gun and its popularity).    The "AR" stands for "ArmaLite Rifle." *Modern Sporting Rifle Facts*, NAT'L SHOOTING SPORTS FOUND., http://www. nssf.org/msr/facts.cfm (last visited Feb. 21, 2015).    ArmaLite did the initial design work on

860                        Albany Law Review                      [Vol. 78.2

then-standard magazine of twenty; the thirty-round standard magazine was developed a few years later.[91]  The 1994 Supreme Court case *Staples v. United States*[92] described the AR-15 as "the civilian version of the military's M–16 rifle," and noted that many parts are interchangeable between the two guns.[93]  The crucial distinction, explained the Court, is that the AR-15 is like all other semiautomatic firearms in that it can fire "only one shot with each pull of the trigger."[94]  The Court pointed out that semiautomatic firearms "traditionally have been widely accepted as lawful possessions."[95]  So legally speaking, the semiautomatic AR-15 is the opposite of the M-16 machine gun: "[C]ertain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation— . . . have the same quasi-suspect character we attributed to owning hand grenades . . . .  But . . . guns falling outside those categories traditionally have been widely accepted as lawful possessions . . . ."[96]

By 1969, the AR-15 faced competition from the Armalite-180 (twenty-round optional magazine), the J&R 68 carbine (thirty rounds), and the Eagle Apache carbine (thirty rounds).[97]

Springfield Armory brought out the M1A semiautomatic rifle in 1974, with a twenty-round detachable box magazine.[98]  The next year, the Ruger Mini-14 rifle was introduced, with manufacturer-supplied standard five, ten, or twenty-round detachable magazines.[99]  Both the M1A and the Mini-14 are very popular to this day.[100]

---

the AR-15 before selling the rights to Colt's.  ARMALITE, INC., A HISTORICAL REVIEW OF ARMALITE 3 (Jan. 4, 2010), *available at* http://www.armalite.com/images/Library%5CHistory .pdf.

[91] PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 104 (2005).  About this time, the Cetme-Sport semiauto rifle with an optional twenty-round detachable box mag magazine came on the market.  GUN DIGEST 1968, at 335 (John T. Amber ed., 22nd Anniversary Deluxe ed. 1967).

[92] Staples v. United States, 511 U.S. 600 (1994).

[93] *Id.* at 603.

[94] *Id.* at 602 n.1, 603.

[95] *See id.* at 612.

[96] *See id.* at 611–12.

[97] *See* GUN DIGEST 1970, at 294 (John T. Amber ed., 24th Anniversary Deluxe ed. 1969).

[98] *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1102 (noting the twenty-round box magazine); *M1A Series*, SPRINGFIELD ARMORY, http://www.springfield-armory.com/m1a-series/ (last visited Feb. 21, 2015).

[99] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1173.

[100] *See* M1A Scout, *What is an M1A Rifle*, M1A RIFLES (July 2, 2009), http://www.m1arifles .com/tag/m14/; Shawn Skipper, *8 Things You Might Not Know About the Ruger Mini-14*, DAILY CALLER (June 3, 2014), http://dailycaller.com/2014/06/03/8-things-you-might-not-know-

By 1979, all of the above guns were challenged in the American market by high-quality European imports such as the Belgian FN-FAL Competition rifle (optional twenty-round magazine), the German Heckler & Koch HK-91 and HK-93 rifles (twenty rounds), the Swiss SIG AMT rifle (twenty rounds), and the Finnish Valmet M-71S rifle (thirty rounds).[101]

Citizen firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. In 1935, Browning introduced the Hi-Power pistol.[102] This handgun was sold with a thirteen-round detachable magazine and is still in production.[103]

In Europe, more so than in America, Browning had to compete against the Spanish Gabilondo twenty-round Plus Ultra, introduced in 1925.[104] Spain's Arostegui, Eulogio brought out the Azul—a semiautomatic with standard magazines of ten, twenty and thirty—in 1935.[105]

Browning's first notable American competition came with the 1964 introduction of the Plainfield Machine Company's "Enforcer," a pistol version of the M1 carbine with a thirty-round magazine.[106]

A tremendous commercial success was the Beretta model 92, a nine millimeter pistol with a sixteen-round magazine, which entered the market in 1976.[107] In various configurations (currently the Beretta 92F) the Beretta is one of the most popular of all modern handguns.[108] Browning introduced another popular handgun in 1977, the fourteen-round BDA (Browning Double Action).[109] Also coming on the market at this time were European handguns such as Austria's L.E.S. P-18 (eighteen rounds) and

---

about-the-ruger-mini-14/. Another gun introduced in 1976 also used magazines larger than fifteen. The Bingham company (from Norcross, Georgia) brought out the PPS 50 and AK-22, .22 caliber rifles with detachable magazines of fifty or twenty-nine rounds. 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 163. The PPS-50 is currently manufactured by Mitchell's Mausers. *See PPS-50/22*, MITCHELL'S MOUSERS, http://www.mauser.org/pps-50-22/ (last visited Feb. 21, 2015). That the gun is still in production four decades later is impressive, but the PPS-50 never became an all-American favorite as did the M1, AR-15, M1A and the Mini-14.

101 GUN DIGEST 1980, at 319–21 (Ken Warner ed., 34th Anniversary Deluxe ed. 1979). Also on the market were the Commando Arms carbine (five, fifteen, thirty or ninety rounds), and the Wilkinson Terry carbine (thirty-one rounds). *Id.* at 319, 322.

102 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 182.

103 *Id.* at 432–33.

104 *See id.* at 465.

105 *Id.* at 72; BREATHED & SCHROEDER, *supra* note 74, at 216–17.

106 *See* GUN DIGEST 1965, at 229 (John T. Amber eds., 19th Anniversary Deluxe ed. 1964).

107 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 121.

108 *Id.* at 122. In 1985 the M9 version of this pistol became the standard U.S. military issue sidearm. *Id.* at 124.

109 *Id.* at 184.

862                          Albany Law Review                        [Vol. 78.2

Germany's Heckler & Koch VP 70Z (also eighteen rounds).[110]

### E.  Magazines After 1979

We end this story in 1979, when Jimmy Carter was President,[111] the Bee Gees bestrode the AM radio Top 40,[112] Gaston Glock was manufacturing curtain rods in his garage,[113] Americans were watching *Love Boat* on broadcast television,[114] and people on the cutting edge of technology were adopting VisiCalc, the first spreadsheet program, run from huge floppy discs.[115]

Long before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership. Indeed, they had been so established before almost everyone alive in 1979 was born.

After 1979, technological improvements continued to foster the popularity of magazines holding more than ten rounds.  First of all, there were improvements across the board in manufacturing, so that magazine springs became more reliable, particularly for magazines holding up to thirty rounds.  This greatly reduced the risk of a misfeed.  Reliability was also enhanced by improvements in shaping the magazines' "lips"—the angled wings at the top of the magazine which guide the next round of ammunition into the firing chamber.[116]

Magazines of all sizes benefited from increasing use of plastic polymers in manufacturing.[117]  Today, many magazine walls are

---

[110]  *See* GUN DIGEST 1980, *supra* note 101, at 297–98.  L.E.S. was the American partner of Austria's Steyr.  The following courts have relied on one of the annual issues of GUN DIGEST: Sturm, Ruger & Co. v. Arcadia Mach. & Tool, Inc., No. CV 85-8459 MRP, 1988 U.S. Dist. LEXIS 16451, at *3–4 (C.D. Cal. Nov. 4, 1988); A. Uberti & C. v. Leonardo, 892 P.2d 1354, 1364 (Ariz. 1995) (discussing how the inclusion of the defendant's guns in the *Gun Digest* established that defendant had sufficient minimum contacts with the state to satisfy personal jurisdiction); Couplin v. State, 378 A.2d 197, 202 n.2 (Md. Ct. Spec. App. 1977); Citizens for a Safer Cmty. v. City of Rochester, 627 N.Y.S.2d 193, 203 n.5 (Sup. Ct. 1994).

[111]  JULIAN E. ZELIZER, JIMMY CARTER 3 (2010).

[112]  *See* DAVID N. MEYER, THE BEE GEES: THE BIOGRAPHY 213–14 (2013).

[113]  PAUL M. BARRETT, GLOCK: THE RISE OF AMERICA'S GUN 13–16 (2012).

[114]  GAVIN MACLEOD & MARK DAGOSTINO, THIS IS YOUR CAPTAIN SPEAKING: MY FANTASTIC VOYAGE THROUGH HOLLYWOOD, FAITH & LIFE 138–39 (2013).

[115]  *See, e.g.*, BOB DENTON, THE PC PIONEERS 97–100 (2d ed. 2014); ROBERT E. WILLIAMS & BRUCE J. TAYLOR, THE POWER OF: VISICALC (1981) (advising how to properly use the VisiCalc system and providing practice exercises on the system).

[116]  *See generally* David Tong, *The Care, Feeding and Reliability of Semi-Automatic Pistols*, CHUCKHAWKS.COM, http://www.chuckhawks.com/care_reliability_autopistols.htm (last visited Feb. 21, 2015).

[117]  *See, e.g.*, Tim Lau, *AR15/M16 Magazine Drop Test: Plastic Vs. Aluminum*, MODERN SERVICE WEAPONS (Dec. 9, 2012), http://modernserviceweapons.com/?p=1072 (comparing the performance of plastic and aluminum magazines).

made from plastic, rather than metal. Closer tolerances in manufacturing, lower costs, and increased durability have all improved magazine quality and reliability.

Likewise, the vast majority of magazines today have a removable baseplate (also known as a "foot plate").[118] Removal of the baseplate allows the magazine to be disassembled for cleaning (e.g., removal of gunpowder residue) or repair (e.g., replacing a worn-out spring).[119] The existence of a removable baseplate also makes it possible for consumers to add after-market extenders to a magazine.[120] These extenders may simply increase the grip length (to better fit a particular consumer's hands), and they may also increase capacity by one, two, or three rounds.[121] Thus, a consumer with a ten-round factory magazine can add a two-rounder extender to create a twelve-round magazine.

Most importantly, the double-stack magazine was perfected. In some box magazines, the ammunition is contained in a single column.[122] In the double-stack magazine, there are two columns of ammunition, side-by-side and touching.[123] When the gun is used, the magazine will first reload a round from column A, then a round from column B, then from column A, and so on.[124]

The practical effect is this: for a handgun, a single stack magazine of seventeen rounds would stick out far below the bottom of the grip, making the gun unwieldy for carrying and holstering. With a double-stack configuration, a seventeen-round magazine can fit inside a standard full-sized handgun grip. The practical limitation of grip size (the size of the human hand) means that relatively larger capacity magazines are possible for relatively smaller cartridges. Thus, a double-stack magazine for the midsize nine millimeter round might hold up to twenty or twenty-one rounds, whereas a double-stack for the thicker .45 ACP cartridge would hold

---

[118] Michael Shain, Expert Report and Opinion at 5–6, Cooke v. Hickenlooper, No. 13-cv-01300-MSK-MJW (D. Colo. Aug. 1, 2013), available at http://coloradoguncase.org/Shain-report.pdf. Kopel is counsel for the Colorado Sheriffs who are the plaintiffs in this case, which is currently on appeal to the Tenth Circuit.

[119] See Mike Wood, 3 Simple Keys to Cleaning Your Pistol Magazines, POLICEONE.COM, July 11, 2014, http://www.policeone.com/Officer-Safety/articles/7358758-3-simple-keys-to-clea ning-your-pistol-magazines/.

[120] Michael Shain, Expert Report and Opinion at 5–7, Cooke, No. 13-cv-01300-MSK-MJW.

[121] See, e.g., Magazine Adapters, TOP GUN SUPPLY, http://www.topgunsupply.com/gun-acces sories-for-sale/magazine-adapters.html (last visited Feb. 19, 2014) (selling magazine adapters that increase capacity and/or increase grip length).

[122] Magazines, Clips, and Speedloaders, FIREARMS ADVANTAGE, http://www.firearmsadvant age.com/magazines_clips_speedloaders.html (last visited Feb. 21, 2015).

[123] Id.

[124] Id.

no more than fifteen.

## III. The History of Ammunition Capacity Bans

An important factor in the consideration of the constitutionality of firearms laws is whether they are traditional and longstanding. For example, the *Heller* Court pointed out that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."[125] The handgun ban was contrasted with "longstanding" guns controls, such as those prohibiting gun possession by felons or the mentally ill.[126] Following *Heller*, the Tenth Circuit has explained that Second Amendment cases must consider "the rarity of state enactments in determining whether they are constitutionally permissible."[127]

At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity. This was not because all guns were single-shot. As detailed above, multi-shot guns predate the Second Amendment by about two hundred years, and Lewis and Clark carried a powerful twenty-two-round gun on their famous expedition.[128]

The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. In 1927, Michigan prohibited "any machine gun or firearm which can be fired more than sixteen times without reloading."[129] Also in 1927, Rhode Island banned "any weapon which shoots more than twelve shots semi-automatically without re-loading."[130]

The Michigan ban was repealed in 1959.[131] That same year, the

---

[125] District of Columbia v. Heller, 554 U.S. 570, 629 (2008).

[126] *Id.* at 626, 629.

[127] Kerr v. Hickenlooper, 744 F.3d 1156, 1178 (10th Cir. 2014).

[128] *See supra* notes 21–31 and accompanying text.

[129] Act of June 2, 1927, No. 373, § 3, 1927 Mich. Public Acts 887, 888 (repealed 1959) ("It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading . . . ."). In 1931, the provision was consolidated into section 224 of the Michigan Code.

[130] Act of Apr. 22, 1927, ch. 1052, §§ 1, 4, 1927 R.I. Acts & Resolves 256, 256–57 (amended 1959).

[131] Under the 1959 revision: "Any person who shall manufacture, sell, offer for sale or possess any machine gun or firearm which shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger . . . shall be guilty of a felony . . . ." Act of July 16, 1959, No. 175, sec. 1, § 224, 1959 Mich. Pub. Acts 249, 250. Michigan's current statute on machine guns contains very similar language. *See* Mich. Comp. Laws Serv. § 750.224 (LexisNexis 2014) ("A person shall not manufacture, sell, offer

Rhode Island law was changed to fourteen shots, and .22 caliber rimfire guns were excluded.[132]    The Rhode Island ammunition capacity law was fully repealed in 1975.[133]

The two statutes applied only to firearms, with Rhode Island only for semiautomatics.  Neither statute covered a magazine that was not inserted in a firearm.

In 1933, Ohio began requiring a special permit for the possession or sale of a semiautomatic firearm with an ammunition capacity of greater than eighteen rounds.[134]  In 1971, during a recodification of the state criminal code, an exemption for .22 caliber was added, and for other calibers the limit was raised to thirty-two or more rounds.[135]

Significantly, the Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun.[136]    (Of course purchase was allowed if one has the special permit.)[137]  With or without the permit, one could buy a sixty-round magazine in Ohio.[138]  The licensing law was fully repealed in 2014.[139]

---

for sale or possess . . . [a] machine gun or firearm that shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger.").

[132]  Firearms Act, ch. 75, secs. 11-47-2, -8, 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975).

[133]  This was accomplished by changing the Firearms Act's definition of "Machine gun" to mirror the federal definition:

[A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Firearms Act, ch. 278, sec. 1, § 11-47-2, 1975 R.I Pub. Laws 738, 738–39, 742 (amended 1989). Rhode Island's definition of machine gun was changed again in 1989.  Act of July 10, 1989, ch. 542, sec. 7, § 11-47-2, 1989 R.I. Pub. Laws. 1371, 1375–76 (codified at R.I. GEN. LAWS ANN. § 11-47-2 (West 2014)).

[134]  Act of Apr. 8, 1933, No. 166, sec. 1, §§ 12819-3, -4, 1933 Ohio Laws 189, 189 (amended 1972).

[135]  Act of Dec. 22, 1972, No. 511, sec. 1, § 2923.11, 1972 Ohio Laws 1866, 1963; OHIO REV. CODE ANN. § 2923.11 (LexisNexis 2014).

[136]  *Ohio: Disclaimer*, BUDSGUNSHOP.COM (July. 11, 2014), http://www.budsgunshop.com/cat alog/feeds/state_reg/ohio_restrictions.pdf.

[137]  OHIO REV. CODE ANN. § 2923.17.

[138]  *See, e.g.*, *Surefire 60-Round High-Capacity Magazine MAG5-60,* GANDER MTN., http://w ww.gandermountain.com/modperl/product/details.cgi?pdesc=SureFire-60-Round-High-Capaci ty-Magazine-MAG5-60&i=447625 (last visited Feb. 21, 2015) (allowing online customers to arrange for pick-up of a SureFire 60-Round High-Capacity Magazine at any of nine Ohio stores).

[139]  H.R. 234, 2013–2014 Leg., 130th Sess. § 2 (Ohio 2014) (enacted) (repealing relevant definition statute, and taking effect Mar. 23, 2015).

866                        Albany Law Review                  [Vol. 78.2

The only longstanding statute banning magazines is found in the District of Columbia. In 1932, Congress passed a District of Columbia law prohibiting the possession of a firearm that "shoots automatically or semiautomatically more than twelve shots without reloading."[140] In contrast, when Congress enacted the National Firearms Act of 1934 to impose stringent regulations on machine guns, it chose to impose no restrictions on magazines.[141] When the District of Columbia achieved home rule in 1975,[142] the district council did not choose to repeal the law but instead promptly enacted the bans on handguns and on self-defense with any gun in the home,[143] which were later ruled unconstitutional by the Supreme Court in *Heller*.[144] The District of Columbia interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns.[145] The District stands alone in its historical restriction of magazines.

The only widespread restriction on magazine capacity came in 1994 when Congress enacted a ban on new magazines holding more than ten rounds.[146] The law was in effect until 2004, at which point Congress allowed it to sunset.[147] The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. The final report, issued in 2004, concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury . . . ."[148] Further,

---

[140] Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

[141] National Firearms Act, Pub. L. 73-474, 48 Stat. 1236 (1934).

[142] *D.C. Home Rule*, COUNCIL D.C., http://dccouncil.us/pages/dc-home-rule (last visited Feb. 21, 2015).

[143] *See* Firearms Control Regulations Act of 1975, No. 1-142, § 201, 23 D.C. Reg. 1091, 1097 (July 23, 1976).

[144] *See supra* notes 13–14, 19–20 and accompanying text.

[145] *See* VIVIAN S. CHU, DC GUN LAWS AND PROPOSED AMENDMENTS 5–6 (2011) ("Prior to Heller, the DC Code's definition of 'machine gun' included 'any firearm, which shoots, is designed to shoot or can be readily converted to shoot . . . semiautomatically, more than 12 shots without manual reloading.' By virtue of this broad definition, any semiautomatic weapon that could shoot more than 12 shots without manual reloading, whether pistol, rifle, or shotgun, was deemed a 'machine gun,' and prohibited from being registered. It appears that under the District's old definition, registration of a pistol was largely limited to revolvers." (quoting D.C. Code § 7-2501.01(10) (LexisNexis 2008))).

[146] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110103(a)–(b), 108 Stat. 1796, 1998–99.

[147] § 110105, 108 Stat. at 2000.

[148] CHRISTOPHER S. KOPER ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994–2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

2014/2015]        The History of Firearm Magazines            867

"the ban has not yet reduced the use of [such magazines] in crime . . . ."[149]  Doctor Koper noted also that state-level firearm bans have not had an impact on crime.[150]

In the modern era, only a few states have enacted magazine restrictions, starting with New Jersey's 1990 ban on magazines over fifteen rounds.[151]   That ban applies only to detachable box magazines for semiautomatic firearms.[152]   A couple years later, Hawaii banned handgun magazines over twenty rounds, and later reduced that to ten.[153]   Maryland in 1994 banned the sale or manufacture of magazines over twenty rounds; the ban did not affect possession, loans, acquisition, or importation.[154]   The Maryland limit was reduced to ten in 2013.[155]

In 1999 California banned the sale of magazines over ten rounds but allowed grandfathered possession, and New York did the same in 2000.[156] (Currently, large capacity magazine bans in Colorado, Connecticut, and Massachusetts also have grandfather provisions, while New Jersey, the District of Columbia, and Hawaii do not.)[157] In 2013 New York removed grandfathering and reduced the limit to seven.[158]  The seven-round limit was suspended shortly thereafter, since there are no seven-round magazines available for many guns.[159]   Instead, the legislature forbade owners of ten-round magazines to load more than seven rounds.[160]  This restriction was

---

[149]  *Id.* at 2.

[150]  *Id.* at 81 n.95.

[151]  Act of May 30, 1990, ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws 217, 221, 235 (codified at N.J. STAT. ANN. § 2C:39-1(y), -3(j) (West 2014)).

[152]  § 2C:39-1(y).  There is an exemption for certain competitive target shooters.  *Id.* § 2C:39-3(j).

[153]  Act of June 29, 1992, ch. 286, sec. 3. § 134-8, 1992 Haw. Sess. Laws 740, 742 (codified at HAW. REV. STAT. ANN. § 134-8 (LexisNexis 2014)).

[154]  Act of May 26, 1994, ch. 456, § 36H-5, 1994 Md. Laws 2119, 2165 (amended 2013).

[155]  *See* Firearm Safety Act of 2013, ch. 427, § 4-305, 2013 Md. Laws 4195, 4210 (codified at MD. CODE. ANN., CRIM. LAW § 4-305 (LexisNexis 2014)).

[156]  *See* Act of July 19, 1999, ch. 129, sec. 3, § 12020(a)(2), (c)(25), 1999 Cal. Stat. 1781, 1785, 1793 (repealed 2012); Act of Aug. 8, 2000, ch. 189, sec. 11, § 265.02(8), 2000 N.Y. Laws 2788, 2793 (amended 2013).

[157]  *Large Capacity Ammunition Magazines Policy Summary*, L. CENTER TO PREVENT GUN VIOLENCE (May 31, 2013), http://smartgunlaws.org/large-capacity-ammunition-magazines-policy-summary/; *see supra* notes 158, 165 and accompanying text.

[158]  Act of Jan. 15, 2013, ch. 1, secs. 38, 46-a, §§ 265.00.23, 265.36, 2013 N.Y. Laws 1, 16, 19 (codified at N.Y. PENAL LAW § 265.36 (McKinney 2014)).

[159]  Freeman Klopott, *Cuomo's 7-Bullet Limit to Be Suspended Indefinitely, Skelos Says*, BLOOMBERG (Mar. 24, 2013), http://www.bloomberg.com/news/2013-03-25/cuomo-s-7-bullet-limit-to-be-suspended-indefinitely-skelos-says.html.

[160]  PENAL §§ 265.36–.37; OFFICE OF DIV. COUNSEL, GUIDE TO THE NEW YORK SAFE ACT FOR MEMBERS OF THE DIVISION OF STATE POLICE 7, 9 (2013), *available at* http://www.nypdcea.org/pdfs/NYSP_Safe_Act_Field_Guide.pdf.

868                          Albany Law Review                        [Vol. 78.2

declared to violate the Second Amendment in a federal district court decision.[161]   New York City outlaws rifle or shotgun magazines holding more than five rounds.[162]

Also in 2013, Colorado enacted a ban on magazines over fifteen rounds,[163] and Connecticut did the same for magazines over ten.[164] Both statutes allowed current owners to retain possession.[165]

Finally, one state has followed Ohio's former approach of magazine licensing, rather than prohibition.   In 1994, Massachusetts began requiring that possession and additional acquisitions of magazines over ten rounds be allowed only for citizens who have a "Class A" firearms license—which most Massachusetts gun owners have.[166]

## IV. WHAT DOES THE HISTORY MEAN?

Given the history above, what does modern legal doctrine say about the permissibility of outlawing magazines, as in the so-called SAFE Act's ban on possession of magazines of more than ten rounds and loading more than seven rounds in a magazine, or New York City's ban on long gun magazines of more than five rounds?  What about bans in other states of more than ten rounds (Maryland, Connecticut, the District of Columbia, California, and Hawaii for handguns only) or more than fifteen rounds (New Jersey and Colorado)?

This Part analyzes these questions in light of Second Amendment

---

[161]  N.Y. State Rifle & Pistol Ass'n v. Cuomo, 990 F. Supp. 2d 349, 372–73 (W.D.N.Y. 2013).

[162]  N.Y.C., N.Y., ADMIN. CODE § 10-306(b) (2015).

[163]  Act of Mar. 20, 2013, ch. 48, sec. 1, §§ 18-12-301(2)(a)(I), -302(1), 2013 Colo. Sess. Laws 144, 144–45 (codified at COLO. REV. STAT. § 18-12-302(1) (2014)).

[164]  Act of April 4, 2013, P.A. 13-3, § 23, 2013 Conn. Acts 47, 66 (Reg. Sess.) (codified at CONN. GEN. STAT. ANN. § 53-202w (West 2015)).

[165]  COLO. REV. STAT. § 18-12-302(2) (permitting a person to maintain possession of a banned magazine if he/she owned it prior to the effective date of the law and maintained "continuous possession" thereafter); CONN. GEN. STAT. §§ 53-202w(e)(4), 53-202x(a)(1) (permitting a person to maintain possession of a banned magazine if he/she possessed it prior to the effective date of the law and declared it to the government).

[166]  MASS. GEN. LAWS ANN. ch. 140 §§ 121, 131(a) (West 2014) (allowing possession and acquisition of magazines manufactured before Sept. 1994 by anyone with a Class A license); Matt Carroll, *Snapshot: Gun Licenses Per 1,000, 2012*, BOSTON.COM, (Jan. 24, 2013), http://www.boston.com/yourtown/specials/snapshot_snapshot_gun_licenses_20 12 (showing the prevalence of Class A licenses in Massachusetts).  A 2014 bill enacted in Massachusetts eliminated the lower category of "Class B" firearms licenses, so presumably all licensed firearms owners in Massachusetts will be able to acquire magazines of more than ten rounds, albeit only magazines manufactured before 1995.  Act of Aug. 11, 2014, ch. 284, 2014 Mass. Acts, *available at* https://malegislature.gov/Laws/SessionLaws/Acts/ 2014/Chapter284.

precedents from the *Heller* Court and from subsequent cases that have relied at least in part on history and tradition in judging Second Amendment cases.

## A. The Crucial Years: 1789–1791 and 1866–1868

For original meaning of the Second Amendment, the most important times are when the Second Amendment was created and when the Fourteenth Amendment was created, since a core purpose of the latter amendment was to make the individual's Second Amendment right enforceable against state and local government.[167]  Congress sent the Second Amendment to the states for ratification in 1789, and ratification was completed in 1791.[168] The Fourteenth Amendment was passed by Congress in 1866, and ratification by the states was completed in 1868.[169]

### 1. Magazines in 1789–1791 and 1866–1868

As of 1789 to 1791, multi-shot magazines had existed for two centuries, and a variety of models had come and gone.[170]  The state-of-the-art gun between 1789 and 1791 was the twenty- or twenty-two-shot Girandoni air rifle, powerful enough to take down an elk with a single shot.[171]

By the time that the Fourteenth Amendment was introduced in Congress, firearms with magazines of over ten or fifteen rounds had been around for decades.[172]  The best of these was the sixteen-shot Henry Rifle, introduced in 1861 with a fifteen-round magazine.[173] The Henry Rifle was commercially successful, but Winchester Model 1866, with its seventeen-round magazine, was massively successful.[174]  So by the time ratification of the Fourteenth Amendment was completed in 1868, it was solidly established that firearms with seventeen-round magazines were in common use.

---

[167]  *See, e.g.*, Ezell v. City of Chi., 651 F.3d 684, 702–03 (7th Cir. 2011).
[168]  JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 218.
[169]  *Id.* at 299.
[170]  *See supra* Part II.B.
[171]  *See supra* notes 27–31 and accompanying text.
[172]  *See supra* notes 32–35 and accompanying text..
[173]  RICHARD C. RATTENBURY, A LEGACY IN ARMS: AMERICAN FIREARM MANUFACTURE, DESIGN, AND ARTISTRY, 1800–1900, at 135 (2014); *see supra* note 49 and accompanying text.
[174]  CLIFFORD R. CADWELL, GUNS OF THE LINCOLN COUNTY WAR 50 (2009); RATTENBURY, *supra* note 173, at 136; *supra* notes 55–55 and accompanying text.

870                        Albany Law Review                        [Vol. 78.2

2.  Magazine Prohibitions in 1789–1791 and 1866–1868

From the colonial period to the dawn of American independence on July 4, 1776, and through the ratification of the Fourteenth Amendment, there were no prohibitions on magazines.  Indeed, the first magazine prohibition did not appear until the alcohol prohibition era in 1927.[175]  Thus, the historical evidence of the key periods for original meaning strongly suggests that magazine bans are unconstitutional.

### B.  "Typically Possessed by Law-Abiding Citizens for Lawful Purposes" or "Dangerous and Unusual"?

The Supreme Court's *Heller* decision distinguished two broad types of arms.  Some arms, such as handguns, are "typically possessed by law-abiding citizens for lawful purposes."[176]  These arms are also described by the Court as being "in common use."[177]  In contrast, some other arms are "dangerous and unusual."[178]  Examples provided by the Court were short-barreled shotguns or machine guns.[179]  The common, typical, arms possessed by law-abiding citizens are protected by the Second Amendment; the "dangerous and unusual" arms are not protected.[180]  By definition, "unusual" arms are not "in common use" or "typically possessed by law-abiding citizens for lawful purposes."[181]

The *Heller* Court did not expressly mandate that historical analysis be used when deciding whether an arm is typical or common or "dangerous and unusual."  The *Heller* Court approvingly quoted the 1939 Supreme Court decision *United States v. Miller*,[182] which had described the original meaning of the Second Amendment as protecting individually-owned firearms that were "in common use at the time."[183]  The *Miller* Court's 1939 decision did not extend Second Amendment protection to sawed-off

---

[175]  *See supra* notes 129–30 and accompanying text; *see also* Act of June 2, 1927, No. 372, § 3, 1927 Mich. Public Acts 887, 888–89 (repealed 1959) (regulating the possession of and carrying of certain firearms that were capable of firing sixteen shots without reloading).
[176]  *See id.* at 625, 629 (majority opinion).
[177]  *Id.* at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).
[178]  *Heller*, 554 U.S. at 627.
[179]  *See id.* at 625, 627.
[180]  *See id.* at 627.
[181]  *See id.*
[182]  *Id.* (quoting *Miller*, 307 U.S. at 179).
[183]  *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179) (internal quotation marks omitted).

2014/2015]          The History of Firearm Magazines                871

shotguns;[184] as *Heller* explained *Miller*, the *Miller* principle was that sawed-off shotguns are dangerous and unusual.[185]

To be precise, *Miller* did not formally rule that short shotguns are *not* Second Amendment arms; the Court simply reversed and remanded the district court's decision granting criminal defendant Miller's motion to quash his indictment.[186] The Supreme Court said that the suitability of sawed-off shotguns as Second Amendment arms was not a fact that was subject to "judicial notice."[187] Presumably the federal district court in Arkansas could have taken up the remanded case and then received evidence regarding what sawed-off shotguns are used for and how common they are. But Miller and his co-defendant Frank Layton had disappeared long before the case was decided by the Supreme Court.[188]

Regardless, subsequent courts, including the court in *Heller*, read *Miller* as affirmatively stating that sawed-off shotguns are not protected by the Second Amendment.[189]

Even though *Heller*'s "common" or "typical" versus "dangerous and unusual" dichotomy seems primarily concerned with contemporary uses of a given type of arm, history can still be useful. As detailed in Part II, magazines of more than ten rounds have been very commonly possessed in the United States since 1862.[190] Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth century. We have more than a century and a half of history showing such magazines to be owned by many millions of law-abiding Americans.[191]

Thus, a court which today ruled that such magazines are "dangerous and unusual" would seem to have some burden of explaining how such magazines, after a century and a half of being

---

[184] *Miller*, 307 U.S. at 178.

[185] *Heller,* 554 U.S. at 625.

[186] *Miller,* 307 U.S. at 177, 183.

[187] *Id.* at 178. "Judicial notice" is when courts rely on facts that are not in the record of the case, but which are indisputably true. FED. R. EVID. 201. For example, they may be a subject of common knowledge (e.g., that in Arkansas, the sun is never visible in the sky at midnight) or can be ascertained from indisputable sources (e.g., that a particular section of the Code of Federal Regulations contains certain language). *See id.*

[188] Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U J.L. & LIBERTY 48, 65–68 (2008). *The Peculiar Story of* United States v. Miller was cited by the Court in *Heller. Heller,* 554 U.S. at 623.

[189] *Heller,* 554 U.S. at 621–22.

[190] *See supra* Part II.

[191] *See supra* Part II.

"in common use" and "typically possessed by law-abiding citizens for lawful purposes," became "dangerous and unusual" in the twenty-first century.

This is not possible. Today, magazines of more than ten rounds are more common than ever before.[192] They comprise about forty-seven percent of magazines currently possessed by Americans today.[193] The AR-15 rifle (introduced in 1963) is the most popular rifle in American history, with sales of several million;[194] its standard magazines are twenty or thirty rounds.[195]

## C. "Longstanding" Controls Versus "Few Laws in the History of Our Nation"

Just as *Heller* distinguishes types of arms (common or typical versus dangerous and unusual), *Heller* distinguishes types of arms-control laws. One type of arms controls are "longstanding," and these are "presumptively lawful."[196] Examples listed by *Heller* are bans on gun possession "by felons and the mentally ill," bans on carrying guns "in sensitive places such as schools and government buildings," and "conditions and qualifications on the commercial sale of arms."[197]

The *Heller* Court highlighted the unusual nature of the District of Columbia anti-gun laws:

> Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down. In *Nunn v. State*, the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). In *Andrews v. State*, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated

---

[192] *See* Fyock v. City of Sunnyvale, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722, at *13 (N.D. Cal. Mar. 5, 2014) (agreeing with and incorporating affidavit from plaintiffs' expert that "whatever the actual number of such magazines in United States consumers' hands is, it is in the tens-of-millions, even under the most conservative estimates.").

[193] *Id.* ("Plaintiffs cite statistics showing that magazines having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned.").

[194] PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 14 (2005); *see* Meghan Lisson, *Run on Guns: AR-15s Sales Soar*, CNBC (Apr. 25, 2013), http://www.cnbc.com/id/1006 73826.

[195] SWEENEY, *supra* note 194, at 99.

[196] District of Columbia v. Heller, 554 U.S. 570, 626, 627 n.26 (2008).

[197] *Id.* at 626–27.

the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns.[198]

What was the history that led the Court to declare the handgun prohibition to be "unusual"—that is, to be the opposite of a traditional gun control that was presumptively constitutional? The District of Columbia handgun ban was enacted in 1975 and took effect in 1976.[199] Chicago enacted a similar ban in 1982, and a half-dozen Chicago suburbs followed suit during the 1980s.[200] In 1837, the Georgia legislature had enacted a handgun ban, but that was ruled unconstitutional on Second Amendment grounds by the unanimous Georgia Supreme Court in 1846.[201] In 1982 and 2005, San Francisco enacted handgun bans, but they were both ruled unlawful because of their plain violation of the California state preemption statute, which forbids localities to outlaw firearms which are permitted under state law.[202]

These are the facts under which the Supreme Court declared handgun bans to be suspiciously rare in America's history—at the other end of the spectrum from the presumptively constitutional "longstanding" controls.

The 1975 District of Columbia handgun ban was thirty-three years old when the Supreme Court decided *Heller* in 2008. This suggests that thirty-three years is not sufficient for a gun control to be considered "longstanding."

As detailed in Part III, the first of today's magazine bans was enacted by New Jersey in 1990, at fifteen rounds.[203] The first state-level ten-round ban did not take effect until California passed such

---

[198] *Id.* at 629 (citations omitted) (citing Nunn v. State, 1 Ga. 243, 251 (1846); Andrews v. State, 50 Tenn. 165, 187 (1871)); *see also Heller*, 554 U.S. at 629 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional . . . ." (quoting State v. Reid, 1 Ala. 612, 616–17 (1840)) (internal quotation marks omitted)).

[199] Edward D. Jones, III, *The District of Columbia's "Firearms Control Regulations Act of 1975": The Toughest Handgun Control Law in the United States—Or Is It?*, 455 ANNALS AM. ACAD. POL. & SOC. SCI. 138, 139 (1981).

[200] *See* McDonald v. City of Chi., 561 U.S. 742, 749 (2010); Steve Chapman, *Chicago's Pointless Handgun Ban: City Gun Ordinances Proved to Be a Failure*, CHI. TRIB., Mar. 4, 2010, at C21.

[201] *Nunn*, 1 Ga. at 246, 251. The *Heller* Court cited this case with approval. *Heller*, 554 U.S. at 612.

[202] Fiscal v. City & Cnty. of S.F., 70 Cal. Rptr. 3d 324, 326, 341–42 (Ct. App. 2008); Doe v. City & Cnty. of S.F., 186 Cal Rptr. 380, 381 (Ct. App. 1982).

[203] *See supra* note 151–52 and accompanying text.

874                          Albany Law Review                    [Vol. 78.2

a law in 2000.[204]  These statutes, and other post-1990 magazine bans, would not qualify as "longstanding."

Previously, three states and the District of Columbia had enacted some magazine restrictions during the alcohol prohibition era.[205] The District of Columbia ban, with modifications, is still in effect.[206] The Michigan and Rhode Island bans were repealed long ago.[207] The Ohio special licensing statute allowed the free purchase of any magazine, but required a permit to insert a magazine of thirty-two rounds or more into a firearm; the permit requirement was repealed in 2014.[208]  It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms.

Several post-*Heller* lower courts have conducted in-depth examinations of the history of particular gun control laws.  The next Part examines each of those cases and then applies their methodology to the historical facts of bans on magazines of more than five, seven, ten, and fifteen rounds.

### D. Lower-Court Decisions Applying History

#### 1. *Ezell v. City of Chicago*

After *McDonald v. City of Chicago* made it clear that the Second Amendment applies to municipal governments, the Chicago City Council relegalized handgun possession and outlawed all target ranges within city limits.[209]  Assessing the constitutionality of the ban, the Seventh Circuit used a two-step test, similar to analysis that is sometimes used in First Amendment cases: (1) Is the activity or item within the scope of the Second Amendment, as historically understood?  If the answer is "no," then the restrictive law does not violate the Second Amendment.[210]  (2) If the answer to the first question is "yes," then the court will apply some form of the heightened scrutiny.  The intensity of the scrutiny will depend on how close the restriction comes to affecting the core right of armed self-defense.[211]

---

[204] *See supra* note 156 and accompanying text.
[205] *See supra* notes 129–30, 134, 140 and accompanying text.
[206] *See supra* notes 140–45 and accompanying text.
[207] *See supra* notes 131, 133 and accompanying text.
[208] *See supra* notes 135–39 and accompanying text.
[209] Ezell v. City of Chi., 651 F.3d 684, 690–91 (7th Cir. 2011).
[210] *Id.* at 702–03.
[211] *Id.* at 703.

So the *Ezell* court began the step-one analysis by considering whether target practice was historically considered part of the Second Amendment right.[212]  Chicago had argued to the contrary, listing some eighteenth- and nineteenth-century state statutes and municipal ordinances restricting firearms discharge within city limits.[213]  The Seventh Circuit found almost all of the listed ordinances to be irrelevant.[214]  Many of them did not ban firearms discharge but simply required a permit.[215]  Others were plainly concerned with fire prevention, an issue that would not be a problem at a properly-designed modern range.[216]  Thus:

> Only two—a Baltimore statute from 1826 and an Ohio statute from 1831—flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression, in contrast to the other regulatory laws we have mentioned. This falls far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States.[217]

So according to the Seventh Circuit, the historical example of repressive laws in one state and one city are insufficient to support the inference that the repressed activity is outside the scope of the Second Amendment.[218]  The historical basis of restrictions that would affect magazines over fifteen rounds is nearly as thin: two states with statutes enacted in 1927, and later repealed, plus the District of Columbia's 1932 law.[219]  As for imposing a ban for guns with magazines of more than ten rounds (or seven or five), there is *no* historical basis.

Thus, under the *Ezell* analysis, bans on magazines infringe the Second Amendment right as it was historically understood, and such bans must be analyzed under heightened scrutiny.

## 2.  *United States v. Rene E.*

In 2009, the First Circuit heard a Second Amendment challenge

---

[212] *Id.* at 704.
[213] *Id.* at 705–06.
[214] *Id.*
[215] *Id.* at 705.
[216] *Id.* at 706.
[217] *Id.* (quoting District of Columbia v. Heller, 554 U.S. 570, 632 (2008)); *see also Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence . . . .").
[218] *See Ezell*, 652 F.3d at 706.
[219] *See supra* notes 131, 133, 140 and accompanying text.

to a federal statute that restricted, but did not ban, handgun possession by juveniles.[220]  The federal statute was enacted in 1994,[221] and so of course was not "longstanding."[222]  The First Circuit looked at the history of state laws restricting juvenile handgun possession, to see if they were longstanding.[223]

The First Circuit found state or local restrictions on handgun transfers to juveniles and judicial decisions upholding such restrictions from Georgia (1911 case), Tennessee (1878 case),[224] Pennsylvania (1881 case),[225] Indiana (1884 case),[226] Kentucky (1888 case),[227] Alabama (1858 case),[228] Illinois (1917 case upholding a Chicago ordinance),[229] Kansas (1883 case allowing tort liability for transfer), and Minnesota (1918 case allowing tort liability for transfer).[230]

Thus, the First Circuit was able to point to six state statutes, all of them enacted well over a century previously.[231]  They were buttressed by one municipal ordinance and two cases allowing tort liability, both of these being nearly a century old.[232]

The history of magazine restrictions is considerably weaker than that of the juvenile handgun statutes analyzed in *Rene E.*  There were six statutes on juveniles, all of which were enacted before 1890, and one of which predated the Civil War.[233]  This is much more than the pair of state statutes on magazines dating from the late 1920s.

The *Rene E.* case does not attempt to quantify how many state statutes are necessary for a gun control to be longstanding; however, we can say that magazine restrictions fall well short of the historical foundation that the First Circuit relied on to uphold juvenile handgun restrictions.

While *Rene E.* and *Ezell* both used history, the particular way that they used it was different.  For *Rene E.*, history was mixed in

---

[220] 18 U.S.C. § 922(x)(2)–(3) (2013); United States v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009).
[221] *Rene E.*, 583 F.3d at 12.
[222] *Id.*
[223] *Id.* at 14–15.
[224] State v. Callicutt, 69 Tenn. 714, 716–17 (1878).
[225] McMillan v. Steele, 119 A. 721, 722 (Pa. 1923).
[226] State v. Allen, 94 Ind. 441, 441 (1884).
[227] Tankersly v. Commonwealth, 9 S.W. 702, 703 (Ky. 1888).
[228] Coleman v. State, 32 Ala. 581, 582–83 (1858).
[229] Biffer v. Chicago, 116 N.E. 182, 184 (Ill. 1917).
[230] Schmidt v. Capital Candy Co., 166 N.W. 502, 503–04 (Minn. 1918).
[231] United States v. Rene E., 583 F.3d 8, 14–15 (1st Cir. 2009).
[232] *Id.*
[233] *Id.*

with substantive analysis of the modern federal statute, which the First Circuit praised for its "narrow scope" and "important exceptions."[234]

For *Ezell*, history was just the first step. *Ezell* used history to determine that the range ban was not presumptively lawful; once that question was answered, *Ezell* proceeded to analyze the ban under heightened scrutiny.[235]

### 3. *Heller II*

#### a. *Majority Opinion*

In the 2008 case *District of Columbia v. Heller*, the Supreme Court ruled that two District of Columbia ordinances violated the Second Amendment: the handgun ban and the ban on the requirement that any firearm in the home be kept locked or disassembled and thus unusable for self-defense.[236]  Further, the District of Columbia required a permit to carry a gun anywhere (even from room to room in one's home)[237] and permits were never granted; the Court ordered that plaintiff Dick Heller be granted a permit.[238]

The Council of the District of Columbia responded by repealing all three of the unconstitutional ordinances and enacting the most severe gun control system in the United States.[239]  Dick Heller and several other plaintiffs challenged the new ordinances in the case known as *Heller II*.[240]

Using the two-step test, the District of Columbia Circuit majority first examined whether any of the challenged provisions were "longstanding."[241]  If so, then the provision would be held as not violating the Second Amendment right, with no further analysis needed.[242]

Regarding handgun registration, the majority identified statutes from New York (1911), Illinois (1881), Georgia (1910), Oregon

---

[234] *Id.* at 11–16 ("[T]his law, with its narrow scope and its exceptions, does not offend the Second Amendment.").  Exceptions include farm and ranch work as well as target shooting or other activities under parental supervision.  18 U.S.C. § 922(x)(3)(A)(i)–(ii) (2013).

[235] Ezell v. City of Chi., 651 F.3d 684, 706 (7th Cir. 2011).

[236] District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

[237] *Id.* at 574–75.

[238] *Id.* at 635.

[239] *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1248–49 (D.C. Cir. 2011).

[240] *Id.* at 1247.

[241] *Id.* at 1252–53.

[242] *See id.* at 1252.

(1917), and Michigan (1927).[243]  In addition, some jurisdictions required handgun buyers to provide information about themselves to retailers, but did not require that the retailer deliver the information to the government: California (1917), Territory of Hawaii (1927), and the District of Columbia (1932).[244]  So "[i]n sum, the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the nation by population."[245]

The requirement that the government be provided with some basic information about persons acquiring handguns, in a manner that was "self-evidently de minimis" was therefore constitutional.[246]  Seven states, with laws originating between 1881 and 1927, were apparently sufficiently numerous and "diverse" to qualify as "longstanding."

However, although de minimis registration of handguns was longstanding, many of the new District of Columbia requirements went beyond traditional de minimis systems.[247]  Further, "[t]hese early registration requirements, however, applied with only a few exceptions solely to handguns—that is, pistols and revolvers—and not to long guns.  Consequently, we hold the basic registration requirements are constitutional only as applied to handguns.  With respect to long guns they are novel, not historic."[248]  So the case was remanded to the district court for further fact-finding, since the District of Columbia government had provided the court with almost no information about whether the novel requirements passed heightened scrutiny by being narrowly tailored.[249]

The case had come to the District of Columbia Circuit following cross motions for summary judgment.[250]  While the circuit court decided that the novel registration requirements needed a more complete factual record, the panel also decided that the record contained enough information for a ruling on the merits of the District's ban on various semiautomatic rifles, which the district council labeled "assault weapons," and on the District's ban on

---

[243] *Id.* at 1253–54.
[244] *See id.* at 1254.
[245] *Id.*  The court listed seven states that today have handgun registration laws.  *Id.* at n.*.
[246] *Id.* at 1254–55.
[247] *Id.* at 1255.
[248] *Id.*
[249] *See id.* at 1247.
[250] *See id.*

magazines holding more than ten rounds.[251]

The District of Columbia Circuit majority stated "[w]e are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity."[252] In a footnote, the majority cited the 1927 Michigan magazine statute and the 1932 District of Columbia ordinance detailed in Part III of this article.[253] There is no reason to think that the majority's determination on this point would change if the 1927 Rhode Island statute had also been cited.

Importantly, the majority did not suggest that the magazine bans enacted in 1990 or thereafter had any relevance to whether magazine bans are "longstanding."

Accordingly, the majority proceeded to analyze the rifle and magazine bans. The majority provided two paragraphs of explanation of why the rifle ban passed intermediate scrutiny and one paragraph on why the magazine ban did so.[254]

Discussion of whether intermediate scrutiny was the correct standard, or whether magazine bans pass intermediate scrutiny, is beyond the scope of this article. However, it does seem to appear that the District of Columbia Circuit would have acted more prudently by remanding the case for fact-finding in the district court. To support the ban, the panel majority could only point to legislative testimony by a gun-prohibition lobbyist and by the District of Columbia police chief, plus a Department of Justice report on the 1994 to 2004 federal ban on such magazines.[255] Notably, the panel majority did not address the report's finding that a ten-year nationwide ban had led to no discernible reduction in homicides, injuries, or the number of shots fired in crimes.[256]

### b. Dissent

A forceful dissent by Judge Brett Kavanaugh critiqued the majority's application of intermediate scrutiny.[257] He argued that

---

[251] *Id.* at 1246, 1260, 1264.
[252] *Id.* at 1260.
[253] *Id.* at 1260 n.*.
[254] *Id.* at 1262–64.
[255] *Id.* at 1263–64.
[256] KOPER EL AL., *supra* note 148, at 92.
[257] *Heller II*, 670 F.3d at 1285 (Kavanaugh, J., dissenting) ("A ban on a class of arms is not an 'incidental' regulation. It is equivalent to a ban on a category of speech. Such restrictions on core enumerated constitutional protections are *not* subjected to mere intermediate scrutiny review. The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny can apply to an outright ban on possession of a class of weapons that have not

880                         Albany Law Review                    [Vol. 78.2

the majority's approach was necessarily incorrect, because its logic on banning semiautomatic rifles would allow a ban on all semiautomatic handguns—which constitute the vast majority of handguns produced today.[258]

More fundamentally, he argued that *Heller* does not tell courts to use tiered scrutiny to assess gun control laws.[259]  Rather, *Heller* looks to history and tradition.[260]  So gun controls that are well-grounded in history and tradition are constitutional; gun control laws which are not so grounded are unconstitutional.[261]

Using the standard of history and tradition, Judge Kavanaugh argued that the entire District of Columbia registration scheme was unconstitutional.[262]  Regarding de minimis handgun registration, the statutes cited by the majority were mostly record-keeping requirements for gun dealers, not centralized information collection by the government.[263]  The novel and much more onerous requirements of the District of Columbia registration system for all guns had no basis in history and tradition.[264]  For all firearms, any registration system beyond dealer record-keeping requirements was unconstitutional.[265]

Judge Kavanaugh examined the history of semiautomatic rifles and found them to be in common use for over a century and thus protected by the Second Amendment from prohibition.[266]  He did not have similar information on magazines and thus urged that the magazine issue be remanded for fact-finding.[267]  In light of the evidence on magazines that has been presented subsequent to the 2011 *Heller II* decision, Judge Kavanaugh's methodology

---

traditionally been banned.").

[258] *Id.* at 1285–86.

[259] *See id.* at 1282.

[260] *Id.* ("*Heller* was resolved in favor of categoricalism—with the categories defined by text, history, and tradition—and against balancing tests such as strict or intermediate scrutiny or reasonableness.").

[261] *See id.*

[262] *Id.* at 1286.

[263] *See id.* at 1292–93.

[264] *Id.* at 1294.

[265] *See id.*

[266] *See id.* at 1287 (citing JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 11).

[267] *Heller II*, 670 F.3d at 1296 n.20 (Kavanaugh, J., dissenting) ("The D.C. ban on magazines of more than 10 rounds requires analysis in the first instance by the District Court.  In order to apply *Heller*'s test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use.  The parties here did not brief that question in much detail.  Evidence presented to the District Court on the history and prevalence of magazines of more than 10 rounds would be helpful to the proper disposition of that issue under the *Heller* test.  Therefore, I would remand to the District Court for analysis of that issue.").

straightforwardly leads to the conclusion that the District of Columbia magazine ban is unconstitutional.[268]    The *Heller II* majority rightly recognized that magazine bans are not "longstanding,"[269] and this article has demonstrated that magazines of more than ten rounds have been a common part of the American tradition of firearms ownership since before the ratification of the Fourteenth Amendment in 1868.

### 4.  *Silvester v. Harris*

Another decision carefully employing historical analysis is *Silvester v. Harris*,[270] from the United States District Court for the Eastern District of California.

A California statute requires that firearms purchasers wait ten days before they can take their gun home from the store.[271]    In California, background checks on firearms buyers are sometimes completed within minutes and sometimes can take a week or longer.[272]    Senior District Judge Anthony Ishii (appointed to the federal court in 1997 by President Clinton)[273] ruled the waiting period unconstitutional, to the extent that the waiting period lasted longer than the time required to complete the background check on a given buyer.[274]

Like the Seventh Circuit in *Ezell*, Judge Ishii looked to 1791 and 1868 as the crucial periods.[275]

California Attorney General Kamala Harris had directed the court to a book arguing that between 1790 and 1840 many Americans might have to travel for several days in order to buy a gun, so there was a de facto waiting period between the time a person decided to buy a gun and when a person could take possession of the gun.[276]    Judge Ishii held this irrelevant; the court's job was to consider the legality of government regulations that

---

[268]  *See* Lindsay Colvin, Note, *History, Heller, and High-Capacity Magazines: What Is the Proper Standard of Review for Second Amendment Challenges?*, 41 FORDHAM URB. L.J. 1041, 1075–80 (2014).

[269]  *Heller II*, 670 F.3d at 1260.

[270]  Silvester v. Harris, No. 1:11–CV–2137 AWI SAB, 2014 U.S. Dist. LEXIS 118284 (E.D. Cal. Aug. 25, 2014).

[271]  CAL. PENAL CODE §§ 26815(a), 27540(a) (West 2014).

[272]  *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *82.

[273]  *Chief District Court Judge Anthony W. Ishii*, U.S. DIST. COURT: E. DIST. OF CAL., http://www.caed.uscourts.gov/caed/staticOther/page_630.htm (last visited Feb. 21, 2015).

[274]  *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *101–02.

[275]  *Compare id.* at *30, *with* Ezell v. City of Chi., 651 F.3d 684, 702–03 (7th Cir. 2011).

[276]  *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *8–9.

might impede the exercise of a constitutional right and the book provided no evidence that government-imposed waiting periods for firearm purchases existed between 1790 and 1840.[277]

Another book explained that the first waiting period law was proposed in 1923—a one-day waiting period for handguns.[278] The law was adopted in California and eventually by eight other states.[279] This too was irrelevant, ruled the court, because it had nothing to do with 1791 or 1868.[280]

The court explained that "[i]t is Defendant's burden to show that the 10–day waiting period either falls outside the scope of Second Amendment protections as historically understood or fits within one of several categories of longstanding regulations that are presumptively lawful."[281]

The complete absence of evidence of waiting periods in 1791 and 1868 eliminated the first possibility.[282] What about the question of whether waiting periods were "longstanding regulations that are presumptively lawful"? The answer to this question is not confined to 1791 and 1868.

The court explained that "the concept of a 'longstanding and presumptively lawful regulation' is that the regulation has long been accepted and is rooted in history."[283] California's 1923 statute did not come close. Besides that, the California wait was only one day and only for retail handguns.[284] Not until 1975 was the number of days extended to double digits and not until 1991 to long guns.[285] Consistent with the unusual nature of waiting periods, only ten states and the District of Columbia today have a waiting period for at least some firearms.[286]

Thus, the court concluded that the plaintiffs' challenge had passed step one of the two-step test,[287] and the court proceeded to apply heightened scrutiny.[288] The court stated that it did not have to decide whether to use strict or intermediate scrutiny.[289] The

---

[277] See id. at *9–10, *78.
[278] Id. at *11.
[279] Id.
[280] Id. at *11–12.
[281] Id. at *75.
[282] Id. at *75–76.
[283] Id. at *78 (citations omitted).
[284] Id. at *79.
[285] Id.
[286] Id. at *30.
[287] Id. at *75–76.
[288] Id. at *80.
[289] Id.

2014/2015]        The History of Firearm Magazines              883

waiting period statute failed intermediate scrutiny, as applied to persons who already possessed a firearm (based on state registration data), and who passed the background check when purchasing an additional firearm.[290]    Therefore, *a fortiori*, the statute would fail strict scrutiny.    The court gave the state legislature 180 days to revise the statute so as to eliminate the post-background-check waiting period for persons who already have a gun.[291]    The plaintiffs had not challenged the waiting period as applied to first-time gun buyers, nor as to persons who had not yet passed the background check.[292]

## V. Conclusion

Rifle magazines holding more than ten or fifteen rounds have been common in the United States since the mid-nineteenth century.[293]    Handgun magazines over ten rounds have been common since 1935, and handgun magazines over fifteen have been common since the mid-1960s.[294]

Magazine prohibition has historically been rare.    There is *no* historical basis for a magazine limit of ten rounds or lower.    As for prohibitions with higher limits, there are only two examples, both of them from 1927, the outer edge of what courts have considered to be examples of state statutes that may be considered "longstanding": Michigan (enacted 1927, repealed 1959), Rhode Island (enacted 1927, loosened 1959, repealed 1975).[295]    Ohio formerly required a special permit to actually insert a magazine above a certain size into a firearm but never banned sales.[296]    (The original limit was eighteen rounds or more and later was thirty-two rounds or more.)[297]    As is often the case, the District of Columbia is the *sui generis* outlier, with its 1932 restriction still in effect today, with some modifications.[298]

Of all the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being

---

[290] *Id.* at *90–91, 96–97.
[291] *Id.* at *101–03.
[292] *See id.* at *23–25.
[293] *See supra* notes 43–64 and accompanying text.
[294] *See supra* notes 102–06 and accompanying text.
[295] *See supra* notes 130, 132–33 and accompanying text.
[296] *See supra* notes 136–39 and accompanying text.
[297] *See supra* notes 134–35 and accompanying text.
[298] *See supra* notes 140–45 and accompanying text.

884                          Albany Law Review                    [Vol. 78.2

"longstanding" or part of American history and tradition.   To the
contrary, ammunition capacity limits are far outside the norm of the
traditional exercise and regulation of Second Amendment rights.
Not until California in 1999 did any state set a magazine limit as
low as ten.[299]

What does this mean for modern legal analysis?   Under judicial
methods which hew closely to history and tradition, the historical
absence (of limits of ten or less) or the extreme rarity (limits of
fifteen or less) would be sufficient for any such modern limit to be
ruled unconstitutional.   Owning such magazines is very long-
established manner in which the right to arms has historically been
exercised in America.

Other courts perform a two-step test.   Challengers to magazine
limit laws should always pass step one, since magazine limits are
not "longstanding."

As for step two—review under some form of heightened
scrutiny—the Supreme Court taught in *Heller* that when the
"severe restriction" of a "ban" has support from "[f]ew laws in the
history of our Nation," the law's constitutionality is very doubtful.
This was true for the prohibition of handguns, and it is also true for
the prohibition of magazines holding more than five, seven, ten, or
fifteen rounds.

---

[299] *See supra* note 156 and accompanying text.

# EXHIBIT 101

An official website of the United States government. Here's how you know

Home • Crime in the U.S. • 2019 • Crime in the U.S. 2019 • Tables • Table 1



U.S. DEPARTMENT OF JUSTICE • FEDERAL BUREAU OF INVESTIGATION • CRIMINAL JUSTICE INFORMATION SERVICES DIVISION

2019 CRIME in the UNITED STATES

Criminal Justice Information Services Division    Feedback | Contact Us | Data Quality Guidelines | UCR Home

Home    Offenses Known to Law Enforcement    Violent Crime    Property Crime    Clearances    Persons Arrested    Police Employee Data

Table 1

**Crime in the United States**
by Volume and Rate per 100,000 Inhabitants, 2000–2019

Overview    Data Declaration    Download Excel (Table 1)    Download Excel (Table 1A)

## Table 1

| Year | Population[1] | Violent crime[2] | Violent crime rate | Murder and nonnegligent manslaughter | Murder and nonnegligent manslaughter rate | Rape (revised definition)[3] | Rape (revised definition) rate[3] | Rape (legacy definition)[4] | Rape (legacy definition) rate[4] | Robbery | Robbery rate | Aggravated assault[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 281,421,906 | 1,425,486 | 506.5 | 15,586 | 5.5 | | | 90,178 | 32.0 | 408,016 | 145.0 | 911,7 |
| 2001[5] | 285,317,559 | 1,439,480 | 504.5 | 16,037 | 5.6 | | | 90,863 | 31.8 | 423,557 | 148.5 | 909,0 |
| 2002 | 287,973,924 | 1,423,677 | 494.4 | 16,229 | 5.6 | | | 95,235 | 33.1 | 420,806 | 146.1 | 891,4 |
| 2003 | 290,788,976 | 1,383,676 | 475.8 | 16,528 | 5.7 | | | 93,883 | 32.3 | 414,235 | 142.5 | 859,0 |
| 2004 | 293,656,842 | 1,360,088 | 463.2 | 16,148 | 5.5 | | | 95,089 | 32.4 | 401,470 | 136.7 | 847,3 |
| 2005 | 296,507,061 | 1,390,745 | 469.0 | 16,740 | 5.6 | | | 94,347 | 31.8 | 417,438 | 140.8 | 862,2 |
| 2006 | 299,398,484 | 1,435,123 | 479.3 | 17,309 | 5.8 | | | 94,472 | 31.6 | 449,246 | 150.0 | 874,0 |
| 2007 | 301,621,157 | 1,422,970 | 471.8 | 17,128 | 5.7 | | | 92,160 | 30.6 | 447,324 | 148.3 | 866,358 |
| 2008 | 304,059,724 | 1,394,461 | 458.6 | 16,465 | 5.4 | | | 90,750 | 29.8 | 443,563 | 145.9 | 843,683 |
| 2009 | 307,006,550 | 1,325,896 | 431.9 | 15,399 | 5.0 | | | 89,241 | 29.1 | 408,742 | 133.1 | 812,514 |
| 2010 | 309,330,219 | 1,251,248 | 404.5 | 14,722 | 4.8 | | | 85,593 | 27.7 | 369,089 | 119.3 | 781,844 |
| 2011 | 311,587,816 | 1,206,005 | 387.1 | 14,661 | 4.7 | | | 84,175 | 27.0 | 354,746 | 113.9 | 752,423 |
| 2012 | 313,873,685 | 1,217,057 | 387.8 | 14,856 | 4.7 | | | 85,141 | 27.1 | 355,051 | 113.1 | 762,009 |
| 2013 | 316,497,531 | 1,168,298 | 369.1 | 14,319 | 4.5 | 113,695 | 35.9 | 82,109 | 25.9 | 345,093 | 109.0 | 726,777 |
| 2014 | 318,907,401 | 1,153,022 | 361.6 | 14,164 | 4.4 | 118,027 | 37.0 | 84,864 | 26.6 | 322,905 | 101.3 | 731,089 |
| 2015 | 320,896,618 | 1,199,310 | 373.7 | 15,883 | 4.9 | 126,134 | 39.3 | 91,261 | 28.4 | 328,109 | 102.2 | 764,057 |
| 2016 | 323,405,935 | 1,250,162 | 386.6 | 17,413 | 5.4 | 132,414 | 40.9 | 96,970 | 30.0 | 332,797 | 102.9 | 802,982 |
| 2017 | 325,147,121 | 1,247,917 | 383.8 | 17,294 | 5.3 | 135,666 | 41.7 | 99,708 | 30.7 | 320,596 | 98.6 | 810,982 |
| 2018[6] | 326,687,501 | 1,209,997 | 370.4 | 16,374 | 5.0 | 143,765 | 44.0 | 101,363 | 31.0 | 281,278 | 86.1 | 810,982 |
| 2019 | 328,239,523 | 1,203,808 | 366.7 | 16,425 | 5.0 | 139,815 | 42.6 | 98,213 | 29.9 | 267,988 | 81.6 | 821,182 |

- [1] Populations are U.S. Census Bureau provisional estimates as of July 1 for each year except 2000 and 2010, which are decennial census counts.
- [2] The violent crime figures include the offenses of murder, rape (legacy definition), robbery, and aggravated assault.
- [3] The figures shown in this column for the offense of rape were estimated using the revised UCR definition of rape. See data declaration for further explanation.
- [4] The figures shown in this column for the offense of rape were estimated using the legacy UCR definition of rape. See data declaration for further explanation.
- [5] The murder and nonnegligent homicides that occurred as a result of the events of September 11, 2001, are not included in this table.
- [6] The crime figures have been adjusted.
- NOTE: Although arson data are included in the trend and clearance tables, sufficient data are not available to estimate totals for this offense. Therefore, no arson data are published in this table.

## Table 1A

| Years | Violent crime[1] | Violent crime rate | Murder and nonnegligent manslaughter | Murder and nonnegligent manslaughter rate | Rape (revised definition)[2] | Rape (revised definition) rate[2] | Rape (legacy definition)[3] | Rape (legacy definition) rate[3] | Robbery | Robbery rate | Aggravated assault | Aggravated assault rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019/2018 | -0.5 | -1.0 | +0.3 | -0.2 | -3.1 | -3.2 | -3.6 | -4.7 | -5.2 | +1.3 | +0 | |
| 2019/2015 | +0.4 | -1.9 | +3.4 | +1.1 | +10.8 | +8.4 | +7.6 | +5.2 | -18.3 | -20.2 | +7.5 | +6 |
| 2019/2010 | -3.8 | -9.3 | +11.6 | +5.1 | | | +14.7 | +8.1 | -27.4 | -31.6 | +5.0 | -1 |

- [1] The violent crime figures include the offenses of murder, rape (legacy definition), robbery, and aggravated assault.
- [2] The figures shown in this column for the offense of rape were estimated using the revised UCR definition of rape. See data declaration for further explanation.
- [3] The figures shown in this column for the offense of rape were estimated using the legacy UCR definition of rape. See data declaration for further explanation.

### Data Declaration

Provides the methodology used in constructing this table and other pertinent information about this table.

### Overview

Download Printable Document

**Table 1—Crime in the United States, by Volume and Rate per 100,000 Inhabitants, 2000–2019**

**Table 1A—Crime in the United States, Percent Change in Volume and Rate per 100,000 Inhabitants for 2 years, 5 years, and 10 years**

- In 2019, the estimated number of violent crime offenses was 1,203,808, a decrease of 0.5 percent from the 2018 estimate.
- The violent crime of murder and nonnegligent manslaughter increased 0.3 percent in 2019 when compared with the 2018 estimate. Rape offenses (legacy definition) decreased 3.1 percent, and aggravated assault offenses increased 1.3 percent. The violent crime of robbery decreased by 4.7 percent when compared with the 2018 estimate.
- The 2019 violent crime rate was 366.7 per 100,000 inhabitants, down 1.0 percent when compared with the 2018 violent crime rate.
- The murder rate was 5.0 per 100,000 inhabitants in 2019, remaining steady when compared with the estimated rate for the previous year.
- The estimated number of property crimes in 2019 was 6,925,677, a 4.1 percent decrease from the 2018 estimate.
- Of the property crimes, the estimated number of burglary offenses decreased 9.5 percent, and larceny-theft offenses declined 2.8 percent. The estimated number of motor vehicle thefts decreased 4.0 percent.

- The 2019 property crime rate was 2,109.9 per 100,000, a 4.5 percent decrease when compared with the 2018 rate.

| Most Wanted | News | What We Investigate | Services | Additional Resources |
|---|---|---|---|---|
| Ten Most Wanted | Stories | Terrorism | CJIS | Accessibility |
| Fugitives | Videos | Counterintelligence | CIRG | eRulemaking |
| Terrorism | Press Release | Cyber Crime | Laboratory Services | Freedom of Information / Privacy Act |
| Kidnappings / Missing Persons | Speeches | Public Corruption | Training Academy | Legal Notices |
| Seeking Information | Testimony | Civil Rights | Operational Technology | Legal Policies & Disclaimers |
| Bank Robbers | Podcasts and Radio | Organized Crime | Information Management | Privacy Policy |
| ECAP | Photos | White-Collar Crime | | USA.gov |
| ViCAP | Español | Violent Crime | **FBI Jobs** | White House |
| | Apps | WMD | Submit a Tip | No FEAR Act |
| **About** | | | Crime Statistics | Equal Opportunity |
| Mission & Priorities | **Resources** | **Contact Us** | History | |
| Leadership & Structure | Law Enforcement | Field Offices | FOIPA | |
| Partnerships | Businesses | FBI Headquarters | Scams & Safety | |
| Community Outreach | Victim Assistance | Overseas Offices | FBI Kids | |
| FAQs | Reports & Publications | | FBI Tour | |





**FBI.gov Contact Center**
Email updates

JA6847

# EXHIBIT 102

# American Homicide Supplemental Volume (AHSV)

# Weapons (W)

Randolph Roth

October, 2009

A supplement to Randolph Roth, *American Homicide*
(The Belknap Press of Harvard University Press, 2009)

**Copyright Randolph Roth, 2009**

**Not for citation or quotation without permission of the author.**

Please note that this appendix is a working draft of material I plan to revise and publish in the future. That is why it is not under the Creative Commons copyright. The author reserves all rights to the material in this section of the AHSV.

**Table of Contents**

**The World**

Figure 1: National Homicide Rates versus Gun Ownership Rates, 1989-2002, by Region

**The United States since World War I**

Figure 2: Gun Use in Homicides by Region, 1919-1933 (victims ages 15 and older)

Figure 3: Gun Use in Suicides by Region, 1919-1933 (victims ages 15 and older)

Figure 4: Gun Use in Homicides by Region and Race, 1919-1933 (victims ages 15 and older)

Figure 5: Gun Use in Homicides versus Homicide Rate in the United States, 1919-1933 (victims ages 15 and older). Hawaii, Puerto Rico, and the Virgin Islands are included.

Figure 6: Gun Use in Homicides versus Homicide Rate in the United States, 1929-1933 (victims ages 15 and older). Hawaii, Puerto Rico, and the Virgin Islands are not included.

Figure 7:  Percent Gun Use in Homicides versus Percent Gun Use in Suicides in the United States, 1929-1933

Figure 8: Gun Use in Homicides in the United States by Region, 1919-1933 and 1976-2003

Figure 9: Gun Use and Homicide Type in the United States, 1976-2003

Figure 10: Household Ownership of Firearms by Region in the United States, 2001

Figure 11: Homicide Rate with Firearms versus Percentage of Households with Firearms, 1999-2005

Figure 12: Homicide Rate without Firearms versus Percentage of Households with Firearms, 1999-2005

Figure 13: Suicide Rate with Firearms versus Percentage of Households with Firearms, 1999-2005

Figure 14: Suicide Rate without Firearms versus Percentage of Households with Firearms, 1999-2005

**England**

Figure 15:  Weapons Use in Homicides in Middlesex County, England, 1549-1632

Figure 16:  Weapons Use in Homicides in Essex and Surrey Counties, England, 1559-1625

Figure 17:  Weapons Use in Homicides among Unrelated Men in England, 1549-1632

**The United States, 1770-1900**

Figure 18: Proportion of Handguns among Guns Used in Homicides

**The North**

New England, 1630-1797

    Figure 19: Gun Use in Homicides versus Homicide Rates among Unrelated European American Adults

    Figure 20: Weapons Use in Homicides among European American Adults in New England

    Figure 21: Gun Use and Homicide Type in Homicides among European American Adults in New England

    Figure 22: Weapons Use in Homicides of African Americans and Native Americans by European American Adults in New England

    Figure 23:  Gun Use and Homicide Type in Homicides among Native American Adults in New England, 1676-1797

New Netherlands, 1636-1656

    Figure 24: Weapons Use in Homicides among European American Adults

New Hampshire and Vermont, 1775-1900

    Figure 25: Gun Use in Homicides versus Homicide Rates among Unrelated Adults

    Figure 26: Gun Use and Homicide Type

    Figure 27: Gun Use in Homicides

    Figure 28: Weapons Use in Homicides

New York City, 1797-1900

    Figure 29: Gun Use in Homicides among Unrelated Adults versus Homicide Rate

    Figure 30: Gun Use and Homicide Type

    Figure 31: Gun Use in Homicides

Figure 32: Weapons Use in Homicides

Figure 33: Ethnicity and Weapons Use in Homicides

Ross and Holmes Counties, Ohio, 1798-1900

Figure 34: Gun Use in Homicides versus Homicide Rates among Unrelated Adults

Figure 35: Gun Use and Homicide Type

Figure 36: Gun Use in Homicides

Figure 37: Weapons Use in Homicides

Cuyahoga County, Ohio, 1822-1876

Figure 38: Gun Use in Homicides versus Homicide Rates among Unrelated Adults

Figure 39: Gun Use and Homicide Type

Figure 40: Gun Use in Homicides

Figure 41: Weapons Use in Homicides

Calhoun, Henderson, and Williamson Counties, Illinois, 1805-1900

Figure 42: Weapons Use in Homicides

Chicago, 1879-1885

Figure 43: Weapons Use in Homicides

Figure 44: Race, Ethnicity, and Gun Use in Homicides

The Northeast and the Midwest, 1847-1900

Figure 45: Race, Ethnicity, and Gun Use in Homicides among Unrelated Adults

Figure 46: Race, Ethnicity, and Gun Use in All Homicides

**The South**

Maryland, 1634-1762

      Figure 47: Gun Use in Homicides versus Homicide Rates among Unrelated European American Adults

      Figure 48: Gun Use in Homicides among European Americans

      Figure 49: Weapons Use in Homicides among European American Adults

      Figure 50: Weapons Use in Interracial Homicides among Adults

Virginia, 1785-1900

      Figure 51: Weapons Use in Homicides in Virginia, 1785-1880

      Figure 52: Weapons Use in Homicides in Virginia, 1881-1900

      Figure 53: Gun Use by Homicide Assailants in Virginia

Georgia and South Carolina, 1779-1900

      Figure 54: Weapons Use in Homicides of African Americans in Georgia and South Carolina

      Figure 55: Weapons Use in Homicides of European Americans in Georgia and South Carolina

      Figure 56: Gun Use by Homicide Assailants in Georgia and South Carolina

Florida, 1821-1861

      Figure 57: Weapons Use in Homicides in Florida by Race of Assailant

**The Trans-Mississippi West**

California, 1830-1900

Figure 58: Gun Use in Homicides

Figure 59: Weapons Use in Homicides in Seven California Counties, 1849-1899

Figure 60: Gun Use and Homicide Type in Seven California Counties, 1849-1899

Figure 61: Weapons Use in Homicides in Los Angeles, 1830-1900

Figure 62:  Gun Use and Homicide Type in Los Angeles, 1830-1900

Figure 63:  Weapons Use in Homicides in San Francisco, 1849-1900

Figure 64:  Gun Use and Homicide Type in San Francisco, 1849-1900

Douglas County, Nebraska, Gila County, Arizona, and Las Animas County, Colorado, 1880-1900

Figure 65: Weapons Use in Homicides

Figure 66: Gun Use and Homicide Type

Arizona, California, Colorado, and Nebraska, 1830-1900

Figure 67: Race, Ethnicity, and Weapons Use in Homicides

# The World

**Figure W 1**



Note: The data for Columbia, 1997, were excluded. It had a gun ownership rate of 18 percent and a homicide rate of 57 per 100,000 persons per year.

# The United States since World War I

**Sources**

The main sources for studying gun use in homicides since World War I are the *Mortality Statistics of the United States* (1919-33), published by the Bureau of the Census, and the *Supplemental Homicide Reports* (1976-2003), compiled by the Federal Bureau of Investigation.  The *Mortality Statistics* do not distinguish among types of homicides, but the SHR's do.

The main sources for studying gun ownership

**Figure W 2**



**Gun Use in Homicides by Region, 1919-1933**
(Victims Ages 15 and Older)

Mortality Statistics of the United States

**Figure W 3**



**Figure W 4**



**Figure W 5**



**Figure W 6**



**Figure W 7**



**Figure W 8**

**Gun Use in Homicides in the United States by Region**

|               | 1919-33 | 1976-2003 |
|---------------|---------|-----------|
| Alaska        | --      | .65       |
| Border States | .76     | .72       |
| Deep South    | .73     | .72       |
| Hawaii        | .31     | .39       |
| Industrial States | .66 | .67       |
| Mountain States | .76   | .62       |
| New England   | .53     | .56       |
| Northwest     | .71     | .57       |
| Prairie States | .70    | .62       |
| Southwest     | .72     | .67       |
|               |         |           |
| Total         |         | .69       |

Source: Bureau of the Census, Mortality Statistics of the United States (1919-33), and Federal Bureau of Investigation, Supplemental Homicide Reports (1976-2003).

**Figure W 9**

**Gun Use and Homicide Type in the United States, 1976-2003**

| | |
|---|---|
| Spouse | .69 |
| Ex-Spouse | .81 |
| Lover | .60 |
| Gay Relationship | .30 |
| Relative | .62 |
| Stranger | .71 |
| Known to Victim | .67 |
| Unknown Relationship | .72 |

Source: Federal Bureau of Investigation, Supplemental Homicide Reports.

**Figure W 10**



Behavioral Risk Factor Surveillance System 2001
National average: 0.36

Note: Respondents who "refused to answer" whether they owned guns were assumed to be gun owners, and those who were "unsure" whether they owned guns were not included in the total number of respondents. Of the 421,334 persons who responded to the BRFSS survey, 15,424 refused to answer (3.7 percent) and 2,148 (0.5 percent) were unsure. The pattern of household ownership of firearms changes little when respondents who "refused to answer" are excluded from the analysis, except in the Mountain states, where 6.8 percent refused to answer.

The Behavioral Risk Factor Surveillance System (BRFSS) is a collaborative project of the Centers for Disease Control and Prevention (CDC), and U.S. states and territories. The BRFSS, administered and supported by CDC's Behavioral Surveillance Branch, is an on going data collection program designed to measure behavioral risk factors in the adult population 18 years of age or older living in households. The BRFSS was initiated in 1984, with 15 states collecting surveillance data on risk behaviors through monthly telephone interviews. The number of states participating in the survey increased, so that by 2001, 50 States, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands were participating in the BRFSS. For details, see Centers for Disease Control and Prevention. Behavioral Risk Factor Surveillance System Users Guide. 1998.

**Figure W 11**



**Figure W 12**



**Figure W 13**



**Figure W 14**



# England

**Figure W 15**

**Weapons Use in Homicides in Middlesex County, England, 1549-1632**

|            | Household | Marital | Unrelated | Relative | All |
|------------|-----------|---------|-----------|----------|-----|
| Dagger     | 0         | 0       | 21        | 0        | 21  |
| Sword      | 1         | 0       | 94        | 0        | 95  |
| Other sharp| 0         | 4       | 23        | 0        | 27  |
| Pike       | 1         | 0       | 2         | 0        | 3   |
| Blunt      | 1         | 2       | 27        | 1        | 31  |
| Gun        | 0         | 0       | 5         | 0        | 5   |
| Physical   | 0         | 2       | 19        | 2        | 23  |
| Poison     | 1         | 2       | 1         | 0        | 4   |
| Unknown    | 0         | 0       | 12        | 1        | 13  |
|            |           |         |           |          |     |
| All        | 4         | 10      | 204       | 4        | 222 |

Percentages

|            | Household | Marital | Unrelated | Relative | All  |
|------------|-----------|---------|-----------|----------|------|
| Dagger     | 0.00      | 0.00    | 0.10      | 0.00     | 0.09 |
| Sword      | 0.25      | 0.00    | 0.46      | 0.00     | 0.43 |
| Other sharp| 0.00      | 0.40    | 0.11      | 0.00     | 0.12 |
| Pike       | 0.25      | 0.00    | 0.01      | 0.00     | 0.01 |
| Blunt      | 0.25      | 0.20    | 0.13      | 0.25     | 0.14 |
| Gun        | 0.00      | 0.00    | 0.02      | 0.00     | 0.02 |
| Physical   | 0.00      | 0.20    | 0.09      | 0.50     | 0.10 |
| Poison     | 0.25      | 0.20    | 0.00      | 0.00     | 0.02 |
| Unknown    | 0.00      | 0.00    | 0.06      | 0.25     | 0.06 |

**Figure W 16**

**Weapons Use in Homicides in Essex and Surrey Counties, England, 1559-1625**

|             | Household | Marital | Unrelated | Relative | All |
|-------------|-----------|---------|-----------|----------|-----|
| Dagger      | 1         | 1       | 28        | 0        | 30  |
| Sword       | 1         | 1       | 69        | 1        | 72  |
| Other sharp | 3         | 2       | 70        | 6        | 81  |
| Pike        | 1         | 0       | 10        | 0        | 11  |
| Blunt       | 10        | 2       | 84        | 5        | 101 |
| Gun         | 0         | 0       | 2         | 0        | 2   |
| Physical    | 6         | 7       | 38        | 3        | 54  |
| Poison      | 1         | 6       | 2         | 2        | 11  |
| Unknown     | 0         | 0       | 1         | 0        | 1   |
|             |           |         |           |          |     |
| All         | 23        | 19      | 304       | 17       | 363 |

Percentages

|             | Household | Marital | Unrelated | Relative | All  |
|-------------|-----------|---------|-----------|----------|------|
| Dagger      | 0.04      | 0.05    | 0.09      | 0.00     | 0.08 |
| Sword       | 0.04      | 0.05    | 0.23      | 0.06     | 0.20 |
| Other sharp | 0.13      | 0.11    | 0.23      | 0.35     | 0.22 |
| Pike        | 0.04      | 0.00    | 0.03      | 0.00     | 0.03 |
| Blunt       | 0.43      | 0.11    | 0.28      | 0.29     | 0.28 |
| Gun         | 0.00      | 0.00    | 0.01      | 0.00     | 0.01 |
| Physical    | 0.26      | 0.37    | 0.13      | 0.18     | 0.15 |
| Poison      | 0.04      | 0.32    | 0.01      | 0.12     | 0.03 |
| Unknown     | 0.00      | 0.00    | 0.00      | 0.00     | 0.00 |

**Figure W 17**

**Weapons Use in Homicides among Unrelated Men
in England, 1549-1632**

|  | Middlesex,<br>1549-1632 | Essex and Surrey,<br>1559-1625 |
|---|---|---|
| Dagger | .12 | .10 |
| Sword | .53 | .24 |
| Other Sharp | .10 | .23 |
| Pike | .01 | .04 |
| Blunt | .13 | .28 |
| Gun | .02 | .01 |
| Physical | .07 | .10 |
| Poison | .00 | .00 |
| Unknown | .02 | .00 |
|  |  |  |
| N | 178 | 290 |

# United States, 1770-1900

**Figure W 18**

**Proportion of Handguns among Guns Used in Homicides**

|              | VT & NH | GA & SC | VA  | OH  | CA  |
|--------------|---------|---------|-----|-----|-----|
| 1770-1815[1] | .10     | .00     |     | .17 |     |
| 1816-1846    | .50     | .50     |     | --  |     |
| 1847-1865    | .35     | .65     |     | .58 | .84 |
| 1866-1880    | .74     | .67     | .78 | .91 | .73 |
| 1881-1900    | .72     | .74     | .75 | .89 | .77 |

NOTE:  The proportions are equal to the number of known handguns divided by the number of known handguns plus the number of known long guns.  The proportions are lower if guns of unspecified type are included in the denominator, but the trends in each jurisdiction are similar.

Cuyahoga County, Ohio:  The proportion cannot be calculated, 1822-46, because there were no gun homicides.  The proportions were .67, 1847-65, and 1.00, 1866-76.

Florida:  The proportion was .31 for white assailants, 1821-1861.  No black or Native American assailants were reported to have committed a homicide with a handgun.

Douglas County, Nebraska:  The proportion was .89, 1880-1900.

Las Animas County, Colorado:  The proportion was .94, 1880-1900.

Gila County, Arizona:  The proportion was.66, 1880-1900.

[1]  The data begin in 1770 in Vermont and New Hampshire, in 1790 in Georgia and South Carolina, in 1798 in Ohio, and in 1849 in California.  The data from Virginia do not distinguish adequately between handguns and other guns before the end of the Civil War, and no gun homicides occurred in Ross, Holmes, or Cuyahoga counties, Ohio, between 1816 and 1846.  There are no data yet available for Cuyahoga County, 1877-1900.

# The North

# New England, 1630-1797

**Figure W 19**



**Figure W 20**

**Weapons Use in Homicides among European American Adults
in New England, 1630-1797**

|  | 1630-1675 | 1676-1769 | 1770-1787 | 1788-1797 |
|---|---|---|---|---|
| Gun | .36 | .13 | .46 | .20 |
| Sharp | .20 | .27 | .17 | .20 |
| Blunt | .16 | .24 | .12 | .28 |
| Physical | .28 | .33 | .23 | .32 |
| Poison | .00 | .03 | .02 | .00 |
| Whip | .00 | .00 | .00 | .00 |
| Number of Weapons Identified | 25 | 94 | 94 | 25 |
| Number of Weapons Not Identified | 5 | 11 | 5 | 1 |
| % Unknown Weapon | .17 | .10 | .05 | .04 |

Note:  Nine of the 24 known homicides among unrelated adults with known weapons, 1630-1675, were committed with guns (38 percent); 10 of 77, 1676-1769 (13 percent), 42 of 81, 1770-1787 (52 percent), and 4 of 19, 1788-1797 (21 percent).

**Figure W 21**

**Gun Use and Homicide Type in Homicides among European American Adults
in New England, 1630-1797**

|                                      | Unrelated | Marital | Relative |
|--------------------------------------|-----------|---------|----------|
| Percent Homicides Committed with Guns | .34       | .00     | .20      |
| Number of Weapons Identified          | 194       | 24      | 20       |
| Number of Weapons Not Identified      | 18        | 3       | 1        |
| % Unknown Weapon                      | .08       | .11     | .05      |

**Figure W 22**

**Weapons Use in Homicides of African Americans and Native Americans
by European American Adults in New England, 1676-1797**

|                                | Black Victims | Native American Victims |
|--------------------------------|---------------|-------------------------|
| Gun                            | .29           | .57                     |
| Sharp                          | .00           | .17                     |
| Blunt                          | .21           | .03                     |
| Physical                       | .29           | .23                     |
| Poison                         | .00           | .00                     |
| Whip                           | .21           | .00                     |
|                                |               |                         |
| Number of Weapons Identified   | 14            | 36                      |
| Number of Weapons Not Identified | 3           | 8                       |
|                                |               |                         |
| % Unknown Weapon               | .18           | .18                     |

**Figure W 23**

**Gun Use and Homicide Type in Homicides among Native American Adults
in New England, 1676-1797**

|  | Unrelated | Marital | Relative | Romance |
|---|---|---|---|---|
| Percent Homicides<br>  Committed with Guns | .14 | .13 | .00 | .50 |
| Number of Weapons<br>  Identified | 43 | 16 | 4 | 2 |
| Number of Weapons<br>  Not Identified | 9 | 1 | 2 | 0 |
| % Unknown Weapon | .17 | .06 | .33 | .00 |

Note:  There were only 5 known homicides of blacks by blacks in New England, 1676-1797.  Two were marital homicides and three were homicides of unrelated adults.  None were committed with guns.

# New Netherlands, 1636-1656

**Figure W 24**

**Weapons Use in Homicides among European American Adults
in New Netherlands, 1638-1656**

| | |
|---|---|
| Gun | .40 |
| Sharp | .20 |
| Blunt | .20 |
| Physical | .20 |
| Poison | .00 |
| Whip | .00 |
| Number of Weapons Identified | 5 |
| Number of Weapons Not Identified | 3 |
| % Unknown Weapon | .38 |

Note:  All known homicides in New Netherlands, 1638-1656, were among unrelated adults.

# New Hampshire and Vermont, 1775-1900

**Figure W 25**



**Figure W 26**



**Figure W 27**

**Gun Use in Homicides in New Hampshire and Vermont, 1775-1900**

|  | 1775-1815 | 1816-1846 | 1847-1880 | 1881-1900 |
|---|---|---|---|---|
| Homicides among unrelated adults | .49 | .17 | .28 | .32 |
| Marital homicides | .06 | .06 | .11 | .40 |
| Homicides of Relatives | .07 | .07 | .28 | .29 |
| Romance homicides | -- | -- | .69 | .69 |
| All homicides | .40 | .14 | .26 | .35 |
| Number of Weapons Identified | 45 | 70 | 280 | 213 |
| Number of Weapons Not Identified | 4 | 5 | 12 | 3 |
| % Unidentified Weapons | .08 | .07 | .04 | .01 |

Note:  Does not include homicides of Native Americans.

**Figure W 28**

**Weapons Use in Homicides in New Hampshire and Vermont, 1775-1900**

|  | 1798-1815 | 1816-1846 | 1847-1880 | 1881-1900 |
|---|---|---|---|---|
| Gun | .40 | .14 | .26 | .35 |
| Sharp | .16 | .21 | .25 | .18 |
| Blunt | .27 | .43 | .24 | .16 |
| Physical | .18 | .19 | .17 | .24 |
| Poison | .00 | .03 | .07 | .07 |
| | | | | |
| Number of weapons<br> Identified | 45 | 70 | 280 | 213 |
| Number of weapons<br> Not identified | 4 | 5 | 12 | 3 |

Note:  Does not include homicides of Native Americans.

# New York City, 1797-1874

The data are from Monkkonen (2001).  The data for 1797-1874 are from Monkkonen's data on individual homicides.  The data for 1797-1900 are from Monkkonen's data on annual homicides.

**Figure W 29**



**Figure W 30**



**Figure W 31**

**Gun Use in Homicides in New York City, 1797-1874**

| | 1797-1815 | 1816-1846 | 1847-1865 | 1866-1874 |
|---|---|---|---|---|
| Homicides among unrelated adults | .16 | .05 | .21 | .25 |
| Spousal homicides | .00 | .00 | .10 | .15 |
| Homicides of relatives | .00 | .00 | .13 | .18 |
| Homicides of lovers[1] | -- | -- | .57 | .57 |
| All homicides | .13 | .05 | .20 | .25 |
| | | | | |
| Number of weapons Identified | 75 | 279 | 919 | 437 |
| Number of weapons Not identified | 22 | 33 | 149 | 25 |

[1] Includes all homicides of lovers, 1797-1874. N = 36. They are not included in the numbers of weapons identified and not identified. One weapon involved in the homicide of a lover could not be identified.

1797-1815: 22 weapons could not be identified, 2 in spouse homicides and 20 in non-family homicides. N: 8 spouse, 3 family, 64 non-family.

1816-1846: 33 weapons could not be identified, 2 in spouse homicides and 31 in non-family homicides. N: 41 spouse, 5 family, 233 non-family.

1847-1865: 149 weapons could not be identified, 12 in spouse homicides and 137 in non-family homicides. N: 106 spouse, 30 family, 783 non-family.

1866:1874: Only 25 weapons could not be identified, all in non-family homicides.  N:  59 spouse, 11 family, 367 non-family.

**Figure W 32**

**Weapons Use in Homicides in New York City, 1797-1900**

|           | Gun | Knife | Poison | Other |
|-----------|-----|-------|--------|-------|
| 1797-1815 | .13 | .19   | .04    | .65   |
| 1816-1847 | .05 | .22   | .03    | .71   |
| 1848-1865 | .20 | .30   | .02    | .47   |
| 1866-1874 | .25 | .27   | .01    | .46   |
| 1875-1900 | .35 | .21   | --     | .44   |
|           |     |       |        |       |
| N         | 867 | 772   | 37     | 1508  |

Note:  230 weapons could not be identified through 1874.

**Figure W 33**

**Ethnicity and Weapons Used in Homicides in New York City, 1797-1874**

| Ethnicity | Percent Homicides with Guns | |
|---|---|---|
| | 1797-1860 | 1861-1874 |
| Native-born White | .27 | .50 |
| German | .28 | .37 |
| Irish | .09 | .26 |
| Black | .03 | .26 |
| Italian | .00 | .21 |

Monkkonen (2001: 35).

**Ross and Holmes Counties, Ohio, 1798-1900**

**Figure W 34**



**Figure W 35**



Note:  There were only two romance homicides in these counties.  Guns were not used in either homicide.

**Figure W 36**

**Gun Use in Homicides in Ross and Holmes Counties,
Ohio, 1798-1900**

|  | 1798-1815 | 1816-1846 | 1847-1880 | 1881-1900 |
|---|---|---|---|---|
| Homicides among unrelated adults | .60 | .00 | .37 | .40 |
| Marital homicides | -- | .00 | .17 | .80 |
| Homicides of Relatives | -- | .00 | .20 | .40 |
| All homicides | .60 | .00 | .31 | .48 |
| | | | | |
| Number of weapons Identified | 10 | 16 | 51 | 25 |
| Number of weapons Not identified | 3 | 0 | 5 | 0 |

Note:  Does not include homicides of Native Americans.

**Figure W 37**

**Weapons Use in Homicides in Ross and Holmes Counties,
Ohio, 1798-1900**

|  | 1798-1815 | 1816-1846 | 1847-1880 | 1881-1900 |
|---|---|---|---|---|
| Gun | .60 | .00 | .31 | .48 |
| Sharp | .10 | .31 | .22 | .24 |
| Blunt | .20 | .31 | .29 | .20 |
| Physical | .10 | .38 | .12 | .08 |
| Poison | .00 | .00 | .06 | .00 |
| Number of weapons Identified | 10 | 16 | 51 | 25 |
| Number of weapons Not identified | 3 | 0 | 5 | 0 |

Note: Does not include homicides of Native Americans.

# Cuyahoga County, Ohio, 1822-1876

**Figure W 38**



**Figure W 39**



**Figure W 40**

**Gun Use in Homicides in Cuyahoga County,
Ohio, 1822-1876**

|                                      | 1822-1846 | 1847-1865 | 1866-1876 |
|--------------------------------------|-----------|-----------|-----------|
| Homicides among unrelated adults     | .00       | .15       | .30       |
| Marital homicides                    | .00       | .09       | .27       |
| Homicides of Relatives               | --        | --        | --        |
| Romance homicides                    | --        | --        | .67       |
| All homicides                        | .00       | .13       | .29       |
| Number of Weapons Identified         | 6         | 67        | 65        |
| Number of Weapons Not Identified     | 0         | 0         | 2         |
| % Unknown Weapons                    | .00       | .00       | .03       |

**Figure W 41**

**Weapons Use in Homicides in Cuyahoga County,
Ohio, 1822-1876**

|  | 1822-1846 | 1847-1865 | 1866-1876 |
|---|---|---|---|
| Gun | .00 | .13 | .29 |
| Sharp | .00 | .19 | .26 |
| Blunt | .50 | .19 | .08 |
| Physical | .33 | .33 | .23 |
| Poison | .00 | .03 | .03 |
| Violence (Blunt or Physical) | .17 | .12 | .11 |
| Number of Weapons Identified | 6 | 67 | 65 |
| Number of Weapons Not Identified | 0 | 0 | 2 |
| % Unknown Weapons | .00 | .00 | .03 |

# Calhoun, Henderson, and Williamson Counties, Illinois, 1805-1900

**Figure W 42**

**Weapons Use in Homicides in Calhoun, Henderson, and Williamson Counties,
Illinois, 1805-1900**

|                              | 1805-1832 | 1833-1865[1] | 1866-1900 |
|------------------------------|-----------|--------------|-----------|
| Gun                          | .75       | .72          | .66       |
| Sharp                        | .13       | .07          | .19       |
| Blunt                        | .00       | .17          | .10       |
| Physical                     | .13       | .03          | .05       |
| Number of Weapons Identified | 9         | 38           | 66        |
| Number of Weapons Not Identified | 1     | 9            | 7         |
| % Unknown Weapons            | .10       | .19          | .10       |

[1] Only 3 known homicides occurred from the end of the frontier period in 1832 to the Mexican War (1833-1846).  The weapon is known in only one of those homicides:  a knife.

# Chicago, 1879-1885

**Figure W 43**

**Weapons Use in Homicides in Chicago, 1879-1885**

|  | Gun | Blunt | Physical | Sharp |
|---|---|---|---|---|
| Homicides among unrelated adults | .49 | .19 | .13 | .19 |
| Marital homicides | .48 | .03 | .24 | .26 |
| Homicides of Relatives | .63 | .13 | .13 | .13 |
| Romance homicides | .73 | .18 | .00 | .09 |
| All homicides | .51 | .16 | .14 | .19 |
| Number of Weapons Identified | 245 | | | |
| Number of Weapons Not Identified | 1 | | | |
| % Unknown Weapons | .00 | | | |

Note:  A long gun was used in only one known case.  All other homicides with known weapons appear to have been committed with revolvers.

**Figure W 44**

**Race, Ethnicity, and Gun Use in Homicides in Chicago, 1879-1885**

All homicides

| | | |
|---|---|---|
| German or Dutch | .69 | 35 |
| English, Scots, or Welsh[1] | .55 | 100 |
| French | .50 | 2 |
| African American | .46 | 24 |
| Irish | .45 | 44 |
| Italian | .33 | 9 |
| Scandinavian | .33 | 3 |
| East European | .30 | 10 |
| Chinese | .00 | 2 |
| | | |
| Unknown assailant | .38 | 16 |

[1] One unknown weapon was used by a Scots assailant.

Homicides among unrelated adults

| | | |
|---|---|---|
| German or Dutch | .71 | 17 |
| English, Scots, or Welsh | .55 | 78 |
| Irish | .51 | 37 |
| French or French Canadian | .50 | 2 |
| African American | .41 | 17 |
| Scandinavian | .33 | 3 |
| East European | .25 | 8 |
| Italian | .25 | 8 |
| Chinese | .00 | 2 |
| | | |
| Unknown assailant | .38 | 16 |

# The Northeast and the Midwest, 1847-1900

**Figure W 45**

**Race, Ethnicity, and Gun Use in Homicides among Unrelated Adults
in the Northeast and Midwest, 1847-1900[1]**

|  | Guns | Known Weapons | Percentage Gun Use |
|---|---|---|---|
| German or Dutch | 24 | 48 | .50 |
| English, Scots, or Welsh | 156 | 340 | .46 |
| Italian | 5 | 14 | .36 |
| African American | 11 | 31 | .35 |
| East European | 3 | 9 | .33 |
| French | 11 | 35 | .31 |
| Unknown assailant | 33 | 107 | .31 |
| Scandinavian | 2 | 7 | .29 |
| Irish | 33 | 118 | .28 |
| Chinese | 0 | 2 | .00 |
| All[2] | 278 | 711 | .39 |

[1] Includes data from New Hampshire and Vermont; Chicago; Calhoun, Henderson, and Williamson counties, Illinois; and Cuyahoga, Holmes, and Ross counties, Ohio.

[2] Gun use in family and intimate homicides was nearly identical: 34 percent.

**Figure W 46**

**Race, Ethnicity, and Gun Use in All Homicides
in the Northeast and Midwest, 1847-1900[1]**

|  | Guns | Known Weapons | Percentage Gun Use |
|---|---|---|---|
| German or Dutch | 39 | 80 | .49 |
| English, Scots, or Welsh | 233 | 543 | .43 |
| Italian | 6 | 15 | .40 |
| African American | 17 | 47 | .36 |
| Eastern European | 5 | 14 | .36 |
| French | 15 | 49 | .31 |
| Unknown assailant | 33 | 108 | .31 |
| Scandinavian | 2 | 7 | .29 |
| Irish | 38 | 167 | .23 |
| Chinese | 0 | 2 | .00 |
|  |  |  |  |
| All | 388 | 1032 | .38 |

[1] Includes data from New Hampshire and Vermont; Chicago; Calhoun, Henderson, and Williamson counties, Illinois; and Cuyahoga, Holmes, and Ross counties, Ohio.

# The South

# Maryland, 1635-1762

**Figure W 47**



**Figure W 48**

**Gun Use in Homicides among European Americans in Maryland, 1635-1762**

|  | 1635-1675 | 1676-1762 |
|---|---|---|
| Homicides among unrelated adults | .40 | .11 |
| Marital homicides | .00 | .00 |
| Homicides of Relatives | -- | .00 |
| Romance homicides | -- | -- |
| All homicides | .40 | .10 |
| Number of Weapons Identified | 43 | 79 |
| Number of Weapons Not Identified | 14 | 19 |
| % Unknown Weapons | .25 | .19 |

Note: Assumes that only half of the twenty victims of political homicide in 1655 were killed by firearms. If all were killed with firearms, the proportion of victims of homicides among unrelated adults who were killed by guns, 1634-75, would have been 64 percent. Seventeen (or the higher figure of 27) of the 42 known homicides among unrelated adults with known weapons, 1635-1675, were committed with guns (40 percent); 8 of 71, 1676-1762 (11 percent).

**Figure W 49**

**Weapons Use in Homicides among European American Adults
in Maryland, 1635-1762**

|  | 1635-1675 | 1676-1762 |
|---|---|---|
| Gun | .63 | .10 |
| Sharp | .05 | .23 |
| Blunt | .19 | .38 |
| Physical | .07 | .28 |
| Poison | .00 | .01 |
| Whip | .07 | .00 |
| Number of Weapons Identified | 43 | 79 |
| Number of Weapons Not Identified | 14 | 19 |
| % Unknown Weapon | .25 | .19 |

**Figure W 50**

**Weapons Use in Interracial Homicides among Adults in Maryland, 1635-1762**

|  | European Assailant/ African Victim | African Assailant/ European Victim |
|---|---|---|
| Gun | .08 | .21 |
| Sharp | .25 | .21 |
| Blunt | .50 | .29 |
| Physical | .08 | .29 |
| Poison | .00 | .00 |
| Whip | .08 | .00 |
|  |  |  |
| Number of Weapons Identified | 12 | 14 |
| Number of Weapons Not Identified | 1 | 5 |
|  |  |  |
| % Unknown Weapon | .08 | .26 |

# Virginia, 1785-1900

**Figure W 51**

**Weapons Use in Homicides in Virginia, 1785-1880**

Percent used by assailants who were

|  | African American | European American | Unknown |
|---|---|---|---|
| **African American victims** | | | |
| Gun | .11 | .41 | .60 |
| Sharp | .36 | .09 | .00 |
| Whip | .00 | .19 | .00 |
| Other | .53 | .31 | .40 |
| Number of weapons Identified | 28 | 32 | 10 |
| Number of weapons Not identified | 4 | 2 | 3 |
| **European American victims** | | | |
| Gun | .00 | .33 | .00 |
| Sharp | .30 | .33 | .50 |
| Whip | .00 | .00 | .00 |
| Other | .70 | .35 | .50 |
| Number of weapons Identified | 10 | 40 | 2 |
| Number of weapons Not identified | 2 | 8 | 3 |

**Figure W 52**

**Weapons Use in Homicides in Virginia, 1881-1900**

Percent used by assailants who were

|  | African American | European American | Unknown |
|---|---|---|---|
| **African American victims** | | | |
| Gun | .57 | .33 | 1.00 |
| Knife | .00 | .00 | .00 |
| Other | .43 | .67 | .00 |
| Number of weapons Identified | 7 | 6 | 1 |
| Number of weapons Not identified | 4 | 0 | 0 |
| **European American victims** | | | |
| Gun | .20 | .71 | 1.00 |
| Knife | .00 | .12 | .00 |
| Other | .80 | .17 | .00 |
| Number of weapons Identified | 5 | 17 | 1 |
| Number of weapons Not identified | 0 | 0 | 0 |

Note: The race of the assailant could not be identified in 10 cases. The weapon is unknown in 6 of those cases. Three of the four known weapons were guns. One of the gun victims was black, the other two of unknown race.

**Figure W 53**

**Gun Use by Homicide Assailants in Virginia, 1785-1900**

Percent used by assailants who were

|  | African American | European American | Unknown |
|---|---|---|---|
| 1785-1880 | .08 | .36 | .50 |
| Known weapons | 38 | 72 | 12 |
| 1881-1900[1] | .46 | .61 | .80 |
| Known weapons | 13 | 23 | 5 |

[1] Includes victims of unknown race.

# Georgia and South Carolina, 1779-1900

**Figure W 54**

**Weapons Use in Homicides of African Americans
in Georgia and South Carolina, 1779-1900**

Percent used by assailants who were

|  | African American | European American | Unknown |
|---|---|---|---|
| **1779-1863** | | | |
| Gun | .00 | .32 | - |
| Knife | .25 | .11 | - |
| Whip | .00 | .32 | - |
| Other | .75 | .26 | - |
| Number of weapons Identified | 16 | 38 | 0 |
| **1864-1900** | | | |
| Gun | .57 | .77 | .80 |
| Knife | .11 | .10 | .20 |
| Whip | .00 | .00 | .00 |
| Other | .33 | .13 | .00 |
| Number of weapons Identified | 46 | 30 | 5 |

**Figure W 55**

**Weapons Use in Homicides of European Americans
in Georgia and South Carolina, 1779-1900**

Percent used by assailants who were

|  | African<br>American | European<br>American | Unknown |
|---|---|---|---|
| **1779-1863** | | | |
| Gun | .17 | .41 | .50 |
| Knife | .08 | .26 | .25 |
| Whip | .00 | .00 | .00 |
| Other | .75 | .33 | .25 |
| Number of weapons<br> Identified | 12 | 70 | 4 |
| **1864-1900** | | | |
| Gun | .56 | .82 | .83 |
| Knife | .33 | .04 | .00 |
| Whip | .00 | .00 | .00 |
| Other | .11 | .14 | .17 |
| Number of weapons<br> Identified | 9 | 82 | 6 |

**Figure W 56**

**Gun Use by Homicide Assailants in Georgia and South Carolina, 1779-1900**

Percent used by assailants who were

|  | African American | European American | Unknown |
|---|---|---|---|
| 1779-1863 | .07 | .38 | .50 |
| Known weapons | 28 | 108 | 4 |
| 1864-1900 | .57 | .80 | .82 |
| Known weapons | 54 | 112 | 11 |

# Florida, 1821-1861

**Figure W 57**

**Weapons Use in Homicides in Florida by Race of Assailant, 1821-1861**

|  | Black | Native American | White |
|---|---|---|---|
| Gun | .30 | 1.00 | .44 |
| Sharp | .39 | .00 | .19 |
| Blunt | .26 | .00 | .11 |
| Physical | .04 | .00 | .04 |
| Poison | .00 | .00 | .00 |
| Whip | .00 | .00 | .03 |
| Hanged | .00 | .00 | .19 |
| Number of Weapons Identified | 23 | 6 | 163 |
| Number of Weapons Not Identified | 27 | 4 | 172 |
| % Unknown Weapon | .54 | .40 | .51 |

Note: Fifty-five percent of victims of white assailants who were not hanged were killed with guns.

# The Trans-Mississippi West

# California, 1830-1900

**Figure W 58**



**Figure W 59**

**Weapons Use in Homicides in Seven California Counties, 1849-1899**

|           | Gun | Sharp | Blunt | Physical | Poison |
|-----------|-----|-------|-------|----------|--------|
| 1849-1865 | .50 | .32   | .07   | .11      | .00    |
| 1866-1880 | .59 | .26   | .10   | .03      | .02    |
| 1881-1899 | .65 | .19   | .09   | .06      | .01    |
| All       | .57 | .26   | .08   | .08      | .01    |
| Known weapons | 693 | 318 | 101 | 91 | 10 |

|           | Proportion of guns of known type that were handguns | Proportion of all guns that were known handguns |
|-----------|-----|-----|
| 1849-1865 | .84 | .76 |
| 1866-1880 | .73 | .66 |
| 1881-1900 | .77 | .74 |

Note:  Weapons could not be identified in 172 of 681 homicides (25 percent), 1849-1865; in 84 of 379 homicides (22 percent), 1866-1880; and in 66 of 475 homicides (14 percent), 1881-1899.

Source: McKanna (2002). Includes Calaveras, Sacramento, San Diego, San Joaquin, San Luis Obispo, Santa Barbara, and Tuolomne counties.

**Figure W 60**

**Gun Use and Homicide Type in Seven California Counties, 1849-1899**

|  | Percent with guns | Homicides with known weapons | Percent with unknown weapons |
|---|---|---|---|
| Homicides among unrelated adults | .57 | 1138 | .22 |
| Family and intimate homicides | .67 | 75 | .06 |
| All homicides | .57 | 1213 | .21 |

Source: McKanna (2002). Includes Calaveras, Sacramento, San Diego, San Joaquin, San Luis Obispo, Santa Barbara, and Tuolomne counties.

**Figure W 61**

**Weapons Use in Homicides in Los Angeles, 1830-1900**

|            | Gun | Sharp | Blunt | Physical | Poison |
|------------|-----|-------|-------|----------|--------|
| 1830-1846  | .13 | .56   | .00   | .31      | .00    |
| 1847-1865  | .55 | .29   | .07   | .09      | .00    |
| 1866-1880  | .62 | .20   | .07   | .11      | .00    |
| 1881-1900  | .63 | .15   | .07   | .13      | .02    |
| All        | .59 | .21   | .07   | .12      | .01    |
| Known weapons | 274 | 97 | 33  | 57       | 5      |

Note: Weapons could not be identified in 17 of 33 homicides (52 percent), 1830-1846; in 133 of 246 homicides (54 percent), 1847-1865; in 102 of 183 homicides (56 percent), 1866-1880; and in 38 of 294 homicides (13 percent), 1881-1900.

Source: Monkkonen (2005).

**Figure W 62**

**Gun Use and Homicide Type in Los Angeles, 1830-1900**

|  | Percent with guns | Homicides with known weapons | Percent with unknown weapons |
|---|---|---|---|
| Homicides among unrelated adults | .57 | 410 | .41 |
| Marital homicides | .77 | 39 | .13 |
| Homicides of relatives | .91 | 11 | .21 |
| Romance homicides | .33 | 6 | .14 |
| All homicides | .59 | 466 | .38 |

Source: Monkkonen (2005).

**Figure W 63**

**Weapons Use in Homicides in San Francisco, 1849-1900**

|           | Gun | Sharp | Blunt | Physical | Poison |
|-----------|-----|-------|-------|----------|--------|
| 1849-1865 | .40 | .43   | .06   | .10      | .02    |
| 1866-1880 | .47 | .40   | .07   | .06      | .01    |
| 1881-1900 | .60 | .22   | .08   | .09      | .01    |
| All       | .52 | .32   | .07   | .08      | .01    |
| Known weapons | 438 | 267 | 60  | 67       | 11     |

Note:  Weapons could not be identified in 46 of 222 homicides (21 percent), 1849-1865; in 55 of 302 homicides (18 percent), 1866-1880; and in 92 of 512 homicides (18 percent), 1881-1900.

Source: Mullin (2005).

**Figure W 64**

**Gun Use and Homicide Type in San Francisco, 1849-1900**

|  | Percent with guns | Homicides with known weapons | Percent with unknown weapons |
|---|---|---|---|
| Homicides among unrelated adults | .50 | 684 | .20 |
| Marital homicides | .61 | 85 | .15 |
| Homicides of relatives | .38 | 22 | .08 |
| Romance homicides | .63 | 52 | .09 |
| All homicides | .52 | 843 | .19 |

Source: Mullin (2005).

**Douglas County, Nebraska**
**Gila County, Arizona**
**Las Animas County, Colorado**
**1880-1900**

**Figure W 65**

**Weapons Use in Homicides
in Arizona, Colorado, and Nebraska, 1880-1900**

|  | Gun | Sharp | Blunt | Physical | Poison |
|---|---|---|---|---|---|
| Douglas county, Nebraska | .63 | .10 | .17 | .10 | .00 |
| Las Animas County, Colorado | .66 | .21 | .09 | .02 | .02 |
| Gila County, Arizona | .82 | .09 | .04 | .04 | .00 |
| All homicides | .70 | .12 | .11 | .06 | .00 |

Proportion of Guns Used That Were Known Handguns:

| | |
|---|---|
| Douglas County, Nebraska | .89 |
| Las Animas County, Colorado | .94 |
| Gila County, Arizona | .66 |

Note:  1 of 106 weapons in Douglas County, Nebraska, could not be identified, 26 of 73 in Las Animas County, Colorado, and 9 of 77 in Gila County, Arizona.

Source:  McKanna (1997).

**Figure W 66**

**Gun Use and Homicide Type in Arizona, Colorado, and Nebraska, 1880-1900**

|  | Percent with guns | Homicides with known weapons | Percent with unknown weapons |
|---|---|---|---|
| Homicides among unrelated adults | .67 | 181 | .17 |
| Family and intimate homicides | .82 | 39 | .00 |
| All homicides | .70 | 220 | .14 |

Source: McKanna (1997).

# Arizona, California, Colorado, and Nebraska, 1830-1900

**Figure W 67**

**Race, Ethnicity, and Gun Use in Homicides in Arizona, California, Colorado, and Nebraska, 1830-1900**

|  | Percent with guns | Homicides with known weapons | Percent with unknown weapons |
|---|---|---|---|
| White, Non-Hispanic | .62 | 1683 | .19 |
| Asian | .55 | 265 | .20 |
| Hispanic | .53 | 320 | .34 |
| African American | .52 | 50 | .07 |
| Native American | .46 | 135 | .30 |
| Unknown | .40 | 289 | .35 |
| All | .57 | 2742 | .23 |

Source: McKanna (1997, 2002), Monkkonen (2005), and Mullin (2005).

# EXHIBIT 103

# William & Mary Bill of Rights Journal

Volume *31 (2022-2023)*
Issue 1                                                                          Article 3

10-2022

## The Right to Train: A Pillar of the Second Amendment

Joseph G.S. Greenlee

Follow this and additional works at: https://scholarship.law.wm.edu/wmborj

 Part of the Second Amendment Commons

### Repository Citation

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill
Rts. J. 93 (2022), https://scholarship.law.wm.edu/wmborj/vol31/iss1/3

Copyright c 2022 by the authors. This article is brought to you by the William & Mary Law School Scholarship
Repository.
https://scholarship.law.wm.edu/wmborj

# THE RIGHT TO TRAIN: A PILLAR OF
# THE SECOND AMENDMENT

Joseph G.S. Greenlee[*]

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
I.   ENGLISH HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
     A.   Devotion to Arms in Ancient England . . . . . . . . . . . . . . . . . . . . . . 96
     B.   Dependence on a Trained Populace for Domestic Order and National
          Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
     C.   Legal Commentaries on the Right to Train . . . . . . . . . . . . . . . . . . . 102
     D.   Shooting Competitions as Practice and Entertainment . . . . . . . . . . . 103
     E.   The Understanding of the English Right at the Time of the Second
          Amendment's Ratification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
II.  COLONIAL AMERICA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
     A.   The Importance of Marksmanship for Food and Survival . . . . . . . . 107
     B.   Shooting Competitions as Practice and Entertainment . . . . . . . . . . . 109
     C.   Community Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
III. REVOLUTIONARY AMERICA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
     A.   Pre-War Focus on Arms Proficiency . . . . . . . . . . . . . . . . . . . . . . . . 114
     B.   Effect of Arms Training in the Revolutionary War . . . . . . . . . . . . . . 117
IV.  RATIFICATION OF THE UNITED STATES CONSTITUTION . . . . . . . . . . . . . 124
     A.   State Constitutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
     B.   Debates over the Ratification of the Constitution . . . . . . . . . . . . . . . 126
     C.   Ratifying the Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
     D.   Post-Ratification Interpretations of the Second Amendment . . . . . . . 131
V.   RESTRICTIONS ON SHOOTING DURING THE COLONIAL AND FOUNDING
     ERAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
     A.   Wartime Measures to Conserve Gunpowder . . . . . . . . . . . . . . . . . . . 134
     B.   Time and Place Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
VI.  MODERN COURT DECISIONS ON THE RIGHT TO TRAIN . . . . . . . . . . . . . . 138
     A.   The Supreme Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
          1.   District of Columbia v. Heller . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
          2.   Luis v. United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140
          3.   New York State Rifle & Pistol Association v. City of New York . . . 140
     B.   Federal Circuit Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143
          1.   Ezell v. City of Chicago (Ezell I) . . . . . . . . . . . . . . . . . . . . . . . . . 143

---

    *  Policy Advisor for Legal Affairs, Heartland Institute; Director of Constitutional Studies,
FPC Action Foundation; http://josephgreenlee.org. The author thanks David Kopel and George
Mocsary for their valuable insights and helpful suggestions.

    2.  *Ezell v. City of Chicago* (*Ezell II*) . . . . . . . . . . . . . . . . . . . . . . . . 144
    3.  *Drummond v. Robinson Township* . . . . . . . . . . . . . . . . . . . . . . 145
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

INTRODUCTION

Since the Supreme Court confirmed that the Second Amendment protects "the individual right to possess and carry weapons" in *District of Columbia v. Heller*, lower courts have been grappling with whether there is also a right to train with those weapons.[1] Courts have considered whether training is a protected activity, whether it is a "core" right, and whether its protection is limited to gaining the minimum competency needed for self-defense.[2]

The federal circuit courts are divided over these questions. The Seventh Circuit struck down a ban on shooting ranges within the city of Chicago because training restrictions are "close[] to implicating the core of the Second Amendment right."[3] After Chicago revised its ban to allow shooting ranges in 2.2 percent of the city, the Seventh Circuit invalidated that regulation as well, along with a provision barring anyone under eighteen from entering a shooting range.[4] The Third Circuit, holding that a ban on center-fire rifle training likely violates the Second Amendment, stated that a training restriction burdens the Amendment's core if it has the effect of depriving people of the "skills commonly used for lawful purposes like self-defense in their homes," but suggested that such restrictions are rare.[5] The Second Circuit held that a law prohibiting New York City residents from taking handguns outside of the city—which contained only seven total ranges for its eight million residents—for training or shooting competitions "does not approach the core area of protection."[6] After the Supreme Court granted certiorari, however, the City of New York opted to amend its law and moot the case rather than defend it before a less agreeable court.[7]

No court yet has explored the legal history of the right to train, nor has any article. This Article presents the first in-depth historical exploration of the right. It reveals that America's Founders viewed the right to train as a pillar of the Second Amendment: it supports every aspect of the right, including self-defense, community defense, militia rights, and the prevention of tyranny. Moreover, the activity of training itself was cherished by the Founders. This history reveals that training is central to the right and deserving of robust Second Amendment protection.

---

[1]  554 U.S. 570, 592 (2008).

[2]  *Id.* at 630.

[3]  Ezell v. City of Chi., 651 F.3d 684, 708 (7th Cir. 2011) (*Ezell I*).

[4]  Ezell v. City of Chi., 846 F.3d 888, 890 (7th Cir. 2017) (*Ezell II*).

[5]  Drummond v. Robinson Twp., 9 F.4th 217, 229–30 (3d Cir. 2021).

[6]  N.Y. State Rifle & Pistol Ass'n v. City of New York, 883 F.3d 45, 62 (2d Cir. 2018).

[7]  N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct 1525, 1526 (2020).

Part I of this Article looks at English history. It explores the millennium leading up to America's founding in which England—through the hue and cry, posse comitatus, and militia—relied on an armed and trained populace for domestic tranquility and national security.

Part II analyzes the colonial era, in which arms proficiency was necessary for food, sport, and survival. Accurate shooting was required for everything, from procuring meat to conquest to self-defense and community defense. Further, because there was such an emphasis on marksmanship, shooting matches became a popular diversion. As a result of the colonists' habitual use of firearms, they became the most skillful shooters in the world.

During the Revolutionary War, discussed in Part III, the Americans' lifelong familiarity with arms provided them with a tremendous advantage over the British. Their superior marksmanship inspired confidence among the Patriots, terrified the British, and greatly contributed to their success on the battlefield. It is reasonable to suggest that the Americans would not have won their independence had the typical colonist not been accustomed to using arms all their lives.

The lessons of the Revolutionary War were fresh in the minds of the Founders when they ratified the Constitution and the Bill of Rights. Part IV delves into the debates during the ratification processes and finds that while the Federalists and Antifederalists disagreed over the need for a declaration of rights, everyone agreed that an armed and trained populace was necessary to prevent tyranny. Indeed, the Second Amendment's text expressly highlights the relationship between a trained society and a free state.

Part V reviews the restrictions on the right to train that existed in the colonial and founding eras. The few laws that restricted recreational shooting were either wartime measures enacted to conserve gunpowder or limitations on shooting at particular times and places. These laws were not intended to limit training, and some included exceptions to allow it.

Part VI analyzes modern cases. While courts generally recognize that there must be some sort of right to train, no court has explored the historical support for the right or the challenged restrictions.

This Article concludes by emphasizing that training is a pillar of the right to keep and bear arms because it is required to develop the skills necessary to effectively exercise the other protected rights, such as self-defense, hunting, and militia service. Given the historical foundation of the right to train, courts should ensure that it is robustly protected by the Second Amendment, as the Founders intended.

## I. ENGLISH HISTORY

In forming their government, Americans sought to both preserve cherished English liberties and expand them. As the Supreme Court explained, the Second

Amendment "codified a right 'inherited from our English ancestors.'"[8] This is not to say that the American arms right is limited to the scope of the English arms right.[9] Rather, Americans were contemptuous of the limitations on the English right.[10] They secured a broader and more robust right, which encompassed their own arms tradition informed by their own experiences.[11] Yet even the relatively limited English right protected the right to train with arms.

## A. Devotion to Arms in Ancient England

The English encouraged training throughout most of their history, starting in the earliest recorded times. The definitive English historian of the eighteenth century, David Hume, wrote of Britain's first inhabitants in his monumental *History of England*.[12] Hume explained that their devotion to arms secured their liberty: "The Britons were divided into many small nations or tribes; and being a military people, whose sole property was their arms and their cattle, it was impossible, after, they had acquired a relish of liberty, for their princes or chieftains to establish any despotic authority over them."[13] "Their governments," Hume added, "though monarchical, were free."[14]

---

[8]  District of Columbia v. Heller, 554 U.S. 570, 599 (2008) (quoting Robertson v. Baldwin, 165 U.S. 275, 281 (1897)).

[9]  *See* Bridges v. California, 314 U.S. 252, 264 (1941) ("[T]o assume that English common law in this [First Amendment] field became ours is to deny the generally accepted historical belief that one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.") (quotation omitted); *id.* (quoting VI THE WRITINGS OF JAMES MADISON, 1790–1802, at 387 (Gaillard Hunt ed., 1906) ("Madison . . . wrote that 'the state of the press . . . under the common law, cannot . . . be the standard of its freedom in the United States.'")).

[10]  When James Madison introduced the Second Amendment in Congress, his notes show that he condemned the limited scope of the "English Decln. of Rts" including that it protected only "arms to Protestts" (Protestants). James Madison, Notes for Speech in Congress Supporting Amendments, June 8, 1789, *in* THE ORIGIN OF THE SECOND AMENDMENT: A DOCUMENTARY HISTORY OF THE BILL OF RIGHTS, 1787–1792, at 645 (David Young ed., 2d ed. 2001); *see also* THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 270 (1880) [hereinafter COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW] (The Second Amendment "was adopted with some modification and enlargement from the English Bill of Rights").

[11]  *See* Poe v. Ullman, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting) (Justice John M. Harlan analyzing the "liberty of the individual" in America by looking to "what history teaches are the traditions from which it developed as well as the traditions from which it broke").

[12]  1 DAVID HUME, THE HISTORY OF ENGLAND FROM THE INVASION OF JULIUS CÆSAR TO THE REVOLUTION IN 1688, at 3 (1775).

[13]  *Id.*

[14]  *Id.*

Their devotion to arms paid off when Julius Caesar invaded Britain in 55 BC and the "common people" successfully repelled the Roman invasion.[15] When Caesar launched another campaign the following year, the British resisted the conquest for nearly a century, until largely being subdued in AD 43.[16]

Once the British were under Roman control, the Romans established a Field of Mars in London, where the "Romans train'd up and exercised their Young Souldiers, and likewise the Youth of the Neighbouring Britains, in the skill and exercise of Arms, that they might be more expert in the use of them upon all emergent Occasions."[17] The purpose was to ensure that "if any sudden Tumults or Insurrections should happen in the City," the British "were then ready and at hand to suppress them."[18]

Over time, however, the British developed too great a dependency on the Romans. When Rome began neglecting Britain to focus on its own teetering empire, Britain lacked the capability to defend itself.[19] It was not long before Britain learned the consequences of an unarmed and untrained populace, as it was repeatedly invaded by enemies and left pleading for Rome's assistance.[20] Tired of coming to Britain's aid, the Romans around 448 AD "informed the Britains that they must no longer look to them for succour, exhorted them to arm in their own defence, and urged, that as they were now their masters, it became them to protect by their valour that independence which their antient lords had conferred upon them."[21]

## B. Dependence on a Trained Populace for Domestic Order and National Security

Having reaped the benefits of a trained populace and suffered the consequences of an untrained populace, English laws soon began requiring arms possession and competency.[22] Jurist Nathaniel Bacon (Francis Bacon's half-brother) wrote in the seventeenth century about the rights of Englishmen under the ancient laws of England.[23] Bacon noted that historically the "strength" of the nation was "the

---

[15] *See* JULIUS CAESAR, THE CONQUEST OF GAUL 100 (S.A. Handford ed., 1951) (1982 reprint).

[16] HUME, *supra* note 12, at 6. Some tribes "maintained an obstinate resistance," but most were defeated by Publius Ostorius Scapula in AD 51, and the rest were conquered by Gnaeus Julius Agricola in the early 80s. *Id.* at 6–8.

[17] John Bagford, A Letter to the Publisher, *in* 1 JOHN LELAND, ANTIQUARII DE REBUS BRITANNICIS COLLECTANEA LXI (1715). Leland (1503–1552) has been called the "father of [England's] local history and bibliography." Archibald L. Clarke, *John Leland and King Henry VIII*, *in* 2 THE LIBRARY 145 (J.Y.W. MacAlister & Alfred W. Pollard eds., 3d. ser., 1911).

[18] Bagford, *supra* note 17, at LXI.

[19] HUME, *supra* note 12, at 9.

[20] *Id.* at 10.

[21] *Id.* at 11.

[22] *See generally* HUME, *supra* note 12.

[23] William Pitt the Elder called Bacon's work "without exception, the best and most instructive book we have on matters of that kind." Letter from William Pitt to Thomas Pitt,

Freemen . . . bound to keep Arms for the preservation of the Kingdom, their Lords, and their own persons," who were "strict in their Discipline"—i.e., training—with arms.[24]

Part of what freemen were "bound" to do was join the "hue and cry" to pursue and apprehend criminals.[25] *The Mirrour of Justices* noted that historically in England, "[i]t was [o]rdained; [t]hat every one of the age of fourteene yeares and above should be ready to kill mortall offenders in their notorious sinnes, or to follow them from [t]owne to [t]owne with [h]ue and [c]ry."[26] It must have been expected that everyone over thirteen would be trained to arms because they could not otherwise "be ready to kill mortall offenders."[27] Indeed, the entire community of people over thirteen years old chasing criminals with deadly weapons and "ready to kill" would often be more dangerous than allowing criminals to flee, unless the community were disciplined in arms.[28]

A related and likewise ancient law-enforcement scheme that required an armed and competent populace was the posse comitatus. When sheriffs needed assistance catching criminals, suppressing riots, or enforcing civil process, they had the authority to summon armed members of the community for help.[29] "The attack of a castle or place of arms must require disciplined troops," Granville Sharp explained at the time of America's founding, "therefore it was certainly necessary that 'every man' so bound by the common law to assist" in the posse comitatus "should be trained in arms."[30]

---

May 4, 1754, *in* LETTERS WRITTEN BY THE LATE EARL OF CHATHAM TO HIS NEPHEW THOMAS PITT, ESQ. (AFTERWARDS LORD CAMELFORD) 38–39 (3d ed. 1804).

[24] NATHANIEL BACON, THE CONTINUATION OF AN HISTORICALL DISCOURSE OF THE GOVERNMENT OF ENGLAND, UNTILL THE END OF THE REGIME OF QUEENE ELIZABETH 40 (1651).

[25]      There is yet another species of arrest, wherein both officers and private men are concerned, and that is upon an *hue* and *cry* raised upon a felony committed. An hue (from *huer*, to shout) and cry, *hutesium et clamor*, is the old common law process of pursuing, with horn and with voice, all felons, and such as have dangerously wounded another. It is also mentioned by statute Westm. 1. 3 Edw. I. c. 9. and 4 Edw. I. *de officio coronatoris*. But the principal statute, relative to this matter, is that of Winchester, 13 Edw. I. c. 1 & 4. which directs, that from thenceforth every country shall be so well kept, that, immediately upon robberies and felonies committed, fresh suit shall be made from town to town, and from county to county. . . .

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1769), *reprinted in* CLASSICS OF ENGLISH LEGAL HISTORY IN THE MODERN ERA 293 (David S. Berkowitz & Samuel E. Thorne eds., 1978).

[26] ANDREW HORNE, THE MIRROUR OF JUSTICES 10 (W. H. trans., 1646). *See also* Nicholas Tindal, in an opinion as the Chief Justice of Common Pleas, called *The Mirrour of Justices* "a book of great authority." 133 ENG. REP. (11 COMMON PLEAS) 94 (1913).

[27] HORNE, *supra* note 26, at 10.

[28] *Id.*

[29] *See* BLACKSTONE, *supra* note 25, at 146.

[30] GRANVILLE SHARP, TRACTS, CONCERNING THE ANCIENT AND ONLY TRUE MEANS OF

When King Alfred established England's militia during his reign from 871–899, he created an even greater need for the people to be expert in arms.[31] The militia required armed members of the community to defend the country against invasions and insurrections.[32] It "was founded on the idea that all the freemen were to be armed, trained, and ready to fight to defend their local and national communities."[33]

Through the hue and cry, posse comitatus, and militia, England's domestic order and natural security historically depended on a significant portion of the population being proficient in arms. It was therefore common throughout England's history to train the people with arms, starting from their youth.

With arms proficiency being so vital to the nation's security, it is no wonder that England has an extensive tradition of training mandates. Such mandates existed since at least 1363, when King Edward III sent letters to London sheriffs mandating "that every citizen, at leisure times and holidays, use in their recreations Bows and Arrows, or Pellets, or Bolts, . . . and learn the art of shooting."[34] A similar 1368 proclamation ensured that "every one of the said city, strong in body . . . learn and exercise the art of shooting."[35] Londoners who opted to "apply themselves to the throwing of stones, wood, iron, hand-ball, foot-ball, bandy-ball, cambuck or cock-fighting" instead of shooting faced imprisonment.[36]

Edward's successor, King Richard II, similarly mandated shooting while forbidding less-worthy hobbies. A 1388 law required that "Servants and Labourers shall have Bows and Arrows, and use the same the Sundays and Holydays, and leave all playing at Tennis or Football, and other Games called Coits, Dice, Casting of Stone, and other such importune Games."[37] Mindless games apparently continued to distract the population over the next couple decades, so the 1388 law was restated

---

NATIONAL DEFENCE, BY A FREE MILITIA 23 (3d ed. 1782) (quoting EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWES OF ENGLAND 193 (1642) ("every man is bound by the Common Law to assist not only the Sherife in his Office for the execution of the Kings Writs (which are the commandments of the King) according to Law; but also his Baily, that hath the Sheriffes Warrant in that behalfe, hath the same authority.")); *see also* WILLIAM JONES, AN INQUIRY INTO THE LEGAL MODE OF SUPPRESSING RIOTS WITH A CONSTITUTIONAL PLAN OF FUTURE DEFENCE 19 (2d ed. 1782) (stressing that "all persons, who constitute the power of a county" must be "bound to be competently skilled in the use of [the musket and bayonet]").

[31] David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761, 771 (2015).

[32] *Id.*

[33] *Id.*

[34] WALTER MICHAEL MOSELEY, AN ESSAY ON ARCHERY: DESCRIBING THE PRACTICE OF THAT ART, IN ALL AGES AND NATIONS 294 (1792). "Bolts were the Arrows used for Cross-bows." *Id.*

[35] 1 JOHN ENTICK, A NEW AND ACCURATE SURVEY OF LONDON, WESTMINSTER, SOUTHWARK, AND PLACES ADJACENT 261 (1766).

[36] *Id.*

[37] 12 Ric. II ch. 6 (1388) (brackets omitted).

in 1409 with the assurance that the said statute will "be firmly holden and kept."[38] The 1409 act punished "every such Labourer or Servant that doth contrary to the same Statute" with "Imprisonment by Six Days."[39] And if the law was not enforced, the local official responsible for enforcement was fined.[40]

Nearly a century later, a 1477 law under King Edward IV provided that "no Person should use any unlawful Games, as Dice, Coits, Tennis, and such like Games, but that every Person strong and able of Body should use his Bow."[41] This law must have been effective, because in 1511, *An Act Concerning Shooting in Long Bowes* recognized the increasing number of "good Archers" due to the regular "exercise of the Subgiettes" in the "shotyng in long bowes."[42] It credited the improvement in archery for having successfully "defended this Realme" against "the cruell malice and daunger" of England's enemies.[43] But it also lamented a recent decline in "[a]rcherie and shotyng in longbowes" due to the increasing popularity of other games and hobbies.[44] The act, therefore, required that every able-bodied subject under 60 years old "use and exercise shotyng in longbowes" and keep "a bowe and arrowes" at home, ready for defensive use at all times.[45] Additionally, fathers were required to provide their sons, and masters were required to provide their servants, with archery equipment and training.[46] By applying to nearly everyone under sixty, this law was significantly broader than the fourteenth-century laws that applied only to laborers and servants.[47]

---

[38]  11 Hen. IV ch. 3–6 (1409).

[39]  *Id.*

[40]  *Id.*

[41]  17 Edw. IV ch. 3 (1477).

[42]  3 Hen. VIII ch. 3 (1511).

[43]  *Id.*

[44]  *Id.*

[45]  *Id.*

[46]  *Id.*

[47]      [L]ocal records suggest that towns took seriously the need to make provision for their inhabitants to practise archery. Lydd in Kent can be found making butts periodically from the 1420s to the 1480s, and by the last decades of the fifteenth century Coventry, New Romney, Plymouth, Rye and Walberswick were all doing the same. The fuller records of the mid sixteenth century sometimes present a more detailed picture. At Bristol half a dozen men or more worked for the best part of a week or even longer to construct butts in the town marsh most years between 1540 and 1557. . . . At Ludlow a team half the size worked for two or three days to construct butts behind the castle most years between 1538 and 1570. . . . Between the 1530s and the 1560s Barnstaple, Dover, Exeter, Eye, Faversham, Leicester, Lyme Regis, Poole, Reading, Southampton, Warwick, Winchester, Windsor, Worcester and no doubt many other towns made similar efforts to keep their butts in good repair.

Steven Gunn, *Archery Practice in Early Tudor England*, 209 PAST & PRESENT 53, 55 (2010).

A similar law, enacted three years later, required all able-bodied subjects to always keep bows and arrows ready at home, practice with them regularly, and if responsible for a young male, to equip and train them.[48] This act stated that it would apply in perpetuity.[49] Additionally, several proclamations issued under Henry VIII during this time ordered local officials to ensure that people were engaging in archery rather than the forbidden games that took attention away from it.[50]

Likely resulting from the growing popularity of firearms in the sixteenth century, a firearms training law was passed along with a longbow training law in 1541.[51] The longbow training law again lamented that "Several new devised Games" had caused "the Decay of Archery," and required that "every man" under sixty "use and exercise shooting in long-bows," while keeping a bow "continually in his house" to "use himself in shooting."[52] Everyone had to "exercise themselves with long-bows . . . in holy days and other times convenient."[53] Also similar to previous laws, the "fathers, governors and rulers of such as be of tender age" were required to "teach and bring them up in the knowledge of the same shooting" and provide them with arms to practice with.[54] The firearms training law allowed "all Gentlemen, Yeomen, and Servingmen," as well as "all the Inhabitants of Citties, Coroughes and Markett

---

Some towns made the effort to build ditches or rails around the butts, while others hired painters to decorate them. *Id.* at 57.

[48]  6 Hen. VIII ch. 2 (1514).

[49]  *Id.*

[50]  1 TUDOR ROYAL PROCLAMATIONS, nos. 108, 121, 138, 163, 183 (Paul L. Hughes & James F. Larkin eds., 1964–69).

[51]  The popularity of handguns and crossbows had long been blamed for taking away from longbow practice. For example, Henry VIII's 1528 proclamation blamed "the newfangles and wanton pleasure that men now have in using of crossbows and handguns" for the declining interest in longbows. *Id.* at no. 121. As a result, some laws restricted the possession and use of crossbows and handguns for certain classes in part to encourage longbow proficiency. *See, e.g.*, 19 Hen. VII, ch. 4 (1503) (limiting crossbows); 3 Hen. VIII ch. 13 (1511) (limiting crossbows); 6 Hen. VIII ch. 13 (1514) (limiting crossbows); 25 Hen. VIII ch. 17 (1533) (limiting crossbows and handguns). Handguns grew in popularity anyway, as the 1541 law reflects. *See* 6 Hen. VIII ch. 13 (1514).

[52]  33 Hen. VIII ch. 9 (1541), *in* 5 THE STATUTES AT LARGE, FROM THE THIRTY-SECOND YEAR OF KING HENRY VIII. TO THE SEVENTH YEAR OF KING EDWARD VI. INCLUSIVE 81 (Danby Pickering ed., 1763).

[53]  *Id.* at 82.

[54]  *Id.* at 81. For examples of enforcement of the longbow training law, see Gunn, *supra* note 47, at 58–59 (finding evidence of 176 individuals in Ludlow being charged for failing to train from 1542–1576 and 72 individuals being charged in Fordwich between 1553–1569); LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 55 (2016) (finding that 59 individuals in Essex were charged from 1573–1574; that Peterborough residents were fined for failing to train while Peterborough constables were fined for failing to enforce the training requirement; and that "leaders in Buckinghamshire, Derbyshire, Essex, Oxfordshire, Warwickshire, and Wiltshire were cooperative and took steps to comply" with the training requirement).

Townes" to "shote with any handgune Demyhake or hagbutt at anye butt or bank of Earth onlye in place convenient for the same."[55]

In addition, there was regular militia training. As of 1581, depending on where one lived throughout the realm, the populace was summoned for arms training in times of peace anywhere from one to sixteen times per year.[56] The following decade, Queen Elizabeth commanded that her subjects be armed and ready to defend the country in an address to both Houses of Parliament: "You that be lieutenants and gentlemen of command in your counties, I require you to take care that the people be well armed, and in readiness upon all occasions."[57] The emphasis on training continued under Charles II, as a 1662 law required that the militia train up to four times per year (for up to two days at a time) in addition to one general muster per year (which lasted up to four days).[58]

It was not until the late seventeenth century that England established a standing army, and not until the nineteenth century that England established a professional police force.[59] Throughout the overwhelming majority of its history, the country relied on its armed populace for domestic order and national security.

## C. Legal Commentaries on the Right to Train

Influential legal commentators long recognized the importance of England's trained populace. Sir John Fortescue, the Chief Justice of the King's Bench, wrote two influential treatises around 1470.[60] In *The Difference Between an Absolute and a Limited Monarchy*, Fortescue contrasted the unarmed and untrained French with the armed and proficient English. The French peasants were "not able to fight, nor to defende the realme; nor thai haue wepen, nor money to bie thaim wepen."[61] In England, on the other hand, where the people were expert in arms, the country could better defend itself.[62] In *De Laudibus Legum Angliæ*, Fortescue advocated for a trained populace and, to that end, starting training at a young age. "[W]hat is or can

---

[55]  33 Hen. VIII ch. 6 (1541).

[56]  2 WILLIAM LAMBARD, EIRENARCHA OR OF THE OFFICE OF THE JUSTICES OF PEACE, IN TWO BOOKES 479 (1581) (reprinted by The Lawbook Exchange, Ltd. in 2003).

[57]  A Speech Made by Queen Elizabeth in Parliament Concerning the Spanish Invasion (1593), *in* 1 THE HARLEIAN MISCELLANY: A COLLECTION OF SCARCE, CURIOUS, AND ENTERTAINING PAMPHLETS AND TRACTS, AS WELL IN MANUSCRIPT AS IN PRINT 437 (1808).

[58]  14 Car. II ch. 3 (1662).

[59]  JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 2 (1994).

[60]  WALTER RALEIGH, THE HISTORIE OF THE WORLD, IN FIVE BOOKES 247 (1614) (Sir Walter Raleigh called Fortescue "that notable Bulwarke of our Lawes").

[61]  JOHN FORTESCUE, THE GOVERNANCE OF ENGLAND: THE DIFFERENCE BETWEEN AN ABSOLUTE AND A LIMITED MONARCHY 114 (Charles Plummer ed., rev. ed. 1885).

[62]  *Id.*

be of greater Use to a Minor," he questioned, "than to be trained up in Military Discipline, whilst he is yet a Minor"?[63] "Indeed," Fortescue asserted, "it will be of no small Advantage to the Kingdom, that the Inhabitants be expert in Arms."[64] John Selden—"England's first legal historian"[65]—added notes to the edition he edited and published in 1616. Demonstrating that arms training remained common practice during the century-and-a-half after Fortescue wrote *De Laudibus Legum Angliæ*, Selden stated that "[t]he Custom of the Nation has been to train up the Freeholders to Discipline."[66]

### D. Shooting Competitions as Practice and Entertainment

Frequent practice and the demand for marksmanship inevitably led to the popularity of shooting competitions. By the thirteenth century, shooting matches "were an integral part of the social scene in Europe and elsewhere."[67] By the end of the fifteenth century, archery practice had become so common that "all the gardens" in London were converted into "a plaine field, for Archers to shoot in."[68] When population growth in Islington, Hoxton, and Shoreditch led to the closure of areas traditionally used for training in 1514, "a furious contest" erupted, "amounting . . . to an insurrection," "in which the citizens practising archery, tenacious of what they had long enjoyed as a right, assembled and destroyed all the fences" obstructing their old training grounds.[69] The archers who removed the barriers and restored the training grounds numbered in the thousands.[70]

The typical shooting practice was a social activity, with practices often involving over a dozen participants and sometimes even more spectators.[71] Shooting competitions could be major events. As Steven Gunn explained:

> The duty to practise archery for the sake of king and kingdom was often lightened by the excitement of competition, as at Canterbury, Chester, Great Dunmow and Shrewsbury, at the

---

[63]  JOHN FORTESCUE, DE LAUDIBUS LEGUM ANGLIÆ 100 (John Selden ed., 2d ed. 1741).

[64]  *Id.* at 100–01.

[65]  Martha A. Ziskind, *John Selden: Criticism and Affirmation of the Common Law Tradition*, 19 AM. J. LEGAL HIST. 22, 22 (1975).

[66]  FORTESCUE, *supra* note 63, at 101.

[67]  M.L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492–1792, at 28 (1980).

[68]  RICHARD BAKER, CHRONICLE OF THE KINGS OF ENGLAND FROM THE TIME OF THE ROMANS GOVERMENT UNTO THE RAIGNE OF OUR SOVERAIGNE LORD KING CHARLES 159 (1643).

[69]  ANTHONY HIGHMORE, THE HISTORY OF THE HONOURABLE ARTILLERY COMPANY OF THE CITY OF LONDON, FROM ITS EARLIEST ANNALS TO THE PEACE OF 1802, at 40 (1804).

[70]  William Hunt, *Civic Chivalry and the English Civil War*, *in* THE TRANSMISSION OF CULTURE IN EARLY MODERN EUROPE 204, 215 (Anthony Grafton & Ann Blair eds., 1990).

[71]  Gunn,  note 47, at 56, 61.

> Whit Monday games at Burrough on the Hill in Leicestershire
> and the wrestling and shooting contests with graded prizes linked
> to Bartholomew Fair in London.[72]

Gunn also identified shooting matches held between communities: "The Scotts of nearby Scot's Hall and their men came to shoot at New Romney in 1506–7, Lord Powis and his men came to shoot at Shrewsbury in 1522–3, and Yorkshire gentlemen held a shooting match at York in 1555."[73]

Archers of the era were highly skilled. "[M]any of them are recorded as shooting at twelve-score pricks or even thirteen-score pricks, targets set 240 or 260 paces away, comparable to the 250–300 yards reckoned as extreme bow range in the Hundred Years War."[74] Firearms became common in shooting competitions in the fifteenth century, and gunners were also skilled.[75] A 1487 match hosted in Germany was held at a distance of 200 meters (nearly 219 yards), an impressive range for the rudimentary firearms of the time.[76]

In 1537, King Henry VIII incorporated by royal charter the Honourable Artillery Company.[77] The Company originated around 1087 "as a society of armed citizens for the protection of the goods of merchants."[78] Henry VIII granted the royal charter "to promote regular practice in shooting the longbow, crossbow, and the handgun."[79] The plan was successful, as interest in marksmanship increased and men vied for acceptance into the Company.

By the seventeenth century, however, enthusiasm for the Company waned— perhaps because London was facing no threat of invasion or because those most passionate about arms training were serving in Ireland.[80] Consequently, in 1610, inspired by ruined European cities that neglected training during peacetime, a group of private citizens revived the weekly training sessions at the Company's Artillery Garden.[81] The effort to reinvigorate training was effective. Writing about 1638 in 1804, Anthony Highmore noted that becoming "great proficients in the use and exercise of arms" was "esteemed the most laudable exercise of diversion in use

---

[72] *Id.* at 64.

[73] *Id.*

[74] *Id.* at 68.

[75] BROWN, note 67, at 28. Firearm competitions were typically held separate from archery competitions due to the superiority of firearms, and rifle competitions were typically held separate from competitions for smoothbore firearms based on the superiority of rifles. *Id.*

[76] *Id.* Historian Lois Schwoerer notes that while "gorgeous guns" were sometimes used as a "status symbol," those "used in hunting, target shooting, and for protection were usually simple and unadorned." SCHWOERER, *supra* note 54, at 7.

[77] Hunt, *supra* note 70, at 214.

[78] RALPH NEVILL, BRITISH MILITARY PRINTS xxxiv (1909).

[79] SCHWOERER, *supra* note 54, at 97.

[80] Hunt, *supra* note 70, at 216.

[81] *Id.* at 213.

amongst the citizens of London."[82] Shooting was pursued with similar zeal in the eighteenth century, when "visit[ing] shooting galleries in London as well as other places for target practice" was all the "rage."[83]

Notably, recreational shooting was an activity in which everyone could participate, including children. In the 1540s, shooting games held in Essex included a bracket for "lads."[84] In his poem *The Artillery Garden*, Thomas Dekker refers to a "muster made by children," in which "Every boy-man in his infantry, [is] Shewing like Mars in his minority."[85] Similarly, Benjamin Johnson hoped in a seventeenth-century poem that "our great men would let their Sonnes Come to their Schooles" so instructors could "show' hem the use of Guns."[86]

Roger Ascham argued that "euerye bodye shoulde learne to shote when they be yonge," because men can only learn to shoot well if "they learne it perfitelye when they be boyes."[87] In his very influential *The Scholemaster* published in 1570, Ascham advised boys to learn to shoot firearms and bows in childhood. "[T]o plaie at all weapones" and "to shote faire in bow, or surelie in gon" were "verie necessarie" skills "for a Courtlie Gentleman."[88] Similarly, John Milton's 1644 treatise *Of Education* advocated for students to practice daily with their arms.[89] Some schools included arms training in their curriculums. For example, at the Lincoln Grammar School in the 1620s, "an old low-country souldier was entertain'd to traine them [the students] in arms, and they all bought themselves weapons, and instead of childish sports, when they were not at their bookes, [they] were exercis'd in all their military postures, and in assaults and defences."[90] Likewise, the free grammar school at Chipping Campden in Gloucestershire "legitimated firearms in the minds of young boys" by "[i]ncluding guns in their educational program" by 1639.[91] A 1615 augmented edition of John Stow's *Annals of London* noted that "the young Schollers, and other youthes, from the age of nine or ten yeares unto seaventeene" voluntarily "practised all points of warre, which they had seene their elders teach, having made them pikes

---

[82]  HIGHMORE, *supra* note 69, at 64.

[83]  SCHWOERER, *supra* note 54, at 113. Schwoerer adds that throughout the centuries, the popularity of guns for marksmanship and other civilian activities "helped to maintain a market for firearms and employment in the gun industry in peacetime." *Id.* at 26.

[84]  Gunn, *supra* note 47, at 61.

[85]  Hunt, *supra* note 70, at 219 (quoting THOMAS DEKKER, THE ARTILLERY GARDEN).

[86]  2 THE WORKES OF BENJAMIN JOHNSON 215 (1640).

[87]  ROGER ASCHAM, TOXOPHILUS 36 (Edward Arber ed., 1868) (1545). Ascham added that "shotinge of all pastymes is moost fitte to be vsed in childhode: bycause it is an imitation of moost ernest things to be done in manhode." *Id.*

[88]  ROGER ASCHAM, THE SCHOLEMASTER 64 (1571). "The record of reprints of Roger Acham's *The Scholemaster*—four between 1571 and 1589, and another one in 1711—shows its popularity." SCHWOERER, *supra* note 54, at 147.

[89]  JOHN MILTON, OF EDUCATION 6–7 (1644).

[90]  LUCY HUTCHINSON, MEMOIRS OF THE LIFE OF COLONEL HUTCHINSON 32 (7th ed. 1848).

[91]  SCHWOERER, *supra* note 54, at 147; *see also* Hunt, *supra* note 70, at 220.

and pieces fit for their weake handling."[92] Meanwhile, a 1622 sermon commended the Artillery Garden and Military Yard companies for training London's "valiant men" as well as "youths, nay very children in feats of arms."[93]

When seventeenth-century kings visited places, the local men would often train to impress them.[94] Sometimes, to the kings' delight, the children would also join.[95] Sir John Oglander wrote that when King James I visited the Isle of Wight in 1607, "hee wase mutch taken with seeing the littel [boys] skirmishe, whoe he loved to see betor and willynglior then menn."[96] Sir Oglander observed that the "[b]oys were drilled in martial exercises in other places as well as in the Island, and their performances pleased Charles I as much as they did his father [James]."[97] Indeed, King Charles I was "gratified by witnessing the proficiency of 'certain boys' in the use of arms" on the Island in 1627, and even granted their request for gunpowder "in the hope that the youths of other places would be stirred up to do the same."[98]

*E. The Understanding of the English Right at the Time of the Second Amendment's Ratification*

In interpreting the United States Constitution, the analytical baseline for English history is how America's Founders understood it. What mattered most in *Heller*, for example, is that "[b]y the time of the founding, the right to have arms had become fundamental for English subjects."[99]

At the time of America's founding, training was revered as both a right and a duty in England. It had long been held as essential to self-preservation. Highmore articulated the view held by generations of his countrymen when he said that "the laws of nature [and] of sound policy require every active citizen to be exercised, and expert in arms of defence and peace for mutual protection."[100] "The ancient power of the country," he added, "is established upon th[e] security" of a trained citizenry.[101] Indeed, England had depended on an armed and trained populace for domestic tranquility and national security for over a millennium. England's 1541 training requirements were still in effect.[102] Shooting competitions were a favorite pursuit. And to many—especially the Americans who just battled Britain in a long

---

[92] JOHN STOW, ANNALES, OR A GENERALL CHRONICLE OF ENGLAND 936 (Edmund Howes ed., 1615).

[93] Hunt, *supra* note 70, at 219.

[94] JOHN OGLANDER, THE OGLANDER MEMOIRS 121 (W.H. Long ed., 1888).

[95] *Id.*

[96] *Id.*

[97] *Id.* at 121 n.2.

[98] *Id.*

[99] District of Columbia v. Heller, 554 U.S. 570, 593 (2008).

[100] HIGHMORE, *supra* note 69, at 4.

[101] *Id.*

[102] SHARP, *supra* note 30, at 16.

and grueling war—Britain's large standing army created an even greater need for a trained populace. As Granville Sharp put it:

> If it be alledged that there can be no occasion, in these modern times, to arm and train the inhabitants of England, because there is an ample military force, or *standing army*, to preserve the peace; yet let it be remembered, that, the greater and more powerful *the standing army is*, so much more necessary is it that there *should be a proper balance to that power*, to prevent any ill effects from it: though there is one bad effect, which *the balance* (howsoever perfect and excellent) cannot prevent.[103]

In sum, as Sharp declared at the time of America's founding, "the laws of England always required the people to be armed, and not only to be *armed*, but to be *expert in arms*."[104]

## II. Colonial America

### A. The Importance of Marksmanship for Food and Survival

In colonial America, arms proficiency was required for survival. Guns were needed for food, self-defense, community defense, and conquest. Poor shooting, therefore, had deadly consequences.[105] It could result in starvation, invasion, insurrection, or defeat in battle.

Great emphasis was placed on proficiency from the earliest colonial days. "Nowhere else was the cult of accuracy so rigorously worshipped as in colonial America."[106] The colonists practiced shooting regularly, and since they depended on one another for security, they passed laws to ensure that the community as a whole was competent with arms.[107]

In 1629, so the community "may bee the better able to resist both forraigne enemies & the natives," the governor of Massachusetts Bay asked that the people "bee exercised in the use of armes."[108] In 1645, the colony ensured that its youth

---

[103] *Id.* at 26.

[104] *Id.* at 18.

[105] "Everywhere the gun was more abundant than the tool. It furnished daily food; it maintained its owner's claims to the possession of his homestead among the aboriginal owners of the soil; it helped to win the mother country's wars for possession of the country as a whole." 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 1 (1910).

[106] ALEXANDER ROSE, AMERICAN RIFLE: A BIOGRAPHY 18–19 (2008).

[107] *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019).

[108] 1 RECORDS OF MASSACHUSETTS, 1628–1641, at 392 (Nathaniel B. Shurtleff ed., 1853).

knew how to shoot, too. Determining that "the training up of youth to the art and practice of arms will be of great use in the country in divers respects," it ordered "that all youth within this jurisdiction, from ten years old to the age of sixteen years, shall be instructed . . . in the exercise of arms," including "small guns, half-pikes, bows and arrows, &c."[109] Starting in 1656, Plymouth Colony required its militiamen to bear arms to church on Sundays "with powder and bullett to improve if occation shall require"—i.e., practice shooting after church when necessary.[110]

The most common laws ensuring arms proficiency were militia laws.[111] The American colonies enacted hundreds of militia laws that required virtually all able-bodied males (most often defined as those aged sixteen to sixty) to keep arms for service in the militia.[112] Virtually all such laws required those militiamen to train with said arms.[113] In a 1744 speech, for example, New Jersey's governor proclaimed that "the Militia, in this Country . . . [is] the whole Body of the People from Sixteen Years of Age to Fifty. It is fit that all these People should be trained and taught the Use of Arms, and it is chiefly for this that the Militia Act is intended."[114] Since the colonies were entirely dependent on a trained militia for their defense, and because the militia consisted of the body of the people, the colonies depended on the people being trained in arms.[115] Militia laws were therefore intended to ensure that the populace possessed arms and could use them effectively.

Most colonists did not need mandates to maintain arms proficiency. As Robert Beverley wrote of Virginians in 1705, "most people there are skilful in the use of fire-arms, being all their lives accustomed to shoot in the woods."[116] It was this habitual practice of using guns in their daily lives, "together with a little exercising," that Beverley thought "would soon make the militia useful."[117]

Joseph Doddridge's writings reveal that little changed throughout the eighteenth century. Writing of the typical Virginian and Pennsylvanian during the 1760s, 70s,

---

[109] THE CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY 734 (1814).

[110] WILLIAM BRIGHAM, THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (1836).

[111] The Supreme Court has noted the American militia system's roots in King Alfred's inventions. See United States v. Miller, 307 U.S. 174, 179 (1939) ("Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409 points out 'that king Alfred first settled a national militia in this kingdom' and traces the subsequent development and use of such forces.").

[112] See Kopel & Greenlee, supra note 107, at 533–89 (covering the 13 original states and colonies, Vermont, and Plymouth Colony).

[113] Id.

[114] 6 DOCUMENTS RELATING TO THE COLONIAL HISTORY OF THE STATE OF NEW JERSEY, 1738–1747, at 187 (William A. Whitehead ed., 1882).

[115] The New Jersey Council described the militia as "the only Means in [the people's] Power of preserving themselves, their Wives, their Children, and their Fortunes." Id. at 227.

[116] ROBERT BEVERLEY, THE HISTORY AND PRESENT STATE OF VIRGINIA 217 (J.W. Randolph ed., 1855).

[117] Id.

and 80s, Doddridge noted that "[a] well grown boy, at the age of twelve or thirteen years, was furnished with a small rifle and shot pouch."[118] It was not government mandates but recreational shooting that developed expertise: "Hunting squirrels, turkeys, and raccoons soon made him expert in the use of his gun."[119]

## B. Shooting Competitions as Practice and Entertainment

Discussing the adults, Doddridge noted that shooting contests, as in England, were popular in America: "Shooting at marks was a common diversion among the men, when their stock of ammunition would allow it."[120] He explained their technique and tendency to shoot at long ranges:

> Their shooting was from a rest, and at a great distance as the length and weight of the barrel of the gun would throw a ball on a horizontal level. Such was their regard to accuracy, in these sportive trials of their rifles, and of their own skill in the use of them, that they often put moss, or some other soft substance, on the log or stump from which they shot, for fear of having the bullet thrown from the mark, by the spring of the barrel. When the rifle was held to the side of a tree for a rest, it was pressed against it as lightly as possible, for the same reason.[121]

---

[118] JOSEPH DODDRIDGE, NOTES ON THE SETTLEMENT AND INDIAN WARS OF THE WESTERN PARTS OF VIRGINIA AND PENNSYLVANIA FROM 1763 TO 1783, INCLUSIVE, TOGETHER WITH A REVIEW OF THE STATE OF SOCIETY AND MANNERS OF THE FIRST SETTLERS OF THE WESTERN COUNTRY 123 (John S. Ritenour & Wm. T. Lindsey eds., 1912).

[119] Id.; see also ROSE, supra note 106, at 19 ("In Europe hunting with guns was a pursuit reserved for the nobility, but in America, where gun ownership on the frontier was more common if not universal, even children were introduced to firearms from an early age.").

[120] DODDRIDGE, supra note 118, at 124.

[121] Id. Alexander Rose likewise explained the unique care that Americans put into each shot:
> Only American riflemen refused to "guess" how much powder to use for their personalized weapon. When they purchased a new rifle, they would rest its muzzle on the snow or on a bleached cloth and fire it. If it spat out unburned residue, they gradually reduced the powder load until none stained the white background. Then they would fashion a powder flask or charger that would dispense exactly the right amount down the barrel. For "tricky" shots, they would rely on long experience and a skilled eye to calculate whether to use extra or skim a little off. For longer ranges, where the ball would be buffeted by the wind and retarded by air resistance, they would add more powder for higher muzzle velocity and a flatter ballistic arc; to increase accuracy by reducing recoil at shorter distances, they would use less.
ROSE, supra note 106, at 19 (footnote omitted); see also id. ("Some riflemen even purchased

Shooting competitions were an activity in which nearly anyone could partici-
pate. The matches offered an ideal opportunity to hone some of the most important
skills for colonial life, while providing colonists with a source of amusement—
especially in rural communities where entertainment was limited.[122] Good marksmen
were praised and admired.

Future president John Adams was especially fond of shooting. "I spent my time
as idle Children do," Adams wrote in his autobiography, "and above all in shooting,
to which Diversion I was addicted to a degree of Ardor which I know not that I ever
felt for any other Business, Study or Amusement."[123] When he "was about nine or
ten years old" he "learn'd the use of the gun and became strong enough to lift it."
"I used to take it to school and leave it in the entry," he explained, "and the moment
it was over went into the field to kill crows and squirrels."[124]

His son, John Quincy Adams, who also became president, valued firearms train-
ing as well. In retirement, he wrote about a recent encounter that reminded him of
his early childhood, in which he performed musket drills for militiamen:

> Cary asked me if I remembered a company of militia who, about
> the time of the battle of Lexington in 1775, came down from
> Bridgewater, and passed the night at my father's house and barn,
> at the foot of Penn's Hill, and in the midst of whom my father
> placed me, then a boy between seven and eight years, and I went
> through the manual exercise of the musket by word of command
> from one of them. I told him I remembered it distinctly as if it
> had been last week. He said he was one of the company.[125]

Before his own presidency (which began in 1825), President James Madison
sent John Quincy Adams to St. Petersburg to serve as Minister to Russia from 1809
to 1814.[126] Adams left his brother Thomas instructions for watching his children in
his absence. Prominent among these was a request that Thomas train the children—
George (age 9), John (age 7), and Charles (age 3)—with firearms:

---

a long, narrow brass or iron tube about half an inch in diameter that could be screwed into
the top of the barrel to function as a rudimentary 'telescopic' sight. (The accessory lacked
a magnifying glass but certainly aided concentration)").

[122] *See* NICHOLAS JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT:
REGULATION, RIGHTS AND POLICY 239 (3d ed. 2021) ("Long-distance shooting contests were
major events in rural communities.").

[123] 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257 (Lyman H. Butterfield ed., 1961).

[124] *Id.* at 258 n.6.

[125] 7 MEMOIRS OF JOHN QUINCY ADAMS: COMPRISING PORTIONS OF HIS DIARY FROM 1795
TO 1848, at 325 (Charles Francis Adams ed., 1875).

[126] 3 WRITINGS OF JOHN QUINCY ADAMS, 1801–1810, at 321 n.1 (Worthington Chauncey
Ford ed., 1914).

> One of the things which I wish to have them taught . . . is the use and management of firearms. . . . The accidents which happen among children arose more frequently from their ignorance, than the misuse of weapons which they know to be dangerous. . . . I beg you occasionally from this time to take George out with you in your shooting excursions, teach him gradually the use of the musket, its construction, and the necessity of prudence in handling it; let him also learn the use of pistols, and exercise him at firing at a mark.[127]

Thomas Jefferson, who succeeded John Adams as president after defeating him in the election of 1800, was also enthusiastic about recreational shooting in the colonial days. By the age of fourteen, Jefferson's father had taught him "to sit his horse, fire his gun, boldly stem the Rivanna when the swollen river was 'Rolling red from brae to brae,' and press his way with unflagging foot through the rocky summits of the contiguous hills in pursuit of deer and wild turkeys."[128] As a young man, Jefferson enjoyed shooting competitions, sometimes placing wagers on his skill. For example, in 1768, he recorded that he "Won shooting 1/6" (one sixpence), and the following year that he "Lost shooting" "2/6."[129]

Jefferson maintained his enthusiasm for firearms training throughout his life. In 1785 he wrote to his nephew about the best form of exercise:

> As to the species of exercise, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprise, and independence to the mind. Games played with the ball, and others of that nature, are too violent for the body, and stamp no character on the mind. Let your gun therefore be the constant companion of your walks.[130]

Over three decades later, Jefferson gifted his favorite pistols to James Madison's adoptive son, John Payne Todd, "in the hope they will afford you [Todd] sport in your daily rides."[131] Jefferson took the opportunity to boast that he "never missed a squirrel [at] thirty. yards with them."[132] Even in his final years, Jefferson still declared

---

[127] *Id.* at 497.

[128] 1 HENRY S. RANDALL, THE LIFE OF THOMAS JEFFERSON 15 (1865).

[129] 1 JEFFERSON'S MEMORANDUM BOOKS, ACCOUNTS, WITH LEGAL RECORDS AND MISCELLANY, 1767–1826, at 81, 150 (James A. Bear, Jr. & Lucia C. Stanton eds., 1997).

[130] THOMAS JEFFERSON, WRITINGS 816 (Merrill D. Peterson ed., 1984).

[131] Letter from Thomas Jefferson to John Payne Todd (Aug. 15, 1816), *in* 10 THE PAPERS OF THOMAS JEFFERSON: RETIREMENT SERIES 321 (J. Jefferson Looney ed., 2013). Jefferson believed the pistols would "suit" Todd because he was "a sportsman." *Id.* at 320.

[132] *Id.* at 321.

himself "a great friend to the manly and healthy exercises of the gun," and suggested that "every American who wishes to protect his farm from the ravages of quadrupeds & his country from those of biped invaders . . . ought to be" a "gun-man."[133]

Adams and Jefferson are especially notable because of their extraordinary roles in America's founding, but their enthusiasm for shooting was ordinary among the colonists.

The freedom to shoot was even used to entice indentured servants to come to America. George Alsop boasted from Maryland in 1666 that "every Servant has a Gun, Powder and Shot allowed him, to sport him withall on all Holidayes and leasurable times, if he be capable of using it, or willing to learn."[134] This, Alsop hoped, would appeal to Englanders who did not enjoy as much liberty as Americans to sport with arms.

Although shooting matches were a common "entertainment form," firearms historian M.L. Brown noted that "[t]he popular shooting match" was also "practical from the standpoint of practice."[135] For the colonies, like the English, depended on a trained populace to maintain domestic order via the posse comitatus and maintain a defense against invasions and insurrections via the militia.[136]

### C. Community Defense

In colonial America, as in England, the hue and cry and posse comitatus helped to keep the peace domestically, and the militia provided security from foreign foes—all of which consisted of ordinary members of the community who were skillful with arms.

The only colony in America without a long tradition of raising and maintaining a militia was Pennsylvania, which, due to its large and influential Quaker population, only began mandating militia service during the French and Indian War in 1755.[137] Yet when French and Spanish privateers terrorized the Delaware River and Atlantic coast in 1747 during King George's War, armed and trained Pennsylvanians stepped forward to defend the colony. Benjamin Franklin published a pamphlet calling for the people of Pennsylvania to create a voluntary organization.[138] In the pamphlet, *Plain Truth*, Franklin argued that

---

[133]  Letter from Thomas Jefferson to Peter Minor (Jul. 20, 1822), *in* 18 THE PAPERS OF THOMAS JEFFERSON: RETIREMENT SERIES 565 (J. Jefferson Looney ed., 2013).

[134]  GEORGE ALSOP, A CHARACTER OF THE PROVINCE OF MARYLAND 59 (Newton D. Mereness ed., 1902) (1666).

[135]  BROWN, *supra* note 67, at 127.

[136]  Kopel, *supra* note 31, at 792–94.

[137]  Kopel & Greenlee, *supra* note 107, at 559–64. Most, but not all, Quakers were pacifists. *See, e.g.*, DAVID B. KOPEL, THE MORALITY OF SELF-DEFENSE AND MILITARY ACTION: THE JUDEO-CHRISTIAN TRADITION 384–89 (2017) (describing diverse Quaker views on self-defense and defense of others, before and during the American Revolution).

[138]  *See Plain Truth: Or, Serious Considerations On the Present State of the City of Philadelphia, and Province of Pennsylvania*, *in* 3 THE PAPERS OF BENJAMIN FRANKLIN (Leonard W. Labaree & Whitfield J. Bell, Jr eds., 1961).

> If this now flourishing City, and greatly improving Colony, is destroy'd and ruin'd, it will not be for want of Numbers of Inhabitants able to bear Arms in its Defence. 'Tis computed that we have at least (exclusive of the Quakers) 60,000 Fighting Men, acquainted with Fire-Arms, many of them Hunters and Marksmen, hardy and bold.[139]

Franklin believed that these fighting men, hunters, and marksmen just needed "Order, Discipline, and a few Cannon."[140]

*Plain Truth*, Franklin wrote later in life, "had a sudden and surprising Effect."[141] A second edition was published, as was a German translation of it, and it spread throughout the colonies. Soon, over ten thousand volunteers signed up, trained regularly, and provided security to the colony.[142]

> Militia laws were clearly not responsible for the people of Pennsylvania having and knowing how to use arms. It was the common possession and usage of arms for numerous everyday purposes such as hunting and target shooting that resulted in the population being familiar with arms and in a position to defend themselves and the Colony.[143]

Another group of colonists who were free from required training but voluntarily maintained firearms competency were students at Harvard College.[144] "[N]o sooner was the College started [in 1636] than the students began to waive their rights and volunteer to train" with the militia.[145] When the college later forbade the students to train with the militia, the students decided to train themselves. They petitioned in 1759 "for Liberty to exercise Themselves in the use of the Fire-Lock," which the faculty granted them permission to do "in the Play-Place" (the site of Memorial Hall), provided that "they behave themselves orderly in their Exercise, & Particularly [t]hat [t]hey explode not any of their Fire-Locks in the College Yard, or Elsewhere (Except Vollies in the Field of Exercise.)"[146] By 1766, this training "was influencing college life considerably."[147]

---

[139] *Id.* at 202.

[140] *Id.*

[141] *Id.* at 278.

[142] DAVID E. YOUNG, THE FOUNDERS' VIEW OF THE RIGHT TO BEAR ARMS 18 (2007).

[143] *Id.* at 16–17.

[144] Among the college's first laws was a 1642 provision requiring a "license of the Overseers of the Colledge" to participate in the "Artillery or traine-Band." Samuel F. Batchelder, *"The Students in Arms"—Old Style*, 29 THE HARV. GRADUATES' MAG. 549, 552 (1921).

[145] *Id.* (quotation marks omitted).

[146] *Id.* at 556–57.

[147] *Id.* 557 n.1.

Nearly "[e]veryone" in colonial America "was expected to be a master of preci-sion shooting—not just for prestige, but for dinner."[148] Thus, even those exempted from mandatory training often made time to train themselves. Indeed, due to their constant dependence on firearms for food and protection, and their habitual use of firearms for sport and entertainment, "[t]he Colonists in America were the greatest weapon-using people of that epoch in the world"[149]—a fact the British would soon learn firsthand.

<div align="center">III. REVOLUTIONARY AMERICA</div>

*A. Pre-War Focus on Arms Proficiency*

As tensions rose between Britain and its North American colonies, Americans' emphasis on marksmanship intensified. They had always relied on accuracy for their most essential needs, but it was now becoming increasingly clear that ordinary Americans—farmers, merchants, shopkeepers, etc.—would have to confront the world's strongest military.

Understanding that their independence would largely depend on their ability to outshoot professional British soldiers, Americans soon equated firearms competence with freedom. Thus, Reverend Simeon Howard, in his famous 1773 sermon in Boston, expressed the need for a free people to be trained in arms:

> A people who would stand fast in their liberty, should furnish themselves with weapons proper for their defence, and learn the use of them . . . . However numerous they may be, if they are unskilled in arms, their number will tend little more to their security, than that of a flock of sheep does to preserve them from the depredations of the wolf: accordingly it is looked upon as a point of wisdom, in every state, to be furnished with this skill, though it is not to be obtained without great labor and expence.[150]

Influential Boston patriot Josiah Quincy echoed this sentiment, asserting that "[t]he supreme power is ever possessed by those who have arms in their hands, and are disciplined to the use of them."[151] Accordingly, the Provincial Congress of

---

[148]  JOHNSON ET AL., *supra* note 122, at 239.

[149]  SAWYER, *supra* note 105, at 1.

[150]  A SERMON PREACHED TO THE ANCIENT AND HONORABLE ARTILLERY-COMPANY, IN BOSTON, NEW ENGLAND, JUNE 7TH, 1773, at 25–26 (1773).

[151]  Josiah Quincy, Jr., Observations on the Act of Parliament Commonly Called the Boston Port-Bill: With Thoughts on Civil Society and Standing Armies (1774), *in* MEMOIR OF THE LIFE OF JOSIAH QUINCY, JUNIOR, OF MASSACHUSETTS: 1774–1775, at 347 (2d ed. 1874).

Massachusetts in 1775 advocated for "all the inhabitants of this colony, to be diligently attentive to learning the use of arms."[152]

As noted above, the inhabitants had long done so. The *Boston Gazette* reported that "[b]esides the regular trained militia in New-England, all the planters sons and servants are taught to use the fowling piece from their youth, and generally fire balls with great exactness at fowl or beast."[153] This phenomenon was confirmed by an Englishman visiting New England in 1774, who noted that "in the cities you scarcely find a Lad of 12 years that does not go a Gunning."[154] In other colonies it was no different. For instance, a Virginia gentleman described American arms culture to his Scottish friend by explaining that "[w]e are all in arms, exercising and training old and young to the use of the gun."[155] Benjamin Franklin reported that "I found at my arrival all America from one End of the 12 united Provinces to the other, busily employed in learning the Use of Arms."[156]

The Americans were confident their firearms expertise would give them a significant edge over their British adversaries. Although they generally had less experience as soldiers and many had never seen war, they had been using firearms their entire lives. John Zubly, a Savannah minister, warned the British that "in the strong sense of liberty, and the use of firearms almost from the cradle, the Americans have vastly the advantage over men of their rank almost everywhere else."[157] He added that American children were "shouldering the resemblance of a gun before they are well able to walk."[158] The eccentric Major General Charles Lee—Washington's second-in-command—also believed that the Americans' lifelong familiarity and expertise with arms would allow them to prevail over the British. Lee found "reason to doubt" that the British troops "composed of the refuse of an exhausted nation . . . should be able to conquer 200,000 active, vigorous yeomanry, fired with the noble ardour . . . all armed, all expert in the use of arms, almost from their cradles."[159]

---

[152] N.H. GAZETTE, Jan. 27, 1775, at 1.

[153] BOS. GAZETTE, Dec. 5, 1774, at 4.

[154] DAVID HARSANYI, FIRST FREEDOM: A RIDE THROUGH AMERICA'S ENDURING HISTORY WITH THE GUN 47 (2018).

[155] Peter Force, *The King's Message to Parliament, of March 7, 1774, to the Declaration of Independence by the United States*, *in* 3 AMERICAN ARCHIVES: A DOCUMENTARY HISTORY OF THE ENGLISH COLONIES IN NORTH AMERICA 621 (4th Ser., Peter Force ed., 1840) [hereinafter 3 AMERICAN ARCHIVES].

[156] Letter from Benjamin Franklin to Jonathan Shipley (July 7, 1775), *in* 1 LETTERS OF DELEGATES TO CONGRESS, 1774–1789, at 604 (Paul H. Smith ed., 1976).

[157] MOSES COIT TYLER, THE LITERARY HISTORY OF THE AMERICAN REVOLUTION, 1763–1776, at 484 (1898).

[158] *Id.* at 485.

[159] *To the People of America* (Feb. 3, 1775) *in* MEMOIRS OF THE LIFE OF THE LATE CHARLES LEE, ESQ. 142 (1792). Lee was notoriously odd. In an intercepted letter that eventually found its way to Lee, John Adams wrote, "[Lee] is a queer creature, but you must love his dogs if you love him, and forgive a thousand whims for the sake of the soldier and the

In fact, Americans' constant use of firearms did make them remarkable marks-
men. One example was provided by John Andrews, an aid to British General
Thomas Gage, who recounted an incident in which Redcoats were unsuccessfully
trying to shoot at a target on the Boston Common. When an American mocked them,
a British officer dared the American to do better. The American repeatedly hit the
target, and "[t]he officers as well as the soldiers *star'd,* and tho't the Devil was in
the man. *Why,* says the countryman, I'll tell you *naow.* I have got a *boy* at home that
will toss up an apple and shoot out all the seeds as its coming down."[160] A clearly
exaggerated report from London warned that American militiamen "all have and can
use arms . . . in so particular a manner, as to be capable of shooting a Pimple off a
man's nose without hurting him."[161]

James Madison was more realistic in boasting about Virginia's marksmen, as
well as his own marksmanship:

> The strength of this Colony will lie chiefly in the rifle-men of
> the Upland Counties, of whom we shall have great numbers.
> You would be astonished at the perfection this art is brought to.
> The most inexpert hands rec[k]on it an indifferent shot to miss
> the bigness of a man's face at the distance of 100 Yards. I am far
> from being among the best & should not often miss it on a fair
> trial at that distance. If we come into an engagement, I make no
> doubt but the officers of the enemy will fall at the distance
> before they get within 150 or 200 Yards. Indeed I believe we
> have men that would very often hit such a mark 250 Yds. Our
> greatest apprehensions proceed from the scarcity of powder but
> a little will go a great way with such as use rifles.[162]

---

scholar." Letter from John Adams to James Warren (July 24, 1775), *in* 2 THE WORKS OF JOHN
ADAMS, SECOND PRESIDENT OF THE UNITED STATES 412 (Charles Francis Adams ed., 1850).
To his credit, Lee took no apparent offense, writing to Adams:

> As you may possibly harbor some suspicions that a certain passage in
> your intercepted letters (may) have made some disagreeable impressions
> on my mind I think it necessary to assure you that it is quite the reverse.
> Until the bulk of mankind is much alter'd, I consider the reputation of
> being whimsical and eccentric rather as a panegyric than sarcasm, and
> my love of dogs passes with me as a still higher complement.

Letter from Charles Lee to John Adams (Oct. 5, 1775), *in* 2 THE WORKS OF JOHN ADAMS,
SECOND PRESIDENT OF THE UNITED STATES 414 (Charles Francis Adams ed., 1850).
    [160] LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON, 1772–1776, at 59 (Winthrop Sargent
ed., 1866).
    [161] BOS. EVENING POST, Nov. 21, 1768, at 2, col. 3.
    [162] Letter from James Madison to William Bradford (June 19, 1775), *in* 1 THE PAPERS OF
JAMES MADISON 153 (William T. Hutchinson et al. eds., 1962).

Madison was correct. Virginia had a tremendous number of sharpshooters. So many, in fact, that when General Washington sought five hundred riflemen, a competition had to be held because far more applied.[163] They were such skilled shots, however, that they destroyed the target before most had an opportunity:

> The commanding Officer . . . took a board of a foot squar and with Chalk drew the shape of a moderate nose in the center and nailed it up to a tree at 150 yd distance and those who came nighest the mark with a single ball was to go. But by the first 40 or 50 that fired the nose was all blown out of the board, and by the time his Comp. was up the board shared the same fate.[164]

Washington, as could be expected, selected his riflemen carefully. And he believed that those who were accustomed to using arms in their daily lives were the most desirable. Thus, Washington wrote, "great care should be observed in choosing active marksmen. The manifest inferiority of inactive persons, unused to arms, in this kind of service, (although equal in numbers,) to men who have practised hunting, is inconceivable. The chance against them is more than two to one."[165]

A Pennsylvanian wrote of another impressive company of roughly a thousand riflemen.[166] "They are, at listing, rejected, unless they can hit a playing-card, without a rest, at one hundred and twenty yards distance," he said.[167] Like many Americans, he believed their training and skill gave them the advantage over the British. "Almost every sensible man, in all the colonies, is trained, and ready to supply any loss," he asserted, whereas "[t]he regulars have . . . never appeared equal to our troops, man for man."[168]

### B. Effect of Arms Training in the Revolutionary War

The Revolutionary War began on April 19, 1775, when the British set out to seize American munitions at Concord, Massachusetts and the Americans resisted with arms, leading to "the shot heard round the world" and the Battles of Lexington and Concord.[169] The Americans' success surprised many and proved the colonists

---

[163]  Diary of John Harrower, 1773–1776, *in* 6 THE AMERICAN HISTORICAL REVIEW 100 (1900).

[164]  *Id.* The *Virginia Gazette* mockingly warned "General Gage, take care of *your* nose." 1 DIARY OF THE AMERICAN REVOLUTION: FROM NEWSPAPERS AND ORIGINAL DOCUMENTS 111 (Frank Moore ed., 1863).

[165]  2 THE WRITINGS OF GEORGE WASHINGTON 140 (Jared Sparks ed., 1883).

[166]  1 LETTERS OF DELEGATES TO CONGRESS, 1774–1789, *supra* note 156, at 609.

[167]  *Id.*

[168]  *Id.*

[169]  *Lexington and Concord: The Shot Heard 'Round the World*, AM. BATTLEFIELD TR.,

could indeed stand up to the powerful British military. Despite being comparatively undisciplined, the Massachusetts farmers, historian Richard Frothingham, Jr. explained, were more effective than the experienced troops due to the farmers' lifelong use of arms:

> [T]his ill-appointed army was not entirely unprepared for an encounter. Some of its officers, and not a few of the privates, had served in the French wars,—an invaluable military school for the colonies; a martial spirit had been excited in the frequent trainings of the minute-men, while the habitual use of the fowling-piece made these raw militia superior to veteran troops in aiming the musket.[170]

After the Battles of Lexington and Concord, Americans prepared for war. As earlier writings demonstrated, Americans' firearms proficiency was the pride of the nation, and their extraordinary skill was frequently used to boost morale among the patriots and intimidate the enemy.

The Continental Congress highlighted the Americans' shooting skills to warn King George III that they would make for a formidable foe.[171] The Congress cautioned that "[M]en trained to Arms from their infancy, and animated by the love of liberty, will afford neither a cheap or easy conquest."[172]

Bearing out this warning, Americans' success in the Revolutionary War was widely attributed to their familiarity and training with arms. Discussing the 1775 Battle of Bunker Hill in 1789, David Ramsay, a South Carolina legislator and delegate to the Continental Congress, explained that,

> None of the provincials in this engagement were riflemen, but they were all good marksmen. The whole of their previous military knowledge had been derived from hunting, and the ordinary amusements of sportsmen. The dexterity which by long habit they had acquired in hitting beasts, birds, and marks [i.e., targets], was fatally applied to the destruction of British officers.[173]

Ramsay determined that Americans had an advantage because "the inhabitants had been, from their early years . . . taught the use of arms."[174] "Europeans," by contrast,

---

https://www.battlefields.org/learn/articles/lexington-and-concord-shot-heard-round-world https://perma.cc/G47C-X8VE (last visited Oct. 18, 2022).

[170]  RICHARD FROTHINGHAM, HISTORY OF THE SIEGE OF BOSTON, AND OF THE BATTLES OF LEXINGTON, CONCORD, AND BUNKER HILL 102–03 (3d ed. 1873).

[171]  1 JOURNALS OF THE AMERICAN CONGRESS FROM 1774–1788, at 106–11 (1823).

[172]  Id. at 110.

[173]  1 DAVID RAMSAY, THE HISTORY OF THE AMERICAN REVOLUTION 204 (1789).

[174]  Id. at 191.

"from their being generally unacquainted with fire arms are less easily taught the use of them than Americans, who are from their youth familiar with these instruments of war."[175]

Thomas Jefferson suggested that American casualties were far fewer than British casualties because Americans were better marksmen. Jefferson wrote "[t]his difference [in casualties] is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy."[176] George Washington confirmed Jefferson's assertions: "Our Scouts, and the Enemy's Foraging Parties, have frequent skirmishes; in which they always sustain the greatest loss in killed and Wounded, owing to our Superior skill in Fire arms."[177]

As the war raged on, John Hancock, President of the Continental Congress, praised American riflemen as "the finest Marksmen in the world."[178] Fellow Massachusettsian John Adams expressed similar acclaim, calling them "the most accurate Marksmen in the world."[179] Even greater admiration came from a clergy-man in Maryland in a series of letters to the Earl of Dartmouth:

> In this country, my Lord, the boys, as soon as they can discharge a gun, frequently exercise themselves therewith, some a fowling, and others a hunting. The great quantities of game, the many kinds, and the great privileges of killing, make the *Americans* the best marksmen in the world, and thousands support their families principally by the same, particularly riflemen on the frontiers, whose objects are deer and turkies. In marching through woods, one thousand of these riflemen would cut to pieces ten thousand of your best troops. I don't, my Lord, speak at random, or write partially. I have travelled too much among these men to be insensible of their abilities.[180]

---

[175] *Id.* at 195.

[176] 1 THE WORKS OF THOMAS JEFFERSON 208 (H. A. Washington ed., 1884).

[177] 7 THE WRITINGS OF GEORGE WASHINGTON: FROM THE ORIGINAL MANUSCRIPTS 1745–1799, at 198 (John C. Fitzpatrick ed., 1932).

[178] Letter from John Hancock to Joseph Warren (June 18, 1775), *in* 1 LETTERS OF MEMBERS OF THE CONTINENTAL CONGRESS 134 (Edmund C. Burnett ed., 1921).

[179] Letter from John Adams to Abigail Adams (June 11, 1775), 1 ADAMS FAMILY CORRESPONDENCE: DECEMBER 1761–MAY 1776, at 215 (Lyman H. Butterfield ed., 1963).

[180] Peter Force, *The Origin and Progress of the North American Colonies; of the Causes and Accomplishment of the American Revolution; and of the Constitution of Government for the United States, to the Final Ratification Thereof, in* 4 AMERICAN ARCHIVES: A DOCUMENTARY HISTORY OF THE ENGLISH COLONIES IN NORTH AMERICA FROM THE KING'S MESSAGE TO PARLIAMENT, OF MARCH 7, 1774 TO THE DECLARATION OF INDEPENDENCE BY THE UNITED STATES 360 (4th Ser., Peter Force ed., 1843).

In another letter the Minister warned, "O, my Lord! if your Lordship knew but one half what I know of *America,* your Lordship would not persist, but be instantly for peace, or resign."[181]

Another warning, this one from William and Thomas Bradford of Philadelphia, was published in the London Chronicle on August 17, 1775. It warned that "[t]his province has raised 1000 rifle-men, the worst of whom will put a ball into a man's head at a distance of 150 yards or 200 yards, therefore advise your officers who shall here-after come out to America, to settle their affairs in England before their departure."[182]

The expectations for American marksmen were high, and they were eager to show off their skills. In the summer of 1775, General Washington "arranged a spectator review of his riflemen."[183]

> In the presence of the army, drawn up in parallel lines each side of the range and an immense crowd of spectators, in which a number of British spies were welcome visitors, a pole 7 inches in diameter was set up, and a marksman stepped off about 250 spaces. At the place where he stopped a company of riflemen was lined up to show what they could do. The mark was about equal to that a man would present standing sideways, and the range about 200 yards. . . . the riflemen, firing singly or at com-mand, so riddled the pole that it was apparent that no enemy could survive an instant.[184]

"General Howe," the commander-in-chief of the British land forces, "was fully as much impressed as the spectators, and wrote home about the 'terrible guns of the rebels.'"[185]

A letter from Maryland on August 1, 1775, described an impressive display that occurred there.

> [I]n the evening, however, they [the riflemen] were drawn out to show the gentlemen of the Town their dexterity at shooting. A clapboard, with a mark the size of a dollar, was put up; they

---

[181] *Id.* at 361.

[182] *Extract of a Letter from Messrs. Bradford, of Philadelphia, to the Printer of a Public Paper, dated Philadelphia, July 8, 1775, in* LETTERS ON THE AMERICAN REVOLUTION, 1774–1776, at 167 (Margaret Wheeler Willard ed., 1925).

[183] SAWYER, *supra* note 105, at 79.

[184] *Id.* at 80; *see also* JOHN G.W. DILLIN, THE KENTUCKY RIFLE 84 (Palladium Press 1998) (1924) ("The *Pennsylvania Gazette* of August 5, 1775, says of the corps: 'A party of these men at a late review on a quick advance, placed their balls in poles of 7 inches diameter, fixed for that purpose, at the distance of 250 yards.' This statement was copied into the *London Chronicle*, August 3–5, and into Almon's *Remembrance* for 1775, 4th ed.").

[185] SAWYER, *supra* note 105, at 80.

> began to fire off-hand, and the bystanders were surprised, few shots being made that were not close to or in the paper. When they had shot for a time in this way, some lay on their backs, some on their breast or side, others ran twenty or thirty steps, and firing, appeared to be equally certain of their mark. With this performance the company were more than satisfied, when a young man took up the board in his hand, not by the end, but by the side, and holding it up, his brother walked to the distance, and very coolly shot into the white; laying down his rifle, he took the board, and holding it as it was held before, the second brother shot as the former had done. By this exercise I was more astonished than pleased. But will you believe me, when I tell you, that one of the men took the board, and placing it between his legs, stood with his back to the tree while another drove the centre.[186]

A few days later, the *Virginia Gazette* reported another remarkable display that occurred in Lancaster, Pennsylvania.

> Two brothers in the company took a piece of board five inches broad and seven inches long, with a bit of white paper, about the size of a dollar, nailed in the centre, and while one of them supported this board perpendicularly between his knees, the other, at the distance upwards of sixty yards, and without any kind of rest, shot eight bullets through it successively, and spared a brother's thigh! Another of the company held a barrel stave perpendicularly in his hands with one edge close to his side, while one of his comrades, at the same distance, and in the manner before mentioned, shot several bullets through it, without any apprehension of danger on either side. The spectators appearing to be amazed at these feats, were told that there were upwards of fifty persons in the same company who could do the same thing; that there was not one who could not plug nineteen bullets out of twenty, as they termed it, within an inch of the head of a tenpenny nail.[187]

The *Gazette* added that "some of them proposed to stand with apples on their heads, while others at the same distance, undertook to shoot them off; but the people who

---

[186] *Letter from Richard Henry Lee to General Washington August 1, 1775, in* 3 AMERICAN ARCHIVES, *supra* note 155, at 1.

[187] 1 DIARY OF THE AMERICAN REVOLUTION FROM NEWSPAPERS AND ORIGINAL DOCUMENTS, *supra* note 164, at 122.

saw the other experiments declined to be witnesses of this."[188] It goes without saying that this high degree of skill could be acquired only through extensive training.

It did not take long for the Americans to get their chance to demonstrate their skill in battle. In Boston, the riflemen picked off Howe's men from long distances. One rifleman, "seeing some British on a scow at a distance of fully half a mile, found a good resting place on a hill and bombarded them until he potted the lot."[189] The British soldiers soon discovered that "it was almost certain death to expose their heads within two hundred yards of the riflemen."[190] As the Army surgeon Dr. James Thacher observed,

> These men are remarkable for the accuracy of their aim; striking a mark with great certainty at two hundred yards distance. At a review, a company of them, while on a quick advance, fired their balls into objects of seven inches diameter, at the distance of two hundred and fifty yards. . . . their shot have frequently proved fatal to British officers and soldiers, who expose themselves to view, even at more than double the distance of common musket-shot.[191]

On August 16, 1775, the *Pennsylvania Gazette* reported: "We are also told that the riflemen had in one day killed ten of a reconnoitering party; and it is added likewise, that they have killed three Field officers. A centry was killed at 250 yards distance."[192] The *Pennsylvania Packet* added about the sentry that "only half his head was seen."[193] On the 21st, the *Pennsylvania Gazette* further reported: "Last Wednesday, some rifleman, on Charlestown side, shot an officer of note in the ministerial service . . . and killed three men on board a ship at Charlestown ferry, at the distance of full half a mile."[194]

Those would not be the only stunningly long shots of the war. When an English soldier on the New Jersey side of the Delaware River "mocked" Jacobus Scout, who was on the Pennsylvania side of the river, the Pennsylvanian gunsmith "shot [the] English soldier at 900 yards and killed him."[195] Another example occurred during

---

[188]  *Id.*

[189]  SAWYER, *supra* note 105, at 81.

[190]  W.H. Hunter, *The Pathfinders of Jefferson County, Ohio*, *in* 6 OHIO ARCHEOLOGICAL AND HISTORY PUBLICATIONS 222 n.35 (Fred J. Heer ed., 1900, Supp. 1980).

[191]  JAMES THACHER, A MILITARY JOURNAL DURING THE AMERICAN REVOLUTIONARY WAR: FROM 1775 TO 1783, at 38 (1823).

[192]  DILLIN, *supra* note 184, at 84.

[193]  *Id.*

[194]  *Id.* at 85.

[195]  HISTORY OF BUCKS COUNTY, PENNSYLVANIA 220 (J.H. Battle ed., 1887); *Tales from the 1769 Vansant/Craven Burying Ground*, THE CRAVEN HALL NEWSLETTER (Craven Hall Historical Society, Warminster, Pa.), Mar. 2021, at 7, https://bit.ly/3CWMLYr [https://perma.cc/A5FE-RAWY]. The inscription on Scout's gravestone noted that "he shot an English soldier at 900 yards and killed him," and "he was an intimate friend of Thomas Paine." *Id.*

the 1778 Siege at Boonesborough: the Shawnees fired into Daniel Boone's fort from hills roughly three hundred yards away[196] and a Shawnee interpreter was said to have been shot at six hundred yards.[197]

Perhaps no long-distance shot was as consequential as Timothy Murphy's during the Battle of Saratoga. The Pennsylvania hunter killed General Simon Fraser from around three hundred yards when the general was rallying his troops during a pivotal point in the battle, which became a turning point in the war.[198] The victory provided the Americans a badly needed morale boost, and it also motivated the French to enter the war in support of the Americans.

Murphy received the order to shoot from Daniel Morgan, in whose rifleman company Murphy served. Morgan, like Washington and other rifle commanders, held a shooting competition for admission into his company.[199] Morgan's shooters were apparently "singularly excellent" because he took twenty-eight more riflemen than the sixty-eight the Congress allowed him.[200] When Morgan assembled the 11th Virginia Regiment, he "found the best shooters in western Virginia by setting up a target depicting a British officer's head (some said it was of King George III) at one hundred yards and requiring his recruits to hit it on their first shot."[201] The Marquis de Lafayette explained that Morgan's riflemen "had been taken, not from different corps, but from parts of the country on the frontiers of the savage tribes, and from amongst men whose mode of life, and skill in firing their long carbines, rendered them particularly useful in that service."[202]

"[T]he best marksman in the British Army,"[203] British Major George Hanger, provided "a proof of [the] most excellent skill of an American rifleman" and challenged "any man [to] shew me an instance of better shooting."[204] He explained that he and others were discretely planning an attack when suddenly an American rifleman killed one of their horses from 300 yards away.[205] As an American captive during the war, Hanger used the opportunity to learn from the Americans about their training and techniques:

> I have often asked American riflemen, what was the most they
> thought they could do with their rifle? They have replied, that

---

[196]  LYMAN COPELAND DRAPER, THE LIFE OF DANIEL BOONE 529 (Ted Franklin Belue ed., 1998).

[197]  Rufus L. Porter, *Porter's Fort*, COLO. SPRINGS GAZETTE TEL., Jan. 2, 1973, at 18.

[198]  SAWYER, *supra* note 105, at 86.

[199]  ROSE, *supra* note 106, at 43.

[200]  *Id.*

[201]  *Id.* at 51.

[202]  *Lafayette "the Friend of America": The First Champion of Revolutionary France, 1757–1834, in* 10 UNIVERSITY LIBRARY OF AUTOBIOGRAPHY 295–96 (1918).

[203]  ROSE, *supra* note 106, at 56.

[204]  GEORGE HANGER, COLONEL GEORGE HANGER'S ADVICE TO ALL SPORTSMEN, FARMERS AND GAMEKEEPERS 122 (1814).

[205]  *Id.*

> they thought they were generally sure of splitting a man's head
> at two hundred yards, for so they termed their hitting the head.
> I have also asked several whether they could hit a man at four
> hundred yards,—they have replied certainly, or shoot very near
> him, by only aiming at the top of his head.[206]

Hanger was "certain, that, provided an American rifleman were to get a perfect aim at 300 yards at me, standing still, he most undoubtedly would hit me."[207] He concluded that "I never in my life saw . . . men who shot better" than the American riflemen.[208]

Many British soldiers agreed. "In the British camp the riflemen were called . . . the most fatal widow-and-orphan makers in the world."[209] And it was not just the riflemen that impressed with their accuracy. One British officer remarked that the Americans shot well despite low-quality firearms: "These fellows were generally good marksmen, and many of them used long guns made for Duck-Shooting."[210]

The Americans likely would have lost the war if not for their superior marksmanship. The odds were overwhelmingly stacked against them. They faced a dangerous scarcity of firearms, ammunition, food, salt, clothing, medical supplies, and money for much of the war. They had a smaller fighting force, drawn from a smaller general population, which was far less experienced in battle. They also had to face paid Hessian mercenaries, hostile Native Americans, and British loyalists, in addition to the British military. But they were able to overcome these obstacles with their zeal for independence and their remarkable skill with arms. They learned firsthand how valuable lifelong firearms practice could be in resisting a tyrannical government, and they kept that lesson in mind when forming their own government.

## IV. RATIFICATION OF THE UNITED STATES CONSTITUTION

### A. State Constitutions

In 1787 and 1788, John Adams published his *Defence of the Constitutions of Government of the United States of America*, a defense of the various state constitutions throughout the United States. Emphasizing the benefits of the militia, Adams argued that a trained populace could not be tyrannized: "That the people be continually trained up in the exercise of arms," ensures that "nothing could at any time be

---

[206] *Id.* at 144.
[207] *Id.* at 210.
[208] *Id.* at 122.
[209] Hunter, *supra* note 190, at 222 n.35 (quotations omitted).
[210] FREDERICK MACKENZIE, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON, BEING THE DIARY OF LIEUTENANT FREDERICK MACKENZIE, ADJUTANT OF THE ROYAL WELCH FUSILIERS, JANUARY 5–APRIL 30, 1775, at 67 (Allen French ed., 1926).

imposed upon the people but by their consent."[211] That was why "Rome, and the territories about it, were trained up perpetually in arms."[212]

For the same reason, Virginia's 1776 declaration of rights provided that "a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State."[213] Pennsylvania's 1776 constitution was the first adopted after the Declaration of Independence. Its Declaration of Rights stated that "the people have a right to bear arms for the defence of themselves and the state."[214] Its "plan or frame of government" provided that "[t]he freemen of this commonwealth and their sons shall be trained and armed for its defence under such regulations, restrictions, and exceptions as the general assembly shall by law direct."[215] Drawing on Pennsylvania's constitution, Vermont's 1777 constitution ensured that "the people have a right to bear arms for the defence of themselves and the State."[216] Under its "Plan or Frame of Government," it used Pennsylvania's language ensuring that the "[t]he freemen of this Commonwealth, and their sons, shall be trained and armed for its defence."[217] Vermont's 1786 constitution kept the language of the arms provision from its 1777 declaration of rights, but provided more general training language: "The inhabitants of this Commonwealth shall be armed and trained for its defence, under such regulations, restrictions, and exceptions, as the General Assembly shall by law direct."[218] In its 1793 constitution, adopted after the U.S. Constitution and the Bill of Rights, Vermont again kept the 1777 declaration of rights language to protect arms rights,[219] and made another minor change to the training language:

---

[211]  3 JOHN ADAMS, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA 471–72 (1787–88) (quoting MARCHAMONT NEDHAM, THE RIGHT CONSTITUTION OF A COMMONWEALTH 89 (1656)).

[212]  *See id.* at 472.

[213]  7 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3814 (Francis Newton Thorpe ed., 1909).

[214]  5 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3083 (Francis Newton Thorpe ed., 1909).

[215]  *Id.* at 3084.

[216]  6 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3741 (Francis Newton Thorpe ed., 1909).

[217]  *Id.* at 3742.

[218]  *Id.* at 3758. In the declaration of rights, a comma was added so it read: "the people have a right to bear arms, for the defence of themselves and the State." *Id.* at 3753. Notably, in writing the 1786 constitution, the convention entertained—and rejected—a proposal to change "a right to bear arms for the defence of themselves and the State" into "a right to bear arms for the defence of the community." VERMONT STATE PAPERS 518 (1823).

[219]  This time, the comma was removed, so it used the exact punctuation of the 1777 guarantee: "the people have a right to bear arms for the defence of themselves and the State." 6 THE FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC

"The inhabitants of this State shall be trained and armed for its defence, under such regulations, restrictions, and exceptions, as Congress, agreeably to the Constitution of the United States, and the Legislature of this State, shall direct."[220]

## B. Debates over the Ratification of the Constitution

During the debates over the United States Constitution, the assertion that an armed and trained populace was the best defense against a tyrannical government was undisputed.[221] Both Federalists and Antifederalists agreed that a populace trained in arms was an essential bulwark that the new government depended upon.

A Federalist writing in the *Philadelphia Independent Gazetteer* on October 23, 1787, asserted that a tyrannical government "could never prevail over an hundred thousand men armed and disciplined, owners of the country, animated not only with a spirit of liberty, but ardent resentment against base treacherous tyrants."[222]

In Federalist 29, Alexander Hamilton made a similar argument. A standing army was not a serious threat to American liberty, he declared, because "that army can never be formidable to the liberties of the people, while there is a large body of citizens little if at all inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow citizens."[223] To Hamilton, a populace armed and trained was "the best possible security against" an oppressive standing army.[224]

"The Republican," writing in the *Connecticut Courant* on January 7, 1788, explained that because Americans possessed arms and knew how to use them, they were safe from tyrants and foreign invasions.

> It is a capital circumstance in favor of our liberty that the people themselves are the military power of our country. In countries under arbitrary government, the people oppressed and dispirited neither possess arms nor know how to use them. Tyrants never feel secure until they have disarmed the people. They can rely

---

LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3764 (Francis Newton Thorpe ed.,1909).

   [220] *Id.* at 3768.

   [221] *See* WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 121 (1825) ("The first [principle of the Second Amendment] is a declaration that a well regulated militia is necessary to the security of a free state; a proposition from which few will dissent.").

   [222] *Essay on Federal Sentiments*, PHILA. INDEP. GAZETTEER, Oct. 23, 1787, *reprinted in* 32 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 435 (John P. Kaminski et al. eds., 2019).

   [223] THE FEDERALIST NO. 29 (Alexander Hamilton).

   [224] *Id.*

> upon nothing but standing armies of mercenary troops for the
> support of their power. But the people of this country have arms
> in their hands; they are not destitute of military knowledge;
> every citizen is required by law to be a soldier; we are all mar-
> shaled into companies, regiments, and brigades for the defense
> of our country. This is a circumstance which increase the power
> and consequence of the people; and enables them to defend their
> rights and privileges against every invader.[225]

Draft speeches intended to be presented at the Maryland Convention further reflect the Framers' understanding of the right to keep and bear arms. One such speech was published in the *Maryland Journal* during July and August of 1788. "It was not delivered, because it was agreed among the members of the majority [the Federalists] not to waste time or protract the decision by arguments in favour of the system."[226] The Federalist's speech explained how a great body of the people, "all of whom know the use of fire-arms," will prevent the American government from using its military against its own people:

> Suppose even this improbable circumstance, an army of 10,000
> men embodied for our destruction, before even the alarm shall be
> spread! The vast extent of our territory, the exertions of thirteen
> governments, the diffusion of knowledge and the spirit of liberty
> amongst the citizens of thirteen different states, all of whom
> know the use of fire-arms, would soon prove the folly and mad-
> ness of the undertaking. In such a case, the president and congress
> might, in vain, call upon the militia. In such a case the force of the
> militia would be exerted against the base traitors to their country.[227]

Charles Carroll was a Federalist who prepared a speech expecting to be elected as a delegate to Maryland's convention—his county, however, elected four Antifederalists instead. According to Carroll, because Americans had arms and the ability to use them, they were safer from tyranny than Europeans who had neither:

> The situation of our People is also very different from those
> of Europe in general; our citizens have arms in their hands, &

---

[225] *The Republican: To the People*, CONN. COURANT, Jan. 7, 1788, *reprinted in* 3 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 529–30 (Merrill Jensen ed., 1978).

[226] *Text of a Federalist Speech Not Delivered in the Maryland Convention*, MD. JOURNAL, July 25, 29 & August 1, 5, 8, 1788, *reprinted in* 12 DOCUMENTARY HISTORY OF THE RATIFI-CATION OF THE CONSTITUTION 867 (John P. Kaminski et al. eds., 2015).

[227] *Id.* at 885.

> know the use of them; the common People of Europe are disarmed, & in general would handle a musket as awkwardly as Hadley's quadrant: The passion for hunting, & the pride of the gentry & nobility co-operating with an insidious policy have wrested from the peasantry of Europe those arms which might serve, under favorable auspices, & in critical emergencies to vindicate & maintain their just rights.—By the federal Constitution all orders of nobility are expressly excluded, and there is no probability of the game laws being introduced into any of the States, of course the great body of the People will retain their arms, and I flatter myself the spirit to use them on every proper occasion.[228]

If a trained populace was essential to preventing tyranny, an untrained populace was dangerous to liberty. The influential Antifederalist, "Federal Farmer," warned about the perils of a general population too busy with their private affairs to maintain arms proficiency:

> But, say gentlemen, the general militia are for the most part employed at home in their private concerns, cannot well be called out, or be depended upon; that we must have a select militia . . . . These corps, not much unlike regular troops, will ever produce an inattention to the general militia; and the consequence has ever been, and always must be, that the substantial men, having families and property, will generally be without arms, without knowing the use of them, and defenceless; whereas, to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them[.][229]

Indeed, as arguably the most influential Antifederalist, George Mason, argued at the Virginia Convention, one method of effectively disarming the people that had historically been used was to allow the militia to fall into disuse.[230] Mason reminded the convention that a former royal governor of Pennsylvania, Sir William Keith, proposed such a plan to the British Parliament "when the resolution for enslaving

---

[228] *Id.* at 837–38.

[229] Federal Farmer, *Letter XVIII*, Jan. 25, 1788, *reprinted in* 20 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1073 (John P. Kaminski et al. eds., 2004). Federal Farmer repeatedly stated that the militia is the general population. *See id.* at 1072 ("militia, when properly formed, are in fact the people themselves"); *id.* ("the militia shall always . . . include, according to the past and general usuage of the states, all men capable of bearing arms"); *id.* at 1073 ("the militia are the people").

[230] 10 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1270–71 (John P. Kaminski et al. eds., 1993).

America was formed in Great-Britain."[231] According to Keith, it was not "good [p]olicy, to accustom all the able men in the Colonies to be well exercised in Arms."[232] It was "more advisable, to keep up a small, regular Force in each Province" so that "in case of a War, or Rebellion, the whole of the regular Troops on the Continent, might without Loss of time be united or distributed at Pleasure."[233] Accordingly, as Mason put it, the British had decided that "to disarm the people . . . was the best and most effectual way to enslave them," and that it was best "not do it openly; but to weaken [the Americans] and let them sink gradually, by totally disusing and neglecting the militia."[234] Mason was convinced that a standing army combined with an untrained populace would surely result in despotism: "When against a regular and disciplined army, yeomanry are the only defence—yeomanry unskilful and unarmed, what chance is there for preserving freedom?"[235] Mason's arguments were consistent with remarks he made during a speech near the start of the Revolutionary War, in which he proclaimed that the people must be "introduce[d] to the use of arms and discipline" to best "act in defence of their invaded liberty."[236]

## C. Ratifying the Second Amendment

The necessity for a trained populace was reflected in proposed declarations of rights, and ultimately, the Second Amendment. Virginia's proposed arms guarantee, which originated with Mason, provided "[t]hat the people have a right to keep and bear arms: that a well regulated militia composed of the body of the people trained to arms, is the proper, natural and safe defence of a free State."[237] The second clause used the same language as Virginia's 1776 declaration of rights, which Mason wrote.[238]

---

[231] *Id.* at 1271.

[232] WILLIAM KEITH, A SHORT DISCOURSE, ON THE PRESENT STATE OF THE COLONIES IN AMERICA, WITH RESPECT TO GREAT BRITAIN (1728), *reprinted in* 6 THE AMERICAN MUSEUM: OR REPOSITORY OF ANCIENT AND MODERN FUGITIVE PIECES, &C. PROSE AND POETICAL 169 (Mathew Carey ed., 1789).

[233] *Id.*

[234] 10 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 230, at 1271.

[235] *Id.*

[236] 1 KATE MASON ROWLAND, THE LIFE OF GEORGE MASON 430 (1892).

[237] 37 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 253 (John P. Kaminski et al. eds., 2020). Virginia's proposed Bill of Rights was nearly identical to the proposals prepared by Mason at the Virginia convention, many of which—including the arms provision—was based on Virginia's 1776 Declaration of Rights that Mason drafted. J. Gordon Hylton, *Virginia and the Ratification of the Bill of Rights 1789–1791*, 25 U. RICH. L. REV. 433, 437, 439 (1991).

[238] 37 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 237, at 113 ("That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State.").

North Carolina proposed the same language as Virginia.[239] New York's proposal was also based on Mason's language, except it substituted "the body of the people trained to arms" with "the body of the People capable of bearing Arms."[240] Additionally, Rhode Island proposed New York's language.[241]

Future vice-president Elbridge Gerry argued that he preferred the "trained to arms" language because it would "furnish a greater certainty" that a competent militia would be maintained.[242] Regardless, the objective of each proposal was to ensure that the populace would be familiar with arms. This objective was also reflected in the final wording of the Second Amendment, which provided that "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."[243] "Well regulated" means trained and disciplined, and the militia includes the body of the people. The body of the people being effective with arms was understood as the best way to protect the state, and the best way to protect the people's liberties from a tyrannical state.

Antifederalist Samuel Nasson emphasized both of these benefits during the constitutional debates. In a speech at the Massachusetts Convention, Nasson praised the people's ability to defend themselves: "What occasion have we for standing armies? We fear no foe—If one should come upon us, we have a militia, which is our bulwark. Let Lexington witness that we have the means of defence among ourselves."[244] The following year, he urged his friend and Federalist congressman George Thatcher to ratify what became the Second Amendment by explaining:

> . . . you know to learn the Use of arms is all that can Save us from a forighn foe that may attempt to subdue us, for if we keep up the Use the-of arms and become well acquainted with them we Shall allway be able to look them in the face that arise up against us.[245]

---

[239]  *Id.* at 266 ("That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural and safe defence of a free State.").

[240]  *Id.* at 257 ("That the People have a right to keep and bear Arms; that a well regulated Militia, including the body of the People *capable of bearing Arms*, is the proper, natural and safe defence of a free State.") (italics in original).

[241]  *Id.* at 273 ("That the people have a right to keep and bear arms; that a well regulated militia, including the body of the people capable of bearing Arms, is the proper, natural and safe defence of a free state.").

[242]  *Id.* at 403.

[243]  U.S. CONST. amend. II.

[244]  6 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1400 (John P. Kaminski et al. eds., 2000).

[245]  Letter from Samuel Nasson to George Thatcher, July 9, 1789, *in* THE COMPLETE BILL OF RIGHTS 296 (Neil H. Cogan ed., 2d. ed. 2015).

*D. Post-Ratification Interpretations of the Second Amendment*

Comments made directly after the Second Amendment was drafted and throughout the following century make clear that firearms training was an important part of the right "to keep and bear arms."[246]

The Bill of Rights was submitted to the states for consideration on September 25, 1789.[247] By the time of President Washington's first address to a joint session of Congress on January 8, 1790, New Jersey, Maryland, and North Carolina had ratified the proposed Amendments.[248] Illustrating that the belief in training was as strong as ever, Washington used his address to remind Americans that "a free people ought not only to be armed, but disciplined."[249] The same point was made during debates in the first Congress. For example, on December 17, 1790—at which point nine of the required eleven states had ratified the Bill of Rights—the House of Representatives discussed the people's ability and willingness to defend themselves.[250] Representative James Jackson declared "that every citizen was not only entitled to carry arms, but also in duty bound to perfect himself in the use of them, and thus be capable of defending his country." To Jackson, one could not credibly contend "that the whole body of the people ought not to be armed, and properly trained."[251]

Vermont's most influential founder was Ira Allen. From 1776 to 1786, "few if any state papers of Vermont were issued that [Ira] did not prepare or assist in preparing."[252] Allen's writings are filled with references to the firearms he carried and used for self-defense, hunting, and target shooting. For example, in 1772 he casually notes a shooting competition between his brother, Ethan Allen, and a "Mr. Peck," when they "lodged at Peck's camp" for an evening,

> Mr. Peck and my brother in the course of the evening had a high banter, and some bets laid for shooting at mark next morning. . . . In the gray of the morning, Mr. Peck and my brother

---

[246] U.S. CONST. amend. II.

[247] *The Bill of Rights: A Transcription*, NAT'L ARCHIVES, https://www.archives.gov/founding-docs/bill-of-rights-transcript [https://perma.cc/W2UZ-RJVA] (last visited Oct. 18, 2022).

[248] *This Day in History| June 21*, HIST. (Nov. 24, 2009), https://www.history.com/this-day-in-history/u-s-constitution-ratified [https://perma.cc/BT5M-J8V5] (last visited Oct. 18, 2022).

[249] 1 JOURNAL OF THE SECOND SESSION OF THE SENATE OF THE UNITED STATES OF AMERICA, BEGUN AND HELD AT THE CITY OF NEW YORK, JANUARY 4TH, 1790; AND IN THE FOURTEENTH YEAR OF THE INDEPENDENCE OF THE SAID STATES 6 (1820).

[250] *James Madison and the Bill of Rights*, BILL RTS. INST., https://billofrightsinstitute.org/essays/james-madison-and-the-bill-of-rights [https://perma.cc/3FLM-NCTN] (last visited Oct. 18, 2022).

[251] 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS: DEBATES IN THE HOUSE OF REPRESENTATIVES: THIRD SESSION, DECEMBER 1790–MARCH 1791, at 95 (1996).

[252] 1 JAMES BENJAMIN WILBUR, IRA ALLEN: FOUNDER OF VERMONT, 1751–1814, at 87 (1928).

> were up and preparing their guns, &c, and soon began to fire.
> Some I heard, and others sleep prevented the notice of. They
> continued their sport till the sun was two hours high.[253]

The activity was so common, it seems, that Ira Allen slept through it.[254] In 1796, Allen traveled to France to purchase 20,000 muskets and twenty-four field pieces for Vermont's militia.[255] While being shipped to America, the arms were seized by the British, who suspected that Allen was planning a revolt against British Canada. While defending himself in Britain's Court of Admiralty, Allen explained that he intended to distribute the arms across Vermont.[256] In doing so, he elucidated his understanding of his right to keep and bear arms in America: "Government have nothing to fear from its Militia. . . . arms and military stores are free merchandize, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government."[257]

In his 1825 "influential treatise," William Rawle, "a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights,"[258] described how the militia's usefulness derived from the people being accustomed to using arms: "In a people permitted and accustomed to bear arms, we have the rudiments of a militia, which properly consists of armed citizens, divided into military bands, and instructed at least in part, in the use of arms for the purposes of war."[259]

As a Supreme Court Justice, Joseph Story published a popular treatise on the Constitution in 1833.[260] Regarding the Second Amendment, Story noted that "[t]he right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic."[261] But Story expressed concern about "a growing indifference" to the right among the people.[262] He worried that the people would neglect their arms and undermine the founders' intent. "There is certainly no small danger, that indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by this clause of our national bill of rights."[263]

---

[253] *Id.* at 28.

[254] *Id.*

[255] STEPHEN P. HALBROOK, A RIGHT TO BEAR ARMS: STATE AND FEDERAL BILL OF RIGHTS AND CONSTITUTIONAL GUARANTEES 38 (1989).

[256] IRA ALLEN, PARTICULARS OF THE CAPTURE OF THE OLIVE BRANCH, LADEN WITH A CARGO OF ARMS 403 (1798).

[257] *Id.* at 403–04.

[258] District of Columbia v. Heller, 554 U.S. 570, 607 (2008).

[259] RAWLE, *supra* note 221, at 140.

[260] *The Idea of the Senate*, U.S. SENATE, https://www.senate.gov/about/origins-foundations /idea-of-the-senate/1833Story.htm [https://perma.cc/7TZY-658R] (last visited Oct. 18, 2022).

[261] 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 746 (1833).

[262] *Id.*

[263] *Id.* at 747.

The "most famous" legal scholar of the nineteenth century was "the judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations."[264] According to Cooley, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms[.]"[265] Echoing the founders of the previous century, Cooley explained that "[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms."[266] Thus, as the Supreme Court asserted, "Cooley understood the right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms."[267]

That same year—which was also the year the Fourteenth Amendment was ratified—John Norton Pomeroy explained that the purpose of the Second Amendment is

> to secure a well-armed militia. . . . But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons. To preserve this privilege, and to secure to the people the ability to oppose themselves in military force against the usurpations of government, as well as against enemies from without, that government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms. . . . The clause is analogous to the one securing the freedom of speech and of the press. Freedom, not license, is secured; the fair use, not the libellous abuse, is protected.[268]

Benjamin Abbott's post–Fourteenth Amendment treatise echoed these sentiments. First, addressing the public benefit of the right to bear arms, Abbott stressed that "[s]ome general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war."[269] Then, focusing on the right secured by the Second Amendment, Abbott added that "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe

---

[264]  District of Columbia v. Heller, 554 U.S. 570, 618 (2008).

[265]  COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW, *supra* note 10, at 271.

[266]  THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 350 (1868).

[267]  *Heller*, 554 U.S. at 618.

[268]  JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES 152–53 (1868).

[269]  BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF LEADING TOPICS IN THE LAW OF THE LAND 333 (1880).

places the use of it, and in due time teaches his sons to do the same, exercises his individual right."[270] Later, Abbott reiterated that "[a]s to guns and pistols, then, the citizen who practises with them is in the exercise of a constitutional right,"[271] because "[o]ne has a general right to practise with firearms."[272]

## V. RESTRICTIONS ON SHOOTING DURING THE COLONIAL AND FOUNDING ERAS

No law prohibited firearms training in seventeenth- or eighteenth-century America, which is significant considering how common shooting was. The restrictions that existed were either wartime measures enacted to conserve gunpowder or limitations on shooting at particular times and places. None were intended to limit the act of training itself. Instead, some included training exceptions.

### A. Wartime Measures to Conserve Gunpowder

Virginia, in 1623, provided that "no commander of any plautation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainment."[273] This law was one of many ensuring that the colonists were always properly armed after an Indian massacre killed 347 of them in 1622.[274] For example, another law passed the same day required that "every dwelling house shall be pallizaded in for defence against the Indians."[275] The powder conservation law was restated in 1631[276] and 1632.[277]

---

[270] *Id.*

[271] *Id.* at 334.

[272] *Id.* at 335.

[273] 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 127 (William Waller Hening ed., 1823).

[274]      [O]n the 22d of *March*, 1622, a little before noon, at a Time when our men were all at Work abroad in their plantations, disperst and unarm'd. This Hellish Contrivance was to take Fffect upon all the several Settlements at one and the same instant. . . . The very Morning of the Massacre, they came freely and unarm'd among them, eating with them, and behaving themselves with the same Freedom and Friendship as formerly, till the very Minute they were to put their Plot into Execution. Then they fell to Work all at once everywhere, knocking the *English* unawares on the Head, some with their Hatchets, which they call *Tommahawks*, others with the Hows and Axes of the *English* themselves, shooting at those who escap'd the Reach of their Hands; sparing neither Age nor Sex, but destroying Man, Woman, and Child, according to their cruel Way of leaving none behind to bear Resentment.

BEVERLEY, *supra* note 116, at 40–41.

[275] 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, *supra* note 273, at 127.

[276] *Id.* at 173.

[277] *Id.* at 198.

During King Philip's War, in 1675 Plymouth Colony fined "whosoever shall shoot of any gun on any unnessesarie occation, or att any game whatsoever, except att an Indian or a woolfe . . . till further libertie shalbe given."[278] During King William's War fifteen years later, after French and Indian forces massacred sixty-two colonists in Schenectady, New York, neighboring Albany passed a powder-conservation law. Because "diverse persons dayly wast powder which is of such necessary use for defence of this City and County of Albany," anyone who "burne any powder unlesse to kill provision" was fined "upon of paine of paying for every shot, or discharging of Gun or Pistoll."[279]

*B. Time and Place Limitations*

In 1642, along with forbidding travel, Virginia forbade shooting on the Sabbath, "unles it shall be for the safety of his or their plantations or corne fields or for defence against the Indians."[280] Virginia passed another similar law in 1657.[281] Rhode Island followed in 1679, prohibiting the "[s]hooting out of any gun . . . more then Necessety Requireth" on the Sabbath.[282] Pennsylvania, in 1794, outlawed "any unlawful game, hunting, shooting, sport or diversion" on "the Lord's day, commonly called Sunday."[283]

Most time and place restrictions limited shooting in populated areas.[284] In 1713, Massachusetts made it illegal "to Discharge or Fire off any Gun upon Boston Neck, within Ten Rods of the Road or High-way leading over the same."[285] That same

---

[278] THE BLUE LAWS OF NEW HAVEN COLONY, USUALLY CALLED BLUE LAWS OF CONNECTICUT; QUAKER LAWS OF PLYMOUTH AND MASSACHUSETTS; BLUE LAWS OF NEW YORK, MARYLAND, VIRGINIA, AND SOUTH CAROLINA 50 (An Antiquarian ed., 1838).

[279] 2 THE DOCUMENTARY HISTORY OF THE STATE OF NEW YORK 124 (E. B. O'Callaghan ed., 1849).

[280] 1 LAWS OF VIRGINIA, 1642–1643, ACT XXXV.

[281] 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, *supra* note 273, at 434.

[282] LAWS AND ACTS OF HER MAJESTIES COLONY OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS MADE FROM THE FIRST SETTLEMENT IN 1636 TO 1705, at 31 (1896).

[283] 3 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE TWENTIETH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND TEN 178 (1810) ("if any person . . . on the Lord's Day, commonly called Sunday . . . shall use or practice any unlawful game, hunting, shooting, sport or diversion whatsoever . . . every such person, so offending, shall, for every such offense forfeit and pay four dollars. . . .").

[284] *See also* ABBOTT, *supra* note 269, at 333–34 (A person "exercises his individual right" when he "practises in safe places," but that is a "very different habit" than "firing at random with them [guns] upon city sidewalks").

[285] THE CHARTER GRANTED BY THEIR MAJESTIES KING WILLIAM AND QUEEN MARY, TO THE INHABITANTS OF THE PROVINCE OF THE MASSACHUSETTS BAY IN NEW-ENGLAND 227 (1726).

year, Philadelphia forbade "firing a gun without a license" in the city.[286] In 1721, Philadelphia again made it illegal to "fire any gun or other firearms . . . within the city of Philadelphia . . . without the governor's special license for the same."[287] It seems that these licenses were expected to be issued liberally, as an additional statute passed the same day forbade shooting birds in the streets of Philadelphia.[288] Such a law would have been unnecessary if virtually everyone was intended to be prohibited from shooting in the city. In 1731, the town of Newport, Rhode Island forbade shooting in "the Streets or Lanes of any Town . . . or in any Tavern of the same, after Dark, on any Night whatsoever."[289]

A 1746 Massachusetts law provided that "no person or persons, from and after the publication of this act, shall presume to discharge or fire off any cannon laden with shot, from any wharfe or vessel in that part of the harbour of [Boston] which is above the castle."[290] The following section provided that "no personal shall . . . discharge any gun or pistol, charged with shot or ball, in the town of Boston (the islands thereto being excepted), or in any part of the harbour between the castle and said town."[291] Reflecting the value placed on target practice, however, the law clarified that it

---

[286] 2 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 551 (Clarence M. Busch ed., 1896).

[287] 3 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 253 (Clarence M. Busch ed., 1896).

[288] *Id.* at 256 ("[N]o person whatsoever shall presume to shoot at or kill with a firearm any pigeon, dove, partridge, or other fowl in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses within the limits of the said city.").

In 1652, the Dutch colony of New Amsterdam prohibited bird hunting in city limits, but did not outlaw other types of shooting:

> Whereas, many guns are daily discharged and fired at Partridges and other game within the jurisdiction of this city *New Amsterdam* and in the vicinity of the Fort, by which firing People or Cattle might perhaps be struck and injured, against which practise complaints have already been made. Therefore the Honorable Director General and Council, in order to prevent accidents, expressly forbid and interdict all persons henceforward firing within the jurisdiction of this city or about the Fort, with any guns at Partridges or other Game that may be chance fly within the city.

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, at 138 (E. B. O'Callaghan ed., 1868).

[289] The CHARTER, GRANTED BY HIS MAJESTY, KING CHARLES II, TO THE GOVERNOR AND COMPANY OF THE ENGLISH COLONY OF RHODE-ISLAND AND PROVIDENCE-PLANTATIONS, IN NEW ENGLAND, IN AMERICA 120 (1744).

[290] 3 THE ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF MASSACHUSETTS BAY 306 (1878).

[291] *Id.*

> [S]hall not be so construed or understood as to prevent soldiers, in their common-training days, with the leave and by order of the commission officers of the company to which they belong, or other persons, at other times, with the leave of one or more of the field-officers of the regiment in Boston, from firing at a mark or target[t], for the exercise of their skill and judgment, provided it be done at the lower end of the common; nor from firing at a mark, from the several batteries in the town of Boston, with the leave of the captain-general, and nowhere else.[292]

In 1750, Pennsylvania broadened Philadelphia's fire prevention law requiring people to acquire a license to "fire any gun or other fire-arm" in the city by applying it to each "county town, or . . . other town or borough, in this province" that is "built and settled."[293] Another section of the law forbade gambling on shooting matches, and made clear that shooting matches—and thus firearms training in general—were unaffected by either the 1750 licensing law, or, therefore, the 1721 licensing law.[294] Specifically, the 1750 gambling law forbade "any person" to "promote or be concerned in any shooting match for any plate, prize, sum of money or other thing of value whatsoever."[295] The following section of the law forbade the distribution of "strong liquors" to anyone "attending" a shooting match.[296] Shooting matches were apparently common and popular events.

In 1785, New York limited shooting during New Year celebrations by forbidding "any person" to "fire or discharge any gun . . . within a quarter of a mile of any building," on "the eve of the last day of December, and the first and second days of January."[297]

In 1790, Ohio made it unlawful to fire a gun within "one-quarter of a mile from the nearest building."[298] Two years later, Elizabethtown, Maryland made it unlawful

---

[292] *Id.* This law was revived three times within the following decade. *Id.* at 488, 574, 755.

[293] 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 108–09 (James T. Mitchell & Henry Flanders eds., 1898).

[294] *Id.* at 109.

[295] *Id.*

[296] *Id.* at 110.

[297] 2 LAWS OF THE STATE OF NEW YORK PASSED AT THE SESSIONS OF THE LEGISLATURE HELD IN THE YEARS 1785, 1786, 1787, AND 1788, INCLUSIVE 152 (1886). A Dutch colony in 1655, New Netherland (which later became part of New York), likewise targeted celebratory shooting, "expressly forbid[ding] from this time forth all firing of Guns, or planting of May poles within this Province of *New Netherland*, on New Years or May days" because "experience hath demonstrated and taught that, besides an unnecessary waste of powder, much Drunkenness and other insolence prevail on New Years and May days, by firing of Guns, planting May poles, and carousing." LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, *supra* note 288, at 205.

[298] 1 THE STATUTES OF OHIO AND OF THE NORTHWESTERN TERRITORY, ADOPTED OR ENACTED FROM 1788 TO 1833, INCLUSIVE 106 (Salmon P. Chase ed., 1833).

to "fire any gun or pistol in the said town."[299] Notably, the Ohio law included exceptions for training as part of militia service: "nothing herein contained shall be construed or extend to prevent the necessary military exercise, evolutions and firings of, or the discharging of cannon or small arms, by any soldiers or troops. . . ."[300]

In sum, considering what a popular activity shooting was, few regulations throughout the colonial and founding eras restricted when or where it could occur. The earlier regulations were wartime measures designed to conserve gunpowder when powder was scarce and difficult to produce in the colonies. Most regulations were time and place restrictions, for example Virginia, Pennsylvania, and Rhode Island forbade shooting on the Sabbath,[301] and New York targeted celebratory shooting.[302] Shooting was limited in certain populated areas of Pennsylvania, Massachusetts, and Ohio, as well as in a single town in both Rhode Island and Maryland.[303] No regulation intended to restrict the activity of target shooting itself, and even the relatively restrictive laws had training exceptions or allowed for shooting with a license. No pre-1800 law regulated controlled target practice.

## VI. MODERN COURT DECISIONS ON THE RIGHT TO TRAIN

### A. The Supreme Court

#### 1. District of Columbia v. Heller

In *District of Columbia v. Heller*, the Supreme Court provided its "first in-depth examination of the Second Amendment."[304] *Heller* involved a challenge to a prohibition on handguns, a prohibition on assembled and functional firearms inside the home, and a prohibition on carrying firearms (even in the home) without a license.[305]

---

[299]  2 THE LAWS OF MARYLAND TO WHICH ARE PREFIXED THE ORIGINAL CHARTER WITH AN ENGLISH TRANSLATION, THE BILL OF RIGHTS AND CONSTITUTION OF THE STATE ch. LII (William Kilty ed., 1800). The book is divided by year; the reference here is to chapter 52 of the year 1792.

[300]  *See* 1 THE STATUTES OF OHIO AND OF THE NORTHWESTERN TERRITORY ADOPTED OR ENACTED FROM 1788 TO 1833, INCLUSIVE, *supra* note 298, at 106.

[301]  *See supra* Section V.B, noting the prohibition of shooting on the Sabbath in these three states.

[302]  *See* 1 THE STATUTES OF OHIO AND OF THE NORTHWESTERN TERRITORY, ADOPTED OR ENACTED FROM 1788 TO 1833, INCLUSIVE, *supra* note 298 and accompanying text, noting the prohibition on celebratory shooting around New Year's Day in New York, as well as similar prohibitions in the preceding New Netherland colony.

[303]  *See supra* Section V.B, noting that Pennsylvania law forbade shooting within the City of Philadelphia, Massachusetts law forbade shooting in mainland Boston, Ohio law forbade shooting near a building, Rhode Island law forbade shooting in the City of Newport, and Maryland law forbade shooting in the Town of Elizabethtown.

[304]  554 U.S. 570, 635 (2008).

[305]  *Id.* at 574–75.

The *Heller* Court analyzed the Second Amendment's text, using history and tradition to inform its original meaning, and held that the Second Amendment protects "the individual right to possess and carry weapons in case of confrontation."[306] All three prohibitions, therefore, were held to violate the Second Amendment.[307]

The Court noted that "[t]he Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically," the Court explained, "but rather announces a purpose."[308] The "prefatory clause," therefore, "does not limit or expand the scope of the operative clause," but it can "resolve an ambiguity in the operative clause" because "[l]ogic demands that there be a link between the stated purpose and the command."[309]

After analyzing each word and phrase of the operative clause, the Court concluded that "they guarantee the individual right to possess and carry weapons in case of confrontation."[310] Returning to the prefatory clause, to ensure that it fits with the Court's interpretation of the operative clause, the Court found that "[i]t fits perfectly, once one knows the history that the founding generation knew."[311] Specifically, "the way tyrants had eliminated a militia consisting of all the able-bodied men . . . not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents."[312]

A populace allowed to possess and carry arms but forbidden to practice with them would be nearly as useless against a tyrannical government as an unarmed populace.[313] As explained in Section II.B, this was a grave concern among the founding generation. Indeed, *Heller* found "many reasons why the militia was thought to be 'necessary to the security of a free State'": for "repelling invasions and suppressing insurrections," to "render[] large standing armies unnecessary," and because "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny."[314] None of these purposes can be served by an untrained populace. It is thus no surprise that *Heller* found the adjective "well-regulated" in the Second Amendment's text as "impl[ying] nothing more than the imposition of proper discipline and training."[315] An armed *and trained* body of the people, not just an armed body, is necessary. If ensuring a well-trained populace was

---

[306] *Id.* at 592.

[307] *Id.* at 635.

[308] *Id.* at 577.

[309] *Id.* at 577–78.

[310] *Id.* at 592.

[311] *Id.* at 598.

[312] *Id.* The Court added that "This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights." *Id.*

[313] *Id.* at 599 ("[T]he threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution.").

[314] *Id.* at 597–98.

[315] *Id.* at 597. The Court cited Rawle and Virginia's declaration of rights, discussed *supra* notes 213, 221.

the "purpose for which the right was codified," as *Heller* says, then training must be protected by the right.[316]

The Court's conclusion that self-defense and hunting are protected rights further supports the right to train.[317] Neither self-defense nor hunting can reliably be accomplished without adequate training. An incompetent shooter makes for an unethical hunter and an even worse defender of life.[318]

Notably, *Heller* relied on Story, Tucker, Sharp, Jefferson, Abbott, Rawle, Cooley, Sumner, Pomeroy, and the Virginia Declaration of Rights.[319] All of these sources, as discussed above, support the right to train with arms.

### 2. *Luis v. United States*

In *Luis v. United States*, a government freeze on a defendant's untainted assets prevented him from hiring counsel and was therefore held to violate the Sixth Amendment. In a concurring opinion, Justice Thomas explained that "[c]onstitutional rights . . . implicitly protect those closely related acts necessary to their exercise."[320] He provided several examples, including that the right to keep and bear arms implicitly protects the right to train with them because it would otherwise be ineffective: "The right to keep and bear arms, for example, 'implies a corresponding right to obtain the bullets necessary to use them,' and 'to acquire and maintain proficiency in their use,'. . . .Without protection for these closely related rights, the Second Amendment would be toothless."[321]

### 3. *New York State Rifle & Pistol Association v. City of New York*

The plaintiffs in *New York State Rifle & Pistol Association v. City of New York* sued New York City and the New York Police Department–License Division

---

[316] *Id.* at 599.

[317] *Id.* ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.").

[318] The holding regarding what arms the Second Amendment protects may also be informative. The Court held that "the sorts of weapons protected [a]re those 'in common use at the time.'" *Id.* at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)). Applied to training, this may suggest that the right to train includes practice with common arms and at their effective range.

[319] *Id.* at 593–97, 602, 606–10, 616–19, 626, 641, and 659.

[320] Luis v. United States, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (first quoting Jackson v. City of San Francisco, 746 F.3d 953 (9th Cir. 2014); then quoting Ezell v. City of Chicago, 651 F.3d 684,704 (7th Cir. 2011)).

[321] *Id.* at 1097 (Thomas, J., concurring) (first quoting Jackson v. City of San Francisco, 746 F.3d 953 (9th Cir. 2014); then quoting Ezell v. City of Chicago, 651 F.3d 684,704 (7th Cir. 2011)).

because their licensing scheme forbade the plaintiffs from transporting handguns to shooting ranges, target competitions, and other target practice outside of New York City.[322] Holders of a "premises license," such as the plaintiffs, could only take their handguns "directly to and from an authorized small arms range/shooting club" located in New York City.[323] When the case was filed, only seven authorized ranges existed in the entire city of over eight million people—or less than one range per million residents.[324]

The Second Circuit applied a two-part test in which it first asks whether the challenged law burdens conduct protected by the Second Amendment as historically understood, and if so, then applies some level of tiered scrutiny—the level of scrutiny depending on the severity of the burden. But in this case, the Court skipped the historical question entirely, announcing that "[w]e need not decide whether" a restriction on training burdens the right, because even if it does, "the Rule passes constitutional muster under intermediate scrutiny."[325]

Having declined to consider the historical understanding of the right, it is unsurprising that the Second Circuit rejected the plaintiffs' arguments that "firearms practice is itself a core Second Amendment right, and that even minimal regulation of firearms training must survive heightened scrutiny."[326] Rather, the Court found heightened scrutiny appropriate only when "regulations amounting to a ban (either explicit or functional) on obtaining firearms training and practice substantially burden the core right to keep and use firearms in self-defense in the home."[327]

As for New York City's restriction, the Court determined that it "does not approach the core area of protection," and could not say for sure that it substantially burdened any Second Amendment rights.[328] Instead, the court applied intermediate scrutiny under a mere assumption that rights were burdened.[329]

The Second Circuit upheld the training restriction under intermediate scrutiny based solely on an affidavit by Andrew Lunetta, the former Commander of the License Division. Lunetta claimed that "taking a licensed handgun to . . . a shooting competition outside the City . . . constitutes a potential threat to public safety" because lawful gun owners "'are just as susceptible as anyone else to stressful

---

[322]  N.Y. State Rifle & Pistol Ass'n v. City of New York, 883 F.3d 45, 52, 54 (2d Cir. 2018). Additionally, one plaintiff sought to transport his handgun from New York City to his second home in upstate New York. *Id.*

[323]  *Id.* at 53.

[324]  *Id.*

[325]  *Id.* at 55 (brackets and quotations omitted).

[326]  *Id.* at 58.

[327]  *Id.* The court reiterated that heightened scrutiny was appropriate for such training bans, not "because live-fire target shooting is *itself* a core Second Amendment right," but because "[p]ossession of firearms without adequate training and skill does nothing to protect, and much to endanger, the gun owner, his or her family, and the general public." *Id.*

[328]  *Id.* at 62.

[329]  *Id.* at 61–62.

situations,' including driving situations that can lead to road rage, 'crowd situations, demonstrations, family disputes,' and other situations 'where it would be better to not have the presence of a firearm.'"[330]

After the Second Circuit upheld the training restriction, the Supreme Court granted certiorari. But then, to avoid the Court's review by mooting the case, the City amended its licensing law to allow the taking of firearms to shooting ranges outside the city.[331]

The City's scheme worked; a majority of the Court ruled the case moot due to the change in the law. Justices Alito, Thomas, and Gorsuch dissented. After disputing the majority's mootness ruling, the dissent addressed the constitutionality of the pre-amendment training restriction. Because "tak[ing] a gun to a range in order to gain and maintain the skill necessary to use it responsibly" is "a necessary concomitant" of self-defense, the dissent explained, "a reasonable opportunity to practice is part of the very right recognized in *Heller*."[332] The fact that the plaintiffs could have trained at out-of-city ranges with someone else's gun was not enough to satisfy that right:

> It is true that a lawful gun owner can sometimes practice at a range using a gun that is owned by and rented at the range. But the same model gun that the person owns may not be available at a range, and in any event each individual gun may have its own characteristics. Once it is recognized that the right at issue is a concomitant of the same right recognized in *Heller*, it became incumbent on the City to justify the restrictions its rule imposes, but the City has not done so. It points to no evidence of laws in force around the time of the adoption of the Second Amendment that prevented gun owners from practicing outside city limits. The City argues that municipalities restricted the places within their jurisdiction where a gun could be fired, and it observes that the Second Amendment surely does not mean that a New York City resident with a premises license can practice in Central Park or Times Square. That is certainly true, but that is not the question. Petitioners do not claim the right to fire weapons in public places *within the City*. Instead, they claim they have a right to practice at ranges and competitions *outside*

[330] *Id.* at 63.

[331] N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525, 1527–28 (2020) (Alito, J., dissenting) ("[O]nce we granted certiorari, both the City and the State of New York sprang into action to prevent us from deciding this case. . . . the City quickly changed its ordinance. And for good measure the State enacted a law making the old New York City ordinance illegal."). The law was also amended to allow licensees to transport firearms to second homes outside of the city. *Id.* at 1526.

[332] *Id.* at 1541–42.

> *the City*, and neither the City, the courts below, nor any of the
> many *amici* supporting the City have shown that municipalities
> during the founding era prevented gun owners from taking their
> guns outside city limits for practice.[333]

Because "[h]istory provides no support for a restriction of this type," the dissenting
Justices would have held the law violative of the Second Amendment.[334]

## B. Federal Circuit Courts

### 1. *Ezell v. City of Chicago* (*Ezell I*)

*Ezell v. City of Chicago* (*Ezell I*) was a challenge to a Chicago ordinance that
both required an hour of range training to own a firearm and prohibited any firing
ranges within the city.[335]

The Seventh Circuit applied the same two-part test applied by the Second
Circuit in *New York State Rifle & Pistol Association*.[336] First, the Seventh Circuit
determined that range training is a protected activity because "[t]he right to possess
firearms for protection implies a corresponding right to acquire and maintain
proficiency in their use."[337] Indeed, "the core right [of self-defense] wouldn't mean
much without the training and practice that make it effective."[338] In step two, the
Court determined that "not quite 'strict scrutiny'" was the appropriate standard
because the ordinance was "a serious encroachment on the right to maintain profi-
ciency in firearm use, an important corollary to the meaningful exercise of the core
right to possess firearms for self-defense."[339]

Chicago did "not come close to satisfying this standard,"[340] because it relied
entirely on "speculation" and failed to present any data or expert opinion.[341] Even
if it had, the ordinance would have failed because the risk posed by shooting ranges
"can be addressed through sensible zoning and other appropriately tailored regula-
tions" that are substantially less burdensome than a complete prohibition.[342] For
example, "straightforward range-design measures that can effectively guard against

---

[333]  *Id.* at 1541.

[334]  *Id.* at 1544.

[335]  651 F.3d 684, 689–90 (7th Cir. 2011). The ordinance banned "[s]hooting galleries,
firearm ranges, or any other place where firearms are discharged." *Id.* at 691 (quoting CHI.
MUN. CODE § 8-20-280).

[336]  883 F.3d 45, 45 (2d Cir. 2018).

[337]  *Ezell I*, 651 F.3d at 704.

[338]  *Id.*

[339]  *Id.* at 708.

[340]  *Id.* at 709.

[341]  *Id.* at 690, 709.

[342]  *Id.* at 709.

accidental injury," designated "locations for the loading and unloading of firearms," as well as "limiting the concentration of people and firearms in a range's facilities, the times when firearms can be loaded, and the types of ammunition allowed."[343] And, of course, the irony was not lost on the Court that Chicago considered range training so critical that the city made it a prerequisite to firearm ownership, yet at the same time argued that it had no place within city limits.[344]

### 2. *Ezell v. City of Chicago* (*Ezell II*)

In response to *Ezell I*, Chicago enacted a new ordinance, which was challenged in *Ezell II*. Specifically, the plaintiffs challenged three provisions:

> (1) a zoning restriction allowing gun ranges only as special uses in manufacturing districts; (2) a zoning restriction prohibiting gun ranges within 100 feet of another range or within 500 feet of a residential district, school, place of worship, and multiple other uses; and (3) a provision barring anyone under age 18 from entering a shooting range.[345]

Under the first two provisions, only 2.2% of the city's acreage was even available for locating a shooting range.

Applying the same test it applied in *Ezell I*, the Court reiterated its findings from *Ezell I*:

> [W]e rejected the City's argument that range training is categorically unprotected by the Second Amendment. We held that the core individual right of armed defense—as recognized in *Heller* and incorporated against the states in *McDonald*—includes a corresponding right to acquire and maintain proficiency in firearm use through target practice at a range. We explained that the core right to possess firearms for protection "wouldn't mean much without the training and practice that make it effective." We noted that *Heller* itself supports this understanding. Finally, we held that the City had failed to establish that target practice is wholly unprotected as a matter of history and legal tradition in the founding era or when the Fourteenth Amendment was ratified.[346]

---

[343] *Id.*
[344] *Id.* at 704–05.
[345] *Ezell II*, 846 F.3d 888, 890 (7th Cir. 2017).
[346] *Id.* at 892.

The Court reemphasized that "[r]ange training. . . . lies close to the core of the individual right of armed defense,"[347] and proceeded to apply heightened scrutiny. The range restriction failed scrutiny because the government again failed to provide meaningful evidence and instead relied on speculation.[348]

Regarding the training ban on persons under eighteen, Chicago argued that such persons have no training rights.[349] The Seventh Circuit found otherwise: "There's zero historical evidence that firearm training for this age group is categorically unprotected. At least the City hasn't identified any, and we've found none ourselves."[350] Additionally, the Court found nothing from *Heller* that would justify the ban: "To the contrary, *Heller* itself points in precisely the opposite direction."[351]

Since minors had a right to train at shooting ranges, the Seventh Circuit applied heightened scrutiny to the law prohibiting them from doing so.[352] But the government was "left to rely on generalized assertions about the developmental immaturity of children, the risk of lead poisoning by inhalation or ingestion, and a handful of tort cases involving the negligent supervision of children who were left to their own devices with loaded firearms."[353] Because the government failed to address these concerns with "a more closely tailored age restriction—one that does not completely extinguish the right of older adolescents and teens in Chicago to learn how to shoot in an appropriately supervised setting at a firing range," the law violated the Second Amendment.[354]

### 3. *Drummond v. Robinson Township*

Drummond brought suit after Robinson Township forbade center-fire rifle practice at sportsman's clubs and forbade for-profit entities from operating ranges.[355] Drummond "did not assert that the rim-fire and non-profit rules injure him in his capacity as the operator of a gun range. Instead, he claimed that the rules restrict his

---

[347] *Id.* at 893.

[348] *Id.* at 896.

[349] *Id.*

[350] *Id.*

[351] *Id.* (citing 554 U.S. at 617–18, 128 S. Ct. 2783 ("[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . . ; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." (quoting THOMAS MCINTYRE COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 271 (1868))); *see also id.* at 619, 128 S. Ct. 2783 ("No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." (quoting BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880))).

[352] *Ezell II*, 846 F.3d at 897.

[353] *Id.* at 898.

[354] *Id.*

[355] Drummond v. Robinson Twp., 9 F.4th 217, 224 (3d Cir. 2021).

customers' efforts to acquire firearms and maintain proficiency in their use," and thus violate their Second Amendment rights.[356]

The Third Circuit applied the familiar two-part test, first asking whether the burdened activity is protected by the Second Amendment and, if so, then applying heightened scrutiny.

At the first step, the Court phrased the questions as follows:

> For the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted. For the non-profit ownership rule, similarly, the question is if our ancestors accepted prohibitions on the commercial operation of gun ranges in areas where they were otherwise allowed.[357]

The Court's review found that "neither type of regulation rests on deep historical foundations."[358]

> Start with the rim-fire rifle rule. In exploring the history of what weapons citizens may carry for self-defense, *Heller* excluded "dangerous and unusual weapons" from the Second Amendment's scope but included "arms in common use" within its protection. This "implies a corresponding right to acquire and maintain proficiency" with common weapons. A right to bear those weapons, after all, "wouldn't mean much without the training and practice that make [them] effective."[359]

Finding a lack of historical precedent for Robinson Township's rules, the Court proceeded to apply heightened scrutiny. There, it explained that "[m]ost purchase and practice restrictions merit intermediate rather than strict scrutiny," with the exception being when "limits on buying and training with weapons in public pose a 'functional[] bar' to defense in private."[360] For example, "[i]f a zoning ordinance has the effect of depriving would-be gun owners of the guns and skills commonly used for lawful purposes like self-defense in their homes, strict scrutiny may be warranted."[361] But here, by contrast, "the Township's ordinance preserves avenues for citizens to acquire weapons and maintain proficiency in their use."[362] For

---

[356] *Id.*
[357] *Id.* at 227.
[358] *Id.*
[359] *Id.*
[360] *Id.* at 229.
[361] *Id.* at 229–30.
[362] *Id.* at 230.

instance, it permits non-profit shooting ranges, allows "citizens to train with other forms of ammunition," and allows commercial ranges and center-fire rifle training in two other districts of the township.[363] So intermediate scrutiny was applied.

The government claimed that its center-fire rifle ban advances "public health, safety, and welfare,"[364] but failed to present anything more than a theory to support its claim. Moreover, the government failed to show that "it 'seriously considered' more targeted tools for achieving its ends."[365] "To take two obvious examples, the Township already instructs Sportsman's Clubs to implement noise-reduction techniques and range-safety best practices," and "it cannot forego an entire 'range of alternatives' without developing 'a meaningful record . . . that those options would fail to alleviate the problems meant to be addressed.'"[366] Therefore, the ban failed intermediate scrutiny.

The non-profit rule also failed intermediate scrutiny. The government again failed to present evidence tying the law to its stated interest: "moderat[ing] the intensity of use at Sportsman's Clubs."[367] And the government again failed to consider less burdensome alternatives to the law: "It is not apparent, for instance, why the Township could not achieve its goals by implementing occupancy limits or hours-of-operation restrictions, for nowhere has it demonstrated . . . that it 'reasonably rejected' common regulatory tools in favor of the unusual prohibition on for-profit firing ranges."[368]

CONCLUSION

When America's Founders created the American government, they drew on the lessons and experiences of their English ancestors, the American colonists, and the Revolutionary War. English history taught them that an armed and trained populace was an effective way to maintain domestic order and prevent foreign invasions. The colonial experience taught them the importance of marksmanship for food and survival, including self-defense and community defense. And the Revolutionary War confirmed that an armed and trained populace was the best defense against a tyrannical government. The Founders' statements throughout the ratification of the Constitution and Bill of Rights show that they considered a trained populace indispensable to the free government they were establishing. The Second Amendment states it explicitly: "A well regulated Militia," that is, the body of the people armed and trained, is "necessary to the security of a free State," so "the right of the people

---

[363] *Id.*

[364] *Id.* at 233.

[365] *Id.* at 232 (quoting Bruni v. City of Pittsburgh, 824 F.3d 353, 371 (3d Cir. 2016)).

[366] *Drummond*, 9 F.4th at 232 (quoting *Bruni*, 824 F.3d at 370–71).

[367] *Id.*

[368] *Id.* at 233 (quoting *Bruni*, 824 F.3d at 371).

148          WILLIAM & MARY BILL OF RIGHTS JOURNAL          [Vol. 31:93

to keep and bear Arms, shall not be infringed."[369] An express purpose of the Amendment was to safeguard the relationship between a trained society and a free state.

　　Training was a favorite activity of the Founding generation because it was the best way to improve as marksmen, which is central to every aspect of the right to keep and bear arms. Training develops the skills necessary for effective self-defense and community defense, improves the militia, and deters tyranny. It is thus a pillar of the right, and future courts should treat it as such.

---

[369] U.S. CONST. amend. II.

# EXHIBIT 104

# Mass Shootings in the United States

rand.org/research/gun-policy/analysis/essays/mass-shootings.html



By Rosanna Smart, Terry L. Schell

Updated April 15, 2021

Summary: There is no standard definition of what constitutes a mass shooting, and different data sources—such as media outlets, academic researchers, and law enforcement agencies—frequently use different definitions when discussing and analyzing mass shootings. For instance, when various organizations measure and report on mass shootings, the criteria they use in counting such events might differ by the minimum threshold for the number of victims, whether the victim count includes those who were not fatally injured, where the shooting occurred, whether the shooting occurred in connection to another crime, and the relationship between the shooter and the victims. These inconsistencies lead to different assessments of how frequently mass shootings occur and whether they are more common now than they were a decade or two ago.

Data show that, regardless of how one defines mass shootings, perpetrators are likely to be men. But several other characteristics that are statistically predictive of perpetration are still uncommon among offenders on an absolute level. The rare nature of mass shootings creates challenges for accurately identifying salient predictors of risk and limits statistical power for detecting which policies may be effective in reducing mass shooting incidence or lethality. Implementing broader violence prevention strategies rather than focusing specifically on the most-extreme forms of such violence may be effective at reducing the occurrence and lethality of mass shootings.

JA7011

Incidents of mass firearm violence galvanize public attention. There has been extensive media coverage of many incidents in the United States in which individuals have used firearms to kill large numbers of people. These mass public shootings are rare events—they constitute less than 15 percent of all mass killings in the United States and are responsible for less than 0.5 percent of all homicides (Duwe, 2020)—but they have far-reaching impacts on citizens' mental health, anxiety, and perceptions of safety (Lowe and Galea, 2017).[1] Mass shootings also frequently generate extensive media coverage related to guns, prompt political discussions about legislative initiatives for how better to prevent gun violence, and may lead to substantial state gun policy changes (Schildkraut, Elsass, and Meredith, 2018; Newman and Hartman, 2019; Luca, Malhotra, and Poliquin, 2020).

In this essay, we first describe different approaches for defining a mass shooting and discuss how using different definitions can influence estimates of mass shooting levels and trends. We then summarize findings from the literature regarding the characteristics of mass shootings, including offender characteristics, types of firearm(s) used, and community-level correlates. We conclude with a brief discussion of the substantial methodological challenges for evaluating how gun policies affect mass shootings. Our discussion here is focused on mass shootings in the U.S. context.

## What Is a Mass Shooting?

The U.S. government has never defined mass shooting as a separate category of crime, and there is not yet a broadly accepted definition of the term. In the 1980s, the Federal Bureau of Investigation (FBI) defined *mass murderer* as someone who "kills four or more people in a single incident (not including himself), typically in a single location" (Krouse and Richardson, 2015). In 2013, Congress defined *mass killing* as a single incident that leaves three or more people dead (Pub. L. 112-265, 2013). However, both definitions include many incidents that would not be considered mass shootings. Furthermore, neither definition was established for the purpose of data collection or statistical analyses. The FBI classification of mass murderer was established primarily with the aim of clarifying criminal profiling procedures (Ressler, Burgess, and Douglas, 1988), and the congressional definition was intended to clarify statutory authority for the provision of U.S. Department of Justice investigatory assistance requested by state and local agencies (Pub. L. 112-265, 2013). Thus, various news outlets, researchers, and law enforcement agencies often use different definitions when reporting on mass shootings, which can complicate our understanding of mass shooting trends and their relationship to gun policy.[2] Table 1 provides examples of the variation in the criteria set by some of the existing data sources on mass shootings in the United States. Depending on which data source is referenced, there were somewhere between six and 503 mass shootings and between 60 and 628 mass shooting fatalities in 2019.

**JA7012**

**Table 1. Variation in How Mass Shootings Are Defined and Counted**

| Data Source | Casualty Threshold (for injuries or deaths by firearm) | Location of Incident | Motivation of Shooter | Number of U.S. Mass Shootings in 2019 | Number of Mass Shooting Fatalities in 2019 |
|---|---|---|---|---|---|
| *Mother Jones* (see Follman, Aronsen, and Pan, 2020) | Three people fatally injured (excluding shooter)[a] | Public | Indiscriminate (excludes crimes of armed robbery, gang violence, or domestic violence) | 10 | 73 |
| Gun Violence Archive (undated-a) | Four people fatally or nonfatally injured (excluding shooter) | Any | Any | 418 | 465 |
| Mass Shooter Database (The Violence Project, undated) | Four people fatally injured (excluding shooter) | Public | Indiscriminate (excludes crimes of armed robbery, gang violence, or domestic violence) | 6 | 60 |
| AP/USA TODAY/Northeastern University Mass Killings database (see Associated Press and *USA Today*, 2019; Callahan, 2019) | Four people fatally injured (excluding shooter) | Any | Any | 33 | 174 |
| Everytown for Gun Safety Support Fund (2019) | Four people fatally injured (excluding shooter) | Any | Any | 19(in 2018)[b] | 112(in 2018)[b] |
| Mass Shooting Tracker (undated) | Four people fatally or nonfatally injured (including shooter) | Any | Any | 503 | 628 |
| Mass Shootings in America database (see Stanford Geospatial Center, undated) | Three people fatally or nonfatally injured (excluding shooter) | Any | Not identifiably related to gangs, drugs, or organized crime | 62 (in 2015)[c] | 202 (in 2015)[c] |

[a] Before January 2013, the casualty threshold for the *Mother Jones* data was four people fatally injured (excluding the shooter).

[b] As of this writing, the Everytown for Gun Safety Support Fund's Mass Shootings in America website with interactive map was up to date as of April 28, 2020. However, the group's downloadable data included incidents through 2018 only.

[c] Stanford's Mass Shootings in America database was permanently suspended in mid-2016. In this table, we provide incident and fatality counts for 2015, the last year of complete data collection. For archived data, see Stanford Geospatial Center, 2018.

**JA7013**

Although there is no official standard for the casualty threshold that distinguishes a mass shooting from other violent crimes involving a firearm, a common approach in the literature is to set a casualty threshold of four fatalities by firearm, excluding the offender or offenders (Fox and Levin, 1998; Duwe, Kovandzic, and Moody, 2002; Gius, 2015c; Krouse and Richardson, 2015; Fox and Fridel, 2016). Using this criterion helps reduce measurement error in identifying mass shootings because fatalities are captured in administrative data and are frequently included in media reports (Duwe, 2000). However, this categorization is not without controversy. It does not capture incidents in which fewer than four victims were killed but additional victims were nonfatally injured, and it does not include multiple-victim homicides in which fewer than four fatalities resulted from gunshots but additional fatalities occurred by other means. Thus, many have chosen alternative definitions of casualty thresholds for mass shootings. For instance, Lott and Landes (2000) adopted the definition of two or more injured victims, Kleck (2016) used a six-victim casualty threshold, the Gun Violence Archive (undated-a) defined *mass shooting* as an incident in which four or more victims (excluding the shooter) are injured or killed, and the Mass Shooting Tracker (undated) set a criterion of four or more people injured or killed (including the shooter).



<u>This page is part of RAND's Gun Policy in America initiative, one of the largest studies ever conducted on the subject. »</u>

Another definitional disagreement is whether to include multiple-victim shooting incidents that occur in connection with some other crime or domestic dispute. Because mass shootings that stem from domestic and gang violence are contextually distinct from high-fatality indiscriminate killings in public venues, some analysts have argued that they should be treated separately. In their analyses of "mass public shootings," Lott and Landes (2000) excluded any felony-related shooting, and Duwe, Kovandzic, and Moody (2002) excluded incidents where "both the victims and offender(s) were involved in unlawful activities, such as organized crime, gang activity, and drug deals" (p. 276). Similarly, other researchers (e.g., Gius, 2015c; Luca, Malhotra, and Poliquin, 2020) have restricted analyses to events that occurred in a relatively public area and in which victims appeared to have been selected randomly. However, others have claimed that this narrow definition ignores a substantial proportion of gun-related violence from family- or felony-related murder (Fox and Levin, 2015). Furthermore, determinants of whether victims were selected indiscriminately or whether the incidents were gang- or crime-related are, to some degree, subjective. Accurate information about the shooter's motivations or connection to gangs may not have been included in police or news reports of the incidents. In contrast, the Mass Shooting Tracker and the Gun Violence Archive count as mass shootings all incidents that meet their designated casualty threshold, regardless of the circumstances that led to the event or the motivation of the shooter.

These definitions make a substantial difference in which incidents are counted.[3] As noted earlier, depending on which data source is used, there were between six and 503 mass shootings in the United States in 2019 (see Table 1); that amounts to a range of incident rates from approximately one incident per 50 million people in the United States to one incident per 1 million people. More-restrictive definitions (e.g., from *Mother Jones*) focus on the prevalence of higher-profile events motivated by mass murder, but they omit more-common incidents occurring in connection with domestic violence or criminal activity, which make up about 80 percent of mass shooting incidents with four or more fatally injured victims (Krouse and Richardson, 2015). Broader definitions (e.g., from the Gun Violence Archive) provide a more comprehensive depiction of the prevalence of gun violence, but they obscure the variety of circumstances in which these incidents take place and their associated policy implications. Furthermore, if the effects of a firearm policy are expected to affect only mass public shooting incidents, then analyses that include domestic violence mass shootings could obscure identification of the expected effects of the policy. Thus, there is value in having multiple measurements of mass shootings—but only if their definitions are clearly and precisely explained and they are used by researchers in a manner appropriate to the analysis.

Although researchers, policymakers, and reporters may rightly make different decisions about the criteria they wish to use to define what counts as a mass shooting, these decisions fundamentally shape the scope of incidents considered, as well as the potential for measurement error in their data. Data sets that use definitions based solely on objective criteria that are widely available across multiple sources (e.g., fatality counts) likely offer greater reliability compared with data sets that rely on objective criteria that may not be consistently reported across multiple sources (e.g., nonfatal shooting injury counts) or that may be difficult to operationalize (e.g., public location).[4] Data sets that define mass shootings based on relatively subjective criteria (e.g., whether an incident was related to criminal activity or domestic violence) may be particularly difficult to reconcile because underlying sources may disagree or differently report on these factors. *Mother Jones*, the Mass Shooter Database, and the Mass Shootings in America database are examples of sources that use some subjective criteria. In the absence of a clear conceptual reason for restricting mass shooting incidents of interest based on subjective criteria, evaluations are likely to produce more-reliable and more-replicable results when using data sources that define mass shootings based only on fatality thresholds (see Table 1).



The Mass Attacks Defense Toolkit provides practical strategies and guidance on deterring, mitigating, and responding to mass attacks. »

Another fundamental issue in documenting mass shootings, and in reconciling differences across data sets, is that the methods used to collect information on mass shootings also vary across sources. There is no comprehensive, administrative data source that captures mass shootings; however, data from the FBI's Supplementary Homicide Reports (SHR) database provide information from 1976 onward on most homicides in the United States, typically including information on the weapon types, number of victims, and number of offenders involved, which can be used to identify which incidents meet specific definitional thresholds of fatalities (Puzzanchera, Chamberlin, and Kang, 2018).[5] When such details are known, the SHR database also provides information on victim-offender relationships (e.g., husband or wife, stranger, neighbor)[6] and incident circumstances (e.g., "gangland killing," "lovers' triangle," "brawl due to influence of alcohol"), which could be used as indicators of familicides and felony-related killings. However, the SHR database relies on voluntary submissions by thousands of separate law enforcement agencies. It does not capture all incidents (about 90 percent completeness), and this missingness is not random. Sometimes, entire states do not submit data for a year or for part of a year, and in most states and years, at least some law enforcement agencies do not submit complete data (Fox, 2004; Fox and Swatt, 2009). In addition to missingness by jurisdiction, there is a high degree of missingness for data elements, particularly in offender characteristics (e.g., the offender may not be known) and incident characteristics (e.g., circumstances or victim-offender relationship).[7] Some analyses have also compared SHR variables with data in police incident reports in specific jurisdictions and found evidence of misclassification regarding victim-offender relationship and incident circumstances (Pizarro and Zeoli, 2013). Others have cross-referenced SHR incidents with historical news records and found issues of coding errors in the SHR database that could affect identification of mass shooting incidents (e.g., double counting of victims or incidents, misclassifying a nonfatal injury as a fatal injury) (Duwe, 2000). Although researchers have noted that these recording errors are relatively uncommon in the SHR, the errors are still important considerations for using the SHR to assess mass shootings (Duwe, 2000; Fox, 2006). Finally, the SHR provides relatively limited detail on offender or victim characteristics, firearm types, and incident setting.

Given these limitations, most data sources for mass shootings do not derive solely from the SHR. Some sources (e.g., the AP/USA TODAY/Northeastern University Mass Killings database) combine information from both news reports and the SHR, others (e.g., *Mother Jones*) rely on news reports alone, and some (e.g., the Mass Shooter Database) combine information from law enforcement records, social media, court transcripts, news accounts, and other primary and secondary sources to obtain detailed information on the characteristics of each incident and offender (see Table 2). Differences in data collection strategies, in large part, reflect differences in the mass

shooting definitions employed (e.g., sources that count nonfatal shooting injuries in their criteria must rely on sources other than the SHR, which captures only fatal injuries), as well as differences in the proposed purpose of the database.

**Table 2. Data Collection Methods and Data Elements Captured Across Mass Shooting Data Sources**

| Data Source and Year Established | Stated Purpose of the Data Set | Methods for Data Collection | Time Period[a] | Data Elements Captured[b] |
|---|---|---|---|---|
| *Mother Jones* Established 2012 | To track the "distinct phenomenon" of indiscriminate shooting rampages in public places resulting in four or more victims killed (later, three or more victims killed) | Media reports | 1982–present | City, state, latitude, and longitude; date; number of fatalities; number injured; setting; shooter gender, race, and age; prior signs of mental health problems for shooter; method of gun acquisition; gun type |
| Gun Violence Archive Established 2013 | To provide data about gun violence in near real time | Automated queries and manual research of more than 7,500 sources (e.g., local and state police records, media, government reports, existing data aggregates) Each case involves secondary validation and de-duplication. | 2014–present | City, state, latitude, and longitude; date; number of fatalities; number injured; victim name, age, and gender; suspect or offender name, age, and gender; incident resolution; summary of incident; weapons involved (gun type, whether stolen) |
| Mass Shooter Database Established 2017 | To study the life histories of mass shooters who shot and killed four or more people in a public place | Primary sources (e.g., social media, correspondence with perpetrators) and secondary sources (e.g., media, court transcripts, journal articles, autopsy reports, medical, school, and law enforcement records) Each case involves independent validation and de-duplication. | 1966–2019 | City, state; incident setting; perpetrator age and gender; number killed; 100 life-history variables for offender, including mental health history, trauma, interest in past shootings, and situational triggers |
| AP/USA TODAY/ Northeastern University Mass Killings database Established 2006 | To provide a comprehensive repository on every mass murder (four or more people, excluding the killer, killed within a span of 24 hours) | Media reports and the SHR database Further details are not provided. Data are not currently publicly available. | 2006–2019 | City, state; date; number of victims; method (e.g., shooting); weapon type; incident summary |

| Data Source and Year Established | Stated Purpose of the Data Set | Methods for Data Collection | Time Period[a] | Data Elements Captured[b] |
|---|---|---|---|---|
| **Everytown for Gun Safety Support Fund mass shootings database[c]Established 2013** | To understand mass shootings (four or more killed) and help point lawmakers to strategies to prevent such events | Primarily media reports, supplemented with the SHR database and police and court records | 2009–present | City, state; date; number killed (by sex); number injured (by sex); number under age 20 killed; number of law enforcement officer deaths and injuries; setting; gun types; shooter age, sex, prohibited possessor status, outcome; whether shooter displayed dangerous warning signs and had prior history of domestic violence; whether there was high-capacity magazine use; incident summary |
| **Mass Shooting TrackerEstablished 2013** | To track all mass shootings with more than three people shot in a single spree | Crowd-sourced data collection, unknown procedures | 2013–present | City, state; number killed; number injured; brief incident name and summary (e.g., offender name, victims) |
| **Mass Shootings in America databaseEstablished 2012** | To provide a curated set of spatial and temporal data about mass shootings in the United States, taken from online media sources, with the aim of facilitating research on gun violence in the United States | Online media resources In general, a minimum of three corroborating sources are required to add the full record into the data set. | 1966–2016 | City, state, latitude, and longitude; date, day of week; number of shooters; number of civilian deaths and injuries; number of law enforcement officer deaths and injuries; shooter age, name, sex, and outcome; number (and types) of guns; setting; motive; shooter history of mental illness; shooter military experience; incident summary |

[a] In this column, *present* means the beginning of 2021.

[b] This column represents the data elements that the source attempts to capture; in many cases, these fields are missing information.

[c] For this data set and reporting on it, see Everytown for Gun Safety Support Fund, 2019.

However, variation in the sources examined to identify incidents can result in varying degrees of completeness or reliability. Data sets that rely solely on news sources or crowd-sourcing (i.e., *Mother Jones*, the Mass Shooting Tracker, and the Mass Shootings in America database) may systematically miss lower-profile incidents and those involving fewer injuries or fatalities (Duwe, 2000; Schildkraut, Elsass, and Meredith, 2018). Systemic biases in the types of incidents that receive widespread media coverage affect the number of incidents that are counted but might also misrepresent the relative characteristics of offenders, victims, or communities involved (Silva and Capellan, 2019a, 2019b). For example, news reports may be less likely to include the perpetrator's race when he or she is White (Park, Holody, and Zhang, 2012) and may be more likely to include speculation about gang involvement when racial and ethnic minorities are involved (Entman and Gross, 2008). Given media sources' limited capacity to cover all current events, mass shootings that occur during other newsworthy events (e.g., presidential elections) may also be systematically missed, particularly in historical analysis relying on print or television media. Finally, the media landscape has changed dramatically over the past three decades; daily local newspapers have disappeared across much of the United States, and the extent to which news sources are searchable on the internet has also changed (Duwe, 2000).

**JA7018**

Thus, any comparison over time in the number or characteristics of mass shootings necessarily involves comparisons across different media sources with different coverage areas, intended audiences, and editorial practices. Data sources that combine information across media reports and law enforcement administrative data—for example, the Gun Violence Archive, the Mass Shooter Database, the Everytown for Gun Safety Support Fund mass shootings database, and the AP/USA TODAY/Northeastern University Mass Killings database—are likely to be more complete, particularly in measuring incidents over a longer historical time frame. However, it is a challenging effort to ensure that different sources of information about the same incident are properly linked (i.e., without a unique incident identifier, researchers must make linkages based on similarities in date, location, and incident information, which may not be identical across different reports of the same incident) so that multiple reports are not counted as separate incidents. Thus, data sets that triangulate across multiple underlying sources (e.g., the Mass Shooter Database and the Gun Violence Archive) require additional effort toward de-duplication and validation.

And even when data sources use the same definition of what constitutes a mass shooting, variation in data collection methods can result in different estimates of mass shooting prevalence. As an example of this issue, Duwe (2020) triangulated information from the SHR, online newspaper databases, and unpublished mass shooting data sets and found that the *Mother Jones* database missed more than 40 percent of mass shootings that met the source's own criteria between 1982 and 2013. Greater missingness occurred for incidents further back in time, likely because of greater challenges with accessing comprehensive news accounts prior to widespread use of digital media for news reporting. Comparing four data sources for mass shootings (the Everytown for Gun Safety Support Fund's mass shootings database, the Gun Violence Archive, the *Mother Jones* database, and the FBI's SHR database), and applying the same definition of mass shooting to each (four or more fatalities, excluding the shooter), Booty et al. (2019) found that estimates of the number of mass shootings in 2017 ranged from five (*Mother Jones*) to 24 (Gun Violence Archive). When triangulating across data sets, the researchers identified 32 unique mass shooting incidents, but only two incidents (6.3 percent) were common to all four data sources. For further discussion, see Booty et al. (2019), Duwe (2000, 2020), and Huff-Corzine and Corzine (2020), which contain a more comprehensive discussion of data collection efforts and their limitations.

## Are Mass Shootings on the Rise?

In 2014, the FBI released a study showing that "active shooting incidents" had increased at an average annual rate of 16 percent between 2000 and 2013 (Blair and Schweit, 2014).[8] In contrast to the varied definitions for mass shootings, there is an agreed-upon definition among government agencies for *active shooter*: "an individual actively engaged in killing or attempting to kill people in a confined and populated area; in most cases, active shooters use firearm(s) and there is no pattern or method to their selection of victims" (U.S. Department of Homeland Security, 2008, p. 2). Using a modified version of this definition to include incidents that had multiple offenders or occurred in confined spaces, Blair and Schweit (2014) found that active shootings had increased from only one incident in 2000 to 17 in 2013. The FBI active shooting reports, which are now produced annually, identified 20 active shooter incidents in 2016, 30 incidents in 2017, 27 incidents in 2018, and 28 incidents in 2019 (FBI, 2018g, 2019g, 2020).

Although Blair and Schweit (2014) explicitly stated that their original FBI active shooter study was "not a study of mass killings or mass shootings" (p. 5), extensive media coverage cited the study as evidence of a sharp rise in mass shootings and mass shooting fatalities (Lott, 2015). However, Blair and Schweit (2014)'s definition of an active shooter incident includes some incidents that would be excluded under any of the commonly used criteria for mass public shootings (see Table 1) because it does not set any casualty threshold. For example, Blair and Schweit's definition includes some incidents in which no people were injured or in which one person was killed and no others were wounded. Setting a threshold of zero victims increases the potential for measurement error, because shooting incidents with no casualties are more difficult to identify from police records and are less likely to receive media coverage (Duwe, Kovandzic, and Moody, 2002). Additionally, because it should be relatively easier to identify more-recent shootings with few fatalities, a low casualty threshold will tend to systematically bias

estimates of the number of shootings upward over time.[9] Even when using a higher-fatality threshold, mass shooting data sources that rely solely on news reports to identify cases also appear to systematically undercount incidents from earlier periods (see previous section and Duwe, 2020).

Even when a more restrictive casualty threshold of four or more fatally injured victims (excluding the shooter) is imposed, empirical evidence on trends in these incidents varies depending on whether the motivation of the shooter is included as a criterion for considering an event a mass shooting. In their analysis of mass shooting trends from 1999 to 2013, Krouse and Richardson (2015) distinguished among mass shootings occurring in public locations that are indiscriminate in nature ("mass public shootings"), mass shootings in which the majority of victims are members of the offender's family and that are not attributable to other criminal activity ("familicide mass shootings"), and mass shootings that occur in connection to some other criminal activity ("other felony mass shootings"). Duwe (2020) adopted similar distinctions in his analysis of mass shootings over the longer time frame of 1976 to 2018.

Figures 1 and 2 show trends in mass shooting incidents and mass shooting fatalities, using the data provided by Duwe (2020), who created his own data set aggregating across several of the sources described in this essay. Using Krouse and Richardson (2015)'s definition of "mass public shootings," Duwe (2020) found that such events constituted about 19 percent of all mass shooting incidents and 27 percent of all mass shooting fatalities from 1976 to 2018. The data from multiple studies suggest a slight increase in the incidence rate of mass public shootings over the past four decades (Cohen, Azrael, and Miller, 2014; Krouse and Richardson, 2015; Duwe, 2020). From 2016 to 2018, the annual rate of mass public shooting incidents was about one incident per 50 million people in the United States (Duwe, 2020). Considering the number of fatalities in these shootings, this corresponds to approximately 0.4 percent of all homicides, or approximately 0.2 percent of all firearm deaths, over that period. However, using an expanded definition of mass shootings that includes domestic- or felony-related killings, there is little evidence to suggest that mass shooting incidents or fatalities have increased (Cohen, Azrael, and Miller, 2014; Krouse and Richardson, 2015; Fox and Fridel, 2016). Adjusted for changes in the size of the U.S. population, the incidence of all mass shootings (four or more fatally injured victims, excluding the offender, regardless of shooter motivation or circumstances) was highest in the late 1980s and early 1990s, averaging one incident per 10 million people from 1989 to 1993 (Duwe, 2020). More recently, between 2016 and 2018, the annual rate of all mass shooting incidents was about one incident per 14 million people (Duwe, 2020). Considering the number of fatalities in these mass shootings, this corresponds to approximately 0.8 percent of all homicides, or approximately 0.4 percent of all firearm deaths, over that period. Thus, different choices about how to define a mass shooting result in different findings for both the prevalence of these events at a given time and whether their frequency has changed over time.

**Figure 1. Trends in Mass Shooting Incidents, 1976–2018**



SOURCE: Author analysis of data from Duwe, 2020.

**Figure 2. Trends in Mass Shooting Fatalities, 1976–2018**



SOURCE: Author analysis of data from Duwe, 2020.

Even if we set aside the facts that reliance on different data sources over time complicates measurement and that findings can depend on how mass shootings are defined, the relative rarity of mass shooting events makes analysis of trends particularly difficult. Chance variability in the annual number of mass shooting incidents makes it hard to discern a clear trend in the risk of such incidents, and trend estimates are sensitive to outliers and to the time frame chosen for analysis (Fox and DeLateur, 2014). For example, although Krouse and Richardson (2015) found evidence of an upward trend in mass public shootings from 1999 to 2013, they noted that the increase was driven largely by events in 2012, in which there was an unusually high number of mass public shooting incidents. Additionally, Lott (2015) suggested that the FBI study's estimate of a dramatic increase in active shooter incidents was largely driven by the choice of 2000 as the starting date, because that year had an unusually low number of shooting incidents. Conducting his own analysis to cover 1977 through 2014, and adjusting the data to exclude

**JA7022**

events with fewer than two fatalities, Lott (2015) found a much smaller and statistically insignificant increase (less than 1 percent annually) in mass shooting fatalities over time. However, when other researchers extended the time frame to cover more-recent years and used a four-fatality threshold for mass public shootings, their findings suggested a significant increase in the incidence and lethality of these events over time (Sanders and Lei, 2018; Duwe, 2020; Lankford and Silver, 2020).

The leverage of extreme incidents is even clearer when examining trends in the number of casualties from mass public shootings over time (Figure 3). The data on deaths and injuries from 2017 mass public shootings are particularly striking: Just one of the seven incidents that occurred (the Las Vegas shooting in October 2017) accounted for more than half of all mass public shooting fatalities and nonfatal injuries in that year.[10] However, even when we exclude the Las Vegas incident, 2008 through 2018 saw the highest average rate of casualties from mass public shootings since the 1970s. In 2018, mass public shootings were responsible for approximately one death per 4 million people in the United States (Duwe, 2020), representing fewer than one of every 200 homicides in that year.

Although different choices about how to define a mass shooting and the period over which to calculate mass shooting trends have resulted in disagreement about whether the frequency of mass shootings has risen, there is clear evidence that the media's use of the term *mass shooting* has increased significantly in recent decades (Roeder, 2016). Unfortunately, the trends one finds in measuring mass shootings over time depend heavily on how the term is defined and the precise period over which the trend is observed, and these trends are likely to be biased by changes in the completeness of the underlying data sources over time. This ambiguity makes it difficult to draw firm conclusions about how these incidents have changed over time or how that information should be used as we try to understand the determinants, costs, and policy implications of mass shootings.

**JA7023**

**Figure 3. Trends in Mass Public Shooting Casualties, 1976–2018**



SOURCE: Author analysis of data from Duwe, 2020.

## Characteristics of Mass Public Shootings

Several studies, largely focused on mass public shootings, have sought to describe the characteristics of individuals who perpetrate mass shootings, evaluate characteristics of each mass shooting incident, and identify the behaviors and motivations that preceded each incident. Most of these studies are purely descriptive, not comparative, and thus should not be interpreted as providing evidence of whether specific individual-level or community-level characteristics are predictive of someone perpetrating a mass shooting.

**JA7024**

According to this literature (see, for example, Capellan et al., 2019; Duwe, 2020), the perpetrators of mass public shootings in the United States have been overwhelmingly male (98 percent) and are most commonly non-Hispanic White (61 percent). In addition, they are most commonly younger than age 45 (82 percent); more specifically, 26 percent of mass public shooters from 1976 to 2018 were younger than age 25, 27 percent were aged 25 to 34, and 29 percent were aged 35 to 44. Relative to the overall U.S. population, mass public shooting offenders are much more likely to be male and are somewhat younger; relative to other homicide offenders, males and non-Hispanic Whites are overrepresented among mass public shooters, and mass public shooters are older. For comparison, of the overall U.S. population in 2019, approximately 49 percent was male, 60 percent was younger than age 45, and 60 percent was non-Hispanic White (U.S. Census Bureau, 2020). Of murderers in 2018 with known offender characteristics, 88 percent were men, 84 percent were younger than age 45 (38 percent younger than 25, 31 percent aged 25 to 34, and 16 percent aged 35 to 44), and 42 percent were White (Hispanic ethnicity information was not provided) (FBI, 2019f).

Media coverage often links mass public shootings with serious mental illness (McGinty et al., 2014, 2016), but estimates of the prevalence of mental illness among mass public shooting offenders vary widely depending on the types of incidents considered and the methods used to define and identify mental illness. Rates of formal diagnoses of psychotic disorders (including diagnoses made post-incident, which may be affected by the incident itself) among mass public shooters are estimated to be about 15 to 17 percent (Stone, 2015; Fox and Fridel, 2016).[11] Studies that use a broader definition of mental illness and consider informal evidence indicative of mental health problems (e.g., statements by law enforcement or family before or after the incident) have found prevalence rates ranging from 30 to 60 percent (Taylor, 2018; Capellan et al., 2019; Duwe, 2020). This informal evidence, which is often obtained subsequent to the incident, is invariably affected by the act of mass violence itself (Skeem and Mulvey, 2020). It does not suggest that mental illness is useful for predicting a subsequent mass shooting. Of note, a study of 106 perpetrators of mass public shootings in the United States between 1990 and 2014 found that less than 5 percent of offenders (*n* = 5) had a history of involuntary commitment or adjudication of dangerousness that would have prohibited them from purchasing a firearm following the federal mental health background check (Silver, Fisher, and Horgan, 2018). Although most research supports that, overall, people with serious mental illness are overrepresented among mass public shooters (Duwe, 2020; Skeem and Mulvey, 2020), this does not imply that serious mental illness *causes* mass shootings, just as we cannot conclude that being a young man causes mass shootings.



## The Experts Weigh In

Compare expert opinions on how gun policies may affect mass shootings in your state and the U.S. as a whole. »

Other researchers and analysts have noted that many mass shooters have a history of domestic violence. Using three mass shooting databases (whose underlying data sources include media reports, court records, and police records) and their own search of criminal records, Zeoli and Paruk (2020) analyzed 89 individuals who perpetrated a mass shooting (involving four or more fatalities, excluding the offender) between 2014 and 2017. Of the 89 individuals, 28 (31 percent) had a history of suspected domestic violence. The authors identified that, of those 28, 17 (61 percent) had prior interaction with the criminal justice system related to domestic violence, and six individuals had a felony or misdemeanor conviction for domestic violence. Using a different definition of mass shooting (involving four or more casualties, including the perpetrator, and excluding felony-related mass shootings), Gu (2020) found that 36 percent of mass shooting incidents from 2014 to 2019 involved an offender with a history of domestic violence or violence against women. Of note, both of these studies included mass shooting familicides, which represent the modal type of mass shooting. Given that intimate partner homicides are commonly preceded by prior incidents of nonfatal domestic violence (Campbell et al., 2007), it may be expected that perpetrators of mass shooting familicides commonly have prior histories of domestic violence. In a study of mass murders from

2006 to 2016 (74 percent of which were shootings), Fridel (2017) found that 30 percent of familicides, 7 percent of mass public killings, and 3 percent of felony-related killings involved an offender with a known history of domestic violence.[12] But because we do not know the rate of domestic violence in the general population based on comparable definitions and data sources, it is not clear the precise extent to which prior domestic violence represents a risk factor for perpetrating a mass shooting.

It is challenging to make broad generalizations about the individual-level motivations of mass shootings. When mass shootings are broadly defined to include familicides, felony-related killings, and mass public shootings, the events include heterogeneous incident types that vary in terms of victim, offender, and incident characteristics (Fridel, 2017; Taylor, 2018). Felony-related killings exhibit particular differences from familicides and mass public shootings. They are, by definition, criminally motivated (in contrast to familicides and mass public shootings, which are more commonly motivated by relationship problems, group grievances, or ideological extremist beliefs); result in significantly fewer deaths; and are significantly less likely to conclude with the death of the perpetrator (Fridel, 2017; Capellan et al., 2019).[13] The etiology of felony-related mass shootings thus, unsurprisingly, bears a stronger resemblance to firearm homicides more broadly. In contrast, familicides and mass public shootings show stronger similarities in terms of offender characteristics and motivations (Fridel, 2017).

Even the subset of mass public shootings seems to encompass a variety of offender types, and some researchers have suggested that the relative prevalence of these offender typologies has changed over time (Capellan et al., 2019).[14] When Capellan and colleagues considered incidents in which an offender used a firearm to kill or "attempt to kill" four or more victims in a public setting, they found that school shootings constituted the majority of mass public shooting incidents in the 1960s and 1970s, and workplace shootings became increasingly prevalent in the 1980s to 2000s (Capellan and Gomez, 2018; Capellan et al., 2019).[15] The past decade has seen an increase in the percentage of mass public shootings that are posited to relate to fame-seeking on behalf of the individual or on behalf of a broader ideology (Capellan et al., 2019; Lankford and Silver, 2020). Some researchers have suggested that this rise in fame- and attention-seeking motivations among mass public shooters has contributed to an escalation in the lethality of these incidents (Langman, 2018; Lankford and Silver, 2020).

Although there are some noted differences across different types of mass public shootings (Capellan and Anisin, 2018; Capellan et al., 2019), an overarching commonality is that most incidents are preceded by some level of planning by the shooter. Among active shooting cases from 2000 to 2013 for which sufficient information was available, 62 percent of offenders planned the attack for more than one month, and 9 percent planned for more than one year (Silver, Simons, and Craun, 2018). Focusing on incidents involving eight or more fatally injured victims, Lankford and Silver (2020) found that at least half of the 18 high-fatality mass public shootings between 2010 and 2019 involved a planning period of one year or longer. About 40 percent of mass public shooters make some form of verbal or written threat (e.g., threats made in front of family or friends or posted to social media) prior to the incident (Duwe, 2020).

Another strand of research has described the types of firearms used in mass shooting incidents and the extent to which variation in weapon choice relates to the lethality of the incident. There are noted challenges to conducting such analyses, partly because of the absence of any official data source that provides complete information on the types of firearms or associated equipment (e.g., ammunition, magazines, scopes) used in shootings (for further discussion, see Koper, 2020). It is common for multiple firearms to be involved in public shootings: Various studies have indicated that multiple firearms were involved in an estimated 34 percent of active shooting incidents across 2000–2017 (de Jager et al., 2018), 42 percent of mass public shooting incidents across 1999–2013 (Krouse and Richardson, 2015), and 79 percent of mass public shooting incidents that resulted in eight or more fatalities across 1966–2019 (Lankford and Silver, 2020). In an analysis of mass public shootings in which shooters *attempted* to kill at least four individuals, Capellan and Jiao (2019) found that 80 percent of offenders had prior access to a firearm, although 41 percent of those individuals obtained additional firearms for the incident.

As shown in Table 3, handguns are the firearm most commonly involved in active shootings and mass shootings; semiautomatic rifles or "assault-style" weapons are used in an estimated 10 to 36 percent of active shootings and mass shootings.[16] The use of large-capacity magazines (LCMs) is more common in mass public shootings and

high-fatality mass shooting incidents than it is in firearm crimes overall. The estimated prevalence of LCM involvement in mass shootings ranges from 20 to 60 percent, or from 45 to 60 percent when restricting the denominator to mass public shootings or high-fatality mass shootings (Table 3). For comparison, LCM-equipped firearms are estimated to constitute 22 to 36 percent of crime guns recovered by police in most urban jurisdictions (Koper et al., 2018). The estimated prevalence of LCM-equipped firearms in the overall stock of civilian-owned firearms is about 15 to 20 percent, although these estimates come from survey data from 1994, and the prevalence has likely increased since then (Cook and Ludwig, 1996; Kleck, 2020).

**Table 3. Percentage of Mass Shooting Incidents Involving the Use of a Firearm with a Large-Capacity Magazine or the Use of a Semiautomatic Rifle or Assault Weapon**

| Data Source | Mass Shooting Definition | Period of Study and Number of incidents | Firearm with an LCM[a](%) | Semiautomatic Rifle or Assault Weapon[b](%) |
|---|---|---|---|---|
| Everytown for Gun Safety Support Fund (2018) | Four or more people fatally injured | 2009–2017, $n = 173$ | 20–58 | NR |
| Koper et al. (2018) | Four or more people fatally injured | 2009–2015, $n = 145$ | 19–57 | 10–36 |
| Krouse and Richardson (2015) | Four or more people fatally injured | 1999–2013, $n = 317$ | NR | 10 |
| Klarevas (2016) | Six or more people fatally injured | 1966–2015, $n = 111$ | 47 | 26 |
| Krouse and Richardson (2015) | Public, did not involve other crimes, four or more people fatally injured | 1999–2013, $n = 66$ | NR | 27 |
| Follman, Aronsen, and Pan (2020) | Public, did not involve other crimes, four or more people fatally injured | 1982–Jan 2019, $n = 92$ | 45–61 (or higher) | NR |
| Capellan and Jiao (2019) | Public, did not involve other crimes, attempted to kill four or more people | 1966–2017, $n = 318$ | NR | 10–34 |
| Klarevas (2019) | Public, did not involve other crimes, four or more people fatally injured | 1966–2017, $n = 43$ | NR | 30 |
| Lankford and Silver (2020) | Public, did not involve other crimes, eight or more people fatally injured | 1966–2019, $n = 34$ | NR | 44 |
| de Jager et al. (2018) | Active shooting | 2000–2017, $n = 248$ | NR | 25 |
| Blau, Gorry, and Wade (2016)[c] | Mass shooting, spree shooting, or active shooting | 1982–2014, $n = 184$ | 37 | 34 |

SOURCE: Information obtained from Blau, Gorry, and Wade (2016), de Jager et al. (2018), Capellan and Jiao (2019), Klarevas (2019), Koper (2020), and Lankford and Silver (2020).

NOTE: NR = not reported.

[a] An LCM is considered to be an ammunition feeding device capable of holding more than ten rounds of ammunition. Koper et al. (2018) includes incidents that involved gun models commonly sold with an LCM, even if the magazine recovered was not reported.

[b] There is no agreed-upon definition of assault weapon, and studies differed in how such rifles or weapons were defined. Most studies considered specific firearms based on federal definitions (Krouse and Richardson, 2015) or a combination of state and federal definitions (Klarevas, 2016, 2019; Koper et al., 2018); some studies (de Jager et al., 2018; Koper et al., 2018; Capellan and Jiao, 2019) considered upper bounds based on a broader definition to include all semiautomatic rifles. The exact definition used was unclear in some studies (Blau, Gorry, and Wade, 2016; Lankford and Silver, 2020).

[c] The criteria for incident inclusion used by Blau, Gorry, and Wade (2016) are somewhat unclear, but the authors appear to consider mass public shootings with four or more fatalities, public spree shootings with two or more fatalities, and active shooter incidents identified by the FBI.

**JA7028**

Finally, a few 2018 and 2019 studies have described community-level characteristics associated with mass shooting incidence. County-level analyses of mass shootings (excluding felony-related mass shootings) from 1990 to 2015 show a higher incidence rate of mass shootings occurring in counties with higher levels of or increasing trends in income inequality (Cabrera and Kwon, 2018; Kwon and Cabrera, 2019a, 2019c), higher population density (Cabrera and Kwon, 2018; Kwon and Cabrera, 2019b, 2019c), higher levels of residential instability (Kwon and Cabrera, 2019b), and lower levels of civic engagement (Kwon and Cabrera, 2019b). However, these findings may simply reflect the fact that mass shootings are more likely to occur in more-populous urban areas where larger gatherings of people are likely to be found; these estimated associations do not clearly show a causal effect of economic or sociocultural conditions on mass shootings.

## Research on Policies That Might Reduce Mass Shootings

The nature of mass shootings creates serious challenges for developing policies that will effectively prevent their occurrence. For instance, their rarity makes it difficult to extract generalizable information to identify useful predictors of risk. The low base rates of these events also ensure that policies targeting individuals based on risk factors would result in an extremely high rate of false positives; even the best available risk factors can identify only a subpopulation in which the risk of committing a mass shooting is on the order of one in a million. Finally, because individuals who perpetrate mass shootings often die by suicide (or expect to be killed by someone trying to stop the shooting), standard deterrence strategies used in crime prevention are unlikely to work; increasing the certainty or severity of punishments seems unlikely to be effective when the perpetrator already expects to die in the mass shooting.[17]

The relative rarity of mass shooting incidents, and particularly mass public shooting incidents, also makes it challenging to empirically assess whether existing policies are effective in preventing them. Since 2015, there has been an increase in published research that takes causal inference methods commonly used to evaluate policy effects on other forms of gun violence and applies these methods to study the effects of state firearm policies on mass shooting incidence or mass shooting fatalities.[18] However, mass shootings are sufficiently rare that the statistical assumptions of these methods rarely hold, threatening the validity of the effect estimates and statistical inference and potentially resulting in spurious effects (Xue et al., 2017).[19] In some cases, modeling rare outcome data with a large number of covariates can result in quasi- or complete separation, whereby one or more of the covariates perfectly predicts the outcome (Albert and Anderson, 1984).[20] Even if models do converge, the sparseness of these outcome data risk model overfitting and biased estimates. These issues are likely exacerbated in studies that adopt narrower definitions of mass shootings—for example, restricting the definition to mass public shootings or to mass public shootings involving a higher threshold of fatalities.

Even in studies that use models more appropriate for the distributional characteristics of mass shooting outcomes, the high degree of variability in mass shooting prevalence, injuries, and fatalities makes analyses of the effects of state policies on mass shooting outcomes subject to extremely low statistical power. Even if a state passed a policy that had large effects on mass public shootings (e.g., it cut the probability of such incidents in half), it is still unlikely that a study of that policy using appropriate statistical methods would find it to have a statistically significant effect. This occurs because most states already have zero mass public shootings in any given year, and, when the rate in the pre-period was already at, or very close to, zero, it is not possible to detect a decline in the risk of such shootings that is due to the policy—no matter how large that effect may be. This pervasive lack of statistical power can result in a published literature characterized by exaggerated effect sizes for any effects that are found to be statistically significant, and these significant estimates, in many cases, may misidentify the direction of the true effect (Gelman and Carlin, 2014).

Further complicating identification of the causal effects of policies on mass shootings is the potential issue of *reciprocal causation*; that is, high-profile mass shooting incidents may themselves prompt legislative changes. Luca, Malhotra, and Poliquin (2020) evaluated the association of mass public shooting occurrence in states with subsequent legislative activity related to firearms. Using data from 1989 to 2014, they found a 15-percent increase in the number of state firearm bills introduced in the year following a mass shooting; states with Democratic-

controlled legislatures did not show significant effects of firearm laws enacted, while states with Republican-controlled legislatures were significantly more likely to enact more-permissive gun laws subsequent to a mass public shooting incident in the state. If mass public shootings are a cause rather than (or in addition to) a consequence of firearm policy, models that fail to appropriately account for this reciprocal relationship may produce biased and misleading estimates of the effects of laws on mass shootings.

Given statistical challenges with accurately estimating the causal effects of a policy on mass shootings, we may be able to learn more about the potential for effective prevention strategies through detailed analyses of the characteristics of mass shootings (ideally for both incidents that occurred and incidents that are believed to have been averted) or through detailed review of how specific policies are being implemented in an effort to prevent mass shootings. Descriptive evidence that mass shootings involving firearms equipped with LCMs result in significantly higher injury and fatality rates may suggest potential benefits of restricting access to LCMs (Koper, 2020), although it may be that the choice to use LCMs reflects more-lethal intentions of the shooter (Kleck, 2016). [21] Similarly, evidence that many mass shooters have a history of domestic violence has led some to suggest potential benefits of stronger implementation of firearm prohibitions related to domestic violence (Zeoli and Paruk, 2020). Finally, although extreme risk protection orders are most commonly requested because of concerns about self-harm (Parker, 2015; Swanson et al., 2017, 2019), a detailed review of case records from 159 such orders issued in California found that 21 (13.2 percent) involved an individual who had access to or was planning to access firearms and expressed or exhibited behavior suggesting intent to perpetrate a mass shooting (Wintemute et al., 2019). These analyses do not directly assess the causal effect of policies on mass shooting outcomes, but they can still provide important insights for crafting and implementing policies.

## Conclusions

It is difficult to make accurate generalizations about mass shootings. These challenges occur, in part, because (1) there are many different definitions for mass shootings, each of which may be useful for a somewhat different purpose; (2) we have incomplete data sources that do not track these events in a consistent manner over time, likely include a biased sample of incidents, and lack the full range of individual and incident characteristics researchers are interested in; and (3) there are statistical limitations inherent in trying to draw inferences from rare and idiosyncratic events. Using definitions that differ in their thresholds for the number and type of victims or the circumstances around the incident results in vastly different estimates of how often mass shooting events occur, how the rate has changed over time, and incident characteristics. Even across studies with a similar definition of a mass shooting, the different data sources (or combinations of data sources) used sometimes result in different findings. A comprehensive administrative data source that reliably captures mass shooting incidents with sufficient detail does not exist; relying on news reports alone is problematic because of well-established systemic bias in what gets reported. Although these issues create problems for understanding the prevalence and patterns of mass shootings at a given point in time, they are exacerbated when trying to understand how mass shootings have evolved over time; this is because of temporal variation in the completeness of underlying data sources that could be used to identify and classify incidents. There may be fewer concerns regarding incomplete or biased data when adopting a narrower definition of mass shootings that includes only the highest-profile incidents with multiple fatalities, but movement toward a more restrictive definition results in identifying a set of incidents that are increasingly rare and idiosyncratic. Thus, the researcher makes a trade-off that mitigates the serious problems with the underlying data but creates additional statistical problems resulting from a much smaller sample size that will not support accurate generalizations to a broader population of mass shooters.

Greater consensus about the number of mass shootings and how their prevalence has changed over time could likely be achieved by adopting a mass shooting definition based on objective criteria for which data are widely available. Defining incidents based on a threshold of fatalities rather than of nonfatal injuries is likely to produce more-reliable and more-comparable estimates over time. However, even a definition that includes nonfatal injuries is arguably preferable to one that requires having accurate data on victim-offender relationship, incident circumstances, or perpetrator motivations. These features, though captured in some administrative data sources and potentially identifiable through reviews of news reports or court and police records, are often subjectively

determined and are inconsistently available in the underlying data. Relative to the criterion of number of victims, assessment of whether a mass shooting incident was related to criminal activity or whether victims were selected randomly is more likely to be influenced by the perspective of the person reporting or recording the information. Depending on the purpose of the research, it may still be necessary to rely on these more-subjective characteristics. However, researchers may need to consider the extent to which they are studying the characteristics of the events themselves rather than, for instance, how the media covers these incidents.

Even if we did have definitive and complete data sources on the characteristics of all mass shooting incidents, it is still likely to be exceedingly difficult to identify useful predictors of mass shootings. With the exception of male sex, risk factors that appear to be overrepresented among mass shooters relative to the general population are often still uncommon among offenders on an absolute level. Thus, even if one could find a way to prevent individuals with a documented serious mental illness from committing a mass shooting—for example, developing and delivering effective treatments to more than 10 million Americans (Bose et al., 2018) or effectively preventing their access to firearms—most mass shootings would still occur because only a fraction of mass shootings are committed by individuals with a documented history of serious mental illness. Researchers are exploring novel machine learning approaches to using information on domestic violence dispatches or patterns of firearm acquisition for violence risk prediction (Berk and Sorenson, 2020; Laqueur and Wintemute, 2020), although the value of these approaches for predicting mass violence is still unknown. Other approaches focused on reducing the lethality of mass shootings may be effective in mitigating the harms of some incidents, even if the approaches do not prevent the occurrence of such incidents.

Finally, even if states and other jurisdictions developed and implemented policies that prevented mass shootings, there are several statistical challenges that make it unlikely that researchers will be able to demonstrate statistically significant benefits of the effective policies. The assumptions underlying many of the approaches commonly used to evaluate the effects of gun policies are likely not to be met when assessing effects on mass shooting incidence or lethality. The rare nature of mass shootings, and particularly mass public shootings, seriously limits statistical power for detecting policy effects, and studies that find statistically significant associations of policies with mass shootings may greatly overestimate the magnitude of these effects.

However, these difficulties should not impede policymakers from trying to develop and implement better policies. Mass shootings are tragic, traumatic, and shocking events. Because of that, they attract media attention and galvanize public opinion. However, they represent a very small fraction of the homicides in the United States. Precisely because mass shootings are so rare and it is so difficult to predict exactly who will perpetrate them, the overall costs and benefits of any policy to address them are likely to be driven by the policy's effects on a broader set of far more-common outcomes, such as overall homicide, suicide, domestic violence, and population health. Improved treatment for mental health problems or suicidality might reduce certain types of mass shootings, but such policies may also reduce far more-common forms of homicide, suicide, and crime and may also improve economic productivity and social well-being. Similarly, policies aimed at reducing domestic violence or preventing crime are worth pursuing for those benefits, and they may also reduce the incidence of some types of mass shootings (i.e., familicides, felony-related killings). Focusing efforts on implementing public policies that reduce violence more broadly, rather than making policy decisions based only on the most-extreme forms of such violence, may not eliminate mass shootings but may reduce their occurrence and lethality and ultimately save more lives.

Mass Shootings

## Notes

Originally published March 2, 2018

## References

- Albert, Adelin, and John A. Anderson, "On the Existence of Maximum Likelihood Estimates in Logistic Regression Models," *Biometrika*, Vol. 71, No. 1, 1984, pp. 1–10.

<div align="center">JA7031</div>

- Associated Press and *USA Today*, "Report: 2019 Records 41 Mass Killings in United States," *Tucson.com*, December 28, 2019.
- Berk, Richard A., and Susan B. Sorenson, "Algorithmic Approach to Forecasting Rare Violent Events: An Illustration Based in Intimate Partner Violence Perpetration," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 213–233.
- Blair, J. Pete, and Katherine W. Schweit, *A Study of Active Shooter Incidents, 2000–2013*, Washington, D.C.: Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, 2014.
- Blau, Benjamin M., Devon H. Gorry, and Chip Wade, "Guns, Laws, and Public Shootings in the United States," *Applied Economics*, Vol. 48, No. 49, 2016, pp. 4732–4746.
- Booty, Marisa, Jayne O'Dwyer, Daniel Webster, Alex McCourt, and Cassandra Crifasi, "Describing a 'Mass Shooting': The Role of Databases in Understanding Burden," *Injury Epidemiology*, Vol. 6, No. 1, 2019, article 47.
- Bose, Jonaki, Sarra L. Hedden, Rachel N. Lipari, and Eunice Park-Lee, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2017 National Survey on Drug Use and Health*, Rockville, Md.: Substance Abuse and Mental Health Services Administration, September 2018.
- Cabrera, Joseph F., and Roy Kwon, "Income Inequality, Household Income, and Mass Shooting in the United States," *Frontiers in Public Health*, Vol. 6, October 2018, article 294.
- Callahan, Molly, "The Story Behind the Data on Mass Murder in the United States," Northeastern University, August 13, 2019.
- Campbell, Jacquelyn C., Nancy Glass, Phyllis W. Sharps, Kathryn Laughon, and Tina Bloom, "Intimate Partner Homicide: Review and Implications of Research and Policy," *Trauma, Violence, and Abuse*, Vol. 8, No. 3, 2007, pp. 246–269.
- Capellan, Joel Alfredo, and Alexei Anisin, "A Distinction Without a Difference? Examining the Causal Pathways Behind Ideologically Motivated Mass Public Shootings," *Homicide Studies*, Vol. 22, No. 3, 2018, pp. 235–255.
- Capellan, Joel A., and SimonPeter Gomez, "Change and Stability in Offender, Behaviours, and Incident-Level Characteristics of Mass Public Shootings in the United States, 1984–2015," *Journal of Investigative Psychology and Offender Profiling*, Vol. 15, No. 1, 2018, pp. 51–72.
- Capellan, Joel A., and Allan Y. Jiao, *Deconstructing Mass Public Shootings: Exploring Opportunities for Intervention*, Albany, N.Y.: Rockefeller Institute of Government, October 2019.
- Capellan, Joel A., Joseph Johnson, Jeremy R. Porter, and Christine Martin, "Disaggregating Mass Public Shootings: A Comparative Analysis of Disgruntled Employee, School, Ideologically Motivated, and Rampage Shooters," *Journal of Forensic Sciences*, Vol. 64, No. 3, 2019, pp. 814–823.
- Cohen, Amy P., Deborah Azrael, and Matthew Miller, "Rate of Mass Shootings Has Tripled Since 2011, Harvard Research Shows," *Mother Jones*, October 15, 2014.
- Cook, Philip J., and Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Washington, D.C.: Police Foundation, 1996.
- de Jager, Elzerie, Eric Goralnick, Justin C. McCarty, Zain G. Hashmi, Molly P. Jarman, and Adil H. Haider, "Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States," *JAMA*, Vol. 320, No. 10, 2018, pp. 1034–1035.
- Duwe, Grant, "Body-Count Journalism: The Presentation of Mass Murder in the News Media," *Homicide Studies*, Vol. 4, No. 4, 2000, pp. 364–399.
- Duwe, Grant, "The Patterns and Prevalence of Mass Murder in Twentieth-Century America," *Justice Quarterly*, Vol. 21, No. 4, 2004, pp. 729–761.
- Duwe, Grant, "Patterns and Prevalence of Lethal Mass Violence," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 17–35.
- Duwe, Grant, Tomislav Kovandzic, and Carlisle E. Moody, "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies*, Vol. 6, No. 4, 2002, pp. 271–296.
- Elsass, H. Jaymi, Jaclyn Schildkraut, and Mark C. Stafford, "Studying School Shootings: Challenges and Considerations for Research," *American Journal of Criminal Justice*, Vol. 41, No. 3, 2016, pp. 444–464.

**JA7032**

- Entman, Robert M., and Kimberly A. Gross, "Race to Judgment: Stereotyping Media and Criminal Defendants," *Law and Contemporary Problems*, Vol. 71, No. 4, 2008, pp. 93–133.
- Everytown for Gun Safety Support Fund, "Mass Shootings in the United States: 2009–2017," December 6, 2018. As of May 15, 2019: http://everytownresearch.org/reports/mass-shootings-analysis/
- Everytown for Gun Safety Support Fund, "Ten Years of Mass Shootings in the United States: An Everytown for Gun Safety Support Fund Analysis," November 21, 2019. As of June 22, 2020: https://everytownresearch.org/massshootingsreports/mass-shootings-in-america-2009-2019/
- FBI—*See* Federal Bureau of Investigation.
- Federal Bureau of Investigation, *Active Shooter Incidents in the United States in 2016 and 2017*, Washington, D.C.: U.S. Department of Justice, April 2018g.
- Federal Bureau of Investigation, "2018 National Incident-Based Reporting System: Data Tables," webpage, 2019e. As of June 19, 2020: https://ucr.fbi.gov/nibrs/2018/tables/data-tables
- Federal Bureau of Investigation, "Expanded Homicide," webpage, Crime in the United States 2018, 2019f. As of June 19, 2020: https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/expanded-homicide
- Federal Bureau of Investigation, *Active Shooter Incidents in the United States in 2018*, Washington, D.C.: U.S. Department of Justice, April 2019g.
- Federal Bureau of Investigation, *Active Shooter Incidents in the United States in 2019*, Washington, D.C.: U.S. Department of Justice, April 2020.
- Follman, Mark, Gavin Aronsen, and Deanna Pan, "US Mass Shootings, 1982–2020: Data from Mother Jones' Investigation," *Mother Jones*, February 26, 2020.
- Fox, James Alan, "Missing Data Problems in the SHR: Imputing Offender and Relationship Characteristics," *Homicide Studies*, Vol. 8, No. 3, 2004, pp. 214–254.
- Fox, James Alan, *Uniform Crime Reports (United States): Supplementary Homicide Reports, 1976–1994*, Boston, Mass.: Northeastern University, College of Criminal Justice, January 18, 2006.
- Fox, James Alan, and Monica J. DeLateur, "Mass Shootings in America: Moving Beyond Newtown," *Homicide Studies*, Vol. 18, No. 1, 2014, pp. 125–145.
- Fox, James A., and Emma E. Fridel, "The Tenuous Connections Involving Mass Shootings, Mental Illness, and Gun Laws," *Violence and Gender*, Vol. 3, No. 1, 2016, pp. 14–19.
- Fox, James Alan, and Jack Levin, "Multiple Homicide: Patterns of Serial and Mass Murder," *Crime and Justice*, Vol. 23, 1998, pp. 407–455.
- Fox, James A., and Jack Levin, *Extreme Killing: Understanding Serial and Mass Murder*, 3rd ed., Thousand Oaks, Calif.: Sage Publications, 2015.
- Fox, James Alan, and Marc L. Swatt, "Multiple Imputation of the Supplementary Homicide Reports, 1976–2005," *Journal of Quantitative Criminology*, Vol. 25, No. 1, 2009, pp. 51–77.
- Fridel, Emma E., "A Multivariate Comparison of Family, Felony, and Public Mass Murders in the United States," *Journal of Interpersonal Violence*, Vol. 36, No. 3–4, 2017, pp. 1092–1118.
- Gelman, Andrew, and John Carlin, "Beyond Power Calculations: Assessing Type S (Sign) and Type M (Magnitude) Errors," *Perspectives on Psychological Science*, Vol. 9, No. 6, 2014, pp. 641–651.
- Gius, Mark, "The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings," *Applied Economics Letters*, Vol. 22, No. 4, 2015c, pp. 281–284.
- Gu, Jackie, "Deadliest Mass Shootings Are Often Preceded by Violence at Home," *Bloomberg News*, June 30, 2020.
- Gun Violence Archive, homepage, undated-a. As of June 26, 2020: http://www.gunviolencearchive.org/
- Huff-Corzine, Lin, and Jay Corzine, "The Devil's in the Details: Measuring Mass Violence," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 317–333.
- Huff-Corzine, Lin, James C. McCutcheon, Jay Corzine, John P. Jarvis, Melissa J. Tetzlaff-Bemiller, Mindy Weller, and Matt Landon, "Shooting for Accuracy: Comparing Data Sources on Mass Murder," *Homicide Studies*, Vol. 18, No. 1, 2014, pp. 105–124.
- Klarevas, Louis, *Rampage Nation: Securing America from Mass Shootings*, Amherst, N.Y.: Prometheus Books, 2016.

- Klarevas, Louis, "Letter to the Editor Re: DiMaggio, C. et al. 'Changes in US Mass Shooting Deaths Associated with the 1994–2004 Federal Assault Weapons Ban: Analysis of Open-Source Data,'" *Journal of Trauma and Acute Care Surgery*, Vol. 86, No. 5, 2019, pp. 926–928.
- Klarevas, Louis, Andrew Conner, and David Hemenway, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health*, Vol. 109, No. 12, 2019, pp. 1754–1761.
- Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," *Justice Research and Policy*, Vol. 17, No. 1, 2016, pp. 28–47.
- Kleck, Gary, *Do Mass Shooters Favor Using High-Capacity Magazines*, Tallahassee, Fla.: Florida State University, working paper, March 10, 2020.
- Koper, Christopher S., "Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High‑Capacity Semiautomatic Firearms," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 147–170.
- Koper, Christopher S., William D. Johnson, Jordan L. Nichols, Ambrozine Ayers, and Natalie Mullins, "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources," *Journal of Urban Health*, Vol. 95, No. 3, 2018, pp. 313–321.
- Krouse, William J., and Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, Washington, D.C.: Congressional Research Service, R44126, 2015.
- Kwon, Roy, and Joseph F. Cabrera, "Income Inequality and Mass Shootings in the United States," *BMC Public Health*, Vol. 19, No. 1, 2019a, article 1147.
- Kwon, Roy, and Joseph F. Cabrera, "Social Integration and Mass Shootings in US Counties," *Journal of Crime and Justice*, Vol. 42, No. 2, 2019b, pp. 121–139.
- Kwon, Roy, and Joseph F. Cabrera, "Socioeconomic Factors and Mass Shootings in the United States," *Critical Public Health*, Vol. 29, No. 2, 2019c, pp. 138–145.
- Langman, Peter, "Different Types of Role Model Influence and Fame Seeking Among Mass Killers and Copycat Offenders," *American Behavioral Scientist*, Vol. 62, No. 2, 2018, pp. 210–228.
- Lankford, Adam, "A Comparative Analysis of Suicide Terrorists and Rampage, Workplace, and School Shooters in the United States from 1990 to 2010," *Homicide Studies*, Vol. 17, No. 3, 2013, pp. 255–274.
- Lankford, Adam, "Mass Murderers in the United States: Predictors of Offender Deaths," *Journal of Forensic Psychiatry and Psychology*, Vol. 26, No. 5, 2015, pp. 586–600.
- Lankford, Adam, and James Silver, "Why Have Public Mass Shootings Become More Deadly? Assessing How Perpetrators' Motives and Methods Have Changed over Time," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 37–60.
- Laqueur, Hannah S., and Garen J. Wintemute, "Identifying High‑Risk Firearm Owners to Prevent Mass Violence," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 109–127.
- Levine, Phillip B., and Robin McKnight, *Not All School Shootings Are the Same and the Differences Matter*, Cambridge, Mass.: National Bureau of Economic Research, Working Paper No. 26728, February 2020.
- Lott, John R., Jr., "The FBI's Misinterpretation of the Change in Mass Public Shootings," *ACJS Today*, Vol. 40, No. 2, 2015, pp. 18–29.
- Lott, John R., Jr., and William Landes, "Multiple Victim Public Shootings," 2000 (unpublished). As of June 29, 2017: http://www.shack.co.nz/pistoltaupo/SSRN_ID272929_code010610560.pdf
- Lowe, Sarah R., and Sandro Galea, "The Mental Health Consequences of Mass Shootings," *Trauma, Violence, and Abuse*, Vol. 18, No. 1, 2017, pp. 62–82.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin, "The Impact of Mass Shootings on Gun Policy," *Journal of Public Economics*, Vol. 181, January 2020.
- Mass Shooting Tracker, homepage, undated. As of June 3, 2020: https://www.massshootingtracker.org
- McGinty, Emma E., Alene Kennedy-Hendricks, Seema Choksy, and Colleen L. Barry, "Trends in News Media Coverage of Mental Illness in the United States: 1995–2014," *Health Affairs*, Vol. 35, No. 6, 2016, pp. 1121–1129.

**JA7034**

- McGinty, E. E., D. W. Webster, M. Jarlenski, and C. L. Barry, "News Media Framing of Serious Mental Illness and Gun Violence in the United States," *American Journal of Public Health*, Vol. 104, No. 3, 2014, pp. 406–413.
- Moreno-Küstner, Berta, Carlos Martín, and Loly Pastor, "Prevalence of Psychotic Disorders and Its Association with Methodological Issues: A Systematic Review and Meta-Analyses," *PLoS One*, Vol. 13, No. 4, 2018.
- Newman, Benjamin J., and Todd K. Hartman, "Mass Shootings and Public Support for Gun Control," *British Journal of Political Science*, Vol. 49, No. 4, 2019, pp. 1527–1553.
- Park, Sung-Yeon, Kyle J. Holody, and Xiaoqun Zhang, "Race in Media Coverage of School Shootings: A Parallel Application of Framing Theory and Attribute Agenda Setting," *Journalism and Mass Communication Quarterly*, Vol. 89, No. 3, 2012, pp. 475–494.
- Parker, George F., "Circumstances and Outcomes of a Firearm Seizure Law: Marion County, Indiana, 2006–2013," *Behavioral Sciences and the Law*, Vol. 33, No. 2-3, 2015, pp. 308–322.
- Pizarro, Jesenia M., and April M. Zeoli, "An Assessment of the Quality of Homicide Data in the Supplementary Homicide Reports: A Research Note," *Justice Quarterly*, Vol. 30, No. 4, 2013, pp. 711–731.
- Public Law 112-265, Investigative Assistance for Violent Crimes Act of 2012, January 14, 2013.
- Puzzanchera, C., G. Chamberlin, and W. Kang, "Easy Access to the FBI's Supplementary Homicide Reports: 1980–2016," Office of Juvenile Justice and Delinquency Prevention, 2018.
- Reaves, Brian A., *Using NIBRS Data to Analyze Violent Crime*, Washington, D.C.: Bureau of Justice Statistics, October 1993.
- Ressler, Robert K., Ann W. Burgess, and John E. Douglas, *Sexual Homicide: Patterns and Motives*, New York: Simon and Schuster, 1988.
- Roberts, John M., Jr., Aki Roberts, and Tim Wadsworth, "Multiple Imputation for Missing Values in Homicide Incident Data: An Evaluation Using Unique Test Data," *Homicide Studies*, Vol. 22, No. 4, 2018, pp. 391–409.
- Roeder, Oliver, "The Phrase 'Mass Shooting' Belongs to the 21st Century," *FiveThirtyEight*, January 21, 2016.
- Sanders, Nathan E., and Victor Lei, "The Role of Prior Information in Inference on the Annualized Rates of Mass Shootings in the United States," *Statistics and Public Policy*, Vol. 5, No. 1, 2018, pp. 1–8.
- Schildkraut, Jaclyn, H. Jaymi Elsass, and Kimberly Meredith, "Mass Shootings and the Media: Why All Events Are Not Created Equal," *Journal of Crime and Justice*, Vol. 41, No. 3, 2018, pp. 223–243.
- Silva, Jason R., and Joel A. Capellan, "A Comparative Analysis of Media Coverage of Mass Public Shootings: Examining Rampage, Disgruntled Employee, School, and Lone-Wolf Terrorist Shootings in the United States," *Criminal Justice Policy Review*, Vol. 30, No. 9, 2019a, pp. 1312–1341.
- Silva, Jason R., and Joel A. Capellan, "The Media's Coverage of Mass Public Shootings in America: Fifty Years of Newsworthiness," *International Journal of Comparative and Applied Criminal Justice*, Vol. 43, No. 1, 2019b, pp. 77–97.
- Silver, James, William Fisher, and John Horgan, "Public Mass Murderers and Federal Mental Health Background Checks," *Law and Policy*, Vol. 40, No. 2, 2018, pp. 133–147.
- Silver, James, Andre Simons, and Sarah Craun, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, Washington, D.C.: Federal Bureau of Investigation, June 2018.
- Skeem, Jennifer, and Edward Mulvey, "What Role Does Serious Mental Illness Play in Mass Shootings, and How Should We Address It?" *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 85–108.
- Stanford Geospatial Center, "Mass Shootings in America," Stanford, Calif.: Stanford University Libraries, undated. As of June 3, 2020: https://library.stanford.edu/projects/mass-shootings-america
- Stanford Geospatial Center, "MSA," GitHub data repository, March 26, 2018. As of December 11, 2020: https://github.com/StanfordGeospatialCenter/MSA
- Stone, Michael H., "Mass Murder, Mental Illness, and Men," *Violence and Gender*, Vol. 2, No. 1, 2015, pp. 51–86.
- Swanson, Jeffrey W., Michele M. Easter, Kelly Alanis-Hirsch, Charles M. Belden, Michael A. Norko, Allison G. Robertson, Linda K. Frisman, Hsiu-Ju Lin, Marvin S. Swartz, and George F. Parker, "Criminal Justice and Suicide Outcomes with Indiana's Risk-Based Gun Seizure Law," *Journal of the American Academy of Psychiatry and the Law*, Vol. 47, No. 2, 2019, pp. 1–10.

**JA7035**

- Swanson, Jeffrey W., Michael A. Norko, Hsiu-Ju Lin, Kelly Alanis-Hirsch, Linda K. Frisman, Madelon V. Baranoski, Michele M. Easter, Allison G. Robertson, Marvin S. Swartz, and Richard J. Bonnie, "Implementation and Effectiveness of Connecticut's Risk-Based Gun Removal Law: Does It Prevent Suicides?" *Law and Contemporary Problems*, Vol. 80, No. 2, 2017, pp. 179–208.
- Taylor, Melanie A., "A Comprehensive Study of Mass Murder Precipitants and Motivations of Offenders," *International Journal of Offender Therapy and Comparative Criminology*, Vol. 62, No. 2, 2018, pp. 427–449.
- U.S. Census Bureau, "National Population by Characteristics: 2010–2019," web tool, June 17, 2020. As of June 20, 2020: https://www.census.gov/data/tables/time-series/demo/popest/2010s-national-detail.html
- U.S. Department of Homeland Security, *Active Shooter: How to Respond*, Washington, D.C., October 2008.
- The Violence Project, "Mass Shooter Database," web tool, undated. As of June 8, 2020: https://www.theviolenceproject.org/mass-shooter-database/
- Wadsworth, Tim, and John M. Roberts, Jr., "When Missing Data Are Not Missing: A New Approach to Evaluating Supplemental Homicide Report Imputation Strategies," *Criminology*, Vol. 46, No. 4, 2008, pp. 841–870.
- Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marisa D. Booty, and Elizabeth A. Stuart, "Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 171–212.
- Wintemute, Garen J., Veronica A. Pear, Julia P. Schleimer, Rocco Pallin, Sydney Sohl, Nicole Kravitz-Wirtz, and Elizabeth A. Tomsich, "Extreme Risk Protection Orders Intended to Prevent Mass Shootings: A Case Series," *Annals of Internal Medicine*, August 2019.
- Xue, Xiaonan, Mimi Y. Kim, Tao Wang, Mark H. Kuniholm, and Howard D. Strickler, "A Statistical Method for Studying Correlated Rare Events and Their Risk Factors," *Statistical Methods in Medical Research*, Vol. 26, No. 3, 2017, pp. 1416–1428.
- Zeoli, April M., and Jennifer K. Paruk, "Potential to Prevent Mass Shootings Through Domestic Violence Firearm Restrictions," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 129–145.

View the full project bibliography

## Citation

Rosanna Smart and Terry L. Schell, "Mass Shootings in the United States," in Rajeev Ramchand and Jessica Saunders, eds., *Contemporary Issues in Gun Policy: Essays from the RAND Gun Policy in America Project*, Santa Monica, Calif.: RAND Corporation, RR-A243-2, 2021, pp. 1–25. As of April 15, 2021: https://www.rand.org/pubs/research_reports/RRA243-2.html

## Featured Researcher

### Rosanna Smart

**Codirector, RAND Drug Policy Research Center**



Rosanna Smart is a senior economist at RAND, codirector of the RAND Drug Policy Research Center, and affiliate faculty of the Pardee RAND Graduate School. Her research is in applied microeconomics, with a focus on issues related to health behaviors, illicit markets, drug policy, and the…

**JA7036**

# EXHIBIT 105

# Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings

**rand.org**/research/gun-policy/analysis/ban-assault-weapons/mass-shootings.html



Updated January 10, 2023

Summary: Evidence for the effect of assault weapon bans on mass shootings is inconclusive. Evidence that high-capacity magazine bans may decrease mass shootings is limited.

**JA7038**

## Key Findings

Assault weapon bans have uncertain effects on mass shootings.



Evidence for this relationship is inconclusive.

Studies with comparable methodological rigor identified inconsistent evidence for the policy's effect on an outcome, or a single study found only uncertain or suggestive effects. Read more about how we determined the strength of gun policy analysis research.

High-capacity magazine bans may decrease mass shootings.



Evidence for this relationship is limited.

At least one study meeting our inclusion criteria and not otherwise compromised by noted methodological weaknesses reported a significant effect of the policy on the outcome, and no studies with equivalent or stronger methods provided contradictory evidence.

We identified six studies that met our inclusion criteria and estimated the effects of state or federal assault weapon bans on multiple-victim shooting incidents or casualties. Two of these (Klarevas, Conner, and Hemenway, 2019; Webster et al., 2020) contribute new findings to this updated review.[1] Each of these studies used different definitions of *mass shooting*, which we highlight in the following sections.

Gius (2015c) focused on *public mass shootings*, which the author defined as incidents resulting in four or more firearm-related fatalities (excluding the offender), and the shooting occurred in a public place, victims were selected indiscriminately, and the shooting was not related to criminal activity. Using a Poisson model and data from 1982 through 2011, Gius (2015c) tested whether state assault weapon bans influence these shooting fatalities or injuries, controlling for the federal assault weapon ban and state-level variation in demographic, socioeconomic, and criminal justice characteristics.[2] Findings showed that *state* assault weapon bans had a statistically significant but smaller effect of reducing mass shooting death rates to 55 percent of what would have been expected without the bans, but results indicated uncertain effects on mass shooting injuries (see the figure below). This report provided little detail describing variation in the timing of the state bans in relation to the

federal ban, and it is unclear whether the estimated effects were confounded by correlation between the state and federal bans. The model did not account for serial correlation in panel data, which can result in large biases in standard errors (Aneja, Donohue, and Zhang, 2014).



## __The Experts Weigh In__

<u>Compare expert opinions on how laws that ban assault weapons and high-capacity magazines may affect mass shootings in your state and the U.S. as a whole. »</u>

Luca, Malhotra, and Poliquin (2016) set the same casualty threshold (four or more killed, not including the shooter) and also excluded incidents that occurred in connection with criminal activity, but they did not restrict incidents to public settings and excluded all events with fewer than three fatally injured victims who were not related to the shooter (e.g., family, romantic partner). Using a linear probability model and data from 1989 to 2014, the authors estimated the effects of state assault weapon bans on a binary indicator for whether a mass shooting occurred in a given state-year. In contrast to Gius (2015c), Luca, Malhotra, and Poliquin (2016) did not control for the federal assault weapon ban from 1994 through 2004, but they controlled for a host of other state-level gun policies; state fixed effects; year fixed effects; and state-level demographic, socioeconomic, and political characteristics. Their findings showed uncertain effects of state assault weapon bans on the probability of a mass shooting incident occurring. However, the effects of gun policies on mass shootings were not the primary focus of Luca, Malhotra, and Poliquin (2016), and the authors intended the estimates to serve solely as a robustness check for their main specification (the effects of mass shootings on gun policy). Although the paper provided limited information to use in evaluating the reported statistical models (e.g., on how these policies were coded), it is clear that the analysis used a linear model to predict a rare dichotomous outcome. Therefore, model assumptions were likely violated, making confidence intervals (CIs) unreliable.

Using data from 1984 to 2017, Webster et al. (2020) again set the same casualty threshold (four or more killed, not including the shooter) and excluded drug- or gang-related shootings; they did not exclude domestic-related incidents, but conducted sensitivity analyses stratified by this characteristic. In negative binomial models including 14 laws, state fixed effects, linear and quadratic time trend terms, and 14 social and economic state covariates, the authors found uncertain evidence that assault weapon bans were associated with mass shooting incidents or deaths. However, they found that states with high-capacity magazine bans had a significant 48-percent reduction in mass shooting incidents, and a suggestive 33-percent reduction in mass shooting fatalities. Because the number of incidents and fatalities is quite low over this period, maximum likelihood estimates like those used in this study may be biased (Kenne Pagui, Salvan, and Sartori, 2022).

Focusing on high-fatality mass shootings that resulted in six or more firearm fatalities, not including the shooter, Klarevas, Conner, and Hemenway (2019) evaluated the effects of high-capacity magazine restrictions from 1990 to 2017. They used logistic regression for mass shooting incidents and negative binomial models for counts of deaths in models with state fixed effects, a continuous term for year to account for temporal trends, and state-level time-varying covariates. When state and federal restrictions were combined, the authors found that the laws were significantly associated with fewer incidents and deaths in mass shootings generally, and in those that involved a high-capacity magazine specifically. However, the effect sizes reported were improbably large, ranging from reductions of 72 percent of all incidents to 99.7 percent of all deaths. Similarly large point estimates were reported for the effects of state restrictions alone, which were significant for mass shootings involving a high-capacity magazine, and suggestive for the wider set of all mass shootings. There were, however, just 69 high-fatality mass shooting incidents (44 involving a high-capacity magazine) over the entire 27-year study period; with only 69 incidents and 63 estimated parameters, estimated law effects are likely biased because of the sparsity of the outcome (Kenne Pagui, Salvan, and Sartori, 2022).

Blau, Gorry, and Wade (2016) considered a broader set of incidents, including mass public shootings with a minimum of four fatalities occurring during a single incident and perpetrated by a single offender; spree shootings occurring across multiple locations in a public place with a minimum of two fatalities; and active shooter incidents, which involve an individual using a firearm and actively killing or attempting to kill others in a confined space or unconfined and populated area. They used a linear probability model to estimate how a variety of gun laws, including state and federal assault weapon bans, relate to the probability of a public shooting incident occurring based on data covering 1982 to 2013.[3] Controlling for state fixed effects and a linear time trend, as well as for the presence of several other state gun laws and a limited set of state covariates (i.e., population size and aggregated personal income), the authors found that state assault weapon bans were significantly and negatively associated with the likelihood of a public shooting event. However, the use of a linear model to predict a dichotomous (and rare) outcome likely violated model assumptions and rendered the results unreliable. The authors' estimated linear probability model can yield predicted probabilities of active shooting incidence that extend far outside the definitional 0 to 1 range of a probability depending on the particular combination of policies present in a given state. Moreover, the estimated model implies negative IRRs, which represent implausible effect sizes, for some of the gun policies that we are studying.[4] This indicates a serious model misspecification (Cox and Snell, 1989; Aldrich and Nelson, 1984) and prevents us from interpreting the estimated coefficients as causal effect estimates.

Gius (2018) analyzed school shooting deaths and injuries using data compiled from Klein (2012), Kalesan et al. (2017), and the Everytown for Gun Safety Support Fund. Using a model similar to that in Gius (2015c), this study evaluated whether federal or state assault weapon bans influence school shooting fatalities or injuries, controlling for background check

laws, state-level variation in demographic and socioeconomic characteristics, and state-level variation in the ratio of firearm suicides to total suicides as a proxy for variation in gun ownership prevalence. The study showed that the presence of a state or federal assault weapon ban between 1990 and 2014 was significantly associated with a 54-percent reduction in the number of school shooting victims (see the figure below). However, it is unclear the extent to which this estimate was identified from the change in the federal law versus from changes in state policy. Additionally, the author did not appear to make adjustments to standard errors to account for serial correlation in panel data, which may lead to overstated precision of the estimates.

The figure below displays the incidence rate ratios (IRRs) and CIs associated with the assault weapon ban policies examined in these studies. We exclude estimates of the federal assault weapon ban from Gius (2015c) and from Blau, Gorry, and Wade (2016) because they do not meet our criteria for inclusion. We also exclude estimates of effects of state assault weapon bans from Blau, Gorry, and Wade (2016), given the concerns with the study results noted earlier.

**JA7042**

# Incidence Rate Ratios Associated with the Effect of Assault Weapon Bans on Mass Shootings

This forest plot shows estimates of how bans on the sale of assault weapons and high-capacity magazines affect mass shootings, based on the evidence in the studies examined. In particular, the graphic shows the standardized effect sizes (or IRRs) and their 95-percent CIs for each outcome. An effect size of 1.00 indicates that, after a state passes the law, we would expect the outcome (e.g., suicide or firearm suicide) to be unaffected. An effect size of less than 1.00 indicates that the law appears to reduce the outcome. For example, if the effect size were 0.92, we would expect the rate of the outcome to fall to 0.92 times the rate prior to passage of the law. Conversely, an effect size of more than 1.00 indicates that the law appears to increase the outcome by a factor equivalent to the effect size value. When the CIs do not include the value of 1.00, the estimated effect is statistically significant at $p < 0.05$.

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| **Assault weapon ban** | | | |
| Gius (2018) We have significant methodological concerns about this study. | Number of deaths & injuries from school shootings | 0.46 [0.33, 0.63] | |
| Luca, Malhotra, & Poliquin (2016) We have significant methodological concerns about this study. | Any mass shooting incident | 1.52 [0.60, 2.43] | |
| **State assault weapons ban** | **Mass shooting** | | |
| Webster et al. (2020) We have no significant methodological concerns about this study. | Incidents | 0.71 [0.34, 1.48] | |
| Gius (2015c) We have significant methodological concerns about this study. | Deaths | 0.55 [0.33, 0.92] | |
| Webster et al. (2020) We have no significant methodological concerns about this study. | Deaths | 1.11 [0.30, 4.16] | |

| Study, by Policy | Outcome Measure | Effect Size (IRR) [95% CI] | |
|---|---|---|---|
| Gius (2015c)<br>We have significant methodological concerns about this study. | Injuries | 1.35 [0.81, 2.23] | —— |
| **Large-capacity magazine ban** | **Mass shooting** | | |
| Webster et al. (2020)<br>We have no significant methodological concerns about this study. | Incidents | 0.52 [0.27, 0.98] | ●—— |
| Klarevas, Conner, & Hemenway (2019)<br>We have significant methodological concerns about this study. | Incidents, high-fatality | 0.28 [0.12, 0.66] | ○—— |
| Webster et al. (2020)<br>We have no significant methodological concerns about this study. | Deaths | 0.30 [0.08, 1.10] | ●—— |
| Klarevas, Conner, & Hemenway (2019)<br>We have significant methodological concerns about this study. | Deaths, high-fatality | 0.03 [0.00, 0.00] | ○ |
| **State large-capacity magazine ban** | **Mass shooting** | | |
| Klarevas, Conner, & Hemenway (2019)<br>We have significant methodological concerns about this study. | Incidents, high-fatality | 0.28 [0.05, 1.53] | ○—— |
| Klarevas, Conner, & Hemenway (2019)<br>We have significant methodological concerns about this study. | Deaths, high-fatality | 0.05 [0.00, 2.90] | ○—— |

|  | 0.0 | 1 |

**NOTE:** IRR values marked with empty circles indicate that we identified concerns with the study's methodology, and these concerns are described in the text above. Filled circles indicate that we identified no significant methodological concerns. An arrow on either end of a CI indicates that the interval is wider than can be displayed on the scale.

## Conclusions

We identified five qualifying studies that estimated the effects of state assault weapon bans on different aspects of mass shootings. Gius (2015c) found that these bans significantly reduce mass shooting deaths but have uncertain effects on injuries resulting from mass shootings. Using similar models, however, Gius (2018) found that assault weapon bans resulted in significantly fewer casualties (deaths and nonfatal injuries) from school shootings. Using a data set similar to that used in Gius (2015c), Luca, Malhotra, and Poliquin (2016) found uncertain effects of state assault weapon bans on the annual incidence of mass shootings. Blau, Gorry, and Wade (2016) found that the bans significantly reduced the annual incidence of mass shootings. Webster et al. (2020) found uncertain evidence of state assault weapon bans on mass shooting incidents and fatalities. Considering our assessment of these findings and the relative strengths of these studies, we find *inconclusive evidence for the effect of assault weapon bans on mass shootings*.

We also identified two studies that examined the effects of high-capacity magazine bans on mass shootings. Webster et al. (2020) found significant or suggestive associations between these state bans and lower rates of mass shooting incidents. Klarevas, Conner, and Hemenway (2019) also found that state-level high-capacity magazine bans were associated with fewer mass shootings and deaths in incidents in which a high-capacity magazine was used, as well as suggestive reductions in all mass shooting incidents and deaths (including those that did not involve a high-capacity magazine). Considering our assessment of these findings and the relative strengths of these studies, we find *limited evidence that high-capacity magazine bans reduce mass shootings*.

Originally published March 2, 2018

## Notes

1. We exclude DiMaggio et al. (2019), who studied the federal assault weapon ban, determining that the study does not meet our inclusion criteria because of the absence of a comparison group. Although the authors focus on an outcome defined as the proportion of all firearm homicide deaths that occurred during mass shootings, this is not equivalent to having a comparison group; mass shooting deaths are included in both the numerator and the denominator. Furthermore, the use of firearm homicides as a comparison group has obvious methodological problems, given that the assault weapon ban (as well as other 1994 legislation passed coincident to the assault weapon ban) might be expected to affect firearm homicide rates. Return to content ⤴

**JA7045**

2. The author found a large and statistically significant association between implementation of the federal assault weapon ban and reductions in mass shooting deaths and injuries. However, because the model included an indicator for years prior to and after the federal ban as a control but there was no comparison group, the analysis of the federal ban does not meet our criteria for inclusion. <u>Return to content ⥮</u>

3. The model included an indicator for the period of the federal ban, but because the federal ban applied to all states, there was no comparison group. Thus, the analysis of the federal ban does not meet our criteria for inclusion. <u>Return to content ⥮</u>

4. For example, the model coefficient for stand-your-ground laws implies an IRR of –2, with a 95-percent CI that lies entirely in the negative IRR range. <u>Return to content ⥮</u>

## References

- Aldrich, John H., and Forrest D. Nelson, *Linear Probability, Logit, and Probit Models*, Beverly Hills, Calif.: Sage Publications, 1984.
- Aneja, Abhay, John J. Donohue III, and Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, Stanford, Calif.: Stanford Law School, Olin Working Paper No. 461, December 1, 2014.
- Blau, Benjamin M., Devon H. Gorry, and Chip Wade, "Guns, Laws, and Public Shootings in the United States," *Applied Economics*, Vol. 48, No. 49, 2016, pp. 4732–4746.
- Cox, D. R., and E. J. Snell, *Analysis of Binary Data*, 2nd ed., New York: Chapman and Hall, 1989.
- DiMaggio, Charles, Jacob Avraham, Cherisse Berry, Marko Bukur, Justin Feldman, Michael Klein, Noor Shah, Manish Tandon, and Spiros Frangos, "Changes in US Mass Shooting Deaths Associated with the 1994–2004 Federal Assault Weapons Ban: Analysis of Open-Source Data," *Journal of Trauma and Acute Care Surgery*, Vol. 86, No. 1, January 2019, pp. 11–19.
- Gius, Mark, "The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings," *Applied Economics Letters*, Vol. 22, No. 4, 2015c, pp. 281–284.
- Gius, Mark, "The Effects of State and Federal Gun Control Laws on School Shootings," *Applied Economics Letters*, Vol. 25, No. 5, 2018, pp. 317–320.
- Kalesan, Bindu, Kinan Lagast, Marcos Villarreal, Elizabeth Pino, Jeffrey Fagan, and Sandro Galea, "School Shootings During 2013–2015 in the USA," *Injury Prevention*, Vol. 23, No. 5, 2017, pp. 321–327.
- Kenne Pagui, Euloge Clovis, Alessandra Salvan, and Nicola Sartori, "Improved Estimation in Negative Binomial Regression," *Statistics in Medicine*, Vol. 41, No. 13, 2022, pp. 2403–2416.
- Klarevas, Louis, Andrew Conner, and David Hemenway, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health*, Vol. 109, No. 12, 2019, pp. 1754–1761.

**JA7046**

- Klein, Jessie, *The Bully Society: School Shootings and the Crisis of Bullying in America's Schools*, New York: New York University Press, 2012.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin, *The Impact of Mass Shootings on Gun Policy*, working paper, Boston, Mass.: Harvard Business School, 2016.
- Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marisa D. Booty, and Elizabeth A. Stuart, "Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States," *Criminology and Public Policy*, Vol. 19, No. 1, 2020, pp. 171–212.

View the full project bibliography

## Featured Researcher

### Rosanna Smart

**Codirector, RAND Drug Policy Research Center**



Rosanna Smart is a senior economist at RAND, codirector of the RAND Drug Policy Research Center, and affiliate faculty of the Pardee RAND Graduate School. Her research is in applied microeconomics, with a focus on issues related to health behaviors, illicit markets, drug policy, and the…

**IDENTICAL PDF AND HARD COPY CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

**VIRUS SCAN CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program SentinelOne Agent, version 22.2.4.558, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<div align="right">

s/Erin E. Murphy
Erin E. Murphy

</div>