# In The United States Court of Appeals
# For the Third Circuit

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC.; et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY; et al.,

*Appellees-Cross-Appellants.*

---

MARK CHEESEMAN; et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY; et al.,

*Appellees-Cross-Appellants.*

---

BLAKE ELLMAN; et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY; et al.,

*Appellees-Cross-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 1-18-cv-10207, 1:22-cv-4360, 1:22-cv-04397)
(Hon. Renee Marie Bumb, Presiding)

**BRIEF OF PLAINTIFFS-APPELLANTS MARK CHEESEMAN, ET AL.**

Bradley Lehman
GELLERT SEITZ BUSENKELL &
BROWN
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
(302) 425-5800
(302) 425-5814 (fax)
blehman@gsbblaw.com

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connolly, and Firearms Policy Coalition, Inc.*

**United States Court of Appeals for the Third Circuit**


**Corporate Disclosure Statement and
Statement of Financial Interest**

No. 24-2450
_____

Association of New Jersey Rifle and Pistol Clubs, et al.


v.

Attorney General New Jersey, et al.


<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.


(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

__Firearms Policy Coalition, Inc.__
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations: None.

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

 None.

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

 None.

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

 N/A

__/s/David H. Thompson__
(Signature of Counsel or Party)

Dated: __11/18/2024__

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

ISSUE PRESENTED ............................................................................4

STATEMENT OF RELATED CASES .......................................................4

STATEMENT OF THE CASE .................................................................5

I. New Jersey's ban on common semiautomatic firearms. ....................5

II. Proceedings below. ...........................................................................7

SUMMARY OF THE ARGUMENT .......................................................12

ARGUMENT ....................................................................................14

I. Standard of Review...........................................................................14

II. New Jersey's Ban on Common Semiautomatic Firearms Is Unconstitutional Under Binding Supreme Court Precedent ........................................16

    A. The District Court Erred In Assessing the Ban on the Colt AR-15 In Isolation. ...................................................................................16

    B. The Banned Firearms Are Constitutionally Protected Arms In Common Use and Cannot Be Banned. ......................................................22

        1. The Banned Firearms Are "Arms" Within the Meaning of the Plain Text of the Second Amendment. .....................................23

        2. History Shows That Arms "In Common Use" Are Categorically Protected...........................................................................

        3. The Banned Arms Are Indisputably In Common Use..............30

CONCLUSION ..................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ..............................................5, 15, 32

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
974 F.3d 237 (3d. Cir. 2020) ...............................................5

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*,
142 S. Ct. 2894 (2022)........................................................5

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002)...........................................................31

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) .............................................20

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) ................................15, 24, 38

*Caetano v. Massachusetts*,
577 U.S. 411 (2016)...........................................................18

*Coalition of New Jersey Sportsmen, Inc. v. Whitman*,
44 F. Supp. 2d 666 (D.N.J. 1999)........................................5

*Counterman v. Colorado*,
600 U.S. 66 (2023).............................................................31

*District of Columbia v. Heller*,
554 U.S. 570 (2008)........................... 1, 10, 11, 16, 17, 23, 24, 25, 26, 27, 29

*Free v. Peters*,
12 F.3d 700 (7th Cir. 1993) ...............................................15

*Friedman v. City of Highland Park*,
136 S. Ct. 447 (2015).........................................................32

*Garland v. Cargill*,
602 U.S. 406 (2024)............................................................2

*Gun Owners' Action League, Inc. v. Swift*,
284 F.3d 198 (1st Cir. 2002)............................................5, 6

*Hanson v. District of Columbia*,
No. 23-7061, 2024 WL 4596783 (D.C. Cir. Oct. 29, 2024) .............25, 29, 34

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)......................................................2, 31, 33, 38

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) .......................................................................14

*New York State Rifle & Pistol Association v. Bruen*,
597 U.S. 1 (2022)...................................... 2, 15, 17, 18, 22, 23, 25, 28, 29, 30

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) .................................................................32, 33

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
290 F.3d 1058 (9th Cir. 2002) .......................................................................31

*Spivack v. City of Philadelphia*,
109 F.4th 158 (3d Cir. 2024) .......................................................................14

*Staples v. United States*,
511 U.S. 600 (1994)................................................................................2, 19

*Stenberg v. Carhart*,
530 U.S. 914 (2000)...................................................................................18

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023) .............................................................15, 28, 29

*Teter v. Lopez*,
93 F.4th 1150 (mem.) (9th Cir. 2024) .........................................................15

*United States v. Rahimi*,
144 S. Ct. 1889 (2024)...............................................................2, 22, 25, 26

## Statutes

U.S. CONST. amend. II....................................................................................23

N.J. STAT. ANN.

§ 2C:39-1(w).....................................................................................6, 18, 19
§ 2C:39-1(w)(1).......................................................................................19
§ 2C:39-1(w)(2).......................................................................................21
§ 2C:39-5(f) .............................................................................................5
§ 2C:39-9(g)..............................................................................................5

## Other Authorities

*2019 Firearms Retailer: Survey Report*, NSSF (2019), *available at Miller v. Becerra*, No. 3:19-cv-1537 (S.D. Cal.), Doc. 22-13 ......................36

*2021 Firearms Retailer: Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E.....36

Alan I. Leshner et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence*, NAT'L RSCH. COUNCIL (2013), https://bit.ly/48ZYjcm....35

*Arms*, NOAH WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3TclVoq.........................................................................24

*Crime Data Explorer: Expanded Homicide Offenses Characteristics in the United States,* U.S. DEP'T OF JUST., FBI, https://bit.ly/3IF5A6M (last visited Nov. 18, 2024) ...................................................................................................37, 38

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994) ......................................................................31

*Definition of "Frame or Receiver & Identification of Firearms*, 2022 WL 1159420 (ATF Apr. 10, 2022) ......................................................2, 3

Div. of Crim. J., Letter from Attorney General Peter Verniero to Director Terrence P. Farley on Guidelines Regarding the 'Substantially Identical' Provision in the State's Assault Firearms Laws (Aug. 19, 1996), https://bit.ly/4fQbVuq ...................................................................6, 7, 18, 19

Emily Guskin et al., *Why do Americans own AR-15s?*, WASH. POST (Mar. 27, 2023), https://wapo.st/3IDZG5I ....................................................34

FRANK MINITER, THE FUTURE OF THE GUN (2014) .................................................37

*Industry Intelligence Report: Firearm Production in the United States With Firearm Import and Export Data*, NSSF (2020), https://bit.ly/3v5XFvz.....31

*Industry Intelligence Report: Firearm Production in the United States With Firearm Import and Export Data*, NSSF (2023), https://bit.ly/42qYo7k.........................................................................36, 37

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases-Again*, HARV. J. L. & PUB. POL'Y PER CURIAM (Sep. 27, 2023), https://bit.ly/49KhTKQ.................27, 28

