# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

### Nos. 24-2415, 24-2450, 24-2506

---

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., ET AL.,
*Appellants/Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants*,

and

MARK CHEESEMAN, ET AL.,
*Appellants/Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants*,

and

BLAKE ELLMAN, ET AL.,
*Appellants/Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants*.

---

On Appeal from the United States District Court for the
District of New Jersey, Nos. 1:18-cv-10507; 1:22-cv-04360;
1:22-cv-04397 (Hon. Peter G. Sheridan, U.S.D.J.)

---

### BRIEF OF APPELLEES/CROSS-APPELLANTS

---

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM
*Solicitor General*
DANIEL VANNELLA
*Assistant Attorney General*
TIM SHEEHAN
CHRISTOPHER IOANNOU
*Deputy Attorneys General*
Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Appellees/Cross-Appellants*

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

COUNTERSTATEMENT OF JURISDICTION .....................................4

COUNTERSTATEMENT OF THE ISSUES PRESENTED....................4

COUNTERSTATEMENT OF THE CASE..............................................4

    A. New Jersey's Assault Weapons and Magazine Capacity Restrictions............4

    B. Procedural History ......................................................................7

SUMMARY OF ARGUMENT ................................................................9

STANDARD OF REVIEW ...................................................................11

ARGUMENT ........................................................................................12

    I.     NEW JERSEY'S ASSAULT WEAPONS AND LCM LAWS DO NOT VIOLATE THE SECOND AMENDMENT...................................12

    A. Plaintiffs Cannot Show That Possessing Assault Weapons Or LCMs Is Protected by the Second Amendment .................................13

        1. These Weapons Are Not In Common Use For Self-Defense ........13

            a. Assault Weapons And LCMs Are Not Well-Adapted or Widely Used For Self-Defense .................................................13

            b. Plaintiffs' Counterarguments Fall Short ..................................26

        2. LCMs Are Not Arms........................................................41

    B. The Challenged Laws Are Consistent With Historical Principles......44

    II.    THE LARGE CAPACITY MAGAZINE RESTRICTION DOES NOT VIOLATE THE TAKINGS CLAUSE ...........................................58

CONCLUSION.....................................................................................61

CERTIFICATE OF COMPLIANCE......................................................64

CERTIFICATE OF BAR MEMBERSHIP ................................................................. 65

CERTIFICATE OF SERVICE .................................................................. 66

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrus v. Allard*,
    444 U.S. 51 (1979)............................................................................61

*ANJRPC v. Atty Gen. New Jersey*,
    910 F.3d 106 (3d Cir. 2018) ....................................................*passim*

*ANJRPC v. Atty Gen. New Jersey*,
    974 F.3d 237 (3d Cir. 2020) ..........................................................59

*Antonyuk v. James*,
    120 F.4th 941 (2d Cir. 2024) ...............................................27, 57, 58

*Aymette v. State*,
    21 Tenn. 154 (1840)........................................................................49

*Barnett v. Raoul*,
    No. 23-209, 2024 WL 4719468 (S.D. Ill. Nov. 8, 2024) ..................38

*Bevis v. City of Naperville*,
    657 F. Supp. 3d 1052 (N.D. Ill. 2023)...............................................12

*Bevis v. City of Naperville*,
    85 F.4th 1175 (7th Cir. 2023) ....................................................*passim*

*Bianchi v. Brown*,
    111 F.4th 438 (4th Cir. 2024) (en banc) ....................................*passim*

*Brown v. Maryland*,
    25 U.S. 419 (1827)..........................................................................47

*Brumback v. Ferguson*,
    No. 22-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) ........12

*Bucklew v. Precythe*,
    587 U.S. 119 (2019)........................................................................31

*Caetano v. Mass.*,
    577 U.S. 411 (2016)........................................................................35

*Capen v. Campbell*,
    708 F. Supp. 3d 65 (D. Mass. 2023) ..........................................12, 40, 41

*Carpenter v. United States*,
    585 U.S. 296 (2018) ..................................................................................33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................11

*Chicago, B. & Q. Ry. Co. v. Illinois*,
    200 U.S. 561 (1906) .................................................................................61

*Crawford v. Washington*,
    541 U.S. 36 (2004) ...................................................................................27

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland
    Sec.*, 108 F.4th 194 (3d Cir. 2024) ........................................15, 24, 27

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland
    Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023) .......................................12, 35

*Dist. of Colum. v. Heller*,
    554 U.S. 570 (2008) ...........................................................................*passim*

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) .......................................................................28

*Duncan v. Bonta*,
    695 F. Supp. 3d 1206 (C.D. Cal. 2023) .............................................12

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) .............................................................33, 36

*Garland v. Cargill*,
    602 U.S. 406 (2024) .................................................................................19

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) ........................................................*passim*

*Hanson v. District of Columbia*,
    671 F. Supp. 3d 1 (D.D.C. 2023) .............................................................12

vi

*Hartford v. Ferguson*,
676 F. Supp. 3d 897 (W.D. Wash. 2023) ............................................12

*Haynes v. Tennessee*,
24 Tenn. 120 (1844)..........................................................................49

*Herrera v. Raoul*,
670 F. Supp. 3d 665 (N.D. Ill. 2023)..................................................12

*Horne v. Department of Agriculture*,
576 U.S. 350 (2015)......................................................................59, 60

*Jackson v. City & Cnty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ............................................................42

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ......................................................33, 34

*Lingle v. Chevron U.S.A.*,
544 U.S. 528 (2005).............................................................................60

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982).............................................................................60

*Luis v. United States*,
578 U.S. 5 (Thomas, J., concurring).................................................42

*McCullen v. Coakley*,
573 U.S. 464 (2014).............................................................................56

*McDonald v. City of Chicago*,
561 U.S. 742 (2010).............................................................................29

*Mid-Century Ins. v. Werley*,
111 F.4th 200 (3d Cir. 2024) .....................................................11, 32

*Miller v. Bonta*,
699 F. Supp. 3d 956 (S.D. Cal. 2023)...........................................12, 37

*Nat'l Amusements Inc. v. Palmyra*,
716 F.3d 57 (3d Cir. 2013) ................................................................61

vii

*Nat'l Ass'n for Gun Rights v. Lamont*,
685 F. Supp. 3d 63 (D. Conn. 2023)............................................................12, 31

*New York v. Ferber*,
458 U.S. 747 (1982)..........................................................................................31

*NYSRPA v. Bruen*,
597 U.S. 1 (2022)........................................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) .......................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*,
646 F. Supp. 3d 368 (D.R.I. 2022) ...............................................................41, 42

*Or. Firearms Fed'n v. Kotek*,
682 F. Supp. 3d 874 (D. Or. 2023) ............................................................*passim*

*Penry v. Lynaugh*,
492 U.S. 302 (1989)..........................................................................................31

*Lara v. Comm'r Pa. State Police*,
91 F.4th 122 (3d Cir. 2024) ..............................................................................58

*Ramos v. Louisiana*,
590 U.S. 83 (2020).............................................................................................27

*Rupp v. Bonta*,
723 F. Supp. 3d 837 (C.D. Cal. 2024) ..............................................................12

*Stanford v. Kentucky*,
492 U.S. 361 (1989)..........................................................................................31

*Staples v. United States*,
511 U.S. 600 (1994)..........................................................................................19

*State v. Huntly*,
25 N.C. 418 (1843) ...........................................................................................40

*State v. Langord*,
10 N.C. 381 (1824) ...........................................................................................39

*State v. Lanier*,
    71 N.C. 288 (1874) ................................................................... 39

*State v. Reid*,
    1 Ala. 612 (1840) .................................................................... 49

*State v. Wilburn*,
    66 Tenn. 57 (1872) ................................................................... 51

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) .................................................. 27

*United States v. Care Alternatives*,
    81 F.4th 361 (3d Cir. 2023) ..................................................... 11

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) ........................................... 41, 43

*United States v. Jenkins*,
    68 F.4th 148 (3d Cir. 2023) ................................................. 59, 60

*United States v. Miller*,
    307 U.S. 174 (1939) ................................................................. 36

*United States v. One Palmetto State Armory*,
    822 F.3d 136 (3d Cir. 2016) ........................................... 15, 35, 37

*United States v. Price*,
    111 F.4th 392 (4th Cir. 2024) (en banc) .............................. 27, 30, 39

*United States v. Rahimi*,
    602 U.S. 680 (2024) ........................................................... *passim*

*United States v. Stevens*,
    70 F.4th 653 (3d Cir. 2023) ..................................................... 44

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
    ___ F. Supp. 3d ____, 2024 WL 3466482 (D. Vt. July 18, 2024) ..... 12

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024) ................................................... 58

*Zamichieli v. Andrews*,
   No. 21-2522, 2024 WL 3466241 (3d Cir. July 19, 2024) .................................23

**Statutes**

28 U.S.C. § 1291 ...................................................................................................4

28 U.S.C. § 1331 ...................................................................................................4

28 U.S.C. § 1343(a)(3) ..........................................................................................4

Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 14, 47 Stat. 650, 654
   (1932) .................................................................................................................52

Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7 ........................................48

Ill. Act of Apr. 16, 1881 ........................................................................................50

N.J. Stat. Ann. § 2C:39-1(w)(1)..........................................................................4, 5

N.J. Stat. Ann. § 2C:39-1(w)(2)............................................................................5

N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j) ...........................................................6

N.J. Stat. Ann. §§ 2C:39-19, -20..........................................................................60

N.J. Stat. Ann. § 2C:58-3 ......................................................................................5

1686 N.J. Laws 289-90, ch. 9 ...............................................................................46

1763-1775 N.J. Laws 346, ch. 539, § 10 ..............................................................46

1784 N.Y. Laws 627 ..............................................................................................47

1837-1838 Tenn. Pub. Acts 200, ch. 137, §§ 1, 2 ...............................................49

1850 Mass. Acts .....................................................................................................50

1871 Tenn. Pub. Acts 81 ch. 90, § 1 .....................................................................51

1868 Fla. Laws 95 ..................................................................................................50

1890 Okla. Sess. Laws 475, § 18 ..........................................................................50

1927 R.I. Pub. Laws 256, §§ 1, 4..........................................................................52

1927 Mass. Acts 413, 413-15, ch. 326, §§ 1-2 ........................................52

1927 Mich. Pub. Acts 888-89 § 3 ...........................................................52

1933 Minn. Laws 231, 232-33, ch. 190 §§ 1, 3 ......................................52

1933 Ohio Laws 189, 189-90..................................................................52

**Other Authorities**

*Guidelines Regarding the "Substantially Identical" Provision* (1996),
https://nj.gov/lps/dcj/agguide/assltf.htm...............................................6

Samuel Bray, *"Necessary and Proper" and "Cruel and Unusual":
Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016) .....................39

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of
National Defence, by a Free Militia* 17-18 (1782)............................................29

William Blackstone, 4 Commentaries on the Laws of England 55, 149
(1769), http://tinyurl.com/4w7aawcy ...................................................39

William English, *2021 National Firearms Survey: Updated Analysis
Including Types of Firearms Owned* (May 13, 2022) .......................................38

# **INTRODUCTION**

From before the Founding until today, States like New Jersey have borne the solemn responsibility to keep their residents safe. That includes protecting residents from the modern scourge of mass shootings, and from the extraordinarily dangerous weapons that facilitate them. While the Second Amendment takes certain responses off the table, reflecting individuals' rights to have arms with which they can defend themselves, the right to keep and bear arms has never been understood as "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Dist. of Colum. v. Heller*, 554 U.S. 570, 626 (2008). Like a range of other States, and like the Federal Government for a decade, New Jersey therefore restricts assault weapons and large-capacity magazines (LCMs) within its borders.

Every circuit to consider Second Amendment challenges to similar laws after *Bruen* has rejected them, *see Bianchi v. Brown*, 111 F.4th 438, 464 (4th Cir. 2024) (en banc); *Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), 95 F.4th 38 (1st Cir. 2024); *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024); *Bevis v. City of Naperville*, 85 F.4th 1175, 1195-97 (7th Cir. 2023), and this Court should do the same. Initially, the restricted weapons—an enumerated list of features and models that constitute "assault weapons," and magazines with capacity greater than ten—lie outside the Second Amendment right. The central component of this constitutional right is the right of civilians to engage in self-defense, and so the kinds of weapons

the Second Amendment protects are those "in common use today for self-defense." *NYSRPA v. Bruen*, 597 U.S. 1, 32 (2022). But assault weapons and LCMs are poorly suited to civilian self-defense while being well-suited to combat and crime: they are designed for long-range combat scenarios to kill as many combatants as quickly as possible. And because they pose significant threats to family members, bystanders, and law enforcement if used in self-defense, they are rarely used in such scenarios—and are disproportionately used in mass shootings instead. The reality is that "assault weapons and [LCMs] are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for self-defense." *Bevis*, 85 F.4th at 1195-97. Much like courts have consistently held the machinegun lies outside the Second Amendment's original scope, the same is true here.

