Nos. 24-2415, 24-2450, 24-2506

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., ET AL.,
*Plaintiffs-Appellants / Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Defendants-Appellees / Cross-Appellants*.

*(additional captions listed on inside cover)*

On Appeal from the United States District Court
for the District of New Jersey
Nos. 1:18-cv-10507, 1:22-cv-04360, 1:22-cv-04397
(Hon. Peter G. Sheridan)

**AMICUS BRIEF OF EVERYTOWN FOR GUN SAFETY
IN SUPPORT OF
DEFENDANTS-APPELLEES/CROSS-APPELLANTS**

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Ave., P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

---

MARK CHEESEMAN, ET AL.,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,

*Defendants-Appellees / Cross-Appellants.*

---

BLAKE ELLMAN, ET AL.,

*Plaintiffs-Appellants / Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,

*Defendants-Appellees / Cross-Appellants.*

---

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ........................................................................................ 4

    I.    New Jersey Can Restrict Assault Weapons and Large-Capacity Magazines Because They Are Most Useful as Weapons of War ................................................................ 4

    II.   The Court Should Reject Plaintiffs' Efforts to Rely on Unreliable and Irrelevant Survey Evidence ......................... 10

CONCLUSION ...................................................................................... 18

# TABLE OF AUTHORITIES

## CASES

*Barnett v. Raoul*,
 No. 3:23-cv-00209, 2024 WL 4719468 (S.D. Ill. Nov. 8, 2024) ...... 12, 17

*Bevis v. City of Naperville*,
 85 F.4th 1175 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491
 (2024) ........................................................................................ *passim*

*Bianchi v. Brown*,
 111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub
 nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024) .............. *passim*

*Capen v. Campbell*,
 708 F. Supp. 3d 65 (D. Mass. 2023), *appeal docketed*, No. 24-1061 (1st
 Cir. Jan. 17, 2024) ................................................................. 5, 6, 9

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
 108 F.4th 194 (3d Cir. 2024), *cert. denied*, No. 24-309, 2025 WL 76443
 (U.S. Jan. 13, 2025) ............................................................. 3, 4, 6, 11

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) .................................................................. 3, 4, 10

*Garland v. Cargill*,
 602 U.S. 406 (2024) ............................................................................ 7

*Nat'l Ass'n for Gun Rights v. Lamont*,
 685 F. Supp. 3d 63 (D. Conn. 2023), *appeal docketed*, No. 23-1162 (2d
 Cir. Aug. 16, 2023) ............................................................................ 11

*New York State Rifle & Pistol Ass'n v. Bruen*,
 597 U.S. 1 (2022) .................................................................. 1, 2, 3, 11

*Rocky Mountain Gun Owners v. Polis*,
 121 F.4th 96 (10th Cir. 2024) ............................................................ 2

*Rupp v. Bonta*,
    723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*, No. 24-2583
    (9th Cir. Apr. 24, 2024) .................................................................. 11, 14

*United States v. Rahimi*,
    602 U.S. 680 (2024) ................................................................................ 2


## OTHER AUTHORITIES

Deborah Azrael et al., *A Critique of Findings on Gun Ownership, Use,
    and Imagined Use from the 2021 National Firearms Survey: Response
    to William English*, 798 SMU L. Rev. (forthcoming 2025),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4894282
    ............................................................................................... 14, 15, 16

Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd
    Amendment Battle*, N.Y. Times (June 18, 2024),
    https://www.nytimes.com/2024/06/18/us/gun-laws-georgetown-
    professor.html ........................................................................... 15, 16, 17

Will Van Sant, *The Secret Plan to Strike Down U.S. Gun Laws*, The
    Trace (Jan. 15, 2025), https://www.thetrace.org/2025/01/gun-rights-
    litigation-funding-scotus/ ...................................................................... 16

William English, *2021 National Firearms Survey: Updated Analysis
    Including Types of Firearms Owned* (May 13, 2022),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494
    ....................................................................................................... 13, 17

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman used an assault weapon to murder twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

New Jersey's restrictions on assault weapons and large-capacity magazines are constitutional under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

(2024), which establish a text- and history-based test for assessing Second Amendment challenges. Plaintiffs' challenge fails at both the text and history steps of the analysis for the reasons set out in the State's brief, Dkt. 36 ("State Br."). Everytown submits this amicus brief to expand on two points that support the constitutionality of the challenged laws on the initial, textual inquiry of the *Bruen-Rahimi* framework.

