Nos. 24-2415, 24-2450, 24-2506

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, ET AL.,
*Appellants-Cross-Appellees*,

*v.*

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees-Cross-Appellants.*

———————

MARK CHEESEMAN, ET AL.,
*Appellants-Cross-Appellees*,

*v.*

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees-Cross-Appellants.*

———————

BLAKE ELLMAN, ET AL.,
*Appellants-Cross-Appellees*,

*v.*

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees-Cross-Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

———————

**BRIEF FOR AMICI CURIAE MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON AS *AMICI CURIAE* IN SUPPORT OF APPELLEES-CROSS-APPELLANTS**

———————

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
Tasha Bahal
*Deputy State Solicitor*
Arjun Jaikumar
Grace Gohlke
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2066
(617) 963-2856
(617) 963-2527
tasha.bahal@mass.gov
arjun.k.jaikumar@mass.gov
grace.gohlke@mass.gov

(*Additional counsel on signature page*)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTERESTS OF AMICI.................................................................................1

SUMMARY OF THE ARGUMENT ...........................................................2

ARGUMENT ..................................................................................................3

    I.     To Promote the Safety and Well-Being of Their Residents, Jurisdictions Impose a Range of Restrictions on Dangerous Weapons and Accessories Not Commonly Used for Self-Defense. ...........................................................................................3

    II.    New Jersey's Restrictions on LCMs and Assault Weapons Comport with the Second Amendment. ...............................................7

          A.    LCMs and Assault Weapons Are Not Presumptively Protected by the Second Amendment. ........................................8

          B.    New Jersey's Laws Are Relevantly Similar to Historical Restrictions on New, and Distinctly Dangerous, Forms of Weaponry. ...............................................................................15

CONCLUSION ...........................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*,
  910 F.3d 106 (3d Cir. 2018) .................................................................8

*Aymette v. State*, 21 Tenn. 154 (1840) ...................................................20

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ............................. *passim*

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ........................................... *passim*

*Capen v. Campbell*, 708 F. Supp. 3d 65 (D. Mass. 2023) ......................................10

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
  664 F. Supp. 3d 584 (D. Del. 2023) ......................................................14

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety &
  Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024) .......................................7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... *passim*

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ................. 13, 17

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) .........................26

*Hartford v. Ferguson*, 676 F. Supp. 3d 897 (W.D. Wash. 2023) .................... 15, 26

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...........................24

*McCullen v. Coakley*, 573 U.S. 464 (2014) .............................................................18

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............................................2

*Nat'l Ass'n for Gun Rights v. Lamont*,
  685 F. Supp. 3d 63 (D. Conn. 2023)...................................................13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .......... *passim*

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024)...............10

*Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874 (D. Or. 2023) ..................13

*Rupp v. Bonta*, 723 F. Supp. 3d 837 (C.D. Cal. 2024) ..................................... 14, 26

*State v. Reid*, 1 Ala. 612 (1840).................................................................25

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011).............................................17

*United States v. Morrison*, 529 U.S. 598 (2000) ........................................................1

*United States v. Rahimi*, 602 U.S. 680 (2024)................................................. *passim*

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019)......................................24

**Statutes**

1750 Mass. Acts 544, chap. 17, § 1 ..............................................................21

1771-72 Mass. Province Laws 167, ch. 9 ..........................................................19n

1772 N.Y. Laws 682, ch. 1549 ...................................................................19n

1782 Mass. Acts 119, ch. 46 .....................................................................19n

1784 N.Y. Laws 627 .............................................................................19n

1819 Ind. Acts 39..............................................................................20n

1821 Maine Laws 98, ch. 25 .....................................................................19n

1821 Tenn. Acts ch. 13 ...........................................................................20n

1825 N.H. Laws 73, ch. 61 .......................................................................19n

1832 Conn. Acts 391, ch. 25......................................................................19n

1837 Ga. Acts. 90, § 1 ...........................................................................20n

1837 Ala. Laws 7, Ch. 77, § 2 .............................................................20n

1837-38 Tenn. Acts 200, Ch. 137, §§ 1-2.............................................20n

1838 Va. Acts 76, Ch. 101, § 1 .............................................................20n

1838 Fla. Laws 36, No. 24 § 1 ..............................................................20n

1839 Ala. Laws 67, Ch. 77, § 1 .............................................................20n

1849 N.Y. Laws 403-404, ch. 278, §§ 1-2.............................................22n

1849 Vt. Acts & Resolves 26, No. 36, §§ 1-2 ........................................22n

1852 Tenn. Acts 246, ch. 169 ................................................................19n

1879 Tenn. Acts 135-36, An Act to Prevent the Sale of Pistols, ch. 96, § 1 ..........21

1881 Ark. Acts 191, no. 96, § 3 ................................................................21

1882 Mass. Acts 212, ch. 269 ................................................................19n

1917 Cal. Sess. Laws 221, Act of May 4, 1917, ch. 145........................22n

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 .........................23

1923 Vt. Acts and Resolves 930, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, ...................................23n

1927 Mich. Pub. Acts 888, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms.................................22

1927 R.I. Pub. Laws 256, Ch. 1052 §§ 1, 4 .........................................23n

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, no. 18, §§ 1-2 ........................................23n

iv

1932 La. Acts 336, No. 80, § 1 ...................................................................23n

1933 Cal. Stat. 1169 ...................................................................................23n

1933 Minn. Laws 231, Ch. 190, § 1.............................................................23

1934 Va. Acts 137-40, Ch. 96......................................................................23n

An Act to Control the Possession, Sale, Transfer, and Use of Pistols and
    Other Dangerous Weapons in the District of Columbia,
    Pub. L. No. 72-275, 47 Stat. 650 (1932)...........................................23n

Fla. Act of Aug. 8, 1868 .............................................................................22

Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425.....................................................22n

George Brooks Young, General Statutes of the State of Minnesota in
    Force January 1, 1889, (Vol. 2, 1888) ..............................................22n

Ill. Act of Apr. 16, 1881, chap. 38 (1885) .................................................22n

Mass. Gen. Stat., chap. 164 (1873) § 11 ....................................................22n

National Firearms Act of 1934, ch. 757, Pub. L. No. 73-474,
    48 Stat. 1236 ......................................................................................23n

Public Safety and Recreational Firearms Use Protection Act,
    Pub. L. No. 103-322................................................................... 4n, 5n

W. Ball, Revised Statutes of the State of Arkansas, Adopted at the
    October Session of the General Assembly of Said State, A.D. 1837, § 13 .......20n

**Rules**

Fed. R. App. P. 29.........................................................................................1

**Other Sources**

J. Brabner-Smith, Firearm Regulation,
    1 LAW & CONTEMP. PROBS. 400 (1934)................................................................26

R. Spitzer, *Gun Law History in the United States and Second Amendment
    Right*, 80 LAW & CONTEMP. PROBS. 55 (2017)....................................................19

S. Cornell & N. DeDino, *A Well Regulated Right: The Early American
    Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) ................................19

**INTERESTS OF AMICI**

Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington share compelling governmental interests in public safety and crime prevention. In furtherance of those interests, and pursuant to Fed. R. App. P. 29 (a)(2), *Amici* submit this brief to explain why New Jersey's regulation of the sale and possession of large-capacity magazines (LCMs) and assault weapons within its borders is wholly consistent with the Second Amendment.

