Nos. 24-2415, 24-2450, 24-2506

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC.; et al.,

*Appellants-Cross-Appellees*,
v.
ATTORNEY GENERAL OF NEW JERSEY; et al.,

*Appellees-Cross-Appellants*

MARC CHEESEMAN; et al.,

*Appellants-Cross-Appellees*,
v.
ATTORNEY GENERAL OF NEW JERSEY; et al.,

*Appellees-Cross-Appellants*

BLAKE ELLMAN; et al.,

*Appellants-Cross-Appellees*,
v.
ATTORNEY GENERAL OF NEW JERSEY; et al.,

*Appellees-Cross-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 1:18-cv-10207, 1:22-cv-4360, 1:22-cv-04397)
THE HONORABLE RENEE MARIE BUMB PRESIDING

## BRIEF OF *AMICI CURIAE*
## GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES, BLUEWAVENJ, CEASEFIRE NJ, NATIONAL COUNCIL OF JEWISH WOMEN–ESSEX COUNTY SECTION, UNITARIAN UNIVERSALIST FAITHACTION NEW JERSEY, AND UNITED MERCER INTERFAITH ORGANIZATION IN SUPPORT OF APPELLEES-CROSS-APPELLANTS

Linda H. Martin
 *Counsel of Record*
Aaron R. Marcu
FRESHFIELDS US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
linda.martin@freshfields.com
aaron.marcu@freshfields.com

Jennifer B. Loeb
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, DC 20005
jennifer.loeb@freshfields.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT AND NOTIFICATION OF PUBLICLY HELD AFFILIATES

Pursuant to Federal Rule of Appellate Procedure 26.1 and L.A.R. 26.1, Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), Brady Center to Prevent Gun Violence ("Brady"), March for Our Lives, BlueWaveNJ, Ceasefire NJ Project of the Princeton-based Coalition for Peace Action ("Ceasefire NJ"), National Council of Jewish Women–Essex County Section (NCJW/Essex), Unitarian Universalist FaithAction New Jersey ("UUFANJ"), and United Mercer Interfaith Organization ("UMIO") state that they are non-profit corporations, have no parent corporation, do not issue stock, and have no publicly-held affiliates.

/s/ *Linda H. Martin*
Linda H. Martin

*Counsel of Record for Amici Curiae*
Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, March for Our Lives, BlueWaveNJ, Ceasefire NJ Project of the Princeton-based Coalition for Peace Action, National Council of Jewish Women–Essex County Section, Unitarian Universalist FaithAction New Jersey, and United Mercer Interfaith Organization

# TABLE OF CONTENTS

I.    INTEREST OF *AMICUS CURIAE* ................................................1

II.   INTRODUCTION ........................................................1

III.  ARGUMENT.................................................................3

    A.    *Bruen* and *Rahimi* Require Courts to Consider Empirical Research...............................................................................3

    B.    Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires Nuanced Analysis. ..............5

        1.    The Frequency, Lethality, and Geographic Concentration of Mass Shootings Are Novel Societal Concerns.....................5

        2.    The Rise of Mass Shootings Coincides with Previously Unimaginable, Unprecedented Societal Concerns. ..................6

        3.    Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings....................................................................9

        4.    *Bruen* Requires Nuance When Analyzing Historical Analogues to the Challenged Laws. ........................................12

    C.    Plaintiffs' Formulation of "Common Use" Is Inherently Flawed, and the Common Use Standard Does Not Apply Here. .................15

    D.    Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment..............................................................................19

        1.    The Firearms listed in the Challenged Laws Are Dangerous and Unusual Weapons. ...........................................19

        2.    The Regulated Features Render Weapons Dangerous and Unusual. ...................................................................23

    E.    The Regulation of LCMs Likewise Does Not Burden the Individual Right to Self-Defense...................................................25

IV.   CONCLUSION..............................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barnett v. Raoul,*
No. 3:23-cv-00209 (S.D. Ill. Jan 24, 2023) ......................................................16

*Bevis v. City of Naperville,*
85 F.4th 1175 (7th Cir. 2023) .................................................................*passim*

*Bianchi v. Brown,*
111 F.4th 438 (4th Cir. 2024) ................................................................*passim*

*Capen v. Campbell,*
708 F. Supp. 3d 65 (D. Mass. 2023) ...........................................................11, 18

*District of Columbia v. Heller,*
554 U.S. 570 (2008)................................................................................*passim*

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland*
*Sec.*, 108 F.4th 194 (3d Cir. 2024).........................................................18, 23, 27

*Duncan v. Bonta,*
19 F.4th 1087 (9th Cir. 2021) ................................................................................27

*Hanson v. District of Columbia,*
120 F.4th 223 (D.C. Cir. 2024).......................................................................4, 6

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) .......................................................................17

*Kolbe v. Hogan,*
849 F.3d 114 (4th Cir. 2017) ............................................................................20

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022)....................................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
804 F.3d 242 (2d Cir. 2015) .............................................................................25

*Ocean State Tactical, LLC v. Rhode Island,*
95 F.4th 38 (1st Cir. 2024)...................................................................12, 13, 18

*Range v. Att'y Gen. United States*,
    2024 WL 5199447 (3d Cir. Dec. 23, 2024)..........................................3

*Richmond Boro Gun Club, Inc. v. City of New York*,
    97 F.3d 681 (2d Cir. 1996) ...........................................................24

*United States v. Rahimi*,
    602 U.S. 680 (2024)...........................................................*passim*

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019).............................................................27

**Statutes**

N.J. Stat. Ann. §§ 2C:39-1 ...........................................................*passim*

N.J. Stat. Ann. §§ 2C:39-3 .......................................................................2

N.J. Stat. Ann. §§ 2C:39-5 .......................................................................1

