Nos. 24-2415, 24-2450, 24-2506

# In The United States Court of Appeals For the Third Circuit

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC.; et al.,

*Plaintiffs-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY; et al.

*Defendants-Appellants.*

---

MARK CHEESEMAN; et al.,

*Plaintiffs-Appellants*,

v.

ATTORNEY GENERAL NEW JERSEY; et al.

*Defendants-Appellees.*

---

BLAKE ELLMAN; et al.,

*Plaintiffs-Appellants*,

v.

ATTORNEY GENERAL NEW JERSEY; et al.

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Nos. 1-18-cv-10207, 1:22-cv-4360, 1:22-cv-04397)
(Hon. Renee Marie Bumb, Presiding)

## *CHEESEMAN* APPELLANTS-CROSS-APPELLEES REPLY AND CROSS-RESPONSE BRIEF

Bradley Lehman
GELLERT SEITZ BUSENKELL &
BROWN
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
(302) 425-5800
(302) 425-5814 (fax)
blehman@gsbblaw.com

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connolly,
and Firearms Policy Coalition, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION.................................................................................................1

SUMMARY OF THE ARGUMENT......................................................................2

ARGUMENT .......................................................................................................4

I.    All firearms are "Arms" within the meaning of the Second Amendment's plain text.................................................................................................4

II.    The State has identified no historical principle or tradition that excuses a ban on some of the most popular firearms in the country. ...................................12

    A. The Supreme Court has held that arms in common use for lawful purposes cannot be banned. ...................................................................12

    B. The State's alternative principle—"excessively dangerous" weapons can be banned—lacks any historical support. ................................................35

CONCLUSION ...................................................................................................44

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Aymette v. State,*
    21 Tenn. 154 (1840) .................................................................................... 41

*Bailey v. United States,*
    516 U.S. 137 (1995) .................................................................................... 27

*Barnett v. Raoul,*
    --- F. Supp. 3d. ----, 2024 WL 4728375 (S.D. Ill. Nov. 8, 2024) ............... 20

*Bevis v, City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) .............................................................. 17, 20

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) .............................................................. 17, 18

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) .............................................................................. 18, 31

*Crawford v. Washington,*
    541 U.S. 36 (2004) ..................................................................................... 7, 8

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ......................... 1, 4, 9, 11, 13, 14, 15, 16, 17, 24, 25, 32,
                                     33, 34, 35, 36, 37, 39, 41

*Duncan v. Bonta,*
    142 S. Ct. 2895 (2022) ................................................................................. 18

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) .................................................................... 18

*Friedman v. City of Highland Park,*
    136 S. Ct. 447 (2015) ................................................................................... 18

*Hamling v. United States,*
    418 U.S. 87 (1974) ....................................................................................... 29

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) ........................................................... 13, 18

*Haynes v. United States,*
    390 U.S. 85 (1968) ....................................................................................... 33

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ...................................................... 18, 29, 30

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ........................................................ 18

*Katko v. Briney*,
    183 N.W.2d 657 (Iowa Sup. Ct. 1971) ........................................ 38

*Lara v. Comm'r Pa. State Police*,
    125 F.4th 428 (3d Cir. 2025) ....................................................... 39

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ......................... 1, 5, 7, 8, 11, 15, 16, 28, 36, 37, 38, 42, 43

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) .................................................... 32

*Ramos v. Louisiana*,
    590 U.S. 83 (2020) ........................................................................ 7

*Roper v. Simmons*,
    543 U.S. 551 (2005) .................................................................... 31

*Staples v. United States*,
    511 U.S. 600 (1994) ............................................................... 29, 30

*Teter v. Lopez*,
    76 F.4th 938 (9th Cir. 2023) .................................................. 40, 42

*Teter v. Lopez*,
    93 F.4th 1150 (9th Cir. 2024) ..................................................... 40

*Teter v. Lopez*,
    No. 20-15948, 2025 WL 259979 (9th Cir. Jan. 22, 2025) ............ 40

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial Number: LW001804*,
    822 F.3d 136 (3d Cir. 2016) ....................................................... 33

*United States v. Rahimi*,
    602 U.S. 680 (2024) ............................................................ 1, 28, 36

**Other Authorities**

1 Wm. & Mary, ch. 2, § 7 (1689) ........................................................ 11

1 BLACKSTONE'S COMMENTARIES (1765) .......................................... 11

1959 Mich. Pub. Acts ......................................................................... 44

1959 R.I. Acts & Resolves ................................................................. 44

Benjamin M. Blau et al., *Guns, laws, and public shootings in the United States*, 48 APPLIED ECON. 1 (2016)............................................................................26

Daniel W. Webster, et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 CRIMINOLOGY & PUB. POL'Y 171 (2020) ......................................................26

Dave Campbell, *A Look Back at the Thompson Submachine Gun,* NRA (Apr. 17, 2019), https://bit.ly/3ZlZL5y ...........................................................................

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. OF LEGIS. 223 (2024).......................................................40

David Kopel, *AR rifle ammunition is less powerful than most other rifle ammunition*, REASON (Apr. 11, 2023), https://bit.ly/4btYMF2 ...................21

David Kopel, *How powerful are AR rifles?*, REASON (Feb. 27, 2023), https://bit.ly/3t4Vh7g ...............................................................................21

DENNIS P. CHAPMAN, THE AR-15 CONTROVERSY: SEMIAUTOMATIC RIFLES AND THE SECOND AMENDMENT (2022) .......................................................................20

E. Gregory Wallace, *"Assault Weapon" Lethality*, 88.1 TENN. L. REV. 1 (2020).................................................................................................22, 23

E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U.L.J. 193 (2018)........24

*Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP. (last updated July 16, 2024), https://bit.ly/3RDN3xe ........25, 26

*Firearm Production in the United States with Firearm Import and Export Data*, NSSF (2023), https://perma.cc/P6A8-DZK2 ...............................................27

Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018), https://bit.ly/46IZbB7...........................................................................21, 22

James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUDIES 125 (2013)...............................................26

John Adams, *Argument for the Defense: 3-4 December 1770*, https://bit.ly/435ah2j ...........................................................................41, 42

Justin Dyal, *The Sig Sauer M18: A Marine's Take on the New Military Sidearm*, NRA EXPLORE (Feb. 25, 2023), https://bit.ly/414iHrY...........................19, 20

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, HARV. J. L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), https://bit.ly/49KhTKQ ..............12, 13

Martin L. Fackler, *Gunshot Wound Review*, 28 ANNALS OF EMERGENCY MED. 194 (1996) ......................................................................................................21

Peter M. Rhee et al., *Gunshot Wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. TRAUMA & ACUTE CARE SURGERY 853 (2016) ..................22

*Springfield Armory: The Best Battle Implement Ever Devised*, NAT'L PARK SERV., https://bit.ly/414EAHW (last visited Feb. 6, 2025) ......................................19

STEPHEN HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 (2022)...........24

William English, *A Response to Critics of the 2021 National Firearms Survey*, UNIV. OF WYO. Working Paper No. 2024-05 (Nov. 25, 2024), https://bit.ly/4hqLNrs ...........................................................................32, 33

William J. Krouse, et al., CONG. RSCH. SERVS., R44126, *Mass Murder with Firearms: Incidents and Victims, 1999-2013* (2015)..............................26, 27

**INTRODUCTION**

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court established a straightforward test for the constitutionality of laws that regulate firearms. It begins with a threshold question of whether the Second Amendment is implicated, which is analyzed with reference only to the "plain text" of the Second Amendment. But where (as here) a law limits what types of "arms" an American can "keep" or "bear," that step should occasion little discussion. Indeed, in *Bruen* itself, as well as in the Supreme Court's most recent Second Amendment case, *United States v. Rahimi*, 602 U.S. 680 (2024), the textual analysis barely factored into the Court's decision (it was entirely omitted in *Rahimi*). The same should be true here—given that the State's ban clearly implicates the Second Amendment—but because the State's burden of proof is insurmountable once it comes time to analyze history to justify its ban on common firearms, it attempts to load up the "textual analysis" with all manner of atextual factors. The Court should reject that attempt.

