Nos. 24-2415, 24-2450, 24-2506

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

—————————

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, et al.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

(*additional captions listed on inside cover*)

—————————

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1:18-cv-10507, 1:22-cv-04397, 1:22-cv-04360

—————————

## RESPONSE AND REPLY BRIEF
## FOR APPELLANTS-CROSS-APPELLEES
## BLAKE ELLMAN, THOMAS R. ROGERS, MARC WEINBERG,
## AND ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS

—————————

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle and Pistol Clubs*

February 7, 2025

————————————

MARK CHEESEMAN, TIMOTHY CONNELLY, FIREARMS POLICY COALITION, INC.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

————————————

BLAKE ELLMAN; THOMAS R. ROGERS; ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

*Appellants-Cross-Appellees*,

v.

ATTORNEY GENERAL NEW JERSEY, et al.,

*Appellees-Cross-Appellants.*

————————————

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ...................................................................................... 1

ARGUMENT .............................................................................................. 5

I.    The Assault Firearms Law Violates The Second Amendment ...................... 5

    A.    The Assault Firearms Law Plainly Restricts Conduct Covered by the Second Amendment's Plain Text ................................. 5

    B.    No Historical Tradition Supports the Assault Firearms Law ............. 13

        1.    The firearms New Jersey bans are in common use.................. 13

        2.    There is no historical tradition of banning common arms that a legislature deems "too dangerous" for civilians .................................................................. 22

        3.    Our Nation's tradition is one of protecting the right to keep and bear semiautomatic firearms, not banning them ....................................................................... 29

    C.    The State Does Not Defend the District Court's Inexplicable Decision to Cabin Plaintiffs' Challenge to Just AR-15s or Offer Any Distinct Defense of Its Ban on Common Shotguns and Pistols ..................................................... 38

II.   The Magazine Ban Violates The Second And Fifth Amendments ............... 42

    A.    The Magazine Ban Violates The Second Amendment ...................... 42

    B.    The Confiscatory Aspect of New Jersey's Magazine Ban Violates the Takings Clause ....................................... 47

CONCLUSION ........................................................................................ 51

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Andrus v. Allard*,
  444 U.S. 51 (1979)...........................................................................50

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
  910 F.3d 106 (3d Cir. 2018) ..................................................... *passim*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*,
  2018 WL 4688345 (D.N.J. Sept. 28, 2018) ......................................15

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023)..................................................... *passim*

*Bianchi v. Brown*,
  111 F.4th 438 (4th Cir. 2024) .................................................... *passim*

*Binderup v. Att'y Gen.*,
  836 F.3d 336 (3d Cir. 2016) ...............................................................10

*Caetano v. Massachusetts*,
  577 U.S. 410 (2010)................................................................... 13, 21

*Chi., Burlington & Quincy Ry. Co. v. Illinois ex rel. Grimwood*,
  200 U.S. 561 (1906)...........................................................................50

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................................... *passim*

*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021)............................................................15

*Duncan v. Bonta*,
  83 F.4th 803 (9th Cir. 2023)..............................................................15

*Folajtar v. Att'y Gen.*,
  980 F.3d 897 (3d Cir. 2020) .................................................................2

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015).............................................................19

*Garland v. Cargill,*
    602 U.S. 406 (2024)................................................................ 33, 44

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) ...........................................37

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ...........................................36

*Kansas v. United States,*
    214 F.3d 1196 (10th Cir. 2000) ...........................................49

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019)................................................10

*Kelo v. City of New London,*
    545 U.S. 469 (2005).............................................................50

*Lara v. Comm'r Pa. State Police,*
    125 F.4th 428 (3d Cir. 2025) ..................................... *passim*

*McDonald v. City of Chicago,*
    561 U.S. 74 (2010)................................................................1

*Mennen Co. v. Atl. Mut. Ins. Co.,*
    147 F.3d 287 (3d Cir. 1998) ...............................................48

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022)...................................................... *passim*

*Nat'l Amusements Inc. v. Borough of Palmyra,*
    716 F.3d 57 (3d Cir. 2013) .................................................50

*Nunn v. State,*
    1 Ga. 243 (1846) ................................................................26

*Ocean State Tactical, LLC v. Rhode Island,*
    646 F.Supp.3d 368 (D.R.I. 2022)........................................44

*Ocean State Tactical, LLC v. Rhode Island,*
    95 F.4th 38 (1st Cir. 2024) .................................................37

*Oregon Firearms Fed'n v. Kotek*,
  682 F.Supp.3d 874 (D. Or. 2023)........................................................44

*Poinier v. Comm'r*,
  858 F.2d 917 (3d Cir. 1988) .............................................................19

*Range v. Att'y Gen.*,
  124 F.4th 218 (3d Cir. 2024) ..................................................... *passim*

*Staples v. United States*,
  511 U.S. 600 (1994).......................................................... 20, 31, 32

*State v. Huntly*,
  25 N.C. 418 (1843) ................................................................. 18, 19

*United States v. Jenkins*,
  68 F.4th 148 (3d Cir. 2023)......................................................... 48, 49

*United States v. Rahimi*,
  602 U.S. 680 (2024)................................................................. *passim*

*United States v. Tann*,
  577 F.3d 533 (3d Cir. 2009) .............................................................48

*Wiese v. Becerra*,
  306 F.Supp.3d 1190 (E.D. Cal. 2018)..................................................49

**Statutes**

Act of May 8, 1792, 1 Stat. 271 ...........................................................28

Pub. L. No. 103-322, 108 Stat. 1796 (1994)............................................32

1797 Del. Laws 104 ..........................................................................27

1798 Ky. Acts 106 ............................................................................27

1917 Cal. Sess. Laws 221 ...................................................................28

1923 Cal. Stat. 695...........................................................................28

1933 Minn. Laws 231 ........................................................................31

1933 Ohio Laws 189 .........................................................................31

1933 S.D. Sess. Laws 245 .......................................................................31

1934 Va. Acts 137 ...................................................................................31

1959 Mich. Pub. Acts 249 ......................................................................31

1959 R.I. Acts & Resolves 260 ..............................................................31

1963 Minn. Sess. L. ch. 753 ...................................................................31

1989 Cal. Stat. 60 ...................................................................................32

N.J.S. §2C:39-1 ................................................................................ *passim*

N.J.S. §2C:39-5 .........................................................................................5

N.J.S. §2C:39-20 ....................................................................................49

## Rules

Fed. R. App. P. 28.1 ...............................................................................39

Third Cir. I.O.P. 9.1 ...............................................................................48

## Other Authorities

Albert Einstein, *Ist die Trägheit eines Körpers von seinem Energieinhalt abhängig?* (*Does the Inertia of a Body Depend Upon Its Energy Content?*), 323 Annalen der Physik 639 (1905) ...................................30

Ford, *Company Timeline*, https://tinyurl.com/ymb9rn6t (last visited Feb. 7, 2025) .....................................................................30

William J. Helmer, *The Gun That Made the Twenties Roar* (1969) .......................20

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* (3d ed. 2021 & 2024 Supp.) ................................................................36

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381 (1994) ..........................................35

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024) ........................................24

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003,* Rep. to the Nat'l Inst. of Just., U.S. Dep't of Just. (2004), https://bit.ly/3wUdGRE. ............................................................... 20, 32

5 *Proceedings of the Virginia Assembly, 1619*, in *Narratives of Early Virginia, 1606-1625*, at 249 (Lyon Gardiner Tyler ed., 1907)............................28

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases— Again*, 41 Harv. J.L. & Pub. Pol'y Per Curiam, Sept. 27, 2023, https://tinyurl.com/2mn2mznc ............................................................30

John Uri, *120 Years Ago: The First Powered Flight at Kitty Hawk*, NASA (Dec. 14, 2023).........................................................................30

U.S. Army FM 3-22.9 (Aug. 12, 2008)....................................................34

Att'y Gen. Peter Verniero, *Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws* (Aug. 19, 1996), https://tinyurl.com/3sm4bex9 ........................................ *passim*

# INTRODUCTION

The Second Amendment protects "the right of the people to keep and bear Arms." Yet, in the state's telling, the only Arms the Second Amendment protects are those that *the state* determines are truly "needed for self-defense." N.J.Br.4. That theory—that it is up to the government, not the governed, to decide what arms the people do and do not need to defend themselves, their loved ones, and their homes— pervades the state's brief. Yet that theory is irreconcilable with the notion that "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010)). The *raison d'être* of the Second Amendment is to keep the state from stripping the people of arms. If it were up to the state to decide which arms the people can and cannot have, then the Second Amendment would confer no right at all; it would provide only a privilege that states could revoke whenever politically expedient.

That is why this Court, sitting en banc, recently "reject[ed]" an argument that sought to "devolve[] authority to legislators to decide whom to exclude from 'the people'" protected by the Second Amendment. *Range v. Att'y Gen.*, 124 F.4th 218, 228 (3d Cir. 2024) (en banc). Any theory that gives elected officials free rein to choose which people may exercise the right to keep and bear arms is inconsistent with the reality that the Second Amendment protects a fundamental right. "[S]uch

'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" *Id.* (quoting *Folajtar v. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J. dissenting)).

That is no less true when it comes to the "object" of the Second Amendment right: "'Arms.'" *See District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). The Second Amendment's text speaks plainly, protecting "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Range*, 124 F.4th at 228 (quoting *Heller*, 554 U.S. at 582), and even those that elected officials may believe are "unnecessary for individual self-defense," *contra* N.J.Br.9. That suffices to defeat New Jersey's contention that its sweeping bans on common semiautomatic firearms and the feeding devices that come standard with them do not even implicate the Second Amendment. When it comes to efforts to prohibit keeping and bearing firearms and their constituent parts, the answer to the threshold "question" whether the law "regulates Second Amendment conduct"—i.e., whether "'the Second Amendment's plain text covers [the restricted] conduct'"—is "easy": Yes. *Range*, 124 F.4th at 228 (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022)).

