

*State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
OFFICE OF THE SOLICITOR GENERAL
PO BOX 080
TRENTON, NJ 08625

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

MATTHEW J. PLATKIN
*Attorney General*

JEREMY M. FEIGENBAUM
*Solicitor General*

August 26, 2025

Patricia S. Dodszuweit, Clerk of Court
U.S. Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

Re:    FRAP 28(j) Letter in Nos. 24-2415, 24-2450, and 24-2506,
       *ANJRPC v. Attorney General* and consolidated cases.

Dear Ms. Dodszuweit:

The State writes regarding *NAGR v. Lamont* (2d Cir. Aug. 22, 2025), which rejects a Second Amendment challenge to restrictions on assault weapons and LCMs. Five circuits have now unanimously rejected such challenges.

The panel initially addressed the scope of the litigation. Judge Walker's opinion, joined by Chief Judge Livingston and Judge Nathan, found that the challengers' facial challenge to the assault weapons law could not proceed, because the challengers "offered no arguments or evidence in opposition to many of the challenged statutes'" other applications. Slip Op. 22. The panel thus "focus[ed]," as relevant here, on "AR-15-style rifles" and LCMs. *Id.*

The panel next rejected the challengers' argument that assault weapons and LCMs merit inviolable protection if they are "widely popular." *Id.* at 28. The panel explained that this approach "distorts" both precedent and history;



"would hinge the right on ... a 'trivial counting exercise'" with absurd results "where unusually dangerous arms" become protected "merely because [they] become[] popular before the government can sufficiently regulate [them]"; and would "strain both logic and administrability." *Id.* at 28-29, 32; *compare* ANJRPC Reply 13-15, *and* Cheeseman Reply 12-18.

Instead, even "assum[ing]" these items are protected, the panel joined "every Circuit to address the question" in "recognizing a historical tradition of regulating unusually dangerous weapons" not just before they circulated, but specifically "after their use in terror or to perpetuate mass casualties." *Id.* at 55 n.40; *see also id.* at 48-54. That tradition spanned from Blackstone's discussion of prohibitions on carrying "dangerous or unusual" weapons, *id.* at 2-5 (Nathan, J., concurring), through antebellum limits on the "unusually dangerous" dirk and Bowie knives, *id.* at 48 (majority), to the "[t]wentieth-century regulation of automatic and semiautomatic weapons," *id.* at 53. And the panel joined that same circuit consensus in finding that assault weapon and LCM restrictions fall within that tradition, recognizing that they regulate "unusually dangerous weapons that have grave capacity for inflicting harm disproportionate" to the self-defense right. *Id.* at 42-43, 54-55.

This Court should reach the same conclusion as its five sister circuits: New Jersey's assault weapon and LCM laws are constitutional.

Respectfully yours,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   /s/ Jeremy Feigenbaum
      Jeremy Feigenbaum
      Solicitor General

Word Count: 348
cc: All counsel via ECF

23-1162-cv; 23-1344-cv
*Nat'l Ass'n for Gun Rights v. Lamont*; *Grant v. Rovella*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2024

ARGUED: OCTOBER 16, 2024
DECIDED: AUGUST 22, 2025

Nos. 23-1162, 23-1344

NATIONAL ASSOCIATION FOR GUN RIGHTS,
TONI THERESA SPERA FLANIGAN,
*Plaintiffs-Appellants*,

Patricia Brought,
*Plaintiff*,

*v.*

NED LAMONT, in his official capacity as the Governor of the State of
Connecticut, PATRICK J. GRIFFIN, in his official capacity as the Chief
States Attorney of the State of Connecticut, SHARMESE L. WALCOTT,
in her official capacity as the State's Attorney, Hartford Judicial
District,
*Defendants-Appellees*,

David R. Shannon, in his official capacity as the State's Attorney,
Litchfield Judicial District,
*Defendant*.

————

EDDIE GRANT, JR., JENNIFER HAMILTON, MICHAEL STIEFEL,
CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.,

SECOND AMENDMENT FOUNDATION, INC.,
*Plaintiffs-Appellants*,

*v.*

JAMES ROVELLA, JOHN P. DOYLE, JR., SHARMESE L. WALCOTT, PAUL J.
NARDUCCI, in their official capacities,
*Defendants-Appellees*,

Edward Lamont, Jr., Patrick Griffin, Margaret E. Kelly, David R.
Applegate, Joseph T. Corradino, David R. Shannon, Michael A.
Gailor, Christian Watson, Paul J. Ferencek, Matthew C. Gedansky,
Maureen Platt, Anne F. Mahoney, in their official capacities,
*Defendants.* [*]

————

On Appeal from the United States District Court
for the District of Connecticut

————

Before:        LIVINGSTON, *Chief Judge*, WALKER, and NATHAN, *Circuit
                Judges*.

————

Before the Court are two related appeals principally
challenging certain gun-control legislation enacted by the
Connecticut legislature in the wake of the 2012 mass homicide at
Sandy Hook Elementary School in Newtown, Connecticut.  The
Connecticut laws at issue restrict the acquisition and possession of
"assault weapons" and "large capacity magazines."  Plaintiffs in both
underlying cases are individuals and organizations opposed to those

———————————

[*] The Clerk of Court is respectfully directed to amend the caption as set
forth above.

restrictions who would seek to acquire and possess weapons restricted by the legislation, including AR-platform firearms and magazines capable of holding more than ten rounds.  Plaintiffs sought to preliminarily enjoin the legislation on the basis that it violated their right to keep and bear arms under the Second Amendment of the United States Constitution.  The district court (Arterton, *J.*), after concluding that Plaintiffs in both cases had failed to demonstrate a sufficient likelihood of success on the merits of their Second Amendment challenges, denied the respective motions for a preliminary injunction.  Plaintiffs now appeal from those rulings.

The Second Amendment protects an individual right to "keep and bear Arms," but that right is not unlimited.  Using the tools of history and tradition required by the analytical framework set forth by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), we conclude that Plaintiffs have not shown a sufficient likelihood of success on the merits of their Second Amendment claims. The challenged Connecticut laws, which impose targeted restrictions on unusually dangerous weapons while preserving numerous legal alternatives for self-defense and other lawful purposes, are consistent with our Nation's historical tradition of regulation of such weapons.  We additionally conclude that Plaintiffs have not demonstrated that the balance of equities and public interest tip in their favor.

Accordingly, we **AFFIRM** the district court's denial of the preliminary injunction in both cases.

Nathan, *Circuit Judge*, joined by Livingston, *Chief Judge*, and Walker, *Circuit Judge*, concurs in a separate opinion.

———

BARRY K. ARRINGTON, Arrington Law Firm, Wheat Ridge, CO, *for Plaintiffs-Appellants National Association for Gun Rights and Toni Theresa Spera Flanigan.*

CAMERON L. ATKINSON, Atkinson Law, LLC, Harwinton, CT (Craig Fishbein, Fishbein Law Firm, LLC, Wallingford, CT; Doug Dubitsky, Law Offices of Doug Dubitsky, North Windham, CT, *on the brief*) *for Plaintiffs-Appellants Eddie Grant, Jr., Jennifer Hamilton, Michael Stiefel; Connecticut Citizens Defense League, Inc.; and Second Amendment Foundation, Inc.*

JOSHUA PERRY, Solicitor General (Janelle R. Madeiros, James M. Belforti, Assistant Attorneys General, *on the brief*), *for* William Tong, Attorney General, State of Connecticut, Hartford, CT, *for Defendants-Appellees Ned Lamont, Patrick J. Griffin, Sharmese L. Walcott, James Rovella, John P. Doyle, and Paul J. Narducci.*

E. Gregory Wallace, Campbell University School of Law, Raleigh, NC, *for amici curiae The International Law Enforcement Educators and Trainers Association and National Association of Chiefs of Police, in support of Plaintiffs-Appellants National Association for Gun Rights and Toni Theresa Spera Flanigan.*

Joseph G.S. Greenlee, Greenlee Law, PLLC, McCall, ID; Cody J. Wisniewski, FPC Action Foundation, Las Vegas, NV, *for amici curiae Firearms Policy Coalition and FPC Action Foundation, in support of Plaintiffs-Appellants Eddie Grant, Jr.,*

*Jennifer Hamilton, Michael Stiefel; Connecticut Citizens Defense League, Inc., and Second Amendment Foundation, Inc.;*

Janet Carter, William J. Taylor, Jr., Everytown Law, New York, NY, *for amicus curiae Everytown for Gun Safety, in support of Defendants-Appellees Ned Lamont, Patrick J. Griffin, and Sharmese L. Walcott.*

Jennifer B. Loeb, Freshfields Bruckhaus Deringer US LLP, Washington, DC; Aaron R. Marcu, Brandt Henslee, Daniel Hodgkinson, Taylor Jachman, Freshfields Bruckhaus Deringer US LLP, New York, NY, *for amici curiae Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, March For Our Lives, and Connecticut Against Gun Violence, in support of Defendants-Appellees Ned Lamont, Patrick J. Griffin, and Sharmese L. Walcott.*

Andrea Joy Campbell, Attorney General, Arjun K. Jaikumar, Assistant Attorney General, State of Massachusetts, Boston, MA; Matthew J. Platkin, Attorney General, Jeremy M. Feigenbaum, Solicitor General, Angela Cai, Deputy Solicitor General, Christopher J. Ioannou, Deputy Attorney General, State of New Jersey, Trenton, NJ; Rob Bonta, Attorney General, State of California, Sacramento, CA; Philip J. Weiser, Attorney General, State of Colorado, Denver, CO; Kathleen Jennings, Attorney General, State of Delaware, Wilmington, DE; Brian L. Schwalb, Attorney General, The District of Columbia, Washington, DC; Anne E. Lopez, Attorney General, State of Hawai'i, Honolulu, HI; Kwame Raoul, Attorney General, State of Illinois, Chicago, IL; Aaron M.

Frey, Attorney General, State of Maine, Augusta, ME; Anthony G. Brown, Attorney General, State of Maryland, Baltimore, MD; Dana Nessel, Attorney General, State of Michigan, Lansing, MI; Keith Ellison, Attorney General, State of Minnesota, St. Paul, MN; Aaron D. Ford, Attorney General, State of Nevada, Carson City, NV; Letitia James, Attorney General, State of New York, New York, NY; Ellen F. Rosenblum, Attorney General, State of Oregon, Salem, OR; Michelle A. Henry, Attorney General, State of Pennsylvania, Harrisburg, PA; Peter F. Neronha, Attorney General, State of Rhode Island, Providence, RI; Charity R. Clark, Attorney General, State of Vermont, Montpelier, VT; Robert W. Ferguson, Attorney General, State of Washington, Olympia, WA, *for amici curiae Massachusetts, New Jersey, California, Colorado, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, in support of Defendants-Appellees Ned Lamont, Patrick J. Griffin, and Sharmese L. Walcott.*

Alinor C. Sterling, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, *for amici curiae Mark Barden, Jacqueline Barden, Jennifer Hensel, David Wheeler, Francine Wheeler, Robert Parker, Alissa Parker, Jillian Soto-Marino, Carlos Mathew Soto, Donna Soto, Carlee Soto Parisi, Nicole Hockley, and Ian Hockley, in support of Defendants-Appellees Ned Lamont, Patrick J. Griffin, and Sharmese L. Walcott.*

———

JOHN M. WALKER, JR., *Circuit Judge*:

On December 14, 2012, twenty-year-old Adam Lanza walked into Sandy Hook Elementary School in Newtown, Connecticut carrying a lawfully-purchased Bushmaster XM15-E2S, an AR-15–style semiautomatic rifle, with 30-round magazines in taped reloads to reduce reload time.  An amateur shooter trained by first-person shooter video games, Lanza unleashed 154 5.56-millimeter rounds in under five minutes.  He killed twenty first-grade students and six educators, then himself.

The Sandy Hook shooting prompted a rapid response from Connecticut legislators.  Within four months, the State had enacted new legislation restricting access to certain military-style firearms and large capacity magazines.  And, a decade later, Connecticut passed additional restrictions on access to certain assault weapons.

Before the Court are two related appeals principally challenging this gun-control legislation.  Plaintiffs in both underlying cases are individuals and organizations opposed to those restrictions who would seek to acquire and possess weapons restricted by the legislation, including AR-platform firearms and magazines capable of holding more than ten rounds.  Plaintiffs sought to preliminarily enjoin the legislation on the basis that it violated their right to keep and bear arms under the Second Amendment of the United States Constitution.  The district court (Arterton, *J.*), after concluding that Plaintiffs in both cases had failed to demonstrate a sufficient likelihood of success on the merits of their Second Amendment challenges, denied the respective motions for a preliminary injunction.  Plaintiffs now appeal from those rulings.

The Second Amendment protects an individual right to "keep and bear Arms," but that right is not unlimited. Using the tools of history and tradition required by the analytical framework set forth by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), we conclude that Plaintiffs have not shown a sufficient likelihood of success on the merits of their Second Amendment claims. Assuming that Plaintiffs' proposed possession of the firearms and magazines at issue is presumptively entitled to constitutional protection, we nonetheless find that the Government has satisfied its burden of showing that the challenged laws are consistent with our Nation's historical tradition of firearm regulation. The challenged Connecticut laws impose targeted restrictions on unusually dangerous weapons while preserving numerous legal alternatives for self-defense and other lawful purposes. Such restrictions impose a burden comparable to historical antecedents that regulated other unusually dangerous weapons unsuitable for and disproportionate to the objective of individual self-defense. These historical antecedents are analogous to the restrictions at issue in this case.

