# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Nos. 24-2415, 24-2450, 24-2506

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., ET AL.,
*Appellants/Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants,*

On Appeal from the United States District Court for the
District of New Jersey, Nos. 1:18-cv-10507; 1:22-cv-04360;
1:22-cv-04397 (Hon. Peter G. Sheridan, U.S.D.J.)

**Appellees/Cross-Appellants Brief Responding
to *Amicus Curiae* The United States**

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM
*Solicitor General*
JAKE MAZEITIS
*Deputy Attorney General*
Office of the N.J. Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Appellees/Cross-
Appellants*

# TABLE OF CONTENTS

                                                                    **PAGE**

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

   I.   THE FEDERAL GOVERNMENT ERRS IN MAKING AN ITEM'S
       CIRCULATION THE DISPOSITIVE CONSTITUTIONAL TEST. ...........2

   II.  THE FEDERAL GOVERNMENT OVERLOOKS AN
       INDEPENDENT HISTORICAL TRADITION, RECOGNIZED
       BY SIX CIRCUITS, OF REGULATING UNUSUALLY
       DANGEROUS WEAPONS. ......................................................................11

CONCLUSION .....................................................................................20

**PAGE(S)**

**Cases**

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) ...................................................................11

*Atkins v. Virginia*,
   536 U.S. 304 (2002) ...........................................................................7

*Aymette v. State*,
   21 Tenn. 154 (1840) .........................................................................17

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023) ............................................ 1, 5, 6, 12

*Bianchi v. Brown*,
   111 F.4th 438 (4th Cir. 2024) .................................................. passim

*Bucklew v. Precythe*,
   587 U.S. 119 (2019) ...........................................................................7

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ...........................................................................4

*Carpenter v. United States*,
   585 U.S. 296 (2018) ...........................................................................7

*Dist. of Colum. v. Heller*,
   554 U.S. 570 (2008) .................................................................. passim

*Duncan v. Bonta*,
   133 F.4th 852 (9th Cir. 2025) ..................................................... 1, 12, 16

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ................................................. passim

*Miller v. California*,
   413 U.S. 15 (1973) .............................................................................7

*Nat'l Ass'n for Gun Rights v. Lamont*,
   __ F.4th ___, 2025 WL 2423599 (2d Cir. Aug. 22, 2025) .......................... passim

*New York v. Ferber*,
   458 U.S. 747 (1982) ...........................................................................7

*NYSRPA v. Bruen*,
   597 U.S. 1 (2022) ...................................................................... passim

*Ocean State Tactical, LLC v. Rhode Island*,
   95 F.4th 38 (1st Cir. 2024) ....................................................... 1, 5, 12

*Rocky Mountain Gun Owners v. Polis,*
   121 F.4th 96 (10th Cir. 2024)..............................................................11

*United States v. Alaniz*,
   69 F.4th 1124 (9th Cir. 2023) ...........................................................11

*United States v. Miller*,
   307 U.S. 174 (1939) ...................................................................8, 10

*United States v. Price*,
   111 F.4th 392 (4th Cir. 2024)...........................................................11

*United States v. Rahimi*,
   602 U.S. 680 (2024) .................................................................. passim

# INTRODUCTION

The Federal Government asks this Court to split with six of its sister circuits. *See Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), 95 F.4th 38 (1st Cir. 2024); *Nat'l Ass'n for Gun Rights v. Lamont ("NAGR")*, __ F.4th ___, 2025 WL 2423599 (2d Cir. Aug. 22, 2025); *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc); *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023); *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) (en banc); *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024). And it asks this Court to do so even though the United States itself maintained federal restrictions on both assault weapons and LCMs for a decade. This Court should decline that invitation.

The Federal Government, echoing the challengers, errs in contending that the exclusive justification for a firearms regulation turns on the firearm's circulation. No court of appeals has ever agreed with the challengers that the volume of a restricted item in circulation is the dispositive constitutional test. And for good reason: this test is ahistorical; leads to inviolable protection for machineguns; is inherently illogical and produces an arms race between manufacturers and officials; is inconsistent with the treatment of other constitutional rights; and finds no support from precedent. The Federal Government's efforts to rehabilitate this popularity test—including to argue that machineguns can be regulated on its view—do not pass scrutiny.

