**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

Nos. 24-2415, 24-2450, 24-2506

---

ASSOCIATION OF NEW JERSEY RIFLE
AND PISTOL CLUBS, INC., ET AL.,
*Appellants/Cross-Appellees,*

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants,*

———————————

On Appeal from the United States District Court for the
District of New Jersey, Nos. 1:18-cv-10507; 1:22-cv-04360;
1:22-cv-04397 (Hon. Peter G. Sheridan, U.S.D.J.)

———————————

**APPELLEES/CROSS-APPELLANTS SUPPLEMENTAL BRIEF**

———————————

JENNIFER DAVENPORT
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

JAKE MAZEITIS
*Deputy Attorney General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(609) 414-0197
Jeremy.Feigenbaum@njoag.gov

*Attorneys for Appellees/
Cross-Appellants*

# **TABLE OF CONTENTS**

INTRODUCTION...................................................................................1

ARGUMENT ......................................................................................2

## TABLE OF AUTHORITIES

**Page(s)**

*Barnett v. Raoul,*
2026 WL 1982951 (7th Cir. July 9, 2026) .................................................8

*Hanson v. District of Columbia,*
120 F.4th 223 (D.C. Cir. 2024) ..........................................................6, 7

*NAGR v. Lamont,*
153 F.4th 213 (2d Cir. 2025) .................................................................5

*NYSRPA v. Bruen,*
597 U.S. 1 (2022) ........................................................................ passim

*United States v. Hemani,*
146 S.Ct. 1677 (2026) ................................................................... passim

*United States v. Rahimi,*
602 U.S. 680 (2024) ..................................................................... passim

*Voisine v. United States,*
579 U.S. 686 (2016) .............................................................................4

*Wolford v. Lopez,*
2026 WL 1825723 (June 25, 2026)................................................. passim

## INTRODUCTION

Since *NYSRPA v. Bruen*, 597 U.S. 1 (2022), the Supreme Court has thrice made clear that a court's primary task when reviewing a firearm regulation is to identify the "principles that underpin our regulatory tradition." *Wolford v. Lopez*, 2026 WL 1825723, *7 (June 25, 2026). Especially given the "dramatic technological changes" and concomitant safety problems that have emerged since the 1700s, *Bruen*, 597 U.S. at 27, these principles "can[] and must" be identified broadly enough such that legislatures can address "circumstances beyond those the Founders specifically anticipated," *United States v. Hemani*, 146 S.Ct. 1677, 1687 (2026). Otherwise, courts risk "trapp[ing]" the law "in amber," *United States v. Rahimi*, 602 U.S. 680, 691 (2024), even as the People and States grapple with the profound social threats heightened by evolving technology.

That is dispositive here: there is a longstanding and diverse tradition of regulating unusually dangerous firearms—that is, weapons whose features are disproportionately dangerous compared to their civilian self-defense uses. That regulatory tradition dates back to England, finds support in sources like Blackstone, and persisted at all periods in American history—including laws for Bowie knives, slungshots, and machineguns.

That tradition permits a legislature to regulate a modern technology disproportionately contributing to our mass-shooting crisis: assault weapons and LCMs. That is what New Jersey did here.

## **ARGUMENT**

1. *Wolford*, like *Rahimi* and *Hemani*, make clear the breadth of the historical tradition matters—especially when legislatures apply that tradition to evolving technologies and social problems.

Begin with the diverse historical record. In *Rahimi*, the Court confronted whether Congress could enact laws disarming domestic abusers. In defining the relevant historical principle, the Court looked to "two distinct legal regimes"—surety and affray laws. 602 U.S. at 694. Recognizing these laws shared a broad purpose of "address[ing] firearms violence" (the "why"), through wholly different procedural mechanisms (the "how"), the Court identified a broad tradition of disarming those "who threaten physical harm to others from misusing firearms." *Id.* at 690, 694-95.

