# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

Nos. 24-2415, 24-2450 & 24-2506

—————————

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS,
INC.; BLAKE ELLMAN; MARC WEINBERG

v.

ATTORNEY GENERAL NEW JERSEY; SUPERINTENDENT NEW
JERSEY STATE POLICE; OFFICER IN CHARGE OF THE CHESTER
POLICE DEPARTMENT; CHIEF OF POLICE OF THE PARK RIDGE
POLICE DEPARTMENT

(D.C. No. 1:18-cv-10507)

MARK CHEESEMAN; TIMOTHY CONNELLY;
FIREARMS POLICY COALITION, INC.,
Appellants in No. 24-2415

v.

ATTORNEY GENERAL NEW JERSEY; SUPERINTENDENT NEW
JERSEY STATE POLICE;  GLOUCESTER COUNTY PROSECUTOR;
OCEAN COUNTY PROSECUTOR,
Appellants in No. 24-2450

(D.C. No. 1:22-cv-04360)

BLAKE ELLMAN; THOMAS R. ROGERS; ASSOCIATION OF NEW
JERSEY RIFLE AND PISTOL CLUBS, INC.; MARC WEINBERG,
Appellants in No. 24-2506

v.

ATTORNEY GENERAL NEW JERSEY; SUPERINTENDENT NEW
JERSEY STATE POLICE;  OFFICER IN CHARGE OF THE CHESTER
POLICE DEPARTMENT; CHIEF OF THE WALL
TOWNSHIP POLICE DEPARTMENT

(D.C. 1:22-cv-04397)

_____

Appeal from the U.S. District Court, D.N.J.
Judge Peter G. Sheridan

Before: CHAGARES, *Chief Judge*, HARDIMAN, SHWARTZ,
KRAUSE, RESTREPO, BIBAS, PORTER, MATEY, PHIPPS,
FREEMAN, MONTGOMERY-REEVES, CHUNG, BOVE,
MASCOTT, and SMITH, *Circuit Judges*

Argued before Merits Panel July 1, 2025
Argued en banc Oct. 15, 2025
Decided July 17, 2026

_____

OPINION OF THE COURT

2

FREEMAN, *Circuit Judge*, filed the Opinion of the Court with whom CHAGARES, *Chief Judge*, and HARDIMAN, BIBAS, PORTER, MATEY, MONTGOMERY-REEVES, and BOVE, *Circuit Judges*, join, and with whom PHIPPS, *Circuit Judge*, joins in part. MATEY, *Circuit Judge*, filed a concurring opinion with whom MASCOTT, *Circuit Judge*, joins. PHIPPS, *Circuit Judge*, filed an opinion concurring in part and concurring in the judgment. MONTGOMERY-REEVES, *Circuit Judge*, filed a concurring opinion. MASCOTT, *Circuit Judge*, filed an opinion concurring in part and concurring in the judgment. CHUNG, *Circuit Judge*, filed an opinion concurring in part and dissenting in part. SHWARTZ, *Circuit Judge*, filed a dissenting opinion with whom KRAUSE, RESTREPO, and SMITH, *Circuit Judges*, join. KRAUSE, *Circuit Judge*, filed a dissenting opinion with whom RESTREPO and SMITH, *Circuit Judges*, join. SMITH, *Circuit Judge*, filed a dissenting opinion.

New Jersey criminalizes the possession of a class of weapons that the State labels "assault firearms." The State also restricts the possession of what it labels "large capacity ammunition magazines" (LCMs), which it currently defines as magazines that can hold more than 10 rounds of ammunition. We will refer to those laws as the "Assault Firearm Provisions" and the "LCM Provisions," respectively.

In three separate lawsuits, gun owners and groups advocating for gun rights challenged both laws under the Second Amendment. One of those lawsuits also challenged the LCM Provisions under the Fifth Amendment's Takings Clause. The District Court consolidated the three cases and resolved them on cross-motions for summary judgment.

When it addressed the Assault Firearm Provisions, the District Court focused its analysis on one brand and model of prohibited firearm: the Colt AR-15. It determined that New Jersey's ban on Colt AR-15s violates the Second Amendment. When it turned to the LCM Provisions, it held that the law does not violate the Second Amendment or the Takings Clause.

Applying the framework announced in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), we agree with the District Court that New Jersey's ban on Colt AR-15s violates the Second Amendment. However, because the record supports the same result for all semi-automatic rifles—not only Colt AR-15s—we will MODIFY the District Court's order so that it deems the Assault Firearm Provisions unconstitutional with respect to the full class of semi-automatic rifles. We will AFFIRM that part of the order as modified.

The LCM Provisions also violate the Second Amendment, so we will REVERSE the District Court's order with respect to those. Because the LCM Provisions violate the Second Amendment, we need not address the Takings Clause challenge.

We will REMAND these matters to the District Court for further proceedings, including for resolution of the Second Amendment challenge to the other models and types of firearms covered by the Assault Firearm Provisions.

## I.

### A.

New Jersey passed the Assault Firearm Provisions and the LCM Provisions in 1990. 1990 N.J. Sess. Law Serv. Ch.

32 (West) (the "Act").  The regulations were inspired, in part, by a high-profile mass shooting at a California elementary school that left five children dead and thirty-three others injured.  As New Jersey's governor at the time explained, "guns capable of wholesale destruction are a direct threat to our police, our citizens and especially our children," and the Act aimed to ensure that "no one can walk off the street and purchase a gun that is designed to wipe out the greatest number of people in the shortest possible time."  App. 4651–52.

Under the Act's Assault Firearm Provisions, it is a crime in New Jersey to knowingly possess an unlicensed assault firearm.  *See* N.J. Stat. Ann. § 2C:39-5(f).[1]  The Act defines "assault firearm" to include a list of over thirty models and types of semi-automatic rifles, pistols, and shotguns, plus any firearm "substantially identical to any of the firearms listed."  *Id.* § 2C:39-1(w)(1)–(2).  The Act also includes descriptions of features that make a weapon an "assault firearm," *id.* § 2C:39-1(w)(3)–(6), resulting in the current definition:

w. "Assault firearm" means:

(1)    The following firearms:

[listing numerous models and types, including the "Colt AR-15 and CAR-15

---

[1] All citations to New Jersey statutes refer to the version of the statutes in effect as of June 13, 2018, unless otherwise indicated.  *See* 2018 N.J. Sess. Law Serv. Ch. 39 (West).

5

series"];[2]

(2)    Any firearm manufactured under any designation which is substantially identical to any of the firearms listed above.[3]

(3)    A semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock.

(4)    A semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds [except] . . . a semi-automatic rifle which has an attached tubular device and which is capable of operating

---

[2] The complete list is reproduced at Appendix A.

[3] In 1996, the New Jersey Attorney General issued guidance about the characteristics that make semi-automatic rifles, pistols, and shotguns "substantially identical" to those on the list of banned firearms.  For example, a semi-automatic rifle is "substantially identical" to a listed weapon if it "has the ability to accept a detachable magazine" and at least two of the following characteristics: (1) "a folding or telescoping stock," (2) "a pistol grip that protrudes conspicuously beneath . . . the weapon," (3) "a bayonet mount," (4) "a flash suppressor" or a "barrel designed to accommodate [one]," and (5) "a grenade launcher."  Att'y Gen. Peter Verniero, *Guidelines Regarding the "Substantially Identical" Provision* (Aug. 19, 1996), https://perma.cc/337W-82Q9.

only with .22 caliber rimfire ammunition.[4]

(5)    A part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person.

(6)    A firearm with a bump stock attached.

*Id.* § 2C:39-1(w).

The Act allows for individuals to receive licenses to purchase, possess, or carry an assault firearm. However, a person can receive such a license only if a state court determines (after a hearing, investigation, and recommendation of a county prosecutor) "that the public safety and welfare . . . require" the issuance of that license. *Id.* §§ 2C:58-5(a)–(b), 2C:39-5(f). The parties challenging the Assault Firearm Provisions submit—and New Jersey does not dispute—that no one in the State has ever received a license for an assault firearm.

The exemptions from the law are narrow. Individuals in the military or law enforcement are exempt from the criminal provisions of the Act. *Id.* § 2C:39-6(a), (j). And people who own certain "assault firearms determined by the Attorney General to be legitimate for target-shooting

[4] Until the 2018 amendments to the Act, this provision read: "(4) A semi-automatic rifle with a fixed magazine capacity exceeding 15 rounds." *See* 2018 N.J. Sess. Law Serv. Ch. 39 (West); *see also infra* pp. 9–10.

purposes" may register and lawfully possess those firearms only if they satisfy several requirements. Among other things, they must have purchased said firearms on or before May 1, 1990 (the date when the Act took effect), be members of a rifle or pistol club that existed before the Act took effect, and have joined the rifle or pistol club no more than 210 days after the Act took effect. *Id.* § 2C:58-12(a)–(b).

Owners of assault firearms may avoid criminal liability by rendering those weapons inoperable. But absent licensure or registration under the strict terms described above, a civilian who knowingly possesses an *operable* assault firearm in New Jersey commits a crime punishable by up to ten years' imprisonment and a $150,000 fine. *Id.* §§ 2C:39-5(f), 2C:43-3(a)(2), 2C:43-6(a)(2).

The Act also includes the LCM Provisions. Those provisions restrict the possession of LCMs to a narrow class of individuals: those who (a) possess licensed "assault firearms" and (b) only use the magazine in connection with competitive shooting events sanctioned by a United States Army official. *Id.* § 2C:39-3(j).

When passed in 1990, the Act defined "large capacity" to mean capable of holding more than 15 rounds of ammunition. *Id.* § 2C:39-1(y) (1990) ("'Large capacity ammunition magazine' means a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm."). But in 2018, in response to an increased threat of mass shootings, New Jersey amended the Act to define "large capacity . . . magazine" as one capable of holding more than 10 rounds of ammunition. *See* 2018 N.J. Sess. Law Serv. Ch. 39 (West) (codified as amended at N.J.

Stat. Ann. § 2C:39-l(y)). The 2018 amendments gave New Jersey residents 180 days to either voluntarily surrender to the government any magazines that could hold more than 10 rounds; transfer those magazines to someone legally entitled to possess them; render those magazines inoperable; or permanently modify them to accept 10 or fewer rounds. N.J. Stat. Ann. § 2C:39-19. The 2018 amendments contain exemptions for firearms purchased before the amendments' effective date that have "a fixed magazine capacity of up to 15 rounds" or that "only accept[ ] a detachable magazine with a capacity of up to 15 rounds" that cannot be modified to comply with the amendment's 10-round limit, *id.* § 2C:39-20, as well as for the magazines that such firearms require, *id.* § 2C:39-3(j)(2).[5]

## B.

When New Jersey amended the LCM Provisions in 2018 to lower the maximum lawful capacity from 15 rounds to 10, the Association of New Jersey Rifle & Pistol Clubs and two of its members (collectively, the "ANJRPC Plaintiffs") sued the State's Attorney General and three police officials (collectively, "New Jersey" or the "State"), asserting that the LCM Provisions violate the Second Amendment and the Fifth Amendment's Takings Clause. Soon after filing suit, the ANJRPC Plaintiffs filed a motion for a preliminary injunction against the enforcement of the LCM Provisions. After an evidentiary hearing, the District Court denied that motion, concluding the plaintiffs were not likely to succeed on the

---

[5] The exemptions to the Assault Firearm and LCM Provisions both require that the owner of an exempt firearm register it with the State. N.J. Stat. Ann. §§ 2C:39-3(j)(2); 2C:39-20.

merits. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal* ("*ANJRPC I*"), No. 3:17-cv-10507, 2018 WL 4688345, at *13 (D.N.J. Sept. 28, 2018).

We affirmed that order on appeal. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.* ("*ANJRPC II*"), 910 F.3d 106, 110 (3d Cir. 2018). Under our then-binding precedent from *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), we applied intermediate scrutiny to the LCM Provisions and held that they did not violate the Second Amendment. *ANJRPC II*, 910 F.3d at 122.[6] We also rejected the Takings Clause claim. *Id.* at 124. We reasoned that the LCM Provisions did not effect a physical taking because owners could sell their over-10-round magazines, modify them, or register any magazines that could not be modified. *Id.* We determined there was no regulatory taking because magazines capable of holding 10 or fewer rounds could still function. *Id.* at 124–25.[7]

Following a remand, the District Court granted summary judgment to New Jersey. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal* ("*ANJRPC III*"),

---

[6] In a dissent, one of our colleagues contended that we should have applied strict scrutiny to the Second Amendment claim, though the LCM Provisions did not withstand even intermediate scrutiny. *ANJRPC II*, 910 F.3d at 127–30 (Bibas, J., dissenting). The dissent did not address the Takings Clause claim.

[7] The ANJRPC Plaintiffs also brought an unsuccessful Fourteenth Amendment equal protection claim based on the exceptions for law enforcement. They do not re-raise their equal protection claim here.

No. 3:18-cv-10507, 2019 WL 3430101 (D.N.J. July 29, 2019). In a short opinion, the District Court explained that summary judgment was appropriate because there were no genuine disputes of material fact and because our opinion in *ANJRPC II* "resolve[d] all legal issues" in the case. *Id.* at *3.

The ANJRPC Plaintiffs appealed the summary judgment order, and we affirmed it. *See Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.* ("*ANJRPC IV*"), 974 F.3d 237 (3d Cir. 2020), *cert. granted, judgment vacated sub. nom.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (2022). We explained that, when we addressed the preliminary injunction issue in *ANJRPC II*, our opinion went "beyond the question of likelihood of success and declared a holding on the merits." *Id.* at 246. In other words, in the prior appeal, we "held very plainly that the [LCM Provisions] do[] not violate the Second Amendment [or] the Fifth Amendment's Takings Clause." *Id.* Because our holding in the prior appeal was not clearly wrong or manifestly unjust, we determined that it bound us under the law-of-the-case doctrine. *Id.* at 247.[8]

The ANJRPC Plaintiffs petitioned for certiorari. After the Supreme Court decided *Bruen*, it granted the certiorari petition, vacated our judgment in *ANJRPC IV*, and remanded the matter to us for further consideration in light of *Bruen*. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct.

---

[8] In a dissent from our *ANJRPC IV* opinion, one of our colleagues opined that we should reconsider our precedent under which intermediate scrutiny applies to Second Amendment cases. *See ANJRPC IV*, 974 F.3d at 248–63 (Matey, J., dissenting).

2894 (2022).  In turn, we remanded the case to the District Court "for further record development, targeted at the legal and historical analysis required under *Bruen*."  *See Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen. N.J.*, No. 19-3142, 2022 WL 22860232, at *1 n.1 (3d Cir. Aug. 25, 2022).

The *Bruen* decision also prompted challenges to the Assault Firearm Provisions.  On the day *Bruen* was decided, Mark Cheeseman, Timothy Connolly, and the Firearms Policy Coalition (collectively, the "Cheeseman Plaintiffs") challenged the Assault Firearm Provisions under the Second Amendment.  One week later, ANJRPC and two of its individual members (the "Ellman Plaintiffs") filed their own challenge to the Assault Firearm Provisions.[9]  The District Court consolidated all three cases.  Following discovery, the parties cross-moved for summary judgment, and the District Court issued an order and opinion resolving all three cases.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin* ("*ANJRPC V*"), 742 F. Supp. 3d 421 (D.N.J. 2024).  That is the decision currently on appeal.

The District Court began its analysis by limiting the scope of its assault-firearm decision to the Colt AR-15.  *Id.* at 424–25.  It explained that it did so because "the information presented to the Court focuse[d] largely on . . . the [Colt]

---

[9] At summary judgment, the Ellman Plaintiffs did not challenge the restrictions on parts "designed or intended to convert a firearm into an assault firearm" or from which an assault firearm could be "readily assembled," nor did they challenge the state's ban on firearms with bump stocks attached.

AR-15,"[10] and each of the other firearms regulated by the Assault Firearm Provisions presented "nuances" that the Court was not equipped to examine. *Id.* at 424.

Applying the *Bruen* framework to the Colt AR-15, the District Court first determined that the plain text of the Second Amendment "covers Plaintiffs' proposed course of conduct—the possession and use of [Colt] AR-15s within the home for self-defense." *Id.* at 442–43.[11]    Next, the District Court determined that New Jersey's restrictions on possessing the Colt AR-15 "cannot stand since [they are] inconsistent with our Nation's historical tradition of firearm regulation." *Id*. at 445. It reasoned that the "AR-15 Provision acts effectively as the total prohibition on a commonly used firearm for self-defense . . . within the home," which it deemed "impermissible under the plain text of [*District of Columbia v. Heller*, 554 U.S. 570 (2008)]." *Id.* at 446.

Turning to the LCM Provisions, the District Court followed our opinion in *ANJRPC II*, which said LCMs are "Arms" within the meaning of the Second Amendment. *Id.* at 448; *see ANJRPC II*, 910 F.3d at 116 ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."). It

---

[10] Although the District Court referred to "the AR-15" in its analysis, it explained that its decision does not reach beyond the AR-15 manufactured by Colt. *ANJRPC V*, 742 F. Supp. 3d at 425 nn.4 & 5.

[11] As we discuss below, Plaintiffs seek to possess these weapons for lawful purposes including, but not limited to, self-defense.

then determined that the Nation has a historical tradition of restricting certain arms (though not banning them outright) in response to safety concerns of the time. *ANJRPC V*, 742 F. Supp. 3d at 451–52. It reasoned that the LCM Provisions achieve New Jersey's stated purpose of "effectively slow[ing] down a mass shooter" without resorting to an outright ban, so those provisions comport with the Second Amendment. *Id.* at 452. Finally, the District Court reasoned that nothing about *Bruen* disrupted our Fifth Amendment Takings Clause analysis in *ANJRPC IV*, so the LCM Provisions do not violate that clause. *Id.* at 452–53.

All parties cross-appealed the District Court's summary judgment order, and we consolidated those appeals. We heard oral argument as a three-judge panel in July 2025, and we reheard the appeals en banc in October 2025.[12]

---

[12] Some members of our Court would opt not to decide these consolidated appeals because the Supreme Court will address the constitutionality of AR-15 bans next term. *See* Krause Op. at 3, 30; Montgomery-Reeves Op. at 1–3; *Viramontes v. Cook County*, No. 24-1437, 2025 WL 1553896 (7th Cir. June 2, 2025), *cert. granted*, --- S. Ct. ----, 2026 WL 1871322 (June 30, 2026); *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025), *cert. granted sub nom.*, *Grant v. Higgins*, --- S. Ct. ----, 2026 WL 1871312 (June 30, 2026). But our decision in these cases resolves a question the Supreme Court has not committed to addressing: the constitutionality of a law restricting possession of magazines that can hold more than 10 rounds of ammunition. Moreover, despite one party notifying us of the Supreme Court's grant of certiorari to address AR-15

## II.[13]

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court determined that the Second Amendment's language "confer[s] an individual right to keep and bear arms." 554 U.S. 570, 595 (2008).

Soon after *Heller*, the Court clarified that the "Due

---

bans, to date no party to these long-pending cases has asked us to hold our decision pending the Supreme Court's decision.

[13] The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).  We have jurisdiction under 28 U.S.C. § 1291.  We review a district court's order resolving cross-motions for summary judgment de novo. *Spivack v. City of Philadelphia*, 109 F.4th 158, 165 (3d Cir. 2024).  When we do so, we apply "the same standards and presumptions as the District Court." *Mid-Century Ins. Co. v. Werley*, 114 F.4th 200, 207 (3d Cir. 2024) (citation modified).  That is, we ask whether, "viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016); Fed. R. Civ. P. 56(a).  When presented with cross-motions for summary judgment, "courts must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Spivack*, 109 F.4th at 166 n.5 (citation modified).

Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The individual right is incorporated against the states because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778.

In *Heller*, after the Supreme Court addressed the meaning of the Second Amendment, the Court turned to the law at issue in that case: a District of Columbia law that (1) "totally ban[ned] handgun possession in the home," and (2) "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. at 628. It summarized the handgun ban as "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [self-defense]," and a prohibition that "extends . . . to the home, where the need for defense of self, family, and property is most acute." *Id.* It concluded that, "[u]nder any of the standards of scrutiny . . . applied to enumerated constitutional rights," the handgun ban "would fail constitutional muster." *Id.* at 628–29.

As for the prohibition on operable firearms in the home, the Court noted that the provision "ma[de] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense." *Id.* at 630. Thus, that prohibition also violated the Second Amendment—at least as applied to the handgun the respondent, Dick Heller, wished to possess in his home for purposes of self-defense. *Id.*; *see also id.* at 575–76 & n.2.

For several years, our Court and our sister circuits interpreted *Heller* to require means-end scrutiny as a part of the

Second Amendment analysis. *See Marzzarella*, 614 F.3d at 89; *Bruen*, 597 U.S. at 17 ("[T]he Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."). As it turns out, we all missed the mark.

In *Bruen*, the Supreme Court clarified that means-end scrutiny has no place in *Heller*'s methodology. *Bruen*, 597 U.S. at 19. Instead, courts must approach Second Amendment cases under a different two-step framework. At the first step, we ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If the answer is yes, then "the Constitution presumptively protects that conduct," and the government cannot "justify its regulation" by "simply posit[ing] that the regulation promotes an important interest." *Id.* Instead, at the second step the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* If the regulation is not consistent with that historical tradition, it cannot stand. *Id.*

The government may carry its burden at *Bruen*'s second step by demonstrating that "relevantly similar . . . modern and historical regulations impose a comparable burden on the right of armed self-defense" and that the burden imposed is "comparably justified." *Id.* at 29. In comparing modern and historical regulations, we consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* Still, the Supreme Court warned against overly stringent analogical reasoning. It explained that the historical analysis "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30. Thus, a modern

regulation need not be a "dead ringer" for a historical one to survive Second Amendment scrutiny.  *Id.*

After clarifying the proper methodology in *Bruen*, the Supreme Court applied that methodology to the contested regulation: a New York State law limiting the public carry of handguns to individuals who could prove "a special need for self-protection distinguishable from that of the general community."  *Id.* at 11–12 (quoting *In re Klenosky*, 428 N.Y.S.2d 256, 257 (App. Div. 1980)).  Under that state law, mere desire to carry handguns in public for self-defense did not suffice.  *Id.* at 12–13, 15–16.

As a threshold matter, the Court noted the lack of dispute about whether the law's challengers—"two ordinary, law-abiding, adult citizens"—were "part of 'the people' whom the Second Amendment protects."  *Id.* at 31–32.[14]  The Court then turned to a disputed question in the first step of the inquiry: "whether the plain text of the Second Amendment protects [the challengers'] proposed course of conduct—carrying handguns publicly for self-defense."  *Id.* at 32.  The Court had "little difficulty concluding that it does."  *Id.*  "After all, the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home."  *Id.* at 33 (citation omitted) (quoting *Heller*, 554 U.S. at 592).

At the second step of the inquiry, the Court conducted a lengthy examination of the historical regulations New York

---

[14] The Court also said there was no dispute that "handguns are weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627).

invoked in support of its law.  *Id.* at 33–70.  It summarized: "Apart from . . . outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense," or "required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community in order to carry arms in public."  *Id.* at 70 (citation modified).  Because there was no historical analogue for *how* New York chose to regulate firearms, the Court concluded that New York did not carry its "burden to identify an American tradition justifying the State's [public-carry regulation]."  *Id.*[15]

Two years after *Bruen*, the Court provided additional detail about how to apply the Second Amendment framework. In *United States v. Rahimi*, the Court clarified that the methodology in *Bruen* was "not meant to suggest a law trapped in amber."  602 U.S. 680, 691 (2024).  Rather, just as the Second Amendment "is not limited only to those arms that were in existence at the founding," the Amendment also "permits more than just those regulations identical to ones that could be found in 1791."  *Id.* at 691–92.  Thus, courts must ask "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."  *Id.* at 692. We do so by addressing the "central" considerations: "[w]hy and how the regulation burdens the [Second Amendment]

---

[15] In *Bruen*, the Court did not explicitly address whether there was a historical analogue for *why* New York enacted its firearm law.  Nonetheless, it observed that New York's law sought to address "handgun violence, primarily in urban areas," 597 U.S. at 27 (citation modified), and it did not distinguish any of the historical regulations it examined on the grounds of dissimilar "whys," *see id.* at 42–60.

right." *Id.*

In *Rahimi*, the Court addressed a Second Amendment challenge to a federal law that bans firearm possession by an individual subject to a domestic violence restraining order if that order includes a finding that the individual represents a credible threat to the physical safety of an intimate partner. 602 U.S. at 684–85. The Court determined that the provision is relevantly similar to historical regulations in *why* it burdens the Second Amendment right. It discussed historical surety and affray laws, which demonstrate that, "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 694. The Court also determined that our Nation's historical tradition supports *how* the provision seeks to accomplish its goal: by temporarily disarming a person after an individualized assessment that he poses a credible threat to the physical safety of others. *Id.* at 699–700. Because the "why" and the "how" of the provision "fit[ ] comfortably" within our Nation's tradition of weapons regulations, the law withstood Second Amendment scrutiny. *Id.* at 690.[16]

---

[16] The Supreme Court also applied this framework in *United States v. Hemani*, 146 S. Ct. 1677 (2026). There, a man who uses marijuana about every other day challenged his federal prosecution for possessing a firearm as an "unlawful user of . . . [a] controlled substance." *Id.* at 1684–85 (quoting 18 U.S.C. § 922(g)(3)). The Court determined that the government's proffered analogues—vagrancy, civil-commitment, and surety laws (categories of what the government called "habitual drunkard laws")—were not

This term, in *Wolford v. Lopez*, the Supreme Court refined the framework set forth in *Bruen*. *Wolford*, No. 24-1046, --- S. Ct. ----, 2026 WL 1825723 (U.S. June 25, 2026). It explained the plain-text analysis required at *Bruen*'s first step "entails three subsidiary questions": whether (1) the law applies to "the people," defined to mean "all members of the political community, *id.* at \*6 (quoting *Heller*, 554 U.S. at 580); (2) the law concerns "any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes," *id.*; and (3) the law restricts "either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms," *id.* (alterations in original).

The Court also elaborated on *Bruen*'s second step: where the government has an opportunity to "show that its challenged law did not infringe the historical understanding of the codified right." *Id.* It explained that courts evaluating historical analogues should consider three factors: (1) the number of jurisdictions in which the historical restrictions were adopted, (2) the extent to which the historical restrictions were well-accepted, whether expressly or tacitly, and (3) whether the historical restrictions are "relevantly similar" to the modern challenged law. *Id.* (quoting *Bruen*, 597 U.S. at 29). To be relevantly similar, "the 'how' and 'why' of the historical analogue and modern regulation must be close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right.'" *Id.*

---

relevantly similar to the "why" or the "how" of the modern law. *Id.* at 1687–92, 1694.

Applying this framework in *Wolford*, the Court struck down a Hawaii law that required anyone carrying a firearm on private property to have the express consent of the property owner. *Id.* at *7–8. The Court concluded that the restriction easily fell within the Second Amendment's plain text, so it proceeded to *Bruen*'s second step. *Id.* at *9–10. There, it rejected the state's historical analogues, which were primarily laws prohibiting unauthorized hunting of game on someone else's property. *Id.* at *12–13. Those historical laws were not relevantly similar in *why* they were enacted. Targeted at unauthorized hunting, those laws aimed to prevent theft of game and the firing of guns that could inflict injury or disturb others on private property. *Id.* at *13. But Hawaii's modern law does not address any of those unwanted effects. *Id.* The historical laws also were not relevantly similar in *how* they functioned. They applied only "to land where game could be found, not retail establishments that residents of cities and suburbs frequent as part of their daily routines." *Id.*[17]

In the years since the Supreme Court announced the historical inquiry required under *Heller* and its progeny, it has

---

[17] The Court also rejected two other "weaker" historical analogues. *Wolford*, 2026 WL 1825723, at *13. It explained that, even if an 1893 Oregon statute could be read to prohibit the carrying of weapons in commercial establishments, "a lone statute adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment sheds little if any light on the meaning of the Second Amendment right." *Id.* And an 1865 Louisiana law that prohibited the carrying of weapons on the "premises or plantations" of another person without their consent was "neither widespread nor widely accepted." *Id.* at *14.

not needed to address which historical period—the 1791 adoption of the Bill of Rights or the 1868 ratification of the Fourteenth Amendment—courts should primarily look to when considering the Second Amendment as incorporated against the States. *See Bruen*, 597 U.S. at 37–38; *Rahimi*, 602 U.S. at 692 n.1. But we have. In *Lara v. Commissioner Pennsylvania State Police*, we assessed a Pennsylvania law that "effectively ban[ned] 18-to-20-year-olds from carrying firearms outside their homes during a state of emergency." 125 F.4th 428, 431 (3d Cir. 2025). When conducting the historical inquiry, we saw that the principles underpinning Founding-era firearm regulations pointed in one direction while the principles underpinning mid-to-late-nineteenth century laws pointed in the opposite direction. *Id.* at 441. Faced with an "irreconcilable conflict" between the laws of those two timeframes, we concluded that we must look to Founding-era laws for analogies to modern-day regulations. *Id.* at 441–42. We reached that conclusion based on the Supreme Court's guidance that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Id.* at 441 (quoting *Bruen*, 597 U.S. at 28).[18] Under *Lara*, we consider historical examples from "before, during, and even after the founding," while "guard[ing] against giving postenactment history more weight than it can rightly bear." *Id.* at 434 (quoting *Bruen*, 597 U.S. at 27, 34–35).

---

[18] We also noted the Supreme Court's statement that it has "generally assumed that the scope of the protection[s] applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Lara*, 125 F.4th at 441 (alteration in original) (quoting *Bruen*, 597 U.S. at 37).

As the Supreme Court explained in *Bruen*, the historical inquiry is "fairly straightforward" in some cases. 597 U.S. at 26. For instance, if "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem" is evidence that the challenged regulation violates the Second Amendment. *Id.*

*Heller* is an example of such a straightforward case. *Id.* at 27. *Heller* involved a "flat ban on the possession of handguns in the home" that the District of Columbia enacted to address the "perceived societal problem [of] firearm violence in densely populated communities." *Id.* As the *Bruen* Court explained, the ban at issue in *Heller* was a regulation "that the Founders themselves could have adopted to confront that problem." *Id.* Yet the Court found no analogous laws in "founding-era historical precedent," so it concluded that the District of Columbia's ban was unconstitutional. *Id.* (quoting *Heller*, 554 U.S. at 631).

*Bruen*, too, required only a straightforward historical inquiry. *Id.* ("[T]he historical analogies here and in *Heller* are relatively simple to draw"). The Court assessed a restriction on the public carry of firearms that New York enacted to address "the same alleged societal problem addressed in *Heller*: 'handgun violence,' primarily in 'urban area[s].'" *Id.* (quoting *Heller*, 554 U.S. at 634). The Court determined that New York's regulation violated the Second Amendment for the same reason as the regulation in *Heller*: there was no Founding-era precedent comparable to the modern regulation. *Id.*

The Supreme Court acknowledged that not all historical analogies are as straightforward as those in *Bruen* and *Heller*.

*See id.* In *Wolford*, the Supreme Court observed that the law it addressed in *Rahimi* "involved conduct that was distinctively modern: the possession of a firearm by a person against whom a domestic violence restraining order had been issued," and thus "called for a more difficult exercise of judgment." *Wolford*, 2026 WL 1825723, at *7. And in *Bruen*, the Court noted that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. To date, however, the Supreme Court has not had occasion to apply that nuanced approach.

## III.

"[T]he Second Amendment right . . . extends only to certain types of weapons." *Heller*, 554 U.S. at 623. Here, the parties dispute whether the weapons New Jersey labels "assault firearms" and "large capacity ammunition magazines" are protected by the Second Amendment. Part of that dispute centers on the Supreme Court's use of the phrase "in common use."

### A.

The first Second Amendment case in which the Court used the phrase "in common use" was *United States v. Miller*, 307 U.S. 174 (1939). There, the Court upheld a regulation prohibiting the interstate transport of short-barreled shotguns. The Court recounted that, at the time of the Founding, men called for militia service "ordinarily . . . were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 179.

The Court used the phrase again in *Heller* when it sought to explicate which weapons are covered by the Second

Amendment.  It quoted the foregoing language from *Miller*, and it added that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."  *Heller*, 554 U.S. at 624; *see also id.* at 627 ("[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty.").  It explained that this language from *Miller* goes to the scope of the Second Amendment right:  "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Id.* at 625.  And *Miller*'s language about protecting "the sorts of weapons . . . 'in common use at the time,'" *id.* at 627 (quoting *Miller*, 307 U.S. at 179), is "supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.*

Later, in *Bruen*, the Court again addressed "in common use."  It recounted that *Heller* "explained . . . that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'"  *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627).  Turning to the handgun ban at issue in *Bruen*, the Court wrote, "Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today."  *Id.*  "Thus, even if . . . colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."  *Id.*

26

The Court's discussion of "in common use" illuminates several points.  First, although the Court sometimes uses only the three-word phrase "in common use," that phrase means *in common use for lawful purposes at the time of the modern restriction*.  The lawful-purposes component of this meaning draws directly from *Heller*, which clarifies that weapons typically used for *unlawful* purposes fall outside the Second Amendment's scope.   554 U.S. at 625 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." (discussing *Miller*, 307 U.S. at 179)).