*Modern Sporting Rifle: Comprehensive Consumer Report*, NSSF (July 14, 2022), https://bit.ly/3GLmErS.......................................................35

iv

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285 (2009) .......................................................33

*Poll of current gun owners*, WASH. POST-IPSOS (2022), https://bit.ly/46CqzRa.............................................................................33, 34

Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02........................................................32

*Sport Shooting Participation in the U.S. in 2020*, NSSF (2021), https://bit.ly/3sPuEQl ...........................................................................35, 36

STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 (Google Books ed. 2022).................................................................................33

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw .......34, 35

**INTRODUCTION**

The question raised by this case is whether the Second Amendment permits New Jersey to make it a crime for law-abiding citizens to possess common semiautomatic firearms. The answer must be no. In *District of Columbia v. Heller*, the Supreme Court held that "[t]he 18th-century meaning" of the word "arms" is "no different from the meaning today"—namely, "weapons of offence, or armour of defence." 554 U.S. 570, 581 (2008) (cleaned up). And because the plain text of the Second Amendment does not distinguish between types of arms, the Amendment's protection "extends, prima facie, to *all* instruments that constitute bearable arms," a category that includes "all firearms." *Id.* at 582 (emphasis added).

To be sure, *Heller* acknowledged that the Second Amendment does not protect a right "to keep and carry any weapon whatsoever." *Id.* at 626. But limitations on the right must come from history. And *Heller* held that "historical tradition" predating ratification of the Second Amendment demonstrates that only "dangerous and unusual weapons" are not protected. *Id*. at 627. Firearms "in common use" by law-abiding citizens, by contrast, are protected, because common arms cannot be unusual. *Id*. And, again, the default is protection; only those weapons that are "*highly* unusual in society at large" are unusual in a constitutionally significant sense. *Id*. (emphasis added).

The Supreme Court clarified two years ago in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 26 (2022), and reaffirmed very recently in *United States v. Rahimi*, 144 S. Ct. 1889, 1897–98 (2024), that *Heller*'s mode of analysis—a review of the plain text of the Second Amendment followed by analogizing modern restrictions to historically grounded ones—governs all Second Amendment challenges. The Court did not in any way undermine *Heller*, but instead provided a more fulsome elaboration of "*Heller*'s methodology." *Bruen*, 597 U.S. at 22. And the Court repeatedly confirmed *Heller*'s central holding that arms in common use are absolutely protected. *See id.* at 22, 32, 47. In doing so, the Court vindicated then-Judge Kavanaugh's dissent in the D.C. Circuit, in which he opined that bans on common semiautomatic firearms like New Jersey's are unconstitutional. *See Heller v. District of Columbia*, 670 F.3d 1244, 1285–91 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting).

The principles established by *Heller* and confirmed by *Bruen* should make this a straightforward case. The paradigmatic semiautomatic firearm banned by New Jersey is the AR-15 platform rifle. Thirty years ago, the Supreme Court described the AR-15 as a "civilian," "commonplace," "generally available," and "traditionally … lawful" firearm. *Staples v. United States*, 511 U.S. 600, 603, 611–12 (1994). It remains "commonly available," *Garland v. Cargill*, 602 U.S. 406, 429–30 (2024) (Sotomayor, J., dissenting), and according to the agency charged with

administering the Nation's firearms laws it is "one of the most popular firearms in the United States," *Definition of "Frame or Receiver" & Identification of Firearms*, 2022 WL 1159420, at *2 (ATF Apr. 10, 2022).

The district court largely followed the above methodology, except that it deviated from *Heller*'s mode of analysis in one critical respect. *Heller* considered the type of firearm at issue (there, handguns) and assessed whether firearms *of that type* could be banned, or whether they were, instead, in common use. The district court in this case, however, declined to do the same. In fact, even though it recognized that both parties treated the AR-15 type rifle as *typical* of the universe of banned firearms, and though New Jersey had not shown that the AR-15 type rifle is relevantly distinct from any of the other "assault firearms" at issue in this case, the district court held that the Colt AR-15 specifically (the model banned by name by New Jersey, but far from the only make and model of AR-15 platform rifle) could not stand in for *any* other firearm, and refused to consider Plaintiffs' claims as to the entire universe of banned arms—including AR-15 platform rifles made by other manufacturers. Instead, the district court narrowed Plaintiffs' claims to be about a single firearm—the Colt AR-15—and held that that specific firearm is in common use and could not be banned, while declining to pass on the constitutionality of any other part of the Ban. This was inconsistent with Supreme Court precedent, and it permitted New Jersey to shelter much of its Ban behind a single scapegoat provision,

insulating from any judicial review what is, under the district court's own reasoning, a law infringing the rights of all New Jerseyans to adequately defend themselves. This Court should reverse that decision.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this case involves a constitutional challenge to state law. The district court entered an order on July 30, 2024 granting in part and denying in part Appellants' motion for summary judgment, and granting in party and denying in part Appellees' cross-motion for summary judgment. JA5. Appellants timely noticed their appeal on July 30, 2024. JA3. This Court has jurisdiction over this appeal from a final judgment under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether New Jersey's ban on common semiautomatic firearms is unconstitutional under the Second and Fourteenth Amendments to the United States Constitution? Issue raised: JA177–179 (Complaint). Issue ruled upon: JA13–14, JA64, JA77 (Opinion).

## STATEMENT OF RELATED CASES

This case has been consolidated for purposes of appeal with *Ellman v. Attorney General New Jersey, et al.*, No. 24-2450, and *Association of New Jersey Rifle and Pistol Clubs, et al. v. Attorney General New Jersey*, No. 24-2506, which

also challenge the New Jersey statutes and policies at issue here and which were consolidated with this case in the district court as well. Those cases were also resolved in the same final opinion and order as this case. This case has not been before this Court before, but the associated case, *Association of New Jersey Rifle and Pistol Clubs*, No. 24-2450, was before this court on appeal from denial of a preliminary injunction, *see Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018), and on appeal from grant of summary judgment to the defendants, in 974 F.3d 237 (3d Cir. 2020), before being remanded to the district court following the Supreme Court's granting certiorari and vacating this Court's decision in light of *Bruen*. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022)

## STATEMENT OF THE CASE

### I. New Jersey's ban on common semiautomatic firearms.

New Jersey broadly bans the possession, transport, shipment, sale, or disposal of arms that it designates as "assault firearms." N.J. STAT. ANN. §§ 2C:39-5(f), 2C:39-9(g). This prohibition is subject to only "very narrow exceptions," *Coalition of New Jersey Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 670 (D.N.J. 1999), that do not diminish the fact that the State's law amounts, for ordinary individuals, to a flat ban on designated firearms, *see, e.g., Gun Owners' Action League, Inc. v.*

*Swift*, 284 F.3d 198, 207 n.6 (1st Cir. 2002) ("The New Jersey law examined in *Coalition* was effectively a ban on assault weapons.").