But even if assault weapons and LCMs were within the Second Amendment's self-defense right, the State's restriction would still be "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). At every period of this Nation's history, a range of States have relied on the "tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians" while leaving open avenues for civilian self-defense. *Bianchi*, 111 F.4th at 471-72; *Bevis*, 85 F.4th at 1199-1202; *OST*, 95 F.4th at 45-52; *Hanson*, 120 F.4th at 237-40. Like limits on machineguns, restrictions on assault weapons and LCMs fit that tradition:

after the "potential for widespread criminal abuse or unreasonable capacity to inflict casualties became apparent," New Jersey restricted them—while still "protecting the core right of citizens to defend themselves." *Bianchi*, 111 F.4th at 464. This Court should reject Plaintiffs' effort to upend that long historical tradition.

Our country is plagued by an epidemic of mass shootings. Not every citizen, and not every State, agrees on the proper policy solution to this crisis. But within the bounds of the Second Amendment, "federalism and democracy" have a fundamental role to play. *Id.* at 467. So when faced with evidence that assault weapons and LCMs are being used with ever more frequency in mass shootings, to ever more devastating effect, New Jersey sensibly chose to restrict the extraordinary modern weapons that make them possible. New Jersey did so by restricting only weapons that are ill-suited to self-defense and scarcely used for that purpose. And in restricting only unusually dangerous weapons, New Jersey did just what legislatures across States and across centuries have done in response to public-safety crises. "These are not our forebears' arms, and these are not our forebears' calamities." *Id.* at 464. But the principles that our forebears sensibly adopted permit precisely these democratic responses.

Because the district court acted consistent with history and precedent when it upheld New Jersey's restriction on LCMs, but erred in invalidating the restriction on the Colt AR-15, this Court should affirm in part and reverse in part.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3). This Court has jurisdiction under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

I.    Whether New Jersey's assault firearms and LCMs laws violate the Second Amendment.

II.    Whether New Jersey's LCM law violates the Takings Clause.

## RELATED CASES AND PROCEEDINGS

The State adopts Plaintiffs' statements of related cases and proceedings.

## COUNTERSTATEMENT OF THE CASE

A.    New Jersey's Assault Weapons and Magazine Capacity Restrictions.

In 1990, following a mass shooting at a California school where the shooter killed five children and wounded thirty-three others using an AK-47 and a handgun, New Jersey enacted a law restricting the possession of assault weapons. P.L. 1990, ch. 32, *codified at* N.J. Stat. Ann. § 2C:39-1(w)(1); *see* JA1056 (Spitzer Rpt. ¶1). In his signing statement, Governor Jim Florio recognized the "wholesale destruction" these weapons inflict, making them a "direct threat to our police, our citizens and especially our children." JA4651. The law, he explained, targets only those weapons "designed to wipe out the greatest number of people in the shortest possible time," JA4652, while leaving in civilians' hands the weapons needed for self-defense.

The 1990 Act's prohibition on "assault firearms" excludes most handguns and rifles, which remain generally available subject to generally applicable permitting and background check requirements. *See* N.J. Stat. Ann. § 2C:58-3. The Act lists the specific firearms prohibited under the defined term "assault firearm," *id.* § 2C:39-1(w)(1), and captures copycat designs by restricting "[a]ny firearm manufactured under any designation which is substantially identical to any of the firearms listed" in subsection (w)(1). *Id.* § 1(w)(2). New Jersey law also clarifies the features that characterize an impermissible "assault firearm": "[a] semiautomatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock;" "[a] semiautomatic rifle with a fixed magazine capacity exceeding 15 rounds;" and "[a] part or combination of parts designed or intended to convert a firearm into an assault firearm," or "from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person." *Id.* § 1(w). In 2017, the definition of "assault weapon" was amended to include "[a] firearm with a bump stock attached." P.L. 2017, ch. 323 § 1(w)(6).

In August 1996, Attorney General Peter Verniero issued guidelines on the criteria that render an arm "substantially identical," N.J. Stat. Ann. § 2C:39-1(w)(2), to the listed "assault firearms" under §1(w)(1). Under the *Guidelines*, a weapon is "substantially identical" if it shares certain features with those arms, including "the ability to accept a detachable magazine," "a folding or telescoping stock," a "pistol

grip … protrud[ing] conspicuously beneath the action of the weapon," "a bayonet mount," "a flash suppressor or threaded barrel designed to accommodate a flash suppressor," and a "grenade launcher." *See Guidelines Regarding the "Substantially Identical" Provision* (1996), https://nj.gov/lps/dcj/agguide/assltf.htm.

New Jersey also sets the permissible capacity for a magazine. In 1990, the Act defined an impermissible "large capacity ammunition magazine" to mean "a box, drum, tube, or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." P.L. 1990, ch. 32 § 1(y). But in 2018—as the threat of mass shootings, often with LCMs, proliferated—New Jersey enacted P.L. 2018, Chapter 39 (A2761), which revised the definition of an unlawful "large capacity ammunition magazine" to 10 rounds. *See* N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j). While the law restricts the capacity of a magazine, it imposes no limitation on the number of magazines— or the amount of ammunition—a person can lawfully possess.

Chapter 39 gave owners of prohibited magazines 180 days to comply with the revised limit. *Id.* § 2C:39-19. Owners could comply in several ways: "[t]ransfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine; [r]ender the semi-automatic rifle or magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less; or [v]oluntarily surrender the semi-automatic rifle or magazine."

*Id.* Chapter 39 also created exemptions for firearms "with a fixed magazine capacity [of up to] 15 rounds which is incapable of being modified to accommodate 10 or less rounds" and a "firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds." *Id.* § 2C:39-20(a). Owners of those weapons simply had to register them within one year of the law's effective date. Both the 1990 Act and Chapter 39 contain certain exemptions, including for law enforcement, that are not applicable here.

B.    Procedural History.

On the same day Chapter 39 was signed into law, the *ANJRPC* Plaintiffs sued, alleging that New Jersey's LCM restriction violates the Second Amendment and the Takings Clause. This Court upheld the LCM restriction at the preliminary-injunction and summary-judgment stages using intermediate scrutiny, but ultimately remanded to the district court after the Supreme Court decided *Bruen*. On remand, the *ANJRPC* Plaintiffs filed an Amended Complaint. JA134.

Meanwhile, two other groups commenced new suits shortly after *Bruen*, now also challenging New Jersey's limits on assault firearms. *See Cheeseman v. Platkin*, No. 22-4360 (D.N.J.) (JA150); *Ellman v. Platkin*, No. 22-4397 (D.N.J.) (JA186). The district court consolidated these matters. No. 18-10507, ECF 148 (Feb. 6, 2023); ECF 168 (Sept. 12, 2023). The parties engaged in extensive consolidated discovery,

including exchanging expert reports and conducting depositions.[1] The parties filed *Daubert* motions and cross-moved for summary judgment.

The district court denied the parties' motions to exclude, and partially granted and denied their summary-judgment motions. JA6-8. Because the court found that the "record is complex and broad," it "relie[d] upon the information it believe[d] to be most credible in making this decision," and denied the evidentiary motions. JA20-21. On the merits, the court explained that Plaintiffs had "focus[ed] their arguments on the AR-15" and had not provided "sufficient information" regarding other assault weapons like the CAR-15 or bump stocks, and so it narrowed the scope of their motion to the "Colt AR-15." JA12-14 & n.5. The court then declared the Colt AR-15 restriction unconstitutional, reasoning that it was an arm "in common use for self-defense." JA56; JA56-64 (declining to "undertak[e] the analytical dive into the historical analogues [the State] provided"). As for LCMs, the district court held that this restriction fit "precisely" the "tradition of prohibiting a subset of arms that could be useful and had become common for self-defense yet nevertheless posed a threat to public safety," JA67-75. And the court rejected the *ANJRPC* Plaintiffs' takings claim since the "exact issue was already addressed and decided by the Third Circuit." JA76 (citing *ANJRPC v. Atty Gen.*, 910 F.3d 106 (3d Cir. 2018) (*ANJRPC I*)).

---

[1] The *Cheeseman* Plaintiffs proffered no experts. No Plaintiffs deposed any of the State's expert witnesses.

The parties timely cross-appealed, JA1-2; JA3-4; JA7938-41, and agreed to a stay pending appeal. *See* DNJ No. 18-10507, ECF 236 (Aug. 21, 2024).

## SUMMARY OF ARGUMENT

I.      As every circuit to consider the question has held, States may restrict assault weapons and LCMs without violating the Second Amendment.

A.      Initially, both assault weapons and LCMs fall outside the scope of the Second Amendment right. The original scope of the right was to protect individuals' ability to defend themselves, which means that the weapons protected by the Second Amendment are the ones "in common use today for self-defense." *Bruen*, 597 U.S. at 32. That inquiry turns on whether the particular weapons at issue are well suited to self-defense and widely used for that purpose, or whether its characteristics make the weapon "excessively dangerous" and "ill-suited and disproportionate to" the core self-defense purpose. *Bianchi*, 111 F.4th at 451-52. As the record below establishes, the features of assault weapons and LCMs—like the features of the M16 itself—are unnecessary for individual self-defense, instead facilitating combat at long distances against large numbers of enemies. Indeed, the features of assault weapons and LCMs are actually ill-suited for self-defense, because they risk injuries to family members, bystanders, and law enforcement, and they inflict injuries far greater than needed for self-defense. In short, "assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different

9

types of firearms that are used for self-defense." *Bevis*, 85 F.4th at 1195-97; *accord Bianchi*, 111 F.4th at 454-59. Plaintiffs' contrary theory of common use—based on whether a weapon is commonly owned, rather than whether it is used or even useful for self-defense—conflicts with broader doctrine, logic, limits on machineguns, and Supreme Court precedents. Nor, in any event, are LCMs "Arms" under the Second Amendment, as they were historically understood to be accessories.

B.     Even were such weapons to fall within the Second Amendment's scope, the State's restrictions remain lawful because they are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. As all four circuits to analyze similar challenges have held, restrictions on assault weapons or LCMs fit the "tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians" while leaving open ample avenues for civilian self-defense. *Bianchi*, 111 F.4th at 471-72; *Bevis*, 85 F.4th at 1199-1202; *OST*, 95 F.4th at 45-52; *Hanson*, 120 F.4th at 237-40. States have for centuries responded to technological advancements in firearms that "contributed to [a] rise in interpersonal violence" by restricting those weapons—and even prohibiting them entirely—once their impact become clear. *Bianchi*, 111 F.4th at 465. That is what New Jersey has done in restricting weapons that facilitate "mass shootings to a degree impossible with Founding or Reconstruction era weapons." *Hanson*, 120 F.4th at 240-42; *Bianchi*, 111 F.4th at 463-64. Although Plaintiffs again

say that States can never prohibit a weapon in sufficient circulation—no matter how dangerous—that is contrary to reams of historical evidence.

II.    The takings claim fails. This Court already found that this LCM law did "not result in either an actual or regulatory taking," *ANJRPC I*, 910 F.3d at 124-25 & n.32, which reflects law of the case. Plaintiffs point to no intervening precedent, but rest on pre-*ANJRPC I* decisions that this Court acknowledged and distinguished. Regardless, *ANJRPC I* was right: the law imposes no taking, because the LCM law does not require owners to turn over their magazines to the State.

## STANDARD OF REVIEW

In "resolving cross-motions for summary judgment," this Court "exercise[s] plenary review," "applying the same standards and presumptions as the District Court." *Mid-Century Ins. v. Werley*, 111 F.4th 200, 207 (3d Cir. 2024). The movant should prevail if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). And at "summary judgment, all reasonable inferences from the record must be drawn in favor of the nonmoving party, and the court may not weigh the evidence or assess credibility." *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (cleaned up).