At that first step, courts consider whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. "If not, the inquiry ends: self-evidently, if the people, weapons, or conduct at issue are outside the Second Amendment's protection, then the government may regulate them without infringing upon the Second Amendment." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024). In challenges to assault weapon and large-capacity magazine restrictions like New Jersey's, the textual inquiry turns on whether the items at issue here are "weapons that 'are in common use for self-defense today,'" *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* ("*DSSA*"), 108 F.4th 194, 211 (3d Cir. 2024) (Roth, J., concurring) (quoting *Bruen*, 597 U.S. at 47), *cert.*

*denied*, No. 24-309, 2025 WL 76443 (U.S. Jan. 13, 2025), meaning they are "suitable for, owned for, and actually used in self-defense," and not "dangerous and unusual weapons" that are "'most useful' as weapons of war" or commonly used for criminal purposes, *id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).

The challenged laws do not implicate the Second Amendment's text. *See* State Br. 13-43. This brief expands on two points related to that inquiry. *First*, it provides additional factual and legal support for the conclusion that the assault weapons and large-capacity magazines covered by New Jersey's laws are weapons and accessories of war. *See id.* at 15-23. *Second*, it explains that Plaintiffs' purported statistics about ownership and defensive usage of assault weapons and large-capacity magazines, *see* Dkt. 32 ("Cheeseman Br.") 33-37; Dkt. 30 ("ANJRPC Br.") 40-41, are based on unreliable and irrelevant survey data and thus cannot help Plaintiffs meet their textual burden to show that assault weapons and large-capacity magazines are "'in common use' today for self-defense," *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627).

# ARGUMENT

## I. New Jersey Can Restrict Assault Weapons and Large-Capacity Magazines Because They Are Most Useful as Weapons of War

The right to bear arms is not absolute. It is "not a right to keep and carry any weapon whatsoever," and it "extends only to certain types of weapons." *Heller*, 544 U.S. at 623, 626. Weapons and accessories that fall outside the Second Amendment's ambit include those that "are 'most useful in military service,' such as 'M-16 rifles and the like.'" *DSSA*, 108 F.4th at 209 (Roth, J., concurring) (quoting *Heller*, 554 U.S. at 627); *see also Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023) (stating that the Second Amendment does not protect "weapons that are exclusively or predominantly useful in military service"), *cert. denied*, 144 S. Ct. 2491 (2024).

New Jersey has explained the military origins of assault weapons and large-capacity magazines. *See* State Br. 15-17. The assault weapons primarily at issue in this suit, including the Colt AR-15, were designed and developed for the U.S. Army in the aftermath of World War II and became standard issue for the U.S. military in the mid-1960s under the name M16. *See id.* at 15-16 (citing expert report of former ATF official);

*see also Bianchi v. Brown*, 111 F.4th 438, 454-55 (4th Cir. 2024) (en banc) (discussing military origins of AR-15), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024). Large-capacity magazines also have military roots. Magazines with the capacity to hold more than ten rounds were designed to enhance the lethality and effectiveness of combat weapons in World War II and are still used by soldiers to shoot rapidly on the battlefield. *See* State Br. 16-17.