There are few interests more paramount to states than protecting public safety, and especially "the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). *Amici* bear the solemn responsibility of ensuring the safety of the public and private spaces that make up the fabric of daily life in a free and democratic society. We work every day to promote our residents' health, welfare, and security, including by taking steps to curb the threats of mass shootings and other forms of gun violence that harm our residents and inhibit their exercise of constitutionally-protected freedoms.

Exercising our police powers in service of these goals, *Amici* have adopted a range of measures that regulate weapons and weapon accessories, while ensuring our residents have access to weapons for individual self-defense. *Amici* share the

conviction that the Constitution allows States to address gun violence in a manner adapted to their local needs, consistent with our Nation's historical traditions.

## SUMMARY OF THE ARGUMENT

The Second Amendment is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Recognizing that "reasonable firearms regulations" can coexist comfortably with the Second Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.), jurisdictions have adopted various restrictions on weapons and accessories that are not in common use for self-defense. Here, New Jersey prohibits the sale and possession of LCMs and assault weapons, which include but are not limited to AR-15 rifles. *See* N.J. STAT. ANN. §§ 2C:39-l(w), 2C:39-l(y), 2C:39-3(j), 2C:39-5(f), 2C:39-9(g)-(h). Like similar laws around the country, New Jersey's law preserves the right of law-abiding, responsible citizens to use firearms for self-defense.

This Court should affirm the portion of the District Court's decision upholding the constitutionality of New Jersey's restrictions on LCMs and should reverse the portion finding New Jersey's restrictions on AR-15 rifles unconstitutional. Neither LCMs nor assault weapons are "Arms" under the Second Amendment. Alternatively, New Jersey's laws are "consistent with the principles that underpin

2

our regulatory tradition" of firearm regulation. *Rahimi*, 602 U.S. at 681 (citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26-31 (2022)). From the earliest days of our Nation through Reconstruction to the present, States and the federal government have imposed limits on firepower and have restricted novel forms of weaponry that pose unique dangers to public safety. These analogous traditions amply justify New Jersey's measured restrictions on LCMs and assault weapons today.

## **ARGUMENT**

**I.     To Promote the Safety and Well-Being of Their Residents, Jurisdictions Impose a Range of Restrictions on Dangerous Weapons and Accessories Not Commonly Used for Self-Defense.**

The Second Amendment "extends only to certain types of weapons." *Heller*, 554 U.S. at 623-25. States and the federal government retain latitude to regulate specific categories of weapons and accessories, including by restricting the public carry, possession, and sale of weapons that are not commonly used for self-defense and that pose a threat to our communities. Indeed, the Supreme Court has recognized the constitutionality of laws banning categories of bearable weapons—among them, "short-barreled shotguns," and "M-16 rifles and the like"—because certain "type[s] of weapon[s]" are simply "not eligible for Second Amendment protection." *Id.* at 621-23, 625, 627 (emphasis removed).

Consistent with that guidance, States and the federal government have

adopted laws that impose restrictions on particularly lethal weapons that are not suitable for or commonly used in self-defense. Like the federal government from 1994 to 2004,[1] ten States and the District of Columbia prohibit the purchase and possession of certain semiautomatic assault weapons.[2] Although state definitions of the prohibited class of weapons differ, they typically encompass weapons like AR-15 and AK-47-style rifles that inflict catastrophic injuries and have distinct combat capabilities, rendering them uniquely devastating in mass shootings.[3] Fourteen jurisdictions ban automatic-fire machine guns, subject to limited exceptions,[4] while 27 States and the federal government ban machine guns manufactured after May 19, 1986, require registration of machine guns owned before that date, or impose other restrictions.[5] Nine States and DC also prohibit short-barreled shotguns or rifles,[6] while the federal government and 23 other States restrict those weapons.[7] Four jurisdictions prohibit high-caliber rifles,[8] five prohibit guns hidden in canes and

---

[1] Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1996-2010, codified at 18 U.S.C. §§ 921 (a), 922 (v) (2000).

[2] *See* Appendix Table 1.

[3] *See id.*

[4] *See* Appendix Table 2.

[5] *See* Appendix Table 3.

[6] *See* Appendix Table 4.

[7] *See* Appendix Table 5.

[8] *See* Appendix Table 6.

other covert weapons,[9] and 19 ban grenades, rocket launchers, or other hand-held destructive devices.[10]

States and the federal government likewise regulate accessories that enhance the lethality of weapons. Fourteen States and DC restrict the size of ammunition magazines that may be used with semiautomatic weapons, while allowing smaller-capacity magazines.[11] Eleven of these jurisdictions set a capacity limit at 10 rounds; others, like Delaware, set a higher capacity limit.[12] Twenty jurisdictions ban bump stocks, trigger cranks, binary triggers, rapid-fire trigger activators, or other devices used to approximate an automatic rate of fire with a semiautomatic weapon.[13] Silencers or suppressors, used to muffle the sound of a gun when it fires, are banned in eight States and DC[14] and are subject to restrictions or registration requirements by the federal government and 20 more States.[15]

---

[9] *See* Appendix Table 7.

[10] *See* Appendix Table 8.

[11] *See* Appendix Table 9. From 1994 to 2004, the federal government also banned handgun and long-gun magazines capable of holding more than 10 rounds. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1998-2000, codified at 18 U.S.C. §§ 921 (a), 922(w) (2000).

[12] *See id.*

[13] *See* Appendix Table 10.

[14] *See* Appendix Table 11.

[15] *See* Appendix Table 12.

States and the federal government also restrict the type and size of ammunition that can be purchased or possessed. While all States allow for robust access to ammunition, at least 26 jurisdictions prohibit especially dangerous forms. Twenty-one jurisdictions and the federal government prohibit the possession or sale of armor-piercing bullets.[16] Nine prohibit ammunition designed to explode, detonate, or segment upon impact.[17] Multiple jurisdictions prohibit certain large-caliber ammunition, usable with .50- or .60-caliber weapons[18]; hollow-point bullets, designed to expand in their target on impact[19]; and Flechette shells, expelled from guns as pieces of metal wire or dart-like projectiles.[20] Others ban certain forms of shotgun ammunition: "Dragon's breath" shells, which are used to simulate a flamethrower by making shotguns spew fireballs or columns of flames, and bolo shells, designed as two or more metal balls connected by a metal wire.[21]

All told, States and the federal government impose a variety of restrictions on a diverse array of especially dangerous weapons, accessories, and ammunition. New Jersey's law prohibiting assault weapons and restricting magazine capacity is of a

---

[16] *See* Appendix Table 13.

[17] *See* Appendix Table 14.

[18] *See* Appendix Table 15.

[19] *See* Appendix Table 16.

[20] *See* Appendix Table 17.

[21] *See* Appendix Table 18.

piece with this tapestry of regulation and, as discussed below, a long history of governmental efforts to deter violence and promote public safety.