N.J. Stat. Ann. §§ 2C:39-9 .......................................................................1

N.J. Stat. Ann. §§ 2C:39-20(a) ...............................................................2

N.J. Stat. Ann. §§ 2C:58-5 .......................................................................1

**Other Authorities**

159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013).....................................28

*1866 Yellowboy Rifle History*, Uberti USA,
    https://tinyurl.com/3x2wjth3.....................................................12

*Are Ar-15 Magazines Interchangeable? Which Ones Are*, Neckbone
    Armory https://tinyurl.com/hppuzpb2 .......................................11

*Attorney General Guidelines Regarding the "Substantially Identical"
    Provision (1996)*, https://tinyurl.com/3bvua5ej........................1, 24, 25

Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the
    United States*, Wash. Post (May 9, 2021),
    https://tinyurl.com/537ww9z4 ....................................................5

Cameron McWhirter & Zusha Elinson,
    *American Gun: The True Story of the AR-15* (2023) ..................24, 29

Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu ....................................................12

Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64...............................................................10

Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://tinyurl.com/bdemd7ya........................................28

Dan Alex*, Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.......................11

Deborah Azrael et al., C*ritique of Findings on Gun Ownership, Use, and Imagined Use from the 2021 National Firearms Survey: Response to William English*, 78 SMU L. Rev....................................................16

Decl. of Robert Spitzer, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF 21-10 (D. Mass. Jan. 31, 2023)........................................12

*Dep. of H. Wayne Carver II, M.D.* at 23, *Pozner v. Fetzer*, No. 18-cv-3122 (Wis. Cir. Ct. Dane Cty. May 21, 2019), http://tinyurl.com/dzu8ybwu. ...........................................................22

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, House Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed ....................................................22, 23

Expert Report of Louis Klarevas ¶¶ 16–17, *Gates et al. v. Polis*, No. 1:22-1866, ECF 74-11 (D. Colo. Sept. 11, 2023).................................10

*Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022)...............................................................7, 8

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.......................8

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.............................................................10

Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317 (2023) ............................................................6

Justin Peters, *The NRA Claims the AR-15 Is Useful for Hunting and Home Defense. Not Exactly*, Slate (June 12, 2016), https://tinyurl.com/4sm9jm3z...................................................................23

*Keeping hot barrels accurate*, AP (Aug. 10, 2018), https://tinyurl.com/3e9td6m5...............................................................24

Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9 ..........................................28

*Key Points About Assault Weapons*, Violence Policy Center (2017) https://tinyurl.com/4h4naw8z ...................................................24, 25

Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754, 1755 (2019)...................................................................................................27

*Marjory Stoneman Douglas High School Public Safety Commission Report*, Fla. Dep't of L. Enforcement (Jan. 2, 2019), https://tinyurl.com/mvs34fky...............................................................26

Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023),  https://tinyurl.com/dkzjskxs .........................................12, 26

Matthew McConaughey, Remarks at White House Press Briefing (June 7, 2022), https://tinyurl.com/445pnczn ....................................23

Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc ...................................................7

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b...................................21

Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, N.Y. Times (June 18, 2024), https://tinyurl.com/49kzj99d..............................................................16

N. Kirkpatrick et al., *The Blast Effect*, Wash. Post (2023), http://tinyurl.com/2kutwsea .................................................20, 22, 23

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, CAMBRIDGE UNIV. PRESS (Aug. 24, 2020), https://tinyurl.com/bdds6wf9 ...............................................................7

*Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23 ...........................................................5

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths,* 80 J. of Trauma and Acute Care Surgery 6, 856 (2016) ...........................................................................11

*Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023), https://tinyurl.com/78cxvafx.............................................................8

*Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023), http://tinyurl.com/bdcts694.............................................................9

*Rifle Marksmanship M16A1, M16A2/3, M16A4, and Carbine*, U.S. Dep't of the Army (2003), https://tinyurl.com/3reu38px...................................21

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27 ........................27

Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture,* Poynter (June 29, 2022), https://tinyurl.com/5bffkafr..............................................................20

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt...................................22

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?,* 49 Hastings Const. L.Q. 145, 168-69 (2022), https://tinyurl.com/zx2dvsmc ...........................................................14

Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u............................................9

Stephen W. Hargarten, *The Bullets He Carried*, 21 West. J. Emerg. Med. 1036 (2020) .............................................11

*TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army (May 2016), https://tinyurl.com/2p963dxd ...................................................12

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.............................................................21

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack,* Reuters  (May 15, 2022), https://tinyurl.com/bdzbf8us ...............................................................8

Timothy B. Dyk, *The Role of Non-Adjudicative Facts in Judicial Decisionmaking*, 76 Stan L. Rev. Online 10 (2023).........................................15

*What is your par time for an AR-15 emergency reload?*, AR15.com (Nov. 22, 2010), https://tinyurl.com/3csjs7kd....................................11

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494 (May 13, 2022), https://tinyurl.com/yc3fer46 .......................................................15, 16

*Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc .........................................12

# I.    INTEREST OF *AMICUS CURIAE*

*Amici Curiae* Giffords Law Center, Brady, March for Our Lives, BlueWaveNJ, Ceasefire NJ, NJCW/Essex, UUFANJ, and UMIO (together, "*Amici*") respectfully submit this brief[1] in support of Defendants-Appellees-Cross-Appellants.

*Amici* are non-partisan, nonprofit organizations dedicated to reducing gun violence and saving lives through sensible gun violence prevention policies. Through partnerships with researchers, public health experts, and community organizations, *Amici* draft, defend, and conduct research for laws, policies, and programs proven to reduce gun violence.