When it comes to the historical analysis, this case remains straightforward. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that an arm that is "in common use" cannot be banned. The State's attempts to avoid the plain implication of this holding for its law—which bans, among other things, the

most popular rifle in America—must similarly be rejected as ahistorical and inconsistent with binding Supreme Court precedent.

## SUMMARY OF THE ARGUMENT

I. Following the Supreme Court's decision in *Bruen*, Second Amendment analysis must begin with the "plain text" analyzed *independently* from any historical limitations on the right. Here, that analysis can and should be short and to the point. *Heller* held that "arms" includes, at a minimum, all firearms, and no one disputes that the items New Jersey dubs "assault firearms" are, in fact, firearms. Therefore, the plain text is implicated. The State fights this conclusion, asserting that considerations of whether an arm is "in common use for self-defense" must be analyzed as part of the text as well, in a naked attempt to shirk its burden under *Bruen*'s historical analysis. But nothing in the text of the Amendment warrants consideration of "common use" at this stage, nor do any of the State's authorities from this or any other area of constitutional law support introducing such a limitation at the threshold of *Bruen*'s analytical framework.

II. Turning to the historical inquiry mandated by *Bruen*, the burden is on the State to show both that there exists some historically recognized exception to the right *and* that its law fits into that exception.

A. The State cannot do so here because, as *Heller* has already held, the *only* historical tradition of firearm regulation that can excuse modern bans on types of

arms is the tradition of restricting "dangerous and unusual" weapons. The problem for the State is that such a tradition can *never* extend to cover arms "in common use" for lawful purposes, and the banned firearms are among the most popular in the country.

With no other options available, the State fights the standard. It asserts that arms are not "in common use" merely because they are *owned*, but instead would require them to be regularly fired or brandished. It suggests that the *only* relevant purpose for owning a firearm is, in fact, "self-defense." And it claims that, independent of the judgment of the American people, it falls to this Court to determine whether the banned arms are actually a good choice for someone seeking to exercise Second Amendment rights. There is no support for any of these claims. The Supreme Court in *Heller* specifically declined to determine *why* handguns were preferred for self-defense, the simple fact that the American people chose them was enough to confer constitutional protection. Similarly, *Heller* specifically rejected the argument that there was a single "purpose" behind the Second Amendment that limited its scope (there, it was claimed that the militia purpose served as an implicit limit on the right), so it is particularly odd to claim now that the case created precisely that sort of limit here. And even if, ultimately, this Court does consider (and to be clear, it should not) whether the banned firearms are useful for self-defense, overwhelming evidence proves that they are.

B. Unable to disprove "common use," the State instead hopes to replace "dangerous and unusual" with a tradition of banning particularly lethal arms *because* of their popularity. There is no support in the record for such a tradition. The State's only Founding era support comes in the form of laws regulating the setting of trap guns and limiting the storage of gunpowder, neither of which banned a type of common firearm or burdened the right in a way remotely similar to New Jersey's ban. The other sources the State relies upon (except for some medieval English laws that are too remote in the other direction) come from too late a period to matter to this Court's historical analysis and can be simply ignored. If, however, they are analyzed, *none* of them demonstrate, as the State needs them to, that the government has the power, consistent with the Second Amendment, to *ban* an arm that is in common use. The State's "assault firearms" ban is, therefore, out of step with the historical record and unconstitutional under the Second and Fourteenth Amendments.

## ARGUMENT

### I. All firearms are "Arms" within the meaning of the Second Amendment's plain text.

At the textual level, this case is straightforward. The Second Amendment's text refers to a right to "keep and bear Arms," and as the Supreme Court has already taught, "Arms" at the very least includes "all firearms." *Heller*, 554 U.S. at 581 (discussing the narrowest Founding-era definition of the term it could find). Here,

given that the so-called "assault weapons" are indisputably firearms, an appropriate and fulsome "plain text" analysis should run all of about two sentences; *Heller* has already done the work. Nevertheless, the State resists this straightforward analysis. Right out of the gate, it errs in describing the nature of the inquiry as "rooted in the Second Amendment's text, as informed by history." State Br. 13 (quoting *Bruen*, 597 U.S. at 19). This is misleading. It is undoubtedly true that the plain text analysis is "informed by history" in the sense that we look, as the Court did in *Heller*, to the historical meanings of the Second Amendment's language to determine its modern scope—but that is not how the State means it. The State instead seeks to conflate *Bruen*'s distinct textual and historical inquiries into a single question; indeed the language it quotes from *Bruen* here is not used to describe the textual analysis specifically, but was part of the Court's description of the *entire Bruen* test: text, informed by history. *Bruen*, 597 U.S. at 19.

*Bruen* was clear that these are distinct analytical questions. It emphasized repeatedly that the textual inquiry is focused exclusively on the "plain" or "bare text" of the Second Amendment, *see id.* at 17, 24, 32, 33, 44 n.11, and it was equally explicit that historical limitations on the right not found in the plain text were relevant only *after* the textual analysis was concluded, with the government bearing the burden of showing any historical exceptions to the right, *see id.* at 25, 33–34, 38–39. This is chiefly relevant here because it shows that there is no room

5

whatsoever in the *Bruen* analysis's "plain text" inquiry for concepts like "common use," which the State does not even attempt to anchor in the text. Nevertheless, the State insists "common use" must be considered here because, otherwise "these concepts have no role in *Bruen*'s threshold step of determining the scope of the right." Br. of Appellees, Doc. 36 at 27 (Jan. 8, 2025) ("State Br."). But to say that it has no role in the threshold inquiry and has no role at all are two different things. As Plaintiffs have emphasized, "common use" is a critical factor in determining whether an arm is protected—it just has no role in determining whether an item is an "Arm" in the first place. Under *Bruen*, the threshold textual inquiry does not ultimately determine the scope of the right, only whether the right is *implicated*. And the State's claim that the right is not even *implicated* when it bans the most popular rifle in America is absurd.

The State's insistence on collapsing *Bruen*'s separate inquiries in this way demonstrates its desire to shift the burden off of itself to prove the firearms it bans are, in fact, "dangerous and unusual," but its maneuver is entirely unsupported by the caselaw. It claims, for example, that this is "how constitutional interpretation works," citing for that proposition the facts that juror unanimity is required by the Sixth Amendment but not mentioned its plain text, that the Sixth Amendment right to confront adverse witnesses is limited to "testimonial statements," and that a number of types of "speech" like libel, incitement, or obscenity, are not "speech"

6

within the scope of the First Amendment. *Id.* at 27–28. As an initial matter, whatever might be true of the First or the Sixth Amendments, the Supreme Court has been perfectly clear that in the Second Amendment context, analysis of historical restrictions on the right comes in to play only *after* the analysis of the "plain text." *See Bruen*, 597 U.S. at 17. But even leaving that aside, each of these examples is perfectly consistent with the Court's approach in *Bruen*. In *Ramos v. Louisiana*, 590 U.S. 83 (2020), as in *Bruen*, the Supreme Court began with the text of the Constitution before finding that, with respect to the Sixth Amendment's provision for "trial, by an impartial jury," "[t]he text and structure of the Constitution clearly suggest that [that] term … carried with it *some* meaning about the content and requirements of a jury trial." 590 U.S. at 89 (emphasis in original). To determine precisely what that content was, just as *Bruen* requires here, the Court then looked to *history*, in the form of "the common law, state practices in the founding era, or opinions and treatises written soon after," to determine that the right included a unanimous verdict requirement. *Id.* at 90. In other words, in *Ramos*, as here, the ultimate contours of the right depended on a close historical analysis, engaged in *after* the plain text was reviewed and found to be implicated.

The same is true of *Crawford v. Washington*, 541 U.S. 36 (2004). There, the Court again began with the Sixth Amendment's text before noting that "[t]he Constitution's text does not alone resolve this case" and explained that determining

the precise contours of the Confrontation Clause would require it to "turn to the historical background of the Clause." *Id.* at 42–43. As in *Bruen*, that exercise involved a historical inquiry into the scope of the right, as it existed both in pre-Revolutionary Britain and at the Founding. *Id.* at 43–47.