Of course, that does not mean that all Arms are immune from all restrictions, as Plaintiffs have taken pains to underscore. But just as the question of who may be prohibited from exercising the right is to be determined by looking to "the historical

2

tradition that delimits the outer bounds of the right to keep and bear arms," *id.* (quoting *Bruen*, 597 U.S. at 19), not by deferring to legislators, so too determining which arms may be banned is matter of historical tradition, not legislative grace. And when it comes to flat bans like New Jersey's, the Supreme Court has already instructed what the relevant historical tradition is: While the keeping and bearing of arms "that are highly unusual in society at large" may be restricted, a state may not prohibit the keeping and carrying of arms that are "typically possessed by law-abiding citizens for lawful purposes"—i.e., "in common use." *Heller*, 554 U.S. at 625, 627; *Bruen*, 597 U.S. at 47.

New Jersey thus bore the burden to prove that the firearms and feeding devices it has banned are *not* in common use. It never even tried to make that showing below, and it does not seriously try to do so now. It instead asks this Court to discard the common-use tradition in favor of deferring to the legislature's assessment of "the suitability of the weapon's features for self-defense." N.J.Br.14. It should go without saying that this Court cannot simply ignore binding Supreme Court precedent. But even if could, that argument finds no support in the historical record, which reveals virtually *no* efforts to ban common arms just because a legislature deemed them "too dangerous" for law-abiding citizens. As that historical record confirms, while "[t]he Constitution leaves [states] a variety of tools for combating th[e] problem[s]" ailing New Jersey, "the enshrinement of constitutional rights

necessarily takes certain policy choices off the table"—and "[t]hese include the absolute prohibition" of arms in common use for lawful purposes. *Heller*, 554 U.S. at 636.

All of that suffices to doom both New Jersey's firearms ban and its magazine ban. Indeed, the only distinct argument the state makes as to the latter is to try to exclude magazines from *any* Second Amendment protection by equating them to "cartridge boxes." But this Court has already rejected the argument that magazines are not "Arms," and it has already concluded that the very magazines New Jersey has banned are common to boot. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.* ("*ANJRPC II*"), 910 F.3d 106, 116-17 (3d Cir. 2018). At any rate, the state's argument defies common sense. "Cartridge boxes" were literally just that: cardboard boxes that held cartridges. Saying that a cartridge box is analogous to a device that actively feeds ammunition into the chamber of a firearm because both hold ammunition is like saying that a gas can is analogous to a combustion engine because both hold fuel. The state fares no better with its dubious effort to exclude so-called "large-capacity magazines" from *ANJRPC II*'s holdings, as that earlier decision in this very case was addressing the same magazines and law at issue here.

When it comes to the confiscatory aspect of its magazine ban, New Jersey does an about-face and wraps itself in *ANJPRC II*. But that decision contained all of two sentences and one footnote of analysis on the Takings Clause issue and

nowhere explained how giving citizens a menu of options to dispose of their property, each of which is a taking, somehow makes the overall scheme not a taking. The state fares no better with its own efforts on the merits, for the simple reason that mandatory divestitures—whether to the state or to a third party—and mandatory transformations of private property are all takings.

In sum, both bans violate the Second Amendment, and the retroactive aspect of New Jersey's confiscatory magazine ban violates the Takings Clause as well. The Court should hold the bans unconstitutional in their entirety.

## ARGUMENT

### I.    The Assault Firearms Law Violates The Second Amendment.

#### A.    The Assault Firearms Law Plainly Restricts Conduct Covered by the Second Amendment's Plain Text.

The Assault Firearms Law ("§1(w)") makes it "a crime" to "knowingly … possess[] an assault firearm," N.J.S. §2C:39-5(f), a term the statute broadly defines to include dozens of models of semiautomatic rifles, pistols, and shotguns, *id.* §2C:39-1(w)(1), (w)(3)-(4), and all firearms with "substantially identical" features, *id.* §2C:39-1(w)(2). *See* Opening.Br.12-14. By its terms, then, §1(w) prohibits people in the state from keeping and bearing arms, *see Heller*, 554 U.S. at 581 ("all firearms" are "'arms'"), including some of the most common firearms in America. The Assault Firearms Law thus self-evidently restricts "conduct" that "the Second Amendment's plain text covers." *Bruen*, 597 U.S. at 24.

The state does not dispute that §1(w) prohibits ordinary New Jerseyans like plaintiffs and their members from keeping and bearing arms. Nor could it; that is the whole point of the law. Nevertheless, the state argues that the law does not even *implicate* the Second Amendment because, in its view, the rifles, shotguns, and pistols it bans are not "Arms" within the meaning of the Second Amendment. N.J.Br.13. According to the state, *Bruen*'s threshold inquiry into what "the Second Amendment's plain text covers," 597 U.S. at 17, does not turn on "the 'normal and ordinary meaning of the Second Amendment's language,'" *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 434 (3d Cir. 2025) (quoting *Bruen*, 597 U.S. at 20). Instead, the state says, it turns on whether arms are "in common use at the time for lawful purposes like self-defense." Opening.Br.13 (quoting *Heller*, 554 U.S. at 624-25, 627).

Setting aside the problem that the inquiry the state proceeds to embark on has little to do with answering that question, *see* N.J.Br.15-26 (examining the "History," "Design Features," and "Lethality" of AR-15 rifles); *but see infra* Part I.B, the state is confused about what the *threshold* inquiry entails. To be sure, history matters at both stages of the Second Amendment inquiry. But the textual inquiry is not designed to explicate the "historical understanding of the scope of the *right*." N.J.Br.13 (quoting *Heller*, 554 U.S. at 625) (emphasis added). That is what the historical-tradition inquiry is for. The textual inquiry is designed to explicate the

"historical understanding" of the *text*, *see Bruen*, 597 U.S. at 17, for the simple and limited purpose of determining whether a law even arguably implicates Second Amendment rights. As this Court has now twice recognized, that does not demand some elaborate examination of historical norms and practices. *See Range*, 124 F.4th at 224, 226; *Lara*, 125 F.4th at 433-38. It simply requires determining how the words used in the Second Amendment would have been understood by the people who wrote and ratified them.

*Heller* is instructive. The Court determined the meaning of the word "Arms" by examining founding-era dictionaries, which confirmed that it was understood "then as now" to encompass "all instruments that constitute bearable arms," regardless of whether they were "specifically designed for military use" or for use in the home. *Heller*, 554 U.S. at 581-82. In fact, the principal question *Heller* was asking in examining those definitions is whether the word would have been understood at the founding to cover *only* arms "specifically designed for miliary use," *see id.*, which suffices to inter the argument that anything particularly useful to the military falls outside the definition of "Arms" entirely. *But see Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023) (positing that "weapons that are exclusively or predominantly useful in military service" do not qualify as "Arms"). As *Heller* explained, even the most "limited" founding-era source it identified still "stated that all firearms constituted 'arms,'" so historical meaning confirms that "the

Second Amendment extends prima facie" to all firearms. *Heller*, 554 U.S. at 581-82. The threshold inquiry is that simple.

To be sure, *Heller* went on to explain that bans on certain types of firearms may nevertheless be permissible if they are not "in common use at the time," because there is a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 624-25, 627. But *Heller* nowhere suggested that those firearms somehow cease to be "Arms" at all. It simply acknowledged (consistent with the nature of any presumption) that the *prima facie* case for protection can be rebutted if there is a "historical tradition" of restricting what the plain text covers. And *Bruen* eliminated any doubt about where historical tradition fits into the mode of analysis that it so painstakingly detailed, explaining that restricted conduct is "presumptively protected" so long as "the Second Amendment's *plain text* covers" it, and that assessing whether a law fits within "this Nation's historical tradition of firearm regulation" is a separate and subsequent inquiry on which the state bears the burden of proof. 597 U.S. at 17 (emphasis added).

That is evident not just from what *Bruen* said, but from how *Bruen* conducted the textual inquiry. *Bruen* used the phrase "plain text" three times to describe that inquiry, *see* 597 U.S. at 17, 32, 33, and it dispensed with it in a few short paragraphs, which simply looked to the "definitions" of the key terms in "the Second Amendment's text" (i.e., "the people," "keep," "bear," and "Arms") that *Heller* had

derived from examining historical sources, *id.* at 31-33.  And while the restriction in *Bruen* precluded citizens from carrying handguns in public, *id.* at 12, the Court did not ask *at the threshold* whether there were comparable historical restrictions.  The Court instead found it sufficient that the ordinary "definition of 'bear'"—i.e., "to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person'"—"naturally encompasses public carry," and that "the Second Amendment's text" does not "draw[] a home/public distinction."  *Id.* at 32 (alterations in original) (quoting *Heller*, 554 U.S. at 584).  To be sure, historical tradition still played a critical role in the Court's inquiry into the "historical understanding of the *scope* of the right" to carry arms, including whether it encompassed public carry.  *Heller*, 554 U.S. at 625 (emphasis added).  But the Court examined that evidence at the historical-tradition stage, not the plain-text stage.  *See* 597 U.S. at 34-70.

The threshold inquiry is equally straightforward here.  The "defin[ition]" of arms—"all instruments that constitute bearable arms," *Range*, 124 F.4th at 228 (quoting *Heller*, 554 U.S. at 582)—naturally encompasses all rifles, shotguns, and pistols, and the Second Amendment's text does not draw any common/uncommon distinction (let alone any distinction based on the "lethality" or "design features") among bearable arms.  It covers all "Arms," full stop, rendering anything that fits

that bill "presumptively protect[ed].'" *Id.* (quoting *Bruen*, 597 U.S. at 17). Whether something that falls within the definition of "Arms" may nevertheless be banned consistent with the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627, is a question to be answered at the next stage of the analysis—and one on which the state, not the challenger, bears the burden of proof. Indeed, when *Bruen* explained how the historical-tradition part of the analysis works, it used the "in common use" tradition as an example. 597 U.S. at 21. And when *Bruen* conducted the historical-tradition analysis, it reiterated that the common-use rule is "[d]raw[n] from … historical tradition," not from the Second Amendment's text. *Id.* at 47.