We additionally conclude that Plaintiffs have not demonstrated that the balance of equities and public interest tip in their favor.

Accordingly, we **AFFIRM** the district court's denial of the preliminary injunction in both cases.

BACKGROUND[1]

Before we discuss the merits of the constitutional claims in the two appeals, we describe the statutes they challenge and the procedural history of the two appeals.

I.    The Challenged Statutes

After the Sandy Hook Elementary School shooting, Connecticut lawmakers declared that "the tragedy in Newtown demand[ed] a powerful response."  Senate Tr., 2013 Sess. (Conn. April 3, 2013) (statement of Sen. Donald E. Williams), *NAGR* App'x 645.[2] Four months later, Connecticut's duly-elected legislators enacted the law at the heart of these appeals: An Act Concerning Gun Violence Prevention and Children's Safety, 2013 Conn. Pub. Acts 13-3.  This legislation amended and expanded Connecticut's existing limits on the acquisition and possession of certain military-style firearms ("assault weapons"), initially enacted in 1993, and imposed restrictions for the first time on magazines capable of holding more

---

[1] References within citations to "*NAGR*" refer to filings in *National Association for Gun Rights v. Lamont*, No. 23-1162-cv ("*NAGR*").  For example, citations to "Br. of *NAGR* Appellants," refer to the briefs on appeal of Plaintiffs-Appellants National Association for Gun Rights *et al.* in the *NAGR* matter.  References within citations to "*Grant*" refer to filings in *Grant v. Rovella*, No. 23-1344-cv ("*Grant*").  For example, citations to "Br. of *Grant* Appellants" refer to the briefs on appeal of Plaintiffs-Appellants Eddie Grant, Jr., *et al.* in the *Grant* matter.  "App'x" refers to the joint appendix, "Sp. App'x" refers to the special appendix, and "Suppl. App'x" refers to the supplemental appendix in the designated matter.

[2] Decl. of John J. Donohue ¶ 98, *NAGR* App'x 239; Br. of Amici Mark Barden *et al.* at 7-10.

than ten rounds ("large capacity magazines").[3]  *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 248, 250-51 (2d Cir. 2015) (describing Connecticut's prior "assault weapon" legislation).  Ten years later, Connecticut again expanded the types of restricted assault weapons to include additional firearms ("2023 assault weapons") in An Act Addressing Gun Violence, 2023 Conn. Pub. Acts 23-53.

The cumulative effect of the challenged firearms restrictions is that Connecticut now prohibits most people in the state from acquiring or possessing "assault weapons," "2023 assault weapons," and "large capacity magazines," as defined below.  *See* Conn. Gen. Stat. §§ 53-202b, 53-202c, 53-202d, 53-202w(b).[4]  At the same time, Connecticut allows firearms that, while dangerous, as all firearms are to varying degrees, are not so uniquely designed to create mayhem.

To appreciate the reach of the carefully calibrated restrictions, we describe the covered weapons in greater detail than we might otherwise find necessary.

---

[3] Plaintiffs argue the terms "assault weapons" and "large capacity magazines" are "rhetorically charged political term[s]."  Br. of *NAGR* Appellants at 2-4.  We use the terms "assault weapons" and "large capacity magazines" because the challenged statutes use those terms, and because we used those terms in addressing an earlier challenge that included the same Connecticut regulatory scheme.  *See Cuomo*, 804 F.3d at 247.

[4] Conn. Gen. Stat. § 53-202b (restricting the giving, distributing, transporting or importing into the state, exposing or keeping for sale, or selling of an "assault weapon"); *id.* §§ 53-202c, 53-202d (restricting the possession of an "assault weapon," unless the owner lawfully owned the firearm before the applicable regulations went into effect and the individual obtained a certificate of possession from the designated state agency); *id.* § 53-202w(b) (restricting the keeping, offering, or exposing for sale of large capacity magazines; transferring large capacity magazines; or buying, distributing, or bringing them into Connecticut).

## A. Assault Weapons

Broadly, Connecticut defines "assault weapon" to include many, but not all, types of fully automatic and semiautomatic firearms. Its prohibitions apply to selective-fire firearms; types of semiautomatic rifles, pistols, and shotguns with military-style features; and various examples of semiautomatic firearms specified by name with military-style features (and their commercially-available or do-it-yourself copies and duplicates).[5] *See Cuomo*, 804 F.3d at 260 (observing that the challenged regulatory scheme restricts only a "limited subset" of firearms). Our non-exhaustive summary focuses on the aspects of the restrictions applicable to, or helpful to understanding their application to, the firearms and ammunition that Plaintiffs would purchase but for the challenged statutes. A general description of the types of weapons that are restricted "assault weapons" follows.

First, an "assault weapon" includes any selective-fire firearm capable of both fully automatic and semiautomatic fire.[6] *See* Conn. Gen. Stat. § 53-202a(1)(A)(i). The longtime standard-issue rifle for the

---

[5] Under Connecticut law, a "rifle" is a firearm "designed . . . to be fired from the shoulder" using a "cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger." Conn. Gen. Stat. § 53a-3(16). A "pistol" or "revolver" is any firearm with a barrel that is less than twelve inches long. *Id.* § 53a-3(18). A "shotgun" is a firearm "designed . . . to be fired from the shoulder" using a "shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger." *Id.* § 53a-3(17).

[6] A selective-fire firearm permits its operator "to choose between semiautomatic and fully automatic" firing capability. Decl. of Brindiana Warenda ¶ 22, *NAGR* App'x 199. Whereas semiautomatic firearms "fire[] one round for each squeeze of the trigger," fully automatic firearms (i.e., machine guns) "fire continuously for as long as the trigger is pressed." *Id.* ¶¶ 20-21.

United States military, the M-16, and its successor, the M4 carbine, are representative selective-fire firearms qualifying as "assault weapons."

Second, an "assault weapon" includes any semiautomatic centerfire rifle that has (1) the capacity to accept a detachable magazine and (2) one or more of five specified military-style features, any one of which satisfies a one-feature test.[7]  *See* Conn. Gen. Stat. § 53-202a(1)(E)(i).  The Bushmaster XM15-E2S used in the Sandy Hook school shooting and other AR-15–style rifles that Plaintiffs would seek to purchase and possess are representative examples of semiautomatic centerfire rifles qualifying as "assault weapons."[8]

---

[7] A centerfire rifle is one designed to be used with centerfire cartridges, in which the gunpowder explosion is initiated by the firing pin striking the primer in the center of the cartridge base.  Br. of Amicus Int'l Law Enforcement Educators & Trainers Ass'n at 21 n.11.  Centerfire cartridges have larger bullets, higher velocity, greater range, and more foot pounds of energy or "stopping power" than other types of cartridges, such as rimfire or pistol ammunition.  Warenda Decl. ¶ 29, *NAGR* App'x 200.

A magazine is a "container that holds ammunition for a firearm" and feeds the ammunition into the firearm.  Warenda Decl. ¶ 39, *NAGR* App'x 201.  A detachable magazine is one that can be removed without disassembling the firearm.  Conn. Gen. Stat. § 53-202a(4).

A semiautomatic centerfire rifle is an "assault weapon" if it (1) is able to accept a detachable magazine and (2) has one or more of the five following military-style features: (A) a folding or telescoping stock; (B) a pistol grip, thumbhole stock, or any other stock that would result "in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing"; (C) a forward pistol grip (i.e., a vertical forward grip or a foregrip); (D) a flash suppressor; or (E) a grenade launcher or flare launcher.  Conn. Gen. Stat. §§ 53-202a(1), (1)(E), (6), (8).

[8] The original AR-15 was manufactured as a selective-fire machine gun and adopted by the U.S. military as the M-16 during the Vietnam War.

Third, an "assault weapon" includes a semiautomatic rimfire rifle that has (1) an ability to accept a detachable magazine and (2) two or more of five specified military-style features, any two of which satisfy a two-feature test.[9]  Conn. Gen. Stat. § 53- 202a(1)(H).  To be considered "assault weapons," rimfire firearms are subject to a two-feature test that is less stringent than the one-feature test applicable to their more powerful centerfire counterparts.

Fourth, an "assault weapon" includes numerous specified semiautomatic firearms, identified by make and model, and their "copies or duplicates."  Conn. Gen. Stat. § 53-202a(1)(A)-(D).  Most of these specified firearms, which generally would also satisfy the applicable "features test," are "semiautomatic versions of the original selective-fire AR-15/M-16, the AK-47, or variants of these weapon platforms in an assortment of calibers."  Decl. of Brindiana Warenda

---

Warenda Decl. ¶ 24, *NAGR* App'x 199.  The Colt Manufacturing Company retained the AR-15 trademark, however, and used that name for the semiautomatic version of the M-16 later developed for the civilian market. *Id*. ¶ 25; *see also Staples v. United States*, 511 U.S. 600, 603 (1994).

[9] A rimfire weapon is one in which the firing pin strikes the rim of the cartridge, releasing a less powerful charge than centerfire cartridges.  *See* Richard Mann, *Rimfire vs. Centerfire, What's the Difference?*, Field & Stream (July 4, 2023), https://www.fieldandstream.com/guns/rimfire-vs-centerfire/ [https://perma.cc/5FLY-RAM6].

A rimfire rifle is an "assault weapon" if it has (1) an ability to accept a detachable magazine and (2) two or more of the five following military-style features: (A) a folding or telescoping stock; (B) a pistol grip that protrudes conspicuously beneath the action of the weapon; (C) a bayonet mount; (D) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (E) a grenade launcher.  2001 Conn. Pub. Acts 01-130; *see also* Conn. Off. of Leg. Rsch., 2024-R-0163, Summary of State Gun Laws 28 (2024) (explaining that Connecticut law also classifies as an assault weapon "rimfire weapons that met the two-feature test under the [2001 amendment to the assault weapons] law").

¶ 23, *NAGR* App'x 199.  Firearms prohibited by name include the Bushmaster XM15 and variants of AR-15–style firearms.

## B.  2023 Assault Weapons

In 2023, Connecticut further expanded its definition of "assault weapon" to include "[a]ny semiautomatic firearm *other than* a pistol, revolver, rifle or shotgun" (colloquially, an "other") that has one or more of seven specified military-style features, any of which satisfy a one-feature test.[10]  2023 Conn. Pub. Acts 23-53, § 23 (codified at Conn. Gen. Stat. § 53-202a(1)(G)) (emphasis added).  Consistent with Connecticut law, we refer to those "other" undefined firearms (with one or more of the specified military-style features) as "2023 assault weapon[s]."  Conn. Gen. Stat. § 53-202a(10).

Prior to the 2023 amendment, there was a "loophole" in Connecticut's regulatory scheme.  Warenda Decl. ¶ 21, *Grant* App'x 328.  Connecticut's reliance on applying varying one- or two-feature

---

[10] An "other," i.e., a firearm that is not a "pistol," "revolver," "rifle," or "shotgun," as defined in Connecticut law (*see supra* note 5), is an "assault weapon" if it has one or more of the seven following military-style features: (A) any grip that permits its operator to grip the weapon in a manner "resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing" (e.g., a pistol grip or thumbhole stock); (B) an ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip; (C) a fixed magazine with the ability to accept more than ten rounds; (D) a flash suppressor or silencer, or a threaded barrel capable of accepting a flash suppressor or silencer; (E) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the operator to fire the firearm without being burned, except a slide that encloses the barrel; (F) a second hand grip; or (G) an arm brace or other stabilizing brace that could allow such firearm to be fired from the shoulder, with or without a strap designed to attach to an individual's arm.  Conn. Gen. Stat. § 53-202a(1)(G); *see also Grant* Sp. App'x 2-3.

tests to firearms that met the statutory definition of a "pistol," "revolver," "rifle," or "shotgun," as defined in Conn. Gen. Stat. § 53a-3, allowed firearms that were *not* pistols, revolvers, rifles, or shotguns to avoid the statute's proscriptions, Conn. Gen. Stat. § 53-202a(1)(G). The 2023 amendment closed the loophole by extending the features test to those "other" firearms. Warenda Decl. ¶ 21, *Grant* App'x 328.

Those weapons now categorized as 2023 assault weapons frequently use pistol braces, which attach to a person's forearm to provide stability. Such an "other" firearm equipped with a pistol brace looks similar to a rifle like an AR-15, even though those "other" firearms were not designed to be fired from the shoulder.[11] Br. of *Grant* Appellants at 8; Warenda Decl. ¶¶ 20-22, *Grant* App'x 328.

## C. Features and Features Tests

As discussed above, Connecticut's definition of "assault weapon" takes into account, for some categories of firearms, whether the firearm has one or more or two or more specified features. The applicable features tests pertain to military-like features that, in the legislature's judgment, enhance the lethality or concealability of the firearm. We discuss some of them here.

Pistol grips and thumbhole stocks are protruding handles underneath the action of the firearm[12] that permit the rifle's operator to grip the firearm at a more vertical angle (as one might hold a pistol).