Instead, there has always existed a distinct historical tradition, one the Federal Government's brief does not seriously grapple with but that each other circuit to date has identified, that permits the regulation of unusually dangerous firearms—that is, weapons whose features are disproportionately dangerous compared to their civilian self-defense uses. That regulatory tradition dates back to England, was endorsed by sources like Blackstone, and has persisted at all periods in American history—from the regulation of Bowie knives, to slungshots, to machineguns, to assault weapons and LCMs. The Federal Government ignores almost entirely *Bruen*'s command to engage in this historical review to divine the "principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Because the Federal Government fails to seriously engage with this history, its brief ignores the tradition of regulating widely owned, yet unusually dangerous, weapons. But that tradition captures the extraordinary dangers assault weapons and LCMs pose.

## ARGUMENT

## I. THE FEDERAL GOVERNMENT ERRS IN MAKING AN ITEM'S CIRCULATION THE DISPOSITIVE CONSTITUTIONAL TEST.

The Federal Government baldly claims that States cannot "ban arms that are in common use … without running afoul of the Constitution." U.S.Br. 3. The Federal Government, like the challengers, reaches its result based on its conclusions that (1) common use is the sole analysis for firearms regulation, and (2) common use refers to the number of items in civilian circulation. U.S.Br. 9-17. Both steps in the logical

chain are faulty. *See* N.J.Reply.Br. 3-7 (explaining common use is not the exclusive Second Amendment test); N.J.Reply.Br. 8-14 (explaining that common use does not mean circulation). And the test that this chain produces is untenable: it is ahistorical; leads to inviolable protection for machineguns; is illogical and would produce a race between firearms manufacturers and officials; is inconsistent with the treatment of other rights; and is inconsistent with Supreme Court precedents. *See* N.J.Br. 31-37; N.J.Reply.Br. 8-14. Because the Federal Government has no better answers to these problems than do the challengers, this Court should reject its test.

First, despite *Bruen* and *Rahimi*'s emphasis on history, a circulation-only test is fundamentally ahistorical. The Federal Government's myopic focus on an item's popularity ignores that American governments have long prohibited weapons when those arms were widely available in the civilian population and had been used for lethal, criminal ends, *Hanson*, 120 F.4th at 240—indeed, such penetration was one reason *why* legislatures had acted to regulate them. *See* NJ.Br. 46-52; N.J.Reply.Br. 17-26; JA4295-96 (Cornell Rpt. at 6-7). Bowie knives offer a perfect example. The Federal Government acknowledges that States "banned the possession, carrying, or sale of specific types of weapons" and that this tradition included "221 19th-century state and territorial laws targeting Bowie knives, a class of weapons associated with hand-to-hand fighting." U.S.Br. 12. And it discusses cases indicating that the Second Amendment right did not extend to Bowie knives. *Id.* at 12-13. But while the Federal

Government claims that Bowie knives were not "commonplace" or "usual," it provides no record or expert evidence for that view. *Id.* To the contrary, the historical record in this case confirms legislatures acted to regulate Bowie knives after they had penetrated the civilian market—indeed, after there was a "craze" for them. *See* N.J.Br. 47-49; N.J.Reply.Br. 24; JA1099 (Spitzer Rpt. ¶61). The Federal Government does not mention let alone grapple with that evidence, but it disproves its theory that weaponry can only be regulated before it is "commonplace."