The tradition's multiple and distinct historical roots were central to the Court's approval of the modern regulation. The Court noted that the modern law was "by no means identical to these founding era regimes"; neither regime disarmed dangerous persons, let alone focused specifically

2

on domestic violence. *Id.* at 698. Still, because the tradition itself included various regulatory approaches to firearm misuse, the Court held that the modern law, although certainly without any historical twin, "fit[] neatly" into the relevant tradition, *id.* at 698, when defined at the "right level of generality," *id.* at 740 (Barrett, J., concurring).

Comparing *Rahimi* to *Wolford* and *Hemani* puts the role of regulatory diversity in stark relief. In each, the Court seriously considered only one single set of regulations. *See Wolford*, 2026 WL 1825723, *12 ("laws [prohibiting] unauthorized hunting"); *Hemani*, 146 S.Ct. at 1686 ("'habitual drunkard' laws"). So the Court's analysis focused on a narrower "'how' and 'why'" undergirding those specific laws. *Wolford*, 2026 WL 1825723, *6. But in *Rahimi*, which involved multiple strands of history, the regulatory principle was substantially broader. For good reason: if a historical legislature dealt with a single issue, it is more difficult to infer an entirely different modern restriction is "consistent with [the] right." *Wolford*, 2026 WL 1825723, *6. By contrast, if multiple historical laws addressed similar problems in different ways, it is more likely a general historical principle swept those policies into some unifying tradition. And while courts should not assume that a prior legislature's inaction implies an absence

3

of authority, *see Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring), adoption of multiple approaches to combat an issue—like misuse of firearms—implies that no specific law perfectly hit the limits of state authority, and instead that the use of other modern tools to ameliorate related problems is "consistent with [the] right." *Wolford*, 2026 WL 1825723, *6.

That is especially true where a modern legislature is confronting a "distinctively modern" problem. *Id.* at *7. Since *Bruen*, the Court has emphasized that courts should identify historical principles at a higher level of generality when challenged regulations "implicat[e] unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27. That is triggered not only when social or technological change presents a novel issue, but also when our understanding of the problem has changed with time. After all, women have "feared [] domestic violence" since the Founding. *Rahimi*, 602 U.S. at 763 (Thomas, J., dissenting). But it is not until relatively recently that legislatures intervened to handle the "potentially deadly combination" of "[f]irearms and domestic strife." *Voisine v. United States*, 579 U.S. 686, 689 (2016). Because *Wolford* understood *Rahimi* as nevertheless involving a "modern" problem, this Court must also be more

4

permissive in defining a tradition when the legislature is responding to new understandings of a longstanding harm.

2. These observations confirm New Jersey's position: our unbroken tradition of regulating "unusually dangerous weapons," which are "disproportionate to the objective of individual self-defense," is capacious and easily sweeps in the challenged laws in this case. *NAGR v. Lamont*, 153 F.4th 213, 222 (2d Cir. 2025); N.J.Br.44-55.

First, the historical record is replete with diverse examples of laws restricting ownership of disproportionately dangerous weapons spanning the common law to the Founding to Reconstruction, including restrictions on possession, manufacture, sale, use, and/or carry of:

- Myriad weapons at common law, including launcegays, crossbows, handguns, hagbuts, and demy hakes, JA4627-34.

- Trap guns in 11 States "in the 1700s-1800s." JA1113-15.

- Bowie knives in all but one State, including after they penetrated the civilian market and were disproportionately used in the craze of illegal dueling. JA1098-107; JA1219-1313.

- Slungshots and clubs in 43 States during the 1800s because they were "widely used" for criminal ends. JA1110-11.

- Pistols in nearly every State after their widespread proliferation due to widespread criminal use. JA1359-70.

5

- Machineguns and semiautomatic firearms in at least 29 States and at the federal level in the early 20th Century. JA1373.