Second, self-defense is one lawful purpose relevant to the common-use inquiry, but it is not the only one.  While self-defense is "central" to the Second Amendment, *see id.* at 628, other lawful purposes also bring a commonly used weapon within the ambit of the Second Amendment.  After all, Founding-era Americans commonly used weapons for hunting in addition to self-defense.  *See id.* at 599 (noting that most Founding-era Americans "undoubtedly thought [the Second Amendment right] even more important for self-defense and hunting" than for securing the citizen militia).  So weapons commonly used for hunting fall under the protection of the Second Amendment.[19]  Whatever the purpose of using a given

---

[19] One dissent contends that we have caused "an unfounded expansion of Second Amendment rights" by recognizing hunting as a lawful purpose supporting the exercise of the right. Krause Op. at 18; *but see* Shwartz Op. at 7, 12–13 n.9, 14 n.14 (recognizing that the Second Amendment protects the right to keep and bear arms for hunting); Chung Op. at 8 (same).  That view is incompatible with Supreme Court authority.   The

arm, the lawfulness of that purpose is a necessary condition of Second Amendment coverage.

Third, a weapon that is "dangerous and unusual" cannot be in common use for lawful purposes. That is, while "dangerous and unusual" may not be the direct opposite of "in common use for lawful purposes," the two descriptors are mutually exclusive. Indeed, in *Heller* the Supreme Court positioned the two in opposition, explaining that the Second Amendment's protection of weapons "in common use at the time" is "supported by the historical tradition" of prohibiting the inverse—"the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. So a weapon "in common use for lawful purposes" cannot be "dangerous and unusual."

Finally, *Bruen* makes clear that when we assess common use for lawful purposes, we consider how a given arm is used in present times—not in the past. In *Bruen*, any argument that "colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s" could "provide no justification" for restrictions on the public carry of handguns

---

Second Amendment codified a right that existed at the time of its enactment, *Heller*, 554 U.S. at 592, when Americans "undoubtedly" valued the right for hunting and self-defense, *id.* at 599; *see also Wolford*, 2026 WL 1825723, at *4 n.4 (observing that hunting was particularly important as a source of sustenance for Founding-era Americans moving west). Moreover, there is no tension between recognizing self-defense as the "core lawful purpose" of the Second Amendment right, *Heller*, 554 U.S. at 630, and recognizing other lawful purposes of that right.

today, when handguns are "unquestionably in common use." 597 U.S. at 47.[20]

---

[20] One dissent says this amounts to "a popularity poll." Shwartz Op. at 17–18 n.19. But we must abide by Supreme Court authority saying governments cannot "restrict[] the public carry of weapons that are unquestionably in common use today," *Bruen*, 597 U.S. at 47, and the popularity of the restricted weapons bears on that question. *See Heller*, 554 U.S. at 628 ("The handgun ban amounts to a prohibition of *an entire class of 'arms' that is overwhelmingly chosen by American society* for th[e] lawful purpose [of self-defense]." (emphasis added)); *id.* at 628–29 ("[B]anning from the home *the most preferred firearm in the nation* to 'keep' and use for protection of one's home and family . . . fail[s] constitutional muster." (emphasis added)); *id.* at 629 ("Whatever the reason, handguns are the *most popular weapon* chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." (emphasis added)).

Additionally, two dissents say we conflate the *possession* of a firearm with the *use* of the firearm. Shwartz Op. at 17–18 n.19; Krause Op. at 21–22. But the Second Amendment protects "the right of the people to keep and bear Arms," U.S. Const. amend. II, not merely the right to "use" arms. And the Supreme Court recently clarified that, in the Second Amendment, "keep" means "possess." *Wolford*, 2026 WL 1825723, at \*6 (instructing courts to ask whether a challenged law "place[s] any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms" (second and third alterations in original)). Respectfully, the meaning of the word "use" in a criminal statute barring certain uses of

B.

With this understanding, we turn to another threshold issue: whether to conduct the "in common use" inquiry at *Bruen*'s first or second step. That question has divided our sister circuits.[21]

The disagreement stems from the Supreme Court's use

---

firearms is irrelevant to this inquiry. *See* Shwartz Op. at 17 n.19 (relying on *Watson v. United States*, 552 U.S. 74, 76 (2007), where the Supreme Court addressed the ordinary or natural meaning of the word "use" in 18 U.S.C. § 924(c)(1)).

[21] *See, e.g.*, *Knife Rts., Inc. v. Bonta*, 165 F.4th 1330, 1338–39 (9th Cir. 2026) (declining to resolve); *United States v. Wilson*, 164 F.4th 380, 387 (5th Cir. 2026) (relying on a pre-*Bruen* Fifth Circuit opinion that appears to have considered common use at step one); *United States v. Bridges*, 150 F.4th 517, 524–28 (6th Cir. 2025) (step two); *Nat'l Ass'n for Gun Rts.*, 153 F.4th at 234–35 (noting that the Second Circuit "has understood the 'in common use' analysis to fall under the first step of *Bruen*," but stating a preference "not to venture into an area in which such uncertainty abounds"); *United States v. Charles*, 159 F.4th 545, 546 (8th Cir. 2025) (discussing a pre-*Bruen* Eighth Circuit opinion that appears to have relied on common use at step one); *United States v. Morgan*, 150 F.4th 1339, 1346 (10th Cir. 2025) (step one); *Hanson v. District of Columbia*, 120 F.4th 223, 232 n.3 (D.C. Cir. 2024) (assuming, without deciding, step one); *Bianchi v. Brown*, 111 F.4th 438, 460–61 (4th Cir. 2024) (en banc) (step one); *Bevis v. City of Naperville*, 85 F.4th 1175, 1193–94, 1198 (7th Cir. 2023) (assuming, without deciding, step two).

of the phrase "common use" in two sections of its *Bruen* opinion.  597 U.S. at 32, 47.  Before its step-one textual inquiry, the Court noted two issues that were not disputed by that parties: that the law's challengers were among "the people" whom the Second Amendment protects, and "that handguns are weapons 'in common use' today for self-defense."  *Id.* at 31–32.  Having stated those understandings about the individuals and the weapons at issue, the Court "therefore turn[ed] to whether the plain text of the Second Amendment protects [the challengers'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 32.

Some courts have relied on this mention of "common use" to conclude that only weapons in common use are "Arms" governed by the plain text of the Second Amendment.  *See, e.g.*, *Bianchi v. Brown*, 111 F.4th 438, 460–61 (4th Cir. 2024) (en banc) ("*Bruen* implies that a weapon must be 'in common use today for self-defense' to be within the ambit of the Second Amendment." (quoting *Bruen*, 597 U.S. at 32)).

But the Court used the phrase "common use" again later in the *Bruen* opinion.  When it assessed historical tradition at step two, it explained that even if "handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today."  597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629).  Today handguns are indeed "the quintessential self-defense weapon." *Id*. So any historical tradition of prohibiting the carrying of handguns during colonial times "provide[d] no justification" for contemporary laws "restricting the public carry of weapons that are unquestionably in common use today." *Id.*

We are persuaded that the first mention of "common

31

use" in *Bruen* merely disposed of an uncontested threshold issue in the case. The Court did so *before* turning to the step-one textual analysis. Later, during its step-two discussion of history and tradition, the Court actually relied on common use. We will do the same.

This reading is supported by the operation of the *Bruen* framework. *Bruen*'s first step is fundamentally a textual inquiry. *See id.* at 32. Yet "common use" appears nowhere in the Second Amendment's text. Nor is it "an inherent part of the definition of 'Arm.'" *Duncan v. Bonta*, 133 F.4th 852, 900 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting). Relying on Founding-era dictionaries, *Heller* defined "Arms" to include "[w]eapons of offence" and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581 (citation modified); *see also id.* at 582 (emphasizing that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding"). And *Wolford* defined "Arms" to mean "any weapon customarily used for offensive or defensive purposes." *Wolford*, 2026 WL 1825723, at *6. Common use has no bearing on those definitions.[22]

While the connection between the step-one textual inquiry and "common use" is tenuous at best, common use fits

---

[22] Read alongside *Heller*'s definition of "Arms," *Wolford*'s use of the term "customarily" distinguishes items that *can* be used, offensively or defensively, as weapons (*e.g.*, bricks) from weapons normally used for offensive or defensive purposes. So "customarily" describes *how* a weapon is normally used, not how commonly the weapon is used for protected purposes.

logically in step two's consideration of analogues.  In *Bruen*, and again in *Rahimi*, the Court explained that we must consider "how and why" a modern regulation and the relevant historical analogue burden the Second Amendment right.  *Bruen*, 597 U.S. at 29; *Rahimi*, 602 U.S. at 692.  Whether a regulation restricts a weapon in common use for lawful purposes is necessarily a part of "how" the regulation burdens the right.  This is why *Bruen* concluded that colonial restrictions on "dangerous and unusual" weapons were inapt analogues for a contemporary New York law that "restrict[ed] the public carry of weapons that are unquestionably in common use today." 597 U.S. at 47.  So common use helped the Court conclude that the colonial restrictions were not "relevantly similar."  *See id.* at 29.

Likewise, the Supreme Court's discussion of common use in *Heller* was a part of its analysis of historical analogues. 554 U.S. at 626–27.  There, the Court explained that handguns were "overwhelmingly chosen by American society for [a] lawful purpose," *id.* at 628, so our nation's "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* at 627, did not support the District of Columbia's ban.  Again, common use of handguns for lawful purposes helped the Court conclude that certain historical prohibitions of weapons were not relevant analogues.

For all these reasons, we will address "common use" at *Bruen*'s second step.[23]

---

[23] The dissents view common use as part of the step-one inquiry.  Shwartz Op. at 8–11; Krause Op. at 4–13; Chung Op. at 1–6.  Before *Wolford*, that was a closer call.  But *Wolford*

**IV.**

Before we apply these principles to the Assault Firearm Provisions of New Jersey's law, we must address a threshold issue particular to this litigation: the scope of our analysis of the Assault Firearm Provisions.  As discussed above, the District Court ruled only as to the Colt AR-15—the firearm about "which the Court ha[d] been provided the most information." App. 13.  Plaintiffs contend that this limitation was improper.[24]

---

explained that *Bruen*'s first step requires us to ask whether a challenged regulation restricts the right to keep or bear "Arms," which are defined to include "any weapon customarily used for offensive or defensive purposes." *Wolford*, 2026 WL 1825723, at \*6; *see also supra* n.22.  A category that includes *any* weapon customarily used for *any* offensive or defensive purpose cannot also be limited to weapons in common use for self-defense.  And it certainly cannot be limited to weapons whose "objective features and uses make [them] proportional to the needs of, and customarily used in service of, an individual's right to keep and bear arms for self-defense."  Krause Op. at 5.  Nor need we "ascertain . . . whether, based on the [weapon]'s history, features, and uses, it is objectively more akin to unusually dangerous military weapons than those in common use for self-defense," Shwartz Op. at 11, before deciding whether a weapon falls within this category.

[24] The Ellman Plaintiffs assert that they challenged all weapons covered by the Assault Firearm Provisions, and the Cheeseman Plaintiffs (who only challenged a subset of covered "assault

We agree with Plaintiffs' view that we need not address only Colt AR-15s.  But there are two reasons why we cannot issue a decision that addresses all the weapons covered by the Assault Firearm Provisions.

First, as the District Court noted, the evidence offered by Plaintiffs and the State was focused heavily on AR-15s and other semi-automatic rifles.  The record about the other weapons classified as "assault firearms" is too sparse to support the analysis required under *Bruen* and its progeny.

The limited record may be the result of the scope of Plaintiffs' challenges.  In their complaint, the Cheeseman Plaintiffs expressly declined to challenge the prohibition on firearms with bump stocks attached, N.J. Stat. Ann. § 2C:39-1(w)(6), and at summary judgment they clarified that they likewise do not challenge N.J. Stat. Ann. § 2C:39-1(w)(4)–(5), which pertain to semi-automatic rifles with a fixed magazine capacity exceeding 10 rounds and parts "from which an assault firearm may be readily assembled."  Only the Ellman Plaintiffs challenged the Assault Firearm Provisions as to all covered weapons.  Yet even though

---

firearms") argue that the Supreme Court's Second Amendment opinions typically focus on *classes* of weapons, not particular makes and models.  The Ellman Plaintiffs also argue that, to the extent the District Court narrowed its ruling based on the State's submissions, that inverts the ordinary operation of Federal Rule of Civil Procedure 56, under which the party moving for summary judgment carries the burden of identifying the issues on which summary judgment is sought.  Therefore, they argue, we should address all firearms meeting the statutory definition of "assault firearm."

those plaintiffs cross-moved for summary judgment (and thus bore the burden of proof on their motion), they did not present evidence pertaining to the full breadth of weapons covered under those Provisions.

Nonetheless, the record before us supports a ruling as to all semi-automatic rifles—not just Colt AR-15s. The AR-15 is a "style" of semi-automatic rifle made by various manufacturers and sold to the public since 1964. *ANJRPC V*, 742 F. Supp. 3d at 432–33. But several manufacturers sell largely interchangeable semi-automatic rifles based on the AR-15 platform. *See Bianchi*, 111 F.4th at 454; App. 1839–41, 1974–75, 1978, 1981. And all covered semi-automatic rifles share common features, regardless of the model or manufacturer. There is no evidence in the record that the Colt AR-15 is meaningfully different than any other banned semi-automatic rifle. That is why the Assault Firearm Provisions restrict the possession not only of the enumerated makes and models of semi-automatic rifles, but also any "substantially identical" semi-automatic rifles—those that share features like telescoping stocks, pistol grips, and flash suppressors. N.J. Stat. Ann. § 2C:39-1(w)(2). Plus, New Jersey neither disputed that the Colt AR-15 is substantively identical to the other banned rifles nor argued that it should be treated differently.[25]

---

[25] In their complaint and briefing to the District Court, the Ellman Plaintiffs challenged all weapons covered by the Assault Firearm Provisions. That necessarily includes the prohibition on semi-automatic rifles of all makes and models. When the District Court chose to address only Colt AR-15s, it did so because of the "nuances" presented by "each individual

In determining whether a modern regulation has a relevantly similar historical analogue, the *Bruen* history-and-tradition test considers the functionality, features, and common use of a regulated weapon. Here, the record contains sufficient information for us to assess the largely interchangeable semi-automatic rifles covered by the Assault Firearm Provisions, but it lacks the evidence and factual findings about the covered semi-automatic pistols and shotguns. Accordingly, we will rule on the Assault Firearm Provisions with respect to all semi-automatic rifles, but our ruling will go no farther. On remand, the District Court shall address the constitutionality of the Assault Firearm Provisions as to semi-automatic pistols, shotguns, and other weapons to which Plaintiffs lodge challenges.

---

firearm" covered by the Assault Firearm Provisions, and because *New Jersey* focused on the Colt AR-15 as the "typical" covered weapon. *ANJRPC V*, 742 F. Supp. 3d at 424. The District Court's choice notwithstanding, our decision to address the arguments Plaintiffs presented throughout their cases is consistent with all party-presentation principles. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (recounting that party-presentation principles guide courts to "decide only questions presented by the parties" rather than "sally[ing] forth . . . looking for wrongs to right" (citation modified)). Moreover, notwithstanding their reminder of our role as a "court of review, not of first view," Shwartz Op. at 2 (quoting *O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 762 n.3 (3d Cir. 2021)), even our dissenting colleagues acknowledge that the District Court's decision was unduly narrow, *see id.* (recognizing that the parties challenged the prohibition on all AR-15s, regardless of manufacturer).

A.

At step one of the *Bruen* framework, we ask whether "the Second Amendment's plain text covers [the] . . . conduct" the Plaintiffs wish to engage in.  597 U.S. at 17.  Here, that proposed conduct is possession of semi-automatic rifles for lawful purposes, including self-defense.

The textual analysis is straightforward.  All agree about two of the three subsidiary questions: Plaintiffs in these consolidated matters are among "the people" whom the Second Amendment protects, and New Jersey's law restricts the keeping and bearing of semi-automatic rifles.  *See Wolford*, 2026 WL 1825723, at *6.  The only remaining question is whether those firearms are "any form of 'Arms, *i.e.*, any weapon customarily used for offensive or defensive purposes." *Id.*  They are.

Like *Wolford*, *Heller* defines "Arms" broadly: "any thing that a man . . . takes into his hands or useth in wrath to cast at or strike another."  *Heller*, 554 U.S. at 581 (citation modified) (first quoting 1 Samuel Johnson, *Dictionary of the English Language* 106 (4th ed. 1773) (reprinted 1978), then quoting 1 Timothy Cunningham, *A New and Complete Law Dictionary* (2d ed. 1771)).  And *Heller* explains that the Second Amendment right "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Id.* at 582.  "[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28.

Even the narrowest Founding-era definition of "Arms"

addressed by the *Heller* Court "stated that all firearms constituted 'arms.'" *Id.* at 581–82 (citing 1 John Trusler, *The Distinction Between Words Esteemed Synonymous in the English Language* 37 (3d ed. 1794)). Because semi-automatic rifles are firearms, they are "Arms" within the meaning of the Second Amendment. The Constitution thus "presumptively protects" individuals' right to keep and bear semi-automatic rifles. *Bruen*, 597 U.S. at 17.

## B.

That brings us to *Bruen*'s second step. Because keeping and bearing semi-automatic rifles is conduct presumptively protected by the Second Amendment, the Assault Firearm Provisions restricting the possession of those weapons can stand only if New Jersey shows they are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. It has not carried that burden.

To determine whether a regulation is consistent with the principles underlying our Nation's tradition of firearm regulation, we consider "[w]hy and how the regulation burdens the [Second Amendment] right." *Id.*; *see also Bruen*, 597 U.S. at 29.

## 1

First, we consider why the Assault Firearm Provisions were enacted. As the State's then-Governor explained, the Provisions were aimed at restricting the possession of "guns capable of wholesale destruction" or that are "designed to wipe out the greatest number of people in the shortest possible time." App. 4651–52. Thus, like the regulations at issue in *Rahimi*, *Bruen*, and *Heller*, the Assault Firearm Provisions seek to

"bar[] people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693.[26]

---

[26] In characterizing the "why" this way, we follow the Supreme Court's example. In *Rahimi*, the Court synthesized the distinct purposes of surety laws ("preventing violence before it occurred") and going armed and affray laws ("punishing those who menaced others with firearms") into a higher-level "why" that encapsulated the purposes of both laws: "barring people from misusing weapons to harm or menace others." 602 U.S. at 694, 697. The Court looked to the "why" of the modern federal law disarming individuals subject to domestic violence restraining orders, and it determined that it "fit[] neatly within th[at] tradition." *Id.* at 698.

*Bruen* was less explicit in characterizing the "why" of the colonial, Founding, and Antebellum-era laws it considered. But it observed that New York's modern law sought to address "handgun violence, primarily in urban areas," 597 U.S. at 27, and it did not conclude that this "why" is too dissimilar from the "whys" of the historical regulations it evaluated. Instead, it concluded that the modern and historical laws are too dissimilar in *how* they regulated weapons. *See id.* at 46–60.

Lastly, characterizing the "why" in this manner is consistent with *Bruen*'s discussion of the "more nuanced approach" that might be required by "cases implicating unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27–28; *see infra* Part IV.B.5. Although the Supreme Court has not had occasion to explain what a more nuanced approach entails, the Court's use of the terms "unprecedented" and "dramatic" indicate that courts should be sparing in their use of a "more nuanced approach." But if we define the "why" of a modern

That is a purpose that fits comfortably within our Nation's tradition of firearm regulation. It can be traced back to common law surety and going armed laws. In *Rahimi*, the Supreme Court reviewed the history of these laws. It explained that surety laws "targeted the misuse of firearms," by "provid[ing] a mechanism for preventing violence before it occurred." *Id.* at 696–97. Going armed laws "provided a mechanism for punishing those who had menaced others with firearms." *Id*. at 697. Together, these examples showed that since "the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 693.[27]

---

weapon regulation too narrowly, every case could present an "unprecedented" concern and the exception would swallow the rule. *Id.* at 28.

[27] As *Heller*, *Bruen*, and *Rahimi* demonstrate, legislatures enact many weapons laws out of concern about weapons being misused to harm or menace others. Thus, *how* a legislature chooses to address weapons misuse may often determine whether a law withstands Second Amendment scrutiny. Still, the "why" metric will serve an important function when the "hows" are analogous but the historical regulations were enacted for distinct purposes. *See Wolford*, 2026 WL 1825723, at *12–13 (rejecting analogues because they were enacted for different reasons than the challenged regulation); *Hemani*, 146 S. Ct. at 1689 (same). For instance, as we discuss below, some Founding-era gunpowder-storage laws limited how much gunpowder could be stored in a single cannister. *See infra* note 33. In that some of those laws limited how much ammunition could be stored together, they are arguably similar to New

2

Next, we look to how New Jersey's regulation burdens the Second Amendment right. The Assault Firearm Provisions make it a crime to knowingly possess a semi-automatic rifle without a license, N.J. Stat. Ann. § 2C:39-5(f), and "no license shall be issued unless [a Superior Court] finds that the public safety and welfare so require," *id.* § 2C:58-5(b). The bar for the issuance of a license is high, and the record contains no evidence of a member of the public ever receiving one. Military, law enforcement, and government personnel are exempt under certain conditions, *id.* § 2C:39-6(a), (j), but there are no exemptions for members of the public. The law's only other carveout is for certain "assault firearms determined by the Attorney General to be legitimate for target-shooting purposes," but that carveout applies only to firearms that (1) were purchased on or before May 1, 1990, (2) belong to an individual who is a member of a rifle or pistol club that existed before the act took effect, and (3) belong to an individual who joined the rifle or pistol club no more than 210 days after the act took effect. *Id.* § 2C:58-12(a)–(b). In sum, given the Assault Firearm Provisions' narrow exemptions and unattainable licensing standard, the law amounts to a de facto ban on the possession of semi-automatic rifles. *See, e.g., Bevis*

---

Jersey's LCM restrictions in *how* they burden the Second Amendment right. *See infra* note 49. But even if the "hows" are similar, gunpowder-storage laws were enacted for fire-safety purposes, not to prevent misuse of firearms to harm or menace others. *See Heller*, 554 U.S. at 632; *see also infra* Parts IV.B.4 & V.B. Because of those disparate "whys," gunpowder-storage laws are not analogous to the LCM Provisions.

*v. City of Naperville*, 85 F.4th 1175, 1182 (7th Cir. 2023) (explaining that a similar regulation's provisions "institute something close to a ban" on assault weapons); *Bianchi*, 111 F.4th at 453 (characterizing a similar regulation as a ban).

But that characterization of the law does not end our analysis of the burden. Common use also bears on "how . . . [a] regulation[] burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. We therefore consider whether semi-automatic rifles are a class of arms "in common use for lawful purposes."[28]

The evidence shows that they are. The District Court found that there are around 24 million AR-l5s and similar sports weapons in circulation—a figure that is surpassed only by the number of registered handgun owners within the United States. New Jersey does not provide any data or statistics of its own to contradict the sheer number of semi-automatic rifles

---

[28] While the parties dispute some facts, those disagreements mainly pertain to legislative facts, not adjudicative facts. *See* Fed. R. Evid. 201(a) advisory committee's note to 1972 proposed rules (explaining that "[a]djudicative facts are simply the facts of the particular case" while legislative facts "are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body"). We may resolve any disputes related to legislative facts, because those are facts subject to judicial notice. *See United States v. Perez*, 150 F.4th 237, 248 (4th Cir. 2025); *United States v. Love*, 20 F.4th 407, 412 (8th Cir. 2021).

in common use for lawful purposes.[29]   Instead, New Jersey argues that the features of semi-automatic rifles are a legacy of their military heritage and are designed for combat.

But the record tells another story.  The District Court found that these weapons are used for lawful purposes including self-defense, target shooting, hunting, and pest control, and that their build and design features, such as their mild recoil, ergonomics, and accuracy make them "a good choice for self-defense." App. 57.

In a different case, we might need to qualitatively examine a weapon's features to determine whether a weapon is in common use for lawful purposes.  Indeed, the Supreme Court has suggested the features of "certain categories of guns . . . including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation" are different from other categories of guns that "traditionally have

---

[29] New Jersey provides some statistical evidence that semi-automatic rifles are rarely used in self-defense.  But statistics on actual usage for self-defense are not revealing here, because even if a weapon is rarely employed in incidents requiring self-defense, it may still be commonly possessed for that lawful purpose or other lawful purposes, such as hunting.  New Jersey also points to data showing that semi-automatic rifles are disproportionately used in certain crimes and argues that this demonstrates that those weapons are not commonly used for lawful purposes.  But that conclusion does not follow from the data.   Even if semi-automatic rifles are disproportionately used in some crimes, those may still represent a small fraction of those weapons' overwhelmingly lawful use.

44

been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 611–12 (1994).[30]   But on the record before us today, we need not precisely define the quantity or qualities that make a weapon in common use for lawful purposes.  Regardless of where those lines may be drawn, the many millions of semi-automatic rifles in circulation for lawful purposes are plainly in common use.

3

This regulation therefore functions like the firearm ban at issue in *Heller*: It prohibits the possession of a class of weapons in common use for lawful purposes.  This similarity to *Heller* facilitates our decision here.  In *Heller*, faced with a similar "why," the Supreme Court determined that no historical regulations were analogous to how the District of Columbia regulated handgun possession: by imposing a "flat ban." *See Bruen*, 597 U.S. at 27 (citing *Heller*, 554 U.S. at 631, 634).  In other words, there was no historical support for the "prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of

---

[30] The Supreme Court also has observed that automatic weapons and semi-automatic weapons differ in meaningful ways. *See Staples*, 511 U.S. at 611–12 (deeming ownership of a machinegun, but not an unmodified AR-15, "quasi-suspect"); *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025) (noting that "[t]he AR-15 is the most popular rifle in the country" and is "widely legal and bought by many ordinary consumers"); *Garland v. Cargill*, 602 U.S. 406, 410 (2024) (holding that a semi-automatic weapon, even when equipped with a bump stock, is not an automatic weapon for purposes of the federal machine gun ban).

self-defense. *Heller*, 554 U.S. at 628.

In *Bruen*, the Supreme Court again considered a regulation intended to stymie interpersonal gun violence. *Bruen*, 597 U.S. at 27. After an exhaustive historical review, the Court found no analogues that supported "a tradition of broadly prohibiting" even "the public *carry* of commonly used firearms for self-defense"—a limitation far less stringent than a full ban on possession.[31] *Id.* at 38 (emphasis added).

Together, *Heller* and *Bruen* teach that bans or broad prohibitions on possessing or carrying of a class of weapons in common use for lawful purposes fail to find support in our Nation's tradition of firearm regulation. That is so even when the regulations are passed with the intention of reducing gun violence.[32]

That principle resolves our inquiry here. That is

---

[31] As the Supreme Court made clear in *Bruen*, historical analogues regulating what were considered "dangerous and unusual weapons" in the past cannot support bans on arms that "are indisputably in common use for self-defense today." 597 U.S. at 47 (internal quotation marks omitted).

[32] One dissent asserts that we "disregard the democratic will of the People of New Jersey" in holding that the Assault Firearm Provisions violate the Second Amendment. Krause Op. at 2. But the Supreme Court recently reinforced that "the Second Amendment has the same meaning in all parts of the United States," and "local attitudes can neither shrink nor inflate" the meaning of that fundamental right. *Wolford*, 2026 WL 1825723, at *11. That truism applies even when citizens express their local attitudes through their legislators.

because the Supreme Court has already evaluated the historical analysis for the kind of regulation before us today: "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. *Heller*, 554 U.S. at 628. There is no historical support for such a measure. *Id.* at 628–29.

4

Even if we were to conduct the analogical analysis anew, we would reach the same conclusion. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," our analysis at *Bruen*'s second step is "fairly straightforward." *Bruen*, 597 U.S. at 26. In such cases, the "lack of a distinctly similar historical regulation addressing that problem"; the enactment of regulations that "addressed the societal problem . . . through materially different means"; or courts' rejection of analogous regulations on constitutional grounds are all "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26–27.

This case "exemplifies this kind of straightforward historical inquiry." *Id.* at 27. New Jersey's regulation addresses societal concerns about the "misus[e] [of] weapons to harm or menace others," which is a societal problem that has existed "[f]rom the earliest days of the common law." *Rahimi*, 602 U.S. at 693. Indeed, in *Rahimi*, the Supreme Court identified one way of addressing this concern that is within our historical tradition: disarming an individual who has been found to pose a clear threat of physical violence to another person. *Id.* at 698.

New Jersey submits that our historical tradition shows

47

that it can also achieve the aim of preventing firearm misuse through the de facto ban enacted by the Assault Firearm Provisions. The State offers several examples of historical analogues for our consideration. None is a relevantly similar analogue for a ban on an entire class of arms in common use for lawful purposes.

For example, the Founding-era gunpowder aggregation laws that New Jersey points to are not apt comparators because the "why" is not analogous. The gunpowder laws were enacted as fire-safety measures, not to address firearm violence.[33] *See Hanson v. District of Columbia*, 120 F.4th 223, 235 (D.C. Cir. 2024).[34]

---

[33] *See, e.g.*, 1784 N.Y. Laws 627, ch. 28 (limiting gunpowder possession per person to 28 pounds, separated into four canisters); 1798–1813 R.I. Pub. Laws 85, §§ 1, 3 (limiting gunpowder possession in any shop, building, or other place to 28 pounds and requiring it to be kept in tin canisters); 1786 N.H. Laws 383–84, § 1 (limiting gunpowder possession in any store, dwelling-house, or building to 10 pounds and requiring it to be kept in a secured canister to avoid forfeiture to the firewards); 1806 Ky. Acts 122, § 3 (authorizing limitations on quantities of gunpowder that may pose a fire danger).

[34] The State invokes a single additional Founding-era analogue: a New Jersey law restricting trap guns, which are firearms rigged to discharge when a string or wire is tripped. *See* 1763–1775 N.J. Laws 343, ch. 540, § 10. Other trap gun regulations were enacted in the late 1800s, but those are too late in time to establish a tradition of regulation. *See, e.g.*, 1875 Mich. Pub. Acts 136, no. 97, § 1; 1869 Wis. Sess. Laws 35, ch.

New Jersey also offers up Antebellum and Reconstruction-era regulations of Bowie knives, slungshots and clubs, pistols, and revolvers as potential analogues. These laws have the same "why" as the Assault Firearm Provisions: They were intended to "bar[ ] people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693.[35] Nonetheless, those regulations are insufficiently analogous for two reasons: They are too late in time, and none enacted an outright ban on a class of weapons in common use for lawful purposes.

We have held that the primary time period for the analogical inquiry is the Founding era. *Lara*, 125 F.4th at 441–42. So we must "guard against giving postenactment history more weight than it can rightly bear." *Id.* at 434 (quoting *Bruen*, 597 U.S. at 35). Where no precedent from the Founding era "evinces a comparable tradition of regulation," regulations from the mid- to late-1800s cannot bear much weight. *Bruen*, 597 U.S. at 27. Post-ratification practice can be evidence of Founding-era principles, but it cannot create a new tradition or contradict Founding-era practices. *Lara*, 125 F.4th at 441. Such is the case here.

---

33, § 1. And the Founding-era New Jersey law alone cannot establish a tradition of regulation. In any event, the "how" of the trap gun regulations is not analogous, because individuals were not restricted from owning firearms—they simply could not rig those firearms to engage in automatic and indiscriminate shooting outside of their presence.

[35] As we explain above, *see supra* Part IV.B.1, this "why" can be traced not just to the Founding era, but the "earliest days of the common law," *see Rahimi*, 602 U.S. at 693.

But even setting aside the timing of regulations on Bowie knives, slungshots and clubs, pistols, and revolvers, none of those regulations are relevantly similar to the Assault Firearm Provisions. Take, for example, the regulations of Bowie knives that several of our sister circuits find persuasive.[36] Between 1837 and 1893, a majority of states and territories enacted restrictions on Bowie knives. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 296–327 (2024). Most of those regulations prohibited the concealed carry of Bowie knives,[37] and some prohibited open carry with intent to do harm[38] or imposed more stringent punishments where Bowie

---

[36] *Ocean State Tactical*, 95 F.4th at 48; *Nat'l Ass'n for Gun Rts.*, 153 F.4th at 243–45; *Bianchi*, 111 F.4th at 466–67; *Bevis*, 85 F.4th at 1201–02; *Duncan*, 133 F.4th at 878–82; *Hanson*, 120 F.4th at 237–38.

[37] *See, e.g.*, 1838 Ala. Laws 67, no. 77, § 1 (prohibiting concealed carry); 1878 Miss. Laws 175, ch. 46, § 1 (prohibiting concealed carry with self-defense exception); 1838 Va. Acts 76, chap. 101, § 1 (prohibiting concealed carry); 1867 Colo. Sess. Laws 191, ch. 22, § 149 (prohibiting concealed carry in any "city, town or village"). *See also Hanson*, 120 F.4th at 237 (observing that most laws regulating Bowie knives prohibited concealed carry and "therefore are not indicative of a 'relevantly similar' tradition" of banning the possession of weapons).

[38] *See, e.g.*, 1886 Md. Laws 602, ch. 375, § 1 (fine or imprisonment for open carry of knife with intent to harm); 1876 Colo. Sess. Laws ch. 24, § 154 (same).

knives were used in the commission of a crime.[39]  But, outside of the Western Territories, only one law, in Georgia, banned the possession of Bowie knives outright.  *See* 1837 Ga. Acts 90, §1 (1838).[40]  A decade after that law was enacted, the Georgia Supreme Court deemed it an unconstitutional violation of the Second Amendment as applied to everything other than concealed carry.  *See Nunn v. State*, 1 Ga. 243 (1846).

A handful of the Western Territories enacted regulations generally prohibiting the open carry of Bowie knives, though some had exceptions for self-defense.[41]  But we heed the Supreme Court's warning about the "exceptional nature" of western restrictions.  *Bruen*, 597 U.S. at 66–70.  Like the Supreme Court, "we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed

---

[39] *See, e.g.*, 1837 Ala. Acts 7, no. 11, § 1 (where Bowie knife is used to kill another, "it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought").