The State classifies a wide variety of firearms as "assault firearms." In addition to listing certain firearms by name—including, as discussed below, the "Colt AR-15 and CAR-15 series"—the law treats as an "assault firearm" any firearm that is "substantially identical" to a named firearm, as well as any "semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds" (except for tubular magazines firing .22 rimfire ammunition). N.J. STAT. ANN. § 2C:39-1(w). "Substantially identical" firearms to "assault firearms" include any semiautomatic rifle with "the ability to accept a detachable magazine" and at least two of the following attributes: a folding or telescoping stock, a pistol grip "that protrudes conspicuously beneath the action of the weapon[,]" a bayonet mount, flash suppressor or threaded barrel designed to accommodate a flash suppressor, or a grenade launcher. Div. of Crim. J., Letter from Attorney General Peter Verniero to Director Terrence P. Farley on Guidelines Regarding the 'Substantially Identical' Provision in the State's Assault Firearms Laws at 2 (Aug. 19, 1996), https://bit.ly/4fQbVuq ("*Guidelines*"). Semiautomatic handguns that accept detachable magazines also qualify if they have two of the following: "an ammunition magazine that attaches to the pistol outside of the pistol grip[,]" "a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or

silencer[,]" "a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned[,]" a "manufactured weight of 50 ounces or more when the pistol is unloaded[,]" or any firearm that constitutes "a semi-automatic version of an automatic firearm[.]" *Id.* at 2–3. And a semiautomatic shotgun is treated as an "assault firearm" so long as it has at least two of the following features: a folding or telescoping stock, "a pistol grip that protrudes conspicuously beneath the action of the weapon[,]" a fixed magazine holding more than five rounds, or the ability to accept a detachable magazine. *Id.* at 3.

## II.  Proceedings below.

The individual plaintiffs in this case are Mark Cheeseman and Timothy Connolly. JA25. Cheeseman and Connolly are law-abiding, adult citizens of New Jersey, both of whom would, if it were not for New Jersey's Ban, possess firearms, including AR-15-style rifles, that are designated as "assault firearms." JA25–26. They desire to use these firearms for home defense, target shooting, and training. JA26. They abstain, however, from possessing such firearms because they fear prosecution for doing so. *Id*. Both Cheeseman and Connolly are members of Firearms Policy Coalition, a nonprofit membership organization that seeks to promote and defend the People's rights, especially, but not limited to, the right to keep and bear arms. JA26; JA257. FPC is also a plaintiff in this lawsuit. JA21.

Plaintiffs filed this suit in June 2022, JA110, and filed an amended, operative complaint in July 2022, JA150, challenging New Jersey's Ban on common semiautomatic firearms which it erroneously and tendentiously labels "assault firearms," under the Second and Fourteenth Amendments. JA177–79. The State moved to consolidate this case with two others raising similar claims, *ANJRPC v. Platkin*, No. 18-cv-10507 (D.N.J.) and *Ellman v. Platkin*, No. 22-cv-4397 (D.N.J.), and the district court granted that motion and consolidated the cases for discovery. *See* Order, Doc. 148 (Feb. 6, 2023). Following discovery, the district court extended its consolidation order to cover dispositive motions. *See* Order, Doc. 168 (Sept. 12, 2023). The parties cross-moved for summary judgment, and on July 30, 2024, the district court granted, in large part, the State's motion, holding in Plaintiffs' favor that the Ban was unconstitutional as applied to "the Colt AR-15 for use of self-defense within the home" but, otherwise concluding that Plaintiffs had not shown the challenged restrictions were unconstitutional. JA77.

In concluding that the Ban was unconstitutional only as specifically applied to the Colt AR-15 rifle, the district court began its opinion by artificially limiting the scope of the challenge brought by Plaintiffs to seek *only* that relief. *See* JA12–13. Although the Court acknowledged that Plaintiffs "broadly frame their argument— effectively seeking a wholesale declaration that the Assault Firearms Law is unconstitutional," JA12, because much of the arguments and evidence proffered by

8

the Plaintiffs (in each of the consolidated cases) and the State Defendants "appears to focus largely on the AR-15 as a typical 'assault weapon' under the Assault Firearms law," the Court concluded it could not, on the record before it, analyze any other provision of the Ban, JA13. Having narrowed Plaintiffs' claims, the Court asserted that "the remainder of the Assault Firearms Law," other than the ban on the Colt AR-15 specifically, "has not been challenged" and so it did not pass on its constitutionality. JA14. In justifying this decision, the Court stated that the "variety of firearms" covered by the Ban that were not the AR-15 had individual "nuances," but it did not explain in what relevant ways the firearms at issue varied or what nuances it perceived that would make them distinct in a constitutionally relevant way from the AR-15. JA12.

Assessing this narrowed claim, the Court concluded that "the AR-15 Provision" of the Ban was unconstitutional, recognizing that *Heller* itself "forbade a complete prohibition on a class of gun ownership." JA53. Applying the by-now-familiar *Bruen* analytical framework, the district court had no difficulty in concluding that "the Second Amendment's plain text covers Plaintiffs' proposed course of conduct—the possession and use of AR-15s within the home for self-defense[.]" *Id*. While acknowledging that "*Heller* and *Bruen* treated handguns and not semi-automatic weapons," the district court recognized that "the applicability of the Second Amendment's text to the question before the Court appears to already

have been answered by those same decisions," which recognized that the text generally extends to the ownership of firearms for defensive purposes within the home. JA54.

The court rejected the State's arguments to the contrary, first dispensing with the notion that the AR-15 is not in "common use for lawful purposes." JA56. Noting that the AR-15 is, like the handguns at issue in *Heller*, "overwhelmingly chosen by American society for [a] lawful purpose," JA56 (quoting *Heller*, 554 U.S. at 628), the court accepted that approximately 24 million Americans own an AR-15-style rifle, a number "exceeded only by the number of registered handgun owners within our Nation," JA56. What is more, the court explained that "AR-15s are well-adapted for self-defense" uses, with specific "design features" that give them "light weight, … very mild recoil, and … good ergonomics" and that make them a popular choice for individuals seeking to exercise their right to defend themselves. JA57. Though the State emphasized to the court that handguns are more popular still, the district court declined to limit the Second Amendment to only "the most popular weapon for defensive gun use in circulation," explaining that "the Supreme Court on this matter [has been] clear: the banning of this firearm for self-defense within the home where it is a firearm that has been shown to be commonly used for a lawful purpose is unpermitted." JA59. In a footnote, the court also rejected the claim that an AR-15 could be banned because it is "most useful in military service," explaining

10

that, even if that were a relevant basis on which to exclude a weapon from the Second Amendment's protection, the mere fact that the AR-15 rifle was "developed from what was originally a military-style weapon during the Vietnam War" was "insufficient to show that it is a weapon most-suited to military use." JA59 n.22.