## **ARGUMENT**

New Jersey's assault-weapons and LCM measures violate neither the Second Amendment nor the Takings Clause.

## I. **NEW JERSEY'S ASSAULT WEAPONS AND LCM LAWS DO NOT VIOLATE THE SECOND AMENDMENT.**

Under each part of the Second Amendment analysis, the State's laws survive. First, Plaintiffs cannot demonstrate that "the Second Amendment's plain text covers [their] conduct," *Bruen*, 597 U.S. at 24, in light of the original understanding of that right. Second, the challenged laws fall well within "the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692. For either or both reasons, this Court should join all four circuits to consider these challenges and uphold the law.[2]

---

[2] Beyond the four circuits that rejected similar challenges, a chorus of district courts have done the same: *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-710, ___ F. Supp. 3d ____, 2024 WL 3466482 (D. Vt. July 18, 2024); *Rupp v. Bonta*, 723 F. Supp. 3d 837 (C.D. Cal. 2024); *Capen v. Campbell*, 708 F. Supp. 3d 65 (D. Mass. 2023); *Nat'l Ass'n for Gun Rights v. Lamont* ("*NAGR*"), 685 F. Supp. 3d 63 (D. Conn. 2023); *Brumback v. Ferguson*, No. 22-3093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874 (D. Or. 2023); *Hartford v. Ferguson*, 676 F. Supp. 3d 897 (W.D. Wash. 2023); *Hanson v. District of Columbia*, 671 F. Supp. 3d 1 (D.D.C. 2023), *aff'd*, 120 F.4th 223; *Herrera v. Raoul*, 670 F. Supp. 3d 665 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175; *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023), *aff'd on other grounds by* 108 F.4th 194 (3d Cir. 2024); *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175. *But see Miller v. Bonta*, 699 F. Supp. 3d 956 (S.D. Cal. 2023), *stayed pending appeal*, 2023 WL 11229998 (9th Cir. Oct. 28, 2023); *Duncan v. Bonta*, 695 F. Supp. 3d 1206 (C.D. Cal. 2023), *stayed pending appeal*, 83 F.4th 803 (9th Cir. 2023).

A.   <u>Plaintiffs Cannot Show That Possessing Assault Weapons Or LCMs Is Protected By The Second Amendment.</u>

Before determining whether state restrictions on assault weapons or LCMs are within our Nation's historical principles, this Court must assess whether they receive Second Amendment protection at all. That threshold inquiry is "rooted in the Second Amendment's text, as informed by history," *Bruen*, 597 U.S. at 19, and asks whether these weapons fall "with[in] the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. These weapons do not: neither assault weapons nor LCMs are "in common use today for self-defense," *Bruen*, 597 U.S. at 20, 32 (quoting *Heller*, 554 U.S. at 576-78, 627), and LCMs are not even "Arms."

1.   *These Weapons Are Not In Common Use For Self-Defense.*

The "sorts of weapons protected" by the Second Amendment are only those "in common use at the time for lawful purposes like self-defense," *Heller*, 554 U.S. at 624-25, 627. Assault weapons and LCMs do not qualify.

a.   <u>Assault Weapons And LCMs Are Not Well-Adapted or Widely Used For Self-Defense.</u>

Plaintiffs' conduct falls outside the Second Amendment, because the assault weapons and LCMs they would possess are not in common use for self-defense. The "right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever

13

and for whatever purpose." *Heller*, 554 U.S. at 626. Rather, because "self-defense is 'the central component' of the Second Amendment," *Bruen*, 597 U.S. at 24, 32, the right is concerned with ensuring individuals have arms with which they can protect themselves; it "is not concerned with ensuring citizens have access to military-grade or gangster-style weapons." *Bianchi*, 111 F.4th at 452; *see Bevis*, 85 F.4th at 1194 (explaining that the Second Amendment focuses on self-defense and does not protect "weapons that are exclusively or predominantly useful in military service"). That is, while the constitutional right "jealously safeguards the right to possess weapons that are most appropriate and typically used for self-defense," it "emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to such a purpose." *Bianchi*, 111 F.4th at 452. Early original sources, too, support this limitation. *Id.* at 450 (citing Blackstone and antebellum decisions for the holding that weapons "not reasonably related or proportional to the end of self-defense" were "understood to fall outside the reach of the right").

In assessing whether an arm is in common use for self-defense, courts assess the objective features and actual uses of the weapon. While the Supreme Court "has not yet had the opportunity to clarify the full array of weaponry that falls outside the ambit of the Second Amendment," it has previously evaluated the suitability of the weapon's features for self-defense or for military or offensive use instead. *Compare Heller*, 554 U.S. at 622-24, 629 ("examin[ing]" handgun's objective "character" and

"nature"—such as its ease of usage in one hand, and its ease of storage—that make it the "the quintessential self-defense weapon" and entitled to protection), *with id.* at 621-22, 624-25, 627 (endorsing bans on short-barreled shotguns and machineguns) *and Bianchi*, 111 F.4th at 451 (describing the dangerous features of a short-barreled shotgun, including its "more destructive power" making it "desirable to malefactors and crooks") *and United States v. One Palmetto State Armory*, 822 F.3d 136, 142 (3d Cir. 2016) (agreeing machineguns warrant no protection given the "exceedingly dangerous" features that make them "primarily weapons of war" and "gangster-type weapons"). Simply put, the question courts have asked is whether a weapon is "well adapted for self-defense" and widely "employed for self-defense," *DSSA*, 108 F.4th at 212 (Roth, J., concurring); *accord Bianchi*, 111 F.4th at 450 (assessing weapon's suitability to self-defense and whether weapon is "typically used by average citizens for self-defense"), or whether its characteristics make it "excessively dangerous" and "ill-suited and disproportionate" to self-defense, *Bianchi*, 111 F.4th at 451-52.

As this record confirms, assault weapons and LCMs are neither adapted nor typically used for self-defense. Consider the features of the restricted items:

**History.** "The intertwined origins of the AR-15[3] and its military version, the M16, show that these weapons were intended for offensive combat applications

---

[3] Although Plaintiffs spill considerable ink arguing that their challenge covers other restricted weapons too, *see* ANJRPC Br. 33-38, they acknowledge "the AR platform

rather than individual self-defense." *Bianchi*, 111 F.4th at 454; *see also Heller*, 554 U.S. at 624, 627 (noting weapons "most useful in military service—M-16 rifles and the like—may be banned" and that a contrary view granting machineguns protection would be "startling"). The record confirms the AR-15 was designed and developed in the 1950s to meet Army specifications. JA1832-33 (Yurgealitis Rpt. ¶¶54-56). After testing against Viet Cong combatants found that the individuals shot suffered "catastrophic injuries … including severing of limbs and decapitation," the AR-15 "was adopted as standard issue by the U.S. Army in the mid 1960's" and renamed the M-16. *Id.* (Yurgealitis Rpt. ¶¶56-57). Colt "sought to capitalize on the military acceptance of the AR-15/M-16," "incorporat[ing] the same construction techniques and configuration as the AR-15 for sale on the civilian market." JA1839 (Yurgealitis Rpt. ¶72); *see also Bianchi*, 111 F.4th at 454.

LCMs bear a similar "military heritage." JA1846 (Yurgealitis Rpt. ¶91). The earliest LCMs with magazine capacity beyond 10 rounds were designed specifically for use by soldiers during World War II. JA1839, 1847 (Yurgealitis ¶¶73, 95-96); *see also* JA1855 (Yurgealitis ¶110) (LCMs were "intended for military use"). They were "developed for military use and allowed soldiers to fire without pausing to reload." *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 909-10 (D. Or. 2023).

---

typically has the features the state has banned," Br. 35, and thus provides one useful illustration of these weapons' unsuitability to civilian self-defense.

And tellingly, manufacturers marketed both LCMs and assault weapons as military weaponry principally intended for offensive use. *See* JA1093-97 (Spitzer Rpt. ¶¶50-58) (collecting examples); JA1843-45 (Yurgealitis Rpt. ¶¶85-88). Indeed, "[t]he use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public." JA1093 (Spitzer Rpt. ¶51).

**Design Features**. Given their common history, it is little wonder "the AR-15 is almost the same gun as the M16 machinegun." *Bevis*, 85 F.4th at 1195-97; *accord Bianchi*, 111 F.4th at 454-56. Both models share the same "effective range, muzzle velocity[,] and semiautomatic rate of fire." JA1839 (Yurgealitis ¶73). Both "share the same core design, and both rely on the same patented operating system." *Bevis*, 85 F.4th at 1195-96. In fact, "the basic configuration, appearance, construction and operation" of the weapon's internal systems "has remained unchanged" since its first use "as a military weapon," and there "are multiple internal parts that are completely interchangeable between military M16's manufactured in the 1960's by Colt and an AR-15 type rifle produced today." JA1839 (Yurgealitis Rpt. ¶¶73-74). Furthermore, "[m]ost versions of the AR-15, like the M16, use detachable 20-round or 30-round magazines that increase the weapon's effective rate of fire and are most useful in prolonged firefights with enemy combatants." *Bianchi*, 111 F.4th at 455; *accord* JA1839 (Yurgealitis Rpt. ¶73).

The enumerated features that render an arm "substantially identical" to listed assault weapons like the AR-15 "increas[e] the firearm's effectiveness in a combat scenario" but have limited individual self-defense usages. JA1857-59 (Yurgealitis Rpt. ¶¶117-129). Among the "combat-functional features" are a "pistol grip that enables fast reloading and accuracy during sustained firing," and "a barrel shroud to protect the shooter's hands from excessive heat during sustained firing." *Bianchi*, 111 F.4th at 455; JA1858-59 (Yurgealitis Rpt. ¶¶122, 127). Others "include a flash suppressor that conceals the shooter's position and facilitates night combat" and "a threaded barrel for affixing of a flash suppressor, recoil compensator, or silencer." *Bianchi*, 111 F.4th at 455; JA1858-59 (Yurgealitis Rpt. ¶¶125, 128).

Although Plaintiffs will emphasize that the M16 can fire automatically while the AR-15 is a semiautomatic weapon, that "pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar." *Bianchi*, 111 F.4th at 456; *accord Bevis*, 85 F.4th at 1195-96. For one, the U.S. Army Manual recognizes the "most important firing technique during modern, fast moving combat is rapid semiautomatic fire"—not automatic fire. JA1867-68 (Yurgealitis Rpt. ¶158); *see Bianchi*, 111 F.4th at 456. For another, the similarities between the AR-15 and M-16 "only increase[]" when accounting for "how easy it is to modify the AR-15" to make it, "in essence, a fully automatic weapon." *Bevis*, 85 F.4th at 1196. "[D]evices like bump stocks, trigger cranks, and binary triggers" are now

known "techniques for firing semiautomatic firearms at rates approaching those of some machine guns." *Bianchi*, 111 F.4th at 456 (quoting *Garland v. Cargill*, 602 U.S. 406, 411 (2024)). The Supreme Court has thus long recognized that "[t]he AR-15 is the civilian version of the military's M-16 rifle" which can be easily "modified" to fire automatically. *Staples v. United States*, 511 U.S. 600, 603 (1994).

**Lethality.** These militaristic features of assault weapons and LCMs result in "phenomenal lethality." *Bianchi*, 111 F.4th at 455 (citation omitted). The restricted assault weapons were "designed to be effective at battlefield ranges of up to 500 yards" with a "typical muzzle velocity" of 3,200 feet per second: at that range and with that velocity, their design is "intended to kill or incapacitate enemy combatants at distances of hundreds of yards[,] not dozens of feet." JA1861 (Yurgealitis Rpt. ¶137); *accord Bianchi*, 111 F.4th at 455. Their velocity also produces extraordinary damage to the body, far more than needed to neutralize an attacker: modeling shows that the AR-15's bullets release with "significantly greater" energy than a handgun or even the Thompson machinegun, and thus cause "significantly larger" cavities in the human body. JA1560-61 (Hargarten Rpt. ¶¶25-28); *accord Bianchi*, 111 F.4th at 455. The State's expert emergency room physician added that assault weapons put "critical solid organs" at higher risk, particularly for children; more likely "result[s] in veins and arteries torn, which increases the risk of catastrophic bleeding"; and are more likely to cause significant damage to bones and skeletal structure." JA1562

(Hargarten Rpt. ¶32). Simply put, "AR-15 style weapons are capable of inflicting enormous damage on the human body, especially for children." *Id.*; *accord Bianchi*, 111 F.4th at 455 (wounds "often cannot be repaired" by surgeons).