This connection between assault weapons, large-capacity magazines, and the military remains today. Civilian assault weapons like the AR-15 are "almost the same gun as the M16 machinegun" and "its carbine version, the M4," currently used by the U.S. military. *Bevis*, 85 F.4th at 1195; *Capen v. Campbell*, 708 F. Supp. 3d 65, 85 (D. Mass. 2023), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024). They "share the same core design, and both rely on the same patented operating system." *Bevis*, 85 F.4th at 1195-96; *see Capen*, 708 F. Supp. 3d at 85. And both the civilian AR-15 and the military M16 and M4 can be outfitted with large-capacity magazines and can fire dozens of bullets in rapid succession, causing extreme damage to the human body. *See*, *e.g.*, *Bianchi*, 111 F.4th at 455; *see also* State Br. 19-20 (describing,

based on expert report of emergency room physician, the "enormous" damage assault weapons cause to organs and tissue and their high fatality rates relative to other firearms).

The sole operational distinction between the AR-15 and the M16 and M4 is that AR-15s are designed to have only semiautomatic capability, while M16s and M4s can fire in both semiautomatic mode and, depending on their configuration, either fully automatic or three-round burst modes. *See Bianchi*, 111 F.4th at 456; *Bevis*, 85 F.4th at 1195-96; *Capen*, 708 F. Supp. 3d at 85. This difference is not a meaningful one in practice. *See* State Br. 18-19; *see also Bianchi*, 111 F.4th at 456 (noting that this difference "pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar").

Although they lack a preset automatic or burst mode, AR-15s can fire at rates near equal to automatic fire. As numerous courts and jurists, including Judge Roth in her *DSSA* concurrence, have observed, "semi-automatic rifles" like the AR-15 "can be modified to fire at rates approaching their fully automatic counterparts" with "ease." *DSSA*, 108 F.4th at 214 n.79 (Roth, J., concurring); *see, e.g., Bianchi*, 111 F.4th at

456 ("[T]he AR-15's rate of fire can be easily converted to mimic military-grade machine guns with devices like bump stocks, trigger cranks, and binary triggers." (citation omitted and alteration adopted)); *Bevis*, 85 F.4th at 1196 (explaining that devices like "a bump stock or a 'binary' trigger" can "double the rate at which semiautomatic weapons can be fired"). Indeed, the Supreme Court stated in *Garland v. Cargill* that a shooter trained in bump-firing technique can shoot a semiautomatic rifle "at rates approaching those of some machineguns" even *without* using a bump stock or similar modification. 602 U.S. 406, 411 (2024); *see id.* at 428 (explaining that a shooter "can achieve a rate of fire that rivals traditional machineguns" whether using a "bump-stock equipped rifle" or "an *unmodified* semiautomatic rifle using the manual bump-firing technique").

Moreover, even though M16s, M4s, and similar military assault rifles are capable of automatic or burst fire, the U.S. military rarely uses them in those modes. Instead, the semiautomatic fire that is characteristic of civilian assault weapons is widely preferred by the military for both training and combat. Retired Marine Colonel Craig Tucker and retired Army Lieutenant Colonel Jason Dempsey recently

7

explained why in sworn declarations in a similar Second Amendment challenge in Illinois. *See* Declaration and Report of Craig Tucker, *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill. Sept. 6, 2024), ECF No. 222-2 ("Tucker"); Declaration and Report of Jason Dempsey, *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D. Ill. Sept. 6, 2024), ECF No. 222-3 ("Dempsey").

Colonel Tucker and Lieutenant Colonel Dempsey are both experienced veterans with extensive knowledge of the military's training and use of firearms. Colonel Tucker commanded numerous infantry units and battalions during his 25 years of service, including in intense infantry combat in Iraq. Tucker ¶ 1. After returning from Iraq, Colonel Tucker trained and certified units for combat in Iraq and Afghanistan at the Marine Corps National Training Center. *Id*. Lieutenant Colonel Dempsey served in the U.S. Army for 22 years after graduating from the U.S. Military Academy at West Point. Dempsey ¶¶ 1, 14. Over the course of his career, he was deployed to Afghanistan multiple times and trained thousands of infantry riflemen for combat. *Id*. ¶¶ 1, 18.