## II. New Jersey's Restrictions on LCMs and Assault Weapons Comport with the Second Amendment.

Against the backdrop of state regulation of unusually dangerous weapons and accessories, and in light of mounting mass shootings, New Jersey chose to restrict assault weapons and large-capacity magazines, while preserving broad access to firearms commonly used for self-defense and magazines that hold up to 10 rounds of ammunition. *See* N.J. STAT. ANN. §§ 2C:39-l(w), 2C:39-l(y), 2C:39-3(j), 2C:39-5(f), 2C:39-9(g)-(h). That choice was constitutional.

Under *Bruen*, a Second Amendment challenge involves two inquiries. *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 210 (3d Cir. 2024) ("*DSSA*") (Roth, J., concurring), *pet. for cert. denied sub nom. Gray v. Jennings*, No. 24-309 (U.S. Jan. 13, 2025). First, courts ask if the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does not, "the regulated activity is categorically unprotected." *Id.* at 18. Second, if the conduct is covered by the plain text, courts ask if the restriction nevertheless "is consistent with the principles that underpin our regulatory tradition" of firearms regulation. *Rahimi*, 602 U.S. at 681. Under either step, New Jersey's restrictions are valid.

7

## A.    LCMs and Assault Weapons Are Not Presumptively Protected by the Second Amendment.

Plaintiffs-appellants have not shown that possessing and carrying LCMs and assault weapons is protected by the Second Amendment at *Bruen*'s first step.

**First,** for the reasons stated in New Jersey's principal brief, LCMs are not bearable "Arms" at all, and this Court's decision in *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 119 (3d Cir. 2018) ("*ANJRPC II*"), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022), does not govern this portion of the *Bruen* analysis. *See* Brief of Appellees-Cross-Appellants Attorney General of New Jersey et al. at 41-44; *see also DSSA*, 108 F.4th at 216 (Roth, J., concurring) ("[T]he evidence that sufficed for the sake of argument in *ANJRPC* [*II*] … does not suffice here" to decide whether LCMs are "Arms").

**Second**, neither LCMs nor assault weapons are entitled to presumptive Second Amendment protection because they are not "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). The Second Amendment's "right to keep and bear arms" is "a specific entitlement with a particular meaning in the ratifying public's consciousness, with baked-in prerogatives and qualifications alike." *Bianchi v. Brown*, 111 F.4th 438, 447 (4th Cir. 2024) (en banc), *pet. for cert. pending sub nom. Snope v. Brown*, no. 24-203. While "Arms typically used by average citizens for self-defense are generally within

8

the ambit of the Second Amendment, … other weapons … [can] be banned without infringing upon the right to bear arms." *Id.* at 450; *see also Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024) ("Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense.").

The record evidence establishes that LCMs and assault weapons are not in common use for lawful self-defense. Assault weapons are designed to inflict catastrophic injuries by firing high-velocity ammunition at long range, and they can easily penetrate walls to injure bystanders, making them poor civilian self-defense weapons. *E.g.*, JA1861-63 (Yurgealitis Rept. ¶¶135-42); *see also Bianchi*, 111 F.4th at 458 ("[F]iring an AR-15 in close quarters will often put the safety of cohabitants and neighbors in jeopardy."). Bullets fired from an AR-15 are "more destructive" than those fired by Thompson machineguns, handguns, or muskets, and the weapon is "capable of causing significantly more destruction than a hunting rifle." JA1561 (Hargarten Rept. ¶¶28-29). Indeed, the AR-15 was "built to generate 'maximum wound effect.'" *Bianchi*, 111 F.4th at 455. LCMs similarly "were not initially designed or intended for the civilian marketplace," but instead "can be traced directly to a military heritage." JA1846 (Yurgealitis Rept. ¶91).

9

The features that make assault weapons ideal for offensive combat make them "ill-suited for the vast majority of self-defense situations in which civilians find themselves." *Bianchi*, 111 F.4th at 458. They lack "the advantages that the Supreme Court identified in *Heller* as establishing the handgun as the 'quintessential self-defense weapon,'" *id.* at 459, since assault weapons are "significantly heavier and longer than typical handguns, making them less concealable, more difficult to use, and less readily accessible." *Capen v. Campbell*, 708 F. Supp. 3d 65, 86 (D. Mass. 2023), *appeal pending*, No. 24-1061 (1st Cir.); *see also* JA1862-63 (Yurgealitis Rept. ¶¶141-42). As the Seventh Circuit concluded, "assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry," *Bevis*, 85 F.4th at 1195-97, which "may be banned," *Heller*, 554 U.S. at 627. *See also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024) ("*OST*"), *pet. for cert. pending*, no. 24-131 (ability of semiautomatic weapons with LCMs to "rapidly hit very many human targets" is "conducive to combat in war zones," but "not a useful feature for self-defense"); *Bianchi*, 111 F.4th at 455.

The AR-15 in particular "is almost the same gun as the M16 machinegun," *Bevis*, 85 F.4th at 1195, "show[ing] that these weapons were intended for offensive combat applications rather than individual self-defense," *Bianchi*, 111 F.4th at 454; *see also Heller*, 554 U.S. at 627 (confirming "M-16 rifles and the like[] may be banned"). The only difference between the AR-15 and the M16 is the latter's

automatic-fire capability, which has little bearing on the AR-15's suitability for offensive combat over self-defense. "[T]he AR-15's rate of fire can 'be easily converted to ... mimic military-grade machine guns' with devices like bump stocks, trigger cranks, and binary triggers." *Bianchi*, 111 F.4th at 456. Furthermore, the U.S. Army "instructs that semiautomatic fire is '[t]he most important firing technique during fast-moving, modern combat' because it 'is the most accurate technique of placing a large volume of fire on ... multiple, or moving targets.'" *Id.* The M16's automatic capability thus "pales in significance compared to the plethora of combat-functional features that makes the [M16 and AR-15] so similar." *Id.; see also Bevis*, 85 F.4th at 1197 (AR-15 not "materially different from the M16").

Nor are assault weapons or LCMs typically used for self-defense. New Jersey's expert explained that assault weapons are used *at most* in 2% of self-defense incidents, and more than ten shots are fired *at most* in 0.3% of all self-defense incidents. JA1480-93 (Allen Rept. ¶¶7-24). As the First Circuit determined, "civilian self-defense rarely—if ever—calls for the rapid and uninterrupted discharge of many shots, much less more than ten." *OST*, 95 F.4th at 45 (citing sources). By contrast, these instruments *are* used disproportionately in mass shootings, especially those causing many fatalities. *E.g.*, JA1632-34 (Klarevas Rept. ¶13 & Figs. 2-6); JA1494-1505 (Allen Rept. ¶¶25-41); JA1750-54 (Webster Rept. ¶¶7-13); *see also Bianchi*, 111 F.4th at 457 ("AR-15 or AK-47 type assault rifles … have been used in every

major terrorist attack on U.S. soil in the past decade"). Simply put, "[s]emiautomatic firearms fitted with LCMs are highly effective weapons of mass slaughter" but are "not … useful … for self-defense." *OST*, 95 F.4th at 46, 49.