# II.    INTRODUCTION

The New Jersey laws regulating possession of assault firearms, N.J. Stat. Ann §§ 2C:39-1(w),[2] 2C:39-5(f), 2C:39-9(g), 2C:58-5, and large capacity magazines ("LCMs"), N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-20(a) (together, the "Challenged Laws"), are constitutional under the test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Bruen* instructs that when a

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a), all parties have consented to this filing. No party's counsel authored any part of this brief, and no one other than *Amici* contributed to its preparation or submission.

[2] A firearm is regulated under § 2C:39-1(w)(2) for being "substantially identical" to a listed firearm if it has the features set forth in the August 19, 1996, *Attorney General Guidelines*, https://tinyurl.com/3bvua5ej ("Guidelines").

law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if the "regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. *Bruen* requires a "nuanced approach" to historical analysis in cases like this one, which "implicat[e] unprecedented societal concerns or dramatic technological changes," to avoid putting a "regulatory straightjacket" on governments seeking to protect the public from dangerous firearms. *Id.* at 27, 30. The Challenged Laws are constitutional under this test because they are analogous, i.e., relevantly similar, to historical regulations that were designed to address pressing public safety concerns of their times.

This Court, however, need not reach the historical regulation question because Plaintiffs' challenge fails at *Bruen*'s threshold first step: the weapons and weapon accessories governed by the Challenged Laws are not covered by the plain text of the Second Amendment because they are uniquely dangerous and not quintessential, or even practical, self-defense weapons. They are weapons of war designed to kill large numbers of people quickly. They are drastically more lethal than any firearms of the 1700s or 1800s.

In addition, Plaintiffs' version of the "common use" test is inherently flawed and should be rejected.

## III.   ARGUMENT

### A.   *Bruen* and *Rahimi* Require Courts to Consider Empirical Research.

In *Bruen*, the Supreme Court articulated a new standard for determining whether a regulation is constitutional under the Second Amendment: the court must determine whether the regulated conduct is covered by the Second Amendment's plain text. 597 U.S. at 24. The burden then shifts to the government to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. *Id*. at 34.

The *Rahimi* Court further explained that Second Amendment jurisprudence is "not meant to suggest a law trapped in amber, . . . the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 602 U.S. 680, 691–92 (2024). Consequently, a modern regulation need not be the "twin" of a historical regulation. *Bruen*, 597 U.S. at 30. The Court has further recognized that, while it is sometimes "relatively simple" to analogize modern regulations to historical laws, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27; *see also Range v. Att'y Gen. United States*, 2024 WL 5199447, at \*22 (3d Cir. Dec. 23, 2024) (Krause, J., concurring) ("Hewing precisely to history and tradition would only make sense in a world where 'arms' still meant muskets and flintlock pistols, and where communities were still small and 'close-knit.'"). The Court identified two

important—but non-exclusive—considerations for determining if historical and modern regulations are relevantly similar: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in American society. *Rahimi*, 602 U.S. at 692. Such research helps courts contextualize modern and historical laws and the prevailing societal backdrop against which those laws were passed, as *Bruen* requires. *Id*.; *see also id.* at 702 (Sotomayor, J., concurring) ("[T]he Court's interpretation [of *Bruen*] permits a historical inquiry calibrated to reveal something useful and transferable to the present day.").

*Bruen*'s analysis of historical analogues thus demands that gun-safety regulations be viewed in light of prevailing societal conditions. Empirical research provides indispensable evidence of these conditions. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 240 (D.C. Cir. 2024) (citing data from the Gun Violence Archive to illustrate increasing frequency of mass shootings). As Justice Barrett wrote in *Rahimi*, the Second Amendment does not "force[] 21st-century regulations to follow late-18th century policy choices." 602 U.S. at 739 (Barrett, J., concurring).

**B.    Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires Nuanced Analysis.**

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the New Jersey legislature to pass the Challenged Laws, which, like copious regulations spanning our Nation's history, were designed to protect the public.[3]

**1.    The Frequency, Lethality, and Geographic Concentration of Mass Shootings Are Novel Societal Concerns.**

In recent years, the United States has seen an exponential rise in public mass shootings. One scholar estimates that a *total* of 25 mass shootings occurred between 1900 and 1965.[4] In astonishing contrast, there were 503 mass shootings in the United States in 2024 alone, and more than 3,100 total since 2020—an average of nearly two per day.[5]

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in this country relative to the rest of the world. A recent comprehensive study analyzing the number of mass shooting incidents and fatalities

---

[3] *See* ECF 36 ("Defendants' Brief") at 1.

[4] *See* Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4.

[5] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.

5

in 36 developed countries found that half did not have a single mass shooting between 1998 and 2019; only ten had more than one mass shooting; and only five had more than two.[6] The United States suffered more than 12 times as many mass shootings as the country with the second-highest count and the greatest number of mass shooting fatalities of all developed countries.[7] The United States makes up 33% of the population of developed countries, yet accounts for 73% of all mass shooting incidents and 62% of mass shooting fatalities.[8]

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any time in our history or in any comparable place in the world. *See Hanson*, 120 F.4th at 241.

### 2. The Rise of Mass Shootings Coincides with Previously Unimaginable, Unprecedented Societal Concerns.

Several modern social phenomena have contributed to the surge in mass shootings during the 21st century, making the prevention of gun violence especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

---

[6] Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317, 331 (2023).