The State's final example, the existence of exceptions to the "speech" protections of the First Amendment, is both its most apt and, correspondingly, the least consistent with the State's own view of the correct analytical framework. It would be equally bizarre to say that an AR-15 is not literally an "arm" and to say that libelous or obscene speech is not literally "speech"—and the State is wrong to the extent that is what it claims happens under the First Amendment. State Br. at 27–28. That libel, for example, is unprotected does not mean it is not "speech" within the plain text of the First Amendment. Indeed, as *Bruen* itself explained, that certain speech, *despite* fitting within the plain text of the First Amendment, is ultimately not protected by that Amendment, is a result of the very same sort of historical analysis that should follow, independently, the textual analysis in Second Amendment cases. *See Bruen*, 597 U.S. at 25 (explaining that under the First Amendment, when the government restricts a type of speech, it has the burden "to show that a type of speech belongs to a 'historic and traditional categor[y]' of constitutionally unprotected speech 'long familiar to the bar' ") (quoting *United States v. Stevens*, 559 U.S 460, 468 (2010)).

There is simply nothing in the Supreme Court's Second Amendment caselaw or in any other area of constitutional law that would support the State's argument that "courts [must] assess whether a weapon gets Second Amendment protection in the first place, before then assessing whether any subsequent restriction falls within our regulatory tradition." State Br. at 28. The State also points to *Heller*'s statement that "the Second Amendment right, whatever its nature, extends only to certain types of weapons," 554 U.S. at 623, for support of this misunderstanding of the test, but *Heller* never said that some weapons could be excluded from the *text*, but that as a result of the very historical analysis that *Bruen* would make explicit, certain weapons (those that were "dangerous and unusual") had historically been denied protected status. The State's misreading of *Heller* self-evidently collapses what should be separate inquiries into one, and then adds a superfluous historical analysis to give it an extra bite at the apple, even though *Heller* very clearly stated that "the sorts of weapons protected [are] those 'in common use at the time.' " 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)), and hence, a firearm so protected, cannot be banned pursuant to any other historical authority to which the State might point.

The State's position does not make sense on its own terms. The State alleges that this process—assessing whether a firearm is in common use, by which it means the firearm is fit, in the State's judgment, to be used for self-defense and is in fact

frequently fired in self-defense all as part of the "plain text" analysis, and then proceeding to history—"allows courts to assess whether a weapon gets Second Amendment protection in the first place, before then assessing whether any subsequent restriction falls within our regulatory tradition." State Br. at 28. But what could it possibly mean for a weapon to "get[] Second Amendment protection" if the State can turn around and ban it anyway? The State's repeated description of the *Bruen* test in this way demonstrates a fundamental misunderstanding of the nature of the analysis. That a firearm is an "arm" means it is *presumptively* protected; it does not end the inquiry, it merely means that the State must prove, by reference to history, that it can be restricted in some way. For this reason, the State is wrong to claim that *Bruen* itself treated the question of whether the handguns the petitioners in that case wanted to carry were "in common use" as part of the textual analysis. *See id.* at 30. Indeed, Plaintiffs addressed this frequent misreading in their opening brief, explaining that the fact that *Bruen* treated handguns' commonality as dispositive of their protected status—not merely a presumptive conclusion based on the text, but a final one based on both text and history—actually confirms Plaintiffs' reading and refutes the State's. *See* Br. of Plaintiffs-Appellants, Doc. 32 (Nov. 18, 2024) ("Pls.' Br."). The State does not engage with this reading at all.

The State offers, as a final basis on which to conclude that the "plain text" includes a "common use" limitation, a series of historical sources that it suggests

limited the right in that way: the 1689 English Bill of Rights that ensured a right to "have Arms for their Defence suitable to their conditions" only "as allowed by Law," 1 Wm. & Mary, ch. 2, § 7 (1689); Blackstone, who described the right to keep and bear arms as "the natural right of resistance and self-preservation" and "the right of having and using arms for self-preservation and defence," 1 BLACKSTONE'S COMMENTARIES 136, 139–40 (1765); and state constitutional provisions, enacted in the Founding era, that similarly described a right "to bear arms in defense of themselves and the state," *Heller*, 554 U.S. at 584–85 & n.8. But only *one* of these historical sources—the 1689 English Bill of Rights—even purports to put a limit on the types of arms presumptively protected by the right, and it does so using language that is notably absent from the Second Amendment—it is self-evidently not part of the "plain text." And as *Bruen* makes clear, the 1689 English codification of the right, though important, was "initially limited" in ways that it had "matured" beyond by the time of the Founding (including, for example, the fact that the Second Amendment's protections extend beyond Protestants). *Bruen*, 597 U.S. at 44–45. As such, the State's interpretive gambit here gets things backwards—the lack of such language in the Second Amendment is not an invitation to read historical restrictions back into it, but rather should be seen as a refutation by the Founders of any similar limitations on the right they enshrined in the Constitution.

Because the Second Amendment's plain text covers "arms" and not "arms in common use" or "arms judged by the State to be suitable for self-defense," this Court should not belabor the point—*Bruen*'s textual analysis is satisfied because the State has banned firearms. The only real question is whether history supports that ban. Because the State's arguments regarding common use *are* relevant to that question, they are discussed in detail below.

## II. The State has identified no historical principle or tradition that excuses a ban on some of the most popular firearms in the country.

### A. The Supreme Court has held that arms in common use for lawful purposes cannot be banned.

**1.** History and binding Supreme Court precedent show that there is just one valid historical principle that can support banning a firearm consistent with the Second Amendment: the principle that "dangerous and unusual" weapons may be so regulated. Given that the plain text of the Second Amendment, as discussed above, does not distinguish between "dangerous and unusual" arms and those in "common use," it follows that the question of whether an arm is "in common use" is relevant to the historical inquiry, but we need not rely only on that. Indeed, both *Heller* and *Bruen* explicitly discussed the "dangerous and unusual" limitation on the right (and corresponding safe harbor for any firearm "in common use" and hence neither dangerous nor unusual) as a principle, derived from history, that was consistent with the scope of the right protected by the Second Amendment. *See* Pls.' Br. at 25–27;

*see also* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases—Again*, HARV. J. L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), https://bit.ly/49KhTKQ. Indeed, given *Heller*'s conclusion that handguns are protected arms follows from the fact that they are common use, binding Supreme Court precedent requires this Court to hold that *only* arms that are not in common use may be banned. *See Heller*, 554 U.S. at 629 ("[H]andguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."); *see also. Hanson v. District of Columbia*, 120 F.4th 223, 260 (D.C. Cir. 2024) (Walker, J., dissenting) (explaining that this was one of *Heller*'s four "increasingly specific holdings" that bind this Court).

That resolves this case. Though it is the State's burden to prove that the banned firearms are dangerous and unusual, Plaintiffs have demonstrated that overwhelming evidence—in the form of consumer surveys, dealer surveys, and firearm manufacturing data, *see* Pls.' Br. at 31–37—proves that the banned firearms are in common use no matter what the threshold is for that determination; indeed, the banned firearms include the most popular rifle in American history.

**2.** The State does not even attempt to dispute that there are tens of millions of the firearms it now bans in private hands across in the country. Rather, it disputes that that is a sufficient condition for protection. In doing so, it warps the "common

use" metric in several ways that make it unrecognizable as the test applied in *Heller*. *First*, it argues that an arm must specifically be "in common use *for self-defense*" and fit for that specific purpose regardless of any other uses, State Br. at 14 (emphasis added). *Second*, it suggests that courts should determine for themselves whether a firearm is so suitable based on an assessment of the features of the banned firearms. *Id.* at 14–15. And *third*, it argues that common use for self-defense cannot merely mean common ownership. *Id.* at 15. This line of reasoning is wrong at every step.