Of course, none of that means that states are powerless to restrict, or even ban, certain types of "Arms." *See* Opening.Br.27-28. It simply means that a state must justify an arms ban by reference to historical tradition, just as New York had to try to do for its carry ban. *See, e.g.*, *Range*, 124 F.4th at 226 (explaining that "individuals with Second Amendment rights may nonetheless be denied possession of a firearm" if the government carries its burden at the historical-tradition stage (quoting *Binderup v. Att'y Gen.*, 836 F.3d 336, 344 (3d Cir. 2016) (en banc) (Ambro, J.)); *accord Lara*, 125 F.4th at 437; *see also Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting). Simply put, issues that find no purchase in the plain text are relevant to whether a law is consistent with "the historical tradition

that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 597 U.S. at 19, not to whether it "regulates arms-bearing conduct" at all, *Rahimi*, 602 U.S. at 691. The state's contrary approach not only is foreclosed by Supreme Court and Circuit precedent, but would make nonsense of *Bruen*. After all, if nothing not *ultimately* protected by the Second Amendment was *presumptively* protected either, then the distinct inquiries *Bruen* articulated would collapse into each other. And if a challenger could not make it past the threshold inquiry without proving that historical tradition does *not* support restricting the conduct in which she wishes to engage, then the state would be relieved of its historical-tradition burden in virtually every case.

The state's effort to smuggle a historical comparative analysis of the "design features" and "lethality" of arms into the threshold inquiry is especially misplaced, as it risks rendering the Second Amendment "a law trapped in amber" in much the same way that Pennsylvania's atextual "textual" arguments in *Lara* did. 125 F.4th at 437 (quoting *Rahimi*, 602 U.S. at 691). There, Pennsylvania argued that "those under the age of 21 were considered minors" from "the founding … through Reconstruction," and so should not be considered part of "the people." *Id.* at 436. The Court did not dispute the state's historical account. It instead rejected Pennsylvania's argument that "the legal status of 18-to-20-year-olds during that period" is relevant to the threshold inquiry. *Id.* at 437.

11

As the Court explained, the argument "that the initial step in a *Bruen* analysis requires excluding individuals from 'the people' if they were so excluded at the founding … conflates *Bruen*'s two distinct analytical steps." *Id.* As a *textual* matter, "the people" includes "all Americans"—i.e., "all members of the political community"—so if someone fits that bill today (as 18-to-20-year-olds plainly do), then she is presumptively one of the people regardless of whether she was considered an "American" at the founding. *Id.* at 435. "If, at step one, we were rigidly limited by eighteenth-century conceptual boundaries, 'the people' would consist solely of white, landed men[.]'" *Id.* at 437. Here, too, if the threshold textual inquiry demanded an examination of how modern firearms compare to those commonly kept and carried during the founding era on metrics like accuracy and rate of fire, it is hard to see how *any* modern firearms would make the cut. *But see Heller,* 554 U.S. at 582 (rejecting as "bordering on the frivolous" the argument "that only those arms in existence in the 18th century are protected by the Second Amendment").

In short, just as in *Range* and *Lara*, the threshold textual inquiry here is "easy." *Range*, 124 F.4th at 228. The Assault Firearms Law prohibits keeping and carrying a laundry list of rifles, shotguns, and pistols, and rifles, shotguns, and pistols plainly fit within the definition of "Arms" that both the Supreme Court and this Court have embraced. That is enough to make the conduct in which plaintiffs wish to engage—possessing those arms—presumptively protected, and to shift to the state "the burden

12

to 'justify its regulation'" as consistent with historical tradition. *Rahimi*, 602 U.S. at 691. Indeed, if a law that bans keeping and carrying firearms does not "regulate[] arms-bearing conduct," *id.*, it is hard to fathom what would.

**B.    No Historical Tradition Supports the Assault Firearms Law.**

**1.    The firearms New Jersey bans are in common use.**

Because all the rifles, pistols, and shotguns that the Assault Firearms Law bans plainly fall within "the Second Amendment's definition of 'arms,'" New Jersey must prove that it nonetheless can ban them "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 28. That is a burden the state cannot bear. The Supreme Court has instructed that the only "arms" a state may ban consistent with that tradition are those that are (at a minimum) "highly unusual in society at large," as opposed to "in common use today" for lawful purposes like self-defense. *Id.* at 47; *accord Caetano v. Massachusetts*, 577 U.S. 410, 417 (2010) (Alito, J., concurring in the judgment). And there is no question that the firearms §1(w) outlaws are commonly owned for lawful purposes such as self-defense. Indeed, the state does not challenge *any* of Plaintiffs' evidence demonstrating how pervasive these arms are in modern America. *See* Opening.Br.29-31 (summarizing evidence); Cheeseman.Br.30-38 (same); *cf.* JA41-42 (finding that AR-15 rifles are "overwhelmingly chosen by American society for [a] lawful purpose" (alteration in original) (quoting *Heller*, 554 U.S. at 628)). Nor does it offer any competing

13

evidence that might show that any of the myriad rifles, pistols, and shotguns §1(w) outlaws are uncommon (to say nothing of "highly unusual in society at large," *Bruen*, 597 U.S. at 47).

The state instead proffers an exceedingly cramped conception of "use for self-defense," insisting that the only "use" that counts is defensively firing a firearm in an active shooting incident. *See* N.J.Br.24-26, 40. That claim cannot be squared with Supreme Court precedent or the Second Amendment's text. As *Heller* explained, what matters when determining whether an arm is "in common use" is whether it is "typically *possessed* by law-abiding citizens for lawful purposes" such as self-defense, not how often it is fired at a would-be attacker. 554 U.S. at 624-25 (emphasis added). Indeed, *Bruen* never even mentioned how often people fire handguns in self-defense situations when determining whether they have a right to carry them. It sufficed there, just as it did in *Heller*, that handguns are "the most popular weapon chosen by Americans for self-defense." *Bruen*, 597 U.S. at 22 (quoting *Heller*, 554 U.S. at 629).

How frequently law-abiding citizens keep versus carry certain firearms, or fire them at ranges versus at attackers, is therefore legally irrelevant, as an individual "uses" her firearm in exactly the manner that "the right to keep and bear Arms" protects every time she does any of those things. By the state's contrary logic, the Second Amendment would not protect rifles at all. *See* N.J.Br.24 (highlighting

14

statistics suggesting that rifles of any kind are used in only 2% to 4% of defensive gun incidents). In fact, by the state's logic, it is hard to see how any firearm would be "in common use," since most people are fortunate enough to never have to fire *any* firearm in self-defense. *Duncan v. Bonta*, 83 F.4th 803, 815 (9th Cir. 2023) (en banc) (Bumatay, J., dissenting); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal* ("*ANJRPC I*"), 2018 WL 4688345, at *6 (D.N.J. Sept. 28, 2018).[1]

Instead of addressing the inquiry that *Heller* and *Bruen* mandate, the state tries to change the subject. While it acknowledges that the question is *supposed* to be whether arms are in common use today for lawful purposes like self-defense, *see* N.J.Br.13, it proceeds to argue at length why it does not think people *should* use the arms it has banned for self-defense. *See* N.J.Br.15-26 (examining the "History," "Design Features," and "Lethality" of AR-15 rifles). The state's claim that people

---

[1] That said, even by the state's flawed metric, its claim that AR-15s are more commonly used for unlawful purposes than for self-defense cannot withstand scrutiny. For instance, the state contrasts the percentage of mass shootings in which AR-15s have been used with the percentage of defensive gun incidents in which they were used, without acknowledging the vastly different denominators. N.J.Br.25. While attaining precise numbers of defensive gun uses is difficult, they certainly number in the millions, *see ANJRPC II*, 910 F.3d at 112 n.8, whereas mass shootings are thankfully exceedingly rare, *see Bianchi v. Brown*, 111 F.4th 438, 529-30 (4th Cir. 2024) (en banc) (Richardson, J., dissenting). And many of the state's statistical arguments "weigh[] rarity like lead when it favors the ban, but then weigh[] rarity like helium when it undermines" it. *Duncan v. Bonta*, 19 F.4th 1087, 1160 (9th Cir. 2021) (en banc) (VanDyke, J., dissenting), *cert. granted*, *judgment vacated*, 142 S. Ct. 2895 (2022); *compare, e.g.*, N.J.Br.24-26, *with Bianchi*, 111 F.4th 528-32 (Richardson, J., dissenting).

do not really need semiautomatic rifles because handguns are better suited to self-defense is whiplash-inducing, as the District of Columbia made the virtually same argument in reverse in *Heller*. *But see Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."). It cannot be that the people are entitled to no arms save those that the Supreme Court has explicitly addressed. But more to the point, the state is once again asking the wrong question.