---

[11] We observe, like the district court, that the *Grant* Plaintiffs acknowledge that the 2023 assault weapons are all semiautomatic firearms. *Grant* Sp. App'x 11. We likewise infer "significant overlap" in the key features of "assault weapons" and "2023 assault weapons." *Id.*

[12] The "action" of the firearm is "the part of the firearm that loads, fires and ejects a cartridge, which part includes, but is not limited to, the upper and lower receiver, charging handle, forward assist, magazine release and shell deflector." Conn. Gen. Stat. § 53-202a(3).

Similarly, forward pistol grips are protruding grips for the non-trigger hand shaped like a standard pistol grip that are fitted to the front end of the firearm.  Conn. Gen. Stat. § 53-202a(6); Warenda Decl. § 17, *NAGR* App'x 199.  Pistol grips, thumbhole stocks, and forward pistol grips facilitate quickly "spray[ing] . . . a large number of bullets over a broad killing zone, without having to aim at each individual target."  *NAGR* App'x 381; *see also* Decl. of John J. Donohue § 65, *NAGR* App'x 224.

Barrel shrouds are ventilated covers that shield the operator from the burning temperatures caused by firing multiple rounds, enabling the operator to hold the overheated barrel during continuous firing.

Telescoping, collapsing, and folding stocks shorten firearms and make them easier to conceal.

Flash suppressors reduce firearms' visible signature when firing and help shooters avoid detection.

### D.  Large Capacity Magazines

The challenged statutes further restrict the acquisition and possession of "large capacity magazine[s]," which the statute defines as "any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition."  Conn Gen. Stat. §§ 53-202w(a)(1), (b).  Consistent with Connecticut law, we refer to these devices as "large capacity magazines."

Firearms that come with or can accommodate large capacity magazines permit a shooter to fire more than eleven rounds[13] without pausing to reload, enabling the firing of a barrage of bullets.

---

[13] The eleven rounds encompass one bullet in the chamber and the ten rounds in the full magazine.

### E.  Exemptions

The challenged statutes exempt from their restrictions, among others, certain trained professionals and grandfathered individuals who timely obtained a certification of possession.  *See* Conn. Gen. Stat. §§ 53-202b(b)(1), 53-202c, 53-202d.

## II.    Procedural History

As noted above, in the two related cases before us, groups of plaintiffs challenge Connecticut's highly specific restrictions on assault weapons, 2023 assault weapons, and large capacity magazines as violating their Second Amendment right to keep and bear arms.

### A.  *National Association for Gun Rights v. Lamont*, No. 23-1162

The first case is *National Association for Gun Rights v. Lamont*, No. 23-1162-cv ("*NAGR*").  The *NAGR* Plaintiffs-Appellants are the National Association for Gun Rights, a nonprofit organization, and Toni Theresa Spera Flanigan, a Connecticut resident legally qualified to possess firearms who wants to own an AR-15 or a similar rifle and magazines that hold more than 10 rounds.  On November 3, 2022, predating the latest restrictions, the *NAGR* Plaintiffs sought from the district court a preliminary injunction enjoining the governor of Connecticut and various state prosecutors from enforcing the restrictions on assault weapons and large capacity magazines on the basis that the restrictions violated Plaintiffs' Second Amendment right to keep and bear arms.

The district court denied the injunction on the basis that the *NAGR* Plaintiffs were unlikely to succeed on the merits of their claims.  In assessing the merits, the district court recognized that *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), had

abrogated in part *New York State Rifle & Pistol Association v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), which addressed both New York and Connecticut firearm regulations and had previously stood as the leading circuit authority for type-of-weapons cases.  The district court therefore developed a new Second Amendment analytical framework based on *Bruen*.  The district court held that (1) plaintiffs bear the burden of demonstrating that their conduct is protected by the Second Amendment's plain text, and (2) they must do so by producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones.  Defendants may attempt to demonstrate that the regulated firearms are instead unprotected dangerous and unusual weapons by showing either that the weapons are unusually dangerous or that they are not commonly used or possessed for self-defense.

If plaintiffs successfully show that the Second Amendment's plain text covers their conduct, the burden then shifts to defendants to justify their regulation based on *Bruen*'s requirements for establishing relevant similarity to history and tradition.

Applying that framework, the district court concluded that the *NAGR* Plaintiffs did not carry their burden of demonstrating that their conduct was protected by the Second Amendment—that is, that the regulated weapons and accessories are commonly sought out, purchased, and used for self-defense.  The district court accepted Defendants' argument that assault weapons and large capacity magazines are typically acquired for their military characteristics, not self-defense; are disproportionately dangerous because of their increased capacity for lethality; and are more often used in committing crimes and mass shootings than in self-defense.

In the alternative, the district court concluded that the record evinced a history and tradition of regulating arms associated with growing rates of violence and lethality, both because of technological innovations in the arms themselves and changing patterns of human behavior. The district court found a history and tradition of regulating the particular kinds of weapons or modes of carry that were most often employed by those causing violence, while permitting the possession of other weapons for the purpose of self-defense. Because the challenged statutes restrict only a subset of each category of firearms that possess new and dangerous characteristics that make them susceptible to abuse by non-law-abiding citizens wielding them for unlawful purposes, the district court found the challenged statutes analogous to regulations in their day of Bowie knives, percussion cap pistols, and other dangerous or concealed weapons.

### B. *Grant v. Rovella*, No. 23-1344

The second case is *Grant v. Rovella*, No. 23-1344-cv ("*Grant*"). The *Grant* Plaintiffs-Appellants are Eddie Grant, Jr.; Jennifer Hamilton; and Michael Stiefel, Connecticut residents who seek to own AR-15 platform firearms and firearms qualifying as 2023 assault weapons, including "a .300 Blackout in a Connecticut 'other' configuration" with pistol grips and fore grips, Br. of *Grant* Appellants at 11;[14] the Connecticut Citizens Defense League, Inc., and

---

[14] The *Grant* Plaintiffs provide scant information about the .300 Blackout in their briefs. It appears to be a type of ammunition rather than a firearm. *See* Dep. of Eddie Grant, *Grant* Suppl. App'x 83:23 (referring to ".300 Blackout rounds"); Richard Mann, *The New Black*, SHOOTING ILLUSTRATED (Dec. 16, 2013), https://www.shootingillustrated.com/content/the-new-black/ [https://perma.cc/54P2-A3YV] (describing the .300 Blackout as a "30-

the Second Amendment Foundation, Inc., two nonprofit associations. On February 3, 2023, the *Grant* Plaintiffs sought from the district court a preliminary injunction enjoining the Connecticut Department of Emergency Services and Public Protection Commissioner and various state prosecutors from enforcing the restrictions on assault weapons, 2023 assault weapons, and large capacity magazines.

The district court denied the preliminary injunction after concluding that the *Grant* Plaintiffs were unlikely to succeed on the merits of their claims for substantially the same reasons as in *NAGR*. Because the *Grant* Plaintiffs had failed to provide specific evidence that the 2023 assault weapons were commonly used for self-defense where pre-June 2023 assault weapons were not, the district court again concluded that they had failed to establish that the weapons were protected by the Second Amendment. And in the alternative, the district court upheld the law based on its determination that the challenged restrictions were consistent with the Nation's history and tradition of firearm regulation for the same reasons as in *NAGR*.

Both the *NAGR* and the *Grant* Plaintiffs timely appealed pursuant to 28 U.S.C. § 1292(a)(1). Amici curiae lined up on both sides.

---

caliber cartridge that would fit in a standard AR-15 magazine"). Plaintiffs nevertheless contend that the .300 Blackout, in their intended configuration, is prohibited by Connecticut law. We accept Plaintiffs' characterization of the .300 Blackout, from which we infer that Plaintiffs refer to a semiautomatic "other" firearm chambered with a .300 Blackout cartridge. *See* Warenda Decl. ¶¶ 67-68, *Grant* App'x 358-60 (discussing the Aero Precision X15, an AR-15 type firearm that can be chambered in .300 Blackout).

# DISCUSSION

## I.    Standard of Review

A preliminary injunction is "an extraordinary remedy" that courts may only award "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To establish their entitlement to a preliminary injunction, Plaintiffs must show that (1) they are likely to succeed on the merits of their claims, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) issuing an injunction is in the public interest.[15] *Id.* at 20. We review the denial of a preliminary injunction for abuse of discretion but "assess *de novo* whether the court proceeded on the basis of an erroneous view of the applicable law." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (quotation marks omitted).

## II.    Likelihood of Success on the Merits

To assess the merits of Plaintiffs' request for a preliminary injunction, we first determine whether the challenged statutes likely violate Plaintiffs' Second Amendment right.  To prevail, Plaintiffs must show that: (1) the Second Amendment's plain text, as informed by history, covers acquiring and possessing assault weapons, 2023 assault weapons, and large capacity magazines; and (2) Defendants

---

[15] The parties dispute whether Plaintiffs seek a mandatory injunction and must meet the higher standard applicable to obtain that kind of relief. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36-37 (2d Cir. 2018) (discussing the differences between mandatory and prohibitory injunctions).  Because we conclude that Plaintiffs are unlikely to succeed on the merits under the lower standard for prohibitory injunctions, it is unnecessary to resolve this dispute.

cannot carry their burden of justifying the challenged statutes by demonstrating that they comport with the Nation's historical tradition of firearm regulation. *See Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (providing that the party seeking the injunction bears the burden of showing that they are entitled to the relief sought).

Although Plaintiffs bring a facial challenge to the entirety of the Connecticut restrictions, they have offered no arguments or evidence in opposition to many of the challenged statutes' applications, thereby failing to "establish that no set of circumstances exists under which the [challenged statutes] would be valid." *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). We therefore focus our review on Plaintiffs' specific challenge to the statutes as-applied to the weapons they seek to possess: AR-15–style rifles, a .300 Blackout-chambered "other" firearm in Plaintiffs' intended configuration, and large capacity magazines (together, the "desired firearms and magazines").[16] *Accord Bianchi v. Brown*, 111

---

[16] The Court has acknowledged that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). So while we would have to conclude the law has no conceivable constitutional application to grant the requested remedy—the complete invalidation of the statutes at issue—the Supreme Court has instructed us to consider partial invalidation (and by extension, a provision's severability), when evaluating facial challenges. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 507 (1985) (holding that "the Court of Appeals should have pursued . . . partial invalidation"); *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (explaining that when a law "contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and maintain the act in so far as it is valid"). We therefore accept Plaintiffs' theory that we may consider their challenge as limited to the portions of the statutes restricting possession of their desired firearms and magazines and proceed

F.4th 438, 452-55 (4th Cir. 2024) (en banc), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025).

We undertake our analysis with the benefit of the district court's thorough opinions and the extensive preliminary records assembled by the parties.

## A.  The Second Amendment

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Over the course of the last two decades, the Supreme Court has issued four opinions that principally inform our understanding of that command.  We summarize them here.

In *District of Columbia v. Heller*, the Court announced for the first time that the Second Amendment "confer[s] an individual right to keep and bear arms."  554 U.S. 570, 595 (2008).  To reach that conclusion, the Court found determinative the operative clause of the Amendment: "the right of the people to keep and bear Arms, shall not be infringed."  *Id*. at 577-95.  Notably, it found that "Arms" encompasses "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *id*. at 582, and that the textual elements of the operative clause "guarantee the individual right to possess and carry weapons in case of confrontation," *id.* at 592.  The Court also concluded that the prefatory clause of the Amendment ("A well regulated Militia, being necessary to the security of a free State") supported its reading of the operative clause.  *Id*. at 598-600.  Applying its interpretation of the Second

_____

to consider the constitutionality of only those specific sections of the statutes.

Amendment, the Court ruled that the regulation at issue in *Heller*, an absolute ban of handgun possession in the home, was unconstitutional.  *Id.* at 635.

But even as it announced the Second Amendment right to keep and bear arms, the Court in *Heller* made clear that this right was "not unlimited."  *Id.* at 595.  The Court did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation."  *Id.* at 595.  Instead, *Heller* recognized that the Second Amendment "codified a *pre-existing* right" to keep and bear arms, *id.* at 592, which was understood at the founding to be a "right of self-preservation," *id.* at 595 (quoting 1 Blackstone's Commentaries 145-46, n.42 (St. George Tucker ed., 1803)); *see also id.* at 594 ("[Americans] understood the right to enable individuals to defend themselves.").  The Court emphasized that self-defense was "the *central component* of the right."  *Id.* at 599.

In cautioning that the right was not unlimited, the Court noted that nothing in *Heller* "should be taken to cast doubt on" certain "longstanding prohibitions on the possession of firearms."  *Id.* at 626.  The Court indicated "that the sorts of weapons protected were those 'in common use at the time,'" *id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)), and limitations on Second Amendment protections for certain types of arms were "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* (citing, *inter alia*, 4 William Blackstone, Commentaries *148-49 (1769)).  The Court acknowledged that some weapons "most useful in military service," such as M-16 rifles and machineguns, "may be banned," observing that a typical militia was "formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense."  *Id.* at 624 (quotation marks

omitted), 627.  The Court did not elaborate further on the types of arms that are, or are not, protected by the Second Amendment.