Second, not only does the popularity test contravene history, but this analysis would produce a result the Court declared to be "startling" and wrong, *Dist. of Colum. v. Heller*, 554 U.S. 570, 624 (2008): inviolable protection for machineguns. *See* N.J.Br. 35-36; N.J.Reply.Br. 12-14. The non-binding concurrence on which the Federal Government relies for its circulation test endorsed inviolable protection for stun guns because 200,000 were in lawful circulation. *See* U.S.Br. 15 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment)). Yet the record suggests 176,000 machineguns are in civilian circulation, a number that would be even higher had they not been long ago prohibited by federal statute. *See* N.J.Reply.Br. 12-13. The Federal Government recognizes that this is untenable, and therefore pledges that protection for machineguns will not be the result of its analysis. *See* U.S.Br. 19 (agreeing States could "prohibit[] fully automatic firearms"). But the reason it gives lacks coherence: it says the States can

regulate machineguns because a prohibition on automatic fire just "regulate[s] the mode or manner" of the arm, rather than banning a class of arms. *Id.* Just the same could be said, however, of restrictions on AR-15s and LCMs, which regulate specific features (alone or in combination) and regulate magazine capacity. Treating bans on machineguns as mere "mode or manner" laws, but laws for assault weapons and LCMs as "bans on arms," is therefore untenable.

Third, as the State's briefing already establishes, the popularity test "strain[s] both logic and administrability." *NAGR*, 2025 WL 2423599, *1; *see* N.J.Br. 32-34; N.J.Reply.Br. 10-11. The test is circular, because the extent of any item's circulation turns in no small part on its lawfulness. *Bevis*, 85 F.4th at 1190. It "hinge[s] the right on … a 'trivial counting exercise' that would 'lead[ ] to absurd consequences' where unusually dangerous arms like the M-16 … can 'gain constitutional protection merely because [they] become[ ] popular before the government can sufficiently regulate [them].'" *NAGR*, 2025 WL 2423599, *11. And it forces a race between firearms manufacturers and elected officials, with the former incentivized to flood the market with their new items prior to regulation, and legislatures incentivized to prohibit weapons quickly—before they forever lose authority to do so. *OST*, 95 F.4th at 50-51.

The Federal Government's answer is wholly nonresponsive. Its amicus brief acknowledges the critiques, but contends that this is the natural upshot of permitting

the "American people … to decide which weapons are useful." U.S.Br.15-16. But that misunderstands the issue. After all, a counting exercise does not merely reflect the People's preferences in the ether; the reason for some items' lack of prevalence is "because they are illegal," while the reason for other items' popularity is that "they have been legal." *Bevis*, 85 F.4th at 1190. That is, looking to the market as proof of preferences *is* the circularity, because "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Id.* And the legislature, reflecting the broader community, has at least as much a claim to reflecting the voice of the People as to which arms are appropriate for self-defense as do the manufacturers that race to flood the market.

Fourth, as the State has explained, a counting exercise is contrary to traditional constitutional first principles. Although plaintiffs admit that this numerical approach is "only a Second Amendment principle" and not "generally applicable," Cheeseman Resp. 29; ANJRPC Resp. 18, the Federal Government tries to argue that popularity tests are "hardly unusual in Anglo-American law." U.S.Br.16. But its brief proves wanting. The Federal Government cites use of "contemporary community standards" in First Amendment obscenity law, and "customary practices" in Fourth Amendment law, as its sole other reference points. *Id.* But the First Amendment has never turned on a dispositive tallying—whether for how many articles circulated before it can be

prohibited as obscene, or how many of an image circulated before it can be banned as child pornography. *See, e.g.*, *Miller v. California*, 413 U.S. 15, 24 (1973) (offering comprehensive guidelines for defining obscenity, none of which turns on tallying alone); *New York v. Ferber*, 458 U.S. 747, 758 (1982) (permitting the prohibition of child pornography based on objective "harm[] to the … health of the child," without regard to how much child pornography circulated). So too the Fourth Amendment bars unlawful entry into the home, no matter how popular that investigatory method might be. *Cf., e.g.*, *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (holding that Fourth Amendment rights are informed by "Founding-era understandings").[1] The Federal Government's argument that counting must be dispositive really does boil down to unwarranted Second Amendment exceptionalism, and it would be especially odd for a right that turns instead on history and analogy. *See NYSRPA v. Bruen*, 597 U.S. 1, 28 (2022).