Taken together, this small sample of the voluminous record proves that States have long regulated in response to the proliferation of unusually dangerous weapons, including by restricting their possession. The multiplicity and diversity of these laws suggest, just as in *Rahimi*, that no single law reached the outer boundaries of acceptable state authority. Instead, the varied means States employed—consistent with our federalist system—together affirm that New Jersey's approach "fits neatly" within the regulatory tradition. *Rahimi*, 602 U.S. at 698.

That extensive, diverse, and unbroken history particularly benefits New Jersey where, as here, it is responding to an "unprecedented societal concern" fostered by the "dramatic technological change" of assault weapons and LCMs: "mass shootings." *Hanson v. District of Columbia*, 120 F.4th 223, 241-42 (D.C. Cir. 2024). "[T]here is no known occurrence of a mass shooting resulting in double-digit fatalities" from 1776 to 1948, JA1641, but they have been on the rise, "increas[ing] over six-fold" just since expiration of the Federal Assault Weapons Ban in 2004, JA 1644. And it strains credulity to say that, because our Founders did not con-

front modern mass shootings, the People today (acting through their state legislatures) would now be powerless to prevent them.

Instead, that is precisely what the tradition of regulating unusually dangerous weaponry allows: it supplies the governing principle that still "appl[ies] to circumstances beyond those the Founders specifically anticipated," *Hemani*, 146 S.Ct. at 1687, but places careful guardrails on laws that leave individuals without sufficient tools for self-defense. That principle is particularly well represented by Bowie knife laws, where legislatures responded to the proliferation of Bowie knives and their contributions to dueling with myriad restrictions including on possession while still leaving nearly all self-defense tools available. And so it covers laws for assault weapons and LCMs that "enabled mass shootings to a degree impossible with Founding or Reconstruction era weapons," *Hanson*, 120 F.4th at 242, while leaving other firearms available. By looking to the principles rather than demanding a perfect match, legislatures still have the breathing room to respond to solve "distinctively modern" threats like mass shootings or domestic violence. *Wolford*, 2026 WL 1825723, *7. History thus avoids becoming a "straightjacket." *Bruen*, 597 U.S. at 30.

7

In short, *Wolford* and *Hemani*, building on *Rahimi*, make clear this Court is charged with identifying historical principles—not perfect historical matches—that allow legislatures to address evolving problems today. Given the strength of New Jersey's historical and evidentiary record, the cases confirm that legislatures can limit evolving weapons that cause unusual, disproportionate public-safety threats, including by restricting the evolving technologies— like AR-15s and LCMs—that enable the modern crisis of mass shootings. Said another way, the People have long been free to use the democratic process to protect themselves from such unusually dangerous weapons. *Wolford*, *Hemani*, and *Rahimi* collectively confirm that this Court should join its six sister circuits—including a ruling yesterday in *Barnett v. Raoul*, 2026 WL 1982951 (7th Cir. July 9, 2026)—and hold that New Jersey's assault weapons and LCM laws are simply another iteration of that long tradition.

Respectfully Submitted,

JENNIFER DAVENPORT
Attorney General of New Jersey

By:  /s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: July 10, 2026

8

## **CERTIFICATE OF BAR MEMBERSHIP**

I certify that that I am a member in good standing of the bar of the

United States Court of Appeals for the Third Circuit.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: July 10, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), as well as L.A.R. 31.1(c), I certify that:

1. This brief complies with the Court's July 6, 2026 Order because this brief contains 1,488 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 word-processing system in Century Schoolbook, 14 point font.

3. The text of the electronic brief is identical to the text of the paper copies.

4. The electronic file was scanned with anti-virus software Crowdstrike Falcon Sense version 7.38.21003.0 and no virus was detected.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: July 10, 2026

## CERTIFICATE OF SERVICE

I certify that on July 10, 2026, the foregoing brief was electronically filed with the clerk of the court with the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, which filing effected service upon counsel of record through the CM/ECF system.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: July 10, 2026