[40] Like the Supreme Court in *Bruen* and *Heller*, we will not give "disproportionate weight," *Bruen*, 597 U.S. at 65, to isolated examples of bans on the possession of an arm that "contradict[ ] the overwhelming weight of other evidence regarding the right to keep and bear arms for defense," *Heller*, 554 U.S. at 632.

[41] *See* 1881 Ark. Acts 191, ch. 96, § 1 (exception for persons "upon a journey"); 1871 Tex. Gen. Laws 25, ch. 34, § 1 (self-defense exception); 1889 Ariz. Sess. Laws 30, ch. 13, § 2 (self-defense exception).

less than 1% of the American population, and also 'contradict the overwhelming weight' of other, more contemporaneous historical evidence'"—particularly because those regulations were "rarely subject to judicial scrutiny." *Id.* at 67–68 (citation modified) (quoting *Heller*, 554 U.S. at 632).

Even if bans on the concealed carry of Bowie knives could support a ban on the possession of the firearms at issue here, regulations restricting Bowie knives remain an inapt analogue because they did not target a class of weapons in common use for lawful purposes. New Jersey has provided no evidence that Bowie knives were in common use for lawful purposes. Instead, it points only to evidence that Bowie knives were widely used in fights and duels as well as other criminal activities. *See* Norm Flayderman, *The Bowie Knife: Unsheathing an American Legend* 25–64 (2004). We are therefore unconvinced that laws regulating Bowie knives are useful comparators for the weapons at issue here.

The other proffered analogues suffer from similar infirmities. Like Bowie knives, slungshots were "a regular part of criminal weaponry." App. 1110, and there is no evidence in the record to suggest that they were commonly used for lawful purposes in addition to unlawful ones. And the regulations on pistols and revolvers that New Jersey invokes did not restrict the *possession* of firearms. Rather, they limited the concealed

carry[42]—or in a few cases, the sale or exchange[43]—of those arms.[44]

---

[42] *See, e.g.*, 1811 Ky. Acts 100, ch. 89, §1 (prohibiting concealed carry of pistols); 1812 La. Acts 172, § 1 (same); 1819 Ind. Acts 39, ch. 24, § 1 (same); 1838 Ark. Acts 280, div. 8, ch. 44, art. 1, § 13 (same); 1838 Va. Acts. 76, ch. 101, § 1 (same); 1838 Ala. Acts 67, no. 77, § 1 (same); 1835 Terr. of Fla. Laws 318, chap. 860 (same). A few Western Territories enacted restrictions on the open carry of some firearms. *See* 1889 Ariz. Sess. Laws 30, ch. 13, § 1; 1869 N.M. Laws 72, ch. 32, §§ 1–2; 1875 Wyo. Terr. Sess. Laws 352, ch. 52, § 1; 1889 Idaho Terr. Gen. Laws 23, § 1; 1890 Okla. Sess. Laws 495, ch. 25, art. 47, §§ 1–2; *see also Bruen*, 597 at 66–70 (discussing these regulations). But, as discussed above, we will not rely on "exceptional" territorial restrictions to establish a historical tradition of regulation. *Bruen*, 597 at 67.

[43] *See, e.g.*, 1881 Ark. Acts 191, 192, ch. 96, § 3 (outlawing the sale or exchange of several weapons, including pistols); 1879 Tenn. Acts 135, ch. 96, § 1 (outlawing sale or exchange of belt pistols, pocket pistols, revolvers, or any other kind of pistol, with military exception).

[44] The exception is an 1871 Tennessee law that banned "publicly or privately" carrying a "belt or pocket pistol or revolver, other than an army pistol." 1871 Tenn. Pub. Acts 81, ch. 90, § 1. The Supreme Court of Tennessee upheld that law. *See State v. Wilburn*, 66 Tenn. 57, 62 (1872). The supreme courts of Alabama and Louisiana considered similar laws and held that bans on concealed carry were constitutional only if open carry was not also prohibited. *See State v. Reid*, 1 Ala. 612, 616, 619–621 (1840); *State v. Chandler*, 5 La. 489, 490

Thus, none of New Jersey's analogues are "relevantly similar" to the challenged law. *Bruen*, 597 U.S. at 29.[45]  The "lack of a distinctly similar historical regulation . . . is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26.

5

The straightforwardness of the analogical inquiry here also resolves a final open question about the structure of the *Bruen* framework as applied here.  In step two of its analysis in *Bruen*, the Supreme Court explained that "[w]hile the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27.  Several of our sister circuits have relied on this language to uphold regulations like those at issue here.  They have opined that semi-automatic rifles are technological developments that "implicat[e] unprecedented societal concerns." *Id.*; *see Capen v. Campbell*, 134 F.4th 660, 668 (1st Cir. 2025); *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 238–39 (2d Cir. 2025); *Bianchi*, 111 F.4th at 464; *Barnett v.*

---

(1850).  Kentucky's Supreme Court struck down a ban on concealed carry, but it did so under a state constitutional provision that protected "the right of the citizens to bear arms in defence of themselves and the state," not under the Second Amendment. *Bliss v. Commonwealth*, 12 Ky. 90, 90 (1822).

[45] To the extent that New Jersey offers as analogues 20th-century regulations restricting the broad classes of machineguns and semi-automatic firearms, those regulations are far too late in time to suggest, on their own, a tradition dating back to the Founding.

*Raoul*, No. 24-3060, --- F.4th ----, 2026 WL 1982951, at *15 (7th Cir. July 9, 2026). We are not persuaded.

As we explained above, this case implicates the societal concern of people "misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693. That concern "has persisted since the 18th century," and "the Founders themselves could have adopted [a similar law] to confront that problem," but they did not. *Bruen*, 597 U.S. at 26–27. This case therefore falls into the category of cases where "the historical analogies . . . are relatively simple to draw," not the category calling for a "more nuanced approach." *Id.* at 27.

Finally, even if we agreed that semi-automatic rifles implicate "unprecedented societal concerns or dramatic technological changes," that would not change the outcome here. That is because the "more nuanced approach" does not permit us to abandon the analogical inquiry prescribed by *Bruen*. Fundamentally, we must determine whether "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29. Even if we loosen the strictures of the analogical inquiry by more broadly construing the "how" and "why" of the analogues New Jersey proffers, regulations that restrict the carrying of certain types of arms do not impose a burden comparable to that of a de facto ban on the possession of an entire class of arms.

We therefore hold that New Jersey's complete prohibition on the possession of semi-automatic rifles runs afoul of the Second Amendment's protections.

**V.**

Applying these principles to the LCM Provisions of New Jersey's law, we conclude that those provisions are inconsistent with the Second Amendment.

**A.**

We begin with *Bruen*'s step-one textual analysis. In *ANJRPC II*, we determined that "magazines are 'arms' within the meaning of the Second Amendment." 910 F.3d at 116. Our textual analysis in that case remains sound post-*Bruen*, so we reaffirm it today.

As discussed above, the Second Amendment's protection of the right to keep and bear arms "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Although history guides our definition of "arms," that term "covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28.

A magazine is a "holder in or on a gun for cartridges to be fed into the gun chamber." *Magazine*, *Webster's Collegiate Dictionary* (9th ed. 1983); *see also Magazine*, *The American Heritage Dictionary* (5th ed. 2018) ("A compartment in some types of firearms, often a small detachable box, in which cartridges are held to be fed into the firing chamber."). For many firearms, magazines "are required as part of the firing process." *Bevis*, 85 F.4th at 1209 (Brennan, J., dissenting).

The Supreme Court has long recognized that "[t]he possession of arms also implie[s] the possession of ammunition." *Miller*, 307 U.S. at 180. That is because

ammunition is "necessary to make meaningful an individual's right to carry a []gun for self-defense." *Hanson*, 120 F.4th at 232; *see Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (holding that the Second Amendment "implies a corresponding right to obtain . . . bullets" (citation modified)). Therefore, "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *ANJRPC II*, 910 F.3d at 116.

The text of the Second Amendment covers all magazines, not just magazines that New Jersey considers "standard capacity." Standard capacity magazines and LCMs are subsets of the broader category of "magazines," separate categories of arms. The determination that magazines are arms, then, necessarily means that LCMs are arms as well.

New Jersey's use of the term "large capacity magazine" further supports this conclusion. The LCM label is not objective: what is considered an LCM is statutorily defined. In New Jersey, that definition has changed over time. Today, a magazine capable of holding 15 rounds of ammunition is an LCM. N.J. Stat. Ann. § 2C:39-1(y). But until 2018, that same magazine was not an LCM. *See* 2018 N.J. Sess. Law Serv. Ch. 39 (West). It would defy reason for a label devised by New Jersey's legislature to govern the reach of the Second Amendment's text.

The State urges us to adopt the Ninth Circuit's view that LCMs are not arms but accessories of weaponry, referred to as "accoutrements" in the Founding era. *See Duncan*, 133 F.4th at 867. As the Ninth Circuit recounted, common accoutrements at the Founding included "flint, scabbards,

holsters, and ammunition containers such as cartridge cases and cartridge boxes." *Id*.

The State notes that a large-capacity magazine is an ammunition container that is harmless when it is not attached to a gun. Accordingly, the State reasons that LCMs do not fit into *Heller*'s Founding-era definitions of "Arms" as items that a person "takes into his hands, or useth in wrath to cast at or strike another." *See id.* (quoting *Heller*, 554 U.S. at 581). It also reasons that, even if some magazines are protected by the Second Amendment because they are necessary to the operation of some firearms, LCMs do not fall into that protected subcategory because no firearm requires a magazine with a capacity of more than ten rounds to function.

There are a few problems with this reasoning. First, this reliance on Founding-era definitions of "Arms" is at odds with the Supreme Court's instruction in *Bruen*. There, the Court explained that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that *facilitate armed self-defense*." *Bruen*, 597 U.S. at 28 (emphasis added). In many cases, modern magazines go beyond merely facilitating self-defense; they are required for some firearms to function. *See Duncan*, 133 F.4th at 898 (Bumatay, J., dissenting). But even where a particular arm does not require the use of a magazine, a magazine unquestionably facilitates the arm user's ability "to cast at or strike another." *Heller*, 554 U.S. at 581. Accordingly, magazines are arms. This reading accords with our earlier observation that because "ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the

meaning of the Second Amendment." *ANJRPC II*, 910 F.3d at 116.

Second, nothing in text of the Second Amendment suggests that the capacity of a magazine bears on whether it receives constitutional protection. So it cannot be that a magazine that can hold ten rounds is an "Arm[]" covered by the plain text of the Second Amendment but a magazine that can hold eleven rounds is not. Although magazines of different capacities may implicate different public policy concerns, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. At least at *Bruen*'s first step, policy choices have no bearing on whether magazines of any size are covered by the text of the Second Amendment.

Likewise, we are unpersuaded by the State's argument that LCMs are not "Arms" covered by the Second Amendment because they are not necessary to operate a firearm. The State reasons that firearms can operate with smaller capacity magazines. But the text of the Second Amendment does not limit "Arms" to the minimum equipment necessary to operate a weapon. And nowhere in *Heller* or *Bruen*'s textual analyses did the Supreme Court suggest that the availability of alternative equipment changes the definition of an arm under the Second Amendment. *See id.* at 576–626; *Bruen*, 597 U.S. at 32–33. Thus, *Bruen*'s textual step is not the correct place for such an inquiry.[46]

---

[46] In *Heller*, the Supreme Court considered and rejected an argument that "it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long

Because magazines are required to operate many firearms, they are "Arms" within the text of the Second Amendment—even when they can hold more than ten rounds of ammunition. Thus, magazines—including those that can hold more than 10 rounds of ammunition—are presumptively entitled to constitutional protection.

B.

We now turn to *Bruen*'s second step, where we ask whether New Jersey has demonstrated that its LCM Provisions are consistent with our Nation's historical tradition. The State has not carried that burden.

As before, we consider "[w]hy and how the regulation burdens the [Second Amendment] right." *Rahimi*, 602 U.S. at 692; *see also Bruen*, 597 U.S. at 29.

We begin by considering why the LCM Provisions were enacted. The original LCM Provisions were passed alongside the Assault Firearm Provisions. The two sets of provisions had the same purpose: to prevent people from misusing these weapons to harm others. And when New Jersey amended the LCM Provisions in 2018 and lowered the lawful capacity of a magazine from fifteen rounds to ten in response to the increased threat of mass shootings, the purpose of the amended Provisions remained the same. Again, the amended LCM

---

guns) is allowed." 554 U.S. at 629. But it did so when considering historical analogues for the challenged modern regulation, not when considering the Second Amendment's plain text.

Provisions addressed a societal concern that dates back to the Founding era. *See Rahimi*, 602 U.S. at 693.

We now examine how the LCM Provisions burden the Second Amendment right. Other than members of law enforcement, the only individuals in New Jersey who can lawfully possess operable LCMs are (1) those who use LCMs with a qualifying and registered "assault firearm" for competitive shooting matches authorized by a United States Army official, N.J. Stat. Ann. § 2C:39-3(j)(1); and (2) those who, since before the 2018 amendments took effect, have owned firearms that can only use detachable magazines that hold between 11 and 15 rounds and that cannot be modified to accommodate 10 or fewer rounds, *id.* §§ 2C:39-3(j)(2); 2C:39-20.

As discussed above, vanishingly few civilians are permitted to register "assault firearms" at all, *see supra* Part I.A, so the subset of those people who may lawfully possess LCMs to use with assault firearms at approved shooting matches is necessarily even smaller. And the other exemption is remarkably narrow, applying only to long-owned nonmodifiable firearms with a narrow capacity range. Even accounting for these exemptions, no civilian in New Jersey who owns firearms for self-defense can possess a magazine capable of holding more than 15 rounds of ammunition. Thus, the LCM Provisions impose a de facto ban on magazines holding more than 15 rounds, and they impose a severe restriction on magazines that can hold 11 to 15 rounds.

We next ask whether LCMs are in common use for lawful purposes. They are.

We have observed that "millions of magazines are owned, often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense." *ANJRPC II*, 910 F.3d at 116 (citations omitted). Of course, not all magazines satisfy New Jersey's definition of an LCM. But the 24 million AR-15s and similar sports rifles in circulation—firearms that we have determined are in common use for lawful purposes—typically come standard with twenty- or thirty-round magazines.[47] And there are over 100 million 30-round AR-15 magazines in circulation.[48]

As one of our sister circuits observed based on similar evidence: "There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). We agree. Based on the data before us, we are assured that LCMs (as defined by New Jersey law) are in common use for lawful purposes.

With this in mind, we consider whether our Nation's historical tradition of regulation supports New Jersey's LCM Provisions. In support of the Provisions, New Jersey offers the

---

[47] In the District Court, New Jersey made boilerplate objections to the admissibility of these facts. The District Court did not resolve the objections, and New Jersey does not reassert them here. Even so, we note that New Jersey does not meaningfully dispute the commonality of LCMs.

[48] The record also contains evidence of many more millions of 30-round magazines in circulation with semi-automatic pistols—a class of firearms we do not examine today.

same analogues as it does for the assault firearms law. Each fails to convince us, for many of the same reasons we have explained. *See supra* Part IV.B.4.

The Founding-era gunpowder storage laws that New Jersey points to were enacted for fire-safety purposes and therefore are not useful analogues to a regulation aimed at preventing firearm violence.[49] And given our holding in *Lara* that a regulation must be supported by a tradition that dates back to the Founding era, 125 F.4th at 441–42, we cannot give much weight to the remainder of New Jersey's suggested analogues. But even if we could give 19th century analogues more weight, the historical regulations New Jersey offers—which largely limited only the concealed carrying of certain arms—cannot support the LCM Provisions' severe restrictions

---

[49] The First and Ninth Circuits have both determined that modern restrictions on magazines that can hold more than ten rounds of ammunition are analogous to Founding-era gunpowder-storage laws. *Ocean State Tactical*, 95 F.4th at 49; *Duncan*, 133 F.4th at 878 ("Both . . . target the component that causes or exacerbates the devastating harm, and both affect the speed at which a person can fire a firearm."). But gunpowder-storage laws are not "relevantly similar" to the LCM Provisions simply because both restrict quantities of ammunition. *Bruen*, 597 U.S. at 29; *see Heller*, 554 U.S. at 632 (observing that gunpowder-storage limits "did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home"). In any event, any similarity in *how* the laws burden the Second Amendment right cannot overcome the disparate reasons *why* the laws were enacted.

and ban on the possession of a broad swath of arms in common use for lawful purposes. *See supra* Part IV.B.4.

As with the Assault Firearm Provisions, we need not employ a "nuanced approach" to analogical reasoning about New Jersey's LCM Provisions. Bans on weapons in common use for lawful purposes are unlawful. *See Bruen*, 597 U.S. at 27; *Heller*, 554 U.S. at 628–29. So are severe restrictions on weapons in common use for lawful purposes. *See Bruen*, 597 U.S. at 47. However much nuance we might employ, we could not overcome the dearth of relevantly similar Founding-era restrictions.

For all these reasons, New Jersey's LCM Provisions violate the Second Amendment.

*       *       *

For the foregoing reasons, we will MODIFY the District Court's summary judgment order in part and AFFIRM it in part as modified, REVERSE the order in part, and REMAND for further proceedings.

**Appendix A**

N.J. Stat. Ann. § 2C:39-1(w)(1) defines "Assault firearm" to include the following firearms:

Algimec AGM1 type

Any shotgun with a revolving cylinder such as the "Street Sweeper" or "Striker 12"

Armalite AR-180 type

Australian Automatic Arms SAR

Avtomat Kalashnikov type semi-automatic firearms

Beretta AR-70 and BM59 semi-automatic firearms

Bushmaster Assault Rifle

Calico M-900 Assault carbine and M-900

CETME G3

Chartered Industries of Singapore SR-88 type

Colt AR-15 and CAR-15 series

Daewoo K-1, K-2, Max 1 and Max 2, AR 100 types

Demro TAC-1 carbine type

Encom MP-9 and MP-45 carbine types

FAMAS MAS223 types

FN-FAL, FN-LAR, or FN-FNC type semi-automatic firearms

Franchi SPAS 12 and LAW 12 shotguns

G3SA type

Galil type Heckler and Koch HK91, HK93, HK94, MP5, PSG-1

Intratec TEC 9 and 22 semi-automatic firearms

M1 carbine type

M14S type

MAC 10, MAC 11, MAC 11-9mm carbine type firearms

PJK M-68 carbine type

Plainfield Machine Company Carbine

Ruger K-Mini-14/5F and Mini-14/5RF

SIG AMT, SIG 550SP, SIG 551SP, SIG PE-57 types

SKS with detachable magazine type

Spectre Auto carbine type

Springfield Armory BM59 and SAR-48 type

Sterling MK-6, MK-7 and SAR types

Steyr A.U.G. semi-automatic firearms

USAS 12 semi-automatic type shotgun

Uzi type semi-automatic firearms

Valmet M62, M71S, M76, or M78 type semi-automatic firearms

Weaver Arm Nighthawk.

MATEY, *Circuit Judge*, joined by MASCOTT, *Circuit Judge*, concurring.

I join the majority's thoughtfully reasoned conclusion that New Jersey's blunderbuss legislation is now, as it was the last three trips to this Court, unconstitutional. And I join the judgment, which will put New Jersey's lawyers to the task of proving how any of the restrictions on these commonly owned and ordinarily enjoyed firearms can meet the rigorous test the majority confirms. Nothing has changed in the decades since the State launched its battle against the Second Amendment and its ongoing defiance of the law. All the while, "[r]ound after round, in both the District Court and this Court, history took center stage," and New Jersey has never lacked ample opportunity to support its firearms ban. *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen.*, No. 19-3142, 2022 WL 22860232, at *3 (3d Cir. Aug. 25, 2022) (Matey, J., dissenting from remand order) [*ANJRPC Remand Order*].[1] There is too much evidence that all of the arms at issue—pistol grips, folding stocks, magazines containing eleven or more rounds, and the semiautomatic shotguns and pistols New Jersey lumped into the definition of "assault weapons" with no real thought—are and have long been in common use for lawful purposes. On remand, New Jersey neither needs, nor deserves, yet another round of lengthy litigation on these same questions. As we confirm today, the Second Amendment demands much more from the regulator than from the challenger, counseling in favor of swift proceedings on remand, not deep discovery to confirm the unconstitutionality of New Jersey's repeated and relentless assault on the Second Amendment. So I reiterate: "Another four years of proceedings to reach those conclusions again is not needed. Nor can the United States remain 'a government of laws . . . if the laws furnish no remedy for the

---

[1] As I explained over three years ago after the Supreme Court decided *Bruen*, "[t]hat the State *decided* not to press those points harder, whether as clever strategy or careless slip, is not relevant. We have been far less forgiving of that sort of waiver by far less sophisticated litigants." *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Att'y Gen.*, No. 19-3142, 2022 WL 22860232, at *3 (3d Cir. Aug. 25, 2022) (Matey, J., dissenting from remand order) [*ANJRPC Remand Order*].

violation of a vested legal right.'" *Id*. at *4 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803)).

But the glass is surely half full, as our decision apprehends that "[t]he right of self defence is the first law of nature," 1 Blackstone's Commentaries, Editor's App. 300 (St. George Tucker ed. 1803), and that "today, no less than in 1791, the Second Amendment guarantees" that natural right, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 78–79 (2022) (Alito, J., concurring). That fundamental truth has been lost on New Jersey's lawyers who at every turn have turned a blind eye to the Constitution while prioritizing histrionics over history. Perhaps New Jersey will now finally honor its oft-repeated commitments to the rule of law and start following this one.

## I.

In 1990, New Jersey enacted a sweeping criminal prohibition on weapons it called "assault firearms." N.J. Stat. Ann. §§ 2C:39-1(w)(1)–(2), -5(f). The ban made it a crime to possess any one of dozens of the Nation's most popular semiautomatic rifles, shotguns, and pistols, or any "substantially identical" gun. *Id.* § 2C:39-1(w)(2). The law also criminalized the possession of semiautomatic shotguns "with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock," *id.* §§ 2C:39-1(w)(3), -5(f), as well as the possession of semiautomatic rifles with a "fixed magazine capacity exceeding 15 rounds," 1990 N.J. Laws 217, 221.

New Jersey also banned what it called "large capacity ammunition magazine[s]," N.J. Stat. Ann. § 2C:39-3(j), making it a crime to possess a "container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm," *id.*; 1990 N.J. Laws 217, 221. In 2018, New Jersey amended the criminal prohibition such that it applied to magazines holding "more than 10 rounds," down from 15. N.J. Stat. Ann. § 2C:39-1(y); *see also id.* § 2C:39-1(w)(4) (prohibiting semiautomatic rifles with a "fixed magazine

capacity exceeding 10 rounds," down from 15).[2] Since their passage, these criminal laws have diverged from the Second Amendment's determination of the natural right to defense.

But at bottom, this case is less about the meaning of the Second Amendment than the process of interpretation. All agree *Bruen* contemplated "two distinct analytical steps." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 435 (3d Cir. 2025). The meaning of these steps is the heart of this dispute as, apparently, "uncertainty abounds" among the courts of appeals about how to apply them. *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 235 (2d Cir. 2025). It need not, and any uncertainty is answered with classical rigor, the sort of legal reasoning that has guided judges in this century, and before. *See* Adrian Vermeule, Common Good Constitutionalism 53 (2022) ("The principles of the classical legal tradition are our own principles written into our own traditions.").[3]

---

[2] As I have explained, and as the majority recognizes, "there simply is no such thing as a 'large capacity magazine.' It is a regulatory term created by the State, meaning no more than the maximum amount of ammunition the State has decided may be loaded into any firearm at one time." *ANJRPC Remand Order*, 2022 WL 22860232, at *4 (Matey, J., dissenting); *see also United States v. McIntosh*, 124 F.4th 199, 217 n.5 (3d Cir. 2024) (Matey, J., concurring in the judgment). For the same reasons, there is no objective meaning of an "assault rifle," a term referring to a long gun with some combination of features that some regulator has decided should not be combined. Virtuous republics commit themselves to principled legal distinctions, not marketing materials recycled into legislation. *Id.*

[3] *See also Range v. Att'y Gen.*, 124 F.4th 218, 234 n.4 & 234–35 (3d Cir. 2024) (Matey, J., concurring) ("consulting classical authorities discussing natural law to inform the determination of written rights" is a "well-established practice," and "[a]bsent exploration of the natural principles that support our legal tradition, we overlook those 'certain primary truths, or first principles, upon which all subsequent reasonings must depend'" (quoting The Federalist No. 31, at 193 (Alexander Hamilton) (C. Rossiter ed., 1961))). Even Justice Holmes, who

3

## II.

*Bruen*, as others have noted, is an expression of the common-law tradition that informs[4] the positive enactment of the preexisting right to bear arms. Using that background, I explain how the *Bruen* framework ensures the continued vitality of the analogical reasoning drawn from the common-law tradition.

---

publicly "dismiss[ed] . . . natural law," *see* Albert Alschuler, *From Blackstone to Holmes: The Revolt against Natural Law*, 36 Pepp. L. Rev. 491, 497 (2009), consulted classical sources to inform his understanding of positive law, *see, e.g.*, *Ker & Co. v. Couden*, 223 U.S. 268, 275–76 (1912) (Holmes, J.) (relying on "intimations of the doctors of the Roman law" expressed in Justinian's Institutes, as well as provisions from King Alfonso X of Castile's thirteenth-century Seven Divisions of Law, to show "[t]hat the question is a vexed one"); *see also id.* at 279 (McKenna, J., dissenting) (relying on a "principle, said to be of natural justice"); *United States v. The La Jeune Eugenie*, 26 F. Cas. 832, 846 (Story, Circuit Justice, C.C.D. Mass. 1822) (No. 15,551) ("[E]very doctrine, that may be fairly deduced by correct reasoning from the rights and duties of nations, and the nature of moral obligation, may theoretically be said to exist in the law of nations . . . . And I may go farther and say, that no practice whatsoever can obliterate the fundamental distinction between right and wrong, and that every nation is at liberty to apply to another the correct principle, whenever both nations by their public acts recede from such practice, and admits the injustice or cruelty of it.").

[4] *See* Hon. Diarmuid F. O'Scannlain, *The Natural Law in the American Tradition*, 79 Fordham L. Rev. 1513, 1523–27 (2011) (explaining "the natural law is useful when interpreting provisions of the Constitution that were themselves efforts to codify pre-existing natural law rights," and "when [judges] recall that our constitutional rights are codifications of those innate rights which exist independent of government," as opposed to "simply what the founders decided to protect," judges "are better equipped for t[he] task" of "protect[ing] these rights against the passion of the times").

## A.

Start with "Step One," a consideration of the commitment that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 497 U.S. at 17. It is a straightforward inquiry, the ordinary threshold review into the relevance of a written law.[5]

"The principal task of courts" at this stage "is to apply the original linguistic meaning" of the Second Amendment to the facts of the case. J. Joel Alicea, Bruen *and the Founding-Era Conception of Rights*, 101 Notre Dame L. Rev. (forthcoming 2026) (manuscript at 5) (on file with author); *see also United States v. Bridges*, 150 F.4th 517, 547 (6th Cir. 2025) (Nalbandian, J., concurring).[6] This first step is necessary

---

[5] "[W]e begin by asking whether the Amendment's terms cover the conduct in question." *United States v. Hemani*, 146 S. Ct. 1677, 1685 (2026). It is "worthwhile to demand" that courts decide, at the threshold, whether to "construe a statute, treaty, or constitutional provision" at all, or "hold it inapplicable instead." Frank H. Easterbrook, *Statutes' Domains*, 50 U. Chi. L. Rev. 533, 533–36 (1983). We can call this pause "classical textualism," where the interpreter confirms "the particulars of the application of the law at issue." Adrian Vermeule, Common Good Constitutionalism 74–75 (2022).

[6] There is reason to believe that the text of the Second Amendment—like the text of other amendments declaratory of preexisting natural rights—should be understood as "a placeholder for complex ideas that would be difficult, if not impossible, to reduce to textual form." Jud Campbell, *Determining Rights*, 138 Harv. L. Rev. 921, 960 (2025); J. Joel Alicea, Bruen *and the Founding-Era Conception of Rights*, 101 Notre Dame L. Rev. (forthcoming 2026) (manuscript at 19) (on file with author) ("True, as Madison conceded, the text could only describe the right as well as 'the nature of the language would admit.' We know that there were, in fact, aspects of the right that were not fully captured by the text." (citation omitted)). That is often the case with positive law, which is no more than "a set of rational ordinances promulgated by the public authority for the common good—

5

because the liberty from state action codified by the Second Amendment is, it seems, more limited than the natural right it recognizes,[7] as the Second Amendment only "'extends, prima

---

that is, in order to give more specific content to the general principles of the natural law." Vermeule, Common Good Constitutionalism, *supra*, at 44. But "it does not follow that the precise wording of the text should play no significant role in understanding the scope of the right." Alicea*, Founding-Era Conception of Rights*, *supra*, at 15–16. To the contrary, it "makes sense to treat a violation of the text as *prima facie* evidence of a violation of the underlying right," *id.* at 19, considering the "members of the First Congress expressed agnosticism about the amendments alongside profound concern about their wording," Campbell, *Determining Rights*, *supra*, at 964; *United States v. Rahimi*, 602 U.S. 680, 708 (2024) (Gorsuch, J., concurring) ("text *and* history dictate the contours of th[e] right," but where the "*text* covers an individual's conduct," that conduct is presumptively protected by the Constitution (emphases added)). Text does not exhaust the law, but it cannot be ignored. *See* Brian Flanagan, *Hard Evidence of the Spirit of the Law*, The New Digest (Feb. 13, 2024) ("[A] rule's text is the dominant but not the sole determinant of how we think it ought to be applied."), https://perma.cc/T5GF-CNVL.

[7] The "natural right of resistance and self-preservation" is secured by the "public allowance, under due restrictions," of "having arms for [one's] defence." 1 William Blackstone, Commentaries *143–44. "[I]t is not, neither can it be in fact, taken away by the law of society," 3 Blackstone, Commentaries *4, and it "naturally belongs to every one, and stands in no need of permission," Emmerich de Vattel, The Law of Nations 466 (Simeon Butler ed. 1820) (1758), meaning the natural right would be present and operative even in the absence of the Second Amendment. *See also Range*, 124 F.4th at 236 (Matey, J., concurring) ("[T]he liberty to defend oneself with arms" is "a right inherent in natural society that 'the law very wisely, and in a manner silently, gives a man'" (quoting Marcus Tullius Cicero, Speech in Defence of Titus Annius

facie, to all instruments that constitute bearable arms.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)); *see also Wolford v. Lopez*, 609 U.S. ----, 2026 WL 1825723, at *6 (U.S. June 25, 2026) ("[B]ecause th[e] right was not in every way coterminous with the Amendment's literal language, further analysis may be needed.").

A familiar path follows. If the arm is bearable, then it is presumed to reside within the liberty protected by the Second Amendment. That presumption can be challenged because the Amendment, like the underlying natural right, is not unlimited. Cause, grounded in traditional reason,[8] may well justify state action that shapes the liberty retained. That is because liberty, as traditionally grounded, does not exist abstractly.[9] It is

---

Milo (c. 52 B.C.), *in* 3 Orations of Marcus Tullius Cicero 390, 394 (C.D. Yonge trans. 1913))).

This natural right to self-defense, and the right to carry a gun for that purpose, is inherent in society because "the law is chiefly ordained to the common good," indeed "every law is," Thomas Aquinas, Summa Theologica, pt. I-II, q. 90, art. 2 (Fathers of the English Dominican Province trans., Benzinger Bros. ed. 1947) (c. 1271), and "the life of the righteous man preserves and forwards the common good," *id.*, pt. II-II, q. 64, arts. 6–7. So it is "not unlawful" to use deadly force insofar as "one's intention is to save one's own life, . . . seeing that it is natural to everything to keep itself in 'being,' as far as possible." *Id.*; *see also* Alberico Gentili, De Iure Belli Libri Tres 164 (John C. Rolfe trans., Oxford ed. 1933) (1612) ("[R]eason itself is the law, which from the beginning has been used for injuring the enemy.").

[8] *Bank of Toledo v. City of Toledo*, 1 Ohio St. 622, 630–31 (1853) ("A legal principle, to be well settled, must be founded upon *sound reason* . . . . [L]aw is the perfection of reason, and that it is the reason and justice of a legal principle, which give to it its vitality.").

[9] Conor Casey & Adrian Vermeule, *Myths of Common Good Constitutionalism*, 45 Harv. J.L. & Pub. Pol'y 104, 108 (2022) ("Law in [the classical legal] tradition is understood, as

always contextual, always understood in relation to the common good. *See Range v. Att'y Gen.*, 124 F.4th 218, 241 (3d Cir. 2024) (Matey, J., concurring).

Of course, because the liberty found in the Second Amendment is one *from* state action, the state carries the burden to demonstrate there is no infringement of the right retained. As *Rahimi* explained, "when the Government regulates arms-bearing conduct, . . . it bears the burden to 'justify its regulation.'" 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24). All meaning that if the firearm regulated by state action is a "bearable arm," then the analysis moves to the state's attempt to explain that its regulation is permissible.

**B.**

That brings *Bruen*'s supposedly enigmatic "Step Two": the regulator must show that the restriction reflects this Nation's "historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Here we must assess whether the regulation's proponent has demonstrated that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Hardly novel, this examination is an expression of customs preexisting the Second Amendment that justified the restriction on the right to bear arms.[10] The test encourages us to use straightforward "common-law method[s]" to help "untangle the *right* to keep

---

Aquinas famously framed it, as an ordinance of reason promulgated by political authorities for the common good."); Dante Alighieri, De Monarchia 40 (Prue Shaw trans. & ed. 1996) (c. 1313) ("[I]f the goal of any society is the common good of its members, it necessarily follows that the purpose of every right is the common good.").