Proceeding to the historical analysis prescribed by *Bruen*, the district court concluded that "[t]he AR-15 Provision cannot stand since it is inconsistent with our Nation's historical tradition of firearm regulation." JA60. The most important support for the district court's statement on this front was *Heller* itself, which the court recognized as forbidding the "total prohibition on a commonly used firearm for self-defense—[in this case] AR-15s—within the home." JA60; *see also id.* ("The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." (quoting *Heller*, 554 U.S. at 630)). Though it undertook anew the work of analyzing the historical evidence assembled by the State, it unsurprisingly found that the analogical work "leads to the same conclusion" that *Heller* indicated it would. JA60. Though the State had assembled historical laws regulating items "including but not limited to trap guns, gunpowder, Bowie knives, slingshots, and clubs," the district court held those comparators were "unavailing given a single fact: New Jersey's AR-15 Provision," unlike those putative analogues, "constitutes a complete ban on a class of firearms that is commonly-used for self-defense." JA61. To illustrate this

point, the court treated laws regulating Bowie knives as exemplary of the State's historical evidence. Even assuming that Bowie knives were, historically, commonly used, it faulted the State's proposed analogues because "the mainstream approach to Bowie knife regulation was to 'ban concealed carry, to forbid sales to minors, or to impose extra punishment for criminal misuse, not to wholesale ban their possession.' " JA62 (quoting David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. OF LEGIS. 224, 293 (2024)). Thus, it concluded that the historical laws and the modern Ban did not have relevantly similar methods of regulating common arms and were no support to the State under *Bruen*. *Id.*

This appeal timely followed. JA3.

## SUMMARY OF THE ARGUMENT

I. The district court erred in treating this case as a challenge only to New Jersey's ban on the "Colt AR-15." Plaintiffs' allegations and the nature of Second Amendment challenges to laws banning *types* of arms both required the Court to analyze the issue more broadly. No plaintiff has alleged an intention to buy a "Colt AR-15 specifically." Rather, they have alleged that they desire to buy firearms classified as "assault firearms" including, but not limited to, AR-style firearms. To be clear, the AR-15 is a platform of rifle that is sold by many manufacturers, not just Colt. Furthermore, under *Heller*, the relevant question to answer in a case like this

12

is not whether the specific firearms the Plaintiffs want to own are constitutionally protected, but rather whether they are part of a *class* of firearms that are constitutionally protected. Here, the relevant class should be "semiautomatic firearms," because that is the general type of firearm targeted by the State's ban. But even if the Court accepts the Ban's own framing, and treats "assault firearms" as a discrete subgroup of semiautomatics, this case comes out the same way.

II. Both semiautomatics generally, and "assault firearms" more specifically, are "arms" that are in common use by law-abiding citizens for lawful purposes. They therefore cannot be banned. Beginning with the text of the Second Amendment, just as the district court concluded that the AR-15 specifically is an "arm," so are *all* the banned "assault firearms" "arms." The Supreme Court in *Heller* has already explained that any weapon that can be carried and that an individual could use in self-defense—a group that includes all bearable firearms—is an "arm" that is presumptively entitled to constitutional protection.

As to history, the Supreme Court in *Heller* has already done the historical work for this case as well. In holding that the District of Columbia's ban on handgun possession violated the Second Amendment, the Supreme Court in *Heller* performed a lengthy analysis of the historical restrictions on the scope of the right, and it adduced the following principle: while "dangerous and unusual weapons" can be banned, arms that are "in common use for lawful purposes" are *per se* protected and

cannot be. That holding resolves this case, because whether the relevant group of arms is "semiautomatic firearms" or "assault firearms," the fundamental fact is that New Jersey's law bans a type of firearms that are in common use for lawful purposes. And even if the Court were to do its own historical work, beyond what *Heller* did, it would not change anything. Indeed, the district court below reviewed extensive historical evidence but found *nothing* suggesting that the State has the power to ban a firearm that is chosen by millions of Americans for lawful purposes. That conclusion compels a reversal of the decision below, with instruction to enjoin the entirety of New Jersey's Ban.

## ARGUMENT

### I.    Standard of Review.

This Court reviews de novo the district court's decision resolving the parties' cross-motions for summary judgment. *Spivack v. City of Philadelphia*, 109 F.4th 158, 165–66 (3d Cir. 2024). Summary judgment is appropriate where the moving party is entitled to judgment as a matter of law and there is no material disputed fact. *Id.* In this case, as the district court recognized, there are relevant factual disputes, but they concern "legislative rather than adjudicative facts." JA19. Because such disputes "do[] not present factual questions for determinations in a trial," the district court was qualified to resolve those disputes on summary judgment below. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). This Court has previously

held that, at least in the context of reviewing a decision granting or denying a preliminary injunction, it reviews a district court's legislative factual determinations for clear error. *See ANJRPC*, 910 F.3d at 114 n.13, *abrogated on other grounds*, *Bruen*, 597 U.S. at 19 & n.4. Given, however, that this Court's ordinary form of review of summary judgment decisions is plenary, its review of legislative factual determinations by the district court on summary judgment should be similarly unrestricted at this stage in the proceedings. *See Free v. Peters*, 12 F.3d 700, 706 (7th Cir. 1993) ("The district judge announced a rule; and appellate review of rules, and therefore (it follows) of the social scientific or other data on which the rules are based, is plenary."). Other circuits have recently recognized that they have unfettered review of legislative fact issues in cases similar to this one. *See Bianchi v. Brown*, 111 F.4th 438, 461 n.2 (4th Cir. 2024) (en banc) (exercising plenary review, following a motion to dismiss, of legislative facts relevant to the constitutionality of a ban on common semiautomatic firearms); *Teter v. Lopez*, 76 F.4th 938, 946–47 (9th Cir. 2023), *reh'g en banc granted, op. vacated*, 93 F.4th 1150 (9th Cir. 2024) (mem.) (similar).

**II.    New Jersey's Ban on Common Semiautomatic Firearms Is Unconstitutional Under Binding Supreme Court Precedent**

**A. The District Court Erred In Assessing the Ban on the Colt AR-15 In Isolation.**

Before it began its *Bruen* analysis, the district court made a fundamental error in this case by limiting Plaintiffs' claims to the single assertion that New Jersey's Ban is unconstitutional as applied specifically against the "Colt AR-15" rifle. JA13 & n.5. This was incorrect as a matter of the Plaintiffs' allegations—both Cheeseman and Connolly have stated that they desire to purchase firearms classified as "assault firearms" under New Jersey law, "*including but not limited to* an AR-15 style rifle." JA253, JA256 (emphasis added). And they did not say that they specifically wanted an AR-15 style rifle manufactured by Colt. But more fundamentally, the district court's narrowing of the question presented to whether the Constitution prohibits New Jersey from banning a particular make and model of firearm is inconsistent with the Supreme Court's approach to assessing bans on *types* of firearms.