LCMs likewise increase mass lethality considerably: they offer "the ability to fire an increased quantity of cartridges without reloading," thereby "increas[ing] the lethality and effectiveness of small arms in combat." JA1855 (Yurgealitis Rpt. ¶110); JA1561 (Hargarten Rpt. ¶30). Medical risks are "amplified when there are multiple bullet wounds," causing "multiple cavities with energy being transferred to different places inside the body, which means the victim's wounds are typically more complex, carry a higher likelihood of injury requiring surgical intervention, and carry a higher likelihood of death." JA1562-63 (Hargarten Rpt. ¶34). Indeed, the average number of casualties in mass shootings is higher when the perpetrator uses assault weapons or LCMs: their usage "has resulted, correspondingly, in 67% and 58% increases in average fatalities per incident." JA1638 (Klarevas Rpt. ¶16); *see also* JA1498 (Allen Rpt. ¶¶32-33) (similar findings); JA1751-54 (Webster Rpt. ¶¶9-13) (citing studies). And the results are even starker when used together: "LCMs with an assault weapon resulted in … a 92% increase in the average death toll associated with incidents that involved neither LCMs nor assault weapons." JA1639 (Klarevas Rpt. ¶17); *see also* JA1498 (Allen Rpt. ¶34) (similar findings). In short,

"magazine capacity directly corresponds to lethality." *OST*, 95 F.4th at 47; *accord Bevis*, 85 F.4th at 1201 n.12.

Individually and taken together, these features of assault weapons and LCMs make them "ill-suited for civilian self-defense." JA1855 (Yurgealitis Rpt. ¶111). As to the AR-15, "many of the weapon's combat-functional features make it ill-suited for the vast majority of self-defense situations in which civilians find themselves." *Bianchi*, 111 F.4th at 458. For one, these weapons lack the very advantages *Heller* emphasized for handguns: "the AR-15 is heavier, longer, harder to maneuver in tight quarters, less readily accessible in an emergency, and more difficult to operate with one hand." *Id.* at 458-59 (citing 554 U.S. at 629). For another, they are "significantly less concealable than a handgun and much more difficult to carry while conducting daily activities" in public. *Id.* The AR-15's added features are unnecessary for self-defense, when there is no need for a grip that allows "fast reloading" or a shroud to protect one's hands from "excessive heat" during "sustained firing," as civilian self-defense episodes involve no such sustained firing. *Id.* at 455; *accord id.* at 463 ("AR-15s and the like are designed to empower an individual soldier to kill as many people in as little time as possible."). Nor does self-defense require features that facilitate shooting at long-distance ranges of 500 yards. *Id.* And LCMs are likewise "ill-suited for typical self-defense scenarios," *id.*, since "civilian self-defense rarely—if ever—

calls for the rapid and uninterrupted discharge of many shots." *OST*, 95 F.4th at 45; JA1861 (Yurgealitis Rpt. ¶137).

To the contrary, these particular features of assault weapons and LCMs render them disproportionate or dangerous in self-defense episodes. Most obviously, "firing an AR-15 in close quarters will often put the safety of cohabitants and neighbors in jeopardy." *Bianchi*, 111 F.4th at 458. "Projectiles travelling at velocities found in banned weapons pose a serious risk of over-penetration in most home construction materials"; an NRA experiment found bullets fired by the AR-15 "easily penetrated" walls made of sheet rock and continued to "explode[] one-gallon water jugs placed 3 feet behind the wall." JA1861-82 (Yurgealitis Rpt. ¶¶137-39). Such firepower also "pose[s] a significant risk to law enforcement," as the "body armor issued to most" officers are designed for handgun bullets with a muzzle velocity of up to 1,200 feet per second—2,000 feet per second fewer than the AR-15's. JA1867 (Yurgealitis Rpt. ¶156). The disproportionality of assault weapons for self-defense is likewise made clear by the heightened risk of organ damage a trauma surgeon cannot repair, which is disproportionate to neutralizing an attacker. JA1562 (Hargarten Rpt. ¶32). That is, the "military origination, combat-functional features, and extraordinary lethality" of assault weapons suit them better for the battlefield than self-defense—like the M16 with which they share "the same basic characteristics, functionality, capabilities, and potential for injury." *Bianchi*, 111 F.4th at 459. So too for LCMs, whose function—

"rapidly hit[ting] very many human targets"—is indeed "conducive to combat in war zones" but "is not a useful feature for self-defense." *OST*, 95 F.4th at 49. In short, these weapons "are much more like machineguns and military-grade weaponry" than firearms typically "used for individual self-defense." *Bevis*, 85 F.4th at 1195.

The district court misunderstood the evidence regarding the AR-15 features. Initially, the district court appears to have simply overlooked a vast quantum of the record: it believed that the record had "evidence only that the AR-15 was developed from what was originally a military-style weapon during the Vietnam War" and did not have evidence that would allow for a determination that the AR-15 "is a weapon most-suited to military use." JA59. But this brief lays out the evidence—as well as extensive case law—discussing those features and their combat uses. *See Zamichieli v. Andrews*, No. 21-2522, 2024 WL 3466241, at *1 (3d Cir. July 19, 2024) (holding that "ignoring material evidence" at summary judgment is "reversible error"). And while the district court identified certain features it believed might make the AR-15 "well-suited to self-defense," each applies to the M16 as well. *Compare* JA57 (citing "light weight, mild recoil," and "good ergonomics"), *with Bianchi*, 111 F.4th at 455-56 (citing M16's "comparative lack of recoil" which facilitates rapid shooting and is therefore "uniquely dangerous"), and *compare* JA57 (discussing "effectiveness of its cartridge for self-defense use"), *with Bianchi*, 111 F.4th at 454 (AR-15 and M16 have "same internal piston firing system"). Nor did the district court detail why such

features would be useful in self-defense or overcome the "many" "combat-functional features" that render the AR-15 so "ill-suited for the vast majority of self-defense situations in which civilians find themselves." *Bianchi*, 111 F.4th at 458.

Furthermore, that assault weapons and LCMs are poorly suited for individual self-defense is confirmed by actual use. *See Bianchi*, 111 F.4th at 450, 460 (assessing "instances of 'active employment' of the weapon" to determine whether weapon is "typically used by average citizens for self-defense"); *DSSA*, 108 F.4th at 212 (Roth, J., concurring) (asking if weapon is widely "employed for self-defense"). Although assault weapons and LCMs are disproportionately used in mass shooting episodes, they are disproportionately unused for self-defense. Below, the State presented FBI evidence that between 2000 and 2022, only once out of 456 active shootings did an "armed civilian interven[e] with an assault weapon." JA1646 (Klarevas Rpt. ¶26). Similarly, another statistical expert concluded that out of a sample of 2,714 defensive gun incidents between January 2019 and October 2022, a "rifle" was used in 51— just 2% of all recorded incidents and 4% of incidents in which the firearm type was known. JA1490-92 (Allen Rpt. ¶¶20-23). And since "rifle" includes more than just assault weapons, this likely overcounts their use in self-defense. That demonstrates proportionally rare self-defense. *See DSSA*, 108 F.4th at 212 (Roth, J., concurring) (noting "evidence that … a widely possessed weapon is occasionally used in self-defense is not, alone, enough" for common use).

LCMs are likewise rarely employed for self-defense, if ever. The same expert found that out of "almost 1,000 incidents of self-defense" culled from two datasets, "in only 0.2% … were more than 10 rounds used." JA1489-90 (Allen Rpt. ¶18). In fact, there were just *two* such cases, and "according to the news stories on these two incidents, the defenders did not appear to need to fire more than 10 shots to defend themselves." JA1479 (Allen Rpt. ¶5 n.2). As the expert explained, in 98% of the incidents, the defender fired between zero and five shots. JA1482-83 (Allen Rpt. ¶¶9-10). Overall, civilian defenders fired an average of 2.2 shots. *Id.* "Plaintiffs have not shown that LCMs are commonly employed for self-defense," while the State has "show[n] that they are not." *Kotek*, 682 F. Supp. 3d at 921-22.

By contrast, assault weapons and LCMs are disproportionately used in exactly the ways their features would suggest: for offensive and criminal use. While assault rifles constitute (at most) 3-5% of firearms in civilian circulation, JA1754 (Webster Rpt. ¶13); JA1635 (Klarevas Rpt. ¶14), they are used in 24% of mass shootings with at least four fatalities, JA1497 (Allen Rpt. ¶30); *accord Bianchi*, 111 F.4th at 456. In other words, assault weapons are used "in fatal mass shootings at percentages five to ten times higher than they would be by chance or if weapon features played no role in these acts of violence." JA1754 (Webster Rpt. ¶13); JA1635-36 (Klarevas Rpt. ¶14). So too attacks on law enforcement: "[d]espite the relative rarity of assault weapons, studies have estimated that they have been used to gun down between 13%

to 20% of those officers killed in the line of duty." *Bianchi*, 111 F.4th at 457; *see also* JA1753 (Webster Rpt. ¶12). And while it is difficult to assess the percentage of LCMs relative to all detachable magazines possessed, *see Kotek*, 682 F. Supp. 3d at 914, they were used in up to 63% of mass shootings, JA1498 (Allen Rpt. ¶31), and 41% of firearms-involved police killings, JA1753 (Webster Rpt. ¶12); JA1628-34 (Klarevas Rpt. ¶12-13) (finding that percentage of recent mass shootings with LCMs rose from 77% to 100%, and those involving assault weapons rose to 53%).

Assault weapons' and LCMs' "all too frequent use in terrorism, mass killing, and police murder" confirms they "offer[] firepower ill-suited and disproportionate to fulfilling the Second Amendment's purpose of armed self-defense." *Bianchi*, 111 F.4th at 459. They are not well suited or widely used to exercise that right, but rather are "most useful in military service" and criminality and fall outside the scope of the original constitutional right. *Id.*; *accord Bevis*, 85 F.4th at 1195-97.

### b.    Plaintiffs' Counterarguments Fall Short.

Because Plaintiffs cannot establish that the assault weapons and LCMs they seek to possess are commonly used in self-defense, they resist this test in two ways. First, they claim that the common-use test is not part of this threshold inquiry at all. ANJRPC Br. 25-29; Cheeseman Br. 23-30. Second, they argue "common use" refers exclusively to the number of items in circulation, and not their usefulness and actual use. ANJRPC Br. 29-31, 40-42; Cheeseman Br. 30-38. Both responses fail.

1. To start, the common-use analysis is a part of the Court's threshold inquiry into the scope of the Second Amendment's original right. *See, e.g. United States v. Price*, 111 F.4th 392, 398-402 (4th Cir. 2024) (en banc) (common use is a "step-one inquiry"); *Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *DSSA*, 108 F.4th at 207, 210-11 (Roth, J., concurring). The Second Amendment states that "the right of the people to keep and bear Arms[] shall not be infringed." Plaintiffs myopically contend that because "common use" and "self-defense" do not appear in that phrase, these concepts have no role in *Bruen*'s threshold step of determining the scope of the right.

But that is not how constitutional interpretation works. *See Bianchi*, 111 F.4th at 447-48; *Bevis*, 85 F.4th at 1194. The Sixth Amendment guarantees "the right to a speedy and public trial, by an impartial jury" without requiring juror unanimity, but that right's "original public meaning"—defined by "common law, state practices in the founding era, [and] opinions and treatises written soon afterward"—demands unanimity. *Ramos v. Louisiana*, 590 U.S. 83, 89-93 (2020). That Amendment also guarantees an accused "the right … to be confronted with the witnesses against him," but the Court has "turne[d] to the historical background of the Clause" to limit that right's scope to "testimonial statements" only. *Crawford v. Washington*, 541 U.S. 36, 42-53 (2004). And the First Amendment' protection of free speech was "enacted against a backdrop of laws and societal understandings" that allowed "governmental

restrictions on libel, incitement, true threats, [and] fighting words," even though each would "fall within a literal reading of the word 'speech,'" *Bianchi*, 111 F.4th at 447-48. In each context, original evidence situates the right codified in the text.