Colonel Tucker and Lieutenant Colonel Dempsey testified that the U.S. military prefers semiautomatic fire to automatic fire for several reasons. First, they explained that semiautomatic fire is more accurate; the rapid recoil of automatic or burst fire makes it difficult to sustain one's aim for multiple shots. Dempsey ¶¶ 19, 22; Tucker ¶ 13; *see also, e.g.*, *Bianchi*, 111 F.4th at 456 ("The U.S. Army Field Manual instructs that semiautomatic fire is '[t]he most important firing technique during fast-moving, modern combat' because it 'is the most accurate technique of placing a large volume of fire on ... multiple, or moving targets.'"); *Capen*, 708 F. Supp. 3d at 85 ("The U.S. Army Manual on Advanced Rifle Marksmanship for the M16/M4 series weapons likewise notes that '[a]utomatic or burst fire is inherently less accurate than semiautomatic fire.'"). Second, automatic or burst fire increases the likelihood of a weapon jamming or warping from prolonged heat. Dempsey ¶¶ 17, 24; Tucker ¶ 13. Third, automatic or burst fire is logistically unsustainable because of the amount of ammunition it requires. Dempsey ¶ 19; Tucker ¶¶ 12-13. For these reasons, the U.S. military trains and expects troops equipped with M16 and M4 rifles to use them in semiautomatic mode in combat. Dempsey ¶¶ 16-18, 31; Tucker ¶¶ 10-11.

In fact, during his over two decades of military service, Lieutenant Colonel Dempsey *never* used his M16-series service rifle "for burst or automatic fire." Dempsey ¶ 16. "[N]or was [he] ever trained, nor did [he] ever train soldiers, on any tactical scenario in which burst or automatic fire from infantry riflemen was called for." *Id.*; *see also Bianchi*, 111 F.4th at 456 (crediting representation by "decorated former U.S. Navy SEAL" that he "'never once fired full auto in combat' during a decade of special operations combat deployments, including the 2011 Osama Bin Laden raid").

In short, assault weapons are "most useful in military service," *Heller*, 554 U.S. at 627, and, as the State explains, *see* State Br. 15-23, so too are large-capacity magazines. They are thus unprotected by the text of the Second Amendment—and New Jersey's laws restricting them are constitutional.

## II.   The Court Should Reject Plaintiffs' Efforts to Rely on Unreliable and Irrelevant Survey Evidence

Plaintiffs cite to several ownership and production surveys in their attempt to show that New Jersey's restrictions on assault weapons and large-capacity magazines are unconstitutional. *See* Cheeseman Br. 33-37; ANJRPC Br. 40-41. However, such survey data focuses on "the

number of weapons owned and the subjective intentions of owners."
*Rupp v. Bonta*, 723 F. Supp. 3d 837, 858 n.17 (C.D. Cal. 2024), *appeal
docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024). Accordingly, as the State
explains, *see* State Br. 30-31, and several courts have recognized, it does
not answer the relevant Second Amendment question—which is
whether these weapons and accessories are "'in common use' today for
self-defense," *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627).
*See, e.g.*, *Bevis*, 85 F.4th at 1198-99 (declining to base its assessment of
the constitutionality of assault weapon and large-capacity magazine
laws "on numbers alone," which would create "anomalous
consequences"); *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d
63, 97 (D. Conn. 2023) (explaining that a "survey on the reason for
which the survey respondents reportedly bought their assault weapons
does not demonstrate that assault weapons and LCMs possess
characteristics that make them well-suited for self-defense"), *appeal
docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *see also DSSA*, 108 F.4th
at 217 (Roth, J., concurring) (noting that "[t]hese [survey] statistics, by
themselves, do not establish that copycat [assault] weapons are

commonly used for self-defense"). Thus, on its own terms, Plaintiffs'

survey evidence is not determinative of the textual issues in this case.