Plaintiffs-appellants erroneously ask a different question: whether the weapons are "in circulation today" in high quantities. *See* Brief of Appellants-Cross-Appellees ANJRPC et al. ("ANJRPC Br.") at 29; Brief of Appellants-Cross-Appellees Cheeseman et al. ("Cheeseman Br.") at 31-32. But relying simply on circulation numbers "contravenes case law in addition to logic." *OST*, 95 F.4th at 50-51. The precedent is clear: whether a weapon falls within the Second Amendment turns on whether it is in common *use* for self-defense, not common *ownership*. *See Bruen*, 597 U.S. at 38 (referring to "commonly *used* firearms for self-defense"); *id.* at 70 (describing "right to bear commonly *used* arms in public"); *see also Heller*, 554 U.S. at 636 (striking down an "absolute prohibition of handguns held *and used* for self-defense" (emphases added)). Courts must consider whether the weapon actually "facilitate[s] armed self-defense," which is "the central component of the Second Amendment right." *Bruen*, 597 U.S. at 28-29; *see also Bianchi*, 111 F.4th at 459-60 (rejecting view that "so long as enough law-abiding citizens own a type of firearm, that type of firearm cannot be prohibited" as "misread[ing] *Heller* and *Bruen*"); *OST*, 95 F.4th at 51. While "a modern American citizen might want to possess a military-grade weapon" for self-defense, that desire alone is insufficient.

12

*Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 103 (D. Conn. 2023), *appeal pending*, No. 23-1162 (2d Cir.); *see also Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 918-19 (D. Or. 2023), *appeal pending*, No. 23-35479 (9th Cir.) (firearms consumers' "subjective intent" cannot be dispositive).

Moreover, an ownership tally approach is hopelessly circular. The quantity of a weapon in circulation depends in large part on when prohibitive legislation was enacted; had governments banned AR-15s the moment they became commercially available, their circulation numbers would be negligible. But "[i]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *see also Bevis*, 85 F.4th at 1198-99. That position "ignores the reality that weapons may well proliferate before lawmakers comprehend that they are ill-suited or disproportionate to self-defense," and "foreclose the ability of legislators to assess these characteristics and to enhance their knowledge through observation and experience." *Bianchi*, 111 F.4th at 460-61; *see also OST*, 95 F.4th at 50 ("Law advances more slowly than the technology it regulates, but must nonetheless be able to respond when the ramifications of a technological development become more apparent over time."). And if a tally threshold were the only test, manufacturers could "secure constitutional immunity

13

for their products" by flooding the market with "a sufficient quantity before legislatures can react"—a wholly illogical proposition. *Bianchi*, 111 F.4th at 461.[22]

Plaintiffs-appellants' position also implies a conclusion *Heller* found "startling": that the Second Amendment protects machine guns. 554 U.S. at 624-25. Data from the Bureau of Alcohol, Tobacco, Firearms, and Explosives shows that civilians legally own hundreds of thousands of machine guns. *See Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 592 (D. Del. 2023), *aff'd on other grounds*, *DSSA*, 108 F.4th 194 (3d Cir. 2024). Under an ownership tallying approach, that would suffice for constitutional protection—an untenable position the Supreme Court has rejected. *See Heller*, 554 U.S. at 624. Multiple circuits have likewise rejected Plaintiffs-appellants' proposed test. *See Bevis*, 85 F.4th at 1190; *Bianchi*, 111 F.4th at 459-61; *OST*, 95 F.4th at 51.

LCMs and assault weapons are not in common use for self-defense, or suitable for that purpose. *See DSSA*, 108 F.4th at 16 (Roth, J., concurring) ("[N]one of the assault weapons or LCMs [the state] seeks to regulate are 'Arms' at *Bruen* step one."). This Court should join other courts post-*Bruen* that have come to this conclusion. *See, e.g.*, *Bevis*, 85 F.4th at 1192-97; *Bianchi*, 111 F.4th at 441-42; *Rupp*

---

[22] Indeed, based on "numbers alone, the federal assault weapons ban would have been constitutional before 2004," but unconstitutional after, when "these weapons began to occupy a more significant share of the market." *Bevis*, 85 F.4th at 1199.

*v. Bonta*, 723 F. Supp. 3d 837, 862 (C.D. Cal. 2024), *appeal pending*, No. 24-2583 (9th Cir.); *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 903-04 (W.D. Wash. 2023); *Lamont*, 685 F. Supp. 3d at 103.

### B.    New Jersey's Laws Are Relevantly Similar to Historical Restrictions on New, and Distinctly Dangerous, Forms of Weaponry.

Even if assault weapons and LCMs are protected "Arms," New Jersey's law is valid under the second step of the *Bruen* analysis. Restrictions on protected arms are constitutional if the government can demonstrate that they are "part of an enduring American tradition of state regulation." *Bruen*, 597 U.S. at 69. Laws like New Jersey's, restricting unusually dangerous weaponry, have a long historical pedigree. Since the earliest days of our republic, governments have restricted access to uniquely dangerous weapons and accessories that pose an inordinate public safety risk once in the commercial market.

To determine whether a statute is consistent with a historical tradition of firearms regulation, courts must reason by analogy. *Id.* at 27-30. This "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. This Court's task is to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id*. There are "at least two metrics" for analyzing whether historic and modern regulations are relevantly similar: "how and why the regulations

15

burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. This analysis does not demand a "historical twin" or a "dead ringer" to modern regulations. *Rahimi*, 602 U.S. at 692.

Indeed, *Rahimi* cautioned that "some courts have misunderstood the methodology" laid out in *Bruen* by insisting on "a law trapped in amber." *Id.* at 691. Properly understood, the Second Amendment "permits more than just those regulations identical to ones" within our nation's early history. *Id.* In cases like this one—involving "unprecedented societal concerns" as well as "dramatic technological changes" posed by LCMs and assault weapons—a "more nuanced approach" is appropriate. *Bruen*, 597 U.S. at 27, 30; *see also Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) ("[h]istorical regulations reveal a principle, not a mold"); *Bianchi*, 111 F.4th at 463 (applying "nuanced approach" to Maryland's assault weapons restriction where "[r]apid advancements in gun technology" have created "mass carnage" unknown to "our forebears").

Moreover, courts should consider the broad sweep of our country's history when reviewing the constitutionality of a state law. In *Heller* and *Bruen*, the Court examined eighteenth- and nineteenth-century statutes and case law. *See Bruen*, 597 U.S. at 44-70; *Heller*, 554 U.S. at 600-19. The Court made clear that post-ratification history is not only relevant, but a "critical tool of constitutional interpretation" that elucidates "the public understanding of a legal text in the period after its enactment

16

or ratification." *Heller*, 554 U.S. at 605 (emphasis removed); *see also Rahimi*, 602 U.S. at 725 (Kavanaugh, J., concurring) ("[T]he Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text."). *Heller* conducted an extensive review of post-ratification sources from 1803 to 1891, *see* 554 U.S. at 605-19, and *Bruen* did likewise through 1890, *see* 597 U.S. at 67. *Heller* took pains to distinguish post-ratification history, which it endorsed, from "postenactment legislative history," which it dismissed as a "contradiction in terms." 554 U.S. at 605 (emphasis removed).