[7] *Id.*

[8] *Id.*

a.    Social Media

Social media platforms create a means of communication exponentially faster, farther-reaching, and more difficult to regulate than anything the Founders could have imagined. Numerous studies correlate social media with increases in anti-social behavior, mental health disorders, extremism, and, ultimately, mass shootings. Social media plays an important role in the radicalization of American extremists;[9] mounting evidence demonstrates that content algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[10]

Many perpetrators of mass shootings have been inspired by violent and extremist discourse they see online. One example is the May 2022 Tops Buffalo shooting, in which a gunman armed with a semiautomatic rifle shot 13 people— killing ten—and broadcast the massacre live on social media.[11] The New York Attorney General reported that the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social media] website a brief

---

[9] *See, e.g.,* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

[10] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[11] *See generally Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022).

clip of a [] mass shooting."[12] The Buffalo shooter posted material on social media, including a racist manifesto, "with the explicit goal of provoking future mass shootings."[13] The shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass shootings inspired by previous attackers."[14] Likewise, on May 7, 2023, another mass shooter killed eight people in Allen, Texas after being influenced by white supremacist materials he found on social media.[15]

b.    Urbanization

Since the Founders' era, American society has also been radically transformed by urbanization. In 1800, the United States averaged 6.1 people per square mile.[16] By 2020, the population had increased by 1,500% to an average of 93 people per square mile.[17]

---

[12] *Id*. at 3.

[13] *Id.* at 15.

[14] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.

[15] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.

[16] *Pop Culture: 1800*, U.S. Census Bureau (Dec. 14, 2023), https://tinyurl.com/78cxvafx.

[17] *Pop Culture: 2020*, U.S. Census Bureau (Dec. 14, 2023), http://tinyurl.com/bdcts694. Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers drastically understate the impact of population density in *urban and suburban* areas, where most mass shootings occur.

This explosion in population density has profoundly changed how people associate. Public gatherings are more frequent and much larger than was possible before extensive urbanization. People gather, for instance, in schools that accommodate thousands of students, tightly packed public transportation, crowded night clubs, sports stadiums, concerts, movie theaters, and parades. Even in rural areas, modern transportation allows large crowds to gather easily, such as at high school football games. These gatherings create vulnerable scenarios where mass shooters can massacre large numbers of victims in mere moments. At the Route 91 Music Festival in Las Vegas, for example, a single shooter killed 60 concertgoers and injured more than 850 others in just 11 minutes.[18]

### 3. Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings.

Against the backdrop of these and other societal changes, advances in gun technology allow even an inexperienced shooter to kill more people more quickly than ever before. For 70% of its 247-year existence, the United States did not experience a mass shooting resulting in double-digit fatalities.[19] The first did not

---

[18] Serge F. Kovaleski & Mike Baker, *Gunman in 2017 Las Vegas Shooting Was Angry at Casinos, New F.B.I. Files Show*, N.Y. Times (Mar. 30, 2023) http://tinyurl.com/ykxj889u.

[19] *See* Expert Report of Louis Klarevas ¶¶ 16–17, *Gates et al. v. Polis*, No. 1:22-1866, ECF 74-11 (D. Colo. Sept. 11, 2023).

occur until 1949 and the second not until 1966, 17 years later.[20] In contrast, such mass shootings occur regularly today.[21]

Indeed, modern firearms far surpass their Founding-era precursors in lethality. The typical Revolutionary-era musket: (i) held just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[22] By contrast, a typical AR-15 rifle (i) can hold 30 rounds[23] (30 times more); (ii) can shoot accurately from around 400 yards[24] (seven times as far); (iii) produces a muzzle velocity of around 3,251 feet per second[25] (over three times faster); and (iv) can be reloaded with full magazines in as little as three seconds.[26] *See Bevis v. City of Naperville*, 85 F.4th 1175, 1196 (7th Cir. 2023); *Capen v. Campbell*, 708 F. Supp. 3d 65, 83 (D. Mass. 2023) (observing that "[t]he features of modern assault

---

[20] *Id.*

[21] *See, e.g.*, *infra* at 9, 20 (Buffalo and Uvalde shootings).

[22] Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64.

[23] *See Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone Armory, https://tinyurl.com/hppuzpb2; *see also* Ingraham, *supra* note 22.

[24] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

[25] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma & Acute Care Surgery 853, 856 (2016).

[26] *What is your par time for an AR-15 emergency reload?*, AR15.com, (Nov. 22, 2010), https://tinyurl.com/3csjs7kd.

weapons—particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable"). One study calculated that "the number of bullets and their energy fired by the Sandy Hook shooter equaled an estimated 171 militiamen storming the school."[27]

Even the leading repeating firearm of the Civil War era was a far cry from modern weapons. The 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[28] a maximum range of around 100 yards (one-fourth of an AR-15), a muzzle velocity of 1,100 feet per second (one-third of an AR-15),[29] required the shooter to manually manipulate a large lever under the rifle before each shot,[30] and could fire only ten shots per minute.[31] Using a modern semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds,[32] which the United States Army defines

---

[27] Stephen W. Hargarten, *The Bullets He Carried*, 21 West. J. Emerg. Med. 1036 (2020).

[28] *Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.

[29] Dan Alex*, Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

[30] *See* Decl. of Robert Spitzer ¶ 48, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF 21-10 (D. Mass. Jan. 31, 2023).

[31] *1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer.").

[32] *See* Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.

as "rapid semiautomatic fire."[33] Modern semiautomatic weapons are "more accurate and capable of quickly firing more rounds than their historical predecessors. And they are substantially more lethal." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44 (1st Cir. 2024).

Current events too frequently illustrate how, with modern technology, a lone individual can murder scores of people in mere minutes. On May 24, 2022, a lone gunman armed with an AR-15-style weapon fired at least 100 rounds in two and a half minutes inside an elementary school in Uvalde, Texas, "likely murder[ing] most of his innocent victims before any responder set foot in the building."[34] The ratifiers of the Second Amendment could not have imagined such rapid, indiscriminate carnage.