First, for the claim that the Second Amendment is limited to protecting arms that are useful for individual self-defense, as opposed to arms that are owned for any lawful purpose like communal defense, target shooting, or hunting, the State is wrong. *Heller* said that self-defense was "the *central component* of the right itself," but it did not say it was *the only* purpose for which it was included in the Bill of Rights. 554 U.S. at 630. Indeed, the Court recognized that in its prefatory clause the Amendment itself "announces the purpose for which the right was codified: to prevent elimination of the militia," though even that explicit purpose neither limited the Amendment's scope nor described "the only reason Americans valued the ancient right." *Id.* at 599. And in addition to the militia and individual self-defense, the Court noted that hunting was also a likely critical concern of many in the Founding era. *Id.* The State's attempt to turn a recognized purpose of the right in

*Heller* into a limitation on the right's scope is antithetical to *Heller*; it is precisely the same move as was attempted by the dissenters in that case—though they denied that preserving a right to self-defense was within the aims of the Second Amendment. *Id.* at 636–37 (Stevens, J., dissenting) ("The Second Amendment plainly … encompass[es] the right to use weapons for certain military purposes. Whether it also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self-defense is the question presented in this case."). *Heller*'s own description of "common use" runs contrary to the State's limiting argument. The *Heller* Court notably *did not* confine the relevant uses to just self-defense, but rather encompassed all the "lawful purposes *like* self-defense" toward which people put their firearms. 554 U.S. at 624 (emphasis added). It is plain that *Heller* did not suggest the limitation that New Jersey now reads into the types of use to which an arm must be put to be protected.

Second, the fundamental wisdom of the "common use" test is that it is the American people themselves, through their decisions about how to arm themselves, who decide which firearms are deserving of protection. The State's suggestion that the courts ought to supplant that judgment with their own, *see* State Br. at 14–15, is inconsistent with *Bruen*'s rejection of making "difficult empirical judgments regarding firearms under the banner of" the tiers-of-scrutiny framework as an impractical and inappropriate task for the judiciary. 597 U.S. at 26. Indeed, it is hard

to believe that when *Bruen* said that its analysis would require the ordinary modes of judicial analysis, it could have intended courts to sit in judgment of the relative merits and demerits of pistol grips and flash suppressors. *See, e.g.*, *id.* at 28.

The State's argument also is inconsistent with *Heller*'s deference to "the American people" who "consider[] the handgun to be the quintessential self-defense weapon," 554 U.S. at 629. The State totally misreads *Heller* on this point, suggesting that before concluding the handgun was "the quintessential self-defense weapon," the Supreme Court first "evaluated the suitability of the weapon's features for self-defense or for military or offensive use instead." State Br. at 14–15; *see also id.* at 37 (*Heller* and *Miller* "focused on the character of the weapon and the nature of the arm rather than its circulation" (cleaned up)). That gets it precisely backwards. In the relevant passage, *Heller* acknowledged that "[t]here are many reasons that a citizen may prefer a handgun for home defense," and then it posited what some of those reasons may be, such as handguns being "easier to store in a location that is readily accessible in an emergency" and "easier to use for those without upper-body strength to lift and aim than a long gun." 554 U.S. at 629. But the Court's ultimate conclusion was that the reasons were not dispositive; rather, handguns were protected because "*[w]hatever the reason*" people choose them, "handguns are the most popular weapon chosen by Americans for self-defense in the home," which makes "a complete prohibition of their use … invalid." *Id.* (emphasis added).

"Whatever the reason" here is critical—the Supreme Court simply did not care *why* the American people preferred the handgun—that was for them to decide, ultimately—all that mattered was that they did commonly choose handguns for a lawful purpose. As for the suggestion that the Court also considered whether certain firearms would be more "desirable to malefactors and crooks," State Br. 15 (quoting *Bianchi v. Brown*, 111 F.4th 438, 451 (4th Cir. 2024)), that simply is not true with respect to handguns. The Court never engaged with the fact that they are undeniably the favorite weapon of armed criminals. Indeed, one of the dissents took the majority to task for this omission, emphasizing that "handguns, … are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals," *Heller*, 554 U.S. at 682 (Breyer, J., dissenting), but the point was, criminal misuse did not matter—once it was shown that the handgun was in common use for *lawful* purposes, its potential for use by criminals was irrelevant.

Third, the State claims that "every appellate court to consider" whether common ownership equates to common use "has rejected it," so that it *must* mean something more. State Br. at 31 (citing *Bevis v, City of Naperville*, 85 F.4th 1175, 1198–99 (7th Cir. 2023); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 438, 50–52 (1st Cir. 2024); *Bianchi*, 111 F.4th at 459–61; *Hanson*, 120 F.4th at 232–33)). As *Heller* and *Bruen* demonstrate, the majority position in the courts of appeals has often been incorrect in Second Amendment jurisprudence, and in this case there is

particularly good reason to be wary. Before *Bruen*, when Courts could still avoid finding a law restricting the availability of arms in common use constitutional by using the now-defunct interest-balancing regime, almost every court to consider "whether a weapon is popular enough to be considered in common use … relied on statistical data of some form, creating a consensus that common use is an objective and largely statistical inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (internal quotation marks omitted). After "common use" acquired teeth—when the Supreme Court made clear in *Bruen* that *only if* a law fits within a historical exception to the right can a court affirm it—that this contorted reading of "common use" has metastasized. And opposite the decisions cited by the majority, many respected jurists have recognized that a firearm that is owned by large numbers of Americans is in "common use" by definition and therefore protected by the Second Amendment. *See, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in judgment); *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari); *Hanson*, 120 F.4th at 251 (Walker, J., dissenting); *Bianchi*, 111 F.4th at 483 (Richardson, J., dissenting); *Duncan v. Bonta*, 19 F.4th 1087, 1140 (9th Cir. 2021) (Bumatay, J., dissenting), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022) (Mem.); *Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (*"Heller II"*).

**3.** In any event, even if this Court accepts the State's claim that it must undertake, itself, an analysis of the merits and demerits of the features of the banned firearms for the purpose of self-defense—and to be clear, such an inquiry is flatly contrary to *Heller* and *Bruen*—the "assault weapon" ban fails under even the State's tailormade test.

First, the State argues that the banned firearms are inappropriate for civilian self-defense because they are, in some cases, descendants of firearms that were developed for the military. State Br. at 15–16. But it simply does not follow that a firearm is not useful to civilians because it is or was useful to the military. For instance, the M1 Garand, which General Patton called "[t]he best battle implement ever devised," *see Springfield Armory: The Best Battle Implement Ever Devised*, NAT'L PARK SERV., https://bit.ly/414EAHW (last visited Feb. 6, 2025), is widely owned by civilians who can buy them directly from the federal government through the civilian marksmanship program, *see* Civilian Marksmanship Program, www.thecmp.org, and is *still* legal in New Jersey despite being literally a military weapon. As the district court put it, "evidence … that the AR-15 was developed from what was originally a military-style weapon during the Vietnam War … is insufficient to show that a weapon is 'most useful in military service.'" JA59 n.22. Moreover, *Heller*'s explicit recognition of the Second Amendment's protection of handguns unquestionably extends to various 1911-style, Beretta, and Sig Sauer

handguns, all of which have been or currently are being used by the United States military and other militaries around the world. *See, e.g.*, Justin Dyal, *The Sig Sauer M18: A Marine's Take on the New Military Sidearm*, NRA EXPLORE (Feb. 25, 2023), https://bit.ly/414iHrY.

In many cases, as in the case of the semiautomatic AR-15 and the military, select-fire M16, the military and civilian firearms share common features and design choices because of commonalities between civilian and military firearm use: the need for accurate fire that can incapacitate an enemy. Nevertheless, "an AR-15 is, frankly, not at all the same weapon as the M16 or M4 carbine used by the United States military." *Barnett v. Raoul*, --- F. Supp. 3d. ----, 2024 WL 4728375, at *44 (S.D. Ill. Nov. 8, 2024). That is because, despite their similarities, the M16 possesses the "one uniquely military firearms technology," that the AR-15 lacks—the ability to fire in automatic or burst mode. DENNIS P. CHAPMAN, THE AR-15 CONTROVERSY: SEMIAUTOMATIC RIFLES AND THE SECOND AMENDMENT 110 (2022); *see also Bevis*, 85 F.4th at 1222 (Brennan, J., dissenting) ("No army in the world uses a service rifle that is only semiautomatic.").