The state tries to justify its sleight of hand by claiming that *Heller* "evaluated the suitability of the weapon's features for self-defense." N.J.Br.14 (citing *Heller*, 554 U.S. at 621-25, 627, 629); *see also* N.J.Br.36-37. But *Heller* did not even discuss any of the "features" of a machinegun or a short-barreled shotgun, let alone evaluate their "suitability" for self-defense. The Court instead offered one and only one reason why they may be banned: because they are not "typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625; *see also id.* at 627 (explaining that "weapons that are most useful in military service … may be banned" if they are "highly unusual in society at large"). Indeed, *contra* N.J.Br.37, the words "exceedingly dangerous weapons" do not even appear in *Heller*, whether when describing machineguns, short-barreled shotguns, or anything else. [2]

---

[2] That likewise suffices to defeat the argument that *Heller* held that the Second Amendment does not protect "weapons that are exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194. *Heller* simply acknowledged that

Nor did *Heller* consider the "suitability" of any "features" of handguns "for self-defense" when concluding that they cannot be banned.  To be sure, the Court offered "many reasons that a citizen may prefer a handgun for home defense:  It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police." *Heller*, 554 U.S. at 629.  But setting aside the problem that none of those "reasons" has anything to do with the kinds of technical "features" the state wants to talk about, the Court made abundantly clear that none of that had any bearing on whether handguns may be banned.  As it explained in the very next sentence:  "*Whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id.* (emphasis added).  For that reason alone, "a complete prohibition of their use is invalid." *Id.* The state's lengthy detour into purported similarities between AR-15 rifles and machineguns is therefore, while factually flawed, *see infra* Part I.B.3, ultimately

---

"weapons that are most useful in military service" may be prohibited *if* they are "highly unusual in society at large." 554 U.S. at 627.  The Seventh Circuit's contrary claim is nonsensical, as the notion that firearms lack Second Amendment protection *precisely because* they are especially useful in military service would put the prefatory and operative clauses at irreconcilable odds. *But see Heller,* 554 U.S. at 598 (concluding that the two "fit[] perfectly").  It also suffers from the same "circularity" problem that that court purported to identify with the common-use test, as what is "most useful in military service" inevitably changes over time too.

17

irrelevant.  What matters under the common-use test is whether arms *are* "'in common use' today for self-defense," *Bruen*, 597 U.S. at 32, not whether the state thinks they should be.

New Jersey insists that the Supreme Court cannot really have meant what it has said (repeatedly) since common use does not play such a role in other constitutional contexts, and it claims that there is "no evidence that the Framers or legislators believed the power to regulate a weapon turned on its popularity." N.J.Br.31-32.  As for the former, the Supreme Court could not have been more emphatic in *Bruen* that it was not subjecting the Second Amendment to the same mode of scrutiny that applies in other constitutional contexts, so deviation from those contexts is hardly a reason not to take the Court at its word.  And the state identifies no other context in which there is a comparable common-use historical tradition that might apply.  As for the latter, the state's claim is inexplicable.  *Heller* did not invent the common-use test out of whole cloth.  The Court derived it from a laundry list of historical sources explicating "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627.  And *Bruen* and *Rahimi* added to that list through their extensive discussions of Northampton statutes and the like.  *See Bruen*, 597 U.S. at 34-70; *Rahimi*, 602 U.S. at 693-98.[3]

---

[3] The state claims that one of those sources, *State v. Huntly*, 25 N.C. 418, 422 (1843), stands for the proposition that "an arm can still be an 'unusual weapon' even if 'there is scarcely a man in the community who does not own' it." N.J.Br.40.  In

Parroting the Seventh Circuit's decision in *Bevis*, the state criticizes the "common use" test as "'circular.'" N.J.Br.32 (quoting *Bevis*, 85 F.4th at 1190). But while the Seventh Circuit may not have been able to resist the temptation to grade the Supreme Court's work, this Court must—not only because to do so would violate "our hierarchical court structure," *Poinier v. Comm'r*, 858 F.2d 917, 919 (3d Cir. 1988), but because the Supreme Court has already considered and rejected the very argument the state presses.[4]  Indeed, the circularity critique first featured in Justice Breyer's dissent in *Heller*, *see* 554 U.S. at 720-21, and it was voiced again in pre-*Bruen* circuit law, *see, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). Yet the Court endorsed the common-use test nevertheless in both *Heller* and *Bruen*. *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21, 47. The Court even went out of its way to make clear in *Bruen* that the Second Amendment protects arms that are common *today* even if they were *not* common at the founding,

---

fact, *Huntly* stands for the opposite proposition—that carrying a gun is not a per se offense under a Northampton analogue even if it is a gun that is not commonly carried. *See* 25 N.C. at 422-23; *Bruen*, 597 U.S. at 52.

[4] The Court should reject New Jersey's pervasive reliance on the Fourth Circuit's decision in *Bianchi* for the same reasons, as that decision, like *Bevis*, elevated pre-*Bruen* precedent above *Bruen*, while deriding the Supreme Court's in-common-use test as "ill-conceived" and "a trivial counting exercise." 111 F.4th at 448, 460; *see Bevis*, 85 F.4th at 1189-90, 1198-99.

confirming that it is not concerned in the slightest by the prospect that an arm might become common over time. *See* 597 U.S. at 47; *see also Heller*, 554 U.S. at 582.[5]

In all events, the circularity critique is unavailing. For one thing, far from validating that critique, the true history of machineguns refutes it. Manufacturers *did* "flood the market," N.J.Br.34 (alterations omitted), with machineguns in the early 1920s after neither the military nor law enforcement wanted them—and law-abiding citizens did not want them either. *See* Opening.Br.10. Indeed, even the state's expert recognizes that, "'[d]espite its initial publicity … the Thompson submachine gun was a [commercial] failure from the start.'" JA1060 (Spitzer Rep. ¶6) (quoting William J. Helmer, *The Gun That Made the Twenties Roar* 129 (1969)); *see* JA1059-68. People instead responded throughout the country by restricting or banning machineguns almost immediately since the only people who seemed to want them were criminals. Within a decade, more than half the states had restricted their possession and use, and the federal government followed suit not long thereafter.

---

[5] The state's passing suggestion (at N.J.Br.33) that AR-15 rifles did not become common until after the federal ban that was in place from 1994 to 2004 expired is therefore beside the point. That said, the state cites no evidence to support that claim, and it is plainly wrong. The Supreme Court recognized *in 1994* that AR-15 rifles "have been widely accepted as lawful possessions," *Staples v. United States*, 511 U.S. 600, 612 (1994), and "there were upwards of 1.5 million privately owned AWs in the U.S." at the time, Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003,* Rep. to the Nat'l Inst. of Just., U.S. Dep't of Just. 1 (2004), https://bit.ly/3wUdGRE.

*See* Opening.Br.9-10.  And while those restrictions could have been repealed at any time, most never have been—even as inadvertent restrictions on *semi*automatic firearms were, *see infra* p.31—which ought to suffice to debunk the state's seeming view that the only thing stopping machineguns from becoming "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629, is the fact that they have long been so highly restricted.[6]

The circularity critique not only has no factual purchase, but ignores half of the legal inquiry.  While *Bruen* focused on whether a firearm is "unusual," the historical tradition asks whether a firearm "is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment).  States thus cannot freeze firearms technology in time by banning new models before they can enter the market and become common, as they would still need to show that a new model is "dangerous" in some way that meaningfully differentiates it from arms that are in common use.  Otherwise, states could outlaw arms with technological advancements that make them *safer* by limiting people to older models that are already common.  Moreover, if a state cannot show that a "new" arm is meaningfully different from one that is already common, then it would flunk the common test too.

---

[6] The state suggests that machineguns actually are "in common use," N.J.Br.35, but it offers no evidence as to whether the relatively few civilians who lawfully own a machinegun keep and bear them for self-defense, rather than as, e.g., collector's items.

Indeed, even New Jersey ultimately admits that a firearm must be "unusually dangerous" to flunk the common-use test. N.J.Br.39. It just declines to answer the critical question: "Unusual compared to what?" The only sensible answer is compared to firearms that people commonly use for lawful purposes such as self-defense. That longstanding historical tradition not only appropriately trusts the American people's judgment in selecting the firearms they think are appropriate to defend themselves, their loved ones, and their property, but *avoids* the kinds of illogical results the state purports to fear. And to the extent that tradition makes it particularly difficult to belatedly ban firearms that are already in wide circulation, there is every reason to think the *Bruen* majority would view that as a feature, not a bug. The historical-tradition analysis here thus begins and ends with the fact that New Jersey cannot begin to prove that the arms it has banned are not in common use for lawful purposes like self-defense.

> **2.    There is no historical tradition of banning common arms that a legislature deems "too dangerous" for civilians.**

Unable to reconcile its arms ban with the only historical tradition the Supreme Court has recognized, the state purports to have discovered a different one. According to New Jersey, "weapons that … pose exceptional dangers to innocent civilians" in the hands of criminals enjoy no constitutional projection whatsoever. N.J.Br.10 (quoting *Bianchi*, 111 F.4th at 471). In other words, by the state's telling, this Nation's historical tradition is one of "defer[ring to] legislatures[']"

determinations that certain arms are just too dangerous in the wrong hands to allow law-abiding citizens to keep them *even if* they are common.  *But see Range*, 124 F.4th at 228.

The first problem with that argument is that it impossible to reconcile with the common-use tradition *Heller* and *Bruen* recognized.  That tradition protects the *right* of the people to keep and bear arms that are in common use, which forecloses any claim that some other tradition allows the same arms to be banned.  That said, it is exceedingly unlikely that the tradition the state purports to have unearthed ever existed, as it would nullify the Second Amendment as a practical matter since *every* firearm is exceedingly dangerous in the hands of someone bent on putting it to criminal ends.  Indeed, if that were all it took to withstand Second Amendment scrutiny, then *Heller* and *Bruen* would have come out the other way.  After all, the District of Columbia certainly maintained—and the majority did not dispute—that it was trying to address the grave threat that handguns pose in the hands of criminals. *See Heller*, 554 U.S. at 634, 636.  So did New York in defending its outlier permitting regime in *Bruen*.  Yet that did not stop the Supreme Court from invalidating both laws.