Soon after *Heller*, the Court decided *McDonald v. City of Chicago*, which held "that the Second Amendment right is fully applicable to the States" under the Fourteenth Amendment.  561 U.S. 742, 750 (2010).  The Court stressed that the right to bear arms is not "a second-class right" subject to "different" rules than other guarantees in the Bill of Rights.  *Id.* at 780.  And the Court repeated *Heller*'s emphasis on the centrality of self-defense to the Second Amendment right, *see id.* at 767, as well as *Heller*'s assurance that the Second Amendment right was not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 786 (quoting *Heller*, 554 U.S. at 626).

Following *Heller* and *McDonald*, appellate courts were left to determine the extent of the Amendment's protections on a case-by-case basis.  Our court, like others, adopted a two-step framework for evaluating challenges to arms regulations, which combined an historical analysis with means-end scrutiny.  *See, e.g., Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012), *abrogated by Bruen*, 597 U.S. 1.  Under our pre-*Bruen* standard, we inquired at step one whether the challenged statutes burdened conduct covered by the Second Amendment, as informed by text and history.  *Antonyuk v. James*, 120 F.4th 941, 963 (2d Cir. 2024) (describing our pre-*Bruen* standard), *cert. denied*, 145 S. Ct. 1900 (2025).  If so, we proceeded at step two to evaluate whether the challenged statutes burdened "the core of the Second Amendment, defined by *Heller* as self-defense in the home."  *Id.* (describing our pre-*Bruen* standard).  If we determined that the burden was *de minimis*, we subjected the challenged statutes to intermediate scrutiny.  *Id.*  If we determined that the burden was substantial and affected the core of the right, we subjected the

challenged statutes to strict scrutiny.  *Id.*  Applying that analysis, we held in *New York State Rifle & Pistol Association v. Cuomo* that the same 2013 legislation challenged by the plaintiffs in this case survived constitutional scrutiny.  804 F.3d 242, 263-64 (2d Cir. 2015).

Eventually, the Supreme Court intervened to course correct the analytical framework.  Its decision in *New York State Rifle & Pistol Association v. Bruen* rejected the two-part framework we had employed.  597 U.S. 1, 17 (2022).  The Court reasoned that means-end scrutiny was inconsistent with *Heller* and established a different two-step framework "rooted in the Second Amendment's text, as informed by history."  *Id.* at 19, 22.  Under this framework, courts are to consider first whether "the Second Amendment's plain text covers an individual's conduct."  *Id.* at 17.  If not, our inquiry ends and there is no Second Amendment protection.  But if it does, "the Constitution presumptively protects that conduct," and we must determine if the regulator—whether the federal government, a state, or a municipality—has carried its burden to show "that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.*; *see also id.* at 33-34 (discussing burden).  "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."  *Id.* at 17 (quotation marks and citation omitted).

In terms of analytical methodology, *Bruen* acknowledged that, while some cases would present straightforward comparisons between historical and modern firearms regulation, courts might have to use a "more nuanced approach" in "cases implicating unprecedented societal concerns or dramatic technological changes."  *Id.* at 27.  In such cases, a court may compare the regulations at issue to "relevantly similar" historical regulations.  *Id.* at 28-29.  The Court

noted two important metrics of similarity: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphasis added).

Two years after *Bruen*, the Supreme Court decided *United States v. Rahimi*, which held that 18 U.S.C. § 922(g)(8)—a statute that criminalizes the possession of firearms by certain individuals subject to domestic violence restraining orders—was facially constitutional. 602 U.S. 680, 700 (2024). Although the regulation at issue in *Rahimi*, restricting who may possess firearms, is notably distinct from the regulation at issue here, restricting what firearms may be possessed, *Rahimi* remains instructive. For one thing, *Rahimi* rejected the contention that the Second Amendment permits only "those regulations *identical* to ones that could be found in 1791." *Id.* at 692 (emphasis added); *see also id.* at 691-92 (observing that the Court's Second Amendment "precedents were not meant to suggest a law trapped in amber"). Thus, *Rahimi* applied *Bruen's* "relevantly similar" analysis to § 922(g)(8) without first determining that the statute implicated unprecedented societal concerns or dramatic technological changes. *Id.* at 692 (quotation marks omitted). And *Rahimi* demonstrated that we may look to different historical traditions "[t]aken together" in assessing the constitutionality of challenged statutes. *Id.* at 698. Applying those principles, *Rahimi* identified an historical tradition of disarming individuals that pose a clear threat of physical violence to another person and identified relevantly similar historical regulations from the founding era, such as surety and going armed laws. *See id.* at 693-98.[17] *Rahimi* thus serves as a useful methodological guide for the use of historical analogues.

---

[17] Surety laws "authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Rahimi*, 602 U.S. at 695. Some surety

With the background from these cases in mind, we consider the constitutionality of the challenged Connecticut statutes.

## B. Preliminary Considerations

We begin our analysis by discussing three concepts, as to each of which the parties have offered competing interpretations, that guide our analysis.

### 1. "In Common Use"

Plaintiffs insist that the challenged restrictions on the desired firearms and magazines violate the Second Amendment because they constitute a categorical ban on "widely popular" weapons in common use today for lawful purposes. Br. of *Grant* Appellants at 7. This, Plaintiffs contend, is "sufficient" for finding that possessing the regulated weapons is protected by the Second Amendment. Br. of *NAGR* Appellants at 8. Even assuming *arguendo* that the desired firearms and magazines are "typically possessed" and "in common use" for lawful purposes, *see Cuomo*, 804 F.3d at 255-57, we disagree.

Plaintiffs distort the precedents on which their argument relies. *Heller* and *Bruen* provide that the Second Amendment "protects *only* the carrying of weapons that are those 'in common use' at the time, as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627) (emphasis added). The cases do not hold that the Second Amendment *necessarily* protects *all*

---

laws specifically targeted the misuse of firearms, and authorized the imposition of bonds from individuals "who went armed with" certain weapons, including "a dirk, dagger, sword, pistol, or other offensive and dangerous weapon." *Id.* at 696 (cleaned up). Going armed laws, also known as affray laws, "prohibited riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 697 (cleaned up).

weapons in common use.  They do not shield popular weapons from review of their potentially unusually dangerous character.   And further, Plaintiffs' proposed "common use" standard would strain both logic and administrability, as it would hinge the right on what the Fourth Circuit aptly called a "trivial counting exercise" that would "lead[] to absurd consequences" where unusually dangerous arms like the M-16 or "the W54 nuclear warhead" can "gain constitutional protection merely because [they] become[] popular before the government can sufficiently regulate [them]."  *Bianchi*, 111 F.4th at 460.

### 2.  "Unusually Dangerous"

The Supreme Court has recognized an "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 21.  Defendants argue that the challenged statutes fall within this tradition.  Plaintiffs and their amici counter that this limitation on the Second Amendment right applies only to those weapons that, unlike AR-15s and large-capacity magazines, are *both* dangerous *and* unusual.  *See* Br. of *Grant* Appellants at 22, 31-35; Br. of Firearms Policy Coalition Amici at 10-12.  We conclude, however, that this historical tradition encompasses those arms that legislators determined were *unusually dangerous* because of their characteristics.

Our understanding of the Second Amendment is informed by history. *Bruen*, 597 U.S. at 26.  Historical prohibitions on affray used both the formulations "dangerous *and* unusual" *and* "dangerous *or* unusual."[18]  Notwithstanding the variations, both the conjunctive and

---

[18] Blackstone defined the offense of affray as the act of riding or going armed with "dangerous *or* unusual" weapons.  *Bruen*, 597 U.S. at 46 (quoting 4 William Blackstone, Commentaries *148-49).  Contemporary and

disjunctive formulations were traditionally understood as meaning "unusually dangerous."  Decl. of Saul Cornell ¶ 20, *Grant* App'x 1220-21 ("Educated readers in the Founding era would have interpreted both phrases to mean the same thing, a ban on weapons that were 'unusually dangerous.'").

Plaintiffs challenge our "unusually dangerous" interpretation by pointing to a concurring Supreme Court opinion characterizing the exception as a "conjunctive 'dangerous *and* unusual test.'"  Br. of *Grant* Appellants at 31-33 (quoting *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring)).  But given the historical evidence cited here, this non-binding concurrence cannot bear the weight Plaintiffs place on it.

What is more, Plaintiffs' argument strips coherence from the historical limitation to the Second Amendment right applicable to dangerous and unusual weapons.  It is axiomatic that to some degree all firearms are "dangerous," *see Caetano*, 577 U.S. at 417-18 (Alito, J., concurring), so that word does no work by itself.  And the phrase "and unusual" or the phrase "or unusual" standing alone raises more questions than it answers.  What is meant by "unusual" standing alone?  "Dangerous" needs a modifier, and its companion "unusual" needs something to modify.  *Unusually dangerous* is the obvious fit to describe weapons that are so lethal that legislators have presumed that they are not used or intended to be used for lawful purposes, principally individual self-defense.[19]

---

historic judicial authorities have repeated Blackstone's disjunctive formulation.  *See id.* ("dangerous or unusual weapons"); *Rahimi*, 602 U.S. at 697 (same); *State v. Huntly*, 25 N.C. 418, 420 (1843) (same); *State v. Lanier*, 71 N.C. 288, 289 (1874) (same); *English v. State*, 35 Tex. 473, 476 (1871) (same).

[19] Defendants' expert describes the phrase "dangerous and unusual" as a hendiadys, which individuals in the founding era would have interpreted

In an excellent concurring opinion, our colleague Judge Nathan further elaborates on why Plaintiffs' emphasis on the "and" in the phrase "dangerous and unusual" does not survive the historical scrutiny that we must undertake and contributes to the historical provenance of the "unusually dangerous" formulation that we posit. We fully join in Judge Nathan's concurrence.

### 3. "Interest Balancing by the People"

The Supreme Court has made clear that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Historically, the right "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. These historical limitations make apparent that the Second Amendment "is the very *product* of an interest balancing by the people." *Id.* at 635. We endeavor to faithfully apply "the terms of the [*people's*] balance enshrined in the Constitution's text" based on history and tradition rather than our personal intuitions or preferences about how to balance individual rights with societal prerogatives. *Bianchi*, 111 F.4th at 472. We thus engage in analogical reasoning that invokes historical practice without resorting to judicial interest balancing.

### C. Presumptive Constitutional Protection

Under *Bruen* step one, we first ask whether the Second Amendment presumptively protects Plaintiffs' individual right to

---

as "unusually dangerous." Cornell Decl. ¶ 20, *Grant* App'x 1220-21. A hendiadys is "two terms," often with one modifying the other, that are "separated by a conjunction" (here, "and") "that work together as a single complex expression." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 413 (2023) (Gorsuch, J., dissenting) (quotation marks and alteration omitted).

acquire and possess the desired firearms and magazines because the "plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct." *Bruen*, 597 U.S. at 32.

Supreme Court authority has not settled the precise scope of the Second Amendment's protections. The Court has elucidated that the Constitution only protects possession of arms that are typically possessed and in common use by law-abiding citizens for lawful purposes (principally individual self-defense), and that are not dangerous and unusual. *Heller*, 554 U.S. at 625, 627. This Court has understood the "in common use" analysis to fall under the first step of *Bruen*. *Antonyuk*, 120 F.4th at 981 (holding that the "threshold inquiry" at *Bruen* step one "requires courts to consider . . . whether the weapon concerned is in common use" (quotation marks omitted)). But the Supreme Court has not made clear how and at what point in the analysis we are to consider whether weapons are unusually dangerous. Nor has the Court clarified how we are to evaluate a weapon's "common use." The Court's opinions may reasonably be read to require such considerations at the first step of *Bruen*'s two-step inquiry, cabining the meaning of "Arms" to those that are not unusually dangerous and that are generally owned and used by ordinary citizens for lawful purposes, principally self-defense.[20] Or the Court's precedents may reasonably be read to require those

---

[20] *See Bianchi*, 111 F.4th at 461 (concluding that because the AR-15 "is a combat rifle that is both ill-suited and disproportionate to self-defense," it is "outside the scope of the Second Amendment"); *Bevis*, 85 F.4th at 1193 (defining "'bearable Arms'" to reach "only . . . weapons in common use for . . . individual self-defense"); *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024), *cert. denied*, No. 24-936, 2025 WL 1603612, at *1 (U.S. June 6, 2025) (considering at step one whether extra-large capacity magazines "constitute bearable arms," and, if so, whether they are "in common use for a lawful purpose, such as self-defense" (cleaned up)).

considerations at *Bruen*'s second step, as part of our analogical comparison of contemporary restrictions to historical analogues embodying constitutionally sound exceptions to the Second Amendment right.[21]  This lack of clarity has led to disagreement among the parties in this case and confusion among courts generally.[22]

We prefer not to venture into an area in which such uncertainty abounds and that is not necessary to resolve this appeal.  Because of the outcome we reach on other grounds, we will simply assume without deciding that the desired firearms and magazines are bearable arms within the meaning of the Second Amendment and that their acquisition and possession is presumptively entitled to constitutional protection.  We thus proceed to *Bruen* step two, which provides a resolution to our quest.

## D. Historical Tradition of Firearm Regulation

We now turn to whether Defendants, at this preliminary stage, have provided sufficient evidence that the challenged statutes are "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.  For the reasons that follow, we conclude that they have done so.