---

[1] Other rights, which go unmentioned in the Federal Government's amicus, likewise foreclose popularity tests. The Eighth Amendment asks whether the new method of execution superadds "terror, pain, or disgrace"; it does not assess how speedy the distribution of that drug has been to States on the market. *Bucklew v. Precythe*, 587 U.S. 119, 133 (2019). And while some prior Eighth Amendment cases looked to the presence of some "national consensus," *Atkins v. Virginia*, 536 U.S. 304, 316 (2002), no such consensus undermines the laws at issue: fifteen States, representing about 40 percent of the American population, restrict assault weapons or LCMs. Nothing suggests the relevant question is instead the popularity of the particular item among gunowners based on their purchases on the market.

Fifth, for all these reasons, it comes as no surprise that the Supreme Court's own precedents refute a dispositive circulation test. *See* NJ.Br. 36-37; N.J.Reply.Br. 9-10. The Federal Government suggests that the Supreme Court already endorsed a circularity-only test by making common use the exclusive constitutional criterion in *United States v. Miller*, 307 U.S. 174 (1939), *Heller*, and *Bruen*. U.S.Br. 13-15. But that argument "distort[s] the precedents on which th[is] argument relies." *NAGR*, 2025 WL 2423599, *11. Instead, the Federal Government is making a logical error: "*Heller* and *Bruen* provide that the Second Amendment 'protects *only* the carrying of weapons that are those in common use at the time,'" but do "not hold that the Second Amendment *necessarily* protects *all* weapons in common use." *Id.* Neither precedent suggests the Second Amendment turns solely on "looking to the number of a certain weapon in private hands." *Hanson*, 120 F.4th at 233.

Rather, "*Bruen* itself precludes" the contention that popularity alone provides inviolable protection, by demanding a searching inquiry into constitutional text and history, not some trivial counting exercise. *Id.* at 233-34. *Heller* is exactly the same: had its understanding of the Second Amendment cared solely about circulation, the *Heller* majority would have stopped after recounting the popularity of the handgun. See U.S.Br. 14 (quoting parts of *Heller* discussing widespread handgun ownership). But it did not—instead spilling considerable ink on the *features* of the handgun that make it well-suited to self-defense. *See Heller*, 554 U.S. at 629. That focus on the

handgun's characteristics is "hardly an *obiter dictum*." *Hanson*, 120 F.4th at 234. And *Heller* went on to find a right to machineguns "startling," notwithstanding their circulation. *Supra* at 4. The Federal Government simply ignores these portions of *Heller*, even though those portions make no sense on its and the challengers' view. In other words, none of the Supreme Court's decisions "shield popular weapons from review of their potentially unusually dangerous character." *NAGR*, 2025 WL 2423599, *11.

Finally, it bears note that the Federal Government introduces an error that not even the challengers make: it argues circulation matters even when individuals buy the weaponry for the purposes of common defense rather than self-defense—*i.e.*, if they buy military-grade weaponry to repel invasions, suppress insurrections, and/or resist tyranny. *See* U.S.Br. 5-9. As an initial matter, the plaintiffs do not advance this argument, and the Federal Government does not explain how it matters to this case. But if this Court considers the theory, it should reject it—just as the Supreme Court has. After all, the Court has already held that "individual self-defense is 'the central component' of the Second Amendment," and so its historical analysis assesses "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29; *see also id.* at 21 ("the Second Amendment protect[s] an individual right to armed self-defense"); *id.* at 17, 66, 70 (likewise describing a right

"to bear arms … for self-defense"). So too *Rahimi*, which spoke of the Amendment as "secur[ing] for Americans a means of self-defense." 602 U.S. at 690.