[10] *See, e.g.*, Samuel Pufendorf, Of the Law of Nature and Nations: Eight Books 52, Barbeyrac note to § 11 (Basil Kennett trans. 4th ed. 1729) (1672) ("If a Person that walks in his Sleep, being advertised of what he does in his Sleep, does not secure his Arms, and take other necessary Precautions to hinder him from doing any Mischief whatsoever, he is not excusable." (citing Aulus Hirtius, De Parem. Jur. Germanic, Lib. 3, Parem. I. § 4)).

and bear arms—that is, the legal claim individuals have against the government not to regulate arms in certain ways—from the mere liberty that early Americans had to possess and carry all sorts of weapons (including some that the Framers may not have recognized as constitutionally protected)," and it "resembles, if not nearly mirrors (albeit in different language), the traditional general-law approach in state court cases involving the right to bear arms." William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1488–89, 1497 (2024); *see also Wolford*, 2026 WL 1825723, at *6 ("It undeniably necessitates an exercise of judgment.").

The Step Two analysis implicates two further questions. First, is the bearable arm in common use? Second, what is the best analogy between customary restrictions and the present limitation; or, in other words, what is the strongest principle native to our tradition that would allow that limitation? Answering both is necessary to avoid the easy error of overly broad or underinclusive comparisons. And each demands critical review of the customs exhibited by earlier events, not a careless canvassing of documents and records. We ask a legal question, not a historical one, avoiding the unfortunate tendency of using history to establish, rather than evidence, the law. And turning too quickly to history risks subordinating law to custom. Law is always richer than facts and circumstances. *See* Alberico Gentili, De Iure Belli Libri Tres 165 (John C. Rolfe trans., Oxford ed. 1933) (1612) ("[T]he laws of war do not vary, although the incidental features of war change; . . . we must not establish our principles from facts but from their reasons.").[11] So we start by asking the regulator: is your

---

[11] *See also* J. Joel Alicea, Bruen *Was Right*, 174 U. Pa. L. Rev. 13, 35–36 (2025) ("Traditions are *reflected in* practices, but they are not *reducible to* practices. A tradition describes some principle or set of principles that *explain* and *unify* the practices. But it is the principles, not the practices, that constitute the tradition."). Of course, "[t]here may be some practices that are so closely associated with the principles they reflect that to do away with the practice is to destroy the tradition." *Id.* at 36 n.181; *see also* Erik Bjorge, *General Principles of Law Formed Within the International Legal*

proposed liberty definition[12] consistent with tradition? And we can test the response by looking for evidence of customarily similar definitions.

**1.**

This is where the common use of the firearm is helpful. When a commonly accepted practice is incompatible with a regulator's proposed definition of the Second Amendment liberty, that is powerful evidence that the proposed definition is inapt. Logically there can be no custom supporting the wholesale ban of a common arm, and indeed, it has long been understood that using an ordinary firearm in a genuine act of

---

*System*, 72 Int'l & Compar. L. Q. 845, 859 (2023) ("[G]eneral principles constitute both the backbone of the body of law . . . and the potent cement that binds together the various and often disparate cogs and wheels of the normative framework." (citation omitted)); John Henry Newman, *An Essay on the Development of Christian Doctrine* 178 (1845) ("The life of doctrines may be said to consist in the law or principle which they embody. Principles are abstract, . . . doctrines relate to facts; doctrines develope, and principles at first sight do not; doctrines grow and are enlarged, principles are permanent."); *id.* at 185 ("Thus the *continuity or the alteration of the principles* on which an idea has developed is a . . . mark of discrimination between a true development and a corruption.").

[12] Every definition has a contracting effect. When a regulator proposes a firearm restriction, it also necessarily offers a definition of the scope of the Second Amendment right. Classical lawyers would refer to constitutionally compliant legislation of this sort as a "reasonable specification of legal principles— . . . *determinationes* or determinations," meant to "give more specific content to the general principles of the natural law." Vermeule, Common Good Constitutionalism, *supra*, at 44. The Supreme Court has adopted this conception of law in commanding courts to "[d]iscern[] and develop[] the law" by assessing whether a proposed regulation is compatible with "the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

10

self-defense does not violate default criminal prohibitions.[13] Here, the record already contains notable evidence that all arms subject to the challenged ban are in common use for lawful purposes and have been for generations.[14] Such common use would disprove the existence of a closely analogous, customary definition of the liberty codified in the Second

[13] *See, e.g.*, Thomas Wood, An Institute of the Laws of England, or, the Laws of England in their Natural Order, according to Common Use 430 (3d ed. 1724) (explaining that, notwithstanding the default prohibitions in the Statute of Northampton, "[m]en may use *Common Arms* according to their Quality and according to the Fashion" for self-defense (emphasis added)); Gentili, *supra*, at 164 (explaining that the legitimacy of an arm is supported by evidence of "usage [by] a former generation").

[14] Along with today's opinion, which clarifies several doctrinal questions under the Second Amendment, such evidence will hopefully streamline, and constrain the scope of, any further District Court proceedings on remand. *See, e.g.*, App. 2677 (6/15/2023 Kapelsohn Rep. at 10) ("Semiautomatic rifles, shotguns, and handguns were all developed before 1900, and were in common use in the 1900s."); App. 2487 (8/4/2023 Kapelsohn Dep. Tr. 142:6–13) ("[T]here are more firearms used in self-defense that are not semi-automatic rifles than that are semi-automatic rifles," including "all kinds of . . . shotguns."); App. 3260 (6/8/2021 Kapelsohn Dep. Tr. 215:13–18) (with respect to pistol grips and recoil-reducing stocks, "the most commonly available, most popular, most successful model of telescoping recoil reducing stock for shotguns" is a model that has the pistol grip "molded in as part of it"). Indeed, the banned weapons appear to fall within the heartland of the Second Amendment protection—an "individual right to own privately and keep weapons suitable for militia service." *See* Marcus Armstrong, *The Militia II: Armed Self-Defense, the Second Amendment, and the Citizen*, 56 St. Mary's L.J. 739, 763 (2025); *see also* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L.J. 1587, 1649 (2014) ("How could an originalist interpretation of the Second Amendment exclude from its protection the kinds of weapons necessary to resist tyranny?").

Amendment. And it would serve as virtually conclusive evidence that no part of the challenged ban comfortably fits any qualifying principle informing our regulatory tradition of contracting the right to bear arms.

### 2.

Some criticize this focus on common use as an absurd "counting exercise," *Lamont*, 153 F.4th at 233 (quoting *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc)), but they miss the point. Absurd is ignoring or diminishing common use, since it can serve as the most helpful illustration of the unsuitability of a sovereign's asserted principle. Common use can reveal that a regulation of a bearable arm is inconsistent with the very reasoning offered by the regulator and can also guide meaningful legislative action.[15] Or, as *Bruen* explains, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26. Here, the already accessible evidence of the regulated objects' common use should illustrate the unsuitability of New Jersey's overly broad analogy to "unusually dangerous" weapons. And as our majority opinion recognizes, once common use is established,

---

[15] "Danger," cries New Jersey. But "[i]t is not the arms which fight, [rather] the men." Gentili, *supra*, at 165. Today's result should make clear that restrictions on natural rights can only withstand constitutional scrutiny when the State exercises discipline in drafting and defending proposals narrowly tailored to the common good, consistent with the regulatory tradition already codified in the Second Amendment. We are "bound to reason through" coherent "arguments from text and history . . . as best we can." *Rahimi*, 602 U.S. at 712 (Gorsuch, J., concurring). Advancing such arguments is a task much harder than New Jersey's preferred practice of regulating everything, everywhere, always, but it is one that the State must accept. Whether labeled as "common sense gun safety," or similarly facile phrases like "sanctuaries," "medicinal," or "safe and effective," defying federal law is not an option available to New Jersey or any state in our Republic.

nothing more will be needed and the State's systematic control of the determined natural right should end without further inquiry.

### III.

But what is the proper course when there is no evidence of common use? Recall *Bruen* explains that courts must extrapolate from past to present by looking at custom as illustrated by historical data. *Id.* at 27 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation."). That makes strong sense, as looking at relevantly similar regulations might reveal a custom supporting the same definition of (or, again, restriction on) liberty resulting from the present policy. Or, better: if there is a custom of regulating a bearable arm that is analogous to the challenged regulation then there is no new deprivation of the liberty maintained by the Second Amendment. Rather, it is the deprivation of a liberty not governed by the Second Amendment in the first place. Courts must arrive at such conclusions not by "uphold[ing] every modern law that remotely resembles a historical analogue" nor by looking for some "historical twin" or "dead ringer.*" Id.* at 30 (citation and emphasis omitted). Instead, we must reason "by analogy—a commonplace task for any lawyer or judge." *Id.* at 28. If anything, that understates the provenance of a practice that stretches, unbroken, through the centuries.[16]

---

[16] Joseph Story, Commentaries on the Constitution of the United States § 157 (Thomas M. Cooley, 4th ed. 1873) (1833) ("The universal principle (and the practice has conformed to it) has been, that the common law is our birthright and inheritance, and that our ancestors brought hither with them upon their emigration all of it which was applicable to their situation. The whole structure of our present jurisprudence stands upon the original foundations of the common law."); 1 James Kent, Commentaries on American Law 342–43 (E.B. Clayton, 4th ed. 1840) (1826) ("[T]he common law has become a code of matured ethics, and enlarged civil wisdom, admirably adapted to promote and secure the freedom and happiness of social life. It has proved to be a system replete

**A.**

This analogical reasoning "requires a determination of whether the two regulations are 'relevantly similar,'" and "needs 'some metric enabling the analogizer to assess which similarities are important.'" *Id.* at 29 (citations omitted). And *Bruen* explains that determination includes "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*[17] Try an easy example and suppose a state bans

---

with vigorous and healthy principles, eminently conducive to the growth of civil liberty . . . . It is the common jurisprudence of the people of the United States, and was brought with them as colonists from England, and established here, so far as it was adapted to our institutions and circumstances . . . . It fills up every interstice, and occupies every wide space which the statute law cannot occupy.").

[17] Here, I depart from Judge Freeman's thoughtful opinion, Maj Op. 39–41 & nn. 26–27, in two ways. First, I do not view *Bruen* and *Rahimi*'s references to the "how and why" of a Second Amendment restriction to require a severable analysis. Our focus is the aims of the legislature and we "apply traditional common-law jurisprudential principles, nothing more, nothing less." William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1494 (2024) ("*Bruen* reflects a valiant attempt to avoid the confusion created by changing conceptions of the common law. But in the process it may have made the inquiry sound more novel than it really is."). *Bruen* characterized "how and why" questions merely as "two metrics" in a non-exhaustive list of considerations that could inform whether a proposed regulation is consistent with tradition. 597 U.S. 1, 29 (2022). *Rahimi* follows that formula noting "[w]hy and how the regulation burdens the right are central to th[e] inquiry," but only as "indicator[s]," because "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right." 602 U.S. at 692. Likewise in *Hemani*, the Court confirmed it has "not yet had cause to 'exhaustive[ly] survey' the features that may render a modern law 'relevantly similar' to historical ones." 146 S. Ct. at 1686. And in *Wolford*, the Court again explained that Step 2 "is not

"tommy gun"-style drum magazines holding ammunition over a certain number of rounds. That could be explained as a restriction on dangerous weapons, dark-colored weapons, even repeating weapons. But the explanations are inapt, both over and underinclusive of plenty of dangerous, dark, repeating firearms.[18] Yet a crisp comparator is possible when we examine why drum magazines were first regulated: their singular use by Prohibition-era criminals for a host of misconduct. William J. Helmer, The Gun That Made the Twenties Roar 126 (1969) ("As a criminal's weapon, the Tommy gun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it had never come off the drawing board."). So the proper analogy is bearable arms used exclusively or, at least, disproportionately, by persons for criminal conduct in contravention of the standards recognized by the political community.[19] As *Bruen* explains, "if earlier generations

---

mechanical." *Wolford v. Lopez*, 609 U.S. ----, 2026 WL 1825723, at *6 (U.S. June 25, 2026). In other words, we need not consider "why" and then "how," only whether the nature of the restriction fits or fights the restrictions on firearms tolerated since the founding.

Second, following *Hemani* and *Wolford*, I frame questions of "why" a regulation exists narrower than invocations of "dangerousness" and "safety," as those concerns can motivate or mask almost any state action. *See Hemani*, 146 S. Ct. at 1687–90; *Wolford*, 2026 WL 1825723, at *13–14. Indeed, as explained above, it seems impossible to imagine scenarios where these talismans are not invoked to defend firearms regulations, the "well-traveled road in the Garden State, where long-dormant regulatory powers suddenly spring forth to address circumstances that have not changed." *Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886, 896 (3d Cir. 2022) (Matey, J., concurring).

[18] Illustrating, again, the silliness of attempting to justify regulations by slogans like "assault rifles" and "large capacity magazines."

[19] In other words, a proper analogy should distinguish between the substantive and accidental features of historical analogues

15

addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 597 U.S. at 26–27.[20]

---

offered by the state in support of a claimed regulatory tradition. "Determining which practices can change consistent with tradition" is a legal inquiry, requiring courts to assess which features of the practice are "substantive," or "part of the contours of the right," and which features are "incidental" or "contingent." Alicea, Bruen *Was Right*, *supra*, at 36 n.181, 52.

[20] We should ask whether analogical reasoning will ever permit the regulation of an existing weapon currently in common use. New firearms present no challenge. If a laser rifle appears tomorrow, then analogies to existing bans will likely support restrictions, and common use would be no concern given its novelty. So, could something like a semiautomatic rifle be regulated based on changing circumstances? Suppose that over a measurable period the ownership and use of a semiautomatic rifle tilted massively toward criminal conduct not sport, self-defense, or defense against tyranny. At that time, a state might return to the "tommy gun" analogy: arms used exclusively or, at least, disproportionately, by persons for criminal conduct in contravention of the standards recognized by the political community might be regulated consistent with the Second Amendment. Additional examples of suitable principles supporting regulation may exist, and we need not list those here, but we can acknowledge what is always understood: the liberties recognized by the Constitution are subject to regulation consistent with the common good.

We can also acknowledge that holding a state law unconstitutional is not a declaration about the per-se legality of the practices or guns being prohibited; it is a ruling on the sufficiency of the regulator's proposed definition of the liberty codified by the Second Amendment. *See Hemani*, 146 S. Ct. at 1687, 1692 (explaining that courts must "decide cases 'based on the historical record' and arguments 'compiled by the

**B.**

At Step Two, we must also embrace the applicability of certain deeply rooted background principles of law that may themselves *detract from* the constitutional validity of a regulation, like the rule against arbitrary exercises of police power.[21] We may also guard against legislative deception and

parties' before us,'" and focusing on the sovereign's "submission"); *see also id.* at 1701 (Alito, J., concurring in the judgment) (focusing on "the deficiency of the Government's analogues"); Alicea, *Founding-Era Conception of Rights*, *supra*, at 39 ("If the text supports the rights-claimant but the historical record is indeterminate, the rights-claimant should win, but in such a scenario, that is not because the original meaning is definitive. . . . If later historical evidence comes to light that supports the government's regulation, courts should be willing to reconsider their prior historical findings and, therefore, their interpretation of what the law is."); Haley N. Proctor, *"Will the Meaning of the Second Amendment Change . . . ?": Party Presentation and Stare Decisis in Text-and-History Cases*, 98 N.Y.U. L. Rev. Online 453, 454 (2023) ("[T]he Second Amendment adopts (and the Fourteenth Amendment incorporates) a pre-existing right whose meaning is largely determinate and unchanging . . . . The Court's *knowledge* of that meaning, however, is another matter.").

[21] The law's disapproval of arbitrary exercises of police power is deeply rooted. *See Varick v. Smith*, 5 Paige Ch. 137, 159 (N.Y. Ch. 1835) ("It is not pretended that, even under the arbitrary government of the Roman emperors, it was lawful or justifiable for the sovereign to take the property of one citizen and give it to another, where the public interest was not concerned in such transfer." (citing 1 Domat's Civil Law, b. 1, tit. 2, § 13)); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *McLean v. Arkansas*, 211 U.S. 539, 547 (1909) ("[T]he police power of the state is not unlimited, and is subject to judicial review; and, when exerted in an arbitrary or oppressive manner, such laws may be . . . violative of rights protected by

subterfuge, because "man does not exist for the sake of government, but government instituted for the sake of man." Collected Works of James Wilson 1083 (Kermit L. Hall & Mark David Hall eds. 2007).[22] These principles—themselves

the Constitution."); *Dobbins v. City of Los Angeles*, 195 U.S. 223, 236 (1904) ("[I]t is now thoroughly well settled by decisions of this court that municipal by-laws and ordinances, and even legislative enactments undertaking to regulate useful business enterprises, are subject to investigation in the courts with a view to determining whether the law or ordinance is a lawful exercise of the police power, or whether, under the guise of enforcing police regulations, there has been unwarranted and arbitrary interference with the constitutional rights to carry on a lawful business, to make contracts, or to use and enjoy property."); *Mugler v. Kansas*, 123 U.S. 623, 661 (1887) ("The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty, indeed, are under a solemn duty, to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution.").

[22] St. Augustine "distinguishe[d] between the admirable Roman leaders who sought 'true glory' and those who desired 'domination,' . . . the latter . . . us[ing] 'guile and deceit, wishing to seem good when they are not.'" Robert J. Delahunty, *The Conscience of a King: Law, Religion, & War in Shakespeare's King Henry V*, 53 J. Cath. Legal Stud. 129, 167 (2014) (quoting St. Augustine, *The City of God*, *in* The Works of St. Augustine 171–73 (Boniface Ramsey ed. 2012)). De Vattel similarly remarked that notwithstanding political pressures, "[g]oodness, friendship, [and] gratitude, are still virtues of the throne." Vattel, *supra*, at 70. More recently and along these lines, scholars have described flavors of "legislative deception," a practice that erodes the very purpose of government. A legislature may sometimes "leave[] the generalized substantive law intact, but legislatively direct[]

part of the common-law right to bear arms—further illuminate the illegality of New Jersey's conduct.[23]

---

that a particular litigation (or group of litigations) arising under that law be resolved in a manner inconsistent with the dictates of that pre-existing generalized law." *See* Martin H. Redish & Christopher R. Pudelski, *Legislative Deception, Separation of Powers, and the Democratic Process: Harnessing the Political Theory of* United States v. Klein, 100 Nw. U. L. Rev. 437, 439 (2006). Or it might "leave[] substantive law unchanged on its face, but alter[] it in a generally applicable manner by enacting procedural or evidentiary modifications that have the effect of transforming the essence—or what can appropriately be described as the 'DNA'—of that law." *Id.* Underexplored in this debate is harm done to the political community by legislative manipulation of manufactured regulatory labels, like "assault firearm" or "LCM." *See* Zachary D. Clopton, *Catch and Kill Jurisdiction*, 121 Mich. L. Rev. 171, 209 (2022) (criticizing practices that "alter[] the essence of underlying substantive law . . . in a manner not likely to be recognized by most political consumers" (quoting Redish & Pudelski, *supra*, at 458)).

[23] *See, e.g.*, *Strickland v. State*, 72 S.E. 260, 263 (Ga. 1911) ("[T]hat the Legislature may prohibit the carrying of concealed weapons essentially concedes the police power of regulation to some extent. If this be conceded, the question then becomes one as to whether the particular regulation involved is legitimate and reasonably within the police power, or whether it is arbitrary, and, under the name of regulation, amounts in effect, to a deprivation of the constitutional right."); *see also State v. Kerner*, 107 S.E. 222, 226 (N.C. 1921) (Allen, J., concurring) ("The right to bear arms, which is protected and safeguarded by the federal and state Constitutions, is subject to the authority of the General Assembly, in the exercise of the police power, to regulate; but the regulation must be reasonable and not prohibitive, and *must bear a fair relation to the preservation of the public peace and safety*." (emphasis added)); Baude & Leider, *supra*, at 1489 ("[S]cholars and cases suggest that legislation could fail to be a proper exercise of the police power [to regulate arms] in multiple ways. The

19

For one, New Jersey relies on concocted catchphrases—"LCMs" and "assault weapons"—regularly modifying the definitions of both without any meaningful limit and "[a]ll based on little more than its current say-so." *United States v. Hemani*, 146 S. Ct. 1677, 1693 (2026) (explaining that a sovereign's "current say-so" is insufficient to justify distinctions drawn in a firearms regulation). The record leaves no doubt that, by LCMs, New Jersey means "no more than the maximum amount of ammunition [it] has decided may be loaded into any firearm at one time. Sixteen rounds was large yesterday, eleven rounds is large today." *ANJRPC Remand Order*, 2022 WL 22860232, at *4 (Matey, J., dissenting). Nor does any limiting principle guide the State's definition of "assault weapons."

While "[t]he State is welcome to market its policy goals using catchy slogans, . . . the rights of our Republic are built on sturdier stuff." *Id.*; *see also Range*, 124 F.4th at 228. And to the extent New Jersey has attempted to simplify its evidentiary burden—either by 1) grouping dozens of different kinds of weapons into its "assault weapons" slogan or 2) deliberately "boost[ing its] claims of regulatory interest," *ANJRPC Remand Order*, 2022 WL 22860232, at *3 (Matey, J., dissenting), in using the "LCM" slogan—this Court is duty-bound to guard against such manipulative practices in light of the countervailing natural right they encroach upon.

\* \* \*

Our Court today returns the Second Amendment to its appropriate place in our constitutional design. That is a welcome step that should end the anxiety imposed over millions of New Jerseyans who have been unable to enjoy their natural liberties without wondering what new turn of phrase will descend from Trenton to take away their freedom. And our

---

regulation could be arbitrary, such that it did not 'bear a fair relation to the preservation of the public peace and safety.' The law could be disproportionate to the legitimate ends sought to be achieved. And, perhaps most importantly, the law could eviscerate the core purpose that the right sought to achieve, in which case the law would amount to a denial or abridgment of the right rather than a mere regulation.").

decision brings opportunity to return the understanding of the Second Amendment to the classical framework designed to inform citizens of the conditions suitable for the maintenance of the common good. For those reasons, and with hope, I concur.

PHIPPS, *Circuit Judge*, concurring in part and concurring in the judgment.

I join the Majority Opinion in nearly every respect, but I do not believe that there is a common purpose between the restrictions on weapons that "our tradition is understood to permit" and the challenged New Jersey statutes. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). In evaluating this issue under the 'why prong' of *Bruen* Step Two, *see N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29 (2022), the Majority Opinion concludes that traditional regulations on the right to keep and bear arms as well as the Assault Firearm Provisions and the LCM Provisions, all have a common purpose – "seek[ing] to 'bar[] people from misusing weapons to harm or menace others.'" Maj. Op. at 39–40 (second alteration in original) (quoting *Rahimi*, 602 U.S. at 693). That characterization of the purpose for the relevant historical restrictions on the right to keep and bear arms is too broad; those had a more focused purpose – to prevent the actual or imminent misuse of firearms to harm or menace others. Using the narrower conception of the purpose for the historical restrictions, the why prong is not satisfied for either of the challenged statutory provisions, and that serves as an independent basis for their unconstitutionality.

In populating the set of relevant historical analogues, I agree with the Majority Opinion that all but two of the proposed historical restrictions of weapons are not valid comparators. Maj. Op. at 49–53 (explaining that the prohibitions on Bowie knives; slingshots; and the concealed carry, sale, or exchange of pistols and revolvers are inapt analogues); *id.* at 63 (explaining that Founding-era gunpowder storage laws are not analogous to "regulation[s] aimed at preventing firearm violence"). The only relevant historical analogues are going armed laws and surety laws.

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court explained both of those comparators and

defined the scope of their applicability. Going armed laws punished individuals based on the misuse of arms to terrify the public, *see id.* at 697, and surety laws targeted "individuals suspected of future misbehavior," *id.* at 695. In reliance on those two analogues, the Supreme Court recognized a history and tradition of regulating the *actual* misuse of weapons:

> From the earliest days of the common law, firearm regulations have included provisions barring people from *misusing weapons* to harm or menace others.

*Id.* at 693 (emphasis added). It also acknowledged a historical tradition of preventing the *imminent* or threatened misuse of firearms:

> Since the founding, our Nation's firearm laws have included provisions preventing individuals who *threaten* physical harm to others from misusing firearms.

*Id.* at 690 (emphasis added). Thus, taken together, these two historical analogues have the purpose of regulating people who *actually* or *imminently* misuse firearms to harm or menace others. *See id.* at 697–98 (explaining that going armed laws "provided a mechanism for punishing those who had menaced others with firearms" and that "surety laws provided a mechanism for preventing violence before it occurred," such that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed"). Under that articulation of purpose, the Assault Firearm Provisions and the LCM Provisions would fail the why prong because those statutes bar the possession of assault rifles and LCMs based on their *potential* for misuse, however remote, and that is broader than actual or imminent misuse.

By contrast, the Majority Opinion does not limit the purpose of going armed laws and surety laws to the actual or

2

imminent misuse of firearms. Its more general formulation of the purpose for those historical regulations – "seek[ing] to 'bar[] people from misusing weapons to harm or menace others'"– includes the potential misuse of firearms to harm or menace others. *See* Maj. Op. at 39–40 (second alteration in original) (quoting *Rahimi*, 602 U.S. at 693). Using that broader formulation, there is a match between the historical purposes for firearm regulation and the purposes behind the Assault Firearm Provisions and the LCM Provisions.

But if the purpose behind the historical analogues is read that capaciously, then it would encompass nearly every firearm regulation because guns are, by their nature, dangerous and capable of misuse. The Supreme Court, however, did not articulate the purpose behind the historical analogues that broadly in *Rahimi*, 602 U.S. at 690, 693, 697, and in later considering other historical analogues, it has resisted that degree of abstraction, *see, e.g.*, *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at *13 (U.S. June 25, 2026) (not characterizing anti-poaching laws as barring the misuse of firearms to harm or menace others despite recognizing that a poacher by "the firing of guns[,] . . . created a risk of inadvertently inflicting death or serious injury on the owner of the property, others who were authorized to use the property, and livestock"). And for good reason. An articulation of the purpose for a historical restriction of weapons at a level of generality such that it will nearly always be satisfied is too broad of a formulation not only because it makes the analysis an empty exercise but also because it jeopardizes the rights expressly protected by the text of the Second Amendment, leaving the 'how prong' as the primary barrier to the limitation of those rights. *See Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) ("[A] court must be careful not to read a principle at such a high level of generality that it waters down the right."); J. Joel Alicea, Bruen *was Right*, 174 U. Pa. L. Rev. 13, 55 (2025) ("[I]nsofar as a party asserts that there is a historical tradition whose 'why' or 'how' reflects antipathy to the nature of the right to keep and bear arms, that cannot be a proper

3

understanding of the tradition, and it likely means that the tradition is being defined at too high or too low a level of generality.").

Even if both interpretations of the purpose behind the historical analogues – one limited to actual or imminent misuse, and the other inclusive of potential misuse – are plausible, the Supreme Court has articulated a tiebreaker: "favor the one that is more consistent with the Second Amendment's command." *Bruen*, 597 U.S. at 44 n.11. Through that lens, it is more consistent with the Second Amendment to construe the purpose of historical analogues more narrowly, such that their intent was the prevention of actual or imminent firearm misuse.

For these reasons, the Assault Firearm Provisions and the LCM Provisions do not satisfy the why prong of *Bruen* Step Two. Other than this respectful disagreement, I join the Majority Opinion.

4

MONTGOMERY-REEVES, *Circuit Judge*, concurring.

I agree with the majority's well-reasoned opinion because current Supreme Court precedent dictates that outcome. But nothing dictates that we issue our opinion now. Instead, principles of judicial restraint suggest we should not. I write separately to address why the majority's opinion is thus unnecessary at this time.

On June 30, 2026, the Supreme Court granted certiorari in *Viramontes v. Cook County*, --- S. Ct. ---, 2026 WL 1871322 (June 30, 2026), and *Grant v. Higgins*, --- S. Ct. ---, 2026 WL 1871312 (June 30, 2026). The Court consolidated the cases for argument on the question of "[w]hether the Second and Fourteenth Amendments guarantee the right to possess AR-15 platform and similar semiautomatic rifles." Pet. for Writ of Cert. i, *Viramontes* (No. 25-238). *Viramontes* concerns a challenge to Cook County's "Blair Holt Assault Weapons Ban." Cook Cnty., Ill., Ordinances art. III, div. 4 (2013). The ordinance defines the term "assault weapon" to include "[a] semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise" with at least one of "a pistol grip without a stock attached," "[a]ny feature capable of functioning as a protruding grip that can be held by the non-trigger hand," "[a] folding, telescoping or thumbhole stock," "[a] shroud attached to the barrel," or "[a] muzzle brake or muzzle compensator." *Id.* § 54-211(1). The ordinance further prohibits "any semi-automatic rifle that has a fixed magazine" with "the capacity to accept more than ten rounds of ammunition." *Id.* § 54-211(2). And it goes on to ban "rifles or copies or

duplicates" of more than 100 rifles, including several based on the AR-15 platform.  *Id.* § 54-211(7)(A).

*Grant* likewise involves a challenge to Connecticut's ban on "semiautomatic, centerfire rifle[s]."  Conn. Gen. Stat. § 53-202a(1)(E) (2023).  The statute defines those to include rifles that have "an ability to accept a detachable magazine" and at least one of "[a] folding or telescoping stock," any grip or stock "which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing," "[a] forward pistol grip," "[a] flash suppressor," or "[a] grenade launcher or flare launcher."  *Id.* § 53-202a(1)(E)(i).  The statute further prohibits "semiautomatic, centerfire rifle[s]" that have "a fixed magazine with the ability to accept more than ten rounds."  *Id.* § 53-202a(1)(E)(ii).  And, like Cook County's ordinance, the statute also lists more than 70 prohibited semiautomatic firearms, including several built on the AR-15 platform.  *Id.* § 53-202a(1)(A)–(C).

In other words, the Supreme Court has granted certiorari in two cases considering constitutional challenges to statutes nearly identical to the one now before us.  *Compare* Cook Cnty., Ill., Ordinances § 54-211, *and* Conn. Gen. Stat. § 53-202a, *with* Maj. Op. 4–7 & nn.2–3.  All three cases concern the same Second Amendment challenge to AR-15 platform firearms.  And all three cases concern substantially similar statutory schemes.  I would therefore hold this case *c.a.v.* pending the Supreme Court's resolution of *Viramontes* and *Grant*.

2

Indeed, we have done so in the past when the Supreme Court grants certiorari on dispositive issues pending before us.[1]

For good reason. Under our system of vertical stare decisis, we are bound to follow the Supreme Court. When the Supreme Court has granted certiorari—no easy task—it has signaled its willingness to bind us. Judicial restraint thus counsels in favor of sitting tight. Otherwise, we risk issuing a conflicting ruling, likely subjecting us to later vacatur or *en banc* proceedings. And even if we should soothsay what the Supreme Court will later hold, no meaningful impact will likely come of it. Before the ink dries in the majority's minted opinion, the District Court will likely stay proceedings pending the outcome in *Viramontes* and *Grant*. And once those cases are decided, they will carry the day.

I see little reason to decide this case now and get out in front of the Supreme Court. But because the majority has decided to do so, I respectfully concur.

---

[1] *E.g.*, *United States v. Smith*, 165 F.4th 751, 756 (3d Cir. 2026); *Wilson v. Warden Canaan USP*, 86 F.4th 536, 537 (3d Cir. 2023); *Khan v. Att'y Gen.*, 979 F.3d 193, 197 n.3 (3d Cir. 2020); *Weitzner v. Sanofi Pasteur, Inc.*, 819 F.3d 61, 63 n.3 (3d Cir. 2016); *In re Messina*, 687 F.3d 74, 79 (3d Cir. 2012). In addition, at least one other court of appeals has vacated submission of a case to wait for the Court's guidance in *Viramontes* and *Grant*. Order at 1, *Miller v. Bonta*, No. 23-2979 (9th Cir. July 1, 2026), Dkt. No. 94.

MASCOTT, *Circuit Judge*, concurring in part and concurring in the judgment.

Like my colleague Judge Matey, I fully support the majority opinion and join its judgment. I join Judge Matey's concurring opinion rather than the majority opinion of the en banc court principally because I agree with Judge Matey that it is unnecessary to remand New Jersey's laws to the district court for further consideration at this point. Maj. Op. at 64. Those laws are inconsistent with the Second Amendment, as Judge Matey's opinion insightfully explains.

The majority opinion is a thoughtful tour de force. That said, I would decline today to reach the majority's hardline selection between 1791 and 1868 in identifying the appropriate starting point for Second Amendment historical analysis. *See* Maj. Op. at 22-23. The State has not made a sufficient evidentiary showing that its laws would be supported by historical practice during either era and, thus, picking one date for constitutional analysis of a broad-based longstanding right is unnecessary here. *Cf. Wolford v. Lopez*, 609 U.S. ___, 2026 WL 1825723, **11-13 (2026) (analyzing but then rejecting each of Hawaii's attempts to justify its modern firearms restrictions with examples of laws dating back as far as an 1833 Hawaii law and 1720s statutes in Pennsylvania, New Jersey, and Maryland).