Begin with *District of Columbia v. Heller*, 554 U.S. 580 (2008). In *Heller*, the plaintiffs challenged a ban on possessing functional handguns and assembled long guns in the home. In holding that law unconstitutional, the Supreme Court did not look to specific makes or models of handgun to see whether they, individually, could be banned. Throughout its lengthy opinion, the Supreme Court always spoke about "handguns" as the relevant *class* or *type* of firearm that was at issue in the case. For

example, in reference to their common use for self-defense, the Court recognized that "*handguns* are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* at 629 (emphasis added). And when discussing the limitations on the scope of the Second Amendment right, the Court made clear that the Second Amendment "extends only to certain *types* of weapons." *Id.* at 623 (emphasis added). The relevant question, then, for the Court was "*what* types of weapons [*United States v.*] *Miller*[, 307 U.S. 174 (1939)] permits," *id*. at 624, and it answered, "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," again looking at the issue *categorically* and giving as an example of such an unprotected weapon, "short-barreled shotguns," *id.* at 625.

The Court did not *once* ask whether the specific type of handgun Dick Heller wanted to own was protected, suggest that the law might be valid against some handguns and not others, or hint that the analysis might differ even between handguns that operate on entirely distinct principles like semiautomatic pistols and revolvers. That was because the challenged law, itself, treated the relevant "type" of firearm as the handgun. *Heller* therefore teaches that Courts should assess bans on *types* of firearms by asking whether that *type* is protected because they are in common use for lawful purposes, not whether discrete examples of the type are individually common.

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam), and *Bruen*, both followed *Heller*'s lead. In *Caetano*, as in *Heller*, the Court accepted the statute's framing of the relevant firearms as "stun guns" and did not distinguish them by model or subgroup. And in *Bruen*, the Supreme Court emphasized at the outset that the *type* of firearms the petitioners were forbidden from carrying for self-defense—again, "handguns"—were categorically protected because they were, as *a group*, " 'in common use' today for self-defense." 597 U.S. at 32.

To be clear, Plaintiffs do not mean to suggest that if a ban does not extend to *all* makes and models of a particular type of firearm it is somehow valid or less suspect. Rather, the key point is that when considering a firearm ban, the important question to ask is what type of firearms are banned. If that type of firearm is in common use, then the ban, even if only on *some* firearms of that type, is unconstitutional, period.

Here, the relevant "category" of arm banned by New Jersey is "semiautomatic firearms." Though the State refers to the firearms it has banned as "assault firearms," that is a pejorative term that does not describe a class of firearm that is functionally distinct from other semiautomatic firearms. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation omitted). In reality, the recognized class of firearms that the

State has targeted for regulation is "semiautomatic firearms," which are both banned by name, and by feature under New Jersey's scheme. *See* N.J. STAT. ANN. § 2C:39-1(w); *Guidelines*, *supra*, at 2–3.[1]

Semiautomatics are the most commonly sold firearms in America today. The "automatic" part of "semiautomatic" does not indicate that they are capable of automatic, machine-gun style fire, but merely refers to the fact that the user need not manually load another round in the chamber after each round is fired. Unlike an automatic firearm, a semiautomatic firearm will not fire continuously on one function of its trigger; rather, a semiautomatic firearm requires the user to engage the trigger each time he or she wants to discharge a round. *See Staples*, 511 U.S. at 602 n.1. The AR-15, or the other firearms banned by name and by feature in New Jersey, are not distinct from this group, but exemplary of it. Indeed, it was an AR-15 that was at issue in *Staples* which the Court described repeatedly as "a semiautomatic weapon," noting that firearms *in that group* were generally classified as "civilian," "commonplace," "generally available," and "traditionally … widely accepted as lawful possessions." *Id.* at 603, 611–12. If the AR-15 were somehow

---

[1] The ban does reach isolated non-semiautomatic firearms, like "[a]ny shotgun with a revolving cylinder." N.J. STAT. ANN. § 2C:39-1(w)(1). Even if these firearms may appropriately be separated from the semiautomatic "assault firearms," it does not excuse the district court's decision to focus solely on the Colt AR-15 as though it were entirely distinct from the other arms at issue.

distinct from the mine run of semiautomatics, *Staples* would undoubtedly have mentioned that critical fact.

But even if the Court rejects that framing, at the very least it is appropriate to treat the firearms that New Jersey itself has grouped together under the heading "assault firearms" as a cohesive group based on common functionality and features. After all, in *Heller*, the Court accepted "handguns" as the relevant subset of firearms to assess for constitutional protection, because that was the subset banned by the District of Columbia. Other courts have done the same, even as they have focused— as the parties did in their briefing below—on the AR-15 as prototypical of the larger class of banned arms. For example, in *Bevis v. City of Naperville*, despite focusing almost exclusively on the AR-15 in its analysis and putting significant emphasis on the similarity between that particular "assault firearm" and the M16 military rifle, the Seventh Circuit made clear that its analysis applied equally to the AR-15 *and* to "its many cousins covered by the Act." 85 F.4th 1175, 1196 (7th Cir. 2023).

The district court had no good reason to proceed differently here. It recognized that the parties presented "the AR-15 as a typical 'assault weapon' under the Assault Firearms Law," JA13, implicitly acknowledging that the *class* of firearms banned by New Jersey has certain relevant similarities or characteristics, and that the entire group of firearms sharing those characteristics could be generalized and assessed together. Indeed, the structure of New Jersey's law demands such treatment.

Following its enumerated list of firearms that it treats as "assault firearms," the district court noted that the law "has a catchall phrase broadening its impact," JA16, that captures "[a]ny firearm manufactured under any designation which is *substantially identical* to any of the firearms listed above," N.J. STAT. ANN. § 2C:39-1(w)(2) (emphasis added). It is this language that the State built upon when it released the *Guidelines* delineating what features on common semiautomatic firearms would make them "substantially identical" to firearms including the AR-15 rifle. *Guidelines*, *supra*, at 3. In limiting its opinion as it did, the district court struck down a ban on the "Colt AR-15" but declined to invalidate the same law as to firearms that New Jersey says are "substantially identical" to it. This reasoning effectively permitted the State to insulate 99% of its Ban from legal scrutiny, by hiding behind a single example of the most common firearm platform, without once showing that there was a relevant difference between the Colt AR-15 and any of the other listed semiautomatic firearms. This was error.

Even if the State had shown, and the district court had found (which again, it did not), that the AR-15 was somehow relevantly different from other banned firearms, it should still have treated them as part of the same group of firearms because the State, itself, lumped them together. If some wheat is thrown out with the chaff because New Jersey sought to ban the most popular civilian rifle in American

history as an "assault firearm," it should not be heard to complain about the effects of its own overzealous grouping.

And as a final alternative, even if the district court were correct to limit its focus to the AR-15, it should have invalidated New Jersey's ban as it applies to all AR-15 platform rifles, not just those manufactured by Colt. All AR-15 platform rifles are constitutionally protected regardless of manufacturer.