The Second Amendment operates just like these provisions—as its plain text reveals. The Second Amendment enshrines the "right" to keep "arms," which cannot be "infringed." That is, the Constitution "codified a *pre-existing* right" to arms. *See Heller*, 554 U.S. at 592; *id.* at 634-35 (emphasizing "rights are enshrined with the scope they were understood to have when the people adopted them"); *Bianchi*, 111 F.4th at 447 (codification of "the right to keep and bear arms" represents a "specific entitlement with a particular meaning in the ratifying public's consciousness, with baked-in prerogatives and qualifications alike."). Determining what arms fall within the scope of that pre-existing "right," and thus what cannot be "infringed," therefore requires "consult[ing] history to determine [its] scope." *Bruen*, 597 U.S. at 25; *see Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021) (confirming "when we sketch the right's scope, our inquiry remains rooted in historical practices"). That allows courts to assess whether a weapon gets Second Amendment protection in the first place, before then assessing whether any subsequent restriction falls within our regulatory tradition. *See Heller*, 554 U.S. at 623 ("[T]he Second Amendment right, whatever its nature, extends only to certain types of weapons.").

And that is where common-use fits: "Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense." *Bevis*, 85 F.4th at 1192-94. As to history, multiple contemporaneous sources confirm the Second Amendment exclusively encompasses such arms. For one, the 1689 English Bill of Rights, "the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, "explicitly protected a right to keep arms for self-defense," *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010), and ensured a right to "have Arms for their Defence suitable to their conditions" only "as allowed by Law." 1 Wm. & Mary, ch. 2, § 7 (1689) (emphasis added). This qualification authorized governments to "restrain the use of some particular sort of arms." Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17-18 (1782). For another, Blackstone—"the preeminent authority on English law for the founding generation—similarly defined the right as "the right of having and using arms for self-preservation and defence." *Heller*, 554 U.S. at 593-94. And "nine state constitutional provisions written in the 18th century or the first two decades of the 19th century … enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.'" *Id.* at 584-85 & n.8. These sources underscore that "individual self-defense is the central component of the Second Amendment right," as originally understood and written. *Bruen*, 597 U.S. at 29 (quoting *McDonald*, 561 U.S. at 767).

Precedent is in accord with history. *Bruen* explained there are two parts of the Second Amendment test: evaluating whether the conduct falls within the scope of the right, and determining whether (even if it does) the restrictions are supported by our Nation's regulatory tradition. *See* 597 U.S. at 18-20. In addressing that first step, *Bruen* made three points: that (1) petitioners were "part of 'the people' whom the Second Amendment protects"; (2) the act of "public carry" fell within the "natural[]" definition of "bear arms"; and (3) the handguns they sought to bear were "weapons 'in common use' today for self-defense." *Id.* at 32. Only then did *Bruen* confirm the "Second Amendment's plain text thus presumptively guarantees" their "proposed course of conduct—carrying handguns publicly for self-defense." *Id.* And only then did *Bruen* place the "burden" on New York to show its law was "consistent with this Nation's historical tradition." *Id.* at 32-34. By assessing "these inquiries at step one" *Bruen* confirms that these "limitations on the scope of the Second Amendment right … are inherent in the text of the amendment." *Price*, 111 F.4th at 400-01.

2. Regardless of which step implicates the "common use" analysis, Plaintiffs' circulation-only test—which looks only to the number of weapons purchased, not to their uses or features—fails for four reasons. Plaintiffs contend that both LCMs and "AR- and similar style rifles" are in common use because consumer surveys, firearm dealer surveys, and firearm production data reveal that "millions of Americans own tens of millions of them" and do so subjectively for, *inter alia*, self-defense reasons.

Cheeseman Br. 32-37; *see also* ANJRPC Br. 28-30, 40-41 (similar, and arguing this circulation tally is "dispositive"). But every appellate court to consider that test has rejected it, *see Bevis*, 85 F.4th at 1198-99; *OST*, 95 F.4th at 50-52; *Bianchi*, 111 F.4th at 459-61; *Hanson*, 120 F.4th at 232-33; *accord ANJRPC I*, 910 F.3d at 116 & n.15 (common ownership is "not dispositive"), since it is inconsistent with constitutional principles, logic, well-accepted restrictions on machineguns, and precedent.

*First*, Plaintiffs' popularity test is inconsistent with traditional constitutional principles. As other courts have found, no other right is "read to expand or contract based on nothing more than contemporary market trends." *Bianchi*, 111 F.4th at 461; *accord NAGR*, 685 F. Supp. 3d at 102 (agreeing "no other constitutional right waxes and wanes based solely on what manufacturers choose to sell"). For example, child pornography falls outside the First Amendment based on its "content" and the "the nature of the harm" it entails—courts never ask how widespread child pornography is when assessing whether it gets First Amendment protection. *New York v. Ferber*, 458 U.S. 747, 763-64 (1982). Courts have similarly explained that "public opinion surveys" are "insufficient evidence" to find a punishment "categorically prohibited by the Eighth Amendment," *Penry v. Lynaugh*, 492 U.S. 302, 334-35 (1989), and have "declin[ed] to rest constitutional law upon such uncertain foundations" as "public opinion polls," *Stanford v. Kentucky*, 492 U.S. 361, 377 (1989) (plurality); *Bucklew v. Precythe*, 587 U.S. 119, 132-35 (2019). It "is common in constitutional

law for courts to consider objective evidence" in assessing the right's scope, instead of resorting to mere popularity. *Kotek*, 682 F. Supp. 3d at 919.

It makes little sense that the Second Amendment would be the only right for which popularity or subjective consumer expectations would become the lynchpin. After all, a "numbers alone" test lacks "textual and historical provenance" under the Second Amendment: Plaintiffs provide no evidence that the Framers or legislators believed the power to regulate a weapon turned on its popularity. *Bevis*, 85 F.4th at 1198-99; *accord Bianchi*, 111 F.4th at 260-61 (finding Plaintiffs' "trivial counting exercise" "makes a mockery" of the long "legal tradition" at "the heart of the right"). Indeed, given *Bruen*'s emphasis on original understanding, a market-trends analysis is inapt. See *Bianchi*, 111 F.4th at 461 (noting modern popularity is inconsistent with a "constitutional right with a 'meaning … fixed according to the understandings of those who ratified it'"). Instead, the original understanding reveals a right focused on self-defense, and thus a right that protects arms which actually serve self-defense ends—not just popular ones. *See Bianchi*, 111 F.4th at 461 (explaining this counting test "totally detaches the Second Amendment's right to keep and bear arms from its purpose of individual self-defense"); *Hanson*, 120 F.4th at 232-33.

*Second*, there is a good reason no constitutional right turns on this circulation-based test: its reasoning is inescapably "circular." *Bevis*, 85 F.4th at 1190. After all, whether a particular weapon is widespread in circulation turns at least in significant

part on whether the weapon is lawful or unlawful; a weapon that is quickly restricted will never become widespread, but that same weapon left legal can be circulated and achieve protection under Plaintiffs' test. Nor is this hypothetical—at the time of the federal prohibition on assault weapons in 1994, "few civilians owned AR-15s," but after 2004, when the law "expire[d] pursuant to its sunset provision, these weapons began to occupy a more significant share of the market," and "most" "AR-15s now in use were manufactured in the past two decades." *Id.* at 1199 (citation omitted). So if courts "looked to numbers alone, the federal ban would have been constitutional before 2004," but "unconstitutional thereafter." *Id.* That cannot be right: "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Id.* at 1190 (quoting *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)); *see also Carpenter v. United States*, 585 U.S. 296, 358-59 (2018) (Thomas, J., dissenting) (decrying "circularity" inherent in tests that turn on subjective beliefs, and emphasizing that tests which rely instead on text and history avoid such logical flaws).[4]

---

[4] It is thus unsurprising that the *Heller* Court declined to respond to Justice Breyer's accusation of "circular reasoning," *see* 554 U.S. at 720-21 (Breyer, J., dissenting), as it had no reason to defend a version of the common-use test it had not adopted. *See Kolbe* 849 F.3d at 141-42 ("[T]he *Heller* majority said nothing to confirm that it was sponsoring the popularity test.").

That circularity would turn the Second Amendment into an arms race between legislatures and firearms manufacturers. Manufacturers would need only "flood[] … the market" with a "state-of-the-art and extraordinarily lethal new weapon" "prior to any governmental prohibition in order to ensure it constitutional protection," *Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017), effectively hinging Second Amendment rights on the effectiveness of advertising campaigns or sale price. *See Bevis*, 85 F.4th at 1195 n.7 (rejecting notion that an item's "entitlement to constitutional protection" turns on its commercial penetration, because constitutionality does not "depend[] on its price"). And Plaintiffs' test would produce troubling incentives for legislatures, requiring States to rush to regulate, even before they are sure a weapon is dangerous, to avoid losing the authority to do so forever. *See Bianchi*, 111 F.4th at 460-61 ("We cannot reasonably expect our representatives to be fortune tellers, anticipating the score of dangers posed by advances in weapons technology. This is particularly true as the pace of weapons manufacturing and distribution has continued to accelerate in recent years."); *OST*, 95 F.4th at 50 (emphasizing the law "advances more slowly than the technology it regulates," but officials "must nonetheless be able to respond when the ramifications of a technological development become more apparent over time"). This Court should thus "decline to hold that arms manufacturers can secure constitutional immunity for their products so long as they distribute a sufficient quantity before legislatures can react." *Bianchi*, 111 F.4th at 461.

*Third*, Plaintiffs' ownership test also "leads to absurd consequences," *Bianchi*, 111 F.4th at 660; *see Bevis*, 85 F.4th at 1198-99, since even some indisputably illegal weapons like machineguns would suddenly become inviolable. Although Plaintiffs barely mention this problem, their counting test would provide Second Amendment protection to machineguns. *Compare DSSA*, 664 F. Supp. 3d at 593 & n.7 (noting evidence "that, as of 2016, there were nearly 176,000 legal civilian-owned machine guns in the United States"), *with Caetano v. Mass.*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (finding stun guns "widely owned" given "approximately 200,000" in civilian circulation). Because the Supreme Court and this Court have rejected that result—instead finding such an implication "startling," *Heller*, 554 U.S. at 624—a test that compels protecting machineguns is necessarily wrong. *Compare Palmetto*, 822 F.3d at 142 (finding the "Second Amendment does not protect the possession of machine guns" as "they are not in common use for lawful purposes"), *with Bianchi*, 111 F.4th at 460 (Plaintiffs' test protects M16 or bazooka if popular enough).

Plaintiffs do not seriously deny that machineguns would get protection under this numbers-only approach, nor do they explain how their test can survive that flaw. At most, they gesture—as did the *Bevis* plaintiffs—at the idea that machineguns did not gain sufficient commercial success in the time between its development and its prohibition, *see* ANJRPC Br. 9-10, but that tells us "nothing about how use of those guns would have evolved, had they remained legal and readily available," *Bevis*, 85

F.4th at 1195. After all, "[i]t is not too much of a stretch to think that some people might like the fully automatic feature of a machinegun, if they were hoping to defend their families, their properties, and themselves from invaders." *Id.* The reason that civilians have nevertheless declined to purchase greater numbers of machineguns for defensive purposes is "because they cannot" under federal law—the very circularity at the heart of Plaintiffs' test. *Id.*; *accord id.* at 1195 n.7 (noting "the number of guns manufactured each year has almost quadrupled" from 1986 and adding that "there is no reason to think that machineguns would not have followed the same pattern, had they been lawful in civilian hands"); *see also Friedman*, 784 F.3d at 409 ("Machine guns aren't commonly owned for lawful purposes today because they are illegal."). It defies reason to think that the only reason machineguns could be restricted today (if they indeed can under Plaintiffs' test) is because Congress acted within years to regulate machineguns before they became "popular" and concomitantly "gain[ed] permanent constitutional protection." *Bianchi*, 111 F.4th at 460-61.

*Fourth*, perhaps unsurprisingly given its inherent flaws, Plaintiffs' popularity test is contrary to Second Amendment caselaw. *See OST*, 95 F.4th at 50-51 (noting "Plaintiffs' proposed popularity test contravenes case law in addition to logic," and ownership "statistics are ancillary to the inquiry the Supreme Court has directed us to undertake"). The Supreme Court has found that short-barreled shotguns may be prohibited, *United States v. Miller*, 307 U.S. 174, 175-83 (1939), but that handguns

may not be, *Heller*, 554 U.S. at 622-29, and both times focused on the "character of the weapon" and the "nature of the arms" rather than its circulation, *Heller*, 554 U.S. at 622-24; *see also OST*, 95 F.4th at 51 (noting that *Miller*, whose outcome *Heller* endorsed, "contains no hint that the court somehow assumed that few people owned [short-barreled shotguns] before they were banned"). Indeed, were Plaintiffs correct that a weapon gains constitutional protection based on popularity, *Heller* would have had no reason to cite the objective features that make the handgun effective and easy-to-use and therefore "the quintessential self-defense weapon." 554 U.S. at 629.