But even if ownership and production data were relevant, the

surveys and statistics Plaintiffs point to are flawed and unreliable. *See*

State Br. 38; JA1649 n.31 (Declaration and Expert Report of Professor

Louis Klarevas); Supplemental Declaration and Amended Expert

Report of Louis Klarevas 9-31, *Barnett v. Raoul*, No. 3:23-cv-00209 (S.D.

Ill. May 20, 2024), ECF No. 190-1 ("Klarevas *Barnett* Report"). Dr.

Klarevas's expert report in *Barnett* rebuts each source of survey and

industry data that Plaintiffs attempt to rely on in their briefs.[2] This

brief focuses on one source in particular: William English's 2021

National Firearms Survey. *See* William English, *2021 National*

*Firearms Survey: Updated Analysis Including Types of Firearms Owned*

(May 13, 2022),

---

[2] *See* Klarevas *Barnett* Report 9-31 (addressing data and survey
findings from (i) William English, (ii) publications of the National
Shooting Sports Foundation (NSSF), and (iii) a Washington Post/Ispos
poll, which are cited and discussed at Cheeseman Br. 33-37 and
ANJRPC Br. 40-41); *see also Barnett v. Raoul*, No. 3:23-cv-00209, 2024
WL 4719468, at *7-9 (S.D. Ill. Nov. 8, 2024) (granting Illinois's motion
to preclude consideration of English and NSSF surveys).

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494 ("English Survey").

The English Survey is a self-published study of the results of an online questionnaire completed by gun owners in 2021. *Id.* at 1. Plaintiffs cite the English Survey for several points, including that (1) 30.2% of gun owners (or about 24.6 million people) own AR-15-style assault weapons, and (2) gun owners "engage in approximately 1.67 million defensive gun uses a year," including "over 200,000 defensive uses of rifles a year." Cheeseman Br. 34-35; *see also* ANJRPC Br. 41 (citing English Survey for points regarding magazine ownership). The English Survey is not a reliable source. It has not been published in accordance with professional norms, and its conclusions are out of step with those of properly conducted studies.

As an initial matter, the English Survey has not undergone the academic review process that is standard for social-science research. "[T]he normal scientific process requires peer-review prior to publication. The drafts [of the English Survey] that have been cited by litigants and others have not undergone this scientific review process." Deborah Azrael et al., *A Critique of Findings on Gun Ownership, Use,*

*and Imagined Use from the 2021 National Firearms Survey: Response to*
*William English*, 78 SMU L. Rev. (forthcoming 2025) (manuscript at 3),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4894282. To the
contrary, the author simply posted his analysis online. At least one
federal court has opined that it "could disregard the English [Survey] in
its entirety" in part because "[p]laintiffs did not submit a version
of English's article that has actually been *published*." *Rupp*, 723 F.
Supp. 3d at 860 n.19. The academic process ensures that social science
is reliable and sound. The English Survey lacks those critical
safeguards.[3] The author has also proven uncooperative in alternative
efforts to test his work, such as through the adversarial process. In
litigation regarding a Washington State assault weapon restriction, for
instance, plaintiffs rescinded their reliance on Dr. English's research
when faced with efforts to compel his testimony. *See* Mike McIntire &
Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment*
*Battle*, N.Y. Times (June 18, 2024),

---

[3] Moreover, as Dr. Klarevas has explained, the author's failure to
disclose the source of the Survey's funding likely violates professional
norms and obligations as a social-science researcher. *See* JA1649 n.31;
Klarevas *Barnett* Report 9.

https://www.nytimes.com/2024/06/18/us/gun-laws-georgetown-professor.html.