Twentieth-century history that does not "contradict[] earlier evidence" is also relevant with respect to establishing a historical tradition of relevantly similar regulation. *See Bruen*, 597 U.S. at 66 & n.28. In *Heller*, the Court characterized twentieth century laws—including laws banning people with felony convictions or mental illness from possessing weapons—as "longstanding" and "presumptively lawful." 554 U.S. at 626-27 & n.26; *see United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011) ("[T]he modern federal felony firearm disqualification law … is firmly rooted in the twentieth century."). Similarly, "*Heller* deemed a ban on private possession of machine guns to be obviously valid," even though "states didn't begin to regulate private use of machine guns until 1927." *Friedman*, 784 F.3d at 408. Furthermore, twentieth-century history can be uniquely probative in cases involving emergent weapons that were not widely publicly available previously. The absence

17

of eighteenth- and nineteenth-century legislative enactments addressing such weapons cannot be dispositive, because there was scant reason for States to regulate the weapons during those eras. This case is a prime example: in the eighteenth century, "virtually all firearms in common use in the era of the Second Amendment were single-shot, muzzle-loading black powder weapons," JA1014 (Cornell Rept. p.24), whereas repeating rifles were considered "singular" and "curious" oddities at the time the Second Amendment was ratified. JA1014-18 (Cornell Rept. p.24-28); *see also* JA1080-87 (Spitzer Rept. ¶40). The Second Amendment, like the First Amendment, "does not require States to regulate for problems that do not exist." *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (citation omitted).

Moreover, the Constitution does not require States to legislate to the zenith of their authority by, for example, restricting curio weapons or those that have yet to pose a public-safety problem. Rather, the Constitution allows States the flexibility to "adopt laws to address the problems that confront them." *Id.*; *see also Rahimi*, 602 U.S. at 739 (Barrett, J., concurring) ("[I]mposing a test that demands overly specific analogues ... assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them.").

New Jersey's laws restricting assault weapons and LCMs have a plethora of "relevantly similar" analogues. From the colonial period on, States and

municipalities adopted measures that sought to restrict the firepower of weapons in order to promote public safety.[23] *See* S. Cornell & N. DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 511 (2004) ("Limits on the amount of gunpowder a person could possess were common and typically in the range of twenty to thirty pounds."); R. Spitzer, *Gun Law History in the United States and Second Amendment Right*, 80 LAW & CONTEMP. PROBS. 55, 80-81 (2017) (summarizing gunpowder storage laws). These gunpowder restrictions "resulted from the accumulation of firepower disproportionate to the lawful purpose of individual self-defense" and so are early examples of arms-related restrictions that "respond[] to the most urgent and visible threats" of the time, "while nonetheless protecting the core right of their citizens to defend themselves with arms in pressing circumstances." *Bianchi*, 111 F.4th at 464.

Similarly, States and the federal government have historically adopted measures that, like New Jersey's laws, regulate novel and unusually dangerous

---

[23] *See, e.g.,* 1782 Mass. Acts 119, ch. 46 (fining anyone who "shall take into any [house or building] within the Town of Boston, any … Fire-Arm, loaded with, or having Gun-Powder."); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627 (restricting home storage of gunpowder to "four stone jugs or tin cannisters" of seven pounds each); 1882 Mass. Acts 212, ch. 269 (requiring registration of more than one pound of gunpowder stored in buildings); 1771-72 Mass. Province Laws 167, ch. 9 (requiring gunpowder imported into Massachusetts be stored in public magazines); *see also* 1832 Conn. Acts 391, ch. 25; 1825 N.H. Laws 73, ch. 61; 1821 Maine Laws 98, ch. 25; 1772 N.Y. Laws 682, ch. 1549; 1852 Tenn. Acts 246, ch. 169.

weapons that contribute to crime without corresponding utility for self-defense. This tradition followed a predictable pattern: first, new weapons technologies were developed; second, they spread into society and created a public safety threat; and third, governments enacted regulations to dampen weapons-related criminality and violence. *See Bianchi*, 111 F.4th at 462 ("[T]he arc of weapons regulation in our nation has mimicked a call and response composition, in which society laments the harm certain excessively dangerous weapons are wreaking, and the state, pursuant to its police power, legislates in kind.").

In the early nineteenth century, States increasingly began imposing restrictions on weapons like Bowie knives[24] and pocket pistols[25] that were contributing to rising murder rates. *See Aymette v. State*, 21 Tenn. 154, 158 (1840) (in upholding law banning sale and concealed carry of Bowie knives, distinguishing between protected weapons and "weapons which are usually employed in private

---

[24] *See, e.g.*, 1837 Ga. Acts. 90, § 1; Ch. 77, § 2, 1837 Ala. Laws 7, 7; No. 24 § 1, 1838 Fla. Laws 36, 36; Ch. 137, §§ 1-2, 1837-38 Tenn. Acts 200; Ch. 101, § 1, 1838 Va. Acts 76, 76; Ch. 77, § 1, 1839 Ala. Laws 67, 67. "Designed for the express purpose of fighting, dirks and Bowie knives generally had longer blades than ordinary knives, crossguards to protect users' hands, and clip points that made it easier to stab an opponent." *Bianchi*, 111 F.4th at 465.

[25] *See, e.g.*, 1819 Ind. Acts 39; 1821 Tenn. Acts ch. 13, p. 15; W. Ball, Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837, § 13, 280 (1838); Ch. 101, § 1, 1838 Va. Acts 76, 76.

broils, and which are efficient only in the hands of the robber and the assassin"); *see* JA1098-1107 (Spitzer Rept. ¶¶60-69) ("a total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name."). Many laws prohibited concealed carry of these weapons, and some, like Arkansas's and Tennessee's postbellum statutes regulating pocket pistols, likewise banned sales. *See* An Act to Prevent the Sale of Pistols, ch. 96, § 1, 1879 Tenn. Acts 135-36; 1881 Ark. Acts 191, no. 96, § 3. *See also OST*, 95 F.4th at 46 (discussing "the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent").

This era also saw continued regulation of clubs and other blunt weapons, including slingshots.[26] As early as 1750, Massachusetts enacted a law authorizing the dispersal or seizure of groups of twelve or more people armed with "clubs or other weapons." 1750 Mass. Acts 544, chap. 17, § 1. The most common regulatory method during the 19th century was the prohibition of concealed carry, but at or around Reconstruction, several states prohibited the manufacture and/or sale of

---

[26] A slingshot is a hand-held weapon comprising "a weight fastened to the end of a chain or rope that can be swung around to apply blunt force to an opponent." *Bianchi*, 111 F.4th at 467 n.9.

slungshots, including New York and Vermont in 1849, Massachusetts in 1850, Florida in 1868, Illinois in 1881, and Minnesota in 1888.[27] Illinois's 1881 law also prohibited possession. Later, additional states prohibited possession of items like slungshots, billy clubs and bludgeons.[28] *See also Bianchi*, 111 F.4th at 466-67 & nn.5-10 (citing restrictions on "excessively dangerous weapons such as Bowie knives, dirks, sword canes, metal knuckles, slungshots, and sand clubs"). *See generally* Spitzer, *Gun Law History*, 80 Law & Contemp. Probs. at 62–68; JA1107-1111 (Spitzer Rept. ¶¶70-77).