**4.    *Bruen* Requires Nuance When Analyzing Historical Analogues to the Challenged Laws.**

The above discussion demonstrates that the New Jersey legislature contended with realities that legislatures of the past did not face: mass shootings occurring more frequently than ever before, structural shifts in society, and rapid advances in gun

---

[33] *TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army, §§ 8-19–20, (May 2016), https://tinyurl.com/2p963dxd.

[34]  Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu.

technology.[35] *See Ocean State*, 95 F.4th at 44 (finding "no direct precedent for the contemporary and growing societal concern that [semiautomatic weapons] have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible"). These drastic societal and technological changes require this Court to employ a nuanced analysis under *Bruen* when comparing the "hows" and "whys" of the Challenged Laws with those of historical laws.

To analogize past and present "hows," this Court must determine whether the Challenged Laws impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 597 U.S. at 29. The New Jersey legislature chose to restrict the use and sale of specific, especially dangerous firearms and accessories, while preserving residents' right to protect themselves with more than a thousand makes and models of legal firearms.[36] This is consistent with our Nation's "strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing." *Bianchi v. Brown*, 111 F.4th 438, 446 (4th Cir. 2024), petition for cert. filed sub nom. *Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024); *see infra* § II.D.

---

[35] *See* Defs.' Br. at 54.

[36] *See id.* at 3.

"This is enough," the Seventh Circuit reasoned, "to satisfy the 'how' question *Bruen* identified." *Bevis*, F.4th at 1199–200.

The motivation behind the Challenged Laws—their "why"—is, fundamentally, to promote public safety.[37] Gun regulations at the Founding and throughout our history had the same motivation.[38] "Limitations on [the] right to self-defense have been recognized in common law since before our nation's founding. . . . [I]t is not just the rights to life and liberty of the defender that matter, but also those of other members of society. Else, how could we have any society at all?" *Bianchi*, 111 F.4th at 449. There is thus a strong and easily discernible link between the past and present "whys."

Employing *Bruen*'s nuanced approach, the Challenged Laws are relevantly similar to many historical weapons regulations and are thus consistent with our nation's tradition of firearm regulation. As the Supreme Court recognized in *Rahimi*, "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons [are permissible]." 602 U.S. at 692. The Challenged Laws are thus constitutional under *Bruen*.

---

[37] *See id.* at 1.

[38] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc.

**C.    Plaintiffs' Formulation of "Common Use" Is Inherently Flawed, and the Common Use Standard Does Not Apply Here.**

Plaintiffs argue that because millions of "semiautomatic firearms [have been] sold in the United States between 1990 and 2018," assault weapons are in "common use" and thus presumptively entitled to Second Amendment protection.[39] This argument is wrong for at least two reasons.

First, Plaintiffs base their factual assertions on unreliable sources. One, a "2021 National Firearms Survey" by William English (the "English Paper"), is an unpublished, non-peer-reviewed[40] summary of an online survey.[41] While Plaintiffs present this survey as an unbiased academic study, it was commissioned specifically for lawsuits such as this one.[42] The English Paper is also plagued by severe methodological flaws, as highlighted in a critique from professors at the Harvard School of Public Health and Duke School of Public Policy.[43] In light of these issues,

---

[39] ECF 37 ("Plaintiffs' Brief") at 32.

[40] When determining validity of scientific evidence, "[c]ourts should consider whether a study was peer reviewed or whether it has been accepted and cited approvingly by experts in the field." Timothy B. Dyk, *The Role of Non-Adjudicative Facts in Judicial Decisionmaking*, 76 Stan. L. Rev. Online 10, 18 n.52 (2023).

[41] Pls.' Br. 34–35.

[42] Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, N.Y. Times (June 18, 2024), https://tinyurl.com/49kzj99d.

[43] Deborah Azrael et al., C*ritique of Findings on Gun Ownership, Use, and Imagined Use from the 2021 National Firearms Survey: Response to William English*, 78 SMU L. Rev. (forthcoming 2025).

the court in *Barnett v. Raoul* recently found the English Paper unreliable due to its "methodological errors and inherent biases." No. 3:23-cv-00209, ECF 257 at 16 (S.D. Ill. Jan 24, 2023).

Another of Plaintiffs' sources, a survey from the National Shooting Sports Foundation ("NSSF Survey"), a firearms trade organization, is also irreparably biased and methodologically flawed.[44] NSSF's research director conducted the survey, but admitted in a recent deposition that he had no formal training in statistics or survey methodologies.[45] He received his training instead "exclusively through LinkedIn Learning," a social media platform.[46] The NSSF obtained firearm production numbers by simply calling NSSF member companies and asking for an estimate or guessing based on manufacturers' websites.[47] It is no wonder the court in *Barnett* also excluded the NSSF Survey from consideration, labelling it "empirically and statistically unreliable." No. 3:23-cv-00209, ECF 257 at 19.

Second, even if Plaintiffs' statistics were accurate, Plaintiffs' use of ownership statistics to define "common use" is inherently flawed: the argument necessarily assumes that every individual who has ever owned one of these weapons

---

[44] Pls.' Br. 35–37.

[45] *Barnett*, No. 3:23-cv-00209, ECF 223-3 at 18:23–19:3.

[46] *Id.*

[47] *Id.* at 107:13–108:16; 182:12–15; 187:20–188:2.

still owns it, actively uses it, uses it only for lawful self-defense purposes, and is a civilian. Courts have squarely rejected the idea that common possession satisfies *Heller*'s common use standard. Indeed, even on remand, the D.C. Circuit accepted that millions of semiautomatic rifles and LCMs had been manufactured and purchased, but found this insufficient because it could not "be certain whether these weapons are commonly used or are useful *specifically for self-defense*." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (emphasis added).