The State unsurprisingly attempts to downplay this distinction, claiming, for instance, that the real military utility of the AR-15 lies in the way it creates devastating injuries, relying for this assertion on outlandish early U.S. Army reports that Viet Cong combatants suffered severed limbs and even decapitation as the result

of rifle fire. *See* State Br. at 16. Though the U.S. Army's Wound Ballistic Laboratory attempted to replicate the claimed effects, they were never able to do so, *see* David Kopel, *How powerful are AR rifles?*, REASON (Feb. 27, 2023), https://bit.ly/3t4Vh7g, and in fact further military experience with the rifles undermined those reports. *See, e.g.*, Martin L. Fackler, *Gunshot Wound Review*, 28 ANNALS OF EMERGENCY MED. 194, 197, 202 (1996) ("The damage caused by the military rifle bullet cannot be differentiated from that caused by a handgun bullet even by the most expert.").

The State's claims about the damaging effects of AR-15 fire do not even make sense in the context of its own argument—it emphasizes, for example, that both the AR-15 and M16 use a "pistol grip that enables fast reloading and accuracy during sustained fire," without suggesting a pistol grip could possibly be the differentiating factor between ordinary rifle wounds and the "devastating" ones it attributes to the banned firearms. In fact, the metrics that do make the AR-15 similar to the M16 in semiautomatic mode—its effective range, muzzle velocity, and semiautomatic rate of fire, *see* State Br. at 17—are not at all dependent upon the specific ergonomic and aesthetic features that draw the State's ire. And even then, it is notable that AR-style or M16 rifles are not exceptional on any of these metrics. *See* David Kopel, *AR rifle ammunition is less powerful than most other rifle ammunition*, REASON (Apr. 11, 2023), https://bit.ly/4btYMF2; Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018),

https://bit.ly/46IZbB7. To the extent there is any truth to the State's assertions about the function of these firearms—for example, where it claims that a bullet fired from an AR-15 carries more kinetic energy than a bullet fired from a typical handgun—that still does not distinguish them from the mine run of other rifles, almost all of which are more "powerful" than handguns in this way. Indeed, AR-15s are relatively *underpowered* when compared to other types of rifles. *See* Peter M. Rhee et al., *Gunshot Wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. TRAUMA & ACUTE CARE SURGERY 853, 856 tbls. 3 & 4 (2016).

Ultimately, of course, that a firearm is deadly is *the point*. The State claims, at points, that even in the hands of a law-abiding citizen, the firepower an AR-15 offers "is disproportionate to neutralizing an attacker." State Br. at 22. This argument is puzzling. If lethal force is justified in self-defense, Plaintiffs are aware of no principle of law—and the State certainly cites none—suggesting that some force is simply *too* lethal. The State posits that the banned firearms pose a greater risk of injuring bystanders because of concerns that projectiles fired from them can pass through walls or other barriers if they miss their intended target. *Id.*. The State notably does not cite a single incident in which a so-called "assault weapon" used by a law-abiding citizen in self-defense did injure someone in this way, and "overpenetration" is not a risk that is unique to the banned firearms: "Nearly all handgun, rifle, and shotgun rounds will pass through walls. FBI testing indicates that

to be reliably effective, bullets must penetrate soft body tissue twelve to eighteen inches, a range necessary to reach and disrupt a vital organ in a human target. This penetration capability also means that bullets will penetrate walls if the shooter misses the target." E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 TENN. L. REV. 1, 37 (2020). And in fact, the risk of injuring bystanders with a rifle is, in some respects, less than with a handgun, given the generally greater degree of accuracy and control most shooters have with rifles.

When it turns to discussing the specific features it bans, the State unintentionally demonstrates why the American people are a better judge of these rifles' utility, as it misunderstands, or undervalues, the purpose of each of them that it mentions. It claims that a "pistol grip … enables fast reloading and accuracy during sustained firing." State Br. at 18. Of course, fast reloading and increased accuracy are *good things* in a rifle that one intends to use for self-defense. It is strange that New Jersey wishes its residents would defend themselves with inaccurate firearms (not to mention inconsistent with the aforementioned concerns with overpenetration and harm to bystanders). And in any event, the real purpose of the pistol grip is simply to give the shooter something to hold onto with his trigger hand, a necessary feature of any rifle. This feature takes the "pistol grip" shape in AR-platform rifles because they are designed, unlike other common rifles, in a "straight-line" fashion, where the stock of the rifle is directly behind, not below, the breach end of the barrel.

This design "requires a pistol grip separate from the buttstock because it is too awkward to pull the trigger while gripping the raised buttstock when firing … from the shoulder." E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. ILL. U.L.J. 193, 229 (2018). The AR-platform's straight-line design itself enhances accuracy by directing recoil energy straight back to the user's shoulder, thus reducing the muzzle rise that occurs with rifles without a straight-line design. *Id.*

The State also claims that a "flash suppressor" "conceals a shooter's position," State Br. at 18, but they have utility to law-abiding citizens seeking to defend themselves as well. They "reduce[] noise and potentially increase[] accuracy," STEPHEN HALBROOK, AMERICA'S RIFLE: THE CASE FOR THE AR-15 332 (2022), and are extremely useful in nighttime self-defense situations where they function to keep a homeowner using a firearm in self-defense from blinding himself accidentally:

> Civilian applications for flash hiders include hunting in low light or at night. Probably the greatest practical benefit of a flash hider for civilians is that it protects the crown of the barrel from dirt and other obstructions. There is no evidence that flash hiders have given terrorists or criminals any advantage in mass shootings or other crimes involving 'assault weapons.'

Wallace, *"Assault Weapon" Myths*, *supra* at 233–34.

Leaving aside their specific features, the State next argues that the banned firearms are not useful in self-defense, essentially, because they are not handguns. *See* State Br. at 21. This argument proves too much—it would, in effect, limit *Heller* to its facts and hold the Second Amendment *only* protects handguns. While "[t]here

are many reasons that a citizen may prefer a handgun for home defense," *Heller*, 554 U.S. at 570, there are also many reasons he may prefer one of the firearms banned by the State, which is not empowered, under the Second Amendment, to make that choice for him. *See, e.g.*, Pls.' Br. at 37 (citing FRANK MINITER, THE FUTURE OF THE GUN 46–47 (2014)).

Finally, the State argues that the banned firearms are "disproportionately" used in mass shootings, where they cause greater casualties than other firearms would, and, by contrast, are rarely fired in self-defense. *See* State Br. at 20, 24. Taken together, the State claims, this confirms its judgments about the actual utility of the banned firearms for self-defense. *Id.* at 24. This is wrong in several ways. First, as discussed above, criminal *misuse* of a common firearm simply does not factor into the analysis of whether it is protected and the *Heller* majority declined to consider that issue at all for handguns. What is more, it was right not to consider it: A peaceable individual's right to keep and bear a self-defense tool cannot be limited by a criminal putting such a tool to evil ends anymore than a peaceable individual's right to privacy can or should be limited by a criminal's desire to conceal contraband.

Second, even if it were relevant (and again, it is not), the State is wrong to claim that the banned firearms cause excess casualties when they are misused in mass shootings. The findings of the State's expert, Klarevas, have been noted by the RAND Corporation "likely biased" because of the limited number of incidents

considered by Klarevas and his co-authors. *Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP. (last updated July 16, 2024), https://bit.ly/3RDN3xe. Other peer-reviewed studies have found that "[w]hen taking a closer look at the incidents themselves … the use of assault weapons is not generally associated with an increase in the number of victims or the number of fatalities." Benjamin M. Blau et al., *Guns, laws, and public shootings in the United States*, 48 APPLIED ECON. 1, 14 (2016); *see also* Daniel W. Webster, et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 CRIMINOLOGY & PUB. POL'Y 171, 188 (2020) ("[M]ost mass shootings do not involve assault rifles," and "bans on assault weapons had no clear effects on either the incidence of mass shootings or on the incidence of victim fatalities from mass shootings.").