It is little surprise, then, that New Jersey cannot muster any historical laws remotely resembling its sweeping ban.  In fact, the state fails to identify almost any historical law that banned an arm that had long been used by law-abiding citizens

23

for lawful purposes. Instead, most of the laws the state discusses did not ban any arms at all, let alone ban an arm commonly possessed by law-abiding citizens for self-defense. For instance, the state begins with laws prohibiting setting "trap guns." N.J.Br.46-47. But unlike rifles, pistols, and shotguns, trap guns are not bearable arms; they are devices used to rig a firearm to fire a projectile automatically when a trap (e.g., a trip wire) is triggered. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 365-66 (2024). These laws thus do not impose *any* "burden [on] a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29, as they criminalize the act of rigging a device to expel a projectile without a human pulling the trigger, not the keeping or bearing of any arm.

The state next invokes the same gunpowder laws that *Heller* rejected as a basis for banning handguns since they were plainly just fire-safety measures. *See* N.J.Br.47; *but see Heller*, 554 U.S. at 632. New Jersey does not even try to explain how the same laws that did not justify banning handguns could somehow justify banning the rifles, shotguns, and pistols its law covers. Instead, the state posits that these fire-safety laws evince a supposed tradition of broad legislative discretion to enact laws to address *any* "[d]anger" posed by arms. N.J.Br.46. Again, if that were the case, then *Heller* would have come out the other way, as D.C. was inarguably legislating to address danger too—and invoked the very same laws in support of its

effort to do so.  The Supreme Court instead sensibly recognized that laws designed to ensure that combustible material would not combust when not in use are self-evidently different from laws that ban arms entirely.

The state's extended discussion of nineteenth-century Bowie knife laws, N.J.Br.47-49, does not move the needle either, as it once again loses sight of the critical "how" piece of the historical-tradition analysis.  Under *Bruen*'s "how" inquiry, courts must compare the mechanics of historical and modern laws, i.e., *how* they regulate; courts do not evaluate where laws might fall on some overarching "burdensomeness" spectrum.  *Id.* at 29 & n.7.  *Rahimi* could not have been clearer about that.  When analyzing whether 18 U.S.C. §922(g)(8) is consistent with historical tradition, the Court did not start by situating the law in a substantial, meaningful, or minimal burden category.  It examined how the law actually works—i.e., by authorizing the government to disarm someone for a "limited duration" only after an individualized "judicial determination[]" that the person "likely would threaten or had threatened another with a weapon"—and compared that to how the government's proffered historical analogues worked.  *Rahimi*, 602 U.S. at 699.  That makes sense, as the whole point of the historical-tradition analysis is to get courts out of the business of making subjective assessments about whether *they* think a burden on Second Amendment rights is sufficiently "meaningful."

25

Under the proper framework, New Jersey's proffered Bowie knife analogues are not remotely similar. For one thing, those laws almost uniformly either prohibited only the concealed carry of Bowie knives (or carry with intent to do harm) or provided heightened punishments for using one in the commission of a crime. *See Bevis*, 85 F.4th at 1217 (Brennan, J., dissenting). The Supreme Court has already concluded that concealed-carry laws do not even support modern laws banning all carry, *see Bruen*, 597 U.S. at 48-49, 53-55; *a fortiori*, they cannot support possession bans. As for the handful of laws that imposed taxes or registration requirements, *see* N.J.Br.48-49, those laws still left people free to acquire and possess Bowie knives, which New Jersey's law does not do vis-à-vis the banned arms. And the lone law that really did ban Bowie knives is the same 1837 Georgia law that banned pistols as well—which the Georgia Supreme Court held unconstitutional as applied to everything but concealed carry. *See Nunn v. State*, 1 Ga. 243 (1846); *cf. Bruen*, 597 U.S. at 54 (singling out *Nunn* as "particularly instructive" on the Second Amendment's meaning); *Heller*, 554 U.S. at 612-13 (praising *Nunn*).

The state next invokes laws regulating various types of clubs and other blunt weapons known as slungshots. *See* N.J.Br.49-50. But it provides little information about those laws—and the reason for its cageyness is not hard to discern. Most targeted groups who were not, at the time, understood to have *any* constitutional rights—namely, enslaved people and other racial minorities. *See, e.g.*, 1797 Del.

Laws 104 (quoted at JA1234) ("[I]f any Negro or Mulatto slave shall presume to carry any guns, … clubs, or other arms and weapons whatsoever, without his master's special license … he shall be whipped with twenty-one lashes, upon his bare back."); 1798 Ky. Acts 106 (quoted at JA1252) (similar). Racist laws that governed only those who were not at the time considered to be part of "the people" protected by the Second Amendment do not tell this Court anything about the rights of those who are.

Moreover, as the state's own expert admitted, the anti-club restrictions levied against disfavored groups were only "anti-carry laws," JA1107, so they flunk the "relevantly similar" test for yet another reason: Laws that restrict only the carrying of certain types of arms (and primarily *concealed* carrying at that) are not remotely similar in *how* they regulate to a law that bans possession. After all, the question is "how … the regulations burden a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29, and a law that restricts only one type of carrying while leaving the right to keep the restricted arm in the home untouched imposes a far different burden than a law that bans both carrying and keeping entirely. Again, *Bruen* did not even consider concealed-carry laws proper analogues for a ban on carrying, let alone for a ban on keeping. 597 U.S. at 47-49.[7]

---

[7] Invoking two twentieth century laws, the state's expert claimed that "some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime." JA1107-08. But those laws did not prohibit club possession—and

The same is true of the pistol and gun laws New Jersey invokes:  Even the state admits that they restricted only concealed carry.  *See* N.J.Br.50-51; JA1112.  No colony or state in the early Republic prohibited people from carrying (let alone keeping) firearms simpliciter.  To the contrary, some state and local laws affirmatively encouraged or even required it.  *See, e.g.*, 5 *Proceedings of the Virginia Assembly, 1619*, in *Narratives of Early Virginia, 1606-1625*, at 249, 273 (Lyon Gardiner Tyler ed., 1907); *see also* Act of May 8, 1792, ch. 33, §1, 1 Stat. 271, 271 (requiring "every free able-bodied white male citizen" between the ages of 18 and 45 to "provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, … a pouch with a box therein to contain not less than twenty-four cartridges … or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder").  Early regulations either prohibited concealed carry while allowing open carry or merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50.

The state is thus left invoking twentieth-century restrictions on "machineguns."  N.J.Br.51-54.  But the Supreme Court has already explained what historical tradition justifies those laws:  "the historical tradition of prohibiting the

---

one exempted ammunition from its ambit, *see* 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

carrying of 'dangerous and unusual weapons.'"  *Heller*, 554 U.S. at 627 (discussing fully automatic M-16 rifles).  That is because machineguns are not and have not ever been "in common use" for self-defense.  *Id.*; *see also supra* n.6.  Those restrictions thus do not begin to support banning arms that are.

### 3.    Our Nation's tradition is one of protecting the right to keep and bear semiautomatic firearms, not banning them.

All of that suffices to doom New Jersey's argument that there is a historical tradition of allowing elected officials to outlaw common arms that they deem "ill-suited for self-defense" notwithstanding the contrary views of the people the Second Amendment protects.  *See* N.J.Br.9.  That said, the state's effort to situate its ban on virtually all semiautomatic rifles in some historical tradition is especially strained, as both history and precedent confirm that this Nation has a longstanding tradition of *protecting* the people's access to these ubiquitous arms, not falsely equating them with machineguns.

At the outset, whatever room there may be for "a more nuanced approach" when it comes to "dramatic technological changes," *Bruen* made clear that no such nuance is necessary when it comes to bans on arms, for the "common use" inquiry already accounts for technological changes in arms by asking what is in common use "*today*."  597 U.S. at 27, 47; *see also* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases—Again*, 41 Harv. J.L. & Pub. Pol'y Per Curiam, Sept. 27, 2023,

https://tinyurl.com/2mn2mznc. That said, semiautomatic rifles and pistols are no modern innovations. They hit the civilian markets before Henry Ford sold his first Model A, before the Wright Brothers took their first flight at Kitty Hawk, and before Albert Einstein realized that energy and mass are equivalent. *See* Opening Br.8-9; Ford, *Company Timeline*, https://tinyurl.com/ymb9rn6t (last visited Feb. 7, 2025); John Uri, *120 Years Ago: The First Powered Flight at Kitty Hawk*, NASA (Dec. 14, 2023), https://tinyurl.com/385htnv4; Albert Einstein, *Ist die Trägheit eines Körpers von seinem Energieinhalt abhängig?* (*Does the Inertia of a Body Depend Upon Its Energy Content?*), 323 Annalen der Physik 639 (1905).

Yet while semiautomatic firearms gained popularity immediately, no state singled them out for special restrictions until a few swept them up (often seemingly inadvertently) in ham-fisted efforts in the 1920s and 1930s to restrict then-new *fully* automatic arms. *See* Opening.Br.43. Even then, by New Jersey's own count, at most only ten states "restrict[ed] semiautomatic weapons" *in any way* "between 1927 and 1934." N.J.Br.52 (citing JA1182-1217). And even that low number significantly overstates the state's case, as New Jersey both counts laws that did *not* ban (or even necessarily apply to) semiautomatic firearms and ignores the short lifespan of the few that (at least arguably) did.

For example, one of the laws the state's historians cite applied only to fully automatic weapons from which multiple shots could be discharged "by a single

function of the firing device," 1933 S.D. Sess. Laws 245, 245-47, ch. 206, §§1-8; *see* JA1209-10; another applied to semiautomatics only to the extent they were "altered or modified to increase the magazine [capacity] from the original design as manufactured by the manufacturers," 1933 Minn. Laws 231, 231-33, ch. 190, §1(b); *see* JA1195-96; and still another merely required a special license, without ever prohibiting sale or possession, *see* 1933 Ohio Laws 189; JA1201-02. Another did not prohibit *possession* of semiautomatic firearms, but rather only heightened the penalties for misusing them. *See* 1934 Va. Acts 137, 137-39, ch. 96, §§1-4 (applying only to use of a 16-round automatic weapon in a "crime of violence" or "for offensive or aggressive purpose"); JA1211-12. At most, only a few early twentieth-century laws purported to ban any kind of semiautomatic firearms. And the state neglects to mention that those laws were ultimately repealed or replaced with laws that restricted only fully automatic firearms. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263; 1963 Minn. Sess. L. ch. 753, at 1229.