---

[21] *See Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 47 (1st Cir. 2024) (situating the "dangerous and unusual" inquiry at step two), *cert. denied sub nom. Ocean State Tactical v. Rhode Island*, No. 24-131, 2025 WL 1549866 (U.S. June 2, 2025); *Hanson*, 120 F.4th at 235 (same).

[22] *See, e.g.*, *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (Mem.) (statement of Thomas, J.) (The Court's "minimal guidance" is "far from a comprehensive framework for evaluating restrictions on types of weapons" and "leaves open essential questions such as what makes a weapon 'bearable,' 'dangerous,' or 'unusual.'"); *Bevis*, 85 F.4th at 1198 (observing that there is "no consensus whether the common-use issue belongs at *Bruen* step or *Bruen* step two").

Because the challenged statutes are state laws, "the prevailing understanding of the right to bear arms" in both 1791 (the year in which the states ratified the Second Amendment) and in 1868 (the year that the Fourteenth Amendment, which *McDonald* held to incorporate the Second Amendment against the states through the Due Process Clause, was ratified) are relevant to our analysis. *Antonyuk*, 120 F.4th at 972-73.  We therefore consider limitations imposed on the Second Amendment right during these time periods and whether these historical traditions of regulation are analogous to the challenged statutes. 691-92.  We also note that while the Court has not "provide[d] an exhaustive survey of the features that render regulations relevantly similar," it has provided "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.  We therefore attend to the Court's instruction to consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as "*central* considerations" in our "analogical inquiry." *Id*. (quotation marks omitted).  If we determine that the challenged statutes' restrictions on acquiring and possessing the desired firearms and magazines are relevantly similar to the Nation's historical tradition of firearms regulation, we may conclude that Plaintiffs are unlikely to succeed on the merits of their challenge and thus the preliminary relief Plaintiffs seek should be denied.

Plaintiffs are unlikely to succeed on the merits.  Connecticut's restrictions on AR-15s, .300 Blackout-chambered "other" firearms (in Plaintiffs' intended configuration), and large capacity magazines are one more chapter in the historical tradition of limiting the ability to "keep and carry" dangerous and unusual weapons.  *Heller*, 554 U.S. at 627.  The challenged statutes are "relevantly similar," *Bruen*, 597

U.S. at 29, to historical antecedents that imposed targeted restrictions on unusually dangerous weapons of an offensive character—dirk and Bowie knives, as well as machine guns and submachine guns—after they were used by a single perpetrator to kill multiple people at one time or to inflict terror in communities.  At the same time, the historical antecedents, like the challenged statutes, preserved alternative avenues for the legal possession of less inherently dangerous arms for self-defense and other lawful purposes.  The challenged statutes thus impose a "comparable burden" and are "comparably justified" as those historical comparators offered by Defendants.  *Id.*

## 1.   The Need for Nuanced Analogical Reasoning

Defendants have not identified, and we have not independently found in the record before us, any exact historical analogues to the challenged statutes.  The apparent absence of an exact historical analogue, however, is not necessarily determinative.  *See Rahimi*, 602 U.S. at 692.  To be sure, *Bruen* instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  597 U.S. at 26-27.  But the Court also instructs that in cases that are not so "straightforward," the lack of a distinctly similar historical analogue may be excused in favor of "nuanced" analogical reasoning.  *Bruen*, 597 U.S. at 27-28.  Here, we conclude that because the challenged legislation addresses novel societal problems stemming from newly developed technology, a nuanced analysis is warranted.

As we discuss below, there is no evidence before the twentieth century that any firearms could be used to carry out mass shootings. Indeed, commonly used firearms "did not have the capacity to occasion a societal concern with mass shootings . . . until dramatic technological changes vastly increased their capacity and the rapidity of firing." *Hanson v. District of Columbia*, 120 F.4th 223, 240 (D.C. Cir. 2024), *cert. denied*, No. 24-936, 2025 WL 1603612 (U.S. June 6, 2025). Therefore, there "simply is no relevantly similar historical analogue to a modern, semiautomatic [firearm] equipped with [a large capacity magazine]." *Id.*

As technology has facilitated an increase in mass shootings, mass shootings have become the object of widespread fear and societal concern. Together they have provoked a spate of state legislation to address a problem that is without direct historical precedent. *Bruen* had this type of situation in mind when it counseled that where direct analogues are absent and the analysis is not "straightforward," we may employ a "more nuanced approach" to evaluate relevant historical antecedents. *Bruen*, 597 U.S. at 26-27.

We will say a bit more about the situation we face: (a) the dramatic technological changes and (b) the unprecedented societal concerns.

a. <u>Dramatic Technological Changes</u>

The record before us reveals that contemporary assault weapons represent dramatic technological changes. Their advanced military-like features enable them to inflict catastrophic injuries that bear no similarity to those injuries caused by the comparatively primitive firearms that were widely available in the founding and reconstruction eras.

Plaintiffs and their amici identify unregulated firearms invented in the founding and reconstruction eras capable of shooting a dozen or more shots before reloading. In their view, this means that there has been no dramatic technological change. They contend that the existence of historical multi-shot firearms, coupled with the absence of distinctly similar historical regulations, is dispositive evidence that the challenged statutes are unconstitutional. Br. of *Grant* Appellants at 53. But the cherry-picked arms on which Plaintiffs rely were different. Unlike today's assault weapons and large capacity magazines, the early multi-shot firearms were neither reliable nor widely used.

Plaintiffs cite Joseph Belton's 16-shot repeating rifle, the Jennings 12-shot flintlock rifles, Pepperbox pistols capable of firing 6 to 24 shots, the Winchester Model 1866 (which could shoot 18 rounds), the 1873 Evans Repeating Rifle (which could shoot 34 rounds), and Bennet and Haviland Rifles (which could shoot 12 rounds), among others. Br. of *Grant* Appellants 48-51; *see also* Br. of Firearms Policy Coalition Amici 19-37. These multi-shot firearms, however, were substantially more difficult to operate and prone to technological failings than contemporary firearms like AR-15s. *See Hanson*, 120 F.4th at 242, 249-51 (explaining that because of these differences, the Jennings multi-shot flintlock rifles, Pepperbox pistols, Bennet & Haviland Revolving Rifles, and the Winchester Model 1866 are irrelevant and unpersuasive comparators). And these malfunctions did not merely cause the weapon to jam or misfire. Rather, early multi-shot arms using "superposed loads," like Belton's 16-shot repeating rifle, were prone to explode if "the sequencing between rounds was off." Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Calif. L. Rev. 1, 23, 27 (2025). The technological limitations of these arms prevented their use for most

practical purposes and assuredly prevented a single gunman from using them to unleash a massacre in a matter of seconds.

The purported multi-shot analogues, moreover, do not appear to have been widely used. In the founding and reconstruction eras, most firearms were muskets and fowling pieces, which are flintlock muzzle-loading firearms. Plaintiffs and their amici discuss the designs of early multi-shot firearms, but they do not provide evidence of their prevalence. This makes sense, as many of the proffered multi-shot firearms were expensive curios, more likely to be seen in exhibitions than in practical use. *Id*. at 23. But even if they were prevalent, there is no evidence that these arms were used for mass murder. The record instead reveals that early multi-shot firearms never "achieve[d] sufficient market penetration to impact gun violence." Cornell Decl. ¶ 41, *NAGR* App'x 955.

The prevalent firearms of the founding and reconstruction eras, as Plaintiffs concede, are technologically distinguishable from modern AR-15–style firearms. Flintlock muzzle-loaders generally held just one round at a time (and often had to be pre-loaded); had a maximum accurate range of 55 yards; had a muzzle velocity of roughly 1,000 feet per second; required at least thirty seconds for the shooter to manually reload a single shot; and were frequently liable to misfire. *See* Decl. of Randolph Roth ¶ 16, *NAGR* App'x 894; Br. of Amici Giffords Law Center to Prevent Gun Violence et al. at 11. As a result, they could do much less harm. A shooter using such a firearm could kill only at a rate of less than one person per minute. *NAGR* Sp. App'x 57. After all, in the 1770 Boston Massacre, seven British soldiers firing flintlock muskets into a crowd managed to take only five lives. Roth Decl. ¶ 41, *NAGR* App'x at 918-19.

By contrast, today's assault weapons—fed continuously by large capacity magazines—are dramatically and reliably lethal. An

AR-15 can hold 30 rounds; is accurate within 400 yards; has a muzzle velocity of approximately 3,251 feet per second; can be reloaded with full magazines in as little as three seconds; and can empty a thirty-round magazine in five seconds. *See* Decl. of Randolph Roth ¶ 49, *NAGR* App'x 926; Br. of Amici Giffords Law Center to Prevent Gun Violence et al. at 11. That's how, in 2019, one terrorist in Dayton, Ohio armed with an AR-15 equipped with 100-round magazines could fire 41 shots in just 32 seconds, killing nine people and wounding 17 others before he was stopped.[23] And unlike their predecessors, contemporary semiautomatic firearms are also widely commercially available, though only recently so.[24]

Modern assault weapons, such as the AR-15, and large capacity magazines represent dramatic technological changes that have given rise to the unprecedented societal concern of mass shootings fueled by this dependable, widespread, and substantially more lethal technology.

### b. Unprecedented Societal Concerns

We find in the record no direct historical precedent for the contemporary, growing societal concern over and fear of mass shootings resulting in ten or more fatalities.

Plaintiffs point to historical mass casualty events for the proposition that mass killings are not an unprecedented societal

---

[23] Holly Yan, et al., *The Dayton gunman killed 9 people by firing 41 shots in 30 seconds. A high-capacity rifle helped enable that speed*, CNN (Aug. 5, 2019), https://www.cnn.com/2019/08/05/us/dayton-monday-shooter-stopped-in-seconds/index.html [https://perma.cc/8RZG-HNXG]; *Bianchi*, 111 F.4th at 463-64.

[24] Automatic and semiautomatic weapons initially became widely commercially available in the twentieth century. AR-15s, in particular, proliferated among civilians in the twenty-first century.

concern.  But there is "no direct precedent for the contemporary and growing societal concern that [assault weapons with large capacity magazines] have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible."  *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 44 (1st Cir. 2024), *cert. denied*, No. 24-131, 2025 WL 1549866 (U.S. June 2, 2025); *see also Hanson*, 120 F.4th at 241 (concluding "mass shootings incidents cause outsized collective trauma on society" and constitute an "unprecedented societal concern").

Early firearms by themselves did not facilitate mass killings.  In the founding era, firearms were common but rarely used to perpetuate homicides.  Mass murders have occurred throughout history, but the "limits of existing technologies" meant that they generally involved the use of multiple people and multiple weapons.  Roth Decl. ¶ 41, *NAGR* App'x 918.  Until the late nineteenth and early twentieth century, mass homicides could only be carried out by groups using primitive firearms and melee weapons—clubs, knives, and nooses—that, though lethal, "did not provide individuals or small groups of people the means to inflict mass casualties on their own."  *Id.*

The Founders faced no problem comparable to a single gunman carrying out a mass murder in seconds.  How could they, when there was "no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948"?  Decl. of Louis Klarevas ¶ 18, *NAGR* App'x 285.  The first single-gunman shooting resulting in ten or more deaths did not occur until 1949.  *Id.*[25]

---

[25] *See also* Patrick Sauer, *The Story of the First Mass Shooting in U.S. History*, Smithsonian          Mag.          (Oct.          14,          2015),

From 1949 to 2004, there were ten mass shootings with double-digit fatalities.  *Id.* ¶ 21, *NAGR* App'x 288.

The proliferation of unusually dangerous weapons, however, has led to a frequent, growing, and extremely lethal threat to public safety, actual and widely perceived.  An assault weapon was first used to perpetuate a mass shooting resulting in ten or more fatalities in 1982.  *Id.* ¶ 20, *NAGR* App'x 288.  After there were five such mass shootings within five years, Congress enacted three significant federal firearms restrictions.  *Id.* ¶¶ 20-21, *NAGR* App'x 285-88.  In the eighteen years after the most significant of those restrictions expired in 2004, there were *twenty* mass shootings each resulting in ten or more deaths.  *Id.* ¶ 21, *NAGR* App'x 288.  Mass shootings continue to be a growing threat unlike anything that the Framers could have imagined.

> Certainly it would have been shocking to the Framers to witness the mass shootings of our day, to see children's bodies "stacked up . . . like cordwood" on the floor of a church in Sutherland Springs, Texas; to hear a Parkland, Florida high school student describe her classroom as a "war zone" with "blood everywhere"; to be at a movie in Aurora, Colorado when suddenly gunfire erupted, leaving "bodies" strewn and "blood on seats, blood on the wall, blood on the emergency exit door"; to run past "shoes scattered, blood in the street, bodies in the street" while bullets blazed through the sky in Dayton, Ohio; to watch law enforcement officers encounter "a pile of dead children" in Sandy Hook, Connecticut; to stand next to

---

https://www.smithsonianmag.com/history/story-first-mass-murder-us-history-180956927/ [https://perma.cc/ZS89-AL6J].

one of those officers as he tried to count the dead children, but "kept getting confused," as his "mind would not count beyond the low teens."