Indeed, the Court took pains to emphasize that the right would *not* encapsulate weapons that are "specifically designed for military use" and "employed in a military capacity." *Heller*, 554 U.S. at 581. While *Miller* (on which the Federal Government relies) suggested the right might extend to "ordinary military equipment" for militias, 307 U.S. at 178, *Heller* balked at this, finding it to be "startling" that the right would protect weapons, like machineguns, which had been "useful in warfare," 554 U.S. at 624; *see id.* at 627 (observing Second Amendment permitted regulation of "weapons that are most useful in military service" such as "M–16 rifles and the like"). *Heller* even spoke to the role of the Second Amendment's prefatory clause regarding militia service, and explained that while this is a "purpose for which the right was codified," *id.* at 599, the substantive right itself was "inherited from our English ancestors" and "unconnected with militia service," *id.* at 599, 616. The Federal Government's effort to justify Second Amendment protection based on military use "to protect the polity from 'invasions,' 'insurrections,' and 'tyranny,'" U.S.Br. 6, is therefore impossible to square with its own admission that machineguns may be prohibited, *see* N.J.Br.

15-17 (discussing military history and use of M16 and assault weapons), and ultimately impossible to square with *Heller*, *Bruen*, and *Rahimi* themselves.[2]

## II. THE FEDERAL GOVERNMENT OVERLOOKS AN INDEPENDENT HISTORICAL TRADITION, RECOGNIZED BY SIX CIRCUITS, OF REGULATING UNUSUALLY DANGEROUS WEAPONS.

Instead, the circuits to consider the validity of assault weapons or LCM laws have canvassed a distinct tradition of weapons regulations. Some reached this issue by treating common use as a "step one inquiry," and moving on to history at *Bruen*'s second step. *See* N.J.Br. 27-30 (explaining this is the proper approach); N.J.Reply.Br. 5-6; *see also United States v. Price*, 111 F.4th 392, 398-402 (4th Cir. 2024) (en banc); *Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113-114 (10th Cir. 2024). Others have done so by sidestepping the question

---

[2] Nor does the Federal Government's historical analysis support its conclusion. *See* U.S.Br. 7-9. The reason that men could use the weapons that they kept at home while in the militia was because, at that time, weapons used for the common defense and for self-defense were "one and the same." *Heller*, 554 U.S. at 625. Said another way, the weapons individuals were using in the militia were ones that were already able to keep at home for individual self-defense. *See id.* at 627-28. But it does not mean that the logic holds in reverse: that individuals may keep in their home weapons for self-defense just because they are used in military service, now that a far more significant chasm exists between weapons of self-defense and ones of common defense. *See id.*; N.J.Br. 15-17 (discussing military capabilities of M16 and related assault weapons). Not even the Federal Government seriously means that individuals should be able to keep any weapons that they would need in the military "in times of war," U.S.Br. 6, because it swiftly retreats when confronted with the question of machineguns.

of common use, instead finding that common use is at the very least not the *exclusive* historical tradition for regulation. *See Hanson*, 120 F.4th at 232; *NAGR*, 2025 WL 2423599, *13 (choosing to "assume without deciding" that the AR-15 and LCMs are protected at step one, but finding they can be prohibited consistent with history). Either way, this Court should undertake a historical inquiry freed from the mistaken view that the Supreme Court endorsed circulation as the sole framework. And when it does so, this Court should join six circuits in recognizing an independent tradition of regulating "unusually dangerous weapons unsuitable for and disproportionate to the objective of individual self-defense." *NAGR*, 2025 WL 2423599, *1; *see Bevis*, 85 F.4th at 1199-1202; *Bianchi*, 111 F.4th at 471; *Duncan*, 133 F.4th at 876; *Hanson*, 120 F.4th at 237-40; *OST*, 95 F.4th at 45-50; N.J.Br. 38-40; N.J.Reply.Br. 11. Any other conclusion is fundamentally ahistorical.