Additionally, I would not go so far as the majority opinion in cementing the label "dangerous and unusual" uses of firearms as "mutually exclusive" of firearms that are "in common use for lawful purposes." *See* Maj. Op. at 28. *Cf., e.g.,*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 47 (2022) (affirmatively describing the Second Amendment standard as protective of the "carrying of weapons that are . . . 'in common use at the time'" with a weapon's "dangerous and unusual" history providing informative but not dispositive context). As the Supreme Court and the majority opinion explain, there is significant historical precedent for government regulation of "dangerous and unusual" firearm uses. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 684, 701-02 (2024) (upholding restrictions disarming threatening individuals); *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) (noting that the Second Amendment is consistent with "longstanding prohibitions on the possession of firearms by felons and the mentally ill"); Maj. Op. at 25-29. But turning that designation into an antitype risks signaling to assertive State regulators that establishing a Second Amendment basis for regulation can be accomplished simply by labeling a firearm use "dangerous and unusual" rather than affirmatively demonstrating historical evidence for the regulation as commanded by the Supreme Court. *See Bruen*, 597 U.S. at 33-38 (describing a practice within the scope of Second Amendment protection as presumptively constitutional unless the regulating government is able to produce historical evidence supporting the restriction).

That said, both the majority and concurring opinions masterfully demonstrate the significant depth of Second Amendment protections under the U.S. Constitution and how far afield New Jersey's laws stray from them. Therefore, I concur.

2

CHUNG, <u>Circuit Judge</u>, concurring in part and dissenting in part.

I respectfully dissent in part from the judgment.  I write separately for two reasons:[1]  1) I disagree with the Majority's

---

[1] I note that while some of the sources I cite herein were not cited by the parties or amici, they have been, or are consistent with authorities, cited by the Supreme Court in Majority and Dissenting opinions.  *See United States v. Miller,* 307 U.S. 174, 179 (1939) (citing Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409).

*See also District of Columbia v. Heller,* 554 U.S. 570 (2008) (citing 3 Bird Wilson, *Works of the Honourable James Wilson* (1804); John Dunlap, *The New York Justice* (1815); 4 Blackstone 55 (1769); Timothy Cunningham, *A New and Complete Law Dictionary* ("arms") (1771); William Hawkins, *A Treatise of Pleas of the Crown* 26 (1771); Granville Sharp, *Tracts, Concerning The Ancient And Only True Legal Means Of National Defence, By A Free Militia* 17-18, 27 (3d ed. 1782); 1 Blackstone's Commentaries 145–146, n. 42 (St. George Tucker ed. 1803) ("Tucker's Blackstone"); *O'Neil v. State,* 16 Ala. 65, 67 (1849); *State v. Huntly*, 25 N.C. 418 (1843) (per curiam); Richard Burn, *The Justice of the Peace and Parish Officer* (29 ed. 1845)).

*See also New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022) (citing *Huntly*, 25 N.C. at 421-22; 4 Blackstone 249; 1 Hawkins 136; Theodore Barlow, *The Justice of Peace: A Treatise* 11-12 (1745); Burn, *The Justice of the Peace and Parish Officer* 243 (11th ed. 1769); George Webb, *The Office and Authority of a Justice of Peace* 92 (1736); *O'Neil,* 16 Ala. at 67; Michael Dalton, *The Country Justice* 282-283 (1690);

conclusion that the question of "common use" is determined at Step Two of the *Bruen* analysis, but for different reasons than my dissenting colleagues; and 2) at Step Two, when considering the sources of the history and tradition of regulating dangerous and unusual firearms, another principle underpinning that regulatory tradition must be considered; to wit, a weapon not commonly worn in public causes a terror to the people.

A. "In Common Use" is Derived from the Text of the Second Amendment, not Historical Regulations

   1. The phrase "in common use" is derived from the operative clause as clarified by the prefatory clause of the Second Amendment, and therefore, whether a weapon is "in common use" is a Step One question

In *United States v. Miller*, the Supreme Court examined the text of the Second Amendment and, based upon that text, concluded that the Second Amendment protected weapons "of

---

Edward Coke, *The Third Part of the Institutes of the Laws of England* 160 (1797)).

*See also United States v. Rahimi,* 602 U.S. 680 (2024) (citing 2 Edw. 3 c. 3 (1328); 4 Blackstone Commentaries (10th ed. 1787); *Huntly*, 25 N.C. 418; Dalton, *The Country Justice* 140–44 (1619); Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756); 1 Hawkins 253; Barlow, *Justice of Peace* at 11; *O'Neil,* 16 Ala. at 67)).

*See also United States v. Hemani,* 608 U.S. –, 2026 WL 1751710, *9 (2026) (citing A Gentleman of the Law, *The Conductor Generalis* (1788)).

2

the kind in common use" by ordinary citizens.[2]  Citing the prefatory clause, the Supreme Court remarked that the Second Amendment's purpose was to protect against the tyranny of standing armies and preserve the ability of the people to form a militia.[3]  It noted that thus "ordinarily when called for [militia] service [] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."[4]  Accordingly, the *Miller* Court held that the Second Amendment did not protect weapons beyond these "kind[s]". Because this understanding is not dependent on the history of regulating dangerous and unusual weapons, but on the text of the Second Amendment itself, whether a weapon is in common

---

[2] 307 U.S. at 178-182.

[3] *Id.* at 179-182. *See also* Tucker's Blackstone Note D 300 (Second Amendment allayed concerns that Article 1, Section 8, would impact states' abilities to control militias); *id.* (addressing Second Amendment and stating that, "Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction"); Sharp, *Tracts* at Part 1 (opining that militias were rooted in the need to defend vicinages, leading to principle that "the people are required to have 'arms of defence and peace' for mutual as well as private defence; for a standing army of regular soldiers is entirely repugnant to the constitution of England and the genius of its inhabitants") (quote at 27); *see also Heller*, 554 U.S. at 594 (citing Sharp when discussing meaning of militia and individual right to bear arms at the time of Founding).

[4] *Miller*, 307 U.S. at 179.

use is a question at Step One.[5]

Relying on *Bruen*, the Majority concludes that the question of common use arises at Step Two and its reasoning makes sense. I do not join that conclusion, though, because such treatment relegates part of the text of the Second Amendment to the same status as historical analogues.[6] But the prefatory clause has a "clarifying function" that helps "resolve an ambiguity in the operative clause."[7] In *Miller*, the Court addressed the third part of Step One, whether a ban on short-barreled shotguns "place[d] any restrictions" on "keeping and bearing arms."[8] The ban did not do so because the Second Amendment protects weapons "in common use."[9] The Supreme Court later explained *Miller*'s holding by reading the operative and prefatory clause together, noting that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-

---

[5] *See Wolford v. Lopez*, – U.S. –, 2026 WL 1825723, *14 (2026)(Barrett, J., concurring) ("Each step [of the *Bruen* analysis] requires a court to look at different evidence—plain text at the first, tradition at the second").

[6] *See Wolford*, 2026 WL 1825723 at *14 (Barrett, J., concurring) ("We look to history that 'elucidates how contemporaries understood the text—for example, the meaning of the phrase 'bear Arms' — at Bruen's first step. We save 'historical gun regulations,' however, for Bruen's second step." (internal citations omitted)).

[7] *Heller*, 554 U.S. at 577-578.

[8] *Wolford*, 2026 WL 1825723 at *6.

[9] *Miller,* 307 U.S. at 178-182.

defense[.]"[10]  That reading did not cast the prefatory clause in a role of impermissibly limiting the Second Amendment right. To the contrary, it reflected "precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface."[11]  That is, reading the clauses together confirmed the Supreme Court's interpretation of the operative clause's plain text as establishing the self-defense right to "possess and carry weapons in case of confrontation[,]"[12] not a right to "carry arms for *any sort* of confrontation[,]"[13] and the clause clarified that "whatever its nature, [the right] extends only to certain types of weapons."[14]

---

[10] *Heller,* 554 U.S. at 624.

[11] *Id.* at 625.

[12] *Id.* at 592.

[13] *Heller,* 554 U.S. at 595 (emphasis in original).  Nor does the right encompass the right to levy war.  U.S. Const. Art. III, Sec. 3 (prohibiting treason, that is, levying war against the United States); 3 Bird Wilson, *Works of the Honourable James Wilson* at 100-103 (discussing treason and "levy[ing] war", i.e. offensive war); *compare id. with id.* at 83-84 (referring to militia service as "that kind of war that is *defensive*") (emphasis added); *id.* at 102 (highlighting difference between affray and treason, stating that "if [perpetrators] have no *military arms,* nor march or continue together in the posture of war, they may be great *rioters*, but their conduct does not amount to a levying of war." (emphasis added)).

[14] *Heller*, 554 U.S. at 623.  After performing its textual analysis, the Supreme Court moved to Step Two and listed a number of constitutional limitations on the Second Amendment right.  It included *Miller's* holding, which it noted

In light of its textual grounding, "in common use" is a Step One question.

    2. Because "in common use" is derived from the Second Amendment, the weapons encompassed by that phrase are not defined in opposition to "dangerous and unusual" weapons

Although I agree with the Majority that, as a functional matter, a limitation on a weapon that is not "in common use" is consistent with the tradition of regulating "dangerous and unusual" weapons, it remains that the two phrases are defined by different considerations.[15] "In common use" is a phrase

was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual' weapons." *Id.* at 627. While this could be read as linking the meaning of "in common use" to "dangerous and unusual" weapons, and divorcing the phrase from the text of the Second Amendment, it should not. In discussing *Miller* in this section, the Court continued to connect *Miller's* holding to the prefatory and operative clauses of the Second Amendment and continued to characterize that holding as the Court's "interpretation of the right" addressing "the sorts of weapons protected[.]" *Id.* at 627.

[15] For this reason, I do not join my dissenting colleagues in concluding that "unusually dangerous" is part of the definition of the phrase "in common use[.]" I agree, though, that the historical tradition of regulating dangerous and unusual weapons may help illuminate the meaning of "in common use," to the extent that the definitions in those laws shed light on the types of weapons individuals were expected to have at home in defense of themselves and their homes. *See, e.g.,*

6

rooted in the Second Amendment's text and is concerned with the "sorts of lawful weapons that [a person would] possess[] at home [to bring] to militia duty."[16]  In contrast (and as further discussed below), the tradition of regulating "dangerous and unusual weapons" addresses the terror that dangerous and unusual weapons cause the public.  That difference matters because a weapon in common use is protected by the Second Amendment, yet a limitation on the right to bear that arm may still be consistent with the history of regulating dangerous and unusual weapons.

Finally, based on the text of the Second Amendment, history, and precedent, I agree with my dissenting colleagues that "in common use" does not include weapons "most useful in military service," meaning a type of weapon one would expect to be used for modern warfare;  nor does the term embrace weapons most commonly used for criminal ends.[17]

---

*Heller*, 554 U.S. at 581-82 (relying on various sources including treatises and historical laws to interpret text of the Second Amendment); *id.* at 582-83 (citing Blackstone and English laws, as well as brief citing laws of Delaware, New Jersey, and Virginia); *see also Wolford*, 2026 WL 1825723 at *14 (Barrett, J., concurring).

[16] *Heller*, 554 U.S. at 627.

[17] *Id.*; *see also id.* at 625 ("[The] Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes[.]"); *id.* at 627-28 ("fact that modern developments have limited the degree of fit between the prefatory clause[,] e.g, weapons to defend the country in war, "and the protected right[,]" e.g., weapons to defend the

7

"In common use" instead refers to the weapons that an ordinary person would have at home for purposes like protecting oneself against violent interpersonal confrontation, protecting the home, and hunting.[18]

---

person and the home, "cannot change our interpretation of the right.").

Sharp suggests that only weapons of "defence and peace" were expected to be kept at home for service in the militia. Sharp, *Tracts* at 2-20 (reviewing sources reflecting individuals were expected to be armed and competent in their use); *cf.* 3 Bird Wilson 102 (difference between affray and treason, includes bearing "military arms" and taking "the posture of war"). The laws he cites indicate that these were typically weapons over a certain length, as shorter weapons were better suited for criminal purposes. *Id.* at 16 (limitation on types of weapons by length of firearm); *id.* at 18 (noting restrictions were on "such arms as were liable to be concealed, or otherwise favour the designs of murderers, [such] as 'cross-bows, little short hand-guns, and little hag-buts' and all guns under certain lengths'"). I cite Sharp not as a source that interprets the text of the Second Amendment, but as one reflecting the history of militias and the types of weapons expected to be possessed at home. His view of the militia is consistent with that articulated in *Miller, Heller,* and American sources like St. George Tucker. *See supra* note 3; *see also Heller*, 554 U.S. at 594 (citing Sharp).

[18] *Heller*, 554 U.S. at 584 ("bear arms" means readiness in case of "conflict with *another person* (emphasis added))(quoting *Muscarello*, 524 U.S. at 143); *id*. at 592 (Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."); *Bruen*, 597 U.S. at 22 (same);

8

Turning to the Act, I would remand because the evidence in the record, and analysis by the District Court, did not address this standard. The District Court reasonably focused its analysis on the number of AR-15s possessed and whether or not experts had deemed them useful for self-defense.[19] The District Court relied upon Plaintiffs' expert evidence and concluded that AR-15s can be useful in defending the home from invasion and for repelling assailants at a certain distance.[20] That finding is not clearly erroneous and is relevant to establishing that AR-15s are in common use. But the District Court did not consider the evidence regarding military purpose and design. Although many military weapons may be highly effective in a civilian setting, that consideration does not address whether they are the type of weapon one would instead expect to be wielded in modern warfare.[21] Moreover, in assessing whether AR-15s were "in common

---

*Rahimi*, 602 U.S. at 708 (Gorsuch, J., concurring) (same); 3 Bird Wilson, *Works of the Honourable James Wilson* at 84 ("bear arms" addresses self-preservation); *see also Heller,* 554 U.S. at 585, citing Wilson; *see also* Sharp, *Tracts* at 14-16 (laws "*required* EVERY MAN *to be exercised* in the use of the *then* fashionable weapons" which did not include weapons under certain lengths)(emphasis in original).

[19] *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin* ("*ANJRPC V*"), 742 F. Supp. 3d 421, 444 (D.N.J. 2024); *id.* at 443, n. 19. I would remand with respect to LCMs as well, for the same reason.

[20] *See, e.g.*, JA336-40.

[21] *ANJRPC V*, 742 F. Supp. 3d at 444-45.

9

use" the District Court relied upon survey evidence[22] of which the methodology and reliability is disputed.[23] For instance, although the record contains statistics that 24.4 million AR-15s are possessed in the United States, this number comes from a survey alleged to use incompletely disclosed questions[24] and methods,[25] and the figure was extrapolated from just 4,665 responses (approximately)[26] by a "cultivate[d]" pool of individuals.[27] The survey nonetheless asserts the extrapolation is a reliable product of "well-powered, statistically informative inferences[.]"[28] That may well be the case. But the lack of a fuller record hampers the ability of any court to agree with that conclusion and, in my view, a genuine dispute exists that

---

[22] *Id.* (citing survey wherein respondents reported they possessed AR-15-type rifles for self-defense); *see also* JA5226-27.

[23] State Defendants' Response to Cheeseman Plaintiffs' Statement of Undisputed Material Facts ¶ 61.

[24] Response Br. at 38 (citing to Louis Klarevas Rpt. ¶ 29 n. 31, noting methodological concerns and that English survey failed to disclose source of sponsorship funding and measurement tools rendering it impossible for "independent observers and researchers to assess, if … question order, question wording, or answer options biased responses.").

[25] *Id.*

[26] JA5194, noting that 30.2% of respondents, JA5195, of 15,450 identified gun owners who fully completed the survey, JA5197, reported owning AR-15s, JA5195.

[27] JA5197.

[28] *Id*.

10

cannot be resolved on this record.  Finally, I agree with the Majority and my dissenting colleagues that the record lacks information addressing other assault firearms.  Given the foregoing, I would remand in full.

B. The English Tradition of Regulating Dangerous and Unusual Weapons Addressed the Terror to People Caused When Encountering Weapons Not Commonly Worn in Public

I now turn to the separate question of whether a limitation on assault firearms is consistent with the Second Amendment's regulatory history and tradition.  The Supreme Court has recognized that the regulation of "dangerous and unusual" weapons is a part of the history and tradition of the Second Amendment.[29]  Pre-Founding English sources indicate that dangerous and unusual weapons were regulated, as a kind of affray,[30] by surety and going armed laws (I will refer to these types of surety and going armed laws collectively as "going

---

[29] *Bruen*, 597 U.S. at 47 (limits on exercise of Second Amendment rights includes prohibitions on the carrying of dangerous and unusual weapons); *Rahimi*, 602 U.S. at 691 (2024) (addressing history of banning the carrying of "dangerous and unusual" weapons); *Heller*, 554 U.S. at 624-25 ("We think that limitation [on arms not in 'common use'] is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons.").

[30] *Bruen,* 597 U.S. at 46; *Rahimi*, 602 U.S. at 697-98 (going armed laws part of the tradition of affray).

11

armed" laws for ease).[31]  In reviewing this history, there are two important metrics to consider:  "how" the right to bear

[31] Michael Dalton, *The Country Justice* 141-42 (1619)(surety for person who "goe or ride Armed offensively" and who "goe or ride armed (offensively) in Faires, Markets, or elsewhere; or shall weare or carry any guns dagges, or pistols charged") and 1746 ed. Dalton, *The Country Justice* at 267-268 (same); 1746 ed. Dalton, *The Country Justice* at 30 (noting it is an offense to "ride or go armed offensively" and that sureties may be required for those "as shall carry any Guns, Daggs or Pistols that be charged, or that shall go apparelled with privy Coats or Doublets"); Edward Coke, *The Third Part of the Institutes of the Laws of England* 159 (1644) ("Coke, *Institutes*"); 4 William Blackstone, *Commentaries on the Laws of England* 149 (1769) (Chapter 11, Offenses Against the Public Peace, riding or going armed with dangerous or unusual weapons); *id.* at 254 (justice may bind someone to peace who makes affray, or goes about with unusual weapons); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 126 (1716) (providing for surety of the peace when Justice of Peace observes an affray); *id.* at 135 (defining affray to include when "a Man arms himself with dangerous and unusual weapons, in such a Manner as will naturally cause a Terror to the People"); Thomas Wood, *An Institute of the Laws of England* 726, 739 (1720) (surety and offense against public peace) and 1772 ed. at 415-24 (same); Giles Jacob, *A New Law Dictionary* ("Riding Arm'd"); Barlow, *The Justice of Peace* 11-12, 528 (affray and surety); Richard Burn, *Justice of the Peace and Parish Officer* 8-10 (1758) (5th edition)(same); 1 John Lord Viscount Dudley, John Ward, and Timothy Cunningham, *Law of a Justice of Peace and Parish Officer* 6-7 (1769) ("An affray is a publick offence

12

arms was limited and "why" the limitation was placed. The "how" imposed by going armed laws is straightforward: curbing the public carry of dangerous and unusual weapons or requiring (or forfeiting) sureties from those who did.[32] The "why" was to prevent a terror to the people and is particularly important here to understand the principle underpinning these regulations.

1. "If A Man Shall Shewe Him Selfe Furnished With Armour Or Weapon, Which Is Not Usually Worne And Borne, It Will Strike A Feare In To Others That Be Not Armed As He Is"

William Hawkins, in his work *A Treatise of the Pleas of the Crown* (1716), noted that an affray need not involve actual violence, such "as where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People[.]"[33]   Hawkins explained though that,

---

to the terror of the King's subjects and so called, because it affrighteth and maketh men afraid" and includes bearing unusual weapons)(quoting Coke, *Institutes* at 158); *id.* at 950 (surety "may be forfeited by the number of a man's company, or by his or their weapons or harness"); Cunningham, *Law Dictionary* at 82 (1771)("affray"); Gentleman of the Middle Temple, *The New Universal Parish Officer* 2-3 (1774)(same)(citing Hawkins); Gentleman of the Lincoln's Inn, *The Modern Parish Officer* 2-3 (1774)(same).

[32] *See supra* note 31.

[33] 1 Hawkins 135 (citing Lambard at 126).   Other English sources repeat this principle.  *See, e.g.,* 2 Wood, *An Institute of the Laws of England* at 739 (1720) (but noting "these statues

13

"no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People" (hereinafter, "terrifying circumstances").[34]  He then detailed a situation in which no terrifying circumstances were present:  "Persons of Quality … wearing common Weapons, or having their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common

---

are seldom put in Execution"); 1772 ed. Wood, *An Institute of the Laws of England* at 423 (same)(citing Coke, *Institutes* at 160, and 1 Hawkins 135); Jacob, *A New Law Dictionary* ("Riding arm'd)(citing Coke, *Institutes* at 162); Barlow, *The Justice of Peace* at 11 (citing William Lambard, *Eirenarcha: Or of the Office of the Justices of Peace* 126 (1602); Coke, *Institute* at 162; 1 Hawkins 118); Burn, *Justice of the Peace and Parish Officer* at 13; 4 Blackstone 149; 1 Dudley, *Law of a Justice of Peace and Parish Officer* at 7 (citing 1 Hawkins 135); Gentleman of the Middle Temple, *The New Universal Parish Officer* at 3 (citing 1 Hawkins 135); Gentleman of Lincoln's Inn, *The Modern Parish Officer* at 2; *see also* 2 Lambard 118 (affray includes wearing "armor or weapon, which is not usually worn and borne"); Dalton, *The Country Justice* at 140, 142 (1619) (none shall "ride or go armed offensively" and surety may be required of those "so armed or weaponed for their defence")(citing Statute of Northampton); 1746 ed. Dalton, *The Country Justice* at 267-68 (same).

[34] 1 Hawkins 136.  *See also* Barlow, *The Justice of Peace* at 12; Burn, *Justice of the Peace and Parish Officer* at 8-9; 1 Dudley, *Law of a Justice of Peace and Parish Officer* at 8.

Fashion to make use of them[.]"[35]  In the absence of terrifying circumstances, Hawkins wrote, a person would not "caus[e] the least Suspicion of an Intention to commit any Act of violence or Disturbance of the Peace."[36]

From this, two things can be discerned:  1) carrying a dangerous and unusual weapon is a terrifying circumstance;[37]

---

[35] *Id.  See also* supra note 31; 2 Wood, *An Institute of the Laws of England* at 739 (1720); Cunningham, *Law Dictionary* at 82 (1771)("Riding armed").

[36] *Id.  See also* supra note 31.

[37] *See supra* note 31.  From Hawkins's list of non-terrifying circumstances, and from other passages in his work and other authorities, one can deduce a corresponding list of terrifying circumstances.  For example, other authorities note arms restrictions based on social station.  *See, e.g.*, *Bruen,* 597 U.S. at 119-20(Breyer, J., dissenting)("Persons of Quality" refers to nobility); Sharp, *Tracts* at 10 (reviewing 13 Edw. I which mandated different kinds of arms for different levels of wealth); 2 Wood, *An Institute of the Laws of England* at 726. (recognizance may be broken by "going armed in an unusual Manner and Above his Degree"); 1772 ed. Wood, *An Institute of the Laws of England* at 417 (same).  Going around with an unusual number of attendants also appeared as a terrifying circumstance in surety, forcible entry, and forcible detainer passages, *see supra* note 31 and *infra* discussion of forcible entry, as was going armed in sensitive places. Coke, *Institute* at 159 ("wheresoever the parliament is holden proclamation should be made forbidding wearing of armor");  2 Edw. 3 c. 3 (1328); *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 786 (2010) (restrictions in schools and government buildings);

15

and 2) a key element of going armed laws was the effect on the public; namely, the perception by the public that the bearer intended violence.[38]  In other words, carrying a dangerous and unusual weapon was recognized to induce a fear of violent intent by the bearer.  For instance, when noting that dangerous and unusual weapons could cause a terror to the people, Hawkins cited William Lambard's work *Eirenarcha: Or of the Office of the Justices of Peace in Two Books* 126 (1581).[39] There, Lambard explained that, "if a man shall shewe him selfe furnished with armour or weapon, which is not *usually worne and borne*, it will strike a feare in to others that be not armed as he is: *and therefore,* [the laws] doe speake of it, by the wordes, *effray del pais,* and *interrorem populi.*"[40]  Stated differently, if people were not accustomed to seeing the weapon worn in public, the wearing of it, in and of itself, prompted fear.  This emphasis on wearing and custom was reflected a short time later by John Hawles, Solicitor General to King William III, when commenting upon the trial of

---

*Heller*, 554 U.S. at 626-27 (same); *Bruen,* 597 U.S. at 30 (restrictions in legislative assemblies, polling places, and courthouses).

[38]The Supreme Court has likewise highlighted that the Statute of Northampton focused on arms "generally worn or carried only *when one intended* to engage in lawful combat or … to breach the peace," reflecting that the mere wearing of such weapons signaled the required intent.  *Bruen*, 597 U.S. at 41 (emphasis added).

[39] *Id.*; *see also* 1746 Dalton, *The Country Justice* at 30 (citing Lambard, *Eirenarcha* at 126); Barlow, *The Justice of Peace* at 11 (citing Lambard, *Eirenarcha* at 126).

[40] 2 Lambard, *Eirenarcha* at 118 (first emphasis added).

Algernon Sidney.[41]  In criticizing evidence of an overt act in breaking a recognizance for good behavior, he remarked that,

> It hath been said that, if a man be bound to his good behavior, it is a breach of his good behavior to wear a sword; and perhaps, heretofore, when swords were not usually worn but by soldiers, it might be so, because it struck a terror in other people as much as a blunderbuss, or the like unusual weapon or the going armed in a coat of mail, for any person but a soldier, doth at this day.  Yet no man will say that, now swords are usually worn by all sorts of people, it is a breach of the good behavior; and so that which heretofore was a crime, by custom now is become none.  It is therefore the unusualness and the unaccountableness of the circumstances make it evidence, which cannot be assigned as reason in the overt-act mentioned.[42]

---

[41]*See A Compleat Collection of State-Tryals and Proceedings Upon Impeachment for High Treason and Other Crimes and Misdemeanours* 645 (1719) (Vol. III) (*Remarks on Trial of Algernon Sidney*, John Hawles, Solicitor General to William III).  This trial took place in 1685, but the commentary was published in 1719, shortly after the publication of *Pleas of the Crown* by Hawkins in 1716.

[42]*Id.*  To be clear, I do not contend that the concept of "common wear" discussed herein wholly encompasses the tradition of regulating "dangerous and unusual" and do not write separately to suggest that my dissenting colleagues are

This passage suggests that the types of weapons to cause a terror to the people were those customarily worn by soldiers, but not by ordinary citizens. Because such weapons were typically borne in the context of lawful combat, a person seeing them out of that context feared ill intent.[43]

That such wearing engendered fear that the bearer intended violence is also reflected in discussions of the conceptually similar crimes of forcible entry and forcible detainer. Like going armed, Hawkins explained that forcible

---

incorrect in their interpretation of that phrase. Hawles's inclusion of the blunderbuss, a weapon very similar to the sawed-off shotgun in *Miller* and which he does not say was commonly worn, suggests that the phrase also encompasses "unaccountable" weapons; i.e., weapons that are unusually dangerous. *See also* Barlow, *The Justice of Peace* at 229 (discussing forcible entry and noting that terrifying circumstance includes "unusual dangerous Weapons").

[43] *See Bruen*, 597 U.S. at 41 (going armed laws regulated weapons "generally worn or carried only *when one intended* to engage in lawful combat or … to breach the peace")(emphasis added).

Matthew Hale also indicated that the wearing of certain weapons could signal intent. In discussing what it meant to "levy war," he noted that, among other things, an assembly "arm[ing] with military weapons, as swords, guns, bills, halberds, pikes," could lead one to "reasonably conclude[] they are in a posture of war[.]" 1 Matthew Hale, *Historia placitorum coronæ. The history of the pleas of the Crown* 151 (1736). Although Hale's work was published in 1736, it was written before his death in 1676.

18

entry onto another's property only occurred when "accompanied with some Circumstances of actual Violence or Terror[.]"[44]  "Circumstances of Terror" were those that "a Man, either by his Behaviour or Speech… [gives] just cause to fear, that he will do [the possessor] some bodily Hurt."[45]  These included "carrying with him such an unusual Number of Servants, or by arming himself in such a Manner, as plainly intimates a Design to back his Pretensions by Force, or by actually threatening to kill, maim, or beat those[.]"[46]  The "manner" in which one "arming himself" communicated an intent to do harm was wearing unusual weapons,[47] which in cases of forcible detainer, included when a squatter "keeps in his House … unusual Weapons [.]"[48]  Bearing the unusual weapon was listed separately, in the disjunctive, from other

---

[44] 1 Hawkins 145, ch. 64, § 25.

[45] 1 Hawkins 145, ch. 64, § 27.

[46] *Id.*

[47] *See* Barlow, *The Justice of Peace* at 229 (discussing "Circumstances of Terror" and stating that "Terror may be caused by an unusual Attendance, unusual dangerous Weapons, or by threatening Force against the Person of those who shall make Resistance"); 4 Blackstone 146 (entry prohibited when it is "carried on and maintained with force, with violence, and unusual weapons"); 2 Cunningham, *A New and Complete Law Dictionary* ("Forcible entry" must be "with a strong hand, unusual weapons, or with menace of life or limb").

[48] *Id.* ("the same Circumstances of Violence or Terror, which will make an Entry forcible, will make a Detainer forcible also.").

terrifying circumstances such as threatening to do harm, indicating that the wearing need not be accompanied by additional conduct to cause the person encountering the weapon to fear the bearer's intent.[49]

In sum, the English authorities reflect that the principle underpinning the going armed laws was that weapons not commonly worn were a terror to the people ("common wear").[50]

2. Common Use was not Dispositive on the Question of Common Wear

The question of common use should not be conflated with the question of common wear. First, as noted above, the concept of common use is derived from the text and purpose of the Second Amendment, not the going armed laws. Second, the going armed laws concerned themselves with the terror caused by "wearing" or "going" *in public*. This is readily apparent from Hawkins's statement that self-defense was no excuse for wearing dangerous and unusual weapons,[51] but that,

---

[49] *Id.* (listing terrifying circumstances for forcible entry and detainer in the disjunctive and including "giving out such Speeches as plainly imply a Purpose of using Force" (forcible entry) and "threaten[ing]s to do some bodily Hurt to the former Possessor" (forcible detainer)).

[50] *Bruen*, 597 U.S. at 29.

[51] 1 Hawkins 136 ("A man cannot excuse the wearing such Armour in publick, by alledging that such a one threatened him, and that he wears it for the safety of his person from his assault[.]"); *see also* Jacob, *A New Law Dictionary* ("Riding

20

nonetheless, "no one shall incur the Penalty of the said Statute for assembling his Neighbors and Friends *in his own House*, against those who threaten to do him any Violence therein[.]"[52] Put simply, the relevant question was not whether the weapon was the kind an ordinary citizen would have to protect against home invasion and confrontation with another, but whether wearing the particular weapon in public would yet still terrify people.

## C. Regulating Weapons not Commonly Worn is Part of the History and Tradition of Firearms Regulation in America

The next consideration is whether regulating weapons that caused a terror to the people, that is, common wear, is part of the history and tradition of firearms regulation at the Founding. American colonial and Founding-era American authorities on the common law indicate that it is. As with the English sources, many American sources continued to state

---

arm'd"); Burn, *Justice of the Peace and Parish Officer* at 9; Barlow, *The Justice of Peace* at 12 (and noting that "persons armed with *privy* Coats of Mail for their Defence, seem not within this Statute")(emphasis added); 2 Wood, *An Institute of the Laws of England* at 739 (1720)(same in 1724 and 1772 eds.); Dudley, *Law of a Justice of Peace and Parish Officer* at 8; 2 Cunningham *New Law Dictionary* ("Riding armed"); Gentleman of the Middle Temple, *The New Universal Parish Officer* at 4. *See also* Dalton, *The Country Justice* at 140, 142 (1619) (none shall "ride or go armed offensively" and surety may be required of those "so armed or weaponed for their defence")(citing Statute of Northampton); 1746 ed. Dalton, *The Country Justice* at 267-68 (same).

[52] 1 Hawkins 136 (emphasis added).

21

that affray occurred when going with or wearing dangerous and unusual weapons[53] and did not occur when "*wearing* []

---

[53] *Bruen*, 597 U.S. at 47 (limits on exercise of Second Amendment rights includes prohibitions on the carrying of dangerous and unusual weapons); *Rahimi*, 602 U.S. at 691 (2024) (addressing history of banning the carrying of "dangerous and unusual" weapons); *Heller*, 554 U.S. at 624-25 ("We think that limitation [on arms not in 'common use'] is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."); William Simpson, *The Practical Justice of the Peace and Parish-Officer* 13 (1761) (affray); Richard Starke, *The Office and Authority of a Justice of Peace* 14 (1774) (addressing "uncommon or offensive Weapons"); A Gentleman of the Law, *The Conductor Generalis* at 10; *Burn's Abridgment, or the American Justice* 22 (Eliphalet Ladd ed. 1792) (affray); Zephaniah Swift, *A System of the Laws of the State of Connecticut*, vol. 2 343 (1795) (breaches of the public peace included when a justice observed, among other things, someone "go[ing] about with unusual weapons[.]"); 4 Blackstone's Commentaries 148 (St. George Tucker ed. 1803); A Gentleman of the Law, *A New Conductor Generalis* 27 (affray); Wilson, *Works of the Honourable James Wilson*, at 79 (affray); *id.* at 150 (surety for those going about with unusual weapons); William Hening, *The New Virginia Justice* 7 (1810) (2d edition) (affray); *id.* at 572 (surety for those going about with unusual weapons); Dunlap, *The New York Justice* at 8 (affray); *id.* at 391 (surety). Many states also codified these laws. *See, e.g.*, 1692 Mass. Acts and Laws no. 6, pp. 11–12; 1699 N. H. Acts and Laws ch. 1; 1761 Acts and Laws of His Majesty's Province of New-Hampshire in New-England 2;

22

common weapons, or having the usual number of attendants, merely for ornament or defence, where it is *customary* to make use of them."[54]  Many further stated that self-defense was not a license to wear "dangerous and unusual weapons," but that using them at home was no offense.[55]  These sources reflect that limitations on dangerous and unusual weapons continued and do not reflect an elimination of the principle that wearing such weapons terrified people.[56]  This makes sense given that

---

1771 An Act for the Punishing of Criminal Offenders, N. H. Acts and Laws ch. 11, § 5, p. 17; 1786 Va. Acts ch. 21; 1794 Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33; 1795 Mass. Acts 436, ch. 25; 1801 Tenn. Acts pp. 260–261; 1821 Me. Laws p. 285.