### B. The Banned Firearms Are Constitutionally Protected Arms In Common Use and Cannot Be Banned.

Properly framed then, the question in this case is whether the semiautomatic firearms dubbed "assault firearms" by New Jersey, as a group, can be banned consistent with the Second Amendment to the United States Constitution. Answering that question means applying essentially the same analysis the district court did without the artificial narrowing of its scope. First, this Court must consider whether the course of conduct the Plaintiffs wish to engage in but for the Firearm Ban is covered by the Second Amendment's "plain text." *Bruen*, 597 U.S. at 17. If it is, as the district court found it was, the Firearm Ban is presumptively unconstitutional and can only be saved if the State can show that it is "consistent with this Nation's historical tradition of firearm regulation." *Id.* That entails a careful review of historical evidence to extract "principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Again, following the district court's analysis of the AR-15, such an analysis inevitably leads to the conclusion that New Jersey's

ban is unlawful, regardless of whether the Court treats the relevant "type" of firearm as "semiautomatics" or "assault weapons."

### 1. The Banned Firearms Are "Arms" Within the Meaning of the Plain Text of the Second Amendment.

The first question under *Bruen* is whether the "plain text" of the Second Amendment protects the conduct in which the Plaintiffs wish to engage but is banned by the statute, here, possessing certain semiautomatic rifles that New Jersey has misleadingly labeled "assault weapons." *Bruen* repeatedly emphasized that the subject of this analysis is the Amendment's "plain text," 597 U.S. at 17, 24, 32, 33, or "bare text," *id.* at 44 n.11. In other words, the focus is only upon the words of the Amendment, their historical meaning, and what they fairly imply. Distinctions that do not appear on the face of the text cannot be found at this stage of the analysis and must be derived, if at all, later, through history.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The question here, then, is what was understood by the term "arms" at the Founding. *Heller* has already answered this question. *See* JA54 ("[T]he applicability of the Second Amendment's text to the question before the Court appears to already have been answered."). "The 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as '[w]eapons of

offence, or armour of defence.' " *Id*. And "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *Id*. The Court also cited without quoting Webster's 1828 American Dictionary of the English Language, which gave as its first definition of arms "[w]eapons of offense, or armor for defense and protection of the body," and said that "[i]n law, arms are any thing which a man takes in his hand in anger, to strike or assault another." *Arms*, NOAH WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://bit.ly/3TclVoq. Summarizing its findings, *Heller* wrote that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.' " 554 U.S. at 582. Firearms, as weapons, are plainly encompassed within "arms." Indeed, while the Court noted one anomalous Founding-era source that "limited 'arms' (as opposed to 'weapons') to 'instruments of offence *generally* made use of in war,' " the Court emphasized that "even that source stated that all firearms constituted 'arms.' " *Id*. at 581. In sum, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id.* at 582. And all firearms are arms. *See Bianchi*, 111 F.4th at 501 (Richardson, J., dissenting) ("Rifles …. have been recognized as 'Arms' covered by the Second Amendment since the Founding."). Because the New Jersey law challenged here bans firearms, the plain text is implicated, and the burden is on the State to justify its law.

**2.    History Shows That Arms "In Common Use" Are Categorically Protected.**

If the Firearm Ban is to survive, New Jersey must prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Ordinarily, that would require the State to establish a relevant tradition of regulation, identifying the principle that permits the State to ban certain types of firearms, and then showing that the Firearm Ban conforms to that principle. *See Rahimi*, 144 S. Ct. at 1898. Here, however, the first part of that analysis has already been done by the Supreme Court. It has derived the principle, from history, that only dangerous and unusual weapons may be banned. It follows that arms that are in common use for lawful purposes (therefore necessarily not dangerous and unusual) are protected and cannot be banned. *See Hanson v. District of Columbia*, No. 23-7061, 2024 WL 4596783, at *27 (D.C. Cir. Oct. 29, 2024) (Walker, J., dissenting) (*Heller* held that "[h]andguns cannot be categorically banned *precisely because* they are in common use for lawful purposes.").

The Supreme Court first elucidated this rule in *Heller*. *See* JA60. Like this case, *Heller* involved a ban on a type of firearm (there, handguns). After *Heller* construed the plain text of the Second Amendment presumptively to cover all firearms as "arms," the Court in Part III of its opinion turned to historical limitations on the textual scope of the right. *See* 554 U.S. at 626–28. It was through examining this history that the Court concluded that, despite its expansive textual scope,

ultimately the Second Amendment "was not a right to keep and carry any weapon whatsoever." *Id*. at 626. Rather, the type of arms that are protected is limited by "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id*. at 627. This was, to use the language of *Rahimi*, the relevant "principle[] that underpin[s] our regulatory tradition" against which *Heller* judged D.C.'s ban on handguns in that case. 144 S. Ct. at 1898.

Because only dangerous and unusual weapons can be banned, it follows that arms "in common use" are protected. *Heller*, 554 U.S. at 627. After all, an arm that is in common use cannot be dangerous and unusual. By definition, a common arm is not "unusual," and as a common arm it cannot be "dangerous" compared to common arms. And this is not just a matter of logic. Just like the permissible prohibitions on "dangerous and unusual weapons," the protection of arms "in common use" was also evidenced by our Nation's history, because normally "when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id*. at 624 (brackets in original) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

The district court effectively got this correct, except in that it accepted the State's framing that "common use" was relevant to the *textual* analysis. *See* JA56–59. There is simply nothing in the "plain text" that would suggest such a limitation could be found there. Nor is there anything of the kind in *Heller*. Although the final

quotation from *Heller* above, regarding the use of "the kind [of arms] in common use at the time" for militia service precedes its historical analysis, that does not suggest that "common use" is part of the "plain text" of the Second Amendment or override the other clear indications from *Heller* that it is a historical principle. Rather, *Heller* only mentioned the rule earlier in its opinion as part of its effort to explain how its textual interpretation of the Second Amendment was consistent with *United States v. Miller*. As part of that discussion, the Court stated that, "[w]e may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits." *Heller*, 554 U.S. at 624 (emphasis in original). Based in part on the quotation above about the use of common arms in militia service, the Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625. "That accords," the Court explained, "with *the historical understanding of the scope of the right*, see Part III, *infra*." *Id*. (emphasis added). Thus, even though this discussion took place outside of the Court's analysis of historical limits on the right, the Court made clear that those historical limits were what was being addressed.

*Bruen* confirms that the exception for "dangerous and unusual weapons" (and correlative *protection* for arms "in common use") is a rule derived from history. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases-Again*, HARV. J. L. & PUB. POL'Y PER

CURIAM (Sept. 27, 2023), https://bit.ly/49KhTKQ. When *Bruen* explained its framework, "common use" was the example it chose for how to use the "historical understanding of the Amendment to demark the limits on the exercise of th[e] right." 597 U.S. at 21. Once it was established that the arms at issue (handguns) were " 'in common use' today for self-defense," there was no need for any further analysis of the type of arm at issue, textual or historical. *Id.* at 32. In distinguishing colonial laws that allegedly restricted the carrying of handguns, *Bruen* explained that regardless of what was true in colonial times, handguns are in common use today. *Id.* at 47. That was significant because "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons[,]' " and *in Heller*, "[d]rawing from this *historical tradition*, [the Court] explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' " *Id*. If there were any doubt that *Heller*'s statements about "common use" were derived from history, *Bruen* put them to rest.