So too for the Supreme Court's and this Court's discussion of the machinegun. As explained above, Plaintiffs' test is contrary to the holdings that machineguns can be restricted—and it is inconsistent with their underlying reasoning too. *Heller* held that any approach giving machineguns constitutional protection would be "startling" not because the Court believed machineguns were infrequently owned but because they were "useful in warfare in 1939." *Id.* at 624. And this Court agreed machineguns "fall outside the protection of the Second Amendment" not based on an assessment of their circulation, but because they are "exceedingly dangerous weapons" and thus "not in common use for lawful purposes." *Palmetto*, 822 F.3d at 142-43. Plaintiffs' ownership test is contrary to the Supreme Court's and this Court's decisions.

Plaintiffs' test also suffers significant administrability and practical problems. For one, Plaintiffs "do not provide a clear threshold for the number of firearms they

believe must be possessed to be in common use"—let alone one that would exclude machineguns. *Bianchi*, 111 F.4th at 460; *compare* ANJRPC Br. 23 (claiming that it challenged state law "as to *all* of the common semiautomatic firearms," but without providing circulation numbers for most firearms, and without identifying the number that suffices). For another, Plaintiffs do not provide clear answers as to which models should be grouped together to assess their circulation. *See Bianchi*, 111 F.4th at 460; (rejecting position that "all semiautomatic rifles" are one class, given "exponential differences in firepower between a small-bore rimfire rifle and a .50 caliber sniper rifle"); JA12-14 (court noting lack of numeric record on firearms other than AR-15). And Plaintiffs' own surveys are themselves mired in uncertainty, if not unreliability. *Compare* Cheeseman Br. 34-35 (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022)), *with Barnett v. Raoul*, No. 23-209, 2024 WL 4719468, at *7 (S.D. Ill. Nov. 8, 2024) (discussing "methodological errors and inherent biases" in this survey); JA4371-72 (Klarevas Rpt. ¶29 n.31) (discussing biases, including hidden sponsorship funding, and failure to "fully and openly disclose the measurement tools").

Plaintiffs' counterarguments cannot overcome these fatal problems. Plaintiffs read *Heller* to declare "that only dangerous *and* unusual weapons may be banned," Cheeseman Br. 25-26 (emphases added), but misread that opinion. Initially, although *Heller* acknowledged that the "common use" requirement was "fairly supported" by

the tradition restricting dangerous and unusual weapons, 554 U.S. at 627, it never found them coextensive. *See Price*, 111 F.4th at 405 (noting that while the "historical tradition regarding the regulation of dangerous weapons *supports* a limitation on the scope of the Second Amendment right, a weapon must be in common use for a lawful purpose to be protected by that right"); *Bianchi*, 111 F.4th at 460.

Plaintiffs are also wrong to conclude that "dangerous and unusual" represent two distinct criteria: after all, because "[a]ll arms are self-evidently 'dangerous,' … 'dangerous' must mean something other than its standard definition or the word would do no work delineating the category." *Hanson*, 120 F.4th at 238 n.7. Instead, "dangerous and unusual" is an "example of the archaic and rhetorical" device known as a "hendiadys," which—like "necessary and proper"—combines to form a single concept of "unusually dangerous." JA4294 (Cornell Rpt. at 5 n.9); *see* Samuel Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016). That helps explain why *Heller* used this phrase both disjunctively and conjunctively, as did its sources. *Compare, e.g.*, 554 U.S. at 623 ("dangerous or unusual"), William Blackstone, 4 Commentaries on the Laws of England 55, 149 (1769), http://tinyurl.com/4w7aawcy ("dangerous or unusual"), *and State v. Lanier*, 71 N.C. 288, 289 (1874) ("dangerous or unusual"), *with* 554 U.S. at 623 ("dangerous and unusual"), *and State v. Langord*, 10 N.C. 381, 383

(1824) ("dangerous and unusual"). It can thus be "infer[red]" that the phrase "means 'uncommonly dangerous.'" *Hanson*, 120 F.4th at 238 n.7.

Even if "unusual" had some standalone meaning, it would not be numerically uncommon. As the First Circuit observed, the Supreme Court has not "intimated that a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is 'unusual.'" *OST*, 95 F.4th at 50-51; *see also State v. Huntly*, 25 N.C. 418, 422 (1843) (noting an arm can still be an "unusual weapon" even if "there is scarcely a man in the community who does not own" it). Rather, its meaning must again "derive at least in part from the essential purpose of the Second Amendment": self-defense. *Capen*, 708 F. Supp. 3d at 79-80. The issue is therefore whether it is "unusual for ordinary citizens to use [the weapon] for lawful purposes, particularly self-defense." *Id.* at 80. And it is indeed unusual for ordinary citizens to use restricted assault weapons and LCMs for civilian self-defense, *see supra* at 24-26, regardless of their popularity on the market, so they fall outside the right.[5]

---

[5] Finally, the claim that *Heller* requires an unprotected weapon to be "highly unusual in society at large," ANJRPC Br. 28-29, 40-41, is badly out of context. *See OST*, 95 F.4th at 50 (referring to this as a "distortion"). *Heller* was just observing that while a modern militia may "require sophisticated arms that are highly unusual in society at large" to be effective, "weapons that are most useful in military service—M-16 rifles and the like"—may still "be banned." 554 U.S. at 627-28.

2.    *LCMs Are Not Arms.*

LCMs are not entitled to threshold Second Amendment protection for another reason: they are not "Arms." *See* ANJRPC Br. 26-27, 38-40 (Plaintiffs recognizing they must show LCMs are "Arms" at the threshold step). The "Second Amendment's definition of 'arms' is fixed according to its historical understanding," which focuses on the word's "'normal and ordinary' meaning." *Bruen*, 597 U.S. at 20, 28 (quoting *Heller*, 554 U.S. at 576-77). That term is neither defined nor historically understood to include ammunition containers like LCMs. *OST*, 646 F. Supp. 3d at 388; *Capen*, 708 F. Supp. 3d at 88-89; *Kotek*, 682 F. Supp. 3d at 911-13.

LCMs do not fit the definition of Arms. As defined at the Founding, Arms are "weapons of offence" that are "use[d] in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (quoting historical dictionaries). But "LCMs, like other accessories to weapons, are not used in a way that 'casts at or strikes another.'" *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386-87 (D.R.I. 2022) (cleaned up). Like silencers, LCMs "generally have no use independent of their attachment to a gun and you can't hurt anybody with one unless you hit them over the head with it." *Id.* at 387. So just as a silencer is a "firearm accessory" rather than "a weapon," LCMs themselves are not "'bearable arm[s]' protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018).

Instead, LCMs are akin to the "ammunition containers" that the Founding and Reconstruction generations understood to be "accoutrements, not arms." JA1417-18 (Baron Rpt. ¶2-3). The State's expert analyzed "the historical use of the terms *arms* and *accoutrements*" during the Founding Era and Reconstruction, JA1417 (Baron Rpt. ¶2), and found that the use of "'Arms' as a stand-alone term refers to weapons," and "almost never includes ammunition or ammunition storage containers." JA1430 (Baron Rpt. ¶29). Such ammunition containers—then known as "cartridge boxes," as the word "magazine" was not so used until the 1860s—were instead "viewed as accoutrements, the ancillary equipment associated with soldiering, or service in the military." JA1428-30 (Baron Rpt. ¶22-28). As "a device that holds … ammunition," *ANJRPC I*, 910 F.3d at 116, LCMs are *not* "Arms" as historically understood.

Plaintiffs' various responses fall short. Initially, Plaintiffs incorrectly conflate LCMs with bullets. But New Jersey entirely agrees the "right to keep and bear arms … 'implies a corresponding right to obtain the bullets necessary to use them.'" *Luis v. United States*, 578 U.S. 5, 26 (Thomas, J., concurring) (quoting *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)). Yet that is inapposite: LCMs are not bullets, without which any "firearm would be useless." *OST*, 646 F. Supp. 3d at 386. Instead, "a firearm does not need a magazine containing more than ten rounds to be useful." *Id.* As the State's expert explained, "[m]agazine capacity is not a determinant of firearm operability." JA1864 (Yurgealitis Rpt. ¶145). So even

accepting the right to keep and bear "Arms" includes textual "Arms" and the objects required for such "Arms" to function, LCMs do not qualify.

That LCMs are attached to "Arms" makes no difference either. *See* ANJRPC Br. 39 (shifting focus to describe LCMs as "semiautomatic firearm[s] equipped with a feeding device"). For one, that logic would render any firearms silencer (or even a grenade launcher) presumptively protected where it is attached to a firearm. *Contra Cox*, 906 F.3d at 1186. For another, even if an LCM is *functionally* attached to some Arm, that does not make the LCM a "weapon of offense" with the contemporaneous *textual* meaning of "Arms." *See Heller*, 554 U.S. at 576, 578 (endorsing "a textual analysis" focused on the "words and phrases" in the Second Amendment). Finally, the history again cuts against Plaintiffs: the State presented evidence below that the word "cartridge boxes" did encompass ammunition containers that fed ammunition into firearms—like modern magazines. JA1434 (Baron Rpt. ¶31(n)) (citing an 1869 newspaper account describing a weapon being "fire[d] ... by turning a crank" and "remov[ing]" and "put[ting] ... in" "cartridge box[es]"). The dispositive fact is that the word "magazine" and phrase "cartridge box" described an object that contains ammunition, constituting an "accoutrement"—not an "Arm."

Plaintiffs get no further citing this Court's pre-*Bruen* holding that "magazines are 'arms' within the meaning of the Second Amendment." *ANJRPC I*, 910 F.3d at 116. For one, this Court never said *LCMs* are arms, making only the undisputed point

that "magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended." *Id.* So this Court's functional statement does not apply well to LCMs, which are unnecessary for function. In any event, this Court's "analysis and holding" were "abrogated by intervening" precedent, *United States v. Stevens*, 70 F.4th 653, 657-60 (3d Cir. 2023): *ANJRPC I* simply did not conduct the historically-driven analysis of "arms" the Supreme Court now requires, *Bruen*, 597 U.S. at 19, or consider the historical evidence the State has thus now compiled on that score, *see* JA1421-23 (Baron Rpt. ¶¶11-14) (the databases from which historical usage was analyzed have only "come online in the past few years").

## B.   The Challenged Laws Are Consistent With Historical Principles.

Even were "the Second Amendment's plain text" to "cover[]" these weapons, these laws are still valid if they are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691-92. This historical analysis requires courts to consider both "how" and "why" the challenged law burden the right to keep and bear arms relative to historical "laws that our tradition is understood to permit." *Id.* at 692. Although the regulation "must comport with the principles underlying the Second Amendment," the law "need not be a 'dead ringer' or a 'historical twin'" to its predecessors. *Id.* (quoting *Bruen*, 597 U.S. at 30). The Second Amendment, after all, is not a "regulatory straightjacket," *Bruen*, 597 U.S. at 30, and was never "meant to suggest a law trapped in amber," *Rahimi*, 602 U.S. at 691; *see also id.* at 691-92

& n.1 (agreeing the Constitution "permits more than just those regulations identical to ones that could be found" at the Founding or Reconstruction); *id.* at 740 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold.").

1. As four circuits agree, there is a "strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing," *Bianchi*, 111 F.4th at 446, "while leaving intact the right to own weapons more suitable to the Second Amendment's purpose of personal protection," *id.* at 471; *see also id.* (emphasizing tradition in which States could "ban[] the sale, manufacture, and possession of weapons that were particularly useful for offensive and criminal purposes"); *OST*, 95 F.4th at 45-50; *Hanson*, 120 F.4th at 237-40; *Bevis*, 85 F.4th at 1199-1202. That means governments today may likewise restrict arms, like assault weapons and LCMs, that have spread in society and posed extreme safety threats through characteristics that made them particularly dangerous or particularly susceptible to disproportionate criminal misuse.