The English Survey's results should also be disregarded because they are inconsistent with those of properly conducted research. A group of five professors from Harvard, Duke, and Northeastern, including four with expertise in "the estimation of rates of gun ownership, use, and misuse" who have made "extensive use of population surveys" in their work, recently reviewed the English Survey. Azrael et al., *supra*, (manuscript at 1, 3). They found serious issues with the study's methodology and statistical results. *Id.* (manuscript at 3). For example, they noted that the Survey's estimate of 1.67 million annual defensive gun uses is 24 times higher than the estimate of the U.S. Bureau of Justice Statistics, which used data collected by the U.S. Census Bureau through the "very high quality" National Crime Victimization Survey between 2014 and 2018. *Id.* (manuscript at 5). The reviewers attribute this discrepancy to several key errors in English's study design, including that he defined defensive gun use extremely broadly (so as to potentially include incidents in which the gun owner criminally misused their firearm). *Id.* (manuscript

15

at 5-6, 14-17, 21-22). The reviewers also found the Survey's estimate of total AR-15 ownership to be significantly inflated (nearly double the industry estimate of the total number of AR-15-style rifles made and imported from 1990 to 2020), likely due to inaccurate sampling methods and misleading phrasing of the relevant survey questions. *Id.* (manuscript at 4-5, 11-13). And they critiqued the Survey's discussion of the ownership of large-capacity magazines and their utility for self-defense. *Id.* (manuscript at 6-7, 22-23); *see also* McIntire & Kantor, *supra* (quoting one of the reviewers, Dr. Matthew Miller of Northeastern University and Harvard University, explaining that "some of Dr. English's findings on self-defense 'strain credulity' and his methodology yielded 'absurd' estimates").

Other scholars have similar concerns. *See, e.g.*, Klarevas *Barnett Report* 10-12, 22-25 (discussing "methodological issues" with English Survey); *see also* Will Van Sant, *The Secret Plan to Strike Down U.S. Gun Laws*, The Trace (Jan. 15, 2025), https://www.thetrace.org/2025/01/gun-rights-litigation-funding-scotus/ (noting that "[a]cademics on both sides of the gun debate have found defects in [English's] scholarship").

These methodological concerns with the English Survey include that the author worded some of the survey questions "in a manner that suggests a negative framing of regulations on firearms and magazines," which can "cue[]" respondents (who are all gun owners) to answer defensively. Klarevas *Barnett* Report 10. Dr. English also failed to disclose in his report the most suggestive portions of the survey questions. *See* McIntire & Kantor, *supra* (explaining that the author omitted the prefaces to some of the survey questions from his report, prefaces "whose wording, according to some polling experts, essentially invited respondents to rebut supposed misconceptions about guns," and providing several examples).

For all these reasons, the English Survey's conclusions about the number of assault weapons and large-capacity magazines in circulation and the frequency of their use for self-defense are likely inaccurate and overstated. The Survey should play no role in the Court's analysis. *See Barnett*, 2024 WL 4719468, at *7 (rejecting any consideration of the English Survey where "methodological errors and inherent biases raise concerns about [its] reliability").

## CONCLUSION

This Court should affirm the district court's partial grant of summary judgment to the State and reverse the partial grant to Plaintiffs.

Dated: January 15, 2025          Respectfully submitted,

/s/ Janet Carter
Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

*Counsel for Amicus Curiae Everytown for Gun Safety*

# CERTIFICATIONS

I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i), 29(a)(5), and 32(a)(7)(B)(i) because this brief contains 3,283 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

2.      I am a member of the bar of the U.S. Court of Appeals for the Third Circuit. My date of admission was August 11, 2021.

3.      A virus detection program, SentinelOne, was run on the electronic version of this brief, and no virus was detected.

4.      The text of the electronic version of the brief is identical to the text of the paper copies.

5.      On January 15, 2025, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system, which will send notice to all registered CM/ECF users.

January 15, 2025                    /s/ Janet Carter
                                   *Counsel for amicus curiae*
                                   *Everytown for Gun Safety*