In the 1920s and 1930s, the Nation witnessed a new wave of regulation of emergent weapons that threatened public safety. Restrictions of this era "include[] bans on sawed-off shotguns … [and] restrictions on machine guns, most of which have been effectively banned nationally since 1986." *OST*, 95 F.4th at 46. Sawed-off shotguns were regulated federally in 1934, "after they became popular with the

---

[27] 1849 N.Y. Laws 403-404, ch. 278, §§ 1-2; 1849 Vt. Acts & Resolves 26, No. 36, §§ 1-2; Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11; Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425; Ill. Act of Apr. 16, 1881, chap. 38 (1885) 88, § 1; George Brooks Young, General Statutes of the State of Minnesota in Force January 1, 1889, Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.

[28] *See, e.g.,* Act of May 4, 1917, ch. 145, §§ 1, 2, 5, 1917 Cal. Sess. Laws 221, 221-22; 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

'mass shooters of their day'—notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." *Id.* at 47.[29] Machine guns were also first regulated by Congress in 1934, about fifty years after their invention. *Id.* at 50.[30] *See also Bianchi*, 111 F.4th at 470 ("At least 29 states enacted anti-machine-gun laws between 1925 and 1934[.]") & n.14 (citing state statutes).

During these decades, some jurisdictions also banned or otherwise restricted high-capacity semiautomatic weapons shortly after they began to proliferate, typically in the same legislation that banned machine guns.[31] In the same era, many states imposed limitations on magazine capacity, typically restricting the number of rounds to between five and eighteen.[32] *See* JA1058-74 (Spitzer Rept. ¶¶5-26) (discussing historical regulation of fully automatic and semiautomatic firearms,

---

[29] *See, e.g.*, National Firearms Act of 1934, ch. 757, Pub. L. No. 73-474, 48 Stat. 1236.

[30] *See, e.g.*, National Firearms Act of 1934; 18 U.S.C. § 922 (o).

[31] An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, no. 372 § 3, 1927 Mich. Pub. Acts 888, 888-89; Ch. 1052 §§ 1, 4, 1927 R.I. Pub. Laws 256, 256-57; An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat. 650, 650 (1932); Ch. 190, § 1, 1933 Minn. Laws 231, 232; Ch. 96, 1934 Va. Acts 137-40.

[32] *See, e.g.*, 1933 Cal. Stat. 1169, 1170; No. 80, § 1, 1932 La. Acts 336, 337; An Act to Regulate the Sale, Possession and Transportation of Machine Guns, no. 18, §§ 1-2, 1931 Ill. Laws 452-53; An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, 1923 Vt. Acts and Resolves 930.

23

ammunition feeding devices, and expanded magazines).

This tradition of regulating unusually dangerous weapons and weapon accessories is relevantly similar to the challenged New Jersey laws with respect to "how and why" the laws "burden" the "right to armed self-defense." *Bruen*, 597 U.S. at 29. With respect to *how*: both types of measures regulate specific dangerous weapons used for criminal and other violent purposes, rather than standard weapons of self-defense. Unlike the laws in *Heller* and *Bruen*, the enactment here, like its historical antecedents, does not ban an entire class of arms and does not effectively prohibit citizens from carrying firearms for self-defense. Indeed, given how rarely assault weapons or weapons fitted with LCMs are used for self-defense purposes, *see supra* at pp.11-12, New Jersey's laws impose at most a negligible burden on the right to armed self-defense. *See Heller v. District of Columbia*, 670 F.3d 1244, 1261-62 (D.C. Cir. 2011) ("*Heller II*") (District's ban on assault weapons does "not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun" and does not "impose a substantial burden on" the right to self-defense (quoting *Heller*, 554 U.S. at 629)), *abrogated in part on other grounds by Bruen*, 597 U.S. 1; *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) (law banning assault weapons "does not heavily burden the core right of self-defense" because using these weapons for self-defense "is tantamount to using a sledgehammer to crack open the shell of a peanut"), *abrogated in part on other grounds by Bruen*, 597 U.S. 1.

24

*Bruen* does not require that the analogue for a weapon-specific ban be an identical weapon-specific ban. Requiring such an exact fit would yield precisely the "law trapped in amber," that the Court rejected in *Rahimi*. 602 U.S. at 691. Instead, *Rahimi* demonstrated that a law that is "by no means identical" to historical regulations can survive a Second Amendment challenge and that a court's analogical reasoning can comprise several types of historical laws that, "taken together," form the shared "principle" underpinning a modern regulation and its historical predecessors. *Id.* at 698; *see also id.* at 739 (Barrett, J., concurring) ("To be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart.") (emphasis in original). Indeed, the historical evidence here presents a closer fit than in *Rahimi. See id*. at 698 (upholding federal ban on possession by individuals subject to domestic-violence restraining orders based on historical surety and going-armed laws, even though such laws were not possession bans).

The "why" of New Jersey's laws is also relevantly similar to the purpose of this tradition of regulation: to enhance public safety in the face of new weapon technology that threatens, or has already inflicted, significant harm on Americans. The Bowie-knife restrictions of the early 1800s, for example, were intended "to promote personal security, and to put down lawless aggression and violence." *State v. Reid*, 1 Ala. 612, 617 (1840). The early twentieth-century regulation of machine

guns, semiautomatic weapons, and ammunition feeding devices stemmed from concern over the "growth of armed gangsterism [that] resulted in the use of more deadly weapons by criminals." J. Brabner-Smith, Firearm Regulation, 1 LAW & CONTEMP. PROBS. 400, 405 (1934); JA1070-75 (Spitzer Rept. ¶¶23-29).

Thus, as other courts have concluded, there is "a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians." *Bianchi*, 111 F.4th at 471; *see also OST*, 95 F.4th at 49-50; *Hanson v. District of Columbia*, 120 F.4th 223, 237-40 (D.C. Cir. 2024); *Lamont*, 685 F. Supp. 3d at 108-113; *Rupp*, 723 F. Supp. 3d at 862-74; *Hartford*, 676 F. Supp. 3d at 904-07; *cf. DSSA*, 108 F.4th at 217 (Roth, J., concurring) ("Delaware's laws [prohibiting large-capacity magazines] are consistent with the nation's historical traditional of firearm regulation."). New Jersey's choice to restrict access to LCMs and assault weapons is consistent with the principles underpinning a long tradition of relevantly similar historical antecedents and comports with the Second Amendment.

## **CONCLUSION**

This Court should affirm in part and reverse in part the order of the District Court and order that judgment enter for the Appellees-Cross-Appellants.