A recent decision by the U.S. District Court for the District of Massachusetts highlights another fallacy inherent in the claim that ownership statistics can insulate a uniquely dangerous firearm from regulation:

> [Plaintiffs' position] would lead to a host of absurd results . . . . [T]he constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. Weapons that unquestionably would have been considered within the ambit of the Second Amendment at the time of ratification . . . would lose their protection because of their relative rarity today. Conversely, an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales out[paced] legislation . . . Moreover, the constitutional analysis would be trapped in an infinite circularity: a weapon may be banned because it is not in common use, and it is not in common use because it is banned[.]

*Capen*, 708 F.Supp. at 78. To put it succinctly, "[a] law's constitutionality cannot be contingent on the results of a popularity contest." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 213 (3d Cir. 2024) ("*DSSA*") (Roth, J., concurring); *see also Ocean State*, 95 F.4th at 50 (Using a "popularity test"

17

to determine if an arm may be regulated "contravenes case law in addition to logic.");
*Bevis*, 85 F.4th at 1198–99 (basing assessment of a law's constitutionality on numbers alone "would have anomalous consequences").

Plaintiffs' use of ownership statistics to define "common use" also ignores the requirement that such weapons must actually be used for *lawful self-defense*, not merely owned or manufactured for defense or even used for lawful recreation. *See Bruen*, 597 U.S. at 28 (Second Amendment protects "instruments that facilitate armed self-defense"); *Rahimi*, 602 U.S. at 690 (the Second Amendment "secures for Americans a means of self-defense").

Finally, *Heller* stands only for the proposition that an "entire class" of arms cannot be "banned" if it is in common use for lawful self-defense. In stark contrast to the total ban on handgun possession in the home challenged in *Heller*, the Challenged Laws here regulate specific, enumerated, especially dangerous firearms, features, and accessories posing a threat to society.[48] They do not "amount to a prohibition of an entire class of 'arms,'" nor do they regulate the particular type of arms that the Supreme Court held to be constitutionally protected in *Heller*. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).

---

[48] *See* Defs.' Br. 3.

### D.    Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.

The Supreme Court has expressly recognized that the Second Amendment does not bestow a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21. Instead, the Court has endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–27. The Second Amendment "emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to [self-defense]." *Bianchi*, 111 F.4th at 452.

The Challenged Laws fit squarely in the historical tradition of prohibiting "dangerous and unusual weapons." They regulate only a limited subset of assault rifles with features that turn them into dangerous military-style firearms designed for war.

### 1.    The Firearms listed in the Challenged Laws Are Dangerous and Unusual Weapons.

A review of the paradigmatic assault rifle, the AR-15, shows how the weapons enumerated in the Challenged Laws are dangerous and unusual. The AR-15 traces its origins to a military-grade rifle designed in the late 1950s.[49] It is functionally the same as the M16, an automatic weapon designed for military combat that is not

---

[49] *See* Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

protected by the Second Amendment. *Heller*, 554 U.S. at 627. The M16's gas-impingement system, which propels bullets "at a speed that would cross six football fields in a second,"[50] was of particular interest to the U.S. military. The AR-15 "is simply the semiautomatic version of the M16 rifle used by our military and others around the world." *Kolbe v. Hogan*, 849 F.3d 114, 139–40 (4th Cir. 2017).

The AR-15 is not rendered appropriate for civilian use merely because it fires semi-automatically (absent easily-obtainable accessories) rather than automatically, as the M16 can.[51] This distinction "between the M16 and AR-15 . . . pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar." *Bianchi*, 111 F.4th at 456. Indeed, the U.S. Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast-moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be."[52]

Due to the AR-15's "phenomenal lethality," versions of it have been the U.S. military's standard-issue assault rifle since the Vietnam War.[53] Indeed, virtually all

---

[50] N. Kirkpatrick et al., *The Blast Effect*, Wash. Post (2023), http://tinyurl.com/2kutwsea.

[51] Notably, it is "easy . . . to modify the AR-15 . . . [to] mak[e] it, in essence a fully automatic weapon." *Bevis*, 85 F.4th at 1196.

[52] *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.

[53] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters'*

of the world's armies now use assault rifles that are variants of the AR-15.[54] Thus, "these assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than . . . firearms that are used for individual self-defense." *Bevis,* 85 F.4th at 1195 (weapons like the AR-15 do not "enjoy Second Amendment protection" because "the AR-15 is almost the same gun as the M16 machinegun.").

This lethality and firepower means that assault weapons devastate victims' bodies in ways that is starkly distinct from modern handguns—what the Supreme Court called the "quintessential self-defense weapon" in *Heller.* 554 U.S. at 629. Though any bullet can kill when it hits a vital organ, according to one trauma surgeon, the energy of a bullet fired from an AR-15 "is so massive . . . your body will literally tear apart."[55] Another trauma surgeon explains that wounds inflicted by a 9mm handgun "look[] like a bad knife cut," but wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there."[56] Assault rifles cause internal damage and gaping exit wounds that drastically reduce a victim's chance of

---

*Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

[54] Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b.

[55] Kirkpatrick, *supra* note 50.

[56] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt.

survival.[57] Not a single one of the 20 children and six adults killed by an AR-15 at Sandy Hook Elementary "had survivable or even treatable injuries."[58]

AR-15-style weapons cause even more catastrophic damage when impacting the smaller bodies of children. A pediatrician in Uvalde, Texas, recalled seeing children "whose bodies had been so pulverized, decapitated by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood-spattered cartoon clothes still clinging to them."[59] "Many children were left not only dead, but hollow."[60] "That degree of destruction . . . is possible only with a high-velocity weapon."[61]

While assault weapons are horrifyingly effective at massacring school children, concert-goers, and spectators at parades, they are "ill-suited and disproportionate to" use in self-defense. *Bianchi*, 111 F.4th at 452. Their size makes them "tough to maneuver" in indoor spaces like the home, and their lethality causes

---

[57] *Id.*

[58] *Dep. of H. Wayne Carver II, M.D.* at 23, *Pozner v. Fetzer*, No. 18-cv-3122 (Wis. Cir. Ct. Dane Cty. May 21, 2019), http://tinyurl.com/dzu8ybwu.