Third, the banned firearms are not disproportionately used in mass shootings. Just as they are overwhelmingly the weapons of choice for criminals generally, handguns are the most common firearms used in mass shootings. James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUDIES 125, 136 (2013). A Congressional research report concluded that, over a fourteen year period, "offenders carried and/or used firearms that could be characterized as 'assault weapons' in . . . 9.78% [of mass shootings]." William J. Krouse, et al., CONG. RSCH. SERVS., R44126, *Mass Murder with Firearms: Incidents*

*and Victims, 1999-2013*, at 29 (2015). But even accepting the State's claim that they are used in 24% of mass shootings with at least four fatalities, that number is proportionate to their general popularity, given that such firearms have been approximately 20% of all firearms sold for over a decade. *See Firearm Production in the United States with Firearm Import and Export Data* at 7, NSSF (2023), https://perma.cc/P6A8-DZK2.

As for the claim that the banned firearms are rarely "used" in self-defense, the State's limited view of "use" as "actively fired in self-defense" is inappropriate. A firearm is like an insurance policy or a seatbelt. It is "used" to be *prepared* for a situation in which it might be needed and with luck, it is never actually fired or even brandished in such a situation. The Supreme Court has previously acknowledged that in common speech, both keeping and firing a firearm can be referred to as "use" of the firearm. *See Bailey v. United States*, 516 U.S. 137, 143 (1995) ("Consider the paradoxical statement: 'I *use* a gun to protect my house, but I've never had to *use* it.' "). While in *Bailey* the statutory scheme led the Court to conclude that "use" in that context was limited to the latter connotation, here the opposite is true. The two types of "use" the Second Amendment specifically contemplates, keeping (i.e., having) and bearing (i.e., carrying), are both counted for nothing in the State's conception of the test. That cannot be correct.

**4.** The State's other objections to the "common use" inquiry are meritless. The State argues that the "common use" test does not make sense because a firearm that is unusual at one time may become common, and, it claims, no other right fluctuates over time in this way. *See* State Br. at 31. But it is a perfectly ordinary feature of constitutional litigation that courts, in applying the same *principles*, may reach different results, over time, as constitutionally relevant facts change. *Bruen* itself contemplated this feature of its analysis when it distinguished colonial statutes restricting the carriage of "dangerous and unusual weapons" as dissimilar to New York's law restricting the carriage of handguns *even if* those colonial statutes were read to bar carrying handguns *then*, because "[w]hatever the likelihood handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today." 597 U.S. at 47.

*Rahimi* solidified this understanding of the Second Amendment analysis when it assured that its prior Second Amendment caselaw was "not meant to suggest a law trapped in amber," noting that arms that could not even have been imagined at the time of the Founding are nevertheless protected today, because while the Second Amendment's principles remain constant over time, their application keeps up with the modern world. 602 U.S. at 691.

Nor is this a unique feature of Second Amendment analysis. The State lampoons Plaintiffs' position by noting that child pornography is unprotected by the

First Amendment without regard to "how widespread" it is. State Br. at 31. Of course, Plaintiffs have never suggested "common use" is a generally applicable principle of constitutional law, only a Second Amendment principle and of course child pornography has always and everywhere rightly been considered "obscene" and unprotected by the First Amendment. But this is a remarkably poor example for the State to select, given that the "obscenity" exception to First Amendment coverage depends upon "contemporary community standards relating to the description or representation of sexual matters," *Hamling v. United States*, 418 U.S. 87, 99 (1974) (quotation marks omitted), and some speech that once was considered obscene may not be today, because of changed circumstances and in spite of the consistent application of that same principle.

For all that, New Jersey overstates how significantly which weapons are protected is likely to change over time. It claims, for instance, that the federal assault weapons ban, which was in force from 1994 to 2004, would have been, under Plaintiffs' argument, constitutional when it was passed, but unconstitutional shortly after it lapsed as the regulated arms came into common use. State Br. at 33. This is doubly wrong. First, even when the federal law was enacted, the banned arms were "in common use" (and hence, the restriction was unconstitutional at the time). The very same year that it was enacted, the Supreme Court in *Staples v. United States* stated that the AR-15, like all other semiautomatic weapons "traditionally have been

widely accepted as lawful possessions." 511 U.S. 600, 612 (1994); *see also Heller II*, 670 F.3d at 1288 (Kavanaugh, J., dissenting) (discussing the same). AR-platform rifles, therefore, should not have been banned even then. And even if they were not in common use in 1994, that would not necessarily mean they could be proscribed. The Supreme Court's stated test is "dangerous and unusual weapons," and while "common use" is a sufficient condition for protection (since it means the firearm, at least, is not unusual), it is not necessary, and arms that are "unusual" but no more dangerous than other, common, firearms, are equally protected. As Plaintiffs have previously explained, the banned firearms are *ordinary* semiautomatic firearms, and no more dangerous than many firearms the State has not banned. *See* Pls.' Br. at 18–20. Even if they were rare, they would be protected.

The State's counterfactual argument about machine guns similarly fails to demonstrate that this test is somehow inconsistent or circular. The State hypothesizes that if machine guns were made available to the general public, manufacturers could "flood the market" with them to guarantee they reach "common use" and garner constitutional protection. State Br. at 34 (cleaned up). This argument, like so many that the State makes, fails to take seriously the basis on which *Heller* rested its decision: the choices of the American people.

The State takes issue with this type of reasoning, disputing that "dangerous and unusual" are actually two separate elements of the test, and instead suggests it

should be read as a hendiadys meaning simply "unusually dangerous." State Br. at 39–40. That is notably *not* how Justice Alito read the term in his concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." (Alito, J., concurring)). And it is difficult to see, even if it is true, why it would entail abandoning "common use" as a heuristic to finding a firearm *not* unusually dangerous. After all, all firearms are dangerous—and a firearm cannot be "unusually dangerous" if it is only as dangerous as ordinary, common firearms.

The State next argues that, if "common use" is considered a relevant metric, then surveys are an inappropriate way to determine whether that threshold is met, noting that surveys of what people consider "cruel and unusual" are not considered relevant evidence in the Eighth Amendment context. State Br. at 31. The comparison with the Eighth Amendment is not an apt one. The inquiry in the Eighth Amendment context is directed at which types of punishments are cruel and unusual. Punishments, of course, are inflicted by the government, and so the Eighth Amendment inquiry looks at factors such as "objective indicia of society's standards, as expressed in legislative enactments and state practice," to determine whether a given punishment " 'has become truly unusual.' " *Roper v. Simmons*, 543 U.S. 551, 563 (2005) (quoting *Atkins v. Virginia*, 536 U.S. 304, 316 (2002)). In the Second Amendment context, by contrast, the inquiry is aimed at determining whether a

particular type of firearm is in common use by the individual citizens of this country. It is difficult to conceive of what evidence would be better than polling data to assess this question, and the Supreme Court in determining that handguns are in common use indirectly relied on defensive gun use survey data. *See Heller*, 554 U.S. at 628 (describing handguns as " 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family' " (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)); *Parker*, 478 F.3d at 400 (citing for this proposition Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 182–83 (1995)). In any event, even if we were to use Eighth Amendment metrics, the State's ban could not pass muster since the vast majority of states do not have "assault weapons" bans.

The State specifically criticizes Plaintiffs' reliance on the 2021 National Firearms Survey, *see* State Br. at 38, but as the author of that survey, Professor William English, has himself explained in responding to these criticisms, his findings "align almost perfectly with other major national surveys like Pew and Gallup" and the maligning of his work is primarily the result of states like New Jersey having "to take increasingly untenable positions, denying that some of the most popular firearms in America are widely owned and sought after for lawful purposes, including self-defense." William English, *A Response to Critics of the*

*2021 National Firearms Survey* at 25, UNIV. OF WYO. Working Paper No. 2024-05 (Nov. 25, 2024), https://bit.ly/4hqLNrs. Of course, even if Professor English's work is entirely ignored, the other major national surveys, as well as the manufacturer and dealer data Plaintiffs have cited, definitively establish that there are, at least, tens of millions of so-called "assault firearms" in the country today. *See* Pls.' Br. at 33–37. The State, for all its nitpicking, does not attempt to dispute that fact.