It is little surprise, then, that the Supreme Court recognized as recently as 1994 that semiautomatic firearms in general—and AR-15 rifles in particular—"have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. The core question before the Court in *Staples* was whether an AR-15 rifle is sufficiently similar to an M16 machinegun to put people on notice that they should ensure that it has not been modified in some way that renders its possession illegal. In answering that question

"no," the Court accepted that "certain categories of guns," including "machineguns," may be so dangerous and unusual that people should know that even their mere possession may be illegal. *Id.* at 611-12. But it refused to extend that logic to "conventional semi-automatic" firearms such as AR-15 rifles, "precisely because guns falling outside those categories traditionally have been widely accepted as lawful possessions." *Id.* at 612, 615. *Staples* thus necessarily turned on two conclusions: (1) semiautomatic AR-15 rifles have traditionally been lawfully owned in this country, while fully automatic machineguns have not, and (2) AR-15 rifles are not even in the same "category," let alone "almost the same gun," as machineguns like the M16, *contra* N.J.Br.17.

Both conclusions were eminently correct. As for the history, it was not until 1989 that any state started targeting AR-15s and other semiautomatic firearms for restriction based on the types of features that render a firearm unlawful under §1(w). *See* 1989 Cal. Stat. 60, 60-64. Congress did not do so until 1994, *see* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)), and it allowed that law to expire in 2004 after a Justice Department study revealed that it had produced "no discernible reduction" in firearm violence, Koper, *supra*, at 96. And even now, bans like New Jersey's remain outliers; the vast majority of the firearms the state now bans (including AR-15s) remain legal in most of the country, while machineguns still do not. In short, semiautomatic rifles and fully automatic

machineguns have always been treated as legally distinct, which should suffice to defeat the state's effort to conflate them.

The reason for that longstanding legal distinction is obvious: Anyone with even a passing familiarity with firearms understands that they are decidedly not "almost the same gun." N.J.Br.17 (quoting *Bevis*, 85 F.4th at 1195). Indeed, for the all the state's focus on "objective features," it does not want to talk about the most obvious one: whether a firearm is capable of firing automatically. That is no minor detail. As the Supreme Court just reiterated, that has a dramatic impact on the very aspects of a firearm that the state puts front and center. A modern semiautomatic firearm fires only one round per trigger pull and has an accurate sustained "fire rate" (which takes into account some but not all practical limitations) of *at most* 60 rounds per minute, depending on variables such as distance. *Garland v. Cargill*, 602 U.S. 406, 433 (2024) (Sotomayor, J., dissenting). "With an M16 in automatic mode," by contrast, "the shooter pulls the trigger once to achieve a fire rate of 700 to 950 rounds per minute," *id.* at 432—a method and rate of fire designed to provide the kind of suppression that can be needed on the battlefield, not the accuracy needed for self-defense in the home.

Indeed, while the state invokes the U.S. Army Manual for the unremarkable proposition that "the 'most *important* firing technique during modern, fast moving combat is rapid semiautomatic fire,'" N.J.Br.18 (emphasis added), it ignores the part

of the manual that goes on to explain that "there *are* significant tactical advantages to having a weapon that can shoot in automatic mode, even if these features are not deployed regularly," *Bianchi*, 111 F.4th at 528 (Richardson, J., dissenting) (citing U.S. Army FM 3-22.9, at 7-13, 7-16, 7-19 (Aug. 12, 2008)). That is why, notwithstanding New Jersey's incessant efforts to label them "military-grade weapons," no military in the world uses semiautomatic-only rifles. *See Bevis*, 85 F.4th at 1222 (Brennan, J., dissenting). Conversely, law-abiding citizens have overwhelming preferred more accurate semiautomatic-only firearms for self-defense from the start—presumably because people sensibly want to minimize the risk of harming the very loved ones and property they are trying to protect.

That §1(w) singles out various common features on semiautomatic rifles does not change the analysis in the slightest, as those features serve obvious defensive purposes while doing nothing to make a semiautomatic firearm function any more like a fully automatic one. For instance, the state seems to think that flash suppressors serve no self-defense purpose. *See* N.J.Br.18. Not so. A flash suppressor is a device designed to reduce or redirect muzzle flash—the sudden flash of light caused by the explosion of gunpowder when one fires a shot—from the user's field of vision. It does not hide the flash from those in the line of fire; it prevents the user from being blinded in low-light conditions, such as during a late-night break-in, and it can help reduce recoil and muzzle movement, increasing

accuracy and making the firearm less painful to use.  *See* JA346-49, JA474-78; David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396-99 (1994).

The state is so zealous to condemn the AR-15 that it even misstates its own law:  It attacks as among "[t]he enumerated features that render an arm 'substantially identical' to listed assault weapons like the AR-15 … 'a barrel shroud to protect the shooter's hands from excessive heat during sustained firing.'"  N.J.Br.18 (quoting *Bianchi*, 111 F.4th at 455).  But New Jersey does not ban barrel shrouds on rifles; it bans them only on certain pistols.  *See* Att'y Gen. Peter Verniero, *Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws* (Aug. 19, 1996), https://tinyurl.com/3sm4bex9 ("*Guidelines*"); Opening Br. 14; *see also* JA350.  At any rate, there is nothing remotely dangerous about barrel shrouds.  They simply "protect the shooter's hand from being burned by a barrel that has become hot from firing," which is why they "have been commonly used on rifle and shotgun barrels since the early 1900's."  JA350.  Features like flash suppressors and barrel shrouds thus *increase* accuracy—which even the state is forced to admit makes a firearm less dangerous, not more.  And they in no way convert a semiautomatic rifle into a fully automatic machinegun.

In short, to say that semiautomatic-only rifles are the same as fully automatic M16s merely because they share external features designed to facilitate their safe,

ergonomic, and effective use would be like saying that civilian Hummer is the same as a military High Mobility Multi-purpose Wheeled Vehicle merely because they look similar and both have adjustable seats, headlights, and power-steering. Moreover, the state's effort to conflate the two proves far too much, as many of its complaints about AR-15 rifles attack features that are common to *all* rifles. *See, e.g.*, N.J.Br.21 (complaining that AR-15s have a longer range and higher muzzle velocity, are "heavier, longer, harder to maneuver in tight quarters," are "more difficult to operate with one hand," and are "significantly less concealable than" handguns).[8] What the state really seems to want is to "cabin the Second Amendment right to effectively cover only handguns." *Bianchi*, 111 F.4th at 477 (Gregory, J., concurring). In fact, the logic of the state's arguments would go even further than that, as "semi-automatic *rifles* fire at the same general rate as semi-automatic *handguns*." *Heller v. District of Columbia*, 670 F.3d 1244, 1289 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); *see also* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403, 1999 (3d ed. 2021 & 2024 Supp.). By the state's telling,

---

[8] The state also ignores the self-defensive benefits these features provide. For example, semiautomatic rifles are more accurate—not just at the extreme end of their range, *see* N.J.Br.21, but at normal self-defense distances. *see, e.g.*, JA337 (rifles "far exceed[] the accuracy" of shotguns at 50 yards); JA452 (police select rifles over pistols when anticipating "shots 'out to 25 yards'"). And their more prominent visibility as compared to handguns may itself suffice to scare off an attacker.

then, it would be equally free to ban the same exceptionally popular handguns that *Heller* deemed "the quintessential self-defense weapon." 554 U.S. at 629.

\* \* \*

In sum, text, historical tradition, precedent, and common sense all thoroughly refute the state's claims that semiautomatic firearms are not "Arms" at all, or that some historical tradition in this Nation supports banning them. To be sure, a handful of other circuits have embraced various of the state's atextual, ahistorical, and counterfactual arguments—albeit not necessarily the same ones. *See Hanson v. District of Columbia*, 120 F.4th 223, 237-40 (D.C. Cir. 2024); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 45-52 (1st Cir. 2024); *Bianchi*, 111 F.4th at 471-72; *Bevis*, 85 F.4th at 1199-1202. But that is hardly a virtue when it comes to the Second Amendment. After all, *Bruen* rejected both the consensus view of nearly every circuit on how to conduct Second Amendment analysis and the majority view on the constitutionality of "good-cause" permitting regimes. 597 U.S. at 15, 18-19. And this Court has already recognized that faux consensus is no match for faithful application of Supreme Court precedents and the principles underlying them. *See Range*, 124 F.4th at 225; *Lara*, 125 F.4th at 433-34. The Court should do so again here and conclude that the state came woefully short of identifying any historical tradition that could justify its sweeping arms ban.

**C.    The State Does Not Defend the District Court's Inexplicable Decision to Cabin Plaintiffs' Challenge to Just AR-15s or Offer Any Distinct Defense of Its Ban on Common Shotguns and Pistols.**

For the most part, the district court correctly applied these principles when it came to the state's ban on AR-15 rifles.[9]  *See* JA60.  But the court then *sua sponte* narrowed Plaintiffs' challenge to the Assault Firearms Law, which outlaws dozens of rifles, shotguns, and pistols—including many that have next to nothing in common with AR-15 rifles—to just AR-15 rifles (and seemingly just those manufactured by Colt).  *See* JA12-13.  As explained at length in the opening brief, that was both inexplicable and indefensible.  Opening.Br.33-38.  The state apparently agrees, as it makes no effort to defend the district court's decision to cabin Plaintiffs' challenge.  All the state has to say about it is contained in a single, one-sentence footnote, where it does not dispute that Plaintiffs' "challenge covers other restricted weapons too" beyond just (Colt) AR-15s.  N.J.Br.15 n.3.  There is thus no impediment to holding *all* of §1(w)'s challenged provisions unconstitutional.