*Bianchi*, 111 F.4th at 463 (quoting Silvia Foster-Frau et al., *Terror on Repeat: A Rare Look at the Devastation Caused by AR-15 Shootings*, WASH. POST (Nov. 16, 2023)) (cataloguing thirty-three mass shootings resulting in nine or more fatalities); *see also Ocean State Tactical*, 95 F.4th at 44; *Duncan v. Bonta*, 133 F.4th 852, 873 (9th Cir. 2025); *Hanson*, 120 F.4th at 241. And such incidents remain distressingly frequent.

*Bruen* thus had in mind the very situation we face here when it counseled that where direct analogues are absent because of unprecedented societal concerns and dramatic technological changes, our analysis may adopt a "more nuanced" approach. It is that approach we undertake here. In employing this "nuanced approach," we examine how the challenged statutes work and the reasons behind them.

2. The Challenged Statutes

The challenged statutes—as applied to AR-15s, .300 Blackout-chambered "other" firearms in Plaintiffs' intended configuration,[26]

---

[26] The relevant features of a .300 Blackout-chambered "other" firearm in Plaintiffs' intended configuration (i.e., with a pistol grip and fore grip) make this firearm substantively similar to the AR-15. *See NAGR* App'x at 381 (discussing how such features enable user to "spray . . . a large number of bullets over a broad killing zone, without having to aim at each individual target"). And Plaintiffs have not argued or provided evidence distinguishing between these categories of challenged weapons. *See Grant* Sp. App'x 11 (observing that "neither side argues that there are any significant differences in the key functionality between the 2023 assault weapons and the more limited group of firearms classified as assault

and large capacity magazines—are, as Defendants contend, targeted restrictions on unusually dangerous weapons that leave open many lawful alternatives to Connecticut residents for armed self-defense.

The challenged statutes focus on unusually dangerous firearms, in substantial part those more powerful semiautomatic centerfire rifles that can accept a large capacity magazine and have an additional military-style feature that increases the firearm's lethality. In so doing, these statutes restrict unusually dangerous weapons that have grave capacity for inflicting harm disproportionate to the Second Amendment's "core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. Consider, as a paradigmatic example, the AR-15s and large capacity magazines that Plaintiffs seek to purchase.

The AR-15 was initially developed for modern military combat. It has the same basic structure and operation, as well as near-equivalent muzzle velocity as its military counterpart, the M-16. Warenda Decl. ¶ 22, *NAGR* App'x 199; Roth Decl. ¶ 49, *NAGR* App'x 925; *Capen v. Campbell*, 708 F. Supp. 3d 65, 85 (D. Mass. 2023), *aff'd*, 134 F.4th 660 (1st Cir. 2025). The AR-15 is more lethal to victims, bystanders, and law enforcement than ordinary handguns typically used for self-defense. Its powerful centerfire ammunition can penetrate standard construction walls, car doors, and law enforcement officers' body armor. *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017). Its standard configuration comes equipped with .223 caliber rounds "designed to fragment and mushroom" in a victim's body, though it may alternatively be configured to fire larger .300 Blackout rounds that inflict even larger entry wounds. Donohue Decl. ¶ 66, *NAGR* App'x 224. Whereas an ordinary handgun causes

---

weapons prior to" the 2023 legislation). The reasoning applicable to the AR-15 set forth in this section therefore applies to both types of desired firearms.

injuries equivalent to a "stabbing with a bullet," an AR-15 exacts serious injuries tantamount to being shot "with a Coke can." *Id.* ¶ 109, *NAGR* App'x 242. It has combat-functional features—like the ability to accept large capacity magazines as well as grips and barrel shrouds that facilitate spray firing—that dramatically increase its utility for lethality and its appeal to mass shooters. *See id.* ¶ 65, *NAGR* App'x 224.

The primary difference between the M-16 and AR-15 is that the AR-15 does not have fully automatic firing capability.[27] Warenda Decl. ¶ 22, *NAGR* App'x 199. Plaintiffs point to this distinction as the critical difference between weapons that can be permissibly regulated and those that cannot. Br. of *Grant* Appellants at 41. But Plaintiffs have not offered evidence that this distinguishing factor fundamentally transforms the AR-15 into a weapon that is substantially less dangerous than its military counterpart. Rather, Defendants have offered evidence that "[a]t ranges over 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit." Donohue Decl. ¶ 168, *NAGR* App'x 263 (quoting Dep't of the U.S. Army, FM 3-22.9: Rifle Marksmanship M16-/M4-Series Weapons, § 7-15 (2008));[28] *see*

_____

[27] An M-16 set to fully automatic can fire approximately 750 to 900 rounds per minute. Roth Decl. ¶ 49, *NAGR* App'x 925. The maximum rate of fire over the same period for a semi-automatic rifle, which requires the user to pull the trigger for each shot, will vary based on the experience and skill of the user. The U.S. Army, however, defines "rapid semiautomatic fire" as 45 rounds per minute. Dep't of the U.S. Army, TC 3-22.9: Rifle and Carbine, § 8-19 (2016).

[28] This U.S. Army manual has since been replaced with an updated version, which again emphasizes the drawbacks of automatic fire, noting that "[a]utomatic or burst fires drastically decrease the probability of hit due to the rapid succession of recoil impulses and the inability of the Soldier

*also Capen*, 708 F. Supp. 3d at 85 (noting that the "U.S. Marine Corps discarded" the M-16's fully automatic function "in favor of a maximum setting of a three-round burst" to "*enhance* lethality by . . . . improving accuracy").

In addition, the AR-15, unlike an ordinary handgun, has features that actually limit its usefulness for self-defense. *Cf. Heller*, 554 U.S. at 629 (discussing characteristics of handguns that make them "the quintessential self-defense weapon"). It is "significantly heavier and longer," "less concealable, more difficult to use, and less readily accessible, particularly for an inexperienced user" than a typical pistol. *Capen*, 708 F. Supp. 3d at 86. And with their high muzzle velocity, AR-15–style weapons are more likely to penetrate a house or apartment wall when fired in a self-defense scenario, threatening family members or the building's other occupants. Donohue Decl. ¶ 154, *NAGR* App'x 257; Roth Decl. ¶ 50, *NAGR* App'x 926.

Moreover, assault rifles with large capacity magazines, like the AR-15, are especially dangerous in mass shootings. An assault weapon, large capacity magazine, or both, has been used in each of the ten deadliest mass shooting events in American history.[29] *See* Donohue Decl. ¶ 49, tbl. 1, *NAGR* App'x 217. Criminals, terrorists, and the mentally ill armed with such weapons may easily fire more

---

to maintain proper sight alignment and sight picture on the target." TC 3-22.9: Rifle and Carbine, *supra* note 27, § 8-21.

[29] In addition, the perpetrators of one-third of the more numerous high-fatality mass shooting events in the last 32 years used assault weapons or other firearms outfitted with large capacity magazines. Klarevas Decl. ¶ 23, *NAGR* App'x 289. And AR-15 or AK-47 type assault rifles were used in "every major terrorist attack on U.S. soil in the past decade." *Bianchi*, 111 F.4th at 457 (citing attacks in San Bernadino, CA; Orlando, FL; Pittsburg, PA; El Paso, TX; and Buffalo, NY).

than eleven rounds before pausing to reload, thereby eliminating breaks that afford victims time to escape and law enforcement time to intervene.

At the same time that the Connecticut statutes restrict access to unusually dangerous weapons, Defendants show, the statutes still allow the lawful possession of many popular weapons, including semiautomatic weapons deemed to be less dangerous by the legislature for self-defense and other lawful purposes. *See* Warenda Decl. ¶ 33, *NAGR* App'x 200. And while Plaintiffs at times characterize Connecticut's law as a "categorical[] ban [on] the possession of multi-shot, semi-automatic firearms," Br. of *Grant* Appellants at 52, Connecticut residents remain able to purchase and possess more than 1,000 firearms for self-defense, hunting, and sport shooting. Among others, the challenged statutes permit Connecticut residents to own and possess popular semiautomatic handguns like the Glock 17 and M9 Barretta, and popular semiautomatic hunting rifles like the Ruger Mini-14 and the Ruger 10/22 Target.[30]

---

[30] Many popular hunting rifles fall outside of Connecticut's definition of "assault weapon" because they are bolt-action rather than semiautomatic. *Top 25 Rifles for Hunting in the Last 50 Years*, PETERSEN'S HUNTING, https://www.petersenshunting.com/editorial/top-25-hunting-rifles-last-50-years/389930 [https://perma.cc/6UQK-QVJT] (last visited May 30, 2025) (including 22 bolt-action rifles in a list of the top 25 hunting rifles in the last 25 years); Richard Mann, *The 6 Best Rifles, Tested and Reviewed*, FIELD & STREAM (Jan. 20, 2021), https://www.fieldandstream.com/guns/best-rifles [https://perma.cc/K5T5-Z8MC] (listing sixteen of the "most exciting" rifles of 2024, including 15 bolt-action rifles, one lever-action, and no semiautomatic rifles); Jordan Sillars, *The Best Deer Hunting Rifle at Every Price Point*, MEATEATER (June 7, 2024), https://www.themeateater.com/gear/general/the-best-deer-hunting-rifle-at-every-price-point [https://perma.cc/2L7B-RXNY] (recommending only bolt-action rifles). These bolt-action rifles are often preferred due to their

3.  The Comparators

Having considered "how and why" the challenged statutes "burden a law-abiding citizen's right to armed self-defense," *Bruen*, 597 U.S. at 29, we next look to whether Defendants are likely to succeed in establishing there are "relevantly similar" historical analogues that "work[] in the same way" and "for the same reasons," as required by our nuanced approach.  *Rahimi*, 602 U.S. at 711 (Gorsuch, J., concurring).  On the record at this stage, we find that Defendants have provided sufficient evidence of analogous historical regulations and that Plaintiffs are therefore unlikely to succeed on the merits.

While the Connecticut statutes lack an "historical twin," *id.* at 701 (quotation marks omitted), Defendants have provided evidence of a longstanding tradition of restricting novel weapons that are particularly suited for criminal violence—a tradition that was

_____

superior accuracy.  Texas Parks & Wildlife, *Common Firearms*, https://tpwd.texas.gov/education/hunter-education/online-course/firearms-and-ammunition-1/common-firearms [https://perma.cc/XN9N-RP3V] (last visited June 25, 2025).  But the ability of semiautomatic weapons to quickly place follow-up shots has led to the popularity of some semiautomatic guns for hunting small- to medium-sized game.  Examples of guns popular for this use include the Ruger Mini-14 and the Ruger 10/22 Target.  *See* Joseph von Benedikt, *Is it Better to Have a Bolt Action or Semiauto?*, PETERSEN'S HUNTING (Feb. 22, 2023), https://www.petersenshunting.com/editorial/great-debate-boltaction-semiauto/469183 [https://perma.cc/A29D-LTWC] (explaining that for hunting under 60 or 70 yards, "a Ruger Mini-14 or the like can serve"); David E. Petzel, *Field & Stream's Ultimate Guide to Hunting Rifles*, FIELD & STREAM, Aug. 2017 (listing the Ruger 10/22 Target as the "top pick" for small game hunting).  Because the Ruger Mini-14 and the Ruger 10/22 Target are not specifically banned weapons and lack features that would otherwise result in their classification as assault weapons, both of these popular hunting weapons are lawful in Connecticut today.

"liquidate[d] and settle[d]" by "a regular course of practice" of regulating such weapons throughout our history. *Bruen*, 597 U.S. at 35-36.

This tradition can be traced back to pre-colonial England, with the enactment of laws prohibiting "riding or going armed, with dangerous or unusual weapons [to] terrify[ ] the good people of the land." *Rahimi*, 602 U.S. at 697 (quoting 4 William Blackstone, Commentaries *148-49). The Statute of Northampton prohibited the carrying of launcegays, which were shorter and lighter than a full knights' lance and designed for thrusting, that were "generally worn or carried only when one intended to . . . breach the peace." *Bruen*, 597 U.S. at 41; *see also* 7 Rich. 2, ch. 13 (1383) (prohibiting riding with launcegays in pre-colonial England).

The tradition of regulating weapons used for criminal violence continued in the 19th century, with state legislatures targeting unusually dangerous, novel, and concealable weapons, including uniquely configured dirk and Bowie knives. *Hanson*, 120 F.4th at 237. These ubiquitous historical restrictions on dirk and Bowie knives exemplify a relevantly similar historical tradition. *See Capen*, 708 F. Supp. 3d at 83 (observing that Bowie knives were subject to regulation by 49 states). The relevance of this history is supported by the text of the Second Amendment, which speaks to the right to keep and bear "arms," not just firearms. *See* U.S. Const. amend. II; *State v. DeCiccio*, 315 Conn. 79, 117, 128 (2014) (concluding that dirks are "Arms" within the meaning of the Second Amendment).