Although the Federal Government claims that the "common-use test has deep roots in both English and American law," U.S.Br. 10, the historical record indicates just the opposite. The Federal Government mostly cites historical evidence allowing for restrictions on "dangerous and unusual weapons"—contending that the need for a weapon to be "and unusual" means it must be numerically uncommon. U.S.Br. 10-13 (considering "common weapons" and "unusual weapons" to be contrasts). But as the Second Circuit recently and powerfully explained, that is a misunderstanding of the original materials. Blackstone—on which *Heller* and *Rahimi* relied—stated that

pre-Founding English tradition included restrictions on "riding or going armed, with dangerous *or* unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton." *NAGR*, 2025 WL 2423599, *26 (Nathan, J., concurring) (emphasis added);[3] *see id.* at *19 (majority) (same, discussing *Rahimi*'s and Blackstone's use of the "dangerous or unusual" formulation). Other Founding-era sources, the Second Circuit observed, "use a mix of 'dangerous or unusual' and 'dangerous and unusual'" in detailing the preexisting legal tradition. *Id.* at *26 (Nathan, J., concurring) (collecting sources); *id.* at *11 n.18 (majority) (same). The Federal Government itself even cites sources referring to regulation of items that are "dangerous or unusual." U.S.Br. 10.

That is, the historical tradition—and these variegated forms of the test—allow for restrictions of "unusually dangerous" weapons. On the one hand, it makes little sense to treat "dangerous and unusual" as a two-prong test allowing regulation of weapons only before they grow popular. Since arms are "self-evidently" dangerous, *Hanson*, 120 F.4th at 238 n.7, this approach would really collapse into a popularity test—thus implicating the many problems described above. *See supra* at 3-9; *see NAGR*, 2025 WL 2423599, *12 (majority) (agreeing "[i]t is axiomatic that to some degree all firearms are 'dangerous'"). Indeed, "the phrase 'and unusual' or the phrase

---

[3] Although formally styled as a concurring opinion, the full three-judge panel joined this concurrence in its entirety, and the majority opinion specifically incorporated its reasoning by reference. *See NAGR*, 2025 WL 2423599, *12, 25.

'or unusual' standing alone raises more questions than it answers. What is meant by 'unusual' standing alone?" *NAGR*, 2025 WL 2423599, *12. And if Blackstone and other Founding-era writers believed they were describing a test that always required two conjunctive prongs to be satisfied, it would be puzzling indeed for them to have used the disjunctive "dangerous or unusual" formulation so many times. But on the other hand, a test that allows the regulation of anything that is "dangerous *or* unusual" works no better: every weapon is dangerous, so this would allow for prohibitions on any weapon whatsoever. Either, standing alone, "strips coherence from the historical limitation to the Second Amendment right." *Id.* So, at bottom, "'[d]angerous' needs a modifier, and its companion 'unusual' needs something to modify." *Id.*

History and logic thus reveal that the tradition the Federal Government cites in its brief actually allows for regulation of "unusually dangerous" weapons, rather than limiting regulation to unpopular weapons. As the Second Circuit explained— in an opinion issued a month before the Federal Government's amicus brief, but that the brief never grapples with—"[u]nusually dangerous is the obvious fit to describe" weapons that can still be regulated. *Id.*; *see also id.* at *12 n.19 (discussing the hendiadys device); N.J.Br. 39 (same). That is consistent, too, with the reasons for pre-Founding restrictions: "the various historical sources" like the Statute of Northampton "reveal a common concern about how 'terrifying' dangerous and unusual weapons are to the public." *NAGR*, 2025 WL 2423599, *26 (Nathan, J.,

concurring) (collecting sources). An assessment of the Statute of Northampton—so central to Blackstone and other sources—confirms restrictions "emerge[d] from concern about danger to the public, not statistical commonality of the threatening weapon. Indeed, glaringly absent from these historical laws is any particular focus on the commonality of the weapons used to cause that terror." *Id.* (noting that "when these historical sources mention weapons, they name ones that were certainly in common use," and collecting sources). So the tradition Blackstone and other contemporaneous sources describe, and the historical laws on which they rely, related to unusually dangerous weapons.