[54] Starke, *The Office and Authority of a Justice of Peace* at 5-6 (emphasis added); A Gentleman of the Law, *The Conductor Generalis* at 11; *Burn's Abridgment, or the American Justice* at 23 (Ladd ed.); Hening, *The New Virginia Justice* at 50.

[55]Starke, *The Office and Authority of a Justice of Peace* at 6; A Gentleman of the Law, *The Conductor Generalis* at 11 (also included in subsequent versions); *Burn's Abridgment, or the American Justice* at 23-24 (Ladd ed.); Hening, *The New Virginia Justice* at 50.

[56] *See supra* note 53 (all retaining language referencing terror to the people); *see also* Starke, *The Office and Authority of a Justice of Peace* at *Preface* (noting that he endeavored to present a current view of the law, due to the "Repeal of a great Number of our Acts of Assembly" and to correct other errors, since the publication of Webb's *Justice of the Peace* in 1736); A Gentleman of the Law, *The Conductor Generalis* at *Preface* (update published because the usefulness of prior versions "has

the principle underpinning the tradition was to prevent a terror to the people, a risk that only occurred in public from *wearing*.

Examining these sources' treatment of forcible entry and forcible detainer, which required a terrifying circumstance, further indicates that common wear remained a part of firearms regulatory tradition. George Webb, who wrote one of the earliest American handbooks for justices of the peace,[57] listed

_____

not been lessened by the Change of Government" and explaining selective incorporation of English common law); *Burn's Abridgment, or the American Justice* at iv-v (Ladd ed.) (intent in printing the American edition of Burn's *Justice of the Peace* manual was to eliminate passages that were "totally inapplicable to the situation of this country" due to statutory and common law differences in the United States, and was directed at those in New Hampshire, Massachusetts, and Vermont); Swift, *Laws of the State of Connecticut* vol. 1 at 2-3 (intent of work is to "exhibit a compleat Systematic view of our constitution and laws: to select and extract from the common law of England, that portion of it which has been received approved from time immemorial, and has become valid and binding in this State [Connecticut]"); Hening, *The New Virginia Justice* at *Preface* (explaining that no *per se* principle applied when considering English common law, accepting some principles both pre-dating and post-dating the American Revolution); Dunlap, *The New York Justice* at *Preface* (noting desire to avoid defect of incorporating English traditions not applicable in some states).

[57] David Flaherty, *An Introduction to Early American Legal History*, published in Essays in the History of Early American Law 24 (United States, Omohundro Institute and UNC

two separate terrifying circumstances when discussing the crime of forcible entry.[58] "Coming with weapons" was only considered terrifying if accompanied by words "threatening life or limb" but "[e]ntering with *unusual* Armour or Weapons, the doors being open" alone sufficed.[59]  Richard Starke, in his 1774 handbook, reiterated the relationship between wear and terror, stating that security could be demanded of "any Person who shall go armed with such uncommon or offensive Weapons as to betray an Intention to Commit Violence[.]"[60] *The New Conductor Generalis* explained that forcible entry is

Press, 2014)(listing also *The Conductor Generalis*, published in 1722 and periodically updated); *see also Bruen*, 554 U.S. at 49 n.14 (citing Webb).

[58] Webb, *Justice of the Peace* at 155 (discussing circumstances involving force, include, "Entering with Force to commit Trespass, tho' the Party doth not quit Possession; Coming with Weapons threatning Life or Loss of Limbs; Breaking upon Doors; Entering with unusual Armour or Weapons, the Doors being open; Coming attended with Many People, or unusual Company, threatning, or using terrifying Menaces; Ejecting, or disstraining for Rent, with Force: These, and such like shall be taken to be a Forcible Entry.")(citing Coke on Littleton, l. 3., s. 431).

[59] *Id.*; Hening, *The New Virginia Justice* at 262 (forcible entry); Dunlap, *The New York Justice* at 107 (forcible entry).

[60] Starke, *The Office and Authority of a Justice of Peace* at 14 (set forth in section addressing "ARMS"); *see id.* at 6 (Affray may be committed "where a Man goes armed in such Manner, and accompanied with such Circumstances, as naturally occasion Terrour, or Apprehensions of Violence[.]")(citing Statute of Northampton).

committed when someone "causes such a terror by … arming himself in such a manner as plainly intimates a design to back his pretensions of force[.]"[61]  That work further detailed that these "circumstances of violence or terrour" included "keep[ing] in his house … unusual weapons[.]"[62]  While this addressed an intruder keeping unusual arms in a home he unlawfully possessed, not public wear, the "terrour" came from the rightful property possessor viewing the weapon.[63]

The North Carolina Supreme Court took this analytical approach in *State v. Huntly*, 25 N.C. 418 (1843) (per curiam). There, the *Huntly* Court found that a gun is "unusual" because it was not customarily worn on the person in public, despite the fact that as to "a double-barrelled gun, or any other gun, … there is scarcely a man in the community who does not own

---

[61] A Gentleman of the Law, *A New Conductor Generalis* at 169.

[62] *Id*. at 170 ("[T]he same circumstances of violence or terrour, which will make an entry forcible, will make a detainer forcible also; from whence it will follows, that whoever keeps in his house an unusual number of people, or unusual weapons, or threatens to do some bodily hurt to the former possessor, if he dare return" uses force); Dunlap, *The New York Justice* at 109 (same).

[63] *See also Comm. v. Dudley*, 10 Mass. 403, 409 (1813) (forcible entry must include "some apparent violence offered, in deed or in word, to the person of another; or the party must be furnished with unusual offensive weapons, or attended by an unusual multitude of people; all which circumstances would tend to excite terror in the owner, and prevent him from claiming or maintaining his right.").

and occasionally use a gun[.]"[64]  It went on to conclude, however, that publicly wearing an unusual gun did not run afoul of the common law unless accompanied by "wicked purpose" to "terrify or alarm."  25 N.C. at 423.[65]  But the *Huntly* Court did not meaningfully discuss the common law when reaching this conclusion and the "wicked intent" contemplated is misaligned with earlier American common law authorities as the *Huntly* Court focused on whether the bearer had wicked purpose.  Yet in common law, an intent to breach the public peace or cause a terror was not required, just participation in an action that the *public could interpret* to reflect an intent to do violence.[66]

---

[64] *Huntly*, 25 N.C. at 422.

[65] *See also O'Neil,* 16 Ala. at 67 (affray may occur when "carrying deadly or unusual weapons *for the purpose* of an affray")(emphasis added).

[66] If the *Huntly* Court's approach is correct, and prohibitions relied solely on the possessor's intent rather than the public's reasonable fear when seeing the possessor, the historical distinction between regulating unusual weapons and regulating common weapons would be meaningless.  *See, e.g.*, Webb, *Justice of the Peace* at 155 (two separate terrifying circumstances include "Coming with Weapons threatning Life or Loss of Limbs" and "Entering with unusual Armour or Weapons, the Doors being open").  This would also call into question the current differential treatment between unusual weapons and common weapons based on this history and tradition, if one accepts that "common use" is a Step Two question.  *See, e.g.*, *Rahimi*, 602 U.S. 680 (holding that a law temporarily restricting the possession of *all* firearms, when

D. The Present Challenge

1. Plaintiffs Bring a Facial Challenge

A facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [challenged law] would be valid."[67]  Therefore, if New Jersey demonstrates a set of circumstances under which the law is consistent with the

---

accompanied by the terrifying circumstance of a demonstrated threat of physical harm, was consistent with the history and tradition of regulation embodied by surety and going armed laws); *Miller*, 307 U.S. 174 (permitting regulation of weapons not in common use, without any accompanying terrifying circumstance).

While the Supreme Court cited *Huntly* with approval in *Bruen* when discussing the "why" of going armed laws, casting doubt on the argument I make here, *Bruen,* 507 U.S. at 51-52, I note that the handguns considered in *Bruen* were both in common use and commonly worn.  *See, e.g.*, *Bruen,* 507 U.S. at 45 (stating that, by the 1700s in England, "domestic gun culture softened *any terror that firearms might once have conveyed*) (emphasis added)(quoting Lois Schwoerer, *Gun Culture in Early Modern England* 4); *id.* ("Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people.").

[67] *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Moody v. NetChoice*, LLC, 603 U.S. 707, 723 (2024) (for a plaintiff to succeed on a facial challenge, there must be no circumstance in which the challenged law would be valid).

28

history and tradition of firearms regulation, the facial challenge fails.

2. The Record is Insufficient to Determine whether Assault Firearms are Commonly Worn

The Act prohibits knowingly possessing an assault firearm, N.J. St.2C:39-5(f), which would include possessing an assault firearm in public, i.e., public carry. This portion of the Act is consistent with the "how" of the going armed laws. As noted above, such laws prohibited the public carry of dangerous and unusual weapons. The "why" addressed by the Act is also consistent with the historical tradition of regulating dangerous and unusual weapons. As the Majority notes, the Act aims to stop "military-style assault weapons" because "guns capable of wholesale destruction" and "designed to wipe out the greatest number of people in the shortest possible time" are a "direct threat to our police, our citizens and especially our children[.]" App. 4651–52; Majority Op. 5. In other words, the Act is meant to address the fear and threat posed when people bear assault firearms *outside* of the home*,* a "why" that is consistent with the principle of common wear underlying the going armed laws: the terror to the people felt by those encountering such weapons in public that the bearer intended and would commit violence.[68] Thus, even assuming that assault firearms are in common use, if not commonly worn, the Act could be constitutionally applied in the circumstances of public carry.

---

[68] The Act also aims to address the danger posed by weapons suited for modern warfare, e.g., weapons not in common use for self-defense.

29

Like the question of common use, the question of common wear appears to be, at least in part, one of degree. Weapons cease to be terrifying in public when they "by custom" become "usually worn by all sorts of people[.]"[69] There is no reason to assume, however, that a weapon becomes commonly worn simply by being in common use; it may be that the public considers some weapons to be appropriate to repel home-intruders yet frightening (and meant to frighten) in the context of activities outside the home.[70]

I would remand because there is understandably no evidence in the record, nor analysis by the District Court, that assault firearms are commonly worn. While the record contains statistics that 24.4 million AR-15-type rifles are possessed in the United States, this number does not establish common *wear* and its reliability is unknown.[71] In addition the number is dwarfed by the hundreds of millions of people who make up the American public and who would view assault firearms when worn. The number is also dwarfed by the statistic, also of unknown reliability, that there are 461.9 million handguns in possession which the public has become

---

[69] The Supreme Court included a similar sentiment in *Bruen*, stating that, by the 1700s in England, "domestic gun culture softened any terror that firearms might once have conveyed." *Bruen*, 597 U.S. at 45.

[70] *See, e.g., Wolford*, 2026 WL 1825723 at *16-17(Barret, J. concurring) (risks addressed by poaching laws are associated with specific locations).

[71] *See* JA1649-50.

accustomed to viewing.[72]    Turning to why people report owning assault firearms, even if reliable, the survey results also do not establish common wear.  Indeed, of the locations in which those surveyed stated they defensively fired, displayed, or stated they had a firearm,[73] over 90% were non-public locations.[74]  And this statistic referenced self-reports regarding all firearms, not assault firearms.  Furthermore, the *actual* uses of assault firearms for self-defense in the record involved possession at home, and likewise do not involve public wearing.[75]    There is other record data, though, that does directly address common wear.  The record contains evidence regarding the frequency that AR-15s are worn in public to commit mass murder (but none regarding the wear for other types of crime) and that AR-15s are capable of piercing police ballistic vests – circumstances that may well cause people to

---

[72] JA1635, 1647; *see also Bruen*, 597 U.S. at 83 (Breyer, J., dissenting)( "[i]n 2017, there were an estimated 393.3 million civilian-held firearms in the United States[.]").

[73] JA5207 (for this question, respondents were not asked to specify the type of firearm referenced).

[74] *See*, *e.g.,* JA5207-08.

[75] JA422-44.  Two articles reported the defensive use of an AR-15 outside of the home, where the bearer heard gunfire and ran with the weapon to respond to the scene.  JA429-33; *see also* https://perma.cc/6TP4-C2HV (JA432, cited by ANJRPC and Ellman Plaintiffs' Expert Emanuel Kapelsohn at JA338-39). These instances did not involve public carry for self-defense.

fear public wearing of AR-15s and the intentions of those who wear them.[76]

Finally, the question of common wear might be addressed by evidence that could be provided upon remand. Currently, the record does not contain data regarding the frequency assault firearms are worn in public by common citizens for lawful purposes, nor evidence of public reaction when such wear occurred. Similarly, the record does not contain self-reports by owners regarding public wear of assault firearms in particular, nor from the public regarding whether encountering assault firearms in public would make them fear that the bearer intended violence.

Accordingly, I would remand in full because, even if the District Court were to find that assault firearms are in common use, the Act could be constitutionally applied to public carry if assault firearms are not commonly worn.[77]

*        *        *

"In common use" is derived from the text of the Second Amendment and is a Step One question. At Step Two, it is part of this country's regulatory tradition to place restrictions on weapons not commonly worn. When analyzing whether a law fits within the tradition of regulating unusual weapons,

---

[76] *See* JA1512-25, 1637, 1642, 1819, 1867, 3312, 3330-31, 3334, 3345-77; *see also* Cheeseman Plaintiffs' Response to State Defendants' Counter-Statement of Undisputed Material Facts ¶ 71.

[77] The facial challenge would therefore fail. *Salerno*, 481 U.S. at 745; *NetChoice, LLC*, 603 U.S. at 723.

focusing only on common use, while ignoring common wear, will result in failure to contemplate whether the law is "consistent with [one of] the principles that underpin our regulatory tradition"[78] – the terror to the people. Like the sword and the handgun,[79] perhaps assault firearms are "by custom" "worn by all sorts of people" for lawful purposes. Because the parties and District Court did not have the opportunity to address the Step One and Step Two principles set forth herein, though, I would remand in full. I thus join in the portion of the judgment ordering remand.

---

[78] *Rahimi*, 602 U.S. at 692.

[79] *A Compleat Collection of State-Tryals and Proceedings Upon Impeachment for High Treason and Other Crimes and Misdemeanours* 645 (1719) (Vol. III) (*Remarks on Trial of Algernon Sidney*, John Hawles, Solicitor General to William III) (noting that "swords are usually worn by all sorts of people" so wearing one "by custom" now eliminates any terror to the people); *see also Bruen*, 597 U.S. at 45 ("Respondents do not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people."); *id.* at 47 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today.").

SHWARTZ, Circuit Judge, dissenting, with whom KRAUSE, RESTREPO, and SMITH, Circuit Judges, join.

The right secured by our Founders in the Second Amendment is "not unlimited." District of Columbia v. Heller, 554 U.S. 570, 626 (2008). It has never been understood to guarantee a citizen the right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. Instead, the Second Amendment allows states to ban certain types of firearms. The Majority, however, holds that states cannot regulate weapons that are currently popular. This approach adopts a contemporary lens, even though the Supreme Court tells us that we are to keep our eye on the history and tradition of banning dangerous and unusual weapons, like the semi-automatic rifles equipped with large capacity magazines ("LCMs") that gunmen have continued to use to commit crimes and mass shootings. Focusing on the text of the Amendment and its history, I conclude, unlike the Majority, that New Jersey's ban on AR-15s and restriction on LCMs, N.J.S.A. § 2C:39-1 et seq. (the "Act"), are constitutional under New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022). As a result, I would reverse the District Court's contrary holding concerning AR-15s and affirm its holding that the LCM restriction complies with the Second and Fifth Amendments.

I

Before proceeding to the substance of the Plaintiffs' challenge, a word on its scope. Article III of the Constitution requires federal courts to pass on only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. As a result, "our adversarial system of adjudication" generally requires us

to "follow the principle of party presentation" and "rely on the parties to frame the issues" that are genuinely in dispute or in need of resolution. United States v. Sineneng-Smith, 590 U.S. 371, 375 (2020) (citation omitted).

As a "court of review, not of first view," O'Hanlon v. Uber Techs., Inc., 990 F.3d 757, 762 n.3 (3d Cir. 2021) (quoting Frank v. Gaos, 586 U.S. 485, 493 (2019) (per curiam)), we should be particularly hesitant to expand the scope of our analysis beyond the issues presented to and identified by the District Court, because "appellate judges enjoy no comparative expertise" in determining "the existence, or nonexistence, of a triable issue of fact," including whether a party has offered sufficient evidence on a hotly contested issue, Ziccardi v. City of Philadelphia, 288 F.3d 57, 62 (3d Cir. 2002) (citing Johnson v. Jones, 515 U.S. 304, 316 (1995)).

Here, the issues squarely presented by the parties were whether the Act's prohibition on AR-15s—as defined in the Act, regardless of manufacturer—and restriction on LCMs were constitutional. The Plaintiffs nominally challenged the Act in its entirety, yet the Cheeseman and Ellman Plaintiffs stated explicitly that they were not challenging all weapons listed therein, carving out, for example, grenade launchers and bump stocks.[1]  Based on the briefing and record before the District Court, the parties further limited their arguments to

---

[1] See Bianchi v. Brown, 111 F.4th 438, 452-54 (4th Cir. 2024) (en banc) (addressing a similar statute's constitutionality only as applied to AR-15s despite nominal facial challenge where the parties only adequately briefed the issue with respect to that firearm), cert. denied sub nom., Snope v. Brown, 145 S. Ct. 1534 (2025).

2

LCMs and AR-15s, which the Plaintiffs discussed in far more detail in their briefs than any other prohibited weapon. This focus is particularly notable in the record evidence on firearm circulation and ownership data, on which the Plaintiffs heavily relied for their argument that the Act violates the Second Amendment. Accordingly, the District Court properly limited its review of the Act to AR-15s and LCMs, see Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC), v. Platkin, 742 F. Supp. 3d 421, 424-25 (D.N.J. 2024).[2]

The Majority's ruling goes far beyond the scope of the arguments presented to the District Court, instead addressing all semi-automatic rifles listed in the Act and announcing that their prohibition violates the Second Amendment. The Majority does so partly based on its observation that the Act says semi-automatic rifles share common features. That these weapons share some common features does not relieve the Plaintiffs of their burden to affirmatively raise the argument and marshal sufficient evidence that the Act's prohibitions on semi-automatic rifles other than the AR-15 are unconstitutional, especially given there are still "exponential differences in firepower" and other features among different models of semi-automatic rifles regulated by the Act. See Bianchi v. Brown, 111 F.4th 438, 460 (4th Cir. 2024) (en

---

[2] While the District Court properly focused its review on AR-15s, it erred in limiting the scope of its review to only Colt AR-15s. The Armalite Corporation originally patented the AR-15 and sold the rights to Colt. The patents have since expired. Many manufacturers sell AR-15s, and there is no meaningful difference between the AR-15s Colt produced and the AR-15s other manufacturers produce. See Bianchi, 111 F.4th at 454-55.

3

banc), <u>cert. denied sub nom.</u>, <u>Snope v. Brown</u>, 145 S. Ct. 1534 (2025) (contrasting a small-bore rimfire rifle and a .50 caliber sniper rifle, both of which are banned semi-automatic rifles under the New Jersey law).

The scope of the Majority's decision therefore exceeds what the parties presented and is contrary to the party-presentation rule and the necessary restraint demanded by Article III. I limit the discussion below to what the Plaintiffs actually argued was unconstitutional: the ban on AR-15s and the regulation of LCMs.

II

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In <u>Heller</u>, the Supreme Court recognized that the Second Amendment confers an individual right to keep and bear arms for self-defense, 554 U.S. at 622, and in <u>Bruen</u>, it announced a two-step framework to analyze whether a regulation infringes that right. 597 U.S. at 24.

<u>Bruen</u> sets forth a two-part test. At <u>Bruen</u> Step One, we must determine whether "the Second Amendment's plain text covers an individual's conduct." <u>Id.</u> at 24. If so, "the Constitution presumptively protects that conduct," and we move to <u>Bruen</u> Step Two, where we ask whether the State can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." <u>Id.</u> If the State cannot do so, the regulation is unconstitutional. <u>Id.</u> We have applied this framework to statutes prohibiting classes

4

of individuals from possessing firearms[3] and places where firearms may be carried.[4]  In this case, we apply it to a law that prohibits possession of specific firearms and parts.  N.J.S.A. § 2C:39-1, et seq.

A

Bruen Step One requires us to determine whether the prohibited or restricted weapons are among the "Arms" that the people presumptively have the right to keep and bear.  Wolford v. Lopez, No. 24-1046, 2026 WL 1825723, at *6 (U.S. June 25, 2026) (explaining that, at Bruen Step One, courts must assess whether the restriction at issue "concern[s] any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes").  The Supreme Court has instructed us to

---

[3] E.g., Lara v. Comm'r Pa. State Police, 125 F.4th 428, 435-38 (3d Cir. 2025) (invalidating a law prohibiting eighteen-to-twenty-year-olds from carrying firearms); Range v. Att'y Gen., 124 F.4th 218, 232 (3d Cir. 2024) (en banc) (holding felons may not be barred from possessing firearms absent a showing they pose a danger); United States v. Moore, 111 F.4th 266, 271-72 (3d Cir. 2024) (holding individuals on post-conviction court-ordered supervision may be barred from possessing firearms).

[4] Koons v. Att'y Gen. N.J., 156 F.4th 210, 219 (3d Cir. 2025), as amended (Sep. 17, 2025) (holding that the "restriction of firearms in discrete locations set aside for particular civic functions and where the presence of firearms was historically regulated as jeopardizing the peace or posing a physical danger to others" may be permissible), en banc granted, opinion vacated, 162 F.4th 100 (3d Cir. 2025).

construe "the Second Amendment's text, as informed by history," Bruen, 597 U.S. at 19, and to ascertain whether the relevant weapons fall "with[in] the historical understanding of the scope of the right" the Second Amendment protects, Heller, 554 U.S. at 625; see also Bruen, 597 U.S. at 25 (requiring "reliance on history to inform the meaning of constitutional text—especially text meant to codify a pre-existing right") (emphasis omitted).

The Supreme Court has observed that the historical context surrounding the ratification of the Second Amendment reveals that the Founders sought to "codif[y] a pre-existing" right for an individual to keep and bear arms, Bruen, 597 U.S. at 20 (emphasis omitted) (quoting Heller, 554 U.S. at 592), the "central component" of which was self-defense, Heller, 554 U.S. at 595, 599.  Specifically, the Founders understood "the common-law right to self-defense . . . mean[t] the right of 'a citizen to "repel force by force" when "the intervention of society in his behalf, may be too late to prevent an injury." Bianchi, 111 F.4th at 448-49 (quoting Heller, 554 U.S. at 595). This right has limitations, including that the threat be imminent, the object of the force be the person posing the threat, not a bystander, and the force be proportional.  Id. at 449-50.  Thus, Heller recognized that only arms proportional to self-defense are protected, and those better-suited for criminal use, like sawed-off shotguns, or military purposes, like M16 rifles, may be banned.  554 U.S. at 625, 627; Bianchi, 111 F.4th at 450-51.  Accordingly, the Second Amendment does not guarantee "a right to keep and carry any weapon

6

whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626.

Beyond this proportionality analysis, Heller also clarifies that the Second Amendment extends only to weapons "in common use" for "lawful purposes"—namely, self-defense or hunting. Id. at 625-27 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)). Conversely, "dangerous and unusual weapons" that are not in "common use" for lawful purposes may be prohibited. Id. at 627.[5]

Plaintiffs' suggestion that Bruen's Step One analysis is simple because "all firearms are arms" and are thus

_____

[5] Heller (and Blackstone) describe a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" using the conjunction "and." 554 U.S. at 627 (citing 4 William Blackstone, Commentaries *148-49). However, because all weapons are inherently dangerous, construing "dangerous" according to its standard dictionary definition would render the word meaningless in this context. For that reason, I agree with the Court of Appeals for the District of Columbia Circuit that the phrase "dangerous and unusual" is better understood as a figure of speech that conveys a single expression, which here would be "unusually dangerous." See Hanson v. District of Columbia, 120 F.4th 223, 238 n.7 (D.C. Cir. 2024), cert. denied, 145 S. Ct. 2778 (2025); Samuel L. Bray, "Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution, 102 Va. L. Rev. 687, 695 (2016) (explaining that the Constitution employs "hendiadys": figures of speech involving "two terms, separated by a conjunction, [that] are melded together to form a single complex expression").

presumptively protected by the Second Amendment is unconvincing. Cheeseman Pls. Br. at 24. Heller instructs that we must confirm that the arm is among the "sorts of weapons protected" by the Second Amendment. 554 U.S. at 627. Indeed, the Heller Court need not have stated that handguns were a "class of 'arms' . . . overwhelmingly chosen by American society for th[e] lawful purpose" of self-defense before turning to the relevant historical evidence if the mere fact that they were firearms alone was sufficient to draw them into the Second Amendment's protection. See id. at 628. Bruen proceeded similarly. 597 U.S. at 32 (acknowledging the handguns at issue were "'in common use' today for self-defense" before conducting its historical analysis at Step Two).

Thus, at Bruen Step One, we must determine whether AR-15s and LCMs as defined under the Act are suitable, and in common use, for self-defense and therefore presumptively protected under the Second Amendment, or whether they are unusually dangerous and therefore outside the Amendment's protection. Bruen, 597 U.S. at 24; Heller, 554 U.S. at 625-27; Bianchi, 111 F.4th at 445 (stating "dangerous and unusual weapons" that are not in "common use" may be prohibited (citing Heller, 544 U.S. at 627)). If Plaintiffs demonstrate that these weapons fall within the Amendment's text—meaning they are both suitable and commonly used for self-defense— the burden shifts to the State to show that the Act is consistent with the Nation's historical regulatory tradition under Bruen Step Two. 597 U.S. at 24.

Bruen makes clear that its first step requires considering whether the "Second Amendment's plain text covers an individual's conduct" because it began its analysis by recognizing, among other things, that "handguns are weapons

8

'in common use' today for self-defense." Id. at 24, 31-32 (citations omitted). Only after making those statements did the Bruen Court move to Step Two. Id. at 32. This sequence shows that the Court considered common use at Bruen Step One.[6] See id. Heller also examined common use as part of its analysis of the weapons the Second Amendment protects. 544 U.S. at 624-28. Indeed, the Heller Court need not have stated that handguns were a "class of 'arms' . . . overwhelmingly chosen by American society for th[e] lawful purpose" of self-defense before turning to the relevant historical evidence if the mere fact that they were bearable weapons alone was sufficient to draw them into the Second Amendment's protection. See id. at 628.[7] Wolford similarly indicated that whether "Arms" are protected by the Second Amendment based on their "customar[]y" use for "defensive" purposes must be assessed

---

[6] This is the view our sister courts of appeals have adopted, see, e.g., United States v. Gomez, 159 F.4th 172, 177-78 (2d Cir. 2025) (considering common use at Bruen Step One); Bianchi, 111 F.4th at 447-52 (same); Hanson, 120 F.4th at 232 (same); United States v. Alaniz, 69 F.4th 1124, 1128 (9th Cir. 2023) (same).

[7] Moreover, it makes little sense to consider contemporary uses of firearms at Bruen Step Two because that step focuses on historical regulations from which we divine principles to apply in the modern day. 597 U.S. at 24. In other words, Step Two's timeframe and analytical object are mismatches for the common use inquiry. See id. at 24, 34. Considering common use at Step Two also dodges Heller's instructions that we must confirm that the weapon at issue is among the "sorts of weapons protected" by the Second Amendment. 554 U.S. at 627.

9

at Step One.[8]  2026 WL 1825723, at *6 (listing "subsidiary questions" courts must analyze to determine whether a restriction implicates the "plain text" of the Second Amendment).

Accordingly, it is at <u>Bruen</u> Step One that we must determine whether AR-15s and LCMs as defined under the Act are objectively suitable and used for self-defense and therefore presumptively protected under the Second Amendment, or whether their objective lethality makes them unusually dangerous and therefore outside the Amendment's protection. <u>Bruen</u>, 597 U.S. at 24; <u>Heller</u>, 554 U.S. at 625-27; <u>Bianchi</u>, 111 F.4th at 445 (stating "dangerous and unusual weapons" that are not in "common use" may be prohibited (citing <u>Heller</u>, 544 U.S. at 627)); <u>United States v. Wilson</u>, 164 F.4th 380, 384 (5th

---

[8] While <u>Wolford</u> defines "Arms" as "any weapon customarily used for offensive or defensive purposes," 2026 WL 1825723, at *6, the rest of the opinion makes clear that these "purposes" do not include uses best suited to military force.  Instead, because the opinion later emphasizes that "self-defense" was "the right <u>Bruen</u> recognized," <u>id.</u> at *9-10 (describing a "hypothetical woman" who sought to carry a concealed handgun for self-defense against a "violent ex-boyfriend"), the use of "offensive" here merely acknowledges the principle that, in some situations, an individual may "reasonably" fire the first shot "to protect his own life." <u>Pellegrino v. United States</u>, 73 F.3d 934, 938 (9th Cir. 1996) (Wallace, C.J., concurring in part).  This reading is consistent with the definition of "offensive" as "[o]f, relating to, or designed for attack."  Black's Law Dictionary (12th ed. 2024).

Cir. 2026) (stating that dangerous and unusual weapons are not in common use and therefore "fall outside the Second Amendment"); see also Krause Op. at 4-11 (explaining why the common use inquiry is an objective, rather than subjective, test).

B

Applying Bruen's objective test, I consider whether AR-15s and LCMs are "Arms" under the Second Amendment. Doing so, I conclude that the objective features of AR-15s and LCMs render them disproportionate to "ordinary self-defense needs" and thus outside the scope of the Second Amendment's protection. Bruen, 597 U.S. at 71.

Starting with the AR-15 prohibition, as Heller explained, the term "Arms" in the Second Amendment context applies "to weapons that were not specifically designed for military use and were not employed in a military capacity." 554 U.S. at 581. As stated previously, the Second Amendment does not cover weapons that are "dangerous and unusual." Id. at 627. We are therefore required to determine whether, based on the AR-15's history, features, and uses, it is objectively more akin to unusually dangerous military weapons than those in common use for self-defense and thus not the "sort[] of weapon[] protected" by the Second Amendment. Id.; see Bianchi, 111 F.4th at 454-61 (considering these factors to determine whether certain arms are protected at Bruen Step One). For the following reasons, the AR-15 is not protected by the Second Amendment.

Beginning with history, the AR-15 has "intertwined origins" with "its military version," the M-16. Bianchi, 111

11

F.4th at 454; see also Staples v. United States, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle . . . ."). In the late 1950s, the Army sought a weapon that could "penetrate a steel helmet" from a long distance, and the Armalite Corporation responded with the AR-15, which originally had both semi-automatic and automatic capabilities. Bianchi, 111 F.4th at 454. The military combat-tested the AR-15 in Vietnam, and both the military and CIA performed additional tests, concluding it "was superior in virtually all respects to the" popular military-grade weapons including the M-1 rifle, Thompson sub-machine gun, and Browning automatic rifle. Id. (citation and internal quotation marks omitted). After demonstrating its capacity to inflict "catastrophic injuries to Viet Cong Combatants . . . including severing of limbs and decapitation," the military designated the AR-15 rifle as the "M-16" and it "was adopted as standard issue by the U.S. army in the mid 1960's." JA1833.

Colt created a semi-automatic version for the civilian market, lacking "select fire capability," or the ability to "switch[] between and function[] in either full- or semi-automatic fire mode."[9]   JA1825, 1839.   However, both

---

[9] Though significant, this difference is not dispositive for our analysis. As the United States Army recognizes, "[t]he most important firing technique during modern, fast moving combat is rapid semi[-]automatic fire," JA1868, because it "is the most accurate technique of placing a large volume of fire on . . . multiple, or moving targets," Bianchi, 111 F.4th at 456 (alteration in original) (citation omitted); accord Nat'l Ass'n for Gun Rts. v. Lamont ("NAGR"), 153 F.4th 213, 241 (2d Cir. 2025).  Thus, commercially available semi-automatic AR-15s

weapons still "share the same core design," "rely on the same patented operating system," Bevis v. City of Naperville, 85 F.4th 1175, 1195-96 (7th Cir. 2023), cert. denied sub nom., Harrel v. Raoul, 144 S. Ct. 2491 (2024), and offer the same "effective range, muzzle velocity[,] semiautomatic rate of fire," JA1839, and kinetic energy on impact, Bevis, 85 F.4th at 1196.

Moreover, like its military counterpart, the version of the AR-15 sold on the civilian market is "most useful in military service," not in self-defense.  Heller, 554 U.S. at 627; Barnett v. Raoul, -- F.4th --, 2026 WL 1982951, at *14 (7th Cir. July 9, 2026) ("AR-15s . . . are dangerous not only in the sense that all firearms are dangerous but also relative to the semiautomatic handguns that *Heller* confirmed are protected.").  It has combat features such as barrel shrouds,[10]

---

are still well-suited for combat but not for Second Amendment protected purposes, like self-defense or hunting.  The same can be said of other semi-automatic weapons.  NAGR, 153 F.4th at 241.

[10] A barrel shroud is a covering that "encircles and protects the end of the barrel, keeping the barrel safe from damage caused by collision with objects and giving the [user] an auxiliary grip on the barrel without burning his hand." JA1830.