A panel of the Ninth Circuit recently correctly applied *Bruen* and *Heller* to a challenge to Hawaii's ban on butterfly knives. In that case, Hawaii pressed, but the court rejected, the argument that the allegedly "dangerous and unusual" nature of butterfly knives "means that they are not 'arms' as that term is used in the Second Amendment." *Teter*, 76 F.4th at 949–50. Instead, citing the same portions of *Heller*

discussed above, the panel noted that "the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting [such] weapons.' " *Id.* (quoting *Heller*, 554 U.S. at 627) (emphasis in *Teter*). Therefore "whether butterfly knives are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis," and since whether an arm is "dangerous and unusual" depends in part on "whether the weapon is commonly possessed by law-abiding citizens for lawful purposes," it was up to Hawaii to prove the arms were not in common use. *Id.* at 950 (quotation marks omitted).

Where courts have gone astray on this issue, they frequently have done so by misreading a particular passage of *Bruen*. In particular, before turning to "whether the plain text of the Second Amendment protects" carrying arms in public, *Bruen* stated that the type of arm at issue was protected because no one "dispute[d] that handguns are weapons 'in common use' today for self-defense." 597 U.S. at 32. The implication some courts have drawn from this is that *Bruen* implies that common use is a textual inquiry because the Court discussed it before turning to the textual meaning of "bear." *See, e.g.*, *Hanson*, 2024 WL 4596783, at *3 n.3. But this is a misreading of *Bruen*. In the passage in question, *Bruen* was clearing the ground of undisputed items and concluded that handguns are protected *period*—as a matter of text *and history*—before turning, first, to the plain text of "bear," and then, second,

to historical restrictions on bearing arms in public. Confirming this reading is the fact that *Bruen* never returned to a discussion of historical restrictions on *types* of arms, as opposed to their carriage. This discussion in *Bruen*, then, in fact *confirms* that the common use test is the product of a historical inquiry, because once it was established that handguns were in common use it followed that they were protected, full stop, not just that they were presumptively protected by the plain text.

### 3. The Banned Arms Are Indisputably In Common Use.

This case thus comes down to the question of whether or not the banned firearms are "dangerous and unusual," which they cannot be if they are "in common use." Because it is New Jersey's burden to show that the Firearm Ban "is consistent" with historical tradition, New Jersey has the burden to demonstrate the arms it has banned are *not* in common use. *Bruen*, 597 U.S. at 24. Any doubt about the nature of this burden was removed by *Bruen*'s comparison of its analytic framework to First Amendment caselaw. To head off the complaint that it was unfair to put the government to its proof in defending a challenged law, the Court noted that this was precisely how things work in the First Amendment context where the government also generally bears the burden of "point[ing] to *historical* evidence about the reach of the First Amendment's protections." *Id*. at 24–25 (citing *United States v. Stevens*, 559 U.S. 460, 468–71 (2010)). In such a case, the government's work is not done merely because it establishes a certain type of speech is unprotected, it must *also*

show that the speech covered by the challenged law (or at issue in the prosecution) is *of that type. Id.*; *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246 (2002) ("[T]he Government must prove that the work, taken as a whole" is obscene.); *Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (true threats); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1107–08 (9th Cir. 2002) (incitement). So too here. New Jersey can only support the Firearm Ban by proving that the arms it has banned are appropriate targets for prohibition under the relevant historical framework.

New Jersey's task is impossible regardless of whether the relevant "type" of firearm is considered to be semiautomatic firearms or so-called "assault firearms." After all, as the district court concluded, the AR-15 *alone* is "in common use" today for self-defense. JA61. As such, any group of semiautomatic firearms in which the AR-15 is included as a paradigmatic example must necessarily also be "in common use."

Common use is overwhelmingly established if the Court accepts "semiautomatics" as the relevant type of firearm at issue. Semiautomatic firearms have been commercially available for over a century. *See Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). According to industry estimates, there were 89 million semiautomatic handguns, 43 million semiautomatic

rifles, and 12 million semiautomatic shotguns, for a total of 144 million semiautomatic firearms sold in the United States between 1990 and 2018 alone. *See Industry Intelligence Report: Firearm Production in the United States With Firearm Import and Export Data* at 17, NSSF (2020), https://bit.ly/3v5XFvz. And currently the vast majority of States do not ban semiautomatic "assault weapons." In addition to New Jersey, the only states that have enacted bans on "assault weapons" (with varying definitions of that term) are California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, New York, Delaware, and Washington. *See* Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02.

Even looking more specifically only at "assault firearms," the firearms banned by New Jersey still easily satisfy the common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in this category. *See Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "[r]oughly five million Americans own" them and "[t]he overwhelming majority . . . do so for lawful purposes."); *ANJRPC*, 910 F.3d at 116 (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most

conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' ").

As explained above, the commonality of these firearms can be demonstrated by looking at the AR-15 and similar modern semiautomatic rifles that epitomize the firearms the State lumps together in this category. The AR-15 is a semiautomatic, centerfire rifle that accepts a detachable magazine and comes standard with a pistol grip. *See* STEPHEN P. HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 at 9 (Google Books ed. 2022) (reproducing portions of the Colt patent for the AR-15). The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1296 (2009). Various sources demonstrate beyond doubt that the AR-15 and similar types of firearms are in common use for lawful purposes.

***Consumer surveys.*** Several consumer surveys demonstrate the commonality of the AR-15 and similar types of rifles. In 2022, Washington Post-Ipsos conducted a survey of a random sample of 2,104 gun owners. *Poll of current gun owners* at 1,

WASH. POST-IPSOS (2022), https://bit.ly/46CqzRa ("WashPost Poll"). The survey asked whether individuals owned AR-15-style rifles. Twenty percent answered yes, *id*., which suggests that "about 16 million Americans own an AR-15." Emily Guskin et al., *Why do Americans own AR-15s?*, WASH. POST (Mar. 27, 2023), https://wapo.st/3IDZG5I. The survey also asked *why* individuals owned AR-15s. Reasons given included protect self, family and property (91%, with 65% stating this was a major reason), target shooting (90%), in case law and order breaks down (74%), and hunting (48%). WashPost Poll at 1–2. Sixty-two percent of AR-15 owners reported firing their AR-15 rifles at least a few times a year. *Id*. at 2.

In 2021, Georgetown Professor William English conducted a survey of 16,708 gun owners. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw; *see also Hanson*, 2024 WL 4596783, at *35–36 & n.172 (Walker, J., dissenting) (citing approvingly the *2021 National Firearms Survey*). The English survey asked whether gun owners had "ever owned an AR-15 or similarly styled rifle?" English, *supra*, at 33. "30.2% of gun owners, about 24.6 million people, indicated that they" had owned such a rifle. *Id*. Of those who owned such rifles, the average person had owned 1.8 and the median 1. *Id*. The English survey also asked why gun owners had owned such a rifle. Answers included recreational target shooting (66%), home defense (61.9%), hunting (50.5%), and defense outside the home (34.6%). *Id*.