A consistent body of historical evidence—from pre-Founding English history through the Prohibition era—supports this principle. The English Bill of Rights, the Second Amendment's "predecessor," guaranteed "Arms for their Defence suitable to their Conditions, and as allowed by Law." *Heller*, 554 U.S. at 593 (quoting 1 W. & M., ch. 2, § 7). Consistent with that understanding, the Crown prohibited certain weapons like launcegays, 7 Rich. 2, ch. 13 (1383), crossbows, handguns, hagbuts,

and demy hakes, 33 Hen. 8, ch. 6, §§ 1, 18 (1541). *See* JA4627-34 (reproducing these laws). And England's colonies across the Atlantic followed suit. After "strife and excitement" broke out over property, *Bruen*, 597 U.S. at 48-49, East New Jersey prohibited the concealed carrying of "pocket pistols, skeins, stillettoes, daggers, or dirks, or other unusual or unlawful weapons," 1686 N.J. Laws 289-90, ch. 9 (JA1271-72). And from the Founding onward, a wide range of States "restricted the use or ownership of certain types of weapons after it became obvious" they "were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates." JA1358 (Roth Rpt. ¶32). As experts have thus found, States have long "singled out weapons that posed a particular danger for regulation or prohibition." JA4296 (Cornell Rpt. at 7). Consider the following:

**Trap Guns.** Trap guns were "devices or contraptions" that "could be set to fire remotely" by "rigging the firearm to be fired with a string or wire which then discharged when tripped." JA1113 (Spitzer Rpt. ¶79). But while they were intended to "defend[] property from intruders," they were instead viewed skeptically given "the likelihood that innocent persons could be injured or killed." JA1114 (Spitzer Rpt. ¶80). New Jersey, recognizing this "most dangerous Method of setting Guns has too much prevailed," prohibited this device in 1771. JA1113 (Spitzer Rpt. ¶79) (citing 1763-1775 N.J. Laws 346, ch. 539, § 10). At "least 18 states had anti-trap

gun laws," with eleven laws being "enacted in the 1700s-1800s." JA1115 (Spitzer Rpt. ¶82); JA1315-23 (collecting laws).

**Gunpowder Aggregation.** While "Founding-era society faced no risk that one person with a gun could, in minutes, murder several dozen individuals," it "did face risks posed by the aggregation of large quantities of gunpowder, which could kill many people at once if ignited." *OST*, 95 F.4th at 49. "In response to this concern, some governments at the time limited the quantity of gunpowder that a person could possess, and/or limited the amount that could be stored in a single container." *Id.* New York, for instance, enacted a statute "preventing 'Danger Arising from the Pernicious Practice of Lodging Gun Powder' by limiting individuals to 28 pounds of gunpowder apiece, which they were required to separate into four different canisters." *Id.* (citing 1784 N.Y. Laws 627, and collecting statutes); JA4319-21. And the power to regulate dangerous instruments like aggregated gunpowder was seen as "a branch of the police power, which unquestionably remains, and ought to remain, with the States." *Brown v. Maryland*, 25 U.S. 419, 443-44 (1827).

**Bowie Knives.** Of particular relevance here, in the 1830s emerged the "Bowie knife," a "distinctive type of long-bladed and usually single-edged knife with a handguard." JA1098 (Spitzer Rpt. ¶61). The Bowie knife's "distinctive features[] encouraged its proliferation," which turned into a popular "craze" among the public. JA1099 (Spitzer Rpt. ¶61). Because "[i]ts features made it 'well-suited to cutting or

stabbing,'" however, *OST*, 95 F.4th at 48, the Bowie knife became "widely used in fights and duels" along with "other criminal activities." JA1099-1100 (Spitzer Rpt. ¶61-62). The weapon acquired a "notorious reputation" among the public, which just "fanned its sale and acquisition." JA1100 (Spitzer Rpt. ¶62).

The States almost universally stepped in. "From the beginning of the 1830s through the early twentieth century, the District of Columbia and every state except New Hampshire passed laws restricting Bowie knives." *OST*, 95 F.4th at 48. Those provisions "ranged from outright bans on their manufacture, sale, and possession; to enhanced criminal penalties for those who used the weapons to commit crimes; to prohibitions on both open and concealed carry." *Bianchi*, 111 F.4th at 467 & n.5; *see also* JA1219-1313 (collecting laws). For instance, Georgia—in 1837—made it a crime to "sell, or offer to sell, or to keep, or to have about their person or elsewhere," "Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c." 1837 Ga. Acts 90 (1838) (JA1240). Alabama, likewise in 1837, aimed to "suppress the Use of Bowie Knives" by enacting a prohibitive financial burden, requiring that "for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars." Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7 (JA1219-20). And Tennessee, once more in 1837, made it a crime to "sell, or offer to sell …

any Bowie knife." 1837-1838 Tenn. Pub. Acts 200, ch. 137, §§ 1, 2 (JA1295). That is, "during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons" had especially "contribut[ed] to rising crime rates." JA1358 (Roth Rpt. ¶32).

Courts consistently "found these statutory regulations on especially dangerous weapons to be consistent with the right to keep and bear arms." *Bianchi*, 111 F.4th at 468 (collecting cases). One court, upholding Tennessee's law, noted Bowie knives were singled out because they "are usually employed in private broils" and "are efficient only in the hands of the robber and the assassin," distinguishing them from protected arms. *Aymette v. State*, 21 Tenn. 154, 158 (1840); *see Haynes v. Tennessee*, 24 Tenn. 120, 122 (1844) (noting Bowie Knives were "extremely dangerous and destructive to human life"); *State v. Reid*, 1 Ala. 612, 617 (1840) (similar). Despite the extent of this restriction across the States, none were invalidated.

**Slungshots and Clubs.** As with Bowie knives, dozens of states enacted anti-slungshot laws in the 19th century—again especially telling evidence. The slungshot "is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s." JA1110 (Spitzer Rpt. ¶74). Slungshots were "widely used" in the 19th Century for criminal ends; they were "easy to make, silent, and very effective." *Id.* That led 43

States to prohibit or restrict them in the 1800s. JA1111 (Spitzer Rpt. ¶76); JA1219-1313 (collecting laws). In 1850, Massachusetts made it a crime to "manufacture[], or cause[] to be manufactured, or sell[], or expose[] for sale, any instrument or weapon of the kind usually known as a slung shot." 1850 Mass. Acts & Resolves 401, 401 (JA1259-60). Florida enacted an identical law in 1868. 1868 Fla. Laws 95, Of Offenses Against the Public Peace, ch. 7, § 11. Other States followed with similar measures. *See* Ill. Act of Apr. 16, 1881 (banning possession, sale, or transfer of slung shots, metallic knuckles, "or other deadl[y] weapon of like character") (JA1245); 1888 Gen. Minn. Law §§ 333, 334 (prohibiting manufacture, sale, or possession with intent to use) (JA1263); 1890 Okla. Sess. Laws 475, § 18 (prohibiting manufacture, sale, or carrying) (JA1287). Similarly, States extensively regulated clubs and blunt objects, understood in the 19th and early 20th Centuries to be embroiled in crime. *See* JA1107-10 (Spitzer Rpt. ¶¶70-73).

**Pistols.** In the lead-up to the Civil War, the single-shot guns prevalent in the early 1800s were displaced by pistols and revolvers, an "improvement[] in weapons technology" which "contributed to [a] rise in interpersonal violence." *Bianchi*, 111 F.4th at 465; *accord* JA1359-70 (Roth Rpt. ¶¶33-46). "Americans scrambled to buy these weapons, which were ideal for killing in the heat of the moment." *Bianchi*, 111 F.4th at 465. They kept them "everywhere," including their "purses[] and pockets," meaning that "civilians had easy access to more portable and precise firearms than

ever before." *Id.* Once "[c]itizens and lawmakers alike recognized that deadly yet concealable weapons—especially pistols[ and] revolvers—were the primary culprits in a large proportion of the homicides and assaults of the day," governments "passed restrictions on carry." *Id.* So over the course of the 19th century and into the early 20th, "nearly every single state would either regulate the carry of certain firearms or place severe restrictions on their possession." *Id.* at 466 & n.4. Tennessee banned carrying "a belt or pocket pistol, or revolver" in public, carving out certain pistols typically carried by members of the military. 1871 Tenn. Pub. Acts 81 ch. 90, § 1 (JA1366-67). That law was upheld. *State v. Wilburn*, 66 Tenn. 57, 59-62 (1872).

**Machineguns and Semiautomatic Firearms.** Semiautomatic arms "became available to consumers in the 1890s," and "automatic weapons quickly followed, with the Thompson submachine gun being patented in 1920." *Bianchi*, 111 F.4th at 469; *accord* JA1373 (Roth Rpt. ¶¶50-53). These weapons became popular among criminals and terrorists, who recognized that "individuals or small groups of people" now had "the power to kill large numbers of people in a short amount of time" with firearms that "could be purchased legally by private citizens." JA1373 (Roth Rpt. ¶¶50-53); *accord* JA1931-33 (DeLay Rpt. ¶80-83). As a result, "early 20th-century criminals gained access to weapons with firepower not seen before in civilian life," and "national tragedies" like the St. Valentine's Day and the Kansas City Massacres "put pressure on government to do something." *Bianchi*, 111 F.4th at 469.

"As for semiautomatic and automatic weapons, a great number of jurisdictions took action," with "at least 29 states enact[ing] anti-machine-gun laws between 1925 and 1934," and ten "restrict[ing] semiautomatic weapons between 1927 and 1934." *Id.* at 470 & nn.14-15 (collecting state statutes); *accord* JA1182-1217. For example, Rhode Island in 1927 prohibited the manufacture, sale, or possession of "any weapon which shoots automatically and any weapon which shoots more than twelve shots semiautomatically." 1927 R.I. Pub. Laws 256, §§ 1, 4 (JA1204-05). Michigan, that same year, barred the manufacture, sale, or possession of "any machine gun or firearm which can be fired more than sixteen times without reloading." 1927 Mich. Pub. Acts 888-89 § 3 (JA1195). And the District of Columbia prohibited "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 14, 47 Stat. 650, 654 (1932) (JA1183-84); *see also* 1927 Mass. Acts 413, 413-15, ch. 326, §§ 1-2; 1933 Minn. Laws 231, 232-33, ch. 190 §§ 1, 3; 1933 Ohio Laws 189, 189-90; 1934 Va. Acts 137-39 ch. 96 §§ 1-7. The concern with machineguns culminated in "the National Firearms Act of 1934, which severely curtailed the civilian possession and general circulation of automatic weapons, as well as sawed-off shotguns, short-barreled rifles, and silencers." *Bianchi*, 111 F.4th at 470.

Restrictions on assault weapons and LCMs fall well within these underlying principles. As explained above, the features of assault weapons and LCMs—like the

features of, *e.g.*, Bowie knives or machineguns—render them "particularly useful for offensive and criminal purposes" and thus "pose exceptional dangers to innocent civilians." *Id.* at 471; *see supra* at 15-26 (laying out origination of such weapons, dangerous features, and harms they have wrought). And consistent with historical responses to such weapons, New Jersey restricted assault weapons and LCMs once their "potential for widespread criminal abuse or unreasonable capacity to inflict casualties became apparent," while still "protecting the core right of [its] citizens to defend themselves with arms in pressing circumstances." *Id.* at 464.

These laws thus share "the same basic purpose" (the "why") of the historical statutes: to "inhibit then unprecedentedly lethal criminal activity by restricting or banning weapons that are particularly susceptible to, and were widely used for, multiple homicides and mass injuries." *Hanson*, 120 F.4th at 239-40. And "they impose a [comparable] burden on the right to armed self-defense" (the "how"): like historical "outright bans" on "class[es] of weapons" that were especially dangerous, *id.* at 240 (citing, *inter alia*, Bowie knives), and posed the "most urgent and visible threats," *Bianchi*, 111 F.4th at 464, New Jersey "regulate[s] weapons that are ill-suited for and disproportionate to the objective of self-defense, while honoring the right of Americans to possess arms more compatible with the Second Amendment's purpose," *id.* at 472. Assault weapons and LCMs are thus "well within the realm of devices that have historically been prohibited once their danger became manifest."

*OST*, 95 F.4th at 45-50; *Bianchi*, 111 F.4th at 472 (finding these items fall within the same tradition); *Hanson*, 120 F.4th at 240; *Bevis* 85 F.4th at 1200-02.