Respectfully submitted,

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

s/ Tasha Bahal
Tasha Bahal
*Deputy State Solicitor*
Arjun Jaikumar
Grace Gohlke
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2066
tasha.bahal@mass.gov
arjun.k.jaikumar@mass.gov
grace.gohlke@mass.gov

Date: January 15, 2025

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General for the*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 S. LaSalle Street
Chicago, IL 60603

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
 King Jr. Blvd.
St. Paul, MN 55155

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am an attorney in good standing of the bar of the Third

Circuit.

<div style="margin-left: 40%;">

*s/ Tasha Bahal*
Tasha Bahal
Deputy State Solicitor
Office of the Massachusetts Attorney General
Massachusetts Bar # 675935

</div>

Date: January 15, 2025

29

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This Amicus Curiae brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29 (a)(5) because this brief contains 6,243 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Amicus Curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

The text of the paper copies of this brief and the text of the PDF version of this brief filed electronically with the Court today are identical.

Prior to electronically filing this brief with the Court today it was scanned by Crowdstrike Falcon, Version 7.19.18913.0, a virus detection software, and found to be free from computer viruses.

*s/ Tasha Bahal*
Tasha Bahal
Deputy State Solicitor
Office of the Massachusetts Attorney General

Date: January 15, 2025

## **CERTIFICATE OF SERVICE**

On January 15, 2025, the undersigned caused this brief to be filed with the Clerk of the United States Court of Appeals for the Third Circuit via electronic filing. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Tasha Bahal*
Tasha Bahal
Deputy State Solicitor
Office of the Massachusetts Attorney General

Date: January 15, 2025

## **APPENDIX**

This Appendix is included pursuant to Fed. R. App. P. 28(f).

### **Table 1: Assault Weapon Restrictions**

The following jurisdictions restrict the possession or sale of assault weapons as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code §§ 30500-30515, 30600, 30605. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202a-202c. |
| **Delaware** | Del. Code tit. 11, §§ 1465-1466(a). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.01, 7-2502.02(a)(6). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.9. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-303. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(w), -5(f) |

| New York | N.Y. Penal Law §§ 265.00(22), 265.02(7). |
|---|---|
| Washington | Wash. Rev. Code §§ 9.41.0001, 9.41.010(2), 9.41.240 (2023 Wash. Sess. Laws, ch. 162, § 1). |

### Table 2: Laws Banning Automatic Weapons

The following jurisdictions ban automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| California | Cal. Penal Code § 32625. |
| Colorado | Colo. Rev. Stat. § 18-12-102. |
| Delaware | Del. Code tit. 11, §§ 1444(a)(5), (b)(1). |
| District of Columbia | D.C. Code Ann. §§ 7-2501.01(10), 7-2502.01, 7-2502.02(a)(2). |
| Hawaii | Haw. Rev. Stat. Ann. § 134-8(a). |
| Illinois | 720 Ill. Comp. Stat. 5/24-1(a)(7)(i). |
| Iowa | Iowa Code §§ 724.1(a), 724.3. |
| Louisiana | La. Rev. Stat. Ann. §§ 40:1751 to 40:1752. |

| | |
|---|---|
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(*i*), -5(a) |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-8(a). |
| **Wisconsin** | Wis. Stat. § 941.26(1g)(a). |

### Table 3: Laws Requiring Registration of Pre-1986 Automatic Weapons

The following jurisdictions require that all automatic weapons manufactured before 1986 be registered with a licensing agency as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(24), 922(o); 26 U.S.C. § 5845(b). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(C). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53-202. |

| | |
|---|---|
| **Florida** | Fla. Stat. §§ 790.001(9), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(2), 16-11-122, 16-11-124(4). |
| **Indiana** | Ind. Code Ann. §§ 35-47-5-8 to 35-47-5-8-10. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, §§ 1051-1052. |
| **Maryland** | Md. Code Ann. §§ 4-401 to 4-405. |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(a), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(a). |
| **Montana** | Mont. Code Ann. §§ 45-8-302 to 45-8-304. |
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |

| | |
|---|---|
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. § 908. |
| **South Carolina** | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6. |
| **Tennessee** | Tenn. Code Ann. §§ 39-17-1302(a)(3), (d). |
| **Texas** | Tex. Penal Code §§ 46.01(9), 46.05(a)(1)(B). |
| **Virginia** | Va. Code §§ 18.2-288 to 18.2-298. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(29), 9.41.190. |
| **West Virginia** | W. Va. Code § 61-7-9. |

**Table 4: Laws Banning Short-Barreled Shotguns or Rifles**

The following jurisdictions ban possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 33210, 33215. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(4), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(15), (17), 7-2502.01, 7-2502.02(a)(1), (a)(3). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(ii). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 121; Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(o), 2C:39-3(b). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(15) to 11-47-2(16), 11-47-8(b). |

**Table 5: Laws Restricting Short-Barreled Shotguns or Rifles**

The following jurisdictions restrict the possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(6), 921(a)(8), 922(a)(4). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(D). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iv), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Florida** | Fla. Stat. §§ 790.001(10)-(11), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(4)-(5), 16-11-122, 16-11-124(4). |
| **Iowa** | Iowa Code § 724.1C. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Michigan** | Mich. Comp. Laws § 750.224b. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(b). |
| **Montana** | Mont. Code Ann. § 45-8-340. |

| | |
|---|---|
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.275. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-02-03. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. § 908. |
| **South Carolina** | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (46), 22-14-6. |
| **Texas** | Tex. Penal Code §§ 46.01(10), 46.05(a)(1)(C). |
| **Washington** | Wash. Rev. Code §§ 9.41.010(41)-(42), 9.41.190. |
| **Wisconsin** | Wis. Stat. § 941-28. |

## Table 6: Laws Banning 50-Caliber and Other High-Caliber Rifles

The following jurisdictions ban possession of rifles designed to shoot 50-Caliber and other High-Caliber ammunition.

| Jurisdiction | Jurisdictional Law |
|---|---|
| California | Cal. Penal Code §§ 30530, 30600, 30610. |
| District of Columbia | D.C. Code Ann. §§ 7-2501.01(8A), 7-2502.01, 7-2502.02(a)(7). |
| Illinois | 720 Ill. Comp. Stat. 5/24-1(a)(15)-(16), 5/24-1.9. |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(c)(3), (5), 2C:39-3(a). |

## Table 7: Laws Banning Covert Weapons

The following jurisdictions ban possession of covert and hidden firearms as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| Alabama | Ala. Code § 13A-11-54. |
| California | Cal. Penal Code § 24410. |
| Massachusetts | Mass. Gen. Laws ch. 140, § 131N. |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(hh), 2C:39-3(m). |
| New York | N.Y. Penal Law § 265.02(6). |