[59] *Dr. Guerrero's Testimony at Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed.

[60] Matthew McConaughey, Remarks at White House Press Briefing (June 7, 2022), https://tinyurl.com/445pnczn.

[61] Kirkpatrick, *supra* note 50.

them to "overpenetrate, sending bullets through the walls of your house," endangering bystanders.[62]

### 2. The Regulated Features Render Weapons Even More Dangerous and Unusual.

Put bluntly, assault weapons are not weapons of lawful self-defense. They are weapons of war. And the features regulated by the Challenged Laws —such as pistol grips, forward grips, and detachable magazines—are "designed to increase lethality and allow shooters to inflict severe damage over great distances." *DSSA*, 108 F.4th at 214 (Roth, J., concurring). Weapons with these features are thus far "outside the scope of 'Arms' presumptively protected by the Second Amendment." *Id.*

Pistol grips[63] attach just behind the trigger and enable the shooter to place his shooting hand beneath the gun. Modern pistol grips were modeled after the Nazi *Sturmgewehr* to "give the shooter another 'crutch' to steady the gun" during rapid, prolonged firing.[64] Pistol grips also enable a shooter to fire from the hip rather than the shoulder. This is inherently inaccurate and thus useless for lawful purposes such as hunting or self-defense, but allows a shooter to indiscriminately spray fire into a crowd. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685

---

[62] Justin Peters, *The NRA Claims the AR-15 Is Useful for Hunting and Home Defense. Not Exactly*, Slate (June 12, 2016), https://tinyurl.com/4sm9jm3z.

[63] N.J. Stat. Ann. §§ 2C:39-1(w)(3); Guidelines II(A)(2), II(C)(2).

[64] Cameron McWhirter & Zusha Elinson, *American Gun: The True Story of the AR-15*, 41 (2023).

(2d Cir. 1996) ("[P]istol grips are designed to make such spray firing from the hip particularly easy.").

Forward grips[65] can be held by the shooter's non-trigger hand, enabling them to exert leverage on the gun with both hands, reducing recoil and maintaining greater control during rapid, prolonged firing.[66] Further, "when shooting a semi-auto rifle in rapid fire mode, an enormous amount of heat is generated" by the barrel.[67] Thus, by holding the forward grip, rather than the hot barrel, the shooter can sustain rapid fire for longer continuous periods. A barrel shroud[68] offers similar protection in prolonged firing.

Detachable magazines[69] equip firearms with significantly higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[70] They can hold as many as 100 rounds before having to reload and allow shooters to replace an empty magazine with a pre-loaded, full magazine in a few seconds with little practice.[71] They are especially lethal when used in

---

[65] Guidelines II(B)(2).

[66] *See Key Points About Assault Weapons*, 1, 8 Violence Policy Center ("VPC") (2017) https://tinyurl.com/4h4naw8z.

[67] *Keeping hot barrels accurate*, AP (Aug. 10, 2018), https://tinyurl.com/3e9td6m5.

[68] Guidelines II(B)(3).

[69] *Id.* at II(A), II(B), II(C)(4).

[70] *See* VPC, *supra* note 66.

[71] *See id.*

combination with "features that allow [for] enhanced control while firing multiple rounds."[72]

* * *

As the Second Circuit observed in *New York State Rifle & Pistol Ass'n v. Cuomo*, which *Bruen* has done nothing to upset, "[the] net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general," such that citizens would not require such weapons for ordinary self-defense. 804 F.3d 242, 262 (2d Cir. 2015). The features regulated by the Challenged Laws increase a weapon's lethality by enabling shooters to sustain rapid fire longer with better control. *See Bevis*, 85 F.4th at 1194. Prolonged rapid firing of an assault weapon has only one purpose: to inflict carnage.

### E.    The Regulation of LCMs Likewise Does Not Burden the Individual Right to Self-Defense.

The LCM provision of the Challenged Laws regulates how frequently a shooter must reload their weapon. *See Bevis*, 85 F.4th at 1197 (explaining that LCM regulations do not place restrictions on ammunition because "[a]nyone who wants greater firepower is free under these laws to purchase several magazines of the permitted size."). Such regulation is necessary because LCMs are designed to

---

[72] *Id.*

perpetrate large-scale devastation. They enhance an already dangerous firearm by allowing it to fire more than ten rounds in rapid succession *without the need to reload*. "In the 30 seconds it takes a person to reload and shoot a 10-round magazine three times, someone with a 100-round magazine can shoot 100 bullets without reloading."[73] LCMs eliminate the critical pause during which a gunman would have to reload and the gunman's targets could escape or attempt to disarm him.[74] Unsurprisingly, "firearms equipped with LCMs are involved in a disproportionate share of mass shootings."[75] States that restrict access to LCMs—usually with a ten-round limit—experience 63% fewer mass shootings than states that do not.[76]

Numerous federal and state courts have found no evidence that firing more than ten bullets without the need to reload is necessary or even beneficial for self-defense. *See, e.g.*, *Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021) (observing that "as in other cases," the record offered no indication that "the added benefit of a[n] [LCM]—being able to fire more than 10 bullets in rapid succession—

---

[73] Berman & Frankel, *supra* note 32.