Next, the State argues that this Court's previous interpretation of "dangerous and unusual" is inconsistent with the test Plaintiffs have laid out here, suggesting that in *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial Number: LW001804*, 822 F.3d 136 (3d Cir. 2016), this Court's conclusion that machineguns are unprotected because they are "not in common use for lawful purposes" was based on an assessment of their dangerousness, not their commonality. State Br. at 37. But that is not correct. The Court, in part, relied on the Supreme Court's statement in *Haynes v. United States*, 390 U.S. 85 (1968), that machine guns are "weapons used principally by persons engaged in unlawful activities." *Id.* at 87. It thus reasoned that they were not commonly used for *lawful* purposes, and it further cited several other circuits holding that such firearms are not "typically possessed by law-abiding citizens for lawful purposes." *Palmetto*, 822 F.3d at 143 (quoting *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012)). It can hardly be said that this Court *needed* to do a specific

counting exercise in *Palmetto*, when the firearm in question was of a type that *Heller* itself referred to as "highly unusual in society at large." 554 U.S. at 627. In fact, *Palmetto* strongly supports Plaintiffs, not the State, as it is indisputably considered "dangerous" and "unusual" to be two separate requirements to meet before a firearm could be banned, just as Plaintiffs argue here.

Finally, the State takes issue with the fact that "common use" does not necessarily provide a bright-line rule, suggesting that the onus is on Plaintiffs to state definitively how many of a given type of firearm is sufficient to put the arm "in common use," State Br. at 38, and, simultaneously, calling it "absurd" that machineguns, of which there are 176,000 in lawful civilian possession, would not be protected when stun guns were considered "widely owned" in *Caetano* when there were 200,000 of them, *id.* at 35. These arguments are opposed to each other and, ultimately, neither is a valid criticism of "common use." First, there is nothing "absurd" about saying that when an arm that was widely available for decades is still owned in significantly lower numbers than a relatively modern arm with relatively narrow utility, that the older arm may be "highly unusual in society at large" while the newer development is relatively "common." Second, *whatever* the lower bound of constitutional protection may be—and there may well be time to work that out in future cases—it surely is not implicated here, where the firearms targeted by the State are second only to the handguns at issue in *Heller* in national popularity.

## B. The State's alternative principle—"excessively dangerous" weapons can be banned—lacks any historical support.

As Plaintiffs have explained, the Supreme Court has held that there is only one valid historical principle by which modern arms bans can be sustained and it is that weapons that are both "dangerous and unusual" may be restricted, while those in "common use" cannot be. The State, however, proposes an alternative, suggesting that "excessively dangerous weapons" can be banned once it is clear "that they are enacting an inordinate toll on public safety and societal wellbeing." State Br. at 45 (quoting *Bianchi*, 111 F.4th at 446). It must be noted that this looks nothing like the narrow, and specific, historical principles that the Supreme Court has recognized in its Second Amendment caselaw; this principle, for instance, suggests that legislatures have broad latitude to determine when a firearm is responsible for a toll on societal wellbeing and legislating accordingly, which runs contrary to *Heller*'s caution that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S. at 636. The State's asserted principle also is utterly irreconcilable with *Heller*, because if there is *any* type of firearm that is "enacting an inordinate toll on public safety and wellbeing," State Br. at 45, it is the handgun which, as Justice Breyer detailed extensively in his dissent, is "the overwhelmingly favorite weapon of armed criminals." *Id.* at 682 (Breyer, J., dissenting). Any principle that would countenance the banning of handguns cannot possibly be correct.

The State's proposed principle also lacks support in the historical record. The State first looks for support to early English law, noting again that the English Bill of Rights contained a limitation that it guaranteed only "Arms … suitable to their Conditions, and as allowed by Law," and that consistent with this limitation, laws from both 1383 and 1541 placed restrictions on certain types of arms that could be owned by restricting launcegays and crossbows. State Br. at 45–46; *Heller*, 554 U.S. at 593. But as both *Bruen* and *Rahimi* have made clear, while English law may be helpful in some cases to illuminate the scope of the right, where the practices of the Founding generation break from earlier English traditions, those earlier traditions are not informative. "Thus, '[t]he language of the constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*,' not as they existed in the Middle Ages." *Bruen*, 597 U.S. at 39 (quoting *Ex parte Grossman*, 267 U.S. 87, 108–09 (1925) (emphasis and brackets in *Bruen*)); *see also Rahimi*, 602 U.S. at 694 ("Through these centuries, English law had disarmed not only brigands and highwaymen, but also political opponents and disfavored religious groups. By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic."). And here, the elimination of that precise language from the English Bill of Rights in the Second Amendment gives good reason to accord these

ancient restrictions little weight. Indeed, the " 'as allowed by law' " language in the English arms right reflected the fact that, "like all written English rights it was held only against the Crown, not Parliament." *Heller*, 554 U.S. at 593 (first quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Our constitution repudiated that limitation, protecting our citizens' fundamental rights from infringement by *any* branch of the government, not just the executive. In any event, *Bruen* discussed both restrictions the State cites for support and held that both targeted not just dangerous but "unusual" weapons, explaining that the anti-crossbow law was borne primarily out of Henry VIII's concern that preferences for other weapons would "threaten[] Englishmen's proficiency with the longbow," 597 U.S. at 42 (discussing 25 Hen. 8, ch. 6 (1533)), and that the launcegay targeted by the earlier law, unlike any modern carried weapon, was "a 10- to 12-foot-long lightweight lance" which was generally "carried only when one intended to engage in lawful combat or . . . to breach the peace," *id.* at 41 (discussing 7 Rich. 2, ch. 13 (1383)).

The State's 1686 New Jersey law is similarly unhelpful. It specifically targeted "pocket pistols" among other "unusual or unlawful weapons." *See* State Br. at 46 (quoting 1686 N.J. Laws 289-90, ch. 9 (JA1271–72)). It was this specific law that, as discussed above, led the Supreme Court to explain that it was entirely possible for a class of weapons to cease being "unusual" and come into constitutional protection—and in doing so, it made clear that the law is of limited value today since

it (1) applied only to "unusual" weapons by its plain terms and (2) merely prohibited the concealed carry of such weapons, while preserving the ability to both own and lawfully carry them openly. *Bruen*, 597 U.S. at 48.

The State next points for support to historical bans on "trap guns," or firearms rigged to fire when a trap, e.g., a trip wire, is sprung. State Br. at 46–47. The State does not even really attempt to explain how trap gun laws are "relevantly similar" to its ban on common semiautomatic firearms. A trap gun ban is not a ban on a type of firearm at all. It is, rather, a ban on rigging a firearm in such a way that it may fire when self-defense is not justified. *See, e.g.*, *Katko v. Briney*, 183 N.W.2d 657, 659 (Iowa Sup. Ct. 1971) (affirming as correct statement of law a jury instruction providing that "[a]n owner of premises is prohibited from willfully or intentionally injuring a trespasser by means of force that either takes life or inflicts great bodily injury; and therefore a person owning a premise is prohibited from setting out 'spring guns' and like dangerous devices which will likely take life or inflict great bodily injury, for the purpose of harming trespassers"). Restrictions on setting trap guns are, therefore, wholly irrelevant to this case.

The same can be said for the State's next analogues, laws regulating the storage of gunpowder, which again, it points to but does not argue are "relevantly similar," except, by implicitly suggesting that modern firearms are like gunpowder stored in large quantities which could "kill many people at once if ignited." State Br.

at 47 (quoting *OST*, 95 F.4th at 49). This does not withstand scrutiny. *Heller* correctly classed these same laws as "fire-safety laws" and noted that they "do not remotely burden the right of self-defense as much as an absolute ban on handguns" (and this is no less true when the object of the ban is "assault firearms"). 554 U.S. at 632. Indeed, the D.C. Circuit in *Hanson* called "[t]he suggestion that [gunpowder storage laws] limited the Second Amendment right to keep and bear arms … silly." 120 F.4th at 235.