On the flip side, the state has forfeited any argument as to any firearms *other than* AR-15s and other rifles "considered to be 'substantially identical'" to them under New Jersey law.  *See* N.J.S. §2C:39-1(w)(1)-(2); *Guidelines* 2; Opening.Br.12-

---

[9] The district court incorrectly treated "common use" as part of the threshold-textual inquiry, but it correctly found that AR-15 rifles are "overwhelmingly chosen by American society for [a] lawful purpose."  JA41-42 (quoting *Heller*, 554 U.S. at 628).

14.  As Plaintiffs have argued at length, and the state does not deny, §1(w) prohibits far more than just AR-15s or similar modern sporting rifles.  That is a problem for the state, because even assuming *arguendo* that a firearm's "objective features" dictated whether a weapon can be banned, N.J.Br.14, the state has not put forward any evidence or argument that any of the other firearms §1(w) prohibits shares the features of the AR-15 that the state maintains make it "ill-suited for self-defense," N.J.Br.9.[10]

Indeed, one would barely even know from the state's brief that §1(w) also outlaws all semiautomatic shotguns that "ha[ve] at least [two] of the following: 1. a folding or telescoping stock; 2. a pistol grip …; 3. a fixed magazine capacity in excess of 5 rounds; and 4. an ability to accept a detachable magazine." *Guidelines* 3; *see* N.J.S. §2C:39-1(w)(1)-(2); Opening.Br.14.  None of those features has anything to do with the "objective features" that the state (wrongly) contends makes an AR-15 rifle more "suitab[le] … for military or offensive use" than "for self-defense."  N.J.Br.14.

Start with telescoping stocks.  The state never once explains how a telescoping stock would make *any* firearm (let alone a shotgun) less suitable for self-defense.

---

[10] It is, of course, too late to do so in its reply brief, as that brief must be confined to the issues on which the state cross-appealed, not the issues on which plaintiffs appealed.  *See* Fed. R. App. P. 28.1(c)(4).

That is because it cannot. A telescoping stock does not affect a firearm's rate of fire, its capacity to accept ammunition, or the power of the projectile discharged. Nor does it render a long gun concealable. It simply allows the user to use the firearm more safely and "accurately" by adjusting the distance of the pull length to meet the user's personal characteristics. *See* JA3445 (noting possible adjustments "by shorter-statured shooters, including female shooters," or for wearing bulkier clothing in winter versus thinner clothing in summer). These are improvements that the state ought to welcome since they make it easier for law-abiding citizens to defend themselves. Pistol grips serve a similar function. *See* JA342-44. Indeed, the state acknowledges that they enhance "accuracy"; it just complains that they also enhance accuracy for criminals, N.J.Br.18, which of course is true of any feature that makes a firearm more accurate. And while the state tries to label them "combat-functional features," *id.*, its argument once again proves too much, as the one thing that *all* handguns (a/k/a pistols) have in common is a pistol grip.

That leaves just "a fixed magazine capacity in excess of 5 rounds" or "an ability to accept a detachable magazine." *Guidelines* 3. While the state certainly thinks that magazines (whether fixed or detachable) that accept more than ten rounds are problematic, *see* N.J.S. §2C:39-1(y); *but see infra* Part II, five is less than ten. Yet the state offers no explanation for why it seems to think that a shotgun equipped to fire six times without reloading is less entitled to constitutional protection than

one equipped to fire five.  In sum, even if this Court were to uphold §1(w)'s ban on AR-15-style rifles, the state has forfeited any defense of the statute's separate and severable ban on common semiautomatic shotguns.

The same is true as to §1(w)'s ban on common semiautomatic pistols.  A semiautomatic pistol is banned as an "assault weapon" if it "has an ability to accept a detachable magazine and has" any two prohibited features, e.g., a "manufactured weight of 50 ounces or more when … unloaded" and the "capa[city]" to "accept[] a … forward handgrip."  *Guidelines* 2-3; *see* N.J.S. §2C:39-1(w)(1)-(2); Opening.Br.14.  The state literally never even mentions that distinct prohibition in its brief—even though Plaintiffs expressly discussed and challenged it in their opening brief, *see, e.g.*, Opening.Br.14, 30, 36.  And the state offers no explanation for why, e.g., a 49-ounce handgun with a forward handgrip is kosher, but a 51-ounce version is somehow "unsuitab[le] to civilian self-defense," N.J.Br.15 n.3.  The state thus has forfeited any defense of this separate and severable ban too.  But in all events, the shotgun and pistol bans are unconstitutional for the same reason as the rifle ban, and the District of Columbia's handgun before it:  While states have many regulatory tools at their disposal for addressing violent crimes and mass shootings, the Second Amendment takes off the table the option of banning common arms.

**II.    The Magazine Ban Violates The Second And Fifth Amendments.**

**A.    The Magazine Ban Violates The Second Amendment.**

1. Like the district court, Plaintiffs began their analysis of whether New Jersey's magazine ban violates the Second Amendment with a critical fact:  This Court has already held that large capacity ammunition "magazines are arms within the meaning of the Second Amendment."  JA65; *see ANJRPC II*, 910 F.3d at 116 ("[T]he question is whether a magazine is an arm under the Second Amendment. The answer is yes."); Opening.Br.38-40.  And far from disturbing that analysis, *Bruen* and *Rahimi*—and now *Range* and *Lara*—have all confirmed that the textual inquiry this Court undertook in *ANJRPC II* is the *only* thing that the threshold inquiry requires.  *See supra*, Part I.A.

The state all but ignores this dispositive holding.  It buries it at the very end of its discussion of its magazine ban, where it notes only that "this Court never said *LCMs* are arms," implying that magazines capable of holding more than ten rounds of ammunition are somehow different, for plain-text-analysis purposes, from those that hold ten or fewer.  N.J.Br.43.  But there is a reason this Court did not confine its conclusion that "a magazine is an arm under the Second Amendment," *ANJRPC II*, 910 F.3d at 116, to certain sizes of magazine:  That conclusion had nothing to do with a magazine's size.  The Court concluded that "magazines are 'arms' within the meaning of the Second Amendment" "[b]ecause magazines feed ammunition into

42

certain guns, and ammunition is necessary for such a gun to function as intended." *Id.* That remains equally true whether a magazine comes in Size Medium, Large, or Small. Indeed, if size mattered, then presumably the Court would have said so; after all, *ANJRPC II* concerned the exact same magazine ban at issue here. At any rate, New Jersey's argument fails on its own terms, as the state does not even explain what would count as an "LCM." Is it the 15-round limit New Jersey imposed from 1990 to 2018? The ten-round limit it now imposes on most firearms? The five-round limit it imposes for fixed shotguns magazines? The state does not say.

New Jersey protests that *ANJRPC II* "did not conduct the historically-driven analysis of 'arms' the Supreme Court now requires, or consider the historical evidence the State has thus now compiled on that score." N.J.Br.44 (citation omitted). Indeed. That is why *ANJRPC II*'s *ultimate* holding is not binding: The Court failed to put the state to its burden of proving that its magazine ban is "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S at 17, and instead upheld the ban under the two-step interest-balancing approach that *Bruen* subsequently rejected, *see ANJRPC II*, 910 F.3d at 117-24; *Bruen*, 597 U.S. at 19; *Range*, 124 F.4th at 225. But the state's effort to evade *ANJRPC II*'s threshold textual analysis by highlighting its failure to address historical tradition yet again "conflates *Bruen*'s two distinct analytical steps." *Lara*, 125 F.4th at 437.

Undeterred by this Court's precedent, the state claims that magazines should not qualify as "Arms" because they "are not used in a way that 'casts at or strikes another.'" N.J.Br.41 (quoting *Ocean State Tactical, LLC v. Rhode Island*, 646 F.Supp.3d 368, 386-87 (D.R.I. 2022)). As *ANJRPC II* correctly recognized, that is just plain wrong. When the user pulls the trigger on a semiautomatic weapon, the firing pin strikes the back of the bullet, producing an explosion, expelling the bullet, while simultaneously producing the energy to eject the spent casing, as the spring in the magazine loads the next round from the magazine into the chamber to be ready for firing. *See Cargill*, 602 U.S. at 416-421; *Oregon Firearms Fed'n v. Kotek*, 682 F.Supp.3d 874, 892 (D. Or. 2023). The magazine thus plays as active a role in the operation of the weapon as the trigger, firing pin, barrel, or any other component. That is particularly clear when it comes to "fixed" magazines—the sort that, as with early Winchesters, cannot be removed without disassembling the weapon. Something that is not just integral to the firing mechanism of a firearm, but literally part of it, is obviously an arm. And nothing in law or logic supports the notion that a component integral to the functioning of a mechanical object ceases to be integral just because engineers figure out how to make it detachable.

That also suffices to defeat the state's exceedingly strained effort to equate ammunition-feeding devices to cardboard boxes that hold ammunition. Producing an expert who was on the losing side of both *Heller* and *Bruen*, New Jersey argues

that because "cartridge boxes" would have been considered "accoutrements" rather than "arms" in 1789, magazines must not be arms either. N.J.Br.42.[11] But cartridge boxes were literally just that—cardboard boxes that held cartridges. They never played any role in the firing mechanism; nor were they ever attached to any firearm or other weapon (or even regularly worn on one's person). A cartridge box is no different from any other box. Saying that a cartridge box is analogous to modern ammunition-feeding device because both hold ammunition is like saying that a gas can is analogous to a combustion engine because both hold fuel. That "the Founding and Reconstruction generations" may have referred to "cartridge boxes" as "accoutrements" rather than "arms," N.J.Br.42, is thus both sensible and irrelevant.