Like the weapons regulated by the challenged statutes, dirk and Bowie knives were technological advancements over ordinary defensive arms because they were designed "expressly for fighting," with longer blades, crossguards to protect fighters' hands, and clip points to facilitate cutting or stabbing adversaries. Roth Decl. ¶ 25,

*NAGR* App'x 903.  In certain respects, these knives were superior even to contemporary firearms, which had limited effectiveness in close quarters.[31]  As with the regulated weapons before us, legislators singled out fighting knives after they were first used in a widely-publicized act of violence resulting in multiple fatalities: Colonel Jim Bowie's "Sandbar Fight" at the Mississippi River on September 19, 1827 that led to two deaths and multiple non-fatal casualties.[32] Ultimately, these knives were used, among other concealable weapons liable to criminal misuse, in "an alarming proportion of the era's murders and serious assaults."  Roth Decl. ¶ 24, *NAGR* App'x 902.  And, like the regulated weapons here, the large blades of Bowie knives wreaked particularly "bloody" and "gruesome" injuries.[33]

Restrictions on dirk and Bowie knives could be severe, whereas restrictions on other types of household and utility knives were nonexistent.  Most states and territories restricted their concealed carry.[34]  *Kachalsky*, 701 F.3d at 95.  These prohibitions at times

---

[31] Roth Decl. ¶ 25, *NAGR* App'x 903; David B. Kopel et. al., *Knives and the Second Amendment*, 47 U. MICH. J.L. REFORM 167, 185 (2013).

[32] Kopel, *supra* note 31, at 180; *The Bowies and Bowie Knives*, N.Y. TIMES, Jan. 27, 1895, at 2.

[33] Kopel, *supra* note 31, at 187 (comparing Bowie knife wounds to the "surgical" and "cosmetic" consequences of low-velocity early firearms).

[34] *See, e.g.*, Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67-68; Act of Feb. 1, 1881, 1881 Colo. Sess. Laws at 74; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at 39; 29 Ky. Gen. Stat. art. 29, § 1 (as amended through 1880); Act of Mar. 25, 1813, 1813 La. Acts at 172; 1886 Md. Laws, ch. 375, § 1; Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws at 231; Act of Mar. 18, 1859, 1859 Ohio Laws at 56; Act of Feb. 18, 1885, 1885 Or. Laws at 33; Act of Dec. 24, 1880, no. 362, 1880 S.C. Acts at 447-48; S.D. Terr. Pen. Code § 457 (1883); Act of Feb. 2, 1838, ch. 101, 1838 Va. Acts at 76; Wash. Code § 929 (1881); W. Va. Code, ch. 148, § 7 (1891); *see Kachalsky*, 701 F.3d at 96 n.21 (also collecting statutes).

restricted the concealed carry of all, or nearly all, weapons,[35] failing to provide support for the existence of an historical tradition of heightened regulations on unusually dangerous weapons.  But many laws specifically targeted the concealed carry of only those "unlawful weapons," Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at 39, "usually used for the infliction of personal injury," Act of Dec. 24, 1880, no. 362, 1880 S.C. Acts 448, § 1C, such as Bowie and dirk knives.[36]

Defendants also offer evidence of state laws banning the open carry of Bowie knives, dirks, and weapons identified as unusually dangerous, with no or limited exceptions.  *See* Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts at 191 (prohibiting "carry[ing], in any manner whatever . . . any dirk or bowie knife"); Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws at 25-27 (imposing severe limitations on the "carry[]" of a "bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense"); *see also Hanson*, 120 F.4th at 237 (collecting statutes).  And Defendants provide examples

---

[35] *See, e.g.*, Act of Mar. 25, 1813, 1813 La. Acts at 172 (prohibiting carrying "any concealed weapon"); 29 Ky. Gen. Stat. art. 29, § 1 (as amended through 1880) (prohibiting the concealed carry of any weapon "other than an ordinary pocket knife"); Act of Feb. 18, 1885, 1885 Or. Laws at 33 (same); Wash. Code § 929 (1881) (prohibiting carrying "any concealed weapon").

[36] *See, e.g.*, Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67-68 (prohibiting, *inter alia*, the concealed carry of "any bowie knife, Arkansas tooth-pick, or any other knife of the like kind"); Act of Jan. 14, 1820, ch. 23, 1819 Ind. Acts at 39 (prohibiting the concealed carry of any "unlawful weapon," such as a "dirk" or "sword in cane"); Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws at 231 (prohibiting the concealed carry of "deadly weapon[s]" including the "bowie-knife"); Act of Dec. 24, 1880, no. 362, 1880 S.C. Acts at 447-48 (prohibiting the concealed carry of specific "deadly weapon[s] usually used for the infliction of personal injury," including "dirk[s]"); 1838 Va. Acts at 76 (prohibiting the concealed carry of any "dirk, bowie knife, or any other weapons of the like kind, from this use of which the death of any person might probably ensue").

of states imposing severe taxes on the sale of such weapons.  In 1837, Alabama imposed a law placing a tax of "one hundred dollars" on the sale of "Bowie Knives," "Arkansaw [sic] Tooth-picks," or knives that "resemble" these weapons.  Act of June 30, 1837, No. 11, § 2, 1837 Ala. Acts 7.  Florida imposed a tax of "two hundred dollars per annum" on sellers of "dirks, pocket pistols, sword canes, or bowie knives," and levied a tax of "ten dollars per annum" on those carrying such weapons.  Act of Jan. 30, 1838, No. 24, § 1, 1838 Fla. Laws 36.  And Tennessee outright banned the sale of such weapons in 1838.  Act of Jan. 27, 1838, ch. 137, § 1, 1837 Tenn. Pub. Acts 200.

These laws imposing the most severe restrictions on unusually dangerous weapons were enacted largely by those southern states facing the most severe increases in violence in the pre-Civil War period.  Roth Decl. ¶ 23, *Grant* App'x 1148-49.  Contemporaneous state court decisions indicate that such regulations were considered permissible exercises of state police power—with different states permitted to make different decisions on how best to protect their citizens.  There is limited historical evidence that courts viewed constitutional rights to self-defense as impaired by regulations that restricted unusually dangerous weapons of an offensive character (including dirk and Bowie knives) while preserving the availability of alternative weapons for self-defense.[37]  To the contrary, state courts repeatedly upheld the constitutionality of such restrictions, affirming that these state legislatures acted "within the scope of their police powers in responding to the demands of [their] own citizens." *Bianchi*, 111 F.4th at 447; *see also Heller*, 554 U.S. at 626 ("[T]he majority

---

[37] For example, in 1837, Georgia forbade the sale, possession, or carry of dirk and Bowie knives, among others.  The Georgia Supreme Court later held that the statute violated the Second Amendment, except to the extent that it prohibited concealed carry.  *See Nunn v. State*, 1 Ga. 243 (1846).

of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."); *Bruen*, 597 U.S. at 50-55.

Among other examples, the Tennessee Supreme Court rejected the argument of a defendant convicted under an 1837 Tennessee law banning the concealed carry of Bowie knives that the law violated his rights arising under Tennessee's constitutional analogue to the Second Amendment. *Aymette v. State*, 21 Tenn. 154, 155 (1840). There, the court noted that "[t]he Legislature . . . ha[d] a right to prohibit the wearing or *keeping* [of] weapons dangerous to the peace and safety of the citizens" that was not impeded by the state constitutional right to bear arms. *Id.* at 159. The Tennessee Supreme Court recognized that the state's restrictions were justified to protect the community from acts of terror by individuals employing unusually dangerous weapons:

> To hold that the Legislature could pass no law upon this subject by which to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms, would be to pervert a great political right to the worst of purposes, and to make it a social evil of infinitely greater extent to society than would result from abandoning the right itself.

*Id.* at 159.  Other courts rejected similar constitutional challenges for nearly identical reasons.[38]

Twentieth-century regulation of automatic and semiautomatic weapons continued the relevantly similar tradition of imposing targeted restrictions on unusually dangerous weapons after their use in multiple-fatality homicides and terror.[39]  The development of the Thompson submachine gun in 1918, and its subsequent use by gangsters in mass shootings, led to the National Firearms Act of 1934, which prohibited ownership of machine guns, submachine guns, and short-barreled shotguns, as well as numerous state analogues.  *See* Cornell Decl. ¶¶ 41, 53, *NAGR* App'x 956 (analogizing "pre-Civil War

---

[38] *See Cockrum v. State*, 24 Tex. 394, 402-03 (1859) (rejecting a constitutional challenge to a law imposing higher penalties for killings committed with Bowie knives because Bowie knives were an "instrument of almost certain death" and because "[h]e who carries such a weapon, for lawful defense, as he may, makes himself more dangerous to the rights of others . . . than if he carried a less dangerous weapon"); *State v. Workman*, 35 W. Va. 367, 373 (1891) ("So, also, in regard to the kind of arms referred to in the [Second A]mendment, it must be held to refer to the weapons of warfare to be used by the militia . . . and not to" weapons including Bowie knives that "are usually employed in brawls, street fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the state.").

[39] Historical evidence postdating ratification of the Second and Fourteenth Amendments is less instructive than earlier evidence but may be considered so long as it does not contradict the text of the Second Amendment or evidence from before or during the period of ratification. *See Bruen*, 597 U.S. at 34-37 ("[T]o the extent later history contradicts what the text says, the text controls."); *id.* ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (quotation marks omitted)); *Antonyuk*, 120 F.4th at 990 n.41 ("Twentieth-century evidence is not as probative as nineteenth-century evidence. . . . But such laws are not weightless.").

fears about weapons of 'bravado[] and affray'" to "[f]ears about
gangster weapons" because both reflected the "ancient common law
tradition of singling out weapons capable of producing a terror");
*Ocean State Tactical*, 95 F.4th at 47 (observing that Congress began
regulating sawed-off shotguns after they were used by the "mass
shooters of their day" (quotation marks omitted)).   But even the
National Firearms Act's severe restrictions on these unusually
dangerous weapons did not unlawfully burden the Second
Amendment right.  *See United States v. Miller*, 307 U.S. 174, 178 (1939)
(upholding the constitutionality of the Act's prohibition on
possession of sawed-off shotguns).

We acknowledge that statutes that restricted the concealed or
open carry of particular arms in public are distinguishable from
restrictions on the acquisition and possession of certain weapons.  But
that does not diminish the constitutionality of appropriate restrictions
that, like the Connecticut statutes, do not impair the core
constitutional right under the Second Amendment.  We conclude that
historical prohibitions on unusually dangerous weapons used in
affray and restrictions on the concealed or open carry of unusually
dangerous weapons, when accompanied by statutes that imposed
taxes on the sale and possession of such weapons, provide an
historical tradition of restricting unusual weapons that is relevantly
similar to the challenged statutes.  Historical legislators regulated
these unusually dangerous arms, like here, after observing the
regulated weapons' unprecedented lethality.  They did so, like here,
to prevent the use of these especially dangerous variants of otherwise
lawful types of weapons in further acts of mass homicide and terror.
And they did so, in a relevantly similar fashion, by singling out
unusually dangerous weapons.

In sum, we conclude that Defendants have, at this preliminary
stage, satisfied their burden to demonstrate that permissible historical
arms regulations that singled out the unusually dangerous weapons
of their day are "relevantly similar" to the challenged statutes.[40]  At
the same time, both the historical and the contemporary legislatures
did not impair the Second Amendment right to self-defense by
allowing many weapons to go unchecked.

The less-than-absolute right codified by the Second
Amendment permits Connecticut legislators to honor the
constitutional balance captured by its text, as interpreted by the
Supreme Court in light of history.  The Second Amendment thus
allows these legislators to do what they did here: implement targeted
regulations designed to protect residents and their children from
experiencing tragedies like the one at Sandy Hook Elementary School

---

[40] Today, we join the First, Fourth, Seventh, Ninth, and D.C. Circuits
(every Circuit to address the question) in approving restrictions on assault
weapons and large capacity magazines and in recognizing a historical
tradition of regulating unusually dangerous weapons after their use in
terror or to perpetuate mass casualties.  *See Ocean State Tactical*, 95 F.4th at
46 (recognizing the tradition of regulating dangerous aspects of weapons
"once their popularity in the hands of murderers became apparent"); *Capen*,
134 F.4th at 671 (recognizing a tradition of "protect[ing] the public from the
danger caused by weapons that create a particular public safety threat");
*Bianchi*, 111 F.4th at 464-72 (describing "a strong tradition of regulating
those weapons that were invented for offensive purposes and were
ultimately proven to pose exceptional dangers to innocent civilians" and
that are "excessively dangerous"); *Bevis*, 85 F.4th at 1199 (describing "the
long-standing tradition of regulating the especially dangerous weapons of
the time"); *Duncan*, 133 F.4th at 874 (identifying tradition of "laws to protect
innocent persons from especially dangerous uses of weapons once those
perils have become clear"); *Hanson*, 120 F.4th at 237-38 (recognizing the
tradition of regulating "weapons that are particularly capable of
unprecedented lethality").

that Connecticut and the nation experienced on December 14, 2012, without sacrificing the self-defense core of the "right of the people to keep and bear Arms."  U.S. Const. amend. II.

Accordingly, based upon the foregoing discussion in this section, we have no difficulty concluding that Plaintiffs have failed to establish a likelihood of success on the merits.

## III.    Other Preliminary Injunction Factors

The district court did not reach, and Plaintiffs only cursorily argue on appeal, that they will be irreparably harmed absent injunctive relief and that the balance of equities and the public interest favor an injunction.  Such cursory treatment is not unexpected, given that Plaintiffs define the irreparable harm as the denial of their constitutional rights and describe the equities and public interest as disfavoring such a denial.  In other words, Plaintiffs argue that each of the injunction factors depends upon the merits of their constitutional claims.

But the Supreme Court has made clear that Plaintiffs must do more to warrant the extraordinary remedy of preliminary injunctive relief.  An injunction "does not follow from [a likelihood of] success on the merits as a matter of course."  *Winter*, 555 U.S. at 32; *see also Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 197 (3d Cir. 2024) (explaining that a preliminary injunction "is not a shortcut to the merits").  Rather, plaintiffs "must make a clear showing" on the remaining factors, which have persisted as "commonplace considerations" in awarding injunctive relief throughout "several hundred years of history."  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quotation marks omitted).  As we have been recently reminded, our power to grant equitable relief "encompasses only those sorts of equitable remedies 'traditionally

accorded by courts of equity' at our country's inception." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2551 (2025) (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Accepting Plaintiffs' argument and concluding that these factors are essentially superfluous when a constitutional harm is alleged would be the sort of "major departure from the long tradition of equity practice" that "should not be lightly implied." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

Accepting that "[o]ur authority to alter legal rights and obligations generally derives from . . . our determination of the merits," we attend closely to these factors, as they "enforce a vital, structural limitation on the role of courts" by restricting grants of relief before the opportunity for a full adversarial testing of the merits. *Hanson*, 120 F.4th at 243; *see also Del. State Sportsmen's Ass'n*, 108 F.4th at 199-201.

### A. Irreparable Harm

For Plaintiffs to satisfy the irreparable harm requirement, they "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (alterations accepted)). This requirement stems from the fundamental purpose of a preliminary injunction, which is not to guarantee the parties suffer no harm during the pendency of litigation but "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks*, 602 U.S. at 346 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). To satisfy this requirement,

however, Plaintiffs argue only that a "violation of constitutional rights per se constitutes irreparable injury." Br. of *NAGR* Appellants at 66. This general assertion is incorrect.

To be sure, we have presumed irreparable harm for alleged deprivations of certain constitutional rights. *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000) (noting this Circuit has presumed that the requirement of irreparable harm was met when plaintiffs alleged deprivations of their Fourth and Eighth Amendment rights). But the Supreme Court has never applied this presumption outside the First Amendment context. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").[1] And even in that context, our Court has not axiomatically applied the presumption that plaintiffs alleging deprivations of First Amendment rights have satisfied the requirement of irreparable harm. *See, e.g., Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) (concluding that the plaintiffs had not "establish[ed] real and imminent irreparable harm" stemming from the alleged First Amendment violation).

Plaintiffs offer little argument as to why we should extend the presumption of irreparable harm in the context of this case. And the Supreme Court's recent emphasis on the limits of our equitable powers caution against extending the presumption to new contexts. But we are also reluctant to run afoul of the Supreme Court's admonishment that the Second Amendment is not a "second-class right," *McDonald*, 561 U.S. at 780, by treating this constitutional harm differently than we have treated others in the past. We therefore proceed to the final requirement for this Court to grant Plaintiffs' requested relief without ruling on the nondispositive issue of whether Plaintiffs have established irreparable harm.

## B. Balance of the Equities and Public Interest

Even if we accept Plaintiffs' argument that we may presume irreparable harm in this context, we must also "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. And we are instructed to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. (quoting *Romero-Barcelo*, 456 U.S. at 312). These two factors merge when the government is party to the suit. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (per curiam).

In balancing the equities, we first acknowledge the harm the government Defendants would suffer if "enjoined . . . from effectuating statutes enacted by representatives of its people." *CASA*, 145 S. Ct. at 2562 (quoting with approval *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). And specific to these challenged statutes, Defendants have provided evidence that granting the requested preliminary injunction would lead to a "flood" of currently restricted weapons entering Connecticut—and that these weapons will be near-impossible to retrieve once within the state.[41] Defendants also provide evidence that the enforcement of laws restricting assault weapons, large capacity magazines, or both, "is associated with a statistically significant decrease in per capita rates of deaths and casualties due to mass shootings." Donohue Decl. ¶ 82, *NAGR* App'x at 232. Taken together, these considerations—

---

[41] Br. of *NAGR* Appellees at 72-73 (citing Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED (Apr. 12, 2019), https://www.kqed.org/news/11740000/gun-groups-more-than-a-million-high-capacity-magazines-flooded-california-during-weeklong-suspension-of-ban [https://perma.cc/3R62-X6VL]).

implicating both the government's interest in enforcing laws enacted by duly-elected legislators and in protecting the lives of its citizens—weigh heavily in the balance.

For their part, Plaintiffs rely only on the assertion that "securing constitutional rights is always in the public interest." Br. of *NAGR* Appellants at 66. We agree that the potential denial of a party's constitutional rights is surely a significant consideration. But the fact that a plaintiff alleges constitutional harm does not end our balance-of-the-equities inquiry. *See, e.g.*, *Am. Civ. Liberties Union v. Clapper*, 785 F.3d 787, 825-26 (2d Cir. 2015). While Plaintiffs point to their inability to use the desired firearms for self-defense, Br. of *NAGR* Appellants at 12; Br. of *Grant* Appellants at 9-14, they do not explain why the thousands of firearms Connecticut's statutes leave available, including several semiautomatic handguns, are insufficient for this purpose during the pendency of the case. And although Plaintiffs have been unable to possess the desired AR-15s and large capacity magazines since 2013, when the relevant legislation was enacted, they offer no instances in which the many remaining available firearms in the years since were insufficient for self-defense purposes. Plaintiffs have offered no other argument or consequences to the public that outweigh the serious effects of granting the requested relief highlighted by Defendants. We require more of plaintiffs seeking the "extraordinary and drastic remedy" of preliminary injunctive relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs have not demonstrated that the balance of equities and public interest tip in their favor.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Judge Nathan's opinion, we **AFFIRM** the district court's denial of the preliminary injunctions in both cases.

NATHAN, *Circuit Judge*, joined by LIVINGSTON, *Chief Judge*, and WALKER, *Circuit Judge*, concurring:

I join Judge Walker's excellent and thorough opinion for the Court in full.  I write additionally to explain why Plaintiffs' proposed "dangerous and unusual" standard is particularly untenable in light of our duty—as instructed by the Supreme Court—to engage in actual historical analysis.

Judge Walker's opinion carefully explains why historical restrictions on "dangerous and unusual" weapons would have been contemporaneously understood as "unusually dangerous."  *See* Op. at 29–31.  Nonetheless, Plaintiffs urge a contrary historical analysis based on one word in *Heller*—the "and" in "dangerous and unusual." *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (quotation marks omitted).  Plaintiffs contend that *Heller's* use of the word "and" means that only those weapons both dangerous *and* unusual are unprotected.  Br. of *NAGR* Appellants at 59; Br. of *Grant* Appellants at 31-32.  In this view, only weapons that are numerically uncommon, and therefore unusual, may be regulated.

Adoption of Plaintiffs' conjunctive test would flatly betray our duty to engage in a careful historical analysis.  *Bruen* instructs that the contours of the Second Amendment right are historically determined. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).  Accordingly, when the people challenge a law on Second Amendment grounds, the judicial role is to "examin[e] text, pre-ratification and post-ratification history, and precedent."  *United States v. Rahimi*, 602 U.S. 680, 714 (2024) (Kavanaugh, J., concurring).

Our commitment to history requires us to look beyond Plaintiffs' reliance on one word in *Heller* and journey to the historical

sources of their proposed standard. *Heller*, the first time the Supreme Court seems to have referenced the "dangerous and unusual" tradition, reads as follows:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." [*United States v. Miller*, 307 U.S. 174, 179 (1939)]. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." *See* 4 Blackstone 148-149 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

*Heller*, 554 U.S. at 627. Thus, the line in *Heller* on which Plaintiffs rely appears to be a quote of Blackstone. *Id*. And indeed, *Rahimi* confirms that *Heller* derived the "dangerous and unusual" language from Blackstone. 602 U.S. at 691 (quoting *Heller* for the "dangerous and unusual" formulation and noting that *Heller* cited Blackstone).

A historically faithful analysis would therefore lead us to the text of Blackstone itself, which reads as follows:

> The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, 2 Edw. III c. 3. upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armor.  [Pott. Antiqu. b. 1. c. 26].

4 Blackstone 148-49 (1769).  As is clear, Blackstone did not use the phrase "dangerous and unusual" and instead described prohibitions on the carrying of "dangerous *or* unusual weapons."  *Id.* (emphasis added).  It would seem a serious subversion of our commitment to history to enshrine a conjunctive test based on the *Heller* opinion's possible misquote of Blackstone.

Even if *Heller* were not quoting Blackstone and instead derived "dangerous and usual" from the string cite of treatises and cases that followed the cite to Blackstone, our historical analysis still requires us to reject Plaintiffs' argument.  The remaining sources to which *Heller* cites use a mix of "dangerous or unusual" and "dangerous and unusual."  *See, e.g.*, H. Stephen, Summary of the Criminal Law 48 (1840) ("dangerous or unusual"); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804) ("dangerous and unusual").  In light of this historical context, the word "and" cannot do the work

that Plaintiffs ask it to do.  Instead, the interchangeable use of "dangerous and unusual" and "dangerous or unusual" supports the proposition that neither "and" nor "or" should be read so literally. *See* Cornell Decl. ¶ 20, *Grant* App'x 1220–21; Elizabeth Fajans & Mary R. Falk, *Hendiadys in the Language of the Law: What Part of "And" Don't You Understand?*, 17 Legal Comm. & Rhetoric: JAWLD 39, 40 (2020). Molding these variegated historical descriptions into a doctrinal test—as we must—the majority rightly reconstructs "unusually dangerous" as the most faithful formulation.

What's more, the historical *reasons* for regulating "dangerous or unusual" weapons further counsel against Plaintiffs' interpretation.  *See Rahimi*, 602 U.S. at 692 ("Why and how the regulation burdens the [Second Amendment] right are central to this inquiry.").  Closer scrutiny of historical regulations on "dangerous and unusual weapons" reveals a tradition of restrictions on public affray—that is, terrifying the public.  Blackstone, for example, described "[t]he offence of riding or going armed, with dangerous or unusual weapons" as a crime that "terrif[ies] the good people of the land."  Blackstone, *supra*, at 148 (emphasis omitted).  Hawkins, another historical source that does use "dangerous and unusual," conveys in substance something identical.  1 W. Hawkins, A Treatise of the Pleas of the Crown, 135 (1716) (describing the offense of affray as "where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People").

Taken together, the various historical sources on affray laws reveal a common concern about how "terrifying" dangerous and

unusual weapons are to the public.  In fact, Blackstone, Hawkins, and other historical sources repeatedly cite one particular statute: the Statute of Northampton of 1328.  *See* Blackstone, *supra*, at 148–49; Hawkins, *supra*, at 135; 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271-72 (2d. Am. ed. 1831); F. Wharton, A Treatise on the Criminal Law of the United States 726 (2d ed. 1852); Stephen, *supra*, at 48 ; W. Lambard, Eirenarcha: Or of the Office of the Justices of Peace 128-29 (4th ed. 1599); *see also Rahimi*, 602 U.S. at 693–94.  And that statute—without explicit reference to the type of weapon used—prohibits "bring[ing]" any "force in affray of the peace."  2 Edw. III c. 3.[1]  This broad restriction, at the heart of the "dangerous and unusual" standard, makes clear that the tradition emerges from concern about danger to the public, not statistical commonality of the threatening weapon.  Indeed, glaringly absent from these historical laws is any particular focus on the commonality of the weapons used

---

[1] In relevant part:

> [I]t is enacted, that no man great nor small, . .  except the King's servants in his presence and his ministers] . . . , be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain not forfeit their armour to the King, and their bodies to prison at the King's pleasure.

2 Edw. III c. 3 (1328) ("ne force mesner en affrai de la pees").  A translation of the statute, which was originally written in Law French, can be found at https://firearmslaw.duke.edu/laws/statute-of-northampton-1328-2-edw-3-c-3-eng [https://perma.cc/P396-JVBH; PDF available at https://perma.cc/2FLM-NNTU].

to cause that terror.  Rather, when these historical sources mention weapons, they name ones that were certainly in common use.  *See* Blackstone, *supra*, at 149 (citing Pott. Antiqu. b. 1. c. 26 for an Athenian law that fined those who were seen carrying a sword or wearing armor on the city streets); E. Coke, Third Part of the Institutes of the Laws of England: Concerning High Treason, and Other Pleas of the Crown, and Criminal Causes 161 (1797) (understanding armed force, in the context of the Statute of Northampton, to include the use of sticks and stones if picked up during the course of an argument).[2]

Plaintiffs ask us to go no further than our first intuition about the word "and."  But we *must* go further because the Supreme Court has instructed us to take historical analysis seriously.  And history requires us to reject the argument that the "dangerous and unusual" tradition focused on the numerosity of the weapons in modern society.  The majority's "unusually dangerous" test earnestly and faithfully carries out the historical inquiry the Supreme Court has mandated.  For these reasons and those stated in Judge Walker's opinion, I join the opinion of the Court in full.

---

[2] The relevant passage in Coke, which is in Latin, quotes 3 H. Bracton, On the Laws and Customs of England 20 (c. 1235) [https://perma.cc/Z3EM-NZ2C].  A translation of Bracton can be found at https://amesfoundation.law.harvard.edu/Bracton/ [https://perma.cc/6MNE-2NJN].