Most critically, the actual history of weapons regulations confirms the validity of regulating unusually dangerous weaponry—revealing "historical antecedents that regulated other unusually dangerous weapons unsuitable for and disproportionate to the objective of individual self-defense," notwithstanding their popularity. *Id.* at *1 (majority). That tradition started in England, and included prohibitions on "carrying of launcegays, which were shorter and lighter than a full knights' lance and designed for thrusting, that were 'generally worn or carried only when one intended to ... breach the peace.'" *Id.* at *19. Even the Federal Government admits these restrictions existed given the use of launcegays in acts of violence, simply suggesting that these weapons were "unusual" because they were used for combat or to breach the peace. U.S.Br. 10 (citing *Bruen*, 597 U.S. at 41). But it cites nothing to show that

launcegays failed to gain popularity, *compare* N.J.Reply.Br. 22 (discussing likely spread of regulated items in England), and the fact these weapons were used for combat or to breach the peace has no place in the Federal Government's own test.

The American tradition likewise includes the regulation of disproportionately dangerous items, "after they were used by a single perpetrator to kill multiple people at one time or to inflict terror in communities," while still "preserv[ing] alternative avenues for the legal possession of less inherently dangerous arms for self-defense and other lawful purposes." *NAGR*, 2025 WL 2423599, *13. That history included restrictions on trap guns, dirk and Bowie knives, slungshots, and both semiautomatic and automatic weapons—among others. *See* N.J.Br. 46-52; N.J.Reply.Br. 22-26; *see also, e.g.*, *Bianchi*, 111 F.4th at 446 (emphasizing these laws typically passed after the weapons proliferated, reflecting a tradition of legislative action "once it bec[ame] clear that [the weapon was] exacting an inordinate toll on public safety and societal wellbeing"). The trap gun, for its part, was a "popular" way of deterring crime that involved "rigging … a firearm to discharge when a person unwittingly trip[ped] a string or wire." *Duncan*, 133 F.4th at 875. This combination of features proved so deadly that States like New Jersey determined that this "most dangerous Method of setting Guns has too much prevailed," and therefore banned the use in 1771. JA1113 (Spitzer Rpt. ¶79) (citing 1763-1775 N.J. Laws 346, ch. 539, § 10).

Some of the strongest evidence derives from the 19th Century's widespread restrictions on dirk and Bowie knives, which both fall within the Founding era body of regulations, and reflect how the American tradition of regulation was "'liquidate[d] and settle[d]' by 'a regular course of practice.'" *NAGR*, 2025 WL 2423599, *19 (finding that the "ubiquitous historical restrictions on dirk and Bowie knives exemplify a relevantly similar historical tradition" of "targeting unusually dangerous, novel, and concealable weapons"). Bowie knives reflected "technological advancements" that were originally designed for offensive fighting, "with longer blades, crossguards to protect fighters' hands, and clip points to facilitate cutting or stabbing adversaries." *Id.* These advancements made them popular but "liable to criminal misuse," and they were implicated in "an alarming proportion of the era's murders and serious assaults," including those with "'gruesome' injuries." *Id.* And once they were "used in a widely-publicized act of violence resulting in multiple fatalities," these knives were "singled out" for particularly "severe" regulation—from outright prohibitions, to an "outright ban[]" on their sale, to "severe taxes," to restrictions on open and/or concealed carry. *Id.* at *19-21 (collecting examples); *Hanson*, 120 F.4th at 237; JA1100-01 (Spitzer Rpt. ¶62). And relevant "court decisions indicate that such regulations were considered permissible exercises of state police power—with different states permitted to make

different decisions on how best to protect their citizens." *NAGR*, 2025 WL 2423599, *21; *see also Bianchi*, 111 F.4th at 468 (same).

The Federal Government's brief does not grapple with this evidence,[4] but this history is dispositive. As the Second Circuit observed, these "historical prohibitions on unusually dangerous weapons used in affray and restrictions on the concealed or open carry of unusually dangerous weapons, when accompanied by statutes that imposed taxes on the sale and possession of such weapons, provide an historical tradition of restricting unusual weapons that is relevantly similar to the challenged statutes. Historical legislators regulated these unusually dangerous arms, like here, after observing the regulated weapons' unprecedented lethality." *NAGR*, 2025 WL 2423599, *22. That history disproves the idea that our legal tradition ever turned on a standalone requirement that an arm be "unusual." Instead, our history reflects the principles on which the State relies here: the restriction of weapons after legislatures understood the extreme dangers they pose in civilian hands.

Finally, the "[t]wentieth-century regulation of automatic and semiautomatic weapons continued the relevantly similar tradition of imposing targeted restrictions

---

[4] The Federal Government's treatment of *Aymette v. State*, 21 Tenn. 154 (1840), is illustrative. Its amicus brief suggests that the Tennessee Supreme Court endorsed a test that turned on the commonality of a weapon. U.S.Br. 12, 18. But as the Second Circuit explained, *Aymette* held that "'the Legislature ... ha[d] a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens' that was not impeded by the state constitutional right to bear arms." *NAGR*, 2025 WL 2423599, *21 (quoting 21 Tenn. at 159).

on unusually dangerous weapons after their use in multiple-fatality homicides and terror." *Id.* at \*21. These weapons came on the civilian market in the late 19th and early 20th Centuries, offering private citizens unprecedented access to a firearm with "the power to kill large numbers of people in a short amount of time." JA1373 (Roth Rpt. ¶¶50-53). And these firearms "exacted a devastating toll and garnered extensive national attention." *Bianchi*, 111 F.4th at 469. So in 1925—seven years after the introduction of the 1918 Thompson submachine gun—States started to act. Through 1934, "at least 29 states enacted anti-machine-gun laws" and "ten states restricted semiautomatic weapons." *Id.* at 470. And the Federal Government itself then passed the National Firearms Act of 1934, which "prohibited ownership of machine guns, submachine guns, and short-barreled shotguns." *NAGR*, 2025 WL 2423599, \*21. The Federal Government barely addresses this evidence—other than to acknowledge, as it must, that modern restrictions on machineguns are lawful, while failing to offer a compelling reason why that coheres with its own test. *See supra* at 4-5. But this is more evidence that legislatures can "prevent the use of these especially dangerous variants of otherwise lawful types of weapons in further acts of mass homicide and terror"—and can do so, "in a relevantly similar fashion, by singling out unusually dangerous weapons." *NAGR*, 2025 WL 2423599, \*22.

*    *    *

History is the centerpiece of Second Amendment doctrine, and the historical record reveals a long tradition of regulating disproportionately dangerous weapons even after they have penetrated the civilian market. New Jersey's laws—which seek to keep its citizens safe from such weaponry, consistent with decisions that the States have made during every period of this Nation's history—fit easily within this tradition, as every other circuit to consider the question has held. This Court should decline to reject the thoughtful conclusions of its six sister circuits.

**<u>CONCLUSION</u>**

The en banc Court should affirm the grant of summary judgment in part to the State and reverse the grant of summary judgment in part to Plaintiffs.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:  <u>/s/ Jeremy M. Feigenbaum</u>
Jeremy M. Feigenbaum
Solicitor General

Dated: October 9, 2025

## CERTIFICATION OF BAR MEMBERSHIP

I certify that that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: October 9, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), as well as L.A.R. 31.1(c), I certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii) because this brief contains 4,867 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 word-processing system in Times New Roman, 14 point font.

3. Pursuant to Local Appellate Rule 31.1(c), I certify that the text of the electronic brief is identical to the text of the paper copies.

4. This brief complies with L.A.R. 31.1(c) because the electronic file was scanned with anti-virus software Crowdstrike Falcon Sensor version 7.27.19907.0, and no virus was detected.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: October 9, 2025

## CERTIFICATE OF SERVICE

I certify that on October 9, 2025, the foregoing brief was electronically filed with the clerk of the court with the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, which filing effected service upon counsel of record through the CM/ECF system. I also certify that, per the Court's August 21, 2025 letter, seventeen paper copies identical to the electronically filed brief will be sent to the Clerk of the Court.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: October 9, 2025