13

flash suppressors,[11] threaded barrels,[12] and the capacity to hold large magazines useful for uninterrupted firing during "prolonged firefights."[13]   Bianchi, 111 F.4th at 455.  Given these features, such weapons can be and have been used to fire at long distances and spray bullets through a crowd, neither of which is required for self-defense when an intruder enters a home.[14]  Additionally, as compared to handguns, bullets fired by AR-15s have "three times the velocity," penetrating the target and points well beyond it, which puts bystanders at risk and causes catastrophic wounds and internal damage that trauma surgeons often cannot repair.  Bianchi, 111 F.4th at 455 (citation omitted).  In addition to their extensive range, AR-15s' muzzle velocity allows them to "inflict[] enormous damage on the human body, especially . . . children."  JA1562.  None of these features are objectively suitable or required for the situation envisioned in the common-law right of self-

---

[11] A flash suppressor is a fixture attached to the end of a rifle's barrel that "reduces the muzzle flash, allowing the operator to more easily maintain vision in low light conditions and also helps to conceal the flash from view."  JA1858.

[12] Threaded barrels are barrels built with internal threads that allow for attachments to be screwed onto a muzzle, such as sound suppressors (also known as "silencers") or flash suppressors, which aid in concealability.

[13] The AR-15's firing rate can "mimic" its fully automatic military counterpart with devices like bump stocks. Bianchi, 111 F.4th at 456 (citation omitted).

[14] Although hunting is also a lawful purpose to possess a firearm, semiautomatic weapons are unlikely to aid in hunting for food or trophies given the destruction they cause to the target.

defense: neutralizing an intruder or assailant in close proximity.

Not only are AR-15s historically tied to, and designed with, features useful for combat and crime, but they are frequently used for those purposes. In fact, AR-15s and similar weapons have been disproportionately used as the weapons of choice for mass shooters, employed in around twenty-four percent of the mass shootings in this country.[15]  Bianchi, 111 F.4th at 456. Assault weapons (coupled with LCMs) were used to commit some of the deadliest mass murders in this country in recent history, including those in Aurora, Colorado (12 killed), Newtown, Connecticut (27 killed), San Bernardino, California (14 killed), Orlando, Florida (49 killed), Las Vegas, Nevada (60 killed), Sutherland Springs, Texas (26 killed), Parkland, Florida (17 killed), Pittsburgh, Pennsylvania (11 killed), El Paso, Texas (23 killed), and Uvalde, Texas (21 killed).[16] See also Worman v. Healey, 922 F.3d 26, 39 (1st Cir. 2019) (noting that "AR-15s equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history," including those in Pittsburgh, Parkland, Las Vegas, Sutherland Springs, Orlando, Newtown, and Aurora), abrogated on other grounds by Bruen, 597 U.S. 1 (2022); Kolbe v. Hogan, 849 F.3d 114, 120 (4th Cir. 2017) (listing mass shootings caused by "military-style rifles and detachable magazines," as well as "handguns equipped with

---

[15] These firearms have been used "in fatal mass shootings at percentages five to ten times higher than would [have been] by chance or if weapon features played no role in these acts of violence." JA1754.

[16] This list does not account for mass shootings that occurred after 2022.

magazines holding more than ten rounds"), abrogated on other grounds by Bruen, 597 U.S. 1 (2022); Nat'l Ass'n for Gun Rts. v. Lamont, 685 F. Supp. 3d 63, 100 n.38 (D. Conn. 2023) (listing mass shootings caused by assault weapons and LCMs, respectively), aff'd, 153 F.4th 213 (2d Cir. 2025); Silvia Foster-Frau et al., Terror on Repeat: A Rare Look at the Devastation Caused by AR-15 Shootings, Wash. Post (Nov. 16, 2023 at 06:00 ET), https://www.washingtonpost.com/nation/interactive/2023/ar-15-force-mass-shootings/ (describing "the repeating pattern of destruction wrought by the AR-15" in eleven mass killings between 2012 and 2023).

Meanwhile, semiautomatic rifles are rarely employed in self-defense, including in active-shooter scenarios. Statistics show that rifles—a category of weapons inclusive of but far broader than AR-15s—were used in just two to four percent of recorded defensive gun incidents. JA1490-92.[17] According to the FBI, only once in 456 active shooter scenarios from 2000

---

[17] Those who keep and bear AR-15s for the purpose of self-defense might not be fully captured through data tracking incidents in which weapons are discharged against an attacker because, thankfully, most people are never faced with such a situation. See Duncan v. Bonta, 83 F.4th 803, 815 (9th Cir. 2023) (en banc) (Bumatay, J., dissenting). All the same, when the relevant question is whether the weapons are "unusually dangerous," the fact that those who do discharge AR-15s are almost never individuals defending themselves proves dispositive of whether those firearms are protected under the Second Amendment.

to 2022 did an "armed civilian interven[e] with an assault weapon." JA1646.[18]

In sum, the AR-15's history, features, and uses indicate it is an unusually dangerous tool used by the military and not an arm in common use by civilians for self-defense.[19] As such,

---

[18] It is of no moment that weapons frequently owned for lawful use may be disproportionately used to commit crimes. See Ass'n of N.J. Rifle & Pistol Clubs, Inc., v. Att'y Gen. N.J. ("ANJRPC I"), 910 F.3d 106, 116 n.17 (3d Cir. 2018) (citing N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 256 (2d Cir. 2015)).  Due to semi-automatic rifles' disproportionate criminal use, military history, and combat-oriented features, they are unusually dangerous weapons outside the Second Amendment's protection.

[19] Like Plaintiffs, the Majority focuses on popularity, namely that millions of Americans have purchased AR-15s and other semiautomatic firearms.  As an initial matter, this focus on the number of firearms purchased conflates ownership with use.  Watson v. United States, 552 U.S. 74, 76 (2007) (explaining that "possession does not amount to 'use'" of a firearm under "ordinary or natural" meaning of "use" (quoting Bailey v. United States, 516 U.S 137, 145 (1995))).  While there is no question that the Second Amendment protects the right "to keep and bear Arms," U.S. Const. ament. II, rather than the right to "use" Arms, the distinction between ownership and use is relevant to whether a weapon is in common use.  Moreover, the fact that many own these weapons does not immunize them from constitutional scrutiny.  Bianchi, 111 F.4th at 460-61; Hanson, 120 F.4th at 232-33; Ocean State Tactical, LLC v. Rhode Island ("OST"), 95 F.4th 38, 50-51 (1st

AR-15s are not Arms that the Second Amendment protects, and the State may ban them.

C

I reach a similar conclusion about the LCM restriction.[20] I do so by first re-examining a statement we made in Ass'n of New Jersey Rifle & Pistol Clubs, Inc., v. Attorney General New Jersey ("ANJRPC I") that magazines are "Arms." 910 F.3d 106, 116 (3d. Cir. 2018).[21] This statement was made before Bruen

---

Cir. 2024), cert. denied, 145 S. Ct. 2771 (2025). If we adopt Plaintiffs' view, then a manufacturer could simply flood the market with a type of gun to foment a constitutional challenge against its regulation. That cannot be correct. The scope of constitutional protection is not defined by a popularity poll. See Bianchi, 111 F.4th at 460-61; OST, 95 F.4th at 50-51.

[20] See, e.g., Owner Operator Indep. Drivers Ass'n v. Pa. Tpk. Comm'n, 934 F.3d 283, 294 n.13 (3d Cir. 2019) (noting, in the context of a constitutional challenge to a state statute, that we may affirm a district court's grant of summary judgment on any grounds supported by the record).

[21] Some courts have concluded that LCMs are "accessories" or "accoutrements" rather than arms because, alone, they pose no harm. E.g., Duncan v. Bonta, 133 F.4th 852, 867-69 (9th Cir. 2025). The State points to this fact as a separate reason for concluding that LCMs are not protected by the Second Amendment. Magazines, however, are necessary components for the use of certain firearms, as they supply bullets to the gun's chamber. Thus, the right to bear magazines that are not unusually dangerous could be viewed as part and parcel of the right to bear arms, much like the right to possess

18

and captures only part of what became <u>Bruen</u>'s Step One analysis.  Because we did not address in that opinion whether LCMs are arms in common use for self-defense such that they fall within the Second Amendment's protection, I do so today and conclude that they are not covered.

To determine whether LCMs are the "sorts of weapons protected" by the Second Amendment, as with AR-15s, I look to the history, features, and uses of LCMs, and conclude that they are neither objectively suited nor actually used for self-defense.  <u>Heller</u>, 554 U.S. at 627; <u>see also</u> <u>Bianchi</u>, 111 F.4th at 454-59.  LCMs carry a "military heritage" similar to AR-15s. JA1846. Emerging during World War II, these magazines were originally "intended for military use," JA1855,[22] and "allowed soldiers to fire without pausing to reload," <u>Or. Firearms Fed'n v. Kotek</u>, 682 F. Supp. 3d 874, 910 (D. Or. 2023).  Even after they were introduced to civilians, their "military character and appearance" were "key" to their successful marketing.  JA1094.

The main feature of LCMs is that they allow users to fire many bullets before having to reload.  This is particularly important in the military context—especially for the infantry—because such capacity allows servicemen to shoot at enemy

---

ammunition.  <u>See</u> <u>ANJRPC I</u>, 910 F.3d at 116 (citing <u>Jackson v. City & County of San Francisco</u>, 746 F.3d 953, 967 (9th Cir. 2014)); <u>Miller</u>, 307 U.S. at 180 (citing historical sources acknowledging that "[t]he possession of arms also implied the possession of ammunition").

[22] Detachable magazines with an ammunition capacity greater than ten rounds did not appear until the early-to-mid-twentieth century.

combatants for longer periods without pause. In this way, LCMs "increase[] the lethality and effectiveness of small arms in combat." JA1855; Ocean State Tactical, LLC v. Rhode Island ("OST"), 95 F.4th 38, 47 (1st Cir. 2024) ("[M]agazine capacity directly corresponds to lethality."), cert. denied, 145 S. Ct. 2771 (2025); see also Barnett, 2026 WL 1982951, at *14 ("[L]arge-capacity magazines amplify each and every one of the AR-15's dangerous characteristics by allowing a shooter to fire more of these lethal rounds without breaking to reload."). Such magazines are "rarely" used in "civilian self-defense" because "the rapid and uninterrupted discharge of many shots, much less more than ten" is not required in such situations. Id. at 45; accord ANJRPC I, 910 F.3d at 118 ("LCMs are not well-suited for self-defense.").[23] Indeed, based on National Rifle Association data, civilian defenders fire only "2.2 shots on average." JA1482-83; accord ANJRPC I, 910 F.3d at 121 n.25 ("[M]ost homeowners only use two to three rounds of ammunition in self-defense."). In contrast, "semi[-]automatic firearms equipped with LCMs can rapidly hit very many human targets[, which] empirically . . . is not a useful feature for self-defense, [but] is presumably conducive to combat in war zones." OST, 95 F.4th at 49. Accordingly, LCMs, like AR-15s, are unusually dangerous "weapons that are most useful in military service," rather than for self-defense, and are not Arms under the Second Amendment. Heller, 554 U.S. at

---

[23] Rather, LCMs are favored by mass shooters, having been "deployed in many of the deadliest mass shootings in recent history." OST, 95 F.4th at 46 (internal quotation marks and citation omitted); accord JA1498 (LCMs were used in up to sixty-three percent of mass shootings).

627. Thus, the Act's restriction on LCMs does not violate the Second Amendment.

III

Even if AR-15s and LCMs were "Arms" under the Second Amendment, the State has shown that the Act's restrictions are consistent with the Nation's historical regulatory tradition and thus are constitutionally permissible under Bruen Step Two. 597 U.S. at 24. At this step, courts compare challenged regulations to "relevantly similar" historical predecessors, if any exist, focusing on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Bruen, 597 U.S. at 29. The "how" portion of the analysis examines how the regulations burden the right, and the "why" portion looks at the justification for that burden. Id.; see also United States v. Rahimi, 602 U.S. 680, 692 (2024).

A historical analogue need not be a "historical twin" or "dead ringer." Bruen, 597 U.S. at 30 (emphasis omitted). Rather, the State must put forth evidence of a "representative" historical analogue to the present regulation, id., to demonstrate the present-day statute's consistency with the principles animating our Nation's historical regulatory tradition stretching back to (and before) the Second Amendment's ratification, see Rahimi, 602 U.S. at 692. The focus on "principles" reminds us to analogize at the proper level of generality: we need not conduct an element-matching exercise between modern and historical statutes, but rather, we consider whether the "principles embodied in different strands of historical firearm regulations, '[t]aken together,'" support

21

contemporary restrictions.[24] <u>Pitsilides v. Barr</u>, 128 F.4th 203, 210 (3d Cir. 2025) (alteration in original) (quoting <u>Rahimi</u>, 602 U.S. at 698).

<u>Bruen</u> instructs that we should look for "a distinctly similar historical regulation" when "a challenged regulation addresses a general societal problem that has persisted since the 18th century," but that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 26-27. AR-15s and LCMs are textbook examples of weapons warranting such an "approach." Firearms of the past did not have the capacity to accomplish the mass shootings that occur today, and thus legislatures of the past would not have needed to consider laws to protect against them. <u>Hanson v. District of Columbia</u>, 120 F.4th 223, 241-42 (D.C. Cir. 2024) (citing Congressional Research Service study finding that mass shootings that are growing increasingly common each year in the United States), <u>cert. denied</u>, 145 S. Ct. 2778 (2025). Given the "dramatic technological changes," <u>Bruen</u>, 598 U.S. at 27, since the founding, there would be no relevantly similar analogues addressing these weapons. <u>Bianchi</u>, 111 F.4th at 464 (observing that "[t]hese are not our forebears' arms, and these are not our forebears' calamities"); <u>Hanson</u>, 120 F.4th at 240 (noting that given the extent of changes in firearm technology, "there simply is no relevantly similar historical analogue to a modern, semi[-]automatic handgun equipped with an [LCM]"); <u>Barnett</u>, 2026 WL 1982951, at *17 (explaining that "dramatic technological change . . . has given

---

[24] That said, we must "not [] read a principle at such a high level of generality that it waters down the right." <u>Rahimi</u>, 602 U.S. at 740 (Barrett, J., concurring).

rise to the unprecedented societal concern of mass shootings, especially those with high fatality counts carried out by lone shooters"). The dramatic "technological changes" therefore warrant a more nuanced, flexible approach at <u>Bruen</u> Step Two to evaluate potential analogues. 597 U.S. at 27.

The State has identified relevant historical analogues revealing a tradition of regulating instruments once disproportionately used by criminals and rarely used in self-defense, just as semi-automatic rifles and LCMs are used today. This tradition dates back to pre-colonial England, which prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land," <u>Rahimi</u>, 602 U.S. at 697 (alteration in original) (quoting 4 William Blackstone, Commentaries *149), including launcegays, shorter and lighter versions of a full knight's lance, which were "generally worn or carried only when one intended to . . . breach the peace," <u>Bruen</u>, 597 U.S. at 41. Since the Founding, our Nation, in turn, has long accepted the principle that states may inhibit "unprecedentedly lethal criminal activity by restricting or banning weapons that are particularly susceptible to, and were widely used for, multiple homicides[,] mass injuries," and other criminal purposes. <u>Hanson</u>, 120 F.4th at 240. As our sister circuits have confirmed, this tradition is evident in prohibitions and restrictions of Bowie knives,[25]

---

[25] <u>E.g.</u>, 1820 Ind. Acts 39; 1837 Ga. Acts 90 (1838); Act of Jun. 30, 1837, ch. 77, § 2, 1837 Ala. Laws 7, 7; 1837-1838 Tenn. Pub. Acts 200, ch. 137, §§ 1, 2; 1838 Va. Acts 76; 1871 Tex. Laws 1st Sess. 25; 1878 Miss. Laws 175; 1879 N.C. Sess. Laws 231; 1880 S.C. Acts 448; 1881 Ark. Acts 191; 1889 Ariz. Sess. Laws 30.

slungshots, and clubs[26] in the early nineteenth century, as well as of machineguns and sawed-off shotguns[27] in the twentieth century.[28] See OST, 95 F.4th at 47-49; Bevis, 85 F.4th at 1200-02; Bianchi, 111 F.4th at 464-72; accord Nat'l Ass'n for Gun Rts. v. Lamont ("NAGR"), 153 F.4th 213, 243-44 & nn.34-36 (2d Cir. 2025).[29]

---

[26] E.g., 1850 Mass. Acts & Resolves 401; 1868 Fla. Laws 95, Of Offenses Against the Public Peace, ch. 7, § 11; 1885 Ill. Stat. Ann. Crim. Code ch. 38, 88; 1888 Gen. Minn. Law §§ 333, 334; 1890 Okla. Sess. Laws 475, § 18.

[27] Bianchi, 111 F.4th at 470 n.14 (collecting examples of laws regulating machineguns); National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934) (regulating certain firearms including machineguns and short-barreled shotguns).

[28] Cf. Lara, 125 F.4th at 438-45 (holding that evidence of a historical tradition after the Founding Era is relevant to the extent that it does not contradict earlier evidence).

[29] As compared to the LCM restriction, these earlier statutes arguably imposed a greater burden on individuals' Second Amendment rights in that they categorically banned classes of weapons whereas the LCM restriction merely limits a firearm's uninterrupted firing capacity, Hanson, 120 F.4th at 240, without limiting the amount of ammunition or number of magazines a user may possess. In short, the Act only restricts an individual's right to shoot more than ten bullets without reloading. Duncan, 133 F.4th at 879 (describing a similar restriction's burden as resting on "only one very specific use of some firearms: the shooting of an eleventh (or successive) round without a brief pause").

An examination of Bowie knives, in particular, is instructive.[30] The knife became popular in the 1830s and had a "distinctive type of long-bladed and usually single-edged knife with a hand guard," JA1098, which, like the weapons at issue here, "wreaked particularly bloody and gruesome injuries," NAGR, 153 F.4th at 243 (citation and internal quotation marks omitted). Perhaps because of its distinctive features, it quickly became popular among the public and was "widely used in fights and duels," JA1099-1100, including a high-profile act of violence involving multiple fatalities, see NAGR, 153 F.4th at 243 (describing "Colonel Jim Bowie's 'Sandbar Fight' at the Mississippi River on September 19, 1827 that led to two deaths and multiple non-fatal casualties."). In response to this criminal use and out of concern for public safety, states began to regulate the knife. Barnett, 2026 WL 1982951, at *9. These regulations were widespread and ranged from restrictions to outright bans. "From the beginning of the 1830s through the early twentieth century, the District of

---

[30] These weapons might not be firearms, but again, the State need only point to a "representative" historical analogue, not a "historical twin" or "dead ringer," Bruen, 597 U.S. at 30, to demonstrate its regulation's consistency with "the principles underlying the Second Amendment," Rahimi, 602 U.S. at 692. Although not historical twins, these weapons are like AR-15s and LCMs because they were disproportionately used to commit crimes. Bianchi, 111 F.4th at 468 (explaining that Founding-era laws restricting the use and ownership of Bowie knives demonstrated historical tradition of regulating weapons disproportionately used for crime); Bevis, 85 F.4th at 1197-1202 (similar).

Columbia and every state except New Hampshire passed laws restricting Bowie knives." OST, 95 F.4th at 48.

Twentieth-century legislatures likewise regulated that era's weapons that were disproportionately used for criminal purposes or distinctly susceptible to such use, including automatic firearms and sawed-off shotguns. The former, such as the Thompson sub-machine gun, was developed for military use but in the 1920s, civilians had access to these weapons, which had "firepower not seen before in civilian life." Bianchi, 111 F.4th at 469. After machineguns were used to commit several high-profile acts of mass violence—such as the St. Valentine's Day and Kansas City massacres—Congress and state legislatures responded. Id. Congress outlawed civilian ownership of automatic weapons, sawed-off shotguns, short-barreled rifles, and silencers in the National Firearms Act of 1934. See NAGR, 153 F.4th at 246; Bevis, 85 F.4th at 1202,[31] and "[a]t least 29 states enacted anti-machine-gun laws

---

[31] "Federal restrictions expanded in 1968, when [the] sale and delivery of destructive devices (defined as an 'explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device') and machineguns were severely restricted" under the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 921(a)(4), § 922(b), 82 Stat. 197, 227, 230 (1968), and "[m]achineguns were banned by the Firearm Owners' Protection Act of 1986." Bevis, 85 F.4th at 1202.

between 1925 and 1934." Bianchi, 111 F.4th at 470 (collecting statutes).

Although some of these historic laws prohibited only carrying these weapons, and others banned them entirely,[32] they speak to a historical practice of regulating dangerous weapons disproportionately used for criminal ends—as opposed to those weapons in common use for self-defense. Bianchi, 111 F.4th at 464-73; Bevis, 85 F.4th at 1198-1202; see also Rahimi, 602 U.S. at 701 (observing that a "historical twin" is not required) (quoting Bruen, 597 U.S. at 30); id. at 739-40 (Barrett, J., concurring) (acknowledging there is no need to "assume[] that founding-era legislatures maximally exercised their power to regulate"). Regulations of Bowie knives, machine guns, and other weapons that did not exist at the Founding but came later in time are not inconsistent with the original meaning of the Second Amendment, and thus "remain relevant in tracing the broader and consistent story of our Nation's regulation of excessively dangerous weaponry" that are disproportionately used and susceptible to being used to commit crimes. Bianchi, 111 F.4th at 469-70; accord Hanson, 120 F.4th at 239; cf. Lara v. Comm'r Pa. State Police, 125 F.4th 428, 438-45 (3d Cir. 2025) (holding that evidence of a historical tradition after the Founding Era is relevant to the extent that it does not contradict earlier evidence). Indeed, Miller upheld a ban on sawed-off shotguns as constitutional, 307 U.S. at 178, and Heller "implicitly approved" a national

---

[32] The Rahimi Court itself relied on both outright bans and restrictions on use as historical analogues in reaching its conclusion that an individual subject to a domestic violence restraining order could be banned from possessing a firearm. 602 U.S. at 693-700.

27

ban on machineguns, <u>Hanson</u>, 120 F.4th at 239 (citing <u>Heller</u>, 554 U.S. at 627), even though those laws severely restricted firearm ownership.    Therefore, viewed under <u>Bruen</u>'s "nuanced approach," as detailed above, 597 U.S. at 27, "the lack of a precise match," <u>Hanson</u>, 120 F.4th at 242 (internal quotation marks omitted), in historical regulations does not preclude our conclusion that the Act, which embodies the principle of earlier laws, is constitutional.

Turning finally to the "how" and "why" questions posed in <u>Bruen</u>, I considered how these laws and the Act burden the right to armed self-defense and reach one conclusion: they do not burden that right.  Like the banned Bowie knife, "banning [semi-automatic rifles and LCMs] imposes no meaningful burden on the ability of [individuals] to defend themselves" because both are "virtually never used in self-defense." <u>OST</u>, 95 F.4th at 45, 50; <u>see also</u> <u>Hanson</u>, 120 F.4th at 236 (describing the burden imposed by a similar restriction as "modest").  In fact, there is a range of firearms New Jersey residents can lawfully keep and bear for self-defense purposes. The answer to "why?" is also clear: the regulation like the historical ones described above, seeks to "restrict arms . . . that have spread in society and pose[] extreme safety threats through characteristics that ma[k]e them particularly dangerous or particularly susceptible to disproportionate criminal misuse." NJ Br. at 45.  Thus, comparing the Act's "how" and "why" to similar, or even more restrictive, historical analogues, I conclude that the State's regulation is consistent with our history and tradition and does not offend the Second Amendment.

In sum, because (1) AR-15s and LCMs are not among the types of weapons protected by the Second Amendment, (2)

28

even if they were, restricting them imposes little to no burden on the "right to armed self-defense," Bruen, 597 U.S. at 29, and (3) laws regulating them fit squarely in our Nation's long historical tradition of restricting unusually dangerous weapons widely used for criminal purposes, Heller, 554 U.S. at 625-27, the Act is constitutional.  In reaching this conclusion, I join our sister courts of appeals who have addressed challenges to similar statutes, and note our Court is now an outlier.  NAGR, 153 F.4th at 246 & n.40 (holding similarly and collecting cases from the Courts of Appeals of the First, Fourth, Seventh, Ninth, and D.C. Circuits cited elsewhere herein); Barnett, 2026 WL 1982951, at *8 (joining "the unanimous circuit consensus" concluding that "a largely overlapping set of historical regulations imposing targeted restrictions on weapons whose danger and lethality stand out . . . justify restrictions on AR-15s and large-capacity magazines").

IV

I also conclude that the Act's compliance provision does not violate the Takings Clause.  What we held in 2018 remains true: the Act "does not result in a taking."  ANJRPC I, 910 F.3d at 125; see Ass'n of N.J. Rifle & Pistol Clubs, Inc., v. Att'y Gen. N.J ("ANJRPC II"), 974 F.3d 237, 245-46 & n.7 (3d Cir. 2020) (determining that the ANJRPC I panel's conclusion on this issue represents the law of the case); see also United States v. Jenkins, 68 F.4th 148, 152 n.6 (3d Cir. 2023) (noting we are bound by a prior panel's precedential decision "absent en banc intervention or additional clarification from

29

the Supreme Court").[33]  Because no intervening precedent has changed any of the legal principles underlying ANJRPC I's conclusion that the compliance provision does not constitute an unconstitutional taking,[34] the ANJRPC Plaintiffs' takings claim again fails.  Jenkins, 68 F.4th at 152 n.6.

V

For the foregoing reasons, I conclude that the Act's ban on AR-15s and restriction on LCMs do not violate the Second Amendment, and the compliance provision does not violate the Takings Clause.  Therefore, I respectfully dissent.

---

[33] Moreover, the Act represents a valid exercise of the State's police power, having been enacted in the interest of public safety rather than for the public use of private property, and thus is not a taking at all.  Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027-28 & n.14 (1992); Mugler v. Kansas, 123 U.S. 623, 668-69 (1887); Nat'l Amusements Inc. v. Borough of Palmyra, 716 F.3d 57, 63 (3d Cir. 2013).

Horne v. Department of Agriculture, 576 U.S. 350 (2015), does not require a different holding.  That case dealt with a per se taking where the Government took actual raisins from raisin-growers for its own use.  Id. at 361-62.  Unlike Horne, the Act does not mandate the State's physical taking of the owners' property because the compliance provision provides alternatives for relinquishing possession of the covered weapons and parts.

[34] Our sister courts of appeals have reached similar conclusions concerning such regulations.  See Duncan, 133 F.4th at 864; OST, 95 F.4th at 52-53.

KRAUSE, *Circuit Judge*, joined by RESTREPO and SMITH, *Circuit Judges*, dissenting.

For more than two centuries, Americans have understood the Second Amendment to permit States to outlaw the possession of certain types of weapons through the deliberative legislative process. Following a horrific mass shooting at a public school, the People of New Jersey, through their elected representatives, chose to restrict civilians from possessing AR-15s and other semi-automatic rifles, as well as large-capacity magazines (LCMs)—weapons that are not proportional to the needs of ordinary self-defense but, rather, are designed to penetrate the steel helmets of enemy soldiers and maximize combatant casualties on the battlefield. Since New Jersey's Assault Firearms Law (the Act) was enacted, gunmen have tragically continued to use semi-automatic rifles equipped with LCMs, like those at issue in this case, to commit mass shootings across the country—at schools, grocery stores, movie theaters, houses of worship, nightclubs, concerts, and parades. Yet today, the majority disregards New Jersey's decision to align its firearm regulations with the deeply rooted regulatory tradition of proscribing these sorts of dangerous weapons, those so lethal that every other Court of Appeals to review a law regulating them has upheld it against constitutional challenge.[1]   And in departing from this

---

[1] *See Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) (large-capacity magazines); *Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) (semi-automatic rifles and large-capacity magazines); *Nat'l Ass'n for Gun Rts. v.*

consensus, the majority isolates us as the only Court of Appeals in the Nation to afford constitutional protection to AR-15s and LCMs.

On what basis does the majority disregard the democratic will of the People of New Jersey and conclude that these weapons deserve constitutional protection?   On the novel theory that these weapons are "in common use" because modern-day manufacturers have pumped a sufficient (yet undefined) number of them into nationwide circulation and some (again, undefined) percentage of gunowners assert their subjective intent to use them only for lawful purposes.   The majority's analysis contravenes the Supreme Court's repeated instructions to evaluate modern laws regulating firearms by comparing them with historical analogues enacted pursuant to principles that have guided legislatures since the Founding. Instead, the majority gives undue weight to today's market trends and the idiosyncratic preferences of an ill-defined subset of gunowners.   And the majority does so despite the ground

---

*Lamont*, 153 F.4th 213 (2d Cir. 2025) (semi-automatic rifles and large-capacity magazines), *cert. granted sub nom.*, *Grant v. Higgins*, --- S. Ct. ----, 2026 WL 1871312 (June 30, 2026); *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc) (semi-automatic rifles); *Barnett v. Raoul*, --- F.4th ----, 2026 WL 1982951 (7th Cir. July 9, 2026) (semi-automatic rifles and large-capacity magazines); *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) (en banc) (large-capacity magazines), *petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025); *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) (per curiam) (large-capacity magazines).

2

shifting beneath our feet: The Supreme Court has granted *certiorari* to resolve within months one of the two questions before us today—the constitutionality of laws prohibiting the possession of AR-15s.[2] The other question, the constitutionality of regulations on LCMs, is presented by a pending petition for *certiorari* that the Court has relisted for its next conference.[3]

In these circumstances, principles of judicial restraint and this Court's historical practice counsel that we stay our hand. In addition, concern for this institution counsels that we seek to achieve consensus to speak clearly and authoritatively. Yet a majority of my colleagues press on, jumping ahead of the Supreme Court to issue five separate opinions.[4]

In doing so, the majority also reaches the wrong result. As explained in Judge Shwartz's persuasive dissent, which I join in full, New Jersey's ban on AR-15s and its restriction on LCMs are constitutional under the two-step framework articulated in *New York State Rifle & Pistol Association v.*

---

[2] *See Viramontes v. Cook County*, No. 24-1437, 2025 WL 1553896 (7th Cir. June 2, 2025), *cert. granted*, --- S. Ct. ----, 2026 WL 1871322 (June 30, 2026); *Lamont*, 153 F.4th 213, *cert. granted sub nom.*, *Grant v. Higgins*, --- S. Ct. ----, 2026 WL 1871312 (June 30, 2026).

[3] *See* Petition for Cert., *Duncan v. Bonta*, No. 25-198 (U.S. Aug. 15, 2025).

[4] Even a member of the majority urges that we hold this case *c.a.v.* because, "once those cases are decided, they will carry the day." Montgomery-Reeves Op. 3.

3

*Bruen*, 597 U.S. 1 (2022). The Plaintiffs' challenge fails at Step One because LCMs and AR-15s—the only semi-automatic rifles proscribed by the Act that the Plaintiffs have actually challenged—are not protected "Arms" under the Second Amendment. And even if they were, taking us to *Bruen* Step Two, our Nation's history and tradition support the firearm regulations adopted by the New Jersey Legislature. The majority reaches the opposite conclusion by misconstruing the test and its application at both steps of the *Bruen* analysis. I write separately to delve further into the majority's errors and to express my concern about their dangerous consequences for the People of New Jersey.

## I.    *Bruen* Step One

### A.  The Objective Inquiry into Protected "Arms"

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that the "Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense," *United States v. Hemani*, 608 U.S. ___, 146 S. Ct. 1677, 1685 (2026) (quoting *Heller*, 554 U.S. at 581), and in *Bruen*, it gave courts a two-step framework to determine whether a regulation infringes on that right, 597 U.S. at 24. At *Bruen*'s first step, we analyze whether "the Second Amendment's plain text covers" the conduct in question, *id.*, which here requires us to ask whether the challenged weapons are among the "Arms" that the people presumptively have the right to keep and bear under the Second Amendment. That inquiry is undoubtedly objective. Indeed, the text of the

4

Second Amendment and Supreme Court precedent direct us to ascertain at Step One if a weapon's objective features and uses make it proportional to the needs of, and customarily used in service of, an individual's right to keep and bear arms for self-defense.  Only then is the weapon "in common use" for "lawful purposes like self-defense," and thus within the ambit of the Second Amendment.  *Heller*, 554 U.S. at 624.

As with other constitutional provisions, we construe the term "Arms" in the text of the Second Amendment "as informed by history," *Bruen*, 597 U.S. at 19, and thus consult "contemporaneous . . . sources of context to ensure that we are understanding" the term "in the way its drafters intended," *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023), *cert. denied sub nom.*, *Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *see also Wolford v. Lopez*, 609 U.S. ___, 2026 WL 1825723, at *14 (June 25, 2026) (Barrett, J., concurring) (stating that *Bruen*'s first step calls for us to "look to history" that "elucidates how contemporaries understood the text—for example, the meaning of the phrase 'bear Arms'" (quoting *United States v. Rahimi*, 602 U.S. 680, 738-39 (2024) (Barrett, J., concurring)).

On several occasions in the last few years, the Supreme Court has set guardrails for courts interpreting the Second Amendment's plain text.  The Court has oft emphasized that, "while the founding generation cherished the Second Amendment right, they did not think it was absolute." *Wolford*, 609 U.S. ___, 2026 WL 1825723, at *5 (majority

5

opinion); *see also, e.g.*, *Heller*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited."); *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring) ("Despite its unqualified text, the Second Amendment is not absolute.").

The Court has also underscored that, when adopting the Second Amendment, our Founders "codified a *pre-existing right*," *Heller*, 554 U.S. at 592, "one that carries the same 'scope' today that it was 'understood to have when the people adopted' it," *Rahimi*, 602 U.S. at 709 (Gorsuch, J., concurring) (quoting *Heller*, 554 U.S. at 592, 634-35); *see also id.* at 737 (Barrett, J., concurring) (explaining that the Second Amendment "codified a pre-existing right, and pre-existing limits on that right are part and parcel of it" (citing *Heller*, 554 U.S. at 570)); *Hemani*, 146 S. Ct. at 1685 ("[We] demand . . . attention to history . . . because the Second Amendment was designed to codify a pre-existing individual right . . . ." (citation modified)).

That pre-existing, common-law right had self-defense as its "*central component*." *Heller*, 554 U.S. at 599.[5]  It was also

---

[5] *See also Wolford v. Lopez*, 609 U.S. ___, 2026 WL 1825723, at *4 (June 25, 2026) ("[T]he Second Amendment protects[] the right of Americans to carry arms for self-defense . . . ."); *United States v. Hemani*, 608 U.S. ___, 146 S. Ct. 1677, 1685 (2026) ("The Second Amendment protects the right of all Americans to keep and bear firearms for self-defense." (citation modified)); *United States v. Rahimi*, 602 U.S. 680, 690 (2024) ("Derived from English practice and codified in the

understood at the Founding to have "baked-in prerogatives and qualifications," including that an individual may only "repel force by force" as a last resort to protect himself from an imminent threat, and that such force must be proportional to the circumstances. *Bianchi v. Brown*, 111 F.4th 438, 447, 448 (4th Cir. 2024) (en banc) (citation modified); *accord Bevis*, 85 F.4th at 1193-94.

These meaningful limitations on the right to self-defense necessarily inform the scope of the individual right to keep and bear arms, rooted in the Second Amendment and articulated in *Heller*. As relevant here, because "the right secured by the Second Amendment is . . . not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626, these limitations cabin the types of weapons that fall within the ambit of the term "Arms" in the Second Amendment*, see id.* at 595 (concluding that the Second Amendment did not enshrine "the right of citizens to carry arms for *any sort* of confrontation").

The Supreme Court made clear in *Heller* that the "types of weapons" to which the "Second Amendment right . . . extends," *id.* at 623, are those "in common use" for "lawful purposes like self-defense," *id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)), leaving federal, state, and local governments free to regulate "dangerous and

---

Second Amendment, the right secures for Americans a means of self-defense." (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022))).

unusual weapons," *id.* at 627 (citation modified); *see also Wolford*, 609 U.S. ___, 2026 WL 1825723, at *6 (defining "Arms" as those instruments "*customarily* used for offensive or defensive purposes" (emphasis added)).  We also look to *Heller* to illustrate the ways in which the Supreme Court has discerned the Founding-era understanding of the term "Arms"—adopting a narrower meaning than the plain text would suggest on its face.  There, the Court gave two exemplars of proscribable weapons: (i) those "not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," 554 U.S. at 625, and (ii) "weapons that are most useful in military service—M-16 rifles and the like," *id.* at 627; *see also id.* (acknowledging that such weapons "may be banned"); *id.* at 624 (clarifying that it would be "startling" to interpret "the National Firearms Act's restrictions on machineguns" as violating the Second Amendment).

Meanwhile, the *Heller* Court held that handguns fall squarely within "the historical understanding of the scope of the right."  *Id.* at 625.  It reached that conclusion through a functional analysis, focusing on handguns' various objective features that make them particularly well-suited to be deployed in and effective for "home defense."  *Id.* at 629.  Handguns, the Court reasoned, were "the quintessential self-defense weapon," noting, for instance, that they, as compared to long guns, are "easier to store in a location that is readily accessible in an emergency . . . [and] can be pointed at a burglar with one hand while the other hand dials the police."  *Id.*  The Court also emphasized both in *Heller* and later in *Bruen* that handguns

8

satisfy the standard self-defense needs of ordinary people. *See id.* at 636 (striking down an "absolute prohibition of handguns *held and used* for self-defense" (emphasis added)); *Bruen*, 597 U.S. at 71 (striking down a statute regulating handgun use because it "prevent[ed] law-abiding citizens *with ordinary self-defense needs* from exercising their right to keep and bear arms" (emphasis added)).

The Supreme Court has thus made clear that whether a type of weapon is "in common use" for purposes of the Second Amendment inquiry—and thereby falls within the scope of the Amendment's presumptive protection—turns on whether its *objective features and uses* make it better suited for self-defense, in contrast to those weapons best suited for offensive military or criminal purposes like inflicting mass casualties on enemy combatants or terrorizing victims while committing a crime. Handguns fit the former category; military-grade weapons, such as M-16s, and weapons "not typically possessed . . . for lawful purposes," like short-barreled shotguns, *Heller*, 554 U.S. at 625, fit the latter. For other weapons not yet addressed by the Supreme Court, the test should be a stable benchmark: whether the weapon's objective features and uses are such that the Founders would have understood the weapon to fall within the pre-existing right to bear "Arms" for self-defense codified in the Second Amendment. The test should not, as the majority would have it, require measurement against an ever-changing yardstick

9

based on a declarant's subjective intent to limit his own use to self-defense.

Here, when we apply the correct test at *Bruen* Step One, it is plain that the objective features and uses of the semi-automatic rifles[6] and LCMs regulated by the Act put them outside the scope of the Second Amendment. Semi-automatic rifles and LCMs, predominantly useful on the battlefield and capable of "phenomenal lethality," *Bianchi*, 111 F.4th at 455 (citation modified), are "much more like machineguns and military-grade weaponry" than handguns or other weapons that are deployed in prototypical self-defense scenarios, *Bevis*, 85 F.4th at 1195; *see Barnett*, --- F.4th ----, 2026 WL 1982951, at *14. While handguns are the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, and thus "fall squarely into [the] category" of "Arms," *Wolford*, 609 U.S. ___, 2026 WL 1825723, at *4, semi-automatic rifles and LCMs are not and do not. The latter are undoubtedly designed for "prolonged firefights," *Bianchi*, 111 F.4th at 455 (citation modified), shooting across far distances, and effectuating mass

---

[6] I agree with Judge Shwartz that the scope of the majority opinion, which reaches the constitutionality of New Jersey's prohibition on a range of semi-automatic rifles, not just the AR-15, goes beyond what the parties have presented. *Accord Barnett*, --- F.4th ----, 2026 WL 1982951, at *7 (evaluating "restrictions on assault weapons . . . based on the circumstances on which the parties have principally focused: an AR-15"). Where the points I make here apply beyond AR-15s, I refer to all semi-automatic rifles.

casualties—not for neutralizing an aggressor at close range. They are also "strongly correlated" with the "unprecedented societal concern of mass shootings," *Barnett*, --- F.4th ----, 2026 WL 1982951, at *18, not with the needs of "ordinary self-defense," *Bruen*, 597 U.S. at 60.

In sum, semi-automatic rifles and LCMs simply do not have the objective features and uses that lend them to being customarily used for "securing the fundamental right of self-defense," which is undoubtedly the "central concern" of the Second Amendment. *Wolford*, 609 U.S. ___, 2026 WL 1825723, at *4 (citation modified). That should have been the end of the road in today's analysis, and we should not be proceeding to *Bruen*'s second step. The majority reaches that step, but only because of a series of errors at Step One, as described below.

## B. The Majority's Misreading of *Bruen* Step One

At Step One, the majority sweeps LCMs and the semi-automatic rifles regulated by the Act under the protection of the Second Amendment by applying the wrong test. It improperly transplants the inquiry of whether a weapon is "in common use" for self-defense and other lawful purposes from Step One to Step Two, and it reduces the initial test to a mere gut check of whether the weapon at issue can be picked up and carried. That reasoning is flawed many times over.

For one thing, the majority's approach is inconsistent. It declares that we must look simply at the literal definition of

11

"Arms" when assessing the constitutional protections afforded to semi-automatic rifles, yet it then ventures beyond this dictionary definition to conclude that magazines—surely a *component* of a firearm but otherwise harmless when not properly inserted and loaded—fall within the scope of the Second Amendment.

For another, the majority ignores Supreme Court guidance in *Heller* and its progeny. As an example, *Bruen* instructed us to focus at its second step on comparing modern regulations with historical analogues and extrapolating principles undergirding regulations from our Nation's history and tradition, *see* 597 U.S. at 24, which means that Step Two's "timeframe and analytical object are mismatches" for the inquiry of whether weapons are in common use *today*, Shwartz Op. 9 n.7. *Heller* clarified that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," 554 U.S. at 626, including machineguns, even though "a normal person can certainly pick up and carry [one]," *Bevis*, 85 F.4th at 1193. "Bearable" therefore "must mean more than 'transportable' or 'capable of being held'" to be consistent with *Heller*. *Id.*

Unsurprisingly, absurd and dangerous consequences follow from the majority's formulation of the Step One inquiry, where any bearable weapon is an "Arm" within the meaning of the Second Amendment. For instance, not just machineguns, but also flamethrowers or even some weapons of mass destruction, as long as they may be grasped, hoisted, and shouldered, would

12

be presumptively constitutionally protected. *Cf. Bevis*, 85 F.4th at 1182 ("Everyone can . . . agree, we hope, that a nuclear weapon such as the now-retired M388 Davy Crockett system, with its 51-pound W54 warhead, can be reserved for the military, even though it is light enough for one person to carry.").

In short, the majority's interpretation of Step One misapplies Supreme Court precedent, diverges from five of our sister circuits that have considered the same question,[7] and pushes us unnecessarily to Step Two of the *Bruen* inquiry.

## II.    *Bruen* Step Two

At Step Two of the *Bruen* analysis, we assess whether a modern law is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, by comparing it to "relevantly similar" historical predecessors and analyzing "how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29. As Judge Shwartz observes, such relevant analogues here, including regulations of Bowie knives, machineguns, and sawed-off shotguns, "reveal[] a tradition of regulating instruments once disproportionately used by criminals and rarely used in

---

[7] *See, e.g.*, *United States v. Gomez*, 159 F.4th 172, 177-78 (2d Cir. 2025); *Bianchi*, 111 F.4th at 447-52; *Bevis v. City of Naperville*, 85 F.4th 1175, 1192-94 (7th Cir. 2023), *cert. denied sub nom.*, *Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023); *Hanson*, 120 F.4th at 232.

13

self-defense." Shwartz Op. 23. The Act's prohibition on semi-automatic rifles and restriction on LCMs fit neatly within that tradition.

The majority, however, having crafted a tautology to conclude that semi-automatic rifles and LCMs are presumptively protected at Step One of the *Bruen* framework, largely reduces the Step Two inquiry to whether a weapon is frequently purchased today—a function of marketing and subjective preferences unmoored from history and Supreme Court precedent. And where the majority does undertake its own historical analysis, it misapplies *Bruen*'s methodology. I address both errors below.

### A. Distorting the Common Use Inquiry

At *Bruen*'s second step, we are instructed to look to history and tradition. Yet the majority adopts and extends the District Court's reasoning that New Jersey cannot regulate LCM possession or ban AR-15s (or, in the majority's view, any proscribed semi-automatic rifles), on the grounds that each weapon is "in common use" *today*. Even as the majority acknowledges that another case might present the "need to qualitatively examine a weapon's features to determine whether a weapon is in common use for lawful purposes," Majority Op. 44, it contends that such features are not relevant to the "in common use" inquiry here because the mere fact that there are "many millions of semi-automatic rifles" and LCMs "in circulation for lawful purposes" today "plainly" answers

14

that question, Majority Op. 45.[8]  That decidedly circular reasoning makes three critical errors.

*First*, the majority mistakenly treats Step Two as an exercise in merely sorting weapons into one of two "mutually exclusive" categories, Majority Op. 28: (1) "dangerous and unusual" weapons, which can be prohibited by federal, state, and local jurisdictions, and (2) weapons that are "in common use for lawful purposes," which cannot.  True, the Supreme Court contrasted the phrases "dangerous and unusual" and "in common use" when it explained "that the Second Amendment protects only the carrying of weapons that are those 'in

---

[8] The majority glancingly mentions some objective features of the AR-15 and LCMs that the District Court cited as ostensibly making these weapons well-suited for self-defense—namely, "their build and design features, such as their mild recoil, ergonomics, and accuracy."  Majority Op. 44 (citation modified).  At this level of generality, the District Court could have been describing many modern firearms, including those banned by the Act that the majority chose not to address.  Those include semi-automatic shotguns, like the Franchi SPAS-12 and USAS-12, as well as revolving cylinder shotguns, like the Street Sweeper and Striker 12.  The fact that a weapon possesses some features that could conceivably be useful in a self-defense scenario does not make it constitutionally protected.  As the First Circuit has observed, a "sawed-off shotgun might be easier to wield in a self-defense situation due to its shorter barrel" than a semi-automatic rifle, *Ocean State Tactical*, 95 F.4th at 48, but *Heller* places such weapons outside the ambit of the Second Amendment, 554 U.S. 570, 623-24 (2008).

common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). But that does not foreclose courts from reviewing a popular weapon's "potentially unusually dangerous character." *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 233 (2d Cir. 2025), *cert. granted sub nom.*, *Grant v. Higgins*, --- S. Ct. ----, 2026 WL 1871312 (June 30, 2026). The Supreme Court has never said that weapons owned by many Americans are "*necessarily* protect[ed]" by the Constitution, such that banning them violates the Second Amendment. *Id.*; *see also Bianchi*, 111 F.4th at 481 (Gregory, J., concurring) (stating that the Supreme Court has never "even implied . . . that legislation that covers a weapon in common use is per se unconstitutional").

*Second*, after focusing its Step Two analysis on whether a regulated weapon is either "dangerous and unusual" or "in common use," the majority misconstrues the meaning of "dangerous and unusual." Its reliance on the number of available semi-automatic rifles and LCMs as evidence that the weapons are "in common use" might make sense if "unusual" in the phrase "dangerous and unusual" had a standalone meaning and meant numerically rare. But neither premise is supported.

For one thing, "unusual" cannot be divorced from "dangerous." The phrase "dangerous and unusual" does not state two distinct criteria; as Judge Shwartz explains, it is better read as a hendiadys—a single expression, denoted by two

16

terms linked by a conjunction, like "necessary and proper"—here, meaning *unusually dangerous*. *Accord Hanson v. District of Columbia*, 120 F.4th 223, 238 n.7 (D.C. Cir. 2024) (per curiam). Otherwise, "dangerous" would be meaningless and "would do no work delineating the category" of proscribable weapons, since all weapons are "self-evidently dangerous."[9] *Id.* (citation modified).

For another, there is no support in Supreme Court caselaw for interpreting "unusual" to denote numerically scarce, such that we should count how many of a particular type of weapon are available to determine whether it receives constitutional protection. The Supreme Court has not "intimated that a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is

---

[9] Interpreting "dangerous and unusual" not as two separate criteria, but as meaning *unusually dangerous*, is also consistent with the fact that, in historical sources cited in *Heller* and *Rahimi*, the hendiadys is sometimes phrased in the disjunctive, not conjunctive—i.e., as "dangerous *or* unusual." *See Rahimi*, 602 U.S. at 697 (citation modified); *Heller*, 554 U.S. at 623 (citation modified). This cuts against the majority's interpretation that a proscribable arm must be both dangerous *and* unusual. *See* 4 William Blackstone, Commentaries on the Laws of England 149 (1769) ("The offense of riding or going armed with dangerous or unusual weapons, is a crime against the public peace . . . ."); *see also Rahimi*, 602 U.S. at 697 (discussing Blackstone's Commentaries when addressing historical prohibitions on the carry of dangerous and unusual weapons); *Heller*, 554 U.S. at 627 (same).

17

'unusual.'" *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 50-51 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025). Rather, by framing "dangerous and unusual" as in opposition to "in common use" for lawful purposes like self-defense, and by giving us an objective test for whether a weapon is "in common use," the Supreme Court has tied the meaning of "unusual" to whether, when faced with a self-defense scenario, it is common or unusual for a civilian to choose to employ that kind of weapon.

*Third*, even if the common use inquiry were dispositive at *Bruen*'s second step, the majority errs in treating the following factors as relevant to determining whether a weapon is "in common use," such that no regulation of the weapon can be constitutional: (1) uses of the weapon besides self-defense, (2) gunowners' subjective preferences, and (3) the weapon's numerical prevalence in the marketplace. I discuss each metric in turn.

In an unfounded expansion of Second Amendment rights, the majority states that "weapons commonly used for hunting fall under the protection of the Second Amendment," Majority Op. 27, and considers the use of semi-automatic rifles and LCMs *for hunting* in concluding that these weapons are "in common use." *Heller* did mention hunting as another lawful use of firearms besides self-defense and noted that hunting was a key purpose for which "Americans valued the ancient right" to bear arms. 554 U.S. at 599; *accord Wolford*, 609 U.S. ___, 2026 WL 1825723, at *4 n.4. But not all lawful activities are

18

constitutionally protected. *Heller* set self-defense apart as "the *core* lawful purpose" protected by the Second Amendment. 554 U.S. at 630 (emphasis added). The Supreme Court has repeatedly reaffirmed, as recently as this Term, that what "[t]he Second Amendment protects [is] the right of 'all Americans' to keep and bear firearms for *self-defense*." *Hemani*, 146 S. Ct. at 1685 (emphasis added) (quoting *Heller*, 554 U.S. at 581); *see also Bruen*, 597 U.S. at 28 (noting that "the Second Amendment's definition of 'arms' . . . covers modern instruments that facilitate armed self-defense" (citation modified)); *Wolford*, 609 U.S. ___, 2026 WL 1825723, at *4 ("[T]he Amendment's central concern [is] securing the fundamental right of self-defense." (citation modified)); *id.* at *15 (Barrett, J., concurring) ("The Second Amendment secures the pre-existing right of the people to have and carry weapons for their defense.").

And where the Supreme Court has invalidated regulations on weapon possession or use, it has done so because the law infringed the individual right to self-defense, not other peripheral, lawful purposes. *See Heller*, 554 U.S. at 628-29 (holding that the handgun ban at issue "fail[ed] constitutional muster" because the handgun is the "preferred firearm" for "protection of one's home and family" (citation modified)); *see also Bruen*, 597 U.S. at 71 (explaining that the regulation is unconstitutional because it overly burdened "ordinary self-defense needs" of "law-abiding citizens"). The Supreme Court has "never recognized" hunting, target shooting, or pest control "as core purposes protected by the Second

19

Amendment," and "[u]ntil it might do so, the bearable arms presumptively protected by the Second Amendment are limited to weapons used explicitly for self-defense." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 211 (3d Cir. 2024) (Roth, J., concurring) (citation modified). The majority's consideration of hunting data to assess the constitutional status of semi-automatic rifles and LCMs is therefore improper.

The majority further departs from *Heller* and *Bruen* in ascribing significance to subjective reports from individuals who attest that they would buy semi-automatic rifles and LCMs for a lawful purpose. Whether a particular weapon falls within the ambit of the Second Amendment does not turn on whether a gunowner can offer a conceivable lawful use for that weapon.[10] Consider, for instance, if plaintiffs in a different lawsuit attested that they wanted to buy machineguns for self-defense—or, in the majority's conception of the Second Amendment, simply for hunting or pest control. Those declarations apparently would satisfy the majority's test for

---

[10] For this reason, the surveys on which Plaintiffs rely are irrelevant, as well as scientifically questionable in their methodologies. The "2021 National Firearms Survey" cited in the Plaintiffs' briefing, for instance, "is an unpublished, non-peer-reviewed summary of an online survey" completed by gunowners. Br. for Amicus Curiae Giffords Law Center to Prevent Gun Violence et al. at 15; *see also* App. 4371-72 n.31 (discussing biases in the 2021 study, including hidden sponsorship funding and failure to "fully and openly disclose the measurement tools").

20

whether the weapons were typically possessed for lawful purposes, even though *Heller* specifically tells us that bans on machineguns are constitutional. *See* 554 U.S. at 624. Subjective preferences are not the touchstone of constitutional protections, nor can they be used to transform idiosyncratic behaviors into protected exercises of constitutional rights.

Even if the majority's mistaken premise that a weapon's popularity is critical evidence of its constitutionality were true, it defies a common-sense reading of the phrase "in common use" to measure that popularity by the metric the majority cites—the number of LCMs and "semi-automatic rifles in circulation." Majority Op. 45. Focusing on the number of circulating and purchased semi-automatic rifles or LCMs does not shed light on actual use of those weapons in self-defense. *See Bianchi*, 111 F.4th at 460 ("[T]he [Supreme] Court's choice of the phrase common *use* instead of common *possession* suggests that only instances of active employment of the weapon should count . . . ." (citation modified)); *Barnett*, --- F.4th ----, 2026 WL 1982951, at *12 n.12 (refusing to equate consumer survey evidence "about why Americans *buy* AR-15s" with evidence that Americans "in fact *use* AR-15s for self-defense" (emphasis added) (citation modified)). Circulation data reveals only how many units of a weapon manufacturers have pumped into the marketplace, not how many people have actually chosen to keep and bear the weapon, and it thus sheds no light on whether a weapon is "in common *use*," under any reasonable reading of those terms. A weapon's prevalence in the modern firearms market has never

21

held constitutional significance—nor does *Heller* suggest that it should.

Using circulation data as a benchmark also has perverse policy implications. Weapons manufacturers could define the scope of the Second Amendment and thwart restrictions on new weapons by flooding the market with enough of a new, potentially highly lethal weapon to secure constitutionally protected status for that weapon before legislators had the chance to regulate it. Correspondingly, legislators would be motivated to regulate hastily, out of fear that they would lose their chance to regulate a weapon if it becomes sufficiently "common," potentially hindering the development of useful technologies before their risks could be assessed.

Finally, over and above the majority's array of assumptions detailed above, its approach is unadministrable for our district courts. Neither the majority nor the Plaintiffs offer a threshold for how many of a type of weapon in circulation would render that weapon "in common use." Nor do they clarify which weapons models courts must consider in the counting exercise, or suggest a referent for what we mean by "in common use"— for instance, if courts should assess the absolute number of a firearm in circulation or the prevalence of that firearm relative to all firearms in circulation, to the U.S. population, or to some other denominator. Semi-automatic rifles would flunk most of those tests in any event: While there may be millions of semi-automatic rifles in circulation, studies in the record suggest that less than eight percent of civilian gunowners have

22

modern sporting rifles, including AR-15s and AK-47s, and modern sporting rifles account for just three to five percent of firearms in circulation.  App. 1647-48, 1754.  So the majority gives up on any administrable test, pronouncing that "[r]egardless of where those lines may be drawn" between weapons afforded constitutional protection and those that are not, semi-automatic rifles and LCMs are protected by the Constitution.  Majority Op. 45.

That provides little direction here, and even less in other contexts.  Consider, for instance, that civilians are estimated to own around 176,000 machineguns, *see Duncan v. Bonta*, 133 F.4th 852, 882-83 (9th Cir. 2025) (en banc), *petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025),[11] which the Supreme Court has definitively told us are not protected by the Second Amendment, *see Heller*, 554 U.S. at 624 (noting that it would be "startling" to interpret the Second Amendment to foreclose restrictions on machineguns).  How far above 176,000 does the majority's "in common use" threshold lie?  This is, unfortunately, just one of the high-stakes questions the majority neglects to answer, declining to engage in a meaningful way with the consequences of its reasoning.

---

[11] The Sixth Circuit clarified in *United States v. Bridges* that the 176,000 estimate excludes machineguns in the possession of law enforcement and refers to the number of machineguns that are *lawfully* owned because they were grandfathered into lawful registration before 18 U.S.C. § 922(o)(2)(A) was enacted in 1986.  150 F.4th 517, 526 (6th Cir. 2025).

23

Under the majority's logic, a ban on any weapon would violate the Second Amendment, so long as manufacturers sold and distributed the weapon faster than legislatures could respond and prospective owners reported that they considered the weapon to be useful for self-defense, hunting, target practice, or the like.    At every step, this logic strays from common sense and Supreme Court guidance, with devastating consequences.

### B.  Misapplying the Historical Analysis

Where the majority's opinion does engage with history and tradition, its comparison of modern weapon regulations to historical analogues warps the methodology the Supreme Court instructs us to undertake at *Bruen* Step Two.

Time and again, the Court has instructed, at Step Two, that the State need not offer—and we need not locate—"historical twin[s]," *Bruen*, 597 U.S. at 30, or undertake "a doomed quest for historical dead ringers," *Range v. Att'y Gen. U.S.*, 124 F.4th 218, 278 (3d Cir. 2024) (en banc) (Krause, J., concurring in the judgment); *see Hemani*, 146 S. Ct. at 1685-86 (disavowing the need for "a historical twin or precise historical precursors" (citation modified)).    Rather, we must consider whether the "principles embodied in different strands of historical firearm regulations, taken together, support contemporary restrictions." *Pitsilides v. Barr*, 128 F.4th 203, 210 (3d Cir. 2025) (citation modified) (quoting *Rahimi*, 602 U.S. at 698). The required degree of similarity between a modern regulation and a historical analogue depends on the novelty of the issues

24

addressed by the modern law: *Bruen* directs us to identify "a distinctly similar historical regulation" when "a challenged regulation addresses a general societal problem that has persisted since the 18th century," but cautions that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 26-27; *see Wolford*, 609 U.S. ___, 2026 WL 1825723, at *7 (explaining that where a challenged law concerns "distinctively modern" conduct that could not have "occurred when the Second and Fourteenth Amendments were adopted," the "application of step two of the *Bruen* framework call[s] for a more difficult exercise of judgment").

Based on two errors in reasoning, the majority effectively jettisons the more nuanced approach and demands "distinctly similar historical regulation[s]." *Bruen*, 597 U.S. at 27. *First*, it characterizes the Act as implicating a Founding-era societal concern, which it can only do by operating at a stratospheric level of generality. The majority does acknowledge that the Act has a *specific, targeted* focus—namely, regulating weapons based on the features that make them uniquely lethal—and it even notes that the Act was "aimed at restricting the possession of guns capable of wholesale destruction or that are designed to wipe out the greatest number of people in the shortest possible time." Majority Op. 39 (quoting *Rahimi*, 602 U.S. at 693). But the majority then disregards the Act's focus on limiting possession of the most harmful weapons and likens the statute to the "regulations at issue in *Rahimi*, *Bruen*, and *Heller*," framing the purpose of the Act as merely seeking to

25

prohibit people "from misusing weapons to harm or menace others." Majority Op. 39-40 (citation modified).

By framing the problem that the Act aims to address at the highest level of generality, the majority strips the language and reasoning of *Rahimi* of its context. When the Supreme Court commented there on the history of firearm regulations "barring people from misusing weapons to harm or menace others," 602 U.S. at 693, it was merely affirming that our Nation has a long history of regulating firearms, not anchoring a principle from which its entire analysis sprung. It was a more specific principle that arose from the Court's review of surety and affray laws: "When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. That principle, crafted at a more appropriate level of generality, supported the constitutionality of 18 U.S.C. § 922(g)(8), which had the targeted purpose of addressing "conduct that was distinctively modern: the possession of a firearm by a person against whom a domestic violence restraining order had been issued." *Wolford*, 609 U.S. ___, 2026 WL 1825723, at *7.[12]

---

[12] The Supreme Court in *Bruen* similarly defined the relevant problem facing legislators at a lower level of generality than the majority opts for here—the purpose of the New York law at issue there was to address "handgun violence, primarily in urban areas," 597 U.S. at 27 (citation modified).

26

Nearly any firearm regulation could be understood to share the purpose of preventing firearm misuse. Just as we must "not . . . read a principle at such a high level of generality that it waters down the right," *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring), we also must not read the societal problem facing legislators at such a high level of generality that we, who are unelected judges, trespass on the duty and prerogative of state legislatures to protect their residents, *see Barnett*, --- F.4th ----, 2026 WL 1982951, at *14 ("Because every firearm regulation is at some level about public safety, that justification operates at such a high level of generality that it waters down the right." (citation modified)).

New Jersey's stated purpose for the Act is to "restrict arms, like [semi-automatic rifles] and LCMs, that have spread in society and pose[] extreme safety threats through characteristics that ma[k]e them particularly dangerous or particularly susceptible to disproportionate criminal misuse." N.J. Br. at 45. Notwithstanding the majority's concerns, that purpose is not so narrow that we need fear defining "the 'why' of a modern weapon regulation [so] narrowly, [that] every case could present an 'unprecedented' concern [such that] the exception would swallow the rule." Majority Op. 40-41 n.26. In fact, it is a "why" that the Supreme Court recognized when discussing sawed-off shotguns in *Heller*. *See* 554 U.S. at 622-24. The majority's decision to paint the far-too-frequent civilian deployment of weapons designed for war to commit mass murder as just a continuation of the age-old problem of individuals "misusing weapons to harm or menace others,"

27

Majority Op. at 40 (quoting *Rahimi*, 602 U.S. at 693), thus elides the contemporary problem facing the New Jersey Legislature.

*Second*, even if the Act did address a problem that the Founders also confronted, the majority still ignores the Supreme Court's directive in *Bruen* that a "more nuanced" approach to comparing modern and historical regulations is warranted when the modern regulation is enacted in response to "dramatic technological changes," 597 U.S. at 27, which is certainly the case here, *see Barnett*, --- F.4th ----, 2026 WL 1982951, at *15 (recognizing that a challenge to AR-15s and LCMs "implicates both of the grounds *Bruen* identified" as requiring a "more nuanced approach" (citation modified)). Founding-era firearms "could not fire more than one shot without being reloaded," *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015), and it took time, "acumen[,] and experience" to reload them, *Bianchi*, 111 F.4th at 464.  No civilian firearm could be used to, "in minutes, murder several dozen individuals," *Ocean State Tactical*, 95 F.4th at 49, unlike today's AR-15s fitted with LCMs, which gunmen used to kill 9 people and injure 17 others in a mere 32 seconds in Dayton, Ohio, *see Bianchi*, 111 F.4th at 463, and kill 60 concertgoers and injure 850 others in 11 minutes at the Las Vegas Route 91

28

Music Festival, *see* Br. for Amicus Curiae Giffords Law Center et al. at 9.[13]

Firearms from the Founding era are about as closely related to semi-automatic rifles as a horse and buggy is to an F-150 truck: While the historic and modern inventions share the same, general purpose (firing ammunition and transporting goods and people, respectively), it would be absurd to elide their modern and historic technologies and capabilities. *See Barnett*, --- F.4th ----, 2026 WL 1982951, at *16 (detailing how "a shooter" with an AR-15 and LCM "can discharge thirty rounds—each of which travels five football fields in half-a-second and releases ten times the energy of a musket ball upon impact—as quickly as he can pull the trigger"). Indeed, if the "technological changes" that brought about the AR-15 and other semi-automatic rifles do not qualify as "dramatic," it is hard to see what would warrant a more nuanced approach at Step Two of *Bruen*. 597 U.S. at 27.

---

[13] Those weapons which, at the Founding, were technically capable of repeat fire were collectors' items or prototypes. It was not until the mid-nineteenth century that guns capable of repeat fire became more widely available. *See Bianchi*, 111 F.4th at 465; *see also Barnett*, --- F.4th ----, 2026 WL 1982951, at *16 (detailing that, throughout most of the nineteenth century, arms capable of repeat fire remained "exceedingly rare" and "never penetrated the commercial or military markets," making it difficult "to see how [these weapons] could have posed a regulatory challenge for historical legislatures" (citation modified)).

*    *    *

The New Jersey Legislature chose to prohibit semi-automatic rifles and regulate LCMs pursuant to its obligations to protect its residents. Its legislative scheme is consistent with our Nation's long-held tradition of regulating particularly dangerous weapons and was responsive to dramatic technological changes and horrific uses of that technology, which legislatures of the past could not have foreseen. The majority disregards democratic will and Supreme Court precedent, risking a dangerous aftermath for the People of New Jersey and those beyond. Because I disagree with the majority's methodology, its outcome, and its needless creation of a circuit split when the Supreme Court stands poised to provide dispositive instruction, I respectfully dissent.

SMITH, *Circuit Judge*, dissenting.

I join Judge Shwartz's incisive dissent in its entirety. I add only that my views in this matter are fortified by the persuasive reasoning of Judge Wilkinson in his comprehensive opinion in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc). I also join the persuasive dissenting opinion of Judge Krause.

*Counsel for Mark Cheeseman, Timothy Connelly, and
Firearms Policy Coalition, Inc.*
William V. Bergstrom        [Argued to Merits Panel]
Peter A. Patterson          [Argued to en banc court]
David H. Thompson
COOPER & KIRK, PLLC

Bradley Lehman
WHITEFORD TAYLOR & PRESTON

*Counsel for Blake Ellman, Thomas R. Rogers, Marc
Weinberg, and Association of New Jersey Rifle and
Pistol Clubs*
Erin E. Murphy [Argued]
Matthew D. Rowen
Nicholas A. Aquart
CLEMENT & MURPHY, PLLC

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.

*Counsel for Attorney General New Jersey, Bradley D.
Billhimer, Christine A. Hoffman, and Superintendent
New Jersey State Police*
Jeremy M. Feigenbaum      [Argued]
Angela Cai
Timothy Sheehan
Daniel M. Vannella
Christopher J. Ioannou
OFFICE OF THE NEW JERSEY ATTORNEY GENERAL

*Counsel for Kenneth Brown, Jr.*
Mitchell B. Jacobs
CLEARY GIACOBBE ALFIERI & JACOBS

*Counsel for Amicus Curiae United States of America*
David N. Goldman
Jason Manion
UNITED STATES DEPARTMENT OF JUSTICE

*Counsel for Amicus Curiae Everytown for Gun Safety*
Janet Carter
EVERYTOWN LAW

*Counsel for Amici Curiae Brady Center to Prevent Gun Violence, March for Our Lives, BlueWaveNJ, Ceasefire NJ Project of the Princeton-based Coalition for Peace Action, National Council of Jewish Women– Essex County Section, Unitarian Universalist FaithAction New Jersey, and United Mercer Interfaith Organization*
Timothy P. Harkness
FRESHFIELDS US

*Counsel for Amici Curiae States of Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington*
Tasha Bahal
OFFICE OF ATTORNEY GENERAL OF MASSACHUSETTS