English also asked about defensive use of firearms. The survey responses indicated that gun owners engage in approximately 1.67 million defensive gun uses a year. *Id*. at 9. This is consistent with other survey data; "[a]lmost all national survey estimates indicate[d] that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million[.]" Alan I. Leshner et al., *Priorities for Research to Reduce the Threat of Firearm-Related Violence* 15, NAT'L RSCH. COUNCIL (2013), *available at* https://bit.ly/48ZYjcm. English found that 13.1% of defensive gun users used a rifle, English, *supra*, at 14–15, which amounts to over 200,000 defensive uses of rifles a year.

Also in 2021, the National Shooting Sports Foundation (NSSF), the Firearm Industry Trade Association, conducted a survey of 2,185 owners of AR- and AK-platform rifles. *Modern Sporting Rifle: Comprehensive Consumer Report* at 10, NSSF (July 14, 2022), https://bit.ly/3GLmErS. Owners were asked to rate on a scale of 1 to 10 (with 1 being not at all important and 10 very important) how important various reasons were for owning the rifles. *Id*. at 18. Responses included recreational target shooting (8.7), home/self-defense (8.3), and varmint hunting (5.8). *Id*. Sixty-seven percent of respondents indicated that they had used their rifle at least five times in the previous twelve months. *Id*. at 41. Another NSSF survey estimated that over

21 million Americans had trained with these types of rifles in 2020. *Sport Shooting Participation in the U.S. in 2020* at *iii*, NSSF (2021), https://bit.ly/3sPuEQl.

    ***Firearm Dealer Surveys.*** In addition to surveying consumers, the NSSF also conducts surveys of firearm dealers. Results from the most recent survey were published in 2021. *See 2021 Firearms Retailer: Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E. Retailers were asked what percentage of firearms they sold were of various types. *Id*. at 9. For 2020, at the top was semiautomatic pistols, at 44.2% in 2020. *Id*. AR/modern sporting rifle was second, at 20.3%, followed by shotgun (12.4%), traditional rifle (11.3%), and revolver (7.2%). *Id*. And 2020 was not an outlier. NSSF's 2019 retailer survey indicated that ARs and other similar rifles constituted between 17.7% and 20.3% of firearm sales in every year from 2011 to 2018 (excepting 2017, when no results were reported). *2019 Firearms Retailer: Survey Report* at 6, NSSF (2019), *available at Miller v. Becerra*, No. 3:19-cv-1537 (S.D. Cal.), Doc. 22-13 at 107.

    ***Firearm Production Data.*** NSSF also has analyzed firearm production data to determine how many AR- and AK-style rifles have been produced for the American market. *Industry Intelligence Report: Firearm Production in the United States With Firearm Import and Export Data* at 7, NSSF (2023), https://bit.ly/42qYo7k. From 1990 to 2021, it estimates that number to be 28,144,000, with totals exceeding one million every year from 2012 to 2021, with

an average of over two million per year over that time period. *See id.* Domestic production of AR- and similar rifles accounted for approximately 20% of all domestic firearms produced for the American market for the decade of 2012 to 2021. *See id.* at 2, 7.

In sum, AR- and similar style rifles unquestionably are in common use for lawful purposes: millions of Americans own tens of millions of them; they account for approximately 20% of all firearm sales in the past decade; and leading reasons for owning them include self-defense, target shooting, and hunting.

> AR-style rifles are popular with civilians . . . around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves.

FRANK MINITER, THE FUTURE OF THE GUN 46–47 (2014).

While AR- and similar style rifles are in common use for lawful purposes, there is one thing they very rarely are used for: violent crime. In the past decade, rifles *of any kind* were used in an average of 365 homicides per year. *Crime Data Explorer: Expanded Homicide Offenses Characteristics in the United States,* U.S. DEP'T OF JUST., FBI, https://bit.ly/3IF5A6M (last visited Nov. 15, 2024) (select a time frame of "10 years"). Assuming *every one* of these rifles was a different AR-15 or similar semiautomatic rifle, that would mean that over 99.999% of these rifles

*are not* used in a homicide every year. And other items are used much more frequently in homicide, including: handguns (an average of 6,525 handgun murders for the same period); knives (an average of 1,438), and hands and feet (an average of 621). *Id*. With handguns used nearly *twenty times* more often in murder than rifles, "if we are constrained to use [New Jersey's] rhetoric, we would have to say that *handguns* are the quintessential 'assault weapons' in today's society[.]" *Heller II*, 670 F.3d at 1290 (Kavanaugh, J., dissenting). The modern semiautomatic firearms that New Jersey bans are overwhelmingly used by law-abiding citizens for lawful purposes.

Given that the banned firearms are "in common use" for lawful purposes, and common use establishes that the historical principle that "dangerous and unusual" weapons may be banned has no application here, that is the end of the analysis. Even if this Court does further analyze the historical laws relied upon by the State below, it will not make a difference. Those laws "do not represent a new and previously unknown tradition. Rather, when properly understood, they represent the same principle already identified in *Heller*: The Second Amendment protects weapons commonly used for lawful purposes but does not protect dangerous and unusual weapons." *Bianchi*, 111 F.4th at 503 (Richardson, J., dissenting); *see also* JA60 (holding that undertaking an independent historical analysis reaffirms the rule found in *Heller*).

## CONCLUSION

This Court should conclude that New Jersey's Ban on "assault firearms" is unconstitutional under the Second and Fourteenth Amendments.

Dated: November 18, 2024

Bradley Lehman
GELLERT SEITZ BUSENKELL &
BROWN
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
(302) 425-5800
(302) 425-5814 (fax)
blehman@gsbblaw.com

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connolly, and Firearms Policy Coalition, Inc.*

# CERTIFICATE OF COMPLIANCE

In accordance with the Federal Rules of Appellate Procedure and this Court's Rules, I certify the following:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 9,456 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3. This brief complies with Local Rule 31.1(c). The text of the electronic brief is identical to the text in the paper copies supplied to the Court. Further, VirusTotal Antivirus Software was run on the electronic brief and no viruses were detected.

4. David H. Thompson, Peter A. Patterson, William V. Bergstrom, and Bradley Lehman are all admitted to practice in the Third Circuit Court of Appeals and are members in good standing.

/s/ David H. Thompson
David H. Thompson

*Counsel for Appellants-Cross-Appellees*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(d) and Local Rule 25.1(b), I hereby certify that on November 18, 2024, I electronically filed the foregoing opening brief with the Clerk of the Court by using the appellate CM/ECF system. Service on all counsel for all parties has been accomplished via ECF.

/s/ David H. Thompson
David H. Thompson

*Counsel for Appellants-Cross-Appellees*