That conclusion becomes even more apparent when considering that this case "implicat[es]" both "unprecedented societal concerns" and "dramatic technological changes." *Bruen*, 597 U.S. at 27. Assault weapons and LCMs "have given rise to an unprecedented societal concern: mass shootings." *Hanson*, 120 F.4th at 241. Indeed, "mass shootings themselves are a relatively recent phenomenon," and yet have only "become ever more common." *Id.*; *accord OST*, 95 F.4th at 44. *Compare* JA1641-43 (Klarevas Rpt. ¶¶19-20) ("There is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948."), *with* JA1644 (Klarevas Rpt. ¶¶21-22) (explaining "frequency rate" of double-digit-fatality mass shootings "has increased over six-fold since the Federal Assault Weapons Ban expired" in 2004). "Rapid advancements in gun technology are a central cause of this mass carnage." *Bianchi*, 111 F.4th at 463; *see id.* at 469 (confirming "the tide of legislative responses to technological advances in weaponry has persisted throughout our history"). Despite Plaintiffs' claims that guns "that can fire several rounds without reloading are nothing new," ANJRPC Br. 4-8, no prior weapon is "remotely comparable" to the restricted ones, *Hanson*, 120 F.4th at 242, 248-51; *see* JA1881-1939 (DeLay Rpt.). Rather, these weapons "have enabled mass shootings to a degree impossible with Founding or Reconstruction era

weapons." *Hanson*, 120 F.4th at 242. "These are not our forebears' arms, and these are not our forebears' calamities." *Bianchi*, 111 F.4th at 464. But consistent with our forebears' principles, these weapons can be regulated.

2. Plaintiffs' responses remain unavailing. Plaintiffs' main argument is again that whenever any weapon achieves sufficient numerical circulation, the government cannot bar its possession. *See* Cheeseman Br. 25-30 (arguing a weapon "in common use" is "protected, full stop, not just … presumptively protected by the plain text"); ANJRPC Br. 31-32 (same). The district court correctly rejected this argument as to LCMs, *see* JA73 (identifying a historical tradition of "prohibiting a subset of arms" that "posed a threat to public safety" even if the weapons "had become [numerically] common for self-defense"), but seemed to accept it as to the Colt AR-15, *see* JA62-63 (finding "a categorial ban on a class of weapons commonly used for self-defense" is per se "unlawful"). As to both assault weapons and LCMs, however, Plaintiffs' claim is wrong. As detailed above, the "common use" inquiry is instead a part of the threshold analysis for Second Amendment protection, *supra* at 27-30, and does not turn on mere circulation, *supra* at 30-40. But Plaintiffs' claim is especially egregious at this second step, because it is precisely the opposite of our historical tradition.

Far from establishing that exceptionally dangerous weapons cannot be barred once they circulate in sufficient numbers, our historical tradition reveals that States act *especially* when the "proliferation" of such weapons contributes to an "increase

in gun violence." *Bianchi*, 111 F.4th at 466-67; *see id.* at 464 (legislators historically act only once "a weapon's potential for widespread criminal abuse or unreasonable capacity to inflict casualties became apparent"). As the court below acknowledged, Bowie knives "proliferated throughout the United States" and "could be used in self-defense against a violent aggressor." JA27; JA61 ("Bowie knife … was commonly-used throughout the United States."). Once "such knives ended up being widely used in fights and criminal activities at that time," and once the "potential misuse became apparent," States repeatedly restricted or banned them. JA27-28. And it makes sense that legislators restrict such weapons once they proliferate, not before: legislators are not "require[d] … to regulate for problems that do not exist," *McCullen v. Coakley*, 573 U.S. 464, 481 (2014), and so "respond when the ramifications of a technological development become more apparent over time," *OST*, 95 F.4th at 50. Said another way, "it defies reason to say that legislatures can only ban a weapon if they ban it at (or around) the time of its introduction, before its danger becomes manifest," and it defies historical practice too. *OST*, 95 F.4th at 50; *Bianchi*, 111 F.4th at 464.

Plaintiffs get no further arguing that even if the historical tradition can support some restrictions on especially dangerous arms, it could never support prohibitions. *See* Cheeseman Br. 25-30; ANJRPC Br. 31-32. Most importantly, that is contrary to the historical evidence itself: "many of the preceding examples"—including certain limitations on Bowie knives, or slingshots, or machineguns—were indeed "outright

bans." *Hanson*, 120 F.4th at 239; *see also Bianchi*, 111 F.4th at 463 (citing "outright bans on their manufacture, sale, and possession"). Moreover, that some States chose instead to limit public carry or brandishing or particular uses of these items likewise supports the same regulatory tradition. *See*, *e.g.*, *Bianchi*, 111 F.4th at 466-68 (citing range of state responses). After all, the Second Amendment does not require modern laws to be a "dead ringer" or "twin" to their historical counterparts. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30); *see also id.* at 698 (upholding statute barring dangerous persons from possessing firearms based upon historical "surety and going armed laws" that restricted public carry alone, and recognizing that while these laws were "by no means identical, they did "not need to be"). That more legislatures did not outright restrict possession does not indicate a constitutional inability to do so— as "[l]egislatures past and present have not generally legislated to their constitutional limits." *Antonyuk v. James*, 120 F.4th at 969-70 (2d Cir. 2024) (noting that resort to "historical silence … is risky"); *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring) (noting assumption that "founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority" is both "flawed" and one "originalism does not require"). Given the "nuanced" test required here, *Hanson*, 120 F.4th at 240-41, this historical evidence more than suffices.

Finally, although Plaintiffs may pick at some historical evidence as postdating the Founding, courts may consider evidence from the Founding, Reconstruction, and

beyond when elucidating the relevant historical principles. *See Rahimi*, 602 U.S. at 692 n.1; *Bruen*, 597 U.S. at 36-38. Because the Second Amendment "right to keep and bear arms is applicable to the States through the Fourteenth Amendment," "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of [the] analysis." *Antonyuk*, 120 F.4th at 972; *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024). And even "late-19th-century" and "20th-century" evidence is probative whenever it does not "contradict[] earlier evidence." *Bruen*, 597 U.S. at 66 n.28. That is why every circuit to consider the issue post-*Bruen* holds that "later-in-time regulations remain relevant in tracing the broader and consistent story of our nation's regulation of excessively dangerous weaponry." *Bianchi*, 111 F.4th at 469-70; *OST*, 95 F.4th at 51-52; *Hanson*, 120 F.4th at 238-39 & n.7; *Bevis*, 85 F.4th at 1201-02.[6] Here, American history consistently supports the same principle.

## II.    THE LARGE-CAPACITY MAGAZINE RESTRICTION DOES NOT VIOLATE THE TAKINGS CLAUSE.

Finally, Plaintiffs' takings claim fails for two reasons: it is foreclosed by this Court's precedent, and it lacks merit. As to the former, this Court already held that

---

[6] While a panel of this Court previously held that "the Second Amendment should be understood according to its public meaning in 1791" when there is a conflict with the right's meaning in 1868, the Supreme Court has since vacated that decision after *Rahimi*. *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 & n.14 (3d Cir. 2024), *cert. granted, judgment vacated*, No. 24-93, 2024 WL 4486348, at *1 (U.S. 2024). But even were that holding still binding, it is inapposite when—as here—there is no conflict across time periods as to the right's meaning.

this LCM measure does "not result in either an actual or regulatory taking." *ANJRPC I*, 910 F.3d at 124. Another panel even acknowledged that this decision—which held "plainly that the Act does not violate … the Fifth Amendment's Takings Clause"— reflects law of the case. *ANRJPC v. Atty Gen.*, 974 F.3d 237, 245-46 (3d Cir. 2020) (*ANRJPC II*). *Bruen* and *Rahimi* did then abrogate *ANJRPC*'s Second Amendment analysis, but not its takings-clause holding.

Plaintiffs' response to the precedential value of *ANJRPC* falls short. Although Plaintiffs do not quarrel with this Court's regulatory-taking holding, they claim this Court is not bound to the actual-taking holding because it "conflicts" with "Supreme Court precedent" that "*predates* the decision." ANJRPC Br. 49 (emphasis added). That is no basis to create an intra-circuit split: "[i]n the rare cases where [this Court] disregarded a prior panel's holding based on Supreme Court precedent that predated the panel, the prior panel did not either explicitly or implicitly decide the impact of th[at] Supreme Court precedent." *United States v. Jenkins*, 68 F.4th 148, 152 n.6 (3d Cir. 2023) (cleaned up). That exception does not apply if, as here, the original panel "analyzed and distinguished" the relevant decision, *id. Compare* ANJRPC Br. 50 (arguing that *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), supports its claim), *with ANJRPC I*, 910 F.3d at 124 n.32 (rejecting claim based on *Horne* and noting *Horne* "dealt with a taking involving property for government use" but LCM law "does not involve a taking for government use in any way"). This Court thus

remains "bound" by *ANJRPC I*'s holding "absent en banc intervention or additional clarification from the Supreme Court." *Jenkins*, 68 F.4th at 152 n.6.

In any event, *ANJRPC I* was correct. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A.*, 544 U.S. 528, 536 (2005). But the State neither directly appropriated nor physically invaded Plaintiffs' property: it "does not require that owners turn over their magazines to law enforcement." *ANJRPC I*, 910 F.3d at 124. Rather, "owners have the option to transfer or sell their LCMs to an individual or entity who can lawfully possess LCMs, modify their LCMs to accept fewer than ten rounds, or register those LCMs that cannot be modified." *Id.* (citing N.J. Stat. Ann. §§ 2C:39-19, -20). Moreover, *Horne* and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) "involved the government necessarily occupying, taking title to, or physically possessing the relevant item." *OST*, 95 F.4th at 53. But here, there can be no "taking just because [New Jersey] offered to assist LCM owners with the safe disposal of their soon-to-be-proscribed weapons," as just one of many options the challenged law left open to LCM owners. *Id.* Because the State's statute therefore "does not involve a taking for government use in any way," "[t]here is no actual taking." *ANJRPC I*, 910 F.3d at 124 & n.32.

And even if the LCM restriction were an actual or regulatory taking, it would still survive because "[a] compensable taking does not occur when the state prohibits

the use of property as an exercise of its police powers rather than for public use." *Id.* at 124 n.32 (collecting cases). While Plaintiffs argue "the Supreme Court squarely rejected any police-power exception to the Takings Clause more than a century ago," ANJRPC Br. 51, their core case actually found that "the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given," *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 593-94 (1906) (recognizing "there is no taking of property for the public use" and no "right to compensation" where "the injury complained of is only incidental to the legitimate exercise of governmental powers for the public good"). Nor can it be otherwise, as Plaintiffs' argument would "effectively compel the government to regulate by purchase" dangerous items. *Andrus v. Allard*, 444 U.S. 51, 65 (1979). So if "abating the danger posed by unexploded artillery shells"— a "heartland" exercise of "a state's traditional police power"—"did not require just compensation," as this Court already held, *Nat'l Amusements Inc. v. Palmyra*, 716 F.3d 57, 63 (3d Cir. 2013), then neither does the restriction on LCMs.

## <u>CONCLUSION</u>

This Court should affirm the grant of summary judgment in part to the State, and reverse the grant of summary judgment in part to Plaintiffs.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:  /s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: January 8, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c), I certify that:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B)(i) because it contains 15,296 words, excluding sections exempted by Fed. R. App. P. 32(f), and thus does not exceed the 15,300-word limit.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

3.      This brief complies with L.A.R. 31.1(c) in that prior to being electronically mailed to the Court today, it was scanned by the following virus detection software and found to be free from computer viruses:

> Company: McAfee, Inc.
> Product: McAfee Endpoint Security, version 10.7.

4.      This brief complies with L.A.R. 31.1(c) in that the text of the electronic brief is identical to the text of the paper copies.

Dated: January 8, 2025

> /s/ Jeremy M. Feigenbaum
> Jeremy M. Feigenbaum
> Solicitor General

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am a member in good standing of the bar of the United States

Court of Appeals for the Third Circuit.

Dated: January 8, 2025

<u>/s/ Jeremy M. Feigenbaum</u>
Jeremy M. Feigenbaum
Solicitor General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2025, I electronically filed the foregoing brief and appendix with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system. Counsel not registered CM/ECF users will be served by mail.

<u>/s/ Jeremy M. Feigenbaum</u>
Jeremy M. Feigenbaum
Solicitor General