## Table 8: Laws Banning Destructive Devices

The following jurisdictions ban the possession of grenades, rocket launchers, bombs, and other destructive devices as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **California** | Cal. Penal Code §§ 16460, 18710. |
| **Colorado** | Colo. Rev. Stat. § 18-12-109(2)(a). |
| **Connecticut** | Conn. Gen. Stat. § 53-80(a). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1444(a)(1), (b)(1). |
| **District of Columbia** | D.C. Code § 22-4515a. |
| **Florida** | Fla. Stat. §§ 790.001(4), 790.161. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(iii). |
| **Iowa** | Iowa Code §§ 101A.1(2A), 724.1(1)(c), 724.3. |
| **Massachusetts** | Mass. Gen. Laws ch. 266, § 102(c). |
| **Minnesota** | Minn. Stat. § 609.668. |

| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(c)(1), 2C:39-3(a). |
| --- | --- |
| New York | N.Y. Penal Law § 265.02(2). |
| Oregon | Or. Rev. Stat. § 480.070. |
| Pennsylvania | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| Rhode Island | R.I. Gen. Laws § 11-47-21. |
| Utah | Utah Code Ann. § 76-10-306(3). |
| Virginia | Va. Code Ann. § 18.2-85. |
| Wisconsin | Wis. Stat. § 941.26(2)(c). |

## Table 9: Laws Restricting Magazine Capacity

The following jurisdictions restrict the quantity of rounds able to be fired from a single magazine as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
| --- | --- |
| California | Cal. Penal Code §§ 16740, 32310. |
| Colorado | Colo. Rev. Stat. §§ 18-12-301, 302, 303. |
| Connecticut | Conn. Gen. Stat. § 53-202w(a)(1). |

| | |
|---|---|
| **Delaware** | Del. Code Ann. tit. 11, §§ 1468, 1469(a). |
| **District of Columbia** | D.C. Code § 7-2506.01(b). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.10. |
| **Maryland** | Md. Code Ann., Crim. Law § 4-305(b). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j). |
| **New York** | N.Y. Penal Law § 265.02(8). |
| **Oregon** | Or. Rev. Stat. § 166.355. |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3. |
| **Vermont** | Vt. Stat. Ann. Tit. 13, § 4021. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(22), 9.41.370. |

## Table 10: Laws Banning Bump Stocks or Similar Devices

The following jurisdictions ban the possession or sale of bump stocks, trigger cranks, trigger activators, and other devices designed to artificially increase the rate of fire for semi-automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
| --- | --- |
| **California** | Cal. Penal Code § 32900. |
| **Connecticut** | Conn. Gen. Stat. § 53-206g. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(6), (b)(2). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Florida** | Fla. Stat. § 790.222. |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8.5. |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(14). |
| **Iowa** | Iowa Code § 724.29. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-305.1(a). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Michigan** | Mich. Comp. Laws § 750.224e. |

| | |
|---|---|
| **Minnesota** | Minn. Stat. § 609.67. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.274. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(ee)-(ff), 2C:39-3(*l*). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(3), (19), 11-47-8(d), 11-47-8.1. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4022. |
| **Virginia** | Va. Code Ann. § 18.2-308.5:1. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(5), 9.41.220. |

## **Table 11: Laws Banning Silencers**

The following jurisdictions ban the possession or sale of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 33410. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(3), (b)(1). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(6). |
| **Massachusetts** | Mass. Gen. Laws ch. 269, § 10A. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(g), 2C:39-3(c). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20. |

## Table 12: Laws Restricting Silencers

The following jurisdictions restrict the possession of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. § 921(a)(3); 26 U.S.C. §§ 5841(a), 5845(a)(7), 5861. |
| **Alaska** | Alaska Stat. §§ 11.61.200(a)(3), (c), (h)(1)(B). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(ii), 13-3102(A)(3), 17-251. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Georgia** | Ga. Code Ann. §§ 16-11-121(7), 16-11-122. |
| **Iowa** | Iowa Code § 724.1B. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(4). |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(b), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(c). |

| | |
|---|---|
| **Montana** | Mont. Code Ann. § 45-8-337. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(5), 2923.17(A), (C)(5). |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. § 908. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (17), 22-14-6. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4010. |
| **Washington** | Wash. Rev. Code § 9.41.250(1)(c). |
| **Wisconsin** | Wis. Stat. § 941-298. |

## Table 13: Laws Banning Armor-Piercing Ammunition

The following jurisdictions ban the possession of ammunition designed to penetrate body armor or vehicle armor as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(17)(B)-(C), 922(a)(7)-(8). |
| **Alabama** | Ala. Code § 13A-11-60(a). |
| **California** | Cal. Penal Code §§ 16660, 30315, 30320. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(1), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(i), 7-2506.01(a)(3). |
| **Florida** | Fla. Stat. §§ 790.31(1)(a), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Indiana** | Ind. Code Ann. § 35-47-5-11.5. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(6). |
| **Kentucky** | Ky. Rev. Stat. Ann. §§ 237.060(7), 237.080. |

| | |
|---|---|
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1810-40:1812. |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, § 1056. |
| **Michigan** | Mich. Comp. Laws § 750.224c. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.273. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(gg), 2C:39-3(f). |
| **North Carolina** | N.C. Gen. Stat. § 14-34.3. |
| **Oklahoma** | Okla. Stat. tit. 21, §§ 1289.19-1289.22. |
| **Rhode Island** | R.I. Gen. Laws § 11-47-20.1. |
| **South Carolina** | S.C. Code Ann. § 16-23-520. |
| **Texas** | Tex. Penal Code §§ 46.01(12), 46.05(a)(2). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## <u>Table 14: Laws Banning Explosive Ammunition</u>

The following jurisdictions ban the possession of high-explosive incendiary ammunition designed to explode or impart energy upon contact via a charge as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(b), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-3.1(a)(6). |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.3. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.4). |
| **New York** | N.Y. Penal Law § 265.01(7). |
| **Tennessee** | Tenn. Code Ann. § 39-17-1304(b). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## Table 15: Laws Banning Large-Caliber Ammunition

The following jurisdictions ban the possession of large-caliber ammunition as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code § 18735. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(2), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(iii), 7-2506.01(a)(3). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-1.9(a)(6), (b), (c) (possession ban effective Jan. 1, 2024). |

## Table 16: Law Banning Hollow-Point Bullets

The following state bans the possession of hollow-point and other ammunition designed to expand on impact as part of its firearm safety laws.

| *State* | *State Law* |
|---|---|
| **New Jersey** | N.J. Stat. Ann. § 2C:39-3(f). |

**Table 17: Laws Banning Flechette Ammunition**

The following states ban the possession of flechette shells, or other ammunition that can be fired in a firearm and that expels two or more pieces of fin-stabilized solid metal wire or two or more solid dart-type projectiles, as part of their firearm safety laws.

| State | State Law |
|---|---|
| **California** | Cal. Penal Code §§ 16570, 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(f), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |

**Table 18: Laws Banning Dragon's Breath and Bolo Shells**

The following states ban the possession of "Dragon's Breath" shells (ammunition that when fired produces sparks and flames simulating a flamethrower) and bolo shells (ammunition containing two or more large lead balls connected by a wire, that when used may sever a target's limb, as part of their firearm safety laws).

| State | State Law |
|---|---|
| **Florida** | Fla. Stat. §§ 790.31(1)(d)-(e), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Iowa** | Iowa Code §§ 724.1(1)(f), 724.2, 724.3. |