[74] During the 2018 shooting in Parkland, Florida, the shooter's 13-second pause to load a new magazine enabled a teacher and ten students to flee. *Marjory Stoneman Douglas High School Public Safety Commission Report*, Fla. Dep't of Law Enforcement, at 32 (2019), tinyurl.com/mvs34fky.

[75] Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 1990-2017, 109 AJPH 1754, 1755 (2019).

[76] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27.

has *ever* been realized in self-defense in the home"), remanded in light of *Bruen*, 142 S. Ct. 2895 (2022); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired.").

Empirical research further demonstrates that the ability to fire more than ten rounds without reloading does not aid in self-defense. The National Rifle Association's Armed Citizen database shows that, in more than 700 self-defense incidents, *less than one half of one percent* (0.5%) involved more than ten rounds of ammunition. *See DSSA*, 108 F.4th at 216 (Roth, J., concurring) ("The record shows it is 'extremely rare' for a person to fire even ten rounds, let alone more than seventeen, in self-defense.") (citing NRA database data). Other sources confirm that civilians engaged in self-defense generally fire only about two shots.[77] And FBI statistics likewise show that "the average gunfight includes 3 rounds fired."[78] The Challenged Laws thus do not impose a burden on the right to possess a firearm for lawful self-defense because LCMs are neither used nor useful in self-defense.

---

[77] *See* Claude Werner, *The Armed Citizen - A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), tinyurl.com/bdemd7ya (average of 2.2 defensive shots fired per incident from 1997–2001).

[78] Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9.

Nothing illustrates the needlessness and destructive capability of LCMs more poignantly than the words of Mark Kelly, United States Senator and husband of Giffords Law Center founder and mass shooting survivor Gabby Giffords. Testifying before Congress about the shooting that nearly took his wife's life, Senator Kelly said: "The first bullet went into Gabby's head. Bullet number 13 went into a nine-year-old girl named Christina-Taylor Green . . . . When [the shooter] tried to reload one 33-round magazine with another 33-round magazine, he dropped it [and was subdued]. I contend if [the shooter] . . . did not have access to a high-capacity magazine . . . Christina-Taylor Green would be alive today."[79]

\* \* \*

Assault rifles and weapons outfitted with the regulated features are uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Supreme Court has held the Second Amendment protects. These "rifles were designed to achieve a simple goal: fire a lot of bullets fast to kill or maim as many enemy soldiers as possible."[80] And until the public availability of these destructive weapons is curtailed, as is the constitutionally permissible purpose of the Challenged Laws, they will continue to be used as horrific offensive weapons to

---

[79] 159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy) (quoting Judiciary Committee testimony of Captain Mark Kelly).

[80] McWhirter & Elinson, *supra* note 64.

commit mass killings of innocent civilians, just as they were in Parkland, Orlando, Uvalde, Highland Park, Buffalo, Las Vegas, and many other domestic massacres.

## IV.  CONCLUSION

For the reasons set forth above and in the Defendants' Brief, this Court should affirm the grant of summary judgment in part to the State, and reverse the grant of summary judgment in part to Plaintiffs.

Dated: January 15, 2025          Respectfully submitted,

/s/ *Linda H. Martin*
Linda H. Martin
  *Counsel of Record*
Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
FRESHFIELDS US LLP
3 World Trade Center, 51st Floor
175 Greenwich Street
New York, NY 10007
(212) 277-4000
linda.martin@freshfields.com
aaron.marcu@freshfields.com
brandt.henselee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

Jennifer B. Loeb
FRESHFIELDS US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
jennifer.loeb@freshfields.com

*Counsel for Amici Curiae*
Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, March for Our Lives, BlueWaveNJ, Ceasefire NJ Project of the Princeton-based Coalition for Peace Action, BlueWave NJ, National Council of Jewish Women–Essex County Section, Unitarian Universalist FaithAction New Jersey, and United Mercer Interfaith Organization

## COMBINED CERTIFICATIONS OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,469 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font in the body of the brief and 11-point Times New Roman font in the footnotes and is double-spaced except for footnotes.

3.      As required by 3d Cir. L.A.R. 31.1(c), I certify that the text of the electronic brief is identical to the text in the paper copies of the brief. The brief was scanned for viruses using Trellis McAfee and Microsoft Defender and no viruses were detected.

4.      As required by 3d Cir. L.A.R. 28.3(d), I certify that I am admitted to practice before the U.S. Court of Appeals for the Third Circuit and am in good standing.


Dated: January 15, 2025             */s/ Linda H. Martin*
                                    Linda H. Martin

                                    *Counsel of Record for Amici Curiae*
                                    Giffords Law Center to Prevent Gun
                                    Violence, Brady Center to Prevent Gun

Violence, March for Our Lives, BlueWaveNJ, Ceasefire NJ Project of the Princeton-based Coalition for Peace Action, BlueWave NJ, National Council of Jewish Women–Essex County Section, Unitarian Universalist FaithAction New Jersey, and United Mercer Interfaith Organization

# CERTIFICATE OF SERVICE

I certify that, on January 15, 2025, a true and correct copy of the foregoing Brief of Amici Curiae in Support of Defendants-Appellees was filed with the Clerk of the United States Court of Appeals for the Third Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

I also certify that seven (7) identical paper copies of the foregoing shall be filed with the Office of the Clerk, United States Court of Appeals for the Third Circuit, within 5 days of the date of electronic filing of the Brief.

Dated: January 15, 2025

*/s/ Linda H. Martin*
Linda H. Martin

*Counsel of Record for Amici Curiae*

Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, March for Our Lives, BlueWaveNJ, Ceasefire NJ Project of the Princeton-based Coalition for Peace Action, BlueWave NJ, National Council of Jewish Women–Essex County Section, Unitarian Universalist FaithAction New Jersey, and United Mercer Interfaith Organization