The State next points to laws regulating Bowie knives. *See* State Br. at 47–49. The Court below referred to these laws as "the closest historical analogue to an AR-15" but still found them unavailing. Opinion, Dist. Ct. Doc. 62 at 53 (July 30, 2024) ("Op."). At the outset, the Court should decline to consider these laws entirely because they come too late in time to inform our understanding of the Second Amendment. *See Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 442 (3d Cir. 2025). *Lara* correctly noted that, where laws from "at least 50 years after the ratification of the Second Amendment" run directly contrary to what came before them, they are deserving of *no* consideration whatsoever under *Bruen*. *Id.* at 441. Taking the State's view of these laws and those that follow them from even later dates in our country's history, that is precisely the case here. With only trap guns and gunpowder regulations to rely on at the Founding, the State has *zero* support from the critical time period for its historical theory that "excessively dangerous"

and popular arms could be banned. Although the State claims these regulations date to "the beginning of the 1830s" there was, in fact, just a *single* law—from 1837 in Georgia—that dates to before the 1860s that restricted Bowie knives at all. *See* 1837 Ga. Laws 90 (JA1240–41); *see also* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. OF LEGIS. 223, 287 (2024). That is too little and too late under *Lara* and *Bruen*.

Even leaving that aside and assuming arguendo that Bowie knives were, in fact, popular arms at earlier periods in American history, the historical record that the State has compiled in this case is conspicuously lacking in laws that actually banned them the way New Jersey bans so-called "assault firearms." Rather, the historical record shows, at most, that they were "often regulated like handguns" or like any other bladed arms. Kopel & Greenlee, *supra* at 293. They were rarely banned and "[t]he very large majority" of states "respected the right to keep and bear arms, including Bowie knives," and contented themselves with merely regulating the mode of carry. *Id.; see also Teter v. Lopez*, 76 F.4th 938, 951 (9th Cir. 2023), *reh'g en banc granted, opinion vacated,* 93 F.4th 1150 (9th Cir. 2024), *and on reh'g en banc,* No. 20-15948, 2025 WL 259979 (9th Cir. Jan. 22, 2025). As the district court acknowledged, that means that "when looking at the 'hows' of the regulation, [historic Bowie knife statutes] do[] not stand against the Supreme Court's dictates

set forth in *Bruen* and *Heller*," because almost none burdened the right to the same degree as New Jersey's ban on "assault firearms" today. Op. at 54.

To the extent these laws might be considered constitutional, it is likely because the arms they targeted were, in fact, "dangerous and unusual." The State, for instance, cites *Aymette v. State*, 21 Tenn. 154 (1840), for the proposition that contemporary courts found these laws constitutional. *See* State Br. at 49. Leaving aside the fact that *Heller* singled *Aymette* out as offering an "odd reading of the right" that was "to be sure, not the one we adopt," 554 U.S. at 613, its analysis, quoted by the State, found that the types of weapons not protected were those that "are usually employed in private broils," *Aymette*, 21 Tenn. at 158, strongly suggesting, at least, that they were not commonly used for lawful purposes.

The State next points to laws regulating slungshots and clubs. State Br. 49 Again, these laws come from too late a period, especially in light of the clear evidence that clubs and similar bludgeoning weapons were accepted as protected arms by the Founders. For instance, at the trial of the soldiers involved in the Boston Massacre, John Adams, defending the soldiers, said of the crowd of Americans who had assembled armed with, among other things, clubs, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, *Argument for the Defense: 3-4 December 1770*, https://bit.ly/435ah2j. In

any event, New Jersey's very general discussion of these laws disguises the fact that, like Bowie knives, there were relatively few laws making it unlawful to own these arms. *See Teter*, 76 F.4th at 951, n.11 (collecting such laws). In fact, just five states truly banned "slungshots" before the 20th century, and two of those laws (from Texas and West Virginia) were clearly inconsistent with the Second Amendment because they also banned the carriage of revolvers and pistols. *See* Ill. Ill. Stat. Ann., Crim. Code, ch. 38 at 88 (1885) (JA1245); 1895 N.D. Rev. Codes 1293 (JA1283–84); Tenn. Pub. Acts (1879), chap. 186 (JA1297); 1871 Tex. Laws 25, § 1 (JA1299–1300); 1882 W. Va. Acts 421 (JA1309). Other laws merely regulated the method of carry. *See, e.g.*, 1873 Ala. Offenses Against Public Justice § 4110 (JA1222) (prohibiting concealed carriage of brass knuckles and slung-shots).

The State then moves on to focus on laws from the 19th century and early 20th century regulating the carry of pistols or restricting their possession. State Br. at 50–51. This comparison is the weakest yet, as *Bruen* made clear that, at most, such regulations show that "the manner of public carry was subject to reasonable regulation" and they obviously cannot show that pistols or other handguns were not and are not constitutionally protected arms. 597 U.S. at 59. The only specific law the State relies on as limiting the right to carry certain types of pistols (while permitting the carriage of the types most commonly used by members of the military), was

noted in *Bruen* as an outlier restriction that was "uniquely severe." *Id.* at 54 (discussing 1821 Tenn. Acts 15, ch. 13).

Finally, the State claims that both semiautomatic firearms and machine guns were heavily regulated in the early 20th century. State Br. at 52. The machine gun laws, as noted above, are easily explained under Plaintiffs' theory of the case. The State's claim that there were ten states that "restricted semiautomatic weapons between 1927 and 1934," *Id.* (quoting *Bianchi*, 111 F.4th at 470 & nn.14–15), is overstated. The laws that the State cites (indirectly through *Bianchi*) are, in general, much less restrictive than the "assault firearms" law at issue here. One law merely required a permit to own a semiautomatic firearm, 1933 Ohio Laws 189 (JA1201–02), two permitted ordinary possession but banned possession for an "offensive or aggressive purpose," 1933 S.D. Sess. Laws 245 (JA1209–10); 1934 Va. Acts 137 (JA1211–12), four laws only targeted machine guns capable of automatic fire, 1927 Mass. Acts 413 (JA1260–61); 1931 Ill. Laws 452; 1932 La. Acts 336, 337–38 (JA1193); 1934 S.C. Acts 1288 (JA1207–09), and one only reached semiautomatic firearms if they had been "changed, altered or modified" from their original design to increase their capacity, 1933 Minn. Laws 231, 232 (JA1195–96). That leaves just two laws cited by the State that did ban semiautomatic firearms, but even those laws only did so for arms above a certain capacity, 1927 Mich. Pub. Acts 887, 888-89 (JA1262) (16 rounds); 1927 R.I. Pub. Laws 256 (JA1204–07) (12 rounds), and we

are not challenging New Jersey's capacity restrictions in this case. In any event, both laws were short-lived aberrations that have long since been repealed, *see* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 263. In other words, laws banning semiautomatic firearms, like New Jersey's, are a uniquely modern aberration unlike anything within the scope of relevant history and fundamentally incompatible with the Second Amendment.

## CONCLUSION

The Court should hold that New Jersey's ban on "assault firearms" is unconstitutional under the Second and Fourteenth Amendments.

Dated: February 7, 2025

Bradley Lehman
GELLERT SEITZ BUSENKELL & BROWN
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
(302) 425-5800
(302) 425-5814 (fax)
blehman@gsbblaw.com

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Appellants-Cross-Appellees Mark Cheeseman, Timothy Connolly, and Firearms Policy Coalition, Inc.*

## CERTIFICATE OF COMPLIANCE

In accordance with the Federal Rules of Appellate Procedure and this Court's Rules, I certify the following:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 11,314 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3. This brief complies with Local Rule 31.1(c). The text of the electronic brief is identical to the text in the paper copies supplied to the Court. Further, VirusTotal Antivirus Software was run on the electronic brief and no viruses were detected.

4. David H. Thompson, Peter A. Patterson, William V. Bergstrom, and Bradley Lehman are all admitted to practice in the Third Circuit Court of Appeals and are members in good standing.

/s/ David H. Thompson
David H. Thompson

*Counsel for Appellants-Cross-Appellees*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(d) and Local Rule 25.1(b), I hereby certify that on February 7, 2025, I electronically filed the foregoing response brief with the Clerk of the Court by using the appellate CM/ECF system. Service on all counsel for all parties has been accomplished via ECF.

/s/ David H. Thompson
David H. Thompson

*Counsel for Appellants-Cross-Appellees*