2. Once one turns to historical tradition, it is easy to see why New Jersey is so keen to avoid it. This Court has already held that magazines that can hold more than ten rounds of ammunition are commonly owned for lawful purposes. *See ANJRPC II*, 910 F.3d at 117; *see also* Opening.Br.40-42. And after *Bruen*, it is clear beyond peradventure that they may not be banned. The state resists that conclusion only by pressing the same arguments it makes as to the rifles §1(w) bans—literally, since its

---

[11] Professor Baron, the state's expert, was the lead author of the "Linguists Briefs," which were relied on by the dissents, and rejected by the majorities, in both *Bruen* and *Heller*. *See Bruen*, 597 U.S. at 109-10 (Breyer, J., dissenting); *Heller*, 554 U.S. at 588-89; *id.* at 646-47 & n.9 (Stevens, J., dissenting). His equally strained efforts here confirm the wisdom of the majorities' assessment.

historical-analysis section is entirely intermingled. Those arguments are fatally flawed for the reasons extensively detailed above. *See supra*, pp.24-29. Moreover, the fact that the state did not bother to separate out its historical-tradition arguments as to magazines from those as to semiautomatic rifles vividly illustrates the absurdly high level of abstraction at which it wants this Court to consider history. *But see Lara*, 125 F.4th at 443 (a state must, under *Bruen*, provide historical regulations that are "genuinely analogous").

In reality, as multiple courts have acknowledged, firearms that can fire more than ten rounds without being reloaded have a history that stretches back centuries, and feeding devices capable of holding more than ten rounds have a history of more than 150 years. *See* Opening.Br.4-9.[12] Yet there is no tradition in this country of banning these arms; to the contrary, the historical record reveals they have been consistently treated as lawful possessions, commonly owned and used for lawful purposes. *See* Opening.Br.4-11, 42-44. That centuries-long history makes the state's argument for special leniency on the theory that "no prior weapon is 'remotely comparable' to the restricted ones" particularly bizarre. N.J.Br.54.

---

[12] What little the state has to say about this history is not even right. For instance, it maintains that "[t]he earliest LCMs with magazine capacity beyond 10 rounds were designed specifically for use by soldiers during World War II." N.J.Br.16 (quoting JA1839, 1847). In fact, the Browning Hi-Power pistol, which had magazine capable of holding more than 10 rounds and was marketed to civilians, was invented in 1935. *See* JA5505.

Only two groups of laws cited by the state bear even remotely on ammunition or ammunition-feeding devices.  First, fire-safety laws regulating gunpowder at least have the virtue of concerning propellant.  *See* N.J.Br.47.  Unfortunately for the state, however, the Supreme Court has already rejected those laws as a basis for banning arms.  *Heller*, 554 U.S. at 632; *supra*, pp.24-25.  And only by completely ignoring "how" and "[w]hy" those laws regulated, *see Rahimi*, 602 U.S. at 692, could the state deem them analogous to an outright ban on feeding devices capable of holding more than ten rounds.

Then there are the few Progressive-era laws, passed to target machineguns, that inadvertently swept in semiautomatics that fired more than a certain number of shots without reloading (and were swiftly repealed).  *See* N.J.Br.52; *supra*, pp. 28-29, 30-31.  Tellingly, New Jersey does not attempt to rely on these laws as a predicate for a tradition of banning magazines containing more than ten rounds; it rather invokes them only to support its supposed tradition of broad legislative discretion to enact laws in response to "danger."  N.J.Br.53.  That is a telling admission that there are no regulations "genuinely analogous" to what New Jersey has attempted to impose.  *Lara*, 125 F.4th at 443.

### B.    The Confiscatory Aspect of New Jersey's Magazine Ban Violates the Takings Clause.

After barely mentioning this Court's precedent, *ANJRPC II*, in its analysis of whether the magazine ban violates the Second Amendment, the state turns around

and wraps itself in it for the purposes of the Takings Clause analysis. But as Plaintiffs explained in the opening brief, the rule that "the holding of a panel in a precedential opinion is binding on subsequent panels," Third Cir. I.O.P. 9.1, "gives way when the prior panel's holding is in conflict with Supreme Court precedent," including precedent that predates the panel decision, *Mennen Co. v. Atl. Mut. Ins. Co.*, 147 F.3d 287, 294 n.9 (3d Cir. 1998). *See* Opening.Br.48-49. The state argues that this rule only applies if "the prior panel did not either explicitly or implicitly decide the impact of th[at] Supreme Court precedent." N.J.Br.59 (quoting *United States v. Jenkins*, 68 F.4th 148, 152 n.6 (3d Cir. 2023)). But that is not the test: The test is simply whether there is a "conflict[] with a Supreme Court decision." *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009) (collecting cases). "The fact that most cases in which [this Court has] applied th[is] exception" have been ones where the prior panel did not analyze the relevant Supreme Court precedent "merely shows (what should be unsurprising) that it is the rare circuit court decision" that fails to do so. *Mennen*, 147 F.3d at 294 n.9.

At any rate, this is that rare case. *ANJRPC II* dismissed the Takings Clause claim in a mere two sentences and a footnote: It explained that New Jersey's ban gives "owners … the option to transfer or sell their LCMs to an individual or entity who can lawfully possess LCMs[ or] modify their LCMs to accept fewer than ten rounds," and it then observed that, "[w]ith these alternatives, '[t]he ban does not

require that owners turn over their magazines to law enforcement.'" *ANJRPC II*, 910 F.3d at 124 (quoting *Wiese v. Becerra*, 306 F.Supp.3d 1190, 1198 (E.D. Cal. 2018)).[13] That is certainly true, but that does not matter if the *other* options violate the Takings Clause too. And Plaintiffs have consistently argued that they do, as neither forced sale to a private party nor forced modification to a different type of property allows citizens to keep their lawfully acquired property (let alone provides any compensation from the state). *See* Opening.Br.49-51. So merely noting that these "options" exist does nothing one way or the other to "analyze[]" whether they are constitutional. N.J.Br.59 (quoting *Jenkins*, 68 F.4th at 152 n.6). That is about a clear-cut example as it gets of failing to "'analyze[] and distinguish[]' the relevant [Supreme Court] decision[s]." N.J.Br.59 (quoting *Jenkins*, 68 F.4th at 152 n.6).

The state's effort to remedy that deficiency fares no better, as it too fails to explain how the forced transfers or transformations its law mandates comply with the Takings Clause. After all, "a choice of [four] unconstitutional coercive regulatory techniques is no choice at all." *Kansas v. United States*, 214 F.3d 1196, 1203 (10th Cir. 2000). The state argues that only a direct transfer to the government constitutes a taking. *See* N.J.Br.60. But the Supreme Court held the opposite in *Kelo*

---

[13] The Court also listed the option to "register those LCMs that cannot be modified." 910 F.3d at 124. But that provision applies only to magazines that are "incapable of being modified," N.J.S. §2C:39-20(a), so it is not available for the mine run magazines at issue in this litigation.

*v. City of New London*, 545 U.S. 469, 473-75 (2005)—a case the state does not even acknowledge even though plaintiffs cited it for that very proposition in their opening brief.  Opening.Br.49.

The state instead claims that the Takings Clause does not apply here at all because it is exercising its police powers.  N.J.Br.60-61.  *ANJRPC II* explicitly declined to "rest" on that argument, 910 F.3d at 124 n.32, and for good reason, as the Supreme Court has rejected for more than a century the argument that states are immune from the Takings Clause whenever they exercise their police powers.  *See Chi., Burlington & Quincy Ry. Co. v. Illinois ex rel. Grimwood,* 200 U.S. 561, 593 (1906); Opening.Br.51-52.  It could hardly be otherwise, as states are almost *always* exercising their police powers in takings cases.

Unsurprisingly, the few cases the state cites in service of this argument do not support it.  They are instead *regulatory* takings cases that stand only for the far more modest proposition that not every regulatory measure that effects some marginal diminishment of property rights requires compensation under the Takings Clause.  *See Andrus v. Allard*, 444 U.S. 51, 65 (1979); *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 63 (3d Cir. 2013).  Those cases thus do not undermine in the slightest the long-standing rule that states cannot evade the strictures of the Takings Clause when effecting a *physical* taking just by invoking their police powers (which New Jersey has not properly done here anyway, *see supra* Part I).  At a minimum,

then, New Jersey's magazine ban is unconstitutional as applied to citizens who lawfully acquired their magazines before it took effect.

## CONCLUSION

This Court should reverse everything other than the district court's conclusion that New Jersey's ban on AR-15 rifles violates the Second Amendment.

Respectfully submitted,

s/Erin E. Murphy

DANIEL L. SCHMUTTER
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
dschmutter@hartmanwinnicki.com

PAUL D. CLEMENT
ERIN E. MURPHY
MATTHEW D. ROWEN
NICHOLAS M. GALLAGHER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

* Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Appellants-Cross-Appellees Blake Ellman, Thomas R. Rogers, Marc Weinberg, and Association of New Jersey Rifle and Pistol Clubs*

February 7, 2025

**CERTIFICATE OF BAR MEMBERSHIP**

The undersigned hereby certifies pursuant to L.A.R. 46.1 that Erin E. Murphy was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit on March 25, 2013, and is presently a member in good standing at the Bar of said court.

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a). Specifically, this brief contains 12,994 words in 14-point Times New Roman font.

**IDENTICAL PDF AND HARD COPY CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

**VIRUS SCAN CERTIFICATE**

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program Norton Security, version 22.24.8.36, has been run on the file and no virus was detected.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy